1    ROB BONTA
     Attorney General of California
2    MARK R. BECKINGTON
     Supervising Deputy Attorney General
3    ROBERT L. MEYERHOFF
     Deputy Attorney General
4    State Bar No. 298196
       300 South Spring Street, Suite 1702
5      Los Angeles, CA  90013-1230
       Telephone:  (213) 269-6177
6      Fax:  (916) 731-2144
       E-mail:  Robert.Meyerhoff@doj.ca.gov
7    *Attorneys for Defendant Rob Bonta in his*
     *official capacity as Attorney General of the*
8    *State of California*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                          CIVIL DIVISION

12

13   **VIRGINIA DUNCAN, RICHARD**        Case No. 3:17-cv-01017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
14   **DAVID MARGUGLIO,**               **COMPENDIUM OF WORKS**
     **CHRISTOPHER WADDELL, and**       **CITED IN DECLARATION OF**
15   **CALIFORNIA RIFLE & PISTOL**       **SAUL CORNELL**
     **ASSOCIATION, INC., a California**
16   **corporation,**                   **VOLUME 3 OF 4**

17                       Plaintiffs,    Courtroom:    5A
                                        Judge:        Hon. Roger T. Benitez
18        v.                            Action Filed:  May 17, 2017

19
     **ROB BONTA, in his official capacity**
20   **as Attorney General of the State of**
     **California; and DOES 1-10,**
21
                         Defendants.
22

23

24

25

26

27

28                                     1

# INDEX

| Works | Decl. Page | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Heydon's Case, (1584) 76 Eng.Rep. 637 (KB) | 27 n.94 | 0002-0007 |
| 1 Zephaniah Swift, A Digest Of The Laws Of The State Of Connecticut 11 (New Haven, S. Converse 1822) | 27 n.94 | 0007-0015 |
| 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 | 25 n.87 | 0016-0017 |
| Md. Const. of 1776, Declaration of Rights, art. III, § 1. | 3 n.4 | 0018-0023 |
| Md. Const. of 1776, Declaration of Rights, art. IV. | 5 n.13 | 0018-0023 |
| Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2 | 23 n.79 | 0024-0025 |
| 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, §§ 1-2 | 18 n.59 | 0026-0028 |
| An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, Laws of The State of New-York, Comprising the Constitution, and the Acts of the Legislature, Since the Revolution, from the First to the Fifteenth Session, Inclusive 191-2 (Thomas Greenleaf, ed., 1792) | 23 n.80 | 0029-0031 |
| N.C. Const. of 1776, Declaration of Rights, art. I, § 3 | 5 n.13 | 0032-0035 |
| N.C. Const. of 1776, Declaration of Rights, art. II | 21 n.71 | 0032-0035 |
| 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15 | 18 n.60 | 0036-0073 |

2

| | | | |
|---|---|---|---|
| 1 | Francois Xavier Martin, A Collection Of Statutes Of The Parliament Of England In Force In The State Of North-Carolina 60–61 (Newbern, 1792) | 4 n.5 | 0074-0075 |
| 2 | | | |
| 3 | | | |
| 4 | 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same | 18 n.60 | 0076-0078 |
| 5 | | | |
| 6 | | | |
| 7 | Idaho Const. of 1889, art. I, § 11 | 28 n.97 | 0079 |
| 8 | Supplements To The Revised Statutes. Laws Of The Commonwealth Of Massachusetts, Passed Subsequently To The Revised Statutes: 1836 To 1849, Inclusive 413 (Theron Metcalf & Luther S. Cushing, eds. 1849) | 21 n.71 | 0080-0081 |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | Statutes Of The State Of New Jersey 561 (rev. ed. 1847) | 21 n.71 | 0082-0083 |
| 13 | An Act Incorporating the residents residing within limits therein mentioned, in 2 NEW YORK LAWS 158 (1785) | 21 n.71 | 0084-0094 |
| 14 | | | |
| 15 | | | |
| 16 | An Act to incorporate the Town of Marietta, in Laws Passed In The Territory Northwest Of The River Ohio 29 (1791) | 21 n.71 | 0095-0097 |
| 17 | | | |
| 18 | Pa. Const. of 1776, ch. I, art. III | 5 n.13, 21 n.70 | 0098-0102 |
| 19 | | | |
| 20 | 9 Statutes At Large Of Pennsylvania 29-30 (Mitchell & Flanders eds. 1903) | 4 n.5 | 0103-0104 |
| 21 | | | |
| 22 | Tex. Const. of 1868, art. I, § 13 | 28 n.97 | 0105-0109 |
| 23 | | | |
| 24 | Utah Const. of 1896, art. I, § 6 | 28 n.97 | 0110-0112 |
| 25 | | | |
| 26 | Vt. Const. of 1777, Declaration Of Rights, art. IV | 21 n.71 | 0113-0122 |
| 27 | Vt. Const. of 1777, Declaration Of Rights, art. V | 5 n.13 | 0113-0122 |
| 28 | | | |

3

| **BOOKS**[1] | | |
|---|---|---|
| *American Dictionary of the English Language* (1828) | 10 n.31 | 0124-0127 |
| Joseph Backus, *The Justice Of The Peace* 23 (1816). | 4 n.7 | 0128-0132 |
| Joan Burbick, *Gun Show Nation: Gun Culture And American Democracy* (2006), xvi-xxii | 14 n.47 | 0133-0142 |
| Brutus, *Essays of Brutus VII*, reprinted in 2 The Complete Antifederalist 358, 400–05 (Herbert J. Storing ed., 1981) | 22 n.76 | 0143-0155 |
| J.J. Burlamaqui, *The Principles Of Natural Law* (Thomas Nugent Trans., 1753) at 201 | 9 n.25 | 0156 |
| Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation Of The Early Federal System*, In 1 The Cambridge History Of Law In America 518–544 (Christopher Tomlins & Michael Grossberg Eds., 2008) | 2 n.3 | 0157-0211 |
| Saul Cornell, *The Other Founders: Antifederalism And The Dissenting Tradition In America*, 1788-1828 (1999), 139 | 22 n.75 | 0212-0222 |
| Saul Cornell, *The Right To Bear Arms,* In The Oxford Handbook Of The U.S. Constitution 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber Eds., 2015) | 2 n.3, 18 n.61 | 0223-0246 |
| Tench Coxe, *A Freeman, Pa. Gazette, Jan. 23, 1788*, Reprinted In Friends Of The Constitution: Writings Of The "Other" Federalists 82 (Colleen A. Sheehan & Gary L. Mcdowell Eds., 1998) | 23 n.77 | 0247-0251 |
| Alexander DeConde, *Gun Violence In America* | 33 n.115 | 0252-0257 |

---

[1] The Declaration of Saul Cornell cites the book – Gary Gerstle, Liberty and Coercion: *The Paradox of American Government, From the Founding to the Present* (Princeton Univ. Press, 2015) --in its entirety and without discussing the book in detail.  *See* Cornell Decl. ¶ 61 n.127.  These books are not included with this filing.

4

| | | |
|---|---|---|
| *Dictionarium Britannicum* (1730). | 10 n.27 | 0258-0260 |
| *Dictionary of the English Language* (1755) | 10 n.29, 10 n.30 | 0261-0263 |
| Markus Dirk Dubber, *The Police Power: Patriarchy and the Foundations of American Government* (2005), 82-87 | 5 n.12, 24 n.84 | 0264-0275 |
| Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (University Of North Carolina Press, 2009) 105-109, 227-238 | 4 n.6 | 0276-0287 |
| 10 Encyclopedia Americana 214 | 22 n.73 | 0288-0293 |
| James E. Fleming & Linda C. Mcclain, *Ordered Liberty: Rights, Responsibilities, and Virtues* (Harvard University Press, 2013), 44-45 | 5 n.10 | 0294-0325 |
| Joanne B. Freeman, *Affairs af Honor: National Politics In The New Republic* (2001) | 15 n.51 | 0326-0333 |
| Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 2, N.2; 91 (1904) | 21 n.72, 24 n.84, 27 n.93 | 0334-0338 |
| Jack P. Greene, *Pursuits Of Happiness: The Social Development of Early Modern British Colonies and the Formation of American Culture* (1988), 170-176 | 14 n.49 | 339-344 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (2016), 198-201 | 14 n.46, 16 n.54, 32 n.109 | 345-353 |
| William N. Hosley, Colt: The Making Of An American Legend (1st Ed. 1996) | 19 n.64 | 354-365 |
| 2 James Kent *Commentaries On American Law* (340) 464 N.2 (Oliver Wendell Holmes, Jr., Ed. 12 Ed. 1873) | 24 n.83 | 366-374 |

5

| | | |
|---|---|---|
| David Thomas Konig, *Regionalism in Early American Law,* In 1 The Cambridge History of Law in America 144 (Michael Grossberg & Christopher Tomlins eds., 2008) | 14 n.49 | 375-380 |
| Gerald Leonard & Saul Cornell, *The Partisan Republic: Democracy, Exclusion, and the Fall of the Founders' Constitution*, 1780s–1830s, At 2 | 10 n.32 | 382-390 |
| New Law Dictionary (1792) | 10 n.26 | 391 |
| New Histories of Gun Rights and Regulation: Essays On The Place of Guns in American Law and Society (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller Eds., Forthcoming 2023). | 8 n.23 | 392 |
| New Universal Dictionary (1763) | 10 n.28 | 393-395 |
| William E. Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* (1998), 170-74. | 30 n.103 | 396-399 |
| William J. Novak, THE PEOPLE'S WELFARE: LAW AND REGULATIONS IN NINETEENTH-CENTURY AMERICA (1996) at 65-66 | 24 n.84 | 2137-2140 |
| Kunal M. Parker, *Common Law History, And Democracy In America, 1790-1900: Legal Thought Before Modernism* (2013), 147-148 | 26 n.88 | 400-405 |
| Randolph Roth, *American Homicide* 56, 315 (2009) | 14 n.48 | 406-409 |
| Harry N. Scheiber, *State Police Power*, In 4 Encyclopedia of the American Constitution 1744 (Leonard W. Levy Et Al. Eds., 1986) | 22 n.74 | 410-419 |
| Barry Alan Shain, *The Nature of Rights at the American Founding and Beyond* (Barry Alan Shain Ed., 2007), 125-127,139-143 | 11 n.34 | 420-430 |
| Quentin Skinner, *Liberty Before Liberalism* (1998), 17-36 | 10 n.31 | 431-443 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier In Twentieth-Century America* (1993), 10-16 | 14 n.47 | 444-450 |
| Kevin M. Sweeney, Firearms Ownership And Militias In Seventeenth And Eighteenth Century England And America, In A Right To Bear Arms?: The Contested Role Of History In Contemporary Debates On The Second Amendment (Jennifer Tucker Et Al. Eds., 2019) | 15 n.50, 16 n.53, 17 n.55 | 468-485 |
| H. Richard Uviller & William G. Merkel, *The Militia And The Right To Arms, Or, How The Second Amendment Fell Silent* 150 (2002). | 12 n.37 | 486-490 |
| Sean Wilentz, Society, Politics, and the Market Revolution, in the New American History (Eric Foner Ed., 1990) | 18 n.63 | 491-503 |

### LAW REVIEWS AND JOURNALS

| | | |
|---|---|---|
| Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014) | 3 n.4 | 0505-0519 |
| Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019) | 12 n.36 | 0575-0587 |
| Samuel L. Bray, 'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution, 102 VIRGINIA L. REV. 687 (2016) | 4 n.9 | 0588-0644 |
| Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021) | 27 n.94 | 0645-0688 |
| Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017) | 5 n.10, 12 n.36 | 0712-0732 |
| Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020) | 10 n.26 | 0733-0752 |

7

| | | |
|---|---|---|
| Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original) | 11 n.35 | 0753-0799 |
| Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999) | 12 n.38 | 0800-0817 |
| Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) | 12 n.39, 20 n.68, 33 n.115 | 0818-0852 |
| Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) | 11 n.35 | 0853-0864 |
| Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713, 1716 (2012) | 4 n.9, 19 n.65 | 0865-0888 |
| Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017) | 13 n.43 | 0889-0932 |
| Saul Cornell, *The Police Power And The Authority To Regulate Firearms In Early America 1–2* (2021) | 12 n.36, 23 n.78, 25 n.86 | 0933-0949 |
| Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022) | 19 n.67 | 0950-0983 |
| Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022) | 13 n.45 | 0984-1020 |

| | | |
|---|---|---|
| Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022) | 28 n.96, 28 n.98, 29 n.99, | 1021-1039 |
| John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 LAW & CONTEMP. PROBLEMS 117 (2020) | 36 n.120 | 1070-1086 |
| Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016) | 10 n.32 | 1087-1108 |
| Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014) | 17 n.58 | 1109-1120 |
| Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016) | 31 n.108 | 1121-1145 |
| Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015). | 6 n.17 | 1172-1189 |
| Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings*, 22 APPLIED ECON. LETTERS 281 (2014) | 36 n.120 | 1190-1193 |
| Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) | 29 n.101, 31 n.109 | 1276-1351 |
| Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) | 10 n.32 | 1352-1367 |
| Aaron T. Knapp, *The Judicialization of Police,* 2 CRITICAL ANALYSIS OF L. 64 (2015) | 5 n.12 | 1368-1387 |

9

| | | |
|---|---|---|
| Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018). | 35 n.119 | 1415-1423 |
| Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms*, CRIMINOLOGY & PUBLIC POLICY 147 (2020) | 36 n.120 | 1424-1447 |
| Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022) | 17 n.57 | 1448-1462 |
| Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. 238, 241 (2014); | 31 n.109 | 1463-1466 |
| John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979) | 5 n.10 | 1467-1493 |
| William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008) | 26 n.89 | 1494-1502 |
| William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994) | 5 n.11 | 1503-1527 |
| Scott W. Phillips, *A Historical Examination of Police Firearms* 94 THE POLICE JOURNAL 122 (2021). | 5 n.14 | 2142-2156 |
| Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) | 11 n.32 | 1528-1557 |
| Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas*, 1836-1900, 121 SOUTHWESTERN QUARTERLY 284 (2020) | 31 n.108 | 1558-1578 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022) | 29 n.100 | 1579-1593 |
| Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018) | 32 n.110 | 1594-1621 |
| Eric M. Ruben & Darrell A. H. Miller, Preface: *The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017). | 8 n.22, 13 n.42 | 1622-1630 |
| Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015) | 19 n.66 | 1631-1642 |
| Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018) | 18 n.62 | 1643-1669 |
| Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019) | 17 n.58 | 1670-1676 |
| Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020) | 32 n.110 | 1677-1706 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017) | Passim | 1707-1733 |
| William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968) | 3 n.4 | 1734-1768 |
| Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public, 55 U.C. DAVIS L. REV. 2495 (2022) | 8 n.23 | 1773-1785 |

11

| | | |
|---|---|---|
| Christopher G. Tiedeman, *A Treatise on the Limitations of the Police Power in the United States* 4–5 (1886) | 31 n.107 | 1786-1790 |
| Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008) | 5 n.11, 5 n.12 | 1791-1809 |
| Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005) | 24 n.84 29 n.101 | 1810-1845 |
| John J. Zubly, *The Law of Liberty* (1775) | 5 n.10 | 1924-1939 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Carolyn Maloney, Supplemental Memorandum: The Committee's Investigation Into Gun Industry Practices And Profits (Jul. 27, 2022) | 34 n.117 | 1958-1980 |
| Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031 | 9 n.25 | 1981-2020 |
| **NEWS ARTICLES** | | |
| Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM) | 33 n.116 | 2022-2024 |
| John Bingham, *Speech, Cincinnati Daily Gazette* (Sept. 2, 1867), As Quoted In Saul Cornell And Justin Florence, The Right To Bear Arms In The Era of the Fourteenth Amendment: Gun Rights or Gun Regulation, 50 SANTA CLARA L. REV. 1043, 1058 (2010) | 30 n.102 | 2025-2055 |

Compendium of Works Cited in Declaration of Saul Cornell
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Polly Mosendz, *Why Gunmakers Would Rather Sell AR 15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06 20/why-gunmakers-wouldrather- sell-ar-15s-than-handguns | 36 n.120 | 2056-2061 |
| Rick Rojas, Karen Zraick, & Troy Closson, *Sandy Hook Families Settle with Gunmaker for 73 Million Dollars*, NEW YORK TIMES, published Feb. 15, 2022, updated Feb. 17, 2022, https://www.nytimes.com/2022/02/15/nyregion/sandy-hook-families-ettlement.html?action=click&module=RelatedLinks&pgtype=Article | 35 n.118 | 2158-2163 |

### OTHER SOURCES

| | | |
|---|---|---|
| 1 William Blackstone, Commentaries, *61 *349 | 4 n.8, 27 n.94 | 2066-2067 |
| John Donohue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/ | 35 n.119 | 2068-2072 |
| Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence*, July 4, 1799, at 7 (July 4, 1799) | 11 n.33 | 2073-2084 |
| Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0 | 16 n.52 | 2085-2118 |
| "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-thecourt-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshallcourt-1801-1835/ | 24 n.82 | 2119-2128 |

13

| | | |
|---|---|---|
| "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-thecourts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/ | 24 n.82 | 2129-2135 |

14

(New York: Barnes and Noble Books, 1979), 93–110; Also helpful are Boynton, *Elizabethan Militia*, 221–224, 249; Younger, *War and Politics*, 136–140; and Richard W. Stewart, *The English Ordnance Office, 1585–1625: A Case Study in Bureaucracy* (Woodbridge, UK: Boydell for the Royal Historical Society, 1966), 128–133.

34. John Smyth, *Men and Armour for Gloucestershire in 1608*, ed. John Maclean (1902; repr., Gloucester, UK: Alan Sutton, 1980). Mark Fissel makes use of this source to analyze militia service on the basis of occupations but not arming. Fissel, *Bishops' Wars*, 201–204.

35. J. G. A. Pocock, "Historical Introduction," in *The Political Works of James Harrington*, ed. J. G. A. Pocock (New York: Cambridge University Press, 1977), 139.

36. Edmund S. Morgan, *Inventing the People: The Rise of Popular Sovereignty in England and America* (New York: W. W. Norton, 1989), 164. See also J. R, Western, *The English Militia in the Eighteenth Century: The Story of a Political Issue 1660–1802* (London: Routledge and Kegan Paul, 1965), 30–35; John Miller, "The Militia and the Army in the Reign of James II," *Historical Journal* 16, no. 4 (1973): 659–679.

37. Morgan, *Inventing the People*, 154–173.

38. Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment," in *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller*, ed. Saul Cornell and Nathan Kozuskanich (Amherst: University of Massachusetts Press, 2013), 313.

39. Harold L. Peterson, *Arms and Armor in Colonial America, 1526–1783* (1956; repr., Mineola, N.Y.: Dover Publications, 2000), 43–44.

40. For a more detailed discussion, see Sweeney, "Firearms, Militias," 313–321.

41. William L. Shea, *The Virginia Militia in the Seventeenth Century* (Baton Rouge: Louisiana State University Press, 1983), 130.

42. Sweeney, "Firearms, Militias," 321–325.

43. Gov. Edward Cranfield to Lords of Trade and Plantations, Portsmouth, October 23, 1682 in *Calendar of State Papers Colonial, 1681–1685*, no. 756, pages 311–312. Of forty-two male decedents inventoried in New Hampshire between 1681 and 1693, thirty-one had firearms, but only eight (19%) of their guns were identified as "muskets." New Hampshire Probate Records, vol. 1 (1655–1698), 247–377, microfilm, Historic Deerfield Library, Deerfield, Mass.

44. Charles Bradley, Phil Dunning, and Gerard Gusset, "Material Culture from the *Elizabeth and Mary* (1690): Individuality and Social Status in a Late Seventeenth-Century New England Assemblage," in *Archéologiques, Collection Hors-Série 1: Mre et Monde: Question d'archéologie Maritime*, Association des Archéologues du Québec (2003): 151. "Muster roll of Captain J. Lightfoot's Middle Company of Foot, New Kent Militia, ca. November 1701, also showing the arms in the possession of each man," CO 5/1312, Part 2, British National Archives, Kew, UK.

45. "Form of Association," in *The Papers of Benjamin Franklin*, ed. Leonard W. Labaree et al., 40 vols. to date (New Haven, N.J.: Yale University Press, 1959– ), 3:208.

46. Henry Bouquet to the Duke of Portland, Fort Du Quesne, December 3, 1758, in *Papers of Henry Bouquet*, vol. 2, *The Forbes Expedition*, ed. S. K. Stevens, Donald H. Kent, and Autumn L. Leonard (Harrisburg: Pennsylvania Historical and Museum Commission, 1951).

47. Sweeney, "Firearms, Militias," 330–331, 334, 342.

48. For an overview of these efforts, see Jim Mullins, "Of Sorts for Provincials," *American Weapons of the French and Indian War* (Elk River, Minn.: Track of the Wolf, 2008), 103–176.

49. Examples: Estate of John Bosworth of Bristol, who died in 1755, contained three guns, in Bristol Wills and Inventories, 1: 170–171; Estate of Deborah Brown of Gloucester, who died in 1755, contained a gun, in Gloucester Probate Records, 1: 155–157; and Estate of Frank Negro of Providence, who died in 1755, listed a gun that was pressed by the government, in Providence Town Council Records, 5: 114. All on microfilm, Rhode Island Historical Society, Providence.

50. For a more detailed discussion, see Sweeney, "Firearms, Militias," 313–321.

51. Privy Council 2, Register, vol. 105:608–609, British National Archives, Kew.

52. De Witt Bailey, *Small Arms of the British Forces in America, 1664–1815* (Woonsocket, R.I.: Andrew Mowbray Publishers, 2009), 128. See also John A. Schultz, "The Disaster of Fort Ticonderoga:

Compendium_Cornell
Page 0483

The Shortage of Muskets during the Mobilization of 1758," *Huntington Library Quarterly* 14 (1951): 307–315.

53.  Sweeney, "Firearms, Militias," 327–338.

54.  Ibid., 343–356.

55.  Robert F. Smith, *Manufacturing Independence: Industrial Innovation in the American Revolution* (Yardley, Pa.: Westholme Publishing, 2016), xii.

56.  Smith, *Manufacturing Independence*; George D. Moller, *Colonial and Revolutionary War Arms.* Vol. 1 of *American Military Shoulder Arms* (1993; repr., Albuquerque: University of New Mexico Press, 2011), 291, 484–485. Moller lists the documentable shipments, their dates, the vessels used—if known—and the quantities of arms involved in this often clandestine trade.

57.  "Citizens' militia" and "people's militia" are chimera found only in District of Columbia et al. v. Heller (Prelim. Print 570) 599–600 (2008).

58.  C. Edward Skeen, *Citizen Soldiers in the War of 1812* (Lexington: University of Kentucky Press, 1999), 73.

59.  Ibid., 12.

60.  Christopher L. Scott, *The Maligned Militia: The West Country Militia of the Monmouth Rebellion, 1685* (Farnham, Surry, UK: Ashgate Publishing, 2015), especially 193–278; *New York Gazette,* May 1, 1758; Paul David Nelson, *William Tryon and the Course of Empire: A Life in British Imperial Service* (Chapel Hill: University of North Carolina Press, 1990), 70–89; and Sean Condon, *Shays's Rebellion: Authority and Distress in Post-Revolutionary America* (Baltimore: Johns Hopkins University Press, 2015), especially 82–104.

61.  Sources for Tables 3.1–3.3: R. W. Ambler, B. Watkinson, and L. Watkinson, eds., *Farmers and Fishermen: The Probate Inventories of the Ancient Parish of Clee, South Humberside, 1536–1742* (Hull, UK: Hull University, 1987); P. C. D. Brears, ed., *Yorkshire Probate Inventories, 1542–1689,* Yorkshire Archaeological Society Records Series 134 (Leeds, UK: Yorkshire Archaeological and Historical Society, 1972); Margaret Cash, ed., *Devon Inventories of the Sixteenth and Seventeenth Centuries,* Devon and Cornwall Record Society, New Series 11 (Exeter, UK: Devon and Cornwall Record Society 1966); C. E. Freeman, "Elizabethan Inventories, 1562–1591," *Bedfordshire Historical Record Society* 32 (1952): 92–107; Edwin George and Stella George, eds., *Bristol Probate Inventories, 1542–1804,* Parts 1–3 (Bristol, UK: Bristol Record Society, 2002–2008); M. A. Havinden, ed., *Household and Farm Inventories in Oxfordshire, 1550–1590* (London: Her Majesty's Stationery Office, 1965); D. M. Herridge, transcriber, *Surry Probate Inventories, 1558–1603,* Surrey Record Society 39 (Woking, UK: Surrey Record Society, 2005); J. A. Johnston, ed., *Probate Inventories of Lincoln Citizens, 1661–1714,* Lincoln Record Society, vol. 80 (Lincoln, UK: Lincoln Record Society, 1989); P. A. Kennedy, ed., *Nottinghamshire Household Inventories,* Thoroton Society Record Series 22 (Bleasby, Nottingham, UK: Thoroton Society, 1963); H. C. F. Lansberry, ed., *Sevenoaks Wills and Inventories in the Reign of Charles II* (Maidstone, Kent, UK: Kent Archaeological Society, 1988); Robert Machin, ed., *Probate Inventories and Manorial Excerpts of Chenole, Leigh and Yetminster* (Bristol, UK: University of Bristol, 1976); John S. More, ed., *The Goods and Chattles of Our Forefathers: Frampton Cotterell and District Probate Inventories 1539–1804* (Chichester, UK: Phillimore, 1976); Lionel M. Munby, ed., *Life and Death in Kings Langley: Wills and Inventories, 1498–1659* (Kings Langley, UK: Kings Langley Local History and Museum Society, 1981); Meryl Parker, ed., *All My Worldly Goods, An Insight into Family Life from Wills and Inventories 1447–1742* (Bricket Wood, UK: Bricket Wood Society, 1991); Meryl Parker, ed., *All My Worldly Goods II: Wills and Probate Inventories of St. Stephen's Parish, St. Albans 1418–1700* (Bricket Wood, UK: Bricket Wood Society, 2004); James Raine, William Greenwell, John Crawford Hogdson, and Hebert Maxwell Wood, *Wills and Inventories Illustrative of the History, Manners, Language, Statistics &c of the Northern Counties of England from the Eleventh Century downward,* Publications of the Surtees Society, vols. 2, 38, 112, 142. (1835, 1860, 1906, 1929); Michael Reed, ed., *The Ipswich Probate Inventories, 1583–1631,* Suffolk Records Society, vol. 22 (1981); Francis W. Steer, ed., *Farm and Cottage Inventories of Mid-Essex 1635–1749* (Chichester, UK: Phillimore, 1969); Barrie Trinder and Jeff Cox, eds., *Yeomen and Colliers in Telford: Probate Inventories for Dudley, Lilleshall,*

*Wellington and Wrockwardine, 1660–1750* (Chichester, UK: Phillmore, 1980); D. G. Vaisey, ed., *Probate Inventories of Litchfield and District 1568–1680*, Staffordshire Record Society, 4th series, vol. 5 (1969); Loerelei Williams and Sally Thomson, eds., *Marlborough Probate Inventories, 1591–1775*, Wiltshire Record Society 59 (2007); Peter Wyatt, ed., *The Uffculme Wills and Inventories, 16th to 18th Centuries*, Devon and Cornwall Record Society, new series, vol. 40 (1997).

62. Sources for Tables 3.5 and 3.6: Charles Thornton Libby, ed., *Province and Court Records of Maine*, vols. 1–2 (Portland: Maine Historical Society, 1928, 1931); William M. Sargent, ed., *York Deeds* (Portland: Brown Thurston, 1889), book 5; York County Probate Records, microfilm, vols. 5–6, in author's possession; Frederick Dow, *The Probate Records of Essex County, Massachusetts*, vol. 1 (Salem, Mass.: Essex Institute, 1916; "Plymouth Colony Probate Records (1620–1692)," transcribed by Ann Yentsch, Catherine Marten, and Joy Stein, vols. 1–2, computer printout, Research Library, Plimoth Plantation, Plymouth, Mass.; Plymouth County Probate Records, vols. 8, 29, 35–36, microfilm, Massachusetts Archives, Boston; New Haven County Probate Records, vol. 6, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.; Hampshire County Probate Records, vols. 6, 14–16, 19–20; microfilm, Historic Deerfield Library, Deerfield, Mass.; Worcester County Probate Records, vol. 2, microfilm Historic Deerfield Library, Deerfield, Mass.; Worcester County Probate Records, vols. 18–19, 26–27, microfilm, Massachusetts Archives, Boston; J. Hammond Trumbull, ed., "Wills and Inventories," in *Public Records of the Colony of Connecticut Prior to the Union with New Haven*, vol. 1 (Hartford: Brown and Parsons, 1850); Connecticut Colonial Records, Hartford District, vol. 2, microfilm, Historic Deerfield Library, Deerfield, Mass.; New Haven Probate Records, vol. 1–2, microfilm, Historic Deerfield Library, Deerfield, Mass.; New Haven Probate Records, vol. 6, 2, 18, microfilm, Connecticut State Library, Hartford, Conn.; Photocopies of Wethersfield, Connecticut Probate Inventories, Research Files, Webb-Deane-Stevens Museum, Wethersfield, Conn. Made from the originals at the Connecticut State Library, Hartford; Inventories and Accounts, 1666–1822, New York [State] Court of Probates, microfilm, New York State Archives, Albany; Inventories of Estates from New York City and Vicinity, 1680–1844, microfilm, New York Historical Society; New York [State] Court of Probates, microfilm, J0301, New York State Archives, Albany; Salem [New Jersey] Wills and Administrations, vol. 2, vol. A, microfilm, Inventories, Wills, and Administrative Papers, 1740–1744, 1770–1775, 1784–1786, 1795–1797, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.; Wills of the County of Philadelphia, Pennsylvania, vols. A–D, W, 1784–1785, 1795–1797, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.; William Hand Browne et al., eds., *Archives of Maryland*, 72 volumes (Baltimore: Maryland Historical Society, 1883–1972), vols. 4, 10, 41, 54; Maryland Prerogative Court, Inventories and Accounts, 1674–1718, vol. 10, microfilm, Maryland Prerogative Court, vols. 26–27, microfilm, in the author's possession; Queen Anne County, Inventories and Account, vol. RW, no. 1, 1784–1785, microfilm, and Anne Arundel County, vol. TG, no 1, microfilm, 1780–1787, vol. JG, 1792–1799, microfilm from Maryland Archives, both in author's possession; Susie M. Ames, ed., *County Records of Accomack–Northampton, 1632–1640* (Washington, D.C., 1954); Susie. M. Ames, ed., *County Records of Accomack–Northampton, 1640–1645* (Charlottesville: University Press of Virginia for the Virginia Historical Society, 1973); Howard Mackey et al., eds., *Northampton County Virginia Record Books*, 9 vols. (Rockport, Maine: Picton Press, 2000–2006), vols. 3, 5, 7; Alice Granbery Walter, ed., *Lower Norfolk County, Virginia Court Records: Books "A" and "B" 1637–1651/2* (Baltimore: Genealogical Publishing Company, 2002); York [Virginia] County Deeds, Orders and Wills," vols. 1–3, 9–11, 19–20, 23, typed transcript, Department of Historical Research, Colonial Williamsburg Foundation, Williamsburg, Va.; Augusta County, Will Books, no. 1, 5, 6, 8–9, microfilm, in author's possession; Lunenburg County, Will Books, no. 1–4, microfilm, in the author's possession; Charleston Will Book, 1692–1693, microfilm, Downs Library, Winterthur Museum, Winterthur, Del.; Charleston County Inventories, K–K, A, C, microfilm, Historic Deerfield Library, Deerfield, Mass.; Alice Hanson Jones, ed., *Colonial Wealth: Documents and Methods* (New York: Arno Press, 1977), vols. 1–3.

Compendium_Cornell
Page 0485

# The Militia and the Right to Arms,

OR, HOW THE SECOND AMENDMENT FELL SILENT

*H. Richard Uviller and William G. Merkel*

DUKE UNIVERSITY PRESS    DURHAM AND LONDON 2002

Compendium_Cornell
Page 0486



© 2002 Duke University Press   All rights reserved
Printed in the United States of America on acid-free paper ⊛
Designed by Rebecca Giménez   Typeset in Monotype Garamond
by Tseng Information Systems, Inc.   Library of Congress Cataloging-
in-Publication Data appear on the last printed page of this book.
We are grateful to the Anne S. K. Brown Collection at Brown University
Library for permission to use the two militia caricatures in chapter 4.

3  1223  06301  1267

against the overreaching of the central government, they enjoin us simply to cut adrift the first phrase of the Second Amendment and enforce the remaining clause to the hilt. The Framers thought the right to arms to be closely associated with the military security of the free state, they wrote it thus in the Charter, the ratifiers so understood it, and the bond endures.

It might be worthwhile to unpack this bundle of shared assumptions and extrinsic referents to sort out those that are so critical to the interpretation of the text that, upon a change of context, the significance of the text changes. Or evaporates entirely.

### LINGUISTIC CONTEXT

In the instance of the Second Amendment, the unadorned linguistics are themselves informative. The right to arms is declared by the verbs, "keep and bear," a phrase carefully selected in preference to alternatives such as "have," "own," "carry," or "possess." Scholars have informed us that, as a term of legal art, the chosen locution has a distinctly military connotation, especially the verb "to bear," which would not have been used in the eighteenth century—as it would not commonly be today—to connote purely private use of arms.[7] You do not bear a shotgun to go duck hunting. As we more fully note below however, the Court of Appeals for the Fifth Circuit has recently chosen a different construction of these words.

But we need not rely entirely on that language in the announcement of the right in the main clause. We have, as we have emphasized throughout these pages, a clear and unequivocal expression of the linguistic context of the primary right in the introductory phrase that accompanies it. The mere presence of the militia phrase sharing a single sentence with the arms clause has, as we have argued persistently, inescapable significance.

In addition, the way the two parts of the provision are expressed amplifies the significance of their conjunction. The critical introductory language does not aver the relationship of the militia to a free state in a simple declarative clause—a form that might have estab-

Compendium_Cornell
Page 0488

lished two severable propositions—the importance of a militia and the right to arms. It does not say: "a well-regulated militia is necessary to the security of a free state, and the right of the people to keep and bear arms shall not be infringed."[8] Had this form been chosen, we might have argued over whether the implication is that the two propositions are linked. Indeed, we might have wondered why the two thoughts share a single sentence.[9]

But it wasn't written that way. Rather, in the first part, the verbal vehicle elected for the verb "to be" is a participle, yielding a phrase known to grammarians as an "ablative absolute construction."[10] This construction characterizes a phrase modifying the substance of the main clause as an adjective would modify a noun, often expressing the condition or circumstances of the assertion of the main clause. It creates an indissoluble link between the two parts of the sentence, and grammatically subjects the right to arms to the rule of the militia modifier. As a simple matter of grammar, the participial modifier is essential for the declarative clause to occur. Had the two statements—regarding the importance of a militia and the right to arms—not been joined in this manner, it might have been possible to argue that even if the first declaration ceases to be true, the second is undiminished. And it seems to us significant that the Framers chose the structure they did.

The linguistics certainly were understood to the framing generation (who were more likely to know the niceties of Latin grammar than we are). Taken together then—as they must be—these two components of the provision grant the people such right to arms as will preserve or empower the militia to assure the security of the community. The linguistically correct reading of this unique construction, we submit, is as though it said: *Congress shall not limit the right of the people (that is, the potential members of the state militia) to acquire and keep the sort of arms appropriate to their military duty, so long as the following statement remains true: "an armed, trained, and controlled militia is the best—if not the only—way to protect the state government and the liberties of its people against uprisings from within and incursions or oppression from without."*

The question then becomes: Has the term "militia" been so eroded by history that in today's social context the concept behind the right expressed retains none of its original meaning? Whether there ever was a time when the amateur local militia was a more effective weapon than a professional army for repelling a foreign invasion of trained

150   THE MILITIA AND THE RIGHT TO ARMS

tions in 1783, Alexander Hamilton (among others) favored the use of national troops to coerce state governments to pay their dues, and scarcely more than a decade after the adoption of the Constitution in 1788, Pennsylvania and Virginia were planning to mobilize their stand-by military units in case Hamilton attempted to rally federal troops to prevent Jefferson from taking office in 1801. Thus, it is not altogether far-fetched to postulate a generally perceived need among the founding generation for local militia to repel federal threats to the liberty of the people and the autonomy of the states.

It is, however, little short of absurd to imagine that today, apart from isolated bands of irrational libertarians, people fear the armed incursion of federal troops on local autonomy. Still, the persistence of an institution is not wholly dependent on the need that gave it birth. And it would be wrong to suppose that in modern times there is no role for locally commanded troops in the enforcement of law or the maintenance of order.

Of course, this conflict does not always play out with the states wearing the white hats as some of the Founders supposed. In one of the most memorable confrontations in recent years, Governor Orville Faubus of Arkansas called up the state militia (which was by then called the "Arkansas National Guard") to resist federal school integration orders by physically blocking African American children trying to enter the school. President Eisenhower then ordered the same units into national service, and they escorted the "Little Rock Nine" to school,[11] providing a scene for unforgettable news photographs that came to symbolize the civil rights victories in the South (as well as providing the basis for a memorable painting by Norman Rockwell).

Given the continued vitality of the social role of armed troops, has the institution of the militia evolved into a viable military force in America today? Medieval monks might enjoy the question: is a military force that developed out of an ancient construct known as "the militia" still a militia though it boasts none of the defining characteristics of that form of military organization, and is, actually, in character the contradiction of many of them? It's a little like the parable

Compendium_Cornell
Page 0490

CRITICAL PERSPECTIVES
ON THE PAST
A series edited by
Susan Porter Benson,
Stephen Brier,
and Roy Rosenzweig

# The New American History

EDITED
FOR THE
AMERICAN
HISTORICAL
ASSOCIATION
BY
**ERIC FONER**



TEMPLE
UNIVERSITY
PRESS/
PHILADELPHIA

Compendium_Cornell
Page 0491

Temple University Press, Philadelphia 19122
Copyright © 1990 by Temple University. All rights reserved
Published 1990
Printed in the United States of America

♾ The paper used in this publication meets the minimum
requirements of American National Standard for Information
Sciences—Permanence of Paper for Printed Library Materials,
ANSI Z39.48-1984

Library of Congress Cataloging-in-Publication Data
The New American history / edited for the American Historical
Association by Eric Foner.
p.   cm.—(Critical perspectives on the past)
Includes bibliographical references.
ISBN 0-87722-698-9 (alk. paper)—ISBN 0-87722-699-7
(pbk. : alk. paper)
1. United States—Historiography.   I. Foner, Eric.   II. American
Historical Association.   III. Series.
E175.N53 1990
973'.072—dc20

89-20563
CIP

► **Contents**

Introduction                                                          vii
ERIC FONER

**PART I / ERAS OF THE AMERICAN PAST**

1   Beneficiaries of Catastrophe: The English Colonies in America    3
    JOHN M. MURRIN

2   The Revolutionary Generation: Ideology, Politics, and Culture
    in the Early Republic                                            25
    LINDA K. KERBER

3   Society, Politics, and the Market Revolution, 1815–1848          51
    SEAN WILENTZ

4   Slavery, the Civil War, and Reconstruction                       73
    ERIC FONER

5   Public Life in Industrial America, 1877–1917                     93
    RICHARD L. McCORMICK

                                                                      v

Compendium_Cornell
Page 0492

# 3

▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶ ▶

## SOCIETY, POLITICS, AND THE MARKET REVOLUTION, 1815–1848

*Sean Wilentz*

FOR MANY YEARS, HISTORIANS HAD LITTLE DIFFICULTY FINDING LABELS TO DE-scribe the period from 1815 to 1848. To some it was the age of Jackson, dominated by Old Hickory and the Democratic party; to others, the era of the common man, a time of sweeping democratic ferment and reform. Today such phrases sound quaint. Two decades' worth of outstanding re-visionist work has made political historians wary of the old presidential synthesis of American history; less attention is now paid to the specific details of Jacksonian electioneering and policy-making, and more to such broad themes as the changing structure of party organizations and the rise of new political ideologies. Likewise, an outpouring of work by social historians—much of it on groups previously slighted—has dramatically changed basic assumptions about the period and raised new, often dis-turbing questions: How can the years that brought the rise of the Cotton Kingdom and the spread of slavery reasonably be called the era of the com-mon man? What was the role of women in this phase of American history? Were not at least some of the democratic advances of the time won at the murderous expense of Native Americans?

By exploring these and other issues, recent studies have moved well beyond the familiar chronicles of political and social elites. They have cast serious doubts on those "consensus" interpretations which assumed

51

that nineteenth-century Americans, whatever their differences, shared an attachment to liberal capitalist ideals. Unfortunately, recent work has fragmented our understanding into a host of academic subspecialties. It has also led, in some instances, to a denigration of formal politics and policy, as if such "traditional" matters as the Bank War or debates over the tariff were unimportant. The job of connecting the pieces—and especially of recombining social and political history—has only just begun. That job is made difficult by persisting scholarly disagreements over all sorts of interpretive issues. Still, one theme does seem to unite Jacksonian historians of various persuasions and suggest a way of once again viewing the period as a whole: the central importance of the market revolution, which, in one way or another, touched the lives of all Americans. As part of that revolution there arose new forms of social life, consciousness, and politics. These, in turn, prepared the way for the Civil War.

## THE MARKET REVOLUTION

The extraordinary economic changes of the early nineteenth century have never failed to impress historians. Between 1815 and 1850 Americans constructed elaborate networks of roads, canals, and early railroad lines; opened up wide areas of newly acquired land for settlement and trade; and began to industrialize manufacturing. What had been in Thomas Jefferson's day a backward rural nation on the fringes of world economic development had by midcentury established many of the preconditions necessary to its becoming a major economic power.

In the 1950s George Rogers Taylor wrote what remains the authoritative account of these changes and dubbed them, collectively, America's "transportation revolution." Since then, historians have done less to challenge Taylor's interpretation than to reexamine some of its implications. Social historians in particular have stressed that economic change radically disrupted existing systems of production and old social hierarchies, replacing them with entirely new opportunities and dependencies. Behind the technological and institutional innovations Taylor discussed was a deeper revolution in human relations, linked to the emergence of new markets in land, labor, and produce.

Much of the scholarly work on this market revolution has concentrated on northeastern cities as key sites of economic development. Intense mercantile activity there, of course, long antedated 1815. Yet between 1815 and 1850 eastern urban capitalists dramatically accelerated the pace of economic change. Often working hand in hand with state and local governments, these merchant capitalists were at the forefront of transportation improvements; they made great strides in expanding credit and financing

resources and in imposing some order on currency and banking; above all, they hastened the erosion of the old artisan handicraft system and the rise of new manufacturing enterprises.

Compared to later periods in U.S. history, industrial growth between 1815 and 1848 was modest; by 1850, the majority of the nation's population still lived in rural areas and worked in agriculture, while only about 14 percent of the labor force worked in manufacturing. Nevertheless, the rate of industrial growth was impressive, especially in the Northeast. The most spectacular examples of early industrialization were the new textile mills of New England, financed by leading established seaboard merchants. Yet as labor historians have shown, mechanization and factory construction constituted only one of several strategies used to revamp manufacturing. In once bucolic single-industry towns (for example, the shoemaking center, Lynn, Massachusetts) merchant capitalists altered production by dividing up craft skills and putting out as much work as possible to country girls living in outlying rural communities. Entrepreneurs in the major seaboard cities and in newer inland settlements such as Cincinnati likewise divided up artisan crafts and relied on underpaid outworkers—women, children, poor immigrants—to produce work for low piece rates. The deployment of these different methods of production brought a rapid increase in the output of raw materials and finished goods, at lower prices and of a higher quality than Americans had ever enjoyed. Simultaneously, however, the new order disrupted the customary artisan regime of masters, journeymen, and apprentices and left thousands of workers dependent on the caprices of the wage-labor market.

Changes in northeastern manufacturing were closely related to a deepening crisis in northeastern rural life. Traditionally, historians slighted the extent of social change in the American countryside before the Civil War. Although improvements in transportation and increased commercialization obviously enlarged the productive capacity of American agriculture, historians tended to assume that most family farms were small capitalist enterprises from at least the mid-eighteenth century on. Recent scholarship, however, has focused on the variety of social pressures, beginning in the 1750s and continuing through the 1840s, that undermined a distinct way of life, one geared more to barter exchange and quasi-self-sufficiency than to the production of cash crops for market. At first, the major impetus for change was demographic, as the mounting population of the settled rural Northeast began to outstrip the available supply of land, leaving rural patriarchs unable to pass on sufficient acreage to their sons. By 1815 these straitened circumstances had led to a steady decline in family size and to an increase in westward migration; it had also heightened farmers' need for cash to buy additional land, thus encouraging them to shift into cash-crop production. The transportation improvements of

the next thirty years facilitated that shift and brought to the countryside (at steadily decreasing prices) manufactured articles previously unavailable in the hinterland. By 1850 the vast majority of northeastern farmers had reorganized their production toward cash crops and were depending on country merchants for household items and farm implements once produced at home.

Few historians would dispute that the market revolution brought substantial material benefits to most northeasterners, urban and rural. But the new abundance was hardly distributed equally. Studies of property holding have confirmed that in small country towns and in large cities alike, a tiny proportion of the northeastern population came to command the bulk of the newly created wealth. Those who benefited most from the market revolution—merchants and manufacturers, lawyers and other professionals, and successful commercial farmers, along with their families—faced life situations very different from those known to earlier generations. The decline of the household as the locus of production led directly to a growing impersonality in the economic realm; household heads, instead of directing family enterprises or small shops, often had to find ways to recruit and discipline a wage-labor force; in all cases, they had to stay abreast of or even surpass their competitors.

Perhaps the most profound set of social changes confronting this new middle class involved the internal dynamics of family life. As Nancy Cott, Mary Ryan, and others have explained, the commercialization of both city and countryside removed women from the production of goods, including goods for strictly household use. The world of the propertied began to separate into two spheres: a male public sphere of politics, business, and the market, and a female private sphere of domestic duties and child rearing. By 1850 a new romantic standard of rights and responsibilities within middle-class families had replaced the more severe patriarchal regime of the eighteenth century—a "cult of domesticity" that vaunted women's supposed moral superiority while it restricted women's place to the home, as wives, mothers, and domestic guardians.

Less fortunate northeasterners faced a very different reality, dominated by the new dependencies created by the market revolution. For those at the bottom—immigrant and black day laborers, outwork seamstresses, the casual poor—a combination of overstocked labor markets and intense competition among employers kept wages and earnings near or below subsistence levels. Even in New England, farm girls who went off to work in factories expecting decent standards and high wages found that mill conditions had deteriorated by the mid-1830s. Those small independent artisans and well-paid craft workers who survived faced the real possibility of falling into similar distress, victimized as they were by an increasingly volatile business cycle and by the downward pressures on earnings and real

wages in various important trades. By the 1830s a new working class was beginning to carve out its own identity in a variety of trade unions and in political efforts aimed at redirecting the course and consequences of American economic expansion. Marginal small farmers, their old networks of barter exchange undone, saw their livelihoods threatened by competition from western areas opened by canal development and by the middlemen's downward pressure on prices. To all these people, middle-class respectability and the cult of domesticity meant little when measured against the struggle to achieve or preserve their economic independence—or barring that, simply to make ends meet.

Far less is known about the market revolution's social impact in the Old Northwest and the western territories, although some fine recent work has started to redirect the field. Studies of migration suggest that rural northeasterners who could not make a go of it tried to avoid entering the urban wage-labor market; the largest single supply of urban workers (at least by 1850) consisted of immigrants and their children, among them hundreds of thousands of new arrivals escaping hard times in Ireland and Germany. Native-born rural northeasterners, joined by migrants from the South, headed west instead, most of them hoping to reconstruct the independent yeoman communities that had crumbled back home. Accordingly, they bought up as much cheap western land as they could to ensure that they would be able to provide for their families and their descendants.

This new yeomanry faced numerous obstacles. First, the removal of Native Americans from the land had to be completed; federal and state authorities willingly complied, using fraud and violence as necessary. Once the lands were open, settlers found themselves pitted against speculators eager to convert the virgin land to capitalist development. As the proportion of public land sold to speculators dramatically increased, would-be settlers and squatters had to battle hard to get the land they wanted. Once settled, farmers usually had to enter into some sort of economic relations with land speculators or bankers, either taking out mortgages or borrowing money to pay for farm improvements.

Despite these hardships, the vast majority of settlers eventually owned their farms outright. Most of them managed, for a time, to set up a facsimile of the yeoman regime. But it was not to last. Hoping to develop markets for their surplus crops, the western yeomen for the most part supported the extension of new east-west transport routes after 1820; the impact of their innovations quickly surpassed early expectations. By 1850 northwestern farm operators were almost fully integrated into commercial markets; specialized production of grain, livestock, or dairy products became the norm for successful commercial farmers. Under the pressure of reorganization, attempts to recreate the old order of yeoman independence collapsed. Although still dominated by small farmers, the Old Northwest

emerged as one of the leading areas of cash-crop agriculture in the world, displacing New England and the mid-Atlantic seaboard as the supplier of eastern and overseas markets.

The opening of the market brought prosperity and rising profits to those farmers who secured sufficient acreage and learned to handle the new rules of credit and competition. Like eastern businessmen (and western businessmen in the new cities along the transport routes), western commercial farmers reordered their public and private lives in accord with the standards of eastern middle-class domesticity. Yet like the Northeast, the Northwest had its dispossessed and those who faced imminent dispossession. Not only were the Native Americans removed from their lands, but so too a substantial number of white settlers suffered from the revolution in marketing. Those unable to get sufficient credit to improve their operations or unwilling to learn capitalist agriculture methods wandered on the periphery of the most concentrated settlement, squatting on unimproved land or purchasing new land—often only to lose it. Those who could not sustain themselves and could not travel farther on fell into the ranks of agricultural wage labor. In all, the rise of capitalist agriculture in the Northwest, as in the Northeast, produced new classes of independent and dependent Americans.

The South experienced the market revolution quite differently, though just *how* differently has been the subject of continuing debate. The outstanding feature of southern economic and social history after 1815 was, of course, the rise of the Cotton Kingdom and the westward expansion of plantation slavery. Since the mid-1950s an outstanding literature on slavery has completely overturned the old sentimentalized, racist interpretation of the plantation as a benevolent institution, supposedly designed as much to civilize "inferior" blacks as to reap profits for the planters. Such recent historians as Eugene D. Genovese, Herbert G. Gutman, Lawrence Levine, and Albert Raboteau have paid especially close attention to the slaves' own experiences and discovered that a distinctive Afro-American culture took shape under slavery, a culture based on religious values and family ties that gave the slaves the power to endure and in certain ways resist the harshness of bondage. Far from a benign world of social harmony, the plantation South was an arena of intense day-to-day struggles between masters and slaves.

Far more controversial has been the argument, advanced most forcefully by Genovese, that the expansion of slavery led to the creation of a distinctive, noncapitalist southern civilization. As Genovese sees it, the southern slaveholders' attachment to land and slaves as their chief forms of investment guaranteed that the South would remain an economic backwater. To be sure, the slaveholders were linked to the wider world of capitalist markets and benefited from the improvement of American commerce and finance; like all men of business, they were acquisitive and at times greedy. But, Genovese contends, the master-slave relationship—so unlike labor relations in the North—created a unique mode of social organization and understanding. At the heart of these arrangements was what Genovese calls paternalism, a system of subordination that bound masters and slaves in an elaborate network of familial rights and duties. Plantation paternalism was fraught with conflict between master and slaves, although (Genovese insists) it did help contain the slaves' rebelliousness. Above all, the slaveholders as a class—and the South as a region—did not share in the possessive individualism and atomistic liberalism that were coming to dominate northern life.

Genovese's interpretation has been extremely influential, though it has also been challenged on various fronts. In particular, historians have questioned Genovese's contention that slavery precluded southern economic development, and that the planters exercised ideological hegemony over their slaves. Generally, however, scholars today agree that the market revolution had the effect of widening the differences between northern and southern society and culture. As historians examine the worlds of southerners who were neither masters nor slaves, southern distinctiveness seems all the more apparent; at the same time, these studies have heightened our appreciation of the complexities of the slave South.

Perhaps the most interesting work of the last few years concerns the nonslaveholders who constituted the majority of the southern white population before the Civil War. Far removed from the old settlements of the Tidewater and the rich soils of the Black Belt, there lived relatively isolated communities of white householders and their families who produced mainly for their own needs and had only occasional contact with the market economy. While their way of life distinguished these southern yeomen from the commercial farmers of the North, it also set them apart from the wealthier, less egalitarian planters of their own region; jealous of their personal independence and local autonomy, the southern yeomen resented any perceived intrusion on their political rights. White supremacy and the yeomen's acquiescence in slavery softened these class differences, but throughout the 1820s and 1830s the southern yeomen remained deeply suspicious of the planters' wealth and power, and the possibility that the planter elite might pursue local development policies to the detriment of the backcountry.

The rediscovery of the persistent southern yeomen—in contrast to the declining northern yeomen—has reinforced the argument for growing social divergence between North and South before 1850. But in a different sense the southern yeomen's dilemmas also point out certain commonalities in the history of commercialization throughout the country, which in turn help us understand the market revolution as a national process.

At one level, commercialization—as overseen by the nation's merchant capitalists, manufacturers, commercial farmers, and planters—created a hybrid political economy by introducing capitalist forms of labor and market agriculture in the North, and by fostering a different slave-based order in the South. Viewed more closely, the market revolution can also be seen to have produced new and potentially troublesome social conflicts within each major section of the country. Entrepreneurs and wage earners, middlemen and petty producers, masters and slaves, planters and yeomen all found themselves placed in unfamiliar positions, arrayed against each other in fresh struggles for power and legitimacy. In the long run the divergences between free labor and slavery would dominate other differences. Before then, however, new social relations and conflicts *within* the various sections generated social tensions that came to the fore in politics.

Understood in this way, the main lines of Jacksonian social and political history begin to look very different than they did to the consensus historians earlier. But in order to come to terms with these matters, historians have had to find out how Americans of different classes, races, and regions experienced the enormous structural changes that confronted them, and how they acted upon those new understandings. Few historians today would argue that economic interest alone determined people's views of the world. Jacksonian historians have found that Americans understood the market revolution as a cultural and political challenge, not simply an economic transformation. These findings have led to a thorough revision of key aspects of American intellectual history after 1815, especially on the contours of political ideology and social consciousness.

## IDEOLOGY AND SOCIAL CONSCIOUSNESS

Much of the most important recent work on ideology and social consciousness after 1815 has focused on Americans whom previous generations thought of as "inarticulate"—including women, slaves, and workingmen. Combined with the history of the market revolution, efforts to study ideas "from the bottom up" have revealed far deeper and more complex divisions between various groups of Americans than were once supposed to have existed. Yet the most profound changes in our understanding of popular ideas have come from a larger reorientation in the ways historians approach early American social and political thought—above all, republican political ideas and the social meanings of evangelical Protestantism.

Studies of early nineteenth-century republicanism owe a great deal to some outstanding work, begun in the 1960s, on eighteenth-century politics and the origins and consequences of the American Revolution.

After surveying American political discourse at the nation's formation, such scholars as Bernard Bailyn, Richard Bushman, J. G. A. Pocock, and Gordon Wood found it difficult to sustain the widespread assumption that America's revolutionary ideology was essentially a pragmatic, legalistic variant of liberal capitalist ideas, derived mainly from John Locke. When late eighteenth-century Americans spoke of politics, they referred to a broad set of principles that they subsumed under the heading of republicanism.

Formulated in a world of monarchs and aristocrats, American republicanism was a radical, nearly utopian vision. Five interlocking concepts formed its key elements: first, that the ultimate goal of any political society should be the protection of the common good, or *commonwealth;* second, that in order to maintain this commonwealth, citizens had to exercise *virtue,* the ability to subordinate private ends to the public good when the two conflicted; third, that to be virtuous, citizens had to be *independent* of the political will of other men; fourth, that to guard against the rise of tyranny, citizens had to exercise their *citizenship* and be active in political life; fifth, that all citizens were entitled to *equality* under a representative, democratic system of laws. Some Americans emphasized certain of these concepts more than others; different groups interpreted them to mean different things; still, current historians argue that Americans drew primarily on these ideals in denouncing Old World inequality and in defining themselves as a nation.

The rediscovery of republicanism has sparked several debates with enormous implications for U.S. history after 1815. Joyce Appleby, for one, has warned against ignoring the prominence of liberal ideas about natural rights in early American political thought—ideas that Appleby thinks opened the way for a new capitalist order. Others have stressed the importance of plebeian democratic notions of the republic as spread among urban artisans and backwoods farmers—notions at odds in several respects with both traditional republican thought and with emerging capitalist liberalism. Still others have argued that republican ideas did not long survive the American Revolution as the mainspring of U.S. political thought. Lately, however, it has seemed that the demise of republican politics has been greatly exaggerated. Historians studying the nineteenth century have found that at least through the 1850s, republican political language proliferated throughout the United States. Rather than giving way to a kind of undifferentiated market liberalism, republicanism, it now seems, became a reference point of struggle as emergent classes identified their own interests with the survival and well-being of the republic itself.

Recent labor historians, for example, have found that many of the protest movements of the early nineteenth century proclaimed a distinct working-class republicanism, which combined republican ideals and the

labor theory of value to touch the deepest emotions of the rank and file. At the heart of the matter was the question of whether the market revolution and its new forms of wage labor advanced or undermined republican ideals. To northern businessmen, commercialization was the handmaiden of republican progress: by increasing national wealth, they believed, entrepreneurs would widen opportunities for all honest and diligent workingmen to achieve virtuous independence. But to a growing number of workers, the market revolution seemed to vitiate republican ideals—by creating new forms of potentially awesome, undemocratic private power such as banks and corporations, by disrupting the supposedly mutualist regime of the artisan workshop, and by threatening workers with permanent dependence on wages and the capitalist labor market. At stake, organized workers argued, were not simply their own material interests (although these were important) but the fate of the republic in a land they thought had been overrun by purse-proud, nonproducing aristocrats and their political allies.

Similar themes appeared in very different settings as Americans interpreted their new, often bewildering circumstances in terms of the republican political legacy. Yeomen and would-be yeomen in the Northeast and the West attacked land speculators and bankers as an elite money power out to deprive farmers of their hard-won independence. Small producers in the South eyed both planters and merchants in southern cities as wealthy incipient aristocrats and tried to expand the political power of ordinary white men. By the 1830s this crisis of republican values, born of the market revolution, had produced popular movements for labor's rights, land reform, debtor relief, expansion of the suffrage, hard money, and numerous other causes. In response, northern businessmen, western speculators, and southern planters attempted in various ways to link their own favored position with the vindication of democratic republicanism.

Alongside these political divisions a deep spiritual and religious crisis also developed, loosely referred to as the Second Great Awakening. The theological implications of the evangelical revivals of the early nineteenth century and the decline of Calvinist orthodoxy was not lost on earlier generations of researchers; the religious ecstasy unleashed by the evangelicals' camp meetings have long fascinated social historians. But except in the work of a few pioneering scholars such as Whitney Cross, the larger social meanings of the revival were usually described—vaguely—as manifestations of an alleged Jacksonian democratic spirit. Historians today are much more exact; the rise of evangelicalism in its many forms seems to have been critical to the social and ideological transformations that accompanied the market revolution.

Nowhere did the revivals have a more profound impact than in those commercializing rural areas of the North and West familiarly known as

the Burned-Over District. Building on the work of Cross, Paul Johnson and Mary Ryan have carefully reconstructed the sociology of northern evangelicalism. Focusing on Charles Finney's revival in Rochester, New York, Johnson found that it was initially a movement of and for businessmen, commercial farmers, and their families. In the new measures and liberalized doctrines of conversion of the Finneyites' free churches, Johnson argues, these people discovered both religious explanations for the breakdown of old interpersonal community relations and a new vision of man and God, consonant with the middle-class virtues of regular industry, sobriety, and self-reliance. Ryan, in a study of Utica, New York, pays closer attention to the gender dimension of the revivals and emphasizes that the majority of evangelical converts through the 1830s were the wives and daughters of businessmen; while serving as "the cradle of the middle class," Ryan concludes, the revivals had the more immediate consequence of helping to forge a religious view of sexual gentility and female spiritual worth in line with emerging forms of domesticity and middle-class respectability. The evangelical awakening seems to have provided a means whereby the new northern middle class forged the moral imperatives that defined them as a class. And once they did that, the evangelized converts (especially women) attempted with uneven success to bring the rest of society into the fold by means of urban missions, Bible societies, and a host of other religiously inspired moral reform efforts.

The revivals came even earlier to the South than to the North and had, if anything, a more pervasive influence—but their social significance was rather different. Slaveholders, particularly those born outside the established eastern upper crust, found in the teachings of various Baptist, Methodist, and New School Presbyterians a promise of spiritual rebirth and a potential instrument for "civilizing" (and thus further subordinating) their slaves. However, as such scholars as Donald Mathews have explained, the social meaning of southern evangelicalism steadily diverged from that of the northern churches—and, in an important respect, from the slaveholders' own original intentions. Northern evangelicals, with their bedrock insistence on human equality before God, the sinfulness of human coercion, and individual responsibility, generated passions that easily took on antislavery connotations. Southern planters could not accept such views and did not permit them in their churches. Instead, southern evangelicalism came to accept the inferiority of blacks and to emphasize the slaveholders' supposed civilizing mission as a form of Christian stewardship. The slaves, however, although drawn to evangelical Christianity, did not take from it the submissive message the slaveholders thought they would. On the contrary, they blended the biblical motifs of exodus and redemption with surviving West African religious customs and made of them a foundation of their own sense of dignity and community.

Taken together, the continued fragmentation of American republicanism and the ferment of the revivals reveal an intricate series of social and ideological redefinitions. Armed with these views, Americans struggled over the basic issues raised by commercialization, interpreting their conflicts as battles for the very soul of the nation. These struggles shaped the political tumults and innovations associated with the age of Jackson.

POLITICS

It is in the area of politics that the recent historiography of the Jacksonian era may seem the most confused. In the 1960s, revisionist political historians were heralding a revolution in methodology and interpretation. Using formidable statistical hardware and the sociological tools of multivariate analysis, the "new" political historians proclaimed as their major finding that, contrary to then prevailing interpretations, economics and class had played only limited roles in shaping political alignments. Ethnicity, culture, and religion, it turned out, were the keys to understanding Jacksonian politics.

These revisionist accounts swept away the mechanistic, often one-dimensional instrumentalism that had marred earlier social interpretations of Jacksonian politics. Yet in the years since this academic revolution began, historians (including some of the "new" political historians) have had second thoughts. Their conclusions did not work for every area of the country; even where they appeared to be valid, the divorce of class factors from culture and ethnicity began to seem artificial. A few efforts at correcting such problems have tried to combine the worthy findings of the "new" political history with those of recent social historians, and out of this work have come more convincing appraisals of the overlapping effects of class, culture, and political ideology. Even more important, these studies have broadened the scope of political history to cover not just electoral contests and voting returns but the entire way in which power was structured and restructured after 1815.

An important early development in this new social history of politics was a full reevaluation of the origins of professional parties, notably in Richard Hofstadter's 1969 book on changing concepts of party from the framing of the Constitution through the 1820s. Inspired partly by, the rediscovery of eighteenth-century republican political discourse, Hofstadter demonstrated how deeply the Founding Fathers abhorred the idea of permanent party divisions, regarding them as factionalized solvents of the commonwealth. Even Thomas Jefferson, head of the first national opposition party in American history, had no intention of making party divi-

sions permanent. Jefferson's celebrated remarks at his first inaugural—"We are all Federalists, we are all Republicans"—meant that in his view only one party, his own, was needed. This anti-party animus lasted down to the 1820s, only to be challenged by a new generation of political upstarts, among them future Jacksonian strategists such as Martin Van Buren. Drawn largely from outside the traditional elite gentry families, this new breed of politicians believed that without regularly organized parties the nation would fall into either unceasing civil strife or oligarchy. Political conflict, they insisted, was inevitable in a nation so diverse as the United States; to deny the expression of that conflict through regular, legitimate channels was both foolhardy and dangerous. Only a forthrightly competitive system of organized parties, each responsible to a broad white male electorate and a party rank and file, and each led by professional politicians, could ensure political stability and legislate the popular will.

The emergence of these new kinds of politicians helped to ventilate the political system, at both local and national levels, by encouraging the expansion of the suffrage and important reforms in representation in states still attached to eighteenth-century property requirements. By 1830 the vast majority of the states had either adopted or moved decisively toward universal adult white male suffrage. This process of democratization—discriminating and oppressive as it was to women and free blacks—did not, however, proceed simply from the idealistic or benevolent efforts of new and emerging political elites. Considerable pressure at the grassroots—particularly from the plebeian backcountry—often instigated democratic reform; once organized, this pressure from below often pushed the politician-reformers to proceed well beyond what they initially expected to achieve.

Shifts in national policy, meanwhile, further exacerbated popular discontent. With the demise of the Federalist party after the War of 1812, it appeared to many as if Jeffersonian principles of frugal government and strict construction of the Constitution had at last been vindicated. Yet partly as a result of the mobilization for the war, elements within the Jeffersonian coalition more friendly to government-supported economic development had begun to gain the upper hand. By the mid-1820s many of these men, joined by ex-Federalists, had started to coalesce in a loose-knit way as what would soon be called National Republicans—shorn of much of the belligerent, elitist animus of the old Federalist party but interested in using national institutions (including the Second Bank of the United States, chartered in 1816) to expand the market revolution. In the presidential election of 1824, John Quincy Adams, a leading figure in this group, emerged the winner—though only after the election was thrown into the House of Representatives, where it was beclouded with charges of

backroom deals and corruption. Suddenly—or so it seemed to some observers—a revamped form of New England Federalism had captured the White House.

In the aftermath of Adams's election, most of the new party professionals gravitated toward the oppositional presidential aspirations of Andrew Jackson; as much as anything, Jackson's eventual election to the presidency in 1828 amounted to a triumph for the professional vision of party politics. It was to prove only the beginning of a tremendous political transformation. Although known to be unfriendly to various National Republican measures, Jackson ran for the White House on his popularity as a military hero rather than on any clearly defined issues. Even as he was sworn into office, it was not altogether clear where he and his newly formed party would stand on the various political controversies of the day. Nor was it clear how Jackson's adversaries would respond, except to announce their opposition to the professional party idea and their distrust (in some cases, detestation) of Andrew Jackson.

The events that shaped the new political alignments—what historians have dubbed the second of the nation's "party systems"—were directly connected to the social tensions of the market revolution. They came with extraordinary rapidity in the years immediately before and after Jackson's election. Labor conflict hit the Northeast on an unprecedented scale as workers and their radical friends organized the first national labor movement—initially with a string of locally based workingmen's parties, then in centralized urban unions and a national trades' union. Employers responded to union activities with their own organizations and with legal prosecutions aimed effectively at denying workers the right to strike. In 1831 the northern revival reached a crescendo with the Finneyite eruption in Rochester; throughout the decade, evangelized middle-class northerners joined churches and religious moral reform societies by the hundreds of thousands. Western small farmers and squatters pressed for reform of public land policy to widen and guarantee their access to the land. Nat Turner's slave rebellion in 1831 touched off a wave of legal repression in the South to prevent any further such insurrections and to uproot antislavery opinion. Southern yeomen joined popular movements demanding further democratization of the suffrage and wider eligibility for officeholding in some of the older slave states.

Against this background the Jacksonians assembled their party constituency and ideology. Jackson himself was a central figure in this process, if only as a popular symbol; current historians have hotly debated exactly what Jackson stood for. In a study heavily influenced by Freudian insights, Jackson's fiercest critic, Michael Paul Rogin, has portrayed the Old Hero as a deeply disturbed man whose need to supplant the generation of the revolutionary fathers bred a pathologically violent character, its violence

directed in particular at Native Americans. In contrast, Jackson's most thorough biographer, Robert V. Remini, has presented him as a politician and statesman who in many respects deserves to be remembered as a man of the people. Yet despite their clashing interpretations, Rogin and Remini (and historians generally) agree that Jackson and his party drew upon the old republican language and reworked it into a powerful political appeal.

Essentially, Jacksonianism developed as an expression of the fears and aspirations of those petty producers and workers threatened by commercialization, as well as of voters in outlying areas not yet integrated into the market revolution. This did not mean, historians are now quick to add, that the Democracy was simply a farmer-labor party, organized as a clear-cut opposition to merchant speculators and wealthy planters. Wealthy men (such as Jackson himself) commanded key party posts throughout the country; among them were men who helped to further the market revolution. Significant numbers of petty producers and wage earners, meanwhile, voted for the Democracy's opponents. Like all successful national parties in U.S. history, both the Democrats and the Whigs were coalitions of diverse social groups. For the most part, though, the Democracy tapped into the attitudes—and won the votes—of northern petty artisans and workers, marginal and middling farmers in the Northeast and Northwest, and southern yeomen. Democrats assumed that there was an inherent conflict between "producers" and "nonproducers," in which entrenched "nonproducers" would seek to use the power of the state to their own advantage. The Democrats' professed aim was not, therefore, to end all economic improvement and expansion but rather to keep the hands of established wealth and privilege off the levers of state power, thereby preventing the creation of a new and permanent monied aristocracy.

Jackson's war on the Second Bank of the United States was a turning-point in the building of his party's constituency and identity; his veto message brilliantly rearticulated the old republican discourse into a ringing defense of small producers against the alleged schemes of merchant capitalist financiers and foreign investors to subvert the Constitution and equal rights. Jackson's veto of federally sponsored internal improvements, along with Democratic congressional efforts for comprehensive land reform, likewise arrayed the "bone and sinew" against those private interests that would bend government to enhance their private power.

Jackson's enemies had difficulty organizing a coherent national opposition to this democratic appeal. Several studies have stressed that the anti-Jacksonians inherited the once prevalent distrust of political parties, which naturally hampered their responses to the Democrats. More important, as John Ashworth has pointed out, anti-Jacksonians tended to distrust electoral democracy altogether as a potential form of demagogic tyranny. Only in the late 1830s did the anti-Jacksonians finally learn to

adapt to the realities of mass democratic politics and pull together as a national political force—the Whig party. Once organized, the Whigs completed a major shift in American political conservatism.

Central to Whig thinking was the desire for an orderly and regulated consolidation of the market revolution. Updating ideas elaborated by the Hamiltonian Federalists and the National Republicans, Whig leaders expected that with the prudent aid of an active, paternalist government (through banking policy, tariffs, and corporate charters), private capital would flourish, making the American economy truly independent of the Old World. Not surprisingly, this stance won considerable approval from northern businessmen, western capitalist farmers, and the larger southern planters. But what turned the Whigs from a poorly organized band into a powerful national party was the larger social and moral vision they attached to their prodevelopment economics and promulgated in their new party organization.

Rejecting the Democrats' claims of an inherent conflict between producers and nonproducers, the Whigs asserted that a basic harmony of interests united all Americans in a kind of mutualist whole. The enlargement of national wealth, they contended, would eventually bring greater opportunity for all. Since, the United States, unlike Britain and Europe, was a classless society, they insisted, all those who exhibited industry, thrift, and self-reliance could expect to earn their personal independence. Poverty and inequality, according to the Whigs, stemmed from individual moral failings, not from any flaws in existing political or economic structures. Reflecting both the ethical injunctions of the Second Great Awakening and the discourse of democratic republicanism, the Whigs' argument effectively presented the political and social consequences of the market revolution as the fulfillment of America's republican destiny. It won them considerable popular support from aspiring northern and western small producers, more fortunate wage earners, and some smaller southern planters and entrepreneurs.

By 1840 the clash between Democrats and Whigs had developed into a new party system of two fairly evenly matched national organizations. The politics of economic development remained at the center of their electoral and legislative battles—yet as recent work has emphasized, these battles expressed intense cultural conflicts as well. In the Northeast, for example, the Whigs' combination of economic and moral appeals struck home with Protestant workers and small producers, particularly those caught up in the revivals. Catholic immigrants, especially Irish Catholics at the bottom of the new labor market, were repelled by the Whigs' cultural politics and stuck with the Jacksonians. In the Northwest and the South the clash between the Democracy's emphasis on equal rights and the Whigs' emphasis on respectability set voters enmeshed in the semi-

autonomous world of the yeomen's communities against those country and city voters more thoroughly integrated into the commercial world. Particularly in the North, these strains surfaced in battles over all sorts of "cultural" issues without any apparent economic logic—temperance, sabbatarianism, nativism, common schooling—with the Whigs taking up the banner of moral reform. Throughout, however, the lines of class, ethnicity, religion, and subregion tended to converge; cultural identities in politics —the Whigs' entrepreneurial moralism versus the Democrats' stress on personal autonomy and equal rights—were inseparable from the ways in which the market revolution was threatening old ways of life, creating new ones, and setting large groups of Americans at odds.

As it happened, these battles were to be overshadowed by the even deeper struggles that emerged in the 1840s and eventually destroyed the second party system. The essential issue was the expansion of slavery; since 1970, historians have greatly enhanced our understanding of how slavery and antislavery came to dominate the political agenda. Numerous studies have established that both the Democrats and the Whigs understood the need to keep issues associated with slavery out of national affairs in order to ensure national party stability. The Constitutional Convention of 1787 and the Missouri Crisis of 1819–21 had shown that this was not always easy to do; the social consequences of the market revolution made the task even harder. The rise of the cotton South and the consolidation of planter power made that region increasingly touchy about any perceived threats to the peculiar institution, especially as the perceived common interest of planter and yeoman in the perpetuation of slavery became the most powerful bond for white southerners across the lines of class and party. In the North, meanwhile, the moral reform efforts that stemmed from the Second Great Awakening and the formation of the new middle class dramatically changed the thrust of antislavery opinion. Out of the maelstrom of reform emerged a new form of antislavery dedicated to "immediate" abolition— a far more radical prospect than anything proposed by the preceding antislavery organizations. Benefiting from the organizational structure of what one historian has called the benevolent empire of reform, and borrowing from propaganda techniques of the revivalist churches, the immediatist abolitionists began to win hundreds of thousands of converts in the most rapidly expanding areas of northern development.

The potential divisiveness of these events did not become fully apparent until after 1840. Before that, party leaders had successfully turned away attempts by both sides to inject slavery into national affairs, using compromise where possible, the threat of force when necessary (as in Jackson's handling of the Nullification Crisis of 1832–33), and parliamentary repression (as in the adoption of the gag rule in 1838).

Two political developments helped alter the situation. First, one wing

of the abolitionist movement rejected the position of William Lloyd Garrison and others who held that reformers should remain outside politics. Members of this wing entered party politics for themselves and began to adapt their antislavery views to broader public opinion. Second, internal disputes within the Democracy set the northern and southern wings of the party at odds, amid claims that southern interests (led by the sectional firebrand John C. Calhoun) intended to take over. Both developments made it difficult for party leaders to return to the kinds of issues that had given rise to the second party system. In the mid-1840s the entire system was shaken when debates over Texas annexation and the Mexican War reopened the kinds of territorial issues that had always been rife with sectional antagonism. By 1848 sectional passions dogged the nation's politics on an alarming scale—passions emblematized when the antislavery Free Soil Party ran on its national ticket two leading figures of the political establishment: the Democratic former president, Martin Van Buren, and the Massachusetts Whig (and son of a former president, John Quincy Adams) Charles Francis Adams.

It would, of course, take another six years before the second party system finally fell apart, and six more after that before the nation was severed. The political generation of Jackson was able to reconstruct intersectional party alliances, at least in Congress; antislavery northerners and southern sectionalists still had a long way to go in building sectional majorities. Yet by 1848 the political impetus behind the Jacksonian party system was quickly exhausting itself. The social and ideological transformations that had given birth to the Jacksonian Democracy and the Whigs continued —but their significance changed as the deeper sectional implications of economic development became paramount.

Here lay the ultimate paradox of the age. The market revolution, having disrupted old social relations and created new ideological and spiritual crises, encouraged the emergence of a new form of mass democratic party politics. Once in place, the second party system revolved around certain intrasectional issues of class and culture linked to the impact of commercialization. Yet the market revolution also widened the social differences between the free-labor North and the slave South. Once those differences entered national politics—agitated by sectional politicians skilled in the techniques of mass democracy—they threatened the very existence of the second party system. The nation's politicians could not forever contain struggles over the meaning of such grand concepts as equality, independence, and individual autonomy in ways that circumvented the fundamental problems raised by the expansion of slavery. In the 1850s and 1860s, Americans would reap the whirlwind.

BIBLIOGRAPHY

This list covers only some of the noteworthy books published since the mid-1970s, plus a few key works from the 1950s and 1960s. Books that might prove useful in the classroom are marked with an asterisk.

Appleby, Joyce O. *Capitalism and a New Social Order: The Republican Version of the 1790s.* New York: New York University Press, 1984.

Ashworth, John. *Agrarians and Aristocrats: Party Ideology in the United States, 1837–1846.* Wolfeboro, N.H.: Longwood, 1983.

Bailyn, Bernard. *The Ideological Origins of the American Revolution.* Cambridge, Mass.: Harvard University Press, 1967.

Berlin, Ira. *Slaves without Masters: The Free Negro in the Antebellum South.* New York: Pantheon Books, 1974.

*Blassingame, John W. *The Slave Community: Plantation Life in the Antebellum South.* Rev. ed. New York: Oxford University Press, 1979.

Boyer, Paul. *Urban Masses and Moral Order in America, 1820–1920.* Cambridge, Mass.: Harvard University Press, 1978.

Bridges, Amy. *A City in the Republic: New York and the Origins of Machine Politics.* New York: Cambridge University Press, 1984.

Bushman, Richard L. *King and People in Provincial Massachusetts.* Chapel Hill: University of North Carolina Press, 1985.

Cole, Donald B. *Martin Van Buren and the American Political System.* Princeton, N.J.: Princeton University Press, 1984.

Cooper, William J. *The South and the Politics of Slavery, 1828–1856.* Baton Rouge: Louisiana State University Press, 1978.

*Cott, Nancy F. *The Bonds of Womanhood: "Woman's Sphere" in New England, 1780–1835.* New Haven, Conn.: Yale University Press, 1977.

Cross, Whitney. *The Burned-Over District: The Social and Intellectual History of Enthusiastic Religion in Western New York.* Ithaca, N.Y.: Cornell University Press, 1950.

Dawley, Alan. *Class and Community: The Industrial Revolution in Lynn.* Cambridge, Mass.: Harvard University Press, 1976.

Douglas, Ann. *The Feminization of American Culture.* New York: Knopf, 1977.

Doyle, Don H. *The Social Order of a Frontier Community: Jacksonville, Illinois, 1825–70.* Urbana: University of Illinois Press, 1978.

Dublin, Thomas. *Women at Work: The Transformation of Work and Community in Lowell, Massachusetts, 1826–1860.* New York: Columbia University Press, 1979.

Faler, Paul G. *Mechanics and Manufacturers in the Early Industrial Revolution: Lynn, Massachusetts, 1780–1860.* Albany: State University of New York Press, 1981.

Foner, Eric. *Politics and Ideology in the Age of the Civil War.* New York: Oxford University Press, 1980.

Formisano, Ronald P. *The Transformation of Political Culture: Massachusetts Parties, 1790s–1840s.* New York: Oxford University Press, 1983.

Foster, Lawrence. *Religion and Sexuality: Three American Communal Experiments in the Nineteenth Century.* New York: Oxford University Press, 1981.

Genovese, Eugene D. *Roll, Jordan, Roll: The World the Slaves Made.* New York: Pantheon Books, 1974.

Gutman, Herbert G. *The Black Family in Slavery and Freedom, 1750–1925.* New York: Pantheon Books, 1976.

———. *Work, Culture, and Society in Industrializing America: Essays in American Working-Class History.* New York: Knopf, 1976.

Hahn, Steven. *The Roots of Southern Populism: Yeoman Farmers and the Transformation of the Georgia Upcountry, 1850–1890.* New York: Oxford University Press, 1983.

Hofstadter, Richard. *The Idea of a Party System: The Rise of Legitimate Opposition in the United States, 1780–1840.* Berkeley: University of California Press, 1969.

Horwitz, Morton J. *The Transformation of American Law, 1780–1860.* Cambridge, Mass.: Harvard University Press, 1977.

Howe, Daniel Walker. *The Political Culture of the American Whigs.* Chicago: University of Chicago Press, 1979.

Jensen, Joan. *Loosening the Bonds: Mid-Atlantic Farm Women, 1750–1850.* New Haven, Conn.: Yale University Press, 1986.

*Johnson, Paul E. *A Shopkeeper's Millennium: Society and Revival in Rochester, New York, 1815–1837.* New York: Hill & Wang, 1978.

Kelley, Robert L. *The Cultural Pattern in American Politics: The First Century.* New York: Knopf, 1979.

Laurie, Bruce G. *Working People of Philadelphia, 1800–1850.* Philadelphia: Temple University Press, 1980.

*Levine, Lawrence W. *Black Culture and Black Consciousness: Afro-American Folk Thought from Slavery to Freedom.* New York: Oxford University Press, 1977.

Lindstrom, Diane. *Economic Development in the Philadelphia Region, 1810–1850.* New York: Columbia University Press, 1978.

Mathews, Donald G. *Religion in the Old South.* Chicago: University of Chicago Press, 1977.

Oakes, James. *The Ruling Race: A History of American Slaveholders.* New York: Knopf, 1982.

Pessen, Edward. *Riches, Class, and Power before the Civil War.* Lexington, Mass.: Heath, 1973.

Peterson, Merrill D. *The Great Triumvirate: Webster, Clay, and Calhoun.* New York: Oxford University Press, 1987.

Raboteau, Albert J. *Slave Religion: The Invisible Institution in the Antebellum South.* New York: Oxford University Press, 1978.

Remini, Robert V. *Andrew Jackson and the Course of American Democracy, 1833–1845,* vol. 3. New York: Harper & Row, 1984.

Rogin, Michael. *Fathers and Children: Andrew Jackson and the Subjugation of the American Indian.* New York: Knopf, 1975.

Rorabaugh, W. J. *The Alcoholic Republic: An American Tradition.* New York: Oxford University Press, 1979.

Ross, Steven J. *Workers on the Edge: Work, Leisure, and Politics in Industrializing Cincinnati, 1788–1890.* New York: Columbia University Press, 1985.

Ryan, Mary P. *Cradle of the Middle Class: The Family in Oneida County, New York, 1790–1865.* New York: Cambridge University Press, 1983.

Satz, Ronald N. *American Indian Policy in the Jacksonian Era.* Lincoln: University of Nebraska Press, 1975.

Smith-Rosenberg, Carroll. *Disorderly Conduct: Visions of Gender in Victorian America.* New York: Knopf, 1985.

Stansell, Christine. *City of Women: Sex and Class in New York, 1789–1860.* New York: Knopf, 1986.

*Stewart, James B. *Holy Warriors: The Abolitionists and American Slavery.* New York: Hill & Wang, 1976.

Taylor, George Rogers. *The Transportation Revolution, 1815–1860.* White Plains, N.Y.: M. E. Sharpe, 1951.

Thornton, J. Mills, III. *Politics and Power in a Slave Society: Alabama, 1800–1860.* Baton Rouge: Louisiana State University Press, 1978.

Wallace, Anthony F. C. *Rockdale: The Growth of an American Village in the Early Industrial Revolution.* New York: Knopf, 1978.

*Walters, Ronald G. *American Reformers, 1815–1860.* New York: Hill & Wang, 1978.

Watson, Harry L. *Jacksonian Politics and Community Conflict: The Emergence of the Second American Party System in Cumberland County, North Carolina.* Baton Rouge: Louisiana State University Press, 1981.

Wiebe, Robert H. *The Opening of American Society: From the Adoption of the Constitution to the Eve of Disunion.* New York: Knopf, 1984.

Wilentz, Sean. *Chants Democratic: New York City & the Rise of the American Working Class, 1788–1850.* New York: Oxford University Press, 1984.

# LAW REVIEWS AND JOURNALS

**89 Chi.-Kent L. Rev. 937**

Chicago-Kent Law Review
2014

The Making of A Legal Historian: Reassessing the Work of William E. Nelson

Felice Batlan and R.B. Bernstein Symposium Editors

Lauren Benton [a1]   Kathryn Walker [aa1]

Copyright (c) 2014 Chicago-Kent College of Law; Lauren Benton; Kathryn Walker

# LAW FOR THE EMPIRE: THE COMMON LAW IN COLONIAL AMERICA AND THE PROBLEM OF LEGAL DIVERSITY

## Introduction

The singularity of the American Revolution has long separated the study of colonial America from the comparative analysis of European colonialism. Recent scholarship has chipped away at this division, emphasizing the revolution's anti-imperial character and exploring its wide-ranging influence in other parts of the British Empire--and other parts of the world not under British control. Yet despite this questioning of the standard narrative of discontinuity between the so-called first and second empires, and despite the emergence of a broadly comparative field of colonial history, the legal history of the thirteen colonies retains residual characteristics of its insular development as a subfield. In particular, it is difficult for historians to shake the habit of framing legal research about the colonial period in ways intended ultimately to explain the revolution or American constitutional debates. This forward-looking perspective sits at odd angles alongside works that seek a contemporary set of reference points such as the late-eighteenth-century legal history of the Iberian and French empires, the influence of parallel engagements in the Indian Ocean and South Atlantic, or continuities with continental jurisprudence. [1]

In the two published and two planned volumes of The Common Law in Colonial America, William E. Nelson does not set out to bridge the divide between the familiar preoccupation with revolutionary origins and recently explored global connections. [2] Yet his volumes contribute to an **\*938** effective merger of the two projects. In analyzing legal diversity and in seeking to identify early elements of legal convergence, Nelson's series addresses questions central to the comparative history of empire and law.

Nelson has collected and sorted an impressive archive of court records from the colonies, and he draws from these records to map the patterns produced as colonists adapted the common law in colonial contexts. Nelson frames the four-volume series as a necessary correction to a flawed yet dominant approach to the study of American colonial law. Too many legal historians, he tells us, have chased the goal of understanding the degree to which law in the colonies mimicked or diverged from English law. Nelson warns that our inadequate grasp of early modern English law makes such comparisons elusive at best, misleading at worst. His goal is different: to compare colonies to one another and to document the variety of legal systems in American colonies and the differing ways that they incorporated the common law. Only this method, he suggests, can give us the materials for understanding how different colonial legal systems assembled themselves into American law, in the process underpinning the revolution and the constitutional framework it engendered. [3]

In pointing to this last objective--understanding legal convergence-- Nelson links the history of seventeenth-century and early eighteenth-century colonial law to the more fully researched late-eighteenth-century revolutionary era's legal transformations. The American Revolution is a familiar ghostly presence, and Nelson's interest in convergence keeps the specter on stage, if in the shadows. This staging requires us to look at Nelson's texts from an odd angle to assess how his perspective contributes to comparative colonial histories. We must conduct this interpretative exercise at a level of abstraction that might make Nelson, a historian who chooses to stay close to his sources, uneasy. It is nonetheless a worthwhile undertaking because it connects Nelson's findings to puzzles of legal diversity and legal convergence in other empires, as well as in later phases of the British Empire.

Compendium_Cornell
Page 0505

The volumes of The Common Law in America address fundamental questions about how law constituted empire: What sets of factors, from local politics to religious differences to environmental and geopolitical pressures, forged legal diversity in empires? When and in what measure did law serve as a force of divergence or of convergence? Does it make sense to label congeries of colonies operating with desultory oversight as comprising an empire, much less as an empire of law?

**\*939**  Our article surveys Nelson's answers to such questions and places them in the company of contrasting approaches to the relation between colonial legal diversity and the constitution of empires. The article begins by characterizing Nelson's findings about the diverse conditions and legal politics of the American colonies. It then considers historians' attempts, using two other approaches, to understand legal diversity in empires. One approach analyzes cross-colonial connections to bring into focus the ways that decentralized processes composed networks that influenced colonial law and its variations. The other approach investigates ideologies, jurisprudence, and administrative schemes in metropolitan centers and traces their impact on the creation of empires as variegated legal fields. We survey both approaches, providing illustrations mainly related to the English (later British) and Spanish empires. Together with Nelson's methodology of comparing colonial legal systems to one another, these two approaches compose a powerful triptych: trans-colonial processes, metropolitan processes, and local legal politics. Considered together, these perspectives allow us to understand Nelson's project as more than a healthy corrective for colonial legal history and a valuable survey of colonial court records. The Common Law in America offers a distinctive story about how law composed empires: slowly, one case and one colonial legal system at a time.

## I. Legal Diversity in Colonial America

Nelson describes a startling array of emerging systems of law in colonial America. In Massachusetts, worries about the arbitrary authority of magistrates drove the colonists' urge to codify law. In Virginia, the politics of property created incentives for clear legal rules. In both places, the common law arrived late, as part of a broader search for order. In New York, within a generation of the assumption of control by the English, the common law had superseded Dutch law in the lower Hudson Valley and had largely supplanted the Puritan law of towns leading to New England. Lord Baltimore in Maryland embraced the common law for the protections that it offered Catholics and their property in the new colony. The pressures of the Indian trade, slavery, and Atlantic commerce dominated law in South Carolina. In North Carolina, the governor's autocratic hand pushed the common law into the background and turned legal forums into arenas of political conflict. Pennsylvania's Quaker elites designed a "government by judiciary" that sheltered robust common-law development. [4] In Delaware  **\*940**  and New Jersey, judges found ways to apply elements of the law of England and the common law, while allowing room for the law to work to protect local norms.

Nelson constructs such generalizations by perceiving patterns in court records. Virginia cases involving harsh penalties for disrupting land and labor arrangements sat within the context of a sparse record of cases punishing adultery. [5]  Massachusetts courts seemed unable to withhold their attention from cases involving "sin" or the crime of espousing Quaker beliefs. [6]  In all the colonies, Nelson shows, the criminal law carried special burdens of representing and pursuing the policies and preferences of elites. [7]  Enforcing the peace had some unpredictable results, as when, to give one example, John and Walter Winter were found guilty and were hanged for killing Indians in their house-turned-fort on the edges of Pennsylvania settlement. [8]

Whereas Nelson relies above all on analysis of colonial court records, he does not isolate the law as a force within colonial society. Instead, legal diversity figures in his narrative as a phenomenon derived from and interacting with other differences. As he argues most explicitly in the volume on the middle colonies and the Carolinas, the common law was central in their early legal systems without, however, erasing the tendency to legal divergence. The "top-down policies of imposing the common law" bumped up against "bottom-up pressures" to preserve local norms and practices. [9]  In Massachusetts, Puritans drew from scripture in making law, but this tactic did not drive the evolution of the colonial legal system, which instead took shape as a result of legal strategies forged by local politics. In most cases, Nelson is referring to a kind of politics that intersected with law, and the term "legal politics" would apply well. [10]  Ruptures also come into view and crowd the volumes' narratives: the 1720 collapse of North Carolina's judicial system, for example, or Lewis Morris's challenge to the legitimacy of the judiciary in East Jersey that spawned a "state of chaos." [11]

In this telling, legal diversity becomes an aspect of a broader phenomenon of colonial diversity. Without describing the full set of distinctive  **\*941**  conditions that prevailed in each colony, Nelson highlights anomalies and portrays colonial legal systems as both reflecting and contributing to legal diversity. Yet Nelson also recognizes that his analysis must account somehow for

Compendium_Cornell
Page 0506

the tendency to adopt the common law and make it central to the colonial legal order everywhere. Even as he highlights legal diversity, Nelson fits the different stories into a broader narrative of convergence. He tells us in his Introduction to Volume I that the project aims to understand why and how such radically different legal systems merge into "American law." [12] Most of this story of convergence, Nelson explains, will come in the second half of the series, in volumes that detail colonial responses to increasingly intrusive imperial policies. [13] In some respects, the result of this approach is to reproduce the known trajectory of attempted imperial consolidation followed by a complexly staged revolt. That is, we could read Nelson as arguing that legal diversity matters but only up to a point; local conditions created colonial differences, but imperial policies drove convergence. Yet that is a simplistic reading, one that does not do justice to Nelson's findings or his method.

Struggling to emerge from these first two volumes is a theory of legal convergence--a way of understanding how we can think of such different colonial legal systems as already deeply connected and, also, linked by more than just a repeating relationship to the center. In discerning Nelson's approach to this problem, we find that not having in print the subsequent volumes, which promise to focus more sharply on imperial policies, may be a blessing. The first two volumes lay the groundwork for Nelson's perspective of the ways that legal convergence developed alongside legal diversity, a pairing that may extend beyond American colonies and reflect more generalized tendencies in empires. In Nelson's telling, colonists grappled mightily to discern the relevance and utility of the common law and to design its relationship to other law. In doing so, they contributed to the discourse and structure of the imperial constitution--and, ultimately, forged what became the framework for revolt against the empire.

How have other historians approached this problem of identifying elusive elements of structure and convergence in geographically diffuse overseas territories with politically varied characteristics? The "imperial turn" that has swept historiography in the last several decades has produced not only a wealth of new studies of imperial law but also warnings against the reification of both "empire" and "state." The "minimal nature of the early-modern state" combined with "habits of local self-government" constrained **\*942** the prospects for imperial governance. [14] Certain categories of conflict-- contested definitions of subjecthood, strains involving delegated authority, and tensions over jurisdiction--influenced the exercise of colonial authority and conditioned the responses of colonists and indigenous peoples to conquest, settlement, and imperial policy. [15]

## II. Circuits of Imperial Law

Although early modern empires operated as complex and flexible frameworks for imperial ambitions and communal conflicts rather than as structures of command, their approaches to law nevertheless generated patterns. [16] Some patterns reflected the tendency of imperial agents and officials to analyze and sometimes to copy one another's methods of legal administration. English designs on North America, and to some extent their visions of colonial order, were in part based on or self-consciously contrasted with the Spanish Empire. [17] In some places, surprising homologies undergirded cross-imperial relations, as when merchant communities that already operated with limited jurisdiction over their own affairs inside one polity sought to establish a similar legal status within new host polities; Portuguese traders in West Africa and the Sephardic diaspora spanning Mediterranean empires are cases in point. [18] European legal interactions were genuinely global in scope, and they relied on some common approaches to law. For example, Dutch and Portuguese strategies in the Indian Ocean and the Pacific world built on their own history of legal pluralism **\*943** while adapting to fit with other sovereigns' understandings of fundamental legal elements such as protection and possession. [19]

Recently, historians have gone further in recording regional and global patterns of law, noting that some legal processes unfolding far from imperial centers gave rise to "networks" that helped, in turn, to structure law in empires. [20] The perspective represents legal diversity as emerging partly from the local effects of cross-regional processes that constituted empires without leading to homogenization or centralization. Kerry Ward's study of circuits of coerced labor in the Dutch overseas empire offers a particularly clear illustration of network analysis of legal diversity. [21] Ward shows that Dutch East India Company officials banished unruly local subjects in the empire, moving them from one Dutch-claimed territory to another, often across very long distances. The Dutch East India Company transported elites from Batavia to Ceylon and the Cape Colony, and moved lower status exiles from the heart of the Cape Colony to its periphery. When threaded through a system of layered sovereignty extending from the metropolitan center to the colonies, such practices knitted together the points of the empire without requiring a single structure of command or a consistent way of categorizing subjects' legal status. Dutch officials' local legitimacy and power depended on their ability to erect and sustain circuits of coerced labor, and these circuits interacted differently with local environments to produce a fluid and variegated empire. [22]

The movement of coerced labor also featured prominently in the formation of other, later imperial networks over which metropolitan officials exercised imperfect control. Denver Brunsman traces the history of impressment of sailors for service in the British navy in the long eighteenth century as such a phenomenon. [23] The navy served as a system of "colonies in motion" charged with sustaining itself through the extraction of labor. [24] **944** Latitude for impressment shifted as metropolitan needs and wartime pressures dictated incentives, and sometimes constraints, to magistrates and ship captains. The practice manufactured circuits tracing imperial interests, with concentrations of impressment activity in places where manpower needs intersected with heightened security concerns. Although present across the empire, impressment generated legal variation, on land and sea as well as in different territories, as it developed in response to "the local social, political, and economic conditions of individual . . . seaports and regions." [25] At the same time, the practice was constitutive of empire by generating the naval capacity that fortified threats of British military action on a global scale and by stimulating new legal mechanisms for imperial oversight. Like British master and servant law, the law regulating press gangs had global reach and formed part of a broader pattern of "negotiated authority" over coerced and semi-coerced labor throughout the empire. [26]

Less organized, and sometimes less well researched, circuits also influenced the nature of English colonizing and the shape of the British Empire. The movement of merchants and officials, including law-trained personnel, affected the development of policies across the "first" and "second" British empires. This circulation is often difficult to document because it had scant central direction and resulted from combinations of patronage, opportunity, and family ties. But its effects were significant. Key English "adventurers" and investors in the seventeenth century, such as Sir Thomas Smyth, Henry Myddleton, and Thomas Roe, participated in both the Virginia Company and the East India Company, and such involvement had the potential to guide legal policy, as when Sir Thomas Grantham intervened to exhort demonstrations of loyalty after both Bacon's Rebellion and a revolt at Bombay. [27] Cross-regional paths became increasingly common. Law-trained Scots joined other Scottish sojourners in the Caribbean and North American colonies in the eighteenth century, and when Scottish commercial interests suffered from Atlantic upheaval, law-trained Scots looked for prospects in the Indian Ocean, playing an outsized role in drafting new plans for legal administration in the territories   **945** of the East India Company. [28] Abolitionists drew on knowledge about colonial law and prize law from men who had done stints in the colonies, and the movement in turn dispatched homegrown legal experts to propel the campaign against the slave trade in the colonies. [29] Men who had served as magistrates or judges in one part of the British Empire ended their careers in another. [30] Military movements influenced the shape of legal policy in the empire in far-flung colonies, too; governors drew on their knowledge to impose martial law in the face of perceived crises of order. [31] Diasporas of legal culture were not limited to elites. African captives developed New World legal strategies based in part on experiences and political theories of law in Africa. [32] Soldiers and sailors carried with them ideas about legal process, and colonial anxieties about their unruliness often drove conflicts over enforcement of the king's peace. [33]

The study of such circuits shows that they sometimes formed in a search to contain local variation or in pursuit of visions of imperial order. The movement of Islamic law judges (qadis) around the Ottoman Empire, for example, responded to imperial officials' recognition that judges were easily drawn into legal politics in ways that made all law local. [34] The Spanish crown's program of administrative changes, grouped under the rubric of the Bourbon reforms, centered on appointments to colonial high courts while touching on all aspects of the legal order. Centralizing effects also  **946**  could emerge from the movements of legal personnel without direction from the metropole. Proposals for strengthening the magistracy of the British Empire in the early nineteenth century took shape in similar ways in response to widely distributed colonial conflicts. [35] Elaborate systems for the sale of colonial posts contributed to a global "institutional revolution" in the long eighteenth century. [36]

Networks and circuits do present some limitations to an understanding of law in empire. Most imperial networks were ragged formations with an uncertain institutional grounding. For example, we tend to think of financial networks as very fluid, with monetization of markets flowing like water to fill every available crevice. But early modern financial circuits in European empires were highly asymmetrical, and the uneven institutional landscape for credit slowed the accumulation of capital in some sectors while creating odd pockets of opportunity in other sectors. [37] The financial revolution of late-seventeenth-century England stimulated transfers of credit and even turned investors towards the empire, but the changes left capital and its instruments heavily concentrated in England. [38]

Compendium_Cornell
Page 0508

If networks rarely mapped neatly onto legal institutions, it is also the case that not all geographically distributed phenomena constituted networks. One of the enduring puzzles of law in colonial America is the faint imprint of the influx of convicts and servants. Although tens of thousands of convicts were transported to Maryland and Virginia in the seventeenth and eighteenth centuries, they appear only rarely in the colonies' court records, where for decades they seem to have been legally indistinguishable from servants and other settlers. [39] Historians sometimes have been tempted to confuse circulating discourse with evidence of politically and legally  **\*947**  significant networks. Characterizations of Atlantic rebellions as epiphenomena of anti-authoritarian networks--mostly imagined based on revolutionary utterances (as reported by elites) and synchronic revolts--make this mistake. [40] Even where there is clearer evidence for cross-colonial movements, the correlation of these movements with colonial legal change can be murky. For example, studying impressments can give us a sense of the different legal character of the Caribbean and the North Atlantic but only along one dimension having to do with naval manpower and not even with regard to such related maritime legal processes as the functioning of prize courts or the local criminal law's handling of sailors in ports. Finally, a focus on the imperial dimensions of some circuits may obscure their full reach and significance--many formative networks spanned multiple empires, such as the webs of producers, merchants, and consumers of the eighteenth-century wine trade; official networks undergirding cross-imperial Caribbean campaigns to contain slave revolts; or the cross-polity relations that structured the African slave trade. [41] Understanding colonial legal diversity through the study of networks and their legal impact is a delicate project, one that requires the complement of studies from other vantage points.

### III. Empire From the Center

Just as questions about the contrast between law in England and the colonies has influenced the historiography of North American colonial law, an implicit comparison of the center and periphery has shaped histories of colonial projects as conceived and managed from the metropole. It is easy to imagine legal diversity resulting primarily from the gap between metropolitan designs and colonial execution. Yet administrative and jurisprudential blueprints were often as messy as colonial realities. J.H. Elliot has taught us to see Spain as a "composite monarchy," a political frame within which crown legal authority had to contend with multiple rivals, beginning with the local laws, or fueros, of its constituent parts. [42] The legal relation between England and Scotland, Ireland, and Wales developed within a field  **\*948**  of tension between visions of legal integration and the persistence of a "multiple kingdom" composed of separate legal systems. Within the hearts of empires, jurisdictional complexity also prevailed. In England, the unifying promise of the common law, "the most centralized legal system of its day," coexisted with a checkerboard of legal communities that included corporate bodies, chartered towns, the northern Marches, and expansive estates under the power of aristocrats. [43] At the core of Catholic and Islamic empires, jurisdictional tensions between religious and secular or crown law also infused legal politics. [44] This legal landscape was an inhospitable environment for centralizing ambitions and an empirical challenge to theories of indivisible sovereignty.

In this context, the extent of legal authority of government over distant territories remained an open question. For the English empire, historians have remarked on the ambiguities of Sir Edward Coke's opinion in Calvin's Case. [45] The 1608 case was contrived to prompt a ruling about whether subjects of James VI in Scotland gained the status of English subjects when he took the throne as James I of England. [46] Coke found that a Scotsman could not sue in the English common law courts over land located in England, but his opinion did not fully resolve the question whether the English common law might extend beyond England. [47] While seeking to solidify the notion of an English common law for England, Coke found it necessary to define English legal authority in Ireland, and he might also have had the young Virginia colony in mind. [48] The result was Coke's recognition that ties of subjecthood extended protections of property, in effect creating "a state of continuing jurisdictional accountability to the Crown" wherever subjects went. [49] This affirmation of the portability of subjecthood opened the possibility for colonists to claim that the protections of the common law extended to them. [50]

Calvin's Case illustrates a pattern of complexity that prevailed in other imperial centers. Hierarchies of legal authority were only marginally  **\*949**  more transparent in the more centralized Spanish Empire, where officials never carefully proscribed such fundamental aspects of legal administration as the relationship between governors and audiencias, or high courts, or the legal status of Indians. Across and within the viceroyalties of New Spain and Peru, legal administration generated new variants on the familiar jurisdictional complexity of the peninsular legal order. [51]

Compendium_Cornell
Page 0509

The administration of law in early modern empires at any given moment resembled a cluttered field, or an asymmetrical matrix, rather than a scaffold or ordered plan. Recent studies have probed several ways to examine such complex metropolitan legal cultures. Several trends have pointed to insights especially relevant to the study of legal diversity in colonial America.

One significant and relatively recent project has been to draw attention to the degree to which Europeans drew on Roman legal concepts and terms in effecting claims to new territories. Mechanisms for acquiring private property in Roman law were used in public law contexts to establish claims by signs of occupation or possession.[52] Instead of investigating English methods of colonizing as distinctive or assuming the centrality of the common law in English colonial projects, this approach recognizes the availability and influence of a broad legal repertoire, one that included the writing of charters and proprietary grants as claims-making instruments intelligible in a civil law context shared across European states and by their agents.[53]

This perspective is valuable not just for debunking "national" stereotypes of styles of claims-making but also for revealing that from their inception colonial ventures were legal projects. There was no sharp break between the flexible legal arguments invoked to stake claims and the constitution of local authority. Establishing jurisdiction, after all, figured in the symbolic vocabulary of occupation or possession, and charters and related instruments "expressed both sovereign prerogative and the designs that projectors created."[54]

**\*950** Creative applications of Roman law also indicated new possibilities for strengthening crown legal authority in colonies. References to Roman concepts was important in not only justifying claims to the greater European community but also in allowing royal power to be asserted using a more extensive range of sovereign and prerogative rights. For Spain, conquest and colonization opened the opportunity to assert greater power over the church and to contain ecclesiastical jurisdiction.[55] For the English crown, the "limited efficacy of the English common law" beyond England created the conditions for the king-in-council, "ruling through royal prerogatives and Roman laws of liberty and natural equity," to advance more effective claims to be the sole vessel of sovereignty and legal authority in the empire.[56] Spanish officials, too, drew selectively from sources as diverse as statutes, the Siete Partidas, equity, custom, and Roman law, not to mention an extended tolerance for continuities in Indian law.[57] The crown often regarded legal diversity as an asset. Spanish officials recognized that legal complexity in New Spain and Peru kept subjects connected to the center as they searched for support against rivals.[58] In Jamaica, the English crown actively resisted allowing the colony to adopt the common law wholesale because it would limit the sovereign and prerogative rights of the king.[59]

These points help to show that legal diversity was not necessarily a result of deviations from or studied ignorance about directions from the center. All empires relied on the delegation of legal authority, jurisdictional complexity, and the portability of subjecthood, and these phenomena by their nature spawned legal diversification. In writing the legal history of English colonies in America, we need not search for the moment when a colonizing project that was pan-European in origins and language turned into an English law of colonizing that centered on land and opened the door to common-law influences.[60] Legal eclecticism, together with the resulting legal diversity, was implicit in the structures and practices of overseas enterprise.

**\*951** At the same time, metropolitan authorities often viewed legal variation as a problem to be managed from the center. A further thrust of recent historiography seeks to describe the mechanisms designed to contain diversity. Ken MacMillan extends backward to the earliest English colonizing ventures a constitutional project of an emerging English state to erect a unifying framework for colonial law.[61] Such a project becomes visible when historians adopt a sufficiently flexible understanding of constitutionalism and its creation. A set of practices managed from the center worked both to establish the objective, however elusive, of colonial oversight and to draw the margins of permissible legal variation. As MacMillan's examination of registers of the Privy Council shows, crown interventions into imperial affairs in this early period of English colonization were prompted largely by concerns related to the exercise of sovereign, prerogative, and imperial rights and responsibilities.[62] The exercise of authority over English activities in the Atlantic also was predicated on a relationship of reciprocity between the king and his subjects, wherein the allegiance of English subjects to the crown ensured their continued protection of their liberties abroad.[63] Yet imperial policy in this period was neither linear nor consistent, as the king and his Privy Councilors sought to strike the delicate balance between establishing central oversight over issues important to the crown and the practical necessity of relinquishing peripheral discretion to those involved in the day-to-day business of colonization.[64] The evolving set of practices of the crown placed limits on colonial autonomy from the outset and was integral in shaping what MacMillan characterizes

Compendium_Cornell
Page 0510

as a "definable, enduring, and bifurcated" Atlantic imperial constitution that balanced the rights of English subjects and the needs of the state. [65]

Clearinghouses for metropolitan oversight also came in the form of the councils appointed to oversee the business of England's foreign plantations and operating under changing names and structures. The crown initially conceived the administration of colonial affairs by councils or committees as a temporary solution to the overflow of colonial business from the Privy Council, but the arrangement became a permanent fixture of colonial administration by the late seventeenth century. [66] Though perhaps best known for their regulation of imperial commerce and enforcement of **952 trade laws, such bodies did much more than regulate commerce. To ensure that colonial laws were not repugnant to the laws of England, they drafted patents and commissions, gathered information about the administration of government and justice in the colonies, wrote and amended governors' instructions, and reviewed colonial legislation. [67] Although no regular or systematic review of colonial legislation was made by the Privy Council or an administrative committee for the plantations before the Restoration in 1660, by the late seventeenth century the power exercised by metropolitan officials to review, and either to amend or to annul, colonial statutes formed the backbone of the crown's efforts to manage legal variation in the colonies. [68] Regulatory concerns of the crown regarding colonial statutes ranged from those involving the empire at large—such as suppressing piracy and regulating the Atlantic slave trade—to those affecting only a few colonists on one island in the Caribbean. [69]

A central insight derived from such findings is that the constitution of the early English "empire" contemplated diversity while seeking to manage it. A key element of this constitutionalism was the elaboration of a doctrine of repugnance permitting all colonial legal orders latitude up to the point of adopting laws that were held to be repugnant within English law. Although the doctrine of repugnance was consistent throughout the centuries of English colonizing as well as commanding in some times and places, we cannot separate its influence from the institutional practices that in their operation refined the meaning of repugnance (and therefore the foundational content of English law) and that cast a wide net for laws and practices to place under review. As Mary Sarah Bilder notes in reporting the strategic misrepresentations **953 of Rhode Island colonists when writing to England about the legislation of the colony, officials on both sides of the Atlantic were making judgments about repugnance and the latitude for legal variation. [70] We must look to the legal politics of both the center and the colonies to understand how and why particular constellations of law were coming into existence.

## IV. Legal Convergence in Colonial America

We are now within sight of the complex context for Nelson's contributions. Before examining his work in more detail and extrapolating its method, we need to comment on one additional possibility for investigating legal diversity—one that Nelson observes with mild skepticism. Some historians have sought to explain legal diversity in English colonies by reference to the characteristics and legal heritage of migrant streams. [71] Nelson recognizes these influences—for example, acknowledging the importance of Puritan reliance on scripture in the early development of Massachusetts law. [72] Yet he does not give exclusive weight to migrants' origins in explaining legal diversity. [73] Instead, he folds this factor into a bundle of formative conditions and even portrays it as subordinate in importance to local politics and, especially, elite strategies. And although noting that colonists were responding actively to pressures from London, Nelson does not rest his account of legal convergence entirely on increasingly meddlesome imperial policy and colonists' strategies in response. [74]

Instead, in Nelson's account, convergence begins early, even as varied legal systems take shape. [75] In addition to the argument that different local social and political conditions produced diversity, Nelson notes that in broad structural terms, "the common social and economic realities that colonists faced" drove law along parallel paths before 1660. [76] Those paths led to the construction of the rule of law, in a development that drew from, and in turn reinforced, elements of a shared English legal culture. As Nelson puts it, convergence was grounded in a "shared commitment to govern under the rule of law and to extract governing law from their English legal **954 heritage." [77] The common law entered at different moments and by different means but gradually became key to every colony's legal system.

Parts of this argument are more explicit than others. Nelson credits John Phillip Reid with the insight that colonists sought stability through the rule of law as a solution to diverse problems of order. [78] In Massachusetts, the impulse to contain disorder derived from the perception of the arbitrary power of magistrates, a sentiment that again would play a central role in legal reform

Compendium_Cornell
Page 0511

in the British Empire in the early nineteenth century. [79] In Virginia, property transactions established a craving for stability and a code of law. [80] Nelson gives credit to Pennsylvania's Quaker elite for realizing the value of legitimate legal institutions to the colony's prospects. [81] Elsewhere, factional politics stymied rule-of-law colonial projects. But even in the most chaotic settings, Nelson glimpses the potential for stability and suggests the centrality of the courts in cultivating confidence in authority, or at the very least enhancing recognition of local government's legitimate jurisdiction. [82]

If disorder in Nelson's story gives rise to visions of order, his narrative is less clear in explaining why specifically the common law featured so prominently in colonists' solutions. Here Nelson implicitly credits the colonists' common legal culture. [83] To be sure, Nelson's legal culture is more repertoire than script; even in places where it was invoked inconsistently, "English common law was present in the background." [84] Variations of such basic practices as the composition of juries and the use of writs prevailed, for example, in the smaller New England colonies even as their legal systems drew closer to that of Massachusetts. [85] The element of legal culture shared by these colonies was the pursuit "of some form of law to rein in judicial discretion." [86] Similarly, in analyzing the diverse legal puzzles of the middle colonies and the Carolinas, Nelson proposes a patterned dynamic--the tension between top-down imposition of the common law and bottom-up attempts to preserve local norms--as both productive and reflective **955** of a shared perspective on law. [87] Neither elites managing the judiciary nor colonists seeking protections in juries could be said to have a more or less authentic or inherently persuasive take on the possibilities of the common law.

In Nelson's analysis, legal culture informed legal strategy, but the endorsement of the common law derived from a bargain struck when colonists at different places in the colonial hierarchy perceived that "it provided a service for which people were prepared to pay." [88] Without explicitly emphasizing legal culture as an element of the emergence, by 1730, of a colonial legal order in which the common law was "in force everywhere," Nelson describes participation in the legal arena as conditioned by the combination of the exigencies of settlement and the search for order. [89] Without citing Reid in this context, Nelson might be building on the perspective elaborated in Reid's Law for the Elephant. In examining the many ways that emigrants on the overland trail in the nineteenth century drew on their knowledge of the law to guide their interactions, Reid describes his topic as "a behaviorism based on law," or patterned actions founded on "legal habit" and "the strength of custom." [90] Just as Reid's emigrants relied on practical knowledge of the law in guiding property transactions and resolving disputes, Nelson's colonists use the law they knew strategically--sometimes inconsistently, and often in doctrinally plural or even inconsistent ways, but always with reference to familiar legal idioms. [91] Nelson does not point to shared culture as the bedrock of American law but instead points to the power of a plastic legal culture to provide the material for a family of common-law adaptations. Like colonists' growing confidence in the rule of law, their cultural perspectives and expectations emerged as they applied their knowledge about law to legal politics: slowly, one conflict at a time.

## V. Conclusion

Our triptych shows three facets of the law of empire. In the first, networks carry legal processes across colonies while setting in motion locally distinctive adaptations. In the second, political forces from the center shape legal policies while also producing the ideological foundations and political **956** conditions for colonial legal diversity. In the third, colonial legal configurations reflect varied local conditions, with similar problems of order, property, and legitimacy urging parallel legal solutions.

In the first two volumes of The Common Law in Colonial America, Nelson has given us a clear image of the third panel of our triptych. Subsequent volumes promise to sharpen this picture by delineating colonial responses to policies from the center. The portrait of legal diversity and convergence belongs to a broader project of assessing an open-ended politics surrounding the emerging imperial constitution. While still looking forward to the late-eighteenth-century rupture and American constitutionalism, Nelson's project sketches a theory of legal convergence that roots rule-of-law consensus and other elements of American legal culture in colonial conflicts that took place well before the revolutionary period. Contemplating this picture, historians work to refine understandings of cross-colonial movements and continue to uncover clumsy but significant mechanisms of imperial legal oversight. As increasingly intricate images of colonial and imperial law emerge from these efforts, scholars will do well to refer to Nelson's volumes on the common law in America and to compare, as he does, colonies to one another rather than to an idealized or imagined metropolitan law. The three-part method devised by Nelson and other gifted legal historians will integrate fully the history of colonial American law into a global and comparative history of empire and law.

Compendium_Cornell
Page 0512

## Footnotes

a1     Lauren Benton is Silver Professor of History and Affiliated Professor of Law at New York University.

aa1    Kathryn Walker is a doctoral candidate, Department of History, New York University.

1      Recent contributions to the comparative legal history of the late eighteenth century are too numerous to list here; examples include, on French imperial law, see generally Malick W. Ghachem, The Old Regime and the Haitian Revolution (2012), on the influence of South Atlantic revolutionary currents on British imperial politics in South Asia, Christopher A. Bayly, Recovering Liberties: Indian Thought in the Age of Liberalism and Empire 42-73 (David Armitage et al. eds., 2012), and on continental influences on American federalism, see generally Alison L. LaCroix, The Ideological Origins of American Federalism (2010).

2      See 1 William E. Nelson, The Common Law in Colonial America: The Chesapeake and New England, 1607-1660 (2008) [hereinafter Nelson, Chesapeake and New England]; 2 William E. Nelson, The Common Law in Colonial America: The Middle Colonies and the Carolinas, 1660-1730 (2013) [hereinafter Nelson, Middle Colonies].

3      Nelson, Chesapeake and New England, supra note 2, at 4-6.

4      Nelson, Middle Colonies, supra note 2, at 100.

5      Id. at 41-47.

6      Id. at 53-57.

7      Id. at 129.

8      Id. at 111.

9      Nelson, Chesapeake and New England, supra note 2, at 7-8.

10     On "legal politics" as an analytic category in imperial legal history, see Lauren Benton, Introduction: Forum on Law and Empire in Global Perspective, 117 Am. Historical Rev 1093 (2012).

11     Nelson, Middle Colonies, supra note 2, at 92, 136.

12     Nelson, Chesapeake and New England, supra note 2, at 6.

13     Nelson, Chesapeake and New England, supra note 2, at 6-7.

14     Derek Hirst, Dominion: England and Its Island Neighbours, 1500-1707, at 156 (2012).

15     For instructive examples of this perspective, see Legal Pluralism and Empires, 1500-1850 (Lauren A. Benton & Richard J. Ross eds., 2013). On subjecthood and delegated legal authority, see Lauren A. Benton, A Search for Sovereignty:

Compendium_Cornell
Page 0513

Law and Geography in European Empires, 1400-1900 (2010) [[hereinafter Benton, A Search]. On jurisdictional shifts as a product of colonial conflicts, Lisa Ford, Settler Sovereignty: Jurisdiction and Indigenous People in America and Australia, 1788-1836 (2010); see also Lauren A. Benton, Law and Colonial Cultures: Legal Regimes in World History, 1400-1900 (2002) [[hereinafter Benton, Law and Colonial Cultures].

16    Lauren A. Benton & Richard J. Ross, Empires and Legal Pluralism: Jurisdiction, Sovereignty, and Political Imagination in the Early Modern World, in Legal Pluralism and Empires, 1500-1850, at 7 (Lauren Benton & Richard J. Ross eds., 2013). Jane Burbank and Frederick Cooper make law one of their categories of comparison in Jane Burbank & Frederick Cooper, Empires in World History: Power and the Politics of Difference (2011).

17    J.H. Elliot, Empires of the Atlantic World: Britain and Spain in America 1492-1830, at 16 (2007).

18    Lauren Benton, The Legal Regime of the South Atlantic World, 1400-1750: Jurisdictional Politics as Institutional Order, 11 J. World Hist. 27, 27-56 (2000); Francesca Trivellato, The Familiarity of Strangers: The Sephardic Diaspora, Livorno, and Cross-Cultural Trade in the Early Modern Period (2009).

19    On protection as an important element of Dutch relations with Japan, see Adam Clulow, The Company and the Shogun: The Dutch Encounter with Tokugawa Japan, 56-57, 174-177 (2014). On possession and Iberian empires, see Lauren A. Benton, Possessing Empire: Iberian Claims and Interpolity Law, in Native Claims: Indigenous Law against Empire, 1500-1920, at 19-40 (Saliha Bellmessous ed., 2011).

20    See, e.g., Kerry Ward, Networks of Empire: Forced Migration in the Dutch East India Company (2008). Ward's work builds on a broader trend of imperial historians to study empires as networks. See, e.g., Alison Games, The Web of Empire: English Cosmopolitans in an Age of Expansion, 1560-1660 (2008). Other historians have used a network approach to analyze cross-imperial processes. See, e.g., David Hancock, Oceans of Wine: Madeira and the Emergence of American Trade and Taste (2009).

21    Ward, Networks of Empire, supra note 20.

22    Ward, Networks of Empire, supra note 20, at 5-6, 12-13.

23    See Denver Brunsman, The Evil Necessity: British Naval Impressment in the Eighteenth-Century Atlantic World (2013).

24    Id. at 6.

25    Id. at 13.

26    Id. at 52. On the regulation of labor in the British empire as exercised through the control of subordinate jurisdictions, see Lauren Benton, This Melancholy Labyrinth: The Trial of Arthur Hodge and the Boundaries of Imperial Law, 64 Ala. L. Rev. 91 (2012). On master and servant law, see generally Masters, Servants, and Magistrates in Britain and The Empire, 1562-1955 (Douglas Hay and Paul Craven, eds., 2004).

27    Lauren A. Benton, The British Atlantic in Global Context, in The British Atlantic World, 1500-1800, at 271, 281 (David Armitage & Michael Braddick, eds., 2009); see Alison Games, The Web of Empire: English Cosmopolitans in an Age of Expansion, 1560-1660, at 6 (2009) (discussing other cases).

Compendium_Cornell
Page 0514

28    See Alan Karras, Sojourners in the Sun: Scottish Migrants in Jamaica and the Chesapeake, 1740-1800(1993); see also Martha McLaren, British India and British Scotland, 1780-1830: Career-Building, Empire-Building, and a Scottish School of Thought on Indian Governance 249-254 (2001).

29    Lauren A. Benton, This Melancholy Labyrinth, in Colonial Connections, 1815-45: Patronage, the Information Revolution and Colonial Government 27-30 (2005).

30    A prominent example is Francis Forbes, who served as Chief Justice of the Supreme Court in Newfoundland before becoming the first Chief Justice of the Supreme Court of New South Wales. Many other cases go undetected because it was commonplace for local elites to serve as magistrates, and their roles went unremarked in the records except when acute conflicts gained attention in London. See Lauren A. Benton & Lisa Ford, Magistrates in Empire: Convicts, Slaves, and the Remaking of Legal Pluralism in the British Empire, in Legal Pluralism and Empires 1500-1850, at 173-198 (Lauren A. Benton & Richard J. Ross eds., 2013). For studies of trans-regional career movements that give short shrift to the circulation of legal personnel, see Colonial Lives Across the British Empire: Imperial Careering in the Long Nineteenth Century (David Lambert & Alan Lester eds., 2010). On "accountability and tenure" of British colonial judges, see John McLaren, Dewigged, Bothered, and Bewildered: British Colonial Judges on Trial, 1800-1900, at 5. (2011).

31    On the circulation of knowledge about martial law in the nineteenth century empires, see Rande Kostal, A Jurisprudence of Power: Victorian Empire and the Rule of Law (2005). On martial law in penal colonies, see Benton, A Search, supra note 15, at 217-221.

32    Benton, Law and Colonial Cultures, supra note 15, at 59-66.

33    See, e.g., Lisa Ford, The Pig and the Peace: Transposing Order in Early Sydney, in Law and Politics and British Colonial Thought: Transpositions of Empire 169-196 (Shaunnagh Dorsett & Ian Hunter eds., 2010).

34    See Karen Barkey, In Different Times: Scheduling and Social Control in the Ottoman Empire, 1550-1650, 38 Comp. Studies Soc. Hist. 460 (1993).

35    See Benton & Ford, supra note 30.

36    See Douglas W. Allen, The Institutional Revolution: Measurement and the Economic Emergence of the Modern World (2011).

37    See generally Joseph C. Miller, The Problem of Slavery as History: A Global Approach (2012) (suggesting that such financial asymmetry was responsible for generated large-scale slaving by undercapitalized Atlantic merchants).

38    See Carl Wennerlind, Casualties of Credit: The English Financial Revolution, 1620-1720, at 197-234 (2011); Benton, supra note 27, at 282.

39    The vast majority were transported in the eighteenth century. A. Roger Ekirch, Bound for America: The Transportation of British Convicts to the Colonies, 1718-1775, at 26-27 (1987). On convicts' shifting legal status, see Alan Atkinson, The Free-Born Englishman Transported: Convict Rights as a Measure of Eighteenth-Century Empire, 144 Past & Present 88, 89-90 (1998). In the seventeenth century, banishment from England and Ireland to the Caribbean, and in the aftermath of rebellions on St. Helena and other nodes of the East India Company generated a circuit of sorts, but perhaps one without the regularity of the Dutch circuits that Ward observed, and without the coordination from the center that occurred across European empires in the late eighteenth century. See Lauren Benton and Devin Jacob, Imperial Circuits of Law: Dutch East India Company Sovereignty, 2 Transnat'l Legal Theory 119-25 (2011); Benton, A Search, supra note 15, at 162-221.

Compendium_Cornell
Page 0515

40    John Donoghue follows Peter Linebaugh and Marcus Rediker's The Many-Headed Hydra: Sailors, Slaves, Commoners, and the Hidden History of the Revolutionary Atlantic (2000) in imagining revolutionary networks behind Atlantic revolts and anti-authoritarian sentiment. See John Donoghue, Fire Under the Ashes: An Atlantic history of the English Revolution (2013). For a critique of this approach, see David Armitage, The Red Atlantic, 29 Revs. Am. Hist. 479 (2001).

41    See, e.g., David Hancock, Oceans of Wine: Madeira and the Emergence of American Trade and Taste (2009); Jeppe Mulich, Microregionalism and Intercolonial Relations: The Case of the Danish West Indies, 1730-1830, 8 J. Global Hist. 72 (2013).

42    See J.H. Elliott, A Europe of Composite Monarchies, 137 Past & Present 48 (1992).

43    Hirst, supra note 14, at 137; Philip Stern, Bundles of Hyphens: Corporations as Legal Communities in the Early Modern British Empire, in Legal Pluralism and Empires, supra note 16, at 21-48.

44    See Benton, Law and Colonial Cultures, supra note 15, at 80-126.

45    See generally Calvin v. Smith, 77 Eng. Rep. 277 (K.B. 1608).

46    Christopher Tomlins, Freedom Bound: Law, Labor, and Civic Identity in Colonizing English America, 1580-1865, at 82-9 (2010).

47    Id.

48    Id.

49    Hirst, supra note 14, at 139.

50    See Daniel J. Hulsebosch, The Ancient Constitution and the Expanding Empire: Sir Edward Coke's British Jurisprudence, 32 L. & Hist. Rev. 439 (2003).

51    On legal diversity in one region reflecting the differing relation of governors to audiencias, see Jeremy Mumford, Vertical Empire: The General Resettlement of Indians in the Colonial Andes 5 (2012).

52    See Lauren Benton & Benjamin Straumann, Acquiring Empire by Law: From Roman Doctrine to Early Modern European Practice, 28 Law & Hist. Rev. 1 (2010); Ken MacMillan, Sovereignty and Possession in the English New World: The Legal Foundations of Empire, 1576-1640 (2006).

53    See Benton & Straumann, supra note 52; MacMillan, supra note 52.

54    Tomlins, supra note 46, at 99; see also Benton, A Search, supra note 15, at 104-161; Benton & Straumann, supra note 52, at 19 (describing the exercise of jurisdiction as evidence of claims).

55    Benton, Law and Colonial Cultures, supra note 15, at 81-82.

Compendium_Cornell
Page 0516

56    See MacMillan, supra note 52, at 7.

57    Christopher P. Albi, Derecho Indiano vs. the Bourbon Reforms: The Legal Philosophy of Francisco Xavier de Gamboa, in Enlightened Reform in Southern Europe and Its Atlantic Colonies, c. 1750-1830, at 235 (Gabriel Paquette ed., 2009); see generally Brian P. Owensby, Empire of Law and Indian Justice in Colonial Mexico (2008).

58    See John Leddy Phelan, Authority and Flexibility in the Spanish Imperial Bureaucracy, 5 Admin. Sci. Q. 1, 47-65 (1960); see also Albi, supra note 57, at 229-235; Benton, Law and Colonial Culture, supra note 15, at 83.

59    Letter from Lord Vaughan to The Council for Trade and Plantations (Jan. 28, 1676) (on file with the National Archives of the United Kingdom).

60    Tomlins makes this distinction between the law of "colonizing" and the law of "planting," though elsewhere he recognizes that there was much overlap. See Tomlins, supra note 46, at 133.

61    See generally Ken MacMillan, The Atlantic Imperial Constitution: Center and Periphery in the English Atlantic World (2011).

62    Id. at 4-8.

63    Id. at 82, 114.

64    Id. at 6-8.

65    Id. at 170.

66    Id. at 7-8, 145-146.

67    The first council commissioned by the crown with responsibilities specifically related to the consideration of colonial affairs was created in 1615, when the king commissioned several Privy Councilors to consider pleas for transportation to overseas settlement. Id. at 145; see also, Charles M. Andrews, British Committees, Commissions and Councils of Trade and Plantations 1622-1675, in 26 Administrative and Political History 9-10 (Johns Hopkins Univ. Studies ed., 1908).

68    Elmer Beecher Russell, The Review of American Colonial Legislation By the King-in-Council 16 (1915); Kathryn Walker, Imperial Administrative Innovations and Adaptions: Poynings Law in Jamaica (Dec. 2013) (manuscript presented at the Atlantic History Workshop, New York University, Dec. 2013) (unpublished manuscript) (on file with author and Chicago-Kent Law Review).

69    When the Lords of Trade considered a set of laws transmitted from Jamaica in 1676, their concerns over various statutes included those posing a direct threat to the royal prerogative--such as language reserving penalties to the public use of the island rather than to the king directly--to concerns over the fees allotted for the marshall's fee for facilitating the executions of persons. A transcript of the minutes notes that "[i]n the Act for regulating the fees of the several offices, the Lords order that Sir Thomas Lynch be spoken to concerning the Marshall's fee...for executing persons which seems to be too great, but he informed their Lordships that the Marshall was at great charges in hiring an executioner and burying the person so 'the fee agreed.'" Great Britain Public Record Office, Calendar of State Papers, Colonial Series,

Compendium_Cornell
Page 0517

America and West Indies, 1675-1676, at p. 393 (W. Noel Sainsbury ed., 1893), available at http://books.google.com/books?id=7xIFAAAAYAAJ&lpg.

70   Mary Sarah Bilder, The Transatlantic Constitution: Colonial Legal Culture and the Empire 51-73 (2004).

71   David Hackett Fischer, Albion's Seed: Four British Folkways in America 6, 783; see also Tomlins, supra note 46, at 215-30.

72   Nelson, Chesapeake and New England, supra note 2, at 53.

73   Id. at 125-131.

74   Id. at 7.

75   Id. at 125.

76   Nelson, Middle Colonies, supra note 2, at 7.

77   Id. at 129.

78   See id. (referencing John P. Reid, Rule of Law: The Jurisprudence of Liberty in the 17th and 18th Centuries (2004)).

79   Id. at 9-10, 127-128.

80   Nelson, Middle Colonies, supra note 2, at 78.

81   Id. at 99-101.

82   E.g., Nelson, Chesapeake and New England, supra note 2, at 111-118.

83   Id. at 130.

84   Id. at 90.

85   Nelson, Chesapeake and New England, supra note 2, at 91-95.

86   Id. at 98.

87   Nelson, Middle Colonies, supra note 2, at 8.

88   Id. at 44.

89    Id. at 146.

90    John P. Reid, Law for the Elephant: Property and Social Behavior on the Overland Trail 11, 19 (1980). See generally John P. Reid, Policing the Elephant: Crime, Punishment, and Social Behavior on the Overland Trail (1997).

91    Reid, Law for the Elephant, supra note 90, at 183-84, 335.

89 CHIKLR 937

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Omitted - Compendium Pages 0520-0535**

**Omitted - Compendium Pages 0536-0574**

Case 3:17-cv-01017-BEN-JLB    Document 124-2    Filed 11/11/22    PageID.12410    Page 54 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

**132 Harv. L. Rev. F. 120**

**Harvard Law Review Forum**
April, 2019

Response
Joseph Blocher [a1]

Copyright © 2019 The Harvard Law Review Association, Joseph Blocher

# RIGHTS AS TRUMPS OF WHAT? [d1]

In the archetypal U.S. rights case, a litigant asks a court to block, invalidate, or remedy a government action on the basis that it violates a constitutional guarantee. The archetype emerges from three basic characteristics of the U.S. constitutional system: the power of judicial review, the state action requirement, and the enumeration of negative (rather than positive) guarantees. In such a case, constitutional rights are tied to certain kinds of government wrongs. But which wrongs? And how can, or should, rights respond to them?

In his important Foreword, *Rights As Trumps?*, Professor Jamal Greene explores "two competing frames [that] have emerged for adjudicating conflicts over rights." [1] In the first, which corresponds with that of rights as trumps, "rights are absolute but for the exceptional circumstances in which they may be limited." [2] In the second, which generally corresponds with proportionality review, "rights are limited but for the exceptional circumstances in which they are absolute." [3] Greene argues that the first frame has been broadly employed by the Supreme Court in recent decades, but that it "has special pathologies that ill prepare its practitioners to referee the paradigmatic conflicts of a modern, pluralistic political order." [4]

As Greene notes, [5] generalizations about the rights-as-trumps frame are hard to maintain because U.S. constitutional law itself is pluralistic and diverse, even within the context of a single constitutional guarantee. **\*121** The First Amendment is sometimes treated as trump-like--when the Court perceives viewpoint discrimination, for example [6]--and often is not--as when the Court evaluates a restriction in a nonpublic forum. [7] The Equal Protection Clause is sometimes treated as trump-like-- when the Court perceives a racial classification motivated by animus [8]--and often is not--as when the Court evaluates a nonsuspect classification. [9]

The underlying question in U.S. constitutional law, then, is usually not whether to embrace the rights-as-trumps frame, but when and why. And it is here that Greene makes an especially subtle and important contribution, by highlighting the ways in which reflexive resort to that frame can lead to an absolutist, corrosive characterization of constitutional conflicts.

For example, "[b]ecause the rights-as-trumps frame cannot accommodate conflicts of rights, it forces us to deny that our opponents have them." [10] Such rights-versus-rights conflicts are exemplified in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, [11] the case with which Greene opens his Foreword. [12] Precisely because the conflicting rights and interests of the individuals are prominent on both sides in that case, it does not neatly fit the government-focused archetype described above-- the State of Colorado is almost an intermediary. But in most cases, even in our pluralistic political order, the government action will usually be more central, raising a different kind of rights-versus-rights conflict: between the rights of an individual rights-holder and what Greene calls "a democratic people's first-order *right* to govern itself." [13]

The modest goal of this Response is to emphasize and extend that aspect of Greene's contribution--not how rights-as-trumps function, but what kinds of government action trigger them. I focus here on two such triggers: first, "government bigotry, intolerance, or corruption," [14] and, second, narrow but exceptional situations where even a well-meaning **\*122** government has simply gone too far. The latter, which are not central to Greene's account, are defined not by government purpose but by the

Compendium_Cornell
Page 0575

burden they place on a rights-holder--where a court perceives that burden to be a total deprivation of the right, it is more likely to bypass scrutiny entirely and to invoke the rights-as-trumps frame. [15]   Put differently: just as proponents of the rights-as-trumps frame will sometimes avoid having to deploy the trump by going to great lengths to deny that a constitutional interest has been burdened, [16]  they might also tack in the other direction and attempt to justify trumps by characterizing the burden as total.

Focusing on the triggers for trumps might seem like nothing more than a way of restating the rules: since trumps are outcome-determinative rules, to say that *X* triggers a rule is just to say that the rule prohibits *X*. [17]  But that shift matters, because the application of a doctrinal rule can too often cover an outcome-determinative "sleight of hand" that set the rule in motion. [18]  By focusing more intently on the *specific* kinds of government wrongs that tend to trigger rules--improper government purpose, total deprivations of a constitutional entitlement, or something else--we might better understand not only the jurisprudential preferences at play, but the underlying views of government. When courts employ the rights-as-trumps frame, they are singling out particular kinds of government wrongs. What kinds? And why?

The first Part of this Response argues that trumps can be triggered not only by the pathological frames that Greene identifies, but also by scenarios where particular laws--even if well-intentioned--go too far in terms of the burdens they impose on rights-holders. Part II explores how these twin frames (Greene's, and my minor addition) have been deployed in Second Amendment litigation. And Part III takes the occasion of the recent grant of certiorari in *New York State Rifle & Pistol Ass'n v. City of New York* [19]  to argue (consistent with Greene) that the Court should avoid endorsing a broad pathological frame in Second Amendment cases, and should instead resolve the case either using some form of proportionality review or the burden-focused trump approach described in this Response.

### *123 I. BURDEN-BASED TRIGGERS FOR TRUMPS

Greene explains that the rights-as-trumps frame results not only from preferences for rules over standards, but also from one's understanding of the relevant rights regime. [20]  In particular, he argues that "a constitutional court's frame for rights adjudication should fit its paradigm rights cases." [21]  And despite his general skepticism of the rights-as-trumps frame, he notes that it might be suitable where the paradigm cases are "pathological" and "courts must defend the very existence of individual rights against government bigotry, intolerance, or corruption." [22]

This account sits comfortably with many standard arguments in favor of rules in constitutional rights adjudication. In the words of the standard-bearer (so to speak) of this view, Justice Black, the absolutist approach to constitutional rights holds that the purpose of the Bill of Rights "was to put the freedoms protected there completely out of the area of any congressional control that may be attempted through the exercise of precisely those powers that are now being used to 'balance' the Bill of Rights out of existence." [23]

It is impossible to give a general account of governmental motive vis-à-vis constitutional entitlements. [24]  Even rights that are especially sensitive to "government bigotry, intolerance, or corruption"--equal protection and free speech are examples--also deal with many cases where government purpose is not the sole or even the main issue. The paradigm cases of government intolerance may be limited to certain doctrinal subcategories such as viewpoint discrimination and racial animus.

Conversely, some rights are not particularly sensitive to government motive and yet have developed their own trump-like rules. This suggests that the rights-as-trumps frame can be triggered by factors other than a diagnosis of pathology. Takings is an example. While there is a nominal motive inquiry in takings cases (that is, the taking must be for a "public use"), its relaxed enforcement by courts suggests that they are not particularly concerned with protecting property rights against bigotry, intolerance, or corruption. [25]  (Whether they *should* be is of course  **124  a matter of debate. [26] ) Regulatory takings law--the basic goal of which is to determine whether a regulation has gone "too far" [27] --is usually governed by the kind of multi-factor balancing test that typifies proportionality review. [28]

And yet takings doctrine also contains trump-type rules. A permanent physical occupation of land, for example, constitutes a taking no matter how minimal and regardless of the government's motivation. [29]  Or consider the rule in *Lucas v. South Carolina Coastal Council*, [30]  which treats as a per se taking anything that denies all economically beneficial uses of land. [31]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12412   Page 56 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

The rule in *Lucas* and others like it trigger the rights-as-trumps frame based not on government intolerance or bigotry, but on the *impact* of a law or regulation. Where that impact constitutes a total deprivation of some aspect of the right--a "ban," as it were--then courts will resort to a trump. One sees the same phenomenon in other areas of constitutional law, including the First Amendment, where the Court has by its own account "voiced particular concern with laws that foreclose an entire medium of expression," [32] and in the nascent law of the Second Amendment, where some judges have identified a per se rule of invalidity against laws that ban classes of weapons, [33] or means of carrying them. [34]

 **\*125**  The justification for applying trumps in these contexts could potentially be explained as a subset of the pathological approach (that is, total deprivations are proxies for government intolerance), but that is not typically how courts have explained it--they focus on the burden to the rights-holder, not the motive of the government. [35] As Greene notes, Professor Ronald Dworkin's own commitment to the rights-as-trumps frame arose from his preoccupation with "wholesale denials of citizenship." [36] And Greene demonstrates that by designing rights to resolve such extreme warnings, Dworkin also ended up drawing some questionable lines--denying, for example, that racial discrimination against a white student implicated any constitutional interest whatsoever. [37]

The preceding is meant simply to be descriptive--to show the existence of an alternative road to trumps. But this alternative road also raises significant complications, some of which it shares with Greene's approach and some of which are distinct. First, applying rights as trumps in the context of total deprivations presents basically the inverse of the scenario that Greene describes, albeit with the same underlying risk of distorting constitutional principles. Rather than avoiding proportionality by characterizing the constitutional burden as zero, it does so by characterizing the burden as total. Rather than minimizing valid constitutional interests, it potentially exaggerates government interference.

Again, *Lucas* is a prime example. The application of a bright-line rule in that case did not depend on a conclusion that South Carolina harbored discriminatory or corrupt intent toward property owners in general, but that it had denied all economically productive uses to Mr. Lucas in particular. [38] The conclusion was not forward-looking and general, but backward-looking and specific. Lucas's case was in no way paradigmatic, but the burden he faced was significant enough--total, according to the (dubious) lower court finding [39] --that it demanded a trump in response. To the dissenters, this was the equivalent of "launch[ing] a missile to kill a mouse." [40]

 **\*126**  Greene's Foreword is mostly about the missiles; this Response is more about the mice--the targets of the rules. And that raises a problem of burden-characterization, which is far more significant for the kinds of triggers I describe than for Greene's framework. [41] To call a law a "ban," for example, is usually not a result of any particular form of doctrinal analysis, but rather an ex ante trigger for rule-like doctrines. Where such a characterization is made--whether the object of the ban is a medium of expression, a class of arms, or a religious group--a court is much more likely to employ the rights-as-trump frame. But the identification of bans is not *itself* totally governed by rules, nor for that matter is it clearly governed by text, history, tradition, or even precedent. Nothing in the First Amendment clearly tells us what a "medium of expression" is, nor why that should matter.

That is not to say that the problem is insurmountable, nor that law can provide no guidance. Ever since Justice Holmes's opinion in *Pennsylvania Coal Company v. Mahon* [42] established that government regulation can sometimes go "too far" and constitute a taking, [43] courts and scholars have worked to resolve the "denominator" problem, which Professor Frank Michelman identified in 1967 (in the pages of this *Review*, no less). [44] The Court's most recent pronouncement came just two years ago in *Murr v. Wisconsin*, [45] which held that, in identifying the parcel against which a regulation's impact should be measured, judges must consider "the treatment of the land under state and local law," "the physical characteristics of the land," and "the prospective value of the regulated land." [46] Ultimately, the question is "whether reasonable expectations ... would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." [47] This inquiry is substantially empirical in the sense that, to adopt Greene's locution, it "requires reliable access to social facts." [48] For present purposes, though, what is particularly notable about the *Murr* test is that it is itself a multifactor "reasonable expectations" approach that operates as a *predicate* to a potential bright-line rule (that is, a finding of total takings).

Compendium_Cornell
Page 0577

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12413   Page 57 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

Although one could illustrate the challenge in virtually any area of constitutional law, such questions are especially prominent in the context of the Second Amendment. A decade after the Supreme Court's **\*127** decision in *District of Columbia v. Heller*, [49] the law and theory of the right to keep and bear arms are starting to take shape, [50] even as important questions remain unanswered. [51] The Second Amendment therefore provides an extremely useful lens into the development of constitutional doctrine and the characterization of legal burdens.

In the course of striking down the District of Columbia's handgun regulation, [52] Justice Scalia's majority opinion noted that the law prohibited "an *entire class* of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose," [53] and was, largely for that reason, unconstitutional. [54] Some judges, including most prominently then-Judge Kavanaugh, have read this to mean that the Second Amendment's scope should be determined on a categorical basis, as imposing bans on, for instance, certain categories of weapons [55] --a per se rule different in kind even from strict scrutiny. [56]

In short, there are at least two triggers for the rights-as-trumps frame: the pathological approach that Greene emphasizes, and a burden-based analysis exemplified by a finding of "total" deprivation. There may well be others. But these triggers are not themselves governed by traditional doctrinal machinery or constitutional interpretation. No amount of interpretive work can separate situations in which the government is exhibiting intolerance and bigotry (thus demanding a trump) from those in which it is merely incompetent (in which case proportionality might be favored). [57] Likewise, labeling a law a "ban" on some aspect of a right (thus subject to a trump) is not clearly governed by text, history, tradition, or even precedent. [58] Nothing in the First Amendment tells us what a "medium of expression" is, nor why that **\*128** should matter. Those determinations can trigger nondiscretionary, categorical rules, but the determinations themselves will almost inevitably involve the kinds of empirical questions that are more suited to proportionality review. [59]

## II. THE PATHOLOGICAL SECOND AMENDMENT?

Greene suggests that the choice of the rights-as-trumps frame might be defensible "where courts must defend the very existence of individual rights against government bigotry, intolerance, or corruption." [60] By contrast, when "the paradigm cases arise from the potential overreach or clumsiness of a government acting in good faith to solve actual social problems, rights adjudication must be sensitive to a democratic people's first-order right to govern itself." [61]

This division of doctrinal labor is attractive. But in many areas, the debate is less about the descriptive or even normative case for the distinction and more about how it applies to particular rights. The root disagreement often has more to do with whether particular cases or rights regimes qualify as paradigmatic or not, and specifically whether particular cases or regimes are really threatened or not. The division between rights-as-trumps and proportionality is the terrain for the conflict--the battlefield, rather than the battle.

Again, the Second Amendment is painfully exemplary. On some prominent accounts, within the right itself--and not just the doctrinal frame--"rests a darker portrait, a legal *Guernica* cluttered with slippery slopes, law school hypotheticals, and assorted horribles on parade." [62] As Judge Kozinski once remarked in a dissenting opinion: "The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed .... However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once." [63] *Masterpiece Cakeshop* merely adopted the "polemical" style; [64] *Heller* was born in it. [65]

**\*129** In the Second Amendment context, then, the dispute is not about Greene's conclusion that proportionality review is appropriate where the "paradigm" cases "arise from the potential overreach or clumsiness of a government acting in good faith to solve actual social problems." [66] Instead, the dispute is about whether the Second Amendment's paradigm cases fit that mold--whether, in other words, Greene is correct that "'tyranny' is simply not at stake in assessing ... a measure requiring a trigger lock on long arms held within the sixty-one square miles of the nation's capital." [67]

For some gun rights advocates, disagreement with the latter proposition is fundamental. They believe that, at least when it comes to guns, "the government is a bad actor and not just a clumsy one," [68] and that support for gun regulation is motivated

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12414   Page 58 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

by anti-gun bias. [69] Among the more extreme, this is something of an article of faith. When the Senate considered expansion of background checks in the wake of the Newtown massacre [70] --a proposal that was overwhelmingly popular, even among gun owners [71] --National Rifle Association leadership described it as part of "an anti-gun agenda that seeks to restrict firearm ownership in America--as much as they can, however they can, and as soon as they can." [72]

Justice Scalia gestured in this direction in the dramatic closing lines of *Heller*: "Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem. That is perhaps debatable, but what is not debatable is that it is not the role of this Court to pronounce the Second Amendment extinct." [73] The suggestion was that an ominous "some" were requesting judicial extinction of the right to keep and bear arms. Viewed through that lens, the resort to rights-as-trumps makes sense, even on Greene's account.

Greene's account also sheds new light on the significance of the fact that some gun rights advocates invoke the constitutional struggle for racial equality, explicitly comparing *Heller* to *Brown v. Board of* **\*130** *Education* [74] and lower courts who reject gun rights claims to the segregationists who engaged in "massive resistance" to *Brown*. [75] As Greene explains, the turn to rights-as-trumps in American constitutional rights law was "a way of reconciling the post-*Lochner* regime of deference to government actors with the unique place of race in the American constitutional order." [76] Claiming the mantle of *Brown* not only ennobles the struggle for gun rights, but might also be a bid to import the rights-as-trumps frame from equal protection law. At the very least, invoking *Brown* helps summon the Elysian notion that judicial review may be justified where the political process has failed. [77]

This makes it particularly notable that the judiciary is regularly accused of treating the Second Amendment as a "second-class right." [78] Justice Thomas, for example, has repeatedly claimed that the Second Amendment is being given second-class treatment. [79]

## III. *NEW YORK STATE RIFLE & PISTOL ASS'N V. CITY OF NEW YORK*

What do these arguments portend for the future of gun rights and regulation? As a doctrinal matter, the Supreme Court has given even less guidance on the Second Amendment than on any of the three areas **\*131** Greene discusses in the "Forward" section of his Foreword. [80] (Gerrymandering is the closest competitor.) But while this Response was being prepared for publication, the Court granted certiorari in *New York State Rifle & Pistol Ass'n v. City of New York*, a challenge to the constitutionality of New York City's licensing scheme limiting the transportation of locked and unloaded handguns to within city limits. [81]

The case presents a near-perfect test of the arguments that Greene makes at length, and which this Response has attempted marginally to amplify. Picking up the "second-class rights" theme discussed above, the petitioners have cast their case as one involving the kind of government bigotry, intolerance, or corruption that, in Greene's framework, demands a trump. Merits briefing has not been scheduled as of this writing, but even in their reply brief at the certiorari stage, petitioners argued that "[t]he City betrays [in this law and in the litigation] its hostility to Second Amendment rights." [82] To the degree that they can convince the Justices that, for example, contemporary gun owners face the same kinds of political or legal obstacles as black Americans did in the civil rights era, [83] *Heller*'s "romantic vision of doctrinal simplicity and coherence" [84] may present a safe haven, walled off by trumps.

But, speaking broadly, that is a hard argument to take seriously. The vast majority of Americans support the individual right to keep and bear arms recognized in *Heller*. [85] The Attorney General and a majority of Congress (joined by the Vice President) filed briefs in *Heller* supporting the right to keep and bear arms for private purposes, as did most state attorneys general. [86] The decision was rendered in the midst of a presidential election, and both major candidates (Barack Obama and John McCain) immediately expressed support for its central conclusion. [87] **\*132** These are not the hallmarks of a widespread anti-gun pathology calling for heightened scrutiny, [88] let alone a rights-as-trumps frame.

Compendium_Cornell
Page 0579

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

If instead the Justices see gun regulations as "workaday acts of governance from which individuals seek retail exemption,"[89] then the decision in *New York State Rifle & Pistol* could look quite different. Greene's account would suggest the application of proportionality review, which would be consistent with the approach overwhelmingly taken by the federal courts of appeals in gun rights cases. [90] The law might well fail such review, but applying it would permit the Court to strike down this outlier law without disturbing the broad, settled doctrinal consensus in the lower courts--a result of precisely the kind of case-by-case doctrinal development that *Heller* invited those courts to perform.

The approach described here highlights a different possible resolution, however: per se invalidation of New York's law on the basis that it goes "too far." This would be the equivalent of *Heller*'s holding that a citywide ban on handguns--the "quintessential self-defense weapon"--is per se unconstitutional in light of the amendment's "core" interest of self-defense. [91] As in *Heller*, the Court could avoid having to credit an allegation of bias on the part of city officials, who, after all, undoubtedly believe themselves to be saving lives and preventing harm. Such a narrow, bright-line rule would become part of the Second Amendment's doctrinal machinery without displacing the overwhelming use of means-end scrutiny to evaluate regulations that impose less of a burden on the right's core interests--just as *Lucas* exists alongside the default multi-factor balancing approach in regulatory takings.

Or perhaps the Court will take another route by opening the door more broadly to as-applied challenges. Although Greene does not discuss as-applied challenges in detail, greater reliance on them may provide a middle way between absolutism and proportionality--a way for courts to provide "retail exemption [s]"[92] without characterizing a rule as **133** facially unconstitutional. To employ one of the Chief Justice's metaphors, [93] as-applied challenges recognize that different batters have different strike zones.

In fact, as-applied challenges are among the most significant issues in Second Amendment litigation today, as some courts have begun to permit them against broad federal prohibitions on gun possession. The Third Circuit did so as applied to challengers with old state misdemeanors on their records. [94] The Sixth Circuit did so as applied to a challenger with a decades-old involuntary commitment for mental illness. [95] Such as-applied challenges raise difficult questions about court capacity and line-drawing, to be sure, but they also better fit the needs of "constitutional adjudication in a mature democracy whose citizens experience themselves as rights-bearers but who nonetheless must cohabit a working ecosystem."[96]

No right behaves like a trump all the time. Nearly all of them do sometimes. When and why they do so is the underlying challenge presented by Greene's Foreword: to identify the triggers for the rights-as-trumps frame, not simply in general terms, but in the contexts of particular cases and particular rights regimes.

## Footnotes

[d1]   Responding to Jamal Greene, *The Supreme Court,* 2017 Term-- *Foreword: Rights As Trumps?,* 132 HARV. L. REV. 28 (2018).

[a1]   Lanty L. Smith '67 Professor of Law, Duke Law School. Many thanks to Jacob D. Charles, Darrell Miller, and Eric Ruben for helpful comments.

[1]   Jamal Greene, *The Supreme Court,* 2017 *Term--Foreword: Rights As Trumps?,* 132 HARV. L. REV. 28, 30 (2018).

[2]   *Id.*

[3]   *Id.*

[4]   *Id.*

Compendium_Cornell
Page 0580

[5]    *Id.* at 43.

[6]    *See* Police Dep't v. Mosley, 408 U.S. 92, 95 (1972); *see also* Barnes v. Glen Theatre, Inc., 501 U.S. 560, 577 (1991) (Scalia, J., concurring in the judgment) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.").

[7]    Regulations of speech in such nonpublic forums are acceptable so long as they are "reasonable in light of the purpose served by the forum and are viewpoint neutral." Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806 (1985).

[8]    Susannah W. Pollvogt, *Unconstitutional Animus*, 81 FORDHAM L. REV. 887, 888 (2012) ("The Court has held on numerous occasions that where a law is based on such animus, it will not survive even the most deferential level of scrutiny under the Equal Protection Clause.").

[9]    City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446 (1985) (applying rational basis review to laws discriminating against the intellectually disabled).

[10]   Greene, *supra* note 1, at 34.

[11]   138 S. Ct. 1719 (2018).

[12]   Greene, *supra* note 1, at 30.

[13]   *Id.* at 128 (emphasis added).

[14]   *Id.* at 127-28.

[15]   *See, e.g.*, Buckley v. Valeo, 424 U.S. 1, 50 (1976) (per curiam) ("[N]o test of reasonableness can save [such] a state law from invalidation as a violation of the First Amendment." (second alteration in original) (quoting Mills v. Alabama, 384 U.S. 214, 220 (1966))).

[16]   *See* William Van Alstyne, *A Graphic Review of the Free Speech Clause*, 70 CALIF. L. REV. 107, 114 n.15 (1982) (collecting cases where Justice Black upheld laws "believed to be unconstitutional ... even by more conservative colleagues not sharing his 'absolute' commitment to the first amendment").

[17]   *See* Greene, *supra* note 1, at 60 (noting correspondence between trumps and rules).

[18]   *Id.* at 76.

[19]   883 F.3d 45 (2d Cir. 2018), *cert. granted*, 139 S. Ct. 939 (2019).

[20]   Greene, *supra* note 1, at 35. Because of the appropriately broad sweep of the Foreword, Greene's account is largely a general one. *See id.* at 96-119 (describing "contingent origins" of the rights-as-trumps frame in U.S. constitutional law).

Compendium_Cornell
Page 0581

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12417   Page 61 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

21      *Id.* at 127.

22      *Id.* at 127-28.

23      Konigsberg v. State Bar, 366 U.S. 36, 61 (1961) (Black, J., dissenting); *see id.* at 61-65.

24      Driven partly by developments in case law, *see, e.g.*, Trump v. Hawaii, 138 S. Ct. 2392, 2420-21 (2018) (considering the constitutionality of President Trump's proclamation limiting entry to the United States for nationals of certain countries), recent scholarship has demonstrated a renewed focus on the relevance of animus. *See* WILLIAM D. ARAIZA, ANIMUS: A SHORT INTRODUCTION TO BIAS IN THE LAW 65-75, 163-72 (2017); Leslie Kendrick & Micah Schwartzman, *The Supreme Court,* 2017 *Term--Comment: The Etiquette of Animus*, 132 HARV. L. REV. 133, 134-36 (2018).

25      *See, e.g.*, Kelo v. City of New London, 545 U.S. 469, 479-80 (2005).

26      *See id.* at 505 (O'Connor, J., dissenting) ("Any property may now be taken for the benefit of another private party, but the fallout from this decision will not be random. The beneficiaries are likely to be those citizens with disproportionate influence and power in the political process, including large corporations and development firms.").

27      Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922) (Holmes, J.).

28      Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124-25 (1978) (describing an "essentially ad hoc, factual inquir[y]" that takes into account the "character of the government action," the regulation's "economic impact ... on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," and the nature of the public purposes or interests).

29      *See, e.g.*, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 434-35 (1982). I mean "minimal" in the physical sense--in *Loretto*, it was a cable and cable box that together covered about one-eighth of one cubic foot of space atop an apartment building. *Id.* at 443 (Blackmun, J., dissenting). In conceptual terms, the Court saw the intrusion as significant: "[T]he government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." *Id.* at 435 (majority opinion) (quoting Andrus v. Allard, 444 U.S. 51, 65-66 (1979)). *Loretto* can therefore be understood as a trump driven by the Court's characterization of the burden on the rights-holder.

30      505 U.S. 1003 (1992).

31      *Id.* at 1019.

32      City of Ladue v. Gilleo, 512 U.S. 43, 55 (1994); *cf.* Citizens United v. FEC, 558 U.S. 310, 337 (2010) (characterizing restrictions on corporate campaign spending as "an outright ban [on speech from a particular class of speakers], backed by criminal sanctions," en route to holding that restriction unconstitutional).

33      *See infra* notes 52-56 and accompanying text; *see also* District of Columbia v. Heller, 554 U.S. 570, 628 (2008) (describing D.C.'s prohibition as reaching "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose").

Compendium_Cornell
Page 0582

34  Wrenn v. District of Columbia, 864 F.3d 650, 666-68 (D.C. Cir. 2017) (striking down D.C.'s good-cause concealed-carry licensing standard under a "categorical approach" upon finding that the law denied "the typical citizen" the freedom to carry a gun).

35  *See, e.g.*, *Gilleo*, 512 U.S. at 55 ("Although prohibitions foreclosing entire media may be completely free of content or viewpoint discrimination, the danger they pose to the freedom of speech is readily apparent--by eliminating a common means of speaking, such measures can suppress too much speech."); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1458 (2009) ("[T]he 'entire medium' and 'entire class' formulations should be seen as shorthand proxies for an inquiry into the functional magnitude of the restriction: whether the measures 'significantly impair the ability of individuals to communicate their views to others,' or whether they significantly impair the ability of people to protect themselves." (quoting *Gilleo*, 512 U.S. at 55 & n.13)).

36  Greene, *supra* note 1, at 32.

37  *Id.* at 67-68.

38  Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019 (1992).

39  *Id.* at 1044-45 (Blackmun, J., dissenting).

40  *Id.* at 1036.

41  I explore this problem more thoroughly in Joseph Blocher, *Bans*, 129 YALE L.J. 308 (2019).

42  260 U.S. 393 (1922).

43  *Id.* at 415.

44  Frank I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 HARV. L. REV. 1165, 1192 (1967).

45  137 S. Ct. 1933 (2017).

46  *Id.* at 1945.

47  *Id.*

48  Greene, *supra* note 1, at 63.

49  554 U.S. 570 (2007).

50  *See generally* Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433 (2018).

51    *See generally* JOSEPH BLOCHER & DARRELL A.H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER 100-17 (2018).

52    The law was and is generally referred to as a "ban," though-- illustrating the central challenge of this Response--it actually was not a complete prohibition. D.C. Code §§ 7-2502.01(b) (2001) (enumerating exceptions for law enforcement officers, dealers, and others); *Heller*, 554 U.S. at 575 n.1 (dismissing exceptions as irrelevant to the challenge, which involved none of those categories).

53    *Heller*, 554 U.S. at 628 (emphasis added).

54    *Id.* at 628-29.

55    *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("It follows from *Heller*'s protection of semi-automatic handguns that semiautomatic rifles are also constitutionally protected and that D.C.'s ban on them is unconstitutional.").

56    *Id.* at 1271 (contrasting a test based on "text, history, and tradition" with a "balancing test such as strict or intermediate scrutiny"); *see also* Tyler v. Hillsdale Cty. Sheriff's Dep't, 837 F.3d 678, 702-07 (6th Cir. 2016) (en banc) (Batchelder, J., concurring in most of the judgment); Houston v. City of New Orleans, 675 F.3d 441, 448 (5th Cir. 2012) (Elrod, J., dissenting), *withdrawn and superseded on reh'g*, 682 F.3d 361 (5th Cir. 2012).

57    Greene, *supra* note 1, at 127-28.

58    *See* Blocher, *supra* note 41.

59    Greene, *supra* note 1, at 63.

60    *Id.* at 127-28.

61    *Id.* at 128.

62    *Id.* at 31 (describing the rights-as-trumps frame).

63    Silveira v. Lockyer, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc); *see also* Bernard E. Harcourt, *On Gun Registration, the NRA, Adolf Hitler, and Nazi Gun Laws: Exploding the Gun Culture Wars (a Call to Historians)*, 73 FORDHAM L. REV. 653, 653-59 (2004) (exploring the longstanding argument made by gun rights advocates that gun control led to the Holocaust).

64    Greene, *supra* note 1, at 80.

65    *See* District of Columbia v. Heller, 554 U.S. 570, 598 (2007) (venerating the idea that "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny").

66    Greene, *supra* note 1, at 128.

Case 3:17-cv-01017-BEN-JLB    Document 124-2    Filed 11/11/22    PageID.12420    Page 64 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

67    *Id.* at 91.

68    *Id.* at 65.

69    *See, e.g.*, JOHN R. LOTT, JR., THE BIAS AGAINST GUNS: WHY ALMOST EVERYTHING YOU'VE HEARD
       ABOUT GUN CONTROL IS WRONG 225-26 (2003).

70    Michael D. Shear, *Background Checks Are Still Stumbling Block in Gun Law Overhaul*, N.Y. TIMES (Apr. 2, 2018),
       https://nyti.ms/2TzgmQ9 [https://perma.cc/C7BX-QAAV].

71    *See* Mark Glaze, *Americans, Even NRA Members, Want Gun Reforms*, CNN (Feb. 1, 2013, 7:42 AM), http://
       www.cnn.com/2013/01/31/opinion/glaze-gun-control [https://perma.cc/EZH8-HJ8U] (stating that "74% of NRA
       members" support background checks).

72    *Senate to Take Up Anti-Gun Legislation Soon!*, NRA INST. FOR LEGIS. ACTION (Apr. 5, 2013), https://
       www.nraila.org/articles/20130405/senate-to-take-up-anti-gun-legislation-soon [https://perma.cc/7B87-P5Q9].

73    District of Columbia v. Heller, 554 U.S. 570, 636 (2007).

74    *See* Alan Gura, *The Second Amendment as a Normal Right*, 127 HARV. L. REV. F. 223, 224 (2014); David B. Kopel,
       *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230, 230 (2014).

75    Editorial, *Massive Gun Resistance*, WALL ST. J. (Apr. 12, 2013, 6:38 PM) https://www.wsj.com/articles/
       SB10001424127887324600704578402760760473 [https://perma.cc/HLZ2-CXAA]. Briefs and scholarship have also
       discussed lower courts' resistance. *See, e.g.*, Petition for Writ of Certiorari at 24, Friedman v. City of Highland Park,
       136 S. Ct. 447 (2015) (No. 15-133); Petition for a Writ of Certiorari at 3, Drake v. Jerejian, 134 S. Ct. 2134 (2014)
       (No. 13-827); Alice Marie Beard, *Resistance by Inferior Courts to Supreme Court's Second Amendment Decisions*, 81
       TENN. L. REV. 673, 673 (2014).

76    Greene, *supra* note 1, at 35 (footnote omitted).

77    *See generally* JOHN HART ELY, DEMOCRACY AND DISTRUST 75-77 (1980).

78    Ruben & Blocher, *supra* note 50, at 1447-50 (providing examples from cases and briefs); *see also* George A. Mocsary,
       *A Close Reading of an Excellent Distant Reading of Heller in the Courts*, 68 DUKE L.J. ONLINE 41, 43 (2018)
       (concluding that data show "evidence of judicial defiance" (footnote omitted)); Adam M. Samaha & Roy Germano, *Is
       the Second Amendment a Second-Class Right?*, 68 DUKE L.J. ONLINE 57 (2018) (concluding that there are plausible
       alternative explanations for the data other than the "second-class" argument). For a broader argument against the second-
       class thesis, see Timothy Zick, *The Second Amendment as a Fundamental Right*, 46 Hastings Const. L.Q. 621 (2019).

79    Silvester v. Becerra, 138 S. Ct. 945, 952 (2018) (Thomas, J., dissenting from the denial of certiorari) ("The right to
       keep and bear arms is apparently this Court's constitutional orphan."); Peruta v. California, 137 S. Ct. 1995, 1999
       (2017) (Thomas, J., dissenting from the denial of certiorari); Voisine v. United States, 136 S. Ct. 2272, 2291-92
       (2016) (Thomas, J., dissenting); Friedman, 136 S. Ct. at 450 (Thomas, J., dissenting from the denial of certiorari);
       Transcript of Oral Argument at 35-39, Voisine, 136 S. Ct. 2272 (No. 14-10154); *see also* Josh Blackman, *Justice
       Thomas Speaks Truth to Power: Second Amendment Is Not a Second-Class Right*, JOSH BLACKMAN'S BLOG

Compendium_Cornell
Page 0585

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12421   Page 65 of 733

RIGHTS AS TRUMPS OF WHAT?, 132 Harv. L. Rev. F. 120

(Mar. 1, 2016), http://joshblackman.com/blog/2016/03/01/justice-thomas-speaks-truth-to-power-second-amendment-is-not-a-second-class-right/ [https://perma.cc/M4XK-CQAX].

80      Greene, *supra* note 1, at 119-31; *see also* Sanford Levinson, *Comment on Ruben and Blocher: Too Damn Many Cases, and an Absent Supreme Court*, 68 DUKE L.J. ONLINE 17, 19-20 (2018).

81      N.Y. State Rifle & Pistol Ass'n v. City of New York, 883 F.3d 45, 52-54 (2d Cir. 2018), *cert. granted*, 139 S. Ct. 939 (2019).

82      Reply Brief for Petitioners at 2, *N.Y. State Rifle & Pistol Ass'n*, No. 18-280 (Nov. 28, 2018).

83      *See* BLOCHER & MILLER, *supra* note 51, at 187-91 (noting and rejecting this argument).

84      Greene, *supra* note 1, at 56.

85      Jeffrey M. Jones, *Public Believes Americans Have Right to Own Guns*, GALLUP (Mar. 27, 2008), http://www.gallup.com/poll/105721/public-believes-americans-right-own-guns.aspx [https://perma.cc/8EGA-F7KL].

86      *See* Brief for the United States as Amicus Curiae at 7, District of Columbia v. Heller, 554 U.S. 570 (2007) (No. 07-290); Brief for Amici Curiae 55 Members of United States Senate, the President of the United States Senate, and 250 Members of the United States House of Representatives in Support of Respondent at 2, *Heller*, 554 U.S. 570 (No. 07-290); Brief of the States of Texas et al. as Amici Curiae in Support of Respondent at 2, *Heller*, 554 U.S. 570 (No. 07-290) (signed by thirty-one states).

87      *See* Dina Temple-Raston, *Supreme Court: Individuals Have Right to Bear Arms*, NPR (June 26, 2008, 10:31 AM), http://www.npr.org/templates/story/story.php?storyId=91911807 [https://perma.cc/G9QV-6ALM].

88      *See, e.g.*, Cass R. Sunstein, *The Supreme Court, 2007 Term--Comment: Second Amendment Minimalism: Heller as Griswold*, 122 HARV. L. REV. 246, 260 (2008) ("There is no special reason for an aggressive judicial role in protecting against gun control, in light of the fact that opponents of such control have considerable political power and do not seem to be at a systematic disadvantage in the democratic process."); *see also* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253, 303 (2009).

89      Greene, *supra* note 1, at 32.

90      *See* Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 194 (5th Cir. 2012) ("A two-step inquiry has emerged as the prevailing approach ...."); *see also* N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242, 254 (2d Cir. 2015) (noting that the two-part test had been largely adopted by the Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, Eleventh, and D.C. Circuits).

91      *Heller*, 554 U.S. at 629-30.

92      Greene, *supra* note 1, at 32.

93      *Chief Justice Roberts Statement--Nomination Process*, U.S. COURTS, https://www.uscourts.gov/educational-resources/educational-activities/chief-justice-roberts-statement-nomination-process [https://perma.cc/E63D-AYTG].

Compendium_Cornell
Page 0586

94    Binderup v. Att'y Gen., 836 F.3d 336, 340, 345-47 (3d Cir. 2016) (en banc).

95    Tyler v. Hillsdale Cty. Sheriff's Dep't, 837 F.3d 678, 681, 687-88 (6th Cir. 2016) (en banc).

96    Greene, *supra* note 1, at 131.

132 HVLRF 120

**End of Document**             © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**102 Va. L. Rev. 687**

**Virginia Law Review**
May, 2016

**Article**

Samuel L. Bray [a1]

Copyright (c) 2016 Virginia Law Review Association; Samuel L. Bray

# "NECESSARY AND PROPER" AND "CRUEL AND UNUSUAL": HENDIADYS IN THE CONSTITUTION

| | |
|---|---|
| INTRODUCTION | 688 |
| I. HOW HENDIADYS WORKS | 695 |
| II. "CRUEL AND UNUSUAL" | 706 |
| *A. The Modern Trend to Read the Terms as Separate Requirements* | 706 |
| *B. Textual Difficulties with Reading the Terms as Separate Requirements* | 709 |
| *C. Reading "Cruel and Unusual" as a Hendiadys* | 712 |
| III. "NECESSARY AND PROPER" | 720 |
| *A. The Modern Trend to Read the Terms as Separate Requirements* | 720 |
| *B. Revisiting the Evidence for Two Requirements* | 726 |
| *C. Reading "Necessary and Proper" as a Hendiadys* | 732 |
| *D. New Light on Three Puzzles* | 740 |
| *E. How Many Things Is It Proper for "Proper" To Do?* | 746 |
| *F. Implications for Judicial Enforcement* | 751 |
| *G. Testing the Hypothesis: Two Case Studies from Marshall's Defense of* McCulloch | 757 |
| CONCLUSION | 761 |

> *"Unfortunately, no one, including the constitutional framers, knows the point of the phrase 'necessary and proper.'"* [1]

> *"Those who object to the [Necessary and Proper Clause] as a part of the Constitution, . . . have they considered whether a better form could have been substituted?"* [2]

**\*688  INTRODUCTION**

FOR more than two centuries, no clause of the U.S. Constitution has been more central to debates over federal power than the Necessary and Proper Clause. [3]  For an interpreter today, it is inevitable to wonder if everything worth saying has already been said. Yet the Clause remains at the heart of major debates in this country, including the recent landmark case of *National Federation of Independent Business v. Sebelius*. [4]  In that case the Court eventually got around to upholding the Affordable Care Act under the taxing power, but only after holding that the individual mandate could not be justified under the Necessary and Proper Clause. The individual mandate, the Chief Justice wrote, might be "'necessary' to the Act's insurance reforms," but it was "not a 'proper' means for making those reforms effective." [5]  Necessary, but not proper. Whether the conclusion was right or not, it was exactly the kind of close reading that one would expect a court to give to the Clause, since it authorizes only congressional actions that are "necessary *and* proper." [6]  Or does it?

Compendium_Cornell
Page 0588

This Article attempts to shed new light on the original meaning of the Necessary and Proper Clause, and also on another Clause of the U.S. Constitution, the Cruel and Unusual Punishments Clause. The phrases "necessary and proper" and "cruel and unusual" can be read as instances of an old but now largely forgotten figure of speech. That figure is *hendiadys*, in which two terms separated by a conjunction work together as a single complex expression. [7] The two terms in a hendiadys are not synonymous, **\*689** and when put together their meanings are melded. (Hendiadys is pronounced *hen-DIE-u-dus*.)

This figure can be found in many languages and registers of speech. It is widespread, for example, in colloquial English. If a farmer says that his cow is "*nice and fat*," he is not praising two qualities of the cow -- niceness and, separately, fatness -- but rather expressing that the cow is nicely fat, quite fat. Or, to use the standard example from Latin poetry, when Virgil writes "we drink from *cups and gold*," he does not mean drinking from two things, but from one: golden cups. [8] Other uses of hendiadys are more complex than simple modification of one term by another. Sometimes there is a reciprocity where each term in the hendiadys modifies the other. Sometimes the individual terms are dissolved and replaced by something new, with each term contributing to the meaning of this new whole. [9] In all these various uses, hendiadys is not mere duplication, such as "cease and desist." [10] Rather it is two terms, not fully synonymous, that together work as a single unit of meaning. It is distinct from a term of art; hendiadys does not require an established technical meaning. [11]

This Article explains what hendiadys is, what it does, and how it can help us understand the Necessary and Proper Clause and the Cruel and Unusual Punishments Clause. [12] The argument here is not that "necessary and proper" and "cruel and unusual" must each be read as a hendiadys. Rather, the argument is that these phrases may be persuasively read that way, and that doing so solves puzzles that have long perplexed courts and commentators.

**\*690** First consider "cruel and unusual." These are often understood as two separate requirements: punishments are prohibited only if they are cruel *and* unusual. [13] Yet this phrase can easily be read as a hendiadys in which the second term in effect modifies the first: "cruel and unusual" would mean "unusually cruel." When this reading is combined with the work of Professor John Stinneford, which shows that "unusual" was used at the Founding as a term of art for "contrary to long usage," [14] it suggests that the Clause prohibits punishments that are innovatively cruel. In other words, the Clause is not a prohibition on punishments that merely happen to be both cruel and innovative. It is a prohibition on punishments that are innovative *in their cruelty*.

This reading has an elegant simplicity. It solves textual puzzles about how "cruel" and "unusual" work together. [15] It also suits the evidence, sparse as it is, that the purpose of the Clause was not to constrain existing punishments, but rather to constrain punishments that might be invented in the future. [16] Furthermore, this reading can lead to an inquiry that is more amenable to judicial resolution. Judges need not determine the quantum of cruelty that is constitutionally permissible (as in other readings); they need only make a comparative determination about whether a punishment is innovative in its cruelty. [17]

Next consider "necessary and proper." Article I enumerates the powers of Congress, and the Necessary and Proper Clause affirms that Congress has not only its enumerated powers but also the incidental powers that are necessary for executing those powers. [18] In other words, for its **\*691** own enumerated ends, and for carrying out the powers of the other branches, Congress may use the necessary means. But how close must the specified ends be to the necessary means? After all, "necessary" has a wide semantic range, and if taken strictly it might authorize only The One Thing We Must Do Or The Sky Will Fall. [19] But "necessary" is paired with a more lax word, "proper." [20] If taken as a hendiadys, the phrase suggests that congressional action need not be "strictly necessary"; it must only be "properly necessary," something like "appropriately necessary." Thus the second term serves as a rule of construction against taking "necessary" in its strictest sense. As Chief Justice Marshall said in *McCulloch v. Maryland*, the word "proper" has the effect of "qualify[ing] that strict and rigorous meaning" that might otherwise be given to "necessary." [21]

This reading of the phrase as a hendiadys suggests that there should not be sequenced inquiries into "necessary" and "proper." There is one single inquiry into how close the connection is between the congressional action and the enumerated power it is intended to carry out. The Clause leaves vague what degree of connection is required. Yet this affirmation of incidental powers is precisely the sort of thing for which a determinate form of words will always be elusive. As a hendiadic phrase, "necessary and proper" does not eliminate that indeterminacy, but it gives it a smaller middling space. There is a rigorous word ("necessary")

and a warning against construing that word with too much rigor ("proper"). Moreover, "proper" reminds us that the incidental power Congress is exercising must belong to -- one could say, it must be *proper to* -- one of the enumerated powers. [22]

The reading of "necessary and proper" offered here solves a textual puzzle. [23] And it is a better fit with the debates about the Clause at ratification **\*692** and in the early republic. In those debates the canonical interpretations did not treat "necessary" and "proper" as separate requirements. [24] Moreover, three features of those debates are puzzling if the terms are read separately. First, it was repeatedly said that the Necessary and Proper Clause does nothing more than make explicit that Congress has incidental powers that were already an "unavoidable implication" of its enumerated powers. [25] Second, the early debates over the Clause were dominated, on both sides, by *reductio ad absurdum* arguments. [26] Third, Madison made an unusual claim: The Clause might be worded imperfectly but there was no better way to put it. [27] These are puzzles if the Clause divides crisply into two requirements. As this Article shows, however, none of these three features remains a puzzle if the Necessary and Proper Clause instead invoked a general principle of incidental powers, drawing a line for congressional action that is on the leeway side of a strict word.

There is of course more than one way to read "necessary and proper" and "cruel and unusual." Each phrase could be read as two requirements. [28] Or each phrase could be read as a tautology. [29] Syntax does not answer these questions. There is no acid test for whether two terms separated **\*693** by a conjunction actually work as one term or two. [30] It is ultimately a matter of which reading makes the most sense all things considered. And whatever reading of the text of these Clauses is adopted, there are other modalities of constitutional interpretation that lie beyond the scope of this Article. [31]

Nevertheless, these are persuasive readings. And if they are accepted, there will be implications. These readings close some avenues of interpretation and open up others; they strengthen the arguments in some judicial opinions and weaken the arguments in others. The central lesson could be summarized in the words of George Wright: "Because phrases involving hendiadys are not often understood as such, their meanings are jumbled, *reduced to a stricter logic than the verbal situation can justify*, or even entirely misread." [32] These Clauses have not been "entirely misread," and the older interpretations are largely consistent with the readings here. In recent times, however, there has been a tendency for courts and commentators to read these Clauses dissectingly, to make every word stand alone instead of recognizing each phrase's essential unity. [33] It is this unity, in its varied and elusive forms, that is emphasized by the figure of speech hendiadys.

Although this Article considers only these two Clauses of the Constitution, the analysis has implications for other paired terms in legal texts. Whenever there is a pair of terms separated by a conjunction, it can be read in various ways: as two requirements, as a tautology, or as a term of **\*694** art (i.e., a term that has technical meaning known to specialists). [34] This Article demonstrates another possibility.

This Article also speaks to how interpreters should think about "text" when interpreting the Constitution. Some scholars would limit arguments from text to a fairly mechanical set of readings. [35] But the possibility of hendiadys is a reminder that there is more to reading a text than taking one word at a time. Hendiadys also illustrates the limits of the bare text. Whether "necessary and proper" and "cruel and unusual" should be understood as instances of hendiadys cannot be determined from the text of the Constitution alone. One must read the text in its setting in life, in its historical context. This point provides support for, among other arguments, Dean William Treanor's critique of those who would read the text of the Constitution apart from the disputes and decisions surrounding its ratification. [36] There is a point of difference, however. Where Treanor criticizes "close reading," this Article suggests that the problem with the existing "close readings" of these Clauses is that they have not been close enough.

This Article proceeds as follows. Part I explains the figure of speech hendiadys. Part II reads "cruel and unusual" as a hendiadys that refers to innovation in cruelty. Part III reads "necessary and proper" as a hendiadys that affirms that Congress has incidental powers to carry into execution the other powers granted by the U.S. Constitution. "Necessary" means the connection between the enumerated end and the incidental power must be close, while "proper" reaffirms that connection and clarifies that "necessary" is not to be taken in its strictest sense.

**\*695  I. HOW HENDIADYS WORKS**

Compendium_Cornell
Page 0590

Hendiadys is a figure of speech in which two terms, separated by a conjunction, are melded together to form a single complex expression. The word *hendiadys* is a Latin word formed from three Greek words (<<foreign language>>) meaning "one by means of two." The "two" in the hendiadys may be nouns, adjectives, or verbs. The "one" is the new meaning or meanings that emerge from the two. In a hendiadys, "a single conceptual idea is realized by two distinct constituents." [37] Or, as one scholar put it, "hendiadys might be thought of as the building of a hybrid representation developed from two distinct concepts, which produces a wider array of implicatures than can be recovered from each of the two original parts." [38]

Yet it is important to qualify the definition used here. Because hendiadys is only a slice of the phenomenon of coordinate construction, any definition exaggerates the difference between what falls just inside and just outside the definitional lines. [39] As defined here, hendiadys is relatively broad. Narrower definitions are restricted to nouns, or to instances in which one term is subordinate to the other. [40] Those limitations are hard to justify, however, and *hendiadys* is commonly used by linguists and literary scholars in this broader sense. [41]

 **\*696**  Many instances of this figure of speech can be found in ancient texts, especially in Akkadian, [42] Hebrew, [43] Greek, [44] and Latin. [45] The standard example is from Virgil's *Georgics*: "we drink from *cups and gold*," meaning "golden cups." [46] In German, hendiadys was employed to good effect by Johann Gottfried von Herder. [47] And scholars have identified this figure of speech in many other languages, including Rotinese, a language predominantly spoken on the Indonesian island of Roti. [48]

 **\*697**  Among English writers, hendiadys is most associated with William Shakespeare. By the count of one scholar, there are sixty-six instances in *Hamlet* alone. [49] Some have the same straightforward quality that the Virgilian example does: "*law and heraldry*" refers to heraldic law. [50] But for other examples in *Hamlet* the meaning of the hendiadic phrase is more complex. When Hamlet speaks of "*sense and secrecy*," he means not a secret sense but "good sense, which calls for secrecy." [51] And when Hamlet refers to the streets that "lend a *tyrannous and damned* light" to a murder, he might mean a light that is "damnably pitiless, or the kind of pitiless light that shines on the damned." [52] Other examples could be given, including ones from Old and Middle English, [53] and in Modern English from Thomas Cranmer, [54] Christopher Marlowe, [55] the translators of the King James Version of the Bible, [56] John Milton, [57] John Locke, [58]  **\*698** George Berkeley, [59] William Blackstone, [60] Edward Gibbon, [61] William Hazlitt, [62] Charles Dickens, [63] Elizabeth Gaskell, [64] William Makepeace Thackeray, [65] E.M. Forster, [66] Dylan Thomas, [67] and many others. [68] Although this figure of speech was not included in the editions of Dr. Johnson's *Dictionary* published in his lifetime, it can be found in the 1827 edition of the *Dictionary* augmented by another hand, [69] and it was included  **\*699** in some older English-Latin dictionaries. [70] In the late eighteenth and early nineteenth centuries, hendiadys was noted in other English dictionaries, [71] in commentaries on Shakespeare, in commentaries on the Bible, [72] and in Latin grammars. [73]

In more recent English usage, hendiadys tends to be colloquial. When Julia Child makes Boeuf Bourguignon in an episode of *The French Chef*, she says that to brown the beef it needs to be "*good and dry*." [74] We know by instinct that she used those two words to mean one thing: it needs to be really dry. If I say "I will *try and do better*," I mean one thing, not two. But neither the trying nor the doing better is redundant. I want to do better but I need to try. Other familiar examples include "*cakes and ale*" and "*law and order*" [75] (both instances of nominal hendiadys); "*hot and bothered*," "*high and mighty*," and "*tried and true*" [76]  **\*700**  (adjectival hendiadys); and "*rise and shine*" (verbal hendiadys). [77] Sometimes, but more rarely, a hendiadys in English combines two different parts of speech: "the *rough and tumble* of politics." [78]

Little attention has been paid to hendiadys in legal texts. [79] But that is not to say it does not exist. This figure of speech has been identified, for example, in ancient Greek and Roman law, [80] and in contemporary Italian legal texts. [81] There are phrases in the Internal Revenue Code of the United States that are good candidates for being read as a hendiadys, including "*ordinary and necessary* expenses." [82] Another likely hendiadys is the "*open and notorious*" requirement for adverse possession. [83] "*Arbitrary and capricious*" may be one. [84] And a commentator has noted that New Jersey and Ohio courts have read the requirement that the state fund a "*thorough and efficient*" school system as if it were a hendiadys. [85] Hendiadys is used in other official documents. For example, on the first page of British passports it is said that the Queen "*requests and*  **\*701**  requires" that the

Compendium_Cornell
Page 0591

bearer be permitted to move freely. [86]  (In addition, there are linguistic phenomena in legal texts that are not technically examples of hendiadys but which are similar, such as a statutory list of conjoined terms that is not reducible to its component parts. [87] )

Hendiadys is thus a figure of speech that can be found in many languages, eras, and registers of speech. [88]  In all these diverse contexts, a pair of words separated by a conjunction can be a single unit of meaning. There is no reason to think it would be impossible for this figure to appear in the Constitution. Before considering that question, however, three more introductory points need to be made.

First, hendiadys is distinct from other semantic relationships, such as a term of art or a mere doubling, but the line between these various relationships is not always sharp, and it can change over time. [89]  For example, often two words are paired but their meanings are synonymous. "Cease and desist" is a lawyerly duplication, at least at present, and it means no more than either "cease" or "desist" alone would mean. [90]  Such a pairing of synonymous words is a tautology, not a hendiadys. [91]  Or consider a term of art, which has an accepted, technical meaning, often  **\*702**  one that has been worn smooth by use. [92]  For example, in ordinary usage "equity" often means justice, but in legal usage it has a technical meaning, referring to the set of doctrines and remedies developed by the English Court of Chancery. [93]  For hendiadys no such established, specialized meaning is required. Yet these concepts cannot always be crisply distinguished, and a hendiadys in a legal text can become a tautology or a term of art. Thus over time a phrase can be protean, shifting shapes, and sometimes -- for a while or for good -- it can be wrestled to the ground and captured in one form. [94]

Second, although hendiadys is not a particularly common figure of speech, it has long been the case that it is more commonly *used* than it is recognized and commented on. Although the phenomenon can be found in a number of classical texts, the first clear attestation of a name for it does not come until the early third century AD. [95]  Although Shakespeare's use of this figure was perceived at least as early as the eighteenth century, [96]  its pervasiveness in the plays seems not to have been  **\*703**  recognized until the 1980s. [97]  And when this figure of speech is identified, there are sometimes skeptics. [98]  (With good reason, too, because those who know the figure can be enthusiastic and exaggerated, finding it everywhere. [99] ) But a writer does not need to know this figure of speech in order to use it. Hendiadys is one of the "mechanisms of language that we use without thinking and without naming." [100]

Third, there is no one thing that hendiadys "means." To recognize that a pair of words with a conjunction is a single complex expression does not establish how the components interact. The uses and possible meanings of hendiadys are multiple, overlapping, and not sharply defined. [101]  Context is crucial. Still, something can be said about the figure's use.

The most common and straightforward use of hendiadys is for one term to modify another. In Greek and Latin, the second term usually modifies the first (e.g., "*cups and gold*"), but that pattern does not hold  **\*704**  in English. [102]  When a hendiadys is used this way, compared to the more common alternative -- having one word modify the other explicitly (e.g., "golden cups") -- the figure has a tendency away from subordination. Hendiadys can let each word have its due, instead of letting one serve the other syntactically, even though one word does serve the other semantically. [103]  Sometimes either term in the hendiadys could modify the other, and it is unclear in which direction the modification runs, or even whether the ambiguity is intended. [104]

Sometimes the terms in the hendiadys will remain distinct, but their relationship will be more dynamic than simply B-modifies-A. [105]  The identity of the terms may be dissolved and replaced by something new, with each term contributing something to the meaning of the whole. [106]  When Polonius, a hendiadys heavy hitter if there ever was one, speaks of "[t]he *flash and outbreak* of a fiery mind," we cannot pry apart the flash and the outbreak. [107]  When he refers to "this *encompassment and drift* of question," it is what Frank Kermode calls "a doublet of which the parts  **\*705**  cannot be made distinct, to be glossed clumsily as meaning by casual, indirect enquiry or something of the sort." [108]  Yet another example of a complex hendiadys can be found in Laertes's dialogue with Ophelia. Laertes refers to the "*perfume and suppliance* of a minute," which, Kermode says, "means something like 'a pleasant, transitory amusement,' but the two nouns are interlocked; one can't remove either of them without destroying the sense." [109]

Compendium_Cornell
Page 0592

In some of these instances there is an intensification of the two terms by their being conjoined. [110]  In other instances the new unitary meaning is not more intense than the sum of its parts. [111]  Sometimes the new meaning even seems to lie intermediate to the two terms. [112]  When Polonius speaks of his "*lecture and advice*," we cannot tell where the lecture ends and the advice begins; perhaps he is saying that his words fell somewhere between a formal lecture and a friendly chat. [113]  Similarly,  **\*706** the requirement that a state fund a "*thorough and efficient*" school system [114]  may suggest an intermediate level of funding: less than would be required with "thorough" standing alone, but more than would be required with just "efficient."

Thus the terms in a hendiadys may be related in multiple ways. One term may modify the other, or the terms may be joined in a more subtle or complex relationship, sometimes one that is ambiguous or even mysterious. We may be uncomfortable with thinking of such ambiguity and mystery in legal texts, but their presence is more intelligible when one thinks of drafting compromises and of the fact that sometimes language is a limit. Sometimes one cannot put the point more precisely, or if one tried it would be over-precise, or faux precise, as in a rule that everyone knows is really a standard.

## II. "CRUEL AND UNUSUAL"

The last Clause of the Eighth Amendment is often read as prohibiting punishments only if they are both cruel and unusual. But the phrase "cruel and unusual" may be read as a hendiadys in which the second term modifies the first: "unusually cruel." There is strong evidence that "unusual" is a term of art in the Eighth Amendment, meaning "contrary to long usage." [115]  Given that evidence, the hendiadys can be glossed as "innovatively cruel." [116]  This is a clear and simple reading. It solves the difficult problem of how "cruel" and "unusual" are related, and it fits the evidence, sparse as it is, about the historical purpose of the Cruel and Unusual Punishments Clause. [117]  In sum, if the phrase is read as a hendiadys, the Clause would prohibit new cruelty in punishment.

### A. The Modern Trend to Read the Terms as Separate Requirements

The Eighth Amendment contains several prohibitions:

> **\*707**  Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. [118]

The text of the Eighth Amendment is understood by some as prohibiting punishments that meet two requirements: they are "cruel" and they are "unusual." That view has roots in some cases from the late nineteenth and early twentieth centuries, [119]  and it has more recently been advanced by Justices Scalia, Thomas, and Breyer. [120]  Scholars who have considered the relationship of these terms in detail, especially Professor David Hershenov and Professor Meghan Ryan, also reach the conclusion that "cruel" and "unusual" are separate requirements. [121]  Other scholars have addressed the question in passing, ones as diverse in their methodology of constitutional interpretation as Professors Akhil Amar, Bradford Clark, Ronald Dworkin, and John Hart Ely: They, too, have described the Clause as prohibiting only punishments that are both cruel and unusual. [122]

**\*708**  There are judges and scholars who resist that conclusion, but they usually concede that their view is in some tension with the text. [123]  It is true that the U.S. Supreme Court has not structured its recent decisions on the Clause in terms of two requirements. [124]  But those decisions have only a tenuous connection to the constitutional text; [125]  they rest primarily on other modalities of constitutional interpretation. [126]

The preceding sketch is not quite complete, for two scholars -- Professors John Stinneford and Kent Greenawalt -- have maintained that the terms are related in some way, even "interlocked." [127]  Even so, to the extent that courts and commentators derive their conclusions about the Eighth Amendment from the fine grain of the text, it is widely thought that "cruel" and "unusual" are independent requirements.

Compendium_Cornell
Page 0593

**\*709  B. Textual Difficulties with Reading the Terms as Separate Requirements**

It is possible to read "cruel" and "unusual" as separate requirements that must both be met for a punishment to be prohibited. But when the terms are read that way certain difficulties emerge. Consider briefly the two terms in the Clause.

*Cruel* is ambiguous, in the technical sense of having multiple meanings. It might be a word about extremity; cruel punishments would be ones that are "exceptionally brutal" [128] or "inhuman." [129] Or *cruel* might refer to an absence of justification. Then cruel punishments would be ones that inflict pain "without good reason." [130] Or it might refer to punishments that are disproportionate to the offense. [131] Or it might refer to punishments that reflect "the disposition of human agents to take delight in or be indifferent to the serious and unjustified suffering their actions cause to their victims." [132] Each of these conceptions is evaluative, and each has something like an implicit adverb: *cruel* is taken to mean inhumanly cruel, unjustifiably cruel, disproportionately cruel, or malevolently cruel. Yet it is not obvious that the word must be limited this way. It could be taken, as David Hershenov has argued, to mean something harsh, without any implication of wrongfulness. [133] In that case, it would **\*710** apply to most punishments, whether in the eighteenth century or the twenty-first.

*Unusual* might seem to be an odd way to constrain punishment. [134] Yet as John Stinneford's recent work shows, the word had two different senses at the Founding. One sense was about frequency. For it, the glosses include "rare," "uncommon," and "out of the ordinary." [135] But in law the word could also be a term of art meaning "contrary to long usage" or "contrary to immemorial usage." [136] Stinneford has advanced strong evidence and arguments for "unusual" being a term of art in the Eighth Amendment. [137] Given the strength of Stinneford's work, the premise here is that "unusual" is used as a term of art. [138]

Now fit "cruel" and "unusual" together. First consider "cruel" as an evaluative term, one that could be glossed, for example, as "unjustifiably severe." [139] The phrase might then refer to punishments that are (1) unjustifiably severe and (2) innovative. But once "cruel" is given an evaluative meaning, it becomes harder to understand why there is a separate requirement that the punishment be innovative. Why would the Eighth **\*711** Amendment not prohibit *all* unjustifiably severe punishments, instead of prohibiting only those unjustifiably severe punishments that also happen to be new? [140] Unsurprisingly, then, scholars who take the first term of the phrase as evaluative tend to sideline the second term. [141]

As already noted, "cruel" can also be taken as a broader and more descriptive term, something like "harsh." [142] Read as two requirements, the phrase would refer to punishments that are (1) harsh and (2) innovative. On this understanding, most punishments would be harsh. What would sort the constitutional harsh punishments from the unconstitutional harsh punishments would be innovation. But there is a problem. A new punishment may be less harsh than what came before, but still be harsh. If most punishments are "cruel" and new punishments are by definition "unusual," then the Clause would prohibit almost all new punishments -- even ones that are *less* cruel than the punishments they replace. [143] It is hard to see why the Eighth Amendment would prohibit nearly all innovation in punishment. [144]

In sum, when the phrase "cruel and unusual" is understood as having two separate requirements that must be met for a punishment to be prohibited, there are textual oddities. Either one term seems superfluous, or the Clause prohibits even ameliorative development in punishment. The **\*712** terms might appear to be separate requirements, but if they are read apart, they do not work well together.

There is a further problem with the two-requirements reading. The prohibited punishments are ones that merely happen to be both cruel and unusual. The Clause might not prohibit death by hanging, but it would prohibit the same old hanging with a newly invented microfiber rope. [145] The scope of the prohibition would turn on an accident, a mere coincidence. Is there another way to understand the relationship of these terms?

*C. Reading "Cruel and Unusual" as a Hendiadys*

A reader who has made it to this point knows what comes next: "cruel and unusual" can be read as a hendiadys. That is, "cruel and unusual" can be read not as two separate requirements, but as a single complex expression. The hendiadys is a straightforward

Compendium_Cornell
Page 0594

instance of the second term modifying the first, like Virgil's "we drink from cups and gold" (i.e., "we drink from golden cups"). Read as a hendiadys, "cruel and unusual" would mean "unusually cruel." [146] If "unusual" is taken as a term of art meaning "contrary to long usage," then the hendiadys would mean "innovatively cruel." [147]

If "cruel and unusual" means "innovatively cruel," then there are no sequenced inquiries into whether a punishment is "cruel" and then "unusual." There is a single inquiry into innovation in cruelty. It is true that one could break this single inquiry into two analytical steps. First, is this punishment innovative? Second, does this punishment's innovation increase cruelty? Yet that is very different from the two steps associated with a two-requirements view. Those who see the phrase as containing two requirements typically ask first whether a punishment is cruel and   *713  then whether it is unusual, treating the two as distinct and unrelated inquiries. [148]  But if the phrase is taken as a hendiadys, as an essential unity, then these two inquiries -- is the punishment innovative? and does the innovation increase cruelty? -- are not really distinct at all. One tells the interpreter to look for innovation; the other tells the interpreter what type of innovation to look for.

In short, if the phrase is taken as a hendiadys, the prohibited punishments would not be ones that merely happen to be both cruel and unusual. [149]  Rather, the Clause would prohibit punishments that are new *in their cruelty*. A new, more painful form of capital punishment; a new, more damaging mode of incarceration (perhaps such as solitary confinement); a new, more demeaning restriction on the freedom of movement of released offenders -- all would be "innovatively cruel."

Two implementing questions would be especially important. First, the baseline: punishments are prohibited if they are new in their cruelty *compared to what*? One could try to identify innovation relative to the baseline of 1791 for the national government (under the Eighth Amendment), and 1791 or 1868 for the state governments (under the Eighth Amendment as incorporated by the Fourteenth Amendment). [150]  Or one could try to identify innovation relative to "long usage," a kind of rolling tradition that from any moment in time stretches backwards a few decades, generations, or centuries. [151]  If "unusual" is a term of art for "contrary to long usage," then this approach is the right one. "Unusual" would not point to punishment practices in a particular year. Rather, it would point to traditional punishment practices, and a tradition can change. [152]

 *714  Second, should an interpreter look to whether there is innovative cruelty relative to punishments generally or relative to punishments for this particular crime? This question cannot be resolved here, but the reception of the case of Titus Oates would suggest the latter. His punishments were considered "cruel and unusual," not because they were contrary to long usage generally, but because they were contrary to long usage as punishments for the crime of perjury. [153]

As far as the text of the Eighth Amendment goes, it is straightforward to read "cruel and unusual" as a hendiadys meaning "innovatively cruel." A hendiadys often works like this, with one term in effect modifying the other. [154]  In this hendiadys, the two terms "cruel" and "unusual" work together so closely and well that their order in the gloss could even be reversed: "cruelly innovative." Either way, the meaning is the same.

But can anything else be said for this reading besides its textual plausibility? First, the "innovatively cruel" reading fits the evidence, slender as it is, for why the Cruel and Unusual Punishments Clause was included in the Bill of Rights. [155]  It appears to have been meant to check the possibility that new, more savage punishments would in the future be  *715  invented or borrowed from civil-law countries. [156]  It was a response to a charge made by Anti-Federalists such as Abraham Holmes and Patrick Henry. In the Massachusetts ratifying convention, Holmes warned that under the unamended Constitution, Congress would be "nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes." [157]  In the Virginia ratifying convention, Henry warned that Congress could invent or borrow "unusual punishments," [158]  and he condemned the proposed Constitution of the United States because it failed to restrain congressional invention. By contrast, he praised the Virginia Declaration of Rights for its prohibition on "cruel and unusual punishments." [159]  (That provision of the Virginia Declaration of Rights would later be described as having been "framed . . . so that no future Legislature, in a moment perhaps of great and general excitement, should be tempted to disgrace our Code by the introduction of any of those odious modes of punishment." [160] ) There was even a point of common ground with James Iredell, an opponent of including a constitutional prohibition on "cruel and unusual punishments." Iredell assumed that the goal would be to constrain cruel innovation, and he disagreed with the Anti-Federalists only about whether a constitutional prohibition would in fact achieve that goal. [161]

Compendium_Cornell
Page 0595

The fears expressed by the Anti-Federalists were not without foundation. Indeed, the first Congress prescribed the death penalty for anyone convicted of murder in a place under exclusive federal jurisdiction -- adding, for the benefit of science and for greater deterrence, that the **\*716** court could require "that the body of [the] offender . . . be delivered to a surgeon for dissection."[162]

In other words, the concern behind the Cruel and Unusual Punishments Clause was about progress. But it was not Herbert Spencer's view of social progress as much as it was William Hogarth's view of the rake's progress.[163] Times change and things can go downhill, and when they do, there needs to be something in the Constitution to resist the devolving standards of decency.[164]

A slide into severe punishments was not, however, thought to be inevitable. Although there was little discussion of the Cruel and Unusual Punishments Clause at the time of its ratification, what discussion there was shows a more subtle, two-sided view of innovation: Legislators should be constrained from innovations that increase cruelty, but they should be encouraged to adopt innovations that ameliorate it.[165] The reading given here exactly fits that two-sided view: "Cruel and unusual" **\*717** is a hendiadys that prohibits not all innovation in punishment, but only innovation that brings new cruelty.[166]

Second, this reading can lead to an inquiry that is better suited to judicial decision making. What makes this second advantage possible is that a hendiadic reading of the phrase allows a broad, non-evaluative reading of "cruel." If "cruel" is taken as an evaluative term, judges are forced to make absolute judgments about what is or is not cruel. That is a difficult question. Of course some punishments are more cruel than others, but the point of difficulty is the constitutional cut-off. If punishments are being judged on whether they are cruel in a sense like "unjustifiably cruel" or "malevolently cruel" -- then the question is an inescapably moral one, a question on which individual judgments are likely to vary widely.[167] If the question is shifted to an inquiry into the subjective intentions and knowledge of government officials, that inquiry too is one on which individual judgments will diverge.[168] Nor is the question made easier by directing it towards a moment in history, as in, "What was considered cruel in 1791?" That is still an abstract moral question,[169] yet with the added difficulty of being a question the present is asking of the past.

But the judicial task changes if the phrase is read as a hendiadys and "cruel" is understood in the sense of "harsh." If what sorts the constitutional punishments from the unconstitutional ones is not whether they are "unjustifiably cruel," but whether they are "innovatively harsh," then the judicial inquiry is a comparative one. Judges would not be determining the quantum of cruelty that is constitutionally permissible, but they would instead be asking whether a punishment shows innovation in its harshness. This task is comparative, and such a task tends to be more amenable to judicial competence.[170]

**\*718** The hendiadic reading given here builds on the work of two scholars who have offered close readings of the text of the Eighth Amendment, namely David Hershenov and John Stinneford.[171] Both present evidence that the evil towards which the Clause was directed was the invention of savage punishments in the future. Both skillfully analyze the Clause. But each struggles with some aspect of the Clause because of trying to take "cruel" and "unusual" as separate requirements.[172] The reading given in this Article has the strengths of Hershenov's and Stinneford's work without the textual weaknesses. It keeps their insights about each term, and it shows that the Clause is well-designed to constrain the creation of future punishments. Understanding the phrase as a hendiadys avoids needless complexity, as well as the danger that the Clause would prohibit nearly all change in punishment.

It should be noted that the phrase could be read as a hendiadys without "unusual" being a term of art. "Unusual" could be taken as a term about frequency.[173] The hendiadys would mean "uncommonly cruel," and it would be a prohibition on punishments that show a degree of cruelty that is rare, as measured against some baseline. A variety of different baselines would be imaginable: 1791 (Justice Scalia[174]), states right now (Justice Kennedy, sometimes[175]), liberal democracies right now **\*719** (Justice Kennedy, other times[176]), and similarly situated defendants (Justice Douglas[177]).

Which baseline is selected would do most of the work in determining the effect of the Clause. Once a baseline was chosen, the judicial task would involve a comparison -- an advantage shared with the other hendiadic reading. But the "uncommonly

Compendium_Cornell
Page 0596

cruel" reading is hard to square with the evidence of how the Clause was originally understood and the evil to which the Clause was directed. [178]

Two concluding points. First, the reading given here does not conform to the Court's recent Eighth Amendment jurisprudence. But that jurisprudence is based on other constitutional modalities. Text is not its strong suit. [179] In one respect, however, this reading does support the recent jurisprudence. In recent cases, a majority of the Justices have been unwilling to read the Clause as having two requirements; [180] that unwillingness is supported by taking the phrase as a hendiadys.

Second, there is an affinity here with those, like Justice Brennan, who would read the Eighth Amendment as embodying a principle. They might find a principle of dignity, or a principle against inhumanity. [181] Their principles are vulnerable to a critique that they take flight from the text and never return. But if "unusual" is understood as a term of art, and the Clause is read as a hendiadys, then the principle is no innovation that **\*720** heightens the cruelty of punishment. This principle would be one that is derived from a close reading, but not a mechanical reading, of the text itself. This is not to say it is a better principle as a matter of political morality, only that it is closer to "cruel and unusual" in the Eighth Amendment.

\* \* \*

On the reading here, the Cruel and Unusual Punishments Clause is more than a sequence of separate elements. What the Clause prohibits is not punishments that happen to be both cruel and new. Rather, it prohibits punishments that are new *in their cruelty*. "Cruel and unusual" is a principle of no innovation in cruelty, and with this unitary reading, the phrase is more coherent than the sum of its parts.

### III. "NECESSARY AND PROPER"

It has recently become common for courts and scholars to insist that the Necessary and Proper Clause authorizes congressional action only if it meets two separate requirements: The action is "necessary" and it is "proper." Here that reading is considered, and an alternative is offered: "Necessary and proper" is a single unit of meaning, a hendiadys. The Clause affirms that Congress has the incidental powers that accompany its enumerated powers. In the reading given here, the Clause does not draw a sharp line for how extensive those incidental powers are. "Necessary" is a rather strict word, but "proper" serves as a rule of construction to prevent it from being given a meaning that is overly strict. "Proper" is also a reminder that an incidental power must belong to an enumerated power.

#### A. The Modern Trend to Read the Terms as Separate Requirements

The Necessary and Proper Clause authorizes Congress:

> To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof. [182]

**\*721** This Clause has been the subject of a vast amount of commentary and a great number of cases. [183] In recent years, the trend has been towards reading the phrase "necessary and proper" as imposing two requirements on any congressional action that is justified under this Clause: It must be "necessary" *and* it must be "proper."

In *National Federation of Independent Business v. Sebelius*, where the Court upheld the Affordable Care Act as an exercise of the taxing power, it first held that the statute could not be justified under the Necessary and Proper Clause: "Even if the individual mandate is 'necessary' to the Act's insurance reforms, such an expansion of federal power is not a 'proper' means for making those reforms effective." [184] That conclusion built on several prior cases in which the Court had treated the two terms as separate requirements. Under "necessary," the Court analyzes whether the legislation is conducive to the exercise of an enumerated

Compendium_Cornell
Page 0597

power, [185] and under "proper" it considers whether the legislation strikes at a provision or principle in the Constitution. [186] As Professor John Manning recently wrote, "the Court now reads the term 'proper' as authorization to determine not only whether an act of Congress complies with specified constitutional limitations, but also whether it fits with **\*722** background principles of federalism and, presumably, also separation of powers." [187]

Accompanying this shift in the Court, and providing impetus for it, is a wave of scholarship that has distinguished "necessary" and "proper" on one ground or another. The leading article, by Professor Gary Lawson and Patricia Granger, argues from text and structure that "proper" is a separate requirement. [188] "Proper," they say, makes the Clause not merely an affirmation of federal power but also a restriction, nothing less than "a textual guardian of principles of separation of powers, principles of federalism, and unenumerated individual rights." [189]

Since Lawson and Granger wrote, many other scholars have argued that "proper" is a separate requirement. Professor Robert Natelson has researched certain aspects of the legal background of the Clause, and he concludes that "proper" is an independent requirement that imports fiduciary duties. [190] "To be proper" a law must "be within constitutional authority, reasonably impartial, adopted in good faith, and with due care -- that is, with some reasonable, factual basis." [191] Professor Geoffrey Miller has analyzed the use of "necessary" and "proper" in Founding-era corporate charters; he concludes, more tentatively, that "proper" might be a requirement that Congress consider the effect of its legislation on citizens, much like a requirement of "proper" action compelled corporate **\*723** managers to consider the effect of their actions on shareholders or employees. [192] Professor Stephen Gardbaum argues that "proper" is an independent requirement that national legislation be consistent with federalism; he differs from Lawson and Granger in that he sees the relevance of this federalism principle not so much in protecting areas of exclusive state authority as in moderating federal preemption in areas of concurrent authority. [193] Professor Randy Barnett suggests that "proper" might channel congressional action towards less intrusive forms, such as "regulating" commerce instead of "prohibiting" it. [194] Professor Ilya Somin argues that "proper" is a separate requirement that "excludes legislation that can only be justified by a line of reasoning that would give Congress unlimited power to impose other mandates, or render large parts of the rest of the Constitution redundant." [195] And other scholars have embraced, to varying degrees and in varying forms, the suggestion that "proper" has separate force. [196]

**\*724** Some scholars have dissented from the ascendant view that the phrase has two requirements. They argue either that "necessary and proper" is a tautology, [197] or, more modestly, that if "proper" is meant to cross-reference other constitutional principles, then the hard work is specifying those principles. [198] But most scholars writing on these cases, even those who reject the Court's recent applications of "proper," have not taken issue with the Court's treatment of the two terms as separate requirements. [199] In short, although it would be an overstatement to say **\*725** there is a consensus, many scholars would agree with Professor Richard Epstein about how to approach the Necessary and Proper Clause: "The secret of sound constitutional interpretation is to take it one word at a time, by asking first what is 'necessary' and then what is 'proper.'" [200]

The reasons for treating "necessary" and "proper" as separate requirements are fairly obvious. Both words are in the Constitution. The separation of these words with *and* seems to indicate a conjunctive reading. [201] There are alternative readings, but they are unattractive. There is little historical support for reading the phrase "necessary and proper" as a term of art, a known technical usage. [202] To read "and" as disjunctive (thus "necessary *or* proper") is even worse. [203] And to read the phrase as a tautology seems like giving up too quickly. [204] It is easy to see why the **\*726** view is now widespread that these terms impose two separate requirements, even if there is significant disagreement about what exactly may be the difference between the requirements.

### B. Revisiting the Evidence for Two Requirements

Despite the seeming plausibility of the two-requirements reading, there is one point that should give us pause. It is actually hard to find early interpretations that treat "necessary" and "proper" as separate requirements. [205] In the ratification debates, that view is unmistakably present in only a single source -- a Federalist pamphlet by "An Impartial Citizen." [206] There is also an ambiguous phrase in James Madison's speech introducing the first amendments to the Constitution. Then there are three sources from the early nineteenth century: an 1811 speech in the House of Representatives, Maryland's argument in *McCulloch*

Compendium_Cornell
Page 0598

*v. Maryland*, and perhaps Spencer Roane's "Hampden" essays criticizing *McCulloch*. This Section considers these sources, and it then raises the question of how to understand the paucity of early references to two requirements.

The first source treating "necessary" and "proper" as separate requirements was apparently a pamphlet defending the proposed Constitution. The pamphlet responded to George Mason, who had warned that the Necessary and Proper Clause would allow Congress to "grant monopolies in trade, constitute new crimes, inflict unusual punishments, and in short, do whatever they please." [207] In rebuttal, "An Impartial Citizen" **\*727** objected that "the laws which Congress can make, for carrying into execution the conceded powers, must not only be *necessary*, but *proper*." [208] And, the pamphleteer said, the statutes Mason warned of "would be manifestly *not proper*." [209] This pamphlet takes the Clause as having two requirements, and it understands "proper" as the more restrictive term. It does not offer further analysis; it does not say why Mason's hypotheticals would fall afoul of "proper."

The next source to clearly adopt a two-requirements reading appears more than two decades later. In 1811, in a debate over the Second Bank of the United States, Representative William Taylor Barry (later the Postmaster General for President Jackson) argued that "proper" was a distinctive requirement. A proper means was one "confined" to the end, not one "entirely distinct from, and independent of the power to the execution of which it was designed as a mean." [210]

The third instance came in 1819, in the arguments in *McCulloch*. One of the attorneys for the State of Maryland, Walter Jones, argued that "proper" was a separate requirement. A constitutional means, he argued, "must be, not merely convenient-fit-adapted-proper, to the accomplishment of the end in view; it must likewise be necessary for the accomplishment of that end. Many means may be *proper*, which are not *necessary*; because the end may be attained without them." [211]

The fourth instance is less certain. It came later in 1819, after *McCulloch* was decided, in the essays published by a leading justice of the Virginia Supreme Court, Spencer Roane, under the name "Hampden." [212] In Roane's extensive criticism of the decision, there is one passage where he glosses *necessary* as "indispensably requisite" and *proper* as "peculiar." **\*728** [213] In Roane's usage, "proper" seems to mean belonging uniquely to, [214] with the implication that the Necessary and Proper Clause allows the use of an incidental power only if it is connected to exactly one enumerated power. He therefore faults Congress and the Supreme Court for failing to say which of the enumerated powers the bank was uniquely connected with. Roane may be treating the two terms as separate requirements, but that is not clear. He is certainly thinking of both terms as involving some aspect of incidental-powers analysis. [215] Then Roane moves on quickly from "proper": his main concern is "necessary." [216]

In addition, there is a phrase from Madison, in his speech in the House of Representatives presenting what became the Bill of Rights, which might be taken as suggesting the terms are separate requirements. But it is not free from doubt. In describing laws that might make it useful to have a Bill of Rights, Madison notes that Congress might abuse its powers under the Necessary and Proper Clause. [217] He raises the possibility that laws will "be considered necessary and proper by Congress" when they are in fact "neither necessary or proper." He then immediately proceeds to give a hypothetical: Congress might consider general warrants to be "necessary" for raising federal revenue. [218] At this point, if Madison thought "proper" was a separate requirement, one would expect that he would say whether general warrants would be "proper." He does **\*729** not. Nor does he mention any possibility of a law being necessary but not proper, or proper but not necessary. Nor does he suggest any way that "necessary" and "proper" differ. In context, then, it is hard to say what exactly Madison meant by "neither necessary or proper." It certainly could mean that he thought the Clause had two requirements, but it could also be rhetorical or imprecise. [219] Instead of taking this phrase as the secret key to Madison's views, the better course is to see what Madison says about the Necessary and Proper Clause more plainly in his other writings, which are considered below. [220]

Apart from the phrase from Madison's speech on the Bill of Rights, the four sources just discussed appear to be the early interpretations that most clearly read the Necessary and Proper Clause as having two requirements. [221] All of these sources stand at some distance from the modern **\*730** two-requirements readings. None of these sources expressly treats "proper" as a textual hook for various other constitutional provisions and principles (e.g., state sovereignty) like Lawson and Granger, *Printz v. United States*, *Alden v. Maine*, or *NFIB*. None of them makes "proper" a font of fiduciary duties, as Natelson argues. [222] Rather, each of these sources seems to treat "proper" as an aspect of incidental-powers analysis. [223] Some see "proper" as a

requirement that a congressional act be "proper to" some particular enumerated power. [224] Note, too, that there is no consistent position in these sources about the relative strength of "necessary" and "proper." [225]

Even more striking is the fact that none of the classic texts on the Necessary and Proper Clause makes a two-requirements argument. This is a silence that speaks. Many of those who argued about the Necessary and Proper Clause in the ratification debates and the debates over the various Banks of the United States would have had strong reasons for advancing a two-requirements reading. [226] Some of the major early interpretations, especially the essays of Hamilton and Madison in *The Feder* **\*731** alist, are concerned with persuading others that the Clause has a limited scope; [227] they could have been aided by pointing to not one but two requirements in the Clause. Other major early interpretations tried to limit the scope of the Clause, especially Madison and Jefferson in the debates over the First Bank of the United States; [228] they would have availed themselves of this argument if they had thought of it. Still others, like Chief Justice Marshall in *McCulloch*, wanted a robust national power but also wanted to allay resistance from those who feared an all-powerful national government; they, too, would have had reason to note a second requirement.

But when Hamilton and Madison urged ratification, they did not appeal to "proper" as an independent requirement to assuage the concerns of the state conventions. [229] In the Bank debate, neither Jefferson nor Madison invoked "proper" as a separate hurdle. [230] In fact, not a single **\*732** speaker in the House debate over the First Bank of the United States treated "proper" as a distinct requirement. [231] In *McCulloch*, Marshall saw no need to raise, nor to resist, the reading of "proper" as a separate limitation on the establishment of a national bank.

In short, none of these classic texts emphasizes a distinction between "necessary" and "proper." None of them organizes the analysis into two separate steps. To find a clear example of a two-requirements reading, one has to venture to texts that are either peripheral or later or both -- the "Impartial Citizen" pamphlet, the speech of Representative Barry in the debate over the Second Bank, Walter Jones's argument in *McCulloch*, and Spencer Roane's criticism of *McCulloch* -- and these still treat "proper" in ways that diverge sharply from the modern two-requirements reading. The lack of any clear evidence for the two-requirements interpretation in the classic texts should give us pause. [232]

## C. Reading "Necessary and Proper" as a Hendiadys

There is a long tradition in American law of reading "necessary" with latitude in the Necessary and Proper Clause. [233] This was Alexander Hamilton's position, but one he expressed only *after* the Constitution **\*733** was ratified. [234] This is widely thought to be Chief Justice Marshall's position in *McCulloch*. [235] This was Justice Story's position in his *Commentaries*. [236] But the view expressed by Hamilton, Marshall, and Story was a response to this problematic phrase, and first the problem needs to be grasped.

*Necessary* is a stark word. It had (and still has) a broad semantic range, running from The One Thing We Must Do Or The Sky Will Fall [237] to something like "appropriate." [238] But the breadth of this semantic range should not make us forget the word's usual connotation was stronger than the postratification Federalist position. Professor Mark Graber has said, "[n]o one besides John Marshall and Alexander Hamilton . . . seriously contends that 'necessary . . . means no more than needful, requisite, incidental, useful or condusive to.'" [239]

**\*734** It is easiest to see the force of this word if one imagines the Necessary and Proper Clause without the words "and proper." If every congressional act had to be "necessary" for furthering an enumerated power, there might be something like strict scrutiny of most federal statutes. If Congress had any other way to execute the enumerated power, could the statute really be necessary? [240] One could think of the members of Congress, every time they passed a statute that did not fall directly under a heading of an enumerated power, as resembling trespassers who break into a cabin for food and have to justify themselves with a necessity defense. The preceding sentence is of course a *reductio ad absurdum*. But that is exactly the form of argument that dominates every one of the classic Federalist statements about the Necessary and Proper Clause. [241] They would not have presented this parade of horrible limitations unless they needed to. They needed to because *necessary* is a strong word.

Compendium_Cornell
Page 0600

None of these classic Federalist arguments invoked a *reductio ad absurdum* about the dangers of rigorously interpreting "proper." There was no need to. "Proper," too, had a broad semantic range, but it was less restrictive. This conclusion is supported, for example, by the relative strictness of "necessary" and "proper" as standards elsewhere in the Constitution. [242] It is further supported by the use of "necessary" and "proper" in roughly contemporaneous corporate charters. [243]

That "proper" is the more lax term is further evident from the controversies over the First and Second Banks. In the debate in the House of **\*735** Representatives, one critic concentrated on the word "necessary," [244] but none concentrated on the word "proper." [245] There is still more evidence from *McCulloch*: Chief Justice Marshall saw "necessary" as a potential threat to effective national government and devoted all of his rhetorical powers to subduing that word; he gave almost no attention to "proper." [246] It is also evident from the criticism of *McCulloch* by those who feared an expansive national government: They concentrated their criticism on how *McCulloch* read "necessary," not how it read "proper." [247] This pattern of usage and argumentation is exactly what one would expect if "necessary" was understood as the more restrictive word. Lawson and Granger argue otherwise, but their sources are generally unpersuasive in showing that "proper" was the more restrictive term. [248]

**\*736** Finally, the notion that "proper" is the less restrictive term gains support from the drafting history of the Clause. The Committee of Detail took a draft of the Constitution that had the word "necessary," and added the words "and proper." The particular member of the committee who added those words was James Wilson, a stalwart supporter of national power. [249] (It is a coincidence, perhaps, that he was also a sometime teacher of Latin. [250])

Yet if the Clause were the Proper Clause (without "necessary and" in the text) it would still be puzzling. Whether legislation is proper looks like a quintessential legislative judgment. Congress should enact laws it thinks are proper; it should not enact laws it thinks are improper. To have courts inquire into the propriety of a law (again, by hypothesis "proper" is standing alone) looks like a question about whether a judge would have voted for the bill. Or, to vary the analogy, it looks like the discretionary veto of the President.

**\*737** Now the Clause gets more puzzling when the two terms are put together. If both terms can be placed along a spectrum of strictness, [251] not as points but as zones, then why use both terms? If each term is taken as an independent requirement -- "necessary" being strict, and "proper" being lax -- what is the point of including the weaker term? These are the problems with a straightforward reading of the Necessary and Proper Clause: "necessary" may be construed as too strict, "proper" may be construed as too lax, and the force of "proper" hardly matters at all because it is pointlessly duplicative. These problems can be mitigated, however, if the phrase is read as a hendiadys.

The starting point is the context in which the phrase appears. The Constitution grants to the national government certain defined and limited powers; all other powers are retained by the people and the states (a structural inference confirmed by the Tenth Amendment). In particular, Article I enumerates the powers of the national legislature. But as soon as there is an enumeration of powers, the question is how much Congress can do to carry out those powers. The Scylla and Charybdis are obvious: If Congress may do anything at all to carry out the enumerated powers, then the very scheme of a national government with defined and limited powers is overthrown; but if Congress may only do the exact things specified in Article I, without any flexibility as to means, then the national government would be almost as weak and restricted as the government operating under the Articles of Confederation. This is a classic Goldilocks problem.

Enter the word "necessary." This is a relatively strict word, and by itself it would probably avoid the problem of unlimited means. But there are difficulties with "necessary": its semantic range is broad, one end of that range is much too strict, and it is vague.

Now add the word "proper." In the hendiadys, it modifies and moderates "necessary." It serves as a rule of construction against taking "necessary" in its strict, Jeffersonian sense. It thus narrows the range of possible meaning for "necessary." But it still leaves the standard vague.

If the phrase is read as a hendiadys, neither word stands alone. The choice of "necessary" suggests a close connection between the congressional action and the constitutionally specified end, while "proper" **\*738** counsels against an overly rigorous understanding of "necessary." The phrase starts with a strict word, then leans in a latitudinous direction. What is required is not that the congressional action be "strictly necessary," or that it be merely "proper," but that it be "properly necessary." Precisely

because both words have such wide semantic ranges, and their extremes would be so destructive to the delicate balance of the constitutional system, those extremes need to be avoided. That is achieved, on paper, by joining the words in a hendiadys.

How, if at all, can this be squared with *McCulloch*? Chief Justice Marshall did not call the phrase a hendiadys. But there are several aspects of Chief Justice Marshall's opinion that fit this reading better than the reading of the Clause as imposing two separate requirements.

One is the emphasis of Chief Justice Marshall's opinion. He concentrated almost entirely on the meaning of "necessary." He never applied "proper" as an independent requirement; [252] rather, he invoked it in only a single paragraph, and then only to use it as guidance for how to construe "necessary." [253] Indeed, he expressly said that including the word "proper" had the effect of "qualify[ing] that strict and rigorous meaning" that might otherwise be given to "necessary." [254] That was all that Marshall did with "proper." But if the Clause contained two independent requirements -- especially if "proper" were the more restrictive one -- then Marshall could hardly have decided the case by holding that the Bank was "necessary" without also considering whether it was "proper." [255]

Then there is the famous sentence in which Marshall summed up the meaning of the Necessary and Proper Clause:

> Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional. [256]

**\*739**  This, too, is easier to fit with reading the Clause as a single unit of meaning. Unlike some of his later interpreters, [257] Marshall does not associate some parts of this sentence with "necessary" and other parts with "proper." He draws one line. It is a blurry jumbled sort of line. But it is one line for the Necessary and Proper Clause. [258]

In sum, *McCulloch* does not apply "necessary" and "proper" as separate requirements. It treats "proper" as excluding a strict reading of "necessary." And it offers a famous summation of the legislation permitted by the Clause, a summation that draws a line falling between the possible extremes of "necessary" and "proper." Each of these points is exactly what one would expect if the Clause were read as a hendiadys. [259]

Now the reading just given to the Necessary and Proper Clause is not conclusive. The relationship of the terms is ambiguous: The syntax allows  **\*740**  these terms to be taken as separate requirements, as a tautology, as a term of art, or as a hendiadys. [260] And no matter what relationship is posited, the terms themselves are still vague. [261] But exactly *how* the terms are vague depends on which reading is adopted. If the terms are read as independent requirements, then there are two vague requirements. If the terms are read as a hendiadys, then there is one vague requirement, and its vagueness is bounded by a rule of construction.

### D. New Light on Three Puzzles

What has been established so far is that reading "necessary and proper" as a hendiadys is possible, and also that it fits certain aspects of the discussion in *McCulloch*. But there is something else to be said for taking the phrase as a hendiadys. Doing so helps to solve several puzzles about how the Clause was described and debated at the Founding.

First, an extraordinary number of early interpreters said that the Clause added no powers but only affirmed ones that would have been implicit in the rest of the Constitution. This view was expressed both before and after ratification, by both friends and foes of robust national power. [262] In Madison's words before ratification, "Had the Constitution  **\*741**  been silent on this head, there can be no doubt that all the particular powers, requisite as means of executing the general powers, would have resulted to the government, by unavoidable implication." [263]

Compendium_Cornell
Page 0602

What is the background principle that is affirmed by the Necessary and Proper Clause? It is a principle of implied powers, and more specifically -- since "implied powers" is now easily misunderstood -- it is the principle that the grant of a general power includes the grant of incidental powers for carrying it out. [264] That is, that when powers are granted, **\*742** "the means of carrying [those powers] into execution . . . are included in the grant." [265] Many examples were given of powers that were or were not incidental to other powers. [266] Although there was substantial agreement that there was a meaningful principle of incidental powers, it was also a principle that was hard to formulate with specificity. It was a principle found in the common law and the law of nations, [267] and also in legal instruments that established an agency relationship. [268]

**\*743** Consider how Madison, in a single speech on the Bank bill in the House of Representatives, glossed the meaning of the principle in five different ways. Included, Madison said, in the grant of an express power are (1) "means *necessary* to the *end*, and *incident* to the *nature* of the specified powers"; (2) "what would have resulted by unavoidable implication, as the appropriate, and as it were, technical means of executing those powers"; (3) "direct and incidental means"; (4) "[whatever is] evidently and necessarily involved in an express power"; and (5) "an accessary or subaltern power, to be deduced by implication, as a means of executing another power." [269] These are not descriptions of five different things, but five descriptions of the same thing: the incidental powers for carrying out an express power are included with it. This principle is what Hamilton called "*the great and essential truth* which it is manifestly the object of that provision to declare." [270]

If the Necessary and Proper Clause is an affirmation of what would otherwise be an implicit grant of authority, then which reading of the text is better? The incidental-powers principle does not have the crisp, two-part logic suggested by *Printz* and *NFIB*. [271] It does not have two requirements. Rather, it is fuzzy, indeterminate, and unitary -- just like the hendiadic reading is fuzzy, indeterminate, and unitary. Recall George Wright's warning about hendiadys in *Hamlet*: "Because phrases involving hendiadys are not often understood as such, their meanings are jumbled, *reduced to a stricter logic than the verbal situation can justify*, or even entirely misread." [272] Here, too, an interpretation that makes each word a separate, independent requirement imposes "a stricter logic" on the incidental-powers principle than it can bear.

**\*744** Second, the dominant rhetorical move in debates about the Necessary and Proper Clause, on both sides, was the *reductio ad absurdum*. Martin Luther once said that human nature is like a drunk peasant riding a horse, always falling off one side or the other. [273] That is the impression one receives about the prospects of the national government from the early debates over the Necessary and Proper Clause. We are told that a loose construction of the Clause might lead to a national government that is so powerful that every counterweight shrivels into nothing, [274] and that a rigorous construction will lead to a national government that itself shrivels into nothing. [275] Leviathan or Lilliputian, with nothing in between. Whatever their merits, both arguments assume that the Necessary and Proper Clause could easily be a slippery slope. [276] The problem both **\*745** sides confront is about degree. No one was concerned about structure, about the interaction between the elements of "necessary and proper." If the Clause should be read as having two independent requirements, then there would need to be discussion of its structure. But if not, if the Clause imposes a single vague requirement, then it is easy to see why the rhetoric would be so dominated by slippery slopes. This sense is further confirmed by Madison's double-slippery-slope description of the analogous Clause of the Articles of Confederation, which put the legislature to "the alternative of construing the term ' *expressly*' with so much rigor as to disarm the government of all real authority whatever, or with so much latitude as to destroy altogether the force of the restriction." [277] It is not a quirk in the wording of the Necessary and Proper Clause that makes it the location of so many slippery-slope arguments, but rather the difficulty of definition that is inherent in questions about incidental powers.

A third puzzle is the trope of impossible drafting. Both Madison and Story push back on critics by saying, in effect, "You suggest a better way to draft it." [278] Implicit in this rejoinder is the idea that whatever the Clause does is difficult to put into words. It is a little elusive.

Now these three puzzles can be seen together. It is clear that from the beginning the Necessary and Proper Clause has been interpreted in many different ways. It is therefore fruitless to seek any sharply defined, uniformly accepted meaning for the Clause. But some readings can still be stronger than others. The two-requirements reading and the hendiadic reading both fail to receive explicit endorsement in the canonical interpretations of the Necessary and Proper Clause. But one of these readings better fits the uncertainties, confusions, and points of conflict in the ratification and postratification literature. If the Clause had two requirements, we would expect to see debate about their interaction, about the cases that might meet one requirement but fail the other one, and about the mechanics of this machine with two moving parts. But instead we see the confusion that would

come from an affirmation of a vague background principle, a single hard-to-define line that would be in constant **\*746** danger of being pulled to one extreme or the other. Taking the phrase as a hendiadys means it is unclear in all the right places.

### E. How Many Things Is It Proper for "Proper" To Do?

In the reading given above, "necessary" suggests a close connection between the incidental power and the enumerated power (i.e., between the congressionally chosen means and the constitutionally specified end). And "proper" works as a rule of construction against an overly rigorous interpretation of "necessary." Given the complex interaction that is possible between the terms in a hendiadys, [279] it is at least open to argument that "proper" has another duty, serving as a reminder that an incidental power must belong to an enumerated one. [280]

The place to begin is with Lawson and Granger's argument. Recall that when they argue for "necessary" and "proper" as two separate requirements, they give "proper" what they call a jurisdictional meaning. [281] That is, congressional action under the Clause must be within the jurisdiction of Congress, which means it must comply with other constitutional provisions and principles, including federalism, the separation of powers, and unenumerated rights. [282] It is that ultimate conclusion which has been invoked by the Court in *Printz*, *Alden*, and *NFIB*.

As support for this, Lawson and Granger appeal to one of the meanings of "proper" in Dr. Johnson's *Dictionary*: "1. Peculiar; not belonging to more; not common." [283] This shade of meaning is rather technical, and it continues today mostly in theological and philosophical writing. The idea is that some characteristic or action is "proper to" an entity of some sort, in the sense that it belongs to, and in some cases belongs only to, **\*747** that entity (e.g., for Heidegger, "to philosophize is proper to the human species" [284] ). Lawson and Granger are certainly on good ground to say that "proper" can bear this sense. They give this sense a decidedly legal gloss by calling it "jurisdictional," but a better word might be "proprietary." We might say that the Clause authorizes carrying-into-execution powers that are "necessary and proprietary."

At this point, Lawson and Granger make two mistakes. First, they confuse sense and reference. They adduce many passages where "proper" is used and the *referent* is jurisdiction, but where the *sense* of the word is not "jurisdictional" (to use their term). [285] Second, they overlook one of the implications of using "proper" in this sense: It would not mean that Congress could act only in ways permitted by the Constitution, but rather that Congress could act only in ways unique to Congress. The fact that something could be done by the executive or the judiciary would mean that it was not "proper" to Congress. [286]

Given these mistakes, one might think that this proprietary sense of "proper" has nothing to add to the interpretation of the Necessary and Proper Clause. But that would be too quick. There is an important, but tacit, assumption in Lawson and Granger's analysis. They assume that the incidental power must be proper to *Congress*. And that is an unsurprising answer if we put the question this way: To *whom* must this power be proper? But consider a question that is slightly but tellingly different: **\*748** To *what* must this power be proper? An answer suggests itself at once: The incidental power must be proper to the enumerated power. [287]

This question -- whether the power to incorporate a bank is an incident of any of the Article I enumerated powers -- is exactly the ground on which the House of Representatives debated the constitutionality of the First Bank of the United States. [288] Moreover, this way of thinking about the Clause has explicit support in Chief Justice Marshall's defense of *McCulloch*. [289] He says that the means must "belong peculiarly" to the enumerated end. [290] Intriguingly, he attributes this idea not to the word "proper" itself but rather to the entire Clause:

> That court has said: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited," "are constitutional." The word "appropriate," if Johnson be authority, means "peculiar," "consigned to some particular use or person," -- "belonging peculiarly."

Compendium_Cornell
Page 0604

Let the constructive words used by the supreme court, in this their acknowledged sense, be applied to any of the powers of Congress. Take for example, that of raising armies. The court has said that "all means which are appropriate," that is, "all means which are peculiar" to raising armies, which are "consigned to that particular use," which "belong peculiarly" to it, all means which are "plainly adapted" to the end, are constitutional. [291]

What Marshall does here is fascinating. He embraces the proprietary sense of "proper" that Lawson and Granger point to, [292] but he reads this not as a link between the incidental power and what Congress may permissibly do, but as a link between the incidental power and the enumerated power it is executing. The incidental power must be proper to the enumerated power. Marshall does not, however, rely on the word "proper" for this concept, but rather on the whole idea of means-end fit. Indeed, **\*749** the word he is defining from Dr. Johnson's *Dictionary* is not even "proper" at all, but "appropriate." [293]

One logical and practical objection must immediately be faced. Certain actions might well be useful means of carrying out multiple enumerated powers. How could such an action be proper to -- belong *only* to -- one enumerated power? For example, if Congress were to set up a special court to hear cases involving vessels seized from pirates, that might be well calculated to execute at least three enumerated powers:

To constitute Tribunals inferior to the supreme Court;

To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations;

To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water. [294]

But one need not understand the proprietary sense of "proper" quite so restrictively. When used in a proprietary sense, the word "proper" can mean "belonging only to" or simply "belonging to." [295] What Marshall has in mind is a close connection between the incidental power and the enumerated power, not a unique connection. He shows this when he equates "belong peculiarly" with a means-end fit that is close, but not so close that it excludes all congressional choice. [296]

**\*750** In the end, the propriety sense of "proper" that Lawson and Granger pointed to does have something to say about the Clause. It does not make "proper" into a separate requirement for congressional action, but it does once again direct our attention to the importance of the fit between the enumerated power and the incidental power.

When this Article suggests that "necessary and proper" is a hendiadys, the core claim is that these terms work together to make explicit that Congress has incidental powers to "carry into execution" the powers given by the Constitution. There must be a close relationship, not one of *Palsgraf*ian remoteness, between the congressionally chosen means and the constitutionally specified end (hence "necessary"), but the relationship required is not one of Jeffersonian strictness (hence "proper"). This is vague, but inevitably so.

What the proprietary sense of "proper" does is reinforce the need to read the two terms together. Like the Cruel and Unusual Punishments Clause, the Necessary and Proper Clause is more than a sequence of separate elements. What it affirms is not that Congress has the power to enact legislation that both happens to be needed and happens to be proper to an enumerated power. [297] Rather, the Clause affirms that Congress has the incidental powers that are proper to each of its enumerated powers precisely because they are the powers ordinarily needed to carry those enumerated powers into execution.

Now one could go further, and draw on other shades of meaning for "proper." Within a hendiadys, this kind of multiplicity of meaning is familiar. But it is a constitution we are interpreting, not a sonnet. Cases must be decided, and so one cannot

Compendium_Cornell
Page 0605

indulge an infinite freedom of creative readings with no end to the *différance*. Even so, the shade of "proper" just discussed -- the proprietary sense -- is pervasive in the early interpretations of the Clause. It again suggests that the Necessary and Proper Clause is not easily reduced to two requirements. The fact that those who made this point often did so not under the banner of "proper" but under the banner of "necessary and proper," is another reminder not to sunder the Clause.

## *751 *F. Implications for Judicial Enforcement*

The reading of the Necessary and Proper Clause given here does not compel a view of who decides its meaning and application. But this reading does point towards some views and away from others. In particular, understanding "necessary and proper" as a hendiadys points away from two views. The first is what might be called the bifurcated-deference view, i.e., the view, reflected in *NFIB* and some recent scholarship, that courts should be more deferential about what is "necessary" but less deferential about what is "proper." The second is John Manning's view that the Clause is an "empty" delegation, and thus an area in which courts should give a high degree of deference to congressional judgments.

The starting point is recalling that incidental powers cannot be fully spelled out in advance. [298] Nor is it possible to specify in advance exactly what the right degree of means-end fit is -- that is the reason for the hendiadys in the first place. Remember Madison's argument: you draft it better. [299] Inevitably, then, the judgment in the first instance will belong to Congress. That is, Congress will decide whether a statute is necessary and proper to an enumerated power. [300] As a practical matter, there is likely to be deference from the courts when assessing the decision Congress made, for three reasons.

First, means-end fit may involve policy questions that are matters for legislative judgment. This point, however, can be easily overstated. The principle of incidental powers that is affirmed in the Necessary and Proper Clause should not be treated as merely a question of policy. Indeed, those who wanted a broader interpretation of the Clause, such as Hamilton, and those who wanted a narrower interpretation, such as St. George Tucker, agreed that the scope of the power affirmed by the Clause was an analytical question suited to judicial resolution, not a policy  *752 question that was a matter of legislative competence. [301] Indeed, Hamilton laid great stress on this point:

> The *degree* in which a measure is necessary, can never be a test of the *legal* right to adopt it. That must ever be a matter of opinion; and can only be a test of expediency. The *relation* between the *measure* and the *end*, between the *nature* of *the mean* employed towards the execution of a power and the object of that power, must be the criterion of constitutionality not the more or less of *necessity* or *utility*. [302]

A similar point seems to be made in *McCulloch* itself. Chief Justice Marshall observed that the Court will not "inquire into the degree of [a statute's] necessity." [303] That observation is usually taken to be a statement of great deference to Congress. But given the similarity to Hamilton's statement, and Marshall's evident familiarity with Hamilton's opinion on the Bank and his reliance upon it in *McCulloch*, [304] Marshall  *753 may instead have been reiterating Hamilton's point that policy is not the criterion under the Necessary and Proper Clause. [305]

Second, Congress and the courts operate at different times when deciding that a law is beyond the scope of the incidental powers affirmed by the Clause. Congress decides before a bill is passed, and less harm is done if members of Congress refrain from enacting a statute because they have constitutional doubts. Courts decide after the bill is passed, and usually after the law has gone into effect. The disruption from a judicial decision that the law is unsupported by the Constitution may be severe, though it would obviously vary from case to case.

Third, striking down a law as not "necessary and proper" for carrying into effect an enumerated power raises distinctive questions of severability when the provisions are interlocking: Taking out this provision as not "necessary and proper" might lead to another one falling for the same reason, and another, and another. These three problems -- policy judgments, disruption costs, and severability domino effects -- mean that on purely practical grounds there is likely to be some deference to legislative judgments under the Clause.

Compendium_Cornell
Page 0606

The question is whether there should be deference beyond these practical considerations. Here the two-requirements reading of the Clause has a clever answer: Whether the statute is "necessary" is a quintessential policy judgment for which the legislature is best suited (hence great deference), but whether the statute is "proper" depends on reading the text and structural principles of the Constitution and that is an inquiry for which the courts are best suited (hence little deference). [306]  If the two-requirements reading were right, this would be at least a plausible approach to judicial enforceability. It would offer some deference and some review, not randomly, but with a division of labor. One weakness would be the inchoate standards for what counts as "proper"; [307] another would be the denigration of Congress's ability and duty to make judgments about the Constitution. But if the two-requirements reading is  **\*754**  wrong, then there is no support at all for this bifurcated deference. There would be only one requirement under the Necessary and Proper Clause, and the question would be whether that one requirement should be given any enforcement beyond the "political safeguards of federalism" [308] and of the separation of powers.

In a recent Foreword for the *Harvard Law Review*, John Manning says no, mostly. [309]  He argues that the Clause embodies a broad delegation, a kind of "empty standard" that must be filled in by someone. That someone, Manning argues, is Congress and thus the courts should defer to any reasonable determination made by Congress that a statute is "necessary and proper" for carrying into execution an enumerated power. It is a Thayerian position for the Necessary and Proper Clause. [310]

Yet Manning's argument is weakened by thinking of the Clause as a hendiadys. If the Clause is read this way, it turns out not to be as "empty" as he suggests. It is unique, but that is not the same thing. As "necessary" is qualified by "proper," an extreme interpretation is ruled out and the indeterminacy is lessened. The background principle of incidental powers is fuzzy but not content-free. [311]  What Manning has ably critiqued is the effort to give "proper" force as an independent requirement. [312] But once "proper" is no longer taken to be an independent requirement, his argument for Thayerian deference is eroded.

 **\*755**  The reading of the Clause given here does support the arguments by Manning and others that the content of the Clause is meant to be filled in over time (or "liquidated," to use a Madisonian term). [313]  As Professor John Harrison has aptly said, the Necessary and Proper Clause

> is the sort of thing that drafters use when their confidence in their own foresight is substantial but not complete, or, more specifically, when they think they have sorted out the big issues to their own satisfaction and want to make sure that strict construction does not interfere with sorting out the details later. [314]

And recall Madison's words about the impossibility of specifying all the incidental powers that would be necessary. [315]  In other words, ex ante specification is impossible and so ex post specification is needed.

This problem of retreating to ex post specification is a familiar one in many areas of law, from the equitable interpretation of statutes [316] to agency law and fiduciary law. [317]  In many of these contexts there is some deference given to the decision maker (e.g., a trustee), but that deference is not quasi-absolute. Thus the need for ex post specification does not provide a reason for Congress to do all the ex post specifying. [318]

Indeed, that conclusion is buttressed by the fact that other clauses in the Constitution make a government actor the sole judge of a matter: e.g., the President's duty under the Recommendations Clause to recommend to Congress "such Measures as he shall judge necessary and expedient."  **\*756**  [319]  But the Necessary and Proper Clause does not. And Madison and Marshall expressly argued that the executive and the judiciary would need to push back if Congress were to exceed its powers under this Clause. [320]  Nor should Marshall's point be seen as merely tactical. The early nationalist position was that the judiciary had a duty "to review" whether the acts of Congress had "an appropriate connection" to its constitutionally defined powers. [321]

Thus, if the Necessary and Proper Clause is read as a hendiadys, it casts doubt on some widely held views about the nature and degree of deference the courts show to Congress. A strategy for *increasing* judicial review under the Clause -- bifurcating the rigor of review, so it can be more strict for "proper" -- is undermined. And a strategy for *decreasing* judicial review under the Clause -- urging the courts to adopt a Thayerian approach because it is an empty delegation -- is also undermined. The courts are

left with the duty of making decisions about the powers that are incident to the enumerated powers. Or, to put the task in more familiar **\*757** terms, courts must consider, as courts often do, the fit between an agent's prescribed ends and chosen means.

### G. Testing the Hypothesis: Two Case Studies from Marshall's Defense of *McCulloch*

In *McCulloch*, Chief Justice Marshall famously said that the means must be "appropriate" and "plainly adapted" to an end that is legitimately constitutional. [322] In his essays defending *McCulloch*, Marshall further discusses the analysis of incidental powers under the Clause with several hypothetical cases. By considering these essays here, I do not mean to suggest that Marshall in his extrajudicial writings can exert control over the meaning of *McCulloch*. The point is rather that "even authors can act as good readers of their own texts." [323]

When discussing these hypothetical cases, Marshall makes clear that he does not see the analysis of means and incidental powers as purely mechanical. There is an irreducibly evaluative element in the consideration of whether the chosen means were "appropriate." [324] Responding to an example given by his interlocutor Amphictyon, Marshall describes a tenant at will who has a right to grow crops, and does grow crops, before being evicted. "To this right," Marshall says, "is annexed as a necessary incident, the power of carrying away the crop." [325] And yet Marshall adds:

> **\*758** Undoubtedly the person allowed to carry away his crop, would not be permitted to thrown down the fences, trample the enclosed fields, and trespass at will on the landholder. But he has a choice of "appropriate" means for the removal of his property, and may use that which he thinks best. [326]

In another example in the same essay, Marshall takes up an old hypothetical case -- what if Congress imposed a land tax, and to make it easier to collect, prohibited the states from taxing land? [327] Marshall said:

> Now I deny that a law prohibiting the state legislatures from imposing a land tax would be an "appropriate" means, or any means whatever, to be employed in collecting the tax of the United States. It is not an instrument to be so employed. It is not a means "plainly adapted," or "conducive" to the end. The passage of such an act would be an attempt on the part of Congress, "under the pretext of executing its powers, to pass laws for the accomplishment of objects not intrusted to the government." [328]

This passage is striking, and it offers a way to test the diverging analytical pathways (though not diverging results) from a two-requirements reading and a hendiadic reading. Note how different the analysis of this hypothetical case would be under *Printz*, *Alden*, and *NFIB*. Under those precedents this would be an easy decision: the statute would be "necessary" -- it would aid federal taxation -- but it would not be "proper," because the prohibition on state land taxes would fail to respect state sovereignty. In other words, if this case were decided today, the textual hook would be "proper" and the relevant language in *McCulloch* would be that the chosen means are "prohibited" and not "consist[ent] with the **\*759** letter and spirit of the constitution." [329] But Marshall never invokes "proper" as the ground of his objection, even though he manifestly objects to this intrusion on the reserved powers of the states. Nor is this because he is treating the policy choice as somehow ineffective or futile -- to the contrary, he treats the policy choice of Congress as being in some constitutional sense *wrong*. And yet he does not attack it as "prohibited" or contrary to the Constitution's "letter and spirit." Rather, he treats the defect of the statute as something exposed through ordinary means-end analysis. [330]

This very passage from Marshall's defense of *McCulloch* is quoted by Lawson and Granger. It is worth quoting at length their assessment of Marshall's treatment of this hypothetical case, because it will show the perceptiveness of their analysis, but also what can be missed by not considering "necessary and proper" as a single unit of meaning:

> If Chief Justice Marshall meant that such a law could not be an efficacious, and hence a "necessary," means of fostering federal tax collection, he was so clearly wrong that the claim would be disingenuous. Nor could he plausibly claim that such a law was not linked to the execution of an enumerated power; the federal government is

expressly given the power to levy taxes. If he were serious that such a law was not, and could not be, a constitutional exercise of the Sweeping clause power, he must have based that conclusion on something in the clause other than the word "necessary" -- he must have meant that the law **\*760** would not be "proper" because it would infringe on the protected rights of the states. [331]

What is perceptive here is the recognition by Lawson and Granger that Marshall is not analyzing the statute in terms of effectiveness. [332] But Lawson and Granger have two buckets to put this analysis in -- it can go in the effectiveness bucket ("necessary"), or it can go in the constitutional-principles bucket ("proper"). Since it doesn't go in the first, it has to go in the second. But this is not how Marshall proceeds. He does not mention "proper"; *he* does not have two buckets.

Finally, note that Marshall clearly thinks that a court should strike down this statute as unsupported by the Necessary and Proper Clause (the "pretext" quote leaves no doubt, since that is what the quoted language meant in *McCulloch*). Thus Marshall is arguing that the Necessary and Proper Clause is judicially enforceable -- that the language to this effect in *McCulloch* was not an empty platitude. And in this argument it is plain that he does not consider the only ground for such judicial action to be the positive violation of another constitutional provision. When a congressional act requires the support of the Necessary and Proper Clause, but receives none, that act is not constitutional.

And so we are back to *McCulloch*, a decision that protected the national government from an extremely rigorous interpretation of the Necessary and Proper Clause, but a decision that did not give Congress free rein. [333] If "the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government," then a court does not over-scrutinize the judgment of Congress. [334] But the Court also said:

> Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land. [335]

## **\*761 CONCLUSION**

Sometimes a familiar text needs to be reread. When it is, we may discover a seemingly new reading that has been there all along, hiding in plain sight. This Article has offered a new reading of two familiar Clauses of the Constitution. It is now common to read the Necessary and Proper Clause as authorizing congressional action only if it is both "necessary" and "proper" for carrying into execution an enumerated power. But reading the phrase "necessary and proper" as a hendiadys makes better sense of the text, the early history, and *McCulloch*. It is common now to read the text of the Cruel and Unusual Punishments Clause as prohibiting punishments only if they are both "cruel" and "unusual." But this phrase, too, makes more sense when it is read as a hendiadys.

This reading of the Necessary and Proper Clause is a blow to a line of argument some Justices have been developing in *Printz*, *Alden*, and *NFIB*, a line of argument that lays great stress on the distinction between "necessary" and "proper." Perhaps it is not a fatal blow. One might justify the conclusions from that line of argument on other grounds -- free-standing structural principles, policy, or even a kind of hydraulic originalism that makes up for the loss of one original power or limit by developing another one. [336] Some of the considerations in the Court's recent cases about "proper" might rightly belong in the analysis of incidental powers. [337] But those arguments would have to be developed, and they would need to stand on some firmer basis than the word "proper." Another implication of the reading here is that there needs to be renewed attention to the closeness of the fit between an enumerated power and the congressional action that purports to be carrying it into execution.

For the Cruel and Unusual Punishments Clause, the reading here points in a different direction than the Supreme Court's cases about "evolving standards of decency." This reading would not help the Justices **\*762** eliminate a punishment they consider passé. What it would do is give them the grounds -- and the duty -- to stand up to democratic majorities that seek to punish with newfound cruelty. Moreover, reading "cruel and unusual" as a hendiadys casts doubt on two approaches to the Clause's

Compendium_Cornell
Page 0609

text. Some Justices, most often liberal ones, read out "unusual" and treat the Clause as requiring only an inquiry into what is "cruel." [338] But if the phrase is a hendiadys, "cruel" cannot be read alone. It must be read with "unusual." Other Justices, most often conservative ones, argue that "cruel" and "unusual" are separate requirements. [339] But they are not, if the phrase is a hendiadys.

This Article does not pretend to determine the exact construction that contemporary courts should give to these Clauses. The interpretations advanced here are persuasive, but not conclusive, and the only modalities of constitutional interpretation that have been considered in detail are text and history. [340] There is more to constitutional law. Yet these readings do have implications. For example, if this reading of the text of the Necessary and Proper Clause were adopted, the textual support for some cases would be undermined, either because they depend on a reading of "proper" that is difficult or impossible to fold into means-end analysis (e.g., *NFIB* [341]), or because they treat so cavalierly the fit between a statute and an enumerated power (e.g., *Wickard v. Filburn* [342]). Other cases might have their reasoning undermined but still be right on different grounds (e.g., *Printz* [343]).

This Article also speaks to the place of text in American constitutional discourse. Some consider these phrases to be crude, "inadvertent," [344] **763** even "constitutional stupidities." [345] But the readings here suggest something quite different. These Clauses are subtle, and they show an adroit recognition of the limits of language and the passage of time. It is not possible to fully specify the incidental powers of Congress; thus "necessary and proper." Times change, and new occasions can bring new savagery; thus "cruel and unusual."

What led to the rise of two-requirements readings of the Necessary and Proper Clause and the Cruel and Unusual Punishments Clause? Why do the readings that are given in this Article, which have affinity with older ones, seem so new? Only speculations can be offered. For legal rules this is an Age of Dissection. Equitable principles that were once overlapping and a bit inchoate are separated into a four-part test. [346] Justiciability principles are fragmented. [347] Phrases like "necessary and proper" and "cruel and unusual" get pulled apart. One might think that this tendency is aided and abetted (that is an alliterative repetition, not a hendiadys) by the rise of textualism and originalism. If so, the fault seems to lie with the friends and the foes of these approaches, for both too often present the reading of a text as a narrow, almost mechanical exercise. [348] But a legal text cannot be read like a telegram -- a word said, then "Stop," then another word, then another "Stop."

For some readers, this Article may seem destabilizing. If there was one word in the Constitution that you thought you knew the meaning of, it was *and*. But if that word turns out to contain significant ambiguity, what hope does the interpreter have? Other readers may be suspicious of what they regard as linguistic archaeology, an excavation to dig up new meanings that have lain below the surface of the constitutional text for centuries. [349] But those concerns misconceive this project. It is true that the term *hendiadys* has not previously been applied to the Constitution. But it is just a term that enables us to recognize a semantic relationship that is common in many languages and texts. This figure of speech is **764** one "we use without thinking and without naming." [350] Seeing these two constitutional phrases as examples of hendiadys does not give them meanings that are radical, unprecedented, or wide-open. In fact, reading "necessary and proper" and "cruel and unusual" as instances of hendiadys brings us closer to the understandings of the earliest interpreters.

## Footnotes

[a1]   Assistant Professor, UCLA School of Law. I am grateful for the criticisms and comments of Will Baude, Jud Campbell, Nathan Chapman, Beth Colgan, Marc DeGirolami, Sharon Dolovich, Stephen Gardbaum, Philip Hamburger, David Hershenov, Allison Hoffman, Albertus Horsting, Joshua Jensen, Andy Kelly, Gary Lawson, Daniel Lowenstein, Michael McConnell, Hashim Mooppan, Michael Moreland, Robert Natelson, Zachary Price, Richard Re, Stephen Sachs, Steve Smith, John Stinneford, Eugene Volokh, Adam Winkler, and participants in law faculty workshops at Berkeley, Notre Dame, and UCLA.

[1]   Mark A. Graber, Unnecessary and Unintelligible, 12 Const. Comment. 167, 168 (1995).

2    The Federalist No. 44, at 299, 303 (James Madison) (Jacob E. Cooke ed., 1961).

3    See, e.g., David P. Currie, The Constitution in Congress: The Jeffersonians, 1801-1829, at 250-58 (2001) (First and Second Banks of the United States); Stephen Gardbaum, Rethinking Constitutional Federalism, 74 Tex. L. Rev. 795, 807-11 (1996) (New Deal); John F. Manning, Foreword: The Means of Constitutional Power, 128 Harv. L. Rev. 1, 30-42 (2014) (Rehnquist and Roberts Courts).

4    132 S. Ct. 2566 (2012).

5    Id. at 2592.

6    See Gary Lawson & Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the Sweeping Clause, 43 Duke L.J. 267, 271-72 (1993); see also Jack M. Balkin, Living Originalism 179 (2011); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 116-17 (2012).

7    *Hendiadys* is defined by the Oxford English Dictionary as: "A figure of speech in which a single complex idea is expressed by two words connected by a conjunction; e.g. by two substantives with *and* instead of an adjective and substantive." Hendiadys, 7 The Oxford English Dictionary 142 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1991). In English it has also been spelled *endiadis*, *hendiadis*, and *hendyadis*, and has been called "the figure of Twynnes." See, e.g., George Puttenham, The Arte of English Poesie 177-78 (Gladys Doidge Willcock & Alice Walker eds., Cambridge Univ. Press 1936) (1589).

8    David Sansone, On Hendiadys in Greek, 62 Glotta 16, 19 & n.10 (1984); George T. Wright, Hendiadys and *Hamlet*, 96 PMLA 168, 168 (1981).

9    E.g., William Shakespeare, Hamlet act 1, sc. 3, l. 9, at 42 (Susanne L. Wofford ed., 1994) ("The *perfume and suppliance* of a minute"). For exposition, see infra text accompanying note 109.

10    On "cease and desist," see infra note 90 and accompanying text.

11    On terms of art and hendiadys, see infra note 34 and notes 92-93 and accompanying text.

12    There may be other instances of hendiadys in the U.S. Constitution, and phrases worth considering include "Piracies and Felonies," U.S. Const. art. I, § 8, cl. 10; "Powers and Duties," U.S. Const. art. II, § 1, cl. 6; "Advice and Consent," U.S. Const. art. II, § 2, cl. 2; "necessary and expedient," U.S. Const. art. II, § 3; "keep and bear," U.S. Const. amend. II; and "searches and seizures," U.S. Const. amend. IV.

13    See Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting); Helling v. McKinney, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting); Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.); In re Kemmler, 136 U.S. 436, 447 (1890); Scalia & Garner, supra note 6, at 116; David B. Hershenov, Why Must Punishment Be Unusual as Well as Cruel to Be Unconstitutional?, 16 Pub. Aff. Q. 77 (2002); Meghan J. Ryan, Does the Eighth Amendment Punishments Clause Prohibit Only Punishments that Are Both Cruel *and* Unusual?, 87 Wash. U. L. Rev. 567 (2010).

14    John F. Stinneford, The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation, 102 Nw. U. L. Rev. 1739 (2008).

15    See infra Section II.B.

16    See Hershenov, supra note 13; Stinneford, supra note 14.

17    Accord Stinneford, supra note 14, at 1745. Professor Stinneford's reading of the entire phrase, however, differs from the one in this Article. See John F. Stinneford, Rethinking Proportionality Under the Cruel and Unusual Punishments Clause, 97 Va. L. Rev. 899, 972 (2011) ("If a punishment is found to be unusual, the next question is whether it is cruel."). The comparative-inquiry advantage depends on the meaning given to "cruel."

18    On incidental powers and the Necessary and Proper Clause, see Gary Lawson, Geoffrey P. Miller, Robert G. Natelson & Guy I. Seidman, The Origins of the Necessary and Proper Clause (2010); John Harrison, Enumerated Federal Power and the Necessary and Proper Clause, 78 U. Chi. L. Rev. 1101 (2011) (reviewing Lawson et al.); John F. Manning, The Necessary and Proper Clause and Its Legal Antecedents, 92 B.U. L. Rev. 1349 (2012) (same). On the terminology of "incidental powers" and "means," see infra note 325.

19    See Thomas Jefferson, Opinion on the Constitutionality of the Bill for Establishing a National Bank, in 19 The Papers of Thomas Jefferson, 24 January to 31 March 1791, at 275, 278 (Julian P. Boyd ed., & Ruth W. Lester assistant ed., 1974) (glossing "the *necessary* means" as "those means without which the grant of the power would be nugatory").

20    On "proper" as the more lax term, see infra notes 242-50 and accompanying text.

21    McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 418-19 (1819).

22    This sense of "proper" is not supported by *McCulloch*, but it is supported by Chief Justice Marshall's essays defending *McCulloch*. See infra Section III.E.

23    See infra text accompanying note 251.

24    These include The Federalist No. 33, at 203 (Alexander Hamilton) (Jacob E. Cooke ed., 1961), No. 44, supra note 2, the opinions of Jefferson and Hamilton regarding the constitutionality of the First Bank of the United States, and the lengthy debate in the House of Representatives over the First Bank of the United States, especially the first speech by Madison. These sources, as well as the early interpretations that *did* read "necessary" and "proper" as separate requirements, are discussed below. See infra Section III.B.

25    See infra notes 262-70 and accompanying text.

26    See infra notes 273-77 and accompanying text.

27    The Federalist No. 44, supra note 2; see also 3 Joseph Story, Commentaries on the Constitution of the United States §§ 1232-1236, at 109-13 (Boston, Hillard, Gray & Co. 1833).

28    On the Necessary and Proper Clause, see, for example, Lawson and Granger, supra note 6. On the Cruel and Unusual Punishments Clause, see, for example, Hershenov, supra note 13, and Ryan, supra note 13.

29    This reading is easier for "necessary and proper." See Eric A. Posner & Adrian Vermeule, Interring the Nondelegation Doctrine, 69 U. Chi. L. Rev. 1721, 1728 n.20 (2002); see also H. Jefferson Powell, The Regrettable Clause: *United States v. Comstock* and the Powers of Congress, 48 San Diego L. Rev. 713, 724 n.42 (2011) ("It is very likely that Chief

Compendium_Cornell
Page 0612

Justice Marshall viewed necessary and proper as a pleonasm with the second adjective proper importing no additional, legally significant, or justiciable meaning." (emphasis omitted)). For discussion, see infra note 204. It has also been suggested that "cruel and unusual" could be a tautology. John D. Bessler, Cruel & Unusual: The American Death Penalty and the Founders' Eighth Amendment 180-81 (2012). On the overlap between "cruel," "cruel and unusual," and "cruel or unusual," see infra note 155.

30     The Concise Oxford Dictionary of Literary Terms 97 (Chris Baldick ed., 1990) ("The status of this figure is often uncertain, since it usually cannot be established that the paired words actually express a single idea.").

31     See Philip Bobbitt, Constitutional Fate: Theory of the Constitution 3-92 (1982).

32     Wright, supra note 8, at 181 (emphasis added). This Article generally follows the convention of italicizing the phrase that is being read as a hendiadys without marking the alteration. That convention is found in Wright and in H. Poutsma, Hendiadys in English, Together with Some Observations on the Construction of Certain Verbs, 2 Neophilologus 202 (1917).

33     For previous suggestions that "necessary and proper" could be read as a single unit of meaning, see Mark A. Hall, Commerce Clause Challenges to Health Care Reform, 159 U. Pa. L. Rev. 1825, 1854 (2011); John T. Valauri, Originalism and the Necessary and Proper Clause, 39 Ohio N.U. L. Rev. 773, 784 (2013). Hall almost anticipates the argument of this Article when he suggests that "necessary and proper" could be "a single construct," with an analogy being the phrase "cruel and unusual." Hall, supra, at 1854. Yet he makes the point only in passing and treats "proper" as a separate requirement that congressional action comport with "constitutional norms." Id. at 1852-54. For previous suggestions that "cruel" and "unusual" fit together, see infra notes 127 and 146.

34     These options shade into one another and can overlap. For example, a phrase may be a term of art known to specialists, yet what the specialists know might simply be *that* the phrase is read as two independent requirements, as two synonyms, or as a hendiadys. On another possibility, a disjunctive reading, see infra note 203.

35     One example is the reading of "Congress" in the First Amendment at issue in Nicholas Quinn Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1252-55 (2010); and Curtis A. Bradley & Neil S. Siegel, Constructed Constraint and the Constitutional Text, 64 Duke L.J. 1213, 1243-47 (2015).

36     See William Michael Treanor, Taking Text Too Seriously: Modern Textualism, Original Meaning and the Case of Amar's *Bill of Rights*, 106 Mich. L. Rev. 487 (2007).

37     Paul Hopper, Hendiadys and Auxiliation in English, *in* Complex Sentences in Grammar and Discourse: Essays in Honor of Sandra A. Thompson 145, 146 (Joan Bybee & Michael Noonan eds., 2002).

38     Nigel Fabb, Is Literary Language a Development of Ordinary Language?, 120 Lingua 1219, 1229 (2010).

39     Cf. Sandra Mollin, The (Ir)reversibility of English Binomials: Corpus, Constraints, Developments 9-10 (2014) (noting that the choice of definition for *hendiadys* determines how much it overlaps with another category).

40     E.g., Fowler's Dictionary of Modern English Usage, at ix (Jeremy Butterfield ed., 4th ed. 2015) [hereinafter Fowler's Dictionary]. On the variety of definitions for hendiadys in biblical Hebrew, see Rosmari Lillas-Schuil, A Survey of Syntagms in the Hebrew Bible Classified as  *Hendiadys, in* Current Issues in the Analysis of Semitic Grammar and Lexicon II: Oslo-Göteborg Cooperation 4th-5th November 2005, at 79, 81-84 (Lutz Edzard & Jan Retsö eds., 2006).

[41] E.g., Edward Hirsch, A Poet's Glossary 278-79 (2014); Frank Kermode, Shakespeare's Language 100-01 (2000); Fabb, supra note 38, at 1229; Wright, supra note 8. The restrictions in the definition here are not pointless. The reference to a conjunction helps the reader grasp the concept, with no loss of scope. (Some languages, such as Akkadian and Latin, do use asyndetic hendiadic constructions, but English does not.) The limitation to two terms is traditional and economical for this Article. There is another figure of speech called *hendiatris*, and yes, it means what you think it means. See Hirsch, supra, at 279; Lillas-Schuil, supra note 40, at 98.

[42] John Huehnergard, A Grammar of Akkadian 125-26 (3d ed. 2011). On hendiadys in Assyrian (which developed from Akkadian), see W. F. Albright, Notes on Assyrian Lexicography and Etymology, 16 Revue D'Assyriologie et D'Archéologie Orientale 173, 178 (1919).

[43] See, e.g., Bill T. Arnold & John H. Choi, A Guide to Biblical Hebrew Syntax, 148-49 (2003); Herbert Chanan Brichto, Toward a Grammar of Biblical Poetics: Tales of the Prophets 40-42 (1992); Lillas-Schuil, supra note 40; see also E. A. Speiser, Introduction to Genesis, at lxx-lxxi (1964) (noting occurrences of hendiadys in Genesis); Jacob Bazak, The Meaning of the Term "Justice and Righteousness" (org]) in the Bible, 8 Jewish L. Ann. 5 (1989) (analyzing the common biblical phrase "justice and righteousness" as a hendiadys that "refers to a system of law free from the usual defects ... [of] legal systems"); J. Kenneth Kuntz, Hendiadys as an Agent of Rhetorical Enrichment in Biblical Poetry, With Special Reference to Prophetic Discourse, in 1 God's Word for Our World 114, 123-133 (J. Harold Ellens et. al. eds., 2004) (giving examples of hendiadys in the Prophets). One of the more familiar examples from the Hebrew Bible is Genesis 1:2, where the earth is described as "*waste and void*" (English Revised Version). Some translations eliminate the hendiadys: e.g., "a vast waste" (Revised English Bible).

[44] Sansone, supra note 8, at 17. For expressions from Plato that are close to, if not quite, hendiadys, see J. G. Warry, 21 Greek Aesthetic Theory: A Study of Callistic and Aesthetic Concepts in the Works of Plato and Aristotle 40-41 (2013). There appears to be at least one example in Middle Hittite, another Indo-European language. See Terumasa Oshiro, Hendiadys in Hittite, *in* Indogermanische Forschungen: Zeitschrift Für Indogermanstik und Allgemeine Sprachwissenschaft 98 (1993).

[45] E.g., Cicero, Catilinarians 276 (Andrew R. Dyck ed., 2008) (listing text and commentary citations for eleven instances of the figure). On precursors to the more developed hendiadys in Virgil, see Walter Stockert, Wood and Wax: "Hendiadys" in Plautus, *in* 6 Papers of the Leeds International Latin Seminar 1 (Francis Cairns & Malcolm Heath eds., 1990).

[46] This line from Virgil is "often taken as the definitive example of hendiadys." Sansone, supra note 8, at 19 & n.10. Other examples from Virgil include "by *force and arms*" (i.e., "by force of arms") and "I fear *the Greeks and bearing gifts*" (i.e., "I fear the gift-bearing Greeks"). Hopper, supra note 37, at 146.

[47] Johann Gottfried von Herder, How Philosophy Can Become More Universal and Useful for the Benefit of the People, *in* Philosophical Writings 3, 28 & n.62 (Michael N. Forster ed. & trans., 2002); see also Michael N. Forster, Introduction to Philosophical Writings, supra, at ix (hinting that Herder's use of hendiadys was conscious).

[48] See Fabb, supra note 38, at 1229. Fabb includes as instances of hendiadys terms that are not adjacent. Some writers on hendiadys in English do the same. See Poutsma, supra note 32, at 215 ("*Conjures* the wandering stars, *and makes* them stand" from Macbeth).

[49] Wright, supra note 8, at 176.

[50] John Upton, Critical Observations on Shakespeare 336 (London, G. Hawkins 1748).

Compendium_Cornell
Page 0614

51    Wright, supra note 8, at 187.

52    Id. at 186.

53    Hopper, supra note 37, at 147, 151, 152.

54    Daniel Swift, The Book of Common Prayer, *in* The Oxford Handbook of English Prose 1500-1640, at 576, 584 (Andrew
      Hadfield ed., 2013) (giving two examples from the General Confession that begins Morning Prayer and Evening Prayer
      in the Book of Common Prayer: "*Almighty and most merciful* Father, we have *erred and strayed* from thy ways, like lost
      sheep."); cf. Kermode, supra note 41, at 101 (noting the "doubles, antitheses, and repetitions" in *Hamlet*, and suggesting
      that "[t]his way of writing was, in its essence, familiar from the English liturgy, and its remote origin is probably in the
      parallelisms found in the Psalms").

55    Christopher Marlowe, Doctor Faustus: A 1604-Version Edition, at 78 (Michael Keefer ed., 2d ed. 2007) ("*the Institute
      / And universal body* of the law").

56    Examples from the earliest chapters of Genesis in the King James Version include "*without forme, and voyd*" (1:2), "*[b]e
      fruitfull, and multiply*" (1:22, 28), "*created and made*" (2:3), "*thy sorowe and thy conception*" (3:16), "*[a] fugitiue and
      a vagabond*" (4:12), and "*a fugitiue, and a vagabond*" (4:14). With the exception of Genesis 2:3, each of these phrases
      is also a hendiadys in the Hebrew original.

57    Wright, supra note 8, at 172, 184 n.14. *Paradise Lost* has, among others, bees "on thir *mirth and dance,* / Intent" (i.e.,
      mirthful dance), "*ancient and prophetic* fame" (i.e., anciently prophesied fame), and "*joy and tidings*" (i.e., joyful
      tidings). John Milton, Paradise Lost, bk. I, ll. 786-87 (Barbara K. Lewalski ed., 2007) (1674); id. at bk. II, l. 346; id.
      at bk. X, ll. 345-46.

58    Govert den Hartogh, Made by Contrivance and the Consent of Men: Abstract Principle and Historical Fact in Locke's
      Political Philosophy, *reprinted in* Locke's Moral, Political and Legal Philosophy 337, 355-57 (J.R. Milton ed., 1999)
      (positing that "Locke is rather fond of the figure of hendiadys," and proceeding to analyze "consent" in terms of the
      words with which Locke pairs it, as in "*Agreement and consent* of Men" and "*contrivance, and the Consent* of Men").

59    A.A. Luce, Berkeley and Malebranche: A Study in the Origins of Berkeley's Thought 156 (2d prtg. 2002) (suggesting
      that Berkeley's "all *knowledge and demonstration*" is probably "a hendiadys, whose real import is 'all demonstrative
      knowledge'").

60    For example, Blackstone says foreign laws that have "been *introduced and allowed* by our laws, so far they oblige, and no
      farther; their authority being wholly founded upon that *permission and adoption*." 1 William Blackstone, Commentaries
      *14. Here there are two instances of hendiadys, chiastically arranged, referring to a treatment of foreign laws that falls
      somewhere between full reception (i.e., introduction and adoption) and mere tolerance (i.e., allowance and permission).
      A less intricate example can be found on the next page of the *Commentaries*, where Blackstone says that a civilian or
      canonist needs to know "how far the English laws have given sanction to the Roman" in order to act "with *prudence
      and reputation* as an advocate," i.e., in order to act with the prudence that redounds to one's reputation. Id. at *15.

61    Paul Cartledge, Vindicating Gibbon's Good Faith, 158 Hermathena 133, 141 (1995) (understanding Gibbon's "an
      *historian and philosopher*" as a hendiadys meaning "a philosophical historian").

Compendium_Cornell
Page 0615

62    William K. Wimsatt, Jr., Parallelism, *in* Perspectives on Style 127, 151-52 (Frederick Candelaria ed., 1968) (suggesting three instances of hendiadys in Hazlitt's lecture *On Dryden and Pope*: "'*Brilliance and effect*' might be 'brilliant effect'; '*smooth and polished*' verse' might be 'smoothly polished verse'; '*tug and war*' suggests 'tug of war.'").

63    Poutsma, supra note 32, at 290 (taking "I felt it was time for *conversation and confidence*" from *David Copperfield* as meaning "confidential conversation"); Garrett Stewart, "Written in the Painting": Word Pictures from Italy *in* Imagining Italy: Victorian Writers and Travellers 216, 233 (Catherine Waters, Michael Hollington & John Jordan eds., 2010) (taking Dickens's "*grace and youth*" to be a hendiadys meaning either "graceful youth" or "youthful grace"); id. at 232 (finding a hendiadys in Dickens's assertion that for the traveler Roman ruins could "*people and restore*" the past).

64    Poutsma, supra note 32, at 290 (glossing Gaskell's "*a sin and a shame*" as "shameful sin").

65    Id. (taking Thackeray's "*verses and nonsense*" to mean "nonsensical verses").

66    See E.M. Forster, Howards End 27-28 (Everyman's Library ed., 1992) ("To think that because you and a young man meet for a moment, there must be all these *telegrams and anger*."); Philip R. Berk, Canto VII: The Weal of Fortune, *in* Lectura Dantis: Inferno, a Canto-by-Canto Commentary 101, 107 (Allen Mandelbaum, Anthony Oldcorn, & Charles Ross eds., 1998) (understanding "all these *telegrams and anger*" as a hendiadys).

67    Wright, supra note 8, at 171-72 (finding several examples in Dylan Thomas, including "*strut and trade*," which "surely means something like 'parading for money'").

68    Numerous examples are collected in Poutsma, supra note 32.

69    Compare Samuel Johnson, A Dictionary of the English Language (6th ed. London, William Pickering 1785) (no entry for "Hendiadys" or "Hendiadis"), with Samuel Johnson & John Walker, A Dictionary of the English Language 342 (R.S. Jameson ed., London, William Pickering 1827) (defining "Hendiadis" as "[a] rhetorical figure, when two noun substantives are used instead of a substantive and adjective").

70    E.g., Elisha Coles, A Dictionary, English-Latin, and Latin-English (London, John Richardson, 2d ed. enlarged 1679) (defining "Hendiadis" as "*one thing expressed by two terms*").

71    E.g., George William Lemon, English Etymology; or, a Derivative Dictionary of the English Language: In Two Alphabets (London, G. Robinson 1783) ("*hendiadis; a rhetorical figure; when one thing is split into two*"). Webster included it, but defined it more narrowly: "A figure, when two nouns are used instead of a noun and an adjective." 1 Noah Webster, An American Dictionary of the English Language (Mario Pei ed., Johnson Reprint Corporation 1970) (1828). On the scope of hendiadys, see supra notes 40-41 and accompanying text.

72    E.g., H. Dimock, Notes Critical and Explanatory on the Books of Psalms and Proverbs 57 (Glocester, R. Raikes 1791) ("*vanity and riches*," in Psalm 39:7, "by an Hendiadis, signif[ies] *vain riches*"); Thomas Wintle, Daniel, an Improved Version Attempted; with a Preliminary Dissertation, and Notes Critical, Historical, and Explanatory 84 (London, Thomas Tegg & Son 1792) ("*light and understanding*" in Daniel 5:11 is "Hendiadys" for "an enlightened understanding"). Dimock notes the possibility of the figure in a number of other passages. Dimock, supra, at 65, 255, 379, 391, 417-18, 469, 471.

73    E.g., Alexander Adam, The Principles of Latin and English Grammar 182 (Edinburgh, A. Kincaid and W. Creech 1772) ("When that, which is in reality one, is so expressed, as if there were two, it is called *Hendiadys;* as, *Pateris libamus et auro*, for *aureis pateris*. Virg."); Farther English Examples, or, Book of Cautions for Children, In Rendering English into Latin; with the Signification, and Use of Certain English Particles 102 (Eton, J. Pote, new ed. 1782) ("HENDYADIS

Compendium_Cornell
Page 0616

*is when one Thing is expressed as if it were two*."); George B. Gardiner & Andrew Gardiner, A Latin Anthology for Beginners with Notes and Vocabulary 96, 105, 114, 124 (London, Edward Arnold 1804) (noting the figure four times).

[74]    The French Chef (WGBH television broadcast Feb. 11, 1963). Another example comes from H.L. Mencken, A Little Book in C Major 19 (1916): "Democracy is the theory that the common people know what they want, and deserve to get it *good and hard.*"

[75]    The Concise Oxford Dictionary of Literary Terms, supra note 30, at 97.

[76]    Brichto glosses "*tried and true*" as "proved true by trial." Brichto, supra note 43, at 40.

[77]    James M. Rose, The Law and the Hendiadys, 23 Westchester B.J. 207, 208 (1996). On verbal hendiadys in English, see Hopper, supra note 37.

[78]    See Gareth B. Matthews, On Not Being Said to Do Two Things, 31 Analysis 204, 207 (1971) (glossing that phrase as "the rough tumble of politics"); Poutsma, supra note 32, at 289 (glossing the phrase as "rough tumbling" (emphasis omitted)).

[79]    For example, Peter Tiersma discusses various conjoined phrases, but he emphasizes their redundancy and never considers the possibility of hendiadys. Peter M. Tiersma, Legal Language 15, 61-65 (1999).

[80]    E.g., Michael Gagarin, The Thesmothetai and the Earliest Athenian Tyranny Law, 111 Transactions Am. Philological Ass'n 71, 72 n.6 (1981); see Stockert, supra note 45, at 6 (suggesting that in Latin the origin of using pairs of near synonyms was in "Roman religious and legal language").

[81]    See Giuseppe Franco Ferrari, Fundamental Rights and Freedoms, *in* Introduction to Italian Public Law 255, 276 (Giuseppe Franco Ferrari ed., 2008); Antonello Tarzia, Public Administration, *in* Introduction to Italian Public Law, supra, at 97, 112-13.

[82]    26 U.S.C. § 162(a) (2012). I am grateful to Eric Zolt for this suggestion.

[83]    These are not separate requirements, for "open and notorious" is *one* of the requirements for adverse possession. Nor do these appear to be synonyms, for adverse possession can be hidden from sight but known to all. Rather, each term contributes something to the whole, either visibility or salience. I am grateful to Stuart Banner for this suggestion and to Thomas Merrill for comments.

[84]    Perhaps "capricious" indicates the kind of arbitrariness that is illegal, or perhaps each term contributes a distinct notion, as with "open and notorious." On the possibility of a hendiadys turning into a term of art, see infra note 94 and accompanying text.

[85]    Jeffrey J. Grieve, Note, When Words Fail: How Idaho's Constitution Stymies Education Spending and What Can Be Done About It, 50 Idaho L. Rev . 99, 129-31 (2014). Grieve uses the term *hendiadys*.

[86]    For discussion of how this phrase can be translated into other languages, including the suggestion that the translator use an adverb or preposition instead of reproducing the structure of the English phrase, see Enrique Alcaraz & Brian Hughes, Legal Translation Explained 39 (2002).

Compendium_Cornell
Page 0617

87    See, e.g., Moskal v. United States, 498 U.S. 103, 120-21 (1990) (Scalia, J., dissenting) ("The entire phrase 'falsely made, forged, altered, or counterfeited' is self-evidently not a listing of differing and precisely calibrated terms, but a collection of near synonyms which describes the product of the general crime of forgery.").

88    See Fabb, supra note 38; Poutsma, supra note 32, at 203.

89    See, e.g., Stockert, supra note 45, at 1-2. In the same work in which Wright counts sixty-six instances of hendiadys in *Hamlet*, he gives another twenty-three doublings that are "not convincing examples" of hendiadys, yet are "close." Wright, supra note 8, at 189-90.

90    See David Mellinkoff, Mellinkoff's Dictionary of American Legal Usage 68 (1992) ("two French-based English words joined in saying *stop, stop*"). Mellinkoff says "cease and desist" has "been so welded by usage as to have the effect, in proper context, of a single word." Id. at 129. As Justice Scalia said, "Lawmakers sometimes repeat themselves -- whether out of a desire to add emphasis, a sense of belt-and-suspenders caution, or a lawyerly penchant for doublets (aid and abet, cease and desist, null and void)." King v. Burwell, 135 S. Ct. 2480, 2498 (2015) (Scalia, J., dissenting).

91    Bazak, supra note 43, at 6 (distinguishing hendiadys from tautology, because "in a tautology the second word is synonymous with the first and is added only for the sake of emphasis"); Stockert, supra note 45, at 1-2, 4-5 (noting that hendiadys requires a "semantic gap," some "semantic discontinuity" between the two terms).

92    Term of Art, Black's Law Dictionary (10th ed. 2014) (defining *term of art* as "[a] word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts").

93    Harrison, supra note 18, at 1116; see also Samuel L. Bray, The Supreme Court and the New Equity, 68 Vand. L. Rev. 997, 1012-14 (2015) (noting the use of "equitable" as a term of art in federal statutes). Similarly, Chief Justice Ellsworth was treating "Appeal" and "Writ of Error" as terms of art when he said they have a "fixed and technical sense." Wiscart v. Dauchy, 3 U.S. (3 Dall.) 321, 327 (1796).

94    One instance of such a process -- two terms being used as a hendiadys that becomes a legal term of art -- is over three thousand years old. According to Moshe Weinfeld, the Akkadian phrase "bond and oath" (*riksu u mamitu*) was used to refer to a treaty: "*riksu* originally expresse[d] the demands presented by the overlord or ally while *mamitu* reflect[ed] the acceptance of the demands by the other party," but "the original meaning of these terms fell into oblivion after they were combined into a hendiadys and turned into a technical term for 'treaty.'" M. Weinfeld, Covenant Terminology in the Ancient Near East and Its Influence on the West, 93 J. Am. Oriental Soc'y 190, 190-91 & n.3 (1973).

95    The first attested naming of this figure of speech appears in Pomponius Porphyrio (early third century AD). The term also appears in the *Homeric Dictionary* of Appollonius the Sophist (first century AD), though it is possible the term was added by a later hand. For the information in this note I am grateful to Albertus Horsting. E-mail from Albertus Horsting, to author (May 8, 2015, 12:49 PDT) (on file with author).

96    For example, see 18 The Dramatick Writings of Will. Shakespeare, With the Notes of All the Various Commentators; Printed Complete from the Best Editions of Sam. Johnson and Geo. Steevens 7 (London, John Bell 1788) (noting that Shakespeare "sometimes expresses one thing by two substantives," such as "*law and heraldry*," i.e., "herald law," and "*death and honour*, i.e. honourable death").

97    See Wright, supra note 8; Frank Kermode, Cornelius and Voltemand: Doubles in *Hamlet*, *in* Forms of Attention 33 (1985).

98      See E. Adelaide Hahn, Hendiadys: Is There Such a Thing? (Based on a Study of Vergil), 25 Classical Wkly. 193 (1922). Brichto calls hendiadys "rather rare in English." Brichto, supra note 43, at 40; see also Matthews, supra note 78, at 207 ("Hendiadys is an ancient trope recognized to be common in Biblical Hebrew and in classical Greek and Latin but thought to be rare in English."). This perception may be incorrect, however. The English examples given above, see supra notes 53-67, have not been previously collected, and there are doubtless many more.

99      Cf. Jeanne Fahnestock & Marie Secor, The Rhetoric of Literary Criticism, in Textual Dynamics of the Professions: Historical and Contemporary Studies of Writing in Professional Communities 76, 87 (Charles Bazerman & James Paradis eds., 1991) (maintaining that "one of the most persuasive endeavors that a literary scholar can engage in is to find something (a device, an image, a linguistic feature, a pattern) that no one else has seen -- and to find it everywhere," and giving as an example George Wright's analysis of hendiadys in Hamlet). For example, one scholar has persuasively argued that "true and fair" is a hendiadys in accounting standards, but when she identifies the same phrase as a hendiadys in Shakespeare and Donne the conclusion is much less convincing, because the context of the quotations suggests that each term should be read separately. See A. Zanola, The 'True and Fair' Legal Formula: Hendiadys or Tautology?, 1 New Ground Res. J. Leg. Stud. Res. & Essays 1 (2013).

100     Fowler's Dictionary, supra note 40, at ix.

101     See Kuntz, supra note 43, at 134; cf. Jacques Derrida, Et Cetera... (and so on, und so weiter, and so forth, et ainsi de suite, und so überall, etc.) (Geoffrey Bennington trans.), reprinted in Deconstruction: A User's Guide 282, 283 (Nicholas Royle ed., 2000) (listing a series of phrases of the form "deconstruction and x," and then saying that "in each of these great sets, the conjunction 'and' is resistant not only to association but also to serialization, and it protests against a reduction which is at bottom absurd and even ridiculous").

102     English usage is varied, but in the colloquial examples the first term tends to be more general; it modifies or intensifies the second ("good and warm," "hot and bothered," "nice and fat"). See Hopper, supra note 37, at 148.

103     Other implications of this straightforward use of hendiadys are seemingly less relevant for legal texts, including the rhetorical value of repetition, see Kuntz, supra note 43, at 134; the indication of verbal aspect in a narrative, see Hopper, supra note 37, at 147-48; and the metrical possibilities created by having another way of putting the point. This last implication may explain the seeming predominance of hendiadys in English poetry, at least before the vers libre revolution. When meter matters, hendiadys is valuable.

104     An example from Hamlet:

        When Horatio says he would not believe in the Ghost "Without the sensible and true avouch / Of mine own eyes" (1.i.57-58), he must mean "the sensorily accurate testimony" of his eyes -- that is, the first adjective must modify the second -- or, if one prefers, "the accurate sensory testimony," with "sensory testimony" taken as a compound unit modified by "accurate." Either way the two elements of the hendiadys, though grammatically parallel, are not semantically parallel, and the most likely paraphrases would change the coordinate structure and make one of the two elements subordinate to the other or to a unit that includes the other.

        Wright, supra note 8, at 174.

105     Some authorities restrict the term to instances where one part is "subordinate in sense to the other." Fowler's Dictionary, supra note 40, at 372. On the scope of hendiadys, see supra notes 40-41 and accompanying text.

106     Fabb, supra note 38, at 1229; R.W.L. Moberly, Whose Justice? Which Righteousness? The Interpretation of Isaiah V 16, 51 Vetus Testamentum 55, 60 (2001) ("[T]he combination [of <<foreign language>>] with mišpat generally creates what is in effect a hendiadys with a differing semantic range from that of <<foreign language>> on its own.").

Compendium_Cornell
Page 0619

107 Kermode, supra note 41, at 109 ("[T]he flash cannot be distinct from the outbreak, and both depend on the fire in 'fiery.'").

108 Id.

109 Id. at 106. Numerous other instances could be given where a hendiadys is more complex than one term modifying another. For example, in *Hamlet*, "*will and matter*" can be understood as "a complicated hendiadys" that means something like "'purposed business.'" Id. at 113. In *Measure for Measure*, there is "a *Hamlet*-like hendiadys: ' *the fault and glimpse* of newness,' which a reader or spectator must expand into something like 'a display of new authority that may be seen as a fault.'" Id. at 150. And in the book of Isaiah, the Lord says: "I cannot endure *iniquity and assembly*." Isaiah 1:13b (author's translation). This is not an accumulation of two separate facts: the people are guilty of moral failure ("iniquity"), and the people engage in religious devotion ("assembly"). Rather it is the conjunction of the two that brings this assertion of divine displeasure. The moral failure of the worshippers makes their worship a moral failure.

110 Kermode, supra note 41, at 102 (describing hendiadys as a figure by which "the meaning of the whole depends upon a kind of unnaturalness in the doubling, a sort of pathological intensification," one that "can introduce unease and mystery into an expression"); Wright, supra note 8, at 169. Intensification is common for English hendiadys in the pattern of "good and x," as well as for hendiadys in biblical Hebrew, see supra note 56 (listing examples of hendiadys in Genesis 1-4).

111 See, e.g., supra note 75 and accompanying text ("cakes and ale"); supra note 50 and accompanying text and note 96 ("law and heraldry" and "death and honour"); supra note 8 and accompanying text ("cups and gold"); supra note 108 and accompanying text ("encom-passment and drift"); supra note 109 ("will and matter" and "the fault and glimpse of new-ness"); cf. Harley Granville-Barker, 1 Prefaces to Shakespeare 169 (1952) (suggesting that where "repetition by complement," i.e., hendiadys, appears in Hamlet, the meaning of the constituents of the phrase is sometimes "amplified or intensified," sometimes "enlarged," and sometimes "modified").

112 In addition to the examples given in the text, see supra note 60.

113 Admittedly this phrase could be taken in other ways: as both rather than each one singly (a "lecture" and "advice") or as both reciprocally (an "advising lecture" and "lecturing advice"). Cf. Kermode, supra note 41, at 110 (suggesting the two are tautologous); Poutsma, supra note 32, at 290 ("= the advice of, or contained in, my former lecture." (emphasis omitted)).

114 See supra note 85 and accompanying text.

115 See Stinneford, supra note 14.

116 In this Article, "innovative" is understood to be synonymous with "contrary to long usage." Drawing and quartering would not be unprecedented in its cruelty, but it would be innovative in its cruelty.

117 See Hershenov, supra note 13; Stinneford, supra note 14, at 1800-10.

118 U.S. Const. amend. VIII.

119   See In re Kemmler, 136 U.S. 436, 447 (1890); cf. U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson, 255 U.S. 407, 430 (1921) (Brandeis, J., dissenting) ("And the punishment inflicted -- denial of a civil right -- is certainly unusual. Would it also violate the Eighth Amendment?").

120   Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting) ("The Eighth Amendment forbids punishments that are cruel and *unusual*."); Helling v. McKinney, 509 U.S. 25, 42 (1993) (Thomas, J., dissenting) ("a party must prove... that the challenged conduct was both cruel and unusual"); Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.) (describing the Eighth Amendment as "forbidding 'cruel *and unusual* punishments'"); Stanford v. Kentucky, 492 U.S. 361, 378 (1989) (plurality) ( "The punishment is either 'cruel *and* unusual' (i.e., society has set its face against it) or it is not."), overruled by Roper v. Simmons, 543 U.S. 551 (2005); see also Scalia & Garner, supra note 6, at 116 ("[T]he *and* signals that cruelty or unusualness alone does not run afoul of the clause: The punishment must meet both standards to fall within the constitutional prohibition.").

121   See Hershenov, supra note 13, at 83-85; Ryan, supra note 13; Joshua L. Shapiro, And Unusual: Examining the Forgotten Prong of the Eighth Amendment, 38 U. Mem. L. Rev. 465, 469 (2008); see also Stinneford, supra note 17, at 972 ("If a punishment is found to be unusual, the next question is whether it is cruel.").

122   John Hart Ely, Democracy and Distrust: A Theory of Judicial Review 14 (1980); Akhil Reed Amar, America's Lived Constitution, 120 Yale L.J. 1734, 1777-79 (2011); Bradford R. Clark, Constitutional Structure, Judicial Discretion, and the Eighth Amendment, 81 Notre Dame L. Rev. 1149, 1200 (2006); Ronald Dworkin, The Arduous Virtue of Fidelity: Originalism, Scalia, Tribe, and Nerve, 65 Fordham L. Rev. 1249, 1253 (1997); Ronald Dworkin, Comment, *in* Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 115, 120 (1997); see also Michael J. Zydney Mannheimer, When the Federal Death Penalty Is "Cruel and Unusual", 74 U. Cin. L. Rev. 819, 831-32 (2006) (treating the text of the Eighth Amendment as if punishments were prohibited only if both "cruel" and "unusual," though also, inconsistently, suggesting the first term is adverbial). Other scholars speak of "cruel" and "unusual" independently, though without explicitly saying that the Eighth Amendment prohibits only punishments that are both. E.g., Vicki C. Jackson, Constitutional Comparisons: Convergence, Resistance, Engagement, 119 Harv. L. Rev. 109, 126 (2005).

123   E.g., Furman v. Georgia, 408 U.S. 238, 376 (1972) (Burger, C.J., dissenting) ("Although the Eighth Amendment literally reads as prohibiting only those punishments that are both 'cruel' and 'unusual,'...."); Sharon Dolovich, Cruelty, Prison Conditions, and the Eighth Amendment, 84 N.Y.U. L. Rev. 881, 883 n.3 (2009) ("The conjunction 'and' in 'cruel and unusual' notwithstanding...."); Tom Stacy, Cleaning Up the Eighth Amendment Mess, 14 Wm. & Mary Bill Rts. J. 475, 491 (2005) ("The Justices sometimes have said that an unconstitutional punishment must be both cruel and unusual, just as the literal text provides.").

124   For example, in Graham v. Florida, 560 U.S. 48 (2010), apart from quotations, the majority opinion only used the words *cruel* and *unusual* as part of the phrase "cruel and unusual." See also Stacy, supra note 123, at 491 (noting that "the Justices have made conflicting declarations about the relationship between the terms 'cruel' and 'unusual'").

125   Corinna Barrett Lain, Lessons Learned from the Evolution of "Evolving Standards," 4 Charleston L. Rev. 661, 673-74 (2010).

126   Cf. David A. Strauss, The Modernizing Mission of Judicial Review, 76 U. Chi. L. Rev. 859, 864 (2009) (finding the U.S. Supreme Court's "modernization approach" to the Cruel and Unusual Punishments Clause to be just "one among many plausible ways to interpret the text" and suggesting that where it has "take[n] root" is in judicial precedent).

127   Kent Greenawalt, Interpreting the Constitution 113, 119 (2015) (noting that at the Founding "the inquiries about the two terms were apparently seen as interlocked"); Stinneford, supra note 17, at 968-69 (treating a punishment that is "unusual," in the sense of contrary to long usage, as presumptively "cruel"); cf. Hugo Adam Bedau, Death is Different: Studies in the Morality, Law, and Politics of Capital Punishment 96 (1987) (accepting what he describes as the Supreme Court's treatment of the phrase as if it were "a ligature, 'cruel-and-unusual punishments,' designating a complex of

Compendium_Cornell
Page 0621

intertwined and inseparable properties"). Professor Caleb Nelson once reserved the question whether the phrase was "a term of art" that could not "usefully be broken down into its individual components." Caleb Nelson, Originalism and Interpretive Conventions, 70 U. Chi. L. Rev. 519, 545 n.120 (2003).

128   Meghan J. Ryan, Judging Cruelty, 44 U.C. Davis L. Rev. 81, 124 (2010).

129   In re Kemmler, 136 U.S. 436, 447 (1890).

130   Margaret Jane Radin, The Jurisprudence of Death: Evolving Standards for the Cruel and Unusual Punishments Clause, 126 U. Pa. L. Rev. 989, 1043-44 (1978); see Gregg v. Georgia, 428 U.S. 153, 183 (1976) (Powell, Stewart, & Stevens, JJ., plurality opinion). For critique, see Youngjae Lee, The Constitutional Right Against Excessive Punishment, 91 Va. L. Rev. 677, 736-42 (2005).

131   See Graham v. Florida, 560 U.S. 48, 60 (2010), modified (July 6, 2010) (if "'grossly disproportionate,' the sentence is cruel and unusual" (quoting Harmelin v. Michigan, 501 U.S. 957, 1005 (1991))).

132   John Kekes, Cruelty and Liberalism, 106 Ethics 834, 838 (1996); see also Dolovich, supra note 123, at 924-26 (understanding "cruelty" to include indifference to the suffering of others).

133   Hershenov, supra note 13, at 78-81. Bedau says that "judging a punishment to be cruel is already condemning it strongly, [and] the idea of a 'tolerably cruel punishment' verges on an oxymoron." Bedau, supra note 127, at 96. But Hershenov provides numerous examples to the contrary from contemporary English speech, as well as an example from the brief debate over the Eighth Amendment. Scholars who look to definitions of the word *cruel* in early dictionaries tend to give less attention to the relatively mundane glosses, such as "causing pain" or "destructive" and "causing pain, grief, or distress." See Ryan, supra note 128, at 121; Stinneford, supra note 17, at 911. In Dr. Johnson's *Dictionary*, the entry for *cruel* contains the following definition for "things":

2. [Of things.] Bloody; mischievous; destructive; causing pain.

Consider mine enemies; for they are many, and they hate me with *cruel* hatred. *Psalm* xxv.19.

We beheld one of the *cruelest* fights between two knights, that ever hath adorned the most martial story. *Sidney*.

1 Johnson, supra note 69 (CRÚEL). Similarly, the preamble to the Pennsylvania Constitution of 1776 condemns King George's "most cruel and unjust war," Pa. Const. of 1776, pmbl -- a formulation which simultaneously suggests that cruelty is a matter of degree and that what was "cruel" was not necessarily considered "unjust."

134   Cf. Bedau, supra note 127, at 97 ("Were we to try to isolate the unusualness of a punishment from its cruelty, we would focus on a property of punishments that has little or nothing to do with moral condemnation.").

135   Stinneford, supra note 14, at 1767.

136   Id. Ronald Dworkin once speculated about a term in the Cruel and Unusual Punishments Clause having a different meaning now than it did at the Founding, but in his hypothetical the term was *cruel*. Ronald Dworkin, Bork's Jurisprudence, 57 U. Chi. L. Rev. 657, 661-62 (1990). According to Dworkin, the sense of the term that would control would be the one from the eighteenth century. Id. at 662.

Compendium_Cornell
Page 0622

137  See Stinneford, supra note 14, at 1766-815. Stinneford leaves no doubt about his conclusion. Referring to the "contrary to long usage" sense of "unusual," he says: "This is the only plausible meaning of the word as used in the Eighth Amendment." Id. at 1810.

138  Without that premise the phrase may still be read as a hendiadys. See infra text accompanying notes 173-78.

139  As noted above, a variety of evaluative glosses of "cruel" are possible, and only one is given here for simplicity. The argument works equally well if another evaluative gloss is used.

140  Exactly the same point could be made if "unusual" were taken to refer to frequency. If the death penalty is cruel, why does it matter that it is rare? But cf. Glossip v. Gross, 135 S. Ct. 2726, 2772 (2015) (Breyer, J., dissenting) (taking the term "unusual" to refer to frequency of use and stating that "[t]he Eighth Amendment forbids punishments that are cruel and *unusual*").

141  E.g., Dolovich, supra note 123, at 883 n.3 ("What seems hard to credit is the notion that a given punishment should be judged constitutional however cruel it may be, so long as its use is sufficiently widespread."). Stinneford is an exception.

142  See Hershenov, supra note 13, at 78-81; see also Anthony F. Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 860 (1969) (suggesting that *cruel* once "had a less onerous meaning," and offering as synonyms from seventeenth and eighteenth century English "severe," "hard," and "excessive"); supra note 133 and accompanying text (noting Dr. Johnson's definition of *cruel*).

143  Hershenov tries to avoid this objection to his broad reading of "cruel," but not persuasively. See Hershenov, supra note 13, at 94 n.27.

144  Note that the same difficulties just described also apply if "unusual" is taken to refer to frequency or distribution, not innovation. If "cruel" is an evaluative term, it would be odd to make frequency or distribution the criterion for sorting between the unjustifiably severe punishments that are constitutional and the ones that are not. See Dolovich, supra note 123, at 883 n.3. If "cruel" is taken as meaning only harsh and "unusual" is understood as a term about frequency or distribution, the Clause would turn out to be a prohibition either of rare punishments or of unevenly applied punishments.

145  For the pithy expression I thank Steve Sachs.

146  A suggestion along these lines was made in passing in Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv. L. Rev. 635, 638 n.16 (1966) ("'Unusual' is probably best thought of as adverbially modifying 'cruel.'"), and it was repeated in Mannheimer, supra note 122, at 831-32. But see Bedau, supra note 127, at 96 (raising and rejecting this possibility). In addition, Corinna Barrett Lain suggests that in older cases "the words 'cruel' and 'unusual' were read as one, prohibiting punishments that were unusually cruel." Lain, supra note 125, at 665. But what she has in mind is something quite different from the reading here -- not a prohibition on cruel innovation, but only a prohibition on torture.

147  If "unusual" refers to frequency, the phrase can still be read as a hendiadys. See infra text accompanying notes 173-78.

148  Stinneford reverses the order, first asking if the punishment is unusual and then if it is cruel. Stinneford, supra note 17, at 972. Although he takes a finding that a punishment is "unusual" as evidence that it is also "cruel" -- and to that extent does not divorce the inquiries -- he still treats "cruel" as a distinct question that "involves an exercise of the Court's own judgment." Id.

149 For a parallel point about "necessary and proper," see infra text accompanying note 297.

150 See Robinson v. California, 370 U.S. 660, 667 (1962).

151 Cf. Stinneford, supra note 17, at 968-72 ("[W]hat the Court should really be asking is whether the punishment meets the standards that have prevailed up until today." (emphasis omitted)).

152 See Greenawalt, supra note 127, at 113 ("If 'long usage' is assessed at the time of a modern court's decision rather than what was being done in 1791, this approach also allows a particular form of evolution over time.").

153 See id. at 112-13 (concluding that the "more convincing account" of why Oates's punishments were cruel and unusual is "that the punishment was out of proportion for the crime of perjury and was not contemplated by the common law or by statute *for that crime*"). There would of course be further questions -- how long exactly is long or immemorial usage, what counts as an aberration not altering the tradition (for example, Titus Oates), whether usage is determined at the time of the offense or the time of sentencing, and so on. Questions like these are not unique to a hendiadic reading. They are inevitable where the governing law is vague and has to be made more precise through the resolution of cases.

154 See supra Part I.

155 On "unusual" in English and early American law, see Stinneford, supra note 14, at 1766-815. At the Founding some state constitutions prohibited punishments that were "cruel," some "cruel or unusual," and some "cruel and unusual." Stinneford offers a good explanation for why these would all be roughly similar, and his argument is strengthened by the hendiadic reading offered here. If there was a consensus that "the government should not impose cruel punishments" and that "the common law was essentially reasonable, so that governmental efforts to 'ratchet up' punishment beyond what was permitted by the common law were presumptively contrary to reason," id. at 1798-99, then there would not be much difference between prohibiting cruel punishments (as determined by their being contrary to long usage), cruel or unusual punishments (largely overlapping concepts), or cruel and unusual punishments (a hendiadys). Even though sharp distinctions should not be drawn between these formulations, it remains true that each has a different range of interpretive possibilities.

156 See Hershenov, supra note 13; Stinneford, supra note 14, at 1800-10; see also Stinneford, supra note 17, at 943-47 (surveying the concerns that led to the Eighth Amendment).

157 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, at 109-11 (Jonathan Elliot ed., 2d ed. Philadelphia, J. B. Lippincott Co. 1891).

158 See Stinneford, supra note 14, at 1803-08 (examining Patrick Henry's arguments).

159 Id. at 1806-07.

160 Aldridge v. Commonwealth, 4 Va. (2 Va. Cas.) 447, 450 (1824).

161 James Iredell ("Marcus"), Answers to Mr. Mason's Objections to the New Constitution, *in* 5 The Founders' Constitution 376 (Philip B. Kurland & Ralph Lerner eds., Liberty Fund reprt. 1987) (1788). Iredell thought a general prohibition would be too vague, and a list of prohibited punishments would fail of its purpose: "[I]f our government [were] disposed to be cruel their invention would only [be] put to a little more trouble." Id. at 376.

Compendium_Cornell
Page 0624

162    David P. Currie, The Constitution in Congress: The Federalist Period 1789-1801, at 95 (1997) (quoting 1 Stat. 113); cf. Simon Devereaux, Inexperienced Humanitarians? William Wilberforce, William Pitt, and the Execution Crisis of the 1780s, 33 L. & Hist. Rev . 839, 853-70 (2015) (describing the circumstances behind the Felons Anatomy Bill proposed in Parliament in 1786). On more recent innovations in cruelty, see Stinneford, supra note 14, at 1754-55; see also Stinneford, supra note 17, at 969-70 ("The government has a pronounced tendency to react to perceived crises by ratcheting up the harshness of punishments.").

163    Compare Herbert Spencer, Social Statics: Or, the Conditions Essential to Human Happiness Specified, and the First of Them Developed 65 (London, George Woodfall & Son 1851) ("Progress, therefore, is not an accident, but a necessity.... [T]he things we call evil and immorality [must] disappear; so surely must man become perfect."), with William Hogarth, A Rake's Progress in Sir John Soane's Museum, London (1732-1733).

164    Whatever the present merits of these two views -- the Court as a pathfinder for evolving standards, and the Court as a pathblocker for devolving standards -- the pathfinder conception is almost inconceivable for the Eighth Amendment before incorporation. Of course these are not the only possible views of the Cruel and Unusual Punishments Clause. The Clause could be understood as requiring judges to undertake a moral analysis of cruelty that is independent of popular views and legislative enactments, whether past or present. That view has difficulty, however, with the word *unusual*.

165    See, e.g., 1 The Debates and Proceedings in the Congress of the United States 754 (Joseph Gales ed., Washington, Gales & Seaton 1834) (Rep. Livermore) (speaking against the Eighth Amendment, but stating that "[i]f a more lenient mode of correcting vice and deterring others from the commission of it could be invented, it would be very prudent in the Legislature to adopt it"). The same two-sided view of innovation in punishment can be found in the Pennsylvania Constitution of 1776, but it took a different tack: instead of prohibiting innovation that led to more cruelty, it encouraged innovation that led to less cruelty. See Pa. Const. of 1776, §§ 38-39.

166    Cf. Stinneford, supra note 17, at 970 ("The English and early American case law confirms that both versions of the Cruel and Unusual Punishments Clause were directed at *new punishments that were harsher than permitted by prior practice*." (emphasis added)).

167    Hershenov, supra note 13, at 81-82. For agreement that American society is divided but disagreement about the implication, compare Richard A. Epstein, The Classical Liberal Constitution: The Uncertain Quest for Limited Government 57-61 (2014), with Radin, supra note 130, at 1064.

168    See Alice Ristroph, State Intentions and the Law of Punishment, 98 J. Crim. L. & Criminology 1353, 1404 (2008).

169    See Antonin Scalia, Response, *in* Scalia, supra note 122, at 129, 145.

170    This can be seen in how judges sometimes take a seemingly absolute inquiry and turn it into a relative one. For example, a plaintiff seeking an equitable remedy must show that there is "no adequate remedy at law." In practice judges treat the inquiry as a comparative one: not "are the legal remedies adequate?" but "are the legal remedies *more* adequate?" See Samuel L. Bray, The System of Equitable Remedies, 63 UCLA L. Rev. 530, 584 (2016) ( "[W]hen a court considers the adequacy of legal remedies, it takes into account a range of considerations... such as 'the burden an injunction will place on the court.'" (quoting Emily Sherwin et al., Ames, Chafee, and Re on Remedies 410 (2012))).

171    See Hershenov, supra note 13; Stinneford, supra note 14; Stinneford, supra note 17. There is of course a large body of scholarship on the Cruel and Unusual Punishments Clause that does not examine the original understanding. E.g., Lee, supra note 130.

172    In more detail: Hershenov argues persuasively that "cruel" is not a highly restrictive term and that "unusual" is what sorts the cruel punishments that are constitutionally permissible from the ones that are not. But he is less convincing in his reading of "unusual" as "the subjective expectation that something is uncommon." And he struggles to avoid the implication of his reading that the Clause would prohibit almost all new punishments, even if they ameliorate cruelty. See Hershenov, supra note 13, at 94 n.27. Stinneford offers extensive evidence that "unusual" was a term of art for "contrary to long usage." He recognizes that the Clause is a restriction on "Cruel Innovation" (in the title of Stinneford, supra note 17), but he still treats "cruel" as a distinct inquiry, see Stinneford, supra note 14, at 972-73. If the phrase "cruel and unusual" is read as a hendiadys, that treatment is needlessly complex.

173    See text accompanying supra note 135.

174    See Harmelin v. Michigan, 501 U.S. 957, 975 (1991) (opinion of Scalia, J.) (calling "the ultimate question" about the Clause "what its meaning was to the Americans who adopted the Eighth Amendment").

175    See Kennedy v. Louisiana, 554 U.S. 407, 422-34 (2008), as modified (Oct. 1, 2008), opinion modified on denial of reh'g, 554 U.S. 945 (2008).

176    See Graham v. Florida, 560 U.S. 48, 80-82 (2010), as modified (July 6, 2010).

177    Furman v. Georgia, 408 U.S. 238, 240, 256 (1972) (Douglas, J., concurring); see also Ely, supra note 122, at 97, 173; Laurence Claus, The Antidiscrimination Eighth Amendment, 28 Harv. J.L. & Pub. Pol'y 119 (2004).

178    See Hershenov, supra note 13 ; Stinneford, supra note 14.

179    See Lain, supra note 125, at 673-74. One could go further and say that the Court's Eighth Amendment jurisprudence and the reading given here draw on different conceptions of the purpose of judicial review. David Strauss captures this difference when he asks: "The real question about modernization is whether the proper function of judicial review is to try to correct, rather than simply to facilitate, the operations of democracy." Strauss, supra note 126, at 907.

180    See supra note 124.

181    Furman v. Georgia, 408 U.S. 238, 281 (1972) (Brennan, J., concurring) (finding the "primary" principle for determining "whether a particular punishment is 'cruel and unusual'" to be that it "must not by its severity be degrading to human dignity"); William J. Brennan, Jr., Constitutional Adjudication and the Death Penalty: A View from the Court, Oliver Wendell Holmes, Jr. Lecture at Harvard University (Sept. 5, 1986), in 100 Harv. L. Rev. 313, 330 (1986) ("A punishment is 'cruel and unusual' if it does not comport with human dignity."). Justice Scalia has also described the Eighth Amendment as containing an "abstract principle" against cruelty, but one "rooted in the moral perceptions of the time." Scalia, supra note 169, at 145.

182    U.S. Const. art. I, § 8, cl. 18.

183    The following sources offer entry points to the literature on the Clause: For a brief survey of major conceptual questions, see Harrison, supra note 18, at 1102-09; on the legal background, see Lawson et al., supra note 18; Juliana Gisela Dalotto, Comment, American State Constitutions of 1776-1787: The Antecedents of the Necessary [and] Proper] Clause, 14 U. Pa. J. Const. L. 1315 (2012); on the drafting history, see John Mikhail, The Necessary and Proper Clauses, 102 Geo. L.J. 1045, 1086-106 (2014); and on the relationship between Congress and the courts in interpreting the Clause, see Manning, supra note 3.

Compendium_Cornell
Page 0626

184  Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2592 (2012). In her dissent from the Necessary and Proper Clause holding, Justice Ginsburg did not object to "necessary" and "proper" as separate requirements. Id. at 2626-28 (Ginsburg, J., concurring and dissenting).

185  E.g., Jinks v. Richland Cty., 538 U.S. 456, 462-64 (2003).

186  E.g., id. at 464-65 (finding a law "proper"); Printz v. United States, 521 U.S. 898, 923-24 (1997) (finding a law not "proper" because it "violates the principle of state sovereignty" that is "reflected in... various constitutional provisions"); Alden v. Maine, 527 U.S. 706, 732-33 (1999) (quoting and leaning on Printz's conclusion that laws in violation of state sovereignty are not "proper"); see also Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2105-07 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) (treating "proper" as a separate limitation on congressional action); Gonzales v. Raich, 545 U.S. 1, 39 (2005) (Scalia, J., concurring in the judgment) (noting precedents that affirm that a federal statute violating state sovereignty is not "proper").

187  Manning, supra note 3, at 54-55 (footnote omitted); see Eugene Gressman, Some Thoughts on the Necessary and Proper Clause, 31 Seton Hall L. Rev. 37, 44 (2000). For an opinion including separation-of-powers principles in "proper," see Zivotofsky, 135 S. Ct. at 2105-07 (Thomas, J., concurring in the judgment in part and dissenting in part).

188  Lawson & Granger, supra note 6. Lawson and Granger's article was cited in Printz, 521 U.S. at 924. On the antecedents, see Lawson & Granger, supra note 6, at 271 n.15. On the article's influence, see Gary Lawson, Making a Federal Case Out of It: Sabri v. United States and the Constitution of Leviathan, 2003-2004 Cato Sup. Ct. Rev. 119, 153-54; John F. Manning, Separation of Powers as Ordinary Interpretation, 124 Harv. L. Rev. 1939, 1987 n.251 (2011).

189  Lawson & Granger, supra note 6, at 271-72. If "proper" required conformity to express constitutional provisions, it would be odd to include that requirement only here and not for all of Congress's enumerated powers. See David P. Currie, The Constitution in the Supreme Court: The First Hundred Years 1789-1888, at 327 n.297 (1985). Similarly, if "proper" required non-abridgment of the rights retained by the people, it would be odd to confine the requirement only to the exercise of power under the Necessary and Proper Clause. See Michael W. McConnell, Natural Rights and the Ninth Amendment: How Does Lockean Legal Theory Assist in Interpretation?, 5 N.Y.U. J.L. & Liberty 1, 8 n.34 (2010).

190  Robert G. Natelson, The Framing and Adoption of the Necessary and Proper Clause, in Lawson et al., supra note 18, at 84, 89-91.

191  Id. at 119.

192  Geoffrey P. Miller, The Corporate Law Background of the Necessary and Proper Clause, in Lawson et al., supra note 18, at 144, 174.

193  Gardbaum, supra note 3, at 813 n.64.

194  Randy E. Barnett, The Original Meaning of the Necessary and Proper Clause, 6 U. Pa. J. Const. L. 183, 219-20 (2003) [hereinafter Barnett, The Original Meaning of the Necessary and Proper Clause]. For an earlier view, see Randy E. Barnett, Necessary and Proper, 44 UCLA L. Rev. 745 (1997) [[hereinafter Barnett, Necessary and Proper].

195  Ilya Somin, The Individual Mandate and the Proper Meaning of "Proper," in The Health Care Case: The Supreme Court's Decision and Its Implications 146, 152 (Nathaniel Persily, Gillian E. Metzger & Trevor W. Morrison eds., 2013).

Somin offers an alternative understanding of "proper" as excluding "new claims of authority that are major independent powers." Id. at 159.

196     See, e.g., Akhil Reed Amar, America's Constitution: A Biography 112-13, 543 n.28 (2005); Balkin, supra note 6, at 179; Currie, supra note 189, at 163 n.37; Scalia & Garner, supra note 6, at 116-17; Akhil Reed Amar, Intratextualism, 112 Harv. L. Rev. 747, 758 n.46 (1999); Jack M. Balkin, Commerce, 109 Mich. L. Rev. 1, 49 (2010); William Baude, Rethinking the Federal Eminent Domain Power, 122 Yale L.J. 1738, 1811 & n.407 (2013); Steven G. Calabresi & Saikrishna B. Prakash, The President's Power to Execute the Laws, 104 Yale L.J. 541, 587 (1994); Michael G. Collins & Jonathan Remy Nash, Prosecuting Federal Crimes in State Courts, 97 Va. L. Rev. 243, 294 (2011); Thomas P. Crocker, Presidential Power and Constitutional Responsibility, 52 B.C. L. Rev. 1551, 1607-14 (2011); David E. Engdahl, The Necessary and Proper Clause as an Intrinsic Restraint on Federal Lawmaking Power, 22 Harv. J.L. & Pub. Pol'y 107, 116 (1998); Richard W. Garnett, The New Federalism, the Spending Power, and Federal Criminal Law, 89 Cornell L. Rev. 1, 79 (2003); Andrew Koppelman, "Necessary," "Proper," and Health Care Reform, in The Health Care Case, supra note 195, at 105, 111; Lawrence Lessig & Cass R. Sunstein, The President and the Administration, 94 Colum. L. Rev. 1, 67 n.278 (1994); Thomas W. Merrill, Rethinking Article I, Section 1: From Nondelegation to Exclusive Delegation, 104 Colum. L. Rev. 2097, 2130 (2004); Mikhail, supra note 183, at 1132; Richard W. Murphy, Separation of Powers and the Horizontal Force of Precedent, 78 Notre Dame L. Rev. 1075, 1082 (2003); Michael Stokes Paulsen, Abrogating Stare Decisis by Statute: May Congress Remove the Precedential Effect of Roe and Casey?, 109 Yale L.J. 1535, 1568 (2000); Saikrishna Prakash, The Essential Meaning of Executive Power, 2003 U. Ill. L. Rev. 701, 737; Neomi Rao, Removal: Necessary and Sufficient for Presidential Control, 65 Ala. L. Rev. 1205, 1229 (2014); Nicholas Quinn Rosenkranz, Federal Rules of Statutory Interpretation, 115 Harv. L. Rev. 2085, 2102 & n.63 (2002); Somin, supra note 195, at 146-47; Ilya Somin, Taking Stock of Comstock: The Necessary and Proper Clause and the Limits of Federal Power, 2009-2010 Cato Sup. Ct. Rev. 239, 264-65; Ernest A. Young, Is There a Federal Definitions Power?, 64 Case W. Res. L. Rev. 1269, 1284-85 (2014).

197     Eric Posner and Adrian Vermeule say: "A more plausible reading because a less dramatic one, is just that the phrase 'necessary and proper' is an example, among many in the Constitution, of an internally redundant phrase." Posner & Vermeule, supra note 29, at 1728 n.20; see also Powell, supra note 29, at 724 n.42 ("It is very likely that Chief Justice Marshall viewed necessary and proper as a pleonasm with the second adjective proper importing no additional, legally significant, or justiciable meaning."). There is some support for that view. See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 324 (1819) (argument of Webster); Opinion of Edmund Randolph, Attorney Gen. of the U.S., to President Washington (February 12, 1791), in Legislative and Documentary History of the Bank of the United States 86, 89 (M. St. Clair Clarke & D. A. Hall comp., Washington, Gales & Seaton 1832) (doubting whether proper "has any meaning"). For critique, see infra note 204.

198     Evan H. Caminker, State Sovereignty and Subordinacy: May Congress Commandeer State Officers to Implement Federal Law?, 95 Colum. L. Rev. 1001, 1031 n.115 (1995); Posner & Vermeule, supra note 29, at 1762 n.20; see also Ernest A. Young, Alden v. Maine and the Jurisprudence of Structure, 41 Wm. & Mary L. Rev. 1601, 1628-30 (2000) (making the same point, not as a criticism of Lawson and Granger but as a careful description of their argument).

199     See, e.g., Koppelman, supra note 196, at 111 (criticizing the idea that the mandate was not "proper," but voicing no objection to the idea of "proper" as a separate requirement); Peter J. Smith, Federalism, Lochner, and the Individual Mandate, 91 B.U. L. Rev. 1723, 1736-37 (2011) (same); see also Manning, supra note 3, at 48-49, 54-60 (assuming for the sake of analysis that "necessary" and "proper" are separate requirements). Some scholars take "proper" as only requiring conformity with other constitutional provisions -- a second requirement, but a minimal one. See Stephen L. Carter, The Political Aspects of Judicial Power: Some Notes on the Presidential Immunity Decision, 131 U. Pa. L. Rev. 1341, 1378 (1983); Hall, supra note 33, at 1852-54 & n.124, 1863. Randy Beck takes "proper" as a second requirement, but only an "internal limitation" that requires close means-end fit, see J. Randy Beck, The New Jurisprudence of the Necessary and Proper Clause, 2002 U. Ill. L. Rev. 581, 636-48-- a position close to the proprietary sense of "proper" discussed below in Section III.E.

200     Epstein, supra note 167, at 211.

Compendium_Cornell
Page 0628

[201]   Lawson & Granger, supra note 6, at 275-76; Somin, supra note 195, at 148.

[202]   See Harrison, supra note 18, at 1116-18; see also Mikhail, supra note 183, at 1121 (rejecting the idea that "necessary and proper" is a term of art). The leading work on the legal background of the Clause -- Lawson et al., supra note 18-- treats the phrase as having many antecedents but not as being a term of art. Accord Harrison, supra note 18, at 1117; Manning, supra note 18, at 1352-53. Contra Mikhail, supra note 183, at 1115. Another useful discussion of legal background is Dalotto, supra note 183. Dalotto's work also does not treat "necessary and proper" as a term of art. Nor was "necessary and proper" treated as a term of art in the early debates discussed below, such as the debate over the First Bank of the United States and the essays of Marshall and Roane. Instead, the words were defined individually and then applied as a unit (see, e.g., _McCulloch_, 17 U.S. (4 Wheat.) at 418-21) -- which is what one would expect for a hendiadys, but not for a term of art.

[203]   See Robert G. Natelson, The Agency Law Origins of the Necessary and Proper Clause, 55 Case W. Res. L. Rev. 243, 265-67 (2004). Not coincidentally, there has also been a suggestion that "cruel and unusual" might be disjunctive. See Treanor, supra note 36, at 499 n.51.

[204]   Eric Posner and Adrian Vermeule take the phrase as a tautology, and there is support for that view. See supra note 197. But there are also difficulties. First, there is ample evidence that "necessary" was understood to be more strict than "proper" as a standard of permissible action. See infra notes 242-50 and accompanying text. Second, two synonymous terms might be added at the same time, but the Committee of Detail took a draft with "necessary" and added "and proper" -- which is hard to explain if the terms meant the same thing. Accord Robert G. Natelson, The Framing and Adoption of the Necessary and Proper Clause, _in_ Lawson et al., supra note 18, at 84, 89. Third, the trope of impossible drafting, see infra note 278 and accompanying text, is difficult to understand if the terms are interchangeable. The Clause could have had only "necessary" or only "proper," and if critics of the Constitution feared one word or the other, its supporters could have alleviated their fears by removing the superfluous but offending word. Note that the arguments given in this footnote are about why "necessary and proper" is not best read as a pair of synonyms in Article I of the U.S. Constitution. Because these words have overlapping semantic ranges, they certainly could be used tautologously, and it seems that in at least some legal texts they were. E.g., sources cited in Robert G. Natelson, The Legal Origins of the Necessary and Proper Clause, _in_ Lawson et al., supra note 18, at 52, 77 n.115.

[205]   See Beck, supra note 199, at 638-39 ("[I]t must be said that the historical evidence for treating the propriety requirement as an external limitation on congressional power seems relatively thin."); McConnell, supra note 189, at 8 n.34 (expressing some skepticism of Lawson and Granger's argument that "proper" protects retained rights, for "[i]t is difficult to know how widespread this interpretation was at the time" and "[t]hose who defended the Constitution without a bill of rights did not take advantage of this argument").

[206]   An Impartial Citizen V, Petersburg Va. Gazette, Feb. 28, 1788, _reprinted in_ 8 Documentary History of the Ratification of the Constitution 428 (John P. Kaminski & Gaspare J. Saladino eds., 1988). Other examples may have eluded me. For contestable ones, see infra note 221.

[207]   An Impartial Citizen V, supra note 206, at 431. The pamphleteer's use of "unusual" is further support for Stinneford's thesis about the term's meaning. See supra notes 135-37 and accompanying text.

[208]   An Impartial Citizen V, supra note 206, at 431.

[209]   Id.

[210]   22 Annals of Cong. 694, 696 (1811) (statement of Rep. Barry).

Compendium_Cornell
Page 0629

211 *McCulloch*, 17 U.S. (4 Wheat.) at 367 (argument of Jones). For David Currie's inclination towards Jones's argument that the terms are separate requirements, though not seemingly towards the way Jones read those requirements, see Currie, supra note 189, at 163 n.37; see also id. at 326-27 & n.297.

212 "Tradition has it that Jefferson intended to appoint Roane" as Chief Justice of the U.S. Supreme Court, "but was forestalled by Ellsworth's resignation and the appointment of John Marshall by John Adams shortly before Jefferson's inauguration." Note, Judge Spencer Roane of Virginia: Champion of States' Rights -- Foe of John Marshall, 66 Harv. L. Rev. 1242, 1242 n.4 (1953).

213 Roane's "Hampden" Essays, No. 3 (June 18, 1819), *reprinted in* John Marshall's Defense of *McCulloch v. Maryland* 106, 125, 133 (Gerald Gunther ed., 1969) [hereinafter Marshall's Defense] (giving multiple definitions from Dr. Johnson's *Dictionary* for each word).

214 See id. at 133.

215 Id. at 133-35. Roane combines the two terms into a single statement summarizing the Clause: "To justify a measure under the constitution it must, therefore, be either 'necessary and proper,' or which is the same thing 'indispensably requisite' and 'peculiar' to the execution of a given power." Id. at 133.

216 Nor was Roane's point about "proper" taken up by the Virginia General Assembly, when it sent instructions to Virginia's U.S. Senators about their "concern and alarm" regarding *McCulloch*. The Virginia General Assembly criticized what Chief Justice Marshall did to "necessary," but not what he did to "proper." Instructions from the General Assembly of Virginia, to James Barbour and James Pleasants, junr., Senators from the State of Virginia, in the Congress of the United States (Dec. 22, 1819), *in* Journal of the House of Delegates of the Commonwealth of Virginia, Begun and Held at the Capitol, in the City of Richmond, on Monday the Sixth Day of December, One Thousand Eight Hundred and Nineteen 56, 57 (Richmond, Thomas Ritchie 1819).

217 James Madison, Amendments to the Constitution (House of Representatives, June 8, 1789), *in* 12 The Papers of James Madison 196, 197, 205 (Charles F. Hobson et al. eds., 1979).

218 Id. at 205-06.

219 Compare the abundant negation in Voltaire's *bon mot* that the Holy Roman Empire was "neither holy, nor Roman, nor an empire." The Oxford Dictionary of Quotations 797 (Elizabeth Knowles ed., 5th ed. 1999) (quoting Volatire).

220 See infra notes 229-30 and accompanying text. Elsewhere Madison asked "Whether any part of the powers transferred to the general government be unnecessary or improper?" The Federalist No. 41, at 268 (James Madison) (Jacob E. Cooke ed., 1961). He proceeded to treat that question as unitary, glossing it as: "[i]s the aggregate power of the general Government greater than ought to have been vested in it?" and answering it without distinguishing "unnecessary" and "improper." Id.

Nevertheless, I do not put much weight on this example. It is one of the myriad occurrences of these terms in *The Federalist* that have nothing to do with the Necessary and Proper Clause, and reasoning from "unnecessary" and "improper" to the meaning of "necessary" and "proper" is a mistake, see infra note 248.

221 Other early interpretations that are sometimes read to suggest two requirements are doubtful. In some, only a single term is used, either "necessary" or "proper," but it is not clear whether the source is referring to one of two requirements or is instead using a shorthand for the entire Clause. E.g., The Federalist No. 33, supra note 24 ("The propriety of a law in a constitutional light, must always be determined by the nature of the powers upon which it is founded."); Letter from Thomas Jefferson, to Edward Livingston (Apr. 30, 1800), *in* 31 The Papers of Thomas Jefferson, 1 February 1799 to 31

Compendium_Cornell
Page 0630

May 1800, at 546, 547 (Barbara B. Oberg ed., 2004) (repeatedly using "necessary" in describing the chain of reasoning -- in the style of "this is the house that Jack built" -- that purported to justify the federal incorporation of a copper mining company). In other instances, both terms (or cognates) are used in close proximity, but the usage appears to be elegant variation or otherwise rhetorical rather than analytic. See, e.g., The Federalist No. 44, supra note 2 ("For in every new application of a general power, the *particular powers*, which are the means of attaining the *object* of the general power, must always necessarily vary with the object; and be often properly varied whilst the object remains the same."); James Wilson, Pennsylvania Ratifying Convention, *in* 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, supra note 157, at 415, 468 ("Whether it will be proper at all times to keep up a body of troops, then there is a question to be determined by Congress; but I hope the necessity will not subsist at all times."). In addition, Story refers to "necessary" and "proper" distinctly, but he does not clearly refer to them as separate requirements. Story, supra note 27, § 1248, at 122 ("But if the intention was to use the word 'necessary' in its more liberal sense, then there is a peculiar fitness in the other word. It has a sense at once admonitory, and directory. It requires, that the means should be, *bonâ fide*, appropriate to the end."); see also id., §§ 1232, 1238, at 110, 114 ("If it be not *expressed*, the next inquiry must be, whether it is properly an incident to an express power, and necessary and proper to its execution.").

222    See supra notes 190-91 and accompanying text.

223    For example, in "An Impartial Citizen V," the sentence immediately prior to the two-requirements point reads:

When a power is vested any where, from the nature of things it must be understood to be attended by such other incidental powers as are necessary to give it efficacy; for to say, that a power is given, without the power of enforcing it, is a solecism in language.

An Impartial Citizen V, supra note 206, at 431.

224    For more on this proprietary sense of "proper," see infra Section III.E.

225    "An Impartial Citizen V" reads "proper" as more restrictive, while Jones reads it as less so. See An Impartial Citizen V, supra note 206, at 431 (arguing that laws made by Congress under the Clause "must not only be *necessary*, but *proper*"); *McCulloch*, 17 U.S. (4 Wheat.) at 367 (argument of Jones) (arguing that "[m]any means may be *proper*, which are not *necessary*"). Representative Barry does not say which he considers more restrictive. But he does seem to accept the narrow view of "necessary" rejected by *McCulloch*, namely that a necessary means is only "*that mean* without which the end could not be produced." 22 Annals of Cong. 696 (1811) (emphasis added); see id. at 697, 699 (glossing "necessary" as "strictly appropriate" and "strictly necessary").

226    The exception is the Anti-Federalists, who had no reason to lay stress on two requirements before ratification.

227    The Federalist No. 33, supra note 24; The Federalist No. 44, supra note 2.

228    See Jefferson, supra note 19; James Madison, The Bank Bill (House of Representatives, Feb. 2, 1791), *in* 13 The Papers of James Madison 372 (Charles F. Hobson et al. eds., 1981). On the connection between Madison's view of the Necessary and Proper Clause and his theory of republican government, see Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution 354-55 (1996).

229    In The Federalist No. 44, supra note 2, for example, Madison argues that the Clause gives only powers that would already exist "by unavoidable implication" from the need to execute the enumerated powers. Although he uses a variety of phrases ("necessary and proper," "unnecessary or improper," "not necessary or proper") he never suggests a particular power might be necessary, or proper, but not both. The one place he alternates the use of the terms appears to be an elegant variation, because repeating "necessarily and properly" in two consecutive clauses would be ungainly. Moreover, when he presented the case for the Bill of Rights in the House of Representatives, he argued that the national government

was not sufficiently constrained by the scheme of enumerated powers paired with the Necessary and Proper Clause. 1 Annals of Cong. 431, 438 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison). His example was that general warrants might be "necessary" for collecting revenue. If "proper" were a separate requirement, the logic of Madison's example would fail: General warrants could be "necessary" but not "proper," in which case the Constitution would restrain the national government without the addition of a Bill of Rights. Cf. Beck, supra note 199, at 638-39 (noting those who argued that a Bill of Rights was unnecessary did not do so on the grounds that "proper" already protected individual liberty).

230   Thus Madison, in his speech on the Bank bill in the House of Representatives, never discussed separately whether the bill was "necessary" and "proper," and he glossed the meaning of a power that was necessary and proper in terms that cannot be divided into those terms: For example, "an accessary or subaltern power, to be deduced by implication, as a means of executing another power." Madison, supra note 228, at 379. Similarly, Jefferson attacked the Bank bill as not being "necessary," with no separate treatment of "proper." Jefferson, supra note 19, at 278. Jefferson did not even point to "proper" when arguing that the Necessary and Proper Clause does not allow Congress to "break down the most antient and fundamental laws of the several states" and to launch "invasions" of "the rights... of the states and state legislatures." Id. at 279-80.

231   The House debate can be found in Legislative and Documentary History of the Bank of the United States, supra note 197, at 37-85. Instead, the debate included many arguments about whether the incorporation of a bank would be incidental to any of the enumerated powers of Article I. In addition to Madison's first speech, cited in the preceding note, see, e.g., Rep. Ames (House of Representatives, Feb. 3, 1791) in Legislative and Documentary History of the Bank of the United States, supra note 197, at 45, 49 (arguing in favor of the constitutionality of incorporating a bank on the ground that it was "fairly relative, and a necessary incident to" several constitutional powers).

232   A further implication of the missing two-requirements reading will become apparent after the hendiadys reading is introduced: If "necessary and proper" had been a studied ambiguity -- a response to disagreement about the scope of national power that left open whether or not "proper" should be read as a separate requirement -- then Madison and Jefferson would have had strong incentives to argue after ratification that "proper" restricted the national government. That they still did not suggests that they did not think that "necessary and proper" could reasonably be read as containing two requirements.

233   There is also a long tradition of reading it more strictly. See, e.g., Jefferson, supra note 19, at 278-79 (glossing "necessary means" not as "those which are merely 'convenient' for effecting the enumerated powers" but rather as "those means without which the grant of the power would be nugatory").

234   Compare The Federalist No. 33, supra note 24, with Alexander Hamilton, Final Version of an Opinion on the Constitutionality of an Act to Establish a Bank (Feb. 23, 1791), in 8 The Papers of Alexander Hamilton, February 1791-July 1791, at 97, 102-05 (Harold C. Syrett & Jacob E. Cook eds., 1965). Even so, Hamilton's view was not wide-open. See Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 206-07. On Hamilton's insistence that means-end fit under the Necessary and Proper Clause is not a question of policy, see infra note 301 and accompanying text.

235   For doubts about how minimal the reading of "necessary" is in McCulloch, see Currie, supra note 189, at 160-68; Gerald Gunther, Introduction, in Marshall's Defense, supra note 213, at 1, 18-21; see also David S. Schwartz, Misreading McCulloch v. Maryland, 18 U. Pa. J. Const. L. 1, 72-79 (2015) (noting ambiguities in McCulloch); cf. Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 207-08 ("Even Marshall's opinion in McCulloch can be read as taking a more circumspect view of congressional power than is commonly taught."); Martin S. Flaherty, John Marshall, McCulloch v. Maryland, and "We the People": Revisions in Need of Revising, 43 Wm. & Mary L. Rev. 1339, 1342 (2002) (critiquing Justice Thomas's less nationalist reading of McCulloch, but concluding that it is "wrong for the right reasons").

Compendium_Cornell
Page 0632

236     Story, supra note 27, § 1243, at 118.

237     See Jefferson, supra note 19, at 278.

238     For examples from Founding-era corporate charters, see Miller, supra note 192, at 161-62.

239     Graber, supra note 1, at 168 (quoting Hamilton, supra note 234). Graber has Madison and Amphictyon on his side. See Madison, supra note 228, at 376-77 (posing a rhetorical question about "whether it was possible" to view terms such as "conducive to" as being "synonymous" with, or even "a fair and safe commentary on," the terms "*necessary* and *proper*"); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), *reprinted in* Marshall's Defense, supra note 213, at 64, 65 ("Would they not have said, if they so intended it, that Congress shall have power to make all laws which may be *useful*, or *convenient*, or *conducive to* the effectual execution of the foregoing powers? Will any man assert that the word ' *necessary*' is synonymous with those other words? It certainly is not. Why then should we change its meaning?"). For doubts about whether the views of Hamilton and Marshall were quite so lax, see supra notes 234-35.

240     Richard Epstein similarly invokes the analogy of tiers of scrutiny in thinking about the Necessary and Proper Clause, and to the same effect: the Clause requires a means-end fit that is at neither end of the spectrum. See Epstein, supra note 167, at 218.

241     The Federalist No. 44, supra note 2; *McCulloch*, 17 U.S. (4 Wheat.) at 416-18; Story, supra note 27, §§ 1239-40, at 114-17. *Reductio ad absurdum* also dominates the arguments on the other side, but more on that shortly.

242     "Proper" is consistently used as a lax standard of wide discretion. See U.S. Const. art. I, § 9; id. art. II, § 2; id art. II, § 3. "Necessary" is a stricter term in Article I, Section 7; Article I, Section 10; Amendment XII (twice); it is the standard for a discretionary but solemn decision in Article V; and it is the stricter term in what is likely another hendiadys in Article II, Section 3, which gives the President the duty of recommending to Congress "such Measures as he shall judge *necessary and expedient*."

243     See Miller, supra note 192, at 160-62. Miller tries to distinguish "proper" from "necessary" in some way other than degree, but that part of the argument is more conjectural and seems to confuse sense and reference. What his examples demonstrate, at least for the corporate charters, is that "necessary" tended to be a more restrictive term than "proper." Id. at 161.

244     Rep. Giles (House of Representatives, Feb. 7. 1791), *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 69, 72.

245     See supra text accompanying note 229.

246     It has been suggested that the Court did not actually consider "proper" in *McCulloch* "because neither side raised the issue." Robert H. Bork & Daniel E. Troy, Locating the Boundaries: The Scope of Congress's Power to Regulate Commerce, 25 Harv. J.L. & Pub. Pol'y 849, 875 n.97 (2002). But the entire Clause was at issue. Daniel Webster argued that the two terms were "probably to be considered as synonymous," and Walter Jones, that the terms were separate requirements. See *McCulloch*, 17 U.S. (4 Wheat.) at 324 (argument of Webster); id. at 367 (argument of Jones). See supra notes 211 & 225 and accompanying text.

247     See supra note 216 and accompanying text.

248     The "Impartial Citizen V" pamphlet does support their view. See Lawson & Granger, supra note 6, at 299 & nn.132-33. But not the other sources they adduce. Some treat "necessary" as more restrictive. Id. at 289-90 & nn.93 & 95 (Spencer, Iredell, Hamilton, Roane). Another says that "proper" qualifies the meaning of "necessary." Id. at 290 n.95 (Clopton). Two others seem to support their conclusion, id. at 289 & n.93 (Wilson: "not only unnecessary, but improper"; Madison: "improper, or at least unnecessary"), but are inapt for two reasons. First, the semantic ranges of "necessary" and "proper" cannot be determined from the semantic ranges of "unnecessary" and "improper." In particular, "unnecessary" can mean something gratuitous, which is not a mere negation of "necessary." Second, in these quotations what is doing the work is not vocabulary but syntax. An English speaker can say "not only x but y," and either term ("unnecessary," "improper") can take either spot. *This construction* does not tell you that one word is stronger or weaker, or more restrictive or less restrictive than the other, only that the meaning of the terms has sufficient plasticity that our expectations for their relationship may be overpowered by clear syntax. Similarly, an English speaker may say, "you listened to me, but you didn't hear me." Or "you heard me, but you didn't listen to me." Both statements are intelligible and they mean the same thing: not because in one of them "listen" is stronger and in the other "hear" is stronger, nor because the terms are indistinguishable, but because their meaning is sufficiently malleable that it can be subordinated to the syntax. The Randolph quotation is mysterious because of how he uses "expedient," especially given that he clearly recognizes its laxity in his second opinion on the Bank. See Opinion No. 2 of Edmund Randolph, Attorney Gen. of the U.S., (Feb. 12, 1791), *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 89, 90 (questioning whether there are any "who construe the words, ' *necessary and proper*,' so as to embrace every expedient power"). That leaves the quotation from Representative Barry, which supports part of Lawson and Granger's thesis, namely that "proper" is a distinctive requirement. But Barry treats "proper" as part of means-end analysis, and he does not suggest that it is the more restrictive term. See supra notes 210 & 225 and accompanying text.

249     See Mikhail, supra note 183, at 1099. On Wilson's life and thought, see William Ewald, James Wilson and the Drafting of the Constitution, 10 U. Pa. J. Const. L. 901 (2008). Note that one member of the Convention drafted, but never made, a motion with alternative language that would have removed "and proper." See Supplement to Max Farrand's The Records of the Federal Convention of 1787, at 231 (James H. Hutson ed., 1987). I do not put much weight on arguments from unmade motions in Philadelphia, but the drafter of the motion was Pierce Butler of South Carolina, who may have wanted to narrow the incidental powers conferred by the Clause. Two hypotheses have been suggested for why he did not make the motion. The first is tactics: Making the motion might have disrupted bargains already struck, ones favorable to South Carolina. Joseph M. Lynch, Negotiating the Constitution: The Earliest Debates over Original Intent 20 (1999). The second is learning: Perhaps "someone pointed out to Butler that the effect of the word 'proper' was to *confine* rather than expand the scope of congressional authority." Natelson, supra note 190, at 91. The first is plausible; the second is not. If Butler decided he was wrong about the meaning of "and proper," then surely he would have recognized that others could be wrong, too -- and it would thus be dangerous to retain words that were susceptible to such misunderstanding. There is a coincidence too striking to omit: Twelve years after James Wilson added "and proper" to the Clause, when he was a Justice of the U.S. Supreme Court, he was imprisoned for debt. The creditor who had him imprisoned was Pierce Butler. See Ewald, supra, at 914-15.

250     Ewald, supra note 249, at 904.

251     I borrow this way of putting the point from Geoffrey Miller, who gives a list of the various formulations in colonial and early republican corporate charters, and he suggests that they can be placed "on a scale of severity of restriction." Miller, supra note 192, at 161.

252     Accord Thomas B. McAffee, The Federal System As Bill of Rights: Original Understandings, Modern Misreadings, 43 Vill. L. Rev. 17, 56 (1998).

253     *McCulloch*, 17 U.S. (4 Wheat.) at 418-19.

254     *Id.*; see also Story, supra note 27, § 1244, at 118-19; cf. A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66 (making the reverse argument, i.e., that "necessary" ruled out a lax reading of "proper").

255    See supra note 246.

256    *McCulloch*, 17 U.S. (4 Wheat.) at 421.

257    United States v. Comstock, 560 U.S. 126, 160-61 (2010) (Thomas, J., dissenting); Barnett, Necessary and Proper, supra note 194, at 772; Beck, supra note 199, at 644-45; Gardbaum, supra note 3, at 815-19; Somin, supra note 195, at 150-51; see also United States v. Kebodeaux, 133 S. Ct. 2496, 2507 (2013) (Roberts, C.J., concurring in the judgment) (finding a federal power to protect the public inconsistent "'with the letter and spirit of the constitution,' and thus not a 'proper [means]'" (citations omitted)).

258    Similarly, when a Virginian critic argued that *McCulloch* gave too liberal a construction to congressional power, he offered a gloss that again drew a single line:

When a law is about to pass, the enquiry which ought to be made by Congress is, does the constitution expressly grant this power? if not, then, is this law one *without which* some power cannot be executed? If it is not, then it is a power reserved to the states, or to the people, and we may not use the means, nor pass the law.

A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 70. But see John Marshall, A Friend to the Union, No. 2 (Apr. 28, 1819), *reprinted in* Marshall's Defense, supra note 213, 91, 93-96 (critiquing Amphictyon's gloss). Justice Story offered a similar gloss on what the Clause required, and though he used "necessary" and "proper" in separate clauses, he does not appear to be drawing a distinction between them (i.e., again a single line):

Whenever, therefore, a question arises concerning the constitutionality of a particular power, the first question is, whether the power be *expressed* in the constitution. If it be, the question is decided. If it be not *expressed*, the next inquiry must be, whether it is properly an incident to an express power, and necessary to its execution. If it be, then it may be exercised by congress. If not, congress cannot exercise it.

Story, supra note 27, §§ 1232, 1238, at 110, 114.

259    A similar treatment of "necessary and proper" as a unitary phrase can be seen in two contemporaneous opinions of Attorney General Wirt that were not concerned with the Necessary and Proper Clause. See Saline Springs in Illinois, 1 Op. Att'y Gen. 420-22 (1820) (treating a statutory reference to any lands that the President "deemed necessary and proper for working the said salt springs" to be a reference to presidential discretion, and glossing the phrase with only the word "necessary" (emphasis omitted)); Case of the Late Collector at Savannah, 1 Op. Att'y Gen. 639 (1824) (answering in a unitary fashion the question "whether it be necessary and proper to bring a suit" against the late collector of Savannah).

260    Each possibility could be expressed less ambiguously: "both necessary and proper"; "necessary, that is, proper"; "'necessary and proper' in the technical sense"; and "necessary-and-proper." All four of these more explicit formulations would, to varying degrees, be stylistically jarring in the Constitution, and at any rate it is no surprise that a semantic relationship can be expressed more and less explicitly.

261    See Timothy A.O. Endicott, Vagueness in Law 54 (2000).

262    See, e.g., The Federalist No. 33, supra note 24, at 204-05 ("[T]he constitutional operation of the intended government would be precisely the same, if these clauses [i.e., the Necessary and Proper Clause and the Supremacy Clause] were entirely obliterated, as if they were repeated in every article.... The declaration itself, though it may be chargeable with tautology or redundancy, is at least perfectly harmless."); The Federalist No. 44, supra note 2; Wilson, supra note 221, at 468 ("It is saying no more than that the powers we have already particularly given, shall be effectually carried into execution."); James Madison, Virginia Ratifying Convention, *in* 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, supra note 157, at 438-39 ("It is only a superfluity.... [I]t gives no supplementary power. It only enables them to execute the delegated powers."); Madison, supra note 228, at 376 ("The clause is in fact merely declaratory of what would have

resulted by unavoidable implication, as the appropriate, and as it were, technical means of executing those powers."); Hamilton, supra note 234, at 106 ("[I]t will not be contended... that the clause in question gives any *new* or *independent* power."); St. George Tucker, View of the Constitution of the United States, *in* 1 Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia 140, 287 (St. George Tucker ed., Philadelphia, William Young Birch & Abraham Small 1803) ("It neither enlarges any power specifically granted, nor is it a grant of new powers to congress, but merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those otherwise granted, are included in the grant."); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 69-70; Marshall, supra note 258, at 96-97 (referring to the famous passage in *McCulloch* -- "Let the end be legitimate..." -- as a "rule of construction," and adding: "I think, as the Supreme Court has thought, that it would be the proper rule, were the grant which has been the subject of so much discussion [i.e., the Necessary and Proper Clause], expunged from the constitution."); Story, supra note 27, §§ 1232, 1238, at 110, 113-14 ("It neither enlarges any power specifically granted; nor is it a grant of any new power to congress. But it is merely a declaration for the removal of all uncertainty...."). But see Rep. Gerry (House of Representatives, Feb. 7, 1791) *in* Legislative and Documentary History of the Bank of the United States, supra note 197, at 75, 78. *McCulloch* is sometimes read to the contrary, but Marshall argued otherwise: "The court [in *McCulloch*] then has not contended that this grant enlarges, but that it does not restrain the powers of Congress; and I believe every man who reads the opinion will admit that the demonstration of this proposition is complete." Marshall, supra note 258, at 97. For additional sources to the same effect, see Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 185-87; Beck, supra note 199, at 592 n.58; Natelson, supra note 203, at 296-314; see also Akhil Reed Amar, Seegers Lecture in Jurisprudence at the Valparaiso University School of Law (Oct. 26, 1998), *in* Constitutional Redundancies and Clarifying Clauses, 33 Val. U. L. Rev. 1, 7-10 (1998) (noting that although *McCulloch* says the Necessary and Proper Clause does not restrict national power, the opinion does not say that the Clause augments national power, and concluding that it "might well be a declaratory or clarifying provision designed to remove all doubts"). This view accords with Professor Jack Rakove's description of the debate over the Necessary and Proper Clause: "the lack of controversy over this clause suggests that [the framers] did not regard it as augmenting the powers already vested in the national government." Rakove, supra note 228, at 180.

263    The Federalist No. 44, supra note 2, at 304. On background principles and the Constitution, see Caleb Nelson, The Legitimacy of (Some) Federal Common Law, 101 Va. L. Rev. 1 (2015); Stephen E. Sachs, Constitutional Backdrops, 80 Geo. Wash. L. Rev. 1813 (2012).

264    The Founders used "incidental powers" and "implied powers" interchangeably: there were implied powers, and they were the incidental powers. In present usage, however, "implied powers" often refers to something quite different, e.g. Mikhail, supra note 183, and so this Article uses "incidental powers." On the relationship between "incidental powers" and "means," see infra note 325.

265    Tucker, supra note 262, at 287-88 (describing the Clause as "merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted, are included in the grant"). The language from St. George Tucker also appears in Story, supra note 27, § 1238, at 113-14. Randolph also saw the Necessary and Proper Clause as affirming incidental powers, but he attributed this to the word "necessary." Randolph, supra note 197, at 89 ("To be necessary is to be incidental, or in other words, may be denominated the natural means of executing a power."). See also Marshall, supra note 258, at 101 (expressly equating the famous standard of *McCulloch* -- "Let the end be legitimate..." -- with the principle of incidental powers); Letter from William Johnson, to James Monroe (June 1822), *in* Jefferson Powell, Languages of Power: A Sourcebook of Early American Constitutional History 324, 324-25 (1991) ("The principle assumed in the case of the Bank is that the grant of the principal power carries with it the grant of all adequate and appropriate means of executing it").

266    See, e.g., *McCulloch*, 17 U.S. (4 Wheat.) at 416-17; The Federalist No. 33, supra note 24, at 206; Hamilton, supra note 234; Jefferson, supra note 19, at 279; Madison, supra note 228, at 377; Letter from James Madison, to Spencer Roane (Sept. 2, 1819), *in* 8 The Writings of James Madison , 1808-1819,  t 447, 449-50 (Gaillard Hunt ed., 1908); Marshall, supra note 258, at 94-100, 102; Roane's "Hampden" Essays, No. 2 (June 15, 1819), supra note 213, at 118-21; Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 134; Tucker, supra note 262, at 287-89; A Virginian's

"Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66-70; Story, supra note 27, § 1253, at 126 n.1; see also Natelson, supra note 204, at 60-68 (giving examples of principals and incidents from English law).

267      For an example from the common law, see infra text accompanying note 325.

268      There is a growing literature that associates the Necessary and Proper Clause with the law of agency and fiduciary relationships, along with doubts about how robust the implications are. See, e.g., Lawson et al., supra note 18; Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 217-18; Harrison, supra note 18; Manning, supra note 18; Natelson, supra note 203; Valauri, supra note 33, at 819-20; cf. Manning, supra note 3 (analogizing the Clause not so much to agency as to agencies). The authors of the leading work on the subject, Lawson et al., supra note 18, often use a two-step analysis, starting with a specific context in which incidental powers were important (e.g., corporate charters, equitable doctrines for trustees) and then moving directly to the Necessary and Proper Clause. I find a three-step analysis more plausible, starting with specific contexts, moving to a more general and less-defined principle of incidental powers, and then moving to the Necessary and Proper Clause. See Harrison, supra note 18, at 1116-18, 1131; Manning, supra note 18, at 1369-74; see also Seth Davis, The False Promise of Fiduciary Government, 89 Notre Dame L. Rev. 1145, 1176-77 (2014) (criticizing an emphasis on trust law as the background for the Necessary and Proper Clause); Eric Lomazoff, Speak (Again), Memory: Rethinking the Scope of Congressional Power in the Early American Republic, 47 Tulsa L. Rev. 87, 89 (2011) (praising the materials on the background of the Clause produced by Lawson, Miller, Natelson, and Seidman, while also noting that their chapters can be considered "competing hypotheses"). What results is less determinate, but more congruent with how the principle of incidental powers was invoked during the ratification and Bank debates.

269      Madison, supra note 228, at 376, 378-79. In his speech presenting what became the Bill of Rights, Madison also described the Clause as giving Congress "certain discretionary powers with respect to the means," so that it may "fulfil every purpose for which the government was established." Madison, supra note 217, at 205.

270      The Federalist No. 33, supra note 24, at 206 (emphasis added).

271      NFIB does not speak with one voice here. Although the decision holds to a two-requirements view of the Clause, it also states that the Clause is only an affirmation that Congress has the powers incidental to its enumerated powers. 132 S. Ct. at 2591.

272      Wright, supra note 8, at 181 (emphasis added).

273      See William Hazlitt, Table Talk; or, Original Essays 351 (London, John Warren 1821) ("Or as Luther complained long ago, 'human reason is like a drunken man on horse-back: set it up on one side, and it tumbles over on the other.'").

274      For Anti-Federalist examples, see Brutus, No. 1, in 2 The Complete Anti-Federalist 363, 367-68 (Herbert J. Storing ed., 1981); Centinel, No. 5, in 2 The Complete Anti-Federalist, supra, at 166, 168-69; An Old Whig, No. 2, in 3 The Complete Anti-Federalist, supra, at 22, 24-26. For examples from Jefferson and Madison, see Jefferson, supra note 19, at 278 (describing a broad construction as one that "would swallow up all the delegated powers, and reduce the whole to one phrase"); Madison, supra note 228, at 376, 378 ("If implications, thus remote and thus multiplied, can be linked together, a chain may be formed that will reach every object of legislation, every object within the whole compass of political economy."); Madison, supra note 266, at 448 (criticizing McCulloch for setting aside the Clause's "definite connection between means and ends" and substituting "a Legislative discretion as to the former to which no practical limit can be assigned"). For other examples, see Randolph, supra note 197, at 89 ("[L]et it be propounded as an eternal question to those who build new powers on this clause, whether the latitude of construction, which they arrogate will not terminate in an unlimited power in Congress."); John Taylor, Construction Construed and Constitutions Vindicated 170 (Richmond, Shepherd & Pollard 1820); A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 73-75.

275     Hamilton, supra note 234, at 103 (criticizing a narrow construction of "necessary," because "[t]here are few measures of any government, which would stand so severe a test"); *McCulloch*, 17 U.S. (4 Wheat.) at 416-18; cf. The Federalist No. 33, supra note 24, at 205-06 (explaining the existence of the Clause on the grounds that it would ward off "the danger which most threatens our political welfare": "that the State Governments will finally sap the foundations of the Union").

276     Madison and Hamilton seem to have recognized the double *reductio*. Madison, though rejecting a latitudinarian interpretation, noted that "very few acts of the legislature could be proved essentially necessary to the absolute existence of government." 4 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, as Recommended by the General Convention at Philadelphia, in 1787, at 417 (Jonathan Elliot ed., Washington, 2d ed. 1836). Hamilton, though rejecting a cramped interpretation, recognized that "[t]he moment the literal meaning is departed from, there is a chance of error and abuse." Hamilton, supra note 234, at 106.

277     The Federalist No. 44, supra note 2, at 303.

278     See id.; Story, supra note 27, §§ 1232-36, at 110-13; see also Madison, supra note 262, at 438-39 (arguing that the Necessary and Proper Clause is stated in general terms because "to delineate on paper all those particular cases and circumstances in which legislation by the general legislature would be necessary... is not within the limits of human capacity").

279     See supra Part I, especially notes 105-14 and accompanying text.

280     For a prior suggestion that "proper" may have multiple functions, see McAffee, supra note 252, at 70-71 & n.207. The sense of "proper" discussed here is anticipated in Beck, supra note 199, at 641-48. Because Beck does not see the phrase as a hendiadys, he draws sharper distinctions between "necessary" or "proper," and he also takes some sources to be using "proper" in a technical sense when they may only be using the word as a shorthand for the entire phrase (e.g., The Federalist No. 33, supra note 24).

281     Lawson & Granger, supra note 6, at 291-98; see also Zivotofsky ex rel. Zivotofsky v. Kerry, 135 S. Ct. 2076, 2105 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part) ("[T]he best interpretation of 'proper' is that a law must fall within the peculiar jurisdiction of Congress.").

282     Lawson & Granger, supra note 6, at 271-72.

283     Id. at 291; see also Zivotofsky, 135 S. Ct. at 2105 (Thomas, J., concurring in the judgment in part and dissenting in part) (endorsing this definition).

284     Marc Froment-Meurice, That Is to Say: Heidegger's Poetics 24 (Werner Hamacher & David E. Wellbery eds., Jan Plug trans., 1998) ("Even Heidegger (at least the 'early' Heidegger) subscribes to the credo, repeated from Plato to Kant and beyond, that to philosophize is proper to the human species, is what signs the human as such, and is inscribed for all time as its 'nature.'"). For a theological example, see Thomas Aquinas, Summa Theologica, pt. III, question 7, art. 10 (Fathers of the English Dominican Province trans., 1913).

285     See the examples in Lawson & Granger, supra note 6, at 291-97. Some of their examples can be read either way, but in some "proper" is clearly better read as "fitting" than as "within the jurisdiction of." One of the latter is the statement in the Vermont Constitution of 1786 that "[c]ourts of justice shall be maintained in every county in this State, and also in new counties when formed; which courts shall be open for the trial of all causes *proper* for their cognizance." Id. at 292 (alteration and emphasis in Lawson & Granger). Jurisdiction is being referred to and set up by this provision of the state constitution, but that is the force of the entire sentence, not of the word "proper."

286     Lawson and Granger might have slipped this band if they had relied not on Dr. Johnson's first sense for "proper" but on his third: "3. One's own." 2 Johnson, supra note 69 ("PRÓPER"). This sense strikes a note of "belonging to" rather than "belonging only to."

287     This point is made in Beck, supra note 199, at 641.

288     See supra note 231.

289     It also has explicit support in Justice Roane's criticism of *McCulloch.* See Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 133. For more discussion of this passage in the third Hampden essay, see supra notes 213-16 and accompanying text.

290     Marshall, supra note 258, at 102.

291     Id. at 101-02.

292     Lawson and Granger cite Marshall's essay, but not this passage.

293     On "proper" in Dr. Johnson's *Dictionary*, see supra note 286 and text accompanying note 283.

294     U.S. Const. art. I, § 8, cls. 9-11.

295     See supra note 286.

296     Marshall finds no distinction between (1) "means which directly and necessarily tend to produce the desired effect" and (2) "means which 'belong peculiarly' to the production of that effect," but finds a sharp distinction between both of these formulations, and (3) "means... *without which* the effect *cannot* be produced." Marshall, supra note 258, at 102. The argument that Marshall is rejecting is that the Clause permits Congress to "employ no means but those *without which* the end *could not* be obtained." Id. at 92-102. Despite Marshall's criticism, this view has not disappeared. Later Justices have sometimes pointed to possible alternatives when assessing whether a challenged statute was truly "necessary and proper." See, e.g., *NFIB*, 132 S. Ct. at 2647 (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("With the present statute, by contrast, there are many ways other than this unprecedented Individual Mandate by which the regulatory scheme's goals of reducing insurance premiums and ensuring the profitability of insurers could be achieved."); Trop v. Dulles, 356 U.S. 86, 114 (1958) (Brennan, J., concurring in judgment) (pointing to "alternative methods" as reason to conclude that "the statute is not 'really calculated to effect any of the objects entrusted to the government'" and thus "falls beyond the domain of Congress") (quoting *McCulloch*, 17 U.S. (4 Wheat.) 316).

297     For a parallel point about "cruel and unusual," see supra note 149 and accompanying text.

298     The Federalist No. 44, supra note 2, at 304; Madison, supra note 262, at 438-39; Marshall, supra note 258, at 103. Iredell made similar arguments against the idea of specifying punishments that were forbidden to Congress. See Iredell, supra note 161.

299     See supra note 278 and accompanying text.

300     See 1 Annals of Cong. 431, 438 (1789) (Joseph Gales ed., 1834) (statement of Rep. Madison) ("for it is for them [i.e., Congress] to judge of the necessity and propriety to accomplish those special purposes which they may have in

contemplation"). The care that Congress shows in making that constitutional judgment has not been constant. Compare Currie, supra note 162, with Keith E. Whittington, James Madison Has Left the Building, 72 U. Chi. L. Rev. 1137, 1155-58 (2005) (reviewing J. Mitchell Pickerill, Constitutional Deliberation in Congress: The Impact of Judicial Review in a Separated System (2004)).

301     Hamilton, supra note 234, at 104; see Tucker, supra note 262, at 288-89 (distinguishing the question whether "the powers implied in the specified powers, have an immediate and appropriate relation to them, as means, necessary and proper for carrying them into execution," from "questions of mere policy, and expediency"); cf. Story, supra note 27, § 1241, at 117 (arguing that Congress's incidental powers do not depend on circumstances that vary over time).

302     Hamilton, supra note 234, at 104. For echoes of this point in later literature, see Epstein, supra note 167, at 215 ("As a legal matter, the question of constitutional power to establish a national bank must be resolved independent of any view of the success of the bank in its commercial operations, which in this instance were substantial."); Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 208 ("[I]f one adopts the view of Jefferson and Madison that 'necessary' means that a given law must be incidental and closely connected to an enumerated power, then this is a matter of constitutional *principle* and within the purview of the Courts to assess."); Gardbaum, supra note 3, at 820-22; Stephen E. Sachs, The Uneasy Case for the Affordable Care Act, 75 L. & Contemp. Probs . 17, 23-25 (2012) ( "To the extent that current doctrine still requires implicit powers to be 'plainly adapted' or 'incidental' to those granted in the Constitution, Congress can't do *everything* necessary to keep its choices from proving unwise."). There is some tension between the idea that incidental powers are not a matter of policy and the idea that the Necessary and Proper Clause was meant to adapt to changing circumstances. See infra note 313 and accompanying text.

303     *McCulloch*, 17 U.S. (4 Wheat.) at 423.

304     See 8 The Papers of John Marshall: Correspondence, Papers, and Selected Judicial Opinions, March 1814-December 1819, at 257 (Charles F. Hobson, ed., Laura S. Gwilliam, ed. assoc., 1995).

305     Accord The Legal Tender Cases, 110 U.S. 421, 450 (1884); see also United States v. Kebodeaux, 133 S. Ct. 2496, 2505-08 (2013) (Roberts, C.J., concurring in the judgment) (declining to join the majority opinion because its policy arguments in favor of the challenged statute were not relevant for deciding whether the statute was supported by the Necessary and Proper Clause).

306     Stephen Gardbaum has also argued for different levels of deference on the two inquiries, Gardbaum, supra note 3, at 817, though he warns against making the review of means-end fit too perfunctory, id. at 819-22.

307     See Beck, supra note 199, at 640; Manning, supra note 3, at 55-57.

308     Herbert Wechsler, The Political Safeguards of Federalism: The Role of the States in the Composition and Selection of the National Government, 54 Colum. L. Rev . 543 (1954).

309     Manning, supra note 3.

310     James Bradley Thayer, and especially his argument for highly deferential judicial review, are discussed in One Hundred Years of Judicial Review: The Thayer Centennial Symposium, 88 Nw. U. L. Rev. 1 (1993).

311     Accord Sachs, supra note 263, at 1861-63. For starting points on the content of the incidental-powers principle, see Robert G. Natelson, The Legal Origins of the Necessary and Proper Clause, *in* Lawson et al., supra note 18, at 52; Harrison, supra note 18; Manning, supra note 18; see also supra notes 264-68 and accompanying text. In addition, Manning's argument for deference depends on the premise that the Clause is a delegation of lawmaking power. Manning,

Compendium_Cornell
Page 0640

supra note 18, at 50 ("Bedrock principles of administrative law teach us that deference, at least in the strong sense, depends on both the existence and the recipient of a delegation."). For the vertical aspect of the Clause, however, it is not obvious that "delegation" is apt here. If the Clause affirms that Congress has incidental powers to execute the enumerated powers -- powers that Congress would have even if the Clause did not exist -- then it is hard to get much mileage out of the Clause being a delegation, and the analogues from administrative law are less apt. As to the horizontal aspect of the Clause, however, Manning's delegation premise would seem to hold.

312   For scholarly views about what content "proper" has as an independent requirement, see supra notes 188-96 and accompanying text.

313   Manning, supra note 18, at 10-11; see also Madison, supra note 266, at 450-51 (noting that it "was foreseen at the birth of the Constitution, that difficulties and differences of opinion might occasionally arise in expounding terms & phrases necessarily used in such a charter... and that it might require a regular course of practice to liquidate & settle the meaning of some of them").

314   Harrison, supra note 18, at 1124; see also Nelson, supra note 127, at 544; cf. The Federalist No. 44, supra note 2, at 304 (rejecting the possibility that the Constitutional Convention might have "attempted a positive enumeration of the powers necessary and proper for carrying their other powers into effect," in part because it would have to be "accommodated... to all the possible changes which futurity may produce"); *McCulloch*, 17 U.S. (4 Wheat.) at 415.

315   See supra note 27 and accompanying text.

316   See McConnell, supra note 189.

317   Henry E. Smith, Why Fiduciary Law Is Equitable, *in* Philosophical Foundations of Fiduciary Law 261 (Andrew S. Gold & Paul B. Miller eds., 2014).

318   See William Baude, Sharing the Necessary and Proper Clause, 128 Harv. L. Rev. F. 39, 45 (2014) ("To be sure, those who exercise power will usually take the first cut at interpreting their own authority, but that tells us nothing about who gets the final say.").

319   See Barnett, The Original Meaning of the Necessary and Proper Clause, supra note 194, at 209-10; Lawson & Granger, supra note 6, at 276-81. Similarly, other legal documents of the time included clauses that expressly gave an agent or fiduciary the power to determine what were incidental powers. See Miller, supra note 192. On "necessary and expedient" as a probable hendiadys, see supra note 242.

320   For example, in The Federalist No. 44, supra note 2, at 305, Madison raises the question: "If it be asked, what is to be the consequence, in case the Congress shall misconstrue this part of the Constitution, and exercise powers not warranted by its true meaning?" His answer has three parts. First, contra Manning, he says the Necessary and Proper Clause is no different in this regard than any other provision of the Constitution ("I answer the same as if they should misconstrue or enlarge any other power vested in them...."). Second, he looks to the President and the courts: "In the first instance, the success of the usurpation will depend on the Executive and Judiciary departments, which are to expound and give effect to the Legislative acts." There is no tempering of this with talk of the clarity of the mistake or the egregiousness of the wrong. Finally, he looks to the people: "[A]nd in the last resort, a remedy must be obtained from the people, who can, by the election of more faithful representatives, annul the acts of the usurpers." See also *McCulloch*, 17 U.S. (4 Wheat.) at 423; id. at 358-59 (argument of Wirt); Lawson & Granger, supra note 6, at 280-85, 301-03. St. George Tucker also expressly recognizes both judicial enforcement and political safeguards in his discussion of the Necessary and Proper Clause, and like Madison as between these two he gives priority to judicial enforcement. See Tucker, supra note 262, at 288-89.

321     H. Jefferson Powell, Enumerated Means and Unlimited Ends, 94 Mich. L. Rev. 651, 671-72 (1995) ("As an early nationlist judge wrote, 'A comparison of the law with the constitution is the right of the citizen.'" (quoting United States v. The William, 28 F. Cas. 614, 615 (D. Mass. 1808) (No. 16,700))). As for the actual practice, see Keith E. Whittington, Judicial Review of Congress Before the Civil War, 97 Geo. L.J. 1257 (2009).

322     McCulloch, 17 U.S. (4 Wheat.) at 421.

323     Umberto Eco, Experiences in Translation 62 n.1 (Alastair McEwen trans., 2001).

324     Marshall, A Friend to the Union No. 2, supra note 258, at 96.

325     Id. Marshall's example shows why "incidental powers" and "means" seem not to be fully interchangeable concepts -- the carrying away is an incident of the growing, but it is not a means to the growing. Similarly, the power to declare war may carry with it, as an incident, the power to conclude a peace, see Natelson, supra note 311, at 63, but not even Clausewitz would call peacemaking a means for war. It may be that the incidental powers that are means are best supported by the Necessary and Proper Clause (they "carry into Execution"), while the incidental powers that are not means are best supported by the enumerated powers themselves. Compare Madison's statement that the meaning of the Necessary and Proper Clause is "limited to means necessary to the end, and incident to the nature, of the specified powers." Madison, supra note 228, at 372, 376. Note that Marshall did urge a sharp distinction between "incidental powers" and "means." John Marshall, A Friend of the Constitution, No. 2 (July 1, 1819), reprinted in Marshall's Defense, supra note 213, at 162-64; John Marshall, A Friend of the Constitution, No. 3 (July 2, 1819), reprinted in Marshall's Defense, supra note 213, at 171-74. This was in response to Roane's call for using only the former term. See Roane's "Hampden" Essays, No. 2 (June 15, 1819), reprinted in Marshall's Defense, supra note 213, at 122-24. There is a logic to Marshall's point, but it seems driven by tactics, because it conveniently let him sidestep some of Roane's arguments. See Marshall, A Friend of the Constitution, No. 4 (July 3, 1819), supra note 213, at 177-78 ("Can he already have forgotten that all his quotations and all his arguments apply to 'incidental' or 'additional' powers, not to the means by which powers are to be executed?"). Ultimately, though, the claims that Roane and Marshall were making about terminology were not consistent with the earlier debates, as can be seen from the variegated langauge used by Madison in the debate over the First Bank of the United States. See supra text accompanying note 269.

326     Marshall, A Friend to the Union No. 2, supra note 258, at 96.

327     The hypothetical appears in both Federalist No. 33 (Hamilton) and in A Virginian's "Amphictyon" Essays, No. 2 (Apr. 2, 1819), supra note 239, at 66-67 .

328     Marshall, A Friend to the Union No. 2, supra note 258, at 100 (quoting McCulloch, 17 U.S. (4 Wheat.) 316).

329     See United States v. Comstock, 560 U.S. 126, 160-61 (2010) (Thomas, J., dissenting) (interpreting McCulloch as distinguishing between "necessary" and "proper": "The means Congress selects will be deemed 'necessary' if they are 'appropriate' and 'plainly adapted' to the exercise of an enumerated power, and 'proper' if they are not otherwise 'prohibited' by the Constitution and not '[in]consistent' with its 'letter and spirit.'") (quoting McCulloch, 17 U.S. (4 Wheat.) 316)); Somin, supra note 195, at 150-51.

330     For another instance of this approach, see St. George Tucker's discussion of a hypothetical "law prohibiting any person from bearing arms, as a means of preventing insurrections." Tucker, supra note 262, at 289. This is exactly the sort of thing that the analysis in Printz and NFIB might suggest was "necessary" but not "proper." But Tucker says the courts "would be able to pronounce decidedly upon the constitutionality of these means" and they would do so "under the construction of the words necessary and proper." Id. The same hypothetical case was discussed by Roane, and he reached

Compendium_Cornell
Page 0642

a similar conclusion: disarming the people is not incidental to quelling insurrections. Roane's "Hampden" Essays, No. 3 (June 18, 1819), supra note 213, at 134-35.

331   Lawson & Granger, supra note 6, at 306 (footnote omitted); see also Somin, supra note 195, at 149 (reaching the same conclusion).

332   For arguments against seeing incidental-powers analysis primarily in terms of policy, see supra notes 301-05 and accompanying text.

333   Marshall, A Friend to the Union No. 2, supra note 258, at 91-105; see supra note 235.

334   *McCulloch*, 17 U.S. (4 Wheat.) at 423.

335   Id.

336   See Lawrence Lessig, Translating Federalism: United States v. Lopez, 1995 Sup. Ct. Rev . 125; Ernest A. Young, Making Federalism Doctrine: Fidelity, Institutional Competence, and Compensating Adjustments, 46 Wm. & Mary L. Rev. 1733 (2005). But cf. Bradford R. Clark, Translating Federalism: A Structural Approach, 66 Geo. Wash. L. Rev . 1161 (1998). A related but narrower question is whether it is important that *something* lies beyond federal power, even if the line being drawn is not itself otherwise persuasive. On that question in relation to the Necessary and Proper Clause, compare 1 Laurence H. Tribe, American Constitutional Law 798-99, 801-02 (3d ed. 2000), with Koppelman, supra note 196, at 115. More generally, see Powell, supra note 321; Richard Primus, The Limits of Enumeration, 124 Yale L.J. 576 (2014).

337   See supra Section III.G, especially the text accompanying notes 324-30.

338   E.g., Furman v. Georgia, 408 U.S. 238, 270 (1972) (Brennan, J., concurring) ("A punishment is 'cruel and unusual,' therefore, if it does not comport with human dignity.").

339   E.g., Harmelin v. Michigan, 501 U.S. 957, 976 (1991) (opinion of Scalia, J.).

340   An exception is *McCulloch*, but no attempt is made to align these readings with recent precedents.

341   132 S. Ct. 2566 (2012). If "proper" is not an independent requirement, the close fit between the individual mandate and the regulations of commerce in the Affordable Care Act would have made the mandate considerably less vulnerable to challenge.

342   317 U.S. 111 (1942). For *Wickard*'s treatment of the regulation of intrastate activity under the Necessary and Proper Clause, see Gardbaum, supra note 3, at 809.

343   521 U.S. 898 (1997). The arguments made against commandeering under "proper" might well fit within an analysis of incidental powers, but any such effort would have to come to terms with the potent historical critique in Wesley J. Campbell, Commandeering and Constitutional Change, 122 Yale L.J.1104 (2013).

344   Furman v. Georgia, 408 U.S. 238, 318 (1972) (Marshall, J., concurring) ("The use of the word 'unusual' in the final draft appears to be inadvertent.").

345    Graber, supra note 1.

346    See Mark P. Gergen, John M. Golden, & Henry E. Smith, The Supreme Court's Accidental Revolution? The Test for Permanent Injunctions, 112 Colum. L. Rev . 203 (2012).

347    See Richard H. Fallon, Jr., The Fragmentation of Standing, 93 Tex. L. Rev . 1061 (2015).

348    See supra note 35.

349    Cf. Suzanna Sherry, Too Clever by Half: The Problem with Novelty in Constitutional Law, 95 Nw. U. L. Rev. 921 (2001).

350    Fowler's Dictionary, supra note 40, at ix; see also 1 P. Vergili Maronis Opera, with a Commentary by John Conington 236, n.192 (2d ed., rev. and corrected, London, Whittaker and Co. 1865) (figures of speech such as hendiadys "are not so much rules which the poets followed, as helps devised by the grammarians for classifying the varieties of language in which the poets indulged").

102 VALR 687

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**109 Geo. L.J. 967**

**Georgetown Law Journal**
April, 2021

Article

Samuel L. Bray [a1]

Copyright © 2021 by Samuel L. Bray

# THE MISCHIEF RULE

*The mischief rule tells an interpreter to read a statute in light of the "mischief" or "evil"--the problem that prompted the statute. The mischief rule has been associated with Blackstone's appeal to a statute's "reason and spirit" and with Hart-and-Sacks-style purposivism. Justice Scalia rejected the mischief rule. But the rule is widely misunderstood, both by those inclined to love it and those inclined to hate it. This Article reconsiders the mischief rule. It shows that the rule has two enduringly useful functions: guiding an interpreter to a stopping point for statutory language that can be given a broader or narrower scope, and helping the interpreter prevent clever evasions of the statute. The mischief rule raises fundamental questions about the relationship of text and context, about the construction of ambiguity, and about legal interpretation when we are no longer in "the age of statutes." In many of our present interpretive conflicts, the mischief rule offers useful guidance, for textualists and purposivists alike.*

## TABLE OF CONTENTS

INTRODUCTION | 968
I. EPISODES IN THE RECEPTION OF THE MISCHIEF RULE | 976
A. *HEYDON'S CASE* | 977
B. BLACKSTONE'S CONVENTIONALITY | 980
C. HART AND SACKS' TRANSFORMATION | 983
D. SCALIA'S REJECTION | 984
II. FINDING THE MISCHIEF | 990
A. THE MISCHIEF AS A PROBLEM ANTECEDENT TO THE LAW | 992
B. SOURCES FOR IDENTIFYING THE MISCHIEF | 994
C. DISTINGUISHING MISCHIEF AND PURPOSE | 997
III. TWO FUNCTIONS OF THE MISCHIEF RULE | 999
A. RATIONALIZING A STOPPING POINT | 999
B. THWARTING CLEVER EVASIONS | 1005
IV. THE MISCHIEF RULE AND THE AGE OF STATUTES | 1007
A. THE MISCHIEF RULE IN THE AGE OF STATUTES | 1007
B. THE MISCHIEF RULE AFTER THE AGE OF STATUTES | 1009
CONCLUSION | 1013

**\*968  INTRODUCTION**

A Tennessee statute imposed duties on railroad engineers. If a railroad engineer found an animal or obstruction on the tracks, the statute required "the alarm whistle to be sounded, and brakes put down, and every possible means employed to stop the train and prevent an accident." [1] But what counted as an "animal" on the tracks? Cows and horses, yes. But what else? Did all the trains in Tennessee have to stop for squirrels?

The stop-the-train case poses difficult questions for some interpretive theories, especially textualism. The text does not identify a stopping point in what counts as an animal. Nor is there a dictionary definition that will include cows but exclude squirrels. Is a textualist interpreter duty bound to say that trains really do have to stop for squirrels?

Compendium_Cornell
Page 0645

There is a legal rule that allows the interpreter to escape this impasse. The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem.[2] Put another way, the generating problem is taken as part of the context for reading the statute. In the real stop-the-train case, the court found the mischief to be (at least especially) the problem of train derailments; the court accordingly held that three domesticated geese were not "animals" within the meaning of the statute.[3] In the court's view, failing to consider the mischief would have meant that trains had to stop even for "[s]nakes, frogs, and fishing worms."[4]

This Article reconsiders and reevaluates the mischief rule. It argues that the mischief rule can help an interpreter give a better account of what the legislature has **969** actually decided. The reason is inherent in how language works: bare words are not always enough, for there may be facts an interpreter needs to know to make sense of those words. In technical terms, the interpreter needs not only semantics but also pragmatics.[5] It is therefore no surprise that courts are continually applying the mischief rule even without knowing it. Nevertheless, the rule has been widely misunderstood. It was celebrated by Henry Hart and Albert Sacks, who found in it the roots of purposivist interpretation,[6] and for that very reason it was rejected by Justice Scalia.[7] But the story is more complicated and more interesting.

The recent literature on legal interpretation includes many references to the mischief rule, but this Article is the first thorough consideration of it as a principle of statutory interpretation. Bill Eskridge considered the rule in a larger analysis of statutory interpretation at the American Founding.[8] Peter Strauss discussed the rule in his argument that an interpreter should look to a statute's "political history."[9] John Manning noted "the complex questions surrounding this traditional tool of construction" and warned of "uncritical application."[10] Anita Krishnakumar found that the Roberts Court is increasingly relying on this principle (including in *Yates v. United States*) in preference to the canon of constitutional avoidance,[11] and she has encouraged interpreters to check their conclusions about the text against "the background circumstances, often referred to as the 'mischief.'"[12] Stephanie Barclay noted conceptual affinities between the mischief rule and decisions that interpret statutes not to reach religious objectors.[13] Andrew Koppelman has written that to exclude something from the coverage of a statute if it is outside the mischief is "the most familiar" and "most legitimate" of the "subtractive moves" available to an interpreter.[14] And in a work on meta rules for interpretation, Richard Re considers the choice that English courts have in deciding between the mischief rule and other rules.[15] And yet this scholarship does not explore the mischief rule in **970** depth. The most extensive treatment in recent U.S. scholarship is about constitutional interpretation.[16]

What is the mischief rule and what does it do? It directs attention to the generating problem, which is public and external to the legislature, something that can be considered observable in the world. The mischief might be indicated in the statute itself or be established by judicial notice, evidence of public debate preceding enactment, or legislative history.[17] Nevertheless, there is no necessary relationship between considering the mischief and consulting legislative history. In the years when English courts applied the "Hansard rule," refusing to consider debates in Parliament, they nevertheless continued to apply the mischief rule.[18]

The mischief rule serves two functions. First, a stopping-point function:[19] it offers a rationale for an interpreter's choice about how broadly to read a term or provision in a legal text. Second, a clever-evasion function: it allows an interpreter to read a legal text a little more broadly to prevent a clever evasion that would perpetuate the mischief. Of these two, the stopping-point function is much more common.

The stopping-point function is useful because any, or at least almost any, legal text is susceptible of being read with different degrees of breadth. A famous hypothetical statute of medieval Bologna prohibited shedding blood in the municipal palace.[20] It could be read to prohibit all shedding of blood, including when a barber accidentally cuts a man while shaving his face, or it could be read more narrowly as prohibiting *violent* shedding of blood.[21] If the mischief were a recent spate of violence in the palace, the interpreter would have a reason to choose the narrower interpretation. Conversely, if the mischief lay in a popular belief that the presence of any shed blood would make the palace, and thus the city, ritually unclean, the mischief rule would suggest a different scope; then the case of the maladroit barber would be covered. This is the stopping-point function of the mischief rule: it gives the interpreter a reason to stop here instead of going further (or stopping short).

The mischief rule might lead an interpreter to choose a broader or narrower scope. But as time passes, and as a statute is pressed into service to answer questions never dreamed of at the time of its enactment, the mischief rule will tend to serve this stopping-point function by offering a narrower reading of the statute. In **\*971** other words, it will encourage the court not to update the statute, and to leave to the legislature the task of passing a new bill to address a new situation. By contrast, the clever-evasion function--which is rarer--typically guides the interpreter to choose a modestly broader scope for the statute. [22]

Consider three recent examples of the stopping-point function. First, *CSX Transportation, Inc. v. Alabama Department of Revenue* is a dispute that made two trips to the U.S. Supreme Court. [23] A federal statute prohibited discriminatory state taxes on interstate railroads, and the first three provisions of the statute explicitly indicated that the relevant comparison was to general commercial and industrial taxpayers. [24] The fourth provision of the statute did not have that explicit comparator, and referred simply to "another tax that discriminates against a rail carrier." [25] Should the fourth provision be given a narrower interpretation--discrimination relative to *general commercial and industrial taxpayers*? Or should it be given a broader reading--discrimination relative to *any taxpayers*? In both cases, a majority of the Justices chose the broader reading, and the authors of the majority opinions (Justices Kagan and Scalia) made standard textualist moves. [26] In both cases, Justice Thomas dissented (joined by Justice Ginsburg), arguing among other things that it was important to adopt the narrower reading so the fourth provision would have "a reach consistent with the problem the statute addressed." [27]

Second, in *Yates v. United States*, the U.S. Supreme Court considered a provision in the Sarbanes-Oxley Act that makes it a federal crime to destroy, conceal, or falsify "any record, document, or tangible object." [28] This Act was famously passed in response to several major corporate and accounting scandals. But did the Act apply if a commercial fisherman was caught catching undersized grouper, and tried to evade prosecution by having the undersized fish thrown overboard? No, said the Court, because a fish did not count as a "tangible object" within the meaning of the statute. [29] The plurality opinion of Justice Ginsburg repeatedly hinted at the mischief to which this provision in the Sarbanes-Oxley Act was **\*972** directed. [30] Although Justice Ginsburg only said that she was "[m]indful" of the problem preceding the statute, [31] the mischief rule supported her stopping point.

Third, consider *Zarda v. Altitude Express, Inc.* [32] The Second Circuit, sitting en banc, held that Title VII's prohibition on discrimination on the basis of "sex" includes within its reach discrimination on the basis of sexual orientation. [33] Judge Lynch dissented, appealing to among other things the "political and social history" that was the context for Title VII, [34] and his dissent shows a strong grasp and endorsement of the mischief rule. [35] Nevertheless, the Supreme Court affirmed the Second Circuit, reading "sex" broadly, and ignoring the mischief because "only the words on the page constitute the law adopted by Congress and approved by the President." [36]

The mischief rule offers the organizing and justificatory principle for what Justice Thomas in *CSX*, Justice Ginsburg in *Yates*, and Judge Lynch in *Zarda* all sensed was the right reading. Yet it is worth noting that in none of these cases did a majority of the Supreme Court apply the mischief rule, and the discussion of the rule has ebbed in American legal scholarship. Why?

The most likely answer is simply that the rule is thought to be equivalent to purposivism. The distinction between mischief and purpose is worked out in more detail below, [37] but here consider a simple theory of action. There are certain things that spur us to consider acting. Spurred on, we act. But we do so not like a coracle, buffeted by the waves, rudderless and unpaddled. Instead, we have reasons for our actions. But the expression, "such and such was my reason for acting" is ambiguous. It could refer to the initial cause, the spur to acting. Or it could refer to the aim (or ultimate aim) that I had for acting. Both are, in a sense, my "reason." Yet they can be assigned different locations in this sentence: "Because of *a*, the action *b*, so that *c*." That ambiguity in my "reason" is precisely why the **\*973** difference between mischief and purpose is usually obscured. The mischief is the spur, the "because of." More technically, for law, the mischief is the problem that precedes the statute and the legal deficiency that allowed it; the mischief is what the statute responds to. The purpose imputed to the legislature is an aim going forward. [38]

There will be instances of convergence between the mischief and the purpose, instances in which the purpose is no more than the removal of the mischief ("because of *a*, the statute *b*, so that *not a*"). Yet there will often be more than that mere convergence; the imputable purpose will often be an extrapolation from the evil to something more abstract. Hart and Sacks are themselves quite clear on this point. They add a crucial step: the interpreter starts with the mischief and then from it infers "the general

purpose."[39] That step is significant. It makes the mischief grist for the mill of purpose. That additional level of abstraction is indeed valuable if a judge sees her role as faithfully interpreting a statute in a way that fulfills the legislature's policy aims--a standard purposivist conception. But it would be an error if a judge sees her role as faithfully interpreting a statute so as to carry out the policy embodied in the statute itself--a standard textualist conception. [40]

Because this Article attempts to give the mischief rule a discrete existence, it is of course true that I am sharpening the contrasts between the mischief and other concepts, including purpose and the equity of the statute. In early modern England these concepts seem to have been entirely overlapping, and even though one can always find cases using the terms interchangeably, over time the concepts somewhat diverged. To a degree not appreciated in much of the literature on statutory interpretation, the purpose and the equity of the statute developed into roomier, more expansive concepts, while the mischief stayed narrower and more grounded. [41]

What is at issue is not mere legal taxonomy, but rather a critical question about the role of context in legal interpretation. Statutory interpreters of all stripes say that context is important, but textualists, especially, will sometimes in practice limit the relevant context to *laws*--that is, other provisions of the same statute, other statutes, and background principles of law. This Article argues for a broader understanding of context that includes the *setting* of legal enactments, one aspect of which is the mischief. Consider three implications of taking the mischief as part of context.

First, there is less pressure on the statutory language. Language never fully expresses intention, and the inadequacy of legal language has long been **\*974** recognized. [42] That inadequacy is partially ameliorated by the mischief rule's stopping-point and clever-evasion functions. Both offer a certain kind of solace to the legislator. One offers some assurance that her decision today on *x* will not be read as a decision tomorrow on *y*. The other offers some assurance to the legislator that her statute will not be circumvented by clever tricks.

Second, there is less surprise and more notice. The functions of the mischief rule allow--and indeed require--judgment, characterization, and subjectivity on the part of the interpreter. Like other elements of context, the mischief rule does not reduce discretion; it does not exclude interpretive options and it may even expand them. [43] But if the interpreter considers the mischief as part of the context for the statute, the enacting legislature is less likely to be surprised by the effect given to its work. In *CCS*, *Yates*, and *Zarda*, for example, the application of the mischief rule would arguably make the reach of the statute less surprising-- not just to the enacting Congress, but also to a reasonable reader at the time of enactment. Although the optimal amount of surprise for the enacting legislature and the reasonable contemporaneous reader is not zero, it is probably not massive. [44] And the mischief rule might keep the subsequent surprises smaller than they otherwise would be.

Finally, thinking about the mischief as part of context highlights a pivotal step in legal interpretation: the construction of ambiguity or non-ambiguity. [45] Once the interpreter has determined that a text is ambiguous, a host of canons and interpretive considerations come into play. Should the mischief rule be considered one of them? Or should it be part of the conscientious interpreter's "initial reading," which might determine whether the text is ambiguous?

An example of why this choice matters is *Bond v. United States*, in which the majority opinion of Chief Justice Roberts is pervaded by an argument that the statute (the Chemical Weapons Convention Implementation Act of 1998), when read in the context from which it arose, was "about" something. [46] That knowledge of what the statute was about--its mischief--led the Court to treat as **\*975** ambiguous its definition of "chemical weapon," which if taken literally would have been extremely broad. [47] In a separate opinion, Justice Scalia refused to read the text in light of the concerns that led to its enactment, and so found no ambiguity. [48] To put his critique in a pointed form, we could say he thought the majority was placing the text on a Procrustean bed, tightening the text to align with the mischief. But that critique depends on the assumption that the text is logically prior to its context, as if it should be (or even could be) read without a context. [49] To the contrary, reading the text in its legal and temporal context is not an act of violence; it is a step toward understanding. [50] Context helps the interpreter see that there is a choice about the scope of the statute, and it guides the choice. [51]

The mischief rule is simply a legal instantiation of a common sense point about all interpretation. To understand statement *x*, an interpreter wants to know its setting. To understand a line of dialogue, it is helpful to know the preceding line of dialogue. It is also helpful to know the situation in which the characters find themselves, to know whether this line was spoken by a character

in response to seeing a live shark or a rubber duck. Although the mischief rule has distinctive qualities that are relevant for law, the underlying intuition that context matters **\*976** will persist as long as human beings use and make sense of language. [52] It is therefore no surprise that even as the concept of the mischief has receded from U.S. legal scholarship, the basic intuition persists in judicial interpretation, even though it is insufficiently developed and inadequately understood.

## I. EPISODES IN THE RECEPTION OF THE MISCHIEF RULE

There is a conventional narrative about statutory interpretation, which goes like this: the dominant approach in the mid- to late-twentieth century, [53] the purposive approach elaborated by Henry Hart and Albert Sacks, was already established in the time of Elizabeth I by *Heydon's Case*. [54] That case urged judges to identify the "mischief" to which the statute was directed, and then to interpret the statute to advance the drafters' purposes. [55] The mischief rule was endorsed by William Blackstone, who equated it with interpreting a statute in light of its "reason and spirit." [56] And so there is a direct line from the sixteenth century to the twentieth century, and now to the twenty-first. [57]

Yet the conventional narrative is subject to doubt. Here is the kernel of truth: *Heydon's Case* did endorse judicial consideration of the "mischief." But there is no straight line in the reception of that idea. This Part introduces *Heydon's Case* **\*977** and then considers three moments of reception of the mischief rule: Blackstone, Hart and Sacks, and Scalia. Blackstone offers a conventional summary of the mischief rule; he never equates it with finding the "reason and spirit" of the law. Hart and Sacks make the mischief rule central to a judge's inference of purpose, and their use of the rule is fundamentally transformative. And Scalia conflates the mischief rule with purposivism and rejects both, perhaps as a way to wall off an avenue by which legislative history might enter the interpretive process.

This Part is preliminary and explanatory. It is not so much an explanation of the mischief rule and how it works (for that, see Parts II and III), as it is an explanation for the rule's shape-shifting quality in legal literature. The mischief rule is misunderstood and now neglected, though not because anything has changed about the basic intuition that a text should be read in context, including in its temporal context. Rather, as the following discussion will show, participants in various debates over statutory interpretation have found it useful to be silent about the mischief rule or to treat it as equivalent to purposivism. For those who embrace purposivism, it seemed unnecessary, something that could be deleted with a parsimony of concepts. For those who criticize purposivism, especially textualists, the equation of mischief and purpose has obscured an important aspect of legal interpretation.

## A. *HEYDON'S CASE*

The canonical authority for the mischief rule is *Heydon's Case*, a decision of the Court of Exchequer in 1584. [58] That case is not the origin of the use of the mischief in statutory interpretation, for the idea is certainly older and was a staple of English legal education. [59] Nevertheless, many interpreters have been drawn to the crisply stated propositions that are attributed to Chief Baron Manwood in Sir Edward Coke's printed report: [60]

> **\*978** [F]or the sure and true interpretation of all statutes in general (be they penal or beneficial, restrictive or enlarging of the common law,) four things are to be discerned and considered:--

> 1st. What was the common law before the making of the Act.

> 2nd. What was the mischief and defect for which the common law did not provide.

> 3rd[.] What remedy the Parliament hath resolved and appointed to cure the disease of the commonwealth.

> And, 4th. The true reason of the remedy; and then the office of all the Judges is always to make such construction as shall suppress the mischief, and advance the remedy, and to suppress subtle inventions and evasions for continuance of the mischief, and *pro privato commodo* [which translates to for private benefit], and to add force and life to the cure and remedy, according to the true intent of the makers of the Act, *pro bono publico* [which translates to for the public good]. [61]

To a reader now, these phrases--"the true reason," "according to the true intent of the makers," "add force and life to the cure"--may seem like an ambitious charter for purposive interpretation. Yet far from being a prophetic intervention into debates today about statutory interpretation, *Heydon's Case* is a product of its time. [62] The judges and lawyers of 1584 were familiar with the idea of the "true **\*979** intent of the makers," but they did not understand this to require a search for the subjective intent of members of Parliament. Rather, they recognized it could be "a kind of fiction, a constructive intention to be gathered from the wording." [63]

Seen in this light, the four enumerated points in *Heydon's Case* are more modest than they are often read to be by modern interpreters. Collectively, these points suggest that the interpreter should consider four things: (1) the old law; (2) the defect in the old law; (3) the new law; and (4) how the new law connects to the defect in the old law. In itself, this is not a manifesto for purposivism. It is an insistence that statutes are not to be read "in abstract, *in vacuo*." [64] Faced with options and ambiguities, judges have guidance on how to resolve them: read the statute in light of the mischief, and as a remedy for the mischief. [65]

The mischief rule has had a long career. Although three episodes of reception will be discussed momentarily, it is worth noting that the rule is considered part of the law of interpretation. [66] It has often been used by federal and state courts, [67] and in some states it is codified. [68] It is intuitive for legislative **\*980** drafters. [69] It is intuitive for Executive Branch officials. [70] And it is intuitive for judges. [71] *CSX, Yates, Zarda*, and *Bond* all show that sometimes judges know the mischief matters.

## B. BLACKSTONE'S CONVENTIONALITY

William Blackstone discusses general principles of legal interpretation in Section 2 of the introduction to his *Commentaries on the Laws of England*. In Section 3 he discusses the interpretation of English statutes, and only here-- not in his general discussion--does he address the mischief rule. [72] This pattern of usage is revealing for the relationship of the mischief rule to other interpretive considerations.

To begin with, Blackstone's presentation of the mischief rule in Section 3 is straightforward, partly quoting from and partly glossing *Heydon's Case*:

> There are three points to be considered in the construction of all remedial statutes; the old law, the mischief, and the remedy: that is, how the common law stood at the making of the act; what the mischief was, for which the common law did not provide; and what remedy the parliament hath provided to cure this mischief. And it is the business of the judges so to construe the act, as to suppress the mischief and advance the remedy. [73]

In Section 2, where Blackstone treats general principles of legal interpretation, he offers five "signs." [74] These are "the words, the context, the subject matter, the effects and consequence, [and] the spirit and reason of the law." [75] The absence of any reference to the mischief has been missed by some commentators, however, who have treated Blackstone's discussion of "the spirit and reason of the law" as if it were a discussion of the mischief rule. [76]

**\*981**  But the relationship between the mischief rule and Blackstone's signs is more complicated. For one thing, the mischief rule cuts across several of the signs. For example, Blackstone's description of the subject matter could also fit the mischief: what was "in the eye of the legislator," the end toward which "all his expressions [are] directed." [77] Also fitting the mischief is part of Blackstone's description of the reason and spirit, for both can be characterized as the "cause which moved the legislator to enact" the law. [78] Note, however, that his illustration for reason and spirit moves beyond the mischief, because it emphasizes not a problem precedent as much as an affirmative legislative aim. [79]

What explains Blackstone's omission of the mischief rule in his account of the general principles of legal interpretation? Two explanations are possible, but each winds up having a similar implication.

One explanation is that Blackstone may have considered the mischief rule to be peculiar to English law. He may have thought of it as a rule specific to the relationship between statutes and the common law. It would then naturally come up in his discussion of English law, not in his discussion of legal interpretation more generally.

**\*982**  Another explanation begins with the need for parsimony. Unless the list of signs is going to be a vast mishmash, a selection is necessary. That still leaves the question of why he included other signs instead of the mischief.

Here it is helpful to see how the signs fit into Blackstone's larger argument. The five signs culminate in "reason and spirit," which Blackstone glosses as "equity." [80] And Blackstone was a famous skeptic of the division between law and equity. [81] He argues that law and equity are identical in their substance and aims, differing only in procedure. [82] To this end, Blackstone tries to show that equity is not distinctive because the common law courts themselves engage in equitable interpretation. That is what the signs are leading up to--all courts engage in equitable interpretation, and therefore it is not distinctive to courts of equity.

For this argument, for this shift from the final sign category to equity, Blackstone needs the final sign to be "reason and spirit," not "mischief." The mischief rule would focus attention backwards on the problem the legislators were attempting to solve. When new circumstances emerge, with cases unforeseen by the legislator, the mischief rule is not as good of a tool for extending the reach of the statute. [83] *This* statute addressed *this* mischief; when a new mischief emerges, a new statute may be needed. But "reason and spirit" is easier to connect with equitable interpretation as presented by Blackstone. It more easily allows Blackstone to argue that common law courts engage in equitable interpretation, and it more easily produces the danger Blackstone attributes to equitable interpretation--that it may "make every judge a legislator, and introduce most infinite confusion." [84] Blackstone's larger argument is therefore well served by omitting the mischief rule in Section 2.

**\*983**  The implications of Blackstone's reception of the rule are twofold. First, Blackstone helps us see that the mischief overlaps with other interpretive considerations (namely, some of his signs). [85] Second, it is nevertheless true that the mischief is not identical to any of those other interpretive considerations.

### C. HART AND SACKS' TRANSFORMATION

Hart and Sacks do not ignore the mischief, and in fact, they give it a place of central importance. [86] But they also transform it. In *The Legal Process*, where Hart and Sacks describe the technique for inferring purpose, they begin with the interpreter's goal of trying "to put itself in imagination in the position of the legislature which enacted the measure," with the assumption that "the legislature was made up of reasonable persons pursuing reasonable purposes reasonably." [87] Next:

> The court should then proceed to do, in substance, just what Lord Coke said it should do in *Heydon's Case* .... The gist of this approach is to infer purpose by comparing the new law with the old. Why would reasonable men, confronted with the law as it was, have enacted this new law to replace it? Answering this question, as Lord Coke said, calls for a close look at the "mischief" thought to inhere in the old law and at the "true reason of the remedy" provided by the statute for it.

Compendium_Cornell
Page 0651

The most reliable guides to an answer will be found in the instances of unquestioned application of the statute. Even in the case of a new statute there almost invariably *are* such instances, in which, because of the perfect fit of words and context, the meaning seems unmistakable.

Once these points of reference are established, they throw a double light. The purposes necessarily implied in them illuminate facets of the general purpose. At the same time they provide a basis for reasoning by analogy to the disputed application in hand.[88]

Hart and Sacks proceed to further describe the process of inferring purpose. They conclude that if "significant choices" remain, the task "is essentially one of creative elaboration of the principles and policies initially formulated in the statute."[89] This is quite a long way from *Heydon's Case*--the imaginative reconstruction, the reasonable legislators, the creative elaboration.[90] But more **\*984** important for understanding the reception of *Heydon's Case* in Hart and Sacks is to see just how preliminary its work is. The mischief is not equated with general purpose; rather, the mischief is a basis for inferring purposes, which in turn "throw ... light" on the general purpose.[91]

It is understandable that readers of Hart and Sacks would conflate the mischief rule and purposivism. If we look at *Heydon's Case* through a modern lens, with Hart and Sacks' own categories, it is easy to find purpose there. After all, the mischief rule shares several features with purposive interpretation: both are about the reasons for laws, both offer an input for decisionmaking that is distinct from the words of the statute, and both may be used to put a case inside or outside of the bare words. But this conflation is anachronistic, for the reasons discussed more thoroughly in Part II.

Nevertheless, there has been a widespread understanding of Hart and Sacks' approach as equivalent to the older common law approach.[92] Whether *Heydon's Case* supports Hart and Sacks is, however, not the point. The point here is simply that anachronistic histories have made it harder to think about the mischief rule as a distinct concept.

### D. SCALIA'S REJECTION

The most influential person in the textualist resurgence of the last forty years was Justice Scalia, and he had definite views on the mischief rule. He was against it. In his late-career collaboration on statutory interpretation with Brian Garner, *Reading Law*, Justice Scalia equates the rule with purposivism.[93] Their definition of *mischief rule* points to the definition of *purposivism*:

[M]ischief rule: The interpretive doctrine that a statute should be interpreted by first identifying the problem (or "mischief") that the statute was designed to remedy and then adopting a construction that will suppress the problem and advance the remedy. • This is a primarily British name for purposivism. The classic and most ancient statement of the rule occurred in *Heydon's Case* .... The prevailing scholarly view today is that the mischief rule represents "the last remnant of the equity of a statute." See PURPOSIVISM.[94]

The lexicographic loop is complete, for their definition of *purposivism* points back to the mischief rule:

 **\*985**  [P]urposivism: The doctrine that a drafter's "purposes," as perceived by the interpreter, are more important than the words that the drafter has used; specif., the idea that a judge-interpreter should seek an answer not in the words of the text but in its social, economic, and political objectives. • Broadly speaking, *purposivism* is synonymous with *mischief rule*. Cf. EQUITY-OF-THE-STATUTE.[95]

In other words, Justice Scalia adopted the conventional narrative that draws a straight line from *Heydon's Case* to Hart and Sacks. And there is little mystery about what Justice Scalia would think about the mischief rule, once that equation was made.

Justice Scalia also rejected the mischief rule in his judicial opinions. In *Oncale v. Sundowner Offshore Services, Inc.*--a Title VII decision that is widely cited in the various recent cases about that statute and discrimination on the basis of sexual orientation-- he emphasized the disconnect between the text and the evil: "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." [96] Although this may sound like a truism, it is noteworthy that *Oncale* cited no authority. [97]

In *Reading Law*, Scalia and Garner give a central place to *Oncale* in their exposition of something they present as if it were a traditional canon of interpretation, namely the "General-Terms Canon[:] General terms are to be given their general **\*986** meaning." [98] Such terms, they say, "are not to be arbitrarily limited." [99] They acknowledge the objection that "those who adopted [a] provision had in mind a particular narrow objective," but quote *Oncale* and consider its statement about statutes going beyond the principal evil to be a "conclusive response to this argument." [100]

It is not, however, a conclusive response. Indeed, there are at least three ways to understand the observation that a statutory prohibition may go beyond (or for that matter stop short of) the principal evil. First, it could be a recognition that the mischief rule is not the only consideration, and that other interpretive considerations might counsel choosing a different scope that is not tied to the mischief. [101] In *United States v. Wiltberger*, for example, Chief Justice Marshall declined to read a statute as expansively as its mischief, not because the mischief was irrelevant, but because it was a penal statute and its structure supported a narrower reading. [102] Second, it could be an expression of the oft-stated idea that the mischief rule only comes into play for an ambiguous statute. [103] Third, it could be, as Justice Scalia takes it, a reason to entirely ignore the mischief.

Of these three ways of understanding the point, the first is compatible with the mischief rule as presented in this Article-- the mischief is part of the context that an interpreter can use both to determine that the text is ambiguous and to resolve the ambiguity. [104] The second understanding is compatible with a narrower view of the mischief rule--one in which it may be used only if the interpreter has already found the text ambiguous. The third understanding, chosen by Justice Scalia, is not compatible with the mischief rule. But there is nothing obvious **\*987** about the third option, and he gives no argument to justify it. At any rate, the bottom line is that Justice Scalia appears to leave no room for the mischief rule in the interpretation of statutes. For him, at least sometimes, [105] consideration of the mischief is nothing more than "result-driven antitextualism." [106]

What explains Justice Scalia's hostility to the mischief rule, and his resistance to allowing the mischief to be part of the statutory context? At least four explanations are possible.

First, Justice Scalia was trained in a world where Hart and Sacks dominated statutory interpretation, and perhaps he accepted their framing of their position as his foil.

Second, in deciding to exclude the mischief from the relevant context, Justice Scalia might have been working not so much *from context to sources* as *from sources to context*. In other words, perhaps he thought (not without reason) that one place to find the mischief would be legislative history. Absolutely committed to the rejection of legislative history, he could not ask a question to which legislative history might provide the answer. [107]

Third, Justice Scalia's preference for rules over standards is well-known. [108] When declining to read a statute in light of the mischief, he sometimes argued that the resulting scope for the statute would be indeterminate and unpredictable. [109] His critique partly misses the mark: an interpretation of the text in light of the mischief will often be more predictable to the reasonable observer than the bare text read for all it is worth (for example, *Yates, Bond, Gonzales v. Oregon*). [110] But he is right that a text read in light of the mischief will tend to **\*988** have a fuzzier boundary. [111]

Finally, there are tensions and inconsistencies in Justice Scalia's interpretive jurisprudence. Sometimes he is resolutely and purely textualist, [112] and at other times he strikes a decidedly traditional pose, allowing practices and conventions at the time of

enactment to work as a safe harbor.[113] This variation cannot be explained in terms of statutory provisions versus constitutional provisions.[114]

By and large, textualists seem to have accepted Justice Scalia's rejection of the mischief rule. The rule does not appear in the decisions of Judge Easterbrook.[115] Admittedly, it has been suggested by John Manning that the mischief could be part of the context for a legal enactment,[116] but he has not developed the point,[117] **989** and he has sometimes associated the mischief rule with purposivism.[118] In *Bostock v. Clayton County*, all of the opinions--which were written by Justices Gorsuch, Alito, and Kavanaugh--present themselves as textualist and cite with apparent approval Justice Scalia's dicta in *Oncale* about the "principal evil";[119] none clearly relies on the mischief.[120] For textualists, then, the dominant positions on the mischief rule seem to be rejection and silence.[121]

One consequence may be that textualists have tended to stress American exceptionalism (especially with respect to the separation of powers) as a way to distance American legal interpretation from what they perceive, because of the mischief rule, to be the more purposivist tradition of the common law. But this idea--that textualists, reacting to and being shaped by Hart and Sacks, have misunderstood how common law courts interpreted statutes and have emphasized constitutional structure in part to separate federal courts from the common law tradition--deserves more consideration than it can receive in this Article.

\* \* \*

The conventional narrative is that *Heydon's Case* established a purposive approach to statutory interpretation, specifically in the form of the mischief rule, and that this approach was carried forward by Blackstone in the eighteenth century and by Hart and Sacks in the twentieth. Despite the inaccuracies of this narrative, it has a strong hold. Courts and scholars slide between mischief and purpose, sometimes using them interchangeably.[122]

**990** Yet there is daylight between these concepts, if we know to look for it. In a recent article, Abbe Gluck and Judge Richard Posner reported the results of a survey of forty-two federal judges.[123] They found overwhelming support for considering purpose, or, as a subheading in their article puts it: *"Almost All Judges Invoked Purpose."*[124] But it is fascinating to find that this is the authors' gloss, not the statements of the judges themselves. As Gluck and Posner report: "Only four of the forty-two judges we spoke with did *not* mention purpose as an appropriate tool of statutory interpretation. The judges we spoke with interpreted the search for purpose in terms of 'the mischief' or 'the problem that gave rise to the statute in the first place.'"[125] Why were the judges interviewed by Gluck and Posner more comfortable speaking in the language of mischief, than in the language of purpose? What exactly is the mischief?

## II. FINDING THE MISCHIEF

The word *mischief* was defined essentially the same way in *Black's Law Dictionary* for a century: "In legislative parlance, the word is sometimes used to signify the evil or danger which a statute is intended to cure or avoid."[126] A similar legal definition is offered in the *Oxford English Dictionary*: "[A] disability or wrong which a person suffers, *esp.* one which is the object of a statute to remove or for which equity affords a remedy."[127] The "mischief rule" is the instruction to courts to consider the mischief, as well as the way in which the statute is a remedy for the mischief.[128] As straightforward as this may seem, two preliminary qualifications need to be noted before the analysis in this Part proceeds.

First, the description of the mischief rule in this Part is more analytically crisp than the historical materials would support. *Mischief, purpose, intention, equity*, etc.--this cluster of terms related to statutory interpretation has been used with remarkable variety in the common law systems over the last five centuries: sometimes broadly and sometimes narrowly, overlappingly and then in contradistinction, to express one ideology or to reject another, with concerns about Stuart monarchs uppermost or concerns about the discretion of federal judges, as conventional terms that bear no special weight and as terms used with idiosyncratic force.[129] Thus there is no one historical **991** concept of the mischief. If a historical definition were attempted, it would have to be a genealogy of these interconnected and impacting ideas, but that is not attempted here. Instead, the focus is on a discernible and demarcated concept of the mischief that is *one* of the things that travels under that name.

Second, the mischief is not here defined by recourse to the older texts on statutory interpretation. Some of them classify the mischief rule as an interpretive consideration that may resolve the meaning of an ambiguous statute, but that may not be used to identify an ambiguity. [130] Yet there are conflicting authorities on this point, [131] and there is reason for doubt: context is not a device for resolving ambiguity that comes into play only after the reading of the text. And the mischief is part of a legal enactment's context. [132] This view of the mischief as part of the interpretive process prior to the resolution of ambiguity accords with the function of other kinds of legal context, such as background principles of law. [133] It also fits the intuitions of Justice Thomas, Justice Ginsburg, and Judge Lynch in *CSX, Yates,* and *Zarda* respectively, as well as the majority of the Court in *Bond*: the mischief was logically anterior to the text, something the interpreter knew while reading the text itself. [134]

What follows, then, is an analytical description of the mischief rule, one that is in contact with how the mischief rule has functioned in the past but is especially  **\*992**  attendant to how it could function in the present. The mischief is analyzed as a problem antecedent to the law in Section II.A, the sources for identifying it are discussed in Section II.B, and mischief and purpose are distinguished in Section II.C.

## A. THE MISCHIEF AS A PROBLEM ANTECEDENT TO THE LAW

The "evil" or "mischief" is logically prior to the enactment of a statute. It is also typical for the mischief to be temporally prior to the statute, but that is not strictly required. That is, the mischief could be anticipated but entirely future: a statute might be passed in the spring to remedy a mischief that will not occur until the following winter, for example.

Identifying the mischief "necessarily involve[s] placing the statute in a historical context." [135] The mischief is sometimes described as (a) the problem that preceded the legislative act and to which the act was directed, or (b) the deficient state of the law prior to the legislative act. One might say that the problem was the law itself. Or one might say the law's failure to remedy the problem was the real problem. Accordingly, some statements of the mischief rule emphasize the social and some the legal. [136]

These two concepts blend together, and both are critical to understanding the mischief. Although the problem that preceded the act is central--as the spur to the act--if it is a past event, then it cannot strictly speaking be remedied by the new law. The past cannot be undone. Thus, the mischief has a compound significance: it is the social problem, and it is also the inadequacy in the law that allowed or allows that problem.

This compound significance is unsurprising, given that the evil or mischief is a technical legal concept. Although the intuition that context and setting matter is pervasive in the interpretation of texts, the legal formulation cannot be applied willy-nilly to interpretation more generally. There is no mischief rule for poems. But legislatures exist to change the law to improve the social condition; problems out there in the world, so to speak, are the legislature's concern.

The mischief is external to the legislators. The mischief is not so much in the mind of the legislator as in the sight of the legislator. [137] As the U.S. Supreme Court said in *Smith v. Townsend*, in words it considered equivalent to the mischief rule as stated in *Heydon's Case*, "courts, in construing a statute, may with propriety recur to the history of the times when it was passed"; [138] and when "endeavoring to ascertain what the congress of 1862 intended, we must, as far as possible,  **\*993**  place ourselves in the light that congress enjoyed, [and] look at things as they appeared to it." [139] Or as the Court said in one of the less controversial parts of one of its more controversial statutory interpretation decisions, "another guide to the meaning of a statute is found in the evil which it is designed to remedy; and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body." [140]

It would be incorrect to see the mischief, this antecedent negative state of affairs, as something entirely objective. Anita Krishnakumar captures this fluidity by applying two different adjectives to the mischief: it is, at one and the same time, the "background mischief" [141] and the "motivating mischief." [142] In other words, the mischief is perspectival: one person could see the mischief one way, and another could see it differently. The bill under consideration might reflect an incompletely theorized agreement about the mischief. Nevertheless, what is being sought is exterior to the legislator. As Peter Strauss has said, "This

inquiry, properly regarded, is prelegal--an inquiry into the conditions generating legislative action, not the meaning of the action itself." [143]  That is relevant for the question of sources.

### *994  B. SOURCES FOR IDENTIFYING THE MISCHIEF

The mischief may be common knowledge, but as time passes a court may be more likely to discern the mischief through documentary evidence. As discussed here, that evidence might come from the statute itself, contemporaneous events, popular debate, and government reports; for some interpreters it might also come from legislative history.

At first, what the court relies on may simply be "general public knowledge of what was considered to be the mischief that needed remedying." [144]  In other words, judicial notice. [145]

When those contemporaneous events are not in the memory of the interpreter, however, or as they begin to fade from that memory or become a subject of dispute, they will need to be established in other ways. One of those ways is by examination of the statute itself, especially if there are enacted findings. [146]  Note that there is some authority that the mischief can be gleaned only from the statute itself. [147]  But such a limitation would not accord with the Court's recent cases  **995**  using the mischief, such as *Bond* (referring to a painting by John Singer Sargent), [148]  and *Adoptive Couple v. Baby Girl* (quoting a judicial gloss on the "rising concern" behind the statute). [149]  Nor would the limitation be a sensible one--what is putatively gleaned from the statute itself will depend in part on the judge's knowledge of the world. [150]

Another means of establishing the mischief is sources that show the popular debate preceding the enactment, including secondary sources that summarize that debate. [151]

Yet another means through which the mischief has been identified is the findings of committee reports or government commissions. When English courts applied the "Hansard rule," refusing to consider Parliamentary debates, they nevertheless considered the findings in government reports that led to legislative action, using these reports to determine the mischief. [152]

Another possible source is legislative history more broadly conceived. [153]  The statements of individual legislators and of committees may summarize, reflect, or interact with the debate preceding the legislative action. [154]  (Of course, all of the  **996**  familiar disagreements about legislative history reappear, including the constitutional and prudential arguments.)

The inquiry into the mischief should not, however, be conflated with the use of legislative history. [155]  Max Radin said, "The 'legislative history' of a statute is taken to mean the successive forms in which the statute is found from the first draft presented until its final passage." [156]  He continued that it "is different obviously from the history of the agitation which resulted in the fact that such a statute was proposed at all. It is this latter history which is contained in the famous four considerations established by the barons of the exchequer in Heydon's Case and popularized by Blackstone." [157]

A court's use of both common knowledge and additional sources is illustrated by *Ho Ah Kow v. Nunan*. [158]  Justice Field, while riding circuit, had to consider a San Francisco ordinance that was on its face race-neutral but was widely recognized as intended to force Chinese men to pay a large fine rather than submit to having their "queues" cut. Justice Field said:

> The ordinance was intended only for the Chinese in San Francisco. This was avowed by the supervisors on its passage, and was so understood by every one. The ordinance is known in the community as the "Queue Ordinance" .... The statements of supervisors in debate on the passage of the ordinance cannot, it is true, be resorted to for the purpose of explaining the meaning of the terms used; but they can be resorted to for the purpose of ascertaining the general object of the legislation proposed, and the mischiefs sought to be remedied. Besides, we cannot shut our eyes to matters of public notoriety and general cognizance. [159]

With any of these sources, what is sought can be considered a kind of equalization. For a new statute, the mischief is more likely to be well-known to all. It is fresh in the interpreter's mind as context for the statute regardless of whether she wants to think of the mischief as a distinct category. What the mischief rule does, therefore, is twofold. For a new statute, the rule encourages the interpreter to bring this idea to the surface and to be open about this category, permitting contestation about what the mischief was. For an old or unfamiliar statute, the mischief rule allows the interpreter to try to consciously put herself in the position she would be in if the statute were new.

### *997  C. DISTINGUISHING MISCHIEF AND PURPOSE

One way to conceptualize the distinction between the mischief and legislative purpose, already implicit in the previous discussion, is that the mischief will tend to be a negative state of affairs antecedent to the law, whereas the purpose is more likely to be an affirmative principle or aim going forward. Indeed, this is one reason that not every statute has a mischief. A statute might be enacted for the creation of some new good, rather than for the resolution of an existing problem. [160]  And within a statute, the provision in question might interact with some other provision of the statute, rather than responding to a discernible mischief in the world. Even so, as intuitive as the distinction just drawn is, it cannot bear the full definitional weight, because negative and positive can be a matter of characterization.

Consider, therefore, distinguishing mischief and purpose in terms of a theory of action. [161]  As suggested in the Introduction, [162] we can distinguish the mischief (*"a"*), the statute that is the legislative act (*"b"*), and the purpose (*"c"*): "Because of *a, b*, so that *c*." In more detail:

Mischief and purpose are distinct in their relation to intentional action. By describing the enactment of a statute as intentional action, I am not suggesting that interpreters should try to discern specific legislative intent. [163]  But legislators do engage in "acts intended to make law," [164]  and therefore intend their acts to accomplish something in the world. [165]  That sense of intention is sufficient to allow an interpreter to distinguish mischief and purpose, each representing an aspect of the "reason" for the legislature's action.

First, there is the motivating or prompting reason, the state of affairs prior to the action. This is the locus of the mischief. It is *a* in the statement: "Because of *a* ...." [166]

 *998  Second, there is the legislature's action--the statute. It responds to the motivational reason, though it may go beyond, or stop short of, fully responding to that motivational reason. It is *b* in the statement: "Because of *a, b* ...."

Third, there is what might be called the telic reason. This is the end, aim, goal, or purpose that on some interpretive theories could be imputed to the legislature. It is *c* in the statement: "Because of *a, b*, so that *c*." The telic reason could be no more than a reproduction of the motivating reason; the legislature's general aim (if the expression may be used) could be stated as simply the mitigation of the prior state of affairs (that is, *c* could be *b*'s cure of *a*). But the general aim could go well beyond that.

Outside of law, it is easy to illustrate the difference: "Because of my stroke, I am exercising daily, so I can live a long life," or "because I failed that exam, I am going to study harder, so I can have the career choices I want." [167]

For a statutory example, consider again the *CSX* cases, involving a federal statute prohibiting state taxes that discriminated against rail carriers. [168]  The Court was required to decide whether to read the fourth provision of the statute as implicitly limited to the mischief that was directly addressed in the first three provisions. That mischief was the use of state property taxes to burden railroads from out of state, or as Justice Thomas put it, the problem was "property taxes that soaked the railroads." [169] The purpose would be the removal of the mischief, but with the broader aim of ensuring a free flow of interstate commerce.

Or consider *Bond v. United States*, where the Court interpreted the Chemical Weapons Convention Implementation Act. [170] Chief Justice Roberts made explicit his view of what prompted the enactment of the Convention and the statute. The first paragraph of his opinion for the Court describes "[t]he horrors of chemical warfare [as] vividly captured by John Singer Sargent in his 1919 painting Gassed." [171]  The next paragraph notes "the devastation that Sargent witnessed in the aftermath of the

Second Battle of Arras during World War I." [172]  "That battle and others like it," he said, *"led to* an overwhelming consensus in the international community that toxic chemicals should never again be used as weapons against human beings." [173]  The Chemical Weapons Convention was adopted, as its preamble says, "for the sake of all mankind, to exclude completely the possibility of the use of chemical weapons." [174]  These observations can be put into the formula suggested in this Article: "Because of the Second Battle of Arras and  **\*999**  others like it, the Convention was adopted and the statute enacted, so that humanity would never again face the use of chemical weapons." [175]

In short, the action of the legislature, in its relationship to the mischief and purpose, can be stated as the following: "Because of the mischief, the legislature enacts a statute, so that the purpose may be achieved." [176]  Some interpreters will happily seek the general purpose of the statute. Even for those of us who would not, the mischief is a distinct concept. Whether it is a useful concept is the question to turn to next.


## III. TWO FUNCTIONS OF THE MISCHIEF RULE

The mischief rule serves two functions. One is the stopping-point function; the other is the clever-evasion function. [177]  In relation to the bare text, the first and more common function (stopping-point) tends to narrow the domain of the statute. The other (clever-evasion) tends to broaden it.


### A. RATIONALIZING A STOPPING POINT

A pervasive problem in legal interpretation is determining the correct scope for a statutory term or provision. This is a staple of every article about "no vehicles in the park." Or consider another one of the hypothetical cases in the statutory interpretation literature: Judge Easterbrook's example of a statute that requires the leashing of "dogs." [178]  Is it the case, Easterbrook asks, that it "requires the leashing of cats (because the statute really covers the category 'animals') or wolves (because the statute really covers the category 'canines') or lions ('dangerous animals')"? [179]  Easterbrook's point is that the reference to "dogs" provides an outer bound on the domain of the statute. [180]  But what about the breadth problem in the other direction? Does the statute require the leashing of a robotic dog? An aged and blind dog carried by its owner? A police dog that is in the park but inside a police car? A dead dog, just hit by a car, that has been moved into the park while its owners are being contacted?

 **\*1000**  One could of course say that a dog is a dog is a dog, and the text has no qualifications about the dog needing to be biological, healthy, unrestrained, or living. Or one could read the statute in light of its mischief (whatever that might be), treating some or all of these as the kinds of barber-in-Bologna cases that are within the bare text but not within the mischief, and thus potentially not within the statute. [181]  In short, the breadth problem works in both directions, and interpreters are constantly called upon to choose an appropriate scope for a legal term or provision.

That is precisely the choice raised in the examples in the Introduction: "animals" in the stop-the-train case, [182]  "discriminate" in the *CSX* cases, [183]  "tangible object" in *Yates*, [184]  "sex" in *Zarda*, [185]  and "chemical weapons" in *Bond*. [186]  In each case, the statutory text could be given a narrower reading in line with the mischief--or not.

In these cases, and others, [187]  the mischief rule offers a rationale for choosing a narrower reading. Indeed, this function of the mischief rule was widely recognized by older interpreters when they insisted (1) that they had a choice about the scope of a statute, and (2) that in making that choice they should consider the mischief to which the statute responds. As Justice Story said, where a statute "is susceptible of two interpretations, one of which satisfies the terms, and stops at the obvious mischief provided against, and the other goes to an extent, which may involve innocent parties in its penalties, it is the duty of the court to adopt the former." [188]  Conversely, the mischief rule might suggest the choice of a broader scope. Again, Justice Story:

> But where the words are general, and include various classes of persons, I know of no authority, which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, where the mischief to be redressed by the statute is equally applicable to all of them. [189]

Compendium_Cornell
Page 0658

**\*1001**  When faced with such choices, the judge should, as *Heydon's Case* puts it, "make such ... construction as shall suppress the mischief." [190]

An array of objections could be mounted--there may be disagreement about the mischief, there could be other canons or interpretive considerations that countenance the opposite conclusion, and so on. All true. Yet those same objections can be made to any aspect of interpretation.

My argument is not that the mischief rule will mark out the One True Interpretation, nor even simply that it will narrow judicial discretion. [191]  Nor will the mischief rule allow a court to correct a mistake on the part of the legislature, as in *King v. Burwell*. [192] Instead, the mischief rule is fundamentally a doctrine of focus and rationalization. It guides the interpreter, directing her attention, and it allows her to express an intuition she has about the scope of a statute.

Although one could think of the mischief rule as a rationalization of whatever the interpreter thinks is good policy [193] --and that no doubt sometimes occurs--it is not the rationalization I have in mind. There is no reason to think Justice Thomas approved of tax-code goodies for favored Alabama firms. Or that Justice Ginsburg approved of the captain of a fishing vessel destroying the evidence that could be used against him. Or that Judge Lynch approved of Congress's failure to protect LGBT Americans from employment discrimination. [194]  Yet they each had  **\*1002**  a strong intuition that the scope of the statute was not simply the scope of the bare words--that those words had to be considered in context, and that the context was not merely legal (that is, not merely other provisions of the statute, other statutes, and background principles of law). Rather, they each had a strong intuition that the term had to be read in the context of the problem to which the statute was addressed. [195]  The context helped them decide what it was that Congress had actually done. [196]

The mischief rule is simply how judges have traditionally expressed their intuition about a stopping point for statutory language. [197]  As familiarity with the mischief rule has receded, the intuitions have not dissolved. They remain, as they likely always will. Yet some interpreters do not have such intuitions about the scope of these statutes. The mischief rule is not so firmly established in contemporary statutory interpretation, nor so conclusive, that it *requires* that a term or provision be given a certain scope. [198]

At this point, the objection might be raised that judicial intuitions about a statute's stopping point are misguided, even dangerous. The legislature has chosen the scope; for example, it used the word "animal" in the stop-the-train case with no exception for geese. [199]  Why should judges make exceptions?

This objection goes to the heart of how the mischief rule works, and more generally how context and pragmatic enrichment work. If we think most statutory texts are clear without looking to context, then there is reason to be concerned about the mischief rule. Adding considerations like the mischief will increase the  **\*1003**  risk of interpretive error. Thinking of a generally worded but clear text, we will see the mischief rule as something that allows a judge to ride in and carve out an ad hoc exception.

But legal language needs context to be understood. [200]  It is true that statutory language is more formal than a conversation; it is not generated and used in a milieu of happy cooperation and generous implicature. [201]  But statutory language is still language, and there remain trade-offs in how much is spelled out explicitly. The mischief rule can be seen as a reflection of the need for contextual enrichment, a tool that developed in law and is well adapted for judicial interpretation of statutory language.

Consider for example the context that is provided by "tacit domain quantifiers." Although the name is technical (and the phenomenon travels under other names, too), the intuition is easy to grasp:

> If I were to open the fridge in search of beer and say "there is no beer," what you would probably understand me to be saying is that there is no beer *in the fridge*. In other words, you would take me to be tacitly restricting the domain of my quantifier to things in the fridge. [202]

The mischief rule encourages the interpreter to think about what was in the eye of the legislature, not as a means of defeating or overriding the text, but as a way to understand it. [203]

The stop-the-train case illustrates how the mischief rule does this. [204] "Animal" might seem clear, but once we understand the problem precedent, the ambiguity of the word comes into focus, and a reasonable reader will not understand the statute as saying that trains have to stop for squirrels and slugs. Nor is the text's dependence on context at all unusual. The bare words of a statute are frequently ambiguous without context, yet the pervasiveness of this phenomenon tends **\*1004** to be missed because interpreters supply the necessary context by instinct. An interpreter who is reading the legislative words in their context, which includes the mischief, is a more faithful agent.

Yet, as noted, knowing the mischief is not conclusive; it does not control and overpower the text. The meaning of some statutes is dependent on knowing the mischief, just as it is true of language that the meaning of some expressions is context dependent. But sometimes the words are so clear that the best account of the legislative decision is simply that it is broader or narrower than the mischief. [205] There is no meta rule for this. Sometimes--but only sometimes--a judge will be convinced that the best account of what the legislature actually decided is provided by the text and mischief in tandem. What the mischief rule does is direct the judge's attention to this possibility. [206]

As time passes and a law is pressed into service in new circumstances, the problem of scope will grow more pressing. The mischief rule will, accordingly, have more bite. At the time of a statute's enactment, a judge who considers the mischief might be just as likely to give the text a broader reading as a narrower one. [207] Over time, however, the mischief rule will tend to suggest a narrower scope, a domain for the statute that does not broaden. The reason is that the evil is fixed at a moment in time, even while new circumstances constantly arise. The statute, when its words are read by an interpreter attentive to the mischief, will thus tend to be enmeshed in the circumstances existing when it was enacted. As new problems emerge, as new mischiefs multiply, the relative fixity of "the mischief" will mean that in some cases where the bare text might be taken to reach a new problem, the application of the mischief rule will keep the statute from "growing" to meet the new challenge.

In this respect, the mischief rule can be compared with dynamic statutory interpretation. [208] Both share a skepticism of finding within the text itself full clarity **\*1005** about its scope. [209] But one difference is temporal: the mischief is in the past; it is usually a problem that immediately preceded the enactment of the statute. Dynamic statutory interpretation looks to societal values in the present, a rolling and evolving present. One might say that dynamic statutory interpretation asks what society would *now* consider to be the mischief addressed by the statute. [210]

Dynamic statutory interpretation also differs from the mischief rule in terms of bias with respect to the problem of scope or breadth. Present values might suggest taking a statute either broadly or narrowly. There is thus no intrinsic bias to dynamic statutory interpretation, for whether present societal values would suggest a broader or narrower reading is entirely contingent on the statute and on the intervening changes in societal values. By contrast, as noted, the mischief rule will more often than not suggest a narrower reading for the statute. The statute will simply do less: there will be more questions for which the answers do not lie within the statute's domain. [211]

## B. THWARTING CLEVER EVASIONS

A second function of the mischief rule is the thwarting of clever evasions by suggesting a modestly broader scope. As *Heydon's Case* puts it, the judge should "suppress subtle inventions and evasions for continuance of the mischief." [212] This could be considered a subset of the first function: the court is choosing a scope that will thwart a clever evasion. Yet it is distinctive enough to deserve separate discussion, especially because this second function of the mischief rule tends to work in the opposite direction from the first--it usually supports a court's choice of a broader reading.

In *Ash Sheep Co. v. United States*, the Court gave a modestly broader reading to a statute in order to prevent circumvention, and it was candid that the mischief was one of two decisive considerations in the case. [213] The statute said: "Every person who drives or otherwise conveys any stock of horses, mules, or cattle, to range and feed on any land belonging to any Indian

or Indian tribe, without the consent of such tribe, is liable to a penalty of one dollar for each animal of such stock." [214]  The defendant corporation had ranged and fed *sheep*, and thus one question in the case was whether sheep came within the scope of "any stock of **\*1006**  horses, mules, or cattle." [215]  As the Supreme Court recognized, the word *cattle* was ambiguous. [216]  It could refer to cows, as distinct from sheep and other animals, but it could also be used in a broader sense to refer to livestock (including cows and sheep). The narrower sense was more common, the Court said. [217]  Indeed, the broader sense of livestock was sufficiently rare that the Court suggested it would not give that interpretation to a newly enacted statute. [218]  Nevertheless, the Court read *cattle* as including sheep because the lower courts and the Department of Justice had accepted that broader reading for half a century, and because "the pasturing of sheep is plainly within the mischief at which this section aimed." [219]  Although not explicitly stated, the Court apparently considered the mischief to be that tribal lands were being used for grazing without the tribes' consent. [220]

If the Court had allowed the grazing of sheep on the tribal lands, the statute could have been circumvented. Thus, the mischief rule "permits ambiguous legislation to be interpreted in such a way as to suppress the mischief which it was designed to eliminate." [221]

Other examples could be given, too. [222]  In these examples, there is a recurring note of modesty. As Chief Justice Marshall said, in a suit in which counsel pointed to *Heydon's Case*:

> It is the province of the legislature to declare, in explicit terms, how far the citizen shall be restrained in the exercise of that power over property which ownership gives, and it is the province of the court to apply the rule to the case thus explicitly described--*not to some other case which judges may conjecture to be equally dangerous*. [223]

When courts do employ the rule to stop a clever evasion, it is not that the court is preventing some other mischief, but rather, as *Heydon's Case* says, the target is  **\*1007**  evasions that would allow "continuance of the mischief." [224]  The clever-evasion function is therefore not meant to allow a judicial remaking of a statute--it is the patching of a hole, not the rebuilding of Theseus's ship plank-by-plank. That is of course a matter of degree and judgment, and it requires good faith on the part of judges. [225]  I see no way to offer a more precise definition.

It is probably not an accident that illustrations of the clever-evasion function tend to be from older cases. This function of the mischief rule is out of keeping with current American legal culture, with its simultaneous embrace of judicial command and discomfort with judicial discretion. [226]

## IV. THE MISCHIEF RULE AND THE AGE OF STATUTES

The mischief rule is a creature of the common law world, not of the age of statutes. [227]  That origin suggests certain limits on how it should be used today. But the question of this difference--that is, the gap between the age of the common law and the age of statutes--also raises questions about whether we are truly still in the latter. And if not, what are the implications for the mischief rule?

### A. THE MISCHIEF RULE IN THE AGE OF STATUTES

Although the mischief rule corresponds to a widespread intuition among judges today, it is also a product of a different time and place. [228]  When *Heydon's Case* invoked the mischief, statutes were the exception and the common law was the norm. [229]  It was therefore possible to see statutes as discrete interventions into a common law world. In such a world, not only were statutes thought of in relation to the common law, but even their interpretive frame was determined by exactly how things stood between the common law and the statute in question. Statutory interventions might displace the common law, and thus deserve narrow interpretation; or they might express or extend the common law, and thus deserve  **\*1008**  broad interpretation. [230]

The world in which *Heydon's Case* expounded the mischief rule is different from ours in ways that affect the rule's use. In that world, there was less demand for courts to update statutes, not because the legislature would, but because the statutes themselves were less important: the law would continue to change, but in the way the common law did under Coke, Holt, Mansfield, and so on. [231] In that world, a statute was more likely to have a single mischief. The breadth and array of mischiefs for a statute like the Affordable Care Act, [232] omnibus bills, and other modern forms of "unorthodox lawmaking" [233] were unknown. The relative narrowness of the statutes in the early days of the mischief rule made it easier to identify a mischief. And in that world, the fallback options were better; if a statute, read narrowly to fit the mischief, did not apply, the common law would. Despite the imperfections of the common law, it would be more intelligible than the fallback options for a massive modern statute like the Affordable Care Act. [234]

For all these reasons, the mischief rule fits the legal culture that produced it--a different legal culture from our own. That conclusion generates certain limits on the application of the mischief rule today.

First, not all statutes, and not all statutory provisions, will have a mischief. [235] A statute might be meant not to solve a problem in the past but to create something affirmative and new. Or a statutory provision might act on some other part of the statute, and not have any independent force.

Second, for some statutes, the mischief will be sufficiently broad and composite that it is basically indistinguishable from a general purpose. [236]

Third, some statutes create a framework for agencies (or states) to choose how to remedy a mischief, with flexibility to change their choices over time. [237] More difficult still, for applying the mischief rule, would be a case in which there was no agreement about what the mischief was, or even completely opposite views on **\*1009** the question, with the only point of legislative concurrence being to let someone else decide both what the problem was and what to do about it.

Fourth, statutes prompted by a narrow mischief may have a broad array of purposes.

These limits suggest the mischief rule will not be useful for all modern statutes. Yet they do not give any reason to abandon the mischief rule where a statute or statutory provision does indeed have a mischief. And it is worth noting how different the mischief rule is from some other interpretive rules rooted in the world of the common law. Many of those rules, such as the rule that statutes in derogation of the common law should be narrowly construed, attempt to yank the statute into conformity with the general law. But the mischief rule is not so aggressive. It recognizes the independent existence of the statute and calls attention to the discontinuity between the statute and the preexisting body of law. Relative to the continuity canons, the mischief rule is a pro-disruption, pro-discontinuity influence. [238]

## B. THE MISCHIEF RULE AFTER THE AGE OF STATUTES

The preceding discussion of the limited role for the mischief rule today rests on an assumption: the mischief rule is from the age of the common law, whereas we live in the age of statutes. But is it evident that we still live in such an age? Apart from a tax law and a coronavirus-relief bill, [239] there were no major statutes enacted during the Trump presidency. The last time there was a significant burst of legislative activity was the 111th Congress (2009-2011). [240] The idea of a legislating Congress--at least of the kind that produced the huge legislative achievements of the 1960s, 1970s, and 1980s--is receding. [241] For some legislators, the cost-benefit analysis favors blocking legislation over passing it. And the trend **\*1010** may pick up speed, as the loss of legislative expertise by attrition is reinforced by attraction: what draws new members to the House and Senate does not seem to be the craft of legislating.

Instead of asking how the mischief rule should operate in an age of statutes, it may be more apt to ask how it should work when Congress is enacting fewer statutes, especially if this new state proves enduring. The answer is twofold, for courts and agencies.

For courts, one logical way to respond is with aggressive dynamic interpretation. In the absence of new legislation, maybe judges should simply make each federal statute do more. Yet inaction by Congress has the effect of reinforcing the textualist

critique of dynamic statutory interpretation. [242] No longer is there any pretense that Congress and the courts are cooperating, and we are left with the naked lawmaking of the federal courts-- courts that may have increasing political volatility. Moreover, the longer the statutory drought continues, the harder it is to defend an aggressive dynamic response. Over time, it will become increasingly illogical and inefficient to fit all the new developments into the cubbyholes of old federal statutes. Statutes do not merely consist of individual terms that can be dialed up or down--terms like "discrimination" (*CSX*), "tangible object" (*Yates*), and "sex" (*Zarda*). [243] They set up complex institutional arrangements that cannot be neatly updated and yet are just as likely to be obsolete.

The alternative may seem counterintuitive: just at the moment in which there are fewer new federal statutes, we could emphasize the limited domain of each one. But this, too, is an intelligible response. As the federal statutes gray, we could candidly admit their limitations. The statutes addressed particular problems; they were not delegations, increasingly remote from us, to authorize unimagined solutions for unimagined problems. [244]

If we do not try to shoehorn legal change into old federal statutes, we can turn to other engines of legal development. One is more frank development of the common law, which is the background against which statutes operate. [245] Another is increased scope for state legislation. Each of these has its own weaknesses, including federal judges being out of practice on the former, and the fragmentation and political polarization attending the latter. But neither of these engines of legal development is hobbled by the structures of the old statutes. And perhaps, in time, the need for federal legislation will bring a change in Congress.

 **\*1011**  The other institution is federal agencies. They already exercise ample lawmaking authority, and they are more suited to this role, in terms of expertise, than courts are. But there is unease among the Justices about the extent of the existing delegations, [246] and one place that judicial unease might emerge is if the Supreme Court strongly endorses the "major questions" doctrine. That doctrine posits that Congress can leave minor questions to agencies, not major questions, unless the statute says so explicitly. [247]

The relevance of the major questions doctrine is not just that it could keep agencies from filling the void left by Congress. More interestingly, the major questions doctrine has an essential similarity with the mischief rule. Both instruct that a legal enactment is not integrated and complete in itself. Rather, it must be set against something else. Just as we need to know the mischief to which the statute responds, so too we need to know something about the question or topic to which the agency's rule is responding--how big is it? And both the mischief rule and the major questions doctrine are interpretive intuitions that are widespread, even without a definitive contemporary formulation.

This sense of a law's responsiveness to a preexisting question or problem is shared by what is sometimes called "the no elephants-in-mouseholes canon." [248] That is, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions--it does not, one might say, hide elephants in mouseholes." [249] This canon, or "convention [] of expression," [250] makes the same kind of move that the mischief rule does: it asks us to consider the object of attention. [251] If Congress was contemplating a mousehole, we should not presume **\*1012** it was stuffed with an elephant. But how do we know whether Congress was contemplating a hole the size of a mouse or the size of an elephant? That is a question about something that lies outside the statute, part of the statute's context and setting. [252]

To date, much of the literature on the major questions doctrine and the no elephants-in-mouseholes canon has, understandably, been focused on administrative law and the relationship of courts and agencies. [253] But these are bespoke versions of a basic point about the interpretation of statutes: statutes should be interpreted not merely as texts, nor merely as texts set among other texts (though they are), but as texts that occur in a time and place. It is in the nature of laws that they transcend their time and place of origin. Taxes that discriminate against railroads could take unimagined forms; the Sarbanes-Oxley Act [254] regulates more than just Enron 2.0; our understanding of what it means to discriminate on the basis of sex is undeniably broader now than in 1964. The tension between this transcendence and particularity is what makes legal interpretation hard. Yet this is a moment in which a number of highly influential theories of interpretation are downplaying particularity, trying to sever the meaning of a legal enactment from its setting. [255]

The mischief rule calls us back to the particularity of a legal rule, its responsiveness to something beyond itself, its situatedness. [256] Something similar is done by the major questions doctrine and the no elephants-in-mouseholes canon. All of

these doctrines remind us that, as Justice Holmes put it, "we ask, not what this man meant, but what those words would mean in the mouth of a normal speaker of English, *using them in the circumstances in which they were used*." [257]

**\*1013  CONCLUSION**

The mischief rule is familiar yet foreign. The term is widely known, yet it is considered to simply be an older vocabulary for purposivism. The concept is more interesting than that, however, and it speaks to present interpretive disputes.

The mischief rule does not neatly fit in the current interpretive landscape. It does not conform to a Scalia-style textualism. It does not generate the broader purpose so important to Hart-and-Sacks-style purposivism. It is out of step with dynamic statutory interpretation, which looks to the values of the present, not the mischiefs of the past. Yet the mischief rule still has something to offer to a wide array of interpreters. It can be used with a good conscience even by a textualist. [258] It reflects a widespread intuition of interpreters, legal and otherwise. [259]

The mischief rule itself does not *determine* the meaning an interpreter should give to a legal text. Perhaps there is dispute about the mischief. Perhaps the mischief rule points toward one reading, while other canons of interpretation point toward some other reading. Knowing the mischief does not tell the interpreter how intensively the statute addresses it. [260] The rule does not contain within itself any formula for the resolution of such disagreement among interpretive considerations. What the mischief rule offers is guidance rather than determination.

But that guidance is useful. It is inherent in language that sometimes the meaning of an expression depends on the context in which the expression appears, not only the textual context but also the temporal context. Sometimes, to give a faithful account of the legislative decision, an interpreter needs to know what the legislature said, and also what the legislature said it about.

**Footnotes**

[a1]   Professor, Notre Dame Law School. © 2021, Samuel L. Bray. For helpful comments and correspondence, I am grateful to Sir John Baker, Amy Barrett, Will Baude, A.J. Bellia, Christian Burset, Jud Campbell, Nathan Chapman, Ryan Doerfler, Charles Donahue, James Dwyer, Frank Easterbrook, Bill Eskridge, Daniel Frost, Rick Hills, Howell Jackson, Emily Kadens, Elizabeth Kamali, Andrew Koppelman, Anita Krishnakumar, Marin Levy, John Manning, Jeff Pojanowski, Richard Re, Stephen Sachs, Adam Samaha, Peter Strauss, and attendees of the faculty workshop at Harvard Law School and University of Richmond School of Law.

[1]   Nashville & K. R. Co. v. Davis, 78 S.W. 1050, 1050 (Tenn. 1902).

[2]   The canonical statement of the rule is in *Heydon's Case* (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a (Exch.). For its discussion, see *infra* Section I.A.

[3]   *Davis*, 78 S.W. at 1050.

[4]   *Id.*

[5]   *See generally* Kent Bach, *The Semantics-Pragmatics Distinction: What It Is and Why It Matters, in* PRAGMATIK: IMPLIKATUREN UND SPRECHAKTE 33 (Eckard Rolf ed., 1997). On tacit domain quantifiers, see *infra* notes 200-03 and accompanying text.

Compendium_Cornell
Page 0664

6   *See* HENRY M. HART, JR. & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1144, 1415 (tent. ed. 1958).

7   *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 433-34, 438 (2012).

8   *See generally* William N. Eskridge, Jr., *All About Words: Early Understandings of the "Judicial Power" in Statutory Interpretation, 1776-1806*, 101 COLUM. L. REV. 990 (2001).

9   Peter L. Strauss, *The Courts and the Congress: Should Judges Disdain Political History?*, 98 COLUM. L. REV. 242, 256-61 (1998).

10  John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 COLUM. L. REV. 673, 733 n.253 (1997).

11  Anita S. Krishnakumar, *Passive Avoidance*, 71 STAN. L. REV. 513, 538, 573-77 (2019).

12  Anita S. Krishnakumar, *Backdoor Purposivism*, 69 DUKE L.J. 1275, 1347 (2020).

13  Stephanie H. Barclay, *The Historical Origins of Judicial Religious Exemptions*, 96 NOTRE DAME L. REV. 55, 113-118 (2020).

14  Andrew Koppelman, Bostock, *LGBT Discrimination, and the Subtractive Moves*, 105 MINN. L. REV. HEADNOTES 1, 21 (2020).

15  Richard M. Re, Interpretive Permissions 2-3 (Jan. 12, 2021) (unpublished manuscript) (on file with author).

16  *See generally* Daniel Frost, *Getting into Mischief: On What It Means to Appeal to the U.S. Constitution*, 28 INT'L J. SEMIOTICS L. 267 (2015).

17  *See infra* Section II.B.

18  *See* Stefan Vogenauer, *A Retreat from* Pepper v. Hart*: A Reply to Lord Steyn*, 25 OXFORD J. LEGAL STUD. 629, 630 (2005). This distinction is recognized in *FBI v. Abramson*, 456 U.S. 615, 638 n.8 (1982) (O'Connor, J., dissenting), albeit with overstatement regarding the "classical English approach" on legislative history. On the complexity of the English tradition, see generally John J. Magyar, *Debunking* Millar v. Taylor*: The History of the Prohibition of Legislative History*, 41 STATUTE L. REV. 32 (2020).

19  I have borrowed the name from Richard Re.

20  I am following the version in R. H. Helmholz, *The Myth of Magna Carta Revisited*, 94 N.C. L. REV. 1475, 1482 (2016).

21  *See id.*

22  *See infra* Section III.B.

Compendium_Cornell
Page 0665

23 Ala. Dep't of Revenue v. CSX Transp., Inc. (*CSX II*), 135 S. Ct. 1136 (2015); CSX Transp., Inc. v. Ala. Dep't of Revenue (*CSX I*), 562 U.S. 277 (2011).

24 *CSX II*, 135 S. Ct. at 1140-41.

25 *Id.* at 1141 (quoting and analyzing 49 U.S.C. § 11501(b)(4) (2012)).

26 *See CSX II*, 135 S. Ct. at 1141, 1143, 1144 (Scalia, J.) ("Subsection (b)(4) contains no such limitation .... This is not our concept of fidelity to a statute's text .... If the task of determining when that is so is 'Sisyphean,' ... it is a Sisyphean task that the statute imposes."); *CSX I*, 562 U.S. at 296 (Kagan, J.) (rejecting a narrow reading of the fourth provision as nothing more than "Alabama's preference for symmetry" and stating "the choice is not ours to make" because "Congress wrote the statute it wrote").

27 *CSX I*, 562 U.S. at 298, 301 (Thomas, J., dissenting) (describing the problem as "property taxes that soaked the railroads"); *see CSX II*, 135 S. Ct. at 1144-45 (Thomas, J., dissenting).

28 135 S. Ct. 1074, 1078 (2015) (quoting and analyzing 18 U.S.C. § 1519 (2012)).

29 *See id.* at 1081.

30 *Id.* at 1079 (indicating that § 1519 has a "financial-fraud mooring" and that in the Sarbanes-Oxley Act, "Congress trained its attention on corporate and accounting deception and cover-ups"); *id.* at 1080 (recognizing § 1519 as part of a law that "target[s] corporate fraud"); *id.* at 1081 (noting the statute was "prompted by the exposure of Enron's massive accounting fraud," describing § 1519 as "cur[ing] a conspicuous omission," and that "[i]n the Government's view, § 1519 extends beyond the principal evil motivating its passage").

31 *See id.* at 1079. *But cf.* Krishnakumar, *supra* note 11, at 538-40 (concluding that Justice Ginsburg's opinion "relied heavily" on the mischief rule).

32 883 F.3d 100 (2d Cir. 2018), *aff'd*, Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020).

33 *Id.* at 131.

34 *See id.* at 144-45 (Lynch, J., dissenting) (alteration in original).

35 *See id.* at 143 ("Legislation is adopted in response to perceived social problems, and legislators adopt the language that they do to address a social evil or accomplish a desirable goal. The words of the statute take meaning from that purpose, and the principles it adopts must be read in light of the problem it was enacted to address."). For contrary arguments about the scope of Title VII's prohibition of employment discrimination on the basis of "sex," see generally William N. Eskridge Jr., *Title VII's Statutory History and the Sex Discrimination Argument for LGBT Workplace Protections*, 127 YALE L. J. 322 (2017); Koppelman, *supra* note 14.

36 *Bostock*, 140 S. Ct. at 1738 ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").

37   *See infra* Section II.C.

38   I am using *purpose* in the sense of a general aim imputed to Congress. On legislative intent, see *infra* notes 163-65 and accompanying text.

39   *See* HART, JR. & SACKS, *supra* note 6, at 1415-16. For discussion, see *infra* Section I.C.

40   *See generally* John F. Manning, *What Divides Textualists from Purposivists?*, 106 COLUM. L. REV. 70 (2006).

41   On purpose, see *infra* Section II.C. On the equity of the statute, see *infra* note 95.

42   *E.g.*, 2 ARISTOTLE, *Nicomachean Ethics, in* THE COMPLETE WORKS OF ARISTOTLE 1729, 1795-96 (Jonathan Barnes ed., 1984); *see also* FELIX FRANKFURTER, SOME REFLECTIONS ON THE READING OF STATUTES 16 (1947) (recognizing "the shorthand nature of language").

43   On the relationship between the mischief and discretion, see *infra* note 111 and accompanying text.

44   *Cf.* Caleb Nelson, *A Response to Professor Manning*, 91 VA. L. REV. 451, 454 (2005) ("Other things being equal, then, interpretive methods that identify legal directives consistent with the ones legislators thought they were establishing should be preferred to interpretive methods that systematically produce legal directives contrary to the ones legislators thought they were establishing.").

45   *See* Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 HARV. L. REV. 2118, 2118 (2016) (reviewing ROBERT A. KATZMANN, JUDGING STATUTES (2014)) (calling the "initial clarity versus ambiguity decision" the "primary problem" in statutory interpretation); Adam M. Samaha, *If the Text Is Clear--Lexical Ordering in Statutory Interpretation*, 94 NOTRE DAME L. REV. 155 (2018) (demonstrating the prevalence of lexical ordering in statutory interpretation and exploring its trade-offs); *see also* Richard M. Re, *Clarity Doctrines*, 86 U. CHI. L. REV. 1497 (2019) (analyzing the concept of "legal clarity").

46   572 U.S. 844, 856 (2014) ("But even with its broadly worded definitions, we have doubts that a treaty about *chemical weapons* has anything to do with Bond's conduct."); *id.* at 860 (considering "the context from which the statute arose-- a treaty about chemical warfare and terrorism"); *id.* at 866 (concluding that "the context from which the statute arose demonstrates a much more limited prohibition was intended").

47   *See id.* at 866. Richard Re recognizes that *Bond* and *Yates* used the same analysis both to identify and to resolve the textual ambiguity. *See* Richard M. Re, *The New Holy Trinity*, 18 GREEN BAG 2D 407, 409-13 (2015). Our readings differ because I emphasize the mischief while he characterizes both cases as purposivist, lumping them with *King v. Burwell. Id.* at 413-15. On *King v. Burwell*, see *infra* note 192 Ryan Doerfler understands *Bond* as centrally about the "class of cases the statute excluded implicitly." *See* Ryan D. Doerfler, *High-Stakes Interpretation*, 116 MICH. L. REV. 523, 554-55 (2018). He criticizes *Bond* for failing to offer "a plausible *linguistic* story of implicit exclusion." *Id.* at 555. I think the mischief generates such a story.

48   *See Bond*, 572 U.S. at 867-68, 873 (Scalia, J., concurring); *see also* Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 HARV. L. REV. 2109, 2150-52 (2015) (agreeing with Justice Scalia that "[f]rom a textualist standpoint ... *Bond* is hard to defend"). For further discussion of *Bond*, see *infra* notes 170-75 and accompanying text.

[49]     *See, e.g.*, Bostock v. Clayton Cty., 140 S. Ct. 1731, 1738 (2020) (stating that "only the words on the page constitute the law" and contrasting them with "extratextual sources and [judges'] own imaginations").

[50]     *See* Ryan D. Doerfler, *Who Cares How Congress Really Works?*, 66 DUKE L.J. 979, 991-94, 997-98 (2017); Christopher R. Green, *Loyal Denominatorism and the Fourteenth Amendment: Normative Defense and Implications*, 13 DUKE J. CONST. L. & PUB. POL'Y 167, 171 (2017) ("[T]he text only expresses meaning in a context, and that context supplies implicit domain limitations."); Patricia M. Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 IOWA L. REV. 195, 199 (1983) ("In the context of the statute, other related statutes, or the problems giving rise to the statute, words may be capable of many different meanings.").

[51]     This is a well-trod path in constitutional interpretation. *E.g.*, Barron v. Mayor of Baltimore, 32 U.S. (7 Pet.) 243, 247-50 (1833) (relying on legal and temporal context). Nevertheless, there are reasons to distinguish the Constitution. Knowing the mischief might be more necessary, given the spare text of the Constitution. Or it might have less weight because the Constitution is meant to endure longer than a statute. *See* Zarda v. Altitude Express, Inc., 883 F.3d 100, 165 (2d Cir. 2018) (Lynch, J., dissenting), *aff'd, Bostock*, 140 S. Ct. 1731. On constitutional provisions and their "paradigm cases," see generally Jed Rubenfeld, *The Paradigm-Case Method*, 115 YALE L.J. 1977 (2006).

[52]     *See infra* notes 200-03 and accompanying text (discussing context, and especially tacit domain quantifiers).

[53]     *See* T. Alexander Aleinikoff, *Updating Statutory Interpretation*, 87 MICH. L. REV. 20, 28 (1988) (referring to Hart and Sacks' purposivism as having "three decades of near hegemony" before the textualist resurgence).

[54]     (1584) 76 Eng. Rep. 637; 3 Co. Rep. 7 a (Exch.).

[55]     *Id.* at 638, 3 Co. Rep. 7 b.

[56]     1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 61 (Oxford, Clarendon Press 1765).

[57]     *See* ROBERT A. KATZMANN, JUDGING STATUTES 31 (2014) ("This [purposive] approach finds lineage in the sixteenth-century English decision *Heydon's Case*."); William S. Blatt, *Interpretive Communities: The Missing Element in Statutory Interpretation*, 95 NW. U. L. REV. 629, 637 (2001) ( "Scholars searching for objective purpose assume that the legislature systematically pursues the common good, an assumption incorporated in the rule in *Heydon's Case*." (footnote omitted)); Anuj C. Desai, *The Dilemma of Interstatutory Interpretation*, 77 WASH. & LEE L. REV. 177, 251 (2020) ( "Purposivism has its roots in the so-called 'mischief rule,' dating back at least to *Heydon's Case* in 1584."); William N. Eskridge, Jr., *Legislative History Values*, 66 CHI.-KENT L. REV. 365, 392-93 (1990); Elizabeth Garrett, *Legislation and Statutory Interpretation, in* THE OXFORD HANDBOOK OF LAW AND POLITICS 360, 369 (Keith E. Whittington, R. Daniel Kelemen & Gregory A. Caldeira eds., 2008) ("The third foundational theory is purposivism, which has its roots in the 'mischief rule' articulated in *Heydon's Case* (1584)."); Michael P. Healy, *Legislative Intent and Statutory Interpretation in England and the United States: An Assessment of the Impact of* Pepper v. Hart, 35 STAN. J. INT'L L. 231, 235 (1999); John F. Manning, *The New Purposivism*, 2011 SUP. CT. REV. 113, 119 n.35 ("The leading English precedent for purposivism is *Heydon's Case*."); Richard A. Posner, *Economics, Politics, and the Reading of Statutes and the Constitution*, 49 U. CHI. L. REV. 263, 265 n.6 (1982) ("For a modern statement of the theory of legislation implicit in Heydon's Case, see H. HART & A. SACKS. ..."); Philip Sales, *Legislative Intention, Interpretation, and the Principle of Legality*, 40 STATUTE L. REV. 53, 56 & n.9 (2019); Frederick Schauer, *Formalism*, 97 YALE L.J. 509, 532 (1988); Strauss, *supra* note 9, at 256, 265 ("Purposive interpretation traces its roots to *Heydon's Case*."). *But see* L.H. LaRue, *Statutory Interpretation: Lord Coke Revisited*, 48 U. PITT. L. REV. 733, 745 n.34 (1987) (cautioning against Hart and Sacks' interpretation of *Heydon's Case* "to say that a judge should ascertain the purpose underlying the statute and then should apply the statute so as to advance that purpose").

Compendium_Cornell
Page 0668

58  76 Eng. Rep. at 637; 3 Co. Rep. 7 a. The report is reprinted with brief editorial comments in 1 THE SELECTED WRITINGS AND SPEECHES OF SIR EDWARD COKE 78 (Steve Sheppard ed., 2003).

59  By the late Middle Ages, English statutes were understood as being "designed expressly to eradicate mischief." NORMAN DOE, FUNDAMENTAL AUTHORITY IN LATE MEDIEVAL ENGLISH LAW 156 (1990). There were significant changes from the late Middle Ages to the early modern period in the conception of a statute and its relationship to the common law, to legislative authority, and to the judicial task. *See generally* A DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES WITH SIR THOMAS EGERTON'S ADDITIONS 3-100 (Samuel E. Thorne ed., 1942) [hereinafter DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES]. Yet already by the end of the fifteenth century, in the inns of court a "reader was expected to explain the 'remedy' by identifying the 'mischief' before the statute." 6 JOHN BAKER, THE OXFORD HISTORY OF THE LAWS OF ENGLAND, 1483-1558, at 22 (2003) [hereinafter 6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND]; *see also* JOHN BAKER, THE REINVENTION OF MAGNA CARTA 1216-1616, at 222 (2017) [hereinafter BAKER, REINVENTION OF MAGNA CARTA] (noting, as of the late sixteenth century, that "[i]t had long been the practice for readers in the inns of court to begin their exposition of a statute by offering a historical explanation of the mischief at which it was aimed").

60  At the time of *Heydon's Case*, Coke was a lawyer of increasing prominence; it would be another twenty-two years before he became a judge. Coke's manuscript report is apparently much shorter, and in it Chief Baron Manwood's main point is that judges should consider the mischief instead of considering whether the statute enlarged or restricted the common law.

61  *Heydon's Case*, 76 Eng. Rep. at 638, 3 Co. Rep. 7 b (enumeration omitted). The factual and legal milieu of the case is complicated, but the gist is that the Court of Exchequer, interpreting one of the Henrician statutes related to the dissolution of the monasteries, read a protection for "any estate or interest for life, year or years" as encompassing copyhold tenure (that is, tenure according to manorial custom). *See id.* That has understandably been read as a decision to expand the reach of the statute. But by the time of *Heydon's Case*, the monasteries had been dissolved for more than four decades; there was no need to read the statute broadly to prevent clever evasions. By finding the Wares' copyhold tenure to be within the protections of the statute, the court was recognizing the doctrinal evolution of copyhold in the intervening decades and assimilating copyhold, at least in this respect, to freehold. On that doctrinal evolution, see generally 6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59, at 644-50; and CHARLES MONTGOMERY GRAY, COPYHOLD, EQUITY, AND THE COMMON LAW (1963). This reading makes sense of the less famous rule of *Heydon's Case*, which lays out presumptions for the interaction of copyhold and statutes. *See* 76 Eng. Rep. at 642, 3 Co. Rep. 9 a; *see also* 7 W. S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 301-04 (1926). Two decades before *Heydon's Case*, the same result had already been reached by two judges of the Court of Common Pleas. *See* GRAY, *supra*, at 201 n.19. That fact reinforces the idea that *Heydon's Case* was not so much a new broadening of the statute as it was a judicial recognition of a doctrinal reshuffling that had already occurred.

62  By the sixteenth century, statutory interpretation had become stricter. *See* 6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59, at 76-81; DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES, *supra* note 59, at 42-47; 1 REPORTS FROM THE LOST NOTEBOOKS OF SIR JAMES DYER, at lix-- lxi (J.H. Baker ed., 1994). *But cf.* THEODORE F. T. PLUCKNETT, A CONCISE HISTORY OF THE COMMON LAW 333-35 (The Lawbook Exch., 5th ed. 2001) (1956) (asserting that "by the reign of Elizabeth ... many lawyers ... gloried in the liberty which the courts enjoyed in playing fast and loose with statutes"); WILLIAM D. POPKIN, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION 11-19 (1999) (emphasizing freedom and discretion in judges' "equitable interpretation" of statutes in early modern England).

63  6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59, at 79-80. Baker's point is about "outsiders" and "later generations," not contemporary expositors who knew the legislative process, though he goes on to show Elizabethan recognition that "[l]egislative intention is a fiction in any case, since a collective body does not have a mind." *Id.*

64    S. E. Thorne, *The Equity of a Statute and* Heydon's Case, 31 ILL. L. REV. 202, 215 (1936); *see also* LON L. FULLER, THE MORALITY OF LAW 83 (rev. ed. 1969) (drawing attention to "the central truth of the Resolution in Heydon's Case, namely, that to understand a law you must understand 'the disease of the commonwealth' it was appointed to cure"). On the idea that the mischief rule directs the interpreter to read the statute in line with the common law, where possible, see *infra* note 238.

65    *See* EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND; OR, A COMMENTARY UPON LITTLETON, *reprinted in* 2 THE SELECTED WRITINGS AND SPEECHES OF SIR EDWARD COKE 742 (Steve Sheppard ed., 2003) (discussing the mischief).

66    *See* Wong Yang Sung v. McGrath, 339 U.S. 33, 45 (1950) ("It is the plain duty of the courts, regardless of their views of the wisdom or policy of the Act, to construe this remedial legislation to eliminate, so far as its text permits, the practices it condemns."); Jacob Scott, *Codified Canons and the Common Law of Interpretation*, 98 GEO. L.J. 341, 345 (2010). For two views of the law of interpretation, compare William Baude & Stephen E. Sachs, *The Law of Interpretation*, 130 HARV. L. REV. 1079 (2017), with Abbe R. Gluck, *Intersystemic Statutory Interpretation: Methodology as "Law" and the* Erie *Doctrine*, 120 YALE L.J. 1898 (2011), and Abbe R. Gluck, *The Federal Common Law of Statutory Interpretation:* Erie *for the Age of Statutes*, 54 WM. & MARY L. REV. 753 (2013).

67    *E.g.*, Bd. of Supervisors v. King Land Corp., 380 S.E.2d 895, 897-98 (Va. 1989); State v. Campbell, 429 A.2d 960, 962-63 (Conn. 1980). For disagreement about the mischief rule, see *In re* House of Representatives Request for Advisory Op. Regarding Constitutionality of 2018 PA 368 & 369, 936 N.W.2d 241, 253 (Mich. 2019) (Clement, J., concurring) (considering the mischief as part of the statute's historical context); *id.* at 266-67 (Markman, J., dissenting) (equating the mischief with purpose and rejecting it); *id.* at 275-78 (Viviano, J., dissenting) (rejecting the mischief rule).

68    *E.g.*, GA. CODE ANN. § 1-3-1 (West, Westlaw through 2020 Legis. Sess.) ("In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy."); N.Y. STAT. LAW § 95 (McKinney, Westlaw through 2019) ("The courts in construing a statute should consider the mischief sought to be remedied by the new legislation, and they should construe the act in question so as to suppress the evil and advance the remedy."); 1 PA. STAT. AND CONS. STAT. ANN. § 1921 (West, Westlaw through 2020 Act 79) ("When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters[,] ... [t]he mischief to be remedied."); *see also* N. X-Ray Co. v. State, 542 N.W.2d 733, 736 (N.D. 1996) (construing a state statute as codifying the mischief rule).

69    *See* LAWRENCE E. FILSON & SANDRA L. STROKOFF, THE LEGISLATIVE DRAFTER'S DESK REFERENCE 31 (2d ed. 2008) ("The sponsor simply says in effect 'here is my problem--fix it.'").

70    *See, e.g., Libya and War Powers: Hearing Before the Comm. on Foreign Relations*, 112th Cong. 7, 16 (2011) (statement of Hon. Harold Koh, Legal Adviser, U.S. Dep't of State) (defending a narrow reading of *hostilities* in the War Powers Resolution in part because of the context in which it arose: "The Congress that passed the resolution in [1973] had just been through a long, major, and searing war in Vietnam").

71    *See* Abbe R. Gluck & Richard A. Posner, *Statutory Interpretation on the Bench: A Survey of Forty-Two Judges on the Federal Courts of Appeals*, 131 HARV. L. REV. 1298, 1327 (2018).

72    *Cf.* JEREMY BENTHAM, A COMMENT ON THE COMMENTARIES: A CRITICISM OF WILLIAM BLACKSTONE'S COMMENTARIES ON THE LAWS OF ENGLAND 99-100 (Charles Warren Everett ed., Scientia Verlag Aalen 1976) (1928) (recognizing that Blackstone's general rules of interpretation are distinct from his more specific rules for statutes).

73    1 BLACKSTONE, *supra* note 56, at 87.

74    *Id.* at 59. On Blackstone's rules for statutory interpretation, see generally John V. Orth, *Blackstone's Rules on the Construction of Statutes, in* BLACKSTONE AND HIS *COMMENTARIES*: BIOGRAPHY, LAW, HISTORY 79 (Wilfrid Prest ed., 2009).

75    1 BLACKSTONE, *supra* note 56, at 59.

76    *E.g.*, William N. Eskridge, Jr., *Textualism, the Unknown Ideal?*, 96 MICH. L. REV. 1509, 1523-24 & n.46 (1998) (reviewing ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997)) (equating "considering the reason and spirit" with the "mischief rule"); *cf.* William S. Blatt, *The History of Statutory Interpretation: A Study in Form and Substance*, 6 CARDOZO L. REV. 799, 804 (1985) (recognizing that Blackstone's "reason and spirit" and the mischief rule are distinct--calling them "scattered, discrete rules, applicable in differing circumstances"--but nevertheless classifying both as "embodi[ments]" of equity). The source of this misunderstanding might be found in Hart and Sacks' juxtaposition within a paragraph of references to *Heydon's Case* and Blackstone's "fifth rule" (that is, fifth sign--"reason and spirit"). *See* HART, JR. & SACKS, *supra* note 6, at 1242.

77    1 BLACKSTONE, *supra* note 56, at 60. Blackstone's illustration for subject matter could also just as easily be used for the mischief because the knowledge of the problem precedent is guiding the interpreter's choice among the senses that an ambiguous term could have. As Blackstone explains:

Thus, when a law of our Edward III. forbids all ecclesiastical persons to purchase *provisions* at Rome, it might seem to prohibit the buying of grain and other victual; but when we consider that the statute was made to repress the usurpations of the papal see, and that the nominations to vacant benefices by the pope were called *provisions*, we shall see that the restraint is intended to be laid upon such provisions only.

*Id.*; *cf.* BENTHAM, *supra* note 72, at 117 (criticizing Blackstone's example of "subject-matter" and suggesting it is better explained in terms of the mischief to be suppressed).

78    *Id.* at 61. For recognition of this overlap, see *In re* Di Torio, 8 F.2d 279, 279 (N.D. Ill. 1925). In the *Institutes*, Coke glosses a statute's mischief as the "cause of the making of the same." COKE, *supra* note 65, at 682.

79    As Blackstone puts it:

An instance of this is given in a case put by Cicero, or whoever was the author of the rhetorical treatise inscribed to Herennius. There was a law, that those who in a storm forsook the ship should forfeit all property therein; and the ship and lading should belong entirely to those who staid in it. In a dangerous tempest all the mariners forsook the ship, except only one sick passenger, who by reason of his disease was unable to get out and escape. By chance the ship came safe to port. The sick man kept possession and claimed the benefit of the law. Now here all the learned agree, that the sick man is not within the reason of the law; for the reason of making it was, to give encouragement to such as should venture their lives to save the vessel: but this is a merit, which he could never pretend to, who neither staid in the ship upon that account, nor contributed any thing to it's preservation.

1 BLACKSTONE, *supra* note 56, at 61 (footnote omitted).

80    *Id.* ("From this method of interpreting laws, by the reason of them, arises what we call *equity*.").

81    *See* DAVID LIEBERMAN, THE PROVINCE OF LEGISLATION DETERMINED: LEGAL THEORY IN EIGHTEENTH-CENTURY BRITAIN 83 (1989) (describing Blackstone's "guiding argument" as the proposition "that no theoretical construction could adequately explain the separation of law and equity in English jurisprudence"); Samuel

L. Bray, *A Parsimonious Equity?: Discussion of* Equity: Conscience Goes to Market, 21 JERUSALEM REV. LEGAL STUD. 1, 2-3, 7 (2020).

82    *See* LIEBERMAN, *supra* note 81, at 84-85; *see also* John H. Langbein, *Introduction* to 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND: A FACSIMILE OF THE FIRST EDITION OF 1765-1769, at viii (The Univ. of Chi. Press 1979) (1768) ("[Blackstone] insisted that there were no material differences between the substantive law of the courts of law and equity, and he concealed or downplayed the facts that made this contention untenable."); Duncan Kennedy, *The Structure of Blackstone's Commentaries*, 28 BUFF. L. REV. 205, 249 (1979) ("[I]t was one of [Blackstone's] central theses that all the English courts did the same thing."). Note that there is an important equivocation, for Blackstone is using *equity* and its cognates in two distinct senses. One is Aristotelian, describing equity as the exceptional case unforeseen by the legislator--Blackstone cites Grotius, but the view is Aristotle's. The other is the more technical sense of *equity* associated with Chancery. For a discussion of these two senses in which Blackstone uses the term, see W. S. Holdsworth, *Blackstone's Treatment of Equity*, 43 HARV. L. REV. 1, 3-6 (1929). Rather than seeing this as a confusion, however, we should see the conflation of the two senses as critical to Blackstone's critique of equity.

83    On the mischief and the equity of the statute, see *infra* note 95.

84    1 BLACKSTONE, *supra* note 56, at 62. For illustrations of Blackstone's concern about such a state of affairs, see generally Emily Kadens, *Justice Blackstone's Common Law Orthodoxy*, 103 NW. U. L. REV. 1553 (2009). For a contrasting view, arguing for tendencies toward dynamism in Blackstone, provided the rituals of law were observed, see Jessie Allen, *Blackstone, Expositor and Censor of Law Both Made and Found, in* BLACKSTONE AND HIS CRITICS 41 (Anthony Page & Wilfrid Prest eds., 2018).

85    *See infra* note 129 and accompanying text.

86    *See* Jeffrey A. Pojanowski, *Reading Statutes in the Common Law Tradition*, 101 VA. L. REV. 1357, 1370 (2015) (noting that Hart and Sacks' "central example of this technique for inferring purpose is ... *Heydon's Case*").

87    HART, JR. & SACKS, *supra* note 6, at 1414-15.

88    *Id.* at 1415 (alteration in original).

89    *Id.* at 1417.

90    For a more freewheeling adaptation, see Max Radin, *A Short Way with Statutes*, 56 HARV. L. REV. 388, 421-22 (1942) (suggesting that *Heydon's Case* could be "recast to serve a modern need," with the interpreter first asking: "What is the purpose of the statute as a whole? ... Is this statutory purpose one that the court feels is good?").

91    HART, JR. & SACKS, *supra* note 6, at 1415.

92    *See supra* note 57.

93    SCALIA & GARNER, *supra* note 7. This is not Justice Scalia's best work, but it has rapidly become a leading source on statutory interpretation for the Supreme Court. By the end of the October 2019 Term, it had already been cited in thirty-nine Supreme Court opinions.

Compendium_Cornell
Page 0672

94 *Id.* at 433-34, 434 n.7 (emphasis omitted) (footnote omitted) (quoting J.H. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 212 (4th ed. 2002)).

95 *Id.* at 438 (emphasis omitted). Scalia and Garner's definition of *equity of the statute*, in turn, is a fine piece of anachronism, reading the long history of statutory interpretation as a continuous battle between two sides:

[E]quity of the statute: The supposed fair application intended for an enactment, as the interpreter's paramount concern-- allowing departures from the statute's literal words. • This statute-specific ally of purposivism arose in the Middle Ages, mostly fell into disuse by the Renaissance, was thoroughly rejected for most of the 19th century, and has made spasmodic comebacks in American law since then. See PURPOSIVISM.

*Id.* at 428 (emphasis omitted). In early modern legal usage, there does not appear to be any distinction between the mischief rule, the equity of the statute, and the fiction of legislative intention. There is, however, a distinction in St. Germain between the equity of the statute, used to bring in analogous cases; and equity in the Aristotelian sense, used to recognize exceptions out of the statute. *See* DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES, *supra* note 59, at 78 & nn.163-64. Later on, a partial divergence seems to develop with *equity* being more easily used of broadening interpretation and *mischief* of narrowing interpretation. *See* Eskridge, Jr., *supra* note 8, at 999. Eventually, for an interpreter who wants to control a statute by reference to some external principle of political morality, equity would become a more congenial concept than mischief. For a conceptual rather than historical analysis of the two senses in which "equity of the statute" can be used, see generally James Edelman, *The Equity of the Statute, in* PHILOSOPHICAL FOUNDATIONS OF THE LAW OF EQUITY 352 (Dennis Klimchuk, Irit Samet & Henry E. Smith eds., 2020).

96 523 U.S. 75, 79 (1998); *see also* Lewis v. City of Chicago, 560 U.S. 205, 215 (2010) ("It is not for us to rewrite the statute so that it covers only what we think is necessary to achieve what we think Congress really intended.").

97 *See Oncale*, 523 U.S. at 79. There is, however, ample authority for the first part of the statement--that is, a statute may go beyond the precipitating evil. *E.g.*, S. Beach Marina, Inc. v. Dep't of Revenue, 724 P.2d 788, 792 (Or. 1986); *see also* Jerome Park Co. v. Bd. of Police, 11 Abb. N. Cas. 342, 347 (Ct. Com. Pl. N.Y.C. & Cty. 1882) (recognizing that broad statutory language can apply to later emerging evils).

98 SCALIA & GARNER, *supra* note 7, at 101, 104 (emphasis omitted). On general terms, see *infra* note 249.

99 SCALIA & GARNER, *supra* note 7, at 101.

100 *Id.* at 103-04, 104 n.7.

101 For example, the interpreter might simply think the best interpretation of the statutory provision is broader than the mischief. *See, e.g.*, Brewer's Lessee v. Blougher, 39 U.S. (14 Pet.) 178, 198-99 (1840).

102 *See* 18 U.S. (5 Wheat.) 76, 105 (1820); *see also* United States v. Sheldon, 15 U.S. (2 Wheat.) 119, 121-22 (1817) ("It may be admitted, that the mischief is the same, whether the enemy be supplied with provisions in the one way or the other; but this affords no good reason for construing a penal law by equity, so as to extend it to cases not within the correct and ordinary meaning of the expressions of the law, particularly when it is confirmed by the interpretation which the legislature has given to the same expressions in the same law."). For Chief Justice Marshall's consideration of the mischief in other cases, see, for example, Brown v. State of Maryland, 25 U.S. (12 Wheat.) 419, 440 (1827) (considering the mischief in constitutional interpretation) and United States v. Daniel, 19 U.S. (6 Wheat.) 542, 547-48 (1821) (considering the mischief in statutory interpretation). On penal statutes and the mischief rule, compare Daggett v. State, 4 Conn. 60, 63-64 (Conn. 1821) (rejecting use of mischief to support a broader reading of a penal statute), and Glanville Williams, *Statute Interpretation, Prostitution and the Rule of Law, in* CRIME, PROOF AND PUNISHMENT: ESSAYS IN MEMORY OF SIR RUPERT CROSS 71 (1981) (criticizing the use of the mischief rule to expand criminal

statures), with United States v. Holte, 236 U.S. 140, 144 (1915) (favoring a broader interpretation that aligned with the mischief, even in a penal statute), and Ash Sheep Co. v. United States, 252 U.S. 159, 169-70 (1920) (same).

103   For critique, see *supra* notes 45-51 and accompanying text, and *infra* notes 130-34 and accompanying text.

104   *See infra* notes 130-34 and accompanying text.

105   For Justice Scalia's consideration of the mischief under the rubric of "historical context," see, for example, Branch v. Smith, 538 U.S. 254, 268-70 (2003) (noting that "[w]hen Congress adopted [the relevant statutory provision] in 1967, the immediate issue was precisely the involvement of the courts in fashioning electoral plans," and thus concluding that "[w]ith all this threat of judicially imposed at-large elections, and (as far as we are aware) no threat of a legislatively imposed change to at-large elections, it is most unlikely that [the statutory provision] was directed solely at legislative reapportionment"), and Vt. Agency of Nat. Res. v. U.S. *ex rel.* Stevens, 529 U.S. 765, 781-82, 781 n.10 (2000) ("As the historical context makes clear, and as we have often observed, the FCA was enacted in 1863 with the principal goal of 'stopping the massive frauds perpetrated by large [private] contractors during the Civil War.'" (quoting United States v. Bornstein, 423 U.S. 303, 309 (1976))).

106   Bond v. United States, 572 U.S. 844, 868 (2014) (Scalia, J., concurring); *see also id.* at 873 (rejecting the majority's use of "the 'concerns' driving the Convention--'acts of war, assassination, and terrorism'--as guideposts of statutory meaning").

107   On the mischief rule and legislative history, see *infra* notes 153-59 and accompanying text.

108   *See generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175 (1989).

109   *See, e.g.,* Bond, 572 U.S. at 872-73 (Scalia, J., concurring); Gonzales v. Oregon, 546 U.S. 243, 287-98 (2006) (Scalia, J., dissenting).

110   The point is linguistic, not legal. Consider an example drawn from Timothy Endicott's discussion of pragmatic vagueness: to whom does the expression "violinist" apply? TIMOTHY A. O. ENDICOTT, VAGUENESS IN LAW 51 (2000). If we applied it to everyone who had ever held a violin and drawn a bow across a string, there would be more determinacy but less predictability; but if we applied it "only to people who are reasonably skilful or at least persistent," *id.*, the scope of the term would be less determinate yet closer to what the reader will usually expect. By contrast, Justice Scalia yoked rules and predictability. *See* Scalia, *supra* note 108, at 1179.

111   Examples include *Bond, see supra* notes 46-48 and accompanying text; *Nashville & K. R. Co. v. Davis*, 78 S.W. 1050 (Tenn. 1902), *see supra* text accompanying note 1; and the hypothetical statute requiring the leashing of dogs in a park, *see infra* notes 178-80 and accompanying text. When choosing a narrower construction because of the mischief, some courts have noted that the resulting scope is somewhat indeterminate. *See, e.g.,* State v. Smith, 25 S.C.L. (Chev.) 157, 160 (Ct. App. 1840) ("We will leave the cases to be adjudged as they arise."). Note that even though the mischief rule will tend to increase this at-the-line indeterminacy, that does not mean that it systematically increases judicial discretion. *But see* Tara Leigh Grove, Commentary, *Which Textualism?*, 134 HARV. L. REV. 265, 295-96 (2020). To the contrary, this Article argues that relying on context (including the mischief) can allow judges to temper their creativity and lessen legislative surprise at their interpretations. Nor should these effects be surprising because there is reason to doubt that increasing interpretive sources increases judicial discretion. *See* Thomas W. Merrill, *Textualism and the Future of the Chevron Doctrine*, 72 WASH. U. L.Q. 351, 373 (1994) (noting that a textualist court has "fewer tools at its disposal to particularize the meaning of the text," and, "like the painter working with a small pallet," the court "necessarily has to become more imaginative in resolving questions of statutory interpretation"). *See generally* Adam M. Samaha, *Looking Over a Crowd--Do More Interpretive Sources Mean More Discretion?*, 92 N.Y.U. L. REV. 554 (2017) (answering the titular question in the negative).

Compendium_Cornell
Page 0674

112    *See, e.g.*, Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78-82 (1998).

113    *See, e.g.*, United States v. Virginia, 518 U.S. 515, 568-70 (1996) (Scalia, J., dissenting).

114    The leading example that Scalia and Garner give for their general-terms canon is the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 72 (1872). SCALIA & GARNER, *supra* note 7, at 101-03. The tension between Justice Scalia's purer textualism and his traditionalism is not recognized in *Reading Law*; there are no citations to *United States v. Virginia*, 518 U.S. at 568-70 (Scalia, J., dissenting). *Cf.* Michael W. McConnell, *Textualism and the Dead Hand of the Past*, 66 GEO. WASH. L. REV. 1127, 1137 n.45 (1998) (noting inconsistency in Justice Scalia's interpretive approach); *infra* note 249 and accompanying text (same).

115    Judge Easterbrook rejects the mischief rule and has apparently never used it in a judicial opinion. Although he has said that when we interpret words, one aspect of context is "the problems the authors were addressing," Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 61 (1994), this passage comes in a broader description of interpretation, which he then retreats from for purposes of legal interpretation, *id.* at 64. For another line of thought in Judge Easterbrook's work that is more consistent with the mischief rule, see *infra* note 244.

116    *See* Manning, *supra* note 40, at 84-85 ("Because speakers use language purposively, textualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing.").

117    *E.g.*, John F. Manning, *The Absurdity Doctrine*, 116 HARV. L. REV. 2387, 2456-76 (2003) (considering alternatives to the absurdity doctrine but not discussing the mischief).

118    *See* John F. Manning, *Textualism and Legislative Intent*, 91 VA. L. REV. 419, 424-25 (2005) [hereinafter Manning, *Textualism and Legislative Intent*] ("[Textualists] subscribe to the general principle that texts should be taken at face value--with no implied extensions of specific texts or exceptions to general ones--even if the legislation will then have an awkward relationship to the apparent background intention or purpose that produced it."); Manning, *supra* note 40, at 93 (placing "public knowledge of the mischief the lawmakers sought to address" within the policy context that is emphasized by purposivists); John F. Manning, *Federalism and the Generality Problem in Constitutional Interpretation*, 122 HARV. L. REV. 2003, 2055 (2005) (referring to "[l]ooking at the precise mischiefs that underlay the document's adoption" as "a classic move of purposivism").

119    *See* 140 S. Ct. 1731, 1749, 1751-52 (2020); *id.* at 1773-74 (Alito, J., dissenting); *id.* at 1834 (Kavanaugh, J., dissenting). For three views of how textualist the opinions are, see Mitchell N. Berman & Guha Krishnamurthi, *Bostock* Was Bogus: Textualism, Pluralism, and Title VII (Feb. 9, 2021) (unpublished manuscript) (available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3777519 [https://perma.cc/5P5D-JCAX]); Grove, *supra* note 111; and Re, *supra* note 15.

120    The dissenting opinions did refer in passing to the mischief or problem to which the statute was directed. *See Bostock*, 140 S. Ct. at 1774 (Alito, J., dissenting); *id.* at 1835 (Kavanaugh, J., dissenting) (faulting the majority for ignoring "the social realities that distinguish between the kinds of biases that the statute sought to exclude from the workplace from those it did not" (quoting *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 162 (2d Cir. 2018) (Lynch, J., dissenting), *aff'd, Bostock*, 140 S. Ct. 1731)). But neither relied on the mischief as Judge Lynch did in his dissent in *Zarda*. *See Zarda*, 883 F.3d at 143 (Lynch, J., dissenting).

121    *Cf.* Koppelman, *supra* note 14, at 21 (calling the mischief rule a "subtractive move[]" that "is probably barred by the new textualism"); *id.* at 25 ("The new textualism's rejection of the mischief rule is one of its deepest weaknesses.").

122     *E.g.*, Sales, *supra* note 57, at 56 (noting that courts read a statute's language "in the light of the scheme of the Act as a whole and its overall purpose (sometimes called the mischief rule)").

123     Gluck & Posner, *supra* note 71.

124     *Id.*

125     *Id.* (footnote omitted).

126     *Mischief*, BLACK'S LAW DICTIONARY (6th ed. 1990). This was the definition from the first edition (1891) through the sixth edition (1990). In subsequent editions the definition has grown bloated and imprecise, and the eleventh edition (2019) introduces the erroneous equation of the mischief rule with purposivism. *See Mischief Rule*, BLACK'S LAW DICTIONARY (11th ed. 2019) (stating that it "is a primarily British name for purposivism").

127     *Mischief*, OXFORD ENGLISH DICTIONARY (3d ed. 2002).

128     *See supra* Section I.A (discussing *Heydon's Case*).

129     *See, e.g.*, 6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59, at 76-81 (discussing equity, mischief, and intent in the late fifteenth and sixteenth centuries); JOHN BELL & GEORGE ENGLE, STATUTORY INTERPRETATION 19 (2d ed. 1987) (describing "the purposive approach [as] more limited than one which tries to 'suppress the mischief'"); DOE, *supra* note 59, at 173-74 (finding differences in how the common law and chancery of the fifteenth century approached "inconvenience" and "mischief"); J. G. SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION 319-21 (Chicago, Callaghan & Co. 1891) (referring to intention, general purpose, subject matter, context, and mischief); Blatt, *supra* note 76, at 821 (showing fluctuations in terms for statutory interpretation); William N. Eskridge, Jr. & Philip P. Frickey, *Statutory Interpretation as Practical Reasoning*, 42 STAN. L. REV. 321, 332 (1990) (distinguishing intentionalism from purposivism, but equating the latter with "a flexible 'mischief' approach"); *cf.* DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES, *supra* note 59 (analyzing how the development of statutory interpretation between the Year Books and Blackstone was tied to changing conceptions of the statute and of legislative authority).

130     *See, e.g.*, SUTHERLAND, *supra* note 129, at 320 ("When the words are not explicit[,] the intention is to be collected from the context[,] from the occasion and necessity of the law[,] from the mischief felt, and [the objects and] the remedy in view; and the intention is to be taken or presumed [,] according to what is consonant [to] reason and good discretion." (quoting 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW *462 (Charles M. Barnes ed., 13th ed. 1884))). The more general proposition was that "if the statute is plain and unambiguous there is no room for construction or interpretation." THEODORE SEDGWICK, A TREATISE ON THE RULES WHICH GOVERN THE INTERPRETATION AND APPLICATION OF STATUTORY AND CONSTITUTIONAL LAW 231 (New York, John S. Voorhies 1857).

131     *E.g.*, United States v. Lewis, 192 F. 633, 639 (E.D. Mo. 1911) (considering the mischief even though "the language of that act is clear and free from ambiguity"); RUPERT CROSS, PRECEDENT IN ENGLISH LAW 185 (1961) (noting "conflicting schools of thought" on whether the mischief rule applies only "to cases of ambiguity"). Some statutes codifying the mischief rule direct that it should be used in all cases of statutory interpretation, and others direct that it should be used when there is ambiguity. *See supra* note 68. For an analysis of lexical ordering in statutory interpretation, see generally Samaha, *supra* note 45.

132     For discussion, see *supra* notes 45-51 and accompanying text.

133    *See, e.g.,* Frank H. Easterbrook, *The Case of the Speluncean Explorers: Revisited,* 112 HARV. L. REV. 1913, 1913-14 (1999).

134    *See infra* notes 170-74 and accompanying text; *see also* Adoptive Couple v. Baby Girl, 570 U.S. 637, 642, 649 (2013) (describing the abuses that "prompted" Congress to enact the Indian Child Welfare Act and concluding that the Court's interpretation of the act "comports with the statutory text [which] demonstrat[es] ... the primary mischief the ICWA was designed to counteract"). Ryan Doerfler has criticized "double count[ing]" the same interpretive consideration when (a) deciding whether a text is ambiguous and (b) resolving the ambiguity. Doerfler, *supra* note 47, at 535-36. I consider the line between ambiguity-construction and ambiguity-resolution to be more fluid.

135    6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59.

136    *E.g.,* WILLIAM TWINING & DAVID MIERS, HOW TO DO THINGS WITH RULES: A PRIMER OF INTERPRETATION 153 n.67 (4th ed. 1999) (*"Heydon's Case* can be interpreted as taking mischiefs of the law, rather than social problems, as the starting point."). It is especially apt to think of the evil as a legal deficiency when the legislative action is the repeal of a statute or the reversal of a judicial decision.

137    *See, e.g.,* Ezekiel v. Dixon, 3 Ga. 146, 158 (1847) (referring, in an opinion that extols the virtues of plain text, to "the mischief which the Assembly had in its eye at the time").

138    Smith v. Townsend, 148 U.S. 490, 494 (1893) (quoting United States v. Union Pac. R.R. Co., 91 U.S. 72, 79 (1875)). The quotation continues: "and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *Id.*

139    *Id.* at 495 (quoting Platt v. Union Pac. R.R. Co., 99 U.S. 48, 64 (1878)). The quotation continues: "and discover its purpose from the language used in connection with the attending circumstances." *Id.; see also* Kelly v. Dewey, 149 A. 840, 842-43 (Conn. 1930) (considering "the circumstances and conditions known to the Legislature at the time of [the statute's] enactment," including the existing law, the known evil, and the official recommendation that "[t]he Legislature ... had before it"); LaRue, *supra* note 57, at 753 (describing the technique in *Heydon's Case* in terms of "two things: (1) the judge reads the statute in the context of pre-existing law, but (2) the judge examines that pre-existing law from the point of view of the legislator and not from his own point of view").

140    Holy Trinity Church v. United States, 143 U.S. 457, 463 (1892). Nevertheless, in *Holy Trinity Church,* because of the clarity of the language, the best account of the legislative decision would have been that the statute simply went beyond the mischief. On the Court's invocation of the evil being less remarkable than its use of legislative history, see Adrian Vermeule, *Legislative History and the Limits of Judicial Competence: The Untold Story of* Holy Trinity Church, 50 STAN. L. REV. 1833, 1843 (1998). As Vermeule puts it:

The Court also argued that the statute should be limited to the scope of the evil that the statute was designed to remedy, as evidenced by "contemporaneous events." It was "common knowledge" that the act's "motive" was to prevent an influx of "cheap, unskilled labor" in the form of "an ignorant and servile class of foreign laborers."

So far the Court's methods were familiar, whatever the merit of its conclusions. The Court's next source for determining congressional intent, however, was internal legislative history, and the opinion gave no explanation for that break from traditional doctrine.

*Id.* (footnote omitted). On post-*Holy Trinity Church* developments that made use of legislative history routine, see generally Nicholas R. Parrillo, *Leviathan and Interpretive Revolution: The Administrative State, the Judiciary, and the Rise of Legislative History, 1890-1950,* 123 YALE L.J. 266 (2013).

141   Krishnakumar, *supra* note 12, at 1278 n.9, 1339, 1347.

142   *Id.* at 1319; *see also id.* at 1281, 1331 ("the mischief that motivated").

143   Strauss, *supra* note 9, at 258. Strauss helpfully distinguishes a statute's "political history" from its "legislative history," *id.* at 243 & n.3, though he fails to press the distinction home, *see id.* at 257 (insisting on finding the mischief in "[h]earings, debates, and reports").

144   HART, JR. & SACKS, *supra* note 6, at 1415; *see also* Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 218 (1936) (Cardozo, J.) ("The evils and embarrassments that brought § 77B into existence are matters of common knowledge."); United States v. Black, 24 F. Cas. 1156, 1158 (C.C.D. Mass. 1875) (No. 14,602) ("We must therefore endeavor to ascertain what the mischief intended to be remedied was. The framer of the act has not enabled us to determine this by any recital in the section itself, and we are therefore left to infer in from our knowledge of the state of the law at the time, and of the practical grievances generally complained of." (quoting Lyde v. Barnard (1836) 150 Eng. Rep. 363, 368; 1 M. & W. 101, 114 (Exch. of Pleas))); Edwards v. Barksdale, 11 S.C. Eq. (2 Hill Eq.) 416, 418 (App. Eq. 1836) ("We know what the canons of the common law were, in relation to descents; and we perfectly well know the evil which was intended to be remedied.").

145   *See, e.g.*, Smith v. Townsend, 148 U.S. 490, 495 (1893).

146   *E.g.*, Adoptive Couple v. Baby Girl, 570 U.S. 637, 649 (2013) ( "The statutory text expressly highlights the primary problem that the statute was intended to solve."); Bulala v. Boyd, 389 S.E.2d 670, 675 (Va. 1990) (stating "the problem described in the preamble," which is the mischief, though also using the words *mischief* and *purpose* interchangeably); *see* Jarrod Shobe, *Enacted Legislative Findings and Purposes*, 86 U. CHI. L. REV. 669, 680 (2019) ("[F]indings often recite facts that Congress found as part of developing the legislation, which are generally an explanation of the 'mischief' that prompted the statute."); *see also* BENTHAM, *supra* note 72, at 141-43 (using the mischief identified in a preamble to interpret a statutory reference to "sheep, or other Cattle"); DISCOURSE UPON THE EXPOSICION & UNDERSTANDINGE OF STATUTES, *supra* note 59, at 114 n.28 (citing early modern usage of preambles to ascertain the mischief--in Francis Bacon's words, "the preamble sets up the mark, and the body of the law levels at it"); FRANKFURTER, *supra* note 42, at 24 (giving an example from the reign of Edward VI); 1 REPORTS FROM THE LOST NOTEBOOKS OF SIR JAMES DYER, *supra* note 62, at lx ("Dyer taught that preambles were 'a key to open the minds of the makers of the act, and the mischiefs which they intended to remedy.'" (quoting Stowell v. Lord Zouche (1565), Plowd. 353v at fo. 369r)). An example of a court determining the subject of a statute from other words in the statute is *Morris v. United States*, 168 F. 682, 684-85 (8th Cir. 1909) (reading "every person" as referring only to oleomargarine manufacturers and dealers, "in harmony with the subject of legislation").

147   *E.g.*, SEDGWICK, *supra* note 130, at 240-43; *cf.* SCALIA & GARNER, *supra* note 7, at 33 (arguing that "the *purpose* of the text ... is a vital part of its context," but that it should "be gathered only from the text itself"). *But see* Brewer's Lessee v. Blougher, 39 U.S. (14 Pet.) 178, 198 (1840) ("It is undoubtedly the duty of the Court to ascertain the meaning of the legislature, from the words used in the statute, *and the subject matter to which it relates*." (emphasis added)); *Black*, 24 F. Cas. at 1158 (citing *Lyde*, 150 Eng. Rep. at 368, 1 M. & W. at 114); W. Ivor Jennings, *Courts and Administrative Law--The Experience of English Housing Legislation*, 49 HARV. L. REV. 426, 453 (1936) ("To study the evils that social legislation is intended to remedy it is necessary to look outside the statutes.").

148   Bond v. United States, 572 U.S. 844, 847 (2014).

149   570 U.S. at 642.

150   *See* Koppelman, *supra* note 14, at 21 & n.108 (critiquing Scalia and Garner for abandoning their precept that the purpose or mischief can only be found in the words of the statute when they add "sizable" to the "colloquial meaning" of *vehicle*

in "[n]o vehicles in the park"); *see also* William N. Eskridge, Jr., *The New Textualism and Normative Canons*, 113 COLUM. L. REV. 531, 560-62 (2013) (reviewing SCALIA & GARNER, *supra* note 7). Indeed, in the sixteenth century, William Fleetwood criticized mistakes about the mischief that would occur when an interpreter tried to read it off the statute. *See* BAKER, REINVENTION OF MAGNA CARTA, *supra* note 59, at 222-23.

151   *E.g.*, Chatwin v. United States, 326 U.S. 455, 463 (1946) (citing, among other things, Hugh A. Fisher & Matthew F. McGuire, *Kidnapping and the So-Called Lindbergh Law*, 12 N.Y.U. L.Q. REV. 646, 653 (1935)); Zarda v. Altitude Express, Inc., 883 F.3d 100, 137-42 (2d Cir. 2018) (Lynch, J., dissenting) (citing secondary sources that summarize the popular debate preceding enactment of the Civil Rights Act of 1964), *aff'd*, Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020); Cahn v. Berryman, 408 P.3d 1012, 1015 (N.M. 2017) (citing previous cases describing the problem addressed by the legislature, including a case relying on Ruth L. Kovnat, *Medical Malpractice Legislation in New Mexico*, 7 N.M. L. REV. 5, 7 (1977)). Also useful may be summaries of the legal developments that preceded and generated the statute. *See* Lofton v. State, 416 So. 2d 522, 523 & n.2 (Fla. Dist. Ct. App. 1982) (citing Lawrence W. Smith, *Fla. Stat. § 806.01: Florida Arson Law--The Evolution of the 1979 Amendments*, 8 FLA. ST. U. L. REV. 81 (1980)).

152   *See* William S. Jordan, III, *Legislative History and Statutory Interpretation: The Relevance of English Practice*, 29 U.S.F. L. REV. 1, 13-17 (1994). On the English tradition regarding statutory interpretation, see generally Magyar, *supra* note 18.

153   *See, e.g.*, *Adoptive Couple*, 570 U.S. at 649; *Chatwin*, 326 U.S. at 462-63; State v. Campbell, 429 A.2d 960, 962 (Conn. 1980); Gletzer v. Harris, 909 N.E.2d 1224, 1228 (N.Y. 2009).

154   *E.g.*, Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs, 17 F.3d 616, 631 (3d Cir. 1994); *see also* Humphrey's Ex'r v. United States, 295 U.S. 602, 625 (1935) ("While the general rule precludes the use of these debates to explain the meaning of the words of the statute, they may be considered as reflecting light upon its general purposes and the evils which it sought to remedy."); WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 5 (2016) ("[I]f the relevant congressional committee reports described the Lafayette Park statute as responsive to a series of accidents in which bicyclists and skateboarders had run into children and knocked over elderly visitors, the rule of law is not well-served by an abstract textualist approach that reads bicycles and skateboards out of the statute."); Manning, *supra* note 10, at 733 ("Just as a book or newspaper or law review article may reveal the reasons for passing legislation, so too might the legislative history, which is itself produced by well-informed observers on the scene.").

155   *Cf.* State v. Victor O., 128 A.3d 940, 949 (Conn. 2016) ("Although our research has not revealed any legislative history explaining the rationale for these amendments, it is well established that, '[i]n determining the true meaning of a statute when there is genuine uncertainty as to how it should apply, identifying the problem in society to which the legislature addressed itself by examining the legislative history of the statute under litigation is helpful.'" (quoting *Campbell*, 429 A.2d at 962)).

156   Max Radin, *Statutory Interpretation*, 43 HARV. L. REV. 863, 873 n.21 (1930).

157   *Id.* (citation omitted); *see also* Zarda v. Altitude Express, Inc., 883 F.3d 100, 144-45 (2d Cir. 2018) (Lynch, J., dissenting), *aff'd*, Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020).

158   12 F. Cas. 252 (C.C.D. Cal. 1879) (No. 6,546).

159   *Id.* at 255.

160   Jeremy Bentham notes that a legislature might enact legislation "procuring benefits" rather than "suppress[ing] mischief," and he gives this example:

Where was the mischief before the acts for the encouragement of the discovery of the Longitude? That the Longitude was not discovered? This seems rather harsh to say. Benefit is certainly a more palatable word: it were a pity to shut the door against the few occasions we can have to introduce it.

BENTHAM, *supra* note 72, at 139.

161   I owe this idea to a conversation with Jordan Lavender.

162   *See supra* notes 37-40 and accompanying text.

163   Apart from the text read in context, I take it that "the intention of the legislature is undiscoverable in any real sense." Radin, *supra* note 156, at 870-71; *see also* FRANKFURTER, *supra* note 42, at 19-20; FULLER, *supra* note 64, at 86-87; SEDGWICK, *supra* note 130, at 382-83. For a sophisticated recent analysis, see Doerfler, *supra* note 50.

164   Joseph Raz, *Intention in Interpretation, in* THE AUTONOMY OF LAW: ESSAYS ON LEGAL POSITIVISM 249, 258 (Robert P. George ed., 1996); *see also* Doerfler, *supra* note 50, at 1024-25.

165   This is a step beyond simply saying "that legislators intend to enact a law that will be decoded according to prevailing interpretive conventions." Manning, *Textualism and Legislative Intent, supra* note 118, at 432-33; *see also* Richard H. Fallon, Jr., *The Statutory Interpretation Muddle,* 114 NW. U. L. REV. 269, 314-17 (2019) (critiquing the attribution to a legislature of only minimal intentions); Nelson, *supra* note 44, at 453-63 (same).

166   One can soften the causal language: "In light of *a, b*." Or: "After *a, b*."

167   I owe the examples to A.J. Bellia.

168   *See supra* notes 23-27 and accompanying text.

169   CSX Transp., Inc. v. Ala. Dep't of Revenue (*CSX I*), 562 U.S. 277, 301 (2011) (Thomas, J., dissenting).

170   572 U.S. 844 (2014).

171   *Id.* at 847.

172   *Id.* at 848.

173   *Id.* (emphasis added).

174   *Id.* at 849 (quoting Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, pmbl., *opened for signature* Jan. 13, 1993, 1974 U.N.T.S. 318).

175   This statement is abbreviated so as not to be unwieldy, but one could expand the statement of the mischief to capture the legal inadequacy: "Because of the Second Battle of Arras and others like it, and the legal regime that made them possible and allows such uses of chemical weapons in the future, ...."

176   *See* Shobe, *supra* note 146, at 683 (distinguishing enacted findings and purposes). Compare Quentin Skinner's distinction between "motive" and "intention," with the former being the reason for the writer or artist to begin, but the latter being the purpose that continues into and is involved with the work itself. Quentin Skinner, *Motives, Intentions and the Interpretation of Texts*, 3 NEW LITERARY HIST. 393, 401-02 (1972). Although Skinner's distinction is not identical with the one here, and is concerned not with laws as much as with poems, it is of interest that he similarly distinguishes an antecedent setting that motivates the creation from a continuing authorial purpose.

177   Another function that might be elaborated is aid in choosing between two non-overlapping senses of a term that are ambiguous (in the technical sense, as contrasted to vagueness, *see* ENDICOTT, *supra* note 110, at 54). Compare Blackstone's example about *provisions*. *See* 1 BLACKSTONE, *supra* note 56, at 60.

178   Frank H. Easterbrook, *Statutes' Domains*, 50 U. CHI. L. REV. 533, 535 (1983).

179   *Id.*

180   *Id.* ("For rules about the rest of the animal kingdom we must look elsewhere.").

181   On the medieval hypothetical case of the barber in Bologna, see *supra* note 20 and accompanying text.

182   Nashville & K. R. Co. v. Davis, 78 S.W. 1050, 1050 (Tenn. 1902).

183   *See supra* notes 23-27 and accompanying text.

184   *See supra* notes 28-31 and accompanying text.

185   *See supra* notes 32-35 and accompanying text.

186   *See supra* notes 46-48 and accompanying text.

187   *E.g.*, N. X-Ray Co. v. State, 542 N.W.2d 733, 737-38 (N.D. 1996) (relying on the mischief to read narrowly the ambiguous statutory term "contractor"); State v. Smith, 25 S.C.L. (Chev.) 157, 160 (Ct. App. 1840) (relying on the mischief to give a narrow reading to "disfiguring" in a statute about marking, branding, or killing animals).

188   Prescott v. Nevers, 19 F. Cas. 1286, 1288-89 (C.C.D. Me. 1827) (No. 11,390). Although here the mischief rule and the rule of lenity align, for Justice Story the mischief rule had independent force. He applied it even when doing so meant a broader reading of a penal statute. *See* United States v. Winn, 28 F. Cas. 733, 734-35 (C.C.D. Mass. 1838) (No. 16,740). *But see* United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 105 (1820) (per Marshall, C.J.) (rejecting a broad reading that relied on the mischief, because of the statute's structure and penal classification). On the mischief rule and penal statutes, see *supra* note 102.

189   *Winn*, 28 F. Cas. at 734; *see also* United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 324-25 (1897) (concluding that railroads, and not manufacturers alone, are within the Trust Act, because "the evil to be remedied is similar" and the "general language [is] sufficiently broad to include them both").

190   (1584) 76 Eng. Rep. 637, 638; 3 Co. Rep. 7 a, 7 b (Exch.).

191    On the mischief rule and discretion, see *supra* note 111. On the mischief rule and predictability, see *supra* note 110 and accompanying text.

192    135 S. Ct. 2480 (2015). In *King v. Burwell*, the Affordable Care Act (ACA) had made tax credits available to any taxpayer who enrolled in an insurance plan through "an Exchange established by the State" under the Act. *Id.* at 2482. The Court had to decide whether the provision also included in its reach exchanges set up by the federal government. *Id.* at 2483. At least one scholar has read the opinion of the Court as relying on the mischief addressed by the ACA. *See* Krishnakumar, *supra* note 12, at 1340. In my view, however, the mischief rule was inapt. In *King v. Burwell*, the Court was not choosing between different degrees of breadth that the statutory phrase could bear or resolving a latent ambiguity; what it did was more like the correction of an error in the enacted statute. *See* Ryan D. Doerfler, *The Scrivener's Error*, 110 NW. U. L. REV. 811, 843-50 (2016); *see also* Abbe R. Gluck, *Justice Scalia's Unfinished Business in Statutory Interpretation: Where Textualism's Formalism Gave Up*, 92 NOTRE DAME L. REV. 2053, 2074 (2017) (describing four words in the ACA as a "potential drafting error"). An additional difficulty with applying the mischief rule in the case was the sheer enormity and complexity of the statute, which made it hard to state the mischief with the particularity that might distinguish it from a general purpose. *Cf.* Abbe R. Gluck, Anne Joseph O'Connell & Rosa Po, *Unorthodox Lawmaking, Unorthodox Rulemaking*, 115 COLUM. L. REV. 1789, 1792-93 (2015) (noting the ACA "is a 2700-page statute worked on by five congressional committees; it delegates not to a single federal agency but to multiple federal agencies, as well as to states, quasi-public actors, and an independent commission, to which it outsourced the controversial question of cutting Medicare"); Shobe, *supra* note 146, at 682-83 (noting that "Congress included several sets of findings throughout the [ACA]," and then listing some that seem indistinguishable from statements of general purpose). This difficulty is further considered in Part IV.

193    *Cf.* Bostock v. Clayton Cty., 140 S. Ct. 1731, 1751 (2020) ("One could also reasonably fear that objections about unexpected applications will not be deployed neutrally.").

194    To the contrary, Judge Lynch said:

Speaking solely as a citizen, I would be delighted to awake one morning and learn that Congress had just passed legislation adding sexual orientation to the list of grounds of employment discrimination prohibited under Title VII of the Civil Rights Act of 1964. I am confident that one day--and I hope that day comes soon--I will have that pleasure.

Zarda v. Altitude Express, Inc., 883 F.3d 100, 137 (2d Cir. 2018) (Lynch, J., dissenting), *aff'd*, *Bostock*, 140 S. Ct. 1731.

195    *Cf.* Duparquet Huot & Moneuse Co. v. Evans, 297 U.S. 216, 221 (1936) (Cardozo, J.) (explaining how "[the words] came there freighted with the meaning imparted to them by the mischief to be remedied and by contemporaneous discussion[,] [i]n such conditions history is a teacher that is not to be ignored." (citation omitted)).

196    *See, e.g.*, Chatwin v. United States, 326 U.S. 455, 462, 464 (1946) (discussing "the general problem to which the framers of the Federal Kidnaping Act addressed themselves," and concluding that "the broadness of the statutory language does not permit us to tear the words out of their context, using the magic of lexigraphy to apply them to unattractive or immoral situations lacking the involuntariness of seizure and detention which is the very essence of the crime of kidnaping"); Mkt. Co. v. Hoffman, 101 U.S. 112, 116 (1879) ("To understand the true meaning of the clause, it is necessary to observe what the subject was in regard to which Congress attempted to legislate."); SUTHERLAND, *supra* note 129, at 320 ("Legislatures, like courts, must be considered as using expressions concerning the thing they have in hand; and it would not be a fair method of interpretation to apply their words to subjects not within their consideration, and which, if thought of, would have been more particularly and carefully disposed of."); *cf.* Frank H. Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 66 (1988) ("The novelty of a question suggests that the legislature did not answer it.").

197    For a distinction between judges' linguistic intuitions and judgments, with an endorsement of the former, see Fallon, Jr., *supra* note 165, at 280-81.

Compendium_Cornell
Page 0682

198    For an exploration of permissive interpretive rules, see generally Re, *supra* note 15.

199    *See* Nashville & K. R. Co. v. Davis, 78 S.W. 1050, 1050 (Tenn. 1902); *supra* text accompanying note 1.

200    *See* Doerfler, *supra* note 50, at 991-94, 997-98, 1028-29; Green, *supra* note 50, at 171; *see also* Bach, *supra* note 5 (distinguishing semantics and pragmatics); Samuel L. Bray, *"Necessary AND Proper" and "Cruel AND Unusual": Hendiadys in the Constitution*, 102 VA. L. REV. 687, 694 (2016) (noting that historical context is critical for determining whether a phrase should be interpreted as a hendiadys); Richard H. Fallon, Jr., *The Meaning of Legal "Meaning" and Its Implications for Theories of Legal Interpretation*, 82 U. CHI. L. REV. 1235, 1246-47, 1260-62, 1303 (2015) (distinguishing "contextual meaning" and "reasonable meaning").

201    *See* Henry E. Smith, *The Language of Property: Form, Context, and Audience*, 55 STAN. L. REV. 1105, 1131 (2003); *cf.* Fallon, Jr., *supra* note 165, at 283-97 (critiquing the use of conversational models for statutory interpretation).

202    Green, *supra* note 50 (quoting DANIEL Z. KORMAN, OBJECTS: NOTHING OUT OF THE ORDINARY 42 (2015)). Whether such quantifiers should be classified as pragmatic is debated. *See, e.g.*, Jason Stanley & Zoltán Gendler Szabó, *On Quantifier Domain Restriction*, 15 MIND & LANGUAGE 219, 220 (2000).

203    *See* Wald, *supra* note 50 ("In the context of the statute, other related statutes, or *the problems giving rise to the statute*, words may be capable of many different meanings, and the literal meaning may be inapplicable or nonsensical." (emphasis added)). In his dissent in *Bostock*, Justice Kavanaugh makes this same point about the absurdity doctrine. *See* Bostock v. Clayton Cty., 140 S. Ct. 1731, 1827-28 (2020) (Kavanaugh, J., dissenting).

204    *Davis*, 78 S.W. at 1050.

205    *See supra* note 140 (discussing *Holy Trinity Church*); *see also* Van Kleek v. O'Hanlon, 21 N.J.L. 582, 591-92 (1845) (Carpenter, J.) (simultaneously recognizing that "[t]he mischief, the old law, and the remedy, are doubtless to be considered in the construction of all remedial statutes," and refusing to adopt a proposed interpretation because "the supposed general intention of the legislature is to be considered in due subservience to the actual language used; and the language is not to be strained to support such supposed intention").

206    *Cf.* Brewer's Lessee v. Blougher, 39 U.S. (14 Pet.) 178, 198-99 (1840) (recognizing the Court's ability to read a statute narrowly if the Justices "are satisfied that the literal meaning of its language would extend to cases which the legislature never designed to embrace in it," yet declining to find any exception to the legislature's "general terms" because there was "no language showing any such design" of a narrower import).

207    For examples of the mischief rule encouraging a broader reading, see *infra* Section III.B. Another example is *NLRB. v. Hearst Publications, Inc.*, where the Court chose a broader reading for *employee*--that is, reading it not as a technical term excluding independent contractors--because "[t]he mischief at which the Act is aimed and the remedies it offers are not confined exclusively to 'employees' within the traditional legal distinctions separating them from 'independent contractors.'" 322 U.S. 111, 126 (1944). *Hearst Publications* was probably wrong at the time given the existing legal meaning of *employee*, and at any rate Congress later amended the relevant statute's language, which essentially reversed the Court's interpretation in *Hearst Publications*. *See* Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 324-25 (1992).

208    *See generally* WILLIAM N. ESKRIDGE, JR., DYNAMIC STATUTORY INTERPRETATION (1994). The two are not conceptually parallel. The mischief rule is a tool that can be used by interpreters holding any one of a number of different theories of statutory interpretation, while dynamic statutory interpretation is such a theory.

209   Similar skepticism of an innate scope in the text itself can be found in canons of statutory interpretation that encourage "broad" or "narrow" readings of certain kinds of statutes. *See, e.g.*, H. Tomás Gómez-Arostegui, *What History Teaches Us About US Copyright Law and Statutory Damages*, 5 WORLD INTELL. PROP. ORG. J. 76, 79-86 (2013) (analyzing the 1909 Copyright Act in light of one such canon).

210   Dynamic statutory interpretation of course goes beyond that, also considering (especially considering) affirmative values.

211   *See generally* Easterbook, *supra* note 178.

212   (1584) 76 Eng. Rep. 637, 638; 3 Co. Rep. 7 a, 7 b (Exch.).

213   *See* 252 U.S. 159, 168 (1920).

214   *Id.* at 163 (quoting U.S. REV. STAT. § 2117 (1875)).

215   *Id.* at 167.

216   *See id.* at 168-69 (discussing dictionary definitions, an earlier decision of the Court on whether the word *cattle* in a letter of credit included *hogs*, and an Attorney General's opinion that invoked "[t]he standard lexicographers" on whether *cattle* included sheep). As Mark Greenberg and Harry Litman note, the Court was focused on the original meaning, not present meaning, of *cattle*. Mark D. Greenberg & Harry Litman, *The Meaning of Original Meaning*, 86 GEO. L.J. 569, 593 & n.95 (1998).

217   *Ash Sheep Co.*, 252 U.S. at 169.

218   *See id.* at 167 ("If this were a recent statute and if we were giving it a first interpretation we might hesitate to say that by the use of the word 'cattle' Congress intended to include 'sheep.'").

219   *Id.* at 169.

220   *See id.* at 167-68.

221   JOHN BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 224 (5th ed. 2019).

222   *E.g.*, United States v. Union Supply Co., 215 U.S. 50, 54-55 (1909); Smith v. Townsend, 148 U.S. 490, 499-501 (1893); The Emily, 22 U.S. (9 Wheat.) 381, 388-89 (1824); Commonwealth v. Trent, 77 S.W. 390, 392 (Ky. 1903). For a possible example that is more recent and controversial, see AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339, 355 (2011) (stating that the Federal Arbitration Act "was enacted in 1925 in response to widespread judicial hostility to arbitration agreements," and reading the saving clause of the Act narrowly to prevent circumvention of the Act).

223   Schooner Paulina's Cargo v. United States, 11 U.S. (7 Cranch) 52, 61 (1812) (emphasis added).

224   (1584) 76 Eng. Rep. 637, 638; 3 Co. Rep. 7 a, 7 b (Exch.).

Compendium_Cornell
Page 0684

225    *Cf.* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1294 (2007) (noting that judicial self-discipline is a matter of degree). The need for good faith in the exercise of a power, and the difficulty of spelling out in advance all the situations in which that power should and should not be used, is a familiar problem from the law of equity. *See generally* Henry E. Smith, *Equity as Meta-Law*, 130 YALE L.J. 1050 (2021); Henry E. Smith, *Fusing the Equitable Function in Private Law, in* PRIVATE LAW IN THE 21ST CENTURY 173 (Kit Barker, Karen Fairweather & Ross Grantham eds., 2017).

226    *See* Samuel L. Bray, *Equity: Notes on the American Reception, in* EQUITY AND LAW: FUSION AND FISSION 31, 32 (John C. P. Goldberg, Henry E. Smith & P. G. Turner eds., 2019).

227    *See generally* GUIDO CALABRESI, A COMMON LAW FOR THE AGE OF STATUTES (1982).

228    *See supra* Section I.A.

229    *Cf.* Radin, *supra* note 90, at 389 ("As long as the common law is basic, the rule of *Heydon's Case* has much to commend it."). It is possible to exaggerate the dominance of the common law, and there were periods with highly significant legislation. *See* BAKER, *supra* note 221, at 220 ("King Henry VIII's parliaments were prodigiously industrious, passing some 677 statutes which occupy almost as much space as all the preceding legislation from Magna Carta onwards."). For more on legislation in late medieval and early modern England, see *id.* at 216-20.

230    *Heydon's Case* notes this dichotomy and says the mischief rule applies to both kinds of statutes. (1584) 76 Eng. Rep. 637, 638; 3 Co. Rep. 7 a, 7 b (Exch.). The difficulties in this dichotomy have been recognized since the sixteenth century. *See* 6 BAKER, OXFORD HISTORY OF THE LAWS OF ENGLAND, *supra* note 59, at 77-79.

231    On the mischief rule in the sixteenth century, see *supra* Section I.A.

232    Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of U.S.C.).

233    *See generally* Gluck et al., *supra* note 192.

234    Patient Protection and Affordable Care Act, 124 Stat. 119. That fact has overshadowed the repeated bouts of litigation over the ACA, raising the stakes enormously for severability analysis and the scope of relief.

235    *See supra* note 160 and accompanying text. This was also true at the time of *Heydon's Case*. One possibility, suggested to me by Sir John Baker, is that the change from "mischief" in Coke's manuscript report to "mischief and defect" in the printed report is precisely to cover this possibility. *See Heydon's Case*, 76 Eng. Rep. at 638, 3 Co. Rep. 7 b.

236    *Cf.* King v. Burwell, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan."). On *King v. Burwell*, see *supra* note 192.

237    *See* Ass'n of Cal. Ins. Cos. v. Jones, 386 P.3d 1188, 1202 (Cal. 2017) ("That the Legislature entrusted to the Commissioner the application of these and other statutory provisions to specific problems--problems the Legislature did not, and in some cases could not, anticipate--is precisely why enactment of section 790.10 makes sense in the broader statutory scheme.").

238   *See* Pierson v. Ray, 386 U.S. 547, 561 (1967) (Douglas, J., dissenting); Jennings, *supra* note 147, at 452. Note that some early American decisions read *Heydon's Case* as instructing courts to read statutes in line with the common law. The font for this line of argument appears to be Chancellor Kent, who cites *Heydon's Case* within an argument that statutes should be interpreted with reference to the common law. 1 JAMES KENT, COMMENTARIES ON AMERICAN LAW 434 (1826); *cf.* Karen M. Gebbia-Pinetti, *Statutory Interpretation, Democratic Legitimacy and Legal-System Values*, 21 SETON HALL LEGIS. J. 233, 259-60 (1997) ("[T]he well-known 'mischief' rule approached statutes from a common law perspective, urging courts to construe statutes as, essentially, gap-filling devices designed to alleviate harms not adequately addressed by the common law."). On Chancellor Kent's interpretation of statutes, see Farah Peterson, *Interpretation as Statecraft: Chancellor Kent and the Collaborative Era of American Statutory Interpretation*, 77 MD. L. REV. 712, 732-48 (2018).

239   *See* Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) (codified as amended in scattered sections of U.S.C.); Tax Cuts and Jobs Act, Pub. L. No. 115-97, 131 Stat. 2054 (2017) (codified as amended in scattered sections of U.S.C.).

240   *See* Dodd--Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (codified as amended in scattered sections of U.S.C.); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of U.S.C.); *see also* Josh Chafetz, *The Phenomenology of Gridlock*, 88 NOTRE DAME L. REV. 2065, 2077-78 (2013) (listing the 11th Congress's accomplishments).

241   A note of caution about my argument is provided by Judge Friendly's lecture decrying "legislative paralysis"--in 1963. *See* Henry J. Friendly, *The Gap in Lawmaking--Judges Who Can't and Legislators Who Won't*, 63 COLUM. L. REV. 787, 797 (1963), *reprinted in* HENRY J. FRIENDLY, BENCHMARKS 41, 53 (1967).

242   *See, e.g.*, Bostock v. Clayton Cty., 140 S. Ct. 1731, 1836-37 (2020) (Kavanaugh, J., dissenting).

243   *See supra* notes 23-35 and accompanying text.

244   *See* Henson v. Santander Consumer USA Inc., 137 S. Ct. 1718, 1725-26 (2017); *cf.* Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 361 (1992) ("A problem neither appreciated nor discussed is not resolved; texts do not settle disputes their authors and their contemporary readers could not imagine."); Easterbrook, *supra* note 178, at 544 (suggesting that apart from so-called common law statutes "the domain of the statute should be restricted to cases anticipated by its framers and expressly resolved in the legislative process").

245   *Cf.* GRANT GILMORE, THE AGES OF AMERICAN LAW 96 (1977) ("Eventually the problem of obsolescent statutes solves itself .... With luck, the statute will turn out to have nothing to say that is relevant to the new issues, which can then be decided on their own merits.").

246   *See, e.g.*, Kisor v. Wilkie, 139 S. Ct. 2400 (2019) (narrowly retaining but limiting *Auer* deference); Gundy v. United States, 139 S. Ct. 2116 (2019) (narrowly rejecting a nondelegation challenge to the federal Sex Offender Registration and Notification Act).

247   *See* FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 159 (2000) ("In extraordinary cases, however, there may be reason to hesitate before concluding that Congress has intended such an implicit delegation."); ESKRIDGE JR., *supra* note 154, at 288. The contours and terminology, and even the existence, of this doctrine are not beyond dispute, as seen in the opinions of Judges Brown, Kavanaugh, and Srinivasan in *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 383, 402, 419 (D.C. Cir. 2017).

248    *See* ESKRIDGE JR., *supra* note 154, at 339 (calling this canon "a half-sibling to the major questions canon"). In a precursor to *Bostock*, one judge analyzed the question in terms of the no elephants-in-mouseholes canon. *See* Wittmer v. Phillips 66 Co., 915 F.3d 328, 336 (5th Cir. 2019) (Ho, J., concurring).

249    Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). This vivid expression is Justice Scalia's, but note the tension with his "general-terms canon." *See supra* note 98 and accompanying text. That putative canon says that general terms are not to be limited; this one limits vague terms. Even Justice Scalia could not quite keep the canons from dueling.

250    Gonzales v. Oregon, 546 U.S. 243, 274 (2006).

251    *See, e.g., id.* at 269-70; Chatwin v. United States, 326 U.S. 455, 462-64 (1946). On the mischief being in the sight of Congress, *see supra* text accompanying note 139. The no elephants-in-mouseholes canon could be adapted to the example of tacit domain quantifiers given. *See supra* note 202 and accompanying text. It would be odd for a speaker to make a statement about there being no beer in the universe (an elephant of a statement) upon the occasion of looking into a refrigerator (a mousehole of an object of attention). Other canons can also be thought of as recognizing tacit domain quantifiers, such as the canon against extraterritorial application.

252    It might be deduced from the statute itself, with a judge's knowledge of the world, but the same is true of the mischief. *See supra* Section II.B (describing how the mischief might be identified).

253    *See generally* Kent Barnett & Christopher J. Walker, *Short-Circuiting the New Major Questions Doctrine*, 70 VAND. L. REV. EN BANC 147 (2017) (discussing the major questions doctrine in the context of *Chevron* deference); Michael Coenen & Seth Davis, *Minor Courts, Major Questions*, 70 VAND. L. REV. 777 (2017) (arguing that the Supreme Court alone should apply the major questions doctrine); Jacob Loshin & Aaron Nielson, *Hiding Nondelegation in Mouseholes*, 62 ADMIN. L. REV. 19 (2010) (connecting the no elephants-in-mouseholes doctrine to the nondelegation doctrine); Jonas J. Monast, *Major Questions About the Major Questions Doctrine*, 68 ADMIN. L. REV. 445 (2016) (discussing the major questions doctrine and comparing it to *Chevron* analysis).

254    Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (codified as amended in scattered sections of U.S.C.).

255    Examples include Justice Scalia's rejection of the mischief rule as inconsistent with textualism, *see supra* Section I.D; Jack Balkin's move to separate out "original expected applications," *see* JACK M. BALKIN, LIVING ORIGINALISM 7 (2011); and Larry Solum's centering of the distinction between interpretation and construction, *see* Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 CONST. COMMENT. 95, 95-96 (2010). For recognition of this in the latter case, see Frederick Schauer, *Constructing Interpretation*, 101 B.U. L. REV. 103, 122 (2021) ("[W]hat lies at the heart of the distinction between interpretation and construction is the idea that the meaning of language can (and must) be divorced from the implications, and especially the normative implications, of that language on a particular occasion.").

256    *See, e.g.*, Bond v. United States, 572 U.S. 844, 860 (2014) (noting "the context from which the statute arose--a treaty about chemical warfare and terrorism").

257    Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 417-18 (1899) (emphasis added).

258    Nor does it need to be regarded as merely one of "textualism's exceptions." *See* John C. Nagle, *Textualism's Exceptions*, ISSUES IN LEGAL SCHOLARSHIP, 2002, at 1-2 (discussing exceptions that textualists have admitted in which the statutory text is not "the end of the interpretive inquiry").

Compendium_Cornell
Page 0687

259    *Cf.* PEGGY PARISH, AMELIA BEDELIA (1963) (recounting the eponymous character's mistaken interpretation of instructions, such as "[c]hange the towels" and "[d]raw the drapes," usually because she fails to understand the mischief).

260    *Cf.* Rodriguez v. United States, 480 U.S. 522, 525-26 (1987) (per curiam) ("[N]o legislation pursues its purposes at all costs."); Manning, *supra* note 40, at 104 ("Legislators may compromise on a statute that does not fully address a perceived mischief, accepting half a loaf to facilitate a law's enactment.").

109 GEOLJ 967

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 0688

**Omitted – Compendium Pages 0689-0711**

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12525   Page 169 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

15 Geo. J. L. & Pub. Pol'y 569

**Georgetown Journal of Law & Public Policy**
Summer, 2017

**Symposium: The Origins and Iconization of the Bill of Rights**

**Paper**
Jud Campbell [a1]

Copyright © 2017 by Jud Campbell

# JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS

## ABSTRACT

*When introducing the Bill of Rights in Congress, James Madison explained that judges would "consider themselves in a peculiar manner the guardians" of those enumerated rights. This famous passage, often treated as authoritative, is conventionally understood to endorse the judicial enforceability of enumerated rights and deny the judicial enforceability of unenumerated rights. Enumeration, in other words, is considered as both a necessary and a sufficient condition for the judicial enforcement of rights against contrary legislation. This Essay disputes each of these orthodox views. Instead, it argues, Madison was commenting on judicial psychology and judicial politics, not judicial duty. Enumeration, in short, would facilitate the enforcement of rights, even if judges were already legally obliged to uphold them. Moreover, this Essay argues, both Madison's proposed bill of rights and his speech in support were deliberately noncommittal about the legal significance of enumeration. Addressing an audience that had conflicting views on that issue, he drafted and defended the Bill of Rights to obtain support from all sides. Consequently, neither the Bill of Rights nor Madison's advocacy reveal whether, legally speaking, enumeration is a necessary or sufficient condition for the judicial enforcement of rights against contrary legislation.*

**TABLE OF CONTENTS**

| | |
|---|---|
| INTRODUCTION | 570 |
| I. EIGHTEENTH-CENTURY RIGHTS | 571 |
| *A. Natural Rights* | 572 |
| *B. Positive Rights* | 576 |
| II. THE PHILADELPHIA CONVENTION | 579 |
| III. THE BILL OF RIGHTS | 583 |
| *A. The Sufficiency of Enumeration* | 586 |
| *B. The Necessity of Enumeration* | 590 |
| CONCLUSION | 591 |

**\*570  INTRODUCTION**

In his speech introducing the Bill of Rights to Congress on June 8, 1789, James Madison explained that one reason for enumerating constitutional rights was that:

> independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights. [1]

This was a minor point in Madison's speech, which focused on how the proposed amendments would help shape public opinion. [2] But the passage has taken on major significance in modern conceptions of judicial authority. Scholars and judges

Compendium_Cornell
Page 0712

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12526   Page 170 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

routinely interpret Madison's comments, which they often treat as authoritative, as a defense of the idea that incorporating rights into the Constitution was both a *necessary* and a *sufficient* condition for their judicial enforcement against contrary legislation. [3]

Madison, however, was defending neither the necessity nor the sufficiency of enumeration. In fact, the Founders were engaged in ongoing debates over the **\*571** legal significance of enumeration, and Madison drafted and supported the Bill of Rights in a way that stayed neutral in that controversy. For many Federalists in Congress, the enumeration of most rights was legally inconsequential. Rights existed prior to constitutional development; they were sometimes judicially enforceable, sometimes not; and enumeration usually did not change their definition or the means of their enforcement. And even Federalists who disagreed with these views hardly were eager to empower judges to limit federal power. If Madison was asserting the necessity and sufficiency of enumeration as a legal matter, he was misreading his audience.

But Madison's point was more practical: Enumeration was *important* to judging. In part, written declarations proved the existence and fundamentality of certain rights, reducing uncertainty about the law. Enumerating rights also gave courts lexical ammunition when confronting political actors, fostering the willingness of judges to enforce those rights in the first place and helping insulate them from political backlash afterward. In an environment where assertions of judicial review were highly controversial, judges needed all the help they could get to "consider themselves" a safeguard for rights.

When taking this position, Madison was employing a prevalent form of constitutional argument. The Founders often spoke about governmental power in terms of *practical* authority (as a political scientist might) rather than *legal* authority (as lawyers usually do). [4] After all, constitutional compliance requires concrete human actions, not just abstract legal obligations. And the Founders took this lesson to heart regarding judicial review. When stressing the importance of enumeration to judging, Madison was making a point about judicial psychology and judicial politics, not judicial duty. He was speaking as a political scientist rather than as a lawyer.

But what, then, was Madison saying about the legal necessity or sufficiency of enumerating rights? The answer is simple: Nothing at all. Personally, Madison had no dog in that fight. And he was trying to sell the Bill of Rights to an audience with competing views. Consequently, both in drafting the Bill of Rights and in publicly advocating for its passage, Madison stayed neutral about the legal importance of enumerating rights. Modern interpreters must, therefore, look elsewhere for historical guidance about the relationship between judicial review and the enumeration of rights.

## I. EIGHTEENTH-CENTURY RIGHTS

Madison was a late convert to the enumeration cause. Like many Federalists, he had agreed to amendments during the ratification debates as a way to diffuse **\*572** the passionate and widespread opposition that had nearly defeated the Constitution. [5] Even after ratification, however, Madison privately derided declarations of rights as mere "parchment barriers," [6] and he became a leading proponent of enumeration only under pressure from his political mentor, Thomas Jefferson, and faced with a bruising electoral campaign in a district drawn to favor his opponent, James Monroe. [7] Madison's "grudging acceptance of political necessity," Jack Rakove observes, "reflected no sudden realization that a national bill of rights would have great practical value." [8]

But reluctant as his paternity of the Bill of Rights may have been, Madison admirably followed through on his campaign promise to amend the Constitution, and it is worth carefully examining his arguments favoring enumeration. To understand Madison's comments in context, however, we need to have a better sense of his audience. The Founders, it turns out, spoke about rights and their judicial enforceability in an initially bewildering, but ultimately comprehensible, variety of ways. [9]

### A. Natural Rights

One type of rights was natural rights, which referred to innate human capacities, like eating, moving, or speaking. "A natural right is an animal right," Thomas Paine succinctly explained, "and the power to act it, is supposed, either fully or in part, to be mechanically contained within ourselves as individuals." [10] In general, though, natural rights did not impose determinate

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12527   Page 171 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

limitations on governmental authority. Rather, because of social obligations stemming either from natural law or from an imagined social contract, the government could restrict natural liberty with the consent of the people or their representatives whenever doing so served the public interest. [11]

Consequently, the retention of natural rights, even in a written bill of rights, usually did not give rise to firm, judicially enforceable limits on legislative power. [12] As Republican lawyer George Hay observed in 1799, if the Speech and Press Clauses simply recognized a natural right of expressive freedom, the First **\*573** Amendment would "amount precisely to the privilege of publishing, as far as the legislative power shall say, the public good requires." [13] Indeed, even those who had an expansive view of judicial power agreed that judges could not apply their own assessments of the general welfare. [14] Questions "of mere expediency or policy" simply were not amenable to judicial resolution. [15] It is entirely unsurprising, then, that Founding Era judges never directly enforced state constitutional provisions that affirmed the inviolability of the natural rights of life, liberty, and property. Constitutional provisions that lacked legal content, Alexander Hamilton aptly stated in *Federalist No. 84*, "amount[ed] to nothing" as a legal matter. [16]

Nonetheless, many Founders affirmed support for a *qualified* judicial application of natural-rights principles. Most straightforwardly, some jurists advocated disregarding laws that clearly departed from the public interest. [17] The enforcement of legislative acts, Virginia Judge Spencer Roane declared in 1809, was not only bounded "by the constitutions of the general and state governments" but "limited also by considerations of justice," at least when laws reflected a "crying grade of injustice." [18] But others virulently contested this idea. Judges "could declare an unconstitutional law void" when "plainly" in violation of the Constitution, George Mason remarked at the Philadelphia Convention, but they **\*574** had to give "free course" to all other laws, "however unjust oppressive or pernicious." [19]

The most common position among American legal elites fell between these extremes. Drawing from their understanding of Edward Coke's 1610 decision in *Dr. Bonham's Case*, [20] the Founders widely agreed that judges should, when possible, construe statutes to comport with the public interest. [21] Alexander Hamilton, for instance, took this view in his famous exposition of judicial authority in *Federalist No. 78*. After explaining that judges would "declare all acts contrary to the manifest tenor of the constitution void," [22] Hamilton noted the importance of judicial independence for the protection of natural rights:

> But it is not with a view to infractions of the [C]onstitution only, that the independence of the judges may be an essential safeguard against the effects of occasional ill humors in the society. These sometimes extend no farther than to the injury of the private rights of particular classes of citizens, by unjust and partial laws. Here also the firmness of the judicial magistracy is of vast importance in mitigating the severity and confining the operation of such laws. [23]

The quintessential abridgment of natural rights by the government, it bears emphasis, was a deprivation of liberty, or property effected by an unjust or partial law.


Meanwhile, a narrower class of natural rights imposed more determinate restrictions on governmental authority. These "r[i]ghts of the mind," as Nathaniel Chipman put it, offered protection for the freedom of religious exercise and **\*575** the right to make well-intentioned statements of one's thoughts, [24] limiting both the ends and the means of governmental authority. [25] But, once again, enumeration did not seem to matter. Everyone had a right "of speaking and writing their minds--a right, of which no law can divest them," Congressman John Vining observed before the First Amendment was ratified. [26] This right, Fisher Ames chimed in, was "an unalienable right, which you cannot take from them, nor can they divest themselves of," and any abridgment would therefore be "nugatory." [27] The Founders often made similar claims about the inalienability of **\*576** religious freedom. [28]

In short, with respect to *natural* rights, enumeration was not a *necessary* or *sufficient* condition for their judicial enforcement. Some Founders saw judges as an important backstop for the defense of natural rights, even though these "rights" generally lacked determinate legal content. Yet, as Roane's and Hamilton's statements plainly reveal, this authority was derived not from

Compendium_Cornell
Page 0714

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12528   Page 172 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

the constitutional enumeration of natural rights but instead from background principles of social-contract theory and of judicial obligation. Enumeration did not, as a legal matter, seem to affect the judicial enforceability of natural rights.

### B. Positive Rights

In contrast to natural rights, positive rights were rights defined in particular relation to governmental authority, like the right to a jury trial, the rule against press licensing, and the ban on ex post facto laws. These rights were often enforceable in court, and some of them--namely, *fundamental* positive rights--even had the status of supreme law. Positive rights with "constitutional or fundamental" status, Federal Farmer explained, could not "be altered or abolished by the ordinary laws." [29] Other positive rights, though, were "mere legal rights" that were "such as individuals claim under laws which the ordinary legislature may alter or abolish at pleasure." [30] A crucial issue, then, was identifying which positive rights were "fundamental."

Many Founders thought that fundamental positive rights were identifiable by looking to custom, without any need for constitutional enumeration. During the colonial period, after all, Americans had widely accepted the existence of a customary constitution that guaranteed a variety of individual rights. [31] "Like other forms of customary law," Larry Kramer observes, "the content of this constitution was uncertain and open-ended," but "[i]t did not follow that nothing was fixed." [32] The fundamentality of some rights, like the protection of a jury trial and the rule against ex post facto laws, was well established. [33]

Consequently, even once Americans began to enact written constitutions, about half of the states did not adopt bills of rights. Enumerating *natural* rights was unnecessary, many Founders thought, because the people retained full control, through their legislative representatives, over regulations of natural **\*577** liberty. [34] The natural rights of life, liberty, and property were thus preserved through republicanism. [35] And since an imagined social contract preserved both the inalienable right of conscience and the host of fundamental positive rights that individuals received "as a consideration for the [natural] rights ... surrendered," [36] it was unnecessary to enumerate these rights in a constitution. These more determinate constraints on legislative authority were already guaranteed.

Nor did this view recede as Americans began adopting declarations of rights in the 1770s and 1780s. Instead, bills of rights were *declaratory* documents, reaffirming those positive rights *already* known to be fundamental, with mentions of some natural rights as well. [37] "The amendments reported are a declaration of rights," Roger Sherman explained in the First Congress. "[T]he people are secure in them, whether we declare them or not." [38] But that did not make enumeration pointless. Rather, writing down rights served an educative function and gave these rights "a degree of explicitness and clarity." [39]

By the late 1780s, however, enumerating rights was not always just a declaratory exercise. Constitutional enumeration also had come to provide an avenue for recognizing the fundamentality of positive rights *not* supported by custom. In other words, incorporating non-fundamental positive rights into a constitution offered a way of elevating those rights to constitutional status. [40] In the late eighteenth century, for instance, many Americans did not perceive there to be customary bans on bills of attainder, religious tests for holding public office, and governmental interference with contracts. [41] If Americans wanted to **\*578** constitutionally prohibit these types of laws, therefore, they needed to enact constitutional rules against them.

When positive rights were recognized as fundamental, whether through custom, constitutional enumeration, or both, [42] these rights were usually judicially enforceable. [43] Indeed, many of these rights, like the right to a jury, dealt with issues of judicial process. [44] And, when recognized as fundamental, they typically operated as supreme law, superseding any contrary legislation. Should Congress attempt to infringe the people's rights, Theophilus Parsons declared in the Massachusetts Ratification Convention, "the act would be a nullity, and could not be enforced." [45] An assortment of Founding Era judicial decisions seem to validate that view with respect to both customary and enumerated rights. [46]

At the same time, however, a number of Americans in the late 1780s began to suggest that enumeration might be a *necessary* condition for the preservation of fundamental positive rights. [47] These suggestions were rarely made in particular reference to *judicial* enforcement. [48] But since so many of those rights were **\*579** about judicial procedures, and since preserving rights

Compendium_Cornell
Page 0715

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12529   Page 173 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

was an obvious precondition for their judicial protection, the positivist dimension of these arguments planted the seeds for the idea that rights had to be constitutionally enumerated before they could trump contrary legislation. [49]

In short, with respect to *positive* rights, enumeration typically was a *sufficient* condition for judicial enforcement, [50] but whether it was also a *necessary* condition was more in doubt. For rights that were not customarily recognized as fundamental, enumeration was clearly necessary. For those rights that were part of the customary constitution, however, many Founders denied the necessity of enumeration, although not everyone agreed.

## II. THE PHILADELPHIA CONVENTION

An episode during the Philadelphia Convention of 1787 illustrates how the Framers applied these principles when drafting the Constitution. The story begins with a discussion about whether to enumerate certain rights.

In the midst of debates over congressional powers, Elbridge Gerry and James McHenry moved for a clause banning federal bills of attainder and ex post facto laws. [51] Gouverneur Morris "thought the precaution as to ex post facto laws unnecessary; but essential as to bills of attainder." [52] Oliver Ellsworth enthusiastically agreed. "[T]here was no lawyer, no civilian," the Connecticut jurist explained, "who would not say that ex post facto laws were void of themselves. It cannot then be necessary to prohibit them." [53] James Wilson chimed in, too, noting that a constitutional ban on ex post facto laws would suggest that the Framers were "ignorant of the first principles of Legislation," or at least were "constituting a Government which will be so." [54] No one, however, denied that it was essential to enumerate a prohibition against bills of attainder, and that proposal passed without dissent. [55]

 **\*580** The weight of opinion among the Framers seemed to be decidedly against enumerating a ban on ex post facto laws. So why did they add one anyway? One possibility is the *educative* function that declarations of rights served in guiding political officials and shaping public opinion--goals that undergirded most calls for a declaration of rights during the ensuing ratification controversy. [56] That point is worth emphasizing: The leading reason for enumerating rights in the late 1780s had nothing to do with courts or judges.

But at the end of the discussion, Hugh Williamson of North Carolina made an intriguing argument relating to the *legal* enforcement of rights. "Such a prohibitory clause is in the Constitution of N. Carolina," Williamson announced, "and tho it has been violated, it has done good there & may do good here, because the Judges can take hold of it." [57] Perhaps enumeration, in other words, would facilitate judicial review.

Indeed, a significant confrontation over the authority of judges to rule on the constitutionality of legislation had recently unfolded in North Carolina. Williamson was a bit confused about the details. The case, *Bayard v. Singleton*, actually raised the question whether a procedural bar in loyalist-property suits violated the right to trial by jury--not the ban on ex post facto laws. [58] But Williamson's point was still valid. The presence of an enumerated jury right in North Carolina's declaration of rights gave the judges in *Bayard* something to "take hold of" when striking down legislation. [59]

But was Williamson saying that enumeration was legally necessary? The historical record is unclear. During the *Bayard* proceedings, the judges never questioned the judicial enforceability of certain unenumerated positive rights. [60] Nor did Williamson or any of his colleagues in Philadelphia rebut Ellsworth's **\*581** claim that "ex post facto laws were void of themselves." [61] After the Convention, in fact, Williamson embraced the standard Federalist position that enumeration was unnecessary. It was "perfectly understood," he insisted, "that under the Government of the Assemblies of the States, and under the Government of the Congress, every right is reserved to the individual, which he has not expressly delegated to this, or that Legislature," thus obviating any need for "a second Declaration of Rights." [62] To be sure, Williamson may have changed his mind, or he might have been arguing disingenuously to advance the ratification cause. But perhaps his earlier comments in Philadelphia were less about the legal necessity of enumeration and more about judicial politics.

North Carolina's experience, after all, revealed that enumeration served a useful purpose during litigation, even if it was not legally essential. As occurred in other states, the exercise of judicial review in North Carolina was highly controversial, leading

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12530   Page 174 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

both to impeachment proceedings against the presiding judges and to a grand jury presentment of Bayard's lawyer, William Richardson Davie, for having asserted the existence of such a controversial power. [63]   And in this precarious environment, judges with textual support for upholding rights were naturally more inclined to disregard legislation and less likely to suffer backlash. Enumerating rights, one might say, would give judges something to "take hold of."

Evidence shows that Williamson was attentive to these political challenges. Only a few months after the Philadelphia Convention adjourned, he defended the creation of federal courts because it was "at least possible that some State may be found in this Union, disposed to break the Constitution," and "the Courts of the offending States would probably decide according to its own laws." [64]   Doing so, of course, would clearly violate the Supremacy Clause. But Williamson was focused on *practical* barriers to judicial review. Even when their legal obligations were clear, he still feared that judges would fail to apply governing law.

Nor was Williamson alone in these concerns. The judiciary had a "natural feebleness," Alexander Hamilton explained in *Federalist No. 78*, and was "in continual jeopardy of being overpowered, awed or influenced by [the] coordinate **\*582** branches." [65]   Promoting judicial independence was thus essential. [66]   Even when politicians lacked widespread public support, pushing back against the political branches would be challenging. "But it is easy to see," Hamilton continued, "that it would require an uncommon portion of fortitude in the judges to do their duty as faithful guardians of the [C]onstitution, where legislative invasions of it had been instigated by the major voice of the community." [67]

But the structural protection of judicial life tenure was not enough. The Framers also expressly declared the judicial duty to follow the Constitution against countervailing state law, even though they generally accepted judicial review as an inherent facet of judging. [68]   First, they provided in the Supremacy Clause that the Constitution would become "the supreme Law of the Land." [69]   As a choice-of-law provision, that Clause required state and federal judges to apply the Constitution against contravening state law. Supreme law, after all, necessarily supersedes inferior law. Yet the Framers said more. Not only was the Constitution "the supreme Law of the Land," but also "the Judges in every State [were] bound thereby." [70]

Almost without question, that provision was legally redundant. [71]   The Judges Clause was "but an expression of the necessary meaning of the former clause," Joseph Story aptly remarked in his famous *Commentaries on the Constitution of the United States*. [72]   But the Clause was still tremendously important. "The very circumstance, that any objection was made [to judicial review]," Story explained, "demonstrated the utility, nay the necessity of the clause, since it removed every pretence, under which ingenuity could, by its miserable subterfuges, escape from the controlling power of the constitution." [73]   Story was exactly right. [74]

**\*583**   The Constitution itself, in other words, demonstrated the Framers' belief that enumeration was important for facilitating judicial review, even when it was legally unnecessary. [75]   In this instance, the Judges Clause provided state judges with something to "take hold of" in their assertion of judicial authority, even though that legal duty was already implicit in the Supremacy Clause. Might Madison have defended the enumeration of rights using the same rationale?

## III. THE BILL OF RIGHTS

The omission of a bill of rights provided a rallying cry for opponents of ratification, whom Federalists pejoratively labeled as "Anti-Federalists." [76]   George Mason, for instance, mentioned the absence of rights at the top of his widely circulated criticisms of the proposed Constitution. "There is no Declaration of Rights," Mason lamented, "and the Laws of the general Government being paramount to the Laws & Constitutions of the several States, the Declarations of Rights in the separate States are no Security. Nor are the People secured even in the Enjoyment of the Benefits of the common-Law." [77]   Opponents of ratification echoed these complaints throughout the ensuing months, eventually obtaining promises from Federalists that they would amend the Constitution soon after the new government began its operations.

Once the First Congress convened, however, Federalists showed little interest in passing amendments. Madison pushed more vigorously. But he, too, revealed a lingering ambivalence about enumeration. Creating a bill of rights would have a "salutary tendency," Madison cautiously explained in his introductory speech, and might "tend to prevent the exercise of undue power." [78] For instance, enumerating rights might "establish the public opinion in their favor" and "be one mean to controul the majority

Compendium_Cornell
Page 0717

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12531   Page 175 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

from those acts to which they might be otherwise inclined." [79]  This discussion was all about the political and educative benefits of enumeration, not its legal consequences.

Madison then shifted toward a more legalistic argument, but he carefully maintained an equivocal tone. The Necessary and Proper Clause, he explained,  **\*584**  gave Congress "certain discretionary powers with respect to the means" for exercising enumerated powers, and this authority *"may* admit of abuse to a certain extent." [80]  "[A]n instance which ... proves that this *might* be the case," Madison commented, was the power to collect revenue, which Congress might invoke to authorize general warrants. [81]  *"If* there was reason for restraining the state governments from exercising this power," he noted, still speaking conditionally, "there is like reason for restraining the federal government." [82]  His equivocation was telling.

Madison then explicitly "admit[ted] the force" of the standard Federalist position that "a bill of rights is not necessary." [83]  Yet again, however, he returned to the idea that enumeration would have, "to a certain degree, a *salutary effect* against the abuse of power." [84]  "If they are incorporated into the constitution," he remarked,

> independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark against every assumption of power in the legislative or executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights. [85]

"Besides this security," Madison then asserted, there was "a great probability" that enumerated rights "would be inforced" by state legislatures who were "able to resist with more effect every assumption of power than any other power on earth can do." [86]

According to the conventional view, Madison was explicitly endorsing the judicial enforceability of all enumerated rights while implicitly denying the constitutional status of all unenumerated rights. [87]  "Madison's point," Laurence Claus asserts, "was that enumeration makes rights judicially enforceable .... That argument would not have been available to him had he actually contemplated, or thought his audience contemplated, that courts would proclaim and enforce federal constitutional rights anyway." [88]  Scholars also often tie Madison's congressional speech to Thomas Jefferson's earlier comment that one reason for declaring rights was "the legal check which it puts into the hands of the  **\*585**  judiciary," [89]  suggesting a legal authority that would not otherwise exist.

Even scholars who focus on Madison's political and educative rationales for declaring rights do not dispute the legal character of his particular comment about judicial review. Jack Rakove, for instance, emphasizes the depth of Madison's skepticism about the judicial enforcement of rights. "Madison," he observes, "did not expect the adoption of amendments to free judges to act vigorously in defense of rights." [90]  But Rakove never disclaims the ostensibly positivist implications of Madison's statement. [91]  A few other scholars have suggested that Madison was making a practical argument, [92]  but these treatments are cursory and still often suggest that Madison was making a point about judicial duty. [93]

 **\*586**  Departing from these earlier studies, this Essay argues that Madison was asserting neither the sufficiency nor the necessity of enumeration for the judicial enforcement of rights against contrary legislation. These arguments are developed in turn.

### A. The Sufficiency of Enumeration

Madison probably joined the First Congress without a committed position about the legal significance of enumeration. Just the previous year, in fact, he had revealed a deep ambivalence about judicial review. "Courts are generally the last in making their decision," he remarked privately to a colleague, so "it results to them, by refusing or not refusing to execute a law, to stamp it with its final character. This makes the Judiciary Dept paramount in fact to the Legislature, which was never intended, and can never be proper." [94]  And just a week after introducing the Bill of Rights, Madison gave a speech in which he clearly denied the supremacy of judges in fixing constitutional meaning. Instead, he "suppose[d]," constitutional decisions "may be made with the most advantage by the legislature itself," at least when acting in good faith. [95]  And, as we have seen, his primary arguments

Compendium_Cornell
Page 0718

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12532   Page 176 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

for enumerating rights had nothing to do with courts or judging. [96] Madison thus was extraordinarily unlikely to champion highly controversial claims of judicial power.

Obviously, though, Madison accepted *some* judicial enforcement of enumerated rights against contrary legislation. He was, after all, talking about "tribunals of justice" protecting against "encroachment upon rights expressly stipulated for in the constitution." [97] And, as we have seen, the Founders widely accepted the judicial enforceability of fundamental positive rights. [98] But perhaps, with a Federalist audience that largely accepted judicial enforcement of *customary* fundamental positive rights, [99] Madison was focusing on the effects of enumeration on judicial psychology and judicial politics, not judicial duty.

Indeed, a careful examination of the newspaper report of Madison's June 8 speech supports this conclusion. He began, after all, by observing that enumeration, while not necessary, would nonetheless have "a salutary effect." [100] And each of Madison's subsequent statements about judicial power fit with this theme. His assertions that courts would *"consider themselves* in a peculiar  **\*587**  manner the guardians" of enumerated rights and "be *naturally led* to resist every encroachment" explicitly speak to judicial psychology, not legal obligation. [101] Enumeration, in short, could bolster the willingness of judges to risk a confrontation with politicians. [102] Judges might still encounter political resistance, of course, but at least they would know that they could hold up the constitutional text--the people's own instructions--as their warrant.

Madison's claim (or, perhaps, reporter Thomas Lloyd's embellishment) that courts would form "an impenetrable bulwark against every assumption of power in the legislative or executive" is more opaque but probably addressed judicial politics. Not only would judges "consider themselves" a guardian of rights; their guardianship of those rights would more likely be "impenetrable." In any event, this passage deserves less attention. The Founders often spoke in a similar grandiose way about juries and press freedom, but this eighteenth-century rhetoric should not be understood literally. (Madison's subsequent praise of state legislatures as "able to resist with more effect every assumption of power than any other power on earth can do" reflects the same rhetorical flair.)

In sum, Madison was not making an argument about legal duties. Still, he may have implicitly taken for granted that enumerating positive rights was sufficient for their judicial enforcement. That idea, after all, was widely accepted by his Federalist audience. [103] Thus, if Madison assumed judicial enforcement  **\*588**  of enumerated *positive* rights, like the guarantee of a jury trial, that assumption was uncontroversial.

Nonetheless, Madison was hardly suggesting that *every* enumerated right would be judicially enforceable against contrary legislation. Consider, for instance, the first proposal in Madison's list of amendments:

> That ... all power is originally vested in, and consequently derived from the people.

> That government is instituted and ought to be exercised for the benefit of the people; which consists in the enjoyment of life and liberty, with the right of acquiring and using property, and generally of pursuing and obtaining happiness and safety.

> That the people have an indubitable, unalienable, and indefeasible right to reform or change their government, whenever it be found adverse or inadequate to the purposes of its institution. [104]

Madison planned for these clauses to appear in the preamble. [105] They "may be called," he explained, "a bill of rights." [106]

Madison's first proposal clearly acknowledged the inalienable natural rights of life, liberty, and property, as well as the "right of revolution" asserted by the rebelling American colonists. [107] Yet nobody at the Founding claimed that these rights were judicially enforceable, at least not in the conventional sense. Natural rights, as we have seen, were judicially enforceable only

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12533   Page 177 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

insofar as judges voided or equitably construed statutes in the face of manifest legislative disregard for the public interest. And even that contested power was derived from general constitutional principles, not the enumeration of rights.

Consider also the First Amendment right of free exercise. This provision recognized a firm limit to federal power--namely, the unconstitutionality of religious persecution. [108] But past this core protection, the Founders did not suggest that judges had primary authority to determine the proper bounds of natural liberty when governmental powers collided with religious concerns in **\*589** other ways. [109] At the state level, for instance, religious freedom was mentioned in nearly every constitution or bill of rights, but judges consistently deferred to legislative or customary judgments regarding the propriety of blasphemy laws and the availability of exemptions when individuals had religious scruples. [110] These conflicts still *implicated* natural rights, but it was not up to judges to determine the degree to which natural liberty should be curtailed in the public interest.

In this context, Madison's audience would not have understood his comments as implying, much less singlehandedly accomplishing, a radical transformation in the nature and scope of judicial authority. Rather, if Madison was suggesting that enumeration was a *sufficient* condition for judicial enforcement, his position undoubtedly was limited to *positive* rights, including longstanding positive-law protections for natural liberty. [111] On that issue, his audience would have broadly agreed.

### *590  B. The Necessity of Enumeration

But what about the *necessity* of enumeration for judicial enforcement? Even if enumeration was sometimes but not always sufficient to trigger judicial enforcement of rights against contrary legislation, was Madison arguing that judicial enforceability was only possible when a right was specifically included in the Constitution?

Madison's drafting and defense of the Bill of Rights demonstrates his desire to remain neutral on this issue. [112] First, as mentioned earlier, Madison explicitly "admit[ted] the force" of the conventional Federalist view that "a bill of rights is not necessary," and he framed his comments about judging only in terms of the "salutary effect" that enumeration might have "to a certain degree." [113] This was hardly language that suggested legal necessity. And in the three clauses about judicial enforcement, Madison never expressly denied that unenumerated rights were judicially enforceable. [114] To be sure, he never took the opposite position either--that some unenumerated rights were *already* enforceable. But that is exactly my point: Madison was not taking a public position on this contested issue.

The context of Madison's speech reinforces this conclusion. Madison was trying to convince his Federalist colleagues, most of whom viewed the enumeration of rights as unnecessary, that they should write them down anyway. Viewed from this standpoint, it is highly unlikely that he was arguing from the opposite premise--that enumeration was *essential*. If that is what he meant, the argument was a loser.

Madison's desire not to take a position on the necessity of enumeration is further reflected in his eleventh proposal:

> The exceptions here or elsewhere in the Constitution, made in favor of particular rights, shall not be so construed as to diminish the just importance of other rights retained by the people, or as to enlarge the powers delegated by the Constitution; but either as actual limitations of such powers, or as inserted merely for greater caution. [115]

**\*591**  This provision, framed as a rule of construction, answered leading objections to the Constitution's omission of rights. "It has been objected ... against a bill of rights," Madison explained, "that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration," rendering them "insecure." [116] For instance, by enumerating only a criminal jury right, Federal Farmer had warned, the Framers had "strongly implied" that the right to a civil jury would not "be regarded in the federal administration as fundamental." [117]

Madison's proposed constructive rule (which, after revisions, became the Ninth Amendment) responded to this concern by guaranteeing that non-enumeration was not a basis for denying the "just importance" of unenumerated rights. This language carefully avoided taking a position on the potential "fundamental" status of unenumerated rights. Did Madison agree, for

Compendium_Cornell
Page 0720

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12534   Page 178 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

instance, with Federal Farmer's suggestion during the ratification debates that it was "doubtful" whether Americans could claim fundamental positive rights "under immemorial usage"? Neither Madison's proposed constructive rule nor his explanatory speech supply an answer. Rather, all that the Ninth Amendment provides is that unenumerated rights remain in whatever position they were in prior to enumeration. [118]

## CONCLUSION

Coming from a culture where judicial power is taken for granted, we have a tendency to forget that "the Founders often spoke in terms of *practical* authority rather than *constitutional* authority." [119] Maybe, in our lawyerly way, we have missed Madison's effort to facilitate rights enforcement by buttressing a legal authority that many thought already existed. Rather than supporting the necessity or sufficiency of enumeration for the judicial enforcement of rights, Madison was making a more practical point. The judiciary, as Hamilton famously remarked, had "neither Force nor Will, but merely judgment." [120] The least that **\*592** the First Congress could do was provide judges with a textual basis for exercising their "awful" duty. [121]

### Footnotes

a1      Assistant Professor, University of Richmond School of Law; Stanford Law School, J.D. 2011; University of North Carolina at Chapel Hill, B.A. 2006. The author thanks Randy Barnett, Will Baude, Jonathan Gienapp, Peter Kaufman, Larry Kramer, Jacob Russell, Kevin Walsh, and the participants in the Third Annual Salmon P. Chase Colloquium at Georgetown University Law Center for helpful comments, and he especially thanks Michael McConnell for ongoing and extraordinarily helpful conversations about Founding Era rights. © 2017, Jud Campbell.

1       James Madison, Amendments to the Constitution (June 8, 1789), *in* 12 THE PAPERS OF JAMES MADISON: CONGRESSIONAL SERIES 196, 207 (Charles F. Hobson et al. eds., 1979).

2       *See id.* at 204-05 (amendments would "have a tendency to impress some degree of respect for [rights], to establish the public opinion in their favor, and rouse the attention of the whole community"); *see also* JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 334-35 (1996) ("The true benefits of a bill of rights [for Madison] were to be found in the realm of public opinion ...."); Colleen A. Sheehan, *The Measure and Elegance of Freedom: James Madison and the Bill of Rights*, 15 GEO. J.L. & PUB. POL'Y 513 (2017).

3       *See, e.g.*, Michael W. McConnell, *Natural Rights and the Ninth Amendment: How Does Lockean Legal Theory Assist in Interpretation?*, 5 N.Y.U. J.L. & LIBERTY 1, 19-20 (2010); Laurence Claus, *Protecting Rights from Rights: Enumeration, Disparagement, and the Ninth Amendment*, 79 NOTRE DAME L. REV. 585, 590, 609 (2004); Bradford R. Clark, *Unitary Judicial Review*, 72 GEO. WASH. L. REV. 319, 347-48 (2003); Arthur E. Wilmarth, Jr., *Elusive Foundation: John Marshall, James Wilson, and the Problem of Reconciling Popular Sovereignty and Natural Law Jurisprudence in the New Federal Republic*, 72 GEO. WASH. L. REV. 113, 175-76 (2003); LEONARD W. LEVY, ORIGINS OF THE BILL OF RIGHTS 259 (1999); Raoul Berger, *The Ninth Amendment, As Perceived by Randy Barnett*, 88 NW. U. L. REV. 1508, 1517 (1994); David S. Bogen, *The Origins of Freedom of Speech and Press*, 42 MD. L. REV. 429, 458 (1983); *Davis v. Passman, 442 U.S. 228, 241-42 (1979)*. Akhil Amar notes the intriguing possibility that Madison was speaking about jury decisions, too, and not just judicial review. AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 129-30 (1998). Tracking Madison's comments, this Essay focuses solely on the problem of judicial review--that is, the enforcement of rights *against contrary legislation*. It does not dispute, however, that judges might be said to "enforce" constitutional rules of judicial procedure (e.g., the Seventh Amendment) simply by following those rules (e.g., by convening a civil jury) in absence of any legislative direction one way or the other.

4       *See* Wesley J. Campbell, *Commandeering and Constitutional Change, 122 YALE L.J. 1104, 1178 n.301 (2013)*. Law professors, too, occasionally think in this way. *See, e.g.*, Aziz Z. Huq, *Judicial Independence and the Rationing of*

Compendium_Cornell
Page 0721

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12535   Page 179 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

*Constitutional Remedies*, 65 DUKE L.J. 1 (2015); Daryl J. Levinson, *Parchment and Politics: The Positive Puzzle of Constitutional Commitment*, 124 HARV. L. REV. 657 (2011).

5    Paul Finkelman, *James Madison and the Bill of Rights: A Reluctant Paternity*, 1990 SUP. CT. REV. 301, 322-28.

6    Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), *in* 11 THE PAPERS OF JAMES MADISON: CONGRESSIONAL SERIES 295, 297 (Robert A. Rutland & Charles F. Hobson eds., 1977).

7    Finkelman, *supra* note 5, at 328-36.

8    RAKOVE, *supra* note 2, at 333; *see also* Finkelman, *supra* note 5, at 304-08. Many of his colleagues thought that Madison was pursuing amendments simply for political reasons. *See* Kenneth R. Bowling, *"A Tub to the Whale": The Founding Fathers and Adoption of the Federal Bill of Rights*, 8 J. EARLY REPUBLIC 223, 236-37 (1988).

9    Some Founders rejected judicial review entirely, but this Essay focuses on the divergence in views among those who accepted judicial review in some form.

10    Common Sense [Thomas Paine], *Candid and Critical Remarks on Letter 1, Signed Ludlow*, PA. JOURNAL AND THEWEEKLYADVERTISER, June 4, 1777, at 1.

11    *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85, 92-98 (2017).

12    *Id.* at 106-08.

13    HORTENSIUS [George Hay], AN ESSAY ON THE LIBERTY OF THE PRESS 38 (Philadelphia, Aurora 1799).

14    *See Brutus No. 6* (Dec. 27, 1787), *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 110, 115 (John P. Kaminski et al. eds., 1984).

15    Letter from James Madison to Spencer Roane (Sept. 2, 1819), *in* 1 THE PAPERS OF JAMES MADISON: RETIREMENT SERIES 500, 501 (David B. Mattern et al. eds., 2009); *see, e.g.*, Trs. of Univ. of N.C. v. Foy, 5 N.C. (1 Mur.) 58, 88 (1805) ("[T]he judiciary are only to expound and enforce the law and have no discretionary powers enabling them to judge of the propriety or impropriety of laws."); Madison, *supra* note 1, at 205 (arguing that "it is for [Congress] to judge of the necessity and propriety" of laws); Virginia Ratification Convention Debates (June 10, 1788) (remarks of James Monroe), *in* 9 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1092, 1112 (John P. Kaminski et al. eds., 1990) (claiming that Congress would be "not restrained or controuled from making any law, however oppressive in its operation, which they may think necessary to carry their powers into effect"); Pennsylvania Ratification Convention Debates (Dec. 4, 1787) (remarks of James Wilson), *in* 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 465, 468 (Merrill Jensen ed., 1976) ("The powers of Congress are unlimited and undefined. They will be the judges of what is *necessary* and *proper*."); *An Old Whig No. 2*, PHILA. INDEPENDENT GAZETTEER, Oct. 17, 1787, *reprinted in* 13 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 399, 402 (John P. Kaminski et al. eds., 1981) ("[F]rom the nature of their power [members of Congress] must necessarily be the judges, what laws are necessary and proper."). When participating in a council of revision, however, judges could venture beyond these limitations to address questions of propriety. *See infra* note 19.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12536   Page 180 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

16    THE FEDERALIST NO. 84, at 580 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). Instead, Hamilton continued, "whatever fine declarations may be inserted in any constitution respecting it, must altogether depend on public opinion, and on the general spirit of the people and of the government." *See id.*

17    *See* Campbell, *supra* note 11, at 107-08.

18    Currie's Adm'rs v. Mut. Assurance Soc'y, 14 Va. (4 Hen. & M.) 315, 346, 350 (1809) (opinion of Roane, J.); *see also* Calder v. Bull, 3 U.S. (3 Dall.) 386, 388 (1798) (opinion of Chase, J.) ("There are certain vital principles ... which will determine and over-rule an *apparent and flagrant* abuse of *legislative* power ...."); Bank of State v. Cooper, 10 Tenn. (2 Yer.) 599, 603 (Special Ct, 1831) (opinion of Green, J.) ("Some acts, although not expressly forbidden, may be against the *plain and obvious* dictates of reason." (emphasis added)).

19    2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 78 (Max Farrand ed., Yale Univ. Press rev. ed. 1966) (1911) (remarks of George Mason); *see also, e.g., Calder,* 3 U.S. at 399 (opinion of Iredell, J.) ("[T]he Court cannot pronounce [a law] to be void, merely because it is, in their judgment, contrary to the principles of natural justice."). Though he did not accept inherent judicial authority to enforce natural law, Mason supported a council of revision enabling federal judges to "giv[e] aid in preventing every improper [state] law. Their aid will be the more valuable as they are in the habit and practice of considering laws in their true principles, and in all their consequences." 2 RECORDS OF THE FEDERAL CONVENTION, *supra*, at 78; *see also Edmund Randolph's Suggestion for Conciliating the Small States* (July 10, 1787), *in* 3 RECORDS OF THE FEDERAL CONVENTION 55-56 (proposing "that any individual conceiving himself injured or oppressed by the partiality or injustice of a law of any particular State may resort to the National Judiciary, who may adjudge such law to be void, if found contrary to the principles of equity and justice").

20    Dr. Bonham's Case, 77 Eng. Rep. 638 (1610); *see generally* R.H. Helmholz, Bonham's Case, *Judicial Review, and the Law of Nature,* 1 J. LEGAL ANALYSIS 325 (2009); PHILIP HAMBURGER, LAW AND JUDICIAL DUTY 622-30 (2008).

21    *See* HAMBURGER, *supra* note 20, at 339-57; LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 20-24 (2004).

22    THE FEDERALIST NO. 78, *supra* note 16, at 524 (Alexander Hamilton).

23    *Id.*; *see, e.g.,* Ham v. M'Claws, 1 S.C.L. (1 Bay) 93, 98 (S.C. Sup. Ct. 1789) ("We are ... bound to give such a construction to this enacting clause ..., as will be consistent with justice, and the dictates of natural reason, though contrary to the strict letter of the law ....").

24    NATHANIEL CHIPMAN, SKETCHES OF THE PRINCIPLES OF GOVERNMENT 174 (Rutland, J. Lyon 1793) (contrasting "r[i]ghts of the mind" with other natural rights); *see* Jud Campbell, *Natural Rights and the First Amendment*, YALE L.J. (forthcoming); *see also, e.g.,* JOHN WITHERSPOON, *Lectures on Moral Philosophy: Lecture VIII, in* 3 THE WORKS OF THE REV. JOHN WITHERSPOON 405, 408 (Philadelphia, William W. Woodward 2d ed., rev. 1802) (mentioning "a right over [man's] own knowledge, thoughts, &c" as an inalienable right). The Founders often referred to these rights as "unalienable" natural rights. *See* Campbell, *supra* note 11, at 97 n.61. Confusingly, the Founders also used the term "unalienable" to describe a broad class of rights--including the rights to life, liberty, and property--that simply could not be divested to the control of a monarch. These rights, however, *could* be regulated in the public interest. *See id.* at 97-98; *see, e.g.,* North Carolina Ratification Convention Debates (July 24, 1788) (remarks of David Caldwell), *in* 4 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION, AS RECOMMENDED BY THE GENERAL CONVENTION IN PHILADELPHIA IN 1787, at 3, 40 (Jonathan Elliot ed., 2d ed., Washington, D.C., n. pub. 1836) ("Unalienable rights ought not to be given up, if not necessary.").

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12537   Page 181 of
733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

<sup>25</sup> A great deal of scholarly confusion about natural rights stems from the fluid and often deceptive ways that Federalists discussed these rights throughout the ratification debates. Federalists usually treated the surrender or preservation of natural rights in terms of the *ends* of governmental power. *See, e.g., The Report of the Constitutional Convention* (Sept. 17, 1787), *in* 13 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 15, at 199, 211 ("It is at all times difficult to draw with precision the line between those rights which must be surrendered, and those which may be reserved ...."); Letter from James Madison to George Washington (Dec. 5, 1789), *in* 12 PAPERS OF JAMES MADISON, *supra* note 1, at 458, 459 ("If a line can be drawn between the powers granted and the rights retained, it would seem to be the same thing, whether the latter be secured by declaring that they shall not be abridged, or that the former shall not be extended."). In other words, "parting with natural rights" was sometimes lexically equivalent to "the surrendering of a power to controul our natural rights." Theophilus Parsons, Essex Result (1778), *in* THEOPHILUS PARSONS, MEMOIR OF THEOPHILUS PARSONS 359, 365 (Boston, Ticknor & Fields 1861). And in this limited sense, withheld powers and retained natural rights were flip sides of the same coin. *Cf.* Thomas B. McAfee, *The Original Meaning of the Ninth Amendment*, 90 COLUM. L. REV. 1215, 1292 (1990). But "unsurrendered" natural liberty could still be regulated pursuant to other valid *ends* of governmental authority. "The absence of an enumerated power over the liberty of locomotion, for instance, meant that the federal government lacked *plenary* authority to restrict individual movement in the public interest," but Congress could still "restrict individual movement when pursuing [its enumerated] powers." Campbell, *supra* note 11, at 103. By contrast, "rights of the mind" were unique because the government lacked authority to abridge these rights even when based on a claimed public benefit. *See id.* at 92, 97.

<sup>26</sup> Congressional Debates (Jan. 21, 1791) (remarks of Rep. John Vining), *in* 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA, MARCH 4, 1789-MARCH 3, 1791, at 340 (William Charles DiGiacomantonio et al. eds., 1995).

<sup>27</sup> *Id.* at 342 (remarks of Rep. Fisher Ames). Vining and Ames opposed a proposal "to prevent" tax collectors from "interfering, either directly, or indirectly, in elections, further than giving their own votes, on penalty of forfeiting their offices." *Id.* at 339 (remarks of Rep. James Jackson). Apparently nobody in Congress asserted that the freedom of speech was unrecognized because the First Amendment was not yet in effect. Moreover, with power to regulate federal employment undisputed, this debate illustrates how *inalienable* rights were *not* the inverse of powers. *Cf. supra* notes 24-25, *infra* note 104 and accompanying text.

<sup>28</sup> *See, e.g.*, Parsons, *supra* note 25, at 371 ("[I]n entering into political society, [man] surrendered this right of controul over his person and property, (with an exception to the rights of conscience) to the supreme legislative power, to be exercised by that power, *when the good of the whole demanded it."*); N.H. CONST. of 1784, pt. 1, art. 4 ("Among the natural rights, some are in their very nature unalienable, because no equivalent can be given or received for them. Of this kind are the RIGHTS OF CONSCIENCE.").

<sup>29</sup> *Federal Farmer No. 6* (1787), *reprinted in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 979, 983-84 (John P. Kaminski et al. eds., 2004).

<sup>30</sup> *Id.* at 984.

<sup>31</sup> The leading study is JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION, 4 vols. (1986-1993). For a shorter discussion, see KRAMER, *supra* note 21, at 9-34.

<sup>32</sup> KRAMER, *supra* note 21, at 14.

<sup>33</sup> *See* Campbell, *supra* note 11, at 106.

Compendium_Cornell
Page 0724

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12538   Page 182 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

34    *See id.* at 96-98; *see, e.g.*, THE FEDERALIST NO. 84, *supra* note 16, at 578 (Alexander Hamilton) ("[I]n strictness, the people surrender nothing, and as they retain every thing, they have no need of particular reservations.").

35    *See* Campbell, *supra* note 11, at 96-98.

36    Parsons, *supra* note 25, at 367.

37    *See, e.g.*, John Phillip Reid, *The Authority of Rights at the American Founding, in* THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND 67, 97 (Barry Alan Shain ed., 2007); GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776-1787, at 295 (1969); *see also* Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. ILL. L. REV. 173, 197 ("Our written Constitution presupposed an established set of fundamental rights not *created* by the Constitution but *protected* or *preserved* by it.").

38    1 ANNALS OF CONG. 715 (1789) (Joseph Gales ed., 1834) (remarks of Rep. Roger Sherman); *see also, e.g.*, Virginia Ratification Convention Debates (June 16, 1788) (remarks of George Nicholas), *in* 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1334 (John P. Kaminski et al. eds., 1993) ("A Bill of Rights, is only an acknowledgement of the pre-existing claim to rights in the people. They belong to us as much as if they had been inserted in the Constitution.").

39    KRAMER, *supra* note 21, at 51.

40    *See Federal Farmer No. 6, supra* note 29, at 984 (fundamental positive rights included rights "so strengthened by long usage as not to be repealable by the ordinary legislature" and rights claimed "under the solemn compacts of the people, as constitutions"); *Federal Farmer No. 16* (1788), *reprinted in* 20 DOCUMENTARY HISTORY OF THE RATIFICATION, *supra* note 29, at 1051, 1057-58 (fundamental positive rights are recognized "under compacts, or immemorial usage").

41    *See, e.g.*, Cooper v. Telfair, 4 U.S. (4 Dall.) 14, 19 (1800) (opinion of Paterson, J.) ("I consider it as a sound political proposition, that wherever the legislative power of a government is *undefined*, it includes the judicial and executive attributes."); Gerard V. Bradley, *The No Religious Test Clause and the Constitution of Religious Liberty: A Machine That Has Gone of Itself*, 37 CASE W. RES. L. REV. 674, 681 (1987) ("[I]n 1787 ... 'non-Christians' could not hold public office anywhere in the states, except perhaps in Virginia."); 1 ANNALS OF CONG. (1790), *supra* note 38, at 1210 (remarks of Rep. Theodore Sedgwick) (acknowledging governmental authority "to interfere with contracts, public and private" when done to promote "the public welfare"). *But see* THE FEDERALIST NO. 44, *supra* note 16, at 301 (James Madison) ("Bills of attainder, ex post facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation.").

42    Enumeration, after all, could remove uncertainty about the fundamentality of particular positive rights, even if the weight of legal authority already supported that view.

43    Americans who rejected Parliamentary supremacy sometimes asserted the judicial enforceability of customary fundamental rights even during the Colonial period. *See* HAMBURGER, *supra* note 20, at 274-78.

44    *See Federal Farmer No. 16, supra* note 40, at 1057 (noting a variety of "particular essential rights the people are entitled to in [judicial] proceedings").

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12539   Page 183 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

45    Massachusetts Ratification Convention Debates (Feb. 5, 1788) (remarks of Theophilus Parsons), *in* 6 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1450 (John P. Kaminski et al. eds., 2000).

46    *See generally* Suzanna Sherry, *The Founders' Unwritten Constitution*, 54 U. CHI. L. REV. 1127 (1987); Suzanna Sherry, *Natural Law in the States*, 61 U. CIN. L. REV. 171 (1992); William Michael Treanor, *Judicial Review Before* Marbury, 58 STAN. L. REV. 455 (2005).

47    *See Federal Farmer No. 16, supra* note 40, at 1057-58 ("[I]t will by no means follow, that [the people] will be entitled to [fundamental positive rights] in the federal courts, and have a right to assert them, unless secured and established by the constitution or federal laws," because "it is doubtful, at least, whether [fundamental positive rights] can be claimed under immemorial usage in this country."); George Mason, *Objections to the Constitution of Government Formed by the Convention, in* 8 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 15, at 43 ("Nor are the People secured even in the Enjoyment of the Benefits of the common-Law; (which stands here upon no other Foundation than it's [sic] having been adopted by the respective Acts forming the Constitutions of the several States.)."); *see also* Jack N. Rakove, *The Dilemma of Declaring Rights, in* THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND, *supra* note 37, at 181, 193 (noting the "positivist" dimension of Anti-Federalist arguments).

48    *See* RAKOVE, *supra* note 2, at 323; *cf. An Old Whig No. 2, supra* note 15, at 402 ("[W]ho can overrule [Congress's] pretensions?-No one, unless we had a bill of rights to which we might appeal, and under which we might contend against any assumption of undue power and appeal to the judicial branch of the government to protect us by their judgements.").

49    *See, e.g.*, Calder v. Bull, 3 U.S. (3 Dall.) 386, 399 (1798) (opinion of Iredell, J.).

50    Two caveats are in order. First, for those Founders who denied judicial authority to determine the constitutionality of statutes, enumeration obviously was not a sufficient condition for judicial enforcement. Second, the scope of enumerated rights might still, in some cases, lack the requisite clarity for judicial enforcement. *See Calder*, 3 U.S. at 399 (opinion of Iredell, J.) ("[A]s the authority to declare [a statute] void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case."); James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law*, 7 HARV. L. REV. 129, 140-42 (1893) (discussing the clarity requirement in Founding Era judicial review); Christopher R. Green, *Clarity and Reasonable Doubt in Early State-Constitutional Judicial Review*, 57 S. TEX. L. REV. 169, 172-83 (2015) (same); John McGinnis, *The Duty of Clarity*, 84 GEO. WASH. L. REV. 843, 880-904 (2016) (same).

51    2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 375. It is important to keep in mind that Madison's notes from late in the Convention are particularly unreliable. *See* MARY SARAH BILDER, MADISON'S HAND: REVISING THE CONSTITUTIONAL CONVENTION 141-47 (2015).

52    2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 376.

53    *Id.*; *see also id.* ("Docr. Johnson thought the clause unnecessary, and implying an improper suspicion of the National Legislature.").

54    *Id.*

55    *Id.* ("The first part of the motion relating to bills of attainder was agreed to nem[ine] contradicente.").

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.12540  Page 184 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

56    *See supra* note 2 and *infra* notes 77-78, and accompanying text.

57    2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 376.

58    *See* HAMBURGER, *supra* note 20, at 458. Williamson can be forgiven for his confusion. Both the dissenters in the North Carolina legislature and the lawyers for the plaintiff made a variety of arguments against the law, including the position that it was an ex post facto law. *See id.* at 452 (describing the lawyers' position); 17 THE STATE RECORDS OF NORTH CAROLINA 419 (statement of legislative dissenters) (Walter Clark ed., Goldsboro, N.C., Nash Bros. Book & Job Printers 1899). The dissenters had also derided the law as "a violation even of the forms of Justice" and thus was, "as an unconstitutional law, ... nugatory." *Id.* at 420. Instead, they insisted, all citizens must enjoy "the known and established rules of Justice, which protect the property of all Citizens equally." *Id.* at 421.

59    2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 376. Notably, Williamson and his friends in North Carolina paid little attention to the hortatory phrasing of the Civil Jury Clause, which declared that the civil jury "is one of the best securities of the rights of the people, and *ought* to remain sacred and inviolable." N.C. Decl. of Rights of 1776, art. XIV (emphasis added). This provides yet another useful reminder that "close-reading textualism is a poor guide to original meaning." William Michael Treanor, *Taking Text Too Seriously: Modern Textualism, Original Meaning, and the Case of Amar's* Bill of Rights, 106 MICH. L. REV. 487, 518 (2007). Scholars, however, routinely point to the hortatory phrasing of bills of rights in the Founding Era as evidence of their non-enforceability. *See* Thomas B. McAffee, *The Bill of Rights, Social Contract Theory, and the Rights "Retained" by the People,* 16 S. ILL. U. L.J. 267, 303 n.101 (1992) (collecting sources).

60    *See* Treanor, *supra* note 46, at 480 ("[T]he court does not suggest that only statutes in that category [of straightforward application of constitutional text] can be properly found unconstitutional.").

61    2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 376.

62    Hugh Williamson, Speech at Edenton, N.C., *in* 16 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 201, 202 (John P. Kaminski et al. eds., 1986).

63    Hamburger rightly notes that some supporters of impeachment criticized the judges for initially *failing* to hold the statute unconstitutional. *See* HAMBURGER, *supra* note 20, at 455. On Davie's impeachment, see PA. PACKET, July 1, 1786, at 2 ("Col. Davie, particularly, sustained those arguments, with so much warmth and energy, that the grand jury, considering his free investigation of the Assembly's conduct as a criminal step, in its nature injurious to, destructive of, and against the peace and dignity of the State, presented him on the 27th ult. But the judges, either more indulgent, or better acquainted with the rights of a lawyer defending his client, or an unprejudiced citizen the liberty of his country, discharged him."). On backlash elsewhere, see KRAMER, *supra* note 21, at 64-69.

64    Williamson, *supra* note 62, at 204.

65    THE FEDERALIST NO. 78, *supra* note 16, at 523 (Alexander Hamilton).

66    *Id.* at 526-27.

67    *Id.* at 528.

68    *See* HAMBURGER, *supra* note 20, at 327-57, 404-61.

Compendium_Cornell
Page 0727

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12541   Page 185 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

69    U.S. CONST. art. VI, cl. 2.

70    *Id.*

71    *See* Campbell, *supra* note 4, at 1163-64. Some legal observers have asserted that the Judges Clause grants federal power to commandeer state judges, *see, e.g.*, Printz v. United States, 521 U.S. 898, 907 (1997), but that interpretation reads the Clause as responding to a nonexistent problem. To the extent that one cares, the evidence of Framers' intent on this issue is indisputable. Prior to being shorted by the Committee of Style, the Clause stated that "the Judges in the several States shall be bound thereby *in their Decisions*, any Thing in the Constitutions or laws of the several States to the Contrary notwithstanding." 2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 169 (emphasis added). Constitutional surplusage, we must recall, was nothing unusual. *See* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 YALE L.J. 1672, 1721 (2012).

72    3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 697 (Boston, Hilliard, Gray, & Co. 1833).

73    *Id.*

74    *See* KRAMER, *supra* note 21, at 75 ("[The Judges Clause] answered the leading objection to judicial review, which was that judges had not been authorized by the people to make such decisions."); RAKOVE, *supra* note 2, at 175 ("[T]he supremacy clause marked an attempt to incorporate a principle of judicial review into all the state governments by the unilateral fiat of the Constitution.").

75    Notably, the Judges Clause involved an issue of great concern to the Framers--namely, *state* adherence to the supremacy of federal law. When it came to a suggestion late in the convention to pass a bill of rights with regard to *federal* power, however, the Framers soundly rejected the proposal. *See* Bowling, *supra* note 8, at 225.

76    *See, e.g.*, 1 ANNALS OF CONG., *supra* note 38, at 731 (remarks of Rep. Elbridge Gerry) ("Those who were called anti-federalists at that time, complained that they had injustice done them by the title, because they were in favor of a Federal Government, and the others were in favor of a national one."). *See generally* PAULINE MAIER, RATIFICATION: THE PEOPLE DEBATE THE CONSTITUTION, 1787-1788 (2010); SAUL CORNELL, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICAA, 1788-1828 (1999).

77    Mason, *supra* note 47, at 43.

78    Madison, *supra* note 1, at 196, 203-04.

79    *Id.* at 204-05.

80    *Id.* at 205 (emphasis added).

81    *Id.* (emphasis added).

82    *Id.* at 206 (emphasis added).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12542   Page 186 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

83      *Id.*

84      *Id.* (emphasis added).

85      *Id.* at 206-07.

86      *Id.* at 207.

87      *See supra* note 3 (collecting sources). Among these authors, Michael McConnell asserts that judges should nonetheless respect retained natural rights by equitably interpreting statutes to avoid conflicts with those rights. *See* McConnell, *supra* note 3, at 22-23.

88      Claus, *supra* note 3, at 609.

89      Letter from Thomas Jefferson to James Madison (Mar. 15, 1789), *in* 14 THE PAPERS OF THOMAS JEFFERSON 659, 659 (Julian P. Boyd ed., 1958). For the development of Madison's ideas, see Jack N. Rakove, *Judicial Power in the Constitutional Theory of James Madison*, 43 WM. & MARY L. REV. 1513, 1531-32 (2002).

90      RAKOVE, *supra* note 2, at 335; *see also* Rakove, *supra* note 88, at 1532 ("[T]he idea that Madison viewed [judicial enforcement of rights] with much optimism seems unlikely."); *cf.* Ralph L. Ketcham, *James Madison and Judicial Review*, 8 SYRACUSE L. REV. 158 (1957) (arguing that Madison vacillated considerably about the propriety and scope of judicial review).

91      Rakove treats Madison's comment about judges as a minor point that should not distract from Madison's general thesis about the practical benefits of enumeration. *See* RAKOVE, *supra* note 2, at 335. This Essay fully agrees with Rakove's depiction of Madison's general thesis, but it offers different interpretations of his comment about judging and, in turn, of the relationship between that comment and his broader thesis. Whereas Rakove treats the minor point as a positivist throwaway line that "came from Jefferson," *id.*, this Essay argues that Madison subtly transformed the argument to *avoid* any positivist implication and, in the same fell swoop, to *reinforce* his broader thesis about the salutary effects of enumeration. But while Rakove has not described Madison's June 8 speech in this way, my thesis aligns with Rakove's reading of other evidence relating to Madison's views about judicial review. *See* Jack N. Rakove, *The Origins of Judicial Review: A Plea for New Contexts*, 49 STAN. L. REV. 1031, 1049 (1997) ("Madison's analysis of the limits of judicial power was essentially a political one, and it followed directly from the critique of the inherent factiousness and parochialism of state politics that drove his constitutional theory."); *id.* at 1057 ("Madison ... obviously believed that the political weakness of the courts would impair their capacity to do justice when they later acted in a properly judicial capacity.").

92      *See, e.g.*, Randy Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 26 (2006) ("Madison's prescient statement about the practical importance of enumerating rights says nothing about how unenumerated rights ought to be treated, much less that they are to be judicially unenforceable.").

93      *See, e.g.*, Ryan Williams, *The Ninth Amendment as a Rule of Construction*, 111 COLUM. L. REV. 498, 515 (2011) ("Although this passage does not necessarily support the proposition that rights omitted from the enumeration were expected to be legally unenforceable, it does suggest the possibility that Madison ... recognized that enumerating rights might place those rights on a different legal footing than unenumerated rights by providing judges with a textual foundation for extending protection to such rights."). Along these lines, Mark Graber cites Madison's statement for the idea that "enumeration *facilitated* judicial protection for the specified rights," Mark A. Graber, *Enumeration and Other Constitutional Strategies for Protecting Rights: The View from 1787/1791*, 9 U. PA. J. CONST. LAW 357, 393 (2007) (emphasis added), but Graber also refers to Madison's speech in a more legalistic way. *See id.* at 361 ("[T]he conclusion

Compendium_Cornell
Page 0729

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12543   Page 187 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

might follow that the Constitution protected only those rights enumerated in the text, rights best protected by the federal judiciary."); *id.* at 379 ("Enumerated rights would enable the federal judiciary to protect the people's liberties."); *see also* DAVID L. LANGE & H. JEFFERSON POWELL, NO LAW: INTELLECTUAL PROPERTY IN THE IMAGE OF AN ABSOLUTE FIRST AMENDMENT 197-98, 208, 210-11 (2009) (framing Madison's comments on enumeration of rights as functional but then insisting on giving enumerated rights legal effect).

94    James Madison, *Observations on the "Draught of a Constitution for Virginia," in* 11 PAPERS OF JAMES MADISON, *supra* note 6, at 285, 293.

95    James Madison, Removal Power of the President (June 17, 1789), *in* 12 PAPERS OF JAMES MADISON, *supra* note 1, at 232, 239.

96    *See supra* note 2.

97    Madison, *supra* note 1, at 207.

98    *See supra* Part I.A.

99    *See* KRAMER, *supra* note 21, at 97.

100    Madison, *supra* note 1, at 206.

101    *Id.* at 207 (emphases added).

102    For concerns about judicial refusals to follow binding law, see James Madison, *Vices of the Political System of the United States* (Apr. 1787), *in* 9 THE PAPERS OF JAMES MADISON: CONGRESSIONAL SERIES 345, 352 (Robert A. Rutland & William M. E. Rachal eds., 1975) ("[T]he acts of Congs .... are tho' nominally authoritative, in fact recommendatory only .... Whenever a law of a State happens to be repugnant to an act of Congress ... [and] the question must be decided by the Tribunals of the State, they will be most likely to lean on the side of the State."); Letter from James Madison to Edmund Randolph (Apr. 8, 1787), *in* PAPERS OF JAMES MADISON, *supra* at 368, 370 ("If the judges in the last resort depend on the States [and] are bound by their oaths to them and not to the Union, the intention of the law and the interests of the nation may be defeated by the obsequiousness of the Tribunals to the policy or prejudices of the States."); *see also* Rakove, *Origins of Judicial Review, supra* note 91, at 1040, 1048 ("Perhaps the crucial matter is not merely for courts to review legislation, but to summon the intestinal fortitude to void a constitutionally doubtful act .... What made the institution of judicial review problematic in their original assessments was not its constitutional legitimacy, but rather doubts about its capacity to withstand the buffeting of either state- or national-oriented political forces."). Just a week after his bill of rights speech, Madison may have expressed doubts "that judges would muster the fortitude to intervene in a highly charged [constitutional] dispute" that turned on unenumerated constitutional principles. Rakove, *supra* note 89, at 1532. It is worth noting, however, that Madison's concern over whether "they" would "decide so calmly as at this time" was perhaps a reference to Senators, not to judges. *See* James Madison, *Removal Power of the President* (June 18, 1789), *in* 12 PAPERS OF JAMES MADISON, *supra* note 1, at 244, 244-45 ("If we leave the constitution to take this course, it can never be expounded until the president shall think it expedient to exercise the right of removal, if he supposes he has it; then the senate may be induced to set up their pretensions: And will they decide so calmly as at this time, when no important officer in any of the great departments is appointed to influence their judgments? The imagination of no member here, or of the senate, or of the president himself, is heated or disturbed by faction: If ever a proper moment for decision should offer, it must be one like the present.").

103    *See supra* Part I.B. and Part II.

Compendium_Cornell
Page 0730

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12544   Page 188 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

104    Madison, *supra* note 1, at 200.

105    *Id.* Two months later, Madison defended the placement of his natural-rights proposal *"in the Constitution ... in this place* [i.e., the preamble]," 1 ANNALS OF CONG., *supra* note 38, at 719 (remarks of James Madison) (emphasis added), which would seem to suggest that these proposed rights would be "incorporated *into the constitution.*" Madison, *supra* note 1, at 206-07 (emphasis added). Others took a different view but without particular reference to judicial review. *See* 1 ANNALS OF CONG., *supra* note 38, at 718 (remarks of Thomas Tudor Tucker) (a preamble is "no part of the Constitution"); *id.* (remarks of Rep. John Page) (same).

106    Madison, *supra* note 1, at 203.

107    *See* Akhil Reed Amar, *The Consent of the Governed: Constitutional Amendment outside Article V,* 94 COLUM. L. REV. 457, 476 (1994) (noting the historical connection between popular sovereignty and the right of revolution).

108    *See* Philip Hamburger, *More is Less,* 90 VA. L. REV. 835, 838-57 (2004).

109    Relying on Madison's June 8 speech, Michael McConnell concludes: "Once the people empowered the courts to enforce the boundary between individual rights and the magistrate's power, they entrusted the courts with a responsibility that prior to 1789 had been exercised only by the legislature." Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion,* 103 HARV. L. REV. 1409, 1445 (1990). Along similar lines, David Bogen concludes that "freedom of speech meant that restrictions on speech are impermissible unless necessary to accomplish a legitimate function of government, and that the courts rather than the legislature should ultimately determine that necessity." Bogen, *supra* note 3, at 458. But Madison, as this Essay argues, was not making a sweeping endorsement of judicial power to determine the proper scope of natural liberty. Not surprisingly, then, there is strikingly little evidence of judicially enforceable religious exemptions at the Founding, *see* Wesley J. Campbell, Note, *A New Approach to Nineteenth-Century Religious Exemption Cases,* 63 STAN. L. REV. 973, 987 (2011), just as there is strikingly little evidence of judicially enforceable protection for expressive freedom outside the protection for well-intentioned statements of one's thoughts, *see generally* Campbell, *supra* note 24. At the same time, however, Founding Era evidence disproves a talismanic acceptance of neutral, generally applicable laws. *See, e.g.,* Michael W. McConnell, *Freedom from Persecution or Protection of the Rights of Conscience?: A Critique of Justice Scalia's Historical Arguments in* City of Boerne v. Flores, 39 WM. & MARY L. REV. 819, 838 (1998) ("[W]hen the Continental Congress, for one example, stated that imposing military conscription on 'people, who, from religious principles, cannot bear arms in any case' would be an act of 'violence to their consciences,' this tells us something about the understood meaning of the rights of conscience ...."); *see also* Wesley J. Campbell, *Religious Neutrality in the Early Republic,* 24 REGENT U. L. REV. 311, 316 (2012) ("The Free Exercise Clause guaranteed a natural, unalienable right of religious freedom--not a right to governmental neutrality."). In my view, Founding Era evidence militates against robust judicial enforcement of religious exemptions but, at the same time, reinforces that incidental restrictions of religious practice or religious conscience *implicated* the natural right of religious freedom, just as every law restricting human actions implicated the natural right of liberty. *See, e.g.,* St. George Tucker, *On the State of Slavery in Virginia* (1796), *in* VIEW OF THE CONSTITUTION OF THE UNITED STATES WITH SELECTED WRITINGS 402, 407 (1999) ("[W]henever [natural] liberty is, by the laws of the state, further restrained than is necessary and expedient for the general advantage, a state of *civil slavery* commences immediately ...."). For articles with pertinent evidence, see, *e.g.,* Philip Hamburger, *Religious Freedom in Philadelphia,* 54 EMORY L.J. 1603 (2005); Vincent Phillip Muñoz, *The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress,* 31 HARV. J.L. & PUB. POL'Y 1083 (2008).

110    *See* Campbell, *New Approach, supra* note 109, at 989-98 (discussing religious-exemption cases from the early 1800s).

111    *See generally* Campbell, *supra* note 24 (discussing the relationship between natural rights and positive rights).

112    Madison's personal view on the necessity of enumeration is unknown. Given his cautious attitude toward judicial review, one can imagine him privately supporting the necessity of enumeration. *See supra* notes 90, 94, and 95 and accompanying

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12545   Page 189 of 733

JUDICIAL REVIEW AND THE ENUMERATION OF RIGHTS, 15 Geo. J. L. & Pub....

text; *see also* 2 RECORDS OF THE FEDERAL CONVENTION, *supra* note 19, at 440 ("Is not that already done by the prohibition of ex post facto laws, which will oblige the Judges to declare such interferences null & void."); *cf. supra* note 89 (mentioning Madison's correspondence with Jefferson). On the other hand, Madison belonged to an elite political class that, steeped in the tradition of customary constitutionalism, widely rejected the notion that enumeration was essential to the judicial enforcement of rights. *See supra* Part I.B. and Part II.

[113]   Madison, *supra* note 1, at 206. At another point, he described his list of rights "either as actual limitations of such powers, or as inserted merely for greater caution," carefully avoiding offending either side. *Id.* at 202.

[114]   *Accord* Randy E. Barnett, *Reconceiving the Ninth Amendment*, 74 CORNELL L. REV. 1, 20 (1988).

[115]   1 ANNALS OF CONG., *supra* note 38, at 435.

[116]   *Id.* at 439.

[117]   *Federal Farmer No. 16, supra* note 40, at 1056. Notably, these arguments focused on fundamental positive rights. *Id.* at 1057-58; *Brutus No. 2* (1787), *reprinted in* 19 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 154, 156-59 (John P. Kaminski et al. eds., 2003); Letter from Thomas Jefferson to James Madison (Dec. 20, 1787), *in* 12 THE PAPERS OF THOMAS JEFFERSON 438, 440 (Julian P. Boyd ed., 1955). A notable exception was the freedom of conscience, which was a natural right, but even that right had enjoyed positive-law protection in some form ever since the Toleration Act.

[118]   *Accord* KURT T. LASH, THE LOST HISTORY OF THE NINTH AMENDMENT 82 (2009) ("*In sum*: The text of the Ninth Amendment prevents interpretations of enumerated rights that negatively affect the unenumerated retained rights of the people .... [T]he fact of enumeration [cannot be] relied upon to suggest the necessity or superiority of enumeration.").

[119]   *See* Campbell, *supra* note 4, at 1178 n.301 (making this point in the context of statements about governmental power more generally).

[120]   THE FEDERALIST NO. 78, *supra* note 16, at 523 (Alexander Hamilton).

[121]   Calder v. Bull, 3 U.S. (3 Dall.) 386, 399 (1798) (opinion of Iredell, J.) ("[A]s the authority to declare [a statute] void is of a delicate and awful nature, the Court will never resort to that authority, but in a clear and urgent case."); Edmund Pendleton, *Pendleton's Account of "The Case of the Prisoners," in* 2 THE LETTERS AND PAPERS OF EDMUND PENDLETON, 1734-1803, at 417 (David John Mays ed., 1967) ("But how far this Court in which it has been properly said the Judiciary Powers of the State are concentrated, can go in declaring an Act of the Legislature void, because it is repugnant to the Constitution, without exercising the Power of Legislation, from which they are restrained by the same Constitution? is a deep, important, and, I will add, an awful question."); *see* KRAMER, *supra* note 21, at 64 ("Early proponents of judicial review were quite self-conscious in recognizing the awful nature of what they were doing: 'awful' in the eighteenth century sense of something full of awe.").

15 GEOJLPP 569

---

*End of Document*                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12546   Page 190 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

**83 Law & Contemp. Probs. 31**

Law and Contemporary Problems
2020

Gun Rights and Regulation Outside the Home

*Joseph Blocher, Jacob D. Charles and Darrell A. H. Miller*, Special Editors

Jud Campbell [a1]

Copyright © 2020 by Jud Campbell

# NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT TO KEEP AND BEAR ARMS

## INTRODUCTION

Speaking to Congress in 1789, James Madison defended his proposed bill of rights as a list of "simple acknowledged principles," and not ones of "a doubtful nature." [1] And true to form, his inclusion of a right to keep and bear arms received little debate at the time. [2] By the mid-nineteenth century, however, judicial interpretations of that right were in disarray. Some judges interpreted the right based on its ostensible purpose of preserving the independence and effectiveness of militias. Others ruled that governmental power extended only to imposing modest restraints on personal firearms--not outright bans. Still more held that all weapons regulations were unconstitutional. So why had Madison's "simple" declaration of the right to keep and bear arms become so hard to interpret?

One possibility is a lack of any genuine original consensus. [3] Another is that Americans were changing their views. Saul Cornell, for instance, argues that by the mid-nineteenth century an individualistic conception of the right to keep and bear arms had begun to supplant the former linkage between that right and civic obligations, like militia service. [4] Meanwhile, Robert Leider treats Antebellum decisions as largely just tracking public opinion, with judges essentially making up doctrine as they went along. [5] This Article embraces elements of each of these stories. But it argues that right-to-bear-arms cases also reflected the complicated **\*32** and often contested relationship between natural rights and positive rights that shaped American rights jurisprudence more broadly. [6]

In part, this Article aims to show how an understanding of American rights discourse can illuminate the first judicial decisions interpreting the right to keep and bear arms. [7] Though seemingly in disarray, these opinions exhibited exactly the sorts of disagreements that one would expect given prevailing understandings of natural rights and positive rights. This does not disprove that other factors were at play. But it suggests a potentially broader consensus about certain aspects of the right than scholars have appreciated. [8]

More broadly, this Article argues that the first right-to-bear-arms decisions exemplify a tension that emerged when judges confronted claims about natural rights and positive rights in a changing social and legal landscape. These tensions arose partly from the problems of "vagueness" and "open texture" that constantly appear in interpretive disputes, especially when the context shifts. [9] But as we will see, matters were even trickier in the nineteenth century because of changing conceptions of the judicial role.

This story begins in Part I with a survey of Founding-Era rights discourse, and particularly the complex relationship between natural and positive rights. Natural-rights reasoning was open-ended and flexible, permitting the government to regulate natural rights in promotion of the public good. Natural rights therefore sounded more in the register of political philosophy than law, with legislatures and juries--not judges--giving them practical effect. Positive-rights discourse, on the other hand, was more

Compendium_Cornell
Page 0733

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12547   Page 191 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

formalist and conservative, using a backward-looking **\*33** historical method for identifying limits on governmental power. [10] Positive rights were therefore more amenable to judicial enforcement. But judges intervened only after the polity itself--through a political settlement--had already rejected a particular type of regulation. Judicial review thus served as only a partial check against abuses of legislative power. [11]

Decades later, however, American judges increasingly viewed themselves as the anointed guardians of the constitutional order. This shift created a dilemma for judges--particularly when legislatures began to innovate in response to novel problems. The tension was stark. Emergent norms of judicial review counseled against absolute deference to legislative judgments. But natural rights lacked legal specificity, and customary law rarely supplied clarity about how to address new problems.

As will be discussed in Part II, the first cases involving the right to keep and bear arms perfectly illustrate this tension. In response to rampant violence, state legislatures in the nineteenth century began to restrict the concealed carry of weapons. In some respects, these laws were unprecedented-- particularly by suddenly converting widely practiced and otherwise innocent behavior into a crime. If legislatures could do *that*, one wondered, was there anything they could not do? Yet while history did not directly support the validity of concealed-carry bans, it did not directly undermine them, either. [12] Customary positive law did not settle the issue because the question had not previously emerged in these terms.

Absent a clear textual or historical basis for invalidation, one judicial option was simply to uphold these laws. And some judges did that. Yet this approach had the significant downside of allowing legislatures to run roughshod over natural rights, and over the protection of customary rights that arguably applied. Another response was to disregard legislative acts that limited freedom in novel ways, or to draw some other line demarcating legislative power. And some judges did that. But doing so conflicted with the judicial task of merely locating, not inventing, constitutional limits on legislative power.

This Article concludes with a brief discussion of how this history might bear on contemporary debates about the Second Amendment. Any use of early decisions requires staying attuned to premises about rights and about judicial review **\*34** that may differ substantially from our own. [13] But while unpacking earlier rights decisions can lead to a better understanding of the past, it also reveals the extraordinary challenge of using history to answer modern questions. Just decades into the nineteenth century, the first right-to-bear-arms decisions were already revealing latent tensions in the law. The Founders simply had not anticipated that changing circumstances and broader conceptions of judicial review would transform rights jurisprudence.

# I

## NATURAL AND POSITIVE RIGHTS

For its first hundred years, American constitutionalism was grounded on a theory of political authority known as social-contract theory. [14] Rather than resting political authority on military force or divine will, social-contract theory posited that governmental authority depended on the consent of the people. [15] In essence, the theory sought to justify--and to limit-- governmental authority by considering why people would agree to form a political society in the first place. [16] And the starting point in this thought experiment was the concept of natural rights.

### A. Natural Rights

Americans understood natural rights as human capacities in an imagined state of nature without a government. These "rights" thus included any human ability that did not depend on governmental authority--thinking, reading, talking, eating, and so on, as well as the enjoyment of the fruits of one's labor. [17] Thomas Paine succinctly described these rights as "animal right[s]." [18] By contrast, positive rights were those defined in terms of governmental authority, like rights of habeas corpus, jury trials, and voting. [19]

**\*35** Importantly, the state of nature was hypothetical, not historical. [20] It was "abstract" and did not dispute that "men come into the world and into society at the same instant." [21] Accordingly, natural rights were not limited to the freedom that existed

Compendium_Cornell
Page 0734

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12548   Page 192 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

at a particular historical moment. Instead, natural rights included the possession and use of technologies--like firearms and printing presses--regardless of whether those technologies were developed after the creation of the political society.

Social-contract theory next posited that humans in a state of nature would unanimously agree to create a political society in a social contract, with each member being an equal citizen of the polity. [22] This body politic, commonly known as "the people," would then, by majority consent, agree to a constitution that vested political authority in a government. In other words, social-contract theory described a two-stage process for establishing political authority: a social contract to create a polity, followed by a constitution to create a government.

Although governmental powers were created in the constitution, individual rights could be recognized at either stage. Many Founders thus thought it unnecessary to include rights in a constitution. [23] Rather, legislative or constitutional restatements of rights were often viewed as merely *declaratory*, without creating the rights they recognized. [24] Indeed, the Ninth Amendment evinces this non-positivist conception of rights. [25] Back then, the primary purpose of enumerating rights was to remind the government and the people about their existence and importance. Enumerating a natural right was irrelevant to its legal status. [26]

Recognizing a natural right, however, did not deny governmental power to restrict that right. [27] Rather, the retention of natural rights shaped the constitutional scheme in more structural terms. First, only the people themselves could limit their own natural rights through laws passed by a representative legislature and enforced by a representative jury. [28] Second, social-contractarian thinking **36** about natural rights posited that the people could restrict natural rights only in promotion of the common good, rather than for the private benefit of certain individuals. [29]

It is no surprise, then, that the Founders viewed discretionary royal licensing as a quintessential violation of natural rights. If the King or his agents could decide who could operate a printing press and who could possess certain firearms, that would plainly violate natural-rights principles. First, it would privilege the interests of some individuals over others, without equally considering everyone's interests. Second, it would consolidate power in the hands of royal officials rather than representative legislatures and juries. [30]

These principles, however, did not point toward a libertarian conception of rights. Legislatures, after all, still had power to regulate these rights. The English Bill of Rights explicitly recognized this power with respect to the right to keep and bear arms, declaring that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." [31] Or, as Massachusetts jurist George Thatcher stated, the "use of arms ... being a natural right, and not surrendered by the constitution," was one that "the people still enjoy, and must continue to do so till the legislature shall think fit to interdict." [32] The natural right to possess and carry weapons required the legislature to act impartially, but it did not correspond to determinate, legalistic restrictions on legislative power. Rather, the constitutional lodestar was the public good.

With this understanding of social-contractarian limits, one can easily see how the scope of general legislative power varied according to circumstances and was not defined by a particular set of policy tools. Rather, the authority that came to be known as the "police powers" was simply governmental power to promote the common good. [33] At one time and place, this principle might warrant a ban on carrying concealed weapons in public. At another time and place it might not. But social-contract theory trained Americans to think about these questions of natural rights and legislative powers in flexible and dynamic terms. [34]

To be sure, lawmakers lacked rightful authority to do whatever they wanted. Social-contractarian principles dictated that "all civil authority delegated by the people"--including legislative power--"must be at all times subservient to the public good." [35] And judges sometimes determined that legislation was invalid on **37** precisely this basis. [36] In general, however, natural rights did not impose precise limits on legislative power.

In my view, then, it makes little sense to delimit specific categories of firearms regulations as being within or beyond the police powers. [37] Tracking weapons regulations in one period--shaped by the prevailing circumstances and attitudes of that period-- would tell us little about the scope of the police powers in different circumstances. Nor did social-contract theory impose any categorical bar on "prohibiting" as opposed to merely "regulating" various forms of natural liberty. [38] The Founders recognized

Compendium_Cornell
Page 0735

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12549   Page 193 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

governmental authority to ban theater performances, billiards halls, lotteries, profanity, various consensual sexual activities, and so on, based on the authority to promote the general welfare.[39]

Finally, it is worth considering the much-confused issue of self-defense. A central feature of social-contractarian thought was that upon leaving the state of nature, individuals could no longer employ self-help remedies to defend their private rights.[40] In general, then, the natural right of self-defense was effectively transformed into a positive right known as the protection of the law. Preventing and remedying private violations of rights was now the responsibility of the body politic, not each individual. A well-recognized exception arose in cases of imminent danger when resort to legal remedies was impossible.[41]

Individuals thus ceded authority to a body politic to defend their rights, but practical considerations required the body politic to delegate some of these responsibilities to a government. The people themselves would remain in control of legislating, but they would do so indirectly by electing representatives. And an  **38** executive branch and court system were established to enforce the law and settle private disputes. In all of these roles, however, members of the government would merely act as *agents* of the body politic.[42]

But here is where Founding-Era views become especially foreign to modern observers. Although the Founders favored creating an executive and judicial branch, they also thought that the body politic should retain substantial *direct* control over the protection of law, without fully delegating this responsibility to the government. In the judicial branch, for instance, juries were prized primarily because they allowed for direct control by the people themselves.[43] Citizens also played a key role in executive functions through institutions like the *posse comitatus* and militia.[44] And to exercise these responsibilities citizens needed training and weaponry.

It was in this sense that the Founders often exalted the right of citizens to maintain weapons in "defense of themselves."[45] This right was part and parcel of the protection of law provided directly by the body politic rather than by governmental agents. It was not limited to a military context, such as defense against foreign invasions or domestic insurrections. Indeed, some even described personal self-defense as falling within the scope of this civic duty.[46] Nor was the right to maintain weapons in self-defense a "collective" right held by state governments. Far from it.[47] But none of this suggested that the public responsibility of protecting private rights was somehow beyond the power and control of the body politic. Social-contract theory posited exactly the opposite.

The natural right of self-defense was thus an integral part of Founding-Era discourse about the right to keep and bear arms, but not in the way that we might  **39** now expect. Unlike most other natural rights, the right of self-defense was surrendered almost entirely to the body politic.[48] Crucially, however, Americans did not think that the body politic then fully assigned that responsibility to the government. Rather, the right and duty of self-defense was largely retained by the people themselves--but principally *as a body politic*, not as disaggregated individuals.[49]

## B. Positive Rights

But Americans did not have a unimodal understanding of rights. In addition to natural rights, the Founders also recognized certain fundamental *positive* rights that prohibited the government from acting in particular ways. Positive rights were thus defined in reference to governmental action or inaction.[50] The right to a jury trial and the right against prior restraints, for instance, were fundamental positive rights because they operated as determinate rules about what the government had to do or could not do, regardless of legislative assessments to the contrary. And because these positive rights were generally legalistic, they were more judicially enforceable than natural rights.[51]

Positive rights also contrasted with natural rights in terms of how they were recognized. As mentioned above, natural rights were liberties in a hypothesized state of nature, and therefore understanding the concept was enough to perceive the breadth of natural rights. By contrast, positive rights had to be created by each political society. One way of doing so was through constitutional enumeration.[52] But many Founders thought that some fundamental positive rights were created in the imagined social contract and could be identified through custom, without any need for constitutional enumeration.[53]

Compendium_Cornell
Page 0736

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12550   Page 194 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

Because of these different points of origin, the method for defining the scope of positive rights naturally depended on whether a written constitution had created  **\*40**  that right. Customary rights were defined historically-- typically by determining the meaning of that right at common law. [54] For new rules, however, textual analysis was far more important. The members of the First Congress, for instance, carefully drafted the Establishment Clause--a new rule--whereas their revisions of other enumerated rights proceeded with little debate. With limited exception, the First Congress was articulating "simple acknowledged principles." [55]

In theory, then, Founding-Era rights discourse featured two types of rights that carried distinct meanings. In practice, however, matters were even more complicated, particularly because some terms--like "freedom of the press"-- could readily refer to a natural right and a fundamental positive right. [56] And with this framing in mind, we can better appreciate the content of--and potential for unresolved tensions within--the right to keep and bear arms.

Insofar as the right to keep and bear arms was a fundamental positive right, American elites naturally viewed that right historically. For example, if a legislature authorized executive officials to arbitrarily disarm the citizenry, as English Kings had done in the seventeenth century, that legislation would abridge a customary positive right. [57] But while this right provided security against the problems of the past, it could not necessarily resolve the problems of the future because its application to those problems was not yet settled. [58]

In theory, of course, fundamental positive rights could be defined broadly or narrowly enough to clarify their application to unanticipated problems. For instance, if one determined that the right to keep and bear arms categorically denied governmental power to regulate the possession or carrying of weapons in any manner, then that understanding would resolve all sorts of unanticipated questions. By contrast, if the right prevented only arbitrary disarmament by royal officials, then its inapplicability to exercises of legislative power would be similarly clear. As it turns out, though, fundamental positive rights were rarely defined with such specificity in advance. Rather, they usually emerged from historical episodes involving opposition to particular policies, thus giving these rights  **\*41**  clear application to some types of governmental acts without necessarily supporting or rejecting their extension to others. Consequently, the scope of fundamental positive rights was often contested.

## II

### NINETEENTH-CENTURY DECISIONS

The interplay between natural rights and customary positive rights may seem foreign to us, but it was familiar to Americans who had grown up in the customary constitutional tradition and had recently justified a political revolution based on blended assertions of natural and positive rights. Yet with subsequent developments in American constitutional law, and particularly the ascension of more robust judicial review, [59] tensions soon emerged over how to construe natural and positive rights.

Police-powers cases were harder for precisely the reasons described earlier. Social-contract theory stipulated that the government could limit natural rights only in pursuit of the public good, and only possessed the powers conducive to that role. Yet exactly what this entailed was highly contestable. As Joseph Priestley summarized:

> That the happiness of the whole community is the ultimate end of government can never be doubted, and all claims of individuals inconsistent with the public good are absolutely null and void; but there is a real difficulty in determining what general rules, respecting the extent of the power of government, or of governors, are most conducive to the public good. [60]

As a matter of principle, legislative power had to be limited. Yet the "real difficulty" that Priestley identified was hardly within the judicial ken. Judges, after all, were not supposed to assess questions "of mere expediency or policy." [61]

A tempting judicial response might be to define the limits of legislative power using a historically grounded approach, borrowing from the tradition of customary constitutionalism. But what, then, should judges do when new social problems emerged, leading to novel legislation? A tradition-based interpretive approach only works if relevant traditions provide direction.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12551   Page 195 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

In sum, judges had to make judgments about how to maintain fidelity to constitutional principles without surpassing limits on the judicial role. [62] Leaving legislatures free to determine the scope of their own powers was increasingly seen as a dangerous abdication of judicial responsibility. Yet these issues were not *legal* in nature--at least not until judges started pretending so. Enforcing natural **\*42** rights and underdeterminate positive rights thus inevitably required judges to adopt rules that were overinclusive, underinclusive, or a combination of both. And that is precisely what one sees in the first Antebellum right-to-bear-arms cases.

## A. *Bliss v. Commonwealth* (Kentucky, 1822) [63]

In response to escalating violence, the Kentucky legislature in 1813 made it a crime to "wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when traveling on a journey." [64] Nearly a decade later, the Kentucky Court of Appeals held that the statute was unconstitutional under the state constitutional guarantee "that the right of the citizens to bear arms in defence of themselves and the state, shall not be questioned." [65]

Whether the right was "regulated" or "prohibited" was irrelevant, the court stated, because "whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution." [66] "[I]n principle," the court explained, "there is no difference between a law prohibiting the wearing [of] concealed arms, and a law forbidding the wearing [of] such as are exposed." [67] Consequently, the justices concluded, any statutes that "diminish or impair [the right] as it existed when the constitution was formed, are void." [68]

The *Bliss* majority then engaged in an extended defense of judicial review. "Whether or not an act of the legislature conflicts with the constitution," it observed, "is, at all times, a question of great delicacy, and deserves the most mature and deliberate consideration of the court." [69] Yet this question "is a judicial one," and "the court would be unworthy [of] its station, were it to shrink from deciding it whenever, in the course of judicial examination, a decision becomes material to the right in contest." [70] Nonetheless, judges should do so only upon a "clear and strong conviction" of unconstitutionality. [71]

The extended discussion of judicial review was no coincidence. Kentucky was in the midst of a massive political upheaval after lower courts had struck down recently enacted debt-relief legislation. [72] And with judicial review under attack, judges in Kentucky likely had little appetite for defending contestable judgments on questions of degree. The only historically grounded line the court could--and did--draw with respect to concealed-carry laws was to recognize legislative **\*43** power to regulate weapons only as far as was done under existing law when the constitution was ratified. [73] Any other approach would pull judges into the unenviable task of coming up with those lines. [74]

In sum, *Bliss* nicely illustrates the importance of formalism and historicism to nineteenth-century judicial appraisals of rights, even as judges more widely--and more aggressively--viewed themselves as responsible for identifying and enforcing constitutional limits on legislative power. The right to keep and bear arms, the *Bliss* court insisted, could not allow for any new regulations since the judiciary had no other way of policing the boundaries.

## B. *Aymette v. State* (Tennessee, 1840) [75]

As in *Bliss*, the defendant in *Aymette* was convicted of violating a state law that barred the concealed carrying of certain weapons. [76] On appeal, he argued that his conviction violated the state constitutional declaration that "the free white men of this State have a right to keep and bear arms for their common defence." [77] This time, however, the argument failed.

Rather than reading this right as a prohibition against new restrictions of weapons, the Tennessee Supreme Court turned to "the state of things in the history of our ancestors" to determine the meaning of the right. [78] That right was based on a denial of the King's authority to disarm Englishmen "by his own arbitrary power, and contrary to law." [79] The historical meaning of the right, in other words, was grounded on a concern about self-rule--not a libertarian notion of freedom from any legal restraint.

Compendium_Cornell
Page 0738

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12552   Page 196 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

Moreover, the additional "evil" that Englishmen feared was that the King, through disarming the people and quartering soldiers in their midst, would "compel them to submit to the most arbitrary, cruel, and illegal measures." [80]

Tennessee's constitutional provision, the court explained, was "adopted in reference to these historical facts," which therefore shaped its meaning. [81] It supplied a right of all free white men to possess arms. [82] But the constitutional text and its undergirding history indicated a right limited to weapons used "by the people in a body, for their common defense." [83] Consequently, this right covered **44 arms "usually employed in civilized warfare, and that constitute the ordinary military equipment." [84] By contrast, "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin," were outside the scope of the right. [85] Moreover, the court continued in dicta, the legislature could "regulat[e] the manner in which [militia-related] arms may be employed," though it would be "somewhat difficult to draw the precise line where legislation must cease." [86]

*Aymette* thus reflected a historically grounded interpretive approach, supplemented by natural-rights reasoning. The history of the right to bear arms in England, the court thought, focused on a particular harm or evil--namely, the disarmament of the populace with respect to their means of resisting arbitrary power--and it was that evil that the constitution prohibited the state from repeating. [87] In this regard, the Tennessee Supreme Court was invoking the classic interpretive canon that statutes should be interpreted in light of the mischief or evil to which the legislature was responding. [88]

*Aymette* thus employed what had been the standard approach to mediating the relationship between natural rights, positive rights, and governmental power. In part, the court recognized clear historical limits on legislative power. The government, it held, could not generally or arbitrarily disarm the white male citizenry with respect to keeping weapons used by militias because of the historical scope of the positive right. [89] But otherwise legislatures had leeway to restrict natural rights, including the possession and use of firearms. Thus, although individuals had a natural right to carry a concealed Bowie knife, the legislature could restrict that right in order to maintain public safety. Here, the *Aymette* court was firmly rebutting the *Bliss* approach. [90] So long as statutes did not repeat these errors of the past or otherwise undermine the militia, the legislature was free to regulate weapons in promotion of the common good.

### *45 C. *State v. Buzzard* (Arkansas, 1842) [91]

As in *Bliss* and *Aymette*, the defendant in *Buzzard* argued that the state ban on concealed carry of weapons violated his right to keep and bear arms. [92] A two-to-one majority rejected this claim. [93]

Chief Justice Ringo began his opinion by returning to first principles. The legislature may restrict liberty to advance "the general interests or welfare of the whole community," he explained, and it had wide discretion to choose "the means best calculated to attain the object." [94] Thus, for example, although individuals have a natural right to speech, the legislature generally had authority to enact "such limitations as have been found necessary to protect the character and secure the rights of others, as well as to preserve good order and the public peace." [95] But an exception arose when "some fundamental law ... expressly, or by necessary or reasonable implication, prohibited the Legislature from [doing so]." [96] This was textbook social-contract theory.

Turning to the right to keep and bear arms, Ringo defined the right broadly, perhaps implicitly recognizing it as a natural right. [97] Yet this right was subject to regulation under law. [98] The crucial question, then, was whether the right also entailed any specific limits on legislative power.

Ringo swiftly rejected the defendant's claim that the right to keep and bear arms disabled the state from regulating weapons. [99] History easily disproved this assertion, he reasoned, since governments had long regulated weaponry. [100] To be sure, the people had a right to defend themselves and their property. But this right was regulated by law and was inextricably tied to the role that individuals performed *as citizens* when defending life, liberty, and property through institutions like the militia. [101] The constitutional recognition of a right to keep and bear **46 arms, Ringo thus insisted, referred specifically to bearing arms in

Compendium_Cornell
Page 0739

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12553   Page 197 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

the performance of this civic responsibility. [102] Consequently, the legislature could prohibit "keeping and bearing arms for any purpose whatever," but this power was "limited or withdrawn" insofar as it would effectively disarm the militia. [103]

In dissent, Justice Lacy relied largely on consequentialist reasoning, which was central to natural-rights discourse. A right limited to the context of militia service, Lacy insisted, would be "valueless and not worth preserving." [104] But a broader right of the people to keep and bear arms for any lawful purpose, without any legal diminution, was "the only security and ultimate hope that they have for the defense of their liberties and their rights." [105] Otherwise, he observed, a legislature could "control or regulate it in any manner that they think proper," [106] thus allowing that right to be "not only abridged, but literally destroyed." [107]

Lacy's sweeping policy judgments fit comfortably within natural-rights reasoning. To identify the terms of the social contract, one had to reconstruct what the people would decide when forming a political society. Consequently, if legislative power to regulate weapons were truly destructive of the ends of the political society, then that power did not exist. Lacy's conclusion, however, was only as strong as his underlying policy assessment. He was not starting with a deontological, libertarian conception of rights.

Lacy also grounded the right to bear arms on the right of personal self-defense. "Has not every man a natural and an unalienable right to defend his life, liberty, or property, when a known felony is attempted to be committed upon either by violence or surprise?," he rhetorically asked. [108] "Upon what principle has he a right to use force to repel force, and even to slay the aggressor," Lacy then inquired, "if he can not make a successful repulsion otherwise?" [109] Preserving adequate means of defense, he insisted, called for a right to possess and carry arms.

From a natural-rights standpoint, however, this argument was delusory. The rationale of Lacy's critique--namely, the insufficiency of legal remedies as a way of preserving private rights--was *precisely the same* rationale that underpinned the Arkansas statute. Lacy's argument about lives potentially *saved* because of weapons was certainly relevant, but it failed to consider the equal worth of lives  **47** potentially *lost*. A natural-rights analysis should have evaluated both. [110] Nonetheless, Lacy's argument highlights the increased prominence of personal self-defense in nineteenth-century discourse. [111] And it reflects a tried and true way to avoid judicial balancing: prioritize some interests and simply ignore the others.

But Lacy's view of the right to keep and bear arms acknowledged limits. Should a person, "in the exercise of [constitutional rights], commit any unlawful act, and prejudice the rights of others," Lacy explained, "then he would be answerable for their unwarrantable use and indulgence." [112] Thus, for instance, "it would be unlawful so to keep arms and ammunition of any kind, as to endanger the lives or property of others." [113]

This was *yet another* approach to constraining legislative power. Lacy's method was far more limiting than history or general social-contractarian principles supported. But it also had the virtue of being more amenable to judicial enforcement. The majority's approach, as Lacy rightly pointed out, effectively left the legislature free to "control or regulate [weapons] in any manner that they think proper," [114] which enabled the legislature to restrain liberty in ways that did not promote the public good.

## D. *Nunn v. Georgia* (Georgia, 1846) [115]

The final case discussed here was an appeal of a conviction in Georgia for *openly* carrying a pistol. [116] Georgia's constitution did not mention a right to keep and bear arms, but the court deemed this omission irrelevant. The right was "one of the fundamental principles, upon which rests the great fabric of civil liberty," Judge Lumpkin wrote, and constitutional declarations of that right merely "reiterated a truth announced a century before, in the act of 1689." [117] This reasoning comported with the court's approach to other unenumerated rights. [118]

In terms of scope, Lumpkin described the right to keep and bear arms as a "right of the whole people, old and young, men, women and boys, and not militia only." [119] Moreover, that right covered "arms of every description, and not such  **48** merely as are used by the militia." [120] It was this right, Lumpkin insisted that "originally belong[ed] to our forefathers, trampled under

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12554   Page 198 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

foot by Charles I and his two wicked sons and successors." [121]  Thus, he concluded, "so far as the [Georgia statute] seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms." [122]

Thus far, we have seen a variety of ways that judges navigated the relationship between natural rights, positive rights, and governmental power. *Nunn* adds another approach: *ipse dixit*. To be sure, Lumpkin had carefully surveyed legal precedents and explained why the fundamental law of Georgia recognized a right to keep and bear arms. But he provided no analysis whatsoever about the right's scope. Maybe his methodology was historical. Or perhaps it was based on a more formalist effort to draw a line between "prohibitions" and "regulations." Or maybe something else. The opinion, however, does not say anything about how the court arrived as its halfway conclusion. It refers to a "natural right of self-defense" and a "constitutional right to keep and bear arms," but Lumpkin did not explain how either concept limited legislative power. [123]

From a judicial-process standpoint, *ipse dixit* has clear drawbacks. From a historical standpoint, however, it had obvious appeal for judges struggling to apply underdeterminate rules. *Ipse dixit* did not, of course, offer a way of avoiding the jurisprudential problem. But it at least enabled Lumpkin to keep it concealed, particularly when shrouded in an erudite discussion of prior cases and the nature of American constitutional rights.

In this regard, it is worth remembering *Nunn's* jurisprudential context. Previous studies have argued that the Georgia Supreme Court was trying to chart a middle path that reflected contemporary public opinion about weapons regulation. [124]  And that may be right. But we should not forget that Lumpkin and his colleagues had a broader interest in articulating limits on the police powers in other ways--including protection of economic rights. [125]  *Nunn* did not involve those other rights directly, of course. But broader concerns were at play.

## III

## CONCLUSION

Like grammatical rules, the conventions of social-contract theory shaped discourse about the right to keep and bear arms, even when unstated. But what can Antebellum right-to-bear-arms cases tell us about the topic of this symposium--whether there is a right to carry weapons outside the home? Modern norms of **\*49** judging continue to prize historical analysis and disfavor judicial lawmaking, so it would be nice if these cases supplied a simple answer. But I am skeptical that they can.

To see why, consider the logic of Judge O'Scannlain's opinion in *Peruta v. County of San Diego*. [126]  The question presented was whether the Second Amendment protects a right to carry handguns outside the home. [127]  O'Scannlain explained that courts must approach questions like this by "look [ing] to the original public understanding of the Second Amendment right as evidence of its scope and meaning." [128]  And he recognized, "in a broad sense," that under an originalist approach "every historical gloss on the phrase 'bear arms' furnishes a clue of that phrase's original or customary meaning." [129]  Nonetheless, he explained,

> with *Heller* on the books, the Second Amendment's original meaning is now settled in at least two relevant respects. First, *Heller* clarifies that the keeping and bearing of arms is, *and has always been*, an individual right. Second, the right is, *and has always been*, oriented to the end of self-defense. Any contrary interpretation of the right, whether propounded in 1791 or just last week, is error. [130]

"What that means for our review," O'Scannlain observed, "is that historical interpretations of the right's scope are of varying probative worth" depending on their consistency with *Heller*'s understanding of Second Amendment history. [131]  Arguments by those who denied an individual right to bear arms were "of no help." [132]  And even when historical figures supported an individual right to bear arms, their discussions of the right's scope were "only marginally useful" when they "embrace[d] the premise that the right's purpose is deterring tyranny" rather than enhancing self-defense. [133]  "Since one needn't exactly tote a pistol on his way to the grocery store in order to keep his government in check," O'Scannlain colorfully opined, "it is no surprise (and, thus, of limited significance for purposes of our analysis) when these courts suggest that the right is mostly confined to the home." [134]

Compendium_Cornell
Page 0741

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12555   Page 199 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

Describing historical figures as having erred in their constitutional views might appear contrary to the historical method. But it seems perfectly sensible to me that modern judges--who constantly have to assess the persuasiveness of conflicting factual evidence and legal opinions--should disregard an argument or conclusion that rests on a faulty premise. [135] This logic, however, is precisely the reason for my skepticism about the modern usefulness of Antebellum right-to- **\*50** bear-arms decisions. All of these decisions rested on embedded assumptions about facts and law that we would now reject.

Some of these assumptions relate to the judicial role. In *Bliss*, for instance, the Kentucky Court of Appeals assumed that constitutional protections of rights must be all or nothing. [136] One might prefer that view, but it runs against nearly all modern rights jurisprudence, including *Heller* itself. [137] Yet so does the broad deference to legislative judgments exhibited in cases like *Aymette* and *Buzzard*. [138]

Other assumptions relate to facts. Consider Judge Lacy's dissent in *Buzzard*. If gun control actually leads to tyranny, [139] the opinion has much to recommend it from the standpoint of natural-rights reasoning. But while many people may agree with that proposition, its empirical foundation is hardly clear two hundred years later.

In fact, all of the judicial opinions discussed in this Article contain embedded assumptions that we do not share. Back then, for instance, citizens played a direct role in defending themselves and the state through the *posse comitatus* and the militia, whereas professionalized police forces and the armed services perform these functions today. [140] Moreover, *all* of the foregoing cases came out of the South, which had a unique culture with respect to firearms. Southern hostility toward the concealed carrying of weapons, for instance, was shaped by norms of masculinity and honor that treated concealing weapons as unmanly and dishonorable. [141] And when we consider attitudes toward the rights of the male citizenry, we cannot forget the ever-present fear of slave revolts that shaped the Southern mindset. [142] Natural-rights reasoning made all of these factors highly salient.

 **\*51** My goal here is not to engage with broader debates over the merits of originalism. Rather, my point is that accurately understanding the content of law at some point in the past requires appreciating the imbedded assumptions in earlier decisions and then considering whether those assumptions were themselves part of the law. This is important even when reading modern decisions. As Michael McConnell puts it, "[w]hen translating constitutional text into judicially enforceable doctrine, a responsible court necessarily takes into consideration not only the meaning of the constitutional provision at issue, but also the institutional implications of the doctrine for the allocation of power between the courts and the representative branches." [143] Failure to appreciate this ordinary feature of judging can lead to serious category errors even when interpreting modern precedents. [144] This problem is far more serious, though, when reading decisions from two hundred years ago--written at a time when underlying conceptions of rights were sometimes radically different than our own.

Unpacking the earliest right-to-bear-arms decisions does reveal that the right to possess and carry weapons extended beyond the home. [145] But recognition of a natural right to possess and carry weapons does not answer questions about the scope of governmental power. The enforcement of these rights, many Americans thought, was coterminous with ensuring limits on the police powers. And assessing those limits required a host of embedded judgments about things like the dangers of private arms-bearing, the role of citizens in law enforcement, and the potential perils of disarmament. Yet even as judges increasingly saw themselves as arbiters of constitutional limits, norms of judicial behavior counseled against open reliance on the policy judgments that natural-rights reasoning required. The wide variety of judicial responses in early right-to-bear-arms cases reflect this tension.

At the same time, the scope of the fundamental positive right to keep and bear arms was still being worked out, too. The right to keep and bear arms was widely recognized as a historically grounded rule--not something created through its enumeration in state and federal constitutions. Its force and meaning therefore depended on its historical scope--not on its textual enumeration. But history did not supply clear answers about how the right should apply in new circumstances.

 **\*52** Nor does history tell us what to do now. Founding-Era judges generally dealt with constitutional uncertainty by deferring to democratic decisions. Judicial review existed, to be sure, but it was highly constrained. As judges became more involved in enforcing underdeterminate natural and positive rights, however, they increasingly had to make choices, even though accepted

Compendium_Cornell
Page 0742

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12556   Page 200 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

methods of legal reasoning prevented expressing the contingency of their decisions. The Antebellum right-to-bear-arms cases thus presaged a central dilemma of American constitutional jurisprudence ever since.

## Footnotes

a1      Associate Professor, University of Richmond School of Law. The author thanks the participants in this symposium and Nathan Chapman for helpful comments.

1       Statement of James Madison (Aug. 15, 1789), *in* 11 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 1270, 1270 (Charlene Bangs Bickford et al. eds., 1992).

2       Most of the debate in the First Congress turned on whether to exempt conscientious objectors from militia service. *See* Vincent Phillip Muñoz, *The Original Meaning of the Free Exercise Clause: The Evidence from the First Congress*, 31 HARV. J.L. & PUB. POL'Y 1083, 1102-09 (2008).

3       *See, e.g.*, MARK V. TUSHNET, OUT OF RANGE: WHY THE CONSTITUTION CAN'T END THE BATTLE OVER GUNS, at xv (2007) ("[T]here's no definitive answer to what the Second Amendment means.").

4       *See* SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 139 (2008) (stating that, during the Jacksonian era, the "new culture of individualism had a profound impact on legal thinking about the right to bear arms, the militia, and the idea of self-defense").

5       *See* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 IND. L.J. 1587, 1587-88 (2014).

6       I use the term "natural rights" advisedly, recognizing that Americans sometimes described natural rights as being surrendered upon entering into a political society. Historical disagreements over how to talk about natural rights, though, should not distract from a broadly shared consensus about the implicit limits on governmental authority imposed by social-contract theory. *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85, 95-96 (2017).

7       My methodology is to present a historical framework for understanding rights and then show how that framework is consistent with the earliest right-to-bear-arms decisions. My argument thus presumes, without attempting to prove here, that judges were operating within this larger conceptual framework.

8       I do not dispute that "Antebellum case law on the right to bear arms was deeply divided on the scope of the right." Saul Cornell, *Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1714-15 (2012). But I do think that judges shared some basic premises about rights and that we can better understand these cases, including their conflicts, by recovering those premises.

9       *See generally* Frederick Schauer, *Second-Order Vagueness in the Law*, *in* VAGUENESS AND LAW: PHILOSOPHICAL AND LEGAL PERSPECTIVES 177 (Geert Keil & Ralf Poscher eds., 2016). Vagueness refers to a lack of clarity in how to apply a particular term. For example, the term "tall" is somewhat vague because people may disagree about whether a man who is just under six feet in height is "tall." By contrast, "open texture" refers to "the ineliminable *possibility* of vagueness." *Id.* at 183. For instance, although it may be beyond debate today that a man who is just under seven feet in height is "tall," that would not be true if all other men suddenly grew an extra foot in height. In other words, even terms and applications of terms that seem clear today might become unclear in light of changed circumstances.

Compendium_Cornell
Page 0743

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12557   Page 201 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

10    My statement that the "discourse" was conservative is deliberate. The actual interpretive practice was often quite dynamic. For an exploration of this conflict between conservative rhetoric and dynamic practice in rights jurisprudence, see Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517 (2019).

11    *See generally* LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW (2004).

12    *See* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 2-3 (1999) (discussing the history of concealed-carry laws). This is not to say, however, that regulations of weaponry were novel. *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* 17-18 (2018) (pointing out a host of other types of arms regulations).

13    For a broader discussion of judicial failures to appreciate the undergirding assumptions behind earlier decisions, see Jonathan S. Masur & Lisa Larrimore Ouellette, *Deference Mistakes*, 82 U. CHI. L. REV. 643, 645 (2015).

14    *See* Campbell, *supra* note 6, at 87. The term "social compact" was more common--and perhaps more reflective of the authoritative and enduring nature of the agreement--but I prefer "social contract" to avoid confusion with the separate historical debate over the nature of the federal union, in which one side advocated a "compact theory" that essentially viewed the federal constitution as a treaty.

15    *See id.* at 88.

16    *See id.* (stating that "[s]ocial-contract theory ... hypothesized that individuals, recognizing the benefits of collective action" each agreed to create a society to promote the common good, which "had powerful implications for the proper scope of governmental power" (citations omitted)).

17    *Id.* at 91.

18    *See* Thomas Paine, *Candid and Critical Remarks on Letter 1, Signed Ludlow*, PA. J. & WEEKLY ADVERTISER, June 4, 1777, at 1.

19    "The Founders sometimes referred to positive rights as *adventitious* or *social* rights." Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 252 n.14 (2017). As used in this Article, positive rights contrasted with natural rights, not with negative rights.

20    Campbell, *supra* note 6, at 87 (citations omitted).

21    JAMES OTIS, THE RIGHTS OF THE BRITISH COLONIES ASSERTED AND PROVED 28 (Boston, Edes & Gill 1764).

22    Campbell, *supra* note 6, at 88 (citations omitted).

23    *See, e.g.*, Statement of Roger Sherman (Aug. 13, 1789), *in* 11 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, *supra* note 1, at 1230 ("[T]he people are secure in [their rights], whether we declare them or not.").

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12558   Page 202 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

24   *See* Campbell, *supra* note 19, at 299 n.237 (collecting sources).

25   *See, e.g.*, Michael W. McConnell, *Tradition and Constitutionalism Before the Constitution*, 1998 U. ILL. L. REV. 173, 197 ("Our written Constitution presupposes an established set of fundamental rights not *created* by the Constitution but *protected* or *preserved* by it.").

26   *See* Jud Campbell, *Judicial Review and the Enumeration of Rights*, GEO. J.L. & PUB. POL'Y 569, 572-76 (2017) (explaining that "judges never directly enforced state constitutional provisions that affirmed the inviolability of the natural rights of life, liberty, and property").

27   Indeed, as discussed below, social-contract theory posited that one of the primary purposes of government was to defend against the *private* infringement of natural rights.

28   Of course, while everyone agreed that legislatures and juries had to represent the people, there were ongoing debates about how representative these institutions should be, both in terms of demography and in terms of whether they should exercise independent, deliberative judgment that might depart from the wishes of the people at large.

29   Campbell, *supra* note 19, at 272-73.

30   Notably, this logic did not make *all* licensing regimes unlawful. For a later discussion, see Commonwealth v. Blackington, 41 Mass. 352, 358-59 (1837).

31   Bill of Rights 1689, 1 W. & M., c. 2 (Eng.).

32   CORNELL, *supra* note 4, at 26-27 (quoting George Thatcher, *Scribble Scrabble*, CUMBERLAND GAZETTE (Jan. 26, 1787)).

33   WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW & REGULATION IN NINETEENTH-CENTURY AMERICA 20 (1996).

34   For an example of the flexible and dynamic nature of natural rights, see *Brick Presbyterian Church v. City of New York*, 5 Cow. 538 (N.Y. 1826), which describes how changing habitation patterns over time functionally changed the government's power to regulate burials in certain areas.

35   Bank of Toledo v. City of Toledo, 1 Ohio St. 622, 631 (1853).

36   *See, e.g.*, Austin v. Murray, 33 Mass. (16 Pick.) 121, 125 (1834) (recognizing the invalidity of a burial regulation but noting that a similar restriction would be valid if "made in good faith for the purpose of preserving the health of the inhabitants").

37   *But see* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 161-65 (2007) (using historical firearms regulations to draw general inferences about governmental power to regulate firearms). To be sure, some historians might care whether the Founders, in their own time and place, viewed certain types of policies as conducive or not conducive to the public good.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12559   Page 203 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

38  *But see* Randy E. Barnett, *Who's Afraid of Unenumerated Rights*, 9 U. PA. J. CONST. L. 1, 19 (2006) ("If the conduct is not, in itself, necessarily rights-violating, then it may not be prohibited, but it may still be regulated.").

39  I take less issue with scholars who insist that the Founders understood the common good in terms of better securing the equal rights of all. *See, e.g.*, Eric R. Claeys, *Takings, Regulations, and Natural Property Rights*, 88 CORNELL L. REV. 1549, 1587-88 (2003); Joseph Postell, *Regulation during the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80, 96-97 (2016). My views on their arguments are beyond the scope of this Article. But the crucial point to recognize--as illustrated by the bans mentioned above--is that governmental power existed even when particular rights holders were made worse off and even when those rights holders were not directly impinging upon the rights of others.

40  JOHN LOCKE, AN ESSAY CONCERNING HUMAN UNDERSTANDING bk. II, ch. XXVIII, § 10, at 194 (3d ed. 1695) ("[M]en uniting into politic societies have resigned up to the public the disposing of all their force, so that they cannot employ it against any fellow-citizens, any farther than the law of the country directs ....").

41  *See* Steven J. Heyman, *Natural Rights and the Second Amendment*, 76 CHI.-KENT L. REV. 237, 245 (2000) (stating that people give up "the right to use force ... only" when they can "appeal to the law for protection").

42  Campbell, *supra* note 6, at 90.

43  *See* JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 295 (1996) (describing the representative function of juries); JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION: THE AUTHORITY OF RIGHTS 50-52 (1986) (explaining how people believed that "jurors represent ... the public" (citations omitted)).

44  *See* FEDERAL FARMER NO. 18 (1788), *reprinted in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1070, 1072 (John P. Kaminski et al. eds., 2004) ("A militia, when properly formed, are in fact the people themselves, and render regular troops in a great measure unnecessary."); Gautham Rao, *The Federal Posse Comitatus Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America*, 26 LAW & HIST. REV. 1, 2 (2008) (describing the role of the *posse comitatus* and its connection to citizenship).

45  Nathan Kozuskanich, *Defending Themselves: The Original Understanding of the Right to Bear Arms*, 38 RUTGERS L.J. 1041, 1042 (2007) (quoting Parker v. District of Columbia, 478 F.3d 370, 385 (D.C. Cir. 2007)); *see id.* at 1045 (arguing that the right to bear arms was tied to militia service and thus primarily intended for the defense of society as a whole). *But see* STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 137 (2008) ("Recognition of the people's right to bear arms 'for the defence of themselves' meant that individuals were entitled to carry arms for personal protection.").

46  James Wilson, for instance, treated the use of force "for the defence of one's person and house" as a duty connected to citizenship. *See* James Wilson, *Of Crimes Against the Right of Individuals to Personal Safety*, *in* 2 COLLECTED WORKS OF JAMES WILSON 1142 (Kermit L. Hall & Mark David Hall eds., 2007).

47  Recall that Americans championed civic participation in militias and juries because they did *not* view militias and juries as instrumentalities of the government.

48  Rights like expressive freedom and religious freedom were retained *by individuals*, even though they could generally be collectively controlled through laws passed in promotion of the public good. By contrast, the natural right to defense of one's person and property was largely surrendered to the body politic.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12560   Page 204 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

49    Along similar lines, the right of revolution was held by the people as a body politic, not as individuals. Of course, as noted above, Anglo-American law long recognized the necessity of *personal* self-defense, too. But modern scholarship too often focuses solely on that right without appreciating the broader significance of the role of the people, as a body politic, directly providing for their own defense.

50    *See An Old Whig IV*, INDEPENDENT GAZETTEER, Oct. 27, 1787, *reprinted in* 13 DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, 497, 502 (John P. Kaminski & Gaspare J. Saladino eds., 1981) (describing fundamental positive rights as "particular engagements of protection, on the part of government," in contrast to "natural liberty ... retain[ed]").

51    *See* Campbell, *supra* note 26, at 576-78.

52    *See id.*

53    *Id.* at 577.

54    Consequently, those who advocated for the enumeration of positive rights often relied on English authorities like Blackstone. *See, e.g.*, Letter from Richard Henry Lee, Va. Delegate, Cong. of the Confederation, to Edmund Randolph, Governor of Va. (Oct. 16, 1787), *in* 8 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 61, 62-63 (John P. Kaminski & Gaspare J. Saladino eds., 1988).

55    *See* Statement of James Madison, *supra* note 1, at 1270.

56    *See* Campbell, *supra* note 19, at 290-94.

57    Charles II and James II had attempted to use the Militia Act of 1662 and Game Act of 1671 as tools of disarmament. *See* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 105, 115-16 (1994). The right to keep and bear arms was included in the English Bill of Rights in response to this experience. *See id.* at 117-21.

58    *See* Jack N. Rakove, *The Second Amendment: The Highest Stage of Originalism*, 76 CHI.-KENT L. REV. 103, 112 (2000) ("No coherent intention or understanding of the existence and scope of a private, individual right to keep and bear arms could accordingly be derived, because that question did not present itself for public debate in the form in which we now know it.").

59    *See* LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 145-89 (2004).

60    JOSEPH PRIESTLY, AN ESSAY ON THE FIRST PRINCIPLES OF GOVERNMENT, AND ON THE NATURE OF POLITICAL, CIVIL, AND RELIGIOUS LIBERTY 57 (2d ed. 1771).

61    Letter from James Madison, Former U.S. President, to Spencer Roane, Judge, Va. Court of Appeals (Sept. 2, 1819), *in* 1 THE PAPERS OF JAMES MADISON: RETIREMENT SERIES 500, 501 (David B. Mattern et al. eds., 2009).

62    For a broader discussion of how this tension shapes doctrine, see LAWRENCE LESSIG, FIDELITY AND CONSTRAINT: HOW THE SUPREME COURT HAS READ THE AMERICAN CONSTITUTION (2019).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12561   Page 205 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

63    Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822).

64    *Id.* at 90.

65    *Id.* (internal quotations omitted).

66    *Id.* at 91-92.

67    *Id.* at 92.

68    *Id.* at 90.

69    *Id.* at 94.

70    *Id.*

71    *Id.*

72    *See generally* Theodore W. Ruger, *A Question Which Convulses a Nation: The Early Republic's Greatest Debate about the Judicial Review Power*, 117 HARV. L. REV. 826, 847-55 (2004).

73    *See Bliss*, 12 Ky. at 90 (concluding that statutes that "diminish or impair [the right] as it existed when the constitution was formed, are void").

74    Notably, the pending debt-relief controversies raised a similar question of whether rights could be limited through regulation. *See* Blair v. Williams, 14 Ky. (4 Litt.) 34, 35 (1823); Lapsley v. Brashears, 14 Ky. (4 Litt.) 47, 47 (1823).

75    21 Tenn. 154 (1840).

76    *See id.* at 155 (stating that the defendant "was convicted ... for wearing a bowie-knife concealed under his clothes, under the act of 1837-1838").

77    *Id.* at 156 (internal quotations omitted).

78    *Id.*

79    *Id.*

80    *Id.* at 157.

81    *Id.* at 157-58.

Compendium_Cornell
Page 0748

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12562   Page 206 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

82    *Id.* at 158.

83    *Id.*

84    *Id.*

85    *Id.*

86    *Id.* at 159.

87    *See id.* at 157.

88    *See* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967 (2021) (describing the mischief rule and explaining how it is not the same as modern purposivist interpretation); Saul Cornell, *The Original Meaning of Original Understanding: A Neo-Blackstonian Critique*, 67 MD. L. REV. 150, 152-53 (2007) (stating that Blackstone and some of the Founders interpreted statutes based on "the evil a provision was intended to remedy"). For a similar approach in another right-to-bear-arms case decided the same year, see *State v. Reid*, 1 Ala. 612, 615 (1840) ("The evil which was intended to be remedied ... was a denial of the right of Protestants to have arms for their defence .... Such being the mischief, the remedy must be construed only to extend so far as to effect its removal.").

89    I use the term "positive" right for consistency. The *Aymette* court's reference to "political" rights connoted a subset of positive rights relating to the exercise of political power, as with voting and jury service, whereas other positive rights, such as the rule against ex post facto laws, operated merely as procedural guarantees or as immunities against a particular type of governmental act.

90    *See Aymette*, 21 Tenn. at 160 (stating that the *Bliss* opinion "is far too limited for a just construction of the meaning of the clause of the constitution they had under consideration").

91    4 Ark. 18 (1842).

92    The various opinions refer to the Second Amendment and to the Arkansas Bill of Rights, which stated that "the free white men of this State shall have a right to keep and bear arms in their common defense." *Id.* at 27 (internal quotations omitted). Both Chief Justice Ringo and Justice Lacy agreed that the two rights were comparable in scope, notwithstanding their textual differences. *See id.* at 27 (opinion of Ringo, C.J.); *id.* at 34 (Lacy, J., dissenting).

93    *See id.* at 27 (opinion of Ringo, C.J.) (concluding that the ban was not "invalid").

94    *Id.* at 19-20.

95    *Id.* at 20.

96    *Id.* at 19.

97    *See id.* at 21 (claiming that "the term 'arms' ... probably includes every description of weapon or thing which may be used offensively or defensively").

Compendium_Cornell
Page 0749

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12563   Page 207 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

98       *See id.* (arguing that "if the right ... be subject to no legal control or regulation whatever, it might, and in time to come doubtless will, be so exercised as to produce in the community disorder and anarchy").

99       *See id.* at 28 (concluding that the ban was not "repugnant either to the Constitution of the United States or the Constitution of this State").

100      *See id.* at 22 (pointing out numerous "instances, in which the right to keep and bear arms has been ... subjected to legal regulations and restrictions, without any question as to the power so exercised").

101      *Id.* at 23-24.

102      *Id.* at 24.

103      *Id.* at 25.

104      *Id.* at 35 (Lacy, J., dissenting).

105      *Id.* at 36.

106      *Id.*

107      *Id.* at 35.

108      *Id.* at 37.

109      *Id.* at 38.

110      *Accord* Heyman, *supra* note 41, at 245-46. Importantly, the social-contractarian principles at work here put no importance on the idea of state action. The body politic had an affirmative responsibility to protect against private harm just as much as it had a negative responsibility not to unnecessarily restrict rights.

111      *See* CORNELL, *supra* note 4, at 137-208.

112      *Buzzard,* 4 Ark. at 41 (Lacy, J., dissenting).

113      *Id.* at 42.

114      *Id.* at 36.

115      1 Ga. 243 (1846).

116      *See id.* at 243.

Compendium_Cornell
Page 0750

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12564   Page 208 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

117     *Id.* at 249.

118     *See, e.g.,* Young v. McKenzie, 3 Ga. 31 (1847); *see generally* AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998); Jason Mazzone, *The Bill of Rights in the Early State Courts,* 92 MINN. L. REV. 1 (2007).

119     *Nunn,* 1 Ga. at 251.

120     *Id.*

121     *Id.*

122     *Id.*

123     *Id.*

124     *See, e.g.,* Leider, *supra* note 5, at 1610.

125     For discussion of various Georgia Supreme Court decisions that relied on similar reasoning, see Mazzone, *supra* note 118, at 37-40, 43, 48-50.

126     742 F.3d. 1144 (9th Cir. 2014), *rev'd en banc,* 824 F.3d. 919 (9th Cir. 2016).

127     *Id.* at 1147.

128     *Id.* at 1153 (citations omitted).

129     *Id.* at 1155.

130     *Id.* (citations omitted).

131     *Id.*

132     *Id.* at 1156.

133     *Id.*

134     *Id.*

135     *See generally* William Baude & Stephen E. Sachs, *Originalism and the Law of the Past,* 37 LAW & HIST. REV. 809 (2019) (discussing the relationship between historical and originalist methodology).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12565   Page 209 of 733

NATURAL RIGHTS, POSITIVE RIGHTS, AND THE RIGHT..., 83 Law & Contemp....

136   *See* Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 91-92 (1822) (stating that "whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution").

137   *See* District of Columbia v. Heller, 554 U.S. 570, 626-27 (2008) (recognizing traditional categories of permissible regulation that have no apparent connection to Founding-Era history).

138   The modern attitude toward judicial enforcement of constitutional rights is perhaps best reflected in Justice Jackson's statement that judges have a duty "of translating the majestic generalities of the Bill of Rights, conceived as part of the pattern of liberal government in the eighteenth century, into concrete restraints on officials dealing with the problems of the twentieth century." W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 639 (1943).

139   *See* State v. Buzzard, 4 Ark. 18, 36 (Ark. 1842) (Lacy, J., dissenting) (arguing that depriving men of the right to keep and bear arms "amounts to tyranny and oppression").

140   *But see* David B. Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 764 (2014) ("[A]lmost all states continue the longstanding legal tradition that armed citizens may be summoned to aid of law enforcement.").

141   *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 126 (2015) (stating that "[a]s a result of the distinct cultural phenomena of ... honor, Southern men carried weapons" (citations omitted)); *see also* Robert J. Cottrol & Raymond T. Diamond, *Never Intended to Be Applied to the White Population: Firearms Regulation and Racial Disparity*, 70 CHI.-KENT L. REV. 1307, 1318-23 (1995) (stating that "the use of arms to resolve personal disputes ... helped lend a different flavor to the Southern experience with arms" and explaining how that experience manifested itself in the courts).

142   *See* Ruben & Cornell, *supra* note 141, at 126 (stating that "Southern men carried weapons ... as a protection against the slaves" (citations omitted)).

143   Michael W. McConnell, *Institutions and Interpretation: A Critique of* City of Boerne v. Flores, 111 HARV. L. REV. 153, 155 (1997); *see also* Mitchell N. Berman, *Constitutional Decision Rules*, 90 VA. L. REV. 1 (2004); Richard H. Fallon, Jr., *Foreword: Implementing the Constitution*, 111 HARV. L. REV. 54 (1997); David A. Strauss, *The Ubiquity of Prophylactic Rules*, 55 U. CHI. L. REV. 190, 196-202 (1988).

144   *See generally* Masur & Ouellette, *supra* note 13 (discussing judicial failures to appreciate the interpretive assumptions in earlier decisions).

145   This Article focuses on historical understandings of rights--not on the linguistic meaning of the Second Amendment. Modern originalists generally search for the semantic meaning of written constitutional texts. In my view, this approach significantly departs from the way that Americans conceptualized most of their rights two centuries ago. The text of a constitutionally enumerated right might be probative of its meaning, but it was generally not *constitutive* of the right. *Cf.* Stephen E. Sachs, *Originalism without Text*, 127 YALE L.J. 156, 160 (2017) (recognizing the potential difference between written law, on the one hand, and written texts that refer to unwritten law, on the other).

83 LCPR 31

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 0752

**97 Tex. L. Rev. 517**

Texas Law Review
February, 2019

Article

Jud Campbell [a1]

Copyright © 2018 by Texas Law Review Association; Jud Campbell

# THE INVENTION OF FIRST AMENDMENT FEDERALISM

*When insisting that the Sedition Act of 1798 violated the First Amendment, Jeffersonian Republicans cast their argument in historical terms, claiming that the Speech and Press Clauses eliminated any federal power to restrict expression. Scholars, in turn, have generally accepted that Republicans had a consistent understanding of the First Amendment throughout the 1790s. But Founding Era constitutionalism was dynamic in practice, even while often conservative in rhetoric, and scholars have missed the striking novelty of the principal argument against the Sedition Act. Republicans had taken a rights provision and transformed it into a federalism rule.*

*Mostly ignored in the literature, and never analyzed as a central feature of the opposition to the Sedition Act, the problem of partisan jury selection drove the shift in Republican thought. As originally understood, speech and press freedoms put juries primarily in charge of administering governmental limitations of expression. Following the development of political parties, however, Republicans perceived that the guarantee of a jury trial was nearly meaningless when federal jurors were hand selected by partisan federal marshals. In response, Republicans promoted a new reading of the First Amendment. Deeply suspicious of abuse by federal judges and juries, Republicans insisted that the First Amendment deprived the federal government of any authority to regulate speech or the press, even though analogous speech and press clauses at the state level left considerable room for states to regulate harmful expression.*

*This episode reveals a latent tension in eighteenth-century constitutionalism. Some threads of Founding Era thought embraced the notion of a document with fixed meaning, but other features encouraged constitutional evolution as conditions changed. Rather than seeking a principled resolution of this tension, however, Republicans developed entirely new arguments and then cast them in historical terms. The invention of First Amendment federalism also *518 raises the possibility of a different path for modern speech doctrine, guided less by a particular theory of why speech is special and more by practical concerns about political entrenchment and politically biased enforcement.*

| | |
|---|---|
| INTRODUCTION | 518 |
| I. THE FIRST AMENDMENT | 525 |
| A. Eighteenth-Century Rights | 526 |
| B. Speech and Press Freedoms | 529 |
| C. The First Amendment | 534 |
| II. THE CABELL AFFAIR | 540 |
| A. The Presentment | 541 |
| B. The Jeffersonian Response | 548 |
| III. THE SEDITION ACT | 551 |
| A. Congressional Debates | 552 |
| B. Republican Opposition | 557 |
| IV. THE INVENTION OF FIRST AMENDMENT FEDERALISM | 561 |
| A. Recasting History | 561 |
| B. Juries, Judges, and Expressive Freedom | 567 |

**Introduction**

Compendium_Cornell
Page 0753

THE INVENTION OF FIRST AMENDMENT FEDERALISM, 97 Tex. L. Rev. 517

In May 1797, with partisan tempers flaring, a Federalist-dominated federal grand jury in Richmond presented "as a real evil the circular Letters of several members of the late Congress, and particularly Letters with the Signature of [Virginia Republican] Samuel J. Cabell." [1] Coming a year before the infamous Sedition Act of 1798, the presentment unleashed a torrent of criticism and catalyzed Republican thought on speech and press freedoms. Crucially, it taught Republicans that they could no longer rely on juries as the great "palladium of liberty." [2] As the Virginia House of Delegates explained that winter, juries had become a tool for the "subjection of the natural right of speaking and writing freely, to the censure and controul of Executive power." [3] Republicans, in response, developed a new conception of the **\*519** Speech and Press Clauses, arguing that the First Amendment removed *all* federal authority over expression, even though state speech and press guarantees left ample room for state-level regulations of harmful speech.

The basic problem, as Republican congressional leader Albert Gallatin explained during the Sedition Act debates, was jury selection. The Judiciary Act, it turns out, put federal marshals in charge of hand selecting federal jurors in many mid-Atlantic and Southern states. Back in 1789, executive control over juror selection *enhanced* rights, helping to ensure that creditors received fairer treatment in federal courts than in state courts dominated by parochial juries. But following the emergence of political parties in the 1790s, the selection of jurors by a federal marshal--a "creature of the Executive," as Gallatin put it--raised grave problems in politically charged cases. [4] "[W]hen the supposed crimes to be punished were a libel against the Administration," Gallatin asked rhetorically, "what security of a fair trial remained to a citizen, when the jury was liable to be packed by the Administration, when the same men were to be judges and parties?" [5]

Mostly ignored by scholars, and never analyzed as a central feature of Republican thought, [6] the problem of partisan jury selection lay at the heart of opposition to the Sedition Act and powerfully shaped Republican strategy and rhetoric about speech and press freedoms. Republicans widely acknowledged that libelous speech ought to be proscribed, and many agreed that seditious speech should be criminally punished. But critics of the government, Congressman Edward Livingston explained, would much **\*520** likelier "receive an impartial trial" in a state tribunal, without "a jury selected by an officer holding his office at the will of the President." [7] With Federalists running all three branches of the national government, Republicans skeptical about the administration of speech-suppressing laws channeled their thinking toward an innovative reading of the First Amendment.

The Republican account of the First Amendment departed substantially from prevailing ideas about speech and press freedoms. [8] In the late eighteenth century, American elites generally understood the freedom of speech as a natural right, qualified in its scope and without concrete legal effect. This principle essentially meant that the government could regulate expression only pursuant to law and only in promotion of the public good, as determined in good faith by the people and their representatives. For many, the freedom of speech also imposed a more categorical limit on governmental power, barring punishment of well-intentioned statements of one's thoughts but leaving the government free to punish efforts to deceive others. The freedom of the press was multifaceted, too, providing both a broad requirement that the government restrict publishing only in the public interest and a narrower categorical ban on licensing rules that imposed "prior restraints" on printers. The latter of these effectively ensured that juries stood between the government and any restrictions on the press.

By the late 1790s, after national political parties had developed, these conventional speech and press freedoms offered little solace to Republicans. The guarantee of a jury trial was nearly meaningless if jurors were hand selected by federal marshals, whose search for jurors of sound judgment would naturally lead them to people with similar political views. And once the jury was stacked, substantive protections would be worthless, too. Partisan juries, they perceived, would tend to view invectives against the Adams Administration as breaching the Sedition Act's prohibition of "false, **\*521** scandalous and malicious" writings--a narrowly drawn legal rule that comported with prevailing law. Strongly suspicious of abuse by federal judges and juries, Republicans insisted that the First Amendment categorically deprived the federal government of *any* authority to regulate speech or the press.

Scholars tend to treat Republican views about the federal Speech and Press Clauses as mostly static, making the fight over the Sedition Act an opportunity for the Founding generation to hash out a constitutional disagreement that had been lurking throughout the 1790s. [9] On this view, the election of 1800 was pivotal in fixing the role of speech and press freedoms in American democracy. "In their first opportunity to weigh in on the matter," Akhil Amar writes, "American voters sided with [James] Madison, vaulting his mentor and fellow free-speech champion Thomas Jefferson into the executive mansion and

sweeping the Jefferson-Madison party into congressional power." [10]  Importantly, this conventional account lends an air of originalist support for our more libertarian approach to modern First Amendment law.

There are some grains of truth to this story of historical continuity. Republicans and Federalists frequently clashed in the 1790s over the role of popular participation in politics, [11] and this conflict occasionally led to **\*522** disputes over speech and press freedoms. [12] Not every rejoinder to the Sedition Act was novel. But the *dominant* Republican argument was a substantial departure from earlier views. When it came to interpreting the First Amendment, the *only* consensus position among Republicans in the late 1790s was that federal protections, *unlike state-level guarantees,* categorically barred any regulation of expression. [13] At the heart of their campaign against the Sedition Act, Republicans were recasting the First Amendment as a rule about the allocation of power between the federal and state governments, not as a guarantee of rights. [14]

The Republican invention of First Amendment federalism highlights latent tensions in American constitutionalism at the Founding. On the one hand, dynamism and creativity thrived. Partisan political objectives were certainly one catalyst for constitutional change, but there were other contributors too. From an experiential standpoint, Americans were born and bred in the evolutionary culture of English customary constitutionalism, where time and again new constitutional principles had emerged from prominent public controversies. This experience made it second nature for the Founders to argue for new constitutional rules. [15] And from a more philosophical bent, elites still embraced flexible interpretive principles derived from social-contract theory, like the idea that constitutions should be construed to promote the public good.

At the same time, however, Americans were beginning to think about and describe their constitution in conservative--even static--terms. To be sure, this phenomenon was not entirely new. English constitutional rhetoric **\*523** had long been backward-looking, replete with claims about the fundamental law that had existed since "[t]ime immemorial." [16] But as historian Jonathan Gienapp has revealed, the idea of constitutional fixity took a new form in the early 1790s as Americans came to associate the writtenness of the constitutional text with a permanence in constitutional meaning. [17] In other words, the Founders increasingly viewed their own constitutionalism as a new type of enterprise, rooted in the interpretation of a historical document with fixed meaning.

With the Republican invention of First Amendment federalism, these strands of Founding Era constitutionalism powerfully collided. Republicans explicitly made arguments about the emergence of a new and unanticipated constitutional problem: the partisan selection of federal jurors. That point bears repeating. Republicans openly discussed the existence of new problems that, in their view, required a particular construction of the First Amendment. Yet when making these observations, they were constrained by the incipient notion of a fixed constitution, limiting their ability to articulate a case for interpretive change. The result was a sharp disjunction in their practice and rhetoric. Republicans adopted a novel constitutional position, based on a forceful argument about how long-held principles ought to apply to new circumstances, all the while casting their argument in originalist terms.

Demonstrating the novelty of the Republican position against the Sedition Act begins in Part I with a survey of debates about expressive freedom a decade earlier. Discussions of speech and press freedoms at that point featured an assortment of ideas, but no one articulated a theory of the First Amendment's Speech and Press Clauses premised on federalism. To be sure, some Founders had more robust theories of expressive freedom than others, and some had a limited view of congressional power to restrict expression under Article I. But nobody thought that the First Amendment had a categorical effect while state constitutional guarantees did not. The whole point of enumerating federal speech and press rights, in fact, was to ensure *parity* in the protection of those rights at the federal and state levels. At the same time, this Part illuminates the more flexible thinking about rights in the 1780s that helped shape Republican thinking about the Sedition Act a decade later.

Part II turns to the Cabell affair, explaining how Republicans came to realize that the advent of political parties, combined with the hand selection of jurors, opened the door to substantial partisan abuses. Partisanship, in other words, undermined the effectiveness of conventional speech and press **\*524** freedoms. [18] And with these concerns in mind, Jefferson and his political allies began to shift toward a new view of the First Amendment--all of this occurring months before the Sedition Act was even conceived.

The Sedition Act is addressed in Part III, with a focus on the Republican opposition. As is true with any innovative thinking, Republican ideas about the First Amendment reflected continuity with certain strands of their earlier views. When opposing

state authority to levy taxes to support religious instruction in Virginia in the mid-1780s, for instance, Jefferson and Madison had described the inalienable natural right to conscience in a way that categorically disclaimed state power to legislate on religious matters. (Notably, their argument lacked any federalism dimension.) And a few years later, during the ratification debates, some Founders had denied the existence of any affirmative federal power to regulate printers under Article I. Moreover, when emphasizing that hand selecting jurors effectively allowed the administration to decide its own cases, Republicans tapped into a longstanding natural-law principle that "a man is not to be a judge in his own cause." [19] These constitutional traditions provided crucial ingredients for later developments in Republican thought.

What was strikingly novel about the opposition to the Sedition Act, however, was their conclusion: The First Amendment imposed a *categorical* ban on federal power to regulate expression *even though analogous state constitutional guarantees did not*. Faced with dire concerns about the administration of a federal sedition law, Republicans sought to transform the Speech and Press Clauses into a rule about the allocation of federal and state power. Rather than argue that new circumstances required a change in constitutional interpretation, however, Republicans cast their argument in terms of original meaning. The First Amendment, Madison asserted in his famous Virginia Report of 1800, "was meant as a positive denial to Congress, of any power whatever on the subject." [20]

Part IV evaluates the Republican effort to revise history. It hardly needs mention that the Sedition Act deserves its place as a national embarrassment. But that is no reason to afford a mythical status to its opposition. Republican constitutional arguments against the Sedition Act--though still defended by **\*525** many scholars and often used in modern constitutional argument [21] -- were deeply problematic. Contorted understandings of history and federalism, not a liberal conception of expressive freedom, endured as the oft-invoked "principles of '98."

But rather than abandoning the Republican opposition to the Sedition Act as a centerpiece of our constitutional tradition, perhaps we might elevate it in a different way. The enduring insight of Republicans was not their wholly invented idea that the Speech and Press Clauses were designed as a federalism rule. Nor was it a theoretical account of why speech deserves special constitutional protection--a perspective that dominates modern judicial decisions and academic commentary on expressive freedom. [22] As argued elsewhere, "[H]istory undermines the notion that the First Amendment itself embraces a particular rationale for protecting expression." [23] The Republican invention of First Amendment federalism, which also lacked a theoretical account, bolsters that conclusion. [24] Rather, the enduring insight of Republicans was that speech-restrictive rules are dangerous when designed and implemented to entrench political power.

That idea could help reorient First Amendment doctrine today. As originally designed, the First Amendment recognized only a few determinate rules and otherwise left the government free to regulate speech and the press to promote the public good. The Republicans opposed to the Sedition Act tapped into this principle, worried that Federalists were not pursuing the interests of the whole political society but instead were simply trying to entrench their own power. As we will see, several foundational First Amendment decisions in the twentieth century stem from a similar concern about partiality in governmental decisions. [25] Since then, however, doctrine has gravitated toward an overriding (and ahistorical) emphasis on content and viewpoint neutrality. Perhaps it is time to bring the pursuit of the public good back to the fore.

## I. The First Amendment

To understand how Republicans reinterpreted the First Amendment in the late 1790s, we first need to consider where matters stood a decade earlier. **\*526** Two points deserve emphasis up front. First, although the term "rights" had a variety of meanings, rights generally were not the inverse of powers, disabling the government from acting within an entire field. Second, the Speech and Press Clauses were designed to provide protections at the federal level that were *equivalent* to those created at the state level by state bills of rights. The constitutional arguments levied a decade later by Republicans against the Sedition Act were thus doubly innovative.

But rights discourse in the late 1780s provides more than just a contrast to arguments against the Sedition Act a decade later. The prevailing conception of rights at the Founding also helps reveal how and why Republicans were able to invent an entirely new understanding of the First Amendment in so little time. Again, two points deserve emphasis. First, speech and press freedoms empowered *juries* to decide cases involving governmental restrictions of expression. This feature put extraordinary pressure on Republicans to come up with a new understanding of the First Amendment once the protection of a jury in sedition cases

was, in their view, undermined by the partisan selection of jurors. Second, and more fundamentally, the philosophical ideas underpinning American thinking about rights had inculcated flexible and dynamic interpretive ideas among the Founders. And these older habits of mind lingered late into the 1790s, even as Americans increasingly framed their constitutional arguments in fixed terms.

### A. Eighteenth-Century Rights

Founding Era constitutionalism was grounded in social-contract theory. [26] This theory was premised on a thought experiment designed to reveal the purposes and limits of governmental authority. It did so by asking, hypothetically, what would lead individuals to form a political community in the first place--an agreement known as a "social compact" or "social contract." After creating a body politic, the theory went, the people would then agree to form a government through an instrument known as a "constitution." [27]

American understandings of rights in the late 1780s flowed from this theory. All individuals, social-contract theory posited, surrendered some of their "natural rights"--or their rights to life, liberty, and property in an imagined "state of nature" [28] --for the greater security of those rights as a  **\*527**  whole. The point of retaining natural rights, however, was *not* to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only *with just cause* and only with *consent of the body politic*. [29] Natural rights retained by the people were subject to regulation by the people.

It was impractical, of course, for the entire body of the people to exercise power directly, so Americans looked to representative institutions for that purpose. Not surprisingly, the most important representative institutions were legislatures, and retained natural liberty could therefore be restricted pursuant to *law*. William Blackstone summed it up nicely in his *Commentaries,* remarking that the natural right "of acting as one thinks fit" is exchanged for civil liberty, which "is no other than natural liberty so far restrained by human laws ... as is necessary and expedient for the general advantage of the public." [30]

But legislatures were not the only representative bodies. Juries, too, served in a representative capacity. In modern constitutional law, we tend to think of juries as factfinding bodies and jury rights as procedural safeguards. [31] Juries in the eighteenth century, however, were not simply, or even primarily, empaneled to protect criminal defendants and civil litigants. Rather, jurors acted as representatives of the entire political society. [32] As John Adams privately noted, "the People are by the Constitution appointed to take [part], in the passing *and Execution* of Laws." [33] In an overstated but revealing comment, Thomas Jefferson went even further: "Were I called upon to decide whether the people had best be omitted in the Legislative or  **\*528**  Judiciary department, I would say it is better to leave them out of the Legislative." [34]

Because the natural rights of life, liberty, and property could be restricted only with the consent of the body politic, juries were integral to the American legal system. [35] "Juries are taken by Lot or by Suffrage from the Mass of the People," Adams declared, "and no Man can be condemned of Life, or Limb, or Property or Reputation, without the Concurrence of the Voice of the People." [36] This view was conventional. "Juries are constantly and frequently drawn from the body of the people, and freemen of the country," Federal Farmer later explained, "and by holding the jury's right to return a general verdict in all cases sacred, we secure to the people at large, their just and rightful controul in the judicial department." [37]

According to social-contract theory, the creation of a body politic set the stage for a "constitution" in which the people created a government by majority consent. [38] In the English tradition, the constitution was customary, stemming from longstanding traditions and an assortment of seminal documents. [39] And these customary protections included a variety of "constitutional" or "fundamental" positive rights that were defined in terms of governmental authority. Notably, some of these rules, like the right to a jury trial and the rule against ex post facto laws, limited how the government could restrict natural liberty.

Social-contract theory thus shaped American thinking about rights, and the following subpart will discuss speech and press freedoms in particular.  **\*529**  But another point is worth emphasis. Social-contract theory trained Americans to think and speak about foundational principles in potentially conflicting terms.

On the one hand, social-contract theory prized arguments about the happiness of the political society as a whole--a highly underdeterminate standard that created substantial room for debate. As Joseph Priestley noted, there was "a real difficulty in determining what general rules, respecting the extent of the power of government, or of governors, are most conducive to the public good." [40] The social contract, we must remember, was not a real agreement; its content was determined by abstract reasoning. This gave the social contract a dynamic, evolutionary character.

At the same time, however, the Founders often talked about the social contract as if it were a historical agreement. [41] They often debated its content, for instance, by invoking what the common law had been since "time immemorial," even without any historical basis for those claims. [42] Moreover, many Founders thought that one of the most reliable ways of ascertaining the dictates of reason was by looking to the lessons of experience, and particularly the customary traditions of the common law. [43] Founding Era constitutionalism thus trained Americans to think and speak about foundational principles in potentially conflicting ways. Republicans would take that training to heart a decade later.

### B. Speech and Press Freedoms

The Founders often described the freedom of speaking, writing, and publishing as a retained natural right. [44] Ordinarily, as we have seen, such "rights" were subject to legislative restrictions that promoted the public good. Unsurprisingly, then, English and American law recognized plenty of limitations on speech through rules against defamation, blasphemy, perjury, profane swearing, and so forth. [45] A series of restrictive English efforts to **\*530** insulate the government from public criticism, however, led libertarian theorists in the seventeenth and eighteenth centuries to view the freedom of speaking, writing, and publishing as vital to representative government.

Particularly important in this effort were the widely read essays that John Trenchard and Thomas Gordon published under the pseudonym *Cato* in the early 1720s. In his essay, "Of Freedom of Speech," Gordon highlighted the connection between public discussion and republican government:

> That men ought to speak well of their governors, is true, while their governors deserve to be well spoken of; but to do publick mischief, without hearing of it, is only the prerogative and felicity of tyranny: A free people will be shewing that they are so, by their freedom of speech.

> The administration of government is nothing else, but the attendance of the trustees of the people upon the interest and affairs of the people. And as it is the part and business of the people, for whose sake alone all publick matters are, or ought to be, transacted, to see whether they be well or ill transacted; so it is the interest, and ought to be the ambition, of all honest magistrates, to have their deeds openly examined, and publickly scanned .... [46]

Gordon essentially argued that overregulation of speech was *against* the public interest because it deprived the public of useful, perhaps even essential, information about their government.

This understanding of the freedom of speech, viewed through the lens of popular sovereignty, dominated American discourse about the right. "The citizen under a free government," James Wilson explained in his law lectures, "has a right to think, to speak, to write, to print, and to publish freely, but with decency and truth, concerning publick men, publick bodies, and publick measures." [47] Others widely agreed that open public discussion was essential to republican government. [48]

To be sure, not all criticism of government was okay. Carefully delineated governmental power to punish sedition, for instance, was usually accepted even among otherwise "liberal" writers like *Cato*. [49] For most **\*531** people, the right to make well-intentioned statements hardly included a corollary right to deceive others. Nonetheless, Americans recognized the importance of remaining vigilant against governmental efforts to suppress dissent under the pretext of fighting sedition. In an essay written after he successfully defended John Peter Zenger against charges of sedition, James Alexander explained that

abuses of the Freedom of Speech are the excrescences of Liberty. They ought to be suppressed; but to whom dare we commit the care of doing it? An evil Magistrate entrusted with a power to *punish Words* is armed with a Weapon the most *destructive* and *terrible*. Under pretense of pruning off the exuberant branches, he frequently destroys the tree. [50]

The English and American response was a constitutional right commonly known as the liberty of the press.

The liberty of the press put juries in control of governmental efforts to regulate expression. First, the principle barred the government from instituting a licensing regime--the famous rule against "previous restraints upon publications" [51] --meaning that jurors rather than governmental censors would have the final word on efforts to control publishing. "The liberty of the press, as established in England," Jean Louis de Lolme explained, ensured that libel prosecutions would "proceed by the Trial by Jury." [52] Controversially, William Blackstone argued that the right afforded no "freedom from censure for criminal matter when published." [53] But American views were more complex. Juries had the power to give general verdicts, and many Americans thought that the truth of putatively seditious statements was a proper ground for acquittal. [54]

 **\*532** Juries thus linked the common law right of press freedom to the retained natural right of speaking, publishing, and writing--together guaranteeing popular control over any efforts to abridge expression. Only one early state constitution explicitly recognized both principles. The Pennsylvania Constitution of 1776 declared that "the people have a right to freedom of speech, and of writing and publishing their sentiments; therefore the freedom of the press ought not to be restrained." [55] Meanwhile, constitutions in other states mentioned only the liberty of the press. [56] But by maintaining a republican form of government and ensuring the right to a jury trial, other states implicitly protected unmentioned natural rights, including the freedom of speaking, writing, and publishing.

Founding Era discussions of the liberty of the press thus reflect a foreign way of thinking. From our modern perspective, speech and press freedoms operate primarily as *substantive* limits on legislative power. The government cannot regulate speech based on the viewpoint being expressed; restrictions of speech based on its communicative content are presumptively unconstitutional; and so forth. [57] Moreover, because expressive freedom operates as a set of substantive legal rules, judges are specially charged with ensuring that the government stays within its proper legal limits. [58]

From this perspective, scholars have voiced exasperation with the idea that the freedom of the press was confined to a rule against prior restraints. Limiting regulations of expression to *lawful* restraints, Wendell Bird writes, would have made press freedom "nothing but a tautology." [59] Indeed, defining expressive freedom in a way that lacked substantive content would be directly contrary to the modern definition of constitutional rights.

In the eighteenth century, however, it was anything but a tautology to  **\*533** affirm that the government could restrict natural liberty only pursuant to laws passed by a representative legislature and enforced by a jury. Founding Era constitutional thought, after all, was obsessed with the dangers of unbounded governmental discretion, particularly when public officials had their own interests at stake. Consequently, acting pursuant to known laws passed and executed with popular consent was, as Alexander Hamilton put it, "the very essence of civil liberty" and the antithesis of arbitrary rule. [60]

The need for representative control over the creation and execution of law was especially profound in the context of sedition because of a famed axiom in eighteenth-century constitutional thought: "No man is allowed to be a judge in his own cause." [61] When someone criticized the government, the Founders widely thought, it would be downright dangerous to give agents of the government, including prosecutors and judges, the power to punish governmental critics. In this context, giving power to juries was crucial.

Commentators during the ratification debates explicitly linked jury rights to concerns about governmental suppression of dissent. The "interposition of a jury," one writer explained, was an essential shield against self-interested prosecutions:

The Chief Magistrate, or the Legislature itself, of a republic, is as liable to personal prejudice, and to passion, as any King in Europe; and might prosecute a bold writer, or any other person, who had become obnoxious to their resentment, with as much violence and rigour. What so admirable a barrier to defend the innocent, and protect the weak from the attacks of power, as the interposition of a jury? In this respect, the trial by jury may well be called the palladium of liberty. [62]

**\*534**  Jury protections were essential, another Anti-Federalist exclaimed, because the government "will easily find pretexts" to restrain "what it may please them to call--the licentiousness of the press." [63]  As Virginia lawyer Alexander White summarized, "should I be unjustly accused of [sedition], the trial by a jury of my countrymen is my security." [64]

These writers could hardly anticipate what lay ahead. The emergence of political parties, combined with the power of the federal administration to hand select jurors in key states, would soon undermine the sanctified status of juries as neutral arbiters in sedition cases.

### C. The First Amendment

Late in the Philadelphia Convention of 1787, a few delegates pushed for a guarantee of the liberty of the press, but these proposals were narrowly defeated. [65]  The Constitution thus emerged without any express protections for the freedom of speaking, writing, and publishing, or for the liberty of the press. As it turned out, the omission of a bill of rights became one of the most contentious issues during the ratification contest.

A complete review of the ratification debates is unnecessary, but a few points are worth highlighting. First, although the Anti-Federalists made all sorts of creative arguments against ratification, nobody seems to have mentioned that the Constitution would threaten the retained natural right to the freedom of speaking, writing, and publishing. [66]  This silence did not stop  **\*535**  Alexander Hamilton and his friends from lambasting Anti-Federalists for misunderstanding the protection for rights in republican governments. Where the people retain sovereignty, Hamilton explained in *Federalist No. 84,* "in strictness, the people surrender nothing; and as they retain everything they have no need of particular reservations." [67]  But if Hamilton was referring to speech freedom, he was responding to a straw man; the freedom of speech was ignored during the ratification controversy. [68]

The omission of a clause protecting the liberty of the press, by contrast, was one of the leading Anti-Federalist objections. Significantly, however, nobody seems to have advocated for the liberty of the press as a way of *uniquely* constraining federal authority relative to state authority. That is, there is no evidence of anyone suggesting that a federal ban on abridging the liberty of the press would take a *different* meaning than its state counterparts. To be sure, Federalists occasionally asserted that the new government would have no authority over the press under Article I. [69]  (More commonly, however, Federalists simply denied that any government could abrogate fundamental positive rights. [70]) And Anti-Federalist "references to press freedom were usually cursory, with no elaboration about what the term meant or what a declaration in its favor would accomplish." [71]  Nonetheless, Federalists and Anti-Federalists alike never suggested that federal protection  **\*536**  for the liberty of the press would somehow be more capacious than its state-level counterparts. [72]

Indeed, the principal Anti-Federalist argument was that the federal constitution--*just like state constitutions*--ought to mention fundamental rights like press freedom. "The powers, rights, and authority, granted to the general government by this constitution, are as complete, with respect to every object to which they extend, as that of any state government," Brutus explained. [73]  To Anti-Federalists, parity in the means of federal and state power warranted the enumeration of *the same* rights at both levels.

Over time, some Federalists recognized merit in that argument. [74]  Among them, most significantly, was James Madison, who emphasized this point in his speech on June 8, 1789, introducing a set of amendments to the House of Representatives. Although congressional powers were limited, Madison explained, Congress had "certain discretionary powers with respect to the means, which may admit of abuse to a certain extent, in the same manner as the powers of the State Governments under

their constitutions may to an indefinite extent." [75] Thus, the people would benefit from having their rights guarded against federal power, too.

For the most part, Madison's push for amendments met with Federalist indifference, and congressional debates on the topic are largely unilluminating. [76] Strikingly, however, nobody so much as hinted that proposed *federal* protections for expression might differ in meaning from their *state* counterparts. Indeed, Madison's draft followed nearly word-for-word the language and structure of Pennsylvania's speech and press clauses: "The people," Madison proposed, "shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the  **\*537**  press, as one of the great bulwarks of liberty, shall be inviolable." [77] The final House version was shorter--simply declaring that "[t]he freedom of speech, and of the press ... shall not be infringed"--but again without any suggestion of a novel meaning. [78] Again, the whole impetus for enumerating rights at the federal level was to recognize "simple, acknowledged principles" that states had already widely embraced. [79]

Indeed, decisive evidence points in the opposite direction. When it first endorsed the Speech and Press Clauses, the House also passed an amendment providing, "No *State* shall infringe ... the freedom of speech, or of the press." [80] This provision reinforces that the First Amendment did not withdraw all federal authority to regulate expression. Put simply, "If infringements of speech and press freedoms arose from *any* controls over expression, then this proposal would have barred state laws against defamation, conspiracy, threats, profanity, blasphemy, perjury, sedition, and so forth." [81] No evidence suggests that any congressman, much less a majority of the House, had such a radical agenda in mind. [82] The First Amendment and its state-restricting counterpart thus did not, at least in the view of the House, categorically bar governmental control over expression. [83]

Nor does the language of the First Amendment suggest a lack of federal power over expression. Scholars who defend that position often point to the First Amendment's opening phrase, "Congress shall make no law ...." [84]  **\*538**  Simply put, however, a ban on passing laws that abridge a certain right in no way suggests a lack of power to pass laws that do *not* abridge that right. If anything, the appropriate inference at the Founding was precisely the opposite, thus *supporting* an inference that federal authority included at least some room for regulating expression. [85]

Before turning to the 1790s, it is worth pausing a moment to consider the First Congress's treatment of another form of natural liberty: religious freedom. In the 1780s, Thomas Jefferson and James Madison had creatively argued that the retained natural right of freedom of conscience meant "that Religion is wholly exempt from [governmental] cognizance." [86] Relying on this position, scholars have read the First Amendment as following this categorical (some say "jurisdictional") approach to natural rights, thus completely depriving the government of all authority with respect to religion. [87] Republicans, too, frequently invoked religious freedom during the Sedition Act debates in support of their innovative reading of the First Amendment. [88]

Although Jefferson and Madison's "jurisdictional" arguments about religious freedom surely informed their responses to the Sedition Act, there are compelling reasons to doubt that it reflected their thinking about expressive freedom in 1789, much less the thinking of their contemporaries. First, the "jurisdictional" argument was highly creative. [89] "Retaining" natural  **\*539**  rights, after all, did not bar their regulation through law. Liberty and property, for example, were retained natural rights, but nobody viewed these freedoms as beyond governmental control. So, too, with religion. American states broadly recognized the inalienable natural right of conscience--a firm ban on direct punishment of religious belief--while simultaneously maintaining a diverse array of rules that dealt with religion, including religious taxes and religious qualifications for holding public office.

Moreover, Madison and his colleagues in the First Congress--many of whom were paranoid about protecting state establishments--never suggested that their proposed state-restraining amendment, which guaranteed a right of free exercise against state governments, might stealthily ban all remaining state support for religion. [90] Rather, that proposal strongly indicates that the natural-rights guarantees in the First Amendment--including the protections for speech and conscience [91] --did not categorically deprive the federal government of authority with respect to those topics.

In any event, whatever one thinks of the meaning of speech and press freedoms in the late 1780s, the simple fact remains that nobody so much as hinted that a guarantee of those rights in the *federal* constitution had a "jurisdictional" meaning, whereas analogous provisions in *state* constitutions left ample room for state governments to regulate harmful speech. In other words,

no one in the 1780s articulated the interpretation of the federal Speech and Press Clauses that Republicans invented a decade later. Many aspects of Founding Era thought were contested or unclear, [92] but this was not one of them. The Founders were not imposing a categorical ban on federal power over expression, and they did not suggest that the federal Speech and Press Clauses would somehow have entirely different meanings than their state-level counterparts.

**\*540  II. The Cabell Affair**

Though originally unanticipated, partisan divisions emerged quickly in the 1790s. By the time John Adams became President in 1797, a genuine crisis had emerged. Federalists were convinced that their Republican opponents were staging an American sequel to France's disastrous revolution. Meanwhile, Republicans saw themselves as the heirs of '76 and the true voice of the people, with Federalists (in their view) busy reestablishing ties with Great Britain and planning to inaugurate an American monarchy. [93]

The ongoing European wars exacerbated these conflicts, and Federalists often jumped at the chance to label their opponents as disloyal French stooges. In his inaugural address on March 4, 1797, John Adams decried "the pestilence of foreign influence, which is the angel of destruction to elective governments." [94] Just two months later, Adams delivered another rousing speech urging Congress to prepare for war in response to French attacks on American shipping. [95] "It must not be permitted to be doubted," Adams stated, "whether the people of the United States will support the government established by their voluntary consent, and appointed by their free choice" or surrender to "foreign and domestic factions, in opposition to their own government." [96]

Republicans pleaded that Federalists had already succumbed to British interests in the Jay Treaty. Particularly outspoken was Virginia Congressman Samuel Jordan Cabell, who harangued Federalists in rambling yet colorful public letters to his constituents. American capitulation to Britain and belligerency toward France, he wrote in January 1797, was "sapping the foundation of that illumined pyramid of liberty" and "thereby hastening with a precipitancy and frantic rage only to be equalled by its depravity and madness, the attainment of the *darling wish* of the aristocracy in this country, the establishment of monarchy." [97] Americans, he ominously declared, "are furiously hurling ourselves into the vortex of tyranny." [98] Cabell's remarks  **\*541**  were typical of 1790s politics, but they soon garnered attention in an unusual forum: the federal circuit court in Richmond.

### A. The Presentment

"The object" of a grand jury's duties, Justice James Iredell announced to the seventeen grand jurors assembled in Richmond on May 22, 1797, "is the preservation of a union." [99] Iredell, continuing a tradition of giving political lectures in the form of jury charges, [100] echoed Adams's complaints about partisan conflict. "This country has great energies for defence, and by supporting each other might defy the world," he announced. "But if we disunite, if we suffer differences of opinion to corrode into enmity, ... we must expect nothing but a fate as ruinous as it would be disgraceful, that of inviting some foreign nation to foment and take advantage of our internal discords." [101] Iredell concluded with an ominous warning: "So critical and peculiar is our situation, that nothing can save us from this as well as every other external danger, but constant vigilance." [102]

The grand jury returned a presentment that took up Iredell's provocative invitation:

> We of the grand Jury of the United States for the District of Virginia, present as a real evil the circular Letters of several members of the late Congress, and particularly Letters with the Signature of Samuel J. Cabell, endeavouring at a time of real public danger, to disseminate unfounded calumnies against the happy Government of the United States, and thereby to separate the people therefrom, and to encrease or produce a foreign influence ruinous to the peace, happiness and independence of these United States. [103]

Newspapers soon published the presentment along with Iredell's charge. [104] The impact was electric. "The presentment going in the public papers just at the moment when Congress was together," Jefferson wrote to Madison, "produced a great effect both on its friends and foes in that body, very much to the disheartening and mortification of the latter." [105]

**\*542**  Many scholars have mistakenly characterized the episode as "an abortive attempt to try Congressman Samuel J. Cabell of Virginia for seditious libel." [106]  The grand jury, however, had issued a "grievance presentment"--a type of censure, common in the South, that did not initiate criminal proceedings. [107]  The following year, for instance, a grand jury in Charleston "presented] as a grievance of the most dangerous nature to the community ... that such a number of dogs are allowed to go about the streets, at present, when canine madness is so very prevalent in the city." [108]  The Cabell presentment, too, pointed to "a real evil," not a crime. [109]

**\*543**  Still, Republicans were livid. Federal judges, Cabell complained, had "become a band of political preachers, instead of a sage body to administer the law." [110]  In a public letter addressed to Iredell, an anonymous author-- perhaps a young Henry Clay--alleged that "by not directing the attorney for the United States to prosecute, you tacitly admitted that the presentment was improper." [111]  He excoriated Iredell for "endeavour[ing] to regulate the degree of heat" of political discussions. "You offer yourself as a political thermometer for the use of the Virginians! But I fear, sir, that the mercury of your political composition, will never rise to the temperature of manliness." [112]

Republican responses to the Cabell presentment flowed from their earlier defense of Democratic-Republican societies in the wake of the so-called Whiskey Rebellion. Federalists, horrified by the blatant disregard for federal law in the West, had pinned the blame on "certain self-created societies," commonly known now as Democratic-Republican societies. [113]  Federalists in Congress sought a resolution condemning the societies for calumnies that, in their view, had excited the insurrection. [114]  In response, congressional Republicans "exploded in wrath." [115]  "The law is the only rule  **\*544**  of right," James Madison insisted, and "what is consistent with that, is not punishable; what is not contrary to that, is innocent, or at least not censurable by the Legislative body." [116]  With rhetorical flair, Madison explained: "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people." [117]

The Cabell affair brought back to the fore Republicans' concerns over the *lawless* nature of public censures. "If these letters contained calumnies that were illegal--If they produced, or increased a foreign influence in our country contrary to law," Cabell himself posited, "the authors were fit subjects for a presentment and for punishment." [118]  But, he explained, only false statements of fact--not opinion--could support criminal charges. [119]  Virginia Senator Henry Tazewell agreed. "Having presented the Letters and not the writers," he explained, "they shew that the writers were no further censureable than for their political opinions. Thus have a Court and Jury erected themselves into a tribunal of political Censors." [120]  Although Republicans frequently invoked speech and press freedoms, [121]  their arguments were directed at the *lawless* nature of the presentment rather than a lack of federal power over speech. [122]  Recall that "the very essence of civil  **\*545**  liberty" in the eighteenth century focused on the existence of prospective, generally applicable *laws*. [123]

Alongside these old concerns about lawless political censorship, a new fear arose among Republicans from the Cabell affair: jury composition. "Look at the names," Cabell wrote, pointing to the presence of several foreigners on the grand jury. [124]  Republicans worried about the jurors' partisanship as well. According to the scurrilous Republican editor James Callender, who was later prosecuted under the Sedition Act, Cabell apparently claimed that "four fifths of the whole band consisted of pardoned tories, and of republicans imported from Scotland." [125]  Tazewell also highlighted the jury's membership, remarking that several jurors he was "not astonished at," meaning they were known Federalist partisans. [126]

Indeed, the members of the grand jury were a powerful and well-connected group. [127]  The foreman, John Blair, was a former Justice of the United States Supreme Court. Joining him were a Federalist member of the Virginia House of Delegates, [128]  four former delegates, [129]  six merchants, [130]  and several county clerks. [131]  Familial relationships abounded, too. One of the  **\*546**  grand jurors was the brother of the federal marshal, [132]  while another was the brother of Cyrus Griffin--one of the presiding judges. [133]

Compendium_Cornell
Page 0763

The prominence of these men was no fluke. Virginia, although the country's most populous state, had a small and interconnected group of affluent men who held most positions of public trust. [134] And the federal marshal hand selected grand jurors from among this venerable group. [135]

In the late 1780s, political elites had viewed the hand selection of jurors as a way of safeguarding rights. As one of the architects of the Judiciary Act, Oliver Ellsworth, put it, "a very ignorant Jury might be drawn by Ballot," and parochial jurors might be inclined against defending property rights. [136] Hand selection ensured that jurors would be men of sound judgment. "Care may be taken in the manner of forming the delegated body," James Wilson explained in his law lectures. [137] Although Federalists uniformly endorsed the need for representative institutions, they did not think that representative bodies had to reflect a cross-section of the society. [138] Rather, a "very guarded selection" of jurors, Wilson observed, could be accomplished "by an officer, **\*547** confidential, impartial, and, by the people themselves, appointed for this very purpose" without undercutting the jury's representative role. [139]

Partisanship was not yet a concern in the late 1780s. To be sure, some people expected that federal *judges* would be loyal supporters of the Washington administration, [140] and countless Anti-Federalists worried about the ability of the federal government to change the *venue* of trials as a way of undercutting the jury right. [141] Alexander Hamilton even acknowledged in *Federalist No. 83* that the hand selection of jurors made judicial proceedings "more accessible to the touch of corruption." [142] But the Founders--in perhaps their greatest oversight--did not appreciate that the affinities of the people would soon fragment along partisan lines.

By the late 1790s, however, jury selection by a presidential appointee presented obvious partiality concerns. Virginia's federal marshal, David Meade Randolph, was an ardent Federalist who exhibited notable patterns in his juror picks. A recent study of federal grand juries in Richmond from 1789 to 1809 found that "[e]very grand jury included several men who were or recently had been members of Virginia's General Assembly or of Congress, and more than a few served prominently in one or the other legislative body or as governor after they were on the grand jury." [143] And their political views, unsurprisingly, tended to mirror those of the Administration. [144] On the Richmond jury in 1797, for instance, eight of the seventeen jurors are known to have been Federalists, [145] and five of the remaining nine were merchants, [146] a group that typically supported the Adams Administration. And Republicans knew it. No wonder they were so worried.

**\*548  B. The Jeffersonian Response**

Editorials about the Cabell presentment continued to appear in Virginia newspapers through late July, [147] but the most interesting response came from Thomas Jefferson, who was then serving as Vice President. By early August, Jefferson had completed a draft petition that he planned to submit surreptitiously to the Virginia General Assembly through one of his friends. [148] The draft reveals two significant developments in Jefferson's thinking.

First, the draft portrayed the federal grand jury as an arm of the government, not as a representative body of the people. "[T]he Grand jury is a part of the Judiciary," Jefferson wrote, and an effort by the judiciary to "interpose" on the "free correspondence" between representatives and their constituents was "to put the legislative department under the feet of the Judiciary." [149] This subordination was "more vitally dangerous," he explained, "when it is considered that Grand jurors are selected by officers appointed and holding their places at the will of the Executive, that they are exposed to influence from the judges who are appointed immediately by the Executive." [150]

Second, Jefferson's draft focused on the presentment's utter lawlessness--not simply its error--thus opening the door to drastic countermeasures. Grand juries, he argued, were constrained by "known limits ... to make presentment of those acts of individuals which the laws have declared to be crimes or misdemeanors." [151] The grand jurors' "departure] out of the legal limits of their said office," he concluded, meant that they had "avail[ed] themselves of the sanction of its cover." [152] For well over one hundred years, jurors in England and the colonies had been immune from civil or criminal penalties. [153] But by acting beyond their

authority, Jefferson asserted, the federal grand jurors made themselves subject to punishment by the state assembly, even for offenses that "escape the definitions of the law." [154]

 **\*549**  Jefferson sent his proposal to James Madison and James Monroe, who each returned with tepid replies. [155]  Monroe wondered "whether it would not be better to address it to the Congress?" [156]  In response, Jefferson admitted that doubts "as to [Virginia's] jurisdiction" had occurred to him, too, but that sending a petition to the House of Representatives "would make bad worse, that a majority of that house would pass a vote of approbation." [157]  Jefferson was in a bind. His argument focused on federal wrongs, but he knew that petitioning Congress would be counterproductive.

An intellectual breakthrough came in his second draft. Jefferson began with the same argument, explaining how the grand jury had exceeded its authority. This time, however, he added that "independently of these considerations of a constitutional nature, the right of free correspondence between citizen and citizen on their joint interests, public or private, and under whatsoever laws these interests arise, is a natural right of every individual citizen, not the gift of municipal law." [158]  All Founders would have agreed that retained natural rights preexisted constitutional formation, but Jefferson used this idea in a novel way. The right to the freedom of communication, he contended, was simply not a federal concern, and *state* control over the retained liberty of speech called for *state* remedies when that freedom was abridged. "[T]he right of free correspondence is not claimed under that [federal] constitution nor the laws or treaties derived from it," he wrote, "but as a natural right, placed originally under the protection of our municipal laws, and retained under the cognizance of our own courts." [159]

Here we see the origins of a new understanding of the First Amendment. In his draft petition, Jefferson did not explain why the protection of natural rights was a uniquely state-based concern. But by contending that "the right of free correspondence is not claimed under that [federal] constitution," Jefferson cast the First Amendment as *not* guaranteeing speech and press rights *as federal rights*. Apparently the Speech Clause gave the federal government no role to play in defending the freedom of speech, even against federal encroachment. Jefferson was not yet explicitly denying federal  **\*550**  authority to control speech, but his argument pointed clearly in that direction.

The evolution of Jefferson's drafts indicates that he developed new ideas in response to the particular challenge posed by the Cabell affair. Jefferson faced a practical problem--an intractable Congress--and he shaped a fascinating and innovative theory to meet that challenge. His desired remedy drove the analysis.

As all creative thinkers do, Jefferson tapped into earlier strands of his constitutional thought. During the controversy over religious assessments in Virginia, for instance, he began with a widely accepted view that "the opinions of men are not the object of civil government, nor under its jurisdiction," [160] signifying that the government could not punish people because of their thoughts. More controversially, Jefferson then argued that the freedom of religious conscience barred public interference with religious matters at all, even in the form of governmental support for religion through taxation. [161]  As noted earlier, this idea was highly creative, and probably not widely accepted. [162]  For present purposes, however, the key point is that Jefferson's claim was about *state-level* support for religion; it had nothing to do with a unique definition of federal rights.

During the ratification debates, Jefferson again made statements that could be read as denials of governmental power over certain natural rights. "There are rights which it is useless to surrender to the government, and which yet, governments have always been fond to invade," he wrote to a correspondent in 1789. [163]  "These are," he continued, "the rights of thinking, and publishing our thoughts by speaking or writing: the right of free commerce: the right of personal freedom." [164]  Understood contextually, however, Jefferson was not insisting that all governments lacked authority to limit expression, commerce, or freedom. Natural rights, in Jefferson's view, were limited not only by a principle against harming others but also by certain social duties. [165]  The freedom of expression, for instance, easily comported  **\*551**  with "liability of the printers for false facts printed." [166]  In any event, Jefferson's discussions of federal rights in the late 1780s again offer no indication that those rights would have different meanings at the federal and state levels. His innovative move toward such a theory in 1797 was genuinely novel, responding to a problem that simply had not existed a decade earlier.

The House of Delegates debated Jefferson's petition in late December 1797. [167]  In the end, the delegates approved resolutions that chastised the grand jury for its "political criminality," but they decided not to pursue impeachment. The resolutions concluded:

> That it ought therefore to be solemnly declared by the House of Delegates, that the said presentment is a violation of the fundamental principles of representation, incompatible with that independence between the co-ordinate branches of government, mediated both by the general and state constitutions; an usurpation of power not confided to one branch over another by any rule, legal or constitutional; and a subjection of the natural right of speaking and writing freely, to the censure and controul of Executive power. [168]

The Virginia House of Delegates thus embraced Jefferson's view of juries as arms of the government--a remarkable development attributable to Republican concerns about jury selection. No longer were juries, as Jefferson had heroically described in 1789, "the firmest bulwarks of English liberty." [169]

## III. The Sedition Act

Acrimonious partisanship escalated even further in 1798. In April, Jefferson informed Madison that "one of the war-party, in a fit of unguarded passion declared some time ago they would pass a citizen bill, an alien bill, & a sedition bill." [170] The object of a sedition bill, he presciently explained, would be "the suppression of the whig presses." [171] Sure enough, in late June federal officers arrested Benjamin Franklin Bache--the irascible editor of the **\*552** most prominent Republican newspaper-- on common law sedition charges, and less than a month later the Federalist majority in Congress passed a sedition law.

### A. Congressional Debates

The Federalist argument for a Sedition Act was straightforward: Congress had an obligation to preserve the government. Seditious publications, Federalists insisted, were "approaches to revolution and Jacobinic domination." [172] Connecticut Representative John Allen put the point vividly: "[T]he liberty of vomiting ... floods of falsehood and hatred" would produce effects already seen "across the water; it has there made slaves of thirty millions of men." [173] Indeed, the specter of revolutionary France loomed over the debates, not simply as a foreign threat but also as a forewarning of what might happen domestically if licentiousness reined free. As Kathryn Preyer cautions, "Only present-mindedness or lack of imagination leads us to dismiss casually such fears as paranoia." [174]

Relying on prevailing understandings of speech and press freedoms, Federalists had no trouble explaining the consistency of the Sedition Act with the First Amendment. "The terms 'freedom of speech and of the press,'" Harrison Gray Otis explained, "were a phraseology perfectly familiar in the jurisprudence of every State, and of a certain and technical meaning ... borrowed from the only country in which it had been tolerated." [175] That freedom, he continued,

> is nothing more than the liberty of writing, publishing, and speaking, one's thoughts, under the condition of being answerable to the injured party, whether it be the Government or an individual, for false, malicious, and seditious expressions, whether spoken or written; and the liberty of the press is merely an exemption from all previous restraints. [176]

**\*553** Otis's comment reflects an important point that scholars often overlook: Many Federalists viewed the *liberty of the press* as simply a rule against prior restraints, [177] but they described the *freedom of speech* in a more capacious manner, embracing a liberty of well-intentioned, noninjurious speaking, writing, and publishing. [178]

Harmful speech, however, was an entirely different matter. "Because I have the liberty of locomotion, of going where I please," John Allen asked, "have I a right to ride over the footman in the path?" Extending this idea, Allen explained: "The freedom of the press and opinions was never understood to give the right of publishing falsehoods and slanders, nor of exciting sedition, insurrection, and slaughter, with impunity." [179] Other Federalists echoed this theme. [180] The sedition bill did not restrain "a free

animadversion upon the proceedings of Congress, or the conduct of its members; it merely prohibits calumny and deception," Harrison Gray Otis remarked. [181] And "an honest jury" could distinguish the two by "decid[ing] upon the falsehood and malice of the intention." [182] Indeed, the Sedition Act explicitly recognized the availability of a truth defense and gave juries the power to render a general verdict. [183] Thus, Otis insisted, the people "were **\*554** still at liberty, and would ever be so, to use their tongues and their pens, like all other property, so as to do no wanton and unjustifiable injury to others." [184]

Republicans lobbed a slew of arguments in reply. [185] To justify "restraints on the liberty of speech and of the press," Albert Gallatin explained, "it was at least necessary to prove the existence of a seditious disposition amongst the people." [186] Yet Federalists had failed, he insisted, in showing the "absolute necessity" that Republicans typically demanded of laws passed pursuant to the Necessary and Proper Clause. [187] Republicans further denied that Congress had authority to "provide for the punishment of any offences against Government" other than those specifically enumerated, [188] unless a "specific power ... could not be carried into effect" without the assistance of federal criminal law. [189]

The First Amendment--then still known as the "third amendment"--featured prominently in Republican arguments. According to John Nicholas, he had "looked in vain amongst the enumerated powers ... for an authority to pass a law like the present; but he found what he considered as an express prohibition against passing it." [190] Nicholas did not deny that false statements had no value. "If there could be safety in adopting the principle, that no man should publish what is false," he explained, "there certainly could be no **\*555** objection to it." [191] What worried Nicholas, though, was the *administration* of a sedition law. The "eye of a jealous Government," he explained, would "torture" critical statements "into an offence against this law." [192] And critics would then "have to be tried by judges appointed by the President, and by juries selected by the Marshal, who also receives his appointment from the President, all whose feelings would, of course, be inclined to commit the offender if possible." [193] The solution, for Nicholas, was a full denial of federal authority. "On this account," he insisted, "the General Government has been forbidden to touch the press." [194]

Edward Livingston made similar points. "Every man's character is protected by law, and every man who shall publish a libel on any part of the Government, is liable to punishment," Livingston explained. [195] But only *state* authorities had that power. It was "much more probable," he insisted, "that justice will be found in a court in which neither of the parties have influence, than in one which is wholly in the power of the President." [196] The problem, in Livingston's view, was straightforward. Federal judges were presidential appointees, and the jury was "selected by an officer holding his office at the will of the President." [197]

Albert Gallatin concurred. "[Although there might be no change made by this bill in the law of libels," he acknowledged, "there was an all-important one made by the transfer of jurisdiction." [198] Again, the crux of the problem was jury selection. Federal marshals chose jurors in many states, Gallatin observed, and each marshal was a "creature of the Executive." [199] The sheriff charged with selecting jurors in Pennsylvania, by contrast, was elected to a three-year term, making him an "officer of the people." [200] This distinction between state and federal jury-selection practices might be "immaterial ... in ordinary suits or prosecutions," Gallatin admitted, but suits "of a political nature" were entirely different. [201] In these cases, he explained, "the jury was liable to be packed by the Administration." [202]

Leading Republicans in the House thus presented a unified attack on the Sedition Act using a new theory of the First Amendment. The degree of **\*556** coordination between Nicholas, Livingston, and Gallatin is unclear, nor do we know how Jefferson may have influenced their strategy. [203] But the harmony of their opposition is striking. All three men pointed to jury selection when explaining why the federal government could not pass a sedition law. Perhaps not coincidentally, these three Republicans--from Virginia, New York, and Pennsylvania--each came from a state where federal marshals hand selected jurors and where most of the leading Republican newspapers operated. Indeed, as it turned out, the bulk of Sedition Act prosecutions were in states with hand selection of jurors. [204]

The Republican emphasis on federal power and jury selection reinforced several of their recurring constitutional motifs. One was an emphasis on constitutional limitations of federal power--a theme in Republican politics throughout the 1790s. Another was a claim about unchecked executive discretion. The principal Republican arguments against the 1798 Alien Friends Act, for

instance, were that Congress lacked authority to pass the bill and that it gave the President too much control. With its emphasis on partisan jury selection, Republican opposition to the Sedition Act played to both of these themes. [205]

Provocatively, Republicans also invoked the longstanding principle that no man may judge his own case, turning the earlier anti-corruption justification for juries on its head. "If there could be safety in adopting the principle, that no man should publish what is false," John Nicholas explained early on in the debates, "there certainly could be no objection to it," [206] accepting that expressive freedom did not require a categorical denial of governmental power over speech. But, he cautioned, "the persons who would have to preside in trials of this sort, would themselves be parties, or at least they would be so far interested in the issue, that the trial of the truth or falsehood of a matter would not be safe in their hands." [207] And it was "[o]n **557** this account," Nicholas concluded, that "the General Government has been forbidden to touch the press." [208]

Congressional Republicans occasionally hinted at a broader understanding of speech and press freedoms without relying on federalism. [209] But these arguments were subject to a devastating Federalist response: states had recognized the limited scope of speech and press freedoms by routinely restricting expression. One state law barred "aiding in a lottery by printing or publishing a scheme on account of it." [210] Another imposed "heavy penalt[ies]" on persons who "by public or private discourse or conversation ... should dissuade or endeavor to prevent an officer from doing his duty in quelling riots." [211] Virginia had passed a law "against cursing and swearing, which," as Harrison Gray Otis pointed out, "is merely using the liberty of speech." [212] Indeed, any number of crimes like forgery or bribery could be "effected through the medium of the press or of the pen" or be "done by words only." [213] In the face of these laws, the new theory offered Republicans a way to deny federal authority to pass the Sedition Act without condemning these sorts of uncontroversial state laws.

### B. Republican Opposition

After the Sedition Act went into effect, Republicans maintained steady attention on the issue of jury selection. "This power in a marshal, is a more complete and severe check on the press, and the right of the people to remark on public affairs," Charles Pinckney declared, "than ten thousand sedition laws, because here the power to select and by that means govern the opinion of juries, is continual, always increasing, and in a great degree subject on every trial to the wishes and directions of a President." [214] In states where "the federal marshals have a right to summon jurors as they please," he implored, "the people *are not free.*" [215] Rather, justice in those states

> **558** must depend not on the laws but the integrity and honest independence of a marshal; to him is left the monstrous and dangerous power of summoning proper or improper, fit or unfit, dishonest or upright men--men who may be the friends or enemies to the parties who are on their trial, or who on political questions may be known to be opposed to them, and to hold opinions diametrically contrary to those which are perhaps in the course of the trial to be submitted to them for their decision. [216]

Fears of partisan jury selection and calls for reform were common themes in other Republican writings. [217]

Thomas Jefferson, too, began to consider ways of reforming jury-selection practices. "[T]he people themselves are the safest deposit of power ... [and] are competent to the appointment or election of their agents," Jefferson wrote in a petition drafted in October 1798. [218] Appointment of jurors, however, "has not been left in their hands, but has been placed by law in officers, dependant on the Executive or Judiciary bodies." [219] In place of this system, Jefferson proposed that Virginians elect a list of federal jurors, with panels of grand and petit jurors chosen randomly from that list. [220] This method would strip control from federal marshals without, in turn, empowering federal judges by creating juries "pliable to the will and designs of power." [221]

While Jefferson was contemplating jury selection, he was also preparing a draft resolution that he called "the Kentuckey resolves," [222] now commonly known as the Kentucky Resolutions of 1798. [223] The draft took an **559** extraordinarily bold position against federal power. The Constitution, he explained, was a mere compact ("under the style & title of a Constitution")

Compendium_Cornell
Page 0768

creating a government "for special purposes" with "certain definite powers." [224] Those powers included authority to recognize only a few crimes-- treason, counterfeiting, piracy, offenses against the law of nations--and "no other crimes whatsoever." [225] Statutes creating any other crimes, he admonished, were "altogether void and of no force." [226]

Jefferson then turned to speech and press freedoms. Under its enumerated powers, and based on the Tenth Amendment, he explained, Congress had "no power over the freedom of religion, freedom of speech, or freedom of the press." [227] Instead, states retained "all lawful powers" respecting those subjects, and each state retained "the right of judging how far the licentiousness of speech and of the press may be abridged without lessening their useful freedom, and how far those abuses which cannot be separated from their use should be tolerated rather than the use be destroyed." [228] In other words, the implicit reservation of speech and press freedoms under the Constitution meant not simply that the federal government could not *abridge* rights to speaking, writing, and publishing, but that it could not touch those subjects *at all* because doing so would require defining the scope of those rights. Recall that Jefferson had already begun to articulate this idea in response to the Cabell presentment.

After offering this account, Jefferson noted that "another & more special provision"--the First Amendment--reinforced the same conclusion: that "libels, falsehood and defamation equally with heresy & false religion are witheld from the cognisance of federal tribunals." [229] The Kentucky Resolutions thus defended an understanding of the First Amendment that limited federal power without explaining how state protections for speech and press freedoms might constrain state governments. [230] And, as with his **\*560** response to the Cabell presentment, Jefferson's argument for exclusive state authority over speech and the press also helped justify his radical state-based remedy: a declaration by the Kentucky legislature that the Sedition Act "is not law but is altogether void and of no force." [231]

In the Virginia Resolutions of 1798, by contrast, James Madison provided a more nuanced account of the First Amendment. The Sedition Act, Madison explained, exercised

> a power not delegated by the constitution, but on the contrary expressly and positively forbidden by one of the amendments thereto; a power which more than any other ought to produce universal alarm, because it is levelled against that right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed, the only effectual guardian of every other right. [232]

The Sedition Act, he concluded, was a "palpable violation" of the rights that the people had "declared and secured." [233] Although not entirely clear, Madison seems to have been suggesting that an equivalent state sedition law would also abridge the right of "free communication among the people." [234]

Just a few weeks later, however, the Virginia legislature issued an "Address" that squarely returned to the Jeffersonian position. [235] "Every libellous writing or expression," the Assembly explained, "might receive its punishment in the State courts, from juries summoned by an officer, who does not receive his appointment from the President, and is under no influence to court the pleasure of Government, whether it injured public officers or private citizens." [236] Yet again, Republicans explicitly adopted a theory of speech and press freedoms grounded on a fear of corruptly chosen federal juries.

**\*561  IV. The Invention of First Amendment Federalism**

*A. Recasting History*

Skepticism about the *administration* of laws abridging speech, rather than opposition to the laws themselves, drove Republican thought. "If the triers were formed of angelic materials ... and blessed with a considerate impartiality, that never was known to dwell in the hot flame of party spirit," a Virginia editorial opined, "this law might not then in its effects be a destruction of any thing but the abuse and licentiousness of the press." [237] But a federal marshal "would, no doubt, select those whom he should think *good* jurors, and warm friends to *his good order,* when a question of *good order* was upon the carpet." [238] And juries therefore were "not so much a body of inquest as instruments of conviction." [239] Republicans echoed these ideas over

and over throughout debates over the Sedition Act, portraying the Act as giving the President dangerous authority to control the outcomes of cases in which he and his party had an interest.

As they recast the First Amendment, Republicans may have realized that the text of the First Amendment was largely unhelpful to their cause. Its language, Federalists pointed out, had an established common law meaning that was generally understood to permit sedition prosecutions. [240] To counter this persuasive textual argument, Republicans shifted their focus to a broader historical narrative. Particularly noteworthy is the account in the Virginia Report of 1800, authored by James Madison.

Madison's historical reimagination began overseas. To understand the "American idea" of the freedom of the press, he explained, it was useful to start with "[t]he essential difference between the British government, and the American constitutions." [241] Under the British constitution, he wrote, "the danger of encroachments on the rights of the people, is understood to be confined to the executive magistrate," and therefore "an exemption of the press from previous restraint by licensers appointed by the king, is all the freedom that can be secured to it." [242] (Madison was referring, at least in part, to the English Bill of Rights, which imposed disabilities on the King but not Parliament. [243]) But in the United States, Madison insisted, "the case is altogether different. The people, not the government, possess the absolute sovereignty." [244] Thus, he concluded:

> **\*562**  This security of the freedom of the press, requires that it should be exempt, not only from previous restraint by the executive, as in Great Britain; but from legislative restraint also; and this exemption, to be effectual, must be an exemption, not only from the previous inspection of licensers, but from the subsequent penalty of laws. [245]

In the English constitutional tradition, however, it was simply untrue that customary constitutional rights restricted only executive power. Rather, these rights routinely imposed limits on the *rightful* exercise of legislative authority. The rule against ex post facto laws is an obvious example. Parliamentary acts were generally unreviewable in court because of Parliament's legal supremacy, but most elites had long since come to the view that sovereignty resided in the people themselves, and that Parliament was constrained by the customary constitution even though its acts were beyond judicial review. [246] Following this tradition, the American colonists had fought a revolution to *defend* their rights as Englishmen--not to transform the meaning of those rights. [247]

Consequently, there was nothing peculiar about using English traditions to define American liberties. [248] Americans "hav[e] derived all [their] rights, from one common source, the British systems," Federal Farmer characteristically explained. [249] To be sure, not all of these rights were enumerated in England's foundational constitutional texts. As Madison had explained in 1789,

> whenever the great rights, the trial by jury, freedom of the press, or  **\*563**  liberty of conscience, come in question in [Parliament], the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. [250]

The First Amendment did not change the *meaning* of these rights by transforming them into restraints on legislative power; speech and press freedoms *already* imposed limits on legislative power. Rather, the American innovation was to *enumerate* these rights. The history of the ratification controversy offered no support to Madison's declaration in the Virginia Report that "[t]he state of the press, therefore, under the common law, can not in this point of view, be the standard of its freedom, in the United States." [251] English press freedom *did* limit Parliamentary authority.

Even if Americans were to depart from Blackstone's definition of press freedom, however, Madison recognized that they would still need to determine "the proper boundary between the liberty and licentiousness of the press." [252] But this difficulty was beside the point regarding *federal* regulations of speech, Madison argued, because the First Amendment "was meant as a positive denial to Congress, of any power whatever on the subject." [253] Venturing beyond his Virginia Resolutions of 1798, Madison now clearly adopted the standard Republican position. "To demonstrate that this was the true object of the article," he wrote,

"it will be sufficient to recall the circumstances which led to it, and to refer to the explanation accompanying the article."[254] Again, Madison was turning to history.

The absence of enumerated rights in the original Constitution, combined with congressional power under the Necessary and Proper Clause, Madison recalled, led to "great apprehensions" that "certain rights, and ... the freedom of the press particularly," might be "drawn by construction within some of the powers vested in Congress."[255] Federalists, he explained, had urged that "the power over the rights in question, and particularly over the press, was neither among the enumerated powers, nor incident to any of *564 them."[256] Thus, he concluded, "it would seem scarcely possible to doubt, that no power whatever over the press, was supposed to be delegated by the constitution, as it originally stood; and that the amendment was intended as a positive and absolute reservation of it."[257] In other words, the press was "wholly exempt from the power of Congress."[258]

Many scholars still defend the Republican view that the First Amendment disabled the federal government from passing laws that touch speech.[259] This argument, in turn, bolsters the idea that free speech challenges should be "facial," focusing on the constitutionality of *laws* rather than the facts of particular cases. Nicholas Rosenkranz, for instance, notes that Thomas Jefferson's analysis of the Sedition Act's constitutional deficiency "was 'facial' in the sense that he found the constitutional violation to be evident on the face of the statute."[260] Along similar lines, relying extensively on Jefferson's and Madison's arguments against the Sedition Act, Kurt Lash argues for a similar assessment of religious freedom because "the original Free Exercise Clause ... appears to be limited to a prohibition of laws that abridge religion *qua* religion."[261] Meanwhile, Will Baude uses the Republican opposition to suggest that "regulation of the press is a great power" that cannot be reached under the Necessary and Proper Clause.[262]

Republicans, however, were making novel arguments against the Sedition Act, offering a distorted view of the First Amendment's origins. To be sure, a few Federalists had argued that the federal government would lack *565 any authority to regulate the press *under Article I.*[263] Most Federalist denials of federal power to restrain the liberty of the press, however, were based on the *implied* retention of rights, not a categorical lack of federal power.[264] And when Federalists had openly denied federal power over the liberty of the press, they often clarified that they were simply disclaiming federal power to initiate a licensing regime.[265]

Most importantly, though, whatever their views on the extent of congressional powers, nobody in the ratification debates suggested that adding a guarantee of speech and press freedoms would reinforce an absence of federal power over expression. If anything, they recognized that such an enumeration would imply just the opposite. As Alexander Hamilton noted in *Federalist No. 84,* for instance, a "provision against restraining the liberty of the press" would "afford[] a clear implication that a power to prescribe proper regulations concerning it was intended to be vested in the national government."[266]

Like so much of constitutional debate in the 1790s, Madison made new arguments in light of new circumstances. The Framers had not anticipated the emergence of political parties, and the alignment of partisan interests among the three branches-- combined with the hand selection of federal jurors in many states--created a toxic environment for political dissenters. And, recognizing this development explicitly, Republicans justified their interpretation of the First Amendment by invoking the axiom of natural law that no man should decide his own case. "[W]hat security of a fair trial remained to a citizen," Albert Gallatin asked rhetorically, "when the jury was liable to be packed by the Administration, when the same men were to be judges and parties?"[267] To the extent that Founding Era constitutionalism allowed appeals to social-contract theory and natural law to interpret constitutional provisions, Republicans had a plausible case that the emergence of political parties had transformed constitutional meaning.[268]

*566 Republicans, however, resolutely avoided casting their argument in terms of constitutional change. Rather, "the best way of coming at the truth of the construction of any part of the Constitution," they insisted, was "examining the opinions that were held respecting it when it was under discussion in the different States."[269] The position of Madison and his colleagues, in other words, was constrained by a constitutional culture that prized historical argument over openly acknowledged shifts in constitutional meaning.[270] History was, as it continues to be, a core feature of American constitutionalism.

The fact that Republicans made new arguments in historical terms ought to give us significant pause about modern reliance on post-ratification statements as evidence of original meaning. Scholars of the Founding have widely appreciated the remarkable diversity and fluidity of constitutional argument, [271] making it tricky to assess whether and how debates in the 1790s reflected original meaning. What the history of the Republican opposition to the Sedition Act adds to this challenge is recognition of a constitutional culture where novel arguments were actually cast in historical terms by the Founders themselves. None of this is to deny our capacity to produce intellectual histories of Founding Era constitutional thought. But that task certainly becomes harder after realizing that the Founders were originalists and living constitutionalists at the very same time.

Drawing on their revised view of history, Republican opponents of the Sedition Act had a profound influence on American constitutionalism. Leading Virginia jurist Spencer Roane described Madison's Report as "the *Magna Charta* on which the republicans settled down, after the great struggle in the year 1799." [272] For the next century, however, that legacy was defined by a narrow understanding of federal power, with profound ramifications that **\*567** went well beyond debates about regulating expression. [273] Over time, some thinkers proposed a broader conception of speech and press rights, but these ideas gained very little traction among judges. As the Supreme Court summarized in 1907, the "freedom of speech and freedom of the press ... do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare." [274]

### B. Juries, Judges, and Expressive Freedom

By the middle of the twentieth century, the Supreme Court began to articulate far more robust free speech doctrines. And just as James Madison had reimagined the First Amendment's origins, the Justices reimagined the Madisonian mythology. In its seminal decision in *New York Times v. Sullivan,* [275] the Court claimed that "the great controversy over the Sedition Act ... crystallized a national awareness of the central meaning of the First Amendment." [276] The Sedition Act was "never tested in this Court," [277] Justice Brennan wrote--failing to mention that seven federal judges (including four of six Supreme Court Justices) had unanimously upheld its constitutionality. [278] But "the attack upon its validity ha[d] carried the day in the court of history," he triumphantly proclaimed. [279]

The only consensus Republican argument against the Sedition Act, however, was that the federal government lacked any authority to regulate expression. Incorporating *that* concept against state governments would have been radical indeed, depriving state and federal authorities from implementing all sorts of uncontroversial laws, like bans on defamation, perjury, and fraud. And even Republican opponents of the Sedition Act had widely acknowledged that public officials could bring libel suits "upon the same footing with a private individual." [280]

**\*568** But rather than grapple with historical complexity, Justice Brennan and his colleagues reinvented the First Amendment yet again. The freedom of speech, the Court held, "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'" [281] Perhaps the Justices were simply misinformed about history, but it seems more likely that their decision--historical homages notwithstanding--was never really about fidelity to original meaning. [282]

The many causes of developments in speech doctrine ever since are well beyond the scope of this Article, but one point is worth highlighting: the Supreme Court regularly announced speech-protective doctrines designed to shield speakers from the whims of biased or ignorant juries. [283] As Justice Harlan explained, "[I]n many areas which are at the center of public debate 'truth' is not a readily identifiable concept, and putting to the pre-existing prejudices of a jury a determination of what is 'true' may effectively institute a system of censorship." [284] With a brooding tone, he continued: "Any nation which counts the *Scopes* trial as part of its heritage cannot so readily expose ideas to sanctions on a jury finding of falsity." [285]

Distrust of state judges and juries--particularly in cases coming out of the South--was commonplace in twentieth-century civil rights decisions. [286] **\*569** Speech cases were no exception. The Court recognized the "freedom to engage in association for the advancement of beliefs and ideas" in a famous 1958 decision overturning an Alabama court's onerous (and legally meritless) discovery order and contempt judgment against the nation's leading civil rights group. [287] Just six years later, *New York Times v. Sullivan* involved an Alabama jury's onerous (and legally meritless) damages award to a local official based on a civil rights

advertisement. [288]  As it expanded doctrinal categories in order to limit abridgments of speech, the Court also ensured that it (and other courts) could review the factual bases of earlier decisions. [289]  Recent cases occasionally reflect similar concerns. [290]  For better or worse, an amendment designed in part to empower juries now stands firmly as a bulwark against their prejudices.

More broadly, the Court's mid-century speech and press decisions were part of an effort to elevate judicial scrutiny in those instances where the justices had less reason to trust the good faith of governmental officials. [291]  The Court's first significant doctrinal expansion under the First Amendment, for instance, came in *Near v. Minnesota,* [292]  which curtailed the power of trial judges to insulate themselves from criticism using contempt sanctions. [293]  Other cases cut back on the ability of political officials to limit speech through discretionary licensing schemes, [294]  with the Justices occasionally signaling broader concerns of political entrenchment. [295]  The Supreme **\*570** Court's earliest First Amendment decisions thus seem to align with a representation-reinforcing theory of judicial review. [296]

But while concerns about self-interested legislation and biased enforcement were often at play in these early cases, the Justices rarely relied on those concerns explicitly. And First Amendment law soon took a different turn. Judicial decisions and scholarly commentaries are now dominated by various substantive theories of expressive freedom, all of which seek to explain why speech and the press are deserving of special protection. [297]  The First Amendment, many argue, exists to protect democratic self-government. [298]  Others point to its role in promoting a marketplace of ideas, "further[ing] the societal interest in the fullest possible dissemination of information." [299]  Still more insist that free speech is essential to "individual self-realization." [300]

None of these theories were baked into the First Amendment, which originally allowed the government to regulate harmful speech in promotion of the public good. [301]  Nor does the Republican invention of First Amendment federalism offer a theoretical justification for treating speech as special. But for those inclined to reorient First Amendment doctrine in a more historically grounded direction, the response to the Sedition Act could still prove relevant. Republicans made strained arguments, to be sure, but their core insight endures: political entrenchment and politically biased enforcement are a clear danger to republican government. Perhaps it is time to bring that concern back to the doctrinal fore. [302]

### Footnotes

a1   Assistant Professor, University of Richmond School of Law. The author thanks Will Baude, Sam Bray, Nathan Chapman, Andy Coan, Saul Cornell, Richard Epstein, Masha Hansford, Tamar Herzog, Dan Hulsebosch, Amalia Kessler, Larry Kramer, Corinna Lain, Maeva Marcus, Michael McConnell, Bernie Meyler, Josh Patashnik, Zach Price, Richard Primus, Jack Rakove, Richard Re, Bob Reinstein, Jason Solomon, Rebecca Tushnet, Kevin Walsh; the participants in the American Founding Group at the University of Georgia, the Federalist Society Annual Faculty Conference, the Institute for Constitutional History Junior Scholars Seminar, the Mid-Atlantic Junior Faculty Forum, the Yale/Stanford/Harvard Junior Faculty Forum; and law faculty workshops at Arizona, Richmond, Stanford, and Temple.

1   Presentment of the Grand Jury of the Circuit Court for the District of Virginia (May 22, 1797) [hereinafter Presentment of the Grand Jury], *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, at 181, 181 (Maeva Marcus et al. eds., 1990).

2   *See, e.g.,* 4 WILLIAM BLACKSTONE, COMMENTARIES \*350 ("[T]he liberties of England cannot but subsist so long as this *palladium* remains sacred and inviolate ...."); A NATIVE OF VIRGINIA, OBSERVATIONS UPON THE PROPOSED PLAN OF FEDERAL GOVERNMENT (1788) (asserting that in prosecutions of "a bold writer, or any other person, who had become obnoxious to [the government,] ... the trial by jury may well be called the palladium of liberty"), *reprinted in* 9 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 655, 686 (John P. Kaminski & Gaspare J. Saladino eds., 1990).

[3]     *Resolution of the Virginia House of Delegates,* VA. GAZETTE, & GEN. ADVERTISER (Richmond), Jan. 3, 1798, at 2.

[4]     8 ANNALS OF CONG. 2164 (1798) (statement of Rep. Albert Gallatin).

[5]     *Id.*

[6]     Many scholars have pointed out Republican *complaints* about jury selection, usually once sedition prosecutions were underway, but these scholars have not explored how fears of partisan juries shaped Republican thought about speech and press freedoms in the first place. *E.g.,* 3 ALBERT J. BEVERIDGE, THE LIFE OF JOHN MARSHALL 42-43 (1919); ZECHARIAH CHAFEE, JR., FREEDOM OF SPEECH 78 (1920); MICHAEL KENT CURTIS, FREE SPEECH, "THE PEOPLE'S DARLING PRIVILEGE": STRUGGLES FOR FREEDOM OF EXPRESSION IN AMERICAN HISTORY 67-68 (2000); PETER CHARLES HOFFER, THE FREE PRESS CRISIS OF 1800: THOMAS COOPER'S TRIAL FOR SEDITIOUS LIBEL 47-48 (2011); Frank Maloy Anderson, *The Enforcement of the Alien and Sedition Laws, in* ANNUAL REPORT OF THE AMERICAN HISTORICAL ASSOCIATION FOR THE YEAR 1912, at 115, 125-26 (1914); *Juror Reform Bills of 1800, in* 4 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, at 270, 270 (Maeva Marcus ed., 1992); Kathryn Preyer, United States v. Callender: *Judge and Jury in a Republican Society, in* ORIGINS OF THE FEDERAL JUDICIARY: ESSAYS ON THE JUDICIARY ACT OF 1789, at 173, 182-83 (Maeva Marcus ed., 1992); Geoffrey R. Stone, *The Story of the Sedition Act of 1798: "The Reign of Witches", in* FIRST AMENDMENT STORIES 13, 20 (Richard W. Garnett & Andrew Koppelman eds., 2012). Richard Buel Jr. observes that lessened confidence in juries reinforced longstanding Republican opposition to proscribing political opinions, RICHARD BUEL JR., SECURING THE REVOLUTION: IDEOLOGY IN AMERICAN POLITICS, 1789-1815, at 251-52 (1972), and Adrienne Koch and Harry Ammon note that Jefferson's effort to reform jury selection was an aspect "of one campaign to defend civil liberties," Adrienne Koch & Harry Ammon, *The Virginia and Kentucky Resolutions: An Episode in Jefferson's and Madison's Defense of Civil Liberties,* 5 WM. & MARY Q. 145, 153 (1948), but these works do not account for the Republicans' innovative theory of the First Amendment.

[7]     8 ANNALS OF CONG. 2153 (1798) (statement of Rep. Edward Livingston).

[8]     *See* Jud Campbell, *Natural Rights and the First Amendment,* 127 YALE L.J. 246, 312 (2017) ("This view became prominent only later in the 1790s, when Republicans realized that Federalist control of all three branches of the federal government, combined with the administration's ability to choose jurors, threatened their political survival."). For more on speech and press freedoms from the Founding Era to the Sedition Act, see generally PHILLIP I. BLUMBERG, REPRESSIVE JURISPRUDENCE IN THE EARLY AMERICAN REPUBLIC: THE FIRST AMENDMENT AND THE LEGACY OF ENGLISH LAW (2010); LEONARD W. LEVY, EMERGENCE OF A FREE PRESS (1985); David A. Anderson, *The Origins of the Press Clause,* 30 UCLA L. REV. 455 (1983); David. S. Bogen, *The Origins of Freedom of Speech and Press,* 42 MD. L. REV. 429 (1983); Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions,* 102 YALE L.J. 907 (1993); William T. Mayton, *Seditious Libel and the Lost Guarantee of a Freedom of Expression,* 84 COLUM. L. REV. 91 (1984); and David M. Rabban, *The Ahistorical Historian: Leonard Levy on Freedom of Expression in Early American History,* 37 STAN. L. REV. 795 (1985). For a closer look at non-elite attitudes, see Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism,* 82 FORDHAM L. REV. 721, 748-54 (2013) and Saul Cornell, *The People's Constitution vs. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate over Originalism,* 23 YALE J.L. & HUMAN. 295, 326-34 (2011).

[9]     *See, e.g.,* Jack M. Balkin, *Nine Perspectives on* Living Originalism, 2012 U. ILL. L. REV. 815, 837 ("The abstract language of the First Amendment left unresolved differing views about the meaning of freedom of speech and press; these disputes would break out into the open later on in the 1790s ...."); James P. Martin, *When Repression Is Democratic and Constitutional: The Federalist Theory of Representation and the Sedition Act of 1798,* 66 U. CHI. L. REV. 117, 121 (1999) ("[T]he Sedition Act was really a 'last hurrah' and pyrrhic victory in a conflict between a fading 'republican' and still emerging 'liberal' understanding of representation and the political and social order."). For portrayals of Republican views as consistent over the 1790s, see, for example, Anderson, *supra* note 8, at 529-33; Jay S. Bybee, *Taking Liberties with the First Amendment: Congress, Section 5, and the Religious Freedom Restoration Act,* 48 VAND. L. REV. 1539,

1567-71 (1995); and Mayton, *supra* note 8, at 117-21. When scholars have drawn on the dynamism of the period, it is often to emphasize a putative shift in views among Federalists. *E.g.,* Anderson, *supra* note 8, at 519-20. Leonard Levy, it is worth noting, famously argued that Republican views substantially evolved in the 1790s. But where Levy perceived *continuity* in an understanding of the First Amendment as a categorical bar on federal regulations of expression, LEVY, *supra* note 8, at 323, and *novelty* in Madison's more liberal understanding of speech and press freedoms, *id.* at 320-25, my view is the opposite. Nobody at the Founding argued that the First Amendment would have a different effect than state speech and press freedoms, but *other* arguments against the Sedition Act were not--as David Rabban rightly points out--"a sudden breakthrough in libertarian thought." Rabban, *supra* note 8, at 852.

[10]   AKHIL REED AMAR, AMERICA'S UNWRITTEN CONSTITUTION: THE PRECEDENTS AND PRINCIPLES WE LIVE BY 169 (2012). For those keeping score, Americans' first electoral opportunity to weigh in on the Sedition Act was the election of 1798--a tidal wave Federalist victory. In another work, Amar wrote that "a popular majority adjudicated the First Amendment question in the election of 1800, by throwing out the haughty and aristocratic rascals who had tried to shield themselves from popular criticism." AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 23 (1998) [hereinafter AMAR, BILL OF RIGHTS]. The Sedition Act, he emphasized, was a "betrayal of the original Bill of Rights." *Id.* at 305.

[11]   *See* COLLEEN A. SHEEHAN, JAMES MADISON AND THE SPIRIT OF REPUBLICAN SELF-GOVERNMENT 54 (2009) (describing the conflict between James Madison and Alexander Hamilton as being "propelled by a fundamental philosophic disagreement over the nature and role of public opinion in a republic"). *See generally* JAMES ROGER SHARP, AMERICAN POLITICS IN THE EARLY REPUBLIC: THE NEW NATION IN CRISIS (1993) (providing an overview of political conflict in the 1790s).

[12]   *See* BUEL, *supra* note 6, at 91-136 (highlighting disagreements over the role of public opinion in various conflicts throughout the 1790s).

[13]   *See* Walter Berns, *Freedom of the Press and the Alien and Sedition Laws: A Reappraisal,* 1970 SUP. CT. REV. 109, 129-35 (discussing the Republican opposition to the Sedition Act and simultaneous acceptance of analogous state laws). For a brief summary of Jefferson's views, see Michael P. Downey, Note, *The Jeffersonian Myth in Supreme Court Sedition Jurisprudence, 76 WASH. U. L.Q. 683, 694-99 (1998).*

[14]   Although limiting powers was sometimes a means for protecting liberty, the Founding generation did not equate "retaining rights" and "reserving powers" in the way that much of the modern scholarship suggests.

[15]   *See, e.g.,* Wesley J. Campbell, *Commandeering and Constitutional Change, 122 YALE L.J. 1104, 1171-74 (2013)* (describing the emergence of the anticommandeering principle post-ratification); David M. Golove & Daniel J. Hulsebosch, *A Civilized Nation: The Early American Constitution, the Law of Nations, and the Pursuit of International Recognition, 85 N.Y.U. L. REV. 932, 1017-18 (2010)* (observing that Federalists and Republicans had "a tendency to reargue" constitutional issues of foreign policy that had appeared settled at the time of ratification); Richard Primus, *''The Essential Characteristic'': Enumerated Powers and the Bank of the United States, 117 MICH. L. REV. 415 (2018)* (presenting Madison's enumerated-powers argument against the national bank, and the ensuing debate, as novel).

[16]   JOHN PHILLIP REID, THE ANCIENT CONSTITUTION AND THE ORIGINS OF ANGLO-AMERICAN LIBERTY 29-30 (2005).

[17]   JONATHAN GIENAPP, THE SECOND CREATION: FIXING THE AMERICAN CONSTITUTION IN THE FOUNDING ERA (2018).

Compendium_Cornell
Page 0775

[18] For an assessment of the broader constitutional impact of the development of parties, see generally Daryl J. Levinson & Richard H. Pildes, *Separation of Parties, Not Powers,* 119 HARV. L. REV. 2312 (2006).

[19] Anarchy, *To the* Anti-Federal Electors *of the County of Dutchess,* POUGHKEEPSIE COUNTRY J., Mar. 18, 1788, *reprinted in* 21 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1449, 1450 (John P. Kaminski et al. eds., 2005); *see also, e.g.,* THE FEDERALIST NO. 10, at 59 (James Madison) (Jacob E. Cooke ed., Wesleyan University Press 1961) ("No man is allowed to be a judge in his own cause ...."); THE FEDERALIST NO. 80, *supra,* at 538 (Alexander Hamilton) ("No man ought certainly to be a judge in his own cause ....").

[20] James Madison, The Report of 1800 (Jan. 7, 1800), *in* 17 THE PAPERS OF JAMES MADISON 303, 339 (David B. Mattern et al. eds., 1991); *see id.* at 340 (declaring that the First Amendment "was intended as a positive and absolute reservation" of any "power whatever over the press").

[21] *E.g.,* LUCAS A. POWE, JR., THE FOURTH ESTATE AND THE CONSTITUTION: FREEDOM OF THE PRESS IN AMERICA 47-48 (1991); Bybee, *supra* note 9, at 1556, 1567-71. For further discussion, see *infra* notes 259-62 and accompanying text.

[22] *See, e.g.,* Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience,* 117 HARV. L. REV. 1765, 1767 nn.6-8, 1768 (2004) (listing several theories).

[23] Campbell, *supra* note 8, at 262.

[24] To be sure, a minority of Republicans made theory-based arguments that have become significant to our modern constitutional ethos. *See, e.g.,* CASS R. SUNSTEIN, DEMOCRACY AND THE PROBLEM OF FREE SPEECH 38, 119, 245 (1993) (drawing on James Madison's ideas).

[25] *See infra* subpart IV(B).

[26] Jud Campbell, *Republicanism and Natural Rights at the Founding,* 32 CONST. COMMENT. 85, 87-88 (2017).

[27] Thomas B. McAffee, *The Bill of Rights, Social Contract Theory, and the Rights "Retained" by the People,* 16 S. ILL. U. L.J. 267, 267, 271 (1992); *see also* sources cited *infra* note 29.

[28] *See, e.g.,* MASS. CONST. pt. 1, art. I (ratified 1780) ("All men ... have certain natural, essential, and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; [and] that of acquiring, possessing, and protecting property ...."), *amended by* MASS. CONST. amend. CVI; *see also* MICHAEL P. ZUCKERT, THE NATURAL RIGHTS REPUBLIC: STUDIES IN THE FOUNDATION OF THE AMERICAN POLITICAL TRADITION 77-82 (1996) (exploring the treatment of these concepts in the writings of Thomas Jefferson).

[29] *See* Campbell, *supra* note 26, at 92-98 (exploring this concept); Hamburger, *supra* note 8, at 909 (same); Barry A. Shain, *Rights Natural and Civil in the Declaration of Independence* (same), *in* THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND 116, 132, 139-41 (Barry Alan Shain ed., 2007); *see also* Campbell, *supra* note 8, at 272 n.114 (collecting additional sources).

[30] 1 WILLIAM BLACKSTONE, COMMENTARIES *121.

31   *See* LARRY D. KRAMER, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 70 (2004) (noting this view).

32   *See, e.g.,* JAMES WILSON, *Of Juries* (explaining this view in connection to social-contract theory), *in* 2 COLLECTED WORKS OF JAMES WILSON 954, 960 (Kermit L. Hall & Mark David Hall, eds., 2007); *see also* KRAMER, *supra* note 31, at 70 ("[T]he eighteenth-century view was more complex."); JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 295 (1996) ("[R]epresentation and jury trial were dual securities for ... personal rights."); JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION: THE AUTHORITY OF RIGHTS 50-52 (1986) (surveying eighteenth-century views of juries); William Michael Treanor *Taking Text Too Seriously: Modern Textualism, Original Meaning, and the Case of Amar's* Bill of Rights, 106 MICH. L. REV. 487, 536 (2007) (discussing the representative view of juries).

33   John Adams, Diary Notes on the Right of Juries (Feb. 12, 1771) (emphasis added), *in* 1 LEGAL PAPERS OF JOHN ADAMS 228, 228 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965).

34   Letter from Thomas Jefferson to Abbé Arnoux (July 19, 1789), *in* 15 THE PAPERS OF THOMAS JEFFERSON 282, 283 (Julian P. Boyd ed., 1958).

35   *See, e.g.,* Virginia Assembly Debates (Dec. 14, 1798) (statement of Del. George K. Taylor) ("[N]atural rights ... could not be deprived ... without a trial by Jury."), *in* DEBATES IN THE HOUSE OF DELEGATES OF VIRGINIA, UPON CERTAIN RESOLUTIONS BEFORE THE HOUSE, UPON THE IMPORTANT SUBJECT OF THE ACTS OF CONGRESS PASSED AT THEIR LAST SESSION, COMMONLY CALLED, THE ALIEN AND SEDITION LAWS 18 (Richmond, Thomas Nicolson 1818) [hereinafter DEBATES IN THE HOUSE OF DELEGATES OF VIRGINIA].

36   Adams, *supra* note 33, at 229.

37   FEDERAL FARMER, LETTER XV TO THE REPUBLIC (1788), *reprinted in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1043, 1048-49 (John P. Kaminski et al. eds., 2004).

38   *See, e.g.,* 1 WILLIAM BLACKSTONE, COMMENTARIES *52 ("[A] state is a collective body ... [that] can therefore be no otherwise produced than by a *political union;* by the consent of all persons ... according to [the state's] constitution[] ...."); John Adams, *Preliminary Observations* ("The first 'collection' of authority must be an unanimous agreement to form themselves into a *nation, people, community,* or *body politic* ...."), *in* 4 THE WORKS OF JOHN ADAMS 299, 301 (Charles Francis Adams ed., Bos., Little, Brown & Co. 1851); James Madison, *Sovereignty* ("[L]et us consult the Theory which contemplates a certain number of individuals as meeting and agreeing to form one political society, in order that the rights the safety & the interest of each may be under the safeguard of the whole."), *in* 9 THE WRITINGS OF JAMES MADISON 568, 570 (Gaillard Hunt ed., 1910).

39   *See generally* JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION, 4 vols. (1986-1993) (comparing British and American constitutional thought). For a shorter discussion, see KRAMER, *supra* note 31, at 9-34.

40   JOSEPH PRIESTLEY, AN ESSAY ON THE FIRST PRINCIPLES OF GOVERNMENT, AND ON THE NATURE OF POLITICAL, CIVIL, AND RELIGIOUS LIBERTY 59 (London, J. Dodsley et al. 1768).

41   *See, e.g.,* JAMES WILSON, *Of Citizens and Aliens* (describing the formation of the social contract historically but then discerning the terms of the social contract through reasoning, not historical inquiry), *in* 2 COLLECTED WORKS OF JAMES WILSON, *supra* note 32, at 1038, 1045; *Brutus II,* N.Y.J., Nov. 1, 1787 (same), *reprinted in* 19 THE

DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 154, 154-55 (John P. Kaminski et al. eds., 2003).

42 *See* REID, *supra* note 32, at 28-40 (reviewing the concept of "immemoriality").

43 Campbell, *supra* note 8, at 290-92.

44 *See id*. at 265 n.73 (collecting sources).

45 *See, e.g.,* JAMES WILSON, *Of the Natural Rights of Individuals* (discussing limits of the freedom of speech), *in* 2 COLLECTED WORKS OF JAMES WILSON, *supra* note 32, at 1053, 1066; William Livingston, *Of the Use, Abuse, and Liberty of the Press,* INDEP. REFLECTOR (N.Y.C.), Aug. 30, 1753 ("Civil Liberty is built upon a Surrender of so much of our natural Liberty, as is necessary for the good Ends of Government; and the Liberty of the Press, is always to be restricted from becoming a Prejudice to the public Weal."), *reprinted in* FREEDOM OF THE PRESS FROM ZENGER TO JEFFERSON 75, 79 (Leonard W. Levy ed., Carolina Acad. Press 1996); Jacob Rush, The Nature of an Oath Stated and Explained (Aug. 8, 1796) (defending bans on profane swearing because it "lessen[s] that awe and reverence of the Supreme Being, which is one of the strongest guards against perjury; and consequently be in a high degree injurious to society"), *in* CHARGES AND EXTRACTS OF CHARGES, ON MORAL AND RELIGIOUS SUBJECTS 25, 31 (Phila., D. Hogan 1803).

46 [THOMAS GORDON], OF FREEDOM OF SPEECH: THAT THE SAME IS INSEPARABLE FROM PUBLICK LIBERTY (1720), *reprinted in* 1 JOHN TRENCHARD & THOMAS GORDON, CATO'S LETTERS: OR ESSAYS ON LIBERTY, CIVIL AND RELIGIOUS, AND OTHER IMPORTANT SUBJECTS 110, 111 (Ronald Hamowy ed., 1995).

47 WILSON, *supra* note 41, at 1046.

48 *See* BUEL, *supra* note 6, at 93-112 (esp. 93), 128-35, 244-61 (esp. 250, 255-57) (offering a balanced assessment of Federalist views).

49 For recognitions of the general approval of sedition laws in the eighteenth century, see BLUMBERG, *supra* note 8, at 2; HOFFER, *supra* note 6, at 139; LEONARD W. LEVY, LEGACY OF SUPPRESSION: FREEDOM OF SPEECH AND PRESS IN EARLY AMERICAN HISTORY 10 (1960) [hereinafter LEVY, LEGACY OF SUPPRESSION]; Berns, *supra* note 13, at 134; Bogen, *supra* note 8, at 462; Hamburger, *supra* note 8, at 910-11; Philip B. Kurland, *The Original Understanding of the Freedom of the Press Provision of the First Amendment*, 55 MISS. L.J. 225, 252 (1985); and Rabban, *supra* note 8, at 810, 823. The acceptance of sedition laws, however, was by no means unanimous. In a revised and retitled version of his pathbreaking and controversial book, *Legacy of Suppression,* Leonard Levy offered contradictory remarks about the original meaning of the First Amendment. LEVY, *supra* note 8, at 272-74.

50 James Alexander, Letter to the Editor, *Free Speech Is a Pillar of Free Government,* PA. GAZETTE (Phila.), Nov. 17, 1737, *reprinted in* FREEDOM OF THE PRESS FROM ZENGER TO JEFFERSON, *supra* note 45, at 62, 62-63.

51 4 WILLIAM BLACKSTONE, COMMENTARIES *151-52.

52 JEAN-LOUIS DE LOLME, THE CONSTITUTION OF ENGLAND, OR AN ACCOUNT OF THE ENGLISH GOVERNMENT 283 (London, T. Spilsbury 1775).

53   4 WILLIAM BLACKSTONE, COMMENTARIES *151-52. Notably, however, Blackstone assumed that "the object of legal punishment" was "the disseminating or making public of bad sentiments, destructive of the ends of society" and that "to censure the licentiousness is to maintain the liberty of the press." *Id.* at *152-53.

54   This issue remained contested for a long time. *See, e.g.,* Letter from John Adams to William Cushing (Mar. 7, 1789) ("The difficult and important question is whether the Truth of words can be admitted by the court to be given in evidence to the jury, upon a plea of not guilty?"), *in* FREEDOM OF THE PRESS FROM ZENGER TO JEFFERSON, *supra* note 45, at 152, 153; Kate Elizabeth Brown, *Rethinking* People v. Croswell*: Alexander Hamilton and the Nature and Scope of "Common Law" in the Early Republic,* 32 LAW & HIST. REV. 611, 612-13, 639-41 (2014) (recounting a famous 1803-1804 New York controversy over the truth defense). American judges sometimes ruled that "a defendant could establish the truth of the publication only to show that he lacked the requisite malicious intent." David Jenkins, *The Sedition Act of 1798 and the Incorporation of Seditious Libel into First Amendment Jurisprudence,* 45 AM. J. LEGAL HIST. 154, 192 (2001).

55   PA. CONST. of 1776, ch. I, art. XII. Vermont, which was not yet recognized as an American state, also mentioned the freedom of speech in its constitution. *See* VT. CONST. of 1786, ch. I, art. XV ("That the people have a right of freedom of speech and of writing and publishing their sentiments, concerning the transactions of government--and therefore the freedom of the press ought not to be restrained.").

56   Anderson, *supra* note 8, at 464-65, app. at 538-41.

57   *See, e.g.,* R.A.V. v. City of St. Paul, 505 U.S. 377, 381 (1992); Texas v. Johnson, 491 U.S. 397, 406, 420 (1989).

58   *See, e.g.,* Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984) ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any [defamation] judgment that is not supported by clear and convincing proof of 'actual malice.'").

59   WENDELL BIRD, PRESS AND SPEECH UNDER ASSAULT: THE EARLY SUPREME COURT JUSTICES, THE SEDITION ACT OF 1798, AND THE CAMPAIGN AGAINST DISSENT 11 (2016).

60   ALEXANDER HAMILTON, THE FARMER REFUTED (1775), *reprinted in* 1 THE PAPERS OF ALEXANDER HAMILTON 81, 100 (Harold C. Syrett ed., 1961); *see* REID, *supra* note 16, at 38-39 (explaining the eighteenth-century conception of arbitrary rule); *see also* HAMILTON, *supra,* at 100 ("When any people are ruled by laws, in framing which, they have no part, that are to bind them, to all intents and purposes, without, in the same manner, binding the legislators themselves, they are in the strictest sense slaves, and the government with respect to them, is despotic").

61   THE FEDERALIST NO. 10, *supra* note 19, at 59 (James Madison); *accord, e.g.,* Calder v. Bull, 3 U.S. (3 Dall.) 386, 388 (1798) (opinion of Chase, J.) ("[A] law that makes a man a *Judge in his own cause* ... is against all reason and justice ...."); THE FEDERALIST NO. 80, *supra* note 19, at 538 (Alexander Hamilton) ("No man ought certainly to be a judge in his own cause ...."). Indeed, the rule that no man should judge his own cause was the foundation of one of Edward Coke's most famous decisions. *See* Dr. Bonham's Case (1610) 77 Eng. Rep. 638, 652; 8 Co. Rep. 107 a, 118 a ("[O]ne cannot be Judge and attorney for any of the parties ...."); *see also* R.H. Helmholz, Bonham's Case, *Judicial Review, and the Law of Nature,* 1 J. LEGAL ANALYSIS 325, 335 (2009) ("There is no doubt ... that acting as a judge in one's own cause had long been regarded as a violation of the law of nature.").

62   A NATIVE OF VIRGINIA, *supra* note 2, at 686. As Theophilus Parsons proclaimed during the Massachusetts Ratifying Convention:

Compendium_Cornell
Page 0779

Let him be considered as a criminal by the general government, yet only his own fellow citizens can convict him--they are his jury, and if they pronounce him innocent, not all the powers of Congress can hurt him; and innocent they certainly will pronounce him, if the supposed law he resisted was an act of usurpation.

Massachusetts Ratification Convention Debates (Jan. 23, 1788) (statement of Theophilus Parsons), *in* 6 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1313, 1328 (John P. Kaminski & Gaspare J. Saladino eds., 2000); *see also, e.g.,* [Samuel Bryan], *Centinel I,* INDEP. GAZETTEER (Phila.), Oct. 5, 1787 ("[I]f I use my pen with the boldness of a freeman, it is because I know that *the liberty of the press yet remains unviolated,* and *juries yet are judges*."), *reprinted in* 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 158, 159 (Merrill Jensen ed., 1976); Letter from John Adams to William Cushing, *supra* note 54, at 153 ("[I]f the jury found [the putatively libelous statements] true and that they were published for the Public good, they would readily acquit.").

63    *Cincinnatus I: To James Wilson, Esquire,* N.Y.J., Nov. 1, 1787 [hereinafter *Cincinnatus I*], *reprinted in* 19 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 41, at 160, 163.

64    Alexander White, *To the Citizens of Virginia,* WINCHESTER VA. GAZETTE, Feb. 22, 1788, *reprinted in* 8 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 402, 405 (John P. Kaminski & Gaspare J. Saladino eds., 1988).

65    2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 341, 587-88, 617 (Max Farrand ed., 1911).

66    Using the Pennsylvania Constitution as a template, several state ratification conventions mentioned the freedom of speaking, writing, and publishing in a preamble their recognition of the liberty of the press. *See* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 93 (Neil H. Cogan ed., 1997) (proposals of North Carolina, Rhode Island, Virginia, and the Pennsylvania minority); *see also The Society of Western Gentlemen Revise the Constitution,* VA. INDEP. CHRON. (Richmond), Apr. 30, 1788 ("That the people have a right to the freedom of speech, of writing, and publishing their sentiments; therefore printing presses shall not be subject to restraint, other than liableness to legal prosecution, for false facts printed and published."), *reprinted in* 9 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 2, at 769, 773.

67    THE FEDERALIST NO. 84, *supra* note 19, at 578 (Alexander Hamilton).

68    *See, e.g.,* Virginia Ratification Convention Debates (June 16, 1788) (statement of Patrick Henry) (mentioning only press freedom), *in* 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1299, 1332 (John P. Kaminski & Gaspare J. Saladino eds., 1993); FEDERAL FARMER, LETTER VI TO THE REPUBLIC (1788) (same), *in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 37, at 979, 985; *see also* Lawrence Rosenthal, *First Amendment Investigations and the Inescapable Pragmatism of the Common Law of Free Speech,* 86 IND. L.J. 1, 15 (2011) ("As for freedom of speech, anti-Federalists said virtually nothing about it."). To be fair to Hamilton, Anti-Federalists had voiced concerns about all sorts of infractions on other forms of retained natural liberty. *See* Philip A. Hamburger, *Trivial Rights,* 70 NOTRE DAME L. REV. 1, 12-17 (1994) (describing Anti-Federalists' appeals for a "remarkably long list of rights," even including a right to hunt).

69    *See* Campbell, *supra* note 8, at 300 n.242 (collecting sources).

70    *E.g.,* A CITIZEN OF NEW YORK [JOHN JAY], AN ADDRESS TO THE PEOPLE OF THE STATE OF NEW YORK (1788), *reprinted in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 37, at 922, 933; *Foederal Constitution,* PA. GAZETTE (Phila.), Oct. 10, 1787, *reprinted in* 13 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 362, 363-64 (John P. Kaminski &

Gaspare J. Saladino eds., 1981); *Uncus,* MD. J. (Balt), Nov. 9, 1787, *reprinted in* 14 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 76, 78 (John P. Kaminski & Gaspare J. Saladino eds., 1983).

[71]   Campbell, *supra* note 8, at 296.

[72]   Support for this statement comes from the author's review of every mention of the word "press" in the first twenty-four volumes of *The Documentary History of the Ratification of the Constitution*.

[73]   *Brutus II, supra* note 41, at 156; *see also, e.g., Cincinnatus I, supra* note 63, at 162 ("The conventions that made the state and the general constitutions, sprang from the same source, were delegated for the same purpose ....").

[74]   Thomas Jefferson may deserve some credit for stimulating shifts in Madison's views. *See, e.g.*, Letter from Thomas Jefferson to James Madison (Mar. 15, 1789) ("[I]n a constitutive act which leaves some precious articles unnoticed, and raises implications against others, a declaration of rights becomes necessary by way of supplement."), *in* 14 THE PAPERS OF THOMAS JEFFERSON 659, 660 (Julian P. Boyd ed., 1958); *see also* PAULINE MAIER, RATIFICATION: THE PEOPLE DEBATE THE CONSTITUTION, 1787-1788, at 443-46 (2010) (summarizing Jefferson's correspondence with Madison over adding a declaration of rights).

[75]   1 ANNALS OF CONG. 438 (1789) (statement of Rep. James Madison). The editors of the Annals of Congress published two versions of the first two volumes. These versions have different pagination but identical title pages, making it necessary to distinguish them by the page headings ("History of Congress" or "Gales & Seaton's History of Debates in Congress") rather than publication details. *See* Campbell, *supra* note 26, at 91 n.27. Citations in this Article are to the "History of Congress" volumes.

[76]   *See* Rabban, *supra* note 8, at 814 ("[T]he few congressional comments on the proposed first amendment were brief, ambiguous, and apathetic." (citing LEVY, *supra* note 8)).

[77]   1 ANNALS OF CONG. 434 (1789) (statement of Rep. James Madison). Pennsylvania's constitution specified that "the people have a right to freedom of speech, and of writing and publishing their sentiments; therefore the freedom of the press ought not to be restrained." PA. CONST. of 1776, ch. I, art. XII.

[78]   House Committee Report (July 28, 1789), *in* 4 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA 27, 28 (Charlene Bangs Bickford & Helen E. Veit eds., 1986).

[79]   1 ANNALS OF CONG. 738 (1789) (statement of Rep. James Madison).

[80]   House Resolution and Articles of Amendment (Aug. 24, 1789) (emphasis added), *in* 4 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA, *supra* note 78, at 35, 39.

[81]   Campbell, *supra* note 8, at 313.

[82]   *See* Anderson, *supra* note 8, at 502, 508 (refuting the notion that any of the Framers considered the Speech and Press Clauses to be absolute prohibitions); Bogen, *supra* note 8, at 458 n. 143 ("Because no one spoke against the adoption of a guarantee of freedom of speech and of the press as placing too strong a limit on government ... any notion that the framers intended all statements to be immune from federal prosecution is hard to credit.").

[83]   Some modern textualists would endorse this use of "drafting history" arguments. *See* John F. Manning, *Textualism as a Nondelegation Doctrine,* 97 COLUM. L. REV. 673, 737 n.272 (1997) ("[T]extualist judges ... do not categorically

exclude a statute's drafting evolution from their consideration of statutory context."); Caleb Nelson, *What Is Textualism?,* 91 VA. L. REV. 347, 361 (2005) ("[M]any textualists use records of a bill's drafting history ... to shed light on how members of the enacting legislature understood the resulting statute ...."). Notably, Congress has constitutional authority to draft and propose amendments, whereas the Philadelphia Convention of 1787, whose then-secretive proceedings are afforded less weight in modern originalist theory, was not authorized to draft the Constitution.

84    *See, e.g.,* Stewart Jay, *The Creation of the First Amendment Right to Free Expression: From the Eighteenth Century to the Mid-Twentieth Century,* 34 WM. MITCHELL L. REV. 773, 791 (2008) ("The introductory clause, 'Congress shall make no law,' which originated in the Senate, exactly paralleled the Federalist position on the press clause; that there was no affirmative power in the Constitution that granted Congress the ability to regulate the press."); Leonard W. Levy, *Introduction* (citing the introductory clause for the view that Congress was "totally without power to enact legislation respecting the press"), *in* FREEDOM OF THE PRESS FROM ZENGER TO JEFFERSON, *supra* note 45, at xix, lvi-lvii.

85    *See infra* note 266 (collecting sources).

86    James Madison, *Memorial and Remonstrance Against Religious Assessments* (ca. June 20, 1785), *in* 8 THE PAPERS OF JAMES MADISON 295, 299 (Robert A. Rutland et al. eds., 1973). Jefferson articulated the idea in a draft bill that Virginia's legislature did not end up passing until 1786. Thomas Jefferson, A Bill for Establishing Religious Freedom (1779), *in* 2 THE PAPERS OF THOMAS JEFFERSON 545, 546 (Julian P. Boyd ed., 1950).

87    *E.g.,* Kurt T. Lash, *The Second Adoption of the Free Exercise Clause: Religious Exemptions Under the Fourteenth Amendment,* 88 NW. U. L. REV. 1106, 1113 (1994); Vincent Phillip Muñoz, *James Madison's Principle of Religious Liberty,* 97 AM. POL. SCI. REV. 17, 23 (2003).

88    *See, e.g.,* 8 ANNALS OF CONG. 2105 (1798) (statement of Rep. Nathaniel Macon) ("[I]f a law like this was passed, to abridge the liberty of the press, Congress would have the same right to pass a law making an establishment of religion, or to prohibit its free exercise ...."); *id.* at 2153 (statement of Rep. Edward Livingston) ("Gentlemen may tomorrow establish a national religion agreeably to the opinion of a majority of this House .... The doing of this is not less forbidden than the act which the House are about to do.").

89    *See* Philip A. Hamburger, *Equality and Diversity: The Eighteenth-Century Debate About Equal Protection and Equal Civil Rights,* 1992 SUP. CT. REV. 295, 353 (calling such arguments "unconventional"). Some earlier commentators took the same position as Jefferson, *e.g.,* RONALD M. PETERS, JR., THE MASSACHUSETTS CONSTITUTION OF 1780: A SOCIAL COMPACT 79-86 (1974), but this was decidedly a "minority point of view," *id.* at 86.

90    Joseph M. Snee, *Religious Disestablishment and the Fourteenth Amendment,* 1954 WASH. U. L.Q. 371, 379-86. As Snee observes, "It is indeed stressing the obvious to conclude that, in [Madison's] mind at least, ... the establishment of a religion by law is not per se an infringement of the equal rights of conscience." *Id.* at 384. I agree, although it seems possible that Madison proposed the clause with awareness that he or others might use it as a basis for disestablishmentarian arguments.

91    James Madison, Notes for Speech in Congress (June 8, 1789) ("[N] *atural rights,* retained--as Speech, Con[science.]"), *in* 12 THE PAPERS OF JAMES MADISON 193, 194 (Charles F. Hobson & Robert A. Rutland eds., 1979); Proposal by Roger Sherman to House Committee of Eleven (July 21-28, 1789) ("[C]ertain natural rights which are retained ... [include] the right of conscience ... [and the right] of Speaking, writing and publishing ... with decency and freedom ...."), *in* THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS, *supra* note *66,* at 83, 83.

92    *See* Bernadette Meyler, *Towards a Common Law Originalism,* 59 STAN. L. REV. 551, 567 (2006).

93    For discussions of the emerging political parties of the 1790s, see generally NOBLE E. CUNNINGHAM, JR., THE JEFFERSONIAN REPUBLICANS: THE FORMATION OF PARTY ORGANIZATION, 1789-1801 (1957); STANLEY ELKINS & ERIC MCKITRICK, THE AGE OF FEDERALISM (1993); and SHARP, *supra* note 11.

94    John Adams, Inaugural Speech to Both Houses of Congress (Mar. 4, 1797), *in* 9 THE WORKS OF JOHN ADAMS 105, 109 (Charles Francis Adams ed., Bos., Little, Brown & Co. 1854). For French political meddling, see ELKINS & MCKITRICK, *supra* note 93, at 341-65, 520-21.

95    *See* ALEXANDER DECONDE, THE QUASI-WAR: THE POLITICS AND DIPLOMACY OF THE UNDECLARED WAR WITH FRANCE 1797-1801, at 8-11 (1966).

96    John Adams, Speech to Both Houses of Congress (May 16, 1797), *in* 9 THE WORKS OF JOHN ADAMS, *supra* note 94, at 111, 118.

97    Circular Letter from Samuel Jordan Cabell (Jan. 12, 1797), *in* 1 CIRCULAR LETTERS OF CONGRESSMEN TO THEIR CONSTITUENTS 1789-1829, at 67, 69 (Noble E. Cunningham, Jr. ed., 1978).

98    *Id.*

99    James Iredell's Charge to the Grand Jury of the Circuit Court for the District of Maryland (May 8, 1797) [hereinafter James Iredell's Charge], *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 173, 177. Iredell's Richmond charge included minor revisions but none pertinent to this part of his charge. *See id.* at 173 nn. 1-7 (noting the differences).

100    *See* WILLIAM R. CASTO, THE SUPREME COURT IN THE EARLY REPUBLIC: THE CHIEF JUSTICESHIPS OF JOHN JAY AND OLIVER ELLSWORTH 126-29 (1995) (providing examples).

101    James Iredell's Charge, *supra* note 99, at 177.

102    *Id.*

103    Presentment of the Grand Jury, *supra* note 1, at 181.

104    VA. GAZETTE, & GEN. ADVERTISER (Richmond), May 24, 1797, at 3.

105    Letter from Thomas Jefferson to James Madison (Aug. 3, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON 489, 490 (Barbara B. Oberg ed., 2002); *see also, e.g.,* A Virginian, *From the Virginia Argus,* AURORA GEN. ADVERTISER (Phila.), June 21, 1797, at 3 ("I do not remember that my astonishment has been so greatly excited as it was the other day at reading a presentment, by the grand jury to the federal court."). Jefferson's use of "it's" as a possessive pronoun-- common at that time--is edited here for clarity.

106    LEVY, LEGACY OF SUPPRESSION, *supra* note 49, at 241; *accord* BLUMBERG, *supra* note 8, at 74 ("The grand jury without dissent promptly returned a presentment charging Cabell with criminal libel ..." (footnote omitted)); JOSHUA A. CHAFETZ, DEMOCRACY'S PRIVILEGED FEW: LEGISLATIVE PRIVILEGE AND DEMOCRATIC NORMS IN THE BRITISH AND AMERICAN CONSTITUTIONS 88 (2007) ( "Samuel J. Cabell ... was charged with seditious libel"); DAVID N. MAYER, THE CONSTITUTIONAL THOUGHT OF THOMAS JEFFERSON 199 (1994) ("[A] federal grand jury had returned a presentment, or formal accusation of crime, against Samuel J. Cabell ... for seditious

libel ...."); NORMAN L. ROSENBERG, PROTECTING THE BEST MEN: AN INTERPRETIVE HISTORY OF THE LAW OF LIBEL 77 (1986) ("[G]rand jurors returned an indictment ... against Congressman Samuel J. Cabell of Virginia for criminal libel."); JAMES MORTON SMITH, FREEDOM'S FETTERS: THE ALIEN AND SEDITION LAWS AND AMERICAN CIVIL LIBERTIES 95 (1956) ("[T]he federal grand jury at Richmond, Virginia, handed down a presentment which denounced the Republican representative from Albemarle district ...."). Several scholars have properly regarded the presentment as distinct from a formal charge. *E.g.,* Koch & Ammon, *supra* note 6, at 152-53. The most thorough summary of the Cabell affair appears in Brent Tarter & Wythe Holt, *The Apparent Political Selection of Federal Grand Juries in Virginia, 1789-1809,* 49 AM. J. LEGAL HIST. 257, 266-74 (2007).

107    *See* Sally E. Hadden, *South Carolina's Grand Jury Presentments: The Eighteenth-Century Experience* (explaining the difference between indictments and presentments), *in* SIGNPOSTS: NEW DIRECTIONS IN SOUTHERN LEGAL HISTORY 89, 89 (Sally E. Hadden & Patricia Hagler Minter eds., 2013); Renée B. Lettow, *Reviving Federal Grand Jury Presentments,* 103 YALE L.J. 1333, 1338 (1994) (same). Some grievance presentments protested the Sedition Act. *See* Douglas Bradburn, *A Clamor in the Public Mind: Opposition to the Alien and Sedition Acts,* 65 WM. & MARY Q. 565, 582 (2008) (discussing a Tennessee presentment).

108    CITY GAZETTE & DAILY ADVERTISER (Charleston, S.C.), Jan. 27, 1798, at 2. Grievance presentments were commonplace. *See, e.g.,* Presentment of the Grand Jury of the Circuit Court for the District of Virginia (May 23, 1794) (expressing a "national Grievanc[e]" over debts owed to Britain), *in* 2 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, at 472, 472 (Maeva Marcus ed., 1988).

109    Contemporaries widely understood the Cabell presentment as grievance presentment rather than as a formal indictment. *See, e.g.,* Samuel Jordan Cabell, Letter, AURORA GEN. ADVERTISER (Phila.), May 31, 1797 ("They do not complain of violations of any law ... but they complain of opinions ..."), *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 183, 183-84; Anonymous Correspondent, Letter, PHILA. GAZETTE, June 16, 1797 ("When judges and juries, whose province is rigid justice under the law, quit that solid ground for the wide field of opinion, they may thereby become political engines ...."), *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 199, 200; Letter from Henry Tazewell to [John Page?] (June 3, 1797) ("If the writers had violated the Laws, the Court and Jury knew that the Culprits and not their opinions were the fit subjects for animadversion."), *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 189, 189. The claim that "the grand jury quickly withdrew its presentment," Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers,* 86 HARV. L. REV. 1113, 1142 (1973), is mistaken.

110    Cabell, *supra* note 109, at 183.

111    Scaevola, *To James Iredell,* VA. GAZETTE, & GEN. ADVERTISER (Richmond), June 11, 1797, *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 192, 194. Clay, who lived in Richmond until November 1797, used the pseudonym Scaevola the following year in Kentucky. 1 CALVIN COLTON, THE LIFE AND TIMES OF HENRY CLAY 29, 187 (N.Y.C, A.S. Barnes & Co. 1846). Clay was involved in opposition to the Sedition Act in Kentucky. Bradburn, *supra* note 107, at 567-68.

112    Scaevola, *supra* note 111, at 192. Iredell responded in a Richmond newspaper, explaining that "it has been a frequent practice in some of the southern states for grand juries to present what they considered as grievances though they could not be the foundation of a criminal prosecution." James Iredell Letter, VA. GAZETTE, & GEN. ADVERTISER (Richmond), June 21, 1797, *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 201, 202.

113    *See, e.g.,* Letter from George Washington to the United States Senate and House of Representatives (Nov. 19, 1794) ("In the four western Counties of Pennsylvania a prejudice ... produced symptoms of riot and violence .... [C]ertain self-created societies assumed the tone of condemnation."), *in* 17 THE PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES 181, 181 (David R. Hoth & Carol S. Ebel eds., 2013); Letter from the United States Senate

Compendium_Cornell
Page 0784

to George Washington (Nov. 22, 1794) ("Our anxiety, arising from the licentious & open resistance to the laws, in the western counties of Pennsylvania, has been increased, by the proceedings of certain self-created societies ...."), *in* 17 THE PAPERS OF GEORGE WASHINGTON: PRESIDENTIAL SERIES, *supra*, at 198, 198.

114    Philip S. Foner, *The Democratic-Republican Societies: An Introduction, in* THE DEMOCRATIC-REPUBLICAN SOCIETIES, 1790-1800: A DOCUMENTARY SOURCEBOOK OF CONSTITUTIONS, DECLARATIONS, ADDRESSES, RESOLUTIONS, AND TOASTS 3, 31 (Philip S. Foner ed., 1976).

115    DAVID P. CURRIE, THE CONSTITUTION IN CONGRESS: THE FEDERALIST PERIOD 1789-1801, at 190 (1997). The vehemence of Republican opposition perhaps stemmed from a fear that Congress might later invoke legislative privileges to *punish* critics of the government.

116    4 ANNALS OF CONG. 935 (1794) (statement of Rep. James Madison).

117    *Id.* at 934; *see also id.* at 917-18 (statement of Rep. William Giles) (making similar points).

118    Cabell, *supra* note 109, at 183.

119    *Id.* at 184 ("If I have written falsely with a view to deceive my countrymen, why did not this enlightened jury state the facts which I have misrepresented?").

120    Letter from Henry Tazewell to [John Page?], *supra* note 109, at 189; *see also* Marius, *To Jugurtha,* VA. GAZETTE, & GEN. ADVERTISER (Richmond), June 24, 1797 ("I doubt ... whether a judicial body of men have a right to brand with infamy, the expression of ... political sentiments .... If they do not punish them because they are without their jurisdiction, neither can they take cognizance of political opinions, which the law has not expressly placed within it."), *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 203, 203-04; Scaevola, *supra* note 111, at 194 ("If the conduct for which mr. Cabell was presented was criminal, the court should have directed a prosecution ....").

121    *E.g.,* Circular Letter from Anthony New (June 17, 1797), *in* 1 CIRCULAR LETTERS OF CONGRESSMEN TO THEIR CONSTITUENTS 1789-1829, *supra* note 97, at 91, 91; Letter from Thomas Jefferson to Peregrine Fitzhugh (June 4, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 415, 417. Perhaps even more commonly, Republicans invoked freedom of opinion. *E.g.,* Marius, *supra* note 120, at 205; Circular Letter from John Clopton (June 19, 1797), *in* 1 CIRCULAR LETTERS OF CONGRESSMEN TO THEIR CONSTITUENTS 1789-1829, *supra* note 97, at 94, 94. Federalists sometimes rejected an absolute privilege to express opinions, making clear the natural-rights basis of the idea. *See* A Virginian, COLUMBIAN CENTINEL (BOS.), June 24, 1797 ("Freedom of opinion is certainly an inherent privilege.--So is freedom of action.--But murder is to be punished by death. And although Grand Jurors are not lawmakers, yet they are its guardians, and it is their peculiar province to stop sedition ...."), *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 205, 205.

122    Federalists responded that the grand jurors were merely presenting *their* opinion of Cabell's letters, leaving Cabell and others free to express their views as well. *E.g.,* A Friend to Juries, *Letter to Samuel Jordan Cabell,* VA. GAZETTE, & GEN. ADVERTISER (Richmond), June 30, 1797, *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 207, 208-09; Timothy Tickle, *Letter to Samuel Jordan Cabell,* VA. GAZETTE, & GEN. ADVERTISER (Richmond), July 5, 1797, *reprinted in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 213, 215-16.

123    HAMILTON, *supra* note 60, at 100.

124    Cabell, *supra* note 109, at 184.

125    1 JAMES T. CALLENDER, THE PROSPECT BEFORE US 20 (Richmond, M. Jones, S. Pleasants, Jr. & J. Lyon 1800).

126    Letter from Henry Tazewell to [John Page?], *supra* note 109, at 189.

127    *See* Letter from James Iredell to Hannah Iredell (May 25, 1797) (describing the Grand Jury as "composed of many of the most respectable Men in the State"), *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 182, 182.

128    Robert Pollard was a Federalist member of the House of Delegates from King William County, where he also was clerk of court for many years.

129    Former delegates were Corbin Griffin, Edward Hack Moseley, Thomas Newton, and Thomas Tinsley.

130    Merchants included Robert Burton and Andrew Donald, who were members of expansive Scottish mercantile networks centered around Glasgow; Thomas Thompson, who was a native of Ireland and worked as a wine merchant in Madiera; Richard Randolph; William Vannerson; and Thomas Newton of Norfolk.

131    Former clerks included Otway Byrd, Edward Hack Moseley, and Thomas Griffin Peachy. Joseph Selden, one of the few Republicans on the grand jury, was a judge in Richmond and later represented Henrico County in the House of Delegates. In 1802, Selden heard a libel complaint against publisher James Thompson Callender. Unlike the other three Republican magistrates, Selden ruled in favor of Callender, deciding "it improper that such a restraint should be laid on the press." ALBANY GAZETTE, Jan. 17, 1803. This story apparently was reprinted from the *Virginia Gazette*.

132    Richard Randolph was the brother of David Meade Randolph.

133    Corbin Griffin was the brother of Cyrus Griffin. Other jurors were related to each other. Andrew Donald was the brother-in-law of fellow juror Callohill Mennis. Richard Randolph was married to Maria Beverley--a first cousin of Otway Byrd's wife and a niece of Thomas Griffin Peachy's wife. Peachy was first cousin of Corbin Griffin, his son had married John Blair's niece, and he was related to Otway Byrd and Robert Pollard through his wife's family.

134    *See, e.g.,* ALBERT H. TILLSON, JR., GENTRY AND COMMON FOLK: POLITICAL CULTURE ON A VIRGINIA FRONTIER 1740-1789, at 18 (1991) ("A small circle of elite families dominated most Virginia counties in the eighteenth century ....").

135    The Judiciary Act instructed federal marshals to summon jurors "designated by lot or otherwise in each State respectively according to the mode of forming juries therein now practised, so far as the laws of the same shall render such designation practicable by the courts or marshals of the United States." Judiciary Act of 1789, ch. 20, § 29, 1 Stat. 73, 88. The Act further provided that federal jurors in each state had to have the same qualifications as required for jury service "in the highest courts of law of such State." *Id.* In six of the original eleven states--Delaware, Maryland, New Jersey, New York, Pennsylvania, and Virginia, plus Kentucky and Vermont-- this meant that federal marshals hand selected jurors. Robert L. Jones, *Finishing a Friendly Argument: The Jury and the Historical Origins of Diversity Jurisdiction,* 82 N.Y.U. L. REV. 997, 1054 (2007); *Juror Reform Bills of 1800, supra* note 6, at 271.

136   Letter from William Loughton Smith to Edward Rutledge (Aug. 9-10, 1789) (reporting Ellsworth's remarks), *in* 4 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 6, at 496, 499; *see also id.* ("[State] Juries were too apt to be biassed ag[ain]st [foreigners], in favor of their own citizens & acquaintances ...."). Whigs had a longstanding complaint against the return of "Corrupt and Unqualified Persons" to serve on juries, including men who "were not Freeholders." An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown 1689, 1 W. & M. c. 2, § 9 (Eng.) [hereinafter English Bill of Rights].

137   WILSON, *supra* note 32, at 961. Robert Jones provocatively describes the federal selection of jurors as the primary impetus for federal diversity jurisdiction. *See* Jones, *supra* note 135, at 1005 ("[F]ederal officials could judiciously exercise their control over federal jury compositions to ensure that only the 'better sort' of Americans would decide cases in the federal courts.").

138   *See* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776-1787, at 495-99 (1969).

139   WILSON, *supra* note 32, at 961.

140   *See* PHILA. INDEP. GAZETTEER, Dec. 14, 1787 (expressing fears of a "*partial* and *interested* FEDERAL COURT"), *reprinted in* 14 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 70, at 459, 459.

141   Some Anti-Federalists emphasized the importance of a local jury to fact-finding given the familiarity of local juries with the characters of the witnesses and parties. JEFFREY ABRAMSON, WE, THE JURY: THE JURY SYSTEM AND THE IDEAL OF DEMOCRACY 27-28 (1994). But, as Abramson trenchantly observes, "The jury served freedom not only by getting the facts right but also by getting the people right. Local citizens were empowered to control the actual administration of justice." *Id.* at 28.

142   THE FEDERALIST NO. 83, *supra* note 19, at 564 (Alexander Hamilton).

143   Tarter & Holt, *supra* note 106, at 263.

144   *Id.* at 283. Federalists in Virginia usually were not partisan firebrands, at least compared to their northern counterparts, but they responded to Federalist calls for order. RICHARD R. BEEMAN, THE OLD DOMINION AND THE NEW NATION, 1788-1801, at 156-58 (1972).

145   Those eight were John Blair, Otway Byrd, Corbin Griffin, Calohill Minnis, Thomas Griffin Peachy, Robert Pollard, Richard Randolph, and Thomas Tinsley.

146   Those five were Robert Burton, Andrew Donald, Thomas Newton, Thomas Thompson, and William Vannerson. Richard Randolph was a merchant but was also a known Federalist.

147   See, for instance, several letters in the *Virginia Gazette, and General Advertiser* (Richmond), July 26, 1797.

148   Letter from Thomas Jefferson to James Madison, *supra* note 105, at 490.

149   Thomas Jefferson, Draft Petition to the Virginia House of Delegates (Aug. 3, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 493, 495.

[150]   *Id.* at 496.

[151]   *Id.* at 495.

[152]   *Id.* The apostrophe in the possessive pronoun "it's" has been removed for clarity.

[153]   *See* JOHN H. LANGBEIN, RENÉE LETTOW LERNER & BRUCE P. SMITH, HISTORY OF THE COMMON LAW: THE DEVELOPMENT OF ANGLO-AMERICAN LEGAL INSTITUTIONS 426-27 (2009) (identifying *Bushell's Case,* a 1670 English decision, as establishing juror immunity).

[154]   Jefferson, *supra* note 149, at 496. Formally, Jefferson proposed that the General Assembly punish the grand jurors through impeachment. John Page also mentioned impeachment shortly after learning of Cabell's presentment. *See* Letter from John Page to St. George Tucker (June 14, 1797) ("What think you of the late Presentment? I confess I feel almost disposed to impeach the Judge & his Gr[d] Jury!!!"), *in* 3 THE DOCUMENTARY HISTORY OF THE SUPREME COURT OF THE UNITED STATES, 1789-1800, *supra* note 1, at 190, 190 n.2.

[155]   Letter from James Madison to Thomas Jefferson (Aug. 5, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 505, 505; Letter from James Monroe to Thomas Jefferson (Sept. 5, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 524, 524.

[156]   Letter from James Monroe to Thomas Jefferson, *supra* note 155, at 524.

[157]   Letter from Thomas Jefferson to James Monroe (Sept. 7, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 526, 526.

[158]   Thomas Jefferson, Revised Petition to the House of Delegates (Aug. 7-Sept. 7, 1797), *in* 29 THE PAPERS OF THOMAS JEFFERSON, *supra* note 105, at 499, 502.

[159]   *Id.; accord* Letter from Thomas Jefferson to James Monroe, *supra* note 157, at 526 ("[T]his right of free correspondence ... has not been given to us under 1st. the federal constitution, 2dly. any law of Congress, or 3dly. any treaty, but as before observed, by nature. It is therefore not alienated, but remains under the protection of [states'] courts").

[160]   Jefferson, *supra* note 86, at 546. Critics of Jefferson's position accepted this premise. *See* An Eastern Layman, *To The Publick,* VA. GAZETTE (Williamsburg), Aug. 14, 1779, at 1 ("That the *opinions* of men are not the objects of civil government, is a dogma, to which every rational mind must necessarily accede ...."); *see also, e.g.,* 4 ANNALS OF CONG. 934 (1794) (statement of Rep. James Madison) ("Opinions are not the objects of legislation."); A Landholder [Oliver Ellsworth], *Letter VII to the Landholders and Farmers,* CONN. COURANT (Hartford), Dec. 17, 1787 ("Civil government has no business to meddle with the private opinions of the people."), *reprinted in* 14 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 70, at 448, 451.

[161]   *See* Jefferson, *supra note* 86, at 546 ("[N]o man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever ....").

[162]   *See supra* notes 86-91 and accompanying text.

163   Letter from Thomas Jefferson to David Humphreys (Mar. 18, 1789), *in* 14 THE PAPERS OF THOMAS JEFFERSON, *supra* note 74, at 676, 678.

164   *Id.*

165   *See, e.g.,* Letter from Thomas Jefferson to the Danbury Baptist Association (Jan. 1, 1802), *in* 36 THE PAPERS OF THOMAS JEFFERSON 258, 258 (Barbara B. Oberg ed., 2009) ("I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.").

166   Letter from Thomas Jefferson to James Madison (July 31, 1788), *in* 13 THE PAPERS OF THOMAS JEFFERSON 440, 442 (Julian P. Boyd ed., 1956).

167   VA. GAZETTE, & GEN. ADVERTISER (Richmond), Jan. 3, 1798, at 1.

168   *Id.* at 2.

169   Letter from Thomas Jefferson to Abbé Arnoux, *supra* note 34, at 282, 283. Federalists protested Republican attacks on the jury, arguing that "legislative interferences with this sacred political institution tend to discredit the same, and by impairing its weight and influence, evidently promote the cause of despotism." VA. GAZETTE, & GEN. ADVERTISER (Richmond), Jan. 3, 1798, at 2. But to no avail; the delegates overwhelmingly voted down Federalist proposals. *Id.* In a rarely mentioned epilogue, the Virginia Senate excoriated the House for passing resolutions on behalf of the people "without the participation of the Senate." VA. GAZETTE, & GEN. ADVERTISER (Richmond), Jan. 10, 1798, at 2.

170   Letter from Thomas Jefferson to James Madison (Apr. 26, 1798), *in* 30 THE PAPERS OF THOMAS JEFFERSON 299, 299 (Barbara B. Oberg ed., 2003).

171   *Id.* at 300.

172   8 ANNALS OF CONG. 2098 (1798) (statement of Rep. John Allen).

173   *Id.*; *see also, e.g., id.* at 2146 (statement of Rep. Harrison Gray Otis) ("[E]very independent Government has a right to preserve and defend itself against injuries and outrages which endanger its existence ...."); *id.* at 2133 (statement of Rep. George Thatcher) (drawing an analogy to a federal law against threatening federal officials). Federalists described as "absurd" the view that the federal government might be "indebted to and dependent on an individual State for its protection." *Id.* at 2146 (statement of Rep. Harrison Gray Otis). Notably, Federalists had already sketched out the basis for a possible sedition law in the 1794 congressional debates over Democratic-Republican societies. *See* 4 ANNALS OF CONG. 937 (1794) (statement of Rep. Samuel Dexter) ("[W]hen [speech and press] were so abused as to become hostile to liberty, and threaten her destruction, the abuses ought to be corrected .... [H]e did not doubt the right to forbid such flagrant outrages on social order, and all arts tending to produce them.").

174   Preyer, *supra* note 6, at 187. For a nuanced and penetrating review of Federalist thought, see generally Marc Lendler, *"Equally Proper at All Times and at All Times Necessary": Civility, Bad Tendency, and the Sedition Act,* 24 J. EARLY REPUBLIC 419 (2004).

175   8 ANNALS OF CONG. 2147 (1798) (statement of Rep. Harrison Gray Otis).

176    *Id*. at 2148.

177    *See id*. at 2102 (statement of Rep. Robert Goodloe Harper) (defining the "true meaning" of "the liberty of the Press" as "no more than that a man shall be at liberty to print what he pleases, provided he does not offend against the laws").

178    The treatment of the Federalist understanding of the First Amendment as *merely* a rule against prior restraints is common in the literature. *See, e.g.,* Genevieve Lakier, *The Invention of Low-Value Speech,* 128 HARV. L. REV. 2167, 2180 & n.51 (2015) (citing Otis for the principle that a "[no-prior-restraint] view of the freedom of speech and press had been propagated by some supporters of the Sedition Act of 1798"); Lendler, *supra* note 174, at 426 n.28 ("[I]t is clear that the Federalists thought the First Amendment meant 'no prior restraint.'"). But Otis and other Federalists referred to that rule when expounding the liberty of the *press*, not the freedom of speech (or, as Otis put it, the "liberty of writing, publishing, and speaking").

179    8 ANNALS OF CONG. at 2098 (1798) (remarks of Rep. John Allen); *see also id*. at 2112 (remarks of Rep. Samuel Dana) ("Is [speech and press freedom] a license to injure others or the Government, by calumnies, with impunity? ... Can it be anything more than the right of uttering and doing what is not injurious to others?").

180    *E.g., id*. at 2167 (statement of Rep. Robert Goodloe Harper); *id*. at 2150 (statement of Rep. Harrison Gray Otis); *id*. at 2102 (statement of Rep. Robert Goodloe Harper).

181    *Id*. at 2150 (statement of Rep. Harrison Gray Otis); *see also, e.g., id*. at 2156 (statement of Rep. Samuel Dana) ("[N]o honest man wanted the liberty of uttering malicious falsehood--and this law would operate against no other publications.").

182    *Id*. at 2149 (statement of Rep. Harrison Gray Otis); *see also id*. at 2168 (statement of Rep. Robert Goodloe Harper) (echoing these comments about the role of juries in determining falsity and malice).

183    The Senate bill did not mention a truth defense, but Federalists may have viewed the idea as implicit "from the construction of the bill itself." *Id*. at 2134 (statement of Rep. Robert Goodloe Harper). Congressional debates reflect wide agreement that juries should be permitted to serve as "judges of the law as well as the fact," *id*. at 2135; *id*. (statement of Rep. William Claiborne), meaning they would have "a power of returning a [general] verdict of guilty, or not guilty," *id*. (statement of Rep. Harrison Gray Otis); *see also id*. at 2136 (statement of Rep. Albert Gallatin) (describing the common law principle that "a jury in criminal cases were judges not only of the fact, but also of the criminality of that fact"); *id*. (statement of Rep. Nathaniel Smith) ("[T]here can be no doubt but juries have already that power ...."). Among those who spoke up, only James Bayard opposed giving power to juries to decide law, arguing that "a power of this kind is much more safely lodged in the hands of learned and upright Judges, than it could possibly be in those of an unlettered and perhaps prejudiced jury." *Id*. (statement of Rep. James Bayard). Bayard worried that "the effect of this amendment would be, to put it into the power of a jury to declare that this is an unconstitutional law, instead of leaving this to be determined, where it ought to be determined, by the Judiciary." *Id*.

184    *Id*. at 2151 (statement of Rep. Harrison Gray Otis); *see also id*. at 2168 (statement of Rep. Robert Goodloe Harper) ("[N]or could he be persuaded that the liberty of the press, as understood by the Constitution, could ever be abridged by a law to punish, on conviction before a jury, the publication of false, scandalous, and malicious libels"). In the so-called "Minority Report," Federalists in the Virginia Assembly, perhaps under the leadership of John Marshall, made similar arguments. Kurt T. Lash & Alicia Harrison, *Minority Report: John Marshall and the Defense of the Alien and Sedition Acts,* 68 OHIO ST. L.J. 435, 457-58 (2007).

185    Scholars often criticize the bill for not protecting Vice President Thomas Jefferson and for its expiration at the end of the presidential term, *e.g.,* Anderson, *supra* note 8, at 520; Mayton, *supra* note 8, at 124, but congressional debates do not reveal Republican opposition to either of these points, *see, e.g.,* 8 ANNALS OF CONG. 2134, 2138 (1798) (reporting

the votes on several amendments to the bill); *see also* Lendler, *supra* note 174, at 420 (noting attempts to reauthorize the Act in 1801).

186    8 ANNALS OF CONG. 2111 (1798) (statement of Rep. Albert Gallatin).

187    *Id.; see also, e.g., id.* at 2159, 2161-62 (statement of Rep. Albert Gallatin) (emphasizing the lack of necessity); *id.* at 2106 (statement of Rep. Nathaniel Macon) (arguing that the availability of state libel prosecutions showed a lack of necessity for federal law).

188    *Id.* at 2158 (statement of Rep. Albert Gallatin); *see also, e.g., id.* at 2151-52 (statement of Rep. Nathaniel Macon) ("They (Congress) have power to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; but they have no power to define *any other crime whatever*." (quoting James Iredell)).

189    *Id.* at 2159 (statement of Rep. Albert Gallatin).

190    *Id.* at 2139 (statement of Rep. John Nicholas).

191    *Id.* at 2140.

192    *Id.*

193    *Id.*

194    *Id.*

195    *Id.* at 2153 (statement of Rep. Edward Livingston).

196    *Id.* at 2154.

197    *Id.* at 2153.

198    *Id.* at 2163 (statement of Rep. Albert Gallatin); *see also id.* at 2159-60 ("The sense, in which he and his friends understood this amendment, was that Congress could not pass any law to punish any real or supposed abuse of the press.").

199    *Id.* at 2164.

200    *Id.* at 2163-64.

201    *Id.* at 2164.

202    *Id.*

203    Jefferson was extraordinarily cautious in his correspondence at this time, DUMAS MALONE, JEFFERSON AND THE ORDEAL OF LIBERTY 319-20 (1962), and his presence in Philadelphia until the eve of the Sedition Act debates in

the House leaves unclear how he may have personally shaped the Republican opposition at this time. Without success, I have reviewed the papers of Albert Gallatin at the Library of Congress, the papers of Edward Livingston at Princeton, and the papers of the Nicholas family at the University of Virginia.

204     Federalists prosecuted the editors of seven newspapers in hand-selection states--two in Vermont, two in New York, two in Pennsylvania, and one in Virginia--and one each in the selection-by-lot states of Massachusetts and Connecticut. BLUMBERG, *supra* note 8, at 102-34. Other confirmed prosecutions took place in Massachusetts, New York, and Vermont, again tilting toward the hand-selection states. *Id*. at 134-39.

205     For Republican opposition to the Alien Friends Act, see generally, JOHN C. MILLER, CRISIS IN FREEDOM: THE ALIEN AND SEDITION ACTS (1951). For continuity in Republican thought about federalism, see generally, K.R. Constantine Gutzman, *The Virginia and Kentucky Resolutions Reconsidered: "An Appeal to the* Real Laws *of Our Country*", 66 J.S. HIST. 473 (2000).

206     8 ANNALS OF CONG. 2140 (1798) (statement of Rep. John Nicholas).

207     *Id*.

208     *Id*.

209     *See, e.g., id*. at 2160 (statement of Rep. Albert Gallatin) (describing reliance on the distinction between liberty and license as an "insulting evasion" of the Constitution). Gallatin further argued that speech was not subject to "previous restraints" unless "the Constitution had given Congress a power to seal the mouths or to cut the tongues of the citizens of the Union," *id.*, and therefore "a Constitutional clause forbidding any abridgement of the freedom of speech must necessarily mean, not that no laws should be passed laying previous restraints upon it, but that no punishment should by law be inflicted upon it," *id*. at 2160-61.

210     *Id*. at 2148 (statement of Rep. Harrison Gray Otis).

211     *Id*.

212     *Id*. at 2149.

213     *Id*. Federalists tried to reauthorize the Sedition Act in January 1801, leading to a reprisal of the same arguments. 10 ANNALS OF CONG. 916-40, 946-58, 960-76 (1801). Republicans again highlighted jury selection as a principal concern. *E.g., id*. at 965 (statement of Rep. Nathaniel Macon); *id*. at 951 (statement of Rep. Albert Gallatin).

214     10 ANNALS OF CONG. 40 (1800) (statement of Sen. Charles Pinckney).

215     *Id*. at 37.

216     *Id*.

217     *See, e.g.,* Virginia Assembly Debates (Dec. 19, 1798) (statement of Del. William Daniel) (warning of "a jury summoned with a *special regard* to their political opinions"), *in* DEBATES IN THE HOUSE OF DELEGATES OF VIRGINIA, *supra* note 35, at 99; AURORA GEN. ADVERTISER (Phila.), Nov. 7, 1799, at 3 ("How could such a President secure the conviction of those men? By *influencing marshals* to *pack* juries, *to select men* who should be devoted to his interest.");

AURORA GEN. ADVERTISER (Phila.), May 20, 1799, at 2 ("The Grand Jury [are] *well selected* and as well calculated to echo the sentiments of any Judge ...."); *see also Juror Reform Bills of 1800, supra* note 6, at 270 ("Concern about juror selection increased during the Sedition Act trials that were held between 1798 and 1800. Throughout those well-publicized proceedings, Republicans insisted that federal marshals were packing juries to secure the conviction of men who had criticized the Adams administration." (footnote omitted)).

218  Thomas Jefferson, Petition to the General Assembly of Virginia (Nov. 2 or 3, 1798), *in* 30 THE PAPERS OF THOMAS JEFFERSON, *supra* note 170, at 571, 572.

219  *Id.*

220  *Id.* at 573.

221  *Id.* Jefferson was tapping into a Republican fear that judges would overbear unwitting jurors. *See* JOHN PHILLIP REID, CONTROLLING THE LAW: LEGAL POLITICS IN EARLY NATIONAL NEW HAMPSHIRE 115-30 (2004) (recounting an episode of heavy-handed judges in early nineteenth-century New Hampshire).

222  Letter from Thomas Jefferson to James Madison (Nov. 17, 1798), *in* 17 THE PAPERS OF JAMES MADISON, *supra* note 20, at 175, 175.

223  Thomas Jefferson, The Kentucky Resolutions of 1798, *in* 30 THE PAPERS OF THOMAS JEFFERSON, *supra* note 170, at 529. The main text quotes from Jefferson's draft, but his "fair copy" is virtually identical. *See* Thomas Jefferson, Jefferson's Fair Copy (before Oct. 4, 1798), *in* 30 THE PAPERS OF THOMAS JEFFERSON, *supra* note 170, at 543, 543-45. On the origins of the Virginia and Kentucky Resolutions, see generally Koch & Ammon, *supra* note 6.

224  Thomas Jefferson, Jefferson's Draft (before Oct. 4, 1798), *in* 30 THE PAPERS OF THOMAS JEFFERSON, *supra* note 170, at 536, 536.

225  *Id.*

226  *Id.*

227  *Id.* at 536-37.

228  *Id.* at 537.

229  *Id.*

230  Jefferson, however, clearly indicated that states could "abridge [ ]" the "licentiousness of speech and of the press." *Id.* Indeed, although Kentucky's 1799 Constitution provided that "every citizen may freely speak, write, and print on any subject," it recognized legal responsibility "for the abuse of that liberty." KY. CONST. of 1799, art. X, § 7. It further provided for a truth defense in "prosecutions for the publication of papers investigating the official conduct of officers or men in a public capacity, or where the matter published is proper for public information." *Id.,* art. X, § 8. These provisions were modeled on PA. CONST. of 1790, art. IX, § 7.

231  Jefferson, *supra* note 224, at 537. In the Virginia legislature, John Taylor of Caroline similarly tied the state-based remedy to the usurpation of state power. *See* Virginia Assembly Debates (Dec. 20, 1798) (statement of Del. John Taylor

Compendium_Cornell
Page 0793

of Caroline) ("[T]he States ... as parties [to the Constitution], were justifiable in preserving their rights under the compact against violation."), *in* DEBATES IN THE HOUSE OF DELEGATES OF VIRGINIA, *supra* note 35, at 132-33.

232    James Madison, Virginia Resolutions (Dec. 21, 1798), *in* 17 THE PAPERS OF JAMES MADISON, *supra* note 20, at 185, 189-90.

233    *Id*. at 190.

234    *Id*.

235    The Address is often errantly attributed to James Madison. *See* David B. Mattern et al., *Note on the Virginia Resolutions, 10 January 1799, and the Address of the General Assembly to the People of the Commonwealth of Virginia, 23 January 1799* (addressing this misconception), *in* 17 THE PAPERS OF JAMES MADISON, *supra* note 20, at 199, 199-206. The Address criticizes Federalist reliance on the First Amendment as a *source* of federal power, but it does not articulate a theory of speech and press freedoms that would inhibit sedition prosecutions.

236    Address of the General Assembly to the People of the Commonwealth of Virginia (Jan. 23, 1799), *in* 6 THE WRITINGS OF JAMES MADISON: COMPRISING HIS PUBLIC PAPERS AND HIS PRIVATE CORRESPONDENCE, INCLUDING NUMEROUS LETTERS AND DOCUMENTS NOW FOR THE FIRST TIME PRINTED 332, 334 (Gaillard Hunt ed., 1906).

237    *The Independent* (Dec. 11, 1798), TIMES & ALEXANDRIA ADVERTISER, Dec. 15, 1798.

238    *Id*.

239    *Id*.

240    *See supra* notes 175-84 and accompanying text.

241    MADISON, *supra* note 20, at 336.

242    *Id*.

243    English Bill of Rights, *supra* note 136.

244    MADISON, *supra* note 20, at 336-37.

245    *Id*. at 337.

246    PHILIP HAMBURGER, LAW AND JUDICIAL DUTY 250-54 (2008); JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION: THE AUTHORITY TO LEGISLATE 84-86 (1991). On the development of popular sovereignty, see generally EDMUND S. MORGAN, INVENTING THE PEOPLE: THE RISE OF POPULAR SOVEREIGNTY IN ENGLAND AND AMERICA (1988).

247   For discussions of English rights and the American Revolution, see generally JACK P. GREENE, THE CONSTITUTIONAL ORIGINS OF THE AMERICAN REVOLUTION (2011) and REID, *supra* note 32.

248   Indeed, when arguing for the protection of customary rights, Anti-Federalists often relied on English authorities like Blackstone. *E.g.,* Letter from Richard Henry Lee to Edmund Randolph (Oct. 16, 1787), *in* 8 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 64, at 61, 62-63.

249   FEDERAL FARMER, LETTER II TO THE REPUBLIC (1787), *reprinted in* 19 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 41, at 214, 216; *see also, e.g.,* A PLEBEIAN, AN ADDRESS TO THE PEOPLE OF THE STATE OF NEW YORK (1788) (asserting that "it was useless to stipulate for the liberty of the press" in New York's constitution, "for the common and statute law of England, and the laws of the colony are established, in which this privilege is fully defined and secured"), *reprinted in* 20 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 37, at 942, 961. Interestingly, some Federalists in the First Congress adopted the narrative of American exceptionalism when protesting a proposed law that would have disabled federal officers from electioneering, with other representatives relying on English precedents. Debates in the House of Representatives, Third Session (Jan. 21, 1791), *in* 14 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA, at 339, 339-42 (William Charles diGiacomantonio et al. eds., 1995).

250   1 ANNALS OF CONG. 436 (1789) (statement of Rep. James Madison). Madison went on to say: "The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution." *Id*. Assuming that the debate records are accurate, Madison seems to have viewed "the British Constitution" as limited to constitutional documents like Magna Carta and the English Bill of Rights. But the key point to recognize is that Madison clearly appreciated in 1789 that English constitutionalism recognized certain "great rights"--like "freedom of the press"--that operated against legislative as well as executive action. Thus, even if those English rights were not explicitly solemnized in constitutional texts, their *definition* needed no transformation when taken from England and applied in the United States.

251   MADISON, *supra* note 20, at 337.

252   *Id*.

253   *Id*. at 339.

254   *Id*.

255   *Id*.

256   *Id*.

257   *Id*. at 340. Madison also used the rule against prior restraints to argue against legislative interference with the press. In order to be effectual, he insisted, the "exemption" of the press from "legislative restraint ... must be an exemption, not only from the previous inspection of licensers, but from the subsequent penalty of laws," *id*. at 337, because "a law inflicting penalties on printed publications, would have a similar effect with a law authorizing a previous restraint on them," *id*. at 336.

258   *Id*. at 340. A year earlier, prominent Virginia lawyer George Hay had offered a similar account of the First Amendment's origins. *See* HORTENSIUS [GEORGE HAY], AN ESSAY ON THE LIBERTY OF THE PRESSS 37-38 (Phila., Aurora Office 1799) ("If the word freedom was used in [a natural-rights] sense, by the framers of the amendment, they meant

to say, Congress shall make no law abridging the freedom of the press, which freedom, however, is to be regulated by law. Folly itself does not speak such language.").

259   *E.g.,* Lash, *supra* note 87, at 1111-14; Mayton, *supra* note 8, at 97, 119.

260   Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L. REV. 1209, 1236, 1271 (2010).

261   Lash, *supra* note 87, at 1113; *see also* Vincent Phillip Muñoz, *Two Concepts of Religious Liberty: The Natural Rights and Moral Autonomy Approaches to the Free Exercise of Religion,* 110 AM. POL. SCI. REV. 369, 369 (2016) ("The founders' jurisdictional understanding of religious liberty denies the idea of a constitutional right to religious exemptions."). Lash later adopted the Jeffersonian position full stop, arguing that prior to 1868 Congress had no authority to grant religious exemptions even to its own laws. Kurt T. Lash, *Power and the Subject of Religion,* 59 OHIO ST. L.J. 1069, 1099-1116 (1998).

262   William Baude, *Rethinking the Federal Eminent Domain Power,* 122 YALE L.J. 1738, 1822 (2013).

263   *See* Campbell, *supra* note 8, at 300 n.242 (collecting sources).

264   *Id.* at 301.

265   *Id.* at 300.

266   THE FEDERALIST NO. 84, *supra* note 19, at 579 (Alexander Hamilton); *see also, e.g.,* THE ADDRESS OF THE MINORITY IN THE VIRGINIA LEGISLATURE TO THE PEOPLE OF THAT STATE; CONTAINING A VINDICATION OF THE CONSTITUTIONALITY OF THE ALIEN AND SEDITION LAWS 12 (1799) ("It would have been certainly unnecessary thus to have modified the legislative powers of Congress concerning the press, if the power itself does not exist."). Some have proposed that this line of reasoning violates the constructive rule in the Ninth Amendment. *E.g.,* Baude, *supra* note 262, at 1796-98. *But see* Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 659 n.3 (2012) (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) (inferring power from the Fifth Amendment). Madison's original draft of the Ninth Amendment included a rule specifically barring a powers-enlarging inference from the enumeration of rights, but this language did not survive in the House. Leslie W. Dunbar, *James Madison and the Ninth Amendment,* 42 VA. L. REV. 627, 632 (1956).

267   8 ANNALS OF CONG. 2164 (1798) (statement of Rep. Albert Gallatin).

268   On the importance of social-contract theory and natural law in shaping constitutional discourse at the Founding, see generally Campbell, *supra* note 26.

269   8 ANNALS OF CONG. 2151 (1798) (statement of Rep. Nathaniel Macon).

270   *See* GIENAPP, *supra* note 17 (exploring this concept); Howard Gillman, *The Collapse of Constitutional Originalism and the Rise of the Notion of the "Living Constitution" in the Course of American State-Building,* 11 STUD. AM. POL. DEV. 191, 192-93, 197-213 (1997) (same); *see, e.g.,* Virginia Assembly Debates (Dec. 13, 1798) (statement of Del. John Taylor of Caroline) ("He then read the 3d article of the amendments to the constitution concerning freedom of speech &c. and asked in what sense this clause was understood at the time of adoption?"), *in* DEBATES IN THE HOUSE OF DELEGATES OF VIRGINIA, *supra* note 35, at 7. To be sure, it is *possible* that Madison fully believed what he was saying about history. But the 1798 Virginia Resolutions, which did not articulate a jurisdictional view of the First Amendment, *see supra* notes 232-34 and accompanying text, suggest that Madison was a latecomer to the dominant

Republican position. For a discussion of "Madison and the Origins of Originalism," focusing on Madison's constitutional arguments earlier in the 1790s, see RAKOVE, *supra* note 32, at 339-65. Intriguingly, Madison's later invocations of the ratification debates may be inconsistent with his earlier views about using that type of evidence in constitutional interpretation. Jack N. Rakove, *The Original Intention of Original Understanding,* 13 CONST. COMMENT. 159, 165 (1996). For a probing discussion of the use of history in English and American constitutionalism, see REID, *supra* note 16, at 28-40.

271    *E.g.,* GIENAPP, *supra* note 17.

272    [Spencer Roane], *Hampden I,* RICHMOND ENQUIRER, June 11, 1819, *reprinted in* JOHN MARSHALL'S DEFENSE OF *MCCULLOCH V. MARYLAND* 106, 113 (Gerald Gunther ed., 1969).

273    *See* Kevin R. Gutzman, *A Troublesome Legacy: James Madison and "The Principles of '98",* 15 J. EARLY REPUBLIC 569, 583-89 (1995) (examining this legacy); Kurt T. Lash, *James Madison's Celebrated Report of 1800: The Transformation of the Tenth Amendment,* 74 GEO. WASH. L. REV. 165, 182-86 (2006) (same); H. Jefferson Powell, *The Principles of '98: An Essay in Historical Retrieval,* 80 VA. L. REV. 689, 690-96 (1994) (same).

274    Patterson v. Colorado *ex rel.* Att'y Gen. of Colo., 205 U.S. 454, 462 (1907). *See generally* DAVID M. RABBAN, FREE SPEECH IN ITS FORGOTTEN YEARS (1997) (examining free speech between 1870 and 1920).

275    376 U.S. 254 (1964).

276    *Id.* at 273.

277    *Id.* at 276.

278    BLUMBERG, *supra* note 8, at 144-45.

279    *Sullivan,* 376 U.S. at 276.

280    TUNIS WORTMAN, A TREATISE CONCERNING POLITICAL ENQUIRY AND THE LIBERTY OF THE PRESS 259 (Da Capo Press 1970) (1800); *see also* ST. GEORGE TUCKER, *View of the Constitution of the United States* (writing in 1803 that "the farmer, and the man in authority, stand upon the same ground: both are equally entitled to redress for any false aspersion on their respective characters, nor is there any thing in our laws or constitution which abridges this right"), *in* VIEW OF THE CONSTITUTION OF THE UNITED STATES WITH SELECTED WRITINGS 91, 237-38 (1999); *cf.* JOHN THOMSON, AN ENQUIRY, CONCERNING THE LIBERTY, AND LICENTIOUSNESS OF THE PRESS, AND THE UNCONTROULABLE NATURE OF THE HUMAN MIND: CONTAINING AN INVESTIGATION OF THE RIGHT WHICH GOVERNMENT HAVE TO CONTROUL THE FREE EXPRESSION OF PUBLIC OPINION, ADDRESSED TO THE PEOPLE OF THE U. STATES 81-84 (N.Y.C., Johnson & Stryker 1801) (calling for unimpeded public debate about public figures, although seemingly not interpreting the First Amendment at this point of the argument).

281    *Sullivan,* 376 U.S. at 279-80.

282    *See* Richard A. Epstein, *Was* New York Times v. Sullivan *Wrong?,* 53 U. CHI. L. REV. 782, 790 (1986) (suggesting that the Court was motivated to "save the Times" from a "deep miscarriage of the common law process"); Dan M. Kahan &

Tracey L. Meares, *Foreword: The Coming Crisis of Criminal Procedure,* 86 GEO. L.J. 1153, 1156 (1998) ("Fidelity to history wasn't the goal of the doctrinal innovations of the 1960's; adapting the law to immediate social needs was.").

283    *See, e.g.,* Time, Inc. v. Hill, 385 U.S. 374, 389 (1967) ("A negligence test [for defamation] would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it ....").

284    *Id.* at 406 (Harlan, J., concurring in part and dissenting in part).

285    *Id.; see, e.g.,* Gertz v. Robert Welch, Inc., 418 U.S. 323, 360 (1974) (Douglas, J., dissenting) ("[A] jury determination, unpredictable in the most neutral circumstances, becomes for those who venture to discuss heated issues, a virtual roll of the dice separating them from liability for often massive claims of damage."); Monitor Patriot Co. v. Roy, 401 U.S. 265, 276-77 (1971) ("A standard of 'relevance,' ... applied by a jury under the preponderance-of-the-evidence test, is unlikely to be neutral with respect to the content of speech ...."); *Hill,* 385 U.S. at 402 (Douglas, J., concurring) (highlighting the "capricious or whimsical circumstances" and "emotions and prejudices" that often guide a jury); *see also* AMAR, BILL OF RIGHTS, *supra* note 10, at 24 ("As the First Amendment's center of gravity has (appropriately, in light of the later Fourteenth Amendment) shifted to protection of unpopular, minority speech, its natural institutional guardian has become an insulated judiciary rather than the popular jury.").

286    *See, e.g.,* Kahan & Meares, *supra* note 282, at 1153 ("The need that gave birth to the existing criminal procedure regime was institutionalized racism .... Modern criminal procedure reflects the Supreme Court's admirable contribution to eradicating this incidence of American apartheid."); Corinna Barrett Lain, *Countermajoritarian Hero or Zero? Rethinking the Warren Court's Role in the Criminal Procedure Revolution,* 152 U. PA. L. REV. 1361, 1388-89 (2004) (making a similar point); *see also* Michael J. Klarman, *The Racial Origins of Modern Criminal Procedure,* 99 MICH. L. REV. 48, 61-67, 79-82 (2000) (giving particular attention to the issue of black jury service).

287    NAACP v. Alabama *ex rel.* Patterson, 357 U.S. 449, 460 (1958).

288    N.Y. Times Co. v. Sullivan, 376 U.S. 254, 256-65 (1964).

289    Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 510-11 (1984).

290    *See, e.g.,* Snyder v. Phelps, 562 U.S. 443, 458 (2011) (concluding that a jury would be "unlikely to be neutral with respect to the content of [the] speech" (alteration in original) (quoting *Bose Corp.,* 466 U.S. at 510)).

291    *See* United States v. Carolene Prods. Co., 304 U.S. 144, 152 n.4 (1938) (laying out the framework for heightened scrutiny). For a provocative discussion of *Carolene Products* and its relationship to speech doctrine, see G. Edward White, *The First Amendment Comes of Age: The Emergence of Free Speech in Twentieth-Century America,* 95 MICH. L. REV. 299, 327-42 (1996).

292    283 U.S. 697 (1931).

293    *Id.* at 712-15.

294    *See, e.g.,* Saia v. New York, 334 U.S. 558, 559-62 (1948) (striking down discretionary licenses for loudspeakers); Hague v. Comm. for Indus. Org., 307 U.S. 496, 515-16 (1939) (striking down discretionary licenses for speech in streets and parks); Lovell v. City of Griffin, 303 U.S. 444, 451-52 (1938) (striking down discretionary licenses for leafleting).

Compendium_Cornell
Page 0798

295  Daryl Levinson & Benjamin I. Sachs, *Political Entrenchment and Public Law,* 125 YALE L.J. 400, 416-18 (2015).

296  Michael J. Klarman, *The Puzzling Resistance to Political Process Theory,* 77 VA. L. REV. 747, 754-55 (1991).

297  *See, e.g.,* Schauer, *supra* note 22, at 1785-86 (reviewing some of these theories).

298  *E.g.,* ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENTT 26 (1948).

299  Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561-62 (1980).

300  Martin H. Redish, *The Value of Free Speech,* 130 U. PA. L. REV. 591, 593 (1982).

301  Campbell, *supra* note 8, at 313.

302  For scholarly suggestions along these lines, see Vincent Blasi, *The Checking Value in First Amendment Theory,* 1977 AM. B. FOUND. RES. J. 521, 631-48; Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem,* 85 GEO. L.J. 491, 502 (1997); Klarman, *supra* note 296, at 753-57; Levinson & Sachs, *supra* note 295, at 402. Of course, translating general concerns about biased decisions into specific doctrinal rules would often be tricky. *See, e.g.,* Pamela S. Karlan, *Foreword: Democracy and Disdain,* 126 HARV. L. REV. 1, 30-31 (2012) (discussing competing ways that a process-based theory of judicial review might apply in the context of campaign-finance cases).

97 TXLR 517

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 0799

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12613   Page 257 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

**16 Const. Comment. 221**

Constitutional Commentary
Summer 1999

Articles
Saul Cornell [a1]

Copyright (c) 1999 Constitutional Commentary; Saul Cornell

# COMMONPLACE OR ANACHRONISM: THE STANDARD MODEL, THE SECOND AMENDMENT, AND THE PROBLEM OF HISTORY IN CONTEMPORARY CONSTITUTIONAL THEORY

A new consensus on the meaning of the Second Amendment appears to be crystallizing among constitutional scholars.[1] This new model asserts that the Second Amendment protects both an individual and a collective right of the people to bear arms. Proponents of this interpretation also argue that Amendment is part of a checking function designed to enable the people to resist government tyranny, by arms if necessary.[2] Borrowing conceptual language from the physical sciences, supporters of this new interpretation contend that scholarship on the Second Amendment has produced a paradigm comparable to that employed by physicists to describe recent research: the new interpretation is dubbed the "Standard Model."[3] To support their interpretation, proponents of the new orthodoxy quote liberally from the writings of Federalists, Anti-Federalists, and early constitutional commentators such as St. George **\*222** Tucker and Joseph Story, in order to support their claim that a broad consensus existed in post-Revolutionary America on the meaning of the right to bear arms.[4]

The growing chorus of support for the Standard Model among legal scholars contrasts with the cool reaction to the Standard Model among early American historians.[5] While legal scholars have confidently asserted the emergence of a new orthodoxy, there is little sign that historians are likely to come to a similar agreement. Indeed, the dominant trends in recent historiography point in the opposite direction. The notion that American political thought might be understood in terms of a single ideological paradigm has collapsed under the accumulating weight of evidence demonstrating the incredible vitality and diversity of American political culture in the Revolutionary era.[6] Ironically, at precisely the moment that many historians have abandoned the search for a "unified field theory" that can accommodate the heterogeneity of American political culture, legal scholars have turned to the language of physics and proclaimed the existence of a Standard Model.[7] Rather than begin **\*223** with the assumption of a broad consensus, historical scholarship has increasingly embraced a pluralist model of early American political and constitutional thought.[8]

The flaws in the Standard Model are emblematic of deeper problems in the way history has been used by constitutional scholars.[9] Partisans of the Standard Model have not only read constitutional texts in an anachronistic fashion, but have also ignored important historical sources vital to understanding what Federalists and Anti-Federalists might have meant by the right to bear arms. The structure of legal scholarship has served to spread these errors rather than to contain them. Once published, these errors enter the canons of legal scholarship and are continuously recycled in article after article.[10] Upon closer inspection, the new orthodoxy on the Second Amendment shares little with the Standard Model employed by physicists. Indeed, recent writing on the Second Amendment more closely resembles the intellectual equivalent of a check kiting scheme than it does solidly researched history.

The problem with the legal scholarship associated with the Standard Model is not simply a function of failing to remain up-to-date with the latest trends in early American historiography. Standard Modelers have more fundamentally failed to heed the useful guidelines suggested by H. Jefferson Powell in his important essay, "Rules for Originalists."[11] In that article, Powell correctly warned legal scholars about the dangers of anachronism in constitutional scholarship. The first error is to assume that the **\*224** framers shared our world view: "The 1787 Constitution and the first twelve amendments," Powell noted, "were

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12614   Page 258 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

written and ratified by people whose intellectual universe was distant from ours in deeply significant ways."[12] The second error, also identified by Powell and committed by the Standard Modelers, is to forget that "[c]onsensus or even broad agreement among the founders is a historical assertion to be justified, not assumed."[13] When Standard Modelers claim that they have produced voluminous evidence to demonstrate such a consensus, they fall into an even more deeply rooted historical fallacy: rather than demonstrate the existence of a broad cultural agreement, supporters of the Standard Model have assumed that a common set of terms implied a deeper consensus on what those terms meant.

This anachronism at the heart of the growing body of literature on the Standard Model has been brought into sharper focus by Eugene Volokh's important essay, "The Commonplace Second Amendment."[14] Volokh produces copious evidence to suggest that similar language was found in nearly all of the constitutional documents produced in post-Revolutionary America, most notably the many state constitutions drafted during this period. Volokh suggests that the inclusion of provisions securing the right to bear arms in state constitutions demonstrates that "these provisions secure rights against the state governments."[15] If this is true, he argues, "they must recognize a right belonging to someone other than the state."[16] For Volokh this discovery provides further proof that the right to bear arms must have been viewed as an individual right by Americans of the Revolutionary generation.

Volokh is not alone. Other supporters of the Standard Model have also marshalled compelling evidence that Americans in this period shared a common constitutional language. But documenting the recurring use of a particular set of terms is not the same as understanding how Americans used the language of constitutionalism. Part of the problem with the Standard Model stems from a failure to grapple with a basic problem of historical interpretation, identified by the Cambridge historian Quentin Skinner in one of the most influential historical essays **\*225** written in the last fifty years, "Meaning and Understanding in the History of Ideas."[17] In that essay, Skinner makes a vital distinction between "the occurrence of the words (phrases or sentences) which denote the given idea, and the use of the relevant sentence by a particular agent on a particular occasion with a particular intention (his intention) to make a particular statement."[18] The approach of Standard Modelers does not tell us much about the intent of the authors who wrote these texts. What did Federalists and Anti-Federalists each mean by the right to bear arms? The Standard Model suffers from the problem that mars so much law office history: a failure to adequately contextualize constitutional texts. To understand what a particular historical actor meant when he wrote about the right to bear arms requires scholars to immerse themselves in the surviving evidence from this period and to analyze published and unpublished sources, private comments as well as public statements. Indeed, in addition to the plethora of traditional textual sources, one must explore the political and social texts from this period. The behavior of the historical actors who wrote these texts must be read alongside their published statements.[19]

This failure of the Standard Model to place language in context is encapsulated in the notion of the "commonplace" that Volokh invokes in his recent essay. Standard Modelers have treated the recurring use of particular constitutional terms as examples of commonplaces.[20] What this approach ignores is the profound difference between our modern notion of the commonplace and the way in which the eighteenth century under **\*226** stood this term. The notion of the commonplace itself needs to be understood historically.

Educated Americans of the Revolutionary generation often kept commonplace books in which they copied passages from important texts. As literary historian Jay Fliegelman notes, the writers of commonplace books invariably edited and improved the texts they selected, in essence interpreting and re-reading the texts they copied. The ideas in commonplace books, upon closer inspection, were anything but commonplace. The practice of transcribing passages into commonplace books, like the drafting of constitutions, was not a passive exercise of simply repeating tired political cliches but rather a dynamic process in which individuals often transformed the meaning of the texts they read in profound ways.[21]

The contentiousness of American political and constitutional thought was evident to John Adams, who lamented the confusion in post-Revolutionary political discourse. Americans, Adams observed, could not even agree on the meaning of so basic a term as republicanism. He cautioned one correspondent that "[f]raud lurks in generals."[22] Exasperated by a tendency for political language to become debased, Adams complained that "[t]here is not a more unintelligible word in the English language than republicanism."[23] Most historians now accept the accuracy of Adams's observation and have recognized that republican, liberal, and religious idioms were mixed together in a bewildering range of combinations during the late eighteenth century.[24]

Compendium_Cornell
Page 0801

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12615   Page 259 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

**\*227**  A systematic survey of the full range of American ideas about rights in the Revolutionary era examining the broad range of relevant sources would be a monumental undertaking. Yet such an exhaustive inquiry is not necessary to raise profound questions about the accuracy of the Standard Model. Consider the case of Pennsylvania, one of the many constitutional examples cited by supporters of the Standard Model. [25]  In one of the most even-handed discussions of the Second Amendment, David T. Hardy concludes that Pennsylvanians "sought an unquestionably individual right." [26]  Pennsylvania is thus a crucial test case for the Standard Model. In addition to the fact that the Standard Modelers rely on it, there are other reasons why Pennsylvania provides an excellent venue to contextualize the debate over the meaning of the Second Amendment. Ratification in this key state produced one of the most lively public debates over the meaning of the Constitution, and the writings of Federalists and Anti-Federalists in Pennsylvania were among the most influential and widely distributed of any essays published during ratification. [27]

How did Pennsylvanians understand the right to bear arms? Rather than demonstrate consensus, the historical evidence suggests that there was considerable conflict over how to understand this right. [28]  Indeed, one need not even look beyond the ranks of Pennsylvania Anti-Federalists to see the contested nature of this seemingly commonplace idea. When the views of Pennsylvania Anti-Federalists are examined in historical context,  **\*228**  they raise serious doubts about the historical validity of the Standard Model.

**RETHINKING THE MEANING OF LIBERTY AND RIGHTS: THE PENNSYLVANIA CONSTITUTION OF 1776**

The language of the Pennsylvania state constitution of 1776 is often cited in support of the Standard Model's claim that the right to bear arms was an individual right that protected citizens from their state governments. The relevant provision in the 1776 Pennsylvania provision asserts:

The people have a right to bear arms for the defense of themselves and the State; and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up. And the military should be kept under strict subordination to, and governed by the civil power. [29]  Shortly after adopting this language into their constitution, Pennsylvanians enacted a stringent loyalty oath. The Test Acts, as they were known to contemporaries, barred citizens who refused to take the oath from voting, holding public office, serving on juries, and transferring real estate. Individuals who refused the oath could also be disarmed, as "persons disaffected to the liberty and independence of this state." [30]  The Acts thus stripped many essential rights from a large segment of the population, perhaps as much as forty percent of the citizenry. Both the timing and language of the Acts suggests that they were not simply an emergency measure enacted during time of war, but a reflection of a particular republican ethos that was antithetical to modern liberal ideas about rights. As historian Douglas Arnold notes, "the avowed policy of the architects of the test acts was, thus, not simply to provide for internal security but to reduce the political community to the 'faithful.'" [31]  Efforts to challenge the  **\*229**  constitutionality of the acts were unsuccessful and they remained in effect until abolished by the legislature in 1789. Throughout this period Pennsylvania's Constitutionalists, the group who would become the leading Anti-Federalists in the state, defended the Acts.

The evidence of the Test Acts shows that, contrary to the claims of legal scholars such as Sanford Levinson and David Williams, there is nothing embarrassing or terrifying about the way Pennsylvanians understood the right to bear arms. Gun ownership in Pennsylvania was based on the idea that one agreed to support the state and to defend it against those who might use arms against it. Only citizens who were willing to swear an oath to the state could claim the right to bear arms. Gun ownership in Pennsylvania was thus predicated on a rejection of the very right of armed resistance posited by the Standard Model. [32]  The failure to consider the Test Acts, arguably the most important pieces of legislation enacted by Pennsylvania after adoption of their Constitution, is a serious historical omission on the part of supporters of the Standard Model. [33]

A number of supporters of the Standard Model have also drawn an analogy between the structural roles played by the press and by an armed population in checking government tyranny. While this comparison is instructive, it rests on an historically questionable reading of the way the press functioned in post-revolutionary America. [34]  While leading Pennsylvania Constitutionalists  **\*230**  certainly believed in freedom of the press, these same individuals also accepted the notion of seditious libel. Support for these two seemingly contradictory propositions did not mean that Constitutionalists were hypocrites. The appropriate means to both guard liberty and restrain licentiousness was to have the jury empowered to determine both the facts and the law on questions of libel. The conception of liberty that Constitutionalists embraced looked to the jury to protect liberty

Compendium_Cornell
Page 0802

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12616   Page 260 of
733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

and to enforce communal norms. Because of this conception of liberty, Pennsylvania's constitution granted enormous latitude to the legislature to enact laws to promote the public good. Thus, for example, the authors of the Pennsylvania constitution showed no reservations about passing legislation banning the theater in Philadelphia as a threat to public virtue. Such a measure was perfectly compatible with constitutional ideas behind the Test Acts. Closing the theater or excluding large numbers of the population from claiming a right to gun ownership sprang from the same republican conception of liberty. [35] Once again, the notion that the Pennsylvania state constitution protected a modern liberal rights based vision of constitutionalism is simply anachronistic.

Proponents of the Standard Model concede that the republican emphasis on virtue justified the exclusion of a small category of citizens from gun ownership. Thus Glenn Harlan Reynolds echoes the claim of gun rights advocate Don Kates that "this emphasis on the virtuous citizen does not preclude laws disarming the unvirtuous (i.e. criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue." [36] This generalization clearly needs to be re-examined. Pennsylvania Constitutionalists, the supporters of the state constitution **231** of 1776, believed that a much wider group of citizens could be excluded from the right to bear arms.

## PENNSYLVANIA ANTI-FEDERALISTS AND THE RIGHT TO BEAR ARMS

The Pennsylvania constitution of 1776 was written by the men who would eventually become the most prominent Anti-Federalists in that state. The most detailed elaboration of Pennsylvania Anti-Federalist ideas about the nature of constitutions and rights was framed by the Anti-Federalist author who adopted the republican pen-name of "An Old Whig." [37] In contrast to supporters of the new Federal Constitution, this Anti-Federalist made it clear that he put his faith in traditional "old whig" principles rather than in the innovations proposed by Federalists. In An Old Whig's constitutional thought, the rights of the community to legislate on behalf of the public good were not antithetical to liberty:

If [the people] yield up all their natural rights they are absolute slaves to their governors. If they yield up less than is necessary, the government is so feeble, that it cannot protect them.--To yield up so much, as is necessary for the purposes of government; and to retain all beyond what is necessary, is the great point. [38] Certain rights could never be ceded by individuals. Religious conscience was the most obvious example of a right which could not be renounced. Other rights could only be compromised when the good of society demanded such sacrifices. Individual liberty could never be sacrificed for the good of a particular interest, or faction. Limits on liberty were permissible as long as laws were enacted by representatives of the people. It was vital, however, for citizens to remain active, vigilant, and even suspicious of government, so that representatives would never lose sight of the public good. This attitude did not mean that Anti-Federalists were anti-statist. [39] Anti-Federalists placed tremendous **232** faith in the ability of the state to legislate on behalf of the public good. It was precisely because the state government could be counted on to represent the will of the people that An Old Whig advised his readers that, "[i]f, indeed, government were really strengthened by such surrender" of rights, and "if the body of the people were made more secure, or more happy by the means, we ought to make the sacrifice." [40] He reiterated this by declaring that "if the good of his country should require it; and every individual in the community ought to strip himself of some convenience for the sake of the public good." [41] Republican notions of citizenship, of sacrificing some measure of one's liberty to serve the public good, were deemed essential. [42] "[W]herever the subject is convinced that nothing more is required from him, than what is necessary for the good of the community, he yields a cheerful obedience, which is more useful than the constrained service of slaves." [43] An Old Whig willingly sacrificed a considerable degree of liberty, including the rights of dissenting religious and political minorities who were effectively disenfranchised and disarmed by state loyalty oaths, when the good of the community demanded such concessions.

An Old Whig provided one of the most thoughtful statements of Pennsylvanian Anti-Federalist constitutional ideals. A more widely distributed and in many respects more influential articulation of those views was provided by "The Dissent of the Minority," written shortly after Pennsylvania's ratification of the federal Constitution. [44] Although assembled in some haste, the **233** views expressed in the Dissent attained a semi-official status as the statement of the Anti-Federalist minority of Pennsylvania's ratification convention. The Dissent not only provided a concise statement of Anti-Federalist objections to the Constitution, but also offered one of the first proposals for amendments to the Constitution, including two provisions on the right to bear arms.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12617   Page 261 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

The two amendments suggested by the Dissent of the Minority that touched on the right to bear arms need to be read against the general principles defined by An Old Whig. The Dissent of the Minority recommended the following amendments to the Constitution:

That the people have a right to bear arms for the defense of themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers. . . .The inhabitants of the several states shall have the liberty to fowl and hunt in seasonable times, on the lands they hold, and on all other lands in the United States not enclosed, and in like manner to fish in all navigable waters, and others not private property, without being restrained therein by any laws to be passed by the legislature of the United States. [45] The key phrase in the first provision of the Dissent, which is generally overlooked, is the clause that allows individuals who pose a danger to the public to be disarmed. Anti-Federalists clearly read this clause in extremely broad terms. The second **234** provision, it is worth noting, bars Congress but not the states from placing restrictions on hunting. Rather than revealing an expansive individual right to bear arms, the Dissent reflects the strong states' rights conception of liberty defended by Pennsylvania Anti-Federalists. While Anti-Federalists in this state may have feared a distant government, they placed enormous faith in their state government.

Only by understanding the nature of Pennsylvania Anti-Federalism can the claim of John Smilie in the Pennsylvania ratifying Convention be properly contextualized. Smilie argued that "[w]hen a select militia is formed; the people in general may be disarmed." [46] What did Smilie mean? If lifted out of context, Smilie's words would seem to provide strong proof of the claims of Standard Modelers. Yet, Smilie, one of the authors of An Old Whig and a strong supporter of his state's Test Acts, clearly accepted that serious restraints could be placed on the right to bear arms without undermining the idea of a liberty. Although he feared that federal control of the militia might disarm citizens, he showed no similar concern about his own state government-- which had done precisely that with its Test Act. Smilie shared with many Anti-Federalists considerable faith in the ability of state government to regulate gun ownership. The state would decide who among the people demonstrated sufficient virtue to be trusted with the important task of serving in the militia.

The question of who exactly were "the people" was not only central to the meaning of the Second Amendment, but was also at the heart of the debate between Federalists and Anti-Federalists during ratification. The key question for Americans after 1776 was how the voice of the people was to be discerned. Indeed, the argument between Federalists and Anti-Federalists turned on this vital issue. For Anti-Federalists, appeals to the people that bypassed the existing structures of government, particularly the states, were viewed as a rhetorical ploy. The American people did not exist as an abstraction. The will of the people could only be organized though corporate entities such as towns and states. [47] The effort to counterpose states' rights and **235** individual rights is one of the most serious anachronisms in recent discussions of Anti-Federalism by supporters of the Standard Model.

Deciding exactly who the people were was closely connected to the problem of social class. Indeed, the meaning of the right to bear arms, unlike virtually any other right described in either state constitutions or the federal Constitution, was colored by the inchoate notions of class and rank that shaped American politics in this period . [48] Standard Modelers have generally approached Anti-Federalists as though they were modern democrats. [49] This misreading of the evidence has colored the way concepts such as the ideal of a general militia have been interpreted. The claim that such a militia included the full body of citizens needs to be carefully scrutinized. One of the most contentious issues pertaining to the militia was efforts by the wealthy to avoid militia service by hiring substitutes. [50] In effect, one could buy an exemption from a basic constitutional obligation. At the other extreme there was also concern over the threat posed by the inclusion of unpropertied citizens within the ranks of the militia. [51] The tendency to homogenize the thought of Anti- **236** Federalists, casting the opposition to the Constitution as an essentially populist democratic movement, ignores the thought of elite Anti-Federalism and confuses the profound differences separating moderate democrats from the most radical wing of the Anti-Federalist coalition. [52]

Consider the case of two authors often quoted by Standard Modelers, New York's Federal Farmer and Virginia's George Mason. Ironically, the more hierarchical nature of Virginia society facilitated a more inclusive view of who might serve in the militia. Virginians such as Mason might confidently count on a political culture shaped by the ideal of deference to contain the threat posed by class antagonisms. New York's Federal Farmer was far less sanguine about the inclusion of the propertyless within the ranks of the militia. [53] While Standard Modelers have often cited Federal Farmer, they have seldom correctly identified its author. [54] Federal Farmer expressed the views of New York's Clintonians and may well have been the merchant Melancton

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12618   Page 262 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

Smith. Federal Farmer's variant of democracy captured the emerging liberal economic ideals of the merchant community in New York. Rather than praise the populism of Daniel Shays, Federal Farmer denounced Shays's Rebellion as an example of **\*237** leveller democracy. [55] Moderate democrats of the middling sort, such as Federal Farmer, were more apt to fear the dangers of an armed mob than they were to trust that such a mob might serve as the ultimate check on government tyranny. Federal Farmer and Pennsylvania's Old Whig each placed their faith in the state militias, not mobs, as the appropriate check on despotism, and were thus willing to limit gun ownership.

The fact that so many Anti-Federalists believed that one could exclude large numbers of individuals from the right of gun ownership suggests that a significant portion of Americans in eighteenth-century America understood liberty in terms rather different than those of modern liberal rights-based constitutional theories. Indeed, it is important to recall that the right of gun ownership was connected with an obligation of militia service. Governments could not only compel attendance at militia musters, but the failure to comply could result in fines. In general, modern rights are not subject to these sorts of restrictions and seldom carry with them these types of obligations. [56]

## NATURAL OR CONSTITUTIONAL RIGHT: THE RIGHT TO BEAR ARMS AS A CHECK ON TYRANNY

For Standard Modelers, the checking function of the Second Amendment was intended by the framers to incorporate a right of revolution into the fabric of constitutionalism. [57] In his provocative article, "The Embarrassing Second Amendment," Sanford Levinson argues that the entire body of the people in arms, "or at least all of those treated as full citizens of the community," provided the ultimate constitutional check on government tyranny. [58] To the extent that Americans of the Revolutionary **\*238** era were Lockeans, such a claim is a truism. Most Americans did accept a right of revolution. Such a right, however, was not a constitutional check, but a natural right that one could not exercise under a functional constitutional government. The people had a right to abolish their government and resort to armed resistance in defense of their liberties when the constitutional structures of government ceased to function. Even if some Anti-Federalists accepted the notion that certain natural rights might be judicially enforceable, few mainstream Anti-Federalists would have accepted that revolution was such a right. [59]

In fact, we can test this hypothesis by examining what happened when the most radical voices within Anti-Federalism tried to claim a right to use the militia and arms to check despotism. The two instances in which radical Anti-Federalists asserted a right to check government tyranny by resorting to arms, the Carlisle Riot and the Whiskey Rebellion, are central to evaluating the historical accuracy of the Standard Model, [60] and the failure to analyze this body of evidence is among the most glaring historical omissions associated with the Standard Model. [61]

Unrest in Carlisle was sparked by the Carlisle Federalists' decision to publicly celebrate their ratification victory. Carlisle **\*239** Anti-Federalists embraced a radical ideology that set them apart from the more moderate democratic ideas expressed in documents such as the Dissent of the Minority or the essays of An Old Whig. For these plebeian populists, the most radical voice among Anti-Federalists, the rights of the Federalist minority in Carlisle were easily cast aside when they contradicted the will of the local community. Plebeian populists were simple majoritarians who embraced an extreme form of local democracy. When Anti-Federalists challenged Federalists revelers in the streets of Carlisle a riot ensued. The Anti-Federalist instigators of the riot were arrested and jailed. When the rioters refused the opportunity for bail, local Anti-Federalists organized themselves through the militia, marched on the jail, and freed the prisoners. For plebeian populists the release of the prisoners was an example of direct democracy in action. Events in Carlisle vindicated their radical conception of constitutionalism and strengthened their resolve to oppose the new government. In contrast to the more sober voices of Anti-Federalist authors such as An Old Whig or Federal Farmer, the Carlisle Rioters did not fear the mob. For these Anti-Federalists the actions of the crowd were an authentic expression of the will of the people. [62]

William Petrikin, a rioter who became a spokesman for plebeian populist ideas, attacked Federalists, accusing them of trying to disarm "farmers, mechanics, labourers." [63] Federalists, Petrikin claimed, thought "[i]t would be dangerous to trust such a rabble as this with arms in their hands." [64] Petrikin's assault on the Federalists' notion of the militia reveals an important aspect of plebeian thinking about this issue. For plebeian populists such as the Carlisle rioters, the militia was a local institution that included the full body of citizens. These Anti-Federalists rejected the notion that one had to be a property owner to vote, serve on juries, or participate in the militia. During the Carlisle **\*240** Riot, plebeian populists chose to bypass both the state courts and the state militia. In contrast to the authors of the Dissent and An Old Whig, plebeian populists were not advocates of states'

Compendium_Cornell
Page 0805

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12619   Page 263 of
733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

rights but supporters of a radical localist vision of democracy. Yet even when plebeians invoked a right to bear arms to check despotism, it was not a constitutional right they asserted, but rather a vaguely articulated natural right of revolution. Their resistance was not couched in terms reminiscent of the language of either the Pennsylvania state constitution or the "Dissent of the Minority."

The notion that the militia was literally the entire body of the people in arms, and the related idea that the people might spontaneously organize to resist tyranny, inspired back-country Anti-Federalists in Pennsylvania to constitute themselves as militia units outside of the control of the state. As one anonymous author noted, "the counties of Cumberland, Dauphine, and Franklin, appear to take the lead, and have been long since repairing and cleaning their arms, and every young fellow who is able to do it, is providing himself with a rifle or musket, and ammunition." [65] This author went on to echo a common plebeian Anti-Federalist criticism of the Constitution, charging that "the lawyers, &c. when they precipitated with such fraud and deception the new system of government upon us, it seems to me, did not recollect, that the militia had arms." [66] Anarchy was not something to be dreaded if the alternative was despotism. "A civil war is dreadful, but a little blood spilt now, will perhaps prevent much more hereafter." [67] The author then went on to note that local militias refused to follow the directions of the state to deliver up their arms.

For local Federalists, the events in Carlisle merely confirmed their suspicion that the opponents of the Constitution were bent on establishing mobocracy. This view was shared by members of the Anti-Federalist elite, who were also horrified by the events in back-country Pennsylvania. For elite Anti-Federalists the right to bear arms and the militia were not a mandate for direct democracy. Bypassing the existing structures provided by the states and resorting to extra-legal crowd actions rendered the actions of plebeian populists contemptible in the **\*241** eyes of elites. Extra-legal actions, such as those taken by Anti-Federalists in Carlisle, were little more than mobocracy. For the eminent Massachusetts Anti-Federalist Elbridge Gerry, the Carlisle riot was a bitter reminder of the levelling tendencies to be found among the populace. Although an outspoken opponent of the Constitution, Gerry shared the Federalist belief that the nation's political problems stemmed from an "excess of democracy." [68] When he learned that the "people threatened the Justice in Carlisle to pull down his House, and the houses of the federalists," Gerry expressed grave concern that "we shall be in a civil War," adding his hope that "[may] God . . . 'avert the evil!' '' [69] Rather than solidifying opposition to the Constitution, the plebeian radicalism of the Carlisle rioters set them in opposition to mainstream Anti-Federalists. [70]

A similar aversion to plebeian radicalism shaped the response of Pennsylvania Anti-Federalist Charles Pettit, who sought to distance himself from events like the Carlisle riot, and to avert any actions that might possibly promote anarchy. To "reject the New Plan and attempt again to resort to the old," would, he argued "throw us into a State of Nature, filled with internal Discord." [71] Pettit confided to George Washington that "[e]ven after the vote of adoption by the State Convention, a large proportion of the people, especially in the western counties, shewed a disposition to resist the operation of it, in a manner which I thought indicated danger to the peace of the State." [72] For Petitt, the willingness of plebeian populists to take their grievances into the streets was an example of mobocracy and had to be prevented at all costs.

**\*242**  The Whiskey Rebellion provides another occasion to test the Standard Model's claims about the meaning of the Second Amendment. Supporters of the Standard Model have not devoted much attention to the Rebellion. This omission is unfortunate for a number of reasons. The Whiskey Rebellion provides additional evidence that leading Anti-Federalists did not believe that individuals could spontaneously constitute themselves as militia units outside the control of the state or assert an individual right to bear arms to check government tyranny. Once again, the radical Anti-Federalists who did assert such a right did not ground it in any constitutional text, but instead framed their actions in terms of a natural, not a constitutional, right of revolution. The Rebellion is particularly fascinating because it prompted responses from a number of individuals who had taken a leading role in the debate over the Constitution, including several Anti-Federalists who had signed the Dissent of the Minority. The Rebellion also drew support from plebeian populists, including individuals who had participated in the Carlisle riot. [73]

The Whiskey Rebellion was a series of disturbances in western Pennsylvania and Kentucky prompted by a Federalist tax on whiskey, which included violent acts of resistance. Support for the rebels was strong in the town of Carlisle. William Petrikin, a leader of the Carlisle riot and a champion of plebeian populist ideals, sought support for the rebels from such prominent former Pennsylvania Anti-Federalists as William Findley and Robert Whitehill, both of whom had signed the Dissent of the Minority. [74]

Compendium_Cornell
Page 0806

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12620   Page 264 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

While Findley sympathized with the grievances of the Rebels, he resolutely denounced their resort to arms and the underlying constitutional misconceptions they used to justify their actions. Findley actually tried to dissuade Petrikin from supporting the rebels. The fallacy of the Whiskey Rebels, Findley explained, was that they did not understand that resistance to unjust laws could not bypass the existing structures of constitutional government. Findley blamed the rebellion on a popular misconception about the nature of constitutional government. "The great error among the people was an opinion, that an immoral **\*243** law might be opposed and yet the government respected." [75] Findley himself repudiated plebeian populist constitutionalism. For plebeian populists, the will of the people could be reconstituted spontaneously in local organizations such as the militia, the jury, or even the crowd. Findley and other mainstream Anti-Federalists rejected this notion. "All men of discretion" realized "that if they permitted government to be violently opposed, even in the execution of an obnoxious law, the same spirit would naturally lead to the destruction of all security and order; they saw by experience that in a state of anarchy the name of liberty would be [profaned] to sanction the most despotic tyranny." [76]

Findley's opposition to the excise tax thus did not include support for "riots or any thing that might tend to promote any unconstitutional exertions." [77] Findley strenuously argued that only legal action was appropriate to protest the excise law, and he denied that the situation faced by citizens in western Pennsylvania resembled that of the colonists who had opposed British tyranny a generation earlier. Americans enjoyed representation under the new government and were therefore bound to obey the law. Findley took great pains to distinguish between the orderly use of extra-legal action during the Revolution--when the people had no legal recourse to challenge the unjust acts of Parliament--and recent actions in western Pennsylvania. [78]

For the plebeian populists, the situation under the federal Constitution appeared to be quite similar to that faced by the colonists. For radical localists a distant government could never represent their interests. The use of extra-legal action during the Rebellion was therefore perfectly consistent with a plebeian constitutionalism. Erecting liberty poles, tarring and feathering excise men, and the use of threatening pseudonymous notes were all actions drawn from the rich stock of ritual behavior central to plebeian political culture in the Anglo-American world. Petrikin had employed many of these same techniques during the struggle against the Constitution. From Petrikin's point of view, the excise was merely the most recent example of how the well-born had created an oppressive government to do their bidding.   **\*244** Petrikin and Findley clearly interpreted the legacy of the Revolution in different ways. [79]

For Petrikin, erecting liberty poles was not the end of protest, but merely the beginning. He sought to dissuade the local militia from joining federal forces marching against the Rebels. Petrikin's vision of the militia as an agent of a radical democracy grew out of the same localist agenda that had inspired him to oppose the Constitution. He hoped that the militia might serve the same function it had during the Carlisle Riot, acting as an agent of local popular democratic agitation and organization. This time, however, Petrikin was disappointed. The militia did not oppose Washington's troops. [80]

At a meeting in Carlisle in which Petrikin and the former Anti-Federalist leader, Robert Whitehill, participated, Petrikin urged local residents to side with the rebels against the government. As one participant noted, Petrikin "sd a great deal agst the excise law & against the Constitution." [81] Petrikin was opposed by Whitehill, who had been one of the most prominent Anti-Federalists in the state. Whitehill "endeavored to show the impropriety of opposing" the law, arguing that "it would be better to submit," since continued opposition could "bring on a revolution." [82] In opposition to Whitehill, Petrikin argued that "the show of Liberty to the West ought not to be falted." Rather it should be "applauded and supported." [83] In response to Whitehill's suggestion that continued resistance would start a revolution, Petrikin observed "all Revns began by force and that it was as well it should begin." [84] The actions of the government had convinced him that "it was time there should be a Revolution--that Congress ought either to Repeal the Law or allow these people to set up a government for themselves--& be separated from us." [85] Robert Whitehill recalled in his testimony that Petrikin claimed that the "People in the West had better Separate themselves from the Government of the U. St. than undergo such hardships as they were subjected to, & they had better form **\*245** of Govermt for themselves--that they should have a govermt who had no President nor King." [86] Petrikin's radicalism embraced not only the rituals of plebeian culture, but an extreme form of democratic localism. He continued to affirm the legitimacy of plebeian rituals of protest and extra-legal action. The right of revolution, Petrikin argued, had not been cast aside with the establishment of the Constitution. In contrast to Findley and Whitehill, Petrikin believed that westerners were in exactly the same relationship to the new government as Americans had been with Britain.

Compendium_Cornell
Page 0807

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12621   Page 265 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

For plebeian radicals the federal government under the Federalist party was just as illegitimate as the government of George III. Indeed, in the view of one contemporary, the Whiskey Rebels "flattered themselves that they were only carrying out Whig principles and following Whig examples in resisting the excise law."[87] Petrikin's politics typified the views of an important radical fringe within the ranks of the Anti-Federalist movement. Plebeian radicals articulated the most radical vision of democracy present in the debate over the Constitution; this ideology was rejected by more mainstream Anti-Federalists. The Whiskey Rebellion demonstrates the irreconcilable tension between moderate democrats such as Findley and plebeian radicals such as Petrikin. This split reflected different constitutional philosophies and approaches to politics.

Rather than view the right to bear arms as an expression of a right of resistance, it would be far more accurate to see the language of both the Pennsylvania state constitution and the federal Constitution as part of an effort to provide the state with a means to crush such resistance. The examples of Shays's Rebellion and the Whiskey Rebellion both demonstrate that the militia was far more likely to be used to support the state than to provide a means to challenge the authority of the state.[88]

## HISTORY AND THE SECOND AMENDMENT: AN OPEN QUESTION

The presence of such profound differences within the ranks of Anti-Federalists (even within a single state) raises serious **\*246** questions about the assumption of the Standard Model that there was a broad consensus in post-Revolutionary American on how the right to bear arms ought to be interpreted. Efforts to discern a monolithic original intent on this issue seem historically naive.[89] The case of Pennsylvania suggests that Americans may have been as deeply divided then as they are now over this question. The idea that radical localists such as the Anti-Federalist Carlisle rioters might have meant the same thing as the ultra-nationalist Joseph Story when they spoke about the right to bear arms seems high unlikely.[90] Even if the case of Pennsylvania Anti-Federalism proves to be exceptional, the claim that a single paradigm can explain all of American constitutional thought on an issue as complicated as the right to bear arms runs counter to dominant trends in recent historical scholarship on the character of early American constitutional and political thought.[91] It would be nothing short of astonishing if there were no significant regional or class variations on an issue as complex as the right to bear arms.[92] Without further historical research and analysis, the truth of the Standard Model appears to be anything but a commonplace.

## Footnotes

[a1]   Associate Professor of History, Ohio State University. I would like to thank Steve Conrad, David Konig, Suzanna Sherry, and Eugene Volokh for reading earlier drafts of this essay.

[1]   See Randy E. Barnett and Don B. Kates, Under Fire: The New Consensus on the Second Amendment, 45 Emory L.J. 1139 (1996).

[2]   Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637 (1989).

[3]   On the use of the term "Standard Model" to describe the emerging body of scholarship on the Second Amendment, see Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461-71 (1995).

[4]   See, e.g., Levinson, 99 Yale L.J. (cited in note 2); Akhil Reed Amar, The Bill of Rights as a Constitution, 100 Yale L.J. 1131 (1991); Eugene Volokh, The Amazing Vanishing Second Amendment, 73 N.Y.U. L. Rev. 831 (1998).

[5]   For explicit historical critiques of the Standard Model, see Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 L. & Hist. Rev. 567 (1998), and Gary Wills, To Keep and Bear Arms, N.Y. Rev. of Books 62 (Sept. 21, 1995). For a response to Wills, see Letters by Sanford Levinson, David C. Williams, and Glenn Harlan Reynolds, N.Y. Rev. of Books 61 (Nov. 16, 1995). The efforts of Standard Modelers to overturn the traditional states' rights argument has blinded legal scholars to the centrality of federalism to the debate over the Bill

Compendium_Cornell
Page 0808

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12622   Page 266 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

of Rights. For a useful corrective to this view, see Don Higginbotham, The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship, 55 Wm. & Mary Q. 39 (1998).

For dissent within the legal academy see Andrew D. Herz, Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility, 75 B.U. L. Rev. 57 (1995), and Dennis A. Henigan, Arms, Anarchy and the Second Amendment, 26 Valp. U. L. Rev. 107 (1991). For an example of historical scholarship supportive of the individual rights position central to the Standard Model, see Robert E. Shalhope, The Ideological Origins of the Second Amendment, 69 J. of Am. Hist. 599 (1982); for a counter-argument that the amendment reflected a collective right rooted in civic republican ideals, see Lawrence Delbert Cross, An Armed Community: The Origins and Meaning of the Right to Bear Arms, 71 J. of Am. Hist. 22 (1984); see also The Right to Bear Arms: An Exchange, 71 J. of Am. Hist. 587 (exchange between Shalhope and Cross).

6    The most recent study of ratification supports the notion that neither Federalist nor Anti-Federalist ideas can be fit into a single explanatory model. Michael Gillespie and Michael Lienesch, eds., Ratifying the Constitution (U. Press of Kansas, 1989). For another useful effort to chart the range of discourses available to Americans during the struggle over the Constitution, see Isaac Kramnick, The "Great National Discussion": The Discourse of Politics in 1787, 45 Wm. & Mary Q. 3 (1988) .

7    It is also ironic that the Standard Model in physics is itself being transformed, as competing versions of string theory have been propounded in an effort to move closer to a more complete account of the universe. See George Johnson, Almost in Awe, Physicists Ponder Ultimate Theory, N.Y. Times D8 (Sept. 22, 1998).

8    The last effort to formulate such a unified field theory was Robert E. Shalhope, Toward a Republican Synthesis: The Emergence of an Understanding of Republicanism in American Historiography, 29 Wm. & Mary Q. 49 (1972). In his more recent work, Shalhope has embraced a more pluralist conception of early American political culture. See Robert E. Shalhope, Roots of Democracy: American Thought and Culture, 1760-1800 (Twayne, 1990). For a post-mortem on republican synthesis, see Daniel T. Rodgers, Republicanism: The Career of a Concept, 79 J. of Am. Hist. 11 (1992). Among historians, pluralism now seems to be the ascendent paradigm for understanding the ideologies of the Founding era.

9    See Laura Kalman, Border Patrol: Reflections on the Turn to History in Legal Scholarship, 66 Fordham L. Rev. 87 (1997).

10   Thus, Akhil Amar cites Sanford Levinson, and David Williams cites Akhil Amar, and Glen Harlan Reynolds cites Levinson, Amar, and Williams. None of these articles has been subjected to the sorts of blind peer review that scholarship published in journals such as the William and Mary Quarterly, Journal of American History or the Law and History Review must pass before publication. Once historical errors enter this closed system, they are endlessly reproduced.

11   H. Jefferson Powell, Rules for Originalists, 73 Va. L. Rev. 659 (1987).

12   Id. at 673.

13   Id. at 684

14   Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. Rev. 793 (1998).

15   Id. at 810.

Compendium_Cornell
Page 0809

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12623   Page 267 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

16      Id.

17      Quentin Skinner, Meaning and Understanding in the History of Ideas, in James Tully, ed., Meaning and Context: Quentin Skinner and His Critics 29-67 (Princeton U. Press, 1988). For a thoughtful discussion of the implications of Skinner's essay for constitutional theory, see Paul Brest, The Misconceived Quest for the Original Understanding, in Jack N. Rakove, ed., Interpreting the Constitution: The Debate Over Original Intent 227-62 (1990).

18      Skinner, Meaning and Understanding at 55 (cited in note 17).

19      On the absence historical contextualization in constitutional theory, see Martin S. Flaherty, History "Lite" in Modern American Constitutionalism, 95 Colum. L. Rev. 523 (1995). On the need to consult non-traditional texts, including social texts such as crowd behavior, to recover lost constitutional voices, see Saul Cornell, Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights, and the Promise of Post-Modern Historiography, 12 L. and Hist. Rev. 1 (1994).

20      Volokh, 73 N.Y.U. L. Rev. at 810 (cited in note 14). Volokh's reading of the Second Amendment has been challenged by David Williams, who stresses the republican character of the Second Amendment. David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551 (1991), and David C. Williams, Response: The Unitary Second Amendment, 73 N.Y.U. L. Rev. 822 (1988). The problem with this critique is that it also assumes a consensus in post-Revolutionary political and constitutional thought.

21      On the culture of commonplace books, see Jay Fliegelman, Declaring Independence: Jefferson, Natural Language, and the Culture of Performance (Stanford U. Press, 1993). See also Douglas L. Wilson, Thomas Jefferson's Early Notebooks, 42 Wm. & Mary Q. 433 (1985); David Konig, Legal Fictions and the Rule(s) of Law: The Jeffersonians Critique of Common Law Adjudication, in Bruce H. Mann and Christopher L. Tomlins, eds., The Many Legalities of Early America (1999). On the notion of readers as active producers of meaning, see Kathy Davidson, Revolution and the Word: The Rise of the Novel in America (Oxford U. Press, 1986).

22      Linda Kerber, The Republican Ideology of the Revolutionary Generation, 37 Am. Q. 474, 474 (1985) (quoting John Adams to Mercy Otis Warren, August, 8, 1807). Kerber's essay stresses both the variety of different discourses available to Americans during the Revolutionary generation and the ability of republicanism to be re-shaped by different groups to suit their particular political aspirations. Additional evidence of Adams's frustration with the absence of consensus in America on the meaning of basic concepts such as republicanism may be found in his monumental study, A Defense of the Constitutions of Government of the United States of America (C. Dilly, 1787).

23      Kerber, 37 Am. Q. at 474 (quoting Adams to Warren) (cited in note 22).

24      For an excellent model of how different idioms could be fused together in novel ways, see James T. Kloppenberg, The Virtues of Liberalism: Christianity, Republicanism, and Ethics in Early American Political Discourse, 74 J. of Am. Hist. 9 (1987).

25      Reynolds, 62 Tenn. L. Rev. (cited in note 3). For other examples of scholarship that has relied on Pennsylvania Anti-Federalist thought, see Thomas B. McAffee and Michael J. Quinlan, Bringing Forward the Right to Keep and Bear Arms: Do Text, History, or Precedent Stand in the Way?, 75 N.C. L. Rev. 781 (1997); Nelson Lund, The Past and Future of the Individual's Right to Arms, 31 Ga. L. Rev. 1 (1996); Stephen P. Halbrook, The Right of the People or the Power of the State: Bearing Arms, Arming Militias, and the Second Amendment, 26 Valp. U. L. Rev. 131 (1991).

26      David T. Hardy, The Second Amendment and the Historiography of the Bill of Rights, 4 J.L. & Politics 1, 39 (1987).

Compendium_Cornell
Page 0810

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12624   Page 268 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

27    On the distribution of these items and other writings by Pennsylvania Federalists and Anti-Federalists, see Merrill Jensen, ed., 13 The Documentary History of the Ratification of the Constitution, 588-96 (State Historical Society of Wisconsin, 1976) ("DHRC").

28    For useful discussions of the different approaches of Federalists and Anti-Federalists to the problem of rights, see Paul Finkleman, Between Scylla and Charybdis: Anarchy, Tyranny, and the Debate over a Bill of Rights, in Ronald Hoffman and Peter J. Albert, eds., The Bill of Rights: Government Proscribed 103-74 (U. Press of Virginia, 1997); on the diversity with the ranks of Anti-Federalists, see Saul Cornell, Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness, in Hoffman and Albert, eds., The Bill of Rights at 175-208.

29    Pennsylvania Convention, Declaration of Rights, August 21, 1776, in Jack N. Rakove, ed., Declaring Rights: A Brief History With Documents 86-87 (Bedford Books, 1998).

30    The Test Act was passed 1777. See James T. Mitchell and Henry Flanders, eds., 9 The Statutes at Large of Pennsylvania 110-14 (Wm. Stanley Ray, 1903). The act was amended and the provisions for disarming "persons disaffected to the liberty and independence of this state" strengthened in 1778. Id. at 346-48.

31    Douglas Arnold, A Republican Revolution: Ideology and Politics in Pennsylvania, 1776-1790 at 109 (Garland Publishing, 1989). Another useful account of the controversy over the Acts may be found in Robert L. Brunhouse, The Counter-Revolution in Pennsylvania, 1776-1790 at 282 (Pennsylvania Historical and Museum Commission, 1942).

32    For an argument that a similar policy informed gun laws in other states, see Bellesiles, 16 L. & Hist. Rev. (cited in note 5).

33    See, e.g., Levinson, 99 Yale L.J. (cited in note 2); Williams, 101 Yale L.J. (cited in note 20). Even in his extremely balanced account, David Hardy does not consider the Test Acts, an omission that calls into question his individualist reading of Pennsylvanian views of the right to bear arms. Hardy, 4 J.L. and Pol. 39 (cited in note 26). Stephen P. Halbrook, The Right to Bear Arms in the First State Bills of Rights: Pennsylvania, North Carolina, Vermont, and Massachusetts, 10 Vt. L. Rev. 255 (1985) provides a cursory treatment of the Acts that both misconstrues the intent and scope of the Acts. Neither Halbrook nor Hardy consults Brunhouse or Arnold's work. The latter's 1976 Princeton University doctoral dissertation, originally titled Political Ideology and the Internal Revolution in Pennsylvania, 1776-1790, provides a detailed discussion of the controversy over the Test Acts.

34    On the connections between the First and Second Amendment and the notion of a checking function, see L.A. Powe, Jr., Guns, Words, and Constitutional Interpretation, 38 Wm. & Mary L. Rev. 1311 (1997). Powe's ideas have been endorsed by J.M. Balkin and Sanford Levinson in The Canons of Constitutional Law, 111 Harv. L. Rev. 963-1013 n.157 (1998). Both of these discussions of free speech rest on outdated historiography tied to the controversy around the work of Leonard Levy. On this debate, see Leonard Levy, Emergence of a Free Press (Oxford U. Press, 1985). For a critique of Levy's thesis, see David M. Rabban, The Ahistorical Historian: Leonard Levy on Freedom of Expression in Early American History, 37 Stan. L. Rev. 795 (1985). The terms of this debate have shifted considerably since the publication of Levy's work. A more historically persuasive effort to root ideas about seditious libel in the context of post-revolutionary constitutionalism may be found in Norman Rosenberg, Protecting the Best Men: An Interpretive History of the Law of Libel (U. of North Carolina Press, 1986). Rosenberg's work provides a useful corrective to the Levy thesis and its critics.

35    It is worth observing that on a variety of other constitutional questions, including issues of political economy and representation, Anti-Federalists did articulate a more liberal constitutional vision. For a good illustration of the liberal dimensions of Pennsylvania Anti-Federalism, see Gordon S. Wood, Interests and Disinterestedness in the Making of the Constitution, in Richard Beeman, et al., eds., Beyond Confederation: Origins of the Constitution and American National Identity (U. of North Carolina Press, 1987). On the blending of liberal and republican elements in Anti-Federalist thought, see Saul Cornell, The Other Founders: Anti-Federalism and the Dissenting Tradition in America, 1788-1828 (U. of North Carolina Press, 1999).

Compendium_Cornell
Page 0811

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.12625  Page 269 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

36     Reynolds, 62 Tenn. L. Rev. at 480 (cited in note 3) (quoting Don B. Kates Jr ., The Second Amendment: A Dialogue, 49 L. & Contemp. Probs. 143, 146 (1986)).

37     In his collection of Anti-Federalist writings, Herbert J. Storing does not identify the authorship of An Old Whig, but evidence for this attribution may be found in a letter from William Shippen, Jr., to Thomas Lee Shippen, (Nov. 18 and 22, 1787), in 2 DHRC at 288 (cited in note 27). These essays were most likely a collective effort of a number of the most prominent members of Pennsylvania's Constitutionalist party. An Old Whig, Essays of An Old Whig, in Herbert J. Storing, ed., 3 The Complete Anti-Federalist 17 (U. of Chicago Press, 1981).

38     Id. at 33.

39     The notion that American political thought was strongly anti-statist is central to the argument of Levinson, 99 Yale L.J. (cited in note 2). A similar notion also informs the argument of McAffee and Quinlan, 75 N.C. L. Rev. (cited in note 25). Both of these arguments also rest on a selective reading of the evidence. Most Anti-Federalists clearly placed great faith in their state governments. A more balanced assessment of Anti-Federalist views about the relationship between liberty and the state may be found in Robert C. Palmer, Liberties as Constitutional Provisions, 1776-1791, in William E. Nelson and Robert Palmer, eds., Liberty and Community: Constitution and Rights in the Early American Republic (Oceana Publications, 1987).

40     An Old Whig, Essays at 49 (cited in note 37).

41     Id.

42     Perhaps the best effort to demonstrate how Whig constitutional thought reconciled liberty with republican ideals may be found in John Phillip Reid, Constitutional History of the American Revolution: The Authority of Rights (U. of Wisconsin Press, 1986), and The Concept of Liberty in the Age of the American Revolution (U. of Chicago Press, 1988).

43     An Old Whig, Essays at 33 (cited in note 37).

44     John Smilie, an author of the Old Whig essays, was one of the signers of the Dissent. Although the Dissent was signed by the Anti-Federalist members of the state ratification convention, including Smilie, it was drafted by Samuel Bryan, one of the most important Anti-Federalist essayists. The Address and Reasons of Dissent of the Minority..., in 2 DHRC at 617-24 (cited in note 27). Gary Wills notes that this piece was composed in a hurry and is not among the most intellectually powerful representations of Anti-Federalist thought. See Wills, N.Y. Rev. of Books at 65 (cited in note 5). While these characterizations may be apt, it is also important to recognize that despite these shortcomings, the Dissent became one of the most widely reprinted Anti-Federalist essays.

       In treating Anti-Federalist thought it is important to draw a distinction between those essays that were influential in 1787-88 and those that have become central to the modern scholarly canon. In a number of cases the texts most esteemed by modern commentators were not necessarily the ones most important to Anti-Federalists during ratification. For more on this issue, see Cornell, The Other Founders at 25-26 (cited in note 35).

45     Dissent of the Minority at 623-24 (cited in note 44). The provisions about hunting and fowling were not emulated by any state ratification conventions when proposals for amendments were debated.

46     Speech from John Smilie to the Pennsylvania State Convention (Dec. 6, 1787), in 2 DHRC at 509 (cited in note 27). For a discussion of the controversy over the creation of a select militia, see Joyce Lee Malcolm, To Keep and Bear Arms:

Compendium_Cornell
Page 0812

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12626   Page 270 of
733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

The Origins of an Anglo-American Right 156 (Harvard U. Press, 1995). Malcolm quotes Smilie's convention speech without placing his statement in the context of Smilie's earlier involvement with the Test Act controversy.

47     On the idea of the people as a political fiction, see Edmund S. Morgan, Inventing the People: The Rise of Popular Sovereignty in England and America 263-87 (Norton, 1988). The connections between states' rights and individual rights in Anti-Federalist thought are discussed in Cornell, Mere Parchment Barriers (cited in note 28).

48     For rather different approaches to the problem of class and rank in this period, see Gordon S. Wood, The Radicalism of the American Revolution (A.A. Knopf, 1992), and Alfred F. Young, ed., Beyond the American Revolution: Explorations in the History of American Radicalism (Northern Illinois U. Press, 1993). The issue of race is even more complex than class. For an argument that race was not an obstacle to gun ownership, see Robert J. Cottrol and Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Georgetown L.J. 309 (1991). For an interpretation that stresses the exclusion of African-Americans, see Bellesiles, 16 L. and Hist. Rev. (cited in note 5).

49     The claim that Anti-Federalism was essentially democratic is central to both Amar, 100 Yale L.J. (cited in note 4), and Williams, 101 Yale L.J. (cited in note 20). The problem with this view is that it ignores the complexity and diversity of Anti-Federalism, which included a broad spectrum of political views, some quite democratic and others extremely elitist.

50     Mark Pitcavage, An Equitable Burden: The Decline of State Militias, 1783-1858 (1995) (Ph.D dissertation, Ohio State University).

51     A number of Anti-Federalists expressed concern over the danger posed by the propertyless, who lacked the virtue associated with a militia composed of yeoman farmers or planters. These Anti-Federalists feared that the rabble might become an instrument of despotism. One forceful expression of this fear occurred in the Virginia Convention. See George Mason, Speech in the Virginia Ratification Convention Debates, in 10 DHRC at 1312 (cited in note 27). Mason believed that state control of the militia provided a solution to this problem by ensuring that virtuous members of the gentry retained positions of authority in the militia. Mason's thought reflected the hierarchical assumptions of planter society. On this point see Morgan, Inventing the People at 173 (cited in note 47). Recent historical scholarship suggests that even in Virginia the politics of deference was breaking down. For a discussion of how members of the Virginia gentry dealt with the threat posed by an armed population, see Michael A. McDonnell, Popular Mobilization and Political Culture in Revolutionary Virginia: The Failure of the Minutemen and the Revolution from Below, 85 J. of Am. History 946, 948 (1998).

52     Cornell, The Other Founders (cited in note 35).

53     New York's Federal Farmer also argued that state control of the militia was necessary to prevent the creation of a select militia composed of the propertyless. In contrast to Mason, Federal Farmer viewed the propertyless as a much greater threat to social stability. Federal Farmer, Letters from the Federal Farmer, in Storing, 2 Complete Anti-Federalist at 341-42 (cited in note 37).

54     The identity of the Federal Farmer has been a subject of considerable controversy. Once thought to be the work of Virginian Richard Henry Lee, the case against Lee is forcefully argued by Gordon S. Wood, The Authorship of the Letters from the Federal Farmer, 31 Wm. & Mary Q. 299 (1974). Wood's suggestion that Federal Farmer was probably a New Yorker has been elaborated by Robert H. Webking who argues that Federal Farmer may have been the New York merchant Melancton Smith. Robert H. Webking, Melancton Smith and the Letters from the Federal Farmer, 44 Wm. & Mary Q. 510 (1987). For examples of legal scholars who have used an older mistaken attribution of Federal Farmer's identity, see David T. Hardy, 4 J.L. & Pol. (cited in note 26); Halbrook, 26 Valp. U. L. Rev. (cited in note 25); Anthony J. Dennis, Clearing the Smoke From the Right to Bear Arms and the Second Amendment, 29 Akron L. Rev. 57 (1995); David B. Kopel and Christopher C. Little, Communitarians, Neorepublicans, and Guns: Assessing the Case for Firearms Prohibition, 56 Md. L. Rev. 438 (1997); Williams, 101 Yale L.J. (cited in note 20); David C. Williams,

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12627   Page 271 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

The Militia Movement and Second Amendment Revolution: Conjuring With the People, 81 Cornell L. Rev. 879 (1996); David E. Vandercoy, The History of the Second Amendment, 28 Valp. U. L. Rev. 1007 (1994).

55    For Federal Farmer's attack on the levelling democracy, see Federal Farmer, Letters at 224, 227, 253 (cited in note 53).

56    On modern theories of rights, see Ronald Dworkin, Taking Rights Seriously (Duckworth & Co., 1977). For a discussion of the historical evolution of American views of rights, see Michael J. Lacey and Knud Haakonessen, eds., A Culture of Rights: The Bill of Rights, in Philosophy, Politics and Law, 1791-1991 (Cambridge U. Press, 1991). For a critique of modern rights based constitutional and political thought, see Mary Ann Glendon, Rights Talk: The Impoverishment of Political Discourse (Macmillan, 1991).

57    Reynolds, 62 Tenn. L. Rev. at 472 (cited in note 3).

58    Levinson, 99 Yale L.J. at 646 (cited in note 2). The issue of citizenship in the post-Revolutionary era was exceedingly complex. Given the problem posed by loyalism, the issue of who might claim the full rights of citizenship is not as simple as Levinson's caveat implies. As historian James Kettner notes, the idea-common in English law-that "citizenship could comprehend separate legal categories of membership" continued to shape constitutional thought in this period. James Kettner, The Development of American Citizenship, 1608-1870 at 215-16 (U. of North Carolina Press, 1978). For a more elaborate treatment of the exclusionary nature of citizenship during this period, see Rogers M. Smith, Civic Ideals: Conflicting Values of Citizenship in U.S. History (Yale U. Press, 1997).

59    Modern scholars are divided over the role of natural rights in early American constitutional thought. For a defense of the idea of an unwritten constitution grounded in natural law, see Suzanna Sherry, The Founders' Unwritten Constitution, 54 U. Chi. L. Rev. 1127 (1987). For alternative views that challenge the notion that the Founders expected judges to enforce principles of natural law drawn from an unwritten constitution, see Helen K. Michael, The Role of Natural Law in Early American Constitutionalism: Did the Founders Contemplate Judicial Enforcement of "Unwritten" Individual Rights?, 69 N.C. L. Rev. 421 (1991), and Thomas B. McAffee, The Original Meaning of the Ninth Amendment, 90 Colum. L. Rev. 1215 (1990).

60    Actions such as the Carlisle Riot and the Whiskey Rebellion are also precisely the type of events that provide an opportunity to write a constitutional history from the bottom up. On the notion of writing constitutional history from the bottom up, see Hendrik Hartog, The Constitution of Aspiration and "The Rights That Belong to Us All," 74 J. of Am. Hist. 1013 (1987), and William E. Forbath, Hendrick Hartog, and Martha Minow, Introduction: Legal Histories from Below, 1985 Wis. L. Rev. 759.

61    Episodes such as the Carlisle Riot and the Whiskey Rebellion, are not part of the current canon of constitutional law. On the concept of a constitutional canon, see Balkin and Levinson, 111 Harv. L. Rev. (cited in note 34), and Saul Cornell, 12 L. & Hist. Rev. (cited in note 19). Williams, 101 Yale L.J. at 582 (cited in note 20), deals briefly with the Whiskey Rebellion. Williams cites no contemporary evidence to substantiate his claim that opposition to the Whiskey Rebels was framed in the language of civic republicanism. For an analysis of contemporary responses to the Whiskey Rebellion, see notes 73-88 and accompanying text.

62    On the Carlisle Riot and the ideology of plebeian populism, see Saul Cornell, Aristocracy Assailed: The Ideology of Backcountry Anti-Federalism, 76 J. of Am. Hist. 1148 (1990). The Standard Modelers generalize populism to all Anti-Federalists. For example, in an influential essay, Amar, 100 Yale L.J. (cited in note 4), argues that Anti-Federalism was essentially populist and democratic in spirit. This account not only homogenizes Anti-Federalist thought but seriously distorts the character of Anti-Federalist populism. In particular, Amar does not address the rather different approaches of moderate democrats and plebeian populists to the problem of rights.

Compendium_Cornell
Page 0814

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12628   Page 272 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

63    Aristocrotis, The Government of Nature Delineated, in Storing, 3 Complete Anti-Federalist at 203 (cited in note 37). Storing did not identify the author in his collection. The attribution is based on a letter from William Petrikin to John Nicholson Carlisle (Feb. 24, 1788), in 2 DHRC at 694 (cited in note 27).

64    Aristocrotis, Nature Delineated at 203 (cited in note 63).

65    Letter from Franklin County, Philadelphia Independent Gazetteer (April 30, 1788), in 17 DHRC at 251-52 (cited in note 27).

66    Id. at 252.

67    Id.

68    Gerry's statements about the dangers of an excess of democracy and the levelling spirit may be found in James Madison, Notes of Debates in the Federal Convention of 1787 at 39 (Ohio U. Press, 1984). Gerry's constitutional thought is discussed at length by George A. Billias, Elbridge Gerry: Founding Father and Republican Statesmen (McGraw-Hill, 1976). Gerry provides an excellent counter example to Akhil Amar's claim that Anti-Federalists were populist democrats, Amar, 100 Yale L.J. (cited in note 4). Elite Anti-Federalists such as Gerry were a vital part of the coalition that opposed the Constitution. For more on elite Anti-Federalist thought, see Cornell, The Other Founders 51-80 (cited in note 35).

69    Cornell, 76 J. of Am. Hist. at 1169 (cited in note 62) (quoting Elridge Gerry in Madison, Notes of the Debates of the Federal Convention at 39 (cited in note 68)).

70    For a description of the mood in Carlisle, see "Extract of a letter from Carlisle" dated January 4, 1788, in Independent Gazetteer (Jan. 12, 1788) DHRC Mfm:Pa. 328.

71    Charles Pettit to Robert Whitehill (June 5, 1788), in 18 DHRC at 154 (cited in note 27).

72    Charles Pettit to George Washington (March 19, 1791), in DHRC Mfm:Pa. 706.

73    The best account of the Rebellion is Thomas P. Slaughter, The Whiskey Rebellion: Frontier Epilogue to the American Revolution (Oxford U. Press, 1986).

74    For a discussion of the connection between the Carlisle riot and the Whiskey Rebellion, see Cornell, The Other Founders 200-13 (cited in note 35).

75    William Findley, History of the Insurrection in the Four Western Counties of Pennsylvania 300 (Samuel Harrison Smith, 1796).

76    Id. at 177.

77    Id. at 285.

78    Id.

Compendium_Cornell
Page 0815

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12629   Page 273 of
733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

79    On plebeian political culture and the rituals of protest, see Alfred F. Young, English Plebeian Culture and Eighteenth-Century American Radicalism, in Margaret C. Jacob and James R. Jacob, eds., The Origins of Anglo-American Radicalism 185 (Humanities Press International, 1984).

80    Cornell, The Other Founders 200-12 (cited in note 35).

81    Id. at 208-09.

82    Id.

83    Id.

84    Id.

85    Id.

86    Id. at 119 (testimony of Robert Whitehill).

87    Thomas P. Slaughter, The Friends of Liberty, the Friends of Order, in Stephen Boyd, ed., The Whiskey Rebellion: Past and Present Perspectives 13 (Greenwood Press, 1985) (quoting Reverend James Carnahan).

88    On this point, see Bellesiles, 16 L. & Hist. Rev. (cited in note 5).

89    Historians are far more dubious about identifying a single intent from among the many different positions voiced by the framers and ratifiers of the Constitution. To claim that commentators writing more than generation later meant the same thing seems even more doubtful. For a discussion of the difficulty of weighting the various perspectives articulated during ratification, see Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution (A.A. Knopf, 1996).

90    Sanford Levinson links Federal Farmer, James Madison, and Joseph Story, together into a single common stance on the meaning of the Second Amendment. Levinson, 99 Yale L.J. at 649 (cited in note 2). The example of Pennsylvania suggests that there was no consensus on this issue. The example of Massachusetts provides additional evidence of profound disagreement over how to interpret the right to bear arms. See Hardy, 4 J.L. and Pol. at 40-42 (cited in note 26).

91    A good sense of the divisions among early American historians may be found in comments collected in The Creation of the American Republic, 1776-1787: A Symposium of Views and Reviews, 44 Wm. & Mary Q. 550 (1987).

92    For two rather different efforts to explore the relationship between regionalism and the emergence of different political cultures in early America, see Jack P. Greene, Pursuits of Happiness: The Social Development of Early Modern British Colonies and the Formation of American Culture (U. of North Carolina Press, 1988), and David Hackett Fischer, Albion's Seed: Four British Folkways in America (Oxford U. Press, 1989). On the relationship of class to the problem of rights consciousness, see Hartog, 74 J. of Am. Hist. (cited in note 60).

16 CONSTCOM 221

Compendium_Cornell
Page 0816

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12630   Page 274 of 733

COMMONPLACE OR ANACHRONISM: THE STANDARD..., 16 Const. Comment. 221

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

73 Fordham L. Rev. 487

**Fordham Law Review**
November, 2004

Symposium: The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives

Panel I: Historical Perspectives

Saul Cornell [a1] Nathan DeDino [aa1]

Copyright (c) 2004 Fordham Law Review; Saul Cornell; Nathan DeDino

# A WELL REGULATED RIGHT: THE EARLY AMERICAN ORIGINS OF GUN CONTROL

## Introduction

It is impossible to discuss gun policy in contemporary America without stumbling over the question of what the Second Amendment means.[1] Few issues in American constitutional law are as bitterly divisive as the meaning of the right to keep and bear arms.[2] Two opposing historical claims have dominated modern Second Amendment debate.[3] Supporters of more robust gun regulation have generally cast the Amendment as a collective right.[4] According to this **\*488** view, the meaning of the Amendment is shaped by the Preamble affirming the importance of a well regulated militia.[5] Collective rights theorists argue that the Second Amendment makes it possible for the states to preserve their well regulated militias against the threat of disarmament by the federal government.[6] Gun rights advocates have placed greater stress on the latter part of the Amendment, which asserts the right of the people to keep and bear arms.[7] For supporters of this individual rights view, the right to bear arms is comparable to freedom of the press, and the Constitution provides the same level of protection for guns as it does for words.[8] For the most ardent supporters of this view, the Constitution protects the right of individuals to have firearms for self-protection, hunting, or to wage revolution against the government itself.[9]

Many, but certainly not all, advocates of gun rights support the notion that courts ought to interpret the Constitution in terms of the original understanding of the founders.[10] Originalism, however, only accounts for part of the role that history plays in this controversy. Even if one were able to banish originalist arguments from this **\*489** debate, history would continue to influence the way Americans understand this issue. To find evidence of the appeal of history, one needs only to search the topic of the Second Amendment on the Internet.[11]

Popular gun rights rhetoric is also deeply originalist in character. This aspect of popular Second Amendment discourse was captured in an amusing episode of America's favorite dysfunctional family sitcom --The Simpsons.[12] Indeed, the Second Amendment is probably the only topic in American constitutional law to be featured prominently in this venue. In a remarkable exchange between Homer Simpson and his daughter Lisa, the conflict between the individual and collective rights views of the Amendment was bluntly stated in comic terms:[13]

> Homer: "But I have to have a gun! It's in the Constitution!"

> Lisa: "Dad! The Second Amendment is just a remnant from revolutionary days. It has no meaning today!"

Compendium_Cornell
Page 0818

Homer: "You couldn't be more wrong, Lisa. If I didn't have this gun, the king of England could just walk in here anytime he wants and start shoving you around." [14] This exchange not only provides one of the most balanced discussions of the Second Amendment in American popular culture, it also underscores the uncanny ability of the Second Amendment to collect and distill popular aspirations and anxieties.

Yet another remarkable example of the importance of history and mythology in this debate is provided by the media attention and public outcry over Michael Bellesiles's controversial and now largely discredited work Arming America. [15] Although Bellesiles never had much impact on jurisprudence or public policy, his attack on the myth of universal gun ownership prompted unprecedented public scrutiny and outrage on the part of gun rights advocates and scholars. [16]

**\*490**  Second Amendment scholarship is now clearly at an important crossroads. While most courts continue to interpret the Second Amendment as a collective right, academic scholarship is more divided. Indeed, the notion that one can describe the current academic debate in terms of a simple dichotomy no longer seems tenable. [17] The current paradigm crisis in Second Amendment scholarship is evidenced in two recent decisions by federal courts that elaborated on two different tri-partite schemes, implicitly abandoning the older dichotomous view that dominated previous jurisprudence and scholarship. In United States v. Emerson, the United States Court of Appeals for the Fifth Circuit, the only federal appeals court to embrace an individual rights view of the Amendment, identified three schools of thought on the Second Amendment: the sophisticated collective rights view, the traditional collective rights view, and the individual rights view. [18] In Silveira v. Lockyer, the United States Court of Appeals for the Ninth Circuit adopted a different typology, concluding that current scholarship could be divided into the following: the collective rights view, the individual rights view, and the limited individual rights view. [19] Rather than fitting into a simple dichotomy, it now appears that Second Amendment scholarship is arrayed across a considerable spectrum, from an expansive individual right to a narrow collective right of the states to maintain their militias.

**\*491  I. The Right to Bear Arms as a Civic Right: Forgotten Contexts of the Second Amendment Reconsidered**

The most interesting and exciting new developments in the field of Second Amendment scholarship have occurred in the middle of this vast spectrum. A number of scholars have suggested that the time may have arrived to abandon both the individual and collective rights models. [20] Although this simple dichotomy may have served the interests of modern gun rights and gun control advocates, this model has become an obstacle to framing a more sophisticated and genuinely historical understanding of the evolution of the constitutional right to bear arms. It may well be that history has little to contribute to this debate. [21] Still, before deciding what relevance, if any, the history might have to the interpretation of the Second Amendment in contemporary constitutional theory, it is important to get the history right.

Rather than give greater weight to only part of the text, recent scholarship strives for a more holistic reading of the Second Amendment. [22] According to this view, the right protected by the Second Amendment is neither a private right of individuals nor a collective right of the states. [23] Perhaps the best way to describe these alternative models would be to characterize them as part of a new paradigm which views the Second Amendment as a civic right. [24] The right to bear arms is one exercised by citizens, not individuals (an important distinction in the Founding Era), who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia. [25] While issues of federalism and states rights continue to be relevant to understanding the context of the Second Amendment debate, the text fits a civic rights model better than either the individual or collective rights paradigms.

This civic rights model comes the closest to faithfully translating the dominant understanding of the right to bear arms in the Founding Era. [26] One of the most important eighteenth-century contexts for understanding this right was the powerful legal discourse of civic  **\*492**  obligation. Historians have long recognized that the Second Amendment was strongly connected to the republican ideologies of the Founding Era, particularly the notion of civic virtue. [27] Other scholars have challenged this claim, arguing that the thought of the founding generation owed more to liberalism than to republicanism. [28] Historical scholarship has abandoned the notion that American political culture can be understood in terms of any single ideological tradition, and

Compendium_Cornell
Page 0819

has embraced a more pluralistic conception of the intellectual world of the founders. [29] Historical scholarship has come to recognize that in addition to republicanism and liberalism, the founding generation was deeply immersed in a legal tradition derived from English common law jurisprudence. [30]

The constitutionalism of the Founding Era sought to balance rights with obligations. Some obligations were voluntary, while others were mandatory. While American constitutionalism sought to create a set of structures conducive to the emergence of a public sphere of political and legal debate, [31] the state could not compel citizens to speak or publish their views on political or legal matters. While modern constitutional theory has generally focused on the concept of negative liberty, Americans of the Revolutionary Era were equally concerned with promoting a positive conception of liberty. [32] Recast in **493** less abstract terms, the constitutionalism of the founding generation was concerned with rights and obligations. The close connection between rights and obligations was central to the way Sir William Blackstone conceptualized the nature of liberty: "[T]he rights of persons that are commanded to be observed by the municipal law are of two sorts; first, such as are due from every citizen, which are usually called civil duties; and, secondly, such as belong to him, which is the more popular acceptation of rights . . . ." [33] The learned English jurist then went on to note that allegiance and protection were "reciprocally, the rights as well as duties of each other." [34] Citizens had both a right and a duty to arm themselves so that they might participate in a militia. Both of these conceptions of rights were bound together in the idea of well regulated liberty. The goal of constitutional government was to constrain arbitrary power, not to hobble government authority. Civil liberty in this scheme, was "no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the publick." [35]

As minister John Zubly noted in a sermon preached before the Provincial Congress of Georgia on the eve of the American Revolution, the "well regulated liberty of individuals is the natural offspring of laws, which prudentially regulated the rights of whole communities." [36] Zubly went on to amplify this notion by observing that "all liberty which is not regulated by law is a delusive phantom." [37] Outside of a well regulated society governed by the rule of law, liberty was nothing more than licentiousness and anarchy. [38] This particular conception of liberty was central to the way the founding generation understood the idea of the right to bear arms. [39] Although the Constitution represented a significant break with many aspects of revolutionary theory, Zubly's conception of well regulated liberty endured. [40]

**494** At the end of the federalist era in 1798, James Sullivan, a prominent lawyer in Massachusetts, contrasted the radically different conceptions of liberty that emerged during the French Revolution with the idea of well regulated liberty enshrined by the American Revolution and perfected by the U.S. Constitution. [41] "[L]iberty in its natural extent," he wrote, "has nothing to do with civil society." [42] He went further, declaring "[t]here is in nature the same degree of dissimilarity between natural liberty and those principles of equal security exhibited in a well regulated society as there is between the untouched clay in the earth, and the finer vessels of China." [43] Constitutional government was not premised on the kind of liberty found in the state of nature, but in the idea of well regulated liberty. [44]

If one acknowledges the centrality of the concept of well regulated liberty to the constitutional thought of the founders, one can readily appreciate the irony of supporters of a modern libertarian creed invoking the ideal of the Minuteman. The ideal of liberty at the root of militia was not part of a radical individualist and anti-statist ideology. The Minuteman ideal was a quintessential expression of the idea of civic obligation and well regulated liberty. The essence of this vision of law and politics has been brilliantly captured by David Hackett Fischer in his wonderful study of Paul Revere's world. [45] Although modern Americans are apt to think about constitutionalism in terms of individual rights and collective responsibilities, Fischer reminds us that the Minuteman ideal was one in which collective rights and individual responsibilities predominated. [46] Nothing better typified the nature of this conception of constitutionalism than the militia. Each individual had a responsibility to help secure the collective rights of all by sacrificing some measure of their liberty to participate in a well regulated militia. [47]

## II. To Bear Arms in Defense of Themselves and the State

One can see additional evidence for a distinctly civic republican conception of bearing arms if one examines the Pennsylvania Declaration of Rights in the Pennsylvania Constitution of 1776. While the language of the Pennsylvania Declaration of Rights has often been invoked in modern Second Amendment scholarship, [48] it has seldom **495** been properly contextualized. [49] It

Compendium_Cornell
Page 0820

is a text often cited, but usually misinterpreted, by modern gun rights scholars as positive proof that the right to bear arms in the Founding Era was thought of as an individual right. [50] To understand this text in context, one must resist the tendency to pluck isolated quotes out of context, a practice that has become all too typical in recent Second Amendment scholarship. [51]

The Pennsylvania Declaration of Rights began by affirming the basic Lockean trinity of life, liberty, and property, [52] a theme that had also figured prominently in Blackstone's writings. [53] Section VIII of the Pennsylvania Declaration of Rights modified this statement, presenting an obligation of each citizen to contribute to the protection of others: [54]

> That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expence of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent, nor are the people bound by any laws, but such as they have in like manner assented to, for their common good. [55]

This provision introduced the obligation to bear arms, a term that clearly signified the use of arms for a distinctly public purpose. One  **\*496**  was obliged to bear arms or contribute in some other comparable manner to the goal of helping society protect each individual. Recognizing that Quakers and several German sects were pacifists, opposed to bearing arms, the Declaration of Rights provided them with an alternative to compulsory military service. [56] Interestingly, this provision of the constitution explicitly exempted the right to bear arms from the prohibition on taking property without compensation. [57] Thus, the state could compel one to serve in the militia, outfit oneself with a weapon, and expend ammunition, while bearing absolutely no legal obligation to compensate citizens for their expenses. [58] In essence, bearing arms was a form of taxation. Rather than stake out a strong claim against government, the original understanding of the right to bear arms gave government a strong claim on the lives and estates of its citizens.

After establishing the obligation to bear arms, Section XIII then stated for the first time in America, a constitutional right of the people to bear arms: [59]

> That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power. [60]

The Pennsylvania Declaration of Rights uttered this principle in the same breath as it attacked standing armies and affirmed civilian control of the military, rather than, for example, articulating this right in the same breath as freedom of religion or the press. The text and structure of the provision both support a civic, military reading of the right to bear arms, not an individual right for personal protection. [61]

 **\*497**  It is certainly true that the right to bear arms was framed as a "right of the people." [62] Although this term has come to be associated with the notion of individual rights in modern legal thought, in the eighteenth century, the phrase "right of the people" could be used to describe rights held by the people as a collective entity, or as individuals. [63] Thus, the Pennsylvania Declaration of Rights described the right of the people to legislate as a right of the people, a usage that clearly connoted a collective right held by individuals acting in concert for public purposes. [64] This is how Albert Gallatin, a leading Pennsylvanian politician, described the nature of rights affirmed in the Pennsylvania Declaration of Rights in a letter to Judge Alexander Addison. [65] The 1776 constitution, Gallatin observed, wisely included a "declaration of the rights of the people at large or considered as individuals." [66] Gallatin's description of the character of the Pennsylvania Declaration of Rights as either something possessed by individuals or the "people at large" illustrates how different the language of rights was in the Founding Era. [67] The right

to bear arms was a perfect example of a civic right, a "right[] of the people at large," a right that citizens exercised when they acted together for a distinctly public purpose. [68]

The Pennsylvania Declaration of Rights also framed freedom of speech and the press as a right of the people. [69] Here the term was more individualistic, but still no less public in orientation. Thus, the right to publish on matters of public concern or to assemble for **\*498** redress of grievances would be constitutionally protected. [70] The right to stage a play or assemble to view such an event, however, would not have enjoyed such protection. Indeed, Philadelphia actually prohibited the theater because it posed a threat to public morality. [71]

The Pennsylvania Constitution also declared that the right to bear arms existed as a means for the people to act in "defence of themselves and the state." [72] Modern gun rights scholarship has consistently misread this phrase as stating an individual, private right of self-defense. [73] The Pennsylvania Constitution did not assert a right of each person to bear arms in defense of himself and the state, but rather framed the right in a collective, as opposed to an individualistic, formulation. It is important to recognize that the militia served to protect communities, as well as the state, against internal and external threats. The militia existed to deal with internal dangers such as riot or insurrection, as well as the threat of invasion.

Additional contextual support for the collective reading of this provision is provided by one of the few contemporary commentaries on constitution-making in Pennsylvania authored by a writer who adopted the pen name Demophilus. [74] Although the exact identity of the author is a mystery, he appears to have been part of the constitutional party that drafted the state constitution. [75] Demophilus echoed the ideas expressed by radical Whig theorists who, in choosing to frame the right to bear arms as a means for citizens to protect themselves and the state, simply followed the standard Whig understanding of the role of the militia as a means of defending the people and the state against external and internal enemies. [76] Breaking **\*499** with its own Quaker heritage, the Pennsylvania Constitution defined the militia in the broadest possible terms:

> The freemen of this commonwealth and their sons shall be trained and armed for its defence under such regulations, restrictions, and exceptions as the general assembly shall by law direct, preserving always to the people the right of choosing their colonels and all commissioned officers under that rank, in such manner and as often as by the said laws shall be directed. [77]

Modern gun rights advocates argue that it would have made no sense to protect a right to bear arms while not protecting an individual right of self-defense. While this might not make sense to modern lawyers, it would have made perfect sense to an eighteenth-century lawyer. [78] The right of individual self-defense was well-established under common law, but was legally distinct from the constitutional right to bear arms included in the various state constitutions. [79] The failure to include an explicit protection for such a right was hardly anomalous: many protections under common law were not included in bills of rights during the Founding Era. [80] Americans drafted their constitutional protections for the right to bear arms in response to their fear that government might disarm the militia, not restrict the common law right of self-defense. [81] Indeed, if one scans the vast corpus of writings from the ratification debates, virtually every reference to bearing arms occurs within the context of the debate over the militia. [82] Even if one includes the Revolutionary Era and the federalist era, references to anything that might be construed as a constitutional right of individual self-defense are exceedingly rare, and almost always turn out to be statements from dissenting constitutional texts that expressed the point of view of the losers in the great constitutional struggles of the eighteenth century. Thus, one notes that modern individual rights theorists are particularly fond of references to Jefferson's rejected proposal for the Virginia **\*500** Declaration of Rights, Samuel Adams's rejected proposal made to the Massachusetts Ratification Convention, and the dissent of the Anti-Federalist minority of the Pennsylvania Ratification Convention. [83]

Another anachronism in contemporary Second Amendment scholarship is the tendency to read modern notions of self-defense into the Founding Era. [84] The linkage between firearms and self-defense in the Founding Era and the early Republic was much more tenuous. This makes sense given that firearms only accounted for a small percentage of homicides in the period before the Civil War. [85] Edged weapons and blunt instruments were better suited to individual self-defense in most situations. [86] There can be little doubt that the founders believed that keeping a musket in one's home, something closely tied to the ideal of a

Compendium_Cornell
Page 0822

well regulated militia, clearly enjoyed constitutional protection. Weapons with little military value, carried in a civilian context, were treated as another matter entirely. [87]  For example, James Madison's proposal for those who violated Virginia's game laws captured the important distinction between civilian and military gun use. In a bill to prevent the killing of deer, Madison proposed that a person who "bear [s] a gun out of his inclosed ground, unless whilst performing military duty" would face penalties of forfeiting their unlawfully killed deer, paying a fine, and being "bound to their good behaviour." [88]  The language of this statute provides a remarkable window into the way Madison understood the differences between bearing a gun for personal use and bearing arms for the common defense. Additional evidence that the law treated weapons intended for militia use differently than those used outside of a military context may be found in two New Jersey laws that gave the state broad power to disarm disorderly persons and armed assemblies. [89]  The state clearly retained the right to regulate the use of **501** firearms and differentiated between the level of restrictions that might be placed on individuals bearing a gun and those bearing arms.

Some sense of the scope of the concept of self-defense in the Founding Era can be obtained by examining the popular guide books that were consulted by justices of the peace, sheriffs, and constables. [90]  Readers of the Conductor Generalis, one of the most popular of these lay guides to the law, would have encountered a detailed explication of the common law crime of affray. [91]  Under common law, justices of the peace, sheriffs, and constables were empowered to disarm individuals who rode about armed in terror of the peace. [92]  Defining exactly what circumstances constituted the crime of affray was precisely the kind of complex, context-bound judgment that defined common law jurisprudence. [93]

The common law not only constrained when and how one might travel with arms, but it defined the limits of legitimate self-defense quite narrowly. Indeed, the military use of arms required citizens to stand and fight, while the civilian requirement was retreat. [94]  In contrast to modern notions of self-defense, [95]  the law of justifiable homicide in the eighteenth century required a retreat to the wall before responding with deadly force: flight, not fight, defined the meaning of self-defense in the founding generation. [96]

To properly understand how American law dealt with firearms, one must not only reconstruct the neglected context of the common law, but also recognize the robust character of the state's police power in early America. [97]  Pennsylvania's Declaration of Rights affirmed that "[t]he people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." [98]  Defining the scope of the individual right to self-defense and the right to own firearms for private use was something that fell within the police powers of the state. It was up to the legislature to create a body of laws dealing with aspects of criminal law, including the law of homicide, which would establish when citizens might use deadly force to protect life, liberty, or property. While one could not eliminate the **502** right of self-defense, the legislature could define the limits of such a right and could enact laws about firearms consistent with the goals of protecting public safety. For instance, states enacted laws about how guns had to be stored, when they could be used for recreational purposes, and when and where citizens could hunt. [99]  The right to bear arms and the right to use firearms for personal reasons were clearly separate and distinct under the Pennsylvania Constitution, which dealt with the right to hunt and the right to bear arms in separate provisions. [100]

### III. From Regulation to Prohibition: Weapons Laws in the Early Republic

Although much ink has been expended to try to fit the Second Amendment into our modern categories of debate, relatively little attention has been devoted to analyzing the kinds of laws and regulations regarding firearms that were enacted in the Founding Era and subsequent decades. Nor has much effort been devoted to carefully analyzing the decisions of courts trying to make sense of this complex body of laws. Gun rights advocates have claimed that gun control is a modern invention. [101]  In reality, a variety of gun regulations were on the books when individual states adopted their arms-bearing provisions and when the Second Amendment was adopted. In the years after the adoption of the Second Amendment, the individual states adopted even more stringent types of regulations. Most gun regulation in the Founding Era and early Republic occurred **503** at the state level. Of course, one might argue that gun regulation at the state level has little bearing on how we should understand the meaning of the Second Amendment. Until the emergence of modern incorporation theory, however, the dominant view of the Bill of Rights was laid down in Barron v. Baltimore, which held that the Bill of Rights only restrained the federal government, not the individual states. [102]  The point of analyzing state gun regulations from the Founding Era and early Republic is not to look for legal precedents that could be applied in a literal fashion; far too much has changed in the nature of federalism in the intervening years to make such a search very probative. Rather, the goal of such an inquiry is to shed light on the historical meaning of the

right to bear arms in the Founding Era and early Republic and to see how the notion of arms bearing fits into the idea of a well regulated society. [103]   American constitutional law did not end at the founding and it is important to recognize the profound changes that swept over American law in the decades after the ratification of the Constitution. [104]   Analyzing past gun regulation at the state level and the litigation it spawned is therefore vital to understanding the complex history of the right to bear arms.

The philosophical connection between state arms-bearing provisions and the Second Amendment would have seemed obvious to Americans in the Founding Era and the early Republic. Both conceptions of arms bearing were tied to the larger concept of a collective self-defense in a well regulated society governed by law. For an influential lawyer and constitutional commentator such as William Rawle, the connection between state arms-bearing provisions and the Constitution was indisputable. [105]   Rawle viewed the right to bear arms as "the corollary" of the Preamble's assertion of the need for a well regulated militia. [106]   While Rawle attacked the English game laws for effectively disarming citizens, he argued strongly for the idea  **504  of regulation and viewed the right to bear arms as inextricably linked to the militia. [107]   In contrast to modern gun rights theory, Rawle believed that there could be no right to bear arms without regulation. [108]

Gun rights legal scholars have made a number of remarkable, almost phantasmagorical claims about the meaning of the term "well regulated." Perhaps the most far-fetched of these is the suggestion that well regulated did not mean government-controlled, but only properly disciplined and drilled. [109]   In the view of Don Kates and Randy Barnett, it makes no sense to read the Second Amendment "as authorizing regulation of arms." [110]   The authors of this curious interpretation of the Second Amendment have constructed a fantasy world where words mean their opposite, and regulation is really anti-regulation. This version of early American history more closely resembles the Bizarro world described in Superman comic books and rendered in hilarious terms in America's best-loved postmodern situation comedy Seinfeld, than it does the constitutional thought of the Founding Era. [111]   After reading bizarre claims like this, one can readily understand why historian Jack Rakove has likened the world of Second Amendment scholarship to a scholarly Twilight Zone. [112]   Arguments such as those of Kates and Barnett are an example of history extra-lite, to borrow Martin Flaherty's apt characterization of so much legal scholarship produced in an originalist vein. [113]   Finding evidence to show that the Bizarro Second Amendment is a fiction  **505  created by modern gun rights scholarship, and not an accurate representation of early American history, is not difficult. If one simply looks at the gun laws adopted in the Founding Era and early Republic, the evidence for robust regulation is extensive. [114]   If American history fit the Bizarro model, then gun regulation after the adoption of the Second Amendment would have virtually disappeared. [115]   In reality, the decades after ratification of the Second Amendment saw increased, not decreased, levels of regulation. [116]

A variety of laws regulating firearms were already in place during the Founding Era. Militia regulations were the most common form of laws pertaining to firearms. [117]   Such laws could be quite intrusive, allowing government not only to keep track of who had firearms, but requiring them to report for a muster or face stiff penalties. [118]   Regulations governing the storage of gun powder were also common. [119]   States prohibited the use of firearms on certain occasions and in certain locations. [120]   A variety of race-based exclusions disarmed slaves, and in some cases, free blacks. [121]   Loyalty oaths also disarmed portions of the population during the Founding Era. [122]

This pattern of regulation shifted dramatically in the decades after the adoption of the Second Amendment. In the years after the war  **506  of 1812, a number of states enacted laws against the practice of carrying concealed weapons. [123]   The first laws were passed in southern states, [124]   but midwestern states such as Indiana also passed similar laws. [125]   The first round of laws made it a crime to carry such weapons. [126]   Later, several states enacted even more stringent laws, banning the sale of concealed weapons. [127]

## A. Eighteenth-Century Gun Laws

Eighteenth-century statutes regulating the use of firearms can be classified as follows: statutes providing for the confiscation of firearms from persons unwilling to take an oath of allegiance to the state, statutes regulating the use of firearms within the context of militia obligations, and statutes regulating the storage of gunpowder. A smaller number of laws also regulated hunting and the discharge of firearms in certain places. These statutes make clear that regulation of firearms is hardly a modern invention.

1. Loyalty Oaths and the Confiscation of Firearms

During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States. [128] To deal with the potential threat coming from armed citizens who remained loyal to Great Britain, states took the obvious precaution of disarming these persons. Thus, the security of the community outweighed any right a person might have to possess a firearm.

In Pennsylvania, if a person "refuse[d] or neglect[ed] to take the oath or affirmation" of allegiance to the state, he was required to deliver up his arms to agents of the state, and he was not permitted to carry any arms about his person or keep any arms or ammunition in his "house or elsewhere." [129] Such a broad provision effectively eliminated the opportunity for someone to violently protest the actions of the Pennsylvania government or defend himself with a firearm. It should be underscored that those refusing to take the oath *507 or affirmation were unable to borrow or even use another person's firearms.

In 1776, Massachusetts passed, at the behest of the Continental Congress, an act that disarmed "such Persons as are notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." [130] The Massachusetts law required "every Male Person above sixteen Years of Age" to subscribe to a "test" of allegiance to the "United American Colonies." [131] One who failed to subscribe to this test was "disarmed . . . [of] all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession or belonging to him." [132]

The Massachusetts law is interesting because it exempts Quakers from signing the test of allegiance administered to all other men. [133] To accommodate their religion, Quakers were provided with a different form of declaration. [134] Thus, under the circumstances, the right for a Quaker to practice his religion outweighed the state's interest in its preferred test of allegiance. The right to bear arms, however, did not outweigh the state's interest in maintaining security through disarmament of those considered dangerous to the state. Instead, the state's interest in public safety dominated.

Disarmament was not limited to the arguably extraordinary period of the American Revolution. In 1787, the Massachusetts legislature passed a law setting out the terms for pardons by the governor for persons who had been involved in Shays's rebellion against the state in the previous year. [135] Those who had taken up arms against the state were, with some exceptions, able to seek a pardon from the governor. [136] To obtain the pardon, however, a person needed to take an oath of allegiance to the state and deliver his arms to the state for a *508 period of three years. [137] In addition, during the same time period, the person would be unable to serve as a juror, hold government office, or vote "for any officer, civil or military." [138]

The nature of the other disqualifications that went along with disarmament only underscores the civic character of the right to bear arms. Those seeking pardon were not robbed of a right to free speech or free exercise of their religion, rights indisputably associated with individuals. Instead, the penalties deal more with the rights and obligations associated with a citizen's duty to society: participation in government as a political official, participation in the legal process as a juror, participation in the electoral process as a voter, and participation in the militia. [139] The law demonstrates that in a well regulated society, the state could disarm those it deemed likely to disrupt society. These types of statutes raise serious questions about the claim of some modern Second Amendment scholars that the right to bear arms was somehow intended to facilitate an individual right of revolution. [140] Quite the opposite was the case. To enjoy the right to bear arms, one had to renounce such revolutionary aspirations. While one might argue such a case if the Second Amendment had been authored by Daniel Shays and his supporters, such radical voices were noticeably absent in the First Congress that drafted the Bill of Rights. [141]

2. Militia Law in the Eighteenth Century

Some of the most common regulations of firearms in the eighteenth century are the laws regulating a state's militia. [142] The laws defined *509 who was part of the militia, who was excused from duty, and what weaponry the citizens were required to procure to meet this obligation. [143]

Compendium_Cornell
Page 0825

In 1778 New York, the militia consisted of "every able bodied male person Indians and slaves excepted residing within [the] State from sixteen years of age to fifty." [144] Massachusetts divided its militia into different groups (e.g., a training band and an alarm list), but generally any "able-bodied Male Person[] . . . from sixteen Years old to fifty" was required to be a member of one group. [145] South Carolina's militia, with certain exceptions, included all men between eighteen and fifty. [146] Those exceptions to militia membership tended to be racially based [147] or contingent upon membership in a certain profession (teachers, politicians, and clergy predominate). [148] Thus, the number of people coming under the militia statutes was considerable.

The state militia statutes had several fairly universal requirements. Members of the militia were required to turn out for regular musters. [149] Militiamen were also required to be armed with certain equipment. In New York, every militia member had to "furnish and provide himself at his own expence with a good musket or fire-lock fit for service[,] a sufficient bayonet with a good belt, a pouch or cartouch box containing not less than sixteen cartridges . . . of powder and ball . . . and two spare flints[,] a blanket and a knapsack." [150] Not only were the militia members required to furnish and provide their arms and ammunition, they were subject to inspections by their leaders. In New York, the colonel or commanding officer called a regimental parade in April and November of each year. [151] Militiamen were required to attend with their equipment--"the arms, ammunition and accoutrements of each man [were] examined, and the **\*510** defaulters . . . noted." [152] Those who failed to attend were fined, and those who attended without the required equipment were also fined. [153] In New York, the names of those absent from the regimental parade were noted and sent to the governor or brigadier-general. [154] In Massachusetts, every six months, the clerk of each company made "an exact List of [each man in the] Company, and of each Man's Equipments." [155] The list was sent on to the commanding officer of the company and the commanding officer of the regiment. [156]

The eighteenth-century militia laws are another example of the lengths to which states could go in order to ensure that their communities were well regulated and safe. Indeed, the excerpts from the above militia laws in force at the end of the eighteenth century shed light on the Second Amendment's language about a "well regulated militia." [157] Militias were certainly well regulated. The state could require a majority of the adult population to muster and offer up their privately held firearms for inspection. In Massachusetts, an "exact" account of each militiaman's firearm and equipment was made, which was then sent on to other officers of the state. [158] The militia laws also underscore how different the eighteenth century was from our own century with regard to civic obligations. Average citizens were required to take part in the defense of their community, using their own property and sacrificing their own time. Finally, militia laws can be seen as another attempt by the state to guarantee the safety of the community. In an era that relied on everyday citizens to provide for community and national defense, the idea of a right to keep and bear arms was a given. To provide the best defense, however, the state also had to ensure that the men were trained and that their equipment was in working order. The eighteenth-century militia laws accomplished these twin goals with regular musters, arms inspections, and penalties for noncompliance.

3. The Safe Storage of Gunpowder

By the close of the eighteenth century, there was already a tradition of statutes regulating the storage and transport of gunpowder. [159] **\*511** These laws were oftentimes enacted to protect the growing population centers, such as Boston, [160] Philadelphia, [161] and New York City. [162] Safe storage laws, however, were not limited to the largest cities. In Pennsylvania, regulations for the storage of gunpowder appeared within the statutes that provided for the initial incorporation of new towns alongside the provisions that created commons and streets and regulated public nuisances. [163]

The statutes provide for the safe storage and transport of gunpowder in a variety of ways. Limits on the amount of gunpowder a person could possess were common and typically in the range of twenty to thirty pounds. [164] Moreover, the amount of powder a person could legally keep was subject to regulation. Many of the statutes specify how the powder a person could legally keep had to be stored. For example, the Pennsylvania statute that established the Town of Carlisle specified that anyone keeping gunpowder "in any house, shop, cellar, store or other place within the said borough" must keep it "in the highest story of the house . . . unless it be at least fifty yards from any dwelling house." [165] In New York, the law required one to separate powder "into four stone jugs or tin cannisters, which shall not contain more than seven pounds each." [166]

Early Americans were permitted to own more gunpowder than they could physically possess. The powder in excess of the legal limit had to be kept, at the owner's expense, in a public magazine. [167] Removal or transport of the powder from the powder house was also subject to safety regulations. In Boston, when gunpowder in excess of the legal limit was transported to the public magazine, it had to be transported "in a waggon or carriage, closely covered with leather or canvas, and without iron on any part thereof, to be first approbated by the Firewards of said town, and marked in capitals, with the words approved powder carriage." [168] Some port cities also had specific **\*512** regulations for what to do with ships arriving with powder on board. New York City required ships to unload gunpowder at a magazine within twenty-four hours of arrival in the harbor and before the ship "hawl[ed] along side of any wharf, pier or key within the city." [169] Boston subjected any "Gun Powder . . . kept on board any ship or other vessel laying to, or grounded at any wharf within the port of Boston" to confiscation. [170]

The point of these statutes was, as they themselves proclaimed, to protect communities from fire and explosion. As Massachusetts's 1780 gunpowder statute put it, its goal was to "deter[] the Inhabitants thereof from keeping certain Quantities of Powder in Houses and Ware-Houses, &c. to the great Inconvenience, Discouragement and Danger of Persons assisting in Time of Fire." [171] As this characteristic language demonstrates, the statutes were quite explicit in their application not just to shops and stores, but also to private individuals' homes.

The state acting under the authority of its robust police powers retained the right to pass safe storage laws prohibiting citizens from keeping loaded firearms in their homes. A 1783 Massachusetts statute declared that "the depositing of loaded Arms in the Houses of the Town of Boston, is dangerous" and provided for fine and forfeiture for anyone keeping a loaded firearm in "any Dwelling-House, Stable, Barn, Out-house, Ware-house, Store, Shop, or other Building." [172]

Colonial and state legislators clearly thought that it was well within their powers to regulate the storage and transport of gunpowder. In addition, the amount of gunpowder an individual or business could keep in a building was also limited. [173] The laws were clearly crafted to meet the needs of public safety, but they also provided a check on the creation of a private arsenal. Indeed, gunpowder in excess of the legal limit typically had to be stored in the public magazine, under the authority of the state. The gunpowder storage laws of the eighteenth century thus constituted a significant limit on the right to bear arms.

## B. Nineteenth-Century Gun Laws

In the nineteenth century, laws directly regulating firearms became far more prevalent. In order to combat the dangers stemming from guns and maintain the goal of fostering a well regulated society, states **\*513** became increasingly ambitious in the range and scope of the laws they enacted regarding firearms. The laws fall into three categories: laws prohibiting the carrying of concealed weapons, laws prohibiting the sale of such weapons, and laws prohibiting the firing of a gun under certain circumstances. [174]

1. The Danger of Concealed Weapons

In the antebellum period, several states had laws banning the carrying of concealed weapons. [175] Ohio's language is fairly typical: "[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty." [176] If convicted, one faced the possibility for a first offense of a fine up to two hundred dollars or imprisonment up to a month. [177]

Some of the states with concealed weapons laws did consider self-defense concerns. However, exceptions from the concealed weapons law for self-defense were limited. In Tennessee, the law explicitly exempted any person who was "on a journey to any place out of his county or state." [178] In Ohio, there was an exception:

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of **\*514** carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused. [179]

Compendium_Cornell
Page 0827

This exception is obviously narrow. First, it applied only to those who were carrying a concealed weapon in connection with their employment. Second, the defendant had to prove to the jury that a "prudent man" in the defendant's position would have been justified in carrying a concealed weapon. Thus, while state legislatures could be mindful of self-defense concerns, those concerns did not outweigh the general application of a ban on concealed weapons. The state decided that the dangers arising from concealed weapons were simply greater than the benefits to the populace.

Indeed, Virginia's legislature was so concerned with concealed weapons that the application of the state's ban on the weapons was rather broad. In Virginia, it was against the law for a person to "habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation." [180] Under the Virginia law, if a person was tried for "murder or felony" and used a concealed weapon to commit the murder or felony, he could still be charged under the concealed weapon law, even if the jury acquitted him of the murder or felony because of self-defense. [181] A second wave of more restrictive regulations went even further, prohibiting the sale of concealed weapons. An 1837 Georgia law criminalized the sale of concealed weapons, effectively moving toward the complete prohibition of this class of weapon. [182] A similar statute was enacted by Tennessee in 1838. [183] The Supreme Court of Tennessee upheld the law, declaring that "the Legislature intended to abolish these most dangerous weapons entirely from use." [184]

**\*515**  Neither the constitutional right to bear arms nor the common law right of self-defense trumped the right of the state to regulate firearms, including prohibitions on certain types of weapons. In this sense, firearms were subject to a level of prior restraint that would have been unthinkable for the free exercise of religion or freedom of the press.

2. Other Regulations on the Use of Firearms in the Antebellum Period

Apart from laws banning the use or sale of concealed weapons, a variety of other laws in the pre-Civil War Era enacted time, place, and manner restraints on firearms use. [185] Laws restricted where a person could shoot a gun. [186] In 1820, Cleveland prohibited the discharge of firearms by local ordinance. [187] An Ohio statute made it a crime to "shoot or fire a gun at a target within the limits of any recorded town plat in [the] state." [188] This provision is found within the same section of the statute that outlaws playing "bullets along or across any street in any town or village" or "running horses within the limits of any such town or village." [189] In a law amending a statute incorporating the towns of Winchester and Reynoldsburgh, the Tennessee legislature gave the mayor and aldermen of those towns the

> power and authority to make any rules and laws regulating the police . . . and the inhabitants . . . to restrain and punish drinking, gaming, fighting, breaking the sabbath, [and] shooting and carrying guns, and enact penalties and enforce the same, so that they do not conflict or violate the constitution of this State, and are consistent with the laws of this State. [190] An 1821 Tennessee statute prohibited the "shoot[ing] at a mark within the bounds of any town, or within two hundred yards of any **\*516** public road of the first or second class within [the] state." [191] In contrast to modern law where many states have pre-empted the right of localities to restrict firearms, local regulation was quite common in pre-Civil War America. [192]

The use of permits or licenses were less common than time, place, and manner restrictions or bans on selected categories of weapons. Such laws were usually used to target groups such as free blacks. Thus, Virginia passed a law in 1806 that required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead." [193]

These statutes all demonstrate the ample power of the state to regulate and restrict firearm usage and ownership to achieve the goal of creating a well regulated society. A wide range of gun regulations, including safe storage laws; time, place, and manner restrictions; and even prohibitions on certain classes of weapons have deep roots in American history stretching back before the American Revolution and extending forward in time long after the Second Amendment was adopted.

Compendium_Cornell
Page 0828

## IV. Judging the Right to Bear Arms: The Pattern of Antebellum Jurisprudence

The change from regulation to prohibition prompted a wide ranging discussion and re-evaluation of the meaning of the right to bear arms and its connection to the right of self-defense. The first important case of the Jacksonian era, Bliss v. Commonwealth, articulated an expansive individual rights conception of arms bearing, effectively prohibiting any regulation of weapons. [194] The decision was not widely emulated, and proved to be controversial within Kentucky. Indeed, a committee of the Kentucky House excoriated the state's highest court for misconstruing historical origins of the right to bear arms. [195] Outside of Kentucky, the rejection of the Bliss model of arms bearing was equally forceful. In Aymette v. State, a Tennessee court accepted the notion that bearing arms was a military activity, but introduced a distinction between keeping arms and bearing arms. [196] In the view of the Aymette court, bearing arms was subject to more stringent **\*517** regulation than keeping arms. [197] The only types of weapons that the Aymette court believed were entitled to full constitutional protection were those that were suitable for the purposes of supporting a well regulated militia. [198] A more narrowly defined militia-based right was framed in State v. Buzzard. [199] In Buzzard, the right to bear arms was narrowly construed to protect only militia-related activity. [200] Invoking a concept central to Anglo-American jurisprudence since Blackstone, the court wrote that the goal of the Constitution was to protect those rights "essential to the enjoyment of well regulated liberty." [201] To conclude, as had the court in Bliss, that the right to bear arms was not subject to reasonable regulation was to encourage anarchy, not liberty. [202]

The more robust level of regulation associated with the second wave of bans on concealed weapons, including prohibitions on the sale of particular classes of weapons, produced another division among state courts. In a somewhat rambling discussion that took note of these divisions, the Georgia Supreme Court found that time, place, and manner restrictions were constitutional, but general prohibitions were not. [203] The Supreme Court of Tennessee rejected this view and upheld a broad ban on certain classes of weapons. [204] The Tennessee court went on to note that "[t]he Legislature thought the evil great, and, to effectually remove it, made the remedy strong." [205] The more robust Tennessee model of regulation proved to be the more influential one. [206]

## V. Did the Fourteenth Amendment Change Things? The Incorporation Conundrum Revisited

The legacy of the founding is only one of the nodes of historical debate over the meaning of the Second Amendment. [207] A small, but **\*518** growing body of scholarly literature has also developed around the connection between the Fourteenth and Second Amendments. One of the most intellectually provocative claims in the Second Amendment debate is Akhil Amar's suggestion that, as a result of the Fourteenth Amendment, the idea of bearing arms was transformed from a collective right into an individual one.

"[B]etween 1775 and 1866," Amar contends, "the poster boy of arms morphed from the Concord minuteman to the Carolina freedmen." [208] There are a number of problems with this argument. In summarizing Amar's argument, Sanford Levinson correctly notes that Amar identifies close to a dozen Reconstruction Era Republicans in Congress who delivered "odes to arms in speeches in the Thirty-ninth Congress." [209] While it is certainly true that Amar finds some important evidence that such a view was present in Congress, he provides no evidence that this view was widely shared by either the ratifiers of the Fourteenth Amendment or a significant portion of the general public. To document Amar's contention would require a very ambitious examination of the surviving documentary record. [210]

Amar certainly deserves credit for being the first serious constitutional scholar to try to chart the profound changes that transformed the meaning of the right to bear arms in the period after the adoption of the Bill of Rights. There can be little doubt about the emergence of a more individualistic conception of arms bearing over the course of the nineteenth century. While the notion of arms bearing had been closely tied to the well regulated militia in the Founding Era, a considerable amount of slippage had occurred in this concept during this time period. [211] Perhaps the best evidence of this paradigm shift is the remarkable change in the language adopted by a number of state constitutions in the Jacksonian era. While Founding Era constitutions affirmed "the right of the people to bear arms in defense of themselves and the state," a number of states in the Jacksonian era affirmed a right of "each citizen to bear arms in **\*519** defense of himself and the state." [212] If every state had abandoned the older language in favor of the new, Amar would have strong support for his notion that a single monolithic collective understanding of arms bearing in the Founding Era was replaced by an equally hegemonic individualistic ideology during Reconstruction.

Compendium_Cornell
Page 0829

Although Amar's model does suggest an important change, he approaches the constitutional thought of the Founding Era and Reconstruction from a model of consensus history that simply does not reflect the complexity of the historical record.

On at least one occasion, Amar has argued that history and constitutional law are distinct and that the legal meaning of arms bearing could well be different than the historical meaning carried by the term. [213]  Amar is surely correct in making this important distinction. While the historical question of how far popular and elite attitudes toward arms bearing had shifted in the century between the Revolution and Reconstruction is fascinating, it is not the question with the most probative value. To answer that question, one must grapple with the myriad theories and critiques of constitutional originalism. [214]

Although he eschews the label, Amar's theory of refined incorporation is ultimately an idiosyncratic version of originalism in which the usual emphasis on Madison and the founding has been  **\*520**  replaced by an equally narrow focus on John Bingham, one of the Framers of the Fourteenth Amendment. [215]  To paraphrase Larry Kramer's critique of originalism, we might describe Amar's account as Reconstruction-obsessed, as opposed to founding-obsessed. [216]  Yet, even when judged by the standards of originalist theory, Amar's account is not without problems. If any intent or meaning ought to guide constitutional interpretation in an originalist paradigm, it ought to be the ratifiers, not the framers of the Fourteenth Amendment. Even if one adopts the more inexact and historically naïve approach to original meaning favored by scholars such as Randy Barnett, which requires focusing on widely shared public meanings, one is still left with the complicated historical task of weighing the myriad, and in many cases, discordant voices who participated in the framing and ratification of the Fourteenth Amendment. For anyone who has taken the time to read extensively in the sources for this period, the claims that the Fourteenth Amendment or arms bearing had a single monolithic meaning in this era are simply untenable. [217]  Even more problematic from the point of view of any originalist theory is the evidence that the leading framers of the Amendment, such as Bingham, sold the Amendment to the American people in radically different terms: as a legal principle that did nothing more than require Americans to follow the golden rule of doing unto others as you would have them do unto you. Fourteenth Amendment originalists who rest incorporation on the historical intent of the framers of the Amendment are effectively engaged in an elaborate legal game of bait-and-switch where the framers' intent is substituted for the meaning associated with the Amendment during ratification. While one can certainly defend incorporation theory on philosophical grounds or in terms of precedent, the historical foundations for this argument are shaky at best.

The different tone and rhetorical strategies employed in Congress and on the stump are evident if one looks at the way John Bingham tried to sell the Fourteenth Amendment to the citizens of Ohio. [218]  In his public speeches to his constituents, he adopted a different rhetorical strategy than the one he used in Washington. Rather than play up a constitutional theory steeped in abolitionist rhetoric, he stressed the notion of equality before the law, a much less threatening concept. [219]  In one speech, Bingham summarized the meaning of Section 1 as doing no more than "embodying in the Constitution the  **\*521**  golden rule, learned at the mother's knee, 'to do as we would be done by.'" [220]  In a more detailed speech focused exclusively on the meaning of the Fourteenth Amendment, Bingham summarized the meaning of Section 1 in the following manner: "It is a simple, strong, plain declaration that equal laws and equal and exact justice shall hereafter be secured within every State of this Union." [221]  He dismissed the charge that the Amendment would destroy the federal system, effectively reducing the individual states and their laws to mere ciphers in a powerful centralized system of government: "It takes from no State any right which hitherto pertained to the several States of the United States." [222]  It is impossible to know for certain if Bingham consciously attempted to recast his rhetoric in response to the vicious black baiting tactics used by Democrats to discredit Republicans as supporters of full equality for blacks. While in his own mind, Bingham could in good faith believe that the subtle shifts in emphasis and tone changed nothing in terms of substance, for his listeners, many of whom were not schooled in the same abolitionist ideas and not steeped in the detailed reports of southern atrocities that outraged Republicans in Congress, it is likely that they took a very different message away from his standard stump speech. For the average man on the street listening to one of Bingham's speeches, the argument would have seemed far closer in spirit to the arguments made by those Congressional Republicans who saw the Fourteenth Amendment as doing little more than requiring the states to treat their citizens equally. [223]

What is most striking about the debates over the framing and ratification of the Amendment is how radically different the rhetoric and arguments used by Republicans in Congress were from the way they presented their argument outside the halls of Congress. In Congress, Republicans highlighted the worst excesses of the black codes, which meant playing up the disarmament of freedmen. [224]  In the public debate over ratification, Republicans adopted a more conservative strategy, stressing a more abstract and less potentially radical principle of equality. [225]  This decision made perfect political sense. Faced with Democratic

Compendium_Cornell
Page 0830

opponents who played up such emotionally charged issues as Negro suffrage and interracial marriage, it was only natural that Republicans would not dwell excessively on the need to arm blacks.

 **\*522**  Rather than view the impact of the Fourteenth Amendment as transforming the meaning of the Second Amendment in the manner suggested by Amar, a more plausible reading of the evidence would be to argue that the codes selectively disarming blacks were rendered unconstitutional as a result of the Fourteenth Amendment. Borrowing from Amar's vivid imagery, one might describe the impact of the Fourteenth Amendment as facilitating the transformation of the Revolutionary Era's all-white southern militias into the Negro militias of the Reconstruction Era. [226]  Amar and other supporters of the individual rights thesis regarding the Fourteenth Amendment have simply ignored the rise of the Negro militias and their importance to the implementation of Reconstruction. Amar's claim that "[r]econstructors obviously had good functional and ideological reasons for downplaying militias" [227] is simply wrong. Congress recognized this fact when it disbanded the rebel-dominated southern militias and then authorized the creation of new militias loyal to the Union. [228]  For southern Republicans, the destruction of the old militia, dominated by Confederate sympathizers, and the creation of a new militia loyal to the Union, was a high priority. [229] Even if Amar and others were correct about how Bingham viewed arms bearing, this was not how Republicans in the South viewed the matter. Southern Republicanism not only invested considerable political capital in reconstructing the militia, but they committed enormous financial resources to arming blacks with government-issued weapons. [230]  In many places, the inclusion of freedmen into these new militias drove many southern whites to create their own alternative, all-white para-military organizations, effectively turning the new state militias into de facto Negro militias. [231]  The story of the Negro militias is therefore key to understanding the contest to define the right to bear arms in the Reconstruction South. Indeed, a remarkable test case for the individual rights thesis may be found in the South Carolina Ku Klux Klan trials. [232]  Republicans within the newly created Department of Justice, including U.S. Attorney General Amos Akerman, developed a strategy to apply Second Amendment protections through the Fourteenth Amendment. [233]  Although Amar and others cite the South  **\*523**  Carolina Ku Klux Klan trials as proof for their individual rights thesis, [234] the evidence of the trials reveals a radically different story.

Among the many outrages perpetrated by the Klan in South Carolina, the disarmament of members of the Negro militia was particularly galling to Republicans. [235] U.S. Attorney General Amos Akerman and U.S. Attorney Daniel Corbin, the two men responsible for prosecuting these cases, worked closely together and consulted with one another on the best legal strategy to pursue against the Klan. [236] The strategy they formulated was the most systematic effort to theorize the constitutional impact of the Fourteenth Amendment on the Bill of Rights. [237] With Akerman's blessing and guidance, Corbin adopted a strategy to use the Fourteenth Amendment as a vehicle to seek indictments against the Klansmen for violating the Second Amendment rights of blacks in South Carolina. [238] While Congress and the various ratification conventions may have been divided over the issue of incorporation, Akerman and Corbin were not. The two men framed their case around the incorporation issue. [239] While Amar, Levinson, and others have interpreted this choice as evidence that Republicans viewed the right to bear arms as an individual right, [240] the transcript of the trial supports a rather different reading of the evidence. In his opening address, Corbin announced to the court that, "if there is any right that is dear to the citizen, it is the right to keep and bear arms," a protection "secured to the citizen of the United States on the adoption of the amendments to the Constitution." [241]  Corbin then noted that some had argued that Barron v. Baltimore [242] had established the precedent that the Bill of Rights was not a restraint on the states. "The fourteenth amendment," Corbin reminded the court, "changes all that theory, and lays the same restriction upon the States that before lay upon the Congress of the United States." [243]  Having made a strong argument for using the Fourteenth Amendment to apply the Second Amendment to the states, Corbin then went on to explain the nature of the crime  **\*524**  committed by the Klan--the disarmament of members of the Negro militia.

> Imagine, if you like--but we have not to draw upon the imagination for the facts--a militia company, organized in York County, and a combination and conspiracy to rob the people of their arms, and to prevent them from keeping and bearing arms furnished to them by the State Government. Is not that a conspiracy to defeat the rights of the citizen, secured by the Constitution of the United States, and guaranteed by the fourteenth amendment? [244]

The argument employed by the government in these trials demonstrates that modern supporters of the individual rights view of the Second Amendment have seriously misconstrued the connection between bearing arms and incorporation in the South

Compendium_Cornell
Page 0831

Carolina Ku Klux Klan trials. [245] While the action of the federal government in that case supports the incorporation thesis, it does not support the individual rights view. Members of the South Carolina Ku Klux Klan did disarm blacks and the government did try to use the Fourteenth Amendment to prosecute them for violations of the Second Amendment right to bear arms. The guns confiscated, however, were not privately owned, but were issued to South Carolina blacks because they were members of the militia. It is true that the guns were held privately, and not stored in arsenals, but they were unquestionably held as part of citizens' militia obligations. The government did try to incorporate the Second Amendment through the Fourteenth, but as a militia right, not an individual right.

The notion of citizens keeping and bearing arms as part of their obligation to participate in a well regulated militia has had a long history, stretching back to the eighteenth century. Nothing about the Fourteenth Amendment changed that reality. Rather, as William Nelson has argued, the primary impact of the Fourteenth Amendment was to force states to treat all citizens equally. [246] Modern incorporation theory has tended to approach the Fourteenth Amendment somewhat anachronistically, framing the issue in terms relevant to modern law, rather than in those appropriate to the historical debate over incorporation in the Reconstruction era. Modern supporters of incorporation have argued that Republicans sought to overrule Barron v. Baltimore and incorporate the Bill of Rights. [247] Their opponents have argued that Republicans did not wish to undermine traditional notions of federalism and hence could not have intended to effectively nationalize the Bill of Rights. [248] The **\*525** problem with this formulation, as Pamela Brandwein has argued, is that both claims may be true. [249] Republicans may have desired to overrule Barron without fundamentally altering the structure of federalism. [250] If one analyzes the issue at stake in the South Carolina Ku Klux Klan trials, it is possible to see how this was possible. When modern incorporation theory is set aside and the issues are understood in context, a different understanding of the connection of the Fourteenth Amendment to the right to bear arms emerges. Akerman and Corbin's theory of the impact of the Fourteenth Amendment on the right to bear arms advanced two interrelated legal doctrines. [251] It barred states from enacting discriminatory legislation that selectively disarmed blacks. It did not establish a single uniform national definition of what kinds of gun laws individual states might enact. States would be free to enact laws regulating or in some cases prohibiting certain types of weapons as long as those laws were not discriminatory and were grounded in some rational basis. States were also prohibited from enacting laws that prevented blacks from bearing arms in the militia. Overruling Barron v. Baltimore and preserving the existing structure of federalism were not mutually incompatible goals in the minds of Republicans even if these two ideas now seem inconsistent in light of subsequent jurisprudence.

### VI. Translating the Founders' Vision: Toward a Workable Jurisprudence for Firearms

Contrary to the claim of some modern gun rights advocates, robust regulation of firearms is not only compatible with the Second Amendment, it is an essential part of the founders' vision of how guns fit within the framework of well regulated liberty. [252] Nothing in the subsequent history, including the ratification of the Fourteenth Amendment, changed the underlying centrality of the concept of well regulated liberty to American law.

Modern Second Amendment scholarship and recent jurisprudence have devoted considerable energy to debating the individual or collective nature of this right. Hardly any attention has been devoted to elaborating a functional Second Amendment jurisprudence. All of the existing theories of the Second Amendment, including those that **\*526** treat it as an individual right, a collective right, or a civic right, leave open the issue of how courts ought to weigh and evaluate firearms regulation. [253] In this sense, recent Second Amendment jurisprudence has been much less pragmatic than earlier efforts by the courts to sort out the meaning of bearing arms. The struggles of antebellum state judges to make sense of the scope of the right to bear arms and the common law right of self-defense might provide some useful guidelines for modern jurists.

Although mechanistically applying the frameworks developed by these jurists makes little sense, there are a few useful principles to be gleaned from this body of case law. Most jurists recognized a fundamental distinction between guns kept in conjunction with a civic obligation to participate in a well regulated militia, and those kept for purely private purposes. Antebellum jurisprudence also accepted that laws regulating the keeping of militia weapons ought to be subject to a different level of scrutiny than laws regulating the bearing of those weapons. There can be little doubt that if Americans were willing to undertake the burdens of recreating the Founding Era's well regulated militia that the scope of Second Amendment protection for some types of firearms would be considerable. [254] It took a concerted effort on the part of Americans to effectively transform the founders' militia into the modern National Guard; it would take an equally concerted effort to recreate the original militia. [255]

Compendium_Cornell
Page 0832

Of course, it is a matter of public policy, not constitutional law, to determine if the time has arrived to restore the founders' militia to its former role in American society. It is also a matter of public policy, not constitutional law, to decide how that militia would be armed and how its arms would be stored. Although gun rights advocates have become somewhat obsessed with proving that the right to bear arms includes private arms for private purposes, there is little in the history, the text, or the structure of the Constitution to support such a view. Only by constructing an alternate history fantasy in which the Second Amendment was authored by Daniel Shays, Samuel Adams, or the dissenting Anti-Federalist minority of Pennsylvania, can such a view be sustained. [256] The absence of any compelling historical evidence to support the individual rights view of the Second Amendment does not mean that government is free to enact any laws it wishes regarding firearms. The concept of well regulated liberty and the common law protections for firearms owners would certainly preclude the nightmare scenario of gun confiscation so often conjured up by gun rights advocates.

**\*527**  Ironically, rather than conjure up a Bizarro history of the Second Amendment, gun rights advocates would have a much stronger legal theory if they abandoned history entirely and developed a more coherent philosophical defense of their support for an expansive individual right to have firearms for private purposes. While such an exercise would certainly improve the quality of individual rights scholarship on the Second Amendment, there is really no need to invent new legal justifications for protecting the rights of firearms owners. Simply applying a rigorous rational basis review of gun laws would achieve this goal admirably. The notion that we ought to give guns the same protection that the Constitution gives words not only makes little practical sense, it creates yet another false constitutional dichotomy: either we treat guns like words or we give guns no legal protection. Even if one accepted that the Second Amendment protected an individual right, there is no reason to assume that such a right merits strict scrutiny by the courts. [257]

Gun rights advocates have often invoked the specter of domestic disarmament as the inevitable outcome of failing to recognize that the Second Amendment protects an individual right. [258] Although intellectually it is not hard to deconstruct such slippery slope arguments, their emotional resonance in American culture is indisputable. [259] The problem with such slippery slope arguments was first recognized by Federalists, who easily disarmed their Anti-Federalist opponents' hysterical rhetoric by noting that, with such high levels of domestic armament, such a fear was illusory. [260] In a nation with so many guns and such widespread popular support for gun ownership, there is little need to fear domestic disarmament. [261] Quite apart from the problems of enforcement, which would be monumental, it is hard to imagine courts accepting any policy or  **\*528**  regulatory scheme that effectively prohibited all firearms under all circumstances even with the most lax rational basis review. [262] The time has arrived to cast aside both the libertarian and gun prohibitionist rhetoric that drives so much of this debate, and focus our attention on creating a regulatory scheme that promotes public safety and recognizes the many legitimate uses of guns in our society.

## Footnotes

a1    Director of the Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy ("Glenn Institute"); Associate Professor of History, The Ohio State University. Research support for this essay was provided by a grant from the Joyce Foundation. I would like to thank Larry Kramer for useful suggestions and the participants in the Glenn Institute/Fordham University School of Law Symposium panel on the history of the Second Amendment and gun regulation: Carol Berkin, Robert Churchill, David Konig, and James Henretta. Earlier versions of this Article were presented at the Department of Legal Studies, University of Delaware; the Department of History, University of California, Berkeley; and the Center for Law, Policy, and Social Science, The Ohio State University Moritz College of Law.

aa1    A.B., Miami University, 2000; J.D., The Ohio State University Moritz College of Law, 2003; Ph.D. Candidate, Department of Political Science, Ohio State University; Research Associate, Glenn Institute.

1    Franklin E. Zimring, Continuity and Change in the American Gun Debate, in Evaluating Gun Policy: Effects on Crime and Violence 441, 450 (Jens Ludwig & Philip J. Cook eds., 2003).

Compendium_Cornell
Page 0833

2    Andrew Jay McClurg, The Rhetoric of Gun Control, 42 Am. U. L. Rev. 53, 57 (1992); Robert Weisberg, Values, Violence, and the Second Amendment: American Character, Constitutionalism, and Crime, 39 Hous. L. Rev. 1, 3 (2002).

3    Generally, the debate has centered around the individual rights versus the collective rights viewpoints. See infra notes 4-9. For an introduction to Second Amendment legal scholarship, see Gun Control and the Constitution: Sources and Explorations on the Second Amendment (Robert J. Cottrol ed., 1994) [hereinafter Gun Control and the Constitution]. For historical writing on the topic, see Whose Right to Bear Arms Did the Second Amendment Protect? (Saul Cornell ed., 2000) [hereinafter Whose Right to Bear Arms].

4    Whose Right to Bear Arms, supra note 3.

5    On the ambiguous role of preambles in constitutional interpretation, see Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 644-45 (1989) (discussing the debates arising from different interpretations of the purpose underlying the text). For a critique of the use of preambles in modern Second Amendment scholarship, see Eugene Volokh, The Commonplace Second Amendment, 73 N.Y.U. L. Rev. 793 (1998). Volokh's claims have been challenged as ahistorical by David Konig, who notes that constitutional and legal treatises from the Founding Era did treat proemes and preambles as establishing the correct context for reading a constitutional or legal text. See David Thomas Konig, The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms," 22 Law & Hist. Rev. 119, 154 (2004).

6    Carl T. Bogus, The History and Politics of Second Amendment Scholarship: A Primer, 76 Chi.-Kent L. Rev. 3, 4 (2000); Michael C. Dorf, What Does the Second Amendment Mean Today?, 76 Chi.-Kent L. Rev. 291, 293-94 (2000).

7    On the individual rights view, see Levinson, supra note 5. See also L.A. Powe, Jr., Guns, Words, and Constitutional Interpretation, 38 Wm. & Mary L. Rev. 1311 (1997); Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461 (1995); cf. William Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L.J. 1236, 1243, 1254 (1994) (noting that the right to bear arms may be individual, but it is not absolute).

8    See Powe, supra note 7, at 1400-01.

9    See Reynolds, supra note 7, at 469, 480, 504-07.

10    For a discussion of originalism, see Randy E. Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101 (2001) [hereinafter Barnett, The Original Meaning], and Randy E. Barnett, An Originalism for Nonoriginalists, 45 Loy. L. Rev. 611 (1999) [hereinafter Barnett, An Originalism for Nonoriginalists]. Barnett critiques the view of the Second Amendment as militia-centric. See Randy E. Barnett, The Relevance of the Framers' Intent, 19 Harv. J.L. & Pub. Pol'y 403, 410 (1996) [hereinafter Barnett, The Relevance of the Framers' Intent]; see also Randy E. Barnett & Don B. Kates, Under Fire: The New Consensus on the Second Amendment, 45 Emory L.J. 1139 (1996). For critiques of Second Amendment originalism, see Daniel A. Farber, Disarmed By Time: The Second Amendment and the Failure of Originalism, 76 Chi.-Kent L. Rev. 167 (2000), and Jack N. Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L. Rev. 103 (2000).

11    Such a search produces a variety of websites. See, e.g., http:// www.gunowners.org; http://www.keepandbeararms.com.

12    The Simpsons: The Cartridge Family (Fox television broadcast, Nov. 2, 1997).

Compendium_Cornell
Page 0834

13    Jonah Goldberg, Homer Never Nods: The Importance of The Simpsons, Nat'l Rev., May 1, 2000, at 36, 37. Goldberg believes that the episode dealing with gun rights makes The Simpsons the only sitcom in memory to treat gun control with any fairness. Id.

14    Id.

15    Michael A. Bellesiles, Arming America: The Origins of a National Gun Culture (2000).

16    James Lindgren, Fall from Grace: Arming America and the Bellesiles Scandal, 111 Yale L.J. 2195 (2002); Danny Postel, Did the Shootouts over 'Arming America' Divert Attention from the Real Issues?, Chron. Higher Educ., Feb. 1, 2002, at A12. Although Bellesiles's thesis only had a modest influence on pending cases, John Lott's discredited "more guns, less crime" hypothesis has continued to shape policy. See John J. Donohue III, The Final Bullet in the Body of the More Guns, Less Crime Hypothesis, 2 Criminology & Pub. Pol'y 397, 400 (2003). The charges of scholarly misconduct against Lott have never been investigated. Chris Mooney, Double Barreled Double Standards, MotherJones.com, Oct. 13, 2003, at http:// www.motherjones.com/news/feature/2003/10/we_590_01.html.

17    Stuart Banner, The Second Amendment, So Far, 117 Harv. L. Rev. 898, 903-05 (2004) (reviewing David C. Williams, The Mythic Meanings of the Second Amendment: Taming Political Violence in a Constitutional Republic (2003)).

18    United States v. Emerson, 270 F.3d 203, 218-20 (5th Cir. 2001); see also Parker v. District of Columbia, 311 F. Supp. 2d 103, 109 (D.D.C. 2004) (dismissing challenge against the constitutionality of Washington, D.C.'s handgun ban and rejecting the individual right to bear arms); Seegars v. Ashcroft, 297 F. Supp. 2d 201, 235 (D.D.C. 2004) (upholding the Washington, D.C. handgun ban and rejecting the individual rights theory). Of course, the notion that there is a sophisticated collective rights view and an unsophisticated view is itself a creation of gun rights scholarship. No scholar on the collective rights side of the debate has embraced this type of terminology. The notion appears to have been first suggested by Robert Cottrol. Robert J. Cottrol, Introduction to Gun Control and the Constitution, supra note 3, at xxxv. Ironically, the sophisticated collective rights view actually rests on an extremely simplistic view of history. See Saul Cornell, "Don't Know Much About History": The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L. Rev. 657, 661-64 (2002) [hereinafter Cornell, "Don't Know Much About History" ]. For a critique of the notion that there is a sophisticated and unsophisticated collective rights argument, see Banner, supra note 17.

19    Silveira v. Lockyer, 312 F.3d 1052, 1060 (9th Cir. 2002).

20    Saul Cornell, A New Paradigm for the Second Amendment, 22 Law & Hist. Rev. 161 (2004) [hereinafter Cornell, A New Paradigm]; Konig, supra note 5; David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich. L. Rev. 588, 613-21 (2000); see H. Richard Uviller & William G. Merkel, The Militia and the Right to Arms, or, How the Second Amendment Fell Silent 147-211 (2002). See generally Richard A. Primus, The American Language of Rights (1999).

21    See Christopher L. Eisgruber, Moral Principle and the Second Amendment, in Guns, Crime, and Punishment in America 140 (Bernard E. Harcourt ed., 2003).

22    Cornell, A New Paradigm, supra note 20; Konig, supra note 5; Yassky, supra note 20.

23    Cornell, A New Paradigm, supra note 20, at 164.

24    See id. at 164-65.

Compendium_Cornell
Page 0835

25    See id.

26    See Lawrence Lessig, Fidelity and Constraint, 65 Fordham L. Rev. 1365, 1371-76 (1997) (explaining the idea of translation).

27    Robert E. Shalhope, The Ideological Origins of the Second Amendment, 69 J. Am. Hist. 599 (1982) (finding civic virtue to come from an individual right to bear arms). For a different view, see Lawrence Delbert Cress, An Armed Community: The Origins and Meaning of the Right to Bear Arms, 71 J. Am. Hist. 22 (1984) (presenting a communal viewpoint of civic virtue).

28    Joyce Appleby, Liberalism and Republicanism in the Historical Imagination 140-41 (1992).

29    On the importance of the ideological interpretation and the debate over republicanism and liberalism in early American history, see id. passim; Isaac Kramnick, The "Great National Discussion": The Discourse of Politics in 1787, 45 Wm. & Mary Q. 3 (1988); Daniel T. Rodgers, Republicanism: The Career of a Concept, 79 J. Am. Hist. 11 (1992).

30    See David Lieberman, The Province of Legislation Determined: Legal Theory in Eighteenth-Century Britain (1989) (describing England's legal traditions); John Phillip Reid, Constitutional History of the American Revolution (abr. ed. 1995).

31    Saul Cornell, The Other Founders: Anti-Federalism & the Dissenting Tradition in America, 1788-1828, at 21 (1999); Jürgen Habermas, Between Facts and Norms: Contributions to a Discourse Theory of Law and Democracy 328-87 (William Rehg trans., MIT Press 1996) (1992); Jürgen Habermas, The Structural Transformation of the Public Sphere: An Inquiry into a Category of Bourgeois Society 28 (Thomas Burger trans., MIT Press 1989) (1962); John L. Brooke, Reason and Passion in the Public Sphere: Habermas and the Cultural Historians, 29 J. Interdisc. Hist. 43 (1998); William E. Forbath, Habermas's Constitution: A History, Guide, and Critique, 23 Law & Soc. Inquiry 969 (1998).

32    In his important essay on the Second Amendment, Sanford Levinson invokes Ronald Dworkin's theory of rights as trumps. Levinson, supra note 5, at 657-58; see Ronald Dworkin, Rights as Trumps, in Theories of Rights 153 (Jeremy Waldron ed., Oxford Univ. Press 1984). The distinction between negative and positive liberty has been treated elsewhere. See Isaiah Berlin, Two Concepts of Liberty, in Four Essays on Liberty 118-72 (1969). On liberty in the Anglo-American world of the founders, see John Phillip Reid, The Concept of Liberty in the Age of the American Revolution (1988) and Quentin Skinner, Liberty Before Liberalism (1998). For an effort to construct a modern theory of politics and law around republican conceptions of liberty, see Philip Pettit, Republicanism: A Theory of Freedom and Government (1997).

33    1 William Blackstone, Commentaries *119 (emphasis omitted).

34    Id.

35    Id. at *121; see also Reid, supra note 32.

36    John J. Zubly, The Law of Liberty 26 (Philadelphia 1775).

37    Id.

38    See id.

Compendium_Cornell
Page 0836

39    On the importance of the idea of a well regulated society, see William J. Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America (1996). The founding generation's concept of well regulated liberty shares many features with modern legal theory's notion of ordered liberty. See Palko v. Connecticut, 302 U.S. 319, 325 (1937).

40    See Gordon S. Wood, The Creation of the American Republic, 1776-1787 (1993).

41    James Sullivan, An Impartial Review of the Causes and Principles of the French Revolution (Boston, Benjamin Edes 1798).

42    Id. at 44.

43    Id.

44    See id. For a general discussion of natural rights theory, see Philip A. Hamburger, Natural Rights, Natural Law, and American Constitutions, 102 Yale L.J. 907 (1993).

45    See David Hackett Fischer, Paul Revere's Ride, at xvii, 149-64 (1994).

46    See id. at xvii.

47    See id. 149-64.

48    See Saul Cornell, Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory, 16 Const. Comment. 221, 227 & n.25 (1999) [hereinafter Cornell, Commonplace or Anachronism]; Cornell, "Don't Know Much About History," supra note 18, at 670 & n.119.

49    For the historical context of Pennsylvania politics, see Douglas M. Arnold, A Republican Revolution: Ideology and Politics in Pennsylvania, 1776-1790, at 43 (1989), and Robert L. Brunhouse, The Counter-Revolution in Pennsylvania, 1776-1790 (1942).

50    Pa. Const. of 1776, Declaration of Rights, reprinted in 5 The Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States, Territories, and Colonies Now or Heretofore Forming the United States of America 3082-84 (Francis Newton Thorpe ed., Scholarly Press, Inc. 1977) (1909) [hereinafter 5 The Federal and State Constitutions].

51    I have explored the context from which the Second Amendment emerged elsewhere. See Saul Cornell, Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic, in Beyond the Founders: New Approaches to the Political History of the Early Republic (Jeffrey L. Pasley et al. eds., Nov. 2004) [hereinafter Cornell, Beyond the Myth of Consensus]. For problematic de-contextualized readings of the Pennsylvania Declaration of Rights, see infra note 60.

52    Pa. Const. of 1776, Declaration of Rights, § I, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082. See generally John Locke, Two Treatises of Government (Peter Laslett ed., Cambridge Univ. Press 1960) (1698).

53    See 1 Blackstone, supra note 33, at *121.

Compendium_Cornell
Page 0837

54    Pa. Const. of 1776, Declaration of Rights, § VIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083.

55    Id.

56    See id.

57    Id. (allowing one who was "conscientiously scrupulous of bearing arms" to be exempted from bearing arms by paying the "equivalent").

58    See id.

59    Id. § XIII. Earlier state constitutions do not mention this right. See Del. Const. of 1776, available at http:// www.yale.edu/ lawweb/avalon/states/de02.htm (last visited Oct. 8, 2004); N.H. Const. of 1776, available at http://www.yale.edu/ lawweb/avalon/states/nh09.htm (last visited Oct. 8, 2004); N.J. Const. of 1776, available at http:// www.yale.edu/ lawweb/avalon/states/nj15.htm (last visited Oct. 8, 2004); S.C. Const. of 1776, available at http://www.yale.edu/lawweb/ avalon/states/sc01.htm (last visited Oct. 8, 2004).

60    Pa. Const. of 1776, Declaration of Rights, § XIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083. For two other individual rights misreadings of this provision, see Stephen P. Halbrook, That Every Man Be Armed: The Evolution of a Constitutional Right 64 (1984); and Joyce Lee Malcolm, To Keep and Bear Arms: The Origins of an Anglo-American Right 148 (1994). See also David B. Kopel, The Second Amendment in the Nineteenth Century, 1998 B.Y.U. L. Rev. 1359, 1407.

61    Barnett & Kates, supra note 10. This false historical claim was repeated in a brief prepared by lawyers from the CATO Institute in Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004). Ironically, the authors of this brief attacked gun control groups for citing the now discredited work of Michael Bellesiles. See Plaintiff's Memorandum of Points and Authorities in Response to Amici at 10-11, 15-16, Parker v. District of Columbia, 311 F. Supp. 2d 103 (D.D.C. 2004) (No. 03-CV-0213), available at http://www.alangura.com/parker/amici/response_to_amici.pdf (last visited Sept. 17, 2004). Sadly, gun rights advocates do not appear to demand the same historical rigor in work that supports their political agenda that they demand of their opponents.

62    U.S. Const. amend. II.

63    See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259, 265-69 (1990); see also David B. Kopel, The Supreme Court's Thirty-Five Other Gun Cases: What the Supreme Court Has Said About the Second Amendment, 18 St. Louis U. Pub. L. Rev. 99, 128-29 (1999) (arguing that Verdugo-Urquidez demonstrates that "right of the people" cannot mean right of the state).

64    Pa. Const. of 1776, Declaration of Rights, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082-83.

65    Letter from Albert Gallatin, to Alexander Addison 2 (Oct. 7, 1789), microformed on Papers of Albert Gallatin, Fiche 1 (New York Univ. & Nat'l Historical Publ'ns Comm'n) [hereinafter Gallatin].

66    Id. These observations were made in the context of proposals to revise the Pennsylvania Constitution. Halbrook mistakenly treats Gallatin's letter discussing the nature of the rights protected in the Pennsylvania Declaration of Rights as describing the Federal Bill of Rights. See Halbrook, supra note 60, at 225 n.169.

Compendium_Cornell
Page 0838

67    Gallatin, supra note 65.

68    Id.

69    Pa. Const. of 1776, Declaration of Rights, § XII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083.

70    Id. §§ XII, XVI, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083-84.

71    On Philadelphia's prohibition of the theater, see Kenneth Silverman, A Cultural History of the American Revolution 66 (1976).

72    Pa. Const. of 1776, Declaration of Rights, § XIII, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3083 (emphasis added).

73    For a good illustration of this sort of anachronistic reading of the Pennsylvania Declaration of Rights, see Volokh, supra note 5, at 810-12.

74    Demophilus, The Genuine Principles of the Ancient Saxon, or English Constitution (Philadelphia, Robert Bell 1776).

75    Although a number of scholars have attributed this essay to George Bryan, one of the leading members of the constitutionalist party and a prominent future Anti-Federalist, Bryan's biographer has expressed doubts about this attribution. See Joseph S. Foster, In Pursuit of Equal Liberty: George Bryan and the Revolution in Pennsylvania 80 (1994).

76    Demophilus, supra note 74, at 23. Demophilus wrote,

      The best constructed civil government that ever was devised, having but a poor chance for duration, unless it be defended by arms, against external force as well as internal conspiracies of bad men, it will be the next concern of the convention, to put the colony militia on the most respectable footing.

      Id. For more on this point, see Don Higginbotham, The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship, 55 Wm. & Mary Q. 39 (1998).

77    Pa. Const. of 1776, § 5, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3084.

78    Nicholas J. Johnson, Beyond the Second Amendment: An Individual Right to Arms Viewed Through the Ninth Amendment, 24 Rutgers L.J. 1 (1992); Don B. Kates, Jr., The Second Amendment and the Ideology of Self-Protection, 9 Const. Comment. 87 (1992) [hereinafter, Kates, The Second Amendment]; Nelson Lund, The Second Amendment, Political Liberty, and the Right to Self-Preservation, 39 Ala. L. Rev. 103 (1987).

79    See 4 Blackstone, supra note 33, at *183-86 (describing common law self-defense in English law); Richard Maxwell Brown, No Duty to Retreat: Violence and Values in American History and Society (1991) (examining the right of self-defense).

80    On state bills of rights in the Founding era, see Donald S. Lutz, A Preface to American Political Theory 49-88 (1992).

81    On this point, see Konig, supra note 5, at 152-53. More generally, see Primus, supra note 20, at 101-05.

82    See, e.g., Don Higginbotham, The Second Amendment in Historical Context, 16 Const. Comment. 263 (1999).

83    Modern supporters of the individual rights view of the Second Amendment are particularly fond of quoting these losing voices and treating them as though they articulated the voice of a majority of Americans. In this sense, individual rights scholarship more closely resembles the popular "what-if histories" that explore how the world might look if the South won the Civil War. For a discussion of Second Amendment scholarship as a form of alternate history science fiction fantasy, see Cornell, A New Paradigm, supra note 20, at 164.

84    See, e.g., Kates, The Second Amendment, supra note 78; Lund, supra note 78.

85    Eric H. Monkkonen, Murder in New York City 32 (2001).

86    See id. at 27.

87    Act of June 10, 1799, ch. DCCCVI, § 2, 1799 N.J. Laws 561, 562 (punishing disorderly persons who were apprehended while carrying offensive weapons such as pistols); Act of Feb. 24, 1797, ch. DCXXXVII, § 1, 1797 N.J. Laws 179, 179 (punishing rioters who were armed with weapons).

88    A Bill for Preservation of Deer (1785), in 2 The Papers of Thomas Jefferson 443-44 (Julian P. Boyd et al. eds., 1950). The bill was presented by Madison to the House, and read twice, but no action was taken. Id. at 444. Virginia had enacted two earlier game laws in 1738 and 1772. Id.

89    § 2, 1799 N.J. Laws at 562; § 1, 1797 N.J. Laws at 179.

90    E.g., The Conductor Generalis: Or the Office, Duty and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-men, and Overseers of the Poor (New York, Hugh Gaine 1788).

91    Id. at 10-11.

92    Id. at 10-13.

93    Id. This widely reprinted guide went through several editions in the period between the American Revolution and the adoption of the Second Amendment.

94    Brown, supra note 79, at 4-6.

95    Id. at 5.

96    Id. at 4-6.

97    Novak, supra note 39, at 19-50; see Christopher L. Tomlins, Law, Police, and the Pursuit of Happiness in the New American Republic, 4 Stud. Am. Pol. Dev. 3 (1990).

98   Pa. Const. of 1776, Declaration of Rights, § III, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3082.

99   See infra Part III.

100   See Pa. Const. of 1776, § 43, reprinted in 5 The Federal and State Constitutions, supra note 50, at 3091.

101   Joyce Lee Malcolm, Infringement, 2 Common-place, July 2002, at http://www.common-place.org/vol-02/no-04/ roundtable/malcolm.shtml. Another ideologically distorted claim has alleged that founders were anti-regulation. See David I. Caplan, Gun Registration, in 1 Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law 257-58 (Gregg Lee Carter ed., 2002). According to Caplan:

At the time of the adoption of the Constitution in 1788, the American people had an absolute, unqualified right to keep ordinary personal firearms and ammunition for defense of home, community, and country. Registration or its equivalent at most was confined to proving that one possessed one rifle or musket for militia purposes; it did not extend to disclosing how many other firearms one possessed, and it did not extend to pistols at all.

Id. at 257. Caplan appears to have not looked at any of the extant gun laws from the period which regulated the possession and use of firearms in a variety of ways. See infra Parts III.A-B. No such right or property claim was absolute in American law in the Founding era. A distorted view of the historical record from the opposing ideological perspective was provided by Michael Bellesiles. Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567 (1998). He argued that guns were held in trust by individuals for the government. Each of these views, libertarian and collectivist, distorts the historical record, which fits neither the modern individual rights nor collective rights paradigm.

102   Barron v. Baltimore, 32 U.S. (7 Pet.) 243, 247 (1833). For the views of Barron contrarians, see Akhil R. Amar, The Bill of Rights: Creation and Reconstruction 145-62 (1998).

103   Gun rights advocates have often cited the language of state constitutional provisions to prove that bearing arms had to be understood as an individual right. See Kopel, supra note 60, at 1413-15; Volokh, supra note 5, at 810-12. According to this view, the right to bear arms could not be a right of the state because its inclusion in a state bill of rights meant it was a claim against the state. Obviously, trying to fit the eighteenth-century right to bear arms into our modern categories is profoundly anachronistic. Bills of rights in the Founding Era included general statements of principle, constitutional obligations, as well as statements of rights. See supra Part II.

104   The changes in the understanding of constitutional law are an important point recently underscored in a thoughtful essay by Sanford Levinson. Sanford Levinson, The Historians' Counterattack: Some Reflections on the Historiography of the Second Amendment, in Guns, Crime, and Punishment in America, supra note 21, at 91.

105   See William Rawle, A View of the Constitution of the United States of America 121 (Philadelphia, H.C. Carey 1825).

106   Id. at 122.

107   Id. at 122-23.

108   See id. at 121-22. Individual rights theorists often claim Rawle as a spokesmen for their view of the Second Amendment. See, e.g., Kopel, supra note 60, at 1384. Apart from the anachronistic quality of this claim, it seriously distorts Rawle's view of the Second Amendment. Rawle's view fits neither the modern individual rights nor collective rights models, but comes closer to the civic right. See supra Part I.

Compendium_Cornell
Page 0841

[109]   Barnett & Kates, supra note 10, at 1210-14.

[110]   Id. at 1209. The research for this particular conclusion was drawn primarily from the dictionary, a rather narrow foundation for such a broad historical claim. In his most recent scholarship, Barnett has expanded the scope of his research somewhat. Cf. Barnett, The Original Meaning, supra note 10. The decision to move beyond the dictionary is commendable, but a serious historical examination of this topic would require surveying a much broader range of primary source materials than Barnett has surveyed to this date. Such an inquiry would need to examine newspapers, pamphlets, sermons, broadsides, and books. Only after completing a systematic and comprehensive survey of the surviving documentary and archival record could one speak with the kind of authority necessary to support Barnett's revisionist claims.

[111]   Seinfeld: The Bizarro Jerry (NBC television broadcast, Oct. 3, 1996); see also Jerry Siegel et al., Superman: Tales of Bizarro World (DC Comics 2000). To describe Bizarro Superman to his friend Elaine, Jerry Seinfeld explains: "Bizarro Superman. Superman's exact opposite who lives in the backwards Bizarro world. Up is down. Down is up. He says 'hello' when he leaves, 'goodbye' when he arrives." Id. at 4.

[112]   Jack N. Rakove, Confessions of an Ambivalent Originalist, 78 N.Y.U. L. Rev. 1346, 1354 (2003).

[113]   Martin S. Flaherty, History "Lite" in Modern American Constitutionalism, 95 Colum. L. Rev. 523 (1995).

[114]   See infra Parts III.A-B.

[115]   The Bizarro Second Amendment is another type of alternate history, a sub-genre of science fiction in which an author posits a different history where the American Revolution never happened or the South won the Civil War. For a discussion of the prevalence of such histories in Second Amendment scholarship, see Cornell, A New Paradigm, supra note 20. Supporters of the Bizarro Second Amendment oftentimes describe their own view as the Standard Model. See Reynolds, supra note 7, at 463.

[116]   See infra Parts III.A-B.

[117]   See infra Part III.A.2.

[118]   See infra Part III.A.2.

[119]   E.g., Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (regarding the transporting and storage of gun powder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (regarding the storage of gun powder); Act of Dec. 6, 1783, ch. CIV, 1783 Pa. Laws 161, ch. MLIX, 11 Pa. Stat. 209 (concerning the securing of the city of Philadelphia from the danger of gunpowder), available at http:// www.palrb.us/statutesatlarge/17001799/1783/0/act/1059.pdf (last visited Oct. 10, 2004).

[120]   See, e.g., Act of April 22, 1785, ch. 81, 1785 N.Y. Laws 152; Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78; Act of Jan. 30, 1847, 1846-1847 Va. Acts ch. 79, at 67. The range of colonial regulation of firearms and gun powder is documented. See, e.g., A Collection of all the Laws of the Province of Pennsylvania: Now in Force 13, 39-40, 85, 197-200, 315-17 (1742) (concerning dueling, the storage of gun powder, the carrying of weapons by "Negroes," firing guns in the City of Philadelphia, and hunting).

[121]   E.g., Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51 (concerning the carrying of weapons by free "Negroes and mulattoes").

122   E.g., Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31 (addressing the disarming of persons who were "disaffected to the Cause of America"); Act of Apr. 1, 1778, ch. LXI, §§ 2, 5, 1777-1778 Pa. Laws 123, 126 (requiring white males over the age of eighteen to take an oath of loyalty or be disarmed).

123   See Kopel, supra note 60, at 1415-19.

124   Id.

125   Id. at 1403.

126   See infra Part III.B.1.

127   See infra notes 182-84 and accompanying text.

128   E.g., Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126.

129   § 5, 1777-1778 Pa. Laws at 126. This provision was contained in a law that also laid out several consequences for those who refused to take the oath or affirmation; for example, lawyers and professors (among others) were not permitted to practice their trades and citizens were unable to "prosecute any suit in equity" or to serve as an "executor or administrator of any person." Id. § 3, at 124; see also Cornell, Commonplace or Anachronism, supra note 48, at 228.

130   ch. VII, 1775-1776 Mass. Acts at 31.

131   Id. The test required, among other things, that the subscribers affirm their belief that the war against Britain was "just and necessary." Id. Additionally, subscribers affirmed that they would not aid or assist the British. Id.

132   Id. at 32.

133   Id. at 35.

134   Notably missing are the requirements that the subscriber believe that the war was a just one and the promise to defend the United American Colonies with arms. Instead, Quakers needed to promise that they would not aid, assist, or pass intelligence to the enemy. Id.

135   Leonard L. Richards, Shays's Rebellion: The American Revolution's Final Battle 38-40 (2002).

136   Act of Feb. 16, 1787, ch. VI, 1787 Mass. Acts 555. The law applied to

   any person or persons, who have acted in the capacity of non-commissioned officers or privates, or persons of any other description, who, since the first day of August, seventeen hundred and eighty-six, have been, now are, or hereafter may be in arms against the authority and Government of this Commonwealth, or who have given or may hereafter give them counsel, aid, comfort or support....

   Id.

Compendium_Cornell
Page 0843

137    Id. at 556.

138    Id. The three-year time period could be shortened for these punishments--but not for the disarmament--provided that the person could "exhibit plenary evidence [to the General Court] of their having returned to their allegiance, and kept the peace, and that they possess an unequivocal attachment to the Government." Id.

139    The disqualifications are also similar in nature to the sorts of privileges taken away regularly from convicted felons today.

140    See infra note 141.

141    Loyalty oaths, disarmament, and the constitutional definition of the crime of treason raise serious questions about the effort to treat the Second Amendment as part of a constitutional right of revolution. See generally Levinson, supra note 5, at 656-57; Reynolds, supra note 7, at 467; David C. Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551, 583 (1991). It also calls into question the argument that an individual right of self-defense was somehow absolute and might trump the needs of collective self-defense. The Shaysite reading of the Second Amendment would therefore be consistent with the Bizarro Theory of the Second Amendment. See supra notes 111-15 and accompanying text.

142    E.g., Act of May 8, 1792, 1792 Conn. Pub. Acts 440 (forming the state militia); Act of July 19, 1776, ch. I, 1775-1776 Mass. Acts 15 (regulating the militia of Massachusetts); Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62 (regulating the militia of New York State); Act of Mar. 20, 1780, ch. CLXVII, 1780 Pa. Laws 347 (regulating the militia of Pennsylvania); Act of Mar. 26, 1784, 1784 S.C. Acts 68 (regulating militia).

143    See supra note 142.

144    ch. 33, 1778 N.Y. Laws at 62.

145    § 1, 1775-1776 Mass. Acts at 15.

146    1784 S.C. Acts at 69.

147    See, e.g., 1778 N.Y. Laws at 62 (providing exclusions for Indians and slaves).

148    See, e.g., § 1, 1775-1776 Mass. Acts at 15.

149    See, e.g., 1784 S.C. Acts at 68. In South Carolina, for example, the governor could order regimental musters every six months in Charleston and once a year in the rest of the state. Ordinary musters of individual companies could be ordered every two months. Id.

150    1778 N.Y. Laws at 62. As further evidence of how poorly our modern constitutional law can translate to eighteenth-century realities, consider the fact that militia members were required to provide their weapons and ammunition at their own expense. Such a notion hardly seems consistent with our current ideas about what constitutes a taking under the Takings Clause. See, e.g., Phillips v. Wash. Legal Found., 524 U.S. 156, 160 (1998) (finding that interest earned on a lawyer's trust account belonged to the client as private property for purposes of the Takings Clause).

151    1778 N.Y. Laws at 65.

152    Id.

153    Id. at 66. Those too poor to afford to equip themselves properly were usually provided with the weapon and necessary equipment by the state. See, e.g., id. at 63; see also § 7, 1775-1776 Mass. Acts at 18.

154    1778 N.Y. Laws at 65.

155    § 9, 1775-1776 Mass. Acts at 18.

156    Id.

157    U.S. Const. amend. II.

158    § 9, 1775-1776 Mass. Acts at 18.

159    E.g., Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (addressing the carting and transporting of gunpowder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (concerning the storage of gunpowder); Act of Dec. 6, 1783, ch. MLIX, 11 Pa. Stat. 209, available at http:// www.palrb.us/statutesatlarge/17001799/1783/0/act/1059.pdf. Laws for the safekeeping of gunpowder, however, continued well into the nineteenth century. E.g., Act of Feb. 24, 1852, ch. CLXIX, 1851-1852 Tenn. Pub. Acts 246.

160    Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507 (relating to storage of gunpowder in Boston); ch. X, 1792 Mass. Acts at 208 (same); Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 218 (same); Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326 (relating to a powder house in Boston).

161    Act of Dec. 6, 1783, ch. MLIX, 11 Pa. Stat. 209.

162    Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627.

163    See, e.g., Act of Sept. 12, 1783, ch. LXXVI, § XLII, 1782-1783 Pa. Laws 124, 140 (concerning storage of gunpowder in the Town of Reading); Act of Apr. 13, 1782, ch. XIV, § XLII, 1781-1782 Pa. Laws 25, 41 (concerning storage of gunpowder in the Town of Carlisle).

164    See supra note 159.

165    § XLII, 1781-1782 Pa. Laws at 41.

166    ch. 28, 1784 N.Y. Laws at 627.

167    E.g., Act of June 19, 1801, ch. XX, 1801 Mass. Acts 507; Act of Oct. 4, 1780, ch. V, 1780 Mass. Acts 326.

168    Act of June 26, 1792, ch. X, 1792 Mass. Acts 208.

169    ch. 28, 1784 N.Y. Laws at 628.

170    ch. XX, 1801 Mass. Acts at 507.

171    ch. V, 1780 Mass. Acts at 326.

172    Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 218 (concerning the storage of gunpowder in Boston).

173    Twenty to thirty pounds of gunpowder is certainly not an inconsiderable amount. See supra note 164 and accompanying text. The point is, however, that the state could limit the amount of gunpowder a person could store in his home or shop to an amount that the state deemed safe.

174    Statutes limiting when and where guns could be fired are not a nineteenth-century invention. Pennsylvania in 1774 and New York in 1785 both passed laws that restricted the firing of guns on New Year's Eve and New Year's Day. Act of Apr. 22, 1785, ch. 81, 1785 N.Y. Laws 152; Act of Dec. 24, 1774, ch. DCCV, 1774 Pa. Stat. 410, available at http:// www.palrb.us/statutesatlarge/17001799/1774/0/act/0705.pdf. The laws of the nineteenth century go far beyond these restrictions and appear to become more expansive in scope.

175    E.g., Act of Mar. 18, 1859, 1859 Ohio Laws 56 (prohibiting the carrying of concealed weapons); Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15; Act of Feb. 2, 1838, 1838 Va. Acts ch. 101, at 76 (preventing the carrying of concealed weapons).

176    § 1, 1859 Ohio Laws at 56. The language of the Tennessee statute made clear the moral depravity of those who carried concealed weapons. ch. XIII, 1821 Tenn. Pub. Acts at 15. The law states that "each and every person so degrading himself, by carrying a dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistols... shall pay a fine." Id. (emphasis added). Clearly, carrying any of these weapons concealed was not something an upstanding and virtuous citizen would do. There might be a right to bear arms, but such a right was tempered by the demands of the well regulated society, and well regulated societies held those carrying concealed weapons in low regard.

177    § 1, 1859 Ohio Laws at 56 (prohibiting the carrying or wearing of concealed weapons).

178    ch. XIII, 1821 Tenn. Pub. Acts at 16. This language is somewhat unclear, however. Presumably, the application to those on a journey outside of their state would protect out-of-staters traveling in Tennessee who were unaware of Tennessee's ban on concealed weapons. The language also seems to carve out a protection for those who were traveling outside of their communities, where they presumably felt less safe.

179    § 1, 1859 Ohio Laws at 56-57.

180    1838 Va. Acts ch. 101 at 76.

181    Id. at 77. Indeed, the law is broader still because it applied to

any such weapon [mentioned in the act], and that the same was hidden or concealed from or kept out of the view of the person against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony....

Id. Thus, the weapon need not have been concealed immediately before it was used for the law to apply under these circumstances.

Compendium_Cornell
Page 0846

182   Act of Dec. 25, 1837, 1837 Ga. Laws 90 (protecting citizens of Georgia against the use of deadly weapons).

183   Act of Jan. 27, 1838, ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200 (banning the sale of Bowie knives and Arkansas tooth picks).

184   Day v. State, 37 Tenn. (5 Sneed) 496, 500 (1857).

185   E.g., Act of Feb. 17, 1831, § 6, 1831 Ohio Laws 161, 162 (preventing certain immoral practices); Act of Dec. 3, 1825, ch. CCXCII, § 4, 1825 Tenn. Priv. Acts 306 (regulating shooting and carrying guns in Reynoldsburgh); Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78-79; Act of Jan. 30, 1847, 1846-1847 Va. Acts ch. 79, at 67; Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51 (restricting Negroes from carrying guns).

186   E.g., § 6, 1831 Ohio Laws at 162.

187   Laws, for the Regulation and Government of the Village of Cleaveland, § 9, in Cleaveland Herald, Aug. 15, 1820, at 1.

188   § 6, 1831 Ohio Laws at 162.

189   Id.

190   ch. CCXCII, 1825 Tenn. Priv. Acts at 307. The language of the statute also tells us that the legislature did not believe that all laws restraining and punishing the shooting and carrying of guns were unconstitutional. The statute's allowance for punishing those who broke the sabbath is also demonstrative of the sort of power the state had in the antebellum period. The well regulated society meant that, while people had the freedom to worship, they also had an obligation to honor the sabbath. Cf. Novak, supra note 39, at 112.

191   Act of Nov. 16, 1821, ch. LXLIII, 1821 Tenn. Pub. Acts 78-79.

192   Scholars have discussed the trend toward greater centralization and preemption in recent firearms jurisprudence. See, e.g., Jon S. Vernick & Lisa M. Hepburn, State and Federal Gun Laws: Trends for 1970-99, in Evaluating Gun Policy: Effects on Crime and Violence, supra note 1, at 345-67. On the robust tradition of local regulation in earlier periods of American history, see Novak, supra note 39.

193   Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51.

194   Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822).

195   For a discussion of Kentucky's political reaction to the Bliss ruling, see Robert M. Ireland, The Problem of Concealed Weapons in Nineteenth-Century Kentucky, 91 Reg. Ky. Hist. Soc'y 370, 372-74 (1993).

196   Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840).

197   Id. at 160.

198    Id. at 158-59.

199    State v. Buzzard, 4 Ark. 18 (1842).

200    Id. at 24-25.

201    Id. at 21; see supra notes 33-35 and accompanying text.

202    Buzzard, 4 Ark. at 21.

203    Nunn v. State, 1 Ga. 243, 249, 251 (1846).

204    Day v. State, 37 Tenn. (5 Sneed) 496, 500 (1857).

205    Id. at 501.

206    See Act of Dec. 25, 1837, 1837 Ga. Laws 90 (protecting citizens of Georgia against the use of deadly weapons); Act of Jan. 27, 1838, ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200 (banning the sale of Bowie knives and Arkansas tooth picks); Day, 37 Tenn. (5 Sneed) at 496. In Nunn v. State, the Georgia Supreme Court construed the scope of the state's police power more narrowly to apply to the regulation of weapons. Nunn, 1 Ga. at 249. In his important treatise, Joel Prentiss Bishop concluded that the more expansive individual rights view of the Bliss court was the minority view regarding the scope of the state's police powers. Joel Prentiss Bishop, Commentaries on the Law of Statutory Crimes § 793 (2d ed. 1883).

207    Amar, supra note 102; Stephen P. Halbrook, Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876 (1998); Levinson, supra note 5. The most comprehensive account of the Fourteenth Amendment remains William E. Nelson, The Fourteenth Amendment: From Political Principle to Judicial Doctrine (1988). For a critique of Second Amendment scholarship on the Founding Era as a form of consensus history, see Cornell, Beyond the Myth of Consensus, supra note 51.

208    Amar, supra note 102, at 266.

209    Levinson, supra note 104, at 108 (quoting Amar, supra note 102, at 258).

210    Michael Curtis argues that incorporation enjoyed broad popular support. Michael Kent Curtis, No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights (1986). Other studies of ratification do not support this claim or Amar's morphing Second Amendment. See James E. Bond, The Original Understanding of the Fourteenth Amendment in Illinois, Ohio, and Pennsylvania, 18 Akron L. Rev. 435 (1985) [hereinafter Bond, Original Understanding]; James E. Bond, Ratification of the Fourteenth Amendment in North Carolina, 20 Wake Forest L. Rev. 89 (1984); Lambert Gingras, Congressional Misunderstandings and the Ratifiers' Understanding: The Case of the Fourteenth Amendment, 40 Am. J. Legal Hist. 41 (1996).

211    Amar, supra note 102, at 266.

Compendium_Cornell
Page 0848

212   See Kopel, supra note 60, at 1410 n.190 (listing state constitutions' right to bear arms provisions); supra note 72 and accompanying text. For a discussion of this transformation, see Cornell, Beyond the Myth of Consensus, supra note 51; Cornell, "Don't Know Much About History," supra note 18.

213   See Chris Mooney, Showdown, Lingua Franca, Feb. 2000, at 28.

214   The literature challenging originalism is enormous. For a particularly forceful statement, see Mark Tushnet, Interdisciplinary Legal Scholarship: The Case of History-in-Law, 71 Chi.-Kent L. Rev. 909, 914 (1996). A detailed philosophical discussion of originalism may be found in Keith E. Whittington, Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review (1999). Whittington's erudite defense of originalism addresses the theoretical and methodological challenges to this interpretive methodology, but provides little historical guidance on how one should weigh different intents or evaluate the meaning or significance of particular texts. Whittington concedes that discerning intent may be difficult, but he insists it is not impossible. Id. A less satisfactory and more historically naïve defense of originalism may be found in Barnett, The Original Meaning, supra note 10; Barnett, An Originalism for Nonoriginalists, supra note 10. For Barnett's view of the Second Amendment, see Barnett, The Relevance of the Framers' Intent, supra note 10. Historical hostility to the methodology of originalism has had little to do with epistemological problems, and has generally focused on the use of evidence, not the epistemological possibility of reconstructing the past. See also Interpreting the Constitution: The Debate over Original Intent (Jack N. Rakove ed., 1990); Jack N. Rakove, Original Meanings: Politics and Ideas in the Making of the Constitution (1996). On the notion of standards for originalists, see H. Jefferson Powell, Rules for Originalists, 73 Va. L. Rev. 659 (1987). For a critique of law office history, see Alfred H. Kelly, Clio and the Court: An Illicit Love Affair, 1965 Sup. Ct. Rev. 119. On originalism as a form of forensic history, see John Phillip Reid, Law and History, 27 Loy. L.A. L. Rev. 193 (1993). On the need for legal scholarship to remain current with historical scholarship, see Flaherty, supra note 113.

215   See, e.g., Bret Boyce, Originalism and the Fourteenth Amendment, 33 Wake Forest L. Rev. 909 (1998).

216   Larry Kramer, Fidelity to History--And Through It, 65 Fordham L. Rev. 1627, 1628, 1638 (1997).

217   See supra note 207.

218   Bingham's speech was published in the local newspaper. John A. Bingham, Politics in Ohio (Aug. 8, 1866), in Cincinnati Commercial, Aug. 10, 1866, at 1.

219   Id.

220   Id.

221   John A. Bingham, The Constitutional Amendment (Aug. 24, 1866), in Cincinnati Commercial, Aug. 27, 1866, at 1.

222   Id.

223   See generally Bond, Original Understanding, supra note 210, at 445.

224   For a good sampling of such rhetoric, see Kopel, supra note 60, at 1447-59.

225   See Bond, Original Understanding, supra note 210, at 442-43.

Compendium_Cornell
Page 0849

226   Sally E. Hadden, Slave Patrols: Law and Violence in Virginia and the Carolinas 204-05 (2001); see also Carl T. Bogus, The Hidden History of the Second Amendment, 31 U.C. Davis L. Rev. 309, 335-37 (1998) (describing the slave patrols made by an all white militia to control the slave population).

227   Amar, supra note 102, at 259.

228   See Lou Falkner Williams, The Great South Carolina Ku Klux Klan Trials, 1871-1872, at 22-29 (1996).

229   Id.

230   Id.

231   Otis Singletary, Negro Militia and Reconstruction (1957).

232   Williams, supra note 228, at 75-76.

233   Id. at 61-64; Kermit L. Hall, Political Power and Constitutional Legitimacy: The South Carolina Ku Klux Klan Trials, 1871-1872, 33 Emory L.J. 921, 941-42 (1984).

234   Amar, supra note 102, at 210.

235   See Williams, supra note 228, at 27-28.

236   Id. at 61-64. See generally The Case of Robert Hayes Mitchell, Sylvanus Shearer and Others, in Proceedings in the Ku Klux Trials at Columbia, S.C. in the United States Circuit Court 147-48 (Negro Univs. Press 1969) (1872) (transcript of the Ku Klux Trials) [hereinafter Proceedings in the Ku Klux Trials].

237   Williams, supra note 228, at 62-64.

238   Robert J. Kaczorowski, The Nationalization of Civil Rights: Constitutional Theory and Practice in a Racist Society, 1866-1883, at 153 (1987) (noting that Akerman was committed to enforcing the rights of citizens through the Fourteenth Amendment); Robert J. Kaczorowski, The Politics of Judicial Interpretation: The Federal Courts, Department of Justice and Civil Rights, 1866-1876, at 122-29 (1985).

239   Proceedings in the Ku Klux Trials, supra note 236.

240   See supra note 209.

241   Proceedings in the Ku Klux Trials, supra note 236, at 147.

242   32 U.S. (7 Pet.) 243 (1833).

243   Proceedings in the Ku Klux Trials, supra note 236, at 147.

Compendium_Cornell
Page 0850



244    Id. at 148.

245    See Amar, supra note 102; Halbrook, supra note 207; Levinson, supra note 5.

246    See generally Nelson, supra note 207, at 11.

247    See Pamela Brandwein, Reconstructing Reconstruction: The Supreme Court and the Production of Historical Truth 56-58 (1999).

248    See id.

249    See id.

250    Id.

251    See Proceedings in the Ku Klux Trials, supra note 236.

252    For problematic efforts to associate guns with modern First Amendment theory's prohibition on prior restraints, see Powe, supra note 7. Another dubious modern claim is that the founders would have not cared about the social cost of the exercise of a right, a dubious claim given the regulatory framework they created to deal with firearms and gun powder. On this anachronistic claim, see Reynolds, supra note 7. In this sense the right to bear arms was certainly not a trump. See supra note 32. When the right is placed in its historical context and viewed as a civic right, this becomes clear.

253    See supra Introduction.

254    Cornell, Beyond the Myth of Consensus, supra note 51.

255    See Uviller & Merkel, supra note 20, at 143.

256    See supra notes 83, 112-16 and accompanying text.

257    For more on this point, see Erwin Chemerinsky, Putting the Gun Control Debate in Social Perspective, 73 Fordham L. Rev. 477, 484 (2004).

258    See Robert J. Cottrol & Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L.J. 309 (1991); Kates, The Second Amendment, supra note 78, at 98.

259    Eugene Volokh, The Mechanisms of the Slippery Slope, 116 Harv. L. Rev. 1026 (2003).

260    Saul Cornell, Introduction to Whose Right to Bear Arms, supra note 3, at 14 (quoting Noah Webster).

261    James Fleming's arguments about the deeply rooted nature of property rights in American society apply with even greater force to gun rights. The deep cultural roots of guns in American history and society render aggressive judicial enforcement of an individual right superfluous. Entrenched social practice and organized political action are the most reliable and effective means for protecting the rights of gun owners and have proven remarkably resilient over time.

Given the power of gun rights groups, the limited funding of gun control groups, and their quite modest agenda of moderate regulation, the idea of a slippery slope on this issue is ludicrous. For an elaboration of this argument with regard to property rights, see James E. Fleming, *Fidelity, Basic Liberties, and the Specter of Lochner, 41 Wm. & Mary L. Rev. 147 (1999)*.

262    James B. Jacobs, Can Gun Control Work? (2002).

73 FDMLR 487

---

**End of Document**                                      © 2022 Thomson Reuters. No claim to original U.S. Government
                                                          Works.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12666   Page 310 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

**106 J. Crim. L. & Criminology 203**

Journal of Criminal Law and Criminology
Spring, 2016

Criminal Law

Saul Cornell [a1]

Copyright © 2017 by Saul Cornell

# "HALF COCKED": THE PERSISTENCE OF ANACHRONISM AND PRESENTISM IN THE ACADEMIC DEBATE OVER THE SECOND AMENDMENT

*James Lindgren's recent forward to* The Journal of Criminal Law and Criminology's *2015 symposium on "The Past and Future of Guns," purports to be a neutral and scholarly account of the current state of the debate on the meaning of the Second Amendment. Lindgren's introductory essay fails to achieve both of these goals. Rather than survey the pre-*Heller *scholarship in a comprehensive and even-handed manner, Lindgren provides a distorted and superficial account of the historical literature. He compounds this error by ignoring the vast post-*Heller *scholarly literature, failing to note that much of this recent body of scholarship has been deeply critical of* Heller, *and has generally vindicated the work of the historians he criticizes. Indeed, the evidence he himself offers in defense of his interpretation actually undercuts his claims about the meaning of the Second Amendment. Lindgren's essay does not chart a path forward in this contentious debate, but proffers an incomplete and analytically flawed account of the Founding Era's understanding of this important provision of the Constitution.*

## *204 THE FUTURE OF THE PAST: HISTORICAL SCHOLARSHIP AND THE SECOND AMENDMENT AFTER *HELLER

Reading James Lindgren's recent forward to *The Journal of Criminal Law and Criminology*'s symposium on "The Past and Future of Guns," [1] one might be tempted to think that nothing new on the Second Amendment had been written in the aftermath of the Supreme Court's decision in *District of Columbia v. Heller*. [2] In fact, *Heller* has spawned a vast new scholarly literature. [3] Not only does Lindgren not engage with the historical scholarship written prior to *Heller*, he fails to consider the post-*Heller* literature, rendering his account of the state of the debate over the Second Amendment's historical meaning both incomplete and unsound. [4] Moving forward in the contentious debate over firearms regulation does, as Lindgren asserts in his discussion of the policy issues, [5] require more attention to evidence, but this sage counsel applies to history every bit as much as it applies to statistical analysis. [6]

It is a bit surprising to see an article on the past and future of the gun debate that makes no mention at all of important recent work by scholars such as Duke University's Joseph Blocher and Darrell Miller, Yale University's Reva Siegel, or Harvard scholar Cass Sunstein, to name just a few of the new voices and senior figures in constitutional law that have entered this ideologically charged field after *Heller*. [7] All of these scholars reject Lindgren's interpretation of history and his reading of *Heller*. [8] Some **\*205** of the harshest criticism of the D.C. gun case and its abuse of history has come from conservative scholars and judges, including Richard Epstein, Charles Fried, Richard Posner, and J. Harvie Wilkinson, another fascinating aspect of the post-*Heller* jurisprudential landscape that Lindgren neglects. [9]

In a brief response it would be impossible to survey the full richness of the new scholarly developments Lindgren overlooks. [10] Nor does space permit a detailed exposé of all of the historical errors and analytical flaws in *Heller* and the outdated body of scholarship Lindgren cites in his essay. [11] In the interest of moving the debate forward, some salient points are worth stressing.

Compendium_Cornell
Page 0853

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12667   Page 311 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

There is substantial scholarly support for the argument that the "individual rights" view articulated in *Heller* and defended by Lindgren was largely an invented historical tradition. [12] Gun rights advocates both within and outside of the legal academy worked assiduously to create this revisionist history of the Second Amendment [13] and deployed it effectively **\*206** in *Heller*. As Reva Siegel and Michael Waldman have each shown, the individual rights interpretation of the Second Amendment was a modern creation. [14] For most of the last century the dominant interpretation of the Second Amendment was as a collective right, not an individual right. The eminent early twentieth century Harvard legal scholar Zechariah Chafee, Jr. captured the earlier scholarly consensus around this conception in an influential article written more than seventy years before *Heller*: "[u]nlike the neighboring amendments," the Second Amendment, Chafee averred, "safeguards individual rights very little and relates mainly to our federal scheme of government." [15] Chafee's article was hardly the only one to embrace such a view. Most legal scholars and courts accepted this collective rights view until a new wave of revisionist scholarship emerged in the 1990s. [16]

Lindgren's dismissive characterization of historians' efforts to formulate a new paradigm for understanding the Second Amendment prior to *Heller* is cast in quasi-conspiratorial terms, as if it were part of some nefarious anti-gun agenda. Lindgren's account of this historiography confuses two different groups of scholars and fails to understand the connections between Second Amendment scholarship and early American **\*207** historiography. [17] He argues that historians:

> [W]ith essentially no original evidence to support their view--and some evidence directly contrary to it--the states' rights academics came up with an entirely new view, which they termed the "civic rights" view. According to this view, the right to keep and bear arms was an individual right, but it could be exercised only with the permission of the state in a militia. [18]

It is hard to credit the claim that there was no new evidence to support the view that the Second Amendment was a civic right. Indeed, Lindgren's hyperbole is typical of much gun rights oriented scholarship, and it is precisely for this reason that Sanford Levinson has described such claims as antithetical "to serious intellectual debate." [19] The new historical paradigm that Lindgren mocks, variously described as a limited individual right, a militia-based right, or a civic right emerged almost simultaneously in the writings of scholars who were working independently from one another and employing different methodological tools, but who were all responding to debates and trends within early American legal historiography. [20] The one commonality among all the scholars drawn to this paradigm was not their connection to contemporary gun politics or previous support for its theory of states' rights, but their emphasis on the necessity of rooting Founding Era American law in the culture of the early modern Anglo-American Atlantic world. [21]

**\*208**  The claim that this new historical paradigm lacked any evidence from the Founding Era neglects the centrality of the militia and the related fear of standing armies to Anglo-American republican discourse in the period between the Glorious Revolution and the adoption of the amended Constitution. [22] The pervasiveness of republican ideas in the legal and political discourses of the Atlantic world in the eighteenth century has been documented time and again by historians of early modern political thought. [23] More than forty years of historiography on republicanism contradicts Lindgren's suggestion that the new civic paradigm was somehow conjured out of thin air. [24] Lindgren's misunderstanding of the relevant historiography goes beyond his lack of appreciation for the centrality of republicanism to Anglo-American legal culture in this period--his analysis demonstrates a failure to grasp some of the most elementary principles of historical inquiry. Thus, he confidently asserts that:

> The problem with [the civic rights model] was that, again, there was no contemporary evidence from the Framers' era to support it, and, indeed, no one had ever heard of the civic rights view for the first two centuries of the Second Amendment's existence. The first use of the term "civic right" to describe the Second Amendment in American law reviews appeared in a 2002 article by the historian Saul Cornell. It would be strange if most of the Framers held the civic rights view of the Second Amendment, but kept it a secret from everyone, including the other Framers. [25]

Compendium_Cornell
Page 0854

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12668   Page 312 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

It is hardly surprising that the Founding Generation did not use a term invented by modern scholars to describe the Second Amendment--how could they? [26] Lindgren has fallen into an elementary historical fallacy. By conflating what modern historians have said about the past with what historical actors actually said in the past, Lindgren has confused a **209** "semantical question about the name by which the object is called," with the historical object itself. In essence, he blurs the differences between primary and secondary sources by conflating modern historical labels with the historical beliefs they describe. [27]

From a strictly textualist interpretive modality, the assertion that there is no evidence for a militia-based reading of the Amendment is easily rebutted by reference to the Second Amendment's text, especially its preamble. [28] Lindgren attempts to get around this particular textual embarrassment by invoking the authority of libertarian legal scholar Eugene Volokh's controversial, and now largely discredited, claim about the role of preambles in Founding Era constitutional texts. [29] Unfortunately, Lindgren ignores the scholarly critiques of Volokh's work, some voiced before *Heller* and others elaborated since the decision. [30] Moreover, anyone familiar with Founding Era sources would have little trouble finding evidence to challenge Volokh's anachronistic interpretation. A good place to start might be the 1750 legal dictionary authored by Giles Jacob, a popular Founding Era text among lawyers. [31] Thomas Jefferson and John Adams each owned a copy of Jacob's law dictionary. [32] Jacob defined the role of a **210** preamble in a way that flatly contradicts Volokh's claims: "[t]he Preamble of a Statute ... which is the Beginning thereof, going before, is as it were a Key to the Knowledge of it, and to open the Intent of the Makers of the Act; it shall be deemed true, and therefore good Arguments may be drawn from the same." [33] This particular gloss on preambles, derived from Lord Coke, was echoed in New Jersey Justice of the Peace James Parker's popular Founding Era legal guide. [34] A 1788 advertisement for Parker's guide described the book as essential reading for Americans interested in the law. "This book is highly esteemed and very necessary" not only for gentleman in their public capacity as Justices of the Peace, but for "every other person who would wish to be acquainted with the laws of the land we live in." [35] Volokh's analysis of preambles ignores these types of sources and other relevant texts essential to recovering the Founding Era's interpretive assumptions and rules of construction. Instead of reconstructing Founding Era practices, Volokh erroneously employs approaches to statutory construction drawn from treatises written a half century later. In short, Volokh reads history backwards, applying nineteenth century rules to understand eighteenth century texts. If one corrects his anachronistic methodology and applies the correct eighteenth century rules and **211** assumptions to the text, one of the central pillars of Justice Scalia's textualist argument in *Heller* collapses. [36]

Additional evidence that the Volokh/Lindgren/Scalia approach to preambles is historically flawed is provided by the very example Lindgren offers to substantiate his interpretation. When read in context, Lindgren's own effort to buttress Volokh's argument, drawn from the Virginia Declaration of Rights' provision on freedom of religion, actually undermines Volokh's claim about the function of preambles in the Founding Era. [37] The Virginia text asserts:

> That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience. [38]

Lindgren's gloss on this text is ahistorical; rather than reconstruct eighteenth-century patterns of reading as the baseline for interpreting this text, he simply reads the text as any modern lawyer might. [39] For Lindgren, "reason" is synonymous with logic and rationalism. Although this might be a plausible reading if the text were written today, such an interpretation is **212** hard to reconcile with the linguistic and ideological context in which the text was written and read in 1776. Here is how Lindgren reads the text:

> Because of the preamble to Virginia's Bill of Rights, would it be reasonable to think that Virginia could decide to protect religions that are based on reason, but not religions based on tradition and memorized catechisms? Of course not. The preamble gives a rationale and a purpose to the right (in this case, the protection of religious liberty); it does not restrict it. [40]

Compendium_Cornell
Page 0855

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12669   Page 313 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

The term "reason" in this context was synonymous with the free exercise of an individual's mental faculties: it meant to argue or to debate. [41] Lindgren is clearly not familiar with the Enlightenment background of the Founding Era and its relevance to the history of religious freedom. [42] George Mason, the primary architect of the Virginia Declaration of Rights, and Thomas Jefferson, another champion of religious freedom, were both profoundly influenced by John Locke's writings on toleration. [43] Locke and those who drew inspiration from him used the term "reason" in a much broader sense than Lindgren's ahistorical reading of the text suggests: "Every Man," Locke wrote, "has Commission to admonish, exhort, convince another of Error; and by reasoning to draw him into Truth." [44] Admonishment and exhortation were not antithetical to reason in Locke's view. Thomas Jefferson used reason in a similar sense when he proposed the following bill in 1779: "The holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either, as was in his Almighty power to do, but to extend it by its influence on reason alone." [45] The Founding Generation would have been categorically **\*213** opposed to any coercion in matters of religion, so the fit between the preamble and the enacting clause was actually quite tight in Lindgren's example. In short, his own evidence contradicts Volokh's claims about the function of Founding Era preambles.

The textualist arguments in favor of the militia-based view of the Amendment are among the strongest evidence to support this interpretation, but one need not rest such an argument on textualist grounds alone. Consider the case of St. George Tucker. [46] Lindgren makes the following claim about Tucker's understanding of the Second Amendment: "If, as the civic rights camp believes, the Framers believed in the civic rights view of the Second Amendment, somebody should have told St. George Tucker, perhaps the leading American legal commentator of the day." [47] It is not clear why exactly Lindgren believes should have told St. George Tucker about modern historical debates over his writings. There are two basic evidentiary problems with his claims about Tucker. First, Lindgren simply ignores Tucker's clear statement that the reason the Second Amendment was adopted by the First Congress was to buttress the federalism provisions of the Tenth Amendment, a point that Justice Stevens raised in his *Heller* Dissent. [48] Tucker's text offers another example of a Founding Era source supporting a conception of the right to bear arms that Lindgren claims is a modern invention.

The second flaw in Lindgren's interpretation derives from his failure to engage in a genuinely holistic historical exercise of reconstructing Tucker's vision of rights before zeroing in on his interpretation of the right **\*214** to bear arms. In volume two of Tucker's Blackstone there is an expansive footnote that explains his conception of rights. Tucker divided rights into four different categories: natural, social, civil, and political. [49] The right of self-preservation was a natural right. The category of civil rights for Tucker included rights related to citizenship. Thus, Tucker expressly noted that "aliens, women and children under the age of discretion ... negroes and mulattoes ... have no civil rights in Virginia, taken in this strict and limited sense." [50] These were precisely the groups in Virginia that did not bear arms, so Tucker's category of "civil right" corresponds to the modern category of civic right. [51] Lindgren approaches the Second Amendment with the simple dichotomous model that has come to dominate modern debate over this issue. Any scholar who took Tucker's thought seriously and sought to understand it historically would recognize that the learned Virginian's eighteenth century conception of rights simply does not fit neatly into the modern categories Lindgren and other legal scholars have sought to impose on the past. Lindgren and others who share his approach to the Second Amendment systematically conflate the common law right to keep or use arms for lawful purposes and the constitutional right to keep **\*215** and bear arms as part of a well-regulated militia. [52] In Tucker's terminology, the former was a natural right modified by common law and the latter was a civil right. A Moravian pacifist in Pennsylvania might have been able to bear a gun for a variety of lawful purposes, but he would have been religiously scrupulous about bearing arms. [53] Women and children might claim a right of individual self-defense under common law, but were not among those who were required to bear arms. [54] Although not every use of the phrase "bear arms" was exclusively military, it was unquestionably the dominant usage in the print culture of the Founding Era. [55] Even if one casts aside the actual patterns of usage, and treats the two usages as equally plausible, Founding Era rules of construction required a recourse to the text's preamble as the appropriate way to decide which reading was legally correct. [56]

Lindgren's methodology also suffers from a common problem that nearly all originalist inquiry falls prey to, a failure to weigh and adequately contextualize eighteenth century texts, effectively treating all sources as if they were equally probative. [57] Legal scholar Larry Kramer has described **\*216** this originalist error as the "funhouse mirror" effect, in which evidence from the past is magnified out of proportion to its actual influence or significance, producing a grotesquely distorted version of the actual history. [58] Lindgren's discussion of Maine Anti-Federalist Samuel Nasson's views of arms bearing illustrates this type of distortion. [59] It is easy to see why Lindgren would have chosen Nasson's text, which is readily available to modern

Compendium_Cornell
Page 0856

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12670   Page 314 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

researchers, because of its inclusion in modern documentary collections. [60] The fact that a text is widely available to modern scholars does not necessarily mean that it was widely available in the Founding Era or even representative of broader views at the time it was written. Nasson was writing to George Thacher, a Federalist member of the First Congress, and a lawyer who would go on to become one of New England's most illustrious jurists. [61] Nasson was a barely literate Maine Anti-Federalist, an odd choice for a proxy for the typical reader of the Constitution posited by most originalist theories. [62] Lindgren never provides a compelling legal justification for taking the views of the Anti-Federalists electoral losers and substituting them for the victorious Federalists who dominated the First Congress that actually wrote the Second Amendment. [63] There is no **\*217** credible historical evidence to support Lindgren's assumption that Nasson's views had any influence on Thacher or any other members of the First Congress. If Nasson's view had been as typical or as influential as Lindgren claims, Congress would have modeled the language of the Second Amendment on the Dissent of the Pennsylvania Minority, a widely distributed Anti-Federalist text which had demanded express protection for a right to hunt. [64] Yet, despite its wide distribution, no other published author or state ratification convention echoed the Dissent's demands for such a right and it was not included in the text Madison consulted when drafting the Second Amendment. [65]

Lindgren's silence about Thacher's extensive discussion of the meaning of the right to bear arms written in the *Cumberland Gazette* is also puzzling. "Scribble Scrabble," the identity Thacher adopted in his popular writing, offers yet another example of an eighteenth century source that supports a civic conception of arms bearing that Lindgren claims is a modern invention. [66] As this brief response has repeatedly demonstrated, Lindgren has not grappled with the voluminous scholarly literature on this issue, especially scholarship written after *Heller*. [67] Nor has he demonstrated a solid grasp of the relevant historical methodologies necessary to understand the meaning of Founding era legal texts. The role of history in constitutional adjudication remains controversial, but one thing seems indisputable: if we are going to use history in constitutional law we **\*218** need to get the history right. [68] At the start of his foreword, Lindgren warned: "Guns seem to have a strange power over people: too often passion drives out thought." [69] Ironically, Lindgren's own essay has become yet another illustration of this sad fact. Instead of moving the debate forward, Lindgren's account is stuck in the acrimonious pre-*Heller* world. It is time to move this debate forward and bring greater historical rigor to Second Amendment scholarship.

## Footnotes

a1     Paul and Diane Guenther Chair in American History, Fordham University. I would like to thank the editorial staff of *The Journal of Criminal Law and Criminology* for their diligence and editorial acumen. Able research assistance for this article was provided by Bradley Barbour, Fordham Law School.

1      James Lindgren, *Forward: The Past and Future of Guns*, 104 J. CRIM. L. & CRIMINOLOGY 705 (2015).

2      554 U.S. 570 (2008).

3      *See infra* notes 7-10.

4      *See infra* notes 7, 9, 11.

5      Lindgren, *supra* note 1, at 705, 711.

6      *See* PHILIP J. COOK & KRISTEN A. GOSS, THE GUN DEBATE: WHAT EVERYONE NEEDS TO KNOW 155-70 (2014) (providing an overview of the historical roots of American gun control measures). Although scholarly standards demand such rigor, there is little evidence that this has much impact on public policy debates. *See* Dan M. Kahan &

Compendium_Cornell
Page 0857

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.12671 Page 315 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

Donald Braman, *More Statistics, Less Persuasion: A Cultural Theory of Gun-Risk Perceptions*, 151 U. PA. L. REV. 1291, 1311-18 (2003).

[7] *See, e.g.*, Joseph Blocher, *Categoricalism and Balancing in First and Second Amendment Analysis*, 84 N.Y.U. L. REV. 375 (2009); Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82, 85-90 (2013); Darrell A.H. Miller, *Text, History, and Tradition: What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852 (2013); Darrell A. H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (2009); Cass Sunstein, *Second Amendment Minimalism: Heller as Griswold*, 122 HARV. L. REV. 246 (2008); Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in Heller*, 122 HARV. L. REV. 191 (2008).

[8] *See infra* pp. 207-08 (describing the civic rights interpretation of the Second Amendment).

[9] J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253, 254 (2009) ("Heller represents a triumph for conservative lawyers. But it also represents a failure--the Court's failure to adhere to a conservative judicial methodology in reaching its decision."); Richard A. Epstein, *A Structural Interpretation of the Second Amendment: Why* Heller *is (Probably) Wrong on Originalist Grounds*, 59 SYRACUSE L. REV. 171, 173-74 (2008); Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, NEW REPUBLIC (Aug. 26, 2008), https://newrepublic.com/article/62124/defense-looseness; Charles Fried, *The Second Annual Kennedy Lecture: On Judgment*, 15 LEWIS & CLARK L. REV. 1025, 1045 (2011) (arguing that the "inappropriate" application of history "led the Court astray" in *Heller*). As Sanford Levinson notes, "Even more to the point, with regard to grasping the complexity of the contemporary debate, is the fact that some strikingly hostile responses to *Heller* have been written by judges and scholars usually (and accurately) identified with the conservative politics." Sanford Levinson, *United States: Assessing* Heller, 7 INT'L J. CONST. L. 316, 319 (2009).

[10] See the articles cited in notes 7 and 9 for a small sampling of post-*Heller* scholarship critical of Heller and many of the historical assumptions upon which Lindgren's essay relies.

[11] Lindgren's approach embodies many of the vices of law office history and "history-lite." For the prevalence of these flaws in much Second Amendment scholarship, see generally Martin S. Flaherty, *Can The Quill Be Mightier Than The Uzi?: History "Lite," "Law Office," And Worse Meets The Second Amendment*, 37 CARDOZO L. REV. 663 (2015). For further elaboration on this point, see *infra* pp. 206-18.

[12] Ironically, Lindgren falls prey to a vice decried by Justice Scalia in a critique of legislative history. Lindgren's selective survey of research in this area was similar to the exercise criticized by Justice Scalia in which judges "look over the heads of the crowd and pick out [one's] friends." ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 36 (1997). Lindgren cites approvingly the work of his former co-bloggers at The Volokh Conspiracy, such as Randy Barnett and Eugene Volokh, and ignores the dozens of critiques of *Heller* from across the ideological spectrum. *See supra* notes 6, 8 and accompanying text.

[13] *See generally* David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359 (1998); Glenn H. Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN. L. REV. 461 (1995) (discussing Second Amendment scholarship). For a critique of the revisionist paradigm, see *infra* notes 14-15 and accompanying text.

[14] MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY xiii, 87-140 (2014) (arguing that the prominence of the individual rights interpretation is the result of a "jurisprudential campaign" by gun-rights activists that began in the 1970s); Siegel, *supra* note 7, at 239 (arguing that throughout most of the twentieth century, legal scholars interpreted the Second Amendment with a primary emphasis on the militia clause, but that "decades of gun rights mobilization transformed the 'natural' meaning of the Constitution's text so that ... a law-and-order Second Amendment simply appeared there as the founders' Constitution"); *see also* Robert J. Spitzer, *Lost and Found: Researching the*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12672   Page 316 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

*Second Amendment*, 76 CHI.-KENT L. REV. 349, 371 (2000) (charting the rise of a new individualistic interpretation of the Second Amendment and discussing the role of gun rights advocates in advancing this view).

[15]  Zechariah Chafee, Jr., *Right to Bear Arms*, 2 ENCYCLOPEDIA OF THE SOC. SCI. 209 (1930). On the intellectual, political, and legal significance of the Encyclopedia in American life, see Jerome Hall, *The Encyclopedia of the Social Sciences*, 25 ILL. L. REV. 233 (1930) (book review) ("Not since the day of the French encyclopedists has as significant a task been undertaken."). Chafee drew on an earlier article by Lucilius A. Emery, *The Constitutional Right to Keep and Bear Arms*, 28 HARV. L. REV. 473 (1915), which was among the most influential law review essays developing this point of view. *See* Spitzer, *supra* note 14, at 384.

[16]  *See* Spitzer, *supra* note 14, at 384 (providing additional evidence that the Chafee view was the dominant paradigm for understanding the Second Amendment for much of the last century).

[17]  Lindgren, *supra* note 1, at 707.

[18]  *Id.*

[19]  Levinson, *supra* note 9, at 327. Among the multitude of new sources consulted by scholars associated with the civic paradigm were H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002) (exploring the Latinate origins of the ablative absolute used in the Second Amendment); Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENT. 221, 227-35 (1999) (challenging the belief that Pennsylvanians sought a modern-style individual right at the time of the state's drafting of its constitution by analyzing the Test Acts, a law that disarmed part of the population and the views of the Anti-Federalist Dissent of the Minority); David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms,"* 22 LAW & HIST. REV. 119, 120 (2004) (exploring the conventions on preambles and the disarmament of the Scottish militias).

[20]  Lindgren, *supra* note 1, at 707.

[21]  Lindgren conflates two different groups of historians working on the Second Amendment in recent years: those associated with a collective rights model, and those who advanced a civic rights model. For a more nuanced and accurate discussion of the historiography, see William Merkel, *A Cultural Turn: Reflections on Recent Historical and Legal Writing on the Second Amendment*, 17 STAN. L. & POL'Y REV. 667, 672 (2006) (arguing that historical scholarship opposing the individual rights view is best seen in terms of a republican school focusing on a civic right and a traditional states rights interpretation, sometimes described as a collective right).

[22]  *See* J.G.A. POCOCK, THE MACHIAVELLIAN MOMENT: FLORENTINE POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION, 183-216 (1975) (arguing that the Second Amendment derives from a language about freedom and the militia stretching back to Machiavelli and the Renaissance).

[23]  For a useful overview of this concept and the related notion of civic humanism, see Philip Pettit et al., *Republicanism*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2003), http://plato.stanford.edu/archives/spr2003/entries/republicanism/; Athanasios Moulaskis, *Civic Humanism*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2011), http://plato.stanford.edu/archives/win2011/entries/humanismcivic/.

Compendium_Cornell
Page 0859

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12673   Page 317 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

24    *See* G. Edward White, *Reflections on the "Republican Revival": Interdisciplinary Scholarship in the Legal Academy,* 6 YALE J.L. & HUMAN. 1, 5 (1994); Daniel T. Rodgers, *Republicanism: The Career of a Concept,* 79 J. AM. HIST. 11, 14-17 (1992).

25    Lindgren, *supra* note 1, at 708.

26    *See supra* note 21.

27    DAVID HACKETT FISCHER, HISTORIANS' FALLACIES: TOWARD A LOGIC OF HISTORICAL THOUGHT 21 (1970).

28    On textualism as a basic modality of constitutional interpretation, see PHILLIP BOBBIT, CONSTITUTIONAL FATE: THEORY OF THE CONSTITUTION 25-38 (1982).

29    Eugene Volokh, *The Commonplace Second Amendment,* 73 N.Y.U. L. REV. 793, 801-02 (1998) (arguing that the preamble to the Second Amendment should not be interpreted as establishing the sole purpose of the Amendment, but simply a purpose).

30    David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of the Right of the People to Keep and Bear Arms,* 22 LAW & HIST. REV. 119, 154-55 (2004) (analyzing a number of Founding era constitutional and legal treatises treating preambles as the key to establishing the meaning of a text); *see generally* David Thomas Konig, *Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America,* 56 UCLA L. REV. 1295 (2009) (providing additional evidence that Volokh's interpretation of preambles was historically flawed). Taken together Konig's two essays have effectively discredited the Volokh thesis. Indeed, legal scholar Sanford Levinson, a leading proponent of the individual rights view and critic of *Heller* describes Konig's critique of the Volokh/Scalia view of preambles as "devastating." Levinson, *supra* note 9, at 321.

31    *See generally* GILES JACOB, A NEW LAW DICTIONARY (6th ed. 1750). *See also* Konig, *supra* note 19, at 156 (describing the wide use of Jacob's dictionary in the eighteenth century).

32    For additional evidence of the influence of Jacob's dictionary in early America, see Gary L. McDowell, *The Politics of Meaning: Law Dictionaries and the Liberal Tradition of Interpretation,* 44 AM. J. LEGAL HIST. 257, 261 (2000). Although McDowell demonstrates the importance of legal dictionaries, his account of the Lockean assumptions about language in the Founding Era is deeply flawed. For a more sophisticated account of John Locke's views of language, see Hannah Dawson, *Locke on Language in (Civil) Society,* 26 HIST. POL. THOUGHT 397 (2005). For the relevance of Dawson's work to the originalism debate, see Jack N. Rakove, *Joe the Ploughman Reads the Constitution, or, The Poverty of Public Meaning Originalism,* 48 SAN DIEGO L. REV. 575, 586 (2011).

33    JACOB, *supra* note 32, under "statute." Volokh does not consult Giles, and misconstrues other relevant Founding Era sources by applying the rules found in nineteenth century treatises, including JOEL PRENTISS BISHOP, COMMENTARIES ON THE WRITTEN LAWS AND THEIR INTERPRETATION § 48 (1882); FORTUNATUS DWARRIS, A GENERAL TREATISE ON STATUTES GENERAL TREATISE ON STATUTES 688 (39th ed. 1835); THEODORE SEDGWICK, A TREATISE ON THE RULES WHICH GOVERN THE INTERPRETATION AND APPLICATION OF STATUTORY AND CONSTITUTIONAL LAW 55 (1857); E. FITCH SMITH, COMMENTARIES ON STATUTE AND CONSTITUTIONAL LAW AND STATUTORY AND CONSTITUTIONALL CONSTRUCTION §§ 562, 567, 573 (1848). Justice Scalia emulated Volokh's anachronistic practice of using texts written at least a half century after the Second Amendment to reconstruct its original meaning. *See* Eugene Volokh, *The Commonplace Second Amendment,* 73 N.Y.U. L. REV. 793, 808 n.51 (1998); District of Columbia v. Heller, 554 U.S. 570, 578 (2008).

Compendium_Cornell
Page 0860

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12674   Page 318 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

34    JAMES PARKER, CONDUCTOR GENERALIS: OR, THE OFFICE, DUTY, AND AUTHORITY OF JUSTICES OF THE PEACE, vii (1788).

35    PARKER, *supra* note 34, at vii. In the period between 1788 and 1791 Coke's rules on preambles were included in half of the James Parker manuals published in America in this interval. For a good example of how Parker's views of preambles influenced other popular legal writers in this period, see FRANCOIS XAVIER MARTIN, THE OFFICE OF THE JUSTICE OF THE PEACE 186 (1791). On the importance of justice of the peace manuals in shaping early American legal culture, see generally Larry M. Boyer, *The Justice of the Peace in England and America from 1506 to 1776: A Bibliographic History*, 34 Q.J. LIBR. OF CONGRESS 315 (1977); John A. Conley, *Doing It by the Book: Justice of the Peace Manuals and English Law in Eighteenth-Century America*, 6 J. LEGAL HIST. 257 (1985).

36    Although Volokh did not consult Founding era justice of the peace manuals in his work on preambles, in his later writing on the Second Amendment he does invoke their authority as highly probative of Founding era legal meaning. *See* Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (describing the importance of justice of the peace manuals as evidence of public meaning in the Founding Era).

37    Lindgren, *supra* note 1, at 707.

38    George Mason, THE VIRGINIA DECLARATION OF RIGHTS (June 12, 1776).

39    Lindgren's interpretive approach is under-theorized in his essay, but he appears to be using a textualist modality, taking the reasonable modern reader as his baseline for interpreting the Virginia Declaration of Rights, a profoundly ahistorical approach to reading an eighteenth century text. Thus, his interpretation neither follows a genuinely originalist approach nor an authentic historical one. *Cf.* Gary Lawson & Guy Seidman, *Originalism as a Legal Enterprise*, 23 CONST. COMMENT 47, 48 (2006) (arguing for the reasonable Founding Era reader as the basis for constructing original meaning). On the historical alternative to originalism, see generally Saul Cornell, *Originalism As Thin Description: An Interdisciplinary Critique*, 84 FORDHAM L. REV. 1 (2015); Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism*, 82 FORDHAM L. REV. 721 (2013); Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015); Jack N. Rakove, *Tone Deaf to the Past: More Qualms about Public Meaning Originalism*, 84 FORDHAM L. REV. 3 (2015). There are multiple candidates for the legal meaning of a text, and not all are determined by history. *See* Richard H. Fallon, Jr., *The Meaning of Legal "Meaning" and Its Implications for Theories of Legal Interpretation*, 82 U. CHI. L. REV. 1235 (2015) (surveying a variety of different possible candidates for how to ascertain the relevant legal meaning of a text, including reasonable meaning, linguistic meaning, contextual meaning, intentional meaning, and interpreted meaning).

40    Lindgren, *supra* note 1, at 707.

41    SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (10th ed. 1792).

42    There is a vast literature on the American Enlightenment. For a useful starting point, see Shane J. Ralston, *American Enlightenment Thought*, INTERNET ENCYCLOPEDIA OF PHILOSOPHY, http://www.iep.utm.edu/amer-enl/ (last visited Sept. 1, 2016) (summarizing the central beliefs of the American enlightenment, including its support for a Lockean view of religious toleration).

43    *See A Bill for Establishing Religious Freedom, 18 Jun. 1779*, FOUNDERS ONLINE, NATIONAL ARCHIVES, http://founders.archives.gov/documents/Jefferson/01-02-02-0132-0004-0082 (last updated Mar. 28, 2016); THOMAS JEFFERSON, THE PAPERS OF THOMAS JEFFERSON, Vol. 2, 545-53 (Julian P. Boyd, ed., 1950); Gerald S. Sandler, *Lockean Ideas in Thomas Jefferson's Bill for Establishing Religious Freedom* 21 J. HIST. IDEAS 110, 110 (1960).

Compendium_Cornell
Page 0861

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12675   Page 319 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

[44]  JOHN LOCKE, A LETTER CONCERNING TOLERATION AND OTHER WRITINGS 14 (Mark Goldie ed., 2010). Jefferson copied this passage from Locke into one of his notebooks. *Notes on Locke and Shaftesbury, 11 October-9 December 1776,* FOUNDERS ONLINE, *National Archives,* http://founders.archives.gov/documents/Jefferson/01-01-02-0222-0007 (last updated Mar. 28, 2016); THE PAPERS OF THOMAS JEFFERSON, *supra* note 43, Vol. 1, 544-50.

[45]  THE PAPERS OF THOMAS JEFFERSON, *supra* note 43, at Vol. 1, 544-50.

[46]  Tucker was a leading Virginia jurist and prominent Jeffersonian who published an important annotated American edition of Blackstone's COMMENTARIES. For Tucker's relevance to modern debates over the Second Amendment, see District of Columbia v. Heller, 554 U.S. 570, 594-95 (2008).

[47]  Lindgren, *supra* note 1, at 709.

[48]  *Heller,* 554 U.S. at 666 n.32. Lindgren's interpretation of Tucker relies entirely on the work of a single unrepresentative historian Robert Churchill. Lindgren, *supra* note 1 at 708. Most historians have been critical of *Heller* and the scholarship it rested on; for a quick summary, see Justice Breyer's Dissent in McDonald v. City of Chicago, 561 U.S. 742, 914 (2010) (Breyer, J., dissenting) (describing the growing historical consensus that *Heller* was wrong). For a discussion of Justice Stevens' use of Tucker and modern gun rights interpretations of Tucker's writings, see generally Saul Cornell, *St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment,* 103 NW. U. L. REV. 1541 (2009). Lindgren's failure to provide a full and balanced scholarly discussion of the evidence and debate over Tucker's thoughts only underscores the ideologically distorted and tendentious nature of his essay. For a model scholarly treatment of this controversy that acknowledges the divergent interpretations of the Tucker evidence, see Martin H. Redish and Matthew B. Arnould, *Judicial Review, Constitutional Interpretation, and the Democratic Dilemma: Proposing a "Controlled Activism" Alternative,* 64 FLA. L. REV. 1485, 1499-1501 (2012).

[49]  ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE, TO THE CONSTITUTION AND LAWS OF THE FEDERAL GOVERNMENT OF THE UNITED STATES AND OF THE COMMONWEALTH OF VIRGINIA 145 n.42 (1803). My notion of a civic right, the concept that Lindgren disparages as a modern invention, was based on Tucker's notion of a "civil right." I deliberately chose not to use Tucker's own language because his preferred term carries such a different set of associations in modern law. *See Civil Rights: An Overview,* LEGAL INFORMATION INSTITUTE, https://www.law.cornell.edu/wex/civil_rights (last visited Sept. 1, 2016); Saul Cornell, *St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings,* 47 WM. & MARY L. REV. 1123, 1143 (2006) (arguing that the Second Amendment, by contrast, fit into Tucker's third and fourth categories, civil rights and political rights). "Tucker's term 'civil right' might best be rendered in modern parlance as a civic right, a right that 'appertain[s] to a man as a citizen or subject.'" *Id.* (quoting TUCKER, *supra* note 49, at 300). In response to Lindgren's snide suggestion that someone needed to inform Tucker about the existence of a civic right, it would be more relevant to ask why Lindgren did not discuss Tucker's eighteenth century conception of civil rights and its relevance to arms bearing?

[50]  TUCKER, *supra* note 49, at 145.

[51]  *See generally* Saul Cornell, *St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings,* 47 WM. & MARY L. REV. 1123 (2006) (arguing for the need to look at all of Tucker's relevant writings on the right to bear arms not just the often quoted passage discussing the "palladium of liberty"). *Cf.* Stephen P. Halbrook, *St. George Tucker's Second Amendment: Deconstructing 'The True Palladium of Liberty',* TENN. J.L. & POL'Y 3, 120 (2006) (making a gun-rights rebuttal to my interpretation). Halbrook makes no effort to contextualize Tucker's theory of rights and ignores the fact that his discussion of self-defense in the section on homicide makes no reference to bearing arms. *Id.*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12676   Page 320 of 733

"HALF COCKED": THE PERSISTENCE OF..., 106 J. Crim. L. &...

52    As Yale's Reva Siegel observes, "there is more evidence in the majority opinion establishing the existence of a common law right of self-defense than there is demonstrating that such a right was constitutionalized by the Second Amendment's eighteenth-century ratifiers." Reva Siegel, *Heller and Originalism's Dead Hand*, 56 UCLA L. REV. 1399, 1415 (2009).

53    The Pennsylvania Moravians provide one of the more interesting examples of conscientious objectors. In contrast to Quakers whose radical peace testimony prohibited all forms of interpersonal violence, including harsh words and gossip, Moravians accepted the right of individual self-defense, but opposed bearing arms for military reasons. *See generally* Jared S. Burkholder, *Neither "Kriegerisch" nor "Quäkerisch": Moravians and the Question of Violence in Eighteenth-Century Pennsylvania*, 12 J. MORAVIAN HIST. 143 (1971); Jack D. Marietta, *Conscience, the Quaker Community, and the French and Indian War*, 95 PA. MAG. HIST. & BIOGRAPHY 3 (1971); Hermann Wellenreuther, *The Quest for Harmony in a Turbulent World: The Principle of "Love and Unity" in Colonial Pennsylvania Politics*, 107 PA. MAG. HIST. & BIOGRAPHY 537 (1983). For additional discussion of the problem of conscientious objectors and the right to bear arms, see Saul Cornell, *Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard*, 29 CONST. COMMENT. 383, 397-401 (2014).

54    *See* Cornell, *supra* note 49, at 400.

55    Nathan Kozuskanich, *Originalism in a Digital Age: An Inquiry into the Right to Bear Arms*, 29 J. EARLY REPUBLIC 585, 606 (2009) (reviewing the scholarly debate over the meaning of the term "bear arms" in the Founding Era and concluding that the dominant usage in the print culture of the period fits a military or collective self-defense understanding of the term).

56    BLACKSTONE, *supra* note 48, at *60.

57    As traditional originalist Richard Kay has noted, public meaning originalism has made it easier to manipulate sources about original meaning, not rendered originalism more rigorous. Richard S. Kay, *Original Intention and Public Meaning in Constitutional Interpretation*, 103 NW. U. L. REV. 703, 719 (2009).

58    Larry D. Kramer, *When Lawyers Do History*, 72 GEO. WASH. L. REV. 387, 394 (2003); *see also* Cornell, *supra* note 49, at 390-91.

59    Lindgren commits a common originalist error by treating the Founding Era as if it were a time of broad constitutional consensus instead of recognizing the profound tensions and conflicts in this period. *See* Cornell, *supra* note 51, at 47. On the range of voices in the Founding Era on the meaning of the right to keep and bear arms, see SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 41-70 (2006). For a slightly revised version of this argument based on post-*Heller* scholarship, see Saul Cornell, *The Right to Bear Arms, in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739-44 (Mark Tushnet et al. eds., 2015).

60    Samuel Nasson, *Letter from Samuel Nasson to George Thatcher* (July 9, 1789), in CREATING THE BILL OF RIGHTS: THE DOCUMENTARY RECORD FROM THE FIRST FEDERAL CONGRESS 260-61 (Helen E. Veit et al. eds., 1991).

61    *See* Cornell, *supra* note 59, at 64.

62    On the political culture of the Maine frontier in this period, see ALAN TAYLOR, LIBERTY MEN AND THE GREAT PROPRIETORS: THE REVOLUTIONARY SENTIMENT ON THE MAINE FRONTIER 1760-1820, 110 (1990). For

an overview of the originalism debate including the rise of the new originalism, see generally Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

63    *See generally* Saul Cornell, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999) (arguing that anti-federalism is best understood as including at least three distinctive groups-- elites, middling radicals, and plebeian radicals; the backcountry was dominated by the latter two groups); Richard H. Fallon, Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015) (analyzing different models of historical meaning relevant to constitutional theory).

64    Joseph Blocher, *Hunting and the Second Amendment*, 91 NOTRE DAME L. REV. 133, 160-61 (2015).

65    *See* Paul Finkelman, *A Well Regulated Militia: The Second Amendment in Historical Perspective*, 76 CHI.-KENT L. REV. 195, 208 (2000) (discussing how Madison "emphatically rejected the goals and language" of the Dissent in drafting the Second Amendment). For another discussion of the problems of using the Dissent as proxy for broader patterns of belief about the meaning of arms bearing, see Saul Cornell, *The Original Meaning of Original Understanding: A Neo-Blackstonian Critique*, 67 MD. L. REV. 150, 158-60 (2007).

66    George Thatcher, *Scribble Scrabble*, CUMBERLAND GAZETTE, Dec. 8, 1786. In this essay Thatcher uses the term "bear arms" broadly to include both military and non-military uses, while simultaneously asserting that only bearing arms for the common defense was constitutionally entrenched in the Massachusetts Declaration of Rights. For a discussion of Thatcher's views on the right to bear arms, see generally Patrick J. Charles, *Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm*, 105 NW. U. L. REV. 1821 (2015).

67    In his preface, Lindgren commends the articles in the symposium for adopting "a seriousness of tone and a commitment to evidence-based reasoning." Lindgren, *supra* note 1, at 711. He further suggests that future scholarship must "follow the evidence to reach conclusions that our ideological compatriots might not embrace." *Id.* at 715. Given these statements, the failure to cite or engage with post-*Heller* scholarship is even harder to fathom.

68    For good discussions of the multiple roles history might play in contemporary constitutional theory, see Jack M. Balkin, *The New Originalism and the Uses of History*, 82 FORDHAM L. REV. 641, 657 (2013); *see generally* Richard H. Fallon, Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015).

69    Lindgren, *supra* note 1, at 705.

106 JCRLC 203

**End of Document**        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12678   Page 322 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

**39 Fordham Urb. L.J. 1695**

**Fordham Urban Law Journal**
October, 2012

Article

Saul Cornell[a1]

Copyright (c) 2012 Fordham Urban Law Journal; Saul Cornell

# THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE HOME: SEPARATING HISTORICAL MYTHS FROM HISTORICAL REALITIES

|  | Introduction | 1695 |
|---|---|---|
| I. | History and the Future of Gun Regulation: Heller's Legacy | 1697 |
| II. | The Scope of the Right to Bear Arms in the Founding Era | 1699 |
| III. | Gun Regulation in the Founding Era and Early Republic: Myths and Realities | 1707 |
| IV. | The Pistol and the Lash: Slavery and the Permissive Right to Carry | 1716 |
| V. | No Right to Carry: The Emergence and Spread of the Massachusetts Model | 1719 |
|  | Conclusion: The Past and Future of the Right to Carry Arms Outside the Home | 1726 |

**Introduction**

Emboldened by their victory in Heller,[1] gun rights advocates are waging a relentless campaign to strike down what little remains of the nation's relatively anemic gun control regime.[2] The Heller opinion itself is also partly responsible for generating a seemingly limitless **\*1696** parade of new lawsuits.[3] Legal scholars from across the ideological spectrum have attacked the controversial five-to-four decision, both for its revisionist rewriting of constitutional history and for its poor judicial craftsmanship.[4] The opinion raised more questions than it answered and left lower courts scrambling to decipher what was prohibited by Heller, if anything, short of a total ban on handguns.[5] The decision articulated no theory of judicial scrutiny, provided no black letter rules, and failed to create any categories of analysis to guide judges. Instead, it left the courts with an incomplete laundry list of presumptively lawful regulations to serve as a model of what remained legal.[6] In United States v. Masciandaro, Judge J. Harvie Wilkinson aptly summarized the problems that Heller's poor judicial craftsmanship wrought: "This case underscores the dilemma faced by lower courts in the post-Heller world: how far to push Heller beyond its undisputed core holding."[7]

The first section of this Article examines the continuing relevance of history in the post-Heller era. The second section focuses on conceptions of the right to bear arms and the right to carry in the Founding era. Apart from service in militia, there is little evidence of a broad constitutional consensus on a right to carry arms in public. The third section analyzes some of the myths and realities about early American gun regulation. The fourth section locates the legal ideal of traveling armed in public in a distinctively southern tradition that was a minority strain within Antebellum law. The final section of this Article explores the alternative theory of robust arms regulation that emerged by the era of the Fourteenth Amendment and became the dominant tradition in American law. The existence of this regulatory **\*1697** tradition has remained hidden from modern scholars and courts because support for high levels of gun regulation was so pervasive outside of the South that few of these laws were ever challenged in court.

**I. History and the Future of Gun Regulation: Heller's Legacy**

Rather than close the book on historical argument, Heller appears to have done the opposite. The court stated this point succinctly in United States v. Masciandaro: "[H]istorical meaning enjoys a privileged interpretative role in the Second

Compendium_Cornell
Page 0865

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12679   Page 323 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

Amendment context."[8]  Unfortunately, judges are in the unenviable position of evaluating the complex and contradictory historical evidence paraded before them. Separating historical myths from historical realities, distinguishing historical fact from error, and disentangling law office history from rigorous historical scholarship are serious problems for the courts in this area of the law.[9]

One of the most controversial issues to arise in the wake of Heller is the right to carry firearms outside of the home. This issue is **\*1698** currently being litigated in the Fourth Circuit and a decision may well be rendered by the time this Article is published.[10]  Masciandaro reveals the problems that Heller has created. In Masciandaro, the defendant was arrested for possessing a loaded firearm in a national park.[11]  The court applied an intermediate scrutiny test and found that the statute in question, which prohibited loaded firearms in national parks, easily passed constitutional muster.[12]  The government's interest was important and the means chosen to effectuate this goal were substantially related to that interest.[13]  Although the three-judge panel agreed on this point, there was substantial disagreement over the scope of Heller's holding regarding the right to bear arms outside of the home.[14]  In Masciandaro, the majority refused to wade into this question. Judge Wilkinson and Judge Duffy embraced a minimalist reading of Heller, counseling judicial restraint, particularly on this crucial question:

> There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation.[15]

Judges Wilkinson and Duffy took no position on this issue, but their argument implicitly suggested that one could make a plausible case that Heller's holding established no right to carry firearms outside the home. Judge Niemeyer, by contrast, argued that Heller did assert the existence of a right beyond the home:

> Consistent with the historical understanding of the right to keep and bear arms outside the home, theHeller Court's description of its actual holding also implies that a broader right exists. The Court stated that its holding applies to the home, where the need "for defense of self, family, and property is most," suggesting that **\*1699** some form of the right applies where that need is not "most acute." Further, when the Court acknowledged that the Second Amendment right was not unlimited, it listed as examples of regulations that were presumptively lawful, those "laws forbidding the carrying of firearms in sensitive places such asschools and government buildings." If the Second Amendment right were confined to self-defensein the home, the Court would not have needed to express a reservation for "sensitive places" outside the home.[16]

The logic of Judge Niemeyer's argument seems especially weak when read against the actual beliefs and practices that the American legal tradition demonstrates. The assertion that the need for self-defense is most acute in the home implies nothing about the existence of a right to self-defense outside the home. Even under Heller's flawed version of history, one plausibly could argue that the Founders decided to constitutionalize the right only in the home. Self-defense beyond the home implicates far broader questions of public safety. It makes historical sense that the Founding generation decided to leave the resolutions of these difficult questions to the more flexible standards afforded by the common law and the public policy preferences of individual legislatures. The fact that the Founding generation needed weapons to train and hunt also has little bearing on how these weapons might have been used outside of the home because pistols were not typically part of the standard weaponry of the militia. Finally, the fact that some states and localities chose to ban carrying in sensitive places while others chose to enact broad bans only underscores that gun regulation in American history reflects the diversity of the American historical experience.[17]

## II. The Scope of the Right to Bear Arms in the Founding Era

Virginia was the first state to draft a new Constitution and Declaration of Rights. George Mason, the primary architect of the Virginia Declaration of Rights, was a leading patriot and took a major  **\*1700**  role in the creation of the new state's militia.[18]  An early advocate for colonial independence, he became an outspoken champion of the militia. Mason urged his fellow citizens

Compendium_Cornell
Page 0866

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12680   Page 324 of
733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

to enact a law to put the colony's militia in a state of readiness for possible war with Britain. Mason's vision of the militia invoked traditional Whig ideas. [19] On January 17, 1775, Mason prepared this set of resolutions for the Fairfax County Committee of Safety, an important institution responsible for coordinating Virginia's military efforts:

> Resolved, That this Committee do concur in opinion with the Provincial Committee of the Province of Maryland, that a well regulated Militia, composed of gentlemen freeholders, and other freemen, is the natural strength and only stable security of a free Government. [20]

Mason's emphasis on the need for the militia to be composed of property holders reflected a view common among members of Virginia's gentry elite that it was dangerous to arm the "rabble." [21] Without the guidance of gentlemen, an armed population might easily become a mob rather than a well-regulated militia. The radicalism of the revolution pushed Mason and other Virginians to embrace a more inclusive conception of the militia. [22] The language that Virginia eventually adopted asserted that the militia was "composed of the body of the people," a formulation that reflected the more democratic ethos associated with Revolutionary ideology. When the committee charged with producing a declaration of rights revised Mason's original draft, they settled on the following language:

> **\*1701**  That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free state; that standing armies, in time of peace, should be avoided, as dangerous to liberty; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power. [23]

Virginia's Declaration of Rights made no mention of the right to bear arms or a right of self-defense. [24] The absence of such language did not mean that Virginians did not esteem the right of self-defense; rather, it merely underscored that they believed such a right was adequately protected under the common law. [25] The militia focus of Mason's language troubled Thomas Jefferson, one of the most forward-looking and innovative legal thinkers in the Old Dominion. [26] Jefferson proposed his own alternative to Mason's language, which included a more expansive statement of the right of individuals to keep and use firearms. [27] Jefferson first proposed that "no freeman shall be debarred the use of arms" but decided to revise his proposal to limit the exercise of this right. [28] Under Jefferson's revised formulation, the right was confined to an individual's home or lands. [29] His revised proposal suggested that the Virginia Declaration of Rights include language asserting that "no freeman shall be debarred the use of arms [within his own lands or tenements]." [30] Jefferson obviously disagreed with the convention and sought to constitutionalize the common law right of self-defense, but his proposal was not enacted. His failed proposal, limiting the right to arms to the home, mirrors the right that the majority asserted in Heller. [31]

**\*1702**  Virginia's Constitution was crafted by members of a planter elite who were often compared to the great leaders of the Roman Republic, men such as Brutus or Cato. Pennsylvania's Constitution, the first to expressly protect a right to bear arms, owed far more to plebeian ideas than to patrician ones. [32] The framers of Pennsylvania's Constitution were men of humble origins who spoke on behalf of the laboring classes and the industrious middling sorts, such as tradesmen and small farmers. [33] One prominent group that took a leading role in crafting the Pennsylvania Constitution hailed from the western part of the state. These men were animated by long-standing grievances against the eastern Quaker elite who had dominated the legislature for most of the colonial period. For more than a decade prior to American independence, backcountry Pennsylvanians pressed for a militia law to help them protect their communities against threats from Indians along the frontier. [34] The Quaker-dominated assembly rebuffed these appeals, preferring to negotiate, not fight, with the Native population. [35] The most notorious incident in this decade-long struggle was the Paxton Boys' Uprising, the massacre of a group of defenseless Conestoga Indians by backcountry Pennsylvanians in 1763. [36] The Apology of the Paxton Volunteers framed their grievances against the Pennsylvania government in the following terms:

Compendium_Cornell
Page 0867

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12681   Page 325 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

> When we applied to the Government for Relief, the far greater part of our Assembly were Quakers, some of whom made light of our Sufferings & plead Conscience, so that they could neither take Arms in Defense of themselves or their Country, nor form a Militia law to oblige the Inhabitants to arm. [37]

**\*1703** The text of the Paxton apology anticipated the language eventually included by Pennsylvanians in their Declaration of Rights, which asserted that the people had a right to "bear arms in defence of themselves and the state." [38] There is no evidence from the Revolutionary era that Pennsylvanians were concerned about threats to the common-law right of individual self-defense. The Quaker-dominated legislature had not attempted to disarm backcountry inhabitants, nor had it passed laws that prevented them from defending their homes against intruders. [39] What the assembly refused to do was enact a militia law or provide arms for frontier communities to mount a concerted collective defense, including retaliatory raids on Indian communities. [40] The language eventually incorporated into the Pennsylvania Declaration of Rights reflected this bitter struggle over public safety, and had little to do with public concern over an individual right to keep arms for self-protection. [41] The first discussion of the right to bear arms in Pennsylvania's Declaration of Rights linked this to an obligation to support public defense. [42] It also set a pattern for other states by noting the need to balance the right to bear arms against the equally important right not to be forced to bear arms. [43] This latter right was vital to religious pacifists opposed to bearing arms, including Quakers and Mennonites. Thus, the first clause to deal with the right to bear arms declared that:

> [E]very member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expence of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will **\*1704** pay such equivalent: Nor are the people bound by any laws but such as they have in like manner assented, to for their common good. [44]

By including a right to bear arms and a right not to be forced to bear arms, the Pennsylvania Declaration of Rights struck a compromise position between the opposing demands of the backcountry residents and the pacifists. Only after asserting the civic obligation to bear arms did the Constitution then affirm:

> That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace, are dangerous to liberty, they ought not to be kept up: And that the military should be kept under strict subordination, to, and governed by, the civil power. [45]

As was invariably true in most Revolutionary-era constitutions, the right to bear arms was also set against the danger posed by standing armies, a juxtaposition that only accentuated the military character of the right. Pennsylvania's Constitution dealt with the private use of arms in a separate context. [46] The Pennsylvania Constitution explicitly protected the right to hunt in a separate provision from the right to bear arms. [47] In contrast to England, where game laws made hunting the exclusive province of the wealthy, Pennsylvania provided its citizens with the "liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed; and in like manner to fish in all boatable waters, and others not private property." [48] The formulation of this right implied a right of government regulation, since hunting might be limited as to time, place, and manner. Still, protecting the right of all citizens to hunt made clear an opposition to the kinds of restrictions that the English game laws codified and that were used to effectively disarm a significant portion of the English population. [49]

**\*1705** Modern gun rights advocates read Pennsylvania's arms bearing provision as protecting an individual right, rewriting the text so that the phrase "bear arms in defense of themselves" is synonymous with the phrase "bear arms in defense of himself." [50] While the latter individualistic formulation of the right gained currency in many places in the nineteenth century, it

Compendium_Cornell
Page 0868

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12682   Page 326 of
733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

did not gain broad acceptance in state constitutions in the Founding era. [51] Yet, even if one accepted the anachronistic reading of Pennsylvania's Constitution, it is hard to justify using it as a model of Founding era constitutionalism. The Pennsylvania Constitution of 1776 broke with nearly every standard practice in America's emerging constitutional culture. Pennsylvania rejected a unicameral legislature and a unitary executive, instead entrusting aspects of judicial review to the Council of Censors, a body charged with preserving the Constitution inviolate. [52] Pennsylvania's Constitution was controversial from its inception. John Adams wrote, "Good God! The people of Pennsylvania in seven years will be glad to petition the Crown of Britain for reconciliation in order to be delivered from the tyranny of their new Constitution." [53]

Neither Virginia nor Pennsylvania expressly protected a right to "keep and bear arms." [54] The first state to introduce this language into American law was Massachusetts. The 1780 Constitution adopted by the State declared that:

> **\*1706** The people have a right to keep and to bear arms for the common defence. And as in time of peace armies are dangerous to liberty they ought not to be maintained without the consent of the legislature; and the military power shall always be held in an exact subordination to the civil authority, and be governed by it. [55]

The convention's inclusion of the word "keep" built on an assumption implicit in the state's militia statute, which had been enacted in the colonial era. [56] Apart from the poor, most white male citizens were required to outfit themselves with military-quality weapons. [57] As was true for virtually every state's militia laws, muskets, not pistols, were the legally designated weapon of the militia. The only exception to this were the horsemen's pistols required of dragoons and other mounted units. [58]

One of most remarkable features of the framing and ratification of the Massachusetts Constitution was the decision to submit the draft constitution to the towns for comment. These responses provide a rare glimpse into popular constitutional ideas in the Founding era, including ideas about armed self-defense. [59] Although individual towns produced dozens of detailed responses to the proposed constitution and identified many flaws in the new frame of government, the right to keep and bear arms did not prompt extensive commentary. The response of the western town of Williamsburgh, however, faulted the constitution's exclusive focus on common defense and proposed the following alternative: "1st that we esteem it an essential privilege to keep Arms in Our houses for Our Own Defence and while we Continue honest and Lawfull Subjects of Government we Ought Never to be deprived of them." [60]

This alternative formulation clearly frames the right in terms similar to Heller's core right of self-defense in the home. [61] This limited formulation of the right was also evidenced in the language **\*1707** chosen by Samuel Adams in his proposed amendment submitted to, but ultimately rejected by, the Massachusetts Ratification Convention. [62] Similar to the town of Williamsburgh, Adams defined the contours of the right in terms of an individual right for one's own defense. [63]

Although there is little doubt that Adams and other Americans believed they had a legal right to defend their homes with deadly force if necessary, there is no evidence that there was broad legal consensus that states needed to constitutionalize the protection of this right outside of the home. [64] Balancing the needs of public safety against the exercise of this right was something best left to the individual state legislatures. [65]

### III. Gun Regulation in the Founding Era and Early Republic: Myths and Realities

It is important to recognize that the Founding generation had little trouble accepting that one might have different legal standards for the use of arms within the home and in public. Thomas Jefferson's legal thoughts provide yet another example of this type of legal double standard for arms. In a bill he wrote to deal with poaching, Jefferson included a provision restricting the ability to travel armed with a musket outside of the context of militia activity. [66] The proposed law penalized any poacher who "bear[s] a gun out of his inclosed ground, unless whilst performing military duty." [67] The purpose of the statute was to make legal distinctions between the different levels of regulation appropriate to the use of firearms in different contexts. [68] In public, militia

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12683   Page 327 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

weapons enjoyed greater legal protection than  **1708**  pistols and other non-military weapons. All weapons, even those owned for militia purposes, were subject to police power regulation. [69]

Although there were hundreds of essays published both for and against the Constitution, the subject of hunting and the right of self-defense outside the home produced little commentary. [70]  Indeed, there is pretty strong evidence that Federalists and Anti-Federalists each saw these issues as matters best left to the state legislatures. [71]  Although Federalist Tench Coxe and the Anti-Federalist author Brutus agreed on few things, they were in complete agreement on this issue. Brutus made this point expressly when he wrote, "[I]t ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ." [72]  Federalist Tench Coxe echoed this understanding, writing that "[t]he states will regulate and administer the criminal law, exclusively of Congress." [73]  The police power of the states would not be diminished under the new Constitution and the individual states would continue to legislate on all matters "such as unlicensed public houses, nuisances, and many other things of the like nature." [74]

Although individual laws varied, a number of states expressly provided that weapons owned in relation to militia service were exempt from seizure in any legal proceedings for debt or delinquent  **1709**  taxes. [75]  The treatment in a Philadelphia edition of the Conductor Generalis, a guidebook for justices of the peace, sheriffs, and constables devoted a long section to goods which were subject to a "distress for rent" action. [76]  Although tradesmen's tools were exempt, no provision was made for firearms, apart from muskets and rifles owned by militiamen. [77]  A comparable guide written for sheriffs and tax collectors residing in Maine, published more than three decades later, evidenced a similar rule. [78]  While clothes, bibles, schoolbooks, and tools necessary for a trade were exempt, the only firearms accorded this privilege were those of the militia. [79]  As The Maine Civil Officer put it, "[e]very citizen enrolled, and providing himself with the arms, ammunition, and accoutrements required by law, shall hold the same exempt from all suits, distresses, execution or sale for debts, or for the payment of taxes." [80]

Patterns of gun ownership in the Founding era also help account for the very different legal protections accorded ordinary pistols and militia weapons. [81]  Americans owned many more long guns and the  **1710**  law bestowed additional constitutional and legal protections on such weapons, including a right to travel to muster and train with these weapons, recognizing the utility of these weapons for militia activity. [82]  Yet, it is worth noting that even these militia weapons were subject to reasonable police power regulations. [83]

The notion that the use of militia weapons outside of the home enjoyed even greater protection than the use of pistols outside of the home makes perfect sense given the language of the Second Amendment. Although Heller held that self-defense in the home was one core value enshrined in the Second Amendment, it is hard to dispute that the Amendment also protects the goal of arming the militia. [84]  Because pistols had little value in hunting and were not standard equipment for ordinary militiamen, it made sense to carve out a broader right to travel with a musket or a rifle since these weapons were needed for training and suitable for hunting. [85]  Although one might travel with a musket to muster, the state could prohibit traveling with a loaded weapon or discharging a weapon on a muster day without permission. [86]

It is easy to mischaracterize the Founding era's recognition that militia weapons might be used in public with a broad right to carry arms. Michael O'Shea, a gun rights scholar, makes this error in his gloss on a well-known passage from the Virginia jurist, St. George Tucker. [87]  In his discussion of the law of treason, Tucker commented on the right to carry a musket in his home state of Virginia. Tucker noted that simply carrying military weapons in Virginia did not imply  **1711**  any treasonous intent, a fact that marked a departure from English precedents. O'Shea ignores the clear military context of Tucker's discussion, eliding the difference between a right to carry militia weapons outside of the home and the right to carry a pistol for self-defense. Tucker's discussion of this issue responded to the prosecution of Fries's Rebellion in Pennsylvania. [88]  Tucker took exception to Judge Samuel Chase's use of English legal authorities in construing the meaning of treason. [89]  Tucker noted that in contrast to English law, the mere possession and use of military style weapons did not provide grounds for a treason prosecution in Virginia:

> But ought that circumstances of itself [array with military weapons], to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself. In many parts of the United States,

Compendium_Cornell
Page 0870

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12684   Page 328 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

> a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side. [90]

Tucker's remarks are easily taken out of context and misinterpreted, so it is worth taking the time to highlight exactly what he claimed. The first point to recognize is that Tucker was talking about the use of military weapons by citizens who would have been members of the eighteenth-century militia. [91] Tucker is quite clear that muskets and rifles, not pistols, are protected by this constitutional right. [92] Second, Tucker himself notes that this expansive conception of a constitutional right to carry military weapons in public was not universally acknowledged by all judges at the time. Justice Chase certainly did not share Tucker's views and the successful prosecution of the rebels in both the Whiskey Rebellion and Fries's Rebellion demonstrate that Tucker's views were not the norm outside of Virginia. [93]

 **\*1712** In Masciandaro, Judge Niemeyer noted the Second Amendment not only protected self-defense but also had to be read with its militia purpose in mind:

> Moreover, the right to keep and bear arms was found to have been understood to exist not only for self-defense, but also for membership in a militia and for hunting, neither of which is a home-bound activity. Indeed, one aspect of the right, as historically understood, was "to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." [94]

Judge Niemeyer extrapolates a right to carry a firearm from an unquestioned historical assumption about the way the militia functioned. Niemeyer seems to assume that one would have needed to travel with a loaded gun to participate in the militia and effectuate the Second Amendment's militia purpose. Yet, in the case of the Second Amendment, historical facts and mythology are often at odds with one another. In fact, states regulated the exercise of this right in a robust manner, including prohibiting militiamen from traveling with a loaded weapon to muster or parade. [95] These types of regulations were uncontroversial exercises of the state's police powers. [96]

Finally, one must reckon with the common law constraints on the use of firearms in the Founding era and early republic. The Statute of Northampton instructed individuals to "bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets." [97] Modern scholars are divided over how to interpret the application of this statute in early American law. In the view of Daryl Miller and Patrick Charles, the Statute of Northampton prohibited **\*1713** armed travel. [98] Eugene Volokh, a leading academic champion of gun rights, rejects this view. He argues that this "Statute was understood by the Framers as covering only those circumstances where carrying arms was unusual and therefore terrifying." [99] Volokh cites the interpretation of this statue by Sir William Hawkins, an important English legal commentator familiar to lawyers in the Founding era. [100] Hawkins formulation of this statute's prohibition cast the prohibition in terms of traveling with unusual and dangerous weapons. [101] This formulation was slightly different than Sir William Blackstone's gloss on the law. Blackstone did not describe the crime of affray in terms of traveling with "dangerous and unusual weapons," but described the statute's prohibition in terms of carrying "dangerous or unusual weapons." [102] The Founders were familiar with both English commentators and it seems likely that there may have been a range of views on interpreting this question. [103]

It is easy for legal scholars and judges to lose sight of the social, cultural, and political contexts in which early American weapons regulations were enacted. Founding era public policy on firearms had several objectives: disarm dangerous and disloyal groups, provide for the safe storage of gunpowder and firearms, and arm and regulate the militia. [104] Interpersonal violence, including gun violence, simply was not a problem in the Founding era that warranted much attention and therefore produced no legislation. [105] Times change, and the law **\*1714** changes with them. [106] As cheaper and more reliable handguns proliferated in large numbers and society underwent a host of profound social and economic changes in the early decades of the nineteenth century, handguns and knives gradually became a social problem. [107] In response to a growing perception that these easily-concealable weapons posed a serious threat to public safety, a number of states passed the first modern-style weapons control

Compendium_Cornell
Page 0871

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12685   Page 329 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

laws. [108] These laws triggered the first cases testing the scope of the constitutional right to keep and bear arms under state law. [109] For the first time in American history, courts were faced with deciding this issue: was the constitutional right to bear arms implicated when one armed oneself with a pistol or a knife outside of the home? [110]

In Masciandaro, Judge Niemeyer relied on Eugene Volokh's framework for implementing Heller. [111] Unfortunately, this framework rests on a number of questionable historical assumptions and claims. In particular, the contention that the "pre-Civil War American legal practice of treating open carrying of weapons as not only legal but constitutionally protected" rests more on historical mythology and a highly selective reading of the evidence than it does on sound historical research. [112] In reality, Antebellum case law on the **\*1715** right to bear arms was deeply divided on the scope of the right. [113] There was a spectrum that ran from the libertarian view elaborated in Bliss v. Commonwealth [114] to the more limited right described in Buzzard v. State. [115] The Fourteenth Amendment largely resolved the division among southern Antebellum courts evidenced by this split. By the time the Fourteenth Amendment was adopted, most legal commentators viewed Buzzard, not Bliss, as the orthodox view. [116]

Legal scholarship is most trustworthy when focused on traditional doctrinal analysis. Yet, narrow doctrinalism can obscure other important legal and historical sources, particularly if one focuses exclusively on cases and ignores legislation. In areas of the law in which a broad constitutional consensus existed and laws were not challenged there would not be any body of case law to consult. If one looks at legal scholarship on the right to bear arms, one of the most striking omissions is any attention to the law outside of the South. [117] Indeed, nearly all of the Antebellum gun cases, with a few notable exceptions, were decided in Southern courts by judges who were typically pro-slavery. [118] This fact merits closer scrutiny. [119]

### **\*1716  IV. The Pistol and the Lash: Slavery and the Permissive Right to Carry**

It is not surprising that the vast majority of the early cases testing the limits and scope of the right to bear arms were Southern. By the 1820s, the Antebellum South was the most violent region in the new nation. [120] Indeed, the South's homicide rates were more than double that of the North's most populous cities, New York and Philadelphia. [121] Given the much higher homicide rates in the South, it is not surprising that this region led the way in passing the first modern style gun control laws. [122]

Southern violence prompted extensive commentary by contemporaries and was put to effective use by abolitionists who linked this culture of violence to the brutality of slavery. [123] Two particular symbols became emblems of the violence of the South: the pistol and the lash. [124] The importance of these cultural associations is vividly captured in this cartoon from The American Anti-Slavery Almanac (1840) [125]:


TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
 **\*1717**  The scene depicted in the image melds together multiple examples of southern brutality. In the distance, a cockfight draws a large crowd seeking the titillation provided by blood sport. A gambling dispute turned deadly occupies the center of the picture. On one side of the image, two gentlemen are about to fire on one another in a duel and a cruel southern master prepares to whip a young slave. The fact that the South was the most violent region of the new nation ought to give scholars and judges pause before looking to this region for constitutional guidelines on how to interpret the meaning of the right to bear arms in the post-Heller era.

If one looks closely at the foundation for Professor Volokh's claim about the right to carry, it consists of a single and quite remarkable statement by the Richmond Grand Jury published in 1820. [126] The Grand Jury denounced the pernicious practice of carrying concealed weapons, while affirming the right to carry arms openly.

On Wearing Concealed Arms

Compendium_Cornell
Page 0872

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12686   Page 330 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

We, the Grand Jury for the city of Richmond, at August Court, 1820, do not believe it to be inconsistent with our duty to animadvert upon any practice which, in our opinion, may be attended with consequences dangerous to the peace and good order of society. We have observed, with regret, the very numerous instances of stabbing, which have of late years occurred, and which have been owing in most cases to the practice which has so frequently prevailed, the era of wearing dirks: Armed in secret, and *1718 emboldened by the possession of these deadly weapons, how frequently have disputes been carried to extremities, which might otherwise have been either amicably adjusted, or attended with no serious consequences to the parties engaged.

The Grand Jury would not recommend any legislative interference with what they conceive to be one of the most essential privileges of freemen, the right of carrying arms: But we feel it our duty publicly to express our abhorrence of a practice which it becomes all good citizens to frown upon with contempt, and to endeavor to suppress. We consider the practice of carrying arms secreted, in cases where no personal attack can reasonably be apprehended, to be infinitely more reprehensible than even the act of stabbing, if committed during a sudden affray, in the heat of passion, where the party was not previously armed for the purpose. [127]

The idea that one might ban concealed carry if one allowed open carry did garner support in Nunn v. State, but there is little evidence that this case was understood to be a controlling precedent in the South, and it was certainly not viewed in this way by the era of the Fourteenth Amendment. [128] In Hill v. State, Georgia's Supreme Court rejected Nunn and asserted that it was "at a loss to follow the line of thought that extends the guarantee . . . to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." [129] Moreover, Nunn had no impact outside of the South. Indeed, scholarship on the right to bear arms had been strangely silent about legal ideas and practices in these other areas of the nation, which included the vast majority of the free population.

### *1719  V. No Right to Carry: The Emergence and Spread of the Massachusetts Model

Outside of the South, a robust model of weapons regulation emerged and gained widespread acceptance. Prohibitions on concealed carry were one type of regulation. [130] A number of states and localities adapted the Statute of Northampton's prohibition on traveling armed, rewriting it in terms that made clear that one cannot travel with offensive weapons. [131] Laws of this type weren't the only prohibitions on traveling armed. States enacted bans on the use of arms in sensitive places. [132] Finally, some states and localities enacted *1720 even more sweeping regulations, including complete bans on traveling armed. In 1835, Massachusetts passed a sweeping law that effectively prohibited the right to travel armed.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace. [133]

The respected jurist Peter Oxenbridge Thacher commented on this law in a grand jury charge that drew praise in the contemporary press. [134] According to this model, one might ban open and concealed carry, as long as one allowed an exception for cases in which an individual had a reasonable fear of imminent violence. [135]

Volokh is correct that bans on concealed weapons were uncontroversial. It is therefore hardly surprising that Thacher shared the dominant cultural view of the day regarding the practice of arming oneself with concealed weapons. Such a practice was cowardly, if not dastardly. This did not mean that one had a right to carry openly. The alternative to concealed carry was not open carry, but rigorous enforcement of the law, which forbade arming oneself except in unusual situations. Thacher's grand jury charge was emphatic about the limited nature of this right:

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.12687 Page 331 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

> In our own Commonwealth [of Massachusetts], no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property. Where the practice of wearing secret arms prevails, it indicates either that the **\*1721** laws are bad; or that they are not executed with vigor; or, at least, it proves want of confidence in their protection. It often leads to the sudden commission of acts of atrocious injury; and induces the individual to rely for defence on himself, rather than on society. But how vain and impotent is the power of a single arm, however skilled in the science of defence, to protect its possessor from the many evil persons who infest society. The possession of a concealed dagger is apt to produce an elation of mind, which raises itself above the dictates both of prudence and law. The possessor, stimulated by a sensitive notion of honor, and constituting himself the sole judge of his rights, may suddenly commit a deed, for which a life of penitence will hardly, even in his own estimation, atone. When you survey the society to which you belong, and consider the various wants of its members;--their numbers, their variety of occupation and character,--their conflicting interests and wants . . . what is it, permit me to ask, preserves the common peace and safety? I know of no answer, but THE LAW. [136]

Thacher's account of the Massachusetts law prohibiting the right to carry arms unambiguously interprets this law as a broad ban on the use of arms in public. In Massachusetts and those states emulating its model, the scope of the right to arm oneself defensively outside of the home was extremely limited. [137] Thacher believed that the state could ban all carrying of firearms, as long as there was an affirmative legal defense available allowing an exception when there was a clear and tangible threat to justify arming oneself defensively. [138] Demonstrating a reasonable fear, it is important to note, imposed a high legal standard. In State v. Duke, the Supreme Court of Texas upheld a comprehensive ban on traveling armed. [139] Texas law also defined the standard of reasonableness in the following way:

> Any person charged under the first Section of this Act, who may offer to prove by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the arms so carried were borne openly, and not concealed beneath the clothing; and if it shall appear that this danger had its **\*1722** origin in a difficulty first commenced by the accused, it shall not be considered a legal defense. [140]

The case also drew a clear line between the use of arms within the home and the use of them in public. The former enjoyed far greater protection than the latter. Thus, even in the region of the nation with the most permissive attitude toward the right to carry, a more stringent and limited conception of this right had emerged by the era of the Fourteenth Amendment.

Outside of the South, the limited right to carry pioneered by Massachusetts was emulated by a number of states. A similar legal standard emerged in Maine, Delaware, The District of Columbia, Wisconsin, Pennsylvania, Oregon, and Minnesota. [141] Rather than demonstrate a consensus on a right to open carry, the historical record demonstrates that outside of the slave South, a radically different and far more limited conception of the right to travel armed emerged. Indeed, by the era of the Fourteenth Amendment, this more limited model had also gained legislative approval and judicial support in parts of the South. [142] To assert this right, one had to be able to demonstrate clear evidence of a reasonable fear of imminent **\*1723** danger before one might legally arm oneself. [143] The notion of a strong tradition of a right to carry outside of the home rests on a set of historical myths and a highly selective reading of the evidence. The only persuasive evidence for a strong tradition of permissive open carry is limited to the slave South.

There is little consensus among judges and scholars about how to interpret the Constitution. Even among those who profess to be supporters of originalism, there is considerable disagreement over originalist methodology. In Heller, the Supreme Court seemed to gesture toward the new originalism and its focus on public meaning. In McDonald, however, the same five-person majority embraced aspects of traditional originalism and its emphasis on discerning the intent of the Framers of the Fourteenth Amendment. [144] The scholarly debate over the merits and flaws in originalist methodology is voluminous. Even accepting the Court's inconsistent and, at times, incoherent originalist methodology, there is simply no compelling historical evidence of a broad legal consensus on a right to carry non-militia weapons outside of the home. Indeed, there is considerable evidence

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12688   Page 332 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

suggesting that a legal consensus had emerged outside of the South that no such right existed. The available evidence strongly suggests that laws restricting the use of firearms outside of the home were the legal norm. [145]

**\*1724**  This conclusion should hardly come as a shock to anyone familiar with the history of Reconstruction. Indeed, Reconstruction-era Republicans were strong supporters of generally applicable and racially neutral gun regulations, including in some cases, bans on traveling armed and bans on handguns. Gun regulation in the years after the adoption of the Fourteenth Amendment became stricter, not looser. [146]  The idea that American law recognized a right to carry firearms in public is more supported by a Hollywood myth of the "wild west" than historical reality. [147]  Even in Dodge City, that epitome of the Wild West, gun carrying was prohibited. [148]

The eminent jurist John Forrest Dillon, analyzed the importance of the reasonable threat exception to broad restrictions. [149]  In a series of essays published in the Central Law Journal in 1874, Dillon explored the complex legacy of American jurisprudence on the issue of the  **\*1725**  right to bear arms, the right of self-defense, and the right to carry. [150]  Dillon's views were similar to those of another celebrated legal theorist of this era, Joel Prentiss Bishop. [151]  Both men acknowledged that the law had to balance the legitimate rights of individual self-defense against the needs of public safety. [152]  Dillon's discussion of this issue was especially thoughtful. Drawing on a recent case, Andrews v. State, he concluded, "every good citizen is bound to yield his preference as to the means [of self-defense] to be used, to the demands of the public good." [153]  The state's compelling interest in promoting public safety did not alter the fact that there "are circumstances under which to disarm a citizen would be to leave his life at the mercy of treacherous and plotting enemy." [154]  Dillon's solution to this dilemma was not permissive open carry. He turned to a common law rule that had been absorbed into the Massachusetts statute prohibiting traveling armed. [155]  If one armed oneself contrary to a legal prohibition and a genuine threat existed, and "[i]f such a state of facts were clearly proven," he opined, it would "clearly be said to fall within that class of cases in which the previously existing common law interpolates exceptions upon subsequently enacted statutes." [156]  Dillon concluded that as far as the right to carry went, states might regulate this practice and prohibit it entirely as long as the common law self-defense exception was recognized. Dillon's summary of the state of the law in the era of the Fourteenth Amendment is hard to reconcile with the views of pro-gun scholars such as Volokh and O'Shea. "Every state," Dillion wrote, "has power to regulate the bearing of arms in such manner as it may see fit, or to restrain it altogether." [157]

**\*1726  Conclusion: The Past and Future of the Right to Carry Arms Outside the Home**

In attempting to fashion a workable firearms jurisprudence in the post-Heller era, judges are likely to continue to consult history, and therefore face all of the problems that have been identified by Heller's critics on the left and right. [158]  The claim that there was a broad consensus in Antebellum law on a right to carry openly mistakenly equates a distinctively Southern tradition of permissive carry with the existence of a larger constitutional consensus on this question. [159]  The dominant legal tradition in America was not open carry, but quite the opposite. A broad range of restrictions on the use of arms in public, including bans on the right to carry in public, emerged in the decades after the adoption of the Second Amendment. Rather than look to the slave South as the foundation for crafting "an analytical framework" for the post-Heller era, judges would do better to look to the North and the Massachusetts model. Robust regulation, including bans on traveling armed, are clearly constitutional and consistent with Heller's recognition of long standing historical traditions of arms regulation in America. [160]

### Footnotes

a1   Paul and Diane Guenther Chair in American History, Fordham University. I would like to thank the editors of the Fordham Urban Law Journal and my colleague Professor Nicholas Johnson for organizing this conference. I would also like to thank Al Brophy, Joe Blocher, Patrick Charles, Chuck Dyke, and Larry Rosenthal for helpful discussions that contributed to my thinking about the issues developed in this essay. Mark Frassetto and Ryan Keating provided invaluable research assistance.

Compendium_Cornell
Page 0875

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12689   Page 333 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

1   District of Columbia v. Heller, 554 U.S. 570 (2008).

2   On modern gun rights gun culture, see Joan Burbick, Gun Show Nation: Gun Culture and American Democracy (2006); Abigail A. Kohn, Shooters: Myths and Realities of American Gun Cultures (2005); Robert J. Spitzer, The Politics of Gun Gontrol (4th ed. 2008); Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in America (2011).

3   Post Heller Litigation Summary, Law Center to Prevent Gun Violence, http://smartgunlaws.org/category/second-amendment/ (last updated Nov. 7, 2012).

4   For a lucid critique of Heller from the right, see J. Harvie Wilkinson III, Of Guns, Abortions, and the Unraveling Rule of Law, 95 Va. L. Rev. 253 (2009). For an equally trenchant critique from the political Left, see Reva B. Siegel, Dead or Alive: Originalism as Popular Constitutionalism in Heller, 122 Harv. L. Rev. 191 (2008).

5   See, e.g., United States v. Decastro, 682 F.3d 160 (2d Cir. 2012) (purchasing firearms in another state); United States v. Staten, 666 F.3d 154 (4th Cir. 2011) (possession of firearm by domestic violence misdemeanants); United States v. Booker, 644 F.3d 12 (1st Cir. 2011) (domestic violence misdemeanants); United States v. Portillo-Munoz, 643 F.3d 437 (5th Cir. 2011) (undocumented immigrants); United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) (possession of firearm with obliterated serial number); United States v. Vongxay, 594 F.3d 1111 (9th Cir. 2010) (felons).

6   Heller, 554 U.S. at 626-27.

7   United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011).

8   Id. at 470. Courts are not just divided over how to weigh particular types of historical evidence, but there is some disagreement over which period of history is relevant to the various types of Second Amendment claims being made. Should the courts focus on Founding era materials, post-enactment sources, or evidence from the era of the Fourteenth Amendment? Justice Scalia employed late nineteenth century sources to interpret Founding era approaches to preambles, an approach that only underscores Heller's intellectual incoherence. For additional discussion of Heller's many temporal oddities, see Siegel, supra note 4, and Saul Cornell, Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller, 69 Ohio St. L.J. 625, 639 (2008). For a more charitable reading of Heller that attempts to bring some order to this question, see Allen Rostron, Justice Breyer's Triumph in the Third Battle over the Second Amendment, 80 Geo. Wash. L. Rev. 703 (2012).

9   On the problems of Second Amendment "law office history" and historical myths clouding Second Amendment discussions, see infra note 112 and accompanying text. Rostron offers some thoughtful comments on the inherent difficulty of using history to resolve modern issues such as the scope of Second Amendment protections for those convicted of domestic violence misdemeanors:

    Exploring how American society viewed domestic violence in the Founding era might be a fascinating topic for a doctoral dissertation, but it would undoubtedly be a challenging undertaking for judges, and ultimately a pointless one because the historical record on an issue of such complexity undoubtedly contains much to support many different views. Judges simply will be disappointed if they hope to find specific and clear historical evidence about the Founding generation's attitude toward the rights of domestic abusers.

    Rostron, supra note 8, at 751-52 (citations omitted).

10  The notion that Heller ought to be read to include a right to carry outside of the home has been most fully developed in two cases decided in the Fourth Circuit. See United States v. Weaver, No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.12690  Page 334 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

(S.D. W. Va. Mar. 7, 2012); Woollard v. Sheridan, No. L-10-2068, 2012 U.S. Dist. LEXIS 28498 (D. Md. Mar. 2, 2012). An appeal in the latter case was being briefed at the time that this Article went to press.

11    Masciandaro, 638 F.3d at 459.

12    Id. at 473.

13    Id.

14    Id. at 469.

15    Id. at 475 (Wilkinson, J., concurring).

16    Id. at 468 (internal citations omitted). See the discussion infra Part IV for specific examples of different types of arms regulation.

17    For a discussion of pistol ownership in the founding era, see infra note 81 and accompanying text. On the militia's standard armaments, muskets and rifles, see discussion infra notes 66-93 and accompanying text. On regulation, see infra notes 66-83 and accompanying text.

18    Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 18-20 (2006) [hereinafter Cornell, A Well-Regulated Militia].

19    Traditional Whig views of the militia may be found in the writings of the Commonwealth tradition. See 3 James Burgh, Political Disquisitions 400-05 (Philadelphia, 1775); Andrew Fletcher, A Discourse of Government with Relation to Militias 40-41, 44-47 (Edinburgh, 1698); Algernon Sidney, Discourses Concerning Government Ch. 2 (London, 1698); John Toland, The Militia Reform'd 16, 46-47 (London, 1695). See generally John Trenchard, An Argument Shewing, that a Standing Army Is Inconsistent with a Free Government and Absolutely Destructive to the Constitution of the English Monarchy (London, 1697).

20    1 George Mason, Fairfax County Committee of Safety Proceedings, in The Papers of George Mason 212 (Robert A. Rutland ed., 1970).

21    Cornell, Well-Regulated Militia, supra note 18, at 18-19.

22    See Cornell, A Well-Regulated Militia, supra note 18, at 18-20. See generally Gordon S. Wood, The Radicalism of the American Revolution (1992) (discussing the radicalism of the Revolution).

23    1 George Mason, Final Draft of the Virginia Declaration of Rights, in The Papers of George Mason, supra note 20, at 288; see also 1 George Mason, Fairfax County Militia Plan "for Embodying the People", in The Papers of George Mason, supra note 20, at 215 [hereinafter Mason, Fairfax County Militia Plan]. Mason noted that the volunteer companies were an expedient until "a regular and proper Militia law for the Defense of the Country shall be enacted by the Legislature of this Colony." Id. at 216; see also 1 George Mason, Virginia Declaration of Rights, in The Papers of George Mason, supra note 20, at 274-76.

24    See Va. Const. of 1776.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12691   Page 335 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

25    See Cornell, A Well-Regulated Militia, supra note 18, at 26-30.

26    1 The Papers of Thomas Jefferson 344 (Julian P. Boyd ed., 1950).

27    See id. at 353.

28    Id.

29    See id. at 353, 363.

30    Id.

31    See id.; see also District of Columbia v. Heller, 554 U.S. 570, 575-76 (2008).

32    For a discussion of the popular plebeian radicalism of Pennsylvania's constitutional tradition, see Cornell, A Well-Regulated Militia, supra note 18, at 20-23.

33    The best historical account of the Pennsylvania arms bearing clause is found in Nathan Kozuskanich, Defending Themselves: The Original Understanding of the Right to Bear Arms, 38 Rutgers L.J. 1041, 1044-46 (2007).

34    Brief for Historians on Early American Legal, Constitutional and Pennsylvania History as Amici Curiae Supporting Respondent, City of Chicago at 13-14, McDonald v. City of Chicago, 130 S. Ct. 3020 (2010) (No. 08-1521), 2010 WL 59031.

35    See id. at 15.

36    See Kevin Kenny, Peaceable Kingdom Lost: The Paxton Boys and the Destruction of William Penn's Holy Experiment 140-71 (2009).

37    The Apology of the Paxton Volunteers, in The Paxton Papers 187 (John R. Dunbar ed., 1764).

38    Pa. Const. of 1776, art. XIII.

39    Brief for Thirty-Four Professional Historians and Legal Historians as Amici Curiae Supporting Respondents at 11, McDonald v. City of Chicago, 130 S. Ct. 3020 (2010) (No. 08-1521), 2010 WL 59025.

40    See id. at 13.

41    See id. at 17-22.

42    See Pa. Const. of 1776, art. VIII.

Compendium_Cornell
Page 0878

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12692   Page 336 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

43    See generally Joseph Blocher, The Right Not to Keep or Bear Arms, 64 Stan. L. Rev. 1 (2012) (discussing the significance of this neglected side of the right to bear arms debate).

44    Pa. Const. of 1776, Declaration of Rights, para. 13, reprinted in Constitutions of the Several Independent States of America 78 (London, 1782); see also Kozuskanich, supra note 33, at 1065. Kozuskanich also deals with anachronistic modern gun rights readings of this text.

45    Pa. Const. of 1776, art. XIII.

46    See id., art. VIII.

47    See id. § 43.

48    Id.

49    See Saul Cornell, St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment, 103 Nw. U. L. Rev. Colloquy 406, 407-08 (2009).

50    See District of Columbia v. Heller, 554 U.S. 570, 601 (2008).

51    Supporters of the individual rights reading of the 1776 Pennsylvania Constitution have been unable to identify any contemporary evidence that this was the dominant understanding of its framers or the general understanding of Pennsylvanians. Instead, they have used James Wilson's comments on the 1790 Constitution as the basis for reconstructing the meaning of the earlier document. Not only did two different bodies draft these provisions, but they structured and worded them differently. Thus, the earlier provision links the right to bear arms with the traditional Whig attack on standing armies. The latter provision clearly separates the two ideas into separate provisions. It is also not entirely clear how typical Wilson's thinking was on this question. Albert Gallatin, another member of the 1790 convention, framed the right in rather different terms, giving it a more clearly military reading. Nor do Pennsylvania courts appear to have seen this provision as having constitutionalized the common law right of self-defense. For further discussion and analysis of this controversy and the relevant sources, see Kozuskanich, supra note 33. On the changing language of the arms bearing provisions of state constitutions, see Cornell, A Well-Regulated Militia, supra note 18.

52    See Pa. Const. of 1776.

53    William Pencak, The Promise of the Revolution, 1750-1800, in Pennsylvania: A History of the Commonwealth 121 (William Pencak & Randal Miller eds., 2002) (quoting John Adams).

54    See generally Va. Const. of 1776; Pa. Const. of 1776.

55    Mass Const. of 1780, pt. 1, art. XVII, in The Popular Sources of Political Authority 446 (Oscar Handlin & Mary Handlin eds., 1966).

56    Cornell, Well-Regulated Militia, supra note 18, at 12.

57    For a discussion of colonial militia laws, see id. at 14-17.

Compendium_Cornell
Page 0879

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12693   Page 337 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

58    For a good example from the era of the Second Amendment, see An Act for Regulating and Governing the Militia of the Commonwealth of Massachusetts (1793), reprinted in Acts and Resolves Passed by the General Court 294 (Wright & Potter Printing Co. 1895) [hereinafter Massachusetts Act].

59    See generally supra note 55 and accompanying text.

60    Town of Williamsburgh (1780), in The Popular Sources of Political Authority, supra note 55, at 624.

61    District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

62    See id. at 601.

63    See id.; see also Town of Williamsburgh (1780), supra note 60, at 624.

64    Even if one canvassed the most expansive statements of the right from the ratification debates, none of these can plausibly be read to justify traveling armed. In this regard, the language proposed by Samuel Adams, which implicates a home-based right, is instructive. See sources cited supra, note 63. Even accepting Heller's dubious claims that the phrase "bear arms" simply meant to carry a gun and had no connection to the militia, one could easily imagine that the right to carry such a gun did not extend beyond the home, which is precisely the conception defended by Jefferson, Adams, and the residents of Williamsburgh.

65    See discussions of Brutus and Tench Coxe, infra Part III, and the idea of federalism embodied in the United States Constitution. See U.S. Const. amend. X.

66    Thomas Jefferson, A Bill for Preservation of Deer, in 2 The Papers of Thomas Jefferson 444 (Julian P. Boyd ed., 1950).

67    Id.

68    Id.

69    There is broad consensus among professional historians on this point. See, e.g., Brief for Thirty-Four Professional Historians and Legal Historians as Amici Curiae Supporting Respondents at 5-12, McDonald v. City of Chicago, 130 S. Ct. 3020 (2010) (No. 08-1521), 2010 WL 59025, at *4-6. The distinguished Massachusetts judge George Thatcher wrote about the right to use arms in analogous terms and recognized the breadth of the state's police power in this area. See Saul Cornell, The Original Meaning Of Original Understanding: A Neo-Blackstonian Critique, 67 Md. L. Rev. 150, 161 (2007). Thatcher's thinking has been largely ignored by judges and legal scholars but merits closer attention. See id. For a more detailed discussion of Thatcher, see Patrick J. Charles, Scribble Scrabble, the Second Amendment, and Historical Guideposts: A Short Reply to Lawrence Rosenthal and Joyce Lee Malcolm, 105 Nw. U. L. Rev. Colloquy 227 (2011).

70    See Jack N. Rakove, The Second Amendment: The Highest Stage of Originalism, 76 Chi.-Kent L. Rev. 103 (2000).

71    See discussion infra text accompanying notes 71-74.

72    Brutus, Essays of Brutus VII, reprinted in 2 The Complete Anti-Federalist 358, 400-05 (Herbert J. Storing ed., 1981).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12694   Page 338 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

73    Tench Coxe, A Freeman, Pa. Gazette, Jan. 23, 1788, reprinted in Friends of the Constitution: Writings of the "Other" Federalists 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

74    Id.

75    The Conductor Generalis, or, the Office, Duty, and Authority of the Justices of the Peace 142 (1792).

76    Id. at 142-43.

77    Id. at 142.

78    Jeremiah Perley, The Maine Civil Officer or the Powers and Duties of Sheriffs, Coroners, Constables, and Collectors of Taxes 29-30 (1825). The statute describing this legal exemption was passed in 1792. For similar discussions from a New Jersey guide from the same period, see James Ewing, A Treatise on the Office and Duty of a Justice of the Peace 70 (1832).

79    See Perley, supra note 78, at 29-30.

80    Id.

81    The question of exactly how well-armed Americans were in the eighteenth century has been an explosive one. No serious scholar now accepts the discredited argument of Michael Bellesiles that Americans were poorly armed. See generally Michael Bellesiles, Arming America: The Origins of a National Gun Culture (2000). For devastating critiques of his thesis, see Ira D. Gruber, Of Arms and Men: Arming America and Military History, 59 Wm. & Mary Q. 217 (2002); James Lindgren & Justin Lee Heather, Counting Guns in Early America, 43 Wm. & Mary L. Rev. 1777 (2002); Gloria L. Main, Many Things Forgotten: The Use of Probate Records in Arming America, 59 Wm. & Mary Q. 211 (2002); Randolph Roth, Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence, 59 Wm. & Mary Q. 223 (2002). Among the many blunders made by Bellesiles, he failed to distinguish between pistols and long guns. In an important new study of the patterns of arms ownership in the eighteenth century, Amherst College social historian Kevin Sweeney notes that pistols constituted a small fraction of the weapons owned by Americans in the Founding era. Americans clearly preferred long guns over hand guns. See Kevin Sweeney, Firearms and Colonial Militias, in The Second Amendment On Trial: Critical Essays on District of Columbia v. Heller (forthcoming 2013) [copy on file with author].

82    See sources cited supra note 81.

83    See Massachusetts Act, supra note 58, at 380; see also District of Columbia v. Heller, 554 U.S. 570, 633-34 (2008).

84    U.S. Const. amend. II.

85    See An Act Concerning the Militia § 120, 1866 Mass. Acts 197 ("A soldier who unnecessarily or without order from a superior officer comes to any parade with his musket, rifle or pistol loaded with ball, slug or shot, or so loads the same while on parade, or unnecessarily or without order from a superior officer discharges the same when going to, or returning from or upon parade, shall forfeit not less than five nor more than twenty dollars."); An Act for the Regulating, Training and Arraying of the Militia, pt. 11, 1778 N.J. Laws 45; An Act for Forming and Regulating the Militia Within this State, and for Repealing All the Laws Heretofore Made for that Purpose § 7, 1786 N.H. Laws 409.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12695   Page 339 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

86    See generally 1785 Va. Acts 9.

87    See Michael P. O'Shea, Modeling the Second Amendment Right to Carry Arms: Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense, 61 Am. U. L. Rev. 585, 637 (2012).

88    See generally Paul Douglas Newman, Fries's Rebellion: The Enduring Struggle for the American Revolution (2004).

89    5 St. George Tucker, Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States; and the Commonwealth of Virginia, app. B at 14 (Phila., William Young Birch & Abraham Small 1803) [hereinafter Tucker, Blackstone's Commentaries].

90    Id.

91    See id.

92    See id.

93    See id.

94    United States v. Masciandaro, 638 F.3d 458, 468 (2011) (Niemeyer, J., concurring) (internal citations omitted).

95    See, e.g., Statutes of the State of New Jersey 765 (Trenton, Phillips & Bogswell 1847); see also The Revised Statutes of the State of New Hampshire 161 (Concord, John F. Brown 1851). Note that "parade" in this context is an essential part of the muster, in which weapons are inspected and fines levied. See generally 5 Military Affairs American State Papers. Documents, Legislative and Executive, of the Congress of the United States, from the First Session of the Twenty-Second to the First Session of the Twenty-Fourth Congress, Inclusive: Commencing March 15, 1832, and Ending January 5, 1836 451-2 (Asbury Dickins & John W. Forney eds., Gales & Seaton 1860).

96    William J. Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America 1-51 (1996).

97    Statute of Northampton, 1328, 2 Edw. 3, c. 3 (Eng.), available at http://press-pubs.uchicago.edu/founders/print_documents/amendIIs1.html.

98    See Patrick J. Charles, The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review, 60 Clev. St. L. Rev. 1, 8 (2012); Darrell A. H. Miller, Guns as Smut: Defending the Home-Bound Second Amendment, 109 Colum. L. Rev. 1278, 1317 (2009).

99    Eugene Volokh, The First and Second Amendments, 109 Colum. L. Rev. Sidebar 97, 101 (2009).

100    See id.

101    Id. Hawkins clearly believed one might not travel with offensive weapons. Defensive use of weapons in the home was clearly protected, but it is not clear how far this right extended beyond the home for the ordinary person. Hawkins expressly noted that "persons of quality," a term that signified elite status and class rank, were not subject to arms restrictions in public. Thus, the right that Hawkins defined seems narrow, not expansive in scope. Id.

Compendium_Cornell
Page 0882

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12696   Page 340 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

102    4 William Blackstone, Commentaries *148-49 (1803).

103    St. George Tucker quotes both authors as good authority on the common law, but also notes that the common law had been modified in each of the American states. See 1 Tucker, Blackstone's Commentaries, supra note 89, at *409.

104    For a discussion of early American gun regulation, see Saul Cornell & Nathan DeDino, A Well-Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 491-505 (2004).

105    With the notable exception of laws addressing dueling, see An Act for the Punishing and Preventing of Duelling, 1719 Mass. Acts 135.

106    See generally Randolph Roth, American Homicide (2009).

107    See Cornell, A Well-Regulated Militia, supra note 18, at 137-50.

108    See infra notes 114-16 and accompanying text.

109    See infra notes 115-17 and accompanying text.

110    See id.

111    United States v. Masciandaro, 638 F.3d 458, 468 (4th Cir. 2011).

112    Eugene Volokh, The First and Second Amendments, supra note 99, at 102; see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1516-17, 1522-23 (2009) [hereinafter Volokh, Implementing]. To illustrate this view, Volokh quotes Willie Nelson's Pancho & Lefty. See id. at 1523 n.331 (quoting Willie Nelson, Pancho & Lefty (Sony Records 1990)). Vololkh acknowledges that "this is a modern source, of course, but one that also captures well the 1800s sentiments." Id. The song was actually written by Townes Van Zandt, who first recorded it on his 1972 album, The Late Great Townes Van Zandt. Without diminishing the artistry of Willie Nelson, or the song's actual author, Townes Van Zandt, I think it is fair to say that the source tells us more about historical myth, than reality. Volokh's inability to distinguish between myth and reality ought to raise additional concerns about his analysis. For a brilliant exploration of such myths, including the appropriation of some aspects of the Mexican revolutionary figure Pancho Villa's life by American artists and entertainers, see Richard Slotkin, Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America (1998). If the song in part draws inspiration from Pancho Villa, it would be evidence for a twentieth century mythology, not a mythology associated with the 1800s. For additional analysis of how Volokh's questionable forays into law office history led the Supreme Court astray in Heller, see Saul Cornell, Heller, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss," 56 UCLA L. Rev. 1095, 1111-12 (2009) and David Thomas Konig, The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms," 22 Law & Hist. Rev. 119, 154 n.96 (2004).

113    See infra notes 120-29 and accompanying text.

114    Bliss v. Commonwealth, 12 Ky. 90 (1822).

115    State v. Buzzard, 4 Ark. 18, 27 (1842).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12697   Page 341 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

116    For a discussion of the spectrum of antebellum jurisprudence and case law, see Saul Cornell & Justin Florence, The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?, 50 Santa Clara L. Rev. 1043, 1052-53 (2010). Compare Bliss, 12 Ky. 90 (declaring that Kentucky's concealed-weapons ban conflicted with the state constitution), superseded by state constitutional amendment, Ky. Const. of 1850 art. XIII, § 25, with Buzzard, 4 Ark. at 27 (upholding arms regulation statute against constitutional challenge). Volokh argues that in the aftermath of McDonald v. City of Chicago, 130 S. Ct. 3020 (2010), legal ideas and norms in the 1860s and 1870s are probative in evaluating contemporary gun regulations. See Volokh, Implementing, supra note 112, at 1524. For the opposing view, see Rostron, supra note 8.

117    For a good illustration of the problems of narrow doctrinalism, see generally Volokh, Implementing, supra note 112, and O'Shea, supra note 87, at 623-41.

118    The most important counterexamples from non-southern sources are a trio of Indiana cases: State v. Mitchell, 3 Blackf. 229 (Ind. 1833); Walls v. State, 7 Blackf. 572 (Ind. 1845); State v. Duzan, 6 Blackf. 31 (Ind. 1841). Of course, southern migration into Indiana may well account for these developments. As historian Nicole Etcheson observes, "forty-four percent of such Hoosiers, thirty-five percent of such Illinoisans, and nineteen percent of such Ohioans were reported born in the Upland South. Since the southerners were the first migrants into these states, these figures disguise an even larger southern presence because the children and grandchildren of southerners were counted as born in Ohio, Indiana, or Illinois." Nicole Etcheson, Manliness and the Political Culture of the Old Northwest, 1790-1860, 15 J. Early Rep. 59, 60 n.2 (1995).

119    I would like to thank Professor Al Brophy of the University of North Carolina School of Law for suggesting this line of inquiry to me.

120    See Roth, supra note 106. Urban areas also experienced a rise in the use of weapons. See Eric H. Monkkonen, Murder in New York City (2001); see also Joshua Stein, Privatizing Violence: A Transformation in the Jurisprudence of Assault, 30 Law & Hist. Rev. 423, 445 (2012) (noting that in the three decades between 1810 and 1840 assaults rose dramatically as did the likelihood that such assaults would involve a weapon).

121    See Roth, supra note 106.

122    On Southern violence, see Dickson D. Bruce, Jr., Violence and Culture in the Antebellum South (1979) and Bertram Wyatt-Brown, Southern Honor: Ethics and Behavior in the Old South (1982).

123    See generally Bruce, supra note 122.

124    Id.

125    Our Peculiar Domestic Institutions, reprinted in The American Anti-Slavery Almanac 25 (New York, Am. Anti-Slavery Soc'y 1840), available at http://digitalgallery.nypl.org/nypldigital/dgkeysearchdetail.cfm? imageID=413034.

126    See Volokh, Implementing, supra note 112.

127    On Wearing Concealed Arms, Daily Nat'l. Intelligencer, Sept. 9, 1820, at 2.

128    Nunn v. State, 1 Ga. 243, 243 (1846). For the pro-slavery beliefs of Judge Lumpkin, the author of the Nunn decision, see Mason W. Stephenson & D. Grier Stephenson, Jr., "To Protect and Defend": Joseph Henry Lumpkin, The Supreme Court of Georgia, and Slavery, 25 Emory L.J. 579, 582-86 (1976). For a discussion of how the antebellum tradition

Compendium_Cornell
Page 0884

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.12698 Page 342 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

was interpreted during the era of the Fourteenth Amendment, see Cornell & Florence, supra note 116, at 1066-69. For good examples of other antebellum models, see generally Aymette v. State, 21 Tenn. 154 (1840) and State v. Buzzard, 4 Ark. 18 (1842).

129     Hill v. State, 53 Ga. 472, 474 (1874) (rejecting the logic of Nunn, but assuming arguendo that the law in question was constitutional even if Nunn were correctly decided).

130     See, e.g., Wash. Rev. Code § 929 (1881) ("If any person shall carry upon his person any concealed weapon ... [he] shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined ... or imprisoned ... not more than thirty days ...."); 1883 Wis. Sess. Laws 713 ("To regulate or prohibit the carrying or wearing by any person under his clothes, or concealed about his person, of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon; and to provide for the confiscation or sale of such weapon.").

131     There are many examples of laws prohibiting offensively arming oneself. See 1849 Cal. Stat. 245 ("[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the County Jail not more than three months."); 19 Del. Laws 733 (1852) ("Any justice of the peace may also cause to be arrested ... all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous.").

132     See 1870 La. Acts 61 ("[I]t shall be unlawful for any person to carry any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor."); 1870 Tex. Gen. Laws 63 ("[I]f any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie knife, dirk or butcher knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same ...."); 1878 Va. Acts 37 ("If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars."); 1859 Wash. Sess. Laws 489 ("Every person who shall convey into any penitentiary, jail or house of correction, or house of reformation, any disguise, or any instrument, tool, weapon or other thing, adapted to or useful in aiding any prisoner there lawfully committed or detained, to make escape ... shall, on conviction thereof, be imprisoned ....").

133     1835 Mass. Acts 750.

134     See Peter Oxenbridge Thacher, Two Charges to the Grand Jury of the County of Suffolk for the Commonwealth of Massachusetts, at the Opening of Terms of the Municipal Court of the City of Boston, on Monday, December 5th, A.D. 1836 and on Monday, March 13th, A.D. 27-28 (1837). The section of the grand jury charge dealing with traveling armed was excerpted and reprinted in Judge Thacher's Charges, Christian Register & Boston Observer, June 10, 1837, at 91. For additional discussion of the Massachusetts model, see Elisha Hammond, A Practical Treatise; or an Abridgement of the Law Appertaining to the Office of Justice of the Peace; and Also Relating to the Practice in Justices' Courts, in Civil and Criminal Matters, with Appropriate Forms of Practice 184-86 (1841).

135     See sources cited supra note 130.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12699   Page 343 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

136    Judge Thacher's Charges, supra note 134, at 91.

137    See sources cited infra note 141.

138    See id.

139    See State v. Duke, 42 Tex. 455, 459 (1874).

140    Id. at 457.

141    See 19 Del. Laws 733 (1852); D.C. Code § 16 (1857) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person ...."); Me. Rev. Stat. tit. 12 § 16 (1840) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself ...."); Wis. Stat. § 16 (1857) ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person ...."); John Purdon, A Digest of the Laws of Pennsylvania, From the Year One Thousand Seven Hundred to the Twenty-First Day of May, One Thousand Eight Hundred and Sixty-One 250 (8th ed., 1862) ("If any person, not being an officer on duty in the military or naval service of the state or of the United States, shall go armed with a dirk, dagger, sword or pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury or violence ...."); The Statutes of Oregon, Enacted, and Continued in Force, by the Legislative Assembly 243 (1855); George B. Young, The General Statutes of the State of Minnesota, as Amended by Subsequent Legislation, With Which are Incorporated All General Laws of the State in Force At the Close of the Legislative Session of 1878 629 (St. Paul, 1879) ("Whoever goes armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapons, without reasonable cause to fear an assault or other injury or violence to his person ...."). For a discussion of these laws in the context of the Statute of Northampton, see Charles, supra note 98.

142    See, e.g., Duke, 42 Tex. 455.

143    These statutes clearly use common law approaches to remedy the evil the legislature perceived. These laws banned a dangerous practice, but acknowledged an exception by allowing individuals to arm themselves in cases where there was a reasonable fear of imminent danger. The enforcement mechanism also relies on a common law model: surety of peace. In an age before modern police forces, when most American lived in smaller rural communities, and there was no modern regulatory or administrative state, adopting this common law approach would have seemed quite natural to legislatures, constables, and judges. This fact was reflected in guidebooks written for justices of the peace and constables. See, e.g., Hammond, supra note 134; see also Novak, supra note 96, at 235-48 (generally discussing the common law's conception of regulation and enforcement); Allen Steinberg, The Transformation of Criminal Justice: Philadelphia, 1800-1880 (1989) (demonstrating that peace bonds were an essential means of criminal justice enforcement in the era before professional police forces and the rise of the modern administrative state).

144    See McDonald v. City of Chicago, 130 S. Ct. 3020 (2010).

145    On methodological and interpretive issues relevant to original intent originalism, see Interpreting the Constitution: The Debate Over Original Intent (Jack N. Rakove ed., 1990) and Daniel A. Farber, The Originalism Debate: A Guide for the Perplexed, 49 Ohio St. L.J. 1085 (1989). On New Originalism, see Randy E. Barnett, An Originalism For Nonoriginalists, 45 Loy. L. Rev. 611, 620 (1999); Gary Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 398 (2002); and Keith E. Whittington, The New Originalism, 2 Geo. J.L. & Pub. Pol'y 599 (2004). Another variant of this theory, semantic originalism, focuses on linguistic meaning, sometimes described as sentence meaning, timeless meaning, or semantic meaning. See, e.g., Lawrence B. Solum, District of Columbia v. Heller and Originalism, 103 Nw. U. L. Rev. 923 (2009). Finally, a less popular alternative suggests using the Founders interpretive methods. See John

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12700   Page 344 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

O. McGinnis & Michael Rappaport, Original Interpretive Principles as the Core of Originalism, 24 Const. Comment. 371, 374 (2007). Recent critiques of New Originalism include Mitchell N. Berman, Originalism Is Bunk, 84 N.Y.U. L. Rev. 1 (2009); Richard H. Fallon, Jr., Are Originalist Constitutional Theories Principled, or Are They Rationalizations for Conservatism?, 34 Harv. J.L. & Pub. Pol'y 5 (2011); and Stephen M. Griffin, Rebooting Originalism, 2008 U. Ill. L. Rev. 1185 (2008).

146     See Carole Emberton, The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South, 17 Stan. L. & Pol'y Rev. 615 (2006). While gun rights advocates have attempted to portray Reconstruction-era Republicans as radical gun rights advocates, the historical reality is far more complex. Abolitionists were divided over the legitimacy of armed self-defense. Antebellum abolitionism existed along a spectrum that ran from John Brown's insurrectionary theory to Quaker pacifism. Reconstruction-era Republicans were also heirs to the antebellum Whig ideal of the well-regulated state. See also Cornell & Florence, supra note 116, at 1060 (discussing evidence of Reconstruction-era support for racially neutral gun regulations intended to promote public safety).

147     See Winkler, supra note 2, at 165.

148     Slotkin, supra note 112. On restrictions in the "wild west," see Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876) and 1876 Wyo. Comp. Laws 52, § 1 (prohibiting anyone from "bear[ing] upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village.").

149     Volokh, supra note 99. Judge Niemeyer and Judge Legg in the Fourth Circuit may have erred in putting too much faith in Volokh's version of the past. See United States v. Masciandaro, 638 F.3d 458, 468 (4th Cir. 2011) (Niemeyer, J., concurring); Woollard v. Sheridan, No. L-10-2068, 2012 U.S. Dist. LEXIS 28498, at *16-17 (D. Md. Mar. 2, 2012).

150     John Forrest Dillon, The Right to Keep and Bear Arms for Public and Private Defense, 1 Cent. L.J. 259 (1874).

151     See generally Joel Prentiss Bishop, Commentaries on the Criminal Law (7th ed. 1882).

152     See id.; see also Dillon, supra note 149.

153     Andrews v. State, 50 Tenn. 165, 188 (1871).

154     Dillon, supra note 149, at 286.

155     See id.; see also Or. Rev. Stat. § 16.17 (1855).

156     See Dillon, supra note 149, at 286.

157     See Dillon, supra note 149, at 296; see also Bishop, supra note 150.

158     For a discussion of the problems with courts ignoring professional historians in favor of advocacy scholarship, see Cass R. Sunstein, Second Amendment Minimalism: Heller as Griswold, 122 Harv. L. Rev. 246, 272-73 (2008) and Richard A. Posner, In Defense of Looseness: The Supreme Court and Gun Control, The New Republic, Aug. 27, 2008, at 38-40.

159     See Nunn v. State, 1 Ga. 243 (1846).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12701   Page 345 of 733

THE RIGHT TO CARRY FIREARMS OUTSIDE OF THE..., 39 Fordham Urb. L.J....

160     See Woollard v. Sheridan, No. L-10-2068, 2012 U.S. Dist. Lexis 28498 (D. Md. Mar. 2, 2012) (targeting a law derivative of the Massachusetts model); see also Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii) (West 2011) ("[T] he Secretary shall issue a permit within a reasonable time to a person who the Secretary finds ... has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.").

39 FDMULJ 1695

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 0888

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12702   Page 346 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

80 Law & Contemp. Probs. 11

Law and Contemporary Problems
2017

The Second Generation of Second Amendment Law and Policy

Eric M. Ruben and Darrell A. H. Miller

Special Editors
Saul Cornell [a1]

Copyright © 2017 by Saul Cornell

# THE RIGHT TO KEEP AND CARRY ARMS IN ANGLO-AMERICAN LAW: PRESERVING LIBERTY AND KEEPING THE PEACE

## I INTRODUCTION

On the final day of its 2008 term, a sharply divided United States Supreme Court issued a five to four decision in *District of Columbia v. Heller*.[1] Reversing almost seventy years of settled precedent that linked the meaning of the "right of the people to keep and bear arms" with the preservation of a "well-regulated militia,"[2] *Heller* interpreted the Second Amendment as an individual right to possess a weapon for self-defense outside of the context of service in a well-regulated militia.[3] Justice Scalia's majority opinion surveyed a broad range of historical materials,[4] but it approached the past as if it were static, when in fact Anglo-American history in this period was not only dynamic, but many areas of law underwent profound transformation.[5] Prior to *Heller*, there had been relatively little scholarship on the scope of this pre-existing right. Most of the **\*12** legal scholarship on the Second Amendment prior to *Heller* simply ignored the problem of historical change entirely.[6] Yet, during the interval between 1688 and the next century and a half, Anglo-American law underwent profound transformation, which had far reaching consequences for law, including the meaning of the right to keep and bear arms.[7] Recognizing the importance of change over time, the essence of any truly historical account, is not simply important to correct the historical record, *Heller's* holding makes history central to the future of Second Amendment jurisprudence. "Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment," the majority wrote "nothing in our opinion should be taken to cast doubt on longstanding prohibitions."[8] Thus, according to *Heller*, establishing a legitimate historical pedigree for gun regulation has become one key to determining if a restriction is presumptively lawful under *Heller's* framework. This article analyzes a neglected area of Second Amendment scholarship: the role of common law restrictions on the scope of keeping and bearing arms in the period between the Glorious Revolution (1688) and the Early American Republic (1800-1835).

## II *HELLER'S* HISTORICAL PARADOX

Although *Heller* posited a static pre-existing English right that had become fixed by the time of the Glorious Revolution, the half century following the Glorious Revolution witnessed a number of important changes in the way the law addressed arms. At the dawn of the eighteenth century the scope of the right to have arms and the meaning of self-defense under English law was quite narrow. Indeed, it would be more accurate to describe the right of self-defense as an exemption from prosecution, not a positive rights claim in the modern sense.[9] The English Declaration of Rights affirmed the right of Protestants to have arms suitable to their condition, as the law allowed, but it did not sanction the use of deadly force in most circumstances and did not even imply a right to own a gun in most situations.[10] What the law did do was acknowledge that one could not be prosecuted for homicide in self-defense. To effectuate this claim, one might use whatever weapons one was legally entitled to possess. The right to keep and use arms was limited by class and religion and subject to extensive Parliamentary **\*13** regulation. Over the course of the next half century, English courts used common law methods of legal interpretation and expanded the scope of

Compendium_Cornell
Page 0889

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12703   Page 347 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

this right, eventually recognizing that ownership of a gun in the home for reasons of self-defense was legal. Although *Heller* mistakenly attributed this legal proposition to the English Declaration of Rights of 1688, [11] the right of self-defense had evolved under common law in the half century following the Glorious Revolution.

The scope of the right to carry arms in public, by contrast, remained narrowly defined and limited to a range of specific situations defined by common law and statute. In particular, the right to travel armed for reasons of self-defense was always balanced against the need to preserve the King's Peace. The preservation of the peace trumped the right to have arms in most circumstances. [12]

The American Revolution may have republicanized this legal tradition, but it did not break with it immediately in a number of key areas. Even after the adoption of new state constitutions, some of which affirmed the right to keep and bear arms, the scope of the right was still shaped by the common law tradition, including the necessity of preserving the peace. In the decades after the American Revolution, what had been a single English common law tradition splintered, producing different regional regulatory regimes. By the middle of the antebellum era in parts of the slave South a permissive regime regarding the open carry of arms gained traction. In other parts of the South, civic republican ideas continued to constrain the scope of the right. Finally, starting in New England and spreading across the nation a more restrictive view of public carry evolved.

The primary bodies of sources consulted for this study are the popular legal guidebooks written for justices of the peace that proliferated in the 150 years following the Glorious Revolution. [13] These texts provide some of the best accounts of popular understandings of Anglo-American legal principles in this period. [14] Written for justices of the peace, constables, and coroners, these guides were addressed to an audience with no formal legal training. [15] Their authors summarized the common understanding of the law and often included boilerplate examples of common legal writs and other useful documents. [16] In many parts of the Anglo-American world, including rural England and the settler societies of the Atlantic world, there were relatively few persons formally trained in the law, so it is hardly surprising that this genre of legal texts became extremely popular. [17] **14** The popularity of these texts also reflects the important role that justices of the peace played in keeping the peace in Anglo-American communities on both sides of the Atlantic. Many of these texts went through multiple editions over the course of the next century and a half, making them an excellent source for tracking the changing meaning of legal concepts over time. [18] The proliferation of these books did not cease after the American Revolution. Indeed, the need for them multiplied because each state in the new American Republic had to grapple with its own unique relationship to the evolution of the common law. By the middle of the antebellum era, the common English legal heritage had become differentiated into distinctive regional legal cultures. [19] Although popular legal guidebooks have occasionally been cited in recent Second Amendment scholarship, the use of these texts has been highly selective and impressionistic. [20] Looking at these sources in a more systematic fashion reveals a process of change far more complex than previous accounts have suggested. [21]

An understanding of the evolving nature of the right to keep and carry arms is not only essential to implementing *Heller*'s historical framework, but it may also offer insight into how to resolve some of the contradictions and jurisprudential problems created by the opinion. [22] In his dissent, Justice Breyer suggested a balancing model that Justice Scalia dismissed as incompatible with the original understanding of the right to keep and bear arms. But it turns out that Breyer and Scalia's divergent approaches may not have been legally incompatible in the Founding era. [23] Something analogous to a balancing exercise was fundamental to the way Anglo-American law dealt with arms throughout this period. [24] The liberty interest associated with the right to arms was always balanced against the concept of the peace. [25] If an individual's exercise of this right threatened the peace, individuals could be disarmed, imprisoned, and forced to provide a peace bond. [26] The American Revolution republicanized the concept of the King's Peace by transmuting it into the people's peace, but the Revolution **15** did not repudiate the centrality of the balancing process used to determine if armed travel violated the peace. [27]

### III ARMS SUITABLE TO THEIR CONDITION AND AS ALLOWED BY LAW

The English Declaration of Rights (1688) affirmed: "[t]hat the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." [28] Although Blackstone described this as the fifth auxiliary right, a protection of English liberty, his discussion underscores the limited nature of this claim, which he described as "a public allowance,

Compendium_Cornell
Page 0890

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12704   Page 348 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." [29] Blackstone's elaboration of the right makes it clear that its inclusion in the Declaration of Rights did not limit Parliament's authority over arms in any way. [30] In fact, the formulation of the right reasserted Parliament's plenary power to legislate on matters pertaining to arms and, when necessary, restrict this right in a manner consistent with its nearly unlimited powers to protect the peace and promote public safety. [31] Perhaps the best illustration of how the scope of this right was understood in the period immediately after the Glorious Revolution is Parliament's debate over a revision to the Game Laws in 1692. The game laws, which regulated hunting, had imposed stiff penalties on the possession of guns for those who failed to meet the property requirements imposed by the acts. The House of Commons considered and rejected by a two to one majority a rider to the act that would have allowed "any Protestant to keep a Musquet in his House, notwithstanding this or any other act." [32] The reaction of the House of Lords was no less negative, it quashed the idea as too radical because it tended to "arm the mob." [33]

**\*16**  The game laws not only limited who might keep arms, they also placed limits on who could travel armed and in what manner. [34] As the game laws make clear, the pre-existing English Right embodied in the Declaration of Rights did not encompass a claim to possess guns if one failed to meet the property requirements imposed by the game acts. [35] Instead, the Declaration of Rights assumed that the scope of the right of self-defense was extremely narrow, amounting to little more than an exemption from prosecution should one need to defend oneself against a deadly assault. [36] Thus, one might use any weapon legally possessed but not demand any particular weapon to exercise this right. [37]

One of the most prolific popularizers of the law in the period after the Glorious Revolution was Giles Jacob, who authored a popular legal dictionary and several general guides to the law. [38] Jacob helped expand popular legal writing as a genre. He summarized the general rule for self-defense concisely: "there must be an unavoidable Necessity for Self-preservation to making killing justifiable." [39] Individuals were obliged to retreat, not stand their ground. [40] William Blackstone endorsed this view later in the century, when he wrote:

> [T]his right of preventive defence, but in sudden and violent cases; when certain and immediate suffering would be the consequence of waiting for the assistance of the law. Wherefore, to excuse homicide by the plea of self-defence, it must appear that the slayer had no other possible means of escaping from his assailant. [41]

William Hawkins, another influential English legal commentator in the first half of the eighteenth-century, underscored the way in which the exercise of this right was exceedingly sensitive to the time and place in which an assault occurred.  **\*17**  In his influential treatise, *Pleas to the Crown*, he wrote:

> [I]n all these Cases, there ought to be a Distinction between an Assault in the Highway and an Assault in a Town; for in the first Case it is said, That the Person assaulted may justify killing the other without giving back at all: But that in the second Case, he ought to retreat as far as he can without apparently hazarding his Life, in respect of the Probability of getting Assistance. [42]

Modern rights claims are typically not context dependent, even if they may be subject to reasonable time, place, and manner restrictions. [43] Self-defense under English common law was almost the opposite of a modern rights claim. The right could only be claimed under specific circumstances that were determined by the time, place, and manner of the threat. [44] The burden of proof was on the subject, not the crown, to show that deadly force had been justified because retreat and the opportunity to seek assistance were impossible. Violent confrontation did not justify the use of deadly force. Subjects were required to retreat rather than stand their ground in most circumstances [45]

A different set of rules applied to confrontations in the home where there was no duty to retreat. It was a well-established maxim under common law that there was no duty to retreat from an attack in the home. [46] Yet, even this cherished principle of common

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12705   Page 349 of
733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

law, the castle doctrine, was bounded and context sensitive. Deadly force was not justified in every case of trespass; a mere trespass at night might justify deadly force while a similar act in the day would not. [47]

One of the most important changes in English law regarding self-defense was a slow and gradual recognition that keeping a gun in the home enjoyed some measure of legal protection. [48] At the end of the seventeenth century there was no right to own firearms under English law. The English Declaration of Rights acknowledged that access to firearms could be limited by class and religion. The various game acts specified with great precision the amount of property required to make owning a firearm legal. Gradually, over the course of the eighteenth century, English courts began reinterpreting the game laws using common law methods of interpretation, eventually concluding that that the mere presence of **\*18** a gun in a home was no longer per se evidence of an attempt to illegally take game. [49] Further, courts finally acknowledged that there might be other legitimate and legal uses for guns, most notably pest control and home defense. [50] Although English courts articulated this legal doctrine by the end of the 1730s, this new, more robust understanding of the law took some time to permeate English legal culture. Popular guides to the law did not start to reflect the new understanding until the 1750s. [51]

### IV NO MAN, GREAT OR SMALL, SHALL GO OR RIDE ARMED: THE STATUTE OF NORTHAMPTON

One of the most significant constraints on armed travel was the Statute of Northampton (1328) enacted during the reign of Edward III. The act declared that all individuals, regardless of their station, were bound to "bring no force in affray of the peace, nor to go nor ride armed by night nor by day." [52] The statute also provided a means of enforcement. Agents of the King could arrest violators who would be obliged "to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The language of the Statute of Northampton was often included, or paraphrased in the texts of the various Royal Peace Commissions issued by Edward III enjoining localities to keep the peace of the realm. In 1361 Parliament created the office of justice of the peace, and endowed it with broad powers to enforce law and order. [53]

The legal authority to enforce the Statute of Northampton became one of the many powers associated with the office of the justice of the peace. Writing over two hundred years after the office of the justice of the peace was created, the influential Elizabethan lawyer William Lambarde underscored this point in his popular legal text *Eirenarcha*. Lambarde's gloss on the Statute of Northampton was also copied nearly verbatim into another legal text he authored, *The Duties of Constables*: "[I]f any person whatsoever shall be so bold, as to go, or ride armed, by night, or by day, in Faires, Markets, or any other places: then any Constable, or any other of the saide Officers, may take such Armour from him, **\*19** for the Queenes use, & may also commit him to the Gaole." [54] The text of the Statute of Northampton and glosses on its main provisions were frequently reprinted in both elite and popular legal guides over the next century. [55] Another measure of its pervasiveness may be found in the writings of Whig theorist James Tyrell, who cited it in his influential defense of the Glorious Revolution *Bibliotheca Politica*. [56] A conservative Whig, Tyrell sought to defend the Glorious Revolution, but also aimed to blunt the most radical and potentially destabilizing arguments about the right of revolution being bandied about in public debate. [57] Although Tyrell conceded that there was a limited right "to take up Arms" in response to "illegal Violence," he was emphatic that this did not sanction traveling armed under normal circumstances. [58] To substantiate this claim, Tyrell cited the Statute of Northampton, reading it as imposing a broad general prohibition on armed travel. Thus, Tyrell wrote it was a crime "so much as to ride or go arm'd as may appear in the Statute of *Northampton*." [59]

The City of London enacted its own local ordinance limiting armed travel that drew on the language of the Statute of Northampton. London's prohibition was equally sweeping: "no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms by day or night." [60] A decade after the adoption of the English Declaration, the force of this restriction was evidenced by a complaint published in a London paper that reported "that several Persons not Qualified by the Laws of this Realm, to carry Arms, have nevertheless in contempt and Violation of the Law, taken on them to Ride and Go Armed." [61]

Legal commentators, both in popular justice of the peace manuals and learned treatises, treated the Statute of Northampton as a foundational principle for enforcing the peace. [62] Writing at the close of the eighteenth century, the **\*20** author of *The Grammar of English Law*, echoed this account by confidently asserting that "no man, great or small, shall go or ride armed, by night or by day, with dangerous or unusual weapons, terrifying the good people of the land." [63] J.P. Gent's *A New Guide for*

Compendium_Cornell
Page 0892

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12706   Page 350 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

*Constables* (1705) averred that the Statute of Northampton prohibited riding or going "armed offensively" before the "King's Justices" or in "Fairs or Markets." [64] Additionally, Joseph Keble, author of another popular guide to the law, warned that if anyone was so "bold as to go or ride Armed, by night or day, in Fairs, Markets, or any other places," constables could disarm him and "commit him to the Goal." [65]

Another formulation of the prohibition on armed travel described it in terms of traveling with "offensive arms," a category that encompassed but was not restricted to firearms. Although a firearm was always an offensive weapon under English law, other items in certain circumstances could fit this legal definition. [66] The infamous Black Act (1723), which punished poachers, and several of the acts passed against smuggling in the eighteenth-century referred to "firearms and other offensive weapons." [67] *The Complete Dictionary of Arts and Sciences* (1764) defined firearms as the quintessential offensive weapons in the eyes of the law: "GUN, fire-arm, a weapon of offense ...." [68] Defensive weapons were understood in traditional terms, such as shields and armor. [69] Under English law, a gun was always an offensive weapon. [70]

Another common formulation of the prohibition on armed travel described the crime in terms of traveling with "dangerous or unusual weapons." [71] Hawkins, in his influential *Pleas to the Crown*, chose a slightly different way to describe the same principle. He noted that the prohibition extended to arming with "dangerous and unusual weapons." [72] All of these legal formulations aimed to **\*21** achieve the same goal: limit armed travel in public, particularly in populous areas. [73]

Concealable weapons posed a different set of problems from the Statute of Northampton as this Elizabethan era statute makes clear:

> Actes of Parliament remaining of force, which included the tenets of the Statute of Northampton to prohibit the carrying of Dagges, Pistolles, and such like, not only in Cities and Townes, [but] in all partes of the Realme in common high[ways], whereby her Majesties good qu[i]et people, desirous to live in peaceable manner, are in feare and danger of their lives. [74]

Given that concealable weapons were culturally associated with furtive motives, it was only natural that English law categorically prohibited travel with them. Joseph Keble, author of the influential 1689 Justice of the Peace Manual, reiterated this prohibition on "Dag[ge]s and Pistols," instructing peace officers to arrest any who traveled armed with these types of weapons. [75] Localities, most notably the city of London, enacted their own specific bans on traveling armed with concealed weapons. London law prohibited traveling "by Night or by Day" with a "Hand-Gun, having therewith Powder and Match." [76]

### V EXEMPTIONS TO THE STATUTE OF NORTHAMPTON'S PROHIBITION ON ARMED TRAVEL

The Statute of Northampton had three distinctive components: the common law crime of affray, a ban on coming armed before the King's representatives, and a prohibition on armed travel in populous areas. [77] Determining if one's actions constituted an affray was context dependent. The ban on appearing armed before the King's representatives and armed travel in populous areas were categorical prohibitions. A number of interpretive canons were also associated **\*22** with the Statute of Northampton and these were frequently included in popular legal guides and learned commentaries. [78]

Charles James, author of *A New and Enlarged Military Dictionary*, summarized the common law crime of affray as follows: "By the common law, it is an offence for persons to go or ride armed with dangerous weapons." [79] Sir Edward Coke's formulation of this crime was widely copied by the compilers of popular legal guidebooks in the eighteenth century. [80] "*Effrayer*, which signifieth to terrifie, or bring fear; and which the Law understandeth to be a common wrong." [81] As with most crimes in this period of English history, proof of actual intent to do harm was not required. Instead, the intent could be inferred from the illegal act itself. [82] In the 1689 edition of his Justice of the Peace manual, Joseph Keble offered a lucid account of why armed travel violated the King's peace irrespective of any specific malicious intent:

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12707   Page 351 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Yet may an Affray be, without word or blow given; as if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed as he is; and therefore both the Statutes of Northampton made against wearing Armour, do speak of it .... [83]

Another Justice of the Peace manual written in 1769 echoed Keble's view that the mere act of arming oneself created an asymmetry of power between the individual armed and those unarmed, a situation that caused terror to the people. [84]  Like previous commentators on the Statute of Northampton, the author noted that the act of riding armed was the crime that created a terror to the people, not a specific intent to terrorize. [85]

 **\*23**  All of the English legal guides enumerated a clear list of exemptions from the general prohibition on traveling armed imposed by the Statute of Northampton. [86]  It would hardly have been necessary for legal guidebooks to set out such a list if there had been a broad general right to travel armed in public. Among the most important exceptions were cases in which subjects assisted in the lawful suppression of violence, crime, riot, or revolt. [87]  Hawkins' *Pleas to the Crown* made it clear that, arming to "suppress rioters, rebels, and enemies" or assist officers of the crown, was not subject to the restrictions imposed by the Statute of Northampton. [88]  Indeed, in this situation arming oneself was as much a civic obligation as it was a right. During the 1780 Gordon Riots in London, the Recorder of London, the city's chief lawyer, described this hybrid right-obligation in forceful terms:

It seems, indeed, to be considered, by the ancient laws of this kingdom, not only a right, but as a duty; for all the subjects of the realm, who are able to bear arms, are bound to be ready, at all times, to assist the sheriff, and other civil magistrates, in the execution of the laws and the preservation of the public peace. [89]

The duty to assist agents of the Crown did not by itself justify owning a gun. [90]  The obligation merely meant one had to assist with whatever weapons one was legally entitled to possess. [91]  Although in extraordinary circumstances individuals might respond on their own to deal with one of these violations of the King's peace, contemporary guidebooks underscored the fact that it was always better to await a summons by representative of the law before unilaterally arming oneself and traveling to provide assistance to restore the King's peace. [92]  If there had been a broad and well-recognized right to travel armed in public, the advice  **\*24**  proffered by this guidebook would have made little sense. As one legal text put it: "the safest Way is to be armed in Assistance of the King's Officers or Ministers of Justice." [93]

English law expressly forbid arming oneself in response to a specific impending threat. [94]  There was broad agreement on this rule. "A Man cannot excuse the wearing of such Armour in Publick, by alleging that such a one threatened him, and that he wears it for the Safety of his Person from Assault." [95]  The appropriate legal response was not to arm oneself. Instead one was required to ensure that a representative of the law, typically a justice of the peace, enforce the peace.

Timothy Dalton's discussion of this important common law method of enforcing the peace, *Surety of the Peace*, explained how representatives of the King's peace and ordinary citizens might seek out a peace bond to prevent or punish individuals who might violate the Statute of Northampton:

All such as shall go or ride armed (offensively) in Fairs, Markets, or elsewhere; or shall wear or carry any guns, dags or pistols charged ... any Constable, seeing this, may arrest them, and may carry them before the Justice of the Peace, and the Justice may bind them to the peace .... [96]

Further, Dalton echoed the view that one might not justify arming oneself because one had been threatened. "[Y]ea, though those Persons were so armed or weaponed for their defense upon any private quarrel," did not excuse arming oneself which "striketh a fear and terror into the King's subjects." [97]  Rather than encourage individuals to arm themselves in response to such

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12708   Page 352 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

threats, English law required individuals to seek out a magistrate, justice of the peace, or constable and have the aggressor disarmed and placed under a peace bond. If one had reason to fear violence, the correct response was to seek out a representative of the King's justice. [98]

## VI ARMED TRAVEL AS A REBUKE TO THE KING'S PEACE AND MAJESTY

It is also important to recognize that affray was a crime against the King's peace. Justices of the peace, constables, and sheriffs, had broad discretion and latitude to arrest, disarm, or require a peace bond for those who threatened the King's peace. Indeed, any individual within a community might approach a justice of the peace with evidence that a particular person posed a threat to public safety and impose a peace bond or even have the person disarmed and jailed. [99] Dalton's *Country Justice* confidently asserted that any who "shall go or ride  **\*25**  armed offensively" were "accounted to be an Affray," and causing a "Fear of the People" created a "breach of the peace." [100]

The paradigmatic exception to this general rule is itself instructive. Aristocrats enjoyed a class-based privilege to travel armed or travel with armed retainers in certain circumstances. Thus, there was a broad consensus that members of the aristocracy did not violate the provision of the statute when they armed themselves because such actions were not viewed as likely to provoke a terror. [101] Theodore Barlow, another author of a popular legal guide, described this class-based privilege in lucid terms. "Wearing Arms, if not accompanied with Circumstances of Terror, is not within this Statute; therefore People of Rank and Distinction do not offend by wearing common Weapons." [102] Timothy Cunningham, author of several legal texts including a legal dictionary, echoed this account by commenting that men of "quality or fashion," and their "attendants" were not subject to the general restrictions on armed travel. [103]

The fact that some members of the elite classes enjoyed a limited exemption from prosecution for affray for mere possession of arms in public underscores the limited scope of this right. Noting the existence of such an exemption only made sense in the context of the broad prohibition on traveling armed in public. The right of English aristocrats to arms does not support the notion that there was a broad right of peaceable armed travel. Under English law, there was no general right to travel armed. [104]

The notion that a broad right to peaceable armed travel existed in early modern England would have been legally incoherent given concepts such as the King's peace and the King's majesty. "The common law," Blackstone observed, "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society." [105] Under English law "all offenses are either against the King's Peace or his crown and dignity." [106] In addition, any "affront to that power, and breaches of those rights, are immediate  **\*26**  offenses against him." [107] Merely traveling with arms impugned the majesty of the crown and implied that the King and his representatives were incapable of keeping the peace. [108] Thus, to arm oneself, apart from the specific exemptions or the context-dependent exceptions recognized by the common law, was by its very nature a rebuke of the King's peace and majesty. [109]

*Sir John Knight's Case* illustrates the way the Statute of Northampton should be set against a web of larger English principles, including the concept of the King's Peace. [110] Gun rights scholars have consistently misread the case, arguing that it helped establish a right of peaceable open carry. In fact, the case stood for the opposite principle. It revealed that even aristocrats, the one group expressly exempted from the Statute of Northampton, were not completely immune from prosecution for traveling with arms. [111]

The case can only properly be understood within the historical context of the tense period between the Exclusion Crisis and the Glorious Revolution: a time when partisan and religious struggles divided the English nation. [112] Rumors of conspiracies circulated widely. [113] Issues of religious tolerance, the problem of monarchical succession, and the continuing battle between Parliament and the King were among the most important political and legal issues dividing England. [114] The key figure in the case, Sir John Knight, was a militant Protestant, who opposed tolerance for Catholics and Dissenters. He was charged with violating the Statute of Northampton by walking armed about the streets of Bristol. [115] Sir John burst into a Catholic religious service to arrest a priest. These actions prompted his own arrest, and he was charged with affray and violating the Statute of Northampton. The jury, composed of other militant Protestants drawn from Knight's community, was sympathetic to his anti-

Compendium_Cornell
Page 0895

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12709   Page 353 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Catholicism and acquitted him. [116] Although Knight escaped punishment thanks to a sympathetic jury, the government still imposed a peace bond on him as a surety of good behavior in the future. [117] Thus, Knight was still punished for his actions.

*27  Far from proving that a permissive attitude towards firearms had emerged by the end of the seventeenth century, the case shows that even members of the aristocracy, the one group expressly exempted from the prohibition on armed travel, were not entirely free to exercise this right in public with impunity. Further, the case gives no indication that the English Courts had abandoned the principles embedded in the Statute of Northampton or that it had fallen into desuetude. It was the jury, not the judges, who reached the verdict in this highly politicized setting. Finally, rather than demonstrate that the Statute of Northampton had ceased to have any meaning under English law, the judges and subsequent legal commentators on *Sir John Knight's Case* offered a very different gloss on the meaning of the case. The case reporter itself reminded readers that the common law offense of affray was not simply a crime against a specific individual or even the local community but a crime against the public and hence a direct challenge to the legal authority of the King. [118] The private act of arming oneself was an inherent affront to the King because it implied that the "King w[as] not able or willing to protect his subjects." [119]

### VII COLONIAL TEXTS, THE ENGLISH LEGACY, AND THE AMERICANIZATION OF THE COMMON LAW

Popular legal guidebooks published in the colonies repeated the standard interpretations of the Statute of Northampton that had appeared in English legal texts. George Webb's *Virginian Justice of Peace* (1736) was the first text published in Virginia. [120] Four decades later another popular guide appeared in North Carolina and it framed these issues in language drawn directly from English authority: "Justices of the Peace, upon their own View, or upon Complaint, may apprehend any Person who shall go or ride armed with unusual and offensive weapons, in an Affray, or among any great Concourse of People. ..." [121] Both texts recognized the continuing relevance of earlier categorical prohibitions, such as not coming armed before the King's representatives. These new American texts generally tracked earlier English texts closely in most regards. The legal consequences of slavery figured in these texts to different degrees, but the general framework applied to armed travel in public remained largely, but not entirely, consistent with earlier English law in this area. [122] One of ***28** the most pronounced differences between colonial law and English law was the expansion of the number of situations in which individuals were required to carry arms to enforce the peace. Under the common law, subjects could be required to assist agents of the crown in preserving the peace. [123] The raising of the "hue and cry" was one of the most important examples of an exception to the prohibition on armed travel. [124] Constables and other representatives of the King's justice were empowered to raise the hue and cry and enlist subjects to apprehend felons. Once the hue and cry was raised, individuals were allowed to arm themselves with whatever weapons they were legally entitled to possess. [125]

In some colonies, most notably southern colonies, those eligible to bear arms might also be required to travel armed on occasions not related to musters, such as going to church. [126] These laws were another adaptation to the realities of colonial life, especially the ongoing hostile relationship with Native Americans and the omnipresent danger of slave uprisings in the South. Relations between Virginians and their Indian neighbors were exceedingly tense in 1619. This helps account for Virginia's passage of a law expanding the scope of normal militia duties and requiring colonists liable to bear arms [127] to travel armed to church. [128]

> ALL men that are fitting to beare armes, shall bringe their peices to the church upon payne for every effence, if the default be in the master, to pay 2*l*b. of tobacco, to be disposed by the church-wardens, who shall levy it by distresse, and the servants shall be punished commander. [129]

When read in context, the law demonstrates the extraordinary power early colonial governments exercised over inhabitants. Further, it does not vindicate a strong liberty interest that might be claimed against government authority. A similar act was passed by the Georgia legislature in 1770, that required "every white male inhabitant of this province ... who is or shall be liable to bear arms in the militia" to bring arms to church. [130] The preamble of the Statute made clear that the purpose of the law was to promote the "necessary ... security and defense of this province from internal dangers and insurrections ...." [131]

Compendium_Cornell
Page 0896

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12710   Page 354 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

The militia played a far more significant role in the colonies than it did in England. It served as a first line of defense against external and internal threats **\*29** and was one of the most important local institutions in many communities. [132] Most colonies, with Quaker Pennsylvania being a notable exception, typically required adult white men between the ages of sixteen and forty-five, who were not infirm or exempt because of their occupation, to equip themselves with a musket or rifle and participate in the militia. [133] The notion that the militia was literally the people was a potent rhetorical form, but largely a fiction. Although a substantial portion of the adult free male population was required to participate in the militia, equating the militia with the people is a mistake. [134]

One of the clearest expositions of the way the constitutional ideal of the militia had been transformed by the colonial experience occurs in a remarkable series of essays published by Samuel Adams in the midst of the worsening relations with Britain prior to the American Revolution. Adams defended the Boston Town meeting's decision to call on residents to arms themselves, invoking English and local legal authority.

> For it is certainly beyond human art and sophistry to prove that British subjects, to whom the privilege of possessing arms is expressly recognized by the Bill of Rights, and, who live in a province where the law requires them to be equip'd with arms, &c. are guilty of an illegal act, in calling upon one another to be provided with them, as the law directs. [135]

> How little do those persons attend to the rights of the constitution, if they know anything about them, who find fault with a late vote of this town, calling upon the inhabitants to provide themselves with arms for their defence at any time; but more especially, when they had reason to fear, there would be a necessity of the means of self preservation against the violence of oppression.--Every one knows that the exercise of the military power is forever dangerous to civil rights .... [136]

Adams did not rest his claim entirely on British sources alone, but also invoked American law, specifically the militia law of the colony. The right Adams described does not easily fit into the simple dichotomies that have defined Second Amendment debate in the modern era. The right was one exercised by individuals, but it was one effectuated by the Boston town meeting acting collectively under legal authority it possessed. Individuals did not act on their own accord, but acted in concert for a collective public purpose--the protection of constitutional liberty. Nor was the right claimed by Adams and other colonists a pure expression of natural rights. Boston had not entered the state of nature. The appeal was to law, not to extra-legal authority. This particular right was an expression of ordered liberty and only made sense within the context of the rule of law. Bostonians were not simply asserting a common law right of self-defense. The right they claimed was distinctly American, it fused together **\*30** several different traditional English rights claims and merged them with American legal practices, effectively recasting them in a new distinctly American constitutional framework. [137]

## VIII THE ABSORPTION OF THE COMMON LAW IN POST-REVOLUTIONARY AMERICA

Samuel Adams and the Boston town meeting were engaging in a creative process of constitutional theorizing and they were hardly unique in Revolutionary America. Towns and communities across the nation had been swept up in the political and constitutional ferment triggered by the imperial crisis. These developments were accelerated when the Continental Congress instructed the states to draft new constitutions a month before Independence was officially declared. [138] These first state constitutions typically included a written declaration of rights. These new documents radically transformed many aspects of American law, but they did not represent a complete break with pre-existing English law, particularly regarding arms. Although a majority of the new constitutions included prohibitions on standing armies, most did not single out the right to bear arms for express protection. Pennsylvania was the first state to do so, but it also included a right not to be forced to bear arms, a concession to religious pacifists such as Quakers, Moravians, and Mennonites. Typically arms bearing provisions also included express language about the need for civilian control of the military. The pairing of the right to bear arms with a right not to bear arms, and the close textual connection between the affirmation of civilian control of the military and the right to bear arms only heightens the strong military focus of these early provisions.

Compendium_Cornell
Page 0897

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12711   Page 355 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

The American Revolution's impact on the common law, including the right to keep arms and restrictions on armed travel, was even more complicated. Rather than speak of the common law's Americanization, it might be accurate to discuss its creolization in the colonial era and early Republic. Although there were some important areas in which English law remained stable, there were also many examples in which the law had evolved to reflect the different social and legal realities of different colonies. [139]

Stressing the pervasive localism and evolutionary character of the absorption of the common law, the distinguished Virginia jurist St. George Tucker believed that:

> **\*31**  the adoption of the laws of England, we see was confined to such as had been theretofore adopted, used, and approved, within the colony, and usually practiced on, in the courts of law; with an exception as to such parts as were repugnant to the rights and liberties contained in the constitution. [140]

Moreover, Tucker noted that one might have recourse to "every law treatise from Bracton, and Glanville, to Coke, Hale, Hawkins, and Blackstone; or in every reporter from the year-books to the days of Lord Mansfield," but such authority mattered little if the law was not consistent with the new state constitutions. [141]  If that were the case, a law contrary to the text of the Constitution would "have no more force in Massachusetts, than an edict of the emperor of China." [142]

Some states absorbed the common law by constitutional means. Thus, Maryland's Declaration of Rights affirmed:

> The Common Law of England, and the trial by Jury, according to the course of that law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity. [143]

Some states passed reception statutes, incorporating parts of the common law. Pennsylvania's statute affirmed that:

> [E]ach and every one of the laws or acts of general assembly that were in force and binding on the inhabitants of the said province on the fourteenth day of May last shall be in force and binding on the inhabitants of this state from and after the tenth day of February next ... and the common law and such of the statute laws of England as have heretofore been in force in the said province, except as is hereafter excepted. [144]

The primary function of the justice of the peace in the new American Republic remained unchanged: to preserve the peace. [145] The transformation of the English legal concept of the King's peace into a post-Revolutionary legal concept consistent with republicanism did have implications for understanding the limits on armed travel in public. In particular, the notion of traveling armed as rebuke to the King's majesty and authority no longer had any legal significance. In a society in which the people were sovereign, the notion of the peace was effectively republicanized. As a Connecticut guide for justices of the peace observed, "the term peace, denotes the condition of the body politic in  **\*32**  which no person suffers, or has just cause to fear any injury." [146] The offense was now one that harmed the body politic, not the King's Majesty. Disturbing the peace remained a serious legal matter, and Justices of the Peace continued to exercise considerable power and authority, including a power to preempt violence by imposing peace bonds, disarmament, or incarceration.

A number of states, including North Carolina, Virginia, and Massachusetts expressly adopted their own versions of the Statute of Northampton. [147]  North Carolina's formulation of the prohibition followed closely on its English predecessor. It declared that no person may "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere." [148]  Virginia's statute also drew on the original English text, with one important change, noted by William Henig, a leading lawyer in the state, who remarked that the legislature introduced additional due process protections for those accused of violating the law. "The act of assembly of Virginia materially differs from the act of

Compendium_Cornell
Page 0898

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12712   Page 356 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

parliament" he wrote, "being more favorable to liberty." [149] In Virginia, a justice of the peace could not seize arms and imprison an individual for more than a month. To impose a stiffer penalty required a jury verdict, a higher due process standard, and hence a greater safeguard for liberty. [150]

In 1795, Massachusetts enacted its own version of the Statute of Northampton drawn from prior English commentators. The law forbade anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." [151] This was a common gloss on the Statute of Northampton used in many of the popular English Justice of the Peace manuals of the previous century. It framed the prohibition in terms of traveling with offensive weapons. The criminal conduct did not require the demonstration of a modern style *mens rea*; the mere act of traveling armed with offensive weapons demonstrated the evil intent required by law. [152]

### *33  IX THE EMERGENCE OF OPPOSING MODELS OF THE RIGHT TO CARRY IN THE EARLY REPUBLIC

In the preface to his edition of Blackstone, St. George Tucker explained that his project was inspired by the need to educate Americans about how the common law had evolved in America. Tucker conceded that it would have been an even more monumental undertaking to try to explicate how this process differed from state to state, so he focused most of attention on his home state of Virginia. [153] Although it is tempting for modern scholars to treat Tucker as if his writings were some type of proxy for an American legal mind, such an approach distorts the fact that Tucker's vision of law was not simply rooted in his experiences as a Virginian, but also in his growing opposition to Federalist constitutionalism. Tucker was an ardent Jeffersonian and any interpretation of his thought that fails to acknowledge this fact is likely to distort his influence and significance. [154] Consider Tucker's often quoted observation, written in response to the prosecution of Fries's Rebellion in Pennsylvania. [155]

> But ought that circumstances of itself to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself. In many parts of the United State, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side. [156]

Tucker was commenting on a federal case that he believed had been decided incorrectly, so it is odd that modern lawyers would treat his comment, and not the federal court decision, as the legally authoritative source. Secondly, Tucker did not claim that the situation in Virginia was universally recognized in all parts of America, but was only true in some areas. Finally, Tucker was talking about a musket, the standard weapon of the militia, and not about concealable weapons. Justice Samuel Chase certainly did not share Tucker's views and the successful prosecution of the rebels in both the Whiskey Rebellion and Fries Rebellion later in the decade suggests that Chase's narrow Federalist view, not the more expansive Jeffersonian view espoused by Tucker, was the legally dominant view of federal courts at this moment in time. [157] Tucker took exception to Federalist  *34  Chase's reliance on traditional English legal authorities, which was particularly disturbing, given his fears that Federalists intended to use the common methods and principles to expand federal power. [158] In contrast to Chase and other Federalists, Tucker believed that American law had not absorbed English common law's broad view of treason. Under English law, a group of armed men traveling was at the very least a riotous assembly and depending on the circumstance a potentially treasonous one. Tucker did not believe that this was the case in Virginia and his often quoted comment about Virginian's traveling with their muskets should be placed in that broader context.

The fact that Tucker discerned a clear difference between Virginia and Pennsylvania on this important point of law as early as the 1790s serves as a reminder that the meaning of arms bearing was not static in the early American republic, but evolving. [159] Indeed, as the market revolution made cheap and reliable hand guns more plentiful, the practice of carrying these weapons in public grow at an alarming rate. It was this new practice of traveling with concealed weapons that prompted the first wave of modern style gun control measures in the South. [160] Kentucky's law was challenged and declared unconstitutional in *Bliss v. Commonwealth* (1822). [161] The court in *Bliss* took an almost absolutist view of the right to bear arms, viewing any regulation as tantamount to a destruction of the right. [162] Elsewhere in the South, a permissive, but less absolutist view took hold. A Richmond Grand Jury (1820) captured this strain of southern thought when it published a statement attacking the dastardly practice of concealed carry, but reiterated that open carry of arms was perfectly legal and honorable. Although the Grand Jury

Compendium_Cornell
Page 0899

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12713   Page 357 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

opposed "any legislative interference with what they conceive to be one of the most essential privileges of freemen, the right of carrying arms" they were equally adamant about expressing their "abhorrence of a practice which it becomes all good citizens to frown upon with contempt, and to endeavor to suppress." The cowardly "practice of carrying **\*35** arms secreted, in cases where no personal attack can reasonably be apprehended." [163]

One of the most thoughtful discussions of how the common law tradition had evolved in the South was Charles Humphreys' *Compendium of the Common Law in force in Kentucky*, which attempted to do for Kentucky what Tucker had done for Virginia: analyze the way English law had been modified and adapted to circumstances in Kentucky. [164] Humphreys specifically took up the question of how the state's constitutional provisions on the right to bear arms, as interpreted by the courts, had modified common law restrictions on "riding or going armed with dangerous or unusual weapons." Although Kentucky had not abandoned this ancient concept, it had modified it to reflect the radically altered context and legal situation in the American South. Determining whether one had violated the peace meant one had to acknowledge that if "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." [165] Interestingly, Humphreys implicitly acknowledged the traditional standard that armed travel was a terror to the people, but he noted that in Kentucky that legal bar had been raised, a heightened standard that he described as terrifying "the people unnecessarily." [166] Yet, even Kentucky eventually backed away from this extreme libertarian interpretation which was eventually rejected when Kentucky revised its constitution in 1849; the new constitution included an express provision that "the General Assembly may pass laws to prevent persons from carrying concealed arms." [167]

The distinctive Southern interpretation of the English common law crime of affray was elaborated in *State v. Huntley* (1843). [168] North Carolina's highest Court noted that "no man amongst us carries it [a gun] about with him, as one of his every day accoutrements--as a part of his dress." Yet, echoing the views of Humphreys and other southern commentators, the court went on to observe that it "is to be remembered that the carrying of a gun per se constitutes no offence. For any lawful purpose-- either of business or amusement--the citizen is at perfect liberty to carry his gun." [169] Striking a note similar to Humphrey, the court noted: "It is the wicked purpose--and the mischievous result--which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people." [170] *State v. Huntley* broke with traditional English common law in two important respects. First, it implicitly recognized that in North Carolina, **\*36** the range of legitimate uses of firearms was considerably broader than it had been under common law, encompassing both "business or amusement." The law still required a legitimate purpose to carry arms, noting that one did not sport arms daily in public, but it acknowledged by its choice of terms a considerable range of legitimate activities. The case also reflected a more profound change in the nature of criminal law. Under the traditional English common law view, the necessary evil intent for a criminal act could be inferred from the prohibited act itself. *Huntley* represents a more modern conception, one in which subjective intent was necessary to establish the mens rea requirement which was an essential element of a crime. Gun rights scholars, most notably David Kopel and Eugene Volokh, have read *Huntley*'s modern-style mens rea requirement back into English legal history, assuming that this requirement existed centuries before it became a part of the law. Their failure to grasp their error follows from a more basic flaw that historian David Hackett Fischer describes as the fallacy of tunnel history. [171] Writing about the history of the crime of affray without consulting any of the standard accounts of the history of Anglo-American criminal law led Kopel and Volokh to ignore the differences between early modern and modern criminal law. [172]

The line of cases that led to *Huntley* represented one of two Southern jurisprudential traditions regarding firearms. A different, more limited conception of the right to keep and bear arms, one more consistent with the traditional eighteenth century militia-based understanding of the right also gained judicial notice in other parts of the South. This alternative vision was elaborated in two cases, *Aymette v. State* and *State v. Buzzard*. [173] In both of these cases the meaning of the right to bear arms was shaped by the traditional civic republican understanding of the militia. Such a conception was neither an individual right in the modern sense, nor was it as narrowly framed as a right of the states--the essence of the modern collective rights theory of the right to bear arms. [174] Laws that inhibited the ability of citizens to keep and bear those arms needed to fulfill their militia obligation would have been unconstitutional. Firearms with little or no value to the preservation of the militia, easily concealed pocket pistols being a notable example, were treated as ordinary property and subject to the full range of the state's police powers, including in the case of some especially dangerous weapons, prohibition. In *Aymette*, the court wrote: "The legislature, therefore, have a right to prohibit the wearing, or keeping weapons **\*37** dangerous to the peace and safety of the citizens, and which are *not* usual in civilized warfare, or would not contribute to the common defence." [175]

Compendium_Cornell
Page 0900

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12714   Page 358 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Given that modern law is dominated by the discourse of rights, it has been difficult for gun rights scholars to make the imaginative leap of faith necessary to understand how the right to bear arms could be anything other than an individual right of self-defense. [176] To understand the Second Amendment one must grasp the fears that animated it: the disarmament of the militia. Although modern Americans fear "black helicopters" and government agents coming to take their guns away, the Founding generation recognized that indifference and debt posed at least as great a danger to militia armament as direct government action. In particular, debt was a pervasive feature of economic life in the agricultural communities of early America. Farmers were dependent on borrowing money until crops were sold at market and loans might be repaid. [177] Protecting privately owned militia weapons from seizure in lawsuits was of paramount importance in making sure that the militia would not simply disarm itself as citizens sold off muskets to pay their debts. In virtually every state, militia laws protected  **38**  privately owned guns from seizure in debt proceedings or sale for failure to pay taxes. [178] In practical terms, these types of protections were of enormous significance. Indeed, during the ratification debate, Anti-Federalists repeatedly stressed that the federal government's power of the purse, particularly onerous taxation, was nearly as dangerous as its control of the military. Had legal protections for privately owned militia arms not existed, this Anti-Federalist fear might have easily come to pass: the state militias might have been disarmed without government taking any direct action. Simply by raising taxes, government could have debt-ridden farmers to disarm themselves by selling off militia weapons. [179]

In the antebellum South two different models of arms bearing emerged and each had profound consequences for the scope of government regulation of armed travel in public. A more libertarian gun rights tradition exemplified by cases such as *Bliss*, *Nunn*, and *Huntley* emerged in parts of the Slave South that vindicated a robust right to travel armed in public. Bans on concealed weapons were permissible, but only if open carry was available. A different, more restricted model also emerged that carried forward a distinctly eighteenth century civic republican vision of arms bearing. In *Aymette* and *Buzzard*, guns related to militia purposes were given full constitutional protection. Other weapons were subject to the full authority of the state's police power. [180]

Legal scholarship prior to *Heller* naturally focused considerable attention on antebellum case law, a fact reflected in Justice Scalia's majority opinion which looked to this tradition to understand the scope of Second Amendment rights in the decades after its adoption. [181] The fact that this jurisprudential tradition was unique to the slave South did not spark much scholarly interest at that time and accordingly did not receive any judicial notice in *Heller*. More recent scholarship by contrast has been directed by Scalia's injunction to look more closely at the history of regulation for guidance. [182] Among the most important discoveries of this new body of scholarship is the importance of local and regional variation in the regulatory tradition that emerged after the adoption of the Second Amendment. This profound localism and regionalism was effectively invisible to the *Heller* court, which erroneously assumed that the Southern tradition embodied in the extant case law was representative of broader American legal attitudes in the Founding era and early republic. In fact, the Southern libertarian  **39**  tradition of permissive carry was exceptional. Outside of the slave South, a different and more restrictive tradition of public carry had emerged. [183]

The foundation for this alternative tradition was the version of the Statute of Northampton enacted by Massachusetts in 1795. Rather than draw on the text of the Parliamentary statute itself, the Massachusetts legislature adopted a gloss that had become popular in many of the justice of the peace manuals. Massachusetts framed its prohibition on public carry in robust terms: It outlawed anyone who "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth." [184] A New Jersey justice of the peace manual published a decade after the Massachusetts statute used the same language regarding bans on traveling "armed offensively." [185] The guide elaborated on what this prohibition meant, describing the considerable powers enjoyed by peace officers to preserve the peace. "So a Justice of the Peace may, in his own discretion, require sureties for the peace from one who shall go or ride offensively to the terror of the people, though they he may not have threatened any person in particular, or committed any particular act of violence." [186] As one Connecticut justice of the peace manual made clear, it was not simply breaches of the peace, but even an "inchoate breach" such as traveling "offensively armed" or with "an unusual number of attendants" that ran afoul of the law. In a comprehensive overview of the "common law, the statute Laws of Massachusetts, and of the United States," the powers of the justice of the peace to detain and arrest those who traveled with offensive weapons, was listed as a separate category from such other crimes affray, riot, and disturbing the peace. [187] In 1835, Massachusetts revised its public carry law. The new Massachusetts statute prohibited armed travel, but it recognized an exception in cases where a person had a reasonable cause to fear imminent violence. [188]

Compendium_Cornell
Page 0901

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12715   Page 359 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace .... [189]

**\*40**  One of the state's most distinguished jurists, Peter Oxenbridge Thacher, offered this gloss on the new law:

In our own Commonwealth, no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property. [190]

A contemporary newspaper writer saw the new law in similar terms, using it as a jumping off point to explore the scope of the state's police powers. After noting that there was nothing unconstitutional about laws prohibiting the discharge of weapons "in cities and populous towns," the article went on to observe that the legislature saw fit to go even further: "have not our legislature forbidden, and ought not every legislature" the dangerous practice of traveling "armed with pistols, swords, daggers, bowie-knives or other offensive and dangerous weapons." [191]  The power to prohibit such weapons followed naturally from the state's police power. Indeed, it was an argument "unfounded and alarming" to claim that a state had the power to punish crimes, but could do nothing to prevent them. [192]

In the decades following the adoption of the Massachusetts model of restrictive public carry states and localities across the nation used it as a model for enacting limits on public carry. [193]  The constitutionality of such statutes came  **\*41**  before the Texas Supreme Court in *English v. State* (1872). [194]  In response to widespread violence, including targeted violence against Freedmen, a Republican-led Texas legislature enacted a statute based on the 1835 Massachusetts model. [195]  The Republican-controlled Texas Supreme Court upheld the law, noting that such laws were "not peculiar to our own State," but had become common: "It is safe to say that almost, if not every one of the States of this union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration." [196]  Although the Texas arms-bearing provision recognized a right to regulate the scope of the right, the court did not think the power the legislature had exercised extraordinary, but rather saw it as a basic exercise of the state's police powers. [197]  "The powers of government are intended to operate upon the civil conduct of the citizen; and whenever his conduct becomes such as to offend against public morals or public decency, it comes within the range of legislative authority." [198]  Two years later, a new court dominated by Democrats opposed to Reconstruction took up a series of cases on the right to carry. [199]  In contrast to the earlier court composed of Republicans, the new Democrat-dominated court took a more expansive view of the right to bear arms, one close in spirit to *Heller's* individual rights model. One point of commonality between the courts was the  **\*42**  view that as long as the law allowed for a self-defense exception for cases of imminent threat, the prohibition on public carry was legal. [200]

Finally, even more sweeping bans on public carry were enacted in parts of the West. In some instances such laws were enacted at the state level and in other cases local communities passed ordinances limiting public carry. [201]  Thus, by the end of the nineteenth century there were multiple models for dealing with the issue of public carry. The permissive Southern model developed in the antebellum slave South did not have much appeal to Americans in the post-Civil War era.

Additional evidence that America had not embraced the permissive Southern model may be found in a comprehensive overview of the laws pertaining to public carry published in *The American and English Encyclopedia of Law*, an influential and popular legal reference work published at the end of the nineteenth century. [202]  The *Encyclopedia* includes a detailed entry on the laws covering carrying firearms in public. It noted that "[t]he statutes of some of the States have made it an offence to carry weapons concealed about the body, while others prohibit the simple carrying of weapons, whether they are concealed or not. Such statutes have been held not to conflict with the constitutional right of the people of the United States to keep and bear arms." [203]  The contributors explained that American law recognized both a permissive and restrictive approach to carry.

Compendium_Cornell
Page 0902

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12716   Page 360 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

The repeated claim made by gun rights advocates and others that there was a widely recognized right of open carry in the nineteenth century is demonstrably false. To the extent that such a right did exist it reflected a regional, not a national  **\*43**  norm. Similarly, the notion that states are prohibited from requiring a reason to travel armed is also historically false. Many states followed Massachusetts and restricted such a right to situations in which individuals had a reasonable fear of imminent threat. If one follows *Heller*'s rule and looks at the historical record in an impartial and scholarly manner, the gun rights mythology about the right to carry turns out to reflect a partial account of the historical record. As the detailed treatment of this issue in the *American and English Encyclopedia of Law* makes clear, the notion of limiting public carry was an uncontroversial proposition at the end of the nineteenth century.[204]

## IX CONCLUSION

A systematic survey of popular guides to the law aimed at justices of the peace, constables, and other peace officers provides an excellent set of sources for exploring how the concepts of self-defense, the right to keep or travel with arms, and the need to balance these claims against the preservation of the peace evolved in the more than two centuries following the Glorious Revolution. Scholarship written before *Heller* offered a static and flawed account of the scope of the English right to keep and travel with arms. The actual history of this pre-existing English right and its evolution under American law is both fascinating and far more complex than either side in the modern debate over gun rights or gun violence prevention have realized. In parts of the American South, a more expansive conception of the right to travel armed emerged. Outside of the South, a more restrictive attitude toward armed travel took hold. By the end of the nineteenth century the more restrictive model was ascendant, but traces of the Southern model continued to exist.

The dispute between Justice Scalia and Justice Breyer over balancing may have been misplaced. The notion that the right of self-defense had to be balanced against the necessity to keep the peace was central to the way the common law dealt with arms. Preserving liberty while protecting the peace is not some modern imposition sprung from the head of modern activist jurists. It is the fundamental guiding principle at the root of Anglo-American law in this area and has always defined the way legislators, justices of the peace, and judges approach the regulation of arms. Perhaps the least appreciated part of the text of the Second Amendment is the clause that asserts the goal of promoting the "security of a free state." Policies that undermine that security are clearly not consistent with the Amendment's purpose. A variety of regulations on the right to keep and bear arms are not only permissible, but are in some sense essential to harmonize the two parts of the Amendment. The long history of common law restrictions only underscore this basic point.

## **\*44 BIBLIOGRAPHY--ALPHABETICAL**

**ENGLISH TEXTS**

Bacon, Matthew, A New Abridgment of the Law (1736).

Bacon, Matthew, A New Abridgment of the Law (1768).

Barlow, Theodore, The Justice of Peace: A Treatise Containing the Power and Duty of that Magistrate (1745).

Barrington, Daines, Observations on the Statutes (1766).

Barrington, Daines, Observations on the Statutes (1769).

Blackerby, Samuel, The Justice of Peace His Companion (1711).

Blackerby, Samuel, The Justice of Peace His Companion (1712).

Blackerby, Samuel, The Justice of Peace His Companion (1715).

Blackerby, Samuel, The Justice of Peace His Companion (1719).

Compendium_Cornell
Page 0903

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12717   Page 361 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Blackerby, Samuel, <u>The Justice of Peace His Companion</u> (1723).

Blackerby, Samuel, <u>The Second Part of the Justice of Peace His Companion</u> (1724).

Blackerby, Samuel, <u>The Second Part of the Justice of Peace His Companion</u> (1729).

Blackerby, Samuel, <u>The First Part of the Justice of Peace His Companion</u> (1730).

Blackerby, Samuel, <u>The First Part of the Justice of Peace His Companion</u> (1734).

Blackerby, Samuel, <u>The Second Part of the Justice of Peace His Companion</u> (1739).

Blackerby, Samuel, <u>The Justice of Peace His Companion</u> (1749).

Blackstone, Sir William, <u>An Analysis of the Laws of England</u> (1756).

Blackstone, Sir William, <u>An Analysis of the Laws of England</u> (1757).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the Third, Vol. 3</u> (1765).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the Third, Vol. 4</u> (1765).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the Second, Vol. 3</u> (1768).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the Second, Vol. 4</u> (1768).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the First, Vol.3</u> (1769).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the First, Vol.4</u> (1769).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Book the First, Vol.4</u> (1770).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Vol. 3</u> (1770).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Vol. 4</u> (1770).

 **\*45**  Blackstone, Sir William, <u>Commentaries on the Laws of England, Vol. 4</u> (1773).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Vol. 4</u> (1774).

Blackstone, Sir William, <u>Commentaries on the Laws of England, Vol. 4</u> (1775).

Bond, J., <u>A Compleat Guide for Justices of Peace, In Two Parts</u> (1707).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1755).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 2</u> (1755).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1756).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1756).

Compendium_Cornell
Page 0904

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12718   Page 362 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1757).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1758).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 2</u> (1758).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1758).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1762).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1762).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1764).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 2</u> (1764).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1766).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1766).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 4</u> (1766).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1769).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1770).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1770).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 4</u> (1770).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1772).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1772).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 4</u> (1772).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 1</u> (1776).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 3</u> (1776).

Burn, Richard, <u>The Justice of the Peace, and Parish Officer, Vol. 4</u> (1776).

Carter, Samuel, <u>Legal Provisions for the Poor</u> (1710).

Coke, Sir Edward, <u>The Reports of Sir Edward Coke Kt. Vol. 4</u> (1727).

Coke, Sir Edward, <u>The Reports of Sir Edward Coke Kt. Vol. 12</u> (1727).

Coke, Sir Edward, <u>The Reports of Sir Edward Coke Kt. Vol. 4</u> (1738).

Coke, Sir Edward, <u>The Reports of Sir Edward Coke Kt. Vol. 12</u> (1738).

Comyns, Sir John, <u>A Digest of the Laws of England, Vol. 1</u> (1762).

Compendium_Cornell
Page 0905

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12719   Page 363 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Comyns, Sir John, <u>A Digest of the Laws of England, Vol. 2</u> (1762).

Comyns, Sir John, <u>A Digest of the Laws of England, Vol. 3</u> (1762).

Comyns, Sir John, <u>A Digest of the Laws of England, Vol. 4</u> (1762).

Comyns, Sir John, <u>A Digest of the Laws of England, Vol. 5</u> (1762).

Cunningham, Timothy, <u>The Practice of a Justice of Peace, Vol. 1</u> (1762).

Cunningham, Timothy, <u>The Practice of a Justice of Peace, Vol. 2</u> (1762).

Dalton, Michael, <u>The Country Justice</u> (1705).

 **\*46**  Dalton, Michael, <u>The Country Justice</u> (1715).

Dalton, Michael, <u>The Country Justice</u> (1727).

Dalton, Michael, <u>The Country Justice</u> (1742).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, <u>The Law of a Justice of Peace and Parish Officer, Vol. 1</u> (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, <u>The Law of a Justice of Peace and Parish Officer, Vol. 2</u> (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, <u>The Law of a Justice of Peace and Parish Officer, Vol. 3</u> (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, <u>The Law of a Justice of Peace and Parish Officer, Vol. 4</u> (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, <u>The Precedents and Supplement to the Law of a Justice Peace and Parish Officer</u> (1770).

Forbes, William, <u>The Duty and Powers of Justices of Peace, in this Part of Great-Britain Called Scotland</u> (1707).

Gardiner, Robert, <u>The Compleat Constable</u> (1710).

Gardiner, Robert, <u>The Compleat Constable</u> (1724).

Gent, P.S., <u>A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers</u> (1704).

Gent, P.S., <u>A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers</u> (1705).

Gent, P.S., <u>A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers</u> (1708).

Gent, P.S., <u>A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers</u> (1712).

Gent, P.S., <u>A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers</u> (1721).

Gent, P.S., <u>A New Guide for Constables</u> (1705).

Gent, P.S., <u>A New Guide for Constables</u> (1709).

Gentleman of Lincoln's Inn, <u>The Modern Parish Officer</u> (1774).

Gentleman of the Inner Temple, The Under-Sheriff (1766).

Gentleman of the Middle Temple, The New Universal Parish Officer (1759).

Gentleman of the Middle Temple, The New Universal Parish Officer (1764).

Gentleman of the Middle Temple, The New Universal Parish Officer (1771).

Gentleman of the Middle Temple, The New Universal Parish Officer (1774).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1730).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1734).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1751).

Hale, Sir Matthew, Pleas of the Crown (1707).

**\*47**  Hale, Sir Matthew, Pleas of the Crown (1716).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1716).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1716).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1724).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1724).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1739).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1739).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1762).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1771).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1771).

Hawkins, William, A Summary of the Crown Law, Vol. 1 (1728).

Hawkins, William, A Summary of the Crown Law, Vol. 2 (1728).

Higgs, Joseph, A Guide to Justices (1742).

Jacob, Giles, The Common Law Common-Placed (1726).

Jacob, Giles, The Common Law Common-Placed (1730).

Jacob, Giles, The Common Law Common-Placed (1733).

Jacob, Giles, The Common Law Common-Placed (1739).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12721   Page 365 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1718).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1720).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1723).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1729).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1731).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1734).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1738).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1744).

Jacob, Giles, <u>The Compleat Parish-Officer</u> (1750).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1736).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1737).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1740).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1750).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1751).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1765).

Jacob, Giles, <u>Every Man His Own Lawyer</u> (1772).

Jacob, Giles, <u>The Modern Justice</u> (1716).

Jacob, Giles, <u>The Modern Justice</u> (1717).

Jacob, Giles, <u>The Modern Justice</u> (1720).

Jacob, Giles, <u>A Review of the Statutes, Both Ancient and Modern</u> (1715).

Jacob, Giles, <u>A Treatise of Laws</u> (1721).

Kilburne, Richard, <u>Choice Precedents Upon All Acts of Parliament, Relating to the Office and Duty of a Justice of Peace</u> (1703).

Kilburne, Richard, <u>Choice Precedents Upon All Acts of Parliament, Relating to the Office and Duty of a Justice of Peace</u> (1715).

 **\*48**  Lilly, John, <u>A Continuation of the Practical Register, in Two Parts, Vol. 2</u> (1710).

Nelson, William, <u>The Office and Authority of a Justice of Peace</u> (1704).

Nelson, William, <u>The Office and Authority of a Justice of Peace</u> (1707).

Nelson, William, <u>The Office and Authority of a Justice of Peace</u> (1710).

Compendium_Cornell
Page 0908

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12722   Page 366 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Nelson, William, The Office and Authority of a Justice of Peace (1711).

Nelson, William, The Office and Authority of a Justice of Peace (1714).

Nelson, William, The Office and Authority of a Justice of Peace (1715).

Nelson, William, The Office and Authority of a Justice of Peace (1718).

Nelson, William, The Office and Authority of a Justice of Peace (1721).

Nelson, William, The Office and Authority of a Justice of Peace (1724).

Nelson, William, The Office and Authority of a Justice of Peace (1726).

Nelson, William, The Office and Authority of a Justice of Peace (1729).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 1 (1736).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 2 (1736).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 1 (1745).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 2 (1745).

Paul, John, A Digest of the Laws Related to the Game of this Kingdom (1776).

Paul, John, The Parish Officer's Complete Guide (1774).

Paul, John, The Parish Officer's Complete Guide (1776).

Pearce, Thomas, The Compleat Justice of the Peace, and Parish Officer (1756).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1728).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1728).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1733).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1733).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1736).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1736).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1751).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1751).

Shaw, Joseph, The Practical Justice of Peace, and Parish and Ward-Officer, Vol. 1 (1756).

Shaw, Joseph, The Practical Justice of Peace, and Parish and Ward-Officer, Vol. 2 (1756).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12723   Page 367 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Shaw, Joseph, Parish Law (1733).

Stubbs, W., The Crown Circuit Companion (1738).

Stubbs, W., The Crown Circuit Companion, Vol. 1 (1749).

Whatley, Robert, A Friendly Admonition to Gentlemen in the Commission of the Peace (1729).


**\*49 WITHOUT AUTHOR**

A Collection of Statutes that Relate to the Office of Justices of the Peace, Deputy Lieutenants, and Commissioners of Sewers (1727).

A Compendious Library of the Law, Necessary for Persons for All Degrees and Professions (1740).

A Compendious Library of the Law, Necessary for Persons for All Degrees and Professions (1743).

The Justice of Peace's Vade Mecum (1719).

The Justice's Case Law (1731).

The Universal Officer of Justice (1730).

The Universal Officer of Justice (1731).


**BIBLIOGRAPHY--CHRONOLOGICAL**

Kilburne, Richard, Choice Precedents Upon All Acts of Parliament, Relating to the Office and Duty of a Justice of Peace (1703).

Gent, P.S., A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers (1704).

Nelson, William, The Office and Authority of a Justice of Peace (1704).

Dalton, Michael, The Country Justice (1705).

Gent, P.S., A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers (1705).

Gent, P.S., A New Guide for Constables (1705).

Bond, J., A Compleat Guide for Justices of Peace, In Two Parts (1707).

Forbes, William, The Duty and Powers of Justices of Peace, in this Part of Great-Britain Called Scotland (1707).

Hale, Sir Matthew, Pleas of the Crown (1707).

Nelson, William, The Office and Authority of a Justice of Peace (1707).

Gent, P.S., A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers (1708).

Gent, P.S., A New Guide for Constables (1709).

Carter, Samuel, Legal Provisions for the Poor (1710).

Compendium_Cornell
Page 0910

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12724   Page 368 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Gardiner, Robert, The Compleat Constable (1710).

Lilly, John, A Continuation of the Practical Register, in Two Parts, Vol. 2 (1710).

Nelson, William, The Office and Authority of a Justice of Peace (1710).

Blackerby, Samuel, The Justice of Peace His Companion (1711).

Nelson, William, The Office and Authority of a Justice of Peace (1711).

 **\*50**  Blackerby, Samuel, The Justice of Peace His Companion (1712).

Gent, P.S., A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers (1712).

Nelson, William, The Office and Authority of a Justice of Peace (1714).

Blackerby, Samuel, The Justice of Peace His Companion (1715).

Dalton, Michael, The Country Justice (1715).

Jacob, Giles, A Review of the Statutes, Both Ancient and Modern (1715).

Kilburne, Richard, Choice Precedents Upon All Acts of Parliament, Relating to the Office and Duty of a Justice of Peace (1715).

Nelson, William, The Office and Authority of a Justice of Peace (1715).

Hale, Sir Matthew, Pleas of the Crown (1716).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1716).

Jacob, Giles, The Modern Justice (1716).

Jacob, Giles, The Modern Justice (1717).

Jacob, Giles, The Compleat Parish-Officer (1718).

Nelson, William, The Office and Authority of a Justice of Peace (1718).

Blackerby, Samuel, The Justice of Peace His Companion (1719).

The Justice of Peace's Vade Mecum (1719).

Jacob, Giles, The Compleat Parish-Officer (1720).

Jacob, Giles, The Modern Justice (1720).

Gent, P.S., A Help to Magistrates, and Minsters of Justice, Also A Guide to Parish and Ward-Officers (1721).

Jacob, Giles, A Treatise of Laws (1721).

Nelson, William, The Office and Authority of a Justice of Peace (1721).

Compendium_Cornell
Page 0911

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12725   Page 369 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Blackerby, Samuel, The Justice of Peace His Companion (1723).

Jacob, Giles, The Compleat Parish-Officer (1723).

Blackerby, Samuel, The Second Part of the Justice of Peace His Companion (1724).

Gardiner, Robert, The Compleat Constable (1724).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1724).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1724).

Nelson, William, The Office and Authority of a Justice of Peace (1724).

Jacob, Giles, The Common Law Common-Placed (1726).

Nelson, William, The Office and Authority of a Justice of Peace (1726).

Coke, Sir Edward, The Reports of Sir Edward Coke Kt., Vol. 4 (1727).

Coke, Sir Edward, The Reports of Sir Edward Coke Kt., Vol. 12 (1727).

Dalton, Michael, The Country Justice (1727).

A Collection of Statutes that Relate to the Office of Justices of the Peace, Deputy Lieutenants, and Commissioners of Sewers (1727).

Hawkins, William, A Summary of the Crown Law, Vol. 1 (1728).

Hawkins, William, A Summary of the Crown Law, Vol. 2 (1728).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1728).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1728).

Blackerby, Samuel, The Second Part of the Justice of Peace His Companion (1729).

Jacob, Giles, The Compleat Parish-Officer (1729).

 *51  Nelson, William, The Office and Authority of a Justice of Peace (1729).

Whatley, Robert, A Friendly Admonition to Gentlemen in the Commission of the Peace (1729).

Blackerby, Samuel, The First Part of the Justice of Peace His Companion (1730).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1730).

Jacob, Giles, The Common Law Common-Placed (1730).

The Universal Officer of Justice (1730).

Jacob, Giles, The Compleat Parish-Officer (1731).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12726   Page 370 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

The Justice's Case Law (1731).

The Universal Officer of Justice (1731).

Jacob, Giles, The Common Law Common-Placed (1733).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1733).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1733).

Shaw, Joseph, Parish Law (1733).

Blackerby, Samuel, The First Part of the Justice of Peace His Companion (1734).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1734).

Jacob, Giles, The Compleat Parish-Officer (1734).

Bacon, Matthew, A New Abridgment of the Law (1736).

Jacob, Giles, Every Man His Own Lawyer (1736).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 1 (1736).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 2 (1736).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1736).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1736).

Jacob, Giles, Every Man His Own Lawyer (1737).

Coke, Sir Edward, The Reports of Sir Edward Coke Kt. Vol. 4 (1738).

Coke, Sir Edward, The Reports of Sir Edward Coke Kt. Vol. 12 (1738).

Jacob, Giles, The Compleat Parish-Officer (1738).

Stubbs, W., The Crown Circuit Companion (1738).

Blackerby, Samuel, The Second Part of the Justice of Peace His Companion (1739).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1739).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1739).

Jacob, Giles, The Common Law Common-Placed (1739).

Jacob, Giles, Every Man His Own Lawyer (1740).

A Compendious Library of the Law, Necessary for Persons for All Degrees and Professions (1740).

Dalton, Michael, The Country Justice (1742).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12727   Page 371 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Higgs, Joseph, A Guide to Justices (1742).

**\*52** A Compendious Library of the Law, Necessary for Persons for All Degrees and Professions (1743).

Jacob, Giles, The Compleat Parish-Officer (1744).

Barlow, Theodore, The Justice of Peace: A Treatise Containing the Power and Duty of that Magistrate (1745).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 1 (1745).

Nelson, William, The Office and Authority of a Justice of Peace, Vol. 2 (1745).

Blackerby, Samuel, The Justice of Peace His Companion (1749).

Stubbs, W., The Crown Circuit Companion, Vol. 1 (1749).

Jacob, Giles, The Compleat Parish-Officer (1750).

Jacob, Giles, Every Man His Own Lawyer (1750).

Harvey, James, A Collection of English Precedents Relating to the Office of a Justice of Peace (1751).

Jacob, Giles, Every Man His Own Lawyer (1751).

Shaw, Joseph, The Practical Justice of Peace, Vol. 1 (1751).

Shaw, Joseph, The Practical Justice of Peace, Vol. 2 (1751).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1755).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 2 (1755).

Blackstone, Sir William, An Analysis of the Laws of England (1756).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1756).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1756).

Pearce, Thomas, The Compleat Justice of the Peace, and Parish Officer (1756).

Shaw, Joseph, The Practical Justice of Peace, and Parish and Ward-Officer, Vol. 1 (1756).

Shaw, Joseph, The Practical Justice of Peace, and Parish and Ward-Officer, Vol. 2 (1756).

Blackstone, Sir William, An Analysis of the Laws of England (1757).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1757).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1758).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 2 (1758).

Compendium_Cornell
Page 0914

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12728   Page 372 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1758).

Gentleman of the Middle Temple, The New Universal Parish Officer (1759).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1762).

Comyns, Sir John, A Digest of the Laws of England, Vol. 1 (1762).

Comyns, Sir John, A Digest of the Laws of England, Vol. 2 (1762).

Comyns, Sir John, A Digest of the Laws of England, Vol. 3 (1762).

Comyns, Sir John, A Digest of the Laws of England, Vol. 4 (1762).

Comyns, Sir John, A Digest of the Laws of England, Vol. 5 (1762).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1762).

Cunningham, Timothy, The Practice of a Justice of Peace, Vol. 1 (1762).

Cunningham, Timothy, The Practice of a Justice of Peace, Vol. 2 (1762).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1762).

 **\*53**  Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1764).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 2 (1764).

Gentleman of the Middle Temple, The New Universal Parish Officer (1764).

Blackstone, Sir William, Commentaries on the Laws of England, Book the Third, Vol. 3 (1765).

Blackstone, Sir William, Commentaries on the Laws of England, Book the Third, Vol. 4 (1765).

Jacob, Giles, Every Man His Own Lawyer (1765).

Barrington, Daines, Observations on the Statutes (1766).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1766).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1766).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 4 (1766).

Gentleman of the Inner Temple, The Under-Sheriff (1766).

Bacon, Matthew, A New Abridgment of the Law (1768).

Blackstone, Sir William, Commentaries on the Laws of England, Book the Second, Vol. 3 (1768).

Blackstone, Sir William, Commentaries on the Laws of England, Book the Second, Vol. 4 (1768).

Barrington, Daines, Observations on the Statutes (1769).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12729   Page 373 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Blackstone, Sir William, Commentaries on the Laws of England, Book the First, Vol.3 (1769).

Blackstone, Sir William, Commentaries on the Laws of England, Book the First, Vol.4 (1769).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, The Law of a Justice of Peace and Parish Officer, Vol. 1 (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, The Law of a Justice of Peace and Parish Officer, Vol. 2 (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, The Law of a Justice of Peace and Parish Officer, Vol. 3 (1769).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, The Law of a Justice of Peace and Parish Officer, Vol. 4 (1769).

Blackstone, Sir William, Commentaries on the Laws of England, Book the First, Vol.4 (1770).

Blackstone, Sir William, Commentaries on the Laws of England, Vol. 3 (1770).

Blackstone, Sir William, Commentaries on the Laws of England, Vol. 4 (1770).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1770).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1770).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 4 (1770).

Dudley and Ward, John Lord Viscount & Cunningham, Timothy, The

Precedents and Supplement to the Law of a Justice of Peace and Parish Officer (1770).

 *54  Gentleman of the Middle Temple, The New Universal Parish Officer (1771).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 1 (1771).

Hawkins, William, A Treatise of the Pleas of the Crown, Vol. 2 (1771).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1772).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1772).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 4 (1772).

Jacob, Giles, Every Man His Own Lawyer (1772).

Blackstone, Sir William, Commentaries on the Laws of England, Vol. 4 (1773).

Blackstone, Sir William, Commentaries on the Laws of England, Vol. 4 (1774).

Gentleman of Lincoln's Inn, The Modern Parish Officer (1774).

Gentleman of the Middle Temple, The New Universal Parish Officer (1774).

Compendium_Cornell
Page 0916

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12730   Page 374 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

Paul, John, The Parish Officer's Complete Guide (1774).

Blackstone, Sir William, Commentaries on the Laws of England, Vol. 4 (1775).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 1 (1776).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 3 (1776).

Burn, Richard, The Justice of the Peace, and Parish Officer, Vol. 4 (1776).

Paul, John, A Digest of the Laws Related to the Game of this Kingdom (1776).

Paul, John, The Parish Officer's Complete Guide (1776).

### Footnotes

[a1]   Paul and Diane Guenther Chair in American History, Fordham University. An earlier draft of this paper was presented at a legal history workshop jointly hosted by the University of Southern California, the Huntington Library, and OIEAHC, The Clark Legal History Colloquium at the Boston University, a Duke/Brennan Center Conference on the Second Generation of Second Amendment Law and Policy, and the University of Texas, Austin. In addition, I would like to thank, Sally Gordon, Peter Mancall, Bruce Mann, Gerry Leonard, James Fleming, Joseph Blocher, Darrell Miller, Eric Ruben, William Forbath, and Robert Owell for comments and suggestions. Research assistance for this essay was provided by Bradley Barbour and Olivia Gonzalez, Fordham Law School.

[1]   District of Columbia v. Heller, 554 U.S. 570 (2008).

[2]   Reva B. Siegel, Dead or Alive: Originalism as Popular Constitutionalism in Heller, 122 HARV. L. REV. 191 (2008); Cass Sunstein, Second Amendment Minimalism: Heller as Griswold, 122 HARV. L. REV. 246 (2008).

[3]   Heller, 554 U.S. at 635.

[4]   See id. at 582-615 (referring to sources from the 1700s to post-Civil War legislation).

[5]   The Court had last dealt with the Second Amendment in United States v. Miller, 307 U.S. 174 (1939), in which it ruled that because shotguns with barrels less than eighteen inches in length had no relationship to a well-regulated militia, the Second Amendment did not guarantee a right to keep and bear such firearms. For examples of scholarly reactions to Heller, see THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER (Saul Cornell & Nathan Kozuskanich eds., 2013) (providing a series of academic responses to the decision). On the transformation of Anglo-American law in this period, see JACK P. GREENE, THE CONSTITUTIONAL ORIGINS OF THE AMERICAN REVOLUTION (2011).

[6]   See Sanford Levinson, United States: Assessing Heller, 7 INT'L J. CONST. L. 316 (2009) at 326; Sunstein, supra note 2.

[7]   Heller, 554 U.S. 570. Heller relied on the work of English historian Joyce Lee Malcolm, JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1996). For critiques of Malcolm's history, see LOIS SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 169 (2016); Patrick J. Charles, The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why it Matters, 64 CLEV. ST. L. REV. 373 (2016).

Compendium_Cornell
Page 0917

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12731   Page 375 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

8       *Heller*, 554 U.S. at 592, 626.

9       Daryl A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 LAW & CONTEMP. PROBS., no. 2, 2017, at 89-90.

10      *Infra* Part III.

11      *Heller*, 554 U.S. at 593.

12      *Infra* Part VI.

13      See Larry M. Boyer, *The Justice of the Peace in England and America from 1506 to 1776: A Bibliographic History*, 34 Q.J. LIBR. CONG. 315 (1977) (discussing the importance of popular guide books in England and America).

14      *Id.*

15      *Id.*

16      *Id.*

17      See John A. Conley, *Doing it by the Book: Justice of the Peace Manuals and English Law in Eighteenth Century America*, 6 J. LEGAL HIST. 257 (1985). For an illustration of how these texts shaped legal culture in the colonies, see Alfred Brophy, *''For the Preservation of the King's Peace and Justice'': Community and English Law in Sussex County, Pennsylvania, 1682-1696, 40 AM. J. LEGAL HIST. 167 (1996)*.

18      *See infra* Parts IV-VII.

19      *Infra* Part IX.

20      Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009). *See also* David Kopel, *The First Century of Right to Arms Litigation*, 14 GEO. J.L. & PUB. POL'Y (2016) (using justice of the peace manuals in an impressionistic manner and reading them anachronistically by failing to recognize that early modern English criminal law had no modern mens rea requirement for establishing criminal intent); *cf.* GUYORA BINDER, CRIMINAL LAW 139-42 (2016).

21      *See infra* Bibliography (listing the texts consulted for this essay).

22      Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703 (2012) (explaining that lower courts have been applying a form of intermediate scrutiny that entails some aspects of balancing).

23      *See* District of Columbia v. Heller, 554 U.S. 570, 689-90 (2008) (Breyer, J., dissenting) (calling for use of a balancing test and arguing that "there simply is no untouchable constitutional right to keep loaded handguns in the house in crime-ridden urban areas.").

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12732   Page 376 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

24    *Infra* Part VI.

25    *Infra* Part VI.

26    *Infra* Part VI.

27    *See* LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009) (examining the evolution of post-Revolution judicial systems and their focus on maintaining peace).

28    1 W. & M. 2, ch. 2 (1689).

29    1 WILLIAM BLACKSTONE, COMMENTARIES *139. Blackstone describes such rights as follows: "But in vain would these rights be declared, ascertained, and protected by the dead letter of the laws, if the constitution had provided no other method to secure their actual enjoyment. It has therefore established certain other auxiliary subordinate rights of the subject, which serve principally as barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."

30    *Id*.

31    On Parliamentary power in this period, see DAVID J. LIEBERMAN, THE PROVINCE OF LEGISLATION DETERMINED (1989).

32    10 H.C. JOUR., 1688-93, at 823-24 (1802); BRITISH HISTORY ONLINE, http://www.british-history.ac.uk/commons-jrnl/vol10/pp823-824 [https://perma.cc/TPF9-3X97] (last accessed Oct. 17, 2016).

33    *See* Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 CLEV. ST. L. REV. 351, 403 (2009) (noting the lack of a pre-existing right to "having arms"); Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 CHI. KENT L. REV. 27, 35 (2000) (discussing the failed effort to amend the game laws to allow subjects to keep arms).

34    For examples of the various game acts, THE GAME LAW: OR, A COLLECTION OF THE LAWS AND STATUTES MADE FOR THE PRESERVATION OF THE GAME OF THIS KINGDOM 13, 36 (5th ed. 1714).

35    *See* WILLIAM NELSON, THE LAWS OF ENGLAND CONCERNING THE GAME OF HUNTING, HAWKING, FISHING, AND FOWLING, 167-77 (2d ed. 1727),

36    For an elaboration of this point, see Miller, *supra* note 9, at 89-90.

37    Although the maxim that "when the law doth give anything to any man, it giveth also, impliedly, whatsoever is necessary for the taking and enjoying of the same" might seem to apply to specific arms, this rule must be read against the Declaration of Rights' affirmation that subjects were only entitled to "arms suitable to their condition" and the game laws property requirements for owning firearms. For this and other relevant maxims, see THE GROUNDS AND RUDIMENTS OF LAW AND EQUITY 321 (1749).

Compendium_Cornell
Page 0919

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12733   Page 377 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

38    On its role in expanding the genre of popular legal writing, see Julia Rudolph, *That "Blunderbuss of Law": Giles Jacob, Abridgement, and Print Culture*, 37 STUD. EIGHTEENTH CENTURY CULTURE 197 (2008).

39    On the limited scope of self-defense under English law at this moment in history, see GILES JACOB, THE LAWS OF APPEALS AND MURDER 46 (1719). *See also*MATHEW HALE, PLEAS TO THE CROWN (1707); WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716).

40    4 WILLIAM BLACKSTONE, COMMENTARIES *184. *See also*GILES JACOB, A LAW GRAMMAR; OR RUDIMENTS OF THE LAW: COMPILED FROM THE GROUNDS, PRINCIPLES, MAXIMS, TERMS, WORDS OF ART, RULES, AND MOOT-POINTS OF OUR LAW 22 (1744) (explaining that deadly force was justified in the case of sudden attach where there was no opportunity to retreat).

41    4 BLACKSTONE, *supra* note 40, at *184.

42    HAWKINS, *supra* note 39, at 73.

43    For a discussion of time, place, and manner restrictions in the context of modern First Amendment doctrine, see Cox v. New Hampshire, 312 U.S. 569 (1941).

44    JACOB, *supra* note 40, at 21-22.

45    HAWKINS, *supra* note 39, at 73.

46    JACOB, *supra* note 39, at 46-48.

47    *Id.*

48    *See* Rex v. Gardner, 93 Eng. Rep. 1056 (K.B. 1739) (holding that simply possessing a gun is permissible because "a gun is necessary for defence of a house, or for a farmer to shoot crows"); Wingfield v. Stratford, 96 Eng. Rep. 787 (K.B. 1752) (reinterpreting the game laws, the King's Bench concluded that they were not supposed "to disarm all the people of England"). Joyce Lee Malcolm erroneously accepts the court's historical conclusion at face value and reads the new conception of gun rights backwards in time to 1688. *See*MALCOLM, *supra* note 7. The court's conclusion is better interpreted as an example of a style of common law legal reasoning that historian John Reid dubs forensic history. *See* John Phillip Reid, *Law and History*, 27 LOY. L.A. L. REV. 193 (1993). English lawyers essentially constructed a new version of the past to justify legal change, preserving the appearance that the law was fixed.

49    Bernadette Meyler, *Towards a Common Law Originalism*, 59 STAN. L. REV. 551 (2006).

50    *See Rex*, 93 Eng. Rep. at 1056.

51    The evidence also suggests that changes in case law did not immediately translate into new treatments in the standard guides to the law. *See*RICHARD BURN, THE JUSTICE OF THE PEACE, AND PARISH OFFICER 468 (2d ed. 1756) (demonstrating that there was a lag time between the cases and their incorporation in popular legal guidebooks).

52    Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.); 20 Rich. 2, c. 1 (1396-97) (Eng.).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12734   Page 378 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

53      On the historical origins of the Statute of Northampton, see A. MUSSON & W. M. ORMROD, THE EVOLUTION OF ENGLISH JUSTICE: LAW, POLITICS AND SOCIETY IN THE FOURTEENTH CENTURY (1998) and Anthony Verduyn, *The Politics of Law and Order during the Early Years of Edward III*, 108 ENG. HIST. REV. 842 (1993). On the role of justices of the peace in the maintenance of law in order in early modern England, see STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, 1550-1640 66-93 (2000) and A.J. Musson, *Sub-Keepers and Constables: The Role of Local Officials in Keeping the Peace in Fourteenth-Century England*, 117 ENG. HIST. REV. 1 (2002).

54      WILLIAM LAMBARDE, THE DUTIES OF CONSTABLES, BORSHOLDERS, TYTHINGMEN, AND SUCH OTHER LOW AND LAY MINISTERS OF THE PEACE 6-14 (1602). On Lambarde's influence, see Wilfrid Prest, *William Lambarde, Elizabethan Law Reform, and Early Stuart Politics*, 34 J. BRIT. STUD. 464 (1995). Lambarde copied this passage verbatim into THE DUTIES OF CONSTABLES (1602). Gun rights scholar Joyce Lee Malcolm erroneously claims that the statute fell into desuetude, see MALCOLM, *supra* note 7. For arguments showing that this was not the case, see Charles, *supra* note 7, at 393.

55      *See* MALCOLM, *supra* note 7, at 104.

56      JAMES TYRELL, BIBLIOTHECA POLITICA: OR AN ENQUIRY INTO THE ANCIENT CONSTITUTION OF THE ENGLISH GOVERNMENT BOTH IN RESPECT TO THE JUST EXTENT OF REGAL POWER, AND THE RIGHTS AND LIBERTIES OF THE SUBJECT 639 (1694).

57      According to historian Martyn Thompson, Tyrell played a key role in popularizing Locke's ideas in the 1690s. Martyn Thompson, *The Reception of Locke's Two Treatises of Government 1690-1705*, 24 POL. STUD. 184 (1976). For a brief but lucid discussion of Tyrell's relevance to early Whig political theory, see Tim Harris, *James II, the Glorious Revolution, and the Destiny of Britain*, 51 HIST. J. 763, 768 (2008).

58      *See* TYRELL, *supra* note 56, at 639.

59      *Id*.

60      JOHN CARPENTER & RICHARD WHITINGTON, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON 335 (Henry Thomas Riley trans., 1862).

61      THE POST BOY (London), Dec. 21, 1699, at 1; *see also* SAMUEL BLACKERBY, THE JUSTICE OF PEACE HIS COMPANION 4 (1715).

62      For a sample of texts making this argument, see JACOB, *supra* note 40, at 426 (citing Hawkins and Blackstone for authority on this proposition and treating the prohibition on traveling armed embodied in the Statute of Northampton separately from the related common law crime of affray); LAMBARDE, *supra* note 54, at 6-14.

63      JACOB, *supra* note 40, at 426; *see also* MICHAEL DALTON, THE COUNTRY JUSTICE, CONTAINING THE PRACTICE OF THE JUSTICES OF THE PEACE OUT OF THEIR SESSIONS 30 (1618) (providing a similar account).

64      J.P. GENT, A NEW GUIDE FOR CONSTABLES, HEAD-BOROUGHS, TYTHINGMEN, CHURCHWARDENS 13 (1705) (clearly distinguished between being offensively armed and the crime of affray). *See also*, BURN, *supra* note 51.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12735   Page 379 of
733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

65   JOSEPH KEBLE, AN ASSISTANCE TO JUSTICES OF THE PEACE, FOR THE EASIER PERFORMANCE OF THEIR DUTY 147, 224 (1683).

66   JELLINGER SYMONS, EXCISE LAWS ABRIDGED, AND DIGESTED UNDER THEIR PROPER HEADS, IN ALPHABETICAL ORDER (2d ed. 1775); *see also*, E.P. THOMPSON, WHIGS AND HUNTERS: THE ORIGIN OF THE BLACK ACT (1975) (describing Parliament's effort to punish poachers).

67   THOMPSON, *supra* note 66 (describing Parliament's effort to punish poachers).

68   THE COMPLETE DICTIONARY OF ARTS AND SCIENCES (1764); THOMAS WALTER WILLIAMS, THE WHOLE LAW RELATIVE TO THE DUTY AND OFFICE OF A JUSTICE OF THE PEACE: COMPRISING ALSO THE AUTHORITY OF PARISH OFFICERS (1793). *See also* HAWKINS, *supra* note 39.

69   CHARLES JAMES, A NEW AND ENLARGED MILITARY DICTIONARY (1805).

70   For evidence of the way English law treated guns, see the sources cited *supra* notes 61-67.

71   ROBERT GARDINER, THE COMPLETE CONSTABLE 9 (1724).

72   4 BLACKSTONE, *supra* note 40, at *148-49 (1803).

73   Modern gun rights advocates and libertarians have interpreted this text anachronistically, arguing that weapons had to be both unusual and dangerous to trigger the prohibition. *See* discussion *supra* note 20. This interpretation is flawed on many levels. Early modern English often used "hendiadys," a grammatical form in which a single idea is expressed by the use of two nouns linked by the conjunction "and." For a brief discussion, see CHRIS BALDICK, THE OXFORD DICTIONARY OF LITERARY TERMS 151 (3d ed., 2008); GENT, *supra* note 64 (arming offensively was a crime, making the act of carrying arms dangerous and therefore unusual); Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys In The Constitution* 102 VA. L. REV. 687 (2016) (arguing for interpreting "necessary and proper" and "cruel and unusual" each as expressing a singular idea despite their conjunction of two terms).

74   BY THE QUENNE ELIZABETH I: A PROCLAMATION AGAINST THE COMMON USE OF DAGGES, HANDGUNNES, HARQUEBUZES, CALLIUERS, AND COTES OF DEFENCE 1 (Christopher Barker, London 1579) (internal quotations omitted).

75   *Id. See also* GENT, *supra* note 64 (describing the Statute of Northampton's prohibition of going "armed offensively" before the "King's Justices" or in "Fairs or Markets").

76   WILLIAM BOHUN, PRIVILEGIA LONDINI: OR, THE LAWS, CUSTOMS, AND PRIVILEGES OF THE CITY OF LONDON 110 (1702).

77   Statute of Northampton, 2 Edw. 3, c. 3 (1328).

78   BURN, *supra* note 51, at 13.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12736   Page 380 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

79     CHARLES JAMES, A NEW AND ENLARGED MILITARY DICTIONARY (1805); *see also* Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.). On the common law crime of affray, see 4 BLACKSTONE, *supra* note 40, at \*148-49 (1803); HAWKINS, *supra* note 39, at 135-36.

80     In his account of the Statute of Northampton, gun rights activist David Kopel casts Tyrell as a modern libertarian who defended an expansive right to travel armed, a characterization that is almost the mirror image of what Tyrrell actually argues in the text. Kopel, *supra* note 20. *Contra* Charles, *supra* note 33 (providing an extensive critique of Kopel's interpretation).

81     MICHAEL DALTON, THE COUNTRY JUSTICE, CONTAINING THE PRACTICE OF THE JUSTICES OF THE PEACE OUT OF THEIR SESSIONS 30 (1618) (providing a similar account).

82     As Simon Stern notes regarding Blackstone treatment of the concept of mens rea "Hence a modern reader might expect to find, in Blackstone's account, some discussion of acts versus intentions, attempts versus completed offenses, and civil versus criminal proof standards, among other topics. That Blackstone pursues these subjects only tangentially and intermittently may be explained by the relatively scant attention devoted to them in the treatises and cases he had at his disposal. It was only in the nineteenth century, in a body of theoretical literature (and with the aid of an analytical method) facilitated to some extent by Blackstone's model, that many of these distinctions came into visibility." Simon Stern, *Blackstone's Criminal Law: Common-Law Harmonization and Legislative Reform*, *in* FOUNDATIONAL TEXTS IN MODERN CRIMINAL LAW 61 (Markus D. Dubber ed., 2014).

83     KEBLE, *supra* note 65, at 147. *See also* Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.), 20 Rich. 2, c. 1 (1396-97) (Eng.) (explaining why the mere act of traveling with an arm triggered an affray irrespective of any particular threatening act or intent to commit a crime).

84     JOHN WARD, THE LAW OF A JUSTICE OF PEACE AND PARISH OFFICER 6-7 (1769) (Describing that when a man furnishes "weapons not usually worn, it may strike a fear into others unarmed").

85     Keble and Ward each articulated the standard view that there was no legal requirement need to demonstrate a specific intent to cause terror because of asymmetrical nature of the encounter between an individual armed and one unarmed.

86     *See* DALTON, *supra* note 63, at 30; GILES JACOB, A NEW LAW-DICTIONARY (1729); KEBLEE, *supra* note 65, at 147, 224; JOHN MILTON NILES, THE CONNECTICUT CIVIL OFFICER 12 (1823) (demonstrating the continuity in English legal views on the limited nature of the right to travel armed in the period between the Glorious Revolution and the American Revolution); WARD, *supra* note 84, at 6-7.

87     WILLIAM HAWKINS, A SUMMARY OF THE CROWN-LAW BY WAY OF ABRIDGMENT OF SERJEANT HAWKINS'S PLEAS OF THE CROWN 155-63 (1728).

88     *Id.*

89     WILLIAM BLIZARD, DESULTORY REFLECTIONS ON POLICE: WITH AN ESSAY ON THE MEANS OF PREVENTING CRIMES AND AMENDING CRIMINALS 59-60 (1785). Joyce Lee Malcolm erroneously interprets this passage as asserting a broad individual right to have arms for personal protection, *see* MALCOLM, *supra* note 7. Malcolm takes this well-known exception to the general prohibition to be the norm under English law, one of many errors in her analysis. The Gordon Riots do not demonstrate a broad right to have arms or travel armed public, but quite the opposite. For an opposing view, see SCHWOERER, *supra* note 7.

Compendium_Cornell
Page 0923

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12737   Page 381 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

90      Until the middle of the eighteenth century, the restrictions of the game laws would have prohibited firearms ownership to those who failed to meet the property requirement. Those individuals who failed to meet this requirement would have been expected to show up with appropriate weapons to the station, either edged weapons or clubs.

91      Statute of Winchester, 1 Statutes of the Realm 26 1235-1377 (1275). "The needs of home defence were met by the enforcement of obligations under the Statute of Winchester (1285) which required all able-bodied males to carry arms in accordance with their station in life." Ian W. Archer, *The Burden of Taxation on Sixteenth-Century London* 44 HIST. J. 599, 620 (2001).

92      JOSEPH SHAW, THE PRACTICAL JUSTICE OF THE PEACE 81 (1728).

93      *Id*.

94      HAWKINS, *supra* note 87, at 155-63 (1728).

95      *Id*.

96      DALTON, *supra* note 63, at 264.

97      *Id*.

98      SHAW, *supra* note 92, at 81 (1728).

99      SAMUEL BLACKERBY, THE JUSTICE OF THE PEACE: HIS COMPANION 4 (1723).

100     DALTON, *supra* note 63, at 30. *Cf.* KEBLE, *supra* note 65; WARD, *supra* note 84 (providing a similar account of the cause of the terror at the root of the crime of affray).

101     BURN, *supra* note 51, at 13.

102     THEODORE BARLOW, THE JUSTICE OF PEACE: A TREATISE CONTAINING THE POWER AND DUTY OF THAT MAGISTRATE 12 (1745).

103     GILES JACOB, A NEW LAW DICTIONARY (6th ed. 1750) (entry under "Armour and Arms," no pagination in original).

104     On rank in English Society, see KEITH WRIGHTSON, ENGLISH SOCIETY: 1580-1680 (1982). Eugene Volokh argues that, "only public carrying 'accompanied with such circumstances as are apt to terrify the people' was thus seen as prohibited; but 'wearing common weapons' in 'the common fashion' was legal." Volokh, *supra* note 20, at 101. Volokh imputes a modern style mens rea requirement instead of applying the standards for criminal intent appropriate to early modern English law. For a discussion of the history of the mens rea requirement, see BINDER, *supra* note 20, at 8, 96, 113, 137-46. The references to common weapons carried in the common fashion is also read anachronistically. The exemption he notes was not general but was class specific and limited to aristocrats and the arms of their retainers, see the discussion in DALTON, *supra* note 63. HAWKINS, *supra* note 87.

Compendium_Cornell
Page 0924

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12738   Page 382 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

105   1 BLACKSTONE, *supra* note 29, at *349.

106   *Id*. at *258.

107   *Id*.

108   Peter Lake & Steve Pincus, *Rethinking the Public Sphere in Early Modern England*, 45 J. BR. STUD. 270, 277 (2006).

109   *See* discussion *supra* note 104.

110   *See* 87 Eng. Rep. 75 (1686).

111   *But cf.* David Kopel, *The First Century of Right to Arms Litigation*, 14 GEO. J.L. & PUB. POL'Y (2016) (misinterpreting Sir John Knight's Case by concluding that "Everyone in the case agreed that the Statute of Northampton outlawed only carrying in a terrifying manner.") Malcolm also misreads the case, *see*MALCOLM, *supra* note 7, at 104-05.

112   *See* J.G.A. Pocock & Gordon J. Schocket, *Interregnum and Restoration*, *in*THE VARIETIES OF BRITISH POLITICAL THOUGHT 146 (J.G.A. Pocock et al. eds., 1993) (providing a useful overview of the topic).

113   *See*STEVEN C.A. PINCUS, ENGLAND'S GLORIOUS REVOLUTION 1688-1689: A BRIEF HISTORY WITH DOCUMENTS (2005).

114   *Id*.

115   NARCISSUS LUTTRELL, 1 A BRIEF HISTORICAL RELATION OF STATE AFFAIRS FROM SEPTEMBER 1678 TO APRIL 1714 389 (1857).

116   *Id*.

117   87 Eng. Rep. 75 (1686) (The militantly Protestant jury had essentially nullified the charge by finding in favor of Knight so the Court's only legal option was a peace bond. The case does not demonstrate that the traveling armed in public had been normalized or decriminalized, but the exact opposite.)

118   *See* Charles, *supra* note 33.

119   87 Eng. Rep. 75 (1686).

120   GEORGE WEBB, VIRGINIAN JUSTICE OF PEACE (1736).

121   *See*JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (1774) (citing MICHAEL DALTON, THE COUNTRY JUSTICE CONTAINING THE PRACTICE, DUTY AND POWER OF THE JUSTICES OF THE PEACE AS WELL IN AS OUT OF THEIR SESSIONS 37 (1705)). Webb expressly framed the prohibition in general terms of traveling armed in populous areas.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12739   Page 383 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

122    *See id.*

123    HAWKINS, *supra* note 87, at 155-63.

124    SIR JOHN COMYNS, A DIGEST OF THE LAW OF ENGLAND 358 (4th ed. 1793).

125    *See* also Statute of Winchester, *supra* note 91.

126    *See* WILLIAM WALLER HENING, THE STATUTES AT LARGE 198 (1823).

127    This requirement only applied to individuals who were already able to bear arms, a subset of the white male population.

128    *See* HENING, *supra* note 126. Early Virginia imposed a variety of obligations on its residents, especially regarding religion. Parents could be penalized for not properly instructing children and apprentices in the catechism endorsed by the Church of England. *Id.* at 181-82. It also taxed colonists to support the established church and penalized those who failed to attend church. *Id.* at 184. In short, modern style rights were in short supply in early Virginia.

129    *Id.* at 174.

130    Act of Feb. 27, 1770, No. 191 (Judiciary Act of Georgia of 1770), *in* ROBERT WATKINS & GEORGE WATKINS, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157 (1800).

131    *Id.*

132    Kevin Sweeney, *Firearms, Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL, *supra* note 5, at 310 (discussing the role of the militia in early American society).

133    *See id.*

134    *Id.*

135    SAMUEL ADAMS, THE WRITINGS OF SAMUEL ADAMS 299 (Harry Alonzo Cushing ed., 1904). For more on Adams, see SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

136    ADAMS, *supra* note 135, at 318.

137    *See* CORNELL, *supra* note 135; Steven G. Calabresi et al., *State Bills of Rights in 1787 and 1791: What Individual Rights are Really Deeply Rooted in American History and Tradition?*, 85 S. CAL. L. REV. 1451 (2012).

138    G. EDWARD WHITE, LAW IN AMERICAN HISTORY 143 (2012).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12740   Page 384 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

139   WILLIAM E. NELSON, THE COMMON LAW IN COLONIAL America (2008); Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law In Colonial America and the Problem of Legal Diversity*, 89 CHI. KENT. L. REV. 937 (2014) (discussing the way different regional legal cultures emerged and transformed the common law).

140   ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES: WITH NOTES OF REFERENCE 214 (1803).

141   *Id.*

142   *Id.*

143   MD. CONST. art. III, § 1 (1776). *See also* William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968) (describing how the American Colonies adopted the common law as the basis for judicial decisions).

144   9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds., 1903).

145   As Laura Edwards demonstrates, the traditional English practice of using private prosecutions for assault and similar crimes gradually gave way to a focus on public prosecution as an affront to the people's peace in the South. *See* LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009).

146   JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

147   *See* A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (1794) (prohibiting individuals from "go[ing] or ride[ing] armed by night or day"); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60-61 (1792) (prohibiting conduct by individuals who "go nor ride armed by night nor by day"); FRANCOIS XAVIER MARTIN, A TREATISE ON THE POWER AND DUTIES OF A CONSTABLE ACCORDING TO THE LAW OF NORTH CAROLINA 9 (1806).

148   FRANÇOIS X. MARTIN, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE, AND OF SHERIFFS, CORONERS, & C. ACCORDING TO THE LAW OF THE STATE OF NORTH CAROLINA 84 (1804).

149   WILLIAM WALLER HENING, THE NEW VIRGINIA JUSTICE 50 (1810).

150   *Id.*

151   ASAHEL STEARNS & LEMUEL SHAW, THE GENERAL LAWS OF MASSACHUSETTS 454 (Theron Metcalf ed., 1823).

152   *See* BINDER, *supra* note 20.

153   TUCKER, *supra* note 140, at 1-9.

154   *See* Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism*, 82 FORDHAM L. REV. 721 (2013) (discussing the problem of taking a single complex

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12741   Page 385 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

thinker such as Tucker and treating him as proxy for a monolithic American Mind); Saul Cornell, *St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings*, 47 WM. & MARY L. REV. 1123 (2006) (explaining the need to root Tucker's constitutional thought, including his views of the Second Amendment, in the growing rift between Federalists and Jeffersonians in the 1790s).

155    For gun rights misinterpretations of Tucker, see Stephen P. Halbrook, *St. George Tucker's Second Amendment: Deconstructing "The True Palladium of Liberty"*, 3 TENN. J.L. & POL'Y 120 (2006); James Lindgren, *Forward: The Past and Future of Guns*, 104 J. CRIM. L. & CRIMINOLOGY 705 (2015).

156    TUCKER, *supra* note 140, at Appendix B.

157    PAUL DOUGLAS NEWMAN, FRIES'S REBELLION: THE ENDURING STRUGGLE FOR THE AMERICAN REVOLUTION (2004).

158    The Jeffersonian opposition in the 1790s feared Federalists were attempting to use English legal methods to expand the power of the Constitution by importing common law ideas, including those about treason, see Kathryn Preyer, *Jurisdiction to Punish: Federal Authority, Federalism and the Common Law of Crimes in the Early Republic* 4 LAW & HIST. REV. 223 (1986).

159    *See*CORNELL, *supra* note 135.

160    *Cf.* ACTS PASSED AT THE FIRST SESSION OF THE TWENTY-FIRST GENERAL ASSEMBLY FOR THE COMMONWEALTH OF KENTUCKY 100-01 (1813) ("An Act to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases" approved in 1813); ACTS PASSED AT THE SECOND SESSION OF THE FIRST LEGISLATURE OF THE STATE OF LOUISIANA 172-75 (1813) ("An Act against carrying concealed weapons, and going armed in public places in an unnecessary manner" approved in 1813); THE REVISED LAWS OF INDIANA, ADOPTED AND ENACTED BY THE GENERAL ASSEMBLY AT THEIR EIGHTH SESSION 79 (1824) ("An Act to prohibit the wearing of Concealed Weapons" approved in 1820); ARK. REV. STAT. div. VIII, ch. 44 (1838); Act of Oct. 19, 1821, ch. 13, 1821 Tenn. Pub. Acts 15. Early Indiana was settled by southerners which makes its situation similar to that of other southern states. Nicole Etcheson, *Manliness and the Political Culture of the Old Northwest, 1790-1860*, 15 J. EARLY REP. 59, 60 n.2 (1995).

161    Bliss v. Commonwealth, 12 Ky. 90 (1822).

162    *Id.*

163    *On Wearing Concealed Arms*, DAILY NAT'L INTELLIGENCER (Sept. 9, 1820).

164    CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822).

165    *Id.*

166    *Id.*

167    KY. CONST. art. III, § 25 (1850).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12742   Page 386 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

168    State v. Huntly, 25 N.C. (3 Ired.) 418 (1843).

169    *Id.*

170    *Id.*

171    *See* DAVID HACKETT FISCHER, HISTORIANS' FALLACIES: TOWARD A LOGIC OF HISTORICAL THOUGHT 142 (1970).

172    *See* Volokh, *supra* note 20, at 101 (erroneously asserting that "the Statute was understood by the Framers as covering only those circumstances where carrying of arms was unusual and therefore terrifying."); David Kopel, *The First Century of Right to Arms Litigation*, 14 GEO. J.L. & PUB. POL'Y (2016) (confusing the jury's act of nullification of the statute with the judge's views and ignoring the fact that the judges imposed a peace bond for a violation of the Statute of Northampton).

173    Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840); State v. Buzzard, 4 Ark. 18 (1842).

174    For an overview of the modern individual rights and collective rights theories of the Second Amendment, see THE SECOND AMENDMENT ON TRIAL, *supra* note 5.

175    Aymette v. State, 21 Tenn. (2 Hum.) 154 (1840). Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*, 61 AM. U.L. REV. 585 (2012) typifies the gun rights misreading of this tradition. O'Shea offers no explanation of why a common law right of self-defense and a civic constitutional right could not have existed separately from one another. Instead, he simply assumes that rights embedded in the Bill of Rights have always been treated the same at all times and places in American history, a dubious historical proposition with little factual bais. "Why not the *hybrid* view of the right, which combines a militia purpose with a personal guarantee against disarmament, thereby treating the Second Amendment 'right of the people' in the same way the other rights of the people in the Bill of Rights have been treated?" For a critique of this type of ahistorical approach to eighteenth century rights, see Cornell, *Meaning and Understanding*, *supra* note 154.

176    On the difficulty of conceptualizing bearing arms outside of the modern rights discourse, see Joseph Blocher, *Gun Rights Talk*, 94 B.U. L. REV. 813 (2014). For examples of gun rights scholars who have trouble understanding that "the past is a foreign country," DAVID LOWENTHAL, THE PAST IS A FOREIGN COUNTRY (1985), in which conceptions of rights might not function in the same way as they do in contemporary law, see Nicholas J. Johnson, *Rights Versus Duties, History Department Lawyering, and the Incoherence of Justice Stevens's Heller Dissent*, 39 FORDHAM URB. L.J. 1503 (2012) (arguing anachronistically that the idea that rights might impose duties makes no sense because modern conceptions of rights do not impose obligations on citizens) and Randy Barnett, *Was the Right to Keep and Bear Arms Conditioned on Service in an Organized Militia?*, 83 TEX. L. REV. 237, 259 (2004) (reviewing H. Richard Uviller & William G. Merkel, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT (2002)) (finding it hard to accept that the Pennsylvanians would have not constitutionalized the individual right of self-defense). Barnett's error stems from his failure to grasp the nature of the English common law context. For a corrective that shows that *Heller*'s individual right is better understood as a traditional English common law right, not a Second Amendment claim, see Reva Siegel, *Heller and Originalism's Dead Hand*, 56 UCLA L. REV. 1399, 1415 (2009) ("[T]here is more evidence in the majority opinion establishing the existence of a common law right of self-defense than there is demonstrating that such a right was constitutionalized by the Second Amendment's eighteenth-century ratifiers.").

177    On the role of debt in Founding era culture, see T.H. BREEN, TOBACCO CULTURE: THE MENTALITY OF THE GREAT TIDEWATER PLANTERS ON THE EVE OF REVOLUTION 31-32 (1985); WOODY HOLTON, FORCED FOUNDERS: INDIANS, DEBTORS, SLAVES, AND THE MAKING OF THE AMERICAN REVOLUTION IN

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12743   Page 387 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

VIRGINIA 61-62 (1999); Emory G. Evans, *Planter Indebtedness and the Coming of the Revolution in Virginia*, 19 WM. & MARY Q. 511 (1962). *See also* Kevin Sweeney, *Amendment*, *supra* note 132.

[178]   Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1708-09 (2012).

[179]   *See* CORNELL, *supra* note 135 and Sweeney, *supra* note 132.

[180]   District of Columbia v. Heller, 554 U.S. 570, 619-21 (2008). For two leading late nineteenth century commentators who argued that *Buzzard, not Bliss* was the ascendant paradigm in American law, see JOEL PRENTISS BISHOP, COMMENTARIES ON THE CRIMINAL LAW (1868) and John Foster Dillon, *The Right to Keep and Bear Arms for Public and Private Defense*, 1 CENT. L.J. 259 (1874).

[181]   *Heller*, 554 U.S. at 610-14.

[182]   *See* Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013) and Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. FORUM 121 (2015).

[183]   *See* Ruben & Cornell, *supra* note 182.

[184]   THE PERPETUAL LAWS, OF THE COMMONWEALTH OF MASSACHUSETTS, FROM THE ESTABLISHMENT OF ITS CONSTITUTION TO THE SECOND SESSION OF THE GENERAL COURT, IN 1798 259 (Isaiah Thomas ed., 1799).

[185]   JAMES EWING, A TREATISE ON THE OFFICE AND DUTY OF THE JUSTICE OF THE PEACE, SHERIFF, CORONER, CONSTABLE 546 (1805).

[186]   *Id.*

[187]   *See* JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23-24 (1816).

[188]   1836 Mass. Acts 750.

[189]   *Id.*

[190]   PETER OXENBRIDGE THACHER, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK, FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF THE TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON, ON MONDAY, DECEMBER 5TH, A.D. 1836 AND ON MONDAY, MARCH 13TH, A.D. 27 (1837); *see also Judge Thacher's Charges*, CHRISTIAN REG. & BOS. OBSERVER 91 (1837) (excerpting and reprinting the section of the grand jury charge dealing with traveling armed).

[191]   *An Address*, HAMPSHIRE GAZETTE, Oct. 24, 1838.

[192]   *Id.*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12744   Page 388 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

193    *See* 19 DEL. LAWS 733 (1852) ("Any justice of the peace may also cause to be arrested ... all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."); ME. REV. STAT. tit. 12 § 16 (1840) ("Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself ..."); MICH. REV. STAT. ch. 162, § 16, reprinted in THE REVISED STATUTES OF THE STATE OF MICHIGAN 690, 692 (1846) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.");

Of Proceedings to Prevent the Commission of Crimes, ch. 14, § 16, 1847 VA. ACTS 127, 129 ("If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided"); 1870 W. VA. LAWS 702, 703, ch. 153, § 8 ("If any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance, with the right of appeal, as before provided, and like proceedings shall be had on such appeal."); REVISED STATUTES OF THE STATE OF DELAWARE, TO THE YEAR OF OUR LORD ONE THOUSAND EIGHT HUNDRED AND FIFTY-TWO 333 (1852) ("Any justice of the peace may also cause to be arrested ... all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."); THE REVISED CODE OF THE DISTRICT OF COLUMBIA, PREPARED UNDER THE AUTHORITY OF THE ACT OF CONGRESS 570 (1857) ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person ...."); THE REVISED STATUTES OF THE STATE OF WISCONSIN: PASSED AT THE ANNUAL SESSION OF THE LEGISLATURE COMMENCING JANUARY 13, 1858, AND APPROVED MAY 17, 1858 985 (1858) ("If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person ...."); THE STATUTES OF OREGON: ENACTED AND CONTINUED IN FORCE BY THE LEGISLATIVE ASSEMBLY, AT THE SESSION COMMENCING 5TH DECEMBER, 1853 220 (1854) ("If any person shall go armed with dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault, injury, or other violence to his person, or to his family or property, he may, on complaint of any other person, having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided."); JOHN PURDON, A DIGEST OF THE LAWS OF PENNSYLVANIA, FROM THE YEAR ONE THOUSAND SEVEN HUNDRED TO THE TWENTY-FIRST DAY OF MAY, ONE THOUSAND EIGHT HUNDRED AND SIXTY-ONE 250 (9th ed. 1862) ("If any person, not being an officer on duty in the military or naval service of the state or of the United States, shall go armed with a dirk, dagger, sword or pistol, or other offensive or dangerous weapon, without reasonable cause to fear an assault or other injury or violence ...."); GEORGE B. YOUNG, THE GENERAL STATUTES OF THE STATE OF MINNESOTA, AS AMENDED BY SUBSEQUENT LEGISLATION, WITH WHICH ARE INCORPORATED ALL GENERAL LAWS OF THE STATE IN FORCE AT THE CLOSE OF THE LEGISLATIVE SESSION OF 1878 629 (1879) ( "Whoever goes armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapons, without reasonable cause to fear an assault or other injury or violence to his person ....").

194    English v. State, 35 Tex. 473 (1871).

195    Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas* 4 TEX. A&M L. REV. (forthcoming), https://papers.ssrn.com/sol3/papers2.cfm?abstract_id=2810806, [https://perma.cc/MDM8-MAJG] (analyzing Republican and Democratic views of gun regulation in Reconstruction era Texas).

196    *Id.*

197    TEX. CONST. of 1869, art. I § 13 ("Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe.").

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12745   Page 389 of 733

THE RIGHT TO KEEP AND CARRY ARMS IN..., 80 Law & Contemp....

198    *English*, 35 Tex. 473.

199    *See* Frasetto, *supra* note 195.

200    *See* State v. Duke, 42 Tex. 455 (1874).

201    On restrictions in the "wild west," see Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876) and 1876 WYO. COMP. LAWS 52, § 1 (prohibiting anyone from "bear[ing] upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village.") For robust local laws, see Ordinances of the Council of the City of Dallas and Annual Reports of City Officers from October 1st, 1886 to June 25th, 1888 (that if any person in the City of Dallas shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slungshot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than two hundred dollars and shall be confined in the city prison not less than twenty nor more than sixty days.).THEODORE HARRIS, CHARTER AND ORDINANCES OF THE CITY OF SAN ANTONIO COMPRISING ALL ORDINANCES OF A GENERAL CHARACTER IN FORCE AUGUST 7TH, 1899 ("If any person, within the corporate limits of the city of San Antonio, shall carry on or about his or her person, saddle, or in his saddle bags, any pistol, dirk, dagger, sling shot, sword cane, spear, or knuckles made of any metal or any hard substance, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he or she shall be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00).") Pueblo Colorado, Ordinances, Section Six, art. II, ch. 8 ("If any person other than a law officer shall carry upon his person any loaded pistol, or other deadly weapon, he shall upon conviction be fined not less than fifteen nor more than fifty dollars for each offense, and in addition thereto forfeit to the city any weapon found on his person.")

202    *Review American and English Encyclopedia of Law*, 29 CENTRAL L.J. 400 (1896).

203    THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (1887). It addressed both relevant state case law and noted that the Second Amendment had not been incorporated. For the rejection of Second Amendment incorporation in the nineteenth century, see United States v. Cruikshank, 92 U.S. 542 (1875). In *McDonald v. City of Chicago*, the Second Amendment was held to apply to the states. McDonald v. Chicago, 561 U.S. 742 (2010).

204    *See* Kopel *supra* note 111; O'Shea, *supra* note 155; Volokh, *supra* note 20.

80 LCPR 11

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



PROTESTS, INSURRECTION, AND THE SECOND AMENDMENT

# The Police Power and the Authority to Regulate Firearms in Early America

By **Saul A. Cornell**, Paul and Diane Guenther Chair in American History, Fordham University

PUBLISHED JUNE 2021

**Brennan Center for Justice** at New York University School of Law

# Introduction

Contemporary Second Amendment jurisprudence looks to history for guidance on evaluating the constitutionality of gun regulation.[1] Although much has been written about *District of Columbia v. Heller's* focus on history, relatively little scholarly attention has focused on the way the decision's analysis aligns with the historical conception of rights in place in the founding era.[2] The language of rights is pervasive in modern American law and is familiar to judges, lawyers, and scholars.[3] Yet modern judges and scholars, working in an originalist modality, seldom acknowledge the distinctive nature of founding era rights theory — including the way the concept of police was not primarily understood in terms of the modern conception of the police power, but rather was typically articulated as a right of the people to regulate their internal police. A proper understanding of how the founding era concept of police informed legal thinking about the right to keep and bear arms is therefore essential to the future of Second Amendment jurisprudence.[4]

Rather than fully flesh out the original meaning of the right to keep and bear arms and connect it to the structure of founding era rights theory, *Heller* plucks isolated phrases from founding era texts and interprets them in much the same way a modern tourist uses a phrase book or translator application.[5] This piecemeal process of translation inevitably distorts the texts it seeks to illuminate. Compounding this problem, *Heller* weaves back and forth between past and present, producing a palimpsest of American constitutional history.[6] In this ahistorical account, founding era militias and Nazis in Skokie, Illinois, march to the same constitutional drumbeat in Justice Antonin Scalia's static vision of an unchanging idea of liberty.[7] This approach to constitutional texts is hard to reconcile with any coherent theory of originalism. It is not simply ahistorical; it is anti-historical to its core.[8]

*Heller's* ahistorical treatment of founding era conceptions of rights emerges most clearly in Justice Scalia's diatribe on constitutional balancing. In his critique of this concept, Justice Scalia imputes to the founding generation a view of rights of fairly recent vintage: an approach to rights most closely associated with Justice Hugo Black's critique of Justice Felix Frankfurter's conception of the First Amendment.[9] Justice Black famously argued that the Bill of Rights' purpose "was to put the freedoms protected there completely out of the area of any congressional control that may be attempted through the exercise of precisely those powers that are now being used to 'balance' the Bill of Rights out of existence."[10] In *Heller,* Justice Scalia channeled Black's jurisprudence, vehemently rejecting the application of modern-style "free standing interest balancing" to Second Amendment questions.[11] Echoing Black, Scalia opined:

> The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.[12]

At one level, Scalia and Black both were undoubtedly correct that the founding era did not use our modern legal metaphor of balancing. But both were wrong about the founding era's conception of rights. Interpreting 18th-century rights talk means jettisoning many of the ideas and concepts that are familiar to modern lawyers and judges, including the idea that founding era constitutions were designed to take "enumerated rights out of the hands of government."[13] Not only was this not how the founding generation viewed the function of written bills of rights, but it also compounds this error by applying an equally ahistorical conception of the scope and function of judicial review as an aggressive rights-protecting mechanism.[14] The founding generation would have been shocked that modern judges would think that the Second Amendment was understood to empower

unelected federal judges to act as "Platonic guardians" of the people's rights, including the right to keep and bear arms.[15] Thus *Heller* is a perfect trifecta of anachronism: it approaches the Second Amendment, founding era rights theory, and judicial review from a distinctly un-originalist and thoroughly modern set of assumptions.[16] In this regard, *Heller*'s many anachronisms mirror the costumes worn by some of the infamous protestors who attacked Congress in the U.S. Capitol riot of January 6, 2021. In one remarkable image from the riot, a protestor dressed as George Washington sporting a tricorne hat looks down at his cell phone while a police officer dressed in modern riot gear gazes at the scene stoically.[17] *Heller's* mishmash of the past and present — its blatant disregard for historical chronology — is a bit like the image of George Washington looking at a cell phone; it is premised on constitutional fantasy that has little connection to historical reality.

Before analyzing the founding era's approach to rights, it is important to clearly articulate how modern American law frames issues of rights. There is a vast, erudite, and complex scholarly literature on the nature of legal rights in contemporary Anglo-American law. An influential definition of modern rights theory advanced by legal philosopher Joseph Raz frames the issue clearly: "An individual has a right if an interest of his is sufficient to hold another to be subject to a duty. His right is a legal right if it is recognized by law, that is if the law holds his interest to be sufficient ground to hold another to be subject to a duty."[18]

Another popular framing of contemporary rights derives from the work of philosopher Ronald Dworkin.[19] According to Dworkin, rights are trumps: strong barriers to government interference.[20] Both of these conceptions of rights are useful in understanding modern Supreme Court jurisprudence. In a thought-provoking essay in the *Harvard Law Review*, constitutional scholar Jamal Greene argues that modern American constitutional law, particularly Supreme Court jurisprudence, has absorbed a good deal of Dworkin's conception of rights as trumps. Thus, "rights are absolute but for the exceptional circumstances in which they may be limited. Constitutional adjudication within this frame is primarily an interpretive exercise fixed on identifying the substance and reach of any constitutional rights at issue."[21]

Joseph Blocher's exploration of this theme, in a short but incisive response to Greene's *Harvard Law Review* foreword, identifies the best exponent of this expansive vision of constitutional rights as Justice Black's absolutist view of the First Amendment.[22] Black's view combines two modern ideas: a libertarian conception of rights and a robust understanding of judicial review. Yet even the most ardent champions of judicial review in the founding era believed that it was an "awesome" power, one that required the utmost judicial humility in its exercise. Failing to adhere to this type of restraint undermined republican ideals and popular faith in government and elevated the judiciary above the legislature.[23] The modern idea of judicial supremacy — an idea that Black, Scalia, and most federal judges take for granted — did not emerge fully formed at the founding but took a long and circuitous path to becoming an accepted feature in American law.[24] As historian Gordon Wood observes:

> Thus for many Americans in the 1790s judicial review of some sort did exist. But it remained an extraordinary and solemn political action, akin perhaps to the interposition of the states that Jefferson and Madison suggested in the Kentucky and Virginia Resolutions of 1798 — something to be invoked only on the rare occasions of flagrant and unequivocal violations of the Constitution. It was not to be exercised in doubtful cases of unconstitutionality and was not yet accepted as an aspect of ordinary judicial activity.[25]

The same reticence about judicial review was true of James Madison's constitutional thought. Historian Jack Rakove's comment about Madison's approach to judicial review underscores Wood's point. Madison, Rakove

Compendium_Cornell
Page 0935

notes, "did not expect the adoption of amendments to free judges to act vigorously in defense of rights."[26] Thus, Scalia's attack on balancing was not rooted in founding era constitutionalism at all; rather, it is a prime example of the type of temporal oddity identified by legal scholar Reva Siegel.[27] Justice Black, not Madison, offered the foundation for *Heller's* anti-balancing screed, an attack that Scalia erroneously imputed to the founding generation. Such a view has little to do with the Constitution's original meaning and is in fact a product of recent American legal history.

Founding era rights talk was an eclectic mix of social contract theory (including Lockean notions), common law, and Whig republicanism.[28] As historian Jonathan Gienapp notes, modern originalist studies of the founding era have worked backwards from contemporary conceptions of rights, where "scholars have thus often begun their analyses with the wrong conception of rights in mind, by assuming that they are 'the inverse of powers.'"[29] Summarizing a generation of scholarship on founding era constitutionalism, Gienapp writes that "early state constitutions vested local legislatures with sweeping authority, not because Revolutionary Americans were indifferent to individual liberty but because they assumed that empowering the people's representatives was the same thing as preserving the people's rights."[30] America's true first freedom — the foundation of all other liberties — was neither the right to bear arms nor the core First Amendment freedoms of speech and the press but the right of the people to enact laws to regulate their own internal police.[31]

Regulation was not antithetical to liberty; it was the necessary precondition for its exercise and survival.[32] In an oration commemorating American independence delivered almost a decade after the adoption of the Constitution, a patriotic orator reminded his audience that "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[33] Liberty, in this model, was not synonymous with the absence of restraint, a libertarian notion at odds with much founding era constitutional and legal thought. Liberty was the freedom to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people.[34]

In modern law, liberty and power are typically cast as antithetical. Accordingly, rights in contemporary law function as trumps, erecting strong barriers against government interference. Founding era lawyers and jurists approached rights with a different conceptual tool kit and set of assumptions.[35] Legal scholar Jud Campbell has recently noted that founding era ideas about rights, including those natural rights retained after the creation of a polity, were not taken off the table, as Scalia's view erroneously claims. "The point of retaining natural rights . . . was *not* to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with *just cause* and only with *consent of the body politic*."[36] Rather than limit rights, regulation was the essential means of preserving rights.[37]

Unrestrained liberty was a threat, not a guardian of rights.[38] This dangerous form of liberty was *licentiousness*, a word that has virtually disappeared from modern rights discourse. Thomas Tudor Tucker, a prominent South Carolina political leader who sat in the first Congress that drafted the first 10 amendments to the Constitution, including the Second Amendment, echoed this viewpoint. "Licentiousness is a tyranny as inconsistent with freedom and as destructive of the common rights of mankind, as is the arbitrary sway of an enthroned despot. And those, who wish to call themselves truly free, have to guard, with equal vigilance, against the one and the other."[39] The preservation of liberty — well-regulated liberty — meant steering a course between arbitrary power and licentiousness.[40] The core right essential to this scheme of ordered liberty was the right of people to enact laws to promote the common good.[41] Recovering this lost language of 18th-century rights, including the

conception of liberty and regulation that shaped American law in the era of the Second Amendment, is essential if *Heller's* originalist framework is to remain true to founding era understandings.[42]

# The People's Right to Regulate Their Internal Police: The Foundation of All Other Rights

The notion of a police right — a right of the people to regulate their internal police — was pervasive in the era of the American Revolution and the Second Amendment. Modern American legal theory does not frame issues of police in the same capacious terms as the founding generation. Indeed, the dominant mode of analyzing this concept is not with the language of rights at all but with the language of power, specifically the police power. Scholars of the police power typically focus on Reconstruction, particularly on doctrinal developments following the *Slaughterhouse Cases*.[43] Focusing on this era inevitably obscures the early American origins of the idea of police — especially the founding era's rights-based conception of police, a concept that was itself grounded in the idea of popular sovereignty.

A new body of legal scholarship on the early republic has recast the history of the police power by reconfiguring the idea of police as a rights-based legal construct that was tied to Revolutionary theories of popular sovereignty. This rights-based discourse was eventually overshadowed by an early version of the modern view of police power. Thus, the idea of a judicially monitored police power was not rooted in founding era constitutionalism at all, but only emerged gradually as part of an expansion of judicial power beginning with the Marshall Court.[44]

One of the best expositions of the earlier vision of police rights occurred in the first state constitutions.[45] The 1776 Pennsylvania Constitution, the first document to assert a right to bear arms, preceded that right by affirming a more elemental one: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[46] The legal concept of "police" — the power of the people, acting through their government, to enact and enforce laws to protect public health, safety, and welfare — was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the 18th century.[47] The concept was elaborated by Sir William Blackstone in his influential *Commentaries on the Laws of England*.[48] By the era of the American Revolution, the concept had become foundational to virtually every feature of Anglo-American law and was included in many of the early state constitutions drafted after the American Revolution.

The 18th-century language of police was primarily a language about the right of legislatures to enact laws to promote public welfare. Indeed, recent corpus linguistics evidence about the use of the phrase "right of the people" has underscored this fact by demonstrating that the phrase more often articulated a collective conception of rights and not a highly individualistic one.[49] Although *Heller* clearly rejected a collective rights reading of the Second Amendment, it did not reckon with the most important founding era right: the right of the people to regulate their internal police. This right was an individual right of citizens, but it was exercised collectively by the people.

Although the rise of a judicial discourse about the police power grew in the 19th century, it did not entirely eradicate the founding era's legislative-based language of the people's right to regulate their internal police. Moreover, the phrase "internal police" had already become common, particularly in state laws establishing towns and defining the scope of their legislative authority.[50] In his classic study of the police power, Ernst Freund noted that the term "police" became widespread in legislative compilations published during the period of legal codification in the late 1820s.[51] The term "police" continued to be used in various statutes and local

Compendium_Cornell
Page 0937

ordinances, but it is indisputable that a slow process of judicializing the concept of police gained traction in American law. The Marshall and Taney Courts facilitated this process, which was aided by state court judges. By the middle of the antebellum era, the concept of state police power had been refined and elaborated by leading jurists and legal theorists.[52]

The application of the police power to firearms and ammunition was singled out as the locus classicus of state police power by Chief Justice John Marshall in *Brown v. Maryland* (1827).[53] Massachusetts judge Lemuel Shaw, one of the most celebrated state jurists of the pre–Civil War era, elaborated this point in his influential opinion in *Commonwealth v. Alger* (1851), a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.[54] Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[55]

Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far-reaching of any exercise of the police power throughout American history. The many ordinances authorizing local government officials to search for gunpowder illustrate the scope of this authority.[56]

By the start of the Civil War, a strong consensus in American law had emerged on the broad scope of the police power.[57] Francis Lieber, a leading commentator on American politics and law in the 19th century, described its role in Anglo-American law in lucid terms: the 1836 edition of the *Encyclopædia Americana* asserted that police, "in the common acceptation of the word, in the United States and England, is applied to the municipal rules, institutions, and officers provided for maintaining order, cleanliness &c."[58] The dominant mode of discussing police had been largely recast as a power rather than a right by mid-century.

No jurisdiction enumerated the full contours of the police power in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.[59] This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[60] Throughout the long arc of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities and states to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[61] This long-standing tradition of using the police power authority to adopt specific laws to meet shifting challenges has continued to the present day.[62]

This vision of the police power was articulated forcefully by the Supreme Court in the *License Cases* when Justice John McLean wrote this about the scope of state police power:

> "It is not susceptible of an exact limitation but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences

Compendium_Cornell
Page 0938

spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied."[63]

The police power — the right of the people to regulate themselves — was dynamic, adapting to the changing needs of American society.

# *State v. Reid*: The Police Power, Balancing, and Purposive Carry in Antebellum Southern Jurisprudence

*Heller* never addresses the police power and its centrality to early American rights theory or antebellum jurisprudence. The omission is striking because *Heller* does devote considerable attention to antebellum southern cases addressing the issue of public carry, and this body of law was strongly influenced by police power jurisprudence.[64] One of those cases, *State v. Reid* (1840), is often cited in the modern Second Amendment debate because of its robust formulation of the right to keep and bear arms. What has not drawn much judicial or scholarly notice is the way the case uses antebellum police power jurisprudence to address the meaning and scope of the right to keep and bear arms.[65]

The *Reid* court observed that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[66] Having framed the issue before as a classic example of police power jurisprudence, the court went on to explain its understanding of how the concept of judicial review related to the proper functioning of the police power. In contrast to Justice Scalia's anti-balancing model, the *Reid* court defended a theory of judicial humility, one far closer in spirit to the founding era's vision of judicial review.[67]

Deference to the legislature was the default rule for the *Reid* court even in cases where a law might conflict with a constitutional provision. "But let it be conceded that it is doubtful, whether the statute does not come in collision with the constitution, yet it is our duty to maintain its validity." The *Reid* court stressed that any responsible judicial body ought to take cognizance of the fact that the law had "received the assent of the two houses of the General Assembly and the Governor." Given these facts, it was vital for the court to act with some deference to the legislature. The court did not suggest abdicating its role and allowing legislatures to run roughshod over the Constitution. Judicial restraint was the appropriate stance in cases in which an alleged constitutional violation fell in a grey zone wherein reasonable jurists might disagree over the legality of the statute. "Before the judiciary can with propriety declare an act of the Legislature unconstitutional," the court asserted, "a case should be presented in which there is no rational doubt."[68] In other words, short of incontrovertible evidence of a clear conflict, courts ought to defer to legislatures. Moreover, the *Reid* court took notice that other southern courts had divided on the constitutionality of restrictions on public carry. In the absence of a judicial consensus, courts ought to tread lightly before striking down laws. In this regard, the *Reid* court also showed far greater judicial modesty than the *Heller* Court. Justice Scalia made no effort to acknowledge this judicial split over the issue of public carry in the antebellum case law; rather than address this division, he simply dismissed the views of any judges who took a different view of the issue than the one he

advanced. Thus, Scalia effectively erased half the antebellum judicial record, an act of judicial arrogance that has few matches in American constitutional law.[69]

Although *Heller* seems to suggest that balancing is impermissible because of history, neither founding era constitutional thought nor the antebellum jurisprudence that Justice Scalia selectively quoted supports such a conclusion. In fact, both periods support the opposite conclusion: a type of legislative balancing is hardwired into the founding era's conception of the police right, and equally central to antebellum police power jurisprudence. *Heller* got both parts of this history wrong, and in this regard its purported model of originalism is itself profoundly un-originalist.

*Reid* offers another cautionary tale for post-*Heller* Second Amendment law. Modern champions of a robust right to carry arms openly in public insist that this right is permissive in nature. The notion that one ought to have a reason to carry, they argue, is inconsistent with the very concept of a fundamental right. Once again, this claim has little foundation in founding era law or in the antebellum jurisprudence so central to *Heller*. In fact, such a view would have required repudiating the Enlightenment foundations for much of early American legal culture.[70] In short, reasonableness has always been a defining feature of the right to carry arms in public under American law.

The facts of *Reid* underscore this important point that has gone unnoticed in post-*Heller* scholarship and jurisprudence. The case involved a sheriff who carried a concealed pistol in violation of the state's prohibition on public carry of arms. The fact that a peace officer was prosecuted for carrying a weapon might seem surprising given the libertarian cast of modern gun rights culture. But the decision makes perfect sense if one roots it in the evolving common law understanding of the limits on public carry inherited from English law. "If the emergency is pressing," the *Reid* court declared, "there can be no necessity of concealing the weapon, and if the threatened violence will allow of it, the individual may be arrested and constrained to find surieties to keep the peace, or committed to jail."[71] The *Reid* court rejected the idea of permissive public carry. Instead, the decision asserted a much narrower vision of purposive open carry: total bans on concealed carry were unproblematic; open carry was permissible, but only if there was a legitimate reason to travel armed. A specific purpose, including a specific and imminent threat, could justify the decision to arm in public, but absent such a reason, open carry in public remained a threat to the peace. Moreover, the sheriff-defendant in *Reid*, the court reasoned, was only entitled to carry openly when the common law methods of surety available to him as a peace officer were deemed to be insufficient to protect him and maintain the peace. The state could not categorically ban open carry, but it could limit and punish those who carried without good cause.

*State v. Huntley* (1843), another favorite case of modern gun rights advocates, also supports the idea of purposive carry and rejects the idea of permissive open carry.[72] *Huntley* marked a clear break from the traditional common law limits on armed travel in public. It represented a distinctive southern strain of an evolving American legal tradition in firearms regulation.[73] Yet even this case drew a sharp distinction between purposive carry and permissive carry. In *Huntley,* the court wrote:

> No man amongst us carries it [a pistol] about with him, as one of his every day accoutrements — as a part of his dress — and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment. But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun per se constitutes no offence. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun.[74]

Carrying weapons for a purpose openly was protected; carrying weapons with no specific purpose was not. The phrase "business or amusement" was not synonymous with carrying a weapon every day as one might carry a watch; the decision to public carry had to be grounded in a specific reason. Thus, in one of the most expansive defenses of gun rights in the antebellum South — the region of the new nation with the most tolerant view of public carry — the right protected was purposive in nature and not permissive. Lawful purpose in this case was defined as a specific activity that merited being armed: hunting, target practice, traveling, or self-defense in response to a clear and specific threat.

# The Police Power in the Era of the Fourteenth Amendment: Defending Gun Regulation and Protecting the Public Sphere

The legal consensus that states enjoyed broad authority to regulate guns and gunpowder under the police power not only survived the Civil War but as a concept flourished during Reconstruction. A wave of state constitution-making also accompanied Reconstruction, and the notion of police power authority to regulate arms carry in public was expressly written into many of the constitutions drafted during the period. Virtually all of the new constitutions drafted and ratified during Reconstruction in southern states and a number of those adopted in the newly admitted western states used a formulation of the right to bear arms that explicitly recognized the right to regulate firearms, particularly public carry.

Idaho's formulation of the right to regulate was among the most robust: "The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."[75] Another popular formulation of the right to keep and bear arms adopted during this period focused on the people's right to regulate public carry. Prior to the Civil War, Georgia's courts had carved out one of the most expansive rights to carry arms in public. The new constitution drafted during Reconstruction stepped back from this earlier libertarian conception and reaffirmed the state's broad police power to regulate arms, especially arms carried in public: "The right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne."[76]

Christopher G. Tiedeman, one of the era's leading legal commentators and a critic of an expansive conception of the police power, conceded that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[77] Thus, even those who were concerned about possible government overreach in this period nonetheless accepted that in matters of public safety the police power was considerable.

Reconstruction witnessed an intensification of firearms regulation. Republicans sought to protect the rights of African Americans to bear arms, but this commitment did not diminish their equally ardent desire to enact strong racially neutral regulations aimed at promoting public safety, especially firearms regulations.[78] The Republicans who wrote the Fourteenth Amendment were among the most ardent champions of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction era Republicans used government power aggressively to protect the rights of recently freed slaves and to promote their vision of ordered liberty.[79]

State police power was not diminished by the Fourteenth Amendment. The author of section one of the Fourteenth Amendment, John Bingham, expressly affirmed this point during the public campaign to ratify the

amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[80] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and the common good. In fact, the passage of such laws was deemed vital to address the threat posed by white supremacist paramilitary violence in many parts of the South.

John Norton Pomeroy, the distinguished constitutional commentator from this era, captured this understanding of police power in his influential treatise written during this period, commenting that when the Second Amendment was interpreted with its "intent and design" in view, the right to keep and bear arms was not a barrier to the state's authority to regulate or limit persons from "carrying dangerous or concealed weapons."[81] Events on the ground in many areas of the reconstructed South made it more urgent to exercise this power to restore order and protect the lives of free persons.

Texas offers some of the best evidence of the scope of regulation envisioned by Republicans during Reconstruction. To preserve the peace, it was necessary to restrict the permissive carry of weapons. Hence, this Texas statute:

> Any person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the state, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person.[82]

Restrictions also prohibited guns in locations deemed to be essential to public or civic life. Thus, Texas specifically criminalized carrying weapons on election day or near a polling place:

> It shall be unlawful for any person to carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. . . . Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less than one month: Provided, that the provisions of this section shall not apply to any officer of the election, police officer, or other person authorized to preserve the peace on the days of election.[83]

Finally, Texas enacted enhanced protections for public safety aimed at limiting the ability of paramilitary groups to intimidate free persons or Republicans by requiring express consent from property owners to carry weapons on private property:

> It shall not be lawful for any person or persons to carry firearms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined a sum not less than one nor more than ten dollars, or imprisonment in the county jail not less than ten days, or both, in the discretion of the court or jury before whom the trial is had.[84]

The necessity of demilitarizing the public sphere and restoring the peace led states to experiment with a range of legal mechanisms to address the problem of gun violence. The regulation of firearms during Reconstruction was not a novel application of the police power but simply an example of the continuing importance of this legal concept to American law. The flexibility of the police power meant that states and localities were able to adapt to changing circumstances and deal with the threats to public order they encountered during Reconstruction.[85]

# Conclusion

*Heller's* judicial reasoning and evidence have been savaged by critics from across the ideological spectrum.[86] Much of this criticism has focused on specific historical errors and jurisprudential claims not properly grounded in history, text, and tradition. Far less attention has been devoted to the opinion's profoundly anachronistic assumptions about the nature of rights themselves. Similarly, examinations of *Heller* have not addressed the decision's failure to recognize the centrality of an expansive view of state police power both in the founding era and in the southern antebellum case law that *Heller* claims is dispositive of the "original meaning" of the Second Amendment." Finally, *Heller's* rejection of interest balancing rests on a decidedly modern, not originalist, conception of the proper role of judicial review in firearms regulation.[87]

Despite its pretenses to be an originalist decision, *Heller* jumps back and forth across time, melding, conflating, and confusing founding era legal doctrines with modern legal theories at odds with early American law. Rather than take regulation out of the hands of the legislature as Justice Scalia suggests, the founding generation expected that states would continue to use their police powers in an active manner to regulate firearms. Even if one sets the founding era's views aside and instead focuses on the antebellum slave-owning jurists that *Heller* treats as oracular, these jurists were part of an antebellum jurisprudential tradition that conceptualized the police power in expansive terms. Judges in this period also viewed judicial review as an awesome exercise to be used sparingly in cases that were clear and beyond contention. This approach included decisions involving gun regulation. Justice Scalia's legal logic seems hard to reconcile with the views of the judges he claimed supported his view of the scope of the right to keep and bear arms.

There is no originalist foundation for *Heller's* failure to grapple with the police power or with Scalia's outsized vision of judicial review of state firearms laws. *Heller's* doctrine finds no support in founding era law or close reading of the antebellum southern case law. Nor did the adoption of the Fourteenth Amendment change the legal scope of state police power elaborated by pre–Civil War judges. *Heller's* vision of the police power is a product of the modern rights revolution. It is a belated attempt to smuggle gun rights into the Warren Court's broad reframing of American constitutional law. *Heller* reflects Justice Black's views of the First Amendment, not James Madison's views of the Second.

There is nothing inherently wrong with adopting a living constitutional approach, but it can hardly be defended on originalist grounds. To do so not only does great violence to the historical record but also erodes confidence in the law and undermines the Supreme Court's authority. Advancing a living constitutional argument dressed up in a tricorne hat and proclaiming that *Heller* is a triumph of a neutral originalist methodology is a sham. Few law professors, jurists, or lawyers outside the ranks of the Federalist Society would find such a claim tenable, given the mountains of evidence amassed in the past decade and the outpouring of scholarship since *Heller* was decided.[88] Rather than serving as a model of originalist neutrality, *Heller* has become a major intellectual blemish, a serious obstacle to originalism's acceptance as an impartial methodology.[89]

A genuinely historical treatment of founding era rights theory — including the right to keep and bear arms — provides scant support for *Heller*'s dismissal of the right of the people to regulate their internal police in the case of firearms. Nor does the antebellum southern case law *Heller* highlights as the key to unlocking the meaning of the Second Amendment support such a claim. Reconstruction did not change these basic facts. If one applies *Heller's* professed methodology neutrally, and Justice Scalia was correct that rights are entrenched with the scope that they had when constitutionalized, then the right of the people to regulate their own police, including firearms, must be treated with the same originalist reverence. Judges, including originalist judges, must recognize the awesome power of the people — including the right to regulate arms. When originalism is applied in a rigorous and disinterested fashion, it presents supporters of *Heller* with an uncomfortable choice: originalists must abandon either *Heller*'s holding or its methodology. It is no longer possible to support both positions and still claim that originalism is a neutral interpretive methodology.

# Endnotes

[1] There is considerable scholarly and judicial debate over how much *Heller*'s "text, history, and tradition" approach forecloses other modalities of constitutional interpretation. For a useful overview of these issues, *see generally* JOSEPH BLOCHER & DARRELL A.H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *HELLER* (2018).

[2] For a notable exception to this general silence, *see generally* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 32 L. & CONTEMP. PROBS. 31 (2020).

[3] *See generally* JOHN PHILLIP REID, CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION: THE AUTHORITY OF RIGHTS (1986); *and* THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007).

[4] Campbell, *supra* note 2.

[5] Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935, 935–36 (2015). To properly recover original meaning, Gienapp invokes Wittgenstein's notion of "language games." *Id.* at 949–50. Making sense of the right to keep and bear arms would require not only an explication of the dictionary definition of the individual words in the amendment but also reconstructing the structure of rights discourse and founding era legal culture more generally.

[6] Reva Siegel describes these disorienting jumps across time as temporal oddities. *See* Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 HARV. L. REV. 191, 196–97 (2008) ("There are temporal oddities in the evidence the majority marshals in support of this claim about the original meaning of the Second Amendment.").

[7] *Compare* Dist. of Columbia v. Heller, 554 U.S. 570, 605 (2008), *with id.* at 634–35. Justice Scalia's discussion of Nazis marching in Skokie as a rebuttal to Justice Breyer's discussion of balancing is egregiously ahistorical. For a historical discussion of the way the right to assemble and protest was understood in the founding era. *See generally* Saul Cornell, *"To Assemble Together for Their Common Good": History, Ethnography, and the Original Meanings of the Rights of Assembly and Speech*, 84 FORDHAM L. REV. 915 (2015).

[8] For a thoughtful discussion of the role of history in constitutional theory that moves beyond the simplistic view of the past at the core of most forms of originalism, *see generally* Jack M. Balkin, *The New Originalism and the Uses of History*, 82 FORDHAM L. REV. 641 (2013); *and* Richard H. Fallon Jr., *The Many and Varied Roles of History in Constitutional Adjudication*, 90 NOTRE DAME L. REV. 1753 (2015). For Balkin's assessment of the tension between originalism and history, *see generally* Jack M. Balkin, *Lawyers and Historians Argue About the Constitution*, 35 CONST. COMMENT. 345 (2020).

[9] Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. F. 120, 123 (2019) (quoting Konigsberg v. State Bar, 366 U.S. 36, 61 (1961) (Black, J., dissenting)); *see generally* T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 YALE L.J. 943 (1987). A corpus linguistic search of the Corpus of Founding Era American English (COFEA), a database hosted by Brigham Young University Law School, shows no evidence that these two terms occurred together. The one example that vaguely analogizes to the modern usage is the following comment made during a congressional debate: "I shall never wish to encroach upon the Constitution, but I will be equally against destroying the balance between the rights which the people have delegated and those they have retained" (3 ANNALS OF CONG. 141–42 (1791–93)).

[10] *Id.*

[11] *Heller*, 554 U.S. at 634. The classic account of the balancing in modern law is Aleinikoff, *supra* note 9. Although *Heller* precludes something Scalia dubs "free standing interest balancing," there is less agreement on whether it precludes all forms of balancing. *See Heller*, 554 U.S. at 634–35; *and* Allen Rostron, *Justice Breyer's Triumph in the Third Battle over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 707 (2012).

[12] *Heller*, 554 U.S. at 634 (emphasis in original).

[13] *See generally* Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019). The irony is doubly compounded by the fact that Scalia's approach, reflecting modern incorporation theory, accepts a theory of federal judicial review of local law that was rejected by the founding generation, making his approach not simply inconsistent with founding era constitutionalism but almost the mirror image of it. Nobody in the founding era would have ever imagined that the Second Amendment could be used to limit state police power authority over gunpowder and firearms. If such a view had been articulated, the Second Amendment would never have been ratified, a fact that makes Scalia's originalism paradoxical. Following Scalia's vision of the Second Amendment would have prevented it from existing, a further illustration of his paradoxical "back to the future" judicial surrealism.

[14] *See generally* Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017). Apart from the more ardent Anti-Federalists, judicial review was recognized by a broad range of legal actors. The power was novel to many in the first generation after the Revolution, resisted by some, and still typically framed in a departmentalist framework in which each branch of government would exercise a kind of constitutional review of statutes during its own legitimate functions. The most fervent champions of

judicial review among the Federalists, however, pressed the idea that the judiciary had a special authority on questions of legal/constitutional interpretation, pushing the doctrine of judicial review far closer to the modern idea of judicial supremacy, in which each branch of government is expected to abide by the legal/constitutional pronouncements of the court even when exercising their own independent functions. For a summary of the voluminous body on the early history of judicial review, *see generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s (2019).

[15] The reference to Platonic guardians is from LEARNED HAND, THE BILL OF RIGHTS 73-77 (1958). There is a strong scholarly consensus that some form of judicial review was widely recognized at the time the Constitution was ratified but that the scope of the power was narrowly defined. The adoption of the Fourteenth Amendment did not challenge the notion that the states would continue to exercise their police power authority to promote public safety. *See infra* notes 77–85 and accompanying text.

[16] For a brief overview of some of the most blatant and egregious historical errors in *Heller* and the scholarship it cited, *see generally* Saul Cornell, *"Half Cocked": The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment*, 106 J. CRIM. L. & CRIMINOLOGY (2016).

[17] The assault on the U.S. Capitol in 2021 included a plethora of symbols and images borrowed from American history, including a number of people dressed in Revolutionary era costumes. *See* Washington Post Staff, *Identifying Far-Right Symbols That Appeared at the U.S. Capitol Riot,*" WASH. POST (Jan. 15, 2021), https://www.washingtonpost.com/nation/interactive/2021/far-right-symbols-capitol-riot/; *and* Brent Stirton, *Trump Supporters Hold "Stop the Steal" Rally in DC amid Ratification of Presidential Election*, GETTY IMAGES (Jan. 6, 2021), https://www.gettyimages.com/detail/news-photo/protester-dressed-as-george-washington-debates-with-a-news-photo/1230734053.

[18] Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984). *See generally* Leif Wenar, *Rights*, *in* THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

[19] Ronald R. Dworkin, *Rights as Trumps*, *in* THEORIES OF RIGHTS 153–67 (Jeremy Waldron ed., 1984). For lucid, brief discussion of Dworkin, *see* Raymond Wacks, *Dworkin: The Moral Integrity of Law*, *in* PHILOSOPHY OF LAW: A VERY SHORT INTRODUCTION 49–64 (2d ed. 2014).

[20] For an exploration of what a Dworkian reading of the Constitution would look like, *see generally* JAMES E. FLEMING, FIDELITY TO OUR IMPERFECT CONSTITUTION: FOR MORAL READINGS AND AGAINST ORIGINALISMS (2015).

[21] For a recent exploration of the impact of Dworkin's framework, *see* Jamal Greene, *The Supreme Court, 2017 Term — Foreword: Rights as Trumps?*, 132 HARV. L. REV. 28, 30 (2018).

[22] *See also* Blocher, *supra* note 9.

[23] Gordon S. Wood, *The Origins of Judicial Review Revisited, or How the Marshall Court Made More Out of Less*, 56 WASH. & LEE L. REV. 787, 795–96 (1999).

[24] In the period before the incorporation of the Bill of Rights, the debate over judicial review of legislation and the protection of individual rights was largely a question about state courts adjudicating state laws. *See* LEONARD & CORNELL, *supra* note 14.

[25] Wood, *supra* note 23, at 798–99.

[26] *See also* JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 355 (1996).

[27] *See* Siegel, *supra* note 6.

[28] Campbell, *supra* note 2.

[29] Gienapp, *supra* note 13, at 119.

[30] *Id.*

[31] THE DECLARATION OF INDEPENDENCE para. 3 (U.S. 1776) ("He has refused his Assent to Laws, the most wholesome and necessary for the public good.").

[32] Modern libertarian legal scholars have generally approached liberty and rights from an anachronistic point of view marred by presentism. *See* RANDY E. BARNETT, OUR REPUBLICAN CONSTITUTION: SECURING THE LIBERTY AND SOVEREIGNTY OF WE THE PEOPLE 31–82 (2016); *and* RICHARD A. EPSTEIN, THE CLASSICAL LIBERAL CONSTITUTION: THE UNCERTAIN QUEST FOR LIMITED GOVERNMENT 3–6, 17–25 (2014). For critiques of this model, *see* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85, 87 (2017).

[33] JOSEPH RUSSELL, AN ORATION; PRONOUNCED IN PRINCETON, MASSACHUSETTS, ON THE ANNIVERSARY OF AMERICAN INDEPENDENCE, JULY 4, 1799 at 7 (Worcester, Mass., Isaiah Thomas 1799) (emphasis in original).

[34] *See generally* GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776–1787 (1969); *and* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998).

[35] *See generally* Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221 (2016).

[36] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). Campbell's work builds on a broad scholarly consensus derived from the work of several scholars, including the works of Wood, Reid, and Rakove; *see also supra* note 3.

[37] *See generally supra* note *34.*

[38] *Id.*

[39] [Thomas Tudor Tucker] Philodemus, *Conciliatory Hints, Attempting, by a Fair State of Matters, to Remove Party Prejudice, Charleston, 1784*, reprinted *in* 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA, 1760–1805, 628 (Donald S. Lutz & Charles S. Hyneman eds., 1983).

[40] On the idea of well-regulated liberty and founding era conceptions of rights, *see generally* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The corresponding modern legal concept would be "ordered liberty"; *see* Palko v. Connecticut, 302 U.S. 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

[41] *See* Campbell, *supra* note 2. Campbell demonstrates that the meaning of the Second Amendment and founding era rights more generally must be placed in the context of the contractarian discourse of rights.

[42] For a useful summary of *Heller*'s complex relationship to other fields of constitutional law, *see* BLOCHER & MILLER, *supra* note 1.

[43] *See generally Slaughter-House Cases*, 83 U.S. 36 (1872); Harry N. Scheiber, *State Police Power*, *in* 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[44] This jurisprudential development was part of a larger effort to limit legislative discretion and curtail democratic overreach begun by the Marshall Court. *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008); *and* LEONARD & CORNELL, *supra* note 14.

[45] *See, e.g.*, MD. DECLARATION OF RIGHTS art. IV (1776); N.C. DECLARATION OF RIGHTS art. I, § 3 (1776); *and* VT. DECLARATION OF RIGHTS art. V (1777).

[46] PA. CONST. of 1776, ch. I, art. III.

[47] *See generally* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996).

[48] 4 WILLIAM BLACKSTONE, COMMENTARIES 162 (1769). On the concept of police in early American law, *see generally* DUBBER, *supra* note 44.

[49] *See generally* Kyra Babcock Woods, *Corpus Linguistics and Gun Control: Why Heller Is Wrong*, 2019 BYU L. REV. 1401 (2020). In her analysis, Woods found that most of the uses of the phrase "right of the people" (65 percent) supported Justice Stevens's reading of the Second Amendment, not Justice Scalia's view. Arguments for a more individualistic reading of this phrase rely not on accepted originalist methods but on intratextualist readings of this phrase within the text of the Bill of Rights. When read against the general use of the term in constitutional writing and speech in the Founding era, the standard approach of most originalists, the meaning of the phrase seems less clearly focused on an individualistic conception of rights.

[50] For examples of this usage, *see An Act Incorporating the residents residing within limits therein mentioned*, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); *and An Act to incorporate the Town of Marietta*, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[51] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[52] Tomlins, *supra* note 44.

[53] Brown v. Maryland, 25 U.S. (12 Wheat.) 419, 442–43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power."). *See generally* Thurlow v. Massachusetts (The License Cases), 46 U.S. (5 How.) 504 (1847).

[54] Commonwealth v. Alger, 61 Mass. (7 Cush.) 53, 76 (1851).

---

Compendium_Cornell
Page 0947

[55] *Id.* at 85. For another good discussion of how state jurisprudence treated the concept, *see* Thorpe v. Rutland & Burlington R.R. Co., 27 Vt. 140, 149 (1855).

[56] *See generally* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[57] John L. Brooke, *Patriarchal Magistrates, Associated Improvers, and Monitoring Militias: Visions of Self-Government in the Early American Republic, 1760–1840, in* STATE AND CITIZEN: BRITISH AMERICA AND THE EARLY UNITED STATES (Peter Thompson & Peter S. Onuf eds., 2013).

[58] 10 ENCYCLOPÆDIA AMERICANA 214 (Francis Lieber ed.,1836).

[59] In the extensive notes he added to James Kent's classic *Commentaries on American Law*, Oliver Wendell Holmes Jr. wrote that regulation of firearms was the locus classicus of the police power. James Kent, 2 COMMENTARIES ON AMERICAN LAW 340 n.2 (Oliver Wendell Holmes Jr. ed., 12th ed. 1873).

[60] *See generally* KUNAL M. PARKER, COMMON LAW, HISTORY, AND DEMOCRACY IN AMERICA, 1790–1900: LEGAL THOUGHT BEFORE MODERNISM (2011).

[61] *See generally* William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[62] *See generally* GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (2015).

[63] *License Cases*, 46 U.S. (5 How.) at 592.

[64] On *Heller*'s heavy reliance on southern case law, *see generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015).

[65] *See generally* State v. Reid, 1 Ala. 612 (1840).

[66] *Id.* at 616.

[67] Rather than presage Justice Scalia's approach in *Heller*, the *Reid* court articulated a point of view closer in spirit to the model of judicial restraint advocated by Judge J. Harvie Wilkinson in his withering critique of *Heller's* judicial hubris. *See* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009).

[68] *Reid*, 1 Ala. at 621. The court noted that other antebellum courts had divided over the constitutionality of similar bans on concealed weapons, a fact that further counseled judicial restraint.

[69] Mitchell N. Berman, *The Tragedy of Justice Scalia*, 115 MICH. L. REV. 783, 803 (2017). Berman's critique of Scalia is withering, charging the justice with a host of judicial vices, including "hubris, overconfidence, arrogance, dogmatism."

[70] William Ewald, *James Wilson and the Scottish Enlightenment*, 12 U. PA. J. CONST. L. 1053 (2010).

[71] *Reid*, 1 Ala. at 621.

[72] State v. Huntley, 25 N.C. 418 (1843)

[73] Ruben & Cornell, *supra* note 64.

[74] *Huntley*, 25 N.C. at 423.

[75] IDAHO CONST. OF 1889, art. I, § 11.

[76] GA. CONST., art. I, § 1, para. VIII. Florida adopted the same formulation; *see* FLA. CONST. , art. I, § 8.

[77] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES CONSIDERED FROM BOTH A CIVIL AND CRIMINAL STANDPOINT 4–5 (1886) (citing Thorpe v. Rutland & Burlington R.R. Co., 27 Vt. 140, 149–50 (1854)).

[78] *See generally* Laura F. Edwards, *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance*, 41 J. OF SUP. CT. HIST. 310 (2016); *and* Darrell A.H. Miller, *"Peruta," the Home-Bound Second Amendment, and Fractal Originalism*, 127 HARV. L. REV. F. 238 (2014). For a discussion of how the courts wrestled with the meaning of the amendment, *see generally* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1988).

[79] *See generally* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the*

---

Compendium_Cornell
Page 0948

*Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); *and* Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005).

[80] Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?*, 50 SANTA CLARA L. REV. 1043, 1058 (2010) (quoting John Bingham, Speech *in* CINCINNATI DAILY GAZETTE (Sept. 2, 1867)).

[81] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868).

[82] *An Act to Regulate the Keeping and Bearing of Deadly Weapons*, Art. 6512, *in* GEORGE WASHINGTON PASCHAL, 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST 1322–24 (1873).

[83] *Id.* at 1317–18 ("Criminal Code, Riots and Unlawful Assemblies at Elections Violence Used Towards Electors, Art. 6490").

[84] *Id.* at 1321 ("An Act to Prohibit the Carrying of Firearms on Premises or Plantations of Any Citizen Without the Consent of the Owner, Art. 6510").

[85] Miller, *supra* note 78.

[86] For a good overview of the widespread criticism of *Heller*'s methodology from left, right, and center, *see* Sanford Levinson, *United States: Assessing* Heller, 7 INT'L J. CONST. L. 316, 319 (2009).

[87] Ruben & Cornell, *supra* note 64.

[88] Stephen P. Halbrook, *To Bear Arms for Self-Defense: A "Right of the People" or a Privilege of the Few?*, 21 FEDERALIST SOCIETY REV. 46 (2020), https://fedsoc.org/commentary/publications/to-bear-arms-for-self-defense-a-right-of-the-people-or-a-privilege-of-the-few-part-2.

[89] Rory K. Little, *Heller and Constitutional Interpretation: Originalism's Last Gasp*, 60 HASTINGS L.J. 1415 (2009); Alison L. LaCroix, *Historical Semantics and the Meaning of the Second Amendment*, PANORAMA (Aug. 3, 2018), http://thepanorama.shear.org/2018/08/03/historical-semantics-and-the-meaning-of-the-second-amendment; Darrell A.H. Miller, *Owning Heller*, 30 U. FLA. J. L. & PUB. POL'Y 153 (2020).

Compendium_Cornell
Page 0949

## Hastings Constitutional Law Quarterly

Volume 49 | Number 2                                                     Article 5

6-2022

# History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?

Saul Cornell

Follow this and additional works at: https://repository.uchastings.edu/
hastings_constitutional_law_quaterly

 Part of the Constitutional Law Commons

Recommended Citation

Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022).
Available at: https://repository.uchastings.edu/hastings_constitutional_law_quaterly/vol49/iss2/5

This Article is brought to you for free and open access by the Law Journals at UC Hastings Scholarship Repository. It has been accepted for inclusion in Hastings Constitutional Law Quarterly by an authorized editor of UC Hastings Scholarship Repository. For more information, please contact wangangela@uchastings.edu.

# History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in *NYSRPA v. Bruen*?

BY SAUL CORNELL*

## TABLE OF CONTENTS

I.  Property Law and Criminal Law: Missing Originalist Contexts for Implementing *Heller* and *McDonald* ...........................................151
II.  Pistol Packin' Patriots and Other Antiquarian Oddities................157
III.  Regionalism and Change Over Time: Treating the Right of Self Defense and Regulation Historically...........................................160
IV.  Armed Travel in Antebellum Boston: Testing the non-Enforcement Thesis............................................................................................166
V.  The Modern Paradigm of Gun Control Emerges: Reconstruction and the Right to Regulate Firearms....................................................168
VI.  Conclusion.....................................................................................171
Table 1 - Post-Civil War State Constitutional Arms Bearing Provisions and Regulation ........................................................................172
Table 2 - Post-Civil War Local Public Carry Laws ..................................175

*District of Columbia v. Heller* and *McDonald v. City of Chicago* made history central to the future of Second Amendment adjudication.[1]   In *NYSRPA v. Bruen,* the Supreme Court will have to decide how to evaluate conflicting accounts of the history of gun regulation in America.[2]  The Court

---

* Paul and Diane Guenther Chair in American History, Fordham University.  I would like to thank Katrina Uyehara, Lisa Tu, and Peter C. Angelica for research assistance and help with creating the maps and tables for this article.  A group of intrepid and eternally patient Second Amendment scholars provided an invaluable sounding board for many of the ideas discussed in this essay.  I would like to thank Eric Ruben, Joseph Blocher, Jake Charles, and Darrell A.H. Miller, for their insights and their exemplary work on this contentious topic.  In a field often marked by rancor they have set a high scholarly bar and remain models of intellectual integrity and collegiality.

1.  District of Columbia v. Heller, 554 U.S. 570, 591, 595 (2008); McDonald v. City of Chicago, 561 U.S. 742, 767–68 (2010).

2.  N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Apr. 26, 2021), https://www.supremecourt.gov/docket/docketfiles/html/public/20-843.html [https://perma.cc/5DQT-ZLUY].

[145]

must distinguish between pseudo-historical arguments that are part of an invented historical tradition, one that can be directly traced to modern gun rights activism, and the actual history of gun regulation, a tradition that extends over more than four centuries of English and American legal history.[3]  Much of this regulatory tradition was not available to either the *Heller* or *McDonald* court because the new materials were identified and collected in the decade after the Court issued its two landmark rulings.[4]  This essay analyzes a number of the most egregious historical errors presented to the Court and summarizes some of the findings of the new historical scholarship.

In contrast to the first generation of scholarship on the Second Amendment that informed much of the opinion in *Heller*, a more recent body of research takes up *Heller* and *McDonald*'s injunctions to explore the history of gun regulation.[5]  This second generation of Second Amendment scholarship relies on powerful new digital searching techniques and virtual archives of primary sources unavailable at the time the two decisions were rendered.[6]  This newly unearthed history has now been scrupulously documented by historians on both sides of the Atlantic: it shows a long tradition of arms regulation in public, extending over six centuries.[7]  In particular, the new evidence links the good cause permit scheme at issue in *NYSRPA v. Bruen* to constitutional developments and legislation enacted during the era of the Fourteenth Amendment, a fact that should render New York law presumptively lawful under the *Heller/ McDonald* history, text, tradition framework.  Yet, despite clear evidence that New York's law was neither anomalous, nor seen as unduly burdensome for the generation that enacted the Fourteenth Amendment, many of the briefs submitted to the court and the claims presented by Paul Clement during oral argument rest on

---

3.  *Compare* Brief for Second Amendment Law Professors as Amici Curiae Supporting Neither Party, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 20, 2021) *with* Brief of Professors of History and Law as Amici Curiae Supporting Respondents, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 21, 2021).

4.  Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

5.  *See Heller*, 554 U.S. 570; *McDonald*, 561 U.S. 742.

6.  Ruben & Miller, *supra* note 4.  For a good illustration of the significant expansion in the range of sources now available, *compare* the breadth of sources available using microfilms materials consulted by Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) *with* the expanded number of sources available using digital materials and search techniques in Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

7.  *See generally* the essays collected in A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019) and the materials presented in the amicus brief by Brief of Professors of History and Law, *supra* note 3.

demonstrably false historical claims.[8]  Even more puzzling, many of the positions advanced during oral argument in *Bruen* suggest that a majority of the Court is considering striking down the New York law, not because it fails the text, history, and tradition test, but because it does not fit the modern expansive vision of gun rights that animates the Republican Party and the Federalist Society.[9]  It would be difficult to overstate the significance of *Bruen* to the future of the contentious debate over gun regulation.  Moreover, the case offers proponents of originalism a rare opportunity to demonstrate that their method is not an ideological smoke screen for results-oriented jurisprudence, but a rigorous and neutral judicial philosophy.

Rather than break free from an earlier generation's penchant for results-oriented law office history, recent gun rights scholarship has carried forward this earlier flawed approach, enhancing it with power of digital searching and an infusion of nearly limitless research support by the NRA and other right-wing sources of funding.[10]  This body of gun rights "scholarship" remains highly selective in both its use of primary and secondary sources and continues to be marred by serious anachronisms and methodological problems.[11]

The gulf separating these opposing visions of America's constitutional past was evident in the oral argument in *Bruen*.  Indeed, Justice Breyer castigated the gun rights version of the past as little more than law office

---

8.  *See* discussion *infra* pp. 4–31.

9.  Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in Heller*, 122 HARV. L. REV. 191 (2008).  The Federalist Society has consistently endorsed a strongly libertarian reading of the Second Amendment, and for a good illustration of this approach, *see The Second Amendment and the New Supreme Court, Federalist Society—2019*, 43 Harv. J. L. & Pub. Pol'y, 219–346 (2020).

10.  Will Van Sant*, The NRA Paid a Gun Rights Activist to File SCOTUS Briefs. He Didn't Disclose it to the Court*, THE TRACE (Nov. 3, 2021).  For a general discussion of the rise of coordinated and funded amicus campaigns, *see* Sheldon Whitehouse, *A Flood of Judicial Lobbying: Amicus Influence and Funding Transparency*, 131 YALE. L.J.F. 141 (2021).  *See in particular*, Amicus Brief for Second Amendment Law Professors, *supra* note 3; Brief for Professors Robert Leider and Nelson Lund, and the Buckeye Firearms Association as Amici Curiae Supporting Petitioners N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 20, 2021); Brief for Mountain States Legal Foundation's Center to Keep and Bear Arms as Amici Curiae Supporting Petitioners, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 16, 2021).

11.  On historical methodology, *see generally* MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS (Cornell University Press ed., 2001). On the methods of professional legal history, *see* THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018).  In contrast to the work of discredited work of historian Michael Bellesiles, gun rights scholarship continues to be churned out with little regard to scholarly norms, *see* Saul Cornell, *"Half Cocked": The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. CRIM. L. & CRIMINOLOGY 203 (2016).  For a short and thoughtful overview of the Bellesiles scandal, *see* David J. Garrow, *Review: Crimes of History*, 29 *The Wilson Quarterly (1976-)* 112 (2005).

history.[12]  Although numerous scholars have derided *Heller* as a particularly egregious example of law office history, it is unusual that a sitting justice would make this type of charge in oral argument.  Justice Sotomayor was even less charitable in her assessment of the arguments being presented to the Court by gun rights attorney Paul Clement, suggesting that he was making up the history out of thin air.[13]  Again, similar claims have been made in academic debate over the Court's gun rights driven Second Amendment jurisprudence, but it is striking to see such trenchant statements in oral argument.[14]

Although clashing views of history have often been presented to the Court in previous cases, the claim that one side's version of the past was essentially made up, literally unanchored from reality, or at least any reality that a serious historian would recognize as a plausible account of the past, is unprecedented in the Court's history.[15]  The level of ideological distortion evident in both the briefing and oral argument in *Bruen* may do what a generation of academic scholarship could not do: thoroughly discredit the claims that originalism is a genuinely neutral and rigorous scholarly methodology.[16]

The historical evidence presented to the Court shows that New York's law is not only long-standing, but some of the material is hundreds of years old: the claim that New York's law is deeply rooted in history, text, and tradition is virtually unassailable.[17]  Arms have been regulated in populace areas for centuries under Anglo-American law.[18]  New York's law at issue in *Bruen* itself derives from permit schemes enacted during the Reconstruction Era, placing them firmly in the period of the Fourteenth Amendment, a fact that makes them presumptively lawful under *Heller* and

---

12.  Transcript of Oral Argument at 10, N.Y. State Rifle & Pistol Ass'n, No. 20-843 (U.S. Nov. 3, 2021), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_8n5a.pdf.

13.  Transcript of Oral Argument, *supra* note 12, at 19.

14.  *See generally*, Patrick J. Charles, *The Invention of the Right to 'Peaceable Carry' in Modern Second Amendment Scholarship*, 2021 U. ILL. L. REV. ONLINE 195.

15.  On the use and abuse of history by the Supreme Court, that introduced the concept of "law office history," *see* Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965).  As the Ninth Circuit recently counseled in *Young v. Hawaii*, courts must proceed carefully when tackling complex historical questions, particularly those that span across more than five hundred years, lest they fall into the trap of law office history.  *Young v. Hawaii*, 992 F.3d 765, 785–86 (9th Cir. 2021) (en banc), *petition for cert. filed*, (U.S. May 11, 2021) (No. 20-843).  Avoiding the trap of "law office history" requires a sophisticated approach to the historical record and the relevant legal sources.

16.  Jonathan Gienapp, *Constitutional Originalism and History*, PROCESS: A BLOG FOR AMERICAN HISTORY (Mar. 20, 2017), http://www.processhistory.org/originalism-history.

17.  Spitzer, *supra* note 6.

18.  *Id.*

*McDonald's* framework.[19]  Nor were these regulations a "mere scattering" of laws as Paul Clement argued: millions of Americans were living under some form of good cause permit scheme by the end of the nineteenth century. Finally, states and localities enforced these and other gun laws in a racially neutral manner until the rise of Jim Crow ushered in an era of white supremacy-motivated prosecutions.[20]  Gun control, it turns out, was not inherently racist, nor was it antithetical to the Fourteenth Amendment; it was an indispensable part of the government framework adopted by Republicans to implement their vision of equality and rights at the core of the Amendment.[21]

The Court's newest champions of originalism, Associate Justices Neil Gorsuch and Amy Coney Barrett, face a particularly difficult challenge reconciling their professed commitment to this theory with a decision striking the law down.  Both jurists have strenuously insisted that originalism is a neutral methodology that follows the historical evidence even if the outcomes are not congenial to their policy preferences or those of the Republican Party's base.[22]  Given that ample evidence was presented in the briefs filed in support of New York that stringent regulation of guns in populace areas is deeply rooted in Anglo-American law, it is odd that neither

---

19.  *See Heller*, 554 U.S. 570; *McDonald*, 561 U.S. 742, 767–68 (2010); JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER (Cambridge University Press ed., 2018).

20.  By the end of the nineteenth century more than half the population of California were living under some type of restrictive public carry legal regime, *see* Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65, 84–85 (2021).  On the racially neutral character of enforcement during Reconstruction and the rise of discriminatory enforcement during Jim Crow, *see* Brennan Gardner Rivas, 55 *Enforcement of Public Carry Restrictions: Texas as a Case Study* 2603, 2607–08, 2616–17, U.C. DAVIS L. REV. (2022) (manuscript at 5–6, 10–12), https://ssrn.com/abstract=3941466.

21.  For a sampling of ideologically slanted scholarship on this topic, *see generally* STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998); Robert J. Cottrol & Raymond T. Diamond, *Never Intended to Be Applied to the White Population: Firearms Regulation and Racial Disparity — The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307, 1310, 1318 (1995); NICHOLAS JOHNSON, NEGROES AND THE GUN: THE BLACK TRADITION OF ARMS (Prometheus, 1st ed. 2014); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17, 18 (1994).  For its strategic deployment in *Bruen*, *see* Brief for Petitioners at 2, 10–13, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 13, 2021); Brief for National African American Gun Ass'n, Inc. in Support of Petitioners at 2–11, N.Y. State Rifle & Pistol Ass'n v. Bruen, No.  20-843 (U.S. July 16, 2021), [hereinafter Amicus Brief for NAAGA].  For a critique of this argument, *see* Mark A. Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation*, 74 SMU L. REV. F. 169 (2021).

22.  Robert Post & Reva Siegel, *Originalism as a Political Practice: The Right's Living Constitution*, 75 FORDHAM L. REV. 545 (2006).

justice devoted much time in oral argument to discussing this body of evidence, a striking omission given their originalist commitments.[23]

Ironically, during oral argument Justice Barrett, asked New York's Solicitor General if she thought *Heller* was correctly decided,[24] but the question would have been more appropriately addressed to Chief Justice Roberts and Justice Kavanaugh. Both justices expressed discomfort with treating the Second Amendment differently than the way *modern courts* treat other rights, an odd concern given the originalist framework dictated by *Heller* and *McDonald*. The proper question should have been: how did Americans in the Founding generation and the era of the Fourteenth Amendment understand the scope of permissible gun regulation?

Even if one jettisoned the history, text, and tradition framework, the characterization of rights by Chief Justice Roberts and Justice Kavanaugh was incorrect as a matter of existing federal jurisprudence.[25] There is no single model for adjudicating rights claims in current constitutional jurisprudence.[26] Even if one restricts the scope of inquiry to the First Amendment, a constitutional analogy favored by gun rights advocates that rests on a weak foundation, there is no single standard for this area of the law: there are multiple tests for constitutionality depending on the type of speech being regulated.[27] Although core political speech triggers strict scrutiny, other types of speech are subjected to more deferential tests, and some types of speech enjoy no First Amendment protections.[28] In short there

---

23. *See* Amicus Brief for Professors of History and Law, *supra* note 3; *see also*, Brief for Patrick J. Charles as Amicus Curiae Supporting Neither Party, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. July 19, 2021).

24. Transcript of Oral Argument, *supra* note 12, at 90.

25. On the problematic analogies between the First and Second Amendment, *see* Gregory P. Magarian, *Speaking Truth to Firepower: How the First Amendment Destabilizes the Second*, 91 TEX. L. REV. 49, 99 (2012); Timothy Zick, *The Second Amendment as a Fundamental Right*, 46 HASTINGS CONST. L. Q. 621–682 (2019).

26. Transcript of Oral Argument, *supra* note 12, at 50 (Justice Kavanaugh addressing Paul Clement, ". . . I want to make sure I understand your main problem here with this permitting regime . . . that's just not how we do constitutional rights, where we allow blanket discretion to grant or deny something for all sorts of reasons"). *Id.* at 94–6 (Chief Justice Roberts addressing Brian H. Fletcher for the United States and drawing comparisons to the First Amendment and other provisions of the Constitution). In fact, rights, including rights expressly protected by the first eight amendments, are not treated in a uniform manner in existing jurisprudence. *See also* Joseph Blocher, *Disuniformity of Federal Constitutional Rights*, U. OF ILL. L. REV. 1479, 1485, 1499 (2020).

27. *See generally* KATHLEEN M. SULLIVAN & NOAH FELDMAN, CONSTITUTIONAL LAW 944–46 (Foundation Press, 19th ed. 2016) (analyzing the different categories of speech and relevant tests for constitutionality).

28. For a good summary of types of speech excluded from First Amendment protection, *see* United States v. Alvarez, 132 S. Ct. 2537, 2544 (2012). In particular, incitement, fighting words, true threats, and incitement to criminal conduct are all excluded and thus if one made the error of

are multiple standards of review in existing First Amendment doctrine.[29] Moreover, few other rights enshrined in the Bill of Rights are given the same level of protection as core political speech.[30]  More germane to *Heller's* originalist framework, guns have never been regulated in a manner analogous to words at any time in the long arc of American legal history. Firearms have always been subject to a variety of prior restraints that would never have been permissible in the case of core political speech.[31]

## I. Property Law and Criminal Law: Missing Originalist Contexts for Implementing *Heller* and *McDonald*

Scholarship on the Second Amendment has generally proceeded with little concern for how the history of other fields within American law illuminate the way guns have been treated by states and localities, where the bulk of gun regulation occurred before the 20th century.[32]  In particular, the history of property and criminal law are indispensable to understanding how the regulation of guns and self-defense has evolved under American law in the period after the adoption of the Second Amendment.

As a historical matter, the proper analogy to gun regulation has never been words but has always been property.[33]  Between the adoption of the

---

treating guns and words as constitutionally similar, the display of a firearm would place among those types of "speech" outside of the First Amendment.

29.  MICHAEL C. DORF & TREVOR MORRISON, CONSTITUTIONAL LAW 159 (Oxford University Press, 1st ed. 2010).

30.  On the problematic analogies between the First and Second Amendment, *see* Gregory P. Magarian, *Speaking Truth to Firepower: How the First Amendment Destabilizes the Second*, 91 TEX. L. REV. 49, 99 (2012); Timothy Zick, *The Second Amendment as a Fundamental Right*, 46 HASTINGS CONST. L. Q. 621–682 (2019).

31.  Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONSTITUTIONAL COMMENTARY 988 (1999).  The example of loyalty oaths illustrates this point.  Many states required loyalty oaths and disarmed those who refused to swear or affirm the oath.  No state required similar oaths to exercise core First Amendment-type freedoms.  Nor can loyalty oaths be understood as imposing a "dangerousness" exemption given that one of the groups disarmed was the Quakers who were pacifists and among the most peaceful and law-abiding communities in early America, a fact that undercuts the interpretation of this evidence offered by Justice Amy Coney Barrett in Kanter v. Barr, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting).  For a discussion of how Quaker disarmament confounds the simple individual rights-collective rights categorization that has defined much recent Second Amendment scholarship and jurisprudence, *see* Saul Cornell, *Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard* 29 CONSTITUTIONAL COMMENTARY 383, 299–401 (2014).

32.  Spitzer, *supra* note 6.

33.  Founding era lawyers and judges approach rights from a paradigm that treated them as property.  Thinking of rights in these terms meant that rights were not exempt from reasonable regulation provided the statutes were enacted by representatives of the people acting to further the common good and not any special or partial interest, *see* John Phillip Reid, THE CONSTITUTIONAL HISTORY OF THE AMERICAN REVOLUTION: THE AUTHORITY OF RIGHTS 96–113 (University of Wisconsin Press ed., 1987).  Understanding eighteenth-century conceptions of rights requires

Second Amendment and enactment of the Fourteenth Amendment, guns were extensively regulated, and the framework governing them was derived from property law. In fact, the scope of gun regulation intensified after the adoption of the Second Amendment and increased after the adoption of the Fourteenth Amendment. Reconstruction witnessed an enormous expansion of gun regulation at both the state and local level.[34]

If one looks closely at Founding era conception of rights, the case for treating guns as a form of property is even stronger. The concept of inalienable right, including self-defense, was expressly listed as part of the Lockean trinity of life, liberty, and property in the first state constitutions.[35] The term inalienable itself derives from English property law. The notion that because the right to acquire property was inalienable, government was prohibited from regulating it in a manner consistent with police power authority has no foundation in Anglo-American jurisprudence.[36] Indeed, such an idea would have been almost incomprehensible to the Founding generation. Property has always been subject to a host of regulations.[37] Just because you owned a tannery, did not mean you got to dump lye into the stream a mile from your neighbor.[38] The same legal principle has always applied to guns.

All guns were not created equal in the eyes of the law during the Founding era.[39] Only a narrow subset of firearms suitable for participation in the militia were given the highest level of constitutional protection. One

---

setting aside many modern legal ideas about rights and recovering the lost language of Founding era "rights talk"; *see* Jonathan Gienapp, *Response: The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

34. Delaware's provision was typical of militia laws from the Founding era and extended additional constitutional protections for militia weapons, making them immune from seizure in debt proceedings or confiscation for failure to pay taxes, *see* Chapter 36, sec. 42 LAWS OF THE STATE OF DELAWARE (1793). All other weapons were subject to the full range of state police power regulation and civil suits. In essence, militia weapons, were a form of taxation, transferring part of the cost of public defense to individual households. For an exploration of the tax analogy in a modern context, *see* Hannah E. Shearer & Allison S. Anderman, *Analyzing Gun-Violence-Prevention Taxes Under Emerging Firearm Fee Jurisprudence*, 43 S. ILL. U. L. J. 157 (2018).

35. Douglas W. Kmiec, *The Coherence of the Natural Law of Property*, 26 VAL. U. L. REV. 367 (1991).

36. *See generally* Joseph Postell, *Regulation during the American Founding: Achieving Liberalism and Republicanism*, 5 AMERICAN POL. THOUGHT 80 (2016).

37. *See generally* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (The University of North Carolina Press, 1st ed. 1996).

38. *Id.* at 218, 227.

39. On the important distinction between arms suitable for the militia and the ordinary arms most popular with Americans at the time of the Second Amendment, *see generally* Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, in A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

of the most fundamental principles in Founding era constitutional law was the rule against taking property without just compensation. Interestingly, some guns were expressly exempted from this rule. Pennsylvania, the first state to recognize the right to bear arms, excluded the requirement to purchase arms and ammunition from the Takings Principle governing nearly all private property. Modern scholarly and judicial treatments of the right to bear arms in the Pennsylvania Constitution typically focus exclusively on Article XIII affirming the right to bear arms. But this provision was the not the first discussion of arms bearing in the state Constitution. The first mention of this right occurred in the context of the Takings Principle and the right of conscientious objectors:

> That every member of society hath a right to be protected in the enjoyment of life, liberty and property, and therefore is bound to contribute his proportion towards the expence [sic] of that protection, and yield his personal service when necessary, or an equivalent thereto: But no part of a man's property can be justly taken from him, or applied to public uses, without his own consent, or that of his legal representatives: Nor can any man who is conscientiously scrupulous of bearing arms, be justly compelled thereto, if he will pay such equivalent, nor are the people bound by any laws, but such as they have in like manner assented to, for their common good.[40]

Government could not take property without compensation, but a subset of firearms were exempt from this rule. The state could require individuals to purchase firearms and use their own ammunition without any compensation. Many of the individual state militia laws also went further and exempted militia weapons from seizure during debt proceedings or sale for payment of tax arrears. All other firearms were treated as ordinary property, subject to the full force of the state's police powers. The modern debate over firearms has operated with a simplistic dichotomy totally alien to the Founding generation. In today's debate guns are either treated like words and entitled to the highest level of constitutional protection or they viewed as entirely outside the scope of constitutional protection. The Founding era approached this issue in more nuanced fashion. Some guns enjoyed protections denied to virtually any other form of property, and other guns were treated in the same way as ordinary property. The modern dichotomy that suggests that guns must be treated like words, or they are entirely outside of constitutional protection is deeply flawed and would have puzzled members of the Founding generation.

---

40.   P.A. CONST. art. VIII (1776).

The principle that not all guns were created equal did not disappear from American law after the Founding era. Several states and localities, passed laws that taxed some weapons, typically pistols, but exempted those firearms "kept for use by military companies."[41] There was also taxes on firing ranges. Directly taxing guns or imposing incidental taxes on their use posed no constitutional issues for Americans in the pre-Civil War era. The trend not only continued after the Civil War, but as was true for nearly every aspect of firearms law, the level of regulation intensified. States and localities taxed pistols during Reconstruction.[42] Alabama imposed the following tax on handguns:

> All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days.

The implication of treating firearms as property, a tradition that extends to the origins of the nation, needs further scholarly attention. The historical evidence that guns have never been treated in the same fashion as words is also overwhelming. Given these facts, the discomfort expressed by Chief Justice Roberts and Justice Kavanaugh about how New York's statute treats the right to bear arms in an anomalous fashion is both historically inaccurate and misrepresents the current state of constitutional jurisprudence. The discomfort felt by both jurists has little to do with New York's law, a statute that has been in place for over a century; the tension is a function *Heller*'s originalism.

Few rights enshrined in the bill of rights are treated in the narrow and circumscribed fashion that the Founding generation approached rights.[43]

---

41.   ANDERSON HUTCHINSON, CODE OF MISSISSIPPI: BEING AN ANALYTICAL COMPILATION OF THE PUBLIC AND GENERAL STATUTES OF THE TERRITORY AND STATE, WITH TABULAR REFERENCES TO THE LOCAL AND PRIVATE ACTS, FROM 1798 TO 1848: WITH THE NATIONAL AND STATE CONSTITUTIONS, CESSIONS OF THE COUNTRY BY THE CHOCTAW AND CHICKASAW INDIANS, AND ACTS OF CONGRESS FOR THE SURVEY AND SALE OF THE LANDS, AND GRANTING DONATIONS THEREOF TO THE STATE 182 (1848).

42.   THE REVISED CODE OF ALABAMA, 169 (1867). *See also* 1867 MISS. LAWS 327–28, An Act To Tax Guns And Pistols In The County Of Washington, ch. 249, § 1.

43.   For a good illustration of this, *see generally* Jud Campbell, *Natural Rights and the First Amendment*, 127 YALE L.J. 246, 312 (2017).

Given that today's First Amendment accords protections largely un-dreamed of in the Founding era, it is hardly surprising that Second Amendment jurisprudence, still in its infancy, has not had time to expand the scope of the right to bear arms to bring it into conformity with other aspects of the modern rights revolution. Most other areas of constitutional law have not been shaped by originalism, but some form of living constitutionalism.[44] What Roberts and Kavanaugh appear to be gesturing toward is a repudiation of *Heller*'s originalism and an application of living constitutionalism to the Second Amendment. Unfortunately, neither jurist articulated this desire in a transparent manner in oral argument.[45]

Given that *Heller* tied the Second Amendment to individual self-defense, one would think that the oral argument in *Bruen* would have devoted greater attention to charting the evolving understanding of this right under Anglo-American law, but sadly this issue did not receive much attention, despite a remarkable brief filed by two of the nation's premier scholars on the history of criminal law, George Fletcher and Guyora Binder.[46] Yet, an understanding of the history of criminal law is indispensable to making sense of the Founding era's approach to self-defense. Although Federalists and Anti-Federalists were divided on many issues, there was little disagreement between the two sides in ratification that the new Constitution would not restrict the states' police powers or their ability to define the scope of self-defense by local statute. Federalist Tench Coxe and the Anti-Federalist author Brutus may have agreed on few things, but they were in accord on this point. Brutus made this point expressly when he wrote, "[I]t ought to be left to the state governments to provide for the protection and defence of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[47] Federalist Tench Coxe, echoed this sentiment, declaring confidently that "[t]he states will regulate and administer the criminal law, exclusively of Congress."[48] Fletcher and Binder's brief underscores the point that there has never been a single uniform standard of self-defense across all American jurisdictions, a basic fact about criminal law, that seems

---

44. Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 WASH. U. L. REV. 1187, 1234 (2015) (arguing "Constitutional law is, after all, replete with instances of non-originalist construction.").

45. Transcript of Oral Argument, *supra* note 12, at 24–27, 52–53.

46. Brief for Criminal Legal Scholars as Amici Curiae Supporting Respondents, N.Y. State Rifle & Pistol Ass'n v. Bruen, (2021) (No. 20-843).

47. BRUTUS, ESSAYS OF BRUTUS VII, reprinted in 2 THE COMPLETE ANTI-FEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

48. TENCH COXE & A. FREEMAN, FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS, 1787-1788 82 (Colleen A. Sheehan & Gary L. McDowell eds., Liberty Fund 1998).

to have escaped the notice of the Supreme Court in its oral argument in *Bruen*.[49]

Under English common law, the use of deadly force was permitted in the home but strictly limited outside of the home.[50]  So, from its very inception, the right of self-defense in the Anglo-American tradition was related to time and space in a unique way that set it apart from other rights. Outside of the home, one had a duty to retreat, not stand your ground under common law if one faced a threat.  The strength of the right diminished as one moved further away from the home and moved into more populous areas.  Additionally, the limits on deadly force were also different if one encountered a home intrusion during the day and if one did so at night.[51] Thus, the right of self-defense existed in constitutional space and time in a way that made it different than other rights.  Consequently, the scope of the right of self-defense was fundamentally shaped by where and when the right was exercised.

The ancient Statute of Northampton (1328), a law that was extensively discussed in the *Bruen* oral argument,[52] singled out sensitive places such as courts and populous areas such as fairs and markets as locations where one could not travel armed unless one was acting to preserve the peace.  Several justices seemed to confuse these two distinct features of the Statute of Northampton thereby eliding the difference between populous areas and historically "sensitive" ones.  A federal courthouse is a sensitive place; Grand Central Station is a populous one.  This important distinction is supported by a host of specific, contemporaneous statutes that existed alongside Northampton-type laws and separately addressed the use of firearms during sensitive *times*, including holidays such as New Year's

---

49. Mark Anthony Frassetto, *Meritless Historical Arguments in Second Amendment Litigation*, 46 HASTINGS CONST. L. Q. 531 (2019).

50. Guyora Binder and Robert Weisberg, *What Is Criminal Law About?*, 114 MICH. L. REV. 1173, 1183 (2016); Daryl A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85 (2017).

51. WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 72–76 (1716).  John Adams used Hawkins extensively in preparing for the Boston Massacre trial, *see* ADAMS PAPERS, LEGAL PAPERS OF JOHN ADAMS, CASES 63 AND 64: THE BOSTON MASSACRE TRIALS 242–270 (L. Kinvin Wroth & Hiller B. Zobel eds., Belknap Press of Harvard University Press, 1965).

52. STATUTE OF NORTHAMPTON 2 EDW. 3, C. 3 (1328), (Phillip B. Kurland & Ralph Lerner eds., The Founders' Const. 1986), https://press-pubs.uchicago.edu/founders/documents/amendIIs1.html.  On the importance of the Statute of Northampton to maintain the peace, *see generally* A. J. Musson, *Sub-Keepers and Constables: The Role of Local Officials in Keeping the Peace in Fourteenth-Century England*, 117 ENG. HIST. REV. 1 (2002).  Transcript of Oral Argument, *supra* note 12, at 48–49, 57–58, 90–91, 93–94.

Day.[53]  Although some populous places may also be sensitive places, and vice versa, the two concepts should not be conflated.

The Statute of Northampton and its American analogs were not just regulations of sensitive places or times.  These types of laws prohibited arms from places of commerce and civic life because 18th- and 19th- century Americans believed that the presence of arms undermined civil society, public peace, and freedom itself.[54]  Fairs and markets were, at that time, the centers of commerce, civic life, and culture.  They were typically the location for the placement of important public announcements—facts which mark them as almost the antithesis of "sensitive places."[55]

## II. Pistol Packin' Patriots and Other Antiquarian Oddities

One of the oddest arguments presented by Clement drew on a claim made in an amicus brief by Second Amendment law professors that noted the unremarkable fact that many in the Founding era carried guns in public.  This "Founders with guns argument" is not simply meritless, it reveals a lack of understanding about the social and cultural history of eighteenth-century America.[56]  Thus, Clement and the pro-gun professors note that Patrick Henry often traveled to court with a musket.  What Clement and the pro-gun briefs ignore is that court days were among the most important public occasions in rural Virginia.  These events were one of the few times when members of the community, typically scattered across the rural landscape of Virginia, gathered together; it was only natural that these occasions would be a convenient time to gather the militia together for muster, inspection, and training.[57]  So rather than provide evidence for a broad free-standing right to travel armed in public, the Henry example merely shows that when traveling to militia muster, Henry carried the weapon that Virginia law compelled him

53.  *1665 N.Y. Laws 205, Ordinance Of The Director General And Council Of New Netherland To Prevent Firing Of Guns, Planting May Poles And Other Irregularities Within This Province*, DUKE CENTER FOR FIREARMS LAW (last visited May 26, 2022), https://firearmslaw.duke.edu/laws/1665-n-y-laws-205-ordinance-of-the-director-general-and-council-of-new-netherland-to-prevent-firing-of-guns-planting-may-poles-and-other-irregularities-within-this-province/.  *An Act to Prevent firing of guns and other firearms within this state, on certain days therein mentioned, 1785*, 2 LAWS OF THE STATE OF NEW YORK 152 (1886).

54.  *See generally* Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 L. & CONTEMP. PROBS. 73 (2020).

55.  *See generally* Chris R. Kyle, *Monarch and Marketplace: Proclamations as News in Early Modern England* 78 HUNTINGTON LIBR. Q. 771 (2015).

56.  *See* Frassetto, supra note 49.

57.  E. Lee Shepard, "*This Being Court Day*": Courthouses and Community Life in Rural Virginia, 103 THE VIRGINIA MAGAZINE OF HISTORY AND BIOGRAPHY 459, 466 (1995); Rhys Isaac, *Dramatizing the Ideology of Revolution: Popular Mobilization in Virginia, 1774 to 1776?* 33 THE WM. & MARY Q. 357, 383 (1976).

to carry on muster days. Similarly, the fact that Thomas Jefferson asked a friend to return a pair of pistols that he mistakenly left locked securely in a case at a tavern he visited in his travels does not support Clement's claim that the Founders promiscuously and habitually carried arms in public. Here is how Clement summarized the Jefferson evidence: "Thomas Jefferson requested that arms be brought to him in the District."[58] Again, the unremarkable fact that members of the nation's political and economic elite owned firearms and used them for a variety of purposes is incorrectly taken as evidence of a broad free-standing right to carry guns in public whenever and wherever an individual traveled. If Clement had quoted the entire relevant section of the latter, not just a snippet out of context, the evidence would support a very different interpretation of Jefferson's actions. "I left at your house, the morning after I lodged there, a pistol in a locked case."[59] Jefferson further remarked that "I have written to desire either Mr. Randolph or Mr. Eppes to call on you for it, as they come on to Congress, to either of whom therefore be so good as to deliver it."[60] The first point worth noting is that Jefferson traveled with his pistols in a locked case. Having accidently left them at an inn, a fact that underscores that the pistols were far from his mind during his travels, he asked that they be returned to him at his friend's convenience, a fact that further suggests that Jefferson did not believe that the pistols were essential to his day-to-day life.[61] Rather than demonstrate that Jefferson was an ardent supporter of unfettered public carry, the full quote shows that Jefferson typically carried weapons locked up when he traveled on the public roads of the new nation. Indeed, Jefferson was so mindful of this need, he had a special pair of pistol holders made that would allow him to carry his arms securely locked when he ventured beyond his vast land holdings in the western part of Virginia.[62]

Although Clement makes much of the guns owned by the Founders, he is dismissive of the law books they owned and the treatment of limits on armed travel that were well established features of the common law. Clement is particularly disdainful of references in amicus briefs to the work of Michael Dalton's *Country Justice*, a popular legal text that was among the most influential legal books published in the eighteenth-century Anglo-

---

58. Reply Brief for Petitioners at 11, N.Y. State Rifle & Pistol Ass'n v. Bruen, (2021) (No. 20-843).

59. Thomas Jefferson Encyclopedia, "Firearms", https://www.monticello.org/site/research-and-collections/firearms.

60. *Id.*

61. *Id.*

62. The research division at Monticello have collected many of Jefferson's comments about firearms. *See* Thomas Jefferson Encyclopedia, *supra* note 59. Contrary to claims of Clement and the Professors of Second Amendment Law Brief, Jefferson securely locked up his guns when traveling in public, going so far as to commission a custom saddle to lock them up.

American world.[63]  Dalton's discussion of the limits on armed travel makes clear why Clement was so eager to downplay Dalton's importance:

> All such as shall go or ride armed (offensively) in Fairs, Markets or elsewhere; or shall wear, or carry any Guns, Dags, or Pistols charged, any Constable; seeing this may arrest them, carry them before a Justice of the Peace, and he may bind them to the Peace; yea, tho' those persons were so armed or Weaponed for their defense upon any private quarrel.

In such situations, Dalton reminded his readers "they might have had the Peace against the other persons: and besides, it striketh a fear and Terror in the King's Subjects.[64]

As Dalton's text made clear, during the Founding Era the act of traveling with an offensive weapon by its very nature provoked a "fear of the people"—there was no need to independently establish a specific intent to terrify, or prove that an action was an actual breach of the peace to meet this terror requirement.[65]  Nor did English law accept that one might pre-emptively arm to address a specified threat, the appropriate response was to bind the threatening person to the peace.  Even if a person was "armed or weaponed for their defense upon any private quarrel," the appropriate response was still to arrest them, and bind the threatening person to the peace. Moreover, if the person continued to arm in contravention of the prohibition on armed travel, the justice of the peace "ought to bind him anew, and by better sureties."[66]

Dalton also noted that the law included an exemption for cases in which individuals acted to preserve the peace.[67]  It would have made little sense for Dalton to underscore this exception in his guide to the law if there was a general right of armed peaceable travel.  As he noted, only "the King's Servants in his presence, and Sheriffs, and their Officers, and other the Kings Ministers, and such as be in their company assisting them in executing the Kings Process, or otherwise in executing of their Office, and all others in pursuing Hue and Cry," were exempt from the prohibition and "may lawfully

---

63.  Reply Brief for Petitioners, *supra* note 58, at 7–8.

64.  *See* Michael Dalton, The Country Justice, Containing the Practice of the Justices of the Peace Out of Their Sessions 380 (1726).

65.  *Id.*  On Dalton's influence and the role of justice of the peace guides to Anglo-American legal culture, *see* Larry M. Boyer, *The Justice of the Peace in England and America from 1506 to 1776: A Bibliographic History*, 34 The Q. J. Of The Library Of Congress 315 (1977).

66.  Dalton, *supra* note 64, at 380.

67.  *Id.* at 381.

bear Armour or Weapons."[68]   Dalton's writings were among the most important legal texts imported to the colonies, and any jurist who purports allegiance to the "original public meaning" of the Second Amendment would be remiss to ignore Dalton's guidance.  John Adams not only owned a copy of Dalton, but he made extensive use of his book's treatment of the common law in his preparation for the Boston Massacre trial.  Adams evidently considered Dalton to be authoritative, as important as other influential English legal commentators he considered, including Coke, Blackstone, and Hawkins (some of whom cited Dalton in their own treatises).[69]  Adams noted that the use of arms to put down riots was not simply legal, but subjects were required to assist agents of the crown to restore the peace.[70]  The use of arms in these contexts was the limited exception to the general rule against public carry.  But Clement takes a very narrow exception to the rule and treats it as dispositive, ignoring the rule itself.

Dalton's writings were incredibly influential at the time that the Second Amendment was ratified, and their significance outlasted the Founding era. Dalton's work continued to be quoted in antebellum American legal texts, including the growing genre of state-specific justice of the peace manuals that proliferated in the early republic.[71]  Dalton's exposition of the law— including his position that there existed no general right to carry firearms in public, even for anticipated self-defense—thus contributed to the general understanding of governmental authority to regulate public carry when the Second Amendment was drafted, as well as when the Fourteenth Amendment made it applicable to the States.

## III. Regionalism and Change Over Time: Treating the Right of Self Defense and Regulation Historically

No scholar familiar with early American legal history would presume to generalize American legal attitudes based on the views of slave-owning judges in the Antebellum era, yet much of the case against New York rests

---

68.   Adams quoted Dalton, Blackstone, and Hawkins, three of the most influential texts in the colonies.  "And so perhaps the killing of dangerous rioters, may be justified by any private persons, who cannot otherwise suppress them, or defend themselves from them; in as much as every private person seems to be authorized by the law, to arm himself for the purposes aforesaid." Hawkins, PLEAS OF THE CROWN p. 71.

69.   Reply Brief for Petitioners, *supra* note 58, at 10–11; "Adams' Argument for the Defense: 3–4        December        1770," *Founders        Online,* NAT'L        ARCHIVES, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016.

70.   NAT'L ARCHIVES, *supra* note 69.

71.   William Henig, one of the most influential legal figures in early Virginia history, quoted extensively from *The Country Justice* in his discussion of surety of the peace and copied the standard form of a surety from Dalton; *see* WILLIAM HENIG, THE NEW VIRGINIA JUSTICE 572–79 (Johnson & Warner, 2nd ed. 1810).

on generalizations derived from the views of this body of sources.[72]  There is little doubt that a more expansive conception of gun rights emerged in parts of the slave-owning South. [73]  But, it is equally indisputable that a different model of firearms regulation emerged in Massachusetts and spread to other parts of the nation, and eventually to some parts of the slave-owning South.[74]  The Massachusetts Model used sureties of the peace and good behavior to enforce the peace.[75]  However, Clement and the other amicus briefs supporting his position misrepresent the nature of sureties, transforming them from a means to limit armed travel and preserve the peace into something resembling a modern shall-issue regulatory framework.[76] The erroneous claim that surety of the peace laws allowed individuals to carry arms, unless a specific individual came forward to demand a peace bond, turns Founding-era history on its head. The purpose of these laws was in fact to achieve the opposite goal: limiting armed travel in public to a very narrow range of situations.[77]

Gun rights advocates have approached Anglo-American law as if little changed between the Glorious Revolution and the American Civil War.[78] But a proper understanding of the evolving meaning of self-defense—and the changing legal response to the potential threat posed by the emergence of cheap, reliable, and easily concealed weapons—is essential to making sense of the legal history of this period.

The common law model of conserving the peace inherited from England was rooted in the face-to-face communal practices of early modern England's rural communities.[79]  Until the rise of modern police forces in the nineteenth century, this community-based model of policing dominated on

72. On the importance of early American regional differences in the evolution of the common law, *see generally* David Konig, *Regionalism in Early American Law*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., Cambridge University Press, 1st ed. 2008); Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

73. Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121 (2015).

74. *Id.*

75. On the Massachusetts Model, *see* Blocher & Miller, *supra* note 19, at 30.

76. Reply Brief for Petitioners, *supra* note 58, at 11–12.

77. DALTON, *supra* note 64, at 380 ("[I]f he hath broken (or forfeited) his Recognizance by Breach of the Peace, the Justice may and ought to bind him anew, and by better Sureties, for the Safety of the Person in Danger . . . .").

78. Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (erroneously reading developments in the antebellum South backward into earlier English and American history.)

79. *See generally* STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND 1550–1640 (Palgrave Macmillan, 1st ed. 2000).

both sides of the Atlantic.[80]  As conservators of the peace, justices of the peace, sheriffs, and constables maintained their traditional authority to enforce the peace.  This included the power to preemptively disarm, bind over with sureties of the peace or good behavior, and imprison those who violated the prohibition on armed travel.[81]

The importance of this tradition was underscored in the Massachusetts case of *Commonwealth* v. *Leach*.[82]  The case addressed the question of how much of the traditional power accorded to justices of the peace under common law had been absorbed into Massachusetts law.  Contrary to Clement's account, the *Leach* case affirmed that the English statutes enacted during the reign of Edward III, bestowing extensive powers on justices of the peace, had been fully absorbed into the state's common law.  This included the wide-ranging authority to detain, disarm, and bind to the peace any individual who traveled armed in public outside of the recognized exemptions.[83]

Massachusetts law expanded gun rights well beyond the traditional English common law view, but it stopped short of the modern libertarian vision being championed in *Bruen*.  The approach taken by Massachusetts in this effort to rationalize their law was built on the landmark decision on the scope of  legal self-defense: *Commonwealth v. Selfridge*, an 1806 case that changed the course of American criminal law and its view of armed self-defense.[84]  By failing to understand the role of *Selfridge* in the history of the evolution of American self-defense law, gun rights advocates and their scholarly allies have warped early American criminal law almost beyond

80.  LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH 100 (The University of North Carolina Press, ed. 2009).  For examples of unreliable historical accounts of sureties and the role of the justice of the peace as conservators of the peace, *see* David B. Kopel and George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's Young v. State of Hawaii*.  For another ahistorical treatment of the same issue, *see* Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms*, GEORGE MASON UNIVERSITY LEGAL STUDIES RESEARCH PAPER SERIES NO. LS 21-06, 1, 13 (2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3697761.  Leider weaponized this argument in his amicus brief in *Bruen*, repeating the same errors, *see* Leider, *supra* note 10.

81.  Cornell, *supra* note 54, at 79, 83, 90.

82.  EPHRAIM WILLIAMS ET AL., REPORTS OF CASES ARGUED AND DETERMINED IN THE SUPREME JUDICIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS 31 (Palala Press ed., 2015).

83.  Reply Brief for Petitioners, *supra* note 58, at 6–7.

84.  Retreat, not stand your ground, was the legal requirement under English common law. The notable exception to this rule was the "castle doctrine" covering deadly force in the home against intruders.  *See Semayne's Case*, 77 Eng. Rep. 194, 195 (1604) (KB).  *See generally*, Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 L. & CONTEMP. PROBS. 85 (2017). On Selfridge's importance to the American law of self-defense, *see* RICHARD MAXWELL BROWN, NO DUTY TO RETREAT VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY (1991).

recognition, and therefore failed to grasp the significance of the Massachusetts Model.[85]

Under English common law, there was no good cause or imminent threat exception that allowed individuals to pre-emptively carry arms to defend against a specified threat. The Massachusetts model built on *Selfridge*'s new reasonable fear standard.[86] According to the *Selfridge* standard, if an individual had a reasonable fear of serious injury or death, with a specified threat, arming pre-emptively was now legal.[87] This new approach to arming in cases of specified need was an important break with English law, but it was not a total rejection of the entire common law approach to limiting armed travel.

It would be hard to over-state the significance of *Selfridge* to American law. *Selfridge* recognized that the traditional communal enforcement of the peace that shaped English law was itself insufficient in the changed circumstances of the early American republic. The world of the Founders had been replaced by the one chronicled by Tocqueville in *Democracy in America*.[88] The evolving right of self-defense as articulated in *Selfridge* reflected the growth of a new, more individualistic conception of armed self-defense—an approach that recognized the need to arm in situations in which an individual could not depend on neighbors or the law for protection.[89]

The new, post-Selfridge standard was codified in two distinct provisions of the criminal code adopted by Massachusetts in the 1830s. The first provision reaffirmed the right of any person to seek a peace bond against any individual who threatened the peace:

> "If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace."[90]

---

85.  Reply Brief for Petitioners, *supra* note 58, at 8–9.

86.  The impact of Selfridge on criminal reform in Massachusetts is evident IN REPORT OF THE PENAL CODE OF MASSACHUSETTS 22, (1844).

87.  On the significance of Selfridge, *see* Francis Wharton, A TREATISE ON CRIMINAL LAW OF THE UNITED STATES (1846) at 259.

88.  George Kateb, *Democratic Individualism and Its Critics*, 6 ANN. REV. OF POL. SCI. 275, 293 (2003).

89.  Daniel Breen, *Parson's Charge: The Strange Origins of Stand Your Ground*, 16 CONN. PUB. INT. L.J. 41, 71 (2017).

90.  1836 Mass. Acts 750.

Massachusetts also expressly reaffirmed the broad powers of justice of the peace to maintain the peace even in cases in which no individual brought forward a complaint, providing that:

> "Every justice of the peace, within his county, may punish by fine, not exceeding ten dollars, all assaults and batteries, and other breaches of the peace, when the offence is not of a high and aggravated nature, and cause to be stayed and arrested all affrayers, rioters, disturbers and breakers of the peace, and all who go armed offensively, to the terror of the people, and such as utter menaces or threatening speeches, or are otherwise dangerous and disorderly persons."[91]

Under Massachusetts law, any justice of the peace thus retained the authority that conservators of the peace had enjoyed under English common law, to arrest or bind over citizens violating the statue prohibiting armed travel.

In his reply brief on behalf of the Petitioners challenging New York's law in *NYSRPA v. Bruen*, Paul Clement falsely claimed that the Massachusetts surety law "required a magistrate to find "reasonable cause" that someone had demonstrated a propensity to *misuse* a firearm to cause "injury, or breach the peace," before a surety could be demanded to *continue* carrying it."[92] Paul Clement was, as usual, wrong about the history. In fact, the reasonable cause standard applied to the narrow exception permitting public carry, not to the general rule prohibiting it.[93] Clement's conclusion that "[t]hese laws thus reinforced the understanding that the people had a baseline *right* to carry arms, and that only *abuse* of that right could justify its restriction," is the exact opposite of how these laws actually worked—as the relevant statutes make clear.[94]

One of the best sources to illuminate the public understanding of the 19th-century Massachusetts law is a commentary authored by one of the State's leading criminal law judges, Peter Oxenbridge Thacher.[95] A standard legal maxim familiar to judges and lawyers in antebellum America held that "great regard, in the exposition of statutes ought to be paid to, the

---

91.   1836 Mass. Acts.

92.   Reply Brief for Petitioners, *supra* note 58, at 11.

93.   1836 Mass. Acts, Chap. 85 Sect. 25.

94.   Clement offers no historical evidence to substantiate his "reading" of how surety statutes were interpreted at the time by leading Massachusetts jurists.

95.   The dominant model of originalism, public meaning originalism, focuses on the how an ideal legally knowledgeable reader at the time would have understood the words of the text, for a useful guide to originalist theory, *see* Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

construction that sages of the law, who lived about the time."[96]  Few figures in antebellum law exemplified the notion of "a sage of the law" than Peter Oxenbridge Thacher.[97]

Thacher explicated the meaning of the Massachusetts law in an influential grand jury charge that was reprinted as a pamphlet and also excerpted in the press.  Grand jury charges were important civic occasion in antebellum America, and were especially significant public events in Massachusetts because they gave the "sages of the law" an opportunity to expound and explicate the meaning of important legal concepts to citizens.  Thacher's reading of his own state's laws on public carry left little room for interpretive disagreement.    "In our own Commonwealth [of Massachusetts]," Thacher reminded members of the grand jury, "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property."[98]

Gun rights advocates have either ignored Thacher's writings or dismissed their relevance.[99]  According to this flawed gun rights account, Thacher's words were largely meaningless with little legal significance.  In

---

96.  Coke's legal maxim regarding the importance of consulting the sages of the law when interpreting statutes was familiar to lawyers and judges in the early Republic, *see* E. FITCH SMITH, COMMENTARIES ON STATUTES AND CONSTITUTIONS 739 (Gould, Banks & Gould, ed. 1848). On Smith's significance to antebellum legal culture, *see* POPKIN, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION 69; *see also* Leider, *supra* note 80.

97.  Thacher was praised by contemporaries for his "thorough knowledge of the criminal law and its practical application," P.O WOODMAN, REPORTS OF CRIMINAL CASES TRIED IN THE MUNICIPAL COURT OF THE CITY OF BOSTON, BEFORE PETER OXENBRIDGE THACHER, JUDGE OF THAT COURT FOR 1823-1843 (Boston, 1845). *The American Review*, an influential Whig magazine, singled out this volume with effusive praise, commenting that the judge's "high character as a magistrate was not only known to the profession in New England, but his published charges to grand juries, and occasional reports of important cases tried before him, had made him known throughout the country." See 3 THE AMERICAN REVIEW: A WHIG JOURNAL OF POLITICS, LITERATURE, ART, AND SCIENCE 222–23 (1846).

98.  Peter Oxenbridge Thacher, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON ON MONDAY, DEC. 5TH A.D. 1836 AND ON MONDAY, MARCH 13TH, A.D. 27-28 (Dutton and Wentworth eds., 1837); *Judge Thacher's Charges*, CHRISTIAN REGISTER AND BOSTON OBSERVER June 10, 1837, p. 91.

99.  For strained efforts by gun rights advocates to discredit Thacher's understanding of his state's criminal law, *see* FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 79–80 (Nicholas J. Johnson et al. eds., 2018); *see also* Leider, *supra* note 80.  On the role of grand jury charges in this period of American legal history, *see* DENNIS HALE, THE JURY IN AMERICA: TRIUMPH AND DECLINE 93–98 (2016); Joshua Glick, *On the Road: The Supreme Court and the History of Circuit Riding,* 24 CARDOZO L. REV. 1753, 1754 (2003).  The phrase "sages of the law" was frequently used by legal commentators from Coke to Kent, *see e.g.*, James Kent, 1 COMMENTARIES ON AMERICAN LAW 463 (1826).  On Coke's instantiation of the concept in Anglo-American law, *see* Wilfrid Prest, *History and Biography, Legal and Otherwise*, 32 ADEL. L. REV. 185 (2011).

reality though, grand jury charges were important civic occasions in part *because* leading jurists expounded the meaning of the law for the public. Thus, if one were genuinely interested in how the Massachusetts law was understood by the public at that time (and certainly by those well-informed readers acquainted with modes of legal reasoning and canons of statutory construction), Thacher's grand jury address would be precisely the type of source that would illuminate the original public meaning of the Massachusetts laws on public carry.[100]  On this matter, Thacher's position and counsel to the public was unequivocal: No civilian had the right to go armed in public "without reasonable cause to apprehend an assault or violence to his person, family, or property."[101]

## IV. Armed Travel in Antebellum Boston: Testing the non-Enforcement Thesis

Gun rights advocates have not only ignored or dismissed the express statements of antebellum criminal jurists about limits on armed travel in antebellum Massachusetts, but they have also concocted an alternative theory of a right to peaceable armed travel based on a wholly speculative and implausible set of claims derived not from any actual sources, but from silences in the historical record.[102]  According to this deeply-flawed view, carrying guns in public was the contemporary norm simply because scholars (half of whom do not seem to be looking particularly hard in the right places) have not yet found any cases *challenging* the Massachusetts law.  This non-enforcement thesis rests on a host of interpretive errors.  It misreads the silences in the historical record, ignores readily available evidence from cities like Boston that Massachusetts' public carry prohibition was in fact enforced, effectively jumbles the historical chronology of gun regulation in the state ignoring important changes in the law over time, and fails to understand how criminal justice and law enforcement functioned in the early republic.[103]

First, it is important to acknowledge that written records of the activities of local justices of the peace from centuries ago, are hard to locate, particularly in rural areas of New England, if they survive at all.  Although

---

100.  There is a vast and seemingly ever-expanding scholarly literature on originalism, for a useful introduction *see generally*, Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375 (2013).

101.  Peter Oxenbridge Thacher, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON ON MONDAY, DEC. 5TH A.D. 1836 AND ON MONDAY, MARCH 13TH, A.D. 27-28 (Dutton and Wentworth, 1837); *Judge Thacher's Charges,* CHRISTIAN REGISTER AND BOSTON OBSERVER June 10, 1837, 91.

102.  Leider, *supra* note 80.

103.  Leider, *supra* note 80.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12786   Page 430 of 733

the records of justices of the peace in rural New England are rare, there is ample historical evidence from Boston, the area's most populous city, that shows armed travel in public was an unusual event, but nonetheless was a crime that was enforced by the Boston police and courts.  The rules and ordinances governing the Boston police expressly empowered police officers to arrest any person who traveled armed in violation of state law.  Such individuals could be stopped and searched, and if weapons were found, could be prosecuted.  The rules governing Boston police were explicit about this power: police had the power to stop and search any individual who disturbed the peace or was "unduly armed with a dangerous weapon."[104]  The gloss on the law in the Boston police rules makes it clear that a good cause—like that required by the modern New York law—was the only reason that would justify armed travel under early Massachusetts law.

The most obvious explanation for why there were no challenges to the Massachusetts prohibition on armed carry is that few individuals at that time traveled armed in heavily-populated areas in the state without a good cause.  Historian Roger Lane, the leading authority on crime in nineteenth-century Boston, concluded after exhaustive and meticulous research that "not many criminals in fact carried arms, even after the invention of the revolver made it possible to do so inconspicuously."[105]  This conclusion is consistent with the fact that Boston police did not themselves routinely carry firearms until decades after the Civil War period: the standard weapon issued to police in the antebellum era was a club, not a firearm.  Not only did the typical Boston policeman not carry a firearm, but the entire police force owned only a handful of revolvers.   Property inventories of the Boston police are illuminating in this regard: the list of moveable property owned by the Boston police for the year 1862 shows a total of 270 clubs and only 7 revolvers.  If Bostonians were promiscuously traveling armed and gun toting posed a serious threat to public safety, it seems highly unlikely that the entire Boston police would have owned a total of just seven revolvers at the start of the Civil War era.[106]

Arrest statistics compiled by Boston's Chief of Police further undermine the non-enforcement thesis.  As the data in Table One shows, only a tiny fraction of assaults in the city involved a weapon of any kind.  Moreover, the number of arrests for unlawfully carrying weapons in public were also miniscule.  Contrary to the claims of modern gun rights advocates, the evidence from Boston does not support the non-enforcement thesis, but rather suggests that citizens generally obeyed their state's prohibition on

---

104.   A SUPPLEMENT TO THE LAW AND ORDINANCES OF THE CITY OF BOSTON 91 (1866).

105.   Roger LANE, POLICING THE CITY: BOSTON 1822-1885 103–04 (Harvard University Press ed., 1967).

106.   ANNUAL REPORT OF CHIEF OF POLICE 1862 CITY DOCUMENT NO. 3 13 (Boston, 1863).

armed travel, and few individuals carried weapons in public in the period leading up to the Civil War.  In short, Bostonians, in contrast to their southern brethren, simply did not habitually arm themselves.[107]

**Boston Police Enforcement Data 1864 and 1866[108]**

| Year | Assault and Battery | Assault With Weapons | Disturbing the Peace | Carrying Weapons Unlawfully |
|------|--------------------|--------------------|--------------------|----------------------------|
| 1864 | 1016 | 100 | 309 | 8 |
| 1866 | 1091 | 78 | 666 | 5 |

When the commentaries by leading jurists from Massachusetts, most notably Peter Oxenbridge Thacher, are considered alongside the data about policing practices in Boston, the absence of pistols in the inventory of the Boston police department, and the decision to continue to arm officers with clubs, not firearms, the gun rights advocates' non-enforcement thesis collapses under the weight of countervailing evidence.

## V. The Modern Paradigm of Gun Control Emerges: Reconstruction and the Right to Regulate Firearms

In a remarkable colloquy between Clement and Justice Thomas during the oral arguments in *Bruen*, the two discussed the relevance of Reconstruction-era practices to understanding the scope of permissible modern regulation.[109]  Reconstruction, the contentious period after the Civil War, is generally acknowledged by originalist judges and scholars to be the period most relevant to understanding how the Second Amendment's protections apply to state laws.[110]  This was a violent period in American history, one where the nation responded to newly-rising levels of gun violence by enacting tough laws.[111]  During Reconstruction, states not only rewrote their constitutional provisions on arms bearing to expressly permit

---

107.   On the different patterns of gun violence in the North and the South in the pre-Civil War era, *see* RANDOLPH ROTH, AMERICAN HOMICIDE 180–249 (Belknap Press of Harvard University Press, 2009).

108.   ANNUAL REPORT OF THE CHIEF OF POLICE 1864, CITY DOCUMENT NO. 6 8–9 (Boston, 1865); ANNUAL REPORT OF THE CHIEF OF POLICE 1866, CITY DOCUMENT NO. 9 9–10 (Boston, 1867).

109.   Transcript of oral argument, *supra* note 12, at 6–9.

110.   Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011); Young v. Hawaii, 992 F.3d 765, 824 (9th Cir. 2021).

111.   Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 615, 621–22 (2006); Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016).

the regulation of public carry, but states and localities passed dozens of new laws regulating nearly every aspect of firearms ownership and use. These laws were aggressively enforced and applied to all without regard to race until the era of Jim Crow, when these facially neutral laws were used as tools of racial oppression.[112]



*Figure 1 - Post-Civil War Local Public Carry Laws (data from Appendix, Table 2)*

Yet, despite having conceded that the evidence from Reconstruction was dispositive, Clement simply dismisses the extensive regulations enacted during this period as little more than a scattering of laws.[113] In fact, as Figure 1 shows, dozens of laws were enacted across the country, and millions of Americans were living under these regulations, including half the population of California and all of the residents of the nation's ten largest cities.[114] Even more germane to the facts before the Court, many localities adopted good cause permit laws—precisely the type of regulations that are at issue in *NYSRPA v. Bruen*.[115] Indeed in many states, the majority of citizens were living under such laws.[116] New York's permit law was modeled on these earlier laws, which emerged during Reconstruction.[117]

As Table 2 shows, most of the nation's largest municipalities had some type of restriction on public carry in place by last decade of the nineteenth

---

112. Brennan Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, U.C. DAVIS L. REV. (forthcoming 2022).

113. Transcript of oral argument, *supra* note 12, at 6–9.

114. *See* Appendix, Table 2.

115. Dozens of cities enacted permit schemes, *see* Charles, *supra* note 23. *See* Appendix, Table 2.

116. *See* Appendix, Table 1.

117. *See* Appendix, Table 2.

century.  The example of California is particularly instructive in this regard.  More than half of the state's population was living under a permit scheme or some other restrictive public carry regime as the new century dawned.[118]  Nor was California unique in this regard.  As Table 2 shows, dozens of similar statutes were passed in the post-Civil War era.  These regulations included permit schemes, bans on concealed carry, or total prohibitions on armed carry in public.[119]  Given that research on gun regulation, particularly during Reconstruction is still ongoing, it is likely that this list will continue to grow as new research reveals previously hidden sources.  These restrictions on public carry governed the lives of millions of Americans who were living under some type of regulatory regime that limited public carry in a manner similar to the New York law at issue in *Bruen*.  The idea that permissive open carry was the legal norm in post-Civil War America is a gun rights fantasy and has no foundation in history.  Under any serious and credible form of originalist analysis, New York's law ought to be presumptively lawful under the *Heller/McDonald* history, text, tradition mode of analysis.

Not only were these laws common in post-Civil War America, but they were generally understood to be consistent with the Second Amendment.  Multiple legal commentators, from the distinguished jurist John Norton Pomeroy to the multi-volume and authoritative *Encyclopedia of English and American Law* all agreed that armed travel in public could be limited, provided a good cause exception was available for those who faced a specified need for self-defense.  Pomeroy stated the matter cogently and concisely: the right to keep and bear arms was fully consistent with laws limiting persons from "carry[ing] dangerous or concealed weapons."[120]

The most important change in American law in the post-Civil War era was not the adoption of permissive carry which had always been a southern phenomenon.  Rather, the most significant transformation was the move from the common law model and its use of an affirmative defense at trial to vindicate a self-defense claim for traveling armed, towards permit-based

---

118.  *Id.*

119.  *Id.*

120.  JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (University of California Libraries, 1868).  3 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (John Houston Merrill ed., 1887).  This influential survey of law was an essential reference for lawyers.  *See* 2 9 AMERICA AND ENGLISH ENCYCLOPEDIA OF LAW, 42 CENT. L. J. 397, 400 (1896) (book review).  In his oral argument Clement claimed that any evidence from beyond the 1870s was not probative because some courts had adopted a militia-based reading of the Second Amendment precluded by *Heller*.  The only jurisdiction where such a claim might be plausible was Kansas where courts did adopt an approach to the Second Amendment that derived from antebellum southern cases *Heller* dismissed as early as 1905.  Transcript of oral argument, *supra* note 12, at 7.  The key Kansas case was City of Salina v. Blaksley, 83 P. 619 (Kan. 1905).  Thus, even by Clement's logic, only laws from the early 20th century ought to be excluded.

schemes. Under such schemes, those wishing to travel armed could present evidence of a specified threat to obtain a permit to carry a weapon, which was typically concealed and not carried openly.[121]  The use of affirmative defense was consistent with the traditional common law surety model that emerged in the context of a pre-industrial society in which most law enforcement was community-based.  Over the course of the nineteenth century, as America modernized and urbanized, professional police forces, police courts, and administrative agencies took over the job of maintaining public order from justice of the peace.  The new permit-based scheme emerged in the context of these larger changes in criminal justice.[122]

## VI. Conclusion

Many of the Supreme Court's newest justices have aggressively defended originalism's history, text, and tradition approach.  *Bruen* offers them an opportunity to demonstrate that this method can be applied rigorously and neutrally.  Doing so means distinguishing between invented historical traditions and real history.  It remains to be seen if they will follow the history or an invented historical tradition more in line with the political preferences of the modern Republican party.  The stakes in this case could not be higher.  The Supreme Court will not only decide the framework for evaluating the constitutionality of future gun laws, but the credibility of the Court is itself at stake.  Much of the recent criticism of the Court has focused on its increasingly politicization.  A decision along partisan lines striking down's New York's law will only lead to the further erosion of the court's legitimacy and intellectual prestige.  If members of the Court care about their institution's future, they would be well-advised to avoid a decision that exemplifies law office history at its worst.

---

121.  *Id.*

122.  *See* ERIC H. MONKKONEN, AMERICA BECOMES URBAN: THE DEVELOPMENT OF U.S. CITIES & TOWNS, 1780-1980 98–108 (University of California Press, 1st ed. 1988).

# APPENDIX

## Table 1 - Post-Civil War State Constitutional Arms Bearing Provisions and Regulation

| Date | State | Provision | Population |
|---|---|---|---|
| 1868 | Georgia | Ga. Const. of 1868, art. I, § 14: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. | 1,184,109 |
| 1869 | Texas | Tex. Const. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. | 818,579 |
| 1870 | Tennessee | Tenn. Const. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. | 1,258,520 |
| 1875 | Missouri | Mo. Const of 1875, art. II, § 17: Right to bear arms, when – That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when hereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. | 2,168,380 |
| 1875 | North Carolina | N.C. Const. of 1875, Art. I, § 30. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing | 1,399,750 |

| | | armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. | |
|------|------|------|------|
| 1876 | Colorado | Colo. Const. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. | 194,327 |
| 1879 | Louisiana | La. Const. of 1879, art. III: A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be abridged.  This shall not prevent the passage of laws to punish those who carry weapons concealed. | 939,946 |
| 1885 | Florida | Fla. Const. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. | 391,422 |
| 1889 | Idaho | Idaho Const. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law. | 88,548 |
| 1889 | Montana | Mont. Const. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid | 142,942 |

| | | | |
|---|---|---|---|
| | | of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. | |
| 1890 | Mississippi | Miss. Const. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. | 1,289,600 |
| 1891 | Kentucky | Ky. Constitution of 1891, § 1.7: The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. | 1,858,635 |
| 1896 | Utah | Utah Const of 1896, art. I, § 6: the people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. | 276,749 |
| | | **Total:** | **12,011,507** |

## Table 2 - Post-Civil War Local Public Carry Laws

| Year | State | City / County | Population Covered | Population Total Per State |
|------|-------|---------------|-------------------|---------------------------|
| ~1885 | Alabama | Tuscaloosa | 4,215 | 26,098 |
| ~1888 | Alabama | Montgomery | 21,883 | |
| ~1903 | Alaska | Skagway | ~9,400 | ~9,400 |
| 1873 | Arizona | Tucson | 3,224 | 88,243 |
| 1889 | Arizona (Entire State) | N/A | 88,243 | |
| 1865 | California | Los Angeles | 5,728 | 340,923 |
| 1876 | California | Sacramento | 21,420 | |
| 1878 | California | Eureka | 319 | |
| 1880 | California | Napa | 7,143 | |
| 1881 | California | Santa Barbara | 5,864 | |
| 1882 | California | Alameda | 16,464 | |
| 1882 | California | San Jose | 872 | |
| 1884 | California | San Francisco | 233,959 | |
| 1884 | California | St. Helena | 1,339 | |
| 1885 | California | Fresno | 10,818 | |
| 1888 | California | Lompoc | 1,015 | |
| 1889 | California | Marysville | 3,991 | |
| 1890 | California | Oakland | 48,682 | |
| 1892 | California | Monterey | 1,662 | |
| 1914 | California | Needles | 3,067 | |
| 1904 | Colorado | Windsor | 305 | 29,383 |
| ~1914 | Colorado | Colorado Springs | 29,078 | |
| 1886 | Connecticut | New Haven | 81,298 | 236,613 |
| 1901 | Connecticut | Naugatuck | 10,541 | |
| 1902 | Connecticut | Waterbury | 45,859 | |
| 1906 | Connecticut | Hartford | 98,915 | |
| 1905 | Idaho | Twin Falls | 13,543 | 17,086 |
| 1910 | Idaho | Caldwell | 3,624 | |
| 1880 | Illinois | Nashville | 2,222 | 23,932 |
| 1893 | Illinois | Evanston | 19,259 | |
| ~1912 | Illinois | Hinsdale | 2,451 | |
| 1870 | Kansas | Abilene | 2,360 | |
| 1877 | Kansas | Empire City | Unavailable | |
| 1879 | Kansas | Arkansas City | 8,847 | |

| 1879 | Kansas | Beloit | 1,835 | |
| 1882 | Kansas | Argentine | 4,732 | |
| 1883 | Kansas | Burlington | 2,011 | 63,600 |
| 1884 | Kansas | Delphos | 4,516 | |
| 1887 | Kansas | Lakin | 258 | |
| 1888 | Kansas | Concordia | 3,401 | |
| 1888 | Kansas | Holton | 3,082 | |
| 1888 | Kansas | Johnston City | 143 | |
| 1888 | Kansas | Fredonia | 1,515 | |
| 1888 | Kansas | Wichita | 23,853 | |
| 1890 | Kansas | Coffeyville | 4,953 | |
| 1890 | Kansas | Coming | 425 | |
| 1891 | Kansas | Halstead | 1,071 | |
| 1893 | Kansas | Scandia | 598 | |
| 1876 | Kentucky | Frankfort | 6,958 | 6,958 |
| 1909 | Maine | Portland | 58,571 | 58,571 |
| 1894 | Maryland (Entire State) | N/A | 1,042,800 | 1,042,800 |
| 1906 | Massachusetts (Entire State) | N/A | 3,365,000 | 3,365,000 |
| 1889 | Michigan | St. Joseph | 3,733 | 3,733 |
| 1870 | Minnesota | Hastings | 3,458 | 59,781 |
| 1882 | Minnesota | St. Paul | 41,473 | |
| 1882 | Minnesota | Worthington | 636 | |
| 1888 | Minnesota | New Ulm | 3,741 | |
| 1912 | Minnesota | Virginia | 10,473 | |
| 1881 | Missouri | Greenville | 1,051 | 355,569 |
| ~1881 | Missouri | St. Louis | 350,518 | |
| 1890 | Missouri | Columbia | 4,000 | |
| 1883 | Montana | Helena | 3,624 | 18,006 |
| 1893 | Montana | Red Lodge | 624 | |
| ~1906 | Montana | Anaconda | 12,988 | |
| 1909 | Montana | Harlowton | 770 | |
| 1880 | Nebraska | Falls City | 1,583 | 57,835 |
| ~1872 | Nebraska | Omaha | 16,083 | |
| 1895 | Nebraska | Lincoln | 40,169 | |
| 1905 | Nevada | Reno | 10,867 | 10,867 |
| 1897 | New Jersey | Montclair | 13,962 | 13,962 |
| ~1885 | New Mexico | Albuquerque | 3,785 | |
| 1887 | New Mexico (Entire State) | N/A | 160,282 | 160,282 (population |

| | | | | adjusted) |
|---|---|---|---|---|
| ~1877 | New York | Syracuse | 51,792 | 3,051,880 |
| 1880 | New York | Brooklyn | 599,495 | |
| 1881 | New York | New York | 1,919,000 | |
| 1891 | New York | Buffalo | 255,664 | |
| 1892 | New York | Elmira | 30,893 | |
| 1905 | New York | Troy | 76,813 | |
| 1909 | New York | Lockport | 17,970 | |
| 1910 | New York | Albany | 100,253 | |
| 1888 | North Dakota | Bottineau | 145 | 145 |
| 1871 | Ohio | Newark | 6,698 | 104,940 |
| 1893 | Ohio | Massillon | 10,092 | |
| 1894 | Ohio | Columbus | 88,150 | |
| 1893 | Oklahoma | Enid | 3,444 | 3,444 |
| 1902 | Oklahoma | Okeene | Unavailable | |
| 1879 | Oregon | Astoria | 3,981 | 3,981 |
| ~1871 | Tennessee | Lebanon | 2,073 | 27,938 |
| 1873 | Tennessee | Nashville | 25,865 | |
| 1897 | Tennessee | Centennial | Unavailable | |
| 1870 | Texas (Entire State) | N/A | 818,579 | 818,579 (population adjusted) |
| 1871 | Texas (Entire State) | N/A | 818,579 | |
| ~1877 | Utah | Provo | 3,432 | 48,275 |
| 1888 | Utah | Salt Lake City | 44,843 | |
| 1895 | Vermont | Barre | 8,448 | 14,687 |
| 1897 | Vermont | St. Albans | 6,239 | |
| 1878 | Washington | Walla Walla | 8,716 | 179,307 |
| 1895 | Washington | Spokane | 86,848 | |
| 1905 | Washington | Tacoma | 83,743 | |
| 1871 | Washington D.C. | N/A | 131,700 | 131,700 |
| 1881 | West Virginia | Wheeling | 30,737 | 733,531 |
| ~1887 | West Virginia (Entire State) | N/A | 702,794 | |
| 1890 | Wisconsin | Berlin | 4,149 | 327,842 |
| ~1896 | Wisconsin | Milwaukee | 285,315 | |
| ~1917 | Wisconsin | Madison | 38,378 | |
| 1875 | Wyoming (Entire State) | N/A | 20,789 | 20,789 |
| | | | **Total:** | **11,567,347** |

### SYMPOSIUM:
### THE 2ND AMENDMENT AT THE SUPREME COURT: "700 YEARS OF HISTORY" AND THE MODERN EFFECTS OF GUNS IN PUBLIC  The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928

June, 2022

**Reporter**
55 U.C. Davis L. Rev. 2545 *

**Length:** 27309 words

**Author: _Saul Cornell_**\*

\* Copyright © 2022 **_Saul Cornell_**. Paul and Diane Guenther Chair in American History, Fordham University.

# Text

[*2545]

INTRODUCTION

Following _Heller_'s instruction to look to history for guidance in evaluating the scope of permissible regulation under the Second Amendment, recent scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American legal tradition. [1]Much **[*2546]** of this material was largely unavailable to the _Heller_ court because the sources were difficult to identify, search, and collect. The creation of powerful searchable digital "virtual" archives has transformed this once moribund sub-field of legal scholarship and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law. [2]

In contrast to much pre- _Heller_ scholarship, this new Second Generation of Second Amendment scholarship has moved beyond the narrow focus on the single issue that defined the previous era's scholarly obsession, the individual or collective nature of the right entrenched in the Second Amendment. [3]The first generation of legal scholars approached their subject matter without engaging directly with other relevant bodies of research and scholarship necessary to understand early American legal history and culture. [4]This tunnel history model, working backward from today's debates and focusing on a narrow range of sources, inevitably produced a distorted

---

[1] _See_ Eric M. Ruben & Darrell A. H. Miller, _Preface: The Second Generation of Second Amendment Law & Policy_, **80 LAW & CONTEMP. PROBS. 1, 5-7 (2017)** (discussing a variety of post- _Heller_ articles that incorporate or explore the history of gun regulation and the use of new sources to illuminate this history).

[2] _See_ ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 39-42 (2015).

[3] _See_ Saul Cornell, "Half Cocked": The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment, _106 J. CRIM. L. & CRIMINOLOGY 203, 206-07 (2016)_ [hereinafter _Half Cocked_].

[4] _See_ Martin S. Flaherty, _Can the Quill Be Mightier than the Uzi?: History "Lite," "Law Office," and Worse Meets the Second Amendment_, _37 CARDOZO L. REV. 663, 677 (2015)_.

55 U.C. Davis L. Rev. 2545, *2546

ahistorical view of the right to keep and bear arms, confusing the preoccupations of modern Americans with those of earlier generations who lived in a pre-modern society that conceptualized firearms regulations in distinctly different terms than those familiar to modern lawyers and judges. [5]The Second Generation of Second Amendment scholarship, by contrast, has incorporated insights from other subfields of legal history outside of the field of Second Amendment study, importing insights from the history of criminal law and the rich literature on the role of regionalism in the Americanization of the common law. [6]It has also taken *Heller's* **[*2547]** injunction to look closely at the history of gun regulation seriously and placed Second Amendment scholarship on a more historically sound footing.

The divergent paths taken by rigorous historical scholarship and ideologically driven gun rights advocacy, masquerading as serious scholarship, is evident in many of the amicus briefs filed in *NYSRPA v. Bruen*, the most important Second Amendment case to reach the Supreme Court in more than a decade. [7]The law at issue in *Bruen*, a good cause permit scheme, builds on a tradition of arms regulation stretching back centuries in Anglo-American law. Indeed, permit schemes similar in scope to New York's permit law first emerged in the era of the Fourteenth Amendment. Such laws were part of a post-Civil War constitutional transformation in the meaning of the right to bear arms that swept across the nation. This reformulation of the right to bear arms in terms of a "right to regulate" in turn triggered an enormous expansion in both the number and types of gun laws passed by states and localities. There was broad agreement among courts, and constitutional commentators in the era of the Fourteenth Amendment that these new laws were consistent with both the Second Amendment and various state arms bearing provisions. [8]

Rather than break free from an earlier generation's penchant for law office history, recent gun rights scholarship, particularly as it was **[*2548]** deployed in the *Bruen* amicus briefs, has carried forward this earlier flawed approach, enhancing it with the power of digital searching and an infusion of nearly limitless research support by the NRA and other right-wing sources of funding. [9]New technologies have made some types of sources more readily available,

_____

[5] *See generally* Lauren Benton & Kathryn Walker, Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity, *89 CHI.-KENT L. REV. 937 (2014)* (discussing the complex set of processes shaping the evolution of early American law, most notably the profound regional differences that emerged as a result of slavery).

[6] *See* Cornell, *Half Cocked*, *supra* note 3, at 207, 210. For a discussion of the minimum standard for undergraduate history majors, see MARY LYNN RAMPOLLA, A POCKET GUIDE TO WRITING IN HISTORY 18 (7th ed. 2012) and MARTHA HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 1-3 (2001). On the methods of professional legal history, see THE OXFORD HANDBOOK OF LEGAL HISTORY (Markus Dirk Dubber & Christopher L. Tomlins eds., 2018). Thus, Paul Clement's briefs in *NYSRPA v. Bruen* rely heavily on dubious historical claims made by legal scholars who mischaracterized the nature of these laws by failing to use the standard techniques of legal history. *See* Transcript of Oral Argument at 23, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Nov. 3, 2021) [hereinafter Transcript of Oral Argument]. For examples of misreading of surety laws, see Brief of Professors Robert Leider & Nelson Lund, & the Buckeye Firearms Ass'n as Amici Curiae in Support of Petitioners at 19-33, *Bruen*, No. 20-843 [hereinafter Brief of Professors Leider & Lund]. For a discussion of the way sureties functioned, see *infra* pp. 33-35, 35 n.131. Indeed, during oral argument, Justices Breyer and Sotomayor both challenged Clement's interpretation as little more than "law office history." *See* Transcript of Oral Argument, *supra*, at 10-11. On the concept of law office history, see Flaherty, *supra* note 4, at 677.

[7] *See* Brief of Amicus Curiae Mountain States Legal Foundation's Center to Keep & Bear Arms in Support of Petitioners at 11-33, *Bruen*, No. 20-843; Brief of Professors Leider & Lund, *supra* note 6, at 7-8; Brief of Amici Curiae Professors of Second Amendment Law et al. in Support of Petitioners at 21-35, *Bruen*, No. 20-843.

[8] Saul Cornell, Symposium, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 68, 74-79 (2021) [hereinafter *The Right to Regulate*] (demonstrating the explicit affirmation of the right to regulate firearms in public included in Reconstruction era state arms bearing provisions and the consequent expansion of state and local regulation of firearms).

[9] On the problems with the gun rights narrative about Anglo-American law, see Cornell, *Half Cocked*, *supra* note 3, at 207-08 and Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, *122 HARV. L. REV. 191, 196-97 (2008)*.

55 U.C. Davis L. Rev. 2545, *2548

but digital searching is not a substitute for rigorous historical research, informed by the standard methods employed by legal historians across disparate fields. [10]

This Article charts the six-century arc of arms regulation in public in the Anglo-American legal tradition. It summarizes existing historical scholarship, exposes historical flaws in gun rights activist writing pretending to be engaged in serious scholarly inquiry, including the dubious claims advanced in the many gun rights amicus briefs filed in *Bruen*, and presents new research crucial to understanding the history of gun regulation and enforcement.

## I. EARLY MODERN "RIGHTS TALK" AND ON-GOING PROBLEMS OF PRESENTISM IN SECOND AMENDMENT SCHOLARSHIP AND LAW

Curiously, much of the debate over the Second Amendment has proceeded without considering a more basic question: how did the Founding era understand the nature of rights? Indeed, during the oral argument in *Bruen*, Chief Justice Roberts and Justice Kavanaugh expressed considerable discomfort because New York's discretionary permit system did not fit with how modern law typically deals with rights. In Justice Kavanaugh's view, "that's just not how we do constitutional rights." [11]Ironically, Justice Barrett queried New York's **[*2549]** Solicitor General about her views on the correctness of *Heller*, but her question would have been better directed to her fellow justices. In essence, Roberts and Kavanaugh's concerns were premised on an implicit rejection of *Heller*'s originalism, which requires that we treat rights claims in the manner that the Founding era approached such matters. [12] *Heller* announced that rights are entrenched with the scope they enjoyed when adopted, but Roberts and Kavanaugh balked at approaching gun rights in the more crimped manner that Founding era rights were generally treated. Rather than honestly express reservations about Scalia's originalism, both justices simply smuggled a quintessentially living constitution approach to rights into their questions without addressing the doctrinal problems such an approach posed for *Heller's* framework. [13]

To understand the roots of the rights anxiety articulated by Roberts and Kavanaugh, one must contrast the way modern law treats rights with the radically different approach taken to rights in the Founding era. [14]There is a large scholarly literature on the nature of legal rights in contemporary Anglo-American law. One of the most useful conceptualizations of modern legal rights was enunciated by the legal philosopher Joseph Raz whose conception of rights claims is apposite: "An individual has a right if an interest of his is sufficient to hold another to be subject to a

---

The Federalist Society has consistently endorsed a strongly libertarian reading of the Second Amendment and, for a good illustration of this approach, see Symposium, *The Second Amendment in the New Supreme Court*, *43 HARV. J.L. & PUB. POL'Y 319 (2020)*. The NRA funded gun rights scholar David Kopel's brief, which was filed in *Bruen*. Will Van Sant, *The NRA Paid a Gun Rights Activist to File SCOTUS Briefs. He Didn't Disclose it to the Court*, TRACE (Nov. 3, 2021), *https://www.thetrace.org/2021/11/scotus-nra-foundation-david-kopel-nysrpa-v-bruen-documents/* [*https://perma.cc/CFP8-DUWM*]. For a general discussion of the rise of coordinated and funded amicus campaigns, see Sheldon Whitehouse, *A Flood of Judicial Lobbying: Amicus Influence and Funding Transparency, 131 YALE L.J. F. 141, 141-74 (2021).*

[10] On historical methodology, see HOWELL & PREVENIER, *supra* note 6. On the methods of professional legal history, see THE OXFORD HANDBOOK OF LEGAL HISTORY, *supra* note 6.

[11] Transcript of Oral Argument *, supra* note 6, at 50. The claim that federal law treats all rights uniformly, including rights enumerated in the Bill of Rights is erroneous. In fact, rights, including rights expressly protected by the first eight amendments, are not treated in a uniform manner in existing jurisprudence. *See* Joseph Blocher, *Disuniformity of Federal Constitutional Rights*, U. ILL. L. REV. 1479, 1485 (2020).

[12] *See District of Columbia v. Heller, 554 U.S. 570, 634-35 (2008)*.

[13] *See* Transcript of Oral Argument *, supra* note 6, at 24-25, 27. The approach to rights in the living constitution tradition is dynamic, not static. *See* Bruce Ackerman, *The Living Constitution*, *120 HARV. L. REV. 1737, 1754 (2007)* (discussing how the scope and understanding of constitutional rights has changed over time).

[14] *See* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, *83 LAW & CONTEMP. PROBS. 31, 32-33 (2020)* [hereinafter *Natural Rights*].

duty. His right is a legal right if it is recognized by law, that is if the law holds his interest to be sufficient ground to hold another to be subject to a duty." [15]This approach was decidedly not how the Founding era conceptualized rights. The rights tradition shaping early American constitutionalism combined social contract theory (including Lockean theory), common law, and Whig republicanism. The constitutional synthesis that emerged from the [*2550] fusion of these legal traditions treated rights differently than modern courts typically approach rights. [16]

The American lawyers, jurists, and ordinary citizens who participated in the great wave of constitution writing that swept across America in the period immediately following the American Revolution drew on this novel approach to rights when framing the first state constitutions. A proper understanding this tradition is the logical starting point for interpreting the Second Amendment and its various state analogs. [17]Historian Jonathan Gienapp's gloss on the problem of interpreting Founding era rights discourse offers a useful cautionary reminder of the danger of smuggling in contemporary legal ideas into accounts of eighteenth-century era texts, beliefs, and practices. "Early state constitutions," as Gienapp notes, "vested local legislatures with sweeping authority, not because Revolutionary Americans were indifferent to individual liberty but because they assumed that empowering the people's representatives was the same thing as preserving the people's rights." [18]Thus, America's true first freedom - the foundation of all other liberties - was neither the right to bear arms nor the core First Amendment freedoms of speech and the press, but the right of the people to enact laws to regulate their own internal police. [19]

Understanding the Founding era conception of "police" is therefore indispensable to applying *Heller's* originalist model of rights. The original Second Amendment co-existed with a robust view of the people's right to regulate their own police. Liberty and power were not seen as antithetical as they are in modern law. Lawyers, judges, and the educated elite, who played such a central role in framing and ratifying [*2551] the Constitution and the subsequent amendments, approached rights with a different conceptual tool kit and set of assumptions. [20]

In this scheme of ordered liberty, regulation was the necessary precondition for the protection and flourishing of rights, not a threat to freedom. [21]As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in

---

[15] Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984). *See generally* Leif Wenar, *Rights*, STANFORD ENCYCLOPEDIA OF PHIL., *https://plato.stanford.edu/entries/rights/* (last updated Feb. 24, 2020) [*https://perma.cc/C6N9-7SGV*] (discussing the modern understanding of rights).

[16] *See* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 CONST. COMMENT. 85, 92-98 (2017) [hereinafter *Republicanism*].

[17] *See* Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233-34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s-1830s, at 8-41 (discussing the issues surrounding the drafting and ratification of the Constitution); Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions).

[18] Jonathan Gienapp, Response, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115, 126 (2019).

[19] *See* THE DECLARATION OF INDEPENDENCE para. 3 (U.S. 1776) ("He has refused his Assent to Laws, the most wholesome and necessary for the public good."). *See generally* Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[20] *See* Gienapp, *supra* note 18, at 121-22.

[21] *See* RANDY E. BARNETT, OUR REPUBLICAN CONSTITUTION: SECURING THE LIBERTY AND SOVEREIGNTY OF WE THE PEOPLE 31-35 (2016); RICHARD A. EPSTEIN, THE CLASSICAL LIBERAL CONSTITUTION: THE UNCERTAIN QUEST FOR LIMITED GOVERNMENT 3-6, 17-25 (2014). For critiques of these ahistorical approaches to rights at the Founding, see Campbell, *Republicanism*, *supra* note 16, at 87.

55 U.C. Davis L. Rev. 2545, *2551

our having an equal voice in the formation and execution of the laws, according as they effect [ sic] our persons and property." [22]By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished. [23]

The key insight derived from taking rights seriously and applying the Founding era's conception of liberty is that the modern terms and categories that have dominated Second Amendment debate, terms such as individual rights and collective rights, distort more than they illuminate the original meaning of the right to keep and bear arms. [24]Eighteenth century discussions of rights simply do not fit such a simplistic modern dichotomy. Legal scholar Jud Campbell's observations regarding the vital Founding era category of retained natural rights, which included the right of self-defense, is an essential starting point for making sense of the Second Amendment and state arms bearing provisions. The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause **[*2552]** and only with consent of the body politic." [25]Rather than limit rights, regulation was the essential means of preserving rights, including self-defense. [26]

Unrestrained liberty was not a guardian of rights in this scheme, it was among the greatest threats to it. [27]This dangerous form of liberty was described by Founding era writers in terms that seem alien to modern law, including a word that has largely disappeared from modern discourse - licentiousness. Thomas Tudor Tucker, a prominent South Carolina political leader who sat in the first Congress that drafted the first ten amendments to the Constitution, including the Second Amendment, captured this vision of how liberty and rights sought to steer a course between tyranny and anarchy. "Licentiousness," he warned members of Congress, "is a tyranny as inconsistent with freedom and as destructive of the common rights of mankind, as is the arbitrary sway of an enthroned despot. And those, who wish to call themselves truly free, have to guard, with equal vigilance, against the one and the other." [28]Well-regulated liberty, what modern legal theorists often describe as ordered liberty,

---

[22] Joseph Russell, An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

[23] See generally QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[24] See Cornell, Half Cocked, supra note 3, at 206-08.

[25] Jud Campbell, The Invention of First Amendment Federalism, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). See generally Cornell, Half Cocked, supra note 3, at 206 (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[26] See Jud Campbell, Judicial Review and the Enumeration of Rights, 15 GEO. J.L. & PUB. POL'Y 569, 576-77 (2017). Campbell's work is paradigm shifting and it renders Justice Scalia's unsubstantiated claim in Heller that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic. This claim has no foundation in Founding era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, see generally SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1-2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] [hereinafter THE POLICE POWER] and Joseph Blocher, Response, Rights as Trumps of What?, 132 HARV. L. REV. F. 120, 123 (2019).

[27] CORNELL, THE POLICE POWER, supra note 26, at 4. Campbell's work builds on a broad scholarly consensus derived from the work of a previous generation of scholars. See supra notes 25-26. See generally THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND, supra note 23 (discussing the history of rights in America and the understanding of early declarations of rights) .

sought to navigate between the danger of unrestrained power and licentiousness. [29]Recovering this **[*2553]** lost language of eighteenth-century rights, including the conception of liberty and regulation that shaped American law in the era of the Second Amendment, is essential if *Heller's* originalist framework is to remain true to Founding Era understandings . [30]

## II. THE MODERN GUN RIGHTS INVENTION OF A RIGHT TO PEACEABLE ARMED TRAVEL: ENGLISH HISTORY VS. GUN RIGHTS FANTASY

Under English law, the monarchy and the English state enjoyed a monopoly on violence. Any arming - outside of those situations where subjects assisted in restoring or preserving the peace - was an encroachment on royal power and therefore a violation of English law. [31]The claim that ordinary subjects had a free-standing right to travel armed, what modern gun rights advocates have dubbed a right to "peaceable armed travel," would be legally incoherent under English theories of sovereignty and law. Claims about a right to peaceable armed travel are not rooted in history, but are part of an invented tradition, conjured out of thin air by modern gun rights activists. [32]

As Sir William Blackstone's *Commentaries* reminded its readers: "all offenses are either against the king's peace or his crown and dignity." [33]Therefore, it followed that any "affronts to that power, and breaches of **[*2554]** those rights, are immediate offenses against [the King]." [34]Traveling armed was an affront to the King's sovereignty and was only justified in a limited set of circumstances. [35]Giles Jacob, perhaps the most prolific author of popular legal guidebooks in the Anglo-American world in the eighteenth century, captured this fundamental insight in his

---

[28]Philodemus, *Conciliatory Hints, Attempting, by a Fair State of Matters, to Remove Party Prejudice*, *(*Charleston 1784), *reprinted in* 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA, 1760-1805, at 606, 628 (Donald S. Lutz & Charles S. Hyneman eds., 1983) (using the pen name "Philodemus," Thomas Tudor Tucker published various works on politics and constitutional law).

[29]On the idea of well-regulated liberty and founding era conceptions of rights, see generally JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The corresponding modern legal concept would be "ordered liberty." *See Palko v. Connecticut, 302 U.S 319, 325 (1937).* For a more recent elaboration of the concept, see JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013).

[30]For a useful summary of *Heller's* complex relationship to other fields of constitutional law, see JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *Heller* (2018).

[31]  *See* 1 WILLIAM BLACKSTONE, COMMENTARIES 258, 338. For an elaboration of the common law framework described by Blackstone, see 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135-36 (London, Eliz. Nutt 1716). This was the conclusion of the Chief Justice of the King's Bench who wrote, "It is likewise a great offence at the *common law*, [traveling armed] as if the King were not able or willing to protect his subjects." Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB). Arms were typically described as offensive (edged weapons and firearms), and defensive (armor or shields). The suggestion made by some gun-rights advocates that the limits on armed travel only applied to armor and not to offensive weapons is contradicted by the clear exposition of the meaning of these terms in legal dictionaries popular in the Founding era. *See District of Columbia v. Heller, 554 U.S. 570, 581 (2008)*; *Armour and Arms*, A NEW LAW DICTIONARY (Henry Lintot, 7th ed. 1756).

[32]The idea of unfettered peaceable public carry is a modern invention of the gun rights movement. For a discussion of how this invented tradition was introduced into legal scholarship, see Patrick J. Charles, *The Invention of the Right to "Peaceable Carry' in Modern Second Amendment Scholarship*, 2021 U. ILL. L. REV. ONLINE 195, 202-06 (2021).

[33] 1 BLACKSTONE, *supra* note 31, at 258.

[34]  *Id.* at 259.

[35]  *See Sir John*, 87 Eng. Rep. at 76 ("It is likewise a great offence at the *common law*, [traveling armed] as if the King were not able or willing to protect his subjects."(emphasis in original)).

55 U.C. Davis L. Rev. 2545, *2554

influential legal dictionary, a text that Thomas Jefferson and John Adams included in their law libraries. [36]Jacob's offered a pithy summary of how English law treated armed travel. "By the Common Law it is an Offence for [Persons] to go or ride *armed* with dangerous and unusual Weapons; But Gentlemen may wear common *Armour* according to their Quality." [37]These inter-related legal principles derived from one of the most elemental features of English law: the King's monopoly on the use of force. "The King may prohibit Force of *Arms*, and punish Offenders according to Law." [38]The idea of a right to peaceable travel would have contravened the King's authority and because of this fact individuals had no such right under common law.

One mechanism for enforcing the King's Peace was the Statute of Northampton (1328), which prohibited appearing armed before representatives of the King's authority and expressly banned traveling armed at "Fairs, Markets, ... [or] elsewhere." [39]Thus, the basic legal framework of English law created by the Statute of Northampton and applied by conservators of the peace (sheriffs, constables, and justices of the peace) in the centuries after it was enacted, clearly excluded arms from sensitive places such as courts, and crowded public spaces such as fairs and markets. The statute also recognized the common law crime of affray as a separate violation of the King's Peace because traveling armed created an asymmetry of power between the armed individual and a law-abiding subject who followed the law's prohibition on  **[*2555]** traveling armed. This asymmetry was the source of the public terror that violated the King's Peace. There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty. English conceptions of criminal law in this era inferred the requisite *mens rea* to establish criminal culpability from the illegal act, there was no necessity to demonstrate a specific evil intent. In modern terms the necessary *mens rea* was objective in nature, not subjective. [40]The notion that the Statute of Northampton was limited only to "punish people who go armed to terrify the King's subjects" is mistaken because it applies an anachronistic understanding of criminal law that did not emerge until centuries later. [41]The mere act of traveling armed was the source of the terror that violated the peace and hence undermined the King's authority.

One of the best sources for understanding this common law framework is Michael Dalton's *Country Justice.* [42]This text became one of the most popular legal guidebooks in the Anglo-American world. Dalton's gloss on the law governing armed travel was unambiguously stated in forceful terms: "All such as shall go or ride armed (offensively) in Fairs, Markets or elsewhere; or shall wear, or carry any Guns, Dags or Pistols charged; ... any Constable, seeing this may arrest them, and carry them before the Justice of Peace, and the Justice may bind them to the Peace; yea, though those persons were so armed or weaponed for their defense upon any private quarrel ... ." [43]There was no

---

[36] On Jacob's influence, see Gary L. McDowell, *The Politics of Meaning: Law Dictionaries and the Liberal Tradition of Interpretation*, 44 AM. J. LEGAL HIST. 257, 260-62 (2000).

[37] A NEW LAW DICTIONARY, *supra* note 31 (alteration in original) (emphasis in original).

[38] *Id.* (emphasis in original).

[39] Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.), *reprinted in* 1 THE STATUTES OF THE REALM 258 (London, John Raithby ed., 1235-1377). On the importance of the Statute of Northampton to maintain the peace, see generally A.J. Musson, *Sub-Keepers and Constables: The Role of Local Officials in Keeping the Peace in Fourteenth-century England*, 117 ENG. HIST. REV. 1 (2002).

[40] Under common law the requisite criminal intent at this period of English history "was presumed from the performance of the unlawful act." GUYORA BINDER, THE OXFORD INTRODUCTIONS TO U.S. LAW: CRIMINAL LAW 140-41 (2016).

[41] Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB); *see* BINDER, *supra* note 40, at 140-41.

[42] MICHAEL DALTON, THE COUNTRY JUSTICE, CONTAINING THE PRACTICE OF THE JUSTICES OF THE PEACE OUT OF THEIR SESSIONS 264 (London, William Rawlins & Samuel Roycroft, eds., 1690). On Dalton's influence and the role of justice of the peace guides to Anglo-American legal culture, see Larry M. Boyer , *The Justice of the Peace in England and America from 1506 to 1776: A Bibliographic History*, 34 Q.J. LIBR. CONG. 315, 317-18 (1977), and JOHN B. NANN & MORRIS L. COHEN, THE YALE LAW SCHOOL GUIDE TO RESEARCH IN AMERICAN LEGAL HISTORY 87 (2018).

55 U.C. Davis L. Rev. 2545, *2555

right to arm pre-emptively under common law because one feared attack. In such situations, Dalton reminded his readers the proper response was not arming, but to seek out an agent of the crown and bind those who threatened the peace to a surety of the peace or good behavior. Sureties were designed to both prevent future crime and punish those who violated the prohibition on arming in public and disturbed the peace. **[*2556]** This system made sense given the social realities of early modern England, a pre-industrial society in which the enforcement of the peace rested on informal mechanisms of community-based policing. [44]

Dalton's popular text not only summarized legal orthodoxy, but it offered insights into the reasons undergirding the common law's approach to the peace. Traveling armed was a particular threat to the peace and a per se violation of the King's peace because "it striketh a fear and Terror in the King's Subjects." [45]The act of traveling with an offensive weapon by its very nature provoked a "fear of the people" - there was no need to establish a specific intent to terrify or prove that an action was an actual breach of the peace to meet this terror requirement. [46]When read in the context of criminal law norms appropriate to the eighteenth century, the meaning of the legal term of art, *in terrorem,* does not support the modern subjective psychological model of *mens rea* and its focus on actual intent or the subjective experiences of those who were terrified by the prohibited conduct. Rather the terror requirement under law arose from the mere act of arming, an action that threatened the King's authority, and disturbed the peace of the realm. [47]

Furthermore, modern law typically characterizes the use of arms in terms of the intent of the user. [48]A gun in this framework may either be an offensive weapon or a defensive weapon depending on its use and the user's mental state at a particular moment. Under English common law, a different categorical approach governed; firearms were always considered as offensive weapons independent of any intent or action. Defensive weapons were a different class of arms entirely and included weapons such as armor and shields. [49]

 **[*2557]** There were a small number of well-recognized exemptions to the general ban on armed travel embodied in the Statute of Northampton. [50]These exceptions aimed to facilitate community-based forms of law enforcement which preserved the King's Peace. [51]Accordingly, one might arm oneself to put down riots, rebellions, or join the

---

[43] DALTON, *supra* note 42, at 264.

[44]  *See generally* STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, C. 1550-1640, at 99-101 (2000) (discussing how the system of sureties functioned in an early modern English society). The system rested on the strong bonds of community and the power of local elites who often posted bonds for poor neighbors, further tying elites and ordinary Britons together in bonds of patronage and deference.

[45] DALTON, *supra* note 42, at 264.

[46]  *See id.*

[47]  *See* BINDER, *supra* note 40, at 140-41.

[48] On the legal debate over guns and self-defense, see generally Eric Ruben, *An Unstable Core: Self-defense and the Second Amendment*, _108 CALIF. L. REV. 63 (2020)_. For an overview of the modern public policy debate over defensive gun uses, see generally Jens Ludwig, *Gun Self-defense and Deterrence*, _27 CRIME & JUST. 363 (2000)_.

[49] Although a firearm was always an offensive weapon under English law, other items in certain circumstances could be treated as offensive arms. *See Gun*, THE COMPLETE DICTIONARY OF ARTS AND SCIENCES 1526 (London, Homer's Head 1764) (defining firearms as the quintessential offensive weapons in the eyes of the law: "GUN, fire-arm, a weapon of offense"). Defensive weapons included shields and armor. *See Arms*, A NEW AND ENLARGED MILITARY DICTIONARY (London, Military Library 1805).

[50] WILLIAM HAWKINS, A SUMMARY OF THE CROWN-LAW BY WAY OF ABRIDGMENT OF SERJEANT HAWKINS'S PLEAS OF THE CROWN 155-63 (1728). (describing exceptions to the general prohibition on armed travel, including the class based privileges of members of the gentry.)

55 U.C. Davis L. Rev. 2545, *2557

"hue and cry." Traditionally, the arms used to meet one's obligation to the crown to enforce the peace were determined by socio-economic class status so that during much of this period ownership of firearms was limited to members of the gentry elite. [52]

*Sir John Knight's Case*, the most significant judicial interpretation of the Statute of Northampton, offers additional confirmation that Dalton's understanding embodied legal orthodoxy. Unfortunately, the case has been misinterpreted by gun rights advocates to support the anachronistic claim that peaceable armed travel was permissible under English common law. Sir John Knight's case stands for the opposite proposition. [53]Gun rights advocates mistakenly assert that the case illustrates that the Statute of Northampton had gone into "desuetude" by the era of the Glorious Revolution (1688-9). If one parses the text of the opinion closely, the reference to desuetude in the Lord Chief Justice's opinion was a specific claim about the rights of members of the gentry to travel armed, not a general endorsement of peaceable armed carry. Members of the English gentry, not ordinary subjects, enjoyed a class privilege to travel armed in a manner appropriate to their station **[*2558]** in life. Thus, to prosecute Knight, a member of the gentry, required a higher burden of proof. The mere possession of arms would not have violated the statute because of his class-based privilege: there had to be an additional demonstration of an actual evil intent (" *in malo animo*") because the law assumed that individuals of his elevated social status did not transgress the statute when they traveled armed in a manner appropriate to their station in life. Historian Tim Harris offers the most accurate summary of the legal and historical significance of the case:

As the presiding judge at Knight's trial, Lord Chief Justice Herbert, observed, the statute had almost gone into desuetude, and there was "now ... a general Connivance to *Gentlemen to ride armed for their Security.*" Herbert felt it necessary to show that Knight had acted *malo animo* (with evil intent) for his alleged offense to come within the terms of the act, though significantly, he insisted that the things of which Knight stood accused were already offenses at common law. [54]

The Chief Justice of the King's Bench wrote that the prosecution should have charged Knight for a crime at common law which would have been a better legal strategy to bring him to justice than an indictment under the Statute of Northampton. It is true that Knight's jury refused to convict him of violating that statute, but if Knight's acts were perfectly legal it would have made no sense for the Chief Justice to argue that there was an alternative legal strategy that would have resulted in conviction. Nor does it make much sense that the court still imposed a peace bond if Knight's actions were lawful. As Harris and others have noted, the only interpretation that makes sense is that Knight's actions were both a violation of the Statute of Northampton and the common law. [55]Although some

---

[51]  *See* BLACKSTONE, *supra* note 31, at 148-49; J.P. GENT, A NEW GUIDE FOR CONSTABLES, HEAD-BOROUGHS, TYTHINGMEN, CHURCHWARDENS 13 (London, Richard Atkins & Edward Atkins eds., 1705).

[52]  *See* Henry Summerson, *The Enforcement of the Statute of Winchester 1285-1327*, 13 J. LEGAL HIST. 232, 240-41 (1992). On gun ownership in England during this period, see Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth-and Eighteenth-Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT 54-57 (Jennifer Tucker et al. eds., 2019) and Philodemus, *supra* note 28, at 628.

[53]  *See* Sir John Knight's Case (1686) 87 Eng. Rep. 75, 76 (KB). *But see* Eugene Volokh, *The First and Second Amendments*, 109 COLUM. L. REV. SIDEBAR 97, 101 (2009) (erroneously arguing that the Statute of Northampton only forbade the carrying of arms when it was "unusual and therefore terrifying"). For additional discussion and corrective to Volokh's ahistorical claims, see Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. ILL. U. L.J. 61, 79 (2018).

[54]Tim Harris, *The Right to Bear Arms in English and Irish Historical Context*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT, *supra* note 52, at 25 (emphasis added).

[55]  *See Sir John*, 87 Eng. Rep. at 76. For an excellent summary of the political climate in England during the era of the Glorious Revolution, see Tim Harris, *James II, the Glorious Revolution, and the Destiny of Britain*, 51 HIST. J. 763, 768 (2008). On the

55 U.C. Davis L. Rev. 2545, *2558

disagreements remain about how to interpret *Knight's Case,* the one thing that is clear, the case does not support the notion that a robust right to peaceable carry of firearms existed under English law; rather, it contradicts this claim.

The principle that the English State could control every aspect of the ownership and use of firearms, including the open carry of firearms, **[*2559]** was later reaffirmed by the language employed in the English Declaration of Rights, which stated "that the subjects which are Protestants may have arms for their defence suitable to their conditions and as allowed by law." [56]Rather than entrench a strong rights claim, this act reaffirmed Parliament's plenary power to regulate in this area. [57]Parliament's power over the regulation of arms was not restrained by the act, and efforts to secure a general free standing right for a subject to have arms in their homes for reasons of self-defense were rebuffed at this time as a threat to public order and safety. [58]In short, despite tendentious efforts to read the act as a gun rights provision, virtually every English historian views the act as an affirmation of legislative power to regulate arms. [59]

---

difference between the common law crime of affray and the specific prohibitions in the Statute of Northampton, see BLACKSTONE, *supra* note 31, at 184.

[56] English Declaration of Rights 1689, 1 W. & M., c. 2 (Eng.); *see* BLACKSTONE, *supra* note 31, at 139 (discussing the rights of Englishmen.).

[57]  *See* TIM HARRIS, REVOLUTION: THE GREAT CRISIS OF THE BRITISH MONARCHY, 1685-1720, at 343 (2006) ("It has been claimed that the Declaration of Rights established a new right to bear arms. In fact, clause seven does not use the term "right' and seems clearly to state that no new legal privilege is being granted here. It explicitly confirms existing limitations on who was allowed to possess arms and, if anything, should more accurately be seen as a gun-control measure." (footnote omitted)).

[58]  *See* DAVID LIEBERMAN, THE PROVINCE OF LEGISLATION DETERMINED: LEGAL THEORY IN EIGHTEENTH-CENTURY BRITAIN 50 (1989) (discussing the plenary power of Parliament during this period); John Phillip Reid, " *In Our Contracted Sphere": The Constitutional Contract, the Stamp Act Crisis, and the Coming of the American Revolution,* 76 COLUM. L. Rev. 21, 24 (1976) (same); *see also* Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective,* 76 CHI.-KENT L. REV. 27, 35 (2000) (discussing the failed effort to amend the game laws to allow subjects to keep arms). English courts eventually reinterpreted the game laws to allow guns in the home in a series of cases in the middle of the eighteenth century. These decisions occurred more than fifty years after the adoption of the English Bill of Rights. *See* Wingfield v. Stratford (1752) 96 Eng. Rep. 787, 787-88 (KB); Rex v. Gardner (1739) 93 Eng. Rep. 1056, 1056 (KB).

[59] Malcolm posited that arms possession and carrying was a fundamental right that Americans inherited from England. Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition,* 10 HASTINGS CONST. L.Q. 285, 287 (1983). Yet neither the sources cited by Malcolm nor recent historical scholarship support her account of the English past. *See* Patrick J. Charles, *The Second Amendment in Historiographical Crisis: Why the Supreme Court Must Reevaluate the Embarrassing "Standard Model" Moving Forward,* 39 FORDHAM URB. L.J. 1727, 1795 (2012) (describing how gun rights advocates, supporters of the so-called Standard Model, "fell into line as they imported Malcolm's research and conclusions into their own writings"). For works challenging Malcolm's claims about gun ownership and usage in England, see LOIS G. SCHWOERER, GUN CULTURE IN EARLY MODERN ENGLAND 169-70 (2016), and Priya Satia, *Who Had Guns in Eighteenth-Century Britain?, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT, *supra* note 52, at 37. The English historian most closely associated with this interpretation, Joyce Lee Malcolm, holds an NRA-funded chair at George Mason Law School, and her work on this topic has been largely discredited. *See, e.g.,* HARRIS, *supra* note 57, at 23 ("The Glorious Revolution has been extensively studied and debated ever since it occurred, yet until the work of Joyce Lee Malcolm, no historian had ever sought to argue that one of its most significant accomplishments was to establish a new right for Protestants to bear arms."); SCHWOERER, *supra,* at 169-70 ("My disagreement here is not with the interpretation that the Second Amendment granted an individual right to arms, but with the idea that the Second Amendment is a legacy of Article VII of the English Bill of Rights."); Satia , *supra,* at 37-40 (describing how gun ownership in England was not normalized or seen as a fundamental right until the Napoleonic era); Priya Satia, *On Gun Laws, We Must Get the History Right,* SLATE (Oct. 21, 2015, 9:34 AM), https://slate.com/news-and-politics/2015/10/wrenn-v-d-c-gun-case-turns-on-english-laws-of-1328-and-1689.html [perma.cc/**5CRC-4**GWP] (describing Malcolm's gun rights interpretation as conjured "out of thin air"). For an especially trenchant critique of Malcolm's work, see Harris,  *supra* note 54, at 23.

55 U.C. Davis L. Rev. 2545, *2559

[*2560] In sum, there is no compelling historical evidence that there was ever a general free-standing right to armed travel for ordinary Britons; rather, the general rule was that open carry and concealed carry of firearms was prohibited, with a class-based exception for the political and economic elite, and due recognition that subjects were required to assist agents of the crown in preserving the peace with whatever weapons they were legally entitled to own under English law. [60] The Declaration of Rights permitted only a limited right to have firearms and travel armed in public outside of a narrow list of exceptions related to the preservation of the peace.

## III. THE ABSORPTION AND TRANSFORMATION OF THE COMMON LAW IN EARLY AMERICA

A good illustration of how the Statute of Northampton and common law limits on armed travel were understood in colonial America are evidenced in an early American justice of the peace manual published just before the American Revolution. Echoing earlier English writers, the prohibition on armed travel in public was summarized as follows:

Justices of the Peace, upon their own View, or upon Complaint, may apprehen any Person who shall go or ride armed with unusual and offensive Weapons, in an Affray, or among any great Concourse of the People, or who shall appear, so armed, before the King's Justices sitting in Court ... . [61]

[*2561] Living on the edge of the British empire, facing French and Spanish imperial power on its borders, an enslaved labor force in much of North America, and an almost constant state of war with Indian tribes, Americans were far better armed than their English brethren. In some instances, colonies required individuals to arm themselves in other circumstances in addition to mandatory militia service, including church going and when working beyond the fortified stockades that protected the early settlements of colonial America. But most of these examples of arming in such circumstances were from the earlier colonial period, before the French and Indian War had secured the borders of British North America. [62]

Apart from Quaker Pennsylvania, settled by pacifists who opposed arms bearing, every colony required a broad swath of the free white male population to submit to militia training and participate in a well-regulated militia. Yet, these militia obligations did not create a modern style rights' claim that could be asserted against early American governments; it imposed legal obligation on the King's subjects. [63] Under English law, all subjects were obligated to assist agents of the King to put down rebellions and enforce the peace. In the colonies these common law

--------------------------------------------------

[60] *See generally* Summerson, *supra* note 52 (discussing the Statute of Winchester and the class-based limits on carrying arms).

[61] JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (New Bern, N.C., James Davis 1774). Fairs and markets were centers of commerce and were typically the location for the placement of important public announcements, facts which mark them as almost the antithesis of "sensitive places." The proper analogy to sensitive places would be the prohibition on coming armed before the King's servants and courts. *See* Chris R. Kyle, *Monarch and Marketplace: Proclamations as News in Early Modern England*, 78 HUNTINGTON LIBR. Q. 771, 784 (2015).

[62] *See* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, **80 LAW & CONTEMP. PROBS. 11, 28 (2017)** [hereinafter *Right to Keep*]. During the era of the Fourteenth Amendment, states began expressly prohibiting arms in places where people gathered, including places of worship. *See* 2 GEORGE WASHINGTON PASCHAL, A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST 1322 (Washington D.C., W. H. & O. H. Morrison 3d ed.1873); LEANDER G. PITMAN, THE STATUTES OF OKLAHOMA, 1890, at 496 (Guthrie, O.K., The State Capital Printing Co. 1891).

[63] The imposition of a militia obligation does not create a right. This legal confusion is pervasive in discussion of minors and the right to bear arms. *See, e.g.*, David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, *43 S. ILL. U. L. J., 495 (2019)* (asserting, erroneously, a core right of minors to bear arms). Simply put, rights and duties are not the same. Modern constitutional theory typically treats them as correlatives, not synonyms. Accordingly, while the existence of a right may impose a duty on *another* legal actor (such as a duty to refrain from interfering with the right), *duties* do not automatically confer individual *rights* and did not do so on those who were required by law to participate in the militia. For a critique the claim that duties create rights, see Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 39 YALE L. & POL'Y REV. INTER ALIA 1, 16 (2021).

55 U.C. Davis L. Rev. 2545, *2561

obligations existed together with a robust militia system. The standard militia weapon was a musket. Most colonies required white men eligible for militia service to procure military quality arms at their own expense. For much of the eighteenth century most English **[*2562]** subjects living outside of the colonies, the public obligation to assist in preserving the peace or serving in the militia would not have created a right to own firearms which were prohibited to all but the gentry elite. [64]

Contrary to the claims of many gun-rights advocates, widespread habitual open carry was not the norm in the era of the Second Amendment and the early Republic in the nation's towns and cities. [65]The fact that some of the individual state constitutions and the Second Amendment protected arms bearing tells us little about armed travel in public outside of the context of militia service and musters. Indeed, states regulated the public carry of arms even in the context of militia service, banning the firing of guns, and in some instances prohibiting traveling to and from muster with a loaded weapon. [66]

A good illustration of the ahistorical approach adopted by gun rights advocates to buttress the invented tradition of peaceable armed travel is evident in an amicus brief filed by a group of pro-gun law professors in *Bruen*. [67]The brief argued that because prominent members of the Founding era often carried arms in public, there was a general right to travel armed in populous areas. Context is key to making sense of this practice and a failure to pay attention to context has led gun rights advocates to distort the past to further their ideological agenda. Thus, Paul Clement doubled down on the "Founders with guns" argument in his reply brief in *Bruen*, making much of the fact that Thomas Jefferson and Patrick Henry owned and used firearms, and carried them in public. [68]Rather than contextualize such evidence, Clement and the Second Amendment Law Professors' brief he cites ignore the realities of life in eighteenth century America which was a sparsely settled and a largely agrarian pre-industrial society. The case of Thomas Jefferson is illustrative. As was true for many in the Founding generation, Jefferson was certainly fond of his guns. He advised his nephew, Peter Carr, that "as to the species of exercise, I advise the gun." To promote a healthy **[*2563]** body, he recommended that "your gun therefore be the constant companion of your walks." [69]

Making sense of Jefferson's statement requires some appreciation for historical context. Jefferson was a large landowner who lived in the western part of Virginia; he owned almost 5,000 acres of largely contiguous land. [70]Carrying a gun in the mountainous regions of western Virginia, on private property, does not tell us much about issues relevant to public carry in more settled areas of the new nation. Indeed, Jefferson securely locked his guns when riding into town or traveling by coach on the public roads, a fact that Clement and the Second Amendment law professors conveniently neglect to mention. [71]Similarly, the interpretation of the significance and meaning of

---

[64] In colonial America, firearms ownership was mandated by law for the segment of the population required to bear arms. *See* Cornell, *Right to Keep*, *supra* note 62, at 11.

[65] For a recent effort to support this dubious claim, see David B. Kopel & George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's* Young v. Hawaii, 2021 U. ILL. L. REV. ONLINE 172, 181 (2021). For a critique of this argument, see Charles, *supra* note 32, at 195.

[66] Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1712 (2016) [hereinafter *Right to Carry*].

[67] *See* Brief of Professors of Second Amendment Law et al., *supra* note 7, at 2.

[68] *See* Reply Brief for Petitioners at 11, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. Oct. 14, 2021) [hereinafter Reply Brief].

[69] *Firearms*, JEFFERSON MONTICELLO, https://www.monticello.org/site/research-and-collections/firearms (last visited Feb. 6, 2022) [https://perma.cc/FN4K-84HT] (quoting Thomas Jefferson to Peter Carr, Aug. 19, 1785).

[70] *Thomas Jefferson's List of Landholdings and Monticello Slaves, [ca. 1811-1812]*, FOUNDERS ONLINE, https://founders.archives.gov/documents/Jefferson/03-04-02-0295 (last visited Feb. 8, 2022) [https://perma.cc/UKK5-EM65].

55 U.C. Davis L. Rev. 2545, *2563

Patrick Henry carrying his musket when he traveled to court is equally ahistorical and lacks vital context. In Virginia, court days were typically muster days for the militia, so Henry travelling with the weapon Virginia law mandated for militia service on day in which the militia was training tells us little about general attitudes towards limits on public carry in populous areas. [72]

One of the many problems with the gun rights account of the Founding era is the assumption that post-Revolutionary America was governed by a single homogenous legal system. This understanding of early American law has been thoroughly discredited by legal historians who have demonstrated that existence of divergent regional legal cultures in colonial America and the Founding era. [73]In particular, few **[*2564]** serious scholars conversant with the last three decades of legal history would ignore the impact of slavery on the creation of a distinctive southern legal culture. The importance of this regional perspective is evident in the use and abuse of the writings of the distinguished Jeffersonian jurist St. George Tucker. Gun rights scholars are fond of quoting Tucker but have persistently misinterpreted him by failing to adequately contextualize his writings. [74]Tucker was a vocal critic of the Federalist judges who dominated the nation's courts in the decade after the adoption of the Constitution. Curiously, gun rights advocates have chosen to accord Tucker's critical remarks of these judges greater legal authority than the decisions of the federal courts. Thus, in the case of gun rights, lawyers and jurists have inverted the hierarchy of authorities familiar to most first-year law students, dismissing federal case laws and taking such critical comments of the established law as legally determinative. [75]

The often-quoted Tucker passage so esteemed by gun rights champions was made as a criticism of the way federal courts prosecuted rebels in western Pennsylvania after the adoption of the bill of rights. [76]The federal courts adopted a traditional English common law view of riot: according to this view a group of men traveling armed was *per se* a crime that violated the peace. For the Federalists in Pennsylvania there was no legal doubt that the rebels in Pennsylvania had rioted, the only legal issue for Federalist judges was if their actions rose to the level of treason under the Constitution. Tucker protested that in Virginia, the traditional English legal understanding of riot no longer applied because the common law in Virginia had evolved and led to the creation of a new higher standard of proof to sustain a charge of riot. In contrast to Pennsylvania, Tucker insisted that a group of men traveling armed with their *muskets* could not *per se* sustain a charge of riot without additional evidence that showed a violation of the peace.

But ought that circumstances of itself, to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself? In many parts of the United States, a man no more thinks, of

---

[71]  *Thomas   Jefferson   to   John   Payne   Todd   August   15,   1816*,   FOUNDERS   ONLINE, https://founders.archives.gov/?q=Jefferson%20to%20Payne%20Todd%20%20August%2015%2C%201816&s=1111311111&sa =&r=1&sr= (last visited Feb. 8, 2022) [https://perma.cc/FW3C-S3RB] ("I had other holsters also made for both to hang them at the side of my carriage for road use; & with locks & staples to secure them from being handled by curious people. one of the wheel locks is a little out of order, and will require a skilful [sic] gunsmith to put to rights ... .").

[72] E. Lee Shepard, " *This Being Court Day": Courthouses and Community Life in Rural Virginia*, 103 VA. MAG. HIST. & BIOGRAPHY 459, 466 (1995). *See generally* RHYS ISAAC, THE TRANSFORMATION OF VIRGINIA, 1740-1790, at 88-114 (1982) (discussing the rituals of court day and muster).

[73] On the importance of early American regional differences in the evolution of the common law, see generally David Thomas Konig, *Regionalism in Early American Law, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

[74]  *See* Cornell, *Half Cocked, supra* note 3, at 213.

[75] On the hierarchy of legal authority in modern constitutional law, see Amy J. Griffin, *Dethroning the Hierarchy of Authority*, 97 OR. L. REV. 51, 58-62 (2018).

[76] For a discussion of the mis-readings of this widely cited Tucker text by gun rights scholars, see Cornell, *Right to Carry*, *supra* note 66, at 1711-12.

55 U.C. Davis L. Rev. 2545, *2564

going out of his house on any occasion, without his rifle or musket in his hand, **[*2565]** than an European fine gentleman without his sword by his side. [77]

Setting aside the probative value of Tucker's commentary as compared to the decision of a federal court, the plain meaning of Tucker's text contradicts the idea that the Founding generation adopted a single monolithic approach to interpreting the legality of armed travel in public. Tucker himself expressly stated that American law diverged on this issue. In fact, Tucker claims that if the fact pattern before the federal courts in Pennsylvania had been adjudicated in his home state of Virginia, the outcome would have been different because absent additional evidence of criminal activity, the charge of riot at common law would have likely failed. [78]What gun rights advocates ignore is that such action did result in successful prosecutions in Pennsylvania. In short, the example gun rights advocates cite to support their view of a general right of peaceable armed travel in the early Republic undercuts that claim. In Tucker's view, Virginia and Pennsylvania law did not treat armed travel in the same fashion. In one place such action was criminal and in the other the mere act of armed travel would not have constituted a criminal offense. Finally, it is worth underscoring the fact that Tucker was talking about carrying a musket, the standard weapon of the militia, not an easily concealed weapon, i.e. a hand gun.

Tucker's comments offer strong evidence that American law had already started to diverge on the legality of armed travel in public. It is easy to forget that the one of the reasons Tucker felt compelled to publish an American edition of Blackstone was because he felt that too few Americans grasped the significance of the divergent trajectories of the common law in different states. [79]Generations of English legal commentators had praised the genius of the common law for its adaptability, and its absorption in America proved no exception to this general pattern. There was no single American version of the common law, but thirteen different common law traditions. There were **[*2566]** important regional commonalities that led to some convergence as well, so it is important to acknowledge the complexity of this process of adaptation. There is a broad scholarly consensus among legal historians that one of the most important forces contributing to this process of differentiation was the impact of slavery on American law. Gun rights advocates have simply ignored this rich body of scholarship, proceeding with an outdated model of consensus history and its assumptions about the homogeneity of early American legal history and culture. [80]Early American firearms law was not an exception to this larger pattern of regional divergence. Nor was early American firearms law static; profound changes swept over American law in the decades after the adoption of the Second Amendment that contributed to further divergence and the emergence of distinctive regional approaches to gun regulation. [81]

Gun-rights advocates focus primarily on a string of Southern cases decided by slave-holding judges to ascertain the public meaning of the right to bear arms in the early Republic and have largely ignored or dismissed the approach

---

[77] 5 BLACKSTONE, *supra* note 31, at app. n.B at 19 (Philadelphia, William Young Birch & Abraham Small 1803).

[78] *See id.*

[79] *See generally* Saul Cornell, *St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings*, 47 WM. & MARY L. REV. 1123 (2006) (discussing the divergent evolution of common law across America as a prime motivating force for Tucker's decision to do an American edition of Blackstone); Saul Cornell, *St. George Tucker's Lecture Notes, the Second Amendment, and Originalist Methodology: A Critical Comment*, 103 NW. U. L. REV. COLLOQUY 406 (2009) (discussing modern gun rights misreading of Tucker and the problem of applying modern legal categories to Founding era thought).

[80] *See generally* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1 (Nicholas J. Johnson et al. eds., 2018) (offering an ideological, slanted, and historically flawed account of the Second Amendment).

[81] On the diversity of early American law and the importance of understanding the changes that transformed constitutionalism, see generally LEONARD L. CORNELL, *supra* note 17. On the emergence of regional differences in firearms regulation, see Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 YALE L.J. F. 121, 125 (2015).*

to firearms regulation in other parts of the new nation. Again, taking legal cues from the most repressive legal regime in American history ought to give modern judges pause, but even more problematic, gun rights advocates have consistently misread the key gun cases adjudicated by Southern jurists. [82]The on-going distortion of Southern jurisprudence remains one of the most pervasive problems in post- *Heller* litigation. [83]It is true that in some parts of the slave South a more expansive view of public carry developed, but this tradition was far more limited in scope than the modern gun rights theory of promiscuous carry absent any specified need. The right to carry, even in the Slave South, was always conditioned on a specific purpose. In short, the body of cases that purports to affirm a universal right of peaceable carry supports a much more limited right of purposive carry. The southern paradigm acknowledged a right to ban concealed carry, a **[*2567]** dastardly and cowardly practice, but it asserted that open carry was protected in cases of specified threats and other specific lawful purposes. There was no unfettered right to carry arms openly in public in pre-Civil War America. [84]

Understanding this body of antebellum Southern case law requires an appreciation of the way early American law framed issues of gun regulation in terms of an emerging police power jurisprudence that was developed by the Marshall Court and various state judges. [85]Although antebellum southern jurists did not use the modern legal metaphor of balancing, judges did employ an analogous type of reasoning to modern balancing analysis, an approach rooted in police power jurisprudence. "Constitutional Rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them." [86]Included in this right was the most basic right of all: the right of the people to regulate their own internal police. The texts of the first state constitutions clearly articulated such a right - including it alongside more familiar rights such as the right to bear arms. Thus, if Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate. [87]

Although the concept of a "police right" has fallen out of favor in modern law, it was fundamental to Founding era law and persisted into the early Republic. The lack of familiarity with this concept among modern lawyers and judges is a fitting testimony to the success of the Marshall Court's reformulation of this Founding era right into the forerunner of the modern judicial concept of the police power. The legal concept of a police right, grounded in popular sovereignty, was slowly overshadowed by an evolving jurisprudence focused on police power. [88]Antebellum jurists developed this body of law to address the complex issues that regulation posed for a rapidly changing society - and few issues were more vexing than firearms regulation. Indeed, the **[*2568]** application of the police power to regulating firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in *Brown v. Maryland*, in which the Court observed that "the power to direct the removal of gunpowder is a branch of the police power." [89]Although Scalia decried modern style judicial balancing in *Heller*,

---

[82] *See* CORNELL, THE POLICE POWER, *supra* note 26, at 2.

[83] *See* Reply Brief, *supra* note 68, at 9-10; Brief of Professors Leider & Lund, *supra* note 6, at 4; Brief of Amici Curiae Professors of Second Amend. L., *supra* note 67, at 33, 35.

[84] For examples see the sources discussed in Cornell, *supra* note 79.

[85] On *Heller*'s heavy reliance on antebellum Southern case law, see generally Ruben & Cornell, *supra* note 81 (discussing the problem of viewing American law through the distorted perspective of southern case law in the early nineteenth century).

[86] *District of Columbia v. Heller, 554 U.S. 570, 634-35 (2008).*

[87] *See id.*

[88] *See generally* LEONARD & CORNELL, *supra* note 17 (discussing how state police power was not curtailed by the federal constitution); Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS L. 64 (2015) (discussing the early American origins of modern jurisprudence on police power); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008) (discussing police power being derived from the people and was rooted in the theory of popular sovereignty).

55 U.C. Davis L. Rev. 2545, *2568

the antebellum southern cases he treated as oracular on the Second Amendment's meaning and the scope of permissible regulation were all interpreted using the legal tools provided by early American police power jurisprudence, a type of legal reasoning that engaged in a form of balancing analysis. [90]

The first modern-style gun control laws aimed at limiting the access and use of handguns emerged during the period of the market revolution, when American industry mass-produced not only wooden clocks and Currier and Ives prints, but reliable and cheap handguns. [91]Courts seeking to interpret these new types of laws, the historical antecedents of today's gun control laws, were addressing a novel problem - the problem of gun violence posed by easily concealed weapons. Although Scalia opined that handguns were the quintessential weapon protected by the Second Amendment, long guns, particularly military quality muskets were the weapon at the core of the original Second Amendment's protections. Indeed, the era of the Second Amendment handguns were a tiny fraction of the weapons owned by Americans and contrary to *Heller's* undocumented historical claims, the entire focus of American arms policy was to discourage Americans from bringing guns in common use to muster. [92]Instead, the government sought to force Americans to purchase heavier military quality weapons needed by the militia that few Americans desired to own because they were less useful in agrarian society in which hunting and pest control were the primary uses of arms. [93]

 [*2569] The emerging body of police power jurisprudence was employed by antebellum judges to weigh the rival claims of those seeking tighter regulations of guns from those opposed to such policies. Understanding the police power is therefore essential to make sense of the antebellum cases *Heller* treats as probative of the Second Amendment's meaning. [94]The scope of the police power was discussed in some detail by the Supreme Court in the *License Cases*, where Justice John McClean formulated this guiding principle:

It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by the legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied. [95]

---

[89] *Brown v. Maryland, 25 U.S. (12 Wheat.) 419, 443 (1827)*. *See generally Thurlow v. Massachusetts, 46 U.S. (5 How.) 504 (1847)* (discussing the police power ability to regulate laws that interfere with foreign commerce).

[90] *See* CORNELL, THE POLICE POWER, *supra* note 26, at 2-3.

[91] On the relationship between the market revolution and firearms production, see Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, *46 HASTINGS CONST. L.Q. 523, 524 (2019)* and Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[92] *See* Sweeney, *supra* note 52, at 57.

[93] *See generally id. (*providing statistics on who owned guns during the founding era, which revealed farmers and laborers were less likely than merchants to own a handgun). In *Heller*, Scalia relies on questionable claims in *United States v. Miller, 307 U.S. 174 (1939)*, a case that Scalia had derided because of its poor handling of the relevant history, *supra* note 26. Moreover, recent historical research also has demonstrated that guns were seldom used for crimes, including crimes of violence, in the era of Second Amendment. Gun crime gradually became a serious problem over the course of the nineteenth century, particularly as easily concealed and more reliable handguns became common. *See* RANDOLPH ROTH, AMERICAN HOMICIDE 180-249 (2009).

[94] Post- *Heller* scholarship generally has not examined this important element of antebellum jurisprudence. But there is a notable exception to this general silence. *See generally* Campbell, *Natural Rights*, *supra* note 14 (discussing the antebellum right-to-bear-arm cases in terms of Founding era rights theory). Campbell's essay is paradigm shifting, recasting the entire debate over the Second Amendment in terms that genuinely reflect the distinctive and radically different way Founding era law conceptualized the problem of rights and regulation.

[95] *Thurlow v. Massachusetts, 46 U.S. (5 How.) 504, 592 (1847)*.

55 U.C. Davis L. Rev. 2545, *2569

The police power - in particular, the right of the people to regulate themselves in the interest of public safety - was thus dynamic, adaptable to the changing needs of American society.

One of the most important cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate. [96]Although the case has been treated as an example of the permissive theory of open carry by gun rights advocates, including Paul Clement in his *Bruen* briefs, a careful reading of the text reveals that it was a classic example of antebellum police power jurisprudence: the *Reid* Court concluded that the state's concealed carry prohibition was a legitimate exercise of police power authority. "The terms in which this provision is phrased," the court **[*2570]** noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals." [97]The regulation of arms was in the court's view at the very core of state police power.

When ripped out of context, *Reid* might seem to support a modern-type permissive conception of public carry, but when read closely and in the context of pre-Civil War judicial writing about the police power, the case supports the opposite conclusion. *Reid* does not vindicate a promiscuous right to carry arms in public; rather, it forcefully articulates a more limited notion of purposive carry. In short, to justify arming in public, one had to have good cause - a specified reason to do so. This requirement applied to open carry as much as it applied to concealed carry. [98]

*Reid* was a case in which a sheriff carried a concealed pistol in violation of Alabama's prohibition on public carry of concealed arms. [99]The fact that a peace officer was prosecuted for carrying a weapon in the course of his duties might seem odd given that police in modern America are typically armed with guns. Firearms were not routinely carried by peace officers and police forces until decades after the Civil War. [100]

It is also vital to read *Reid* against the background of an inherited common law tradition. "If the emergency is pressing," the *Reid* Court declared, "there can be no necessity for concealing the weapon, and if the threatened violence will allow of it, the individual may be arrested and constrained to find sureties to keep the peace, or committed to jail." [101] *Reid* acknowledged a fact that many modern gun rights activists and some judges have ignored - the imposition of a peace bond was the primary mechanism for the enforcement of the peace in the early **[*2571]** republic and was among the core powers of justices of the peace, constables, and sheriffs, who all continued to function as conservators of the peace under American law. The appropriate legal response to the danger posed by someone traveling armed in public was to impose a peace bond, a surety of the peace. Only if circumstances precluded following this course of action would a sheriff be justified in arming - and in that case, the correct decision was not to carry the weapon concealed but in the open. So rather than demonstrate a broad free-

---

[96] *See State v. Reid, 1 Ala. 612, 612 (1840)* (discussing how a police power analysis is essential to adjudicating the constitutionality of firearms regulations).

[97] *Id. at 616*.

[98] Most public carry cases in the antebellum South, apart from rare outlier decisions, such as *Bliss v. Commonwealth*, adopted this approach to firearms regulation. *See Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 92 (1822)*. In that case the court adopted an absolutist view of the right to bear arms, but the decision was overturned by a revision of the state constitution. For a useful discussion of *Bliss* in terms of the police power, see ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 91 (1904).

[99] *Reid, 1 Ala. at 612*.

[100] *See* Scott W Phillips, *A Historical Examination of Police Firearms*, 94 POLICE J.: THEORY, PRAC. & PRINCIPLES 122, 124 (2021).

[101] *Reid, 1 Ala. at 621, 616* ("[The state constitutional right to bear arms] neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places ... .").

55 U.C. Davis L. Rev. 2545, *2571

standing right of peaceable carry, *Reid* shows that armed law enforcement had not yet emerged as the primary means to keep the peace. A peace bond was the proper legal course of action if one faced a threat. Thus, the sheriff-defendant in *Reid* could be prosecuted, the court reasoned, because there was no necessity to arm. The state could not categorically ban open carry in cases where an individual had a specified need for self-defense, but it could limit carry to those with good cause and punish those who carried without good cause. [102]Reid supports a narrowly tailored right to carry arms openly for reasons of a specified need for self-defense. [103]

*State v. Huntly*, another favorite case of modern gun-rights advocates, adopted a broader conception of the scope of public carry, but it, too, clearly articulated a theory of purposive carry and rejected the ideal of permissive open carry. [104] *Huntly* marked a bolder departure from the traditional English common law limits on armed travel in public and for this reason it has become the lodestar for much modern gun rights **[*2572]** scholarship and advocacy. [105]Yet even this case drew a sharp distinction between purposive carry and permissive carry. In *Huntly,* the court wrote:

No man amongst us carries ... [a pistol] about with him, as one of his every day accoutrements - as a part of his dress - and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment. But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun *per se* constitutes no offence. For any lawful purpose - either of business or amusement - the citizen is at perfect liberty to carry his gun. [106]

Carrying weapons for a specified lawful purpose openly was protected; carrying weapons with no specific purpose - *habitual carry* - was not. "Lawful purpose" was defined as a specific activity that merited being armed: hunting, target practice, traveling beyond one's community, or self-defense in response to a clear and specific threat. [107]The phrase "business or amusement" was not synonymous with carrying a weapon every day as one might carry a pocket watch, the court observed; it was an action that had to be grounded in some specified reason. [108]Thus, even

_____

[102] For evidence that open carry of handguns was relatively rare, see another essay in this symposium, Mark Frassetto, *The Myth of Open Carry,* 55 UC DAVIS L. REV. 2515 (2022) [hereinafter *Open Carry*].

[103] The good cause requirement at the heart of *Bruen* was clearly established by the time *Reid* was decided, a fact that ought to render it presumptively lawful under *Heller*'s framework. Moreover, *Reid* raises further questions about the modern conception of rights and related standards of review invoked by Chief Justice Roberts and Justice, Kavanaugh. *See* Transcript of Oral Argument, *supra* note 6 and accompanying text.

[104] *See State v. Huntly, 25 N.C. 418, 422-23 (1843). Huntly* did adopt the emerging modern understanding of criminal *mens rea* that slowly developed over the course of the nineteenth century and superseded the traditional common law view. According to this new view, criminality was linked to a psychological state of mind, an evil intent. This view repudiated the objective view of criminal intent in which the evil design was inferred from the illegal act itself. Yet, reading this modern conception of criminality backward in time into the Founding era and English common law, as gun rights advocates have continued to do, is profoundly anachronistic. For a good illustration of this gun rights error, see Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense,* 61 AM. U. L. REV. 585, 635-37 (2012).

[105] For an illustration of how modern gun rights advocates and scholars have misread the Southern tradition, see Reply Brief, *supra* note 68, at 7-8.

[106] *Huntly, 25 N.C. at 422-23* (emphasis in original).

[107] Modern American self-defense law has specified a variety of qualifications limiting the use of deadly force, and thus, this body of law is in tension with the idea of permissive carry championed by gun-rights advocates. This issue has not received sufficient attention by jurists and scholars. For a notable exception to this general scholarly neglect, see Ruben, *supra* note 48, at 64-65.

[108] Kopel and Moscary mistakenly claim that "business or amusement" was a legal term of art that included all lawful activity. However, the text of *Huntly* makes clear that wearing a gun habitually without good cause was not lawful, so in this decision the term clearly refers to purposive carry, not permissive carry. *See* Kopel & Mocsary, *supra* note 65, at 183 n.86.

55 U.C. Davis L. Rev. 2545, *2572

in one of the most expansive interpretations of gun rights in the antebellum South, the region of the new nation with the most tolerant view of public carry, the right asserted was purposive in nature and not permissive.

An 1838 Virginia law clearly reveals the limited notion of public carry at the core of antebellum southern law. The statute did not embrace promiscuous gun carry, it expressly singled out "habitual carry" as a violation of the peace:

 [*2573]

Be it enacted by the general assembly, That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from this use of which the death of any person might probably [sic] ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offense forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same. [109]

The legal principle articulated in both *Reid* and *Huntly,* and clearly expressed in the Virginia statute (1836) rejected "habitual carry" - the vision of public carry championed by today's gun rights advocates and the key issue at stake in *NYSRPA v. Bruen.* Purposive carry, traveling armed with a good cause, including a specified threat, is the tradition that is deeply rooted in American history. Permissive open carry, the goal of modern gun rights advocates, and the aim of the challenge to New York's century old law in *Bruen,* is an invented tradition that only emerged relatively recently in American history. [110]

IV. GUN REGULATION OUTSIDE OF THE SLAVE SOUTH: THE DEVELOPMENT AND SPREAD OF THE MASSACHUSETTS MODEL

Outside of the antebellum South, a different and more restrictive tradition of gun regulation took hold. First developed in Massachusetts, this alternative approach was more expansive than the traditional English right, but less capacious than the Southern model advanced in *Reid* and *Huntly.* [111]

The new Massachusetts model built on earlier American statutes reaffirming the principals embodied in the Statute of Northampton. In 1795, Massachusetts enacted its own version of the Statute of Northampton using language drawn from prior English commentators. The law forbade anyone who "shall ride or go armed offensively, to the  [*2574] fear or terror of the good citizens of this Commonwealth." [112]The legal terms "armed offensively" and "terror of the good citizens" tracked closely the traditional common law usage of these terms. Justices of the peace manuals on both sides of the Atlantic in the eighteenth century were all in accord that the mere act of traveling armed was the source of the terror and that firearms were the quintessential offensive weapon. [113]

---

[109] 1838 Va. Acts 76, § 1.

[110] *See* Charles, *supra* note 32, at 205-07.

[111] *See* Cornell, *Right to Carry*, *supra* note 66 at 1720 & n.134.

[112] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436, *reprinted in* ASAHEL STEARNS & LEMUEL SHAW, THE GENERAL LAWS OF MASSACHUSETTS 454 (Theron Metcalf ed., Boston, Wells & Lilly & Cummings & Hilliard 1823).

[113] *See* BINDER, *supra* note 40, at 139-42; GEORGE FLETCHER, RETHINKING CRIMINAL LAW 208 (1978). Many discussions of the terror requirement read backward from the nineteenth century subjective standard. *See, e.g.,* Volokh, *supra* note 53, at 101 (erroneously taking the holding in *State v. Huntly, 25 N.C. 418, 423 (1843),* as dispositive of Anglo-American criminal law assumptions from preceding centuries, using a method that essentially reads history backwards).

55 U.C. Davis L. Rev. 2545, *2574

Gun rights advocates have misinterpreted the 1795 statute, reading it in isolation and ignoring the common law tradition against which it would have been interpreted at the time of its enactment. [114] The common law model of conserving the peace was rooted in the face-to-face communal practices of early modern England's rural communities. Until the rise of modern police forces later in the nineteenth century, this community-based model of policing dominated on both sides of the Atlantic. [115] As conservators of the peace, justices of the peace, sheriffs, and constables maintained their traditional authority to enforce the peace. [116] A key early case vital to understanding the continuing  [*2575] relevance of the English legal tradition in Massachusetts, *Commonwealth* v. *Leach*, affirmed that the statutes of Edward III bestowing extensive powers on justices of the peace had been absorbed into the common law of their state, including the wide-ranging authority to detain, disarm, and bind to the peace any individual who traveled armed outside of the recognized exemptions. [117] The importance of this idea is evident in the treatment of this concept in the popular justice of the peace manual, *The Massachusetts Justice*: "The statues of Edward III, respecting the jurisdiction and powers of the justice of the peace, have been adopted and practiced upon here, and are considered to be as part of our common law." [118]

The law in Massachusetts governing armed travel in public did not remain static between the Founding era and the rise of Jacksonian democracy: a period of profound legal and constitutional change. [119] One area that drew the attention of reformers was the need to revise the criminal law. In fact, in Massachusetts many of the state's leading jurists, including Joseph Story, were involved in this ambitious project to codify and rationalize the state's criminal law. [120] The first important iteration of these changes was incorporated into the revised criminal code in the 1830s. The approach taken by the Massachusetts codifiers in this effort to rationalize their law built on the landmark Massachusetts decision, C *ommonwealth v. Selfridge*, a case that changed the course of American criminal law

---

[114] *See* Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436. The mischief rule advanced in *Heydon's Case,* (1584) 76 Eng. Rep. 637 (KB) - the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy - continued to shape Anglo-American views of statutory construction well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 31, at 61. The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822). For a modern scholarly discussion of the rule, see Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[115] *See* LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH 105-06 (2009) (discussing how the peace functioned to enforce social hierarchy in a patriarchal society).

[116] For unreliable ahistorical accounts of sureties that ignore the role of the justice of the peace as conservators of the peace, see Kopel & Mocsary, *supra* note 65 at 175-76 and the unpublished essay by Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms* 13 (George Mason Univ. Legal Stud. Rsch. Paper Series No. LS 21-06, 2021), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3697761 [https://perma.cc/RV6P-RS88]. Leider omitted his discussion of Madison liquidation and repurposed his analysis for his amicus brief in     *Bruen. See* Brief of Professors Leider & Lund, *supra* note 6, at 19-30. Both the *draft* book chapter and brief engage in the type of law office history that has marred so much Second Amendment scholarship. *See* Cornell, *Half Cocked, supra* note 3 at 205-06; *see also* discussion *infra* pp. 2579-88.

[117] *See* Commonwealth v. Leach 1 EPHRAIM WILLIAMS, REPORTS OF CASES ARGUED AND DETERMINED IN THE SUPREME JUDICIAL COURT OF THE COMMONWEALTH OF MASSACHUSETTS 31 (Boston, Tileston & Weld 1804-1805).

[118] JOHN C. B. DAVIS, THE MASSACHUSETTS JUSTICE: A TREATISE UPON THE POWERS AND DUTIES OF JUSTICES OF THE PEACE WITH COPIOUS FORMS 1 (Worcester, W. Lazell 1847).

[119] *Republicanism*, *supra* note 16.

[120] *See* JOSEPH STORY, *Codification of the Common Law, in* THE MISCELLANEOUS WRITING OF JOSEPH STORY 698, 698 (William Story ed., Boston, Charles C. Little & James Brown 1852) (discussing the evolution of the American common law). The best study of Story's complicated relationship to codification is R. KENT NEWMYER, SUPREME COURT JUSTICE JOSEPH STORY: STATESMAN OF THE OLD REPUBLIC 272-81 (G. Edward White ed.1985).

and its view of armed self-defense. [121]It is impossible to understand developments in **[*2576]** Massachusetts and elsewhere on armed travel in public without some appreciation of the impact of Selfridge on American law.

The bitter political conflicts of the Jeffersonian era provided the backdrop for the *Selfridge* case which became one of the new nation's first sensational murder trials. A scant two years after the Hamilton and Burr duel ended in tragedy, partisan political acrimony again led to a fatal shooting that shocked the nation. The site for this tragedy was not an isolated field in New Jersey, but the crowded streets of Boston. The victim, Charles Austin, was a Harvard student and the son of Benjamin Austin, one of New England's most prominent Jeffersonians and an influential newspaper publisher. Young Austin was shot in front of a crowd of onlookers on a busy street in Boston. Thomas Selfridge, the man charged with Austin's murder, was one of the city's most respected lawyers and a leading light of New England Federalist's establishment. [122]The key issue in the case was the legality of Selfridge's decision to pre-emptively arm himself because he believed that an imminent and specified threat to his life existed. [123]Under English common law there was no good cause or imminent threat exception that allowed individuals to pre-emptively carry arms to defend against possible aggression. [124]The decision in *Selfridge* broke with this precedent and established a new reasonable fear standard for the use of deadly force in self-defense. According to the new *Selfridge* standard, if an individual had a reasonable fear of serious injury or death, faced a **[*2577]** specified threat, arming was now legal. Although the new *Selfridge* standard marked a significant expansion of the right of self-defense and set America on a radically different legal course than England in this area of criminal law, it was not a total rejection of the entire common law approach to limiting armed travel. The new standard did not justify promiscuous carry or a free-standing right of peaceable public carry, it carved out a significant new exception to the traditional common law model, allowing individuals to arm when they faced a specific threat. *Selfridge* was an implicit recognition that the traditional communal methods of enforcement of the peace, including the use of sureties, was insufficient to protect life in the changed circumstances of the new American republic, where individuals could no longer depend on their community for protection from threats. The traditional community-based approach of the common law had to be supplemented with a new more individualistic conception of armed self-defense, an approach that recognized the need to arm in situations in which an individual could not depend on neighbors or the law for protection. [125]

---

[121]  *See* Commonwealth v. Selfridge, 2 Am. St. Trials 544, 700 (Mass. 1806). For the political context of the case, see SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 110-17 (2006) [hereinafter WELL-REGULATED].

[122] Jack Tager, *Politics, Honor and Self-Defense in Post-Revolutionary Boston: The 1806 Manslaughter Trial of Thomas Oliver Selfridge*, 37 HIST. J. MASS 84, 85 (2009).

[123]  *See* Trial of Thomas O. Selfridge, Attorney at Law, Before the Hon. Isaac Parker, Esquire. For Killing Charles Austin on the Public Exchange, in Boston, August 4th, 1806, (Boston, 1806); THO. O. SELFRIDGE, A CORRECT STATEMENT OF THE WHOLE PRELIMINARY CONTROVERSY BETWEEN THO. O. SELFRIDGE AND BENJ. AUSTIN; *see also* A BRIEF ACCOUNT OF THE CATASTROPHE IN STATE STREET, BOSTON, ON THE 4TH AUGUST, 1806: WITH SOME REMARKS (1807).

[124] Retreat, not stand your ground, was the legal requirement under English common law. The notable exception to this rule was the "castle doctrine," covering deadly force in the home against intruders. *See* Semayne's Case (1604) 77 Eng. Rep. 194, 195 (KB). *See generally* Darrell A. H. Miller, *Self-Defense, Defense of Others, and the State*, 80 LAW & CONTEMP. PROBS. 85 (2017) (discussing the nature of self-defense law in America). On *Selfridge*'s importance to the American law of self-defense, see RICHARD MAXWELL BROWN, NO DUTY TO RETREAT: VIOLENCE AND VALUES IN AMERICAN HISTORY AND SOCIETY 7 (1991). For a useful summary of the holding in *Selfridge* and its importance to understanding the history of armed self-defense in America, see Ruben, *supra* note 48, at 84. By failing to grapple with the paradigm shifting role of *Selfridge*, gun rights advocates have misread the early history of self-defense and regulation of armed public carry in Massachusetts. *See* supra p. 2571; *infra* pp. 2579-88.

[125] Gun rights advocates have ignored the importance of *Selfridge* in transforming traditional English common law views of self-defense, an omission that has led them to assert a static and quintessentially ahistorical view of the evolving law of self-defense. For example, Leider's discussions of Massachusetts law in both his unpublished essay and *Bruen* brief, proceed without any

55 U.C. Davis L. Rev. 2545, *2577

The new post- *Selfridge* standard in self-defense law in Massachusetts was codified in two distinct provisions of the revised Massachusetts criminal code adopted in the 1830s. The first provision reaffirmed the right of any person to seek a peace bond against any individual who threatened the peace, but now recognized a good cause exception for armed travel.

If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace ... . [126]

Massachusetts law also expressly reaffirmed the broad powers of Justice of the Peace to maintain the peace even in cases in which no individual brought forward a complaint.

[*2578]

Every justice of the peace, within his county, may punish by fine, not exceeding ten dollars, all assaults and batteries, and other breaches of the peace, when the offence is not of a high and aggravated nature, and cause to be stayed and arrested all affrayers, rioters, disturbers and breakers of the peace, and all who go armed offensively, to the terror of the people, and such as utter menaces or threatening speeches, or are otherwise dangerous and disorderly persons. [127]

Gun rights advocates have misinterpreted the way surety laws functioned in antebellum America because they have ignored the role *Selfridge* played in changing the law of self-defense. The revised laws carved out a specific exemption for specified threat, it did not sanction promiscuous carry.

The mechanisms for enforcing the new Massachusetts model was surety of the peace or good behavior. Any justices of the peace or any member of the community could have an individual bound to the peace. The payment of a peace bond did not function as a de facto license to carry, a claim that is wholly invented and has no foundation in the historical record. In his reply brief in *NYSRPA v. Bruen*, Paul Clement repeated this false claim which is little more than a gun rights fantasy. According to Clement's erroneous account, the surety laws "required a magistrate to find "reasonable cause' that someone had demonstrated a propensity to *misuse* a firearm to cause "injury, or breach the peace,' before a surety could be demanded to *continue* carrying it." [128]In fact, as the statute's text makes clear the reasonable cause standard applied to the exception, not to the rule. [129]Clement's conclusion that "these laws thus reinforced the understanding that the people had a baseline *right* to carry arms, and that only *abuse* of that right could justify its restriction," is demonstrably false. Nor does the text support Clement's claim that one could continue to carry arms if bound to the peace, another idea pulled out of thin air. This distorted version of the past ignores the plain meaning of the relevant statutes and the long history of how sureties of the peace functioned under Anglo-American law. [130]If Clement's contention were true then the language of the statute would [*2579] also sanction individuals to continue uttering "menacing speeches" if they paid their bond, an absurd contention. The only justification for traveling armed was the existence of a specified threat, the new *Selfridge*

---

references to *Selfridge*'s modifications of English law, a vital context for understanding the Massachusetts surety statutes. *See* Brief of Professors Leider & Lund, *supra* note 6, at 2, 4-7; Leider, *supra* note 116, at 12-17.

[126] Act of Feb. 1836, tit. 2, ch. 134, § 16, 1836 Mass. Acts 748, 750.

[127] Act of Feb. 1836, tit. 1, ch. 85, § 24, 1836 Mass. Acts 526, 529.

[128] Reply Brief, *supra* note 68, at 9.

[129] *See* Act of Feb. 1836, tit. 2 ch. 134 § 16, 1836 Mass. Acts 748, 750.

[130] For the best account of the English tradition of sureties, see HINDLE, *supra* note 44, at 94-114. On the American use of sureties, see EDWARDS, *supra* note 115, at 96. Leider's account fails to take cognizance of this history and accordingly produces an ahistorical account of how criminal law functioned in both England and early America. *See* Leider, *supra* note 116, at 12-17.

55 U.C. Davis L. Rev. 2545, *2579

standard. In fact, violators of the Massachusetts law not only faced the prospect of being bound to the peace, but they were liable to further fine or jail time if they traveled armed.

All persons, arrested for any of the said offences, shall be examined by the justice, before whom they are brought, and may be tried before him, and if found guilty, may be required to find sureties of the peace, and be further punished by fine as before provided; or, when the offence is of a high and aggravated nature, they may be committed or bound over, for trial before the court of common pleas, or other court having jurisdiction of the case. [131]

By failing to understand the role that *Selfridge* played in the evolution of the law of self-defense, gun rights advocates have failed to understand that the key innovation in the new regulatory scheme implemented in Massachusetts was the inclusion of a new good cause exception for cases where a specific threat existed. Grounded in *Selfridge's* new understanding of self-defense, a legal acknowledgement of a right to arm pre-emptively if a specified threat existed was a significant expansion of gun rights. [132] Although this new conception falls far short of the extreme libertarian vision at the core of the modern gun rights movement, it is important not to smuggle modern ideological assumptions into an assessment of what the law in the 1830s meant. The new criteria were no longer based on where and when one traveled, the key factors underlying the common law's approach to determining if self-defense was legitimate, but now included some recognition of the subjective psychological state of the person threatened and their reasonable fears of harm. Including this principle made the Massachusetts model consistent with the Enlightenment goals of criminal law reform in Massachusetts and elsewhere. [133] Modern gun **[*2580]** rights advocates support for shall issue or constitutional carry is a type of habitual or promiscuous public carry, a practice that was expressly prohibited in early America. [134] The Massachusetts model did not, as Clement and other gun rights claim, sanction habitual public carry: it expanded the right to travel armed in a limited fashion by recognizing the new reasonableness standard premised on the existence of a specified and concrete threat that justified arming oneself in public.

One of the best sources for understanding the public meaning of the Massachusetts law that provided a template for the Massachusetts Model emulated by other states is a commentary on the original statute authored by one of the nation's most respected jurists in pre-Civil War America, Peter Oxenbridge Thacher. [135] Lawyers and judges in

---

[131] Act of Feb. 1836, tit. 1, ch. 85, § 25, 1836 Mass. Acts 526, 529.

[132] One of the leading commentators on the common law, William Hawkins, was emphatic that arming oneself could not be justified or "excused," by claiming "that such a one threatened him, and that he wears for the safety of his person from his assault." HAWKINS, *supra* note 31, at 136. On *Selfridge's* role in changing the course of American law, see *BROWN, supra note 124*, and CORNELL, WELL-REGULATED, *supra* note 121, at 116-17.

[133] On the role of Enlightenment thought, particularly Scottish Enlightenment thought, in legal reform in antebellum America, see Susanna Blumenthal, *The Mind of a Moral Agent: Scottish Common Sense and the Problem of Responsibility in Nineteenth-century American Law*, **26 LAW & HIST. REV. 99, 104-05 (2008)**. Thus, the new Massachusetts model shared one feature with the southern Huntley decision, both reflected a new emphasis on an Enlightenment based view centered on subjective psychological experience, a departure from the traditional common law approach to criminal law.

[134] *See* Clayton E. Cramer & David B. Kopel, " *Shall Issue": The New Wave of Concealed Handgun Permit Laws*, *62 TENN. L. REV. 679, 694-96 (1995)*. For a more scholarly treatment of this issue, see generally Jacob D. Charles, *Securing Gun Rights by Statute: The Right to Keep and Bear Arms Outside the Constitution*, *120 MICH. L. REV. 581 (2022)*.

[135] The dominant model of originalism, public meaning originalism focuses on how an ideal, legally knowledgeable reader at the time would have understood the words of the text. For a useful guide to originalist theory, see generally Keith E. Whittington, *Originalism: A Critical Introduction*, *82 FORDHAM L. REV. 375 (2013)*. Critiques of originalism are legion. For historical critiques of originalist methodology, see generally Saul Cornell, *Reading the Constitution, 1787-91: History, Originalism, and Constitutional Meaning*, *37 LAW & HIST. REV. 821 (2019)*; Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, *84 FORDHAM L. REV. 935 (2015)*; and Jack Rakove, *Tone Deaf to the Past: More Qualms About Public Meaning Originalism*, *84 FORDHAM L. REV. 969 (2015)*. For other critiques, see generally FRANK CROSS, THE FAILED PROMISE OF ORIGINALISM 112-15 (2013) and Stephen M. Griffin, *Rebooting Originalism*, *2008 U. ILL. L. REV. 1185, 1186-91 (2008)*.

55 U.C. Davis L. Rev. 2545, *2580

antebellum America were familiar with a legal maxim drawn from Lord Coke that "great regard, in the exposition of statutes ought to be paid to, the construction that sages of the law, who lived about the time." [136] **[*2581]** Few jurists in Massachusetts, better fit the category of "sage of the law" than Peter Oxenbridge Thacher. Indeed, Judge Thacher's reputation extended well beyond Massachusetts; he was recognized by members of the antebellum legal community to be one of the nation's leading experts on criminal law. Contemporaries praised him for his "thorough knowledge of the criminal law and its practical application." [137]

Thacher explained the meaning of his state's prohibition on armed travel in an influential grand jury charge that was reprinted as a pamphlet and was deemed sufficiently important to be published separately in the press. *The American Review*, an influential Whig magazine, singled out the publication of a collection of Judge Thacher's cases and grand jury charges as a major contribution to American law. Praising the judge's "high character as a magistrate," the review remarked that Thacher "was not only known to the profession in New England, but his published charges to grand juries, and occasional reports of important cases tried before him, had made him known throughout the country." [138]Gun rights advocates have either ignored or dismissed the relevance of Thacher's commentary on his state's law, casting his authoritative explication of the text as little more than empty verbiage uttered on a largely meaningless ceremonial occasion. [139]In fact, grand jury charges were important civic occasion in antebellum America because they gave the "sages of the law" an opportunity to expound and elucidate important legal concepts to the public. [140]Jury charges offer one of the clearest illustrations of the way judges in the **[*2582]** antebellum era would have interpreted the Massachusetts statute prohibiting armed travel absent a good cause. [141]

Thacher's reading of his own state's laws on public carry left no room for interpretive confusion: "In our own Commonwealth [of Massachusetts]," he reminded members of the grand jury "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." [142]The Massachusetts model of gun regulation limited public carry to

---

[136] E. FITCH SMITH, COMMENTARIES ON STATUTES AND CONSTITUTIONS 739 (New York, Banks, Gould & Co. 1848). Coke's legal maxim regarding the importance of consulting the sages of the law when interpreting statutes was familiar to lawyers and judges in the early Republic. *See id.* On Smith's significance to antebellum legal culture, see WILLIAM D. POPKIN, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION 69-70 (1999). Modern gun rights advocates have ignored this rule, substituting their own ahistorical reading of the law in place of the views of the leading criminal jurists of period. *See, e.g.,* Leider, *supra* note 116 (dismissing Thacher's reading of Massachusetts law based on a presentist assumptions and ignoring the relevant early American rules of statutory construction).

[137] *Reports of Criminal Cases Tried in the Municipal Court of the City of Boston, Before Peter Oxenbridge Thacher, Judge of that Court, from 1823 to 1843,* AM. REV.: WHIG J. POL., LITERATURE, ART & SCI., Feb. 1846, at 222-23; *see* REPORTS OF CRIMINAL CASES, TRIED IN THE MUNICIPAL COURT OF THE CITY OF BOSTON, BEFORE PETER OXENBRIDGE THACHER, JUDGE OF THAT COURT, FROM 1823 to 1843, at v (Horatio Woodman ed., Boston, Charles C. Little & James Brown 1845).

[138] *Reports of Criminal Cases tried in the Municipal Court of the City of Boston, supra* note 137, at 222-23; *see* REPORTS OF CRIMINAL CASES, TRIED IN THE MUNICIPAL COURT OF THE CITY OF BOSTON, *supra* note 137, at v.

[139] The decision of gun rights advocates to disregard Thacher's interpretation of his own state's law violates both the accepted rules of legal historical method and the relevant rules of statutory construction well known to judges and lawyers in antebellum America. *See* JOHNSON ET AL., *supra* note 80, at 79-80; Leider, *supra* note 116, at 13.

[140] The phrase "sages of the law" was frequently used by legal commentators from Coke to Kent. *See, e.g.,* JAMES KENT, 1 COMMENTARIES ON AMERICAN LAW 463 (New York, O. Halsted 1826) (describing law reports as faithful records containing "true portraits of the talents and learning of the sages of the law"). On Coke's instantiation of the concept in Anglo-American law, see Wilfrid Priest, *Talents and Biography, Legal and Otherwise*, 32 ADEL. L. REV. 185, 188 (2011).

[141] On the role of grand jury charges in this period of American legal history, see DENNIS HALE, THE JURY IN AMERICA: TRIUMPH AND DECLINE 93-98 (2016); Joshua Glick, Comment, *On the Road: The Supreme Court and the History of Circuit Riding,* 24 CARDOZO L. REV. 1753, 1754 (2003).

55 U.C. Davis L. Rev. 2545, *2582

situations in which an individual faced a specified threat. It embodied the new *Selfridge* standard that modified the traditional common law framework inherited from English law. It was a significant expansion of the right of self-defense, but it was not, as modern gun rights advocates have mistakenly urged, an endorsement of habitual carry. 143

Nor was Thacher the only distinguished Massachusetts jurist to characterize his state's ban on armed travel as a general prohibition absent a specified threat. Other jurists in Massachusetts echoed Thacher's account of the law. Judge Abel Cushing, who served on the Roxbury Police Court, interpreted the Massachusetts statute in the same manner as Thacher. Cushing endorsed the view that the mere act of traveling armed, even if done peaceably, without good cause, violated the statute. 144

Cushing's views on the law emerged clearly in the Snowden case, a gun prosecution that generated considerable interest in the press because of its connection with the increasingly militant turn of abolitionism in the wake of controversy over the Fugitive Slave Act  **[*2583]** (1850). 145Isaac and Charles Snowden were the sons of a prominent Black minster allied with the radical Garrisonian wing of abolitionism. Their arrest became a newsworthy event covered in papers across the nation after the two men were charged with violating the state's statute prohibiting armed travel absent good cause. Ardent supporters of the immediate end to slavery, Garrisonians denounced the Constitution as a "covenant with death." 146Abolitionists in Boston allied with the Garrisonian wing of the movement believed that the law no longer bound individuals who were engaged in the abolitionist fight against slavery. To gain a full understanding of the Snowden trial and its significance as a source for understanding the enforcement of antebellum gun laws one must situate the case in two inter-related contexts: the violent history of abolitionism in Boston and the norms governing criminal law and prosecutions in the city.

The Snowden brothers were apprehended late at night in the vicinity of one of Boston's armories at a time when city officials feared the prospect of violence between abolitionists and their opponents. 147"Night walking," was a crime under Massachusetts law, a fact that itself would have justified members of the night watch stopping and interrogating the two men. 148Prior to their arrest Boston had been convulsed by abolitionist and anti-abolitionist

---

142 PETER OXENBRIDGE THACHER, TWO CHARGES TO THE GRAND JURY OF THE COUNTY OF SUFFOLK FOR THE COMMONWEALTH OF MASSACHUSETTS, AT THE OPENING OF TERMS OF THE MUNICIPAL COURT OF THE CITY OF BOSTON ON MONDAY, DEC. 5TH A.D. 1836, AND ON MONDAY, MARCH 13TH, A.D. 1837, at 27 (Boston, Dutton & Wentworth 1837); *see Judge Thacher's Charges*, CHRISTIAN REG. & BOS. OBSERVER, June 10, 1837, at 91.

143 *Supra* note 132.

144 Judge Cushing's Police Court remarks were reported in the abolitionist press, see *Arrests for Carrying Concealed Weapons*, LIBERATOR, Apr. 11, 1851, at 59. *Cf.* the official accounts in the Complaint, Commonwealth v. Snowden, No. 1443 (Bos. Police Ct. Apr. 5, 1851) (providing an account of the court's actions); Record Book Entry, Commonwealth v. Snowden, Bos. Police Ct. R. Book 1117 (May 1851) (showing the disposition of the case and Snowden's adherence to the terms of the peace bond imposed by the court).

145 *See generally* H. Robert Baker, *The Fugitive Slave Clause and the Antebellum Constitution*, 30 LAW & HIST. REV. 1133 (2012) (examining the changing interpretations of the fugitive slave clause over time).

146 On the politics of abolitionism during this period, see generally Corey M. Brooks, *Reconsidering Politics in the Study of American Abolitionists*, 8 J. CIV. WAR ERA 291 (2018).WAR ERA 291 (2018) and James B. Stewart, *The Aims and Impact of Garrisonian Abolitionism,* 1840 -1860 15 CIVIL WAR HISTORY 197 (1969). For a historical discussion of Black abolitionists in Boston during this period, see James Oliver Horton & Lois E. Horton, *The Affirmation of Manhood: Black Garrisonians in Antebellum Boston*, *in* COURAGE AND CONSCIENCE: BLACK & WHITE ABOLITIONISTS IN BOSTON 127, 146 (Donald M. Jacobs ed., 1993).

147 A number of anti-abolitionist papers charged that the Snowdens had attempted to force their way into an armory, but it is difficult to verify the accuracy of this claim. *See The Boston Slave Case*, N.H. PATRIOT & STATE GAZETTE, Apr. 10, 1851; WILMINGTON J. April 11, 1851, at 2.

violence. At a tumultuous public meeting, Wendall Phillips, one of the nation's most fiery anti-slavery orators, exhorted Boston's abolitionist community, including African-Americans, to arm themselves against slave catchers and anti-abolitionist mobs. Anticipating possible bloodshed, the mayor **[*2584]** had mobilized units of the militia and put the watch on high alert. [149]When the two men were apprehended near a city armory and searched by the watch, a loaded pistol and a large butcher's knife were discovered, a clear violation of the state law on traveling armed without a good cause. [150]

A deeply flawed and ahistorical account of the Snowden case figures prominently in two gun rights amicus briefs filed in *Bruen*. [151]Instead of presenting the full story of this fascinating case, the two gun rights accounts of the Snowden case in *Bruen* cast the two men as innocent gun owners peaceably engaged in legal activities who were harassed by police eager to target Boston's Black community. [152]Yet, if one looks at all of the available historical evidence, a different story emerges that supports the account of Massachusetts law in Judge Thacher's grand jury charge and directly contradicts a central claim of gun rights advocates in *Bruen* that surety laws did not restrict public carry and were seldom enforced.

The most egregious historical error committed by gun rights advocates is the omission of any discussion of radical abolitionism in Boston, a vital context for making sense of the case. By the 1850s many abolitionists had abandoned pacifism and embraced a militant view, championing armed resistance to slavery. In the inflammatory speech that preceded the arrest of the Snowdens, Phillips, a close friend of the Snowdens, had denounced the futility of continuing to use constitutional and legal means to thwart slavery. Rather than follow laws tainted by slavery, Phillips urged his audience to arm themselves and resist all efforts to enforce the fugitive slave act and any other legal processes that supported slavery. In short, Phillips advised abolitionists **[*2585]** in Boston to carry arms regardless of the legality of the practice under Massachusetts law. [153]

The decision of the Snowden's to arm themselves takes on a different meaning and significance when read against Phillips' recent appeal to arms and the unrest in the city. The Snowdens were closely linked with Phillips and his militant abolitionist agenda. At their hearing Phillips not only helped pay the two men's peace bonds, but he unleashed a fusillade of invective at the presiding judge in the case, Abel Cushing who responded by declaring that he would dispense "equal justice," and render his decision " *irrespective of color.*" The Garrisonian newspaper, The *Liberator*, presented the judge in a less than favorable light, but if one looks at the press coverage of the case from papers representing the full range of antebellum political views, the charge of racial bias seems less persuasive. [154]Still, one point that is beyond dispute is that Judge Cushing believed that armed travel without good cause

---

[148] Report of the Chief of Police and Captain of the Watch, City Document No. 4, at 5, DOCUMENTS OF THE CITY OF BOSTON FOR THE YEAR 1855 (1856) (listing arrests for night walking).

[149] A transcription of Phillips's speech based on an abolitionist account by a spectator was published in the Antislavery Bugle. *Remarks of Wendell Phillips*, ANTISLAVERY BUGLE, May 24, 1851. For other less sympathetic contemporary accounts of Phillips' call to arms to Bostonians, see THE DAILY UNION, April 08, 1851, at 3 and *From the Sublime to the Ridiculous*, THE SOUTHERN PRESS April 07, 1851.

[150] *Supra* note 144. The Massachusetts Law allowed arming for a specified threat, but the general tumult in the city was not judged to be such a threat by the court that heard the *Snowden* case.

[151] *Supra* note 7.

[152] Racial harassment of African-Americans in Boston was undoubtedly a problem. Similarly, some gun laws, particularly in the South, were designed to disarm African-Americans selectively. But the fact that gun laws sometimes were used to further an insidious agenda does not mean all gun laws and all examples of enforcement were racially motivated. *See* Mark A. Frassetto, *The Nonracist and Antiracist History of Firearms Public Carry Regulation, 74 SMU L. REV. F. 169, 173-74 (2021)* [hereinafter *The Nonracist*].

[153] Kellie Carter Jackson, FORCE AND FREEDOM: BLACK ABOLITIONISTS AND THE POLITICS OF VIOLENCE 82 (2019); Wendell Phillips, THE CONSTITUTION: A PRO-SLAVERY COMPACT, OR EXTRACTS FROM THE MADISON PAPERS, 5-10 (New York, American Anti-Slavery Society, 3rd ed. 1856).

55 U.C. Davis L. Rev. 2545, *2585

violated the state law. The *Liberator's* summary of the Judge's interpretation of the state law makes this point clearly: Judge Cushing, *The Liberator* noted: "held that walking peacefully ... with arms in your pocket which you neither use nor threaten to" met the statute's definition of traveling ""armed offensively, to the terror of the people,' against the statute." [155]Despite the clear statement by the presiding judge of the Snowden case on the meaning of the Massachusetts law, the two amicus briefs discussing the case in *Bruen* conclude that the case illustrates that surety laws were not enforced, apart from some isolated racially targeted prosecutions. [156]

Moreover, both briefs assume that the views of radical abolitionists who counseled violating existing laws were representative of orthodox legal views in antebellum America. Elevating the views of radical abolitionists over the views of leading jurists in the state makes neither historical nor legal sense. If the goal of originalism is the reconstruction of the public meaning of the law, Judge Cushing's views, not those of his radical abolitionist critics, are legally dispositive. Garrisonian abolitionists, including Phillips, rejected the authority of the **[*2586]** Constitution and expressly counseled violating existing laws to achieve their laudable goals of immediate abolitionism. [157]

The final resolution of Isaac Snowden's case in police court illustrates the way sureties functioned and further highlights the problem of approaching antebellum law without an understanding of the relevant legal history. Having been bound to the peace and having adhered to the terms of his peace bond the trial judge dismissed the case, correctly concluding that no further legal action was necessary, nor warranted by the terms of the statute. [158]The appropriate legal strategy for Snowden to avoid prosecution would have been to argue that he had a good cause to fear attack and hence armed himself in accord with the exception recognized by the statute. Snowden had made such an argument at his hearing, but the court rejected his claim. Instead, Snowden was bound to the peace, the primary mechanism for enforcement provided by the law. When Snowden later appeared in court, the judge concluded that there was no further need for prosecution because Isaac had adhered to the terms of his bond. The case does not support the non-enforcement thesis, the law had been *enforced* because the peace had been kept and Snowden had adhered to the term of his surety. [159]The claim that the **[*2587]** Snowden case demonstrates a

---

[154] Abolitionist newspapers such as *The Liberator* viewed the prosecution as racist. Pro-Slavery newspapers and Whig publications articulating a less radical version of anti-slavery ideology portrayed the judge's actions as appropriate. *See supra* notes 144, 147.

[155] *Supra note 144, 147*.

[156] *Id.*

[157] Phillips embraced the radical Garrisonian view and declared that the path forward for abolitionism "is over the Constitution, trampling it under foot; not under it, trying to evade its fair meaning." *See* WENDELL PHILLIPS, REVIEW OF LYSANDER SPOONER'S ESSAY ON THE UNCONSTITUTIONALITY OF SLAVERY 35 (1847). For Phillips' relationship to abolitionist constitutionalism, see WILLIAM WIECK, THE SOURCES OF ANTI-SLAVERY CONSTITUTIONALISM IN AMERICA, 1760-1848, at 246 (1977). On the moral dilemma and legal quandary of being an anti-slavery judge after the passage of the Fugitive Slave Act of 1850, see Peter Karsten, *Revisiting the Critiques of Those Who Upheld the Fugitive Slave Acts in the 1840s and '50s*, 58 AM. J. L. HIST. 291 (2018).

[158] Gun rights advocates have applied anachronistic assumptions and principles drawn from modern criminal law instead of using the antebellum rules that governed the case at the time. *See* Brief of Professors Leider & Lund, *supra* note 6, at 8-30. They erroneously argue that because Isaac Snowden was "caught red handed" and could not challenge the arrest using the modern exclusionary rule, he would have been prosecuted if the mere circumstances of carrying a gun had been a crime under common law. In fact, the court documents and contemporary newspaper accounts make clear that crime was not charged at common law: Snowden was prosecuted for a violation of the state's prohibition on armed travel absent good cause and the court dismissed his arguments that he had a specified need to be armed. The correct penalty under the statute was a peace bond. On the norms of criminal prosecution during this period and the continuing importance of peace bonds, see generally Mary E. Vogel, *The Social Origins of Plea Bargaining: Conflict and the Law in the Process of State Formation, 1830-1860*, 33 LAW & SOC'Y REV. 161 (1999).

[159] Both of the *Bruen* Amicus that discuss the Snowden case depend on the flawed scholarship of Robert Leider, *supra* note 116. Kopel and Mocsary describe Leider's work as "exhaustive," but ignoring the abolitionist context of the Snowden case,

right to carry arms in public rests on a series of ahistorical claims and legal interpretive errors. The case offers dramatic evidence that confirms Judge Thacher's understanding of his state's law was the orthodox legal view at the time and undermines the non-enforcement thesis of modern gun rights advocates advanced in *Bruen*.

Francis Hilliard, another prominent Massachusetts jurist interpreted his state's law in the same manner as Thacher and Cushing. A prolific legal author, Hilliard's *Elements of the Law* a popular legal text, went through two editions before the Civil War. [160]Hilliard also served as a justice on the Police Court of Roxbury, Massachusetts, a position that gave him first-hand exposure to the practice of criminal law in his home state of Massachusetts. In a study published at the end of his distinguished career that spanned almost a half a century, Hillard wrote that the right to bear arms did not sanction carrying arms "habitually." [161]This was the orthodox view in American law. There is no contemporaneous account by any sitting judge in antebellum Massachusetts supporting the gun rights interpretation of the Massachusetts Model. The "sages of the law" who wrote about the law at the time all rejected the habitual public carry view advanced by Paul Clement and the gun rights briefs in *Bruen*. [162]In fact, three of the leading jurists sitting on criminal courts in antebellum Massachusetts **[*2588]** unambiguously described their state's laws as a total ban on armed travel in populous areas in the absence of a good cause.

Massachusetts continued the work of codifying its criminal law code in the decade following the enactment of the two statutes prohibiting public carry of arms without good cause. A report produced by the commission appointed to analyze the state criminal code in 1844 offers further insight into how armed travel in public was understood by the leading legal minds in the state. The report adopts the same interpretation evidenced in the writings of the leading criminal law jurists in the state. [163]The report's authors noted that there were several criminal activities that might result in a justice of the peace imposing a surety of the peace or good behavior. [164]

The commission discussed the type of persons included in the category of "dangerous or disorderly person." Among the categories of persons who were considered dangerous and disorderly were any "affrayer, rioter, disturber of the peace," and those "uttering menaces or threatening speeches." Additionally, the commissioners treated individuals who went "offensively armed" as a separate category of dangerous and disorderly person. [165]The commissioners viewed armed travel absent good cause as a violation of the law. The inclusion of a good cause exception for those traveling armed would have made no sense if there was a presumptive right to travel

---

confusing common law crimes with statutory offenses, and giving greater weight to radical abolitionist ideas than the views of the "sages of the law" is an example of law office history, not rigorous and neutral scholarship. *See* Kopel & Mocsary, *supra* note 65 at 184. Rather than follow orthodox legal history methods, an approach that requires consulting a wide range of sources, Leider's argument rests on cherry picked evidence gleaned from digital keyword searches. Although key word searches of digital sources may form part of an effective research strategy they are not a substitute for a truly exhaustive canvass of the relevant sources. In particular, key word searching encourages confirmation bias because the results are shaped by the choice of terms, Tim Hitchcock (2013) *Confronting the Digital,* 10 CULTURAL AND SOCIAL HISTORY 9, 14-17 (2013). On the dangers of historical bias and ways to minimize it, see C. Behan McCullagh , *Bias in Historical Description, Interpretation, and Explanation*, 39 HIST. & THEORY 39, 63 (2000). Consulting multiple sources representing diverse points of view of the same event is one of the most widely employed methods used by historians to minimize confirmation and selection bias. Leider's failure to consult a full range of contemporary accounts of the case is therefore a significant departure from accepted historical practice.

[160] FRANCIS HILLIARD, THE ELEMENTS OF LAW: BEING A COMPREHENSIVE SUMMARY OF AMERICAN CIVIL JURISPRUDENCE FOR THE USE OF STUDENTS, MEN OF BUSINESS, AND GENERAL (2d ed., Boston, Hillard, Gray & Co. 1848).

[161] FRANCIS HILLIARD, 1 AMERICAN LAW: A COMPREHENSIVE SUMMARY OF THE LAWS IN ITS VARIOUS DEPARTMENTS 18 (1883).

[162] *Supra* note 68.

[163] WILLARD PHILLIPS & SAMUEL B. WALCOTT, REPORT OF THE PENAL CODE OF MASSACHUSETTS PREPARED UNDER A RESOLVE OF THE LEGISLATURE, PASSED ON 10TH OF FEBRUARY, 1837, at 369, 391 (1844).

[164] *Id.*

[165] *Id.*

55 U.C. Davis L. Rev. 2545, *2588

armed. In the view of the commissioners there was no unfettered right to peaceable armed travel, apart from situations in which an individual faced a specified threat. [166]

Gun rights advocates have not only ignored or dismissed the express statements of antebellum jurists and the commission report's comments about limits on armed travel in antebellum Massachusetts, but they have buttressed their invented theory of a right of peaceable armed travel based on a wholly speculative and implausible set of claims derived from **[*2589]** silences in the historical record. [167]According to this view gun carry was the norm because there were no cases challenging the Massachusetts law. This non-enforcement thesis rests on multiple interpretive errors. It misreads the silences in the historical record, ignores readily available evidence of enforcement available for Boston, effectively jumbles the historical chronology of gun regulation in the state by ignoring important changes in the law over time, and fails to understand how criminal justice and law enforcement functioned in the early republic. [168]

First, it is important to recognize that records of the activities of local justices of the peace, particularly in rural areas of New England are difficult to locate, if they survive at all. [169]Although the records of justice of the peace in rural New England are rare, there is ample evidence from Boston, the area's most populous city that shows the armed travel in public was a rare event, but nonetheless was a crime that was enforced by the Boston police and courts. The rules and ordinances governing the Boston police expressly empowered police officers and members of the watch to arrest any who traveled armed in violation of state law. Individuals could be stopped and searched and if weapons were found could be prosecuted, exactly what happened in the Snowden case. The rules governing Boston police were explicit about this power: police had the power to stop and search any individual who disturbed the peace or was "unduly armed with a dangerous weapon." [170]Again the good cause exception included in the law was a key element in deciding if a case merited prosecution.

The most obvious explanation for why there were no challenges to the Massachusetts prohibition on armed carry is that few individuals traveled armed in populace areas such as Boston without good cause. Historian Roger Lane, the leading authority on crime in nineteenth-century Boston, concluded that "not many criminals in fact carried arms, even after the invention of the revolver made it possible to do so inconspicuously." [171]This conclusion is consistent with the fact that Boston police did not themselves routinely carry firearms until decades after the Civil War period: the standard weapon issued to police in the antebellum era was a club, not a firearm. Property inventories of the Boston police further **[*2590]** underscore this point: the list of moveable property owned by the Boston police for the year 1862 shows a total of 270 clubs and only seven revolvers. If Bostonians were promiscuously traveling armed and gun toting posed a serious threat to public safety, it seems highly unlikely that the entire Boston police force would have owned a total of seven revolvers at the start of the Civil War era. Boston police did not routinely carry firearms till decades after the Civil War. If gun carry was common in the city, police practices would have adapted to this fact and police would have been armed with guns, not clubs. Boston police did

---

[166] Leider and Lund do not consider the report of the Massachusetts commissioners, one of many relevant sources absent from their analysis. Their analysis relies largely on newspapers selected by digital searches, a deeply flawed methodology that exacerbates confirmation bias. For a discussion of the danger of confirmation bias in historical research using digital searching, see Claude Ewert, *Reflections on Historical Research Using Digital Archives: A Bias We Cannot Overcome*, THE CAMBRIDGE RESEARCHER (Apr. 4, 2021), *https://cambridgeresearcher.com/reflections-on-historical-research-using-digital-archives-a-bias-we-cannot-overcome/* [*https://perma.cc/VN3N-2PWC*] (Apr. 14, 2021).

[167] *See* Kopel & Mocsary, *supra* note 65, at 183-85; Leider, *supra* note 116, at 14-17.

[168] *See supra* note 116.

[169] MICHAEL STEPHEN HINDUS, PRISON AND PLANTATION: CRIME, JUSTICE AND AUTHORITY IN MASSACHUSETTS AND SOUTH CAROLINA, 1767-1878, at 61-62 (1980). On Boston, see ROGER LANE, POLICING THE CITY: BOSTON, 1822-1885, at 225-35 app. I (1967).

[170] A SUPPLEMENT TO THE LAW AND ORDINANCES OF THE CITY OF BOSTON 91 (1866).

[171] LANE, *supra* note 169, at 103-04.

not believe that promiscuous gun carriage was a serious threat to public safety or a threat to their lives. These undeniable facts are based on actual evidence, a stark contrast to the proponents of the non-enforcement thesis whose argument relies on the absence of evidence, and inferences from silences in the historical record. [172]

Enforcement statistics compiled by the city's Chief of Police offer the most direct evidence contradicting the non-enforcement thesis. As the data in Table One shows, only a tiny fraction of assaults in the city involved a weapon of any kind. Moreover, the number of arrests for unlawfully carrying weapons in public were also miniscule. Contrary to the claims of modern gun rights advocates, the evidence from Boston does not support the non-enforcement thesis, but rather suggest that citizens generally obeyed their state's prohibition on armed travel and few individuals carried weapons in public in the period leading up to the Civil War. In short, Bostonians, in contrast to their southern brethren, did not habitually arm themselves. [173]

Table 1. Boston Police Enforcement Data 1864 and 1866 [174]

| Year | Assault and Battery | Assault With Weapons | Disturbing the Peace | Carrying Weapons Unlawfully |
|------|---------------------|----------------------|----------------------|------------------------------|
| 1864 | 1016                | 100                  | 309                  | 8                            |
| 1866 | 1091                | 78                   | 666                  | 5                            |

When the commentaries by leading jurists from Massachusetts are considered alongside the data about policing practices in Boston, the **[*2591]** gun rights non-enforcement thesis collapses under the weight of countervailing evidence.

## V. RECONSTRUCTION, THE PROGRESSIVE ERA, AND THE RISE OF THE MODERN REGULATORY STATE

The Civil War and Reconstruction had a profound impact on American gun culture. The new state constitutions drafted after the Civil War abandoned Founding era language focused on ancient fears of standing armies that had haunted so many in the era of the American Revolution. In place of the militia-centric language of these eighteenth-century texts, Reconstruction era state constitutions substituted a new formulation of the right to bear arms that expressly recognized broad police power authority to regulate arms in public. The new threat facing Americans during Reconstruction was no longer "lobster back" British regulars, but easily concealed weapons, terrorist organizations such as the Ku Klux Klan and inter-personal gun violence. [175]

As weapons proliferated and gun violence increased, governments, including states and localities, implemented the new constitutional paradigm embodied in post-Civil War state constitutions and passed a range of laws to deal with gun violence and the increasingly common practice of concealed carry. The Republicans who framed the Fourteenth Amendment and dominated politics during the height of Reconstruction were not averse to using the power of state and local government to further their goals, and nothing was more pressing than restoring peace and public order. Protecting the rights of African Americans, including the right to keep and bear arms, was not incompatible with robust regulation of firearms. Racially neutral regulations aimed at promoting public safety was not in conflict with the goals of the Fourteenth Amendment; it was the indispensable public policy needed to implement its vision of equality and civil rights. [176]

------------------------------------------

[172] *See* ANNUAL REPORT OF CHIEF OF POLICE 1862 CITY DOCUMENT NO. 3, at 13 (Boston, 1863).

[173] On the different patterns of gun violence in the North and the South in the pre-Civil War era, see ROTH, *supra* note 93, at 180-249.

[174] ANNUAL REPORT OF THE CHIEF OF POLICE, FOR THE YEAR 1864, CITY DOCUMENT NO. 6, at 8-9 (Boston, 1865); ANNUAL REPORT OF THE CHIEF OF POLICE 1866, CITY DOCUMENT NO. 9, at 9-10 (Boston, 1867).

[175] Cornell, *The Right to Regulate*, *supra* note 8, at 69.

[176] For a discussion of the importance of such broad racially neutral laws aimed at demilitarizing the public sphere, see Darrell A. H. Miller, Peruta , *The Home-Bound Second Amendment, and Fractal Originalism, 127 HARV. L. REV. F. 238, 241-42 (2014)*.

55 U.C. Davis L. Rev. 2545, *2591

This post war consensus on the need for robust gun regulation was evident in Texas. Indeed, the necessity of racially neutral gun regulations of this sort eventually was recognized by both Republicans and Democrats in Texas because the state was plagued by paramilitary violence that threatened public order and post-war stability. [177]This [*2592] view of the constitutionality of racially neutral gun regulation gained judicial notice in *English v. State*, a case in which the Texas Supreme Court confidently affirmed that restrictions on public carry were "not peculiar to our own State." [178]Indeed, the court concluded that "it ... [was] safe to say that almost, if not every one of the states of this Union ... [had] a similar law upon their statute books, and, indeed, so far as we ... [had] been able to examine them, they ... [were] more rigorous than the act under consideration." [179]Even after the adoption of the Fourteenth Amendment, the court reasoned that good cause laws were entirely consistent with protections for the right to bear arms. [180]

The Texas Court was not mistaken. The Lone Star state was hardly unique in implementing an aggressive gun control regime in the era of Reconstruction. Colorado's Constitution (1876) included an express affirmation of the right to ban concealed carry in its arms bearing provision: "The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons." [181]The state legislature acted quickly on this power and banned concealed carry by statute; a number of other localities also passed concealed weapons bans, and a few localities enacted more sweeping prohibitions on all public carry. [182]Localities in every region of the nation adopted similar bans. [183]Although modern gun rights [*2593] advocates have argued that bans on concealed carry left open a robust right to public carry, such a view ignores the cultural norms and practices of the post-Civil War period. Changes in firearms technology, consumer preferences, and social norms meant carrying pistols on the hip or openly was a relatively rare event, particularly in the increasingly urban world of post-Civil War America. Most Americans who armed themselves, particularly in urban areas, chose pocket pistols. [184]

---

[177] *See* Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113-17 (2016) [hereinafter *The Law*]; *see also* Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900* 121 SW. HIST. Q. 284, 298-99 (2020).

[178] *English v. State, 35 Tex. 473, 479 (1871)*.

[179] *Id.*

[180] For a discussion of this case in the context of Reconstruction, see Frassetto, *The Law, supra* note 177, at 113-17.

[181] COLO. CONST. of 1876, art. II, § 13.

[182] *See* COLO. REV. STAT. § 248 (1774). For examples of local concealed carry ordinances, see DENVER, COLO., REV. ORDINANCES § 12 (1875); GEORGETOWN, COLO., REV. ORDINANCES § 9 (1877). For a more general ban on public carry, see GUNNISON, COLO., ORDINANCES ch. VIII, art. II, §§1, 16-20, 23 (1881).

[183] *See, e.g.*, Tucson, Ariz., Ordinance 9 (Jan. 28, 1873), *reprinted in* ARIZ. WKLY. CITIZEN, Feb. 8, 1873, at 2 (prohibiting the carrying of deadly weapons by individuals who are not peace officers); 1871 Ky. Acts 89 ch. 1888, §§1-2, 5 (prohibiting the carrying of concealed deadly weapons); 1887 Mich. Pub. Acts 14 § 1 (prohibiting the carrying of concealed weapons); Worthington, Minn., Ordinance to Prevent the Carrying of Concealed Weapons (Feb. 9, 1882), *reprinted in* WORTHINGTON ADVANCE, Feb. 9, 1882, at 3 (prohibiting any person within the city to carry a concealed weapon and providing that any person who violates the ordinance shall be subject to a fine, and, if unable to pay the fine, jail time); 1885 Or. Laws 33§§1-2 (prohibiting the carrying of concealed weapons within the city and providing that persons convicted of such shall be subject to a fine and jail time); Nashville, Tenn. Ordinance, Carrying Pistols, Bowie-Knives, Etc. (Dec. 26, 1873), *reprinted in* ORDINANCES OF THE CITY OF NASHVILLE 340-41 (William K. McAlister, Jr. ed., 1881) (providing that any person in the city found carrying a deadly weapon shall be guilty of a misdemeanor and fined fifty dollars); Austin, Tex., Ordinance Prohibiting the Unlawful Carrying of Arms (May 4, 1880), *reprinted in* DAILY DEMOCRATIC STATESMAN, May 9, 1880, at 2 (prohibiting the carrying of weapons by civilians).

[184] For additional evidence supporting the waning popularity of open carry, see Frassetto, *Open Carry, supra* note 102.

55 U.C. Davis L. Rev. 2545, *2593

In 1879 *The Gentleman's Magazine* confidently stated that "every State in the American Union has a law against carrying concealed weapons, and every pair of pants manufactured from Main to California, and from the Lakes to the Mexican gulf has a pistol pocket." [185]A popular guide to firearms published in the same decade echoed this observation, reminding its readers that "in many States the carrying of firearms, for purposes of defense, by private individuals is recognized by law; in others it is strictly prohibited." As for habitual carry, there was "no ground upon which it can be justified." The best method for carrying a pistol when there was "expected danger," a specified threat, was carrying a pistol in a pocket. [186]The popularity of sporting pistols in pockets, shaped the language of fashion in this period. One newspaper commented that "every pair of trousers in the United States" had a hip pocket that was frequently used to carry a small pistol, a development that led American tailors to begin describing this sartorial feature as a "pistol pocket." [187]Rather than usher in an era of pervasive open carry of arms, post-Civil War Americans overwhelmingly chose to carry arms concealed if they carried them at all. There is little evidence that open carry was common, particularly in urban areas.

The move away from public carry and turn to concealed carry prompted a prominent Colorado attorney to denounce his state's concealed carry prohibition as a *de facto* ban on all public carry.

[*2594]

Modern improvements and common convenience have driven every weapon out of consideration except the revolver, it is a practical disarmament where a man is not allowed to carry such weapon in the only way which common sense allows it to be carried. No one but a fool will parade the streets with a revolver outside the person any more than he would carry his pocket book or his watch outside the person. A man will carry his watch in his watch pocket, and his revolver in his hip pocket, which the tailor made for it, and the only place where he can carry it without making a hippodrome of his person. It is just as senseless as if the law allowed the use of hats-provided they are not worn on the head. [188]

A similar assessment of the decline in open carry prompted one pro-gun judge in Louisiana to lament his state's long-standing prohibition on concealed carry. In a spirited grand jury charge, he bemoaned prohibitions on concealed weapons because it meant that decent law abiding citizens would not carry openly: "he cannot, without being absurd, walk the public streets with his pistol exposed upon his person." [189]Respectable men who wished to "avoid being ludicrous" had little choice but to carry weapons concealed. [190]Given these facts, a ban on concealed weapons amounted to comprehensive ban on public carry in most jurisdictions, particularly populous areas. [191]

The other significant development in firearms regulation that began during Reconstruction was the growth of local permit schemes in many of the nation's cities and towns. This approach to gun regulation reflected the declining influence of justices of the peace as the primary agents of law enforcement in urban post-Civil War America. The rise of professional police forces and police courts changed the nature of law enforcement. [192]The traditional surety

---

185 Albany de Fonblanque, *The Pistol in America*, GENTLEMAN'S MAG., July to Dec. 1879, at 321.

186 *THE PISTOL AS A WEAPON OF DEFENSE* (1875) at 9, 12.

187 *Getting "The Drop."*, SAINT PAUL DAILY GLOBE, Aug. 11, 1889, at 8.

188 *Carrying Concealed Weapons*, 4 COLO. L. REP. 277-78 (1884).

189 *Judge Moise Makes Up His Grand Jury*, DAILY PICAYUNE, Dec. 3, 1895, at 3.

190 *Id.*

191 *See* Frassetto, *Open Carry*, *supra* note 102, at 3.

192 On the transformation of American law and the rise of the modern regulatory state, see Herbert Hovenkamp, *Appraising the Progressive State*, 102 IOWA L. REV. 1063, 1068-75 (2017), William J. Novak, *Common Regulation: Legal Origins of State*

55 U.C. Davis L. Rev. 2545, *2594

model of enforcing the peace, it is worth recalling, was rooted in common law and this in turn reflected the realities of life in the small face to face agrarian communities of the early modern Anglo-American world. This informal community-based approach was well suited to a pre-industrial society in which members [*2595] of the local gentry elite, who typically served as justices of the peace, could count on the mechanisms of deference and a web of patron-client relationships to help them maintain social order. [193]Slowly over the course of the nineteenth century, as America modernized, urbanized, and became a more diverse and highly mobile society, traditional community-based mechanisms of law enforcement eroded. Sureties were less effective at securing the peace in America's growing metropolitan cities. New institutions and processes were necessary to police America's expanding and increasingly heterogeneous cities. Professional police forces, special police courts, and new administrative agencies were better suited to maintaining social order and the peace in the urban world of nineteenth-century America. [194]

By the end of the nineteenth century, Americans residing in urban areas, particularly those dwelling in the nation's most populous cities, were likely to be living under some form of restrictive public carry legal regime: bans on concealed carry, good cause permit schemes, or broad restrictions on public carry with good cause and affirmative self-defense exceptions. [195](See Table Two). Millions of Americans were living in cities that implemented some form of public carry restriction by the end of the nineteenth century.

[*2596]

Table 2. Post Civil War Limits on Public Carry in the Nation's Ten Largest Cities

| Rank | City | Population (1900) | Regulation |
|---|---|---|---|
| 1 | N.Y. | 3,437,202 | Permit |
| 2 | Chicago | 1,698,575 | Permit |
| 3 | Phila. | 1,293,697 | State Concealed Carry Prohibition |
| 4 | St. Louis | 575,238 | Permit |
| 5 | Boston | 560,892 | Prohibition with good cause exception |
| 6 | Baltimore | 508,957 | Concealed Carry Prohibition |
| 7 | Cleveland | 381,768 | State Prohibition on Concealed Carry |
| 8 | Buffalo | 352,387 | Permit |
| 9 | Cincinnati | 342,782 | State Prohibition on Concealed Carry |
| 10 | San Francisco | 325,902 | Permit |

196
197

---

*Power in America*, 45 HASTINGS L.J. 1061, 1081-83 (1994), and Jed H. Shugerman, *The Legitimacy of Administrative Law*, 50 TULSA L. REV. 301, 304-05 (2015).

[193] *See generally* ALLEN STEINBERG, THE TRANSFORMATION OF CRIMINAL JUSTICE, PHILADELPHIA 1800-1880, at 5-6 (Thomas A. Green ed., 1989) (noting that justices of peace were generally regarded as "neighbors" and "plain people" who sat on the criminal court and had legislative responsibilities, contributing to the maintenance of social order).

[194] ERIC H. MONKKONEN, AMERICA BECOMES URBAN: THE DEVELOPMENT OF U.S. CITIES AND TOWNS, 1780-1980, at 98-109 (1995).

[195] On the legal consensus that regulations of public carry were not in conflict with the right to bear arms, see THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (John Houston Merrill ed., 1887) and John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 CENT. L.J. 259, 260 (1874). For modern confirmation of these assessments, see Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55, 68 (2017).

[196] 1 U.S. CENSUS OFF., CENSUS REPORTS 1xix tbl. XXII (1901).

[197] *See* NEW YORK, N.Y., ORDINANCES OF THE MAYOR ALDERMAN AND COMMONALTY OF THE CITY OF NEW YORK art. XXVII (1881).

55 U.C. Davis L. Rev. 2545, *2596

198
199
200
201
202
203
204
205
206

Faced with rising levels of gun violence states and localities eagerly embraced the new tools to deal with threats to the peace. [207] **[*2597]** Constitutional commentators saw few problems with such regulations which were understood to be a straightforward application of the police power. [208]

## VI. RECONSTRUCTION, RACE, AND THE POLITICS OF GUN CONTROL

One of the most persistent and insidious myths clouding debate over the Second Amendment during the period of Reconstruction is the false claim that gun control in this period was inherently racist. [209]This erroneous claim

---

[198] *See* CHICAGO, ILL., ORDINANCES pt. 1, ch. 8, § 1 (1873).

[199] *See* FREDERICK C. BRIGHTLY, ANNUAL DIGEST OF THE LAWS OF PENNSYLVANIA FOR THE YEARS 1873 TO 1878, at 1778 (1878).

[200] *See* ST. LOUIS, MO., REV. ORDINANCES ch. 26, art. 2, § 989 (1893).

[201] *See* MASSACHUSETTS GENERAL STATUTES ch. 155, sec. 46; ch. 212, sec. 15 (1906).

[202] *See* Act of Mar. 14, 1888, 1888 Md. Laws 522 (describing the consequences of a person found to be concealing a pistol or deadly weapon on their person). For discussion of the way this statute was interpreted at the time, see LEWIS HOCHHEIMER, A MANUAL OF CRIMINAL LAW, AS ESTABLISHED IN THE STATE OF MARYLAND 146-47 (1889).

[203] *See* An Act to Prohibit the Carrying or Wearing of Concealed Weapons, OHIO REV. CODE ANN. § 33.211 (1860).

[204] *See* An Act to Revise the Charter of the City of Buffalo, 1891 N.Y. Laws 129, 177.

[205] *See* OHIO REV. CODE ANN. § 33.211 (1860).

[206] *See* CITY OF SAN FRANCISCO, GENERAL ORDERS OF THE BOARD OF SUPERVISORS PROVIDING REGULATIONS FOR THE GOVERNMENT OF THE CITY AND COUNTY OF SAN FRANCISCO 8 (1884).

[207] *See* ROTH, AMERICAN HOMICIDE, *supra* note 93, at 347-54.

[208] *See* JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152-53 (Boston, Houghton, Osgood & Co., 4th ed. 1879); THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW, *supra* note 195, at 438; Dillon, *supra* note 195, at 261.

[209] For examples of historically dubious claims that gun control during Reconstruction was racist, see STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, at 10-11 (1998) and Robert J. Cottrol & Raymond T. Diamond, " *Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity - The Redeemed South's Legacy to a National Jurisprudence - Freedom: Constitutional Law*, 70 CHI.-KENT L. REV. 1307, 1309-11 (1995). *See also* NICHOLAS JOHNSON, NEGROES AND THE GUN: THE BLACK TRADITION OF ARMS 81-82 (2014); Justin Aimonetti & Christian Talley, *Race*, Ramos *, and the Second Amendment Standard of Review*, 107 VA. L. REV. ONLINE 193, 210 (2021); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17, 17-18 (1995). These accounts rest on impressionistic and cherry-picked evidence. They also do not examine the actual practices in place at the local level. Equally problematic, all of these authors fail to distinguish between the actions of pro-Reconstruction Republicans

55 U.C. Davis L. Rev. 2545, *2597

confuses the racist Black Codes enacted by Confederate sympathizers shortly after the conclusion of the war with the racially neutral laws passed and enforced by Republicans during the brief period when they controlled southern governments. Recent scholarship has illuminated the social and legal history of enforcement practices during Reconstruction, providing a remarkable glimpse into how the post-Civil War era restrictions on public carry functioned at the local level. Although parts of the antebellum South had a relatively lax regulatory regime for public carry, the Republican dominated legislatures in the Reconstruction South broke with this tradition and enacted a variety of sweeping laws aimed at preserving the peace. Protecting free persons and Republicans from the threat posed by vigilante violence and terrorist paramilitary groups such as the Ku Klux Klan was essential to **[*2598]** both restoring order and to advancing the political goals of Reconstruction. [210]Racially neutral limits on public carry were not inimical to the project of Reconstruction, they were indispensable to its success. These laws were not only actively enforced in the Reconstruction era South, but they were done in a racially neutral fashion. [211]

Consider the case of De Soto Parish in Louisiana. The pattern of prosecution and conviction rates for crime in this locality offer a remarkable glimpse into how law functioned during the brief window when Republicans controlled the South. Although local records for many areas of the South are not available, De Soto Parish is a rare exception where extensive documentation has survived the vicissitudes of time and local record keeping. The evidence from DeSoto illuminates the complex connections between race, guns, and Reconstruction.

Table 3. Race and Criminal Justice in De Soto Parish during Reconstruction: Racial Disparities in Prosecution and Conviction [212]

|  | Whites | | | Blacks | | |
|  | Convicted | Indicted | Rate | Convicted | Indicted | Rate |
| Crime |  |  |  |  |  |  |
| Murder | 1 | 12 | 8.3 | 6 | 10 | 60 |
| Assault | 6 | 20 | 30 | 4 | 15 | 26.6 |
| Other violent | 0 | 0 |  | 1 | 4 | 25 |
| Total violent | 7 | 32 | 21.8 | 11 | 29 | 37.9 |
| Concealed weapon | 9 | 13 | 69.2 | 6 | 13 | 46.1 |

Historian Mark Leon De Vries has produced a meticulous and deeply researched account of the legal history of this parish, exhuming a wealth of data about how law functioned at the local level. [213]De Vries' research reveals the complex racial dynamics governing the administration of local justice. Republicans had mixed success with protecting African Americans in De Soto. Forms of systematic racism endured, but the one **[*2599]** area in which Republicans did achieve the laudable goal of preserving the peace in a racially neutral manner was regulation of habitual public carry.

---

during the period in which they controlled southern government and the actions of white supremacist Jim Crow governments that took control of the South after Reconstruction was dismantled. For a critique that gun control is a racist canard, see Patrick J. Charles, *Racist History and the Second Amendment: A Critical Commentary*, 43 CARDOZO L. REV. (forthcoming 2022); Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 611, 621-22 (2006); and Frassetto, The Nonracist, *supra* note 152, at 173-74.

[210]  *See* Cornell, *The Right to Regulate*, *supra* note 8, at 69-71.

[211]  *See* Brennan Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC DAVIS L. REV. 2603 (2022).

[212] The data in this table is adapted from Mark Leon De Vries, *Between Equal Justice and Racial Terror: Freedpeople and the District Court of DeSoto Parish During Reconstruction*, 56 LA. HIST. 261, 292-93 (2015).

[213] *Id.*

Reconstruction did not eliminate all forms of systemic racism from De Soto Parish. Facially neutral criminal laws did have a disparate impact on Blacks and whites but not in the way that gun rights advocates have asserted. [214]There was a sharp racial disparity in the outcome of homicide prosecutions. Black victims were far less likely to obtain justice against a white defendant and Black men accused of homicide were far more likely to be convicted and punished for alleged crimes. The racial disparity evident in vastly different outcomes of prosecutions reveals the continuing impact of structural racism in homicide cases. But, Republicans enjoyed far greater success at implementing a racially neutral regime for enforcing public carry restrictions. Whites were not only vigorously prosecuted for violations of the state's long-standing ban on concealed carry, but they were convicted at significantly higher rate than Blacks. In contrast to homicide prosecutions, neutral enforcement of prohibitions of public carry promoted the peace and hence made everyone safer, a fact that likely contributed to Republican's ability to enforce these laws in a racially neutral manner. The evidence from De Soto Parish is consistent with other recent scholarship on gun law enforcement in Reconstruction era Texas. [215]In Texas a similar pattern regarding enforcement of public carry laws also emerged during Republican rule. Based on this new body of scholarship it now seems clear that Republicans in the Reconstruction South not only passed facially neutral gun laws, but they successfully enforced them in a non-discriminatory fashion, aiming to protect the peace and further the goals of promoting equality. [216]Although the rise of Jim Crow eventually made neutral enforcement of gun laws in the South impossible, recognizing the brief historical window during Reconstruction era when Republican led governments enforced gun laws neutrally is a useful corrective to claims that gun control laws are always racist.

The dawn of the new century led to an intensification of efforts to regulate firearms, including public carry. In 1906, Massachusetts modernized its firearms regulatory scheme, prohibiting public carry **[*2600]** without a license. [217]To obtain a permit one had to demonstrate a "good reason to fear an injury to [one's] person or property." [218]Other states adopted similar laws. New York's Sullivan law (1911), a comprehensive gun control measure that imposed limits on both the sale and ability to carry arms in public, prompted some criticism from gun rights advocates, but few mainstream legal commentators questioned its constitutionality. [219]The growing popularity of these types of law led other states and localities to adopt similar statutes and ordinances. [220]In 1923, the U.S. Revolver Association published a model public carry law, later adopted by additional states, that included a similar good cause requirement. The right to obtain a permit to carry was conditioned on having a "good reason to fear an injury to his

---

[214] *See id.*

[215] *See id.*; *see also* Rivas, *supra* note 211.

[216] *See* De Vries, *supra* note 212, at 292-93; *see also* Rivas, *supra* note 211.

[217] As legal scholar Eric Ruben observes, "administering weapons laws ex ante through a licensing scheme, rather than ex post at trial, has various advantages for the weapon bearer." Ruben, *supra* note 48, at 97.

[218] Act of Mar. 16, 1906, ch. 172,§§1-2, 1906 Mass. Acts 150 (regulating the carrying of concealed weapons).

[219] For the historical context of the enactment of the Sullivan law and reactions to it, see PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY 175-98 (2018). For the constitutionality of the law, see *People ex rel. Darling v. Warden of City Prison, 139 N.Y.S. 277, 286 (N.Y. App. Div. 1913).*

[220] *See, e.g.*, Act effective 1927,§§1, 4-6, 1927 R.I. Pub. Laws 256 (regulating the possession of firearms); Act effective 1917,§§3-4, 1917 Cal. Stat. 221-25 (prohibiting "an act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another"); Act effective 1917, §§1, 3-A, 4, 4-A, 4-B, 4-C, 1917 Or. Laws 804-08 ("Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act.").

person or property." The model law was approved by the NRA's future president, Karl T. Frederick. [221]The very first issue of the Duke Law School journal of Law and Contemporary Problems  (1934) explained that the use of license or  **[*2601]**  permit schemes had become a standard feature of gun regulation in the twentieth century and was unquestionably constitutional. [222]

CONCLUSION

Limits on armed travel in public are of ancient vintage, stretching back deep into Anglo-American law. In England prior to colonization, the open carry of firearms was generally prohibited in populous areas, with limited exceptions for community defense and law enforcement, and with a legally sanctioned exception for the gentry elite. There is no historical evidence of an individual right for ordinary Britons to carry weapons outside of these narrow and well-defined exceptions. This common law framework was imported to the American colonies, but it was modified to reflect the realities of life in a frontier society that was in a constant state of preparedness for war with rival European powers and the indigenous population of North America.

American Independence did not mark a total rupture with this inherited tradition, but it did accelerate the transformation and Americanization of the common law. As was true for nearly every aspect of early American law, there was significant regional differences between the way the law evolved in the New Republic. While some Southern states recognized an individual right to openly carry firearms for specific purposes, this view was largely restricted to the white citizens of slave-holding states. In other parts of pre-Civil War America, there was a more limited right to carry for reasons of self-defense when a specified threat existed. Contrary to claims of gun rights advocates there was no broad free-standing right of peaceable armed travel in populous areas in antebellum America. Moreover, the claim that these laws were never enforced is historically inaccurate: these laws were enforced in multiple jurisdictions.

After the Civil War, commencing in the era of the Fourteenth Amendment, the level of firearms regulation at both the state and local level intensified. States and localities enacted a variety of limits on public carry, including bans on open carry, prohibitions on concealed carry, and permit schemes. Important changes in the modes of policing and enforcing the peace had profound implications for the enforcement of these regulations. The growth of professional police forces in urban areas, and expansion of police courts, in the years after the Civil War led to greater convergence in the approach to firearms regulation than had been possible in antebellum America where local justices of the  **[*2602]**  peace dominated law enforcement. By the end of the century, a variety of gun laws limiting public carry, including good cause permitting had become a fixture in American law. Millions of Americans were living under regulatory regimes that limited the right to carry guns in public.

The trend toward greater regulation intensified during the early decades of the next century. By the dawn of the New Deal era, the basic contours of the modern approach to firearms regulation were firmly established. Limits on armed travel in public were central to this approach to preserving the peace and protecting the liberty of all Americans from the dangers of gun violence.

UC Davis Law Review
Copyright (c) 2022 Regents of the University of California. All Rights Reserved

---

**End of Document**

---

[221]  *National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. on Ways and Means*, 73rd Cong. 38-62 (1934) (statement of Karl T. Frederick, President, National Rifle Association of America).

[222] John Brabner-Smith, *Firearm Regulation*, 1 LAW & CONTEMP. PROBS. 400, 401-04 (1934).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12834   Page 478 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

**55 U.C. Davis L. Rev. Online 65**

**U.C. Davis Law Review Online**
September, 2021

**Symposium Essay**
Saul Cornell [a1]

Copyright © 2021 by Saul Cornell

# THE RIGHT TO REGULATE ARMS IN THE ERA OF THE FOURTEENTH AMENDMENT: THE EMERGENCE OF GOOD CAUSE PERMIT SCHEMES IN POST-CIVIL WAR AMERICA

Under the framework developed in *District of Columbia v. Heller* and refined in *McDonald v. City of Chicago* the outcome of firearms litigation often hinges on demonstrating that there is a clear historical genealogy or analogue to modern gun laws. If a regulation is grounded in history it provides a strong foundation for upholding the challenged statutes and ordinances.[1] The Ninth Circuit took note of this fact when it highlighted the need for a detailed examination of the history of state statutes and local ordinances in *Young v. Hawaii*, describing this material as "the best evidence we have of the American understanding **\*66** of the interface between the right to keep and bear arms and the police power."[2]

Discussions of Founding era history and the English roots of Anglo-American gun regulation have dominated much of the existing scholarship and jurisprudence.[3] The role of Reconstruction-era law has figured less prominently in these debates, but this period is vital to understanding the history, text, and tradition model that *Heller* demands.[4] Indeed, in *McDonald v. City of Chicago*, Justice Alito refined and elaborated *Heller's* history, text, and tradition model for evaluating the constitutionality of gun regulation.[5] Extending the focus of analysis **\*67** beyond the Founding era, Alito took note of developments in American law up to and including Reconstruction. Building on *McDonald's* analysis, the Seventh Circuit decision in *Ezell v. City of Chicago* explained the relevance of Reconstruction-era practices to *Heller's* historical framework: "*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified."[6]

Despite these judicial pointers, scholarship on the history of firearms regulation during Reconstruction has lagged far behind studies of early American gun regulation.[7] This essay collects and analyzes evidence about Reconstruction-era firearms regulation and summarizes these findings.[8] Reconstruction ushered in one of the most intense periods of gun regulation in American history. The Republicans who framed and enacted the Fourteenth Amendment were eager to protect the Second Amendment rights of recently freed persons, including an individual right of self-defense. But Republicans were equally committed to enacting strong racially neutral gun regulations, aimed at reducing interpersonal violence and preserving the peace, a task vital to the success of Reconstruction.[9] Scores of new regulations were enacted and one of the main goals of these laws was to limit the public carry of weapons. These laws were not driven by racial animus, as some gun rights advocates have erroneously claimed, but sought to protect vulnerable populations in the South, including former slaves and Republicans eager to further the aims of Reconstruction.[10]

One area of regulation that has not received sufficient attention is municipal ordinances. During the Reconstruction Era, localities enacted some of the most sweeping laws in American history and pioneered new **\*68** approaches to gun regulation.[11] The most important and influential type of these new ordinances were good cause permit schemes. Indeed, by the end of Reconstruction, these discretionary good cause permitting schemes had not only proliferated in number but were in the process of becoming the dominant model of gun regulation in America. In states such as California, more than half the population lived under such

Compendium_Cornell
Page 1021

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12835   Page 479 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

schemes by the end of the nineteenth century.[12] Similarly, four of the nation's largest cities at the dawn of the new century, including New York, St. Louis, Buffalo and San Francisco, also embraced this form of gun regulation.[13]

Justice Alito's important insights in *McDonald* have not received enough attention in recent Second Amendment scholarship and jurisprudence. The changes in the language of state constitutional texts between the Founding era and the era of Reconstruction merits closer scrutiny.[14] Understanding this transformation requires analyzing the changing fears driving American constitutional thinking about the right to bear arms. For Reconstruction-era lawyers and judges schooled in common law modes of legal analysis, one of the most important interpretive tools was the mischief rule--the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and remediate.[15] By the era of **69** Reconstruction, gun violence had emerged as a serious problem in American life and legislators responded to this development by enacting scores of new laws.

Founding era fears about the federal government's threat to state militias, Alito noted, had largely abated by the time of the Civil War. One of the most important consequences of this shift was the adoption of state arms bearing provisions that were more self-consciously individualistic.[16] What has not drawn much scholarly or judicial notice, though, is the profound change in the structure and language that accompanied the rise of a more individualistic formulation of the right to bear arms after the Civil War.

The inclusion of more individualistic language was only part of the change in the language of these texts. States also included provisions expressly affirming the right to regulate arms. In fact, state after state cast aside the eighteenth century's dominant formulation of arms-bearing, dropping references to the dangers of standing armies and the necessity of civilian control of the military. In place of these ancient fears of tyrannical Stuart monarchs and standing armies, a new fear permeated these texts: gun violence. To borrow a key concept from the common law: a new mischief had emerged, one that required a different remedy. The constitutional danger nineteenth century America faced, one that intensified after the Civil War, was not "lobster-back" redcoats facing off against minutemen, but interpersonal gun violence and the collective terrorist violence perpetuated by groups such as the Ku Klux Klan.[17] In response to these new threats to the peace and safety of the republic, a novel formulation of the right to bear arms emerged in state constitutional law--a new model that forged an indissoluble bond between the right to regulate arms and the right to bear arms.[18]

Powered by this new constitutional framework, uniting arms bearing and regulation into a single principle, states and localities took up the challenge of framing policies that both protected the right to bear arms **70** and the public's right to enjoy the peace by enacting dozens of new laws regulating nearly every aspect of the right to keep and bear arms.[19] Laws regulating the sale of arms; prohibitions on possessing arms in churches, schools, and polling places; bans on concealed carry; general bans on public carry; and new discretionary permit schemes that limited the right of armed travel to situations in which citizens had a good cause to fear attack were among the most important laws adopted during this period.[20]

## I. RECONSTRUCTION AND THE RIGHT TO BEAR ARMS

Although scholars have long recognized that Reconstruction, the period after the Civil War, ushered in profound changes in American law, the impacts of those changes on gun regulation and conceptions of the right to bear arms have not been subjected to rigorous historical analysis.[21] The Civil War had a profound impact on gun violence in America. The trauma of the war and the enormous increase in the production of guns necessary to supply two opposing armies intensified the problem posed by firearms violence and gave a new impetus to regulation.[22] A false historical narrative has warped much of the modern debate over the meaning of the right to keep and bear arms in the era of Fourteenth Amendment. According to this erroneous account, Reconstruction-era Republicans opposed gun regulation because it was inherently racist and aimed at disarming Blacks.[23] Confederate **71** sympathizers in the Reconstruction South did attempt to use gun regulations in a racially targeted fashion, as part of the infamous Black Codes, hoping to facilitate the return of white rule. Although eager to dismantle these racist laws disarming Blacks, Republicans also used government power proactively to rebuild the militia system and pass a range of racially neutral gun control measures aimed at promoting public safety.[24] Rather than oppose an expansion of gun regulation, Reconstruction-era Republicans (including those responsible for framing and ratifying the Fourteenth Amendment) aimed to use racially neutral gun laws, including those designed to demilitarize the public sphere, to restore order and empower freed

Compendium_Cornell
Page 1022

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12836   Page 480 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

people to participate in civic life, most importantly elections. [25] Republicans were committed to a vision of government that would protect the rights of recently freed slaves and promote the ideal of a well-regulated society. [26]

Nothing better illustrates the linkage between gun regulation, the right to bear arms and the protection of free persons than General Daniel Sickles' General Orders. [27] In General Order No. 1 Sickles declared that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent." [28] It is worth noting that **72** General No. 1 not only affirmed a right to bear arms, but reasserted the right to regulate arms, including bans on concealed carry and limits on the ability to travel armed on private property. Moreover, gun rights advocates ignore General Order No. 7 issued by Sickles several months later. Addressing the problem of promiscuous public carry, a practice that led to the disruption of civil society, Sickles issued another order prohibiting "[o]rganizations of white or colored persons bearing arms, or in-tend[ing] to be armed." [29] Order No. 7 prohibited drilling, parading, and patrolling with arms, limiting public carry to those enrolled in the military forces of the United States. [30] Sickles followed up with General Order No.10, a measure that banned all public carry and made concealed carry "an aggravation of the offense." [31]

Other laws aimed at limiting arms in polling places, schools, and other important public venues where people gathered were also enacted by Reconstruction era governments. [32] During the colonial period, some legislatures passed laws requiring settlers to bring arms to church, but during Reconstruction laws were passed banning firearms in churches, schools, and other public places in which people gathered in significant numbers. [33] The aim of these laws was to preserve the peace and enable civil society to function in the South. These were not restrictions on guns in sensitive places but were an effort to eliminate guns from public places essential for civic life to flourish. For example, one law from Texas prohibited guns in multiple public venues:

> If any person shall go into any church or religious assembly, any school-room or other place where persons are assembled for **73** educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering, composed of ladies and gentleman, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk, or butcher-knife, or fire-arms, whether known as a six shooter, gun, or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same: *Provided*, That nothing contained in this section shall apply to locations subject to Indian depredations: *And provided further*, That this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law. [34]

Many of the new constitutions adopted after the Civil War in Southern states, and the newly admitted Western states, reflected this approach to firearms regulation, entrenching it in the same provisions affirming the right to bear arms. [35] In keeping with the vision of law embodied in these new constitutional provisions, Republicans enacted dozens of new laws to reduce gun violence and promote public safety. [36]

The first state constitutions enacted after the American Revolution typically separated the right of the people to regulate their internal police from specific statements about the right to bear arms. Comparing the language of the Revolutionary era Pennsylvania Constitution 1776 and 1868 Texas Constitution side by side is instructive. [37] The Founding era formulation of the right to bear arms was distinct from the right of the people to regulate their internal police. The Reconstruction era formulation not only omits references to the dangers of standing armies and the need for civilian control of the military but merges the right to **74** regulate arms and the right to bear them into a single constitutional principle. [38] The Reconstruction-era constitutional solution cast aside the eighteenth-century language that was steeped in fears of standing armies and substituted in its place new language affirming the state's police power authority to regulate arms, particularly in public.

Compendium_Cornell
Page 1023

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12837   Page 481 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

| PENNSYLVANIA CONSTITUTION (1776) | TEXAS CONSTITUTION (1868) |
|---|---|
| "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." | "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe. [40] |
| "That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power." [39] | |

The constitutional danger Americans faced during and after Reconstruction was unregulated firearms, particularly the danger posed by public carry. The debates in the Texas constitutional convention illustrate the centrality of this concern. The proliferation of weapons and the absence of regulation was a palpable fear in the convention that drafted the Texas Constitution--so much so that the convention passed a resolution prohibiting weapons in the convention hall. [41] One delegate reminded the convention's members that the constitutional **75** right to bear arms ought not be confused with the pernicious practice of habitually arming. [42] The right, he cautioned, ought not "be construed as giving any countenance to the evil practice of carrying private or concealed weapons about the person." [43]

**Table One. Post-Civil War State Constitutional Arms Bearing Provisions about Regulation**

| DATE | STATE | PROVISION |
|---|---|---|
| 1868 | Georgia | GA. CONST. of 1868, art. I, § 14: [T]he right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe by law the manner in which arms may be borne. |
| 1868 | W. Texas | W. TEX. CONST. of 1868, Art. I, § 13: Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe. |
| 1869 | Texas | TEX. CONST. of 1869, art. I § 13: Every person shall have the right to keep and bear arms, in the lawful defense of himself or the State, under such regulations as the Legislature may prescribe. |
| 1870 | Tennessee | TENN. CONST. of 1870, art. I, § 26: That the citizens of this State have a right to keep and to bear arms for their common |

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12838   Page 482 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

| Year | State | Provision |
|---|---|---|
| | | defense. But the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime. |
| 1875 | Missouri | MO. CONST. of 1875, art. II, § 17: That the right of no citizen to keep and bear arms in defense of his home, person and property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the practice of wearing concealed weapons. |
| 1875 | North Carolina | N.C. CONST. of 1875, art. I, § 24. A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed; and as standing armies in time of peace, are dangerous to liberty, they ought not to be kept up, and the military should be kept under strict subordination to, and governed by, the civil power. Nothing herein contained shall justify the practice of carrying concealed weapon, or prevent the legislature from enacting penal statutes against said practice. |
| 1876 | Colorado | COLO. CONST. of 1876, art. II, § 13: That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons. |
| 1876 | Texas | TEX. CONST. of 1876, art. I, § 23: Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime. |
| 1877 | Georgia | GA. CONST. of 1877, art. I, § 22: The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe the manner in which arms may be borne. |
| 1879 | Louisiana | LA. CONST. of 1879, art. III: A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed. |
| 1885 | Florida | FLA. CONST. of 1885, art. I, § 20: The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne. |
| 1889 | Idaho | IDAHO CONST. of 1889, art. I, § 11: The people have the right to bear arms for their security and defense: but the legislature shall regulate the exercise of this right by law. |
| 1889 | Montana | MONT. CONST. of 1889, art. III, § 13: The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but nothing herein contained shall be held to permit the carrying of concealed weapons. |
| 1890 | Mississippi | MISS. CONST. of 1890, art. III, § 12: The right of every citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power when thereto legally summoned, shall not be called in question, but the legislature may regulate or forbid carrying concealed weapons. |

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12839   Page 483 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

| 1891 | Kentucky | KY. CONST. of 1891, § 1(7): The right to bear arms in defense of themselves and of the State, subject to the power of the General Assembly to enact laws to prevent persons from carrying concealed weapons. |
| 1896 | Utah | UTAH CONST. of 1896, art. I, § 6: The people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law. |

**\*78**  The new focus on regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights. [44]  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters in Ohio that after the adoption of this Amendment, states would continue to bear the primary responsibility for "local administration and personal security." [45]  As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact whatever reasonable measures were necessary to promote public safety and secure the common good. [46]

The formulation of the right to bear arms adopted in post-Civil War state constitutions drew on antebellum jurisprudence and constitutional theory's robust view of state police power, including the right to regulate firearms. These post-war constitutional texts explicitly recognized broad legislative authority to regulate the right to bear arms. It would be difficult to understate the significance of this change: across the nation, state legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms, especially public carry. Indeed, the number of laws enacted skyrocketed, as did the number of states passing such laws. [47]  States fulfilled their role as laboratories of democracy by implementing a range of regulations aimed at curbing the problem of gun violence: limiting the sale of firearms, taxing particular types of weapons perceived to pose threats to public safety, imposing limits on the access of minors to weapons, and restricting the public places one might carry arms. [48]  Texas banned "[a]ny person carrying on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purpose of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing." [49]  The law aimed to preserve the peace and prevent the  **\*79**  intimidation of free persons, the exact opposite of the claims of gun rights advocates who have insisted that gun control during Reconstruction was tainted by an insidious racist agenda. [50]

In the post-war period the number of laws limiting public carry increased dramatically, a trend that continued into the first decades of the twentieth century. There was broad agreement among courts and constitutional commentators that laws banning concealed weapons posed no constitutional issues. Some states went further and enacted more sweeping limits on open carry. [51]  Rather than oppose limits on public carry, the dominant paradigm for firearms regulation in the era of the Fourteenth Amendment supported robust regulation of public carry, provided the laws were racially neutral and contained appropriate exceptions for specified good cause needs for self-defense. [52]

## II. STATE REGULATION OF PUBLIC CARRY IN THE ERA OF THE FOURTEENTH AMENDMENT: A BRIEF OVERVIEW

**Table 2. Examples of State Firearms Laws Passed Between 1865 and 1900 Impacting Public Carry**

Compendium_Cornell
Page 1026

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12840   Page 484 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

| STATE | YEAR | CATEGORY | SOURCE | STATUTORY TEXT |
|-------|------|----------|--------|----------------|
| Texas | 1866 | Carry on the lands of others | Act of Nov. 6, 1866, ch. 92, § 1, 1866 Tex. Gen. Laws 90. | That it shall not be lawful for any person or persons to carry fire-arms on the enclosed premises or plantation of any citizen, without the consent of the owner or proprietor, other than in the lawful discharge of a civil or military duty, and any person or persons so offending shall be fined or imprison[ed] or both . |
| Indiana | 1875 | Brandishing | Act of Mar. 13, 1875, ch. 17, § 1, 1875 Ind. Acts 62. | [I]f any person shall draw or threaten to use any pistol, dirk, knife, slung-shot, or any other deadly or dangerous weapon upon any other person, he shall be deemed guilty of a misdemeanor Provided, That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law. |
| Mississippi | 1878 | Prohibitions on Persons Deemed Irresponsible | Act of Feb. 28, 1878, ch. 46, § 4, 1878 Miss. Laws 175, 176. | [A]ny student of any university, college or school, who shall carry concealed, in whole or in part, any [pistol or other concealable deadly weapon], or any teacher, instructor, or professor who shall, knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor . |
| Missouri | 1879 | Sensitive Places (courts, church, schools, colleges) | Act of Apr. 30, 1879, § 1, 1879 Mo. Laws 90, 90. | Hereafter it shall be unlawful for any person in this State, except he be a sheriff or other officer, in the discharge of official duty, to discharge or fire off any gun, pistol or firearms of any description in the immediate vicinity of any court house, church or building used for school or college purposes. |
| Arkansas | 1881 | Prohibitions on Pistols, (exception for military weapons) | Act of Apr. 1, 1881, no. 96, § 3, 1881 Ark. Acts 191, 192. | Any person who shall sell, barter or exchange, or otherwise dispose of, or in any manner furnish to any person any person [sic] any pistol, of any kind whatever, except such as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge, for any pistol, or any person who shall keep any such arms or cartridges for sale, shall be guilty of a misdemeanor. |

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12841   Page 485 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

| | | | | |
|---|---|---|---|---|
| Nevada | 1881 | Penalty for carry while intoxicated | Act of Jan. 28, 1881, ch. 7, § 1, 1881 Nev. Stat. 19, 19-20. | Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor . |
| Vermont | 1884 | Prohibitions on Certain Types of Weapons (spring loaded traps) | Act of Nov. 25, 1884, no. 76, § 1, 1884 Vt. Pub. Acts 74, 74-75. | A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. |
| Maryland | 1890 | Sensitive Times (Sabbath) | Act of Apr. 3, 1890, ch. 273, § 1, 1890 Md. Laws 297, 297. | No person whatsoever shall hunt with dog or gun on the Lord's day, commonly called "Sunday," nor shall profane the Lord's day by gunning, hunting, fowling, or by shooting or exploding any gun, pistol or firearm of any kind, or by any other unlawful recreation or pastime . |
| Florida | 1899 | Sensitive Places (Trains) | Act of May 29, 1899, ch. 4701, § 1, 1899 Fla. Laws 93, 93. | That it shall be unlawful for any person to discharge any gun, pistol, or other fire-arm, except in self defense, while on any passenger train in this State; or to recklessly handle any fire-arm or other weapon in the presence of any other person or persons on any train carrying passengers in this State. |
| Indiana | 1875 | Sell, barter, or give a pistol to a minor | Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Acts 59, 59 | That it shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. |

**\*82**  Federal territories enacted a variety of limits on armed travel in public, which suggests that the new, more robust vision for regulation was not limited to state and municipal law. [53] New Mexico adopted a broad prohibition on public carry: "[I]t shall be unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory ...." [54] This provision was not unique. Idaho adopted a similar law, prohibiting "any person ...

Compendium_Cornell
Page 1028

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12842   Page 486 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

to carry, exhibit or flourish any ... pistol, gun or other **\*83** deadly weapons, within the limits or confines of any city, town or village or in any public assembly of Idaho Territory." [55]

The broad latitude legislatures and municipalities exercised over firearms regulation was widely acknowledged by the major constitutional commentators of the period as well. John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carry [ing] dangerous or concealed weapons." [56] Pomeroy's observation is borne out by the legislation on public carry presented below in Table 3. [57]

### III. LOCAL REGULATION AND THE RISE OF PERMIT SCHEMES IN THE ERA OF THE FOURTEENTH AMENDMENT

Gun regulation in the era of the Fourteenth Amendment was not limited to state-level interventions; there was also an enormous growth in the number of local ordinances. Developments at the local level have drawn relatively little scholarly or judicial notice but this was one of the areas in which government was most active. [58] A local ordinance adopted by Huntsville, Missouri offers a glimpse of the sweeping scope of such regulations. [59] It contained multiple provisions, including:

   • A ban on concealed carry in public;

   • A ban on public carry in public places where people assembled for religious, "educational, literary, or social purposes";

   • A ban on carry in courthouses;

   • A ban on carry into a "public assemblage of persons met for any lawful purpose" except militia-related activities;

 **\*84** • A ban on open public carry and public display of a weapon in a rude or threatening manner;

   • A ban on carry while intoxicated;

   • An exception for travelers passing through town.

Finally, the ordinance also included an affirmative defense exception for good cause, i.e., a specific threat to "home, person or property." [60]

The most common types of local regulations were bans on concealed carry. Evanston, Illinois's ordinance was typical: "It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot." [61] Residents in the ten most populous cities in America at the end of the nineteenth century all lived under some form of restrictive public carry regime: permit schemes, complete bans on concealed carry, or some type of total ban with a specified threat and self-defense exception. [62] In some parts of the country a majority of the population

Compendium_Cornell
Page 1029

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12843   Page 487 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

were living under a model of gun regulation that limited public carry. The case of California is instructive in this regard since most of its inhabitants were subject to one of these types of limits on public carry. [63] Table 3 lists the municipalities in the state that enacted permit laws after the Civil War.

**Table 3. Municipalities with Permit Schemes in Post-Civil War California** [64]

| LOCATION | YEAR PERMIT ORDINANCE ENACTED | POPULATION IN 1900 |
|---|---|---|
| Sacramento | 1876 | 17,897 |
| Napa | 1880 | 16,451 |
| San Francisco | 1880 | 342,782 |
| Santa Barbara | 1881 | 18,934 |
| Alameda | 1882 | 180,197 |
| St. Helena | 1884 | 1,582 |
| Fresno | 1885 | 37,862 |
| Lompoc | 1888 | 972 |
| Marysville | 1889 | 3,497 |
| Oakland | 1890 | 66,960 |
| Monterey | 1892 | 19,380 |

**\*85**  Within a decade of the end of Reconstruction about half the population of the state of California was living under good cause discretionary permit schemes such as those listed in Table Three. The list of municipalities adopting such regulations included tiny towns such as Lompoc, and the state's largest city, San Francisco. [65] Gun violence in California in this period was a complex problem, but the range of municipalities adopting good cause permit schemes, large heterogenous urban areas and smaller towns, suggest that these policies enjoyed broad popular support and were understood at the time to be consistent with California's constitution. [66]

Good cause permitting schemes were not the only type of restrictions adopted to deal with the problem of gun violence in post-Civil War California. Other localities, most notably Los Angeles and San Jose, adopted more restrictive laws limiting the ability to carry arms in public. The law enacted by Los Angeles was sweeping in scope, prohibiting public carry "concealed or otherwise."

> [N]o persons, except peace officers, and persons actually traveling, and immediately passing through Los Angeles city, shall wear or carry any dirk, pistol, sword in a cane, slung-shot, or other dangerous or deadly weapon, concealed or otherwise, within the corporate limits of said city, under a penalty of not more than one hundred dollars fine, and imprisonment at the discretion of the Mayor, not to exceed ten days. It is hereby  **\*86**  made the duty of each police officer of this city, when any stranger shall come within said corporate limits wearing or carrying weapons, to, as soon as possible, give them information and warning of this ordinance; and in case they refuse or decline to obey such warning by depositing their weapons in a place of safety, to complain of them immediately. [67]

Compendium_Cornell
Page 1030

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12844   Page 488 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

If one adds together the population figures for the jurisdictions in California with either a good cause permit scheme in place or a more restrictive ban on public carry, such as the one in place in Los Angeles, the numbers demonstrate that the majority of Californians were living under a legal regime that curtailed the right to travel armed in public within populace areas. In short, the example of California offers strong evidence that some type of limit on armed travel in populated areas had become an accepted feature of American law by the end of the nineteenth century. Indeed, limits on the public carry of dangerous weapons are one of the most enduring features of American law, operating continuously in some form from the colonial era through Reconstruction and up until the rise of modern gun control laws in the twentieth century.[68]

The early history of good cause permit schemes has not figured prominently in post-*Heller* scholarship and jurisprudence because local ordinances have been difficult to identify and collect. But, starting with Reconstruction good cause permit ordinances emerged as the ascendent model in firearms regulation. By the end of the nineteenth century this approach to firearms regulation had become the dominant paradigm in America and had largely supplanted the common law inspired surety-based models of enforcing the peace that predominated before the Civil War.[69] The older surety model reflected the realities of life in early **\*87** modern England and colonial America. This approach to preserving the peace was well-suited to a pre-industrial society in which members of the local gentry elite could count on the mechanisms of deference and a web of patron-client relationships to help them maintain social order.[70] As America modernized, urbanized, and became a more diverse and highly mobile society over the course of the nineteenth century, these traditional mechanisms of law enforcement, including sureties, were slowly replaced by a criminal justice system that did not rely on informal mechanisms to maintain order. In a society in which the bonds of community had weakened, binding an individual to the peace was no longer an effective means to preserve social order.[71] Professional police forces, courts, and administrative agencies were better suited to maintaining order and peace in the new urban world of nineteenth-century America where people living in close proximity were less likely to be knit together in the bonds of community.[72] Thus, by end of the nineteenth century, permit schemes that took advantage of these new institutions and the tools provided by professional police forces had largely replaced the traditional common law mechanisms of sureties, or **\*88** peace bonds, as the dominant method for dealing with the dangers posed by gun violence.[73]

## IV. LIMITS ON ARMED TRAVEL IN PUBLIC DURING THE ERA OF THE FOURTEENTH AMENDMENT: HISTORY, TEXT, AND TRADITION AND THE GOOD CAUSE PERMIT MODEL

A comprehensive and scholarly review of the nation's laws on public carry published in the last decade of the nineteenth century noted that bans on concealed weapons and more general prohibitions on armed carry were permissible, provided they included a good cause exception for specified threats.[74] John Forrest Dillon's overview of American firearms law and the constitutional right to keep and bear arms endorsed this view. Drawing on recent cases, including *Andrews v. State*, he concluded, "[E]very good citizen is bound to yield his preference as to the means [of self-defense] to be used, to the demands of the public good."[75] Dillon acknowledged that the police power was not without limit in this area. Contrary to the claims of modern gun rights advocates, Dillon did not believe that there was a fundamental right to carry arms in public openly. Nor did he believe that the right to bear arms trumped state and municipal police power authority to regulate such behavior, taking it entirely out of the hand of the people's representatives. He did, however, recognize that American law acknowledged the continuing validity of affirmative defenses for necessity in cases of specified threats and reasonable self-defense.[76] Dillon concluded that as far as the right to carry went, states might regulate this practice and prohibit it entirely as long as the common law self-defense exception was recognized. "Every state," Dillon wrote, "has power to regulate the bearing of arms in such manner as it may see fit, or to restrain it altogether."[77] In those cases in which a state sought the more stringent form of regulation, Dillon argued that the common law would offer those who needed to travel armed an affirmative defense. Dillon's survey of American law was not the only commentary to come to this conclusion. Another comprehensive overview of American law published in the last decade of the nineteenth century reached the same judgment. The survey of American law and public carry was published **\*89** in *The American and English Encyclopedia of Law*, an influential and popular legal reference work that became a fixture on bookshelves in law offices across the nation. It noted that "[t]he statutes of some of the States have made it an offence to carry weapons concealed about the body, while others prohibit the simple carrying of weapons, whether they are concealed or not. Such statutes have been held not to conflict with the constitutional right of the people of the United States to keep and bear arms."[78]

Compendium_Cornell
Page 1031

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12845   Page 489 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

Although there has been considerable discussion of the implications of *Heller's* understanding of the right to keep and bear arms, *McDonald's* focus on constitutional change, especially the changes wrought by Reconstruction, have not received nearly as much attention. Yet, *McDonald* makes Reconstruction's history vital to understanding the scope of permissible regulation today. [79] Read together these two landmark decisions make clear that when state and local regulation are at issue it is the era of the Fourteenth Amendment that is the most important time-period for understanding what is presumptively lawful under *Heller's* framework. Until now, this crucial period of firearms regulation has been largely neglected by post-*Heller* scholarship. This history is critical to fashioning a post-*Heller* firearms jurisprudence consistent with *McDonald*. Then, as now, states and localities function as America's laboratories of democracy, experimenting with different forms of regulation. This function is hardwired into our federal system. Unfortunately, this rich and diverse part of our legal history has been largely invisible in post-*Heller* scholarship and jurisprudence. Scholars and courts need to reckon with this history more fully before evaluating the constitutionality of gun laws. Rather than acting as a high-water mark for gun rights, Reconstruction ushered in a period of expansive regulation. Courts, legislators, and commentators during this period recognized that the robust power to regulate firearms, particularly in public, was not only constitutional, but essential to preserve ordered liberty. The key innovation in this period, a development that became the dominant model of firearms regulation in America, good cause permit schemes continue to function as an important part of efforts to address the problem of gun violence. These ordinances were first enacted by municipalities but were soon emulated by states. In short, this model is deeply rooted in history, text, and tradition. As such, these **\*90** laws are indisputably presumptively lawful under *Heller's* framework. Modern judges attempting to construct a post-*Heller* firearms jurisprudence that is sensitive to history, text, and tradition need to recognize that discretionary good cause permit schemes are firmly rooted in America's long history of gun regulation. If originalist judges wish to remain true to *Heller's* model such laws are undeniably constitutional.

### Footnotes

a1   Copyright © 2021 Saul Cornell. Paul and Diane Guenther Chair in American History, Fordham University.

1   District of Columbia v. Heller, 554 U.S. 570, 591, 595 (2008); McDonald v. City of Chicago, 561 U.S. 742, 767-68 (2010).

2   Young v. Hawaii, 992 F.3d 765, 824 (9th Cir. 2021).

3   Although there is widespread agreement that history, text, and tradition are important to *Heller's* framework, there is less agreement about whether this approach precludes other standard modes of constitutional analysis entirely. *See* JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF *H*ELLER 100-17 (2018).

4   On the expansion of regulation during Reconstruction, see PATRICK J. CHARLES, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018); Saul Cornell & Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1068-69 (2010).

5   *See McDonald*, 561 U.S. at 767-68. For Justice Kavanaugh's view on the model, see *Heller v. District of Columbia (Heller II), 670 F.3d 1244, 1271 (D.C. Cir. 2011)* (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). For Justice Gorsuch's view, see *Peruta v. California, 137 S. Ct. 1995, 1998 (2017)* (Mem.) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari) (noting positively that a Ninth Circuit panel decision "pointed to a wealth of cases and secondary sources from England, the founding era, the antebellum period, and Reconstruction"). On the likely increasing relevance of history given the recent Court appointees, see *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York, 140 S. Ct. 1525, 1540-41 (2020)* (Alito, J., dissenting) (per curiam) (arguing that the fact that the City "point[ed] to no evidence of laws in force around the time of adoption of the Second Amendment that prevented gun owners from practicing outside city limits" was "sufficient to show that the New York City ordinance [was] unconstitutional") and Joseph S. Hartunian, *Gun Safety in the Age of Kavanaugh*, 117 MICH.

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.12846 Page 490 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

L. REV. ONLINE 104, 115-16 (2019). Chief Justice Roberts also gestured toward a historical approach in the *Heller* oral argument: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well." Transcript of Oral Argument at 77, District of Columbia v. Heller, 554 U.S. 570 (2008) (No. 07-290). For Justice Barrett's view, see *Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting) ("There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people--for example, violent felons--who fall entirely outside the Second Amendment's scope ... Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right .... These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away. In my view, the latter is the better way to approach the problem.").

6   Ezell v. City of Chicago, 651 F.3d 684, 702 (7th Cir. 2011).

7   *See supra* note 4.

8   *See infra* Tables 1, 2.

9   It is vital to distinguish between the racially motivated Black codes enacted by Confederate sympathizers and the racially neutral laws enacted by Republicans to protect free persons and Republicans from terrorist violence. See Carole Emberton, *The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South*, 17 STAN. L. & POL'Y REV. 611, 621-22 (2006).

10  For the most recent example of the gun control is racist canard, see Justin Aimonetti & Christian Talley, Essay, *Race, Ramos, and the Second Amendment Standard of Review*, 107 VA. L. REV. ONLINE 193, 194 (2021).

11  For an important exception to this lack of attention to local laws, see generally Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013) (comparing urban and rural firearm municipal ordinances).

12  *See infra* Table 3 and related text.

13  An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, § 209, 1891 N.Y. Laws 129, 176-77 (Mar. 27, 1891); *Prohibiting the Carrying of Concealed Deadly Weapons, Sept. 17, 1880, in* GENERAL ORDERS OF THE BOARD OF SUPERVISORS PROVIDING REGULATIONS FOR THE GOVERNMENT OF THE CITY AND COUNTY OF SAN FRANCISCO 7-8 (1884); EVERETT W. PATTISON, THE REVISED ORDINANCE OF THE CITY OF ST. LOUIS, TOGETHER WITH THE CONSTITUTION OF THE UNITED STATES, AND OF THE STATE OF MISSOURI, THE CHARTER OF THE CITY; AND A DIGEST OF THE ACTS OF THE GENERAL ASSEMBLY, RELATING TO THE CITY 491-92 (1871); ELLIOTT F. SHEPARD & EBENEZER B. SHAFER, ORDINANCES OF THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK, IN FORCE JANUARY 1, 1881, at 214-15 (1881). For population data, see *Table 13. Population of the 100 Largest Urban Places: 1900*, U.S. BUREAU OF THE CENSUS (June 15, 1998), https://www2.census.gov/library/working-papers/1998/demo/pop-twps0027/tab13.txt [https://perma.cc/TQ2K-3PMP].

14  *See* McDonald v. City of Chicago, 561 U.S. 742, 767-68 (2010).

15  The interpretation and application of the mischief rule raises a host of jurisprudential issues. *See* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 967 (2021). To reconstruct the original meaning of the law at the time of the Fourteenth Amendment, one must reconstruct how the rule was understood in the eighteenth century and in the era of Reconstruction. The mischief rule was articulated in Heydon's Case [1584] 76 Eng. Rep. 637, and elaborated on in 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 61 (1765). For the rule in post-

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12847   Page 491 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

Civil War constitutional thought, see JOEL PRENTISS BISHOP, COMMENTARIES ON THE WRITTEN LAWS AND THEIR INTERPRETATION 206 (1882).

16   Actually, a more self-consciously individualistic language to describe the right to bear arms, one expressly tied to self-defense, emerged during the Jacksonian era--much earlier than Alito credits. *See* SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 142-4 (2006).

17   *See* RANDOLPH ROTH, AMERICAN HOMICIDE 350-54 (2009); ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION 116-17 (2019).

18   *See infra* notes 37-40.

19   *See* Cornell & Florence, *supra* note 4, at 1069.

20   *See infra* note 36.

21   For discussions of the continuing problems with legal scholarship on the right to bear arms and its penchant for anachronistic claims, see generally Saul Cornell, *''Half Cocked'': The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment, 106 J. CRIM. L. & CRIMINOLOGY 203 (2016)* and Martin S. Flaherty, *Can The Quill Be Mightier Than the Uzi?: History "Lite," "Law Office," and Worse Meets the Second Amendment, 37 CARDOZO L. REV. 663 (2015).*

22   *See* ROTH, *supra* note 17.

23   Several authors, including prominent gun rights activists, have argued that gun control was part of a racist agenda to strip freed persons of color of their rights, an erroneous conclusion that conflates the Black Codes with the Republican-enacted racially neutral gun regulations aimed at demilitarizing the South and pacifying the public sphere so African Americans could vote and organize to protect their rights. For a discussion of the vital importance of this distinction to evaluating Reconstruction-era laws, see discussion *infra* note 50. For a sampling of ideologically slanted scholarship on this topic, see generally STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998); Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to Be Applied to the White Population": Firearms Regulation and Racial Disparity--The Redeemed South's Legacy to a National Jurisprudence?, 70 CHI.-KENT L. REV. 1307, 1310, 1318 (1995)* (The authors ignore laws enacted by legislatures dominated by Republicans aimed at protecting Blacks in the Reconstruction South.); Clayton E. Cramer, *The Racist Roots of Gun Control, 4 KAN. J.L. & PUB. POL'Y 17, 18 (1995).*

24   *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism, 127 HARV. L. REV. F. 238, 241 (2014)*; *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted, 42 HARV. J. ON LEGIS. 187, 205 (2005)* (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

25   *See* WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA 51-53 (1996).

26   *See generally* RONALD M. LABBÉ & JONATHAN LURIE, THE SLAUGHTERHOUSE CASES: REGULATION, RECONSTRUCTION, AND THE FOURTEENTH AMENDMENT (2003) (discussing the origins of the Fourteenth Amendment).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12848   Page 492 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

27  For a gun rights reading of Order No. 1 that ignores its strong support for racially neutral limits on public carry, see Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *This Right Is Not Allowed by Governments that are Afraid of the People: The Public Meaning of the Second Amendment when the Fourteenth Amendment Was Ratified,* 17 GEO. MASON L. REV. 823, 854, 857 (2010). General Order No. 7 is not mentioned at all. For a similar one-sided reading of the evidence, see Cottrol & Diamond, *supra* note 23.

28  1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION: POLITICAL, MILITARY, SOCIAL, RELIGIOUS, EDUCATIONAL & INDUSTRIAL 1865 TO THE PRESENT TIME 207-208, 211 (1906) (reprinting General Order No. 1 and General Order No. 7).

29  *See* Miller, *supra* note 24, at 241.

30  EDWARD MCPHERSON, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION, (FROM APRIL 15, 1865, TO JULY 15, 1870) 204 (1875) https://quod.lib.umich.edu/m/moa/abz4761.0001.001/216?xc=1&g=moagrp&q1=General +Sickles&view=image&size=100 [https://perma.cc/M53U-STLW].

31  *Id.*

32  *See, e.g.,* 1890 Okla. Laws 495, art. 47, sec. 7 ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.").

33  For a good illustration of the colonial policy, see AN ACT FOR THE BETTER SECURITY OF THE INHABITANTS BY OBLIGING THE MALE WHITE PERSONS TO CARRY FIRE ARMS TO PLACES OF PUBLIC WORSHIP (1770), *reprinted in* GEORGIA COLONIAL LAWS 471 (1932). For a good example of the restrictive approach taken during Reconstruction, see REVISED STATUTES OF THE STATE OF MISSOURI 224 (John A. Hockaday ed., 1879).

34  AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS (1871), *reprinted in* 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1862 TO 1872, at 1322 (George Washington Paschal ed., Washington D.C., 1873).

35  *See infra* Table 1.

36  *See* Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas,* 4 TEX. A&M L. REV. 95, 113-17 (2016); Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900,* 121 SW. HIST. Q. 284, 294 (2020).

37  PA. CONST. of 1776 amends. III, XIII; TEX. CONST. of 1868, art. I, § 13.

38  *See, e.g.,* UTAH CONST. of 1896, art. I, § 6.

39  PA. CONST. of 1776 amends. III, XIII.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12849   Page 493 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

40    TEX. CONST. of 1868, art. I, § 13. For similarly expansive constitutional provisions enacted after the Civil War, see *infra* Table 1.

41    1 CONSTITUTIONAL CONVENTION, JOURNAL OF THE RECONSTRUCTION CONVENTION, WHICH MET AT AUSTIN, TEXAS, JUNE 1, 1868 (Austin, TX, Tracy, Siemering & Co. 1870) at 248 [hereinafter RECONSTRUCTION CONVENTION] ("The convention do order that no person shall hereafter be allowed in this hall, who carries belted on his person, revolvers or other offensive weapons.").

42    Modern gun rights advocates have erroneously argued that antebellum law established a constitutional right of permissive open carry. In fact, the cases cited for this proposition, including those cited by *Heller*, do not support such an expansive and unregulated right; rather, they support a notion of purposive carry, not permissive carry. On this confusion, see Saul A. Cornell, *The Police Power and the Authority to Regulate Firearms in Early America*, BRENNAN CTR. FOR JUST., June 2021, at 1, 8, https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/VG35-5FBX].

43    RECONSTRUCTION CONVENTION, *supra* note 41, at 152.

44    *See* Cornell & Florence, *supra* note 4, at 1056-58.

45    *Id.* at 1058 (quoting John Bingham's Sept. 2, 1867, speech to the voters of Ohio).

46    For a discussion of how the courts wrestled with the meaning of the Fourteenth Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 148-51 (1998).

47    See *infra* Tables 2 & 3 for examples. On the expansion of regulation after the Civil War, see Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 59-61 (2017).

48    *Id.*

49    An Act to Regulate the Keeping and Bearing of Deadly Weapons, Apr. 12, 1871, *reprinted in* 2 A DIGEST OF THE LAWS OF TEXAS: CONTAINING THE LAWS IN FORCE, AND THE REPEALED LAWS ON WHICH RIGHTS REST FROM 1864 TO 1872, at 1322 (George Washington Paschal, ed., Washington, D.C., 1873).

50    Gun rights advocates have simply ignored the most recent scholarship on gun control and race relations during Reconstruction, including the rich new literature on gun regulation, enforcement, and Reconstruction in Texas. For more, see the discussion in Frassetto, *supra* note 36, at 102-04, and Rivas, *supra* note 36, at 287.

51    For a good illustrations of state concealed carry statutes, see Act of Mar. 22, 1871, ch. 1888, § 1-2, 5, 1871 Ky. Acts 89, 89-90; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231, 231-32.

52    For an illustrative set of examples, see Table 2.

53    Territories had considerable latitude to enact laws consistent with their police power authority, but unlike states or localities, they were obligated to abide by the Second Amendment, even prior to the adoption of the Fourteenth Amendment. On the limits imposed by the Constitution on governments created in the territories, see JOSEPH STORY, 3 COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1319 (1833) ("What shall be the form of government established in the territories depends exclusively upon the discretion of congress. Having a right to erect

Compendium_Cornell
Page 1036

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12850   Page 494 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

a territorial government, they may confer on it such powers, legislative, judicial, and executive, as they may deem best. They may confer upon it general legislative powers, subject only to the laws and constitution of the United States.") Thus, territorial laws would have had to be consistent with Second Amendment irrespective of any interpretation of the Fourteenth Amendment and the issue of incorporation.

54    Act of Jan. 29, 1869, ch. 32, § 1-2, 1869 N.M. Laws 72, 72-73.

55    Act of Feb. 4, 1889, § 1, 1888 Idaho Laws 23, 23; *see also* Act of Jan. 11, 1865, § 1, 1864 Mont. Laws 355 (preventing the carrying of concealed deadly weapons in the cities and towns of the territory); Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Sess. Laws 352. ("That hereafter it shall be unlawful for any resident of any city, town or village, or for any one not a resident of any city, town or village, in said Territory, but a sojourner therein, to bear upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village.").

56    JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152-53 (1868).

57    *See infra* Table 3.

58    The most notable exception to this lack of attention to the importance of local regulation in American firearms law is Joseph Blocher, *Firearm Localism*, 123 YALE L.J. 82 (2013).

59    Huntsville, Mo., Rev. Ordinance in Relation to Carrying Deadly Weapons (July 17, 1894).

60    *Id.*

61    Evanston, Ill., Rev. Ordinances, ch. 29, § 531 (1893).

62    Copies of these ordinances may be found in the appendix to Brief for Patrick J. Charles as Amicus Curiae Supporting Neither Party app. at 2-11, N.Y. State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S. docketed Dec. 23, 2020) 2021 WL 3145961. Population statistics may be found in Campbell Gibson, *Population of the 100 Largest Cities and Other Urban Places in the United States: 1790 to 1990*, (U.S. Census Bureau, Working Paper No. POP-WP027.

63    *See* sources cited *supra* note 62.

64    *Id.*

65    Brief for Patrick J. Charles as Amicus Curiae Supporting Neither Party app., *supra* note 62, at 2-11.

66    On the problem of gun violence in California during this period, see CLARE V. MCKENNA, RACE AND HOMICIDE IN NINETEENTH-CENTURY CALIFORNIA 11-12, 103 (2007). Race was certainly an important factor in many places in California, but the range of communities enacting limits on public carry of some kind, permit laws, bans on concealed weapons, or broader bans, militates against imputing nefarious racial motives to all the legislation enacted to reduce gun violence. Moreover, racial minorities were often the victims of homicides and assaults in these communities and had a vested interest in reducing the levels of gun violence.

Compendium_Cornell
Page 1037

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12851   Page 495 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

67   William M. Caswell, *Ordinances of the City of Los Angeles, § 36, in* REVISED CHARTER AND COMPILED ORDINANCES AND RESOLUTIONS OF THE CITY OF LOS ANGELES 85 (1878).

68   An Act for the Punishing of Criminal Offenders, 1694 Mass. Laws 12, no. 6 ("Further it is Enacted by the authority aforesaid, That every Justice of the Peace in the County where the Offence is committed, may cause to be staid and arrested all Affrayers, Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively before any of their Majesties Justices, or other Their Officers or Ministers doing their Office or elsewhere."). On New York's 1911 Sullivan law, see BLOCHER & MILLER, *supra* note 3, at 42.

69   This community-based model of policing originated in England and continued in America until the rise of modern police forces in the nineteenth century. Any justice of the peace could detain, disarm, and if necessary, bind an individual to the peace by imposing a surety, a peace bond. Under the common law in America the conservation of the peace remained central to the legal system. As conservators of the peace, justices of the peace, sheriffs, and constables maintained their broad common law authority. Additionally, any member of the community who felt threatened could have a justice of the peace impose a surety, a peace or good behavior bond, as a measure to conserve the peace. On sureties in England, see STEVE HINDLE, THE STATE AND SOCIAL CHANGE IN EARLY MODERN ENGLAND, 1550-1640, at 100 (2000). For an informative study of the transfer of English criminal justice to the colonies, see generally, Alfred L. Brophy, *"For the Preservation of the King's Peace and Justice": Community and English Law in Sussex County, Pennsylvania, 1682-1696, 40 AM. J. LEGAL HIST. 167 (1996).* Gun rights advocates have erroneously argued that peace bonds required an individual to come forward to start this process, but this claim ignores the role of the justice of the peace as conservators of the peace. *See* David B. Kopel and George A. Mocsary, *Errors of Omission: Words Missing from the Ninth Circuit's* Young v. Hawaii, U. ILL. L. REV. ONLINE 172, 184 (2021). This error has been repeated by other gun rights advocates. *See also* Robert Leider, *Constitutional Liquidation, Surety Laws, and the Right to Bear Arms* 13 (March 2021) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3697761 [https://perma.cc/RV6P-RS88]. Leider's flawed analysis of gun regulation rests on anachronistic interpretations of the historical evidence and ignores the relevant scholarship in the history of criminal law, the result is a presentist and distorted account of the enforcement of prohibitions on armed travel in pre-Civil War Massachusetts. For a general account of the history of criminal law in this period, see ELIZABETH DALE, CRIMINAL JUSTICE IN THE UNITED STATES, 1789-1939 (2011). On the norms governing antebellum Massachusetts, see Mary E. Vogel, *The Social Origins of Plea Bargaining: Conflict and the Law in the Process of State Formation, 1830-1860 33 L. & SOC'Y REV. 161, 163 (1999).*

70   *See* McPherson, *supra* note 30.

71   *See* ERIC H. MONKKONEN, AMERICA BECOMES URBAN: THE DEVELOPMENT OF U.S. CITIES & TOWNS, 1780-1980, at 98-108 (1988).

72   *Id.*

73   *See supra* notes 17-19 and accompanying text.

74   See John Forrest Dillon, The Right to Keep and Bear Arms for Public and Private Defense, 1 CENT. L.J. 295, 296 (1874).

75   Andrews v. State, 50 Tenn. 165, 188 (1871).

76   Dillon, *supra* note 74, at 296.

77   *Id.*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12852   Page 496 of 733

THE RIGHT TO REGULATE ARMS IN THE ERA OF THE..., 55 U.C. Davis L. Rev....

78      3 THE AMERICAN AND ENGLISH ENCYCLOPEDIA OF LAW 408 (John Houston Merrill ed., 1887). This influential reference work was considered to be an essential part of a basic reference library for lawyers. *See* American and English Encyclopedia *of Law, Vol. 29*, 42 CENT. L.J. 397, 400 (1896) (book review).

79      *See* sources cited *supra* note 5.

55 UCDLRON 65

---

**End of Document**                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Omitted - Compendium Pages 1040-1069**

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12854   Page 498 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

**83 Law & Contemp. Probs. 117**

Law and Contemporary Problems
2020

Gun Rights and Regulation Outside the Home

*Joseph Blocher, Jacob D. Charles and Darrell A. H. Miller*, Special Editors

John J. Donohue [a1]

Copyright © 2020 by John J. Donohue

# THE SWERVE TO "GUNS EVERYWHERE": A LEGAL AND EMPIRICAL EVALUATION

## I

## INTRODUCTION

There has been a profound shift in the legal landscape concerning firearms over the last forty years. Before then, substantial state restrictions--even complete prohibitions--on gun carrying were quite common, and they enjoyed considerable support among Republican voters and politicians. Today, the large majority of states confer the "right-to-carry" (RTC) with little or no restriction. After unwisely granting cert and proceeding with oral argument in *New York State Rifle and Pistol Association v. City of New York*, in which the U.S. Supreme Court was asked to create an individual right under the Second Amendment to carry guns outside the home, the Court chose to leave this question for another day. [1] One argument frequently used to justify this expansion of the Second Amendment is that good guys with guns can quickly thwart mass shootings. Yet since the end of the federal assault weapons ban in 2004, deaths from mass shootings have been rising sharply even as lawful gun toting has increased substantially. [2] Moreover, a growing body of evidence suggests that allowing expanded gun access outside the home has increased violent crime.

While *New York State Rifle and Pistol Association*, which involved an idiosyncratic and moot provision of city law, would have been a terrible vehicle to make new constitutional law, it did have the potential to either confine the **\*118** Second Amendment to its current contours or vastly expand its reach in a way that could have wiped out a considerable array of state and local legislative enactments limiting the right to carry weapons outside the home and restricting the power and deadliness of permissible weaponry. In Part II, I survey the latest literature on the empirical effects of RTC laws on gun violence, which should be an issue of central concern when the Court next considers whether to mandate "constitutional carry."

Part III then explores several examples of the dangers of a vision of the Second Amendment that fails to account for, or even to competently assess, the empirical effects surveyed in Part II or any other relevant empirical evidence. I conclude that in interpreting the Second Amendment, courts must reflect carefully on the consequences of their decisions for both public safety and democracy. This is particularly important with respect to constitutional decisions that may impose large social costs in terms of increased gun massacres and violent crime, while simultaneously thwarting the democratic will of the people as expressed in legislation and state referenda.

## II

## THE IMPACT OF RIGHT TO CARRY LAWS

To think sensibly about desirable policies concerning carrying guns outside the home, one must begin with the best evidence on the impact of RTC laws on crime. My study with coauthors Abhay Aneja and Kyle Weber examining the impact of RTC laws found that whatever benefit might come from gun carrying by private citizens seems to be more than offset by overall

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12855   Page 499 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

increases in violent crime. [3]  In addition, a number of recent studies have found that permissive gun-carrying leads to *higher* rates of homicide, [4] and there is little question it leads to enormous increases in gun thefts that can further stimulate criminal activity. Indeed, while RTC laws have shown no ability to reduce robberies, states that adopt these laws see *increases* in the percentage of robberies committed with a gun. [5]

The lax regulation of the huge number of guns in the hands of U.S. civilians poses a significant challenge for law enforcement. Just as American criminals shoot faster because of the dangers posed by an armed population, so do the American police, who legitimately fear the prospect of facing an armed assailant. As a result, American police officers kill at far higher levels than their counterparts in other affluent nations. Consider this striking fact: *in the first twenty-four days of 2015*, police in the United States fatally shot fifty-nine individuals, which was greater than the comparable number of fifty-five shot by  **\*119**  police in England and Wales *over the past twenty-four years.* [6]  A well-regulated militia may be necessary to the security of a free state, but promiscuous and unregulated possession of firearms, including assault weapons with high-capacity magazines, leads to increased fatalities and other socially harmful consequences.

### A. Panel Data Analysis of RTC Laws

Violent crime in the United States has steadily decreased for the past thirty-five years. [7]  Surely the increase in gun-carrying is responsible for that benign trend? The simple answer is no. While some early work in the late 1990s claimed to find that RTC laws did reduce violent crime, [8]  a report issued in 2005 by the National Research Council using data through 2000 showed that with the tools and data available at that time, the statistical models were too fragile to provide a clear picture of the impact of RTC laws on crime. [9]  In the last decade, though, a growing body of evidence using updated tools and methodologies contradicts the early studies and suggests that the costs of RTC laws exceed their benefits. [10]

A quick examination of the long-term changes in crime shows that simple claims that more guns lead to less crime should be given little credence. For example, Figure 1 depicts percentage changes in the violent crime rate over a thirty-eight-year period for three groups of states: those that never adopted RTC laws, those that adopted RTC laws sometime between 1977 and 2014, and those that adopted RTC laws prior to 1977. It is noteworthy that the 42.3 percent drop in violent crime in the nine states that never adopted RTC laws is almost an order of magnitude greater than the 4.3 percent reduction experienced by states that adopted RTC laws during the thirty-eight-year period. [11]

While the graphical evidence can be illuminating, one needs to consider other factors that can influence crime to determine the causal effect of RTC laws. The standard econometric tool that tries to control for these other factors in the period following state adoption of RTC laws is called a panel data model with state and year fixed effects. The early work by John Lott and David Mustard that used this tool was marred by at least two econometric shortcomings that were common in applied econometric papers prior to around 2004. [12]  First, most research during this time relied on what we now know were inaccurate standard errors that exaggerated the statistical significance of their findings. Second, early  **\*120**  researchers were also less aware of or at least less attentive to the concern that pronounced crime trends prior to adoption could badly bias panel data estimates of the impact of RTC laws. Both of these problems, coupled with the far less complete data that was available at that time, undermined the early work evaluating RTC laws.

### Figure 1. Changes in Violent Crime Rates Depending on Adoption of RTC Laws, 1977-2014[13]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Unlike that early work, my more recent study with Aneja and Weber benefits from both advances in econometric practice and more complete data, and finds that on average RTC laws are associated with a roughly nine percent higher rate of violent crime. [14]  This panel data model properly adjusts its standard errors (through clustering) and controls for an array of variables that might be thought to influence crime in each state, such as levels of incarceration, police, income, poverty and unemployment rates, beer consumption, demographics, and the percentage of state population living in metropolitan statistical areas.

What about the concern that unexplained trends in violent crime prior to adoption could be obscuring the true impact of RTC laws on crime? To understand this potential problem, note that the panel data model is essentially a difference-in-differences

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12856   Page 500 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

estimator that tells us what happened to violent crime after RTC law adoption compared to states that did not adopt RTC laws. If the crime trends in both adopting and non-adopting states had previously been the same--that is, both sets of states showed "parallel trends"--and that pattern is altered after RTC adoption, then one has evidence that RTC laws influenced the **121** path of crime. While the violation of the parallel-trends assumption badly marred Lott's statistical model, our research does not share this problem. [15]

Figure 2 graphically depicts the estimated impact of RTC laws using the DAW panel data model. Because the law can have no impact before it goes into effect, we know that if the DAW model works properly, the estimated effect of the law in the years prior to adoption should be zero. The figure shows exactly this pattern. Put differently, Figure 2 shows that, controlling for the various explanatory variables used in the DAW model, the trends in the violent crime rates in adopting and non-adopting states during the ten years prior to RTC adoption are nearly perfectly parallel. [16] Once the RTC laws go into effect (designated as year zero in Figure 2), violent crime immediately starts to rise above what we would otherwise have expected, and ten years after adoption, the estimated increase in violent crime from RTC laws is greater than fifteen percent. To put a violent crime increase of this magnitude in perspective, note that it is plausible to estimate that one could engineer a crime *reduction* of roughly fifteen percent by doubling America's already bloated prison population. In other words, if one wanted to have an RTC law but restrain violent crime through increased incarceration to the level that would exist without having an RTC law in place, one would roughly have to double the state prison population, thereby incurring high social costs in both monetary and human terms.

**Figure 2. The Impact of RTC Laws on Violent Crime, DAW model, 1979-2014** [17]

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*122  B. Synthetic Control Analysis of RTC Laws**

While panel data analysis has been the workhouse of empirical evaluation of the impact of various state law changes, it is not a perfect or infallible tool. Ideally, one would like to have a randomized experiment with enough states being randomly assigned to one set of policies and another group of states assigned to an alternative policy. Without random assignment, one relies on control variables to capture other influences on violent crime, and there is always some uncertainty whether a rich enough array of such controls has been used. These limitations in panel data analysis led Harvard economist Alberto Abadie and his coauthors to develop a new technique that has already gained widespread acceptance: synthetic control analysis. [18]

DAW implemented this approach for thirty-three RTC law adoptions occurring over three decades throughout the country. [19] Since we know the pattern of crime prior to any state's adoption of a RTC law, we use the synthetic control analysis to find a weighted average of other states with no RTC laws to approximate the pattern of crime for our adopting state prior to RTC adoption. This "synthetic control" is then observed in the post-treatment period to compute the impact of RTC laws by measuring the difference in crime rates between the adopting state and its synthetic control. By comparing what actually happened to crime after RTC adoption to the crime performance of the synthetic control over the same period, we can generate estimates of the causal impact of RTC laws on crime.

Figure 3 shows the synthetic control graph for violent crime in Texas over the period from 1977 through 2006 (ten years after the adoption of Texas's 1996 RTC law; the 1996 law adoption is represented by the vertical line in Figure 3). The non-adopting states with similar pre-adoption crime patterns used to generate the "synthetic Texas" control were California, weighted at 57.7 percent owing to its similar attributes to Texas, Nebraska weighted 9.7 at percent, and Wisconsin weighted at 32.6 percent.

**\*123  Figure 3. 1996 Texas RTC Law on Violent Crime Rate using Synthetic Control Analysis** [20]

One of the advantages of the synthetic control methodology is that one can assess how well synthetic Texas matches the pre-RTC law passage pattern of violent crime to see whether the methodology is likely to generate a good fit in the ten years of post-passage data. Here, in Figure 3, the fit looks rather good at mimicking the pre-passage rises and falls in violent crime in Texas. This pattern increases our confidence that synthetic Texas provides a plausible prediction of what would have happened in Texas had it not adopted a RTC law.

Compendium_Cornell
Page 1072

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12857   Page 501 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

Figure 3 reveals that both Texas and synthetic Texas show declining crime rates in the post-passage decade after 1996. But what is noteworthy is that the crime drop is substantially *greater* in synthetic Texas, which had no RTC law over that period, than in actual Texas, which did. Figure 3 depicts that ten years after adopting its RTC law, violent crime in Texas was 16.9 percent higher than we would have expected had it not adopted an RTC law. (This is quite comparable to the average estimate shown in Figure 2 using the panel data approach.)

Note that Figure 3 illustrates perhaps the most important lesson of causal inference: one cannot simply look before and after an event to determine the event's consequence. Rather, one needs to estimate the difference between what did unfold and the counterfactual of what would have unfolded without the event. The public and law enforcement officials may have perceived the falling crime rate post-1996 (the solid black line), but only a rather sophisticated statistical analysis can discern that Texas would have experienced a more sizable **\*124** violent crime decline if it had not passed a RTC law (the dotted line). More specifically, Texas experienced a 19.7 percent decrease in its aggregate violent crime rate in the 10 years following the enactment of its RTC law, while synthetic Texas experienced a larger 31.0 percent decline. As such, DAW's results suggest that Texas's RTC law actually imposed a large social cost on the state.

The value of the synthetic control methodology over the panel data models considered above is that it provides a highly transparent estimate of that counterfactual, using a tool designed to ensure the validity of the parallel-trends assumption critical to achieving meaningful causal estimates. Figure 3 makes clear what Texas is being compared to, and we can reflect on whether this match is plausible and whether anything other than RTC laws changed in these three states during the post-passage decade that might compromise the validity of the synthetic control estimate of the impact of RTC laws. Thus, when Lott quotes a Texas District Attorney suggesting that he had reversed his earlier opposition to the state's RTC law in light of the perceived favorable experience with the law, [21] we are given a perfect illustration of how one could easily draw the incorrect causal inference that Texas's decline in crime was facilitated by its (in fact) crime-inducing RTC law. [22]

Table 1 shows DAW's overall synthetic control estimates for the impact of RTC laws on violent crime for all thirty-three adopting states. The estimates of the average treatment effect percentage (TEP) suggest that states that passed RTC laws experienced more deleterious changes in violent criminal activity than their synthetic controls did in the ten years post-adoption. On average, treatment states had aggregate violent crime rates that were almost seven percent higher than their synthetic controls five years after passage and around fourteen percent higher ten years after passage. Table 1 suggests that the longer the RTC law is in effect (up to the tenth year that we analyze), the greater the cost in terms of increased violent crime.

**\*125  Table 1. The Impact of RTC Laws on the Violent Crime Rate, DAW Covariates, Full Sample, 1977-2014** [23]

|     | AVERAGE NORMALIZED TEP | N | PSEUDO *P* VALUE |
| --- | --- | --- | --- |
| *(1)* | -0.117 (1.076) | 33 | 0.936 |
| *(2)* | 2.629 [a2] (1.310) | 33 | 0.274 |
| *(3)* | 3.631 [a2] (1.848) | 33 | 0.22 |
| *(4)* | 4.682 [aa1] (2.068) | 33 | 0.192 |
| *(5)* | 6.876 [aaa1] (2.499) | 33 | 0.094 |
| *(6)* | 7.358 [aaa1] (3.135) | 33 | 0.106 |
| *(7)* | 10.068 [aaa1] (2.823) | 33 | 0.06 |
| *(8)* | 12.474 [aaa1] (3.831) | 31 | 0.038 |

Compendium_Cornell
Page 1073

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12858   Page 502 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

| *(9)* | 14.021 [aaa1] (3.605) | 31 | 0.032 |
| *(10)* | 14.344 [aaa1] (2.921) | 31 | 0.032 |
| Note: Standard errors in parentheses. Row numbers indicate post-passage year under consideration; *N* = number of states in sample. The synthetic controls method was ran using the nested option, and each year's estimate is the average effect across N states. | | | |

**Footnotes**

[a2]   $p < 0.10$;

[aa1]   $p < 0.05$;

[aaa1]   $p < 0.01$.

The extensive array of panel data and synthetic control estimates of the impact of RTC laws that DAW presents uniformly undermine the "More Guns, Less Crime" hypothesis. [24] There is not even the slightest hint in the data using any econometrically sound regression that RTC laws reduce violent crime. Indeed, the weight of the evidence from both the panel data estimates and the synthetic control analysis discussed herein supports the view that adopting RTC laws substantially increases overall violent crime in the ten years post-passage. While both approaches have advantages and disadvantages, the picture that emerges from each econometric method is the same: violent crime *increases substantially* in the ten years following RTC adoption.

**C. Other Recent Research Documenting Crime Increases from RTC Laws**

Beyond our own work, a number of other recent studies provide further support for the conclusion that RTC laws increase violent crime. For example, Michael Siegel and his co-authors look at state data from 1991-2015 and   **\*126**   concluded that RTC laws increase overall homicide 6.5 percent, firearm homicide by 8.6 percent, and handgun homicide by 10.6 percent. [25] A second paper by Siegel and his co-authors extended the dataset for one additional year, through 2016, and controlled for a richer array of gun laws to ensure that other legal changes are not driving the results in the initial paper. [26] Again, they found that RTC laws increase homicides by nine percent. [27]

To explore whether the state analyses are too aggregated to give precise estimates of the impact of RTC laws, Cassandra Crifasi and co-authors looked at 136 large, urban U.S. counties from 1984-2015. They found that RTC laws increase firearm homicides by four percent. [28]

Similarly, Mark Gius explored the specific legal change of a state moving from a prohibition on concealed carry to the adoption of a RTC law. [29] Using a synthetic control approach, Gius found that this transition to RTC law elevates overall homicide by 4.9 percent and firearm homicides by 12.3 percent. [30]

Moreover, two recent and extremely creative papers lend further credence to the finding that RTC laws elevate violent crime. The first, by Jonathan Colmer and Jennifer Doleac, uses the fact that increases in temperature tend to elevate violent crime to explore the impact of RTC laws on such crime. [31] They found that a one-degree Celsius increase in temperature is associated with a 0.4 percent increase in homicides without RTC laws and 1.0 percent increase in homicides with RTC laws. [32] In other words, the crime-stimulating effect of hotter temperatures is 150 percent larger in places with freer gun carrying access.

The second paper, by Richard Boylan, begins by using two tests to show that police departments are less likely to submit statistics when crime is high, which led previous studies based on the Uniform Crime Reporting program (UCR) to underestimate crime

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12859   Page 503 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

and to often understate the impact of policies on crime.[33] As it turns out, the police departments that under-report tend to be in RTC states, which is not surprising if RTC laws elevate crime and police departments try to disguise the elevated crime (or are too overwhelmed by it to spend time to fully **\*127** report it). Within his sample, Boylan found that RTC laws increase crime by 18 percent if one accepts the UCR data that all of the above studies rely on, but that the estimated crime increase rises to 29 percent if one controls for the selective under-reporting of crime.[34] In other words, Boylan believes that even though virtually all of the credible studies in the last five years have found that RTC laws *increase* crime, the true picture is even worse than these studies suggest.

### D. Mechanisms Behind the Increased Crime from RTC Laws

While the weight of the evidence supports the conclusion that increased gun carrying leads to a higher rate of violent crime, the findings above are focused only on identifying net effects and do not directly address the mechanisms by which more guns lead to more crime. We know that there are some instances where gun carrying thwarts crime, and one could imagine there might also be some deterrent impact of increased gun carrying. However, the finding that RTC laws elevate violent crime means that the crime-inducing effect of more guns in public must outweigh any beneficial influences. But what generates these harmful effects?

The most obvious pernicious influence is that ready access to guns can quickly turn arguments into deadly encounters. There is certainly plenty of evidence suggesting that road rage incidents and other arguments have ended with lethal violence only because of the presence of guns.[35] Additionally, guns carried outside the home are more likely to be lost or stolen, making them particularly valuable to criminals since they cannot be traced back to them.[36] A rough but plausible estimate would be that RTC laws are directly responsible for approximately 100,000 gun thefts per year, which equates to twenty-five percent of total annual gun thefts.[37]

Moreover, some of the more naïve thinking about the impact of increased gun carrying by "law abiding citizens" implicitly assumes that RTC laws will tip the balance in favor of the good guys, and the bad guys will take no responsive action **\*128** that would escalate their dangerousness. The problem with this view is that it ignores that the bad guys act to gain more weaponry and act more aggressively in the wake of RTC adoption. Indeed, a panel data estimate using data from 1980 to 2016 reveals that after adoption of RTC laws, the percentage of robberies committed with a firearm rises by 18 percent (t = 2.60).[38] A synthetic control analysis predicts an even more ominous response: the percentage of robberies committed with a firearm increases by 35 percent over 10 years (t = 4.48).[39] It might be a tolerable tradeoff if the increase in armed and dangerous criminals were offset by an overall decline in robberies, but in fact there is no evidence that RTC laws reduce the overall amount of robberies. Indeed, a panel data analysis associates adoption of RTC laws with a 9 percent *increase* in overall robberies (t = 1.85) while the synthetic control analysis suggests a 7 percent growth over 10 years (t = 1.19).[40]

This evidence shows that criminals react in some socially harmful ways to the adoption of RTC laws for the simple reason that they do not want to be shot. It also shows that police act more aggressively and violently as gun-carrying proliferates for much the same reason. Apart from car accidents, virtually the only threat to police safety comes from armed civilians. This in part explains why civilians are killed by police in the United States at a higher rate than in comparably affluent countries that are far less gun-saturated.[41]

Similarly, the increased shootings, thefts, aggravated assaults, and accidental discharges that follow from increased gun carrying take up an enormous amount of additional police time.[42] This tax on police activity puts upward pressure on violent behavior since, as numerous studies have shown, the police are one of the most important elements in restraining crime.[43]

**\*129**  III

### LEGAL CONSIDERATIONS IN LIGHT OF THE EMPIRICAL EVIDENCE

The previous discussion has illustrated that the best empirical evidence suggests that allowing citizens to carry concealed handguns as a matter of right will elevate violent crime. Similarly, the empirical evidence suggests that restrictions on assault weapons and high-capacity magazines can reduce the rising death toll from mass shootings.[44] One would ordinarily think this

Compendium_Cornell
Page 1075

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12860   Page 504 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

information would be enormously important for crafting wise policies concerning the carrying of weapons outside the home. But the special interests of the gun lobby and supporters of an aggrandized individual Second Amendment right argue that the consequences of gun carrying and of the growing power and danger of weaponry are irrelevant. This raises the question of the appropriate role of empirical evidence in Second Amendment litigation and interpretation.

### A. Should Public Safety Influence the Scope of the Second Amendment?

The extreme non-consequentialist view is that empirical evidence on gun policy should have no impact on judicial opinions because the Founders sealed the fate of the victims of gun violence by enacting the Second Amendment, taking off the table the consequences of that hoary determination of 1791. While many would find such a claim bewildering, this was the assertion of then-Judge Brett Kavanaugh's dissent in a D.C. Court of Appeals case in which he was outvoted by two other judges (both originally appointed to the federal bench by Ronald Reagan). [45]

Kavanaugh argued that "text, history, and tradition" should "guide analysis of gun laws." [46] In his view, the Supreme Court had "expressly rejected *judicial* assessment of 'the costs and benefits of firearms restrictions' and stated that courts applying the Second Amendment thus would not have to make 'difficult empirical judgments' about the efficacy of particular gun regulations." [47] Judge Kavanaugh announced that one of the conclusions that followed from this position was that there could be no ban on semi-automatic assault weapons, [48] and he would presumably draw the same conclusion about broad restrictions on the right to carry guns outside the home.

Some defenders of Kavanaugh's position have tried to ground this view on "the Framers' vision of governance, which emphasizes a judiciary that plays an important but limited role and leaves policymaking to" the legislative branch of government. [49] But this defense is untenable. One cannot announce that the **\*130** legislature is more institutionally competent to evaluate the best empirical evidence concerning bans on assault weapons and restrictions on the right to carry weapons outside the home only to strike down such legislative enactments while claiming that the best empirical evidence is irrelevant when interpreting the Second Amendment. Kavanaugh was trying to foreclose legislative action, not defer to it. The modern version of virulent Second Amendment advocacy is the height of anti-democratic judicial activism wedded to anti-scientific proclivities to produce bad public policy.

Of course, the original sin behind Kavanaugh's misguided approach is the harshly-criticized five to four 2008 *Heller* decision authored by Justice Scalia that for the first time created an individual Second Amendment right [50] --which was, in the words of Justice John Paul Stevens, "unquestionably the most clearly incorrect decision" issued during his long tenure on the Court. [51] In *Heller*, the self-avowed originalist and textualist Scalia ignored the Supreme Court's pronouncement in *United States v. Miller* that the Second Amendment should be "interpreted and applied" in light of its "obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces ...." [52] In other words, the decision that Kavanaugh claimed established the "text, history, and tradition" test of what was lawful gun regulation had itself ignored or mischaracterized the text, history, and tradition of the Second Amendment.

Even if the majority in *Heller* had not completely botched the text, history, and tradition relevant to their inquiry, the Kavanaugh gloss of indifference to public safety considerations in deciding Second Amendment cases would still be highly problematic since it inhibits the ability to address the new and growing dangers posed by modern weaponry. Scalia did raise and then immediately reject one possible avenue to limit the potential harm of his decision, stating: "Some have made the argument ... that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way." [53] But of course not only does this argument not "borde[r] on the frivolous," [54] as Scalia asserted, it also makes perfect sense to consider whether the reasons for the Amendment are still operative today and whether the vastly **\*131** more deadly weaponry currently available would further or undermine its goals of advancing security.

The first question is rather easily answered given the fact that the Founders explained the purpose of the Second Amendment in its very first clause, as the Court itself noted in *Miller*. [55] The Second Amendment was designed to ensure that the federal government would have the ability to generate a fighting force to defend the country. [56] However, civilian ownership of firearms no longer plays any role in furthering that objective. The security of the United States against domestic and foreign enemies

Compendium_Cornell
Page 1076

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12861   Page 505 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

is now guaranteed by the U.S. military and the National Guard. Therefore, as even Justice Scalia acknowledged in *Heller*, the right the Court created in that 2008 opinion did not include the right to have weapons of war. [57]

When one compares the weaponry available at the time of the Founding to that available today, it becomes clear that the difference is immense. This difference has important implications for constitutional analysis. The Continentals were clearly not carrying around anything even remotely like modern assault weapons. There could not be a mass shooting problem in 1791 given the nature of the weaponry available to average citizens.

The situation could not be more different today. Hundreds were shot in a matter of minutes in the horrendous Las Vegas shooting in 2018. [58] The Dayton, Ohio shooting in the Summer of 2019 was terminated with astonishing quickness owing to the large police presence that resulted in more bullets fired *at* the shooter than *by* him; yet, even though he was killed within thirty-two seconds of his initial firing, he still managed to shoot twenty-six people, killing nine, because of the enormous power, deadliness, and speed of his assault weapon. [59]

Any claim that the Second Amendment eliminates the ability to address the current, growing mass shooting problem in the United States because any gun in "common use" is now beyond government control is fatuous. If "originalist" Justice Scalia had contemplated what the practical framers of our Constitution **\*132** would have thought about the idea that an Amendment that they crafted would bind the hands of government hundreds of years later in a way that would facilitate mass murder, he likely would have realized the troubling nature of any such position.

And yet then-Judge Kavanaugh thought that the *Heller* holding that citizens have the right to a handgun in the home also mandated their right to have an assault weapon. Kavanaugh struggled with what most would find to be a rather simple categorization question: he could conclude that AR-15's were more like handguns, which *Heller* said could not be banned, or more like "M-16 rifles," which *Heller* said could be banned. The en banc panel of the Fourth Circuit provided the obvious answer: "[T]he banned assault weapons ... are among those arms that are 'like' 'M-16 rifles'--'weapons that are most useful in military service'--which the *Heller* Court singled out as being beyond the Second Amendment's reach." [60]

Judge Kavanaugh, however, thought AR-15's were more like handguns, and therefore could not be banned. [61] His vapid dissenting opinion is at odds not only with his former D.C. Circuit colleagues, but also directly conflicts with every other appellate court that has considered this issue, all of which have upheld bans on assault weapons against Second Amendment attacks. [62] Although Judge Kavanaugh was correct that handguns kill more individuals overall than assault rifles, that does not pose an argument for preventing governmental action to ban assault rifles. Handguns also kill far more Americans than bazookas, hand-held missile launchers, and nuclear arms, but the notion that the right to keep and bear these arms cannot be infringed is hopefully beyond serious debate.

### B. Fighting the Tyranny of the Federal Government or of Second Amendment Fundamentalists

Some have tried to justify an aggrandized Second Amendment on the grounds that the Second Amendment is in place to enable individuals to fight a tyrannical federal government. Once we have crossed that bridge, of course, there would have to be a right to all of the weapons that the federal government has. Otherwise, telling citizens that it is their right to fight the tyrannical federal **\*133** government while tying their hands behind their back by not giving them adequate weaponry would be the most cynical deception. The Second Amendment cannot be a suicide pact for our most patriotic and freedom-loving citizens who are willing to stand up against tyrants with their own weapons.

But surely no one would believe that the unregulated mob could stand up to the overwhelming power of the United States military. While this "anti-tyranny" justification may seem far-fetched for modern times, it is still invoked by some in positions of power. For example, in 2016, Senator Rand Paul tweeted: "Why do we have a Second Amendment? It's not to shoot deer. It's to shoot at the government when it becomes tyrannical!" [63]

While some may applaud this zeal, I am highly dubious that we want to encourage "the people" to have the weapons that would enable them to start shooting at "the government" when they decide it is tyrannical. Some Pennsylvanians entertained this notion when they launched the Whiskey Rebellion, which prompted President George Washington in 1794 to amass an army of

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12862   Page 506 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

13,000 from four state militias to march on the rebels and end the insurrection.[64]  The American Civil War is also not a stirring endorsement of the idea that those who would take up arms against the federal government are the ones fighting *against* tyranny.

While this anti-tyranny view of the Second Amendment may seem like theatrical political rhetoric, it has garnered some federal judicial support. For example, two separate lawsuits were filed in California federal courts seeking to enjoin the implementation of California's 2016 ban on high-capacity magazines prior to its July 1, 2017 effective date.[65]  This led to two federal district court judges deciding the request for a preliminary injunction on the same day, with Judge William Shubb of the Eastern District of California issuing a sensible ruling rejecting the Second Amendment claim.[66]  In a macabre version of Russian Roulette, however, the case filed by the California Rifle and Pistol Association, an NRA affiliate, was assigned to Judge Roger Benitez, who delighted the gun lobby by issuing the desired injunction two days before the ban was to take effect.[67]

Judge Benitez's order quoted a statement--absurd on its face in the context of modern America--reading, "tyranny thrives best where government need not fear the wrath of an armed people."[68]  A tyrannical federal government that has the support of the U.S. military will have little to fear from weapons in the hands **134** of private citizens.[69]  Moreover, the references in Judge Benitez's opinion to the shooting at the Congressional baseball practice in Alexandria, Virginia[70] highlight the exact opposite of his claims: encouraging U.S. citizens to arm themselves to stand up against tyranny is foolish, and the more powerful the weapons that these "fighters against tyranny" have at their disposal, the more needless deaths and injuries will occur.[71]

But granting a preliminary injunction to the NRA and stopping the new ban on possession of high-capacity magazines from taking effect was only the beginning of the damage. On March 29, 2019, Judge Benitez struck down not just the new law about to take effect (which had been adopted by both the state legislature and the people of California via referendum by an almost two-to-one margin[72]), but *all* restrictions on high-capacity magazines[73] which had effectively been in place for decades.[74]  High-capacity magazines immediately started pouring into the state following the Judge's decision,[75] and the California Attorney General was only able to stop that fiasco a week later when the state secured a stay of Benitez's order pending Ninth Circuit Court of Appeals review.[76]

Judge Benitez concluded his opinion with some words of encouragement:

> **135**  The State has not carried its burden to justify the restrictions on firearm magazines protected by the Second Amendment based on the undisputed material facts in evidence. That is not to be lamented. It ought to provide reassurance .... [I]t is the proudest boast of our Second Amendment jurisprudence that we protect a citizen's right to keep and bear arms that are dangerous and formidable.[77]

I have grave concerns about any proud boasts that unleash the gun industry to provide increasingly dangerous and formidable weapons to mass shooters around the country.

I should hasten to add that in *Weise v. Becerra*, Judge William Shubb, the other federal district judge to address California's ban on high-capacity magazines, ruled that "because California's ban does not substantially burden individuals' ability to defend themselves, intermediate scrutiny is appropriate."[78]  Judge Shubb then correctly explained that since this level of scrutiny requires "(1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective[,]" the California law was constitutional.[79]  Note how Judge Shubb--unlike Judges Kavanaugh and Benitez--was showing deference to legislative judgments as opposed to making imperial judicial pronouncements.

While some federal judges have shown an appalling indifference to the growing menace of mass slaughters, one hopes that the U.S. Supreme Court will heed the words penned by conservative Reagan appointee J. Harvie Wilkinson III when the Fourth Circuit voted to uphold the Maryland assault weapons ban:

> To say in the wake of so many mass shootings in so many localities across this country that the people themselves are now to be rendered newly powerless, that all they can do is stand by and watch as federal courts design

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12863   Page 507 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

their destiny-- this would deliver a body blow to democracy as we have known it since the very founding of this nation. [80]

Judge Wilkinson's admonition about the threat to democracy posed by extreme deference to special interests is especially compelling given their success in blocking policies such as universal background checks that have overwhelming support--even among NRA members. [81] In the face of the evident threat to **136** democratic rule posed by these special interests, courts should be particularly deferential to broadly popular legislative enactments designed to promote public safety that have garnered enough support to break through the stranglehold of these special interests. Rather than further tightening this stranglehold as the opinions of Scalia, Kavanaugh, Benitez and other like-minded advocates would do, the judicial branch should take great care not to further entrench the dangerous, anti-democratic objectives of these special interests.

Finally, it should be noted that to the extent the argument of being a bulwark against tyranny is to be offered as an explanation for an expansive interpretation of the Second Amendment, it would not provide support for the claim that citizens should have a right to carry guns outside the home. The tyranny argument turns on having access to a gun when the time comes to launch the rebellion. Moving about town with a gun does nothing to advance that interest, but does generate the unhappy consequences of the increased violent crime discussed above.

## IV

## CONCLUSION

The evidence that RTC laws increase violence should cause particular hesitation to any court contemplating an extension of the Second Amendment beyond the right to have a gun in the home for self-defense to a right to carry guns outside the home. Depending on what vision of the Second Amendment the Supreme Court ultimately adopts, there is a danger that a substantial price in lives and in increased violent crime will be paid if the court strikes down legislative restrictions on gun carrying outside the home and accelerates our growing mass shooting problem by overturning bans on assault weapons and high-capacity magazines. Legislative judgments that address the problem of gun violence based on sound policy considerations are particularly deserving of deference. Ignoring empirical evidence will create a jurisprudence that disregards the societal costs of guns while shackling the democratic will of the people and exposing them to unnecessary levels of lethal violence. We should not interpret constitutional rights that way.

### Footnotes

[a1]    C. Wendell and Edith M. Carlsmith Professor, Stanford Law School, and Research Associate, National Bureau of Economic Research. Thanks to Theodora Boulouta, Trevor Hastie, Rob Tibshirani, and workshop participants at Columbia and Yale Law Schools for helpful assistance, comments, and suggestions on aspects of this Article.

[1]    N.Y. State Rifle & Pistol Ass'n v. City of New York, 140 S. Ct. 1525 (2020) (per curiam).

[2]    After the federal assault weapons ban lapsed in 2004, the gun industry was able to flood the market with increasingly more powerful weaponry (including large-capacity magazines) that enable mass killers to kill ever more quickly with predictable results. The decade after the ban elapsed saw a sharp increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward. John Donohue & Theodora Boulouta, *That Assault Weapon Ban? It Really Did Work*, N.Y. TIMES (Sep. 4, 2019), https://www.nytimes.com/2019/09/04/opinion/ assault-weapon-ban.html [https://perma.cc/Z73J-MT4C]. The deadly pace has only increased in the last five years, with notably little benefit from interventions from private individuals carrying weapons (as opposed to police or security personnel). *See id.*; *see also* John Donohue & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD

Compendium_Cornell
Page 1079

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12864   Page 508 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

LAW SCH. LEGAL AGGREGATE BLOG (Oct. 15, 2019), https://stanford.io/2MWNsrV [https://perma.cc/C234-NC7Q].

[3]     John J. Donohue, Abhay Aneja & Kyle Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. EMPIRICAL LEGAL STUD. 198, 200 (2019) [hereinafter DAW 2019].

[4]     *See generally infra* Part II.A-D.

[5]     DAW 2019, *supra* note 3, at 210.

[6]     Jamiles Lartey, *By the Numbers: US Police Kill More in Days than Other Countries Do in Years*, GUARDIAN (Jun. 9, 2015), https://www.theguardian.com/us-news/2015/jun/09/the-counted-police-killings-us-vs-other-countries [https://perma.cc/3USA-XNKA].

[7]     *See generally* DAW 2019, *supra* note 3.

[8]     *See* John R. Lott, Jr. & David B. Mustard, *Crime, Deterrence, and Right-to-Carry Concealed Handguns*, 26 J. LEGAL STUD., no. 1, 1997, at 65.

[9]     NAT'L RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 49-50 (Charles F. Wellford et al. eds., 2005).

[10]    *See infra* Part II.A-D.

[11]    DAW 2019, *supra* note 3, at 213. The discussion in the following paragraphs comes from evidence presented in this work.

[12]    *See generally*, *e.g.*, Lott & Mustard, *supra* note 8.

[13]    Reprinted from Figure 1 in DAW 2019, *supra* note 3, at 214.

[14]    *Id.* at 217. This estimate is highly statistically significant, with a standard error that was less than one-third the size of the nine percent estimate.

[15]    *See id.* at 220-22.

[16]    Essentially, the fact that the dark line to the left of the initial year of RTC law adoption in Figure 2 is flat and close to zero tells us that our panel data model is well-behaved in that (1) it correctly predicts that RTC laws have no effect on violent crime before they are adopted, and (2) the trends in crime are similar for adopting and non-adopting states in the years prior to RTC adoption.

[17]    Reprinted from Figure 2 in DAW 2019. *Id.* at 221. We regress crime on dummies for pre- and post-passage years and DAW covariates. The reference year is the year before adoption and adoption year is the first year with RTC in place at any time, meaning that in states that adopt after January 1, this will capture only a partial effect of RTC laws. We

Compendium_Cornell
Page 1080

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12865   Page 509 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

display the 95 percent confidence interval for each estimate using cluster-robust standard errors and show the number of states that contribute to each estimate.

18   *See generally* Alberto Abadie & Javier Gardeazabal, *The Economic Costs of Conflict: A Case Study of the Basque Country*, 93 AM. ECON. REV. 1 (2003).

19   This and the following discussion come from DAW 2019, *supra* note 3, at 224-27.

20   Reprinted from Figure 5 in DAW 2019. *Id.* at 227.

21   JOHN R. LOTT, JR., MORE GUNS, LESS CRIME: UNDERSTANDING CRIME AND GUN CONTROL LAWS 15 (3d ed. 2010).

22   *See* DAW 2019, *supra* note 3, at 288.

23   Reprinted from Table 5 in DAW 2019. *Id.* at 233.

24   This hypothesis appears, for example, in Lott & Mustard, *supra* note 8.

25   Michael Siegel et al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923, 1923 (2017).

26   Michael Siegel et al., *The Impact of State Firearm Laws on Homicide and Suicide Deaths in the USA, 1991-2016: A Panel Study*, 34 J. GEN. INTERNAL MED. 2021, 2024 (2019).

27   *Id.*

28   Cassandra K. Crifasi et al., *Association between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 383, 387 (2018); Cassandra K. Crifasi et al*., Correction to: Association Between Firearm Laws and Homicide in Urban Counties*, 95 J. URB. HEALTH 773, 773-74 (2018).

29   Mark Gius, *Using the Synthetic Control Method to Determine the Effects of Concealed Carry Laws on State-Level Murder Rates*, 57 INT'L REV. L. & ECON. 1, 6 (2019).

30   *Id.*

31   Jonathan Colmer & Jennifer L. Doleac, Do Right-to-Carry Laws Mitigate or Exacerbate Violent Crime? Evidence from the Temperature-Violent Crime Relationship 1 (Nov. 9, 2019) (unpublished manuscript) (on file with author).

32   *Id.*

33   Richard T. Boylan, Official Statistics Underreport Crime: Evidence from Regression Discontinuity and State Reporting Laws 1 (June 12, 2019) (unpublished manuscript) (on file with author).

Compendium_Cornell
Page 1081

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12866   Page 510 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

34    *Id.* at 9.

35    *See, e.g.*, Staff, *Road Rage Incident on I-5 in South Sacramento Leads to Woman Being Shot*, ABC10 (Sept. 25, 2018), https://www.abc10.com/article/news/crime/road-rage-incident-on-i-5-in-south-sacramento-leads-to-woman-being-shot/103-597441561 [https://perma.cc/HQS8-M9HQ]. A 2015 study found that approximately 10.4 percent of the population has both significant anger traits *and* access to a firearm, and that millions of these Americans routinely carry a firearm in public. Jeffrey W. Swanson et al., *Guns, Impulsive Angry Behavior, and Mental Disorders: Results from the National Comorbidity Survey Replication (NCS R)*, 33 BEHAV. SCI. & L. 199, 209 (2015).

36    As an example, an NBA player bought a $50,000 assault weapon only to have the gun stolen from his unlocked car a few minutes later. Jack Baer, *Hassan Whiteside Buys $50K Assault Rifle, Immediately Has it Stolen After Leaving it in Unlocked Rolls Royce*, YAHOO! SPORTS (Nov. 15, 2018), https://sports.yahoo.com/hassan-whiteside-buys-50k-assault-rifle-immediately-stolen-leaving-unlocked-rolls-royce-020551481.html [https://perma.cc/3CKW-J722].

37    *See* DAW 2019, *supra* note 3, at 207. A nationally representative web-based survey conducted in April 2015 of 3,949 subjects revealed that those who carried guns outside the home had their guns stolen at a rate over 1 percent per year. Given the current level of roughly 16 million permit holders, a plausible estimate of the additional guns stolen by virtue of the increased gun carrying induced by the adoption of RTC laws is roughly 100,000 guns per year.

38    *Id.*

39    *Id.*

40    *Id.* at 210.

41    *See supra* note 6. The estimated rate of 2.93 killings by U.S. police per million citizens is about 42 times greater than the killing rate by police in Germany and more than 100 times that of police in England and Wales. Franklin E. Zimring, *Firearms and Violence in American Law*, *in* BRIDGING THE GAP: A REPORT ON SCHOLARSHIP AND CRIMINAL JUSTICE REFORM, 4-5 (Erik Luna ed.) (U.C. Berkeley Pub. Law Research Paper No. 2939902, 2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2939902 [https://perma.cc/6FSU-UFFQ]. Zimring also found that police in the United State die from assaults while on duty (overwhelmingly from fatal shootings) at about 35 times the rate of police in Germany and 17 times the rate of police in the United Kingdom. *Id.*

42    *See, e.g.*, Laurie Merrill, *Police Urge Holster Use After Man Shoots His Own Penis*, AZ CENT. (Aug. 7, 2011), http://www.azcentral.com/community/chandler/articles/2011/08/07/20110807cr-penisshot0811.html#ixzz6GtZitpgK [https://perma.cc/R8Z5-JGHP].

43    As the Council of Economic Advisors has found, "[e]xpanding resources for police has consistently been shown to reduce crime; estimates from economic research suggest that a 10 percent increase in police force size decreases crime by 3 to 10 percent." COUNCIL OF ECON. ADVISORS, ECONOMIC PERSPECTIVES ON INCARCERATION AND THE CRIMINAL JUSTICE SYSTEM 5 (2016). In other words, if the entire array of impositions on police time imposed by lawful gun carrying in the United States took up ten percent of police time, then one would expect this would elevate crime from three to ten percent. *See also* Steven Mello, *More COPS, Less Crime*, 172 J. PUB. ECON. 174, 189 (2019) (stating that the social value of an additional police officer exceeds $300,000).

44    *See supra* note 1.

Compendium_Cornell
Page 1082

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12867   Page 511 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

45    Heller v. District of Columbia, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

46    *Id.* at 1278.

47    *Id.* (emphasis added) (quoting the majority opinion).

48    *See id.* at 1287-88.

49    Anne Swearer & Scott French, *Brett Kavanaugh's Defense of Second Amendment is Hardly 'Extremist'*, HERITAGE: COMMENTARY (Jul. 18, 2018), https://www.heritage.org/courts/commentary/brett-kavanaughs-defense-second-amendment-hardly-extremist [https://perma.cc/5MRU-ZFS6].

50    District of Columbia v. Heller, 554 U.S. 570 (2008).

51    John Paul Stevens, *The Supreme Court's Worst Decision of My Tenure*, ATLANTIC (May 14, 2019), https://www.theatlantic.com/ideas/archive/2019/05/john-paul-stevens-court-failed-gun-control/587272/ [https://perma.cc/X3RC-AHY7]. For two more of the many strong criticisms of Scalia's decision in *Heller* and its "faux originalism," both by conservative Reagan-appointed federal court of appeals judges, see generally Richard A. Posner, *In Defense of Looseness*, NEW REPUBLIC (Aug. 27, 2008), http://www.newrepublic.com/article/books/defense-looseness [https://perma.cc/7NBB-UZCR]; and J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 VA. L. REV. 253 (2009). It is certainly challenging to think of another Supreme Court decision that would be as totally misguided from every conceivable dimension of constitutional interpretation-- originalist, textualist, or pragmatist--that one might attribute to its author.

52    307 U.S. 174, 178 (1939).

53    *Heller*, 554 U.S. at 582.

54    *Id.*

55    Historian David Konig has written the authoritative work establishing that constitutional and legal treatises from the Founding era considered preambles to be critical in establishing textual meaning. *See* David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of the Right of the People to Keep and Bear Arms*, 22 LAW & HIST. REV. 119, 154-55 (2004) [hereinafter Konig, *A Missing Transatlantic Context*] (arguing the Second Amendment was created for national defense); *see also* David Thomas Konig, *Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America*, 56 UCLA L. REV. 1295 (2009) [hereinafter Konig, *Why the Second Amendment Has a Preamble*].

56    Konig, *A Missing Transatlantic Context, supra* note 55, at 154-55; *see also generally* Konig, *Why the Second Amendment Has a Preamble, supra* note 55.

57    *See Heller*, 554 U.S. at 636.

58    Richard A. Oppel Jr., *MGM Resorts Sues 1,000 Victims of Las Vegas Shooting, Seeking to Avoid Liability*, N.Y. TIMES (July 17, 2018), https://www.nytimes.com/2018/07/17/us/mgm-resorts-sues-victims.html [https://perma.cc/NK9N-53W7].

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12868   Page 512 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

59    Adeel Hassan, *Dayton Gunman Shot 26 People in 32 Seconds, Police Timeline Reveals*, N.Y. TIMES (Aug. 13, 2019), https://www.nytimes.com/2019/08/13/us/dayton-shooter-video-timeline.html [https://perma.cc/BNJ5-YS6P].

60    Kolbe v. Hogan, 849 F.3d 114, 137 (4th Cir. 2017).

61    Heller v. District of Columbia, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("In my judgment, ... D.C.'s ban on semi-automatic rifles ... [is] unconstitutional under *Heller*. In *Heller*, the Supreme Court held that handguns--the vast majority of which today are semi-automatic--are constitutionally protected because they have not traditionally been banned and are in common use by law-abiding citizens. There is no meaningful or persuasive constitutional distinction between semiautomatic handguns and semi-automatic rifles. Semi-automatic rifles, like semi-automatic handguns, have not traditionally been banned and are in common use by law-abiding citizens for self-defense in the home, hunting, and other lawful uses.").

62    *See* Worman v. Healey, 922 F.3d 26 (1st Cir. 2019); Kolbe v. Hogan, 849 F.3d 114 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 469 (2017); N.Y. State Rifle & Pistol Ass'n v. Cuomo, 804 F.3d 242 (2d Cir. 2015); Friedman v. City of Highland Park, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015); *see also* Wilson v. Cook Cty., 937 F.3d 1028 (7th Cir. 2019); Commonwealth v. Cassidy, 479 Mass. 527 (2018), *cert. denied*, 139 S. Ct. 276 (2018).

63    Rand   Paul   (@RandPaul),   TWITTER   (Jun.   23,   2016,   9:48   AM),   https://twitter.com/RandPaul/ status/746022114042478592?s=20 [https://perma.cc/37SN-Q6LM].

64    Matthew Waxman, *Remembering the Whiskey Rebellion*, LAWFARE (Sep. 25, 2018), https://www.lawfareblog.com/ remembering-the-whiskey-rebellion [https://perma.cc/S3UN-TJ8D].

65    Both lawsuits challenged California Penal Code 32310 under the Second Amendment and the large-capacity magazine possession ban in subsections (c) and (d) under the Takings Clause. *Wiese* also included an Equal Protection and vagueness claim, and *Duncan* also included a Due Process claim.

66    Wiese v. Becerra, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018).

67    Duncan v. Becerra, 265 F. Supp. 3d 1106, 1139 (S.D. Cal. 2017).

68    *Id.* at 1133 n.16.

69    Moreover, "if you want to bring down a domestic tyrant, the statistical analysis strongly suggests that nonviolent mobilizations are generally a more promising tack than armed struggle." John Markoff, *Opposing Authoritarian Rule with Nonviolent Civil Resistance*, 48 AUSTRALIAN J. POL. SCI., no. 2, 2013, at 233, 236, http:// dx.doi.org/10.1080/10361146.2013.787670 [https://perma.cc/A7JQ-RV6Y]. *See also* ERICA CHENOWETH & MARIA J. STEPHAN, WHY CIVIL RESISTANCE WORKS: THE STRATEGIC LOGIC OF NONVIOLENT CONFLICT (2011).

70    *Duncan*, 265 F. Supp. 3d at 1130.

71    For example, in July 2016, incensed by police shootings of unarmed black men, Gavin Long used a particularly powerful TAVOR assault rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. James Gill, *Civilians Carrying 'Ultimate Weapon' Gavin Long Used in Baton Rouge Would Be Regarded Worldwide as Insane*, NEW ORLEANS ADVOC. (Aug. 10, 2016), https://www.nola.com/opinions/james_gill/article_4567899b-0cac-5e78-81ad-84729147171f.html [https://

Compendium_Cornell
Page 1084

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12869   Page 513 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

perma.cc/QZ9V-95MU]. This example, as well as the Alexandria baseball field shooting, shows the profound lack of wisdom in encouraging private citizens in modern America to believe they could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government.

[72]   On July 1, 2016, the California legislature enacted the legislation that criminalized possession of high-capacity magazines within the state as of July 1, 2017, and the California electorate strongly endorsed this position in adopting Proposition 63 on November 8, 2016. *See Large Capacity Magazines in California*, GIFFORDS L. CTR. TO PREVENT GUN VIOLENCE (Dec. 10, 2019), https://lawcenter.giffords.org/large-capacity-magazines-in-california/ [https://perma.cc/DR97-PLA9].

[73]   The federal assault weapons ban had prohibited the acquisition of new high-capacity magazines since September of 1994, and the California legislature had further prohibited the purchase, sale, transfer, receipt, or manufacture of such magazines since 2000.

[74]   *See* Duncan v. Becerra, 366 F. Supp. 3d at 1131, 1186 (S.D. Cal. 2019) (holding that California's limitations on high-capacity magazines were unconstitutional).

[75]   Don Thompson, *Delay Sought on Ruling Allowing High-Capacity Ammo Magazines*, ABC NEWS (Apr. 2, 2019), https://abcnews.go.com/US/wireStory/delay-sought-ruling-allowing-high-capacity-ammo-magazines-62120179 [https://perma.cc/T8ES-J29U].

[76]   Duncan v. Becerra, No. 17-cv-1017-BEN-JLB, 2019 U.S. Dist. LEXIS 63045 (S.D. Cal. Apr. 4, 2019).

[77]   *Duncan*, 366 F. Supp. 3d at 1183. Judge Benitez's two opinions were marred by numerous claims that were inaccurate, misleading, or did not stand for the proposition he claimed (often standing for the exact opposite). For example, he stated that "Nationally, the first study to assess the prevalence of defensive gun use estimated that there are 2.2 to 2.5 million defensive gun uses by civilians each year. Of those, 340,000 to 400,000 defensive gun uses were situations where defenders believed that they had almost certainly saved a life by using the gun." *Id.* at 1135. The cited defensive gun use numbers are wildly inaccurate, which underscores the dramatic unreliability of much of the research on which pro-gun forces rely. Since the largest number of homicides in the United States was about 25,000 in 1992, the idea that private gun toters saved lives anywhere close to 400,000 times a year is absurd--as anyone with the most basic knowledge of U.S. homicide rates would know. While these numbers still have currency among Second Amendment enthusiasts, they are widely acknowledged to be among the most wholly inaccurate figures referenced in U.S. policy debates. *See* David Hemenway, *The Myth of Millions of Annual Self-Defense Gun Uses: A Case Study of Survey Overestimates of Rare Events*, 10 CHANCE 6, 6 (1997).

[78]   Wiese v. Becerra, 306 F. Supp. 3d 1190, 1196 (E.D. Cal. 2018).

[79]   *Id.* at 1196-97 (quoting Fyock v. City of Sunnyvale, 779 F.3d 991, 998-99 (9th Cir. 2015)).

[80]   Kolbe v. Hogan, 849 F.3d 114, 150 (4th Cir. 2017).

[81]   *See* Brett Samuels, *Poll: Most NRA Members Support Comprehensive Background Checks*, HILL (Mar. 8, 2018), https://thehill.com/blogs/blog-briefing-room/377455-poll-most-nra-members-support-comprehensive-background-checks [https://perma.cc/6QA2-S683] ("69 percent of NRA members support comprehensive background checks. Among gun owners not in the organization, 78 percent support requiring background checks for all firearm purchases.").

Compendium_Cornell
Page 1085

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12870   Page 514 of 733

THE SWERVE TO "GUNS EVERYWHERE": A LEGAL..., 83 Law & Contemp....

83 LCPR 117

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government
Works.

# Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights

## Dan Edelstein[*]

### Abstract

Most histories of early-modern rights focus on particular concepts of rights: for instance, notions of subjective vs. objective right, or on the presence/absence of particular rights (e.g., self-preservation). But focusing on specific rights has led scholars to pay less attention to what happens to rights as a whole when individuals enter into a political state, and also to miss the fact that historical actors tended to think about rights within broader conceptual regimes. In this paper, I identify three major early-modern rights regimes: the abridgment regime, which emphasizes the abandonment or alienation of rights (e.g., Hobbes); the transfer regime, in which natural rights are transferred to the state, and can only be retrieved under specific conditions (e.g., Spinoza and Locke); and the preservation regime, which insists that we should be able to enjoy the individual exercise of our natural rights even under government (e.g., Jefferson). After laying out the historical origins and conceptual bases of these regimes, I sketch a brief history of their respective trajectories between the early sixteenth and the late eighteenth centuries, focusing in particular on the rather curious and contingent reasons why the preservation regime shot to success after the 1760s.

### Introduction

The history of human rights has recently exploded as a field, but it is a field that, ironically, exhibits a curious anxiety about history. More specifically, this anxiety concerns the chronological depths that historians should, or shouldn't, plumb. One group, following the lead of Samuel Moyn, argue that our contemporary understanding of human rights has shallow intellectual roots: in *The Last Utopia*, Moyn pointed to the 1970s as the "breakthrough" moment; more recently, he extended that chronology back to the 1930s, in his study of *Christian Human Rights*.[1] Other historians have called attention to other pivotal moments, such as the decolonization movement of the 1960s,[2] or nineteenth-century slave-trade courts.[3] But even those who are more willing to recognize the parallels between, say, the 1789 Declaration of the Rights of Man and of the Citizen, and the Universal Declaration of Human Rights hesitate to extend the history of rights much farther back. Lynn Hunt, for instance, situates the "invention of human rights" in the

---

[*] Professor of French, Stanford University.

[1] Samuel Moyn, Last Utopia (2010); The Breakthrough (Jan Eckel & Samuel Moyn eds., 2013); Samuel Moyn, Christian Human Rights (2015) [hereinafter Christian Human Rights].

[2] Steven L.B. Jensen, The Making of International Human Rights: The 1960s, Decolonization, and the Reconstruction of Global Values (2016).

[3] Jenny S. Martinez, The Slave Trade and the Origins of International Human Rights Law (2012).

ISSN 2291-9732

CAL

eighteenth century, and rejects the earlier history of rights as irrelevant, claiming that "'natural right(s)' had too many possible meanings."[4]

In contrast to these historians who draw a line in the past and refuse to pass *plus ultra*, there is a second group that plunges far deeper, and situates the critical turning point for human rights in the late medieval period. One of the most influential scholars in this group is the French legal historian Michel Villey, who left a strong mark on many of the Cambridge school historians, Richard Tuck in chief.[5] According to Villey, the critical moment in the history of rights was the introduction of the concept of "subjective" rights in the fourteenth century—at that point, a right (*ius*) became reconfigured as an entitlement that granted a "legal power" to individuals.[6] Villey contrasted these rights with an "objective" right, the universal justice that classical philosophers, most famously Aristotle and Cicero, placed at the foundation of natural law. Confusingly, this concept was also expressed as *ius*, most famously in Ulpian's definition of justice as the "constant and perpetual will to give to each his due" (*constans et perpetua voluntas ius suum cuique tribuens*).[7] A political conservative, Villey lamented the transition from classical-objective to modern-subjective concepts of right; the Cambridge historians, for their part, mostly celebrate this evolution. But both parties agree that the critical turning point in the history of rights lay in the late Middle Ages (with William of Ockham often serving as a convenient marker), before culminating in the seventeenth century. Indeed, for these historians, the post-seventeenth-century history of rights is often given short shrift. A similar historical logic can be found in Leo Strauss's equally influential account of modern natural right, which he defined as the moment when natural rights became prioritized over natural law.[8] For Strauss, this shift also culminated in the seventeenth century, with Hobbes and Locke.

So where the first group of historians rarely looks back before 1700, the second group tends not to move beyond that date. Accordingly, both have blind spots: it is hard to justify Hunt's claim that the earlier history of natural rights is irrelevant to Enlightenment and revolutionary rights talk, given the close intertwinement of human and natural rights. After all, the French Declaration of Rights itself refers to "les droits *naturels*, inaliénables et sacrés de l'Homme" (Preamble, emphasis added). Conversely, the fixation on the seventeenth century, and particularly on English natural law theorists, is equally problematic. Hobbes may well have distinguished right and law (*ius* and *lex*) more explicitly than his predecessors, but he also argued that we must "lay down" most of our natural

---

[4] Lynn Hunt, Inventing Human Rights 23 (2007).

[5] I discuss Villey's influence on Richard Tuck in Dan Edelstein, Is There a "Modern" Theory of Natural Law? Notes on the History of Human Rights, __ Humanity __ (forthcoming 2016).

[6] See Michel Villey, La genèse du droit subjectif chez Guillaume d'Occam, 9 Archives de philosophie du droit 97 (1964).

[7] Institutes 1.1.

[8] Leo Strauss, Natural Right and History (1950). An important historian who works in this vein is Michael Zuckert, Natural Rights and the New Republicanism (1994). But see also Richard Tuck, Natural Rights Theories (1979).

rights when entering into society (he makes an exception for the right to self-preservation).[9] Even Locke agreed to some extent on this point, insisting that when we gather in a body politic, we must "give up" our two natural powers or rights, namely the right to self-preservation and the right to punish.[10] The revolutionary proposition that, in the words of the 1789 French Declaration, "the goal of every political association is to conserve the natural and imprescriptible rights of man" (art. 2)—an idea also found in the Virginia Declaration of Rights and in the United States Declaration of Independence[11]—was far from an established idea in the seventeenth century.

The missing chapter in the history of rights therefore concerns the transition between the early-modern and modern periods, or roughly speaking, the two centuries between 1600 and 1800. At stake during this period is not so much the *emergence* of a subjective concept of rights (the Villey question), or even the *preponderance* of this concept during this time (the Strauss question), but rather the establishment of a particular "regime" of rights over rival regimes, a regime that stressed the inalienability of rights in political society.

The concept of a rights regime is common in discussions of contemporary human rights practices, where it refers to the "systems of norms and decision-making procedures accepted by states as binding."[12] It is taken for granted that different rights regimes can coexist at the same time, though generally this diversity is driven by geography. In an age before human rights tribunals, there were fewer opportunities for "decision-making procedures," but the observation that there were competing "systems of norms" still holds true. Other factors differentiating these regimes in early-modern Europe were the political narratives in which the regimes were embedded. Most theorists agreed that we possessed natural rights in the state of nature, but conflicts arose over what happened to these rights when we contracted into political society. There were three main possibilities: rights could be *preserved* (the "revolutionary" understanding, which remains our basic definition today); rights could be *abridged*, or even renounced entirely; or rights could be *transferred*, either to the body politic as a whole, or to a civil government. These three rights regimes were not always exclusive, and some accounts of natural rights in political society drew on more than one conception. But together they map out the basic frameworks available for thinking about rights in the seventeenth and eighteenth centuries.

Identifying these different rights regimes can help dispel a number of misconceptions about the early-modern history of rights. First, their lengthy coexistence draws attention to the fact that this history cannot be told as a linear (or worse: teleological) narrative. The rise of "subjective" rights talk between the fourteenth and seventeenth centuries did not inevitably lead to our current understanding of rights as "trumps," valid

---

[9] Thomas Hobbes, Leviathan ch. 14 (1651).

[10] John Locke, Second Treatise of Government §§ 128-130 (1690) [hereinafter Second Treatise].

[11] Virginia Declaration of Rights § 1 (1776).

[12] See Jack Donnelly, Universal Human Rights in Theory and Practice 127 (2002).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12874   Page 518 of 733

at all time and in all places.[13] On the contrary, at different moments in this history, the preservation regime was dismissed as politically dangerous and philosophically naïve. Other historical and political processes also had to come into play for this regime to prevail.

If (and secondly) this regime did ultimately win out over its rivals in the eighteenth century, however, it was not because the Enlightenment facilitated a conceptual breakthrough that was unthinkable in prior centuries. On the contrary, as I argue below, the basic idea that natural rights carried over into political society had been around long before, and was a cornerstone of revolutionary movements in the sixteenth and seventeenth centuries. To ask when, exactly, human rights emerged in their "modern" form is a *question mal posée.*

Finally, on a more methodological level, thinking about the history of natural and human rights in terms of competing regimes, rather than of specific concepts, not only underscores the limited payoff of asking origin questions, but also encourages us to focus more on the unpredictable twists and turns of a longer historical process. It forces us, in a word, to embrace genealogy, and to seek "the accidents, the minute deviations . . . that gave birth to those things that continue to exist and have value for us," and to "reestablish the various systems of subjection" that at different historical junctures conditioned or even silenced certain arguments about rights.[14]

This article tells the story of how the preservation regime won out over its rivals to become the standard rights regime still in place today. I begin by recounting how this regime was first mobilized in the context of two political crises: the French wars of religion and English Civil War. These upheavals in turn spawned two sophisticated responses to the preservation regime: the abridgment regime (with Hobbes) and the transfer regime (with Spinoza and Locke). Finally, I conclude with the preservation regime's revival in the American colonies, where it took the form of "natural constitutionalism," and in France, at the hands of the Physiocrats, before reflecting on the implications of these regional differences for the respective courses of the American and French Revolutions.

## I. Weaponizing Natural Rights: From the Saint-Bartholomew's Day Massacre to the English Civil War

By the end of the eighteenth century, it no longer was current to think of rights in any other way than in accordance with the preservation regime. The question of when rights became "rights" can thus be phrased as: when did it cease to become common to argue that rights could be transferred or abandoned? When we approach the history of rights from this angle, the most surprising observation we can make is that the preservation regime, which in many respects is the most contemporary, is in fact very old.

Already in sixteenth-century France, there were authors who employed the language of natural rights to describe the political liberties and privileges that individuals

---

[13] Ronald Dworkin, Taking Rights Seriously (1977).

[14] Michel Foucault, Nietzsche, Genealogy, History, in The Foucault Reader 76, 81-83 (Paul Rabinow ed., 1984).

could claim in society. For instance, in his famous discourse "on voluntary servitude," written around 1550, Etienne de La Boétie argued that "if we live with the rights that nature gave us [*les droits que la nature nous a donnés*] and according to her lessons, we will naturally obey our parents, follow reason, and be enslaved to no-one."[15] These rights, as this passage clearly indicates, were meant to remain in force in civil society; to abandon them was to alienate ourselves from our very humanity. As La Boétie wrote elsewhere, "man must . . . retrieve his natural right [*se remettre en son droit naturel*], and, so to speak, revert from beast to human."

Montaigne would remark many years later that La Boétie's argument was not particularly original.[16] The essayist was in part seeking to defend his friend from accusations of Protestantism (see below), but the premises of his treatise can indeed be traced back to conciliarist and scholastic theories, which had been developed over the previous four hundred years.[17] As Quentin Skinner has shown, these ideas had enjoyed a rebirth at the beginning of the sixteenth century in Paris, where the Scottish theologian John Major led a revival of Thomist natural law.

By the late sixteenth century, the preservationist argument would be caught up in the religious conflict then engulfing France—it was revolutionary Huguenots who first published La Boétie's treatise, and they advanced similar ideas in their own pamphlets (such as the 1574 *Le Reveille-Matin des François*, or Théodore de Bèze's 1575 *Du droit des magistrats sur leurs subjets*, where Bèze repeatedly speaks of "droits humains"[18]). This confessional association would in fact continue to color the preservation regime up through the early eighteenth century. After the revocation of the Edict of Nantes, in 1685, Protestant exiles would again brandish the language of natural rights to defend themselves against a despotic Catholic monarch: we find this argument, for instance, in Jean Claude's *Les Plaintes des protestants cruellement opprimés dans le royaume de France* (1686), Jean Tronchin du Breuil's *Lettres sur les matières du temps* (1690), and Jean Jennet's four-volume history of the Dutch Republic (1704).

For most of the seventeenth century, however, the preservation regime vanished from France. The reason for this may, ironically, have more to do with Catholic zealots. The *ligueur* Jean Boucher had applauded the Jesuit-educated Jean Châtel's attempt on the life of Henri IV (in 1594), arguing that "we know what has always been said in judgment of tyrants . . . Cicero wrote . . . that all natural rights vanish before tyrants [*tous droicts de*

---

[15] Étienne de La Boétie, Discours de la servitude volontaire 57-62 (1922); see Nannerl Keohane, The Radical Humanism of Étienne de La Boétie, 38 J. Hist. Ideas 119 (1977).

[16] Michel de Montaigne, De l'Amitié, in Essais bk. I, ch. 28 (1580).

[17] For this history, and the other details in this paragraph, see 2 Quentin Skinner, Foundations of Modern Political Thought (1978); see also Ralph E. Giesey, Rulership in France, 15th-17th Centuries (2004); John Witte, The Reformation of Rights: Law, Religion and Human Rights in Early Modern Calvinism (2007); Paul-Alexis Mellet, Les Traités monarchomaques: confusion des temps, résistance armée et monarchie parfaite, 1560-1600 (2007).

[18] Théodore de Bèze, Du droit des magistrats sur leurs subjets 87 (1575).

*nature cessent envers les tyrans*]."[19] When François Ravaillac murdered Henri IV in 1610, it was his purported Jesuit connection (and the recent justification of tyrannicide by the Jesuit theologian Juan de Mariana, in *De Rege et regis institutione*, 1598),[20] that led to a purge of Jesuit authors along with any scholars who had advanced what was now viewed as a regicidal doctrine.[21] The emergence of an absolutist political culture in France thus corresponded with a silencing of natural rights talk.

But it was not silenced everywhere. Across the Channel, during the English Civil War, another group of rebels latched on to the idea that all men conserved natural rights in society. This group was commonly known as the Levellers.[22] Two of their leading pamphleteers in particular, John Lilburne and Richard Overton, combined the natural rights arguments of the French Huguenots with more traditional claims about English "rights and liberties." Lilburne refers to them in one breath as "naturall, rationall, nationall, and legall liberties, and freedoms,"[23] while Overton made this identification even more explicit in *An Arrow Against all Tyrants* (1646), where he argued that the charges on which he was held in the Tower of London were "illegal, and contrary to the natural rights, freedoms and properties of the free Commoners of England (confirmed to them by Magna Charta, the Petition of Right, and the Act for the abolishment of the Star-chamber)."[24] The effect of this identification was double: on the one hand, it gave greater legitimacy to civil rights, and even left open the possibility of extending them beyond those spelled out in ancient-constitutional documents; on the other hand, it inscribed natural rights in a constitutional framework, which in turn "confirmed" them. The merger of natural rights theory with constitutional liberties—a political discourse that I call "natural constitutionalism"—would remain an Anglo-American idiosyncrasy, and would be one of the main differences between the American and French revolutionary rights regimes in the late eighteenth century.

---

[19] François de Vérone Constantin [Jean Boucher], Apologie pour Iehan Chastel Parisien, execute a mort, et pour les peres & escholliers, de la Societé de Iesus, bannis du Royaume de France 81 (1595). Skinner does not mention this work, but does discuss Boucher and other ligueurs in passing. Skinner, supra note 17, at 345-47; see also Mack P. Holt, The French Wars of Religion 131-32 (1995).

[20] See Harro Höpfl, Jesuit Political Thought: The Society of Jesus and the State, c.1540-1630 ch. 13 (2004); Harald Braun, Juan de Mariana and Early Modern Spanish Political Thought (2007); see generally Franklin L. Ford, Political Murder: From Tyrannicide to Terrorism (1985).

[21] See Lawrence Brockliss, French Higher Education in the Seventeenth and Eighteenth Centuries: A Cultural History 298-300 (1987).

[22] See notably The Levellers in the English Revolution (G.E. Aylmer ed., 1975); on the Puritan roots of this movement, see David Como, Radical Puritanism, c. 1558-1660, in The Cambridge Companion to Puritanism 241 (John Coffey & Paul C.H. Lim eds., 2008).

[23] See John Lilburne, The Charters of London: or, The second part of Londons liberty in chaines discovered 1 (1646).

[24] Richard Overton, An Arrow Against all Tyrants (1646), reprinted in The English Levellers 69 (Andrew Sharp ed., 1998); see also the subtitle of this pamphlet, which announces its subject: "Wherein the originall rise, extent, and end of magisterial power, the natural and national rights, freedoms and properties of mankind are discovered, and undeniably maintained." Id. at 54. By the same author, see also To the high and mighty states, the knights and burgesses in Parliament assembled (1646).

But the Levellers' ideas were not representative of political thought on the Parliamentary side. Cromwell and his entourage remained skeptical of natural rights, which never became part of the official discourse: they are missing from the "Act Declaring and Constituting the People of England to be a Commonwealth and Free-State" (1649), as well as from the constitution that Parliament eventually did pass in 1753, the *Instrument of Government*. Politically, the Levellers were swiftly disbanded and even physically eliminated after 1649. Their ideas resurfaced now and then during the Restoration, most notably in the writings of William Penn, and then after the Glorious Revolution, in pamphlets by radical Whigs.[25] But by the late seventeenth century, the preservation regime of rights had largely been displaced by two others.

## II. The State Strikes Back: The Abridgment and Transfer Regimes of Rights

The first of these other regimes was most explicitly formulated by Thomas Hobbes in *De Cive* (1642), and then again in *Leviathan* (1651). Hobbes began by fully accepting the premise of the preservation regime, namely that we hold from nature certain rights.[26] He even argued that some of these rights (chiefly those dealing with the preservation of our lives, bodies, or physical liberty) could be enjoyed under any circumstances. But he rejected the conclusion that we could maintain all of our natural rights in society, insisting instead that we had to "lay them down." [27] With Hobbes, then, we encounter an "abridgment" regime of rights: where the Levellers had insisted that a legitimate political order must preserve the natural rights of subjects, Hobbes countered that the very condition for political order was the renunciation of most of these rights.

Hobbes's position was not entirely new. An antecedent for it can be found in legal interpretations of the *lex regia*, the Roman law theory of sovereignty, according to which the people alienated their political rights after electing a new emperor.[28] It was precisely this situation that Grotius had in mind when he, too, discussed the alienation of political rights:

> It is lawful for any Man to engage himself as a Slave to whom he pleases . . . . Why should it not therefore be as lawful for a People [who] are at their own Disposal, to deliver up themselves to any one or more Persons, and transfer the Right of governing them upon him or them, without reserving any Share of that Right to themselves?[29]

---

[25] See, e.g., William Penn, The Peoples Ancient and Just Liberties Asserted in the Tryal of William Penn, and William Mead 58 (1670); John Toland, A Letter to a Member of Parliament, Shewing, That a Restraint on the Press is Inconsistent with the Protestant Religion 7 (1698).

[26] See generally Noel Malcolm, Aspects of Hobbes ch. 13 (2002); Kinch Hoekstra, Hobbes on Law, Nature, and Reason, 41 J. Hist. Phil. 111 (2003); Quentin Skinner, Hobbes and Republican Liberty (2008); Philip Pettit, Made with Words: Hobbes on Language, Mind, and Politics (2008); Perez Zagorin, Hobbes and the Law of Nature (2009).

[27] Hobbes, supra note 9, ch. 14.

[28] See David Johnston, The Jurists, in The Cambridge History of Greek and Roman Political Thought 616 (C.J. Rowe & Malcolm Schofield eds., 2000).

[29] Hugo Grotius, The Rights of War and Peace 261 [1.3.8] (Richard Tuck ed., 2005).

As the Levellers and other rebels insisted, on the contrary, that natural rights must always be retained, Hobbes did give the abridgment regime a distinctive and defining new twist. Before Hobbes, the state of nature and civil society tended not to be viewed as such existentially different conditions. By driving an ontological wedge between them, he made it far easier to imagine that something natural, like rights, might not persist in society. As we will see, one of the preconditions for restoring the preservation regime in the eighteenth century would be the re-joining of nature and society. But the split that Hobbes consumed between the two states would have a lasting effect: even authors who disagreed with his rights claims often accepted this division.

Hobbes was a controversial author, but his abridgment regime proved politically expedient in Restoration and Williamite England.[30] Many Tory authors, including Jeremy Taylor, Samuel Parker, William Sherlock, and (in the early eighteenth century) Richard Fiddes adopted this argument about rights to defend a more powerful figure of the sovereign. Even some of Hobbes's philosophical opponents could agree with him on rights. Richard Cumberland, who became Bishop of Petersborough in 1691, and devoted many chapters of his *De legibus naturae* (1672, English trans., 1727) to assailing Hobbes, nonetheless granted him this point: "I own, indeed, That the various Vicissitudes of Human Life and Actions, do necessarily introduce various Alienations of antient Rights, and many new Regulations concerning them."[31] Hobbes's great challenger on the continent, Samuel von Pufendorf, also strongly criticized his definition of a "right," but similarly allowed for civil laws to curb our natural rights in society.[32]

The strongest challenge to the Hobbesian thesis came not from the preservationists, but from a third rights regime. Hobbes himself had disclosed its possibility, arguing in *Leviathan* that there were, in fact, two ways of "laying aside" a natural right: the first was by "renouncing it," in which case the right simply disappears; but the second was by "transferring it to another," in which the case "the benefit" of the right is granted "to some certain person, or persons" (ch. 14). This "transfer" hypothesis would be taken up shortly thereafter by Spinoza in his *Theological-Political Treatise* (1670).[33]

Spinoza famously distinguished his argument in this work from Hobbes's own political thought, claiming that "I always preserve natural right in its entirety [*ego naturale jus*

[30] Jon Parkin, Taming the Leviathan: The Reception of the Political and Religious Ideas of Thomas Hobbes in England 1640-1700 (2010); Samuel I. Mintz, The Hunting of Leviathan: Seventeenth-Century Reactions to the Materialism and Moral Philosophy of Thomas Hobbes (2010).

[31] Richard Cumberland, A Treatise of the Laws of Nature 677 (Jon Parkin ed., John Maxwell trans., 2005).

[32] Samuel von Pufendorf, The Whole Duty of Man According to the Law of Nature 2.13 (Andrew Tooke trans., 1705).

[33] The following discussion of Spinoza draws on Alexandre Matheron, Individu et communauté chez Spinoza (1969); Douglas J. Den Uyl, Power, State and Freedom: An Interpretation of Spinoza's Political Philosophy (1983); Etienne Balibar, Spinoza and Politics (Peter Snowdon trans., 1998); Steven Barbone & Lee Rice, Introduction, in Spinoza, Political Treatise 1 (Samuel Shirley trans., 2000); Steven Nadler, A Book Forged in Hell: Spinoza's Scandalous Treatise and the Birth of the Secular Age (2011).

*semper sartum tectum conservo*]."[34] This statement has led some commentators to conclude that Spinoza argued that individuals could preserve their natural rights in society, or that he "leaves the citizen with his natural right intact."[35] But this conclusion rests on a misreading of what Spinoza meant by "natural right." Spinoza used the expression *jus naturale* in this letter in the singular: he is therefore not claiming that individuals preserve their subjective natural rights (singular entitlements) in their entirety, only that his own argument does not contradict objective natural right (universal justice).[36] And he believed it possible to remain faithful to the principles of natural right all the while obliging citizens to renounce the individual enjoyment of subjective natural rights.

The mechanism for this process lay in Spinoza's concept of a rights transfer. By means of the social contract, Spinoza argued, "each individual hands over [*transferat*] the whole of his power to the body politic," after which "the latter will then possess sovereign natural right over all things" (16.45). There is no question that this transfer amounts to a loss: "[I]t is clear that by transferring, either willingly or under compulsion, this power into the hands of another, [the individual] in so doing necessarily cedes also a part of his right" (16.44). But in Spinoza's account, our original rights do not just go up in smoke, as they did for Hobbes. Instead, they are assumed by the collectivity: we "enjoy *as a whole* the rights which naturally belong to [us] as individuals." By transferring our rights, however, we can no longer enjoy them on our own. Indeed, for Spinoza, we do not preserve, as individuals, any of our original natural rights in society, not even the right to self-preservation.[37] There are no "rights provisions" in Spinoza's social contract theory, unless they were clearly specified at the time the contract was established: "[I]f [men] had wished to retain any right for themselves, they ought to have taken precautions for its defence and preservation" (16.48). But such "precautions" were the exception, not the norm.

Identifying this third type of rights regime can help clear up a confusion in the history of rights, namely the place of John Locke in the genealogy of the revolutionary declarations of the late eighteenth century.[38] The influential, libertarian interpretation of Locke, advanced for instance by Robert Nozick or Michael Zuckert, casts him as the fore-

---

[34] Spinoza to Jarig Jelles, June 5, 1764 (letter no. 50), in Complete Works 891 (Michael L. Morgan ed., Samuel Shirley trans., 2002).

[35] Jonathan Israel, Radical Enlightenment 57 (2001); see also Nadler, supra note 33, at 194; Arthur P. Monahan, The Circle of Rights Expands 193 (2007).

[36] See also the use of right in the following passage: "[T]he right and ordinance of nature [ *Jus et Institutum naturae*], under which all men are born, and under which they mostly live, only prohibits such things as no one desires, and no one can attain." Theological-Political Treatise, in Complete Works 16.19. (Rather than providing page numbers for citations, I will refer to chapter and paragraph number, both inline and in notes).

[37] "Men either tacitly or expressly handed over to it [the sovereign] all their power of self-defence, or in other words, all their right." TPT 16.47; see also Robert McShea, Political Philosophy of Spinoza 187 (1968) ("Spinoza's definition of natural right excludes the rights-of-man thesis.").

[38] See esp. James Tully, A Discourse on Property: John Locke and His Adversaries (1980); Jeremy Waldron, The Right to Private Property (1988); A. John Simmons, The Lockean Theory of Rights (1992).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12880   Page 524 of 733

father of the preservation regime of rights.[39] Much of the debate over Locke's theory of rights has taken place among philosophers, who focus on Locke's own internal arguments. When considered from a broader historical perspective that spans the work of generations of theorists, however, it becomes clearer that Locke's arguments about rights are more closely aligned with the transfer rather than with the preservation regime. Like Spinoza (whom he read and annotated), Locke argues that we transfer our rights when entering into political order.[40] There were some exceptions to this rule: he does affirm that we preserve a natural right to religious freedom at all times,[41] and Locke's labor theory of property can be read as extending into society (though this case is less clear, since civil law and money disrupt the natural economy of property). But to describe Locke as a strong and clear advocate for the preservation regime is ungrounded: Locke does not adhere to the later revolutionary belief that political associations have as their goal the protection of rights, but rather he argues that the very reason we enter into society in the first place is because natural rights are insufficient for protecting our life, liberty, and fortune.

Locke is explicit about the fact that we must "give up" our natural rights when joining a body politic. He discusses this point in the *Second Treatise of Government*, chapter 9, "Of the Ends of Political Society and Government." Here he sums up the situation of man in the state of nature, where "to omit the liberty he has of innocent delights, a man has two powers" (§ 128).[42] These powers are (1) "doing whatsoever he thought fit for the preservation of himself, and the rest of mankind," and (2) the executive "power of punishing" (§§ 129-30); both of these "powers" are elsewhere described as "rights" (see, e.g., §§ 8-11). He then describes what happens to these powers or rights when we contract into society: "Both these he gives up, when he joins in a private, if I may so call it, or particular politic society, and incorporates into any common-wealth" (§ 128). This "giving up" is construed, in part at least, as a loss, as Locke's further comments about the effects of this transition suggest: "[H]e is to *part also* with as much of his natural liberty, in providing for himself, as the good, prosperity, and safety of the society shall require" (§ 130, emphasis added). Parting with our natural rights is the price to pay for society's greater guarantees

---

[39] The classic libertarian interpretation is Robert Nozick, Anarchy, State, and Utopia (1974), esp. ch. 3; for an overview of his argument, and other libertarian views on Locke, see Natural Rights Liberalism from Locke to Nozick (Ellen Frankel Paul et al. eds., 2005). For a typical expression of this interpretation, see Zuckert, supra note 8, at 302 ("the institution of government" for Locke is designed for "the securing of rights").

[40] See Wim Klever, Locke's Disguised Spinozism [Part 1], 6(11) Conatus: Filosofia de Spinoza 61 (2012); Wim Klever, Locke's Disguised Spinozism [Part 2], 6(12) Conatus: Filosofia de Spinoza 53 (2012).

[41] As Locke noted elsewhere, in A Letter Concerning Toleration and Other Writings 53 (Mark Goldie ed., 2010). ("Liberty of Conscience is every mans natural Right.").

[42] The fact that our natural right to private property is not also listed here implies that for Locke, this right falls under the more general right to self-preservation; hence, it follows that it, too, is given up when we enter into society. Support for this interpretation can be found in his Second Treatise, supra note 10, § 25: "[M]en, being once born, have a right to their preservation, and consequently to meat and drink, and such other things as nature affords for their subsistence." Let us also not forget that for Locke, our first property is our "own person," id. § 27; therefore, it is logical that his theory of property should be folded into his broader ideas about self-preservation.

of security: "[M]en unite into societies, that they may have the united strength of the whole society to secure and defend their properties . . . ." (§ 136).

As for Spinoza before him, "giving up" in Locke thus has the double sense of resigning and transferring: we give up, but we give up to.[43] Therein lies the principal difference between the transfer and the abridgment regimes: in the former, we hand over our rights to the community, whereas in the latter, they just vanish. But what happens to these rights once they've been transferred? Locke writes that the government has a "fiduciary power" with regards to the people (§ 156), an expression which could be read as implying that government manages our rights on our behalf, as a trustee.[44] But as Peter Laslett has pointed out, Locke never literally defines government as "a trust," but rather describes the process through which we place trust in the government: see for instance, "the community put the legislative power into such hands as they think fit, with this trust, that they shall be governed by *declared laws* . . . ." (§ 136, underline added).[45]

This is an interesting and important passage, as it underscores how natural rights do not really continue to be operative in any practical capacity in the political order. The legitimacy of government comes from the trust placed in it, and the rights given up to it, but governments do not exercise power directly on the basis of rights. Rather, it is through "declared laws," or as Locke writes elsewhere, "stated rules," or "established and promulgated laws." As Alex Tuckness has argued, Locke believed that the legislature takes the natural "powers" we transferred to it and transforms them into a new, legislative power.[46] The institution of government is thus less the result of a fiduciary than of a quasi-alchemical process, turning individual rights into collective laws.

This discussion of Locke's theory of rights in society could be developed further, notably with respect to the right of resistance. But the broader point I would stress is that, even if there are some preservationist elements in Locke's theory of rights—and there clearly are, most notably the right to religious conscience—Locke certainly did not stress overall a preservation regime of rights.

What's more, there's strong evidence that he was not read, at the time, as doing so. One of his friends and fellow Whig theorists, Matthew Tindal, modeled his own political arguments on Locke's, and similarly emphasized the transfer regime. Tindal steered close to the Lockean line in his *Essay Concerning the Power of the Magistrate* (1697), a work that he sent to Locke in their first recorded correspondence, and where he summarized the transfer thesis in terms that left little place for the preservation of rights:[47]

---

[43] Locke also uses the language of transfer: see notably "[N]o body can transfer to another more power than he has in himself." Second Treatise, supra note 10, § 135.

[44] See, e.g., Ruth Grant, John Locke's Liberalism 69 (1987).

[45] See Peter Laslett, Introduction, in John Locke, Two Treatises of Government 115 (1988).

[46] Alex Tuckness, Locke and the Legislative Point of View (2002).

[47] See Tindal to Locke, Jan. 20, 1697, and also his letter of Oct. 9, 1701, in Electronic Enlightenment Scholarly Edition of Correspondence (E.S. de Beer ed., 2008).

> The only Difference between being in a State of Nature, and under Government, consists in this, that under Government Men have debarred themselves from exercising their natural Rights, and intrusted the Magistrate to do those things that in the State of Nature every one of them had a Right to do; so that the Magistrate's Power is not larger, but theirs more contracted than it was in that State.[48]

But it wasn't only Locke and friends who thought about rights in accordance with the transfer regime. It would continue to attract supporters well into the eighteenth century. One publication that ensured that the transfer regime would resonate throughout the eighteenth century, both in Britain and in the American colonies, was *Cato's Letters* (first published 1720-23). In letters authored by Thomas Gordon, we read, for instance, how "[t]hat right which, in the state of nature, every man had, of repelling and revenging injuries . . . is transferred to the magistrate, when political societies are formed, and magistracy established"; he also writes about how "men quitted part of their natural liberty to acquire civil security."[49] Rather than "understanding the purpose behind the institution of government" as "the securing of rights," as Michael Zuckert has argued, Gordon's Cato (and Trenchard's Cato wasn't always on the same page) affirmed on the contrary that in society we exchange natural rights for civil laws, again in accordance with the transfer regime.[50]

At the dawn of the Enlightenment, therefore, there were essentially three different "rights regimes," or frameworks for thinking about rights, that shared the stage. To some extent, these were rival theories, particularly in the case of the abridgment and the preservation regimes. The transfer regime was more ambiguous: on the one hand, it could be combined with preservationist arguments, as we saw with Locke and others who wanted to retain *some*, if not all rights; on the other, it shared a resemblance with (and in many respects began as a revision of) the abridgment regime, since it similarly insisted on our *loss* of rights. But perhaps the most relevant point to make from a historical perspective is that nothing suggested, in the early 1700s, that the preservation regime would come to dominate the landscape of political thought later that century. If anything, the opposite was true: the voices who argued for the preservation of rights in society tended to simply state this claim and then move on. The preservation regime was indeed the least theorized of the three; accordingly, it is found more commonly in polemical writings, such as those of the French Huguenot exiles or the English radical Whigs, and less so in works of political theory.

In the second half of this paper, I address the question of how the preservation regime rose to prominence in the eighteenth century. But first I would like to consider a central irony in the history of rights. As we have seen, the preservation regime was behind the early bursts of rights talk in the (French) sixteenth and (English) early-seventeenth centuries, and would then again become the dominant paradigm for the revolutionary

---

[48] Matthew Tindal, An Essay Concerning the Power of the Magistrate 10 (1697).

[49] See respectively letters no. 55 (Dec. 2, 1721) and no. 33 (June 17, 1721), in Cato's Letters (Ronald Hamowy ed., 1995).

[50] See Zuckert, supra note 8, at 302. Interestingly, John Trenchard's letters tend to describe rights in light of the preservation regime. See letters no. 20, 90, and 91, in Cato's Letters, supra note 49. But Trenchard does not delve into social contract theory in the same way as does Gordon.

rights regimes of the American colonies and France. But it was largely missing from the period in the middle, which corresponds to the canonical moment of "high theory" in the history of natural rights—roughly speaking, from Hobbes to Rousseau. Viewed from this perspective, the classical period of natural right theory ceases to appear as the crucible of modern rights thought (which is how most contemporary rights theorists depict it), but instead stands out as a curious parenthesis, which ultimately had little bearing on the theories and practices of rights in revolutionary times. The reason for their irrelevance lies in the fact that these were the theorists, as I noted earlier apropos of Hobbes, who placed the greatest distance between the natural and civil states of humanity, thereby facilitating arguments about renunciation or transfer. It took the Enlightenment's rejection of this natural/social divide, and predilection for more "natural" theories of society, to make the preservation regime emerge as the most appealing and only plausible approach to thinking about rights.

## III. Rights Regimes in the Age of Revolutions

The story of how the abridgment and transfer regimes fell by the wayside is very different for the British Atlantic colonies than for France, and in this third section I will briefly recount these twin tales. While the Declarations that capped off the eighteenth century bore a strong family resemblance, they were fraternal twins at best, and possibly even *faux amis*. What becomes apparent as we carry this study forward is how the preservation regime in France stayed close to its natural law origins, whereas the American colonists adopted a more idiosyncratic version, fusing natural law and English constitutionalism.

Perhaps the most striking observation to be made, when considering the American history of natural rights, is that in the Atlantic colonies—and particularly in the province of Massachusetts Bay—natural constitutionalism thrived from early on in the eighteenth century. During the first Great Awakening, in the 1740s, Bostonians were already framing their arguments in terms of natural, constitutional rights. Elisha Williams, a minister, Harvard graduate, and rector of Yale College, argued in 1744 that "The Rights of *Magna Charta* depend not on the Will of the Prince or the Will of the Legislature; but they are the *inherent* natural Rights of *Englishmen*." He also drew heavily on natural law theory, in this case on "the celebrated Mr. *Lock*" and "his *Treatise of Government*."[51]

A few years later, on the centennial of Charles I's execution, the Boston reverend Jonathan Mayhew offered a full-throated defense of Parliament's actions, as necessary "to vindicate their natural and legal rights: to break the yoke of tyranny, and free themselves and posterity from inglorious servitude and ruin." John Adams would later point to this sermon as one of the earliest expressions of "the principles and feelings which produce[d] the Revolution."[52]

---

[51] Elisha Williams, The Essential Rights and Liberties of Protestants 64, 5 (1744).

[52] Jonathan Mayhew, A Discourse Concerning Unlimited Submission and Non-Resistance to the Higher Powers 12 (1750); 10 John Adams, The Works of John Adams 301 (Charles Francis Adams ed., 1856).

But the most famous and sophisticated theorist of natural constitutionalism was James Otis, one of the early New England leaders of the American Revolution. Otis was a lawyer, and was very well versed in the continental tradition of natural law theory. Hence, in his famous pamphlet on *The Rights of the British Colonies Asserted and Proved* (written in response to the Sugar Act of 1764), Otis grounded his arguments in natural law: "There can be no prescription old enough to supersede the law of nature, and the grant of God almighty; who has given to all men a natural right to be *free*, and they have it ordinarily in their power to make themselves so, if they please." But he was equally passionate about the constitutional rights of British subjects:

> The common law is received and practiced upon here, and in the rest of the colonies; and all antient and modern acts of parliament that can be considered as part of, or in amendment of the common law, together with all such acts of parliament as expressly name the plantations; so that the power of the British parliament is held as sacred and as uncontroulable in the colonies as in England.[53]

Clearly, for Otis, the source of rights wasn't an either/or question—*both* natural law *and* English constitutionalism were essential ingredients to his defense of the colonists' rights. Constitutionalism provided Otis (and his fellow Americans) with specific examples of rights, particularly in criminal procedure; but natural law allowed him to extend rights to the broader political power of self-government. Most of the historiography of American rights privileges one source of rights to the detriment of the other, when in fact both were critical for producing the American revolutionary discourse of rights.[54]

Indeed, it was both in terms of natural law and English constitutionalism that the Americans would march toward independence. Congress made this very explicit in its "Declaration and Resolves of the First Continental Congress," which asserted that "the inhabitants of the English colonies in North-America, by the immutable laws of nature, the principles of the English constitution, and the several charters or compacts, have the following RIGHTS." What's revealing about this declaration, and would set a precedent for subsequent ones, is that the juxtaposition of natural and constitutional sources of rights would be teased apart in the articles or resolves. Here, the first resolve draws clearly from natural law, and refers to the universal rights of all individuals ("they are entitled to life, liberty and property"). But the second resolve moves specifically to "all the rights, liberties, and immunities of free and natural-born subjects, within the realm of England."

As these two sources become untangled in the enumeration of specific rights, we can better appreciate why the American and French declarations had a superficial resemblance, yet differed so much in detail. Both sets of revolutionaries asserted their most basic political rights in the name of natural law, but the Americans then pivoted to re-

---

[53] The Rights of the British Colonies Asserted and Proved 12, 71-72 (1764).

[54] I deal with this issue in more detail in the book version of this article. The importance of constitutionalism for American rights has been emphasized in particular by John Philip Reid, notably in Constitutional History of the American Revolution (1995); whereas the natural law influence was stressed in the older "liberal" historiography, as well as by Straussian theorists: see, respectively, Louis Hartz, The Liberal Tradition in America (1955), and Zuckert, supra note 8.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12885   Page 529 of 733

asserting their (soon to be former) English constitutional rights. The Maryland declaration took a revealing and blunt approach to this effort, simply importing English common law rights wholesale:

> [T]he inhabitants of Maryland are entitled to the common law of England, and the trial by Jury, according to the course of that law, and to the benefit of such of the English statutes, as existed at the time of their first emigration, . . . and of such others as have been since made in England, or Great Britain, and have been introduced, used and practiced by the courts of law or equity.[55]

As this passage highlights, what the Americans wished to preserve above all were the common law rules of criminal procedure, chief amongst which was the trial by jury.[56] American revolutionaries waxed lyrical over this right, and every state declaration secured it by name. But if trial by jury was the centerpiece of this system, it was not the only part. The state declarations overflowed with other criminal procedural rights, again all taken from English common law. They forbade warrantless searches and excessive bail, and insisted on the quintessential English right of *habeas corpus*. In this respect, the Americans continued to be good followers of Blackstone, who had similarly insisted on the unique importance of the English justice system for preserving English liberties and natural rights: the trial by jury was "the principal bulwark of our liberties" and "a privilege of the highest and most beneficial nature."[57]

Many of these procedural rights would be enshrined in the Bill of Rights: indeed the fourth, fifth, sixth, and eighth amendments all deal with the criminal justice system. If one adds in the seventh amendment, which deals with civil trials, then a full half of the original ten amendments concern "judicial" rights and criminal procedure. The larger point here is that these rights are wholly foreign to natural law theory, and derive solely from English common law tradition. It is no surprise, then, that none of these features of American rights talk would appear in the French Declaration of Rights. No other common law countries, let alone civil law ones (like most of France), enjoyed such detailed criminal procedural rights, or the precedent of an earlier Bill of Rights (i.e., the 1689 English Bill of Rights). Anglo-American rights talk thus stands out as an anomaly in the longer history of early-modern rights.

How did the French, then, come around to insist on the preservation regime of rights in their revolutionary declarations? Were they modeling their claims on the Americans, as Georg Jellinek suggested over a century ago?[58] The French were certainly well attuned to political developments across the Atlantic. Benjamin Franklin and the duc de La Rochefoucauld d'Anville (himself a future member of the Assembly) had published a translation, in 1783, of the major political documents of the American Revolution, including

---

[55] Md. Const. of 1776, Decl. of Rts., art. III. More broadly, see Forrest McDonald, Novos Ordus Seclorum 40 (1985).

[56] See Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction (1998); see also Jack Rakove, Original Meanings 294-95 (1996).

[57] 3 William Blackstone, Commentaries on the Laws of England 349 (Thomas P. Gallanis ed., 2016) (1768).

[58] Georg Jellinek, The Declaration of the Rights of Man and of Citizens (Max Farrand trans., 1901) (1895).

the thirteen state constitutions or colonial charters, six of which were preceded by declarations of rights.[59] Shortly thereafter, in 1788, the revolutionary enthusiast Filippo Mazzei came out with a very popular history of the American Revolution, which dealt at length with the Virginia Declaration of rights (included there in translation as well).[60] Some transatlantic connections were even more direct: the marquis de Lafayette began collaborating with Thomas Jefferson on drafts for a French declaration in January 1789, and would continue to consult with his American friend up through July.[61]

But other historians have pointed out the significant differences between "rights of man" and *droits de l'homme*. Writing at the time of the bicentenary, Marcel Gauchet and Lucien Jaume both questioned the extent to which the 1789 Declaration really afforded full-blown rights at all. The French document was equivocal, far from absolute, and not even wholly concerned with rights: half of the articles in the Declaration deal with laws, not rights. Taking their inspiration from Alexis de Tocqueville, Gauchet and Jaume saw in this *légicentrisme* a congenital Gallic obsession with a strong, absolutist state, purveyor of the law.[62]

While I agree with Gauchet and Jaume that French rights talk was no mere translation or imitation of Anglo-American rights claims, I present here a very different account of their differences. French revolutionary rights talk, I argue, can be traced back to continental natural law sources, not of the Hobbesian, absolutist variety, but rather of a far more liberal sort. Indeed, if the preservation regime of rights regained prominence in the eighteenth century, it was in large part thanks to a small group of economists known as the Physiocrats.[63] Given the revolutionary associations of this regime in the sixteenth century, it is somewhat surprising that a group of writers with such strong ties to the French crown revived it in the eighteenth; but then again, it is actually not all that surprising, since Physiocracy, more than any other eighteenth-century school of political thought, brought nature and society back into close proximity. To quote the title of one of their best known statements, the Physiocrats preached *L'Ordre naturel et essentiel des sociétés politiques* (a work by Pierre-Paul Le Mercier de La Rivière, published in 1767). They also placed the question of natural rights in society at the heart of a very real and pressing issue that consumed public attention in the 1750s and 1760s: the grain trade.

---

[59] Constitutions des treize États Unis de l'Amérique (1783).

[60] 1 Filippo Mazzei, Recherches historiques et politiques sur les États-Unis de l'Amérique septentrionale 154-63 (1788). More broadly, see Durand Echeverria, Mirage in the West: A History of the French Image of American Society (1957).

[61] See Thomas Jefferson, Letter to James Madison, Jan. 12, 1789, in 14 The Papers of Thomas Jefferson Digital Edition 436 (Barbara B. Oberg & J. Jefferson Looney eds., 2008); see also Lloyd S. Kramer, Lafayette in Two Worlds: Public Cultures and Personal Identities in an Age of Revolutions (2000).

[62] See in particular Marcel Gauchet, La Révolution des droits de l'homme (1989); Les Déclarations des droits de l'homme (Lucien Jaume ed., 1989).

[63] On the Physiocrats, see most notably Catherine Larrère, L'Invention de l'économie au XVIIIe siècle: du droit naturel à la physiocratie (1992); Michael Sonenscher, Physiocracy as a Theodicy, 23 Hist. Pol. Thought 326 (2002); Liana Vardi, The Physiocrats and the World of the Enlightenment (2012).

Before 1750, very few French writers had paid much attention at all to natural rights: Montesquieu, for instance, does not discuss natural rights in any of his major works; they are largely missing from Voltaire's pre-1750 writings, as well. But in 1747, the future leader of the Physiocrats, François Quesnay, was already developing the preservation regime in the second edition of his *Essai physique sur l'œconomie animale.* Here we find a section entitled "La Liberté," in which we read that "Men have natural and legitimate rights in the social order."[64] He also claimed that the advent of civil society did not require a social contract, but came about naturally.

Quesnay's arguments seem mostly to have been fashioned against Hobbes, whom he alludes to on various occasions. He may also have been familiar with Locke, though there is little in Quesnay's thinking about rights that can be traced directly back to him. Quesnay's thought appears mainly to have been influenced by more classical sources: he had read Cicero at a young age, and possessed a copy of *De officiis,* in French translation, where he could have learned about the Stoic belief that "the sovereign good is to live according to what nature demands of us." This text may have further encouraged his natural rights talk, as it contained strong language about those who dared to "strike at the rights of humanity [*blesser les droits de l'humanité* ]."[65] More generally, the basic Physiocratic narrative about the origins of the state closely follows Aristotle's, which similarly progresses, in a natural, stadial development, from the family, to the village, to the community, then to the state.

Once Quesnay moved to Versailles, where he was Mme de Pompadour's private physician and became *premier médecin ordinaire du roi,* he largely ceased to publish under his own name, with the exception of three articles in the *Encyclopédie.*[66] The 1750s and '60s was the period when Quesnay's collaborations with other Physiocrats, in particular the marquis de Mirabeau, were most intense, and in the second half of the 1760s, they began publishing their doctrine vigorously. Quesnay himself signaled the charge, with the (anonymous) publication in 1765 of *Le droit naturel.* Again, he insists here that no transfer, exchange, or abridgment of rights can or should occur: "[N]atural right, understood in the natural and legal spheres, extends to all states in which men may find themselves."[67] Society is the ultimate preserve of natural rights, as it is the function of positive laws to secure, even to *expand,* them: "[M]en who place themselves under the rule, or rather the protection, of the positive laws issued by a tutelary authority, extend their natural right a great deal [*étendent beaucoup leur droit naturel* ], rather than restricting it."[68]

---

[64] From the table of contents, in 3 François Quesnay, Essai physique sur l'œconomie animale 609 (1747); see also id. at 369: "This power [i.e., government] does not destroy every man's natural right [*le droit naturel de chaque homme*]; on the contrary, it affirms [*assure*] and regulates it according the most fitting and relevant needs of society."

[65] Les Offices de Cicéron 326, 367-68 (Philippe Goibaud-Dubois ed. & trans., 1691).

[66] See Christine Théré & Loïc Charles, The Writing Workshop of François Quesnay and the Making of Physiocracy, 40 Hist. Pol. Econ. 1 (2008).

[67] François Quesnay, Le Droit naturel 13 (1765) (emphasis added).

[68] Id. at 28-29.

The other card-carrying Physiocrats who defended the preservation regime in these years were joined by a number of Physiocratic sympathizers, including Mirabeau's son, the future revolutionary Honoré-Gabriel de Riqueti; the marquis de Condorcet, who took up his pen to defend his mentor Turgot's liberal grain-trade policy, in the name of natural rights; and the abbé Morellet, who rebutted Ferdinando Galiani's mocking attack on Physiocracy, the *Dialogues sur le commerce des blés* (1770). What is most interesting about the adoption of this Physiocratic argument, however, is the way that it evolved from a liberal economic claim to politically liberal one. Quesnay did not consider political rights at all in his defense of natural rights; for him, we retained property rights, but sovereignty resided in a "legal despot." Condorcet and Mirabeau *fils*, however, broadened this economic angle, and used the same arguments about rights to attack *political* injustices, such as slavery (in the case of Condorcet) and *lettres de cachet* (for Mirabeau).[69] This gradual drift from economic to political logic also explains the irony that it would be the man Louis XV referred to as "my thinker" who revived the rights regime that would be enshrined by the revolutionaries.

If Physiocracy ended up having such an impact on the French history of rights, it is also because even those who challenged or were indifferent to its economic conclusions (the derivation of all value from agriculture) often accepted its political premises (the preservation of natural rights in society). This was particularly true of the group of *philosophes* who congregated at the salon of the baron d'Holbach in the 1760s and '70s, most of whom are not usually considered "Physiocrats" (with some exceptions), but who did the most to ensure that what started out as the Physiocratic account of natural rights would become commonplace by the time of the French Revolution.

The Physiocrats and the *holbachiens* are rarely discussed in the same breath or even in the same books,[70] but their social ties ran deep and strong. Diderot, a close friend of the baron's and a fixture of his salon, first met Quesnay in the early to mid-1750s, when he was fishing for contributors to the *Encyclopédie*; according to Jean-François Marmontel, also a member of the coterie, Quesnay routinely hosted Diderot, d'Alembert, Helvétius, and himself in his Versailles apartment. Another habitué of d'Holbach's salon was Charles-Georges Le Roy, also a close friend of Diderot, and one of Quesnay's collaborators in the 1750s.[71] Morellet first heard Galiani's arguments against Physiocracy in the baron's salon, where the Neapolitan rehearsed them before publishing his attack.

In addition to the considerable overlap between the Physiocratic and *philosophe* social networks, there is an abundance of textual evidence showing that the *philosophes*

---

[69] See respectively Nicolas de Condorcet, Réflexions sur l'esclavage des nègres (1781); Honoré-Gabriel de Riqueti, comte de Mirabeau, Essai sur le despotisme (1776); Des Lettres de cachet et des prisons d'état (1782), 2 vols.

[70] The classic study of d'Holbach's coterie is Alan Charles Kors, D'Holbach's Coterie: An Enlightenment in Paris (1976), but it does not mention the Physiocrats; conversely, most work on the latter (including Liana Vardi's recent book: see above) does not consider the coterie.

[71] See Kors, supra note 70, at 17-18 (and passim); on Le Roy's relations with Quesnay, see Théré & Charles, supra note 66.

incorporated the basic political tenets (if not the precise economic doctrines) of the Physiocrats in some of the best known and most widely read books of the late Enlightenment. These include the baron d'Holbach's own *Système de la nature* (1770), one of the top "forbidden best-sellers" of the late eighteenth century.[72] One of the chief accusations d'Holbach leveled against priests and tyrants was that they stripped us of our natural and human rights: he railed against "despotism, tyranny, the corruption and licentiousness of Princes, and the blinding of the people who are forbidden, in heaven's name, from loving liberty and . . . to enjoy their natural rights [*user de leurs droits naturels*]."[73]

     These ideas were also echoed in the work that rattled the old regime to its very core: the abbé Raynal's *Histoire des deux Indes* (first edition, 1770), a collective work with roots, once again, in d'Holbach's salon, where Raynal was a regular.[74] A leitmotiv of its indictments of marauding colonial powers was their violations of the natural rights of peoples around the world. The extermination of native Americans in Spanish colonies, for instance, was explained by the fact that "they felt the natural right they had to be free, because they did not want to be slaves."[75] European tyrants and oppressors must face the threat of a legitimate resistance, as had happened in the American colonies:

> If peoples are happy with their government, they will keep it. If they are unhappy . . . it
> will be the impossibility of suffering any longer that will determine them to change it. The
> oppressor will call this salutary uprising a revolt, even though it is only the legitimate exercise of the natural and inalienable right of the oppressed.[76]

Natural rights, in this reading, now extended beyond property and liberty to include the most politically subversive right of all—what the French revolutionaries were soon to call the right of "resistance to oppression."[77]

     Two decades before the French National Assembly issued the Declaration of the Rights of Man and of the Citizen, and some years before the American Revolution, French writers had already outlined a theory of natural rights (sometimes even referring to them as "les droits de l'homme")[78] that stressed the importance of preserving rights in society, singling out liberty, security, and property—as well as, more rarely, resistance from oppression—as key inalienable rights.[79]

---

[72] See Robert Darnton, The Forbidden Best-Sellers of Pre-Revolutionary France 63 (1995).

[73] 2 Paul-Henri Thiry, baron d'Holbach, Système de la nature 262 (1775).

[74] On these relations, see Kors, supra note 70, at 21-22 & passim. A great deal has been written about Raynal's book: among recent works, see Sankar Muthu, Enlightenment Against Empire ch. 3 (2003); and Anoush Fraser Terjanian, Commerce and Its Discontents in Eighteenth-Century French Political Thought (2012).

[75] 3 Guillaume Thomas Raynal, Histoire philosophique et politique 90 [5.15] (1781).

[76] Révolution de l'Amérique 37 (1781). On the depiction of the American Revolution found here, see notably Keith M. Baker, Revolution 1.0, 11 J. Mod. Eur. Hist. 187 (2013).

[77] Declaration of the Rights of Man and of the Citizen § 2 (1789).

[78] See, e.g., 4 Raynal, supra note 75, at 271 [8.22].

[79] See 1 d'Holbach, supra note 73, at 96.

In 1789, the belief in "les droits naturels, inaliénables et sacrés de l'Homme" was hardly radical, and did not require a shadowy network of atheistic philosophers to gain passage in the National Assembly.[80] The desire for a Declaration of Rights featured in number of *Cahiers de doléances* that were compiled in the run-up to the gathering of the Estates General.[81] During the debates, Mirabeau himself commented on the key contributions of the Physiocrats—including his father—to the ideas and ideals expressed in the Declaration: "Everything is contained in that elevated, liberal, seminal principle that my father and his illustrious friend, M. Quesnay, celebrated thirty years ago."[82] This history of rights thus confirms Emile Boutmy's response to Jellinek that the Declaration's sources could just as well be found in the French Enlightenment as in American political documents or Protestant natural law books.[83]

Of course, the American Revolution had solidified the connection in French minds between natural rights and political legitimacy—Jellinek was not all wrong, either. But the rights afforded by the French Declaration nonetheless differed significantly from their American counterparts. Most importantly, we find none of the criminal procedural rights that were so dear to the Americans. As opposed to the five out of ten amendments in the U.S. Bill of Rights that deal with due process, the French Declaration has but one article (§ 7), which provides a limited set of guarantees (since they depend on the content of the law). The purpose of this article, as we know from the debates, was to abolish the dreaded *lettres de cachet*; so the appeal to "the law" here should not be read in terms of some atavistic commitment to absolutism. At the same time, this reliance on a law-based protection of citizens is revealing, as it underscores the persisting faith among French revolutionaries that aligning natural and civil law, rather than establishing stand-alone rights provisions, would lead to a fairer justice system. But it would be hypocritical to fault the French for turning to law rather than procedural rights in their first efforts at reforming the justice system. Not only did the continental tradition of natural law, on which they drew, encourage this direction, but they also simply did not have the same English common law tradition as the Americans at their disposal.

What this meant for the French, however, was that the connection between natural rights and criminal procedural rights was very tenuous. Natural rights hovered, untethered, above the French legal system, largely disconnected from laws, the criminal code, legal practices, and jurisprudence. As a result, over the subsequent years, it would prove far more difficult for the French revolutionaries to define and, more importantly, to integrate rights into the fabric of law and society. Conversely, it would also prove far easier to unmoor rights entirely and, in troubled times, to use the law, not to protect, but to

---

[80] Contra Jonathan Israel, Revolutionary Ideas: An Intellectual History of the French Revolution from *The Rights of Man* to Robespierre (2014).

[81] See Stéphane Rials, La Déclaration des droits de l'homme et du citoyen 115-18 (1988).

[82] 8 Archives parlementaires 453 (Aug. 18, 1789).

[83] See Emile Boutmy, La Déclaration des droits de l'homme et du citoyen et M. Jellinek, 17 Annales des sciences politiques 419 (1902).

repress. When the Adams administration in the United States passed the Alien and Sedition Acts, in 1798, a robust legal culture centered on rights ensured that they would be short-lived (for the most part).[84] But when the French government faced similar concerns about foreign nationals and seditious print material, there were fewer legal bulwarks to provide much resistance. This is not to say that the French emphasis on legality was somehow inherently totalitarian, but rather that when political crises occurred, there were fewer legal provisions in place to prevent authorities from instituting the new legislation of the Terror.

## Conclusion

What does this genealogy of early-modern rights regime teach us about the broader history of human rights? First, it drives home the inconvenient fact that the history of human rights cannot be separated from the longer, torturous history of natural law. The change in nomenclature, from natural to human rights, was never clear cut, and took different paths in different languages. The French today still speak of *les droits de l'homme*; when Pius VI criticized the French Declaration of Rights, he disputed their definition of *jura hominis*.[85] The shift in English from "rights of man" to "human rights" may appear more substantial than it seems, particularly since authors had used a wide variety of synonymous expressions for this concept throughout the seventeenth and eighteenth centuries. Between 1789 and 1948, natural law theory may have receded into the background, but recent work on the Church's role in promoting human rights in the 1930s and '40s, and the very drafts of the Universal Declaration of Human Rights (UDHR), clearly indicate that the rights regime embraced by the United Nations remains dependent on the framework of natural law.[86]

Secondly, this genealogy reveals the extent to which the post-WWII human rights regime drew from the Anglo-American common law tradition as well. The emphasis in the American state declarations, as well as in the U.S. Bill of Rights, on criminal procedural rights was not reflected in the French Declaration of Rights, but would be found in the UDHR. Articles 5-12 all deal with the criminal justice system, and echo the fourth, fifth, and eighth amendments (on unreasonable searches and seizures: UDHR art. 12; habeas corpus: UDHR art. 9; against cruel and unusual punishment: UDHR art. 5). I do not mean to suggest a direct line between these documents, but rather that by the mid-twentieth century, human rights doctrine had fully incorporated this common law tradition, as well.

Finally, do the Enlightenment and the age of Revolutions enjoy a privileged place in the history of human rights? Even if human rights were not invented during this time, Lynn Hunt is right to highlight the extent to which they were broadly publicized and democratized. Rights had already been conceptualized as universally applicable (one need but think

---

[84] Terri Diane Halperin, The Alien and Sedition Acts of 1798: Testing the Constitution (2016).

[85] See the papal encyclical Adeo nota, in 2 Collection générale des brefs et instructions de Notre Très-Saint Père le Pape Pie VI, at 70 (M.N.S. Guillon ed., 1798).

[86] See Moyn, Christian Human Rights, supra note 1; Johannes Morsink, The Universal Declaration of Human Rights: Origins, Drafting, and Intent 284 (1999).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12892   Page 536 of 733

of Vitoria on the Native Americans), but this applicability was not universally recognized. With some polemical exceptions—e.g., the French wars of religion or the English Civil War—rights talk remained a predominantly scholarly dialect. By freeing rights talk from the domain of erudite disquisitions, Enlightenment authors brought it to the disposal of a broader readership, which would accordingly latch onto it in revolutionary times.

But the same period also left its mark on the conceptual history of rights. In part, this mark was conceptual: the Enlightenment understanding of human rights departed from earlier, juridical definitions by stressing their connection to feelings, rather than reason. But mostly, this mark was achieved through erasures.[87] After 1789, it became exceedingly infrequent for political theorists or actors to consider human rights as entitlements that did not carry over from a pre-political state into a political one. It did not take the Enlightenment to imagine this concept of rights, but, by shoving older rights regimes into the dustbin of history, the *philosophes* and the American patriots did ensure its long-term success.

---

[87] Dan Edelstein, Enlightenment Rights Talk, 84 J. Mod. Hist. 1 (2014).

❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖◇❖

## Memoranda and Documents

### AMERICAN ARMS MANUFACTURING AND THE ONSET OF THE WAR OF 1812

#### ANDREW J. B. FAGAL

O N 3 May 1813 the British burned Maryland's Principio Iron Works to the ground. Within six months, however, the foundry's owner had the furnace back in blast and had entered into a new contract with the federal government to produce cannon for the U.S. Navy.[1] Rear Admiral George Cockburn reportedly said of his short-lived victory, "the Americans know better how to make guns than to use them."[2] His comment opens up a line of inquiry into the onset of the War of 1812 that has not been adequately explored by scholars.

Almost as soon as the United States declared war on Great Britain, contemporaries began hotly debating its origins.[3] Historical assessments have been no less divided. Scholars have alternately offered up impressment, trade restriction, Indian war, western expansion, economic depression, national honor, the breakdown of diplomacy, and, more recently, the publication of John Henry's mysterious dealings alongside a pervasive "conspiratorial Anglophobia" as the primary

---

The author would like to thank Douglas Bradburn, Diane Miller Sommerville, J. David Hacker, Samuel Watson, Charles Niemeyer, Brian Arthur, Robert Martello, Robert Smith, the participants in McNeil Center for Early American Studies' Works-in-Progress Series, and the anonymous reviewers for their insights on the piece.

[1]For owner Samuel Hughes's contract to supply the federal government, see the Baltimore *Federal Gazette,* 15 July 1814.

[2]Ralph E. Eshelman, Scott S. Sheads, and Donald R. Hickey, *The War of 1812 in the Chesapeake: A Reference Guide to Historic Sites in Maryland, Virginia, and the District of Columbia* (Baltimore: Johns Hopkins University Press, 2010), p. 178.

[3]See, e.g., the Republican response by "Messala" in William Duane's *Aurora General Advertiser* (18 February 1813) to Governor Caleb Strong's message to the Massachusetts legislature. Strong had incorrectly pegged the war's origin to the British Orders in Council, "Messala" claimed, while the Royal Navy's impressment of American seamen was the true cause. For the Federalist interpretation of impending war as a ploy to conquer Canada, see *Poulson's American Daily Advertiser* (Philadelphia), 23 January 1812, and as a way to bolster manufacturing, 10 and 28 January 1812.

*The New England Quarterly*, vol. LXXXVII, no. 3 (September 2014). © 2014 by The New England Quarterly. All rights reserved. doi:10.1162/TNEQ_a_00372.

Compendium_Cornell
Page 1109

causes for the conflict.[4] None of these issues, however, was new in 1812; each dated back to the Revolution. Perhaps a more pertinent question, then, is the one Bradford Perkins raised fifty years ago: why did Americans not go to war earlier than they did?[5] What conditions, in other words, allowed the United States to assert itself on the world stage in 1812 but not before? The resilience of the Principio Iron Works offers a clue.



Nearly forty years prior to the 1812 declaration of war against Great Britain, American policymakers and government officials struggled to meet the demands of securing the country's newfound independence. During the early years of the American Revolution, the new states

[4]Henry Adams questioned the maritime explanation of impressment but did not offer an alternate explanation (*History of the United States of America During the Administrations of James Madison* [1890; New York: Library of America, 1986], chap. 7). In the early twentieth century, historians of the progressive school began to associate Western expansionism with the fear of a pan-Indian confederacy armed and funded by Great Britain: see Louis M. Hacker, "Western Land Hunger and the War of 1812: A Conjecture," *Mississippi Valley Historical Review* 10 (March 1924): 365–95, and Julius W. Pratt, *The Expansionists of 1812* (1925; Gloucester: Peter Smith, 1957). In the early 1960s, at the height of the Cold War, scholars emphasized the breakdown in Anglo-American diplomacy: see Albert Z. Carr, *The Coming of War: An Account of the Remarkable Events Leading to the War of 1812* (New York: Doubleday & Co., 1960), and Bradford Perkins, *Prologue to War: England and the United States, 1805–1812* (Berkeley: University of California Press, 1961). Great Britain's maritime policies and the failure of American economic coercion was advanced by Reginald Horsman, *The Causes of the War of 1812* (Philadelphia: University of Pennsylvania Press, 1962), while Norman K. Risjord pointed to national honor in "1812: Conservatives, War Hawks, and the Nation's Honor," *William and Mary Quarterly,* 3rd ser., 18 (April 1961): 196–210. Roger Brown posited a multicausal interpretation in *The Republic in Peril: 1812* (1964; New York: W. W. Norton & Co., 1971). Thereafter, most studies found themselves consigned to particular case studies to either prove or disprove existing theories: see, e.g., Victor Sapio, *Pennsylvania & the War of 1812* (Lexington: University Press of Kentucky, 1970). With the advent of cliometric methods, Ronald L. Hatzenbuehler and Robert L. Ivie propounded an econometric model showing that the Republican Party had formed a cohesive voting bloc in support of its leaders: *Congress Declares War: Rhetoric, Leadership, and Partisanship in the Early Republic* (Kent, Ohio: Kent State University Press, 1983). Recently the Canadian expansion theory alongside maritime issues has been revived by J. C. A. Stagg, *Mr. Madison's War: Politics, Diplomacy, and Warfare in the Early American Republic, 1783–1830* (Princeton: Princeton University Press, 1983), pp. 31–47; Jon Latimer, *1812: War with America* (Cambridge: Harvard University Press, 2007), p. 25; and Lawrence A. Peskin, "Conspiratorial Anglophobia and the War of 1812," *Journal of American History* 98 (December 2011): 648–49.

[5]Bradford Perkins, ed., *The Causes of the War of 1812: National Honor or National Interest?* (New York: Holt, Rinehart and Winston, 1962), p. 3; see also, Hatzenbuehler and Ivie, *Congress Declares War,* p. 8.

and the national government, saddled as they were with the responsibility of arming and outfitting their militias and the Continental Army, adopted a variety of measures to foster the domestic production of military supplies. They lifted trade embargoes on imported war materiel, offered bounties and contracts to private manufacturers, confiscated loyalist property, and created publicly owned and operated factories. While the Franco-American alliance and the maturation of the army's military supplies department proved adequate to the demands of the Revolutionary War, thereafter doubts lingered about the United States' capacity to repel a military assault. The country's first Secretary at War, Benjamin Lincoln, reflected in a 1783 memorandum to Congress, "The modes which shall be adopted to complete the magazines with a full supply of stores—and the manner of keeping up the supply will, in my opinion, mark the future character of the new Empire."[6]

In his first address to Congress, President George Washington echoed Vegetius' ancient adage, "If you wish for peace, prepare for war." Congress, he advised, "should promote such manufactories, as tend to render [the U.S.] independent of others for essential . . . military supplies."[7] The next day, the House of Representatives requested that Alexander Hamilton, secretary of the Treasury, draw up a plan to address the president's recommendation.[8] Although producing domestic military supplies was only one component of Hamilton's "Report on Manufactures," the document embodied two radically different visions for the new nation's future war-making capabilities.[9] The first was articulated by Tench Coxe, Treasury's assistant secretary and an early drafter of the report. Coxe reasoned that the current "season of profound peace" had lowered demand for war materiel.

[6]Benjamin Lincoln, Memorandum regarding Arsenals, 3 March 1783, *Papers of the Continental Congress,* reel 45, item 38, p. 289.

[7]"From George Washington to the United States Senate and House of Representatives, 8 January 1790," *The Papers of George Washington: Presidential Series,* ed. Dorothy Twohig, 16 vols. to date (Charlottesville: University of Virginia Press, 1987), 4:543–49.

[8]"House of Representatives Journal," *Documentary History of the First Federal Congress of the United States of America,* ed. Linda Grant De Pauw et al., 20 vols. to date (Baltimore: Johns Hopkins University Press, 1977), 3:265.

[9]For the relationship between the "Report on Manufactures," revenue generating tariffs, and military expansion, see Gerald Clarfield, "Protecting the Frontiers: Defense Policy and the Tariff Question in the First Washington Administration," *William and Mary Quarterly,* 3rd ser., 32 (July 1975): 443–64, and Douglas A. Irwin, "The Aftermath of Hamilton's 'Report on Manufactures,'" *Journal of Economic History* 64 (September 2004): 800–821.

To ensure that supplies were available when future needs required, Coxe counseled Congress to protect private, domestic "manufactories of military supplies," such as arms, cannon, gunpowder, and sail cloth, by imposing high tariffs on imported commodities.[10] For Coxe, the national government should exert its authority to tax to encourage private interests to serve the public good.

Hamilton, on the other hand, believed that the central government should wholly own the means of military production. After the government had succeeded in establishing its public credit, he insisted, securing domestic arms manufactures was "the next great work to be accomplished." Hamilton did not trust the market. In the short term, perhaps, contracts with private suppliers and modest increases in the tariff rate would suffice. But in the long run, he opined, "there appears to be an improvidence, in leaving these essential instruments of national defence to the casual speculations of individual adventure." Although in principle "manufactures on the immediate account of Government are to be avoided," Hamilton conceded, constructing and maintaining the nation's arms and military equipment "seems to be one of the few exceptions, which that rule admits."[11]

In 1794 Congress approved the creation of national armories at Springfield, Massachusetts, and Harpers Ferry, Virginia, and established Treasury Department control over contracting.[12] As Federalist Congressman William Fitzsimmons of Pennsylvania and Secretary of War Henry Knox understood during the 1794 debate over the

[10]Tench Coxe, "Tench Coxe's Draft on the Report on the Subject of Manufactures," in *The Papers of Alexander Hamilton,* ed. Harold C. Syrett and Jacob E. Cooke, 27 vols. (New York: Columbia University Press, 1961), 10:17.

[11]Alexander Hamilton, "Report on Manufactures," *Hamilton Papers,* 10:291, 317. Many historians, although they do not deal with the military aspects of Hamilton's report, have noted Hamilton's general ambivalence about directly fostering American domestic manufacturers. See John R. Nelson Jr., *Liberty and Property: Political Economy and Policymaking in the New Nation, 1789–1812* (Baltimore: Johns Hopkins University Press, 1987), pp. 42–48; Lawrence Peskin, "How the Republicans Learned to Love Manufacturing: The First Parties and the 'New Economy,'" *Journal of the Early Republic* 22 (Summer 2002): 235–37; and Andrew Shankman, "'A New Thing on Earth': Alexander Hamilton, Pro-Manufacturing Republicans, and the Democratization of American Political Economy," *Journal of the Early Republic* 23 (Autumn 2003): 323–26.

[12]"An Act to provide for the erecting and repairing of arsenals and magazines, and for other purposes," *Statutes at Large,* 3rd Cong., 1st Sess. (1794), p. 352; "An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same," *Statutes at Large,* 3rd Cong., 1st Sess. (1794), pp. 369–70; "An Act to establish the Office of Purveyor of Public Supplies," *Statutes at Large*, 3rd Congress, 2nd Sess. (1794), p. 419.

national armories, the cost of arms in the domestic market was high.[13] Therefore, protecting the arms industry was not in the nation's best interests, and so they and their fellow Federalists invited overseas competition to safeguard a steady flow of military hardware.[14] During the Washington and Adams administrations, to secure current supplies within the country and to augment them with materiel from abroad, all "cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenados, gunpowder, sulphur or saltpetre" were barred from export and exempted from the tariff.[15] Republican James Madison, in contrast, courted American manufacturing interests in his 1794 pamphlet *Political Observations*. The Republican Party "were as ready as any, to fortify our harbours, and fill our magazines and arsenals," he announced. "[T]hese were safe and requisite provisions for our permanent defence."[16] While the Federalists sought to nationalize the arms industry by establishing arsenals and, until they were up and running, relying on imports to stabilize the cost of domestic military supplies, the Republicans favored policies designed to help private producers.

The Republican Party continued to court military manufacturing interests in the late 1790s. During the Quasi-War with France, Republican Congressmen Samuel Smith of Maryland and Matthew Lyon of Vermont both objected to the Federalist-backed renewal of the export ban and tariff exemption because they believed that these measures would harm cannon and shot manufacturers in their states.[17] With the Springfield and Harpers Ferry armories established, however, and Navy Secretary Benjamin Stoddert's initiatives to acquire land for shipyards and islands for timber as well as to build a national

[13]*American State Papers, Documents, Legislative and Executive, of the Congress of the United States, Military Affairs,* 7 vols. (Washington: Gales and Seaton, 1832) 1:65.

[14]John Beale Bordley, *Sketches on Rotations of Crops, and other Rural Matters. To which are annexed, Intimations On Manufactures; on the Fruits of Agriculture; and on new Sources of Trade, Interfering with Products of the United States of America in Foreign Markets* (Philadelphia: Charles Cist, 1796), p. 71; Evans microfiche no. 30103.

[15]"An Act prohibiting for a limited time the Exportation of Arms and Ammunition, and encouraging the Importation of the same," signed 22 May 1794, *Statutes at Large,* 3rd Cong., 1st Sess. (1794), pp. 369–70.

[16]James Madison, *Political Observations* (Philadelphia, 1795), p. 11; Evans microfiche no. 29017. In his pamphlet, Madison referred to Republican support for "An act to provide for the Defence of certain Ports and Harbors in the United States," *Statutes at Large,* 3rd Cong., 1st Sess. (1794), pp. 345–46.

[17]*Annals of Congress, House of Representatives,* 5th Cong., 1st Sess. (1797), pp. 248–50.

cannon foundry underway, Federalist policymakers could be reasonably confident that the national government would eventually produce all the war materiel it needed.[18] Meanwhile, prominent Republicans such as George Logan of Pennsylvania lamented, "We are dependent on Great Britain for almost every Article of Clothing we wear, for a great part of the Furniture of our Houses, for the Instruments of our amusements, and for the means of our Defence."[19]

In the wake of his success in the presidential election of 1800, Thomas Jefferson officially repudiated Alexander Hamilton's political economy of war.[20] Although he did not decommission the armories at Springfield and Harpers Ferry, he accepted Tench Coxe's recommendation that the federal government could, and should, use its coercive tax power to shape private interests, which in turn would benefit the public good. In 1779 Jefferson believed that "to make [arms] within ourselves then as well as the other implements of war, is as necessary as to make our bread within ourselves," but the president's former experience as governor of Virginia had revealed the limitations of Hamilton's vision for a state-run military industry.[21] During the Revolution, Virginia had built its own arms factory in Fredericksburg, but it quickly fell into disarray and never met the state's need for arms. In response, Jefferson contracted with Peter Penet of Nantes, France, to construct a munitions works in Richmond.[22] Penet's failure to fulfill

[18]Merritt Roe Smith, "George Washington and the Establishment of the Harpers Ferry Armory," *Virginia Magazine of History and Biography* 81 (October 1973): 415–36, and Michael A. Palmer, *Stoddert's War: Naval Operations during the Quasi-War with France, 1798–1801* (Columbia: University of South Carolina Press, 1987), pp. 125–27.

[19]George Logan, *A Letter to the Citizens of Pennsylvania, On the Necessity of Promoting Agriculture, Manufactures, and the useful Arts* (Philadelphia: Patterson & Cochran, 1800), p. 16; Evans microfiche no. 37841.

[20]For Jefferson's dismantling of the Federalist military establishment, see Theodore J. Crackel, *Mr. Jefferson's Army: Political and Social Reform of the Military Establishment, 1801–1809* (New York: New York University Press, 1987), and Samuel Watson, "Trusting to the 'Chapter of Accidents': Contingency, Necessity, and Self-Constraint in Jeffersonian National Security Policy," *Journal of Military History* 76 (October 2012): 973–1000.

[21]Thomas Jefferson to Benjamin Harrison, 30 October 1779, *Papers of Thomas Jefferson*, ed. Julian P. Boyd et al., 40 vols. to date (Princeton: Princeton University Press, 1950), 3:126.

[22]The factory's woes are revealed in a series of letters between November 1780 and April 1781: see *Jefferson Papers*, 4:119, 4:327–28, 4:304–5, 4:430–31, 4:549–50, 5:11, and 5:355. The "Contract between the State of Virginia and Peter Penet, Wendel & Company," 22 July 1779, is in *Jefferson Papers*, 3:49. Penet failed to recruit workmen from France, as promised; see Peter Penet to the War Office, Philadelphia, 20 May

the contract did not alter Jefferson's view about the rightness of the
private option.[23] Two decades later, now-president Jefferson asked
Congress whether "the idea of establishing works for the fabrication
of cannon and other military articles by the public" was preferable
to "purchasing at market, where competition brings every thing to its
proper level of price and quality."[24] The market to which Jefferson
alluded in 1802 was not laissez-faire; it was protected. In encouraging
private domestic producers to compete with one another for gov-
ernment patronage, Jefferson alerted members of his party that his
administration would continue to reverse the military and economic
policies favored by the Federalists.

In 1803, when John Rutledge Jr. of South Carolina spearheaded
a Federalist attempt to remove tariffs on arms and munitions im-
ports, a coalition of Republicans from Massachusetts, Virginia, and
the mid-Atlantic states supported their president and narrowly de-
feated the bill.[25] Opposing the measure, Republican Congressman
John Randolph of Roanoke, Virginia, favored "encouraging manu-
factures" instead, as did William Eustis of Massachusetts, Madison's
future secretary of war, who predicted that if the resolution passed,
"the manufacturers of arms must become manufacturers of horse
shoes."[26] In a petition to Congress, arms manufacturers in Lancaster
County warned that with a vote in the affirmative, "the government of
the United States will crush this manufacture in its infant establish-
ment."[27] In late 1805, the House revisited the 1790s ban on exporting
arms and munitions, but the corresponding tariff duties were not on
the table. When Federalist Josiah Quincy questioned the process,
Republican Jacob Crowninshield responded that lifting the protec-
tive measure "might . . . injure our manufactures in a degree not

1780, *Papers of the Continental Congress,* reel 100, item 78, vol. 18, p. 291, and Penet
to Jefferson, 20 May 20 1780, *Jefferson Papers,* 3:385.

[23]See Jefferson's communications with Patrick Henry, John Jay, and Henry Knox
in *Jefferson Papers,* 8:68, 8:213, 8:507, 8:455, 9:214, and 15:422.

[24]Thomas Jefferson, "To the Senate and the House of Representatives," 2 February
1802, *Jefferson Papers,* 36:499.

[25]*Annals of Congress, House of Representatives,* 7th Cong., 2nd Sess. (1803), p. 425.

[26]*Annals of Congress, House of Representatives,* 7th Cong., 2nd Sess. (1803),
pp. 391, 394.

[27]*Memorial of Sundry Gun Manufacturers of the Borough of Lancaster, in the
State of Pennsylvania* (Washington, D.C.: William Duane & Son, 1803), p. 4; Shaw &
Shoemaker no. 5349.

Compendium_Cornell
Page 1115

MEMORANDA AND DOCUMENTS      533

contemplated. We certainly manufactured a great quantity of gun-powder and muskets." In other words, the industry was producing military supplies in such quantities that surpluses might be sold over-seas, but tampering with market protections threatened to disrupt the industry's healthy growth.[28]

The Republicans' political economy of war received a significant boost when Jefferson appointed Tench Coxe to be Purveyor of Public Supplies in 1803. The position gave Coxe, the Republicans' primary theoretician of peacetime war preparation, the power and respon-sibility to contract for all goods on behalf of the army, a role of uncharacteristic power within the early republic's limited structures of governance. As Treasury Secretary Albert Gallatin tersely com-mented, "several hundred thousand dollars pass annually through his hands."[29] In years of peace, the purveyor was free to disburse be-tween one-quarter and one-third of the War Department's budget without congressional interference.[30] Federal patronage, in the form of military contracts, would eventually play a defining role in leading the country toward a second conflict with Great Britain as Coxe used his official influence to promote domestic military manufacturers.[31]

In 1806, Republican Congressman Joseph B. Varnum of Mas-sachusetts reported on behalf of a committee tasked with completing the "arming of the militia of the United States." He had tabulated militia returns and found that only about half the country's militia was armed, with the North far outpacing the South.[32] Historian Robert Churchill has questioned the dependability of Varnum's statistics, but accurate or not, they motivated the Republicans to redouble their ef-forts toward the national defense.[33] On 20 January 1807, only months before the *Chesapeake* affair moved the country toward its second war with England, Coxe sent Jefferson a memorandum proposing

[28]*Annals of Congress, House of Representatives,* 9th Cong., 2nd Sess. (1805), pp. 269–71. Meanwhile, the Atlantic port cities carried on a thriving trade in arms and munitions as the Caribbean militarized in response to the Haitian Revolution.

[29]Albert Gallatin to Thomas Jefferson, 21 June 1803, *The Writings of Albert Gal-latin,* ed. Henry Adams, 3 vols. (1879; New York: Antiquarian Press, 1960), 1:123–25.

[30]Jacob E. Cooke, *Tench Coxe and the Early Republic* (Chapel Hill: University of North Carolina Press, 1978), pp. 426–27.

[31]Tench Coxe's journals, ledgers, and correspondence, collected in *The Papers of Tench Coxe,* microfilm ed. (Philadelphia: Historical Society of Pennsylvania, 1977), document the extent of his patronage.

[32]*American State Papers, Military Affairs,* 1:198–203.

[33]Robert H. Churchill, "Gun Ownership in Early America: A Survey of Manuscript Militia Returns," *William and Mary Quarterly,* 3rd ser., 60 (July 2003): 615–42.

that the federal government issue contracts to private suppliers to arm the whole body of the militia.[34] Instead of relying upon indirect tariff protections, Coxe recommended that the administration take a more active role in the market. Jefferson approved Coxe's plan in principle, but given the numbers involved, he thought it unfeasible without the aid of imports.[35] Coxe, however, had not been idle. He replied, "The cost of rifles, when I came into office was \$13"; by negotiating with gunsmiths throughout Pennsylvania, he had "gradually reduced them to \$9.50 and 10 for which they cannot be imported."[36] Coxe had the will and, with the considerable patronage at his disposal, the ability to strengthen the United States' war-making capacity.

In June 1807, off the coast of Virginia, the British warship HMS *Leopard* fired upon the USS *Chesapeake.* While Jefferson and his secretary of state, James Madison, sought to coerce the British to give up impressment through trade embargoes, they also prepared the country for war. The administration sketched out, and Congress approved on paper, a relatively large army of regulars, volunteers, and militia as well as improved costal fortifications and an expanded gunboat navy.[37] Arming a mobilized militia was central to the Republicans' strategic vision of a well-managed political economy of war.[38] Opening debate on the issue, Virginia Representative John Randolph asked, "What manufacture were the United States more interested in cherishing and extending, than the manufacture of arms for the public defence—for arming the whole body of the militia?"[39] While Randolph and other "Old Republicans" objected to standing armies during times of peace, they supported annual disbursements from a sinking fund to ensure that domestic manufacturers produced a steady supply of arms. With such legislation in place, Randolph estimated

[34]Tench Coxe, January 1807, Opinions, Dated Received July 24, *The Papers of Thomas Jefferson,* ser. 1, General Correspondence, Library of Congress, American Memory, at http://hdl.loc.gov/loc.mss/mtj.mtjbib016880, accessed 10 January 2011.

[35]Jefferson to Coxe, 27 March 1807, *Papers of Thomas Jefferson,* at http://hdl.loc .gov/loc.mss/mtj.mtjbib017077.

[36]Coxe to Jefferson, 6 April 1807, *Papers of Thomas Jefferson,* at http://hdl.loc .gov/loc.mss/mtj.mtjbib017111.

[37]Crackel, *Mr. Jefferson's Army,* pp. 176–79; Spencer C. Tucker, *The Jeffersonian Gunboat Navy* (Columbia: University of South Carolina Press, 1993), pp. 31–33; and Gene A. Smith, *"For the Purposes of Defense": The Politics of the Jeffersonian Gunboat Program* (Newark: University of Delaware Press, 1995), pp. 70–72.

[38]"An Act making provision for arming and equipping the whole body of the Militia of the United States," *Statutes at Large,* 10th Cong., 1st Sess. (1808), vol. 2, pp. 490–91.

[39]*Annals of Congress, House of Representatives,* 10th Cong., 1st Sess. (1808), vol. 2, pp. 2175–76.

that only "five or six years" would be required to arm the citizenry. Without delay Coxe, who had been granted an appropriation of two hundred thousand dollars per year, entered into agreements with seventeen domestic manufacturers, many of which he had dealt with previously.[40] He also distributed start-up funds of nearly one hundred thousand dollars to help arms manufacturers make the necessary capital improvements to ramp up production quickly.

Although northern representatives fretted that they were subsidizing states that had not adequately armed their own militias, in fact, the Jefferson administration's military contracts disproportionately benefited New England.[41] Massachusetts, for example, built the greatest number of gunboats.[42] While Eli Whitney's factory in New Haven, Connecticut, was already doing a brisk business with the federal government and the state of New York, Coxe's contracts spawned additional arms industries. Supplied with power from the Blackstone River and a $6,450 start-up loan from the federal government, Stephen Jenks, of Providence, Rhode Island,

built a convenient shop 30 feet by 40 feet, four stories high including the lower room where the boring and grinding of the barrels is done their boring machine bores six barrels at a time they have two forging shops which go by water with hammers convenient for drawing skelps and to weld barrels with and one other wheel which carries two grindstones convenient for grinding mountings and bayonets. All standing on a good mill privilege and a durable stream of water.[43]

With the assistance of a federal loan, Jenks had built a modern arms factory. He incorporated new technology, such as trip-hammers, which allowed for a stronger weld on gun barrels, and by introducing techniques of mass production, he sped up his deliveries.[44] In November 1810, the sureties of the Jenks & Sons arms contract reported to Coxe that the factory was producing an average of four muskets

[40] "Purveyor of Public Supplies Ledgers, 1803–1812," *Coxe Papers,* vols. 26–28.

[41] For a broad overview of the New England arms industry during the early republic, see Felicia Johnson Dreyup, *Arms Makers of the Connecticut Valley: A Regional Study of the Economic Development of the Small Arms Industry, 1798–1870* (Northhampton: Smith College Studies in History, 1948).

[42] Smith, *The Jeffersonian Gunboat Program,* pp. 83–84.

[43] Charles Williams (U.S. Inspector of Arms) to Tench Coxe, 3 July 1810, transcribed in Peter A. Schmidt, *U.S. Military Flintlock Muskets and Their Bayonets: The Early Years, 1790–1815* (Woonsocket: Andrew Mowbray Inc., 2006), p. 256.

[44] Merritt Roe Smith, *Harpers Ferry Armory and the New Technology: The Challenge of Change* (Ithaca: Cornell University Press, 1977), p. 114.

a day, or at least twelve hundred per year.[45] By May 1811, despite some problems associated with his deliveries, Stephen Jenks informed Coxe that his factory had just delivered 650 stands of arms to Captain James House at the Springfield Armory and would continue to deliver more.[46]

Writing to Tadeusz Kosciuszko in early 1810, Jefferson boasted about the success of his war policies, which James Madison had largely continued after he was inaugurated president in 1809:

From the moment that the affair of the *Chesapeake* rendered the prospect of war imminent, every faculty was exerted to be prepared for it, & I think I may venture to solace you with the assurance that we are in a good degree prepared. Military stores for many campaigns are on hand, all the necessary articles (sulphur excepted) & the art of preparing them among ourselves abundantly, arms in our magazines for more men than will ever be required in the field, & 40,000 new stand yearly added, of our own fabrication, superior to any we have ever seen from Europe; heavy artillery much beyond our need, an increasing stock of field pieces, several foundries casting one every other day, each.[47]

Jefferson was not alone in his enthusiasm for how quickly American industry had matured in the in the first decade after his election. In his 1810 "Report on American Manufactures," Treasury Secretary Albert Gallatin, who served in both the Jefferson and Madison administrations, announced that gunpowder and arms manufacturers were so "firmly established" that supplies currently exceeded domestic consumption. Both the public and private armories, he observed, "may if wanted, be immediately enlarged." E. I. du Pont's gunpowder mill, as well as others in Maryland and Pennsylvania, could easily triple their production "if there was a demand for it."[48] In the fall of 1811, responding to the queries in Madison's war message regarding the country's weapons supply, Republican Congressman Adam Seybert of Pennsylvania claimed that "the manufacture of cannon and small arms, and the stock and resources of all the necessary munitions, are

[45]William Daggett, Ezekiel Carpenter, Pardon Jenks, Jabez Jenks to Tench Coxe, 20 November 1810, in Schmidt, *Flintlock Muskets,* pp. 257–58.

[46]Stephen Jenks to Coxe, 8 May 1811, in Schmidt, *Flintlock Muskets,* p. 258.

[47]Thomas Jefferson to Thadeusz Kosciuszko, 26 February 1810, *Papers of Thomas Jefferson: Retirement Series,* ed. J. Jefferson Looney, 10 vols. to date (Princeton: Princeton University Press, 2004), 2:257–58.

[48]Albert Gallatin, *Report of the Secretary of the Treasury on American Manufactures, Prepared in Obedience to a Resolution of the House of Representatives* (Brooklyn: Thomas Kirk, 1810), pp. 3, 16–18; Shaw and Shoemaker microfiche no. 21859.

Compendium_Cornell
Page 1119

MEMORANDA AND DOCUMENTS  537

adequate to emergencies." The rapid and dramatic advances of the military industry, Seybert crowed, "demonstrate the great resources of this Republic."[49] In the years preceding the War of 1812, then, the leaders of the Republican Party were convinced that, through their extensive patronage of domestic manufacturers and a favorable tariff regimen, *they* had solved a critical problem that had beset the United States during the Revolutionary War: a ready domestic supply of arms and munitions.

As Donald Hickey has shown, the decision to declare war on Great Britain in 1812 was complex and arose from numerous grievances.[50] But in 1812, the United States was not just willing, it was *ready,* to go to war. While both major parties clearly understood the state's obligation to protect its citizens by being prepared for war, the Federalists and Republicans advocated vastly different policies to achieve that end. Alexander Hamilton thought that the federal government should manufacture its own munitions, while Tench Coxe promoted government contracts and protected market incentives. When Republicans gained control of the government in 1800, they acted on Coxe's recommendations. As he observed after hostilities began, "*The difference in the situations of the United States, at the respective commencements of hostilities, in the year 1775, and in the year 1812, is greater, in respect to the various manufactures necessary to defence,* than it is in respect to any other matter in the whole circle of its national industry."[51] The young nation had armed itself for war, and contrary to warnings from Republicans and Federalists alike regarding the country's preparedness, to war it would go.

[49]*Annals of Congress, House of Representatives,* 12th Cong., 1st Sess. (1811), p. 524.

[50]Donald R. Hickey, *The War of 1812: A Forgotten Conflict* (Urbana: University of Illinois Press, 1995), pp. 26–28.

[51]*American State Papers, Finance,* 2:676.

Andrew J. B. Fagal *is currently a visiting assistant professor at Binghamton University, State University of New York, where he recently completed his dissertation, "The Political Economy of War in the Early American Republic, 1774–1821."*

4 Tex. A&M L. Rev. 95

Texas A&M Law Review
Fall, 2016

Article

Mark Anthony Frassetto [a1]

Copyright © 2016 by the Texas A&M University School of Law; Mark Anthony Frassetto

# THE LAW AND POLITICS OF FIREARMS REGULATION IN RECONSTRUCTION TEXAS

## TABLE OF CONTENTS

| | |
|---|---|
| I. INTRODUCTION | 95 |
| II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON PUBLIC CARRY IN HISTORICAL CONTEXT | 97 |
| A. *The Uniquely High Levels of Violence in Texas* | 97 |
| B. *The Radical Republican Administration of Edmund Davis* | 101 |
| 1. Edmund Davis's Rise to Governor | 101 |
| 2. The Davis Administration: 1870-1872 | 102 |
| 3. The Davis Administration: 1873-1874 | 108 |
| III. LEGAL CHALLENGES AND INTERPRETATION OF THE 1871 PROHIBITION ON PUBLIC CARRY | 110 |
| A. *The Texas State Constitution and Arms Bearing* | 111 |
| B. *The Texas Supreme Court, 1867-1874* | 112 |
| C. *The Semicolon Court Cases* | 113 |
| D. *The 'Redeemer' Court Cases* | 118 |
| IV. CONCLUSION | 121 |

## I. INTRODUCTION

The current state of scholarship on Second Amendment history paints post-Civil War firearms regulations as racist efforts by Southern states to prevent blacks from defending themselves against racial violence. [1] This reading distorts the historical record by ignoring the actors responsible for numerous gun laws across the former **\*96** Confederacy. This Article is, in part, an effort to respond to such accounts by presenting the first detailed analysis of the post-war legislative response to widespread firearm violence in Texas, as well as the judicial interpretations of that legislation. [2] More fundamentally, this Article provides an in-depth account of the political views of the Republican Unionists, who followed their ratification of the Fourteenth Amendment with strict regulation on publicly carrying firearms to protect freedmen from racial violence.

Given the Supreme Court's instruction in *District of Columbia v. Heller* that the historical understanding should inform how the right to keep and bear arms is understood today, [3] the views of those who wrote the Fourteenth Amendment (through which the Second Amendment applies to the states) are plainly relevant. [4] As this Article's account of Texas history makes clear, the Republican Unionists who ratified the Fourteenth Amendment held a narrow view of the right to carry firearms in public, and believed public carry could be broadly regulated. By contrast, it was the Southern Democrats--who had fought relentlessly against the Fourteenth Amendment after losing the Civil War--who advocated an expansive view of the right to carry guns in public, a view which gun rights proponents continue to espouse today.

Part II of this Article explains that Texas, like most Southern states, suffered widespread violence against freedmen and their Republican supporters during the Reconstruction period. [5] But unlike in many **\*97** states, Republican Unionists in Texas confronted racist reactionaries' violence with strong legislative and executive action. On the heels of the Fourteenth

Compendium_Cornell
Page 1121

Amendment--which Republicans drafted and ratified--Republicans in Texas enacted a law prohibiting the carrying of firearms under most circumstances.

Part III of this Article recounts the diverging outcomes of two legal challenges to Texas's broad restrictions on public carry, in which the Texas Supreme Court evaluated both federal and state constitutional attacks on the law. The first challenge, in 1872, was considered by a high court made up of Republicans and Unionists, who decisively upheld the law under both the Second Amendment and its analogue in the Texas Constitution. By 1874, when the Court heard the second challenge, its membership had completely changed. That Court-- made up entirely of Democrats, four-fifths of whom were former Confederate officers-- took a much broader view of the right to bear arms. However, even this Democrat-controlled Court concluded that the law did not infringe upon the right to bear arms.

The Republican Unionists may have lost political and judicial control in Texas, but their legacy lives on through the Fourteenth Amendment. As such, their philosophy on the role of government, the Constitution, and self-defense-- including their narrow view of the right to carry arms in public--is a crucial part of the history of the Second Amendment. Justice Scalia's instructions in *Heller* to look to history in interpreting the Second Amendment means an accurate portrayal of historical gun regulations is of crucial importance. This Article is intended as an initial step in that direction.

## II. TEXAS'S RECONSTRUCTION-ERA RESTRICTIONS ON PUBLIC CARRY IN HISTORICAL CONTEXT

### A. *The Uniquely High Levels of Violence in Texas*

Texas was a uniquely violent place, both before and after the Civil War. While violence in every Confederate state far exceeded violence in the North, Texas's levels of violence stood out even among the Confederate states. [6] At the time of annexation in 1845, the homicide rate in lawless South Texas was a staggering 100 per 100,000 and a likely 50 per 100,000 in the slaveholding portion of East Texas. [7] As a reference **\*98** point, the 2013 U.S. murder rate was 4.5 per 100,000. [8] Visitors to Texas before the Civil War often commented on the high levels of violence and how well-armed many Texans were. Frederick Law Olmstead, the famed landscape architect, wrote after touring Texas in the 1850s:

> The street affrays are numerous and characteristic. I have seen, for a year or more, a San Antonio weekly [newspaper], and hardly a number fails to have its fight or its murder. More often than otherwise, the parties meet upon the plaza by chance, and each, on catching sight of his enemy, draws a revolver, and fires away. ... [I]t is, not seldom, the passers-by who suffer. Sometimes it is a young man at a quiet dinner in a restaurant, who receives a ball in the head; sometimes an old negro woman, returning from market, who gets winged. [9]

Violence continued in Texas during the War, especially against Unionists. In 1862, forty-two suspected Union sympathizers were lynched in Gainesville, while in 1863, German-American Unionists were massacred while attempting to flee to Mexico. [10]

A report commissioned by the 1868-69 Constitutional Convention (the "Convention Report") found that violence further increased in the period after the Civil War ended in 1865. Homicides had increased from a reported total of 98 in 1865 to 347 in 1867. [11] While the investigators admitted these numbers "came far short of representing the actual number," as they included full reports from only thirty of Texas's 127 counties, they showed the trend of increasing violence in Texas, much of it political. [12] Even with the Convention Report's under-inclusive numbers, the murder rate in Texas during the period from 1860 to 1868 was forty-five times that in New York. [13] Texas led **\*99** the nation in murders throughout the post-War period. In 1870, Texas had at least 323 murders, a staggering 195 more than the next-most-deadly state. [14] The Convention Report authors wrote they doubted "such a record of blood can be exhibited in any Christian or civilized State in the world in a time of peace." [15]

## MINIMUM HOMICIDE RATES IN RECONSTRUCTION TEXAS [16]

Compendium_Cornell
Page 1122

| YEAR | 1865 | 1866 | 1867 | 1868 | 1869 | 1870 |
|---|---|---|---|---|---|---|
| Total Population | 711,397 | 732,833 | 754,270 | 775,706 | 797,143 | 818,579 |
| White Population | 492,796 | 507,176 | 521,557 | 535,938 | 550,319 | 564,700 |
| Black Population | 218,193 | 225,249 | 232,306 | 239,362 | 246,416 | 253,700 |
| Reported Murders | 98 | 170 | 347 | 319 | N/A | 323 |
| White Victims | 47 | 75 | 173 | 182 | N/A | N/A |
| Black Victims | 51 | 95 | 174 | 137 | N/A | N/A |
| Overall Murder Rate (per 100,000) | 13.776 | 23.198 | 46.005 | 41.124 (70.498) | 49.6 [17] | 39.45 [18] |
| White Rate (per 100,000) | 9.537 | 14.788 | 33.17 | 33.216 (58.213) | N/A | N/A |
| Black Rate (per 100,000) | 23.374 | 42.176 | 74.901 | 57.235 (98.118) | N/A | N/A |

Texas was especially resistant to emancipation and Reconstruction, resulting in staggering levels of violence against blacks and Unionists. Presidential Reconstruction-era governor James Throckmorton even proposed a system of gradual emancipation be implemented, in clear **100** violation of both the Emancipation Proclamation and Thirteenth Amendment. [19] Provisional military governor Andrew J. Hamilton in a letter to President Johnson described reports of "shooting and hanging of Negroes by the half dozens at a time, for the crime of leaving their former Masters." [20] General W.E. Strong described freedmen being treated "unmercifully, and shot down like wild beasts, without any provocation ...." [21] And fifth military district Commander Major General Joseph J. Reynolds reported "murder of negroes is so common as to render it impossible to keep an accurate account of them." [22] The Convention Report showed that between 1865 and 1867, for every white person murdered by a black person, thirty-seven black people were murdered by whites. [23] Many of the 460 murders of whites during that time period were also attacks on white Republicans by Democrats. [24]

Given the frequency of attacks on blacks and Republicans, the investigation and prosecution of these crimes left much to be desired. Abner Doubleday, a Civil War General stationed in Texas after the War, reported that not a single white man had been convicted of murder in Texas since it achieved independence from Mexico. [25] This was obviously an exaggeration, but the reality was only slightly less extreme. Of the approximately 1,000 homicides reported in Texas between 1865 and 1869, there were only 279 indictments, five convictions, and one execution (a freedman). [26] That meant only one of every 200 murderers was actually punished for his crime. The Convention Report stated bluntly why these numbers were so low: "It is our solemn conviction that the courts, especially juries, as a rule, will not convict ex-rebels for offenses committed against Union men and freedmen ...." [27] Even when a conviction was secured, justice was often still out of reach. In one case, a white man who had attacked and nearly beat to death a freedman was arrested by a Freedman's Bureau agent, turned over to civil authorities, and convicted; the punishment was a fine of one cent. [28] In 1870, a reported 702 murderers and 413 attempted murderers were on the loose in Texas. [29] Crime, especially directed toward blacks and Unionists, was out of control.

**101**  **B.** *The Radical Republican Administration of Edmund Davis*

In 1869, Radical Republican Edmund Davis was elected Governor of Texas. Davis's administration would be defined by its effort to restore order in Texas in the face of Democratic opposition. As part of this effort, Davis would establish an integrated statewide police force, a state-funded public education system, and, most notably for this Article, a statewide ban on carrying

firearms in public. Ultimately, in the face of widespread opposition, most of the efforts of Davis and his Radical Republican party were doomed. However, Davis's statewide ban on public carry remained in place for more than a century. The actions of his administration, especially regarding public carry of firearms, provide insights into the Radical Republicans' philosophy on guns, self-defense, and the role of government.

### 1. Edmund Davis's Rise to Governor

Prior to the Civil War, Davis served as a judge in South Texas and was a close political ally of Texas Revolution hero and Unionist, Sam Houston. [30] Davis opposed secession, and attempted to run for a position as a delegate to the secession convention in order to oppose leaving the Union. [31] After secession, Davis refused to swear a loyalty oath to the Confederacy and was removed from his judgeship. [32] Davis fled Texas and served as an officer in the Union army, rising to the rank of Brigadier General by the end of the War. [33]

After the War, Davis was elected as a delegate to the 1866 Texas Constitutional Convention as a Unionist who supported the proposals of military governor Andrew J. Hamilton. [34] During Presidential Reconstruction, Davis and the Unionists were in the distinct minority in the convention, which refused to ratify the Thirteenth and Fourteenth Amendments and essentially restored control to the secessionists who controlled the state during the War. At the convention, Davis was limited to procedural maneuvers to stall particularly egregious provisions and to introducing doomed provisions in protest. Notably, Davis proposed universal male suffrage for blacks, a position well out front of his party at the time. [35] In 1868, as a result of the Republican controlled Congress seizing control of Reconstruction policy, a new Constitutional **\*102** Convention was called and Davis was selected as a compromise candidate between conservatives and Radical Republicans for convention president. [36] During the conference, Davis assumed leadership of the Radical Republicans. His able management of an extremely contentious conference propelled him to statewide prominence. [37]

In 1869 the federal government sought to return control of Texas to an elected state government. An election--in which former Confederate soldiers were generally prohibited from voting for the new government--was held to fill the state government created by the 1868 Constitutional Convention. [38] Davis was elected Governor of Texas by less than 800 votes in an election marred by violence against blacks seeking access to the polls. [39] This violence and intimidation was especially severe in Falls County, where white plantation owners marched their black employees to the polls, handed them a ballot of Davis's opponent, and watched as it was dropped into the ballot box. Blacks attempting to vote for Davis had their lives threatened and ballots ripped from their hands. [40] In Milam and Navarro counties, voting was discontinued after federal and local officials were attacked and mobs of whites stormed the polls in order to prevent blacks from voting. [41] After the election, racial violence continued in both counties, with blacks pistol-whipped in front of the courthouse in Navarro County in retribution for Davis's election. [42]

### 2. The Davis Administration: 1870-1872

In the midst of this chaos and widespread resistance, Davis began his term as governor. In his inaugural message, Davis called the legislature's attention to the "consideration of measures to establish law and order throughout the State, and the punishment or repression of crime." [43] Davis proposed several policies to reduce crime in Texas, including reorganizing the state militia, which had been disbanded under military rule; establishing a state police force; creating an impartial court system; and establishing free, state-funded, public schools (which Davis identified as a long-term crime prevention measure). [44] **\*103** The state legislature adopted all of these policies in one form or another. [45] As a first step, Davis created a racially integrated state police force to "follow up and arrest offenders" where the "authorities are too weak to enforce respect [for the law] or indisposed to do so." [46] The creation of the force drew sharp opposition from both Democrats and conservative Republicans, who claimed that creating the state police was an inappropriate transfer of power from local governments to the Governor. State Senator and former slave Matthew Gaines cut to the true heart of the opposition, stating it was not the result of fear over executive power, but rather opposition to the "idea of gentleman of my color being armed and riding around after desperadoes." [47]

The resistance, however, was insufficient to stop the establishment of Davis's force, which was granted powers not given to local law enforcement, including the authority to cross county lines and act independently of local law officers. [48] The chief of the state police was also granted power to command all local law enforcement when necessary to suppress crime and arrest offenders. [49] The force, which split approximately sixty percent white and forty percent black, was diverse to a level surpassing many modern police departments, including among its officers whites, freedmen, Tejanos, and Asians, as well as both former Union and Confederate soldiers. [50] This racial diversity was enough for Texas Democrats to dub the state police (when being polite) a "Negro Militia." [51]

During Davis's inaugural address, he also called for the prohibition on carrying handguns in public. Davis stated:

> I would, in this respect of prevention of crimes, call your attention to the provisions of section thirteen of the Bill of Rights, on the  **\*104**  subject of bearing arms. The Legislature is there given a control over the privilege of the citizen, in this respect, which was not in the old constitution. There is no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State. I recommend that this privilege be placed under such restrictions as may seem to your wisdom best calculated to prevent the abuse of it. Other than in a few of the frontier counties there is no good reason why deadly weapons should be permitted to be carried on the person. [52]

That summer, the state legislature partially fulfilled Governor Davis's request by passing a law forbidding the carrying of any "bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind," at a variety of locations:

> any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election ... or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly. [53]

The fine for violating the new law was a whopping $50 to $500 (the modern equivalent of $1,000 to $10,000). [54]

While the prohibition on carrying firearms at public gatherings provided an important tool for the state police to maintain order, it proved insufficient to prevent and deter crime. [55] In a letter to the 1871 session of the state legislature, Governor Davis stated the law was "a very partial remedy" and went on to say "instances of personal violence occur almost daily" and "are within the experience of everybody." [56] Davis stated that a total prohibition on carrying arms rather than the limited prohibition enacted in the previous session would be "a great preventative of violence and bloodshed" and "essential to the complete suppression of lawlessness." [57] Confusion about the proper enforcement of the 1870 Law also contributed to one of the more serious crises faced by the Davis administration.

 **\*105**  During the summer of 1870, Madison County was wracked by violence against freedmen. Tensions reached their peak on July 21, 1870, when a band of disguised men staged a jailbreak on the Madison County jail, releasing two murderers. In response, State Police Private John H. Patrick, a Republican with ambitions for higher office, assembled a group of black militia and began confiscating guns from any person carrying them, under color of the 1870 Act. [58] Patrick's confiscation order, along with the fact that blacks were enforcing laws against whites, led to widespread public outrage. A local deputy sheriff formed a posse with the ostensible purpose of arresting Patrick, but an actual intent to foment violence against politically active blacks and Republicans, based on the claim that blacks had joined Patrick's militia unit with the intention of murdering whites. [59] The posse sought Patrick at his home, but he was in Austin where a disciplinary hearing had been convened to look into his actions. The group instead killed two militia leaders. [60] In response to this incident and other chaos in the county--including militia members being killed, shot, and attacked, and freedmen being whipped by whites--Governor Davis ordered forty state police and three-hundred state guards into Madison County to restore order. Many of his opponents viewed these actions as tyrannical, and the event damaged the reputation of the state police and the Davis administration statewide.

In response to concerns about the effectiveness of the 1870 Act, and likely partially as a result of the confusion in Madison County, the Texas Legislature drafted a bill in 1871 that prohibited the carrying of any "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife ... [without] reasonable grounds for fearing an unlawful attack on his person ...." [61]  The bill punished first offenses with confiscation of the weapon and a fine between $25 and $100 (approximately $500-$2,000 with inflation) [62] and up to sixty days in prison for a second offense. [63]  The law's exception allowing publicly carrying a firearm when in fear of unlawful attack was further narrowed by requiring the defendant to show that the  **\*106**  danger was "immediate and pressing," and "of such a nature as to alarm a person of ordinary courage," that "the weapon was borne openly and not concealed beneath the clothing," and that the claimed danger did not have "origin in a difficulty first commenced by the accused." [64]  This clarified that the exception did not apply when a person had carried a firearm due to a generalized fear of crime, but rather only when a specific threat existed. The penalties for the 1870 Act were also amended to provide for confiscation of the weapon and imprisonment for up to 90 days for subsequent offenses. [65]  The law granted the governor the power to exempt counties from the carry prohibition if they were dubbed a frontier county "liable to incursions of hostile Indians." [66]  The law also included exceptions for people carrying weapons on their own property or in their place of business, members of the militia in active service, law enforcement officers, and the transportation of arms in the baggage of travelers. [67]

The bill titled "An Act to Regulate the Keeping and Bearing of Deadly Weapons," was introduced by Republican Representative Frederick Grothaus on January 24, 1871. [68]  The bill passed out of the Judiciary Committee 5-3, receiving primarily Republican support. [69]  On March 9, 1871, the House passed the bill by a margin of 60-12, with all twelve black representatives voting in favor of the bill. [70]  On March 29, 1871, the Senate passed the bill by a 20-4 margin with support of both of the State's black Senators. [71]  In both chambers opposition to the law consisted primarily of Democrats, and conservative  **\*107**  Republicans, who had served in the Confederate Army. [72]  Governor Davis signed the bill on April 12, 1871. [73]

The new prohibition on public carry was widely enforced across the State, especially by the state police. [74]  Line police officers consistently sent their superiors reports of arresting those carrying weapons. [75]  Local law enforcement also participated in arresting those carrying weapons illegally. [76]  In fact, Governor Davis declared martial law in Limestone County, in part because of the aftermath of a shootout between police and a man they were trying to arrest for carrying a pistol. [77]  Davis specifically mentioned the citizens' failure to obey the law against carrying pistols and other weapons as a reason for the declaration. [78]

While state and local law enforcement worked to carry out the ban, many citizens resisted. Some tried to circumvent the law by posing as state or local law enforcement that were exempted from the public carry restrictions. It was difficult to know who was lying, but in at least one case an imposter who was discovered carrying a revolver was arrested  **\*108**  and fined. [79]  Similarly, a few state police officers who were terminated for misconduct continued to fraudulently act as officers and on occasion were arrested for illegally carrying firearms. [80]  Some efforts to enforce the law turned violent, including the Lampasas Massacre of 1873, the deadliest single incident in the brief existence of the state police. Four state police officers were murdered by members of a local cattle-rustling gang when they attempted to arrest a gang member who was violating the public carry ban. [81]  Despite this resistance, law enforcement efforts to enforce the public carry prohibition continued.

### 3. The Davis Administration: 1873-1874

During the elections of 1872, a coalition of Democrats and conservative Republicans campaigned against Davis's policies and the Democrats retook control of the state legislature by an overwhelming margin. In Davis's 1873 address to the now extremely hostile Democratically-controlled House of Representatives, he stated the prohibition on public carry "had a most happy effect," and to further push for its enforcement, Davis "offered a standing reward for the arrest and conviction of violators of it." [82]  The fate of Davis's law enforcement efforts was, however, in large measure, linked to the fate of the state police. In 1873, when the Democrats retook the House of Representatives and Senate, they immediately defunded and then disbanded Davis's police force.

Governor Davis vetoed the legislature's initial bill disbanding the state police, questioning the wisdom of dissolving the force at a time when lawlessness was "still rampant in parts of the state" and praising the bravery and efficacy of the state police. He offered to work with the legislature to prevent any future incidents of abuse of power, but the fate of the police was sealed on April 22, 1873, when the House of Representatives passed the repeal over Davis's veto in a 58-7 vote. [83] Between 1870 and 1872 the state police had made more than 6,000 arrests, effectively suppressed the Ku Klux Klan, and provided freedmen real protection against racial violence. [84] Democrats cheered the disbandment of the police as a great victory over Radical Republican oppression. In Georgetown and Waco, jubilant crowds stormed the jails and set free many of the prisoners arrested by the state police. [85] The abolishment of the state police threw sole responsibility for law **109** enforcement back into the hands of the local sheriffs and deputies who had failed so miserably to check crime prior to the police's creation. An Adjutant General's report at the end of the year reported "the 'arms law' [concerning personal weapons] except in the more populous counties, is being entirely disregarded ...." [86]

In December 1873, Davis lost his reelection bid for governor in an overwhelming defeat as former Confederate supporters were again allowed to vote and Texas saw a massive influx of immigrants from other southern states. [87] But shortly afterwards, the Texas Supreme Court invalidated the election because it had been conducted under an election statute passed by the Democratically-controlled state legislature in violation of the Texas Constitution of 1869. [88] In what was often derisively called "the semicolon case," the Court was tasked with interpreting Article 3, Section 6 of the Texas Constitution of 1869, which read "All elections for State, District and County officers shall be held at the county seats of the several counties, until otherwise provided by law; and the polls shall be opened for four days, from 8 o'clock A. M. until 4 o'clock P. M. of each day." [89] The Court held that the provision allowed the legislature to change the location of elections but not the times. [90] Because the election law had limited elections to a single day rather than the four days required by the 1869 Constitution, the Court tossed out the results of the entire election. [91]

Davis was faced with the unenviable choice of either ignoring a decision of the state Supreme Court (every member of which he had appointed) or refusing to recognize a governor and state legislature elected by a 2-1 margin. Davis knew that retaining the governorship was not feasible, but he also knew that the legal legitimacy of a state government elected through an election that had been invalidated by **110** the state Supreme Court would be dubious. [92] Davis sought a statement of recognition from President Grant for the new legislature before it sat, but President Grant only gave a vague statement that it would be "prudent" and "right" to "yield to the will of the people." [93] Shortly afterwards, the newly elected legislature assembled and sought the recognition of Davis, who refused to grant it without some sort of recognition from the President or Congress. The legislature responded by inaugurating Richard Coke as governor. Davis refused to leave office without federal recognition for the new government, and believed his term ran an additional three months. He posted militia to guard the executive offices from a Democratic takeover. [94] The Democrats responded by placing their own militia to guard the legislative chamber. To avoid conflict, Davis agreed to send his militia forces away. Shortly afterwards, Davis agreed to vacate the governor's mansion under protest. [95] Davis leaving office marked the end of the Reconstruction period in Texas.

### III. LEGAL CHALLENGES AND INTERPRETATION OF THE 1871 PROHIBITION ON PUBLIC CARRY

In the three years following enactment of the 1871 prohibition on public carry, two major legal challenges reached the Texas Supreme Court. The first was heard by a Court made up entirely of Davis appointees sympathetic to Reconstruction--the same Court that later invalidated the election of the Democratic legislature. [96] This "Semicolon Court" was held in such disrepute among Democratic "redeemers" that its opinions were only considered quasi-precedential among judges and attorneys in post-Reconstruction Texas. [97] The second challenge came in 1874, after the Democratic legislature, furious at the Court's ruling against the validity of its election, removed the entire bench from office and appointed a new Democratic slate of judges. [98]

 **111** These two cases created a kind of natural experiment that isolated the cotemporaneous legal views on firearms rights of Republican Unionists and Democratic redeemers. Ultimately, both Courts ruled that the general prohibition on carrying firearms in public was constitutional, but they relied on radically different reasoning in doing so. The distinctions in their legal reasoning embody the difference in the jurisprudential approach to the right to bear arms of the Southern Democrats whose rebellion resulted in the passage of the Fourteenth Amendment and the Republican Unionists who supported and passed the Amendment.

Compendium_Cornell
Page 1127

## A. *The Texas State Constitution and Arms Bearing*

The Texas Constitution has contained a Second Amendment analogue since the first Constitution of the Republic of Texas which read: "Every citizen shall have the right to bear arms in defense of himself and the Republic. The military shall at all times and in all cases be subordinate to the civil power." [99] In 1845, in the first Texas State Constitution, the two provisions of the 1836 Constitution were separated and the Second Amendment analogue was tweaked to read: "Every Citizen shall have the right to keep and bear arms, in the lawful defence of himself and the State." [100] This language remained consistent in both the 1861 Confederate State Constitution and the 1866 Presidential Reconstruction Constitution. [101]

After the takeover of Congress by Radical Republicans and the passage of the First Reconstruction Act, a new Texas Constitutional Convention was called in 1868. One of the major concerns facing the delegates was the growing lawlessness in Texas, especially that targeting freed slaves and Republicans. [102] In his opening message to the convention, then Governor Elisha Pease stated, "crime was never more prevalent in Texas [than now]." [103] Many delegates also likely had in mind the attempted lynching of sitting Supreme Court Justice Colbert Caldwell and the organization of the Ku Klux Klan in Texas, which had recently killed several blacks in a march through a freedmen's community. [104] In this lawless period, the delegates narrowed the scope of the firearms right to say: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe." [105] This constitution was ratified in 1869, and its provision on the right to **\*112** keep and bear arms was in force when both legal challenges to the public carry law were heard. [106]

## B. *The Texas Supreme Court, 1867-1874*

During the Reconstruction period, the Texas Supreme Court underwent unprecedented upheaval. As a result of changes in federal policy and state politics between 1866 and 1874, Texas went through four different Supreme Courts. [107] During Presidential Reconstruction, in the immediate aftermath of the Civil War, Texas Democrats adopted a Constitution meant to change as little as possible without bringing federal retribution. Under the terms of that constitution, a slate of five Democratic Justices were elected, four of whom had served as officers in the Confederate army. [108] With the advent of Congressional Reconstruction, the federally appointed military governor of Texas appointed a new Court more sympathetic to the Union. [109] This Court sat until the ratification of the Republican-drafted Constitution of 1869 and the inauguration of Edmund J. Davis as governor in 1870.

In 1870, Davis filled the now three-member state Supreme Court, forming the so-called Semicolon Court. The Court's first three justices were Lemuel Evans, Wesley Ogden, and Moses B. Walker, all of whom had unionist sentiments and close ties to the North. [110] Evans was a Tennessee-born conservative Republican who was forced to flee Texas during the Civil War after opposing secession, ending up in Washington D.C. [111] Ogden was born in New York and practiced law in Ohio and New York before moving to Texas in 1849. Ogden was also forced to flee Texas after opposing secession, but returned after the War, serving in several judicial positions prior to being appointed to the Court. [112] Walker was the only member of the Court who could fairly be called a carpetbagger. [113] Prior to the War, Walker was a Yale-educated Ohio attorney and failed politician who rose to the rank of brevet brigadier general during the War. Walker remained in the military **\*113** after the War and was assigned to Texas, where he was appointed to the military Supreme Court. [114]

The 1873 election that unseated Davis also included a referendum on a state constitutional amendment to disband the State Supreme Court and replace it with a new Court made up of five Justices. [115] The newly elected Governor Coke appointed three justices who had previously served on the Confederate Texas Supreme Court and one justice who had served on the Court when Democrats controlled it during Presidential Reconstruction. Two of the Justices had been representatives at the Texas Secession convention. Thomas J. Devine, one of the associate justices appointed by Governor Coke, had the distinction of being one of only three people tried for treason after the Civil War. [116] The Fortieth edition of the Texas Reports pointedly acknowledged the transition to the "Redeemer" Court saying: "[w]ith this volume we pass to another era in the judicial history of Texas. Those who have before construed the laws of this [s]tate, and who have assisted in the effort to preserve constitutional freedom for its citizens, again constitute its court of last resort." [117]

C. *The Semicolon Court Cases*

The Semicolon Court's major case concerning firearms, *English v. State*, arose out of three prosecutions under the 1871 Texas public carry law. English had been convicted for carrying an unloaded "out of repair" pistol while intoxicated, and a second appellant was convicted of carrying a butcher knife at a religious assembly. [118] The appellants challenged both the 1871 general prohibition on carrying firearms in public as well as the specific restriction on carrying in enumerated public places first enacted in 1870. He and his co-defendants brought challenges, under both the federal Second Amendment and Article 1, Section 13 of the Texas Constitution of 1869. [119]

 **114** Justice Walker wrote the opinion for a unanimous Court. The opinion first looked to whether the federal Second Amendment prevented Texas from prohibiting the carrying of firearms. Interestingly, the Court found that unlike other rights enumerated in the Bill of Rights, the Second Amendment, standing alone, applied equally to both state and local governments. [120] This interpretation relied exclusively on the work of New York legal commenter Joel Prentiss Bishop, with the opinion quoting two entire paragraphs from Bishop's treatise on Criminal Law. [121] Relying on Bishop, Walker adopted a militia-based view of the Second Amendment, finding that the only weapons protected were those used during service in the militia because "such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free State.'" [122]

Justice Walker's opinion further stated that under the Second Amendment "'bear' arms refers merely to the military way of using them, not to their use in bravado and affray." [123] Walker--who was quite familiar with firearms, having served as a Colonel for the Ohio volunteers during the Civil War, and having been shot three times during the battle of Chickamauga--decisively found that the law did not violate the Second Amendment, stating:

> No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the Constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the Legislature to punish and prohibit. [124]

The Court then went on to uphold the law under the Second Amendment, saying: "The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover the wants of society." [125]

Next, the Court turned to consider the case under Article 1, Section 13 of the Texas State Constitution of 1869. The Court decided that the  **115** term "arms" as used in the Texas State Constitution had the same meaning as in the Second Amendment and was limited to militia weapons. [126] It went on to state that the provision of section 13--making the right subordinate to the regulations prescribed by the state legislature--clearly allowed for the prohibition on publicly carrying firearms except in limited circumstances. Walker's opinion then clarified that even in the absence of the provision allowing regulation, the prohibition on public carry would be valid. [127]

Justice Walker next discussed how Texas's law was consistent with the laws enacted in other states. He observed that:

> This law is not peculiar to our own State, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the States of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration. [128]

While Walker did not cite the specific statutes he mentioned, he most likely referred to a series of laws primarily enacted in the North, which generally prohibited carrying a firearm or other dangerous weapon without reasonable cause to fear an attack on oneself or one's family. The laws of Maine, Massachusetts, Michigan, Minnesota, Oregon, Pennsylvania, Virginia, West Virginia, and Wisconsin all included such statutes. [129]

Justice Walker's opinion then shifted from legal analysis to a discussion of the relationship between individuals, their community, and government, stating in reference to the 1871 Act that:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which States and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the State for redress. We must not go back to the state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.

> ...

> **\*116**  The powers of government are intended to operate upon the civil conduct of the citizen; and whenever his conduct becomes such as to offend against public morals or public decency, it comes within the range of legislative authority. [130]

On this point, the Court quoted John Stuart Mill's *On Liberty*:

> "It is one of the undisputed functions of the government, to take precautions against crime before it has been committed, as well as to detect and punish it afterwards. The right inherent in society, to ward off crimes against itself by antecedent precautions, suggests the obvious limitations to the maxim, 'that purely self-regarding misconduct cannot properly be meddled with in the way of prevention or punishment.'" [131]

Walker's opinion rejected the challenge to the portion of the law that prohibited carrying weapons at public assemblies even more vehemently. Justice Walker wrote for the Court that: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." [132]  The Court upheld the public assembly provision just as it had the general public carry prohibition.

The Semicolon Court had a few other opportunities to interpret the 1871 Act. In *Jenkins v. State*, the Court, again in a decision by Justice Walker, upheld the sufficiency of an indictment for carrying firearms. The Court found that the government was not required to plead that the defendant did not fall into the exceptions in the act; rather it was the defense's burden to prove the defendant fell within one of the laws exceptions. [133]

In *Waddell v. State*, the Court contrasted the right to keep arms for self-defense in the home, which it had recognized as protected in *English*, with carrying arms in public, which could be strictly regulated. In *Waddell*, it reversed a defendant's conviction for carrying a firearm when the defendant purchased two pistols, proceeded to several other stores in town seeking ammunition to fit his gun, and then travelled to his home fifteen miles out of town. The Court found the conduct within the statute's exception for keeping or bearing arms on one's own premises or on a journey, stating:

> **\*117**  he had a perfect right to purchase the arms, and for the purpose of obtaining ammunition to suit them, he had a right to take them with him, to any place where such ammunition was sold; and then he had a perfect right to take them to his home for any lawful purpose he may have intended to serve with them, such as guarding his house against thieves and robbers, defending himself and family against murderers or assassins. [134]

The Court then reaffirmed the validity of the law stating, "[W]e find nothing in the act which, rightly construed, takes away any right or abridges any reasonable and lawful privilege of the citizen."[135] The Court then advised prosecutors and lower courts against bringing similar cases, saying,

> if wrong constructions are placed upon this act, and absurd and vexatious prosecutions for acts not within the denunciation of the law are tolerated and entertained by the courts, the law itself must become unpopular, even odious, to a free people, and the Legislature will be driven by public indignation and protest to repeal the law.[136]

In contrast to *Waddell*, in *Baird v. State*, the Court upheld the conviction of a defendant who carried a handgun while hog hunting.[137] The defendant claimed his carrying was legal under the "place of business" exception because he hunted hogs in the forest every winter, which he claimed made it his regular business. The Court was unwilling to grant the exception such a broad interpretation, noting that if "place of business" included anywhere a person could conduct business, "every man could very plausibly set up the right to keep and bear arms on every occasion, for he could always claim to be at his own business ...."[138] The Court limited place of business to a particular location dedicated exclusively to a person's business. The Court also rejected a challenge that the prosecution had failed to show that the person was not on his own property at the time of the crime, saying whether a person owned the property where he was arrested for carrying is within the defendant's own knowledge and power of proof.[139] However, the Court again cautioned against overly zealous application of the law, saying:

> **\*118** The constitutionality of that act being admitted, its beneficial effects upon society have been quite fully demonstrated and placed almost beyond question. But while it is generally conceded that the execution of that law, in the spirit, and for the purposes intended by the law-making power, would greatly conduce to the peace and quiet of the citizens of the State, yet it must also be admitted that any attempt to prostitute that law from the purposes for which it was enacted into an instrument of oppression to annoy and harass any peaceful and law-abiding citizen, would greatly tend to bring that law into disfavor, and create and stimulate a demand for its repeal. It is therefore but just and reasonable that this law, as well as all others, should be executed in the spirit intended, for the good of the citizens generally, and not as a snare to entrap the unwary who intend no wrong, and believe they are exercising only their legitimate or inalienable rights.[140]

Possibly in response to these concerns, after laying down the rule that Baird's conduct violated the law, the Court reversed the conviction on a technical issue.[141]

## D. *The 'Redeemer' Court Cases*

When the Redeemer Democrats took over the governorship, they reconstituted the Supreme Court and appointed Democratic judges to replace the Semicolon Court.[142] While the Democrats repealed most of the Davis administration's legislative accomplishments, they left in place the prohibition on public carry, although enforcement was sporadic.[143] The newly constituted Court heard several challenges to the 1871 Firearms Act during its first year and issued a series of three opinions interpreting the Act. Notably, while all three decisions reversed the defendant's conviction for carrying firearms, even the "Redeemer" Court concluded that the public carry prohibition was constitutional.

The first and most important case was *State v. Duke*, an appeal by the state after the district court had found an indictment under the 1871 law deficient on constitutional grounds.[144] The "Redeemer" Court upheld the law as the Semicolon Court had, although with very **\*119** different reasoning.[145] The first difference arose out of the applicability of the Second Amendment. The "Redeemer" Court found the Second Amendment did not apply to the states, citing *Barron v. Baltimore* and the *Slaughter-House Cases*.[146] While this decision was fully supported by law, and anticipated the next year's decision of the United States

Supreme Court in _United States v. Cruikshank_, 92 U.S. 542 (1875), it is also consistent with the Democratic desire to minimize the role of the federal government and the reach of federal constitutional law within the state.

The Court then considered the statute under Article 1, Section 13 of the Texas Constitution of 1869. The Court disagreed with the Semicolon Court's militia-based reading of Section 13, noting that the Texas right excluded the Second Amendment's recitation of the well-regulated militia language, and instead stated:

> The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for defense of the State. If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. [147]

The Court then stated:

> Regarding, then, some kinds of pistols as within the meaning of the word, we are of the opinion that the Act in question is nothing more than a legitimate and highly proper regulation of their use. ... It undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business. [148]

However, the Court then went on to uphold the lower court's dismissal of the indictment on the grounds that the state failed to plead that the exceptions in the Act did not apply to the defendant's conduct.  **120**  In doing so, the Court overturned the Semicolon Court's _Jenkins_ decision which had come to the opposite conclusion. [149]

The Semicolon and "Redeemer" Courts also disagreed about the scope of citizens' self-defense rights. The Semicolon Court was adamant that citizens in a society relinquish the power to settle scores, and instead rely on the state to keep the peace. The "Redeemer" Court spoke of no such limitations. Rather, the Court essentially permitted citizens to decide the appropriate level of self-defense by upholding a right to keep "commonly kept" arms "appropriate for 'open and manly use in self-defense.'" [150] The Court went so far as to name several "commonly kept" arms protected by the state constitution, including pistols and double-barreled shotguns. [151]

In a pair of cases decided the same day as _Duke_, the "Redeemer" Court interpreted the exceptions to the public-carry ban, overturning convictions in both cases. In _Young v. State_, the Court reversed a conviction for carrying a pistol because the trial court judge had refused to let in evidence regarding threats made against the defendant. [152] The defendant claimed he only carried a pistol because he had previously been attacked, and his attacker after being restrained had yelled, "If I didn't kill you this time, damn you, I will do it yet." [153] The trial judge, in an extremely narrow reading of the exception, found as a matter of law that this statement was inadequate because the attacker was not physically present at the time defendant was arrested with the gun. [154] The Court disagreed, finding that the issue was a mixed matter of both fact and law that should have gone to a jury. The Court noted: "[i]t is easy to imagine circumstances under which the danger might be most imminent, though the person from whom it was threatened was not immediately present." [155]

 **121**  In the second decision interpreting the law's exceptions, the Court reversed a conviction for carrying a pistol on two grounds. [156] First, the indictment did not state that the defendant lacked reasonable grounds to fear an unlawful attack. [157] Second, the defendant was traveling sixteen miles to a nearby town, a journey he expected to last two or three days. [158] The Court found this was sufficient to bring the defendant within the exception for travelers. [159] While these decisions seem reasonable, they do appear to be part of a pattern of finding technical flaws in indictments and prosecutions in order to avoid subjecting defendants to punishment under the 1871 Act.

However, the "Redeemer" Court did not overturn every firearms conviction that came before it. [160] In *Titus v. State*, the Court upheld a conviction for carrying a pistol while hunting. The Court made clear that the statute did not include an exception for hunting and that the use of pistols in hunting is neither "necessary or proper." [161] While the Semicolon Court's *Baird* decision was clearly on point, the Court did not cite it as precedent, but rather only stated that *Baird* "is a case similar to the present." [162]

## IV. CONCLUSION

As the foregoing makes clear, at the time of the ratification of the Fourteenth Amendment, restrictions on publicly carrying firearms were not viewed by Texas Republicans as violative of any right. Rather, in 1870 and 1871, faced with a horrifying rate of violence, Texas's Republican state legislature did not feel constrained in taking action to protect the people of Texas. This resulted in a general prohibition on carrying firearms that was aggressively enforced by a newly created state police force. This restriction was consistent with the Republican view that individuals surrendered their personal right to avenge grievances by entrusting government to maintain societal order.

Contrary to the historical accounts presented by many scholars, these laws were obviously not enacted based on racial animus. Then, as now, gun violence weighed most heavily on the black community. **\*122** [163] But, unlike the present day inaction of Congress and many state legislatures, in the face of aberrational homicide rates, the government of Texas under Governor Edmund Davis took action. This action was taken with the full support of the black community who it was intended to protect. [164] The law was also enforced in a racially neutral manner during the Davis administration. [165] The Texas state police was a fully integrated police force closely aligned with the Republican governor and fully committed to protecting freedmen from violence perpetrated by whites.

When interpreting the rights protected by the Fourteenth Amendment, scholars should look to the legal views of those who supported the enactment and ratification of the Fourteenth Amendment rather than those who fought to abscond from the constitutional system, and in the case of Texas Democrats, specifically rejected ratification of the Fourteenth Amendment. [166] The Republican-appointed Supreme Court did not struggle to uphold the prohibition on carrying firearms. Justice Walker, a former Union general, found the law consistent with the laws of the rest of the nation and self-evidently valid and beneficial. In contrast, the law was viewed with suspicion when it came before the "redeemed" Supreme Court, which expressed sympathy for a right to "manly self-defense." These differing views are representative of the differing Republican and Democratic views about gun rights, self-defense, and the role of government. The Republican view was enshrined in the Fourteenth Amendment after the North's victory in the Civil War. This view should be the guide in interpreting the scope of the Second Amendment now.

### Footnotes

a1   Counsel, Everytown for Gun Safety, B.A. Marquette University, J.D. Georgetown University Law Center. I would like to thank Professor Darrell Miller, Professor Joseph Blocher, Professor Saul Cornell, Eric Ruben, Adam Skaggs, and Patrick Charles for their guidance in drafting this Article. I would like to especially thank Professor Robert Dykstra for his incredibly generous assistance with Part II, especially his assistance in calculating homicide rates, and his efforts to find homicide records for 1869. Opinions expressed in this Article are solely those of the Author and do not necessarily reflect the views of Everytown for Gun Safety.

1   *See, e.g.*, Stephen P. Halbrook, *The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights*, 41 BAYLOR L. REV. 629 (1989) (discussing directly on the subject of this Article, but portraying the events described in a very anti-Republican manner); Robert J. Cottrol & Raymond T. Diamond, *"Never Intended to be Applied to the White Population": Firearms Regulation and Racial Disparity--The Redeemed South's Legacy to a National Jurisprudence?*, 70 CHI.-KENT L. REV. 1307 (1995). Also, see Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995), which is especially inaccurate historically on this topic.

[2]  Several major provisions of the laws discussed in this Article were repealed by the Texas state legislature during the 2015 legislative session. *See* Tex. H.B. 910, 84th Leg., R.S. (2015) (repealing S.B. 11, 84th Leg., R.S. (2015)). Everytown for Gun Safety opposed these changes.

[3]  *See* District of Columbia v. Heller, 554 U.S. 570, 626-28 (2008).

[4]  *See* McDonald v. City of Chicago, 561 U.S. 742, 771-80 (2010); Akhil Reed Amar, *The Second Amendment as a Case Study in Constitutional Interpretation,* 2001 UTAH L. REV. 889, 889-90 (2001); Clayton E. Cramer et al., *This Right is Not Allowed By Governments That Are Afraid of the People: The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified,* 17 GEO. MASON L. REV. 823 (2010).

[5]  In this Article, the terms "Republican" or "Radical Republican" will be used to identify Unionists who generally supported black civil rights, the policies of Reconstruction, and the administration of Edmund J. Davis. "Democrat" will be used to refer to secessionists who opposed Reconstruction, black civil rights, and the administration of Edmund J. Davis. The political divisions in Reconstruction Texas were not nearly this clear cut, but a more detailed taxonomy would go beyond the level of detail necessary for this Article. Reconstruction refers to the period of Federal and Republican control in Texas from 1865-1874 and nationally from 1863-1877. Reconstruction is generally divided into two periods. The first, Presidential Reconstruction, during which the rebel states were treated indulgently by the federal government and the Southern pre-war political order generally remained in place, took place from 1865 to early 1867. The second period, known as Congressional Reconstruction, began when the Radical Republican majorities elected in 1866 took office. The Radical Republican Congress passed the Reconstruction Acts, which placed the rebel states under military control and excluded former Confederates from politics. During Congressional Reconstruction, control was eventually passed from federal military governors to Republican-controlled state governments, most of which included blacks. Reconstruction ended at different times in each state when control returned to conservative white Democrats known as "redeemers." *See generally* ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863-1877 (1988).

[6]  *See, e.g.*, HORACE V. REDFIELD, HOMICIDE, NORTH AND SOUTH: BEING A COMPARATIVE VIEW OF CRIME AGAINST THE PERSON IN SEVERAL PARTS OF THE UNITED STATES 11, 68 (Ohio State Univ. Press 2000) (1880).

[7]  RANDOLPH ROTH, AMERICAN HOMICIDE 234 (2009). Roth attributes this extremely high murder rate to the weak governance provided by Mexico and instability and conflict caused by the transition from Mexico, to the Republic of Texas, to the United States. This was especially true in South Texas where it is estimated at least 200 people were murdered by bandits between 1836 and 1845.

[8]  *Uniform Crime Reports: Murder*, FED. BUREAU OF INVESTIGATION, http://1.usa.gov/1YNrV3N [https://perma.cc/8WFL-AYU2] (last visited July 12, 2016).

[9]  FREDERICK LAW OLMSTED, A JOURNEY THROUGH TEXAS: OR, A SADDLE-TRIP ON THE SOUTHWESTERN FRONTIER 158 (Univ. of Tex. Press 1978) (1857); *see also* BARRY A. CROUCH & DONALY E. BRICE, THE GOVERNOR'S HOUNDS: THE TEXAS STATE POLICE, 1870-1873 10 (2011) (describing a Texan's conversation with northern journalist Albert D. Richardson in which the Texan told Richardson, "if you want to obtain distinction in this country, kill somebody.").

[10]  *Great Hanging at Gainesville*, TEX. ST. HIST. ASS'N, http://bit.ly/1W53ai6 [https://perma.cc/M2UZ-GPTC] (last visited July 12, 2016); CARL H. MONEYHON, EDMUND J. DAVIS OF TEXAS: CIVIL WAR GENERAL, REPUBLICAN LEADER, RECONSTRUCTION GOVERNOR 48 (2010).

[11]    Ann Patton Baenziger, *The Texas State Police During Reconstruction: A Reexamination*, 72 SW. HIST. Q. 470, 471 (1969).

[12]    CROUCH & BRICE, *supra* note 9, at 20.

[13]    *Id.*; *see also* TEX. CONSTITUTIONAL CONVENTION (1868-1869), JOURNAL OF THE RECONSTRUCTION CONVENTION: WHICH MET AT AUSTIN, TEXAS 501 (Tracy, Siemering & Co. 1870) (New York state, despite having a population five times the size of Texas, only suffered a total of forty-seven murders in 1867--300 less than the number of murders in Texas during the same year).

[14]    Baenziger, *supra* note 11, at 473.

[15]    CROUCH & BRICE, *supra* note 9, at 20.

[16]    These rates are calculated using Reconstruction Journal Records for the homicide numbers and 1860 and 1870 census information for the population numbers. The Convention Report records are clearly and admittedly under-inclusive, so these numbers provide only a minimum homicide rate during the period. The actual homicide rate may have been significantly higher--possibly double or triple the calculated rate. Populations are calculated by dividing the difference between the 1860 and 1870 census evenly and allocating across the ten years. Homicide Rates for 1868 were calculated using both the raw numbers, which included up to the end of July, and numbers adjusted for the remaining five months.

[17]    This rate is calculated using Freedmen's Bureau Records for 46 counties during the first quarter of 1869, adjusting for the population of those counties. It is impossible to determine whether these counties are representative of the state as a whole, and intuitively more anarchic counties seem less likely to accurately report their records. It is also impossible to determine whether the murder rate was subdued by relatively cold weather in the early part of the year. This data also does not account for the more tumultuous period surrounding the election at the end of 1869. The Author would like to again thank Robert Dykstra for locating these records and calculating the 1869 homicide rate.

[18]    This number was calculated based on statistics released by the Federal Census Bureau, and published in the Daily State Journal (Austin) in August 31, 1871. *See* Baenziger, *supra* note 11, at 473 n.13. *See also* ROTH, *supra* note 7, at 569 n.123 (estimating a homicide rate of 268 per 100,000 in South and West Texas).

[19]    MONEYHON, *supra* note 10, at 77.

[20]    CROUCH & BRICE, *supra* note 9, at 11-12.

[21]    *Id.* at 12.

[22]    *Id.* at 21.

[23]    TEX. CONSTITUTIONAL CONVENTION (1868-1869), *supra* note 13, at 194.

[24]    *Id.* at 195.

[25]    CROUCH & BRICE, *supra* note 9, at 15.

26   Baenziger, *supra* note 11, at 473. These numbers were not broken down by race, so it is possible Doubleday's statement about murder prosecutions was accurate during the post-War period.

27   TEX. CONSTITUTIONAL CONVENTION (1868-1869), *supra* note 13, at 199.

28   *Id.*

29   Baenziger, *supra* note 11, at 473.

30   Carl H. Moneyhon, *Edmund Jackson Davis*, TEX. ST. HIST. ASS'N, http://bit.ly/1XT3kLm [https://perma.cc/ E4JK-8TV8] (last visited July 24, 2016).

31   *Id.*

32   MONEYHON, *supra* note 10, at 40-41. Sam Houston was also removed as governor for refusing to swear loyalty to the Confederacy, an action akin to removing George Washington from office. Thomas H. Kreneck *Samuel Houston*, TEX. ST. HIST. ASS'N, http://bit.ly/1UnCfMQ [https://perma.cc/R2JB-66LW] (last visited July 24, 2016).

33   MONEYHON, *supra* note 10, at 59-72.

34   *Id.* at 79-80.

35   *Id.* at 82-83. Davis may have meant suffrage for blacks meeting educational or literacy thresholds.

36   *Id.* at 114-15. At the time, the primary dispute between the two factions was over the *ab initio* issue, which was whether the legislative and judicial acts of the secessionist governments should have continued validity.

37   *Id.* at 122. The convention collapsed without finalizing a state constitution.

38   *See generally* Dale Baum, *Chicanery and Intimidation in the 1869 Texas Gubernatorial Race*, 97 SW. HIST. Q. 36 (1993).

39   *Id.* at 36.

40   *Id.* at 49.

41   *Id.* at 38-39 (stating that the discontinued voting in Milam and Navarro counties almost certainly did not swing the election results).

42   *Id.* at 40.

43   H.J. of Tex., 12th Leg., 1st C.S. 14 (1870) (inaugural address of Governor Edmund J. Davis).

44      *Id*. at 18-21.

45      Act approved June 24, 1870, 12th Leg., C.S., ch. 10, 1870 Tex. Gen. Laws 11, 11, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 185, 185 (1898); Act approved July 1, 1870, 12th Leg., C.S., ch. 13, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 193, 193 (1898); Act approved July 2, 12th Leg., C.S., ch. 14, 1870 Tex. Gen. Laws 21, 21, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 195, 195 (1898); Act approved Aug. 13, 1870, 12th Leg., C.S., ch. 68, 1870 Tex. Gen. Laws 113, 113, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 287, 287 (1898). The school system adopted by the Davis administration provided equal funding for all students in the state, in contrast with the system in effect in Texas 100 years later and controversially upheld by the Supreme Court in *San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973)*.

46      Baenziger, *supra* note 11, at 473.

47      *Id*. at 474.

48      Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 8, 1870 Tex. Gen. Laws 19, 20, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 193, 194 (1898).

49      Act approved July 1, 1870, 12th Leg., C.S., ch. 13, § 5, 1870 Tex. Gen. Laws 19, 19, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 193, 193 (1898).

50      *See* CROUCH & BRICE, *supra* note 9, app.; Baenziger, *supra* note 11, at 475. Crouch and Brice dispute the forty percent cited by Baenziger, and originally used as a criticism of the state police force, but do not dispute that the state police were integrated to a degree unprecedented at the time.

51      Baenziger, *supra* note 11, at 475.

52      H.J. of Tex., 12th Leg., 1st C.S. 19 (1870). Handguns accounted for around two-thirds of the murders in Texas during the period, which is an aberrationally high percentage for the time. *See* ROTH, *supra* note 7, at 356.

53      Act approved Aug. 12, 1870, 12th Leg., C.S., ch. 46, 1870 Tex. Gen. Laws 63, 63, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 237, 237 (Gammel Book Co. 1898); CROUCH & BRICE, *supra* note 9, at 26.

54      Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

55      CROUCH & BRICE, *supra* note 9, at 61 (discussing the arrest of Joseph Elliott for wearing arms in a public assembly during efforts to stop the notorious West Gang).

56      H.J. of Tex., 12th Leg., R.S. 57 (1871).

57      *Id*.

58    CROUCH & BRICE, *supra* note 9, at 39-40 (Patrick would be fired in December 1870). Confusion does not seem to have been limited to Patrick. In one instance a district court judge, F.P. Wood, ordered anyone who carried a gun in town, not just those at public assemblies, to be arrested. *Id*. at 62.

59    *Id*. at 40.

60    *Id*.

61    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927 (1898).

62    Calculated using inflation calculator at http://www.westegg.com/inflation/, which is based on consumer price index statistics going back to 1800 (last visited July 12, 2016).

63    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927 (1898).

64    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 2, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927 (1898).

65    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25, 25-26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927-28 (1898).

66    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 4, 1871 Tex. Gen. Laws 25, 26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 928 (1898).

67    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 1, 1871 Tex. Gen. Laws 25, 25, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927 (1898).

68    H.J. of Tex., 12th Leg., R.S. 95 (1871); Britney Jeffery, *Frederick Edward Grothaus*, TEX. ST. HIST. ASS'N, http://bit.ly/1Llq64O [https://perma.cc/HY5L-X6JD] (last visited July 24, 2016).

69    H.J. of Tex., 12th Leg., R.S. 443-44 (1871) (Judiciary Committee Report dated February 28, 1871).

70    The black representatives who supported the measure were Richard Allen, D.W. Burley, Silas Cotton, Goldstein Dupree, Jeremiah J. Hamilton, Mitchell Kendall, David Medlock, John Mitchell, Henry Moore, Sheppard Mullens, Benjamin Franklin Williams, and Richard Williams. *See* H.J. of Tex., 12th Leg., R.S. 523-32 (1871).

71    G.T. Ruby and freedman Matthew Gaines were the two black senators who supported the Amendment. *See* S.J. of Tex., 12th Leg., R.S. 538 (1871).

72    Members of the House voting nay: Abbot (Democrat, Confederate Officer); English (Unknown Party, Confederate Officer); M.A. Gaston (Democrat); Hawkins (Conservative); F. Kyle (Democrat, Confederate Officer); J.W. Lane (Democrat); Jas. A. Miller (Democrat); W.C. Pierson (Radical/Democrat) (There is some dispute as to the political affiliation of W.C. Pierson he is listed as a Radical Republican in the Texas State Almanac from 1870, but his obituary states he was one of the few Democrats who served in the Texas House of Representatives during Reconstruction); Robb (Democrat, Confederate Officer); E. Ross (Democrat); Self (Unknown); G.H. Slaughter (Radical Republican).

Members of the Senate voting nay: Bowers (Conservative, Confederate Officer); Cole (Democrat); Dillard (Democrat, Confederate Officer); Picket (Conservative). *See* H.J. of Tex., 12th Leg., R.S. 523-32 (1871); S.J. of Tex., 12th Leg., R.S. 538 (1871); TEXAS ALMANAC (1870) (for party affiliation information); *The Handbook of Texas*, TEX. ST. HIST. ASS'N, https://tshaonline.org/hand-book (for biographical information) (last visited July 12, 2016).

73    Act approved Apr. 12, 1871, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25, 25-26, *reprinted in* 6 H.P.N. Gammel, *The Laws of Texas* 1822-1897, at 927, 927-28 (1898).

74    *See generally* State v. Clayton, 43 Tex. 410 (1875); State v. Duke, 42 Tex. 455 (1874); Young v. State, 42 Tex. 462 (1874); Smith v. State, 42 Tex. 464 (1874); Titus v. State, 42 Tex. 578 (1874); Waddell v. State, 37 Tex. 354 (1873); Baird v. State, 38 Tex. 599 (1873); English v. State, 35 Tex. 473 (1872); Jenkins v. State, 36 Tex. 638 (1872); McNell v. State, 14 S.W. 393 (Tex. Ct. App. 1890); Wilson v. State, 10 S.W. 749 (Tex. Ct. App. 1889); Cathey v. State, 5 S.W. 137 (Tex. Ct. App. 1887); Roberson v. State, 228 S.W. 236 (Tex. Crim. App. 1921); George v. State, 234 S.W. 87 (Tex. Crim. App. 1921); Mayfield v. State, 170 S.W. 308 (Tex. Crim. App. 1914); Harris v. State, 126 S.W. 890 (Tex. Crim. App. 1910); Davidson v. State, 45 S.W. 488 (Tex. Crim. App. 1898); Sexton v. State, 45 S.W. 920 (Tex. Crim. App. 1898); *Ex parte* Jones, 41 S.W. 626 (Tex. Crim. App. 1897).

75    CROUCH & BRICE, *supra* note 9, at 122.

76    *An Acting Officer Murdered*, DAILY HERALD (Dallas, Tex.), July 15, 1871, at 4; WEEKLY DEMOCRATIC STATESMAN (Austin, Tex.) Sept. 21, 1871, at 4.

77    *A Negro Outrage at Springfield*, WEEKLY DEMOCRATIC STATESMAN (Austin, Tex.), Oct. 5, 1871, at 3.

78    CROUCH & BRICE, *supra* note 9, at 108.

79    *Id*. at 120.

80    *Id*. at 124. In contrast to the strict enforcement of the prohibition on public carry, the state police opposed efforts by local Democratic law enforcement to disarm freedmen of their militia and special police weapons. *Id*. at 141.

81    *Id*. at 150-56.

82    H.J. of Tex., 13th Leg., R.S. 33-34 (1873).

83    Baenziger, *supra* note 11, at 488.

84    FONER, *supra* note 5, at 440.

85    Baenziger, *supra* note 11, at 488.

86    *Id*. at 489.

87    FONER, *supra* note 5, at 549.

88    *See generally Ex parte* Rodriguez, 39 Tex. 705 (1873). Davis had signed the election law. *Id.* at 706.

89    Lance A. Cooper, *"A Slobbering Lame Thing"? The Semicolon Case Reconsidered*, 101 SW. HIST. Q. 320, 323 (1998).

90    The *Rodriguez* decision, and the Davis administration generally, have been vilified in Texas history since Democrats regained full control in 1874. *See generally* T.R. FEHRENBACH, LONE STAR: A HISTORY OF TEXAS AND THE TEXANS (1968). One textbook used in a state-mandated government course at Texas colleges described the "injustice, oppression, and extravagance" of the Davis administration and the twelfth legislature as "undoubtedly, the worst in the history of the state." WILBOURN E. BENTON, TEXAS POLITICS: CONSTRAINTS AND OPPORTUNITIES (5th ed. 1984). However, the Court's reading of the state constitution seems reasonable, although bold in the context the decision was made. Cooper, *supra* note 89, at 339.

91    *See Ex parte* Rodriguez, 39 Tex. at 773-74. Similarly, another dispute existed surrounding the term of the governor because of inconsistent provisions in the State constitution as to the length of the Governor's term and the inauguration of a new governor. *See generally* Carl H. Moneyhon, *Edmund J. Davis in the Coke-Davis Election Dispute of 1874: A Reassessment of Character*, 100 SW. HIST. Q. 130 (1996).

92    *Id.* at 133-34.

93    *Id.* at 143.

94    *Id.* at 146.

95    *Id.* at 149.

96    There was one change in the Court membership between the *English* decision and the *Semicolon* case. *See* Hans W. Baade, *Chapters in the History of the Supreme Court of Texas: Reconstruction and "Redemption" (1866-1882)*, 40 ST. MARY'S L.J. 17, 78, 116 (2008).

97    *Id. at 92.* I use "Semicolon Court" here as shorthand for the Court appointed by Governor Davis. The designation has traditionally been used derisively, especially by Southern scholars critical of Reconstruction. Use of the designation here is for clarity only and is in no way intended to be critical of the Court. Similarly the use of the term "redeemers" is used only to be consistent with historical discussion of the period and in no way to imply the reassertion of conservative white control was a positive development.

98    *Semicolon Court*, TEX. ST. HIST. ASS'N, http://bit.ly/1KQlYzG [https://perma.cc/5ADF-TNJS] (last visited July 24, 2016).

99    REPUB. TEX. CONST. of 1836, Declaration of Rights, § 14.

100   TEX. CONST. of 1845, art. I, § 13.

101   TEX. CONST. of 1861, art. I, § 13; TEX. CONST. of 1866, art. I, § 13.

102   MONEYHON, *supra* note 10, at 48.

103    *Id.* at 116.

104    *Id.* at 117.

105    TEX. CONST. of 1869, art. I, § 13.

106    *Constitution of 1869*, TEX. ST. HIST. ASS'N, http://bit.ly/1IVwcsy [https://perma.cc/Z8AQ-NAMP] (last visited July 24, 2016).

107    Baade, *supra* note 96, at 18.

108    *Id.* at 36-37.

109    *Id.* at 50.

110    In 1873, Justice Evans was replaced with pre-War unionist John David McA-doo. Upon secession, McAdoo chose Texas over the Union and served in the Confederate military--ultimately rising to the rank of Brigadier General. *See John David McAdoo*, TEX. ST. HIST. ASS'N, http://bit.ly/1OiKF3D [https://perma.cc/924J-SP2N] (last visited July 24, 2016).

111    Baade, *supra* note 96, at 79-80.

112    *Id.* at 81.

113    Carpetbagger is a derogatory term for a person who moved from the North to the South during reconstruction to take advantage of political opportunities, here the term is intended to be merely descriptive. FONER, *supra* note 5, at 295 n.28.

114    *Moses B. Walker*, TEX. ST. HIST. ASS'N, http://bit.ly/1NcaN2f [https://perma.cc/D4P3-B2KT] (last visited July 24, 2016).

115    Although the Semicolon Court invalidated the election, the Democrats convened the legislature anyway, passing the Amendment by the required two-thirds vote in each chamber. Baade, *supra* note 96, at 121.

116    *Id.* at 123.

117    *Id.* at 124 (citing Alex W. Terrell & Alex S. Walker, *Preface* to 40 Tex., at v, v (1882)).

118    English v. State, 35 Tex. 473, 473-74, 480 (1872). No evidence of the circumstances of third prosecution is available, but the Supreme Court reversed the judgment in that appellant's case, which presumably means that that court's ruling was in conflict with the *English* decision. A request to the Texas State Archives--which houses Texas Supreme Court records for this period--for records related to the *English* and *Duke* cases resulted in an archivist informing the Author that the Court records for both cases had been lost at some time prior to 1944 when cases were indexed.

119    *Id.* at 474, 478.

Compendium_Cornell
Page 1141

120    *Id.* at 475 (citing JOEL PRENTISS BISHOP, *Carrying Weapons,* COMMENTARIES ON THE LAW OF STATUTORY CRIMES 493 (1873)).

121    *See generally* BISHOP, *supra* note 120. Notably, Bishop believed the Second Amendment applied to the states by its own terms rather than through either the due-process or privileges and immunities clauses of the Fourteenth Amendment.

122    *English,* 35 Tex. at 475; BISHOP, *supra* note 120, at 497.

123    *English,* 35 Tex. at 473, 475.

124    *Id.* at 476.

125    *Id.* at 477. Walker also made an interesting distinction between the right protected by the Second Amendment, and a pre-existing right to self-defense, stating: "There is no abridgement of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law." *Id.*

126    *Id.* at 478.

127    *Id.* at 478-79 ("But we do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the State or Federal Constitution.").

128    *Id.* at 479.

129    *See generally* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context,* 125 YALE L.J.F. 121, 130-32 (2015). *See also* 1841 Me. Laws 709, ch. 169, § 16; 1836 Mass. Acts 750, § 16; 1846 Mich. Pub. Acts 690, ch. 162, § 16; 1851 Minn. Laws 526, ch. 112, § 18; 1853 Or. Laws 218, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6; 1847 Va. Acts 127, ch. 14, § 15; 1870 W. Va. Acts 702, ch. 153, § 8; 1838 Wis. Sess. Laws 381, § 16.

130    *English,* 35 Tex. at 477-78.

131    *Id.* at 478 (The reporter has the Court citing to pages 56 and 57 of John Stuart Mill's *On Liberty,* but the actual quotes appear between pages 172 and 175).

132    *Id.* at 478.

133    *Jenkins v. State,* 36 Tex. 638 (1872) (The headnotes for *Jenkins* describe the offense as "carrying concealed weapons" while the actual statute prohibits carrying weapons generally).

134    *Waddell v. State,* 37 Tex. 354, 356 (1873). This is similar to language in the 1871 Tennessee case. *See also Andrews v. State,* 50 Tenn. 165, 178-79 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.").

135    *Waddell*, 37 Tex. at 355.

136    *Id.*

137    Baird v. State, 38 Tex. 599 (1873).

138    *Id.* at 601.

139    *Id.* at 602.

140    *Id.* at 600-01. The Court seems to have wanted to avoid creating an excuse for the now Democratically controlled state legislature to repeal the public carry law.

141    *Id.* at 603.

142    Baade, *supra* note 96, at 121.

143    *See, e.g.*, The Weekly Democratic Statesman (Austin, Tex.) Mar. 26, 1874 at 3; *Row on Sunday*, The Waco Daily Examiner (Waco, Tex.) June 9, 1874 at 3; The Dallas Daily Herald (Dallas, Tex.) Nov. 13, 1874 at 4; *Judge Burford's Court*, The Dallas Daily Herald (Dallas, Tex.) at 4; Mayor's Court, The Dallas Daily Herald (Dallas, Tex.) June 17, 1875 at 4; *Bold Resistance - The Difficulties of Enforcing Laws*, The Dallas Weekly Herald, July 17, 1875 at 3; The Dallas prosecutions occurred under a Dallas City Ordinance with identical language to Texas's statewide law, *see Ordinances of the City of Dallas*, Dallas Herald (Dallas, Tex.) June 15, 1872 at 1.

144    State v. Duke, 42 Tex. 455 (1874).

145    *Id.* at 457.

146    *Id.* at 457-58 (citing *Barron v. Baltimore*, 32 U.S. 243 (1833) and *Slaughter-House Cases*, 83 U.S. 36 (1873)). The *Slaughter-House Cases* were decided after the *English* decision, but *English* did not rely on the Fourteenth Amendment for the applicability of the Second Amendment to the States.

147    *Id.* at 458-59. Notably, by making this distinction *Duke* does seem to interpret the Second Amendment as a militia based rather than individual right.

148    *Id.* at 459 (reversing the conviction because the prosecution had failed to assert that the defendant did not fall into the statutory exceptions).

149    *Id.* at 461. *See generally* Jenkins v. State, 26 Tex. 638 (1872); *see also* State v. Clayton, 43 Tex. 410 (1875) (finding the indictment valid, which read defendant "unlawfully carr[ied] on and about his person a certain pistol, he then and there having no reasonable grounds for fearing an unlawful attack on his person, nor was he then and there either a militiaman in actual service, or a peace officer, or a policeman, nor was he then and there on his own premises or at his own place of business." This was sufficient to plead the exceptions).

150    *Duke*, 42 Tex. at 458. For a discussion of the culture of honor and violence prevalent in the South, see BERTRAM WYATT-BROWN, SOUTHERN HONOR: ETHICS & BEHAVIOR IN THE OLD SOUTH (Oxford Univ. Press 1983).

151    *Duke*, 42 Tex. at 458-59.

152    Young v. State, 42 Tex. 462 (1874).

153    *Id.* at 463.

154    *Id.* at 463-64.

155    *Id.* at 464; *see also* Bailey v. Commonwealth, 74 Ky. 688, 692-93 (1876) (interpreting similar language to allow carry when a specific threat exists even if that threat is not actually present); Chatteaux v. State, 52 Ala. 388, 390 (1875) (continuing to carry a pistol concealed after passing through a dangerous area does not meet the exception for good reason to apprehend an attack).

156    Smith v. State, 42 Tex. 464 (1874).

157    *Id.* at 465.

158    *Id.*

159    *Id.* at 466.

160    At the time, every criminal defendant was entitled to an appeal as of right to the State Supreme Court. This proved burdensome to the Supreme Court, which resulted in the creation of the Texas Court of Criminal Appeals. Baade, *supra* note 96, at 126.

161    Titus v. State, 42 Tex. 578, 579 (1874).

162    *Id.* at 579. The Semicolon Court cases were held in such ill repute in "redeemed" Texas that attorneys practicing in Texas avoided citing them as precedent.

163    *See generally* Nate Silver, *Black Americans Are Killed at 12 Times the Rate of People in Other Developed Countries*, FIVE THIRTY EIGHT (June 18, 2015, 5:33 PM), http://53eig.ht/1RdE3VR [https://perma.cc/Q4XS-KA3C].

164    *See supra* notes 71-72.

165    This Article does not speak to the enforcement of the laws in the post-Reconstruction period. While press accounts from the post-Reconstruction period seem to indicate that the law continued to be enforced against both the white and black population, it is virtually certain that blacks would have been treated unfairly.

166     Texas Democrats also rejected ratification of the Thirteenth Amendment. *Constitutional Convention of 1866*, TEX. ST. HIST. ASS'N, http://bit.ly/1ZYBA6d [https://perma.cc/T5AQ-95M3] (last visited July 24, 2016).

4 TXAMLR 95

---

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**Omitted - Compendium Pages 1146-1171**

**84 Fordham L. Rev. 935**

**Fordham Law Review**
December, 2015

**Forum Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning**
Jonathan Gienapp [a1]

Copyright (c) 2015 Fordham Law Review; Jonathan Gienapp

# HISTORICISM AND HOLISM: FAILURES OF ORIGINALIST TRANSLATION

## INTRODUCTION

For as long as the U.S. Constitution has existed, Americans have appealed to the history of its creation to interpret its meaning. But only since the advent of originalism--the well-known constitutional theory that requires interpreting the Constitution today in accordance with its original meaning--has historical study been so immediately implicated by constitutional interpretation. Despite potential, though, for meaningful exchange between originalists and historians, little has taken place. That originalism plays an ever-growing role in contemporary political culture only makes the lack of dialogue all the more unfortunate.

For these reasons, Lawrence Solum and Saul Cornell's recent exchange provokes a refreshing, long-overdue debate that ultimately implicates a fundamental issue: What relationship does historical inquiry as practiced by professional historians have to the theories of originalism that legal scholars have refined? [1]  At first glance, Cornell's claim that the recovery of original meaning would necessarily involve historical reasoning as historians practice it seems intuitive. [2]  Solum, however, contends that historical methods play a far more limited role in this recovery than historians would like to believe. Indeed, he effectively argues for an originalism without history. That is tendentiously put, as Solum acknowledges that originalists must draw upon the eighteenth-century American past. Nevertheless, he thinks the goal can be accomplished largely without traditional historical knowledge or practice.

This argument suffers from several fatal difficulties, however, and none more problematic than its treatment of a central matter implicated by any kind of originalism: historical translation. The Constitution has a different meaning now than it did when it was created, so recovering its original **\*936**  meaning requires engaging in some kind of translation that will transform the Constitution back into its eighteenth-century form (or transform the eighteenth-century Constitution into twenty-first-century language). Originalists, led by Solum, acknowledge the centrality of this requirement, but misunderstand what it entails. By failing to historicize the American Founding, their method of translation proceeds from the faulty premise that the Founding generation and we today occupy more or less the same linguistic world, an assumption that enables their translation to take a narrow and atomistic form. Accordingly, as a result of this failure to historicize, they fail to appreciate the holistic character of meaning--that individual utterances earn their meaning based on how they fit into a linguistic whole--and, accordingly, target the wrong object of interpretation, focusing on individual words and statements when they must first grasp the broader idioms from which those component parts issued. By appreciating the necessity of historicism, and with that the holistic requirements of meaning and translation, it becomes clear that no matter which sort of original meaning is targeted, the only suitable method of translation is an avowedly historical one.

## I. ORIGINALISM WITHOUT HISTORY

Solum marginalizes historians in at least three unpersuasive ways. First, he confuses originalist method and theory. Second, he claims that originalists and historians target distinct kinds of meaning. Finally, he contends that historians cannot provide the necessary method to discover the appropriate kind of original meaning.

Compendium_Cornell
Page 1172

### A. Theory or Method?

Solum downgrades history, first, by confusing the issue, by needlessly exploring the potential for intellectual history to replace constitutional interpretation.[3] No historian has ever suggested that this is a proper use for history, so proving that such an imaginary project is misguided is a distraction. The question that should be explored is: What role should historical method play in understanding what the Constitution meant circa 1787 through 1788 (or at any other relevant historical moment)? Subsequent implications for constitutional theory and jurisprudence are matters entirely separate from the purely methodological issue of recovering original meaning.

### B. What Kind of Meaning?

But even when Solum correctly focuses on the methodological debate, he is clear that historians can play no more than a "supplementary and complementary" role in the recovery of original meaning because "[o]riginalists and historians have different understandings of 'meaning' that reflect fundamentally different purposes of constitutional history and **\*937** contemporary originalist practice."[4] The kind of meaning that originalists are after is what he calls "communicative content," the elucidation of which leads Solum to reiterate a set of interlocking arguments he has made in several other settings.[5] Constitutional meaning is divided into two categories-- communicative content and legal content--and two activities that discover them--interpretation and construction.[6] Communicative content should not be confused with legal effect. But, it should also not be confused with other kinds of meanings, either the "motivations or purposes" that lay behind its construction or the "consequences or applications" that might have been expected to follow from it.[7] Communicative content is simply the "meaning of a text in the linguistic sense," and because this kind of meaning "is not the primary aim of historians," they cannot offer originalists "a distinctive method for the determination of the communicative content of the constitutional text."[8] Thus, historians who insist that originalists need to acquire a deeper familiarity with historical practice are simply guilty of "conceptual confusion."[9]

Solum is partial to communicative content because he champions "public meaning originalism."[10] As is by now well-known, this brand of the theory privileges the original public meaning of the Constitution over the subjective intent of its Framers, the subjective understanding of its ratifiers, and the expected applications that many originally assumed would follow from the document.[11] Dominant today among originalists, public meaning originalism is built on a conventions-based understanding of language, which means both that meaning is regulated by publicly shared conventions and that the only constitutional meaning that can have legal force is its **\*938** conventional one. Unlike in ordinary conversation, public meaning originalists argue, great distances (geographic and contextual) separated speaker and audience when the Constitution was created, meaning that those who initially probed the Constitution did not have access to the communicative intentions of its Framers (especially not the complex drafting history that accounted for its creation). Instead, they only had access to the text itself and the linguistic conventions at the disposal of any competent reader.[12] Moreover, because the document was a product of popular approval, all that can be enforceable is what a person competent in Founding-era linguistic conventions would have taken it to mean.[13] Solum privileges communicative content because of these justifications.[14]

### C. What Kind of Method?

There are many ways to critique Solum's narrow conception of communicative content, including by insisting that Founding-era intent and understanding cannot be so easily bracketed from public meaning.[15] But, conceding for now (no matter how problematic it might otherwise be) that originalists can exclusively target conventions-based meaning, is Solum justified in thinking that by narrowing the target he has escaped reliance on history? He implies that if authorial intents, expected purposes, or other kinds of meaning were indeed the object of interpretation, then traditional historical methods would prove necessary. Are similar methods really not relevant to discovering public meaning?

Put another way, no matter which kind of constitutional meaning Solum privileges, he still needs a method of historical translation. He acknowledges as much because language changes over time, affording words different meanings than they once had, a notable fact for any **\*939** originalist because, according to what Solum has called the "fixation thesis,"[16] "original

Compendium_Cornell
Page 1173

meaning was *fixed* or determined at the time each provision of the [C]onstitution was framed and ratified." [17] The matter thus comes down to this: for Solum's broader claim about the relationship between history and originalism to stand, it is not enough to pinpoint communicative content as the goal of interpretation; he must also demonstrate how he can translate communicative content back into its original form without requiring historical methods. Solum stakes his argument to a distinction in meaning: originalists target public meaning, historians something else. But this distinction is insufficient, for no matter which kind of original meaning he privileges, he must demonstrate that he can recover it without the historical translation techniques practiced by historians. Only *then* can public meaning originalists claim to have escaped reliance on history.

If Solum's argument rests on his method, rather than its object, how, then, does Solum propose locating original communicative content? His approach begins with identifying the simple meaning of various words or phrases, or their combination based on the operative rules of grammar, which he variously calls "plain meaning," "literal meaning," or "semantic meaning." [18] Some of these meanings might have differed in the eighteenth century, so the interpreter must study the patterns of Founding-era linguistic usage to grasp original semantic meaning. [19] Of course, this definitional and grammarian work can be done well or poorly, as illustrated by some notoriously flawed originalist work. [20] But assuming semantic meaning is recovered in a credible way, it is important to recognize, Solum explains, that it is not communicative content because legal utterances typically communicate far more than their literal content. "The gap between semantic content and full communicative content is filled by what we can call 'contextual enrichment,'" which requires two things. [21] The first is to set the Constitution in the "publicly available context of constitutional communication" that existed at the time of its inception. [22] The second requirement is to grasp the lessons of pragmatic enrichment drawn from the philosophy of language, which really seems to mean the work of Paul **\*940** Grice. [23] Because lots of things go without saying, these techniques are necessary to grasp what was presupposed or implied by constitutional utterances. [24] Solum spends far more time discussing Grice than eighteenth-century linguistic usage for reasons that, while only implied, profoundly shape his argument. Repeatedly, he suggests that philosophy, in being conceptually prior to history, enables originalists to bypass the latter. Accordingly, as originalists have dedicated themselves to Grice (some of them anyway), they are on surer interpretive footing than historians. And, to the extent that historians have turned to language philosophy, doing so only reinforces Solum's deeper point: that originalist method is not grounded in history. So then it would seem that attention to Founding-era semantic usage plus, especially, appreciation of Grice, provides originalists with a complete, historian-free method.

To be sure, Solum does not speak for all public meaning originalists, let alone all originalists. But given what they have otherwise argued, it is hard to believe that any leading public meaning originalist would dispute the fundamental logic of Solum's method. [25] Meanwhile, even if other originalists were to take issue, public meaning originalism has come to so dominate the field that the point would still be of far-reaching significance. Thus, if Solum's conception of originalist translation cannot withstand scrutiny, then such a revelation sheds light more broadly on the originalism-history relationship.

## II. ISSUES WITH ORIGINALIST TRANSLATION: HOLISM AND HISTORICISM

Solum can escape historical method only if he presents a workable alternative method, a method that can satisfactorily recover some kind of original constitutional meaning without doing what historians do. Ultimately, though, his method, like so many commonly found in originalist work, suffers from major deficiencies. Understanding these failings, as well as the makings of a suitable alternative, reveals why, contrary to Solum's insistence, historical method and practice is in fact essential to any brand of originalism.

To adequately map all aspects of a proper method of originalist translation is beyond the scope of this brief response, even if the focus is limited just to public meaning. But, as a beginning, I will attend to two critical aspects of historical translation, indeed perhaps the most important ones and certainly the ones that most immediately correct the deficiencies in Solum's method. Recovering any meaning--and *especially* the public meaning-- of a historical text is simply impossible without appreciating these two critical aspects of historical translation.

**\*941** *A. Meaning Holism*

Compendium_Cornell
Page 1174

The first of these is "meaning holism," the doctrine that the meaning of the part only be understood by situating it in the context of the whole. The meaning of individual linguistic components--words, phrases, or utterances--can only be understood in terms of their relations within the conceptual vocabulary of which they are a part.

Solum and other originalists fail to grasp this point. Rather than seeing meaning and translation holistically, they conceive of it in thoroughly atomistic terms, believing that effective translation can be conducted at the level of term-for-term without engaging in any broader form of substitution. Solum's favorite examples of translation--"domestic violence" in the eighteenth century and "deer" in the twelfth--are substituted against an otherwise steady background of putative conceptual objects being picked out. [26] He unwittingly keeps the structure of linguistic conventions constant between present and past while merely filling in that structure with discreet component content.

But this approach fails to fully construe language as a *social convention*, that is, an intersubjectively constructed set of norms. Public meaning originalism is entirely premised on the fact that linguistic meaning is conventional, yet at least Solum advances a decidedly shallow brand of linguistic conventionalism. Language, in being a social practice, is necessarily contingent, a fact that applies as much to the *structure of conventions* as to the *individual meanings of words* within that structure. One is reminded of Clifford Geertz's objection that human scientists have all too often problematically set the diversity of culture against the unity of the human mind. The things thought are multiple, but the mode of thinking itself is assumed unitary across space and time. [27] Applied to language, this powerful distinction juxtaposes the cacophony of different linguistic uses with a unifying structure of logical linguistic relations presumed to underlie the entirety of that diversity. [28] Holistic translation nullifies this distinction by targeting the logical sinews of language every bit as much as its discreet parts. It translates *all* of language.

### *942  B. Historicism: The Foreignness of the Founding Era

Solum and many originalists unwittingly adopt their atomistic mode of translation because interpretation commonly takes this form. Novel remarks are typically uttered by speakers inhabiting more or less the same conceptual and linguistic world as the listener. By sharing this background, the speaker and listener already share enough of the whole language to make atomistic translation possible. But when the utterance is not made today but instead several hundred years ago, in a very different conceptual-linguistic world than the one in which we currently reside, matters change, and decisively so. Originalists' flawed method of translation is a direct result of failing to appreciate this crucial lesson. They uncritically assume that the Founding generation and we more or less reside in the same linguistic-conceptual world. So even though they acknowledge differences between the Founders' usage of words and our own, critically, originalists set such differences against a common linguistic structure apparently shared by all.

But the first key to understanding the American Founding is appreciating that it is a foreign world. Originalists talk often about recovering the "lost constitution," but with little awareness for why it merits this label. [29] Not because modern justices have abandoned it, but because its original meaning has been obscured by changes in conceptual vocabulary. Understanding the American Founding, and recovering the "lost constitution," requires appreciating this historical distance. "The past is a different world," as Bernard Bailyn has aptly instructed. [30] "Whether one moves away from oneself in cultural space or in historical time," Rhys Isaac has added in the same vein, "one does not go far before one is in a world where the taken-for-granted must cease to be so . . . . Ways must be found of attaining an understanding of the meanings that the inhabitants of other worlds have given to their own everyday customs." [31] Grasping these unfamiliar meanings involves historicizing the past and reckoning with it on its own foreign terms. [32] It involves, as Bailyn has put it, "penetrat[ing] into the substructures of thought and behavior, into the silent assumptions, the perceptual maps, the interior experiences that shape overt expressions and events" to decode "the perceptual universes of the participants." [33]

For modern Americans, perhaps few past periods seem more recognizable--in terms of the questions its people asked, the concepts they deployed, the theories they generated, the causes they endorsed, and the issues they debated--than the American Founding. But, in fact, appreciating the inherent differentness of the past is *most* important when it  **\*943**  seems otherwise familiar. The field-changing scholarship of Bernard Bailyn and Gordon Wood that long ago revised our understanding of the Revolutionary era was driven by precisely this insight, beginning from the premise that the revolutionaries' guiding assumptions were different than our own and that their distinct linguistic behavior needed to be grasped on its own terms. [34] As Wood himself put it in his magnum opus, *The Creation of the American Republic*, "As I explored [the revolutionaries'] pattern of beliefs, it became evident that" the prevailing interpretive approach to the American Founding had "been deeply ahistorical,

there had been too little sense of the irretrievability and differentness of the eighteenth-century world."[35]  Those who assume that no such historicism is required to understand the Founding generation will be chronically perplexed by that generation's seemingly paradoxical obsession with representation but apathy toward voting, their state-level debates over bicameralism that showed little interest in the separation of powers, and their simultaneous obsession with bills of rights and commitment to test oaths. Examples of this kind could be indefinitely multiplied. But by understanding the Founders' uncommon vocabulary, such confusion washes away. In the process, crucially, the parts that appear familiar take on different meanings. Historicism and holism can be taken to extreme lengths--and have been by some in the past[36]--but that lesson should not minimize their essential importance.

Solum, like most originalists, perpetuates the flawed assumption that Founding-era utterances are fairly easy to understand because they were spoken and written in English.[37] As he problematically asserts, "[C] ontemporary American English is not identical to late eighteenth-century American English. In many particular cases, however, the contemporary meanings of the words and phrases in the constitutional text today are identical to the meanings at the time the Constitution was framed **944** and ratified."[38] Similarly, to explain that understanding historical texts requires no prior knowledge of an author's motivations or background, on another occasion he blithely asserts:

> When you encounter a stranger who shares competence with you in a natural language (English), then usually you can communicate about a wide variety of topics with very thin information about the stranger . . . rely[ing] on widely shared conventional semantic meanings and the kind of contextual information that strangers are likely to possess.[39]

According to Solum, making sense of Alexander Hamilton, William Findley, or the average man on the eighteenth-century street (a popular public meaning originalist figure) is as simple as confronting an English-speaking stranger today, because it can be happily assumed that both parties share a common semantic structure and common abilities for contextualizing discursive antics.

To the contrary, recovering eighteenth-century communicative content means putting aside our working linguistic knowledge--how we trace logical connections between meanings, how we enrich ambiguous utterances, and how we relate meaning to context--and replacing it with Founding-era linguistic knowledge. Because Solum and other originalists fail to historicize, they fail to grasp the necessity of holistic translation.

## III. TOWARD REMEDYING ORIGINALIST TRANSLATION

Appreciating the lessons of historicism and linguistic holism do not just expose the deficiencies of originalists' most popular brand of historical translation, but also help supply a remedy. More is needed. Many critical and related points cry out for examination, and, in work currently in progress, I attempt to map all of the relevant contours of originalist translation.[40] Nonetheless, drawing attention to holism and historicism furnishes an essential start.

### A. The Convergence of History and Philosophy

The holistic-historicist point is not only the cure for many kinds of originalism, but it is also precisely the one upon which much edifying work in the philosophy of language and intellectual and cultural history have commonly converged. Neither is prior to the other, and each could be emphasized independently. Indeed, one could absorb a great deal about historicism and holism purely by studying historical work--either implicitly from empirical studies or explicitly from penetrating methodological pieces.[41] However, because Solum and other public **945** meaning originalists suggest that they can bypass history by way of philosophy, it is of the utmost importance to shine a light on the philosophical path of this convergence. While I could easily draw upon historians' methodological reflections to reach similar points, and while I can gladly agree with Jack Rakove that historians can "happily pass their lives without worrying how much allegiance they owe to the work of Chomsky, Austin, Wittgenstein, or . . . Grice,"[42] given Solum's selected tact, it is critical to meet him on his chosen ground. While philosophy does not afford foundations (as Solum at times implies), it does offer powerful tools, ones that strikingly reinforce historians'

HISTORICISM AND HOLISM: FAILURES OF ORIGINALIST..., 84 Fordham L. Rev. 935

own methodological instincts. [43] Thus, the most effective way to reveal why historical practice is indispensable for originalism is to place an emphasis, at least for now, on how language philosophy otherwise points in that direction.

Moreover, Solum's portrayal of language philosophy is effectively based on one philosopher--Paul Grice--who is presented almost folk heroically, as evidently the key to unlocking all constitutional mysteries. While Grice's standing in modern philosophy is undeniable, because he never investigated what was necessary to bridge *historical* differences between speaker and listener, compared to other leading philosophers he offers much less to specifically originalist interpretive inquiries. [44] Indeed, his work is only of use *after* the Constitution has been translated and does not otherwise help on this front. The work of a different cadre of analytic philosophers of language provides a much more useful collection of tools for the matter at hand, tools that parallel many of those that leading intellectual and cultural historians have themselves sharpened.

### B. Skinner and Wittgenstein

To better see this convergence of intellectual history and analytic language philosophy, we ought to begin with the intellectual historian who has drawn most consciously and extensively upon analytic philosophy and about whom Solum has the most to say: Quentin Skinner. Perhaps because others have alerted him that Skinner's arguments do damage to his own, Solum goes to considerable, vituperative lengths to try to expose Skinner's mistakes. Where he could have simply dismissed Skinner's work on the **\*946** basis of relevance (for simply targeting the wrong kind of textual meaning), he instead opts for theoretical incompetence, contending that Skinner is "deeply confused" about interpretive method itself. [45] Clearly this is the place to start in understanding Solum's missteps, because highlighting how Solum misses Skinner's historicism and holism helps to reveal precisely what Solum's method of historical translation lacks.

At first glance, it is no small irony that Solum finds Skinner so offensive. After all, Skinner was a thorough-going linguistic conventionalist who was almost exclusively interested in public meaning. Interpretive efforts, he felt, needed to begin with an understanding of texts as speech acts and, thus, "the *conventions* surrounding the performance of" them. [46] Moreover, he claimed that both dimensions of meaning that were essential to textual interpretation--locutionary meaning (an utterance's sense and reference) and illocutionary force (the meaning of making such an utterance)--fully derived from publicly legible conventions. Skinner certainly stressed the importance of recovering authorial intent, but always intent *in* acting as opposed to intent *to* act. [47] He had no interest in confusing motive with intent and thus no interest in confusing mental states that preceded speech acts with the public meaning of performing such acts. The intentions that most interested him were to be "inferred from an understanding of the significance of the act itself." [48] As Skinner famously argued, the meaning (understood as the force) of Machiavelli's well-known advice in *The Prince*, that a prince "should know how to follow evil courses if he must," [49] varied depending on whether all other contemporaneous advice books for princes offered identical advice or none did. [50] This was not a matter of prior mental states or subjective aims. It was concerned with the *public* meaning of that statement to a reader immersed in the relevant communicative context.

What about any of this should merit Solum's opposition? Skinner's convention-based understanding of both linguistic meaning and performative utterances seems to parallel the approach defended by Solum and other public meaning originalists. Skinner's disaggregation of illocutionary intent from either prior motive or anticipated goal squares precisely with what Solum gets at in his extended Gricean discussion of communicative intentions. [51] Skinner's distinction between locutionary meaning and illocutionary force parallels Solum's own distinction between **\*947** semantic meaning and contextual enrichment. [52] Skinner's insistence that deciphering illocutionary force requires "delineat[ing] the whole range of communications which could have been conventionally performed on the given occasion by the utterance of the given utterance" [53] sounds strikingly similar to Solum's own insistence that meaning must be enriched based on the public context of conventional communication. Maybe Solum does not fully grasp the inner logic of Skinner's approach. But there must be some awareness of these parallels because one of the two major criticisms that Solum levels against Skinner is that, in relying so heavily on Grice's account of "speaker's meaning," Skinner turns out to be little more than an originalist. The parallels in this regard are actually stronger still. For to the extent that Solum draws any distinction on this front between Skinner and himself, it is only that Skinner appears to privilege original intentions originalism. Except, as Solum himself tells us, "under normal circumstances, the communicative intentions of the author of a legal text will converge with the public meaning of a text," meaning that public meaning originalists and sophisticated original intent originalists are after much the same thing. [54] Add to this that Skinner's most compelling critics have assailed him for too simply reducing authorial intent to ruling linguistic conventions, for believing that "the intentions

with which anyone performs any successful act of communication must, *ex hypothesi*, be publicly legible," and the similarities are more striking. [55]

Yet, despite all of this, Solum clearly has no interest in enlisting Skinner as an ally, as illustrated by his second major criticism, in which he criticizes Skinner not on the basis of being banal, but for being confused, by paradoxically weaving together a Gricean account of illocutionary performances with Ludwig Wittgenstein's meaning-use doctrine. [56] Solum assumes that by equating meaning with use, Wittgenstein must have been saying what has otherwise been advanced by many critics of originalism: that "the meaning of an expression is the use to which it [was] put," [57] a formulation poised to fallaciously equate communicative content with purposes or motives. Thus, in simultaneously using Grice (and gesturing **\*948** toward communicative content) and Wittgenstein (and diverting from it), Skinner's project proved incoherent.

We historians might have reason to thank Solum for exposing such a false idol. But it is not Skinner who is confused. Solum is certainly right that Skinner's reliance on Wittgenstein is of the utmost importance, but not for the reasons he identifies. Better understanding why Skinner made extensive use of Wittgenstein requires comprehending what the Austrian-British philosopher actually meant by his well-known dictum that linguistic meaning follows linguistic use. According to Solum:

> It is true that Wittgenstein is associated with the notion that meaning is use, or as he put it, "Words are deeds." The idea is that the meaning of an expression is the use to which it is put. Wittgenstein was onto something, but it was not a theory of communicative content. Words are used to accomplish deeds, but the deeds are not the meaning of the words in the relevant sense of meaning. We can extend Wittgenstein's observation about words to texts. Put crudely, texts can be used to accomplish deeds. Locke's *Second Treatise* could be part of Lord Shaftesbury's political program. Thomas Hobbes's *Leviathan* could be restoration ideology. John Rawls's *A Theory of Justice* could be an apology for the Great Society. There is nothing wrong with calling the political purposes of these historical texts their "meaning," so long as we are clear that this is not their meaning in the sense of communicative content. [58]

Whatever Solum might mean here, this is absolutely not what the later Wittgenstein meant when he famously wrote: "For a *large* class of cases . . . in which we employ the word 'meaning' it can be defined thus: the meaning of a word is its use in the language." [59] Far from abandoning a search for communicative content, Wittgenstein instead was describing *precisely* what was necessary to grasp it: holism and historicism.

The later Wittgenstein was casting doubt on the classic representational picture of language (in which the content of sentences was a product of the prelinguistic referents that words sought to mirror) and putting in its place a functionalist account of meaning (in which the content of sentences was a product of how words were used in contingent discursive contexts). [60] For too long, he felt, philosophers had been obsessed with pinning down the essential meanings of words by locating the concepts that those words putatively represented. He began *Philosophical Investigations*, his most important work, with the central features of this picture: "[E]very word has a meaning. This meaning is correlated with the word. It is the object for which the word stands." [61] The assumption was that there was something essentially common to all possible uses of a word that, by capturing its uniform essence, amounted to its meaning. But to isolate this meaning-- **\*949** these necessary and sufficient conditions for using a word-- philosophers had been forced to abstract language from its messy, everyday contexts in order to analyze it in the sublime setting of pure logic. [62] Consequently, Wittgenstein surmised, they would do so at the cost of learning anything about linguistic meaning at all. As he wrote, "We have got on to slippery ice where there is no friction and so in a certain sense the conditions are ideal, but also, just because of that, we are unable to walk. We want to walk: so we need *friction*. Back to the rough ground!" [63] By analogy, philosophers had effectively tried to analyze a single chess piece or chess move, removed from the context of the game of chess itself. Only when the chess piece was returned to the context of the game could one understand the moves that could be made with it. The same went for language: only when language was returned to the messy reality of its everyday usage could usage, and thus meaning, be illuminated.

In this regard, Wittgenstein likened using language to playing a game in order to recapture that it was a situated, contextualized activity. [64] Philosophers had gone wrong assuming that language had a single purpose, when it was evident that it had a multiplicity of purposes captured in the multiplicity of "language games" that people played. [65] Depending on the language

Compendium_Cornell
Page 1178

game one was playing--whether one was giving an order, describing an object, or making a joke--language functioned differently. Each of these games exhibited regularities, or what Wittgenstein called "grammars," that governed their operations. But such grammars were implicit, built-in norms rather than technical, formal rules given down from on high. Just as there was no essential, underlying structure to all games (basketball, cricket, hide and seek)--but rather only what could be called family resemblances--there was no common feature, only numerous overlaps, in the multiplicity of ways in which people used words and sentences. Meaning varied depending on the language game in question. [66]

Because Wittgenstein saw language as fundamentally a social practice--rather than as a medium essentially tied to something external--he considered the constitutive elements of language to be contingent and historical. Language games were subject to change. "[T]his multiplicity is not something fixed, given once for all . . . new types of language, new language-games, as we may say, come into existence, and others become obsolete and get forgotten." [67] To study language historically, then, was not simply to study different individual uses of words but, far more broadly, to study the different language games at play. To isolate an utterance from *950 this context meant imposing the interpreter's own language games on the utterance and, in so doing, obscuring its original meaning.

Thus, a Wittgensteinean reading of a historical text would not, pace Solum, focus on the purposes to which the text was being put. Instead, it would situate the utterances that make up the text in the original language game (or games) in which they developed. Restoring original meaning was thus primarily about recovering original language games. In other words, it necessitated holism. By construing meaning as use, Wittgenstein was not abandoning communicative content in favor of purposes, but instead explaining what was actually entailed in grasping it.

Three conclusions can be drawn from these Wittgensteinean insights. First, Skinner's reliance on Wittgenstein was not incoherent. Indeed, most of the speech act theorists upon whom Skinner drew took Wittgenstein's turn toward ordinary language as their inspiration. [68] Skinner's approach might well demand refinement, and there are those whom Solum favorably cites who suggest just this, but these criticisms are not premised on the notion that Wittgenstein and ordinary language philosophy constitute mutually exclusive approaches--far from it. [69]

Second, beyond redeeming Skinner's coherence, appreciating Skinner's reliance on Wittgenstein reveals how, despite otherwise sharing an interpretive commitment to linguistic conventionalism, Skinner is nonetheless deeply at odds with public meaning originalists. The divergence is not explained by Skinner's inconsistency or infidelity (that, as Solum claims, Skinner turns out to be an inauthentic originalist). To the contrary, Skinner diverges from constitutional originalists because he turns out, by comparison, to be a far more authentic public meaning originalist and precisely because he appreciated Wittgenstein's foundational philosophical lessons--that an appropriately historicist brand of public meaning requires contextualizing original utterances holistically. Indeed, Skinner had a penetrating understanding of the foreignness of the past. His methodological writings were largely aimed at those (then dominant in the history of political thought) who tended to read historical texts in deeply ahistorical and decontextualized ways, confident that great texts were autonomous from their time and place because their authors spoke to eternal problems. [70] Far from being autonomous, Skinner argued that historical texts were a product of reigning linguistic conventions, ones that were often strange in light of our own. In the place of an ahistorical essentialism that placed texts in the transhistorical context of perennial debates, Skinner opted for a historicist nominalism. He refused to see words as a transitory medium through which thinkers accessed unchanging concepts and instead saw concepts as an extension of knowing how to contingently use words. While Plato, Machiavelli, and Hobbes might all have referenced the "state," their uses of the word--regulated by such distinct language games--were *951 so different that it proved illusory to assume that they were picking out identical concepts. [71] Accordingly, Skinner grasped that anybody interested in extracting the original public meaning of a text needed to see how a word specifically functioned in the language games of its epoch.

While Skinner helps illustrate the virtues of a Wittgensteinean approach, the third, and most important, conclusion to draw takes us well beyond Skinner. It is now much clearer why whole languages must be the object of originalist translation. Because the original meaning of an utterance cannot be separated from the language game in which it appeared, translation cannot atomistically focus on individual words or expressions. In order to properly elucidate any single Founding-era utterance, it is imperative that it be restored to its original discursive context, understood just as Wittgenstein described.

*C. Wittgenstein's Successors*

Leading philosophers--chief among them Donald Davidson and Robert Brandom-- have picked up where Wittgenstein left off, extending his historicism and holism. [72] As Davidson has argued,

> If sentences depend for their meaning on their structure, and we understand the meaning of each item in the structure only as an abstraction from the totality of sentences in which it features, then we can give the meaning of any sentence (or word) only by giving the meaning of every sentence (and word) in the language. [73]

Put succinctly, "[O]nly in the context of the language does a sentence (and therefore a word) have a meaning." [74] These holists vividly reveal the limitations of atomistic originalist translation by tackling two important targets that undergird it: semantic atomism and the meaning-belief distinction.

Semantic atomism is premised on the belief that semantic properties can be supplied to individual linguistic units independent of the attribution of other such properties. Purely through the powers of reference or ostensive definition one can intelligibly grasp the meaning of a word. The essential attributes of a semantic term, in other words, can be isolated from the rest of a language.

The holistic doctrine of inferentialism challenges this atomism by asserting that a sentence's semantic content is a product of the inferential relations it has with other sentences. No single sentence (like no single perceptual experience) can have conceptual content on its own. This point was first introduced vis-à-vis the tradition of atomistic empiricism, most prominently by Wilfrid Sellars, who referred to the atomistic account of **\*952** knowledge by acquaintance as "the Myth of the Given." [75] He argued that such so-called knowledge by acquaintance improperly conflated causation with justification, or the physical processes that caused an empirical episode with the ability to count that episode as evidence for knowing something. For it to qualify as the latter, that is to have propositional conceptual content, one would also have to know how to inferentially relate it to lots of other beliefs or, more simply, to know how to use it as a logical premise or conclusion in reasoning. [76] (Put another way, the physical processes that cause an observer to think that the sky is blue can only lead the observer to actually formulate that belief if he is already programmed with a particular conceptual vocabulary. The world can cause people to formulate a belief, but only other beliefs can actually justify the belief.) The content of an individual episode, then, is a function of how it fits into these relations, which implicates all that surrounds and comes before the episode as much as anything about the physical causes or processes of the episode itself. To know something is not to give an episode an "empirical description," but rather to "plac[e] it in the logical space of reasons, of justifying and being able to justify what one says." [77] Hence why Sellars famously concluded, that "*all* awareness . . . is a linguistic affair"--knowledge of perceptual episodes is a function of knowing how to place those episodes in chains of inferential reasoning. [78] Language, tied together by a series of inferential relations, makes a conceptual whole through which human beings navigate the world. [79]

Robert Brandom has most extensively worked out the implications of this inferentialism by constructing a fully expressivist account of meaning, in which "grasping the *concept* that is applied in" a sentence amounts to "mastering its *inferential* use." [80] Conceptual--and thus semantic-- content, he has argued, is, in character, interrelated. Because "one must have many concepts in order to have any," one cannot understand the content of any one concept without "mastery of the proprieties of inference that govern the use of other concepts and contents as well." [81] Thus, Brandom has contended that "the inferential notion of semantic content is essentially holistic." [82] He has revealingly elaborated,

> Inferences involve both premises and conclusions. The inferential role of one of the premises essentially depends on that of the conclusions, and vice versa. One could not know something about the inferential role of one content without knowing at least something about the inferential roles **\*953** of others that could be inferred from it, or from which it could be inferred. [83]

As Richard Rorty put it, succinctly summing up Brandom's insight, "[T]he inferences drawn from and to assertions made with the sentence constitute the only content that the sentence has." [84] By the logic of inferentialism, successfully translating a sentence necessitates also translating its associative relations to other sentences. Only then will its meaning be preserved.

Grasping the original meaning of any constitutional phrase means *first* knowing how to use it, at its time of creation, as a premise or conclusion in other inferences.

Philosophical holism also has targeted the meaning-belief distinction. This distinction imagines a two-stage process in which human beings first devise a language and next apply those meanings to the world to form beliefs. In its most influential philosophical form, it became known as the "analytic-synthetic distinction," under which analytic beliefs were those true by meaning alone, as opposed to synthetic beliefs, which were true based on the empirical state of the world. "All bachelors are unmarried" offered a famous example of an analytic belief (one true solely by the meaning of the words), while "there are some bachelors" offered an example of a synthetic belief (one true not because of what the words meant but because of a contingent state of the world). But W. V. O. Quine famously upended this distinction by suggesting that there was no such categorical distinction to be drawn between analytic and synthetic statements. He showed that when confronted with recalcitrant experiences that challenge established beliefs, adjustments in meaning or belief could both just as successfully accommodate a novel experience.[85] Rather than being *prior* to beliefs, meanings are inextricably *intertwined* with beliefs in a single, holistic understanding of human rationality. Astutely drawing out these broader implications, Brandom has asserted, "[T]o understand natural languages, we have to understand how the *one* thing we do, *use* the language, can serve at once to settle the meanings of our expressions *and* determine which of them we take to be true."[86] In other words, meaning cannot be discerned independent of belief. Language use (applying meanings to form beliefs) is, contrary to what atomists maintain, a unitary, indivisible process.

The interdependence of meaning and belief has been explored most extensively by Davidson, specifically in his discussion of "radical interpretation" (which was built on Quine's "radical translation"), in which he sought to understand how one could interpret the meanings of people whose language was completely unknown.[87] His goal was to expose the **\*954** knowledge upon which all linguistic understanding is based, to capture the problem of translation in its purest form. But his project also promised more general insights about translation and meaning. As he put it, "The problem of interpretation is domestic as well as foreign . . . [a]ll understanding of the speech of another involves radical interpretation."[88] He concluded that decoding the meanings of another's utterances necessarily relies upon an entwined project of ascribing beliefs by realizing that "radical interpretation" necessarily entails the "principle of charity."[89] An interpreter would need to supply some basic beliefs to begin hashing out the speaker's meanings by determining when a speaker had at least acceded to certain sentences, even if they remained unknown sentences.[90] From there, one could supply enough working beliefs to allow for the establishment of enough provisional meanings to then refine the now-existent working theory of belief, through which the now-existent working theory of meaning could be further refined, and so on. Interpreting the speech of another "from scratch" showed how fundamentally intertwined meaning and belief were. Meanings could only be understood against a background of assumed belief, and beliefs could only be understood against a background of assumed meanings. The two formed an "interlocked" whole, because "[e]ach interpretation and attribution of attitude is a move within a holistic theory."[91]

The implications of these reflections for a proper understanding of constitutional originalism are momentous. For if meaning and belief are intertwined, then *even if* public meaning originalists insist that neither subjective intents nor purposes play any role in the discovery of original meaning, they still must concede that a wider understanding of commonly held Founding-era beliefs plays a constitutive role. It is impossible to hash out the meaning of any utterance without understanding the background of beliefs against which it was set. Deducing what a speaker means is unfeasible without understanding what the speaker *might* believe. I say "might" because even if the listener does not know what the speaker actually believes (what public meaning originalists are loathe to legitimize), the listener must still have familiarity with the kind of historically specific beliefs that otherwise inform the utterance to properly deduce its meaning. Meaning and belief, quite simply, are inextricably intertwined. To invoke one nontrivial example: even if it is reasonable to bracket Madison and his congressional peers' intent in drafting what became the Second Amendment, it is not possible to bracket the general constellation of beliefs (widely held circa 1791) from which anybody at the time would have relied to give its wording meaning. Only through a deep inquiry into the period's unfamiliar beliefs can one decipher the period's unfamiliar meanings. As Davidson surmised: "Perhaps there are some who think it would be possible to establish the correctness of a theory of interpretation without **\*955** knowing, or establishing, a great deal about beliefs, but it is not easy to imagine how it could be done."[92] If it seems possible to public meaning originalists, then that is only because they have not, as Davidson put it, "ke[pt] assumptions from going unnoticed" by unwittingly supplying modern beliefs as the necessary background against which meanings are stabilized.[93] Not only then, have originalists been prone to impose modern language games on eighteenth-century utterances, but they have been prone to impose modern beliefs on them as well. In so doing, they insure that they never, in fact, read the original Constitution at all.

Compendium_Cornell
Page 1181

**CONCLUSION**

Translation must run deeper than the atomistic meanings of words, no matter how extensive the array of examples from which that analysis is culled. The amount of evidence is not the issue--the object of interpretation is. Systematically recovering the original meaning of Founding-era utterances requires translating eighteenth-century language holistically. Only then can we recover the connective tissue that linked one meaning to the next and the web of inferential relations that gave individual utterances their specific content.

Getting at this holism can only be done by recreating the debates in which key constitutional terms were implicated in considerable detail.[94] Any thickly historicist study of the Founding period has attended to such debates-- sometimes to trace intellectual influences or to detect personal or political motives, but always to situate meaning in the flow of discursive activity.[95] Nothing can substitute for carefully working through the logic of whole arguments. Because not only will the inferential content of expressions become clear, but so too will the broader architecture of meaning. Only then will the hidden presuppositions and silent logical connectives begin to emerge. Wittgenstein suggested that we habitually learn language games from within.[96] We only come in contact with grammar through cases. We should heed that advice and recreate the Founding era's games and attendant practices from within--based on real moves within them.

No doubt the work will be demanding. Learning how to make moves in such games is tantamount to mastering a conceptual vocabulary. One must take up residence with the natives, painstakingly observing their linguistic behavior to learn how to speak as they once did. But there is no credible alternative. Keyword searches or corpus linguistics will miss too much of what went into meaning by losing sight of holistic connections *between*  **\*956**  meanings.[97] Only by seeing those connections can original meaning once again come into sight.

Regardless of whether most historians are familiar with Wittgenstein, Davidson, or Brandom, most would recognize their lessons because they have long been central to the rigors of historical method. Beyond Skinner, the work of Keith Baker, J. G. A. Pocock, and Mark Bevir especially demonstrates this fact.[98] Beyond even them, though, historians do not need to be told that thick, discursive context is indispensable to grasping the meaning of historical utterances. Nonetheless, showing how this philosophy reinforces historical instinct helps sharpen the point. Linguistic holism engenders much the same historicist perspective that historians have long favored. Originalists should appreciate the viewpoint.

Appreciating holism and historicism only begins to reveal what is entailed in a complete translation of Founding-era discursive practices. But, for now, appreciating them at least shows some of the crucial limitations of Solum and other originalists' methods of translation, including, especially, why targeting public meaning, despite what Solum insists, in no way frees them from historians' techniques. All originalists, no matter which kind of original meaning they privilege, must demonstrate sensitivity to historicism and holism. Which is just another way of saying that, in order to genuinely recover the original meaning of the constitutional text, originalists of any stripe must behave as historians.

**Footnotes**

a1    Assistant Professor of History, Stanford University.

1    *See* Saul Cornell, *Meaning and Understanding in the History of Constitutional Ideas: The Intellectual History Alternative to Originalism*, 82 FORDHAM L. REV. 721, 722 (2013); Lawrence B. Solum, *Intellectual History As Constitutional Theory*, 101 VA. L. REV. 1111, 1113 (2015) [hereinafter Solum, *Intellectual History As Constitutional Theory*]; Lawrence B. Solum, *The Fixation Thesis: The Role of Historical Fact in Original Meaning*, 91 NOTRE DAME L. REV. 1 (forthcoming 2015) [hereinafter Solum, *The Fixation Thesis*]; Lawrence B. Solum, Originalism and History (Aug. 29, 2014) (unpublished manuscript) (on file with the *Virginia Law Review*) [hereinafter Solum, Originalism and History].

Compendium_Cornell
Page 1182

[2]    Cornell, *supra* note 1, at 725-40.

[3]    Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1112-14.

[4]    Solum, Originalism and History, *supra* note 1, at 1; *see also* Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1155.

[5]    *See* Lawrence B. Solum, *Originalism and Constitutional Construction*, 82 FORDHAM L. REV. 453, 455 n.3 (2013); *see also* Lawrence B. Solum, *Communicative Content and Legal Content*, 89 NOTRE DAME L. REV. 479, 480 (2013) [hereinafter Solum, *Communicative Content and Legal Content*]; Lawrence B. Solum, District of Columbia v. Heller *and Originalism*, 103 NW. U. L. REV. 923, 924 (2009) [hereinafter Solum, District of Columbia v. Heller *and Originalism*]; Lawrence B. Solum, *Originalism and the Unwritten Constitution*, 2013 U. ILL. L. REV. 1935, 1937 [hereinafter Solum, *Originalism and the Unwritten Constitution*]; Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 CONST. COMMENT. 95, 96 (2010); Lawrence B. Solum, *Semantic Originalism* (Il. Pub. Law & Legal Theory, Research Paper No. 07-24, 2008).

[6]    This distinction pervades Solum's writings, but also has proved critical in recent originalist scholarship. *See, e.g.*, JACK M. BALKIN, LIVING ORIGINALISM 129 (2011); KEITH E. WHITTINGTON, CONSTITUTIONAL CONSTRUCTION: DIVIDED POWERS AND CONSTITUTIONAL MEANING 3 (1999); Randy E. Barnett, *An Originalism for Nonoriginalists*, 45 LOYOLA L. REV. 611, 622 (1999).

[7]    Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1123, 1115-16.

[8]    *Id.* at 1155; Solum, Originalism and History, *supra* note 1, at 1, 2.

[9]    Solum, Originalism and History, *supra* note 1, at 1; *see* Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1164.

[10]   Solum, Originalism and History, *supra* note 1, at 1.

[11]   For the shift to public meaning originalism, see Keith E. Whittington, *Originalism: A Critical Introduction*, 82 FORDHAM L. REV. 375, 377 (2013); Keith E. Whittington, *The New Originalism*, 2 GEO. J.L. & PUB. POL'Y 599, 609-10 (2004).

[12]   *See* Vasan Kesavan & Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 GEO. L. J. 1113, 1115 (2003).

[13]   *See generally* JOHN O. MCGINNIS & MICHAEL B. RAPPAPORT, ORIGINALISM AND THE GOOD CONSTITUTION (2013); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012); KEITH E. WHITTINGTON, CONSTITUTIONAL INTERPRETATION: TEXTUAL MEANING, ORIGINAL INTENT, AND JUDICIAL REVIEW (1999).

[14]   *See* Solum, *Communicative Content and Legal Content*, *supra* note 5, at 494-502, 507 (explaining the communication constraints inherent to the Constitution); Solum, *Originalism and the Unwritten Constitution*, *supra* note 5, at 1937-38 (describing the conventional character of language); Solum, Originalism and History, *supra* note 1, at 11-12 (explaining the normative-historical justification of public meaning originalism); *id.* at 16-17 (claiming that the Framers' intentions, if discoverable, likely converged with the public meaning of the text).

15   This point has been emphasized by several constitutional scholars and historians alike. *See* Larry Alexander & Saikrishna Prakash, *''Is That English You're Speaking?'' Why Intention Free Interpretation Is an Impossibility*, 41 SAN DIEGO L. REV. 967, 968 (2004); Saul Cornell, *St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment*, 103 NW. U. L. REV. 1541, 1544 (2009); Richard S. Kay, *Original Intention and Public Meaning in Constitutional Interpretation*, 103 NW. U. L. REV. 703, 704 (2009); Caleb Nelson, *Originalism and Interpretive Conventions*, 70 U. CHI. L. REV. 519, 556-60 (2003); Jack N. Rakove, *Joe the Ploughman Reads the Constitution, or, The Poverty of Public Meaning Originalism*, 48 SAN DIEGO L. REV. 575, 586 (2011); William Michael Treanor, *Taking Text Too Seriously: Modern Textualism, Original Meaning, and the Case of Amar's Bill of Rights*, 106 MICH. L. REV. 487, 504 (2007).

16   Lawrence B. Solum, *What Is Originalism? The Evolution of Contemporary Originalist Theory*, *in* THE CHALLENGE OF ORIGINALISM: THEORIES OF CONSTITUTIONAL INTERPRETATION 12, 33 (Grant Huscroft & Bradley W. Miller eds., 2011) (ebook).

17   *Id.*; *see* Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1150 (acknowledging that originalism must avoid anachronism); Solum, *The Fixation Thesis*, *supra* note 1, at 13-16, 62-68 (identifying "linguistic drift").

18   Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1116-18, 1125-26.

19   Solum, Originalism and History, *supra* note 1, at 12-13.

20   Cornell, *supra* note 1, at 740-42; David Thomas Konig, *Why the Second Amendment Has a Preamble: Original Public Meaning and the Political Culture of Written Constitutions in Revolutionary America*, 56 UCLA L. REV. 1295, 1302 (2009).

21   Solum, Originalism and History, *supra* note 1, at 2, 13.

22   Solum, *Originalism and the Unwritten Constitution*, *supra* note 5, at 1942.

23   Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1125-32; Solum, Originalism and History, *supra* note 1, at 13-14.

24   Solum, *Intellectual History As Constitutional History*, *supra* note 1, at 1125-32.

25   *See* BALKIN, *supra* note 6, at 3-58; RANDY E. BARNETT, RESTORING THE LOST CONSTITUTION: THE PRESUMPTION OF LIBERTY 389-95 (2014); MCGINNIS & RAPPAPORT, *supra* note 13, at 123-26; SCALIA & GARNER, *supra* note 13, at 15-28.

26   Solum, District of Columbia v. Heller  *and Originalism*, *supra* note 5, at 945-46; Solum, *The Fixation Thesis*, *supra* note 1, at 15-16.

27   Clifford Geertz, *The Way We Think Now: Toward an Ethnography of Modern Thought*, *in* LOCAL KNOWLEDGE: FURTHER ESSAYS IN INTERPRETIVE ANTHROPOLOGY 147, 152-53 (1983).

28   As a crucial upshot of the linguistic turn in philosophy was recognition that having a mind is, in essence, having the ability to use a language, Geertz's observation about the human mind proves all the more applicable to understanding human language. *See, e.g.*, ROBERT B. BRANDOM, PERSPECTIVES ON PRAGMATISM: CLASSICAL, RECENT,

Compendium_Cornell
Page 1184

AND CONTEMPORARY 22-23 (2011); MICHAEL DUMMETT, FREGE: PHILOSOPHY OF LANGUAGE (1993); 4 RICHARD RORTY, PHILOSOPHY AS CULTURAL POLITICS 176 (2007); RICHARD RORTY, PHILOSOPHY AND THE MIRROR OF NATURE (1979); WILFRID SELLARS, EMPIRICISM AND THE PHILOSOPHY OF MIND (1997); Donald Davidson, *Seeing Through Language*, *in* TRUTH, LANGUAGE, AND HISTORY 127-41 (2005).

[29]   *See generally* BARNETT, *supra* note 25; Lino A. Graglia, *How the Constitution Disappeared*, *in* STILL THE LAW OF THE LAND? 37-61 (1987).

[30]   BERNARD BAILYN, SOMETIMES AN ART: NINE ESSAYS ON HISTORY 22 (2015).

[31]   RHYS ISAAC, THE TRANSFORMATION OF VIRGINIA 1740-1790, at 5 (1999).

[32]   For more on historicism, see generally Jonathan Gienapp, *Using Beard to Overcome Beardianism: Charles Beard's Forgotten Historicism and the Ideas-Interests Dichotomy, 29 CONST. COMMENT. 367 (2014)*.

[33]   BAILYN, *supra* note 30, at 22.

[34]   *See generally* BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (1967); STANLEY ELKINS & ERIC MCKITRICK, THE AGE OF FEDERALISM: THE EARLY AMERICAN REPUBLIC, 1788-1800 (1993);  GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787 (1969). For more on the historiographical revolution they initiated, see Daniel T. Rodgers, *Republicanism: The Career of a Concept*, 79 J. AM. HIST. 11, 22 (1992).

[35]   WOOD, *supra* note 34, at xvi. Ironically and revealingly, originalists often cite Wood's masterful study approvingly, with little awareness that its fundamental conceit often undermines much of what they are otherwise arguing. For an illustrative example, see Saikrishna B. Prakash & John C. Yoo, *The Origins of Judicial Review, 70 U. CHI. L. REV. 887, 933-34 (2003)*.

[36]   For discussions of such extremes, see Mark Bevir, *Why Historical Distance Is Not a Problem*, 50 HIST. AND THEORY 24, 24 (2011); Donald Davidson, *On the Very Idea of a Conceptual Scheme*, *in* INQUIRIES INTO TRUTH AND INTERPRETATION 183-98 (2001); A. P. Martinich, *A Moderate Logic of the History of Ideas*, 73 J. HIST. IDEAS 609, 610 (2012); Richard Rorty, *The World Well Lost*, *in* CONSEQUENCES OF PRAGMATISM 3, 4 (1982).

[37]   This problem is pervasive. *See, e.g.*, MCGINNIS & RAPPAPORT, *supra* note 13; Saikrishna Prakash & John Yoo, *Against Interpretive Supremacy, 103 MICH. L. REV. 1539, 1540 (2005)*. For legal scholars who have issued versions of these lessons to no avail, see, for example, Larry D. Kramer, *When Lawyers Do History, 72 GEO. WASH. L. REV. 387 (2003)*; H. Jefferson Powell, *Rules for Originalists, 73 VA. L. REV. 659, 673 (1987)*.

[38]   Solum, *Communicative Content and Legal Content*, *supra* note 5, at 498.

[39]   Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1144.

[40]   *See generally* Jonathan Gienapp, Historical Translation and Constitutional Originalism (Sept. 1, 2015) (unpublished manuscript) (on file with author).

[41]   Examples abound. *See, e.g.*, KEITH MICHAEL BAKER, INVENTING THE FRENCH REVOLUTION: ESSAYS ON FRENCH POLITICAL CULTURE IN THE EIGHTEENTH CENTURY (1990); MARK BEVIR, THE LOGIC OF THE HISTORY OF IDEAS (1999); ELIZABETH A. CLARK, HISTORY, THEORY, TEXT: HISTORIANS

AND THE LINGUISTIC TURN (2004); IAN HACKING, HISTORICAL ONTOLOGY (2002); J. G. A. POCOCK, VIRTUE, COMMERCE, AND HISTORY: ESSAYS ON POLITICAL THOUGHT AND HISTORY, CHIEFLY IN THE EIGHTEENTH CENTURY (1985); WILLIAM H. SEWELL, JR., LOGICS OF HISTORY: SOCIAL THEORY AND SOCIAL TRANSFORMATION (2005); Gabrielle M. Spiegel, *History, Historicism, and the Social Logic of the Text in the Middle Ages*, 65 SPECULUM 59, 59-86 (1990).

[42]    Rakove, *supra* note 15, at 588.

[43]    Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1122, 1128-29 (betraying an almost Kantian commitment to the logical priority of philosophical reasoning in contending that any historical or legal account of communication *must* be reconciled with the work of philosophers and linguists). My proposed understanding of the relationship between philosophy and history echoes that of  PHILOSOPHY IN HISTORY (Richard Rorty et al. eds., 1984).

[44]    *See generally* PAUL GRICE, STUDIES IN THE WAY OF WORDS (1989).

[45]    Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1153; Solum, Originalism and History, *supra* note 1, at 26.

[46]    Quentin Skinner, *"Social Meaning" and the Explanation of Social Action*, *in* MEANING AND CONTEXT: QUENTIN SKINNER AND HIS CRITICS 94 (James Tully ed., 1988).

[47]    On this point, Skinner is frequently misunderstood. For his clearest statement, see Quentin Skinner, *A Reply to My Critics*, *in* MEANING AND CONTEXT: QUENTIN SKINNER AND HIS CRITICS,  *supra* note 46, at 231, 278-80.

[48]    *Id.* at 279.

[49]    MACHIAVELLI, THE PRINCE, *reprinted in* 36 THE HARVARD CLASSICS 1, 68 (Charles W. Eliot ed., 1910).

[50]    Quentin Skinner, *Meaning and Understanding in the History of Ideas*, *in* MEANING AND CONTEXT: QUENTIN SKINNER AND HIS CRITICS,  *supra* note 46, at 61-63.

[51]    Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1132-36.

[52]    Perhaps by favorably citing A. P. Martinich, *Four Senses of "Meaning" in the History of Ideas: Quentin Skinner's Theory of Historical Interpretation*, 3 J. OF PHIL. & HIST. 225 (2009), Solum disagrees that illocutionary force is an important part of public meaning. But Martinich's criticism is only that sentences, not entire texts, can have illocutionary dimensions, an accommodation that might lead us to question whether the Constitution conceived as a single utterance carries illocutionary force, but not one that denies that its clauses have such force.

[53]    Skinner, *supra* note 50, at 63-64.

[54]    Solum, Originalism and History, *supra* note 1, at 17; *see also* Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1134.

55   Skinner, *supra* note 47, at 279. For Skinner's most penetrating critic, see Bevir, *supra* note 36, at 40-50, 135-36 (arguing that "linguistic meaning," which is established on the basis of conventions, cannot fix "hermeneutic meaning," which is the intended performance of a specific utterance).

56   Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1151.

57   Solum, Originalism and History, *supra* note 1, at 25 (alteration in original).

58   Solum, *Intellectual History As Constitutional Theory*, *supra* note 1, at 1151-52.

59   LUDWIG WITTGENSTEIN, PHILOSOPHICAL INVESTIGATIONS § 43, at 20e (G. E. M. Anscombe trans., 1953). For how Wittgenstein's later work was a dramatic revisal of his earlier philosophy, see Richard Rorty, *Wittgenstein and the Linguistic Turn*, *in* PHILOSOPHY AS CULTURE POLITICS 160, 160-75 (2007).

60   *See* Rorty, *supra* note 59, at 160-75.

61   WITTGENSTEIN, *supra* note 59, pt. I.

62   Wittgenstein was referring to the long representationalist tradition in philosophy, stretching back to Plato, but more immediately to then dominant trends in analytic philosophy, particularly logical positivism, which tried to break language down to its atomic properties to engage in logical conceptual analysis. *See id.* §§ 23, 46.

63   *Id.* § 107.

64   *Id.* §§ 7-42.

65   *Id.* § 7 (discussing the concept for the first time).

66   LUDWIG WITTGENSTEIN, ON CERTAINTY § 65 (G. E. M. Anscombe & G. H. von Wright eds., Denis Paul & G. E. M. Anscombe trans., 1969).

67   WITTGENSTEIN, *supra* note 59, § 23.

68   *See, e.g.*, J. L. AUSTIN, HOW TO DO THINGS WITH WORDS (1962).

69   *See generally* Martinich, *supra* note 52.

70   *See* Skinner, *supra* note 50, at 43-56.

71   *See* Skinner, *supra* note 47, at 278-81.

72   The best overview of post-Wittgensteinean work on specifically these themes is Richard Rorty's *Wittgenstein and the Linguistic Turn*. *See* Rorty, *supra* note 59, at 176.

73    Davidson, *supra* note 36, at 17, 22.

74    *Id.*

75    SELLARS, *supra* note 28, at 32-34.

76    *Id.* at 13-25.

77    *Id.* at 76.

78    *Id.* at 63.

79    *Id.* at 76.

80    ROBERT B. BRANDOM, ARTICULATING REASONS: AN INTRODUCTION TO INFERENTIALISM 11 (2000). For a suggestive take on how Brandom's philosophy could enhance intellectual history, see David L. Marshall, *The Implications of Robert Brandom's Inferentialism for Intellectual History*, 52 HIST. & THEORY 1 (2013).

81    ROBERT B. BRANDOM, MAKING IT EXPLICIT: REASONING, REPRESENTING, AND DISCURSIVE COMMITMENT 89-90 (1994).

82    *Id.* at 90.

83    *Id.*

84    Rorty, *supra* note 59, at 120, 123.

85    *See generally* W. V. O. Quine, *Two Dogmas of Empiricism*, *in* FROM A LOGICAL POINT OF VIEW: LOGICO-PHILOSOPHICAL ESSAYS 20 (1953).

86    BRANDOM, *supra* note 28, at 25.

87    *See generally* Davidson, *supra* note 36, at 125; W. V. O. Quine, *Translation and Meaning*, *in* WORD AND OBJECT 26 (1960).

88    DAVIDSON, *supra* note 36, at 125.

89    *Id.* at xviii-xx, 36.

90    *Id.* at xviii-xx, 27.

91    *Id.* at 154.

92      *Id.* at 143.

93      *Id.* at 125.

94      For my own attempt to provide such an account, see Jonathan Gienapp, *Making Constitutional Meaning: The Removal Debate and the Birth of Constitutional Essentialism*, 35 J. EARLY REPUBLIC 375 (2015).

95      The best example continues to be JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION (1996).

96      WITTGENSTEIN, *supra* note 59, § 31.

97      Solum, Originalism and History, *supra* note 1, at 12-13 (encouraging these methods).

98      *See supra* note 46 and accompanying text.

84 FDMLR 935

---

**End of Document**                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*Applied Economics Letters*, 2014
http://dx.doi.org/10.1080/13504851.2014.939367



# The impact of state and federal assault weapons bans on public mass shootings

Mark Gius

**Department of Economics, Quinnipiac University, Hamden, CT 06518, USA**
**E-mail:** Mark.gius@quinnipiac.edu

The purpose of the present study is to determine the effects of federal and state assault weapons bans on public mass shootings. Using a Poisson effect model and data for the period 1982 to 2011, it was found that both state and federal assault weapons bans have statistically significant and negative effects on mass shooting fatalities but that only the federal assault weapons ban had a negative effect on mass shooting injuries. This study is one of the first studies that looks solely at the effects of assault weapons bans on public mass shootings.

**Keywords:** assault weapons ban; mass shootings

**JEL Classification:** K14; I12

## I. Introduction

According to a recent report prepared by the Congressional Research Service (Bjelopera *et al.*, 2013), a public mass shooting has four distinct attributes:

(1) Occurred in a relatively public place.
(2) Involved four or more deaths – not including the shooter.
(3) Victims were selected randomly.
(4) Shooting was not a means to a criminal end, such as robbery or terrorism.

Examples of high-profile public mass shootings that fit this definition are Sandy Hook, Aurora, Fort Hood, Virginia Tech and Columbine. Many of the perpetrators in these mass shootings used multiple types of firearms. Contrary to popular belief, however, assault rifles were not the predominant type of weapon used in these types of crimes. In fact, according to a recent study, handguns were the most commonly used type of firearm in mass shootings (32.99% of mass shootings); rifles were used in only 8.25% of mass shootings (Huff-Corzine *et al.*, 2014). All data used in Huff-Corzine *et al.* (2014) is for the period 2001–2010.

Even though rifles are used in less than 10% of public mass shootings, one of the first pieces of legislation that comes up for consideration whenever there is a mass shooting is an assault weapons ban. For example, after the Sandy Hook shooting, there was a call for a revival of the 1994 federal assault weapons ban. This firearms ban was part of the Violent Crime Control and Law Enforcement Act of 1994 and outlawed semi-automatic weapons that had certain distinguishing features, such as pistol

Downloaded by [Quinnipiac University], [M. P. Gius] at 06:57 14 August 2014

© 2014 Taylor & Francis

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12950   Page 594 of 733

Downloaded by [Quinnipiac University], [M. P. Gius] at 06:57 14 August 2014

grips, flash hiders and folding stocks (Koper, 2004). The ban was very narrow; only 118 gun models were banned under this law. In addition to banning certain types of guns, the 1994 law also prohibited large-capacity magazines, which held more than 10 rounds of ammunition. This prohibition affected many more types of guns than the assault weapons ban primarily because many semi-automatic weapons, including handguns, are capable of using large-capacity magazines.

The 1994 law had several loopholes and exemptions. All assault weapons and large-capacity magazines manufactured prior to the effective date of the ban were legal to own and transfer. In addition, only exact copies of the banned assault weapon models were banned; models without certain characteristics were still legal even though the rate of fire was the same. Finally, there was no prohibition against new, legal assault weapons being able to accept older, grandfathered large-capacity magazines. Hence, most new, legal models of assault rifles could use pre-ban large-capacity magazines. Given the above, the federal law was limited in its ability to affect firearm availability or crime.

Regarding state-level assault weapons bans, California was the first state to enact such a law in 1989. Several other states followed California's lead and enacted their own bans shortly thereafter (Connecticut, Hawaii and New Jersey), and then, in 1994, the federal ban was enacted. After the federal ban expired in 2004, all of the states that had bans prior to 1994 opted to continue with them.

Even though there have been numerous calls for assault weapons bans, both at the state and at the federal level, very little research has been conducted on the effects of these laws on mass shootings. Gius (2014), looking at data for the period 1980 to 2009, found that state-level assault weapons bans had no significant effects on gun-related murder rates, but that the federal assault weapons ban was associated with a 19% increase in gun-related murders. Chapman *et al.* (2006) examined the effects of Australia's 1996 gun law reforms on firearm-related homicides, including mass shootings, and found that, after enactment of the laws, there were declines in firearm-related homicides and suicides but no significant decrease in unintentional firearm deaths. It was also noted that there were 13 mass shooting incidents in Australia in the 18 years prior to the enactment of the stricter gun control measures but no mass shootings after passage of the laws. Koper (2004) looked at trends and correlations and concluded that the federal assault weapons ban's effect on gun-related violence was minimal at best. Duwe *et al.* (2002) examined the effects of right-to-carry laws on mass shootings. Using data for the period 1977 to 1999, the authors employed both Poisson and negative binomial models and found that right-to-carry laws had no statistically-significant effects on mass shootings. Finally, Lott and Landes (2000) looked at mass shooting incidents also for the period 1977 to 1997 and found that states that enacted right-to-carry laws had fewer mass shootings than states that did not enact such laws.

The purpose of the present study is to determine the effects of the federal and state assault weapons bans on public mass shootings. Using a Poisson, fixed-effect model and data for the period 1982 to 2011, it was found that both state and federal assault weapons bans had statistically significant and negative effects on mass shooting fatalities but that only the federal assault weapons ban had a negative effect on mass shooting injuries. This study is one of the first studies that looks solely at the effects of assault weapons bans on public mass shootings. Most prior studies examined the effects of other types of gun control measures on mass shootings (Lott and Landes, 2000; Duwe *et al.*, 2002; Chapman *et al.*, 2006) or the effects of assault weapons bans on much broader categories of crime (Koper, 2004; Gius, 2014).

## II. Empirical Technique and Data

In order to determine whether assault weapons bans have any effects on public mass shootings, the following equation is estimated in the present study:

$$
\begin{aligned}
Y = {} & \alpha_0 + \alpha_1 \text{ state assault weapons ban} \\
& + \alpha_2 \text{ federal assault weapons ban} \\
& + \alpha_3 \text{ control variables} \qquad\qquad (1) \\
& + \alpha_4 \text{ state fixed effects} \\
& + \alpha_5 \text{ year fixed effects}
\end{aligned}
$$

where $Y$ is the number of deaths or injuries due to mass shootings. Control variables include the following: percentage of population that is black; population density; percentage of population that has a 4-year college degree; per capita median income; annual unemployment rate; percentage of population that is aged 18–24;

Downloaded by [Quinnipiac University], [M. P. Gius] at 06:57 14 August 2014

*Assault weapons bans and mass shootings*                                                               3

percentage of population that is aged 25–34 and per capita prison population. The state assault weapons ban variable is expressed as a dummy variable that equals one if the state has an assault weapons ban and zero otherwise. The federal assault weapons ban dummy variable equals one for the years 1995–2004.

All data are state level and were collected for the years 1982–2011. Socio-economic data were obtained from the *Statistical Abstract of the United States* and other relevant Census Bureau documents. Information on state-level assault weapons bans were obtained from Ludwig and Cook (2003), the Legal Community against Violence, the National Rifle Association and the US Bureau of Alcohol, Tobacco, Firearms and Explosives.

Data on mass shootings were obtained from the Mother Jones website and the *Supplementary Homicide Reports*, US Department of Justice. According to this data, there were 57 public mass shooting incidents from 1982 to 2011. For the assault weapons ban period (which includes the federal ban years and the years when states that had their own assault weapons bans), there were 24 public mass shootings; for the nonban period, there were 33 incidents. The average number of fatalities per mass shooting during the assault ban period was 7.5; during the nonban period, the average number of fatalities was 8.6.

## III. Results and Concluding Remarks

A Poisson, two-way fixed-effect model, controlling for both state-specific and year-specific effects, was used to estimate the effects of state and federal assault weapons bans on public mass shootings. All observations were weighted by state population. Results are presented on Table 1.

These results indicate that fatalities due to mass shootings were lower during both the federal and state assault weapons ban periods. Although some prior research has shown either that assault weapons bans did not reduce crime or that they actually increased gun-related murder rates (Gius, 2014), the present study's focus on mass shootings shows the effectiveness of these gun control measures in reducing murders due to mass shootings. Regarding the injury regression, state-level assault weapons bans had no statistically-significant effects, but the federal ban had a significant and negative effect on mass shooting injuries.

It is important to note that these results are not unexpected. In 2012, for example, there were 72 fatalities due to mass public shootings. Of those 72, at least 30 were committed using a rifle. In the same year, there were 12 765 murders, of which only 322 were committed using a rifle. Rifles (assault weapons) are used much more frequently in mass shootings than they are in murders in general. Hence, any law that restricts access to rifles is likely to be much more effective in reducing mass shootings than it is in reducing murders in general.

Finally, it is important to note that mass shooting fatalities are a very small percentage of overall murders. Hence, even if a certain type of gun control measure was found to completely eliminate mass shootings (which assault weapons bans do not), the overall murder rate would decline by a very small

**Table 1.  Poisson fixed-effects regression results**

| Variable | Mass shooting deaths | Mass shooting injuries |
|---|---|---|
| State assault weapons ban | −0.59202 (−2.28)** | 0.298 (1.16) |
| Federal assault weapons ban | −1.079 (−7.04)*** | −1.733 (−10.10)*** |
| Proportion of population that is black | 65.66 (5.33)*** | 87.05 (6.20)*** |
| Population density | −0.0177 (−2.73)*** | −0.0542 (−7.18)*** |
| Real per capita median income | 0.000029 (0.48) | 0.00021 (3.53)*** |
| Proportion of population with college degree | 1.66 (0.70) | −4.72 (−2.21)** |
| Unemployment rate | −0.0698 (−0.02) | −3.51 (−1.06) |
| Proportion of population >18 and <25 | −55.21 (−5.94)*** | −84.27 (−7.81)*** |
| Proportion of population >24 and <35 | −39.20 (−5.09)*** | −20.59 (−2.65)*** |
| Per capita prison population | −0.00362 (−4.62)*** | −0.00067 (−0.85) |
| Log-likelihood | −1846.48 | −2860.63 |

*Notes*: ** 1% < *p*-value < 5%; *** *p*-value < 1%.
Test statistics are in parentheses.
State and year fixed effects are not reported.

Downloaded by [Quinnipiac University], [M. P. Gius] at 06:57 14 August 2014

amount. Therefore, although the results of the present study indicate that assault weapons bans are effective in reducing mass shooting fatalities, their effects on the overall murder rate are probably minimal at best.

## References

Bjelopera, J., Bagalman, E., Caldwell, S. *et al.* (2013) *Public Mass Shootings in the United States: Selected Implications for Federal Public Health and Safety Policy*, Congressional Research Service, Washington, DC.

Chapman, S., Alpers, P., Agho, K. *et al.* (2006) Australia's 1996 Gun law reforms: faster falls in firearm deaths, firearm suicides, and a decade without mass shootings, *Injury Prevention*, **12**, 365–72. doi:10.1136/ip.2006.013714

Duwe, G., Kovandzic, T. and Moody, C. (2002) The impact of right-to-carry concealed firearm laws on mass public shootings, *Homicide Studies*, **6**, 271–96. doi:10.1177/108876702237341

Gius, M. (2014) An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates, *Applied Economics Letters*, **21**, 265–7. doi:10.1080/13504851.2013.854294

Huff-Corzine, L., McCutcheon, J., Corzine, J. *et al.* (2014) Shooting for accuracy: comparing data sources on mass murder, *Homicide Studies*, **18**, 105–24. doi:10.1177/1088767913512205

Koper, C. (2004) An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003, Report to the National Institute of Justice, US Department of Justice.

Lott, J. and Landes, W. (2000) Multiple victim public shootings, Unpublished Paper, University of Chicago Law School, Chicago, IL.

Ludwig, J. and Cook, P. (Eds) (2003) *Evaluating Gun Policy: Effects on Crime and Violence*, The Brookings Institution, Washington, DC.

View publication stats

**Omitted - Compendium Pages 1194-1218**

**Omitted - Compendium Pages 1219-1247**

**Omitted - Compendium Pages 1248-1275**

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12956   Page 600 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

**42 Harv. J. on Legis. 187**

**Harvard Journal on Legislation**
Winter, 2005

Article

Robert J. Kaczorowski [a1]

Copyright © 2005 by the President and Fellows of Harvard College; Robert J. Kaczorowski

# CONGRESS'S POWER TO ENFORCE FOURTEENTH AMENDMENT RIGHTS: LESSONS FROM FEDERAL REMEDIES THE FRAMERS ENACTED

*Professor Robert Kaczorowski argues for an expansive originalist interpretation of Congressional power under the Fourteenth Amendment. Before the Civil War, Congress actually exercised, and the Supreme Court repeatedly upheld, plenary Congressional power to enforce the constitutional rights of slaveholders. After the Civil War, the framers of the Fourteenth Amendment copied the antebellum statutes and exercised plenary power to enforce the constitutional rights of all American citizens when they enacted the Civil Rights Act of 1866 and then incorporated the Act into the Fourteenth Amendment. The framers of the Fourteenth Amendment thereby exercised the plenary power the Rehnquist Court claims the framers intended to exclude from Congress. The framers also adopted the remedies to redress violations of substantive constitutional rights the Court says the framers intended to reserve exclusively to the states. The Rehnquist Court's Fourteenth Amendment jurisprudence, contradicted by this history, is thus ripe for reevaluation.*

If, indeed, the Constitution guarantees the right ... the natural inference certainly is, that the national government is clothed with the appropriate authority and functions to enforce it. The fundamental principle, applicable to all cases of this sort, would seem to be, that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist on the part of the functionaries to whom it is entrusted .... The remark of Mr. Madison, in the Federalist, [sic] (No. 43,) would seem in such cases to apply with peculiar force. "A right (says he) implies a remedy; and where else would the remedy be deposited, than where it is deposited by the Constitution?" meaning, as the context shows, in the government of the United States. [1]

## *188 INTRODUCTION

A forgotten but profoundly important fact of the nation's constitutional history is that the U.S. Congress exercised plenary power to enforce a constitutionally recognized property right as early as 1793. [2] Congress enacted civil remedies to redress violations of a slaveholder's constitutionally secured property right to recapture his runaway slaves. [3] The statute imposed a civil fine and tort damages on anyone who interfered with the slaveholder's constitutional right. [4] In 1842, the U.S. Supreme Court unanimously affirmed Congress's plenary remedial power as a "fundamental principle" of constitutional law in *Prigg v. Pennsylvania*. [5] Justice Story's cited authority for this fundamental principle was *McCulloch v. Maryland*, an opinion written by perhaps the greatest jurist to serve as Chief Justice, John Marshall. [6] Chief Justice Marshall, in turn, derived this "fundamental principle" from James Madison, whose *Federalist 44* Marshall paraphrased, albeit without attribution. [7] Justice Story also relied on Madison in recognizing Congress's plenary remedial powers when he quoted Madison's *Federalist 43* as authority for the

Compendium_Cornell
Page 1276

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12957   Page 601 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

"fundamental principle" that rights secured by the Constitution delegate to Congress plenary power to enforce them. [8] Chief Justice Roger B. Taney concurred fully in these views. [9]

According to the Supreme Court today, however, Congress's power to remedy the violation of constitutional rights is anything but plenary. In *City of Boerne v. Flores*, [10] the Rehnquist Court struck down the Religious Freedom Restoration Act [11] (RFRA) and held that Congress's power to enforce the rights secured by the Fourteenth Amendment is limited to remedying state violations. [12] According to the Court, the Fourteenth Amendment does not delegate to Congress the power to define the rights the Fourteenth Amendment secures, to enforce the rights themselves, or even to determine what constitutes a state violation of Fourteenth Amendment rights. [13] Subsequently, in a later case, the Rehnquist Court struck down **189** a provision of the Violence Against Women Act [14] (VAWA) that imposed civil liability on anyone who committed an act of physical violence against a woman because of gender animus. [15] Citing *Boerne*, the Court reasoned that Congress's remedial powers under the Fourteenth Amendment, limited as they are to correcting state violations of constitutional rights, do not authorize Congress to create civil remedies and impose civil liability against a private individual who violates another individual's constitutional rights. [16]

The Rehnquist Court based its recent interpretations of Congress's Fourteenth Amendment remedial powers on its conception of the intent of the Amendment's framers. In striking down the RFRA in *Boerne*, the Court, speaking through Justice Anthony Kennedy, held that the framers of the Fourteenth Amendment intentionally limited Congress's powers under the Amendment to remedying state violations of the rights it secured. [17] According to the Court, the framers intentionally refused to give Congress plenary remedial powers, such as the authority to define Fourteenth Amendment rights, to determine what constitutes a violation of these rights, and to redress violations of Fourteenth Amendment rights committed by private individuals. [18] The framers refused to give such plenary power to Congress, Justice Kennedy opined, because to do so would have given Congress "too much legislative power at the expense of the existing constitutional structure .... [and also would have given] Congress a power to intrude into traditional areas of state responsibility, a power inconsistent with the federal design central to the Constitution." [19]

It is clear that the Rehnquist Court has forgotten the Madisonian first principles of American constitutionalism, as articulated by Chief Justices Marshall and Taney and Justice Story, which recognized plenary congressional power to enforce constitutional rights and to remedy their violation. [20] The Rehnquist Court also seems unaware of the congressional and **190** judicial enforcement of slaveholders' constitutionally secured property rights from the nation's founding through the Civil War. This oversight is likely attributable to the constitutional right Congress enforced. For Americans today, the ownership of another human being is morally repugnant and inconceivable as a constitutionally secured right. Nevertheless, the Founders secured this property right when they incorporated the Fugitive Slave Clause in the Constitution. [21] The founding generation enforced it when the Second Congress, comprising many of the political leaders who drafted and ratified the Constitution, enacted a statute in 1793 which conferred on slave owners civil remedies comparable to the civil remedies that the Rehnquist Court held Congress was not authorized to enact for the enforcement of Fourteenth Amendment rights. [22] In 1850, Congress again legislated to enforce slaveholders' constitutionally secured property right in their slaves, adopting additional remedies and an elaborate federal enforcement structure that required federal officials to enforce the statute on penalty of a civil fine payable to the owners of the fugitive slaves, and imposed civil damages and criminal penalties on any party who interfered with the recapture or aided the escape of runaway slaves. [23] The United States Supreme Court, every lower federal court, and, with only one exception, every state appellate court presented with the issue upheld the constitutionality of these statutes and Congress's plenary power to enact them. [24]

 **191** The history of the federal government's enforcement of slaveholders' constitutionally secured property rights was too recent and too traumatic for the framers of the Civil Rights Act of 1866 [25] and the Fourteenth Amendment to have overlooked it. Indeed, history presented them with a disturbing moral question of fundamental importance: if the Constitution delegated to Congress plenary power to protect the property rights of slave owners, how can it not have delegated to Congress the same plenary power to protect the fundamental rights of all freemen? The framers answered this question by insisting that Congress had to possess comparable power to enforce the constitutional rights of all Americans.

Compendium_Cornell
Page 1277

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12958   Page 602 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

## I. THE HISTORICAL BACKGROUND OF FEDERAL CONSTITUTIONAL RIGHTS ENFORCEMENT IN 1866

When the Senators and Representatives of the Thirty-Ninth Congress legislated to secure the rights of American citizens in 1866, they did so within the context of a seventy-five-year history of federal constitutional rights enforcement, in which Congress exercised plenary power to remedy violations of a constitutionally secured property right. [26]

### A. The Fugitive Slave Clause

The first constitutionally secured personal right that the U.S. Congress legislated to enforce was the property right of slave owners to recapture their runaway slaves, a right that was guaranteed by the Fugitive Slave Clause. [27] In 1793, the Second Congress enacted a statute that conferred on slave owners three civil remedies to redress violations of this right. [28] The first civil remedy enabled the owner to go into federal or state court and secure a certificate authorizing him to return the fugitive slave to the place from which she fled. [29] The second and third civil remedies were a civil fine of $500 and tort damages, respectively, recoverable from anyone who obstructed a slave's recapture or aided her escape. [30]

The text of the Fugitive Slave Clause was analogous to that of the Fourteenth Amendment because both prohibited the states from infringing certain constitutional rights. The Fugitive Slave Clause [31] consisted of **\*192** two provisions. On its face, the first clause prohibited any state into which a fugitive slave escaped from enacting or enforcing any law or regulation that would interfere with the slave owner's right to the service or labor of the runaway slave. [32] The second provision required that the fugitive slave be delivered to the person to whom the service or labor was owed. [33] However, the clause did not identify whose duty it was to deliver the fugitive slave to the claimant.

In *Prigg v. Pennsylvania*, decided in 1842, the United States Supreme Court upheld Congress's plenary power to enact the 1793 Fugitive Slave Act and the civil remedies it provided. [34] In his opinion for the Court, Justice Joseph Story delineated the Court's duty in interpreting the Constitution, namely, to interpret it "in such a manner, as, consistently with the words, shall fully and completely effectuate the whole objects of it." [35] From this duty Story defined the Court's obligation to interpret the Constitution so as to "secure and attain the ends proposed." [36] He thus interpreted the prohibition against state interference with the slaveowner's right to the service or labor of the fugitive slave, that is, a prohibition against state action, as an affirmative guarantee of "a positive, unqualified right on the part of the owner of the slave." [37] The Fugitive Slave Clause therefore secured "all the incidents to that right" and "[put] the right to the service or labor upon the same ground, and to the same extent, in every other state as in the state from which the slave escaped." [38] The Fugitive Slave Clause also required that the fugitive slave "be delivered up on Claim of the Party to whom such Service or Labour may be due," [39] and the Court held that the constitutional guarantee of this right delegated to Congress the plenary power to enforce it. [40] Story explained, "If, indeed, the constitution guarantees the right, and if it requires the delivery upon the claim of the owner (as cannot well be doubted), the natural inference certainly is, **\*193** that the national government is clothed with the appropriate authority and functions to enforce it." [41]

In explaining Congress's plenary remedial powers to enforce constitutionally secured rights, Story implicitly relied upon Chief Justice Marshall's opinion in *McCulloch v. Maryland* and on James Madison's *Federalist 44* and *43*. Story proclaimed *McCulloch's* general principle of constitutional delegation of Congress's legislative power: "The fundamental principle, applicable to all cases of this sort ... that where the end is required, the means are given; and where the duty is enjoined, the ability to perform it is contemplated to exist, on the part of the functionaries to whom it is intrusted." [42] Chief Justice Marshall, in turn, had taken this principle from James Madison's *Federalist 44*. [43] Story elaborated how Madison's and Marshall's ends/means principle explained Congress's power to enforce constitutionally secured rights. He asserted that the constitutional recognition of rights, even when the recognition is in the nature of a prohibition on the states from infringing the rights, makes Congressional enforcement of those rights an end and object of the federal government, and thus implies the constitutional authority and duty to enforce the rights and to provide effective remedies to prevent and redress their violation. [44] Story buttressed this principle of Congress's remedial power by quoting Madison's *Federalist 43* as authority for the proposition that a right recognized in the Constitution is a personal right enforceable against any one who may violate it, and that the constitutional right implies a delegation to Congress of remedial power to secure and protect it. [45]

Compendium_Cornell
Page 1278

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12959   Page 603 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Story advanced another theory, based on the "Arising Under" Clause of Article III, [46] in explaining Congress's plenary power to enforce the property right secured by the Fugitive Slave Clause. He described this constitutional right as a personal property right enforceable by the slave's owner against another private party, constituting a case or controversy arising under the Constitution. [47]  The Supreme Court was unanimous in these conclusions. [48]  Indeed, the Taney Court twice affirmed its *Prigg* decision  **194**  and upheld the constitutionality of the Fugitive Slave Acts of 1793 and 1850. [49]  The Arising Under Clause consequently empowered Congress to provide complete protection of the right. [50]

In an opinion concurring in part and dissenting in part, Chief Justice Taney agreed with the Court's discussion regarding the right of the slaveholder. [51]  He declared, "This right of the master being given by the constitution of the United States, neither congress nor a state legislature can, by any law or regulation, impair it or restrict it." [52]  Taney also concurred with the opinion's holdings regarding the power of Congress to protect the rights of citizens in slaveholding states to exercise this right, "to provide by law an effectual remedy to enforce it," and inflict penalties on violators. [53]  However, the Chief Justice dissented from the Court's holding that the power to enforce this constitutional right and to remedy its violation was "vested exclusively in congress." [54]  Taney insisted that the states had concurrent power to enforce property rights secured by the Fugitive Slave Clause. [55]

Taney's defense of the states' constitutional power to enforce the slaveholders' constitutional right actually strengthened Story's theory of congressional delegation as Taney's opinion broadened this theory to include the states. Indeed, the Chief Justice characterized as a well-settled rule of construction the Court's interpretation that the Constitution's prohibition on the states from interfering with a constitutional right implied the power to enforce it. [56]  In disagreeing with the Court's conclusion that this remedial power was delegated exclusively to Congress, Taney insisted that the words of the Fugitive Slave Clause required "the people of the several states, to pass laws to carry [it] into execution." [57]  Taney reasoned that "[t]he Constitution is the law of every state in the Union; and is the paramount law. The right of the master, therefore, ... is the law of each state; and no state has the power to abrogate or alter it." [58]

Taney reinforced his textual construction with examples of other constitutionally secured rights that the states enforced even though the Constitution  **195**  placed the rights "under the protection of the general government." [59]  The constitutional clauses the Chief Justice had in mind were the Contract Clause [60] and the Privileges and Immunities Clause. [61]

Analogizing to the right to contract, Taney then acknowledged that Congress had the power to enforce the right to contract and referenced the remedy that Congress enacted to enforce it. [62]  He referred to the Judiciary Act of 1789 and stated that "in order to secure [the right to contract], congress has passed a law authorizing a writ of error to the Supreme Court." Nevertheless, Taney insisted that the federal enforcement of the right to contract did not deprive the states of concurrent jurisdiction, noting that "no one has ever doubted, that a state may pass laws to enforce the obligation of a contract, and may give to the individual the full benefit of the right so guaranteed to him by the Constitution." Taney wanted to know why the states may not, in the same way, enforce the "individual right now under consideration."

Using the same reasoning, Taney argued that the states may protect and enforce the rights guaranteed by the Privileges and Immunities Clause even though the Constitution places those rights under the protection of the federal government. [63]  Taney thus interpreted the Contract Clause and the Privileges and Immunities Clause, in addition to the Fugitive Slave Clause, as delegating to the national government plenary power to enforce the rights they secured, while the clauses also preserved the states' concurrent power over these rights.

Although the Taney Court differed on the question of whether the power of enforcement was exclusive to the government, it embraced the theory of plenary congressional power, and expressly rejected the states' rights, strict construction theory that Pennsylvania advanced to argue that Congress lacked constitutional authority to enforce constitutional rights and duties "unless the power to enforce these rights, or to execute these duties can be found among the express powers of legislation enumerated in the Constitution." [64]  According to this argument, constitutional rights and duties, such as those expressed in the Fugitive Slave Clause, that did not explicitly delegate the power to enforce and perform them were self-executing. The Taney Court rejected this interpretation, using the same theory of constitutional delegation that the Marshall Court affirmed in *McCulloch* when it rejected a similar argument. [65]  Story wrote that Pennsylvania's  **196**  strict construction interpretation would effectively

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12960   Page 604 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

nullify constitutional rights and prevent Congress from achieving many of the ends the Constitution delegated to the federal government. [66]

Story noted that "[s]uch a limited construction of the constitution has never yet been adopted as correct, either in theory or practice." To the contrary, Congress "has, on various occasions, exercised powers which were necessary and proper as means to carry into effect rights expressly given, and duties expressly enjoined thereby." [67] The crucial point here is that the Taney Court unanimously held that a constitutional prohibition upon the states from infringing a right establishes a constitutional guarantee of the right, and that the constitutional recognition of the right makes its enforcement one of the ends of the federal government, thereby implicitly delegating to Congress plenary power to enforce the right and to remedy all its violations.

### B. The Fugitive Slave Acts

The *Prigg* decision gave rise to the need for the 1850 Fugitive Slave Act, as the Court had held that the states were not empowered to enforce the Fugitive Slave Clause and the Fugitive Slave Act of 1793. *Prigg* thus permitted the free states to withdraw their courts and local law enforcement officials from assisting slaveholders and their agents to recapture fugitive slaves. This was one of the reasons Chief Justice Taney insisted that the Constitution delegated such power to the states and imposed on them the duty to enforce the Fugitive Slave Clause and the legislation that Congress enacted to implement it. He objected that "the remedy provided by congress" in the 1793 Fugitive Slave Act would be "ineffectual and delusive ... if state authority is forbidden to come to its aid." [68] It was simply too dangerous and too expensive to rely on federal courts alone to enforce slaveholders' rights, due to the scarcity and remoteness of federal courts. Taney predicted that, if local authorities were unable to act under state law to assist in the recapture of fugitive slaves, "the territory of [a free] state must soon become an open pathway for the fugitives escaping from [slave] states." [69]

In 1850, Congress strengthened the enforcement of the slaveholders' constitutional right that was weakened by *Prigg* when it enacted the Fugitive Slave Act of 1850, which created a federal enforcement structure, adopted an additional tort remedy, and imposed criminal penalties on anyone who violated it. [70] In doing so, Congress exercised its plenary power to define the scope of the slave owner's constitutional right, to determine **\*197** what constituted a violation of this right, and to provide civil and criminal remedies for the violation of this right. The 1850 statute was more sweeping than the Fugitive Slave Act of 1793 not only because it provided additional remedies, but also because it obligated federal legal officers to enforce it and provided a structure that enabled the federal government to play a prominent role in its enforcement. [71]

The 1850 Fugitive Slave Act contained several important remedial and enforcement provisions. The statute established a federal structure to enforce the slave owners' right that has been analogized to a federal bureaucratic agency. [72] It authorized federal judges to appoint U.S. commissioners with the power "to exercise and discharge all the powers and duties conferred by this act," including the power to authorize the seizure and return of fugitive slaves to the places from which they may have escaped. [73] It imposed on federal marshals and deputy marshals the duty to execute "all warrants and precepts issued under the provisions of this act, when to them directed" under penalty of a $1,000 fine payable to the claimant. [74] Should the fugitive slave escape while in custody of a federal or deputy marshal, the marshal was made liable to the claimant for the full value of the slave. To assist these federal officers, the statute authorized federal commissioners to summon a *posse comitatus* when they deemed necessary, and commanded citizens to assist when their services were required. On a mere affidavit by the claimant or his agent stating that he had reason to believe that a rescue would be attempted by force before he could return the slave to the state from which she fled, the federal officer who made the initial arrest was required to retain as many persons as necessary to overcome such force and to return the slave to the state from which she escaped. [75] The fees and costs incurred in this process were to be paid out of the U.S. Treasury. Congress thus provided for the removal of fugitive slaves by federal force at federal expense whenever the return of fugitive slaves was met with local resistance in a free state.

The 1850 Fugitive Slave Act provided additional and presumably more effective remedies to redress violations of slave owners' constitutional rights than the 1793 Act. Firstly, the 1850 Act substituted the civil penalty of the 1793 Act with criminal penalties. [76] The practical effect of making **\*198** the infringement of the slaveholder's property right a federal crime was to shift the initiative and costs of enforcing the right to the federal government. Nevertheless, the 1850 statute preserved the tort remedy authorized by the 1793 statute and added an additional tort remedy, such that violators were liable for "civil damages" in the amount of $1,000 for each fugitive slave who was lost. [77] These damages were recoverable in an action of debt in a

Compendium_Cornell
Page 1280

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12961   Page 605 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

federal district court. [78]  The $1,000 fine was double the amount of the civil penalty recoverable in an action of debt under the 1793 Fugitive Slave Act. [79]  As a damage remedy for the loss of slaves, the statutory amount of $1,000 was greater than the damages generally awarded for lost slaves in tort actions under the 1793 Fugitive Slave Act. [80]  Additionally, the 1793 and 1850 Fugitive Slave Acts offered the slaveholder alternative federal damage remedies, depending upon whether the slaves escaped or were recovered. [81]  In *Ableman v. Booth*, the United States Supreme Court upheld the constitutionality of the Fugitive Slave Act of 1850 in a strong, nationalistic opinion written by Chief Justice Taney. [82]

### *199   C. The Thirteenth Amendment and the Civil Rights Act of 1866

The Court's *Ableman* decision was handed down just three years before the outbreak of the Civil War. During the Civil War, Congress repealed the 1793 and 1850 Fugitive Slave Acts [83]  and adopted and sent to the states for ratification the Thirteenth Amendment, which abolished slavery. [84]  When the nation ratified the Thirteenth Amendment in 1865, it negated the Fugitive Slave Clause and the other provisions of the Constitution recognizing slavery. [85]  This amendment produced a revolutionary change in the United States Constitution in transforming the document from a fundamental guarantee of slavery to a universal guarantee of liberty.

Republicans, who dominated the Thirty-Ninth Congress, overwhelmingly interpreted the Thirteenth Amendment as a universal guarantee of liberty. The Speaker of the House of Representatives, Schuyler Colfax, proclaimed that one of the principal objectives of the Thirty-Ninth Congress was to make the Constitution's guarantees of freedom and fundamental rights a practical reality. [86]  Republicans achieved this objective by   **200**  enacting the Civil Rights Act of 1866 [87]  in April and adopting the Fourteenth Amendment and sending it to the states for ratification in June 1866. The framers made it clear that they modeled the Civil Rights Act's civil and criminal remedies and enforcement structure on the Fugitive Slave Acts, especially the Fugitive Slave Act of 1850. [88]  Indeed, they incorporated the enforcement structure of the 1850 Fugitive Slave Act into the Civil Rights Act. [89]

The Republican leaders and supporters of the Civil Rights Act of 1866 insisted that Congress possessed as much constitutional authority to protect and enforce human rights and equality as it had exercised to protect and enforce the property right in slaves. Thus, Senator Lyman Trumbull interpreted section 1 of the Thirteenth Amendment as a delegation of plenary power to Congress to define and secure the civil liberties of all Americans, not only the civil rights of the former slaves. Trumbull believed that in prohibiting slavery, the Constitution secures freedom to all Americans. "That amendment declared that all persons in the United States should be free," Trumbull emphasized, and he declared: "[t]his [civil rights] measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom." [90]  He admonished that Congress had the same plenary power to enforce the civil rights that inhere in a state of freedom as it had to enforce the constitutional rights of slave owners. Trumbull insisted that

> **201**  under the constitutional amendment which we have now adopted, and which declares that slavery shall no longer exist, and which authorizes Congress by appropriate legislation to carry this provision into effect, I hold that we have a right to pass any law which, in our judgment, is deemed appropriate, and which will accomplish the end in view, secure freedom to all people in the United States. [91]

Republican leaders justified Congress's plenary power to protect the civil rights of all Americans by asserting the Marshall Court's theories of broad implied powers and constitutional delegation in *McCulloch v. Maryland* and the Taney Court's application of *McCulloch*'s theories in *Prigg*. For example, the Civil Rights Bill's House Floor Manager, James Wilson, interpreted the Thirteenth Amendment's prohibition against slavery as a positive guarantee of freedom and proclaimed: "[h]ere, certainly, is an express delegation of power" to enact the Civil Rights Bill. [92]  Asking rhetorically, "[h]ow shall it be exercised? Who shall select the means?" Wilson answered: "[h]appily, sir, we are not without light on these questions from the Supreme Court." He quoted from *McCulloch v. Maryland* where Chief Justice Marshall stated that, although the powers of the federal government are limited, the Constitution nevertheless allows the legislature the discretion to exercise the powers it confers "'to perform the high duties assigned to it in the manner most beneficial to the people.'" [93]  Then Wilson asserted Chief Justice

Marshall's famous principle of implied powers, which Wilson quoted: "Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist [sic] with the letter and spirit of the Constitution, are constitutional." [94]  Applying Marshall's interpretation of constitutional delegation to interpret the Thirteenth Amendment, which the *Prigg* Court applied to interpret the Fugitive Slave Clause, Wilson asserted that no one can question that the Civil Rights Bill is an appropriate "enforcement of the power delegated to Congress" by the Thirteenth Amendment. "The end is legitimate," he proclaimed, "because it is defined by the Constitution itself. The end is the maintenance of freedom to the citizen." [95]

Representative Wilson also offered a detailed explanation of Congress's plenary power to enforce the rights guaranteed in the Bill of Rights, which he grounded in Justice Story's opinion in *Prigg*. [96]  "In the case of Prigg v. Commonwealth of Pennsylvania-- and this it will be remembered was  **202**  uttered in behalf of slavery--I find this doctrine, and it is perfectly applicable to this case." Wilson read from Story's opinion in *Prigg*, where Story paraphrased Chief Justice Marshall's opinion in *McCulloch*:

> the fundamental principle applicable in all cases of this sort would seem to be that where the end is required the means are given; and where the duty is enjoined the ability to perform it is contemplated to exist on the part of the functionaries to whom it is intrusted,

which is to say, on the federal government. [97]  Wilson then quoted Justice Story quoting Madison's assertion that the remedies for constitutional rights violations must be provided by the federal government: "'A right,' says he, 'implies a remedy: and where else would the remedy be deposited than where it is deposited by the Constitution?' meaning, as the context shows, in the Government of the United States.'" Wilson also quoted Story's understanding of *Federalist 43*, stating that the natural conclusion is that the government must carry into effect the rights and duties of the Constitution, barring any provisions to the contrary. [98]  Wilson applied Madison's and Story's understanding of Congress's constitutional powers to the Bill of Rights and proclaimed:

> Now, sir, in relation to the great fundamental rights embraced in the bill of rights, the citizen being possessed of them is entitled to a remedy. That is the doctrine as laid down by the courts. There can be no dispute about this. The possession of the rights by the citizen raises by implication the power in Congress to provide appropriate means for their protection; in other words, to supply the needed remedy. The citizen is entitled to the right [sic] of life, liberty, and property .... The power is with us to provide the necessary protective remedies. [99]

Wilson concluded the point with a statement of the social contract: these protective remedies, he said, "must be provided by the Government of the United States, whose duty it is to protect the citizen in return for the allegiance he owes to the government." The framers of the Civil Rights Act and the Fourteenth Amendment thus affirmed the theories of the Marshall and Taney Courts that attributed to Congress the plenary power and the constitutional duty to enforce the rights secured by the Constitution,  **203**  theories which also considered the duty to enforce constitutional rights to be one of the ends for which the federal government was established.

The framers' theory of plenary constitutional delegation was also premised on their assumption that equality and the natural rights of life, liberty, and property and rights incident thereto proclaimed in the Declaration of Independence constituted the fundamental rights of all Americans. [100]  The framers and supporters insisted that the Constitution recognizes and secures these rights in various provisions, primarily the Thirteenth Amendment, but also in others such as the Privileges and Immunities Clause of Article IV, the Bill of Rights, and the Fifth Amendment's explicit guarantee of life, liberty, and property. [101]  They applied to these constitutional provisions the *McCulloch* and *Prigg* theories of broad constitutional delegation of implied congressional power and insisted that these provisions delegated to Congress plenary power to enforce and protect the fundamental rights of all Americans, and that they authorized Congress to enact civil and criminal remedies and a federal enforcement structure to ensure that all Americans are secure in their civil rights. The framers also argued that the principles of the Declaration of Independence, and the social contract that these principles betokened, were incorporated into the Constitution through these provisions and that the Declaration of Independence and the Constitution imposed a duty on Congress to enforce the fundamental rights they recognized and secured as rights of United States citizens. [102]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12963   Page 607 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

**\*204  II. THE CIVIL RIGHTS ACT OF 1866**

Armed with this broad understanding of citizens' rights and of Congress's constitutional power to enforce them, the Thirty-Ninth Congress enacted the Civil Rights Act of 1866. [103]  To eliminate opponents' claims that the statute was unconstitutional, the framers of the Fourteenth Amendment incorporated the Civil Rights Act into section 1 of the Amendment. [104]  Thus, the scope of Congress's remedial powers to enforce the rights secured by the Fourteenth Amendment are at least as broad as the remedial powers Congress exercised in adopting the Civil Rights Act of 1866. In addition, the framers intended the Fourteenth Amendment to constitutionalize their interpretation of the other provisions of the Constitution, which, they argued, secured the rights of all Americans and thus delegated plenary power to Congress to enforce and protect them.

Because the provisions of the Civil Rights Act of 1866 are central to the meaning and scope of the Fourteenth Amendment, it is necessary to examine the statute's provisions. In brief, the Civil Rights Act of 1866 conferred U.S. citizenship on all Americans. [105]  It defined and conferred some of the rights that U.S. citizens, as such, enjoy, and, like the Fugitive Slave Act of 1850, it authorized the lower federal courts to provide civil and criminal remedies to redress violations of these rights. [106]  It criminalized only certain violations of citizens' rights. [107]  However, it conferred jurisdiction on the federal courts to dispense ordinary civil and criminal justice, traditionally administered by the states, whenever individuals were unable to enforce or were denied their civil rights in the states' systems of justice. [108]  To ensure the statute's effective enforcement, it established a federal enforcement structure patterned on the Fugitive Slave Act of 1850. [109]

On its face, the Civil Rights Act of 1866 contradicts the Rehnquist Court's interpretation of the intention of the framers of the Fourteenth Amendment regarding the scope of the remedial powers they intended to delegate to Congress. The Rehnquist Court held that the framers of the Fourteenth Amendment intentionally refused to intrude into traditional areas of state responsibility and therefore refused to give to Congress the power to define constitutional rights, particularly the rights secured by the Fourteenth Amendment, and the power to enact civil remedies to redress violations of Fourteenth Amendment rights committed by private  **\*205**  actors. [110]  Unquestionably, the framers sought to preserve traditional state jurisdiction over individual rights. However, the Rehnquist Court overlooked the fact that the Constitution, as amended by Republicans in 1865, intruded upon traditional state jurisdiction and assumed traditional state powers, because the Thirteenth Amendment abolished state laws and institutions that recognized, defined, and enforced the status of African Americans as slaves, abolished the property right of slave owners in their slaves, and eliminated the master/slave relationship. [111]  More importantly, the framers of the Fourteenth Amendment asserted that the Thirteenth Amendment determined that the status of all Americans, not only that of the former slaves, is that of freemen, which they equated with the status of United States citizenship. [112]  The framers of that Amendment also asserted that the Amendment delegated to Congress the power to protect the rights to which Americans are entitled as freemen, that is, the power to define and enforce the rights of United States citizenship. [113]

The framers of the Fourteenth Amendment, many of whom drafted and voted for the Thirteenth Amendment, again intruded into traditional areas of state jurisdiction and exercised plenary power to define and enforce the rights of United States citizens when they enacted the Civil Rights Act of 1866. The framers expressly stated that they intended the Civil Rights Act to make the Thirteenth Amendment a practical reality. The Civil Rights Act therefore defined the constitutionally secured status of all Americans as U.S. citizens, specified some of the constitutionally secured rights that Americans were to enjoy as U.S. citizens, provided civil remedies and criminal penalties to redress violations of these civil rights, and provided a federal enforcement structure to protect and enforce the status and rights of U.S. citizens. [114]  Part III of the Article discusses how, within two months of enacting the Civil Rights Act of 1866, the framers adopted the Fourteenth Amendment, in part, to ensure the statute's constitutionality by incorporating it into section 1 of the Fourteenth Amendment. It is to the provisions of the Civil Rights Act and the debate relating to Congress's power to enact them that we now turn.

*A. Section 1: Congress Confers United States Citizenship and Some of the Rights of United States Citizens on All Natural Born Americans*

As adopted, section 1 of the Civil Rights Act intruded into traditional areas of state responsibility. Indeed, it supplanted the states' police powers  **\*206**  relating to citizenship in three ways. First, section 1 of the Civil Rights Act defined the status of ''all [native-born] persons'' who met specified minimal qualifications as United States citizens and conferred citizenship on such

Compendium_Cornell
Page 1283

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12964   Page 608 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

persons in every state and territory of the United States." [115]   This was the first time in the nation's history that Congress defined United States citizenship. [116]   Second, section 1 defined some of the civil rights Americans were to enjoy as U.S. citizens. [117] Third, section 1 guaranteed that all U.S. citizens were to enjoy these civil rights on the same bases as the most favored class of citizens enjoyed them. [118]   These provisions secured the status and civil rights of U.S citizens, state laws to the contrary notwithstanding.

The framers of the Civil Rights Act understood the Citizenship Clause as a definition of the status that the Thirteenth Amendment already secured for all Americans. [119]   However, they added the Citizenship Clause to section 1 of the Act for two practical reasons. First, they wanted to ensure that black Americans enjoyed the same civil rights that white citizens enjoyed. Senator Trumbull explained that the Citizenship Clause was necessary because the former slaveholding states denied the civil rights of American blacks on the grounds that they were not citizens and therefore not entitled to all of the civil rights that white citizens enjoyed. [120]   The framers intended the Civil Rights Act to define and secure the rights of all Americans, but it was to make doubly certain that it would secure the civil rights of black Americans that the framers added language to section 1 that declared that United States citizens "of every race and color" are entitled to every substantive right enumerated in section 1 on the same basis  **207**  "as is enjoyed by white citizens." [121]   As shall be seen, the framers did not intend to limit the Civil Rights Act to a guarantee of racial equality by including such guarantees in the Act. In conferring citizenship on all Americans, Congress exercised a plenary power of a sovereign nation and overrode the states' prior determinations of the status of their inhabitants. [122]

The second pragmatic reason motivating the framers to insert the Citizenship Clause in section 1 is that they believed it provided an additional source of congressional power to enforce civil rights. The bill's floor manager in the House of Representatives, James Wilson of Iowa, made this clear when he introduced the amendment to the Civil Rights Bill that added the Citizenship Clause. [123]   Section 1 initially applied to all of the "inhabitants" of the United States, but Wilson's amendment restricted the civil rights guarantees of section 1 to U.S. citizens. He stated that the amendment was intended to limit the bill only to citizens rather than all inhabitants of the United States, as there was doubt whether Congress had the power to extend this protection to non-citizens. [124]   He explained why Congress necessarily possessed the power to enforce the civil rights of American citizens: "If citizens of the United States, as such, are entitled to possess and enjoy the great fundamental civil rights which it is the true office of Government to protect," then Congress "must of necessity be clothed with the power to insure to each and every citizen these things which belong to him as a constituent member of the great national family." [125]   Senator Trumbull asserted the same position. He insisted that "it is competent for Congress to declare, under the Constitution of the United States, who are citizens." [126]   He argued that "certain fundamental rights belong to every American citizen, and among those are the rights to enjoy life and liberty and to acquire property .... We would protect a citizen in a foreign nation in those rights. Certainly, then, the Government has power to protect them within its own jurisdiction." [127]

That Republicans understood that the guarantee of citizenship and civil rights of section 1 applied to and protected the civil rights of all U.S.  **208**  citizens is reflected in two proposals introduced in the House to exclude former confederates from its protective guarantees. Representative Ralph Hill of Indiana proposed an amendment to the Citizenship Clause of the Civil Rights Bill that would have excluded "those who have voluntarily borne arms against the Government of the United States or given aid and comfort to the enemies thereof." [128]   He explained that, if these persons "are not now entitled to the full rights of citizenship, it at least leaves them without giving them those rights by this bill." [129]   Representative Ebenezer Dumont, also of Indiana, offered a similar, but more explicit amendment which stated that nothing in section 1

> shall be construed as re-extending the rights of citizenship to any one who has renounced the same, or acknowledged allegiance to any government or pretended government in hostility to the United States, or held office under the same, nor to any one who voluntarily has borne arms against the United States in the late rebellion, or who has been guilty of any act whatever which by the laws of nations makes a forfeiture of citizenship. [130]

The extensive congressional debate over the question of citizenship evinces the considerable importance congressional legislators attached to citizenship in assessing Congress's power to enforce civil rights. Both supporters and opponents stated that the constitutional authority to define and confer citizenship encompassed the power to define and enforce the rights of citizens. For example, Senator Trumbull maintained that native-born African Americans are citizens of the United States, just as

Compendium_Cornell
Page 1284

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12965   Page 609 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

are white Americans. [131] Trumbull further explained that it was necessary to declare native-born Americans, especially black Americans, to be United States citizens, because it is by virtue of their United States citizenship that they were entitled to the Thirteenth Amendment's guarantee of the natural rights of freemen throughout the United States. [132] Trumbull maintained that, if there were any doubt whether black Americans were U.S. citizens and thus entitled to the natural rights of U.S. citizenship, all doubts would be resolved "by passage of a law declaring all persons born in the United States to be citizens thereof. That this bill proposes to do. Then they will be entitled to the rights of citizens." [133] Trumbull expressly defined the civil rights of U.S. citizens as the natural rights of freemen, and stated that "they belong to them in all the States of the Union." [134] Senator  **209 Trumbull restated this natural rights theory of U.S. citizenship in rebutting President Johnson's veto of the Civil Rights Bill. [135] Representative William Lawrence of Ohio, a member of the House Judiciary Committee and the only Representative to speak on the President's veto of the Civil Rights Bill, also asserted this principle in rebuttal to the President's veto message. Lawrence proclaimed that the power to confer citizenship "is an exercise of authority which belongs to every sovereign Power, and is essentially a subject of national jurisdiction. The whole power over citizenship is intrusted to the national Government." [136]

Supporters of the Civil Rights Act therefore amended section 1 by including the clause that defined and conferred United States citizenship on all Americans for the specific purpose of ensuring that all Americans would be entitled to federal protection in their civil rights as citizens. [137] These were the views of the House and Senate floor leaders of the Civil Rights Bill. Other legislators expressed this same understanding. For example, conservative Republican Representative Henry J. Raymond, who was also a founder and editor of *The New York Times*, asserted this view [138] even though he voted to sustain the President's veto of the Civil Rights Act. [139] Raymond proclaimed his desire to raise African Americans to equal status with other persons by giving them the right of citizenship and securing all rights resulting from citizenship. [140] He reasoned that all other rights flow from citizenship and making African Americans citizens would guarantee them the same rights as any other U.S. citizen. [141]

 **210  Senator Garrett Davis of Kentucky, although an ardent opponent of the Civil Rights Act, nevertheless agreed that if African Americans were given citizenship, they would be entitled to the same treatment as white citizens barring any differences authorized "by the express language of the Constitution." [142] However, Davis restricted Congress's power over citizens "to such matters as concern the citizens of different States." The reason, Davis explained, was that the Comity Clause [143] was the sole source of Congress's power to enforce the rights of United States citizens, and it applied only when citizens of one state traveled into another state. The problem with the Civil Rights Bill, according to Davis, was that it protected the civil rights of all U.S. citizens within the states in which they resided. It is significant that Senator Davis, a Democrat with states' rights sympathies, thought Congress possessed the power to enforce the rights secured by the Comity Clause. He proposed a bill to enforce the Comity Clause, which would protect the rights of citizens when in a state other than the state of their residence.

It is the framers' theory of U.S. citizenship and Congress's power to enforce the rights of United States citizens encompassed in the Civil Rights Bill that caused conservative Republican Representative Columbus Delano to oppose its enactment. [144] He feared that the statute would completely supplant state jurisdiction over citizens' rights. Delano accepted the Republicans' principle that United States citizens, as such, are entitled to all of the privileges and rights of citizenship, acknowledging that the Thirteenth Amendment made the former slaves citizens of the United States and therefore entitled to all of the rights and privileges of citizenship. [145] Consequently, he believed no law was needed to give emancipated slaves citizenship. [146] However, Delano was troubled that:

> [I]f we adopt the principle of this bill we declare in effect that Congress has authority to go into the States and manage and legislate with regard to all the personal rights of the citizen--rights of life, liberty, and property. You render this Government no longer a Government of limited powers; you concentrate and consolidate here an extent of authority which will swallow up all or nearly all of the rights of the States with respect to the property, the liberties, and the lives of its citizens. [147]

 **211  He insisted that the Constitution "was never designed to take away from the States the right of controlling their own citizens in respect to property, liberty, and life." [148] Yet, he proclaimed his desire to see the provisions of the law enforced upon the South. [149]

Compendium_Cornell
Page 1285

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12966   Page 610 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Delano reconciled these two apparently contradictory positions by proposing a constitutional amendment that would require the States to enforce the fundamental rights of life, liberty, and property and also authorize Congress to enforce these rights if the states failed to do so. [150] Delano explained that he wanted Congress to exercise no more power over the states than necessary and "would not allow it to go in the first instance to secure these rights, but allow it to go only when the States refuse to apply and give such security under the fundamental law of the nation." [151]

Thus, Delano did not object to Congress exercising the requisite power to enforce the substantive civil rights of United States citizens. To the contrary, he proposed to give Congress this power. Rather, he sought to preserve concurrent state jurisdiction and state police powers over citizens' civil rights by authorizing the federal government to assume jurisdiction over and enforce civil rights only if the states failed to do so.

It is notable that Delano objected to the Civil Rights Act because it enforced civil rights directly, without the need for any state violation or denial of civil rights. It is also noteworthy that his proposed amendment, which sought to give Congress civil rights enforcement authority only "where the States withheld it," [152] nevertheless delegated to Congress the power to supplant the states and to enforce citizens' substantive rights. In other words, Delano's conception of Congress's remedial power was not limited to or exclusively directed at remedying a state's denial of a citizen's civil rights; rather, it was directed at enforcing and protecting substantive civil rights, albeit limited to situations in which a state failed to provide this protection itself. Though more moderate and more respectful of states' rights than the remedies Congress adopted in the Civil Rights Act, Delano's conception of Congress's power to enforce civil rights was **\*212** substantive and not "remedial" as the Rehnquist Court defined Congress's power to enforce Fourteenth Amendment rights. Significantly, supporters of the Civil Rights Act rejected Delano's proposal to condition Congress's power to enforce substantive civil rights upon a state's failure to enforce citizens' rights. They chose to enforce substantive civil rights directly.

The debate over citizenship suggests that the Civil Rights Act supplanted state authority over citizens' rights in a second way. The Civil Rights Act overrode any inconsistent state laws and defined some of the rights that Americans possess as U.S. citizens "in every State and Territory in the United States." [153] Senator Trumbull insisted that United States citizenship conferred fundamental rights on all Americans, and he described these rights by paraphrasing Justice Washington's opinion in *Corfield v. Coryell*: [154] "They are those inherent, fundamental rights which belong to all free citizens or free men in all countries, such as the rights enumerated in this bill, and they belong to them in all the States of the Union." [155] Senator Trumbull thus declared that U.S. citizens possessed these civil rights independent of state law: "[T]he federal government has authority to make every inhabitant ... a citizen, and clothe him with the authority to inherit and buy real estate, and the State[s] ... cannot help it." [156] Just what these rights are had never been determined with any specificity, however. The framers of the Civil Rights Act described the essential rights of free men and citizens in broad, generic terms as the rights to life, liberty, and property. [157] There was some question whether the rights to life, liberty, and property included political rights, such as voting and holding public office, and what the era considered to be social rights, such as nondiscriminatory access to public accommodations and schools. Most of the framers and supporters asserted the view that political and social rights are not among the civil rights and privileges and immunities of citizenship, [158] and so those were not included among the rights specified in section 1.

To avoid uncertainty and ambiguity regarding the rights secured by the Civil Rights Act, the framers explicitly specified in section 1 some of the rights they found essential to U.S. citizenship because those rights were essential to political and economic freedom and individual autonomy in the context of 1866. [159] Section 1 declared that

> **\*213** such citizens, of every race and color ... shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishments, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding. [160]

These rights are essentially economic rights and the means of enforcing them in the courts, the right to the protection of the law for the safety of one's person and property, and the right to equal punishments for legal infractions. Thus, Congress exercised the plenary power of a sovereign government by defining and conferring some of the rights that individuals possess as U.S. citizens, "any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." [161] Section 3 of the Civil Rights

Compendium_Cornell
Page 1286

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12967   Page 611 of
733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Act conferred exclusive jurisdiction on the federal courts to try any civil actions brought by citizens to redress violations of these civil rights, whether attributable to the actions of public officials or private individuals acting in their private capacities. [162]

The United States Supreme Court has asserted this view of the framers' intent in enacting the Civil Rights Act of 1866. As early as 1883, in **\*214** *The Civil Rights Cases*, [163] the Court acknowledged that Congress undertook to enforce the Thirteenth Amendment by

> secur[ing] to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property, as is enjoyed by white citizens. [164]

The Court recounted the framers' understanding of the Thirteenth Amendment, stating that the framers equated "those fundamental rights which are the essence of civil freedom" to "those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery." [165] However, unlike the framers, who emphasized Congress's power under the Thirteenth Amendment to enforce the rights of U.S. citizens, the Court in *The Civil Rights Cases* emphasized Congress's Thirteenth Amendment powers to enforce those rights the denial of which constitutes an incident or badge of servitude. [166] Nevertheless, the Court held that federal legislation enacted pursuant to the Thirteenth Amendment "may be direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not." [167] The Court affirmed this view in 1968 when it held that section 1 of the Civil Rights Act of 1866 secured to black and white citizens alike the right to property and the right to make and enforce contracts throughout the United States against violations from any source, "whether governmental or private." [168]

**\*215** It is because opponents understood that the power Congress exercised in enacting the Civil Rights Act was the plenary power of defining and enforcing the civil rights of all citizens against any violation that opponents objected so vehemently, arguing that Congress usurped the states' police power to determine and regulate the rights of their citizens and thus consolidated the states' police power in the federal government. [169] **\*216** However, the framers of the Civil Rights Act chose not to displace the states completely.

The third way section 1 of the Civil Rights Act supplanted state authority over citizens' rights was by providing that all U.S. citizens shall enjoy and exercise the enumerated civil rights as the most favored class of citizens (white citizens) enjoyed and exercised them. Because it conferred the enumerated civil rights on the same bases "as whites enjoy" them, section 1 expressly prohibited the infringement or denial of citizens' **\*217** rights because of racial and other improper animus. [170] The Civil Rights Act again supplanted state law by prohibiting the states from discriminating unreasonably among citizens in their civil rights, especially, but not only, on the basis of race. [171] In addition to defining and conferring the civil **\*218** rights and immunities of United States citizens, therefore, the Civil Rights Act overrode state laws that discriminated on the bases of race, color, or condition of servitude, and probably on the bases of religion, country of origin, and political affiliation, and it imposed on state officials a federal duty to recognize and enforce the civil rights of all citizens in the same manner that the officials recognized and enforced the civil rights of white citizens.

Not simply a guarantee of racial equality in citizens' rights or of an equality in state-conferred rights, the Civil Rights Act defined a national citizenship consisting of a body of fundamental rights that proponents and opponents understood its framers and supporters expressly intended to secure to all citizens of the United States, white as well as black, native-born as well as the foreign-born. [172] Thus, Representative Wilson proclaimed that the Civil Rights Act was intended "to protect [all] our citizens, from the highest to the lowest, from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men." [173] Senator Reverdy Johnson, a leader of the Democratic opposition who was regarded as the foremost authority on the Constitution, confirmed this view, stating that the Civil Rights Act "professes to define what citizenship is, [and] it gives the rights of citizenship to all persons without distinction of color, and of course embraces Africans or descendants of Africans." [174] Consequently, although black Americans were the intended primary beneficiaries of civil rights protection,

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12968   Page 612 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

drafters and supporters of the Civil Rights Act expressed their intention of protecting white citizens as well.[175] This was also the understanding of observers outside of Congress. **\*219** [176] The framers obviously intended to protect civil rights against violations beyond those motivated by racial discrimination.

Even the Supreme Court, as early as 1883, recognized that the framers of the Civil Rights Act understood Congress had the power, and that it intended to use this power to intrude upon and supplant traditional state authority over the civil rights of all Americans. The Court observed that the framers undertook to enforce the Thirteenth Amendment by "secur[ing] to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom,"[177] and that they equated these rights to "those fundamental rights which appertain to the essence of citizenship."[178] Indeed, the Court affirmed that legislation enacted pursuant to the Thirteenth Amendment "may be direct and primary, operating upon the acts of individuals, whether sanctioned by state legislation or not."[179]

**\*220**  The framers' theory of U.S. citizenship and of constitutional delegation assumed plenary congressional power to enforce the rights of U.S. citizens and to supplant the states' authority over the rights of U.S. citizens; they rejected any intention of displacing the states completely in performing the essential governmental function of enforcing citizens' rights. To the contrary, they wanted to preserve state authority over citizens' rights and therefore drafted the Civil Rights Act in such a way as to preserve concurrent state police powers.[180] They expressed the desire to supplant the states and enforce citizens' rights only to the extent necessary under the circumstances they confronted in 1866.[181] For example, while they could have conferred unconditionally on all U.S. citizens the rights enumerated in section 1, they chose not to do so.

The framers and supporters of the Civil Rights Act gave two reasons for avoiding an outright grant of civil rights to every U.S. citizen. One reason is that an unconditional grant of civil rights would have entitled all citizens to these rights on the same basis as every other citizen. However, the framers did not believe that all citizens are entitled to the same civil rights or to exercise civil rights on the same basis as others. There were, and there continue to be, legitimate and reasonable discriminations among different classes of citizens regarding citizens' rights. For example, minors and the insane do not enjoy the same rights as rational adults.[182] In 1866, married women did not enjoy the same rights as unmarried women or as men, whether married or unmarried.[183]

The framers sought to preserve these distinctions in state law, which they considered to be legitimate discriminations, as they sought to abolish other kinds of discriminations, such as those based on race and political animus. Thus, Representative Wilson explained that

> [T]he words ["as is enjoyed by whites"] were not in the original bill, but were placed there by an amendment offered by myself. And the reason for offering it was this: it was thought by some persons that unless these qualifying words were incorporated in the bill, those rights might be extended to all citizens, whether male or female, majors or minors.[184]

Representative Lawrence repeated this explanation when he observed that "distinctions created by nature of sex, age, insanity, &c., are recognized **\*221** as modifying conditions and privileges," and may therefore be permitted, "but mere race or color, as among citizens, never can."[185]

The second reason the drafters of the Civil Rights Bill avoided an outright grant of civil rights is that they sought to preserve state jurisdiction over citizens' rights.[186] Preserving state jurisdiction over citizens' rights highlights a significant difference between the rights secured by the Civil Rights Act of 1866 and the Fugitive Slave Act of 1850. The Supreme Court had held that the Constitution created the slave owners' property rights secured by the Fugitive Slave Clause and that the Constitution did not delegate to the states the authority to enforce these rights. Consequently, the power to enforce the slave owners' right of interstate recapture was delegated exclusively to Congress, and Congress could provide for the enforcement of this federal right only in the federal courts.[187]

Compendium_Cornell
Page 1288

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12969   Page 613 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

The power to enforce the personal rights and liberties of citizens was a different matter altogether. Historically, the enforcement and protection of these rights and the administration of civil and criminal justice were core areas of the states' traditional police powers. Except as they affected fugitive slaves, the states had exercised these powers virtually without the federal government's oversight. The framers of the Civil Rights Act sought to preserve the states' concurrent jurisdiction over the personal rights of U.S. citizens and the common law and statutory regulations which determined the manner in which individuals exercised and enjoyed these rights. [188] They thereby avoided the burden of legislating detailed federal codes relating to the various areas of civil law and criminal law.

One must keep in mind, however, that the Fugitive Slave Acts of 1793 and 1850 had supplanted the states' police power to protect and enforce the personal liberties of their inhabitants, regardless of race, in cases involving fugitive slaves. These statutes provided for the enforcement of slave owners' constitutional rights over fugitive slaves through federal tribunals. [189] Following this precedent, congressional Republican leaders proclaimed that **222** citizens of the United States were entitled to the federal protection of their constitutional rights, and they proclaimed their intention of providing that protection by the federal government through the Civil Rights Act. For example, Representative Wilson declared: "citizens of the United States ... are entitled to certain rights; and ... I affirm that being entitled to those rights it is the duty of the Government to protect citizens in the perfect enjoyment of them. The citizen is entitled to life, liberty, and the right to property." [190]

The Civil Rights Act posed a problem of constitutional federalism. Asserting that the federal government possessed the constitutional power, and the duty, "to protect citizens in the perfect enjoyment of ... life, liberty, and the right to property" it threatened to supplant the states' traditional jurisdiction over and constitutional power to administer ordinary civil and criminal justice. [191] Indeed, in conferring the status and rights of citizenship on all Americans and providing remedies to redress their violation, Congress could have completely supplanted the states' jurisdiction over citizenship and citizens' rights.

Opponents of the Civil Rights Act insisted that it did precisely that. For example, Senator Saulsbury accused Republicans of "invad[ing] the States and attempt[ing] to regulate property and personal rights within the States." [192] Saulsbury complained that the states

> find themselves by the bill invaded and defrauded of the right of determining who shall hold property and who shall not within its limits, who shall sue and be sued, and who shall give evidence in its courts. All these things are taken out of the control of the States by the paramount authority of this bill, if it be a constitutional bill, and the power is given to the Federal Congress to determine these things, the will of a State to the contrary notwithstanding." [193]

**223** He maintained, correctly, that if the Civil Rights Act was constitutional, then Congress could supplant the states' police powers completely. Quoting the *Federalist Papers*, Saulsbury insisted that "all these powers embraced in your bill are reserved to the States and to the States exclusively, because certainly they concern the lives, liberties, and properties of the people," and therefore the internal affairs of the states. [194]


Representative Michael Kerr, a Democrat from Indiana, expressed the same objection in the House, arguing that the theory underlying the Civil Rights Act authorized the federal government to displace the states in regulating citizens' substantive rights. Maintaining that the states possessed the exclusive power to define and regulate citizens' civil rights, Kerr objected that the bill "rests upon a theory ... [that] asserts the right of Congress to regulate the laws which shall govern in the acquisition and ownership of property in the States, and to determine who may go there and purchase and hold property, and to protect such persons in the enjoyment of it." [195] He warned that this theory denied "the right of the **224** State to regulate its own internal and domestic affairs, to select its own local policy, and make and administer its own laws for the protection and welfare of its own citizens." Kerr concluded with a warning that the Civil Rights Act tended toward the usurpation of the states' police power that its underlying theory portended: "Congress, in short, may erect a great centralized, consolidated despotism in this capital. And such is the rapid tendency of such legislation as this bill proposes." [196]

Senate opponents also warned that the principles underlying the Civil Rights Act authorized Congress to replace the states' civil and criminal laws with federal laws. For example, Senator Garrett Davis maintained that "[t]he principles involved in this bill, if they are legitimate and constitutional, would authorize Congress to pass a civil and criminal code for every State

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12970   Page 614 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

in the Union." [197] He reasoned that if Congress had the power to require the states to adopt racially uniform laws relating to civil rights and criminal penalties, then it had "the power to occupy the whole domain of local and State legislation." [198] The power Congress attempted to exercise in enacting the Civil Rights Act went much further, Davis warned: "If this congressional power exists to the extent that it is attempted to be exercised in this bill, it is without limit except by congressional discretion and forbearance." [199] Expressing the same view, President Andrew Johnson vetoed the Civil Rights Bill, among other reasons, because its provisions

> interfere with the municipal legislation of the States, with the relations existing exclusively between a State and its citizens, or between inhabitants of the same State--an absorption and assumption of power by the General Government which, if acquiesced in must sap and destroy our federative system of limited powers, and break down the barriers which preserve the rights of the States. It is another step, or rather stride, toward centralization
> **\*225** and the concentration of all legislative power in the national Government. [200]

Opponents thus acknowledged that the theory of constitutional authority proponents argued to support the constitutionality of the Civil Rights Act was a recognition of Congress's plenary power to define, confer, enforce, and protect citizens' civil rights. They therefore argued that the statute usurped the states' sovereign powers reserved to them by the Tenth Amendment. [201]

Significantly, not a single supporter of the Civil Rights Act denied opponents' warnings that its proponents' understanding of Congress's powers to protect citizens' civil rights gave Congress the power to supplant the states in the administration of justice. Nevertheless, supporters did expressly deny that they intended to exercise Congress's plenary power to enforce citizens' rights to the complete annihilation of the states' police power. To the contrary, they expressly stated that they intended to preserve the states' police powers. "The declaration of citizenship does not confer any right the exercise of which on their part cannot be restrained by a State Legislature so as to protect the general peace and welfare of the States. I am sure of that." [202]

This view was echoed outside of Congress. Thus, the New York *Evening Post* responded to President Johnson's veto of the Civil Rights Bill in an editorial stating that Congress did not "usurp the power of the local legislature to prescribe in what manner the rights of person and property shall be secured." [203] Elaborating, the editor explained that Congress did not declare "by what rules evidence shall be given in courts, by what tenure property shall be held, or how a citizen shall be protected in his occupation." Rather, Congress "only says to the states," whatever laws they enact regulating the enjoyment of civil rights, they should "make them **\*226** general; make them for the benefit of one race as well as another." The framers thus drafted the Civil Rights Act to confer and secure civil rights subject to state regulations, which were themselves subject to Congress's power to modify and supplant them as Congress did in the provisions of the Act. They expressly rejected the burden of enacting federal codes regulating areas of private law, such as contract law, property law, and criminal law. [204]

Pragmatism alone would have been a sufficient reason for preserving state police powers over civil rights. The federal government was simply not equipped or prepared to assume completely the administration of civil and criminal justice. [205] In addition, Civil Rights Act proponents were committed to constitutional federalism, a federalism that preserved state police powers but recognized the national government's ultimate responsibility for and power to enforce citizens' civil rights.

Although they expressed their desire to supplant the states' police powers to the extent necessary to secure the civil rights of American citizens, not a single proponent of the Civil Rights Act expressed a desire to prohibit the states from performing these most essential state functions. To the contrary, they clearly expressed their wish that the states exercise concurrent jurisdiction over the rights of U.S. citizens and enforce each citizen's rights impartially. [206] For example, Senator Stewart agreed with opponents that it would be more desirable that the states should "secure to the freedmen personal liberty" but believed that, since they had not, Congress unquestionably possessed the power to do so. [207] It "was the intention of those who amended the Constitution ... to give the power to the General Government to pass any necessary law to secure to the freedmen personal liberty," Stewart argued. "I believe that was the intention. I believe that is within the legitimate scope of legislation." Stewart insisted that Congress "ought and must exercise it if the States will not do justice to the freedmen," and "that was the intention in framing the [Thirteenth] amendment of the Constitution." [208] Thus, if a state failed to provide justice to an American citizen, Congress provided in the Civil Rights Act the justice that the state withheld.

Compendium_Cornell
Page 1290

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12971   Page 615 of
733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

**\*227**  It bears repeating that the framers and supporters repeatedly asserted that Congress possessed plenary power to enact any law to secure the rights of U.S. citizens, but that they also disclaimed any intention of exercising the full scope of this power to the exclusion of state authority over citizens' rights. Declaring civil rights to be among the constitutionally secured rights of U.S. citizens, the Civil Rights Act authorized federal civil remedies against anyone who discriminated against a citizen and thereby violated any of the rights enumerated in section 1.[209]  The statute left the redress of ordinary violations of section 1 rights, such as an ordinary breach of contract claim or the prosecution of a crime not motivated by a discriminatory animus, to the states' systems of civil and criminal justice on the assumption that the states would give appropriate relief. The framers sought to compel state officials and judges to provide impartial justice by imposing criminal penalties on those who did not.[210]  However, if a state court failed to redress an ordinary civil claim or to prosecute an ordinary crime and thereby denied to a party one of the civil rights enumerated in section 1, or, more broadly, if a state failed to enforce any legal right recognized by state law or failed to bring criminal offenders to justice, and the failure violated a citizen's section 1 civil rights, the Civil Rights Act authorized the federal courts and legal officers to supplant the states and to administer the civil or criminal justice that the states denied.[211]

Representative Wilson explained this enforcement structure when he asserted the *Prigg*[212] Court's theory of the plenary power and duty of Congress to enforce a citizen's constitutional rights, stating that, "in relation to the great fundamental rights embraced in the bill of rights, the citizen being possessed of them is entitled to a remedy" whenever they are violated.[213]  Wilson then noted that the states were depriving American citizens  **\*228**  of the rights guaranteed by the Bill of Rights. "When such a case is presented can we not provide a remedy?" he asked rhetorically. He answered, "Who will doubt it? ... The power is with us to provide the necessary protective remedies .... If not, from whom shall they come?" he queried. Adding the principles of the Declaration of Independence to the constitutional theory of *Prigg*, Wilson boomed, "They must be provided by the Government of the United States, whose duty it is to protect the citizen in return for the allegiance he owes to the Government." Thus, when U.S. citizens needed the federal government to protect their rights and to remedy their violation, the Civil Rights Act authorized federal courts and law enforcement officers to stand in the place of their state counterparts and to give citizens this civil and criminal justice.

But, if the State administered civil and criminal justice impartially in ordinary cases, there would then be no need for federal intervention or for a federal forum to enforce citizens' civil rights.[214]  Senator Trumbull explained that the states were not dispensing justice impartially, which necessitated congressional action. However, if everyone recognized that black Americans are entitled to the same civil rights as white Americans, Trumbull opined, "and would act upon [this recognition], the States would do it, and there would be no occasion for the passage of the bill."[215]  Since the states were unwilling to secure the rights of all Americans, "and Congress has authority to do it under the [thirteenth] constitutional amendment, is it not incumbent on us to carry out that provision of the Constitution?" Representative Wilson made the same point in the House. Explaining that the states were refusing to protect the rights of some Americans, he declared that "the practice of the States leaves us no avenue of escape, and we must do our duty by supplying the protection which the States deny."[216]

**\*229**  Scholars disagree whether the framers of the Fourteenth Amendment sought to enforce substantive rights or merely equality in state-conferred rights.[217]  Most studies approach this question with the assumption that the framers considered only two alternative courses of action: either the framers intended to supplant state jurisdiction over citizens' rights, or they intended to preserve state jurisdiction.[218]  Scholars have equated the first course of action to enforcing substantive rights and the second to enforcing an equality in state-conferred rights against discriminatory state action.[219]  They have failed to consider a third course of action, namely, that the framers sought to enforce substantive civil rights and to preserve concurrent state jurisdiction over citizens' substantive rights, though subject to congressional oversight and modification.

This Article argues that the framers adopted this third approach and asserted plenary power to enforce substantive rights of U.S. citizens and, at the same time, preserved state concurrent power over those rights, albeit a significantly diminished state power. The Article maintains that this third alternative most accurately explains the framers' understanding of the Civil Rights Act. The least one can say with certainty is that proponents of the Civil Rights Act said that they intended to assert Congress's power to enforce the substantive rights of all American citizens, whites as well as blacks, that they asserted Congress's power to enforce substantive civil rights, and that opponents acknowledged and objected that supporters exercised such plenary power in enacting the Civil Rights Act. The enforcement structure established in the remaining sections of the Civil Rights Act clearly

Compendium_Cornell
Page 1291

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12972   Page 616 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

demonstrates that the framers authorized federal law enforcement officials and the federal courts to administer ordinary civil and criminal justice when Americans were unable to get justice within the states' systems of civil and criminal justice. [220]

Senator Trumbull regarded section 1 as "the basis of the whole bill." [221] Having explained this section, he declared that the only question was: "will this bill be effective to accomplish the object, for the first section will amount to nothing more than the declaration in the Constitution itself unless we have the machinery to carry it into effect." [222] Stating that he intended to make the bill effective in protecting the civil rights of all Americans, Trumbull explained that "[t]he other provisions of the bill **\*230** contain the necessary machinery to give effect to what are declared to be the rights of all persons in the first section." [223]

### B. Section 2: Violating Citizens' Rights Is Made a Federal Crime

Like the framers of the Fugitive Slave Act of 1850, the framers of the Civil Rights Act of 1866 imposed criminal sanctions on persons who violated the civil rights secured by section 1. Asserting that "A law is good for nothing without a [criminal] penalty," Senator Trumbull characterized section 2 as "the valuable section of the bill." [224] However, Congress did not exercise its full penal powers, for section 2 limited federal criminal sanctions to civil rights violations committed under color of law or custom and motivated by racial animus. Viewed from the perspective of the twenty-first century, section two establishes that one of the remedies the framers of the Fourteenth Amendment adopted to correct racially discriminatory state action was to compel state judges and law enforcement officials to enforce federally secured civil rights by threatening them with criminal prosecution should they fail to do so.

This penal section defined two federal crimes against citizens' civil rights. The first provided that "any person" who subjected or caused to be subjected "any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act" was "guilty of a misdemeanor," but only if he acted "under color of any law, statute, ordinance, regulation, or custom" and because the person whose right was being deprived had been "held in a condition of slavery or involuntary servitude ... or by reason of his color or race." [225] The second crime consisted of imposing "different punishments, pains, or penalties" on any such persons. [226] These crimes were punishable by a fine of up to $1,000 or imprisonment for up to one year, or both, at the discretion of the court. [227]

### C. Congress Asserts Plenary Power To Punish Civil Rights Violators While Preserving Concurrent State Police Powers

Although the drafters of the Civil Rights Act limited criminal sanctions to persons who acted under color of law or custom and out of racial animus, they asserted that Congress possessed plenary power to redress violations of citizens' rights by imposing criminal sanctions on anyone who violated a citizen's civil rights. [228] Referring to section 2, Senator Trumbull **\*231** explicitly declared that "[t]he right to punish persons who violate the laws of the United States cannot be questioned." [229] Indeed, he argued that, under the Thirteenth Amendment, "we have a right to pass any law which, in our judgment, is deemed appropriate, and which will accomplish the end in view, secure freedom to all people in the United States." Trumbull explained that criminal penalties would stop civil rights violations when everyone understands "that any person who shall deprive another of any right or subject him to any punishment in consequence of his color or race will expose him to fine and imprisonment." But, Senator Trumbull contended, it was not necessary to prosecute all wrong-doers, but only to prosecute a few, particularly the leaders of local communities, to put an end to the racially motivated civil rights violations that pervaded the southern states after the Civil War. [230]

Not a single supporter of the Civil Rights Bill denied that Congress possessed the plenary penal powers that its principal author attributed to Congress. Indeed, opponents argued that the bill represented the exercise of such plenary power. [231]

That there was little debate on this issue is understandable for at least two reasons. First, it had been long established that Congress has implied power to impose criminal penalties on anyone who violates federal statutes. [232] Second, the criminal penalties of section 2 were intended principally **\*232** to punish state judges and law enforcement officers who failed to enforce the Civil Rights Act over racially discriminatory state laws and legal process. To the Civil Rights Act's opponents, punishing

Compendium_Cornell
Page 1292

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12973   Page 617 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

state judges and legal officers for enforcing state laws was an intolerable and outrageous invasion of states' rights and the independence of state courts. [233]

The drafters of the bill restricted its criminal penalties to persons who acted under color of law or custom for two reasons. They sought to preserve state jurisdiction over criminal justice, so they brought within the federal system of criminal justice only those violations of civil rights that were not being redressed and were not likely to be redressed within the states' criminal justice systems. One of their strategies was to distinguish federal criminal violations of citizens' civil rights from ordinary crimes punishable under state criminal codes by limiting federal criminal penalties to civil rights violations committed under color of law or custom and motivated by racial animus. [234] However, the framers of the Fourteenth Amendment also conferred federal original jurisdiction to try ordinary crimes and civil suits whenever a party was unable to enforce or was denied under state law a civil right secured in section 1. [235]

Senator Trumbull explained that "the words 'under color of law' were inserted as words of limitation, and not for the purpose of punishing persons who would not have been subject to punishment under the act if they had been omitted." [236] Thus, any person punishable under section 2 would already have been subject to federal criminal punishment. Section 2 did not bring the civil rights violator within federal criminal jurisdiction, because the violation of a citizen's civil rights secured by section 1 would have subjected the violator to whatever federal penalties Congress chose to impose. Rather, section 2 limited federal criminal penalties to only a portion of potential civil rights violators upon whom Congress had the constitutional authority to impose criminal penalties. [237]

 *233  Representative Wilson similarly explained in the House of Representatives that the Civil Rights Bill was not intended to supplant the states in the administration of criminal justice. Representative Benjamin F. Loan asked Wilson "why the [Judiciary] committee limit[ed] the provisions of the second section to those who act under the color of law. Why not let [the provisions] apply to the whole community where the acts are committed?" Wilson responded, "We are not making a general criminal code for the States." [238] Clearly, the drafters and supporters of the Civil Rights Act sought to preserve state criminal jurisdiction and imposed federal criminal sanctions for civil rights violations only when, in their estimation, federal penalties were needed.

The nation's experience with the Fugitive Slave Acts demonstrated that federal courts and officials were insufficient to enforce citizens' constitutional rights effectively and that state and local courts and officials played an essential role in administering civil and criminal justice. [239]  *234  One, or at most two federal judges sat in a state, and U.S. attorneys and marshals were similarly limited in number. [240] This was one of the reasons Chief Justice Taney dissented from the Court's holding in *Prigg v. Pennsylvania* that the states did not possess constitutional authority to enforce the Fugitive Slave Clause. [241] Congress attempted a partial solution to the problem of insufficient federal courts and legal officers in the 1850 Fugitive Slave Act by authorizing federal judges to appoint U.S. commissioners with powers of justices of the peace to enforce the 1850 statute. [242] Even then, the federal judicial system sometimes remained inadequate to enforce the Fugitive Slave Act without the assistance of the United States military, the state militia, and local law enforcement personnel. [243] The framers of the Civil Rights Act wisely sought to preserve the jurisdiction and role of state systems of criminal justice as they crafted a system of federal criminal justice which included the enforcement structure originally established under the Fugitive Slave Act of 1850. [244]

### D. Congress Legislates To Compel State Judges and Law Enforcement Officials To Enforce Federal Civil Rights

On the other hand, state and local judicial and executive officials in the southern states were failing to enforce and often were denying citizens' civil rights. The failure of state and local legal institutions to protect citizens' civil rights presented the drafters of the Civil Rights Act with the second practical problem they attempted to resolve and the second  *235  reason they limited section 2's criminal penalties to persons acting under color of law or custom and out of racial animus: They wanted to compel state judges and law enforcement personnel to enforce the civil rights of all Americans, black as well as white, Unionists as well as southern sympathizers. However, the Supreme Court in *Prigg v. Pennsylvania* and *Kentucky v. Dennison* had ruled that Congress lacked the constitutional authority to compel state officials to enforce constitutional rights and to perform duties that the Constitution imposes on them. [245] According to these precedents, Congress could not command state officials to protect and enforce the civil rights of U.S. citizens. In particular, state judges were free to ignore the Civil Rights Act and to enforce racially discriminatory state statutes and customs with impunity. [246]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12974   Page 618 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Opponents of the Civil Rights Act protested that punishing state officials who performed their duties under state laws, even laws that violated the Civil Rights Act, was a gross violation of Supreme Court precedents and of the states' sovereign powers. Representative Eldridge, for example, asserted that the purpose of section 2 "was to control the judge and prevent his executing the law of the State by his judgment when it operated peculiarly upon the freedman and therefore enforce the execution of the Federal law." [247]  In an apparent reference to *Prigg* and *Dennison*, he stated that "[t]he question has been decided over and over again that [Congress] cannot enforce [its laws] through a State judge." Echoing Senator Trumbull, Representative Thayer replied that Congress had the authority to punish "anybody" who violates its statutes "under color or authority of any kind." The bill "imposes on a judge [no] more than to refrain from violation of the law." Eldridge was unmollified by Thayer's protests. Instead, Eldridge insisted, section 2 was an unconstitutional invasion of and attack upon the independence of the states' judiciary.

In the Senate, Garrett Davis of Kentucky also objected that section 2 violated state sovereignty, usurped state police powers, and undermined the independence of the state judiciary. He argued that judicial "authority holds that the States are sovereign, 'especially in regard to'" traditionally local matters such as property, family law, and "'the protection of the persons of those who live under their jurisdiction.'" [248]  Imposing criminal penalties on state judges and other officials for failing to enforce the Civil Rights Act was therefore an unconstitutional intrusion. [249]

The framers freely acknowledged that their intention in section 2 was to compel state officials, especially state judges, to enforce the rights  **236**  of black citizens by imposing criminal penalties on those officials if they violated the Civil Rights Act in their official capacities. Senator Trumbull defended the bill's imposition of criminal penalties on state judges and executive officers on the principle that anyone who violates a federal law subjects himself to criminal prosecution, and the fact that he committed the violation while acting under color of state law or authority was no defense. [250]  Denying Congress this power "places officials above the law," Trumbull admonished. He asserted that Congress possesses the power to punish anyone who violates federal law, even those who violate federal law while acting under color of state law. [251]  Trumbull insisted that Congress may compel state officers to enforce constitutional rights secured by federal statute by subjecting them to criminal sanctions if they did not. The doctrine that Congress may not punish those who violate federal law when acting under color of state authority, Trumbull maintained, is "a doctrine from which the rebellion sprung, and in entire harmony with the declaration of Mr. Buchanan, that there was no power to coerce a State." [252]

In the House, Representative Wilson offered a similar explanation of the criminal penalties of section 2. [253]  When asked by Representative Loan why section 2 punishes only "those who act under color of law," Wilson explained that the local laws of the states discriminated in reference to civil rights. Penalties were necessary, Wilson asserted, implying the framers' intention of forcing state officials to comply with the civil rights guarantees of the Civil Rights Act: "A law without a sanction is of very little force."

Arguing that Congress did not have the constitutional authority to impose criminal penalties on state officials who failed to enforce constitutional rights without amending the Constitution, Representative John A. Bingham suggested substituting civil liability for section 2's criminal penalties. [254]  While he supported the goal of compelling state legal officers to enforce citizens' constitutional rights, he did not believe that Congress possessed this power without amending the Constitution. He reasoned "that the care of the property, the liberty, and the life of the citizen, under the solemn sanction of an oath imposed by your Federal Constitution, is in the States, and not in the Federal Government." Bingham then declared that his proposed constitutional amendment sought to delegate to Congress the power to compel state officers to enforce the Bill of Rights and to punish them if they failed to do so. Bingham thus proposed an amendment to the  **237**  Civil Rights Bill, striking out all penal sanctions, "and in lieu thereof" giving to "all citizens injured by denial or violation of any of the other rights secured by" the Civil Rights Bill a civil action for damages and double costs. [255]

Representative Wilson rejected Bingham's amendment to the Civil Rights Bill. He retorted that there was no difference in principle between protecting citizens' rights through a civil remedy and through criminal sanctions. [256]  Although, he argued, the principle of Congress's power to provide civil remedies and criminal remedies was the same, Wilson saw a significant practical difference between the costs and effectiveness of civil and criminal remedies. Criminal penalties shifted the cost of rights enforcement to the federal government, thus affording effective protection to "the humblest citizen." Under Bingham's suggested civil remedies, "the citizen despoiled of his rights, instead of being properly protected by the Government, must press his own way through the courts and pay the bills attending thereon. This may do for the rich, but to the poor, who need

Compendium_Cornell
Page 1294

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12975   Page 619 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

protection, it is a mockery." Decrying the inadequacy of "a few dollars in the way of damages," even "against a solvent wrong-doer," to protect constitutional rights, Wilson insisted that the government had a duty "to provide proper protection, and to pay the costs attendant on it."

Wilson expected the House to vote for the Civil Rights Bill, either with or without Bingham's amendments, and so Wilson

> shall at least have the consolation of knowing that this intelligent House accepts the conclusion that the Committee on the Judiciary arrived at--that all these rights belong to the citizen and should be protected, the only difference between us being that the committee insists that the protection should be extended at the cost of the government, while those in favor of the instructions believe that we should compel the citizen to seek his remedy at his own cost. [257]

**\*238**  Nevertheless, it is significant that Bingham stated that he intended his proposed constitutional amendment to compel state officials to enforce citizens' Bill of Rights guarantees and that Congress might do so by imposing civil liability in addition to criminal penalties on those officials who failed to enforce citizens' Bill of Rights guarantees. It is equally significant that Republican leaders and supporters of the Civil Rights Bill expressed their understanding that Congress could compel state officials to enforce federal rights by imposing civil liability and criminal sanctions on them should they fail to do so. [258]

While scholars have understood section 2's "state action" requirement for federal crimes only as a limitation on Congress's power to enforce citizens' rights, [259] the debates on this question demonstrate that it was not so viewed by the Congress that enacted the Civil Rights Act. Opponents of the Civil Rights Act vociferously asserted that imposing criminal sanctions on state officials who violated another person's civil rights when acting under color of law or custom was an unconstitutional expansion of Congress's legislative powers because doing so violated principles of constitutional federalism and Supreme Court precedents by compelling state and local judges and law enforcement officials to enforce federal civil rights. [260] The debate these penalties generated evinces the extraordinary expansion of federal legislative power they represented. [261] **\*239**  Thus, by criminalizing civil rights violations committed by persons acting under color of law or custom, the framers of the Civil Rights Act circumvented or ignored Supreme Court precedents which opponents insisted prohibited Congress from compelling state officials to enforce federal rights and to perform federal duties. Through the threat of criminal prosecution, the Act's supporters sought to compel state judges and law enforcement officials to perform the federal duty of enforcing the civil rights of American citizens.

The federal legal officers who were responsible for enforcing the Civil Rights Act interpreted their legislative duty to include the prosecution  **\*240**  of state and local officials and judges who violated citizens' civil rights. [262] Conscientious officers of the Freedmen's Bureau sought to secure an impartial administration of civil and criminal justice in the South by arresting and prosecuting state and local judges and law enforcement officers for failing to provide blacks and white Unionists with the equal protection of the law. Southern judges were prosecuted for declaring the Civil Rights Act unconstitutional, for enforcing racially discriminatory state laws, for imposing racially discriminatory punishments on black criminal defendants, and for refusing to allow black witnesses to testify, whether their actions were authorized by or were in violation of state rules of evidence. Bureau agents prosecuted state law enforcement officers for failing to act on complaints filed by blacks and unpopular whites. Bureau agents also prosecuted state officers for infringing the rights of blacks to carry firearms and for infringing blacks' rights to be protected against unreasonable searches and seizures. [263] State officials were also subjected to federal prosecution for participating in outrages committed against blacks and for prosecuting white Unionists in harassment suits motivated by political animus. [264]

### E. Congress Punishes Private Individuals Who Violate Civil Rights Under Color of Law or Custom

There is persuasive evidence that the framers of the Civil Rights Act of 1866 also intended to impose section 2 criminal penalties on private individuals. In a variety of ways, private parties violated civil rights under color of law and custom after the Civil War. [265] Black Americans desperately needed federal protection from Southern whites who refused to accept them as free and equal citizens. Supporters emphasized the existence of the black codes and racially discriminatory administration of justice in southern states to demonstrate the need for congressional legislation that recognized and protected the rights of the former

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12976   Page 620 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

slaves. [266] These supporters also referred to the black codes to explain the kind of protection Congress should provide. [267] The Southern black codes were updated  **\*241**  versions of the antebellum slave codes, and they subordinated Southern blacks to white domination under conditions reminiscent of slavery. [268]

**\*242**  However, the black codes were not the only problem, and perhaps they were not the primary problem that Congress needed to address in 1866 because military commanders nullified the codes and ordered their officers to ensure that they were not enforced before the Civil Rights Act was enacted. [269] The Southern states retained the penal codes applicable to slaves except those specifically amended by statute.

An important feature of these Southern black codes is that they legitimated and authorized the practices of Southern whites that subordinated Southern blacks and subjected them to the economic and social control of whites. [270] The black codes gave employers contract rights and methods of enforcing contracts against black laborers that were not available in contracts with white laborers. Further, the black codes gave landowners methods of disciplining black tenants and field hands that they were not legally authorized to use against white tenants and field hands. Black codes authorized employers and landowners, as well as ordinary whites organized into patrols, to enforce an informal, customary system of controls that restricted blacks' freedom to move from place to place. In addition, blacks in the South were denied access to local systems of civil and criminal justice when they sought to redress violations of their rights and punishment for crimes committed against them.

Members of the Thirty-Ninth Congress spoke about these injustices as problems they sought to address and remedy. At the very beginning of the congressional session, for example, Senator Henry Wilson of Massachusetts quoted from a Louisiana vagrancy statute requiring the freedmen, among other things, to "furnish themselves with a comfortable home and visible means of support within twenty days after the passage of this act," on penalty of being arrested and "hired out by public advertisement to some citizen, being the highest bidder, for the remainder of the year in which they are hired." [271] It also required the consent of a freedman's former employer, officially recorded by the parish recorder, before he or she was permitted to change employers. Should his employer die, the freedman was obligated to the deceased's heirs or whoever acquired his property. The statute authorized the employer to enforce these and other provisions, such as a prohibition of general conversation during working hours,  **\*243**  by a fine for disobedience, defined as failure to obey reasonable orders, neglect of duty, and leaving home without permission. All disputes were to be settled by the employer, with a right of appeal to the nearest justice of the peace and two freeholders, one each selected by the employer and laborer. If the laborer should leave the employ during the term of employment, the employer was authorized to have the laborer arrested and returned to his employ to finish the contract. Senator Wilson also cited a Mississippi black code that authorized "any person" to arrest and return "any freedman, free negro, or mulatto" who leaves the employ of his master and collect a fee of $5 plus 10 cents per mile. Private individuals acting under color of these laws violated the Civil Rights Act and thus rendered themselves criminally liable under section 2. Other supporters of the Civil Rights Bill referred to (and quoted) correspondence among Freedmen's Bureau officials and military officers describing the strategies by which Southern whites subordinated blacks through law and by the actions of private individuals authorized by law and/or custom. Representative William Windom of Minnesota quoted from the correspondence between military officers serving as Freedmen's Bureau agents in the South and General O. O. Howard, the Commissioner of the Freedmen's Bureau. [272] Windom read a letter from a Colonel De Gauss to General Howard concluding that the "'negroes are not yet free'" in some portions of Texas. "'[T]he pass system is still in force, and when a freedman is found at large without a pass, he is taken up and whipped.'"

Lieutenant Stewart Eldridge wrote to General Howard on November 28, 1865 from Vicksburg, Mississippi, informing Howard of a "freedmen's bill" that the Mississippi legislature had just enacted into law. The statute prohibited freedmen from holding, leasing, or renting real estate; it compelled them to marry whomever they were living with and "'to support the issue of what was in many cases compulsory co-habitation'"; it excluded the freedmen's testimony "'in cases all white'"; it authorized mayors and boards of police "'by their sole edict to prevent any freedmen from doing any independent business and to compel them to labor as employes [sic] with no appeal from such decision'"; and it "'gives power to any white citizen over the person of a freedman unknown to any other law, and denies the right of appeal beyond the county court.'" Following the enactment of this statute, Colonel Samuel Thomas, assistant Freedmen's Bureau commissioner in Mississippi, wrote that "'Thousands of acres have been rented from owners of land by freedmen who expected that they would be allowed to cultivate land in this way. They are notified that they must give up their leases by citizens.'" Windom reported that, "In Virginia the laws and customs reduce the negro to vagrancy, and then seize and sell him as a vagrant," evidently to white landowners to work off their punishment for vagrancy. In various states "there are laws compelling  **\*244**  the return of the freedman to his master under the name of employer, and allowing him to be whipped for insolence," Windom recounted.

Compendium_Cornell
Page 1296

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12977   Page 621 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

The conditions these legislators described reflected a socio-legal structure that relied on private actors acting under legal authority and/or following customary practices designed to deny civil liberty to Southern blacks and to subordinate them to white domination. Windom detailed these conditions, sardonically characterizing them as "some specimens of protection which [the Freedmen] get from the civil authorities of the States in which they live." He explained that Southern whites used vagrancy laws to keep Southern blacks in a state of virtual slavery. Southern blacks were prohibited from owning or renting a home and from earning a livelihood, and then they were "arrested and sold as vagrants because they have no homes and no business." Planters conspired to "compel" black field workers "to work for such wages as their former master may dictate," and to "deny" blacks the "privilege" of being hired "to any one without the consent of the master."

In response to civil rights opponents who argued that the condition of Southern blacks did not warrant federal legislation, Windom queried,

> Sir, do you at this late day call the whipping-post and the pass system evidences of liberty? Do you call that man free who cannot choose his own employer or name the wages for which he will work? Do you call him a freeman who is denied that most sacred of all possessions, a home? Is he free who cannot bring a suit in court for the defense of his rights?

With as much sadness as sarcasm, Windom concluded, "Sir, if this be liberty may none ever know what slavery is."


As the sole representative to speak in the House of Representatives following President Johnson's veto of the Civil Rights Bill, Representative William Lawrence of Ohio, a member of the House Judiciary Committee, elaborately reported conditions in the South that necessitated the bill's enactment. Lawrence quoted at length from testimony given before the Joint Committee on Reconstruction, which was in the process of drafting the proposal that became the Fourteenth Amendment, from newspapers, and from correspondence of military commanders in the Southern states. He quoted the Cincinnati *Commercial* reporting that, under the "rigidly enforced" Mississippi vagrancy statute, "the freed slaves are rapidly being reenslaved."[273] Lawrence lamented that "No negro is allowed to buy, rent, or lease any real estate; all minors of any value are taken from their parents and bound out to planters; and every freedman who does not contract for a year's labor is taken up as a vagrant." Lawrence proclaimed that it would be "barbarous, inhuman, infamous" to abandon the former **\*245** slave "to the fury of their rebel masters, who deny them the benefit of all laws for the protection of their civil rights."

The framers of the Civil Rights Act undoubtedly understood the right to the equal protection of the laws as a personal right citizens possessed in relation to private individuals as well as to the government. They certainly expressed their intention of punishing private parties who violated citizens' civil rights while acting under color of law or custom. Senator Trumbull made this clear in describing the penalties as aimed not at "State officers especially, but everybody who violates the law. It is the intention to punish everybody who violates the law."[274]

One of the reasons Senator Garrett Davis of Kentucky opposed the Civil Rights Act was precisely because of the criminal sanctions imposed by section 2 on public officers and on private individuals who acted under color of discriminatory state statutes. Asserting that the right to marry is a civil right secured by section 1 of the Civil Rights Act, Davis argued that, in states such as Kentucky and Illinois that prohibited interracial marriage, "the clerk who refused a license to a negro to marry a white person, the preacher who would not perform the ceremony," as well as "the officers of the law who would enforce its penalties against persons who had violated it, would themselves become criminals, and subject to punishment under this act."[275] Davis argued that because racially discriminatory practices in public accommodations were established by law, ordinances and customs, proprietors who enforced these discriminatory laws and customs on ships and steamboats, in hotels and saloons, in churches and on railroads, would subject themselves to criminal penalties under the Civil Rights Act. Davis objected to the enforcement structure that the bill established "for the benefit of the favored negro race." It "directs the appointment of legions of officers to prosecute [violators] both penally and civilly ... at the cost of the United States," and puts at their disposal "the posse comitatus, the militia, and the Army and Navy of the United States, to execute this bold and iniquitous device to revolutionize the Government and to humiliate and degrade the white population ... to the level of the negro races."[276]

  **\*246** The framers and supporters of the Civil Rights Act discussed a variety of situations in which private individuals infringed citizens' civil rights under color of law and/or custom. In light of the framers' expressed intention of protecting citizens' civil

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12978   Page 622 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

rights from the actions of private individuals, their statements strongly support the view that the "under color of law or custom" qualification of section 2 criminal punishments was not intended to exclude private individuals, but, as the framers said, to distinguish federal crimes from ordinary crimes and explicitly to extend criminal sanctions to include state judges and other state officers, in addition to private individuals.

### F. Section 3: Congress Authorizes a Federal System of Civil and Criminal Justice To Enforce Americans' Civil Rights

Section 3 of the Civil Rights Act prescribed the federal legal process that Representative Wilson said Congress was obligated to provide to citizens who were unable to enforce their rights in the state systems of civil and criminal justice.[277] In section 3, Congress exercised plenary power to remedy civil rights violations by conferring jurisdiction on the federal courts to redress, with civil remedies and criminal punishments, violations of citizens' rights committed by private individuals as well as state and local officials. Additionally, Congress explicitly extended federal legal process and remedies to white persons who were unable to enforce or were denied their civil rights in state courts. Thus, said Senator Thomas Hendricks, the Civil Rights Act

> provides, in the first place, that the civil rights of all men, without regard to color, shall be equal; and, in the second place, that if any man shall violate that principle by his conduct, he shall be responsible to the court; that he may be prosecuted criminally **\*247** and punished for the crime, or he may be sued in a civil action, and damages recovered by the party wronged.[278]

Section 3 of the Civil Rights Act of 1866 provided a federal system of civil and criminal justice and conferred civil and criminal jurisdiction on the federal courts in three distinct situations. First, like the Fugitive Slave Act of 1850, it conferred exclusive criminal and civil jurisdiction on federal district courts to try "all crimes and offences committed against the provisions of this act."[279] This provision conferred exclusive jurisdiction on the federal courts to try all civil actions brought against private parties to remedy violations of the civil rights secured in section 1 and all prosecutions brought under the criminal provisions of section 2.[280]

The other two jurisdictional provisions of section 3 were controversial, extraordinary remedies adopted to redress state action and inaction as well as civil suits filed by private individuals that violated a citizen's civil rights. The second provision conferred concurrent jurisdiction on federal district and circuit courts to try "all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts or judicial tribunals of the State or locality where they may be any of the rights secured to them by the first section of this act."[281] The third provided for the removal of

> any suit or prosecution, civil or criminal, that has been or shall be commenced in any State court against such person [who is denied or cannot enforce rights secured by this act], for any cause whatsoever, or against any officer, civil or military, or other person, for any arrest or imprisonment, trespasses, or wrongs done or committed by virtue or under color of authority derived from this act or [the Freedmen's Bureau Acts], or for refusing to do any act upon the ground that it would be inconsistent with this act.[282]

### **\*248**  G. Congress Confers Original Jurisdiction on Federal Courts To Try Cases Arising Under State Law Whenever a Party Is Unable To Enforce or Is Denied Section 1 Civil Rights in the State

On its face, section 3 authorized the federal courts to supplant state and local courts and to try ordinary state civil actions and criminal prosecutions whenever a party was unable to enforce or was denied a civil right in the state's legal system.[283] For example, in a state that prohibited the testimony of black witnesses in cases involving white parties, section 3 authorized a black party wishing to sue a white party under state law to bring his suit in federal court. This jurisdiction applied in criminal prosecutions as well.[284] Section 3 authorized federal courts to try these civil suits and criminal prosecutions according to federal law, to the extent that federal law provided remedies and penalties applicable to these cases. Where federal law did not provide such remedies and penalties, federal courts were to try these civil and criminal cases according to the common law of the states in which they sat, as modified by the state's constitution and statute law, provided they were not inconsistent with

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12979   Page 623 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

federal law. [285] This provision thus afforded persons a federal forum whenever they were unable to enforce or were denied in the states' systems of civil and criminal justice the civil rights secured by section 1 of the statute. Representative Wilson proclaimed that, since the States were failing to enforce and protect the "personal rights" to life, liberty, and property guaranteed by the Bill of Rights to which "every citizen" is entitled, Congress "must do our duty by supplying the protection which the states deny." [286] Wilson later explained that he meant that Congress possesses the power to remedy violations of these rights, and that "the necessary protective remedies ... must be provided by the Government of the United States, whose duty it is to protect the citizen in return for the allegiance he owes to the Government." [287] Section 3 demonstrates that the framers exercised plenary remedial power and authorized displacement of state systems of justice whenever the federal government was required to enforce citizens' civil   **\*249**   rights because of a state's failure to do so, even to the extent of giving federal courts jurisdiction to try civil causes and criminal prosecutions arising under state law.

### H. Congress Authorizes Federal Courts To Try Criminal Prosecutions Arising Under State Criminal Law

The most startling jurisdiction section 3 conferred on federal courts was the authority to prosecute crimes committed in violation of the criminal laws of the states whenever a party to the "cause" was denied or was unable to enforce in the state courts any of the civil rights secured in section 1. [288] From 1866 to 1871, the federal court in Louisville, Kentucky administered criminal justice to black Kentuckians who were the victims of crimes committed by whites who would have gone unpunished but for the criminal jurisdiction section 3 conferred on the federal courts. [289] Blacks could not get civil or criminal justice in state and local courts because Kentucky rules of evidence prohibited a black person from testifying in any case in which a white person was a party. Since the state's rules of evidence violated section 1 of the Civil Rights Act, the U.S. attorney, Benjamin H. Bristow, simply took over the function of prosecuting whites accused by blacks of having committed crimes against them. [290] The federal court dispensed criminal justice in these cases until the Supreme Court decided *Blyew v. United States*, which restricted section 3 jurisdiction to criminal prosecutions brought against black defendants, and the Kentucky legislature repealed the racially discriminatory testimony statute and permitted black witnesses to testify on the same basis as white witnesses. [291]

### **\*250**  I. Congress Confers Jurisdiction on Federal Courts To Enforce the Civil Rights of Whites as Well as of Blacks

The text of section 3, particularly when understood within the context of conditions in the South immediately after the Civil War, demonstrates that the framers and supporters of the Civil Rights Bill intended section 3 to protect the civil rights of white Unionists and Union soldiers in the South from violations committed by private individuals motivated by political animus. The framers repeatedly expressed the need to protect southern white Unionists from civil rights deprivations. [292] They recounted pervasive incidents of southerners persecuting white Unionists and military personnel by bringing vexatious lawsuits and criminal prosecutions for actions they undertook during the Civil War and under authority of federal law. [293] Former Confederates also intimidated Unionists through acts of violence and economic harassment. [294]

The federal systems of civil and criminal justice provided by section 3 offer some of the strongest evidence that the framers and supporters of the Civil Rights Act intended to secure through federal legal process the substantive rights of all Americans, whites as well as blacks, as rights of U.S. citizens. In defending this section, Representative Lawrence quoted a variety of sources that demonstrated not only that the former slaves, but also Union military personnel and "the white Union population" in the South required federal protection "to secure [their] civil rights." [295]

Lawrence read from a letter to Representative William D. Kelley from Governor W. G. Brownlow of Tennessee, dated March 8, 1866, complaining that rebel candidates for local offices "'have made a clean sweep, turning the Union men out and electing their own candidates ....'" Since President Johnson's policy of lenient pardons, rebels had become more impudent, "'cursing loyal men, and threatening them with shooting or hanging, boasting that they have the President on their side ... [L]oyal men cannot travel on a steamboat, or in a railroad car, without being insulted.'" They "'feel that there is no safety for them, unless Congress shall choose to protect them.'" The governor reported that federal troops had to be dispatched "'to protect loyal men and freedmen, who were fleeing for safety'" to the state capital.

**\*251**  Lawrence quoted the Cincinnati *Commercial* of February 26, 1866, describing "outrages against freedmen" across its southern border in Kentucky and reporting that the criminals boasted of turning out not only blacks but also certain whites.

Compendium_Cornell
Page 1299

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12980   Page 624 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

The newspaper's account of the outrages was based on at least six letters it received from U.S. Representative Samuel McKee of Kentucky detailing outrages in various parts of the state. One horrific case involved "a party of white men" who raided the home of a nearly eighty-year-old free black man, kicked him to death, and robbed him of his money. "'They then raked coals from the fire and putting him on them, roasted first one side, then the other.'" The perpetrators "'also burnt two others nearly to death, putting out the eye of one, and boasted that they had not only intended to drive out the negroes, but intended also to drive out certain whites.'"

Lawrence reported the persecution of white Quakers in North Carolina who were native North Carolinians, but who held pro-Union political views. He quoted at length from the Raleigh (North Carolina) *Progress* of March 21, 1866, which described the intimidation and oppression of Quakers that forced them to leave the state. The Quakers believed they were denied "'that equality and protection which they feel they ought as loyal citizens to enjoy.'" The Raleigh newspaper reported that, "'because they would take no voluntary part in the war against the Government, and hailed with joy the coming of their deliverers, they are driven out from the land of their nativity and the homes of their childhood by persecutions and oppressions heaped upon them by the disaffected ....'" Lawrence went on to state that "'They tell that they are driven out by persecutions, and that they have been hunted down because of their opposition to the war and their devotion to the Union ....'"

Representative Lawrence quoted General George Thomas as saying, in Congressional testimony before the Joint Committee on Reconstruction, that the Union Army should remain in the state "'until the people show that they are themselves willing and determined to execute civil law with impartial justice to all parties.'" [296] If the army and the Freedmen's Bureau were removed from Alabama, the general testified, "'I do not believe the Union men or the freedmen could have justice done them.'" He testified that legal process and other forms of harassment would be used against white Unionists to drive them out of the state. "'Injustice toward [white Unionists] would commence in suits in courts for petty offenses, and neighborhood combinations [would] annoy them so much that they could not reside among them.'" Without a restraining force in the South, state law would force the freedmen "'back into a condition of virtual  **\*252**  slavery.'" "'[T]hey would be compelled by legislative enactments to labor for little or no wages,'" and these laws "'would assume such form that they would not dare to leave their employers for fear of punishment.'"

Representative Broomall listed ways in which private individuals were infringing the civil rights of white Unionists and Union soldiers under color of state law. [297] He proclaimed, *inter alia*, that he was "ready to prove that white men, citizens of the United States, have been, and are now being punished under color of State laws for refusing to commit treason against the United States ...." Union soldiers "have been arraigned in State courts, under State laws, for the crime of shooting down traitors on the field of battle ...." They have been convicted of murder and have been "saved from being hanged ... [only] by the interposition of" the Freedmen's Bureau. Broomall admonished that Southern Unionists "are begging in vain for a redress of wrongs in the courts of the reconstructed South."

### *J. Congress Protects Unionists and Union Soldiers by Authorizing Them To Remove Vexatious Lawsuits and Prosecutions to Federal Courts for Trial*

Representative Lawrence freely quoted the testimony of Major General Alfred H. Terry, Commander of the Department of Virginia, before the Joint Committee on Reconstruction, in which Terry stated that, because of prejudice in Virginia, state and local courts would not afford white Unionists "'any adequate protection for their rights of person and property,'" but that they "'would be persecuted through the machinery of the courts, as well as privately.'" [298]

Former Confederates controlled Southern state governments, and state and local law enforcement officers used their legal systems to sanction and assist individuals in defying federal law and authority and to persecute Unionists and Federal officers, in addition to the freedmen, with violence and economic intimidation. [299] Southerners also filed thousands of  **\*253**  civil lawsuits and criminal prosecutions against Union soldiers in revenge for their actions on behalf of the Union, Federal authority, and emancipation. [300] Harassment suits and prosecutions were especially virulent in Kentucky. [301] For example, Senator Garrett Davis, a leading opponent of the Civil Rights Bill in the Senate, and Representative Brutus Clay, who opposed the statute in the House, sued General John M. Palmer for $10,000 and $40,000 respectively for freeing their slaves. [302] Senator Davis may have had his lawsuit in mind when he argued that the Civil Rights Bill was unconstitutional, among other reasons, because it transferred "all penal prosecutions and civil lawsuits instituted in the State courts for offenses and trespasses committed under color of it into the Federal courts." [303]

Compendium_Cornell
Page 1300

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12981   Page 625 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

### K. Section 3 Authorizes State and Federal Officials To Remove State Prosecutions for Refusing To Enforce Racially Discriminatory State Laws or for Enforcing Federal Law During and After the Civil War

The text of section 3 demonstrates that politically motivated harassment suits and prosecutions were important evils that the Thirty-Ninth **\*254** Congress legislated to remedy. [304] It also shows that the framers of the Civil Rights Act intended to protect state officials who refused to enforce state statutes that were inconsistent with the proposed statute. For example, Representative Wilson introduced the amendment to section 3 that authorized state officers to remove to federal courts civil and criminal cases commenced against them in state courts "for refusing to do any act upon the ground that it would be inconsistent with this act" with the explanation "that this amendment is intended to enable State officers, who shall refuse to enforce State laws discriminating in reference to these rights on account of race or color, to remove their cases to the United States courts when prosecuted for refusing to enforce those laws." [305]

In providing for the removal to federal courts of civil and criminal cases instituted in the state courts, the framers of the Civil Rights Act claimed they were merely emulating the actions the military took to protect freedmen, white Unionists, and military officials from this oppression. Representative Lawrence quoted at length General Ulysses S. Grant's orders directing military commanders to suspend such civil suits and criminal prosecutions in the state courts and to interpose military authority "to protect [freedmen, Unionists, and military personnel] from any penalties or damages that may have been or may be pronounced or adjudged in said [state] courts in any of said cases." [306] To protect the freedmen from prosecutions under vagrancy laws and criminal statutes that imposed different penalties on blacks and whites for the same offenses, military officers removed such cases for trial in federal courts, or to military or Freedmen's Bureau courts where federal courts were not established. [307] Indeed, all cases in which freedmen were unable to enforce their rights in the state courts of South Carolina were to be removed to federal tribunals. [308] The Freedmen's Bureau was particularly important in assisting the freedmen to enforce their labor contracts, because local tribunals refused to do so. [309] The framers of the Civil Rights Act cited the military's actions as precedents for section 3 jurisdictional provisions which replaced state systems of civil and criminal justice with federal systems in situations just like those described and others in order to enforce citizens' civil rights. [310]

### \*255  L. Civil Rights Act Opponents Attack Displacement of State Administration of Justice

Opponents attacked section 3 on federalism grounds, because it completely supplanted state laws in administering civil and criminal justice. Senator Saulsbury, for example, objected that all civil and criminal cases in which a black person might be called as a witness in a state that prohibited black testimony in state courts would have to be tried in federal court. [311] In addition, Saulsbury argued that the removal provision of section 3 "is flagrantly unconstitutional," because it gave to the federal courts exclusive jurisdiction to carry state law into effect. He insisted that this provision violated Article III of the Constitution. [312] He gave as an example an action of ejectment against a free Negro who was forbidden by state law to testify in state court. "In such a case as that, this bill authorizes the circuit or district court of the United States to take cognizance of that action of ejectment, and the state courts are excluded from its consideration." This hypothetical case did not arise under the Constitution, laws, or treaties of the United States, to which "alone the courts of the United States have jurisdiction," Saulsbury insisted. "If there is one principle more clearly recognized than another, it is that the Federal courts will not attempt to administer the State laws, and neither will the State courts attempt to administer the Federal laws." Saulsbury explained further, "a Federal court will not apply to an act a punishment created under the statute of a State. It will not execute the criminal laws of a State, and you cannot confer upon it jurisdiction to do so, because its jurisdiction is defined and limited in the [U.S.] Constitution." [313]

Even worse, section 3's "cause affecting a party" provision potentially deprived state courts of jurisdiction even in cases in which only whites **\*256** are parties. In a hypothetical assault by a white person against another white person in which the victim introduces the testimony of "twenty white men" to prove it, Saulsbury maintained, the defendant, who "does not want to suffer, and at least if he has to suffer he wishes to put it off as long as possible," will call a black witness, who "knows nothing about the case," just to get the case into federal court. [314] Because in his home state of Delaware blacks were prohibited from testifying in such cases unless there were no white witnesses, the judge would bar the black witness from testifying. Under the Civil Rights Act, Saulsbury complained, the case would be transferred to Federal court. Saulsbury concluded, "The passage of this bill is the last act to convert a Federal Government with limited and well-defined powers into an absolute, consolidated despotism." [315]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12982   Page 626 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

In the House, Representative Kerr, speaking for the bill's opponents, agreed that the Civil Rights Act usurped the states' police powers, specifically, the states' power to regulate their own internal affairs, to select their own public policies, to enact and administer their own criminal codes. [316] Kerr insisted that, if Congress had the constitutional authority to enact a law like the Civil Rights Act, Congress could constitutionally dispense with the states entirely. If Congress could determine who could sue and testify in state courts, he argued, it could determine who could not. If Congress could order the transfer of lawsuits and criminal prosecutions from the state courts to federal courts as this bill provided, it could "dispense with the State courts entirely." In fact, Kerr objected, under section 3 "the people of the States are denied all remedy in their own courts, but must seek it at great expense and inconvenience, almost equivalent to its denial, in the Federal Courts." [317] Kerr admonished that Congress was dictating to each state how to protect their citizens' right to life, liberty and property under due process of law and was "usurp[ing] the functions of the State government." In short, if the principles of the Civil Rights **\*257** Bill were sound, Congress "could erect a great centralized, consolidated despotism in this capital." [318]

### M. Civil Rights Act Supporters Defend Replacing State Civil and Criminal Jurisdiction with Federal Civil and Criminal Jurisdiction

The Act's House and Senate supporters not only did not deny opponents' charges that the Civil Rights Act supplanted state civil and criminal process, they defended the incursion into the states' police powers. They asserted that the Civil Rights Act simply authorized federal legal officers to do what President Johnson had authorized the military to do to protect the civil rights of U.S. citizens. [319]

For example, Representative Wilson quoted from military orders issued by General Grant and other field commanders to protect military personnel and white Unionists from retaliatory civil suits and criminal prosecutions and the freedmen from discriminatory prosecutions in the local courts. [320] "By these orders," Wilson summarized, "'State laws,' 'State courts,' municipal ordinances and courts, are crushed and pushed out of the way to make room for the perfect enjoyment by the citizen of a portion of his rights." He noted that these were "some of the very things which this bill proposed to secure through the powerful operations of the courts." Wilson insisted that "we may provide by law for the same ample protection through the civil courts that now depends on the orders of our military commanders."

Senator Trumbull made the same arguments in the Senate to defend Congress's substitution of federal for state civil and criminal process. Trumbull rebutted the President's veto message of the Civil Rights Bill, in which the President objected that section 3 took away from the states the administration of criminal justice as it applied to black Americans in states that denied them any of the rights secured by section 1. [321] The senator argued, in part, that orders issued by military commanders under the President's authority provided the very remedies for civil rights violations that were provided in the Civil Rights Bill. [322] "Adequate remedy can be provided without assailing the independence of the judiciary, says the President," Trumbull remarked. Trumbull read military orders which directed that cases concerning "persons of color" be taken from state and given "'the same rights and remedies accorded to all other persons'" in **\*258** such courts, that judges and other state officials who disobeyed these orders shall be punished, that all laws shall apply equally to all inhabitants in order "[t]o secure the same equal justice and personal liberty to the freedmen as to other inhabitants." Trumbull admonished, "Why, sir, here are the very provisions of this bill embodied in military orders issued under presidential authority." In view of these actions, Trumbull chided, "who is breaking down the barriers of the States, and making strides toward centralization?" [323]

The actions the Union army took to protect the freedmen, white Unionists, and Union soldiers from civil rights violations thus provided the framers and supporters of the Civil Rights Act with another model, in addition to the Fugitive Slave Acts of 1793 and 1850, for enforcement provisions to secure the rights of Americans. [324] The Civil Rights Act authorized federal legal officers and federal courts to displace state systems of civil and criminal justice and to remedy civil rights violations regardless of the source of the violation, not simply to remedy state violations of civil rights. Senator Trumbull explained that, with respect to a black American, federal jurisdiction was not conferred, and a federal cause of action did not arise, simply "because there was on the statute-book of the State a law discriminating against him." [325] If the discriminatory statute or custom "was held valid [the claimant] would have a right to remove [his cause] to a Federal court--or, if undertaking to enforce his right in a State court he was denied that right, then he could go into the Federal court." Thus, it was the violation of the right, not a particular

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12983   Page 627 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

state statute or custom, that was the wrong the Civil Rights Act was directed to remedy. However, judicial enforcement of a discriminatory state statute or custom provided conclusive evidence of the civil right denial.

The framers' remedy for the denial of the equal protection of the laws was to confer jurisdiction on the federal courts to dispense the protection that was being denied. [326] The state denial of a civil right or its failure to enforce the right served as the prerequisite for section 3 federal jurisdiction to try civil and criminal cases arising under state law and those cases removed from the state courts. The state action did not limit the scope of the federal court's subject matter jurisdiction or its remedial powers. That **259** is, Congress did not limit the federal court's jurisdiction or remedial powers to the discriminatory state action. Rather, Congress remedied the civil rights by authorizing the federal courts to adjudicate and decide the substantive issues in the civil suit or criminal prosecution in which the party was unable to enforce or was denied a civil right. [327] The framers of the Civil Rights Act conferred this extraordinary jurisdiction on the federal courts as one of the remedies they adopted to redress civil rights violations attributable to state action or state inaction. This extraordinary civil and criminal jurisdiction was an additional remedy to the exclusive jurisdiction section 3 conferred on federal courts to punish criminal offenses against the statute and to dispense civil remedies to redress violations of the civil rights enumerated in section 1.

Trumbull made this clear when he declared that Congress possessed the constitutional authority under the Thirteenth Amendment to authorize the federal courts to exercise jurisdiction over all cases affecting the freedmen in states where a discriminatory custom or statute prevails, if such jurisdiction were necessary to secure them in their civil rights. Trumbull stated, "I think we have the authority to confer that jurisdiction under the second clause of the [Thirteenth Amendment]. That clause authorizes us to do whatever is necessary to protect the freedman in his liberty." [328] Of course, racially discriminatory statutes and customs would not have authorized white citizens to bring their claims in the federal courts under section 3.

Declaring the government's obligation to protect its citizens' personal rights, Representative Wilson similarly explained the need for the extraordinary civil and criminal jurisdiction Congress conferred on federal courts to provide federal systems of civil and criminal justice which supplanted those of the states. [329] The need arose because state and local judges and executive officials in the southern states were failing to enforce and often were denying citizens' civil rights. If a state should deprive a citizen "without due process of law, of these rights, as has been the case in a multitude of instances in the past, have we no power to make him secure in his priceless possessions?" Wilson queried. "[W]hen such a case is presented, can we not provide a remedy? Who will doubt it? Must we wait for the perpetration of the wrong before acting? Who will affirm this?" Wilson then made clear that the Civil Rights Act authorized federal courts to replace those of the states and dispense the civil and criminal **260** remedies to redress substantive civil rights the states were denying. "The power is with us to provide the necessary protective remedies .... They must be provided by the government of the United States, whose duty it is to protect the citizen in return for the allegiance he owes to the Government." Wilson thus grounded Congress's power and duty to civilly remedy and criminally punish violations of Americans' civil rights in its obligation under the social contract. [330]

Section 3 authorized perhaps the deepest intrusion of federal legal process and displacement of state legal process of any statute Congress has ever enacted. It did not simply confer exclusive jurisdiction on the federal courts to try all civil actions and criminal prosecutions to remedy violations of the civil rights it secured. It conferred jurisdiction on the federal courts to try civil causes of action that arose under state law and to prosecute crimes committed against the penal laws of the states whenever a state failed to enforce or denied any of the civil rights secured by the statute to a party to the civil or criminal cause of action. Significantly, the Supreme Court upheld this section 3 jurisdiction. [331]

### N. Sections 4 through 10: Civil Rights Enforcement Structure Adopted from the Fugitive Slave Act of 1850

The drafters of the Civil Rights Act of 1866 copied most of the rest of the "necessary machinery to give effect to" civil rights protection from the Fugitive Slave Act of 1850. [332]

Like the Fugitive Slave Act of 1850, section 4 of the Civil Rights Act of 1866 created a federal structure to enforce the statute more effectively. It authorized federal judges to appoint U.S. commissioners to enforce the provisions of and the rights secured by the statute. [333] Perhaps **261** more importantly, section 4 imposed a duty on all federal officers, "at the expense of the United States, to institute proceedings against all and every person who shall violate the provisions of this act," and to arrest violators for the purpose of trying them in the appropriate federal court. [334]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12984   Page 628 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Emulating the Fugitive Slave Act of 1850, section 5 imposed the duty on all federal marshals and deputy marshals "to obey and execute all warrants and precepts issued under the provisions of this act ... and to use all proper means diligently to execute the same." If they failed to do so, they were subject to a fine "in the sum of one thousand dollars, to the use of the person upon whom the accused is alleged to have committed the offense." [335]  Congress thus imposed a $1,000 fine payable to the victim of a civil rights violation on federal officials who failed diligently to execute the statute.

Section 5 of the Civil Rights Act of 1866, like section 5 the 1850 Fugitive Slave Act, also authorized federal commissioners "to summon and call to their aid the bystanders or posse comitatus" of the county as may be necessary to perform their duties under the act. The 1866 statute authorized the summoning of a posse comitatus "to insure a faithful observance of" the Thirteenth Amendment. [336]

Section 6 of the 1866 Act was analogous to section 7 of the 1850 Fugitive Slave Act in that it subjected to federal criminal penalties any one who "shall knowingly and wilfully obstruct, hinder, or prevent any officer, or other person" from executing any warrant or process under this act or from "arresting any person for whose apprehension such warrant or process may have been issued." [337]  This section also imposed criminal penalties on any one who "shall rescue or attempt to rescue such person from [federal] custody ... or shall aid, abet, or assist any person so arrested ... to escape from [federal] custody" or anyone who "shall harbor or conceal any person for whose arrest a warrant or process shall have been issued as aforesaid, so as to prevent his discovery and arrest after notice or knowledge of the fact that a warrant has been issued for the apprehension of such person." [338]  This provision was almost identical to section 7 of the  **\*262**  Fugitive Slave Act of 1850, which imposed penalties on anyone who prevented the arrest or harbored, concealed, rescued, or assisted the escape of fugitive slaves. [339]

Section 7 of the 1866 Act provided that federal attorneys, marshals, and deputy marshals were to be paid their fees for services under the Act. [340]  These fees, and the costs of arresting, housing, and feeding prisoners were to be paid out of the United States Treasury. [341]

Section 8 authorized the President of the United States to reassign federal judges and legal officers to locations where they were needed to redress violations of the Civil Rights Act. [342]  Section 9 of the Civil Rights Act authorized the President of the United States to deploy the army, navy, or militia "as shall be necessary to prevent the violation and enforce the execution of this act." [343]  Although the Fugitive Slave Act of 1850 did not have a comparable military provision, it did authorize federal legal officers to remove fugitive slaves by force and at government expense to the states from which they fled if the claimant made out an affidavit that he had reason to believe that the fugitive would be rescued by force. [344]  However,  **\*263**  the Fillmore and Pierce administrations used the U.S. armed services to enforce the Fugitive Slave Act of 1850. [345]  The final section of the Civil Rights Act of 1866 authorized final appeals to the U.S. Supreme Court for all questions of law arising under this statute. [346]

### III. THE FOURTEENTH AMENDMENT INCORPORATES THE CIVIL RIGHTS ACT OF 1866

Having thoroughly debated issues relating to citizenship, citizens' rights, Congress's power to enforce citizens' rights, and the remedies and enforcement structure to secure citizens' rights in the Civil Rights Act debates, there was relatively little debate of these issues when the proposal that became the Fourteenth Amendment was before Congress. Nevertheless, supporters and opponents of both of these measures understood that the framers and proponents of the proposed Fourteenth Amendment intended it to achieve the same objectives as the Civil Rights Act: to secure the fundamental rights of U.S. citizens. The following discussion will show that the members of the Thirty-Ninth Congress understood that section 1 of the proposed Fourteenth Amendment was intended to put the guarantees of the Civil Rights Act of 1866 into the Constitution, thereby ensuring its constitutionality and insulating it against repeal. The Act's provisions, as explained in this Article, demonstrate that Congress exercised plenary legislative power to define and enforce the rights of U.S. citizens when it enacted the Civil Rights Act of 1866, giving federal legal officers and federal judges jurisdiction that displaced that of their state counterparts in administering civil and criminal justice. Because the framers of the Fourteenth Amendment intended it to put the guarantees of the Civil Rights Act into the Constitution and thus ensure its constitutionality, they necessarily understood the Fourteenth Amendment, at a minimum, as a delegation to Congress of the plenary power to define and enforce in the federal courts the substantive rights of U.S. citizens that they had just exercised in enacting the Civil Rights Act of 1866.

Compendium_Cornell
Page 1304

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.12985 Page 629 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

**\*264** *A. Civil Rights Act Debates and the Proposed Fourteenth Amendment*

The original version of the proposed Fourteenth Amendment was worded as a delegation of plenary congressional power to secure the privileges and immunities of U.S. citizens and to secure the equal protection of the rights of life, liberty, and property of all persons. [347] The proposed amendment borrowed language from the Necessary and Proper Clause, the Comity Clause, and the Fifth Amendment and expressly delegated to Congress the "power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." [348] Opponents of the proposed amendment and the Civil Rights Bill argued that the Bingham amendment demonstrated that supporters of these measures believed that Congress did not have the power to enact the statute and that the proposed amendment rendered the statute unnecessary.

The House of Representatives took up the original Bingham amendment immediately before it considered the Civil Rights Bill. Representative Andrew J. Rogers, Democrat from New Jersey, led the opposition. Rogers's comments are especially authoritative, because he was a member of the House Judiciary Committee from which the Civil Rights Bill was reported, and he also served on the Joint Committee on Reconstruction which drafted the proposed Fourteenth Amendment. [349] He noted the equivalence between the two measures even before the House of Representatives took up the Civil Rights Bill. Rogers acknowledged that Bingham introduced his proposal "so to amend [the Constitution] that all persons in the several States shall by act of Congress have equal protection in regard to life, liberty, and property." [350]

**\*265** When the House began debate on the Civil Rights Bill three days later, Rogers maintained that Bingham had offered his proposed amendment to provide Congress with the constitutional authority "to pass this [Civil Rights] bill," because it was intended to grant Congress the power "'to make laws which shall be necessary and proper to secure to the citizens of each State all the privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the right of life, liberty, and property.'" [351] He asserted that the Civil Rights Bill and Bingham's proposed amendment were identical in objectives and scope and that Bingham's amendment authorized all of the remedies and guarantees contained in the Civil Rights Bill: "There is no protection or law provided for in that constitutional amendment which Congress is authorized to pass by virtue of that constitutional amendment that not contained in this proposed act of Congress which is now before us." Rogers claimed that Bingham's amendment implied that the Republican members of the Joint Committee on Reconstruction, including Representative Bingham, believed that a constitutional amendment was necessary to empower Congress to enact the Civil Rights Bill. He claimed that those who supported the Civil Rights Bill were about to enact a statute they knew to be unconstitutional. [352]

Republican supporters of Bingham's proposed amendment, such as Burton C. Cook, Republican from Illinois and member of the House Judiciary Committee, conceded that both measures were intended to protect the freedmen in their civil liberties and that the Bingham Amendment, if adopted, would delegate to Congress the power to enact the Civil Rights Act, but insisted that Congress was empowered to enact the statute even without Bingham's amendment. [353] However, Cook noted that Rogers had opposed Bingham's proposed constitutional amendment, which would have given Congress the power to enact the Civil Rights Act. "[Rogers] is for the protection of these men, but he is against every earthly mode that can be devised for protecting them," Cook chided. [354]

Supporters argued that both the statute and the constitutional amendment were needed to secure citizens' rights. Representative Thayer, for example, explained that Bingham's amendment put the protections afforded by the Civil Rights Act into the Constitution. "I approve of the **\*266** proposition of the gentleman from Ohio, [Mr. Bingham,] in which he offers to put this protection [extended by the Civil Rights Act] substantially into the Constitution of the United States." [355] Although he believed that Congress possessed the legislative authority to enact the Civil Rights Act without Bingham's proposed amendment, Thayer would vote for both the Civil Rights Bill and Bingham's proposed amendment "in order to make things doubly secure."

Bingham, however, argued that Congress did not have the constitutional authority to enact the Civil Rights Act without his proposed amendment. He believed that the Civil Rights Bill and his proposed constitutional amendment sought to achieve the same objective: "to enforce in its letter and its spirit the bill of rights as embodied in [the] Constitution. I know that the enforcement of the bill of rights is the want of the Republic," Bingham opined. [356] However, because of judicial precedents

Compendium_Cornell
Page 1305

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12986   Page 630 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

interpreting the Bill of Rights as limitations upon the powers of Congress, but not upon the states, Bingham argued that Congress did not possess the constitutional power to enforce the Bill of Rights without amending the Constitution, and therefore did not possess the power to enact the Civil Rights Act. He intended to give Congress this very power, as well as the power to compel state officials to perform what Bingham said was their constitutionally imposed duty to enforce the guarantees of the Bill of Rights. [357]

Representative Wilson agreed with Bingham that the Civil Rights Bill and Bingham's proposed constitutional amendment sought to secure to U.S. citizens the rights guaranteed by the Bill of Rights. However, applying the *McCulloch/Prigg* theories of constitutional delegation and interpretation, he argued that Congress could enforce the Bill of Rights without Bingham's constitutional amendment. Wilson insisted that the Bill of Rights secured the rights of life, liberty, and property and the rights incident thereto, that these rights are the civil rights of U.S. citizens, and that their enforcement and protection are therefore within the jurisdiction of the United States. [358]

 **\*267**  Wilson quoted *Prigg v. Pennsylvania* [359] as authority for the theory of Congress's power to enforce the rights secured by the Bill of Rights and to remedy their violation, where Justice Story said that the constitutional guarantee of a right delegates to Congress plenary power to enforce it:

> Now, sir, in relation to the great fundamental rights embraced in the bill of rights, the citizen being possessed of them is entitled to a remedy. That is the doctrine of the law as laid down by the courts. There can be no dispute about this. The possession of the rights by the citizen raises by implication the power in Congress to provide appropriate means for their protection; in other words, to supply the needed remedy. [360]

Thus, both the Republican House leader on the Civil Rights Act, Representative Wilson, and the principal author of the Fourteenth Amendment, Representative Bingham, stated that the proposed constitutional amendment and the Civil Rights Act were intended to achieve the same objective: the federal enforcement of rights secured in the Bill of Rights as rights of United States citizens.

### B. House Debates on the Revised Proposed Fourteenth Amendment

The House of Representatives referred Bingham's original amendment back to the Joint Committee on February 28, 1866. [361] On April 28, after the Civil Rights Act was enacted into law, the Joint Committee, on Bingham's motion, substituted a new section for Bingham's original proposal. The substitute, with a citizenship provision added by Senator Howard on the floor of the Senate, was ratified as section 1 of the Fourteenth Amendment. [362] The text no longer explicitly delegated to Congress the power to enforce citizens' privileges and immunities and their right to the equal protection of the laws. [363] The new version was expressed as prohibitions  **\*268**  upon the states from infringing citizens' privileges and immunities and all persons' rights to life, liberty, and property under due process of law and the right to the equal protection of the law. Nevertheless, the express delegation of legislative power to Congress to enforce the rights secured by section 1, in addition to the power to enforce the other three sections of the Fourteenth Amendment, was moved to a new section 5. [364] The following discussion will show that House members interpreted the new proposed constitutional amendment exactly as they did Bingham's original proposal, and that they understood that the revised amendment incorporated the Civil Rights Act of 1866 and ensured Congress's plenary power to enforce citizens' constitutional rights. [365]

Representative Thaddeus Stevens, Radical Republican from Pennsylvania, co-chair of the Joint Committee of Fifteen on Reconstruction and House floor manager of the proposed amendment, saw no change in Congress's plenary powers to define and enforce citizens' rights between Bingham's original proposed amendment and the revised proposed amendment, and he understood that the final version incorporated the Civil Rights Act of 1866. [366] It is noteworthy that Stevens and other Bingham amendment supporters understood the revised proposed amendment, like Bingham's original proposal, as putting into the Constitution the affirmative guarantees of the Civil Rights Act. Stevens made this assertion on introducing the revised proposal, paraphrasing it as follows: "The first section prohibits the States from abridging the privileges and immunities of citizens of the United States, or unlawfully depriving them of life, liberty, or property, or of denying to any person within their jurisdiction the 'equal' protection of the laws." Stevens interpreted these prohibitions on the states from infringing fundamental rights as

Compendium_Cornell
Page 1306

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12987   Page 631 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

incorporating the Civil Rights Act and as delegating to Congress the plenary power to enact this statute and any other legislation Congress deemed appropriate to protect these rights. This interpretation of the proposed Fourteenth Amendment was analogous to the Supreme Court's interpretation of the Fugitive Slave Clause's prohibitions on the states from interfering with slave holders' right of recapture. [367] Moreover, Stevens equated the guarantees of this proposal to other **269** constitutional guarantees of citizens' rights, such as the Bill of Rights and the Privileges and Immunities Clause of Article IV. [368]

Like the congressional Republican leaders in the Civil Rights Bill debates, Stevens explained the necessity for the constitutional amendment even though the Civil Rights Act had been enacted into law. [369] One of the amendment's purposes, he said, was to prevent a future Congress from repealing the protections afforded to citizens by the Civil Rights Act. Acknowledging that Bingham's proposed constitutional amendment and "the civil rights bill secur[e] the same things," Stevens cautioned that a statute is not as effective a guarantee of individuals' rights as a constitutional amendment, because "a law is repealable by a majority." He predicted "that the first time that the South with their copperhead allies obtain the command of Congress it will be repealed .... This amendment once adopted cannot be annulled without two thirds of Congress. That they will hardly get." [370]

Nor did the revised proposed amendment's opponents see any change in Congress's powers to define and enforce the rights of U.S. citizens. House opponents repeatedly attacked the proposal's supporters for unscrupulously enacting the Civil Rights Act and proposing a constitutional amendment to ensure the statute's constitutionality after the fact. Thus, Representative William E. Finck, Democrat of Ohio, replied to Stevens, stating, "Well, all I have to say about this [first] section is, that if it is necessary to adopt it, in order to confer upon Congress power over the matters contained in it, then the civil rights bill, which the President vetoed, was passed without authority, and is clearly unconstitutional." [371]

Finck's attack brought Republican James A. Garfield of Ohio to the defense of himself and his Republican colleagues who voted for the Civil Rights Act from the imputation that they knowingly acted unconstitutionally. The future President said in rebuttal that section 1 of the proposed amendment was intended to put the Civil Rights Act into the Constitution in order to prevent Finck's party from repealing the statute when they **270** gained control of Congress. [372] Garfield stated that Finck "undertakes to show that because we propose to vote for this section we therefore acknowledge that the civil rights bill was unconstitutional." Denying that this was the reason for Republicans' support of section 1, Garfield asserted that "every gentleman knows [the Civil Rights Bill] will cease to be a part of the law whenever the sad moment arrives which [sic] [the Democratic] party comes into power. It is precisely for that reason," Garfield declared,

> that we propose to lift that great and good law above the reach of the plots and machinations of any party, and fix it ... in the eternal firmament of the Constitution .... For this reason, and not because I believe the civil rights bill unconstitutional, I am glad to see that first section here. [373]

Nevertheless, other House Republicans expressed their intention of ensuring the constitutionality of the Civil Rights Act by adopting the revised proposed constitutional amendment. Representative John M. Broomall, Republican from Pennsylvania, observed that Republicans had "voted for this proposition in another shape, in the civil rights bill." [374] It was because Bingham expressed the view that the statute was unconstitutional without a constitutional amendment delegating to Congress the power to enact it, Broomall explained, that "we put a provision in the Constitution which is already contained in an act of Congress." He noted, moreover, that Democrats voted against the Civil Rights Bill on the ground that it was unconstitutional. Although Broomall said he believed the Civil Rights Act was constitutional as enacted, "yet it is not with that certainty of being right that would justify me in refusing to place the power to enact the law unmistakably in the Constitution. On so vital a point I wish to make **271** assurance doubly sure." [375] He also shared his Republican colleagues' objective of preventing the statute's repeal by a future Congress. [376]

It is significant that no one in the House of Representatives saw any difference in the power delegated to Congress to define and enforce citizens' rights in Bingham's original proposed amendment and the revised proposal that became section 1 of the Fourteenth Amendment. To the contrary, even conservative Republican Representative Henry J. Raymond of New York, who voted to sustain President Johnson's veto of the Civil Rights Bill, explicitly asserted that Bingham's original proposed amendment, the Civil Rights Act, and the revised proposed constitutional amendment expressed the same principle: that declaring persons U.S. citizens entitled them to all of the rights, privileges, and immunities of citizens and delegated to Congress

plenary power to secure citizens' rights. [377]  In the debates relating to the Civil Rights Act, Raymond had defined the principle of the bill as securing to all Americans "whatever rights, immunities, privileges, and powers [that] belong as of right to all citizens of the United States." [378]  Later, in the Fourteenth Amendment debates, he stated that this same principle was again before the House in the form of the proposed constitutional amendment. [379]  Raymond acknowledged that, when this principle was before the House in the form of the Civil Rights Bill, he voted against it because he believed the proposed statute was unconstitutional, and he expressed the belief that many who voted for it also believed it was unconstitutional. [380]  This principle was again before the House in this revised proposal "so to amend the Constitution as to confer upon Congress the power to pass [the civil rights bill]." [381]  Declaring himself "heartily in favor of the main object which that [civil rights] bill was intended to secure," Raymond stated, "I shall vote very cheerfully for this proposed amendment to the Constitution, which I trust may be ratified by States enough to make it part of the fundamental law." [382]

It is because he agreed that these measures were essentially the same that Representative Wilson was skeptical that Raymond voted against the **272** Civil Rights Act because he thought it was unconstitutional. He recalled that, earlier in the session, Raymond had introduced his own bill to protect citizens in their civil rights. [383]  Raymond's bill simply declared that all native-born persons are "'citizens of the United States, and entitled to all rights and privileges as such.'" [384]  Raymond expressly stated that his proposed constitutional amendment would have delegated to Congress the power to secure all citizens in the enjoyment of their citizenship rights and to provide remedies for their violation. It is noteworthy that Raymond's bill and comments reflected the *McCulloch/Prigg* interpretation of Congress's implied power to enforce constitutionally recognized, constitutionally secured, and constitutionally conferred rights. He saw no inconsistency in voting against the Civil Rights Bill because he thought it was unconstitutional and later supporting the principle "of securing to all the rights of citizenship with whatever power we possessed." [385]

Wilson was no more convinced of Raymond's motivation now that the proposed Fourteenth Amendment was before the House than he was in the Civil Rights Act debates. [386]  Wilson insisted that section 1 of the Civil Rights Act embodied "its essential and vital principle. All the other sections [of the Civil Rights Act of 1866] provide merely for the enforcement of the principle embraced in the first section, which was simply a declaration that all persons without distinction of race or color should enjoy in all the States and Territories civil rights and immunities." [387]  The principle of section 1 of the Civil Rights Act, in other words, was that the federal government would guarantee and enforce the civil rights of all Americans.

As he did in the Civil Rights Act debates, [388]  Wilson argued a social contract theory of congressional power to enforce citizens' rights supported by the Supreme Court's decision in *Prigg v. Pennsylvania*. [389]  He stated that Congress possessed the power to confer citizenship and to declare citizens entitled to fundamental rights as such, which included the power to enforce the rights of citizens. [390]  In thus explaining the principle of the **273** Civil Rights Act of 1866 and equating it to the principle of the revised proposed constitutional amendment, Wilson, like the unanimous Supreme Court in its interpretation of the Fugitive Slave Clause in *Prigg*, interpreted the prohibitions against state infringements of individual rights in the revised proposed Fourteenth Amendment as a delegation of plenary power to enforce these rights. Moreover, in defending the criminal penalties the Civil Rights Act imposed on state judges and executive officers who violated citizens' civil rights and arguing that the revised proposed constitutional amendment delegated such power to Congress, Wilson, and through his agreement, Raymond, suggested that the Fourteenth Amendment empowered Congress to compel state officials to enforce federal guarantees of citizens' rights. [391]

It is because the revised version of the proposed constitutional amendment, like Bingham's original proposal, attempted to incorporate the Civil Rights Act into the Constitution that Representative Rogers opposed it. He viewed the Civil Rights Act as a usurpation of the states' police power, and, by incorporating it into the proposed constitutional amendment, all of these measures were attempts by their framers to usurp and consolidate the states' police powers in the federal government. The proposed Fourteenth Amendment "is no more nor less than an attempt to embody in the Constitution of the United States that outrageous and miserable civil rights bill," Rogers stated, "which was a direct attempt to consolidate the power of the States and to take away from them the elementary principles which lie at their foundation." [392]  At the end of the House debate on the revised proposed amendment one month later, Rogers continued to insist that the Joint Committee's proposed amendment "simply embodied the gist of the civil rights bill ... and gave authority to Congress to pass appropriate legislation to enforce the amendment." [393]  He protested that the revised proposed amendment represented a radical change in American federalism, which intruded upon and consolidated in the federal government traditional state police powers, a view shared by his Democratic colleagues. [394]

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12989   Page 633 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

**\*274**  Opponents of the revised proposed amendment also attacked it because it delegated to Congress the power to define and enforce the rights of U.S. citizens that Congress had just exercised in enacting the Civil Rights Act under the Thirteenth Amendment. Thus, Representative Charles E. Phelps of Maryland declared that "The 'privileges or immunities' of citizens are such as Congress may by law ascertain and define." [395]  He "presumed" that "it would be for Congress to define and determine by law in what the 'privileges and immunities' of citizens of the United States consist," just as Congress defined the rights of emancipated blacks under the authority of the Thirteenth Amendment. However, he differentiated between "civil rights" and "privileges and immunities, arguing that the proposed constitutional amendment was a covert Republican scheme to secure Negro suffrage. [396]

### C. Senate Debates on the Revised Proposed Fourteenth Amendment

The Senate did not debate the proposed Fourteenth Amendment until after Congress had enacted the Civil Rights Act of 1866. Additionally, the Senate did not debate Bingham's original proposal, but only considered the revised Bingham Amendment. Nevertheless, like members of the House, senators equated the Civil Rights Act and the revised proposed amendment. Senators noted the connection between these two measures as soon as the Fourteenth Amendment debates began. Senator Jacob Howard, a member of the Joint Committee of Fifteen on Reconstruction, opened debate on the revised proposed amendment on May 30, 1866, introducing an amendment to the revised Bingham Amendment that added the Citizenship Clause. [397]  The citizenship provision stated that "[a]ll persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside." [398]  Howard declined to discuss this citizenship amendment because "the question of citizenship has been so fully discussed in this body [during the Civil Rights Bill debates] as not to need any further elucidation, in my opinion." [399]  He simply asserted, "This amendment ... is simply declaratory of  **\*275**  what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." [400]

Senator Howard's comment explains why Congress gave so little attention to the Citizenship Clause of section 1 of the Fourteenth Amendment, which the framers understood delegated to Congress plenary power to define and enforce the fundamental rights of U.S. citizens. The framers had also amended section 1 of the Civil Rights Act of 1866 with a Citizenship Clause, which defined and conferred citizenship on all Americans, and limited the protective guarantees of section 1 only to citizens of the United States. They said they made these changes precisely to ensure that Congress possessed the power to enact the Civil Rights Act and to ensure that black Americans would be recognized as U.S. citizens and receive the federal protection of their civil rights that the statute provided to all citizens. [401]  Supporters repeatedly proclaimed that U.S. citizenship entitled the individual to the natural rights of all freemen. The citizen being entitled to these rights, Congress possessed plenary power to enforce and protect citizens' rights. [402]

Legislators made the same arguments in the Fourteenth Amendment debates. Thus, Senator John Conness of California supported the addition of the Citizenship Clause to section 1 of the proposed amendment, complaining that "the Mongolian" was a victim of crimes committed with impunity because he was prohibited from testifying in California state courts. [403]  He understood the Citizenship Clause as a declaration that persons born in the United States are citizens of the United States, and, as such, they are "entitled to civil rights." [404]  Conness expressed his satisfaction that it therefore provided "that the children born here of Mongolian parents shall be declared by the Constitution of the United States to be entitled to civil rights and to equal protection before the law with others," as rights conferred by this clause. [405]  Senator James R. Doolittle of Wisconsin, on the other hand, wanted an express exclusion of Native Americans from the Citizenship Clause precisely because "citizenship, if conferred,  **\*276**  carries with it, as a matter of course, the rights, the responsibilities, the duties, the immunities, the privileges of citizens, for that is the very object of this constitutional amendment to extend." [406]  In extending these privileges, immunities, and duties of citizenship, the Citizenship Clause delegated to Congress the authority to enforce these privileges, immunities, and duties. [407]  Doolittle then equated the proposed Fourteenth Amendment and the Civil Rights Act, stating that the Civil Rights Act "was the forerunner of this constitutional amendment, and to give validity to which this constitutional amendment is brought forward, and which without this constitutional amendment to enforce it has no validity so far as this question is concerned." [408]  Senator Henderson, citing various authorities, including Chief Justice Taney's opinion in *Dred Scott*, [409]  argued that U.S. citizenship entitles Americans to "all the personal rights, privileges, and immunities guarantied [sic] to citizens of this

Compendium_Cornell
Page 1309

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12990   Page 634 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

'new Government,''' and, when such citizens "desired to remove from one State to another they had a right to claim in the State of their domicile the 'privileges and immunities of citizens in the several States.'" [410]

However, the Constitution had failed to define citizenship and to specify who is entitled to citizens' rights and privileges. Section 1 of the Fourteenth Amendment was intended to fill this constitutional gap. Thus, Senator Reverdy Johnson acknowledged that "very serious questions have arisen, and some of them have given rise to embarrassments, as to who are citizens of the United States, and what are the rights which belong to them as such; and the object of this amendment is to settle that question." [411] Acknowledging this gap, Representative Joseph H. Defrees of Indiana noted that the Citizenship Clause addressed and resolved this problem.

> Section one indisputably fixes the character of those who are entitled to be regarded as citizens of the United States or citizens of the several States, and secures to all life, liberty, and property, and places all persons upon an equality, regardless of their condition or color, so far as equal protection of the law is concerned. Certainly none can take exceptions to the provisions of this section. [412]

The Citizenship Clause of section 1 of the Fourteenth Amendment, which defined and conferred citizenship on all Americans, ensured the constitutionality **\*277** of the Citizenship Clause of section 1 of the Civil Rights Act of 1866. These legislators expressed the understanding that, in securing the status of all Americans as citizens of the United States, the Amendment's Citizenship Clause delegated plenary power to Congress to define and enforce the rights of every U.S. citizen, thus ensuring the constitutionality of all of the provisions of the Civil Rights Act. The Civil Rights Act debates also demonstrate that both proponents and opponents of the Civil Rights Act expressed the view that, in conferring citizenship, Congress entitled individuals to the rights of citizenship and to the protection of the federal government in enjoying and exercising these rights. [413]

Senator Doolittle also equated Bingham's original proposed amendment, the Civil Rights Act, and the revised proposed amendment that ultimately became the Fourteenth Amendment, concluding that the revised amendment was intended, like Bingham's original amendment, to ensure the constitutionality of the Civil Rights Act of 1866. [414] He maintained that the Joint Committee of Fifteen on Reconstruction feared that the Civil Rights Act was unconstitutional "unless a constitutional amendment should be brought forward to enforce it." When Senator William P. Fessenden, co-chair of the Joint Committee, denied this, Doolittle argued that he had the right to infer that the Joint Committee doubted the constitutionality of the Civil Rights Act. [415]

**\*278** In the debate that ensued from Doolittle's question, Senate supporters of the Civil Rights Act of 1866 and the proposed Fourteenth Amendment, like their counterparts in the House, stated that they intended section 1 of the amendment to put the statute's guarantees into the Constitution in order to protect those guarantees from future repeal and to remove any doubt about the statute's constitutionality. [416] Senator Howard answered Senator Doolittle, explaining that the revised constitutional amendment was intended to put the Civil Rights Act and federal guarantees of citizenship and citizens' rights into the Constitution, placing those rights beyond the possibility of legislative repeal:

> We desired to put this question of citizenship and the rights of citizens and freedmen under the civil rights bill beyond legislative power of such gentlemen as the Senator from Wisconsin [Doolittle], who would pull the whole system up by the roots and destroy it, and expose the freedmen again to the oppressions of their old masters. [417]

The importance of the Citizenship Clause of section 1 of the Fourteenth Amendment for Congress's power to secure the rights of all Americans and the Republicans' political and constitutional theories which defined the scope of this power, has not been fully understood. According to the *McCulloch/Prigg* theory of constitutional delegation, which most congressional Republicans endorsed, in defining and conferring U.S. citizenship on all Americans, the Fourteenth Amendment delegated plenary power to Congress to define and protect citizens' rights. [418] And, in prohibiting the states from infringing the privileges and immunities of U.S. citizens, the Privileges or Immunities Clause implicitly recognized and secured citizens' constitutional rights, which additionally secured citizens' rights **\*279** by creating a self-executing guarantee in addition to delegating plenary power to

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12991   Page 635 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Congress to enforce the rights thus secured. [419] Under the Republicans' theory of constitutional interpretation, the Due Process and Equal Protection Clauses extended constitutional protection to all persons in the U.S., whether citizens or not, and delegated to Congress plenary power to enforce the rights of life, liberty, and property and the right to the equal protection of the laws for all inhabitants of the United States. [420] Section 5 of the Fourteenth Amendment constituted an explicit delegation of plenary power to Congress to enforce citizens' and non-citizens' rights secured by section 1, thus putting Congress's power to enforce constitutionally secured rights beyond cavil. [421]

Pursuant to this understanding of the Fourteenth Amendment, Congress, after the Fourteenth Amendment was ratified, re-enacted the Civil Rights Act of 1866 in section 18 of the Enforcement Act of 1870. [422] Congress also extended to non-citizens the civil rights secured to U.S. citizens in section 1 of the Civil Rights Act of 1866, except the right to property, in sections 16 and 17 of the Enforcement Act of 1870. [423] The Senate Floor Manager of the 1870 Act was Senator William Stewart, one of the Republican senators who voted for the Fourteenth Amendment. Senator Stewart stated that securing the civil rights of non-citizens was simply extending to all American inhabitants the equal protection of the laws along with the means of enforcing this right in federal courts, just as the Civil Rights Act of 1866 had secured the civil rights of U.S. citizens:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that all persons who are in the United States shall have the equal protection of our laws. It extends the operation of the civil rights bill, which is well known in the Senate and to the country, to all persons within the jurisdiction of the United States. [424]

**\*280**  Stewart added, "The civil rights bill, then, will give the United States courts jurisdiction to enforce it." [425]

The framers of the Fourteenth Amendment understood that it authorized Congress to extend to noncitizens the kinds of guarantees of constitutional rights and remedies to redress their violation that the Civil Rights Act of 1866 secured to U.S. citizens. The Civil Rights Act, in turn, evidences the kind of legislation the framers of the Fourteenth Amendment intended to empower Congress to enact to enforce the constitutional rights of all persons. Senator Stewart explicitly stated that the Senate Judiciary Committee deemed it Congress's duty to put into the 1870 Enforcement Act provisions to secure to aliens the Fourteenth Amendment right to the equal protection of the laws. "For twenty years every obligation of humanity, of justice, and of common decency toward [the Chinese] people has been violated ... in California and on the Pacific coast .... If the State courts do not give them the equal protection of the law," he promised, "if public sentiment is so inhuman as to rob them of their ordinary civil rights ... we will protect Chinese aliens or any other aliens ... and give them a hearing in our courts" to ensure they are "protected by all the laws and the same laws that other men are." [426]

**CONCLUSION**

The Civil Rights Act of 1866 offers a critical insight into the framers' understanding of the Fourteenth Amendment and the power they intended to delegate to Congress to remedy violations of constitutional rights.  **\*281**  This Article has shown that the framers of the Fourteenth Amendment enacted the Civil Rights Act of 1866 to enforce and protect the civil rights of U.S. citizens and then incorporated it into the Fourteenth Amendment to ensure its constitutionality, to insulate it against future repeal, and to put its statutory guarantees of civil rights into the Constitution.

The framers of the Fourteenth Amendment modeled the remedies and enforcement structure of the Civil Rights Act of 1866 on the remedies and enforcement structure earlier Congresses adopted to enforce the slaveholders' constitutionally secured property right in their slaves. They legislated within the context of federal constitutional rights enforcement dating back to the nation's founding. Republicans in 1866 asserted theories of constitutional interpretation and delegation of congressional powers that the Supreme Court had articulated in explaining Congress's plenary power to enforce personal rights secured by the Constitution, theories articulated by jurists such as Chief Justice John Marshall, Chief Justice Roger B. Taney, and Justice Joseph Story and derived from *Federalist Papers* authored by James Madison.

The provisions of the Civil Rights Act demonstrate that the framers of the Fourteenth Amendment exercised plenary power to define and enforce the civil rights of U.S. citizens. But, they exercised this plenary power in a way that preserved the states'

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12992   Page 636 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

concurrent power over civil rights. In section 1 of the Civil Rights Act, the framers exercised the plenary power of a sovereign nation and defined and conferred U.S. citizenship on native-born Americans and declared that all U.S. citizens were to enjoy civil rights on the same bases as the most favored citizens enjoyed them. This provision fixed the status of all Americans as citizens and overrode any states' laws to the contrary. In defining some of the civil rights of U.S. citizens as they did, the framers preserved the state laws that regulated the manner in which these rights were enjoyed and exercised, with the exception that states could no longer discriminate on the basis of race, color, or previous condition of servitude. The framers also required that state crimes and punishments be the same for all citizens.

In section 2 of the statute, the framers adopted a criminal remedy for violations of a person's civil rights by making it a federal crime to violate the rights secured in section 1, but, again, they did so in a way that preserved the states' police power over ordinary crimes against persons and property. The framers distinguished federal crimes from ordinary crimes by restricting federal criminal penalties to persons who violated a citizen's civil rights when acting under color of law or custom and out of racial animus. This provision is one of the remedies for state-action violations of civil rights the framers of the Fourteenth Amendment adopted.

In section 3, the framers conferred exclusive jurisdiction on federal courts to remedy violations of the civil rights secured in section 1. Because section 1 secured civil rights on the basis of equal enjoyment rather than absolute enjoyment, federal civil jurisdiction was limited to violations **\*282** that were motivated by some animus the framers regarded as impermissible, such as race, ethnicity, or political affiliation. Thus, ordinary civil violations of civil rights remained within state jurisdiction. Federal criminal jurisdiction was limited to violations motivated by racial animus and committed under color of law or custom. Notwithstanding these restrictions on federal jurisdiction, the framers conferred on federal courts jurisdiction directly to remedy violations of substantive rights.

The framers devised a truly extraordinary remedy for violations of civil rights caused by state action or inaction: they conferred jurisdiction on the federal courts to the exclusion of the states, to administer civil and criminal justice in actions arising under state law. Whenever a party to a civil cause of action, a victim of a crime, or a defendant in a criminal prosecution arising under state law was unable to enforce or was denied by the state any of the rights secured in section 1, the framers granted federal courts original jurisdiction to try the civil action or the criminal prosecution. The remedial structure the framers adopted to remedy violations of civil rights caused by a state's affirmative denial of a section 1 civil right, that is, state action, or by the failure of the state to enforce a section 1 civil right, in other words, state inaction, authorized federal courts and federal legal officers to supplant state courts and state legal officers and to try the underlying action. In addition, the framers provided for the removal to a federal court of any civil or criminal action commenced against a party who was unable to enforce or was denied in the state court a civil right secured by section 1. Federal courts were to try these civil actions and criminal prosecutions according to federal law, unless federal law was not sufficient to furnish suitable civil remedies and criminal punishments. In these situations, federal courts were to try these cases under state law, so long as the relevant state law was consistent with the Constitution and laws of the United States. As this Article has shown, the lower federal courts and the Supreme Court upheld this remarkable assumption by the federal government of the state's authority to enforce its own civil and criminal laws.

The Rehnquist Court has held that the framers of the Fourteenth Amendment intended to withhold from Congress plenary power to define and enforce the substantive rights it secures, and that the framers left to the states the power to enforce Americans' substantive constitutional rights. The Rehnquist Court has also concluded that the Court, not Congress, is authorized to define the rights the Fourteenth Amendment secures and to determine when these rights are violated. In its view, the framers intended to limit Congress's remedial power under the Fourteenth Amendment to correcting unjust state action. The framers thus intended to deprive Congress of the power to remedy violations of Fourteenth Amendment rights caused by the actions of private individuals.

The provisions of the Civil Rights Act of 1866 demonstrate that the Rehnquist Court's understanding of the intent of the framers of the Fourteenth **\*283** Amendment is quite wrong. In enacting this statute, the framers exercised the plenary power that the Rehnquist Court said the framers did not want Congress to have, and they adopted the kinds of remedies to redress violations of substantive rights that the Rehnquist Court said they wanted to leave to the states. Whatever justifications one might advance in support of the Rehnquist Court's state-action interpretation of the Fourteenth Amendment, the intent of its framers is not among them. To the contrary, any justification will have to be strong enough to overcome original intent.

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.12993  Page 637 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

## Footnotes

a1    Professor of Law, Fordham University School of Law. J.D., New York University, 1982; Ph.D., University of Minnesota, 1971; M.A., DePaul University, 1967; B.Sc., Loyola University (Chicago), 1960.

1    Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 615-16 (1842).

2    *See* Act of Feb. 12, 1793, ch. 7, §§ 3-4, 1 Stat. 302-05 (repealed 1864).

3    *See id.*

4    *See id.*

5    *Prigg,* 41 U.S. (16 Pet.) at 615.

6    McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819).

7    THE FEDERALIST NO. 44, at 285 (James Madison) (Clinton Rossiter ed., 1961). Explaining the national government's implied powers, Madison wrote: "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included." *Id.* at 285.

8    *See* THE FEDERALIST NO. 43 (James Madison) (Clinton Rossiter ed., 1961).

9    *See Prigg,* 41 U.S. (16 Pet.) at 626 (Taney, C.J., concurring in part and dissenting in part).

10    521 U.S. 507 (1997).

11    42 U.S.C. § 2000bb (1994).

12    *Boerne,* 521 U.S. at 519.

13    *See id.* at 519-20.

14    42 U.S.C. § 13981 (1994).

15    *See* United States v. Morrison, 529 U.S. 598 (2000).

16    *Id.*

17    *See Boerne,* 521 U.S. at 522.

Compendium_Cornell
Page 1313

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12994   Page 638 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

18    *See id.*

19    *Id.* at 520-21.

20    Contrast Chief Justice Rehnquist's statement of Madisonian first principles in *United States v. Lopez*, in which he prefaced his analysis of Congress's enumerated powers under the Commerce Clause with a statement of "first principles" of constitutional federalism and separation of powers:

      We start with first principles. The Constitution creates a Federal Government of enumerated powers. As James Madison wrote: The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite. This constitutionally mandated division of authority was adopted by the Framers to ensure protection of our fundamental liberties. Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front.

      514 U.S. 549, 552 (1995) (citations and internal quotations omitted). The Court held that even Congress's expressly delegated powers, such as its power to regulate interstate commerce, are not plenary and that Congress must exercise all of its powers, both enumerated and implied, subject to "judicially enforceable outer limits" because "it was the Judiciary's duty 'to say what the law is.'" *Id.* at 566 (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803)). The Court thus subordinated Congress to the Supreme Court and established that Congress must exercise its legislative powers subject to the Supreme Court's supervision. In *Boerne*, Justice Kennedy repeated Chief Justice Rehnquist's theory of separation of powers and constitutional federalism and attributed this "federal design central to the Constitution" to the framers of the Fourteenth Amendment, stating: "Under our Constitution, the Federal Government is one of enumerated powers ... judicial authority to determine the constitutionality of laws ... is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'" *Boerne*, 521 U.S. at 516 (quoting *Marbury*, 5 U.S. (1 Cranch) at 176).

21    *See* U.S. CONST. art. IV, § 2, cl. 3.

22    *Compare* Act of Feb. 12, 1793, ch. 7, §§ 3-4, 1 Stat. 302-05 (repealed 1864) *with Boerne*, 521 U.S. at 515.

23    *See* Fugitive Slave Act of 1850, ch. 60, 9 Stat. 462 (1850) (repealed 1864).

24    *See* Robert J. Kaczorowski, *Fidelity Through History And To It: An Impossible Dream?* 65 FORDHAM L. REV. 1663, 1677-78 n.64 (1997). The Wisconsin Supreme Court was the only court to deny the constitutionality of the Fugitive Slave Act of 1850. *See In re* Booth, 3 Wis. 49 (1854); Booth and Rycraft, *In re* 3 Wis. 179 (1855). However, the United States Supreme Court forcefully upheld the Act's constitutionality and ordered the Wisconsin court's compliance with its decision. United States v. Booth, 59 U.S. (18 How.) 477, 478 (1855); Ableman v. Booth, 62 U.S. (21 How.) 506, 526 (1858).

25    Act of Apr. 9, 1866, ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)) [hereinafter Civil Rights Act of 1866].

26    *See generally* Robert J. Kaczorowski, *The Supreme Court and Congress's Power to Enforce Constitutional Rights: An Overlooked Moral Anomaly*, 73 FORDHAM L. REV. 153 (2004).

27    U.S. CONST. art. IV, § 2, cl. 3.

28   *See* Act of Feb. 12, 1793, ch. 7, §§ 3-4, 1 Stat. 302-05 (repealed 1864).

29   *See id.* § 3.

30   *See id.* § 4.

31   The Fugitive Slave Clause provides:

> No person held to Service or Labour in one State, under the Laws thereof, escaping into another, shall, in Consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

U.S. CONST. art. IV, § 2, cl. 3.

32   *Id.*

33   *Id.*

34   41 U.S. (16 Pet.) 539, 539 (1842).

35   *Id.* at 612. Today, originalism, as a theory of constitutional interpretation, is generally invoked by constitutional and political conservatives to limit the constitutional powers of the federal government and to restrict the scope of constitutionally protected rights. *Compare* United States v. Lopez, 514 U.S. 549, 549 (1995), City of Boerne v. Flores, 521 U.S. 507, 507 (1997), *and* United States v. Morrison, 529 U.S. 598, 598 (2000), *with* Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 539 (1842).

36   *Prigg*, 41 U.S. (16 Pet.) at 611.

37   *Id.* at 612.

38   *Id.* at 613.

39   U.S. CONST. art. IV, § 2, cl. 3.

40   *Prigg*, 41 U.S. (16 Pet.) at 615.

41   *Id.*

42   *Id.*

43   *See McCulloch*, 17 U.S. (4 Wheat.) 316, 316 (1819); *supra* note 7.

44   *See Prigg*, 41 U.S. (16 Pet.) at 619.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12996   Page 640 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

45    *See id.* at 616; THE FEDERALIST NO. 44, at 285 (James Madison) (Clinton Rossiter ed., 1961). Supporters of the Civil Rights Act of 1866 quoted this passage from *Prigg* in arguing that Congress possessed the constitutional authority to protect the civil rights of U.S. citizens. *See infra* notes 97-99 and related commentary. Contrast Chief Justice Rehnquist's articulation of Madisonian first principles in United States v. Lopez, 514 U.S. 549, 552 (1995); *supra* note 20.

46    Article III, section 2 provides that: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority ...." U.S. CONST. art. III, § 2, cl. 1.

47    *See Prigg*, 41 U.S. (16 Pet.) at 616 (quoting U.S. CONST. art. III, § 2, cl. 1).

48    Although it was unanimous in Justice Story's interpretation of the Fugitive Slave Clause and its delegation to Congress of plenary power to enact the Fugitive Slave Act of 1793, the Court divided six to three on the questions of whether Congress's power to enforce the Fugitive Slave Clause was exclusive and whether state and local courts were obligated to exercise the jurisdiction that section 3 of the Act conferred on them to enforce the federal right. *See id.* at 621-25; *id.* at 627 (Taney, C.J., concurring in part and dissenting in part); *id.* at 635-36 (Thompson, J., concurring in part and dissenting in part); *id.* at 636 (Baldwin, J., concurring in part and dissenting in part); *id.* at 648-49 (Wayne, J., concurring in part and dissenting in part); *id.* at 650 (Daniel, J., concurring in part and dissenting in part); *id.* at 673 (McClean, J., concurring in part and dissenting in part).

49    *See* Jones v. Van Zandt, 46 U.S. (5 How.) 215, 229 (1847); Ableman v. Booth, 62 U.S. (21 How.) 506, 508 (1859).

50    *See Prigg* at 616.

51    *Prigg*, 41 U.S. (16 Pet.) at 626 (Taney, C.J., concurring in part and dissenting in part).

52    *Id.*

53    *Id.*

54    *See id.* at 627 (Taney, C.J., concurring in part and dissenting in part).

55    *Id.*

56    *See id.* at 627-28.

57    *Id.* at 628.

58    *Id.*

59    *Id.* at 629.

60    U.S. CONST. art. I, § 10, cl. 1 provides that "[n]o State shall ... pass any ... law impairing the Obligation of Contacts."

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12997   Page 641 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

61    U.S. CONST. art. IV, § 2, cl. 1 provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

62    Except as otherwise noted, the following discussion is taken from *Prigg*, 41 U.S. (16 Pet.) at 629 (Taney, C.J., concurring in part and dissenting in part).

63    *Id.*

64    *Id.* at 618.

65    *See* McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819).

66    *See Prigg*, 41 U.S. (16 Pet.) at 618.

67    *See id.* at 618-19.

68    *Id.* at 631 (Taney, C.J., concurring in part and dissenting in part).

69    *Id.* at 632.

70    Fugitive Slave Act of 1850, ch. 60, 9 Stat. 462 (1850) (repealed 1864).

71    *See id.*

72    *See* Allen Johnson, *The Constitutionality of the Fugitive Slave Acts*, 31 YALE L.J. 161, 181-82 (1921).

73    Fugitive Slave Act of 1850 §§ 1, 4.

74    Except as otherwise noted, the following account is taken from *id.* § 5 at 9 Stat. 462-63.

75    *Id.* § 9 at 9 Stat. 465.

76    *Id.* § 7 at 9 Stat. 464. The 1850 statute imposed criminal sanctions on any one who knowingly and willingly hindered the claimant from seizing the fugitive slave, who rescued or attempted to rescue the fugitive slave, who aided, abetted or assisted the fugitive slave to escape, or who harbored or concealed the fugitive slave. *See id.* On conviction, the defendant was subject to a fine of up to $1,000 and imprisonment for up to six months. *See id.*

77    *See id.*

78    *See id.* Section 7 provided that persons who prevented or hindered the arrest of a fugitive slave, or who rescued or attempted to rescue a fugitive slave, or who aided a fugitive slave in escaping, or who harbored or concealed a fugitive slave, would "forfeit and pay, by way of civil damages to the party injured by such illegal conduct," in addition to the criminal penalties it imposed. *See id.*

Compendium_Cornell
Page 1317

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12998   Page 642 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

79    *See* Act of Feb. 12, 1793, ch. 7, §§ 3-4, 1 Stat. 302-05 (repealed 1864).

80    *See, e.g.*, Oliver v. Weakley, 18 F. Cas. 678, 679 (C.C.E.D. Pa. 1853) (No. 10,502) (awarding damages of $2,800 for twelve escaped slaves, two husbands, two wives and eight children); Ray v. Donnell, 20 F. Cas. 325 (C.C.D. Ind. 1849) (No. 11,590) (awarding damages of $1,500 for one adult woman slave and her four children); Driskell v. Parish, 7 F.Cas. 1095, 1100 (C.C.D. Ohio 1849) (No. 4,088) (fixing value of two escaped slaves at $500); Giltner v. Gorham, 10 F. Cas. 424, 427 (C.C.D. Mich. 1848) (No. 5,453) (fixing value of six escaped slaves at $2,752); Jones v. Van Zandt, 13 F. Cas. 1040 (C.C.D. Ohio 1843) (No. 7,505) (fixing value of escaped slave at $600).

81    *See* Act of Feb. 12, 1793, ch. 7, §§ 3-4, 1 Stat. 302-05 (repealed 1864). Justice Grier, as circuit Justice, ruled that the 1850 Fugitive Slave Act did not repeal the tort action of compensatory damages under the 1793 Fugitive Slave Act and declared that:

In case of a rescue of a captured fugitive, or of an illegal interference to hinder such recapture, when the master had it in his power to effect it, the defendant would be liable, not only to the penalty, but also to pay the full value of the slave thus rescued, and even punitive or exemplary damages, as in other actions for a tort.

Oliver v. Kauffman, 18 F. Cas. 657, 660 (C.C.E.D. Pa. 1850) (No. 10,497).

82    Ableman v. Booth, 62 U.S. (21 How.) 506, 526 (1858) (declaring that the Fugitive Slave Act of 1850 was constitutional "in all of its provisions" and that it was "fully authorized by the Constitution of the United States"). The Court had earlier enforced the 1850 statute in a case in which its constitutionality was not at issue. *See* Norris v. Crocker, 54 U.S. (13 How.) 429, 439-40 (1851) (holding that the "civil damages" of $1,000 provided in section 7 repealed the civil penalty of $500 provided in the Fugitive Slave Act of 1793, but that the damages applied only if the slave was lost. For injuries other than loss of the slave, the slave owner retained his tort action under the 1793 Act.).

83    Congress repealed the Fugitive Slave Acts on June 28, 1864. *See* 3 HENRY WILSON, HISTORY OF THE RISE AND FALL OF THE SLAVE POWER IN AMERICA 395-402 (1872); STANLEY CAMPBELL, THE SLAVE CATCHERS: ENFORCEMENT OF THE FUGITIVE SLAVE LAWWWW, 1850-1860, at 194-95 (1968); THOMAS D. MORRIS, FREE MEN ALL: THE PERSONAL LIBERTY LAWS OF THE NORTH, 1780-1861, at 218 (1974).

84    U.S. CONST. amend. XIII.

85    Sections 1 and 2 of the Thirteenth Amendment state:

Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation.

U.S. CONST. amend. XIII, §§ 1-2.

86    Colfax first announced this objective in a speech he delivered in Washington, D.C., on November 18, 1865, shortly before the organization of the Thirty-Ninth Congress. He declared that

The Declaration of Independence must be recognized as the law of the land, and everyman, alien and native, white and black, protected in the inalienable and Godgiven rights of life, liberty and the pursuit of happiness. Mr. Lincoln, in that Emancipation Proclamation which is the proudest wreath in his chaplet of fame, not only gave freedom to the slave, but declared that the Government would maintain that freedom. We cannot abandon them and leave them defenseless at the mercy of their former owners. They must be protected in their rights of person and property. These free men must have the right to sue in courts of justice for all just claims, and to testify also, so as to have security against outrage

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.12999   Page 643 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

and wrong. I call them free men, not freed men. The last phrase might have answered before their freedom was fully secured, but they should be regarded now as free men of the Republic.

O. J. HOLLISTER, LIFE OF SCHUYLER COLFAX 271 (1886). *See also id*. at 269-70; A. Y. MOORE, THE LIFE OF SCHUYLER COLFAX 284 (1868). Hollister reported the public's reaction to Colfax's speech, much of which was approving. HOLLISTER, *supra* at 272-73. For example, the *Chicago Republican* editorialized that the speech was Colfax's most accurate assessment of the sentiment of the people; the *Indianapolis Journal* described it as "the sentiments of ninety-nine out of every hundred of [the Republican] party, both in and out of Congress," and *The New York Times* acknowledged that Colfax made this speech to announce "the probable course of Congress this coming session. We most heartily endorse all its positions." *See id*. Colfax repeated these themes on being elected Speaker of the House. *See* CONG. GLOBE, 39th Cong., 1st Sess. 5 (1865). The Congressional Globe is now available online at http:// memory.loc.gov/ammem/amlaw/lwcg.html.

87   Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

88   *See* Kaczorowski, *supra* note 26, at 205-06.

89   For example, Senator Lyman Trumbull, the principal author of the Civil Rights Act of 1866 and the bill's Senate floor manager, proclaimed:

Most of [the Civil Rights Bill's provisions] are copied from the late fugitive slave act, adopted in 1850 for the purpose of returning fugitives from slavery into slavery again. The act that was passed at that time for the purpose of punishing persons who should aid negroes [sic] escape to freedom is now applied by the provisions of this bill to the punishment of those who shall undertake to keep them in slavery.

CONG. GLOBE, 39th Cong., 1st Sess. 475 (1866). Trumbull was only one of numerous Senators and Representatives who acknowledged that the Civil Rights Act incorporated the remedies and enforcement structure of the Fugitive Slave Act of 1850. *See* Kaczorowski, *supra* note 26, at 205-06.

90   CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866).

91   *Id*.

92   CONG. GLOBE, 39th Cong., 1st Sess. 1118 (1866).

93   *Id*. (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 420 (1819)).

94   *Id*. (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 420.)

95   *See* Kaczorowski, *supra* note 26, at 212-13.

96   Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539 (1842).

97   Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1294 (Mar. 9, 1866) (quoting *Prigg*, 41 U.S. (16 Pet.) at 615).

98   *Id*. (quoting *Prigg*, 41 U.S. (16 Pet.) at 616.)

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13000   Page 644 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

99    *Id.*

100   *See* Kaczorowski, *supra* note 26, at 223-24.

101   *Id.* at 57-65.

102   Representative Wilson introduced the Civil Rights Bill in the House with the following statement of Congress's authority to enact it:

> If citizens of the United States, as such, are entitled to possess and enjoy the great fundamental civil rights which it is the true office of Government to protect, and to equality in the exemptions of the law, we must of necessity be clothed with the power to insure to each and every citizen these things which belong to him as a constituent member of the great national family.

> CONG. GLOBE, 39th Cong., 1st Sess. 1118 (1866). Wilson elaborated, explaining that Congress's power to enact a bill to enforce and protect the rights of its citizens "depends on no express delegation," that "this power permeates our whole system," because it is a power inherent in the sovereign nature of the federal government. *Id.* at 1119. Congress therefore "possess[es] the power to do those things which Governments are organized to do," such as protect its citizens' rights, and it has the same latitude in selecting the means "through which to exercise this [inherent] power that belongs to us when a power rests upon express delegation." *Id.* Wilson further maintained that Congress's power to enact the Civil Rights Bill emanated from the fact that the rights the bill protected were the natural rights of U.S. citizenship and from the federal government's duty to protect the rights of its citizens--an obligation imposed upon it by the social contract. *See id.* at 1119. Senator Trumbull insisted that Congress had an obligation, not simply the power, to enforce civil rights, an obligation under the social contract proclaimed in the Declaration of Independence, which he maintained was incorporated into the Constitution. *See id.* at 474-75, 573. For additional discussion, see Kaczorowski, *supra* note 26, at 216-24.

103   Civil Rights Act of 1866. ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

104   *See infra* notes 397-426 and accompanying text.

105   Civil Rights Act of 1866, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

106   *Id.* § 3.

107   Civil Rights Act of 1866, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)); Fugitive Slave Act of 1850, ch. 60, 9 Stat. 462 (1850) (repealed 1864).

108   *Id.* §§ 2-3.

109   *Id.* §§ 4-7.

110   *See* City of Boerne v. Flores, 521 U.S. 507, 519 (1997); United States v. Morrison, 529 U.S. 598, 598 (2000). *See also supra* notes 10-16 and accompanying text.

111   U.S. CONST. amend. XIII.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13001   Page 645 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

112    *See supra* note 86 and accompanying text.

113    *See* Kaczorowski, *supra* note 26, at 212-13.

114    Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

115    *See id*. § 1. To qualify for United States citizenship, individuals need only be born in the U.S. and not be subject to a foreign power. Indians who were not obligated to pay taxes were presumed to be subject to a foreign power, their tribes. *See id*. § 1.

116    *See* CONG. GLOBE, 39th Cong., 1st Sess. 527 (1866) (statement of Sen. Hendricks); *id*. at 504 (statement of Sen. Johnson); *id*. at 2764-67 (statement of Sen. Howard); *id*. at 2768-69 (statement of Sen. Wade); *id*. at 1295-96 (statement of Rep. Latham); Edward Bates, *Citizenship*, 10 OP. ATT'Y GEN. 382 (1866); 2 JAMES G. BLAINE, TWENTY YEARS IN CONGRESS 189 (1866); JAMES KETTNER, THE DEVELOPMENT OF AMERICAN CITIZENSHIP 341 (1978).

117    Civil Rights Act of 1866 § 1.

118    *Id*.

119    CONG. GLOBE, 39th Cong., 1st Sess. 475, 527, 574, 600, 1756 (1866) (statements of Sen. Trumbull); *id*. at 504 (statement of Sen. Johnson); *id*. at 523, 576, 595 (statements of Sen. Davis); *id*. at 570 (statement of Sen. Morrill); *id*. at 571 (statement of Sen. Henderson); *id*. at 602 (statement of Sen. Lane of Indiana); *id*. at 1780 (statement of Sen. Yates); *id*. at 1152 (statement of Rep. Thayer); *id*. at 1157 (statement of Rep. Thornton); *id*. at 1266 (statement of Rep. Raymond); *id*. at 1291 (statement of Rep. Bingham); *id*. app. at 156 (statement of Rep. Delano).

120    *Id*. at 475. Some senators and representatives also denied that black Americans were entitled to enjoy the rights of citizens for the same reason. *See, e.g.*, *id*. at 42, 476, 477 (statements of Sen. Saulsbury); *id*. at 499 (statement of Sen. Cowan); *id*. at 576 (statement of Sen. Davis); *id*. at 600-01 (statement of Sen. Guthrie); *id*. at 1123 (statement of Rep. Rogers).

121    *Id*. at 573. *See also infra* notes 137-141 and accompanying text.

122    *See* CONG. GLOBE, 39th Cong., 1st Sess. 1832 (1866) (statement of Rep. Lawrence); *see also infra* note 136 and accompanying text.

123    *See* CONG. GLOBE, 39th Cong., 1st Sess. 1115 (1866).

124    *Id*.

125    *Id*. at 1118.

126    *Id*. at 475.

127    *Id*. at 1781. The Supreme Court also acknowledged the government's power to protect citizens in foreign lands, but it refused to recognize the government's power to protect them within its own jurisdiction. *See* Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 80 (1873). Conservative Republican Representative Henry J. Raymond, who voted against the

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.13002  Page 646 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

Civil Rights Bill but nevertheless proclaimed his support for the federal enforcement of civil rights, acknowledged that Congress had the power to enforce civil rights because these are rights Americans enjoy as U.S. citizens. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1266 (1866) (arguing that the Civil Rights Act entitles "citizens of the United States ... to all the rights, privileges, and immunities of citizenship").

128  *Id*. at 1154.

129  *Id*. at 1154.

130  *Id*. at 1156.

131  *Id*. at 475.

132  *Id*.

133  *Id. Accord, id*. at 1151-53 (statement of Rep. Thayer).

134  *Id*. at 1757 (statement of Sen. Trumbull); *see also id*. at 572 (statement of Sen. Williams) (declaring that the Civil Rights Bill "confer [s] upon all the inhabitants of every State and Territory all the civil rights that belong to a citizen").

135  *Id*. at 1756.

136  *Id*. at 1832.

137  Courts and scholars have failed to appreciate that the framers of the Civil Rights Act and the Fourteenth Amendment understood the Citizenship Clause of the Civil Rights Act as an exercise of Congress's plenary power to define and protect citizens' rights. They have also failed to understand that the framers believed that in conferring citizenship and defining the rights of U.S. citizens, Congress was entitled to exercise plenary power to protect citizens' rights. Thus, according to the framers' understanding, the Citizenship Clause of the Fourteenth Amendment, in itself, constituted a delegation of plenary congressional authority to define and protect the rights of United States citizens. *See* Robert J. Kaczorowski, *Revolutionary Constitutionalism in the Era of the Civil War and Reconstruction*, 61 N.Y.U. L. REV. 863, 912-13 (1986).

138  CONG. GLOBE, 39th Cong., 1st Sess. 1266 (1866).

139  CONG. GLOBE, 39th Cong., 1st Sess. 1861 (1866).

140  CONG. GLOBE, 39th Cong., 1st Sess. 1266 (1866). *See also infra* note 256.

141  CONG. GLOBE, 39th Cong., 1st Sess. 1266 (1866). During the Fourteenth Amendment debates, Wilson referred to Raymond's comments and agreed that:

after declaring all persons born in the United States citizens and entitled to all the rights and privileges of citizens, it would be competent for the Government of the United States to enforce and protect the rights thus conferred, or thus declared .... That being conceded, the power to protect those rights must necessarily follow ... as was laid down in

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13003   Page 647 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

the well-known case of [*Prigg*] vs. The Commonwealth of Pennsylvania, where the Supreme Court declared that the possession of the right carries with it the power to provide a remedy.

*Id*. at 2512.

142    Except where otherwise noted, the following account is taken from *id*. at 597 (statement of Sen. Davis).

143    U.S. CONST. art. IV, § 2, cl. 1.

144    *See* CONG. GLOBE, 39th Cong., 1st Sess. app. at 156-59 (1866).

145    *See id*. app. at 156.

146    *See id*.

147    *See id*. app. at 158.

148    *See id*.

149    *See id*. app. at 156.

150    *See id*. app. at 158-59.

151    *See id*. Representative Delano recommended that Congress adopt Representative John A. Bingham's proposed constitutional amendment, modified to require the states to enforce citizens' fundamental rights and empowering Congress to enforce these rights should the states fail to do so.

I am still of the opinion ... that if we do anything upon this subject at all, we had better do it by taking up the amendment to the Constitution offered by my colleague, [Mr. Bingham] (sic) now postponed till April, modifying it in the form I have suggested, and making it the fundamental law, and then proceeding to secure the rights of these persons in a way in which we shall not be trampling down or endangering the fundamental law of the land.

*Id*. app. at 159.

152    *Id*. app. at 159.

153    Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

154    Corfield v. Coryell, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823).

155    CONG. GLOBE, 39th Cong., 1st Sess, 474 (1866) (statement of Sen. Trumbull).

156    *Id*. at 500.

157    *See* Kaczorowski, *supra* note 137, at 922-26; *see also infra* sources cited in notes 301-305.

158    *See* Kaczorowski, *supra* note 137. at 881-84, 922-26.

159    *See* Robert J. Kaczorowski, *The Enforcement Provisions of the Civil Rights Act of 1866: A Legislative History in Light of Runyon v. McCrary, 98 YALE L.J. 565, 570 (1989).*

160    Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27 (codified as amended at 42 U.S.C. §§ 1981-1982 (2000)).

161    Civil Rights Act of 1866 § 1. Scholars disagree over whether the framers understood section 1 as a guarantee of the rights there enumerated as equal rights under state law or as substantive rights of U.S. citizenship. *See, e.g.*, WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL, DOCTRINE 7-10, 110-23 (1988) (arguing that the framers and supporters were divided in their views and that this question was left unresolved until the United States Supreme Court decided the issue); EARL M. MALTZ, CIVIL RIGHTS, THE CONSTITUTION, AND CONGRESS, 1863-1869, at 66-67 (1990) (arguing that the framers "clearly limited the scope of the [Civil Rights] bill to matters of racial discrimination," leaving the states to determine what rights should be granted to citizens, which created "a potential danger" that "the states could deny the enumerated rights to all citizens, thus defeating the basic purpose of the bill"); John Harrison, *Reconstructing The Privileges or Immunities Clause, 101 YALE L.J. 1385, 1387-97, 1402-04 (1992)* (arguing that the framers intended to secure equality in state-conferred rights); Kaczorowski, *supra* note 159, at 572-74; Kaczorowski, *supra* note 137, at 912-13 (arguing that the framers intended to secure section 1 rights as the substantive rights of U.S. citizenship, but preserving concurrent state jurisdiction over these rights). However, as the Supreme Court's decisions in The Civil Rights Cases, 109 U.S. 3 (1883), Jones v. Alfred G. Mayer Co., 392 U.S. 409 (1968), and Runyon v. McCrary, 427 U.S. 160 (1976) show, the question whether section 1 conferred equal rights or substantive rights does not have to be resolved for the purposes of this Article. *See infra* notes 163-168 and accompanying text.

162    *See* Civil Rights Act of 1866 § 1. This provision also conferred exclusive jurisdiction on federal courts to try all criminal prosecutions as provided in section 2 of the Fourteenth Amendment.

163    109 U.S. 3 (1883).

164    *Id.* at 22. *Accord* United States v. Rhodes, 27 F. Cas. 785, 789 (C.C.D. Ky. 1866) (No. 16,151) (upholding the constitutionality of the Civil Rights Act of 1866 and Congress's power to enforce the civil rights of U.S. citizens on the grounds that the Thirteenth Amendment made the former slaves United States citizens and secured the personal liberty of "every one, of every race, color, and condition" within the United States); United States v. Given, 25 F. Cas. 1324, 1325 (C.C.D. Del. 1873) (declaring that the "thirteenth, fourteenth, and fifteenth amendments of the constitution have confessedly extended civil and political rights, and ... have enlarged the powers of [C]ongress" to enforce these rights).

165    The Civil Rights Cases, 109 U.S. at 22.

166    *Id.* at 20-21.

167    *Id.* at 23.

168    Alfred H. Mayer Co., 392 U.S. at 423-24 (holding that "when Congress provided [in] ... the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citizens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private"). In considering the constitutionality of the present codification of this property right, the Court quoted the Civil Rights Cases and reasserted the constitutionality of the right to property originally secured by the Civil Rights Act, declaring that the fact that it

Compendium_Cornell
Page 1324

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13005   Page 649 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

operates upon the unofficial acts of private individuals, whether or not sanctioned by state law, presents no constitutional problem. If Congress has power under the Thirteenth Amendment to eradicate conditions that prevent Negroes from buying and renting property because of their race or color, then no federal statute calculated to achieve that objective can be thought to exceed the constitutional power of Congress simply because it reaches beyond state action to regulate the conduct of private individuals.

The Court later interpreted guarantees in section 1 of the right to contract in the same way. *See* Patterson v. McLean Credit Union, 491 U.S. 164 (1989), Runyon, 427 U.S. 160, 170-71 (1976).

169   For example, Democratic Senator Willard Saulsbury of Delaware objected that the Civil Rights Act was "one of the most dangerous that was ever introduced into the Senate of the United States," insisting that the Constitution "does not of itself declare, and human ingenuity cannot torture it into meaning that the Congress of the United States shall invade the States and attempt to regulate property and personal rights within the States." CONG. GLOBE, 39th Cong., 1st Sess. 476 (1866). Saulsbury explicitly stated that the Civil Rights Act "assumes jurisdiction over subject-matters of which Congress has no jurisdiction" and "positively deprives the State of its police power of government" by determining who shall hold property within the states, "who shall sue and be sued, and who shall give evidence in its courts" by assuming the function of "securing to the citizen the possession of his person and property within the limits of a State" and the "authority over the judicial tribunals in administration of law in the States," which, Saulsbury complained, was "a denial to the States of their police power of regulation." *Id*. at 478. Senator Cowan agreed and admonished that, if "we have the right to pass such a law as this" under the authority of the Thirteenth Amendment, then "we have a right to overturn the states themselves completely." *Id*. at 499. He later clarified that the bill intervened in the states and determined the relationships of inhabitants to one another and to the government. *Id*. at 604. Senator Davis declared that the Civil Rights Act violated "the theory and principle of our Government," because it purported to "interfere with the local concerns of any state [regarding] all of the rights, privileges, and immunities its citizens shall enjoy and their regulation," observing that it conferred the rights enumerated in section 1 "upon all the inhabitants of the United States, of every race and color;" that it interposed federal jurisdiction over the administration of justice, usurping "the reserve [sic] rights of the States, ... their power to legislate for their own domestic concerns, in relation to their own people, the punishment of their own people, the property and estates and transactions and contracts of their own people." *Id*. at 595-98. Passage of the Civil Rights Act would "utterly subvert our Government," Davis warned, because it was "wholly incompatible with its principles, with its provisions, or with its spirit." *Id*. Should it become law, the Civil Rights Act would produce "a perfect and despotic central consolidated Government." *Id*. "Congress by this bill are presuming precisely the power," Davis admonished, "to establish a civil and penal code for all the states of the Union," concluding that section 1 "is a great stride towards the consolidation of all power by Congress than has ever before been taken or conceived." *Id*. at 1414, 1415. Senator McDougall endorsed the views expressed by Senators Cowan and Guthrie. *Id*. at 604.

Opponents in the House of Representatives expressed similar views. Representative Rogers, for example, objected that the Civil Rights Act was intended to extend to black Americans "all the rights to life, liberty, and property ... [and] every privilege that ought to be guaranteed to any man in the United States for the protection of his life, his liberty, and his property," but he denied that Congress had the authority "to enter in the domain of a State and interfere [in this way] with internal police, statutes, and domestic regulations." *Id*. at 1120. Rogers claimed that the Civil Rights Act "would destroy the foundations of the Government as they were laid and established by our fathers." *Id*. Representative Eldridge characterized the Civil Rights Act as "one of the most insidious and dangerous" measures directed against the American people and said it was "designed to take away the essential rights of the States" by proposing "to enter the States and regulate their police and municipal affairs," and concluded that "[t]here is no doubt it is a measure designed to accumulate and centralize power in the Federal Government." *Id*. at 1154. Representative Thornton argued that "it has uniformly been held that each State has the exclusive right to determine the status of its inhabitants," and he denied the necessity of conferring on freedmen "all the rights necessarily included in the term civil rights and immunities" to protect their freedom. *Id*. at 1566. In doing so, the Civil Rights Bill was "trench[ing] upon the rights of the States, and [was] assuming power which has always belonged to the States of the Union," namely, "the right to determine and fix the legal status of [their inhabitants], the local powers of self government, the power to regulate all the relations ... between husband and wife, parent and child ... all the fireside and home rights which are nearer and dearer to us than all the others." *Id*. at 1566-67. Thornton predicted that the Civil Rights Bill was "but a stepping-stone to a centralization of the Government and the overthrow of the local powers of the States. Whenever that is consummated, ... [t]here will be nothing left but absolute, despotic, central power." *Id*. at 1567. Representative Delano pointedly stated:

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13006   Page 650 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

[I]f we adopt the principle of this bill we declare in effect that Congress has the authority to go into the States and manage and legislate with regard to all the personal rights of the citizen--the rights of life, liberty, and property. You render this Government no longer a Government of limited powers, you concentrate and consolidate here an extent of authority which will swallow up all or nearly all of the rights of the States with respect to the property, the liberties, and the lives of its citizens.

*Id.* app. at 158. Representative Kerr emphasized the outer reach of the power Congress was exercising in enacting the Civil Rights Act. He proclaimed, "This bill rests upon the theory that Congress has the right to declare who shall be citizens of the United States, and then to provide that *such* citizens shall enjoy in the *States* all the privileges and immunities allowed therein to the most favored class of citizens." *Id.* at 1268. (Emphasis in original). Kerr denied that Congress possesses this "right" and warned: "If it exists at all, it exists without limit on its exercise, except the will of Congress." *Id.* at 1268, 1270. Representative Latham accused the Republican supporters of the Civil Rights Act of "interfer[ing] with the internal policy of the several States so as to define and regulate the 'civil rights or immunities among the inhabitants' therein." *Id.* at 1296. The bill would transform American federalism by completely centralizing power in the federal government, it "would change not only the entire policy, but the very form of our Government, by a complete centralization of all power in the national Government," which he believed would be "most dangerous to the liberties of the people and the reserved rights of the States." *Id.* President Johnson voiced the same views in explaining his veto of the Civil Rights Bill. He denied that Congress had the constitutional authority to "abrogate all State laws of discrimination between the two races in the matter of real estate, of suits, and of contracts generally." *Id.* at 1680. All of these subjects had hitherto "been considered as exclusively belonging to the States. They all relate to the internal policy and economy of the respective States. They are matters which in each State concern the domestic condition of its people." *Id.*

170     Civil Rights Act of 1866 § 1. Conservative Republican from Pennsylvania, Senator Edgar Cowan, for example, complained that "[t]his is a proposition to repeal by act of Congress all State laws, all state legislation, which in any way create distinctions between black men and white men in so far as their civil rights and immunities extend." CONG. GLOBE, 39th Cong., 1st Sess. 603 (1866); *see also id.* at 474 (statement of Sen. Trumbull) (stating that a purpose of the Civil Rights Bill is to "destroy all these discriminations" in state law, which the Thirteenth Amendment voided); *id.* at 504 (statement of Sen. Howard) (stating that the civil rights bill only contemplates "that in respect to all civil rights ... there is to be hereafter no distinction between the white race and the black race"); *id.* at 505-06 (statement of Sen. Johnson) (declaring that "[t]he first section of this bill says that there is to be no discrimination" between whites and blacks, and that it prohibits antimiscegenation laws because "[w]hite and black are considered together, put in a mass, and the one is entitled to enter into every contract that the other is entitled to enter into"); *id.* at 599, 1757 (Sen. Trumbull) (stating that "the very object of the bill is to break down all discrimination between black men and white men ... it is simply intended to carry out a constitutional provision, and guaranty to every person of every color the same civil rights," by declaring "that there shall be no distinction in civil rights between any other race or color and the white race"); *id.* at 601 (statement of Sen. Hendricks) (stating that the Civil Rights Bill provides "that the civil rights of all men, without regard to color, shall be equal"); *id.* at 602 (statement of Sen. Lane of Indiana) (declaring that the objectives of the Civil Rights Bill are to secure to the freedmen "the rights, privileges, and immunities of freemen," and to "give effect to [these objectives] by doing away with the slave codes of their respective States where slavery was lately tolerated," codes that the Thirteenth Amendment nullified); *id.* at 603 (statement of Sen. Wilson) (justifying the need for the Civil Rights Bill to secure "the new-born civil rights we are now about to pass" for the freedmen from "laws ... so atrocious ... and so persistently ... carried into effect by the local authorities, that [Union generals] have issued positive orders forbidding the execution of the black laws that have just been passed"); *id.* at app. 182, 183 (statement of Sen. Davis) (arguing that the Civil Rights Bill proscribed all discriminations against black Americans in favor of white persons); *id.* at 1118 (statement of Rep. Wilson) (declaring that section 1 of the Civil Rights Bill prohibits discrimination in civil rights or immunities among United States citizens and guarantees the same specified rights to "such citizens of every race and color ... as is enjoyed by white citizens"); *id.* at 1158 (statement of Rep. Windom) (stating that the Civil Rights Bill "declares that hereafter there shall be no discrimination in civil rights or immunities among the citizens of any State or Territory of the United States on account of race, color, or previous condition of slavery, and that every person ... shall have the same [enumerated] right[s]"); *id.* at 1293 (statement of Rep. Shellabarger) (stating that the bill prohibits the states from discriminating "on account of race color, or former condition of slavery").

171     *See* Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (1866). Political animus was a major problem that Congress sought to address in protecting southern white unionists, federal officials, and military personnel in the South. *See infra* notes

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13007   Page 651 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

292-310 and accompanying text. Xenophobia and anti-Catholicism were other problems Republicans sought to address. Representative Lawrence explicitly stated that the Bill was intended to "protect every citizen, including the millions of people of foreign birth who will flock to our shores to become citizens and to find here a land of liberty and law." CONG. GLOBE, 39th Cong., 1st Sess. 1833 (1866). Other participants in the Civil Rights Bill debates stated that the bill was intended to prevent prejudice based on country of national origin and religion. *See, e.g.*, *id*. at 1294 (statement of Rep. Shellabarger) (arguing that the Civil Rights Bill would prohibit the state of Ohio from passing a law forbidding U.S. citizens of German extraction from owning property, inheriting property, living in Ohio, or coming to work in Ohio); *id*. at 1415 (statement of Sen. Davis) (objecting that the Civil Rights Bill would authorize Congress "to go into [New Hampshire] and to abrogate" a statute that prohibited Roman Catholics from holding state offices, thus prohibiting "that distinction among her citizens").

172    *See, e.g.*, *id*. at 41 (statement of Sen. Sherman); *id*. at 474, 599, 1757 (statements of Sen. Trumbull); *id*. at 504-05 (statement of Sen. Johnson); *id*. at 595, 598 (statements of Sen. Davis); *id*. at 603 (statement of Sen. Cowan); *id*. at 3035 (statement of Sen. Henderson); *id*. at 1066-67 (statement of Rep. Price); *id*. at 1117 (statement of Rep. Wilson); *id*. at 1120-21 (statement of Rep. Rogers); *id*. at 1263-65 (statement of Rep. Broomall); *id*. at 1264 (statement of Speaker Colfax); *id*. at 1291, 1292 (1866), 2542 (statement of Rep. Bingham); *id*. at 1833-35 (statement of Rep. Lawrence).

173    *Id*. at 1118.

174    *Id*. at 505 (statement of Sen. Johnson).

175    The Supreme Court has held that the framers intended the Civil Rights Act to secure the rights of whites as well as blacks and the Court has applied it to protect the civil rights of whites. *See, e.g.*, Shaare Tefila Congregation v. Cobb, 481 U.S. 615 (1987); Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987); McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273 (1976). The Court also asserted this view shortly after the statute's enactment. Although it noted that it was primarily intended to protect black Americans from racial prejudice and discrimination, the Court declared that the Civil Rights Act "extends to both races the same rights, and the same means of vindicating them." Blyew v. United States, 80 U.S. (13 Wall.) 581, 593 (1872). The congressional debates offer abundant evidence supporting the Supreme Court's holding. *See* CONG. GLOBE, 39th Cong., 1st Sess. 475-76, 599, 1760 (statements of Sen. Trumbull) (proclaiming that "this bill applies to white men as well as black men" because the bill "declares that all persons in the United States shall be entitled to the same civil rights, the right to the fruit of their own labor, the right to make contracts, the right to buy and sell, and enjoy liberty and happiness," and further noting that "[it] protects a white man just as much as a black man"); *id*. at 505 (statement of Sen. Johnson) (stating that "the white as well as the black is included in this first section"); *id*. at 595, 598, 1415, app. at 184 (statement of Sen. Davis) (complaining that the Civil Rights Bill applies "to a free negro or a white local resident citizen of" any state and that the Civil Rights Bill "was a flagrant, reckless, and enormous usurpation of power by the majority of the two Houses" because it extended the Thirteenth Amendment to protect the civil rights of whites and free blacks); *id*. at 1803 (statement of Sen. Lane of Kansas) (stating that the Civil Rights Bill "secured equal rights to all"); *id*. at 1115 (statement of Rep. Wilson) (reporting the Civil Rights Bill as a bill "to protect all persons in the United States in their civil rights, and to furnish the means for their vindication"); *id*. at 1153 (statement of Rep. Thayer) (claiming "The [Civil Rights] bill ... extend[s] these fundamental immunities of citizenship to all classes of people in the United States, [and] provides means for the enforcement of these rights or immunities."); *id*. at 1158 (statement of Rep. Windom) (admonishing that "the negro question ... never will rest until this nation does justice to the negro and every other citizen in it"); *id*. at 1262, 1264 (statement of Rep. Broomall) (exhorting that the Federal Government was duty-bound "to guard the rights of those who in the midst of the rebellion periled their lives and fortunes for its honor, of whatsoever caste or lineage they be," and "that no system of reconstruction ought to be considered unless it shall effectually guaranty the rights of the Union men of the South," insisting that "it is the solemn obligation of this Government to protect the property and the person of every loyal man"); *id*. at 1264 (statement of Speaker of the House Colfax) (stating that the Civil Rights Bill is "very wide in its range, proposing to protect all persons in the United States in their civil rights and furnishing the means of their vindication"); *id*. at 1291 (statement of Rep. Bingham) (characterizing the Civil Rights Bill as "legislation in favor of the rights of all before the law"); *id*. at 1294 (statement of Rep. Shellabarger); *id*. at 1833 (statement of Rep. Lawrence). *See also infra* notes 285-299 and accompanying text.

Case 3:17-cv-01017-BEN-JLB  Document 124-2  Filed 11/11/22  PageID.13008  Page 652 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

176    PHILADELPHIA EVENING BULL., Mar. 30, 1866, collected in Scrapbook on the Civil Rights Bill 47 (E. McPherson ed., n.d.), in Edward McPherson Papers container 99 (collection available in Library of Congress). *See also* PHILADELPHIA AM. & GAZETTE, Apr. 7, 1866, *id*. at 79; PHILADELPHIA N. AM., Apr. 7, 1866, *id*. at 78; N.Y EVENING POST; Apr. 2, 1866, *id*. at 61-62; N.Y. EVENING POST, Mar. 28, 1866, *id*. at 32; BALTIMORE AM., Mar. 23, 1866, *id*. at 4; PHILADELPHIA PRESS, n.d., 1866, *id*. at 25-26; ROCHESTER DEMOCRAT, n.d., *id*. at 37; YONKERS STATESMAN, n.d., *id*. at 53.

177    The Civil Rights Cases, 109 U.S. 3, 22 (1883).

178    *Id*.

179    *Id*. at 23. The Court's view of the scope of the rights Congress could enforce under the Thirteenth Amendment may have been narrower than that of the framers of the Civil Rights Act of 1866. The Court can be read as limiting Congress's rights-enforcement power under the Thirteenth Amendment to those rights the denial of which would constitute a badge of slavery. It is sufficient to recognize that, even on this narrower view of Congress's Thirteenth Amendment power, the Court acknowledged Congress's plenary power to define and enforce those civil rights that are essential to individual liberty.

180    *See infra* notes 198-213 and accompanying text.

181    *See id*.

182    *See infra* notes 184-185 and accompanying text.

183    *See id*.

184    CONG. GLOBE, 39th Cong., 1st Sess. app. at 157 (1866).

185    *Id*. at 1835. *See also id*. at 572, 573 (statement of Sen. Henderson) (arguing that a U.S. citizen takes citizenship rights subject to state regulations, such as contract law prohibiting "lunatic[s]" from making enforceable contracts and drinking laws which "forbid the selling of intoxicating liquors to minors under twenty-one years of age"); *id*. at 1293 (statement of Rep. Shellabarger) (arguing that the Civil Rights Bill leaves undisturbed the state's power to regulate the rights of married women and minors). Nevertheless, Senator Cowan continued to insist that section 1 conferred the same right to contract and property on married women and minors regardless of state law. *Id*. at 1792. In addition, the framers refused to undertake the onerous and complicated task of legislating federal civil and criminal codes to replace those of the states that an unconditional grant of civil rights would have necessitated. *See, e.g., infra* notes 236-238 and accompanying text.

186    *See infra* notes 236-238 and accompanying text.

187    Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 622-24 (1842). The Court held that state legislatures could prohibit state and local judges from enforcing the Fugitive Slave Act. *See id*. at 622. *See also supra* notes 48 and 54 and accompanying text.

188    *See infra* notes 236-238 and accompanying text.

189    *See* Act of Feb. 12, 1793, ch. 7. §§ 3-4, 1 Stat. 302-05 (repealed 1864); *See* Fugitive Slave Act of 1850, ch. 60, 9 Stat. 462 (1850) (repealed 1864).

Compendium_Cornell
Page 1328

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13009   Page 653 of
733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

190    CONG. GLOBE, 39th Cong., 1st Sess. 1294 (1866). *See also id.* at 474-76 (statement of Sen. Trumbull) (arguing that U.S. citizens are entitled to the inalienable rights to life, liberty, and property proclaimed in the Declaration of Independence, and the Civil Rights Act was intended to secure and enforce these rights); *id.* at 1151-53 (statement of Rep. Thayer) (arguing that the Civil Rights Bill merely declared that all native born Americans shall enjoy the fundamental rights of citizenship, which secure life, liberty, and property and equal protection of the law).

191    CONG. GLOBE, 39th Cong., 1st Sess. 1294 (1866). *See also infra* notes 192-196 and accompanying text.

192    CONG. GLOBE, 39th Cong., 1st Sess. 476 (1866).

193    *Id.* at 478; *id.* at 602 (statement of Sen. Cowan) (objecting that the Civil Rights Bill intervened in the states and determined the relationships of inhabitants to one another and to the state governments and proclaiming that the Civil Rights Bill was unconstitutional under the original theory of federalism, where "the people of the several States in their domestic and civil and political relations are to be regulated [exclusively] by the States"); *id.* at 1778 (statement of Sen. Johnson) (asserting that "[t]he first section usurps, as I think, what has heretofore been considered as the exclusive authority of the States"); *id.* at 1121 (statement of Rep. Rogers) (insisting that the Civil Rights Bill gives Congress the right "to enter the sovereign domain of a State and interfere with [state] statutes and local regulations," undermines "those solid bulwarks of constitutional liberty erected by our fathers," consolidates power in the Federal Government, and "destroy[s] the foundations of the Government as they were laid and established by our fathers"); *id.* app. at 158 (statement of Rep. Delano) (quoting Madison's *Federalist 45*, which stated that the reserved rights of the states "'extended to all the objects which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people, and the internal order, improvement, and prosperity of the State,'" insisting that the Constitution established the Federal Government as "a Government with limited powers, powers restricted to the necessary objects of its existence and the proper discharge of the great duties devolving upon it" and that it "was never designed to take away from the States the right of controlling their own citizens in respect to property, liberty, and life"). *See also supra* note 169.

194    CONG. GLOBE, 39th Cong., 1st Sess. 478 (1866). Saulsbury did not identify the specific Federalist Paper he was quoting. *See also id.* at 596, 1414-15 (statement of Sen. Davis) (stating that Congress's powers "are particularly defined in the eighth section of the first article of the Constitution," and that Congress cannot "interfere with the local concerns of any state, such as all of the rights, privileges, and immunities its citizens shall enjoy and their regulation," reasoning that judicial authority holds "the States are sovereign, 'especially in regard to the administration of justice, and in the regulation of property and estates, the laws of marriage and divorce, and the protection of the persons of those who live under their jurisdiction'" and that "this authority expressly lays it down that all these subjects are the distinctive and exclusive subjects of State legislation; that over them the authority, the jurisdiction of the respective States is as though the States were foreign countries") (quoting Abbott v. Bayley, 6 Pick, (23 Mass.) 89, 92 (1827)); *id.* at 601 (statement of Sen. Guthrie) (stating that "[t]he first section of this bill attempts to repeal all the state laws and to enact new laws for them, the enforcement of which is put into new hands" and complaining that "under the pretense of giving effect to the freedom of the slave" Congress had "originated a system that is constantly interfering with the laws of the States, and constantly interfering with the citizens of the States, bringing them before your tribunals and questioning them whenever they attempt to enforce a State law against a black man"); *id.* at 1270 (statement of Rep. Kerr) (stating that the Civil Rights Bill authorized Federal executive officers and Federal courts "to usurp the functions of the State government" in securing citizens' fundamental rights, including Bill of Rights guarantees). *See also supra* note 169.

195    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1270 (statement of Rep. Kerr).

196    Kerr supported his contention that the states possessed the exclusive power to define and regulate the rights of citizens with judicial opinions recognizing this power under the Comity Clause. He maintained that the states' power in this respect was exclusive. *Id.* at 1269-70.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13010   Page 654 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

197    *Id*. at 1414 (statement of Sen. Davis). *See also id*. at 597 (statement of Sen. Davis) (arguing that principles justifying the Civil Rights Bill invested Congress "with the power to establish a civil and penal code for all the States of the Union"); *id*. app. at 158 (Rep. Delano) (warning that, "[I]f we now go on to a system of legislation based upon the assumption that Congress possesses the right of supreme control in [respect to property, liberty, and life]." that "whether we are not assisting to build up a consolidated Government in view of the powers of which we may well tremble ... the authority assumed as the warrant for this bill would enable Congress to exercise almost any power over a State"); *id*. at 1271 (statement of Rep. Kerr).

198    *Id*. at 1415 (statement of Sen. Davis). Davis later commented that the Civil Rights Bill would have been named more appropriately "'An act to consolidate all the reserved sovereignty and powers of the several State into the Congress and Government of the United States.'" *Id*. at 182.

199    *Id*. at 1415.

200    *Id*. at 1681 (President Johnson's veto message). Senator Johnson defended the President's veto with the same argument. *Id*. at 1777 (reciting the rights secured in section 1 and arguing that, "If Congress can legislate in relation to these rights ... the States are abolished," because "the further provision in this bill follows ... that Congress has the authority to constitute its own tribunals for the purpose of granting relief for the enforcement of these rights, then the State courts may be closed up." If Congress's authority to enact section 1 exists, "nothing can be plainer" than that, with respect to these civil rights, "this Government is a consolidated Government ... it is still more obvious that the result is an entire annihilation of the power of the States").

201    U.S. CONST, amend. X.

202    CONG. GLOBE, 39th Cong.; 1st Sess. 574 (statement of Sen. Henderson). *See also id*. at 600, 605 (statement of Sen. Trumbull) (arguing that the Civil Rights Act would not operate in a state that performs its constitutional obligation to protect and enforce citizens' rights); *id*. at 1785 (statement of Sen. Stewart) (arguing that the Civil Rights Act's penal section only imposes federal penalties against individuals in states that have discriminatory laws or customs).

203    The following account is taken from the N.Y. EVENING POST (n.d., n.p.), collected in Scrapbook on the Civil Rights Bill 32 (E. McPherson ed., n.d.), in Edward McPherson Papers container 99 (collection available in Library of Congress).

204    *See supra* notes 173-176 and accompanying text.

205    *See infra* notes 213-216, 228-237 and accompanying text.

206    *See* CONG. GLOBE, 39th Cong., 1st Sess. 504 (1866) (statement of Sen. Howard); *id*. at 505 (statements of Sens. Johnson, Trumbull, and Fessenden); *id*. at 572, 574 (statement of Sen. Henderson); *id*. at 573-74 (statement of Sen. Williams); *id*. at 1832 (statement of Rep. Lawrence); *id*. at app. 158-59 (statements of Reps. Delano, Wilson, and Niblack).

207    Except where otherwise noted, the following account is taken from *id*. at 1785 (statement of Sen. Stewart).

208    Senator Stewart's expressed understanding of Congress's Thirteenth Amendment power to enforce citizens' rights and his expressed desire to exercise this plenary power expressly contradict Justice Kennedy's interpretation of Stewart's objections to the proposed Fourteenth Amendment. *See* City of Boerne v. Flores, 521 U.S. 507, 521 (1997).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13011   Page 655 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

209    The United States Supreme Court has repeatedly so held. *See* The Civil Rights Cases, 109 U.S. 3, 23-35 (1883); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 423-24 (1968); Runyon v. McCrary, 427 U.S. 160, 170-71 (1976); Patterson v. McLean Credit Union, 491 U.S. 164 (1989). Section 3 of the Civil Rights Act conferred exclusive jurisdiction on federal courts to try all violations of section 1 rights. Civil Rights Act of 1866 § 3, ch. 31, 14 Stat. 27 (1866).

210    Civil Rights Act of 1866 § 2. *See infra* notes 261-291 and accompanying text.

211    Civil Rights Act of 1866 § 3. *See* United States v. Rhodes, 27 F. Cas. 785, 787 (C.C.D. Ky. 1866) (No. 16,151) (upholding federal jurisdiction to try all offenses against the Kentucky criminal code involving black victims of crime and black criminal defendants on the grounds that the state's rules of evidence denied black parties affected by the cause of action the same right to testify as was enjoyed by white parties); Blyew v. United States, 80 U.S. (13 Wall.) 581, 593 (1871) (affirming federal jurisdiction to try offenses against state criminal laws, but restricting this jurisdiction to criminal prosecutions against black defendants who were denied or could not enforce under state legal process any right secured by section 1 of the Civil Rights Act of 1866). This enforcement structure is more fully explained at *infra* notes 277-331 and accompanying text.

212    Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539 (1842).

213    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1294 (1866) (statement of Rep. Wilson).

214    *See id.* at 600 (statement of Sen. Trumbull). Senator Trumbull paraphrased and answered Senator Davis's accusation that the Civil Rights Bill "breaks down the local legislation of all the States; it consolidates the power of the States in the Federal Government," by stating:

Why, sir, if the State of Kentucky makes no discrimination in civil rights between its citizens, this bill has no operation whatever in the State of Kentucky. Are all the rights of the people of Kentucky gone because they cannot discriminate and punish one man for doing a thing that they do not punish another for doing? The bill draws to the Federal Government no power whatever if the States will perform their constitutional obligations.

*See id.*

215    Except where otherwise noted, the following account is taken from *id.* at 605 (statement of Sen. Trumbull). Senator Stewart made the same argument specifically in reference to the penal sanctions of the bill's second section. *See id.* at 1785.

216    *Id.* at 1118 (statement of Rep. Wilson). Senator Thomas Hendricks, Democrat from Indiana and a member of the Senate Judiciary Committee, stated that the Civil Rights Bill

provides, in the first place, that the civil rights of all men, without regard to color, shall be equal; and, in the second place, that if any man shall violate that principle by his conduct, he shall be responsible to the court; that he may be prosecuted criminally and punished for the crime, or he may be sued in a civil action, and damages recovered by the party wronged.

*Id.* at 601

217    *See, e.g.,* sources cited in *supra* note 161.

218    *See id.*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13012   Page 656 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

219    *See id.*

220    *See infra* notes 277-331 and accompanying text.

221    CONG. GLOBE, 39th Cong., 1st Sess. 474 (1866) (statement of Sen. Trumbull).

222    *Id.* at 475 (statement of Sen. Trumbull) (referring to the Thirteenth Amendment as the "declaration in the Constitution").

223    *Id.* at 474.

224    *Id.*

225    Civil Rights Act of 1866, ch. 31, § 2, 14 Stat. 27.

226    *Id.*

227    *Id.*

228    *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 475 (statement of Sen. Trumbull); *id.* at 1758; *id.* at 1155 (statement of Rep. Thayer).

229    Except where otherwise noted, the following account is taken from *id.* at 475. Senator Trumbull illustrated this point by analogizing to Congress's penal powers under the Comity Clause. It is noteworthy that Senator Garrett Davis, a strong opponent of the Civil Rights Act, believed that Congress had the power to enact legislation to enforce the Comity Clause against anyone who violated a privilege or immunity secured by this provision. *See supra* note 142 and accompanying text. Chief Justice Taney also believed that Congress possessed the power to enforce the rights secured by the Comity Clause, which, he asserted, authorized Congress to punish anyone who deprived another of a right secured by the Clause, and even to authorize federal authorities to call out the Army and Navy to protect the rightholder. *See supra* note 63 and accompanying text.

230    Members of the Forty-Second Congress shared this view and included in the Ku Klux Klan Act of 1871, which was by its title was designed "to enforce the Provisions of the Fourteenth Amendment," a section that imposed third-party civil liability on members of local communities who were aware of and could have prevented, but failed to try to prevent, personal injuries and property damage by mobs, such as the Ku Klux Klan. *See* Ku Klux Klan Act of 1871, ch. 22, § 6, 17 Stat. 13, 15 (1871). Their strategy was to force local community leaders publicly to oppose Klan violence in the expectation that community leaders could bring the violence to an end. *See* Robert J. Kaczorowski, *Reflections on Monell's Analysis of the Legislative History of § 1983*, 31 URB. LAW. 407, 412-13 (1999).

231    *See supra* notes 146-151, 169-171, 192-200 and *infra* notes 288-291, 311-318 and accompanying text. Civil Rights Act proponents did not deny that it supplanted state civil and criminal systems. Indeed, they defended these invasions of state police powers as necessary to enforce and protect the rights of United States citizens. *See supra* notes 198-199 and *infra* notes 250-252, 277, 319-323 and accompanying text.

232    Chief Justice John Marshall proclaimed that Congress's penal powers are essentially implied powers. In justifying the broad theory of implied powers the Court adopted in *McCulloch v. Maryland*, Marshall proclaimed that:

Everyone acknowledges that Congress possesses the power to punish any violation of federal law, even though this power is not expressly delegated by the Constitution. The good sense of the public has pronounced, without hesitation,

Compendium_Cornell
Page 1332

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13013   Page 657 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

that the power of punishment appertains to sovereignty, and may be exercised, whenever the sovereign has a right to act, as incidental to his constitutional powers. It is a means for carrying into execution all sovereign powers, and may be used, although not indispensably necessary.

McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 416, 418 (1819). Senator Trumbull and his supporters applied this principle of sovereign power to justify imposing criminal penalties not simply upon the actions of ordinary citizens but of state judges and other public officials as well. *See supra* notes 228-229 and *infra* notes 247-253 and accompanying text.

233    *See infra* notes 247-249 and accompanying text.

234    *See* CONG. GLOBE, 39th Cong., 1st Sess. 1758 (1866) (Sen. Trumbull); *id*. at 1120 (Rep. Wilson); *id*. at 1294 (Rep. Shellabarger); *id*. at app. 158 (Reps. Delano, Wilson, and Niblack); Kaczorowski, *supra* note 159, at 581, 588.

235    Civil Rights Act of 1866 § 3. Section 3 is explained *infra* notes 277-282 and accompanying text.

236    CONG. GLOBE, 39th Cong., 1st Sess. 1758 (1866).

237    This analysis deviates from the widely held views of scholars who have interpreted the "under color of law or custom" principle as the outer limits of congressional authority to impose criminal sanctions and civil liability on individuals who violate citizens' constitutional rights. They have understood this principle, and the language of section 1, as limiting congressional authority to discriminatory state action. *See, e.g.*, HERMAN BELZ, EMANCIPATION AND EQUAL RIGHTS: POLITICS AND CONSTITUTIONALISM IN THE CIVIL WAR ERA 108-40 (1978); HERMAN BELZ, A NEW BIRTH OF FREEDOM: THE REPUBLICAN PARTY AND FREEDMEN'S RIGHTS, 1861-1866, at 157-77 (1976); MICHAEL LES BENEDICT, A COMPROMISE OF PRINCIPLE: CONGRESSIONAL REPUBLICANS AND RECONSTRUCTION, 1863-1869, at 27, 41, 48, 56-69, 122-26, 147-49, 170 (1973); CHARLES FAIRMAN, RECONSTRUCTION AND REUNION, 1864-88, PART ONE, at 1228-29, 1238-42 (1971); HAROLD M. HYMAN, A MORE PERFECT UNION: THE IMPACT OF THE CIVIL WAR AND RECONSTRUCTION ON THE CONSTITUTION 457, 467-68 (1973); MALTZ, *supra* note 161, at 70-78; PHILLIP PALUDAN, A COVENANT WITH DEATH: THE CONSTITUTION, LAW, AND EQUALITY IN THE CIVIL WAR ERA 58, 261, 274-75 (1975); Michael Les Benedict, *Preserving the Constitution: The Conservative Basis of Radical Reconstruction*, 61 J. AM. HIST. 65, 78-80 (1974).

238    CONG. GLOBE, 39th Cong., 1st Sess. 1120 (1866); *see also id*. at 1294 (Rep. Shellabarger stating that section 2 "is meant, therefore, not to usurp the powers of the States to punish offenses generally against the rights of citizens in the several States, but its whole force is expanded in defeating an attempt, under State laws, to deprive races and the members thereof as such of the rights enumerated in this act"). Shellabarger proposed a bill to supplement Trumbull's Civil Rights Bill, which also posited jurisdictional limits to distinguish federal civil rights crimes from ordinary crimes punishable within the states' systems of criminal justice. Shellabarger's proposal was to enforce the privileges and immunities that U.S. citizens enjoy under the Comity Clause by imposing criminal penalties on individuals who violated them, but who were not acting under color of law or custom. Shellabarger recognized Congressional power to punish every violation of a citizen's fundamental rights, but he proposed requiring an intent element, thus limiting federal criminal jurisdiction in a manner similar to that of section 2 of the Civil Rights Act. Shellabarger proposed criminal penalties for any individual who violated another's fundamental right with "the intent to deprive one from another state of the particular right or of all rights" secured by the Comity Clause. Letter from S. S. Shellabarger to Lyman Trumbull (Apr. 7, 1866), collected in 65 Lyman Trumbull Papers (collection available in Library of Congress) (emphasis in original). Although Senator Trumbull believed that Shellabarger's proposal "reenacted [Trumbull's] civil rights bill," Shellabarger attempted to persuade Trumbull that his proposal differed from Trumbull's bill by making it a federal crime to violate the privileges and immunities secured by the Comity Clause "*by one not acting under color of law* and as against one seeking to go from state to state." *Id*. (emphasis added).

239    *See supra* notes 68-82 and accompanying text.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13014   Page 658 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

240   Senator Cowan commented that giving federal courts exclusive jurisdiction over violations of civil rights was a delusion and no remedy because one, or at most two, federal courts functioned in the former slave states, and they were too few and too remote from most of the claimants intended to use them. He added that black Americans were too poor to gain access to them. These circumstances rendered the federal remedy a virtual nullity. *See* CONG. GLOBE, 39th Cong., 1st Sess. 1782 (1866).

241   Prigg v. Pennsylvania, 41 U.S. (16 Pet.) 539, 630-32 (Taney, C.J., concurring in part and dissenting in part). Taney argued that, because federal courts were too few and too remote, federal remedies would be "ineffectual and delusive" if state authorities did not help in administering them. *Id.* at 631.

242   Fugitive Slave Act of 1850, ch. 60, §§ 1-4, 9 Stat. 462 (1850) (repealed 1864). The framers of the Civil Rights Bill authorized federal judges to exercise the same power to appoint commissioners to enforce the Civil Rights Act. *See* Civil Rights Act of 1866 § 4 (codified as amended at 42 U.S.C. §§ 1981-82 (2000)).

243   For example, a company of the United States army, another company of Marines, Massachusetts state militiamen, and Boston police constables assisted federal marshals who took fugitive slave Anthony Burns to a ship in Boston Harbor for his voyage to Charleston, South Carolina. *See* ALBERT J. VON FRANK, THE TRIALS OF ANTHONY BURNS: FREEDOM AND SLAVERY IN EMERSON'S BOSTON 203-19 (1998). Senator Reverdy Johnson recalled that, because the Fugitive Slave Act of 1850 was "obnoxious to the whole communit[ies]" within the Northern states, it was enforced only "by power, by military or civil power, threatening upon each occasion when resort was had to it to involve the particular community where the attempt was made in civil strife and bloodshed ...." Cong. Globe, 39th Cong., 1st Sess. 505 (1866).

244   *See* Civil Rights Act of 1866 §§ 4-9. These provisions are discussed *infra* notes 333-345 and accompanying text.

245   *See* Prigg v. Pennsylvania, 41 U.S. (16 Pet.) at 539; Kentucky v. Dennison, 65 U.S. (24 How.) at 76-77.

246   *Id.*

247   Except where otherwise noted, the following discussion is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1154 (1866).

248   *Id.* at 596 (apparently quoting from *Dennison*).

249   *Id.*

250   Except where otherwise noted, the following discussion is taken from *id.* at 1758.

251   *See id.* at 1759. Senator Trumbull's reference was to the Supremacy Clause. U.S. CONST. Art. VI, cl. 2. Clause 3 further requires that all state executive and judicial officers "shall be bound by Oath or Affirmation, to support this Constitution." U.S. CONST. art. VI, cl. 3.

252   CONG. GLOBE, 39th Cong., 1st Sess. 1760 (1866).

253   Except where otherwise noted, the following account is taken from *id.* at 1120.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13015   Page 659 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

254    Except where otherwise noted, the following account is taken from *id*. at 1292.

255    *Id*. at 1291. Representative Latham also objected that section 2 was "a departure from the principles and practices of the Government." *Id*. at 1296. He reasoned that the Constitution and laws of the United States must be executed by federal officers, and where there is a conflict between federal law and state law, "the legitimate remedy is civil and not penal; or in other words, that the legitimate remedy is by appeal to the United States courts instead of by penalty upon the State officer executing the State law." *Id*.

256    Except where otherwise noted, the following account is taken from *id*. at 1295.

257    The "instructions" to which Wilson referred were separate amendments to the Civil Rights Bill offered by Representative Bingham and Representative Raymond which would have eliminated the bill's criminal sanctions. *See supra* notes 254-255 and accompanying text. While Bingham's proposal would have changed the criminal sanctions of section 2 to civil remedies, Raymond's proposal simply declared that all persons born in the United States are "citizens of the United States, and entitled to all rights and privileges as such." CONG. GLOBE, 39th Cong., 1st Sess. 1266-67 (1866). Raymond thought that declaring the freedmen to be citizens entitled them to all of the rights of citizens, including the right to sue in federal court to enforce their civil rights whenever they were unable to enforce them or were denied them in state court. *Id*.

258    The exchange between Bingham and Wilson manifests their intention of compelling state officials to enforce federal law by imposing federal civil liability and criminal penalties on the officials' failure to do so. This raises questions regarding recent Supreme Court decisions that have held that Congress lacks the power to impose such sanctions against states, even pursuant to its legislative authority under the Fourteenth Amendment. *See, e.g.*, Printz v. United States, 521 U.S. 898 (1997); New York v. United States, 505 U.S. 144 (1992). Scalia's majority opinion in *Printz* is based largely on history, which he found to be lacking in any examples of Congress requiring state executive officials to perform federal duties. Scalia obviously overlooked the Civil Rights Act and other Reconstruction enforcement statutes, which contradict his conclusion. The issue of whether the framers of the Fourteenth Amendment intended to compel state officials to enforce the provisions and statutes that Congress enacts in order to implement the amendment warrants fresh investigation.

259    *See supra* note 237 and accompanying text.

260    Senator Cowan considered section 2 an "atrocity," because a state judge legitimately may question the constitutionality of the Civil Rights Act, but if deciding against its constitutionality "he subjects himself to a criminal prosecution." If deciding in favor of the Act, however, the judge is likely to "be impeached by [his] own State Legislature." CONG. GLOBE, 39th Cong., 1st Sess. 1783 (1866).

261    *See, e.g.*, *id*. at 475-76 (Sens. Trumbull and Cowan debating the justice of subjecting state judges to criminal sanctions for enforcing racially discriminatory state laws in violation of the Civil Rights Act); *id*. at 500, 603-04, 1783 (statement of Sen. Cowan) (complaining that section 2 "is the first time I think in the history of civilized legislation that a judicial officer has been held up and subjected to a criminal punishment for that which may have been a conscientious discharge of his duty ... where a bill of indictment is to take the place of a writ of error, and where a mistake is to be tortured into a crime"); *id*. at 598, 1415, app. 182 (statement of Sen. Davis) (objecting "[t]hat any man or any court or any officer of the law who presumes to inflict upon a negro a different punishment than that to which a white man is subject for the same act, shall himself be regarded as an offender against the law," and insisting that "[t]he Congress of the United States have no right to take jurisdiction over such a case or the parties to such a transaction ... to declare and to denounce such punishment against the State courts and State officers for thus executing the constitutions and penal laws of the States"); *id*. at 1758 (statement of Sen. Trumbull) (denying that criminal sanctions attempt to punish state legislators, but "admit[ting] that a ministerial officer or a judge, if he acts corruptly or viciously in the execution or under color of an illegal act, may be and ought to be punished; but if he acted innocently the judge would not be punished"); *id*. at 1778 (statement of Sen. Johnson) (attacking section 2 for destroying the independence of the states' judiciary by making criminals out of state judges who enforced an inconsistent state statute in the good faith belief that the Civil Rights Bill

Compendium_Cornell
Page 1335

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13016   Page 660 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

was unconstitutional); *id*. at 1809 (statement of Sen. Saulsbury) (predicting revolution and bloodshed should federal legal officers attempt to enforce the "grossly, palpably, fragrantly unconstitutional" provisions of the Civil Rights Bill against state judges); *id*. at 1119 (statements of Reps. Loan and Wilson) (discussing criminal sanctions imposed on public officers and not on others); *id*. at 1121 (statement of Rep. Rogers) (complaining that section 2 would subject a state judge to federal criminal prosecution for administering a state anti-miscegenation law he was sworn to uphold and was in good conscience enforcing); *id*. at 1154 (statement of Rep. Eldridge) (charging that section 2 is "a most flagrant and tyrannical interference with the independence of the [state] judiciary"); *id*. at 1265 (statement of Rep. Davis of New York) (expressing the fear that section 2 might unconstitutionally subject to federal punishments state judges who performed their duties in obedience to state laws that conflicted with the Civil Rights Act, and state officers who obeyed process issued by state courts under such laws, before a federal court had ruled on the constitutionality of the Civil Rights Act); *id*. at 1267 (statement of Rep. Raymond) (stating it was neither "just" nor "right" to punish a state court judge "for enforcing a State law"); *id*. at 1270 (statement of Rep. Kerr) (declaring that section 2 punishes only "persons acting under State authority in some sort of official capacity," naming county boards, school teachers, and other public officials who discriminated against blacks); *id*. at 1291-92 (statement of Rep. Bingham) (denying that Congress had the authority to impose criminal sanctions on state officers who obeyed and enforced state laws in good faith, recommending that the criminal penalties be changed to civil liability, and declaring that he proposed a constitutional amendment "which would arm Congress with the power to compel [state officials'] obedience to the oath [to uphold the Constitution], and punish all violations by State officers of the bill of rights"); *id*. at 1294 (statement of Rep. Shellabarger) (stating that section 2 punishes only wrongs committed under color of state authority); *id*. at 1680 (President Johnson's veto message) (stating that section 2 "provides for counteracting such forbidden legislation by imposing fine and imprisonment upon the legislators who may pass such conflicting laws, or upon the officers or agents who shall put, or attempt to put, them into execution," thus "invading the immunities of legislators" and "assailing the independence of the judiciary"); *id*. at 1837 (statement of Rep. Lawrence) (responding to President Johnson, stating "it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded.").

262   Except where otherwise noted, the following account is taken from ROBERT J. KACZOROWSKI, THE POLITICS OF JUDICIAL INTERPRETATION: THE FEDERAL COURTS, DEPARTMENT OF JUSTICE AND CIVIL RIGHTS, 1866-1876, at 27-48 (1985).

263   *Id*. at 36-38.

264   *Id*. at 29, 37-38.

265   *See infra* notes 292-297 and accompanying text for the ways in which private individuals violated the civil rights of white Unionists and federal officers under color of law.

266   *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 91-96 (1866) (statement of Sen. Sumner); *id*. at 1118 (statement of Rep. Wilson); *id*. at 474, 1758-59 (statement of Sen. Trumbull).

267   For representative statements, see, for example, CONG. GLOBE, 39th Cong., 1st Sess. 39, 603 (1865) (statement of Sen. Wilson) (expressing, during his proposal of the Civil Rights Act, the need for federal civil rights protection because the old slave codes were still "being executed, and in some [states] in the most merciless manner," describing statutes in Georgia, Louisiana, and Mississippi and admonishing that "these reconstructed Legislatures, in defiance of the rights of the freemen and the will of the nation embodied in the [thirteenth] amendment to the Constitution, have enacted laws nearly as iniquitous as the old slave codes that darkened the legislation of other days"); *id*. at 474, 1759 (statement of Sen. Trumbull) (describing Mississippi and South Carolina statutes that denied the freedmen certain rights, subjected them to severe penalties, and imposed restrictions on them that had been imposed on them during slavery, and stating that "[t]he purpose of the [Civil Rights] bill under consideration is to destroy all these discriminations, and to carry into effect the constitutional amendment"); *id*. at 602 (statement of Sen. Lane of Indiana) (explaining that the Civil Rights Bill is necessary "because we fear the execution of these laws if left to the State courts"); *id*. at 603 (statement of Sen. Cowan) (protesting that "[t]his is a proposition to repeal by act of Congress all State laws, all state legislation,

Compendium_Cornell
Page 1336

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13017   Page 661 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

which in any way create distinctions between black men and white men in so far as their civil rights and immunities extend"); *id.* at 1785 (statement of Sen. Stewart) (stating that it would be more desirable that the States should "secure to the freedmen personal liberty, but, since they have not, Congress unquestionably possesses the power to do so"); *id.* at 1118-19 (statement of Rep. Wilson) (proclaiming Congress's duty to protect every citizen in the "great fundamental rights which belong to all men" from "[l]aws barbaric and treatment inhuman ... meted out by our white [Civil War] enemies to our colored friends," and explaining that the criminal sanction provided in section 2 "grows out of the fact that there is discrimination in reference to civil rights under the local laws of the States," for which "we provide that the persons who under the color of these local laws should do these things shall be liable to this punishment"); *id.* at 1123 (statement of Rep. Cook) (stating that the former rebel state legislatures have enacted laws "so malignant in their spirit toward these freedmen, so subversive of their liberties" that the President and military commanders "have set aside those laws and prevented their execution," and now Congress "provide[s] by legislative action precisely the same thing and nothing more" than the orders issued by military commanders under the authority of the President "to protect these people in the enjoyment of their freedom"); *id.* at 1153 (statement of Rep. Thayer) (stating that Congress must protect the natural rights of citizens because at least six southern legislatures "have enacted laws which, if permitted to be enforced, would strike a fatal blow at the liberty of the freedmen and render the constitutional amendment [abolishing slavery] of no force or effect whatever"); *id.* at 1295 (statement Rep. Latham) (stating that although the wording of section 1 makes no reference "to discriminations by the State or other local law, yet it is very evident from its connections, and from the entire bill, that its reference is to such discriminations"); *id.* at 1293 (statement of Rep. Bingham) (stating that the Civil Rights Bill proposes to "reform the whole criminal and civil code of every State government by declaring that there shall be no discrimination between citizens on account of race or color in civil rights or in the penalties prescribed by their laws"); *id.* at 1123 (statement of Rep. Cook); *id.* at 1160 (statement of Rep. Windom) *id.* at 1263 (statement of Rep. Broomall); *id.* at 1293 (statement of Rep. Bingham); *id.* at 1295 (statement of Rep. Latham); *id.* at 1785 (statement of Sen. Stewart); *id.* at 1833-36 (statement of Rep. Lawrence) (quoting at length from testimony given before the Joint Committee on Reconstruction, from newspapers, and from correspondence of military commanders in Southern states discussing discriminatory statutes enacted by southern legislatures; the legislatures' failure to enforce the civil rights of blacks; and the actions taken by officers of the military and Freedmen's Bureau to nullify these statutes and to provide tribunals to dispense to blacks the protection and justice that the states denied).

268    *See, e.g.,* 1865-66 Ala. Acts 86, 98, 100, 112, 116, 120; 1866-67 Ark. Acts 13, 35, 122; 1865-66 Fla. Laws chs. 1465-79; 1865-66 Ga. Laws 3, 43, 101, 108, 233-34, 240, 248, 250-52, 254; 1866 Ga. Laws 38-39, 208, 210, 212, 217; 1865 La. Acts 10-12, 16, 19-20, 34; 1865 Miss. Laws chs. 4-6, 23-24; 1865-66 N.C. Sess. Laws 6, 35, 40, 42, 62, 64, 72; 1865 S.C. Acts 4730 §§ 4-5, 4731, 4733, 4791, 4797; 1865-66 Tenn. Pub. Acts 4, 34, 40, 56; 1866 Tex. Gen. Laws 63, 80, 82, 111, 120, 128, 153-54; 1865 Va. Acts chs. 14-15, 17-19, 21-25, 28, 62, 113, 116, 138, 142, 258. *See generally* THEODORE BRANTNER WILSON, THE BLACK CODES OF THE SOUTH (1965).

269    *See* General Orders No. 3, Jan. 12, 1866, Adjutant General's Office, *reprinted in* THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION 122-23 (Edward McPherson ed., 1875). *See also* General Orders No. 7, Mar. 4, 1866, Headquarters, Dep't of South Carolina, *reprinted in* CONG. GLOBE, 39th Cong., 1st Sess. 1834 (1866).

270    Except as is otherwise noted, this discussion is taken from ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION, 1863-1877, at 199-201 (1988); LEON F. LITWACK, BEEN IN THE STORM SO LONG: THE AFTERMATH OF SLAVERY 292-386 (1979); and WILSON, *supra* note 268.

271    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 39 (1866).

272    Except where otherwise noted, the following account is taken from *id.* at 1160.

273    Except where otherwise noted, the following account is taken from *id.* at 1833.

274    *Id.* at 500. Echoing Trumbull's rationale, Chief Justice Salmon P. Chase, as circuit justice, held that an apprenticeship contract between a black child and her former master violated the child's right to the full and equal benefit of all laws

Compendium_Cornell
Page 1337

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13018   Page 662 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

and proceedings for the security of her person and property secured by section 1 of the Civil Rights Act because it did not grant her benefits that state law required masters to extend to white apprentices. In re Turner, 24 F. Cas. 337, 339 (C.C. Md. 1867) (No. 14,247).

275   Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. app. 183 (1866). *See also supra* note 261 (statements of Senator Davis).

276   *Id.* at app. 183. Davis's comments regarding the posse comitatus and militia and military provisions refer to the Civil Rights Act's sections 5 and 9 respectively. *Id.* For additional statements expressing the framers' intention of imposing criminal penalties on private individuals, see, for example, *id.* at 475 (statement of Sen. Trumbull) (analogizing Congress's authority to enact the criminal sanctions of the Civil Rights Bill to Congress's authority to punish any individuals who violated a citizen's rights under the Comity Clause); *id.* at 1125 (statement of Rep. Cook) (arguing that Congress was obligated to protect the freedmen from "men who are proving day by day, month by month, that they desire to oppress them, for they had been made free against their consent"); *id.* at 1156 (statement of Rep. Eldridge) (acknowledging that the bill's proponents "refer us to individual cases of wrong perpetrated upon the freedmen of the South as an argument why we should extend the Federal authority into the different States to control the action of the citizens thereof"); *id.* at 1156 (statement of Rep. Thornton) (conceding that "Congress has the power to punish any man who deprives a slave of the right of contract, or the right to control and recover his wages. To that extent it may be necessary to have legislation.").

277   Representative Wilson argued that, since U.S. citizens were entitled to the rights secured by the Bill of Rights, it was the right and duty of Congress "to provide a remedy .... The power is with us to provide the necessary protective remedies. If not, from whom shall they come? From the source interfering with the right? Not at all." *Id.* at 1294. Senator Lane of Indiana explained, "We should not legislate at all if we believed the State courts could or would honestly carry out the provisions of the [thirteenth] constitutional amendment; but because we believe they will not do that, we give the Federal officers jurisdiction." *Id.* at 602-03.

278   *Id.* at 601. Senator Hendricks was a member of the Senate Judiciary Committee that drafted the Civil Rights Bill.

279   Civil Rights Act of 1866, ch. 31, 14 Stat. 27, § 3; *see* Fugitive Slave Act of 1850 § 3. ch. 60, 9 Stat. 462 (1850) (repealed 1864).

280   Referring to the civil remedies, for example, Senator Cowan objected that in those states where certain persons are not permitted to make legally enforceable contracts, "this bill is to give them a right to enforce them, to give them a right to go into a court where the judges say they cannot go, and he has no jurisdiction to determine their causes." CONG. GLOBE, 39th Cong., 1st Sess. 1783 (1866).

281   Civil Rights Act of 1866 § 3.

282   *Id.*

283   Senator Davis insisted that the Civil Rights Bill was unconstitutional, in part because it transferred "all penal prosecutions and civil suits instituted in the State courts for offenses and trespasses committed under color of it into the Federal courts." CONG. GLOBE, 39th Cong., 1st Sess. app. 184 (1866).

284   *See infra* notes 288-291 and accompanying text.

285   Civil Rights Act of 1866 § 3.

Compendium_Cornell
Page 1338

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13019   Page 663 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

286    CONG. GLOBE, 39th Cong., 1st Sess. 1118 (1866).

287    *Id.* at 1294. Wilson repeatedly insisted that it was Congress's right and duty to provide civil and criminal remedies to redress violations of citizens' civil rights, particularly when the states failed to do so. *See supra* notes 125, 173, 190, 213, 216, 256, 277 and accompanying text. Congress acted on this very theory when it enacted the civil and criminal remedies of the Violence Against Women Act Pub. L. No. 103-322, Title IV, § 40302, 108 Stat. 1941 (1994). The Supreme Court struck down the civil remedy, holding that it exceeded Congress's remedial powers under the Fourteenth Amendment. United States v. Morrison, 529 U.S. 598. 627 (2000).

288    *See supra* note 281 and accompanying text. *See* United States v. Rhodes, 27 F. Cas. 785, 786-87 (C.C.D. Ky. 1866) (No. 16,151) (upholding under section 3 a federal prosecution for a state crime of burglary committed by white defendants who broke into the home of a black woman who was denied the right to testify by Kentucky statutes); Blyew v. United States, 80 U.S. (13 Wall.) 581. 591-93 (1872) (upholding the constitutionality of section 3 but restricting federal criminal jurisdiction over state crimes to those committed by black defendants who are unable to enforce or are denied civil rights secured by section 1).

289    United States v. Rhodes, 27 F. Cas. at 786-87; KACZOROWSKI, *supra* note 262, at 52; ROSS A. WEBB, BENJAMIN HELM BRISTOW: BORDER STATE POLITICIAN 51-58 (1969); Victor B. Howard, *The Black Testimony Controversy in Kentucky, 1866-1872,* 58 J. NEGRO HIST. 140, 146-53 (1973); Ross A. Webb, *Benjamin H. Bristow: Civil Rights Champion, 1866-1872,* 15 CIVIL WAR HIST. 39, 39-42 (1969); Letter from Benjamin H. Bristow to John Marshall Harlan (Mar. 20, 1866) (collected in John Marshall Harlan Papers container 14 in the Library of Congress); Letter from John Marshall Harlan to William Belknap (Dec. 15, 1869) (collected in John Marshall Harlan Papers available in The Filson Club); Letter from Bland Ballard to Lyman Trumbull (Mar. 30, 1866) (collected in 65 Lyman Trumbull Papers; microfilm collection available in the Library of Congress); Letters from Noah H. Swayne to Rutherford B. Hayes (Jan. 10, 1870 and Apr. 27, 1871) (collected in Rutherford B. Hayes Papers in Rutherford B. Hayes Library).

290    *See* Webb, *Benjamin H. Bristow: Civil Rights Champion, supra* note 289, at 39-42.

291    80 U.S. (13 Wall.) 581, 592-93 (1871); KACZOROWSKI, *supra* note 262, at 142, 165; Ross A. Webb, *Kentucky: Pariah Among the Elect, in* RADICALISM, RACISM, AND PARTY REALIGNMENT: THE BORDER STATES DURING RECONSTRUCTION 128 (Richard O. Curry ed., 1969); Victor B. Howard, *The Breckinridge Family and the Negro Testimony Controversy in Kentucky, 1866-1872,* 49 FILSON CLUB HIST. Q. 56 (1975); Howard, *supra* note 289; Mary S. Donovan, Kentucky Law Regarding the Negro, 1865-1877 (unpublished M.A. thesis, University of Louisville, 1967).

292    *See supra* notes 171-176 and accompanying text.

293    *See* Kaczorowski, *supra* note 137, at 874-79.

294    *See id.*

295    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1835 (1866).

296    *See also id.* at 1264 (statement of Rep. Broomall) (stating that "citizens of the United States, whether of the North or the South, loyal men who never took part in treason, have had their property confiscated by the State courts, and are denied remedy in the courts of the reconstructed South").

297    The following account is taken from *id.* at 1263.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13020   Page 664 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

298    Except where otherwise noted, the following account is taken from *id.* at 1833. Terry believed Unionists would not be safe if the military were removed from the state, a belief "'supported by, as I think, the unanimous feeling of the Unionists themselves.'" Virginians varied in their attitudes toward the freedmen. Although some treated them kindly and justly, many more "'treat them with great harshness and injustice ... and to reduce them to a condition which will give to the former masters all the benefits of slavery, and throw upon them none of its responsibilities.'" *Id.*

299    See JOINT COMM. ON RECONSTRUCTION, 39th Cong., 1st Sess. REPORT ON RECONSTRUCTION (1866), and the correspondence sent to senators and representatives in the 39th Congress, *e.g.*, Letter from J. W. Shafter to Lyman Trumbull (Dec. 12, 1865), Letters from T. J. Gretlou to Lyman Trumbull (Jan. 8, 19, 1866), Letter from G. Koerner to Lyman Trumbull (Jan. 11, 1866), Letter from A. A. Smith to Lyman Trumbull (Jan. 18, 1866), Letter from Grant Goodrich to Lyman Trumbull (Feb. 1, 1866) (collected in 63 Lyman Trumbull Papers; available in Library of Congress); Letter from John Dietrich to Lyman Trumbull (July 16, 1866) (collected in 68 Lyman Trumbull Papers, *supra*); Letter from H. S. Parmenter to John Sherman (Jan. 29, 1866) (collected in 92 John Sherman Papers; available in the Library of Congress); Letter from Brig. Gen. J. W. Sprague to John Sherman (Apr. 4, 1866) (collected in 98 John Sherman Papers, *supra*); Letter from Gen. George A. Custer to Zachariah Chandler (Jan. 4, 1866) (collected in Zachariah Chandler Papers, container 4 in the Library of Congress); Letter from Judge John C. Underwood to Benjamin F. Butler (Jan. 24, 1866) (collected in Benjamin F. Butler Papers, box 37 in the Library of Congress); Letter from William Ware Peck to Charles Sumner (Jan. 1, 1866), Unsigned Letter to Charles Sumner (Jan. 9, 1866) (collected in 76 Charles Sumner Papers in Houghton Library, Harvard University); Letter from Tho. Shankland to Judge Adj. Gen. Joseph Holt (May 19, 1866) (collected in 52 Joseph Holt Papers in the Library of Congress); Letter from George W. Kingsbury to Justin S. Morrill (June 18, 1866) (collected in 10 Justin S. Morrill Papers in the Library of Congress); Letter from H. B. Allis to Benjamin F. Wade (Mar. 21, 1866) (collected in Benjamin F. Wade Papers in the Library of Congress).

300    *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 1526 (1866) (Rep. McKee); *id.* at 2021 (Sen. Clark); *id.* at 2054 (Sens. Wilson and Clark); E. MERTON COULTER, THE CIVIL WAR AND READJUSTMENT IN KENTUCKY 293 (1926); David Achtenberg, *With Malice Toward Some: United States v. Kirby, Malicious Prosecution, and the Fourteenth Amendment, 26 RUTGERS L.J. 273, 275-76 (1995)* (documenting the various kinds of civil suits and criminal prosecutions that were brought against Unionists and Union soldiers); *see also* United States v. Kirby, 74 U.S. (7 Wall.) 482 (1869) (murder prosecution for killing of anti-Union guerrillas).

301    Assistant United States Attorney for Kentucky Benjamin H. Bristow informed Attorney General James Speed on February 9, 1866 of how Kentuckians were using state and local legal process to intimidate and harass white Unionists and Union soldiers: "'Suits and prosecutions are being instituted against Federal officers for acts done in the line of duty.'" Unionists were also being sued and prosecuted for giving the federal government "'a hearty and cordial support.'" Bristow informed the Attorney General of "'a concerted movement ... in every portion of the State ... to oppress and impoverish Union men, and as far as possible drive them from the State.'" Letter from Benjamin H. Bristow, Assistant United States Attorney to James Speed, Attorney General (Feb. 9, 1866), *in* Papers of the Attorney General of the United States: Letters Received 1809-1870 [hereinafter A.G. Source-Chronological File] folder 1 at 87 (on file at Record Group 60, National Archives), *quoted in* Achtenberg, *supra* note 300, at 302.

302    Achtenberg, *supra* note 300, at 299.

303    CONG. GLOBE, 39th Cong., 1st Sess. app. 184 (1866).

304    Professor Achtenberg shows that Congress discussed the problem of vexatious lawsuits and prosecutions in at least three different contexts: the debates on amendments to the Habeas Corpus Suspension Act, the debates on the Civil Rights Act of 1866, and the report and hearings of the Joint Committee on Reconstruction. Achtenberg, *supra* note 300, at 337-42.

305    CONG. GLOBE, 39th Cong., 1st Sess. 1366-67 (1866).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13021   Page 665 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

306    General Orders No. 3, *quoted in* CONG. GLOBE, 39th Cong., 1st Sess. 1834 (1866).

307    *See id*.

308    *See* General Orders No. 7, *quoted in* CONG. GLOBE, 39th Cong., 1st Sess. 1834 (1866).

309    DONALD NIEMAN, TO SET THE LAW IN MOTION: THE FREEDMEN'S BUREAU AND THE LEGAL RIGHTS OF BLACKS 179-89 (1979).

310    *See infra* notes 319-325 and accompanying text.

311    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 479 (1866).

312    U.S. CONST., Art. III, § 2, cl. 1 (defining the judicial power of the United States).

313    CONG. GLOBE, 39th Cong., 1st Sess. 480 (1866). President Johnson vetoed the Civil Rights Bill, in part, on this theory of federalism and constitutional delegation. Whenever a black American commits "murder, arson, rape, or any other crime" in states that denied blacks any right secured by the Civil Rights Act, "all protection and punishment through the courts of the States are now taken away," and they are transferred to the federal courts, the President protested. He denied that Congress had the power to confer this jurisdiction on federal courts, insisting that Article III limited federal judicial power to cases arising under the Constitution, treaties, and laws of the United States. *Id*. at 1680. Senator Reverdy Johnson, the leading Senate authority on the Constitution, more broadly complained that section 3 of "the [Civil Rights] bill goes upon the theory that there is but one Government created by the Constitution, having all legislative power and all judicial power within the limits of every State. The whole criminal code of the States, therefore, is hereby abolished." *Id*. at 1778. *See also id*. at 599 (statement of Sen. Davis) (objecting that section 3 provides for the removal of cases from the state courts into the federal courts in cases arising under state law and relating to local transactions); *id*. at 1782 (statement of Sen. Cowan) (objecting that local contract and property disputes that should be settled in state courts under state law must now be resolved in federal courts under section 3, which also transferred to federal courts the prosecution of "ordinary crimes and offenses").

314    Legal counsel for two white defendants who were convicted in federal court of a brutal murder of four blacks ranging in age from seventeen to ninety made the same argument to the United States Supreme Court in a challenge to the federal court's section 3 jurisdiction in the case. *See* Blyew v. United States, 80 U.S. (13 Wall.) 581, 586-88 (1871). In a decision based on statutory construction, the Supreme Court affirmed this argument in limiting section 3 jurisdiction in criminal cases to prosecutions involving black defendants. The Court dismissed the case against the white defendants, holding that the language of section 3 did not confer jurisdiction on federal courts in criminal prosecutions of white defendants. Nevertheless, the Supreme Court upheld section 3 jurisdiction in criminal prosecutions brought under state law against black defendants. *See id*. at 592-95.

315    *Id*. at 481. *See also id*. at 601 (statement of Sen. Guthrie) (warning that "when you overturn the State governments, interfere by your legislation with their laws, supersede their courts, keep up a constant contention between the individuals and the tribunals, you are destroying the unity of this Government, and the purposes for which the States were formed").

316    Except where otherwise noted, the following account is taken from *id*. at 1270. For Representative Kerr's actual words, see *supra* notes 195-196.

317    *Id*. at 1271.

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13022   Page 666 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

318    *Id*.

319    *See id*. at 1759 (statement of Sen. Trumbull); *id*. at 1119 (statement of Rep. Wilson); *id*. at 1124 (statement of Rep. Cook); *id*. at 1153 (statement of Rep. Thayer); *id*. at 1158, 1160 (statement of Rep. Windom); *id*. at 1263 (statement of Rep. Broomall); *id*. at 1833-35 (statement of Rep. Lawrence).

320    The following account is taken from *id*. at 1119.

321    *See id*. at 1680.

322    Except where otherwise noted, the following account is taken from *id*. at 1759-60 (quoting General Sickles's order dated Mar. 4, 1866).

323    Representative Lawrence similarly replied to President Johnson's veto message complaining that the Civil Rights Bill "invades the judicial power of the State," stating, "I answer it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded." *Id*. at 1837.

324    *See* Achtenberg, *supra* note 300, at 337-42; Kaczorowski, *supra* note 159, at 580-81; Kaczorowski, *supra* note 137, at 875 nn.48-49; Barry Sullivan, *Historical Reconstruction, Reconstruction History, and the Proper Scope of Section 1987*, 98 YALE L.J. 541, 547-57 (1989).

325    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 1759 (1866) (statement of Sen. Trumbull).

326    *See supra* notes 311-318 and accompanying text.

327    The actions taken by the federal officers who were responsible for enforcing the Civil Rights Act on its enactment evince this understanding of the statute. They prosecuted private individuals for ordinary state crimes, such as murder, manslaughter, assault, and theft, when state or local institutions failed to bring perpetrators to justice because of racial or political animus. *See* KACZOROWSKI, *supra* note 262, at 9-10, 34, 38, 52-53, 135-43; *see also supra* notes 288-291 and accompanying text.

328    CONG. GLOBE, 39th Cong., 1st Sess. 1759 (1866).

329    Except where otherwise noted, the following account is taken from *id*. at 1294.

330    See *supra* notes 99, 213, 254-257, and *infra* notes 388-391 and accompanying text for additional statements of the importance of social contract theory to the framers' understanding of Congress's power and obligation to secure citizens' civil rights by enacting a statute like the Civil Rights Act.

331    Blyew v. United States, 80 U.S. (13 Wall.) 581 (1871).

332    Senator Trumbull so informed his colleagues, stating that the Civil Rights Bill's enforcement provisions were "copied from the late fugitive slave act, adopted in 1850 for the purpose of returning fugitives from slavery into slavery again." CONG. GLOBE, 39th Cong., 1st Sess. 475 (1866). Senator Trumbull repeated that the genesis of sections 4 through

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13023   Page 667 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

7 of the Civil Rights Act was in the Fugitive Slave Act of 1850 when Congress was deciding to pass the Civil Rights Act over President Johnson's veto. *See id.* at 1759-60.

333   Civil Rights Act of 1866 § 4 ordered that, "with a view of affording reasonable protection to all persons in their constitutional rights of equality before the law ... and to the prompt discharge of the duties of this act, it shall be the duty of" the federal circuit courts and superior courts of the territories of the United States "to increase the numbers of commissioners, so as to afford a speedy and convenient means for the arrest and examination of persons charged with a violation of this act." *Compare* Civil Rights Act of 1866, § 4 *with* Fugitive Slave Act of 1850 §§ 1-4. Opponents attacked this provision as deputizing anybody to arrest a state judge who refused to admit the testimony of a black witness or a white man who infringed the civil rights secured to Negroes under this bill and to try them in federal court. *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 479-80 (1866).

334   Civil Rights Act of 1866 § 4. Senator Davis of Kentucky interpreted section 4 "of this unconstitutional, void, and iniquitous act" as requiring federal legal officers to institute both civil suits and criminal prosecutions on behalf of black victims of civil rights violations. CONG. GLOBE, 39th Cong., 1st Sess. 599 (1866). Senator Cowan characterized the U.S. commissioners authorized by the bill as "paid, hired informer[s]" and "public prosecutors" who were commissioned "to pry about, and they are to see that this law is executed and that all lawgivers, all Governors, all judges, all juries, everybody who has anything to do with the administration of the State law are punished if this law be violated." *Id.* at 1784.

335   *Compare* Civil Rights Act of 1866 § 5 *with* Fugitive Slave Act of 1850 § 5.

336   *Compare* Civil Rights Act of 1866 § 5 *with* Fugitive Slave Act of 1850 § 5.

337   *Compare* Civil Rights Act of 1866 § 6 *with* Fugitive Slave Act of 1850 § 7.

338   *Id.* Referring to the civil fine of section 5 and the criminal fine of section 6, Senator Davis complained that a federal legal officer was subject to the two penalties, noting that the Civil Rights Act "creates two separate penalties on a defaulting officer, ... one for the benefit of the United States, and the other for the benefit of the free negro ... [which] is assessed in the form of liquidated damages." CONG. GLOBE, 39th Cong., 1st Sess. 599 (1866).

339   § 7, 9 Stat. 462, 464.

340   *Compare* Civil Rights Act of 1866, § 7 *with* Fugitive Slave Act of 1850 § 8.

341   Civil Rights Act of 1866 § 7.

342   § 8, 14 Stat. 27, 29. There was no analogous provision in the Fugitive Slave Act of 1850.

343   Ch. 31, § 9, 14 Stat. 27, 29 (1866). Senator Lane of Indiana defended the authorization of "the power of the military to enforce" the statute because

[n]either the judge, nor the jury, nor the officer as we believe is willing to execute the law .... We should not legislate at all if we believed the State courts could or would honestly carry out the provisions of the constitutional amendment; but because we believe they will not do that, we give the Federal officers jurisdiction.

*Id.*

Senator Lane reminded his Senate colleagues that the military "were called upon to execute the fugitive slave law and to suppress a riot growing out of the attempt to enforce it" in Boston, a reminder of the struggle to return Anthony Burns

Compendium_Cornell
Page 1343

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13024   Page 668 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

from Boston to Virginia. CONG. GLOBE, 39th Cong., 1st Sess. 602-03 (1866). When opponents protested that this provision set up a military despotism to enforce the Civil Rights Act, Senator Trumbull answered that the Militia Clause of Article I authorizes Congress to provide for calling out the militia to aid in the execution of the laws of the United States and to prevent their violation, asserting that "the militia may be called out to prevent them from committing an act. We are not required to wait until the act is committed before anything can be done," and citing past precedents, including the Act of Mar. 10, 1838, ch. 31, 5 Stat. 212, 214, § 8 (1838), which he quoted word for word in section 9. *Id.* at 604-05 (1866). Representative Lawrence conceded that in ordinary times it may be better to await the Supreme Court's ultimate decision on questions regarding the constitutionality of discriminatory state law and legal process. But, he noted, "we now employ military power to reach the same results, to secure civil rights," because the need to secure civil rights was so immediate and urgent. *Id.* at 1837. This strategy presaged the tactics Department of Justice lawyers and marshals would use to enforce the 1870 and 1871 Enforcement Acts against the Ku Klux Klan. *See* KACZOROWSKI, *supra* note 262; ALAN W. TRELEASE, WHITE TERROR: THE KU KLUX KLAN CONSPIRACY AND SOUTHERN RECONSTRUCTION 383-418 (1971).

344   Section 9 provided that, on affidavit of the claimant that he had reason to believe that the fugitive slave would be rescued by force, it became the duty of the federal officer who held the fugitive "to remove him to the State whence he fled, and there to deliver him to said claimant, his agent, or attorney." Fugitive Slave Act of 1850 § 9. This authorization of the use of force to execute the Fugitive Slave Act was in addition to two other authorizations of the use of force: the posse comitatus provision of section 5 and the right of the claimant to seize the fugitive slave without legal process recognized in section 6. *See id.* §§ 5-6.

345   LEONARD W. LEVY, THE LAW OF THE COMMONWEALTH AND CHIEF JUSTICE SHAW 89-90 (1957); JAMES M. MCPHERSON, BATTLE CRY OF FREEDOM: THE CIVIL WAR ERA 119-20 (1988); VON FRANKKKK, *supra* note 243, at 72, 174-75.

346   Ch. 31, § 10, 14 Stat. 27, 29 (1866).

347   Representative John A. Bingham introduced the original version of his proposed constitutional amendment in the House of Representatives on February 26, 1866. CONG. GLOBE, 39th Cong., 1st Sess. 1033-34 (1866). The House debated the proposal for three days in February 1866. It decided to return Bingham's proposal to committee on February 28, and the next day, March 1, it began debate on the Civil Rights Bill. The Senate had debated the Civil Rights Bill from January 29 through February 2, 1866, when it passed the bill and sent it to the House of Representatives. The Senate did not debate the original version of Bingham's amendment. Justice Kennedy acknowledged that the original Bingham proposal delegated plenary power to enforce fundamental rights when he noted that it was replaced with the language that is now in the Constitution. He asserted that, "Under the revised Amendment, Congress's power was no longer plenary but remedial." City of Boerne v. Flores, 521 U.S. 507, 522 (1997).

348   CONG. GLOBE, 39th Cong., 1st Sess. 1033-34 (1866). The Joint Committee of Fifteen on Reconstruction adopted this version on February 3, 1866. BENJAMIN B. KENDRICK, THE JOURNAL OF THE JOINT COMMITTEE OF FIFTEEN ON RECONSTRUCTION: 39TH CONGRESS, 1865-1867, at 61 (photo. reprint 1969) (1914). *Cf.* U.S. CONST. art. I, § 8, cl. 18; U.S. CONST. art. IV. § 1; U.S. CONST. amend. V.

349   CONG. GLOBE, 39th Cong., 1st Sess. 1120 (1866); KENDRICK, *supra* note 348, at 196-97.

350   CONG. GLOBE, 39th Cong., 1st Sess. app 133-34 (1866). *See also* Rogers's comments in *id.* at 135.

351   *Id.* at 1120 (quoting Bingham's proposed constitutional amendment). Except where otherwise noted, the following account is taken from *id.*

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13025   Page 669 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

352  *See also id.* at 1155 (statement of Rep. Eldridge) (arguing that Bingham "admitted, or seemed to admit, when [his] resolution was under consideration, that there is by the Constitution as it now stands no warrant for the Federal Government to go into a State for the purpose of protecting the citizen in his rights of life, liberty, and property," and "that the majority of this House have urged the necessity of the passage of [Bingham's] resolution to amend the Constitution in order to enable them to attain the purpose sought by this bill").

353  *See id.* at 1124.

354  *Id.* Representative Rogers's speech is in *id.* at app. 133-40.

355  Except where otherwise noted, the following account is taken from *id.* at 1153.

356  *Id.* at 1291.

357  *See id.* at 1292. Bingham insisted that the Constitution required state officials to enforce its provisions. Because he believed that Congress lacked the power to force state officials to perform this duty, Bingham proposed to delegate this power to Congress. *Id.*; *see also supra* notes 254-255 and accompanying text.

358  Wilson said:

I find in the bill of rights which the gentleman [Bingham] desires to have enforced by an amendment to the Constitution that "no person shall be deprived of life, liberty, or property without due process of law." I understand that these constitute the civil rights belonging to the citizens in connection with those which are necessary for the protection and maintenance and perfect enjoyment of the rights thus specifically named, and these are the rights to which this [Civil Rights] bill relates.

*Id.* at 1294 (quoting the Fifth Amendment). Although Wilson directed his comments to the rights guaranteed by the Fifth Amendment's due process clause, he also stated that the Civil Rights Bill was intended to remedy violations of rights guaranteed generally by the Bill of Rights. *See supra* notes 257-258 and accompanying text.

359  41 U.S. (16 Pet.) 539 (1842).

360  *Id.* at 1294.

361  *Id.* at 1095.

362  *See supra* note 348. Section 1 provided that:

All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

363  The original language provided that:

The Congress shall have the power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property.

Compendium_Cornell
Page 1345

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13026   Page 670 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

KENDRICK, *supra* note 348, at 106, 116.

364   Section 5 declares that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S CONST. amend. XIV, § 5; *see also* KENDRICK, *supra* note 348, at 115-17.

365   Justice Kennedy failed to consider these debates in the legislative history of the Fourteenth Amendment presented in *City of Boerne v. Flores*, 521 U.S. 507, 520-23 (1997).

366   Except as otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 2459 (1866).

367   *See supra* notes 34-49 and accompanying text.

368   CONG. GLOBE, 39th Cong., 1st Sess. 2459 (1866). Stevens said that the Privileges or Immunities Clause, the Due Process Clause, and the Equal Protection Clause "are all asserted, in some form or other in our [Declaration of Independence] or [Bill of Rights]." *Id.*

369   Except where otherwise noted, the following account is taken from *id.*

370   *See also* CONG. GLOBE, 39th Cong., 1st Sess. 2506 (1866) (statement of Rep. Eldridge) (acknowledging that Stevens's stated purpose for adopting section 1 of the proposed amendment was to prevent the repeal of the Civil Rights Act by placing the statute into the Constitution); *id.* at 2540 (statement of Rep. Farnsworth) (urging passage of section 1 on the grounds that Democrats will join with representatives of the rebel states when they are readmitted to Congress and that they will repeal the civil rights bill).

371   *Id.* at 2461; *see also id.* at 2506 (statement of Rep. Eldridge) (insisting that section 1 of the proposed amendment was an admission that the Civil Rights Act is unconstitutional, and that Stevens's stated purpose for adopting section 1 was to prevent the Act's repeal by placing it in the Constitution). Eldridge also made similar statements regarding Bingham's original proposal earlier in the Civil Rights Bill debates. *See supra* note 352.

372   *Id.* at 2462. Justice Kennedy, in his discussion of the Fourteenth Amendment's legislative history, failed to mention Garfield's remarks quoted here, which clearly express Garfield's understanding that the revised language of the proposed Fourteenth Amendment delegated plenary power to Congress to enforce fundamental rights. *See* City of Boerne v. Flores, 521 U.S. 507, 522 (1997). Justice Kennedy instead quoted remarks Garfield made five years later for the proposition that "[t]he revised Amendment proposal did not raise the concerns expressed earlier regarding broad congressional power to prescribe uniform national laws with respect to life, liberty, and property. ('The [Fourteenth Amendment] limited but did not oust the jurisdiction of the State[s]')." *Id.* at 523 (citing CONG. GLOBE, 42d Cong., 1st Sess. app. 151 (1871)). This account shows that Justice Kennedy was clearly mistaken in this conclusion. *See also infra* notes 392-396 and accompanying text.

373   CONG. GLOBE, 39th Cong., 1st Sess. 2462 (1866). Representative Thayer joined Garfield in denying that Republicans supported section 1 of the proposed amendment because they believed the Civil Rights Act was unconstitutional without it. Rather, Republicans supported it "in order, as was justly said by [Representative Garfield], that that provision so necessary for the equal administration of the law, so just in its operation, so necessary for the protection of the fundamental rights of citizenship, shall be forever incorporated in the Constitution of the United States." *Id.* at 2465.

374   Except where otherwise noted, the following account is taken from *id.* at 2498.

Compendium_Cornell
Page 1346

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13027   Page 671 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

375   *See also id*. at 2511 (statement of Rep. Eliot) (stating, "I voted for the civil rights bill ... under a conviction that we have ample power to enact into law the provisions of that bill. But I shall gladly do what I may to incorporate into the Constitution provisions which will settle the doubt which some gentlemen entertain upon that question.").

376   *Id*. at 2498 (statement of Rep. Broomall) ("If we are already safe with the civil rights bill, it will do no harm to become the more effectually so, and to prevent a mere majority from repealing the law and thus thwarting the will of the loyal people.").

377   *See id*. at 2512.

378   *See id*. at 1266.

379   *See id*. at 2502.

380   *Id*. Raymond explained in the Civil Rights Act debates that he could not support the bill because he did not believe Congress had the authority to impose criminal penalties on state judges who enforced racially discriminatory state laws in violation of the Civil Rights Act. *See supra* notes 127, 138-141, 257 and accompanying text.

381   CONG. GLOBE, 39th Cong., 1st Sess. 2502 (1866).

382   *Id*.

383   *Id*. at 2505.

384   *Id*. (quoting Rep. Raymond's proposed civil rights bill).

385   *Id*.

386   Except where otherwise noted, the following account is taken from *id*. at 2512.

387   *Id*. at 2505.

388   *See supra* notes 99, 213, 256, 286-287, 329 and accompanying text.

389   41 U.S. (16 Pet.) 539 (1842).

390   CONG. GLOBE, 39th Cong., 1st Sess. 2512-13 (1866). Wilson reasoned that, "after declaring all persons born in the United States citizens and entitled to all the rights and privileges of citizens," as Raymond's bill provided, "it would be competent for the Government of the United States to enforce and protect the rights thus conferred, or thus declared." "That being conceded, the power to protect those rights must necessarily follow," Wilson continued, "as was laid down in the well-known case of *Prigg vs. The Commonwealth of Pennsylvania*, where the Supreme Court declared that the possession of the right carries with it the power to provide a remedy." He insisted, therefore, that the remedial "sections of the civil rights bill were but the result of that power, affirmed by the Supreme Court in the [*Prigg* case], to protect the rights which the citizen possessed."

Compendium_Cornell
Page 1347

Case 3:17-cv-01017-BEN-JLB Document 124-2 Filed 11/11/22 PageID.13028 Page 672 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

391    For a discussion of the framers' intent to compel state judges and executive officers to enforce the guarantees of the Civil Rights Act, see *supra* notes 245-264 and accompanying text.

392    CONG. GLOBE, 39th Cong., 1st Sess. 2538 (1866). Rogers's remarks explicitly contradict Justice Kennedy's suggestion that the revised amendment did not raise the federalism concerns that Bingham's original proposal aroused. City of Boerne v. Flores, 521 U.S. 507, 523 (1997). President Johnson stated in his veto message that he could not sign the Civil Rights Bill because of similar federalism concerns. The President's veto message is briefly quoted in *supra* note 200 and accompanying text. For the full text of the President's veto message, see CONG. GLOBE, 39th Cong., 1st Sess. 1679-81 (1866).

393    CONG. GLOBE, 39th Cong., 1st Sess. app. 229 (1866).

394    *See, e.g.*, *id.* at 2260-64 (statement of Rep. Finck); *id.* at 2500 (statement of Rep. Shanklin); *id.* at 2538, app. 230-31 (statement of Rep. Rogers); *id.* at 3147 (statement of Rep. Harding of Kentucky).

395    *Id.* at 2398. Phelps's statement directly contradicts Justice Kennedy's conclusion that the revised version of the amendment was intended to deprive Congress of the power to define the substance of citizens' rights. *See Boerne*, 521 U.S. at 523-24.

396    *See* CONG. GLOBE, 39th Cong., 1st Sess. 2398 (1866).

397    CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866). Howard served as the floor manager because Senator William P. Fessenden, co-chair of the Joint Committee, was sick the day the proposed amendment came up for debate in the Senate. KENDRICK, *supra* note 348, at 311.

398    *Id.* at 2890.

399    *Id.* As part of the exhaustive congressional debate on the nature and rights of U.S. citizens that had preceded his introduction of the citizenship amendment, Senator Howard had explained his conception of the privileges and immunities of U.S. citizens, as "the ordinary rights of freemen," which "include personal rights guaranteed and secured by the first eight amendments to the Constitution." *Id.* at 2765. *See supra* notes 115-223 and accompanying text for an analysis of the framers' understanding of the rights of U.S. citizenship and Congress's power to enforce these rights.

400    CONG. GLOBE, 39th Cong., 1st Sess. 2890 (1866). *Accord id.* at 3031 (statement of Sen. Henderson) (stating that "this [citizenship] section will leave citizenship where it now is"). The Citizenship Clause produced a debate over what groups were included and excluded from U.S. citizenship, a debate similar to that which ensued in the debates relating to the Civil Rights Bill. While Republicans argued that citizenship was open to all peoples, most Democrats argued that American citizenship should be restricted to white Europeans to protect them from races they regarded as inferior. *See, e.g.*, *id.* at 498-500, 504-07, 523, 528-31, 575, 1776-77, 1780-81.

401    *See supra* notes 159-162 and accompanying text.

402    *See id.*

403    *See* CONG. GLOBE, 39th Cong., 1st Sess. 2892 (1866).

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13029   Page 673 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

404    *See id.*

405    *Id.*

406    *Id.* at 2892-93.

407    *Id.*

408    *Id.* at 2896.

409    Dred Scott v. Sandford, 60 U.S. (19 How.) 393. 422-23 (1857).

410    CONG. GLOBE, 39th Cong., 1st Sess. 3032 (1866) (quoting *Dred Scott*).

411    *Id.* at 2893.

412    *Id.* at app. 227.

413    *See supra* notes 214-220 and accompanying text. Senator Garrett Davis of Kentucky suggested that supporters understood the Citizenship Clause of the proposed amendment to be sufficient to assure the constitutionality of the Civil Rights Act and to secure the civil rights of African Americans. He asserted that

The real and only object of the [Citizenship Clause], which the Senate added to [section 1], is to make negroes citizens, to prop the civil rights bill, and give them a more plausible, if not a valid, claim to its provisions, and to press them forward to a full community of civil and political rights with the white race, for which its authors are struggling and mean to continue to struggle.

CONG. GLOBE, 39th Cong., 1st Sess. app. 240 (1866). In the Civil Rights Act debates Davis conceded that citizenship entitled the individual to all of the fundamental rights that citizens enjoy. *See supra* note 142 and accompanying text. He nevertheless objected that the Comity Clause restricted Congress's power over citizenship "to such matters as concern the citizens of different States," and insisted that Congress "has no power whatever to act in relation to the matters of this bill so far as those matters concern the citizens of a single State." CONG. GLOBE, 39th Cong., 1st Sess. 595 (1866). He objected, therefore, that "[t]he principles involved in this bill, if they are legitimate and constitutional, would authorize Congress to pass a civil and criminal code for every State in the Union." *Id.* at 1414. For additional discussion of Senator Davis's views, see *supra* notes 197-199, 248 and accompanying text.

414    Except where otherwise noted, the following account is taken from CONG. GLOBE, 39th Cong., 1st Sess. 2896 (1866).

415    *See id.* Doolittle asserted that Bingham had "maintained that the civil rights bill was without any authority in the Constitution," and that he proposed "to amend the Constitution so as to enable Congress to declare the civil rights of all persons." Doolittle insisted that he had a "right to infer that it was because of Mr. Bingham," other House Republicans, and members of the Joint Committee of Fifteen, to which the proposed amendment had been referred, "had doubts, at least, as to the constitutionality of the civil rights bill" that they now proposed "to amend the Constitution" in order "to give [the statute] validity and force." Indignant, Senator James W. Grimes of Iowa, a member of the Joint Committee, denied Doolittle's accusation and characterized it as "an imputation upon every member who voted for the [civil rights] bill, the inference being legitimate and logical that they violated their oaths and knew they did so when they voted for the civil rights bill." *Id.*

Compendium_Cornell
Page 1349

Case 3:17-cv-01017-BEN-JLB   Document 124-2   Filed 11/11/22   PageID.13030   Page 674 of 733

CONGRESS'S POWER TO ENFORCE FOURTEENTH..., 42 Harv. J. on Legis. 187

416    Senator Luke P. Poland of Vermont elaborated this intention, stating that the Civil Rights Act and section 1 of the proposed constitutional amendment were intended to enforce the principles of republican government expressed in the Declaration of Independence and secured throughout the Constitution, an implied reference to Bill of Rights guarantees. *See id.* at 2961. Poland observed that Congress had already legislated to advance these principles when it enacted "what is called the civil rights bill." However, he also noted that "persons entitled to high consideration" had doubted and denied Congress's power to enact this statute and "to enforce principles lying at the very foundation of all republican government." Asserting the desirability of leaving no doubt as to Congress's power to enforce these principles, Poland was confident that "every Senator will rejoice" in supporting the proposed constitutional amendment which would "remove all doubt upon this power of Congress." *Id.*

417    *Id.* at 2896.

418    *See supra* notes 92-102 and accompanying text.

419    *See supra* notes 120-151 and accompanying text.

420    *See supra* notes 31-56, 91-102 and accompanying text.

421    *See, e.g.*, CONG. GLOBE, 39th Cong., 1st Sess. 43 (1866) (statement of Sen. Trumbull) (stating that the framers of the Thirteenth Amendment intended its prohibition of slavery in section 1 as a positive guarantee of liberty which delegated to Congress plenary power to enforce the natural rights of free men, and that they intended section 2 "to put it beyond cavil and dispute").

422    Ch. 114, § 18, 16 Stat. 140, 144 (1870).

423    *Id.* §§ 16-17. Recall that the framers amended the original version of section 1 of the Civil Rights Bill by narrowing its application from all inhabitants in the several states to citizens of the United States because they believed that restricting the bill's guarantees to citizens' civil rights would remove doubts over Congress's authority to enact it. *See supra* notes 124-127 and accompanying text.

424    CONG. GLOBE, 41st Cong., 2d Sess. 1536 (1870).

425    *Id.* For additional statements on the meaning of "equal protection of the laws," see *id.* and *id.* at 3807-08 (statement of Sen. Stewart) (stating that the aliens provisions that became sections 16 and 17 of the 1870 statute "giv[e] all the protection of the laws"). *See also id.* at 1536 (statement of Sen. Pomeroy) (supporting the extension of equal protection to aliens); *id.* at app. 473 (statement of Sen. Carpenter) (suggesting that the Fourteenth Amendment's Equal Protection Clause authorizes the civil remedies and criminal penalties adopted in the various sections of the 1870 statute); *id.* at 3802 (statement of the Vice-President) (stating that "The Senate ... inserted various propositions to enforce the fourteenth amendment ... to put down illegal bands of marauders; To protect the equal rights of citizens under the laws; to reenact the civil rights law"); *id.* at 3871 (statement of Rep. Bingham) (stating that the Fourteenth Amendment entitles white immigrants "to the equal protection of the laws," not only of state law but of federal law as well). *But see id.* at app. 473 (May 20, 1870) (statement of Sen. Casserly) (rejecting the understanding of proponents of the Enforcement Act of 1870 that the Fourteenth Amendment authorizes Congress to punish "the criminal or illegal acts of a private person in a State, in depriving another of his life by murder, or of his liberty by false imprisonment, or of his property by stealing it, all 'without due process of law,' .... Otherwise Congress might take to itself, under pretense of enforcing the fourteenth amendment, the entire criminal and civil jurisdiction in the States of offenses and trespasses against life, liberty, and property by private persons acting without any color of State authority."). *Accord id.* at 3874 (statement of Rep. Beck) (stating that re-enacting the Civil Rights Act was intended to enforce the Fourteenth Amendment); app. 546 (statement

Compendium_Cornell
Page 1350

of Rep. Prosser) (agreeing with Beck and the Democrats that re-enacting the Civil Rights Act was intended to enforce the Fourteenth Amendment).

426     *Id.* at 3658.

42 HVJL 187

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

13 Yale J.L. & Human. 391

Yale Journal of Law & the Humanities
Summer 2001

Essay

Victoria Kahn [a1]

Copyright (c) 2001 Yale Journal of Law and the Humanities, Inc.; Victoria Kahn

# EARLY MODERN RIGHTS TALK

Modern historians of political thought, legal historians, critical legal theorists, and others regularly look to the seventeenth century as the "classic" period of rights talk, the period which shaped the development of all subsequent liberal political theory. Thus, scholars as diverse as Carole Pateman, Ian Shapiro, John Rawls, and Mary Ann Glendon have taken the seventeenth century as their point of departure in evaluating the role of rights in modern liberal theory. The same is true of older scholars, such as Leo Strauss and C. B. Macpherson, not to mention the numerous historians of political thought for whom Hobbes and Locke mark the beginning of the liberal tradition. [1] Although this list of strange bedfellows would seem to suggest a considerable divergence of opinion about what transpired in the seventeenth century, there is in fact surprising agreement **\*392** about the emergence of a proto-liberal conception of the rights-bearing individual and of individual consent to political contract as the basis of political legitimacy. Ernst Bloch articulated the scholarly consensus in Natural Law and Human Dignity when he described the most important feature of the new language of rights as "the belief that individuals constitute and preserve social life." These individuals are the possessors of "private rights," which

> cannot be violated except under the one condition that the individual consents to let this happen out of what he considers his own best interest. It was a juridical rather than a historical concept that led to the view that a just state could not be thought of except as the product of the will of its members. [2]

All of the above named scholars have argued that our ways of thinking and talking about rights are still shaped in part by the "classic" early modern discussions of the rights-bearing individual. Perhaps more surprising, all are agreed that this formative influence has been harmful--although for different reasons. Some, like Leo Strauss (who can stand here for a long line of politically conservative critics), have argued that the seventeenth-century discourse of individual rights ushered in the historicism and relativism of the modern age. [3] Others, like C. B. Macpherson (who can stand for a long line of Marxist-inspired critics), have argued that the rights-bearing individual of the seventeenth-century, the individual who in Locke's words has "property in his person," was modeled on the protocapitalist economy of the seventeenth century, and that this conception of rights has had a deleterious influence on subsequent liberal attempts to think about justice, especially just distribution. [4] The feminist political theorist Carole Pateman extended Macpherson's argument to gender, claiming that the liberal language of rights and social contract is essentially the same as patriarchal models of political obligation: the language of rights simply obscures-- and thus helps to preserve--inequitable relations of power. [5] More recently, and from a much more socially conservative communitarian perspective, Mary Ann Glendon has attacked the "possessive individualism" of the early modern period, arguing that rights talk, then and now, imagines the individual as prior to the community and fosters a conflict regarding rights to scarce resources rather than encouraging us to think of our responsibilities to our fellow citizens. [6] Finally, and taking a somewhat different tack, Ian Shapiro **\*393** has argued that the early modern language of rights was far more coherent than modern liberal rights talk, because it was informed by certain epistemological and religious convictions that most of us no longer share. In Hobbes, Locke, and many of their contemporaries, rights talk was underpinned by a theory of objective interests and (in the case of Locke and others) divine will, that constrained the rampant pursuit of self-interest and made seventeenth-century rights talk immune to the objections of relativism--to which modern liberalism is vulnerable. In contrast, according to Shapiro, the individualism, even monadism, of Rawls and Nozick is indefensible: an anachronistic throw-back to early modern thought without early modern presuppositions, and thus an inadequate way of talking about rights in an age of globalism. [7] Thus all

of the critics I have mentioned suggest that we need to know more about the underlying assumptions of early modern views so we can see how their current influence is unwarranted--so we can see how inappropriate they are to our own very different time and society.

I would like to concede both the influence of this version of early modern rights talk and its problematic relevance to modern debates, and still argue that there is something of positive value in the seventeenth-century language of rights that bears on contemporary discussion. And that is the insight, for all the debate about "natural rights" in this period, that rights are discursive-- derived by rational deliberation and discussion--even, we might say, linguistically constituted. Despite their interest in the early modern period, none of the contemporary critics I have mentioned has anything to say about the "talk" part of seventeenth-century "rights talk." And yet it is arguably this discursive focus--the awareness on the part of some seventeenth-century writers that language as a set of conventions could serve as a model for rights--that is of greatest relevance to modern discussions of rights. [8] An account of early modern "rights talk" as opposed to "rights theory" would then focus not simply on discussions of rights in this period, but rather on discussions of rights as a matter of talk. In order to appreciate this point, we need to backtrack a few steps and say something about the historical context of the language of rights in the early modern period.

Rights talk emerged in the seventeenth century in response to what we might call a crisis of legitimation, an overlapping set of political crises involving religious and civil wars and international conflict. [9] This crisis **\*394** was moral and epistemological as well. In contrast to those late scholastics who explained the binding force of agreements in terms of the Aristotelian virtues of promise-keeping, liberality, and commutative justice, seventeenth-century English and continental Protestant writers were operating in a world in which such Aristotelian assumptions were no longer taken for granted. [10] The task of political thinkers and jurists was to find a new way of talking about obligation and binding agreements in the absence of religious and political consensus. In one common account of the discursive shift in this period, the language of law replaced that of virtue. [11] But this formulation does not do justice to the sophisticated early modern reflection on the linguistic dimension of rights, reflection that was itself generated by the search for a common language of obligation. Along with rights, I argue, language took center stage. In particular, language as a conventional system of signs was seen to be the precondition and model for the articulation of early modern rights.

In the following account of rights talk I focus on Hugo Grotius's De jure belli ac pacis (1625) and Samuel Pufendorf's De jure naturae et gentium (1672). [12] Now read as a classic of international law, Grotius's work is by most accounts the first important example of the new rights talk; Pufendorf was an admirer of both Grotius and Hobbes and, in the late seventeenth and eighteenth centuries, an extremely influential theorist of natural rights. Both authors offer an account of political association predicated on the individual transfer of natural rights to a sovereign, and both must accordingly explain why individuals should and do keep their promises of obedience, their political contracts.

As in all early modern theories of political contract, Grotius and Pufendorf waver between voluntarism and rationalism, between emphasizing the role of the individual's will and consent in legitimating political rule and the role of reason in conforming to already existing **\*395** standards of justice. [13] In the first case, they focus on subjective natural rights, in the second on objective natural law. In the first case, the argument for keeping one's promises tends to be prudential and pragmatic, in the second, moral or theological. But there is a midpoint between these extremes, and that is the argument that language itself provides a basis for rights talk that is neither theologically determined nor merely prudential and self-interested. In both Grotius and Pufendorf, this kind of rights talk takes three forms: the quotation of previous discourses about rights; the argument that the political contract is analogous to, and founded on, a prior linguistic contract; and the suggestion that the constructive power of language is itself constitutive of rights. None of these arguments logically dictates the others, nor are they in all respects consistent with each other or with the presupposition of an objective natural law. But together they show the effort on the part of at least two important early modern theorists to take language into account in the formation and articulation of rights.

We can begin to get a sense of the discursive occasion and motive for early modern rights talk by turning to the Prolegomena of Grotius's De jure belli ac pacis. Here Grotius explains his reasons for writing:

> Fully convinced . . . that there is a common law among nations, which is valid alike for war and in war, I have had many and weighty reasons for undertaking to write upon this subject. Throughout the Christian world I observed a lack of restraint in relation to war, such as even barbarous races should be ashamed of; I observed that men rush

Compendium_Cornell
Page 1353

to arms for slight causes, or no cause at all, and that when arms have once been taken up there is no longer any respect for law, divine or human. [14]

As though to emphasize the occasion of conflict, Grotius makes controversiae (controversies) the first word of chapter one. To the early modern reader, the word "controversiae" would have conjured up not only contemporary religious and political controversies but also rhetorical exercises training students to argue on both sides of a question (as in the elder Seneca's Controversiae), thereby emphasizing the inextricability of discursive and political conflict. Grotius then goes on to argue, from common linguistic usage, that "war" has come to mean "not a contest but a condition," [15] just as Hobbes would argue in Leviathan. [16] It was in **396** response to this condition that Grotius, like Hobbes and Pufendorf, turned to natural law. Natural law seemed to offer a point of convergence or agreement for the otherwise competing interests of individuals or nations, a lowest common denominator. An important part of this new minimalism was the focus on subjective rights. In Grotius and others, natural rights were a subset of natural law. [17] Whereas natural law referred to an objective order, natural right referred to subjective faculties and powers--such as the freedom to defend oneself and one's property. Along with our natural sociability, the natural right of self-preservation seemed to provide a particularly compelling motive for political obligation.

What was the rhetorical force of the language of rights and what sorts of argument did this language itself promote? In some cases, the power of the new language of rights lay in the fact that it was ahistorical--and thus a way of wrenching consensus from historically embedded conflicts and traditional but contested legitimations of authority. This was the rhetorical function of the state of nature and of the description of rights as "natural." Natural rights were opposed to divine right, feudal rights and obligations, traditional notions of hierarchy and authority, historical custom and consensus. [18] Thus Grotius goes out of his way to distinguish natural law and natural right from historically variable positive law, whether in an individual country or in the law of nations. The discussion of natural law can only be made systematic, he tells us, if it is divorced from positive law:

> For the principles of the law of nature, since they are always the same, can easily be brought into a systematic form; but the elements of positive law, since they often undergo change and are different in different places, are outside the domain of systematic treatment. [19]

But in other cases (or, in the case of Grotius, in other places), natural rights alone or both natural law and natural rights were linked to history. At times Grotius argues that whereas natural law is absolute, natural rights are relative and historical: they come into being in--and help to negotiate--the postlapsarian, historical existence of individuals and nations. At other times, while insisting that the law of nature is always and everywhere the same, Grotius allows that it encompasses things that are created by human volition. As an example, he cites the notion of ownership. Once ownership has been historically introduced by human agreement, it is wrong according to natural law to take someone's **397** property without his consent. [20]

This entwining of natural law and history was enshrined in Grotius's response to the question of how to prove the existence of the law of nature. This may be done either a priori by matching human behavior to natural law or--the easier way--a posteriori, by considering what natural law has been thought to be "among all nations, or among all those that are most advanced in civilization." [21] The linking of natural law and natural rights to history then mandates a particular kind of rights talk. As anybody knows who has dipped into them, Grotius's De jure belli ac pacis and Pufendorf's De jure naturae et gentium offer encyclopaedic, proto-anthropological investigations of rights talk from antiquity to the seventeenth century. Drawing on "the testimony of philosophers, historians, poets, [and] orators," [22] they introduce the reader to the customs of ancient Roman worship, penal law, polygamy, and slave contracts. But along with such historical examples, the reader of Grotius and Pufendorf would take away a methodological lesson as well. In these texts, any claim regarding the universality of rights is supported not simply by reference to a divinely authored natural law, but also by a wide array of historically and culturally disparate examples from classical and contemporary texts, suggesting that we can only know which rights are "natural" by knowing what people have historically made or said of them. Customs--and customary ways of speaking--are thus not simply opposed to natural laws, but evidence of their historical instantiation. This, then, is the first way in which we should construe early modern "rights talk." [23]

Compendium_Cornell
Page 1354

The second way we should understand "rights talk" has to do with the analogy between the political contract and what I have called the linguistic contract. For many early modern authors, natural rights were the basis of the political contract. [24] According to this argument, individuals have natural rights of self-preservation and dominion which they consent to transfer to the sovereign in exchange for protection, security, and what Hobbes called "commodious living." This exchange of protection for **\*398** obedience was the essence of the political contract. Such a contract prompted the obvious question: Why do individuals remain bound by it when the sovereign appears to act contrary to their interests? Why should and do they keep their promises? From antiquity onwards, one answer to this question was that we are morally obliged to do so by the divine and natural law that "promises must be kept" (pacta servanda sunt), as well as by the implicit sanction of divine punishment. But in the seventeenth century, this answer was very often supplemented by another, which involved an analysis of the mechanism of promising and of the social conventions--the social contract--of language. Beginning with the assumption that language is a distinctively human capacity which is essential for the founding of society, rights theorists such as Grotius gradually articulated the insight that language itself entails certain obligations. On the basis of this normative view of language, they then argued that a linguistic contract--a contract about the meaning and right use of language--is the precondition of all other contracts.

Drawing on a range of classical, patristic, and humanist texts, Grotius represents language as the sign of our rational and sociable nature. [25] Like Cicero, Grotius sometimes confidently asserts that man has "an impelling desire for society, for the gratification of which he alone among animals possesses a special instrument, speech (sermonem)." [26] He spells out the implications of this view in his discussion of good faith in Book 3. Here Grotius goes so far as to criticize Cicero's opinion that promises could be broken in exceptional cases. [27] Although lying might be permitted in wartime, promises have a special status as a sign of our rationality: "From the association of reason and speech arises that binding force of a promise with which we are dealing." [28]

At other times, Grotius gives greater emphasis to the indispensable role language played in eliciting our capacity for reason and sociability. Here **\*399** Grotius draws on, among others, Cicero's account of the linguistic origin and preservation of society in De inventione. According to this account, the eloquence of one man was necessary both to transform irrational "wild savages into a kind and gentle folk," and--once society had been established-- to induce "those who had great physical strength to submit to justice without violence." [29] Moreover, Cicero goes on to argue, eloquence also has a role to play in regulating violence itself. In a passage that could describe Grotius's own ambitions, Cicero tells us that, after "eloquence came into being and advanced to greater development . . . in the greatest undertakings of peace and war (in rebus pacis et belli) it served the highest interests of mankind." [30] Grotius proposes a similar role for eloquence with regard to his savage and irrational contemporaries. As we have seen, in the Prolegomena to De jure belli Grotius makes it clear that the goal of his ambitious treatise is to subdue irrational force--to subdue war itself--to the constraints of rational discourse.

In De jure naturae et gentium Pufendorf follows Grotius's emphasis on and interpretation of our capacity for speech:

> This one fact alone might be sufficient proof that man was intended by nature for a social life, namely, that he of all creatures has been given the ability to express his thoughts to others by means of articulate sound, which faculty can be of no logical use to men, unless they lead a social life. [31]

Language, in other words, enables those verbal agreements which facilitate the peaceful social relations dictated by natural law: "[T]he law of nature commands, in a general way and indefinitely, that men enter into agreements of some kind or other, since without them social relations and peace between men could not be preserved." [32] Accordingly, like Grotius, Pufendorf argues that promises and agreements must be kept--pacta **\*400** servanda sunt--by referring not only to natural law but also to language as proof of our social and moral obligations. Language provides both evidence of, and a vehicle for, our natural disposition to peaceful and faithful social relations.

Pufendorf makes an even stronger claim for the power of language to bring reason and sociability into being when, like Grotius, he locates speech at the dividing line between violence and law. Thus in his discussion of "the natural state of man," Pufendorf quotes with approval Horace's description in Book One of his Satires:

> "When living beings first crawled on earth's surface, dumb brute beasts, they fought for their acorns and their lair with nails and fists, then with clubs, and so from stage to stage with the weapons which need thereafter fashioned for them, until they discovered verbs and nouns by which to make sounds express feelings. From that moment

they began to give up war, to build cities, and to frame laws . . . ." [33]  In this genealogy of society, nouns and verbs replace clubs; the ability to frame laws in language replaces the natural state of war. Language, in short, brings into being an entirely new set of social and political relations to which human nature was not originally inclined.

Accordingly, Pufendorf distinguishes between the minimal obligations incumbent upon us by the "mere law of humanity," and those rights and obligations created by "agreement or covenants":

> [I]f mutual offices, the real fruit of humanity, are to be practised more frequently between men, and by a kind of set rule, it was necessary for men themselves to agree among themselves on the mutual rendering of such services as a man could not also be certain of for himself on the mere law of humanity. [34]  Social relations are a linguistic artifact--specifically, an artifact of the verbal contracts we enter into. In the examples that follow we see that actual contracts exemplify the social, world-making capacities of language; they supplement the natural duties of charity by creating new rights and obligations [35]; they bring society as we know it into being. In support of this view Pufendorf cites Isocrates's view in Against Callimachus that

> treaties and pacts [ foederibus et pactis] "have such effect, that most of the affairs of life among both Greeks and barbarians are transacted through pacts and covenants [ pactis & conventis]. . . . By means of these we form contracts [ commercia agitamus] with one another, and  **\*401**  lay aside private enmities as well as general wars." [36]  In addition he quotes Aristotle's Rhetoric: "'If contracts are invalidated, the intercourse of men is abolished.'" [37]  For these pragmatic reasons, as well as because of the a priori moral law, Pufendorf subscribes to Cicero's argument in De officiis that even villains need to keep faith with each other. [38]

Although Grotius and Pufendorf both point to speech as evidence of our natural reason and sociability--and thus of our natural obligation to keep our promises--they also argue that a political contract is necessary because our natural disposition was not enough to ensure peaceful and faithful interaction. In these works, reflection on political obligation is always shadowed by skepticism, by the conviction of sin, or by its secular equivalent: the recognition that we are naturally prone to breach of promise. Thus it was a short step from Grotius's and Pufendorf's observations on the distinctively linguistic nature of human society to the insight that a linguistic contract logically preceded the social or political contract. Because political and other contracts are forged in language, part of what is involved in making a contract is making language itself dependable or calculable. A contract in language is inevitably also a contract about the use of language--one that proscribes deceit, equivocation and, in most cases, coercion. The possibility of binding signification then becomes the precondition of binding oneself politically, the precondition of the irrevocable transfer of rights. [39]

Grotius makes the connection between right linguistic usage and right government at various points in De jure belli. The centerpiece of his argument appears in Book 2, Chapter 16, On Interpretation. This chapter is obviously indebted to earlier humanist legal scholars who, in their effort to codify the norms of interpretation, gave increased attention to the rules for the interpretation of Roman law found in Digest 50.16, de verborum significatione. [40]  Like his humanist predecessors, Grotius was anxious to  **\*402**  discover ways of constraining subjective intention, including criteria regarding the "objective" or socially determined meaning of words. [41]  Even more than his predecessors, Grotius was acutely aware of the political implications of his attention to the norms of interpretation. In particular, he tried to articulate a middle ground between tyranny and anarchy by arguing that the meaning of an individual's consent to a contract, including a political contract, is constrained by the social contract of language.

Thus, to the fundamental question regarding political obligation--Must we mean what we say?--Grotius answers a resounding yes:

> If we consider only the one who has promised, he is under obligation to perform, of his own free will, that to which he wished to bind himself. "In good faith what you meant, not what you said, is to be considered," says Cicero.

Compendium_Cornell
Page 1356

But because internal acts are not of themselves perceivable, and some degree of certainty must be established, lest there should fail to be any binding obligation, in case every one could free himself by inventing whatever meaning he **\*403** might wish, natural reason itself demands that the one to whom the promise has been made should have the right to compel the promisor to do what the correct interpretation suggests. For otherwise the matter would have no outcome, a condition in which morals is held to be impossible. [42]

In this passage Grotius both acknowledges and appears to depart from the widespread medieval view that internal acts are perceivable by God and morally binding for that reason. [43] Instead, he imagines a world in which morals are secured in the realm of interpersonal communication. Confronting the ever-present possibility of deception and equivocation, he asserts a public standard of meaning and accountability: Words should be understood "according to current usage." [44] That is, while appealing to the independent authority of natural reason, Grotius also locates that authority in common linguistic practice--in the hope that language itself might provide the ethical and interpretive guidelines which are "not of themselves perceivable," and for which there is no more obvious foundation. [45]

This characteristically early modern tension between subjective intention and objective meaning--the objective constraints of language--is also apparent in Grotius's discussion of promises in Book 2, Chapter 11 of De jure belli. In this chapter, Grotius argues against the French jurist Connanus's view that some material proof or consideration is necessary for an agreement to be binding. But even here, where Grotius is defending the canon law principle that we are bound by our bare promises (promises without consideration), he focusses not simply on the necessary representation of the promise in language but also on the way language constrains our meaning in ways we may not intend. [46] According to Grotius, to be able to promise is to be able to alienate one's actions or **\*404** freedom, just as we alienate or transfer our right to property. [47] In Grotius's account, the mechanism of such alienation--the way we secure our promises--is language: We represent our intention by means of "external signs." This analogy between the alienation of one's intention in language and the alienation of property then informs Grotius's argument that one can consent to permanent alienation of one's rights by means of an irrevocable political contract. But this representation of our intention in language may involve a different kind of alienation as well, as we see when Grotius quotes Proverbs: "Thou art snared by the words of thy mouth," and Ovid's Metamorphoses (Book 2, line 51), where Apollo regrets his promise to Phaeton: "My word has become yours." [48] In these two examples, the emphasis is not so much on the way verbal promises effectuate the will of the speaker as on the way language may bind the speaker to express but nevertheless unintended terms. [49]

As the preceding has already suggested, to focus on the obligations that language creates was not only to consider the relation of intention to the social contract of meaning. It was also, necessarily, to take up the question of performance. In his Introduction to the Jurisprudence of Holland, Grotius argues,

> The duty of keeping faith arises from speech or anything that resembles speech. Speech is given to man alone amongst animals for the better furtherance of their common interest in order to make known what is hidden in the mind; the fitness whereof consists in the correspondence of the sign with the thing signified, which is called "truth." But since truth considered in itself implies nothing further than the correspondence of the language with the mind at the actual moment when the language is used, and since man's will is from its nature changeable, means had to be found to fix that will for time to come, and such means are called 'promise.' [50]

Because our will is changeable, Grotius argues, we need to invent ways to bind ourselves, to bind our intention to perform, and this self-binding **\*405** takes the form of a promise or contract. Here language appears as a condition of mortgaging the will. Language is what allows us to sustain the fiction of an identical will--and of conscience--through time. As he often does, Grotius is not so much working forward from the natural moral law as working backward from language. For language to make sense, promises have to be possible. It may not be too much to say that the power of the will to bind itself is a consequence of language--of language conceived of as the rational bond of society and as the tropological power to transfer one's rights. In the Prolegomena to De jure belli Grotius famously claims that even if we were to imagine (etiamsi daremus) that God did not exist, we would still be bound by the dictates of natural law. [51] In light of the arguments we have surveyed, we can now recast

Grotius's formulation: "etiamsi daremus," even if we were to imagine that God did not exist, language would still permit the transfer of rights and would still dictate certain rational obligations. As Grotius says in the passage from The Jurisprudence of Holland, our intentions are themselves bound by language, not the other way around. [52]

But Grotius was not naive about the force of the linguistic contract. In On Interpretation and elsewhere in De jure belli it is clear that this force is normative rather than actual: conventions of meaning cannot preclude deception; instead, they provide the norm for the enforcement of promises. At the same time, because norms are not the same as constraints, Grotius also acknowledges the necessity of some kind of extra-linguistic compulsion to enforce the common understanding: "the one to whom the promise has been made should have the right to compel the promisor to do what the correct interpretation suggests." [53] The relevance to international affairs is clear. According to De jure belli, a just war is one that has been precipitated by an international breach of promise or some other violation, and that grants the injured party the "right to compel," the right to exercise force against another nation.

In On the Duty of Man and Citizen Pufendorf is even more explicit about the linguistic contract that precedes the political contract. [54]   **406**  According to Pufendorf, we incur "a double obligation by using [[language] whether in speech or in writing":

> The first is that users of a given language . . . must employ the same words for the same objects following the usage of that language. For since neither sounds nor particular letter-shapes naturally signify anything (for if they did, all languages or forms of writing would necessarily converge), the use of language would become meaningless if everyone could give an object any name he wanted. To prevent this, it is necessary for a tacit agreement [ [ tacitam conventionem] to be made among users of the same language to denote each thing with one particular word and not another. . . . The second obligation involved in the use of language is that in speaking to someone one should disclose the sense of one's mind to him in such a way that he may clearly know it. [55]

Like Grotius, Pufendorf argues in De jure naturae et gentium that there is an implicit social contract regarding both the meaning and the well-intentioned use of signs. The imposition of meaning is established by consent, agreement, and pact. Linguistic connotation is also a function of social interaction, for words gain accessory meanings as "an expression of our judgment or passion and esteem." [56] He asserts that the social agreement regarding the right usage of words is dictated by the law of nature, which forbids deceit by the use of signs. [57] But he also casts this argument in terms of the "right" (jus) not to be deceived, attendant upon the conventions of language. [58] In On the Duty of Man and Citizen Pufendorf goes further, arguing that such linguistic rights are themselves socially constituted, thus changeable: here he justifies various forms of equivocation or lying in terms of their conformity to social concerns or what he calls "moral truth." [59] Like Grotius, then, Pufendorf vacillates between arguing that the moral obligation to keep our promises is dictated by substantive natural law and that it is created by linguistic convention itself. [60] It is the latter argument that is of particular interest to our post-foundationalist world.

In addition to proto-anthropological rights talk and the linguistic contract, there is a third and final way in which early modern reflection on the political contract anticipates modern rights talk. As I mentioned before, the early modern emphasis on the linguistic constitution of rights can be interpreted as a response to skepticism about the legibility of  **407**  natural law or as an attempt to stress the historically contingent activities of persuasion and negotiation in response to the lethal conflicts generated by the wars of religion. In either case, early modern rights talk is characterized, in Bloch's words, by "the belief in the power of a logical construction," the belief that we can only know what we have made or constructed ourselves. [61] Hobbes, Pufendorf, and Locke, all in their different ways, articulated versions of this belief. In De Homine, Hobbes asserts that "politics and ethics . . . can be demonstrated a priori; because we ourselves make the principles." [62] Pufendorf puts forward a view of moral (as opposed to natural) entities as specifically human inventions or constructions; and Locke asserts in a similar vein that, like God, man has a maker's knowledge and natural right in "the work of his hands" and other intentional actions. [63]

This emphasis on construction has usually been interpreted in terms of mathematical models of cognition. Bloch's comment on the belief in logical construction is typical: "This is an essential trait of modern bourgeois thought since its inception: It knows only that which has been rationally produced, and it must be able to be reconstructed logically from its elements and foundations. . . . Here mathematics provided the model." [64] There is certainly plenty of evidence that Hobbes thought of his

political theory in this way, and Grotius, too, claimed scientific precision for his analysis of natural rights. [65] But the preceding analysis suggests an alternative interpretation of the power of construction, one that focusses on the constitutive power of language. Following in the footsteps of their humanist predecessors, Grotius, Hobbes, Pufendorf, and Locke all developed to different degrees the analogy between God the creator and man the maker, not least of all in terms of the linguistic power of creation first instanced in the divine fiat: let us make man in our image and likeness. [66] In their historical account of rights talk, Grotius and Pufendorf **\*408** in particular suggest that a similar fiat is at work in the declaration of rights. The innovation of at least some early modern theories of political contract, as P. S. Atiyah has correctly observed, is not "the idea of a relationship involving mutual rights and duties," but rather the idea that contract creates and sustains this relationship by means of the free choice of individuals. [67] The same could be said of the relationship between the linguistic contract and mutual rights: What distinguishes the early modern from the medieval period is not so much the idea of natural rights, which had a prior life in medieval philosophy, but the idea that such rights might be created and sustained by our linguistic agreement, without any other foundation. [68]

I am not suggesting that early modern contractarians are theorists of modern human rights. Among the many theoretical and practical reasons this could not be the case (some of which I have explored above) is the simple fact that early modern rights talk was perfectly compatible, in the minds of many of its proponents, with political absolutism. I am also not suggesting that simply failing to understand the history of rights talk must result in unsuccessful modern discussions of rights. But, in attempting to deal with the seventeenth-century equivalent of a crisis of foundationalism, Grotius and Pufendorf do have something to contribute to our modern debates. Specifically, they provide both a historical corrective and a methodological alternative to modern accounts of rights. Although a full treatment of the implications of early modern rights talk for modern debates cannot be undertaken here, it is clear that Grotius and Pufendorf challenge the consensus discussed at the beginning of this essay, a consensus that defines liberalism (both then and now) in terms of a pre-social essentialist version of the self; ahistorical individual rights; and ahistorical, universally valid natural laws. In the alternative genealogy I am suggesting, at least some early modern rights talk looks forward to modern attempts to define the liberal self as already embedded in culture and language, as constituted through an ongoing series of interpersonal relations. [69] It also looks forward to efforts to locate rights somewhere **\*409** between positivism and the metaphysics of natural law, in the in-between space of conversation. [70]

The contemporary relevance of the early modern focus on the discursive dimension of rights is suggested by Thomas Haskell's article The Curious Persistence of Rights Talk in the "Age of Interpretation." Haskell argues (against Leo Strauss on the one hand, and Nietzsche on the other) that it is still possible to talk about rights, even once one has accepted the historicist critique of positivism. Whereas Strauss and Nietzsche agreed that rights needed a metaphysical foundation in natural law (which for Strauss was at least desirable and for Nietzsche impossible), Haskell suggests that we think about rights as conventions:

> Rights need not be either eternal or universal, but if they are to do us any good, they must be rooted deeply enough in the human condition to win the loyalty of more than a few generations (and ideally, more than a few cultures). Conventions possess the requisite durability. [71]

Haskell concedes that

> [R]ights as rational conventions will lack some of the qualities that have traditionally been claimed for rights. . . . Far from being fixed once and for all in a constitution or a bill of rights, the definition of rights will be a perpetual object of contention between rival groups with strong vested interests, both ideal and material, in one interpretation or another. [72]

Although Haskell makes a compelling case for the continued significance of rights talk in the absence of metaphysical foundations, he devotes little attention to language. Here, it is useful to turn to the work of Claude Lefort and Jürgen Habermas. For Lefort, the very idea of human rights implies the disentangling of the notion of right from that of power, and this in turn means that "the source of right" is "the human utterance of right" [73] :

Modern democracy invites us to replace the notion of a regime **\*410** governed by laws, of a legitimate power, by the notion of a regime founded upon the legitimacy of a debate as to what is legitimate and what is illegitimate-- a debate which is necessarily without any guarantor and without any end. The inspiration behind both the rights of man and the spread of rights in our day bears witness to that debate. [74]

To rephrase Lefort in Grotius's terms, rhetorical controversiae may profitably substitute for physical conflict; in fact, it is only when speech replaces violence that rights can appear. A similar argument is put forward by Jürgen Habermas in his article Multiculturalism and the Liberal State. Habermas criticizes what he calls "the liberal assumption that human rights are prior to popular sovereignty. . . . The addressees of law," he argues, "must be in a position to see themselves at the same time as authors of those laws to which they are subject." [75] And this means that "[i]t must be up to the citizens themselves to debate and deliberate in public, and to have parliaments democratically decide, on the kinds of rights they regard as necessary for the protection of both private liberties and public participation." [76] If this notion of democratic deliberation is a far cry from the early modern rights talk of Grotius, Hobbes, and Pufendorf, the insight that rights are created in and by language is not.

As I have argued, Grotius's attempt to think of language as both the result of a contract and as the enabling condition of any individual contract is one part of this alternative genealogy. In placing the linguistic contract at the center of his account of political obligation, Grotius stresses the mutual dependence of the "sovereign subject" who freely enters into a contract and the social and linguistic conventions that enable the subject to communicate, that is, to make sense. This analysis of the way in which language both enables and constrains the individual speaking subject might ultimately lead one to reject the metaphor of the contract, with its attendant voluntarism and its talk of individual rights, as inappropriate. In the terms of one modern critic, we could then say that Grotius ultimately helps us see that "the contract of language is not one that is freely entered into by autonomous and sovereign speakers"; "no speaker has the right to **\*411** recede from the contract . . . except at the price of ceasing to be a speaker at all." [77] But rather than equate this irrevocable linguistic contract with political repression and social control, we might instead want to hold onto the Grotian model of the linguistic contract as an emblem of "the negotiated character of social knowledge," and thus the ever-present possibility of renegotiating social and political relations through rights talk. [78] For this reason, as I have argued, modern critics and defenders of liberalism would do well to look again at the early modern period, which offers us a richer and more contested legacy of rights talk than the usual histories of liberalism would suggest.

### Footnotes

[a1]    Victoria Kahn is Professor of English and Comparative Literature at UC Berkeley.

[1]    See generally Mary Ann Glendon, Rights Talk (1991); Carole Pateman, The Sexual Contract (1988); John Rawls, A Theory of Justice (1971); Ian Shapiro, The Evolution of Rights in Liberal Theory (1986); Leo Strauss, Natural Right and History (1950); C. B. Macpherson, The Political Theory of Possessive Individualism: Hobbes to Locke (1962). See also Political Theory and the Rights of Man (D. D. Raphael ed., 1967); and, more recently, A Culture of Rights (Michael J. Lacey & Knud Haakonssen eds., 1991).

[2]    Ernst Bloch, Natural Law and Human Dignity 54 (Dennis J. Schmidt trans., MIT Press 1986) (1961).

[3]    See generally Leo Strauss, supra note 1.

[4]    See generally Macpherson, supra note 1; Bloch, supra note 2; Shapiro, supra note 1.

[5]    See generally Pateman, supra note 1.

6      See generally Glendon, supra note 1.

7      See generally Shapiro, supra note 1.

8      On rights as rational conventions, see Thomas Haskell, The Curious Persistence of Rights Talk in the "Age of Interpretation," 74 J. Am. Hist. 984 (1987).

9      The secondary literature on the evolution of the concept of rights is enormous. For accounts that stress the originality of seventeenth-century theories of natural rights, see Knud Haakonssen, Natural Law and Moral Philosophy (1996); J. B. Schneewind, The Invention of Autonomy: A History of Modern Moral Philosophy (1998); Shapiro, supra note 1; Richard Tuck, Philosophy and Government, 1572-1651 (1993). For dissenting views, see Brian Tierney, The Idea of Natural Rights: Studies in Natural Rights, Natural Law and Church Law, 1150-1625 (1997); Johann Sommerville, From Suarez to Filmer: A Reappraisal, 25 Hist. J. 525 (1982). Tierney locates the decisive shift towards a subjective notion of rights in the twelfth century rather than the seventeenth, although he also stresses that medieval rights theory did not focus on the individual in the same way early modern rights theory does. I am most persuaded by the accounts of Haakonssen, Schneewind, Shapiro, and Tuck.

10      See James Gordley, The Philosophical Origins of Modern Contract Doctrine (1991). For some scholars of this period, including Gordley, the absence of Aristotelian or Thomist metaphysics means that contract theory (then and now) is doomed to incoherence. I want to suggest, in contrast, that both then and now incoherence is not the only alternative to Aristotle. Late sixteenth- and seventeenth-century men and women were grappling in their own way with a crisis of foundationalism and many were attempting self-consciously to forge a new basis of social and political obligation, in which language had an important normative role to play.

11      See, e.g., Schneewind, supra note 9, at 76.

12      I cite from the following editions: Hugo Grotius, De jure belli ac pacis libri tres (James Brown Scott ed., Francis W. Kelsey trans., Clarendon Press 1925) (1625); Samuel Pufendorf, De jure naturae et gentium libri octo (Walter Simons ed., C. H. & W. A. Oldfather trans., Clarendon Press 1934) (1672). In both cases I cite book, chapter, section, and (when there is one) subsection.

13      See Patrick Riley, Will and Political Legitimacy (1982); Shapiro, supra note 1, especially part II; James Tully, An Approach to Political Philosophy: Locke in Contexts (1993), especially ch. 9.

14      Grotius, Prolegomena, in De jure belli, supra note 12, at para. 28.

15      Grotius, supra note 12, at bk. 1. ch. 1, and bk. 1, ch. 2, §§ 1-2.

16      "For WARRE, consisteth not in Battell onely, or the act of fighting; but in a tract of time, wherein the Will to contend by Battell is sufficiently known." Thomas Hobbes, Leviathan 88 (Richard Tuck ed., Cambridge Univ. Press 1994) (1651). Schneewind, supra note 9, at 72, also notes that controversiae is the first word of chapter one in De jure belli.

17      Hobbes is an exception, deriving natural laws hypothetically from natural rights. See Hobbes, supra note 16, at chs. 14, 15.

18      The issue of custom is complicated since, for example, in England the customary language of the ancient constitution was linked to that of natural rights.

19 Grotius, supra note 14, at para. 30. See also id. at paras. 39-41; Grotius, supra note 12, at bk. 1, ch. 1, § 10 (discussing how the law of nature is different from the law of nations).

20 Grotius, supra note 12, at bk. 1, ch. 1, § 10.4.

21 Id. at bk. 1, ch. 1, §12.1

22 Grotius, supra note 14, at para. 40.

23 See Grotius, supra note 12, at bk. 1, ch. 1, § 12 (use of quotations as proof); see also Grotius, supra note 14, at paras. 40, 46. For a good discussion of the tension in De jure belli between arguments from natural law and arguments from positive law and local custom, see Jane O. Newman, "Race," Religion, and the Law: Rhetorics of Sameness and Difference in the Work of Hugo Grotius, in Rhetoric and Law in Early Modern Europe 285 (Victoria Kahn & Lorna Hutson eds., 2001).

24 In the following pages, the term "social contract" refers to the contract individuals enter into with each other to form society; the "political contract" is the contract between those members of society and the sovereign. The two are usually analytically distinct in seventeenth-century discussions of political obligation, with the language of contract being used most often to refer to the political contract. Hobbes is the exception to the distinction between society and the political contract: With the demise of the Hobbesian political contract individuals re-enter not society but a bellicose state of nature.

25 In his account of the relationship between language, society, and political association, Grotius was influenced by Cicero, who offered two accounts of social and political association to his early modern readers. In the rhetorical treatises, Cicero painted a picture of men wandering in a state of nature until they were brought together by the powerful eloquence of a single individual. See Cicero, De inventione, at bk. 1, §§ 1.2-2.3 (H.M. Hubbell trans., Harvard Univ. Press 1976) (n.d.); Cicero, De oratore, at bk. 1, §§ 8.33-34 (E.W. Sutton & H. Rackhaus trans., Harvard Univ. Press 1967) (n.d.). In these and other works, he also put forward an Aristotelian view of man's natural sociability, and natural disposition to form political associations. See, e.g., Cicero, De officiis, at bk. 1, §§ 4.12, bk. 1, §§ 17.53-18.54 (Walter Miller trans., Harvard Univ. Press 1968) (n.d.) [hereinafter Cicero, De Officiis]. Thus, Cicero vacillated between descriptions of man's natural sociability and of a state of nature in which men were asocial, irrational, and bellicose. He alternately described the gift of speech as reflecting our reason or bringing it into being. The first account was predicated on natural law as the source of right reason, while the second implied the arbitrary imposition of political order.

26 Grotius, supra note 14, at para. 7.

27 Compare Grotius, supra note 12, at bk. 3, ch. 19, § 2.1 with Cicero, De officiis, supra note 25, at bk. 3, §§ 24.92- 25.95.

28 Grotius, supra note 12, at bk. 3, ch. 19, § 1.3 ("Nam verum eloquendi obligatio est ex causa").

29 Cicero, De inventione, supra note 25, at bk. 1, § 2.3.

30 Id. Grotius refers directly to Cicero in a way that suggests that Cicero is one of the sources of his title: "Cicero justly characterized as of surpassing worth a knowledge of treaties of alliance, conventions, and understandings of peoples, kings, and foreign nations; a knowledge, in short, of the whole law of war and peace (in omni denique belli jure & pacis)." Grotius, supra note 14, at para. 2. The editor refers the reader to Cicero's speech For Balbus, bk 6, § 15.

31 Pufendorf, supra note 12, at bk. 4, ch. 1, § 1. One of Pufendorf's sources, as he make clear in the very next sentence, is Aristotle, Politics, at bk. I, ch. ii § 1.2, which says:

  the power of speech is intended to set forth the expedient and the inexpedient, and likewise the just and the unjust. And it is a characteristic of man that he alone has any sense of good and evil, of just and unjust, and the association of living beings who have this sense makes a family and a state.

  Id. See also Pufendorf, On the Duty of Man and Citizen 77 (James Tully ed., Michael Silverthorne trans., Cambridge Univ. Press 1991) (1691) ("Everyone knows how useful, how simply necessary, an instrument of human society language (sermo) is. Indeed, it has often been argued, on the basis of this faculty alone, that man is intended to live a social life." And yet Pufendorf's conception of sociability (like Grotius's) is not predicated on an Aristotelian account of virtue and of political association. See generally Schneewind, supra note 9.

32 Pufendorf, supra note 12, at bk. 3, ch. 4, § 1.

33 Pufendorf, supra note 12, at bk. 2, ch. 2, 2 (quoting Horace, Satires, at bk. 1, satire 3) (n.d.).

34 Id. at bk. 3, ch. 4, § 1.

35 Id.

36 Id. (quoting Isocrates, Against Callimachus).

37 Id. (quoting Aristotle, Rhetoric, at bk. 1, ch. xv [1376b10]).

38 See Cicero, De officiis, supra note 25, at bk. 2, § 11.40 (The importance of justice is "so great, that not even those who live by wickedness and crime can get on without some small element of justice."). Pufendorf is drawing here on Grotius, supra note 12, at bk. 2, ch. 16, § 1, which includes the example from Isocrates. Pufendorf comments approvingly, "if it were not necessary to keep promises, it would be in no way possible with any confidence to base one's calculations on the assistance of other men." Pufendorf, supra note 12, at bk. 3, ch. 4, § 2. In this way Pufendorf finally arrives at the dictum that it is "a most sacred precept of natural law... that every man keep his given word, that is, carry out his promises and agreements," id.; but it is notable that, like Grotius, he does so by a series of pragmatic, even utilitarian arguments, drawn as much from Aristotle's and Cicero's rhetorical works as from invocations of the moral law.

39 Hence the large place given by both Grotius and Pufendorf to the rules for the interpretation of contracts--a feature usually not seen in late scholastic treatises and probably traceable to humanist commentaries on Roman law, with their heightened attention to questions of language and interpretation. On early modern legal interpretation, see note 41, infra.

40 See Ian Maclean, Interpretation and Meaning in the Renaissance: The Case of Law 95-101 (1992).

41 On humanist jurisprudence, see Kathy Eden, Hermeneutics and the Rhetorical Tradition (1997); Donald R. Kelley, History, Law, and the Human Sciences (1984); Donald R. Kelley, The Human Measure: Social Thought in the Western Legal Tradition (1990); Ian Maclean, supra note 40. Maclean demonstrates a pervasive concern in Renaissance legal texts with objective and subjective criteria of interpretation, the first focussing on the meaning of the words and the second on the intention of the speaker. He also shows that this distinction is untenable: although most Renaissance authors assume "the priority of thought over language," they also assert "the impossibility of thought without language." Id. at 146. Intention, that is, is only accessible through language, through the interpretation of words that takes the form of other words. While focussing on civil law, Maclean also demonstrates the existence of the same concerns in Suárez's theological treatise on law and in English legal thought, and comments:

Compendium_Cornell
Page 1363

This is on the one hand not surprising, as Roman law provides a precedent for legal thinking for canonists and common lawyers alike and supplies many maxims useful to both; on the other hand, it leaves the modern historian with the question whether the similarities of approach arise out of a common legal outlook, or a common crisis about language which affected Renaissance thinkers at more or less the same time.

Id. at 202. Maclean asserts that both explanations are likely.

Maclean also demonstrates the greater concern in Renaisssance texts than in their medieval predecessors with the determination of subjective intention:

Verba, according to Aristotle and Cicero, are mental symbols or tokens (notae animi) representing concepts which are common to all men.... By the late Renaissance, on the authority of the Corpus [ Juris Civilis] and of writers on forensic rhetoric, the definition of verba has been extended to read "notae rerum declarantes animi voluntatisque passiones et motus" (symbols of things which express the passions and movements of the mind and will). The introduction of subjective meaning is significant.... Its apparent exclusion in the medieval period permitted the elaboration of a logic which treated only intellectus or thoughts and ignored the word as an expression of feelings (motus animi) or perception (sensus, species).

Id. at 160-61. My reading of Grotius bears out Maclean's observations. Grotius and many of his contemporaries argued both that the subject's intention was crucial to the binding force of political and legal contracts, and that intention was constrained or dictated by the form of the contract itself. By this, they seemed to mean something different from the scholastic view that the emphasis on intention is compatible with objective obligations attendant upon the essence of a particular contract. Rather, for early modern contract theorists, the form of the contract is viewed as a constraint on wayward intention and equivocation.

42    Grotius, supra note 12, at ch. 2, bk. 16, § 1.1(emphasis added); accord id. at bk. 2, ch. 13, § 1.1-5.

43    See Harold J. Berman, Law and Revolution: The Formation of the Western Legal Tradition 247 (1983).

44    "Populari ex usu." Grotius, supra note 12, at bk. 2, ch. 16, § 2.

45    With his greater skepticism about the force of common usage, Hobbes provides an instructive point of contrast. In De Cive and Leviathan Hobbes puts forward the radical claim that not just understanding but also "truth... depends on men's consent and agreements" concerning the common use of words. Agreements can take place once we agree about the meaning of "promise" and "agreement." Yet he also cautions the reader not to rely on language alone: "[I]t is universally true of language that although it rightly takes first place among the signs by which we disclose our ideas to others, it cannot do the job on its own; it needs the help of a context [ multarum circumstantiarum]." Hobbes, On the Citizen [De Cive] 219, 232 (Richard Tuck ed., Michael Silverthorne trans., Cambridge Univ. Press 1998) (1642); accord Hobbes, supra note 16. Context determines meaning, however, only if the sovereign determines the context; otherwise there will be endless disputes concerning proper meaning and proper ownership, and these disputes are tantamount to the state of war.

46    See Berman, supra note 43, at 245-50 (discussing bare promises or nuda pacta).

47    "The third way [of making a promise] is, where such a determination is confirmed by evident signs of an intention to convey a peculiar right to another, which constitutes the perfect obligation of a promise, and is attended with consequences similar to an alienation of property." Grotius, supra note 12, at bk. 2, ch. 11, § 4.1. This translation draws on the more fluent translation, Grotius, The Rights of War and Peace 134 (A.C. Campbell trans., M.W. Dunne 1901), as well as on Scott's edition.

48    Grotius, supra note 12, at bk. 2, ch. 11, § 4.1.

Compendium_Cornell
Page 1364

49      For the view that neoscholastic/natural law notions of contract saw no contrast between the will and the terms of its expression in a contract, see Gordley, supra note 10, at 109:

Modern theories tend to set in opposition, on the one hand, the will of the parties, and on the other any attempt by a court or legislature to judge the fairness of a contract. For the late scholastics and the natural lawyers, there was no such radical opposition. To hold the parties to the terms natural to the type of contract they entered into was to effectuate their will.

50      Grotius, The Jurisprudence of Holland 292-93 (R. W. Lee ed. & trans., 1926) quoted in Richard Tuck, Natural Rights Theories 69-70 (1979).

51      Grotius, supra note 14, at para. 11.

52      Hobbes also attributes a kind of binding force to language. Discussing the second law of nature, "Stand by your agreements, or keep faith," Hobbes remarks commonsensically that "agreements would be pointless if we did not stand by them:"

For in making an agreement, one denies by the very act of agreeing that the act is meaningless.... Anyone therefore who makes agreement with someone, but does not believe he is obliged to keep faith with him, believes that making agreements is meaningless and at the same time meaningful, and that is absurd. Therefore either one should keep faith with every one or one should not make agreements.

Hobbes, supra note 45, at 44 (ch. 3). Yet, for Hobbes, the injunction in the last sentence betrays the fact that the binding power of language is hypothetical, or rather contingent upon the power of the sovereign to enforce our agreements.

53      Grotius, supra note 12, at bk. 2, ch. 16, § 1.1 (emphasis added).

54      Pufendorf, supra note 31.

55      Id., at bk. 1, ch. 10, § 2-3.

56      Pufendorf, supra note 12, at bk. 4, ch. 1, § 5-6.

57      See id. at bk. 3, ch. 4, § 2; bk. 4, ch. 1, § 1.

58      See id. at bk. 4, ch. 1, § 10.

59      Pufendorf, supra note 31, at bk. 1, ch. 10, § 7.

60      See Grotius, supra note 12, at bk. 2, ch. 13, §§ 1-5, bk. 2, ch. 16, § 1.1-2.

61      Bloch, supra note 2, at 55.

62      Hobbes, De Homine 42 (ch. 10, § 5) (Bernard Gert, T. S. K. Scott-Craig & Charles T. Wood trans., 1972) (1668).

63      John Locke, Two Treatises of Government, at bk. 2, ch. 5, § 27 (Peter Laslett ed., 1988). On the role of the workmanship metaphor in Locke, see Shapiro, supra note 1, at 103-10, drawing in part on James Tully, A Discourse on Property: John Locke and His Adversaries (1980). On the role of construction in Pufendorf, see J. B. Schneewind, Pufendorf's Place

in the History of Ethics, 72 Synthèse (1987); Alfred Dufour, Pufendorf, in The Cambridge History of Political Thought 1450-1700, at 566 (J. H. Burns & Mark Goldie eds., 1991). For Pufendorf "moral entities are inventions, some of them divine, most of them human. But Pufendorf does not think that their status as constructions gives us any reason to doubt their force and efficacy." Alfred Dufour characterizes Pufendorf's "new theory of power in which all kinds of authority were grounded in agreement or free consent," as "conventionalism." Dufour, supra at 130. Ultimately, however, in Pufendorf's account the validity of these conventions depends on the will of God.

64    Bloch, supra note 2, at 55.

65    Grotius, supra note 14, at para. 58.

66    Hobbes deliberately invokes the biblical fiat in the Introduction to Leviathan. Hobbes, supra note 16.

67    P. S. Atiyah, The Rise and Fall of Freedom of Contract 41 (1979).

68    As I have indicated, this constructivist or, at its extreme, anti-foundationalist view of rights is in tension, in early modern texts, with the belief in objective natural law. Yet, it was also possible to hold that rights were created by rational agreement but only received their obligatory force from the existence of a divine creator. On this distinction in Locke, see Tully, supra note 13, at ch. 9.

69    Such a view of the self could arguably make room in liberalism for collective as well as individual rights. See Maleiha Malik, Communal Goods as Human Rights, in Understanding Human Rights 138, 154, 159-60 (Conor Gearty & Adam Tomkins eds., 1996). Malik is discussing the communitarian dimension of the work of liberal theorists Will Kymlicka, Liberalism, Community and Culture (1989); and Charles Taylor, Multiculturalism and the Politics of Recognition (1992). For a compelling analysis of the interpersonal dimension of the liberal self and the social promise of contract, with particular reference to nineteenth-century American literature and contract law, see Brook Thomas, American Literary Realism and the Failed Promise of Contract (1997).

70    See Owen M. Fiss, Human Rights as Social Ideals, in Human Rights in Political Transitions: Gettysburg to Bosnia 263, 273, 275 (Carla Hesse & Robert Post eds., 1999). See also Thomas, supra note 69, at 45 ("Works of realism... challenge the formalism of contract law by presenting promising as an interpersonal act that is grounded neither in a scientific appeal to the laws of nature nor a moral appeal to God's witness."). Thomas's analysis of the novel's anti-foundationalist account of contracting has antecedents in early modern attempts to formulate an account of obligation in the absence of any legible, substantive natural law.

71    Haskell, supra note 8, at 1104-05.

72    Id. at 1005. Interestingly, although Haskell stresses interpretation and gestures ironically towards "literocentrism," he does not accord much weight to language itself. Yet in a final, appreciative analysis of Thomas Kuhn's work on the interpretive conventions of scientific communities, he quotes Kuhn on language itself as the basis of any objectivity we have. See id. at 1010-11.

73    Claude Lefort, Human Rights and the Welfare State, in Democracy and Political Theory 37 (David Macey trans., 1988).

74    Id. at 39.

75    Jürgen Habermas, Multiculturalism and the Liberal State, Stan. L. Rev. 849, 852 (1995).

Compendium_Cornell
Page 1366

76    Id. at 851. This elevation of speech is not the same thing as the elevation of opinion or contingent interests. See Lefort, supra note 73, at 38, 41 ("right cannot be immanent within the social order without the very idea of right being debased"). On the establishment of right through the discourse of rights, see also Norberto Bobbio, The Age of Rights (1996), who also stresses the necessary protection of rights by the coercive power of the state; and Richard Flathman, The Practice of Rights 6-7, 185 (1976). The notion that the declaration of rights is performative--that it actually helps constitute the rights to which it refers--is widespread in contemporary discussions of international human rights. See, e.g., Fiss, supra note 70; Michael Ignatieff, Human Rights, in Human Rights in Political Transitions, supra note 70; Ruti Teitel, Millenial Visions: Human Rights at Century's End, in Human Rights in Political Transitions, supra note 70.

77    Christopher Prendergast, The Order of Mimesis 37 (1986).

78    Id. at 41. Prendergast does not discuss rights talk, though he does elaborate the parallel between the social contract and the contract of mimesis. In the early modern period, Grotius provided ammunition both to those who supported absolute monarchy and those who, like Locke, argued that the contract with the sovereign was by definition revocable. See Tuck, supra note 50, at ch. 7.

13 YJLH 391

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Compendium_Cornell
Page 1367

*2 CRITICAL ANALYSIS OF LAW __(2015) (forthcoming)*

# THE JUDICIALIZATION OF POLICE

## Aaron T. Knapp*

This article asks whether the Constitution of the United States, as understood by its original proponents, gave the federal government police powers. The conventional historical wisdom says that the Constitution reserved police powers to the states alone and that the framers meant for the federal government, as one of limited power, to possess no general policing authority.[1] In modern American constitutional jurisprudence, the police power has thus come to function as both a constraint on federal power and a shield from principled judicial scrutiny of the state governments. Rarely has a modern legal historian or constitutional scholar seriously investigated the historical existence of a *federal* police power.[2] Rather, judges and scholars alike have tended uncritically to accept at face value the Federalists' representations as to the intended repositories of police powers in 1787. I shall suggest here that this constitutes a considerable oversight in our constitutional commentary and jurisprudence that has

* Lecturer, Department of Political Science, Boston University; Ph.D. Candidate, Department of History, Boston University. The author thanks Christopher Tomlins, Markus Dubber, Gerald Leonard, and David Konig for their helpful comments.

[1] See, e.g., Bond v. United States, 572 U.S. __ (2014) (slip opinion at 8) (noting that the states retained "broad" police powers, but that the federal government "has no such authority and 'can exercise only the powers granted to it'")

[2] For an excellent exception, see Christopher Tomlins, Necessities of State: Police, Sovereignty and the Constitution, 20 J. Pol'y Hist. 47 (2008) (examining Federal police power in immigration and Indian affairs in the nineteenth century). Ernst Freund's influential early twentieth-century treatise on the police power noted a few constitutional grounds for federal police powers in the powers to regulate commerce and Indian affairs, but otherwise proceeded on the assumption that the states and localities retained all the major police powers worthy of discussion. See Ernst Freund, The Police Power: Public Policy and Constitutional Rights (1904). Provoked by the Supreme Court's invalidation of the Keating-Owen Child Labor Act of 1916, Robert E. Cushman's series of articles in the progressive era examined whether, in view of text and case law, Congress had police powers under the Commerce, Taxing, and Postal Clauses. See Robert E. Cushman, National Police Power under the Commerce Clause of the Constitution, 3 Minn. L. Rev. 289 (1919) [Part I]; 3 Minn. L. Rev. 381 (1919) [Part II]; 3 Minn. L. Rev. 452 (1919) [Part III]; Robert E. Cushman, National Police Power under the Taxing Clause of the Constitution, 4 Minn. L. Rev. 247 (1920); Robert E. Cushman, National Police Power under the Postal Clause of the Constitution, 4 Minn. L. Rev. 402 (1920). Cushman examined congressional power only and did not focus on historical understandings in 1787. William Crosskey's controversial mid-century historical opus motioned toward federal police powers under the Constitution lost to the eighteenth century. William Winslow Crosskey, Politics and the Constitution in the History of the United States (1953) (2 vols.). Recent historical work on the Necessary and Proper Clause suggests a far broader grant of implied power to the federal government at the founding than the conventional historical wisdom recognizes. See John Mikhail, The Necessary and Proper Clause*s*, 102 Geo. L.J. 1045 (2014). Richard Primus's recent article rejects the so-called "internal-limits" doctrine traditionally applicable to exercises of congressional power, arguing, inter alia, that the founders did not embrace the doctrine. See Richard Primus, The Limits of Enumeration, 124 Yale L.J. 576 (2014). The article makes few historical claims and Primus "takes no position on whether the Constitution authorizes Congress to do whatever a national government with a police power could do," but rather argues that in construing a particular power we "should not exclude an otherwise reasonable construction on the grounds that it would leave Congress constrained only by process limits and affirmative prohibitions." Id. at 583.

1

Electronic copy available at: https://ssrn.com/abstract=2569096

*2 CRITICAL ANALYSIS OF LAW __(2015) (forthcoming)*

distorted our historical knowledge of what actually happened at the levels of both constitutional discourse and constitutional structure in and after 1787. To be sure, neither the Federalists nor their Antifederalist counterparts actually used the term *police* to describe federal power. The *concept*, however, shaped their attitudes toward federal authority in ways that problematize prevailing scholarly understandings of the federal government as one of defined powers and of the judicial function with respect to those powers.

The American framers perceived the crisis under the Articles of Confederation as primarily a policing problem with regard to the states. To address this problem, James Madison and other nationalists at the Federal Convention fought hard to vest Congress with a preemptive discretionary negative on all state legislation. The negative garnered significant support at the Convention's outset, but concerns over its practicability and potential to instigate overt conflicts between the federal and state governments ultimately caused most the delegates to abandon it. With the subsequent adoption of the Supremacy Clause, however, the courts contemplated in Article III inherited and in the process altered, though not beyond recognition, the superintending police function vis-à-vis the states originally embodied in the congressional negative. The Supremacy Clause, of course, bound the state judges by name. The very logic of supremacy, however, together with the specter of inconsistent judgments and compromised judicial independence at the state level, prevented reformers in 1787 from relying on the state judges alone to perform this function in cases where federal authority came under threat from the states on matters of law. In the end, it fell to the Supreme Court to keep the states in line short of war through, among other things, judicial review of state legislation. The article contributes to the literature in this area by locating the historical origins of the Court's authority to invalidate state legislation not in the common law, nor in "judicial duty," natural law, popular sovereignty, or written constitutions, but rather in police powers handed down from the monarchial tradition conceived as a constituted government's inherent prerogative of self-preservation.

## I. LAW AND POLICE IN THE ANGLO-AMERICAN EIGHTEENTH CENTURY

Although etymologically related to the Latin term *politia* and, going forward, to the English term *policy*, the first iterations of the term *police* in history occurred in late-medieval France, carrying the denotation of good order and administration.[3] Scholars, however, have identified its conceptual antecedents in classical times—specifically, in the idea of *patria potestas* or household governance, the discretionary power wielded by a head of household over family members.[4] The state's police power, on this view, becomes household governance writ large. The Germanic variation on the classical household, *mund*—referring to a household's peace and the father's prerogative to secure it—apparently became appropriated during the early modern period in both

---

[3] See Oxford English Dictionary (online), entry for Police (2014).
[4] Markus D. Dubber, The Police Power: Patriarchy and the Foundations of American Government pt. 1 (2005).

2

Electronic copy available at: https://ssrn.com/abstract=2569096

England and on the Continent to conceptualize a monarch's open-ended powers to keep order and guarantee the common welfare.[5] Blackstone's discussion of the police power in the *Commentaries* does something to confirm this understanding in the eighteenth century.[6]

We should underline at the outset the distinction between police as an *institution* and police as a *discourse of power*; and, within the discourse of power, between police as a *noun*, referring to a government's discretionary authority to pursue broad ends such as security, the peace, and the general welfare; and police as a *verb*, referring to magisterial action taken to anticipate and prevent violations of even clearly defined laws.[7] To this configuration of historical usages we may add the expression *police offense*, defined as prohibited conduct that threatens state interests instead of violating them, and which therefore serves to prevent harm rather than punish it.[8] In all these respects, historians and scholars of the eighteenth century have contrasted police with *law*, conceived as remedial justice administered under delimiting standing rules chiefly through the instrumentality of the courts.[9] Over and above the offices of county sheriffs and federal marshals, distinct police departments as such did not exist in either England or the United States until well into the nineteenth century.[10] Yet if it lacked an institutional identity, commentators can agree that police had an important historical presence as a discourse and "science" in the eighteenth century on both sides of the Atlantic.[11]

On the American side, historians have argued that the concept of police took on a particular meaning in the context of the American Revolution's "democratic promise."[12]

---

[5] Id. at 11-21.; see also William J. Novak, Common Regulation: Legal Origins of State Power in America, 45 Hastings L.J. 1061, 1085-86 (1994) (observing these features in the English monarchial tradition).

[6] 4 William Blackstone, Commentaries on the Laws of England 162 (1769).

[7] On police as preventative in nature, see Dubber, supra note 4, at 68-69. Dubber provocatively argues that the definition of police has come to rest on "its very undefinability." Id. at 120. In Commonwealth v. Alger, Massachusetts Chief Justice Lemuel Shaw explained his state's police powers as an inheritance of sovereignty itself—i.e., "all the power which exists anywhere" unlimited by the common law—rendering "all social and conventional rights . . . subject to such reasonable limitations . . . [as determined] necessary and expedient." 61 Mass. 53, 82, 83, 85 (1851). In the License Cases, Chief Justice Taney defined the police power as "the power of sovereignty, the power to govern men and things within the limits of its dominion." License Cases, 5 U.S. (5 How.) 504, 583 (1847); see also New York v. Miln, 36 U.S. 201, 141 (1837) (noting that police power extends to "men and things" within the state's jurisdiction). The early twentieth-century treatise writer Ernst Freund defined the police power with reference to two characteristics: "it aims directly to secure and promote the public welfare, and it does so by restraint and compulsion." Freund, supra note 2, at 3.

[8] See Dubber, supra note 4, at 22-23, 76.

[9] On the distinction between police and law, see Dubber, supra note 4, at xvi, 68-69, 220-21 n.19; Christopher Tomlins, Law, Labor and Ideology in the Early American Republic 38 (1993). Jeremy Bentham suggested a distinction between law and police as "branches of administration," the former remedial and the latter preventative. Jeremy Bentham, The Theory of Legislation 242 (Ogden ed., 1931).

[10] See, e.g., Roger Lane, Policing the City: Boston, 1822-1855 (1967); Clive Emsley, The English Police: A Political and Social History (1991).

[11] See Dubber, supra note 4, at 47-93.

[12] Tomlins, supra note 9, at 38.

3

Electronic copy available at: https://ssrn.com/abstract=2569096

*2 CRITICAL ANALYSIS OF LAW __(2015) (forthcoming)*

Some have gone so far as to suggest that police became linked in American constitutional culture to the popular will and to the pursuit of happiness itself.[13] The state constitutions, a few of which employed the term "police" in describing powers thereunder, gave some expression to the idea of police as popular majoritarian rule.[14] All this changed, however, with ratification of the Constitution, after which an alternative paradigm of law ultimately prevailed over, subsumed, and in the process transformed the concept of police in America. The Constitution of 1787 and its judicial interpreters become, from this perspective, the primary historical instantiations of *law* in the early republic, and police becomes refashioned as security rather than happiness, falling primarily within the bailiwick of the states and local government, where governmental exertions proceeding under its banner would enjoy relative immunity from judicial scrutiny.[15]

Such characterizations of police under the Constitution, however, tend simply to take the bait of the Federalists rather than seriously examining whether and how the Federalists drew on the historical traditions of police extant in 1787, even if they did not use the term. Here I want to highlight one strain of eighteenth-century police discourse surrounding those powers that flowed from the inherent authority of a constituted sovereign government to preserve and defend itself: the prerogative of sovereign self-preservation. This species of power remained indifferent to the rights of subjects or citizens. It did not admit of any legal limitations and could justify a constituted government pursuing all manner of discretionary measures designed to anticipate and prevent challenges to its authority. For evidence that police so conceived occupied the minds of the Federalists in 1787, we need look no further than Publius himself. "[E]very government," Hamilton wrote, "ought to contain in itself the means of its own preservation."[16] To protect the national community "against future invasions of the public peace by . . . domestic convulsions," Publius believed, "[t]here ought to be a CAPACITY to provide for future contingencies as they may happen; and as these are illimitable in their nature, it is impossible safely to limit that capacity."[17]

But how did the American doctrine of popular sovereignty impact this strain of eighteenth-century police discourse? Popular sovereignty's conflation of ruler with ruled and its corresponding commitment to the autonomy of citizens stood in some tension with the power to police, whose very existence and exercise presupposed a strict

---

[13] See id.

[14] See, e.g., Md. Const. of 1776, Dec. of Rights, art. II; Pa. Const. of 1776, Dec. of Rights, art. III.

[15] See Tomlins, supra note 9, at 39. For all intents and purposes, the Supreme Court shares this view of constitutional history. See supra note 1.

[16] See The Federalist No. 59, at 352 (Alexander Hamilton) (Isaac Kramnick ed., 1987).

[17] The Federalist No. 34, supra note 16, at 228, 227 (Alexander Hamilton). See also 1 The Records of the Federal Convention of 1787, at 19 (Max Farrand ed., 1911) (Edmund Randolph citing the federal government's inability to "defend itself against the encroachments from the states" as one of the key defects of the confederation) [hereinafter Convention Records]. It also bears noting that the Preamble to the Constitution made the federal government's overriding purpose to pursue police-related ends, including "domestic Tranquility" and "the general Welfare." U.S. Const. pmble.; see also Tomlins, Necessities of State, supra note 2, at 50 ("[T]he Preamble declares that all federal power is directed toward "police" ends"—improvement and security for all.").

4

Electronic copy available at: https://ssrn.com/abstract=2569096

separation between ruler and ruled, and therefore heteronomy rather than autonomy. Certainly, anyone familiar with the standard sources from the ratification debates knows that the Federalists habitually depicted the Constitution as the people's creation and the government created thereunder as ultimately answerable to them. Yet our present inquiry turns not on the identity of either the Constitution's ratifiers or the electorate, but on the question of *sovereignty* in day-to-day governance under the ratified frame of government. Here we might heed Benjamin Rush who in 1787 insisted that while the people might possess some sovereignty on election days, "[a]fter this, it is the property of their rulers."[18] Moreover, notwithstanding founding-era historians' unconstrained use of the phrase "popular sovereignty" to distinguish early American constitutional culture, the historical actors themselves in 1787 never uttered it in connection with the system they contemplated under the Federal Constitution. The record reveals only one man running amongst the Federalists in 1787 referring with any regularity to the American people as "sovereign" under the Constitution.[19] All others reserved application of this term to constituted governments.[20]

Historians and scholars have done much to debunk the myth of American statelessness at the state and local levels in the late eighteenth and nineteenth centuries.[21] Fewer historical commentators have questioned perceived statelessness at the federal level prior to the Civil War[22]—this in part because the Jeffersonian legacy

---

[18] Benjamin Rush, On the Defects of the Confederation (1787), in The Selected Writings of Benjamin Rush 26, 28 (Dagobert D. Runes ed., 1947) [hereinafter Rush Writings].

[19] Aaron T. Knapp, Law's Revolutionary: James Wilson and the Birth of American Jurisprudence, 29 J.L. & Pol. 189, 226-27 (2014).

[20] Often they used it to refer to the state governments. See, e.g., The Federalist No. 47, supra note 16, at 365 (James Madison) (suggesting that equality in the Senate recognized the "independent and sovereign States"). The state ratifying conventions produced many other instances of this usage. See, e.g., 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution, As Recommended by the General Convention at Philadelphia in 1787, at 26 (Jonathan Elliot ed., 1891) [hereinafter Elliot's Debates] (Theophilus Parsons noting at the Massachusetts convention that the Senate embodied the "sovereignty of the states"); 3 id. at 527 (George Mason asking at the Virginia convention, "Is the sovereignty of the state to be arraigned like a culprit, or private offender?"). They also used the term to refer to the federal government. See The Federalist No. 9, supra note 16, at 122 (Alexander Hamilton) (noting that equal representation in the Senate made the states "constituent parts" of the newly created "national sovereignty" in government); The Federalist No. 42, supra note 16, at 277 (James Madison) (implying the need for "sovereignty in the Union"); see also Benjamin Rush, On the Defects of the Confederation (1787), in Rush Writings, supra note 18, at 28 (asserting that Congress is "the only sovereign power in the United States").

[21] See, e.g., William Novak, The People's Welfare: Law and Regulation in Nineteenth-Century America (1996); David Sehat, The Myth of American Religious Freedom (2011).

[22] For a recent exception examining the nineteenth century, see Brian Balogh, A Government Out of Sight: The Mystery of National Authority in Nineteenth-Century America (2009); see also Max M. Edling, A Revolution in Favor of Government (2008) (arguing that the Federalists endeavored to invest the federal government with those attributes that characterized the fiscal-military state in the English political tradition); Max M. Edling, A Hercules in the Cradle: War, Money, and the American State, 1783-1867 (2014). A few authors have over the years attempted to raise scholarly awareness of the Federalists' distinctive concern for administration. The seminal work is Leonard D. White, The Federalists: A Study in Administrative History (1948). For promising recent work in this area, see Edling, supra; Jerry L. Mashaw, Recovering American Administrative Law: Federalism Foundations, 1787-1801,

Electronic copy available at: https://ssrn.com/abstract=2569096

did in fact do much to render the federal government practically invisible to many Americans during this period. Even after the Civil War, leading monographs contend, the federal government continued to exist as a mere "state of courts and parties."[23] To be sure, the anti-statist doctrines cultivated by the Jeffersonians cast a long historical shadow in the nineteenth century—and beyond. The movement for constitutional reform in 1787, however, in which Jefferson played no appreciable part, proceeded on a contrary set of motivations and understandings.

Reformers in 1787 made it their mission to create a reified federal state entity, distinct from and superior to the people and states, and thereby capable of policing both by its prerogative of self-preservation. The Constitution declared the federal government supreme within its sphere, depositing all the traditional indicia of governmental sovereignty—including the power to tax, to take private property, to regulate immigration and naturalization, to coin money and punish counterfeiting, to declare war, and to enter into treaties—in the central government, even if it allocated some of these powers among the different departments in some innovative ways. Congress's oft-overlooked plenary authority under Article 1, Section 8 over designated seats of government and annexes "in all cases whatsoever" provides additional compelling textual support for a contemplated sovereign federal state in 1787, as do the Constitution's broad provisions for federal military power vis-à-vis internal threats.[24] On a more practical level, federal tax collection in the ports and in the interior soon after ratification, together with the considerable federal court system created by the Judiciary Act of 1789 (conceived as an arm of the federal state rather than its monitor), gave immediate and concrete expression to the new federal state.

Probably the most powerful founding-era evidence touching both the intended locus of sovereignty and the question of "stateness" in 1787, however, lay in the Constitution's treason clause and in judicial decisions in the 1790s expounding it.[25] The crime of treason in the Anglo-American eighteenth century held the distinction of being, simultaneously, a criminal offense and a police offense.[26] As it developed in England, the whole object of the jurisprudence surrounding the crime became anticipating and preventing the actual crime—killing the king—by targeting certain predecessor offenses some of which, over time, morphed into treason itself.[27] The

---

115 Yale L.J. 1256 (2006); Gautham Rao, "The Creation of the American State: Customhouses, Law, and Commerce in the Age of Revolution" 85 (Ph.D. diss., University of Chicago, 2008); Gautham Rao, At the Water's Edge: Customhouses, Governance, and the Origins of the Early American State (University of Chicago Press, forthcoming). For another recent work that touches on the early national period as context for larger compensation-related administrative transformations that occurred after the Civil War, see Nicholas R. Parillo, Against the Profit Motive: The Salary Revolution in American Government (2013)

[23] See Stephen Skowronek, Building a New American State: The Expansion of National Administrative Capacities, 1877-1920, at 25 (1982).

[24] U.S. Const. art. I, §8, cls. 17, 12, 15, 16.

[25] U.S. Const. art. III, § 3. The Articles of Confederation left the crime of treason entirely to the several states. See also 2 Convention Records, supra note 17, at 347 (Doctor Johnson referring to "treason agst the sovereign, the supreme Sovereign, the United States").

[26] See supra note 8 and accompanying text.

[27] See Dubber, supra note 4, at 25-30 (discussing emergence of constructive and petit treason).

Electronic copy available at: https://ssrn.com/abstract=2569096

United States Constitution established a constitutional definition of treason that borrowed language from old English statutes[28] and assumed that the judiciary would adjudicate treason cases subject to constitutional evidentiary requirements (an overt act confirmed by two witnesses) and congressional punitive determinations. The Federalists suggested that the Constitution's treason provisions circumscribed the crime so as to prevent the English doctrines of constructive treason from taking hold in the American context.[29] In fact, however, the crime of treason against the federal state, or "the United States," had the potential to extend further than in England because the American "sovereign" could, both in theory and practice, encompass  much more than a personal monarch could.[30] Early Congresses, moreover, did not apparently feel too constrained by the treason clause, using its underlying principles to create crimes found nowhere in the Constitution. In 1790, for example, Congress defined a crime called "misprision of treason," which created a legal duty for citizens to police treasonous activity subject to fines and imprisonment, by criminalizing failure to report knowledge of it to officials.[31]

The Sedition Act of 1798 subsequently made any combination or conspiracy formed to oppose the government or its laws short of treason itself, a criminal misdemeanor punishable by fines and imprisonment.[32] Congress, however, created no administrative mechanism to police sedition. Policing sedition fell to the people, while punishing it fell to the federal courts. To be sure, the federal judges adjudicated crimes against the new federal state with a singular vigor in the 1790s. Yet, as American legal historians know well, the judges did much more than mechanically enforce criminal prohibitions defined in congressional statutes. They also created crimes not specifically set forth in the Constitution or legislation but that found justification in the same prerogative of sovereign self-preservation that underlay treason.[33] The family of common law crimes established by the Federalist judges in the 1790s around the conceptual core of treason fell within the ambit of police offenses.[34]

## II. POLICING THE STATES

---

[28] Compare U.S. Const. art. III, § 3 with Statute 25 Edward III, reprinted in Edward Coke, The Third Part of the Institutes of the Laws of England 1 (London, 1817).

[29] See James Willard Hurst, The Law of Treason in the United States 126-45 (1945). This did not assuage the Antifederalists. Luther Martin, for example, objected to the Treason Clause as follows: "By the *principles* of the American revolution, *arbitrary power may* and *ought* to be resisted, even by *arms* if necessary." Yet if a state ever attempted to so resist federal power, Martin contended, "the *State* and every of *its citizens* who *act under its authority* are guilty of a direct act of treason." Luther Martin, The Genuine Information, reprinted in 3 Convention Records , supra note 17, at 223.

[30] Markus Dubber, The State as Victim: Treason and the Paradox of American Criminal Law 6 (http://papers.ssrn.com/abstract=1526787).

[31] Act of Apr. 30, 1790, ch. 9, § 2, 1 Stat. 112.

[32] Act of July 14, 1798, ch. 74, § 1, 1 Stat. 596.

[33] See Judge Richard Peters's opinion in United States v. Worrall, 28 F. Cas. 774 (C.C.D. Pa. 1798) (No. 16, 766), in Francis Wharton, State Trials of United States during the Administrations of Washington and Adams 198 (1849) [hereinafter State Trials].

[34] See Dubber, supra note 4, at 95-104.

7

Electronic copy available at: https://ssrn.com/abstract=2569096

Shays' Rebellion certainly illustrated for reformers in 1787 that individuals could threaten governmental authority in significant ways that required both prevention and punishment, and the post-ratification tax rebellions confirmed this threat's persistence into the 1790s. Experience under the Articles of Confederation, however, demonstrated that the states and not individuals posed the most formidable threats to federal authority and therefore presented the most serious policing problem in 1787. As it happened, the federal government would receive scant legislative jurisdiction over the states under the Constitution (treason and the family of police offenses it spawned applied only to individuals) and therefore could not police the states by quite the same means it might police individuals. The Articles of Confederation created peculiar difficulties for the continental government in this regard and states'-rights Antifederalists had a vested interest in perpetuating those difficulties during and after the ratification debates. Sovereign self-preservation required the credible threat of coercion and the sovereign states would not be coerced so long as they remained sovereign. The absence of any effective means of federal sovereign self-preservation vis-à-vis the contumacious states under the Articles of Confederation stands as a key historical motivation for constitution reform in 1787. One cannot easily read James Madison's pre-Convention essay regarding the "Vices" of the confederation without sensing Madison's urgent desire to invest the federal government with adequate means by which not only to sanction the state legislatures for impinging upon the "general interest," but to prevent those incursions from occurring in the first instance.[35]

The Constitution of 1787 attempted to answer the problem of governing the sovereign states in a number of ways. The Article I Section 10 prohibitions, for example, divested the states of sovereignty in certain matters, even if the question remained how precisely that divestiture would get enforced. Equal representation in the Senate, moreover, incorporated some measure of state sovereignty into the federal government itself. A third way to deal with the states lay in simply avoiding them altogether and instead governing individuals and, by all appearances, the framers understood most of Article I Section 8 to do just that.[36]

In Philadelphia, the Virginia Plan had offered more direct ways of dealing with the policing problem created by disobedient states under the Articles of Confederation. First, it contained a "force clause" giving the federal government the power to employ military force against recalcitrant states.[37] Madison and others, however, successfully argued that more prudent and peaceful measures recommended themselves. Toward this end, Madison championed another provision in the Virginia Plan that would have given Congress authority to negative any and all legislation passed in the states prior to enactment.[38] The congressional negative held special appeal for key nationalists, who

---

[35] 2 Convention Records, supra note 17, at 27; James Madison, Vices of the Political System of the United States, in 2 The Writings of James Madison 361-69 (Gaillard Hunt ed., 1901) [hereinafter Madison Writings].

[36] This, in turn, resulted in divestitures of state sovereignty in certain areas and, in others, concurrent jurisdiction tipping in favor of the federal government under the Supremacy Clause in cases of conflict.

[37] 1 Convention Records, supra note 17, at 21.

[38] Id.

8

Electronic copy available at: https://ssrn.com/abstract=2569096

deemed it indispensable to peaceably defending the "general authority . . . against encroachments of the subordinate authorities."[39]

The structural homologies that the congressional negative shared with eighteenth-century understandings surrounding the police power merit an appreciation that they have not received in the historical literature. The negative both embodied a federal police power (the *noun*) and gave Congress the power to police (the *verb*). Its objective lay specifically in preserving federal authority as such over the states. It had a significant discretionary component, operating without any textual or structural limits outside the political process.[40] Finally, the negative would have also anticipated and prevented state legislative violations before they became operative in the manner of police, rather than sanctioning existing violations in the manner of law.

No one in Philadelphia expressly referred to the congressional negative as a police power. Yet the delegates could not have easily avoided the conclusion had they thought about it in these terms. For a number of reasons ranging from practical to ideological, the congressional negative met its demise in Philadelphia and one imagines would have encountered great opposition among the Antifederalists had it survived the Convention.[41] Yet, as leading constitutional historians recognize, its animating principles lived on and, with the reintroduction of an independent supremacy clause on July 17, the powers linked to the failed congressional negative became vested in the courts.[42]

### III. JUDICIALIZING POLICE

On July 17, most delegates had agreed in principle to establish a Supreme Court with some jurisdiction over the states and to give Congress authority to create inferior federal courts at its discretion. Significantly, the delegates at this time continued to link the judicial function to the broad police end of maintaining "national peace and

---

[39] 5 Madison Writings, supra note 35, at 23. On the theory, evolution, and demise of the congressional negative, see Charles Hobson, The Negative on State Laws: James Madison, the Constitution, and the Crisis of Republican Government, 36 W. & Mary Q. 215 (1979).

[40] In the original Virginia Plan, the negative would apply anytime "in the opinion of the National Legislature" a state law contravened "the articles of Union." 1 Convention Records, supra note 17, at 21. The Virginia Plan's "articles of Union," however, did not enumerate and define powers, but rather proposed to empower the federal government to pursue the general police ends of "national peace and harmony." *Id.* at 22.

[41] On which see Hobson, supra note 39.

[42] See Larry Kramer, The People Themselves 75-76 (2010); Alison LaCroix, The Ideological Origins of American Federalism 171 (2010); Jack N. Rakove, The Origins of Judicial Review: A Plea for New Contexts, 49 Stan. L. Rev. 1031, 1046-47 (1997). The otherwise contrarian and backward-looking New Jersey Plan first introduced the idea of an independent supremacy clause. *See* 1 Convention Records, supra note 17, at 245 (Paterson Resolution No. 6: all treaties and federal laws "shall be the supreme law of the respective States so far forth as those Acts or Treaties shall relate to the said States or to their Citizens, and the Judiciary of the several states shall be bound thereby, anything in the respective laws of the Individual States to the contrary notwithstanding"). For Antifederalist-to-be Luther Martin's July 17 reintroduction of this clause, now loaded with new constitutional meaning in the congressional negative's wake, see 2 id. at 28-29.

Electronic copy available at: https://ssrn.com/abstract=2569096

harmony."[43] The plenary powers associated with the failed congressional negative jibed well with the judicial function so conceived. Thereafter, however, the delegates drafted Article III which enumerated specific cases and controversies to which the judicial power would extend. At the same time, the fairly weak supremacy clause introduced on July 17 became considerably more robust over the ensuing weeks, incorporating the Constitution itself into the "supreme Law of the Land" and subordinating thereto state *constitutions* in addition to state laws.[44] Our question therefore becomes whether the police powers vis-à-vis the states embodied in the congressional negative that, in theory, devolved upon the judicial department on July 17 survived the limitations established by Article III and, thereafter, the Judiciary Act of 1789, taking into account the Supremacy Clause's mandate in its final form.

Article III laid out some very broad categories of jurisdiction for the federal courts, "in Law and Equity," that included cases arising under the Constitution, federal law or treaties, admiralty and maritime, and others wherein the status of the parties invoked national concerns.[45] Evidence exists that the framers understood these enumerated jurisdictional categories not to *replace* the overriding goal of "national peace and harmony" so much as *enable* the federal courts to pursue that goal.[46] If talk of a national council of legislative revision (to include federal judges) and of the judicial power reaching "*questions*" rather than cases suggested an expanded magisterial role for the judges outside litigation, however, the delegates ultimately converged around confining the federal courts' jurisdiction to concrete controversies "of a Judiciary Nature."[47] The Supreme Court received appellate jurisdiction over all such cases, except those over which it had original jurisdiction, subject to some congressional regulation.[48] The Judiciary Act of 1789, which by no means legislated to the limits of the Constitution, codified much of this.[49] But if the First Congress declined to vest the lower federal courts with the general federal question jurisdiction otherwise contemplated in Article III, it took another step not expressly authorized by Article III. Namely, it made federal jurisdiction in a number of areas touching national concerns, including revenue, federal crimes, and cases involving states, *exclusive* to the federal courts, thereby barring the state courts from deciding these matters.[50]

With this said, the state courts would continue to handle the lion's share of the country's judicial business in the early republic notwithstanding the Judiciary Act. Enforcing national *supremacy* over the state legislatures and constitutions, however, raised special concerns for reasons already suggested. The Supremacy Clause, of course, bound the state judges by name.[51] Yet the logic of supremacy itself demanded

---

[43] 2 Convention Records, supra note 17, at 133 (Committee of Detail's first draft).
[44] *Id.* at 169, 389.
[45] U.S. Const. art. III, § 2. cls. 1 & 2.
[46] 2 Convention Records, supra note 17, at 147 (Committee of Detail's fourth draft).
[47] 1 id. at 22; 2 id. at 430.
[48] U.S. Const. art. III, § 2, cl. 2
[49] See Act of Sept. 24, 1789, ch. 20, 1 Stat. 73.
[50] See id. §§ 9, 11, 13, 1 Stat. at 76-77, 78-79, 80-81.
[51] U.S. Const. art. VI, § 2. cl. 3.

10

Electronic copy available at: https://ssrn.com/abstract=2569096

federal supervision of the state judges, most of whom, if they did not stand for popular elections in the states, retained connections with the state legislatures deemed too close for comfort by many Federalists.[52] The Supremacy Clause therefore imposed the same duty on the Article III judges as it did the state judges, with the important difference that, in the case of the federal judges, the scope of this duty included superintending authority over the state judges themselves.[53]

The Judiciary Act established a few mechanisms by which the lower federal courts might exercise such superintending authority if called on to do so in justiciable cases or controversies.[54] The legislation, for example, gave federal circuit courts the power to halt state proceedings on removal.[55] Yet whatever Congress did or did not do in the years after ratification, Article III *required* the creation of a single Supreme Court to possess direct authority over the states in two central respects. First, Article III gave the Court original jurisdiction over all "Cases . . . in which a state shall be Party."[56] Here, arguably, the Court would not "police" the states any more than it would police individual litigants in a given case or controversy.[57] To the extent that state suability offered a viable constitutional mechanism for governing the states, however, ratification of the Eleventh Amendment thereafter took it off the table in many cases.[58]

The Supreme Court's authority over the states, however, had dimensions independent of its capacity to subject the state governments directly to the judicial process as civil defendants consistent with the Constitution. It also had authority over *state courts*. This included the discretionary supervisory authority traditionally wielded by superior courts over inferior ones in the English judicial tradition to issue writs of

---

[52] The Judiciary Act of 1789 expressed this constitutional imperative in Section 25. See Act of Sept. 24, 1789, ch. 20, § 25, 1 Stat. 85. On political controls over the state judges under the state constitutions, see Gerhard Casper, Separating Power: Essays on the Founding Period 136 (1997). The possibility of inconsistent rulings among the state courts also necessitated a judicial monitor at the federal level. See The Federalist No. 82, supra note 16, at 460 (Alexander Hamilton) (observing that, in matters of national concern, an appeal from the state courts would "naturally lie to that tribunal [the Supreme Court] which is destined to unite and assimilate the principles of national justice and the rules of national decisions").

[53] See Ware v. Hylton, 3 U.S. (3 Dall.) 199, 237 (1796) (opinion of Chase, J.) (noting that "National or Federal Judges are bound by duty and oath to the same conduct" as the state judges under the Supremacy Clause).

[54] See, e.g., Act of Sept. 24, 1789, ch. 20, § 25, 1 Stat. 85.

[55] Id. § 12, 1 Stat. 79-80 (setting forth removal procedures); see also infra notes 59, 64, 65, and accompanying text (discussing additional mechanisms of superintendence).

[56] U.S. Const. art. III, § 2.

[57] The rise of so-called "preventative adjudication" in suits between individuals, which prevents injuries from occurring through judicial declarations of rights with preclusive effect, would await the twentieth century. See generally Samuel Bray, Preventative Adjudication, 77 U. Chi. L. Rev. 1275 (2010). On the first state declaratory judgment acts, see Charles C. Ascher & James M. Wolf, Current Legislation, 20 Colum. L. Rev. 106-07 (1920). While such adjudication had roots in English Chancery practices, courts in England did not begin to entertain declaratory relief requests not ancillary to legal remedies until well into the nineteenth century. See Itzhak Zamir, The Declaratory Judgment 7 (1986). For further discussion of preventative adjudication in constitutional cases, see infra notes 86, 87, 88, and accompanying text.

[58] U.S. Const., Amendment XI. See also Hans v. Louisiana, 134 U.S. 1 (1890) (holding that the Constitution bars citizens of a state from suing the state for damages without its consent in the federal courts based on federal question jurisdiction).

11

Electronic copy available at: https://ssrn.com/abstract=2569096

*mandamus, prohibition,* and *habeas corpus* (among others) to state courts and judges under appropriate circumstances.[59] These inherited writs had a distinctive policing component insofar as all might interfere with pending state court proceedings prior to final resolution of those proceedings.[60] The anti-injunction clause in the Judiciary Act of 1793 forbidding federal judges from issuing "writs of injunction" to stay proceedings in state courts only confirmed that the judicial power established in the Constitution authorized federal injunctive relief against the state courts in the first instance.[61] Notwithstanding the modern Supreme Court's fairly broad constructions of the anti-injunction rule, the rule originally (and understandably) confined itself to single circuit-riding justices and therefore did nothing to affect the Supreme Court's jurisdiction.[62]

---

[59] See James E. Pfander, Federal Supremacy, State Court Inferiority, and the Constitutionality of Jurisdiction-Stripping Legislation, 101 Nw. U. L. Rev. 191, 199-200 (2007). Chief Justice Jay stated in 1792 that the practices of King's Bench and Chancery in England would provide the model for "the practice of this Court." 1 Documentary History of the Supreme Court of the United States, 1789-1800, at 203 (Maeva Marcus ed., 1985) [hereinafter DHSC]. Section 13 of the Judiciary Act of 1789 provided for prohibition and mandamus authority in the Supreme Court, though did not mention the state courts by name. See Act of Sept. 24, 1789, ch. 20, § 13, 1 Stat. 81. Section 14 gave the federal courts power to issue writs of *scire facias* (compelling a person to come before the court and show cause), *habeas corpus*, and any others "provided for by statute" or "necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law." Id. § 14, 1 Stat. 81-82. At least two federal cases in the 1790s confirmed that the Court's supervisory writ authority applied regardless of whether the Court had statutory jurisdiction, appellate or original, on other grounds. See United States v. Peters, 3 U.S. (3 Dall.) 121, 129 (1795) (granting petition to bar proceedings in admiralty by writ of prohibition); United States v. Lawrence, 3 U.S. (3 Dall.) 42, 47 (1795) (hearing application for a writ of mandamus to the district court despite no other jurisdictional grounds). Later, *Marbury v. Madison* held the Judiciary Act's grant of mandamus authority to the Court unconstitutional insofar as it purported to authorize the Court to issue the writ as an original matter to Secretary of State Madison because, according to Marshall, the case did not otherwise fall within the original jurisdiction laid out for the Court in Article III (i.e., litigation involving states or affecting ambassadors, public ministers or consuls), which Marshall regarded as an exclusive and delimiting grant. 5 U.S. (1 Cranch) 137, 176 (1803). Subsequent cases revised the Court's position on its prerogative writ authority in the direction of broadening it. See Ex Parte Bollman & Ex Parte Swartwout, 8 U.S. (4 Cranch) 75 (1807). None of these cases, however, involved petitions from state court litigants and therefore none directly touched upon the question of whether the Constitution empowered the Court to supervise state courts through prerogative writs in the absence of other statutory jurisdiction. To the extent the Court ever had any prerogative writ authority capable of providing an independent basis for jurisdiction vis-à-vis state courts, two factors conspired to produce its demise over the course of the nineteenth century: first, the rise of states'-rights federalism from whose influence neither Marshall nor Story or Kent, let alone Taney, could extricate themselves; and, second, the federal courts' early concession of jurisdictional dependence upon Congress. To the extent that the Court's inherited supervisory writ authority entailed power to intervene in state proceedings prior to their final resolution as per state procedures, moreover, the Court's twentieth-century abstention doctrines erected additional barriers. See Donald K. Doernberg, Sovereign Immunity or the Rule of Law: The New Federalism's Choice 132-47 (2005).

[60] The original forms of *habeas corpus*, for example, applied pre-conviction. See Ex Parte Bollman & Ex Parte Swartwout, 8 U.S. (4 Cranch) 75, 98-101 (1807) (discussing different forms of the writ).

[61] Act of Mar. 2, 1793, ch. 22, § 5, 1 Stat. 335.

[62] See id. § 5, 1 Stat. at 335; see also William T. Mayton, Ersatz Federalism under the Anti-Injunction Statute, 78 Colum. L. Rev. 330, 332-38 (1978). The legislation also did nothing to limit the federal courts sitting in equity from issuing injunctive relief to state courts on motion rather than writ in matters over

12

*2 CRITICAL ANALYSIS OF LAW __(2015) (forthcoming)*

The federal judiciary's authority to enjoin state officials from enforcing unconstitutional state laws, moreover, rendered the anti-injunction rule essentially nugatory in constitutional cases.[63]

In addition to its inherent supervisory authority over state courts, the Supreme Court also possessed appellate jurisdiction over state high courts in cases where state law threatened federal authority, and Congress arguably lacked power to meddle with this essential superintending function that became memorialized in Section 25 of the Judiciary Act.[64] Related to this facet of the Court's constitutional jurisdiction lay the power to nullify state legislation or constitutional provisions contrary to the United States Constitution, federal law or federal treaties—without question the defining function of judicial review as understood by the framers of the Constitution, the Judiciary Act of 1789, and the federal judges in the 1790s.[65] As to whether we can say that the Court received some kind of police power over the states, this aspect of the Court's authority warrants closer attention, for it had descended directly from the congressional negative via the Supremacy Clause and Article III in Philadelphia. To assess its operation more fully in this light, we turn to the first case after ratification in

---

which they had acquired jurisdiction prior to the state court in question. See James E. Pfander, The Anti-Injunction Act and the Problem of Federal-State Jurisdiction Overlap, 91 Texas L. Rev. 1, 8 (2013).

[63] See Osborn v. Bank of the United States, 22 U.S. (9 Wheat) 738, 739 (1824) (holding that Eleventh Amendment does not apply to suits against "officers and agents of the State, who are intrusted with the execution of [] [state] laws") (syllabus); Ex Parte Young, 209 U.S. 123, 150-52 (1908). After the decision in *Ex Parte Young*, Congress mandated that only three-judge district courts could issue injunctive relief in cases challenging the constitutionality of state laws, from whose decisions litigants could appeal directly to the Supreme Court. See Act of June 18, 1910, ch. 309, § 17, 36 Stat. 557 (current version at 28 U.S.C. § 2284 (2000)). On preventative injunctions of state enforcement officials in constitutional cases, see infra notes 86, 87, 88, and accompanying text.

[64] Act of Sept. 24, 1789, ch. 20, § 25, 1 Stat. 85; see also Lawrence G. Sager, Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts, 95 Harv. L. Rev. 17, 51 (1981) (observing that "as the delegates to the Constitutional Convention made their peace on issue after issue, the Supreme Court's superintendence of state compliance with national law emerged as the fulcrum of the national government" and that, while debates occurred over whether the Supreme Court's appellate oversight would constitute a sufficient restraint on the states, the necessity of such oversight remained undisputed). The early Supreme Court employed Section 25's critical machinery for the first time in 1796 when in *Olney v. Arnold*, a complex revenue case brought by recalcitrant Rhode Island merchants against the conscientious federal customs collector Jeremiah Olney, the Court reversed the Rhode Island Superior Court of Judicature by writ of error in favor of Olney. 3 U.S. (3 Dall.) 308 (1796). For the most detailed discussion of the case available, see Maeva Marcus, Introduction to Olney v. Arnold; Olney v. Dexter, in 7 DHSC, supra note 59, at 565-77. For documents relating to the case, see id. at 577-624.

[65] On original understandings in this regard, see Rakove, supra note 42, at 1045; see also The Federalist No. 80, supra note 16, at 445 (Alexander Hamilton) (discussing judicial power and emphasizing its purpose of "enforcing" the Constitution's "restrictions on the authority of the State legislatures"). The Supremacy Clause did not unequivocally render the federal Constitution supreme over *federal* legislation or treaties, only over state law and constitutions. U.S. Const. art. VI, § 2. That the framers declined to create a council of revision, moreover, suggests a limited role, if any, for the federal courts in reviewing the constitutionality of federal legislation.

13

Electronic copy available at: https://ssrn.com/abstract=2569096

which the Supreme Court struck down a state law under the Supremacy Clause—*Ware v. Hylton* in 1796.[66]

*Ware* began as a transatlantic contract case filed by a British decedent's administrator against Virginian merchants in the Virginia federal circuit court. To fund its war efforts, Virginia passed sequestration legislation in 1777 permitting those Virginians owing money to British creditors to pay some or all of the money owed to the creditor into the state treasury in exchange for a state certificate purporting to discharge liability for the amount deposited.[67] The defendants in *Ware* had paid money into the treasury in 1780 and, when sued in *Ware*, pled the sequestration act in defense. The plaintiffs, in turn, pled Article IV of the Treaty of Peace (enacted in 1783), which provided that "creditors on either side, shall meet with no lawful impediment to the recovery of the full value in sterling money, of all bona fide debts heretofore contracted."[68] The circuit court held that the defendants had satisfied the debt under state law to the extent paid to the state treasury and the Treaty of Peace could not compel them to pay those monies again to the plaintiff.[69] The basis for the two-judge majority's decision lay in the terms of the treaty as applied to the particular facts of the case. At the time of the Treaty's enactment in 1783, circuit judge James Iredell held, the plaintiffs did not qualify as "creditors" within Article IV's contemplation because state law, together with the defendant's affirmative act of payment into the treasury, had already completed the defendant's release from liability.[70]

The Supreme Court reversed and awarded damages and costs to the plaintiffs.[71] All the participating justices agreed that the Supremacy Clause made Article IV of the Treaty of Peace supreme over the sequestration act and thereby rendered the Virginia legislation null and void. Harkening back to the theories and practices that prevailed under the Articles, the defendants' counsel argued on appeal that the federal government lacked power to repeal a state law and therefore that Article IV could purport to do no more than order the state legislatures to repeal legal impediments to British claims.[72] Since Virginia had not actually repealed the legislation, on this view, the defendant could rely on it notwithstanding the treaty. The justices in *Ware* readily concluded that one of the Constitution's primary purposes lay in eliminating such state prerogatives. In the lead opinion, Justice Chase stressed that the Supremacy Clause

---

[66] See Ware v. Hylton, 3 U.S. (3 Dall.) 199 (1796).

[67] An act for sequestering British Property, enabling those indebted to British subjects to pay off such debts, and directing the proceedings in suits where such subjects are parties (Oct. 1777 session), reprinted in 9 William Waller Henning, The Statutes at Large, Being a Collection of All the Laws of Virginia . . . [1619-1792] 377 (1969).

[68] Definite Treaty of Peace Between the United States of American and his Britannic Majesty, 8 Stat. 80 (Sept. 3, 1783), art. IV [hereinafter Treaty of Peace].

[69] See Marcus, Introduction, in 7 DHSC, supra note 59, at 210-13.

[70] See id. at 211-12; see also Ware, 3 U.S. at 277 (Justice Iredell reiterating the reasons for the circuit court's judgement); William Tilghman's Notes on the Justices Opinions, in 7 DHSC, supra note 59, at 347.

[71] Ware, 3 U.S. at 285.

[72] Id. at 216-17 (arguments of defendants' counsel Alexander Campbell).

14

Electronic copy available at: https://ssrn.com/abstract=2569096

"entirely removed" any doubts as to the self-executing scope of Article IV.[73] By "force" of the Supremacy Clause alone, Chase held, state laws impairing British contract rights became "totally annihilate[d]" and "prostrated before the treaty."[74]

There still remained, however, the circuit court's finding (embraced by the defendants) that at the time of the Treaty's enactment in 1783, no valid debt existed as to the money already paid into the treasury and therefore the Treaty did not apply to the parties at bar irrespective of the Supremacy Clause. Justice Cushing registered the decisive response. Article IV, Cushing held, voided the sequestration act "*ab initio*," with the result that its provisions never possessed the force of law and therefore nothing the defendants did under its auspices could ever boast legal validity.[75]

To what extent did the *Ware* decision involve an exercise of police or police-like powers over Virginia? As a functional matter, the decision certainly operated to preserve and protect federal authority and supremacy against offending state exertions. The doctrine of voidance *ab initio*, moreover, did in fiction precisely what Madison and the nationalists in Philadelphia had envisaged the congressional negative doing in fact. At the same time, the *Ware* decision rested on the terms of an executive treaty that together with the Constitution and the Judiciary Act's jurisdictional stipulations established limits on what the judges could do, whereas the congressional negative contemplated no such limitations applicable to Congress in the first instance. On the other hand, the Constitution contained no meaningful textual limitations bounding the executive power from which treaties flowed beyond the procedural requirement of consulting the senate, and Justice Chase, while reserving for the courts a special role in declaring state law repugnant to treaties null and void—"Courts must adjudge the laws creating the impediments void"[76]—held that federal treaties themselves remained all but exempt from judicial review.[77] The retroactive effect accorded both the treaty and the Supremacy Clause by the judges in *Ware*, moreover, essentially rendered both into ex post facto directives and, as such, in considerable tension with the rule of law. Finally, it bears emphasis that no constitutional mechanism existed to check or limit the Court's construction of the Treaty of Peace as applied to the parties in *Ware*, even as the case's history suggested that reasonable judges might disagree as to the propriety of that construction.[78]

Did the *Ware* decision anticipate or prevent wrongdoing in the manner of police, or simply remedy accomplished wrongs in the manner of law? Confining our view to the parties in *Ware*, the answer seems clear. The Court determined plaintiff's contract rights

---

[73] Id. at 236.

[74] Id. at 237, 242. Justice Iredell recused himself from voting in the decision but interposed a longwinded reiteration of his circuit court opinion anyway.

[75] Id. at 282 ("the plain and obvious meaning of it, goes to nullify, *ab initio*, all laws, or the impediments of any law, as far as they might have been designed to impair, or impede, the creditor's right, or remedy, against his original debtor").

[76] William Tilghman's Notes on the Justices Opinions [in *Ware*], in 7 DHSC, supra note 59, at 344.

[77] Ware, 3 U.S. at 237 ("If the Court possess a power to declare treaties void, I shall never exercise it but in a very clear case indeed.").

[78] The early federal judges established this principle without controversy in *Hayburn's Case*. See 2 U.S. (2 Dall.) 409, 411 (1792).

Electronic copy available at: https://ssrn.com/abstract=2569096

in light of applicable law and ordered the defendant to pay damages to compensate the plaintiffs for a wrong (refusal to pay) already done. This suggests the paradigm of law not police.[79] Here, however, our question is not whether the Court policed the parties to the case itself, but whether the decision effectively policed the state of Virginia through anticipatory prevention of some greater public wrong. What in this case might the greater public wrong have been? Extrapolating from Madison's comments, it would consist in the aggregate private harm to individuals, together with the real if somewhat intangible degradation of federal authority caused by the legislation over time.[80] What, then, would serve as the fitting judicial remedy for this public wrong? The answer again seems clear: Voiding the legislation *in fact* by, for example, enjoining the state to repeal it; and requiring the state to make existing claimants whole.

In *Ware*, the basis for the larger constitutional wrong certainly had occurred—Virginia had passed an act that impeded British creditors' rights in contravention of supreme law in the form of the Treaty of Peace. The particular individuals at bar in *Ware*, however, could plead only one small part of the greater public wrong caused by the legislation. And while the judicial fiction of void *ab initio* did insinuate that the Court had within its contemplation rights not specifically claimed in the case, the fact remained that the Court's jurisdiction extended no further than the named litigants.

Nor, for the same reason, did or could the *Ware* Court order the fitting judicial remedy vis-à-vis Virginia for the greater public wrong. Here again, the Court's remedy could apply only to the litigants. Virginia had not been served with process in the case and did not otherwise appear in the caption. Indeed, not only did the *Ware* Court remain incapable of ordering Virginia to affirmatively do or pay anything (because the state was not a party), but, as we have noted, the Eleventh Amendment ratified soon thereafter barred all the federal courts from asserting jurisdiction over the states in cases brought by individuals. The Eleventh Amendment thrust the Court into a twice-removed position with respect to the states, capable of reaching them only indirectly through individuals but unable under ordinary circumstances to determine all the underlying rights claims or otherwise to bring the full sanction of the law to bear upon the states as political entities.[81]

With all these things said, however, we cannot quite conclude that the Court's pronouncements in *Ware* affected only the particular parties to the litigation. The Court directed its holding, in part, to state legislation and therefore the authority of the state government. We need not posit a fully developed vision of judicial supremacy in 1796 to appreciate that cases such as *Ware*, by remedying private wrongs via nullifications of state-level legislative improprieties, publically marked out the parameters of federal authority in ways that preserved national supremacy for its own sake and that might prevent augmentations to the aggregate private harm arising from the legislation going forward.

---

[79] See supra note 57.
[80] See 5 Madison Writings, supra note 35, at 28.
[81] See infra notes 86, 87, and accompanying text.

Electronic copy available at: https://ssrn.com/abstract=2569096

## CONCLUSION

The foregoing analysis has a number of revisionary implications for contemporary constitutional understandings, a few of which I shall highlight in closing. First, the analysis reminds us that a police-related discourse of illimitation flowing from the federal government's intended prerogative of sovereign self-preservation coexisted with a legal discourse of limitation in the minds of key framers, in the Constitution's text, and in the initial efforts to operationalize the Constitution in the 1790s. As demonstrated in *Ware*, beyond the Preamble perhaps no clause in the Constitution gave fuller expression to this discourse of illimitation than the treaty power; and no department of government would bring this power to bear internally on states and individuals with more constitutional consequence than the federal judiciary. In recent decades the Supreme Court has tended carefully to avoid questions that might force it to confront the Article II treaty power's sweeping scope.[82] If and when the Court has an opportunity squarely to address the matter in the future and chooses to pursue it, the justices will, as always, find no internal textual limits by which to cabin the treaty power and will have to grapple with substantial historical evidence that the Federalists understood it as unshackled by either textual or structural limitations.[83]

Second, understanding judicial review as an exercise of the prerogative of sovereign self-preservation problematizes the idea that protecting individual rights stood as the original animating purpose of judicial review under the Constitution. Federal sovereignty in 1787 certainly encompassed the rights invoked in Article I, Section 10, but by no means did it end with them. It seems clear that the justices in *Ware* felt no special sympathy for the British creditors whose rights the sequestration act had impeded. While the Court ultimately ruled in favor of the creditors, the seriatim opinions had a larger message regarding the constitutional supremacy of the federal government that transcended the parties' respective claims. That the *Ware* Court beat the Supremacy Clause's drum so hard and heavy suggests that the justices in 1796 made

---

[82] The Court has recently intimated that "principles of federalism" might limit it. See Bond v. United States, 572 U.S. __ (2014) (slip opinion at 10).

[83] The treaty power, in Publius's words, could have "no constitutional shackles" for "it is impossible to foresee or to define the extent and variety of national exigencies, or to define the extent and variety of the means which may be necessary to satisfy them." The Federalist No. 23, supra note 16, at 185, 184 (Alexander Hamilton) (emphasis omitted). Little direct historical evidence exists as to whether the framers believed the Bill of Rights applied to treaties. After the Supreme Court's decision in *Missouri v. Holland*, 252 U.S. 416 (1920), wherein the Court rejected the Tenth Amendment as an independent limitation on the treaty power, commentators suggested that the individual rights provisions in the Bill of Rights might be similarly inapplicable to treaties. See, e.g., Thomas Reed Powell, Constitutional Law in 1919-20, 19 Mich. L. Rev. 1, 13 (1920). In *Reid v. Covert*, however, a plurality of justices held that military court proceedings taking place in foreign nations pursuant to executive agreements did have to comply with grand jury indictment and trial by jury requirements, but otherwise seemed to broaden Holland's holding as to the Tenth Amendment. See 354 U.S. 1, 18 (1957); see also Curtis A. Bradley, The Treaty Power and American Federalism, 97 Mich. L. Rev. 390, 425-26 (1998) (discussing *Reid*). But see Bond v. United States, 572 U.S. __ (2014) (slip opinion at 10) (suggesting that principles of federalism might limit the treaty power).

17

Electronic copy available at: https://ssrn.com/abstract=2569096

protecting federal authority against state encroachments an important constitutional end in and of itself, independent of the litigants' claimed rights.[84]

Third, we often think of judicial review not only as an expression of law, but the *quintessential* expression of fundamental law in the American constitutional order. As to original understandings of federal judicial review of state law, what I have offered here suggests more complex origins that lay, in part, in the discourse of police vis-à-vis the states embodied in the Virginia Plan's congressional negative. Although historians and scholars have failed to appreciate it, the congressional negative would have vested Congress with both police powers and the power to police, each flowing from the federal government's inherent prerogative of sovereign self-preservation vis-à-vis the states. After its defeat in Philadelphia, moreover, the congressional negative's constitutional function devolved on the courts and, ultimately, the Supreme Court in the form of judicial review of state legislation. To go so far already permits us to view judicial review of state law under the Constitution in a whole new historical light—not as an expression of fundamental law, but as the judicialization of police.

To say that police became judicialized as a constitutional matter in Philadelphia, however, leaves open the extent to which the Court in fact inherited or exercised either police powers or the power to police, or both, with regard to the states. Seen through the prism of *Ware*, the judicialization of police produced in practice something like a mongrel of law and police. Janus-faced, the *Ware* court cast its analytical gaze simultaneously in both directions, corresponding to an underlying tension between the limits of the Court's *jurisdiction* and the plenary character of its received constitutional *function*. Its jurisdiction extended no further than the named private litigants. Accordingly, the scope of the Court's remedy remained exceedingly narrow as compared to the broad preemptive scope of the proposed congressional negative. At the same time, however, the judicial fiction of voidance *ab initio* (which had real legal effects) purported to anticipate and prevent every wrong that had occurred or might ever occur under the Virginia legislation's banner. If the *Ware* Court remedied a private wrong in fact, then, it policed a public wrong in fiction. The power to police the states embodied in the failed congressional negative therefore lived on, if not in the judicial process per se, then in the judicial imagination.

Yet even the latter formulation understates the extent to which the Court's decisions striking down state laws in cases between individuals would implicate the discourse of police, for the judicial process itself in such cases also served a policing function. Indeed, the very limits of the Court's jurisdiction to justiciable cases or controversies between individual litigants—limits shored up by the Eleventh Amendment—meant that each alleged private wrong arising from repugnant state legislation otherwise within the Court's jurisdictional reach could constitute nothing more (and nothing less)

---

[84] See Ware, 3 U.S. (3 Dall.) at 237 (opinion of Chase, J.) (asserting that the federal government "has superior power to the Legislature of any State, because no Legislature of any State has any kind of power over the Constitution, which was its creator"). The same can be said of many of the key Marshall Court decisions, and even a few cases in the Taney era. See, e.g., Ableman v. Booth, 62 U.S. (21 How.) 506 (1859).

Electronic copy available at: https://ssrn.com/abstract=2569096

than a vicariously committed *police offense* vis-à-vis the greater constitutional wrong caused by the legislation.[85]

To truly understand the judicial process's policing functions in constitutional cases, however, we must look beyond *Ware* and into the nineteenth century when the Court began carving out for the federal judiciary additional means by which to reach the states in connection with nullifying legislation notwithstanding the Eleventh Amendment. In *Ex Parte Young*, the Supreme Court confirmed what it considered a well-established principle, that the Eleventh Amendment applied only to cases naming the states as defendants and therefore did not preclude suits in federal courts against individual state officials (in this case, the Minnesota Attorney General) to enjoin those officials from enforcing state laws deemed contrary to the federal Constitution.[86] The federal courts, in other words, still lacked power to command a state as such to take affirmative action or otherwise draw on its treasury to compensate individual claimants for harms already done.[87] Sitting in equity, however, they could *prevent* a state from doing harm in the future—not by enjoining the legislature to repeal the offensive law or by declaring it void *ab initio* so as to reach past transactions, but by directly commanding the relevant individual administrative officials to cease enforcing it on a prospective basis.[88] Judicial review from this perspective looks less like a mongrel of law and police than, in essence, police without law. If the *object* of power had changed when measured against the failed congressional negative—from the legislative to the administrative branches of the states, and from collective bodies to individuals—the *nature* of that power had remained the same.

Finally, all these observations suggest a theory of federalism at sharp variance with the one adopted by the modern Supreme Court. Rather than embracing its originally contemplated police-like superintending function over the states on behalf of the federal government as a whole, the modern Court now essentially permits the states and

---

[85] See supra note 8 and accompanying text (defining police offense).

[86] Ex Parte Young, 209 U.S. 123, 150-52 (1908) (citing nineteenth-century cases). While most of the cases cited by the Court postdated the Civil War, the eight-judge majority in *Young* did not find the Fourteenth Amendment's alteration of federal-state relations relevant to the Eleventh Amendment analysis, and placed considerable weight in the 1824 case of *Osborn v. Bank of the United States*. Id. at 150 (citing Osborn v. Bank of the United States, 22 U.S. (9 Wheat) 738 (1824)). In the sole dissent, Justice Harlan declared that the principle endorsed by the Court would "work a radical change in our governmental system" that would enable even inferior federal courts "to supervise and control the official action of the States as if they were 'dependencies' or provinces." Id. at 175.

[87] The Court has since held that Congress may abrogate state sovereign immunity under Section 5 of the Fourteenth Amendment. Fitzpatrick v. Bitzer, 427 U.S. 445 (1978).  The Court has further held that while Article I does not generally empower Congress to abrogate state sovereign immunity, Seminole Tribe v. Florida, 517 U.S. 44 (1996), the Bankruptcy Clause does. Central Virginia Community College v. Katz, 546 U.S. 356 (2006).

[88] This might occur by orders of injunction or, as in cases such as *Roe v. Wade*, by simply declaring the respective rights and duties in question. 410 U.S. 113, 166 (1973) (holding that the Court's declared opinion as the rights in question sufficed to conclude the matter without an injunction: "we assume the Texas prosecutorial authorities will give full credence to this decision that the present criminal abortion statutes of that State are unconstitutional").

19

Electronic copy available at: https://ssrn.com/abstract=2569096

individuals acting in their name to police Congress.[89] Perhaps no other feature of the modern Court's jurisprudence labors under so much historical contradiction.

---

[89] See, e.g., New York v. United States, 505 U.S. 144 (1992); Printz v. United States, 521 U.S. 898 (1997); Alden v. Maine, 527 U.S. 706 (1999); Bond v. United States, 564 U.S.___(2011); Bond v. United States, 572 U.S. ___ (2014).

Electronic copy available at: https://ssrn.com/abstract=2569096

**Omitted - Compendium Pages 1388-1414**

J Urban Health
DOI 10.1007/s11524-017-0205-7



# Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources

**Christopher S. Koper** · **William D. Johnson** ·
**Jordan L. Nichols** · **Ambrozine Ayers** · **Natalie Mullins**

© The New York Academy of Medicine 2017

**Abstract** Policies restricting semiautomatic assault weapons and large-capacity ammunition magazines are intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other military-style features conducive to criminal use. The federal government banned such weaponry from 1994 to 2004, and a few states currently impose similar restrictions. Recent debates concerning these weapons have highlighted their use in mass shootings, but there has been little examination of their use in gun crime more generally since the expiration of the federal ban. This study investigates current levels of criminal activity with assault weapons and other high-capacity semiautomatics in the USA using several local and national data sources including the following: (1) guns recovered by police in ten large cities, (2) guns reported by police to federal authorities for investigative tracing, (3) guns used in murders of police, and (4) guns used in mass murders. Results suggest assault weapons (primarily assault-type rifles) account for 2–12% of guns used in crime in general (most estimates suggest less than 7%) and 13–16% of guns used in murders of police. Assault weapons and other high-capacity semiautomatics together generally account for 22 to 36% of crime guns, with some estimates upwards of 40% for cases involving serious violence including murders of police. Assault weapons and other high-capacity semiautomatics appear to be used in a higher share of firearm mass murders (up to 57% in total), though data on this issue are very limited. Trend analyses also indicate that high-capacity semiautomatics have grown from 33 to 112% as a share of crime guns since the expiration of the federal ban—a trend that has coincided with recent growth in shootings nationwide. Further research seems warranted on how these weapons affect injuries and deaths from gun violence and how their regulation may impact public health.

**Keywords** Firearms · Assault weapons · Violence

## Introduction

Firearm violence imposes a significant burden on public health in the USA. From 2010 through 2012, the nation experienced an annual average of 11,256 firearm homicides and 48,534 non-fatal assault-related gunshot victimizations that cost society nearly $22 billion a year in lifetime medical and work-related costs [1]. One type of policy response to reduce gun violence involves restricting or mandating design changes in particular types of firearms that are considered to be especially dangerous and/or attractive for criminal use.

Restrictions on assault weapons (AWs) represent one particularly controversial and highly contested form of such legislation that has featured prominently in gun policy debates in recent decades. In general, AW laws

C. S. Koper (✉) · W. D. Johnson · J. L. Nichols ·
A. Ayers · N. Mullins
Center for Evidence-Based Crime Policy, Department of
Criminology, Law and Society, George Mason University, Fairfax,
VA, USA
e-mail: ckoper2@gmu.edu

Published online: 02 October 2017

⚫ Springer

restrict manufacturing, sales, and ownership of semiautomatic firearms with large ammunition capacities and other military-style features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense [2]. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and barrel shrouds on pistols. AW laws also commonly include restrictions on large-capacity magazines (LCMs), which are typically defined as ammunition feeding devices holding more than ten rounds of ammunition (some laws have higher limits). LCM restrictions are arguably the most important components of AW laws in that they also apply to the larger class of high-capacity semiautomatic firearms without military-style features. In the broadest sense, AW-LCM laws are thus intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and other features conducive to criminal use. The federal government enacted a national ban on AWs and LCMs in 1994 but allowed it to expire in 2004. Currently, eight states and the District of Columbia have AW and/or LCM restrictions, as do some additional localities [3].

Recent discussion and debates concerning these weapons have largely focused on their use in mass shootings. However, there has been little examination of the use of AWs and LCMs in gun crime more generally since the expiration of the federal ban. Studies conducted around the time of the federal ban found that AWs accounted for up to 8% of guns used in crime (generally between 1 and 6% and averaging around 2%) and that the broader class of firearms equipped with LCMs (including AWs and other semiautomatic firearms equipped with LCMs) accounted for up to a quarter [2, 4–12]. Criminal use of such weaponry declined during the years of the federal ban [2, 13, 14], but trends since then have only been examined in the state of Virginia, where LCM use rose following the ban's expiration [14]. Semiautomatic weapons with LCMs and/or other military-style features are common among models produced in the contemporary gun market [15, 16], but precise estimates of their production and ownership are unavailable. Growth in the use of such weapons could have important implications for public health as these weapons tend to produce more lethal and injurious outcomes when used in gun violence [2, 17]. This study provides an updated examination of the AW issue by investigating current levels of criminal activity

with AWs and other LCM firearms as measured in a variety of national and local data sources.

## Data and Methods

There is no national data source that can be used to count the numbers of homicides, non-fatal shootings, or other crimes committed with AWs and other LCM firearms. Therefore, criminal use of these weapons was approximated by examining and triangulating across several local and national data sources on guns used in different types of crimes.

### Local Data Sources

The local-level analyses are based on guns recovered by police over multiple years (defined below) in a convenience sample of ten cities including Hartford (CT), Rochester (NY), Syracuse (NY), Baltimore (MD), Richmond (VA), Minneapolis (MN), Milwaukee (WI), Kansas City (MO), Seattle (WA), and Sacramento (CA). Large cities were selected for the analysis (these cities range in size from roughly 124,000 to 684,500) due to the concentration of gun violence in urban areas [18, 19]. Patterns and trends in these particular cities may not be indicative of those elsewhere; further, some (Baltimore, Hartford, Rochester, Syracuse, and Sacramento) are covered by state AW and LCM restrictions that were in effect during all or portions of the study period (this study does not attempt to evaluate the implementation and effects of these laws or variations therein). Nonetheless, these cities constitute a geographically diverse set of ban and non-ban locations, thus strengthening generalizations. The data were obtained from law enforcement authorities in these jurisdictions except where otherwise noted. Information available in most of the police databases included the type, make, model, and caliber of each confiscated firearm; the date when it was recovered; and the type of crime with which it was associated.

Guns recovered by police (often referred to as "crime guns") are the only readily available data with which to study patterns and trends in the types of guns used in crime across jurisdictions, and they are commonly used in research on gun markets, gun violence, and gun policy [2, 9, 20–37]. Guns confiscated by police include guns recovered in violent crime investigations as well as those recovered in connection with weapon offenses



Compendium_Cornell
Page 1416

Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms

(illegal possession, carrying, and discharges), drug violations, property crimes, and other incidents. These samples thus represent guns known to have been used in violence as well as guns possessed and/or carried by criminal and otherwise high-risk persons. As others have noted, they represent a sample from the population of guns that are at greatest risk of misuse [24] and thereby provide a probable sample of guns used to commit crimes [21]. As caveats, nonetheless, it should be noted that police do not recover all guns used and possessed illegally, and it is possible that the types of guns they confiscate differ from those of unrecovered guns linked to illegal possessors and users. The analyses highlighted below are based on all confiscated firearms in the study jurisdictions. Additional analyses conducted with just those guns clearly connected to a violent offense, which represented at least 13 to 19% of guns across the cities, produced very similar results except where noted (separate offense-type analyses could not be conducted with the Syracuse and Rochester gun data or the Richmond LCM data).

National Data Sources

National-level analyses were conducted using three data sources and compilations. The first consists of information on firearms recovered by law enforcement agencies throughout the nation and reported to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) for investigative tracing of their sale histories. Guns reported to ATF provide a national sample of crime guns numbering in the hundreds of thousands annually (predominantly from urban jurisdictions), but they do not constitute a statistically representative sample for the nation given that gun tracing is voluntary (agencies trace guns as needed for specific investigations and/or analysis of illegal gun markets) and varies between agencies and over time [24, 27, 38–40]. Further, publicly available data on traced guns are limited to aggregate figures on basic types and calibers of the weapons, thus limiting the analyses that could be conducted as described below. The other national data sources included information on guns used in murders of police officers and mass murder incidents. Prior research has shown that AWs and LCM firearms are used in a higher share of these crimes, due presumably to their lethality and attractiveness to the types of offenders who commit these offenses [2, 4], and this has been a prominent issue in the AW debate. Information on firearms used in murders of police,

including the type, make, model, and caliber of each weapon, was obtained from the Federal Bureau of Investigation (FBI), which compiles these data from reports by police agencies throughout the country. Information on firearms used in mass shooting incidents was collected from lists and reports compiled by several organizations since there is no single official data source that regularly provides detailed and comprehensive information on mass murders and the guns used in these incidents [41–50]. Consistent with many prior studies of this issue, firearm mass murders were defined as incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed. This increased the number of sources that could be used to gather information. As described below, however, detailed weapon information could not be found in public sources for many of the cases.

## Methods

There is no universal definition of an AW that applies across current and past AW laws. For example, the expired federal ban and some current state laws define AWs as having two military-style features, whereas other state bans and a recent (2013) proposal for a new federal ban use a one feature criterion [2, 51]. For this study, AWs were defined based on the weapons that have most commonly been identified as such based on the old federal ban, current state laws, and the recently proposed federal ban. This list included more than 200 make-model combinations covered by either of the federal lists (2004 and 2013) or at least two of the state laws. Based on preliminary analyses showing that most recovered AWs are assault rifles (as opposed to assault pistols or assault shotguns), an additional ceiling estimate of AW use was calculated based on the prevalence of semiautomatic rifles. This was also done to compensate for imprecision in the AW estimates (due, for example, to missing or partial gun model data, lack of information about the specific features or configurations of the weapons that could affect their AW status, and possible omissions from the operational AW list).

Use of guns with LCMs could only be measured precisely for the Syracuse, Baltimore, and Richmond analyses, which are based on data sources having an indicator for magazine capacity (which is typically

C. Koper et al.

missing from police gun databases), and some of the mass murder incidents. For most analyses, use of LCM firearms was approximated based on recoveries of semi-automatics that are commonly manufactured and sold with LCMs, referred to below as LCM-compatible firearms. Identification of these models was based on gun catalogs (such as the *Blue Book of Gun Values* and *Gun Digest*) and examination of gun manufacturers' websites. This method likely overstates LCM use to some degree since many LCM compatible firearms can also be equipped with smaller magazines. As a rough guide, inspection of all recoveries of a small number of LCM-compatible handgun models in the Baltimore data revealed that approximately four of five were equipped with LCMs. Conversely, LCM use can also be undercounted for guns that were missing complete model information or equipped with aftermarket LCMs, which are available for some guns not sold with LCMs at retail. LCM use was not estimated for Rochester and Sacramento since New York and California have had longstanding restrictions on magazines with more than ten rounds (hence, it seems less likely that LCM-compatible guns recovered in those jurisdictions were actually equipped with LCMs).

Data were collected from 2014 through 2016. Current estimates of AW and LCM use were developed using the most recent 2–3 years of data from the local police databases and ATF data. Data spanning the most recent 5–6 years were used to generate contemporary estimates of AW and LCM use in murders of police and mass murders due to the rarity of these events. As described below, some data sources were also used to estimate trends in the use of semiautomatic rifles and LCM firearms since the expiration of the federal ban. Reported figures highlight AWs and LCM firearms as a share of crime guns in order to control for differences in the volume of gun crime and overall gun recoveries between places and over time. Other noteworthy aspects of the data and analyses are discussed below.

## Results

### Local Analyses

Results of the local analyses are presented in Table 1. For each site, estimates are based on data spanning different portions of the 2011–2014 period. The number of guns

analyzed ranged from 281 in Syracuse to 4994 in Kansas City and totaled 21,551 across all data sources.

Estimates of the prevalence of AWs among crime guns ranged from a low of 2.4% in Baltimore to a high of 8.5% in Syracuse. Assault rifles (e.g., variations of the AR-15 or AK-47) accounted for the majority of AWs in all sites and more than three-quarters in all but one (Richmond). The remaining AWs consisted entirely (or nearly so) of assault pistols (e.g., the TEC-9 or TEC-22). The share of crime guns consisting of semiautomatic rifles of any sort is also displayed in Table 1 for localities that had gun databases with gun-type designations (i.e., handgun/rifle/shotgun, semiautomatic/non-semiautomatic). These estimates ranged from a low of 4.1% in Hartford to 12.4% in Rochester but were less than 9% for most cities. (The Milwaukee estimate is based on the percentage of crime guns that were rifles of any sort as semiautomatic/non-semiautomatic designations were unavailable.) As noted, the semiautomatic rifle estimates, which include both AW-type and non-AW-type rifles, provide a likely ceiling for estimates of AW prevalence.

The percentage of crime guns clearly equipped with an LCM (including AWs and other high-capacity semi-automatics, most of which are pistols) was 16.5% in Baltimore during the 2012–2014 period, but this figure rose to 21.5% for guns that were connected to a violent crime. These findings are similar to those from a recent news report (involving a separate and independent analysis of Baltimore data) indicating that 18.4% of guns recovered in Baltimore had LCMs for the period of 2010 through 2016 [52]. In Richmond, 22% of crime guns were equipped with LCMs during 2008 and 2009 based on data collected by the Virginia State Police and initially reported by *The Washington Post* [14] (the *Post's* reported figures have been reanalyzed here to focus on the most recent available years and to assess trends). Crime guns were least likely to be equipped with LCMs in Syracuse (14.6%), where New York State LCM restrictions have been in effect since the early 2000s.

For the other sites, the prevalence of LCM-compatible guns ranged from 22.2% in Hartford to 36.2% in both Kansas City and Seattle, with the majority of the estimates (3 of 5) higher than one-third. In most of these cities, the prevalence of LCM guns was similar whether focusing on all guns or those connected to a violent crime. In Hartford, however, 30% of violent crime guns were LCM compatible in contrast to 22.2% for all guns. Further, a supplemental analysis of guns linked to assault-

Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms

**Table 1** Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among guns recovered by police: estimates for selected cities and years

| Location and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
|---|---|---|---|
| Hartford, CT (2011–2012, $N = 854$) | 2.6% | 4.1% | 22.2% overall, 30% for guns linked to violent crime |
| Rochester, NY (2012–July 2014, $N = 1687$) | 4.9% | 12.4% | Not estimated |
| Syracuse, NY (2012–May 2014, $N = 281$) | 8.5% | 12.1% | 14.6% |
| Baltimore, MD (2012–Sep. 2014, $N = 4680$) | 2.4% | 5.4% | 16.5% overall, 21.5% for guns linked to violent crime |
| Richmond, VA (AW analysis: 2012–2013, $N = 1180$) (LCM analysis: 2008–2009, $N = 1960$) | 2.7% | Not estimated | 22.0% |
| Minneapolis, MN (2012–Aug. 2014, $N = 2178$) | 3.4% | 6.4% | 25.1% overall, 46.3% for guns linked to shootings |
| Milwaukee, WI (Jul. 2013–Jun. 2014, $N = 1868$) | 4.6% | < 9.4% | 35.5% |
| Kansas City, MO (2012–Aug. 2014, $N = 4994$) | 6.1% | 6.3% | 36.2% |
| Seattle, WA (2012–July 2014, $N = 596$ guns linked to violent crimes or weapons violations) | 6.4% | 7.9% | 36.2% |
| Sacramento, CA (Aug. 2013–Jul. 2014, $N = 1273$) | 6.0% | Not estimated | Not estimated |

Estimates are based on general gun recovery samples except where noted. Estimates were similar for guns known to have been connected to violent crimes except where noted. Large-capacity magazine (LCM) estimates for Syracuse, Baltimore, and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). Other LCM estimates are based on recoveries of LCM compatible firearm models. The Milwaukee semiautomatic rifle estimate is based on the prevalence of all rifles

related shootings in Minneapolis (using gunshot victimization data provided by Minneapolis police) revealed that 46.3% were LCM compatible, though this was based on a small sample ($n = 80$ guns).

National Analyses

Results of the national analyses are presented in Table 2. AW prevalence was approximated in the national ATF tracing data for 2012 and 2013 ($n = 481,632$) based on traces of guns in calibers .223, 5.56, and 7.62 mm. These are common calibers for AW-type semiautomatic rifles, though not all firearms in these calibers are AWs, and not all AWs fall into these calibers. This method nonetheless yielded an estimate of 5%, which is within the range of estimates provided by the local analyses. Further estimates of semiautomatic rifles and LCM firearms were not possible given the limitations of published tracing data.

Guns used in murders of police were analyzed for the years 2009 through 2013 ($n = 219$, excluding cases involving the officers' own weapons, which are often LCM firearms). AWs accounted for an estimated 13.2% of the firearms used in these crimes overall and varied

between 8 and 18% from year to year. Virtually all of the AWs (97%) were assault rifles. Semiautomatic rifles overall accounted for 15.5% of the firearms used in these cases and ranged from 5 to 23% annually. LCM-compatible firearms more generally constituted 40.6% of the murder weapons, ranging from 35 to 48% annually.

AW and LCM use in firearm mass murders was examined for a sample of 145 incidents that occurred from 2009 through 2015 but could only be estimated within broad ranges due to high levels of missing weapons data in public accounts. AWs were used in at least 10.3% of these incidents. However, only 42 incidents had sufficiently detailed weapon information to make a definitive determination regarding AW use; among these cases, 35.7% involved AW use. All but one AW case involved an assault rifle. (A separate estimate for semiautomatic rifle use is not presented because only two additional cases clearly involved a semiautomatic rifle with an unclear or non-AW designation.) LCM firearms overall were involved in at least 18.6% of the incidents based on cases that involved clear possession of LCMs, AWs, or other LCM-compatible models. Although many additional cases involved semiautomatic firearms, an LCM coding could

C. Koper et al.

**Table 2** Prevalence of assault weapons, semiautomatic rifles, and semiautomatics with large-capacity magazines among national samples of guns recovered by police, guns used in murders of police, and guns used in mass murders

| Data source and sample | Assault weapons as % of guns | Semiautomatic rifles as % of guns | Semiautomatics with large-capacity magazines as % of guns |
|---|---|---|---|
| Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF): guns recovered by police and reported to ATF for investigative tracing (2012–2013, $N = 481,632$) | 5% | Not estimated | Not estimated |
| Federal Bureau of Investigation: guns used in murders of police (2009–2013, $N = 219$) | 13.2% | 15.5% | 40.6% |
| Public reports of firearm mass murders (4+ killed) (2009–2015, $N = 145$) | 10.3–35.7% | Not estimated | 18.6–57.4% |

Assault weapon estimate for ATF data is based on reported firearms in calibers .223, 5.56, and 7.62 mm. LCM estimates are based on recoveries of LCM compatible firearm models in the FBI data and recoveries of both LCMs and LCM compatible firearms in the mass murder data

only be made for 47 cases, 57.4% of which involved an LCM firearm. The identified AW and LCM cases typically occurred in public locations (80%) and resulted in more than twice as many people shot on average as did other incidents (13.7 victims on average for AW-LCM cases versus 5.2 for other cases; $t$ test $p$ level < 0.01).

Trend Analyses

Trends in the use of AWs and LCM firearms since the end of the federal AW ban or the early post-ban years were also estimated using selected data sources that had sufficiently detailed weapon information and spanned the period of interest. First, trends in recoveries of semiautomatic rifles were used to approximate trends in crime with AWs using the FBI national data on police murders (2003–2013) and data from the following cities and time periods: Baltimore (2004–2014), Rochester (2004–2014), Syracuse (2004–2014), Milwaukee (2006–2014, based on all rifles), Seattle (2008–2014), Minneapolis (2006–2014), and Kansas City (2008–2014). In summary, these analyses (not shown) revealed little evidence of upward trends in the use of semiautomatic rifles across sites.

Second, trends in crimes with LCM firearms were estimated based on guns used in murders of police (2003–2013) as well as guns recovered in Baltimore (2004–2014), Richmond (2003–2009), and Minneapolis (2006–2014). Table 3 shows changes over time in the percentage of guns that were LCM firearms using the earliest and latest years of each data source. In relative

terms, the prevalence of LCM firearms increased from 33 to 49% in the Baltimore, Minneapolis, and national (FBI) data (note that Maryland restricted LCMs with more than 20 rounds throughout this period and extended these restrictions to LCMs with more than 10 rounds in late 2013). The largest increase occurred in Richmond, where LCM firearms increased 111.5%, rising from 10.4% of recovered guns in 2003–2004 (the final years of the federal AW ban) to 22% in 2008–2009. Similar trends have also been reported for the state of Virginia overall [14]. All of these changes were statistically significant ($p < 0.05$) based on chi-square tests of the equality of proportions.

**Discussion**

Subject to caveats noted above, this examination of several national and local data sources suggests that AWs are used in between 2 and 9% of gun crimes in general with most estimates being less than 7%. Upper bound estimates of AW use based on semiautomatic rifles range from 4 to 12% in most data sources and are typically less than 9%. These estimates are broadly similar to those generated in the early 1990s prior to the federal AW ban [2], though they are perhaps somewhat higher on average. However, comparisons of these estimates with others should be made cautiously, as operational definitions of an AW have varied across studies and estimates presented here are based on the most contemporary definitions of AWs. One clearly notable



Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms

**Table 3**   Changes in prevalence of semiautomatics with LCMs: estimates for selected local and national data sources and time frames, 2003–2014

| Data source/location | LCM firearm prevalence: early time period | LCM firearm prevalence: late time period | Change in LCM firearm prevalence |
|---|---|---|---|
| Baltimore crime guns | 11.1% (2004, 2006, $N$ = 5369 total firearms) | 16.5% (2012–Sep. 2014, $N$ = 4381 total firearms) | + 48.6%** |
| Richmond, VA crime guns | 10.4% (2003–2004, $N$ = 2413 total firearms) | 22.0% (2008–2009, $N$ = 1960 total firearms) | + 111.5%** |
| Minneapolis crime guns | 16.8% (2006–2007, $N$ = 2564 total firearms) | 25.1% (2012–Aug. 2014, $N$ = 2178 total firearms) | + 49.4%** |
| National (FBI): guns used in murders of police | 30.4% (2003–2007, $N$ = 224 total firearms) | 40.6% (2009–2013, $N$ = 219 total firearms) | + 33.6%* |

Change in proportions statistically significant at $p < 0.05$ (*) or $p < 0.01$ (**)

Estimates are based on general gun recovery samples except where noted. LCM estimates for Baltimore and Richmond are based on known LCM recoveries (the Richmond estimates are based on Virginia State Police data initially reported by *The Washington Post*). The early period estimate for Baltimore excludes the year 2005 due to an unusually large number of guns appearing that year within the buyback/turn-in/safekeeping category. Other LCM estimates are based on recoveries of LCM compatible firearm models

recent change is that assault rifles, rather than assault pistols, now account for a substantial majority of AWs used in crime in contrast to prior estimates [2]. This implies an increase over time in the average lethality of AWs used in violence.

LCM firearms, which include AWs as well as other high-capacity semiautomatics, appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence. These estimates are comparable to or higher than earlier estimates of LCM use. However, the higher-end estimates may overstate LCM use somewhat as most are based on measurement of LCM-compatible guns that may not all have been equipped with LCMs.

Consistent with prior research, this study also finds that AWs and LCM firearms are more heavily represented among guns used in murders of police and mass murders. AWs account for 13–16% of guns used in murders of police, while LCM weapons overall account for about 41% of these weapons. Estimates for firearm mass murders are very imprecise due to lack of data on the guns and magazines used in these cases, but available information suggests that AWs and other high-capacity semiautomatics are involved in as many as 57% of such incidents. Further, they are particularly prominent in public mass shootings and those resulting in the highest casualty counts.

Importantly, trend analyses suggest that LCM firearms have grown substantially as a share of crime guns since the expiration of the federal ban on AWs and LCMs. This implies possible increases in the level of gunfire and injury per gun attack during this time. Consistent with this inference, national statistics from the Centers for Disease Control and Prevention (CDC) and the FBI show that the ratio of gun homicides and assaultive non-fatal shootings to overall reported violent gun crimes (homicides, assaults, and robberies) rose from an average of 0.163 for 2003–2005 to an average of 0.21 for 2010–2012 (calculated from CDC [53] and FBI [54] data). This change was driven by non-fatal shootings, which have been trending upward since the early 2000s and recently reached their highest levels since 1995 [1]. The findings presented in this study suggest the possibility that greater use of high-capacity semiautomatics has contributed to this upward trend in shootings.

Further study would seem warranted on LCM use trends with additional jurisdictions and data sources. Research on this issue could be facilitated by more systematic efforts to collect detailed information on crime guns and magazines in local police databases as well as through national data collection systems like the Supplemental Homicide Reports and the National Violent Death Reporting System. Study of these weapons is also hampered by lack of public data on production of LCMs and LCM-compatible firearms. The need for better data on this issue may become more pressing if there continue to be significant changes in the lethality of commercially available firearms.

Additional research is also needed to quantify the effects that LCM use has on injuries and deaths from gun attacks—and by extension on the costs to society

from gun violence. Research suggests that gunfire attacks involving semiautomatics produce more lethal and injurious outcomes [2, 10, 17, 55] and that 4–5% of assault-related gunshot victims are wounded in attacks involving more than ten shots fired [2]. However, such evidence is extremely limited at present. Studies of this issue, combined with evaluation research on the effects of current state and local LCM laws, could provide additional insights into the efficacy of expanding LCM restrictions at the local, state, and/or national levels. Research illuminating the public health and safety benefits of AW-LCM restrictions could also inform the courts as they continue to adjudicate recent challenges to the constitutionality of these statutes. Although this study does not directly evaluate any AW-LCM law, it provides further evidence that the federal ban curbed the spread of high-capacity semiautomatic weapons when it was in place and, in so doing, may have had preventive effects on gunshot victimizations.

**Acknowledgments**   The authors thank the police agencies that provided data for this study: the Hartford (CT) Police Department, the New York State Police, the Baltimore Police Department, the Richmond (VA) Police Department, the Minneapolis Police Department, the Milwaukee Police Department, the Kansas City (MO) Police Department, the Sacramento Police Department, the Seattle Police Department, and the Federal Bureau of Investigation. The authors also thank Grace Beya, Mark Ecleo, and Thomas Prifti for additional research assistance. The opinions expressed in this manuscript are those of the authors and should not be attributed to any of the aforementioned organizations or individuals.

# References

1. Fowler KA, Dahlberg LL, Haileyesus T, Annest JL. Firearm injuries in the United States. *Prev Med.* 2015;79:5–14.

2. Koper CS. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* Report to the National Institute of Justice, U.S. Department of Justice. Philadelphia, PA: Jerry Lee Center of Criminology, University of Pennsylvania; 2004.

3. Law center to prevent gun violence. http://smartgunlaws.org. Accessed May 2016.

4. Adler WC, Bielke FM, Doi DJ, Kennedy JF. *Cops under fire: law enforcement officers killed with assault weapons or guns with high capacity magazines.* Washington, DC: Handgun Control, Inc.; 1995.

5. Beck A, Gilliard, D, Greenfeld L, et al. *Survey of state prison inmates,* 1991. Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice. 1993.

6. Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. *JAMA.* 1996;275:42–5.

7. Hutson HR, Anglin D, Pratts MJ Jr. Adolescents and children injured or killed in drive-by shootings in Los Angeles. *N Engl J Med.* 1994;330:324–7.

8. Hutson HR, Anglin D, Kyriacou DN, Hart J, Spears K. The epidemic of gang-related homicides in Los Angeles county from 1979 through 1994. *JAMA.* 1995;274:1031–6.

9. Kleck G. *Targeting guns: firearms and their control.* New York: NY; Aldine de Gruyter; 1997.

10. McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. Urban firearm deaths: a five-year perspective. *J Trauma.* 1993;35:532–7.

11. New York State Division of Criminal Justice Services. *Assault weapons and homicide in New York City.* Albany, NY: Author; 1994.

12. Zawitz MW. *Guns used in crime.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 1995.

13. Koper CS. America's experience with the federal assault weapons ban, 1994–2004: key findings and implications. In: Webster DW, Vernick JS, editors. *Reducing gun violence in America: informing policy with evidence and analysis,* vol. 2013. Baltimore MD: Johns Hopkins University Press; 2013. p. 157–71.

14. Fallis D VA. Data show drop in criminal firepower during assault gun ban. *The Washington Post,* 2011; January 23.

15. Lee J, editor. *Gun digest 2015.* Iola, WI: Krause Publications; 2014.

16. Violence Policy Center. *The militarization of the U.S. civilian firearms market.* Washington, DC: Author; 2011.

17. Reedy DC, Koper CS. Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention.* 2003;9:151–5.

18. Planty M, Truman JL. *Firearm violence, 1993–2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.

19. Smith EL, Cooper A. *Homicides in the U.S. known to law enforcement, 2011.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice; 2013.

20. Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace reports. In: *National report.* Washington, DC: United States Department of the Treasury; 2000. p. 2002.

21. Brill S. *Firearm abuse: a research and policy report.* Washington, DC: Police Foundation; 1977.

22. Braga AA, Wintemute GJ, Pierce GL, Cook PJ, Ridgeway G. Interpreting the empirical evidence on illegal gun market dynamics. *J Urban Health: Bull New York Acad Med.* 2012;89:779–93.

23. Braga AA, Pierce GL. Disrupting illegal firearms markets in Boston: the effects of operation ceasefire on the supply of new handguns to criminals. *Criminol Public Policy.* 2005;4(4):717–48.

24. Cook PJ, Braga AA. Comprehensive firearms tracing: strategic and investigative uses of new data on firearms markets. *Arizona Law Review.* 2001;43:277–309.

25. Koper CS. Federal legislation and gun markets: how much have recent reforms of the federal firearms licensing system reduced criminal gun suppliers? *Criminol Public Policy.* 2002;1:151–78.

26. Koper CS. Crime gun risk factors: buyer, seller, firearm, and transaction characteristics associated with gun trafficking and criminal gun use. *J Quant Criminol.* 2014;30:285–315.



Compendium_Cornell
Page 1422

Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms

27. Pierce GL, Braga AA, Hyatt RR Jr, Koper CS. Characteristics and dynamics of illegal firearms markets: implications for a supply-side enforcement strategy. *Justice Q.* 2004;21:391–422.

28. Vernick JS, Webster DW, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on crime guns. *Injury Prev.* 1999;5:259–63.

29. Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning saturday night special handguns on homicides. *Am J Epidemiol.* 2002;155:406–12.

30. Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prev.* 2006;12:255–30.

31. Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *J Urban Health: Bull New York Acad Med.* 2006;83:778–87.

32. Webster DW, Vernick JS, Hepburn LM. Relationship between licensing, registration, and other gun laws and the source state of crime guns. *Injury Prev.* 2006;7:184–9.

33. Webster DW, Vernick JS, Bulzacchelli MT. Effects of state-level firearm seller accountability policies on firearm trafficking. *J Urban Health: Bull New York Acad Med.* 2009;86:525–37.

34. Wintemute GJ. *Ring of fire: the handgun makers of southern California.* Davis, CA: Violence Prevention Research Program, University of California, Davis; 1994.

35. Wintemute GJ, Romero MP, Wright MA, Grassel KM. The life cycle of crime guns: a description based on guns recovered from young people in California. *Ann Emerg Med.* 2004;43:733–42.

36. Wintemute GJ, Cook PJ, Wright MA. Risk factors among retail handgun dealers for frequent and disproportionate sales of guns used in violent and firearm related crimes. *Injury Prev.* 2005;11:357–63.

37. Wright MA, Wintemute GJ, Webster DW. Factors affecting a recently purchased handgun's risk for use in crime under circumstances that suggest gun trafficking. *J Urban Health: Bull New York Acad Med.* 2010;87:352–64.

38. Koper CS. Purchase of multiple firearms as a risk factor for criminal gun use: implications for gun policy and enforcement. *Criminol Public Policy.* 2005;4:749–78.

39. Kleck GBATF. Gun trace data and the role of organized gun trafficking in supplying guns to criminals. *Saint Louis Univ Public Law Rev.* 1999;18:23–45.

40. National Research Council. *Firearms and violence*: a critical review. Washington, DC: The national academies press; 2005.

41. Citizens Crime Commission of New York City. *Mass shooting incidents in America* (1984–2012). http://www.nycrimecommission.org/mass-shooting-incidents-america.php. Accessed March 2015.

42. Everytown for Gun Safety. *Analysis of recent mass shootings.* New York: NY; Author; 2014.

43. Everytown for Gun Safety. *Mass shootings in the United States:* 2009-2016. New York: Author; 2017.

44. Mass shooting tracker, gun violence archive. http://www.shootingtracker.com/. Accessed Aug. 2016.

45. Federal Bureau of Investigation. *A study of active shooter incidents in the United States between 2000 and 2013.* Washington, DC: U.S. Department of Justice.

46. Kaminski Leduc JL. *Weapons used in mass shootings.* Report 2013-R-0057. Hartford: Connecticut; Office of Legislative Research, Connecticut General Assembly; 2013.

47. Aronsen G, Follman M, Pan D. A guide to mass shootings in America. *Mother Jones.* http://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed Feb. 2015, Jul. 2016.

48. New York City Police Department. *Active shooter: recommendations and analysis for risk mitigation. New York: counterterrorism bureau,* New York City Police Department; New York, NY; 2012.

49. Violence Policy Center. *Mass shootings in the United States involving high-capacity ammunition magazines.* http://www.vpc.org/fact_sht/VPCshootinglist.pdf. Accessed June 18, 2015.

50. Berkowitz B, Gamio L, Lu D, Uhrmacher K, and Lindeman T. The math of mass shootings. *The Washington Post* https://www.washingtonpost.com/graphics/national/mass-shootings-in-america/. Accessed Aug. 2016.

51. Assault Weapons Act of 2013. OLL13047, 113th Cong. (2013).

52. Freskos B. Baltimore police are recovering more guns loaded with high-capacity magazines, despite ban on sales. *The trace.* 2017; Apr. 1. https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/ Accessed Apr. 1, 2017.

53. Centers for Disease Control and Prevention. Injury Center. https://www.cdc.gov/injury/wisqars/. Accessed March 2015.

54. Federal Bureau of Investigation. Uniform crime reporting. https://ucr.fbi.gov/ucr. Accessed March 2015.

55. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356–60.

DOI: 10.1111/1745-9133.12485

**SPECIAL ISSUE ARTICLE**

COUNTERING MASS VIOLENCE IN THE UNITED STATES

*CRIMINOLOGY
& Public Policy*

# Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms

## Christopher S. Koper 

George Mason University

**Correspondence**
Christopher S. Koper, Department of Criminology, Law & Society, Center for Evidence-Based Crime Policy, George Mason University, 4400 University Drive, MS 6D12, Fairfax, VA 22030.
Email: ckoper2@gmu.edu

The author thanks William Johnson for research assistance in the preparation of this paper. An earlier version of this paper was presented at the George Mason University-Carnegie Mellon University Workshop on An Evidence-Based Approach to Understanding and Countering Mass Violence in America held in April 2019 with funding from the National Science Foundation. The author thanks conference participants for their comments on the earlier draft.

**Research Summary:** This article examines the use, impacts, and regulation of assault weapons and other high-capacity semiautomatic firearms as they pertain to the problem of mass shootings in the United States. High-capacity semiautomatics (which include assault weapons as a subset) are used in between 20% and 58% of all firearm mass murders, and they are used in a particularly high share of public mass shootings. Mass shootings perpetrated with these firearms result in substantially more fatalities and injuries than do attacks with other firearms, and these differences are especially pronounced for the number of victims with nonfatal gunshot injuries. The federal ban on assault weapons and large-capacity (>10 rounds) ammunition magazines of 1994 had exemptions and loopholes that limited its short-term effects, but its expiration in 2004 was followed by an increase in the use of these weapons in mass shootings and other crimes. Growing evidence suggests that state-level restrictions on large-capacity magazines reduce mass shootings, but further research is needed on the implementation and effects of these laws.

**Policy Implications:** Restrictions on large-capacity magazines are the most important provisions of assault weapons laws in part because they can produce broader reductions in the overall use of high-capacity semiautomatics that facilitate high-volume gunfire attacks. Data on mass shooting incidents suggest these magazine restrictions can

Compendium_Cornell
Page 1424

> potentially reduce mass shooting deaths by 11% to 15% and
> total victims shot in these incidents by one quarter, likely
> as upper bounds. It may take several years for the effects of
> these laws to be fully realized, however, depending on their
> specific provisions, especially with regard to treatment of
> pre-ban weaponry.

Dating back to the 1980s, public concern over mass shootings in the United States has prompted ongoing debates about the need to restrict particularly deadly categories of firearms that can facilitate the commission of such acts. These debates have focused broadly on semiautomatic firearms with large ammunition capacities and more specifically on subsets of these firearms, known as "assault weapons," with additional military-style features that are believed to make them more dangerous and/or attractive for criminal uses. Over the last several decades, these types of firearms have been used in many of the most deadly and injurious acts of mass violence in the United States. In response, the federal government imposed restrictions on these weapons in 1994 but allowed them to expire in 2004. Debates about reinstating these restrictions have intensified during the last few years mainly in response to several recent and highly tragic public mass shootings perpetrated with assault weapons or other high-capacity semiautomatics. Although efforts to revive the federal restrictions have been unsuccessful to date, nine states and the District of Columbia currently have their own restrictions on such weapons, as do some additional localities (see the Giffords Law Center to Prevent Gun Violence at https://lawcenter.giffords.org/).

In this essay, I examine available data on the use of assault weapons and other high-capacity semiautomatics in mass shootings and investigate the potential to reduce deaths and injuries from mass violence through restrictions on these weapons. I also examine whether federal and state restrictions on these weapons have been effective in reducing their use in mass shootings. In summary, available evidence, while limited in quantity and precision, suggests that restrictions on these weapons have the potential to reduce deaths and injuries from mass shootings, at least modestly and perhaps by more substantial margins, especially for nonfatal injuries. Despite the limitations of the prior federal law restricting these weapons, its expiration has coincided with a rise in crimes with high-capacity semiautomatics that has likely contributed to higher victim counts in mass shootings. The effects of state-level restrictions, which vary in important ways, are not yet clear, even though there is growing evidence that states with these restrictions have fewer mass shootings. Having noted these tentative conclusions, there is need for better data and more in-depth research on various aspects of this issue.

# 1 | OVERVIEW ON THE AVAILABILITY, USE, AND RESTRICTION OF ASSAULT WEAPONS AND OTHER HIGH-CAPACITY SEMIAUTOMATICS

Laws aimed at curbing the availability and use of semiautomatic assault weapons (AWs) and other high-capacity semiautomatics focus on two categories of weaponry.[1] AW laws impose restrictions on semiautomatic firearms that accept detachable ammunition magazines and have one or more additional military-style features that are considered useful in military and criminal applications but unnecessary in shooting sports or self-defense. Examples of the latter features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and barrel shrouds on pistols.[2]

AW laws are typically complemented by restrictions on large-capacity magazines (LCMs), which are most commonly defined as ammunition feeding devices holding more than 10 rounds of ammunition. Some LCM laws allow or have previously allowed higher limits for some or all firearms, and a few states have LCM restrictions without bans on AWs (all states with AW bans currently have LCM bans, but that has not always been true). Other salient features of these laws are discussed in subsequent sections.

LCM restrictions are arguably the most important components of AW–LCM laws—and thus the most relevant to the amelioration of mass shootings—for two reasons. One is that an LCM is the most functionally important feature of an AW-type firearm. Guns defined as AWs can often be equipped with LCMs holding 30 or more rounds; hence, removing LCMs from these weapons greatly limits their firepower. In other respects, AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition. The second reason is that LCM restrictions also apply to the much larger class of high-capacity semiautomatics without military-style features. This includes many common semiautomatic pistol and rifle models that are sold with LCMs in the range of 11–20 rounds or sometimes higher. LCM restrictions do not ban all firearms capable of accepting LCMs, but they do limit the capacity of the ammunition magazines that can be sold for these weapons. LCM restrictions thus have the ability to affect a much larger share of gun crimes. Accordingly, the discussion below places a greater emphasis on the overall use and restriction of firearms with LCMs. (The terms "LCM firearm" and "high-capacity semiautomatic" are used interchangeably throughout this essay to refer to any semiautomatic with an LCM, including both AW and non-AW models.)

In the broadest sense, AW–LCM laws are intended to reduce gunshot victimizations by limiting the stock of semiautomatic firearms with large ammunition capacities and, to a lesser degree, other features conducive to criminal use. Although offenders blocked from access to AWs and LCMs can commit crimes with other guns and smaller magazines, the logic underlying AW–LCM laws is that forcing this substitution should limit the number of shots fired in gun attacks, thus, reducing the number of people shot per attack and/or the number sustaining multiple wounds. This idea is supported by a small number of studies suggesting that attacks with semiautomatic firearms—including AWs and other guns equipped with LCMs—tend to result in more shots fired, more persons wounded, and more wounds inflicted per victim than do attacks with other firearms (Jager et al., 2018; Koper, 2004; McGonigal et al., 1993; Reedy & Koper, 2003; Richmond, Branas, Cheney, & Schwab, 2004; Roth & Koper, 1997). With respect to mass shootings in particular, AW and LCM use could conceivably affect both the prevalence and the severity of mass shootings by increasing the likelihood that shooting incidents produce enough victims to qualify as a mass shooting (Jager et al., 2018) and increasing the number of fatalities and injuries per mass shooting. Evidence on these matters is considered in more detail below.

Semiautomatic weapons with LCMs and other military-style features are common among models produced in the contemporary gun market (e.g., Lee, 2014; Violence Policy Center, 2011), but precise estimates of their production and ownership are unavailable.[3] National survey estimates indicate that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds in 1994 (Cook & Ludwig, 1996, p. 17) just before the passage of the federal AW–LCM ban, which prohibited further production of LCMs but allowed continued ownership and sale of pre-ban LCMs. More recent estimates are not available, but these numbers have likely grown since the federal ban expired in September 2004.

Recent studies of criminal use of AWs and other LCM firearms indicate that AWs (primarily assault-type rifles) account for 2% to 12% of guns used in crime in general (based on analysis of guns recovered by police), with most estimates suggesting they account for less than 7%. In combination, however, AWs and other high-capacity semiautomatics account for 22% to 36% of crime guns overall,

and some estimates suggest they account for higher shares (upward of 40%) of guns used in serious violence (Koper, Johnson, Nichols, Ayers, & Mullins, 2018).[4] Notably, high-capacity semiautomatics have grown by as much as 112% as a share of crime guns since the expiration of the federal ban. This trend has coincided with recent growth in shootings nationwide (Fowler, Dahlberg, Haileyesus, & Annest, 2015; Koper et al., 2018) and may also be linked to a rising incidence of high-volume gunfire incidents (Koper, Johnson, Stesin, & Egge, 2019). Mass shootings in public locations have also grown in incidence and severity (i.e., victim counts) during this time (Duwe, 2020, this issue; Lankford & Silver, 2020, this issue), and many of these recent tragedies have been perpetrated by offenders using AWs or other high-capacity semiautomatics. The Citizens Crime Commission of New York City (CCCNYC), for instance, reported that there were 19 public mass shootings between 2005 and February 2018 in which offenders with LCM firearms killed at least four people and in total killed or wounded at least 10 (Cannon, 2018). These developments suggest the need for a closer examination of the degree to which AW and LCM use contribute to deaths and injuries from mass violence.

## 2 | USE AND IMPACTS OF HIGH-CAPACITY SEMIAUTOMATICS IN MASS SHOOTINGS

Measuring the use of AWs and other LCM firearms in mass shooting incidents presents several challenges. For one, there is no universal definition of a mass shooting incident. Across different data sources and studies, researchers have defined these incidents using different numeric thresholds based on fatalities and/or total victim counts. The discussion below focuses on studies of firearm mass murders defined as incidents in which at least four persons were killed, not including the shooter if applicable and irrespective of the number of additional victims shot but not killed.[5] This is consistent with many prior studies of mass shootings. Inferences about the use of AWs and other LCM firearms in mass shootings, however, could differ based on other fatality thresholds or definitions of mass shootings that are based on wounded victims.

A further complication is that there is no official data source that regularly provides detailed and comprehensive data on the types of guns and magazines used in shooting incidents or that provides full counts of victims killed and wounded in these attacks.[6] Accordingly, detailed information on mass shootings and the weapons involved must be gathered mainly from media searches, open sources, and public databases that have been compiled by various media, public interest, research, and government organizations. Analyses based on these sources are thus contingent on their comprehensiveness and accuracy. Some sources attempt to capture all mass shootings (however defined), whereas others focus specifically on public mass shootings that are unrelated to other forms of crime (like robbery, gang, or drug violence). This particular type of mass shooting has become an increasing societal concern as result of the seemingly random nature of many of these incidents, their substantially higher and growing victim counts (Duwe, 2020; Krouse & Richardson, 2015; Lankford & Silver, 2020),[7] and the higher use of AWs and other high-capacity semiautomatics in these incidents (on the latter point, see below; also see Duwe, 2007; Koper et al., 2018; Krouse & Richardson, 2015).

Finally, there are notable difficulties surrounding the identification of AWs and other LCM firearms in these public sources. Information on weapons and magazines used is often missing or insufficiently detailed to make a definitive determination as to whether the firearm(s) used was an AW or an LCM firearm;[8] hence, reported counts of these weapons are often minimum estimates of their use. The identification of AWs may also vary somewhat across sources as there is no universal definition of an AW that applies across all current and past federal and state AW laws.[9] Sources vary, moreover, in the extent to which they document these issues when AW and LCM firearm counts are reported.

**TABLE 1**   Selected estimates of assault weapon and large-capacity magazine use in firearm mass murders

| Data Source and Sample | % With Any LCM Firearm | % With AW Model |
|---|---|---|
| Everytown for Gun Safety (2018): all firearm mass murders with 4+ killed, 2009–2017 (N = 173) | 20% (min) – 58% (max) | Not estimated |
| Koper et al. (2018): all firearm mass murders with 4+ killed, 2009–2015 (N = 145) | 19% (min) – 57% (max) | 10% (min) – 36% (max) |
| Krouse and Richardson (2015): all firearm mass murders with 4+ killed, 1999–2013 (N = 317) | Not estimated | 10% (all incidents) 27% (public incidents) |
| Klarevas (2016): all firearm mass murders with 6+ killed, 1966—2015 (N = 111) | 47% (all years) 67% (2006–2015) | 25% (all years) 26% (2006–2015) |
| *Mother Jones* (Follman, Aronsen, & Pan, 2019): public firearm mass murders with 4+ killed that did not involve other crimes, 1982–Jan. 2019 (N = 92) | 45% – 61%, or higher | Not estimated |

*Notes.* The maximum estimates from Everytown (2018) and Koper et al. (2018) are based on calculating LCM or AW cases as a percentage of only those cases in which a definitive determination could be made about the weapon type. The Koper et al. LCM counts include cases involving gun models typically sold with an LCM, even if the magazine recovered was not explicitly reported. The estimates from *Mother Jones* (Follman et al., 2019) are original tabulations using data available as of this writing and exclude cases with fewer than four fatalities. The *Mother Jones* range is based on cases with explicit reporting of an LCM (45%) combined with cases that clearly involved gun models typically sold with an LCM (totaling 61%). The estimate would be higher if adjusted for missing gun model data.

## 2.1 | Estimates of the use of high-capacity semiautomatics in mass shootings

Having stated these caveats, I present several estimates of the use of AWs and other LCM firearms in mass murder shooting incidents in Table 1. This collection does not include all AW and LCM estimates that researchers have reported but focuses, rather, on recent estimates (post-2000) and specialized sets of cases that seem particularly pertinent to the AW–LCM debate. In some instances, the table highlights multiple figures of interest reported by researchers. Additional details about the estimates are provided in the table notes.

These studies suggest that LCM firearms are used in at least 20% of all firearm mass murders; adjusting for missing gun data in available sources, this figure could be upward of 50% (Everytown for Gun Safety, 2018; Koper et al., 2018). Specific AW models are used in at least 10% of all firearm mass murders and potentially as many as a third, adjusting for missing data (Koper et al., 2018; Krouse & Richardson, 2015). The use of AWs and other high-capacity semiautomatics is higher in public mass shootings (Follman et al., 2019; Krouse & Richardson, 2015) and in cases that involve higher fatality counts (Klarevas, 2016).[10] Most notably, estimates suggest that LCM firearms are involved in approximately half to two thirds of public mass shootings and firearm mass murders involving six or more fatalities. Furthermore, some data suggest that the use of high-capacity semiautomatics in mass murders has been rising over time (Klarevas, 2016).

Overall, these figures suggest that high-capacity semiautomatics are used disproportionately in mass shootings relative to their use in gun crime more generally (see prior discussion of Koper et al., 2018). This pattern likely reflects a combination of the greater firepower of these weapons and the

characteristics and intentions of shooters who use them in these rampages. These estimates also serve as rough upper bound estimates of the extent to which LCM restrictions might reduce the occurrence of firearm mass murders. Most conservatively, they imply that eliminating LCM use might reduce the overall incidence of firearm mass murders up to 19% to 20% based on minimum estimates of their use in these cases and contingent on the four-fatality threshold.[11] The actual effect might well be considerably smaller, however, because offenders could likely kill four or more victims in many of these cases even if using non-LCM firearms.

Developing a better understanding of the extent to which LCM firearm use affects the incidence of firearm mass murders would require studies comparing representative samples of attacks with LCM and non-LCM firearms to determine how LCM use affects the likelihood of a shooting incident resulting in a mass casualty event. One step in this direction has been taken by Jager et al. (2018), who studied weapon types used and victim differentials in active shooter incidents documented by the FBI from 2000 to 2017. The FBI defines these incidents as cases in which an individual is killing or attempting to kill people in a confined or populated area, irrespective of the number of persons killed or wounded (see https://www.fbi.gov/about/partnerships/office-of-partner-engagement/active-shooter-resources). Adjusting via regression modeling for the use of multiple firearms (which arguably reflects on the shooter's intentionality) and the location and year of the shooting, Jager et al. (2018) found that incidents involving semiautomatic rifles (which accounted for 25% of the cases and serve as a rough approximation of the use of AW-type and other LCM rifles) resulted in 97% more fatalities and 81% more wounded victims.[12] On average, semiautomatic rifle cases involved 4.3 fatalities and 5.5 persons wounded in contrast to 2.5 fatalities and 3.0 persons wounded in other cases. Although more work is clearly needed on this issue, these findings support the hypothesis that use of high-capacity semiautomatics has some impact on the incidence of mass murders.

## 2.2 | Impacts of high-capacity semiautomatics on mass shooting outcomes

Several studies have contrasted counts of victims killed and wounded in mass shootings with and without high-capacity semiautomatics. Selected figures from these studies are reported in Table 2, with a focus on victim differentials associated with use of any LCM firearm as reported in recent studies or specialized studies of public shootings or incidents with especially high fatality counts.[13] Based on these victim differentials, I also offer some projections of gunshot victimizations that could potentially be prevented through restrictions on LCMs. Note that the figures used from the most recent studies exclude the October 2017 Las Vegas mass shooting that resulted in 58 deaths and 413 injuries. This outlier event, which involved LCM weapons, resulted in several times more victims shot and killed than have all other firearm mass murders (its exclusion makes the LCM victim differentials in Table 2 more conservative).

Data from these studies consistently indicate that use of LCM firearms contributes to more deaths and injuries in mass shooting attacks and that this impact is most pronounced for counts of persons wounded (as reflected in Table 2 for the total victim counts). Across the studies, average fatalities are 38% to 85% higher when LCMs are used (based on the Klarevas [2016] and Everytown [2018] studies, respectively), with most estimates in the range of 60% to 67% (all other cited sources). Total victims killed and wounded, in contrast, are two to three times higher when LCMs are used in all sources with information on wounded victims. This is consistent with the concern that LCM weapons enable rapid spray fire that, although perhaps less accurate, gives offenders the ability to wound higher numbers of victims, particularly in crowded public settings. Another pattern that be gleaned from Table 2 is that the LCM victim differentials are a result in large measure of public mass shootings, which tend to produce higher victim counts in general but especially when LCM weapons are used.[14]

**TABLE 2**  Selected reports of victim differentials by large-capacity magazine use and estimates of potential victim reductions from large-capacity magazine restrictions

| Data Source and Sample | Avg. Fatalities | Avg. Victim Totals (Killed and Injured) | Estimated Reduction From LCM Restriction |
|---|---|---|---|
| Everytown for Gun Safety (2018): all firearm mass murders with 4+ killed, 2009–2017 (*N* = 172, excluding the Oct. 2017 Las Vegas incident) | LCM: 8.7 Non-LCM: 4.7 | LCM: 16.1 Non-LCM: 6.0 | 14% (deaths) 26% (total deaths and injuries) |
| Koper et al. (2018): all firearm mass murders with 4+ killed, 2009–2015 (*N* = 145) | LCM: 7.5 Non-LCM: 4.6 | LCM: 13.7 Non-LCM: 5.2 | 11% (deaths) 24% (total deaths and injuries |
| Klarevas (2016): all firearm mass murders with 6+ killed, 1966–2015 (*N* = 111) | LCM: 9.5 Non-LCM: 6.9 | Not estimated | 15% (deaths) |
| Citizens Crime Commission of New York City (Cannon, 2018): public firearm mass murders with 4+ killed that did not involve other crimes, Jun. 1984–Feb. 2018 (*N* = 78, excluding Oct. 2017 Las Vegas incident) | LCM: 9.7 Non-LCM: 5.8 | LCM: 20.5 Non-LCM: 8.8 | 30% (deaths) 46% (total deaths and injuries) |
| Dillon (2013): public firearm mass murders with 4+ killed that did not involve other crimes as reported by *Mother Jones*, 1982–2012 (*N* = 62) | LCM: 10.19 Non-LCM: 6.35 | LCM: 22.58 Non-LCM: 9.9 | 23% (deaths) 39% (total deaths and injuries) |

*Notes.* Calculations conducted by the author from the listed sources. The Everytown (2018) and Cannon (2018) data exclude the outlier Oct. 2017 Las Vegas LCM case that resulted in 58 killed and 413 injuries. Non-LCM calculations for the Everytown data are based on the highest victim estimates for cases that did not clearly involve an LCM (i.e., cases that definitely did not involve LCMs and cases with unknown LCM status).

Extrapolating from these patterns, we can also make rough estimates of the degree to which deaths and injuries in mass shooting events might be reduced by restrictions on LCMs. These calculations use the victim averages for non-LCM cases to estimate the level of death and injury that would have resulted from the LCM cases had attackers been forced to substitute non-LCM firearms. These estimates can then be used to project the number and percentage of deaths and injuries that could have been prevented across the full sample of incidents. As shown in the final column of Table 2, the projections suggest that LCM restrictions could potentially reduce fatalities by 11% to 15% across all firearm mass murder incidents and reduce total injuries by 24% to 26%.[15] Effects would likely be greater for public mass shootings, with total deaths and injuries in these cases potentially declining by somewhere between

one third and one half. The specific magnitudes of the estimates for public mass shootings, however, should be viewed with particular caution, given some of the concerns surrounding the completeness of those data sources and variations thereof (e.g., see Duwe, 2007, 2020). Also note that the prevention estimates overall would be higher if the Las Vegas incident was included in the most recent data sources.[16]

These estimates should be viewed as approximations based on several considerations. For starters, they are based on comparisons of victim differentials in LCM and non-LCM attacks that produced enough casualties to qualify as mass shootings. These attacks were perpetrated by offenders with a clear intent to shoot a large number of people, and they may provide the best estimates of LCM impacts under such conditions. Nonetheless, estimated LCM impacts on attack outcomes might possibly be larger or smaller if based on more comprehensive samples that included attempted, actual, and near mass shootings (e.g., Jager et al., 2018). The potential of LCM restrictions to reduce mass shootings might also be underestimated here if the availability of high-capacity semiautomatics increases the likelihood that some people will attempt mass shootings.

On the other hand, the impacts of LCM restrictions might be lower than these projections even with very large reductions in LCM availability. This is in part because some shooters with LCM weapons, notably those who had a clear intent and plan to kill and wound especially high numbers of victims, would have likely inflicted higher than average casualty counts even if they had used non-LCM firearms, although perhaps not to the same degree. One obvious adaptation to LCM restrictions would be to carry multiple non-LCM guns and/or low-capacity magazines. We should not assume, however, that use of multiple guns or magazines would completely negate the impacts of LCM use. Use of multiple firearms and magazines, while common in firearm mass murders, is not universal; some firearm mass murders (as well as other attacks with the potential to become mass shootings) happen spontaneously or without much premeditation. In such incidents, the lethality of the firearms and magazines at hand may be particularly consequential to the outcome. Furthermore, using multiple non-LCM guns and magazines for a sustained attack requires a shooter to make gun and/or magazine changes that reduce the rate of fire relative to using firearms with LCMs (e.g., see Klarevas, 2016, pp. 211–212). This arguably gives people under attack additional seconds to escape, take cover, or possibly overtake and incapacitate the shooter.

Although evaluating these arguments fully will require more in-depth analyses of the dynamics of mass shooting incidents (and perhaps near mass shooting incidents as well), available data and analyses do not provide obvious support for the multiple gun/multiple magazine substitution hypothesis, at least not with respect to the use of multiple guns. For example, in Koper et al.'s (2018) collection of mass firearm murders resulting in four or more deaths, cases in which shooters used multiple non-LCM guns averaged 5.3 fatalities and 7.2 total victims killed or wounded—averages substantially less than those for attacks with LCM firearms (regardless of number), especially for the total victim counts (see Table 2). Similarly, multiple gun cases without LCMs documented in the February 2019 version of the *Mother Jones* media organization's data on public firearm mass murders (4+ killed; Follman et al., 2019) resulted in substantially fewer victims killed and wounded than did cases with LCM firearms; averages killed were 7.2 for multiple non-LCM firearm cases and 10.0 for LCM cases (excluding the Las Vegas incident), whereas averages for the total killed and wounded were 11.4 for multiple gun non-LCM cases and 21.3 for LCM cases (excluding the Las Vegas incident).[17]

Others have also reported that victim differentials associated with the use of LCM firearms or semi-automatics more generally persist even when accounting for the use of multiple firearms (Blau, Gorry, & Wade, 2016; Jager et al., 2018; Klarevas, 2016). To illustrate, data reported by Klarevas (2016, pp. 221–224) show that "gun massacres" (defined as incidents with six or more fatalities) committed with multiple non-LCM firearms average 7.2 victims killed (calculated by the author from the Klarevas

figures), whereas LCM cases average 9.5 victims killed overall (see Table 2) and 11.2 victims killed when multiple guns are used that include an LCM firearm. As a final illustration, Kleck's compilation of shots fired estimates for a sample of 25 mass shootings that resulted in six or more victims killed or wounded from 1994 to 2013 shows that cases involving LCM firearms averaged at least 134 shots on average in comparison with ~26 shots on average for cases involving multiple non-LCM firearms (calculated from Kleck, 2016, p. 43).[18,19]

Notwithstanding these arguments, a more general caveat to this discussion is that the comparisons of mass shootings with and without LCM firearms reviewed above are bivariate and do not account for characteristics of the actors or situations that might influence attack outcomes and potentially confound the relationship between the types of weapons used and these outcomes. Such factors could include, among others, the intentions, motives, mental state, and skill of the shooter(s); the nature of the circumstances surrounding the shooting (e.g., offender and victim relationships); the type of location where the shooting occurred (e.g., whether it was indoors or outdoors, the type of venue, and how confined potential victims were); the number of people present who could have been shot deliberately or incidentally; the characteristics and health of potential victims; the number of shooters; and the numbers and types of weapons and magazines used. At present, such studies are lacking, but a few efforts have been made in this direction, such as the Jager et al. (2018) study referenced above. Similarly, in a regression analysis of 184 mass shootings, spree shootings, and active shooter incidents from 1982 through 2015, Blau et al. (2016) found that use of LCM firearms (but not AWs) increased fatality and total victim counts by 47% and 61%, respectively, controlling for several characteristics of the offenders and incidents. These covariates included the offender's mental health, age, and race, whether the incident occurred in a school or workplace, and the types of guns used by the offender.[20] Other studies suggest the need to also examine the interactions of elements like the shooter's mental health and the weaponry used in determining attack outcomes (Anisin, 2018).

Additional and more in-depth studies along these lines are needed to provide more precise estimates of the effects of high-capacity semiautomatics on the incidence and outcomes of mass shootings. It would also be helpful to have more detailed analyses of the dynamics of these events that reveal the number and timing of shots fired and persons hit (e.g., peak rates of fire and whether shots were fired in high-volume spurts or in continuous fashion), timing of reloads (if applicable), shots fired and persons hit with specific guns and magazines (if multiple guns or magazines were used), and victims killed or wounded with rounds fired in excess of ten when LCM firearms were used. Such information would likely have to be collected from police reports, forensic analyses, and court documents. Yet, despite the limitations of the currently available data and analyses, the differences in outcomes between LCM and non-LCM attacks are large enough to suggest that LCM restrictions could produce at least modest reductions in mass shooting fatalities and injuries over time.[21] In the next section, I turn to what is known about current and previous efforts to regulate LCM availability.

## 3 | EFFECTS OF ASSAULT WEAPON AND LARGE-CAPACITY MAGAZINE RESTRICTIONS ON MASS SHOOTINGS

During the last few decades, there have been several efforts to restrict the availability of AWs and LCMs at the national, state, and local levels. Below, I review research that has been conducted on federal and state restrictions, highlighting key features of these laws and what is known about their impacts on AW–LCM use and mass shootings. I also briefly address lessons that might be drawn from similar gun control measures implemented outside the United States.

### 3.1 │ The federal assault weapons and large-capacity magazine ban of 1994

The federal AW–LCM law passed in 1994 imposed a ten-year ban on the "manufacture, transfer, and possession" of AWs and LCMs holding more than ten rounds of ammunition. The law's AW provision specifically prohibited 18 models and variations by name as well as revolving cylinder shotguns. It also contained a generic "features test" provision that generally prohibited other semiautomatic firearms having two or more military-style features. Other details of the law's provisions and coverage are reviewed elsewhere (Koper, 2004). A key feature needing emphasis here, however, is that the ban exempted all AWs and LCMs that were manufactured prior to the law's effective date of September 13, 1994. These guns and magazines were thus "grandfathered" and legal to own and transfer. Although imprecise, estimates suggest there were upward of 1.5 million privately owned in the United States when the ban took effect (Koper, 2004, p. 10). Moreover, gun owners in America possessed an estimated 25 million guns that were equipped with LCMs or ten round magazines in 1994 (Cook & Ludwig, 1996, p. 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the country as of 1995. On top of this existing stock, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering exemption, with the largest number arriving in 1999 (Koper, 2004, pp. 65–66). During this same period, importers were also authorized to import an additional 42 million pre-ban LCMs that may have arrived after 2000.

The short- and long-term effects of the federal AW–LCM ban on gun markets and gun violence more generally have been reported elsewhere (Koper, 2004, 2013; Koper & Roth, 2001, 2002; Roth & Koper, 1997, 1999; also see Gius, 2014). In short, the ban had mixed effects in reducing crimes with the banned weaponry as a result of its various exemptions and loopholes, particularly those pertaining to LCMs. Crimes with AWs began to decline shortly after the ban's passage, likely in part because of the interest of collectors and speculators in these weapons, which helped to drive their prices higher through the end of the 1990s (thus making them less accessible and affordable to criminal users). Criminal use of other semiautomatics equipped with LCMs, however, appeared to climb or remain steady through the late 1990s and into the early 2000s, adjusting for overall trends in gun crime (Koper, 2004, 2013).[22] Available evidence suggests that criminal LCM use eventually declined below pre-ban levels but only near the ban's expiration in 2004 (see especially Koper, 2013). As noted, crimes with LCM firearms have since increased. These trends are important to assessing the magnitude and timing of any impact that the federal ban may have had on the more specific problem of mass shootings.

Since the ban's expiration, several researchers studying mass shooting trends have examined variations in these incidents across the pre-ban, ban, and post-ban years. Fox and DeLateur (2014, pp. 324–327), for example, claimed that the federal ban had little impact on overall trends in firearm mass murder incidents (4+ killed) or victims based on Supplemental Homicides Report data from 1976 through 2011. Their data show that incidents per month both increased by 4% to 5% during the ban years and then increased by larger amounts (14% and 21%, respectively) after the ban. Time series results suggested that both incidents and victims per month were lower during the ban years after accounting for general time trends, but neither the ban nor post-ban changes were statistically significant.

Similarly, Webster, McCourt, Crifasi, and Booty, in their state-level panel study (2020, this issue), suggested that the rate of mass murder incidents and victims did not change significantly during the ban years in comparison with their averages across the pre-ban (1984–1994) and post-ban (2005–2017) periods after controlling for state gun laws, time trends, state-level fixed effects, and various social factors. The results of their analyses, however, also show upward post-ban trends in the mass murder victim rate and the average number of victims killed per incident that accelerated dramatically

CRIMINOLOGY
& Public Policy    **157**



**FIGURE 1**   Gun massacres (6+ killed) by weapon type, 1986–2015
*Source.* Data taken from Klarevas (2016)

after 2014. Changes in offender motivations and behaviors seem to be driving this trend (Lankford & Silver, 2020), but the increasing availability of LCM weapons may also be a facilitator.

In contrast, others have argued that the federal ban reduced deaths and injuries from public mass shootings more specifically, citing reductions in both the occurrence of these events and the victims per incident average during this time (Blau et al., 2016; Cannon, 2018; DiMaggio et al., 2018; Gius, 2015; Lemieux, 2014; Phillips, 2017). Setting aside potential concerns about the completeness of these samples, the most sophisticated of these studies was conducted by Gius (2015), who examined the effects of the federal ban, as well as those of state AW–LCM bans, on deaths and injuries from public mass shootings (4+ killed) using a state-level panel analysis for the years of 1982–2011. Controlling for state-level demographics, population density, income, unemployment, prison population, and fixed effects for states and years, Gius's results suggest the federal ban reduced public mass shooting deaths and injuries by 66% and 82%, respectively. Gius, however, did not specifically examine the effects of the federal ban on mass shootings committed with AWs and other LCM semiautomatics.

A closer look at Gius's (2015) mass shooting data, which were taken from the *Mother Jones* collection of public shootings, yields a more nuanced picture. Compared with the pre-ban years, cases involving the use of an LCM firearm increased during the ban years, whereas the overall rate of cases held steady.[23] Both LCM and non-LCM cases then increased during the post-ban years. Hence, Gius's estimates seem to reflect a general post-ban increase in the rate and severity of public mass shootings as measured in the *Mother Jones* data and perhaps a drop in victims per incident during the ban years that was unrelated to changes in the use of LCM firearms.[24]

A comparable pattern also emerges from the work of Klarevas (2016), who found that "gun massacres" resulting in six or more fatalities declined in rate and severity (i.e., victim counts) during the federal ban (also see Klarevas, Conner, & Hemenway, 2019). This pattern is consistent with the notion that a reduction in AW and LCM use might have reduced the deadliest mass shootings. Klarevas stated that massacres specifically involving LCM firearms declined by one third during the ban (2016, p. 350) before rising substantially after its expiration. The overall incidence of these gun massacres, however, also declined by 37% during the ban years (2016, p. 242), which suggests the decline in LCM cases was proportional to a more general reduction in non-LCM cases and likely independent of the federal ban. A similar pattern can be seen in more detailed figures that Klarevas reported for the periods of 1986–1995, 1996–2005, and 2006–2015, which roughly approximate the decades before, during, and after the federal ban (2016, p. 219). As shown in Figure 1, massacres involving LCM firearms were

stable from the first to the second period (9 for each period, although AW cases declined) and then nearly tripled during the third period. Cases not involving LCMs declined by one third from the first to the second period and then more than doubled during the next decade.[25]

Overall, therefore, it seems that mass shootings with LCM firearms remained steady during the ban years, relative to pre-ban levels, or declined in proportion to trends in mass shootings more generally. Reductions observed during the ban years for some categories of mass shootings seem more likely to have been attributable to other factors, a conclusion that is consistent with other research on the wider effects of the federal ban. The law's significant exemptions ensured that its full effects would occur only gradually over time, and those effects were still unfolding at the time it expired (Koper, 2004, 2013). Nonetheless, these mass shooting studies have also underscored the federal ban's preventive value in capping and eventually reducing the supply of AWs and LCMs. What is arguably most notable in the preceding studies is the rise in mass shootings with LCM weapons that has occurred since the end of the federal ban and its correspondence with increasingly lethal and injurious incidents. This rise in LCM use would arguably have not happened, or at least not to the same degree, had Congress extended the ban in 2004. Considering that mass shootings with high-capacity semiautomatics are considerably more lethal and injurious than other mass shootings, it is reasonable to argue that the federal ban could have prevented some of the recent increase in persons killed and injured in mass shootings had it remained in place.[26] This is a more subtle and nuanced policy argument, but one that is central to understanding the value of the previous federal ban and any reconstituted version of that law that may be considered or implemented in the future.

## 3.2 | State bans on assault weapons and large-capacity magazines

In addition to the expired federal ban, several states have also made efforts to restrict AWs and/or LCMs. Currently, nine states have LCM bans, and all but two of these states have AW restrictions that were passed contemporaneously with or before the LCM restrictions. Table 3 provides an overview of these laws with primary emphasis on their LCM provisions. As shown, there are important differences between these state laws, and there have been significant changes in specific state laws over time. For example, some states began with only AW restrictions and later expanded their laws to cover LCMs. The LCM provisions also differ and have changed over time with respect to magazine capacity limits and whether pre-law LCMs are grandfathered (and whether grandfathered LCMs require registration). The latter issue may be particularly consequential as LCM owners in states without grandfathering provisions must discard or relinquish their LCMs, potentially making those laws more effective and their impacts more rapid.[27] Also note that some important changes to LCM laws have only recently taken effect.

State-level AW and LCM restrictions have potential strengths and weaknesses relative to the prior federal ban. A weakness is that the impacts of state regulations can be offset to some degree by the inflow of prohibited weaponry from nonrestrictive states.[28] On the other hand, some state AW–LCM laws could potentially have larger and more rapid effects than did the federal ban depending on their specifics with regard to whether they allow continued possession and/or transfer of pre-law AWs and LCMs. To my knowledge, there has been little-to-no study of the implementation of these state laws (including aspects of enforcement and punishment) or their impacts on the availability and criminal use of LCM firearms.[29] A few studies, however, have examined the association of state-level AW–LCM laws with gun violence and other crimes. In those studies that have examined gun homicides and other shootings (the crimes that are logically most likely to be affected by LCM bans), evidence has been mixed. Although states with AW and LCM laws tend to have lower gun murder rates, this association is not statistically significant when controlling for other social and policy factors