1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                                CIVIL DIVISION

12

13   **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
14   **DAVID MARGUGLIO,**
     **CHRISTOPHER WADDELL, and**          **COMPENDIUM OF WORKS**
15   **CALIFORNIA RIFLE & PISTOL**          **CITED IN SUPPLEMENTAL**
     **ASSOCIATION, INC., a California**    **DECLARATION OF JOHN J.**
16   **corporation,**                       **DONOHUE**

17                            Plaintiffs,   Courtroom:   5A
                                            Judge:       Hon. Roger T. Benitez
18        **v.**                            Action Filed:  May 17, 2017

19
     **ROB BONTA, in his official capacity**
20   **as Attorney General of the State of**
     **California; and DOES 1-10,**
21
22                            Defendants

23

24

25

26

27

28                                        1

1

## INDEX

2

3

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **LAW REVIEWS AND JOURNALS** | | |
| Anthony A. Braga & Philip J. Cook, *The Association of Firearm Caliber with Likelihood of Death from Gunshot Injury in Criminal Assaults*, J. Am. Med. Ass'n (2018) | 5 n.5 | 002-011 |
| Elzerie de Jager et al., *Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States*, 320 J. Am. Med. Ass'n 1034 (2018) | 6 n.6 | 012-013 |
| Philip J. Cook & John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, J. Am. Med. Ass'n 1191 (2022) | 7 n.7 | 014-015 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Fed. Bureau of Investigation, Active Shooter Incidents in the United States 2021 (2022) | 3 n.2 | 017-046 |
| Press Release, Justin Trudeau, *Further Strengthening Our Gun Control Laws*, May 30, 2022 | 10 n.11 | 047-050 |
| **NEWS ARTICLES** | | |
| Associated Press, *New Zealanders Hand in 50,000 Guns After Assault Weapon Ban*, Dec. 21, 2019 | 10 n.10 | 052-055 |
| Amanda Coletta, *Canada Vows to 'Freeze' Handgun Sales, Buy Back Assault-style weapons*, Wash. Post, May 30, 2022 | 10 n.11 | 056-058 |
| John J. Donohue, *Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?*, Brennan Center for Justice, June 2021 | 11 n.14 | 059-069 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | |
|---|---|---|
| Spencer Hsu, *Proud Boys Leader Tarrio, 4 Top Lieutenants Charged with Seditious Conspiracy in Widening Jan 6 Case*, Wash. Post, June 6, 2022 | 11 n.13 | 070-072 |
| Michael Klein, *Did the Assault Weapons Ban of 1994 Bring Down Mass Shootings? Here's What the Data Tells Us*, The Conversation, June 8, 2022 | 9 n.8, 9 n.9 | 073-077 |
| Meryl Kornfield & Mariana Alfaro, *1 in 3 Americans Say Violence Against Government Can Be Justified, Citing Fears of Political Schism, Pandemic*, Wash. Post, Jan. 1, 2022 | 10 n.12 | 078-084 |
| Jesse McKinley et al., *Buffalo Suspect Planned Attack for Months, Online Posts Reveal*, N. Y. Times, May 16, 2022 | 5 n.3 | 085-092 |
| Ashley Parker et al., *From Sandy Hook to Buffalo and Uvalde: Ten Years of Failure on Gun Control*, Washington Post, May 22, 2022 | 5 n.3 | 093-100 |
| Craig Whitlock et al., *Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition*, Wash. Post, May 15, 2022 | 5 n.3 | 101-103 |

3

# LAW REVIEWS AND JOURNALS





**Original Investigation | Public Health**

# The Association of Firearm Caliber With Likelihood of Death From Gunshot Injury in Criminal Assaults

Anthony A. Braga, PhD; Philip J. Cook, PhD

## Abstract

**IMPORTANCE**  A foundational issue in firearms policy has been whether the type of weapon used in an assault affects the likelihood of death.

**OBJECTIVE**  To determine whether the likelihood of death from gunshot wounds inflicted in criminal assaults is associated with the power of the assailant's firearm as indicated by its caliber.

**DESIGN, SETTING, AND PARTICIPANTS**  Cross-sectional study with multivariate analysis of data on shooting cases extracted by the authors from police investigation files for assaults that took place in Boston, Massachusetts, between January 1, 2010, and December 31, 2014. These data were analyzed between October 1, 2017, and February 18, 2018. In all cases the victim sustained 1 or more gunshot wounds in circumstances that the Boston Police Department deemed criminal. The working sample included all 221 gun homicides and a stratified random sample of 300 nonfatal cases drawn from the 1012 that occurred during the 5-year period. Seven nonfatal cases were omitted because they had been misclassified.

**EXPOSURES**  The primary source of variation was the caliber of the firearm used to shoot the victim.

**MAIN OUTCOMES AND MEASURES**  Whether the victim died from the gunshot wound(s).

**RESULTS**  The final sample of 511 gunshot victims and survivors (n = 220 fatal; n = 291 nonfatal) was predominantly male (n = 470 [92.2%]), black (n = 413 [80.8%]) or Hispanic (n = 69 [13.5%]), and young (mean [SD] age, 26.8 [9.4] years). Police investigations determined firearm caliber in 184 nonfatal cases (63.2%) and 183 fatal cases (83.2%). These 367 cases were divided into 3 groups by caliber: small (.22, .25, and .32), medium (.38, .380, and 9 mm), or large (.357 magnum, .40, .44 magnum, .45, 10 mm, and 7.62 × 39 mm). Firearm caliber had no systematic association with the number of wounds, the location of wounds, circumstances of the assault, or victim characteristics, as demonstrated by $\chi^2$ tests of each cluster of variables and by a comprehensive multinomial logit analysis. A logit analysis of the likelihood of death found that compared with small-caliber cases, medium caliber had an odds ratio of 2.25 (95% CI, 1.37-3.70; $P$ = .001) and large caliber had an odds ratio of 4.54 (95% CI, 2.37-8.70; $P$ < .001). Based on a simulation using the logit equation, replacing the medium- and large-caliber guns with small-caliber guns would have reduced gun homicides by 39.5%.

**CONCLUSIONS AND RELEVANCE**  Firearms caliber was associated with the likelihood of death from gunshot wounds in criminal assault. Shootings with larger-caliber handguns were more deadly but no more sustained or accurate than shootings with smaller-caliber handguns. This conclusion is of direct relevance to the design of gun policy.

*JAMA Network Open.* 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

🔓 **Open Access.** This is an open access article distributed under the terms of the CC-BY License.

---

**Key Points**

**Question**  Is there an association between the likelihood of death for firearms shooting victims and the caliber of the firearm?

**Findings**  A cross-sectional study using 5 years of data extracted from investigation files kept by the Boston Police Department determined that the case-fatality rates of assaults inflicting gunshot injury increased significantly with the caliber of the firearm. Caliber was not significantly correlated with other observable characteristics of the assault, including indicators of intent and determination to kill.

**Meaning**  The findings are foundational to the debate over whether deadly weapons should be better regulated and provide evidence against the common view that whether the victim lives or dies is determined largely by the assailant's intent and not the type of weapon.

✚ **Invited Commentary**

✚ **Supplemental content**

Author affiliations and article information are listed at the end of this article.

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 002

JAMA Network Open | Public Health
Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

## Introduction

In 1 of 6 cases of criminal assault inflicting a gunshot wound, the victim dies.[1] Whether any such shooting proves fatal is determined by the number and location of wounds and by the size and weight of the bullets, among other variables.[2,3] Systematic studies of gunshot wound severity have documented trends associated with the mix of firearms commonly used in assaults.[4,5] Of particular concern in the 1980s and early 1990s was the rapid shift from revolvers to semiautomatic pistols and from smaller caliber to medium and larger caliber.[6,7] The pistols were more powerful and enabled the shooter to fire a large number of rounds rapidly, increasing the chance of multiple wounds.[6-8] While speculative, recent studies suggest a continuing trend toward greater wound severity associated with the greater power of firearms in common use.[9,10] (Improved trauma care may have prevented an increase in the national case-fatality rate.[11]) It is widely accepted among medical and public health professionals that the likelihood of death in an assault increases with the power of the gun.[2,3,6-8,12] But that belief is routinely challenged by advocates and some social scientists in the national debate over gun regulation.[13,14]

The opposing view holds that it is not the type of weapon that determines whether the victim lives or dies, but rather the intent of the assailant.[13-17] This notion is captured by the old slogan "guns don't kill people; people kill people." In this view, an assailant who is determined to kill will do what is necessary to accomplish that purpose, regardless of weapon type.[11-19] As a logical corollary, the 1 in 6 who die from a gun assault differ from those who survive with respect to the shooter's intent and determination. In effect, the criminal law and the courts conform with this view by treating a fatal shooting as a more serious crime than a nonfatal shooting. The outcome of the shooting (life or death) is viewed as a reliable guide to the intent—the determination to kill—of the shooter. The most severe punishments, including the death penalty and life in prison, are reserved for cases in which the victim dies.

In 1972, Franklin Zimring published a seminal article that challenged the belief that the outcome of the shooting was primarily determined by the intent of the shooter.[20] He found that nonfatal and fatal shootings were very similar with respect to the circumstances and observed characteristics of the victims and assailants. In effect, the survivors were "lucky" in that in many cases a small change in the path of the bullet would have resulted in the victim's death. A notable pattern in Zimring's data was that the likelihood of death was correlated with the caliber of the assailant's firearm. He concluded that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive, a phenomenon he dubbed "instrumentality." The contrary view is that the caliber of the gun is simply a reflection of the assailant's determination to kill, with little independent influence on the probability of death.[11-19]

The importance of instrumentality in the gun debate is illustrated by findings from a recent survey of experts by the RAND Corporation. Respondents were asked to estimate the effect on the overall homicide rate of a policy that was successful in reducing the firearms homicide rate. Those respondents who on other items had favored permissive firearms regulation tended to believe that assailants would substitute other weapons with nearly the same effect, unlike those respondents who favored more restrictive regulations: "Median responses by the permissive class suggested that 90 percent of prevented firearm homicides would end as a homicide by another means, and median responses by the restrictive class estimated that just 20 percent would. The middle 50 percent of responses from each group (ie, between the 25th and 75th percentile) did not overlap."[21]

The relative importance of chance vs intention in determining the likelihood of death cannot be measured because there is no direct measure of intention in available data. But if Zimring is correct that the caliber of the gun in an assault is not correlated with systematic factors such as the skill and determination of the assailant, then the pattern of case-fatality rates across calibers provides a clean test of instrumentality, akin to an experiment.

JAMA Network Open. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 003

JAMA Network Open | Public Health    Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

This study follows the original Zimring analysis but with better data and more sophisticated statistical techniques.

## Methods

Official incident reports for 221 homicides and 1012 nonfatal gun assaults where victims and survivors sustained gunshot wounds were accessed through the Boston Police Department (BPD). These represent all cases known to the BPD for the period January 1, 2010, to December 31, 2014, that were deemed to be criminal by the BPD (not justified or self-inflicted). The research team did not have the resources to code all of the nonfatal cases, and instead selected a stratified random sample of 300 gunshot survivors by randomly selecting 60 survivors per year. Of the selected cases, 1 was excluded because the event did not occur in the BPD's jurisdiction, and 6 were excluded because it was determined that the individual had not been shot. One gun homicide and 2 nonfatal assaults were committed with shotguns and excluded from the study because of the difficulty of comparing the type of wounds generated by the multiple pellets of a shotgun blast with those created by bullets. The final nonfatal shooting survivor sample included 291 individuals and the final fatal shooting victim sample included 220 individuals.

The institutional review board at Northeastern University approved the study with the requirement that gunshot victim and survivor identities were kept confidential by the removal of all personal identifying information (informed consent from the participants was not required). The study conforms with the Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) reporting guideline for cross-sectional research studies.[22]

The research team attempted to acquire detailed information on the 511 fatal and nonfatal shootings by interviewing investigators and reviewing incident reports and detective case files (including emergency medical response and coroner reports). The case files for the homicide victims were generally complete in recording number and location of wounds, but some of the files for nonfatal cases were missing this information. Furthermore, some homicide and assault cases were missing data on firearm caliber, either because cartridge and bullet fragments were not recovered, or if recovered were too damaged to make a determination of the specific caliber. For analyses requiring data on caliber, the working sample included 367 cases (184 nonfatal and 183 fatal). There were no systematic differences between cases included in the analysis and those excluded because of absence of caliber data (eTable 1 in the Supplement).

### Statistical Analysis

Descriptive statistics were used to compare the characteristics of fatal and nonfatal criminal shootings with respect to the demographic characteristics of gunshot victims and survivors, the circumstances of the assault, and other variables. Multivariate binary and multinomial logistic regression models were used to estimate the relationship between a categorical outcome variable and a predictor variable, holding the influence of other variables constant. The conventional 2-tailed .05 level of significance was selected as the benchmark to reject the null hypothesis of no difference in the association between variables. Missing data for caliber and wounds were analyzed using multivariate logistic regression to ascertain if missingness was systematic or as good as random (eTable 2 in the Supplement).

The primary analysis, which uses the working sample, had 3 goals. The first goal was to determine whether caliber is statistically independent of observable characteristics of the assault, including indicators of skill and intent, to validate the claim that caliber serves as a natural experiment for testing instrumentality. We used $\chi^2$ tests to compare caliber with each cluster of variables (demographic characteristics of the victim, circumstances of the assault, neighborhood in which the assault occurred, whether it was indoors or outdoors, number of shots fired, and number and location of wounds). In addition, a multinomial logit equation was estimated with all these covariates included.

🔓 JAMA Network Open. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 004

Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

The second goal was to use this natural experiment to estimate the causal relationship between caliber of the assailant's firearm and likelihood that the victim died. The third goal, building on the second, was to estimate the effect of a hypothetical intervention, namely replacing all the medium- and large-caliber guns with small-caliber guns. Using the logit regression equation as the basis for the simulation, the probability of death was calculated for each assault (and then averaged) under both the observed calibers (small, medium, and large) and the hypothetical case of replacing all larger calibers with small.[23] The percentage reduction in fatalities (homicides) was a measure of the overall effect of instrumentality associated with caliber for our sample.

It should be noted that the probabilities of death reflect the fact that the nonfatal shootings are a sample of the total, whereas nearly all homicides are included. Hence the computed probabilities are a multiple of the true probabilities of death. But the ratio of estimated probabilities should be unaffected, as the multiple is the same for the numerator and denominator of the ratio.

In all analyses, caliber was coded as either small (.22, .25, and .32), medium (.38, .380, and 9 mm), or large (.357 magnum, .40, .44 magnum, .45, 10 mm, and 7.62 × 39 mm). The wound location was coded as head or neck; chest, back, or abdomen; or arms and legs. The number of wounds was coded as 1 or more than 1.

Stata SE 14.1 statistical software (StataCorp) was used to calculate the maximum likelihood estimates of the parameters for the predictor variables and to compute the associated probability values. In line with current best practice, robust standard errors were used, clustered by police district. Policing districts were used as indicators for Boston neighborhoods to capture both variations in community contexts and local policing practices that could affect the lethality of shootings and the quality of investigative information.[24,25]

## Results

**Table 1** presents the characteristics of gunshot victims and survivors and circumstances in gun assaults and homicides occurring in Boston between January 1, 2010, and December 31, 2014. The final sample of 511 gunshot victims and survivors (220 fatal and 291 nonfatal) was predominantly male (n = 470 [92.2%]), black (n = 413 [80.8%]) or Hispanic (n = 69 [13.5%]), and young (mean [SD] age, 26.8 [9.4] years). The fatal and nonfatal cases have very similar distributions across each variable, including victim and survivor sex, race/ethnicity, age, and criminal history; circumstances that led to the shooting; and police district. For only 1 variable is there a statistically significant difference between fatal and nonfatal cases, and that is whether the shooting occurred indoors or outdoors. Fatal shootings were more likely to occur indoors (54 of 220 [24.5%]) relative to nonfatal shootings (39 of 291 [13.4%]), with a difference of 11.1 percentage points (95% CI, 4.2%-18.0%; *P* = .001). Most gunshot victims and survivors were young minority men with prior court arraignments. Most attacks occurred in circumstances where gangs or drugs played an important role (according to BPD investigation results). Most were in outdoor locations in the disadvantaged Boston neighborhoods of Roxbury, Mattapan, and Dorchester.

**Table 2** reports the distribution of calibers, shots fired, number of gunshot wounds, and wound location for nonfatal and fatal cases. Police investigations determined firearm caliber in 184 nonfatal cases (63.2%) and 183 fatal cases (83.2%). Most interpersonal gun violence involves handguns, and Boston is no exception. Only 1 gun homicide was committed with a rifle caliber (7.62 × 39 mm fired from an AK-47 assault rifle). The most common caliber was 9 mm in both nonfatal shootings (50 of 184 [27.2%]) and gun homicides (65 of 183 [35.6%]). Homicides were more likely to involve large-caliber firearms (60 of 183 [32.8%]) relative to nonfatal shootings (33 of 184 [17.9%]).

The number of shots fired in each case was estimated by the BPD based on spent bullets and cartridge casings recovered at the crime scene. The mean (SD) number of shots was higher in fatal shootings (6.11 [5.73]) than in nonfatal shootings (4.41 [3.98]). Homicide victims were more likely to have multiple gunshot wounds (119 of 183 [65.0%]) than were nonfatal shooting survivors (50 of 184 [27.2%]), and the mean (SD) number of gunshot wounds for homicide victims was

🔓 JAMA Network Open. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

correspondingly higher than the number for survivors (2.82 [2.76] vs 1.67 [1.41], respectively). A separate calculation found that the number of shots fired was statistically unrelated to caliber for both fatal and nonfatal cases (eTable 3 in the Supplement).

The distributions of wound locations differed in the expected way. For individuals with a single wound, 84 of 134 (62.7%) were peripheral (legs, arms, or shoulders) for nonfatal cases, compared with only 1 of 64 (1.6%) for fatal cases. For individuals with multiple wounds, the most serious wound was peripheral in 18 of 50 nonfatal shootings (36.0%) compared with 1 of 119 fatal shootings (0.8%). (The ranking used to determine seriousness was based only on location, with head and neck most serious; then chest, back, and abdomen; then arms, shoulders, and legs.)

**Table 3** provides results relevant to the first goal of the analysis. It presents the results of a multinomial logistic regression on the caliber of the gun used in the assault. In model 1, the variables include the sex, race, and age of the victim or survivor, the circumstances (motivation) of the attack, and whether the attack occurred indoors or outdoors. Model 2 adds additional covariates, including the number of wounds and location of the most serious wounds (both considered indicators of skill

Table 1. Wounded Individuals, Circumstances, and Locations of Criminal Shootings in Boston, 2010-2014

| Characteristic | No. (%) Nonfatal (n = 291) | Fatal (n = 220) | Test Statistic | P Value |
|---|---|---|---|---|
| Sex | | | | |
| Male | 270 (93.1) | 200 (90.9) | $\chi^2_1 = 0.854$ | .36 |
| Female | 21 (6.9) | 20 (9.1) | | |
| Race | | | | |
| Black | 231 (79.4) | 182 (82.7) | | |
| Hispanic | 41 (14.1) | 28 (12.8) | $\chi^2_3 = 1.219$ | .75 |
| White | 15 (5.2) | 8 (3.6) | | |
| Asian or other | 4 (1.3) | 2 (0.9) | | |
| Age, mean (SD), y | 27.0 (9.1) | 26.4 (9.6) | $t = .721$ | .47 |
| Criminal history | | | | |
| Prior arraignments, mean (SD), No. | 12.4 (11.3) | 11.9 (10.7) | $t = .506$ | .61 |
| Circumstance[a] | | | | |
| Gang | 166 (66.5) | 147 (66.8) | | |
| Drug | 40 (15.9) | 38 (17.1) | | |
| Personal dispute | 38 (13.1) | 22 (10.1) | | |
| Robbery | 6 (2.5) | 8 (3.7) | $\chi^2_5 = 2.809$ | .73 |
| Domestic | 5 (2.0) | 4 (1.8) | | |
| Other | 0 | 1 (0.5) | | |
| Location | | | | |
| Outdoor | 252 (86.6) | 166 (75.5) | $\chi^2_1 = 10.449$ | .001 |
| Indoor | 39 (13.4) | 54 (24.5) | | |
| Police district | | | | |
| A-1: Downtown | 7 (2.4) | 4 (1.8) | | |
| A-7: East Boston | 5 (1.7) | 2 (0.9) | | |
| A-15: Charlestown | 1 (0.3) | 4 (1.8) | | |
| B-2: Roxbury | 82 (28.2) | 63 (28.6) | | |
| B-3: Mattapan | 71 (24.4) | 60 (27.2) | | |
| C-6: South Boston | 7 (2.4) | 5 (2.3) | | |
| C-11: Dorchester | 65 (22.3) | 34 (15.5) | $\chi^2_{11} = 9.434$ | .58 |
| D-4: Back Bay, Fenway | 15 (5.2) | 15 (6.8) | | |
| D-14: Allston, Brighton | 4 (1.4) | 3 (1.4) | | |
| E-5: West Roxbury | 7 (2.4) | 10 (4.5) | | |
| E-13: Jamaica Plain | 14 (4.8) | 11 (5.0) | | |
| E-18: Hyde Park | 13 (4.5) | 9 (4.1) | | |

[a] Circumstance percentages excluded shooting victims and survivors whose assailants had unknown motives.

JAMA Network Open. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

and determination to kill). There are no statistically significant results for either model. Supplemental $\chi^2$ analyses of association of caliber with victim or survivor and shooting characteristics also yielded statistically nonsignificant results, confirming the results of the multivariate analysis (eTable 4 in the Supplement). The lack of systematic association is what would be expected if caliber were assigned at random, as in an experiment.

**Table 4** presents the results of a multivariate logistic regression on whether the event was fatal or nonfatal. The effects of caliber on odds of death are estimated, controlling for gunshot victim and survivor characteristics, whether the shooting occurred indoors or outdoors, and neighborhood indicators (included, not shown). Relative to shootings involving small-caliber firearms (reference category), the odds of death if the gun was large caliber were 4.5 times higher (OR, 4.54; 95% CI, 2.37-8.70; *P* < .001) and, if medium caliber, 2.3 times higher (OR, 2.25; 95% CI, 1.37-3.70; *P* = .001). The odds of death in indoor shootings were 2.6 times higher than in outdoor shootings (OR, 2.55; 95% CI, 1.79-3.64; *P* < .001). The effects of caliber size and indoor location remained strong in the alternate specifications in models 2 and 3. None of the other covariates had a statistically discernible effect on the odds of death.

The overall effect of larger caliber on deaths can be estimated by simulation using the logit regression results in Table 4. The simulation uses the 367 shooting cases (184 nonfatal [63.2%] and

Table 2. Firearm Calibers and Wounds for Criminal Shootings in Boston, 2010-2014

| Characteristic | No. (%) | |
| --- | --- | --- |
| | Nonfatal (n = 184) | Fatal (n = 183) |
| Caliber | | |
| .22 | 14 (7.6) | 6 (3.3) |
| .25 | 11 (6.0) | 5 (2.7) |
| .32 | 13 (7.1) | 12 (6.6) |
| .380 | 32 (17.4) | 17 (9.3) |
| .38 | 31 (16.8) | 18 (9.8) |
| 9 mm | 50 (27.2) | 65 (35.5) |
| .357 Magnum | 5 (2.7) | 13 (7.1) |
| .40 | 15 (8.2) | 18 (9.8) |
| .44 Magnum | 1 (0.5) | 2 (1.1) |
| .45 | 12 (6.5) | 24 (13.1) |
| 10 mm | 0 | 2 (1.1) |
| 7.62 × 39 mm | 0 | 1 (0.6) |
| Small caliber | 38 (20.7) | 23 (12.6) |
| Medium caliber | 113 (61.4) | 100 (54.6) |
| Large caliber | 33 (17.9) | 60 (32.8) |
| Shots fired, mean (SD), No. | 4.41 (3.98) | 6.11 (5.73) |
| No. of wounds | | |
| Single | 134 (72.8) | 64 (35.0) |
| Multiple | 50 (27.2) | 119 (65.0) |
| Mean (SD) | 1.67 (1.41) | 2.82 (2.76) |
| Single-wound location | | |
| Total single wounds | 134 (100) | 64 (100) |
| Head, neck | 9 (6.7) | 35 (54.7) |
| Chest, back, abdomen | 41 (30.6) | 28 (43.8) |
| Arms, shoulders, legs | 84 (62.7) | 1 (1.6) |
| Multiple-wound location | | |
| Total multiple wounds | 50 (100) | 119 (100) |
| Head, neck | 6 (12.0) | 60 (50.4) |
| Chest, back, abdomen | 26 (52.0) | 58 (48.7) |
| Arms, shoulders, legs | 18 (36.0) | 1 (0.8) |

🔓 *JAMA Network Open*. 2018;1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833

Downloaded From: https://jamanetwork.com/ on 10/14/2022

183 fatal [83.2%]) with known caliber. First, the predicted probability of death for each shooting case was computed using the actual caliber (mean [SD] probability, 0.499 [0.154]), and then the predicted probability on the assumption that all shootings had been with a small-caliber gun (mean [SD] probability, 0.302 [0.137]). The ratio of mean probabilities was 0.605. The implication is that if the medium- and large-caliber guns had been replaced with small caliber (assuming everything else unchanged), the result would have been a 39.5% reduction in gun homicides.

## Discussion

In a pioneering article published in 1972, Franklin Zimring sought to demonstrate that the type of weapon used in a criminal assault had a causal effect on the likelihood that the victim would die.[20] He compiled a data set that allowed him to compare the case fatality rates for criminal shootings by caliber of weapon, which he asserted was a sort of "natural experiment." He demonstrated that fatality rate was positively correlated with caliber and argued that this gradient was a direct reflection of the intrinsic power and lethality of the weapon. In this article we revisit his analysis with more complete data and more sophisticated statistical methods. We were able to confirm the strong positive association between caliber and fatality rate and summarize the overall effect of larger calibers by simulating the effect on outcomes if all the guns had been small caliber. The result is a 39.5% reduction in the probability of death, implying an equal reduction in the gun homicide rate if the same shootings had occurred but with small-caliber weapons, rather than the actual mix of small, medium, and large calibers.

Table 3. Multinomial Logistic Regressions of Shooting Characteristics on Caliber

| Characteristic[a] | Logistic Regression Coefficient (Robust Standard Error) | | | |
| | Model 1[b] | | Model 2[b] | |
| | Large Caliber | Medium Caliber | Large Caliber | Medium Caliber |
|---|---|---|---|---|
| Sex (male) | | | | |
| Female | 1.103 (0.809) | 0.886 (0.748) | 1.231 (0.926) | 0.978 (0.744) |
| Race (white) | | | | |
| Black | 0.087 (0.847) | 0.504 (0.704) | 0.204 (0.765) | 0.641 (0.812) |
| Hispanic | 0.332 (0.947) | 0.246 (0.791) | 0.638 (0.903) | 0.827 (0.895) |
| Asian or other | 0.937 (1.051) | 0.871 (0.687) | 0.886 (0.993) | 0.415 (0.711) |
| Age | −0.008 (0.023) | 0.007 (0.019) | −0.010 (0.024) | −0.002 (0.021) |
| Prior arraignments | −0.018 (0.013) | −0.011 (0.012) | −0.013 (0.015) | −0.013 (0.013) |
| Circumstances (other) | | | | |
| Gang | 0.981 (0.809) | 0.897 (0.490) | 0.988 (0.734) | 0.768 (0.531) |
| Drug | 0.876 (0.719) | 0.708 (0.607) | 0.814 (0.896) | 0.735 (0.660) |
| Personal dispute | 0.493 (0.782) | 0.787 (0.621) | 1.106 (0.925) | 0.861 (0.673) |
| Robbery | −0.506 (1.290) | 0.332 (0.846) | 0.084 (1.321) | 0.715 (0.855) |
| Domestic | 0.495 (0.337) | 0.341 (0.239) | 0.509 (0.357) | 0.309 (0.231) |
| No. of wounds (single wound) | | | | |
| Multiple wounds | NI | NI | 0.209 (0.383) | 0.167 (0.325) |
| Most serious wound location (leg, arm, shoulder) | | | | |
| Chest, back, abdomen | NI | NI | −0.609 (0.484) | −0.597 (0.405) |
| Head, neck | NI | NI | 0.791 (0.569) | 0.119 (0.505) |
| Scene location (outdoor) | | | | |
| Indoor | 0.049 (0.462) | 0.051 (0.399) | −0.037 (0.475) | 0.086 (0.402) |
| Shots fired | NI | NI | 0.007 (0.040) | 0.011 (0.036) |
| Constant | −0.431 (1.215) | −0.0242 (0.953) | −0.988 (1.295) | −0.207 (1.075) |
| Log pseudolikelihood | −339.052 | | −311.541 | |
| Pseudo $R^2$ | 0.037 | | 0.062 | |
| Individuals included in analysis, No. | 344 | | 344 | |

Abbreviation: NI, not included.

[a] The default categories for the dummy variables are identified in parentheses.

[b] Base category in the multinomial dependent variable is small caliber.

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 008

Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

That result suggests that the instrumentality effect is large even if the analysis is limited to gun caliber. It would also be of interest to quantify the effect of replacing guns of all types with other commonly available weapons. Presumably the effects would be still larger, although the precise nature of the substitution would have to be specified.

## Limitations

The main challenge to the results in the current analysis is the possibility that shooters who used large-caliber guns, in comparison with those who used smaller-caliber guns, were somehow more determined to kill or more skillful at killing in ways that are not well measured by the number and location of wounds. That possibility is created by the fact that guns are not randomly assigned to shooters. But we demonstrated that just as if there were random assignment, caliber was uncorrelated with all observable aspects of the shootings except whether the wounded person lived or died.

There are other limitations of this study. First, caliber was not available for all shootings. We found no statistical pattern of missingness within each of the 2 categories of fatal and nonfatal, but that does not completely settle the issue. Second, the study is limited to the criminal shootings known to the police in a particular time and place.

## Conclusions

Whether the type of weapon matters in affecting the outcome of a shooting is a foundational issue in the debate over appropriate gun regulation. The results here support the view that the intrinsic power and lethality of the weapon had a direct effect on the likelihood that a victim of a criminal shooting died. For Boston, in the period studied here, simply replacing larger-caliber guns with small-caliber guns with no change in location or number of wounds would have reduced the gun homicide rate by 39.5%. It is plausible that larger reductions would be associated with replacing all types of guns with knives or clubs.

The finding that the type of weapon is associated with fatality rate provides insight into the nature of homicide. Whether the victim of a serious assault lives or dies is to a large extent a matter of chance, rather than a question of the assailant's intent. The probability of death is connected to the intrinsic power and lethality of the weapon. That suggests that effective regulation of firearms could

Table 4. Multivariate Logistic Regressions of Caliber and Event Characteristics on Shooting Outcome

| Characteristic[a] | Odds Ratio | Logistic Regression Coefficient (Robust Standard Error) |
|---|---|---|
| Caliber (small) | | |
| Medium | 2.251 | 0.811 (0.253)[b] |
| Large | 4.543 | 1.513 (0.331)[b] |
| Sex (male) | | |
| Female | 1.051 | 0.051 (0.386) |
| Race (white) | | |
| Black | 1.997 | 0.691 (0.652) |
| Hispanic | 1.769 | 0.571 (0.681) |
| Asian or other | 0.876 | −0.132 (1.308) |
| Age | 1.000 | 0.001 (0.009) |
| Prior arraignments | 1.000 | 0.001 (0.008) |
| Scene location (outdoor) | | |
| Indoor | 2.553 | 0.937 (0.180)[b] |
| Constant | −1.910 (0.784)[c] | |
| Log pseudolikelihood | −324.885 | |
| Pseudo $R^2$ | 0.075 | |
| Individuals included in analysis, No. | 344 | |

[a] The default categories for the dummy variables are identified in parentheses. Area dummy variables are included but not shown in the table. Robust standard errors were clustered by 12 Boston Police Department districts.

[b] $P < .01$.

[c] $P < .05$.

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 009

reduce the homicide rate. That conclusion is relevant to the national debate over gun regulation, although insufficient in itself to demonstrate that any particular regulation would satisfy a cost-benefit test.

---

**ARTICLE INFORMATION**

**Accepted for Publication:** April 30, 2018.

**Published:** July 27, 2018. doi:10.1001/jamanetworkopen.2018.0833

**Open Access:** This is an open access article distributed under the terms of the CC-BY License. © 2018 Braga AA et al. *JAMA Network Open.*

**Corresponding Author:** Anthony A. Braga, PhD, School of Criminology and Criminal Justice, Northeastern University, 360 Huntington Ave, Boston, MA 02115 (a.braga@northeastern.edu).

**Author Affiliations:** School of Criminology and Criminal Justice, Northeastern University, Boston, Massachusetts (Braga); Sanford Institute of Public Policy, Duke University, Durham, North Carolina (Cook).

**Author Contributions:** Drs Braga and Cook had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis.

*Concept and design:* All authors.

*Acquisition, analysis, or interpretation of data:* All authors.

*Drafting of the manuscript:* All authors.

*Critical revision of the manuscript for important intellectual content:* All authors.

*Statistical analysis:* All authors.

*Obtained funding:* Braga.

*Administrative, technical, or material support:* Braga.

*Supervision:* Braga.

**Conflict of Interest Disclosures:** Dr Braga reported grants from the US Bureau of Justice Assistance during the conduct of the study. No other disclosures were reported.

**Funding/Support:** This work was supported by the US Bureau of Justice Assistance (grant 2011-DB-BX-0014).

**Role of the Funder/Sponsor:** The US Bureau of Justice Assistance had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**REFERENCES**

**1.** Cook PJ, Rivera-Aguirre AE, Cerdá M, Wintemute G. Constant lethality of gunshot injuries from firearm assault: United States, 2003-2012. *Am J Public Health.* 2017;107(8):1324-1328. doi:10.2105/AJPH.2017.303837

**2.** Hargarten SW, Karlson TA, O'Brien M, Hancock J, Quebbeman E. Characteristics of firearms involved in fatalities. *JAMA.* 1996;275(1):42-45. doi:10.1001/jama.1996.03530250046025

**3.** Fackler ML, Malinowski JA. The wound profile: a visual method for quantifying gunshot wound components. *J Trauma.* 1985;25(6):522-529. doi:10.1097/00005373-198506000-00009

**4.** Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990. *Arch Surg.* 1992;127(6):694-698. doi:10.1001/archsurg.1992.01420060066010

**5.** McGonigal MD, Cole J, Schwab CW, Kauder DR, Rotondo MF, Angood PB. Urban firearm deaths: a five-year perspective. *J Trauma.* 1993;35(4):532-536. doi:10.1097/00005373-199310000-00006

**6.** D'Alessio JG. Gunshot wounds: bullet caliber is increasing. *J Trauma.* 1999;47(5):992-993.

**7.** Wintemute GJ. The relationship between firearm design and firearm violence: handguns in the 1990s. *JAMA.* 1996;275(22):1749-1753. doi:10.1001/jama.1996.03530460053031

**8.** Kellermann AL, Lee RK, Mercy JA, Banton J. The epidemiologic basis for the prevention of firearm injuries. *Annu Rev Public Health.* 1991;12:17-40. doi:10.1146/annurev.pu.12.050191.000313

**9.** Sauaia A, Gonzalez E, Moore HB, Bol K, Moore EE. Fatality and severity of firearm injuries in a Denver trauma center, 2000-2013. *JAMA.* 2016;315(22):2465-2467. doi:10.1001/jama.2016.5978

**10.** Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg.* 2014;76(1):2-9. doi:10.1097/TA.0b013e3182ab19e7

---

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 010

JAMA Network Open | Public Health
Association of Firearm Caliber With Death From Gunshot in Criminal Assaults

**11**. Kent AJ, Sakran JV, Efron DT, Haider AH, Cornwell EE III, Haut ER. Understanding increased mortality after gunshot injury. *Am J Public Health*. 2017;107(12):e22-e23. doi:10.2105/AJPH.2017.304100

**12**. Karlson TA, Hargarten SW. *Reducing Firearm Injury and Death: A Public Health Sourcebook on Guns*. New Brunswick, NJ: Rutgers University Press; 1997.

**13**. Kleck G. *Point Blank: Guns and Gun Violence in America*. Hawthorne, NY: Aldine de Gruyter; 1997.

**14**. Blackman PH. A critique of the epidemiological study of firearms and homicide. *Homicide Stud*. 1997;1(2):169-189. doi:10.1177/1088767997001002005

**15**. Hahn RA, Bilukha OO, Crosby A, et al. Task Force on Community Preventive Services. First reports evaluating the effectiveness of strategies preventing violence: firearms laws: findings from the task force on community prevention services. *MMWR Recomm Rep*. 2003;52(RR-14):11-20.

**16**. Institute of Medicine and National Research Council. *Priorities for Research to Reduce the Threat of Firearm-Related Violence*. Washington, DC: National Academies Press; 2013.

**17**. National Research Council. *Firearms and Violence: A Critical Review*. Washington, DC: National Academies Press; 2005.

**18**. Wolfgang M. *Patterns in Criminal Homicide*. Philadelphia: University of Pennsylvania Press; 1958. doi:10.9783/9781512808728

**19**. Wright JD, Rossi PH, Daly K. *Under the Gun: Weapons, Crime, and Violence in America*. Hawthorne, NY: Aldine de Gruyter; 1983.

**20**. Zimring FE. The medium is the message: firearm caliber as a determinant of death from assault. *J Legal Stud*. 1972;1:97-124. doi:10.1086/467479

**21**. Morral AR, Schell TL, Tankard M. *The Magnitude and Sources of Disagreement Among Gun Policy Experts*. Santa Monica, CA: RAND Corporation; 2018. doi:10.7249/RR2088.1

**22**. von Elm E, Altman DG, Egger M, Pocock SJ, Gøtzsche PC, Vandenbroucke JP; STROBE Initiative. The Strengthening the Reporting of Observational Studies in Epidemiology (STROBE) statement: guidelines for reporting observational studies. *J Clin Epidemiol*. 2008;61(4):344-349. doi:10.1016/j.jclinepi.2007.11.008

**23**. Muller CJ, MacLehose RF. Estimating predicted probabilities from logistic regression: different methods correspond to different target populations. *Int J Epidemiol*. 2014;43(3):962-970. doi:10.1093/ije/dyu029

**24**. Harding DJ. *Living the Drama: Community, Conflict and Culture Among Inner-City Boys*. Chicago, IL: University of Chicago Press; 2010. doi:10.7208/chicago/9780226316666.001.0001

**25**. Braga AA, Dusseault D. Can homicide detectives improve homicide clearance rates? *Crime Delinq*. 2018;64(3):283-315. doi:10.1177/0011128716679164

**SUPPLEMENT.**
**eTable 1.** Wounded Individual Characteristics, Circumstances, and Locations of Criminal Shootings by Missing and Non-Missing Caliber Data
**eTable 2.** Multivariate Logistic Regressions of Missing Wound and Missing Caliber Data for Gun Homicides and Non-Fatal Gun Assaults
**eTable 3.** Comparison of Shots Fired by Caliber in Criminal Gun Assaults
**eTable 4.** Gunshot Victim and Survivor Characteristics and Shooting Characteristics by Caliber Sizes

Downloaded From: https://jamanetwork.com/ on 10/14/2022

Compendium_Donohue
Page 011

# Letters

RESEARCH LETTER

### Lethality of Civilian Active Shooter Incidents With and Without Semiautomatic Rifles in the United States

Semiautomatic rifles have been used in some of the largest active shooter incidents in US history.[1] The weapons were banned in 1994 under the federal assault weapons ban but were reintroduced to the public marketplace in 2004.[2] Currently, there are no comprehensive assessments of injuries from different types of firearms. We compared the number of persons wounded, killed, and either wounded or killed during active shooter incidents with and without semiautomatic rifles.

**Methods** | An active shooter incident is defined by the Federal Bureau of Investigation (FBI) as a situation in which an individual is actively engaged in killing or attempting to kill people in a confined or populated area.[3] The FBI has tracked all active shooter incidents since 2000 and has the most comprehensive data set available.[3] We retrieved active shooter incident characteristics from the publicly accessible FBI database through 2017 (accessed May 18, 2018).[3] For each incident, we extracted shooter age, name, year, location (city and state), number of people wounded, killed, and wounded or killed, place of shooting (commerce, education, government, open space, residences, health care, and house of worship), and type of firearms present (rifle, shotgun, handgun).

The FBI reports do not distinguish whether a rifle was semiautomatic; therefore, for each incident in which the FBI reported that a rifle was present, a media content analysis was performed to identify semiautomatic rifle presence. An a priori search hierarchy was established in which the primary data sources were court and police documents or statements (44.9%; 35 of 78), and secondary data sources were news articles. At least 3 news articles from different media outlets were required to triangulate data. No discrepancies among sources were found. All incidents with the presence of a semiautomatic rifle were classified as semiautomatic rifle incidents regardless of other firearm presence. The Las Vegas, Nevada, shooting, which represented a statistical outlier, and the San Bernardino, California, shooting, which had more than 1 shooter present, were excluded. Negative binomial regression was used to estimate the association between presence of a semiautomatic rifle and the total numbers nonfatally wounded, killed, and either wounded or killed, and the percentage of persons who died if wounded at the incident, controlling for the place and year of shooting and the presence of other firearms. Significance was set at $P < .05$ (2-sided). Stata version 15.1 was used for analysis.

**Results** | Of the 248 active shooter incidents, 76 involved a rifle, and we identified the type in all instances. A semiautomatic rifle was involved in 24.6% (n = 61) of incidents, and 75.4% (n = 187) involved handguns (n = 154), shotguns (n = 38), and nonsemiautomatic rifles (n = 15). Multiple firearm types were involved in 60.7% (n = 37 of 61) of semiautomatic rifle incidents and 25.1% (n = 47) of non-semiautomatic rifle incidents.

There were 898 persons wounded and 718 killed. Active shooter incidents with vs without the presence of a semiautomatic rifle were associated with a higher incidence of persons wounded (unadjusted mean, 5.48 vs 3.02; incidence rate ratio [IRR], 1.81 [95% CI, 1.30-2.53]), killed (mean, 4.25 vs 2.49; IRR, 1.97 [95% CI, 1.38-2.80]), and wounded or killed (mean, 9.72 vs 5.47; IRR, 1.91 [95% CI, 1.46-2.50]) (**Figure**). The percentage of persons who died if wounded in incidents with a semiautomatic rifle (43.7% [n = 259 of 593]) was similar to the percentage who died in incidents without a semiautomatic rifle (44.9% [n = 459 of 1023]) (IRR, 0.99 [95% CI, 0.60-1.61]).

**Discussion** | Although 44% of persons wounded in active shooter incidents died of their injuries, irrespective of the type of firearm used, more people were wounded and killed in incidents in which semiautomatic rifles were used compared with incidents involving other firearms. Semiautomatic rifles are designed for easy use, can accept large magazines, and fire high-velocity bullets, enabling active shooters to wound and kill more people per incident.[4]

Limitations of this study include the lack of data on specific injuries, demographics, and other details of the incidents. Incidents involving semiautomatic rifles may differ from other incidents in ways that may partially explain the association but could not be controlled (ie, intentionality of the shooter). This lack of data highlights the need for a national centralized database to inform the debate on an assault weapons ban.



**Figure. Unadjusted Mean Number of Victims Injured and Killed per Active Shooter Incident With and Without Semiautomatic Rifles**

The error bars indicate 95% CIs.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Anna Ferrari on 10/19/2022

Compendium_Donohue
Page 012

Elzerie de Jager, MBBS(Hons)
Eric Goralnick, MD, MS
Justin C. McCarty, DO
Zain G. Hashmi, MBBS
Molly P. Jarman, PhD, MPH
Adil H. Haider, MD, MPH

**Author Affiliations:** Center for Surgery and Public Health (CSPH), Brigham and Women's Hospital, Boston, Massachusetts (de Jager, McCarty, Hashmi, Jarman, Haider); Department of Emergency Medicine, Brigham and Women's Hospital, Boston, Massachusetts (Goralnick).

**Accepted for Publication:** July 11, 2018.

**Corresponding Author:** Adil H. Haider, MD, MPH, Center for Surgery and Public Health, Brigham and Women's Hospital, 75 Francis St, Boston, MA 02115 (ahhaider@bwh.harvard.edu).

**Author Contributions:** Dr Haider had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Concept and design:* De Jager, Goralnick, McCarty, Hashmi, Haider.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* De Jager, Goralnick, McCarty, Haider.
*Critical revision of the manuscript for important intellectual content:* De Jager, Goralnick, McCarty, Hashmi, Jarman, Haider.
*Statistical analysis:* Goralnick, McCarty, Hashmi, Jarman, Haider.
*Administrative, technical, or material support:* De Jager, Goralnick, McCarty, Haider.
*Supervision:* Goralnick, Haider.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest. Dr Haider reports stock holdings and being cofounder of Patient Doctor Technologies. No other disclosures were reported.

1. Cummings W, Jansen B. Why the AR-15 keeps appearing at America's deadliest mass shootings. *USA Today.* February 14, 2018. https://www.usatoday.com/story/news/nation/2018/02/14/ar-15-mass-shootings/339519002/. Accessed February 23, 2018.

2. Koper CS, Roth JA. The impact of the 1994 federal assault weapons ban on gun markets: an assessment of short-term primary and secondary market effects. *J Quant Criminol.* 2002;18(3):239-266. doi:10.1023/A:1016055919939

3. Federal Bureau of Investigation. Active shooter resources, Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University, FBI resources. 2018. https://www.fbi.gov/about/partnerships/office-of-partner-engagement/active-shooter-resources Accessed May 18, 2018.

4. Coble YD, Eisenbrey AB, Estes EH, et al; Council on Scientific Affairs, American Medical Association. Assault weapons as a public health hazard in the United States. *JAMA.* 1992;267(22):3067-3070. doi:10.1001/jama.1992.03480220085033

## COMMENT & RESPONSE

### Antiplatelet Therapy After Coronary Artery Bypass Grafting

**To the Editor** Dr Zhao and colleagues concluded that among patients undergoing elective coronary artery bypass graft (CABG) surgery with saphenous vein grafting, ticagrelor plus aspirin significantly increased graft patency after 1 year vs aspirin alone.[1] However, based on current best evidence and standards of care, the aspirin dosage (100 mg/d) used in this study for the aspirin-alone group may have been suboptimal.[2]

The largest placebo-controlled trial to date in this field was the Veterans Administration Cooperative Study.[3] The aspirin dosage in this trial was 325 mg/d. The 1-year graft occlusion rate in the aspirin-alone group was lower than that noted by Zhao and colleagues (15.8% vs 23.5%). Similarly, a previous meta-analysis of 5 randomized clinical trials suggested that

a medium dosage of aspirin (300-325 mg/d) more successfully reduced graft occlusion within the first year of CABG than low-dosage regimes (50-100 mg/d).[4] In addition, pharmacokinetic studies have shown that an aspirin dose of 100 mg is sufficient to suppress thromboxane synthesis in healthy controls but ineffective at suppressing platelet thromboxane formation in the majority of post-CABG patients.[2,5] This observation reflects the phenomenon of platelet resistance during the post-CABG period, which is believed to be due to the effects of cardiopulmonary bypass and surgical trauma.[2,5] Therefore, current scientific guidelines prefer a higher aspirin dosage (>100 mg/d) early after CABG to improve graft patency.[2]

In the study by Zhao and colleagues, the dosage of aspirin administered in the aspirin alone group may have been suboptimal, which could have confounded their findings by favoring the ticagrelor plus aspirin group. Furthermore, any new therapy must be compared with the currently best available therapy, which was not done in this study.[2] Therefore, the generalizability of these findings is of potential concern.

Rahman Shah, MD
Kirstin Hesterberg, DO

**Author Affiliations:** Division of Cardiology, University of Tennessee School of Medicine, Memphis.

**Corresponding Author:** Rahman Shah, MD, Section of Cardiovascular Medicine, University of Tennessee School of Medicine, 1030 Jefferson Ave, Memphis, TN 38104 (shahcardiology@yahoo.com).

**Conflict of Interest Disclosures:** The authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest and none were reported.

1. Zhao Q, Zhu Y, Xu Z, et al. Effect of ticagrelor plus aspirin, ticagrelor alone, or aspirin alone on saphenous vein graft patency 1 year after coronary artery bypass grafting: a randomized clinical trial. *JAMA.* 2018;319(16):1677-1686. doi:10.1001/jama.2018.3197

2. Kulik A, Ruel M, Jneid H, et al. Secondary prevention after coronary artery bypass graft surgery: a scientific statement from the American Heart Association. *Circulation.* 2015;131(10):927-964. doi:10.1161/CIR.0000000000000182

3. Goldman S, Copeland J, Moritz T, et al. Improvement in early saphenous vein graft patency after coronary artery bypass surgery with antiplatelet therapy: results of a Veterans Administration Cooperative Study. *Circulation.* 1988;77(6):1324-1332. doi:10.1161/01.CIR.77.6.1324

4. Lim E, Ali Z, Ali A, et al. Indirect comparison meta-analysis of platelet therapy after coronary surgery. *BMJ.* 2003;327(7427):1309. doi:10.1136/bmj.327.7427.1309

5. Zimmermann N, Kienzle P, Weber AA, et al. Aspirin resistance after coronary artery bypass grafting. *J Thorac Cardiovasc Surg.* 2001;121(5):982-984. doi:10.1067/mtc.2001.111416

**To the Editor** The Different Antiplatelet Therapy Strategy After Coronary Artery Bypass Graft Surgery (DACAB) trial provides needed insight into the utility of dual antiplatelet therapy (DAPT) with ticagrelor as the second agent in patients undergoing CABG.[1] The current American Heart Association and American College of Cardiology (AHA/ACC) guideline is based on limited evidence and restricted to resumption of DAPT in patients who present with acute coronary syndrome. Consequently, intersurgeon variability in DAPT use is high with a relatively low rate of DAPT use.[2]

Several trial characteristics deserve attention in evaluating the clinical applicability of the findings.

© 2018 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Anna Ferrari on 10/19/2022

Compendium_Donohue
Page 013

Opinion



# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.


Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201


Supplemental content

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an outsized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required submachine guns and other firearms capable of fully

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semiautomatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Anna Ferrari on 10/19/2022

Compendium_Donohue
Page 014

Opinion   Viewpoint

### Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade when the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved between weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

### The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shooting in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semi-automatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

### Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

### Conclusions

In 2017, the New York Times polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger ever since then.[10]

ARTICLE INFORMATION

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

REFERENCES

**1.** Cook PJ, Goss KA. The Gun Debate: What Everyone Needs to Know. 2nd ed. Oxford University Press; 2020.

**2.** Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3.** Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4.** Smart R, Morral AR, Smucker S, et al. The Science of Gun Policy. RAND; 2020.

**5.** Duwe G. Patterns and prevalence of lethal mass violence. Criminol Public Policy. 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6.** Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7.** Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://www.theviolenceproject.org/mass-shooter-database/

**8.** Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9.** Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. JAMA. 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10.** Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by Anna Ferrari on 10/19/2022

Compendium_Donohue
Page 015

# LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS

**U.S. Department of Justice**
**Federal Bureau of Investigation**





# ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN
# 2021

MAY 2022



# Acknowledgements

This report was written by the FBI Office of Partner Engagement in collaboration with the FBI Criminal Investigative Division, the FBI Critical Incident Response Group, and the Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University.[1]

This report is in the public domain. Authorization to reproduce this publication in whole or in part is granted. The accompanying citation is as follows: *Active Shooter Incidents in the United States in 2021*, Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C., and the Advanced Law Enforcement Rapid Response Training (ALERRT) Center at Texas State University, published 2022.





The FBI and the ALERRT Center support the *Don't Name Them* campaign. This campaign encourages media, law enforcement, and public information officers to shift their focus from the perpetrators of active shooter incidents toward the victims, survivors, and heroes who stopped them, as well as the communities that come together to help in the healing process. To learn more, visit dontnamethem.org.

---

1    This report supplements the previous publications: Blair, J. Pete, and Schweit, Katherine W. (2014). *A Study of Active Shooter Incidents 2000–2013*, Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2014; *Active Shooter Incidents in the United States in 2014 and 2015*, Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2016; *Active Shooter Incidents in the United States in 2016 and 2017*, Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2018; *Active Shooter Incidents in the United States in 2018*, Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2019; *Active Shooter Incidents in the United States in 2019*, Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2020; *Active Shooter Incidents in the United States in 2020*, and Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2021.

# Introduction

The FBI has designated 61 shootings[2] in 2021 as active shooter incidents.

The FBI defines an active shooter as one or more individuals actively engaged in killing or attempting to kill people in a populated area.[3] Implicit in this definition is the shooter's use of a firearm. The *active* aspect of the definition inherently implies the ongoing nature of an incident, and thus the potential for the response to affect the outcome.

The FBI works proactively to identify incidents that meet the scope of this study, using internal FBI holdings and repositories, official law enforcement reports (when obtainable), as well as open-source data. However, there is no mandated database collection or central intake point for reporting active shooter incidents, which exists for other crimes.

The active shooter incident research in this report is valid as of March 25, 2022. If additional incidents meeting FBI criteria are identified after the publication of this document, every effort will be made to factor those incidents into future reporting.

When evaluating shooting incidents to determine if they met the FBI's active shooter definition, researchers considered for inclusion:

- Shootings in public places
- Shootings occurring at more than one location
- Shootings where the shooter's actions were not the result of another criminal act
- Shootings resulting in a mass killing[4]

- Shootings indicating apparent spontaneity by the shooter
- Shootings where the shooter appeared to methodically search for potential victims
- Shootings that appeared focused on injury to people, not buildings or objects

This report does not encompass all gun-related shootings. A gun-related incident was excluded if research established it was the result of:

- Self-defense
- Gang violence
- Drug violence
- Contained residential or domestic disputes
- Controlled barricade/hostage situations
- Crossfire as a byproduct of another ongoing criminal act
- An action that appeared not to have put other people in peril

This methodology was first articulated in *A Study of Active Shooter Incidents in the United States Between 2000 and 2013* and was applied to the 2021 shooting incidents for consistency.[5]

This report is part of a series of FBI active shooter-related products published since September 2014. These reports are not intended to explore all facets of active shooter incidents but rather intended to provide law enforcement officers, other first responders, corporations, educators, and the public with a baseline understanding of active shooter incidents.

---

2    See pages 21–28 for incident summaries.
3    U.S. federal government agencies define an active shooter as "an individual actively engaged in killing or attempting to kill people in a confined and populated area." The FBI expands this definition to include more than one individual in an incident and omits the word confined as the term excludes incidents that occurred outside buildings.
4    The federal definition of "mass killing" is defined as "three or more killings in a single incident." Derived from Investigative Assistance for Violent Crimes Act of 2012, 28 USC § 530C(b)(1)(M)(i)
5    Blair, J. Pete, and Schweit, Katherine W. (2014). *A Study of Active Shooter Incidents 2000–2013*, Texas State University and Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2014.

Compendium_Donohue
Page 019



# Incident Statistics

## *Active Shooter Incidents 2017–2021*



**Figure 1**

## Summary

For the period 2017–2021, active shooter incident data reveals an upward trend: the number of active shooter incidents identified in 2021 represents a 52.5% increase from 2020 and a 96.8% increase from 2017.

A breakdown of the number of incidents within the five-year period 2017–2021[6] is as follows:

- 2017: 31
- 2018: 30
- 2019: 30
- 2020: 40
- 2021: 61

---

6    See *Active Shooter Incidents 20-Year Review, 2000–2019* for additional details; Federal Bureau of Investigation, U.S. Department of Justice, Washington, D.C. 2020; and *Active Shooter Incidents in the United States in 2020*.

Compendium_Donohue
Page 020

## By the Numbers, a Comparison of 2020 vs. 2021 Statistics

| 2020 | | 2021 |
|---|---|---|
| **40** in 19 states | Total Incidents | **61** in 30 states* |
| **164** 38 killed 126 wounded | Casualties (Excluding Shooters) | **243** 103 killed 140 wounded |
| **1** | Law Enforcement Officers Killed | **2** |
| **11** | Law Enforcement Officers Wounded | **5** |
| **5** | Met "Mass Killing" Definition | **12** |
| **8** | Incidents Where Law Enforcement Engaged Shooters | **17** |
| **42** 35 male 3 female 4 unspecified | Shooters / Gender | **61** 60 male 1 female |
| **1** | Shooters Wore Body Armor | **2** |
| **7** | Shooters Committed Suicide | **11** |
| **4** | Shooters Killed by Law Enforcement | **14** |
| **2** | Shooters Killed by Citizen | **4** |
| **24** 5 at large | Shooters Apprehended by Law Enforcement | **30**** 1 at large |

= Decreased metrics
= Increased metrics

*Two incidents occurred in two states
**One shooter was killed in a vehicle crash and does not fit into any other shooter-resolution categories*

**Figure 2**



## 2021 Active Shooter Incidents by Month



**Figure 3**

## Summary

December had the fewest number of incidents (one), and similar to 2020, June had the highest number of incidents (12).[7] When compared to 2020, April saw the biggest increase in incidents (from zero to 10). A breakdown of number of incidents by month is as follows:

- January: **3**
- February: **2**
- March: **5**
- April: **10**
- May: **5**
- June: **12**
- July: **4**
- August: **7**
- September:
- October: **2**
- November: **4**
- December: **1**



**Figure 4**

## Summary

Unlike 2020, Active Shooter incidents occurred every day of the week. Like 2020, Saturdays saw the most incidents (14). A breakdown of number of incidents by day of the week follows:

- Sunday: **6**
- Monday: **7**
- Tuesday: **12**
- Wednesday: **7**
- Thursday: **11**
- Friday: **4**
- Saturday: **14**

---

7    June 2020 had eight incidents.

ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN **2021**

## 2021 Active Shooter Incidents by Time of Day



**Figure 5**

## Summary

Of the 61 active shooter incidents in 2021, 55.7% (34 incidents) occurred during p.m. hours (between 12:00 p.m. and 11:59 p.m.), and 44.3% (27 incidents) occurred during a.m. hours (between 12:00 a.m. and 11:59 a.m.). Data shows that an active shooter incident is more likely to occur (63.9%) between 6:00 a.m. and 5:59 p.m. (39 incidents occurred during this timeframe).

A breakdown of number of incidents by time is as follows:

- 12:00 a.m. to 5:59 a.m.: **11**
- 6:00 a.m. to 11:59 a.m.: **16**
- 12:00 p.m. to 5:59 p.m.: **23**
- 6:00 p.m. to 11:59 p.m.: **11**

## 2021 Active Shooter Incidents by Location, Including Mass Killings



**Figure 6**

## Summary

The 61 active shooter incidents in 2021 occurred in 30 states.[8]

- Six incidents occurred in **California**.
- Five incidents each occurred in **Georgia**[9] and **Texas**.
- Four incidents each occurred in **Colorado** and **Florida**.
- Three incidents each occurred in **Indiana, Michigan, North Carolina,** and **Tennessee**.

- Two incidents each occurred in **Alabama, Arizona, Illinois, Maryland, Nevada,** and **South Carolina**.
- One incident each occurred in **Arkansas, Connecticut, Idaho, Kansas, Kentucky, Louisiana, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, New York, Ohio, Pennsylvania,** and **Wisconsin**.

Twelve of the 61 incidents met the criteria cited in the federal definition of mass killings[10] (three or more killings in a single incident).[11]

---

8   Two separate incidents occurred in two states (Various locations, Richmond County, Wrens, GA, and Graniteville, SC; and Various locations, Phenix City, AL, and Columbus, GA). When an incident occurred in two or more states, it was counted only once (in the state where the FBI identified that the public was most at risk).
9   Two of the five incidents occurred in multiple states—incident nos. 29 and 44.
10   Investigative Assistance for Violent Crimes Act of 2012, 28 USC § 530C(b)(1)(M)(i).
11   The statute does not address the inclusion or exclusion of the shooter. The FBI does not include the shooter in its mass killing statistics.



# Casualties

The 61 active shooter incidents reviewed in this report resulted in 243 total casualties (103 killed and 140 wounded,[12] excluding the shooters). The incidents with the highest number of total casualties (15 with eight killed and seven wounded) occurred at FedEx Ground Plainfield Operations Center, Indianapolis, Indiana, and (15 with one person killed and 14 people wounded) at Kroger Grocery Store, Collierville, Tennessee.

The incident with the highest number killed (10) occurred at King Soopers Grocery Store, Boulder, Colorado.

## *2021 Active Shooter Locations with Five Highest Casualty Counts*



**Figure 7**

## Summary

A breakdown of the incidents/locations with the five highest total casualty counts is as follows:

- FedEx Ground Plainfield Operations Center, Indianapolis, Indiana: eight killed, seven wounded **(15)**
- Kroger Grocery Store, Collierville, Tennessee: one killed, 14 wounded **(15)**
- Various locations in Phoenix, Arizona: one killed, 12 wounded **(13)**
- Oxford High School, Oxford, Michigan: four killed, seven wounded **(11)**
- King Soopers Grocery Store, Boulder, Colorado: 10 killed **(10)**

---

12   A number of those identified as wounded were not injured by gunfire but rather suffered injuries incidental to the shooting, such as being hit by flying objects/shattered glass or falling while running. For purposes of this study, the FBI sought to isolate the exact number of individuals who fell into this category when research permitted.



## *Active Shooter Incidents 2017–2021 Total Casualties*



*The Route 91 Harvest Festival shooting impacts the 2017 casualty count (56 killed, 489 wounded).

**Figure 8**

## Summary

The total casualty count for 2021 (243) is below the average for the period 2017–2020 (345.25),[13] but exceeded casualties in 2020 (164) with a 48 percent increase. The 2021 numbers represent the third highest total casualty count over the last five years (2017–2021).

A breakdown of the number of total casualties for the 2017–2021 period is as follows:

- 2017: **734**
- 2018: **225**
- 2019: **258**
- 2020: **164**
- 2021: **243**

---

13   The average number of casualties for the 2017–2020 period is 345.25 per year, a figure amplified by the atypical Route 91 Harvest Festival shooting incident in Las Vegas, NV (56 killed, 489 wounded).

## Active Shooter Incidents 2017–2021 Total Killed and Wounded



*The Route 91 Harvest Festival shooting impacts the 2017 casualty count (56 killed, 489 wounded).

**Figure 9**

## Summary

The highest number of deaths from an active shooter incident in 2021 occurred at the King Soopers Grocery Store, Boulder, Colorado, where 10 people were killed. The second highest number of deaths occurred at Santa Clara Valley Transportation Authority Rail Yard, San Jose, California, where nine people were killed. 2021 saw the **highest number** of deaths since 2017, and a **171.1 percent increase** from 2020. 2021 deaths **were above the average (92.3)** for the period 2017–2020. There was a **11.1 percent increase** in people wounded in 2021 compared with 2020. In 2021 the **number of wounded was below the average (253)** for the period 2017–2020. A breakdown of the number of people killed and wounded for the 2017–2021 period is as follows:

- 2017: **143 killed, 591 wounded**[14]
- 2018: **86 killed, 139 wounded**
- 2019: **102 killed, 156 wounded**
- 2020: **38 killed, 126 wounded**
- 2021: **103 killed, 140 wounded**

---

14   2017 includes the Route 91 Harvest Festival in Las Vegas, NV (56 killed, 489 wounded).



# Law Enforcement/Security Personnel Engagement and Casualties

In 17 incidents,[15] law enforcement engaged the shooter. In four of those incidents, law enforcement sustained injuries (one was killed and three were wounded from gunfire).

- In one incident, the first officer to arrive at the scene was shot and killed as he engaged the shooter.[16]

- In one incident, a law enforcement officer was wounded after being shot in the chest during an exchange of gunfire (a protective vest stopped the bullet).[17]

- In one incident, a responding officer was shot in the arm during an exchange of gunfire.[18]

- In one incident, a law enforcement officer was shot in the abdomen during an exchange of gunfire. The wounded officer returned fire, killing the shooter.[19]

In one incident, security personnel engaged the shooter and sustained injuries.

- Two security officers were wounded during an exchange of gunfire with an armed employee.[20]

# Citizen Engagement and Casualties

In two incidents,[21] citizens engaged the shooter. In one incident citizens sustained injuries.

- In one incident,[22] seven employees exchanged multiple volleys of gunfire with the shooter, four of them during the final encounter resulting in the death of the shooter.

Two people were killed (one customer and one employee) and two employees were wounded (one was shot in the arm and one in the leg). The shooter was killed at the scene by armed employees.

---

15   Various locations in Chicago and Evanston, IL; Various locations, Houston, TX; King Soopers Grocery Store, Boulder, CO; Unspecified commercial office complex, Orange, CA; San Antonio International Airport, San Antonio, TX; Various locations, Fullerton, CA; Oneida Casino, Green Bay, WI; Various locations, Indianapolis, IN; Winston-Salem Police Department District One Office, Winston-Salem, NC; Various locations, Winthrop, MA; Various locations, Cleveland Park, Spartanburg, SC; Various locations, Tucson, AZ; Palace Inn Motel, Houston, TX; Mt. Zion Church, Scott County, MS; Specified residential locations, Lakeland, FL; Kalamazoo Transportation Center, Kalamazoo, MI; Various locations, Denver, CO.
16   King Soopers Grocery Store, Boulder, CO.
17   Various locations, Indianapolis, IN.
18   Various locations, Cleveland Park, Spartanburg, SC.
19   Various locations, Denver, CO.
20   Smile Direct Club Facility, Antioch, TN; security officers wounded are not included in law enforcement wounded numbers.
21   Jefferson Gun Outlet, Metairie, LA, and Three Corners Townhouses, Fort Smith, AR.
22   Jefferson Gun Outlet, Metairie, LA.



# Other Citizen Involvement

2021 witnessed an increase in incidents where citizen involvement impacted the engagement.[23] In four incidents,[24] citizens confronted the shooter, thereby resulting in the incident ending.

- In one incident, two citizens confronted and tackled a shooter until law enforcement officers arrived.[25]

- In one incident, a teacher disarmed and detained the shooter (a student) until law enforcement arrived.[26]

- In one incident, an armed citizen shot and killed a gunman who had just ambushed a law enforcement officer.[27]

- In one incident, an armed employee shot and killed the shooter (an employee terminated earlier in the day).[28]

---

23   The FBI promotes Run, Hide, Fight protocol(s). See fbi.gov/survive for additional details.
24   Gaslamp Quarter, San Diego, CA; Rigby Middle School, Rigby, ID; Old Town Arvada, Arvada, CO; and Agrex Elevator, Superior, NE.
25   Gaslamp Quarter, San Diego, CA.
26   Rigby Middle School, Rigby, ID.
27   Old Town Arvada, Arvada, CO.
28   Agrex Elevator, Superior, NE.



# Locations[29]










| Commerce: | Education: | Government: | Open Space: | Residence: | Houses of Worship: | Health Care: | Other: |
|-----------|------------|-------------|-------------|------------|---------------------|-------------|--------|
| **32** | **2** | **3** | **19** | **3** | **1** | **1** | **0** |

 Thirty-two of the 61 active shooter incidents occurred in areas of **commerce**, resulting in 68 killed and 72 wounded.

- Twenty-eight incidents[30] occurred in business environments **open** to pedestrian traffic, resulting in 57 killed, including three managers,[31] 17 employees,[32] two law enforcement officers,[33] and one security officer.[34] Fifty-four were wounded, including 17 employees,[35] and one law enforcement officer.[36] One of the shooters was known to be an employee of the business.[37] Two shooters were former employees,[38] one a former business owner,[39] and one was an employee of a third party vendor within an identified business.[40]

---

29   In *A Study of Active Shooter Incidents in the United States Between 2000 and 2013*, the FBI identified 11 locations where the public was most at risk during an incident. These locations include commercial areas (divided into businesses open to pedestrian traffic, businesses closed to pedestrian traffic, and malls), education environments (divided into schools [pre-kindergarten through 12th grade] and institutions of higher learning), open spaces, government properties (divided into military and other government properties), residences, houses of worship, and health care facilities. In 2018, the FBI identified an additional location category (other location) to capture incidents that occurred in venues other than the 11 previously identified locations.
30   Various locations in Chicago and Evanston, IL; Jefferson Gun Outlet, Metairie, LA; Various locations, Acworth, Atlanta, GA; King Soopers Grocery Store, Boulder, CO; Various locations, Baltimore County, MD; Unspecified commercial office complex, Orange, CA; Snappy Mart Convenience Store, Koshkonong, MO; 241 North Main Street, Branford, CT; San Antonio International Airport, San Antonio, TX; Stop & Shop Store, West Hempstead, NY; Wawa Gas Station, Allentown, PA; Oneida Casino, Green Bay, WI; Azuza Hookah Bar and Lounge, Houston, TX; Publix Grocery Store, Royal Palm Beach, FL; Old Town Arvada, Arvada, CO; Walmart Supercenter #1217, Franklin, NC; Gallops Gas Station, Kendallville, IN; Palace Inn Motel, Houston, TX; Marathon Gas Station and Tony's Gas Station, Toccoa, GA; La Cerveceria de Barrio Restaurant , Miami Beach, FL; Enigma Club & Lounge, Wichita, KS; Elks Lodge 473, Colorado Springs, CO; Kroger Grocery Store, Collierville, TN; Various Unspecified Locations, Los Angeles, CA; Agrex Elevator, Superior, NE; Chevron Gas Station, Las Vegas, NV; Kalamazoo Transportation Center, Kalamazoo, MI; Various locations, Denver, CO.
31   Stop & Shop Store, West Hempstead, NY; Elks Lodge 473, Colorado Springs, CO.
32   Jefferson Gun Outlet, Metairie, LA; Various locations, Acworth, Atlanta, GA; Oneida Casino, Green Bay, WI; Agrex Elevator, Superior, NE; Various locations, Denver, CO.
33   King Soopers Grocery Store, Boulder, CO; Old Town Arvada, Arvada, CO.
34   Various locations in Chicago and Evanston, IL.
35   Jefferson Gun Outlet, Metairie, LA; Various locations, Baltimore County, MD; Stop & Shop Store, West Hempstead, NY; Oneida Casino, Green Bay, WI; Kroger Grocery Store, Collierville, TN; Agrex Elevator, Superior, NE.
36   Various locations, Denver, CO.
37   Stop & Shop Store, West Hempstead, NY.
38   Oneida Casino, Green Bay, WI; Agrex Elevator, Superior, NE.
39   Various locations, Denver, CO.
40   Kroger Grocery Store, Collierville, TN.

Compendium_Donohue
Page 030

- Of the 28 shooters, one wore body armor.[41] Twelve shooters were apprehended by law enforcement (three at the scene and nine at other locations), five shooters were killed by law enforcement at the scene, one shooter was killed by law enforcement at another location, three shooters were killed by an armed citizen at the scene before law enforcement arrived.[42] Two shooters committed suicide at the scene before law enforcement arrived, two shooters committed suicide at the scene after law enforcement arrived, and two shooters committed suicide at another location, before law enforcement arrived. At the time of this report, one shooter remains at large.[43]

- For 2021, there was one incident in which no casualties were reported.[44]

- Four incidents[45] occurred in business environments **closed** to pedestrian traffic, resulting in 11 killed, all employees. Eighteen were wounded, including 15 employees,[46] one law enforcement officer,[47] and two security officers.[48] Three shooters were employees,[49] and one shooter was a previous employee.[50]

- Of the four shooters, none wore body armor. One shooter was killed by law enforcement at the scene, one shooter was apprehended by law enforcement at another location, one

shooter committed suicide at the scene after law enforcement arrived, and one shooter committed suicide at another location before law enforcement arrived.

 Two[51] of the 61 incidents occurred at **education** locations, resulting in four killed (students)[52] and ten wounded (eight students, two employees).

- Of the two shooters, none wore body armor. One shooter was apprehended by law enforcement at the scene; one shooter was apprehended by law enforcement at the scene, after being restrained by an unarmed citizen.

 Three[53] of the 61 incidents occurred on **government property** locations, resulting in nine killed (employees)[54] and two wounded.

- Of the three shooters, none wore body armor. One shooter was killed by law enforcement at the scene, one shooter was apprehended by law enforcement at another location after an exchange of gunfire, and one shooter committed suicide at the scene after law enforcement arrived.

- For 2021, there was one incident in which no casualties were reported.[55]

---

41   King Soopers Grocery Store, Boulder, CO.
42   Agrex Elevator, Superior, NE.; Jefferson Gun Outlet, Metairie, LA; Old Town Arvada, Arvada, CO. In two of these incidents the armed citizen was an employee (Metairie, LA, and Superior, NE).
43   Azuza Hookah Bar and Lounge, Houston, TX.
44   Walmart Supercenter #1217, Franklin, NC.
45   Kent Moore Cabinets Corporate, Bryan, TX; FedEx Ground Plainfield Operations Center, Indianapolis, IN; Mueller Manufacturing Company, Albertville, AL; Smile Direct Club Facility, Antioch, TN.
46   Kent Moore Cabinets Corporate, Bryan, TX; FedEx Ground Plainfield Operations Center, Indianapolis, IN; Mueller Manufacturing Company, Albertville, AL; Smile Direct Club Facility, Antioch, TN.
47   Kent Moore Cabinets Corporate, Bryan, TX.
48   Smile Direct Club Facility, Antioch, TN.
49   Kent Moore Cabinets Corporate, Bryan, TX; Mueller Manufacturing Company, Albertville, AL; Smile Direct Club Facility, Antioch, TN.
50   FedEx Ground Plainfield Operations Center, Indianapolis, IN.
51   Rigby Middle School, Rigby, ID; Oxford High School, Oxford, MI.
52   Oxford High School, Oxford, MI.
53   Riverside Tech Park/Fort Detrick, Frederick, MD; Santa Clara Valley Transportation Authority Rail Yard, San Jose, CA; Winston-Salem Police Department District One Office, Winston-Salem, NC.
54   Santa Clara Valley Transportation Authority Rail Yard, San Jose, CA . The victims included transit employees and union members representing Valley Transportation Authority workers when the shooting began. All those killed were categorized as VTA employees by law enforcement sources (see: https://countysheriff.sccgov.org.)
55   Winston-Salem Police Department District One Office, Winston-Salem, NC.



 Nineteen[56] of the 61 incidents occurred in **open space** locations, resulting in 15 killed, including one emergency medical technician. Fifty-one people were wounded. The wounded included three law enforcement officers,[57] one security officer,[58] and two emergency personnel.[59]

- Of the 19 shooters, none wore body armor. Four shooters were apprehended by law enforcement at the scene, one shooter was apprehended by law enforcement at the scene after being restrained by citizens, and six shooters were apprehended by law enforcement at another location. Five shooters were killed by law enforcement at the scene, two shooters committed suicide at the scene before law enforcement arrived, and one shooter was killed at another location in a vehicle crash.

- For 2021, there was one incident in which no casualties were reported.[60]

 Three[61] of the 61 incidents occurred at **residence(s)** locations, resulting in six killed and one wounded.

- Of the three shooters, one wore body armor.[62] Two shooters were apprehended by law enforcement at the scene after an exchange of gunfire, and one shooter was killed at the scene by an armed citizen.

 One[63] of the 61 incidents occurred at a **house of worship** location with no casualties reported.

- One shooter did not wear body armor and was killed by law enforcement at the scene.

 One[64] of the 61 incidents occurred at a **health care** location, resulting in one killed and four wounded.

- One shooter did not wear body armor and was apprehended by law enforcement at the scene.

- Four IEDs were discovered by law enforcement at the scene. Two had detonated, and two were recovered and rendered safe.

⚙ None of the 61 incidents occurred in the following location during 2021:

- **Other** locations

---

56   Various locations, Columbus, OH; Various locations, Austin, IL; Gaslamp Quarter, San Diego, CA; Various locations, Fullerton, CA; Various locations, Indianapolis, IN; Various locations, Atlanta, GA; Various locations, Phenix City, AL, and Columbus, GA; Various locations, Phoenix, AZ; Lock 4 Park, Gallatin, TN; Various locations, Winthrop, MA; Various locations, Cleveland Park, Spartanburg, SC; Various locations, Boone, NC; Various locations, Tucson, AZ; Various locations, Richmond County, Wrens, GA and Graniteville, SC; South Beach Pier, South Haven, MI; Redondo Beach Pier, Redondo Beach, CA; Various locations, Las Vegas, NV; Various locations (Le Palace nightclub and unspecified neighborhood), Orlando, FL; Interstate 65, Louisville, KY.
57   Various locations, Austin, IL; Various locations, Indianapolis, IN; Various locations, Cleveland Park, Spartanburg, SC.
58   Various locations (Le Palace nightclub and unspecified neighborhood), Orlando, FL.
59   Various locations, Tucson, AZ.
60   Various locations, Columbus, OH.
61   Various locations, Houston, TX; Three Corners Townhouses, Fort Smith, AR; Specified residential locations, Lakeland, FL.
62   Specified residential locations, Lakeland, FL.
63   Mt. Zion Church, Scott County, MS.
64   Allina Health Clinic, Buffalo, MN.



# The Shooters

Sixty-one shooters carried out 61 active shooter incidents.[65] Sixty shooters were male, and one was female. Sixty shooters acted alone.[66]

The youngest shooter was 12 years old; the oldest was 67 years old. Other details about the shooters are as follows:

- Two shooters wore body armor.[67]
- One shooter had four IEDs.[68]
- Thirty of the shooters were apprehended by law enforcement (13[69] at the scene and 17 at another location).
- Fourteen shooters were killed by law enforcement (13 at the scene and one at another location).

- Four shooters were killed by armed citizens.
- One shooter was killed at another location in a vehicle crash.
- Eleven shooters committed suicide (four at the scene before law enforcement arrived, four at the scene after law enforcement arrived, and three at another location before law enforcement arrived).
- One shooter remains at large.
- Six shooters were employees,[70] four shooters were former employees,[71] two shooters were current students,[72] two shooters had past personal or professional relationships,[73] and one shooter was a business owner. [74]

---

65   For the Azuza Hookah Bar and Lounge shooting, Houston, TX, the exact number of shooters remains unknown; however, one shooter has been factored into the total number of shooters for this incident (reference: Houston Police Department Incident Update, incident #076598521 dated June 8, 2021).
66   FBI can confirm that 60 shooters acted alone; however, in the Azuza Hookah Bar and Lounge shooting incident, Houston, TX, the exact number of shooters remains unknown.
67   King Soopers Grocery Store, Boulder, CO; Specified residential locations, Lakeland, FL.
68   Allina Health Clinic, Buffalo, MN. Four IEDs were discovered by law enforcement at the scene. Two had detonated, and two were recovered and rendered safe.
69   Two of the shooters were apprehended by law enforcement at the scene after being restrained by citizens (Gaslamp Quarter, San Diego, CA; Rigby Middle School, Rigby, ID).
70   Riverside Tech Park/Fort Detrick, Frederick, MD; Kent Moore Cabinets Corporate, Bryan, TX; Stop & Shop Store, West Hempstead, NY; Santa Clara Valley Transportation Authority Rail Yard, San Jose, CA; Mueller Manufacturing Company, Albertville, AL; and Smile Direct Club Facility, Antioch, TN.
71   FedEx Ground Plainfield Operations Center, Indianapolis, IN; Oneida Casino, Green Bay, WI; Kroger Grocery Store, Collierville, TN; and Agrex Elevator, Superior, NE.
72   Rigby Middle School, Rigby, ID, and Oxford High School, Oxford, MI.
73   Unspecified commercial office complex, Orange, CA, and Various locations, Denver, CO.
74   Elks Lodge 473, Colorado Springs, CO.

ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN **2021**

16



## 2021 Active Shooters by Gender



**Figure 10**

### Summary

A breakdown of the number of shooters by gender follows:

- Male: **60**[75]
- Female: **1**

## 2021 Active Shooters by Age Group



**Figure 11**

### Summary

A breakdown of the number of shooters by age group follows:

- 18 and younger: **2**
- 19–24: **14**
- 25–34: **18**

- 35–44: **10**
- 45–54: **9**
- 55–64: **6**
- 65–74: **1**
- Unknown: **1**

---

75    FBI can confirm that 60 shooters acted alone; however, in the Azuza Hookah Bar and Lounge shooting incident, Houston, TX, the exact number of shooters remains unknown.

## 2021 Active Shooters by Incident Resolution



**Figure 12**

## Summary

A breakdown of the incident resolutions for active shooters follows:

- Apprehended: **30**
- Killed: **19\***
- Suicide: **11**
- At large: **1**

*\*One shooter was killed in a vehicle crash and does not fit into any other shooter-resolution categories.*



# Recap and Conclusion

In 2021, the FBI designated 61 shootings as active shooter incidents. In these incidents, 103 people were killed and 140 wounded, excluding the shooters. The highest number of casualties (eight killed and seven wounded) occurred at FedEx Ground Plainfield Operations Center, Indianapolis, Indiana. The second highest number of casualties (one killed, 14 wounded) occurred at Kroger Grocery Store, Collierville, Tennessee. The incident with the highest number killed (10) occurred at King Soopers Grocery Store, Boulder, Colorado.

Across the 61 incidents, two law enforcement officers were killed, and five law enforcement officers were wounded. The overall total for law enforcement officers killed and wounded (seven) is equal to the number killed and wounded in 2017.[76] Those are the lowest figures in five years (2017–2021).

The 61 incidents were carried out by 61 shooters. Sixty shooters were male, and one was female. Individual shooters carried out all the incidents.[77] The age range of the shooters was 12 years old to 67 years old. Two shooters wore body armor. Thirty shooters were apprehended by law enforcement, 14 shooters were killed by law enforcement, four shooters were killed by armed citizens, one shooter was killed in a vehicle accident during a law enforcement pursuit, 11 shooters committed suicide, and one shooter remains at large.

In two of the incidents, citizens engaged gunfire with the shooter. In one incident, the shooter was killed, two citizens were killed, and two citizens were wounded. In four incidents, citizens (armed and unarmed) confronted the shooter and ended the incident. In one incident, two citizens tackled and restrained a shooter until law enforcement arrived. In one incident, a teacher disarmed and detained the shooter (student) until law enforcement arrived. In one incident, an armed citizen shot and killed the shooter (who had just

ambushed a law enforcement officer). In one incident, an armed employee shot and killed an employee who had been fired earlier in the day.

Thirty-two active shooter incidents occurred in **commerce-related environments (open and closed).** The locations range from grocery stores to manufacturing sites. Four shooters were employees, three shooters were former employees, one was a former business owner, and one was an employee of a third-party vendor within the affected business. In 23 incidents, the relationship between the shooter and the impacted business is unspecified.

Two incidents occurred at **education** locations, including one at a middle school and one at a high school. Both shooters were students.

Three incidents occurred on **government property** locations, including one at a police department, one at a U.S. Army facility, and one at a railyard. Two of the three shooters were employees.

Nineteen incidents occurred in **open space** locations, including interstate highways, public beaches, public parks, and public roads.

Three incidents occurred in **residences**, two in residential neighborhoods (i.e., house/townhouse) and one at an apartment complex.

One incident occurred at a **house of worship** location. The incident occurred outside of a church.

One incident occurred at a **health care** location. The incident occurred inside a clinic.

Active shooter incidents in 2021 (61) increased by 52.5 percent compared with 2020 (40) and 96.8 percent compared with 2017 (31). 2021 witnessed the highest number of active shooter incidents for the years 2000–2021.[78]

---

76   In 2017, law enforcement casualties were four killed and three wounded.

77   FBI can confirm that 60 shooters acted alone; however, for the Azuza Hookah Bar and Lounge shooting incident, Houston, TX, the exact number of shooters remains unknown.

78   See *Active Shooter Incidents 20-Year Review, 2000–2019* and *Active Shooter Incidents in the United States 2020* for details.

Compendium_Donohue
Page 036



Casualty counts are higher for 2021 (243) when compared with 2020 (164), indicating a 48 percent increase. The casualties in 2021 represents the third highest total casualty count over the last five years (2017–2021). 2021 saw the highest number of deaths (103) since 2017, a 171.1 percent increase from 2020 and above the average (92.3) for the period 2017–2020. There was an 11.1 percent increase in people wounded (140) in 2021 compared with 2020 (126), but below the average (253) for the period 2017–2020.

Twelve of the 61 incidents met the criteria cited in the federal definition of mass killings. For the period 2017–2021, the number of mass-killing incidents in 2021 are above the five-year average (10.25),[79] and a 140 percent increase over 2020.

For 2021, the FBI observed an emerging trend involving roving active shooters; specifically, shooters who shoot in multiple locations, either in one day or in various locations over several days.[80]

The FBI remains dedicated to assisting federal, state, local, tribal, and campus law enforcement in its active shooter prevention, response, and recovery efforts, as well as to training its international law enforcement partners. The FBI remains steadfast in its efforts to train private citizens, as it is imperative that citizens understand the risks faced and the resources available in an active shooter situation.

---

79   2017 (13), 2018 (10), 2019 (13), 2020 (5), and 2021 (12).
80   Approximately 27 incidents involved an active shooter shooting at people in multiple locations, either in one day or in various locations over several days.

Compendium_Donohue
Page 037



# 2021 Active Shooter Incident Summaries









| Commerce: **32** | Education: **2** | Government: **3** | Open Space: **19** | Residence: **3** | Houses of Worship: **1** | Health Care: **1** | Other: **0** |

As explained in the introduction to this report, the FBI evaluated and identified 61 active shooter incidents that occurred in 2021. Summaries of these incidents are listed below.



### 1.  Various locations in Chicago and Evanston, IL (Commerce)

 On January 9, 2021, at approximately 1:50 p.m., an identified male, 32, armed with a handgun, began a shooting spree from Chicago to Evanston, Illinois. Five people were killed (including a security guard); two people were wounded. The shooter was killed by law enforcement at the scene in Evanston, Illinois following an exchange of gunfire.

### 2.  Various locations, Columbus, OH (Open Space)

On January 25, 2021, at approximately 11:36 a.m., an identified male, 26, armed with a shotgun, began shooting at several people throughout the Columbus, Ohio area at various locations before leading police on a vehicle chase and crashing. There were no casualties reported. The shooter was killed in the crash.

### 3.  Various locations, Houston, TX (Residence)

 On January 25, 2021, at approximately 2:20 p.m., an identified male, 43, began shooting in a neighborhood in Houston, Texas. The shooter went to a nearby convenience store and fired several shots at bystanders. The shooter then walked around the neighborhood firing his gun. One person was killed. The shooter was apprehended by law enforcement at the scene following an exchange of gunfire.

### 4.  Allina Health Clinic, Buffalo, MN (Health Care)

On February 9, 2021, at approximately 10:54 a.m., an identified male, 67, armed with a handgun, began shooting inside the Allina Health Clinic in Buffalo, Minnesota. Four IEDs were planted at the scene, two detonated, and two were recovered and rendered safe. One person was killed; four people were wounded. The shooter was apprehended by law enforcement at the scene.

### 5.  Jefferson Gun Outlet, Metairie, LA (Commerce)

On February 20, 2021, at approximately 2:50 p.m., an identified male, 27, armed with a handgun, began shooting inside the Jefferson Gun Outlet, Metairie, Louisiana. Two people were killed (one employee); two people were wounded (employees). The shooter was killed by armed citizens (employees) during an exchange of gunfire at the scene.

### 6.  Various locations, Acworth, Atlanta, GA (Commerce)

On March 16, 2021, at approximately 4:58 p.m., an identified male, 21, armed with a handgun, began shooting inside Young's Asian Massage, Acworth, Georgia. At approximately 5:45 p.m., the identified male began shooting inside Gold Spa and Aromatherapy Spa, Atlanta, Georgia. Eight people (seven employees) were killed; one person was wounded. The shooter was apprehended by law enforcement at another location.



### 7. Various locations, Austin, IL (Open Space)

 On March 20, 2021, at approximately 11:30 a.m., an identified male, 29, armed with a handgun, began shooting in various locations in Austin, Illinois. Two people were wounded (including one law enforcement officer). The shooter was apprehended by law enforcement at the scene.

### 8. King Soopers Grocery Store, Boulder, CO (Commerce)

On March 22, 2021, at approximately 2:30 p.m., an identified male, 21, armed with a handgun, began shooting inside/outside the King Soopers Grocery Store, Boulder, Colorado. Ten people were killed (including one law enforcement officer). The shooter was apprehended by law enforcement at the scene following an exchange of gunfire.

### 9. Various locations, Baltimore County, MD (Commerce)

On March 28, 2021, at approximately 6 a.m., an identified male, 27, armed with a handgun, began shooting inside a residence in Baldwin, Maryland. The shooter then drove to the Royal Farms Store, Essex, Maryland and began shooting inside and outside the store. Four people were killed; one person (employee) was wounded. The shooter returned to his home and set fire to his apartment before committing suicide.

### 10. Unspecified Commercial Office Complex, Orange, CA (Commerce)

On March 31, 2021, at approximately 5:34 p.m., an identified male, 44, armed with a handgun, began shooting inside an unspecified commercial office complex in Orange, California. Four people were killed; one person was wounded. The shooter was apprehended by law enforcement at the scene following an exchange of gunfire.

### 11. Riverside Tech Park/Fort Detrick, Frederick, MD (Government)

 On April 6, 2021, at approximately 8:20 a.m., an identified male, 38, armed with a handgun and a rifle, began shooting outside a business in Riverside Tech Park, Frederick, Maryland. The shooter then fled to nearby Fort Detrick, Maryland. Two people were wounded. The shooter was killed by the Fort Detrick security guards at the scene.

### 12. Kent Moore Cabinets Corporate, Bryan, TX (Commerce)

On April 8, 2021, at approximately 2:30 p.m., an identified male, 27, armed with a handgun, began shooting inside Kent Moore Cabinets Corporate, Bryan, Texas. One person (employee) was killed; six people (five employees and one law enforcement officer) were wounded. The shooter was apprehended by law enforcement at another location.

### 13. Snappy Mart Convenience Store, Koshkonong, MO (Commerce)

On April 10, 2021, at approximately 5 a.m., an identified male, 28, armed with a handgun, began shooting inside and outside the Snappy Mart Convenience Store, Koshkonong, Missouri. One person was killed; three people were wounded. The shooter was apprehended by law enforcement at another location.

### 14. 241 Main Street, Branford, CT (Commerce)

On April 13, 2021, at approximately 12 p.m., an identified male, 38, armed with several handguns and rifles, began shooting outside 241 Main Street (situated in a commercial district), Branford, Connecticut. One person was wounded. The shooter committed suicide at the scene when confronted by law enforcement.



**15. San Antonio International Airport, San Antonio, TX (Commerce)**

On April 15, 2021, at approximately 2:30 p.m., an identified male, 46, armed with a handgun, began shooting outside the arrivals area of Terminal B, San Antonio International Airport, San Antonio, Texas. One person was wounded. The shooter committed suicide at the scene during an exchange of gunfire with law enforcement.

**16. FedEx Ground Plainfield Operations Center, Indianapolis, IN (Commerce)**

On April 15, 2021, at approximately 11 p.m., an identified male, 19, armed with two rifles, began shooting inside and outside the FedEx Ground Plainfield Operations Center, Indianapolis, Indiana. Eight people (employees) were killed; seven people (employees) were wounded. The shooter committed suicide at the scene as law enforcement arrived.

**17. Stop & Shop Store, West Hempstead, NY (Commerce)**

On April 20, 2021, at approximately 11:19 a.m., an identified male, 30, armed with a handgun, began shooting inside the Stop & Shop Store, West Hempstead, New York. One person (employee) was killed; two people (employees) were wounded. The shooter was apprehended by law enforcement at another location.

**18. Wawa Gas Station, Allentown, PA (Commerce)**

On April 21, 2021, at approximately 4:48 a.m., an identified male, 45, armed with a handgun, began shooting in the Wawa Gas Station parking lot, Allentown, Pennsylvania. One person was killed; one person was wounded. The shooter committed suicide at another location.

**19. Gaslamp Quarter, San Diego, CA (Open Space)**

On April 22, 2021, at approximately 10:30 p.m., an identified male, 32, armed with a handgun, began shooting in the Gaslamp Quarter, San Diego, California. One person was killed; four people were wounded. The shooter was apprehended by law enforcement at the scene after being restrained by two citizens.

**20. Various locations, Fullerton, CA (Open Space)**

On April 27, 2021, at approximately 1 a.m., an identified male, 50, armed with a handgun, began a series of drive-by shootings in various locations in Fullerton, California. Two people were killed; one person was wounded. The shooter was killed by law enforcement during an exchange of gunfire at the scene.

**21. Oneida Casino, Green Bay, WI (Commerce)**

On May 1, 2021, at approximately 7:27 p.m., an identified male, 62, armed with a handgun, began shooting inside the Oneida Casino (Duck Creek restaurant inside the Radisson Hotel & Conference Center) Green Bay, Wisconsin. Two people were killed (employees); one person was wounded (employee). The shooter was killed at the scene by law enforcement during an exchange of gunfire.

**22. Rigby Middle School, Rigby, ID (Education)**

On May 6, 2021, at approximately 9:08 a.m., an identified female, 12, armed with a handgun, began shooting inside and outside Rigby Middle School, Rigby, Idaho. Three people (including two students and a school employee) were wounded. The shooter was apprehended by law enforcement at the scene after being disarmed and restrained by a teacher.



### 23. Three Corners Townhouses, Fort Smith, AR (Residence)

 On May 15, 2021, at approximately 7:15 a.m., an identified male, 26, armed with a semi-automatic rifle, began shooting inside and outside the Three Corners Townhouses (apartment complex), Fort Smith, Arkansas. One person was killed. The shooter was killed at the scene by an armed citizen.

### 24. Santa Clara Valley Transportation Authority Rail Yard, San Jose, CA (Government)

 On May 26, 2021, at approximately 6:34 a.m., an identified male, 57, armed with three handguns, began shooting in Santa Clara Valley Transportation Authority Rail Yard, San Jose, California. Nine people (employees) were killed. The shooter committed suicide when confronted by law enforcement at the scene.

### 25. Various locations, Indianapolis, IN (Open Space)

 On May 29, 2021, at approximately 3:36 p.m., an identified male, 22, armed with two handguns, began shooting in and around various locations in Indianapolis, Indiana. Four people were wounded (including a law enforcement officer). The shooter was apprehended by law enforcement after an exchange of gunfire at the scene.

### 26. Various locations, Atlanta, GA (Open Space)

 On June 5, 2021, at approximately 8:35 a.m., an identified male, 22, armed with a handgun, began shooting at joggers in two locations in Buckhead District, Atlanta, Georgia. One person was wounded. The shooter was apprehended by law enforcement at another location.

### 27. Azuza Hookah Bar and Lounge, Houston, TX (Commerce)

 On June 8, 2021, at approximately 1:45 a.m., an unidentified male, armed with a rifle, began shooting at the Azuza Hookah Bar and Lounge, Houston, Texas, after being denied entry. Five people were wounded. The shooter remains at large.

### 28. Publix Grocery Store, Royal Palm Beach, FL (Commerce)

 On June 10, 2021, at approximately 11:34 a.m., an identified male, 55, armed with a handgun, began shooting in the Publix Grocery Store, Royal Palm Beach, Florida. Two people were killed. The shooter committed suicide at the scene before law enforcement arrived.

### 29. Various locations, Phenix City, AL and Columbus, GA (Open Space)

On June 11, 2021, at approximately 8:11 p.m., an identified male, 39, armed with a handgun, began shooting outside the Courtyard by Marriott hotel in in Phenix City, Alabama, wounding one. Two hours later, the subject shot three more people at an unspecified location in Columbus, Georgia. On June 12, 2021, at approximately 2 p.m., the subject shot an individual under the Oglethorpe Bridge in Columbus, Georgia. In total, five people were wounded. The shooter was apprehended by law enforcement at another location.

### 30. Winston-Salem Police Department District One Office, Winston-Salem, NC (Government)

 On June 14, 2021, at approximately 3:34 p.m., an identified male, 26, armed with a rifle and a handgun, began shooting at Winston-Salem Police Department District One Office, Winston-Salem, North Carolina. There were no casualties reported. The shooter was apprehended by law enforcement at another location, following an exchange of gunfire.



### 31. Mueller Manufacturing Company, Albertville, AL (Commerce)

 On June 15, 2021, at approximately 2:30 a.m., an identified male, 34, armed with a handgun, began shooting in Mueller Manufacturing Company, Albertville, Alabama. Two people (employees) were killed; two people (employees) were wounded. The shooter committed suicide at another location before law enforcement arrived.

### 32. Various locations, Phoenix, AZ (Open Space)

 On June 16, 2021, at approximately 6 p.m., an identified male, 19, armed with a rifle, began a shooting spree that continued for two days in various locations in Phoenix, Arizona. One person was killed; 12 people were wounded. The shooter was apprehended by law enforcement at another location.

### 33. Old Town Arvada, Arvada, CO (Commerce)

On June 21, 2021, at approximately 1:30 p.m., an identified male, 59, armed with a shotgun, began shooting in Old Town Arvada, Arvada, Colorado. One person (law enforcement officer) was killed. The shooter was killed at the scene by an armed citizen.

### 34. Walmart Supercenter #1217, Franklin, NC (Commerce)

On June 23, 2021, at approximately 12:15 a.m., an identified male, 58, armed with a rifle, began shooting at workers unloading a truck outside Walmart Supercenter #1217, Franklin, North Carolina. There were no casualties reported. The shooter was apprehended by law enforcement at another location.

### 35. Lock 4 Park, Gallatin, TN (Open Space)

On June 23, 2021, at approximately 3:45 p.m., an identified male, 22, armed with a handgun, began shooting in Lock 4 Park, Gallatin, Tennessee. Two people were wounded. The shooter committed suicide at the scene before law enforcement arrived.

### 36. Various locations, Winthrop, MA (Open Space)

On June 26, 2021, at approximately 2:45 p.m., an identified male, 28, armed with two handguns, began shooting at people in various locations in Winthrop, Massachusetts. Two people were killed. The shooter was killed at the scene by law enforcement during an exchange of gunfire.

### 37. Gallops Gas Station, Kendallville, IN (Commerce)

On June 27, 2021, at approximately 11:59 p.m., an identified male, 24, armed with a handgun, began shooting inside Gallops Gas Station, Kendallville, Indiana. One person was killed, two people were wounded. The shooter was apprehended by law enforcement at another location.

### 38. Various locations, Cleveland Park, Spartanburg, SC (Open Space)

 On July 1, 2021, at approximately 2:30 p.m., an identified male, 45, armed with a gun, began shooting at Spartanburg Water employees in Spartanburg, South Carolina. The shooter then went to a nearby home and began shooting at people. One person was killed; four people were wounded (including one law enforcement officer). The shooter was killed at the scene by law enforcement during an exchange of gunfire.

### 39. Various locations, Boone, NC (Open Space)

On July 3, 2021, at approximately 10:03 a.m., an identified male, 24, armed with two handguns, began shooting (from a vehicle) at people (in vehicles) at various locations, Boone, North Carolina. One person was wounded. The shooter was apprehended by law enforcement at another location.



### 40. Various locations, Tucson, AZ (Open Space)

 On July 18, 2021, at approximately 3:45 p.m., an identified male, 35, armed with a handgun, began shooting at people, emergency personnel, and law enforcement in various locations in Tucson, Arizona. Three people were killed (including one emergency personnel); four people were wounded (including two emergency personnel). The shooter was killed by law enforcement during an exchange of gunfire at the scene.

### 41. Palace Inn Motel, Houston, TX (Commerce)

On July 18, 2021, at approximately 11:08 p.m., an identified male, 35 armed with gun, began shooting at the Palace Inn Motel, Houston, Texas. Two people were killed; two people were wounded. The shooter was killed by law enforcement during an exchange of gunfire at the scene.

### 42. Marathon Gas Station and Tony's Gas Station, Toccoa, GA (Commerce)

On August 1, 2021, at approximately 11:37 a.m., an identified male, 31, armed with a handgun, began shooting at Marathon Gas Station, Toccoa, Georgia; at approximately 12:42 p.m., the subject began shooting at Tony's Gas Station, Toccoa, Georgia. Three people were wounded. The shooter was apprehended by law enforcement at another location.

### 43. Smile Direct Club Facility, Antioch, TN (Commerce)

On August 3, 2021, at approximately 5:58 a.m., an identified male, 22, armed with a handgun, began shooting inside the Smile Direct Club facility, Antioch, Tennessee. Three people were wounded, including one employee and two security personnel. The shooter was killed by law enforcement at the scene.

### 44. Various locations; Richmond County, Wrens, GA; and Graniteville, SC (Open Space)

On August 14, 2021, at approximately 8 a.m., an identified male, 33, armed with a handgun, began shooting at a vehicle on U.S. Highway 1, Richmond County, Georgia. At approximately 8:55 a.m., the shooter began shooting inside a Family Dollar store in Wrens, Georgia. At approximately 11:49 a.m., the shooter began shooting inside a residence in Graniteville, South Carolina. In total, one person was killed; three people were wounded. The shooter was apprehended by law enforcement at the scene.

### 45. Mt. Zion Church, Scott County, MS (House of Worship)

 On August 14, 2021, at approximately 1:45 p.m., an identified male, 50, armed with a rifle and a shotgun, began shooting at workers at the Mount Zion Church, Scott County, Mississippi. There were no casualties reported. The shooter was killed by law enforcement after an exchange of gunfire at the scene.

### 46. South Beach Pier, South Haven, MI (Open Space)

 On August 20, 2021, at approximately 2:15 p.m., an identified male, 19, armed with a handgun, began shooting at people at the South Beach Pier, South Haven, Michigan. One person was killed; one person was wounded. The shooter committed suicide at the scene before law enforcement arrived.

### 47. La Cerveceria de Barrio Restaurant, Miami Beach, FL (Commerce)

On August 24, 2021, at approximately 6:30 p.m., an identified male, 22, armed with a handgun, began shooting at people in the La Cerveceria de Barrio restaurant, Miami Beach, Florida. One person was killed. The shooter was apprehended by law enforcement at the scene.



### 48. Redondo Beach Pier, Redondo Beach, CA (Open Space)

 On August 25, 2021, at approximately 8:20 p.m., an identified male, 36, armed with a handgun, began shooting at people at the Redondo Beach Pier, Redondo Beach, California. Two people were wounded.  The shooter was killed by law enforcement at the scene.

### 49. Specified residential locations, Lakeland, FL (Residence)

 On September 5, 2021, at approximately 4:30 a.m., an identified male, 33, armed with three guns, began shooting at people in two separate residences, Lakeland, Florida. Four people were killed; one person was wounded. The shooter was apprehended by law enforcement after an exchange of gunfire at the scene.

### 50. Various locations, Las Vegas, NV (Open Space)

 On September 6, 2021, between approximately 7:30 p.m. and 9:00 p.m., an identified male, 35, armed with a handgun, began shooting at people at various locations in Las Vegas, Nevada. Three people were killed. The shooter was apprehended by law enforcement the following day at another location.

### 51. Enigma Club & Lounge, Wichita, KS (Commerce)

On September 7, 2021, at approximately 12:38 a.m., an identified male, 23, armed with a handgun, began shooting at people inside the Enigma Club & Lounge, Wichita, Kansas. One person was killed; five people were wounded. The shooter was apprehended by law enforcement at another location.

### 52. Elks Lodge 473, Colorado Springs, CO (Commerce)

On September 9, 2021, at approximately 3:30 p.m., an identified male, 43, armed with a handgun and a shotgun, began shooting at people inside and outside Elks Lodge 473, Colorado Springs, Colorado. Two people (managers) were killed. The shooter was apprehended by law enforcement at another location eight days later.

### 53. Various locations (La Palace nightclub and unspecified neighborhood), Orlando, FL (Open Space)

 On September 10, 2021, at approximately 12 a.m., an identified male, 29, armed with a gun, began shooting at people outside Le Palace nightclub, and in an unspecified neighborhood, Orlando, Florida. Four people were wounded (including a security guard). The shooter was apprehended by law enforcement at another location.

### 54. Kroger Grocery Store, Collierville, TN (Commerce)

On September 23, 2021, at approximately 1:30 p.m., an identified male, 29, armed with two handguns and a rifle, began shooting at people in Kroger Grocery Store, Collierville, Tennessee. One person was killed; 14 people were wounded (10 employees). The shooter committed suicide at the scene before law enforcement arrived.

### 55. Various unspecified locations, Los Angeles, CA (Commerce)

On October 8, 2021, at approximately 3:45 p.m., an identified male, 45, armed with a handgun, began shooting at people at various unspecified locations in Los Angeles, California. One person was wounded. The shooter was killed by law enforcement at the scene.

ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN **2021**



### 56. Agrex Elevator, Superior, NE (Commerce)

On October 21, 2021, at approximately 1:20 p.m., an identified male, 61, armed with a handgun, began shooting inside Agrex Elevator, Superior, Nebraska. Two people were killed (employees); one person was wounded (employee). The shooter was killed at the scene by an armed citizen (employee) prior to arrival of law enforcement.

### 57. Chevron Gas Station, Las Vegas, NV (Commerce)

On November 4, 2021, at approximately 12:30 a.m., an identified male, 22, armed with a handgun, began shooting at people at a Chevron Gas Station, Las Vegas, Nevada. One person was killed. The shooter was apprehended by law enforcement at another location.

### 58. Interstate 65, Louisville, KY (Open Space)

On November 20, 2021, between approximately 10:11 a.m. and 11:28 a.m., an identified male, 51, armed with a handgun, began shooting at people in vehicles on Interstate 65, Louisville, Kentucky. One person was wounded. The shooter was apprehended by law enforcement at the scene.

### 59. Kalamazoo Transportation Center, Kalamazoo, MI (Commerce)

On November 27, 2021, at approximately 9:12 a.m., an identified male, 54, armed with a handgun, began shooting inside a bus at Kalamazoo Transportation Center, Kalamazoo, Michigan. Three people were wounded. The shooter was killed by law enforcement at the scene following an exchange of gunfire.

### 60. Oxford High School, Oxford, MI (Education)

On November 30, 2021, at approximately 12:51 p.m., an identified male, 15, armed with a handgun, began shooting inside Oxford High School, Oxford, Michigan. Four people were killed (students); seven people (six students and one teacher) were wounded. The shooter was apprehended by law enforcement at the scene.

### 61. Various locations, Denver, CO (Commerce)

On December 27, 2021, between approximately 5:25 p.m. and 6:11 p.m., an identified male, 47, armed with a handgun and a rifle, began shooting at people at various locations in Denver and Lakewood, Colorado. Five people were killed (two employees); two people (including one law enforcement officer) were wounded. The shooter was killed by law enforcement after an exchange of gunfire at another location.



For more information about the Federal Bureau of Investigation's Active Shooter Resources, visit our website:

**fbi.gov/survive**



ACTIVE SHOOTER INCIDENTS IN THE UNITED STATES IN **2021**

May 30, 2022
Ottawa, Ontario

Keeping Canadians safe is the Government of Canada's top priority. We know that one Canadian killed by gun violence is one too many, which is why, two years ago, we banned over 1,500 types of military-style assault firearms. We also strengthened our gun control laws to expand background checks and keep firearms out of the wrong hands. These measures are helping to keep our children and communities safe.

The Prime Minister, Justin Trudeau, today announced the introduction of new legislation to further strengthen gun control in Canada and keep Canadians safe from gun violence. Bill C-21 puts forward some of the strongest gun control measures in over 40 years.

These new measures include:

- **Implementing a national freeze on handguns** to prevent individuals from bringing newly acquired handguns into Canada and from buying, selling, and transferring handguns within the country.

- **Taking away the firearms licenses** of those involved in acts of domestic violence or criminal harassment, such as stalking.

- **Fighting gun smuggling and trafficking** by increasing criminal penalties, providing more tools for law enforcement to investigate firearms crimes, and strengthening border security measures.

- **Addressing intimate partner violence, gender-based violence, and self-harm involving firearms** by creating a new "red flag" law that would enable courts to require that individuals considered a danger to themselves or others surrender their firearms to law enforcement, while protecting the safety of the individual applying to the red flag process, including by protecting their identity. In addition, the government will invest $6.6 million to help raise awareness of the new law and provide supports to vulnerable and marginalized groups to navigate the provisions.

In addition to this new legislation, the Government of Canada will require long-gun magazines to be permanently altered so they can never hold more than five rounds and will ban the sale and transfer of large capacity magazines under the *Criminal Code.*

These are the measures that chiefs of police, families of survivors, doctors, and advocates have been asking us to take, and they build on the many concrete actions

we have already taken. The Government of Canada will work with provinces, territories, Indigenous communities, and municipalities to implement these measures, and will continue to do whatever it takes to keep guns out of our communities and make Canada a safer country for everyone.

## Quotes

> "One Canadian killed by gun violence is one too many. I've seen all too well the tragic cost that gun violence has in our communities across the country. Today, we're proposing some of the strongest measures in Canadian history to keep guns out of our communities and build a safer future for everyone."
>
> — The Rt. Hon. Justin Trudeau, Prime Minister of Canada

> "We made a commitment to Canadians to tackle gun violence. The legislation we introduced today is part of our comprehensive strategy to promote safe and responsible gun laws, invest in law enforcement to stop organized crime and illegal gun smuggling at the border, and to invest in communities to address root causes and prevent gun crime from occurring in the first place. This legislation will help to reduce gun violence and keep Canadians safe."
>
> — The Hon. Marco E. L. Mendicino, Minister of Public Safety

> "Violent crime involving firearms has devastating impacts on communities across the country. This bill combines evidence-based policies and tougher *Criminal Code* penalties, among other measures, to better protect our communities. This includes people who are vulnerable to intimate partner violence and gender-based violence, and those who are at risk of hurting themselves. That is what we promised we would do, and that is what we are doing with this bill."
>
> — The Hon. David Lametti, Minister of Justice and Attorney General of Canada

## Quick Facts

- To ensure the national freeze on handguns can be implemented swiftly, the Minister of Public Safety has already tabled regulatory amendments in both the House of Commons and the Senate. These regulations will help stop the growth of personally owned handguns in Canada and are expected to come into force in Fall 2022.

- In 2020, the Prime Minister announced the ban of over 1,500 models and variants of assault-style firearms. A buyback program will be introduced to offer fair compensation to affected owners and businesses.

- Going forward, we will also ensure military-style assault weapons are automatically prohibited when they enter the market. We will continue working to ensure any new weapons that fit the definition of assault-style weapon are captured.

- Earlier this year, the government announced an investment of $250 million through the Building Safer Communities Fund (BSCF) to help communities across the country prevent gun and gang violence by tackling its root causes, particularly for at-risk children.

- Budget 2021 provided more than $312 million in new funding to increase firearms tracing capacity and implement stronger border control measures to fight gun smuggling and trafficking. Law enforcement agencies seized more than double the number of firearms at the border in 2021, compared to 2020, which is also the highest number of firearms seized in recent years.

- The number of registered handguns in Canada increased by 71 per cent between 2010 and 2020, reaching approximately 1.1 million. Handguns were the most serious weapon present in the majority of firearm-related violent crimes (59 per cent) between 2009 and 2020.

- In 2018, firearms were present in over 600 intimate partner violence incidents in Canada. Victims of intimate partner violence are approximately five times more likely to be killed when a firearm is present in the home.

## Related Products

- Firearms (https://www.publicsafety.gc.ca/cnt/cntrng-crm/frrms/index-en.aspx)

- A comprehensive strategy to address gun violence and strengthen gun laws in Canada: BILL C-21, An Act to amend certain Acts and to make certain consequential amendments (firearms) (https://www.publicsafety.gc.ca/cnt/cntrng-crm/frrms/c21-en.aspx)

## Associated Links

- Bill C-21, An Act to amend certain Acts and to make certain consequential amendments (firearms) (https://www.parl.ca/LegisInfo/en/bill/44-1/c-21)

- Prime Minister announces ban on assault-style firearms (https://pm.gc.ca

/en/news/news-releases/2020/05/01/prime-minister-announces-ban-assault-style-firearms)

- Government takes action to prevent gun violence with $250 million Building Safer Communities Fund (https://www.canada.ca/en/public-safety-canada/news/2022/03/government-takes-action-to-prevent-gun-violence-with-250-million-building-safer-communities-fund.html)

- Homicide in Canada, 2020 (https://www150.statcan.gc.ca/n1/pub/85-002-x/2021001/article/00017-eng.htm)

- Trends in firearm-related violence crime in Canada, 2009 to 2020 (https://www150.statcan.gc.ca/n1/pub/85-002-x/2022001/article/00009-eng.htm)

# NEWS ARTICLES

WORLD

# New Zealanders hand in 50,000 guns after assault weapon ban

The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March killed 51 worshippers at two Christchurch mosques.



—   New Zealand police officers handling a firearm example at a press preview ahead of a gun buyback scheme at the Trentham racecourse in Upper Hutt, near Wellington.   DAVE LINTOTT / AFP - Getty Images

   SAVE

Dec. 21, 2019, 12:36 AM PST

**By Associated Press**

WELLINGTON, New Zealand – New Zealand authorities said Saturday their country will be a safer place after owners handed in more than 50,000 guns during a buyback program following a ban on assault weapons. But critics say the process was flawed and many owners have illegally stashed their firearms.

The government banned the most lethal types of semi-automatic weapons less than a month after a lone gunman in March killed 51 worshippers at two Christchurch mosques. The police then launched a six-month program to buy the newly banned weapons from owners.

The buyback ended midnight Friday, with gun collection events staying open late as police reported in a surge in last-minute returns.

Provisional figures indicate 33,000 people handed in 51,000 guns, and another 5,000 guns as part of a parallel amnesty in which owners could hand over any type of firearm without any questions being asked but without getting compensated.

Owners also modified another 2,700 guns to make them legally compliant, while police said they had seized a further 1,800 guns from gangs since March. And police said they're in the process of collecting another 1,600 guns from gun dealers.

Police Minister Stuart Nash told reporters Saturday that criminals would find it harder to get their hands on assault weapons because they tended to steal them from lawful owners, but those weapons would now be out of circulation.

Police Deputy Commissioner Mike Clement thanked gun owners for doing the right thing. He acknowledged in a statement it had been "a difficult process for some people."

## Get the Morning Rundown

Get a head start on the morning's top stories.

| Enter your email | SIGN UP |

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE

**Recommended**



U.S. NEWS

**United passenger jet returns to Chicago after hitting bird**



**U.S. NEWS**

**Breaching whale shocks father and son fishing off Jersey Shore as it nearly comes aboard boat**

Both Nash and Clement said the country was now safer than it had been before the March attacks.

But Nicole McKee, a spokeswoman for the advocacy group Council of Licensed Firearms Owners, said owners had kept about two-thirds of the banned weapons because they had lost faith in the government and hadn't been offered adequate compensation.

"They never overcame being blamed by authorities for being somehow responsible for a heinous act of terrorism – something they would never do," McKee said in a statement.

The ban on assault weapons was strongly backed by lawmakers in an historic 119-1 vote after the mosque attacks. Lawmakers are now considering further restrictions, including creating a register to track all guns.

Police figures indicate the government paid out just over 100 million New Zealand dollars ($66 million) to compensate owners during the buyback.

Associated Press

ABOUT

CONTACT

HELP

CAREERS

AD CHOICES

PRIVACY POLICY

DO NOT SELL MY PERSONAL INFORMATION

© 2022 NBC UNIVERSAL

CA NOTICE

TERMS OF SERVICE

NBC NEWS SITEMAP

ADVERTISE

SELECT SHOPPING

SELECT PERSONAL FINANCE

NEWS                              MSNBC                              TODAY

## The Washington Post

Democracy Dies in Darkness

**AMERICAS**

# Canada vows to 'freeze' handgun sales, buy back assault-style weapons

By Amanda Coletta

May 30, 2022 at 10:20 p.m. EDT

TORONTO — Canada on Monday introduced new gun-control legislation that, if passed, would implement a "national freeze" on buying, importing, transferring and selling handguns, effectively capping the number of such weapons already in the country.

The bill, which officials here cast as "the most significant action on gun violence in a generation," also includes "red flag" laws that would allow judges to temporarily remove firearms from people deemed to be a danger to themselves or others and stiffer penalties for gun smuggling and trafficking.

"We recognize that the vast majority of gun owners in this country are responsible and follow all necessary laws," Prime Minister Justin Trudeau told reporters in Ottawa. "We are, however, facing a level of gun violence in our communities that is unacceptable."

The proposed legislation came after mass shootings in Texas and across the U.S.-Canada border in Buffalo in recent weeks have revived a long-simmering debate in the United States about whether Congress might act to curb gun violence.

"Unfortunately, the reality is in our country [gun violence] is getting worse and has been getting worse over the past years," Trudeau said. "We need only look south of the border to know that if we do not take action, firmly and rapidly, it gets worse and worse and more difficult to counter."

Many provisions of the proposed legislation were featured in a gun-control bill that was introduced last year but that did not pass before a federal election was called in August. Gun-control advocates criticized its buyback program for banned guns, which was voluntary. The Liberals pledged stricter gun-control measures if reelected.

Such measures enjoy broad public support here, particularly in urban centers. The Liberal Party typically employs guns as a wedge issue during federal election campaigns, painting their Conservative counterparts as supportive of easing gun-control measures to gain an edge.

Gun-control advocates have long called for a national ban on handguns. But some provincial and municipal officials have opposed one.

The "freeze" envisioned by the proposed legislation is not a ban because people who already own them could continue to possess and use them. But they could only transfer them to businesses, and chief firearms officers would be barred from approving the transfer of handguns to individuals.

The bill is likely to pass with the support of the New Democratic Party. The Conservatives on Monday criticized Liberal gun-control efforts, charging that they unfairly target law-abiding gun owners and fail to adequately stamp out the smuggling of illegal weapons across borders.

"Today's announcement fails to focus on the root cause of gun violence in our cities: illegal guns smuggled into Canada by criminal gangs," Raquel Dancho, the Conservative public safety critic, said in a tweet. "The PM has had 7 years to fix this serious issue yet he continues to chase headlines and bury his head in the sand."

The measures unveiled Monday come after the government banned 1,500 makes and models of "military-style assault weapons" in 2020, after a gunman posing as a police officer charged across rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police officer, in the country's deadliest mass shooting.

The government said Monday that it plans to introduce a mandatory buyback program that would offer compensation to owners of the banned firearms. Details on the program are expected this summer, and the government hopes to begin buying back the guns, including AR-15s, the kind used in the school attack in Texas, by the end of the year.

"It's going to be hard," said Marco Mendicino, Canada's public safety minister. "But we're going to get it done."

Some measures announced Monday would not require parliamentary approval, but a change to regulations.

While mass shootings are relatively rare here compared to the United States, the rate of firearm-related homicides has increased since 2013, according to data from Statistics Canada. It said that the percentage of homicides involving a firearm jumped from 26 percent in 2013 to 37 percent in 2020.

Nearly 60 percent of firearm-related violent crimes involve handguns, according to the national statistics agency. But it said that there are "many gaps" in the data, including on the "source of firearms used in crime" and "whether a gun used in a crime was stolen, illegally purchased or smuggled into the country."

During hearings in a public inquiry this year on the "causes, context and circumstances" of the mass shooting in Nova Scotia, evidence was presented on the provenance of the large cache of weapons that the attacker, Gabriel Wortman, had on hand during the hours-long assault.

Wortman, a denturist, did not possess a firearms license and obtained his weapons illegally. The commission heard that there were "two, and potentially three," instances when police received information about his access to firearms. Little, if anything, was done, according to testimony.

Several of the guns were traced and sourced to gun stores in nearby Maine. A friend there told police that Wortman took one or more of the guns without his knowledge or permission, while he gave the shooter a Ruger P89 "as a sign of gratitude" for his help with "tree removals and other odd jobs at his residence."

An AR-15 came from a gun shop in California, but Wortman first saw it at a gun show in Maine and someone else bought it for him. Witnesses told the RCMP after the shooting that Wortman would disassemble the firearms and roll them up in his truck's tonneau cover to smuggle them across the border.



**PROTESTS, INSURRECTION, AND THE SECOND AMENDMENT**

# Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?

By **John J. Donohue**, C. Wendell and Edith M. Carlsmith Professor of Law, Stanford Law School

PUBLISHED JUNE 2021

**Brennan Center for Justice** at New York University School of Law

# The Original Sin

We are approaching the 13th year as a nation that has enshrined in the Second Amendment a *private* right of individuals to have guns. Had the Supreme Court been asked to rule on this issue any time prior to 2000, or if the butterfly ballot in Palm Beach, Florida, had not turned an estimated 2,800 would-be Al Gore voters into Pat Buchanan voters, or if Chief Justice John Roberts had realized in 2008 how much mischief the *District of Columbia v. Heller* decision would unleash, there would likely be no federal constitutional right of individuals to have firearms today. The question now before the country is whether the damage of *Heller* will be contained or whether the Supreme Court will continue down the path of Second Amendment expansion that the gun lobby has dictated to a compliant Republican Party in opposition to the growing demands for reasonable gun regulation.

While the increasing menace of mass shootings and the growing realization that other affluent countries simply do not have the same level of homicidal firearm violence as the United States have persuaded large majorities of Americans to favor an array of gun regulations, the gun lobby — with its vice-like hold on Republican politicians — has utterly thwarted even wildly popular measures such as universal background checks. Through a careful campaign of litigation and judge-shopping, aided by its strong and effective input into federal judicial selection, the gun lobby is hoping to turbocharge the Second Amendment to create a new right to carry guns outside the home, to end restrictions on assault weapons and high-capacity magazines, and to prohibit sensible regulations such as gun registration, safe storage laws, age requirements for firearm possession, and uniform restrictions on felons having guns.

# Lessons from January 6

If there is a bright spot in the horrific events of the January 6 attack on the U.S. Capitol, it is what it teaches us about the value and importance of gun regulation to the well-being of our democracy. Importantly, the U.S. Capitol attack clarified the profound errors in almost everything the National Rifle Association (NRA) and the gun lobby have ever said about gun policy. Consider the gun lobby protestation that "Gun control simply doesn't work." Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction. Without Washington, DC's profoundly wise firearm restrictions, a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons. When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims. Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire.

The pernicious Proud Boys leader Enrique Tarrio, who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire. At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo. Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws.[1]

The gun lobby has fought to try to subvert these wise protections in legislatures and in the courts. An egregious legislative campaign has pushed for congressional action that would allow anyone with a concealed carry permit from any state to lawfully carry throughout the United States (the "Concealed Carry Reciprocity Act"). Ironically, the advocates for this federal legislation often trumpet a states' rights rhetoric that is completely inconsistent with the idea that the gun laws of, say, North Dakota or Texas should govern the District of Columbia, New York, or California. Hopefully, the events of January 6 will help inter any further efforts in the direction of "national reciprocity of gun carrying." Washington, DC's restrictions meant that gun owners who traveled there for the Trump protest — including the Proud Boys and members of armed militias — knew that gun carrying would invite police scrutiny, so they largely left them at home. Note that the NRA's claim that it is desirable to have "good guys with guns" is largely fatuous. One minute the Trump supporters who stormed the Capitol were "law-abiding" patriots; the next minute they were criminals. Indeed, most mass shooters are "law-abiding citizens" . . . until they open fire and start their wanton destruction.

Disarmed by Washington, DC, gun laws, some of the rioters did what criminals frequently do: seek to seize guns from lawful possessors, which happens roughly 400,000 times per year throughout the United States.[2] (Recall that the Boston Marathon bombers killed a police officer near MIT for one purpose only: to steal his firearm.)[3] When Washington, DC, police officer Michael Fanone was overwhelmed by the riotous U.S. Capitol crowd, he realized the idea that his gun could protect him was a fantasy. Fanone stated that he could have killed two or three of the rioters, but then they would certainly have killed him. Instead, Fanone stated, "Some guys started getting a hold of my gun and they were screaming out, 'Kill him with his own gun.'"[4] Fanone saved his life by appealing to the humanity of the crowd and saying that he had children.

Perhaps the greatest pedagogical lesson taught by the U.S. Capitol insurrection is the sheer lunacy of the claim that high-powered weapons in the hands of the public are needed to protect against a tyrannical federal government. When Sen. Rand Paul made the claim "Why do we have a Second Amendment? . . . It's to shoot at the government when it becomes tyrannical!" some dismissed it merely as the political rhetoric of a demagogic blowhard, but the assertion has even received endorsement from members of the federal judiciary. The somewhat unhinged and now-retired Ninth Circuit Court of Appeals Judge Alex Kozinski endorsed the view that the Second Amendment would protect against federal tyranny.[5]

More recently, U.S. District Judge Roger Benitez repeated the claim in enjoining a California law that banned high-capacity magazines.[6] Indeed, Judge Benitez went on to strike down all restrictions on high-capacity magazines and seemed to believe that citizen access to the most lethal weaponry was an essential feature of ordered liberty. Again, one might think this to be simply the aberrant view of a solitary judge, but a panel of the Ninth Circuit Court of Appeals upheld Judge Benitez's decision with a misguided opinion penned by a recent Trump appointee.[7]

The lessons of the U.S. Capitol invasion of January 6 may have been in the minds of some federal judges on February 25, 2021, when the Ninth Circuit vacated the panel decision and set the case down for en banc rehearing. First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd.[8] There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government.[9] Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.

# The Transformation of the NRA and the Republican Party on Gun Policy

Interestingly, the NRA and Republicans used to disagree completely with the aggrandized view of the Second Amendment that has continued to metastasize since the *Heller* decision. Indeed, the former head of the NRA testified in support of the 1934 federal gun control act, stating "I do not believe in the general promiscuous toting of guns. I think it should be sharply restricted and only under licenses."[10] Ronald Reagan in May 1967 stated that "[t]here's no reason why on the street today a citizen should be carrying loaded weapons. [Guns are] a ridiculous way to solve problems that have to be solved among people of good will."[11]

The renowned conservative Republican and former U.S. Supreme Court Chief Justice Warren Burger told PBS *NewsHour* in late 1991 that the Second Amendment "has been the subject of one of the greatest pieces of fraud, I repeat the word fraud, on the American public by special interest groups that I have ever seen in my lifetime." Burger was dismayed at the attempts to thwart reasonable gun control measures with what he considered to be phony and absurd interpretations of the Second Amendment. Despite acknowledging that he was "a gun man. I have guns. I have been a hunter ever since I was a boy," Burger continued: "Someone asked me recently if I was for or against a bill which was pending in Congress calling for five days waiting period. I said 'Yes, I'm very much against it. It should be a 30-day waiting period 'till they find out why this person needs a handgun."[12]

The events of March 16, 2021, when an unhinged 21-year-old killed eight in Atlanta, underscore the wisdom of Burger's remarks. The shooter had legally bought a 9-millimeter handgun in a gun shop on the very day of the shooting — so that he could commit mass murder. Thankfully, when police released a picture of the assailant from video footage, his parents contacted authorities, leading to his capture before he achieved his intended goal of killing more in Florida.[13] How much better for all involved if he had not been able to buy a gun in the first place? At the very least, a 30-day waiting period would have provided an opportunity for the shooter's immediate mental health crisis — he had just been thrown out of his home by his parents — to pass, potentially saving many lives.

Former solicitor general for Richard Nixon Erwin Griswold echoed the theme of Burger's remarks when he stated, in a 1990 *Washington Post* editorial: "To assert that the Constitution is a barrier to reasonable gun laws, in the face of the unanimous judgment of the federal courts to the contrary, exceeds the limits of principled advocacy. It is time for the NRA and its followers in Congress to stop trying to twist the Second Amendment from a reasoned (if antiquated) empowerment for a militia into a bulletproof personal right for anyone to wield deadly weaponry beyond legislative control."[14] These remarks came from a "lifelong Republican with a background of Midwest conservatism" who was "built like a granite block and [was] just as inflexible in his conceptions of basic rectitude."[15]

No Republican politician could utter such views today, when the most zealous expansion of "gun rights" has become the virtue signaling of today's "conservatives." By the mid-1970s, 45 states and the District of Columbia had either banned concealed carry of firearms or restricted it to those who could establish themselves to be an appropriate candidate for a concealed carry permit. As late as 1986, 16 states completely prohibited private gun carrying and all but eight required some government scrutiny to determine if someone should be allowed to carry a gun outside the home.[16] Today, Republicans show their fealty to the gun lobby by arguing that there is a federal constitutional right to carry guns without governmental restriction, and 16 states have passed "permitless carry laws," sometimes wishfully referred to as "constitutional carry," as they await the gun lobby's

efforts to provide a vehicle for the Supreme Court to issue a decision that would expand the *Heller* notion of a Second Amendment right to have a gun in the home to the more expansive right to have it with you in virtually any public venue.[17]

The consequences of the gun lobby position that any 18-year-old should be allowed to parade around with a gun as a matter of constitutional right are not likely to be benign. For example, consider that right now under current state law any 19-year-old in Missouri is allowed to carry a concealed weapon without securing a permit, establishing good character or any need for a weapon, or having any training in its use. When the University of Missouri tried to enforce its decades-old ban of guns on campus to avoid having armed 19-year-olds in its classrooms and roaming its campus, it was sued — and the Missouri attorney general (and now U.S. senator) Josh Hawley argued that the Constitution called for overturning the ban. On June 8, 2020, the trial court sustained the ban, but the fact that the university had to spend considerable resources to hire expert witnesses and a private law firm (since the typical defense by the state attorney general was absent) and go through a trial to sustain a gun ban on a university campus that has been in place for well over half a century indicates the changed world in which we live today.[18] The implicit tax on wise policy that gun interests now impose on state and local governments and public universities is not inconsiderable, prompting many to reluctantly acquiesce to allowing promiscuous access to guns that officials are confident will be socially harmful.

# The Importance of the Federal Assault Weapons Ban

Louis Klarevas[19] was the first to provide evidence that the federal assault weapons ban — which had been in place from 1994 to 2004 — had limited gun massacres, defined as violent incidents in which a shooter killed at least six individuals. To further probe this finding, Theodora Boulouta and I culled through the *Mother Jones* mass shooting database over a 35-year period to assess the pattern of public mass shootings, not including crimes of armed robbery, gang violence, or domestic violence.[20] Figure 1 shows the number of incidents of such gun massacres and the deaths resulting therefrom.[21] The figure reveals a number of important points.

First, cases of public mass shootings in which six or more individuals die have been growing sharply over the last 15 years — a period when the legal ability to carry guns outside the home has increased dramatically. There is certainly no indication that this expanded gun toting has slowed the growth in the number of these gun massacres.

Second, one sees that the number and deadliness of these mass shootings dropped during the 10 years of the federal assault weapons ban, 1994–2004, and rose sharply after the ban was lifted.[22] Although the number of incidents is too limited to highlight the 25 percent drop in gun massacres, the 40 percent drop in overall fatalities during the period of the federal ban is noteworthy.

On its face, the lower death toll is plausible since for that decade mass killers could not simply waltz into a gun store and buy an assault weapon with a high-capacity magazine, as they can do in most of the United States today.[23] On the other hand, figure 1 also shows that overall, violent crime dropped by roughly 14 percent during the decade of the federal assault weapons ban. This curve raises the question of whether the decline in gun massacres and deaths was simply part of a larger drop in crime. The short answer is no.

After the federal ban lapsed in 2004, the gun industry was able to flood the market with increasingly powerful weapons that allow mass killers to kill ever more quickly, with predictable results. The decade after the ban

elapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued to decline (again reflected in figure 1). In other words, our independent assessment confirms the Klarevas finding: gun massacres fell during the assault weapons ban and rose sharply when it was removed in 2004.



**Figure 1:** Gun Massacres Were Less Frequent and Less Deadly During the Federal Assault Weapons Ban

**Sources:** Mass shooting data from *Mother Jones*; violent crime rate data from the FBI's Uniform Crime Reporting (UCR) Program.

**Notes:** Dates begin and end in September to reflect the period from September 13, 1994, to September 12, 2004, when the federal assault weapons ban was in place. Dots mark 10-year averages, except for the last dot, which marks the 5-year average from 2015 to 2019. Massacres are defined as incidents in which six or more people were killed, not including the perpetrator.

What has happened since 2014 is even more alarming. In five years, the number of fatalities in these gun massacres has already topped the previous high that occurred during the entire decade after the federal assault weapons ban was removed. This murderous leap has occurred at the same time that overall violent crime persisted on a downward trend, as the dotted line in figure 1 confirms. If we continue at the post-2014 pace until 2024, the last column of figure 1 shows that we will have an order of magnitude increase in gun massacre deaths over a 20-year period.[24]

Figure 2 illustrates the average number of fatalities in each mass shooting for the same four periods shown in figure 1. The pattern is the same: fatalities per incident fell during the federal assault weapons ban and have

risen sharply thereafter. With the weaponry available to citizens getting ever more potent and plentiful, the average number of people who die per incident has increased by 121 percent in the last five years compared to the level during the assault weapons ban (18.1 versus 8.2 deaths per incident). Assault weapons and/or high-capacity magazines were used in all 15 of the gun massacres since 2014; all 272 people who died in gun massacres since 2014 were killed by weaponry prohibited under the federal assault weapons ban.

The 19-year-old killer of 17 at Marjory Stoneman Douglas High School in Parkland, Florida, in 2018[25] and the 2019 Dayton shooter (who killed nine)[26] possessed traits that would have disqualified them from access to any firearm in other affluent nations, let alone an AR-15 style weapon.[27] In the United States, however, there was virtually no impediment to their acquiring such weapons to commit mass murder. The common NRA claim that we should "just enforce the gun laws we have" makes little sense when the gun laws we have are so weak and porous — in large part because of the NRA.



**Figure 2: Gun Massacres: Deaths per Incident**

**Source:** *Mother Jones.*

**Notes:** Dates begin and end in September to reflect the period from September 13, 1994, to September 12, 2004, when the federal assault weapons ban was in place. Massacres are defined as incidents in which six or more people were killed, not including the perpetrator.

I should quickly note that the identical pattern exists whether one uses five or four deaths as the definition of a mass shooting, as I have shown elsewhere.[28] Indeed, it is useful to see the results from using a more restrictive definition that only looks at gun massacres in which, say, at least 10 individuals were killed by the shooter. In fact, there were no such high-fatality public shootings by lone gunmen in the decade of the federal assault weapons ban. In the decade after the ban ended, the United States suffered through six of these horrific killings,

and in the last *five* years we have suffered through 10 such massacres, causing 231 deaths (compared to the 13 killed by two shooters at Columbine during the federal assault weapons ban *decade*).[29]

This research highlights the causal mechanism — restraining access to weaponry with the ability to rapidly kill — that explains why the federal assault weapons ban was effective and why its elimination has facilitated more deaths in public mass shootings. When the government imposes wise restraints on the ability to kill wantonly and voluminously, the number of deaths from these traumatic mass shootings will fall. Of course, with less lethal weaponry available to those who would commit mass murder, fewer cases make it across any given threshold, since the most dangerous weapons help an ambitious mass killer to get over the bar.[30]

Importantly, the federal assault weapons ban limited the size of gun magazines to 10 rounds. The Las Vegas shooter could not have shot as many individuals as he did in 11 minutes without access to high-capacity magazines, and this is the reason that virtually all the deaths from gun massacres in the last five years have come from weapons equipped with such magazines.[31] The 10-year ban on such magazines sharply drove up their price and limited their availability, so it is not surprising that even when public mass shootings occurred, the body count was curtailed during the decade of the ban.[32]

The NRA is correct that "good guys with guns" can play a role in ending these mass shootings but misguided on who it thinks the good guys are. They are called *the police*. In fact, the graphics in figures 1 and 2 would have been even more dramatic without the greater resources and improved police response aimed to stop mass shootings that has developed in the last 15 years.

# Conclusion

Over the last few decades, the Second Amendment has metastasized into a catalyzing force behind an array of social pathologies, including racism, misogyny, xenophobia, autocratic and anti-democratic tendencies, and even attacks on the very notion of truth — whether through the caricatures of history that its adherents often trumpet, the grotesquely distorted empirical assertions they often reference,[33] or the fantastical claims they offer about the magical effectiveness of guns to stop mass shooters, dangerous criminals, and even tyrannical governments. The Second Amendment has become a straitjacket for Republican politicians who must acquiesce to every demand of the gun lobby and the thoughtless, virtue-signaling battle cry of those trying to establish their conservative credentials, bolster some comforting identity, or overcome some sense of personal weakness or vulnerability. It is time for courts and legislatures to stop compounding the self-inflicted wounds of America's destructive drift toward a free market in guns.

# Endnotes

[1] Tarrio had posted online that "the Proud Boys will turn out in record numbers on Jan 6th but this time with a twist," indicating that they would spread out incognito. *See* Associated Press, *Judge Bans Proud Boys Leader from Washington, D.C., After Arrest*, NBC NEWS (Jan. 5, 2021), https://www.nbcnews.com/news/us-news/judge-bans-proud-boys-leader-washington-d-c-after-arrest-n1252906.

[2] John Donohue, Abhay Aneja & Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, J. EMPIRICAL LEGAL STUDIES, 198, 247 n.19 (2019).

[3] Michele McPhee, *New Images Show Sean Collier Murder Scene After Boston Marathon Bombing*, ABC NEWS (Mar. 11, 2015), https://abcnews.go.com/US/images-show-sean-collier-murder-scene-boston-marathon/story?id=29556597.

[4] Mark Morales, *"Kill Him with His Own Gun": Police Describe Facing the Mob at the Capitol*, CNN (Jan. 15, 2021), https://www.cnn.com/2021/01/14/politics/police-officers-capitol-riot-hodges-fanone/index.html.

[5] *See* Silveira v. Lockyer, 328 F.3d 567, 569–70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc).

[6] *See* Duncan v. Becerra, 366 F. Supp. 3d 1131, 1141 (S.D. Cal. 2019).

[7] *See* Duncan v. Becerra, 970 F.3d 1133, 1169 (9th Cir. 2020).

[8] Recall that in 1990, a relatively small portion of the U.S. military fighting more than 6,000 miles from the United States needed only four days to defeat the battle-tested Iraqi army of more than 1 million men. Consider the Iraqi weaponry that afforded virtually no protection from the American military: "With about 6,000 battle tanks, 300 fighter planes and a vast array of missiles, Iraqi war-making equipment is impressive by any standard. In its top-line stockpile are battle-tested weapons that have earned stellar reputations in the decade's few wars: the Soviet T-72 tank, the Chinese Silkworm missile, the French Mirage fighter and the Exocet tactical missile, which almost sank the U.S. guided-missile frigate Stark in the Persian Gulf in 1987." *See* John M. Broder & Douglas Jehl, *Iraqi Army: World's 5th Largest but Full of Vital Weaknesses*, L.A. TIMES (Aug. 13, 1990), https://www.latimes.com/archives/la-xpm-1990-08-13-mn-465-story.html.

[9] In July 2016, incensed by police shootings of unarmed black men, Gavin Long used a particularly powerful assault rifle with a 40-round magazine to shoot six police officers in Baton Rouge, Louisiana, killing three before he himself was killed by a police sniper. Prior to the attack, a 911 call was made when Long was spotted walking in the July heat wearing a coat, body armor, and a ski mask while carrying a TAVOR assault rifle — which the manufacturer, Israel Weapon Industries, describes as "the ultimate weapon of the 21st century," employed by armed forces around the globe. Louisiana's open carry law gave the police no basis for disarming him. Israel Weapon Industries notes on its webpage that this particular weapon, developed in cooperation with the Israel Defense Forces, was "especially created" in response to "dynamic changes in the modern battlefield, the threats of global terrorism and the demands of ever-changing combat situations." *See* James Gill, *Civilians Carrying "Ultimate Weapon" Gavin Long Used in Baton Rouge Would Be Regarded Worldwide as Insane*, NEW ORLEANS ADVOCATE (Aug. 10, 2016), https://www.nola.com/opinions/james_gill/article_4567899b-0cac-5e78-81ad-84729147171f.html.

[10] *National Firearms Act Hearings Before the H. Comm. on Ways and Means*, 72nd Cong. (1934) (testimony of Karl T. Frederick), http://www.keepandbeararms.com/nra/nfa.htm#p45.

[11] Steven Rosenfeld, *7 Uncovered Quotes That Reveal Just How Crazy the NRA's Become*, SALON (Jan. 23, 2013), https://www.salon.com/2013/01/23/7_uncovered_quotes_that_reveal_just_how_crazy_the_nras_become. Indeed, Ronald Reagan was also in favor of the Brady Bill, which was named after his former press secretary who took a bullet to the head during John Hinckley's attempted assassination of Reagan. *Supra.*

[12] *Warren Burger 2nd Amendment Fraud* (PBS NEWSHOUR 1991), https://www.youtube.com/watch?v=Eya_k4P-iEo.

[13] Kate Brumback, *Atlanta-Area Shootings Leave 8 Dead, Many of Asian Descent*, WHYY (Mar. 16, 2021), https://whyy.org/articles/georgia-massage-parlor-shootings-leave-8-dead-man-captured.

[14] Erwin N. Griswold, *Phantom Second Amendment "Rights,"* WASH. POST (Nov. 4, 1990), https://www.washingtonpost.com/archive/opinions/1990/11/04/phantom-second-amendment-rights/f4381818-fed9-4e63-8d62-f62056818181.

[15] Dennis Hevesi, *Erwin Griswold Is Dead at 90; Served as Solicitor General*, N.Y. TIMES (Nov. 21, 1994), https://www.nytimes.com/1994/11/21/obituaries/erwin-griswold-is-dead-at-90-served-as-a-solicitor-general.html.

[16] *See generally* John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 L. & CONTEMP. PROBS. 117 (2020).

[17] *See, e.g.,* Sami Sparber, *Texas Republicans Have Long Pushed to Allow "Constitutional Carry" of Guns. Proponents Say This Year Is Their Best Chance.*, TEXAS TRIBUNE (Apr. 06, 2021), https://www.texastribune.org/2021/04/06/texas-constitutional-carry; and Gerald Harris, *Republicans Moving Ahead on "Permitless Carry" of Guns Despite Law Enforcement Opposition*, WATE (Mar. 18, 2021), https://www.wate.com/news/republicans-moving-ahead-on-permitless-carry-of-guns-despite-law-enforcement-opposition.

[18] The court held that the gun ban was subject to strict scrutiny but found that the university had made a sufficient showing to withstand strict scrutiny under the Missouri constitution. Missouri ex rel. Schmitt v. Choi, Nos. 16BA-CV03144, 16BA-CV02758, 2020 WL 5093608, at *16 (Mo. Cir. June 8, 2020). The court noted that University of Missouri Police Chief Doug Schwandt graduated first in his class from the police academy, was trained at the FBI academy at Quantico, and was an accomplished marksman, having received the highest marksmanship score of anyone in his police academy class and having served as a firearms instructor. *Id.* at *2. Based on this wealth of knowledge and his 40 years of experience in law enforcement, the chief testified that he was "unequivocally" opposed to changing the gun ban, *id.*, because guns on campus "would have nothing but adverse impacts in countless ways." *Id.* at *3. Chief Schwandt testified that "when guns are stolen, and guns are stolen all the time out of cars, they are used in crimes," adding that was "not my assumption. That's my experience." *Id.* He further "testified that an active shooter scenario is 'already a very extremely challenging arena now in the law enforcement community' and that changing the Rule would 'make[] it more complex and make[] it even more difficult.'" *Id.* Moreover, as I testified and the judge found, every element of the opposing statistical expert's testimony was consistent with the police chief's opinion that guns on campus would elevate violent crime. *Id.* at *7–*8.

[19] *See generally* LOUIS KLAREVAS, RAMPAGE NATION: SECURING AMERICA FROM MASS SHOOTINGS (2016).

[20] *Mother Jones* has compiled a comprehensive listing and description of mass shootings from 1982 to the present. *See* Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982–2021: Data from Mother Jones' Investigation*, MOTHER JONES (Mar. 22, 2021), https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data; *see also* John Donohue & Theodora Boulouta, *That Assault Weapon Ban? It Really Did Work*, N.Y. TIMES (Sept. 4, 2019), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html.

[21] Figures 1 and 2 are replicated from John Donohue & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STAN. L. SCHOOL LEGAL AGGREGATE BLOG (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives.

[22] The Federal Assault Weapons Ban took effect September 13, 1994, and expired on September 13, 2004, due to a sunset provision that allowed the law to lapse after President George W. Bush reneged on his campaign promise to support retention of the federal ban. *See id.*

[23] Only seven states and the District of Columbia ban assault weapons, and all of those plus Colorado and Vermont restrict the permissible size of the ammunition magazines. *See Assault Weapons*, GIFFORDS L. CTR., https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/#:~:text=Seven%20states%20and%20the%20District,of,%20Columbia%20prohibit%20assault%20weapons (last visited May 14, 2021); *Large Capacity Magazines*, GIFFORDS L. CTR., https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines (last visited May 14, 2021).

[24] We followed Klarevas's six-death criterion for our definition of a gun massacre, and simply note that the numbers of mass shootings would be substantially larger using alternative definitions, such as the Gun Violence Archive definition of *four individuals wounded by gunfire in a single incident*. Using that more capacious definition, there were 366 mass shootings in the first 318 days of 2019, killing 408 and injuring 1477. *See* Skye Gould & Shayanne Gal, *There Have Been 366 Mass Shootings in the US So Far in 2019 — Here's the Full List*, INSIDER (Nov. 14, 2019), https://www.insider.com/number-of-mass-shootings-in-america-this-year-2019-8. The number of these mass shootings leapt past 600 in 2020. *See* Daniel Victor & Derrick Bryson Taylor, *A Partial List of Mass Shootings in the United States in 2021*, N.Y. TIMES (May 10, 2021), https://www.nytimes.com/article/mass-shootings-2021.html.

[25] The school was so concerned with the behavior of Nikolas Cruz that he was searched for weapons every morning before school. *See* Natalie Musumeci, *Parkland Shooter Was Searched for Weapons Every Morning Before School*, N.Y. POST (July 26, 2019), https://nypost.com/2019/07/26/parkland-shooter-was-searched-for-weapons-every-morning-before-school. Needless to say, this is not the profile of someone for whom judicious government authorities would readily grant a request for a license to have a firearm.

[26] The warning signs for the Dayton shooter screamed out that this was a person who should not have access to weapons. *See* Paul P. Murphy et al., *Dayton Shooter Had an Obsession with Violence and Mass Shootings, Police Say*, CNN (Aug. 7, 2019), https://www.cnn.com/2019/08/05/us/connor-betts-dayton-shooting-profile/index.html. Being kicked out of school for having a "hit list" of people he wanted to kill or rape would ordinarily be frowned upon by those evaluating fitness to have a gun. Indeed, almost every mass shooter except the Las Vegas shooter showed dramatic signs that they should not be near weapons, but of course, many of the people who should have understood these signs did nothing and sometimes even failed to perceive danger. For example, Nancy Lanza actually seemed to believe that it was good that her disturbed son Adam should have access to firearms. *See* Diane Dimond, *Did Nancy Lanza Handle Her Guns Responsibly? "You'll Be Surprised," Police Spokesman Says*, DAILY BEAST (July 12, 2017), https://www.thedailybeast.com/did-nancy-lanza-handle-her-guns-responsibly-youll-be-surprised-police-spokesman-says. She paid with her life, but 26 other families also were destroyed because of her mindless enthusiasm for guns and gross misperception of their protective power. The mother of the mass killer at Umpqua Community College in Oregon had a similar benevolent view of her son's fascination with guns despite her knowledge of his struggles with mental illness and the fact that he had once threatened her with a shotgun. *See* Jack Healy, Mike McIntire & Julie Turkewitz, *Oregon*

*Killer's Mother Wrote of Troubled Son and Gun Rights*, N.Y. Times (Oct. 5, 2015), https://www.nytimes.com/2015/10/06/us/mother-of-oregon-gunman-wrote-of-keeping-firearms.html?smid=pl-share. She boasted online of how their arsenal would keep them safe from intruders and sneered at legislative efforts by "lame states" directed at gun safety: "I keep two full mags in my Glock case. And the ARs & AKs all have loaded mags. No one will be 'dropping' by my house uninvited without acknowledgement." *Id.*; *see also* Julie Turkewitz, *Oregon Gunman Smiled, Then Fired, Student Says*, N.Y. Times (Oct. 9, 2015), https://www.nytimes.com/2015/10/10/us/roseburg-oregon-shooting-christopher-harper-mercer.html (noting that eight students and a professor were killed in an attack in Oregon in October 2015).

[27] John Donohue, *How US Gun Control Compares to the Rest of the World*, Conversation (June 24, 2015), https://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-79490.

[28] *See* Donohue & Boulouta, *supra* note 20.

[29] It should be stressed that the cost of mass shootings goes far beyond the horrific deaths and injuries and destroyed families to impose substantial psychological costs on the community, survivors, and often the nation and beyond. *See generally* Maya Rossin-Slater et al., *Local Exposure to School Shootings and Youth Antidepressant Use* (Stan. Inst. Econ. Pol'y Rsch. Working Paper No. 19-036, Dec. 2019), https://siepr.stanford.edu/sites/default/files/publications/19-036.pdf#:~:text=Local%20Exposure%20to%20School%20Shootings%20and%20Youth%20Antidepressant,events%20on%20the%20mental%20health%20of%20surviving%20youth.

[30] The Defense Department chose the fully automatic version of the AR-15 for battlefield use in Vietnam. The speed of fire and devastating injuries inflicted by the AR-15 make it one of the most effective mass killing technologies — even when restricted to only semi-automatic operation, which is actually the customary battlefield mode of fire. In fact, the U.S. Army's own field manual states that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," noting, "it is surprising how devastatingly accurate rapid semi-automatic fire can be." Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://www.rollingstone.com/politics/politics-features/all-american-killer-how-the-ar-15-became-mass-shooters-weapon-of-choice-107819.

[31] Stephen Paddock killed 58 concertgoers at a Las Vegas concert and injured nearly 1,000 others on Oct. 1, 2017. *See* Vanessa Romo, *FBI Finds No Motive in Las Vegas Shooting, Closes Investigation*, NPR (Jan. 29, 2019), https://www.npr.org/2019/01/29/689821599/fbi-finds-no-motive-in-las-vegas-shooting-closes-investigation.

[32] In the attack on Congresswoman Gabrielle Giffords in 2011, her assailant was tackled when he went to reload another high-capacity magazine into his weapon. A nine-year-old girl waiting to meet the congresswoman was killed by the 13th shot — beyond the 10-round limit of the expired federal assault weapons ban. *See Victims in 2011 Giffords Attack See Parallel to U.S. Capitol Riot*, Norwalk Hour (Jan. 9, 2021), https://www.pressreader.com/usa/the-norwalk-hour/20210109/281668257610305. See also J.J. Stambaugh, *Takedown of Alleged Shooter Recounted*, Knoxville News Sentinel Co. (July 29, 2008), https://web.archive.org/web/20080729184422/http://www.knoxnews.com/news/2008/jul/29/takedown-alleged-shooter-recounted (discussing the 2008 Tennessee shooting where the church shooter who killed two and wounded six was tackled and stopped while trying to reload); *Accused Oregon School Shooter Shows No Emotion in Court*, CNN (May 22, 1998), http://www.cnn.com/US/9805/22/oregon.shooting.pm (discussing the 1998 Oregon shooting where the 15-year-old school shooter was stopped after killing two and wounding 22 after he emptied his 50-round, high-capacity magazine).

[33] Empirical studies about millions of defensive gun uses or claiming that more guns lead to less crime are wholly discredited but live on as a blight on our democracy. *See generally* John J. Donohue, Abhay Aneja & Kyle D. Weber, *Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis*, 16 J. Empirical Legal Studies 198 (2019).

## The Washington Post

Democracy Dies in Darkness

**LEGAL ISSUES**

# Proud Boys leader and lieutenants charged with seditious conspiracy

The group is the second whose members face the federal rare charge in the Capitol attack

By Spencer S. Hsu, Rachel Weiner and Tom Jackman

Updated June 6, 2022 at 7:00 p.m. EDT  |  Published June 6, 2022 at 3:10 p.m. EDT

Henry "Enrique" Tarrio, the former longtime chairman of the extremist group Proud Boys, was indicted on a new federal charge of seditious conspiracy with four top lieutenants on Monday. The charges expand the Justice Department's allegations of organized plotting to oppose through violence the certification of President Biden's election victory, culminating in the attack on the Capitol by a mob on Jan. 6, 2021.

Tarrio, 38, was not in the District that day but allegedly guided activities from nearby Baltimore as Proud Boys members engaged in the earliest and most aggressive attacks to confront and overwhelm police at several critical points on restricted Capitol grounds. Another defendant, Dominic Pezzola of Rochester, N.Y., broke through the first window of the building at 2:13 p.m. with a stolen police riot shield, authorities said.

A 10-count superseding indictment returned Monday morning charges Tarrio, Pezzola and three other existing defendants — Ethan Nordean of Washington state, Joe Biggs of Florida and Zachary Rehl of Pennsylvania — with "opposing the lawful transfer of presidential power by force," eventually mustering and coordinating the movements of as many as 300 people around the Capitol that day. The defendants are accused of fomenting and spearheading a riot that stormed the Capitol, eventually forcing the evacuation of Congress as it met to confirm the 2020 election results.

Federal prosecutors previously leveled the historically rare charge of seditious conspiracy for the first time in the Jan. 6 attack against Stewart Rhodes, the founder and leader of the extremist group Oath Keepers, and 10 associates. Since the charges were filed in January, a year after the violence, two of the other defendants, Joshua James of Alabama and Brian Ulrich of Georgia, and one other Oath Keeper member, William Todd Wilson of North Carolina, have pleaded guilty to the charge and are cooperating with the Justice Department.

In April, a Tarrio co-defendant, Charles Donohoe of North Carolina, pleaded guilty to two felony counts including obstructing an official proceeding of Congress. His plea provided insights into the plans and intention of the group to disrupt the electoral vote confirmation. Tarrio and the others pleaded not guilty to a previous indictment that

to disrupt the electoral vote confirmation. Tarrio and the others pleaded not guilty to a previous indictment that charged them with offenses including conspiring to obstruct Congress or impede police in a civil disorder.

The new charges add two counts, seditious conspiracy, punishable by up to 20 years in prison, and conspiracy to prevent an officer from discharging any duties. A new hearing was set for Friday. Rehl attorney Carmen Hernandez called the action by prosecutors ahead of an August trial date exceedingly heavy-handed against her client, who she said committed no violence and at worst is allegedly to have associated with the Proud Boys as his right under the First Amendment.

"To bring such a serious charge against Mr. Rehl at this late date without alleging a single new fact against him is simply wrong and deserves a response," Hernandez wrote in a filing. Tarrio attorney Nayib Hassan said his client "is looking forward to trial and his day in court." Attorneys for Nordean declined to comment.

The charges show prosecutors pulling together a wider picture of organization within extremist groups that shared overlapping if not common goals. The investigations have exposed hints of coordination among groups, even as the FBI and Justice Department are expanding their investigations into the political orbit of former president Donald Trump. The House select committee investigating the Jan. 6 attack is expected to shine a spotlight on such connections in public hearings starting Thursday.

In recent weeks, prosecutors have introduced as evidence in the latest case a video of a meeting in an underground parking garage near the Capitol among Tarrio, Rhodes and Kellye Sorelle, an attorney who has worked with the Oath Keepers, on the eve of the rioting. Leaders of two right-wing groups, Joshua Macias of Vets for Trump, a scheduled speaker the following day, and Bianca Gracia, head of Latinos for Trump and a Jan. 6 event organizer with White House ties, were also at the meeting.

Snippets of audio released do not capture what the group discussed. Tarrio has said he was only interested in connecting with Sorelle because she was a "good attorney" after he was released from jail and ordered to leave Washington pending trial for a separate incident, the burning of a Black Lives Matter banner stolen from a church in the District in late 2020 after a different pro-Trump rally. Tarrio pleaded guilty in the banner-burning case and completed a four-month jail term earlier this year.

Meanwhile, multiple Oath Keepers members provided security for Trump confidant Roger Stone on Jan. 5 and Jan. 6, court records show, while at previous pro-Trump rallies he surrounded himself with Proud Boys, including Tarrio, who has served as an aide to Stone.

In the Oath Keepers case, a defendant this spring made public the transcript of a Nov. 9, 2020, videoconference call of the Oath Keepers, in which Rhodes has Sorelle debrief members on "multiple pods working" to challenge Biden's election victory. Sorelle said those in the pods included the Trump campaign, the Republican National Committee, QAnon supporters and the legal team of Rudy Giuliani.

Tarrio also used an encrypted messaging app to communicate with both Rhodes and Stone, who had drawn up a "Stop the Steal" plan on Nov. 5, two days after the election, according to footage from a documentary crew that The Washington Post has reported on. Stone, Macias, Sorelle and Garcia have not been accused of wrongdoing. Stone has denied that he knew about illegal conduct at the Capitol.

The Monday indictment largely restated the role Tarrio allegedly played in discussions that preceded the violence at the Capitol. On Dec. 30 and 31, prosecutors said, Tarrio exchanged messages with an individual who sent him a plan called "1776 Returns" to occupy "crucial buildings" in Washington, including the House and Senate, with "as many people as possible." After sending it, the individual allegedly messaged Tarrio that the "revolution is [sic] important than anything," to which Tarrio allegedly replied, "That's what every waking moment consists of … I'm not playing games."

On Jan. 3, an unidentified "Person 3" wrote on an encrypted Proud Boys leadership chat that the group should "plan the operations based around the front entrance to the Capitol building," according to the indictment. The following day, it alleged, Tarrio posted a voice message to a "Ministry of Self Defense" leaders group, stating, "I didn't hear this voice note until now, you want to storm the Capitol." After the Capitol was breached, Tarrio wrote in a Telegram group chat, "We did this," prosecutors said.

That night, in a new detail alleged in the 32-page indictment, a fellow Proud Boys member identified as "Person 1" messaged Tarrio exulting with a profanity, "1776." Tarrio, according to the charging document, then replied "The Winter Palace," a reference to a Proud Boys planning document that had a section called "Storm the Winter Palace," referring to the Russian Revolution of 1917 and the former imperial palace in St. Petersburg that was raided by Bolsheviks, CNN first reported.

Someone identified in the indictment as "Person 1" also suggested to Tarrio that the election result could be invalidated if lawmakers failed to vote by midnight, a seeming attempt to interpret the Electoral Counting Act in a way to deny Biden's victory that echoed the effort by Trump's own lawyers.

The Proud Boys are known for brandishing batons at rallies and gatherings and for being eager to spar with their perceived enemies in the leftist antifa movement. During a presidential election debate in fall 2020, Trump famously refused to denounce the Proud Boys, urging them to "stand back and stand by." The group took those words as a rallying cry, which appeared to energize members in the months leading up to Jan. 6. While its leaders disavow racism, some members have ties to groups that espouse white-nationalist rhetoric common among hate groups.

Proud Boys engaged in street brawls with antifa members during pro-Trump rallies in Washington in late 2020, one of which included the flag-burning incident at the church and one in which a Proud Boys member, Jeremy Bertino of North Carolina, was stabbed, matching prosecutors identification of "Person 1."

# THE C**O**NVERSATION

Academic rigor, journalistic flair



The Clinton-era ban on assault weapons ushered in a period of fewer mass shooting deaths. AP Photo/Dennis Cook

## Did the assault weapons ban of 1994 bring down mass shootings? Here's what the data tells us

Published: June 8, 2022 3.31pm EDT

**Michael J. Klein**
Clinical Assistant Professor of Surgery, New York University

A spate of high-profile mass shootings in the U.S. has sparked calls for Congress to look at imposing a ban on so-called assault weapons — covering the types of guns used in both the recent Buffalo grocery attack and that on an elementary school in Uvalde, Texas.

Such a prohibition has been in place before. As President Joe Biden noted in his June 2, 2022, speech addressing gun violence, almost three decades ago bipartisan support in Congress helped push through a federal assault weapons ban in 1994, as part of the Violent Crime Control and Law Enforcement Act.

That ban was limited — it covered only certain categories of semi-automatic weapons such as AR-15s and applied to a ban on sales only after the act was signed into law, allowing people to keep hold of weapons purchased before that date. And it also had in it a so-called "sunset provision" that allowed the ban to expire in 2004.

Nonetheless, the 10-year life span of that ban — with a clear beginning and end date — gives researchers the opportunity to compare what happened with mass shooting deaths before, during and after the prohibition was in place. Our group of injury epidemiologists and trauma surgeons did just that. In 2019, we published a population-based study analyzing the data in a bid to evaluate the effect that the federal ban on assault weapons had on mass shootings, defined by the FBI as a shooting with four or more fatalities, not including the shooter. Here's what the data shows:

Before the 1994 ban:

From 1981 — the earliest year in our analysis — to the rollout of the assault weapons ban in 1994, the proportion of deaths in mass shootings in which an assault rifle was used was lower than it is today.

Yet in this earlier period, mass shooting deaths were steadily rising. Indeed, high-profile mass shootings involving assault rifles — such as the killing of five children in Stockton, California, in 1989 and a 1993 San Francisco office attack that left eight victims dead — provided the impetus behind a push for a prohibition on some types of gun.

During the 1994-2004 ban:

In the years after the assault weapons ban went into effect, the number of deaths from mass shootings fell, and the increase in the annual number of incidents slowed down. Even including 1999's Columbine High School massacre — the deadliest mass shooting during the period of the ban — the 1994 to 2004 period saw lower average annual rates of both mass shootings and deaths resulting from such incidents than before the ban's inception.

From 2004 onward:

The data shows an almost immediate – and steep – rise in mass shooting deaths in the years after the assault weapons ban expired in 2004.

Breaking the data into absolute numbers, between 2004 and 2017 – the last year of our analysis – the average number of yearly deaths attributed to mass shootings was 25, compared with 5.3 during the 10-year tenure of the ban and 7.2 in the years leading up to the prohibition on assault weapons.

## Saving hundreds of lives

We calculated that the risk of a person in the U.S. dying in a mass shooting was 70% lower during the period in which the assault weapons ban was active. The proportion of overall gun homicides resulting from mass shootings was also down, with nine fewer mass-shooting-related fatalities per 10,000 shooting deaths.

Taking population trends into account, a model we created based on this data suggests that had the federal assault weapons ban been in place throughout the whole period of our study — that is, from 1981 through 2017 — it may have prevented 314 of the 448 mass shooting deaths that occurred during the years in which there was no ban.

And this almost certainly underestimates the total number of lives that could be saved. For our study, we chose only to include mass shooting incidents that were reported and agreed upon by all three of our selected data sources: the Los Angeles Times, Stanford University, and Mother Jones magazine.

Furthermore, for uniformity, we also chose to use the strict federal definition of an assault weapon — which may not include the entire spectrum of what many people may now consider to be assault weapons.

## Cause or correlation?

It is also important to note that our analysis cannot definitively say that the assault weapons ban of 1994 caused a decrease in mass shootings, nor that its expiration in 2004 resulted in the growth of deadly incidents in the years since.

Many additional factors may contribute to the shifting frequency of these shootings, such as changes in domestic violence rates, political extremism, psychiatric illness, firearm availability and a surge in sales, and the recent rise in hate groups.

Nonetheless, according to our study, President Biden's claim that the rate of mass shootings during the period of the assault weapons ban "went down" only for it to rise again after the law was allowed to expire in 2004 holds true.

As the U.S. looks toward a solution to the country's epidemic of mass shootings, it is difficult to say conclusively that reinstating the assault weapons ban would have a profound impact, especially given the growth in sales in the 18 years in which Americans have been allowed to purchase and stockpile such weapons. But given that many of the high-profile mass shooters in recent years purchased their weapons less than one year before committing their acts, the evidence suggests that it might.

**The Washington Post**

*Democracy Dies in Darkness*

# 1 in 3 Americans say violence against government can be justified, citing fears of political schism, pandemic

The Post-UMD poll, coming a year after the Jan. 6 attack on the Capitol, marks the largest share of Americans to hold that view since the question was first asked more than two decades ago.

By Meryl Kornfield and Mariana Alfaro

January 1, 2022 at 5:59 p.m. EST

Phil Spampinato had never contemplated the question of whether violence against the government might be justified — at least not in the United States. But as he watched Republicans across the country move to reshape election laws in response to former president Donald Trump's false fraud claims, the part-time engineering consultant from Dover, Del., said he began thinking differently about "defending your way of life."

"Not too many years ago, I would have said that those conditions are not possible, and that no such violence is really ever appropriate," said Spampinato, 73, an independent.

The notion of legitimate violence against the government had also not occurred to Anthea Ward, a mother of two in Michigan, until the past year — prompted by her fear that President Biden would go too far to force her and her family to get vaccinated against the coronavirus.

"The world we live in now is scary," said Ward, 32, a Republican. "I don't want to sound like a conspiracy theorist but sometimes it feels like a movie. It's no longer a war against Democrats and Republicans. It's a war between good and evil."

A year after a pro-Trump mob ransacked the Capitol in the worst attack on the home of Congress since it was burned by British forces in 1814, a Washington Post-University of Maryland poll finds that about 1 in 3 Americans say they believe violence against the government can at times be justified.

The findings represent the largest share to feel that way since the question has been asked in various polls in more than two decades. They offer a window into the country's psyche at a tumultuous period in American history, marked by last year's insurrection, the rise of Trump's election claims as an energizing force on the right, deepening fissures over the government's role in combating the pandemic, and mounting racial justice protests sparked by police killings of Black Americans.

The percentage of adults who say violence is justified is up, from 23 percent in 2015 and 16 percent in 2010 in polls by CBS News and the New York Times.

A majority continue to say that violence against the government is never justified — but the 62 percent who hold that view is a new low point, and a stark difference from the 1990s, when as many as 90 percent said violence was never justified.

While a 2015 survey found no significant partisan divide when it comes to the question of justified violence against the government, the new poll identified a sharper rise on the right — with 40 percent of Republicans and 41 percent of independents saying it can be acceptable. The view was held by 23 percent of Democrats, the survey finds.

Acceptance of violence against the government was higher among men, younger adults and those with college degrees. There was also a racial gap, with 40 percent of White Americans saying such violence can be justified, compared with 18 percent of Black Americans.

People's reasoning for what they considered acceptable violence against the government varied, from what they considered to be overreaching coronavirus restrictions, to the disenfranchisement of minority voters, to the oppression of Americans. Responses to an open-ended question on the survey about hypothetical justifications included repeated mentions of "autocracy," "tyranny," "corruption" and a loss of freedoms.

The growth in the share of Americans willing to accept violence against the government identified by The Post-UMD poll may be partly due to methodology. Previous surveys were conducted by phone, while the new poll was largely conducted online, and studies have found respondents are more willing to voice socially undesirable opinions in self-administered surveys than when asked by an interviewer.

Recent surveys, though, have identified a similar trend, and subsequent interviews of some of the 1,101 respondents who participated in the Dec. 17-19 Post-UMD poll found that the events of the past two years have prompted people to reconsider their views. (The new poll has a margin of error of plus or minus four percentage points.)



**Higher share of Americans say it could be justified to take violent action against the government**

Q: Do you think it is ever justified for citizens to take violent action against the government, or is it never justified?

Source: Dec. 17-19, 2021, Post-UMD poll of 1,101 U.S. adults with an error margin of +/- 4 percentage points. 10/15, 4/10 and 4/95 from CBS News/New York Times

EMILY GUSKIN / THE WASHINGTON POST

It wasn't until Jan. 6 that 75-year-old Beverly Lucas considered the fact that people could attempt to violently attack the government. Lucas, who voted for Trump and identifies as a Republican, said she was horrified watching the images of people clad in "Make America Great Again" apparel storming the Capitol, assaulting police officers who were guarding the building.

"That never should have happened in this country," she said. "It's a sobering idea that elected representatives should fear for their lives because of a mob."

Still, Lucas said she had not ruled out the possibility that she would agree with violence if there was no available nonviolent alternative, referencing the Revolutionary War.

"When in the course of human events the government no longer represents the people, and there is no recourse, then it might be time," she said.

"I don't think that will ever happen," she added.

The Capitol attack also set off alarms for Rob Redding, 45, a New York political independent who has been a talk-show host and runs a website focused on Black-oriented news. He said he has since considered arming himself to protect his loved ones.

The insurrectionists, he said, were attempting to "subvert American democracy because now it's becoming equal for all people."

"We are in a state where we're going to have to arm ourselves, absolutely," Redding said. "I'm a Black man in America. ... I believe in protecting myself."

Redding added that he doesn't believe in breaking laws "unless laws are unjust." "To sit up here and say that I support violence against our government, I don't. I support government being level and equal for all people."

## About 4 in 10 Republicans and independents say violent action against the government is sometimes justified

Q: Do you think it is ever justified for citizens to take violent action against the government, or is it never justified?

| | Justified | Never justified | No opinion |
|---|---|---|---|
| U.S. adults | 34 | 62 | 4 |
| Democrats | 23 | 74 | |
| Independents | 41 | 54 | 5 |
| Republicans | 40 | 57 | |

Source: Dec. 17-19, 2021, Post-UMD poll of 1,101 U.S.

Taylor Atkins, 29, who lives in Atlanta and works in health-care administration, said she "absolutely" believes it is justifiable to take arms against the government in situations where those in power use their positions to oppress Americans, particularly those of ostracized identities.

Atkins, a Democrat, described the Jan. 6 riot as "insane," saying "there wasn't a need for violent outrage just because the president that you wanted to didn't win."

But, she added: "For people of color — I'm Black — we're actually losing our lives. We're actually fighting over if my life is valuable."

A new mom, Atkins said she didn't join Black Lives Matter protests during the summer of 2020 because she had a baby back home. She also said she doesn't support looting — but often, she noted, that's the only way demonstrators can get attention.

Atkins said she has considered arming herself for her own "protection," especially as the pandemic continues heightening tensions between civilians and the government. She pointed to clashes in Europe last year, where thousands of civilians protesting coronavirus measures fought police across the continent.

"I feel like that's justified because, obviously, we do all care about each other ... but everybody has the right to be a person and be free and make their own decisions," she said. "As long as they're not truly impacting somebody else, as far as they have covid and are not going to the store and actually coughing on somebody, they should be allowed to leave their house."

Ward, the Michigan mother of two and self-employed housekeeper, said she would not participate in violence that she anticipates could come in her lifetime if the government imposes stricter rules such as an expansive vaccine mandate. She said she believes other people could be justified to "express their Second Amendment right" if the government infringes their freedom of choice and nonviolent action such as protests were unsuccessful.

Despite voting for Trump, Ward and other Republicans expressed disappointment with the insurrection on Jan. 6, saying they did not believe rioters had justification to commit violence.

## Reasons Americans say it would be justified to take violence against the United States government

Q: Under what circumstances would it be justifiable to take violent action against the United States government? (Among the 34 percent who say violence against government could be justified; up to two open-ended responses accepted)

| | |
|---|---|
| Government violates or takes away rights or freedoms/Oppresses people | 22% |
| Government no longer a democracy/Becomes a dictatorship/Coup/Military takes over | 15 |
| Government violates constitution | 13 |
| Government abuses power/Tyranny | 12 |
| Government is violent against citizens/Safety at risk | 11 |
| Government not working in citizens' best interests/Will of people | 8 |
| Corruption/Fraud | 5 |
| To stop communism or socialism | 4 |
| American Revolution/Declaration of Independence/Reference to founding fathers | 3 |

| | |
|---|---|
| President or government does not accept election results/Elections cancelled/Widespread voter fraud | 3 |
| Government is wrong (in general) | 3 |
| Nazis/Fascists take power | 2 |
| Other | 7 |
| No opinion/No answer | 12 |

Source: Dec. 17-19, 2021, Post-UMD poll of 396 Americans who say violence against the U.S. government could be justified with an error margin of +/- 6.5 percentage points.

EMILY GUSKIN / THE WASHINGTON POST

Many respondents, particularly Republicans, cited the hardening battle lines over public health measures — and how far the government might go to combat the coronavirus — as a factor in their shifting views.

Don Whittington, 62, who lives in Prattville, Ala., and works in construction, said the pandemic has shown how easily it can be for some Americans to lose control over their freedoms, sparking angst among some groups, though he said he believes America is still far from a scenario that would push civilians to rebel against their government.

"What I can see across the country — there is going to come a point where people, both Democrat and Republican, are going to quit putting up with the things that are taking place," said Whittington, a Republican.

Still, Whittington, a devout Christian and a firearm owner, said he wouldn't be one to fight in a revolution.

"Because of my worldview, and because of my belief in God, I don't know that I would ever use a weapon against a government or anybody else," he said.

Matthew Wood, 37, a call center operator in Nampa, Idaho, said he has gotten more involved in local politics since the start of the pandemic, demanding fewer restrictions. If officials won't listen to people like him, he said, violence would be acceptable as a last resort. "If governments aren't willing to work and make changes, then so be it," said Wood, a Republican.

Tomasz Antoszczak, a 39-year-old Democrat from New Jersey, said he did not believe justified violence could happen any time soon, stressing that such action would be "a very last resort." But he said that the last administration's attempts to overturn the results of the election could have gone differently, potentially tipping the scales.

"With last year's insurrection, if things had gone in a different direction for some reason, and if the folks who stormed the Capitol were successful, and if the election was overturned and the results were overturned, and if Trump would have stayed in power," Antoszczak said. "That's just a lot of ifs."

Antoszczak expressed concern about the lawmakers he said "caved in" to the demands of the last administration.

"The last couple of years definitely opened my eyes a little bit more as to how fragile our government can be," he said.

James Lee, a Democrat in Florida, argued that American democracy was built on negotiation based on conflict, meaning that it took the Revolutionary War to achieve the political system the country has now.

"Whenever you lose that negotiation factor or the democracy itself, then, yeah, violence is going to have to be used in order to reestablish the democracy that we have," he said.

Still, Lee said he wouldn't be one to fight a despotic government.

"If I have to resort to firearms, in my opinion, I've already lost the battle," he said.

*Scott Clement and Emily Guskin contributed to this report.*

**The New York Times** | https://www.nytimes.com/2022/05/16/nyregion/buffalo-shooting-attack.html

Buffalo Shooting  >

---

# Buffalo Suspect Planned Attack for Months, Online Posts Reveal

The 18-year-old was able to buy an assault-style weapon even though he had been held for a mental health evaluation in high school.

**By Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius**
May 16, 2022

BUFFALO — A cache of online postings suggests months of preparation and planning preceded Saturday's racist massacre in Buffalo and shows how the suspect evaded a state law that could have prevented him from owning a gun.

New York's so-called red-flag law took effect in 2019, allowing judges to bar people believed to be dangerous from possessing firearms. Yet Payton S. Gendron, the 18-year-old man accused of killing 10 people at a Tops supermarket on Saturday, was able to buy an assault-style weapon despite having been held for a mental health-evaluation last year after making a threatening remark at his high school.

He described the remark — he responded to a school project question by writing that he wanted to commit a murder-suicide — as a joke, according to a law enforcement official familiar with the case, and was released.

But the postings that came to light on Monday make it evident that Mr. Gendron was lying.

"I got out of it because I stuck with the story that I was getting out of class and I just stupidly wrote that down," Mr. Gendron wrote. "That is the reason I believe I am still able to purchase guns. It was not a joke, I wrote that down because that's what I was planning to do."

The ruse worked: On Monday, state police confirmed that they did not seek a red-flag order against Mr. Gendron, who is now charged with one of the deadliest racist massacres in recent American history.

The newly discovered writings appear to have been posted on Discord, a chat application,

by a user named Jimboboiii before being uploaded to internet forums as a pair of comprehensive documents. They feature thousands of lines of racist, antisemitic and often rambling remarks, and include details on how Mr. Gendron apparently planned and practiced for his attack and paid for his weapons and other equipment.

Jimboboiii was also the name used in a livestream that Mr. Gendron posted on Saturday as he began his attack on Tops, snippets of which circulated online on several platforms before being expunged.

The Discord posts include pictures of Mr. Gendron and extensive details that align with what is publicly known about him, and in many ways mirror a racist screed the authorities have confirmed he published online just before the attack.

The compendium also appears to show that Mr. Gendron fully realized the consequences of his violence. "I am well aware that my actions will effectively ruin my life," reads one posting from early December. "If I'm not killed during the attack I will go to prison for an inevitable life sentence."

Since New York's so-called red-flag law took effect in 2019, judges have issued 589 orders barring people from possessing firearms, according to the state Office of Court Administration. About 18 orders to take guns away from people are issued per month under the law.

The process involves filing an application with the state court system at the county level, stating that a person "is likely to engage in conduct that would result in serious harm to self or others."

"There's a real question about whether that law was effectively applied when this person was apparently detained after making threats," said State Senator Brian Kavanagh, a Democrat who represents parts of Lower Manhattan and Brooklyn and who sponsored the bill. "We passed the law specifically to ensure that people who exhibit signs of being dangerous to themselves or others can be denied access to guns."

Mr. Gendron's newly discovered online posts also cast doubt on the thoroughness of his mental health evaluation. "I had to spend ~20 hours in that ER waiting for somebody to give me 15 minutes to talk to me," he wrote. "This proved to me that the US healthcare system is a joke."

But even the few people close to Mr. Gendron appeared to have little inkling about what was in store. Matthew Casado, 19, said in an interview on Monday that he was one of Mr. Gendron's only friends, having known him since they were in second grade together.

The friends had gone target shooting in the past, and on Friday, the day before the attack, Mr. Casado said Mr. Gendron unexpectedly showed up at his house and dropped off five boxes of ammunition. Later, Mr. Casado got a text message from Mr. Gendron, who said "he needed space to rearrange his house," Mr. Casado said. He added that Mr. Gendron said he would return that evening to pick up the bullets. He never did.

A day later, Mr. Casado, who is Latino, learned that his friend was accused of committing the racist massacre.

"Until Saturday, I always knew him as a good person. He was never racist towards me, or around me," Mr. Casado said in the backyard of his home in Conklin. "I didn't know he was racist."

The Discord postings, first reported by The Washington Post, also suggest that Mr. Gendron initially intended to stage his killing on March 15 to correspond with the third anniversary of a 2019 attack at two mosques in Christchurch, New Zealand, a massacre that left 51 people dead.

In a separate screed Mr. Gendron is believed to have posted in the days before the attack on the supermarket, he expressed admiration for the gunman in that killing and another in El Paso in 2019, as well as repeated references to a white supremacist ideology known as replacement theory, which imagines a nefarious scheme to "replace" white Americans — and voters — with immigrants or people of color.

> **Sign up for the New York Today Newsletter**  Each morning, get the latest on New York businesses, arts, sports, dining, style and more. Get it sent to your inbox.

The theory, once confined to conspiracy websites and publications, has found a larger audience in recent years as prominent conservative commentators and lawmakers have helped spread versions of it.

Alex B. Newhouse, the deputy director of the Center on Terrorism, Extremism and Counterterrorism at the Middlebury Institute of International Studies, said in an interview on Monday that Mr. Gendron might belong to the same pattern of extremism as the shooters in El Paso and Christchurch, and that he sought to bring about complete social destruction.

A lot of Mr. Gendron's writing "was more of a means to an end than an end itself," Mr.

Newhouse said. "It's a way to recruit and radicalize people."

Investigators believe that Mr. Gendron traveled halfway across New York, from his home in a small town near Binghamton, to shoot and kill Black people in east Buffalo, an area known for its large Black population — going so far as to visit the neighborhood the day before the attack in what they described as a reconnaissance mission.

On Monday, police and city officials also confirmed that Mr. Gendron had traveled to Buffalo in early March — seemingly in preparation for his aborted March 15 plan — and that they believed Mr. Gendron had planned a prolonged massacre on Saturday.

Mr. Gendron surrendered to the police after his attack and was charged with first-degree murder, to which he pleaded not guilty. Of the victims of the shooting, several were older shoppers as well as a supermarket security guard. The guard exchanged fire with the suspect, who was protected by body armor and fired a semiautomatic rifle.

President Biden will visit Buffalo on Tuesday to visit with families who lost relatives, including the family of Ruth Whitfield, an 86-year-old grandmother killed while shopping at Tops. On Monday, the Whitfield family expressed grief and outrage, demanding that the nation's leaders do more to fight white supremacy and the ubiquity of guns often used in such mass shootings.

"We're tired of losing our loved ones to senseless violence," said Garnell Whitfield Jr., a former Buffalo fire commissioner, flanked by his siblings as well as Ms. Whitfield's grandchildren and great-grandchildren.



Garnell Whitfield Jr., the former Buffalo fire commissioner whose mother, Ruth Whitfield, was killed in the attack, spoke at a news conference with Mayor Byron Brown.  Gabriela Bhaskar/The New York Times

At a midday news conference, Mr. Whitfield was joined by Buffalo's mayor, Byron W. Brown, who also called for gun control measures and improved mental health treatment. He echoed a call made on Sunday by Gov. Kathy Hochul, his fellow Democrat, for measures to stop hate speech from spreading online.

"The availability of guns in this country needs to change," Mr. Brown said. "People spreading hate through the internet and indoctrinating people in the ways of hate needs to change. The lack of services for people with mental health issues needs to change."

Another victim of the shooting, 72-year-old Katherine Massey, had seemingly been well aware of the danger, penning a letter last year to The Buffalo News, according to the newspaper, in which she argued for "extensive federal action/legislation to address" gun violence.

Mr. Gendron had recently purchased a Bushmaster assault weapon near his home in Conklin, N.Y., according to Robert Donald, the owner of Vintage Firearms in Endicott, N.Y., who primarily sells collectible firearms.

In Mr. Gendron's home county, Broome, there have been 11 red-flag orders, or about one for every 18,000 residents — roughly average for the state. The court system does not

track the number of applications that were denied.

Nineteen states have enacted such laws, including Virginia and New Mexico as recently as 2020. Because almost all have been enacted within the past 10 years, there is limited research on their effectiveness.

The law enforcement official who had been briefed on the call about Mr. Gendron last year said that in New York, hundreds of school threats are called in annually — including three on Monday in the wake of the massacre — and that in each case, authorities interview students and parents to determine whether students have access to guns. The authorities then try to make a reasoned call on what action to take.

The shooting in Buffalo — New York's second most-populous city — has shaken many Black residents who say they have endured discrimination and segregation there.

That tension has been intensified by false alarms about other shootings as well as Monday's arrest of a local man, Joseph S. Chowaniec, 52, who was charged by the Erie County district attorney, John J. Flynn, with making threatening calls to two local businesses on Sunday in which he referenced the shooting at Tops.

At a news conference on Monday afternoon, Mr. Flynn pleaded for patience from the public, noting that Mr. Gendron is innocent until proven guilty. Still, even some elected officials seemed frustrated by prospect that justice might be delayed too long.

"This young man was walking around with a camera on his head: He showed the whole world what he was doing," said Assemblywoman Crystal Peoples-Stokes, a Buffalo Democrat who serves as State Assembly majority leader and is Black. "And I understand that they got to go through a court. I get that. But a lot of the anger that people have inside is from the fact that their loved ones have been murdered for going to the supermarket."



John Flynn, the Erie County district attorney, asked for patience as prosecutors prepare the case against the suspect.  Joshua Bessex/Associated Press

Such sentiments were also expressed by Mr. Whitfield, whose family is being represented by the civil rights attorney Benjamin Crump. Mr. Crump said he and a legal team were considering lawsuits against a wide variety of people and institutions — including cable news stations and politicians — he called "the root of the hate."

"Even though they may not have pulled the trigger," Mr. Crump said, "They loaded the gun."

Mr. Whitfield, the former fire commissioner, was emotional in speaking of his mother, Ruth, whom he described as a loving force — "My mom was my heart," he said — whose death had "forever changed, forever damaged" his family.

At the same time, he said he planned to fight for changes to laws to make such massacres more difficult.

"We're going to cry, and we're going to grieve," he said. "But that's not all we're going to do."

Ashley Southall and Troy Closson contributed reporting.

Jesse McKinley is a Metro correspondent for The Times, with an emphasis on coverage of upstate New York. He previously served as bureau chief in Albany and San Francisco, as well as stints as a feature writer, theater

columnist and Broadway reporter for the Culture desk.  @jessemckinley

Jonah E. Bromwich covers criminal justice in New York, with a focus on the Manhattan district attorney's office, state criminal courts in Manhattan and New York City's jails.

During his time on Metro, Mr. Bromwich has covered investigations into former president Donald J. Trump and his family business, the fall of New York Governor Andrew M. Cuomo and the crisis at the jail complex on Rikers Island, among other topics.  @jonesieman

Andy Newman writes about social services and poverty in New York City and its environs. He has covered the New York metropolitan area for The Times for 25 years and written nearly 4,000 stories and blog posts.  @andylocal

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Despite State Law, Buffalo Suspect Purchased Rifle

---

## Buffalo Shooting  ›

Republicans play on fears of 'great replacement' in bid for base voters.

'Uncle Teeny,' who worked at Tops, was known as a 'helping heart.'

What do most mass shooters have in common? They bought their guns legally.

Racist attack spotlights Elise Stefanik's echo of replacement theory.

The closing of the Tops market on Buffalo's East Side has created a 'food desert.'

/

## The Washington Post

Democracy Dies in Darkness

# From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control

Biden has played a central role in the unsuccessful efforts to enact significant firearms legislation amid thousands of mass shootings, including another this week at a Texas elementary school

By Ashley Parker, Tyler Pager and Colby Itkowitz

Updated May 24, 2022 at 11:06 p.m. EDT   |   Published May 22, 2022 at 6:00 a.m. EDT

Gabrielle Giffords huddled with Vice President Joe Biden in his private office just off the Senate floor on an April Wednesday in 2013, watching the stunning defeat of a bill to expand background checks to most gun sales.

Giffords — a former Democratic lawmaker who still had difficulty speaking after being shot in the head in 2011 during an event in her Arizona district — was equal parts furious and devastated as she watched 46 of her former colleagues, including five Democratic senators, vote against the gun-control measure informally known as Manchin-Toomey.

The gun bill had emerged in the wake of the mass shooting at Sandy Hook Elementary School in Newtown, Conn., just four months prior — a massacre that left 20 children and six adults dead. Now it was clear that not even 20 slaughtered first-graders would move the nation to change its gun laws.

Biden empathized with Giffords, telling her he understood how painful it was to see the defeat of the background check measure negotiated by Sens. Joe Manchin III (D-W.Va.) and Patrick J. Toomey (R-Pa.), said Peter Ambler, who had joined Giffords's congressional staff just five days before she was shot and now is the executive director of Giffords, a group devoted to fighting gun violence.

But Biden also offered an encouraging note, telling Giffords the failed vote would infuriate the American people and spur them to take action to prevent gun violence: "This is actually going to help you build a movement," Ambler recalled Biden saying.

Biden's optimism was misplaced. Since Sandy Hook, the nation has experienced more than 3,500 mass shootings, according to the Gun Violence Archive, a nonprofit organization that tracks gun violence and defines a mass shooting as an incident in which four or more people are killed or injured.

The shootings have touched nearly every imaginable slice of American life: A Black church in Charleston, S.C. (2015). A government-funded nonprofit center in San Bernardino, Calif. (2015). A gay nightclub in Orlando (2016). A country music festival in Las Vegas (2017). A high school in Parkland, Fla. (2018). A synagogue in Pittsburgh (2018). A Walmart in majority-Hispanic El Paso, followed just hours later by a shooting in a popular nightlife corridor in Dayton, Ohio (2019). Asian American massage businesses in Atlanta (2021).

Then on May 14, a racist attack at a supermarket in a Black neighborhood of Buffalo left 10 dead and thrust mass shootings back into the news.

And then again on Tuesday, at least 19 students and two teachers were killed in a mass shooting at Robb Elementary School in Uvalde, Tex., about 80 miles west of San Antonio. The alleged gunman, 18-year-old Salvador Ramos, was apparently killed by police officers at the scene.

In the nearly decade-long stretch between Sandy Hook and Buffalo and Uvalde, congressional efforts to change gun policies in any significant way have repeatedly failed, despite lawmakers occasionally commencing gun-control discussions anew in the wake of particularly harrowing gun tragedies. And Biden has played a central role in many of those unsuccessful efforts, first as vice president under Barack Obama and now as president.

Biden frequently touts his role in passing a 1994 assault weapons ban — but that bill included a 10-year "sunset" clause, meaning the law automatically expired in 2004 after Congress did not renew it.

After Sandy Hook, Obama made Biden his point person on guns. Biden led a team that proposed nearly two dozen executive actions on guns that Obama signed, but he also oversaw the failed Manchin-Toomey effort.

Now as president, Biden has yet to receive from the Democratic-controlled Congress any major piece of legislation aimed at preventing mass shootings. Most Republicans remain opposed to any proposed changes, arguing that new restrictions would have little impact on the frequency of mass shootings and would impinge on Americans' constitutional right to bear arms.

Returning from Buffalo in the aftermath of the latest massacre, Biden said there was "not much on executive action" that he could carry out on gun control and, referring to the 1994 assault weapons ban, said, "I've got to convince the Congress that we should go back to what I passed years ago."

He also acknowledged the political head winds he was still facing, nearly a decade after Sandy Hook.

"The answer is going to be very difficult," Biden added before boarding Air Force One to fly back to Washington. "It's going to be very difficult. But I'm not going to give up trying."

# 'It won't be easy'

In 2012, five days after Sandy Hook and six days before Christmas, Obama addressed reporters, promising to "use all the powers of this office" to help prevent more gun tragedies.

With Biden standing just behind his right shoulder, Obama announced he had asked his vice president to lead an effort to produce a set of concrete proposals to curb gun violence by January.

"It won't be easy — but that can't be an excuse not to try," Obama said.

Biden threw himself into the effort. He and his team held roughly 200 meetings, said a former top Biden policy adviser from that period, who spoke on the condition of anonymity to discuss private conversations. Biden and his team huddled with Cabinet officials, policy experts, active duty service members, veterans, outdoors enthusiasts, gun violence prevention groups, police officers and, of course, Sandy Hook families.

"We were doing everything we could to lessen the chances of someone coming into possession of a weapon and slaughtering people," said Shailagh Murray, Biden's deputy chief of staff at the time. "It was probably the most substantive exercise that we undertook in the office the whole time I was there, and people from all over the government participated."

Matt Bennett, a co-founder of Third Way, a Democratic think tank, helped some of the Sandy Hook families navigate Washington bureaucracy. He said Biden and his team "were convening regular meetings to scour every nook and cranny of the federal code to figure out what they could do with their pen, and they did everything they could possibly think of — but that's not that much."

By mid-January, Biden produced a comprehensive road map for combating gun violence, and Obama announced 23 executive actions — including directing the Centers for Disease Control and Prevention to research the causes of gun violence; launching a nationwide responsible gun ownership campaign; providing law enforcement, first responders and school officials with proper training for active shooter situations; and launching a national discussion about mental health.

On Capitol Hill, Manchin — a proud gun owner who had grown up around firearms in West Virginia — found himself deeply moved by the shooting and was looking for a Republican partner to help draft a bipartisan gun bill.

On Valentine's Day 2013, Manchin and Toomey flew together to Pittsburgh for an energy conference, and the two senators from neighboring states became friendly after chatting during the flight.

A month later, after running into Toomey at Washington's Union Station, Manchin broached the idea of teaming up on a gun deal and returned to Capitol Hill enthused. "He came into the office and said, 'Toomey's in,'" said Jonathan Kott, then Manchin's communications director.

In many ways, Toomey was a natural choice. Like Manchin, he was a gun owner and had a strong rating from the National Rifle Association — but the bipartisan deal also promised potential political payoff.

"Pennsylvania was considered a little more bluish than it is now, and I think Toomey was thinking about suburban voters he wanted to seal the deal with to be a long-standing politician in Pennsylvania, so I think that's what upside he saw in it politically," said Brian Fallon, who at the time was the communications director for Sen. Charles E. Schumer (D-N.Y.), now the Senate majority leader.

To many gun-control advocates, the compromise Manchin and Toomey came up with was modest to the point of being toothless. It would have expanded background checks to most gun sales, but it also loosened some existing gun restrictions — what one senior Republican staffer on Capitol Hill at the time described as "Second Amendment sweeteners" — in an effort to mollify the NRA and prevent it from actively lobbying against the bill.

But after other pro-gun groups, such as Gun Owners of America, came out against the measure, so, too, did the NRA.

"From a policy standpoint, the thing became very diluted in order to get Manchin and Toomey to support it, but the upside was that it was something, and nothing had been done on guns for so long and so getting anything done would have been a victory over the NRA," Fallon said. "It would have been symbolic, in that it would have opened the door to do something on guns going forward."

Several people involved in the discussions at the time said Biden was fairly removed from the Manchin-Toomey proposal snaking its way through the Capitol.

"I don't recall him being involved at all," Fallon said, saying that similar to the issue of immigration, the Obama-Biden administration's approach was, "Let the lawmakers do their thing and see what they come up with."

Part of that was by design, allies said, because the White House feared that too much Capitol Hill involvement by Obama or Biden would spook Republicans.

Still, some were frustrated with what they viewed as Biden's inaction.

"The Biden role was a joke," said a former Democratic Senate aide, speaking on the condition of anonymity to share a candid opinion. "He couldn't fight his way out of a paper bag. Biden did not move one single person. Manchin got Toomey, and Manchin is the one who really put things together."

Manchin and Biden did speak on the phone throughout the process, with Biden sharing lessons he learned helping pass the Brady Handgun Violence Prevention Act in 1993 and the ban on assault weapons in 1994.

A current Biden policy adviser who also worked for him as vice president, speaking on the condition of anonymity under terms set by the White House, said, "He was definitely working the phones and calling senators until the very end."

It soon became clear that with Manchin-Toomey, clearing the 60-vote filibuster threshold would be a heavy lift. Some Republicans, pointing to their support on other hot button cultural issues, like gay rights and immigration, worried that they couldn't take another political hit with their base.

"There was definitely a sense at that time that for a lot of Republicans it was too much 'culture change' too quickly," Ambler said. "They didn't feel like there was room in their politics to take on any additional territory."

In the end the measure was defeated, 54 to 46, in April 2013 with only four Republicans — Toomey included — ultimately supporting the bill.

Four Democratic senators — Max Baucus of Montana, Mark Begich of Alaska, Heidi Heitkamp of North Dakota and Mark Pryor of Arkansas — also voted against the bill. Three were later defeated in reelection bids, and Baucus became an ambassador. Then-Senate Majority Leader Harry M. Reid (D-Nev.) supported the bill but voted against it for procedural reasons.

Baucus and Biden were close friends, having served together in the Senate since the late 1970s and, to some, Baucus's no vote underscored Biden's lack of influence on the issue. "It's pretty astonishing that Baucus wouldn't step up for his buddy Biden," the former Democratic Senate aide said.

David Ramseur, who was Begich's chief of staff, said Begich was "a product of Alaska, a lifetime member of the NRA, first to get a concealed permit in Alaska." But Begich also had a young son at the time and, like nearly everyone in the nation, was deeply affected by the Sandy Hook shooting.

Ramseur said he vividly remembers the Sandy Hook parents coming to lobby their office. "I still have one of those rubber bracelets with his son's name on it, and I look at it every day in my car," he said, referring to a memento given out by one of the parents. "It was a tough vote."

Much of the Democratic ire was reserved for Heitkamp, who had recently been elected and did not have to run again until 2018.

Giffords had been lobbying her former colleagues to vote for Manchin-Toomey, and in one meeting, she urged Heitkamp to support the legislation, according to two people with direct knowledge of the meeting, who spoke on the condition of anonymity to disclose a private conversation. Heitkamp, through tears, conveyed she believed voting for the bill was the right thing to do, they said. But Heitkamp ultimately told Giffords she couldn't support it, suggesting the politics were too difficult for her, the people said.

Tessa Gould, a Heitkamp spokeswoman who was her chief of staff at the time, disputed that account: "Not only did this meeting not happen but the characterization is completely inconsistent with what Heidi's thinking and our internal discussions were at the time about the bill."

After the vote, Obama called it "a pretty shameful day for Washington."

Kott, Manchin's aide at the time, said he concluded that significant federal gun-control legislation was all but doomed.

"We as a country watched 20 babies get murdered and we did nothing," he said. "And then month after month, every time a new mass shooting would happen, people would ask, "Are you going to reintroduce it?' And the answer was: 'Why? We have even less votes now.'"

# 'We've got to stop this nonsense'

Sen. Chris Murphy (D-Conn.) blames former president Donald Trump's call with Ukrainian President Volodymyr

Zelensky for thwarting one of Congress's best chances in recent years at passing gun-control legislation.

Murphy — who, as the junior senator from Connecticut, views gun control as a passion project — said that in the decade after Sandy Hook talk of federal action to prevent gun violence has bubbled up periodically, usually after another particularly devastating mass shooting.

But in his view, the most promising opportunity came in August 2019, after back-to-back shootings in El Paso and Dayton, which combined left 32 people dead and scores injured.

In the aftermath, Murphy said, he and several other senators began negotiating with then-Attorney General William P. Barr about a deal to expand background checks to all commercial sales. He said they also had a 45-minute conversation with Trump, after which Trump instructed his staff to write background check legislation.

But then in September, news leaked that Trump had pressured Zelensky to investigate Biden — at the time his opponent in the 2020 presidential election — in exchange for military aid, and the gun discussions ground to a halt.

"What happened is the Zelensky call became public, and those negotiations never started back up once we were on a fast track towards impeachment," Murphy said.

The Trump years presented several other moments of potential opportunity. In October 2017, a gunman above the Las Vegas Strip opened fire at a country music festival, killing more than 50 and wounding hundreds.

The shooter had used a device known as a bump stock, which makes it easier to fire a semiautomatic rifle more rapidly, and the following December, Trump's Justice Department banned bump stocks.

The Trump administration later also tried to issue guidance that could have outlawed stabilizing braces, which help steady a shooter's aim, but ultimately withdrew the guidance amid outcry both inside the White House and among Republicans and gun rights groups.

In early 2018, a shooting at Marjory Stoneman Douglas High School in Parkland killed 17. A week after the shooting, Trump met with some of the Parkland survivors and families, clutching a note card with Sharpie-scrawled prompts such as, "What can we do to help you feel safe?" and "I hear you."

The following week, in a meeting with Democratic and Republican lawmakers, Trump bucked the NRA, calling for "comprehensive" gun legislation. He warned fellow Republicans that they can't be "petrified" of the powerful gun group and at one point suggested, "Take the guns first, go through due process second."

"It's time," Trump told the group. "We've got to stop this nonsense."

But the next day, Trump hosted the NRA's top lobbyist in the Oval Office — a meeting both men later described on Twitter as "great" — and all post-Parkland momentum at the administration level seemed to end.

Kris Brown, the president of Brady, a gun violence prevention organization, remembers talking with Democratic senators at the time, thinking that perhaps Trump and his team would help with federal legislation.

The group, Brown said, thought that "maybe this is an opportunity for us — and then it lasted all of 24 hours."


# 'The before and after moment'

After the Buffalo shooting, Manchin again called on Congress to take up his bipartisan background checks deal from nearly a decade ago.

"If you can't pass Manchin-Toomey, how are you going to get enough votes for anything else?" Manchin told reporters.

But even that seems unlikely.

In an interview with The Washington Post, Toomey said that neither Biden nor his staff has contacted the senator about working on gun legislation. Toomey, however, added that he was "not shocked," saying he has tried to engage the White House on other issues and has been unable to get Biden to take his calls.

He also said he is skeptical that the Buffalo tragedy will prompt a meaningful federal gun bill.

"I never say never, but I don't think there's anything President Biden can do or say," Toomey said. "The political dynamic is such that a popular Republican president would have more of chance. ... A Democratic president isn't in a position, especially an unpopular one like Biden."

Still, allies and advisers say Biden views gun control as a critical issue.

He entered the White House with an aggressive plan to tackle gun violence, administration officials said, and since taking office, he has announced four packages of executive actions on the topic. These include cracking down on "ghost guns," promoting the safe storage of firearms, and federal funding to bolster police forces and expand community violence intervention programs.

In June 2021, Biden issued a gun crime reduction agenda, which in part called on cities and states to use funding from the American Rescue Plan for public safety, and White House officials say $10 billion from that legislation has already been used for crime prevention.

Biden has also tried to corral the Senate into confirming a director to run the Bureau of Alcohol, Tobacco, Firearms and Explosives — a position that has been without a Senate-confirmed leader since 2015. His first nominee, David Chipman, withdrew after bipartisan opposition, but the White House has made an aggressive push behind the president's second nominee, Steve Dettelbach, a former U.S. attorney.

"While there's a lot of frustration with this administration, and I think it's very fair, this is the greatest champion we've had on addressing gun violence in history in my opinion because he's taken a more holistic, comprehensive approach," said Greg Jackson, the executive director of the Community Justice Action Fund, which works to end gun

violence in communities of color. "It's not just reactive to one moment to one shooting or to one media story. It's really looking at this as a whole."

For Murphy, nine years after Sandy Hook, the tale of the nation's quest to end gun violence remains a hopeful one. The anti-gun movement began in earnest in 2013, he says, arguing that "there are not a lot of moments where everybody goes from Position A to Position Z. You need to build political power in order to enact important, controversial social change."

"I think that we have made enormous progress over the last nine years, and I sort of look at Sandy Hook as the before and after moment," Murphy said.

Yet the before and after can look hauntingly similar. The Buffalo shooter, for instance, used the same weapon as the Sandy Hook shooter — a Bushmaster XM-15 semiautomatic rifle. The suspect allegedly wrote in an online document that he modified it to hold more ammunition.

The Washington Post

Democracy Dies in Darkness

**INVESTIGATIONS**

# Massacre suspect said he modified Bushmaster rifle to hold more ammunition

By Craig Whitlock, David Willman and Alex Horton

May 15, 2022 at 8:47 p.m. EDT

The suspect in the Buffalo supermarket massacre purchased the primary weapon allegedly used in the shooting — a used Bushmaster XM-15 semiautomatic rifle — from a licensed dealer near his hometown but said he then illegally modified the gun so he could use a high-capacity magazine.

The suspect, 18-year-old Payton S. Gendron, described how he amassed his arsenal in lengthy online postings that authorities believe he wrote in the weeks before the massacre on Saturday. He said he bought the Bushmaster in January from Vintage Firearms, a small gun store about 15 miles from his home in Conklin, N.Y., paying $960 for the rifle, a sling to carry it and some ammunition.

He also recounted how he acquired two backup weapons: a Mossberg 500 shotgun that he purchased in early December and a Savage Axis XP bolt-action rifle that he received from his father as a Christmas present when he was 16 years old.

Gendron was arrested Saturday and charged with murder after police said he killed 10 people and wounded three others in a shooting spree at a Tops Friendly Markets store in Buffalo. Authorities said that the attack was racially motivated and that Gendron targeted the store because it was in a predominantly Black neighborhood.

The owner of Vintage Firearms, 75-year-old Robert Donald, confirmed to the New York Times and ABC News on Sunday that he sold the Bushmaster to Gendron. He said a background check raised no flags and that agents from the Bureau of Alcohol, Tobacco and Firearms visited his shop — an old one-room house — on Saturday night to collect paperwork from the sale.

"I happened to have this particular gun at this particular time," Donald told ABC. "And this particular guy happened to buy it. After the gun leaves the firearm shop, you have no control."

In New York state, customers ages 18 and older are allowed to buy rifles and shotguns without a permit, though they need to pass an instant criminal background check at the time of the sale. (Gun-control laws are more restrictive in New York City.)

Gun-purchase background checks are supposed to flag individuals with a history of mental illness but usually prohibit sales only to people in severe cases, such as people who have been institutionalized by a judge. Law enforcement officials said they investigated Gendron last June after he allegedly made a threatening statement. Buffalo Police Commissioner Joseph Gramaglia said New York state police took Gendron, then 17, into custody and transferred him to a hospital for a mental health evaluation. He was released a day and a half later.

In 2013, the state of New York passed a law banning the sale of assault-style semiautomatic rifles with 10 common features, including protruding pistol grips, flash suppressors, and folding or telescoping stocks. One of the suspect's online postings includes a photo of his Bushmaster XM-15 E2S Target rifle with what appeared to be a pistol grip. He did not specify whether he purchased the rifle that way or whether he added the grip later.

In one posting, Gendron admitted to illegally modifying the weapon in another way. He wrote that he used his father's power drill to remove a state-mandated lock that prevented the attachment of magazines with more than 10 rounds of ammunition.

New York state law bans the use of high-capacity magazines with more than 10 rounds. Gendron wrote that he wanted to use 30-round magazines during the massacre so he didn't have to reload frequently.

In one posting, Gendron referred eight times to New York's gun laws or those who obey them as "cuck" or "cucked," a misogynist slur popular among some far-right extremists.

"Since I live in New York, I had to buy a cucked version of this before illegally modifying it," Gendron wrote. "Since I live in cucked New York, and I am only 18, I can't legally buy a lower or a standard 'assault rifle.'" He added that he "could've even bought a NY-safe featureless rifle, but what kind of cuck does that?"

According to the Giffords Law Center to Prevent Gun Violence, eight states and the District of Columbia have banned "large capacity ammunition magazines" for both rifles and handguns. The laws in the District and most of those states — California, Connecticut, Maryland, Massachusetts, New Jersey, New York and Vermont — limit the number of allowable rounds to 10. Colorado authorizes 15 rounds for all firearms; Vermont allows 15 for handguns.

In a detailed and often-rambling explanation of his weapons and gear, the suspect wrote that he deliberately loaded heavier rounds to use in an initial volley to penetrate glass at the front of the supermarket where he expected a security guard would be keeping watch. He then loaded lighter rounds deeper in the magazine so he could use them to target shoppers and other victims in the store. Lighter bullets travel faster and can tumble through bodies more easily, causing maximum damage as they yaw through flesh.

A semiautomatic rifle can fire as fast as the shooter can pull the trigger. In a live-streamed video that the suspect posted online, he shoots his first victims quickly outside before moving into the store to fire on others, appearing to empty his magazine after about 30 shots. The entire sequence, from initial shots to the reload, is about 20 seconds.

The Bushmaster family of rifles is part of the ubiquitous family of AR-15 style weapons — the most common rifle in the United States. Used Bushmaster XM-15s can be bought for about $1,000 or less, putting it on the lower end of some AR-15 models that sell for hundreds more. The rifle is a no-frills option that lacks a rail system, which limits

accessories like optics, lasers and forward grips. The alleged shooter complained there was no way to attach a light other than duct-taping one to the hand guard.

The Bushmaster XM-15 is the same model rifle that was used in two other notorious mass shootings: the 2002 D.C. sniper case, in which two gunmen killed 10 people at random during a month-long spree of terror in the Washington region; and the 2012 massacre at Sandy Hook Elementary School in Newtown Square, Conn., during which a lone gunman killed 20 first-graders and six staff members.

In February, the families of nine victims from the Sandy Hook massacre settled a lawsuit against Remington Arms, the manufacturer of the Bushmaster, for $73 million. Federal law makes it difficult to sue gun manufacturers for product liability. But the plaintiffs used a novel legal strategy, arguing under Connecticut law that the Bushmaster was tantamount to a weapon of war and that Remington improperly marketed the rifles to civilian men.

In one of his postings, the suspect offered a mixed appraisal of the Bushmaster XM-15 he had purchased. While said he selected the rifle for its lethality, he complained that its 20-inch barrel was too long and unwieldy. "This is literally the worst option for me since I will be mainly indoors and in my car." He said he would bring the Mossberg shotgun and the Savage Axis XP rifle mainly as backup.

When Buffalo police arrested Gendron, they said, he was carrying a semiautomatic rifle that matched the description of the Bushmaster. The other two guns were recovered from his car.

**CORRECTION**

A previous version of this article incorrectly described the Savage Axis XP rifle as semiautomatic. It is bolt-action. The article has been corrected.

Jon Swaine, Reis Thebault and Alice Crites contributed to this report.