ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | Case No. 3:17-cv-01017-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**<br><br>**VOLUME 1 OF 7**<br><br>Courtroom:    5A<br>Judge:        Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 28 n.88 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 25 n.79 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 26 n.80 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 35 n.103 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 34 n.102 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 34 n.102 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 35 n.103 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 34 n.99 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 13 n.31, 30 n.90 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910,* at 372 (Berkeley: University of California Press, 1986) | 30 n.91 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 30 n.90 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 12 n.30 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 19 n.53 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 15 n.39, 18 n.52, 19 n.53 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 19 n.53 | 0186-0215 |
| George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016); Eric Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001) 137-38 | 12 n.31 | 1750-1752 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 22 n.66 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | 27 n.82, 30 n.91 | 0223-0234 |
| Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000) 25-27, 32, 64-65, 91-92, 114 | 13 n.31 | 1753-1759 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152 | 13, n.31 | 1760-1767 |
| Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* 1-8 (Baltimore: John Hopkins University Press, 2016) | 12 n.30 | 1768-1773 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 22 n.66 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 22 n.66 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 30 n.91 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 22 n.67, 22 n.68, 23 n.69, 23 n.70, 23 n.71 | 0283-0329 |
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 19 n.53, 19 n.54 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 19 n.53, 19 n.53 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 23 n.71 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 30 n.90 | 0363-0368 |

4

| | | |
|---|---|---|
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987)X | 30 n.91 | 0369-0375 |
| Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989) 42-45 | 11 n.29 | 1774-1776 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 17 n.51 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 9 n.13 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 17 n.51 | 0477-0504 |
| Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996) | 12 n.30 | 1777-1778 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 34 n.99 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45, 61-63 (especially the graphs on 38, 39, and 91), 118-121, 145-149, 158, 162, 180-186, 195-196, 199-203, 218-219, 297-302, 332, 337, 354, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 1779-1811 |
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 31 n.93 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | 9 n.13 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | 9 n.13 | 0684-0689 |
| Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006) 91-102 | 12 n.31 | 1813-1820 |
| Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969) 65-70, 282-291, 319-328, 413-425, 463-467 | 11 n.29 | 1821-1846 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 31 n.93 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 32 n.95, 32 n.96, 33 n.98 | 0714-0728 |

## LAW REVIEWS AND JOURNALS

| | | |
|---|---|---|
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 19 n.53 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 7 n.5 | 0772-0794 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Clayton E. Cramer & Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted Aug. 12, 2016, 6-7, https://papers.ssrn.com/so13/papers.cfm?abstract_id=2599851. | 27 n.83, 28 n.84, 28 n.85, 28 n.86, 28 n.87, | 1848-1862 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 29 n.90 | 0795-0819 |
| C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54 Vanderbilt Law Review 1805, 1805-1847 (2001). | 15 n.38 | 1863-1905 |
| Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017) 308-322 | 12 n.31 | 1906-1914 |
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 10 n.20 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 30 n.91 | 0840-1021 |
| Jack N. Rakove, *The Second Amendment: The Highest State of Originialism*, 76 Chicago-Kent L. Rev. 157 (2000) | 12 n.30 | 1915-1979 |
| Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), https://repository.tcu.edu/handle/116099117/26778. | 24 n.79 | 1980-2210 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 25 n.79, 25 n.80, 27 n.81 | 1022-1036 |

7

| | | |
|---|---|---|
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216-239 (2007) | 16 n.45 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173-195 (2011) | 24 n.78, 27 n.82 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 6 n.4, 20 n.58 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 34 n.202 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 33 n.97 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 16 n.48 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and Regulations (2012) | 33 n.97 | 1157-1264 |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 35 n.105 | 1266 |

| | | |
|---|---|---|
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 37 n.111 | 1268-1269 |
| Buymymags.com – Home Page (last accessed on Oct. 4, 2022), https://www,buymymags.com/ | 37 n.110 | 2212-2213 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 8 n.7 | 1270-1310 |
| "A Complete Guide to Binary Triggers," Americanfirearms.org, (last accessed Oct. 4, 2022), https://www.americanfirearms.org/guide-to-binary-triggers/ | 37 n.111 | 2214-2237 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 33 n.96 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 37 n.110 | 1322-1325 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 36 n.109 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 37 n.111 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 36 n.108 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 38 n.112 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 13 n.34, 16 n.46, 21 n.64, 24 n.76 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 36 n.107 | 1438-1689 |

| | | |
|---|---|---|
| The Violence Project's Mass Shooter Database, https://www.theviolenceproject.org/mass-shooter-database/ | 39 n.113, 40 n.114 | 1690 |
| Guns.com, AR-15s | 33 n.96 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 33 n.96 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 40 n.115 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 23 n.71 | 1748 |

[i] The Declaration of Randolph Roth cites 30 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶  n. 29, n. 30, n. 37, n.38, n. 45, n.65, n.77, n.82, n.89, n.91, n.92, n.94, n.95, n.98, n.99, n.100, (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); ; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath that Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); *LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997);

10

1

2   Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B.

3   Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Hertà E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Horace V. Redfield, *Homicide, North and South: Being*

4   *a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The*

5   *Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and*

6   *Southern Reconstruction* (New York: Harper and Row, 1975); Saul Cornell, *A Well-Regulated Milita: The Founding Gathers and the Origins of Gun Control in*

7   *America* (New York: Oxford University Press, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean

8   White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Bertram Wyatt-Brown, *Southern*

9   *Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982). Should the Court wish to receive excerpted copies of these works Professor

10   Spitzer can provide them.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# HISTORICAL STATUTES

CRIMES AND MISDEMEANORS—THIRD CLASS. [CHAP.

chattels stolen, etc., of less value than thirty-five dollars, etc.

or chattels of less value than thirty-five dollars, that shall have been stolen or taken by robbers, knowing the same to be stolen or taken by robbers, with intent to defraud the owner, every person so offending shall, on conviction thereof, be fined in any sum not exceeding two hundred dollars, and be imprisoned in the cell or dungeon of the jail of the county, and be fed on bread and water only, for a term not exceeding thirty days, at the discretion of the court.

Curwen's R. S., 181.   Curwen's Laws, 361.

An Act supplementary to an act providing for the punishment of crimes, passed March 7, 1835.

*[Passed April 4, and took effect May 1, 1859.   56 vol. Stat. 158.]*

Seduction under promise of marriage, etc.;

(210.) SEC. I.   *Be it enacted by the General Assembly of the State of Ohio,* That any person over the age of eighteen years, who, under promise of marriage, shall have illicit carnal intercourse with any female of good repute for chastity, under the age of eighteen years, shall be deemed guilty of seduction, and upon conviction, shall be imprisoned in the penitentiary for not less than one, nor more than three years, or be imprisoned in the county jail not exceeding six months; but in such case the evidence of the female must be corroborated to the extent required as to the principal witness in cases of perjury.

—Evidence required.

An Act to prohibit the carrying or wearing of concealed weapons.

*[Passed March 18, and took effect April 1, 1859.   56 vol. Stat. 56.]*

The offense of carrying or wearing concealed weapons.

(211.) SEC. I.   *Be it enacted by the General Assembly of the State of Ohio,* That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Penalty.

When the jury shall acquit the accused.

(212.) SEC. II.   If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon on weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

SEC. III.   This act to take effect and be in force from and after the first day of April next.

An Act to protect literary societies.

*[Passed and took effect April 2, 1859.   56 vol. Stat. 113.]*

Punishment for disturbing school or literary society.

(213.) SEC. I.   *Be it enacted by the General Assembly of the State of Ohio,* That if any person or persons shall hereafter willfully disturb, molest or interrupt any literary society, or any school or society formed for the intellectual improvement of its members, such person or persons so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not less than five nor more than twenty dollars, with costs of prosecution, and shall stand committed until such fine shall have been paid : Provided, such commitment shall not exceed five days; and provided, further, that the judgment for costs shall not be abated until such costs shall have been fully paid.

Compendium_Roth
Page 0002

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14692   Page 14 of 295

(214.) Sec. II.  That it shall be the duty of any judge of probate, justice of the peace, or mayor of any city, town, or incorporated village in this state, upon information by affidavit, to issue his warrant, causing the body of the accused forthwith to be brought before him, and if, upon investigation, shall be found guilty, to adjudge against said guilty party or parties, the penalty provided in the first section of this act. *Prosecution therefor;*

(215.) Sec. III.  All prosecutions under this act shall be in the name of the state of Ohio, and all such fines collected shall be paid into the township treasury of the proper township, for the benefit of common schools therein. *Same, and disposition of fines.*

Sec. IV.  This act shall be in force from and after its passage.

An Act to amend the act entitled "an act to amend the act entitled 'an act for the prevention of certain immoral practices,'" passed February 17, 1831—said last act being passed March 26, 1841. *Swan's R. S. 306.*

[*Passed and took effect April 12, 1858.  55 vol. Stat. 151.*]

(216.) Sec. I.  *Be it enacted by the General Assembly of the State of Ohio,*  That no person shall sell, or expose for sale, give, barter, or otherwise dispose of in any way, or at any place, any spiritous or other liquors, or any article of traffic whatever, at or within the distance of two miles from the place where any religious society, or assemblage of people, are collected or collecting together for religious worship in any field or woodland: Provided, that nothing in this act shall affect tavern keepers exercising their calling, nor distillers, manufacturers, or others, in prosecuting their regular trades at their places of business, or any persons disposing of any ordinary articles of provision, excepting spiritous liquors, at their residences, nor any person having a written permit from the trustees or managers of any such religious society or assemblage, to sell provisions for the supply of persons attending such religious worship, their horses or cattle, such persons acting in conformity to the regulations of said religious assembly and to the laws of the state. *Selling liquors, etc., within two miles of any religious meetings.*

(217.) Sec. II.  That any person found guilty of committing a breach of the provisions of this act, shall forfeit and pay for every such offense a fine of not less than ten or more than one hundred dollars, into the township treasury for the use of the common schools in said township where said offense was committed; and any judge of the common pleas, sheriff, coroner, or justice of the peace of the county, or any constable thereof, shall, upon view or information, and with or without warrant, apprehend any person so offending, and seize all such liquors or other articles of traffic, and the utensils or furniture containing them, and convey them before a justice of the peace; and the said justice, upon the complaint under oath or affirmation of said officer apprehending such offender, or any person giving information, shall issue his warrant of arrest, which shall be formally served by the proper officer, and proceed to inquire into the truth of said accusation, and if found true, shall proceed to bind said offender in such amount not exceeding five hundred dollars, as he shall deem proper, to answer at the next regular term of the common pleas in said county, to be proceeded with by indictment, the fine and costs to be collected as in other criminal cases: Provided, that if such defendant or defendants shall plead guilty, said justice shall affix the penalty and proceed to judgment; and in such case he shall immediately issue an execution against the property and body of the defendant or defendants for the fine and costs, unless paid or secured; and said defendant or defendants shall not be discharged until said judgment and costs shall be fully paid or secured to be paid. *Prosecution therefor.*

Compendium_Roth
Page 0003

454                    CRIMES AND MISDEMEANORS—THIRD CLASS.            [CHAP.

Accused on acquittal to recover double costs, etc.

(218.) SEC. III.   That in any prosecution against any person or persons for a violation of the provisions of this act, if the defendant or defendants shall be acquitted, he or they shall recover of the person or persons filing the complaint double the amount of his or their costs, which said justice shall award.

SEC. IV.   That the act to which this is amendatory be, and the same is hereby repealed.   This act to take effect from and after its passage.

### An Act regulating the sale of poisons.

[*Passed April* 13, 1852.   50 *vol. Stat.* 167.]

Preliminary remarks.

(219.) SEC. I.   *Be it enacted by the General Assembly of the State of Ohio,* That it shall not hereafter be lawful for any apothecary, druggist, or other person in this state, to sell or give away any article belonging to the class of medicines usually denominated poisons, except in compliance with the restrictions contained in this act.

What to be done when poisons sold.

(220.) SEC. II.   That every apothecary, druggist, or other person, who shall sell or give away, except upon the prescription of a physician, any article or articles of medicine belonging to the class usually known as poisons, shall be required: 1st. To register in a book kept for that purpose the name, age, sex and color of the person obtaining such poison. 2d. The quantity sold. 3d. The purpose for which it is required. 4th. The day and date on which it was obtained. 5th. The name and place of abode of the person for whom the article is intended. 6th. To carefully mark the word "poison" upon the label or wrapper of each package. 7th. To neither sell or give away any article of poison to minors of either sex.

How arsenic to be prepared before sale.

(221.) SEC. III.   That no apothecary, druggist, or other person, shall be permitted to sell or give away any quantity of arsenic less than one pound, without first mixing either soot or indigo therewith, in the proportion of one ounce of soot or half an ounce of indigo to the pound of arsenic.

Penalty for violating two preceding sections.

(222.) SEC. IV.   That any person offending against the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be fined in any sum not less than twenty nor more than two hundred dollars, at the discretion of any court of competent jurisdiction.

### An Act to prevent and punish fraud in the use of false stamps, brands, labels, or trade marks.

[*Passed and took effect March* 29, 1859.   56 *vol. Stat.* 86.]

Forging brand, stamp, label, etc.

(223.) SEC. I.   *Be it enacted by the General Assembly of the State of Ohio,* That any person or persons who shall knowingly and willfully forge or counterfeit, or cause or procure to be forged or counterfeited, any representation, likeness, similitude, copy or imitation of the private stamp, brand, wrapper, label, or trade mark, usually affixed by any mechanic, manufacturer, druggist, merchant or tradesman, to and upon the goods, wares, merchandise, preparation or mixture of such mechanic, manufacturer, druggist, merchant or tradesman, with intent to pass off any work, goods, manufacture, compound, preparation or mixture, to which such forged or counterfeited representation, likeness, similitude, copy or imitation is affixed or intended to be affixed as the work, goods, manufacture, compound, preparation or mixture of such mechanic, manufacturer, druggist or tradesman, shall, upon conviction thereof, be imprisoned in the county jail for a period of not less than three months nor more than twelve month, and fined not exceeding five hundred dollars.




DATE DOWNLOADED: Tue Oct 18 16:47:26 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1870 63 .

ALWD 7th ed.
, , 1870 63 .

Chicago 17th ed.
"," Texas - 12th Legislature, Called Session, General Laws : 63-64

AGLC 4th ed.
'' Texas - 12th Legislature, Called Session, General Laws 63

OSCOLA 4th ed.
'' 1870 63

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

GENERAL LAWS.                    63

# CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2.  That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

——————

# CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

Compendium_Roth
Page 0006

county of Hill; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

Sec. 2.  That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

Sec. 3.  That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

Sec. 4.  That this act be in force from and after passage.

Approved August 12, 1870.

---

# CHAPTER XLVIII.

### AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

Sec. 2.  That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

Sec. 3.  That this act shall take effect from and after its passage.

Approved August 12, 1870.

Compendium_Roth
Page 0007




DATE DOWNLOADED: Tue Oct 18 16:51:24 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1871 25 .

ALWD 7th ed.
, , 1871 25 .

Chicago 17th ed.
"," Texas - 12th Legislature, 1st Session, General Laws : 25-27

AGLC 4th ed.
'' Texas - 12th Legislature, 1st Session, General Laws 25

OSCOLA 4th ed.
'' 1871 25

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

GENERAL LAWS.          25

## CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided,* that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further,* that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

Compendium_Roth
Page 0009

bled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.

SEC. 4.   This act shall not apply to, nor be enforced in any county of the State, which may be designated, in a proclamation of the Governor, as a frontier county, and liable to incursions of hostile Indians.

SEC. 5.   All fines collected under the provisions of this act shall be paid into the treasury of the county, and appropriated exclusively to the keeping in repair and maintenance of public roads, and all weapons forfeited to the county under the provisions of this act shall be sold as may be prescribed by the county court, and the proceeds appropriated to the same purpose.

SEC. 6.   It shall be the duty of all sheriffs, constables, marshals, and their deputies, and all policemen, and other peace officers, to arrest any person violating the first or third sections of this act, and to take such person immediately before a justice of the peace of the county where the offense is committed, or before a mayor or recorder of the town or city in which the offense is committed, who shall investigate and try the case without delay.   On all such trials the accused shall have the right of a trial by jury, and of appeal to the district court; but, in case of appeal, the accused shall be required to give bond with two or more good and sufficient sureties in a sum of not less than one hundred nor more than two hundred dollars, if convicted under the first section and in a sum of not less than two hundred nor more than one thousand dollars, if convicted under the third section of this act; said bond to be payable to the State of Texas, and approved by the magistrate, and conditioned that the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

Sec. 7.   Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

Sec. 8.   That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

Sec. 9.   It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

―――――

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

Section 1.   *Be it enacted by the Legislature of the State of Texas*, That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

Sec. 2.   That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.




DATE DOWNLOADED: Tue Oct 18 17:37:32 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

ALWD 7th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

APA 7th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

Chicago 17th ed.
"Public Law 65-68 / Chapter 83, 65 Congress, Session 2, An Act: To prohibit the
manufacture, distribution, storage, use, and possession in time of war of explosives,
providing regulations for the safe manufacture, distribution, storage, use, and
possession of the same, and for other purposes.," U.S. Statutes at Large 40, no. Main
Section (1917): 385-389

McGill Guide 9th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917).

AGLC 4th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917)

MLA 9th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /
Chapter 83, 65 Congress. 40 Stat. 385 (1917). HeinOnline.

OSCOLA 4th ed.
To prohibit the manufacture, distribution, storage, use, and possession in time of
war of explosives, providing regulations for the safe manufacture, distribution,
storage, use, and possession of the same, and for other purposes., Public Law 65-68 /

the Act of March second, nineteen hundred and one, be, and the same is hereby, amended as follows:

"The Secretary of War is hereby authorized to permit, under such regulations as he may prescribe, any officer or enlisted man on the active list of the Army, any retired officer or enlisted man of the Army on active duty, and any permanent civilian employee under the jurisdiction of the War Department on duty outside of the continental limits of the United States, to make allotments of his pay for the support of his wife, children, or dependent relatives, or for such other purposes as the Secretary of War may deem proper.  All allotments of pay of officers, enlisted men, and civilian employees that have been or shall be paid to designated allottees previous to the receipt by disbursing officer of notice of discontinuance of the same from the officer required by regulations to furnish such notice shall pass to the credit of the disbursing officer who has made or shall make such payments; and, if erroneous payment is made because of the failure of an officer to report, in the manner prescribed by the Secretary of War, the death of the grantor, or any fact which renders the allotment not payable, then the amount of such erroneous payment shall be collected by the Quartermaster General from the officer who fails to make such report, if such collection is practicable. Nothing herein shall be construed to invalidate allotments now in force."

*Allotment of pay.
Extended to officers and enlisted men on active duty and civilians in military service abroad.*

*Credit allowed for payments to designated allottees prior to notice of discontinuance.*

*Collection of erroneous payments.*

*Existing allotments valid.*

Approved, October 6, 1917.

---

**CHAP. 82.**—An Act To authorize the construction, maintenance, and operation of a bridge across Little River, in Poinsett County, Arkansas, at or near the section line between sections thirty-five and thirty-six, township eleven north, range six east.

*October 6, 1917.
[S. 2938.]*

*[Public, No. 67.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That Poinsett County, Arkansas, is hereby authorized to construct, maintain, and operate a bridge and approaches thereto across Little River, a tributary to Saint Francis River, at a point suitable to the interests of navigation, at or near the section line between sections thirty-five and thirty-six, township eleven north, range six east, fifth principal meridian, in Poinsett County, in the State of Arkansas, in accordance with the provisions of the Act entitled "An Act to regulate the construction of bridges over navigable waters," approved March twenty-third, nineteen hundred and six.

*Little River.
Poinsett County, Ark., may bridge.*

*Location.*

*Construction.
Vol. 34, p. 84.*

Sec. 2.  That the right to alter, amend, or repeal this Act is hereby expressly reserved.

*Amendment.*

Approved, October 6, 1917.

---

**CHAP. 83.**—An Act To prohibit the manufacture, distribution, storage, use, and possession in time of war of explosives, providing regulations for the safe manufacture, distribution, storage, use, and possession of the same, and for other purposes.

*October 6, 1917.
[H. R. 3932.]*

*[Public, No. 68.]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That when the United States is at war it shall be unlawful to manufacture, distribute, store, use, or possess powder, explosives, blasting supplies, or ingredients thereof, in such manner as to be detrimental to the public safety, except as in this Act provided.

*Explosives.
Manufacture, etc., restricted in time of war.
Post, p. 1711.*

Sec. 2.  That the words "explosive" and "explosives" when used herein shall mean gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuses, detonators, and other detonating agents, smokeless powders, and any chemical compound or me-

*"Explosive" and "explosives."
Articles included as.*

Compendium_Roth
Page 0013

386         SIXTY-FIFTH CONGRESS. Sess. I. Ch. 83. 1917.

chanical mixture that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of, or any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects, or of destroying life or limb, but shall not include small arms or shotgun cartridges: *Provided,* That nothing herein contained shall be construed to prevent the manufacture, under the authority of the Government, of explosives for, their sale to or their possession by, the military or naval service of the United States of America.

*Proviso.*
Manufacture for Government use, etc., not affected.

"Ingredients."
Materials included as.

Sec. 3. That the word "ingredients" when used herein shall mean the materials and substances capable by combination of producing one or more of the explosives mentioned in section one hereof.

"Person."
Extension of term.

Sec. 4. That the word "person," when used herein, shall include States, Territories, the District of Columbia, Alaska, and other dependencies of the United States, and municipal subdivisions thereof, individual citizens, firms, associations, societies and corporations of the United States and of other countries at peace with the United States.

Unauthorized possession, etc., forbidden.

Sec. 5. That from and after forty days after the passage and approval of this Act no person shall have in his possession or purchase, accept, receive, sell, give, barter or otherwise dispose of or procure explosives, or ingredients, except as provided in this Act: *Provided,* That the purchase or possession of said ingredients when purchased or held in small quantities and not used or intended to be used in the manufacture of explosives are not subject to the provisions of this Act: *Provided further,* That the superintendent, foreman, or other duly authorized employee, at a mine, quarry, or other work, may, when licensed so to do, sell or issue, to any workman under him, such an amount of explosives, or ingredients, as may be required by that workman in the performance of his duties, and the workman may purchase or accept the explosives, or ingredients, so sold or issued, but the person so selling or issuing same shall see that any unused explosives, or ingredients, are returned, and that no explosives, or ingredients, are taken by the workman to any point not necessary to the carrying on of his duties.

*Provisos.*
Ingredients in small quantities, etc., allowed.

Licensed use at mines, quarries, etc., for workmen allowed.

Restrictions.

Interstate transportation not affected.

Sec. 6. That nothing contained herein shall apply to explosives or ingredients while being transported upon vessels or railroad cars in conformity with statutory law or Interstate Commerce Commission rules.

Manufacture without license forbidden.

Sec. 7. That from and after forty days after the passage of this Act no person shall manufacture explosives unless licensed so to do, as hereinafter provided.

Licenses.
Information required from applicants and licensees.

Sec. 8. That any licensee or applicant for license hereunder shall furnish such information regarding himself and his business, so far as such business relates to or is connected with explosives or ingredients at such time and in such manner as the Director of the Bureau of Mines, or his authorized representative, may request, excepting that those who have been or are at the time of the passage of this Act regularly engaged in the manufacture of explosives shall not be compelled to disclose secret processes, costs, or other data unrelated to the distribution of explosives.

Secret processes excepted.

Itemized records to be kept by licensees.

Sec. 9. That from and after forty days after the passage and approval of this Act every person authorized to sell, issue, or dispose of explosives shall keep a complete itemized and accurate record, showing each person to whom explosives are sold, given, bartered, or to whom or how otherwise disposed of, and the quantity and kind of explosives, and the date of each such sale, gift, barter, or other disposition; and this record shall be sworn to and furnished to the

Compendium_Roth
Page 0014

Director of the Bureau of Mines, or his authorized representatives, whenever requested.

SEC. 10. That the Director of the Bureau of Mines is hereby author- *Classes of licenses.* ized to issue licenses as follows:

(a) Manufacturer's license, authorizing the manufacture, possession, *Manufacturer's.* and sale of explosives and ingredients.

(b) Vendor's license, authorizing the purchase, possession, and sale *Vendor's.* of explosives or ingredients.

(c) Purchaser's license, authorizing the purchase and possession of *Purchaser's.* explosives and ingredients.

(d) Foreman's license, authorizing the purchase and possession of *Foreman's.* explosives and ingredients, and the sale and issuance of explosives and ingredients to workmen under the proviso to section five above.

(e) Exporter's license, authorizing the licensee to export explo- *Exporter's.* sives, but no such license shall authorize exportation in violation of any proclamation of the President issued under any Act of Congress.

(f) Importer's license, authorizing the licensee to import explosives. *Importer's.*

(g) Analyst's, educator's, inventor's, and investigator's licenses *Technical, etc.* authorizing the purchase, manufacture, possession, testing, and disposal of explosives and ingredients.

SEC. 11. That the Director of the Bureau of Mines shall issue *Issue by Director of* licenses, upon application duly made, but only to citizens of the *Mines Bureau.* *Restriction.* United States of America, and to the subjects or citizens of nations that are at peace with them, and to corporations, firms, and associations thereof, and he may, in his discretion, refuse to issue a license, *Discretionary refusal.* when he has reason to believe, from facts of which he has knowledge or reliable information, that the applicant is disloyal or hostile to the United States of America, or that, if the applicant is a firm, association, society, or corporation, its controlling stockholders or members are disloyal or hostile to the United States of America. The director may, when he has reason to believe on like grounds that *Revocation.* any licensee is so disloyal or hostile, revoke any license issued to him. Any applicant to whom a license is refused or any licensee whose *Appeals to Council of* license is revoked by the said director may, at any time within thirty *National Defense on* *refusal, etc.* days after notification of the rejection of his application or revocation of his license, apply for such license or the cancellation of such revocation to the Council of National Defense, which shall make its order upon the director either to grant or to withhold the license.

SEC. 12. That any person desiring to manufacture, sell, export, *Applications.* import, store, or purchase explosives or ingredients, or to keep explo- *Sworn statement required in.* sives or ingredients in his possession, shall make application for a license, which application shall state, under oath, the name of the applicant; the place of birth; whether native born or naturalized citizen of the United States of America; if a naturalized citizen, the date and place of naturalization; business in which engaged; the amount and kind of explosives or ingredients which during the past six months have been purchased, disposed of, or used by him; the amount and kind of explosives or ingredients now on hand; whether sales, if any, have been made to jobbers, wholesalers, retailers, or consumers; the kind of license to be issued, and the kind and amount of explosives or ingredients to be authorized by the license; and such further information as the Director of the Bureau of Mines may, by rule, from time to time require.

Applications for vendor's, purchaser's, or foreman's licenses shall *Officers authorized to* be made to such officers of the State, Territory, or dependency *administer oaths.* having jurisdiction in the district within which the explosives or ingredients are to be sold or used, and having the power to administer oaths as may be designated by the Director of the Bureau of Mines, who shall issue the same in the name of such director. Such officers *Fees, records, etc.* shall be entitled to receive from the applicant a fee of 25 cents for

388                    SIXTY-FIFTH CONGRESS.  Sess. I.  Ch. 83.  1917.

each license issued.   They shall keep an accurate record of all licenses issued in manner and form to be prescribed by the Director of the Bureau of Mines, to whom they shall make reports from time to time as may be by rule issued by the director required.   The necessary blanks and blank records shall be furnished to such officers by the said director.   Licensing officers shall be subject to removal for cause by the Director of the Bureau of Mines, and all licenses issued by them shall be subject to revocation by the director as provided in section eleven.

*Removal of licensing officers, etc.*

*Ante, p. 387.*

*Explosives inspectors.*
*Appointment authorized.*

SEC. 13.  That the President, by and with the advice and consent of the Senate, may appoint in each State and in Alaska an explosives inspector, whose duty it shall be, under the direction of the Director of the Bureau of Mines, to see that this Act is faithfully executed and observed.   Each such inspector shall receive a salary of $2,400 per annum.   He may at any time be detailed for service by said director in the District of Columbia or in any State, Territory, or dependency of the United States.   All additional employees required in carrying out the provisions of this Act shall be appointed by the Director of the Bureau of Mines, subject to the approval of the Secretary of the Interior.

*Pay, details, etc.*

*Administrative employees.*

*Specified unlawful acts connected with licenses.*

SEC. 14.  That it shall be unlawful for any person to represent himself as having a license issued under this Act, when he has not such a license, or as having a license different in form or in conditions from the one which he in fact has, or without proper authority make, cause to be made, issue or exhibit anything purporting or pretending to be such license, or intended to mislead any person into believing it is such a license, or to refuse to exhibit his license to any peace officer, Federal or State, or representative of the Bureau of Mines.

*Unauthorized divulging of information forbidden.*

SEC. 15.  That no inspector or other employee of the Bureau of Mines shall divulge any information obtained in the course of his duties under this Act regarding the business of any licensee, or applicant for license, without authority from the applicant for license or from the Director of the Bureau of Mines.

*Distinctive marking of premises.*

SEC. 16.  That every person authorized under this Act to manufacture or store explosives or ingredients shall clearly mark and define the premises on which his plant or magazine may be and shall conspicuously display thereon the words "Explosives—Keep Off."

*Unauthorized presence at premises, etc., forbidden.*

SEC. 17.  That no person, without the consent of the owner or his authorized agents, except peace officers, the Director of the Bureau of Mines and persons designated by him in writing, shall be in or upon any plant or premises on which explosives are manufactured or stored, or be in or upon any magazine premises on which explosives are stored; nor shall any person discharge any firearms or throw or place any explosives or inflammable bombs at, on, or against any such plant or magazine premises, or cause the same to be done.

*Discharging firearms, etc.*

*Effective rules, etc., to be made.*

SEC. 18.  That the Director of the Bureau of Mines is hereby authorized to make rules and regulations for carrying into effect this Act, subject to the approval of the Secretary of the Interior.

*Punishment for violations.*

SEC. 19.  That any person violating any of the provisions of this Act, or any rules or regulations made thereunder, shall be guilty of a misdemeanor and shall be punished by a fine of not more than $5,000 or by imprisonment not more than one year, or by both such fine and imprisonment.

*Investigations to be made of all explosions and fires.*

*Localities, etc., specified.*

*Report of findings, etc.*

SEC. 20.  That the Director of the Bureau of Mines is hereby authorized to investigate all explosions and fires which may occur in mines, quarries, factories, warehouses, magazines, houses, cars, boats, conveyances, and all places in which explosives or the ingredients thereof are manufactured, transported, stored, or used, and shall, in his discretion, report his findings, in such manner as he may deem fit, to the proper Federal or State authorities, to the end that if such explosion has been brought about by a willful act the

Compendium_Roth
Page 0016

person or persons causing such act may be proceeded against and brought to justice; or, if said explosion has been brought about by accidental means, that precautions may be taken to prevent similar accidents from occurring. In the prosecution of such investigations the employees of the Bureau of Mines are hereby granted the authority to enter the premises where such explosion or fire has occurred, to examine plans, books, and papers, to administer oaths to, and to examine all witnesses and persons concerned, without let or hindrance on the part of the owner, lessee, operator, or agent thereof. *Authority conferred on employees.*

SEC. 21. That the Director of the Bureau of Mines, with the approval of the President, is hereby authorized to utilize such agents, agencies, and all officers of the United States and of the several States, Territories, dependencies, and municipalities thereof, and the District of Columbia, in the execution of this Act, and all agents, agencies, and all officers of the United States and of the several States and Territories, dependencies, and municipalities thereof, and the District of Columbia, shall hereby have full authority for all acts done by them in the execution of this Act when acting by the direction of the Bureau of Mines. *Utilization of Federal, State, etc., agencies.* *Authority conferred for official acts.*

SEC. 22. That for the enforcement of the provisions of this Act, including personal services in the District of Columbia and elsewhere, and including supplies, equipment, expenses of traveling and subsistence, and for the purchase and hire of animal-drawn or motor-propelled passenger-carrying vehicles, and upkeep of same, and for every other expense incident to the enforcement of the provisions of this Act, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $300,000, or so much thereof as may be necessary: *Provided,* That not to exceed $10,000 shall be expended in the purchase of motor-propelled passenger-carrying vehicles. *Appropriation for all expenses.* *Proviso. Amount for motor vehicles.*

Approved, October 6, 1917.

---

CHAP. 84.—An Act Extending the time for the construction of a bridge across Flint River, in the State of Georgia.

October 6, 1917. [H. R. 4232.]

[Public, No. 69.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the times for commencing and completing the construction of a bridge authorized by Act of Congress approved April seventeenth, nineteen hundred and sixteen, to be built across the Flint River, Georgia, by Mitchell County, or by Baker County, Georgia, jointly or separately, are hereby extended one and three years, respectively, from the date hereof. *Flint River. Time extended for bridging, by Mitchell County or Baker County, Ga. Vol. 39, p. 52, amended.*

SEC. 2. That the right to alter, amend, or repeal this Act is hereby expressly reserved. *Amendment.*

Approved, October 6, 1917.

---

CHAP. 85.—An Act To provide for the reimbursement of officers, enlisted men, and others in the naval service of the United States for property lost or destroyed in such service.

October 6, 1917. [H. R. 5647.]

[Public, No. 70.]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Paymaster General of the Navy be, and he is hereby, authorized and directed to reimburse such officers, enlisted men, and others in the naval service of the United States as may have suffered, or may hereafter suffer, loss or destruction of or damage to their personal property and effects in the naval service due to the operations of war or by shipwreck or other marine disaster when such loss, destruction, or damage was without *Navy. Reimbursement for losses of personal property. Applications.*

## CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and sh.ll forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further*, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3. If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

bled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.

SEC. 4. This act shall not apply to, nor be enforced in any county of the State, which may be designated, in a proclamation of the Governor, as a frontier county, and liable to incursions of hostile Indians.

SEC. 5. All fines collected under the provisions of this act shall be paid into the treasury of the county, and appropriated exclusively to the keeping in repair and maintenance of public roads, and all weapons forfeited to the county under the provisions of this act shall be sold as may be prescribed by the county court, and the proceeds appropriated to the same purpose.

SEC. 6. It shall be the duty of all sheriffs, constables, marshals, and their deputies, and all policemen, and other peace officers, to arrest any person violating the first or third sections of this act, and to take such person immediately before a justice of the peace of the county where the offense is committed, or before a mayor or recorder of the town or city in which the offense is committed, who shall investigate and try the case without delay. On all such trials the accused shall have the right of a trial by jury, and of appeal to the district court; but, in case of appeal, the accused shall be required to give bond with two or more good and sufficient sureties in a sum of not less than one hundred nor more than two hundred dollars, if convicted under the first section and in a sum of not less than two hundred nor more than one thousand dollars, if convicted under the third section of this act; said bond to be payable to the State of Texas, and approved by the magistrate, and conditioned that the defendant will abide the judgment of the district court that may

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7. Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8. That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9. It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

————

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2. That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

Compendium_Roth
Page 0020

# NATIONAL FIREARMS ACT OF 1934

# 48 STAT. 1236

Compendium_Roth
Page 0021

1236          73d CONGRESS.   SESS. II.   CHS. 756, 757.   JUNE 26, 1934.

available to pay claims on account of any check, the amount of which has been included in any balance so covered into the surplus fund.

Advances for land surveys.
U.S.C., title 43, sec. 863.

Sec. 22. So much of the Act of August 18, 1894 (U.S.C., title 43, sec. 863), as authorizes the Governors of the States therein named to advance money from time to time for the survey of certain townships located within such States, which money shall be reimbursable, is hereby repealed.

Moneys in U.S. court registries.

Sec. 23. Moneys in, or payable into, the registry of any United States court, in the discretion of the court, may be deposited in official checking accounts with the Treasurer of the United States, subject to disbursement on order approved by the court.

Survey of certain accounts to be made by Comptroller General.

Sec. 24. The Comptroller General of the United States shall cause a survey to be made of all inactive and permanent appropriations and/or funds on the books of the Government and also funds in the official custody of officers and employees of the United States, in which the Government is financially concerned, for which no account-

Report to Congress.

ing is rendered to the General Accounting Office; and he shall submit to the Congress annually, in a special report, his recommendations for such changes in existing law relating thereto as, in his judgment, may be in the public interest.

Existing provisions not affected.

Sec. 25. The provisions of this Act shall not be construed to alter or amend any existing authorization for an appropriation.

Saving clause.

Sec. 26. All Acts and/or parts of Acts inconsistent or in conflict with the provisions of this Act are hereby repealed to the extent of such inconsistency or conflict.

Short title.

Sec. 27. The short title of this Act shall be the "Permanent Appropriation Repeal Act, 1934."

Approved, June 26, 1934.

[CHAPTER 757.]

AN ACT

June 26, 1934.
[H.R. 9741.]
[Public, No. 474.]

To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this Act—

National Firearms Act.
Limitation of terms for purposes of Act.
"Firearm."

(a) The term "firearm" means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

"Machine gun."

(b) The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

"Person."

(c) The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

"Continental United States."

(d) The term "continental United States" means the States of the United States and the District of Columbia.

"Importer."

(e) The term "importer" means any person who imports or brings firearms into the continental United States for sale.

"Manufacturer."

(f) The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14712   Page 34 of 295

(g) The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

(h) The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

(i) The term "Commissioner" means the Commissioner of Internal Revenue.

(j) The term "Secretary" means the Secretary of the Treasury.

(k) The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $500 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year.  Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for.  The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal-revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal-revenue laws shall, insofar as not inconsistent with the provisions of this Act, be applicable with respect to the taxes imposed by this Act.

(c) Under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under this section has been paid by the manufacturer, the Commissioner shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in

*Marginal notes:*
"Dealer."
Exceptions.
"Interstate commerce."
"Commissioner."
"Secretary." "To transfer" or "transferred."
Registration requirements.
Taxes.
Fractional parts of year.
Failure to register and pay tax unlawful.
Transfer tax; stamps.
Applicable administrative provisions of narcotic tax law to govern.
Vol. 38, p. 785; Vol. 44, p. 92.
U.S.C., Supp. VII, pp. 592, 644.
Refund, if for exportation.
Unlawful transfers.

Compendium_Roth
Page 0023

blank in duplicate for that purpose by the Commissioner. Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided*, That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

(b) The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue.

(c) Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner. The original thereof with stamps affixed, shall be returned to the applicant.

(d) No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

(e) If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

(f) Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2(a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

SEC. 5. (a) Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided*, That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

(b) Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of sixty days without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

SEC. 6. It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

SEC. 7. (a) Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and

*Marginal notes:*
*Proviso.*
Identification.

Preparation and distribution of forms.

Identifying marks, etc., to be indicated in orders.

Transferor to transfer stamp-affixed order for each prior transfer.

Notice to Commissioner of transfers exempted.

Registered importers, etc.

Possessors of firearms to register with collector within 60 days.

*Proviso.*
Acquisitions after effective date need not be registered.

Prosecutions. Presumption raised by possession.

Unlawfully receiving or possessing.

Seizure and forfeiture.

Compendium_Roth
Page 0024

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14714   Page 36 of 295

forfeiture, and (except as provided in subsection (b)) all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies. *Provisions of internal-revenue laws extended.*

(b) In the case of the forfeiture of any firearm by reason of a violation of this Act: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is in the possession of any officer of the United States except the Secretary, such officer shall deliver the firearm to the Secretary; and the Secretary may order such firearm destroyed or may sell such firearm to any State, Territory, or possession (including the Philippine Islands), or political subdivision thereof, or the District of Columbia, or retain it for the use of the Treasury Department or transfer it without charge to any Executive department or independent establishment of the Government for use by it. *Sale, etc., forbidden.* *Disposition of.*

SEC. 8. (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner. *Identification marks.*

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury. *Obliteration, etc., unlawful.* *Possession of, deemed sufficient evidence for conviction.* *Exception.*

SEC. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require. *Importers, manufacturers, etc., required to keep records.*

SEC. 10. (a) No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory. *Regulation of traffic in firearms in places under control of United States.*

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction (including the Philippine Islands), in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported or brought in contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury. *Unlawful acts.* *Fraudulent importations, possession, etc.* *Receiving, concealing, etc.* *Possession deemed sufficient evidence for conviction; exception.*

SEC. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce. *Transportation in interstate commerce.*

Compendium_Roth
Page 0025

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14715   Page 37 of 295

Rules, etc., to be prescribed.

SEC. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

Transfers, when provisions not applicable.

SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

Penalty provision.

SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

Excise taxes.
Firearms herein defined exempt from.
Vol. 44, p. 93; Vol. 47, p. 264.
U.S.C., Supp. VII, p. 604.

SEC. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Saving clause.

SEC. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Effective date.

SEC. 17. This Act shall take effect on the thirtieth day after the date of its enactment.

Citation of title.

SEC. 18. This Act may be cited as the "National Firearms Act."

Approved, June 26, 1934.

----

[CHAPTER 758.]

AN ACT

June 26, 1934.
[H.R. 9769.]
[Public, No. 475.]

To amend the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes", is hereby amended so as to permit the Secretary of the Interior, in his discretion, to sell under the provisions of said Act the coal and asphalt deposits referred to therein in tracts of less than nine hundred and sixty acres where such smaller tract or acreage adjoins a developed tract on which active mining operations are being conducted and is needed by the operator in further developing the existing mine: *Provided,* That where the sale of such smaller tract or acreage is not deemed advisable, the Secretary of the Interior may in his discretion, lease said tract under the same terms and conditions as developed tracts are leased under the Act of April 21, 1932 (47 Stat. 88), with the exception that the minimum tonnage requirement contained therein is hereby waived as to leases on such small tracts.

Choctaw and Chickasaw Indians, Okla.
Vol. 46, p. 788.
Sales of coal and asphalt deposits authorized.

Proviso.
Leases.

Vol. 47, p. 89.
Minimum tonnage requirement waived.

Approved, June 26, 1934.

# NATIONAL FIREARMS ACT OF 1938

# 52 STAT. 1250

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14717   Page 39 of 295

[CHAPTER 850]

June 30, 1938
[S. 3]
[Public, No. 785]

AN ACT

To regulate commerce in firearms.

*Federal Firearms Act.*
*Definitions.*
*"Person."*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

(1) The term "person" includes an individual, partnership, association, or corporation.

*"Interstate or foreign commerce."*

(2) The term "interstate or foreign commerce" means commerce between any State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any Territory or possession or the District of Columbia.

*"Firearm."*

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

*"Manufacturer."*

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellent powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this Act.

*"Dealer."*

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breach [1] mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this Act.

*"Licensed dealer."*
*"Crime of violence."*

(6) The term "crime of violence" means murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.

*"Fugitive from justice."*

(7) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding.

*"Ammunition."*

(8) The term "ammunition" shall include all pistol or revolver ammunition except .22-caliber rim-fire ammunition.

*Unlawful acts.*
*Transportation, etc., of firearms or ammunition without license.*

SEC. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

*Knowingly receiving same.*

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

*Transportation, etc., to other than licensed manufacturer or dealer.*

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license be exhibited to such manufacturer or dealer by the prospective purchaser.

---

[1] So in original.

Compendium_Roth
Page 0028

Case 3:17-cv-01017-BEN-JLB   Document 128   Filed 11/11/22   PageID.14718   Page 40 of 295

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions (including the Philippine Islands), or the District of Columbia of a crime of violence or is a fugitive [1] from justice.

*Shipment to person under indictment, etc.*

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime of violence or who is a fugitive [1] from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

*Shipment by person under indictment, etc.*

(f) It shall be unlawful for any person who has been convicted of a crime of violence or is a fugitive [1] from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act.

*Receipt by person convicted of crime of violence, etc.*

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

*Transportation of stolen firearms, etc.*

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

*Traffic in stolen firearms.*

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.

*Transportation of firearms from which serial number has been removed.*

SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

*Licenses, application, fee.*

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

*Issuance.*

*Proviso.*
*Issuance after revocation.*

(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secre-

*Revocation on conviction of licensee.*

*Proviso.*
*Temporary continuance; bond.*

---

[1] So in original.





DATE DOWNLOADED: Tue Oct 18 17:33:17 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

ALWD 7th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

APA 7th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

Chicago 17th ed.
"Public Law 91-452, 91 Congress, Session 2, An Act: Relating to the control of
organized crime in the United States.," U.S. Statutes at Large 84, no. Main Section
(1970): 922-962

McGill Guide 9th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).


AGLC 4th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970)

MLA 9th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970). HeinOnline.

OSCOLA 4th ed.
Relating to the control of organized crime in the United States., Public Law 91-452,
91 Congress. 84 Stat. 922 (1970).

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
   *Copyright Information*

922                         PUBLIC LAW 91-450–OCT. 14, 1970                    [84 Stat.

Public Law 91-450

October 14, 1970
[S. 4235]

AN ACT

To continue the jurisdiction of the United States District Court for the District of Puerto Rico over certain cases pending in that court on June 2, 1970.

U.S. District
Court for the
District of Puerto
Rico.
Jurisdiction.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 13 of the Act entitled "An Act to provide for the appointment of additional district judges, and for other purposes", approved June 2, 1970 (Public Law 91–272; 84 Stat. 294), is amended by striking out the period at the end thereof and inserting in lieu thereof the following: "; however, nothing in this section shall impair the jurisdiction of the United States District Court for the District of Puerto Rico to hear and determine any action or matter begun in the court on or before June 2, 1970.".

Approved October 14, 1970.


Public Law 91-451

October 14, 1970
[H. R. 12943]

AN ACT

To amend section 3 of the Act of November 2, 1966, to extend for three years the authority to make appropriations to carry out such Act.

Jellyfish
control.
Appropriation.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 3 of the Act entitled "An Act to provide for the control or elimination of jellyfish and other such pests in the coastal waters of the United States, and for other purposes", approved November 2, 1966 (16 U.S.C. 1203), is amended by striking out "for the fiscal year ending June 30, 1970" and inserting in lieu thereof "for the period beginning July 1, 1969, and ending June 30, 1973".

80 Stat. 1149.

Approved October 14, 1970.


Public Law 91-452

October 15, 1970
[S. 30]

AN ACT

Relating to the control of organized crime in the United States.

Organized Crime
Control Act of
1970.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "Organized Crime Control Act of 1970."

STATEMENT OF FINDINGS AND PURPOSE

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money

Compendium_Roth
Page 0031

obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear on the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

## TITLE I—SPECIAL GRAND JURY

Sec. 101. (a) Title 18, United States Code, is amended by adding immediately after chapter 215 the following new chapter:

62 Stat. 829.
18 USC 3321.

### "Chapter 216.—SPECIAL GRAND JURY

"Sec.
"3331. Summoning and term.
"3332. Powers and duties.
"3333. Reports.
"3334. General provisions.

### "§ 3331. Summoning and term

"(a) In addition to such other grand juries as shall be called from time to time, each district court which is located in a judicial district containing more than four million inhabitants or in which the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, certifies in writing to the chief judge of the district that in his judgment a special grand jury is necessary because of criminal activity in the district shall order a special grand jury to be summoned at least once in each period of eighteen months unless another special grand jury is then serving. The grand jury shall serve for a term of eighteen months unless an order for its discharge is

Compendium_Roth
Page 0032

entered earlier by the court upon a determination of the grand jury by majority vote that its business has been completed. If, at the end of such term or any extension thereof, the district court determines the business of the grand jury has not been completed, the court may enter an order extending such term for an additional period of six months. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter.

"(b) If a district court within any judicial circuit fails to extend the term of a special grand jury or enters an order for the discharge of such grand jury before such grand jury determines that it has completed its business, the grand jury, upon the affirmative vote of a majority of its members, may apply to the chief judge of the circuit for an order for the continuance of the term of the grand jury. Upon the making of such an application by the grand jury, the term thereof shall continue until the entry upon such application by the chief judge of the circuit of an appropriate order. No special grand jury term so extended shall exceed thirty-six months, except as provided in subsection (e) of section 3333 of this chapter.

"§ 3332. **Powers and duties**

"(a) It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. Such alleged offenses may be brought to the attention of the grand jury by the court or by any attorney appearing on behalf of the United States for the presentation of evidence. Any such attorney receiving information concerning such an alleged offense from any other person shall, if requested by such other person, inform the grand jury of such alleged offense, the identity of such other person, and such attorney's action or recommendation.

"(b) Whenever the district court determines that the volume of business of the special grand jury exceeds the capacity of the grand jury to discharge its obligations, the district court may order an additional special grand jury for that district to be impaneled.

"§ 3333. **Reports**

"(a) A special grand jury impaneled by any district court, with the concurrence of a majority of its members, may, upon completion of its original term, or each extension thereof, submit to the court a report—

"(1) concerning noncriminal misconduct, malfeasance, or misfeasance in office involving organized criminal activity by an appointed public officer or employee as the basis for a recommendation of removal or disciplinary action; or

"(2) regarding organized crime conditions in the district.

Examination; filing as public record.

"(b) The court to which such report is submitted shall examine it and the minutes of the special grand jury and, except as otherwise provided in subsections (c) and (d) of this section, shall make an order accepting and filing such report as a public record only if the court is satisfied that it complies with the provisions of subsection (a) of this section and that—

"(1) the report is based upon facts revealed in the course of an investigation authorized by subsection (a) of section 3332 and is supported by the preponderance of the evidence; and

"(2) when the report is submitted pursuant to paragraph (1) of subsection (a) of this section, each person named therein and any reasonable number of witnesses in his behalf as designated by him to the foreman of the grand jury were afforded an opportu-

nity to testify before the grand jury prior to the filing of such report, and when the report is submitted pursuant to paragraph (2) of subsection (a) of this section, it is not critical of an identified person.

"(c)(1) An order accepting a report pursuant to paragraph (1) of subsection (a) of this section and the report shall be sealed by the court and shall not be filed as a public record or be subject to subpena or otherwise made public (i) until at least thirty-one days after a copy of the order and report are served upon each public officer or employee named therein and an answer has been filed or the time for filing an answer has expired, or (ii) if an appeal is taken, until all rights of review of the public officer or employee named therein have expired or terminated in an order accepting the report. No order accepting a report pursuant to paragraph (1) of subsection (a) of this section shall be entered until thirty days after the delivery of such report to the public officer or body pursuant to paragraph (3) of subsection (c) of this section. The court may issue such orders as it shall deem appropriate to prevent unauthorized publication of a report. Unauthorized publication may be punished as contempt of the court.

*Report, copy to public officers.*

"(2) Such public officer or employee may file with the clerk a verified answer to such a report not later than twenty days after service of the order and report upon him. Upon a showing of good cause, the court may grant such public officer or employee an extension of time within which to file such answer and may authorize such limited publication of the report as may be necessary to prepare such answer. Such an answer shall plainly and concisely state the facts and law constituting the defense of the public officer or employee to the charges in said report, and, except for those parts thereof which the court determines to have been inserted scandalously, prejudiciously, or unnecessarily, such answer shall become an appendix to the report.

*Answer, filing.*

"(3) Upon the expiration of the time set forth in paragraph (1) of subsection (c) of this section, the United States attorney shall deliver a true copy of such report, and the appendix, if any, for appropriate action to each public officer or body having jurisdiction, responsibility, or authority over each public officer or employee named in the report.

"(d) Upon the submission of a report pursuant to subsection (a) of this section, if the court finds that the filing of such report as a public record may prejudice fair consideration of a pending criminal matter, it shall order such report sealed and such report shall not be subject to subpena or public inspection during the pendency of such criminal matter, except upon order of the court.

"(e) Whenever the court to which a report is submitted pursuant to paragraph (1) of subsection (a) of this section is not satisfied that the report complies with the provisions of subsection (b) of this section, it may direct that additional testimony be taken before the same grand jury, or it shall make an order sealing such report, and it shall not be filed as a public record or be subject to subpena or otherwise made public until the provisions of subsection (b) of this section are met. A special grand jury term may be extended by the district court beyond thirty-six months in order that such additional testimony may be taken or the provisions of subsection (b) of this section may be met.

*Additional testimony.*

*Special grand jury term, extension.*

"(f) As used in this section, 'public officer or employee' means any officer or employee of the United States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, or any political subdivision, or any department, agency, or instrumentality thereof.

*"Public officer or employee."*

PUBLIC LAW 91-452–OCT. 15, 1970 [84 Stat.

62 Stat. 829.
18 USC 3321.
18 USC app.

**"§ 3334. General provisions**

"The provisions of chapter 215, title 18, United States Code, and the Federal Rules of Criminal Procedure applicable to regular grand juries shall apply to special grand juries to the extent not inconsistent with sections 3331, 3332, or 3333 of this chapter."

(b) The part analysis of part II, title 18, United States Code, is amended by adding immediately after

**"215. Grand Jury**‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ 3321"

the following new item:

**"216. Special Grand Jury**‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ 3331."

71 Stat. 595.

SEC. 102. (a) Subsection (a), section 3500, chapter 223, title 18, United States Code, is amended by striking "to an agent of the Government" following "the defendant".

(b) Subsection (d), section 3500, chapter 223, title 18, United States Code, is amended by striking "paragraph" following "the court under" and inserting in lieu thereof "subsection".

(c) Paragraph (1), subsection (e), section 3500, chapter 223, title 18, United States Code, is amended by striking the "or" following the semicolon.

(d) Paragraph (2), subsection (e), section 3500, chapter 223, title 18, United States Code, is amended by striking "to an agent of the Government" after "said witness" and by striking the period at the end thereof and inserting in lieu thereof: "; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.".

## TITLE II—GENERAL IMMUNITY

62 Stat. 856.
18 USC 5001.

SEC. 201. (a) Title 18, United States Code, is amended by adding immediately after part IV the following new part:

### "Part V.—Immunity of Witnesses

"Sec.
"6001. Definitions.
"6002. Immunity generally.
"6003. Court and grand jury proceedings.
"6004. Certain administrative proceedings.
"6005. Congressional proceedings.

**"§ 6001. Definitions**

"As used in this part—

80 Stat. 378,
948.

"(1) 'agency of the United States' means any executive department as defined in section 101 of title 5, United States Code, a military department as defined in section 102 of title 5, United States Code, the Atomic Energy Commission, the China Trade Act registrar appointed under 53 Stat. 1432 (15 U.S.C. sec. 143), the Civil Aeronautics Board, the Federal Communications Commission, the Federal Deposit Insurance Corporation, the Federal Maritime Commission, the Federal Power Commission, the Federal Trade Commission, the Interstate Commerce Commission, the National Labor Relations Board, the National Transportation Safety Board, the Railroad Retirement Board, an arbitration board established under 48 Stat. 1193 (45 U.S.C. sec. 157), the Securities and Exchange Commission, the Subversive Activities Control Board, or a board established under 49 Stat. 31 (15 U.S.C. sec. 715d);

*Post*, p. 930.

"(2) 'other information' includes any book, paper, document, record, recording, or other material;

"(3) 'proceeding before an agency of the United States' means any proceeding before such an agency with respect to which it is

authorized to issue subpenas and to take testimony or receive other information from witnesses under oath; and

"(4) 'court of the United States' means any of the following courts: the Supreme Court of the United States, a United States court of appeals, a United States district court established under chapter 5, title 28, United States Code, the District of Columbia Court of Appeals, the Superior Court of the District of Columbia, the District Court of Guam, the District Court of the Virgin Islands, the United States Court of Claims, the United States Court of Customs and Patent Appeals, the Tax Court of the United States, the Customs Court, and the Court of Military Appeals.

62 Stat. 872;
Ante, p. 294.
28 USC 81.

## "§ 6002. Immunity generally

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1) a court or grand jury of the United States,
"(2) an agency of the United States, or
"(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

## "§ 6003. Court and grand jury proceedings

"(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

"(1) the testimony or other information from such individual may be necessary to the public interest; and
"(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

## "§ 6004. Certain administrative proceedings

"(a) In the case of any individual who has been or who may be called to testify or provide other information at any proceeding before an agency of the United States, the agency may, with the approval of the Attorney General, issue, in accordance with subsection (b) of this section, an order requiring the individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

Compendium_Roth
Page 0036

"(b) An agency of the United States may issue an order under subsection (a) of this section only if in its judgment—

"(1) the testimony or other information from such individual may be necessary to the public interest; and

"(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

## "§ 6005. Congressional proceedings

"(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before either House of Congress, or any committee, or any subcommittee of either House, or any joint committee of the two Houses, a United States district court shall issue, in accordance with subsection (b) of this section, upon the request of a duly authorized representative of the House of Congress or the committee concerned, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

"(b) Before issuing an order under subsection (a) of this section, a United States district court shall find that—

"(1) in the case of a proceeding before either House of Congress, the request for such an order has been approved by an affirmative vote of a majority of the Members present of that House;

"(2) in the case of a proceeding before a committee or a subcommittee of either House of Congress or a joint committee of both Houses, the request for such an order has been approved by an affirmative vote of two-thirds of the members of the full committee; and

"(3) ten days or more prior to the day on which the request for such an order was made, the Attorney General was served with notice of an intention to request the order

"(c) Upon application of the Attorney General, the United States district court shall defer the issuance of any order under subsection (a) of this section for such period, not longer than twenty days from the date of the request for such order, as the Attorney General may specify."

(b) The table of parts for title 18, United States Code, is amended by adding at the end thereof the following:

"V. Immunity of Witnesses--------------------------------------------- 6001".

Sec. 202. The third sentence of paragraph (b) of section 6 of the Commodity Exchange Act (69 Stat. 160; 7 U.S.C. 15) is amended by striking "49 U.S.C. 12, 46, 47, 48, relating to the attendance and testimony of witnesses, the production of documentary evidence, and the immunity of witnesses" and by inserting in lieu thereof the following: "(49 U.S.C. § 12), relating to the attendance and testimony of witnesses and the production of documentary evidence,".

*Repeal.* Sec. 203. Subsection (f) of section 17 of the United States Grain Standards Act (82 Stat. 768; 7 U.S.C. § 87f(f)), is repealed.

Sec. 204. The second sentence of section 5 of the Act entitled "An Act to regulate the marketing of economic poisons and devices, and for other purposes", approved June 25, 1947 (61 Stat. 168; 7 U.S.C. § 135c), is amended by inserting after "section", the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

*Repeal.* Sec. 205. Subsection (f) of section 13 of the Perishable Agricultural Commodities Act, 1930 (46 Stat. 536; 7 U.S.C. § 499m(f)), is repealed.

SEC. 206. (a) Section 16 of the Cotton Research and Promotion Act (80 Stat. 285; 7 U.S.C. § 2115) is amended by striking "(a)" and by striking subsection (b).

(b) The section heading for such section 16 is amended by striking ": Self-Incrimination".

SEC. 207. Clause (10) of subsection (a) of section 7 of the Act entitled "An Act to establish a uniform system of bankruptcy throughout the United States", approved July 1, 1898 (52 Stat. 847; 11 U.S.C. § 25(a)(10)), is amended by inserting after the first use of the term "testimony" the following language: ", or any evidence which is directly or indirectly derived from such testimony,".

SEC. 208. The fourth sentence of subsection (d) of section 10 of the Federal Deposit Insurance Act (64 Stat. 882; 12 U.S.C. § 1820(d)), is repealed. *Repeal.*

SEC. 209. The seventh paragraph under the center heading "DEPARTMENT OF JUSTICE" in the first section of the Act of February 25, 1903 (32 Stat. 904; 15 U.S.C. § 32), is amended by striking ": *Provided*, That" and all that follows in that paragraph and inserting in lieu thereof a period.

SEC. 210. The Act of June 30, 1906 (34 Stat. 798; 15 U.S.C. § 33), is repealed. *Repeals.*

SEC. 211. The seventh paragraph of section 9 of the Federal Trade Commission Act (38 Stat. 722; 15 U.S.C. § 49), is repealed.

SEC. 212. Subsection (d) of section 21 of the Securities Exchange Act of 1934 (48 Stat. 899; 15 U.S.C. § 78u(d)), is repealed.

SEC. 213. Subsection (c) of section 22 of the Securities Act of 1933 (48 Stat. 86; 15 U.S.C. § 77v(c)), is repealed.

SEC. 214. Subsection (e) of section 18 of the Public Utility Holding Company Act of 1935 (49 Stat. 831; 15 U.S.C. § 79r(e)), is repealed.

SEC. 215. Subsection (d) of section 42 of the Investment Company Act of 1940 (54 Stat. 842; 15 U.S.C. § 80a-41(d)), is repealed.

SEC. 216. Subsection (d) of section 209 of the Investment Advisers Act of 1940 (54 Stat. 853; 15 U.S.C. § 80b-9(d)), is repealed.

SEC. 217. Subsection (c) of section 15 of the China Trade Act, 1922 (42 Stat. 953; 15 U.S.C. § 155(c)), is repealed. *42 Stat. 853.*

SEC. 218. Subsection (h) of section 14 of the Natural Gas Act (52 Stat. 828; 15 U.S.C. § 717m(h)), is repealed.

SEC. 219. The first proviso of section 12 of the Act entitled "An Act to regulate the interstate distribution and sale of packages of hazardous substances intended or suitable for household use," approved July 12, 1960 (74 Stat. 379; 15 U.S.C. § 1271), is amended by inserting after "section" the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

SEC. 220. Subsection (e) of section 1415 of the Interstate Land Sales Full Disclosure Act (82 Stat. 596; 15 U.S.C. § 1714(e)), is repealed. *Repeals.*

SEC. 221. Subsection (g) of section 307 of the Federal Power Act (49 Stat. 856; 16 U.S.C. § 825f(g)), is repealed.

SEC. 222. Subsection (b) of section 835 of title 18, United States Code, is amended by striking the third sentence thereof. *74 Stat. 811.*

SEC. 223. (a) Section 895 of title 18, United States Code, is repealed. *Repeal. 82 Stat. 162.*

(b) The table of sections of chapter 42 of such title is amended by striking the item relating to section 895.

SEC. 224. (a) Section 1406 of title 18, United States Code, is repealed. *Repeal. 70 Stat. 574.*

(b) The table of sections of chapter 68 of such title is amended by striking the item relating to section 1406.

SEC. 225. Section 1954 of title 18, United States Code, is amended by striking "(a) Whoever" and inserting in lieu thereof "Whoever" and by striking subsection (b) thereof.

SEC. 226. The second sentence of subsection (b), section 2424, title 18, United States Code, is amended by striking "but no person" and all that follows in that subsection and inserting in lieu thereof: "but no information contained in the statement or any evidence which is directly or indirectly derived from such information may be used against any person making such statement in any criminal case, except a prosecution for perjury, giving a false statement or otherwise failing to comply with this section."

SEC. 227. (a) Section 2514 of title 18, United States Code, is repealed effective four years after the effective date of this Act.

(b) The table of sections of chapter 119 of such title is amended by striking the item relating to section 2514.

SEC. 228. (a) Section 3486 of title 18, United States Code, is repealed.

(b) The table of sections of chapter 223 of such title is amended by striking the item relating to section 3486.

SEC. 229. Subsection (e) of section 333 of the Tariff Act of 1930 (46 Stat. 699; 19 U.S.C. § 1333(e)), is amended by striking ": *Provided*, That" and all that follows in that subsection and inserting in lieu thereof a period.

SEC. 230. The first proviso of section 703 of the Federal Food, Drug, and Cosmetic Act, approved June 25, 1938 (52 Stat. 1057; 21 U.S.C. § 373), is amended by inserting after "section" the following language: ", or any evidence which is directly or indirectly derived from such evidence,".

SEC. 231. (a) Section 4874 of the Internal Revenue Code of 1954 is repealed.

(b) The table of sections of part III of subchapter (D) of chapter 39 of such Code is amended by striking the item relating to section 4874.

SEC. 232. Section 7493 of the Internal Revenue Code of 1954 is repealed.

SEC. 233. The table of sections of part III of subchapter (E) of chapter 76 of the Internal Revenue Code of 1954 is amended by striking the item relating to section 7493.

SEC. 234. Paragraph (3) of section 11 of the Labor Management Relations Act, 1947 (49 Stat. 455; 29 U.S.C. § 161(3)), is repealed.

SEC. 235. The third sentence of section 4 of the Act entitled "An Act to provide that tolls on certain bridges over navigable waters of the United States shall be just and reasonable, and for other purposes", approved August 21, 1935 (49 Stat. 671; 33 U.S.C. § 506), is repealed.

SEC. 236. Subsection (f) of section 205 of the Social Security Act (42 U.S.C. § 405(f)) is repealed.

SEC. 237. Paragraph c of section 161 of the Atomic Energy Act of 1954 (68 Stat. 948; 42 U.S.C. § 2201(c)), is amended by striking the third sentence thereof.

SEC. 238. The last sentence of the first paragraph of subparagraph (h) of the paragraph designated "Third" of section 7 of the Railway Labor Act (44 Stat. 582; 45 U.S.C. § 157), is repealed.

SEC. 239. Subsection (c) of section 12 of the Railroad Unemployment Insurance Act (52 Stat. 1107; 45 U.S.C. § 362(c)), is repealed.

SEC. 240. Section 28 of the Shipping Act of 1916 (39 Stat. 737; 46 U.S.C. § 827), is repealed.

SEC. 241. Subsection (c) of section 214 of the Merchant Marine Act, 1936 (49 Stat. 1991; 46 U.S.C. § 1124(c)), is repealed.

SEC. 242. Subsection (i) of section 409 of the Communications Act of 1934 (48 Stat. 1096; 47 U.S.C. § 409 (l)), is repealed.

Margin notes:

76 Stat. 42.

62 Stat. 813.

Repeal, effective date. 82 Stat. 216.

Repeal. 68 Stat. 745.

Repeal. 68A Stat. 586. 26 USC 4874.

Repeal. 68A Stat. 893.

Repeal. 61 Stat. 150.

Repeal.

Repeal. 53 Stat. 1368.

Repeals.

66 Stat. 722.

Compendium_Roth
Page 0039

Sec. 243. (a) The second sentence of section 9 of the Interstate Commerce Act (24 Stat. 382; 49 U.S.C. § 9), is amended by striking "; the claim" and all that follows in that sentence and inserting in lieu thereof a period.

(b) Subsection (a) of section 316 of the Interstate Commerce Act (54 Stat. 946; 49 U.S.C. § 916(a)), is amended by striking the comma following "part I" and by striking ", and the Immunity of Witnesses Act (34 Stat. 798; 32 Stat. 904, ch. 755, sec. 1),".

(c) Subsection (a) of section 417 of the Interstate Commerce Act (49 U.S.C. § 1017(a)), is amended by striking the comma after "such provisions" and by striking ", and of the Immunity of Witnesses Act (34 Stat. 798; 32 Stat. 904, ch. 755, sec. 1),".

*56 Stat. 297.*

Sec. 244. The third sentence of section 3 of the Act entitled "An Act to further regulate Commerce with foreign nations and among the States", approved February 19, 1903 (32 Stat. 848; 49 U.S.C. § 43), is amended by striking "; the claim" and all that follows in that sentence down through and including "*Provided,* That the provisions" and inserting in lieu thereof ". The provisions".

Sec. 245. The first paragraph of the Act of February 11, 1893 (27 Stat. 443; 49 U.S.C. § 46), repealed.

*Repeals.*

Sec. 246. Subsection (i) of section 1004 of the Federal Aviation Act of 1958 (72 Stat. 792; 49 U.S.C. § 1484(i)), is repealed.

Sec. 247. The ninth sentence of subsection (c) of section 13 of the Internal Security Act of 1950 (81 Stat. 768; 50 U.S.C. § 792(c)), is repealed.

Sec. 248. Section 1302 of the Second War Powers Act of 1942 (56 Stat. 185; 50 U.S.C. App. § 643a), is amended by striking the fourth sentence thereof.

Sec. 249. Paragraph (4) of subsection (a) of section 2 of the Act entitled "An Act to expedite national defense, and for other purposes", approved June 28, 1940 (54 Stat. 676; 50 U.S.C. App. § 1152(a)(4)), is amended by striking the fourth sentence thereof.

*56 Stat. 179.*

Sec. 250. Subsection (d) of section 6 of the Export Control Act of 1949 (63 Stat. 8; 50 U.S.C. App. § 2026(b)), is repealed.

Sec. 251. Subsection (b) of section 705 of the Act of September 8, 1950, to amend the Tariff Act of 1930 (64 Stat. 816; 50 U.S.C. § 2155(b)), is repealed.

Sec. 252. Section 23-545 of the District of Columbia Code is repealed.

*Ante, p. 619.*

Sec. 253. Section 42 of the Act of October 9, 1940, 54 Stat. 1082 (D.C. Code, sec. 35-1346), is repealed.

Sec. 254. Section 2 of the Act of June 19, 1934, 48 Stat. 1176 (section 35-802, District of Columbia Code), is repealed.

Sec. 255. Section 29 of the Act of March 4, 1922, 42 Stat. 414 (section 35-1129, District of Columbia Code), is repealed.

Sec. 256. Section 9 of the Act of February 7, 1914, 38 Stat. 282, as amended (section 22-2721, District of Columbia Code), is repealed.

Sec. 257. Section 5 of the Act of February 7, 1914, 38 Stat. 281 (section 22-2717, District of Columbia Code), is amended by striking out "2721" and inserting in lieu thereof "2720".

Sec. 258. Section 8 of the Act of February 7, 1914, 38 Stat. 282 (section 22-2720, District of Columbia Code), is amended by striking out "2721" and inserting in lieu thereof "2720".

Sec. 259. In addition to the provisions of law specifically amended or specifically repealed by this title, any other provision of law inconsistent with the provisions of part V of title 18, United States Code (adding by title II of this Act), is to that extent amended or repealed.

*Ante, p. 926.*

Sec. 260. The provisions of part V of title 18, United States Code, added by title II of this Act, and the amendments and repeals made by

*Effective date.*

Compendium_Roth
Page 0040

title II of this Act, shall take effect on the sixtieth day following the date of the enactment of this Act. No amendment to or repeal of any provision of law under title II of this Act shall affect any immunity to which any individual is entitled under such provision by reason of any testimony or other information given before such day.

## TITLE III—RECALCITRANT WITNESSES

62 Stat. 950;
82 Stat. 62.
28 USC 1821-
1825.

Sec. 301. (a) Chapter 119, title 28, United States Code, is amended by adding at the end thereof the following new section:

### "§ 1826. Recalcitrant witnesses

"(a) Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of—

"(1) the court proceeding, or

"(2) the term of the grand jury, including extensions,

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

"(b) No person confined pursuant to subsection (a) of this section shall be admitted to bail pending the determination of an appeal taken by him from the order for his confinement if it appears that the appeal is frivolous or taken for delay. Any appeal from an order of confinement under this section shall be disposed of as soon as practicable, but not later than thirty days from the filing of such appeal."

(b) The analysis of chapter 119, title 28, United States Code, is amended by adding at the end thereof the following new item:

"1826. Recalcitrant witnesses.".

75 Stat. 795.

Sec. 302. (a) The first paragraph of section 1073, chapter 49, title 18, United States Code, is amended by inserting "or (3) to avoid service of, or contempt proceedings for alleged disobedience of, lawful process requiring attendance and the giving of testimony or the production of documentary evidence before an agency of a State empowered by the law of such State to conduct investigations of alleged criminal activities," immediately after "is charged,".

(b) The second paragraph of section 1073, chapter 49, title 18, United States Code, is amended by inserting immediately after "held in custody or confinement" a comma and adding "or in which an avoidance of service of process or a contempt referred to in clause (3) of the first paragraph of this section is alleged to have been committed,".

## TITLE IV—FALSE DECLARATIONS

62 Stat. 773;
78 Stat. 995.
18 USC 1621-
1622.

Sec. 401. (a) Chapter 79, title 18, United States Code, is amended by adding at the end thereof the following new section:

### "§ 1623. False declarations before grand jury or court

"(a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

"(b) This section is applicable whether the conduct occurred within or without the United States.

"(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

"(1) each declaration was material to the point in question, and
"(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

"(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

"(e) Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."

(b) The analysis of chapter 79, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1623. False declarations before grand jury or court."

## TITLE V—PROTECTED FACILITIES FOR HOUSING GOVERNMENT WITNESSES

SEC. 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

SEC. 502. The Attorney General of the United States is authorized to rent, purchase, modify, or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or a willingness to testify by, such a witness would place his life or person, or the life or person of a member of his family or household, in jeopardy. Any person availing himself of an offer by the Attorney General to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

SEC. 503. As used in this title, "Government" means the United     "Government." States, any State, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof. The offer of facilities to witnesses may be conditioned by

Compendium_Roth
Page 0042

934                           PUBLIC LAW 91-452—OCT. 15, 1970                      [84 Stat.

the Attorney General upon reimbursement in whole or in part to the United States by any State or any political subdivision, or any department, agency, or instrumentality thereof of the cost of maintaining and protecting such witnesses.

Appropriation.    Sec. 504. There is hereby authorized to be appropriated from time to time such funds as are necessary to carry out the provisions of this title.

## TITLE VI—DEPOSITIONS

62 Stat. 832;
82 Stat. 210.
18 USC 3481-
3502.

Sec. 601. (a) Chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new section:

### "§ 3503. Depositions to preserve testimony

"(a) Whenever due to exceptional circumstances it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved, the court at any time after the filing of an indictment or information may upon motion of such party and notice to the parties order that the testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place. If a witness is committed for failure to give bail to appear to testify at a trial or hearing, the court on written motion of the witness and upon notice to the parties may direct that his deposition be taken. After the deposition has been subscribed the court may discharge the witness. A motion by the Government to obtain an order under this section shall contain certification by the Attorney General or his designee that the legal proceeding is against a person who is believed to have participated in an organized criminal activity.

Notice.    "(b) The party at whose instance a deposition is to be taken shall give to every party reasonable written notice of the time and place for taking the deposition. The notice shall state the name and address of each person to be examined. On motion of a party upon whom the notice is served, the court for cause shown may extend or shorten the time or change the place for taking the deposition. The officer having custody of a defendant shall be notified of the time and place set for the examination, and shall produce him at the examination and keep him in the presence of the witness during the examination. A defendant not in custody shall have the right to be present at the examination, but his failure, absent good cause shown, to appear after notice and tender of expenses shall constitute a waiver of that right and of any objection to the taking and use of the deposition based upon that right.

Counsel, appointment.    "(c) If a defendant is without counsel, the court shall advise him of his rights and assign counsel to represent him unless the defendant elects to proceed without counsel or is able to obtain counsel of his Expenses, payment by U.S. own choice. Whenever a deposition is taken at the instance of the Government, or whenever a deposition is taken at the instance of a defendant who appears to be unable to bear the expense of the taking of the deposition, the court may direct that the expenses of travel and subsistence of the defendant and his attorney for attendance at the examination shall be paid by the Government. In such event the marshal shall make payment accordingly.

"(d) A deposition shall be taken and filed in the manner provided in civil actions, provided that (1) in no event shall a deposition be taken of a party defendant without his consent, and (2) the scope of examination and cross-examination shall be such as would be allowed in the trial itself. On request or waiver by the defendant the court may direct that a deposition be taken on written interrogatories in the manner provided in civil actions. Such request shall constitute

a waiver of any objection to the taking and use of the deposition based upon its being so taken.

"(e) The Government shall make available to the defendant for his examination and use at the taking of the deposition any statement of the witness being deposed which is in the possession of the Government and which the Government would be required to make available to the defendant if the witness were testifying at the trial.

*Statements of witnesses, availability.*

"(f) At the trial or upon any hearing, a part or all of a deposition, so far as otherwise admissible under the rules of evidence, may be used if it appears: That the witness is dead; or that the witness is out of the United States, unless it appears that the absence of the witness was procured by the party offering the deposition; or that the witness is unable to attend or testify because of sickness or infirmity; or that the witness refuses in the trial or hearing to testify concerning the subject of the deposition or part offered; or that the party offering the deposition has been unable to procure the attendance of the witness by subpena. Any deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer all of it which is relevant to the part offered and any party may offer other parts.

*Depositions, conditions for use.*

"(g) Objections to receiving in evidence a deposition or part thereof may be made as provided in civil actions."

(b) The analysis of chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new item:

"3503. Depositions to preserve testimony."

## TITLE VII—LITIGATION CONCERNING SOURCES OF EVIDENCE

### Part A—Special Findings

Sec. 701. The Congress finds that claims that evidence offered in proceedings was obtained by the exploitation of unlawful acts, and is therefore inadmissible in evidence, (1) often cannot reliably be determined when such claims concern evidence of events occurring years after the allegedly unlawful act, and (2) when the allegedly unlawful act has occurred more than five years prior to the event in question, there is virtually no likelihood that the evidence offered to prove the event has been obtained by the exploitation of that allegedly unlawful act.

### Part B—Litigation Concerning Sources of Evidence

Sec. 702. (a) Chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new section:

*Ante, p. 934.*

### "§ 3504. Litigation concerning sources of evidence

"(a) In any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, or other authority of the United States—

"(1) upon a claim by a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by the exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the alleged unlawful act;

"(2) disclosure of information for a determination if evidence is inadmissible because it is the primary product of an unlawful

Compendium_Roth
Page 0044

act occurring prior to June 19, 1968, or because it was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, shall not be required unless such information may be relevant to a pending claim of such inadmissibility; and

"(3) no claim shall be considered that evidence of an event is inadmissible on the ground that such evidence was obtained by the exploitation of an unlawful act occurring prior to June 19, 1968, if such event occurred more than five years after such allegedly unlawful act.

"Unlawful act."     "(b) As used in this section 'unlawful act' means any act the use of any electronic, mechanical, or other device (as defined in section
82 Stat. 212.     2510(5) of this title) in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

(b) The analysis of chapter 223, title 18, United States Code, is amended by adding at the end thereof the following new item:

"3504. Litigation concerning sources of evidence."

Applicability.     Sec. 703. This title shall apply to all proceedings, regardless of when commenced, occurring after the date of its enactment. Paragraph (3) of subsection (a) of section 3504, chapter 223, title 18, United States Code, shall not apply to any proceeding in which all information to be relied upon to establish inadmissibility was possessed by the party making such claim and adduced in such proceeding prior to such enactment.

## TITLE VIII—SYNDICATED GAMBLING

### PART A—SPECIAL FINDINGS

Sec. 801. The Congress finds that illegal gambling involves widespread use of, and has an effect upon, interstate commerce and the facilities thereof.

### PART B—OBSTRUCTION OF STATE OR LOCAL LAW ENFORCEMENT

62 Stat. 769;     Sec. 802. (a) Chapter 73, title 18, United States Code, is amended
81 Stat. 362.     by adding at the end thereof the following new section:
18 USC 1501-
1510.          "§ 1511. Obstruction of State or local law enforcement

"(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

"(1) one or more of such persons does any act to effect the object of such a conspiracy;

"(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

"(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.

Definitions.     "(b) As used in this section—

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

"(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

"(c) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization, except as compensation for actual expenses incurred by him in the conduct of such activity.

68A Stat. 163.
26 USC 501.

"(d) Whoever violates this section shall be punished by a fine of not more than $20,000 or imprisonment for not more than five years, or both."

Penalty.

(b) The analysis of chapter 73, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1511. Obstruction of State or local law enforcement."

## Part C—Illegal Gambling Business

Sec. 803. (a) Chapter 95, title 18, United States Code, is amended by adding at the end thereof the following new section:

62 Stat. 793;
75 Stat. 492, 498;
76 Stat. 42.
18 USC 1951-
1954.

### "§ 1955. Prohibition of illegal gambling businesses

"(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned for not more than five years, or both.

Penalty.

"(b) As used in this section—

Definitions.

"(1) 'illegal gambling business' means a gambling business which—

"(i) is a violation of the law of a State or political subdivision in which it is conducted;

"(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

"(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

"(2) 'gambling' includes but is not limited to pool-selling, book-making, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

"(3) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

"(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

Compendium_Roth
Page 0046

Seizure and forfeiture.

"(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizure, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

Exception.

"(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity."

68A Stat. 163.
26 USC 501.

(b) The analysis of chapter 95, title 18, United States Code, is amended by adding at the end thereof the following new item:

"1955. Prohibition of illegal gambling businesses."

PART D—COMMISSION TO REVIEW NATIONAL POLICY TOWARD GAMBLING

ESTABLISHMENT

SEC. 804. (a) There is hereby established two years after the effective date of this Act a Commission on the Review of the National Policy Toward Gambling.

Members, appointments.

(b) The Commission shall be composed of fifteen members appointed as follows:

(1) four appointed by the President of the Senate from Members of the Senate, of whom two shall be members of the majority party, and two shall be members of the minority party;

(2) four appointed by the Speaker of the House of Representatives from Members of the House of Representatives, of whom two shall be members of the majority party, and two shall be members of the minority party; and

(3) seven appointed by the President of the United States from persons specially qualified by training and experience to perform the duties of the Commission, none of whom shall be officers of the executive branch of the Government.

(c) The President of the United States shall designate a Chairman from among the members of the Commission. Any vacancy in the Commission shall not affect its powers but shall be filled in the same manner in which the original appointment was made.

Quorum.

(d) Eight members of the Commission shall constitute a quorum.

## DUTIES

Sec. 805. (a) It shall be the duty of the Commission to conduct a comprehensive legal and factual study of gambling in the United States and existing Federal, State, and local policy and practices with respect to legal prohibition and taxation of gambling activities and to formulate and propose such changes in those policies and practices as the Commission may deem appropriate. In such study and review the Commission shall—

    (1) review the effectiveness of existing practices in law enforcement, judicial administration, and corrections in the United States and in foreign legal jurisdictions for the enforcement of the prohibition and taxation of gambling activities and consider possible alternatives to such practices; and

    (2) prepare a study of existing statutes of the United States that prohibit and tax gambling activities, and such a codification, revision, or repeal thereof as the Commission shall determine to be required to carry into effect such policy and practice changes as it may deem to be necessary or desirable.

(b) The Commission shall make such interim reports as it deems advisable. It shall make a final report of its findings and recommendations to the President of the United States and to the Congress within the four-year period following the establishment of the Commission.

(c) Sixty days after the submission of its final report, the Commission shall cease to exist.

## POWERS

Sec. 806. (a) The Commission or any duly authorized subcommittee or member thereof may, for the purpose of carrying out the provisions of this title, hold such hearings, sit and act at such times and places, administer such oaths, and require by subpena or otherwise the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as the Commission or such subcommittee or member may deem advisable. Any member of the Commission may administer oaths or affirmations to witnesses appearing before the Commission or before such subcommittee or member. Subpenas may be issued under the signature of the Chairman or any duly designated member of the Commission, and may be served by any person designated by the Chairman or such member.

(b) In the case of contumacy or refusal to obey a subpena issued under subsection (a) by any person who resides, is found, or transacts business within the jurisdiction of any district court of the United States, the district court, at the request of the Chairman of the Commission, shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a subcommittee or member thereof, there to produce evidence if so ordered, or there to give testimony touching the matter under inquiry. Any failure of any such person to obey any such order of the court may be punished by the court as a contempt thereof.

(c) The Commission shall be "an agency of the United States" under subsection (1), section 6001, title 18, United States Code, for the purpose of granting immunity to witnesses.

(d) Each department, agency, and instrumentality of the executive branch of the Government including independent agencies, is authorized and directed to furnish to the Commission, upon request made by the Chairman, on a reimbursable basis or otherwise, such statistical

*Marginal notes:*
Gambling, study and review.

Law enforcement.

Legislation.

Reports to President and Congress.

Termination.

Hearings, subpena powers.

Court order requiring attendance.

*Ante,* p. 926.

Federal and State information services.

Compendium_Roth
Page 0048

data, reports, and other information as the Commission deems necessary to carry out its functions under this title. The Chairman is further authorized to call upon the departments, agencies, and other offices of the several States to furnish, on a reimbursable basis or otherwise, such statistical data, reports, and other information as the Commission deems necessary to carry out its functions under this title.

#### COMPENSATION AND EXEMPTION OF MEMBERS

SEC. 807. (a) A member of the Commission who is a Member of Congress or a member of the Federal judiciary shall serve without additional compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred in the performance of duties vested in the Commission.

(b) A member of the Commission who is not a member of Congress or a member of the Federal judiciary shall receive $100 per diem when engaged in the actual performance of duties vested in the Commission plus reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of such duties.

#### STAFF

SEC. 808. (a) Subject to such rules and regulations as may be adopted by the Commission, the Chairman shall have the power to—

(1) appoint and fix the compensation of an Executive Director, and such additional staff personnel as he deems necessary, without regard to the provisions of title 5, United States Code, governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at rates not in excess of the maximum rate for GS-18 of the General Schedule under section 5332 of such title; and

> 80 Stat. 443, 467.
> 5 USC 5101, 5331.
> *Ante,* p. 198-1

(2) procure temporary and intermittent services to the same extent as is authorized by section 3109 of title 5, United States Code, but at rates not to exceed $100 a day for individuals.

> 80 Stat. 416.

(b) In making appointments pursuant to this subsection, the Chairman shall include among his appointments individuals determined by the Chairman to be competent social scientists, lawyers, and law enforcement officers.

#### EXPENSES

> Appropriation.

SEC. 809. There are hereby authorized to be appropriated to the Commission such sums as may be necessary to carry this title into effect.

#### PART E—GENERAL PROVISIONS

SEC. 810. Paragraph (c), subsection (1), Section 2516, title 18, United States Code, is amended by adding "section 1511 (obstruction of State or local law enforcement)," after "section 1510 (obstruction of criminal investigations)," and by adding "section 1955 (prohibition of business enterprises of gambling)," after "section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan),".

> 82 Stat. 216.

SEC. 811. No provision of this title indicates an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of a State or possession, or a political subdivision of a State or possession, on the same subject matter, or to relieve any person of any obligation imposed by any law of any State or possession, or political subdivision of a State or possession.

> State laws, priority.

Compendium_Roth
Page 0049

# TITLE IX—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

SEC. 901. (a) Title 18, United States Code, is amended by adding immediately after chapter 95 thereof the following new chapter:

*62 Stat. 683.*

## "Chapter 96.—RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS

"Sec.
"1961. Definitions.
"1962. Prohibited racketeering activities.
"1963. Criminal penalties.
"1964. Civil remedies.
"1965. Venue and process.
"1966. Expedition of actions.
"1967. Evidence.
"1968. Civil investigative demand.

## "§ 1961. Definitions

"As used in this chapter—

"(1) 'racketeering activity' means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473, relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), sections 2314 and 2315 (relating to interstate transportation of stolen property), sections 2421–24 (relating to white slave traffic), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), or (D) any offense involving bankruptcy fraud, fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic or other dangerous drugs, punishable under any law of the United States;

*76 Stat. 1119.*
*78 Stat. 203.*
*62 Stat. 705.*
*80 Stat. 904.*
*76 Stat. 41.*
*82 Stat. 160.*
*75 Stat. 491.*
*62 Stat. 763.*
*70 Stat. 523.*
*62 Stat. 769.*
*81 Stat. 362.*
*Ante, p. 936.*
*62 Stat. 793.*
*75 Stat. 498,*
*492.*
*76 Stat. 42.*
*Ante, p. 937.*
*62 Stat. 806.*
*61 Stat. 157;*
*73 Stat. 537, 535.*

"(2) 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

"(3) 'person' includes any individual or entity capable of holding a legal or beneficial interest in property;

"(4) 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

Compendium_Roth
Page 0050

"(5) 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

"(6) 'unlawful debt' means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate;

"(7) 'racketeering investigator' means any attorney or investigator so designated by the Attorney General and charged with the duty of enforcing or carrying into effect this chapter;

"(8) 'racketeering investigation' means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this chapter or of any final order, judgment, or decree of any court of the United States, duly entered in any case or proceeding arising under this chapter;

"(9) 'documentary material' includes any book, paper, document, record, recording, or other material; and

"(10) 'Attorney General' includes the Attorney General of the United States, the Deputy Attorney General of the United States, any Assistant Attorney General of the United States, or any employee of the Department of Justice or any employee of any department or agency of the United States  so designated by the Attorney General to carry out the powers conferred on the Attorney General by this chapter. Any department or agency so designated may use in investigations authorized by this chapter either the investigative provisions of this chapter or the investigative power of such department or agency otherwise conferred by law.

## "§ 1962. Prohibited activities

"(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

"(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control

65 Stat. 717.

of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

## "§ 1963. Criminal penalties

"(a) Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

"(b) In any action brought by the United States under this section, the district courts of the United States shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including, but not limited to, the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper. *Court restraining orders.*

"(c) Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the United States, it shall expire, and shall not revert to the convicted person. All provisions of law relating to the disposition of property, or the proceeds from the sale thereof, or the remission or mitigation of forfeitures for violation of the customs laws, and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof. Such duties as are imposed upon the collector of customs or any other person with respect to the disposition of property under the customs laws shall be performed under this chapter by the Attorney General. The United States shall dispose of all such property as soon as commercially feasible, making due provision for the rights of innocent persons. *Property, seizure and disposition.*

## "§ 1964. Civil remedies

"(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons. *Jurisdiction.*

"(b) The Attorney General may institute proceedings under this section. In any action brought by the United States under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter such restraining orders or prohibitions, or take

such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.

"(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

"(d) A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

### "§ 1965. Venue and process

"(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

"(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

"(c) In any civil or criminal action or proceeding instituted by the United States under this chapter in the district court of the United States for any judicial district, subpenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

"(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

### "§ 1966. Expedition of actions

"In any civil action instituted under this chapter by the United States in any district court of the United States, the Attorney General may file with the clerk of such court a certificate stating that in his opinion the case is of general public importance. A copy of that certificate shall be furnished immediately by such clerk to the chief judge or in his absence to the presiding district judge of the district in which such action is pending. Upon receipt of such copy, such judge shall designate immediately a judge of that district to hear and determine action. The judge so designated shall assign such action for hearing as soon as practicable, participate in the hearings and determination thereof, and cause such action to be expedited in every way.

### "§ 1967. Evidence

"In any proceeding ancillary to or in any civil action instituted by the United States under this chapter the proceedings may be open or closed to the public at the discretion of the court after consideration of the rights of affected persons.

### "§ 1968. Civil investigative demand

"(a) Whenever the Attorney General has reason to believe that any person or enterprise may be in possession, custody, or control of any documentary materials relevant to a racketeering investigation, he may, prior to the institution of a civil or criminal proceeding thereon,

Compendium_Roth
Page 0053

issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such material for examination.

"(b) Each such demand shall—

"(1) state the nature of the conduct constituting the alleged racketeering violation which is under investigation and the provision of law applicable thereto;

"(2) describe the class or classes of documentary material produced thereunder with such definiteness and certainty as to permit such material to be fairly identified;

"(3) state that the demand is returnable forthwith or prescribe a return date which will provide a reasonable period of time within which the material so demanded may be assembled and made available for inspection and copying or reproduction; and

"(4) identify the custodian to whom such material shall be made available.

"(c) No such demand shall—

"(1) contain any requirement which would be held to be unreasonable if contained in a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation; or

"(2) require the production of any documentary evidence which would be privileged from disclosure if demanded by a subpena duces tecum issued by a court of the United States in aid of a grand jury investigation of such alleged racketeering violation.

"(d) Service of any such demand or any petition filed under this section may be made upon a person by—

"(1) delivering a duly executed copy thereof to any partner, executive officer, managing agent, or general agent thereof, or to any agent thereof authorized by appointment or by law to receive service of process on behalf of such person, or upon any individual person;

"(2) delivering a duly executed copy thereof to the principal office or place of business of the person to be served; or

"(3) depositing such copy in the United States mail, by registered or certified mail duly addressed to such person at its principal office or place of business.

"(e) A verified return by the individual serving any such demand or petition setting forth the manner of such service shall be prima facie proof of such service. In the case of service by registered or certified mail, such return shall be accompanied by the return post office receipt of delivery of such demand.

"(f)(1) The Attorney General shall designate a racketeering investigator to serve as racketeer document custodian, and such additional racketeering investigators as he shall determine from time to time to be necessary to serve as deputies to such officer.

"(2) Any person upon whom any demand issued under this section has been duly served shall make such material available for inspection and copying or reproduction to the custodian designated therein at the principal place of business of such person, or at such other place as such custodian and such person thereafter may agree and prescribe in writing or as the court may direct, pursuant to this section on the return date specified in such demand, or on such later date as such custodian may prescribe in writing. Such person may upon written agreement between such person and the custodian substitute for copies of all or any part of such material originals thereof.

"(3) The custodian to whom any documentary material is so delivered shall take physical possession thereof, and shall be responsible for the use made thereof and for the return thereof pursuant to

Compendium_Roth
Page 0054

this chapter. The custodian may cause the preparation of such copies of such documentary material as may be required for official use under regulations which shall be promulgated by the Attorney General. While in the possession of the custodian, no material so produced shall be available for examination, without the consent of the person who produced such material, by any individual other than the Attorney General. Under such reasonable terms and conditions as the Attorney General shall prescribe, documentary material while in the possession of the custodian shall be available for examination by the person who produced such material or any duly authorized representatives of such person.

"(4) Whenever any attorney has been designated to appear on behalf of the United States before any court or grand jury in any case or proceeding involving any alleged violation of this chapter, the custodian may deliver to such attorney such documentary material in the possession of the custodian as such attorney determines to be required for use in the presentation of such case or proceeding on behalf of the United States. Upon the conclusion of any such case or proceeding, such attorney shall return to the custodian any documentary material so withdrawn which has not passed into the control of such court or grand jury through the introduction thereof into the record of such case or proceeding.

"(5) Upon the completion of—

"(i) the racketeering investigation for which any documentary material was produced under this chapter, and

"(ii) any case or proceeding arising from such investigation, the custodian shall return to the person who produced such material all such material other than copies thereof made by the Attorney General pursuant to this subsection which has not passed into the control of any court or grand jury through the introduction thereof into the record of such case or proceeding.

"(6) When any documentary material has been produced by any person under this section for use in any racketeering investigation, and no such case or proceeding arising therefrom has been instituted within a reasonable time after completion of the examination and analysis of all evidence assembled in the course of such investigation, such person shall be entitled, upon written demand made upon the Attorney General, to the return of all documentary material other than copies thereof made pursuant to this subsection so produced by such person.

"(7) In the event of the death, disability, or separation from service of the custodian of any documentary material produced under any demand issued under this section or the official relief of such custodian from responsibility for the custody and control of such material, the Attorney General shall promptly—

"(i) designate another racketeering investigator to serve as custodian thereof, and

"(ii) transmit notice in writing to the person who produced such material as to the identity and address of the successor so designated.

Any successor so designated shall have with regard to such materials all duties and responsibilities imposed by this section upon his predecessor in office with regard thereto, except that he shall not be held responsible for any default or dereliction which occurred before his designation as custodian.

"(g) Whenever any person fails to comply with any civil investigative demand duly served upon him under this section or whenever satisfactory copying or reproduction of any such material cannot be done and such person refuses to surrender such material, the Attorney General may file, in the district court of the United States for any

Compendium_Roth
Page 0055

judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of this section, except that if such person transacts business in more than one such district such petition shall be filed in the district in which such person maintains his principal place of business, or in such other district in which such person transacts business as may be agreed upon by the parties to such petition.

"(h) Within twenty days after the service of any such demand upon any person, or at any time before the return date specified in the demand, whichever period is shorter, such person may file, in the district court of the United States for the judicial district within which such person resides, is found, or transacts business, and serve upon such custodian a petition for an order of such court modifying or setting aside such demand. The time allowed for compliance with the demand in whole or in part as deemed proper and ordered by the court shall not run during the pendency of such petition in the court. Such petition shall specify each ground upon which the petitioner relies in seeking such relief, and may be based upon any failure of such demand to comply with the provisions of this section or upon any constitutional or other legal right or privilege of such person.

"(i) At any time during which any custodian is in custody or control of any documentary material delivered by any person in compliance with any such demand, such person may file, in the district court of the United States for the judicial district within which the office of such custodian is situated, and serve upon such custodian a petition for an order of such court requiring the performance by such custodian of any duty imposed upon him by this section.

"(j) Whenever any petition is filed in any district court of the United States under this section, such court shall have jurisdiction to hear and determine the matter so presented, and to enter such order or orders as may be required to carry into effect the provisions of this section."

(b) The table of contents of part I, title 18, United States Code, is amended by adding immediately after

"95. Racketeering _____ 1951"

the following new item:

"96. Racketeer Influenced and Corrupt Organizations_____ 1961"

Sec. 902. (a) Paragraph (c), subsection (1), section 2516, title 18, United States Code, is amended by inserting at the end thereof between the parenthesis and the semicolon ", section 1963 (violations with respect to racketeer influenced and corrupt organizations)". <span>82 Stat. 216.</span>

(b) Subsection (3), section 2517, title 18, United States Code, is amended by striking "criminal proceedings in any court of the United States or of any State or in any Federal or State grand jury proceeding" and inserting in lieu thereof "proceeding held under the authority of the United States or of any State or political subdivision thereof".

Sec. 903. The third paragraph, section 1505, title 18, United States Code, is amended by inserting "or section 1968 of this title" after "Act" and before "willfully". <span>76 Stat. 551.</span>

Sec. 904. (a) The provisions of this title shall be liberally construed to effectuate its remedial purposes.

(b) Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title. <span>Federal and State laws, priority.</span>

(c) Nothing contained in this title shall impair the authority of any attorney representing the United States to—

(1) lay before any grand jury impaneled by any district court of

Compendium_Roth
Page 0056

the United States any evidence concerning any alleged racketeering violation of law;

(2) invoke the power of any such court to compel the production of any evidence before any such grand jury; or

(3) institute any proceeding to enforce any order or process issued in execution of such power or to punish disobedience of any such order or process by any person.

## TITLE X—DANGEROUS SPECIAL OFFENDER SENTENCING

62 Stat. 837.
18 USC 3561-
3574.

SEC. 1001. (a) Chapter 227, title 18, United States Code, is amended by adding at the end thereof the following new sections:

### "§ 3575. Increased sentence for dangerous special offenders

"(a) Whenever an attorney charged with the prosecution of a defendant in a court of the United States for an alleged felony committed when the defendant was over the age of twenty-one years has reason to believe that the defendant is a dangerous special offender such attorney, a reasonable time before trial or acceptance by the court of a plea of guilty or nolo contendere, may sign and file with the court, and may amend, a notice (1) specifying that the defendant is a dangerous special offender who upon conviction for such felony is subject to the imposition of a sentence under subsection (b) of this section, and (2) setting out with particularity the reasons why such attorney believes the defendant to be a dangerous special offender. In no case shall the fact that the defendant is alleged to be a dangerous special offender be an issue upon the trial of such felony, be disclosed to the jury, or be disclosed before any plea of guilty or nolo contendere or verdict or finding of guilty to the presiding judge without the consent of the parties. If the court finds that the filing of the notice as a public record may prejudice fair consideration of a pending criminal matter, it may order the notice sealed and the notice shall not be subject to subpena or public inspection during the pendency of such criminal matter, except on order of the court, but shall be subject to inspection by the defendant alleged to be a dangerous special offender and his counsel.

"(b) Upon any plea of guilty or nolo contendere or verdict or finding of guilty of the defendant of such felony, a hearing shall be held, before sentence is imposed, by the court sitting without a jury. The court shall fix a time for the hearing, and notice thereof shall be given to the defendant and the United States at least ten days prior thereto. The court shall permit the United States and counsel for the defendant, or the defendant if he is not represented by counsel, to inspect the presentence report sufficiently prior to the hearing as to afford a reasonable opportunity for verification. In extraordinary cases, the court may withhold material not relevant to a proper sentence, diagnostic opinion which might seriously disrupt a program of rehabilitation, any source of information obtained on a promise of confidentiality, and material previously disclosed in open court. A court withholding all or part of a presentence report shall inform the parties of its action and place in the record the reasons therefor. The court may require parties inspecting all or part of a presentence report to give notice of any part thereof intended to be controverted. In connection with the hearing, the defendant and the United States shall be entitled to assistance of counsel, compulsory process, and cross-examination of such witnesses as appear at the hearing. A duly authenticated copy of a former judgment or commitment shall be prima facie evidence of such former judgment or commitment. If it

appears by a preponderance of the information, including information submitted during the trial of such felony and the sentencing hearing and so much of the presentence report as the court relies upon, that the defendant is a dangerous special offender, the court shall sentence the defendant to imprisonment for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felony. Otherwise it shall sentence the defendant in accordance with the law prescribing penalties for such felony. The court shall place in the record its findings, including an identification of the information relied upon in making such findings, and its reasons for the sentence imposed.

"(c) This section shall not prevent the imposition and execution of a sentence of death or of imprisonment for life or for a term exceeding twenty-five years upon any person convicted of an offense so punishable.

"(d) Notwithstanding any other provision of this section, the court shall not sentence a dangerous special offender to less than any mandatory minimum penalty prescribed by law for such felony. This section shall not be construed as creating any mandatory minimum penalty.

"(e) A defendant is a special offender for purposes of this section if—

"(1) the defendant has previously been convicted in courts of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for two or more offenses committed on occasions different from one another and from such felony and punishable in such courts by death or imprisonment in excess of one year, for one or more of such convictions the defendant has been imprisoned prior to the commission of such felony, and less than five years have elapsed between the commission of such felony and either the defendant's release, on parole or otherwise, from imprisonment for one such conviction or his commission of the last such previous offense or another offense punishable by death or imprisonment in excess of one year under applicable laws of the United States, a State, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency or instrumentality thereof; or

"(2) the defendant committed such felony as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise; or

"(3) such felony was, or the defendant committed such felony in furtherance of, a conspiracy with three or more other persons to engage in a pattern of conduct criminal under applicable laws of any jurisdiction, and the defendant did, or agreed that he would, initiate, organize, plan, finance, direct, manage, or supervise all or part of such conspiracy or conduct, or give or receive a bribe or use force as all or part of such conduct.

A conviction shown on direct or collateral review or at the hearing to be invalid or for which the defendant has been pardoned on the ground of innocence shall be disregarded for purposes of paragraph (1) of this subsection. In support of findings under paragraph (2) of this subsection, it may be shown that the defendant has had in his own name or under his control income or property not explained as derived from a source other than such conduct. For purposes of paragraph (2) of

Compendium_Roth
Page 0058

this subsection, a substantial source of income means a source of income which for any period of one year or more exceeds the minimum wage, determined on the basis of a forty-hour week and a fifty-week year, without reference to exceptions, under section 6(a)(1) of the Fair Labor Standards Act of 1938 (52 Stat. 1602, as amended 80 Stat. 838), and as hereafter amended, for an employee engaged in commerce or in the production of goods for commerce, and which for the same period exceeds fifty percent of the defendant's declared adjusted gross income under section 62 of the Internal Revenue Act of 1954 (68A Stat. 17, as amended 83 Stat. 655), and as hereafter amended. For purposes of paragraph (2) of this subsection, special skill or expertise in criminal conduct includes unusual knowledge, judgment or ability, including manual dexterity, facilitating the initiation, organizing, planning, financing, direction, management, supervision, execution or conceal-ment of criminal conduct, the enlistment of accomplices in such con-duct, the escape from detection or apprehension for such conduct, or the disposition of the fruits or proceeds of such conduct. For purposes of paragraphs (2) and (3) of this subsection, criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.

"(f) A defendant is dangerous for purposes of this section if a period of confinement longer than that provided for such felony is required for the protection of the public from further criminal conduct by the defendant.

"(g) The time for taking an appeal from a conviction for which sentence is imposed after proceedings under this section shall be measured from imposition of the original sentence.

## "§ 3576. Review of sentence

"With respect to the imposition, correction, or reduction of a sen-tence after proceedings under section 3575 of this chapter, a review of the sentence on the record of the sentencing court may be taken by the defendant or the United States to a court of appeals. Any review of the sentence taken by the United States shall be taken at least five days before expiration of the time for taking a review of the sentence or appeal of the conviction by the defendant and shall be diligently prosecuted. The sentencing court may, with or without motion and notice, extend the time for taking a review of the sentence for a period not to exceed thirty days from the expiration of the time otherwise prescribed by law. The court shall not extend the time for taking a review of the sentence by the United States after the time has expired. A court extending the time for taking a review of the sentence by the United States shall extend the time for taking a review of the sentence or appeal of the conviction by the defendant for the same period. The taking of a review of the sentence by the United States shall be deemed the taking of a review of the sentence and an appeal of the conviction by the defendant. Review of the sentence shall include review of whether the procedure employed was lawful, the findings made were clearly erroneous, or the sentencing court's discretion was abused. The court of appeals on review of the sentence may, after considering the record, including the entire pre-sentence report, information submitted during the trial of such felony and the sentencing hearing, and the findings and reasons of the sen-tencing court, affirm the sentence, impose or direct the imposition of any sentence which the sentencing court could originally have imposed, or remand for further sentencing proceedings and imposi-tion of sentence, except that a sentence may be made more severe only

29 USC 206.

26 USC 62.

on review of the sentence taken by the United States and after hearing. Failure of the United States to take a review of the imposition of the sentence shall, upon review taken by the United States of the correction or reduction of the sentence, foreclose imposition of a sentence more severe than that previously imposed. Any withdrawal or dismissal of review of the sentence taken by the United States shall foreclose imposition of a sentence more severe than that reviewed but shall not otherwise foreclose the review of the sentence or the appeal of the conviction. The court of appeals shall state in writing the reasons for its disposition of the review of the sentence. Any review of the sentence taken by the United States may be dismissed on a showing of abuse of the right of the United States to take such review.

## "§ 3577. Use of information for sentencing

"No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

## "§ 3578. Conviction records

"(a) The Attorney General of the United States is authorized to establish in the Department of Justice a repository for records of convictions and determinations of the validity of such convictions.

"(b) Upon the conviction thereafter of a defendant in a court of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof for an offense punishable in such court by death or imprisonment in excess of one year, or a judicial determination of the validity of such conviction on collateral review, the court shall cause a certified record of the conviction or determination to be made to the repository in such form and containing such information as the Attorney General of the United States shall by regulation prescribe.

"(c) Records maintained in the repository shall not be public records. Certified copies thereof—

"(1) may be furnished for law enforcement purposes on request of a court or law enforcement or corrections officer of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;

"(2) may be furnished for law enforcement purposes on request of a court or law enforcement or corrections officer of a State, any political subdivision, or any department, agency, or instrumentality thereof, if a statute of such State requires that, upon the conviction of a defendant in a court of the State or any political subdivision thereof for an offense punishable in such court by death or imprisonment in excess of one year, or a judicial determination of the validity of such conviction on collateral review, the court cause a certified record of the conviction or determination to be made to the repository in such form and containing such information as the Attorney General of the United States shall by regulation prescribe; and

"(3) shall be prima facie evidence in any court of the United States, the District of Columbia, the Commonwealth of Puerto Rico, a territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof, that the convictions occurred and whether they have been judicially determined to be invalid on collateral review.

47-348 O - 72 - 64 (Pt. 1)

Compendium_Roth
Page 0060

Hearing notice.

"(d)  The Attorney General of the United States shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing regulations under this section."

(b)  The analysis of chapter 227, title 18, United States Code, is amended by adding at the end thereof the following new items:

"3575. Increased sentence for dangerous special offenders.
"3576. Review of sentence.
"3577. Use of information for sentencing.
"3578. Conviction records."

80 Stat. 215.

Sec. 1002.  Section 3148, chapter 207, title 18, United States Code, is amended by adding "or sentence review under section 3576 of this title" immediately after "sentence".

## TITLE XI—REGULATION OF EXPLOSIVES

### PURPOSE

Sec. 1101.  The Congress hereby declares that the purpose of this title is to protect interstate and foreign commerce against interference and interruption by reducing the hazard to persons and property arising from misuse and unsafe or insecure storage of explosive materials. It is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, storage, or use of explosive materials for industrial, mining, agricultural, or other lawful purposes, or to provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.

Sec. 1102.  Title 18, United States Code, is amended by adding after chapter 39 the following chapter:

68 Stat. 170;
74 Stat. 87, 808.
18 USC 831.

### "Chapter 40.—IMPORTATION, MANUFACTURE, DISTRIBUTION AND STORAGE OF EXPLOSIVE MATERIALS

"Sec.
"841. Definitions.
"842. Unlawful acts.
"843. Licensing and user permits.
"844. Penalties.
"845. Exceptions; relief from disabilities.
"846. Additional powers of the Secretary.
"847. Rules and regulations.
"848. Effect on State law.

### "§ 841. Definitions

"As used in this chapter—

"(a)  'Person' means any individual, corporation, company, association, firm, partnership, society, or joint stock company.

"(b)  'Interstate or foreign commerce' means commerce between any place in a State and any place outside of that State, or within any possession of the United States (not including the Canal Zone) or the District of Columbia, and commerce between places within the same State but through any place outside of that State. 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, and the possessions of the United States (not including the Canal Zone).

"(c)  'Explosive materials' means explosives, blasting agents, and detonators.

"(d)  Except for the purposes of subsections (d), (e), (f), (g), (h), (i), and (j) of section 844 of this title, 'explosives' means any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes,

Compendium_Roth
Page 0061

but is not limited to, dynamite and other high explosives, black powder, pellet powder, initiating explosives, detonators, safety fuses, squibs, detonating cord, igniter cord, and igniters. The Secretary shall publish and revise at least annually in the Federal Register a list of these and any additional explosives which he determines to be within the coverage of this chapter. For the purposes of subsections (d), (e), (f), (g), (h), and (i) of section 844 of this title, the term 'explosive' is defined in subsection (j) of such section 844.

*Publication in Federal Register.*

"(e) 'Blasting agent' means any material or mixture, consisting of fuel and oxidizer, intended for blasting, not otherwise defined as an explosive: *Provided*, That the finished product, as mixed for use or shipment, cannot be detonated by means of a numbered 8 test blasting cap when unconfined.

"(f) 'Detonator' means any device containing a detonating charge that is used for initiating detonation in an explosive; the term includes, but is not limited to, electric blasting caps of instantaneous and delay types, blasting caps for use with safety fuses and detonating-cord delay connectors.

"(g) 'Importer' means any person engaged in the business of importing or bringing explosive materials into the United States for purposes of sale or distribution.

"(h) 'Manufacturer' means any person engaged in the business of manufacturing explosive materials for purposes of sale or distribution or for his own use.

"(i) 'Dealer' means any person engaged in the business of distributing explosive materials at wholesale or retail.

"(j) 'Permittee' means any user of explosives for a lawful purpose, who has obtained a user permit under the provisions of this chapter.

"(k) 'Secretary' means the Secretary of the Treasury or his delegate.

"(l) 'Crime punishable by imprisonment for a term exceeding one year' shall not mean (1) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices as the Secretary may by regulation designate, or (2) any State offense (other than one involving a firearm or explosive) classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

"(m) 'Licensee' means any importer, manufacturer, or dealer licensed under the provisions of this chapter.

"(n) 'Distribute' means sell, issue, give, transfer, or otherwise dispose of.

## "§ 842. Unlawful acts

"(a) It shall be unlawful for any person—

"(1) to engage in the business of importing, manufacturing, or dealing in explosive materials without a license issued under this chapter;

"(2) knowingly to withhold information or to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive for the purpose of obtaining explosive materials, or a license, permit, exemption, or relief from disability under the provisions of this chapter; and

"(3) other than a licensee or permittee knowingly—

"(A) to transport, ship, cause to be transported, or receive in interstate or foreign commerce any explosive materials, except that a person who lawfully purchases explosive

materials from a licensee in a State contiguous to the State in which the purchaser resides may ship, transport, or cause to be transported such explosive materials to the State in which he resides and may receive such explosive materials in the State in which he resides, if such transportation, shipment, or receipt is permitted by the law of the State in which he resides; or

"(B) to distribute explosive materials to any person (other than a licensee or permittee) who the distributor knows or has reasonable cause to believe does not reside in the State in which the distributor resides.

"(b) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person except—

"(1) a licensee;

"(2) a permittee; or

"(3) a resident of the State where distribution is made and in which the licensee is licensed to do business or a State contiguous thereto if permitted by the law of the State of the purchaser's residence.

"(c) It shall be unlawful for any licensee to distribute explosive materials to any person who the licensee has reason to believe intends to transport such explosive materials into a State where the purchase, possession, or use of explosive materials is prohibited or which does not permit its residents to transport or ship explosive materials into it or to receive explosive materials in it.

"(d) It shall be unlawful for any licensee knowingly to distribute explosive materials to any individual who:

"(1) is under twenty-one years of age;

"(2) has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

"(3) is under indictment for a crime punishable by imprisonment for a term exceeding one year;

"(4) is a fugitive from justice;

"(5) is an unlawful user of marihuana (as defined in section 4761 of the Internal Revenue Code of 1954) or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4721(a) of the Internal Revenue Code of 1954) ; or

"(6) has been adjudicated a mental defective.

"(e) It shall be unlawful for any licensee knowingly to distribute any explosive materials to any person in any State where the purchase, possession, or use by such person of such explosive materials would be in violation of any State law or any published ordinance applicable at the place of distribution.

"(f) It shall be unlawful for any licensee or permittee willfully to manufacture, import, purchase, distribute, or receive explosive materials without making such records as the Secretary may by regulation require, including, but not limited to, a statement of intended use, the name, date, place of birth, social security number or taxpayer identification number, and place of residence of any natural person to whom explosive materials are distributed. If explosive materials are distributed to a corporation or other business entity, such records shall include the identity and principal and local places of business and the name, date, place of birth, and place of residence of the natural person acting as agent of the corporation or other business entity in arranging the distribution.

"(g) It shall be unlawful for any licensee or permittee knowingly to make any false entry in any record which he is required to keep pursuant to this section or regulations promulgated under section 847 of this title.

68A Stat. 565.
26 USC 4761.

79 Stat. 227;
82 Stat. 1361.
21 USC 321.
74 Stat. 57.
26 USC 4731.

Record requirements.

Post, p. 959.

Compendium_Roth
Page 0063

"(h) It shall be unlawful for any person to receive, conceal, transport, ship, store, barter, sell, or dispose of any explosive materials knowing or having reasonable cause to believe that such explosive materials were stolen.

"(i) It shall be unlawful for any person—

"(1) who is under indictment for, or who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

"(2) who is a fugitive from justice;

"(3) who is an unlawful user of or addicted to marihuana (as defined in section 4761 of the Internal Revenue Code of 1954) or any depressant or stimulant drug (as defined in section 201(v) of the Federal Food, Drug, and Cosmetic Act) or narcotic drug (as defined in section 4731(a) of the Internal Revenue Code of 1954) ; or

"(4) who has been adjudicated as a mental defective or who has been committed to a mental institution ;

68A Stat. 565.
26 USC 4761.

79 Stat. 227;
82 Stat. 1361.
21 USC 321.
74 Stat. 57,
26 USC 4731.

to ship or transport any explosive in interstate or foreign commerce or to receive any explosive which has been shipped or transported in interstate or foreign commerce.

"(j) It shall be unlawful for any person to store any explosive material in a manner not in conformity with regulations promulgated by the Secretary. In promulgating such regulations, the Secretary shall take into consideration the class, type, and quantity of explosive materials to be stored, as well as the standards of safety and security recognized in the explosives industry.

"(k) It shall be unlawful for any person who has knowledge of the theft or loss of any explosive materials from his stock, to fail to report such theft or loss within twenty-four hours of discovery thereof, to the Secretary and to appropriate local authorities.

## "§ 843. Licenses and user permits

"(a) An application for a user permit or a license to import, manufacture, or deal in explosive materials shall be in such form and contain such information as the Secretary shall by regulation prescribe. Each applicant for a license or permit shall pay a fee to be charged as set by the Secretary, said fee not to exceed $200 for each license or permit. Each license or permit shall be valid for no longer than three years from date of issuance and shall be renewable upon the same conditions and subject to the same restrictions as the original license or permit and upon payment of a renewal fee not to exceed one-half of the original fee.

"(b) Upon the filing of a proper application and payment of the prescribed fee, and subject to the provisions of this chapter and other applicable laws, the Secretary shall issue to such applicant the appropriate license or permit if—

"(1) the applicant (including in the case of a corporation, partnership, or association, any individual possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of the corporation, partnership, or association) is not a person to whom the distribution of explosive materials would be unlawful under section 842(d) of this chapter;

"(2) the applicant has not willfully violated any of the provisions of this chapter or regulations issued hereunder;

"(3) the applicant has in a State premises from which he conducts or intends to conduct business;

"(4) the applicant has a place of storage for explosive materials which meets such standards of public safety and security against theft as the Secretary by regulations shall prescribe; and

Compendium_Roth
Page 0064

956                                   PUBLIC LAW 91-452—OCT. 15, 1970                   [84 Stat.

"(5) the applicant has demonstrated and certified in writing that he is familiar with all published State laws and local ordinances relating to explosive materials for the location in which he intends to do business.

License authority.

"(c) The Secretary shall approve or deny an application within a period of forty-five days beginning on the date such application is received by the Secretary.

"(d) The Secretary may revoke any license or permit issued under this section if in the opinion of the Secretary the holder thereof has violated any provision of this chapter or any rule or regulation prescribed by the Secretary under this chapter, or has become ineligible to acquire explosive materials under section 842(d). The Secretary's action under this subsection may be reviewed only as provided in subsection (e) (2) of this section.

Denial or revocation, written notice.

"(e) (1) Any person whose application is denied or whose license or permit is revoked shall receive a written notice from the Secretary stating the specific grounds upon which such denial or revocation is based. Any notice of a revocation of a license or permit shall be given to the holder of such license or permit prior to or concurrently with the effective date of the revocation.

Judicial review.

"(2) If the Secretary denies an application for, or revokes a license, or permit, he shall, upon request by the aggrieved party, promptly hold a hearing to review his denial or revocation. In the case of a revocation, the Secretary may upon a request of the holder stay the effective date of the revocation. A hearing under this section shall be at a location convenient to the aggrieved party. The Secretary shall give written notice of his decision to the aggrieved party within a reasonable time after the hearing. The aggrieved party may, within sixty days after receipt of the Secretary's written decision, file a petition with the United States court of appeals for the district in which he resides or has his principal place of business for a judicial review of such denial or revocation, pursuant to sections 701–706 of title 5, United States

80 Stat. 392.
Records, availability.

Code.

"(f) Licensees and permittees shall make available for inspection at all reasonable times their records kept pursuant to this chapter or the regulations issued hereunder, and shall submit to the Secretary such reports and information with respect to such records and the contents thereof as he shall by regulations prescribe. The Secretary may enter during business hours the premises (including places of storage) of any licensee or permittee, for the purpose of inspecting or examining (1) any records or documents required to be kept by such licensee or permittee, under the provisions of this chapter or regulations issued hereunder, and (2) any explosive materials kept or stored by such licensee or permittee at such premises. Upon the request of any State or any political subdivision thereof, the Secretary may make available to such State or any political subdivision thereof, any information which he may obtain by reason of the provisions of this chapter with respect to the identification of persons within such State or political subdivision thereof, who have purchased or received explosive materials, together with a description of such explosive materials.

"(g) Licenses and permits issued under the provisions of subsection (b) of this section shall be kept posted and kept available for inspection on the premises covered by the license and permit.

## "§ 844. Penalties

"(a) Any person who violates subsections (a) through (i) of section 842 of this chapter shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Compendium_Roth
Page 0065

"(b) Any person who violates any other provision of section 842 of this chapter shall be fined not more than $1,000 or imprisoned not more than one year, or both.

*Ante,* p. 953.

"(c) Any explosive materials involved or used or intended to be used in any violation of the provisions of this chapter or any other rule or regulation promulgated thereunder or any violation of any criminal law of the United States shall be subject to seizure and forfeiture, and all provisions of the Internal Revenue Code of 1954 relating to the seizure, forfeiture, and disposition of firearms, as defined in section 5845(a) of that Code, shall, so far as applicable, extend to seizures and forfeitures under the provisions of this chapter.

82 Stat. 1230.
26 USC 5845.

"(d) Whoever transports or receives, or attempts to transport or receive, in interstate or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results, shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

70 Stat. 540.
18 USC 34.

"(e) Whoever, through the use of the mail, telephone, telegraph, or other instrument of commerce, willfully makes any threat, or maliciously conveys false information knowing the same to be false, concerning an attempt or alleged attempt being made, or to be made, to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property by means of an explosive shall be imprisoned for not more than five years or fined not more than $5,000, or both.

"(f) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other personal or real property in whole or in part owned, possessed, or used by, or leased to, the United States, any department or agency thereof, or any institution or organization receiving Federal financial assistance shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years, or fined not more than $20,000, or both; and if death results shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

"(g) Whoever possesses an explosive in any building in whole or in part owned, possessed, or used by, or leased to, the United States or any department or agency thereof, except with the written consent of the agency, department, or other person responsible for the management of such building, shall be imprisoned for not more than one year, or fined not more than $1,000, or both.

"(h) Whoever—

"(1) uses an explosive to commit any felony which may be prosecuted in a court of the United States, or

"(2) carries an explosive unlawfully during the commission of any felony which may be prosecuted in a court of the United States,

shall be sentenced to a term of imprisonment for not less than one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than five years nor more than twenty-five years, and, notwithstanding any other provision of law, the court shall not suspend the sentence of such person or give him a probationary sentence.

"(i) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both; and if personal injury results shall be imprisoned for not more than twenty years or fined not more than $20,000, or both; and if death results shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.

"Explosive."

"(j) For the purposes of subsections (d), (e), (f), (g), (h), and (i) of this section, the term 'explosive' means gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion.

82 Stat. 91.
18 USC 232.

## "§ 845. Exceptions; relief from disabilities

"(a) Except in the case of subsections (d), (e), (f), (g), (h), and (i) of section 844 of this title, this chapter shall not apply to:

"(1) any aspect of the transportation of explosive materials via railroad, water, highway, or air which are regulated by the United States Department of Transportation and agencies thereof;

"(2) the use of explosive materials in medicines and medicinal agents in the forms prescribed by the official United States Pharmacopeia, or the National Formulary;

"(3) the transportation, shipment, receipt, or importation of explosive materials for delivery to any agency of the United States or to any State or political subdivision thereof;

"(4) small arms ammunition and components thereof;

"(5) black powder in quantities not to exceed five pounds; and

"(6) the manufacture under the regulation of the military department of the United States of explosive materials for, or their distribution to or storage or possession by the military or naval services or other agencies of the United States; or to arsenals, navy yards, depots, or other establishments owned by, or operated by or on behalf of, the United States.

"(b) A person who had been indicted for or convicted of a crime punishable by imprisonment for a term exceeding one year may make application to the Secretary for relief from the disabilities imposed by this chapter with respect to engaging in the business of importing, manufacturing, or dealing in explosive materials, or the purchase of explosive materials, and incurred by reason of such indictment or conviction, and the Secretary may grant such relief if it is established to his satisfaction that the circumstances regarding the indictment or conviction, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief will not be contrary to the public interest. A licensee or permittee who makes application for relief from the disabilities incurred under this chapter by reason of indictment or conviction, shall not be barred by such indictment or conviction from further operations under his license or permit pending final action on an application for relief filed pursuant to this section.

Compendium_Roth
Page 0067

**"§ 846. Additional powers of the Secretary**

"The Secretary is authorized to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved, in order that if any such incident has been brought about by accidental means, precautions may be taken to prevent similar accidents from occurring. In order to carry out the purpose of this subsection, the Secretary is authorized to enter into or upon any property where explosive materials have been used, are suspected of having been used, or have been found in an otherwise unauthorized location. Nothing in this chapter shall be construed as modifying or otherwise affecting in any way the investigative authority of any other Federal agency. In addition to any other investigatory authority they have with respect to violations of provisions of this chapter, the Attorney General and the Federal Bureau of Investigation, together with the Secretary, shall have authority to conduct investigations with respect to violations of subsection (d), (e), (f), (g), (h), or (i) of section 844 of this title.

**"§ 847. Rules and regulations**

"The administration of this chapter shall be vested in the Secretary. The Secretary may prescribe such rules and regulations as he deems reasonably necessary to carry out the provisions of this chapter. The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations. *Notice; hearing opportunity.*

**"§ 848. Effect on State law**

"No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together."

(b) The title analysis of title 18, United States Code, is amended by inserting immediately below the item relating to chapter 39 the following:

**"40. Importation, manufacture, distribution and storage of explosive materials**_____ **841".**

Sec. 1103. Section 2516(1)(c) of title 18, United States Code, is amended by inserting after "section 224 (bribery in sporting contests)," the following: "subsection (d), (e), (f), (g), (h), or (i) of section 844 (unlawful use of explosives),". *82 Stat. 216.*

Sec. 1104. Nothing in this title shall be construed as modifying or affecting any provision of—

   (a) The National Firearms Act (chapter 53 of the Internal Revenue Code of 1954); *82 Stat. 1227. 26 USC 5801.*

   (b) Section 414 of the Mutual Security Act of 1954 (22 U.S.C. 1934), as amended, relating to munitions control; *68 Stat. 848.*

   (c) Section 1716 of title 18, United States Code, relating to nonmailable materials; *62 Stat. 781.*

   (d) Sections 831 through 836 of title 18, United States Code; or *68 Stat. 170;*

   (e) Chapter 44 of title 18, United States Code. *74 Stat. 808.*

Sec. 1105. (a) Except as provided in subsection (b), the provisions of chapter 40 of title 18, United States Code, as enacted by section 1102 of this title shall take effect one hundred and twenty days after the date of enactment of this Act. *82 Stat. 1214. 18 USC 921. Effective dates. Ante, p. 952.*

(b) The following sections of chapter 40 of title 18, United States Code, as enacted by section 1102 of this title shall take effect on the date of the enactment of this Act: sections 841, 844(d), (e), (f), (g), (h), (i), and (j), 845, 846, 847, 848, and 849.

960                        PUBLIC LAW 91-452–OCT. 15, 1970              [84 STAT.

*Ante,* p. 952.
(c) Any person (as defined in section 841(a) of title 18, United States Code) engaging in a business or operation requiring a license or permit under the provisions of chapter 40 of such title 18 who was engaged in such business or operation on the date of enactment of this Act and who has filed an application for a license or permit under the provisions of section 843 of such chapter 40 prior to the effective date of such section 843 may continue such business or operation pending final action on his application. All provisions of such chapter 40 shall apply to such applicant in the same manner and to the same extent as if he were a holder of a license or permit under such chapter 40.

SEC. 1106. (a) The Federal Explosives Act of October 6, 1917 (40

55 Stat. 863.
Stat. 385, as amended; 50 U.S.C. 121–143), and as extended by Act of July 1, 1948 (40 Stat. 671; 50 U.S.C. 144), and all regulations adopted thereunder are hereby repealed.

Repeal.
74 Stat. 87.
(b) (1) Section 837 of title 18 of the United States Code is repealed.

(2) The item relating to such section 837 in the chapter analysis of chapter 39 of such title 18 is repealed.

Appropriation.
SEC. 1107. There are hereby authorized to be appropriated such sums as are necessary to carry out the purposes of this title.

## TITLE XII—NATIONAL COMMISSION ON INDIVIDUAL RIGHTS

SEC. 1201. There is hereby established the National Commission on Individual Rights (hereinafter in this title referred to as the "Commission").

Members, appointment.
SEC. 1202. The Commission shall be composed of fifteen members appointed as follows:

(1) four appointed by the President of the Senate from Members of the Senate;

(2) four appointed by the Speaker of the House of Representatives from Members of the House of Representatives; and

(3) seven appointed by the President of the United States from all segments of life in the United States, including but not limited to lawyers, jurists, and policemen, none of whom shall be officers of the executive branch of the Government.

SEC. 1203. The President of the United States shall designate a Chairman from among the members of the Commission. Any vacancy in the Commission shall not affect its powers but shall be filled in the same manner in which the original appointment was made.

SEC. 1204. It shall be the duty of the Commission to conduct a comprehensive study and review of Federal laws and practices relating to special grand juries authorized under chapter 216 of title 18, United

*Ante, p.* 923.
States Code, dangerous special offender sentencing under section 3575

*Ante,* p. 948.
of title 18, United States Code, wiretapping and electronic surveillance, bail reform and preventive dentention, no-knock search warrants, and the accumulation of data on individuals by Federal agencies as authorized by law or acquired by executive action. The Commission may also consider other Federal laws and practices which in its opinion may infringe upon the individual rights of the people of the United States. The Commission shall determine which laws and practices are needed, which are effective, and whether they infringe upon the individual rights of the people of the United States.

SEC. 1205. (a) Subject to such rules and regulations as may be adopted by the Commission, the Chairman shall have the power to—

(1) appoint and fix the compensation of an Executive Director, and such additional staff personnel as he deems necessary, without regard to the provisions of title 5, United States Code,

governing appointments in the competitive service, and without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, but at rates not in excess of the maximum rate for GS–18 of the General Schedule under section 5332 of such title; and

(2) procure temporary and intermittent services to the same extent as is authorized by section 3109 of title 5, United States Code, but at rates not to exceed $100 a day for individuals.

(b) In making appointments pursuant to subsection (a) of this section, the Chairman shall include among his appointment individuals determined by the Chairman to be competent social scientists, lawyers, and law enforcement officers.

Sec. 1206. (a) A member of the Commission who is a Member of Congress shall serve without additional compensation, but shall be reimbursed for travel, subsistence, and other necessary expenses incurred in the performance of duties vested in the Commission.

(b) A member of the Commission from private life shall receive $100 per diem when engaged in the actual performance of duties vested in the Commission, plus reimbursement for travel, subsistence, and other necessary expenses incurred in the performance of such duties.

Sec. 1207. Each department, agency, and instrumentality of the executive branch of the Government, including independent agencies, is authorized and directed to furnish to the Commission, upon request made by the Chairman, such statistical data, reports, and other information as the Commission deems necessary to carry out its functions under this title. The Chairman is further authorized to call upon the departments, agencies, and other offices of the several States to furnish such statistical data, reports, and other information as the Commission deems necessary to carry out its functions under this title.

Sec. 1208. The Commission shall make interim reports and recommendations as it deems advisable, but at least every two years, and it shall make a final report of its findings and recommendations to the President of the United States and to the Congress at the end of six years following the effective date of this section. Sixty days after the submission of the final report, the Commission shall cease to exist.

Sec. 1209. (a) Except as provided in subsection (b) of this section, any member of the Commission is exempted, with respect to his appointment, from the operation of sections 203, 205, 207, and 209 of title 18, United States Code.

(b) The exemption granted by subsection (a) of this section shall not extend—

(1) to the receipt of payment of salary in connection with the appointee's Government service from any source other than the private employer of the appointee at the time of his appointment, or

(2) during the period of such appointment, to the prosecution, by any person so appointed, of any claim against the Government involving any matter with which such person, during such period, is or was directly connected by reason of such appointment.

Sec. 1210. The foregoing provisions of this title shall take effect on January 1, 1972.

Sec. 1211. There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this title.

Sec. 1212. Section 804 of the Omnibus Crime Control and Safe Streets Act of 1968 (Public Law 90–351; 18 U.S.C. 2510 note) is repealed.

**Margin notes:**

80 Stat. 443, 467.
5 USC 5101, 5331.
*Ante,* p. 198-1.

80 Stat. 416.

Travel expenses.

Agency cooperation.

Reports and recommendations to President and Congress.

76 Stat. 1121.

Effective date.

Appropriation.

Repeal.
82 Stat. 223.

962          PUBLIC LAW 91-453—OCT. 15, 1970          [84 STAT.

## TITLE XIII—GENERAL PROVISIONS

Separability.

SEC. 1301. If the provisions of any part of this Act or the application thereof to any person or circumstances be held invalid, the provisions of the other parts and their application to other persons or circumstances shall not be affected thereby.

Approved October 15, 1970.

Public Law 91-453

October 15, 1970
[S. 3154]

AN ACT

To provide long-term financing for expanded urban mass transportation programs, and for other purposes.

Urban Mass Transportation Assistance Act of 1970.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Congress finds that the rapid urbanization and the continued dispersal of population and activities within urban areas has made the ability of all citizens to move quickly and at a reasonable cost an urgent national problem; that it is imperative, if efficient, safe, and convenient transportation compatible with soundly planned urban areas is to be achieved, to continue and expand the Urban Mass Transportation Act of 1964; and that success will require a Federal commitment for the expenditure of at least $10,000,000,000 over a twelve-year period to permit confident and continuing local planning, and greater flexibility in program administration. It is the purpose of this Act to create a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary to satisfy its urban mass transportation requirements.

78 Stat. 302.
49 USC 1601 note.

Federal financial assistance.
78 Stat. 303.

SEC. 2. Section 3 of the Urban Mass Transportation Act of 1964, as amended (49 U.S.C. 1602), is amended—

(1) by redesignating subsection (c) as subsection (e); and
(2) by striking out subsections (a) and (b) and inserting in lieu thereof subsections (a), (b), (c), and (d), as follows:

Grants and loans.

"(a) The Secretary is authorized, in accordance with the provisions of this Act and on such terms and conditions as he may prescribe, to make grants or loans (directly, through the purchase of securities or equipment trust certificates, or otherwise) to assist States and local public bodies and agencies thereof in financing the acquisition, construction, reconstruction, and improvement of facilities and equipment for use, by operation or lease or otherwise, in mass transportation service in urban areas and in coordinating such service with highway and other transportation in such areas. Eligible facilities and equipment may include land (but not public highways), buses and other rolling stock, and other real and personal property needed for an efficient and coordinated mass transportation system. No grant or loan shall be provided under this section unless the Secretary determines that the applicant has or will have—

Eligible facilities and equipment.

# BOOKS

**Princeton University Press**

Chapter Title: Front Matter

Book Title: Sacco and Vanzetti
Book Subtitle: The Anarchist Background
Book Author(s): Paul Avrich
Published by: Princeton University Press. (1991)
Stable URL: https://www.jstor.org/stable/j.ctv131bwkz.1

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Princeton University Press* is collaborating with JSTOR to digitize, preserve and extend access to *Sacco and Vanzetti*

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms



This content downloaded from 132.1__.__51.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

_____

Sacco and Vanzetti

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0076

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0077

# Sacco and Vanzetti

## THE ANARCHIST BACKGROUND

*Paul Avrich*

PRINCETON UNIVERSITY PRESS

PRINCETON, NEW JERSEY

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0078

Copyright © 1991 by Princeton University Press
Published by Princeton University Press, 41 William Street,
Princeton, New Jersey 08540
In the United Kingdom: Princeton University Press, Chichester, West Sussex

All Rights Reserved

*Library of Congress Cataloging-in-Publication Data*
Avrich, Paul
Sacco and Vanzetti : the anarchist background / by Paul Avrich
p.    cm.
Includes bibliographical references and index.
ISBN 0-691-04789-8
ISBN 0-691-02604-1 (pbk.)
1. Sacco, Nicola. 1891–1927.  2. Vanzetti, Bartolomeo. 1888–1927.
3. Anarchists—United States—Biography.  4. Anarchism—United States—History.
5. Sacco-Vanzetti case.  I. Title.
HX843.7.S23A97  1991
364.1'523'09227447—dc20
[B]  90-40838

This book has been composed in Linotron Primer

Princeton University Press books are printed on acid-free paper and meet the
guidelines for permanence and durability of the Committee on Production
Guidelines for Book Longevity of the Council on Library Resources

Third printing, and first paperback printing, 1996

Printed in the United States of America

10 9 8 7 6

This content downloaded from 132.174.251.110 on Fri, 21 Oct 2022 07:51:01 UTC
All use subject to https://about.jstor.org/terms

Compendium_Roth
Page 0079



SAN FRANCISCO PUBLIC LIBRARY

3 1223 03955 8953

# ALL
# GOD'S
# CHILDREN

## The Bosket Family
## and the American
## Tradition of
## Violence

## FOX BUTTERFIELD

# ALL GOD'S CHILDREN

The Bosket Family and the
American Tradition of Violence

## FOX BUTTERFIELD



*Alfred A. Knopf  New York*

1995

929.2089 B652b

Butterfield, Fox.

All God's children : the
  Bosket family and the
    1995.

THIS IS A BORZOI BOOK
PUBLISHED BY ALFRED A. KNOPF, INC.

Copyright © 1995 by Fox Butterfield
Map copyright © 1995 by David Lindroth, Inc.
All rights reserved under International and Pan-American Copyright Conventions.
Published in the United States by Alfred A. Knopf, Inc., New York, and
simultaneously in Canada by Random House of Canada Limited, Toronto.
Distributed by Random House, Inc., New York.

Grateful acknowledgment is made to the following for permission to reprint
previously published material:

*Alfred A. Knopf, Inc.:* "Harlem" from *The Panther and the Lash* by Langston Hughes,
copyright © 1951 by Langston Hughes. Reprinted by permission of
Alfred A. Knopf, Inc.

*University of North Carolina Press:* Excerpts from *Francis S. Pickens and the Politics of
Destruction* by John B. Edmunds, Jr., copyright © 1986 by the University of North
Carolina Press. Reprinted by permission of the University of North Carolina Press.

Library of Congress Cataloging-in-Publication Data
Butterfield, Fox.
All God's children : the Bosket family and the American tradition of violence /
Fox Butterfield. — 1st ed.
     p.     cm.
Includes bibliographical references (p.   ) and index.
ISBN 0-394-58286-1
1. Bosket family.   2. Afro-Americans—Biography.
3. Afro-American prisoners.   4. Violence—United States.
5. Racism—United States.   6. United States—Race relations.
I. Title.
E185.96.B98     1995
929'.2'08996073—dc20          95-1540
                              CIP

Manufactured in the United States of America

First Edition

SAN FRANCISCO PUBLIC LIBRARY

3 1223 03955 8953
S.F. PUBLIC LIBRARY

# CHAPTER I

# "BLOODY EDGEFIELD"

*Edgefield . . . has had more dashing, brilliant, romantic figures, statesmen,
orators, soldiers, adventurers, daredevils, than any county of South Caro-
lina, if not any rural county in America. . . . They gave to their village
and county a character that was South Carolinian, more intense, more
fiery, than was found elsewhere.*

William Watts Bell, *The State That Forgot*

I N   E A R L Y   N O V E M B E R   1 7 8 1 , with the outcome of the American
Revolution much in doubt, Captain James Butler of the South Caro-
lina militia got word that a raiding party of Tory loyalists had seized a
herd of cattle and a bevy of horses from his neighbors. His fellow settlers
at Mount Willing, little more than a forest clearing in the backcountry
wilderness, urged him to lead a force to pursue the marauders. Butler
demurred. He had been released from eighteen months in a British jail
in Charleston only weeks before. He had suffered enough, he said, and
his farm needed tending.

Butler had immigrated to the South Carolina backcountry in the early
1760s over the great wagon trail that led from Pennsylvania through the
Shenandoah Valley of Virginia, then the most heavily traveled road in
America. With him came his wife, two sisters, and a growing family,
which now numbered eight children in all. The Butlers were of Scotch-
Irish descent, part of a huge wave of 250,000 immigrants who arrived in
Pennsylvania between 1715 and 1775 from the north of England, Scotland,
and northern Ireland. They spoke English, not Gaelic, but had a lilting
cadence in their voices, an accent preserved in the speech of the South
today. These Scotch-Irish were a poor but proud people who had left
their homelands after centuries of incessant warfare. In temperament,
they were tough, blunt, touchy, hard-drinking, and pugnacious.

The Butlers' new land in South Carolina was promising. It lay halfway
between the Blue Ridge Mountains and the Atlantic Ocean in what would

become Edgefield County. There were great primeval forests of oak and hickory and endless stretches of longleaf pine. In the spring, the undergrowth was clothed in splashes of pink, white, and magenta by dogwood and azaleas. Swarms of wild turkeys, geese, ducks, and pigeons darkened the sky. Everywhere there was an abundance of small streams and rivers for water. Along their banks, stands of sugarcane grew in profusion, often reaching higher than a man's head. The red clay soil was rich, good for growing corn and grazing cattle and horses. Some of the settlers experimented with cotton, but until Eli Whitney invented the cotton gin across the nearby Savannah River in Georgia in 1793, separating the seeds from the fiber was too difficult to make it a profitable crop. Still, a few of this first generation in the backcountry, including the Butlers, had already acquired enough wealth to buy black slaves.

But if the land was rich, life had proven vicious. Since 1760, spanning the whole time the Butlers had been in South Carolina, the area around them had been engaged in some of the cruelest fighting in American history. The conflict had started with a massacre in 1760 by Cherokee Indians that killed scores of settlers. In one attack, the seventy-six-year-old grandmother of John C. Calhoun, a future vice president of the United States and the greatest of all the Carolinians, was murdered in an ambush with twenty-two other people.

By 1761, when the Cherokee were defeated, much of the backcountry was devastated. Homeless veterans formed outlaw gangs that abducted young women from their villages and tortured wealthy planters and merchants to make them reveal where they had hidden their valuables. Infuriated by this lawlessness, the more respectable settlers formed themselves into "Regulators" to break up the gangs. It was the first organized vigilante justice in America.

The Regulators succeeded. But they were so brutal that the leading historian of the movement, Richard Maxwell Brown, has argued that "they introduced the strain of violence and extremism that was to be the curse of the upcountry and the nemesis of South Carolina" for more than a century. Often they were sadistic. One group of fifty Regulators who captured a "roguish and troublesome" fellow, said to be a horse thief, stripped him and tied him to a tree with a wagon chain. Then they each took turns giving him ten lashes, for a bloody total of five hundred stripes, to the accompaniment of a drum and fiddle.

An uneasy calm ensued in the early 1770s, but the fighting erupted even more violently with the advent of the American Revolution in 1775. Along with the battles between the Continental and British armies, there was a guerrilla war of family against family and neighbor against neighbor; it was carried on by ambush, atrocity, and plunder. "No conflict within

the borders of the United States has surpassed the South Carolina Back Country civil war in cruelty and bitterness," it has been said.

Some of the militia on both sides—the Tories and the Revolutionaries, or Whigs—were in the war explicitly for booty. Two of the leading South Carolina Whig officers, Andrew Pickens and Thomas Sumter, made plunder part of their troops' pay. "Each Colonel to receive three grown negroes and one small negro," one set of instructions advertised. "Each Major to receive three grown negroes; Captain two grown negroes; Lieutenants one large and one small negro; the Staff one large and one small negro; the Sergeants one and a quarter negro; each private one grown negro."

The most sanguinary episode in the backcountry feuding came in 1781 as a troop of three hundred Tory militia cavalry under Major William Cunningham, known as "Bloody Bill," moved out of British headquarters in Charleston, passed through the American lines, and advanced up the Saluda River on Mount Willing, where the Butlers lived. In background, Cunningham was much like Captain Butler. He, too, was of Scotch-Irish descent and had emigrated down the wagon trail from Pennsylvania and Virginia, settling with a group of his relatives only a few miles from Mount Willing. He had fought with Butler in some of the same battles against the Cherokee and at the outset of the Revolution had joined the colonists against the British. But he changed sides abruptly in 1778 after he received word that his brother, who was lame and an epileptic, had been whipped to death by a Whig militia captain.

On a vengeful raid, Bloody Bill's troop stole the horses and cattle from Captain Butler's neighbors. Butler's reluctance to join in the pursuit was finally overcome by a plea from his nineteen-year-old son, James, who refused to take part in the expedition unless his experienced father headed it. The Revolutionaries soon overtook a small band of Cunningham's raiders and recaptured their animals. The elated men stopped at dusk at a tavern ten miles southeast of Mount Willing near Cloud's Creek. The creek itself was named for a family that had been killed by the Cherokee a few years earlier. Thinking themselves safe, and unaware of the size of the rest of Bloody Bill's force, the colonists passed the night drinking happily, without posting a sentinel.

Early the next morning, while still drunk, Butler's men were roused by the tavernkeeper's daughter, who saw Cunningham's troops approaching. It was three hundred against thirty, and Cunningham had them surrounded. The Tory major demanded a surrender. But the younger James Butler was suspicious of the enemy commander and told his companions that he "would settle the terms of the capitulation." At that, he fired his flintlock rifle, killing a Tory and setting off a general

fusillade. James himself was mortally wounded while he knelt to prepare a second shot. As he lay dying, he handed the rifle to his father, who kept firing until he had exhausted all the balls in his pouch.

An unconditional surrender was arranged. The Revolutionaries were made to stand on a ladder suspended as a bench, and Bloody Bill then ordered that they all be put "to the unsparing sword." Captain Butler grabbed a pitchfork and tried to defend himself, until a saber stroke severed his right hand. Only two of the thirty men escaped.

Cunningham continued his raid up the Saluda River, massacring several more groups of settlers. At Mount Willing, Mrs. Sarah Smith, a sister of Captain Butler's, led a group of wives, mothers, and sisters to bury the dead. Only Captain Butler, with his severed hand, and his son were recognizable. The rest of the men were placed in a common grave, dug by the victims' slaves.

Major Cunningham fled South Carolina after the Revolution; one of his lieutenants, Matthew Love, did not. In November 1784, three years to the day after the Cloud's Creek massacre, Love was pardoned by a judge in accordance with the terms of the peace treaty with England. A crowd led by Butler's oldest son, William, was waiting at the courthouse. While the sheriff watched, the mob took Love outside and hanged him from a tree.

It was not until almost a century later, after the Civil War, that the African-Americans kept as slaves at Mount Willing were publicly identified. Before emancipation, virtually no records gave the surnames of slaves in South Carolina because, by law, slaves were deemed "chattels personal in the hands of their owners." As a South Carolina court succinctly put it, "they are, generally speaking, not considered as persons but as things." When slaveholders referred to their bondsmen at all, on bills of sale or in inventories of their plantations, they listed only the slave's first name. But in 1868, the name of Willie Bosket's great-great-grandfather, Aaron Bosket, appeared on the voter registration rolls for Mount Willing precinct, Edgefield County. It was the first election in which the former slaves were allowed to vote and the first public recording of Willie's family. Willie's ancestors had not chosen to live in Edgefield—they had been sold into slavery there—and legally they did not exist. Nonetheless, they tilled Edgefield soil, and as the years passed and generations of Boskets followed one another, they came to feel that the county was their home as much as it was the Butlers'. Like the white families, they came to be part of Edgefield. Aaron, born into hard servitude, had a phrase for it that he took from an old spiritual: "We are all God's children."

THE CLOUD'S CREEK MASSACRE and the era of violence in the backcountry from 1760 to the 1780s left an unhappy stamp on the early settlers. The physical destruction alone was awful; Edgefield was a wasteland. A minister who had fled another heavily fought-over district along the coast and returned at the end of the war found that "all was desolation." Every field, every plantation, he wrote, "showed marks of ruin and devastation. Not a person was to be met with in the roads." Society itself, he thought,

> seems to be at an end. . . . Robberies and murders are often committed on the public roads. The people that remain have been peeled, pillaged and plundered. . . . A dark melancholy gloom appears everywhere, and the morals of the people are almost entirely extirpated.

Inland, in the backcountry, it was worse, particularly around Mount Willing. John A. Chapman, a historian who was born in Edgefield early in the nineteenth century, said, "I doubt whether any part of the State, or of the United States, suffered more from the strife between Whig and Tory than did this particular section of Edgefield."

The constant fighting, looting, and killing left many people with a numbed, often casual attitude toward violence. Soon, the county acquired a reputation as "Bloody Edgefield" because of its high number of murders. Judge Thomas J. Mackey, who rode the South Carolina circuit, presiding over the regular fall and spring sessions of court week in Edgefield, said facetiously, "I am going to hold court in Edgefield, and I expect a somewhat exciting term, as the fall shooting is about to start."

Mason L. "Parson" Weems, an itinerant writer best known for the biography of George Washington that invented the pleasant fiction of little George and the cherry tree, visited Edgefield to peddle his books. He was inspired to pen a sensational tract, *The Devil in Petticoats, or God's Revenge Against Husband Killing.* It told the tale of Becky Cotton, an Edgefield lady who murdered her three husbands and deposited their bodies in a pool near her house. "Oh mercy!" Parson Weems began. "What! Old Edgefield again! Another murder in Old Edgefield! . . . Well, the Lord have mercy upon Old Edgefield! For sure it must be Pandemonium itself, a very district of Devils."

Cotton was the name of Becky's third husband. She killed her first spouse by running a mattress needle through his heart; the second she poisoned; Cotton's head she split with an ax. Put on trial in 1806, she

8                         ALL GOD'S CHILDREN

"came off clear," Weems discovered. Her tears and beauty, he said, conquered the judge and jury. One juror even became her fourth husband. In the end, though, Becky Cotton was killed by one of her brothers.

Judge John Belton O'Neall, a distinguished South Carolina jurist, recalled attending his first court session at Edgefield not long after the Becky Cotton trial. "The dockets were enormous," he said, with more than two hundred cases, a huge number for an agricultural county with a total population of twenty-four thousand whites and blacks. Edgefield's biggest town was Edgefield Court House, also known as Edgefield Village, with a mere three hundred inhabitants.

Determining crime rates in antebellum South Carolina is necessarily inexact; contemporary judges, juries, and sheriffs had limited interest in keeping statistics. But some rough estimates can be made. One careful study of judicial records for the period from 1800 to 1860 found that the murder rate in South Carolina, an overwhelmingly rural, agrarian area, was four times higher than that in Massachusetts, then the most urban, industrial state. This goes against a central theorem of modern criminology, which predicts higher homicide rates in densely populated urban regions, where crowding and anonymity break down traditional social ties and values. In South Carolina, prosecutions for all crimes of violence— including assault and rape as well as murder—made up almost sixty percent of the court cases, but only eighteen percent in Massachusetts, where the most common criminal acts were theft and public drunkenness. The records also show that the vast majority of people put on trial for violent crimes in antebellum South Carolina were whites; the slaves were thought to be a gentle people.

If the murder rate in South Carolina was high compared with the North, one scholar has suggested it was even higher in Edgefield, perhaps double the state average.

The prevalence of murder in Edgefield in the mid-nineteenth century can be crudely measured through the county coroners' reports of juries of inquest. From 1844 to 1858, the Edgefield coroners officially recorded sixty-five murders. That is probably an undercount, since a number of deaths were attributed to natural causes or "acts of God" that by a less charitable interpretation might have been the result of deliberate violence, such as a person who drowned after being beaten. Nevertheless, that works out to an annual rate of 18 murders per 100,000 inhabitants. In 1992, according to the FBI's Uniform Crime Reports, only one state in the entire country, Louisiana, approached this figure, with a homicide rate of 17.4 per 100,000.

These figures for antebellum Edgefield might be dismissed as an anomaly, given the county's small size. But Edgefield was part of the

South, and every statistical measure in the years that have followed has shown that the South, not the "Wild West" as popularly believed, was the most violent region of the United States. H. V. Redfield, a correspondent for the Cincinnati *Commercial* stationed in the South after the Civil War, was so struck by the frequency of murder there that he put together the first quantitative study of the subject in 1880, using figures gleaned from local newspaper reports. By his calculations, in 1878 the three Southern states of South Carolina, Kentucky, and Texas (which was then settled mostly by Southerners) numbered between 12.2 and 28.8 murders per 100,000 citizens. In urban Massachusetts that year, the rate was only 1.4. Vermont and New Hampshire, two Northern states that were predominantly agricultural, like most of the South, recorded only a single murder between them in 1878, Redfield pointed out. South Carolina had 128. Even New York City averaged only 3 to 7 homicides per 100,000 throughout the nineteenth century. "Have we not here two civilizations?" Redfield asked. He was the first of a series of writers and scholars to suggest that the South had produced a culture of violence.

The statistical differences persisted. In 1933, the year the federal government first published homicide data for the entire country, the ten states with the highest murder rates were all Southern or border states that had been involved in the Confederacy, from Virginia to Texas. South Carolina's homicide rate was almost four times the national average.

Over the years, many theories have been advanced for the South's propensity for violence. One is fanciful—that the region's hot climate produced hot tempers. Others offer what may be parts of the explanation. At least since Frederick Law Olmsted journeyed through the South in the 1850s and penned his three-volume work, *The Cotton Kingdom*, writers have pointed to the persistence of frontier conditions in the South. The frontier bred lawlessness, according to this thesis, and Southern plantation agriculture, with its widely scattered settlements and paucity of roads, bridges, and schools, remained a frontier until after the Civil War. Edgefield, with its early history of backcountry fighting, seems to support the theory. But not all parts of the South shared this gory military history. And recent studies of the American West contradict the stereotypes of pervasive violence in cattle towns there. In fact, the bloodshed that erupted on the Western frontier may have been Southern violence brought in via Texas.

Another contributor to Southern bellicosity was the heavy influx of Scotch-Irish among the region's settlers. These immigrants shocked the good Quakers of Pennsylvania, where they first arrived in the new world. Benjamin Franklin chastised them for being "white savages." Their way of life was an outgrowth of seven centuries of fighting between the kings

of England and Scotland over the borderlands they inhabited. They had grown inured to their towns being sacked and burned and their kinsmen tortured to death. Many had been forcibly resettled in Ireland. When they came to America, they brought with them a penchant for family feuds, a love of whiskey, and a warrior ethic that demanded vengeance. Their prevailing principle, "lex talionis," the rule of retaliation, helps explain the Cloud's Creek massacre and the bloodiness of the fighting in the South Carolina backcountry from 1760 to 1785.

One of their favorite sports was a savage form of wrestling, or "wrasling," which evolved in Virginia into "rough and tumble" and in South Carolina into "knock down and drag out." An Irish traveler, Thomas Ashe, described a fight between a Virginian and a Kentuckian. The contestants were asked if they wanted to "fight fair" or "rough and tumble." When they replied "rough and tumble," the crowd roared in approval. The Virginian began by pitching "himself into the bosom of his opponent," sinking his sharpened fingernails into the Kentuckian's head. "The Virginian never lost his hold . . . fixing his claws in his hairs and his thumbs on his eyes," and ripped his opponent's eyes from their sockets. Even after the eyes were gouged out, the fight continued. The Virginian sunk his teeth into the Kentuckian's nose and bit it in two pieces. He then tore off the Kentuckian's ears. Finally, the "Kentuckian, deprived of eyes, ears and nose, gave in." The victor, though maimed and bloodied himself, was carried around the grounds by the crowd.

In an effort to halt this pastime, South Carolina in 1786 made any defendant found guilty of premeditated mayhem subject to the death penalty. Mayhem was defined as "violently depriving" another person of a member of his body, excepting the ears and nose. The ears and nose were excluded because their loss only disfigured the victim. Despite the severity of the law, gouging flourished. Judge Aedanus Burke, who worked the Edgefield circuit, was appalled by the number of one-eyed men in his courtroom. "Before God, gentlemen of the jury, I never saw such a thing before in the world!" he once exclaimed. "There is a plaintiff with an eye out! A juror with an eye out! And two witnesses with an eye out! What a state of society you must have in this part of the country!"

Behind this brutality lay an ethic of "primal honor," brought with the Scotch-Irish to the new world. It had its roots in the blood feuds between families and clans dating to the Middle Ages. Above all, honor meant reputation; a man's worth resided in the opinion of others. Honor also meant valor; a man had to be prepared to fight to defend his honor if challenged or insulted. This concern with honor produced "rough and tumble" and an abundance of assaults and murders among the proletariat in the backcountry.

*"Bloody Edgefield"*

The slaveholding gentry of Virginia and the aristocracy of low-country South Carolina, along the coast, had developed a similar code in seeking to copy the manners of the English ruling class. "In the sixteenth and seventeenth centuries tempers were short and weapons to hand," Lawrence Stone has written.

> The behavior of the propertied classes, like that of the poor, was characterized by the ferocity, childishness and lack of self-control of the Homeric age. . . . The educational and social system of the age inculcated ideals of honour and generosity. Impulsiveness was not reproved, readiness to repay an injury real or imagined a sign of spirit. . . . Moreover, a gentleman carried a weapon at all times, and did not hesitate to use it.

Thus for the Southern upper class, just as for the lower class, honor became a compelling passion, an overwhelming concern with one's reputation and manliness. For the gentry, honor had an added element of gentility, requiring its adherents to be generous hosts and occasionally to improve their libraries and show religious devotion. But mostly a Southern gentleman was expected to be truthful and to be good at riding horses, playing cards, and handling firearms. Honor brought out both the best and the worst in its apostles. Contemporaries described Southerners as gracious and hospitable, but touchy and pugnacious. For honor required gentlemen to pay great attention to appearances to ensure proper respect, and when that was not forthcoming, violence could quickly erupt. In practice, this meant that it was as intolerable to call a man a liar as to hit or shoot him.

The code of honor reached its apogee in the duel. Dueling had virtually disappeared in the North after Aaron Burr killed Alexander Hamilton in 1804, and even in England, where Southern cavaliers looked for inspiration, dueling declined in the early nineteenth century. But in the South, and especially in South Carolina, the code duello, "affairs of honor," became the accepted means for gentlemen to settle disputes. A gentleman did not go to court; the law was seen as weak. As Andrew Jackson's mother told him when he was young, "The law affords no remedy that can satisfy the feelings of a true man."

There is no record of the number of duels fought, but contemporary accounts suggest they were frequent. William Faux, an English traveler, wrote that in Charleston he had been introduced to thirteen men, eleven of whom "had killed their man" in duels. The editor of the *Gazette* in Camden, South Carolina, saw nothing out of the ordinary in reporting that three duels had taken place there in a single week in 1817.

12                  ALL GOD'S CHILDREN

In 1812, South Carolina outlawed dueling, levying a heavy fine and up to a year in jail for all participants, including seconds. If the duel was fatal, the survivor could be prosecuted for murder. But few men were tried for dueling, and none were convicted of murder. South Carolina law held that homicide could be either "felonious, justifiable or excusable," and juries were always ready to apply the two limitations to the duelist.

The elaborate handbook on which duelists relied, *The Code of Honor*, was written by a former governor of the state, John Lyde Wilson, who deplored the Christian doctrine of turning the other cheek. Such forbearance, he said, is "utterly repugnant to those feelings which nature and education have implanted in the human character." If the antidueling laws were enforced, Wilson insisted, "all that is honorable in the community would quit the country and inhabit the wilderness with the Indians." Duels are necessary, Wilson argued, because "words are no satisfaction for words."

Dueling became a cherished part of culture for many planters. Louis T. Wigfall, the son of a prominent Edgefield family, who had lost one brother in a duel, ran into trouble himself at the University of Virginia when he invited a Southern belle, a Miss Leiper, to dance during a social gathering. She refused, Wigfall was insulted, and so he challenged her escort to a duel. Later, back in Edgefield, he was accused by another young planter, Preston Brooks, of being a coward. Since Brooks was out of town, Wigfall challenged Brooks's father instead. When the older man declined, Wigfall went to the courthouse and, in keeping with the code duello, put up a public notice calling him a scoundrel. He also shot and killed a member of the Brooks clan who tried to tear the note down. Eventually, Wigfall and Preston Brooks met in a duel, leaving both wounded. Each went on to become a Southern hero, Brooks as a congressman from South Carolina, Wigfall as a senator from Texas.

Another of Wigfall's brothers, Arthur, an Episcopal priest, denounced the slaughter produced by all this dueling. "There exists in our country a privileged class, *soi disant*, men of honor, who have established for themselves a higher law," he said in a sermon. "They put their foot upon the criminal code and trample it in the dust. They may and they do commit murder with impunity." Reverend Wigfall had no objection to a privileged class, if it was built on virtue and intelligence. "But we do protest, and shall with our dying breath protest against an aristocracy of crime."

Reverend Wigfall had espied something significant—these cavaliers of honor placed themselves above the law. In the antebellum South, there

*"Bloody Edgefield"*                    13

was a fine line between heroism in the name of honor and criminality, between deeds of valor and acts of violence. Honor could make men brave, or cruel; it could make them nobly rash, or simply self-destructive. Honor was a powerful quotidian force, determining men's destinies and even affecting the course of state and national politics.

THE SAME SENTIMENTS of honor that compelled Louis Wigfall to duel led other citizens of Edgefield into more mundane forms of violence: street fights, drunken brawls, and shootings over card games. These eruptions, known as "personal difficulties," were the most common form of violence in Edgefield and accounted for a large percentage of the county's high murder rate. Southerners' copious consumption of whiskey and the proclivity of most Southern white men to carry firearms, even in the romanticized mint-julep-and-magnolia days of the antebellum period, contributed to the problem. But it took honor, the need to prove one's manhood and protect one's good name, to ignite these fights. "There is no one here but carries arms under his clothes," a young Alabama lawyer told Alexis de Tocqueville in a remark that could have been said in Edgefield. "At the slightest quarrel, knife or pistol comes to hand. These things happen continually; it is a semibarbarous state of society."

In the barroom of Edgefield's Spann Hotel in July 1851, two friends fell into an argument while drinking at the counter. Philip Goode, the more belligerent of the two, accused his friend, William Cloud, of boasting that he could whip Goode in a fight. Cloud denied making the claim and said "he had nothing against him," according to witnesses. One patron recalled that Cloud "tried to retreat as honorably as he could."

But Goode persisted, calling Cloud "a damn liar," the worst offense to honor. Soon, Goode climbed off his bar seat, grabbed Cloud by the coat collar, and fired his "large six barrel revolver" into his friend's chest. The two were so close that the murdered man's coat "took fire from the shot."

"God damn you," Goode swore, standing over the dead man and firing twice more. "That will satisfy you."

The dictates of honor ensnared even members of Edgefield's most esteemed families in "personal difficulties." In July 1856, George Tillman, a lawyer and member of the state legislature, was playing a game of faro in the Planters Hotel. There was a history of violence in his family—his father, a wealthy planter, had once killed a man during a card game, and two of his brothers were shot and killed after insulting gentlemen—and Tillman himself had been in a duel and wounded two men. Now, during

the faro game, Tillman got into an argument over how much money he had bet. When a bystander backed his opponent, Tillman denounced him as "a God damn liar" and shot him dead.

At his trial, Tillman was let off with a two-year sentence for manslaughter since the shooting was regarded as unpremeditated. In jail, Tillman was treated more like a guest than a felon; he was given comfortable quarters and allowed the pursuit of a courtship and the resumption of his law practice. Afterward, Tillman was repeatedly elected to Congress. Homicide was no bar to elective office.

Tillman's mild punishment was hardly unusual. In the sixty-five cases of homicide recorded by the Edgefield coroners between 1844 and 1858, only thirty-three people were tried for murder. Eighteen were acquitted, ten were found guilty of the lesser charge of manslaughter, and only five were convicted of murder.

Juries, given the choice of deciding whether a homicide was "felonious, justifiable or excusable," were readily prepared to entertain arguments that a defendant had acted in self-defense or been provoked on a point of honor. They shared the opinion of an Edgefield lawyer who wrote, "We have a sort of honorable crime. . . . Whenever the Southern dagger is drawn, there is something manly and chivalrous in the use of it." Southerners did not think of themselves as lawless; they believed passionately in the Constitution and they took their Bible literally. Both, after all, could be read to justify slavery.

EDGEFIELD TYPIFIED the up-country South, yet there was also something that set it apart, that made Edgefield's residents even more pugnacious, reckless, and prone to shed blood. By the middle of the nineteenth century, mere mention that a person hailed from Edgefield was enough to explain his character to other South Carolinians. During the war between the United States and Mexico in 1846, a South Carolina judge who had volunteered with his state's Palmetto Regiment came across a young soldier busy dodging bullets. "You seem to be rather pert to get out of the way of the bullets," the judge said.

"Wall," replied the soldier, "I don't hanker after bullets as a general thing."

"Then why in the deuce did you come down here?" inquired the judge.

"Wall! you see capen'," replied the stranger, "I b'long to old Edgefield deestrick and I jes' kim here to get away from danger."

A South Carolina journalist later calculated that Edgefield "has had more dashing, brilliant, romantic figures, statesmen, orators, soldiers,

adventurers, daredevils, than any county of South Carolina, if not of any rural county in America." Most Edgefield families, he noted,

> were kin, by blood or marriage, and they gave to their village and county a character that was South Carolinian, more intense, more fiery, than was found elsewhere. . . . They seemed to be, if they were not, harder riders, bolder hunters, more enterprising and masterly politicians. Their virtues were shining, their vices flamed. They were not careful reckoners of the future, sometimes they spoke too quickly and so acted, yet in crises an audacity that might have been called imprudence by milder men made them indispensable to the state.

One reason for Edgefield's special character may have been that it was a major point of contact between the up-country Scotch-Irish settlers, who were Presbyterians and Baptists, and the low-country gentry, who were of English stock and Episcopalian. These two peoples each brought its own culture of honor, one coarser, one seemingly more genteel; the resulting mixture was highly combustible, producing a level of tension absent elsewhere in South Carolina.

Edgefield's history also played a role in setting it apart. Many of its famous characters, including George Tillman, descended from the settlers who survived the brutal warfare between 1760 and 1785. They grew up in families where stories of the battles and massacres of that generation were told and retold as a living legacy, and some of them had treasured souvenirs. The eldest son of Captain James Butler, the militia commander killed at Cloud's Creek, narrowly missed capturing his father's nemesis, Bloody Bill Cunningham, in a horse race through the forest; but he did manage to seize the Tory officer's sword and pocketbook. These were handed down in the family. Over time, the early settlers' experiences took shape as legend, and legend grew into the Edgefield tradition. This heritage gave Edgefield a character that made it different from other communities in the South in much the same way that New York is different from Boston, and Los Angeles is different from San Francisco.

It was not just physical violence that Edgefield inherited from the days of the Cloud's Creek massacre. It was also a penchant for political extremism. Edgefield, along with Charleston, South Carolina's only city before the Civil War, produced a disproportionate share of the state's political leaders, most of them "fire-eaters," or pro-secession radicals in the local lexicon. Edgefield was "a breeding ground for the species." Although its white population never exceeded seventeen thousand before 1900, the county turned out ten of South Carolina's nineteenth-century governors. It has also been home to one of South Carolina's two United

16                    ALL GOD'S CHILDREN

States senators for most of the period from 1842 to the present. The
incumbent is Strom Thurmond, a native of Edgefield Court House who
has been in the Senate since 1954, making him the Senate's most senior
member. He originally came to national attention as the rebellious Dixie-
crat candidate for president in 1948, opposing Harry Truman as too
liberal on civil rights.

During the nineteenth century, these governors and senators, as well
as a flock of congressmen from Edgefield, served as key participants at
every crucial juncture in South Carolina's radical history. They were
ardent advocates of nullification, declaring the tariff of 1828 illegal and
proposing to use force against the federal government. In 1860, they
helped lead South Carolina and then the South into the Civil War. In
1876, leaders from Edgefield ended Reconstruction in South Carolina by
intimidating, killing, and defrauding African-American voters. And in the
1890s, a politician from Edgefield led the effort to impose segregation
on South Carolina. Edgefield may have been small in size, but its impact
was large. What South Carolina—the hotspur state—was to the nation,
Edgefield was to South Carolina.


ONE OF EDGEFIELD'S POLITICIANS was Preston Brooks, the
man who fought a duel with Louis Wigfall. Brooks, too, was a descendant
of the settlers massacred at Cloud's Creek; his grandmother was a sister
of Captain James Butler. Six feet tall, with a proud military record in the
Mexican War, Brooks was elected to Congress and once half-humorously
proposed that representatives be required to check their firearms in the
cloakroom before appearing on the House floor.

On May 19, 1856, he had listened with rising anger as Senator Charles
Sumner of Massachusetts, a leading abolitionist, excoriated his cousin,
Senator Andrew Pickens Butler, for supporting the pro-slavery govern-
ment of Kansas. Speaking from the Senate floor, Sumner branded Butler
as the Don Quixote of slavery, a man who "has chosen a mistress to
whom he has made his vows, and who, though ugly to others, is always
lovely to him . . . the harlot, Slavery." Sumner also mocked the elderly
Butler's slight labial paralysis, charging that "with incoherent phrases"
he "discharged the loose expectoration of his speech." Brooks was further
outraged by Sumner's claim that South Carolina suffered a "shameful
imbecility from Slavery."

The Massachusetts senator had "insulted South Carolina and Judge
Butler grossly," Brooks wrote to his brother. Under the code of honor,
Butler was obliged to flog Sumner, but "this Butler is unable to do,"
Brooks reasoned, because Sumner was thirty pounds heavier and in more

robust health. "Under the circumstances," Brooks concluded, "I felt it to be my duty to relieve Butler and avenge the insult to my State."

Although Sumner's remarks were slanderous, Brooks did not even consider bringing a lawsuit. This was a matter of personal honor. Nor did Brooks think of challenging the Massachusetts senator to a duel, feeling that since an abolitionist was "incapable of courage," Sumner would not accept. But mainly Brooks would not challenge Sumner because, under the code duello, a duel must be between social equals. Brooks did not want to grant Sumner that respectability. The punctilio of honor also ruled out Brooks's using a pistol or sword to punish an insulting inferior. In the end, the instrument he chose was a gold-headed gutta-percha walking stick given him by a friend.

On May 22, Brooks found Sumner at his desk in the Senate, autographing printed copies of his speech for admirers. Brooks was fuming with anger, but honor required that he wait until some ladies who were in the visitors gallery left the chamber. At last, "under the highest sense of duty," he approached Sumner.

"I have read your speech twice over carefully," Brooks began. "It is a libel on South Carolina, and Mr. Butler, who is a relative of mine." Sumner tried to rise from his desk, but his long legs were tucked under it and it was bolted to the floor. Before the senator could move, Brooks gave Sumner "a slight blow" with the smaller end of his cane. When Sumner tried to cover his head with his arms, Brooks felt "compelled to strike him harder than he had intended," raining down blow after blow.

Blood was now streaming from Sumner's head. Finally, with a huge effort, he ripped the desk from the floor and staggered down the aisle semiconscious. "Toward the last he bellowed like a calf," Brooks told his brother. "I wore out my cane completely."

It took Sumner three years to recover from his wounds, and the assault polarized the nation. Northerners were outraged; protest meetings were held in virtually every city and dozens of small towns. In the South, Brooks became an instant hero. "Every Southern man sustains me," he wrote his brother. "The fragments of the stick are begged for as sacred relics." In Charleston, a group of merchants bought a new cane for Brooks, which they inscribed, "Hit him again."

The news even made its way to the slaves on his plantation in Edgefield, where some of them regarded "Marse Preston" as a hero. "One day he marched right in de Senate, wid his gold head cane, and beat a Senator til him fainted," recalled an ex-slave many years later. It was " 'bout sumpin' dat Senator say 'bout him old kinsman, Senator Butler," the former slave remembered. "Dat turn de world up side down."

The House of Representatives moved to expel Brooks but fell well

short of the two-thirds vote required; ominously, every Southern congressman but one supported Brooks. In a gesture of bravado, Brooks resigned anyway and was reelected overwhelmingly.

The incident underscored how strongly the dictates of honor governed life in Edgefield. To Northerners, Brooks's attack had been brutal and lawless, a criminal act. To Southerners, Brooks had been a gentleman, justifiably defending a relative and his state. As Brooks himself explained, "Public opinion distinguishes between crime and honorable resentment." In coming years, the code of honor would persist and deeply influence all those who lived in Edgefield. Honor, along with violence, was part of the region's heritage.

Compendium_Roth
Page 0098



THIS
BITTER-
SWEET
SOIL

*The Chinese in
California Agriculture,
1860–1910*

SUCHENG
CHAN

*University of California Press
Berkeley • Los Angeles • London*

*To the memory of Asian immigrants
who made California so green*

325.251,C3605t
Chan, Sucheng
        This bittersweet soil

University of California Press
Berkeley and Los Angeles, California

University of California Press, Ltd.
London, England

© 1986 by
The Regents of the University of California

Typeset by Asco Trade Typesetting Ltd., Hong Kong
Printed in the United States of America

Library of Congress Cataloging in Publication Data

Chan, Sucheng.
    This bittersweet soil.

  Bibliography: p.
  Includes index.
  1. Farmers—California—History.  2. Chinese—
California—History.  3. Agriculture—Economic aspects—
California—History.  I. Title.
HD8039.F32U62 1986     338.1'089951'0764     85-1084
ISBN 0-520-05376-1

1 2  3  4  5  6  7  8  9

SAN FRANCISCO
PUBLIC LIBRARY

*Violence and Persistence*

Several waves of anti-Chinese activities swept agricultural California in 1876–79, 1886, and 1893–94, all of which were years of economic hardship. A number of writers, particularly Carey McWilliams and Victor and Brett de Bary Nee, have concluded that these activities drove the Chinese out of rural areas, but such was in fact not the case. The Chinese not only persisted in agriculture, increasing both in numbers and in the amount of land they leased in several of the major agricultural regions in the decades just before and after the turn of the century, but also survived in one area—the Sacramento–San Joaquin Delta—where a small Chinese farming community was established and has remained to this day.

The economic dislocations of the 1870s enabled anti-Chinese groups in San Francisco to gather increasing support, as the Chinese were blamed for the economic problems all workers faced. Anti-Chinese sentiment spread to the countryside where the Order of Caucasians (sometimes known as the Caucasian League), a white supremacist group, was established in the late spring of 1876. The group first came to public notice in July 1876 when, in the aftermath of the shooting of a white man named Cheer by a Chinese worker at the American House in Truckee in Nevada County near Donner Summit, a mob had gathered menacingly in front of the Truckee jail where three Chinese witnesses were confined. On discovering that the man who had done the shooting was not in the jail, the mob dispersed, but someone apparently notified the engineer of the local fire brigade that he would be shot should he attempt to put out any fires in Chinatown. A reporter then sent telegrams to the leading newspapers along the Pacific Coast spreading the rumor that the Caucasian League would burn Chinatown. On July 14 two prominent millmen, George Schaffer and Elle Ellen, received similar threatening notices that said:

Dear Sir: You are respectfully requested without further warning to discharge the Chinamen in your employ, and give your work to whites instead, whom you well know are suffering from the effects of all those heathens in our midst. Think well of the country of your adoption, and try to assist

the poor white man in making an honest living. Take heed lest the course you are now pursuing shall fall upon your own head with tenfold vengeance. [Signed]—Native Americans.[1]

The public charged the Caucasian League with threats to burn the town. In response, the organization's president, Hamlet Davis, one of Nevada County's oldest pioneers, issued a denial. A meeting was held, with some 150 of the 200 reported members of the League in attendance. The group issued a statement saying they deprecated mob violence and regretted that

[a] certain bad element has sprung up in our midst, which has shown a tendency to riotous conduct by appearing upon our streets during the night, armed and masked, and by sending certain anonymous, threatening letters to some of our citizens and property-holders.[2]

The Chinese, meanwhile, left their wooden buildings and barricaded themselves in the few brick or stone houses they had. The *San Francisco Bulletin* reported that the Chinese had bought six hundred revolvers since the troubles began and could be heard daily practicing their shooting. They sent for a detective, said to be paid by the Chinese Six Companies in San Francisco, to help them, while the Central Pacific Railroad Company sent its own detectives to Truckee to guard the company's property. Insurance companies began canceling the fire insurance policies they had issued.[3]

The Order of Caucasians also led rallies in Red Bluff in April and in Marysville in May 1876. The group held its first state convention in Sacramento the following September.[4]

In February and March, 1877, a series of violent anti-Chinese acts occurred in Chico and its vicinity in Butte County. In mid-February, the soap factory of John Bidwell, which had been leased to some Chinese for use as a slaughter house, was burned. A threatening note sent to Bidwell said, "Sir, you are given notice to discharge your Mongolian help within ten days or suffer the consequences." Then, on February 28, some men set fire to the barn on the ranch of the widow, Mrs. Patrick, who had leased her orchard and garden to Chinese. Six horses were burned alive, and the dwelling house of the Chinese tenants

was consumed by flames as well. Shots were fired at the Chinese as they attempted to put the fire out. The Chinese suffered an estimated loss of $1,500.[5] A third incident took place on March 5 when the home of some Chinese in Nord was burned. The inhabitants escaped before fire engulfed the building, but the arsonists shot at the Chinese as they retreated. The day after, a washhouse operated by Ah Shu on Chico Creek was burned.[6]

Several unsuccessful attempts to burn both the "old" and the "new" Chinatown in Chico were made in March,[7] but the event that respectable citizens of Chico found most deplorable was the murder on the evening of March 14 of several Chinese who had been hired to grub and clear a piece of land on the Chris Lemm ranch, located about a mile outside of Chico on the Humboldt Road. Five armed men went to the ranch, shot four of the Chinese, doused their house with kerosene, and set it on fire. Two other Chinese were wounded but managed to escape. One died later, and the other managed to reach town to report the incident to the police. John Bidwell formed a Committee of Safety to patrol the town. Professional detectives were hired to search for suspects, and the citizens of Chico contributed $1,000 as a reward for their capture. The flood of threatening letters continued.[8]

Finally, on March 27 five men suspected of murdering the Chinese on the Lemm ranch, and seven others suspected of the other acts of arson, were captured. The confession of Ned Conway, who was caught first as he dropped a threatening letter in the mail, led to the arrest of the others. Confessions by Conway, Thomas Stainbrook, Henry C. Wright, Adam Holderbaum, H. T. Jones, and Charles Slaughter, which were published in the *Chico Enterprise* on March 30, 1877, revealed that members of the Laborers' Union—an off-shoot of the Order of Caucasians—and particularly those belonging to a group known as the Council of Nine, had planned to instigate a reign of terror in the Chico countryside in an attempt to oust the Chinese from the area. According to some of the confessions, Ned Conway, Charles and John Slaughter, Eugene Roberts, and Thomas Stainbrook, had gone to the Lemm ranch with the intention of robbing the Chinese, who they believed had plenty of money. They entered the cabin of the Chinese, held them at gunpoint, and searched for money. Only then did Roberts suggest that they each choose

a Chinese to shoot. Some of the others objected, but four Chinese were killed anyway. Roberts had a bottle of kerosene in his pocket, threw it over the heads and clothes of the Chinese, and one of the Slaughter brothers lighted a match to set their victims on fire.[9]

The grand jury rushed through the hearings in three days. Five men were held for murder and arson, and six for arson. Pleasant Slaughter, brother of Charles and John, was sentenced to ten years for burning Bidwell's factory. Stainbrook, Roberts, Charles Slaughter, and John Slaughter each received a life sentence, while H. T. Jones, who refused to confess to anything, received twenty years. Writing in the Yuba City and Marysville *Independent Herald* three-quarters of a century later, a reporter commented:

> Had their victims been white men they would have been hanged. In fact, they would have been, undoubtedly, accorded that special type of hanging termed lynching.[10]

John Bidwell's factory was rebuilt, but on the night before it was to reopen, it was burned to the ground again.

Other acts of wanton violence against the Chinese continued after the Chico incidents. At the same time, employers elsewhere also received threatening notices. In August 1877 the San Francisco *Daily Morning Call* reported that white farmers in the Sacramento Delta had received letters dated July 1877, which said:

> Notice is heare given to all men who owns lands on the Sacramento River is heare ordered to dispense with Chinese labour or suffer sutch consiquinces as may follow within tenn days. We have heaved and puked over Chinese imposition long a nuff. Good-by John Long Taile.[11]

Sixty farmers, "in the main sturdy old pioneer settlers" who employed Chinese, met in Courtland under the leadership of J. V. Sims and O. R. Runyon and declared that "the Chinamen were of necessity employed and found to be sturdy, sober and industrious, the whites being the very reverse."[12] They bemoaned the fact that

> modern labor has degenerated.... It is no way for workmen to act, to demand work and then be resort to riot, arson

# HISTORY

OF

# EDGEFIELD COUNTY

## FROM THE EARLIEST SETTLEMENTS

TO

# — 1897 —

BIOGRAPHICAL AND ANECDOTICAL; WITH SKETCHES OF THE
SEMINOLE WAR; NULLIFICATION; SECESSION; RECON-
TRUCTION; CHURCHES AND LITERATURE; WITH ROLLS
OF ALL THE COMPANIES FROM EDGEFIELD IN
THE WAR OF SECESSION; WAR WITH MEX-
ICO AND WITH THE SEMINOLE INDIANS.

BY

## JOHN A. CHAPMAN, A. M.,

Author of SECOND PART OF ANNALS OF NEWBERRY; SCHOOL HISTORY
OF SOUTH CAROLINA, ETC.

NEWBERRY, S. C.
ELBERT H. AULL, PUBLISHER AND PRINTER.
1897.

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

Generated on 2022-10-18 18:35 GMT / https://hdl.handle.net/2027/coo.31924023790826
PUBLIC DOMAIN / http://www.hathitrust.org/access_uses

A 615295

Entered according to Act of Congress in the year 1897,
By JOHN A. CHAPMAN,
In the office of the Librarian of Congress,
At Washington, D. C.

Generated on 2022-10-18 18:35 GMT / https://hdl.handle.net/2027/coo.31924023760436
PUBLIC DOMAIN / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

7-BEN-JLB Document 128 Filed 11/11/22 PageID.1 295

assumed the command, giving his lieutenancy to John Corley, and, the danger of the party requiring a resort to desperate measures, placed him in rear with an order to cut down the first man that gave way. It happened that Joseph Corley, among others, was about to give way, which would have left the small remnant of the Whigs to certain destruction. John Corley, true to his instructions, with drawn sword menaced his brother with instant death unless he returned to his post. Joseph did return and behaved well afterwards.

Vardell had been killed, and before his breath left him he begged his comrades not to let his body fall into the hands of the Tories. The wounded Watson, lying between the contending parties, had made a similar appeal, specially to William Butler: "Billy, do not let them take me."

The Whigs made one more charge and carrying off their comrades retreated, but found time to bury poor Vardell under a clay root and cover him with their swords. At some little distance from the scene of conflict they took refuge in a wooden outhouse, being pursued, but circumspectly, by the Tories. Watson, severely wounded, and the sudden apprehension of death, still maintained a military resolution. A woman happened to be in the house in which they entered whose infant, some three weeks old, was in a dwelling some distance off. Watson insisted she should be detained; that their weakened condition required concealment and she might betray them. They found, means, however, to get information of their perilous situation to Orangeburg, and Captain, subsequently General Rumph, hastened to their relief. Under his escort Watson was carried upon a litter in a dying condition to Orangeburg where he expired and was buried. William Butler superintended the military honors of his funeral.

While serving with Ryan the subject of our memoir was engaged in another expedition against the Tories in Orangeburg District. They were in force near the Court House. A number of Tories, finding their condition desperate, deserted to the Whigs, and Ryan, distrusting them, placed them in front with instructions to his men to shoot them if they proved false. In the fight which ensued his chief was again disabled and William Butler assumed the command. The Tories were defeated.

CORNELL UNIVERSITY      CORNELL UNIVERSITY

In 1782 Cunningham made a second incursion into the Ninety-Six District. Perfectly familiar with the country in his youth, possessed of great sagacity, fertility in military expedients and endowed with all the physical qualities so essential to the partizan, he was no mean adversary to contend with. A favorite manœuvre with him was to divide his command upon the march into small detachments, to be concentrated by different routes near the point at which the blow was aimed. In this manner he had concentrated his force at Caradine's ford on Saluda. William Butler then was commanding a company of Rangers under the authority of General Pickens and, with a portion of his company marched to meet him. With a view to ascertain the enemy's position he resorted to a ruse. Approaching the residence of Joseph Cunningham, near the junction of Little Saluda with Big Saluda, he sent forward his brother, Thomas Butler, with Abner Corley to the house at night. Thomas Butler was an excellent mimic and, imitating the voice of one of William Cunningham's men, called Nibletts, asked from without where our friend Cunningham was. The wife of Joseph Cunningham replied that he had crossed at Caradine's ford. With that information William Butler himself rode up to the house and mounting Joseph Cunningham on a horse compelled him to guide the party across the ford.

They crossed the ford at 12 o'clock at night and next morning halted in a peach orchard near Bauknight's Ferry. The horses were unbridled but with the saddles on feeding upon peas out of a canoe when a grey mare, which Cunningham was known to have taken out of the neighborhood, was observed passing back, having escaped from his camp. This incident disclosed in some measure the state of affairs, and the Rangers received the orders to march. The Rangers numbered some thirty and Cunningham's men about twenty. The bloody scene of Cloud's Creek animated any encounter between Butler and Cunningham with more of the feelings of the duello than the battle-field. Approaching the Tory position unobserved, John Corley was detailed with eight men to gain their rear and upon a concerted signal to commence the attack, while the main body advanced under cover of a hedge. The Tories were drying their blankets by their camp fires; Cunningham, himself, was at a little distance off from his band. As it after-

Digitized by CORNELL UNIVERSITY

Original from CORNELL UNIVERSITY

wards appeared, Butler's person being at one time exposed in advancing before the signal was given, he was observed by the Tories, but taken for their leader, for there was a striking personal resemblance between the two men.

Corley's furious assault, himself foremost in the charge, was the first intimation to the Tories that their exasperated foes were at hand. Cunningham was promptly at his post, but, taken by surprise and attacked by superior numbers, thought only of safety. Having no time to saddle his horse, but with partizan quickness seizing his holsters sprang to his seat, while Butler, singling him out, dashed in pursuit. Both men were remarkably fine riders and tradition has preserved the names of the horses they rode. Cunningham was mounted on a mare which had become celebrated in the service as "Silver Heels," while Butler rode a horse called "Ranter." As Butler carried only a sabre and Cunningham only pistols that had been rendered useless by the rain of the night before, for he snapped them repeatedly over his shoulders at his adversary as he fled, life or death hung upon the speed of the horses. As long as the chase was in the woods "Ranter" maintained his own, but when he struck an open trail in which the superior strides of Cunningham's thoroughbred could tell, turning in his seat and patting with triumph and confidence the noble animal that bore him, he tauntingly exclaimed, "I am safe," and dashing rapidly away from his adversary, he escaped by himself swimming the Saluda near Lorick's ferry. When William Butler returned from the pursuit of Cunningham he found a portion of his command assembled at the Tory camp under circumstances which gave him great concern. Turner, one of his prisoners, had been deliberately shot through the head after he had surrendered. When Butler sternly rebuked the act Seysin, who had done the deed, justified himself by reciting an outrage the unfortunate Tory had inflicted upon his mother. The verdict of the corps was in Seysin's favor and no court martial was held upon him. There was certainly strong palliating circumstances in the case. The Tory had stripped Mrs. Seysin to the waist and tying her had severely whipped her to force her to disclose where a party of Whigs, among whom was her son, were.

A pursuit of Cunningham's men was ordered for the pur-

Generated on 2022-10-18 28:37 GMT / https://hdl.handle.net/2027/coo.319503970430
Public Domain / http://www.hathitrust.org/access_usepd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

pose of capturing or dispersing them, and some were overtaken while crossing the river. Butler, finding his men disposed to fire upon them, ordered De Loach, who was raising his rifle, to desist. Sherwood Corley was then in the river, had snapped his pistol at the retreating party, not heeding the order, he deliberately primed it afresh while in the water and killed a Tory named Davis while he was ascending the Edgefield bank. The result of this action was the dispersion of Cunningham's famous band. He, himself, retired to Cuba where he died, being prevented from returning to his native State after the war by a proscriptive proclamation of the authoritives. He was awarded something like an ovation by the British. Goudy, a gallant partizan of the Revolution, visited Cuba after the war on account of his health. Cunningham, in the true spirit of hospitality, called upon him with an invitation to dinner. Whether Goudy accepted the invitation or not we cannot say; but Cunningham told him that on one occasion he had ridden up with an escort at his back to a house near Ninety-Six, in which Goudy and others were playing cards, with a view to ascertaining if William Butler was among them. "Why did you not fire upon us?" asked Goudy. "I had no temptation to kill you," said Cunningham, "but if Billy Butler had been there you would have had the floor flooded with blood."

From this time until after the close of the war, William Butler continued at the head of the Rangers, under command of General Pickens, and was considered his favorite captain. He had, however, very little duty other than patrol to perform. His company of Rangers was not discharged until 1784, more than a year after the peace.

With the resumption of the pursuits of civil life, the soldier's thoughts reverted to the young girl of Saluda with whom his meeting during Green's retreat from Ninety-Six has already been mentioned. Nor had she forgotten the young officer of the cocade and plume, for when the household rejected him, (the stepfather forbade him to visit her), she told him to come, she would see him. They were married the 3d of June, 1784.

Miss Behethland Foot Moore, whom William Butler had thus selected as the partner of his life, was a woman of strong, and in many respects remarkable traits of character. She al-

Generated on 2022-10-18 18:35 GMT / https://hdl.handle.net/2027/coo.31924023396336
PUBLIC DOMAIN / http://www.hathitrust.org/access_use#pd

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

ways exercised great influence with her husband and he relied
much upon her judgment and advice. He seemed to have in-
spired her with a deep feeling, almost amounting to a fascina-
tion; of itself a high tribute to his memory.

In 1794 William Butler was elected by the Legislature of
South Carolina Sheriff of Ninety-Six District. He discharged
few of the ministerial duties, however, leaving them to his
brothers, Thomas and Stanmore, who were his deputies; but
he always conducted the military escort of the Judge coming
into the District and presided as High Sheriff during the sit-
ting of the Court.

The sheriff of that day was an officer of distinction and was
generally detailed upon offices of honor. William Butler, as
Sheriff of Ninety-Six, received General Washington when
upon the Southern tour, from the authorities of Georgia, and
conducted him by the Pine House to the Ridge, which was near
the termination of his territorial jurisdiction  At the Ridge,
General Hampton, then sheriff of what was called Camden
District, received and conducted him by Granby, through Cam-
den and thence to Charlotte, North Carolina, where the
authorities of that State received the illustrious patriot. (There
is certainly an error here. Washington passed through the
District in 1791).

In 1796 General Pickens resigned the office of Major-
General of the upper division of South Carolina militia and
through his recommendation William Butler was elected by the
State Legislature to fill the vacancy. In 1800 General Butler
became a candidate for Congress against Robert Goodloe Har-
per, the incumbent from the Ninety-Six District. Mr. Harper
had been elected as a Republican, but from conscientious
motives joined the Federalists and supported what was pecu-
liarly unpopular at the South—Jay's Treaty.  This raised
opposition to him at home and General Butler was selected as
the opposition candidate, his old commander, John Ryan, mov-
ing the nomination. He succeeded in the election and took
his seat in 1801.

When the resolution, charging General Wilkinson with com-
plicity with Burr, in his attributed treason, was moved and
adopted in the House of Representatives, the occasion gave rise
to great sensation.  A discussion took place upon the floor as

Generated on 2022-10-18 18:18 GMT / https://hdl.handle.net/2027/coo.31924039930hb
PUBLIC DOMAIN / http://www.hathitrust.org/access_usepo

Digitized by
CORNELL UNIVERSITY

Original from
CORNELL UNIVERSITY

Compendium_Roth
Page 0110

# ARMED
# IN
# AMERICA

### A HISTORY OF GUN RIGHTS *from*
### COLONIAL MILITIAS *to* CONCEALED CARRY

PATRICK J. CHARLES

 Prometheus Books

59 John Glenn Drive
Amherst, New York 14228

Compendium_Roth
Page 0111

Published 2018 by Prometheus Books

*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry.* Copyright © 2018 by Patrick J. Charles. All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, digital, electronic, mechanical, photocopying, recording, or otherwise, or conveyed via the Internet or a website without prior written permission of the publisher, except in the case of brief quotations embodied in critical articles and reviews.

Top cover image © Media Bakery
Bottom cover image © Jamie Carroll / Shutterstock
Cover design by Liz Mills
Cover design © Prometheus Books

Every attempt has been made to trace accurate ownership of copyrighted material in this book. Errors and omissions will be corrected in subsequent editions, provided that notification is sent to the publisher.

Inquiries should be addressed to
Prometheus Books
59 John Glenn Drive
Amherst, New York 14228
VOICE: 716–691–0133. • FAX: 716–691–0137
WWW.PROMETHEUSBOOKS.COM

22 21 20 19 18    5 4 3 2 1

Library of Congress Cataloging-in-Publication Data

Names: Charles, Patrick J. (Historian), author.
Title: Armed in America : a history of gun rights from colonial militias to concealed carry / Patrick J. Charles.
Description: Amherst, New York : Prometheus Books, 2018. | Includes index.
Identifiers: LCCN 2017028290 (print) | LCCN 2017039818 (ebook) | ISBN 9781633883147 (ebook) | ISBN 9781633883130 (hardback)
Subjects: LCSH: Firearms—Law and legislation—United States—History. | Gun control—United States—History. | BISAC: POLITICAL SCIENCE / Constitutions. | HISTORY / United States / General.
Classification: LCC KF3941 (ebook) | LCC KF3941 .C49 2018 (print) | DDC 344.7305/33—dc23
LC record available at https://lccn.loc.gov/2017028290

Printed in the United States of America

3 1223 12351 3096

*For my daughter, Addison Harper Charles.*

Compendium_Roth
Page 0112

# CONTENTS

| | |
|---|---|
| Acknowledgments | 9 |
| Introduction | 11 |
| Chapter 1. "In Guns We Trust": Bearing Arms in America Today | 19 |
| Chapter 2. The Antecedents of the Second Amendment | 41 |
| Chapter 3. American Constitutionalism and the Second Amendment | 70 |
| Chapter 4. The Transformative Nineteenth Century | 122 |
| Chapter 5. The Gun-Rights Movement Develops | 166 |
| Chapter 6. The NRA Commandeers the Gun-Rights Movement | 194 |
| Chapter 7. Gun Rights Under Fire | 231 |
| Chapter 8. The Birth of the Gun-Rights Golden Age | 273 |
| Epilogue | 311 |
| Notes | 317 |
| Index | 541 |

Compendium_Roth
Page 0113

## CHAPTER 3

# AMERICAN CONSTITUTIONALISM AND THE SECOND AMENDMENT

As was addressed in the preceding chapter, at the outbreak of the American Revolution the Founding Fathers' understanding of the right to arms was rooted in the English experience.[1] The right was looked upon as a constitutional check to standing armies and ensured the people, through service in the militia, maintained a vital interest in the preservation of their liberty. For the most part, American conceptions of arms bearing were one and the same with English conceptions. As England developed into a global power and European nations turned to professional armies, however, England was compelled to become far less reliant on the militia, and the entire system fell into disrepute.[2] Yet in the American colonies the militia remained essential. The American colonies' preference for a militia made sense both economically and defensively. Not only was the cost of a militia significantly less than a standing army, the militia was also more geographically encompassing. Rather than maintain expensive military outposts, scattered across the colony, a militia could be easily assembled by any local township or county.[3] This is not to say the militia was without its faults. Nonetheless, the militia was revered as an essential function of republican government and liberty. This reverence for the militia as a republican institution was reflected in late eighteenth-century American constitutionalism.

The first uniquely American constitutions came immediately after the Continental Congress adopted the Declaration of Independence, when John Hancock, the president of the Continental Congress, sent letters to each of the colonial assemblies informing them of the Declaration's effects.[4] Hancock wrote that the Declaration first dissolved "all connection between *Great Britain* and the *American Colonies*" as to "declare them free and independent States," and second was to serve "as the *ground* and *foundation* of a future

Government."[5] On the same day that the Declaration was adopted, the Continental Congress pressed forward with what would eventually be the first United States Constitution, otherwise known as the Articles of Confederation.[6] This was followed by state constitutional conventions. In 1776 alone, Delaware, Maryland, New Hampshire, New Jersey, Pennsylvania, South Carolina, and Virginia all adopted their first constitutions. A year later, Georgia, New York, and Vermont followed suit, with Massachusetts adopting its first constitution in 1780. At the close of the eighteenth century, eleven out of the original thirteen states adopted constitutions.[7] Additionally, the first two United States territories to obtain statehood, Kentucky and Tennessee, passed their first constitutions.[8]

In the majority of these state constitutions was a Declaration of Rights, and the protections afforded in each were largely similar.[9] The liberty or freedom of the press, for example, was in virtually every state constitution. It was merely stated in different terms.[10] The same was true for the right to arms. Five state constitutions recognized the importance of having a "well-regulated militia" and four recognized a general right to "bear arms."[11] The language found within these state constitutions would ultimately find its way into the text of the Second Amendment, which states, "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."[12]

Much like Article VII of the English Declaration of Rights, the Second Amendment presents a number of questions, such as: what was a well-regulated militia by the late eighteenth century? Why was it so necessary to the security of a free state? Was the right to keep and bear arms intimately related to this well-regulated militia, and if so, how?

In recent decades, a handful of lawyers sought to answer these questions by focusing intently on the Second Amendment's text. They broke down the text piecemeal, defined each word or phrase as they understood it, and reassembled the whole.[13] While these lawyers must be credited with bringing new life and purpose into the Second Amendment, their approach and use of evidentiary sources, as this chapter will illuminate, fails to meet the historian's burden.

Historically speaking, it is simply not enough to approach the Second Amendment, or any constitutional provision for that matter, as a linguistic puzzle because historical context, the most relied upon, accepted, and important implement to recreating and understanding the past, is generally lost in the process.[14] Historical context is in fact the very first lesson every student of history learns, and it is particularly important when deducing a writer's words or intentions—what is otherwise known as the history of ideas, or intellectual

Compendium_Roth
Page 0114

history.[15] Historians know that words are inert and must be placed in the time of their construction. If a writer's meaning changes, it is only due to, in historian Joyce Appleby's words, the "imaginative processes" of later "human inventors and users," not the originating writer.[16] Thus, whenever historians seek to understand or dissect the past, they must remain aware in order to balance historical texts, images, and theories responsibly, with precision, and to connect them to a particular historical world.[17]

Historians must never assume meaning with a modern predisposition.[18] Rather, when seeking to understand the past, historians must import historical language into its proper construct, "point out conventions and regularities that indicate what could and could not be spoken in the language, and in what ways the language qua paradigm encouraged, obliged, or forbade its users to speak and think."[19] To state this differently, in order to understand the past the historian must do more than decipher text and hypothesize what the text could mean. Certainly deciphering text, including constitutional text, is an important part of any historical assessment. However, it is a useless endeavor if performed without historical context. And in order to obtain historical context the historian must retain historical consciousness.

Retaining historical consciousness is not the same as using one's historical imagination. Drawing conclusions from one's historical imagination is nothing more than building upon speculations and predispositions. Conversely, to retain historical consciousness is to understand the past on its own terms; that is what the evidentiary record assuredly informs us.[20] As Pulitzer Prize—winning historian Gordon S. Wood aptly put it, "To possess a historical sense does not mean simply to possess information about the past. It means to have a different consciousness, a historical consciousness, to have incorporated into our minds a mode of understanding that profoundly influences the way we look at the world."[21]

A fitting example to differentiate between retaining consciousness and using one's imagination is the history surrounding Article VII of the 1689 English Declaration of Rights, which was outlined in the preceding chapter. Recall how the evidentiary record, particularly the political commentary and debates surrounding Parliament's dissatisfaction over the 1661 and 1662 Militia Acts, showed that Article VII was adopted with the parliamentary right of self-preservation and resistance in mind.[22] This is the very epitome of retaining historical consciousness, for it is an assessment of the past based on historical context and what the evidentiary record provides, not what may be inferred or theorized. In contrast, using one's historical imagination would be to the follow the path of Joyce Lee Malcolm, who made a number of historical

inferences about Article VII that turned out to be unsubstantiated by the evidentiary record.[23]

In defense of Malcolm, there is certainly nothing wrong with her, or any historian for that matter, making some assumptions. Regardless of how much historical evidence is unearthed on a particular time, event, or subject, historians have to make assumptions about the past.[24] However, it is the duty of historians to minimize the size and number of assumptions that they make by eliciting historical context to the greatest detail. Moreover, historians must not organize historical knowledge upon assumptions without realizing what they are doing and then "make inferences from that organization and claim that these are the voice of history."[25] This is essentially where Malcolm faltered. Malcom built her entire thesis on the assumption that Article VII was meant to enshrine a right for Englishmen to have and to hold weapons for self-defense and then arranged all the historical evidence to fit that narrative. The important point to be made is that in order to fully understand the past, including the historical genesis of the Second Amendment, one must contextualize and accept the past on its own terms, as well as contextualize and accept the political, ideological, and philosophical origins from which the right developed.

As with any constitutional right, the idea behind the Second Amendment did not materialize out of thin air. It arose from experience and dialogue. So far as historians know, the earliest conception of a right to arms appeared in the writings of Niccolò Machiavelli and James Harrington and subsequently flourished in England's political discourse of the late seventeenth century.[26] But despite a number of political writers emphasizing the importance of the right to arms and its intimate connection with a constitutional well-regulated militia, the English militia, as an actual functioning military defense system, had been inadequate since the time of Queen Elizabeth.[27]

This factual inconvenience did little to dissuade political writers from romanticizing the past—especially Roman and Florentine times, when militia service and arms-bearing were considered an important badge of citizenship—and restoring the militia to its proper historical pedestal.[28] Consider, for example, the 1699 political tract *A Letter to a Member of Parliament*, where a framework for the establishment of a constitutional militia was laid out.[29] In the tract, it was asserted that the safety and preservation of England should not be trusted to the "*Country Rabble*, or a *Giddy Multitude*," but to the "whole united Power of both" the landed gentry and all "capable of bearing Arms."[30] It was also emphasized that the entire militia be "well Arm'd and Disciplin'd" and "under good Discipline, and skilful Officers."[31] Militiamen were not to be armed, equipped, and merely sent on their way. Rather, to constitute a constitutional militia required

Compendium_Roth
Page 0115

military discipline and training, both individually and collectively. This was due to the fact that in the late seventeenth century military efficiency and movement were premised on economy of force. The effectiveness and power of each volley or charge was useless unless the militia acted in unison. Moreover, a company or battalion could not defend itself from an assault, by either infantry or cavalry, if the entire militia did not maneuver and work together as one.[32]

The freethinking and progressive writings of Andrew Fletcher and John Toland, the most liberal militia proponents of the late seventeenth century, also conveyed this very basic yet important principle. Fletcher made sure to differentiate between a militia that was "under no other Discipline than that of an ordinary and ill-regulated Militia" and one that was well-regulated.[33] A "well-regulated Militia," wrote Fletcher, was capable of defending "against any Foreign Force" so that the "Nation may be free from the Fears of Invasion from abroad, as well as from the Danger from Slavery at home."[34] A well-regulated militia was not to be confused with an armed citizenry. Rather, a well-regulated, effective, and constitutional militia required men of all classes acting together as one.[35] This brought social and civic balance to the "minds of men, as well as forming their bodies, for military and v[irtuous] Actions."[36] Conversely, for society to do nothing but arm the militia served no other purpose than to create an armed mob because arms alone did not provide the requisite training and discipline necessary to defeat a professional army:

> A good Militia is of such Importance to a Nation, that it is the chief part of the Constitution of any free Government. For tho as to other things, the Constitution be never so slight, a good Militia will always preserve the publick Liberty. But in the best Constitution that ever was, as to all other parts of Government; if the Militia be not upon a right foot, the Liberty of that people must perish.[37]

Toland was also a proponent for "modeling and disciplining" the militia to preserve the English Constitution.[38] Also like Fletcher, Toland emphasized how virtue, education, and military and civil discipline were essential in establishing a well-regulated militia:

> [I]n a well-regulated Militia Gentlemen make their Discipline to be properly an Exercise or Diversion in time of Peace; and in War they fight not only to preserve their own Liberty and Fortunes, but also to become the best Men in their Country. . . . After all, if Gentlemen will be at the pains of fighting for their own . . . tis surely worth their while to learn the Art of doing it.[39]

Where Toland distinguished himself from Fletcher was in his rejection of the lower classes participating in the militia. While Fletcher did not see a problem with accepting "Servants"—that is, so long as "many Persons of Quality or Education be among them"—Toland was for limiting militia participation to "Men of Property, or Persons that are able to live of themselves."[40] According to Toland, what separated freemen from servants was their respective interests in society. While freemen fought "for their Liberty and Property," servants had "nothing to lose but their Lives."[41]

Although Fletcher and Toland disagreed on the composition of the militia, they agreed that only a well-regulated militia would do any service to the nation.[42] An effective well-regulated militia required, as one mid-eighteenth-century political writer put it, "nothing less than uninterrupted daily Exercise, penal Laws, severe Discipline, military Authority, and Subordination," for the "whole Strength" of a militia "consists of cohesion . . . of its Individuals; and their destructive Power, in their quick, yet cool Manner of Firing" as a "Body of Men" or one cohesive unit.[43] Without this cohesion it was foreseen:

> [S]hould you take your Fire-Arms along with you, that John in the Rear will be firing his Piece into the Back-side of his Friend Tom in the Front; or, which would be still worse, blow out the Brains of his noble Captain. To some of your intrepid Patriots and Heroes, who are resolved, dam-me! to fight, Blood to the Knees, in Defence of their Lives, Wives, and Properties, these may seem Considerations of no Importance. . . . But the Dangers to which you are about to expose yourselves are infinite. . . . Seriously, Gentlemen, I assure you, that a Firelock, with a Bayonet fixed on the End of it, is a very awkward Kind of Instrument; and that it requires more Dexterity than you may be aware of, to manage it, without wounding your Neighbors. Many and frequent are the Accidents . . . among regular Troops. . . . What therefore may be expected from half-disciplined Men, I need not inform you.[44]

This understanding of a well-regulated militia—that is, a constitutional body of citizens capable of bearing arms where men would train together in the Art of War and an *esprit de corps* would flourish—remained influential on both sides of the Atlantic. In 1739 Massachusetts, Reverend Samuel Mather, the son of Reverend Cotton Mather, published a tract entitled *War Is Lawful, and Arms Are to Be Proved*. While underscoring the importance of uniform and proper arms, Mather stated that such arms were useless if "their designed End is not attain'd."[45] This end required that citizens have knowledge in the "Use and Exercise" of arms and be able to demonstrate it.[46] And to those citizens who were not properly instructed in the Art of War, Mather was of the opinion:

And, if any *pretend to appear in Arms*, which They *know not how to use*, because *They never exercised and proved* Them, *They deserve to be condemned for their Folly and Rashness* . . . when and where *Men have not known the use of warlike Instruments*, and have bin [sic] *unacquainted with Military Order*, the *strongest Party has generally*, if not always, *prov'd victorious and triumphant*.[57]

In addition to political tracts, the constitutional significance and purpose of a well-regulated militia was frequently conveyed in eighteenth century militia law preambles.[48] These preambles were not empty rhetoric. They served to remind the reader of the purpose and significance of the law.[49] As early as 1660, Massachusetts law recognized that "the well Ordering of the Militia is a matter of great concernment to the safety & welfare of this Commonwealth."[50] In 1724, New York adopted a militia law that proclaimed, "Whereas an orderly and well disciplin'd Militia is justly esteemed to be a great Defence and Security to the Welfare of this Province . . ."[51] Then there was Pennsylvania, which included the following preamble in its 1757 Militia Act:

Whereas *Self-preservation* is the first principle and law of nature, and duty that every man dispensibly owes not only to himself but the *Supreme* Director and Governor of the *Universe*, who gave him *Being*; And Whereas; in a state of *political Society* and *Government*, all men, by their *original compact* and *agreement*, are obliged to unite in *defending* themselves and those of the same community, against such as shall attempt unlawfully to deprive them of their just rights and liberties, and it is apparent to every *rational creature*, that without defence no government can possibly subsist.[52]

The preamble's reference to the right of self-preservation was an acknowledgement of the much larger philosophical principle outlined in the preceding chapter, that is, that a well-regulated militia ensured the people's rights, liberties, and property were protected from destruction. Also, a well-regulated militia was seen as uniting the community for the greater good or, as the Pennsylvania Assembly put it, a "well-regulated Militia is the most effectual guard and security of every country" and essential "for the safety and security of our constituents."[53] But in order to accomplish the people's security and safety, the militia had to be properly "armed, trained, and disciplined, in the art of war."[54] Only then could the people, through the militia, effectively "assert the just rights of his majesty's crown" and "defend themselves, their lives and properties, and preserve the many invaluable privileges they enjoy under their present happy constitution."[55]

Noting the importance and purpose of a well-regulated militia in militia law preambles continued into the late eighteenth century, both prior to and after the ratification of the United States Constitution. In 1777, Maryland's militia law stated, "Whereas a well regulated militia is the proper and natural defence of a free government . . ."[56] In the same year, New York's militia law proclaimed, "Whereas the Wisdom and Experience of Ages, point out a well regulated Militia, as the only secure Means for defending a State, against external Invasions, and internal Commotions and Insurrections . . ."[57] In 1779, Rhode Island's militia law read, "Whereas the Security and Defence of all free States essentially depend, under God, upon the Exertions of a well regulated Militia . . ."[58] Meanwhile, North Carolina's 1777 militia law read analogous to the prefatory clause of the Second Amendment, stating, "Whereas a well regulated Militia is absolutely necessary for the defending and securing the Liberties of a free State . . ."[59]

What these late-eighteenth-century preambles collectively demonstrate is that a well-regulated militia was viewed as a crucial aspect of American liberty. The belief in a well-regulated militia as the people's birthright and security permeated throughout the American Revolution. As Thomas Paine wrote in *Common Sense*, "A well-regulated militia will answer all the purposes of self-defence, and of a wise and just government."[60] Joseph Reed, the President of Pennsylvania's Supreme Executive Council, delivered similar sentiments to the militia by reminding them of the "inestimable advantages of a well regulated militia."[61] Then there was Timothy Pickering, who inscribed on the title page of his 1775 treatise *An Easy Plan for the Militia* the following: "Almost every *free* State affords an Instance of a National Militia: For *Freedom* cannot be maintained without *Power*; and Men who are not in a Capacity to *defend* their *Liberties*, will certainly *lose* them."[62]

Pickering, a future secretary of war, secretary of state, and member of Congress, was a strong militia proponent.[63] Having studied under British military officers, Pickering authored two treatises on the organizing, disciplining, and training of the militia. In 1769, Pickering's first treatise appeared in the *Essex Gazette* under the penname "A Military Citizen" and received praise for diffusing "a true military Spirit throughout" Massachusetts.[64] It sought to address "the true Design of the Militia, and of Training-Days" by prescribing an effective system of military discipline.[65]

Pickering started his treatise by addressing the importance of the militia as a whole:

The Design of a Militia . . . is principally for the Security of the Country against the violent Attempts of its Enemies. But this Security is to be

Compendium_Roth Page 0116

Compendium_Roth
Page 0117

obtained only by making the Militia acquainted with Military Discipline; and that is the *principle End* and Business of Training-Days. But the well disciplining [of] the Militia not only gives us this Security, but also answer these very important Purposes; it renders useless that dangerous power, and grievous Burden, a *standing Army*, and has a natural Tendency to introduce and establish good Order; and a just Subordination among the different Classes of People in the Community.[66]

In particular, Pickering observed how training days, as constituted, were highly inefficient in providing an effective militia. One day would be "spent in firing at Mark," yet the actual military maneuvers were nothing but a "mock-Engagement" where men "learn a little of Military Discipline."[67] Pickering queried, "Is it worth while to keep such a Militia on Foot? Is it not a real Injury to the Province? A useless, nay a mischievous Expence of Time, of Money, of Ammunition?"[68] He then proceeded to answer his own questions:

[B]ecause the Men learn nothing, or next to nothing, of Military Discipline . . . instead of good Order and a just and necessary subordination, such Training serves only to introduce, encourage and promote Licentiousness, a Disregard to all Order, and Contempt of those in Office. . . . The best Method of obtaining this Knowledge in Military Affairs, is by the Officers reading the Exercise repeatedly by themselves; and at certain Times meeting together, and then again reading and explaining it, and communicating to each other whatever Discovering they have made in any Points not so clearly expressed. . . . And let every Action, or Evolution, be tried and performed as soon as it is read.[69]

Pickering's views on the importance of military discipline and training to effectuate a well-regulated militia were quite common. As other military commentators before him, Pickering did not believe arms by themselves, the firing of arms, or the individual exercise of arms would constitute an effective well-regulated militia.[70] To merely comprise a militia of men in arms, with little military training and discipline, was an unregulated or ill-regulated militia, not a well-regulated one. In Pickering's words:

The Manner of loading and firing as explained in the *Manual Exercise* is designed . . . to teach us to do every Action together, as well in the most expeditious Manner. For it is not the scattering Fire of one here, and another there, just as they happen to get loaded, that will frighten regular Troops—



This British political cartoon was intended to be a humorous depiction of the ineffective nature of late-eighteenth-century militia training days. In the lower left corner, a militiaman is aiming a cannon in the direction of a completely unorganized and undisciplined militia formation. In the lower right corner, other militiamen are drinking heavily, with one of them handing his rifle to a prostitute. (Richard Godfrey, "A Field Day, or the City Militia," 1779. Image courtesy of the library of Congress.)

Compendium_Roth
Page 0118



This British political cartoon sought to highlight how the militia was often comprised of nothing more than an armed rabble. The officer leading the formation is depicted as being sufficiently overweight. Meanwhile, the first row of the militia formation is comprised of a shoe cobbler, brick layer, artist, tailor, and barber, which is intended to convey that the militia, as constituted, was ill-suited as a military fighting force. (James Gillray, "Supplementary-Militia, Turning-Out for Twenty-Days Amusement," 1796. Image courtesy of the Library of Congress.)

No it is the close, compact Fire of large Number at once, by which whole Ranks are slaughtered, that dismays an Enemy and puts them to Flight. But granting that we had the most perfect Use of the Firelock (which is by no Means true) and could load and fire with the exactest Uniformity; and were besides, drawn up in the most complete Order to engage an Enemy. . . . For the Ranks and Files would by that Movement be so broken and disordered, that our bare Knowledge of the Firelock would do us very little Service, and before we could get into Order again, the Enemy might cut us to Pieces. The right Use of the Firelock therefore is not the whole, nay it is the smallest Part, of military Discipline.[71]

Six years later, Pickering published his second treatise, *An Easy Plan for the Militia*. It was such a respected work in the field of military discipline that General George Washington ordered six copies to assist in training the Continental Army, and the Massachusetts Provincial Congress officially adopted the treatise "to instruct and exercise" the Massachusetts militia at "all their publick Trainings and Musters accordingly."[72] Pickering was ultimately inspired to write *An Easy Plan for the Militia* because the customary training manual, known as the Norfolk exercise, was not "short and easy" as it should be.[73] He found many of the "actions and motions" to be "useless, or needlessly" repetitive, and therefore set out to reform militia training so that men might "learn all the essential parts of discipline."[74] To Pickering, the problem with all preceding military manuals and treatises was that maxims were "blindly adopted, without any examination of the principles on which they are founded."[75] While it was certainly important to instruct the militia in the art of war as the manuals intended, it was equally important that "the men be clearly informed of the Reason of every action and movement—or the Uses to which they can be applied."[76]

Here, what Pickering wanted to convey was the idea that knowledge was an essential part of military discipline. This is a military principle that carries on to this day. In its basic form, the principle requires that every member be able to perform the military functions of other members so that when one member falls another takes their place. The principle applies to all ranks, military subordinates, and superiors. No matter who falls on the day of battle, someone within the ranks must carry on and assume the role:

As the militia of America is composed of men of property, and will be engaged, not to make conquests for Ambition, but merely in their own defence; so they will need only information of their duty to dispose them to do it. . . . When men see the reason and use of any action or movement, they

Compendium_Roth
Page 0119

will learn it with much more alacrity and pleasure. 'Tis particularly requisite for the militia to be informed in what cases and circumstances the several parts of the exercise, but especially of the evolutions, may be applied, and used to advantage. There is a great variety of movements useful on different occasions, "but they ought never to be performed without explaining to the soldiers the *meaning*, and the *benefit* that may be drawn from them;" by this means the men will be enticed into discipline, and be ready to perform what is required on all occasions. . . . Caesar mentions a remarkable instance in which the knowledge and experience of his private soldiers saves his army. . . .

Amidst these difficulties, two things, says Caesar, fell out to the advantage of the Romans: one was, the knowledge and practice of the soldiers; because, having gained experience in former battles, every soldier know what was proper to be done in such an emergency, as well as his officer. To remedy the want of experience as much as possible, the militia should be let into the ground and reason of every action and movement; to which it experience should ever be added, their ability to attack or defend must vastly exceed that of those whose skill is found on mere practice.[77]

Naturally, the acquisition of military knowledge required repeating the basic tenets of the military exercise.[78] These tenets included firing, marching, wheeling, maneuvering, evolutions, and understanding the importance of military subordination.[79] The tenets of the military exercise were not acquired by each individual exercising the motions, but by the professional exercise of the militia as a collective body.[80] This fostered an *esprit de corps* among the men, as well as ensured that the militia was an effective military force.

Suffice it to say, Pickering's overall approach to training the militia was a gradual one. Militiamen were instructed in single "squads" so that the officers could easily correct "what is amiss."[81] It was only once the militiamen performed "well in this manner" that they were exercised in ranks.[82] The process was slow but necessary in order to ensure the "greatest possible uniformity in the motions."[83] Uniformity, whether it was in maneuvers, evolutions, or firing, promoted discipline and produced an economy of force.[84] "These actions should be performed with quickness and uniformity, and with grace," wrote Pickering, because the entire purpose was "to throw as many shot as possible at your enemy; with *uniformity*, to prevent the interruptions to each other, [and] the confusion and dangerous accidents which would inevitably happen."[85] Certainly the uniform discharge of arms was important, but it was nowhere near as important at being able to maneuver. Pickering had briefly touched on this point in his first militia treatise and expounded on it in *An Easy Plan for the Militia*:

In the militia we are apt to lay too much stress upon, and almost to think ourselves disciplined, if we can perform the manual exercise . . . the principal part of all exercise depends upon the *legs*: and that to the legs we ought to apply ourselves. That is to say, the men should, above all things, be taught and accustomed to march in exact order, and in equal time, lifting up their feet and setting them down together, with perfect regularity. . . . [W]hoever does not follow this method, is ignorant of even the first elements of the art of war.[86]

Pickering was clearly knowledgeable on training the militia, and what his writings inform us is that the Massachusetts militias that assembled to face the British at Battle of Lexington and Concord, and later isolated the British within the Boston Neck, were viewed as much more than a random assemblage of armed men. Thanks in part to Pickering, these militias had been training, drilling, and preparing for almost a year.[87]



The above imprint captures the way many late-eighteenth-century Americans remembered the Battle of Lexington and Concord. While a group of militiamen evacuated colonists from the battleground, the bulk of the militia force is valiantly battling the British Army head on. (Elkanah Tisdale, "Battle of Lexington," 1790. Image courtesy of the Library of Congress.)

Compendium_Roth
Page 0120

Outlining the importance that the Founding Fathers placed on military discipline and training to effectuate a constitutional well-regulated militia is vital because there are many contemporary Americans who improperly equate a well-regulated militia as being one and the same within a mere armed citizenry.[88] Nothing could be further from the truth. The Founding Fathers would have categorized such militias as ill-regulated, unregulated, or an armed mob. To the Founding Fathers, a well-regulated militia indicated something far more specific—and far more important—than an armed citizenry. A well-regulated militia provided constitutional balance and united the people in defense of their rights, liberties, and property in order to unite the people as a common community.

Another common misconception among some contemporary Americans is that the Founding Fathers understood the right to arms as embodying a "right to associate in militia companies independent of the government and use those arms against despotism."[89] While there were indeed "independent" militia companies both during and after the American Revolution, said companies existed at the behest of the colonial governments, and later the federal and state governments.[90] Consider the Fairfax County Militia Association, which was one of many independent Virginia militias under the direction of local committees of safety, each of which represented the interests of the local populace.[91] The impetus behind creating the independent Virginia militias was not to facilitate some independent right to assemble as a militia trained in the military discipline and exercise. They were assembled at the behest of the Virginia Convention. As Colonel George Mason, who would later draft the 1776 Virginia Declaration of Rights, wrote, the "Regulation & Establishment" of the Fairfax County Militia Association was only "to be preserved & continued, *until a regular and proper Militia Law* for the Defence of the Country shall be enacted by the Legislature of this Colony."[92]

Mason's reference to a "proper Militia Law" was the expiration of Virginia's militia law in July 1773.[93] This contextually explains why the Virginia Convention agreed to the formation of independent militia companies, each with their own rules and regulations.[94] Eventually, in 1775, the Virginia Convention passed a comprehensive militia law, and the independent militias were disbanded.[95] There were multiple reasons for this, but none more important than the fact that the independent militias lacked proper military discipline and training. As historian William E. White explains:

> [T]he problems with discipline were great. The method of voting prior to each decision made the officers ineffective and enlisted men insubordinate. Officers refused to obey the command of their commander in chief, and enlisted men as well as officers absented themselves as often as they liked for trips to the tavern. Disorder was the order of the day. . . . Men fired weapons for no apparent reason, an action which caused great confusion among green recruits fearful of attack and wasted precious powder.[96]

Virginia was not the only colony lacking a well-regulated and effective militia. A number of colonies, due to a number of reasons, were faced with a similar problem. It was primarily for this reason that General Washington and the Continental Congress formed the Continental Army. However, given that a standing army was the antithesis of republican government and liberty, selling the idea to the colonial assemblies proved to be a difficult task. What unfolded was a compromise in which the Continental Congress would only control the Continental Army, and the provincial assemblies would retain control of their respective militias. The compromise was later challenged by General Washington, who wanted the militias within his camp to be placed under his administrative and operational control.[97] Samuel Adams forcefully dissented:

> It is certainly of the last Consequence to a free Country that the Militia, which is the natural Strength, should be kept on the most advantageous Footing. A standing Army, however necessary it may be at some times, is always dangerous to the Liberties of the People. [While] Soldiers are apt to consider themselves as a body distinct from the rest of the Citizens . . . The Militia is composed of free Citizens. There is therefore no Danger of their making use of their Power to the destruction of their own Rights, or suffering others to invade them. I earnestly wish that young Gentlemen of military Genius . . . might be instructed in the Art of War, and at the same time taught the Principles of a free government, and deeply impressed with a Sense of the indispensable Obligation which every member is under to the whole Society.[98]

Adams also divulged his feelings on the matter in a newspaper editorial signed "Caractacus." He noted the importance of ensuring that the militia was independent of federal control, writing that only "people of the smallest property, and perhaps of the least virtue among us" would join continentally paid minutemen.[99] Adams further noted, "It is needless to declaim long upon the advantages of a well regulated militia. A knowledge of the use of arms is the only condition of freedom."[100] He went on to add that military knowledge "often precludes the use of arms," proving that virtue and training was seen as a justifiable prerequisite for arms bearing.[101]

Other Founding Fathers were just as forthright in expressing their prefer-

Compendium_Roth
Page 0121

ence for a well-regulated militia over a standing army. John Hancock, for one, preferred a well-regulated militia because from it "we have nothing to fear; their interest is the same with that of the state."[102] Hancock elaborated on this common "interest" as being akin to Machiavelli's *virtù*, writing that the militia "march into the field with that fortitude which a consciousness of the justice of their cause inspires . . . they fight for their houses, their lands, for their wives, their children . . . they fight for their liberty, and for themselves, and for their God."[103] Prominent attorney, advocate, and politician Josiah Quincy also preferred a well-regulated militia over a standing army. In the 1776 tract *Observations on the Act of Parliament*, Quincy wrote that in order to maintain a "free government," arms should be in the hands of "those who have an interest in the safety of the community, who fight for their religion and their children."[104] "Such are a well regulated militia," wrote Quincy, because it is "composed of the freeholders, citizen and husbandman, who take up arms to preserve their property as individuals, and their rights as freemen."[105]

The Founding Fathers preference for a well-regulated militia over a standing army was codified in the Articles of Confederation. Article VI, section 4 provided that "every State shall always keep up a well-regulated and disciplined militia, sufficiently armed and accoutred, and shall provide and constantly have ready for use, in public stores, a due number of field-pieces and tents, and a proper quantity of arms, ammunition, and camp equipage."[106] Article VI, section 4 was not empty rhetoric. On June 23, 1781, just months after the ratification of the Articles, Pennsylvania governor Joseph Reed attested to its importance. Confronted with an ineffective militia to defeat the British, Reed wrote to the Pennsylvania Assembly of the need for reforms in order to repel the British. A reformed militia would not only "render effective assistance" to the Continental force, but would also properly "avail ourselves of the disposition and virtue of this class of men."[107] To support his request, Reed invoked Article VI, section 4, writing, "I cannot therefore have any other view in this Address, than an anxious desire to preserve the honor and support the interest of the State, in maintaining a well regulated militia, which the Articles of Confederation and the voice of wisdom and sound judges declare not only to be highly proper, but indispensably necessary."[108]

In the end, the Articles never lived up to the Founding Fathers' expectations.[109] This was in part due to the Articles failing to sufficiently provide for the national defense. In August 1786, the events of Shays's Rebellion underscored this deficiency. The rebellion developed when Captain Daniel Shays, a Revolutionary War veteran from Massachusetts, led a group of dissolute farmers, who were having their lands confiscated for failure to pay their debts. Years prior to

the outbreak of the war, the courts were intentionally shutdown by the revolutionaries to prevent the Crown from officially seizing farmers' lands due to unpaid taxes. It took fifteen years for the Massachusetts courts to reopen, and, when they did, there remained many outstanding debts that created many insolvent farmers, many of whom were Revolutionary War veterans. Shays and others responded by taking up arms to prevent any of the courts from sitting.[110]

The military force that ultimately dismantled the rebellion was not the well-regulated state militias promised under the Articles of Confederation. Rather, it was defeated by a private army raised by former Continental Army major general Benjamin Lincoln. By January 1787 the rebellion was in check. As for the rebels' punishment, Lincoln wrote to Washington that it "must be such, and be so far extended as thereby others shall be deterred from repeating such acts of outrage in [the] future."[111] Still, the government could not be too stern. Lincoln felt that, in the "hour of success," the government should "hold out . . . terms of mercy."[112] Such an act of forgiveness would "apply to the feelings of the delinquents, beget in them such sentiments of gratitude and love by which they will be led to embrace with the highest cordiality that Government which they have attempted to trample under foot."[113]

To the dismay of Lincoln, Washington, and certainly others, Massachusetts did not propose such favorable terms. On February 16, 1787, the Massachusetts legislature granted Governor James Bowdoin the authority to pardon anyone who participated in the rebellion, but only on the following conditions:

> That they shall keep the peace for the term of three years . . . and that during that term of time, they shall not serve as Jurors, be eligible to any town office, or any other office under the Government of this Commonwealth, and shall be disqualified from . . . giving their votes for the same term of time, for any officer, civil or military, within this Commonwealth, unless such persons, or any of them, shall . . . exhibit plenary evidence of their having returned to their allegiance . . . That it shall be the duty of the Justice before whom any offender or offenders aforesaid may deliver up their arms, and take and subscribe the oath aforesaid . . . and it shall be the duty of the Justice to require such as shall take and subscribe the oath of allegiance, to subjoin their names, their places of abode, and their additions, and if required, to give to each offender who shall deliver up his arms . . . a certificate of the same under his seal . . . . and it shall be the duty of such Major General or commanding officer, to give such directions as he may think necessary, for the safe keeping of such arms, in order that they may be returned to the person or persons who delivered the same, at the expiration of said term of three years, in case

Compendium_Roth
Page 0122

such person or persons shall have complied with the conditions above-mentioned, and shall obtain an order for the re-delivery of such arms, from the Governour.[114]

Worth noting is the condition that the rebels forfeit their arms for a period of three years. Throughout the Revolutionary War, the forfeiture of arms was in fact quite common. Similar to the practice of their English forefathers, the Founding Fathers disarmed those deemed to be disloyal or who failed to take the oath of allegiance.[115] It was for this reason that there was no vocal objection to the Shays rebels' disarmament.[116] It did not matter that Article XVII of the 1780 Massachusetts Constitution's Declaration of Rights protected the right of the people to "keep and bear arms for the common defence."[117] For Article XVII was not understood as an individual right to acquire, own, and use arms for any and all purposes. Rather, Article XVII was viewed as being intimately tied to militia service.[118]

An act passed by the Massachusetts legislature immediately following Shays's Rebellion confirms this:

> Whereas in free government, where the people have a right to keep and bear arms for the common defence, and the military power is held in subordination to the civil authority, it is necessary for the safety of the state that the virtuous citizens thereof should hold themselves in readiness, and when called upon, should exert their efforts to support the civil government and oppose attempts of factitious and wicked men who may wish to subvert the laws and constitution of their country.[119]

Seven years later, in a general order, Massachusetts Militia adjutant general William Donnison delivered a similar construction of Article XVII:

> A well regulated Militia, composed of the great body of the Citizens, is always the chief dependence of a free people for their defence. Americans have ever esteemed the right of keeping and bearing Arms, as an honorable mark of their freedom; and the Citizens of Massachusetts, have ever demonstrated how highly they prize that right, by the Constitution they have adopted, and the laws they have enacted, for the establishment of a permanent Militia—by the readiness and alacrity with which they equip themselves, and march to the field—and by the honest pride they feel whenever they put on the exalted character of Citizen-Soldiers.[120]

Like many before him, Donnison understood the link between arms bearing, liberty, and the advancement of the public good. The right to arms was not a license to resist perceived tyranny. An anonymous 1789 editorial in the *Independent Chronicle* illustrated this very point by posing the question "What would you think of a militia who should use their arms to oppress, terrify, plunder, and vex their peaceable neighbours, and then say they were armed for the common good, and must be free?"[121] The question was posed to make the point that the "freedom of the press" could be regulated to protect the "reputation," "feelings," and "peace of a citizen."[122] The same premise held true for the right to arms. As the editorial pointed out, "There are laws to restrain the militia," and any laws that restrict the freedom of the press were similar because both "prevent the wonton injury and destruction of individuals" and ensured there was a legal "line some where, or the peace of society would be destroyed by the very instrument designed to promote it."[123]

The understanding that the right to arms did not include a right to resist perceived tyranny was sufficiently outlined in a series of newspaper editorial exchanges contemporaneous with the events of Shays's Rebellion. The editorials centered on the constitutionality of the Portland Convention, which was an assemblage of Maine counties considering a separation from Massachusetts. While the Convention was seeking the formation of an independent Maine, it raised public suspicions of another Shays's Rebellion.

The editorial exchange began with an article penned by the anonymous Senex, who described the different assemblages as nothing more than "mere mobs" in violation of the Massachusetts Constitution.[124] Senex thought these assemblages violated Articles VII and XIX of the Declaration of Rights. While the former embodied William Blackstone's right of governmental self-preservation, the latter was a constitutional predecessor to the First Amendment.[125] To Senex, it did not matter that there was not any Massachusetts law declaring that assemblages were illegal. In Senex's mind, they were still "evil and dangerous—subversive of all order, peace, or security."[126] They were in violation of the law because the Massachusetts Constitution already provided the people with a means to redress their grievances.[127] In Senex's words, "the people of each town [must] follow the dictates of their invaluable Constitution, by remonstrances to the legislature, and instructions to their several representatives."[128] Any other method of redress, according to Senex, would be to endorse "anarchy and confusion so incident to mobs and conventions."[129]

Under the pen name "Scribble Scrabble," Judge George Thatcher, a member of the Portland Convention and later member of the First Congress, responded to Senex's classification of lawful assemblies as mobs, and did so

Compendium_Roth
Page 0123

90    ARMED IN AMERICA

by distinguishing the Convention from Shays's Rebellion.[130] It was at this juncture that the exchange between Senex and Thatcher turned to late-eighteenth-century rules of constitutional interpretation. Senex's response was one of strict construction. He believed that if the Declaration of Rights provided the people with a constitutional means to redress injuries, it was only through that vehicle that the people might "request (or even demand)" that such injuries be resolved.[131] In contrast, Thatcher interpreted the Declaration of Rights as a social compact with constitutional limits. To Thatcher, the Declaration was not the totality of the people's rights but a list that the government could never usurp. Thatcher's principle disagreement with Senex's interpretation was the way it grouped the Shays's rebels, who were unlawfully armed and rebelling against Massachusetts, with the peaceful Portland Convention that was seeking "Enquiry and information" to erect themselves into a government.[132] Thatcher elaborated on this point:

> In one county the people meet in a Convention to collect the sentiments of the people, and lay them before the General Court. In another they assemble in town meetings, and consult upon the public good. In some counties the people assemble in bodies, and with force and arms, prevent the Courts of Justice sitting according to law . . .
>
>     When we consider the late Portland Convention, as to its constitution and its end, it appears to me essentially different from the meetings of the people in some of the western counties.[133]

Worth noting is Thatcher's reference to the "public good," for it was the entire premise through which eighteenth-century lawmaking and constitutional interpretation was premised.[134] It was also the foundation from which Thatcher would explain the scope of right to arms.

Thatcher's reason for examining the right to arms was to illustrate the impropriety of Senex's limited interpretation of the Declaration of Rights. In Thatcher's words, "where the declaration secures a particular right, in itself alienable, or the use of a right, in the people, it does not at the same time contain, by implication, a negative of any other use of that right."[135] Applying this rule to Article XVII, which provided that the "people have a right to keep and to bear arms for the common defence," Thatcher noted it did not prohibit the people from "using arms for other purposes than [the] common defence."[136] Thatcher reasoned that because Article XVII "does not contain a negative," "the people have the full uncontrouled use of arms, as much as though the Declaration had been silent upon that head."[137]

AMERICAN CONSTITUTIONALISM    91

Thatcher was not claiming that Article XVII afforded an unalienable right to arms for whatever purpose. Rather, he viewed the use of arms for other purposes as an "alienable right" that the legislature could "controul" in "all cases . . . whenever they shall think the good of the whole require it."[138] Ultimately what Thatcher was trying to constitutionally convey was that the Massachusetts Declaration of Rights recognized core "rights and privileges" that are "esteemed essential to the very being of society; and therefore guarded, by being declared such, and prefixed to the constitution as a memento that they are never to be infringed."[139] To state this differently, Thatcher viewed the Declaration of Rights as embodying a constitutional bottom upon which the legislature could never infringe. In the case of Article XVII, this meant the Massachusetts Assembly could never deprive the people from participating in the common defense. Conversely, all other uses of arms were alienable and could be "abridged by the legislature as they may think for the general good."[140]

On January 12, 1787, Senex replied to Thatcher's interpretation of the Declaration of Rights. He feared that Thatcher was inferring that the people had a right to abolish, separate, and reform government as they saw fit. Senex then proceeded to turn Thatcher's argument on its head. He argued that if Article VII "contains no negative," there was "no reason why [the people] have not this right" to "reform, alter, or totally change their government . . . even when their safety does not require it."[141] Senex then applied this same reasoning to Thatcher's interpretation of Article XVII:

> The people have a right to keep and bear arms for the common defence. Have they a right to bear arms against the common defence? According to the gentleman's reasoning, I answer yes; for to say that a man has a certain right, and that he is not denied any other use of the right, is most assuredly saying that he possesses that right for every purpose.[142]

Here, Senex sought to expose a serious flaw in Thatcher's interpretation of Article XVII. By the late eighteenth century, it was well-settled that the right to arms did not embody a right to armed revolt. Such an interpretation ran afoul of the constitutional restraints placed on the right since its inception in the 1689 English Declaration of Rights. It seems, however, that Senex missed the thrust of Thatcher's argument. At no point in his previous editorials did Thatcher advocate the lawfulness of armed rebellion; he actually denounced such behavior as "essentially different" and not seeking a redress of grievances "in a legal way."[143] Still, in order to clarify his argument, Thatcher offered the following response:

Compendium_Roth
Page 0124

The right to reform or alter government, is not created by the Bill of Rights. . . . [I]t is a right independent of the Bill of Rights, and exists in the people anterior to their forming themselves into government. . . . Senex asks if the people have a right to bear arms against the common defence? I answer, that whatever right people had to use arms in a state of nature, they retain at the present time, notwithstanding the 17th article of the Bill of Rights.[144]

Thatcher's response clarifies that he was articulating the right of governmental self-preservation, or what Blackstone deemed the "fifth auxiliary right."[145] He understood that once a civil compact is created, the people "surrender a certain portion of their alienable rights; or rather, to vest in certain persons, a power to make laws for, and controul the alienable rights of, the whole."[146] At the same time, should the government fail to achieve the "end of government" (i.e., the "happiness of the people"), the people, through their representatives, retained the power to reform or alter government.[147] Thatcher elaborated on this point:

The right to institute government, and the right to alter and change a bad government, I call the same right: I see no difference between them. The end of this right is the *greatest happiness* of the greatest number of the people; and the means or object made use of, is government. This right I understand to be a physical power, under the direction of reason, to bring about this *happiness*. Therefore, when the people have agreed upon a certain set of rules, which they denominate government . . . they are binding, on the presumption that they will produce the degree of happiness before mentioned. . . . It is not the existence of government, or any agreement contained therein, that gives the people a right to destroy it when it does not answer the end for which it was instituted. The existence of a bad government only affords an opportunity for this *right* . . . to come into exercise.[148]

In its entirety, the Senex and Thatcher editorial exchange reveals much about late-eighteenth-century constitutional interpretation, including the Founding Fathers' views on the right to arms. Although Article XVII only guaranteed the right to arms for the "common defence," Thatcher did not foreclose other uses of arms for lawful purposes. As Thatcher stated in his penultimate editorial to Senex, "The question is not, whether two persons can have an exclusive right to the same thing, at one and the same time; but, whether the bill of rights, by securing to the people a right originally in them," in a state of nature, "thereby prohibits them the other uses of that right, which they also had originally a right to."[149]

In addition to outlining the legal contours of the right to arms, Shays's Rebellion was in part responsible for discarding the Articles of Confederation and forming the United States Constitution.[150] What Shays's Rebellion taught the Founding Fathers was that the federal government lacked sufficient authority to provide for the national defense. The problem with the Articles—at least from a national defense standpoint—was twofold. First, the Articles made it almost impossible to call forth and direct the militia without first convening Congress and nine of the thirteen states concurring. Merely assembling a congressional caucus was difficult enough, let alone obtaining the necessary supermajority to vote.[151] Second, even if Congress was quickly convened and voted to call forth the militia, there was no uniformity of arms, training, or discipline among the respective state militias—meaning that while some state militias qualified as well-regulated, others were ill-regulated, unregulated, or something resembling an armed mob.

The Founding Fathers sought to remedy these deficiencies when they adopted the Constitution, and they did so by coming to a political compromise; one where authority over the militia was divided between the federal and state governments.[152] Article I, section 8 empowered Congress to call "forth the militia to execute the laws of the union, suppress insurrections and repel invasions," as well as "organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States."[153] The states, meanwhile, retained the power to appoint militia officers and train their militias according to the mode of discipline "prescribed by Congress."[154]

Although this compromise was universally accepted by Federalists, who comprised the majority of delegates attending the Constitutional Convention in Philadelphia, Pennsylvania, anti-Federalists, who were the political minority, viewed it as impeding on states' rights and endangering republican liberty.[155] What was particularly concerning to anti-Federalists was the fact that the Constitution also afforded Congress the power to raise standing armies.[156] It did not matter that Federalists such as James Wilson, Alexander Hamilton, and James Madison each outlined the constitutional necessity of affording the federal government broad military authority.[157] Anti-Federalists believed that the Constitution, as constructed, would lead to the erosion of republican government and liberty.

To voice their concerns and overall dissatisfaction, anti-Federalists took to the press.[158] One anti-Federalist objected to the congressional power to raise and support a standing army because, unlike the militia, it would be composed of "a body of men distinct from the body of the people," "governed by different laws," and proven to be the "main engine of oppression, and the

Compendium_Roth
Page 0125

means of enslaving almost all the nations of the world."[159] Another opined that congressional misuse of the militia might lead to the destruction of both the "public liberty" and the "personal liberty of every man."[160] Meanwhile, Luther Martin, one of the Maryland delegates to the Constitutional Convention, opposed granting the federal government authority over the militia because it encroached upon the states' "*only defence* and *protection* . . . for the security of *their rights* against *arbitrary encroachments* of the *general government*."[161] Martin thought that if the Constitution was to vest authority over the militia in either the federal or state governments, the state governments were in a far better position to understand the "situation and circumstances of their citizens, and the regulations that would be necessary and sufficient to effect a well-regulated militia in each."[162] This would serve the best interests of the national defense and continue to provide the states with the means "to *thwart* and *oppose* the general government."[163] The militia was, in Martin's words, the "*last coup de grace* of the State governments."[164]

The anti-Federalists' approach to fixing these constitutional deficiencies, and others, was to proffer amendments at state ratifying conventions. In some cases the amendments accompanied the respective state convention's ratifying documents, and in others the amendments only appeared in the press.[165] One amendment, proposed by anti-Federalists at the New York Convention, requested that the militia would "not be subject to martial law, except in time of war, rebellion or insurrection," and that a standing army "ought not to be kept up, except in cases of necessity, and at all times the military shall be under strict subordination to the civil power."[166] The anti-Federalists at the Maryland Convention proposed that the Constitution be amended to ensure the state militias could not be "marched out of the state without the consent of the legislature of such state."[167] Multiple state ratifying conventions proposed that "no standing army shall be kept up in time of peace, unless with the consent" of a supermajority of Congress.[168] Meanwhile, with the events of Shays's Rebellion still fresh in the mind of New Hampshire anti-Federalists, the New Hampshire Convention proposed that "Congress shall never disarm any citizen, unless such as is or have been in actual rebellion."[169]

In addition to proffering constitutional amendments that would curtail or supplant federal authority, anti-Federalists proposed a number of amendments that would form a Bill of Rights. Included in some of these proposals were variations on the right to arms. Anti-Federalists within the Pennsylvania Convention, otherwise known as the Pennsylvania Minority, were the first to propose such a right be included in the Constitution:

> That the people have a right to bear arms for the defence of themselves and their own state, or the United States, or for the purpose of killing game, and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil powers.[170]

The Pennsylvania Minority's right-to-arms proposal was essentially borrowed from the Pennsylvania Constitution's Declaration of Rights.[171] What separated the two was that the former included an additional protection for the "killing of game" and a declaration against disarmament except for "crimes committed" or if a "real danger of public injury" was possible.[172] The Pennsylvania Minority's call for hunting protections did not end there. Borrowing once more from the Pennsylvania Constitution, the Pennsylvania Minority proffered an amendment that provided the "inhabitants of the several states" shall be afforded the "liberty to fowl and hunt in seasonable times, on the lands they hold, and on all other lands in the United States," excluding private property.[173]

Federalist responses to the Pennsylvania Minority were rather dismissive. Noah Webster, for one, wrote a sarcastic critique that struck directly at the Minority's request for hunting protections:

> But to complete the list of unalienable rights, you would insert a clause in your declaration, *that every body shall, in good weather, hunt on his own land, and catch fish in rivers that are public property*. Here, Gentlemen, you must have exerted the whole force of your genius! Not even the *all-important* subject of *legislating for a world* can restrain my laughter at this clause![174]

In delivering this criticism, Webster was trying to make the point that a national Bill of Rights should only include those protections that are deemed vital for continuance of a democratic republic. Hunting, fowling, and fishing did not qualify.

Federalist Tench Coxe was equally critical of the Pennsylvania Minority's proposed amendments.[175] Regarding the Pennsylvania Minority's concerns over the Constitution affording the federal government broad military powers, Coxe responded that nowhere in the Constitution did it permit the federal government to disarm the state militias, nor did the Constitution place a premium on a standing army over a well-regulated militia.[176] While Coxe conceded that the people should always be mindful of the risks associated with

a standing army, he noted that the state militias would curtail the need for one. "The militia, *who are in fact the effective part of the people at large*, will render many troops *quite unnecessary*," wrote Coxe.[177]

The anti-Federalists attending the Virginia Convention were the second to proffer the right to arms to be included in the Constitution, and, much like the Pennsylvania Minority, their proposed amendment was borrowed from their Declaration of Rights. What differentiated the anti-Federalists' proposed amendment from the Virginia Declaration of Rights was that the former included the prefatory language "the people have a right to keep and bear arms." The proposed amendment read in full, "That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defense of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore that in all cases the military should be under strict subordination to, and governed by, the civil power."[178]

The anti-Federalists at the New York Convention followed Virginia's lead. Initially, New York anti-Federalists touted a much different right-to-arms proposal, one that effectively curtailed federal authority over the militia:

> That the militia should always be kept well organized, armed and disciplined, and include, according to past usages of the states, all the men capable of bearing arms, and that no regulations tending to render the general militia useless and defenceless, by establishing a select corps of militia, or distinct bodies of military men, not having permanent interests and attachment to the community, ought to be made; and that the military ought not to be subject to martial law except in time of war, invasion or rebellion; and that in all cases the military should be under strict subordination to and governed by the civil power.[179]

But, upon further consideration, New York anti-Federalists went along with Virginia's proposal, albeit with one slight modification. Rather than stipulating that a well-regulated militia was comprised of the "body of the people trained to arms," they included the language "body of the people *capable of bearing arms*."[180] Although the variance in language was slight, the New York anti-Federalists' choice of language was more consistent with the larger anti-Federalist objection that the federal government might ignore the fact that classes of people were incapable of bearing arms, whether that incapability was due to physical, moral, or religious reasons.

In the end, the anti-Federalists' efforts at amending the Constitution proved

unsuccessful. Despite the anti-Federalists submitting 210 amendments for consideration, James Madison and the Federalist majority did not make one alteration to the Constitution, nor did they include a Bill of Rights.[181] All that mattered to the Federalists was that the Constitution was ratified and in full force. But over the next ten months James Madison developed a change of heart and sought to include a series of amendments that were to be placed in Article I, section 9. On June 8, 1789, Madison submitted the amendments to the House of Representatives. Although it took some time and deliberation, the House eventually approved Madison's request, so long as any amendments were separate from the Constitution itself. The House then submitted Madison's amendments to a select committee in which each state had one member.[182]

Considering the lapse in time from the state ratifying conventions to Madison submitting his proposed amendments, it is unknown how, if at all, the different right-to-arms proposals impacted Madison's drafting of what would become the Second Amendment. While Madison was undoubtedly aware of the different right-to-arms proposals, the evidentiary record does not provide any affirmative link between them and Madison's draft of the Second Amendment. Stylistically speaking, however, Madison's draft suggests it was in some way influenced by the different state ratifying conventions' right-to-arms proposals. Madison's draft read in full, "The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms shall be compelled to render military service in person."[183]

The select committee of the House, to which Madison's draft of the Second Amendment was referred, made two substantive changes. First, the select committee rearranged the amendment's composition by moving the militia language to the front. Second, the select committee suggested a more detailed definition of the militia. The amendment now read, "A well regulated militia, composed of the body of the people, being the best security of a free State, the right of the people to keep and bear arms shall not be infringed, but no person religiously scrupulous shall be compelled to bear arms."[184] This version of the amendment was subsequently delivered to the Senate for debate.

On August 17, 1789, Senate deliberation began with Elbridge Gerry of Massachusetts expressing concern over the "religiously scrupulous" clause. Gerry feared the inclusion of such a clause would allow the federal government to prevent certain individuals from bearing arms. As Gerry saw it, the federal government could accomplish this by excluding undesirable classes of people as "religiously scrupulous," thus making the amendment's protection useless.[185] After considerable debate as to whether the "religiously scrupulous"

Compendium_Roth
Page 0126

Compendium_Roth
Page 0127

clause would in fact impede the amendment's purpose, it was moved that the clause be struck. The motion did not pass, with twenty-two voting for it, and twenty-four against.[186]

Gerry also expressed dissatisfaction with the amendment's language of a well-regulated militia "being the best security of a free state."[187] He feared the language insinuated that while a militia was the "best security," it also admitted a standing army was an analogous choice. Therefore, Gerry moved that the amendment should read a "well regulated militia, trained to arms," because this would ensure it was the federal government's duty to properly maintain the militia.[188] Although Gerry's motion was not seconded, the language, reading "being the best security of a free state," was eventually removed. The words "necessary to the" were put in place of "the best," thus making the amendment convey what Gerry wanted it to—that a well-regulated militia was the only security of a free state.[189]

Two days later, on August 20th, debate on the "religiously scrupulous" clause was once more initiated. Thomas Scott of Pennsylvania feared that since religion was on the decline such a clause would exempt those individuals from bearing arms.[190] Elias Boudinot of New Jersey disagreed and preferred the clause remain intact. Boudinot felt that by removing the "religiously scrupulous" clause the amendment would no longer protect those who "would rather die than use" arms in a military capacity.[191] In order to appease Boudinot the Senate agreed that the words "in person" be added after the word "arms."[192] The proposed amendment now read, "A well regulated militia, composed of the body of the people, being the best security of a free state; the right of the people to keep and bear arms shall not be infringed, but no person, religiously scrupulous, shall be compelled to render military service in person."[193]

On August 25th, the amendment was read to the Senate once more, and, before it was returned the House of Representatives, a number of substantive changes were made. The words, "composed of the body of the people" and "but no one religiously scrupulous of bearing arms shall be compelled to render military service in person" were removed. Additionally, the word "best" was removed in favor of "necessary to."[194] After all changes were made, the amendment was now in its final form and read, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear Arms, shall not be infringed."[195]

Unlike the 1787 Convention, where the Constitution was drafted and debated in secrecy, the legislative proceedings pertaining to the Bill of Rights were made public. Indeed, with such legislative transparency came critical commentary, particularly in the press. Yet as it pertained to what would become the Second

Amendment, commentary was sparse. From the commentary that was printed, every author to write on the amendment did so in context of limiting federal authority over the militia or of the federal government neglecting the militia and maintaining a standing army. Some commentators praised the Second Amendment.[196] Such was the case with Tench Coxe, who, under the penname "A Pennsylvanian," wrote, "As civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, and as the military forces which must be occasionally raised to defend our country, might pervert their power to the injury of their fellow citizens, the people are confirmed . . . in their right to keep and bear their private arms."[197] Other commentators criticized the Second Amendment. As one anonymous newspaper editorial put it, the Second Amendment was an insufficient protection against the federal authority because it did not "ordain, or constitutionally provide for, the establishment" of a well-regulated militia.[198]

Considering the historical record in its entirety, the reason why the Second Amendment was placed within the Bill of Rights is rather uncontroversial. Consistent with republican ideology up through the late eighteenth century, the Second Amendment was intended to serve as a counterpoise to federal military authority.[199] Left unanswered is how the Founding Fathers understood the Second Amendment would function.

Was the Second Amendment merely an affirmation of the states' desire to maintain the militia system, a reminder to the federal government to maintain a constitutional well-regulated militia, or was it about the people having and using arms? As with any historical question, finding a definitive answer can prove difficult.[200] But for those historians who have examined the genesis of the Second Amendment, the evidence ultimately leads to the conclusion that the Founding Fathers understood the right as being intimately tied to the sustained maintenance of a well-regulated militia.

Recall that one of the anti-Federalists' concerns with affording the federal government broad military powers was that it would lead to the erosion of republican liberty. The anti-Federalists feared this could be accomplished should the federal government decide to maintain a standing army and neglect the militia. This in turn would shift the power of "the sword" from the people, who maintained a vested interest in their liberty through service in the militia, to a standing army that was comprised of self-interested conscripts.[201] The Second Amendment protected against this.

This understanding of the Second Amendment can be found in the legal commentary that followed the ratification of the Bill of Rights. Consider the writings of prominent Virginia jurist St. George Tucker. Writing in 1803, Tucker noted how during the Virginia Constitutional Convention there was

Compendium_Roth
Page 0128

general concern among the attending delegates over the Constitution's division of militia powers between the federal and state governments.[202] As Tucker recalled, "all room for doubt, or uneasiness upon the subject" was "completely removed" upon including the Second Amendment in the Bill of Rights. As Tucker saw it, the Second Amendment ensured "that the power of arming the militia, not being prohibited to the states, respectively, by the constitution," was "consequently, reserved to them, concurrently with the federal government."[203] It was for this reason that Tucker then referred to the Second Amendment as the "true palladium of liberty," given that it balanced the Constitution in favor of the people.[204] Tucker knew that in "most governments" the "right of self-defense"—what Blackstone had referred to as the right of self-preservation and resistance—was kept under the "narrowest limits possible."[205] This was particularly the case whenever standing armies were "kept up, and the right of the people to keep and bear arms" was prohibited.[206] The Second Amendment, however, protected against this by ensuring the people, through service in the militia, were able to defend and preserve their liberty.[207]

Tucker was neither the first nor last legal commentator to describe the Second Amendment in this fashion.[208] Writing in 1833, fellow jurist Joseph Story also referred the Second Amendment as the palladium of liberty:

> The importance of this article will scarcely be doubted by any persons, who have duly reflected upon the subject. The militia is the natural defence of a free country against sudden foreign invasions, domestic insurrections, and domestic usurpations of power by rules. It is against sound policy for a free people to keep up large military establishments and standing armies in time of peace, both from the enormous expenses, with which they are attended, and the facile means, which they afford to ambitious and unprincipled rulers, to subvert the government, or trample upon the rights of the people. The right of the citizens to keep and bear arms has justly been considered, as the *palladium of the liberties of a republic*, since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally even if these are successful in the first instance, enable the people to resist and triumph over them.[209]

In recent years, a number of lawyers and legal scholars have latched onto Tucker and Story's expositions to advance the theory that the Second Amendment was intended to protect a right to have and use weapons, for both public and private purposes, and that this accomplished the Founding Fathers' objective of maintaining a well-regulated militia.[210] Such an inter-

pretation, however, extends Tucker's and Story's commentaries beyond their intended context, and therefore breaks the bands of historical elasticity. Tucker and Story were describing the Second Amendment in the context of the militia, nothing more. At one point, Story even cautioned against the people being armed indiscriminately. He noted that although "the importance of a well regulated militia would seem so undeniable," it was "difficult to see" how "it is practicable to keep the people duly armed without some organization."[211] Story feared a time might come when the people were generally indifferent to the idea of maintaining a well-regulated militia, which was "certainly no small danger" because "indifference may lead to disgust, and disgust to contempt; and thus gradually undermine all the protection intended by this clause of our national bill of rights."[212]

Another problem with the interpretation advanced by modern lawyers and legal scholars is that it is in direct conflict with what the Founding Fathers credited as being the palladium or bulwark of liberty. At no time did any political or legal commentator in the late eighteenth century or early nineteenth century refer to the ownership or use of arms as the palladium or bulwark of republican liberty. For those historians who have examined the origins of the right to arms, this is not at all surprising. Every political and legal commentator from the Glorious Revolution through the American Revolution agreed that the right to arms was useless unless the militia was properly trained and disciplined. To quote once more from Timothy Pickering, "The right Use of the Firelock therefore is not the *whole*, nay it is the *smallest Part*, of military Discipline."[213]

A well-regulated militia, however, was another matter. It was quite common for the Founding Fathers to toast the militia as the palladium or bulwark of republican liberty.[214] During the Revolutionary War, General Washington described the militia as "the palladium of our security, and the first effectual resort in case of hostility."[215] Similarly, Major General Nathanael Greene wrote that the militia is the "great bulwark of civil liberty," which "promises security and independence to this country."[216] In 1800, Massachusetts representative Harrison Gray Otis exclaimed that the "great national resource, the militia" was "the palladium of the country."[217] Meanwhile, Samuel Dana, a former Massachusetts representative of Congress, member of the Middlesex bar and chief justice on the Massachusetts Court of Common Pleas, described the militia as "palladium of our Country."[218]

Comparable testimonials as to the importance of a well-regulated militia appeared frequently in newspapers. A 1798 address to the militia published in the *Connecticut Gazette* emphasized the importance of "obedience to orders and exertions to perfect" themselves in the "military art" and reminded them:

Compendium_Roth
Page 0129

The importance and practicability of a well regulated and disciplined Militia, in a free country, cannot be doubted, this day you have evinced that such a thing is altogether practicable—You are the *palladium* of which your country leans for the protection against all foreign invasion: From the Militia are to be rallied the permanent and better disciplined Armies, in case of war; and in the hour of danger you are to be prepared to march, defend and protect your country and constitution.[219]

In an October 1785 edition of the *Independent Ledger*, it read that "all good citizens" consider a "well-regulated militia . . . as the national bulwark and defence of those liberties which have been earned at the expence of so much treasure and the blood of our best citizens."[220] Meanwhile, in a July 1789 edition of the *New-York Packet*, an editorial discussed how maintaining a well-regulated militia required the "habitual exercise" in military training and "manly discipline, which is the bulwark of the country."[221] Maintaining this knowledge was considered the "sole means to render a standing army useless" and to "form a truly warlike militia."[222] Thus, in line with militia commentators from the Glorious Revolution through the American Revolution, it was not the mere possession of arms that secured the nation, it was knowledge of the military art, for "education is a bulwark against tyranny, it is the grand palladium of true liberty in a republican government."[223] Without this knowledge the militia was nothing more than a "disorderly populace, or a mass of animal machines."[224]

What these historic newspaper testimonials inform us is *why* the Founding Fathers viewed a well-regulated militia as being the people's bulwark or palladium of republican liberty—this *why* being that a well-regulated militia would protect the nation and the Constitution from threats, both internal and external. And these testimonials were just a few of many instances where a well-regulated militia was referred to as the palladium or bulwark of republican liberty. For instance, in an 1811 address by Pennsylvania militia general John Hamilton emphasized how the militia was the "sure basis on which the liberties of [the] country must rest":

A well organized militia has been justly styled the bulwark of the nation; and so long as they are armed, and disciplined, they will super[sede] the necessity of employing that potion of idleness and corruptor of morals, *a standing army*. . . . [Remember] the spirit of '76, prove yourselves worthy of that inheritance of freedom and independence, bequeathed to you by the patriots and heroes of the revolution, meet on a parade, like a band of brothers, and maintain your rights, liberties and independence, with your last breath.[225]

Others were just as forthright in connecting the importance of a well-regulated militia in securing the people's rights and liberties. Federalist and Connecticut House representative Samuel Dana, for one, perfectly captured the link between serving in the militia, individual and communal virtue, and both appreciating and understanding the concept of liberty. "If we are to preserve our liberties, to perpetuate our nation, we must lay the foundation in the cultivation of virtue, in the dissemination of useful knowledge, we must learn to know our rights with certainty, we must cultivate a spirit capable of defending them," wrote Dana.[226] Much like Machiavelli, Trenchard, and other prominent militia commentators before him, Dana was conveying the time-honored republican principle that every citizen is a soldier and every soldier a citizen: ". . . in our military system, that the defence of our country be confided to our own citizens, that it should consist entirely of the people; that the soldiers should always be citizens, possessed of the same sentiments and dispositions as the other citizens. . . . We should most carefully guard against making our soldiers too distinct a body from the other citizens, of turning the profession of a soldier into the trade of a mercenary."[227]

To Dana, arms were not central to creating or preserving a well-regulated militia.[228] Arms were merely a tool to accomplish this constitutional end.[229] More important were a "knowledge of tactics, and a perfection of discipline."[230] These were "the great objects to attain to."[231] Dana knew militia without discipline was nothing but a "wieldy mass" that "instead of being a bulwark, a defence, they would prey upon, and finally destroy the very country they were designed to protect."[232] A militiaman's principal duty was not to be armed. Rather, the "first, second, and third duty" was "obedience."[233]

This is not to say arms were completely insignificant. As Dana noted, arms were the means, and the people were instructed and "constantly inspire[d]" to "bear them for their own defence."[234] By "own defence," Dana was articulating the principle that, in a well-regulated militia, every citizen maintained a vital interest in preserving their liberty and property, both individually and collectively, as well as the very government that secured their inalienable rights.[235] Dana made this point clear, noting, "Let us cheerfully submit to sacrifice some part of our time, some portion of our property, to acquire the art of defending the residue. It is the price, which must be paid for a national defence. The right of bearing arms for the common defence, is recognized among our unalterable laws. These arms must not be suffered to rust in our houses, which would render them as useless, as if they were stored in the enemies' magazines."[236]

Joel Barlow, a prominent Connecticut lawyer and literalist, also wrote on the importance of a well-regulated militia.[237] Although Barlow did not

Compendium_Roth
Page 0130

describe the militia as the palladium or bulwark of liberty, his legal philosophy corresponds with the aforementioned militia commentators.[238] Barlow knew that people had to sacrifice themselves for the greater good and it was imperative that they developed a balance in civil and military virtue. This sacrifice was necessary to properly effectuate a constitutional well-regulated militia: "Every citizen ought to feel himself to be a necessary part of the great community, for every purpose to which the public interest can call him to act; he should feel the habits of a citizen and the energies of a soldier, without being exclusively destined to the functions of either. His physical and moral powers should be kept in equal vigour; as the disuse of the former would be very soon followed by the decay of the latter."[239]

In addition to balancing civil and military virtue, the Founding Fathers understood a well-regulated militia as providing constitutional balance among the respective branches of government. Authority over the militia, as well as the military as a whole, had to be distributed proportionally among the branches of government and the people.[240] This was the only way to prevent the creation of a permanent "military establishment."[241] As Barlow put it, a true constitutional militia would prevent a scenario where people strove for "excellence in warlike achievements ... without regard to the cause" and for "no other motive than that of providing places for sons, brothers, cousins, or the voters themselves."[242]

As a matter of historiography, it is quite remarkable whenever contemporary Americans refer to the Second Amendment as merely the right to "keep and bear arms." They have all but forgotten the amendment's reference to a well-regulated militia, yet this was the very core of Second Amendment, at least as it was understood by the Founding Fathers. Much like their English ancestors, the Founding Fathers truly believed that a well-regulated militia would place a check on the federal government, and secure republican liberty for years to come. The military alternative, a standing army, was considered extremely dangerous because the interests of soldiers were seen as being detached from interests of the community, and therefore a standing army would be more likely to oppress the community that they were entrusted to protect. Conversely, it was believed that a well-regulated militia would never oppress the community because it was comprised of the people themselves.

While the Second Amendment's reference to a well-regulated militia is obvious in light of the evidentiary record, there is less clarity as to what the framers meant by the "right of the people." Were the framers referring to "the people" as a state-sponsored militia or were they denoting something more individualized? There is an argument to be made in support of either inter-

pretation.[243] As it pertains to the interpretation that the Second Amendment guarantees the right of "the people," as a state-sponsored militia, to "keep and bear arms," one needs to look no further than historical tradition and practice. Ever since English subjects began settling in North America, colonial, local, and later state governments subscribed to a well-regulated militia as the people's birthright. As addressed earlier, this view was frequently expressed in militia laws, military and militia treatises, and political writings. The Founding Fathers firmly believed in the right of the people to take part in defending their community because this ensured constitutional balance and united the community in defense of their rights, liberties, and property.[244]

At the same time, there is an argument to be made that the Second Amendment must afford a more individualized right, one somewhat separate and distinct from defending the community. The Second Amendment does not stipulate the right of a "well-regulated militia" or "militia" to "keep and bear arms." The Second Amendment expressly provides it is a right of "the people," and if one scrutinizes the use of "the people" within the Bill of Rights as a whole, one sees that there is an argument to be made that the right is individualized, in one form or another.[245] This more individualized interpretation of the Second Amendment is bolstered by the fact that eighteenth-century militia laws generally required every militiaman to acquire, possess, and maintain his own arms and accoutrements.[246] While this was not always the case, these laws seemingly suggest that there is historical precedent for the people being armed in order to form a well-regulated militia. But recall the ideological and philosophical underpinnings of a constitutional well-regulated militia up through the late eighteenth century. As a matter of republican thought, a mere armed citizenry was the very antithesis of a well-regulated militia. This was nothing more than a "wieldy mass," that "instead of being a bulwark, a defence, they would prey upon, and finally destroy the very country they were designed to protect."[247] In other words, an armed citizenry by itself was predominantly viewed as dangerous to a republican liberty, not a guarantee or advancement of it. Considering this fact, it is almost impossible to historically accept any late-eighteenth-century interpretation of the Second Amendment that is distinct or separate from a well-trained, well-disciplined, government-sponsored militia. To quote from Associate Justice Joseph Story, it is "difficult to see" "how it is practicable to keep the people duly armed without some organization," for such a scenario would "gradually undermine all the protection intended by this clause in our national bill of rights."[248]

This militia-based assessment of the Second Amendment has been characterized by some modern lawyers and legal scholars as "patently nonsensical,"

Compendium_Roth
Page 0131

"gibberish," and "nonsense on stilts."[249] In its place, they assert that the amendment's reference to a well-regulated militia could have only been understood as amplifying the right to keep and bear arms, not qualifying it.[250] UCLA law professor Eugene Volokh is a proponent of this interpretation and frames the Second Amendment's reference to a well-regulated militia in the following terms:

> The Framers *may have* intended the right to keep and bear arms as a means towards the end of maintaining a well-regulated militia—a well-trained armed citizenry—which in turn would have been a means towards the end of ensuring the security of a free state. But they didn't merely say that "a well-regulated Militia is necessary to the security of a free State" (as some state constitutions said), or "Congress shall ensure that the Militia is well-regulated," or even "Congress shall make no law interfering with the security of a free State." Rather, they sought to further their purposes through a very specific means.
>
> Congress thus may not deprive people of the right to keep and bear arms, even if their keeping and bearing arms in a particular instance doesn't further the Amendment's purposes.[251]

As a matter of legal advocacy, Volokh's analysis is extremely clever. However, as a well-thought and objective history, Volokh's analysis is deficient.[252] What Volokh completely overlooks is that the Founding Fathers never associated a well-regulated militia, well-organized militia, well-ordered militia, well-disciplined militia, or any other variation with a mere armed citizenry. The armed citizenry equals a well-regulated militia conclusion is something that Volokh and others have simply manufactured out of thin air, with one writer going so far as to boldly claim that the Founding Fathers "never defined a 'well regulated' militia."[253]

Assessments like these are historically disingenuous, especially seeing that the aforementioned militia variations appeared regularly in eighteenth-century militia laws. This alone debunks how Volokh and others have articulated what constituted a well-regulated militia in the late eighteenth century, as well as its constitutional pieces. Still, despite manufacturing a past that never was, this ad hoc approach to understanding the Second Amendment has become commonplace among legal academics known as constitutional originalists. This group of legal scholars sees value in trying to uncover the "original meaning" or "original understanding" of the Constitution by legally scrutinizing the linguistic usage of its text for those who wrote and ratified it, as well as the general public to whom it was addressed.[254]

Consider for example Georgetown University law professor Randy E. Barnett, who claims as a matter of "empirical fact" that the Second Amendment's reference to a "well-regulated militia" was a synonym for "well-trained," embodied the promise of an armed citizenry, and cannot remotely be understood as qualifying the right to keep and bear arms in any way.[255] To the contemporary reader, unfamiliar with the late eighteenth century, its law, and its language, Barnett's conclusion is plausible. How are they to know of the abundance of historical evidence rebutting Barnett's claim, the intricacies of a well-regulated militia in late-eighteenth-century terms, or the ideological and philosophical underpinnings of the constitutional body? But for those familiar with the history of standing armies and militias, from the sixteenth century through the turn of the nineteenth century, Barnett's originalist conclusion directly flies in the face of republican liberty.[256]

The overarching problem with Barnett's and other originalists' take on the Second Amendment is that they are seeking to make sense of a late-eighteenth-century right in the twenty-first century. It also does not help Barnett and originalists that they often employ poor historical methodologies when reconstructing the past. Barnett and originalists have been known to sidestep historical context and conduct poor or incomplete research and therefore fail to reconstruct a past that meets the required evidentiary burden.[257] Whether originalists want to admit it or not, the unabashed truth is that the academic disciplines of intellectual history and originalism are not one and the same.[258] While both academic disciplines rely on the past, the discipline of intellectual history is the only one that adheres to history-objectivity norms and seeks to understand the past on its own terms.[259]

A prime example, as it pertains to the Second Amendment, is how originalists often associate the Founding Fathers' conception of right to arms as being one and the same with modern libertarianism. This is not contextual history, with the purpose of understanding the past for the sake of understanding the past. It is Whiggish history—that is, the subordination of the past by advancing the interests of the present. In this case the *interest* is gun rights. To state this differently, by injecting modern libertarianism into the Second Amendment, what many originalists have ignored is that the right to arms, like many late-eighteenth-century-rights, was more declaratory than concrete. As historian Jack N. Rakove has eloquently put it, "[A]t the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles rather than the codification of legally enforceable restrictions or commands."[260] It was this very conception of the Bill of Rights—as a list

Compendium_Roth
Page 0132

of vital republican principles and public rights—that was advanced by Congress when it submitted the amendments to the states for ratification. This fact is confirmed the preamble Congress attached to the Bill of Rights for ratification by the states. The preamble read, "The Convention of the States having, at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further *declaratory* and *restrictive clauses* should be added, and as extending the grounds of public confidence in the Government will best ensure the beneficent ends of its institution."[261]

The fact that many eighteenth-century rights were declaratory did not mean they did not have legal teeth. The language of the Third Amendment plainly barred the quartering of soldiers in a person's home unless it was with the "consent of the owner" or expressly allowed by law.[262] The Fourth Amendment was also instructively restrictive in that it prohibited federal officials from issuing warrants unless "probable cause" was present.[263] While these rights clearly restricted federal action, other late-eighteenth-century rights were meant to embody republican principles with the purpose of balancing the Constitution in favor of the people. These rights, much like the right to keep and bear arms in a well-regulated militia, were frequently referred to in literature as palladiums of liberty. In the late eighteenth century, such rights included political representation, the writ of habeas corpus, the freedom of election, the right to trial by jury, and the freedom of the press.[264] Viewing the Second Amendment through this prism—as a right that balanced the Constitution in favor of the people—it is quite historically perplexing when anyone today declares that the Founding Fathers' right to arms was virtually an unfettered right to acquire, own, and use arms in both public and private.[265]

There are a number of reasons why such a broad conception of the Second Amendment fails to pass historical muster. First, there is no substantive evidence to suggest that the impetus for including the Second Amendment in the Bill of Rights was about anything other than checking federal military authority. Not even post-ratification commentary suggests otherwise. If anything, the Founding Fathers' refusal to incorporate the broader language suggested by the state ratifying conventions—most notably the amendment proposed by the anti-Federalist Pennsylvania Minority—conveys that the Second Amendment's purpose was tailored. Second and more importantly, up through the late eighteenth century legal practice conveys that arms, whether they were military arms or private arms, were regulated in the interests of the public good.[266] There were regulations pertaining to hunting, citizenship, loyalty to government, transportation, preparatory carriage in public, assembly,

the types of arms or weapons one might possess, and when and where one might legally discharge firearms.[267]

Somehow, in direct conflict with the breadth of historical evidence, there are those, such as National Rifle Association (NRA) lawyer and George Mason law professor Nelson Lund, who continue to assert that the Founding Fathers "enjoyed an almost unlimited right to keep and bear arms" and that there is "virtually no historical evidence" to support imposing any legal limits.[268] There are two reasons why Lund and others consistently arrive at such an ahistorical conclusion. The first is that the history of the right to arms and firearms regulations is central to the advancement of present day gun-rights, and this conclusion bodes well for their advancement (see chapter 8). The second reason why Lund and others have come to such an ahistorical conclusion is that they have embraced the tenets of originalism. What these tenets dictate is that the text of the Second Amendment guarantees two distinct rights, the right to "keep arms" and the right to "bear arms," and each must be defined by the common late-eighteenth-century usage of the words "keep" and "bear." Under this approach to decoding the past, the right to "keep arms" embodies a right to retain arms, or have them in custody, and the right to "bear arms" embodies a right to carry said weapons for self-defense, whether such carriage should happen to take place in public or private.[269] But when one unpacks the evidence supporting these originalist conclusions, there are a number objectivity concerns, as well as late-eighteenth-century linguistic miscalculations.

Consider the originalist claim that the phrase "bear arms" was generally understood by the Founding Fathers as meaning to "carry arms."[270] To the contemporary reader, unfamiliar with late-eighteenth-century linguistics, the historical claim seems sensible. However, a detailed investigation into the late-eighteenth-century usage of "bear arms" reveals that the phrase was overwhelmingly used in the context of military service.[271] For an individual or group to "bear arms" denoted that they were serving in a militia or military capacity. The term "bear arms" was rarely used to denote anything else. One historian conducted a linguistic analysis from 1750 to 1800 and found only 2 percent of all documents containing the phrase "bear arms" used it outside of the militia or military context.[272] Yet, in the landmark 2008 Second Amendment case *District of Columbia v. Heller*, Supreme Court of the United States justice, and faint-hearted originalist, Antonin Scalia somehow came to the opposite conclusion. According to Scalia, despite the breadth of historical evidence, the military context of "bear arms" was the idiomatic usage, not its general usage.[273]

Scalia's historical conclusion is mythmaking at its finest, but Scalia did not stop there. Scalia applied equally dubious reasoning in examining the late-

Compendium_Roth
Page 0133

eighteenth-century usage of the phrase "keep arms." Indeed, Scalia conceded that the phrase "keep arms" was not as prevalent in the "written documents of the founding period" that he could find, but he ultimately concluded that the phrase must have been understood by the Founding Fathers as protecting an individual right to have arms "unconnected with militia service."[274] What is principally significant about Scalia's concession is that it shows just how predisposed some originalists are to defining historical text with, at best, circumstantial evidence. In doing so, Scalia and other originalists seemingly ignored the fact that virtually all of the Second Amendment's language can be found in colonial and state militia laws. To state this differently, the legal usage of terms such as "well-regulated militia," "bear arms," and "keep arms" can all be found in militia laws, each of which denoted a military context.[275] This is a context that perfectly coincides with the intellectual origins of the right to arms, as well as the Second Amendment's drafting and ratification history.

The faulty logic that can be produced by originalist interpretations of the Second Amendment does not stop there. Recall how originalists interpret "bear arms" as meaning to "carry arms" for self-defense. If one applies this logic in order to determine the historical scope of the Second Amendment in public, one cannot help but conclude that it protects a right to preparatory armed carriage. Here is how one legal commentator recently framed it: "[If] the Second Amendment guarantees an individual right to bear arms in defense of both an individual and the state, this must imply the ability to carry those arms outside of one's home. It is difficult to imagine how one could exercise the right to bear arms in defense of the state from the confines of one's living room."[276] NRA lawyer Stephen P. Halbrook has advanced a similar rationale. Where Halbrook distinguishes himself from the preceding originalist is in how his approach centers around the absence of the word "home" and the inclusion of the word "militia" in the Second Amendment, as well as the text and structure of the Bill of Rights as a whole:

> [The Second Amendment] guarantees not only the right to "keep" arms, such as in one's house, but also to "bear arms," which simply means to carry arms without reference to a specific place. The explicit reference to the militia indicates that the right is not home-bound, nor is the right to bear arms limited to militia activity. When a provision of the Bill of Rights relates to a house, is says so plainly—the Third Amendment requires the consent of the owner for a soldier to "be quartered in any house." First and Second Amendment rights are not limited to one's house or other premises—the people have the right to "the freedom of speech, [and] of the press," "peaceably assemble, and to peti-

tion the government for redress of grievances," and to "keep and bear arms." Nothing in the text guaranteeing these rights limits them to the home.[277]

Then there is Volokh, who uses virtually the same legal reasoning to assert that the Second Amendment must have protected a right to preparatory armed carriage. As Volokh puts it, seeing that "self-defense has to take place wherever the person happens to be," nearly any "prohibition on having arms for self-defense in a particular place . . . is a substantial burden on the right to bear arms for self-defense" and therefore presumably unconstitutional.[278] Like Halbrook, Volokh seeks to invoke history. In Volokh's mind, Anglo-American tradition and practice dictated that only "public carrying 'accompanied with such circumstances as are apt to terrify the people' was . . . seen as prohibited," but "'wearing common weapons' in 'the common fashion' was legal."[279] What Volokh, Halbrook, and others failed to research, however, was the rich Anglo-American history of regulating armed carriage. As was outlined in the preceding chapter, armed carriage restrictions developed out of the English common law and date back to the thirteenth century. These restrictions were later codified in the Statute of Northampton and survived well into the eighteenth century, on both sides of the Atlantic, both prior to and after the ratification of the Constitution.[280]

Another problem with the historical conclusions of Volokh, Halbrook, and other likeminded lawyers is that they are built upon presentism, or how contemporary Americans perceive the right of self-defense to operate, not how it was perceived or operated in the late eighteenth century. The two eras are not one and the same. Today, many states have changed their laws in such a way that the person claiming self-defense is often indemnified. In the late eighteenth century, however, this was not the case. The law dictated a duty to retreat.[281] In other words, the law constrained individuals from needlessly killing each other under the auspices of self-defense. Moreover, there was no presumption of innocence should one person kill another under the auspices of self-defense. As James Davis articulated the principle in his 1774 treatise *The Office and Authority of a Justice of the Peace*, "Self-Defence is excusable only upon inevitable Necessity: The Party assaulted must giv[e] Back as far as he can, without endangering his own Life, and the mortal Wound must not be given till after such Retreat, otherwise it is Manslaughter."[282] Late-eighteenth-century jurist and legal historian John Haywood articulated the principle in similar terms, stipulating, "[T]he law requires that the person who kills another in his own defence, should have retreated as far as he conveniently or safely can to avoid the violence of the assault, before he turns upon his assailant."[283] But unlike Davis, Haywood added that self-defense was not

Compendium_Roth
Page 0134

a "preventive" right: "This right of natural defence does not imply a right of attacking, for instead of attacking one another for injuries past or impending, man need only have recourse to the proper tribunals of justice. They cannot therefore legally exercise this right of preventive defence."[284] Certainly, in the late eighteenth century, if a person was faced with an imminent threat, and could not retreat without endangering their own life, deadly force was authorized. However, this was the exception, not the general rule. Thus, whenever anyone today claims that the Founding Fathers viewed the preparatory carriage of dangerous weapons in public as a constitutional right or as some type of social good that deterred crime, they are not advancing history.[285] They are rewriting it to fit a modern narrative.[286]

This is not to say that people living in the late eighteenth century did not carry arms when it was deemed appropriate, whether during travels for self-defense, hunting, militia service, and so forth. They most certainly did. Rather, what these laws or restrictions historically illustrate is that the general carriage and use of arms was not considered as falling under the constitutional umbrella of the Second Amendment. There is no substantiated historical evidence to suggest otherwise. In fact, by the close of the eighteenth century, not one lawyer or legal commentator had referred to the preparatory carriage of dangerous weapons as being protected by the Second Amendment or the right to arms, nor was there any reference to the Second Amendment or right to arms in any self-defense or justifiable homicide cases, nor did any lawyer or legal commentator lump the Second Amendment or the right to arms with self-defense or justifiable homicide jurisprudence. The Second Amendment and the right to arms were simply not discussed in this fashion.

In an attempt to supplement a complete lack of historical evidence showing that the Founding Fathers conceived of the Second Amendment as protecting a right to preparatory armed carriage, Halbrook and other likeminded legal scholars have routinely advanced three arguments, none of which are historically substantiated. The first argument goes like this: because eighteenth-century colonial laws often required able-bodied men to carry firearms, whether it was for militia muster, security patrols, or watchmen duty, the Founding Fathers must have ratified the Second Amendment with the understanding that it protected a right to preparatory armed carriage in public places.[287]

In recent years, this argument has become a staple in legal briefs filed by gun-rights advocates.[288] To historically support this proposition, gun-rights advocates often cite a little known 1770 Georgia statute titled "An Act for the Better Security of the Inhabitants, By Obliging the Male White Persons to Carry Fire Arms to Places of Public Worship."[289] The primary purpose of the statute was to ensure that Georgia's colonists were adequately prepared to suppress slave revolts or attacks by indigenous tribes.[290] Putting aside the moral constitutional dilemma that the Georgia statute was an antecedent of slavery—that is, a means through which white male freeholders subjugated blacks and mulattoes—what this line of argument omits is that these types of laws made the carrying of arms compulsory. To be clear, the colonists were *required* to carry arms *by law*, and such carriage was at the license of government. The carrying of arms in these instances was not at the discretion of the colonists, nor was it because the colonists believed that they were exercising their constitutional right to bear arms. It is also worth noting that sometimes the very same laws that required colonists to carry arms restricted the time, place, and manner in which the arms were borne.[291] Needless to say, to claim that compulsory arms-bearing statutes are constitutional proof positive that the Second Amendment was ratified to protect a right to preparatory armed carriage in public places is to stretch the evidentiary record beyond the bands of elasticity, fabricate history, and therefore construct a late-eighteenth-century constitutional premise that never existed.

This brings us to the second argument that is often advanced by Halbrook and other likeminded legal scholars in order to claim that the Second Amendment protected a right to preparatory armed carriage. They claim that because George Washington, Thomas Jefferson, Patrick Henry, and perhaps other Founding Fathers, spoke positively about carrying firearms, whether for hunting or on travels through the countryside, that it was inherently understood in the late eighteenth century that the Second Amendment protected the "carrying of ordinary arms" for preparatory self-defense almost anywhere and everywhere.[292] The outlandishness of this line of historical thinking is notable. Just because eighteenth century persons owned and used firearms, and carried those firearms at times, does not mean it was perceived by those same persons as a constitutionally protected right to do so, particularly in densely populated public places. First, at no point in any of the quotes attributed to Washington, Jefferson, or Henry is it even remotely suggested that they were carrying arms under the constitutional umbrella of the Second Amendment or a state constitutional right-to-arms provision, or even that the Second Amendment or a state constitutional right-to-arms provision was remotely implicated. Moreover, what this line of historical thinking completely sidesteps is the fact that the Founding Fathers maintained a number of firearms restrictions on the statute books with the purpose of preserving the public peace, preventing deadly affrays, and advancing the public good.[293]

For contemporary historians, jurists, legal scholars, or, for that matter,

anyone to interpret the statements of Washington, Jefferson, and Henry as constitutional proof positive that there was a right to preparatory armed carriage in public places would essentially mean that *any* statement, made by *any* of the Founding Fathers, attesting to *any* action must be interpreted today as enshrining a constitutional right to do so. But to accept this premise would be to flip the entire academic discipline of intellectual history on its head. Not to mention, from a constitutional jurisprudence standpoint it would open up a Pandora's Box of new rights and protections that the Constitution and Bill of Rights was never designed to even remotely protect.

The third and last argument often advanced by Halbrook and other like-minded legal scholars is that legal precedent decided long ago that English subjects retained a right to preparatory armed carriage in public. As historical support for this argument, they cite a rather obscure 1686 English case, *Rex v. Knight* (hereafter referred to as Knight's case), where Sir John Knight was prosecuted under the Statute of Northampton for carrying firearms into a church but was ultimately acquitted by a Bristol jury.[294] In particular, Halbrook and others claim that the Founding Fathers interpreted Knight's case as enshrining the legal principle that the "peaceable public carrying of arms is lawful, and that carrying with malicious intent to terrify people is not."[295]

To those unfamiliar with the ins and outs of history, this analysis of Knight's case may appear sound. However, a close examination of the evidence reveals some serious errors. One of the most serious is that there is no evidence available to suggest that the Founding Fathers—or any American living from the late seventeenth century through the close of the eighteenth century—interpreted Knight's case as enshrining a right to peacefully carry dangerous weapons in public places. In fact, Knight's case does not even appear in American print literature until 1843.[296] This includes all legal commentaries, manuals, treaties, opinions, and correspondence—at least not that any historian or scholar has been able to locate thus far. Considering this fact, it is historically odd for Halbrook and other likeminded legal scholars to come to the historical conclusion that Knight's case was generally understood by the Founding Fathers as enshrining a legal right to preparatory armed carriage in public.[297] How can such a conclusion be true if there is no substantiated evidence to support it?

This is not to say that Knight's case was absent in all legal literature before 1843. Across the Atlantic, particularly in England and Ireland, there are a few scattered references to Knight's case. However, during this period, there is not one instance to be found in which Knight's case was interpreted as enshrining a right to peacefully carry dangerous weapons in public places. For instance, in the 1726 edition of William Nelson's *An Abridgement of the Common Law,*

Knight's case was cited for the proposition that the punishment for going publicly "armed with a Gun" is "Forfeiture of the Armour and Imprisonment."[298] In the 1793 edition of Sir John Comyns's *A Digest of the Laws of England,* Knight's case was cited in the section pertaining to the seizure of arms. In particular, Comyns referenced Knight's case for the legal proposition that there "may be an information against any one for going or riding in arms to the terror of the people."[299] Meanwhile, in William Hawkins highly influential *Pleas of the Crown,* Knight's case was cited for the following legal proposition:

> That no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People; from whence its seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons, or having their usual Number of Attendants with them, for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of an intention to commit any Act of Violence or Disturbance of the Peace.[300]

Standing alone, this passage has been used by Halbrook and others to support their peaceable public carrying interpretation of Knight's case and the Statute of Northampton.[301] Hawkins's treatise was indeed well known by the Founding Fathers, and the above passage does state that in order for a person to be in violation of the Statute of Northampton required "Circumstances as are apt to terrify the People," or what was otherwise legally known as an affray.[302] History in context, however, rebuts any peaceable public carrying interpretation. For one thing, as both the text of the Statute of Northampton and an abundance of English legal treatises convey, it was the *act* of carrying dangerous weapons in public that was sufficient to amount an affray, "strike a feare," or "striketh a feare."[303] As Ferdinando Pulton, the prominent Elizabethan legal editor put it, the Statute of Northampton served "not onely to preserve peace, & to eschew quarrels, but also to take away the instruments of fighting and batterie, and to cut off all meanes that may tend in affray or feare of the people."[304]

Another problem with accepting Halbrook's and others' peaceable public carrying interpretation is that it completely dismisses Hawkins's previous passages on the Statute of Northampton.[305] In the above quoted passage, Hawkins was listing one of common law exceptions to the general rule, and a quite rare exception at that. Historians know this because immediately preceding the above quoted passage Hawkins writes that any Justice of the Peace may "seize the Arms" of anyone found to be violating the Statute, and that no one was

Compendium_Roth
Page 0136

excused in the "wearing of such Armour in Publick, by alledging that such a one threatened" them or "for the Safety of [their] Person from . . . Assault."[306] It is only after outlining the Statute of Northampton's general prohibition on wearing "arms" and "armour" that Hawkins lists the exceptions, which included the lawful assembling of the hue and cry, in defense of one's home (the Castle Doctrine), and the above quoted passage pertaining to "persons of Quality."[307]

As it pertains to the "persons of Quality" exception, one must read the entire passage to understand it. It contains time, place, and manner conditions that would have been subject to the discretion of government officials. Moreover, there is nothing in the passage that precludes government officials from enforcing the general prohibition. To read Hawkins's discussion on the Statute of Northampton otherwise—that is, in the way Halbrook and others would like us to—would make Hawkins's preceding passages superfluous, and therefore the exception would swallow the general rule and five centuries of history.[308]

The story of how Knight's case was first misappropriated by Halbrook and others goes back to the mid to late 1970s, when gun-rights advocates were intently searching for historical evidence that supported a rather broad interpretation of the Second Amendment. David I. Caplan, a devoted NRA member and lawyer, was notably the first to interpret Knight's case as enshrining a right to peaceably carry firearms in public places.[309] In a study paid for by the Indiana Sportsman Council, Caplan claimed that although the Statute of Northampton originally "banned all carrying of arms by private persons," by the late seventeenth century, as a result of Knight's case, the Statute was given a "narrow reading" requiring specific intent.[310] In coming to this historical interpretation, Caplan did not provide any supporting evidence other than the case summaries in the *English Reports*.[311] A year later, Caplan's published the findings of his study in the *Fordham Urban Law Journal*, and from there, once it was widely distributed in the NRA's flagship magazine *American Rifleman*, it was accepted by gun-rights advocates as true.[312]

Unbeknownst to Caplan and the gun-rights advocates who followed him, until the late eighteenth century the *English Reports* were never meant to be a full historical account of the relevant cases. Rather, the *English Reports* were intended to instruct practitioners and students on the intricacies of legal pleading.[313] Herein entered historian Joyce Lee Malcolm, who was the first to research Knight's case beyond the *English Reports*.[314] On its face, Malcolm's research bolstered Caplan's claims. Malcolm noted how Knight, a former sheriff of Bristol, had long been a zealous enforcer of the English laws against religious nonconformists, and how one evening Knight, accompanied by the mayor and aldermen of Bristol, broke up a Catholic mass and

seized the attending Catholic priest.[315] Malcom went on to note that it was James II who was angered by Knight's actions and sought to use the Statute of Northampton to prosecute Knight, and later as a legal vehicle to disarm his political enemies.[316] But, according to Malcolm, James II's plan was thwarted by a Bristol jury. In Malcolm's words, after "due deliberation the jury acquitted" Knight because at that time Englishmen generally understood there was a general right to go armed and the court was "not prepared to approve the use of the [Statute of Northampton] to disarm law-abiding citizens."[317]

Malcolm's reading of Knight's case was emphatically embraced by gun-rights advocates and scholars.[318] However, none of them looked at the evidentiary record to see whether Malcolm's findings were historically valid. If they had looked they would have learned that other than pointing out that Knight was a zealous enforcer of laws against religious nonconformists and eventually prosecuted under the Statute of Northampton, Malcolm's account of Knight's case was severely misleading. For one, there was not one piece of historical evidence to suggest that James II intended on using the Statute of Northampton as a vehicle to disarm his enemies. This is a historical finding that Malcolm created out of thin air. Second, in reconstructing the history of Knight's case, Malcolm either failed to fully research the case background or purposefully omitted a substantial amount of primary source material. In doing so, Malcolm failed to sufficiently detail the overt political nature of Knight's prosecution. This includes the important fact that the Bristol mayor and alderman accompanying Knight were given clemency. Knight, however, was not.[319] Malcolm also failed to address the fact that Knight never rested his innocence on a common law right or privilege to go armed.[320]

In light of these factual discrepancies, and assuming that Knight was tried for going armed with the Bristol mayor and alderman, this author surmised that the only logical explanation as to why the jury acquitted Knight was that he had accompanied government officials—a legal exception to prosecution under the Statute of Northampton—and therefore would have been presumed innocent by the jury unless he carried the arms outside the bounds of prescribed government duties.[321]

This historical account of Knight's case, however, has also turned out to be suspect, due to an insightful article by English historian Tim Harris.[322] What Harris found on Knight's case that was particularly insightful was that Knight was not prosecuted under the Statute of Northampton for going armed in seizing the Catholic priest, but for an incident that took place shortly after this—an incident that was substantially more alarming to James II.[323] Harris's finding effectively altered the entire timeline of Knight's case.[324] It also revived

Compendium_Roth
Page 0137

the historical question: "Why was Knight acquitted by the Bristol jury?" But, as Harris notes, providing a definitive answer to this question is almost impossible. The historical record does not specify on what legal grounds, if any, the jury acquitted Knight. Neither the *English Reports* nor the other historical accounts of Knight's case provides us with the jury's reasoning. What historians can state with certainty is that the jury impaneled in Knight's case did not necessarily have to acquit Knight on legal grounds. Up through the close of the seventeenth century it was quite common for English juries to issue acquittals for personal or political reasons.[325]

What everyone writing on the history of Knight's case did get right is that the story does indeed begin with the seizure of the Catholic priest. At the time of that seizure, James II was encouraging Catholics to worship openly in violation of law. While the people of Bristol applauded the actions of Knight, the mayor, and the aldermen, James II was displeased, to say the least.[326] Knight, the mayor, and the alderman were subsequently summoned to the king's Privy Council to answer for the entire affair.[327] Therein, the mayor and aldermen were given clemency and the blame fell upon Knight.[328] Fortunately for Knight, any case against him pertaining to the seizure quickly became legally moot once the Catholic priest informed the court that he did not want to move forward with legal proceedings.[329] This is not to say that Knight was legally free and clear. Before the seizure of the Catholic priest was rendered legally moot, Knight, accompanied by his servant, went armed in Bristol with a blunderbuss to an Anglican service. Regarding this incident, Knight testified that he generally did not go armed while in Bristol. Although Knight admitted that he generally rode to Bristol "with a Sword and Gun," he always left them "at the end of Town" when he entered and took them "when he went out."[330] But in this instance Knight broke protocol and carried his blunderbuss into Bristol.[331]

Contrary to what Halbrook and some others have insinuated, Knight was not peacefully carrying the blunderbuss in the streets just to do so, or because it was understood to be a privilege or right.[332] It was quite the opposite. Knight went armed because he feared for the safety of both himself and the Anglican parishioners, which he erroneously believed were in danger of being murdered by Catholics.[333] This was what Knight referred to as being "Godfreyed"—an intentional reference to the 1678 murder of London magistrate Sir Edmund Berry Godfrey, who had been found dead in a London ditch after having been investigating the Popish Plot. Knight's insinuation that the Protestant parishioners were to be "Godfreyed" would have been more alarming to James II than the seizure of the Catholic priest. Indeed, three Catholics were convicted of murdering Godfrey and subsequently executed. It turned out, however, that

the convictions were based upon the perjured testimony of Titus Oates, who was later branded "Titus the Liar."[334] Thus, Knight's insinuation that Protestants would be "Godfreyed" was not only a lie that undermined the rule of law, but it was also a lie that served to sensationalize Protestant fears of Catholics, fears that James II was trying to overcome under his rule.[335]

Here, it is worth noting that Knight's case would have never come to trial if Knight had admitted fault for his actions. Knight was in fact offered a pardon by the attorney general but chose to submit a plea of not guilty.[336] At trial, despite Knight having reason to fear for his safety, he never pleaded his innocence on the grounds that he went armed peaceably or under the auspices that he had a right to preparatory armed self-defense in public. While fearing for his own safety certainly made Knight a more sympathetic defendant to the jury, it would have been a poor legal defense for Knight to make.[337] Therefore, Knight pleaded his innocence on the grounds of "active Loyalty" to the crown and claimed that his actions were well intentioned.[338] This was a strong legal defense for Knight, who was a prominent figure within the town of Bristol. In 1682, he had been knighted by Charles II and also, at various times, had served as Bristol's warden, councilman, and sheriff.[339] In an attempt to sully Knight's reputation and loyalty to the crown, the attorney general provided evidence that Knight had expressly refused a "Commission to be a Captain in the time of Monmouth's Rebellion."[340] Knight sufficiently countered the attorney general's claim with "very good proofe" that he only refused the commission because of the distances involved with carrying out its duties.[341]

Knight's legal defense was not the only thing that was working in his favor. The people of Bristol overwhelmingly supported Knight's actions in suppressing religious nonconformists, including the Catholic priest.[342] Also, by the time of trial, it was widely known that the prosecution against Knight was political in nature.[343] Not only was it known that at multiple times the attorney general had refused to receive information on behalf of Knight's defense, but rumors within Bristol were swirling that the attorney general had tried to stack the jury with some of the religious "Fantaticks that Sir John Knight had tormented."[344] Fortunately for Knight, the jury that was paneled turned out to be quite favorable, and they ultimately returned a verdict of not guilty.[345] Among the members of the jury were a number of Bristol aldermen, including two former Bristol mayors, Sir William Hayman and Sir William Clutterbuck, all of whom had known and worked with Knight personally, as well as with Knight's father, for years.[346]

Despite the jury having acquitted Knight, under English law the King's Bench could have exerted influence and try to reverse the decision.[347] Knight

Compendium_Roth
Page 0138

did in fact break protocol and carry arms through the streets of Bristol. But fortunately for Knight the presiding judge, Lord Chief Justice Edward Herbert, decided not "to be seveare upon Sir *John* . . . because the matter would not beare it."[348] Also, Herbert was troubled by the manner in which the attorney general handled the case. Herbert in fact scolded the attorney general, stating, "if there be any blinde side of the Kings business you will allwaies lay your finger upon it, and shew it to the Defendants."[349] But whatever sympathy Herbert may have held for Knight as a defendant, as a matter of law Knight was ultimately held accountable for his actions. In agreement with the petition of the attorney general, Herbert placed Knight on a bond as a surety for good behavior.[350]

Understanding the circumstances of Knight's indictment, trial, acquittal, and post-trial bond is important because it once more highlights the ease with which Second Amendment myths are produced and maintained. For over four decades, Halbrook and other likeminded legal scholars have sold us on the false conception that Knight's case stands for a right to preparatory armed carriage. Yet, as outlined above, this interpretation is completely without historical merit. Knight's case had nothing to do with a right to go armed, nor was it even later interpreted by the Founding Fathers as enshrining such a right. Perhaps there is a historical argument to be made that by the mid to late nineteenth century there were some legal minds that interpreted Knight's case as enshrining such a right. But this is far cry from historically claiming that Knight's case codified such a right in Anglo-American law, and that this right was generally understood and accepted up through the late eighteenth century. There is no substantiated evidence to support such a conclusion.

With that said, it is worth noting that Halbrook and other likeminded legal scholars are not the only ones to commit historical errors. Historians are equally fallible at times, including this author. This is an important aspect of researching and writing history. But what differentiates most legal writers from most historians is that the latter are willing to engage in critical discourse—that is, to receive historical criticism, reflect upon it, admit fault or error when presented with it, and formally correct it.[351] The historical point that needs to be emphasized is there are number of modern misconceptions and myths about the Second Amendment's origins, meaning, and purpose. As outlined above, much of the fault lies with modern lawyers, originalists, and legal scholars who approach the history of the Second Amendment as a legal thought experiment not as an objective inquiry into the past for the sake of understanding the past.[352] Essentially, what these modern lawyers, originalists, and legal scholars have done is advance one misleading or unsubstantiated historical claim after another and another, until the history of the Second

Amendment resembled a narrative akin to modern libertarianism. This is not history; it is mythmaking, period.

If a true and objective historical inquiry reveals anything regarding the ratification of the Constitution and the Bill of Rights, it is that the Second Amendment was premised upon the constitutional significance of a well-regulated militia in late-eighteenth-century political thought and the idea that the right to "keep and bear arms" would ensure the security and viability of the United States for years to come.[353] To the Founding Fathers, the Second Amendment right to arms was not intended for the independent whims of individuals acting alone, but for the people contributing to the communal greater good through the militia, which was concurrently regulated and controlled by the federal and state governments.[354] This right might seem odd to modern lawyers, originalists, legal scholars, and many Americans today, but historically understood the right to take part in defending one's liberties in a well-regulated militia, against enemies foreign and domestic, was a fundamental right. Its origins developed in mid-seventeenth-century England and was often characterized by the Founding Fathers as one of the palladiums of liberty. The historical record is clear in this regard. Not one political or legal commentator, from the Glorious Revolution in 1689 through the ratification of the Bill of Rights in 1791, advanced the notion that the individual ownership and use of arms was what secured the nation and the people's rights, liberties, family, and property. Rather, it was military training, discipline, and service in a well-regulated militia that was the palladium or bulwark of republican liberty.

While modern lawyers, originalists, and legal scholars are welcome to opine that such a late-eighteenth-century right is nonsense in twenty-first-century terms, this tells us nothing about the Second Amendment's origins, meaning, and purpose. The fact that a right to arms no longer functions the way it was originally intended and understood, because of other changes in society and the law, does not mean such a right never existed or is "nonsense," as one recent legal scholar put it.[355] It just means the historical basis of the right is foreign to us, and therefore is difficult for the modern mind to conceptualize and understand.[356]

Yet despite the origins and ratification history of the Second Amendment speaking strongly with one voice, in defense of modern lawyers, originalists, and legal scholars there are indeed historically based legal arguments to be made that the Second Amendment must be interpreted as protecting the individual ownership and use of arms as a means to check federal tyranny or to carry firearms for self-defense. These conceptions of the right began to appear in the nineteenth century, and they are the subject of the next chapter.

# THE
# BILL OF RIGHTS
## IN
# MODERN AMERICA

*Revised and Expanded*

Edited by DAVID J. BODENHAMER
and JAMES W. ELY, JR.

*Indiana University Press*
Bloomington & Indianapolis

Compendium_Roth
Page 0139

This book is a publication of

Indiana University Press
601 North Morton Street
Bloomington, Indiana 47404-3797 USA

http://iupress.indiana.edu

*Telephone orders*  800-842-6796
*Fax orders*  812-855-7931
*Orders by email*  iuporder@indiana.edu

First edition titled *The Bill of Rights in Modern America:
After 200 Years*
© 1993, 2008 by Indiana University Press
All rights reserved

No part of this book may be reproduced or utilized in any
form or by any means, electronic or mechanical, including
photocopying and recording, or by any information storage
and retrieval system, without permission in writing from the
publisher. The Association of American University Presses'
Resolution on Permissions constitutes the only exception
to this prohibition.

The paper used in this publication meets the minimum
requirements of American National Standard for Information
Sciences—Permanence of Paper for Printed Library
Materials, ANSI Z39.48-1984.

Manufactured in the United States of America

Library of Congress Cataloging-in-Publication Data

The Bill of Rights in modern America / edited by David J.
Bodenhamer and James W. Ely, Jr. — Rev. and expanded
  p. cm.
 Includes bibliographical references and index.
 ISBN-13: 978-0-253-35159-3 (cloth : alk. paper)
 ISBN-13: 978-0-253-21991-6 (pbk. : alk. paper)  1. United States.
Constitution. 1st–10th Amendments. 2. Civil rights—United States.
I. Bodenhamer, David J. II. Ely, James W., [date]
 KF4550.A2B49 2008
 342.7308'5—dc22

                          2007043211

1 2 3 4 5 13 12 11 10 09 08

and other government branches over the extent of this tension and the overlap of the two clauses. "Our decisions recognize," she noted, "that there is room for play in the joints between the clauses, some space for legislative action neither compelled by the Free Exercise Clause nor prohibited by the Establishment Clause."

As the United States grows more diverse, both religiously as well as ethnically, this "play between the joints" of the two religion clauses will no doubt invite further scrutiny by the courts, and in situations undreamed of by the framers. The rise to political prominence of the so-called "religious Right" in the Republican Party, and its demands upon government, will, if successful, undoubtedly lead to prolonged litigation. To take but one example, the Welfare Reform Act of 1996 included language that indicated religious groups could be eligible for participation as providers of some welfare-related services. President George W. Bush trumpeted his "faith-based initiative" that would have implemented that language. So far Bush's plan has not gotten off the ground, in large measure because many church organizations believe that the costs and problems related to accepting federal money would outweigh the possible advantages. Should this plan ever get started, and should a beneficiary program use some of the money to support a clearly religious activity, there would surely be a court challenge.

# 5

## Public Safety and the
## Right to Bear Arms

ROBERT J. COTTROL AND
RAYMOND T. DIAMOND

On Tuesday, November 20th, 2007, the United States Supreme Court grant-ed certiorari in a case involving the District of Columbia's ban on handguns. The statute had been successfully challenged in the United States Court of Appeals for the District of Columbia Circuit on the grounds that it violated the Second Amendment's guarantee of "the right of the people to keep and bear arms." With its decision to grant certiorari, the Supreme Court entered a constitutional controversy from which it had been largely absent for nearly seventy years, the meaning and scope of the Second Amendment. That con-troversy, the debate over the Second Amendment, has occupied a somewhat curious place in American constitutional discourse. It is the subject of a vast polemical literature in the popular press, part of the often strident debate over gun control. Where once the amendment suffered from an unfortunate scholarly neglect, it has over the last two decades become an arena of lively and sometimes acrimonious debate among historians, legal scholars, and political scientists. The Court's decision is likely to provide a definitive legal ruling on the amendment although it is unlikely to end the controversy over the amendment's original meaning and how it should be applied in modern America.[1]

The debate over the Second Amendment is part of the larger debate over gun control, and as such it focuses on whether or not the framers intended to limit the ability of government to prohibit or severely restrict private own-ership of firearms. It is a debate fueled, in part, by the fear generated by this nation's high crime rate, including an average of 10,000 homicides commit-ted annually with firearms. The debate is also fueled by the existence of broad public support for firearms ownership for self-defense and the fact

that roughly half the homes in the country have firearms. Two interpretations, broadly speaking, of the amendment have emerged from the debate. Some students of the Second Amendment stress the amendment's militia clause, arguing either that the constitutional provision was only meant to ensure that state militias would be maintained against potential federal encroachment or that the individual's right to keep and bear arms was meant to be protected only within the context of a highly regulated, regularly drilling state militia. Adherents of both variants of what might be called the collective rights view argue that the Second Amendment poses little in the way of an impediment to strict, even prohibitory gun control given the fact that most Americans at the start of the twenty-first century are not regularly engaged in the business of militia training.

Supporters of the individual rights view stress the amendment's second clause, arguing that the framers intended a militia of the whole, or at least a militia consisting of the entire able-bodied white male population. For them this militia of the whole was expected to perform its duties with privately owned weapons. Advocates of this view also urge that the militia clause should be read as an amplifying rather than a qualifying clause; that is, while maintaining a "well-regulated militia" was a major reason for including the Second Amendment in the Bill of Rights, it should not be viewed as a sole or limiting reason. The framers also had other reasons for proposing the amendment, including a right to individual self-defense.

The right to keep and bear arms became controversial in the late twentieth century, yet for much of American history constitutional commentators extolled the right as a fundamental cornerstone of liberty that could not be denied free people. This widespread agreement occurred in part because of the frontier conditions that existed from the colonial period through much of the nineteenth century. The role of privately owned arms in achieving American independence, particularly in the early years of the Revolution, strengthened this consensus. The often violent and lawless nature of American society also contributed to the widespread view that the right to possess arms for self-defense was fundamental.

But the Second Amendment and the right to keep and bear arms cannot be understood solely through an examination of American history. Like other sections of the Bill of Rights, the Second Amendment was an attempt to secure what was believed to be a previously existing right. The framers of the Bill of Rights did not believe they were creating new rights. Instead, they were attempting to prevent the newly formed federal government from encroaching on rights already considered part of the English constitutional heritage.[2]

To understand what the framers intended the Second Amendment to accomplish, it is necessary to examine their world and their view of the right

to bear arms as one of the traditional "rights of Englishmen." The English settlers who populated North America in the seventeenth century were heirs to a tradition over five centuries old governing both the right and the duty to be armed. In English law the idea of an armed citizenry responsible for the security of the community had long coexisted, perhaps somewhat uneasily, with regulation of the ownership of arms, particularly along class lines. The Assize of Arms of 1181 required the arming of all free men. Lacking both professional police forces and a standing army, English law and custom dictated that the citizenry as a whole, privately equipped, assist in both law enforcement and military defense. By law all men ages sixteen through sixty were liable to be summoned into the sheriff's posse comitatus. All persons were expected to participate in the hot pursuit of criminal suspects, the "hue and cry," supplying their own arms for the occasion. There were legal penalties for failure to participate. The maintenance of law and order was a community affair, a duty of all citizens.[3]

And all able-bodied men were considered part of the militia and were required, at least theoretically, to be prepared to assist in military defense. The law required citizens to possess arms. Towns and villages were required to provide target ranges in order to maintain the martial proficiency of the yeomanry. Despite this, the English discovered that the militia of the whole maintained a rather indifferent proficiency and motivation. By the sixteenth century the practice was to rely on select bodies of men intensively trained for militia duty rather than on the armed population at large.

Although English law recognized a duty and a right to be armed, both were highly circumscribed by English class structure. The law regarded the common people as participants in community defense, but it also regarded them as a dangerous class, useful perhaps in defending shire and realm but also capable of mischief with their weapons, mischief toward each other, their betters, and their betters' game. Restrictions on the type of arms deemed suitable for common people had also long been part of English law and custom. Game laws had long been one tool used to limit the arms of the common people. The fourteenth-century Statute of Northampton restricted the ability of people to carry arms in public places. A sixteenth-century statute designed as a crime control measure prohibited the carrying of handguns and crossbows by those with incomes of less than 100 pounds a year. After the English Reformation, Catholics were also often subject to being disarmed as potential subversives.

The need for community security had produced a traditional duty to be armed in English law, but it took the religious and political turmoil of seventeenth-century England to transform that duty into a notion of a political or constitutional right. Attempts by the Stuart kings Charles II and James II to

disarm large portions of the population, particularly Protestants and sus-
pected political opponents, met with popular resistance and helped implant
into English and later American constitutional sensibilities the belief that
the right to possess arms was of fundamental political importance. These ef-
forts led to the adoption of the seventh provision of the English Bill of Rights
in 1689:

> That the subjects which are Protestants may have arms for their defense suitable
> to their conditions and as allowed by law.[4]

By the eighteenth century, the right to possess arms, both for personal
protection and as a counterbalance against state power, had come to be
viewed as one of the fundamental rights of Englishmen on both sides of the
Atlantic. Sir William Blackstone, whose *Commentaries on the Laws of En-
gland* greatly influenced American legal thought both before the Revolution
and well into the nineteenth century, listed the right to possess arms as one
of the five auxiliary rights of English subjects without which their primary
rights could not be maintained:

> The fifth and last auxiliary right of the subject, that I shall at present men-
> tion, is that of having arms for their defense, suitable to their condition and de-
> gree and such as are allowed by law. Which is also declared by the same statute
> . . . and is indeed a public allowance, under due restrictions, of the natural right
> of resistance and self-preservation, when the sanctions of society and laws are
> found insufficient to restrain the violence of oppression.[5]

If some five centuries of English experience had transformed the duty to
be armed for the common defense into a right to be armed, in part, to resist
potential political oppression, a similar evolution in thought had occurred
in the American colonies between the earliest seventeenth-century settle-
ments and the American Revolution. Early English settlements in North
America had a quasi-military character, an obvious response to harsh fron-
tier conditions. Governors of settlements often held the title of militia cap-
tain, reflecting both the civil and military nature of their office. In order to
provide for the defense of often isolated colonies, special effort was made to
ensure that white men capable of bearing arms were brought into the col-
onies.

Far from the security of Britain and often facing hostile European pow-
ers at their borders, colonial governments viewed the arming of able-bodied
white men and the requirement for militia service as essential to a colony's
survival. The right and duty to be armed broadened in colonial America. If
English law qualified the right to own arms by religion and class, those con-
siderations were significantly less important in the often insecure colonies.

If by the seventeenth century the concept of the militia of the whole was largely theoretical in England, in America it was the chief instrument of colonial defense. While the English upper classes sought to restrict the ownership of arms on the part of the lower classes in part as a means of helping to enforce game laws, there were significantly fewer restrictions on hunting in North America with its small population and abundant game. From the beginning, conditions in colonial America created a very different attitude toward arms and the people.

Race provided another reason for the renewed emphasis on the right and duty to be armed in America. Britain's American colonies were home to three often antagonistic races—red, white, and black. For the settlers of British North America, an armed and universally deputized white population was necessary not only to ward off dangers from the armies of other European powers but also to ward off attacks from the indigenous Indian population that feared the encroachment of English settlers on their lands. And an armed white population was essential to maintain social control over blacks and Indians who toiled unwillingly as slaves and servants in English settlements. This helped broaden the right to bear arms for whites. The need for white men to act not only in the traditional militia and posse capacities but also to keep order over the slave population helped lessen class, religious, and ethnic distinctions among whites in colonial America. That need also helped extend the right to bear arms to classes traditionally viewed with suspicion in England, including indentured servants.

The colonial experience helped strengthen the appreciation of early Americans for the merits of an armed citizenry. That appreciation was of course further strengthened by the experience of the American Revolution. The Revolution began with acts of rebellion by armed citizens. And if sober historical analysis reveals that it was actually American and French regulars who ultimately defeated the British and established American independence, the image of the privately equipped ragtag militia successfully challenging the British Empire earned a firm place in American thought and helped influence American political philosophy. For the generation that authored the Constitution, it reinforced the lessons their English ancestors had learned in the seventeenth century. It revitalized Whiggish notions that standing armies were dangerous to liberty. It helped transform the idea that the people should be armed and security provided by a militia of the people from a matter of military necessity into a political notion, one that would find its way into the new Constitution.

This view that an armed population contributed to political liberty as well as community security found its way into the debates over the Constitution and is key to understanding the Second Amendment. Like other pro-

visions of the Constitution, the clause that gave Congress the power to provide for organizing, arming, and disciplining the militia excited fears among those who believed that the proposed Constitution could be used to destroy both state power and individual rights. It is interesting, in light of the current debate over the meaning of the Second Amendment, that both Federalists and Anti-Federalists assumed that the militia would be one that enrolled almost the entire white male population between the ages of sixteen and sixty and that militia members would supply their own arms.

But many feared that the militia clause could be used both to do away with the state's control over the militia and to disarm the population. Some expressed fear that Congress would use its power to establish a select militia. Many viewed a select militia with as much apprehension as they did a standing army. The English experience of the seventeenth century had shown that a select militia could be used to disarm the population at large. Richard Henry Lee of Virginia expressed the fear that a select militia might serve this end.[6]

In their efforts to answer critics of the Constitution, Alexander Hamilton and James Madison addressed the charges of those critics who argued that the new Constitution could both destroy the independence of the militia and deny arms to the population. Hamilton's responses are particularly interesting because he wrote as someone who was openly skeptical concerning the military value of the militia of the whole. The former Revolutionary War artillery officer conceded that the militia had fought bravely during the Revolution, but he argued it had proved no match for regular troops. Hamilton urged the creation of a select militia that would be more amenable to military training and discipline than the population as a whole. Despite this he conceded that the population as a whole should be armed.

But if Hamilton gave only grudging support to the concept of the militia of the whole, Madison, author of the Second Amendment, was a much more vigorous defender of it. In *The Federalist,* Number 46, he left little doubt that he saw the armed population as a potential counterweight to tyranny:

> Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government: still it would not be going too far to say, that the State governments, with the people on their side, would be able to repel the danger. The highest number to which, according to the best computation, a standing army can be carried in any country, does not exceed one hundredth part of the whole number of souls; or one twenty-fifth part of the number able to bear arms. This proportion would not yield, in the United States, an army of more than twenty-five or thirty thousand men. To these would be opposed a militia amounting to near half a million citizens with arms in their hands, officered by men chosen among themselves, fighting for

Compendium_Roth
Page 0147

their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted, whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops. Those who are best acquainted with the late successful resistance of this country against the British arms, will be most inclined to deny the possibility of it. Besides the advantage of being armed, which the Americans possess over the people of almost every other nation, the existence of subordinate governments, to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprises of ambition, more insurmountable than any which a simple government of any form can admit of. Notwithstanding the military establishments in the several kingdoms of Europe, which are carried as far as the public resources will bear, the governments are afraid to trust the people with arms.[7]

This desire to maintain a universal militia and an armed population played a critical part in the adoption of the Second Amendment. The amendment, like other provisions of the Bill of Rights, was designed to prevent the newly created federal government from encroaching on rights already enjoyed by the people. It is important to remember that firearms ownership, for self-defense and hunting, was widespread with few restrictions, at least for the white population. It is also significant that the universally accepted view of the militia, at the time, was that militiamen would supply their own arms. One year after the ratification of the Bill of Rights, Congress passed legislation reaffirming the notion of a privately equipped militia of the whole. The act, titled "An Act more effectually to provide for the National Defense by establishing an Uniform Militia throughout the United States," called for the enrollment of every free, able-bodied white male citizen between the ages of eighteen and forty-five into the militia. The act required every militia member to provide himself with a musket or firelock, a bayonet, and ammunition.[8]

The decades between the adoption of the Second Amendment and the Civil War brought little opportunity for judicial interpretation of the constitutional provision. While a number of jurisdictions had laws prohibiting the carrying of concealed weapons, there were few restrictions concerning the ownership or the open carrying of arms in antebellum America. Most laws restricting the possession of firearms were to be found in the slave states. These laws generally prohibited the possession of firearms on the part of slaves and free blacks. Outside of the slave states the right to have arms was generally not impaired, not even for free Negroes. There was no federal legislation restricting firearms ownership, and since *Barron v. Baltimore* (1833) held that the Bill of Rights only limited the power of the federal government, there was no occasion before the Civil War for the federal courts to examine the issue.

Compendium_Roth
Page 0148

If in the antebellum era there was an absence of federal court decisions on the Second Amendment, there was nonetheless widespread agreement concerning the scope and meaning of the provision among commentators and in the limited number of state court decisions that examined the issue. Noted jurist and legal commentator St. George Tucker contrasted the Second Amendment's robust guarantee of a right to keep and bear arms with the more restrictive English guarantee, noting that class restrictions and game laws had not limited the American right in the way that the English right had been limited. Supreme Court Justice Joseph Story also regarded the right as fundamental:

> The right of the citizens to keep, and bear arms has been justly considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if they are successful in the first instance, enable the people to resist, and triumph over them.[9]

If leading antebellum commentators saw the right as central to a free people, federal courts were largely silent on the subject. The only pronouncement from the Supreme Court on the subject before the Civil War came in Justice Taney's opinion in *Dred Scott v. Sandford* (1857). Taney indicated that African Americans, slave or free, could be denied the right to possess arms just as they could be denied freedom of speech, assembly, and travel. Despite the silence of the federal courts on the subject, state courts began developing a jurisprudence of the right to keep and bear arms, interpreting relevant provisions of state constitutions. These cases attempted to balance the right to bear arms against competing interests in public safety. Generally state courts upheld prohibitions against carrying concealed weapons. Some state courts limited the right to carry arms to those weapons that were suitable for use in "civilized warfare," an attempt to prohibit the carrying of weapons that were thought to be used exclusively for criminal purposes. Most of these cases involved restrictions on carrying concealed firearms. In one antebellum case the Georgia Supreme Court decided that the Second Amendment applied to that state.[10]

It would take the turmoil of the Civil War and Reconstruction to bring the Second Amendment before the Supreme Court. The end of the Civil War brought about a new conflict over the status of former slaves and the power of the states. The defeated white South sought to preserve as much of the antebellum Southern social order as could survive Northern victory and national law. Southern states were not prepared to accord to the newly emancipated black population the general liberties enjoyed by white citizens. Indeed, former slaves did not even have the rights that Northern states had long given free Negroes.

In 1865 and 1866 Southern states passed a series of statutes known as the black codes. These statutes were designed, in part, to ensure that traditional Southern labor arrangements would be preserved. They often required black agricultural workers to sign labor contracts that bound them to their employers for a year. Blacks were forbidden to serve on juries and could not testify or act as parties against whites. Vagrancy laws were used to force blacks into labor contracts and to limit freedom of movement. And as further indication that the former slaves had not yet joined the ranks of free citizens, Southern states passed legislation prohibiting blacks from carrying firearms without licenses, which whites were not required to have. The Mississippi statute provides a typical example of restrictions of this kind:

> Be it enacted, . . . that no freedman, free Negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof in the county court shall be punished by fine, not exceeding ten dollars, and pay the cost of such proceedings and all such arms or ammunition shall be forfeited to the informer; and it shall be the duty of every civil or military officer to arrest any such freedman, free Negro or mulatto found with any such arms or ammunition, and shall cause him or her to be committed to trial in default of bail.[11]

Such measures caused strong concerns among Northern Republicans. Many charged that the South was trying to reinstate slavery and deny former slaves those rights long considered essential to a free people. The news that the freedmen were being deprived of the right to keep and bear arms was of particular concern to champions of Negro citizenship. For them the right of the black population to possess weapons went beyond symbolic importance. It was important both as a means of maintaining the recently reunited union and as a means of ensuring against the virtual reenslavement of those formerly in bondage. Faced with a hostile South determined to preserve the antebellum social order, Northern Republicans were particularly alarmed at provisions that preserved the right to keep and bear arms for former Confederates while disarming blacks, the one group in the South with clear Unionist sympathies. This helped convince many Northern Republicans to seek national enforcement for the Bill of Rights.

The debates over the Fourteenth Amendment and the civil rights legislation of the Reconstruction era suggest the determination of Congress to protect the right to keep and bear arms and other provisions of the Bill of Rights against state infringement. Representative Jonathan Bingham of Ohio, the author of the Fourteenth Amendment's privileges or immunities clause, and other Republican supporters of the Fourteenth Amendment expressed

Compendium_Roth
Page 0150

the view that the clause applied the Bill of Rights to the states. The Southern efforts to disarm the freedmen and to deny other basic rights to former slaves played an important role in convincing the Thirty-ninth Congress that traditional notions concerning federalism and individual rights needed to change.[12]

If the events of Reconstruction persuaded the Thirty-ninth Congress of the need for applying the Bill of Rights to the states, the Supreme Court in its earliest decisions on the Fourteenth Amendment moved to maintain the antebellum federal structure. The Supreme Court's first pronouncements on the Second Amendment came about after the enactment of the Fourteenth Amendment and concerned the extent to which the latter amendment extended the protection of the right to keep and bear arms. The first case, *United States v. Cruikshank* (1875), stemmed from charges brought by federal officials against William Cruikshank and others for violating the constitutional rights of a group of black men who were attempting to vote. The charges included claims that Cruikshank and his associates violated the right of the black men to peaceably assemble and that they also violated their right to bear arms. The Court in a majority opinion authored by Chief Justice Morrison R. Waite held that the federal government had no power to protect citizens against private action that deprived them of their constitutional rights. The opinion held that the First and Second Amendments were limitations on Congress, not private individuals. For protection against private criminal action the individual was required to look to state governments.[13]

The next case in which the Court examined the Second Amendment, *Presser v. Illinois,* more directly involved the question of whether or not the Second Amendment in combination with the Fourteenth set limits on the ability of states to limit the right to bear arms. That case involved a challenge to an Illinois statute that prohibited individuals who were not members of the organized militia from parading with arms. Justice William Woods's majority opinion noted that the statute did not infringe on the right to keep and bear arms. Woods nonetheless used the case to indicate that the Second Amendment did not apply to state governments even in light of the Fourteenth Amendment. Woods also indicated that the citizenry at large constituted a reserve militia that was a resource for the United States government and hence could not be disarmed by state governments, independent of Second Amendment considerations. *Presser* is still cited as precedent indicating that the Fourteenth Amendment does not incorporate the Second Amendment.[14]

The nineteenth century would come to an end with legal commentators in general agreement that the right to keep and bear arms was an important

Compendium_Roth
Page 0151

one for a free people. Michigan jurist Thomas M. Cooley discussed the subject in his treatise on constitutional law. Anticipating some of the modern debate on the subject, Cooley expressed the view that the amendment should not be seen as restricted only to members of the militia. He noted that the purpose of the Second Amendment was to allow the people to provide a check against potential governmental usurpation of power. Cooley went on to note that a restriction of the right to arms to members of the militia, whose membership could be limited by the government, would allow the government to defeat the very purpose of the amendment.[15]

The nineteenth century would end with reasonably broad agreement among those constitutional commentators who considered the issue that the right to have arms was an important safeguard for the freedoms of the American people. It should be added that that agreement was a broad agreement in principle that usually did not extend to the messy details of what kinds of firearms regulation were and were not consistent with the principle. Because firearms regulation was a matter of state and local law, the federal courts, adhering to the view that the Second Amendment did not apply to the states, had little to say on the subject.

State courts did develop a jurisprudence on the right to have arms that examined state firearms regulation in light of provisions in state constitutions protecting the right to have arms. These cases usually provided state and local governments more leeway in regulating the carrying of arms, particularly concealed weapons, than in restricting the ownership of arms. Thus the 1871 Tennessee case of *Andrews v. State* held that the right to bear arms was an incident of militia service and subject to reasonably broad state regulation, while the right to own arms was a private right with limitations on state restriction.[16]

The early twentieth century would bring about new efforts at firearms regulation and with it new attitudes concerning arms and the Second Amendment. Traditional beliefs concerning the importance of arms were frequently being tempered by the view that whole classes of people were unfit to exercise this prerogative. In the South, state governments, freed from the federal scrutiny that existed in the Reconstruction era, used laws regulating concealed weapons to accomplish what had been attempted with the postwar black codes. Discriminatory enforcement of these laws often left blacks disarmed in public places while whites remained free to carry firearms. This state of affairs helped facilitate lynchings and other forms of racial violence during the Jim Crow era.

But the South was not the only region where social prejudice restricted the right of disfavored minorities to possess firearms. If the white South saw armed blacks as a threat, politicians in other regions saw a similar threat aris-

ing from large-scale immigration from southern and eastern Europe. The new immigrants, like others before them, often met hostile receptions. They were associated with crime and anarchy and stereotyped as lazy and mentally unfit. Many native-born Americans feared the immigrants would bring anarchist-inspired crime from Europe, including political assassinations and politically motivated armed robberies. These fears led in 1911 to passage of New York's Sullivan Law. This state statute was aimed at New York City, a place where the large, foreign-born population was believed to be peculiarly susceptible to crime and vice. The Sullivan Law went far beyond typical gun control measures of the day. It prohibited the unlicensed carrying of weapons and required a permit for the ownership or purchase of pistols. Violation of the statute was a felony. The first person convicted under the statute was a member of one of the suspect classes, an Italian immigrant.[17]

It was in this early-twentieth-century atmosphere that the collective rights view of the right to bear arms first began to attract the attention of the judiciary. In one of the earliest cases to adopt this view, *Salina v. Blaksley,* the Supreme Court of Kansas interpreted that state's constitutional provision protecting the right to bear arms as a protection that only applied to the militia and not for individual purposes.[18] In 1911 Maine chief justice Lucillius A. Emery authored an essay, "The Constitutional Right to Keep and Bear Arms," in the *Harvard Law Review,* urging that the right to bear or carry arms should be viewed as a right limited to militia service. He also noted that legislatures could not prohibit the keeping or ownership of arms, echoing the distinction made by the Tennessee court in *Andrews.*[19]

These developments affected relatively few Americans at the beginning of the twentieth century. The nation was still largely rural. Firearms ownership for both self-defense and hunting were fairly commonplace. And statutes regulating firearms ownership were relatively rare and unobtrusive. For most citizens access to firearms was largely unimpaired and there was not too much occasion for either the courts or constitutional commentators to say much concerning the Second Amendment.

This situation would change after the First World War. Prohibition brought about the rise of organized gangs engaged in the sale of bootlegged alcohol. Territorial rivalries among the gangs led to open warfare on the streets of the nation's major cities. That warfare was made even more terrifying by the introduction of a terrifying new weapon, the Thompson submachine gun. A fully automatic weapon, developed too late for use in World War I, the "Tommy Gun" was one of the first submachine guns in widespread use. Used by violent criminals in their wars on each other, the Thompson also claimed the lives of a fair number of members of the general public as well.

100 | MODERN RIGHTS IN CONTROVERSY

The end of the twenties and the end of Prohibition did not bring a halt to notorious misuse of automatic weapons. The rise in the 1930s of such desperadoes as John Dillinger, "Pretty Boy" Floyd, "Ma" Barker, George "Machine Gun" Kelly, and Clyde Barrow and Bonnie Parker became a part of American folklore. The exploits of such criminals were made more vivid and terrifying by the new medium of talking motion pictures. Thus, the horrors of criminal misuse of automatic weapons were forcibly brought home to the public.

These events caused the Roosevelt administration to propose the first federal gun control legislation. The National Firearms Act of 1934 required registration, police permission, and a prohibitive tax for firearms that were deemed gangster weapons, including automatic weapons, sawed-off shotguns, and silencers. It is interesting in light of the current debate that the Roosevelt administration deemed the act a revenue measure, conceding that an outright ban on such weapons would probably be beyond Congress's powers.

The 1934 act gave rise to the Supreme Court's last decision to date on the Second Amendment, *United States v. Miller.* It was a curious case. Both sides of the Second Amendment debate have claimed that the decision authored by Justice James C. McReynolds supports their views. Interestingly, the Court only heard arguments by the government. The federal government appealed a decision by a federal district court invalidating the National Firearms Act of 1934 in a case involving the unlicensed transportation of an unregistered sawed-off shotgun. The Court focused on the weapon in question:

> In the absence of any evidence tending to show that the possession of a [sawed-off shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument. Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.[20]

Advocates of the collective rights view have emphasized the Court's focus in the *Miller* decision on the militia, claiming that it was an indication that the Court saw the Second Amendment as being concerned only with the preservation of state militias. But the Court's discussion of the militia indicates that it saw a clear relationship between the individual right and the maintenance of the militia:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia

comprises all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.[21]

Probably the most accurate way to view what the Court did in *Miller* is to see it as an updating of the nineteenth-century civilized warfare doctrine. McReynolds's decision relied on the antebellum Tennessee case *Avmette v. State,* which allowed the state to restrict the carrying of those types of weapons which were frequently used by criminals and not suitable for the common defense. The Supreme Court in *Miller* remanded the case to the lower courts to determine whether or not a sawed-off shotgun was a weapon appropriate for militia use. That determination was never made.[22]

Although *Miller* was the Court's most comprehensive exploration of the Second Amendment, it had little effect on either firearms regulation or the general public's view concerning the right to keep and bear arms. For nearly three decades after *Miller* little existed in the way of federal firearms regulation. State and local legislation existed but with few exceptions, such as the New York Sullivan Law, these were usually traditional regulations governing the manner of carrying weapons, not outright prohibitions. There was little serious attempt to mount constitutional challenges to these restrictions. The Second Amendment was thus bypassed in the postwar Supreme Court's process of applying most of the provisions of the Bill of Rights to the states. Justice Hugo Black, who was an advocate of the view that the Fourteenth Amendment made all of the Bill of Rights applicable to the states, argued that the Second Amendment should also apply to the states, but the Court has not heard a case on that issue since *Presser.* It is probably accurate to say that at least until the 1960s most people, including attorneys and judges, accepted the view that the Second Amendment protected an individual right but otherwise thought very little about the matter because firearms restrictions, even on the state and local levels, were slight.

It would take the turmoil of the 1960s and the tragedy of three assassinations to bring about the birth of the modern gun control movement and create the current debate over the meaning of the Second Amendment. The assassination of President John F. Kennedy in 1963 brought calls for stricter national controls over the sale of firearms. Urban riots and the assassinations of civil rights leader Martin Luther King, Jr., and Senator Robert F. Kennedy helped lead to the passage of the Gun Control Act of 1968, the first federal legislation that seriously affected the purchasing of firearms for large numbers of Americans. This legislation limited the purchase of firearms through the mails and also restricted the importation of surplus military rifles. The act also prohibited the purchase of firearms by those with felony

convictions, even though the legislation provided no means of checking a purchaser's record. Some of the provisions of the 1968 act would later be modified by legislation passed in 1986.

The 1968 act proved to be something of a watershed. Since then a national debate over gun control and a subsidiary debate over the meaning of the Second Amendment have become perennial features in American politics. The rise of a highly visible national gun control movement since the 1960s during has been something new in American political life. Some adherents of this new political movement have advocated relatively moderate measures. These have included screening measures designed to prevent individuals with suspect backgrounds, criminal records, or histories of mental instability from purchasing firearms. Such measures are essentially extensions of firearms regulations that have long existed in many states, attempts to limit firearms use by undesirable persons. These kinds of regulations have long existed even in states with state constitutional protection for the right to bear arms and courts willing to enforce such guarantees. The more modest measures pose little threat to the general public's right to possess firearms.

But since the 1960s, others have argued for more radical measures. Their view has been that state and local government and, more importantly, the federal government can and should outlaw the general public's right to possess whole categories of firearms that had previously been owned by large numbers of law-abiding citizens. Many in the gun control movement argued that ownership of guns for self-defense or as part of a universal citizens' militia was dangerous and atavistic. They claimed that the only legitimate reason for civilian firearms ownership was for sporting purposes, usually hunting, and that even that ownership should be permitted only under stringent licensing. Efforts were made to ban firearms that did not meet this "sporting purposes" definition. In the 1970s and 1980s gun control advocates urged the banning of handguns, particularly cheap ones popularly known popularly as "Saturday Night Specials." In the 1990s many gun control supporters advocated bans on "assault weapons," a term employed without great precision to include semiautomatic rifles with military features such as bayonet lugs and pistol grips, or virtually all semiautomatic rifles, depending on the user's definition. The gun control movement scored some success with its campaign against assault weapons. A handful of states enacted bans on some semiautomatic firearms. Congress enacted a ten-year prohibition on the sale of semiautomatic rifles with military-style features in 1994. Congress refused to renew the ban in 2004.

This advocacy of wholesale restrictions on firearms ownership helped bring about the modern debate over the meaning of the Second Amendment. Much of the effort to reinterpret the Second Amendment as a collec-

tive right has been an attempt to justify proposed firearms restrictions that at earlier periods in American history would have been regarded as unconstitutional. Since the 1960s a vigorous polemical debate over whether the amendment should be seen as a broad individual right or as a right limited to a highly controlled militia context has been waged in the nation's editorial pages and broadcast media.

Despite the passion of the public debate, the Supreme Court kept a curious silence on the issue. The Court had opportunities to address it: the lower federal courts in the 1970s and 1980s upheld gun control legislation either by citing *Miller* for the proposition that the Second Amendment only protected the right to bear arms in a militia context when addressing federal legislation, or *Presser* for the proposition that the amendment did not apply to the states. The Supreme Court declined to grant certiorari in these cases and provide a definitive modern ruling on the issue.

If the Court has been reluctant to directly address the issue of the Second Amendment and its applicability to the gun control issue, it has, curiously enough, been willing to acknowledge the right to bear arms as dicta in cases extraneous to the gun control issue. Starting with Justice Harlan's dissent in the 1961 case *Poe v. Ullman,* involving a Connecticut anti-contraception statute, the right to bear arms has frequently been noted in privacy cases:

> [T]he full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This "liberty" is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; *the right to keep and bear arms* . . . [italics added][23]

Statements by other justices, sometimes in dicta, sometimes in statements to the press, have given heart to supporters of either the individual or collective rights viewpoints, but the Court retained its institutional silence on the subject.

If the Supreme Court in recent decades has been reluctant to address the controversy, other important legal actors have been making pronouncements on the Second Amendment and the right to arms more generally. Forty-four of the fifty states have right to keep and bear arms provisions in their constitutions. While the federal jurisprudence on the right is somewhat thin, state courts have developed a rather robust jurisprudence, ranging from fairly restrictive to fairly expansive views of the right. Congress has also played a role in Second Amendment interpretation. In 1982 the Senate Judiciary Committee's Subcommittee on the Constitution issued a report supporting the individual rights view of the amendment. Four years later Congress passed the Firearms Owners Protection Act, protecting the right

of interstate travel with firearms. The statute was prefaced with congressional findings declaring the Second Amendment an individual right.

The 1980s would see the rise of the academic debate over the Second Amendment. At first it was a debate that mainly engaged independent scholars not affiliated with universities and usually connected to groups supporting or opposing stricter gun controls. Because the subject inherently involves a debate over original intentions or understandings, historians tended to enter the debate sooner than scholars in the legal academy. Something of a milestone in the history of the debate came in 1989 with the publication of Sanford Levinson's "The Embarrassing Second Amendment," in the *Yale Law Journal*. For the first time since gun control had become a national issue in the 1960s, a major constitutional scholar was arguing in a leading law journal that the Second Amendment deserved a serious examination and that the individual rights view was likely the more accurate one. Levinson's article spurred other scholars in law, history, and political science to take up the issue with such leading scholars as Akhil Amar, Saul Cornell, Leonard Levy, Jack Rakove, Laurence Tribe, William Van Alstyne, and Garry Wills, among many others.[24]

The new scholarship probably played a part in reawakening interest on the part of the judiciary in the Second Amendment. Supreme Court Justice Clarence Thomas indicated a favorable disposition toward the individual rights reading of the amendment in the 1997 case *United States v. Printz*.[25] Justice Scalia has expressed support for the individual rights view in scholarly commentary. A major breakthrough for individual rights advocates came in 2001 with the Fifth Circuit case *United States v. Emerson*.[26] In *Emerson*, which involved a Second Amendment challenge to a prosecution of an individual who possessed a firearm in violation of a restraining order, the Fifth Circuit Court of Appeals held that the Second Amendment was an individual right but that a restraining order prohibiting possession of firearms on the part of an individual suspected of domestic violence was reasonable regulation. A 2002 decision by the Ninth Circuit Court of Appeals in *Silveira v. Lockyer* upheld California's ban on assault weapons, holding that the Second Amendment was a collective right. The decision seemed written in part to rebut the Fifth Circuit's opinion in *Emerson*.[27]

National politics would also play a role in issues of Second Amendment interpretation. The election of George Bush in the very close election of 2000 brought to national office an administration that had enjoyed the support of the National Rifle Association, which probably tipped the electoral balance in a number of states. One result of this was a new attitude in the Justice Department more supportive of the individual rights view than had been the case in recent decades. In 2004 the attorney general's office under Attorney

General John Ashcroft's direction issued a formal memorandum on the Second Amendment. The memorandum reflected Ashcroft's long-standing support for the individual rights interpretation. As might be expected, the memorandum met with strong criticism by proponents of stricter gun control and strong support by its opponents. The Ashcroft memorandum was interesting for its detailed analysis of the history and meaning of the Second Amendment, reflecting much of the new scholarship that had developed since the 1990s.[28]

The debate continues into the twenty-first century. It continues to be waged in academic journals and the popular media. The Supreme Court still retains its institutional reluctance to enter the fray, although Chief Justice John Roberts in his 2005 confirmation hearing indicated that he believed the proper interpretation of the Second Amendment was still an open issue and one that the lower federal courts had not resolved. The political branches of government seem largely sympathetic to protecting the right to have arms. During the 1990s and continuing into the first decade of the twenty-first century, an increasing number of states have passed legislation liberalizing the right of citizens to carry guns for self-protection, a reflection of both public fears of crime and the political skill of the National Rifle Association. Some forty states have statutes permitting almost anyone eligible to own a firearm to obtain a license to carry a concealed weapon. In 2006 Congress passed legislation prohibiting lawsuits against firearms manufacturers for criminal misuse of firearms. The legislation contained findings that the Second Amendment protected a right of individuals regardless of whether or not they were members of the militia. That same year Congress also passed legislation prohibiting public officials from disarming citizens during times of natural disaster. This measure was enacted in part in response to actions taken by New Orleans officials during Hurricane Katrina. During that crisis New Orleans police confiscated guns from citizens in New Orleans, sometimes in dramatic confrontations played out on national television.

The March 2007 decision by the U.S. Court of Appeals for the D.C. Circuit overturning the District of Columbia's handgun ban on Second Amendment grounds undoubtedly played a key role in ending the Supreme Court's traditional reluctance to consider Second Amendment cases. In a 2–1 decision in the case *Parker v. District of Columbia*, a three-judge panel of the D.C. Circuit declared the District of Columbia's ban on handguns unconstitutional.[29] The majority opinion authored by Judge Laurence H. Silberman of the D.C. Circuit held that the Second Amendment was a right of individuals and that the District of Columbia's ban contravened that right. It was the first time that a federal court had held that a specific piece of gun control legisla-

tion violated the Second Amendment. The full D.C. Circuit denied the District of Columbia's petition for an en banc hearing or hearing by the full D.C. Circuit, thus letting the panel opinion stand.[30] The government of the District of Columbia filed a petition for certiorari which was granted in November.

This chapter is being completed in early December of 2007. As we are writing, parties and amici are preparing briefs for what will be the most important Second Amendment case in United States history. Oral arguments in the case involving the handgun ban in the District of Columbia will take place in the spring of 2008 with a decision likely in the early summer. We, of course, do not know how the Court is going to rule but its decision is not likely to end the academic and popular debate over the amendment. The debate over arms and rights in contemporary America is fueled by mixed feelings and often contradictory impulses on the part of the American people. Times of crisis, natural disasters like Hurricane Katrina, or the attacks on September 11, 2001, illustrate one dimension of the debate. During such occasions we often see media reports of dramatic increases in sales of guns as an indication that large numbers of ordinary citizens see firearms ownership as useful when public officials seem powerless to protect the population. Another dimension of the debate is often seen when particularly horrible killings occur with firearms; mass shootings in schools and workplaces are vivid, albeit rare, examples. At such times the public often demands new measures designed to keep guns out of the hands of those likely to commit random acts of violence. These highly visible occurrences intensify the debate over gun control and the subsidiary debate over the meaning of the Second Amendment.

In many ways the time has come for a new debate over the Second Amendment, its meaning and how it might be applied in the twenty-first century. The idea that the right to keep and bear arms was meant to be tied so closely to membership and participation in a militia over which the government has total power to organize or fail to organize is one that can only be sustained through a highly strained reading of the history. Like nineteenth-century jurist Thomas Cooley we also believe that such a reading creates a right that the government can defeat at any time simply by the way it decides to organize the militia. We would accept no such reading with any other provision of the Bill of Rights, nor should we with the Second Amendment.

But to say that the individual rights reading of the Second Amendment is the more plausible and stronger reading of the provision should not end debate on the issue. There should be a debate over whether or not the amendment should simply be repealed. Clearly many advocates of strong

gun control measures believe the amendment to be an anachronism, a relic of an atavistic age of universal militias, posses, slave patrols, vigilantes, and citizens armed against each other. If this is so, they should make that case. It is a hard case to make in an America with widespread gun ownership and some forty-four states that have enacted or reenacted right to bear arms provisions in their state constitutions in the twentieth century, but in the final analysis radical constitutional change should be the result of sustained debate and amendment, not simply ignoring or creatively reinterpreting key constitutional provisions.

There is, however, an even more interesting debate that might be had with respect to public safety and the right to bear arms. That debate would involve examining how best to recognize and protect the right while also allowing legislatures leeway to develop criminologically sound measures designed to limit, insofar as possible, access to weapons on the part of career criminals and those who are mentally unstable. Such a debate would involve recognizing that the right to have arms has been and remains part of the American constitutional tradition, that it is valued by large segments of society, and that the right sets real limits on governmental regulation. It also involves recognizing that measures designed to keep weapons out of undesirable hands are not necessarily inconsistent with this right. In the second half of the twentieth century, we were unable to develop this kind of debate on the national level precisely because of the effort to redefine the Second Amendment into meaninglessness. Perhaps in the first half of the twenty-first century a greater willingness to recognize the Second Amendment will allow the dialogue to begin.

# 6

## The Enigmatic Place of
## Property Rights in Modern
## Constitutional Thought

JAMES W. ELY, JR.

The notion that property ownership is essential for the enjoyment of liberty has long been a fundamental tenet of Anglo-American constitutional thought. Property is more than the physical possession of an object. The concept of ownership encompasses a range of interests, including the right to use, develop, and dispose of one's property. Envisioning property ownership as establishing the basis for individual autonomy from government coercion, the framers of the Constitution placed a high value on the security of property rights. Echoing the philosopher John Locke, John Rutledge of South Carolina advised the Philadelphia convention that "Property was certainly the principal object of Society."[1] Further, the framers believed that respect for property rights was crucial to encourage the growth of national wealth. In the main the framers relied upon a variety of institutional arrangements, such as the separation of powers, to guard the rights of property owners. Still, the Constitution and Bill of Rights contain important provisions designed to restrain legislative incursions on property rights.

Not surprisingly, therefore, throughout most of American history the Supreme Court functioned as a guardian of property and economic rights against legislative encroachments. Although the Progressive movement of the early twentieth century challenged the high constitutional standing of property and called for greater governmental management of the economy, the Supreme Court remained leery of laws that limited the rights of property owners. The Court's defense of traditional property rights in the 1930s, however, threatened the New Deal program to combat the Great Depression, eventually causing President Franklin D. Roosevelt to propose his plan to

# Concealed Weapon Laws of the Early Republic

*Dueling, Southern Violence, and Moral Reform*

Clayton E. Cramer

PRAEGER

Westport, Connecticut
London

Compendium_Roth
Page 0163

Library of Congress Cataloging-in-Publication Data

Cramer, Clayton E.
    Concealed weapon laws of the early republic : dueling, southern violence, and moral reform / Clayton E. Cramer.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 0–275–96615–1 (alk. paper)
    1. Firearms—Law and legislation—Southern States—History—19th century.  2. Southern States—Social life and customs—1775–1865. I. Title.
    KF3941.C729  1999
    344.75'0533—dc21        99–18014

Copyright © 1999 by Clayton E. Cramer

All rights reserved. No portion of this book may be reproduced, by any process or technique, without the express written consent of the publisher.

Library of Congress Catalog Card Number: 99–18014
ISBN: 0–275–96615–1

First published in 1999

Praeger Publishers, 88 Post Road West, Westport, CT 06881
An imprint of Greenwood Publishing Group, Inc.
www.praeger.com

Printed in the United States of America



The paper used in this book complies with the Permanent Paper Standard issued by the National Information Standards Organization (Z39.48–1984).

10  9  8  7  6  5  4  3  2  1

# Contents

*Acknowledgments*                                         vii

1.  What Is the Mystery?                                    1

2.  Social Control of Free Blacks                          9

3.  The Back Country Culture of Violence                  17

4.  Kentucky                                              47

5.  Louisiana                                             67

6.  Indiana                                               77

7.  Arkansas                                              85

8.  Georgia                                               97

9.  Tennessee                                            105

10.  Virginia                                            113

11.  Alabama                                             117

12.  "That Dog Won't Hunt"                               127

rebellion.[2] Alexis de Tocqueville quoted a Louisiana planter named Brown in 1831: "It is an odd thing, at New Orleans the coloured men always make common cause with the whites against the blacks."[3] A U.S. Navy officer, appointed to a post at New Orleans shortly after the Louisiana Purchase, observed that the question remained open as to whether "[T]he free quadroon mulatto and black people . . . will be entitled to the rights of citizens or not. . . . It is worth the consideration of government they may be made good citizens or formidable abettors of the . . . slaves if they should ever be troublesome."[4]

General James Wilkinson's report to the Secretary of War early the next year also expressed an interesting mixture of hope and fear with respect to the free black population of Louisiana:

> The Jealousies of the People of Colour & the Whites seem to be increasing, & if I may judge from what I see & hear, the former are most to be relied by us for they have universally mounted the Eagle in their Hats & avow their attachment to the United States—while the latter still demonstrate their love for the Mother Country and do not conceal the fond Hope, that some incident of the depending War [the Napoleonic Wars], may return them to Her Bosom—I speak generally—The People of Colour are all armed, and it is my Opinion a single envious artful bold incendiary, by rousing their fears & exciting their Hopes, might produce those Horrible Scenes of Bloodshed & rapine, which have been so frequently noticed in St. Domingo [Haiti].[5]

---

2. Laura Foner, "The Free People of Color in Louisiana and St. Domingue," *Journal of Social History* 3 [Summer 1970]:420-421. H. E. Sterx, *The Free Negro in Ante-Bellum Louisiana* (Rutherford, N.J.: Fairleigh Dickinson University Press, 1972), 84-89, and less directly, Gwendolyn Midlo Hall, *Africans in Colonial Louisiana: The Development of Afro-Creole Culture in the Eighteenth Century* (Baton Rouge: Louisiana State University Press, 1992), 323-324, describe this same balance of power position of free blacks in Spanish Louisiana in the 1780s and 1790s.

3. Tocqueville, *Journey*, 62.

4. Benjamin Morgan to Chandler Price, August 7, 1803, Clarence Edwin Carter, ed., *Territorial Papers of the United States* (hereinafter *Territorial Papers*) (Washington, D.C.: Government Printing Office, 1940) 9:7.

5. James Wilkinson to the Secretary of War, January 11, 1804, *Territorial Papers* 9:160.

The well-known "Address from the Free People of Color" to Governor Claiborne, also in January of 1804, expressed the desire of the colored militia to continue to serve the new government.[6] Governor Claiborne accepted this volunteer colored militia, for which he received much criticism,[7] suggesting that the hostility of Louisiana whites to armed blacks remained strong. The fear was perhaps understandable; the records for early Louisiana are full of evidence and rumors of slave rebellion, in which the whites believed the free blacks would take the slave side.[8]

Significantly with respect to the question of concealed weapons, one of the free mulatto informants against a French agitator named Le Grand accused him of asking, "if the Slaves in General were acquainted with the use of fire Arms whether they were allowed to wear them. . . . They were to make themselves masters of all the Arms Ammunition &c. and to assassinate all those persons who should refuse to join them or made the smallest resistance to their measures."[9]

Unlike Kentucky, dueling apparently was *not* a factor in Louisiana's ban of concealed carrying of arms in 1813. France appears to have played a major role in the revival of dueling in the late eighteenth century in Europe, and the Francophone population of Louisiana certainly preserved this French tradition, with duels still fought in New Orleans at the beginning of the twentieth century.

---

6. *Territorial Papers* 9:174-175.

7. Governor Claiborne to the Secretary of State, January 26, 1805, *Territorial Papers* 9:381; Governor Claiborne to the Secretary of State, January 8, 1806, *Territorial Papers* 9:561. See Secretary of War Dearborn's suggestion to Claiborne to diminish the colored militia in H. Dearborn to Governor Claiborne, February 20, 1804, William C. Claiborne, Dunbar Rowland, ed., *Official Letter Books of W.C.C. Claiborne* (Jackson: Mississippi Department of Archives and History, 1917), 2:54-55.

8. Governor Claiborne to the President, April 15, 1804, *Territorial Papers* 9:222; Secretary Graham to the Secretary of State, September 9, 1805, *Territorial Papers* 9:499; John Watkins to Secretary Graham, September 6, 1805, *Territorial Papers* 9:500-504; Secretary Graham to the Secretary of State, *Territorial Papers* 9:556 (a message in code, because of its delicacy); James Mather to Governor Claiborne, January 8, 1809, *Territorial Papers* 9:817-819; Thomas H. Cushing to Governor Claiborne, January 10, 1809, *Territorial Papers* 9:819-820.

9. John Watkins to Secretary Graham, September 6, 1805, *Territorial Papers* 9:501.

But the French dueling tradition involved swords, and therefore "fatalities and even serious wounds were rare, for a scratch usually sufficed to bring the combat to an end."[10] American duelists used pistols and occasionally shotguns, rifles, carbines, and Bowie knives, with much deadlier results.[11] Louisiana, perhaps because dueling was so much a part of the Creole tradition, even compared to the South, was a late adopter of a dueling oath constitutional provision—in 1848. The measure was apparently never enforced.[12]

In the case of Louisiana, an interesting immigrant population appeared shortly before the Louisiana concealed weapon laws. Many French planter refugees from the Haitian Revolution had settled in Spanish Caribbean colonies. In 1809, Napoleon crowned his brother Joseph Bonaparte as King of Spain. A nationalistic reaction in Spanish America led to anti-French violence, followed by expulsion of the French. A contemporary report found that 9,059 of these expelled Frenchmen had moved to Louisiana. This population consisted of 2,731 whites, 3,102 free blacks, and 3,226 slaves, changing the Anglophone/Francophone balance of power. Many of the new arrivals were of a higher class than the native French population.[13]

If higher pretensions meant more dueling among this new aristocracy, this might well explain the timing of the 1813 concealed weapon law. The 1809 immigrants would not yet be American citizens, and therefore unable to exert political power to prevent passage of such a law. There is, however, no evidence from the English language press of Louisiana to support such a hypothesis. There is abundant evidence of what seems to have caused the concealed weapon law—not duelists, but backwoodsmen.

New Orleans in the first two decades of American rule was a riotous and violent town. A report to the Secretary of the Treasury about the newly acquired Louisiana territory described the sort of policing that New Orleans would require and why: "The Government of a city, exposed to the riots of untractable sailors, drunken Indians, and Kentucky boatmen, more vicious and savage than either, must be considerably energetic."[14] Several years later, the

---

10. Stevens, *Pistols at Ten Paces*, 130.
11. Stevens, *Pistols at Ten Paces*, 21-23, 88-91; Asbury, *The French Quarter*, 142-143.
12. Asbury, *The French Quarter*, 145.
13. Ingersoll, "Old New Orleans," 711-713.
14. John Pintard to the Secretary of the Treasury, September 14, 1803, *Territorial Papers* 9:52.

problem had apparently not subsided. John Watkins's letter to Governor Claiborne observed that, "From peculiar Circumstances we are surrounded with more than an ordinary portion of vicious men," requiring severe punishments, and a Black Code "to enforce all that Discipline which our situation requires. . . ."[15]

The opening of the Mississippi to duty-free trade dramatically expanded commerce from Kentucky, Ohio, Indiana, and Illinois.[16] This increased commerce, however, brought not only commercial expansion to New Orleans, but also a wild and violent population of flatboatmen. Known to the French-speaking population as *Kaintocks*, they sometimes worked their way downriver simply for the opportunity to visit the New Orleans fleshpots:

> It was with good reason that the Creoles feared and disliked the *Kaintocks*, for the robustious river men, thousands of whom came ashore at New Orleans every year, caused more trouble than any other class in the history of the city. . . . [T]he flatboat bullies devoted themselves to the activities which combined to form what they call a frolic—drinking, fighting, gambling in the resorts. . . . Singly and in groups they issued from the dives and literally terrorized the town, invading and frequently wrecking the respectable coffee-houses, cabarets, restaurants, and theaters; and attended on these excursions by a horde of thieves and garroters who pillaged and murdered while the flatboat men kept the police and citizens fully occupied. The police were utterly unable to cope with such ferocious brawlers as the bullies of the Mississippi, and failed to

---

15. John Watkins to Governor Claiborne, April 2, 1806, *Territorial Papers* 9:821.
16. Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 12-13; Rohrbough, *The Trans-Appalachian Frontier*, 359-360; Asbury, *The French Quarter*, 94-95. Cuming, *Sketches*, 266, described commercial shipping from Kentucky to New Orleans in 1807. Fordham, *Personal Narrative*, 79, 106, 116, described commercial shipping between the Ohio River or Illinois Territory to and from New Orleans in 1817, and passenger travel that would allow him to leave Illinois and "be with you in Hertfordshire, via New Orleans, in two months." Carlton, *The New Purchase*, 185, described commercial ventures involving the floating of produce at least as early as the 1820s from the Kentucky/Indiana border to New Orleans.

maintain even a semblance of order in the city when the river men went on a rampage.[17]

Indeed, the New Orleans police were so effectively routed by the flatboatmen that they were disarmed by the city government for cowardice.[18]

Unlike for Kentucky, there are both legislative and newspaper accounts of the Louisiana Legislature's actions in passing the concealed weapon law. Unfortunately, the newspaper accounts of Lousiana's legislative actions tell us no more than the official legislative *Journal*—a simple statement of actions taken on bills.[19] A careful reading of the New Orleans, *Louisiana Gazette and Daily Advertiser* for 1812 and 1813 and the New Orleans, *Louisiana Courrier* for 1813 reveals nothing that might illuminate the legislature's reasons for adopting a concealed weapon law. There is more coverage of murders and duels in other states and nations[20] than in Louisiana itself.[21] Yet there are obscure references that suggest that there *were* high levels of murder in New Orleans that, for

17. Asbury, *The French Quarter*, 94-95. Michael Allen, *Western Rivermen, 1763-1861: Ohio and Mississippi Boatmen and the Myth of the Alligator Horse* (Baton Rouge: Louisiana State University Press, 1990), 45, 111, 123-126, similarly confirmed the violent nature of these hard working, hard drinking, usually illiterate backwoodsmen. Allen, 93-94, pointed to wharf records to demonstrate that these boatmen had overwhelmingly "English, Scotch, and Scotch-Irish surnames."

18. Asbury, *The French Quarter*, 95-96. Rousey, *Policing the Southern City*, 17-19, 33, mentioned an *attempt* to disarm the New Orleans police in 1806 because of an incident involving some brawling sailors and an innocent bystander whom the police injured—not because of cowardice.

19. (New Orleans) *Louisiana Courrier*, February 12, 1813; February 15, 1813; March 12, 1813; *Journal de la Chambre des Representans Pendant la Seconde Session de la Premiere Legislature de l'Etat de la Louisiane* (New Orleans: P. K. Wagner, 1813), 131. Examination of *General Index to the First Twelve Volumes, or First Series, of Niles' Weekly Register* (Baltimore: Franklin Press, 1818), and *Niles' Weekly Register*, 1-5, provided no information about the Louisiana statute.

20. "A Duel Between a Kentuckian and an Englishman," *LG&DA*, April 23, 1812; "Robbery and Murder," *LG&DA*, May 23, 1812; "From the London *Courier*, May 12th," *LG&DA*, July 21, 1812; untitled article about a Baltimore murder, *LG&DA*, August 7, 1812.

21. "Horrid Murder," *LG&DA*, August 8, 1812; "Robbery and Murder," *LG&DA*, February 6, 1813.

whatever reason, were not published: "☞ No assassinations since our last!!"[22]  In a town of 17,000 people,[23] a day passing without murder is a sobering thought indeed.

Why was there so little coverage of murders, if a day without a murder was worthy of attention? These murders, for the most part, took place among temporary residents from upriver. The population of New Orleans quadrupled during the first twenty years of American rule (from 1803 to 1823), and as much as "one-third to one-fourth of the increase was composed of thieves, ruffians, vagabonds, and prostitutes" becoming part of "the lowest and most vicious elements of New Orleans' population specialized in catering to the vices and appetites of the *Kaintocks*. . . ."[24]

In a section of town known as "the Swamp," the flatboatmen and the ruffians engaged in mayhem and scores of fights every night, averaging, by some estimates, half a dozen murders each week, "none investigated by the municipal authorities, or, for that matter, even reported."[25] The police did not enter "the Swamp," much less attempt to impose any law within it. As long as the problem stayed among these troublesome men from out of town, murders would have been of little concern to the permanent residents of New Orleans. A concealed weapon law, however, provided an opportunity to suppress the carrying of weapons in respectable parts of the city, especially against a troublesome class of people whose presence was necessary for commercial reasons.[26]

When we analyze the 1813 law with the back country flatboatmen in mind, some of the law's interesting characteristics make a lot more sense. The law's preamble promised more than the body of the law delivered:

> Whereas assassination and attempts to commit the same, have
> of late been of such frequent occurrence as to become a subject
> of serious alarm to the peaceable and well disposed inhabitants
> of this state; and whereas the same is in a great measure to be

22. "☞ No assassinations since our last!!," *LG&DA*, January 21, 1813. John Smith Kendall, *History of New Orleans* (Chicago: Lewis Publishing Co., 1922), 1:66-67, based on New Orleans death records, confirmed that homicide levels were extraordinarily high in New Orleans during this period.

23. Rousey, *Policing the Southern City*, 11.

24. Asbury, *The French Quarter*, 98-99.

25. Asbury, *The French Quarter*, 100.

26. Asbury, *The French Quarter*, 98-100.

attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner. . . . [27]

While the preamble suggests that the following law will deal with "going . . . armed in an unnecessary manner," and not just concealed weapons, the statute only prohibits *concealed* carrying of any weapon, "such as a dirk, dagger, knife, pistol or any other deadly weapon . . . that do not appear in full open view. . . ."[28]

The statute is similar to the Kentucky law in some respects. The punishment was a fine of $20 to $50, "one half to the use of the state, and the balance to the informer. . . ."[29] These would have been extremely heavy fines—and rewards—to flatboatmen who arrived in New Orleans with an average of $35 pay in their pocket.[30] But where the Kentucky statute's punishment was limited to fines, a second violation of the Louisiana law carried not only a fine of up to $100 but also up to six months imprisonment. A vaguely worded section provided for capital punishment for use of a concealed weapon against a person, though it is unclear whether death was reserved for those assaults that resulted in death or for any battery with a concealed weapon.

Finally, a section provided that persons convicted under this law could be ordered to post a bond to keep the peace, and anyone unable to post such a bond could be jailed for up to twenty days.[31] The most important difference between the Kentucky and Louisiana statutes, however, is that the Louisiana statute had no exemption for travelers—and the reason for this difference, and the ability to jail offenders who could not post a bond, becomes clear once it is understood that the Louisiana statute was aimed at back country flatboatmen, all of whom were "travelers."

How vigorously was this statute enforced? Against respectable members of society, apparently not very vigorously. Joseph Holt Ingraham visited New Orleans in the 1830s and described how

---

27. *Acts Passed at the Second Session of the First Legislature of the State of Louisiana,* hereinafter *Louisiana Acts* (1813) (New Orleans: Baird and Wagner, 1813), 172-175.

28. *Louisiana Acts* (1813), 172-175.
29. *Louisiana Acts* (1813), 172-175.
30. Allen, *Western Rivermen,* 102.
31. *Louisiana Acts* (1813), 172-175.

"Every, or nearly every gentleman" carried a sword cane, or a concealed dirk, apparently with little fear of punishment.[32]

Other pieces of evidence from the same period suggest that the law was either not enforced vigorously, or that it was widely disobeyed. Judge Canonge, "in his charge to the grand jury of the criminal court of New Orleans . . . particularly calls attention to the prevalence of drunkenness, and the habit of carrying concealed weapons. From these, says he, results the greater part of those odious crimes which have added so many cases to the criminal docket of New Orleans."[33]

An incident in the Louisiana statehouse during the same period suggests that the law also was not taken very seriously by elected officials. On February 3, 1835, "a distinguished lawyer of New Orleans" entered the Louisiana House of Representatives chamber and struck the Speaker of the House with a cane. The Speaker drew a pistol (apparently concealed, unless the "distinguished lawyer" was suicidal) and fired through the lawyer's coat, without hitting the lawyer. The lawyer then drew a pistol and wounded the Speaker.[34]

Ingraham's observations and this incident involving the Speaker of the House suggest that the concealed weapon laws were not intended to apply to gentlemen, or at least that gentlemen did not believe themselves honor bound to obey the law. This would be consistent with a Kentucky flatboatmen theory of motivation, since gentlemen with concealed weapons were not considered a public safety concern.

Louisiana's 1813 statute waited until 1850 to be challenged on constitutional grounds, perhaps because the Louisiana Constitution had no guarantee of a right to keep and bear arms. When the challenge came, it was based on the Second Amendment to the U.S. Constitution. While the Louisiana Supreme Court accepted that the Second Amendment was a limitation on the state's power, it upheld the ban on *concealed* carrying of deadly weapons:

> This law became absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations commit-

---

32. Ingraham, *The South-West,* 1:89-90.
33. "Judge Canonge . . . ," (Little Rock) *Arkansas State Gazette,* December 12, 1837, 3.
34. Murray, *Travels,* 1:142-143.

ted upon unsuspecting persons. It interfered with no man's right to carry arms (to use its own words), "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[35]

This judicial elucidation of the purpose of the concealed weapon law took place almost forty years after its passage, at a time when the exact details of early New Orleans would have remained only in the memories of a few old men. While the Louisiana Supreme Court agreed that the problem was "a vicious state of society," it also argued that this vicious state grew "out of the habit of carrying concealed weapons . . . " rather than, as the historical evidence suggests, the other way around. This decision also seems oblivious to the targeted nature of the law, perhaps because it was easier to defend a general statute than one that was selectively enforced. As will become obvious in later chapters, Louisiana is unique in that it adopted a concealed weapon law not because of its residents, but because of its visitors.

Chapter 6

# Indiana

Indiana is often thought of as a northern state, but like other parts of the Northwest Territory, settlers in the southern part of the state were usually of southern origin, while settlers in the northern part of the state were often from Puritan-dominated New England. Southerners dominated early immigration to the Old Northwest, and "southern culture predominated in Ohio, Indiana, and Illinois until the 1830s."[1]

John Stillman Wright described 1818 southern Indiana and its settlers. From his description of their diet as consisting of "hominy, hoe-cakes, and hogs" and his reproduction of their accent, it is clear that these settlers were backwoodsmen from the southern states. To Wright's distress and disgust, the southern Indiana settlers resolved disputes personally:

> Although every county has its *seat of justice*, as they are termed, yet people, most frequently, depend on their own personal powers, for the redress of their real or imaginary grievances; and the most powerful arm generally wins the cause; except when, as has sometimes happened, the knife or dirk of one of the combatants ends the awful conflict. This heathenish mode of deciding controversies is so frequently resorted to, that the sight of persons disfigured by having an eye gouged out, or a nose, lip, ear, or finger bit off, is too common to excite sur-

---

35. *State* v. *Chandler*, 5 La. An. 489, 490, 491 (1850).

---

1. Berwanger, *The Frontier*, 18.

prise or disgust, after a person has been a short time in the
country [emphasis in original].[2]

At the same time that travelers reported frequent violence,
sheriffs seem to have left no documentary evidence of performing
any official functions associated with these personal attacks. John
Tipton served as sheriff of Harrison County, Indiana, from 1816 to
1820. One might conclude from reading his collected papers that
his duties involved only disputes about runaway slaves and exe-
cuting civil judgments; almost nothing in his papers and letters
from this period indicates any serious crimes came under his juris-
diction other than those related to kidnapping of slaves.[3]

Examination of the only Indiana newspaper that covered the pe-
riod provides little information about the level of violence, perhaps
because the town of publication was so small—though still one of
the urban centers of frontier Indiana.[4] Many of the reports of mur-
ders and violent attacks, moreover, provided no information about
the weapon used, much less whether it might have been concealed.[5]

At least one murder given sensational coverage did apparently
involve concealed weapons. Two young men were competing for the
affections of a young lady in Lawrenceburgh, Indiana. Mr. Fuller
offered Mr. Warren the chance to write a note disclaiming any in-
terest in her, or engage in a duel. Mr. Warren declined to do either,
at which point Fuller shot and killed Warren with a pistol. The re-
port emphasized that Warren was "highly respected" and Fuller, his
murderer, was "pleasing in his address, intelligence, and communi-
cative." The report closes with, "Great God! Is this human nature?
When the restraining power of offended Heaven is withdrawn, man
becomes desperate, and dies by his own hand."[6]

There is some discussion of dueling in this Indiana newspaper,
but mostly of duels fought in other states.[7] However, there is other

---

2. Wright, *Letters from the West*, 62-63.

3. Tipton, *The John Tipton Papers*, 1:119-225.

4. Rohrbough, *The Trans-Appalachian Frontier*, 363.

5. "Trial for Murder," *Brookville Enquirer & Indiana Telegraph*
(hereinafter *BE&IT*), June 18, 1819, 2. Examination of indices for
*Niles' Weekly Register*, 13-18, reveals nothing about the Indiana con-
cealed weapon law.

6. "Communicated," *BE&IT*, January 14, 1820, 3.

7. "On the 6th inst. a duel was fought near Bladensburg . . . ,"
*BE&IT*, February 26, 1819, 2; "A man of the name of Stuard lost his life

---

evidence that dueling was common enough in Indiana to be worthy
of discussion and condemnation. A letter to the editor from "Squib"
complains about the pretensions of gentlemen, and humorously
suggests that their code of conduct requires them to be ignorant of
anything useful, to "swear with energetic eloquence," to gamble,
and to "express an extraordinary sense of *honor*, and at the same
time declare with the most unequivocal expression, your determina-
tion to wipe out every stain it receives by a challenge. Also, be fre-
quent and loud in your complaints of the tyrany [sic] and oppres-
sion of the laws against dueling."[8] Squib's complaint certainly
shows a class consciousness, but in this case, attacking those with
pretensions of being members of a higher class—the men who be-
lieved that dueling was a sign of their aristocracy.

Somewhat less belligerent than those that "Squib" satirized, but
still showing the importance of the culture of honor in Indiana, is
an ad from a William Shannon. Shannon complained of a whis-
pering campaign against him that alleged he had been jailed in
Wayne County for a felony, which he strongly denied. "There are
some people that will ransack a county to destroy the standing of a
man, and thereby leave a lasting stain on families who had no con-
trol over the transaction. I will give a Reward of ONE HUNDRED
DOLLARS to any creditable person that will announce to the Public
the facts that I am charged with, supported by affidavit."[9]

A traveler's account described how the Indiana Legislature
struggled with the problem of dueling in January 1818, and in a
way that suggests a connection between brawling, dueling, and the
use of deadly weapons, reminiscent of Kentucky's situation:

> A repeal of the old law against duelling has been obtained, and
> a new one enacted which subjects delinquents to corporal pun-
> ishments, in addition to the other penalties of fine and disabil-
> ity to hold public offices. . . .
>
> This bill was thrown out at the third reading. The subject is
> involved in more difficulty than it is in Europe. Every State
> has attempted to put a stop to duelling, and some have nearly
> effected it, but the manners and dispositions have not become
> more moderate [or] more mild. There are a number of dissi-

---

last week . . . ," *BE&IT*, March 26, 1819, 2; "A pair of dunces agreed to
shoot at each other . . . ," *BE&IT*, September 17, 1819, 2.

8. "Squib," *BE&IT*, March 5, 1819, 2.

9. "To The Public," *BE&IT*, March 5, 1819, 3.

pated and desperate characters, from all parts of the world, as-
sembled in these Western States; and these, of course, are
overbearing and violent. It is nearly impossible for a man to be
so circumspect, as to avoid giving offence to these irritable spir-
its, who, in fact, do not always want for provocation to be inso-
lent. The Kentuckians on these occasions use their dirks, and
the Ohio men are abusive. Men of education and manners will,
if they can, fight with weapons and the vulgar bite, kick, and
gouge each other.[10]

Apparently the bill was eventually passed, contrary to
Fordham's description of its demise at the third reading. Like Ken-
tucky, Indiana passed a dueling oath requirement for some elected
officials in 1816, as part of the first legislature's acts.[11] Indiana ex-
panded this dueling oath requirement in 1818 to cover all legisla-
tors, civil and military officials, judicial branch employees, and law-
yers.[12] The oath was apparently too onerous for at least one occu-
pation: it was repealed for lawyers in 1820.[13]

In that same year, Indiana adopted a ban on concealed carrying
of weapons quite similar in form to the Kentucky law. A review of
the legislative journals published in the *Brookville Enquirer & In-
diana Telegraph* provided very little detail about its passage. The
first mention of it was its third reading in the Indiana House on
January 8, 1820. Its first mention in the Senate was also its third
reading on January 14, 1820.[14]

In the absence of any other evidence, it seems likely that Indi-
ana had made the same connection as Kentucky—that severe re-
strictions on dueling required regulation of the concealed carrying
of deadly weapons so as to prevent insults from escalating to homi-
cide.

The concealed weapon statute was concise. It provided, "That
any person wearing any dirk, pistol, sword in cane, or any other
unlawful weapon, concealed, shall be deemed guilty of a misde-
meanor, and on conviction thereof, shall be fined in any sum not ex-

---

10. Fordham, *Personal Narrative*, 148-149.

11. Lewis, "Dissent," 37.

12. *Laws of the State of Indiana, Passed and Published at the Second
Session of the General Assembly* (Corydon: A. & J. Brandon, 1818), 362-
365.

13. Lewis, "Dissent," 37-38. What may be the law in question was
reported under "State Legislature," *BE&IT*, December 31, 1819, 2.

14. "State Legislature," *BE&IT*, January 28, 1820, 2; "State Legisla-
ture," *BE&IT*, February 4, 1820.

---

ceeding one hundred dollars, for the use of county seminaries: *Pro-
vided however*, that this act shall not be so construed as to affect
travellers [emphasis in original]."[15]

Like the Kentucky statute, this one punished concealed carrying
of weapons only by a substantial fine. Like the Kentucky statute,
and unlike the Louisiana law, it exempted travelers without defin-
ing who is a traveler. An interesting quirk of the statute, unique to
the concealed weapon laws of the early Republic, was that the fines
were to go to seminaries. One might read into this that the legisla-
tors saw some connection between carrying concealed weapons and
a lack of religious instruction. (Indiana amended the law in 1831 so
that fines no longer went to seminaries.)[16]

The Indiana Supreme Court upheld the constitutionality of this
statute in *State* v. *Mitchell* (1833). The *entire* decision of the Indi-
ana Supreme Court was a single sentence: "It was *held* in this case,
that the statute of 1831, prohibiting all persons, except travelers,
from wearing or carrying concealed weapons, is not unconstitu-
tional [emphasis in original]."[17] The *Mitchell* decision, in conjunc-
tion with the *Bliss* v. *Commonwealth* (Ky. 1822) decision, may ex-
plain why no states adopted concealed weapon laws between 1820
and 1837. The *Bliss* decision had firmly declared that the right to
keep and bear arms was constitutionally protected, even for con-
cealed weapons, and the opinions of constitutional commentators on
the similar guarantee in the U.S. Constitution were as expansive as
*Bliss* in their reading of the right.[18] Until 1833, the only precedent
in American law concerning concealed weapon regulation was *Bliss*.

Significantly, when other state supreme courts upheld bans on
carrying of concealed weapons, most acknowledged the existence of

---

15. *Laws of the State of Indiana, Passed at the Fourth Session of the
General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

16. *Revised Laws of Indiana, in Which Are Comprised All Such Acts
of a General Nature as Are in Force in Said State; Adopted and Enacted
by the General Assembly at Their Fifteenth Session* (Indianapolis: Doug-
lass & Maguire, 1831), 192.

17. *State* v. *Mitchell*, 3 Blackford 229 (Ind. 1833). See Cramer, *For
the Defense of Themselves and the State*, generally for a discussion of
the role of this decision in setting the pattern of American jurispru-
dence on the right to keep and bear arms.

18. Cramer, *For the Defense of Themselves and the State*, 69-71, con-
cerning early constitutional commentary on the federal guarantee, and
69-96 for an examination of all antebellum decisions on right to keep
and bear arms.

*Bliss* but instead concluded that *Mitchell*, a one sentence decision without precedent, citations, authorities, or even an argument, was more correct.[19] Perhaps the hiatus from passage of concealed weapon laws between 1820 and 1837 resulted from some question as to whether this approach was constitutional. Once the *Mitchell* decision appeared in 1833, there could be at least a legitimate argument as to the constitutionality of concealed weapon laws, with two different supreme courts coming to differing opinions.

There were many similarities between Indiana and its neighbors to the east and west with respect to violence. Elias Pim Fordham described a party he attended in the Illinois Territory in 1817 which had excluded some "vulgar" party-crashers. Some of Fordham's party "armed themselves with Dirks (poignards worn under the clothes)" to resist another such attempt, but later "In going away some of the gentlemen were insulted by the rabble, but the rumour that they [the gentlemen] were armed with dirks and pistols prevented serious mischief."[20]

Henry Bradshaw Fearon, a Briton traveling through America in 1818, described the behavior of the inhabitants of Illinois Territory in a way that sounds quite similar to Indiana during the same period: "Small provocations insure the most relentless and violent resentments. Duels are frequent. The dirk is an inseparable companion of all classes; and the laws are robbed of their terror, by not being firmly and equally administered."[21]

Southern Illinois and Ohio, like southern Indiana, were dominated by back country culture, yet they did not adopt concealed weapon laws during the early Republic. What made Indiana different? While southern culture was dominant in all three states, the level of dominance varied, with Indiana in the lead. The Indiana historian Andrew Cayton observed that, "Because Indiana remained far more southern and rural than its counterparts north of the Ohio River, opponents of moral and educational reform had much greater success there. Indiana was still debating the necessity of public schools long after Ohio and Illinois had committed themselves to them."[22]

---

19. *State* v. *Reid*, 1 Ala. 619, 620 (1840); *State* v. *Buzzard*, 4 Ark. 25, 28 (1842).

20. Fordham, *Personal Narrative*, 219-220.

21. Fearon, *Sketches of America*, 260.

22. Cayton, *Frontier Indiana*, 294. Also see Rohrbough, *The Trans-Appalachian Frontier*, 140-142, for an example of an *en masse* transplantation of New England village culture to northern Ohio.

---

Another significant difference is that Ohio, being east of Indiana, was further removed from the frontier stage of development. Ohio entered the Union in 1803; Indiana achieved statehood in 1816; Illinois became a state in 1818. Perhaps there was a stage in between wilderness and full settlement where high levels of violence made concealed weapon regulation seem like a good idea. While this "frontier stage" might explain Indiana's 1820 law, it fails to explain Kentucky's 1813 law. Kentucky entered the Union in 1792 and was certainly further removed from the frontier condition in 1813 than Indiana was in 1820.

There is one similarity between Indiana and Kentucky, however, that might explain why Illinois did not adopt a concealed weapon law during this period. Kentucky and Indiana both adopted severe dueling oath measures two years or less before banning the concealed carrying of weapons. Illinois Territory had passed a dueling oath measure at some point before 1815, but this law was never published. The territorial legislature repealed it in 1815.[23] Because the Illinois Territory law had never been published, it is possible that it did not create the problems of insults escalating to homicide that motivated both the Kentucky and Indiana statutes.

Finally, there is one other significant difference between Illinois and Indiana. Illinois was apparently unique among antebellum American states in having executed a duelist. William Bennett was indicted, convicted, and hanged for causing the death of Alphonso Stewart in an 1820 duel.[24] Indeed, one of the startling aspects of the many laws passed to prohibit dueling is the rarity of antebellum convictions.[25] While this unique distinction seems hard to believe, others who have researched the matter have found antebellum trials for dueling extraordinarily rare, and convictions even rarer. By all accounts, dueling enjoyed widespread support from the antebellum southern population. One British traveler to America in the

---

Rohrbough, *The Trans-Appalachian Frontier*, 67-76, emphasizes the seminal role of Governor Arthur St. Clair (a Pennsylvanian) in establishing the laws of the Northwest Territories.

23. Lewis, "Dissent," 36. That a law was passed but not published seems implausible, though territorial governments, as will be seen in the discussion of Arkansas, were often "rough and ready" in their procedures. Lewis's source was an 1845 Illinois statute.

24. Lewis, "Dissent," 36-37.

25. Stevens, *Pistols at Ten Paces*, 93.

1830s, after describing in detail a duel in Virginia, decried this acceptance:

> It is only necessary to add, that both these parties were men of as high standing as any in their district, both members of the legislature, and that this duel was fought within fifty miles of the capital of the United States. Where can we find in the annals of early Rome, or of Gothic barbarism, or anywhere else (except, perhaps, some instances of more glaring atrocity in Louisiana), a personal quarrel carried on in a spirit more vindictive and barbarous? . . . [I]t does derive some importance, as a collateral indication of national character, from the fact that the parties were in respectable and responsible positions, and that the circumstances attending the duel were related to me in a manner rather laudatory of the courage, than deprecatory of the thirst of blood displayed. . . .[26]

Bennett's execution suggests that dueling had become unacceptable behavior to the people of Illinois. The underlying culture of honor that provoked dueling oaths and in turn, concealed weapon laws, was apparently no longer dominant in Illinois.

---

26. Murray, *Travels,* 1:115-117. Gamble, *Savannah Duels,* 134-135, pointed to evidence from Savannah Grand Jury presentments against dueling in 1808 and 1819 that show the practice was alive, well, and in no danger of leading to any convictions.

# Chapter 7

# Arkansas

From the laws that were passed, one might conclude that the concern about concealed weapons in the late 1830s was specific to a few southern states. Yet some evidence suggests that there were other places where concealed carrying of deadly weapons was becoming more regular, and of some concern, at least in a few quarters. In some of the settled cities of the East, as large numbers of immigrants arrived in the 1830s, the concealed carrying of handguns for self-defense became more common.[1]

The Tuscumbia *North Alabamian* reprinted a Baltimore grand jury report that asserted, "The wearing of deadly weapons . . . is an intolerable nuisance, unnecessary in the present state of any civilized community, dangerous in its tendencies, pernicious in its consequences, and destructive alike of good morals and the public peace." The grand jury then pointed to the example of Governor Tacon in Cuba, who ordered suppression of gambling, then of carrying concealed weapons:

> Gov. Tacon does not spend much time in talking or passing resolutions—but like Bonaparte, he issues his orders, and the thing is done. . . . Persons are now as safe in Havana at all times of night as they are in New York. Why cannot our mag-

---

1. Samuel Walker, *Popular Justice: A History of American Criminal Justice* (New York: Oxford University Press, 1980), 56-59; Richardson, *Urban Police,* 19-28; Kennett and Anderson, *The Gun in America,* 145-148; Lane, *Policing the City,* 3-13, 33-36.

istrates administer our good wholesome laws with some of Gov. Tacon's decisions.[2]

Another example of this increasing concern—or at least awareness—of an increasing level of concealed carrying of weapons appears in the *Clarke County* (Ala.) *Post*, that reported, "No dirk has been seen in the Ohio Legislature since a member appeared there with a wooden one stuck in his bosom, and a long corn-cob handle attached to it."[3] The symbolism of the corn-cob handle is obscure, but that it was intended as ridicule of the practice of carrying deadly weapons is clear.

As the Louisiana statute's preamble showed, and will be seen with some of the Alabama editorials, banning of concealed carrying of deadly weapons was often carelessly equated with a ban on *any* form of wearing deadly weapons. This suggests (but does not prove) that the open carrying of deadly weapons was subject to sufficient social stigma to guarantee that a ban on concealed carry was, effectively, a ban on all carrying.

If any state typified the back country culture of violence better than Kentucky, it may well have been Arkansas. The same year that Arkansas became a territory, the commander of the territorial militia was killed in a duel. One superior court judge killed another in 1824 over a card game. In 1827, "the territorial secretary killed a territorial delegate in an affair of honor. To a greater degree than in other territories, violence in Arkansas involved some of the leading public officeholders."[4] Malcolm J. Rohrbough observed, "Arkansas had more than its share of bloodshed. Almost everyone went armed. The columns of the *Arkansas Gazette* carried numerous accounts of the violence and mayhem that human beings committed against one another, much of it in the name of personal honor."[5]

Many of the statutes adopted in the period 1837-1839 identified two specific weapons that were banned for concealed carry. One was the Bowie knife, first developed in Arkansas. The other was the Arkansas toothpick. These two weapons themselves have a story to tell, and it is a reminder that although terror is not a rational reaction, it often plays a part in the making of laws.

2. "Wearing deadly Weapons," (Tuscumbia) *North Alabamian*, June 23, 1837, 2.

3. "The force of Ridicule," *Clarke County* (Ala.) *Post*, June 16, 1837, 1.

4. Rohrbough, *The Trans-Appalachian Frontier*, 273-274.

5. Rohrbough, *The Trans-Appalachian Frontier*, 284.

The most feared weapon of the 1830s was not a firearm, but the Bowie knife. The Bowie knife (and its first cousin, the Arkansas toothpick) was "a favored weapon of the Southern aristocracy," a knife blade typically eight to twelve inches long, designed for close range fighting.[6] *Niles' National Register*, the preeminent national weekly newspaper of the period, carried a series of articles in 1836-1838 that quickly established the Bowie knife in the national consciousness as a weapon especially suited to killing, of which the incident in the Arkansas legislature (discussed later in this chapter) was an especially shocking example.[7]



**Bowie Knives from the Collection of R. L. Wilson[8]**

The Bowie knife had a fearsome image. At the Kentucky Constitutional Convention of 1849, delegates debated adding a provision

6. Williamson, "Bowie Knives," 40-53.

7. Thorp, *Bowie Knife*, 44; William F. Pope, *Early Days in Arkansas* (Little Rock, Ark.: Frederick W. Allsopp, 1895), 225; "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838.

8. Original photograph courtesy of R. L. Wilson. Sketches by Rhonda Thorne Cramer.

to the new constitution to discourage dueling. During those debates one of the opponents of the anti-dueling clause observed: "I ask gentlemen which has produced most misery and mourning in Kentucky, the duel or the bowie knife? Which, I ask, has shed most blood, the fair and open combat or the knife of the assassin?"[9]

A Texas Supreme Court decision from 1859 (*Cockrum* v. *State*) also gives some clues about the curious manner in which the courts regarded the Bowie knife. Article 610 of the Texas Penal Code punished manslaughter committed with a Bowie knife or dagger the same as murder. The defendant's attorney argued that by discriminating against an inexpensive weapon, this penalty enhancement would "substantially . . . take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol."[10] The Texas Supreme Court justified the enhanced penalty in a way that shows the fear of Bowie knives:

> The right to carry a bowie-knife for lawful defence is secured, and must be admitted. It is an exceedingly destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defence, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon.[11]

The *Cockrum* decision is clearly incorrect in its claims about the hazard of a Bowie knife relative to other weapons, and yet, a Bowie knife made a bloody mess of a person. A pistol or rifle made an almost surgical wound by comparison. The sight of a person disemboweled with a Bowie knife must have been a profoundly disturbing sight. The *Cockrum* decision's claim was factually incorrect, but completely understandable as a human reaction to a horrifying sight.

---

9. *Kentucky Constitutional Convention Debates 1849*, 822.

10. *Cockrum* v. *State*, 24 Tex. 394, 396 (1859).

11. *Cockrum* v. *State*, 24 Tex. 394, 402, 403 (1859).



**Modern Reproductions of the Bowie Knife and Arkansas Toothpick
(1/4 scale)[12]**

While the Bowie knife's mid-1830s notoriety was too late to explain the 1813 statutes of Louisiana and Kentucky and the 1820 Indiana statute, the timing was perfect to explain the statutes adopted in the late 1830s. All of these laws included the Bowie knife, and a few of the statutes that we will examine in later chapters apply *only* to the Bowie knife—a symbol of human butchery

---

12. Sketches by Rhonda Thorne Cramer.

that seems to have been a primary target of many of these laws, even more than concealed handguns.

The Bowie knife was not intrinsically different from the daggers and hunting knives that were in common use before James Bowie handed James Black his model for what would become the Bowie knife.[13]  While the Bowie knife developed a fearsome reputation (and the *Niles' National Register*'s horrified coverage of it may have created a national demand for what had been previously a regional specialty),[14] it represented a refinement (or perhaps brutalization) of existing knives rather than a fundamentally new technology.

Travelers' accounts and memoirs of Arkansas residents show that in territorial days it was a very aggressive, very violent society. Henry Rowe Schoolcraft's account of 1818 Ozark frontier culture is instructive.  While staying in a settlement of two families, Schoolcraft pointed to the deplorable state of morals of the inhabitants: "In their childish disputes, boys frequently stab each other with knives, two instances of which have occurred since our residence here.  No correction was administered in either case, the act being rather looked upon as a promising trait of character."[15]  And Schoolcraft had been there only two weeks!

Arkansas was awash in dueling and less formal brawls by the 1820s.[16]  In the words of an early settler, these were caused by "the want of action and constant occupation, and the great interest taken in local politics; or quarrels growing out of some real or fancied wrong, or disputes over a piece of land or other property. . . ."  But while a duel was often the outcome, "others resulted in a rough and tumble fight or a shooting or cutting scrape."[17]  Similarly, in 1831, Arkansas Territorial Governor Pope expressed his concern about passions out of control, arguing that the willingness of juries to reduce murder to manslaughter encouraged killing: "Men should be brought to bridle their passions when life is at stake, and no excuse for shedding blood should be received but that of *absolute necessity*.  The distinction between murder and manslaughter should

---

13. Thorp, *Bowie Knife*, 22-23.  But see R. P. Bowie, "The Bowie Knife," *Niles National Register* 55:70, September 30, 1838, for a slightly different account of its origin, from James Bowie's brother.

14. Thorp, *Bowie Knife*, 47.

15. Schoolcraft, *Rude Pursuits*, 74.

16. Pope, *Early Days*, 33-44, 168-172.

17. Pope, *Early Days*, 102-103.

be abolished in all cases where a dirk, pistol or other deadly weapon is used, except in cases of *self-defense* [emphasis in original]."[18]

Unlike in Kentucky, there were newspapers—at least a few—during the period in which Arkansas apparently passed its first concealed weapon law.  In examining these newspapers, there was no shortage of homicides, attempts at it, and other violent crimes.  What makes the news coverage so interesting, however, is that the volume and nature of the crimes reported did not seem to justify a measure aimed specifically at concealed weapons.  (Of course, as with the coverage of murder in New Orleans in the period 1812-1813, what newspapers thought appropriate to cover was not necessarily indicative of the volume and nature of the crimes that were actually taking place.)

Like other newspapers of 1837 examined for this work, the *Arkansas Times & Advocate* observed, "Scenes of murder and robbery appear to be the order of the day in the United States."[19]  But also like other newspapers of the day, the murders and almost murders considered worthy of coverage in Arkansas newspapers seem to have been gathered from an astonishingly large part of the United States.  Most of these events were reprinted from other newspapers and took place in other states.[20]  In some of these reported crimes,

---

18. Pope, *Early Days*, 103.

19. "To Our Patrons," *AT&A*, January 22, 1838, 2.

20. "It is with hearfelt sorrow . . . " (newspaper editor killed in a Louisiana affray, weapon not specified), (Little Rock) *Arkansas State Gazette*, October 17, 1837, 2;  "We learn from the *St. Louis Republican . . .* ," *AT&A*, October 30, 1837, 2; "Murder" (in Louisiana), *AT&A*, November 13, 1837, 3; "Murder and Robbery" (discussing a Kentucky crime), *AT&A*, October 30, 1837, 3; "Arrest of a Murderer" (in North Carolina), *AT&A*, November 13, 1837, 3; "Murder in Texas," (Little Rock) *Arkansas State Gazette*, December 5, 1837, 2; "Wm. P. McGrew, who was arrested in this state last fall . . . " (murder in Alabama, weapon unidentified), (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2, also reprinted in (Little Rock) *Arkansas State Gazette*, December 5, 1837, 3; "Murder" (in Tennessee), *AT&A*, January 8, 1838, 2, with even more detailed coverage of the same murder in "Inhuman Murder," *AT&A*, January 15, 1838, 2; "Murderers Broke Jail" (in Mississippi), *AT&A*, January 15, 1838, 2; "Going Ahead of Arkansas" (in Kentucky), *AT&A*, January 22, 1838, 2; "An affray took place . . . " (in Mississippi), *AT&A*, January 29, 1838, 2; "Murder" (in Tennessee, weapon not identified), *AT&A*, February 10, 1838, 2; "Mail Robbery and Murder" (in Louisiana or Mississippi, weapon not identified), *AT&A*,

there was no use of deadly weapons, concealed or otherwise.[21] Others involved weapons unlikely to be restricted by any law, such as an axe.[22] A few Arkansas incidents did involve deadly weapons, though whether they were concealed or not is not clear from the report.[23]

One incident is unclear as to its applicability to concealed weapon statutes, since it involved two men engaged in a fight with shotguns in downtown Little Rock. The unintentional injury of a teenage girl who was a bystander certainly argued that some of Little Rock's citizens were both too willing to use firearms and too careless about who they hit.[24] Other crimes involving firearms reported from Arkansas were clearly crimes of premeditation, in which concealment was not an issue.[25] In their own category were many duels, some of which took place in Arkansas,[26] but most of which were reported from other states.[27]

Some of the acts of violence reported were clearly forms of rough justice. One account described a lawyer wanted for several felonies, apparently including rape, and his situation received an entirely humorous coverage: "The attorney . . . was a few days since shot through the suburbs of his 'unmentionables.' Wound said not to be mortal, although a transformation to the neuter gender may be seriously apprehended."[28]

One homicide that did involve concealed deadly weapons, however, was on center stage and involved players who could not be ig-

---

February 12, 1838, 2; "The Grand Jury of Shelby County" (in Kentucky), *AT&A*, February 12, 1838, 2; "Daring Attempt at Murder, Robbery and Arson" (in Missouri, using club and arson), *AT&A*, March 19, 1838, 3.

21. "An affray took place on the public square . . . " (location uncertain), (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2.

22. "Horrible" (location uncertain), (Helena, Ark.) *Constitutional Journal*, November 16, 1837, 2, reprinted as well in the (Little Rock) *Arkansas State Gazette*, November 28, 1837, 3.

23. "Homicide" (weapon not stated), (Little Rock) *Arkansas State Gazette*, October 31, 1837, 2; "Wm. McKinney was shot dead . . . " (in Arkansas), *NDRB*, January 12, 1838, 2.

24. "Unfortunate Occurrence," *AT&A*, March 19, 1838, 2.

25. "More Murders," *AT&A*, March 19, 1838, 2.

26. "A rencounter recently took place . . . ," *AT&A*, October 30, 1837, 2.

27. "Duel," *AT&A*, November 27, 1837, 2; "Duel," "Another Duel," *AT&A*, December 11, 1837, 2; "The Duel," *AT&A*, March 12, 1838, 2.

28. "Glorious Uncertainty of the Law," *AT&A*, February 12, 1838, 2.

---

nored. Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J. J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.

Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."[29] "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted."[30] While Wilson was expelled from the House on the spot,[31] the killing was ruled excusable by a jury in Wilson's home county causing "the most intense indignation through the entire State."[32]

Local coverage of this shocking crime in the *Arkansas Times & Advocate* was at first quite restrained. After reporting the election of Grandison D. Royston "in the place of John Wilson . . . expelled," the *Arkansas Times & Advocate* next reported on the expulsion. Finally, after admitting that they could have reported it in the pre-

---

29. Pope, *Early Days*, 225; "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838. Oddly enough, the newspapers closest in time and location to this crime gave the least detailed coverage of the struggle. See "General Assembly," *AT&A*, January 22, 1838, 3.

30. Thorp, *Bowie Knife*, 4.

31. Pope, *Early Days*, 225-226. But "General Assembly," (Little Rock) *Arkansas State Gazette*, December 12, 1837, 2, reported the expulsion as taking place two days later.

32. Thorp, *Bowie Knife*, 1-5; Pope, *Early Days*, 226, indicates that Wilson requested trial in his home county, perhaps because of the publicity in Little Rock. A contemporary account from a Georgia paper, however, claimed that Wilson was tried before three judges in Little Rock. See "The trial of John Wilson . . . ," (Milledgeville, Ga.) *Southern Recorder*, March 6, 1838. *Niles' National Register* 54:193, May 26, 1838, also reported that Wilson was indicted in Pulaski County. "The Murder in Arkansas," *Niles' National Register* 54:258, June 23, 1838.

vious issue, the *Arkansas Times & Advocate* admitted that this "unfortunate and much to be lamented affair took place, which we then thought proper not to make any notice of."[33] The *Arkansas State Gazette*, on the other hand, reported the incident immediately.[34] Arkansas papers more remote from Little Rock devoted an appropriate level of attention to it by calling it, somewhat hyperbolically, an "outrage . . . without a parallel in the annals of the history of our country."[35]

The *Arkansas Times & Advocate* appears not to have been alone in this desire to avoid discussion of this "unfortunate" incident. The official legislative journal's coverage of this event, published in the *Arkansas Times & Advocate* over the next several weeks, at first simply swept it under the rug. The legislative journal for the day of the killing has Representative Anthony presenting his "preamble and resolution, relating to the Real Estate Bank," his last actions before the fight began, and a few lines later, the House moving to a bill for the "relief of J. J. Anthony" (presumably a pension for his widow). Anthony's sudden death and Wilson's immediate expulsion were simply left out of that day's journal. Only in the following day's journal was there any mention of Anthony's death and Wilson's expulsion ("for disorderly behaviour").[36] One might conclude from the tone that this was just another only slightly unusual event. Not until January 22, 1838 did a revised version of the journal appear, in which a more accurate account of the day's activities appeared.[37]

It is hard to imagine that this deadly incident did not cause the Arkansas legislature to ban concealed carrying of deadly weapons, but there was simply no coverage of the 1838 Arkansas statute in the Arkansas newspapers. Even the summary of laws passed after

33. "Grandison D. Royston . . . ," "On Tuesday last . . . ," "Fatal rencontre!" *AT&A*, December 11, 1837.

34. "The Funeral of Major Joseph J. Anthony . . . ," "Unfortunate and Fatal Rencontre!" (Little Rock) *Arkansas State Gazette*, December 5, 1837, 2.

35. "Melancholy," (Helena, Ark.) *Constitutional Journal*, December 14, 1837, 2.

36. "General Assembly," *AT&A*, December 18, 1837, 2. The relief act was apparently backdated to before Representative Anthony's murder. See "An Act for the Relief of J.J. Anthony," *AT&A*, March 26, 1838, 1.

37. "General Assembly," *AT&A*, January 22, 1838, 2-3.

the session ended did not list it.[38] Why was there no discussion of this new law? Perhaps because it was not truly new.

The first session of the Arkansas legislature directed the governor to appoint two lawyers to "revise and arrange the statute laws of this State, and prepare such a code of civil and criminal laws as, in their opinion, may be necessary for the government of this State, in accordance with the constitution. . . ."[39] The editor of the published edition of these laws explained that, in "no State was ever such a revision more imperatively called for, more needful for the common weal." The laws in effect in Arkansas when it became a state were a mixture of statutes passed by the legislatures of Missouri, Arkansas, and Louisiana Territories, as well as laws "enacted . . . by the governor and judges of Arkansas territory." The result, according to the editor, "resembled some of those old baronial castles, still extant in England, where the Gothic mingles with the Corinthian, the Doric with the Chinese style of architecture, as different ages have added different portions to the heterogeneous structure."[40]

These revised laws were presented to the Arkansas legislature in October 1837, and examined piecemeal by various committees, which amended them "as seemed proper."[41] The adoption of these bills was apparently uncontroversial, with one newspaper commenting that "those that have passed, met with but little amendment."[42] It is entirely possible that Arkansas's concealed weapon law was not new, and therefore uncontroversial. If so, this tells us something of how seriously the law was taken, in that at least two members of the Arkansas legislature were violating it on that fateful day that Speaker of the House Wilson took offense at Representative Anthony's insult.

The 1838 Arkansas statute was upheld in an 1842 Arkansas Supreme Court decision that equated self-defense with revenge and implied there was no right to self-defense. It is also the only antebellum decision that denied that the "right of the people" was an in-

38. "List of Acts," *AT&A*, March 12, 1838, 3.

39. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan and Co., 1838), v.

40. *Revised Statutes of the State of Arkansas*, vi.

41. *Revised Statutes of the State of Arkansas*, v-vi.

42. "The Legislature," (Little Rock) *Arkansas State Gazette*, November 28, 1837, 2.

dividual right to *carry* arms, though it recognized individuals had a right to *keep* arms.[43]

Most of the concealed weapon laws adopted in the period 1837-1839 were passed in the few weeks following this bloody and very publicized incident. It would be tempting to assume that the killing in the Arkansas statehouse had some significant influence on these laws that passed like falling dominoes in the weeks after this event. Oddly enough, if this killing had any influence on other states, it was relatively little, or at least left little evidence. Georgia's law, passed twenty-one days after this incident, does not appear to have been influenced at all. The first newspaper accounts of this bloody event did not appear in Georgia newspapers until January, 1838,[44] after the Georgia statute was signed into law. The first reference in Nashville's *Daily Republican Banner* was on December 21, 1837,[45] after the Tennessee Senate had already passed the Bowie knife bill. At most, it might have influenced the Tennessee House, but there are no further references to the Arkansas statehouse killing in the *Daily Republican Banner* before the new law was passed. Virginia and Alabama's laws prohibiting concealed carry could have been influenced by this exercise in rude lawmaking, but as will be seen in later chapters, the newspaper record for these states is unavailable.

Unfortunately, we do not have enough information to draw any conclusions about why Arkansas passed its concealed weapon law. There is nothing in the evidence that would argue against high rates of violence as a proximate cause of the law. While Arkansas could certainly fit into the "dueling oaths lead to assassination" model that fits some of the other states, there is also no evidence that confirms it.

---

43. *State* v. *Buzzard*, 4 Ark. 18, 22 (1842). The majority opinion on the nature of the right, and equating self-defense with revenge, was not followed by any other courts in the nineteenth century. See Cramer, *For the Defense of Themselves and the State* for an examination of American jurisprudence on this subject.

44. "The Tragedy in Arkansas," (Milledgeville) *Georgia Journal*, January 9, 1838, 3; "A Tragedy in the Arkansas Legislature," *Macon* (Ga.) *Telegraph*, January 15, 1838, 3; "The Tragedy in Arkansas," (Milledgeville, Ga.) *Southern Recorder*, January 16, 1838, 3. Milledgeville was the capital of Georgia during this period.

45. "A Tragedy in the Arkansas Legislature," *NDRB*, December 21, 1837, 3.

Compendium_Roth
Page 0179

# Appendix A

# Text of the Laws

Concealed weapon statutes adopted before 1846, in chronological sequence.

## KENTUCKY (1813)

CHAP. LXXXIX.

*AN ACT to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases.*

Approved, February 3, 1813.

Sec. 1. *BE it enacted by the general assembly of the commonwealth of Kentucky*, That any person in this commonwealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless when travelling on a journey, shall be fined in any sum, not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury — and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of the commonwealth.

This act shall commence and be in force, from and after the first day of June.[1]

## LOUISIANA (1813)

### AN ACT

Against carrying concealed weapons, and going armed in public places in an unnecessary manner.

Preamble. Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

Sect. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dollars nor less than twenty dollars, one half to the use of the state, and the balance to the informer, and should any person be convicted of being guilty of a second offence before any court of competent jurisdiction, shall pay a fine of not less than one hundred dollars to be applied as aforesaid, and be imprisoned for a time not exceeding six months.

Sect. 2. *And be it further enacted,* That should any person stab or shoot, or in any way disable another by such concealed weapons, or should take the life of any person, shall on conviction before any competent court suffer death, or

---

1. *Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky* (Frankfort: Gerard & Berry, 1813), 100-101.

such other punishment as in the opinion of a jury shall be just.

Sect. 3. *And be it further enacted,* That when any officer has good reason to believe that any person or persons have weapons concealed about them, for the purpose of committing murder, or in any other way armed in such a concealed manner, on proof thereof being made to any justice of the peace, by the oath of one or more credible witnesses, it shall be the duty of such judge and justice to issue a warrant against such offender and have him searched, and should he be found with such weapons, to fine him in any sum not exceeding fifty dollars nor less than twenty dollars, and to bind over to keep the peace of the state, with such security as may appear necessary for one year; and on such offender failing to give good and sufficient security as aforesaid; the said justice of the peace shall be authorized to commit said offender to prison for any time not exceeding twenty days.[2]

## INDIANA (1820)

### CHAPTER XXIII.

*AN ACT to prohibit the wearing of concealed weapons.*

Approved, January 14, 1820.

Sec. 1. *BE it enacted by the General Assembly of the State of Indiana,* That any person wearing any dirk, pistol, sword in cane, or any other unlawful weapon, concealed, shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be fined in any sum not exceeding one hundred dollars, for the use of county seminaries: *Provided however,* that this act shall not be so construed as to affect travellers.[3]

## INDIANA (1831)

Sec. 58. That every person, not being a traveller, who shall wear or carry any dirk, pistol, sword in a cane, or other

---

2. *Acts Passed at the Second Session of the First Legislature of the State of Louisiana* (New Orleans: Baird and Wagner, 1813), 172-175.
3. *Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly* (Jeffersonville: Isaac Cox, 1820), 39.

Compendium_Roth
Page 0181

dangerous weapon concealed, shall upon conviction thereof, be fined in any sum not exceeding one hundred dollars.[4]

## ALABAMA (1837)

### AN ACT

#### To suppress the use of Bowie Knives.

Section 1.  *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person carrying any knife or weapon, known as Bowie Knives or Arkansas Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [*sic*] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.

Sec. 2.  *And be it further enacted,* That for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

Approved June 30, 1837.[5]

## GEORGIA (1837)

AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons.

Section 1.  *Be it enacted by the Senate and House of Representatives of the State of Georgia, in General Assembly met,*

4. *Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session* (Indianapolis: Douglass & Maguire, 1831), 192.

5. *Acts Passed at the Called Session of the General Assembly of the State of Alabama* (Tuscaloosa: Ferguson & Eaton, 1837), chap. 11, 7.

*and it is hereby enacted by the authority of the same.* That from and after the passage of this act, it shall not be lawful for any merchant, or vender of wares or merchandize in this State, or any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere, any of the hereinafter described weapons, to wit: Bowie, or any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used, as horseman's pistols, &c.

Sec. 2.  *And be it further enacted by the authority aforesaid,* That any person or persons within the limits of this State, violating the provisions of this act, except as hereafter excepted, shall, for each and every such offence, be deemed guilty of a high misdemeanor, and upon trial and conviction thereof, shall be fined, in a sum not exceeding five hundred dollars for the first offence, nor less than one hundred dollars at the direction of the Court; and upon a second conviction, and every after conviction of a like offence, in a sum not to exceed one thousand dollars, nor less than five hundred dollars, at the discretion of the Court.

Sec. 3.  *And be it further enacted by the authority aforesaid,* That is shall be the duty of all civil officers, to be vigilent [*sic*] in carrying the provisions of this act into full effect, as well also as Grand Jurors, to make presentments of each and every offence under this act, which shall come under their knowledge.

Sec. 4.  *And be it further enacted by the authority aforesaid,* That all fines and forfeitures arising under this act, shall be paid into the county Treasury, to be appropriated to county purposes: *Provided, nevertheless,* that the provisions of this act shall not extend to Sheriffs, Deputy Sheriffs, Marshals, Constables, Overseers or Patrols, in actual discharge of their respective duties, but not otherwise: *Provided, also,* that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view: *And provided, nevertheless,* that

the provisions of this act shall not extend to prevent venders, or any other persons who now own and have for sale, any of the aforesaid weapons, before the first day of March next.

Sec. 5. *And be it further enacted by the authority aforesaid,* That all laws and parts of laws militating against this act, be, and the same are, hereby repealed.[6]

## TENNESSEE (1838)

### CHAPTER CXXXVII.

An Act to suppress the sale and use of Bowie Knives and Arkansas Tooth Picks in this State.

Section 1. *Be it enacted by the General Assembly of the State of Tennessee,* That if any merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons whatsoever, shall sell or offer to sell, or shall bring into this State, for the purpose of selling, giving or disposing of in any other manner whatsoever, any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick, such merchant, pedlar, jeweller, confectioner, grocery keeper, or other person or persons for every such Bowie knife or knives, or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick so sold, given or otherwise disposed of, shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a person not less than one month nor more than six months.

Sec. 2. That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum

---

not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

Sec. 3. That if any person shall maliciously draw or attempt to draw any Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas tooth pick, from under his clothes or from any place of concealment about his person, for the purpose of sticking, cutting, awing, or intimidating any other person, such person so drawing or attempting to draw, shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State for a period of time not less than three years, nor more than five years.

Sec. 4. That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this State, for a period of time not less than three years, nor more than fifteen years.

Sec. 5. That this act shall be in force from and after the first day of March next. And it shall be the duty of the several judges of the circuit courts in this State to give the same in charge to the grand jury every term of the respective courts, and any civil officer who shall arrest and prosecute to conviction and punishment any person guilty of any of the offences enumerated in this act, shall be entitled to the sum of fifty dollars, to be taxed in the bill of costs, and the attorney general shall be entitled to a tax fee of twenty dollars in each case, when a defendant shall be convicted, and no prosecutor required on any presentment or indictment for any of the offences enumerated in this act.[7]

---

6. *Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837* (Milledgeville: P. L. Robinson, 1838), 90-91.

---

7. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8* (Nashville: S, Nye & Co., 1838), 200-201.

## ARKANSAS (1838)

Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.[8]

## VIRGINIA (1838)

Chap. 101.—An ACT to prevent the carrying of concealed weapons.

[Passed February 2, 1838.]

1. *Be it enacted by the general assembly.* That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offence forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and for each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

2. *And be it further enacted,* That if any person shall hereafter be examined in any county or corporation court upon a charge of murder or felony, perpetrated by shooting, stabbing, maiming, cutting or wounding, and it shall appear that the offence charged was in fact committed by any such weapon as is above mentioned, and that the same was hidden or concealed from or kept out of the view of the person

8. *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837* (Boston: Weeks, Jordan and Co., 1838), Div. VIII, Art. I, § 13, p. 280.

against whom it was used, until within the space of one half hour next preceding the commission of the act, or the infliction of the wound, which shall be charged to have caused the death, or constituted the felony, it shall be the duty of the examining court to state that the fact did so appear from the evidence; and if the court shall discharge or acquit the accused, such discharge or acquittal shall be no bar to an indictment for the same offence in the superior court having jurisdiction thereof, provided the same be found within one year thereafter. And whether the accused shall be by such court sent on for further trial or discharged, it shall be lawful to charge in the indictment that the offence was committed in any of the modes herein before described; and upon the trial it shall be the duty of the jury (if they find the accused not guilty of the murder or felony) to find also whether the act charged was in fact committed by the accused, though not feloniously, and whether the same was committed or done with or by means of any pistol, dirk, bowie knife, or other dangerous weapon, which was concealed from or kept out of the view of the person on or against whom it was used, for the space before mentioned, next preceding such use thereof; and if the jury find that the act was so committed, they shall assess a fine against the accused, and it shall be lawful for the court to pronounce judgment as in cases of misdemeanor.

3. This act shall be in force from and after the first day of June next.[9]

## ALABAMA (1839)

### AN ACT

To suppress the evil practice of carrying weapons secretly.

Section 1. *Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened,* That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansaw [sic] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending, shall on conviction thereof, before any court having competent ju-

9. *Acts of the General Assembly of Virginia, Passed at the Session of 1838* (Richmond: Thomas Ritchie, 1838), 76–77.

152                                          APPENDIX A

risdiction, pay a fine not less than fifty nor more than five
hundred dollars, to be assessed by the jury trying the case;
and be imprisoned for a term not exceeding three months,
at the discretion of the Judge of said court.

Sec. 2.  *And be it further enacted,* That it shall be the duty
of the Judges of the several Circuit Courts of this State to
give this act specially in charge of the Grand Juries, at the
commencement of each term of said Courts.

Sec. 3.  *And be it further enacted,* That the Secretary of
State shall cause this act to be published for three months
in the papers of Mobile, Montgomery, Tuscumbia,
Huntsville, Wetumpka and Tuscaloosa, which publishers
shall be paid out of any money in the Treasury not other-
wise appropriated.

                         Approved Feb. 1, 1839.[10]

---

10. *Acts Passed at the Annual Session of the General Assembly of the
State of Alabama* (Tuscaloosa: Hale & Eaton, 1838 [1839]), chap. 77, 67-
68.

Compendium_Roth
Page 0185

# FOR THE DEFENSE
# OF THEMSELVES
# AND THE STATE

*The Original Intent and*
*Judicial Interpretation of the*
*Right to Keep and Bear Arms*

Clayton E. Cramer

Foreword by Preston K. Covey

PRAEGER

Westport, Connecticut
London

Compendium_Roth
Page 0186

.6429180



**MAIN**

**Library of Congress Cataloging-in-Publication Data**

Cramer, Clayton E.
    For the defense of themselves and the state : the original intent
and judicial interpretation of the right to keep and bear arms /
Clayton E. Cramer ; foreword, Preston K. Covey.
        p.    cm.
    Includes bibliographical references and index.
    ISBN 0–275–94913–3 (alk. paper)
    1. Firearms—Law and legislation—United States—History.
2. United States—Constitutional law—Amendments—2nd—
Interpretation and construction.    I. Title.
KF3941.C73    1994
344.73'0533—dc20
[347.304533]            94–13728

British Library Cataloguing in Publication Data is available.

Copyright © 1994 by Clayton E. Cramer

All rights reserved. No portion of this book may be
reproduced, by any process or technique, without the
express written consent of the publisher.

Library of Congress Catalog Card Number: 94–13728
ISBN: 0–275–94913–3

First published in 1994

Praeger Publishers, 88 Post Road West, Westport, CT  06881
An imprint of Greenwood Publishing Group, Inc.

Printed in the United States of America



The paper used in this book complies with the
Permanent Paper Standard issued by the National
Information Standards Organization (Z39.48–1984).

10 9 8 7 6 5 4 3 2 1

KF3941
C73
1994
MAIN

## CONTENTS

Foreword ........................................................................ vii

Preface ........................................................................ xiii

Acknowledgments............................................................ xvii

  I.  Definitions............................................................... 1

 II.  European Origins ................................................... 19

III.  The Legislative History of the Second Amendment ............. 31

 IV.  Problems of Judicial Interpretation ...................................... 63

  V.  "To Keep and Carry Arms Wherever They Went"............... 69

 VI.  "No Negro... Shall Be Allowed to Carry Fire-Arms" ............ 97

VII.  "Carrying Concealed Weapons Is a Grievous Evil" ............ 141

VIII. "A Proper Reason for Carrying a Pistol" ........................... 165

 IX.  Civil Rights, Civil Disturbances......................................... 197

  X.  The Right Comes Out of Its Coma? .................................. 221

 XI.  At the Crossroads............................................................. 269

      Selected Bibliography....................................................... 275

      Index .............................................................................. 281

Compendium_Roth
Page 0187

William Simpson, laborer, on the first day of April,... 1833, with force and arms,... being arrayed in a warlike manner, then and there in a certain public street and highway situate, unlawfully, and to the great terror and disturbance of divers good citizens of the said state, then and there being, an affray did make, in contempt of the laws of the land, to the evil example of all others in the like case offending, and against the peace and dignity of the state.[11]

Simpson was convicted, and fined $20. On appeal, the Tennessee Supreme Court concluded that the indictment leading to conviction was defective, because the crime of making an "affray" requires:

First. There must be fighting. Second. This fighting must be by or between two or more persons. And, Third. It must be in some public place to cause terror to the people. Hence it must follow, that if either of these requisites are wanting, to wit, fighting or actual violence, and the number of persons necessary for the constitution of it.[12]

After discussing Edward III's Statute of Northampton (1328) that prohibited the carrying of "dangerous and unusual arms," and Hawkins' interpretation of it as not prohibiting completely the carrying of arms, the Court went on to point out its inapplicability to this case:

But suppose it to be assumed on any ground, that our ancestors adopted and brought over with them this English statute, or portion of the common law, our constitution has completely abrogated it; it says, "that the freemen of this state have a right to keep and to bear arms for their common defence." Article 11, sec. 26. It is submitted, that this clause of our constitution fully meets and opposes the passage or clause in Hawkins, of "a man's arming himself with dangerous and unusual weapons," as being an independent ground of affray, so as of itself to constitute the offence cognizable by indictment. By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature; and it is conceived, that it would be going much too far, to impair by construction or abridgment a constitutional privilege which is so declared; neither, after so solemn an instrument hath said the people may carry arms, can we be permitted to impute to the acts thus licensed such a necessarily consequent operation as terror to the people to be incurred thereby; we must attribute to the framers of it the absence of such a view.[13]

The judgment against Simpson was reversed.

Justice Peck, in a dissenting opinion, was unwilling to reverse the judgement, but his reasoning similarly supports the majority opinion with respect to the applicability of the statute of Edward III and the carrying of arms:

One can commit an affray, as by arming himself, rushing into a public place and threatening to kill. Though the words do not make the affray, yet the acts coupled with them will, if fear ensue, amount to an affray... It is not true, as supposed, that to constitute an affray there must be a fighting of two in a public place. An assault by one in a public place will be an affray, though if in a private place, the same act would amount to nothing more than an assault.[14]

*None* of the justices on either side of this decision were prepared to hold the bearing of arms *by itself* as a violation of either common law or the Statute of Northampton, and the majority recognized Tennessee's "for the common defence"

---

11 *Simpson v. State*, 5 Yerg. 356, 357 (Tenn. 1833).
12 *Simpson v. State*, 5 Yerg. 356, 358 (Tenn. 1833).
13 *Simpson v. State*, 5 Yerg. 356, 359, 360 (Tenn. 1833).
14 *Simpson v. State*, 5 Yerg. 356, 363 (Tenn. 1833).

Constitutional provision as protecting an individual right to carry such arms. Since the justices were concerned with the carrying of arms in such a manner as would induce "terror to the people," it is hard to see how they could have justified a law that prohibited concealed carry. Arms that could not be seen could hardly produce terror.

But something interesting happened in 1834, the year after the *Simpson* decision—the Tennessee state constitution was revised. Article 11, §26, adopted in 1796, had originally said: "That the freemen of this State have a right to keep and to bear arms for their common defence." The 1834 revisions changed this section to: "That the free *white* men of this State have a right to keep and to bear arms for their common defence."[15] [emphasis added]

In 1833, it guaranteed the right to all "freemen," regardless of race. Did the *Simpson* v. *State* (1833) provision cause the 1834 revision to the Tennessee Constitution? Was Simpson a free black? Or did the awareness of the potential that free blacks could carry arms provoke the change?

There is another, more likely explanation for the Tennessee constitutional change, and the increasingly ambivalent attitude about the right to carry arms during this period in the South. Nat Turner's rebellion, in August 1831 had provoked great fear in the South:

> Despite the fact that after 1831 no more slave insurrections were seen in the South, it was precisely then that the South became most victimized by its own fears, being "racked at intervals," as Clement Easton writes, "by dark rumors and imagined plots." These periodic upheavals over suspected revolts—characterized by furious vigilante hunts and wild confusion, all based on mirage—constitute one of the more bizarre chapters in Southern history.[16]

and:

> Under the antebellum color-caste system, the status of free Negroes in Tennessee steadily deteriorated. The state legislature, in 1831, barred the immigration of free blacks into the state.… The constitutional convention of 1834 produced a further restriction by withdrawing the legal right to vote which free blacks previously had held in Tennessee.[17]

It appears that concern about the dangers of armed free blacks providing arms to slaves was already on the rise, even before Turner's particularly bloody uprising. Florida had enacted a license procedure for carrying of firearms by free blacks in 1828, but repealed it in February of 1831, disarming free blacks in public. It may be, however, that Turner's rebellion hastened a process already under way, for Maryland and Virginia both passed prohibitions of free blacks carrying arms in December 1831 and Georgia completely prohibited black possession of firearms in 1833. Similarly, Florida authorized "white citizen patrols to seize arms found in the homes of slaves and free blacks…" However, the statute provided at least the possibility that a good reason might prevent punishment.[18]

---

15 Thorpe, 6:3424, 6:3428.

16 Stanley M. Elkins, *Slavery*, (Chicago: University of Chicago Press, 1968), 209, 220.

17 Joseph H. Cartwright, *The Triumph of Jim Crow*, (Knoxville, Tenn.: University of Tennessee Press, 1976), 4.

18 Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward An Afro-Americanist Reconsideration", in *Georgetown Law Journal*, 80:2 [December 1991], 337-8.

---

The next decision by the Tennessee Supreme Court was considerably different: *Aymette* v. *State* (1840). This is one of those cases with far-reaching impact, principally because it so narrowly defined the right to keep and bear arms. It was cited repeatedly during the nineteenth century as courts looked for precedents to uphold restrictions on the carrying of arms.

In 1837, the Tennessee Legislature had prohibited the carrying of concealed Bowie knifes; interestingly enough, no other weapons were similarly restricted. William Aymette, on June 26, 1839, at Pulaski, in Giles County,

> had fallen out with one Hamilton, and that about ten o'clock, p.m., he went in search of him to a hotel, swearing he would have his heart's blood. He had a bowie-knife concealed under his vest and suspended to the waistband of his breeches, which he took out occasionally and brandished in his hand. He was put out of the hotel, and proceeded from place to place in search of Hamilton, and occasionally exhibited his knife.

> The jury, under the charge of the court, returned a verdict of guilty.

Aymette was fined $200, a stiff fine in 1840. On appeal, Aymette argued that the law was unconstitutional, based on article 11, §26 of the Tennessee Constitution. The Tennessee Supreme Court pointed to the laws of Charles II, prohibiting arms to those who had "not lands of the yearly value of £100," and argued that the English Bill of Rights (1689) protection of the right to arms:

> *does not mean for private defence, but, being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws.* This declaration of right is made in reference to the fact before complained of, that the people had been disarmed, and soldiers quartered among them contrary to law. The complaint was against the government. The grievances to which they were thus forced to submit were for the most part of a public character, and could have been redressed only by the people rising up for their common defence, to vindicate their rights.

The section under consideration, in our bill of rights, was adopted in reference to these historical facts, and in this point of view the language is most appropriate and expressive. Its words are, "the free white men of this state have a right to keep and bear arms for their common defence." It, to be sure, asserts the right much more broadly than the statute of 1 William & Mary. For the right there asserted is subject to the disabilities contained in the act of Charles II. There, lords and esquires, and their sons, and persons whose yearly income from land amount to £100, were of suitable condition to keep arms. But, with us, every free white man is of suitable condition, and, therefore, every free white man may keep and bear arms. But to keep and bear arms for what? If the history of the subject had left in doubt the object for which the rights is secured, the words that are employed must completely remove that doubt. It is declared that they may keep and bear arms for their common defence... The object, then, for which the right of keeping and beating arms is secured is the defence of the public. *The free white men may keep arms to protect the public liberty, to keep in awe those who are in power, and to maintain the supremacy of the laws and the constitution.*[19] [emphasis added]

The right to possess military arms as tools of revolution and resistance were guaranteed not simply to organized militias, but to individual free white men:

> The words "bear arms," too, have reference to their military use, and were not employed to mean wearing them about the person as part of the dress. As the object for which the right to keep and bear arms is secured is of a general and public nature, to be exercised by the people in a body, for their common defence, so the arms the right to keep which is secured are such as are usually employed in civilized warfare, and that constitute the

---

19 *Aymette* v. *State*, 2 Hump. (21 Tenn.) 154, 155, 156, 158 (1840).

not only upon constitutional grounds, but upon the immutable principles of natural and equal justice, that all men have a right to, and which to deprive them of amounts to tyranny and oppression. Can it be doubted, that if the Legislature, in moments of high political excitement or of revolution, were to pass an act disarming the whole population of the State, that such an act would be utterly void, not only because it violated the spirit and tenor of the Constitution, but because it invaded the original rights of natural justice?[37]

Lacy also illustrated how the same reasoning used to justify laws prohibiting concealed carry could be extended in equally absurd ways to deprive the people of other rights protected by the Federal and state constitutions:

The people are secured in their persons, houses, papers, and effects, against unwarrantable searches and seizures; but on probable cause, supported by oath and affirmation. Now, if the Legislature possess the power claimed for it, it surely has the means of carrying it into effect. Can it, directly or indirectly, invade the sanctuaries of private life and of personal security, by authorizing a public inquisition to search for either open or concealed weapons? Besides, private property cannot be taken for public uses, without due compensation being first made according to law. A man's arms are his private property; how, then, can he be legally deprived of them? If they can forbid him, under the penalty of fine and imprisonment, to keep them concealed or exposed about his person, or on his own premises, although their unrestrained use may be necessary for all the purposes of his ordinary business and of personal defence, then certainly the right of keeping and bearing arms according to his own discretion, is infringed and violated, and his own free will in the management of this property abridged and destroyed.

Lacy pointed out a potential inequity from such an approach to this right:

[S]uppose a citizen of the State were indicted upon a charge of murder, and he could make out a clear case of justifiable homicide, the laws of nature, upon which the laws of society are presumed to be based, instead of punishing, commends for the act; of course, he stands acquitted of all blame; but, on the trial, the evidence shows that he was compelled to take life with a concealed weapon, and the State thinks proper to indict him for this new offence, which is forbidden by an act of the Legislature; and the proof being clear upon the point, of course he may be convicted and rendered infamous for life. What then becomes of the right of self-defence? Is it not swept away from him by legislative discretion, and the doctrine of self-preservation destroyed, which nature has implanted in the breast of every living creature, and which no laws, either human or divine, can abrogate or annul?[38]

The majority opinion in the *Buzzard* decision is by far the most extreme statement in opposition to an individual right to keep and bear arms in the period before the Civil War. Not only is it contrary to the liberal view of the right to arms, but it also lacks the republican understanding that arms, to be effective in defense of public liberty, required widespread possession among the people.

The following year, the *State* v. *Huntly* (1843) decision was handed down by the North Carolina Supreme Court. The North Carolina Supreme Court's decision far more accurately describes both the republican and liberal schools of the Second Amendment. A Robert Huntly was convicted of, "The offence of riding or going armed with unusual and dangerous weapons to the terror of the people… an offence at common law…."

37 *State* v. *Buzzard*, 4 Ark. 18, 36, 37 (1842).
38 *State* v. *Buzzard*, 4 Ark. 18, 37, 38, 39 (1842).

While Huntly's attorney tried to claim that North Carolina's constitutional protection of the right to "bear arms for the defence of the State" overrode the Statute of Northampton (1328), the North Carolina Supreme Court did not agree:

While it secures to him a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised. If he employ those arms, which he ought to wield for the safety and protection of his country, to the annoyance and terror and danger of its citizens, he deserves but the severer condemnation for the abuse of the high privilege, with which he has been invested.

While acknowledging that the provision of the North Carolina Constitution was, as the text suggests, "for the defence of the State," this decision also recognized that an *individual* right was created by it.

For its justification of the conviction, the Court pointed to *Sir John Knight's case* in Hawkins' *Treatises of the Pleas of the Crown* to demonstrate that being armed for the purpose of terrorizing people was a violation of the common law, and that the Statute of Northampton merely codified and provided "only special penalties and modes of proceeding for its more effectual suppression." More important, North Carolina had specifically renounced the statutory law of England and Great Britain on January 1, 1838.

While agreeing that the actions for which Huntly was convicted were a violation of the common law, the North Carolina Supreme Court also held that:

it is to be remembered that the carrying of a gun *per se* constitutes no offence. *For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. It is the wicked purpose—and the mischievous result—which essentially constitute the crime.* He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people. [emphasis added]

The North Carolina Supreme Court acknowledged that the gun in question "a double-barrelled gun, or any other gun, cannot in this country come under the description of 'unusual weapons,' for there is scarcely a man in the community who does not own and occasionally use a gun of some sort."[39]

At no point did the North Carolina Supreme Court address the issue of concealed carry of arms. In light of their agreement with the common law prohibition on carrying weapons "to terrify and alarm," it might well be argued that concealed carry of arms was therefore more socially responsible.

The following year, the North Carolina Supreme Court made a decision whose full significance would not appear until after the Civil War and passage of the Fourteenth Amendment. An 1840 statute provided:

That if any free negro, mulatto, or free person of color, shall wear or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger or bowie-knife, unless he or she shall have obtained a licence therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying therefor, he or she shall be guilty of a misdemeanor, and may be indicted therefor.

Elijah Newsom, "a free person of color," was indicted for carrying a shotgun without a license, in Cumberland County in June of 1843—at the very time the

39 *State* v. *Huntly*, 3 Iredell 418, 420, 421, 422, 423 (N.C. 1843). This case has been frequently miscited as *State* v. *Huntley*, perhaps because the name is spelled both ways in the decision.

North Carolina Supreme Court was deciding *Huntly*. Newsom was convicted by a jury; but "on motion of the defendant's counsel, the court arrested the judgement," and the Solicitor for the State appealed to the Supreme Court." Newsom's attorney argued that the statute requiring free blacks to obtain a license to "keep and bear arms" was "unconstitutional, being in violation of the 2d article of the amended constitution of the United States, and also of the 3d and 17th articles of the Bill of Rights of this State."

The North Carolina Supreme Court quickly disposed of the first claim, that the Second Amendment was a limitation on state laws: "It is therefore only restrictive of the powers of the Federal Government." The North Carolina Supreme Court then cited *Barron* v. *Baltimore* (1833) (though it was miscited as "*Barrow* v. *Baltimore*"), to buttress that position.

Next, the North Carolina Supreme Court tackled the state constitutional guarantees, which had been used in *State* v. *Huntly* (1843), the year before. The "3d article" referred to by Newsom's counsel, prohibited "the granting of exclusive privileges or separate emoluments." The North Carolina Supreme Court acknowledged that the 1840 statute imposed a restriction on free blacks, "from which the white men of the country are exempt." The Court then asked if racially discriminatory legislation was therefore unconstitutional, and gave the answer:

If so, then is the whole of our legislation upon the subject of free negroes void. From the earliest period of our history, free people of color have been among us, as a separate and distinct class, requiring, from necessity, in many cases, separate and distinct legislation.[40]

What followed was a long list of laws that affected free blacks only, dating from 1777. The Court held that since society had long acquiesced in such distinctions, from the time that the North Carolina Constitution was written, therefore the third article was not intended as a guarantee against racially discriminatory laws.[41]

The 17th article of the 1776 North Carolina Constitution declared:

That the people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power.[42]

The Court now addressed this constitutional protection, but in language subtly different from that used in *Huntly*: "We cannot see that the act of 1840 is in conflict with it... The defendant is not indicted for carrying arms in defence of the State, nor does the act of 1840 prohibit him from so doing."[43] But as seen in *Huntly*, the Court had acknowledged that the restrictive language "for the defence of the State" did not preclude an individual right.[44] The Court then attempted to justify the necessity of this law:

Its only object is to preserve the peace and safety of the community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color, of fire arms or other arms of an offensive character. Self preservation is the first law of nations, as it is of individuals. And, while we acknowledge the solemn obligations to obey the constitu-

40 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 251, 252 (1844).
41 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 252, 253 (1844).
42 Thorpe, 5:2788.
43 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 254 (1844).
44 *State* v. *Huntly*, 3 Iredell 418, 422 (N.C. 1843).

tion, as well in spirit as in letter, we at the same time hold, that nothing should be interpolated into that instrument, which the people did not will. We are not at liberty to give an artificial and constrained interpretation to the language used, beyond its ordinary, popular and obvious meaning. Before, and at the time our constitution was framed, there was among us this class of people, and they were subjected to various disabilities, from which the white population was exempt. It is impossible to suppose, that the framers of the Bill of Rights did not have an eye to the existing state of things, and did not act with a full knowledge of the mixed population, for whom they were legislating. They must have felt the absolute necessity of the existence of a power somewhere, to adopt such rules and regulations, as the safety of the community might, from time to time, require.[45]

The North Carolina Supreme Court also sought to repudiate the idea that free blacks were protected by the Bill of Rights by pointing out that the Constitution excluded free blacks from voting, and therefore free blacks were not citizens. Of course, article 17, unlike some other, more careful state arms provisions,[46] did not limit the right to bear arms to just *citizens*, but to *people*—and try as hard as they might, it would be difficult to argue that a "free person of color," in the words of the Court, was not one of "the people."

The North Carolina Supreme Court assumed that the framers of the North Carolina Constitution did not consider free blacks as being within the protections of the North Carolina Bill of Rights. Even at the first census in 1790, there were already 5,041 free blacks in North Carolina.[47] The other possibility—not considered by the Court—is that the framers of the North Carolina Constitution did not consider armed free blacks a worrisome matter.

To this point, all of these decisions have been based on the various state constitutional protections; none relied directly on the Second Amendment as the basis to overturn a law. But that changed with *Nunn* v. *State* (1846), when the Georgia Supreme Court became the first state supreme court to recognize the Second Amendment as a limitation on the states.

Georgia had passed a law in 1837 which prohibited the sale of "Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols..."[48] Other language contained in the statute strongly suggests that the intent was to stop the sale of concealable deadly weapons, and to prohibit the carrying of small handguns. The Georgia Supreme Court overturned this law as violative of the Georgia Constitution and the Second Amendment of the U.S. Constitution:

The language of the *second* amendment is broad enough to embrace both Federal and State governments—nor is there anything in its terms which restricts its meaning... Is this a right reserved to the *States* or to *themselves*? Is it not an unalienable right, which lies at the bottom of every free government? We do not believe that, because the people withheld this arbitrary power of disenfranchisement from Congress, they ever intended

45 *State* v. *Newsom*, 5 Iredell 181, 27 N.C. 250, 254 (1844).
46 Early constitutions limiting the right to bear arms to citizens: Connecticut (1818), Kentucky (1792 & 1799), Maine (1819), Mississippi (1817), Pennsylvania (1790)—but not the 1776 Pennsylvania Constitution, Republic of Texas (1838), State of Texas (1845).
47 Bureau of the Census, *Negro Population in the United States 1790-1915*, (Washington: Government Printing Office, 1918; reprinted New York: Arno Press, 1968), 57.
48 *Nunn* v. *State*, 1 Ga. 243, 246 (1846).

to confer it on the local legislatures. This right is too dear to be confided to a republican legislature.

It is commonly assumed that the doctrine of incorporation is a twentieth century interpretation of the Fourteenth Amendment; but here in *Nunn*, we are told, in relation to the Federal Bill of Rights:

> Questions under some of these amendments, it is true, can only arise under the laws and Constitution of the United States. But there are other provisions in them, which were never intended to be thus restricted, but were designed for the benefit of every citizen of the Union in all courts, and in all places; and the people of the several States, in ratifying them in their respective State conventions, have virtually adopted them as beacon-lights to guide and control the action of their own legislatures, as well as that of Congress.[49]

While the Fourteenth Amendment and the doctrine of incorporation caused some Southern state legislatures to recognize that the Second Amendment was a limitation on state power in the years immediately after the Civil War,[50] the Georgia Supreme Court in this decision recognized the Second Amendment as a restriction on the states well before the Civil War and the passage of the Fourteenth Amendment—even though the U.S. Supreme Court refused to recognize *any* of the Bill of Rights as limitations on state power. Nor was this interpretation of the Second Amendment's protection against both federal and state laws unique. William Rawle's *A View of the Constitution* (1829) also considered the Second Amendment to be a limitation on both federal and state power.

The breadth of members of the class with an individual right to bear weapons (albeit, for an ultimately collective purpose), in the Georgia Supreme Court's understanding, was extraordinary:

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree; and all of this for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State. Our opinion is, that any law, State or Federal, is repugnant to the Constitution, and void, which contravenes this *right*, originally belonging to our forefathers, trampled under foot by Charles I. and his two wicked sons and successors, reestablished by the revolution of 1688, conveyed to this land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta!* And Lexington, Concord, Camden, River Raisin, Sandusky, and the laurel-crowned field of New Orleans, plead eloquently for this interpretation! [emphasis in the original]

Finally, after this paean to liberty—in a state where much of the population remained enslaved, forbidden by law to possess arms of any sort—the Court defined the valid limits of laws restricting the bearing of arms:

> We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void...*[51] [emphasis in the original]

---

49 *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).
50 Halbrook, *That Every Man Be Armed*, 124-35.
51 *Nunn* v. *State*, 1 Ga. 243, 250, 251 (1846).

both white abolitionists and free black citizens. In the South, vigilantes suppressed all opposition to slavery...[81]

The problem of mob violence directed against abolitionists was sufficiently widespread during the 1830s, when the concealed weapons laws became increasingly common in the South, that President Martin Van Buren's Inaugural Address, delivered in March of 1837, addressed the problem twice.[82]

In the South, where slaveholders were overwhelmingly in control, laws to protect attacking mobs from the "unfair advantage" of abolitionists carrying concealed weapons would not be surprising. In the same church where William Lincoln had so poorly guessed the race of the men entering the church, he preached a sermon on the evils of slavery:

> As he spoke, Lincoln noticed that the attention of the congregation had been drawn to his side. "I turned and saw the sheriff & a deputy pointing 2 pistols at the pulpit & I said 'Ye seek to kill me, a man that hath told you the truth'..."

Indeed, before Lincoln left that valley, he narrowly missed being shot to death.

In the Northern states, where slaveholders had little direct influence on state governments, the need to keep abolitionists in fear might have been less obvious. One celebrated example of the abolitionist use of arms in the North is the Oberlin rescue of runaway slave John Price in September 1858. The slavecatchers and U.S. marshals were besieged by hundreds of armed abolitionists, black and white, thus effecting the non-violent release of Price.[83] The connection between arms ownership and revolution was expressed during the trial of the Oberlin Rescuers in a letter to the *Portage County Democrat*, "We must no longer submit to the despotism of the Federal government. Our wrongs we must right if we can through the Ballot Box, and if this fail us, through the Cartridge Box."[84]

The most obvious connection to prohibition of concealed carry of arms in the South is that most of these laws were adopted in the years immediately following Nat Turner's 1831 rebellion. While free blacks were banned from carrying weapons (openly or concealed) in statutes different from those that banned concealed carry, the curious grouping in geography and time of these laws suggests that fear of slave revolt, or of armed abolitionists, or both, provoked these laws. A detailed history of each state's concealed weapons statutes is beyond the scope of this work, but is necessary to resolve the question of why these laws appeared almost exclusively in slave states during the antebellum period.

## VI. "NO NEGRO... SHALL BE ALLOWED TO CARRY FIRE-ARMS"

After the Civil War, the modern understanding of the right to bear arms began to take shape, almost entirely in the former states of the Confederacy, and the border states where slavery had existed before the war—and this understanding accepted new, more restrictive laws on the open carry of arms. At least part of the impetus for these laws was related to the newly freed slaves.

At the end of the Civil War, the newly restored Southern legislatures adopted a series of laws known as the Black Codes; the purpose of these laws was to create restrictions on free blacks that would maintain the dominant position of Southern whites. Many of these restrictions were aimed at reducing the freedmen to a position of economic dependence; others seem designed to make them unable to defend themselves. (A case can be made that the two situations were connected.) An example is the Mississippi black code, which required "that no freedman, free Negro, or mulatto not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk, or Bowie knife..." Similarly, St. Landry Parish, Louisiana, passed a series of "Police Regulations" that included: "No negro who is not in the military service shall be allowed to carry fire-arms, or any kind of weapons, within the parish, without the special written permission of his employers, approved and [e]ndorsed by the nearest and most convenient chief of patrol..."[1] Alabama's variant did not even include a process by which a "freedman, free negro or mulatto" might obtain a permit.[2]

Of course, white Southerners had a different perspective on why such laws were needed, with even respected Southern historians arguing, half a century later, "The restrictions in respect to bearing arms, testifying in court, and keeping labor contracts were justified by well-established traits and habits of the negroes...."[3] Before the Civil War, free blacks had not been allowed to possess arms in many (perhaps all) of the slave states, so it is difficult to see how there could be "well-established traits and habits" with respect to bearing arms immediately on the end

1 "Mississippi Black Code", in *Annals of America,* (Chicago: Encyclopedia Britannica, Inc., 1976), 9:634. Michael Les Benedict, *The Fruits of Victory: Alternatives in Restoring the Union, 1865-1877,* (New York: J.B. Lippincott Co., 1975), 87. Cottrol and Diamond, 344, quote a very similar Louisiana statute adopted in 1865.

2 Cottrol and Diamond, 345.

3 William A. Dunning, *Reconstruction, Political and Economic,* (New York: Harper, 1907), quoted in Francis L. Broderick, *Reconstruction and the American Negro, 1865-1900,* (London: Macmillan Co., 1969), 21.

of the war.[4] Maryland, a slave state that had remained within the Union, had prohibited slaves from carrying guns without "a license from his said master" before the war, and free blacks were completely forbidden possession of either firearms or ammunition.[5] These arms prohibitions prohibited free blacks from owning *dogs* without a license, and authorized any white to kill an unlicensed dog owned by a free black, out of fear that blacks would use dogs as weapons. Mississippi went further, and prohibited *any* ownership of a dog by a black person.[6]

Maryland abolished slavery in 1864, and the slave codes were repealed the following year. In 1867, Maryland held a constitutional convention; at that convention, an attempt was made to add "and every citizen has the right to bear arms in defence of himself and the State" to the new constitution. Some delegates, including champions of compensation to slaveowners, argued against it, on the grounds that, "Every citizen of the State means every white citizen, and none other." Apparently, there was fear that the language would entitle blacks to carry arms. An attempt to add a considerably more narrow form of the right, "and the citizen shall not be deprived of the right to keep arms on his premises," was also rejected. Halbrook tells us: "Barnes's amendment may have been rejected so that former slaves in Maryland could not keep arms in their homes."[7] However, Halbrook provides no persuasive evidence to support his conjecture.

It had been widely recognized in the period before the Civil War that there was an inverse relationship between arms possession and slavery:

> [B]oth proponents and opponents of slavery were cognizant that an armed black population meant the abolition of slavery, although some blacks were trusted with arms to guard property, for self defense, and for hunting. This sociological fact explained not only the legal disarming of blacks, but also the advocacy of a weapons culture by abolitionists. Having employed the instruments for self-defense against his pro-slavery attackers, abolitionist and Republican Party founder Cassius Marcellus Clay wrote that "'the pistol and the Bowie knife' are to us as natural as the gown and pulpit."[8]

An example of the terror that Southerners held of armed blacks may be found in a decision of the Confederate Congress, May 1, 1863. Black Union soldiers bearing arms would be treated as insurrectionist slaves under the laws of the state where they were captured—which almost certainly would result in the death penalty. The same decree "approved the death penalty for white officers captured while leading black units," and indeed, this had already been the practice in Arkansas in 1862.

---

4 Stephen P. Halbrook, *A Right To Bear Arms*, (Westport, Conn.: Greenwood Press, 1989), 94, 111. While slaves were allowed to possess firearms in Georgia, it was only with permission of his master for specified purposes, and the arms were to be stored in the master's house. Also, see Featherstone & Gardiner, 102.

5 Halbrook, *A Right To Bear Arms*, 111-3. Halbrook, "The Fourteenth Amendment and the Right to Keep and Bear Arms: The Intent of the Founders", in *The Right To Keep And Bear Arms*, 70. Featherstone and Gardiner, 102.

6 Theodore Brantner Wilson, *The Black Codes of the South*, (University of Alabama Press, 1965), 26-30.

7 Halbrook, *A Right To Bear Arms*, 111-3.

8 Featherstone & Gardiner, 101. Featherstone and Gardiner cite the quote from Cassius Marcellus Clay as H. Greeley, ed., 7 *The Writings of Cassius Marcellus Clay*, 257 (1848).

---

Black Union soldiers were massacred by Confederate troops while trying to surrender at Fort Pillow, Tennessee, in April 1864.[9]

During the closing days of the Civil War, the Virginia Legislature passed a bill providing for the use of black soldiers; an opponent argued: "What would be the character of the returned negro soldiers, made familiar with the use of fire-arms, and taught by us, that freedom was worth fighting for?"[10] The South was not alone in its fear of armed blacks. Representative Thaddeus Stevens observed: "When it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in hysterics."[11]

After the war, the fear of armed blacks remained strong. Senator Willard Saulsbury, a Delaware Democrat, expressed his opposition to the presence of black soldiers in the post-war Regular Army: "'What would be the effect,' he asked his fellow senators, 'if you were to send negro regiments into the community in which I live to brandish their swords and exhibit their pistols and their guns?'"[12] When the Civil Rights Act of 1866 was being debated, Senator Saulsbury spoke against it, on the grounds that if passed, it would invalidate the Delaware law that required "that free negroes shall not have the possession of firearms or ammunition."[13]

Myrta Lockett Avary's *Dixie After The War* contains a chapter on "Secret Societies" which articulates white fears of bloodthirsty freedmen, out to murder white men, in order to rape the white women. Many of the hearsay accounts involve armed blacks, engaging in wanton murders, and negligent discharges of firearms.[14]

Fear of black retribution provoked tremendous stress among white Georgians in the summer of 1865: "Everywhere there were vivid secondhand accounts of armed blacks drilling in nightly conclaves, waiting only for the signal that would trigger a coordinated massacre sometime during the Christmas holidays." Similar fears soon appeared in the Carolinas. While no evidence was found that such uprisings were actually planned, by November the panic had spread to more than sixty counties throughout the former Confederacy—largely in the states with the largest black populations. These fears increasingly centered on organized black rifle companies, and not surprisingly, many whites began to see disarming the freedmen as necessary for their safety (or at least found it necessary to use this as a cover for some other purpose):

> In the late summer of 1865 a Summerton, South Carolina, vigilance committee agreed to disarm the freedmen of the area because of the danger of insurrection. At the vigilance meeting, however, conservative planter Warren Manning challenged the plan to disarm the blacks. He recalled that some of his slaves carried weapons for the protection of the plantation before the war, and now these men had been "made free and therefore had a right to carry arms."

---

9 William S. McFeely, *Frederick Douglass*, (New York: W.W. Norton & Co., 1991), 227-8. Nalty, 44.

10 Halbrook, "The Fourteenth Amendment...", 69.

11 Kenneth M. Stampp, *The Era of Reconstruction, 1865-1877*, (New York: Vintage Books, 1965), 104.

12 Nalty, 51.

13 Cong. Globe, 39th Cong., 1st Sess., pt. 1, 474 (Jan. 29, 1866), quoted in Featherstone and Gardiner, 102.

It also appears that a wildly distorted description of an insurrection at Morant Bay, Jamaica, in October of 1865 may have added fuel to the fire of fear.

White-dominated state governments that formed at this point rapidly began to form militias; their concern was that the federal troops which occupied the region would be insufficient, or perhaps unwilling, to protect whites from the feared insurrection of the freedmen. In many cases, militias formed without formal state recognition, and began searching black homes, confiscating the freedmen's firearms. In Eufala, Alabama, a militia company was joined by federal troops in confiscating arms from free blacks.[15]

Some white southern conservatives did recognize that the old laws would have to change, and that the old "criminal and police regulations" would have to be made color-blind, even before the Fourteenth Amendment had been proposed.[16] Many of the antivagrancy laws adopted in the South after the Civil Rights Act of 1866 "made no reference to race, to avoid the appearance of discrimination... But it was well understood... that 'the vagrant contemplated was the plantation negro.'"[17] As we examine the ostensibly color-blind laws completely prohibiting the carrying of weapons, suddenly adopted by the slave states after the Civil War, we should consider that color-blindness is as much in the application of the law, as the written statute itself.

It would be convenient if we could find clear-cut evidence that the post-war laws prohibiting the carrying of arms were passed for the purposes of selective enforcement. Certainly, with a great deal of work, it might be possible to ascertain the race of the defendants in some of the post-war cases, and to the extent that available records allow it, more detailed, state-by-state studies should attempt it.[18] But *if* these laws were passed for the purpose of selective enforcement, appeals through the courts might have been selective as well; it is interesting to find that many of the decisions from this period in the Southern states manage to uphold the laws, and release the defendants.

That arms were used frequently by the freedmen for self-defense, should come as no surprise:

> Blacks sought to arouse the conscience of the nation, but they also availed themselves of the right of self-defense. They were defending not only their individual lives but the lawful state and local governments established by Reconstruction... The night riders who set out on a lynching expedition often found in their targeted victim a fighter who would offer the greatest possible resistance. Collectively, groups of blacks fought back

---

14 Myrta Lockett Avary, *Dixie After The War*, (New York: Doubleday, Page & Co., 1906; reprinted New York: Da Capo Press, 1970), 263-278.

15 Dan T. Carter, *When The War Was Over: The Failure of Self-Reconstruction in the South, 1865-1867*, (Baton Rouge: Louisiana State University Press, 1985), 192-4, 199-201, 219-21.

16 Carter, 190.

17 Eric Foner, *Reconstruction*, (New York: Harper & Row, 1988), 200-1.

18 While county of original trial is present for nearly all cases, this may not always be the county of residence of the defendant; last names only are used in most of these decisions; unless the defendant was of long residence in the county in question, the chances of finding them in the previous or following decennial censuses are remote.

---

against the terror and, where offered the opportunity, blacks eagerly volunteered to serve in the militias organized by the Radical state governments.[19]

Eric Foner's *Reconstruction* gives many examples of white violence directed against former slaves, many for imagined crimes, and many because the former slaves failed to give the expected level of deference to their former masters. Violence directed against blacks engaged in political agitation was widespread, and blacks engaging in armed self-defense provoked "waves of fear among Southern whites."[20] In the words of one Louisiana black: "As one of the disfranchised race... I would say to every colored soldier, 'Bring your gun home'."[21]

In response to the murder of a black militiaman in 1876 in South Carolina, a protest meeting of 1000 blacks and 500 whites adopted a resolution that made it clear that such outrages carried a high risk:

> We tell you that if it comes to too far in this thing. Remember that there are 80,000 black men in this State who can bear Winchester rifles and know how to use them, and that there are 200,000 women who can light a torch and use the knife, and that there are 100,000 boys and girls who have not known the lash of a white master, who have tasted freedom, once and forever, and that there is a deep determination never, so help them God, to submit to be shot down by lawless regulators for no crimes committed against society and law.[22]

Both sides took up arms in the pursuit of their political goals, although the goal of conservatives in doing so was to reduce the freedmen to submission. A proposal by which South Carolina Democrats sought to recover control from the freedmen included:

> 3. That the Democratic Military Clubs are to be armed with rifles and pistols and such other arms as they may command...
>
> Democrats must go in as large numbers as they can get together, and well armed...
>
> 16. Never threaten a man individually. If he deserves to be threatened, the necessities of the times require that he should die...[23]

The first post-war decision, *Smith* v. *Ishenhour* (1866), took place in Tennessee. The Confederate state government had passed an ordinance ordering all arms to be taken from the citizens of each county, apparently for the purpose of arming Tennessee soldiers. Conrad Ishenhour was appointed by Governor Harris to effect this action in Cocke County; after the war, one A.E. Smith filed suit for the value of a gun seized from him, and won a judgement against Ishenhour. Ishenhour then appealed to the Tennessee Supreme Court.

While the decision in this case principally revolved around the postwar actions of the state government in declaring all acts of the Confederate state government, "null and void from the beginning," the Tennessee Supreme Court expressed its horror at such an effort:

> In the passage of this Act, the 26th section of the Bill of Rights, which provides, "that the free white men of this State have a right to keep and bear arms for the common de-

---

19 Herbert Shapiro, *White Violence and Black Response*, (Amherst, Mass.: University of Massachusetts Press, 1988), 21.

20 Foner, 119-123.

21 Foner, 120.

22 Shapiro, 21.

23 Benedict, 142.

fense," was utterly disregarded. This is the first attempt, in the history of the Anglo-Saxon race, of which we are apprised, to disarm the people by legislation.[24]

Tennessee had returned to Conservative control in the 1869 state elections[25] because of factional rivalries within the Republican Party. The new Conservative majority in the legislature arranged for a constitutional convention in 1870 to revise the Tennessee Constitution. If there had been any doubt as to the goals of the new Conservative legislative majority, they were quickly dispelled as the legislature repealed laws designed to protect blacks from the Ku Klux Klan, rejected the Fifteenth Amendment (black voting rights), abolished the state school system established by the Republicans, and repealed a statute that guaranteed non-discrimination in railroad accommodations.

The 1870 constitutional convention made a number of changes, clearly intended to preserve white dominance: segregation of the public schools was mandated, and interracial marriage or cohabitation was prohibited.[26] Another provision allowed the Legislature to regulate the carrying of arms. The Legislature then passed "The Act of 1870, c. 13," which prohibited the carrying of "a dirk, sword-cane, Spanish stiletto, belt or pocket pistol or revolver," either openly or concealed.[27] (It appears that the law in question did not prohibit the open carrying of large pistols.) In 1871, the Tennessee Supreme Court heard three similar appeals, and gave a single ruling on all three: *Andrews v. State* (1871), *State v. O'Toole* (1871), and *State v. Custer* (1871).

In *Andrews v. State* (1871), Andrews was convicted of violating the new law, and appealed his conviction. In *State v. O'Toole* (1871), O'Toole was indicted, but the judge quashed the indictment on the grounds that the law in question was unconstitutional, and because the indictment was defective in not charging that the pistol O'Toole carried was a "belt pistol, or pocket pistol." The district attorney then appealed the judge's decision in quashing the indictment. In the third case, *State v. Custer* (1871), Custer appears to have pleaded guilty to the charge, was sentenced to prison, but the District Attorney asked that Custer be "required to give sureties to keep the peace, which being refused, he appealed for the State."[28]

The same attorney represented both Andrews and O'Toole; attorneys for all three defendants argued that, "by Article 2 of the amendments to the Constitution of the United States, the right to bear arms was protected." Andrews and O'Toole's attorney also argued that the 1870 Constitution's authority

to regulate did not involve the power to prohibit, and that this act was a prohibition. That in Aymette's case the arms carried were not arms of warfare, the wearing of which the Legislature had the power to prohibit; that this is the only point decided in that case—all else is *dictum*. He insisted that the words relied upon by Judge Green [the judge in the *Aymette* decision] as restrictive, *i.e.*, "for the common defense," could not be of any effect, as the right was guaranteed without any such restriction in the Constitution of the United States; that the necessity was not only to keep them at all times, to be inured to their use by constantly bearing them about with them; that the power in the

24 *State v. Ishenbour*, 43 Tenn. (3 Coldwell) 214, 215, 216, 217 (1866).
25 Richard H. Abbott, *The Republican Party and the South, 1855-1877*, (Chapel Hill, N.C.: University of North Carolina Press, 1986), 207-8.
26 Cartwright, 13-14, 18.
27 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 171 (1871).
28 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 166 (1871).

Constitution of 1870 to regulate the wearing of arms, implies a right to wear as well as to bear arms, and that this right was subject only to be regulated, not destroyed.[29]

Similarly, Custer's attorney, "insisted upon the protection of the Constitution of the United States, and of the State, and that the Legislature had no power over the arms of civilized warfare, but might prohibit the carrying of other arms."[30]

The Tennessee Supreme Court's decision cited *Barron* v. *Baltimore* (1833) as evidence that the Second Amendment like the rest of the Bill of Rights, did not apply to the states.[31] It appears that neither defense attorney argued that the recently ratified Fourteenth Amendment incorporated the protections of the Bill of Rights.

The Court went on to argue that because of similarities between the Second Amendment and Tennessee's 1834 constitutional protection that "the free white men of this State have a right to keep and bear arms for their common defense," that the same reasoning should be applied to both—even though the U.S. Senate specifically rejected "for the common defense." Next, the Court concluded that because both provisions were found in proximity to discussions of the militia, that the right in question was only for the purpose of collective defense, "when called into actual service for the security of the State"—although the principal concern of the Framers was not the security of the State, but the security of the civil liberties of the people.

The Court acknowledged that the right of keeping arms:

necessarily involves the right to purchase and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted; and as they are to be kept, evidently with a view that the citizens making up the yeomanry of the land, the body of the militia, shall become familiar with their use in times of peace, that they may the more efficiently use them in times of war: then the right to keep arms for this purpose involves the right to practice their use, in order to attain to this efficiency. The right and use guaranteed to the citizen, to be exercised and enjoyed in time of peace, in subordination to the general ends of civil society; but, as a right, to be maintained in all fulness....

The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.

But farther than this, it must be held, that the right to keep arms involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace; that in such use, he shall not use them for violation of the rights of others, or the paramount rights of the community in which he makes a part.[32]

This reasoning, with respect to "ordinary modes usual in the country" creates an interesting question: was the carrying of "pocket pistols" a mode "usual in the country"? From the speed with which three different cases came to trial after the Tennessee Legislature made carrying pocket pistols illegal, and from the comments in Kentucky's *Hopkins* v. *Commonwealth* (1868) decision, it would appear that, in-

29 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 167 (1871).
30 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 167, 168 (1871).
31 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 172, 173 (1871).
32 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 177, 178, 179 (1871).

deed, it was a common practice, and could therefore be considered protected by this line of argument.

That there were limits to the authority of the Legislature to restrict the carrying of arms, at least arms of a military nature, may be found in the Court's statement:

> The Convention of 1870, knowing that there had been differences of opinion on this question, have conferred on the Legislature in this added clause, the right to regulate the wearing of arms, with a view to prevent crime.

> It is insisted by the Attorney General, as we understand his argument, that this clause confers power on the Legislature to prohibit absolutely the wearing of all and every kind of arms, under all circumstances. To this we can not give our assent. The power to regulate, does not fairly mean the power to prohibit; on the contrary, to regulate, necessarily involves the existence of the thing or act to be regulated... Adopt the view of the Attorney General, and the Legislature may, if it chooses, arbitrarily prohibit the carrying of all manner of arms, and then, there be no act of the citizen to regulate.[33]

The Court continued with its explanation of the nature of the right to bear arms:

> It is insisted by the Attorney General, that the right to keep and bear arms is a political, not a civil right. In this we think he fails to distinguish between the nature of the right to keep, and its necessary incidents, and the right to bear arms for the common defense. Bearing arms for the common defense may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed; *but the right to keep them, with all that is implied fairly as an incident to this right, is a private individual right, guaranteed to the citizen, not the soldier.* [emphasis added]

> It is said by the Attorney General that the Legislature may prohibit the use of arms common in warfare, but not the use of them in warfare; but the idea of the Constitution is, the keeping and use of such arms as are useful either in warfare, or in preparing the citizen for their use in warfare, by training him as a citizen, to their use in times of peace.

The Court next quoted Joseph Story's remarks about the meaning of the Second Amendment that we examined on page 70, and observed:

> We cite this passage as throwing light upon what was intended to be guaranteed to the people of the States, against the power of the Federal Legislature, and at the same time, as showing clearly what is the meaning of our own Constitution on this subject, as it is evident the State Constitution was intended to guard the same right, and with the same ends in view. So that, the meaning of the one, will give us an understanding of the purpose of the other.

> The passage from Story, shows clearly that this right was intended, as we have maintained in this opinion, and was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights....

> We may for a moment, pause to reflect on the fact, that what was once deemed a stable and essential bulwark of freedom, "a well regulated militia," though the clause still remains in our Constitutions, both State and Federal, has, as an organization, passed away in almost every State of the Union, and only remains to us as a memory of the past, probably never to be revived.[34]

---

33 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 180, 181 (1871). The Tennessee Attorney General, Joseph B. Heiskell, was also the reporter for Tennessee Supreme Court decisions; Heiskell took advantage of this opportunity to get the last word by footnoting this portion and asserting that this was *not* his argument.

34 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 182, 183, 184, 185 (1871). Perhaps this was the case in former states of the Confederacy, but it is by no means clear that the militia was fading away elsewhere in the United States. California, for example, appears to have maintained an active state militia;

---

The Court next used the *Aymette* v. *State* (1840) precedent, and quoted it that, "the object for which the right to keep and bear arms is secured is of a general nature, to be exercised by the people in a body for their common defense, so the arms—the right to keep which is secured—are such as are usually employed in civilized warfare, and constitute the ordinary military equipment." Further, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense."[35]

The Court acknowledged that there was an individual right to possess military arms on private property. But on the subject of carrying arms off of private property, the Court held to a narrower definition of this right:

> The principle on which all right to regulate the use in public of these articles of property, is, that no man can so use his own as to violate the rights of others, or of the community of which he is a member.

> So we may say, *with reference to such arms, as we have held, he may keep and use in the ordinary mode known to the country, no law can punish him for so doing, while he uses such arms at home or on his own premises; he may do with his own as he will, while doing no wrong to others.* Yet, when he carries his property abroad, goes among the people to public assemblages where others are to be affected by his conduct, then brings himself within the pale of public regulation, and must submit to such restrictions on the mode of using or carrying his property as the people through their Legislature, shall see fit to impose for the general good.[36] [emphasis added]

The Tennessee Court's opinion was not unanimous. Justice Sneed "dissented from so much of the opinion as questioned the right of the Legislature to prohibit the wearing of arms of any description, or sought to limit the operation of the act of 1870." Justices Nelson and Turney concurred in much of the majority decision, and agreed that the intent of the Legislature was "to promote the public peace," but:

> I am, nevertheless constrained by a sense of duty to observe, that, in my opinion, that statute is in violation of one of the most sacred rights known to the Constitution. Ever since the opinions were promulgated, it has been my deliberate conviction that the exposition of the Constitution by Judge Robert Whyte, in Simpson v. The State... was much more correct than that of Judge Green in Aymette v. The State... The expression in the case last named, that the citizens do not need for the purpose of repelling encroachment upon their rights, "the use of those weapons which are generally employed in private broils, and are efficient only in the hands of the robber and assassin," is, in my view, an unwarrantable aspersion upon the conduct of many honorable men were well justified in using them in self-defense.... The provision contained in the declaration of rights in the Constitution of 1834, that "that the free white men of this State have a right to keep and bear arms for their common defense," is not restricted to public defense.... Had such been the intention, the definite article "the," would would [sic] have been employed, instead of the personal pronoun "their," which is used in a personal sense, and was intended to convey the idea of a right belonging equally to more than one, general in its nature, and universally applicable to all the citizens. The word "bear" was not used alone in the military sense of carrying arms, but in the popular sense of

---

this author has seen a certificate from 1879, issued by the Adjutant General of California, acknowledging seven years of good service in the state militia, which exempted the militiaman from jury duty.

35 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 184, 185 (1871).

36 *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 185, 186 (1871).

wearing them in war or in peace. The word "arms," means "instruments or weapons of offense or defense," and is not restricted, by any means, to public warfare.[37]

Justice Nelson went on to explain how the carrying of pistols had been commonplace during the Civil War, and that after the war ended, the practice had continued, with "dangerous wounds, as well as frequent homicides" being the result, and that giving authority to the Legislature to regulate the carrying of deadly weapons was recognized by the 1870 Constitutional Convention as not completely prohibiting the carrying of weapons, but that:

> if worn upon the person, they shall be worn in a public manner. The act of 1870, instead of regulating, prohibits the wearing of arms, and is, therefore, in my opinion, unconstitutional and void...
>
> Regretting, as I do, that the nobler objects of bearing and wearing arms are too often and too horribly perverted, I can not approve legislation which seems to foster and encourage a craven spirit on the part of those who are disposed to obey the laws, and leaves them to the tender mercies of those who set all law at defiance.[38]

In the majority decision, the Court came to the conclusion that regulation of the *manner* in which arms could be carried on public property was, for some classes of weapons, within the purview of the Legislature, but that ownership was not; and furthermore, that the distinction between those weapons that could be restricted, and those that could not, was dependent upon whether or not the weapons were weapons of war—this being an especially protected class.

Determining the history of the 1870 Convention, the motives of the various parties involved, and the nature of the brawls which so frightened the Tennessee Court would be a worthwhile pursuit, though unfortunately outside the scope of this work. Nonetheless, it would appear that Tennessee's law reflected the will of the resurgent white majority of Tennessee. Throughout the 1870s, KKK violence operated to the detriment of Tennessee blacks.[39] It seems unlikely that the arms laws were intended as a restraint on the KKK.

Later that year, the Tennessee Supreme Court heard an appeal that led to a simpler decision—and one that has been widely cited in support of restrictive arms carrying laws, in spite of its inappropriateness. The defendant, Thomas Page, was convicted of carrying a revolver, "about eight inches long, but that it was not such weapon as is used as a weapon of war," and threatening to use it against an apparently non-aggressive person. The Court clarified that while the carrying of a weapon was not necessarily criminal, the case before them was definitely one of those criminal misuses of the right to bear arms:

> In the case before us, the intent with which Page was carrying his pistol was fully developed. He was carrying it that he might be armed, as was shown by his threatened assault upon [Page's victim]. It would probably be difficult to enumerate all the instances in which one of these weapons could be carried innocently, and without criminality. It is sufficient here to say, that, without the intent or purpose of being or going armed, the offense described in this statute can not be committed.[40]

37 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 193, 194 (1871).
38 *Andrews v. State*, 3 Heisk. (50 Tenn.) 165, 194, 195, 201 (1871).
39 Cartwright, 19.
40 *Page v. State*, 3 Heisk. (50 Tenn.) 198, 200, 201 (1871).

In 1871, in response to the *Andrews v. State* (1871) decision, the Tennessee Legislature revised the law prohibiting the carrying of pistols, such that it was illegal to carry a

> belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands...[41]

By exempting "army pistols" carried "openly in his hands," the Legislature hoped to write a law that would still prohibit the carrying of most deadly weapons, by allowing only one mode of carry—the mode which is the most aggressive and dangerous manner imaginable.

Robert Wilburn was charged with violating this new statute. The first count charged him with carrying "a belt and pocket pistol and revolver pistol, the same being an arm such as is not commonly carried and used in the United States army." The second count charged that Wilburn did "unlawfully and willfully carry an army pistol privately and concealed, and not openly in his hands..." which contradicts the claim in the first charge, since the Act of 1871 had defined an "army pistol" to be something other than "a belt or pocket pistol." The judge quashed the second count of the indictment, and at trial, Wilburn was acquitted on the first count. The State appealed the judge's decision quashing the second count of the indictment.[42] Since the Legislature had rewritten the law specifically to meet the requirements handed down by the Court in the earlier cases, the Court found the law, as written, constitutional.[43]

As part of the continuing effort to discourage concealable handguns, on March 17, 1879, Tennessee passed a law prohibiting the sale of "belt or pocket pistols, or revolvers, or any other kind of pistol except army or navy pistols." Persons already licensed to sell pistols were allowed to continue to sell them until their license expired, at which point no future sales were allowed.

Some time after the expiration of his license, Burgoyne was indicted for having illegally sold pistols prohibited under the ordinance. In this case, the Second Amendment was apparently not raised by the defendant, and the case was decided on the narrow grounds of whether it was within the authority of a state government to prohibit the sale of a good in the interests of public welfare—which the Court held that the state government possessed.[44]

While not strictly a "right to keep and bear arms" case, the Tennessee Supreme Court's decision in this case presents a disturbing question: can a right continue to exist if the mechanisms for the exercise of that right are no longer available for purchase? Would a law banning the sale of printing presses necessarily violate the First Amendment protections of free speech?

In *Carroll v. State* (1872), the Arkansas Supreme Court upheld the precedent in *State v. Buzzard* (1842). The defendant Carroll argued that he had carried a concealed pistol because he was in danger of "receiving great bodily violence," did so only within his own home, and asked the judge to charge the jury accordingly. The

41 *State v. Wilburn*, 7 Bax. 57, 61 (Tenn. 1872).
42 *State v. Wilburn*, 7 Bax. 57, 58 (Tenn. 1872).
43 *State v. Wilburn*, 7 Bax. 57, 62, 63 (Tenn. 1872).
44 *State v. Burgoyne*, 7 Lea 172, 173, 179, 40 Am. Rep. 60 (Tenn. 1881).

trial judge refused to do so. The Arkansas Supreme Court recapitulated the *Buzzard* decision:

a constitutional right to bear arms in defense of person and property does not prohibit the legislature from making such police regulations as may be necessary for the good of society, as to the manner in which such arms shall be borne. Neither natural nor constitutional right authorizes a citizen to use his own property or bear his own arms in such way as to injure the property or endanger the life of his fellow citizen, and these regulations must be left to the wisdom of the legislature, so long as their discretion be kept within reasonable bounds. And it is not unreasonable for the legislature to enact that deadly weapons shall not be worn concealed, that those associating with the bearer may guard against injury by accident or otherwise.[45]

"Reasonable bounds," of course, is a highly elastic phrase—one that reappears throughout the judicial history of the right to keep and bear arms—and with substantially different meanings in different cases. The Court upheld the right of the Legislature to ban concealed carry, because that was "reasonable," but hinted that there were limits beyond which such laws were not "reasonable," and that banning open carry might well be beyond those limits. But over the next few years, the Arkansas Supreme Court gave a series of contradictory decisions about the meaning of this right—changing direction so readily as to make it questionable whether there was any overriding theory behind these decisions.

In 1874, the Republicans lost control of the Arkansas Legislature.[46] In 1875, Arkansas passed a law making it a misdemeanor to "wear or carry any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon..." with the usual exceptions for police officers, travellers carrying such weapons "with their baggage," or any person directed by a police officer "to assist in the execution of any legal process." Not only concealed carry, but also open carry had been outlawed. Later that year, in *Fife* v. *State* (1876), Alfred Fife was indicted for violating this law in Pine Bluff, Arkansas. Perhaps of some relevance to the decision of the court, Fife threatened a person who was apparently not a threat to him.

The Arkansas Supreme Court used Joseph Story's *Commentaries on the Constitution of the United States* and Thomas Cooley's *Constitutional Limitations* to decide that arms were protected by the Second Amendment as a restraint on "usurpation and arbitrary power of rulers," and that "the arms which it guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well-regulated militia, and such as are necessary and suitable to a free people, to enable them to resist oppression, prevent usurpation, repel invasion, etc., etc.," but that the Second Amendment was "a restraint upon Federal, and not upon State legislation."[47]

The Arkansas Constitution contained a "right to keep and bear arms for their common defense" clause, which according to the Arkansas Supreme Court, was carried over from the 1836 state constitution; but the Court used "for their common defense," and quoted the Tennessee Court's decision in *Andrews* v. *State* (1871) to decide that only weapons

---

45 *Carroll* v. *State*, 28 Ark. 99, 100, 101 (1872).
46 Birdsall S. Viault, *American History Since 1865*, (New York: McGraw-Hill, 1989), 17-18.
47 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 557, 558 (1876).

adapted to the ends indicated above, that is, the efficiency of the citizen as a soldier, when called on to make good the defense of a free people; and these arms he may use as a citizen, in all the usual modes to which they are adapted, and common to the country. What then, is he protected in the right to keep and thus to use? Not every thing that may be useful for offense or defense, *but what may properly be included or understood under the title of "arms," taken in connection with the fact that the citizen is to keep them, as a citizen.* Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. *Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the legislature.*[48] [emphasis added]

While recognizing that large military handguns (what the Court called a "repeater") were protected, the Arkansas Court held that this "did not mean pocket revolver."[49] Without acknowledging that the Arkansas law had made it illegal to "wear or carry any pistol of any kind whatever," the Court held "that the plaintiff in error was carrying a pistol of that class or character intended to be prohibited by the legislature, and which we think may be prohibited, in the exercise of the police power of the State, without any infringement of the constitutional right of the citizens of the State to keep and bear arms for their common defense."[50] If we accept that pocket pistols were not arms of a soldier, and that the Second Amendment was not restrictive of state legislative authority, this decision, based on the "common defense" clause, was perfectly logical.

It is tempting to see the *Fife* decision as part of an increasingly restrictive attitude by the Arkansas Supreme Court towards the right to keep and bear arms. But two years later, in *Wilson* v. *State of Arkansas* (1878), the Court once again changed course. Chancy Wilson was indicted on the grounds that he did "unlawfully carry a pistol as a weapon, contrary to the statute such case made and provided, and against the peace and dignity of the State..." Wilson had borrowed "a large army size six shooter, a revolving pistol, 44 caliber, eight inches in the barrel, such as is commonly used in warfare" for the purpose of pig hunting. Upon reaching his destination, Wilson spoke with his host, "pulled the pistol out of his boot, cocked it a few times to see if it would revolve, and then put it around under his coat, and went into dinner." It is not clear if the revolver was concealed in his boot, but it certainly was concealed under his coat. The trial court refused to allow a statement either by the owner of the pistol or Wilson as to the purpose of having the revolver, and refused to charge the jury that "an army size pistol" was not subject to the restriction of the Arkansas law.

The Arkansas Supreme Court, citing *Fife*, agreed that regulation was acceptable, but:

No doubt in time of peace, persons might be prohibited from wearing war arms to places of public worship, or elections, etc. *Andrews* v. *State*, 3 *Heiskell*, 182.

But to prohibit the citizen from wearing or carrying a war arm, except upon his own premises or when on a journey traveling through the country with his baggage, or when

---

48 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).
49 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 560 (1876).
50 *Fife* v. *State*, 31 Ark. 455, 25 Am. Rep. 556, 561 (1876).

acting as or in aid of an officer, is an unwarranted restriction upon his constitutional right to keep and bear arms.

If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege.[51]

In the same session, the Arkansas Supreme Court decided another weapons case, *Holland* v. *State* (1878):

James Holland was indicted in the Circuit Court of Yell county, for carrying a pistol as a weapon.

On the trial but one witness was examined. He stated, in substance, that the first time he ever saw defendant, was on the 1st of October, 1875, in Yell county. He had two large sized six shooting pistols, one of them a Remington, navy size and loaded, and the other a Colt's army pistol. The pistols were such as are commonly used in the United States military and naval service. Defendant was carrying them in his saddle-bags, and stated he was from Texas. Witness did not know whether he was on a journey or not.

Not surprisingly, Holland

asked the court to charge the jury that if they found from the evidence that the pistols, proven to have been carried, were army sized pistols, and were such as are commonly used in the United States military and naval service, they must acquit defendant.

The court refused this instruction, defendant was convicted, a new trial refused him, he took a bill of exceptions and appealed.[52]

Chief Justice English again delivered the opinion of the Arkansas Supreme Court: "The court erred in refusing to instruct the jury as moved by appellant." After citing *Fife* v. *State* (1876) and *Wilson* v. *State of Arkansas* (1878), the Arkansas Supreme Court reversed the conviction, and ordered a new trial. The pistols in question were apparently concealed "in his saddle-bags," but the defense of the pistols being standard U.S. military models was sufficient to justify their concealed carriage.

The Arkansas Legislature responded to the *Wilson* and *Holland* decisions by passing a new weapons law. The Act of April 1, 1881, prohibited "the carrying of army pistols except uncovered and in the hand." In *Haile* v. *State* (1882), the first two sections of this act (which regulated carrying of handguns) were challenged. The defendant, Haile, was convicted in Pope County of carrying "uncovered, and buckled around his waist... a large revolving pistol, known as the Colts army pistol, and such as is used in the army and navy of the United States..."

The Arkansas Supreme Court decided:

The question is, can the Legislature regulate the mode of carrying any arms which the citizens have the constitutional right to keep and bear for their common defense? We have decided that it may, to some extent, which means that it may, in a reasonable manner, so as, in effect, not to nullify the right, nor materially embarrass its exercise.

At this point, the Court had taken a position which could be considered the "reasonable" regulation school—the manner could be regulated, but the right could not be destroyed.

51 *Wilson* v. *State of Arkansas*, 33 Ark. 557, 558, 559, 560 (1878).
52 *Holland* v. *State*, 33 Ark. 560, 561 (1878).

Next, the Court articulated its republican view of the nature of the right protected by the Arkansas Constitution:

*The constitutional provision sprang from the former tyrannical practice, on the part of governments, of disarming the subjects, so as to render them powerless against oppression.* It is not intended to afford citizens the means of prosecuting, more successfully, their private broils in a free government. It would be a perversion of its object, to make it a protection to the citizen, in going, with convenience to himself, and after his own fashion, prepared at all times to inflict death upon his fellow-citizens, upon the occasion of any real or imaginary wrong. The "common defense" of the citizens does not require that. The consequent terror to timid citizens, with the counter violence which would be incited amongst the more fearless, would be worse than the evil intended to be remedied. [emphasis added]

This paragraph, too, can be regarded as an honest statement of belief. But next, the Court explains its reasoning in upholding the 1881 statute:

The Legislature, by the law in question, has sought to steer between such a condition of things, and an infringement of constitutional rights, by conceding the right to keep such arms, and to bear or use them at will, upon one's own premises, and restricting the right to wear them elsewhere in public, unless they be carried uncovered in the hand. It must be confessed that this is a very inconvenient mode of carrying them habitually, but the habitual carrying of them does not seem essential to "common defense." The inconvenience is a slight matter compared with the danger to the whole community, which would result from the common practice of going about with pistols in a belt, ready to be used on every outbreak of ungovernable passion. It is a police regulation, adjusted as wisely as the Legislature thought possible, with all essential constitutional rights.[53]

If "timid citizens" were terrorized by the wearing of holstered guns, how would requiring those guns to be carried in the hand reduce the fear? The purpose of the law was to make the carrying of guns for defensive purposes so inconvenient, and so likely to provoke an accidental shooting, as to make it impractical to carry a gun.

The Court did not abandon the notion of a right to keep arms, however:

The constitutional right is a very valuable one. We would not disparage it. A condition of things within the experience of men, still very young, illustrates the importance of keeping alive in the mind, and well defined, these old land-marks of Saxon liberty. "*Semper paratus,*" [always ready] is a good motto. Yet if every citizen may keep arms in readiness upon his place, may render himself skillful in their use by practice, and carry them upon a journey without let or hindrance, it seems to us, the essential objects of this particular clause of the bill of rights will be preserved, although the citizen be required to carry them uncovered, and in the hand, off his own premises, if should deem it necessary to carry them at all.[54]

The Arkansas Supreme Court referred to the Tennessee Bill of Rights, with its very similar protection of the right to keep and bear arms, and how the Tennessee Supreme Court had found a very similar law constitutional in *State* v. *Wilburn* (1872). Alas, the Court had transformed the name into *State* v. *Welburne*, which is not a particularly persuasive piece of evidence that they had actually read the decision.

The final paragraph of the *Haile* decision, however, contains a statement that was a reminder that there were limits to the authority of the state to regulate the possession of military weapons: "There need be no fear, from any thing in these

53 *Haile* v. *State*, 38 Ark. 564, 565, 566 (1882).
54 *Haile* v. *State*, 38 Ark. 564, 566, 567 (1882).

sections, that the citizen may not always have arms, and be skilled in their proper use, whenever the common defense may require him to take them up."[55]

In *Dabbs* v. *State* (1882), the Arkansas Supreme Court upheld the third section of the Act of April 1, 1881, which prohibited the sale of any pistol other than those "used in the army or navy of the United States and known as the navy pistol." Dabbs pled guilty in Pulaski County, Arkansas, of selling such a pistol. On appeal, Dabbs' attorney cited a number of provisions of the U.S. Constitution with respect to regulation of interstate commerce, sought to use the Fourteenth Amendment and the "privileges and immunities" clause of the Constitution, as a basis for overturning the ban. Dabbs' attorney also pointed to the Georgia decision *Nunn* v. *State* (1846) which overthrew a similar law. He also claimed that *Fife* v. *State* was "no authority in this case. No act of this description ever sustained by any court. Not even this court has gone so far, although it has gone to considerable length..." Dabbs' attorney then cited *State* v. *Buzzard* (1842), and *Wilson* v. *State of Arkansas* (1878).

Attorney-General Moore, arguing for the law, claimed "The right to 'keep and bear arms' may be absolutely prohibited," and pointed to *State* v. *Buzzard* (1842) and *Fife* v. *State* (1876) as precedents.[56] While this is certainly an accurate description of the *Buzzard* decision, the *Fife* v. *State* (1876) decision, as we have seen, did not go so far as to completely deny such a right.

Justice Smith wrote the opinion of the Arkansas Supreme Court. First, he disposed of the interstate commerce provision, citing such well-known precedents as *Gibbons* v. *Ogden* (1824), to find that since the state had authority to regulate, "and even to suppress, the traffic in intoxicating liquors within its borders," it certainly had the authority to regulate or prohibit gun sales, at least with respect to the issue of interstate commerce.[57]

Next, Justice Smith dispensed with the Fourteenth Amendment since it was "to secure to negroes all the civil rights that white citizens enjoy, and to prevent discriminations against them as a class, or on account of their race." While Justice Smith did not say so explicitly, the implication was that because it was intended to protect blacks against racial discrimination, it could therefore *not* be relevant to the rights of citizens who were not subject to racial discrimination—a position that would certainly provoke a hearty laugh from the legal community today, when the Fourteenth Amendment has become the heart of lawsuits protecting all sorts of classes.

With respect to the "privileges and immunities" argument:

Nor does it conflict with *sec. 2 of art. 4*, of the Constitution of the United States, which provides that the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States; for all are placed upon an equality by the act. The citizen of Tennessee can not sell the forbidden articles upon the territory of Arkansas any more than one of our citizens.[58]

56 *Dabbs* v. *State*, 39 Ark. 353, 354, 355, 43 Am. Rep. 275 (1882).

57 The *Gibbons* decision had struck down a New York State granted monopoly on steamship operations, on the grounds that any commerce between two states was within the power of the Congress to regulate, and while a state could regulate internal commerce, it could not regulate interstate commerce. McDonald, 80-82.

58 *Dabbs* v. *State*, 39 Ark. 353, 356, 43 Am. Rep. 275 (1882).

---

But of course, such an argument ignores the natural rights view that the right of bearing arms for self-defense, recognized by the common law of England, was one of the "privileges and immunities" shared by citizens "of the several States," discussed in *Dred Scott* v. *Sandford* (1857).

Finally, the heart of the dispute is addressed in the last paragraph of the decision:

The law was enacted as a measure of precaution for the prevention of crimes and calamities. It is leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare. *Fife v. State*, 31 Ark., 455.[59]

Don Kates argues that such statutes were passed to disarm blacks, by making the only affordable handguns unavailable.[60] The parallel to efforts in the 1960s and 1970s to ban so-called "Saturday Night Specials"—guns on average smaller, cheaper, and more concealable than military & police sidearms—should be obvious. If, in fact, the motivations for such laws were racial in nature, we should not be surprised that these statutes were all passed in former slave states.

It is asserted that the name, "Saturday Night Special" is derived from the phrase, "niggertown Saturday night,"[61] an uncomplimentary assertion about the level of violence among blacks. Attempts to verify this origin for the term "Saturday Night Special" were inconclusive. The OED defines it as, "a cheap, low-calibre pistol or revolver such as might be used by a petty criminal," with its first use in a *New York Times* article of 1968. "Saturday Night," used as an attribution, is defined as, "some form of revelry."[62] The leap from "revelry" to a petty criminal's gun, is mystifying. A search of several dictionaries of slang found no definition of "niggertown Saturday night," but did reveal a definition of "Saturday Night Special" as "a small handgun, often used in the many fracas that occur over Saturday night in a big US city."[63] A North Carolinian acquaintance reports having heard the terms "Niggertown" and "Saturday night" used in 1968 in a form that suggested that the combination of Saturday night, alcohol, and blacks, inevitably led to violence.[64] The leap from murder as a form of black revelry, to any cheap handgun being a "niggertown Saturday Night Special," to the cleaned-up "Saturday Night Special," is a logical one. However, this does not necessarily mean that it is etymologically correct, and this topic is in need of further research.

Texas, unlike the other states of the Confederacy, remained a frontier society. The close of the Civil War appears to have led to a dramatic increase in violence—though from the sketchy available evidence, in quite the opposite direction feared by the whites of the deep South. The Texas Constitutional Convention of 1868-69 compiled a report on lawlessness and violence from a variety of sources; while there is reason to suspect the accuracy and completeness of the data, even a historian with a strong bias against the report has agreed that violence had reached unprecedented levels during this period.

60 Kates, "Toward A History of Handgun Prohibition...", 11, 13-14.

61 Kates, "Toward a History of Handgun Prohibition...", 25.

62 OED, 14:509.

63 Jonathan Green, *The Dictionary of Contemporary Slang*, (New York: Stein & Day, 1984), 241.

64 Joseph Knapp, Personal communication to the author, November 12, 1991.

Compendium_Roth
Page 0201

From the close of the war to June of 1868 the report found 1,035 murders had been committed: 509 of the victims were white, and 409 victims were freedman. The Convention's report may have overemphasized political and racial motivations for these murders, but murder was a serious and increasing problem. The combination of disenfranchised whites, newly freed blacks about to get the vote, and a variety of adjustment problems as former slaves and masters worked out new economic relationships, would seem to have been factors in this problem.[65] It appears the 1860 population of Texas was 604,000; by 1870, the population was 819,000.[66] If we accept the population during the period 1865-1868 as 700,000, that would give an annual murder rate of 49 per 100,000 population—more than four times the highest murder rate for the entire United States in the twentieth century.[67]

Circumstances leading to the 1869 state elections were highly irregular; General Reynolds, the military governor of Texas, appointed Edmund J. Davis as Provisional Governor. Actual control of the state government remained in the hands of General Reynolds until April 16, 1870. Governor Davis and the Radical Republican-dominated legislature passed a series of laws designed to deal with the problems of lawlessness: organizing a state militia; creating, for the first time, a state police force of 250 men, under the direct control of the governor; and a law to "put restrictions on the indiscriminate carrying of dangerous weapons."[68] It appears that the State Police succeeded in suppressing the Klan's violence, "providing freedmen with a real measure of protection in a state notorious for widespread violence."[69]

The act of April 12, 1871 made it illegal to carry arms openly. It was quickly challenged, and in 1872, the Texas Supreme Court wrote a single decision which covered three very different cases: *William English* v. *State* (1872), *State v. G. W. Carter*, and *State v. William Daniel*, appealed from the district courts of Marion, Kaufman, and Van Zandt counties, respectively. All involved a violation of the new law, which prohibited the carrying of pistols, Bowie knives, sword-canes, spears, brass knuckles,[70] "unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing," with the usual exemptions for peace officers, active members of the militia, and in one's own home or business.[71]

Each of the cases was somewhat different, and yet a single decision was rendered for all:

In English's case the offensive weapon was a pistol, and it was proved that he was in a state of intoxication while wearing it about in the city of Jefferson. He proved, in defense, that the pistol was not loaded at the times it was seen by the witnesses against him;

65 Charles William Ramsdell, *Reconstruction in Texas*, (New York: Columbia University Press, 1910; reprinted Gloucester, Mass.: Peter Smith, 1964), 219-24. Also, see Foner, 119-23, for evidence that this problem of violence directed against freedmen was not confined to Texas.

66 *Historical Statistics of the United States, Colonial Times to 1970*, (Washington: Government Printing Office, 1975), 35.

67 Bureau of Justice Statistics, *Report to the Nation on Crime and Justice*, 2nd ed., (Washington: Government Printing Office, 1988), 15.

68 Ramsdell, 285-6, 289, 291-2, 295-8.

69 Foner, 440.

70 *English* v. *State*, 35 Tex. 473 (1872). In a later case—*State v. Duke*, 42 Tex. 455 (1875)—the Texas Supreme Court quoted the entire law in question, but cites it as the act of April *11*, 1871, not April *12*.

71 *State v. Duke*, 42 Tex. 455, 456, 457 (1875).

and further, that it was out of repair, and he had taken it along with him to have it mended, as he expected soon to go to a neighboring county after his mother, and wished to carry the pistol with him....

The charge against Daniels was going "into a religious assembly, having about his person a butcher knife." The state's witnesses proved that they saw the defendant in church on the occasion in question, and that the handle of a butcher knife was sticking out above the waistband of his breeches, and between the skirts of his frock coat. They saw nothing but the handle. The court below charged that the handle raised a presumption of a blade.

No transcript in Carter's case has come to the hands of the reporter, nor any brief in his behalf, or in behalf of Daniels.[72]

Of course, this is not surprising; from the form of the case names involving Carter and Daniel, it would appear that Carter and Daniel succeeded in persuading the district court judge that the cases against them were without merit, and that these were appeals by the prosecutor. In the case of Carter, the Texas Supreme Court reversed the district court's decision.

In the case of Daniel, or Daniels (for the Court referred to this defendant by both names, and to the case as both *State* v. *Daniel* and *Daniels* v. *State*), the Court affirmed the decision of the district court.[73] Was Daniels convicted by the district court, or released? The lack of brief on behalf of Daniels suggests that he was already a free man, and had no reason to appeal the district court's decision—a problem that repeatedly occurs in cases involving the right to keep and bear arms. Not surprisingly, without an advocate opposing such laws, the court would be primarily influenced by the brief filed by the attorney general.

The Court quoted Bishop's *Criminal Law* to the effect that the Second Amendment was a restriction not only on the federal government, but on the states as well, in language very similar to Rawle's statements in *A View of the Constitution*. The Court quoted Bishop's straightforward admission that there was no authority for the narrow view of "arms" given in *Aymette* v. *State* (1840):

As to its interpretation, if we look to this question in the light of judicial reason, *without the aid of specific authority*, we shall be led to the conclusion that the provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such only are properly known by the name of 'arms,' and such only are adapted to promote 'the security of a free state.' In like manner the right to 'bear' arms refers merely to the military way of using them, not to their use in bravado and affray. [emphasis added]

The Court also quoted Bishop with respect to the Georgia decision *Nunn* v. *State* (1846), the antebellum Louisiana decisions, and Alabama's *Owen* v. *State* (1858). The Texas Supreme Court then cited Bishop as asserting that "the doctrine generally approved by the American authorities" is the one taken in *Aymette* v. *State* (1840), *State* v. *Reid* (1840), *State* v. *Mitchell* (1833), and *State* v. *Newsom* (1844)—and then tells us this doctrine was accepted by Blackstone: "[T]he offense of riding or going around armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land."[74]

72 *English* v. *State*, 35 Tex. 473, 474 (1872).

73 *English* v. *State*, 35 Tex. 473, 481 (1872).

74 *English* v. *State*, 35 Tex. 473, 475, 476 (1872).

But of course, the decisions taken in *Aymette* and *Reid* are very different—only *concealed* carry was held to be unprotected in *Reid*, while open carry was clearly protected; in *Aymette*, the issue of open carry was not directly addressed, though it was implied that open carry was not protected. The Court next addressed the issue of what arms are protected:

> To refer the deadly devices and instruments called in the statute "deadly weapons," to the proper or necessary arms of a "well-regulated militia," is simply ridiculous. No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit. *The word "arms" in the connection we find it in the constitution of the United States, refers to the arms of a militiaman or soldier, and the word is used in its military sense.* The arms of the infantry soldier are the musket and the bayonet; of cavalry and dragoons, the sabre, holster pistols and carbine; of the artillery, the field piece, siege gun, and mortar, with side arms. [emphasis added]

> The terms dirks, daggers, slungshots, sword-canes, brass knuckles and bowie knives, do not belong to military vocabulary. Were a soldier on duty found with any of these things about his person, he would be punished for an offense against discipline.[75]

The Court made a distinction between a bayonet, a piece of military equipment which every member of the militia was required to own under the Militia Act of 1792,[76] and a "dagger" or "bowie knife." (If such a distinction was valid in 1872, it has evaporated today, when bayonets have become equivalent to a nineteenth century Bowie knife in size, and combat knives are issued to soldiers.) But those arms that were unambiguously military weapons were completely protected. The discrepancy between this decision and *Cockrum v. State* (1859) is a yawning chasm.

Yet the Court did agree that there were circumstances under which the carrying of deadly weapons for personal defense was appropriate, if not constitutionally protected:

> The act referred to makes all necessary exceptions, and points out the place, the time and the manner in which certain deadly weapons may be carried as means of self-defense, and these exceptional cases, in our judgment, fully cover all the wants of society. There is no abridgement of the personal rights, such as may be regarded as inherent and inalienable to man, nor do we think his political rights are in the least infringed by any part of this law.[77]

The Court then echoed the language of *Aymette v. State* (1840) about the evils of revenge:

> It will doubtless work a great improvement in the moral and social condition of men, when every man shall come fully to understand that, in the great social compact under and by which states and communities are bound and held together, each individual has compromised the right to avenge his own wrongs, and must look to the state for redress. We must not go back to that state of barbarism in which each claims the right to administer the law in his own case; that law being simply the domination of the strong and the violent over the weak and submissive.

---

75 *English* v. *State*, 35 Tex. 473, 476, 477 (1872).
76 *Annals of Congress*, 2 Cong., May 8, 1792, 1394.
77 *English* v. *State*, 35 Tex. 473, 477 (1872).

But as with *Aymette*, the Court blurred the distinction between revenge and self-defense—holding that having the ability to defend oneself was equivalent to taking away the state's authority to try and punish a criminal.

The Court's feelings on personal liberty are also explicated:

> It is useless to talk about personal liberty being infringed by laws such as that under consideration. The world has seen too much licentiousness cloaked under the name of natural or personal liberty; natural and personal liberty are exchanged, under the social compact of states, for civil liberty.[78]

With respect to the more narrowly worded Texas Constitutional provision:

> It is further claimed that this is a law in violation of the thirteenth section, first article, of our own constitution, which reads thus: "Every person shall have the right to keep and bear arms in the lawful defense of himself or the state, under such regulations as the legislature may prescribe." We understand the word "arms," when used in this connection, as having the same import and meaning which it has when used in the amendment of the federal constitution.[79]

But where the Court held that the Second Amendment did not protect an individual right for self-defense, the language of the Texas Constitution was explicitly individual ("Every person shall have the right to keep and bear arms") and explicitly for self-defense ("in the lawful defense of himself").

Without question, the Texas Constitutional provision gave the Legislature authority to regulate the keeping and bearing of arms. But unlike many other courts, which recognized that it was possible to regulate a right into non-existence, the Texas Supreme Court held that the legislature had regulated it by this law, without taking the right away.

That the Court intended some nineteenth century "social engineering" can be found in the closing paragraphs of its decision:

> But a law is not be to be set aside because it may be repugnant to the wishes, or distasteful to a class of the community, for it is generally to that class that the law is more especially addressed. Were such a rule to obtain in civilized states, it would operate a revocation of all legislative functions; the mob would assume to declare what should be law, and what should not. There could be no reformation of evils in society. Communities and states would degenerate just in proportion as their laws were wise and wholesome, or foolish and immoral.

Careful reading of these sentences leads to some disturbing questions: what "class of the community" was this law supposed to reform? What "mob" was the Court concerned about? Somehow, the language of this decision makes it hard to picture a small number of criminals as the class the Court felt compelled to restrain and chastise.

Even more astonishing is the wishful thinking and elitist sentiment expressed in the next paragraph:

> The law under consideration has been attacked upon the ground that it was contrary to public policy, and deprived the people of the necessary means of self-defense; that it was an innovation upon the customs and habits of the people, to which they would not peaceably submit. We do not think the people of Texas are so bad as this, and we do think that the latter half of the nineteenth century is not too soon for Christian and civilized states to legislate against any and every species of crime. Every system of public

---

78 *English* v. *State*, 35 Tex. 473, 477 (1872).
79 *English* v. *State*, 35 Tex. 473, 478 (1872).

laws should be, in itself, the purest and best system of public morality. We will not say to what extent the early customs and habits of the people of this state should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators.

We now reach the part of this decision that suggests the "class" at whom this law may have been aimed, or at whom the Texas Supreme Court felt that it should be aimed:

*A portion of our system of laws, as well as our public morality, is derived from a people the most peculiar perhaps of any other in the history and derivation of its own system. Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snovi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of each of these nations blended together in a system by no means to be compared with the sound philosophy and pure morality of the common law.*[80] [emphasis added]

Are we to interpret this as indicating that the statute was aimed at the Hispanic population of Texas? None of the defendants have Hispanic names; yet this may indicate only the quality of justice, and possibility for appeal, available to Hispanics who violated this law. And, as we have also seen, the common law *did* recognize a right to self-defense, and a right to carry arms.

Three years passed, and in the intervening period, the Republicans lost control of Texas,[81] though not before Democrats and a black militia came close to armed warfare in the statehouse. The Democrats, once again in control of the legislature, rapidly repealed many of Governor Davis' measures, including the state police,[82] but not the weapons restrictions.

In the next case, *State* v. *Duke* (1875), George Duke was indicted for violation of this act; it was charged that Duke did "unlawfully carry on his person one pistol, known as a six-shooter." The trial judge in Caldwell County set aside Duke's indictment on the grounds that a violation of law had not been charged, because the carrying of a pistol, by itself, was not a violation of the law.[83] The technical nature of the indictment's inadequacy occupied much of the Court's decision in this case, and is uninteresting from the standpoint of the right to keep and bear arms.

However, the issue of what constitutes "protected arms" was addressed by the Texas Supreme Court, as was the extent of State and Federal Constitutional protections. The Court first excluded the Second Amendment from consideration, because, in the Court's opinion, the Bill of Rights was not a limitation on state laws. Next, the Court considered the Texas constitutional provision.[84]

While the Court in *State* v. *Duke* (1875) upheld the precedent of *English* v. *State* (1872), that the law limiting the carrying of weapons did not conflict with this constitutional provision, they did take issue with the *English* decision's definition of "arms":

*We... do not adopt the opinion expressed that the word "arms," in the Bill of Rights, refers only to the arms of a militiaman or soldier.* Similar clauses in the Constitution of other

---

80 *English* v. *State*, 35 Tex. 473, 478, 479, 480 (1872).
81 Viault, 17-18.
82 Ramsdell, 313, 316-7.
83 *State* v. *Duke*, 42 Tex. 455, 456, 459, 460 (1875).
84 *State* v. *Duke*, 42 Tex. 455, 457, 458 (1875).

States have generally been construed by the courts as using the word *arms* in a more comprehensive sense....[85] [emphasis added]

The arms which every person is secured the right to keep and bear (in the defense of himself or the State, subject to legislative regulation), must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State. *If this does not include the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed, then the only arms which the great mass of the people of the State have, are not under constitutional protection. But beyond question, the dragoon or holster pistol is part of the arms of a soldier in that branch of the service.* (Coldwell v. The State, 3 Heiskell, 166,[86] and English v. The State, 35 Texas, 476). Regarding, then, some kinds of pistols as within the meaning of the word, we are of the opinion that the Act in question is nothing more than a legitimate and highly proper regulation of their use. We are not called on to lay down general rules, prescribing how far legislative regulation may be extended, without trespassing on the constitutional rights of the citizen. The question for our decision is the constitutionality of the Act under which this indictment was proved. It undertakes to regulate the place where, and circumstances under which a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business. We hold that the statute under consideration is valid, and that to carry a pistol under circumstances where it is forbidden by the statute, is a violation of the criminal law of the State.[87] [emphasis added]

And so the action of the district judge in overturning the indictment was upheld, but the statute was again upheld as constitutional.[88]

Immediately after the *Duke* decision, the Texas Supreme Court decided a number of other appeals in conjunction with the same law. While interesting in their own right, no constitutional issues were raised or discussed in *Young* v. *State* (1875), *Smith* v. *State* (1875), or *Williams* v. *State* (1875).[89]

The Georgia Court's prewar recognition of a right to keep and bear arms began to crumble after the Civil War. Most of the details of *State* v. *Hill* (1874) have not made it into the decision. Unfortunately, all that the headnotes tell us about the case is that the plaintiff was named Miles Hill, and that he was indicted "under section 4528 of the Code, prohibiting the carrying of pistols... to any court of justice...." The decision itself tells us nothing else about the circumstances under which Mr. Hill violated the law.

Justice McCay, writing the opinion of the Georgia Supreme Court, quickly disposed of the Second Amendment as well as natural law:

It is now well settled that [the Bill of Rights] are all restriction, not upon the states, but upon the United States. And this would seem to be the inevitable conclusion from the history of these amendments as well as from their nature and even their terms. I do not myself assent to that other limitation of the legislative powers of our general assembly

---

85 But, as has been the case in many of these decisions, there are some disturbing errors in the cited cases: *Bliss* v. *Commonwealth* became *Bliss* v. *Cane* in the list of citations that followed.
86 *State* v. *Duke*, 42 Tex. 455, 458 (1875). *Coldwell* v. *The State* is incorrect; the location cited is *Andrews* v. *State*, 3 Heisk. (50 Tenn.) 165, 8 Am. Rep. 8 (1871).
87 *State* v. *Duke*, 42 Tex. 455, 458, 459 (1875).
88 *State* v. *Duke*, 42 Tex. 455, 462 (1875).
89 *Young* v. *State*, 42 Tex. 462 (1875); *Smith* v. *State*, 42 Tex. 464 (1875); *Williams* v. *State*, 42 Tex. 466 (1875).

insisted upon in the argument, and sometimes announced by courts, to-wit: the "higher law," which is appealed to as above even the constitution.

But Hill also argued that the Georgia constitutional provision protected his right to bear arms—and in light of the decision of the Georgia Supreme Court in *Nunn* v. *State* (1846), it was a reasonable argument to advance. But there had been changes in the Georgia Constitution, and the changes created a loophole:

> At last, therefore, if this act be unconstitutional it must be because it is conflict with the state constitution. Article I., section 14, of the constitution of 1868 is as follows: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed; but the general assembly shall have power to prescribe by law the manner in which arms may be borne." The act of October, 1870, upon which this indictment is based, is in these words: "No person in said state shall be permitted or allowed to carry about his or her person any dirk, Bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except militia muster grounds."[90]

What was the purpose of this law? Violence had successfully intimidated blacks into not voting in Georgia in the 1868 elections, giving control of the Legislature to the Democrats.[91] The 1865 Georgia Constitution adopted the entire U.S. Bill of Rights, including the Second Amendment. The 1868 constitutional convention used the Second Amendment with the addition of "but the General Assembly shall have the power to prescribe by law the manner in which arms may be borne."[92] The exact reason for this addition is not clear, but at least one black Republican newspaper had advised its readers in 1866 that the Second Amendment protected their right to arms: "All men, without distinction of color, have the right to keep and bear arms to defend their homes, families or themselves."[93]

In October 1870 the Georgia Legislature was under Republican control because of military intervention by the occupying Union army, and new elections were scheduled for December of that year. It would seem likely that the Republicans sought to protect blacks from intimidation in the courts and polling places. By 1874, when this decision was decided, Georgia was back in the control of the Democrats.[94]

The Georgia Supreme Court devoted more than a page to expressing Justice McCay's opinion that, "Were this question entirely a new one, I should not hesitate to hold" that the state and Federal provisions guaranteed "only the right to keep and bear the 'arms' necessary for a militiaman," and proceeded to explain:

> I have always been at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day. It is in my judgment a perversion of the meaning of the word arms, as used in the phrase "the right to keep and bear arms," to treat it as including weapons of this character. *The word "arms," evidently means the arms of a militiaman, the weapons ordinarily used in battle, to-wit: guns of every*

90 *State* v. *Hill*, 53 Ga. 472, 473, 474 (1874).

91 Abbott, 201.

92 Halbrook, *A Right To Bear Arms*, 116.

93 *The Loyal Georgian* (Augusta), Feb. 3, 1866, 3, col. 4, quoted in Halbrook, *A Right To Bear Arms*, 115-6.

94 Abbott, 209. Viault, 17-18.

> *kind, swords, bayonets, horseman's pistols, etc.* The very words, "bear arms," had then and now have, a technical meaning.[95] [emphasis added]

Justice McCay then went on to articulate his reasons for believing that "to bear arms" was specifically military, based on the use of this construction in a number of contexts which are military. No historical or lexicographical authority was cited for his understanding of this meaning of "bear arms," or his narrow definition of "arms." As we have already seen, contemporary uses and dictionaries demonstrate that Justice McCay was incorrect about the Framers' meanings.

Justice McCay then admits that his own personal beliefs on the subject are insufficient justification:

> But assuming that the guarantee of our state constitution was intended to include weapons of this character, (which, considering that it was made a part of the constitution after the decision of *Nunn vs. The State*, in 1 *Kelly*, is not improbable,) we still are of the opinion that the act of October, 1870, is not unconstitutional. The practice of carrying arms at courts, elections and places of worship, etc., is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee. Take the clause in its largest sense; let the word "arms" include weapons of every kind; we think its guarantee would not cover so absurd, useless, defiant, and disorderly a practice as this act of 1870 forbids.[96]

Justice McCay then argued that the clause concerning a "well regulated militia" declared the purpose of the "the right of the people," and therefore the Constitutional provision restricted the purpose of the right:

> The constitution declares that as such a militia is necessary to the existence of a free state, the right of the people to keep and bear arms shall not be infringed. To effect this end, the right to have arms would seem to be absolute, since without this right, it would not be possible to attain the end contemplated, to-wit: an armed militia, organized and ready for the public exigencies. But it is obvious that the right to bear or carry arms about the persons at all times and places and under all circumstances, is not a necessity for the declared object of the guarantee; nay, that it does not even tend to secure the great purpose sought for, to-wit: that the people shall be familiar with the use of arms and capable from their habits of life, of becoming efficient militiamen. If the general right to carry and to use them exist; if they may at pleasure be borne and used in the fields, and in the woods, on the highways and byeways, at home and abroad, the whole declared purpose of the provision is fulfilled.[97]

At this point, the differences between this decision, and *Nunn v. State* (1846), are undramatic. Justice McCay acknowledged a right to possess arms out on the highways, but then held that this guarantee

> is in no fair sense a guarantee that the owners of these arms may bear them at concerts, and prayer-meetings, and elections. At such places, the bearing of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of proper respect for the majesty of the laws, and a marked breach of good manners. If borne at all under the law, they must be borne openly and plainly exposed to view, and under the circumstances we allude to, the very act is not only a provocation to a breach of the peace, but dangerous to human life.[98]

95 *State* v. *Hill*, 53 Ga. 472, 474 (1874).

96 *State* v. *Hill*, 53 Ga. 472, 474, 475 (1874).

97 *State* v. *Hill*, 53 Ga. 472, 475, 476 (1874).

98 *State* v. *Hill*, 53 Ga. 472, 476 (1874).

On the one hand, they are "offensive" and a "provocation" if exposed to view, but may only be "borne openly." Justice McCay's notion of a right could easily be squeezed out between the requirement for open carry and the requirement to not offend or provoke.

To justify the idea that there were proper limitations on the power of the government that did not destroy that right, Justice McCay next cited a section of the Georgia bill of rights that requires, "The right of the people to appeal to the courts... shall not be impaired," and drew an analogy between that right and the right to bear arms:

> If the legislature restrict the appeal to certain times and places, and under certain reasonable conditions necessary for the public good; if it pass a statute of limitations, or regulate the rules of evidence or provide that one judgment of the court shall be conclusive, all these are limitations upon the right to appeal to the courts... One guarantee is not to swallow up all others, but each is to be construed reasonably in reference to its plain intent, and other rights guaranteed to the people. The right to go into a court-house and peacefully and safely seek its privileges, is just as sacred as the right to carry arms, and if the temple of justice is turned into a barracks, and a visitor to it is compelled to mingle in a crowd of men loaded down with pistols and Bowie-knives, or bristling with guns and bayonets, his right of free access to the courts is just as much restricted as is the right to bear arms infringed by prohibiting the practice before courts of justice.[99]

After arguing that the clause of the Georgia constitutional provision which provides, "the legislature may prescribe the manner in which arms may be borne," was broader than an allowance for the legislature to prohibit concealed carry," McCay seemed to back down, and admit that such regulations must be "reasonable":

> The right to "tote" them, as our colored people say, would be a bootless privilege, fitting one, perhaps, for playing soldier upon a drill ground, but offering no aid in that knowledge which makes an effective, to-wit: a shooting soldier. To acquire this skill and this familiarity, the words "bear arms" must include the right to load them and shoot them and use them as such things are ordinarily used, so that the "people" will be fitted for defending the state when its needs demand; and *when the constitution grants to the general assembly the right to prescribe the manner in which arms may be borne, it grants the power to regulate the whole subject of using arms, provided the regulation does not infringe that use of them which is necessary to fit the owner of them for a ready and skillful use of them as a militiaman. Any restriction which interferes with this is void, whether it relates to the carrying of them about the person, or to the place or time of bearing them.*

> The manner of bearing arms includes not only the particular way they may be carried upon the person, that is openly or secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped, but it includes, also, the time when, and the place where, they may be borne. It is no reply to this view of the subject to say that if the legislature may do this, they may, in effect, prohibit the carrying them altogether. The same reply may be made to the admitted right to prescribe the manner of carrying arms upon the person. *If the legislature were to say arms shall not be borne on the shoulder, nor in the hands, or on the arms, but they shall only be borne strapped or fastened upon the back, this would be prescribing only the manner, and yet, it would, in effect, be a denial of the right to bear arms altogether.* The main clause and the limitation to it are both to be construed reasonably, and in view of the declared object of the provision.[100] [emphasis added]

99 *State* v. *Hill*, 53 Ga. 472, 477, 478 (1874).
100 *State* v. *Hill*, 53 Ga. 472, 479, 480, 481 (1874).

What, exactly, does this mean? This decision is like a drunken driver, weaving from side to side, and narrowly missing clear statements of what is protected. The right does not exist in a church, a courtroom, or a concert, but it does exist on the highways, and apparently, in a number of other public places. The legislature may prohibit open carry, or concealed carry, or nearly any aspect of how a weapon is to be carried, except that such a restriction must not deny the right to bear arms altogether.

The history of the 1877 state constitutional convention suggests that the Georgia Supreme Court's willingness to uphold restrictions on open carry had an impact on the populace. The language of the 1868 constitution was again adopted, with only the deletion of the words "by law." When this clause was being debated, the arguments advanced suggest that the purpose was to allow the legislature to prohibit concealed carry; a proposal to allow the legislature to "prescribe the manner *and place* in which arms may be borne" was voted down. Concealed carry was not protected, but by implication, open carry, nearly anywhere, was protected.[101]

By the end of Reconstruction, the notion of a right to carry concealed arms had been so thoroughly denied by the courts of the former Confederacy that defense attorneys were no longer arguing it before Southern state supreme courts. Typical of a number of cases during this period is *Chatteaux* v. *State* (1875). Chatteaux, a fruit and vegetable dealer in Mobile, Alabama, carried a concealed pistol in the early hours of the morning, as he passed through a dangerous section of town on his way to the marketplace. Later that same evening, Chatteaux went to the post office, no longer concerned about his safety, but still carrying the pistol in his pocket, where it had been since morning. He removed the pistol from his pocket, though the decision does not tell us why he did so.

Citing the *Eslava* decision, in which the constitutional right to carry arms was neither asserted nor denied,[102] the Alabama Supreme Court held "that the right to carry a pistol, or other weapon concealed, for any of the reasons mentioned in the statute, was co-extensive only with the necessity or occasion on which the right depended." Chatteaux's conviction was upheld.[103] Neither the Second Amendment, nor the Alabama Constitution's protection of a right to keep and bear arms, was raised by the defense.

The *Dred Scott* decision had recognized that the rights of "citizens of the United States" were protected against state action; this should have been sufficient basis for Congress to pass federal laws protecting freedmen from state action. But since the *Dred Scott* decision had successfully drawn a line between "citizens" and "people," it is not surprising that a more explicit extension of the Bill of Rights to restrict state laws was desired. While rhetoric of the time was built around protecting the rights of the freedmen, crasser political motivations have been postulated as well. (Improving the conditions of free blacks in the South would tend to reduce migration of them to the North—where they were no more welcome than in the South.) As part of that effort, the Civil Rights Act of 1866 and the Fourteenth Amendment were passed, intended to guarantee that the "privileges and

101 Halbrook, *A Right To Bear Arms*, 116.
102 *Eslava* v. *State*, 49 Ala. 355 (1873).
103 *Chatteaux* v. *State*, 52 Ala. 388, 391 (1875).

immunities" of citizens of the United States would be protected from abusive state laws.

In the debates surrounding the Civil Rights Act of 1866, both opponents and supporters agreed that passage of it would restrict the authority of the states to disarm blacks. Opponents argued that it would prohibit racially discriminatory gun control laws, while supporters insisted it would protect the rights of blacks to have arms—a subject of some importance, as many of the Southern states and municipalities attempted to restrict or prohibit possession or carrying of arms by blacks.[104]

Considerable dispute still surrounds the intentions of the Fourteenth Amendment, but recent scholarship is increasingly willing to recognize that the Fourteenth Amendment was intended to extend *all* of the Bill of Rights to the states. When the Fourteenth Amendment was introduced in Congress in 1866, "a chief exponent referred to 'the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as freedom of speech and of the press; ... the right to keep and bear arms...'"[105]

The noted Reconstruction historian Eric Foner recently wrote:

The states, declared Michigan Sen. Jacob Howard, who guided the Amendment to passage in the Senate, could no longer infringe on the liberties the Bill of Rights had secured against federal violation; henceforth, they must respect "the personal rights guaranteed and secured by the first eight Amendments." [Rep. John] Bingham said much the same thing in the House. Some portions of the Bill of Rights were of little moment in 1866.... *But it is abundantly clear that Republicans wished to give constitutional sanction to states' obligation to respect such key provisions as freedom of speech, the right to bear arms,* trial by impartial jury, and protection against cruel and unusual punishment and unreasonable search and seizure. The Freedmen's Bureau had already taken steps to protect these rights, and the Amendment was deemed necessary, in part, precisely because every one of them was being systematically violated in the South in 1866.[106] [emphasis added]

Other supporters argued for the amendment because it was needed to overturn laws that prohibited "colored men to carry weapons without a license."[107] Two years later, when the anti-Klu Klux Klan bill was debated in Congress, Bingham, the principal draftsman of the Fourteenth Amendment, repeated what the "rights and privileges" secured by it included:

Mr. Speaker, that the scope and meaning of the limitations imposed by the first section, fourteenth amendment of the Constitution may be more fully understood, permit me to say that the privileges and immunities of citizens of a State, are chiefly defined in the first eight amendments to the constitution of the United States.[108]

In *U.S.* v. *Cruikshank* (1876), the Supreme Court had an opportunity to express its opinion about the Second Amendment and its relation to the Fourteenth

---

104 Halbrook, "The Fourteenth Amendment...", 70-71. Halbrook is a proponent of the view that the Fourteenth Amendment was intended, at least partly, to protect freedmen from state gun control laws; evidence corroborating Halbrook's understanding of the philosophy of the Radical Republicans from a less partisan source can be found in Avery Craven, *Reconstruction: The Ending of the Civil War*, (New York: Holt, Rinehart, and Winston, 1969), 168-71, 174-5.

105 Congressional Globe, 39th Congress, 1st Sess., pt. 3, 2765 (May 23, 1866), quoted in Halbrook, "The Fourteenth Amendment...", 72.

106 Foner, 258-9.

107 Halbrook, "The Fourteenth Amendment...", 72.

108 Congressional Globe, 42nd Congress, 1st Sess., pt. 2, Appendix, 84 (March 31, 1871), quoted in Halbrook, "The Fourteenth Amendment...", 75.

---

Amendment. The Supreme Court decision described this case as a mob of whites, including one William Cruikshank, who had broken up a freedmen's political meeting, deprived them of their arms, and prevented them from voting in a state election. In fact, more than one hundred black men were prevented from voting by being murdered by Cruikshank's mob.[109] Under the Enforcement Act of 1870, the whites involved were indicted, tried, and convicted in the federal courts.[110] On appeal, the Supreme Court overturned their convictions in an ingenious manner, completely subverting Congressional intent with respect to the Fourteenth Amendment and the Enforcement Act of 1870. While only some parts of the decision are relevant to the Second Amendment, the Court used the same arguments with respect to the First and Second Amendments.

Acknowledging that the Fourteenth Amendment had extended the rights of national citizenship to be protected from state abuse, the Court adopted a novel concept: such rights were protected *only* to the extent that they were related to the *national* government. The Court contended that, "The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for anything else connected with the powers or duties of the National Government, is an attribute of national citizenship and, as such, under the protection of and guarantied by, the United States." Similarly, the First Amendment "was not intended to limit the powers of the state governments in respect to their own citizens, but to operate upon the National Government alone." It is within this narrowly defined view of the Bill of Rights that the Court found:

The right of bearing arms for a lawful purpose is not a right granted by the Constitution; neither is it any manner dependent upon that instrument for its existence. The Second Amendment declares that it shall not be infringed, but this means no more than that it shall not be infringed by Congress.[111]

The *Cruikshank* decision, in essence, held that the Bill of Rights was *not* incorporated by the Fourteenth Amendment, except as such rights related to the national government. Republican commentary on the *Cruikshank* decision is astonishing for the conclusions reached:

Supreme Court decisions on the "right to bear arms" have repeatedly stated that the Second Amendment was conceived of as a restraint on the power of the federal government over the state militias. In *U.S. v. Cruikshank*, 95 U.S. 542 (1874), the Court held that while there may be an individual right to possess arms, it existed independently of the Second Amendment.[112]

In fact, there is no such statement of intent in the *Cruikshank* decision, contrary to the assertion in the first sentence quoted above, and no reference to "state militias." With respect to the second sentence above, the Court ruled that the right existed before the Constitution, and that the meaning of the Second Amendment was "that it shall not be infringed by Congress." Later in the decision, the Court declared:

---

109 Lucy E. Salyer, "Cruikshank, United States v.," in Kermit L. Hall, ed., *The Oxford Companion to the Supreme Court of the United States*, (New York: Oxford University Press, 1992), 209.

110 *U.S. v. Cruikshank*, 92 U.S. 542, 548, 555 (1876).

111 *U.S. v. Cruikshank*, 92 U.S. 542, 552 (1876).

112 Michael K. Beard and Samuel S. Fields, "National Coalition to Ban Handguns Statement on the Second Amendment", in *The Right To Keep And Bear Arms*, 92. Note that the spelling and citation of this case are incorrect. Since the spelling is incorrect throughout Beard & Fields' paper, it can't be a typo.

The Second Amendment declares that it shall not be infringed; but this, as has been seen, means no more than that it shall not be infringed by Congress. This is one of the amendments that have no other effect than to restrict the powers of the National Government, leaving the people to look for their protection against any violation by their fellow-citizens of the rights it recognizes, to what is called, in City of N.Y. v. Miln, 11 Pet. 129, the "powers which relate to merely municipal legislation, or what was perhaps, more properly called internal police," "not surrendered or restrained" by the Constitution of the United States.[113]

Levin, another member of the republican school, tells us:

U.S. v. Cruickshank, implied that there was a *personal* right to bear arms upon which Congress could not infringe. The central point of the opinion, however, was to state that the second amendment did not apply to state governments, and such governments could pass whatever legislation they desired without fear of federal sanction.[114]

But of course, this is *not* the central point of the opinion. The Court decided that the Fourteenth Amendment did *not* include all the protections of the Bill of Rights, and then set about determining which rights were incorporated. Beard, Fields, and Levin never tell us that the *Cruikshank* decision held that *only* the right to vote and assemble had come under the authority of the Federal Government, and then, only if voting for federal offices or assembling to petition Congress.[115]

Further, the Court made an interesting assertion with respect to the nature of the rights protected by the Bill of Rights. In discussing the right to peaceably assemble:

The particular Amendment now under consideration assumes the existence of the right of the people to assemble for lawful purposes, and protects it against encroachment by Congress. The right was not created by the Amendment; neither was its continuance guarantied, except as against congressional interference. For their protection in its enjoyment, therefore, the people must look to the States.[116]

The same logic and phrasing was used by the Court with respect to the Second Amendment:

The second and tenth counts are equally defective. The right there specified is that of "bearing arms for a lawful purpose." This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence.[117]

The Court asserted that these rights were not *granted* by the Constitution, but were pre-existing. The Amendments *recognized* those rights, and protected them against Congress' infringement. It is possible to quote "The right was not created by the Amendment..." in such a manner as to imply that the Court believed that no such right existed; within the larger context of the discussion, it is clear that the Court was resisting the incorporation doctrine clearly stated by the principal author, proponents, and opponents of the Fourteenth Amendment, but was not denying that these rights existed, at least in a moral sense.

113 *U.S. v. Cruikshank,* 92 U.S. 542, 553 (1876). *New York v. Miln* (1837) upheld a New York State law that required ship captains landing immigrants to post a bond against them becoming public charges. Background, 82-83.

114 Levin, 124-5. At least Levin cites the case location correctly; only the name is misspelled, but that error is made consistently. It appears that Beard, Fields, and Levin are all relying on a common (and erroneous) secondary source for their information about this case.

115 *U.S. v. Cruikshank,* 92 U.S. 542 (1876).

116 *U.S. v. Cruikshank,* 92 U.S. 542, 552 (1876).

117 *U.S. v. Cruikshank,* 92 U.S. 542, 553 (1876).

In the twentieth century, this doctrine of incorporation has been recognized as extending nearly all of the Bill of Rights to protect citizens against state laws. To use *Cruikshank* as evidence that the Second Amendment does not protect an individual right is valid only if we accept *Cruikshank's* reasoning with respect to free speech, freedom of assembly, and all the rest of the protections of the Bill of Rights that are now incorporated.

Nearly all the decisions during this period took place in former slave states; our next two decisions are remarkable in that they took place in states not experiencing the social dislocations of emancipation. *Wright* v. *Commonwealth* (1875), took place in Pennsylvania. A Jonathan Wright was indicted in April 1871 in Schuylkill County, charging that: "he 'did unlawfully and maliciously carry on and about (his) person, a certain concealed deadly weapon, commonly called a pistol, with intent, with the pistol aforesaid, unlawfully and maliciously, to do bodily harm to some other person, to the inquest unknown, &c.'"

While the jury found Wright innocent, they did order him to pay court costs. The defendant appealed the order to pay court costs, arguing that the May 5, 1864 county ordinance which prohibited the carrying of concealed weapons was a violation of the 21st section of Pennsylvania's Bill of Rights. Since his indictment was for an action which was not a crime, Wright felt that he should not be obligated to pay.

The Pennsylvania Supreme Court's ruling is short, without citation of either precedent or authority for their decision about the constitutionality of the law in question: "Such an unlawful act and malicious intent as this has no protection under the 21st section of the Bill of Rights, saving the right of the citizens to bear arms in defence of themselves and the state." The Court further held that the jury must have had a good reason for imposing court costs on the defendant, even if they found him innocent. While the headnotes for this decision assert that "prohibiting the carrying of concealed weapons, is not obnoxious to the Bill of Rights, sect. 21," the decision itself specifies both "an unlawful act and malicious intent,"[118] suggesting that the combination of the two elements was required to constitute a crime. But did the court consider the carrying of concealed weapons to be part of the malicious intent, or was some other evidence of criminal intent required?

An additional interesting question is what part, if any, the 1873 Pennsylvania Constitutional Convention played. The 1790 Pennsylvania Constitution, Article IX, §21, contained the guarantee: "That the right of citizens to bear arms, in defence of themselves and the State, shall not be questioned."[119] At the 1873 convention, an attempt was made to add the word "openly" after the word "citizens": "Thomas Struthers, the proponent of the change, argued that persons charged with carrying arms secretly 'fall back on the Constitution, which they say authorizes the bearing of arms, and therefore the act of Assembly is unconstitutional.'"

His opponents responded that this would require them "to walk the streets of this city at night without any protection whatever from ruffians"; another argued that the law in Pennsylvania "required showing of evil intent" in conjunction with concealed carrying of weapons, and was thus a constitutional law. The proposed

118 *Wright* v. *Commonwealth,* 77 Pa. St. 470, 471 (1875).

119 Thorpe, 5:3101.

amendment lost, 54-23.[120]  It is not clear if the Pennsylvania Supreme Court took
into account the actions of the constitutional convention two years before, or inde-
pendently reflected the same sentiments held by the majority of the delegates.

Another Northern decision during this period was *Wiley* v. *Indiana* (1876).  The
defendant Wiley was convicted of carrying a concealed weapon.  No attempt was
made to challenge the law on constitutional grounds; the only dispute was whether
the prosecution was required to prove that Wiley was *not* a traveller, and thus sub-
ject to the law, or whether the defense had an obligation to demonstrate that Wiley
*was* a traveller, and thus exempt from the law.  The Indiana Supreme Court held
that the obligation was on the defense to prove that he was a traveller, not on the
prosecution to prove that he wasn't.[121]  This strongly suggests that the carrying of
concealed arms was not recognized as a right by the Indiana Court, consistent with
the decision in *State* v. *Mitchell* (1833).

Labor violence played a part in two decisions from Illinois during this period.
One of these decisions is *Presser* v. *Illinois* (1886), one of the U.S. Supreme Court's
often misquoted statements about the meaning of the Second Amendment.  By
examining the circumstances under which this decision was handed down, we can
better understand—and be horrified—by the logic of the Court.

One of the original theses upon which research for this work was started was that
fear of labor violence, and the desire to oppress workers, played a major role in the
narrow republican interpretations of the right to arms that have appeared through-
out the history of the Republic.  But while there is some evidence to support this
position, the bulk of the evidence suggests that labor unions were only a small part
of this judicial misinterpretation of the Second Amendment and its state analogs.

There are a number of decisions in which the Second Amendment is merely an
innocent bystander.  These decisions reflect the increasingly severe violence associ-
ated with the development of large industrial combinations in late nineteenth cen-
tury America, and the growth of labor unions in response.  While sometimes cited
as evidence by the republican school that no individual right is protected by the
Second Amendment, a more detailed examination of the decisions suggests other-
wise.  Also of interest is what the circumstances that led to these decisions tell us
about the loss of the ideal of a people's militia.  The National Guard, by the period
after the Civil War, began to play an increasingly important role in intimidating la-
bor unions.  In Chicago, a group of immigrant German socialists formed an armed
club to defend themselves and their families against criminal attacks by the Na-
tional Guard.[122]

The first decision in this vein is primarily *not* a "right to keep and bear arms"
case.  But exactly what it is, from the syllabus and decision, is a bit of a mystery.
What should have been a straightforward case of refusing jury duty, turned into a
decision eighteen pages long, with three pages of syllabus, and a baffling array of
secondary issues.  For those researching the issues of militia duties, and the relation-
ship between the National Guard, standing armies, and military duty, *Dunne* v.
*People* (1879) is a gold-mine of citations and issues.

120 Halbrook, *A Right To Bear Arms*, 116-7.
121 *Wiley* v. *Indiana*, 52 Ind. 516, 517, 518 (1876).
122 Sanford Levinson, "The Embarrassing Second Amendment", *Yale Law Journal*, 99 [December
1989], 637, 652-3.

Peter J. Dunne had been summoned to jury duty in Cook County, in September
1879.  He attempted to excuse himself from jury duty by arguing that "he was an
enlisted, active member of the 'Illinois National Guard'," and was therefore exempt
under the statute of May 28, 1879.  The court refused to accept his excuse, and
fined him $50.  There was apparently some question about the validity of this stat-
ute (at least in part), and both parties requested that the Illinois Supreme Court
hear the case.  They did hear it, in November of that same year.[123]

Mr. Dunne challenged, it appears, nearly every aspect of the law in question; of
interest to us is the authority of the state government to regulate the private bearing
of arms.  The Illinois Supreme Court upheld the authority of the state to regulate
private organizations parading with arms:

> The right of the citizen to "bear arms" for the defence of his person and property is not
> involved, even remotely, in this discussion.  This section has no bearing whatever on that
> right, whatever it may be, and we will enter upon no discussion of that question.
> Whether bodies of men, with military organizations or otherwise, under no discipline or
> command by the United States or the State, shall be permitted to "parade with arms" in
> populous communities, is a matter within the regulation and subject to the police power
> of the state.[124]

The Illinois Supreme Court appears to have acknowledged that a "right of the
citizen to 'bear arms' for the defence of his person and property" did exist, but then
the Court backtracked and referred to it as, "that right, whatever it may be," and re-
fused to discuss it further.  Was this just clumsy writing, or were more sinister mo-
tives involved?

Immediately following this statement was an assertion far removed from both
Revolutionary and modern notions of the proper limits of governmental power:

> In matters pertaining to the internal peace and well-being of the State, its police powers
> are plenary and inalienable.  It is a power co-extensive with self-protection, and is some-
> times termed, and not inaptly, the "law of overruling necessity."  Every necessary act for
> the protection, safety and best interests of the people of the State may be done under this
> power.  Persons and property may be subjected to all reasonable restraints and burdens
> for the common good.  Where mere property interests are involved, this power, like
> other powers of government, is subject to constitutional limitations; but where the inter-
> nal peace and health of the people of the State are concerned, the limitations that are
> said to be upon the exercise of this power are, that such "regulations must have reference
> to the comfort, safety and welfare of society."  It is within the power of the General As-
> sembly to enact laws for the suppression of that which may endanger the public peace,
> and impose penalties for the infraction of such laws.  What will endanger the public se-
> curity must, as a general rule, be left to the wisdom of the legislative department of the
> government.[125]

As will become apparent in the next case, opposition to the Illinois statute regu-
lating private militias did not end with *Dunne*; the month after this decision, the is-
sue of private militias ceased to be an abstraction.  *Presser* v. *Illinois* (1886) presents
an example of how the U.S. Supreme Court narrowly upheld the right to keep and
bear arms, apparently as an individual right, based on a republican view of military
obligation—while upholding a law that violated the spirit of the Second
Amendment.

123 *Dunne* v. *People*, 94 Ill. 120, 123 (1879).
124 *Dunne* v. *People*, 94 Ill. 120, 140, 141 (1879).
125 *Dunne* v. *People*, 94 Ill. 120, 141 (1879).

In response to the previously mentioned abuses of workers by the Illinois National Guard, a workers' militia was established.[126] Herman Presser led a march of this workers' militia, called the *Lehr und Wehr Verein* ("teaching and defense union"), through the streets of Chicago, with Presser on horseback carrying a sword in his hand, and the workers carrying rifles behind him. Presser was indicted under the 1879 Illinois militia statute, which prohibited any militia from organizing, drilling, or parading "without the license of the governor."

On appeal from the Illinois Supreme Court, the U.S. Supreme Court upheld the validity of the statute forbidding private militias. At the same time, in response to Presser's claim that his Second Amendment rights were being denied, the court ruled that: "A state cannot prohibit the people therein from keeping and bearing arms to an extent that would deprive the United States of the protection afforded by them as a reserve military force."[127] While the Court upheld the restrictions on unofficial militias, it argued that:

> We think it clear that the sections under consideration, which only forbid bodies of men to associate together as military organizations, or to drill or parade with arms in cities and towns unless authorized by law, do not infringe the right of the people to keep and bear arms. But a conclusive answer to the contention that this amendment prohibits the legislation in question lies in the fact that the amendment is a limitation only upon the power of congress and the national government, and not upon that of the state.[128]

The Second Amendment was only a limitation on the power of the Federal Government—not the states. But the "right of the people to keep and bear arms," was in the Court's opinion, protected from federal interference. While Presser had invoked the "privileges and immunities" clause of the Fourteenth Amendment in asserting his protection from Illinois law,[129] the Court's acceptance of the Fourteenth Amendment incorporation doctrine was still many years in the future.

The Court also acknowledged:

> It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the states, and, in view of this prerogative of the general government, as well as of its general powers, the states cannot, even laying the constitutional provision in question out of view, prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the general government.[130]

*Even if the Second Amendment was ignored*, the states could not prohibit the people from keeping and bearing arms. While maintaining the republican view of arms ownership, the Court implied that the widespread ownership of military arms in private hands, "for maintaining the public security," was a right guaranteed against state interference. Those who cite *Presser* as evidence that the Second Amendment is not a restraint on state laws, appear to have missed this other part of the decision.

What makes this decision so disturbing is that by acknowledging the validity of the Illinois statute that established a "select militia"—effectively a state army used to

126 Levinson, 99:652-3.
127 *Presser* v. *Illinois*, 116 U.S. 252, 254, 255 (1886).
128 *Presser* v. *Illinois*, 116 U.S. 252, 265, 266 (1886).
129 *Presser* v. *Illinois*, 116 U.S. 252, 262 (1886).
130 *Presser* v. *Illinois*, 116 U.S. 252, 266 (1886).

suppress labor unionists, while denying the right of workers to defend themselves collectively—the Court had completely subverted the intent of the "no standing armies" requests. Is this what Madison had in mind in *Federalist* 46, when he suggested a standing army of 30,000 men would be opposed by a militia consisting of the whole people? The intent of the Framers had been perverted in the interests of maintaining the status quo of nineteenth century industrialism.

Ten years later, the Massachusetts Supreme Judicial Court heard *Commonwealth* v. *Murphy* (1896), a case quite similar to *Presser* v. *Illinois* (1886). Murphy and a number of associates had styled themselves as the "Sarsfield Guards," and marched together with inoperative rifles, in violation of: "St. 1893, c. 367, §124, which prohibits all but certain bodies of men from drilling or parading with firearms..." Murphy argued that the statute that he was convicted of violating was: "in contravention of the seventeenth article of the Massachusetts Declaration of Rights, which declares that 'the people have a right to keep and bear arms for the common defence.'"[131]

The Court did not agree:

> This view cannot be supported. The right to keep and bear arms for the common defence does not include the right to associate together as a military organization, or to drill and parade with arms in cities and towns, unless authorized to do so by law. This is a matter affecting the public security, quiet, and good order, and it is within the police powers of the Legislature to regulate the bearing of arms so as to forbid such unauthorized drills and parades. *Presser* v. *Illinois*, 116 U.S. 252, 264, 265. *Dunne* v. *People*, 94 Ill. 120.

Up to this point, the decision was correct: armed bands marching through the streets certainly could be construed as an attempt at intimidating others—although intimidating the government might be argued as the purpose suggested in *Federalist* 46. Certainly, the *Dunne* and *Presser* decisions are correctly cited as precedent. But next:

> The protection of a similar constitutional protection has often been sought by persons charged with carrying concealed weapons, and it has been almost universally held that the Legislature may regulate and limit the mode of carrying arms... The early decision to the contrary of *Bliss* v. *Commonwealth*, 2 Litt. 90, has not been generally approved.[132]

It is certainly true that the right *of individuals* to carry arms, either openly or concealed, had been argued repeatedly before various state supreme courts. But the Court appears to have been unaware that *Bliss* v. *Commonwealth* (1822) was only one of several decisions that had recognized a right to carry concealed. Further, a more accurate comparison would have been to those cases where equivalent state constitutional provisions had been argued successfully, to protect the right of individuals to carry arms openly—for indeed, the rifles in question were carried openly by the "Sarsfield Guards." The Massachusetts Supreme Judicial Court made no statement about whether the right *of individuals* to openly carry arms, or to keep arms, was within the protections of the state constitutional protection, and the Second Amendment was apparently not raised by the defendant.

131 *Commonwealth* v. *Murphy*, 166 Mass. 171, 172 (1896). Unfortunately, the decision of the Court gives us no information for determining to what purpose this private army was established.
132 *Commonwealth* v. *Murphy*, 166 Mass. 171, 172, 173 (1896).

Without question, industrial strife was a major concern of the period between the Civil War and World War I. The 1873 panic, induced by the bankruptcy of Jay Cooke and Co., provoked a depression of unprecedented length.[133] Contemporary accounts of the series of strikes which took place during 1877 show that armed violence and the threat of armed violence by labor unionists played a significant role in strengthening the union position relative to employers. Many incidents related in Joseph Dacus' *Annals of the Great Strikes* involved unionists preventing the carrying out of business with the threat of armed violence.[134] When confronting regular army units, the workers were, in at least one instance, markedly better armed than the soldiers; the workers "were supplied with Henry and Winchester repeating rifles, and from this circumstance were able to overawe any train-guard likely to be sent out." The Army still had not made the step up to repeating rifles, and were consequently less effectively armed than the civilian population.[135]

National Guard units in some instances refused to fight against unionists, apparently because they were insufficient in arms and numbers to be effective; and in a few instances, they joined the strikers in horror at the needless bloodshed caused by other National Guard units.[136] Francis Corbin's, "Are we not the militia? Shall we fight ourselves? No, sir; the idea is absurd,"[137] was found to be at least occasionally effective as a restraint on needless bloodshed. That the population took advantage of their right to keep and bear arms under such circumstances may be found in a description of a massacre in Reading, Pennsylvania, where the National Guard opened fire on an unresisting and peaceful crowd, in response to rock throwing by an related group of strikers. A number of people under attack by the Guardsmen responded with handguns, leading to injuries among the Guardsmen, some serious. Similarly, an overreaction by Guardsmen in Pittsburgh led to open armed warfare with not only strikers, but with ordinary citizens, sickened by the senseless killings. The widespread ownership of handguns and rifles made the Guardsmen's Gatling guns of limited value, as urban guerrilla warfare erupted.[138]

Arms were employed by factions other than strikers and National Guardsmen, however. In some cities, strikes did not remain peaceful, and not always because of Guardsmen shooting down unarmed and unresisting civilians. In Pittsburgh, rioting quickly extended beyond the property of the railroads:

> The militia having fled the city, and there being no United States regulars at hand, the citizens of Pittsburgh were at the mercy of a mob, without the least possibility of resisting its demands. Such was the situation late Sunday evening, when... a vigilance committee was raised for the purpose of preventing a further waste of property. The

133 Jeremy Brecher, *Strike!*, (San Francisco: Straight Arrow Books, 1972), xiv.

134 Joseph A. Dacus, *Annals of the Great Strikes*, (Chicago: L.T. Palmer & Co., 1877; reprinted New York: Arno Press, 1969), 33, 59, 212-213. Dacus was a journalist, and *Annals of the Great Strikes*, while containing a vivid and detailed contemporary account of the events, suffers the deficiencies one might expect from a journalist: no sources, and no clear distinctions between eyewitness accounts, second-hand sources, and simple rumor. Dacus makes it clear that his sympathies, and that of many other Americans, were at least partially with the strikers. Dacus clearly distinguishes between the strikers, and mobs of hooligans, and "idlers," that Dacus called "Internationalists" and "Communists."

135 Dacus, 59. Robert V. Bruce, *1877: Year of Violence*, (Indianapolis: Bobbs-Merrill Co., 1959; reprinted Chicago: Quadrangle Books, Inc., 1970), 94, 96.

136 Dacus, 42, 212-3, 216, 156. Bruce, 194.

137 Elliot, 3:112-3.

138 Dacus, 208. Bruce, 165-7, 191-3.

> committee was rapidly recruited and its members were first supplied with base-ball bats, but these were afterwards exchanged for guns.... As soon as the force was organized they marched to Seventh avenue, where hundreds of spectators who had been waiting for some one to lead, joined with them in preventing further incendiarism.[139]

Concerned that the strikers might turn riotous in Buffalo, New York, the police department and sheriff swore in hundreds of ordinary citizens as temporary policemen to deal with the threat in July 1877; similar events took place in Indianapolis, Indiana, Chicago, St. Louis, and San Francisco at the same time.[140] Similarly, Governor Thomas Young of Ohio issued a proclamation on July 25, 1877:

> To avert all danger, and in order to successfully meet all resistance to thorough execution of the law, I hereby call on all law-abiding men in all our cities, towns and villages to tender their services to their respective civil authorities, and under their direction and control organize themselves into a volunteer police force sufficiently strong to overawe the lawless elements.[141]

In essence, *this* was the sort of militia envisioned by the Founding Fathers—though in this case, concerned about the problems of anarchy, not tyranny. Not all the strikes turned violent and, in some cases, arms in the hands of the strikers actually protected railroad property from drunken rioters, and prevented loss of life.

While contemporary accounts of murders committed with concealed weapons during the 1877 disturbances are scarce, the horrified tone of these accounts suggests that the murderous use of concealed weapons was considered especially execrable.[142] Concealed weapons in the hands of strikers also played a significant role in the eruption of violence at the Homestead Steel Works in 1892.[143]

Throughout the 1890s, the arms carried by strikers were a fundamental part of the process by which unions sought to counterbalance both company private armies and National Guard units. The disturbances in Anderson County, Tennessee, provoked by the use of convict labor as strikebreakers, provide an example:

> [M]iners from the surrounding counties, including some from Kentucky, armed with shotguns, Winchester rifles, and Colt pistols, began pouring into Briceville and Coal Creek, on trains and mules and even on foot. They formed a line and marched on the offending mine, spreading out into the mountain ranges and taking cover behind rocks and trees as they drew close. They sent a committee forward to demand the expulsion of prisoners. When a militia Colonel moved as if to capture the committee, one of its members waved a handkerchief as a signal to the miners, who sprang from cover. The 2,000 armed miners had little difficulty persuading the militia and guards to accompany them to the railroad station with the convicts, and return again to Knoxville.[144]

Another strike, in Pennsylvania, caused the following message to be delivered by the strikers to the strikebreakers and deputies who were protecting them from union intimidation: "We are heavily armed and will return bullet for bullet if the deputies fire on us."[145]

139 Dacus, 141.

140 Dacus, 156-7, 296, 313, 385, 418. Bruce, 178-80, 200-1, 240-1. The San Francisco riots had the added element of anti-Chinese violence and arson.

141 Dacus, 274.

142 Dacus, 297, 300, 336-7.

143 Brecher, 57.

144 Brecher, 67.

145 *New York Times*, May 25, 1894, quoted in Brecher, 72.

Compendium_Roth
Page 0211

An example of conditions that should have caused the courts to retreat from the right to keep arms (if any labor violence could have done so), were associated with the Illinois Central Railroad strike of 1911. In Illinois and Mississippi, handguns and rifles were widely used by strikers in murderous attacks on strikebreakers, and "led to a complete breakdown of civil government in parts of Mississippi." Martial law was finally declared when ten National Guard regiments failed to restore order.[146]

One historian of the 1892 Homestead strike argues:

> The decisive effect of militiamen cannot be overemphasized; one searches United States labor history in vain for a single case where the introduction of troops operated to the strikers' advantage. In virtually all conflicts before and after 1892 the state guard acted, in effect, as a strikebreaking agency...[147]

It is in this context that we must consider the increasing unwillingness to admit that the "militia" referred to something wider than just the National Guard.

Somewhat after the close of Reconstruction is *State* v. *Wilforth* (1881). The defendant, Wilforth, was indicted and convicted for "going into a church house in said county where people were assembled for literary purposes, viz: for the purposes of a school exhibition, the same defendant having about his person fire-arms..." Apparently, Wilforth was carrying a pistol concealed, in violation of an 1875 state law that made it a misdemeanor to have "any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon" upon one's person in "any church or place where people have assembled for religious worship."

While Wilforth attempted to argue that he was unaware of the law, the Missouri Court responded with "*Ignorantia legis excusat neminem*"—ignorance of the law is no excuse. Wilforth also argued that the law in question violated the Second Amendment. The Court acknowledged that some state courts had recognized that their state constitutions protected concealed carry of arms, including *Bliss* v. *Commonwealth* (1822), but erroneously included Tennessee in that category. The Missouri Court went on to cite the more common cases, including *Nunn* v. *State* (1846), *State* v. *Reid* (1840), and *State* v. *Jumel* (1858) to bolster their position that concealed carry was *not* protected by state constitution arms provisions.[148] However, *Jumel* was decided based on the Second Amendment, and *Nunn* was decided based on both the Georgia Constitution and the Second Amendment.

Finally, the Missouri Court expressed its opinion about the Missouri law being challenged:

> Whether such statutes are or not in conflict with the federal constitution, is an open question so far as the federal courts are concerned, the question never having been passed upon by any of them, as far as we know. Following the weight of authority as indicated by the state courts, and in the light of section 17, article 2 of the constitution of this State, which declares "that the right of no citizen to keep and bear arms in defense of his home, person or property, or in aid of the civil power, when thereto legally summoned, shall be called in question; but nothing herein contained is intended to justify the prac-

---

146 Graham Adams, *Age of Industrial Violence 1910-15*, (New York: Columbia University Press, 1966), 132-5.

147 Leon Wolff, *Lockout, The Story of the Homestead Strike of 1892: A Study of Violence, Unionism and the Carnegie Steel Empire* (New York: Harper & Row, 1965), 228, quoted in Brecher, 236.

148 *State* v. *Wilforth*, 74 Mo. 528, 529, 530, 531 (1881).

---

tice of wearing concealed weapons," we must hold the act in question to be valid and binding, and as intended only to interdict the carrying weapons concealed.[149]

In so doing, the Missouri Supreme Court had recognized that the right to carry arms openly was protected by the state constitutional protection of the right "to keep and bear arms"—only concealed carry was within the Legislature's power to prohibit.

In 1883, Missouri passed yet another law regulating the carriage of deadly weapons; the new law prohibited "the carrying of concealed, dangerous, and deadly weapons upon the person, and the exhibition of the same, and the carrying of deadly weapons when intoxicated..." The defendant in *State* v. *Shelby* (1886) had withdrawn a revolver from his pocket in a saloon, while intoxicated. The Missouri Supreme Court reaffirmed its position that the Legislature had the authority to prohibit the concealed carrying of deadly weapons, and similarly held that the provision prohibiting possession of a deadly weapon while intoxicated was within the proper regulatory authority of the government. The only significant change from the *State* v. *Wilforth* (1881) decision was that the Missouri Court was now aware of the *U.S.* v. *Cruikshank* (1876) decision: "The second amendment to the constitution of the United States is a restriction upon the powers of the national government only, and is not a restriction upon state legislation."[150] But since the Missouri Court's decision in *Wilforth* had been based on the Missouri Constitution, this did not affect the precedent from the *Wilforth* decision.[151]

The first post-Civil War North Carolina case was *State* v. *Speller* (1882). L.R. Speller and a man named Jenkins had been engaged in a progressively more severe argument; according to Speller, Jenkins made an attempt to cut Speller on Saturday with a razor, and made death threats against Speller. Jenkins and Speller subsequently swore out complaints against each other, and when a police officer serving the warrant against Speller on Monday found a concealed pistol on him, Speller was arrested, indicted, and convicted of carrying a concealed weapon, in violation of an 1879 North Carolina law. It is easy to be sympathetic to Speller's fears; Jenkins lived half a mile from Speller, while the nearest peace officer was a mile and a half away. In an age before telephones and patrol cars, the chances of Speller successfully surviving an armed attack by Jenkins would have been remote.

On appeal, Speller's attorney argued that the jury should have been charged that the extenuating circumstances behind his carrying of a concealed weapon took precedence over the concealed weapon law.[152] Speller's attorney also raised the issue of the constitutionality of the concealed weapons law.

The North Carolina Supreme Court refused to overturn the lower court's decision, and in discussing the constitutional issues:

> We concede the full force of the ingenious argument made by counsel upon this point, but cannot admit its application to the statute in question. The distinction between the "*right to keep and bear arms*," and "*the practice of carrying concealed weapons*" is plainly

---

149 *State* v. *Wilforth*, 74 Mo. 528, 531 (1881).

150 *State* v. *Shelby*, 90 Mo. 302, 304, 305, 306, 2 S.W. 460 (1886).

151 The Missouri Court also cited "*Anderson* v. *State*, 3 Heiskell (Tenn.) 172" as evidence for the non-applicability of the Second Amendment to state laws — but of course, the case wasn't *Anderson*, but *Andrews*.

152 *State* v. *Speller*, 86 N.C. 697, 698 (1882).

observed in the Constitution of this State. The first, it is declared, shall not be infringed, while the latter may be prohibited. Art. I, sec. 24.

As the surest inhibition that could be put upon this *practice* deemed so hurtful as to be the subject of express mention in the organic law of the State, the Legislature has seen fit to enact that at no time, and under no circumstances, except upon his own premises, shall any person carry a deadly weapon *concealed* about his person, and it is the strict duty of the courts, whenever an occasion offers, to uphold a law thus sanctioned and approved. But without any constitutional provision whatever on the subject, can it be doubted that the Legislature might by law *regulate* this right to bear arms—as they do all other rights whether inherent or otherwise—and require it to be exercised in a manner conducive to the peace and safety of the public? Thus far as the statute assumes to go. It does not say that a citizen when beset with danger shall not provide for his security by wearing such arms as may be essential to that end; but simply that if he does do so, he must wear them openly, and so as to be seen by those with whom he may come in contact. The right to wear *secret weapons* is no more essential to the *protection* of one man than another, and surely it cannot be supposed that the law intends that an unwary advantage should be taken even of an enemy.[153] [emphasis in original]

Open carry was protected; concealed carry was not—even in life-threatening circumstances.

In *State* v. *Pigford* (1895), Sam Pigford was arrested outside his home for "failure to work the public road." He was convicted, and sentenced to three days in jail, at which point, the jailer found that he was carrying a concealed pistol. While Pigford was serving his sentence, he was charged with the concealed weapons charge, and convicted. On appeal, the issue of the North Carolina Constitution's provision appears not to have been raised, but the North Carolina Supreme Court held:

The defendant was not prohibited from carrying the pistol on his own premises, and if it had been made to appear that when arrested he had asked to be allowed to leave it at home and the officer had refused, here would have been some semblance of a defense, but even in that event it would still have been incumbent on the defendant to explain satisfactorily why he did not carry the pistol openly as he had a right to do, after leaving his premises, and not concealed about his person.[154]

The Court did not articulate where this right to carry openly came from; nor did they hold that there was a right to carry a pistol concealed at one's own premises—merely that it was not prohibited. Nonetheless, the decision in *Pigford* is consistent with the rest of the post-war North Carolina decisions—open carry was a "right," while concealed carry was not.

While Southern supreme courts were busy hearing cases involving the carrying of arms, and in many cases, denying that any individual right to bear arms was protected by either the Federal or state constitutions, the legal commentators up North seem not to have noticed. Broom & Hadley's edition of Blackstone's *Commentaries*, published in 1875, carries an annotation on Blackstone's statement of "The fifth and last auxiliary right of the subject... is that of having arms for defence" that quoted the Second Amendment. The same note then tells us: "The constitutions of several of the states contain a similar clause. The right of carrying arms for self-protection was discussed in *Bliss* v. *Commonwealth*..."[155]

153 *State* v. *Speller*, 86 N.C. 697, 700 (1882).

154 *State* v. *Pigford*, 117 N.C. 748, 749 (1895).

155 William Blackstone, *Commentaries on the Laws of England*, edited by Herbert Broom & Edward A. Hadley, (Albany, N.Y.: John D. Parsons, 1875), 1:121, note 64.

It would appear that the decisions of the Southern courts made little or no impact on Broom and Hadley, who clearly saw the Second Amendment and the state analogs as protecting a right to carry arms—even in that most extreme of decisions, *Bliss* v. *Commonwealth* (1822). This suggests that the South was, once again, pursuing a set of policies not generally shared with the rest of the United States.

The Reconstruction governments were ephemeral; Republican rule collapsed in Virginia, North Carolina, and Georgia in 1871; in Texas in 1873, Alabama and Arkansas in 1874, Mississippi in 1876. The last of the Republican-dominated state governments fell in South Carolina, Louisiana, and Florida with the removal of federal troops in 1877.[156] But the loss of the rights of blacks was usually a gradual process, not completed until the 1890s. Consequently, we should not expect, if firearms laws were racially motivated, that they would be passed immediately and completely on the collapse of the Republican governments.[157] Furthermore, the Reconstruction governments in many cases were coalitions of white Republicans (both Northern "carpetbaggers" and Southern "scalawags"), other whites who had remained loyal to the Union, and freedmen. The conventions that wrote new constitutions

were, with only one and possibly two exceptions, predominantly white... [T]he new governments, as now formed, were never Negro-dominated, as was once thought. Only in South Carolina, and at times in Louisiana, was the Negro in a majority in any branch of government, and then it was in the lower house.[158]

As tempting as it might be to see these Republican state governments of freedmen and whites pursuing the social equality that Radical Republicans such as Thaddeus Stevens promoted, the evidence is otherwise. In many cases, the freedman's white allies saw blacks as members of an inferior, child-like race. In Mississippi, for example, Whigs were most of the whites who participated in the reformed Union government, and operated as a conservative influence. Similarly in Virginia and Tennessee, white Unionists were unenthusiastic about giving the freedmen the vote and full equality in the courts.[159] Even Northern Republicans began to look askance at the apparent lack of combativeness of Southern blacks in responding to the violence of the KKK: "'The capacity of a people for self-government,' a Northern friend lectured Judge Tourgee, 'is proved, first of all, by its inclination and capacity for self-protection... If people are killed by the Ku-Klux, why do they not kill the Ku-Klux?'"[160]

As we have already seen in the summary of the Texas decisions, the Republican Party was in control of the Texas Legislature when the statute prohibiting the bearing of arms was passed; similarly, Georgia was under Republican control at the time its restrictive law was passed. It is, however, important to remember that relations between white and black Republicans during Reconstruction were sometimes strained,[161] and Texas, where blacks were less essential to white Republicans than elsewhere, was no exception.[162]

156 Viault, 17-18.

157 Elkins, 12.

158 Craven, 229.

159 Craven, 235-6. Stampp, 162-3.

160 Foner, 435-6.

161 Abbott, 185-6, discusses how public accommodations and integrated schools bills split the Republican Party in Louisiana along racial lines. Abbott, 228-9, discusses how the actions of Southern

Tennessee and Arkansas passed laws severely restricting open carry shortly after the loss of Republican Party control, and the resurgence of white conservatives in the legislatures. It is tempting to conclude from the combination of post-war fear of armed freedmen, and the dates of adoption of many of these statutes, that the purpose of these laws prohibiting or severely limiting open carry, was to make it impossible for blacks to carry arms for either defense or offense.

Other evidence that tends to support this hypothesis is that the Texas statute contained so many exceptions, and these exemptions were phrased with such a lack of clarity (what constitutes "travelling"?) that it provided many opportunities for the prosecution to not charge a violation, and for juries to find the defendant innocent. That so many of the Texas decisions upheld the constitutionality of the law, while finding the defendants innocent, also lends credibility to this argument. The language of the Texas Supreme Court, comparing the "sound philosophy and pure morality of the common law" to the Spanish, "a people the most peculiar perhaps of any other" in *English* v. *State* (1872), certainly gives a credible basis for suspecting that the law restricting open carry may have been intended for "a class of the community"[163] (*i.e.*, Hispanics), other than criminals.

Don Kates, perhaps reflective of his years as a civil rights attorney in the South, sees a correlation between the availability of cheap handguns in the late 1860s, the struggle for political dominance in Reconstruction governments, and the sudden burst of laws severely restricting open carry, as part of an effort by the Klan to crush the freedmen into subservience, by limiting their right to defend themselves. In particular, the prohibition of the Tennessee Legislature on the carrying of any handguns but "the Army and Navy model," was an attempt, in Kates' opinion, to make all but the most expensive type of handgun unusable for self-defense away from home.

Kates argues that handguns did not become "financially accessible... until the end of the Civil War brought the sale of large stocks of military surplus weapons," and that until extremely cheap handguns, called "suicide specials," appeared on the market in the late 1860s, handguns were not common in the West or South. Further, that the practice of carrying concealed weapons was so widespread in the East that: "By the 1870s the practice of Eastern manufacturers of men's ready-to-wear trousers was to sew a holster into the right hip pocket of every pair made, to allow the concealed gun-carrying which was still legal in the East."[164]

Indeed, an examination of the decisions during the period after the Civil War shows that nearly all took place in states of the former Confederacy, or the former slave states that had stayed with the Union. Until 1890, when the West Virginia decisions started, the only Northern states where concealed weapons statutes were brought before state supreme courts were Indiana and Pennsylvania. In the case of

Republican legislatures injured the prospects of the Republican Party in the North, leading to increasingly hostile statements towards blacks by Horace Greeley, Carl Schurz, and James Shepherd Pike.

162 J. Mason Brewer, *Negro Legislators of Texas*, (Dallas, Tex.: Mathis Publishing Co., 1935; reprinted San Francisco: R&E Research Associates, n.d.), 26-27, contains examples of the needless hostility of white Republicans towards black Republicans in the Texas Legislature, to the detriment of common political goals.

163 *English v. State*, 35 Tex. 473, 479 (1872).

164 Kates, "Toward A History of Handgun Prohibition...", 11, 13-14.

---

Pennsylvania, we saw evidence that concealed carry *by itself* was not a crime in the eyes of the Pennsylvania Supreme Court.

Kates sees the flood of cheap handguns as motivating these restrictions; a strong case can be made that the other event coincidental with the end of the Civil War— a huge increase in the percentage of free blacks in former slave states—may be the real cause of this burst of activity in prohibiting *concealed* carry of arms.

What about the laws restricting *open* carry? Kates' position with respect to the suddenly lowered prices of revolvers after the Civil War might be a good explanation for the sudden emergence of open carry laws, as the "riffraff" could suddenly carry an effective arm of either defense or offense. But it fails to explain why such laws prohibiting open carry of cheap weapons, such as the much feared Bowie knife, did not appear before the Civil War everywhere, and also fails to explain why laws prohibiting open carry of arms did not appear in the North until the end of the nineteenth century or later.[165] Once again, the only obvious common denominator of the states that passed prohibitions on open carry is that they were former slave states.

Even in the absence of cheap revolvers, there is some evidence that cheap handguns of other types were common before the war. Henry Deringer's well-known design appeared originally in 1850, selling for three dollars.[166] To explain the laws regulating or restricting open carry—nearly all of which appear to have been passed in former slave states—we must look to the unsettled conditions and unsettling white fears that resulted from the Civil War, emancipation, Reconstruction, and the restoration of white hegemony (albeit, a nervous one) over the black population. Was there a real problem of public safety, or were these laws passed with the intention that only blacks would be subject to them?

What caused the Texas laws against open carry? The obvious answer—that there was a serious problem of murder in post-war Texas—may well be the correct one. The question that remains to be addressed is why the Democrats, who with great industry repealed many of the Republican laws,[167] did not repeal this one as well, since the available evidence suggests that the murder victims were disproportionately blacks, not whites.

Reconstruction remains a controversial period; historians continue to argue about the extent to which partisan political concerns, racism, and genuine Southern grievances determined the policies and actions of the various participants. While there is strong evidence that racism motivated this burst of laws restricting open carry, the evidence is not conclusive, and to some extent, this reflects the lack of scholarship which has been devoted to studying the motivations of the Reconstruction and "redeemed" Southern Democrat state governments on this issue. A more complete

165 It is also a valid question whether handguns were rare before the Civil War; this author's great-great-great-grandfather expropriated a Colt's revolver from a captured Confederate soldier after the Battle of Fishing Creek. Clayton E. Cramer, ed., *By The Dim And Flaring Lamps: The Civil War Diary of Samuel McIlvaine*, (Monroe, N.Y.: Library Research Associates, 1990), 15.

166 Michael Newton, *Armed and Dangerous: A Writer's Guide to Weapons*, (Cincinnati, Ohio: Writer's Digest Books, 1990), 31-32. Newton's work is intended as an tutorial on guns for fiction writers; in spite of an impressive bibliography, few of the facts contained in it are footnoted, and it should be regarded with caution. It does provide, however, a painless introduction to the technology of firearms.

167 Brewer, 66-67.

answer requires in-depth studies of gun control in each of the former slaveholding states.

Compendium_Roth
Page 0215

# HANDGUNS OF THE WORLD

## Military Revolvers and Self-Loaders from 1870 to 1945

**Edward C. Ezell**

**STACKPOLE BOOKS**

Case 3:17-cv-01017-BEN-JLB  Document 128  Filed 11/11/22  PageID.14906  Page 228 of 295

Compendium_Roth
Page 0217

*... of the World* by Edward C. Ezell
... reference book for all collectors—
... and professionals alike—of
... revolvers around the globe.
... guns in use today, for business
... both, have evolved from
... weapons. Between 1870 and
... effort was exerted to improve
... efficiency, and fire power for
... which in turn resulted in what
... consider classic firearms.
*... guns of the World*, Mr. Ezell
... his own expertise as well
... collectors, historians, and
... around the world. Interna-
... collectors in Great Britain, Japan,
... and many other countries,
... assisted Mr. Ezell with
... sharing with him hundred-
... ments and photographs.
... allowed him to handle and
... antique treasures from their
... collections.
... wanting to research the
... a privately owned an-
... all the answers:
... manufacturers, exact lo-
... are all here.
... photographs and line
... easy to pick out model
... your weapon to a re-
... models in this com-

... ma and reference
... beyond reproach. Mr.
... recorded here in vivid
... pistols, the men
... and the companies
... Browning, Colt,
... Lefaucheux, Bor-
... more.
... loader, author
... design from the
... complicated innova-
... possible by im-
... equipment and

HANDGUNS OF THE WORLD

Copyright © 1981 by Edward C. Ezell

Published by
STACKPOLE BOOKS
Cameron and Kelker Streets
P.O. Box 1831
Harrisburg, Pa. 17105

Published simultaneously in Don Mills, Ontario, Canada
by Thomas Nelson & Sons, Ltd.

All rights reserved, including the right to reproduce this book or
portions thereof in any form or by any means, electronic or mechanical,
including photocopying, recording, or by any information storage and
retrieval system, without permission in writing from the publisher.
All inquiries should be addressed to Stackpole Books, Cameron and
Kelker Streets, P.O. Box 1831, Harrisburg, Pennsylvania 17105.

Printed in the U.S.A.

Library of Congress Cataloging in Publication Data

Ezell, Edward Clinton.
    Handguns of the world.

    Includes index.
    1. Pistols—History.  2. Revolvers—History.
I. Title.
UD410.E93 1981      623.4′43      82–8575
ISBN 0–8117–0816–0      AACR2

Photocomposition and camera by
General Graphic Services, York, PA

**24   HANDGUNS OF THE WORLD**



**FIGURE 1–16.   Samuel Colt (1814–1862) died at the relatively young age of 48 years, but he left a giant imprint on the American and European firearms industry. (Colt)**

bers were countersunk so that they would fit over the conical shape of the breech end of the barrel. Upon firing, a coil spring and wedge were forced forward by the falling cock, thus assuring that the barrel and cylinder chamber were aligned, a very important point in revolver design. The forward movement of the cylinder also reduced the loss of gas at the junction of the cylinder and barrel. This sealing effect helped to maintain projectile velocity and reduced the tendency for accidental discharge of adjacent chambers, a serious problem encountered in all revolvers using loose gunpowder in the cylinder. Existing Collier pistols have a cylinder with five chambers that revolve on a steel pin affixed to the underside of the barrel. Although these arms had a mechanically operated self-priming feature, the cylinder had to be turned by hand. A typical Collier revolver (No. 89) measured 355.6 millimeters overall, with a 155.58-millimeter barrel and a 47.63-millimeter cylinder. The barrel bore diameter was 12 millimeters.

No more than 300 Collier revolvers of all types were manufactured before 1827 when Collier went out of business. The gunmaker had originally intended that the cylinder of his design would be rotated mechanically, but in about 1824 he apparently abandoned mechanical rotation to simplify the fire-

arm. The Collier revolvers were unsuccessful for two reasons. The guns were expensive to fabricate given existing manufacturing techniques. And they did not exploit the percussion system of ignition. Only a few Collier-type arms were adapted to the newer system of priming. Collier and his colleagues came along at a transitional period, but better designs based on more modern manufacturing processes and percussion priming would survive.[12]

## The Impact of Samuel Colt

Samuel Colt (1814–1862) was the first person to successfully solve the revolver problem.[13] Only 21 years old when he applied for an English patent on a percussion revolver, Colt demonstrated considerable sagacity and business sense. He applied for a British patent first because he knew that due to a peculiarity in British patent law a patent in that country would be voided by a prior patent in any other country. Colt's British and French patents did not prohibit him from obtaining an American one for the same invention, however. The multinational patents also indicate that he was intending to go after big sales. American inventors at this period did not usually patent their ideas abroad, but Colt was a marketing person. He wanted military contracts in as many places as possible. With that kind of market in mind, the gunmaker designed his revolver to be made by machine.

Colt was awarded British patent 6,906 on 22 October 1835 and U. S. patent 9,430X on 25 February 1836. Both protected the same fundamental ideas until 1857. He claimed the following new inventions in his American patent:

1. The application of the caps at the end of the cylinder.
2. The application of a partition between the caps.
3. The application of a shield over the caps as a security against moisture and the action of the smoke upon the works of the lock.
4. The principle of the connecting-rod between the hammer and the trigger.
5. The application of the shackle to connect the cylinder with the ratchet.
6. The principle of locking and turning the cylinder.
7. The principle of uniting the barrel with the cylinder by means of the arbor running through the plate and the projection under the barrel.
8. The principle of the adopter and the application of the lever, neither of which is used in pistols.

In modern terms, the Colt design worked as follows. The cylinder was rotated by cocking the hammer.* As the hammer was drawn to the rear, the pawl (lifter) linked to the hammer engaged teeth (ratchet) in the rear of the cylinder to turn it. A bolt locked the cylinder at the time of discharge. This was simpler than the Collier method of alignment. Colt employed percussion cap nipples at the rear of the cylinder, with their axes in line with the bore of the barrel. The partitions between them prevented simultaneous discharge due to a flash-

---

*Colt's revolvers until 1878 were single-action. Some helpful definitions include: *single-action*, a revolver in which the cylinder is rotated by cocking the hammer; *self-cocking*, a revolver in which the cylinder is rotated and the hammer actuated by pressing the trigger; *double-action*, a revolver that can be operated as either single-action or self-cocking according to need.

Compendium_Roth
Page 0218



FIGURE 1–17.   Samuel Colt's British revolver patent number 6,909, 22 October 1835. (*British Patent Office*)

Compendium_Roth
Page 0219

**26   HANDGUNS OF THE WORLD**





FIGURE 1–18.   Three variations of the Colt Paterson percussion revolver. *Top:* .34 caliber (8.6mm) Belt Model with 127mm barrel. *Middle,* .28 caliber (7.1mm) Baby Model with 76mm barrel. The loading lever was installed at the Colt factory. *Bottom,* .36 caliber (9.1mm) Texas Model with 139mm barrel. This revolver weighed about 1,133 grams. *(Colt)*

Compendium_Roth
Page 0220

around. In attaching the barrel of the revolver to the pin around which the cylinder revolved, Colt demonstrated considerable cleverness. That method of connecting the barrel, cylinder, and pistol grip/frame would be employed by the Colt Company for nearly 40 years.

Sam Colt's revolvers were a success, but not an overnight success. To start with, Colt needed money with which to build prototypes, finance his patent applications, and establish a factory. Between 1831 and 1836, he drew on personal and family resources to finance his activities. Dudley Selden, a cousin and lawyer, was given the tasks of incorporating the Patent Arms Manufacturing Company in New Jersey and selling stock to potential investors.

Historian Russell Fries notes, "the business history of the Patent Arms Manufacturing Company, from 1836 to 1841, is primarily the story of gradual disenchantment between Colt and the company over the issue of sales to the government."[14] Colts believed military sales were essential and directed nearly all of his energies in that direction. The other stockholders wanted to market the revolvers to civilians until such a time as the military decided to purchase the Colt sidearm. Pressures on Colt to put the pistol, called the *Paterson* after the location of the factory in Paterson, New Jersey, into production revealed to the investors that the pistol still needed development and perfection. Colt had oversold its state of readiness for series production.

Early tests of Colt's revolving pistol by the U.S. Army in February and June 1837 revealed several weaknesses in the design. It had to be disassembled for reloading, and it required too many cumbersome accessories, which could be lost. Praised for its rapidity of fire, the revolver was judged to be too complex and too expensive to be easily manufactured. This trial was educational for all parties involved in the Patent Arms Manufacturing Company. Sam Colt learned that his pistol was not as perfect as he had been telling people. The shareholders discovered that Colt was more interested in making weapons for promotional purposes than for immediate sale. The company went bankrupt in 1841.

Many excuses have been given for the failure of Colt's first attempt to manufacture a mechanical revolver. As one writer saw it, "Colt failed because he did not yet fully understand the principles of machine manufacture, and because he did not develop his pistol sufficiently prior to marketing it." The result was "an imperfect product at an impractical price."[15] When Colt reentered the revolver business in 1847, he began on a more modest scale, and he kept control of the company in his own hands. His first factory had been established on too grandiose a scale to be immediately profitable. The second time around, Colt rented his factory, contracted out with other manufacturers, and expanded his operations only as his sales warranted.

Colt's Paterson revolvers sparked sufficient interest in this new type handgun to create a demand when America's war with Mexico began in 1846. Many of the Texans drawn into the confrontation had used pistols purchased in 1839 by the Texas government from Patent Arms Manufacturing Company. They found the Paterson to be sufficiently strong and reliable for the mounted fighting man. After a short period of negotiation with Captain Samuel H. Walker of the U.S. Mounted Rifles, Colt and the United States government signed a contract for 1,000 revolvers on 4 January 1847. In order to meet the contract deadline, Colt subcontracted the manufacture of the firearms to Eli Whitney, Jr., on 29 May 1847. The resulting pistol became popularly known as the Whitneyville-Walker. Whitney delivered the officially designated *Colt Model 1847 Army Revolver* the following July.

The Whitneyville-Walker Colt was a significant improvement over the Paterson model. Most important, it was much more robust and very powerful, but gained its strength and power at a severe weight penalty. Although still single-action, the new model had a permanently-fixed trigger and trigger guard, whereas the Paterson had a folding trigger. The Whitneyville-Walker also had an attached rammer and lever to assist in loading. In many Paterson revolvers, this function was carried out with a separate loading tool.

After this first successful contract, others followed. On 13



FIGURE 1–19.   This model of the 1847 Army Revolver was manufactured at Eli Whitney's armory in Whitneyville, Connecticut. From Samuel Colt's own collection, this Whitneyville-Walker was supposedly Samuel Walker's own revolver, sent back to Colt from Mexico following Walker's death in October 1847. *(Colt)*

**28   HANDGUNS OF THE WORLD**

### TABLE 1-1   COMPARISON OF THREE EARLY COLT MODELS

| | Texas Model Revolver (1836–1841) | Whitneyville-Walker Colt Model 1847 Army Revolver | First Model Dragoon Colt Model 1848 Holster Pistol |
|---|---|---|---|
| Caliber | .40 (10.16mm) | .44 (11.18mm) | .44 (11.18mm) |
| Overall length | 355.6mm | 393.7mm | 355.6mm |
| Weight empty | 1133 g | 2070 g | 1984.5 g |
| Barrel length | 228.6mm | 228.6mm | 114.3mm |
| Number of shots | 5 | 6 | 6 |

July 1847, Colt received permission to build a second lot of 1,000 revolvers of a new model. Known variously as the *Dragoon Model*, the *Old Model Army*, and the *Model 1848*, this new revolver series was a winner. Between 1848 and 1860, approximately 20,000 Dragoons were manufactured. The U.S. military purchased more than 7,000 from 1848 to 1856. Colt moved his operations to Hartford, Connecticut in 1847 where over the next four years he moved from one building to another as his production levels grew. And he added new people to his production staff. His most important new employee was Elisha K. Root, who came to Colt in 1851 to be general supervisor of the manufacturing operations. Root went about adding many new machine tools—automatic drop hammers, turret lathes, barrel rifling machines—to the factory, speeding up the manufacturing process and reducing the machining time for each part to the minimum.

By the time the Dragoon model pistols were being manufactured, the Colt pistol mechanism had evolved to the form it would have until 1878 when a double-action mechanism would be introduced. Sam Colt, with designer-engineer Elisha Root's assistance, set out to capture the military and civilian markets of the United States and Europe. The size and shape of the handguns they produced varied, but the mechanism remained essentially the same. Their one attempt to develop a new revolver hammer mechanism, called the Root side-

hammer, was more suited to revolving rifles and muskets than pistols. (About 40,000 Root pistols and about 17,000 to 18,000 long arms were made.) Before 1873 when the new centerfire Model P was introduced, Colt had produced more than 850,000 single-action percussion revolvers.

## Challenges to Colt's Monopoly

Sam Colt was successful, in part, because he had a virtual monopoly. As late as 1849, his main competitors were the builders of multibarreled revolving arms called pepperboxes. There were no revolver makers in England, and on the Continent only Devisme and Lenormand were making such weapons, and then by hand. In the United States, Colt did not have a rival until 1850 when the Massachusetts Arms Company of Chicopee Falls introduced a revolver. But the idea of a revolver was a good one, and naturally other manufacturers wanted to cash in on the business.

The firm of Wesson, Stevens, and Miller of Hartford, Connecticut, had been producing hand-rotated revolvers under designer Daniel Leavitt's American patent 182 of 29 April 1837. On 5 March 1850, the Massachusetts Arms Company was incorporated to manufacture a Leavitt revolver that had

### TABLE 1-2   COLT REVOLVER (HANDGUN) PRODUCTION, 1836–1873

| | |
|---|---:|
| **Patent Arms Manufacturing Company, Paterson, New Jesery** | |
| Paterson Pocket Model Revolver No. 1 (c. 1836–1838), ca. | 500 |
| Paterson Pocket Model Revolver No. 2 (c. 1838–1840), ca. | 800 |
| Paterson Belt Model Revolver (1838–1840), ca. | 900 |
| Paterson Holster Model Revolvers (Texas Model) (c. 1838–1840), ca. | 1,000 |
| **Colt (Whitney Armoury), New Haven, Connecticut** | |
| Whitneyville-Walker, M1847 Revolver (Serial #1–1100) (1847), ca. | 1,100 |
| **Colt, Hartford, Connecticut** | |
| Whitneville Hartford Dragoon Revolver ("Transitional Walker"; serial #1100–1340) (late 1847), ca. | 240 |
| First Model Dragoon M1848 Revolver (Serial #1341–about 8,000) (1848–1859), ca. | 7,000 |
| Second Model Dragoon M1848 Revolver (Serial # ca. 8000–10,700) (1850–1951), ca. | 2,700 |
| Third Model Dragoon M1848 Revolver (Serial # ca. 10,200–19,600) (c. 1851–1861), ca. | 10,500 |
| Model 1848 Baby Dragoon Revolver (Serial #1–15,500) (c. 1847–1850), ca. | 15,000 |
| Model 1849 Pocket Revolver (1850–1873), ca. | 325,000 |
| Model 1849 was also made in London (1853–1857), ca. | 11,000 |
| (Serial # for both 12,000–340,000) | |
| Model 1851 Navy Revolver (1850–1873) | 215,348 |
| Model 1851 was also made in London (1853–1857) | 42,000 |
| (Serial # 1–215,348 and 1–42,000) | |
| Model 1855 Sidehammer Pocket Revolver (Root sidehammer; made in two distinct serial series) (c. 1855–1870), ca. | 40,000 |
| Model 1860 Army Revolver (Serial #1–200,500) (c. 1860–1873), ca. | 200,500 |

# ETERNITY STREET

## STREET

*Violence and Justice in*
*Frontier Los Angeles*

JOHN MACK FARAGHER

W. W. NORTON & COMPANY

*Independent Publishers Since 1923*

*New York · London*

FOR MICHELE HOFFNUNG.

Copyright © 2016 by John Mack Faragher

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Quad Graphics Fairfield
Book design by Marysarah Quinn
Production manager: Anna Oler

ISBN 978-0-393-05136-0

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

1 2 3 4 5 6 7 8 9 0

Christopher N. Wilson, and former ranchero J. J. Warner—met with federal officials and assured them of their peaceful intentions. What they required, the Indian leaders insisted, was federal protection of their homelands. "The danger to which they are now exposed," wrote a correspondent for the Sacramento *Daily Union*, "is that Congress, not finding any convenient lands in the south of California whereupon to place them, will propose to remove them to some distant reservation, . . . a separation as hopeless as the barbarous removal of the Acadian farmers immortalized by Longfellow in 'Evangeline.'"

Olegario insisted that the Luiseños still held legal title to their homeland, that it had never been ceded to the United States. Through the influence of Anglo friends, he traveled to Washington, D.C., where he met with President Ulysses S. Grant, who issued an executive order establishing reservations at the sites of several small rancherías. But the struggle was far from over. Some of those reservations were later disestablished and the residents forcibly removed from their homes and the graves of their ancestors.

In 1877, when several hundred acres of prime Luiseño grazing land came under threat of confiscation, Olegario organized his followers to protect them. The land had been leased by Antonio María "Chino" Varela, son of the late José Sérbulo Varela, former Manilla gangster and Confederate war veteran, who had lost a leg while in service to the South. When Varela and his vaqueros arrived with a herd of several hundred sheep, they were met by Olegario and sixty well-armed men, who escorted them off the property. Varela filed a complaint with the local justice, who issued a warrant for Olegario, but the Indians expelled the constable who came to arrest him. A few days later, however, Olegario died in his sleep. The protest collapsed and Varela took possession. The local press reported the cause as apoplexy or heart disease, but Olegario's followers claimed their leader had been poisoned.

The Luiseños continued to suffer from encroachments on their homelands. "These Indians have been badly treated and are subjects of sympathy," wrote the editor of the San Diego *Union*, but "sympathy

for the Indians that ignores the right of white property-holders and settlers is the most pernicious thing that can befall the Indians, for the effect is only to postpone action that alone can save them from going to the wall in a hopeless contest with an advancing civilization."

IN THE MEANTIME cheap Indian labor was being replaced by cheap Chinese labor. The growth of the Chinese community—like the surging demand for real estate or the expansion of the domestic fuel market—was another vital indicator of economic activity. Chinese men began moving to the pueblo in significant numbers during the postwar boom. The 1870 census counted 234 Chinese in the county, and 172 in the city, a snapshot of a rapidly expanding community. They came to California with the intention of working, saving, and returning home with a pile of money, a motive widely shared by immigrants of all backgrounds. Attracted to Los Angeles by expanding prospects for employment, they found work as domestics and cooks, farmworkers and common laborers, the kind of low-wage jobs formerly filled by emancipados.

Some brought entrepreneurial skills. Chinese farmers grew vegetables for the domestic market on leased land south of the city, and Chinese vegetable peddlers—their baskets suspended from long bamboo shoulder yokes—soon were a common sight in all neighborhoods. Chinese laundrymen opened the first commercial laundries in the early 1860s and quickly dominated the business, by 1871 operating eleven of the city's thirteen washhouses and employing a quarter of its Chinese residents. A cigar factory, an herb shop, and a restaurant were among other commercial ventures Chinese entrepreneurs aimed at Angelenos. Because Chinese names were recorded in various and inconsistent ways, it is virtually impossible to track the owners of these enterprises. In 1870 the census enumerator recorded most Chinese in Los Angeles by given name only, often with the addition of the honorific title *Ah*, in the original Cantonese conveying intimacy or affection, but in the way it was employed by Americans a term of estrangement,

effectively erasing individual identity. One of the few men listed by his complete name was physician Chee Long Tong (or, in the correct sequence, with family name first, Tong Chee Long), who established a traditional Chinese medical practice and treated a number of Anglo patients, who knew him as Dr. Gene Tong.

More than half the Chinese in the city, including Dr. Tong, lived in the sprawling adobes along Negro Alley, divided and subdivided into a warren of low-rent rooms. Over the years, the Coronel adobe, the building that anchored the alley's southwest corner, had been the site of numerous saloons and dives. It was where Sheriff Barton had first proved his mettle in a memorable July Fourth shoot-out with unruly gamblers, where Tom Smith had danced on the monte table before egging Frank Dana into a lethal gunfight, where John Buckley, Pancho Cruz, and Augusta Cañada had played out their lethal ménage à trois. By 1870 the Coronel building housed the Wing Chung general store, Dr. Tong's office and residence, a Chinese rooming house, a barbershop, and a café. Nearby, wedged between saloons and gambling houses, was a small Chinese theater and a temple or "joss house," several little fan-tan parlors and opium dens, as well as numerous brothel cribs. Negro Alley remained the pueblo's preeminent vice district, but it had also become Chinatown.

At first the local press treated the Chinese with bemused condescension, noting the exotic language, hair style, and costume of the "almond-eyed family" from the "Celestial Kingdom." But as the number of Chinese expanded, the tone of the coverage grew darker. The *Star* focused on what it claimed was the destructive competition between "the Chinese worker and the citizen laboring man," ignoring the fact that the Chinese filled jobs Anglos and Californios had traditionally scorned and assigned to Indian workers. The *Daily News*, edited by Jack King, was even more negative, publishing a series of deeply racist and inflammatory editorials on "the Chinese menace." The Chinese were a people "without one single redeeming feature," the *News* declared, "so utterly depraved and debased that no single thought of virtue or honesty ever entered their heads." In a particu-

larly vicious column, a reporter offered his impression of the "pariahs" who resided along "Nigger Alley."

> Within the buildings, herded like beasts, men, women and children dwell together, ignoring all distinctions of sex, and filthy to a degree absolutely appalling. Noisome vapors pervade the air, creating a stench sickening to senses unperverted by daily contact with these loathsome quarters. Here, crimes too horrible to name are undoubtedly matters of ordinary and perhaps daily or nightly occurrence.

With allusions to animals, filth, and unregulated lust, the press coverage portrayed the residents of Chinatown as barely human.

The negative reporting was accompanied by a dramatic upsurge in violence directed at Chinese residents. The records of the city's justice courts, reasonably complete for the 1860s, include no complaints of violence against Chinese individuals before the spring of 1869, when teamster George Enkhardt was found guilty of having "maliciously run his wagon, loaded with brick, into the cart of a Chinaman and smashing it to pieces." It was followed by no fewer than twenty violent attacks over the subsequent two years. Santiago Aguella was charged with "maliciously cutting and beating Ah Loy over the head and face with one wagon whip without cause or provocation." Andy Sharkey was fined for "beating and kicking a Chinaman without provocation." Patrick H. Gleason pled guilty to maliciously assaulting a Chinese man. When Justice William H. Gray asked Gleason whether he had anything to say in extenuation of his offense, he explained that a Chinese man had "called him hard names," leaving him so angry that "he pitched into the first Chinaman he met." He felt such "great antipathy to the Chinamen," Gleason said, he simply could not help himself.

The Chinese responded forcefully to the violence against them, filing complaints in justice court and pursuing the prosecution of their tormenters. Virtually every Chinese resident of Los Angeles was a member of a *huiguan*, or company, a mutual benefit association

Compendium_Roth
Page 0226

designed to assist and protect overseas Chinese. Six *huiguan* established headquarters in San Francisco during the 1850s and 1860s, opening branches in other western cities as the need arose. Five of the six *huiguan* had members in Los Angeles, but a majority of the city's Chinese belonged to the Sze Yup Company. The companies assisted their members with employment and lodging, offered them meeting rooms and lounges where they could relax with their countrymen, and provided them with the assurance that in the event of an untimely death in a foreign land their remains would be returned to family members in China.

The companies also hired local lawyers to represent their members in court. California law forbade Chinese witnesses from testifying in cases involving white persons, but when the lawyer for a defendant moved to quash the complaint of a Chinese man on those grounds in 1869, Justice Gray overruled him, rejecting his "ingenious resort to legal technicalities." Thereafter Chinese residents enjoyed full access to Gray's court.

THE REVENUE of the Sze Yup Company came not only from membership fees but from the services it provided its members. Gambling and opium concessions offered lucrative returns. But with Chinese men outnumbering women by a ratio of five to one, the sex trade was the profit center. A handful of the approximately three dozen Chinese women who resided in the city in 1870 were the wives or mistresses of prominent men. The majority, though, were prostitutes, servicing not only their own countrymen but a growing number of Anglo and Latino customers as well.

Near the Plaza late one night, an off-duty patrolman was accosted by a Chinese streetwalker who tugged at his coat and asked him how he liked it. He played dumb, saying he didn't know what she meant. "You fuck me for two bits," she said. When he hesitated, she doubled down. "Me give you two fucks for two bits." Even at low rates like those, the typical Chinese prostitute produced an annual profit of sev-

eral hundred dollars for her pimp. The sex trade in Chinatown was valued at thirty or forty thousand a year, the equivalent of several million in today's dollars. While the Sze Yup Company did not manage the brothels itself, its members did, and a share of the revenue went to the company in exchange for referrals and protection.

These women were very young and very vulnerable. Some were the victims of kidnappings in China; others had been sold into slavery by their impoverished families. Forcibly transported to the United States, they were indentured to brothel masters, typically for a term of four years, considered the maximum working life of a prostitute. If they complained or resisted, they risked punishment. The record overflows with accounts of Chinese prostitutes beaten, whipped, and sometimes tortured by brothel masters. One evening as two patrolmen made their rounds near Negro Alley they heard a woman's screams. Rushing down a dark corridor they came upon a group of Chinese men standing over a severely beaten woman who was bleeding profusely from cuts about her face and head. Nearby was her master, Sing Lee, headman of the Sze Yup Company. In halting English she told the patrolmen that she had been punished for resisting his plan to sell her to another man. Both Sing Lee and the woman were arrested and taken to jail, where he was released after paying a small fine. But, according to the *Star*, the woman "begged to be allowed to stay, stating that Sing was 'a big Chinaman,' and that, because she had been the cause of his going to jail, the other Chinamen would kill her [and] cut her body into little pieces." Nevertheless, she was turned out to an unknown fate.

Chinese prostitutes sometimes ran away, but when they did their masters often filed false complaints against them for theft, thus enlisting the authorities in their apprehension. Los Angeles patrolmen, easily corrupted with a little cash, proved eager to cooperate. In October 1870, when the Sze Yup Company offered a $100 reward for the return of a particularly valued woman, both City Marshal William Warren and Deputy Joseph Dye jumped into action. Dye learned where the woman was hiding, but it was Warren who made the arrest and col-

lected the reward. He was escorting the woman to jail, trailed by a large crowd of Chinese, when Dye confronted him on Main Street. "Warren, what are you going to do in regard to this matter?" Dye demanded. "I want my money." Warren brushed him aside. "I don't want anything to do with you," he said. "But you have defrauded me," Dye exclaimed. "You're a damned dirty liar," Warren responded. Dye reacted instinctively, raising his walking stick to strike, but Warren had a derringer pistol concealed in his hand, and he fired first. The ball struck Dye in the forehead but miraculously glanced off, leaving him with nothing more serious than a bad bruise and a terrible head-ache. The two men pulled their revolvers and, in the words of one witness, "the pistol shots commenced thick and fast." Three bystanders were struck before Warren was hit in the groin and fell to the ground, mortally wounded. "I'm killed," he cried. He died the following morning. Tried for manslaughter in district court, Dye was released after Judge Morrison declared the homicide a clear case of self-defense and directed the jury to bring in a verdict of not guilty.

Most fugitive prostitute cases ended more prosaically in the court-room of Justice Gray, who resented the ability of Chinese brothel masters to corrupt the judicial system. Although slavery had been out-lawed by the Thirteenth Amendment to the Constitution, few public officials applied the law of the land to the bondage of Chinese women. Justice Gray was the exception. "The law does not recognize slavery," he exhorted the principals at the close of a hearing in which two Chinese masters disputed the ownership of a woman. Yet Gray had to acknowledge that he did not possess the authority to intervene and release her. "The Court," he declared, "regrets its want of power to punish both parties as they deserve, for the violation of the Laws of the Land and for contempt of this Court in attempting to make it a party to the transaction."

As CHINATOWN GREW, other *huiguan* established branches in Los Angeles, and the Sze Yup Company slipped from its dominant

position. A power struggle broke out among headman Sing Lee's top lieutenants, Sam Yuen and Yo Hing, legitimate businessmen but brothel masters as well, both of them fined in justice court for "main-taining and residing in a house of ill fame." Reports of the conflict began appearing in 1868 and continued through the autumn of 1870, when both men resigned from the old company and led their factions into two *huiguan* that had recently established branches in Los Angeles. Sam Yuen became headman of the local Ning Yung Company; Yo Hing assumed leadership of the branch of the Kong Chow Company. With that move the struggle sharpened for control of the Chinatown vice trade. "Sunday evening, extensive preparations for a battle royal were made by the Chinese denizens of Negro Alley," the *Star* reported in January 1871. "Between the lines formed by the two companies were the headmen arguing the point at issue, which appearances indi-cated could only be settled by an appeal to the law of arms." But "the row was nipped in the bud" by the timely arrival of the newly elected city marshal, Francis Baker.

Sam Yuen quickly negotiated a defensive alliance with his old boss, Sing Lee. But Yo Hing took them both on. About thirty years old, Yo Hing was both charismatic and commanding, "a huge man," in the description of a contemporary, with "a voice that fairly rumbled when he talked." His Los Angeles career had begun several years earlier when he went to work as a cook in the household of Jack King and his family. He quickly worked his way up, leasing land to grow vegetables and investing his profits in a cigar factory and brothels in Chinatown. Yo Hing was fluent in English and maintained good relations with important Anglos. Horace Bell described him as "a fine fellow," and the *Star* praised him as "the best and most favorably known Chinaman in the city."

Yet in his struggle for control of Chinatown, Yo Hing did not hesi-tate to employ ruthless tactics. In the spring of 1871 his men abducted the wife of a prominent Chinese merchant, an ally of Sam Yuen's, and succeeded in keeping her hidden for several months. Sam Yuen was shamed as a leader unable to protect his own people, and after months

of humiliation he decided the time had come to eliminate his rival once and for all. He put a price on Yo Hing's head and arranged for two professional Chinese gunmen to come from San Francisco. In mid-October they arrived on the steamer, intent on collecting the reward. The contract on Yo Hing was common knowledge in Chinatown, and the cadre of the two companies prepared themselves for a battle royal, stockpiling arms and ammunition. The proprietor of a local hardware store reported he had "sold forty or fifty pistols to Chinamen within the last few days."

On the morning of Monday, October 23, as Yo Hing emerged from an apartment at the northern end of Negro Alley, Ah Choy and Yu Tak, the San Francisco hitmen, were waiting for him. "They fired at me," Yo Hing told the *Star*. "I ran into the house. Ah Choy's pistol got out of order, I think a cap caught in the cylinder, and that saved my life. One ball passed through my coat and shirt." The shooters fled and Yo Hing hurried to the office of his attorney, Jack King, where he swore out a complaint charging the two men "with the crime of assault with deadly weapons with intent to kill." They were arrested and jailed. At a hearing in Justice Gray's court the following afternoon, rival boss Sam Yuen posted their bail.

Yo Hing considered himself in mortal danger. "They are bound to kill me," he told a reporter for the *Star*. "They will kill me even if they are killed after. They don't care and will kill anybody who tries to arrest them." Yo Hing was determined to seize the offensive, which he did that afternoon, shortly before sundown. Sam Yuen later provided his version of what happened. The gunman Ah Choy, he said, "was eating his evening meal, at a back part of a house on the east side of Negro Alley, heard a fuss, and went out to the front door. Yo Hing and three others were around with pistols, and one of them shot Ah Choy in the neck." Moments later three or four of Sam Yuen's fighters burst from the Coronel building across the street and began firing at the assailants.

Mounted patrolman Jesús Bilderrain had been warned by Chinese informants to expect "a big China fight." He was a couple of blocks

away when he heard the sound of gunfire. "Follow me," he shouted to fellow officer Esteban Sánchez. He sprang into the saddle and spurred his horse toward Negro Alley. As he approached, Bilderrain testified, "I saw six or seven Chinamen about the middle of the street shooting at each other." He charged into them and the gunmen scattered, running into open doors on either side of the alley. Bilderrain jumped down and nabbed one of them. That was when he saw Ah Choy lying in the doorway of an east side adobe, "dying from a shot he had received." Sánchez rode up. "I saw Bilderrain afoot, ahold of a Chinaman," he said. "At the same time I saw another Chinaman shoot at Bilderrain with a pistol in each hand." Sánchez jumped down and pursued the shooter around the corner of the Coronel, but was driven back by sustained gunfire from a group of Ning Yung fighters massing in the corral at the back of the building.

Bilderrain hailed a bystander and requested his assistance in taking his captive to jail. As they hurried along the south side of the Coronel, a Chinese fighter emerged from the Wing Chung store, fired at them, then darted back inside. Handing his prisoner off to the bystander, Bilderrain charged after the man, revolver in hand. He ran through the open door and someone slammed it behind him. "The house was plum full of Chinamen," Bilderrain said. One of them pressed a pistol to his chest, and he instinctively grabbed it with his left hand. The gunman pulled the trigger, but the hammer came down on Bilderrain's finger. "I went to smack him down," he said, "but some of the Chinamen then shot me." The bullet penetrated his right shoulder, disabling his gun hand. "I had no show for my life," as Bilderrain put it, realizing his only chance was to get out. "I thought I was mortally wounded and I was anxious to die outside," he said. He wrenched the door open with his good hand and stumbled out onto the veranda.

Walter Lyon, who operated a shop in the Arcadia Block, just steps away, saw Bilderrain "come running out with three Chinamen at his heels, pistols in each hand and firing promiscuously." A Mexican boy standing nearby was hit in the leg. Patrolman Sánchez charged after the gunmen, who retreated back into the Coronel, leaving the door ajar.

Bilderrain steadied himself against a post and blew several long blasts on his police whistle. Sánchez stepped up on the veranda, approached the open door, and warily peered in. The interior was thick with gun smoke, but through the haze he could see the figure of a man. "He leveled his pistol at me," said Sánchez. "I presented my pistol and we both fired at the same time." Both shots went wide. Sánchez jumped to the right side of the door and pressed himself against the adobe wall. Robert Thompson, a bystander summoned by Bilderrain's whistle, came running up with another man, and they positioned themselves against the wall on the left side. "What's the matter?" asked Thompson. "The Chinamen are shooting," said Sánchez. "They have shot Bilderrain," the other man added. Thompson pulled his revolver, reached around the door jamb, and blindly fired into the room. "Look out, there are two or three in there and they may shoot you," Sánchez warned. "I'll look out for that," said Thompson. Then, stepping directly in front of the threshold, he fired again. The answering fire from inside was instantaneous. Thompson staggered back, clutching his chest. "I'm killed," he said.

AN ANGLO AND TWO LATINOS had been shot by Chinese fighters. From that point on, that was all that mattered. Robert Thompson suffered a mortal wound, and although Bilderrain and the Mexican boy would recover, the rumors coursing through town placed all three at death's door. Nathan King, a security guard at the railroad depot several blocks away, heard that "the Chinese were killing the white men by wholesale in Negro Alley." He grabbed a rifle and a revolver and hurried there along with dozens of others. Groups of curious and confused men milled about the northern end of Los Angeles Street, where it met Negro Alley. Suddenly a burst of gunfire came from the Coronel building. "The Chinese discharged the contents of their revolvers promiscuously among them," wrote one observer, and "the crowd scattered like leaves before the whirlwind." They quickly regrouped with serious purpose. "Almost every man's hand sought the back pocket of

his pants, and a pistol was drawn, cocked and discharged at the Chinamen in less time than it takes to tell." The firing continued as the sun set behind the western hills and the streets began to darken. Gas street lamps had been installed on downtown streets the previous year, but they would not be lit that evening. The gunfire was intended to keep the attention of the crowd focused on the façade of the Coronel while most of the company fighters escaped out the back, slipping into the vineyards and orange groves, only a few steps away.

Finally the firing from the Coronel stopped altogether. But the crowd in the street kept up an indiscriminate fire at the building for another ten or fifteen minutes. No one realized that the company fighters had already fled. Inside the adobe walls of the Coronel were several dozen terrified Chinese men and women, none of whom had anything to do with the gunfight. Outside, at the head of Los Angeles Street, the crowd was intent on wreaking revenge.

It was a situation fraught with peril. Marshal Francis Baker might have organized his patrolmen and attempted to disperse the crowd, which at that point numbered fifty or seventy-five men. But he decided instead to form them into a posse. "I called to citizens to stop shooting," he testified, "and we would put a guard around the house." He issued orders to surround the Coronel and allow no one to cross the line. "If any Chinamen come out, let them have it," he told one man. "Hail any Chinaman attempting to escape," he instructed another, "and in case he would not stop, shoot him." Sheriff James Burns, who showed up a few minutes later, endorsed that plan. "Prevent anyone from going in or coming out," he told the crowd, and if they resist, "bring them down." This disastrous decision, legitimizing the use of lethal violence, led directly to the horrible events that took place over the next several hours.

BAKER AND BURNS had no sooner established their blockade than a Chinese man bolted from one of the buildings and made a desperate attempt to escape. "Here's one! Here's one!" someone cried.

The man was swinging a hatchet, attempting to cut his way through the crowd, and several men began pummeling him with canes and clubs. Two patrolmen waded in and grabbed him; assisted by a clerk named Charles Avery, they began marching him toward the jail, four or five blocks away, trailed by a mob of several dozen men shouting, "Hang him! Hang him!" At the corner of Main and Temple, the heart of the city's business district and only a block from the jail, someone struck Avery on the back of the head, and as he fell to the ground the mob closed in around the officers, pinioning their arms and seizing their prisoner. A big, burly man wielding a Colt's Dragoon shouted for a rope, and one of the mob ran into a dry goods store and emerged with a new coil. Benjamin McLaughlin, watching from the veranda of the Downey Block, was appalled and he confronted the man. "I said it was not right," McLaughlin later testified, "and he said I was a damned Chinaman."

"To the hill!" someone shouted, and the crowd took up the chant. The victim was dragged up Temple Street to the gate of Tomlinson's old corral, where Michel Lachenais had been lynched ten months before. The rope was thrown over the same crosspiece and a knot hurriedly fashioned at the other end. "Hoist him up!" cried the big man with the Dragoon. "God damn him, if you don't put that rope around his neck I'll shoot him anyhow." The noose was forced over the victim's head, and he was jerked up by three or four men. The new rope was stiff and the knot wouldn't slip, so one of the men shimmied up a gate post, and steadying himself against the crosspiece jumped up and down on the victim's shoulders several times, breaking both his collar bones. Several others pulled out their revolvers and riddled the swinging body with bullets. Then the mob hurried back to Negro Alley, celebrating its accomplishment.

"That fellow didn't kick over five seconds," Sheriff Burns heard one of the lynchers exclaim on their return. "They've hanged him," he heard another man say. Burns watched as the lynchers began infecting others in the crowd with their blood lust. "Damn it," shouted the man with the Colt's Dragoon, "we'll show them how to hang China-

men." Several men incited the crowd with incendiary speeches, and there were angry shouts of "¡carajo la Chino!"—fuck the Chinamen! Things were spiraling out of control and Burns figured he had just one more chance. At his urging, District Attorney Cameron Thom stepped up on a box and delivered a law-and-order speech that had little effect. Burns himself then mounted a barrel, shouted for attention, and as a group assembled around him, began pleading for calm. Suddenly the top of the barrel collapsed, Burns crashed to the ground, and the crowd roared with laughter. "No attention was paid to his words," lamented Charles Avery. "Many were anxious to put a stop to the affair," testified John M. Baldwin, a prominent local surveyor, "but there was no one to lead."

At 7 PM the local correspondent for the *Daily Alta California* of San Francisco filed a dispatch by telegraph, the first report to the outside world of the disaster taking place in downtown Los Angeles. "The excitement in this city is intense," he wrote.

> Citizens are arming and Negro Alley and the Chinese quarters are in a state of siege. Already upward of 100 men armed with Henry rifles and shotguns guard the street. One Chinaman has just been captured, taken through the main street, and hanged by the citizens on a lot formerly Tomlinson's Corral and Lumber Yard, the same spot where Lachenais was hung by the vigilantes for killing Mr. Bell a few months ago. . . . The sheriff and civil authorities have given up all attempts to restrain the mob, and no one can tell how far they may go.

ROBERT THOMPSON DIED shortly before 7 PM, and the news quickly circulated through the city. Within an hour the crowd at the head of Los Angeles Street had grown to five or six hundred men, a substantial portion of the three or four thousand adult males residing in the city. The Chinese inside the Coronel hunkered down, and the crowd grew restless. About 8 PM a group of men mounted the roof and

Compendium_Roth
Page 0231

after chopping holes through the asphaltum began firing down on the people hiding inside. One Chinese man was immediately killed. Another bolted and dashed into the street. The armed crowd did precisely as it had been instructed by the marshal and the sheriff. "It seemed to me five hundred shots were fired at once," one witness testified. The man, hit numerous times, died in the middle of Negro Alley.

Someone threw a burning torch into the Coronel, and soon smoke began billowing from the holes in the roof. The great Chicago fire had taken place only a few weeks before, and everyone was acutely aware of the danger of general conflagration. One of the patrolmen demanded that the would-be arsonist retrieve the torch, and under the threat of the officer's revolver he warily ventured inside and dragged it out. Suddenly realizing that the Chinese inside had put up no defense, dozens of men began pouring into the building. "Half the horror of the scene was shrouded by the veil of night," wrote one observer. "But to the sense of hearing it stood forth more prominently than it could possibly have done during the day, when the busy hum of the wakeful city would have somewhat smothered the noise."

Young Joseph Mesmer also vividly remembered the furor. "My memories of that night of horrors are vivid and indelibly burned into my brain," he later wrote.

> During my youth my curiosity led me to see practically every lynching that took place in Los Angeles, and I had observed many gruesome sights. But the events that transpired that night were the most irresponsible and bloodthirsty I had ever witnessed. . . . What I saw and heard as a boy of sixteen stands before my eyes to this day as a realization of the extent to which maddened human beings can go. Many of the rioters seemed actually inhuman. They were wild-eyed and sweat-grimed. Knives, pistols, and sword-canes were in many hands; and some armed themselves with short iron-pipes and clubs. Nearly all dashed about trying to vent their brutality on the unfortunate Chinamen the moment they were within reach.

At least one more Chinese was shot and killed inside the Coronel. Another man was seen running from the building. "Like hounds sighting their quarry, a hundred men and boys dashed after him and seized his streaming queue, manhandling him roughly," said Mesmer. "A score at once dashed off with him at a run for Tomlinson's corral."

It was approximately 8:45 PM. Four Chinese men had already been killed. Over the next twenty or thirty minutes fourteen more would be lynched in one of the nation's most appalling episodes of collective violence. Four more men were hanged at Tomlinson's, including Dr. Gene Tong, the only one of the victims recognized by the mob. Dr. Tong pled for his life in both English and Spanish, offering the lynchers gold and silver if they would let him go. At the mention of money, someone pulled off the doctor's trousers and began going through his pockets, looking for cash. Finding none, a frustrated lyncher thrust his revolver in the doctor's mouth and pulled the trigger, blowing off the side of his face. He was probably dead before he was hanged. "It was a most heinous and gruesome scene," wrote Joseph Mesmer. "I have seen a good many men hung, both legal and by the vigilance committee, but nothing so revolting as what befell these Chinese."

Back at the Coronel men and women were being pulled from their hiding places. The lynchers ignored the women, but forced nooses over the heads of the men and dragged them down the street to John Goller's wagon shop, where the crossbar of his portico became a makeshift gallows. "I saw them bring a lot of Chinamen to my house," Goller testified, "and I remonstrated with them for bringing them where my little children were." One of the mob pressed the barrel of his rifle against Goller's cheek and cocked it. "Dry up, you son of a bitch," he said. Goller retreated into his house. Seven Chinese were hanged from his porch, pulled up by a group of men and boys on the roof, one of whom danced a quick step and called out to those below, "bring me more Chinamen, boys, patronize home trade."

Young attorney Henry T. Hazard, watched the proceedings with a mounting sense of self-loathing. With Goller's portico crowded with suspended bodies, the mob dragged several more victims to a large

and a woman who operated a boardinghouse across the street rushed over and offered her clothesline. "Hang them!" she shouted. "Hang them!" As the line was being cut and nooses fashioned, Hazard took a stand. Climbing onto the tongue of the wagon, he shouted to the mob. "Do you know if the man you're hanging is guilty?" There were catcalls. "You better dry up and get down or we'll hang *you*," one man shouted. "But it isn't right," said Hazard. His friends pulled him down as just someone fired a pistol and a bullet whistled past his face. Three more men were hanged from the high sides of the wagon.

LAWYER AND REAL ESTATE AGENT Robert M. Widney, leader of the Los Angeles vigilantes, was walking from his residence in the southern portion of the city to his office in the Downey Block, at the corner of Temple and Main, when he was hailed by Samuel C. Foy, a longtime resident who operated a harness and saddle shop on Los Angeles Street, only a few steps from Negro Alley. Foy was a vigilante from way back, and served with Widney as one of the leaders of the Law and Order Party. "They are killing all of the Chinese off," Foy exclaimed. Widney supposed he was joking. "It's a fact," said Foy, and he explained what was happening. Widney's first concern was that members of their organization might be involved in the violence. Foy assured him that was not the case. Widney told Foy to round up all the "old vigilantes" he could find and bring them to the corner of Temple and Main. He would be back as soon as he retrieved the revolver he kept in his office.

But Widney could not locate his Colt's Navy six-shooter, so when he came out onto the street and came face-to-face with a mob forcing two Chinese men up Temple toward Tomlinson's gate, he was unarmed. "Years of experience as a trapper and hunter and in the early days of Nevada mining camps," Widney later wrote, "had demonstrated that words were useless with such rioters." Not knowing what else to do, he followed them up the hill. At Tomlinson's he ran into John Baldwin, a vocal opponent of Widney's brand of vigilantism,

one of the few men who had turned out to help Sheriff Burns protect Michel Lachenais. That night, however, the two found common cause, both circulating through the crowd, remonstrating with the lynchers. One man—Widney described him as a broad-faced Irishman with square-cut whiskers—pushed a revolver in Widney's face and demanded that he shut up. They had important work to do, he said. Widney asked whether he was a vigilante. "Damn it," the man replied, "we are all vigilantes." He paused, then looked directly at Widney. "And there are a lot of white men here who ought to be hanged also." Widney was stunned. "I believe he referred to me." Widney and Baldwin moved off to the side and watched in silence as the Chinese victims were hoisted up.

Afterward Widney returned to the corner of Temple and Main, where he found Sam Foy and a few others, including grocer John Lazzarovich and Widney's brother William. The younger Widney had taken the revolver from the office and also had a single-shot pistol. He handed the Colt to his brother. Now they all were armed. Widney was determined to rescue the Chinese from the hands of the lynchers. He was equally determined to rescue the reputation of the vigilantes from any association with the mob.

"We saw two or three groups coming with Chinamen," he testified. It was do or die. The first group came up, led by the burly man with the Colt's Dragoon. "The cheap labor is done away with now," he shouted. "Every damned Chinaman will be hung by morning!" William Widney confronted him. "What are you going to do with that man?" he asked. "Hang him, by God," the man with the Dragoon replied. Widney thrust his little single-shot pistol in the big man's face as others grappled with him and seized his revolver. "I can get another in two minutes," the man sputtered. But in the face of this simple demonstration of force by a group of determined men, the mob released its victim, and Foy and young Widney quickly escorted the Chinese man down Spring Street to the jail. Within seconds another group of lynchers arrived, dragging a victim. Lazzarovich and the elder Widney waded into the crowd and seized him. The lynchers

resisted, and one of them leveled a revolver at Lazzarovich. Widney pressed his Colt against the man's chest. "Get out or I will kill you," he said in a low, threatening voice. The man went pale and moved aside, and as he did so the mob melted away. Lazzarovich and several others took the Chinese victim to the jail. Widney and the others repeated this several times, saving the lives of four or five men.

Their action succeeded in turning the tide, supplying the leadership that the authorities had failed to provide. One or two patrolmen rescued several more Chinese, but their action came late. At about 9:20 PM Sheriff Burns took charge of the armed vigilantes at the corner of Main and Temple and led them back to Negro Alley, where they established an armed guard around Chinatown. The lynchers retreated to the saloons, where they drank and celebrated until early morning. Over the years the vigilantes of Los Angeles had fostered the conditions which allowed this ghastly orgy of mob violence to take place. But give them their due. On that night of horrors they were instrumental in ending the lynchings.

· CHAPTER 29 ·

IMPERFECT JUSTICE

AT THE DIRECTION of County Coroner Joseph Kurtz, the mangled bodies of the eighteen Chinese victims were taken to the jail yard and laid on the ground in two parallel rows. The reporter for the *Daily News* saw them there early the next morning. "Their countenances were ghastly and distorted," he wrote, "many of them besmeared with blood and pierced with bullets." Among the approximately twenty Chinese successfully escorted to the jail, a number were wounded, some seriously. Many more had fled into the vineyards and orange groves east of Chinatown or found refuge in the homes of Angelenos. In the morning they went to the jail, searching for missing friends and relations. It was with their help that Coroner Kurtz was able to identify the dead, although the various iterations of his list, recorded in court documents or printed in the press, are inconsistent and feature almost no complete names. In addition to Dr. Tong, the victims included cooks, laundrymen, and common laborers. They were affiliated with four separate *huiguan*. Some had lived in Los Angeles for several years, others had just arrived. Kurtz summoned a coroner's jury, and once they had completed the gruesome task of examining the victims, their bodies were placed in redwood coffins and transported

# ·PISTOLS AND REVOLVERS·

## AND THEIR USE

### By MAJOR JULIAN S. HATCHER

*Ordnance Department, U. S. Army*

Member of the Springfield Revolver Club.  Member of the United States
Revolver Association.  Life Member of the National Rifle Association.
"Distinguished Pistol Shot," U. S. Army



SMALL-ARMS TECHNICAL PUBLISHING  COMPANY

MARSHALLTON, DELAWARE
U.  S.  A.

Digitized by Google 

Original from
UNIVERSITY OF CALIFORNIA

G.v 11'15
H '

COPYRIGHT, 1927, BY
SMALL-ARMS TECHNICAL PUBLISHING CO.

PRINTED IN U. S. A.

Generated on 2022-10-18 20:10 GMT / https://hdl.handle.net/2027/uc1.b3130270
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Compendium_Roth
Page 0236

arranged so that one movement of the lever placed a ball
in the barrel, filled the chamber with powder, and then
charged the pan with priming.  In short, for each motion
of the lever a shot could be fired.  The great drawback to
this and other repeating mechanisms that were tried be-
fore the day of metallic cartridges was that a magazine
of loose powder had to be carried in the weapon itself, and
without a metallic cartridge case the sealing of the
breech was imperfect, so that a flash escaped, and the
danger was always present that ignition of the loose
powder in the magazine might occur with disastrous re-
sults to the user.  That this danger was not imaginary
is indicated by the fact that the remains of a Mortimer
pistol that had been wrecked by such an explosion may
be seen in the collection of arms loaned to the National
Museum by the United States Cartridge Company.

Another device that occurred to the more inventive
among the early gun makers was to arrange the gun with
only a single barrel, but with two locks, so that if two
charges were loaded into the barrel the one nearest the
muzzle could be fired first, leaving the other one as a re-
serve.  The disadvantage of this system was that oc-
casionally leakage occurred past the wad dividing the
two loads, which resulted in the explosion of both charges
at the same time.

These were some of the means by which gunmakers
struggled to increase the number of shots available, but
another system which was more popular than any of
these was to make a gun with several barrels pivoted
around a central axis and arranged to be turned so as to
bring one barrel after another into line with the lock.
This was the beginning of the "revolver" principle.  It
was employed at least several centuries ago, as match-
lock pistols are in existence which are built on this
pattern.  The early guns of this kind were of the pepper-
box style, with all the barrels of the same length, and

Generated on 2022-10-10 19:47 GMT / https://hdl.handle.net/2027/uc1.b3138278
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

8                    *PISTOLS AND REVOLVERS*

many of them had no mechanism for turning the barrels, which had to be brought in line with the locks by hand each time a shot was fired. See Figs. 12 and 13.

In these pepperboxes all barrels pointed forward, as will be seen by the illustration, and this is an important point because sometimes in these old muzzle-loading guns with loose black powder there was danger of the flash from one barrel being communicated to the next, and they might all go off at once.

One inventor made up a revolving pistol in which the chambers were all arranged in a flat cylinder like the spokes of a wheel. This system had the disadvantage of some of the chambers pointing backward toward the user. It is said that the inventor of this gun was killed in experimenting with it because all the chambers went off at once and one of the bullets, which was pointing toward him, was discharged to the rear with fatal results. Fig. 5.

In 1835 Colonel Colt made his invention, which produced the first successful revolver as we know the weapon today. The simple, but ingenious mechanism which he produced provided for a cylinder with six chambers, pivoted so the chambers could be brought successively into line with the barrel.

By an arrangement of levers and ratchets the cocking of the hammer first caused the cylinder to revolve, then locked it in line with the barrel. This invention marks the advent of the first successful repeating firearm.

The revolver became highly popular, and time has proved that Colonel Colt's device was singularly well designed for its purpose, for with the changes necessary to adapt it to the use of metallic cartridges the original mechanism exists almost unaltered in the Colt single-action Army revolver, which is manufactured in large quantities today and is still popular.

The early Colt revolvers were made for cap-and-ball, and the patent covered a cylinder closed at the rear end

Generated on 2022-10-18 19:47 GMT   /   https://hdl.handle.net/2027/uc1.b3138278
Public Domain, Google-digitized   /   http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Compendium_Roth
Page 0238



EXAMPLES OF EARLY HAND FIREARMS DATING FROM THE MATCH-LOCK AND
WHEEL-LOCK PERIOD TO THE INVENTION OF THE COLT REVOLVER

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

**10**          *PISTOLS AND REVOLVERS*

and fitted with nipples for percussion caps. The impor-
tant feature of this construction was the fact that be-
tween each two caps there was a wall of metal, which
prevented the possibility of the explosion of one cap set-
ting off the next one.

After the invention of the Colt revolver there were a
host of other revolvers that gradually came on the market.



DETAILS OF AN EARLY COLT REVOLVER. FROM "AMERICAN INVENTIONS" (1872)

Many of these did not have this feature of a partition
between the nipples, and as a result it was not uncommon
for two or more of the cylinders to go off at once.

The Colt revolvers were also made in the form of
carbines and rifles with the same revolving cylinder
mechanism. These Colt rifles were not as practical as
the revolvers, because there is always a flash of fire be-
tween the front of the cylinder and the rear of the barrel
in any revolver, and in using these Colt rifles this flash
used to burn the user's arm, because his left arm was
extended in the usual manner of holding the rifle.

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

Compendium_Roth
Page 0240

The most unfortunate thing about these revolving rifles was that occasionally, from one cause or another, two or more chambers would go off at once, and this always resulted in shooting away part of the left hand, which is placed in front of the cylinder in grasping the gun in the usual way. For this reason these revolving rifles did not have any lasting popularity.

The muzzle-loading, or cap-and-ball revolvers were used exclusively up to 1859, when cartridge revolvers were introduced, and they were used for a long time after 1859 because it was some years after the first introduction of the cartridge revolvers before they were as reliable or powerful as the cap-and-ball types. "American Inventions in Small Arms," by General Norton, which was published in 1872, shows the .36-caliber Navy revolver with the caption, "Pattern now used by U. S. Navy." And there are thousands of cap-and-ball revolvers in use in the United States even today (1927) in the backwoods sections, especially in the Southern States, where cartridges are difficult to obtain from the village general stores, and where the cost of fixed ammunition by the usual boxful is locally almost prohibitive to a large proportion of the poorer inhabitants.



COLT'S NAVY PISTOL.

PATTERN ONCE USED BY THE U. S. NAVY (AS LATE AS 1872). CALIBER OF BORE .36, CARRYING 50 ELONGATED OR 86 ROUND BULLETS TO THE POUND. FROM "AMERICAN INVENTIONS," NORTON (1872)

Generated on 2022-10-18 20:12 GMT  /  https://hdl.handle.net/2027/uc1.b3130278
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF CALIFORNIA

## CHAPTER II

### FURTHER PROGRESS—THE DEVELOPMENT OF MODERN
### TYPES

Although the cartridge revolver was introduced by Smith & Wesson in 1859, a type of metallic cartridge had been invented some time before that. It was a rim-fire cartridge patented by Flobert, of Paris, in 1845. It consisted of a small copper shell containing fulminate only and a small ball. This ammunition was used only in the so-called "saloon" pistol, a single-barrel arm made in France and occasionally sold in America. The Flobert cartridges were the so-called "B. B." and "C. B." caps which most of our readers used in their boyhood days and which are still widely sold.

In 1854 Harold Smith and D. B. Wesson designed the .22-caliber rim-fire cartridge, and began its manufacture in Springfield, Mass. On February 14 of the same year they obtained patent No. 10535 for a repeating pistol, which pistol is shown in the photograph. They formed a limited partnership on June 5, 1854, and began its manufacture at Norwich, Conn., under this patent.

The repeating pistol that they invented was indeed remarkable and deserves more than passing notice. Not only was it a cartridge weapon but it had an entirely new and distinct repeating action and one of the most successful ones in the world, for the mechanism of this Smith & Wesson pistol was afterwards incorporated in the famous Henry rifle, which later became the Winchester "Model of 1866" and was succeeded by the well-known Winchester "Model of 1873," which contained almost identically the same mechanism as that first de-

12




Original from
UNIVERSITY OF CALIFORNIA



A HISTORY

*of*

THE COLT REVOLVER

Compendium_Roth
Page 0243

A HISTORY OF THE COLT REVOLVER

COPYRIGHT . . . 1940

BY CHARLES T. HAVEN AND FRANK A. BELDEN

All rights reserved. This book
or parts thereof may not be
reproduced in any form with-
out permission of the publisher.

830227
REFERENCE

PRINTED IN THE UNITED STATES
BY QUINN & BODEN COMPANY, INC., RAHWAY, N. J.

Compendium_Roth
Page 0244

*CHAPTER TWO*

# THE YOUTH AND EXPERIMENTS OF SAMUEL COLT

*The Founding of the Paterson Factory*

SAMUEL COLT was born on what was then Lord's Hill in the city of Hartford, Connecticut, July 19, 1814, the son of Christopher and Sarah Caldwell Colt. From an early age he was interested in firearms and pyrotechnics of all sorts. Between the ages of seven and sixteen he is known to have owned several pistols and taken them apart to study their mechanism. He passed through varied exploits as a youth, which included working of a farm in Glastonbury, Connecticut, attending school at Ware and the Academy of Amherst, which he left rather suddenly after some early experiments with torpedoes on a Fourth of July that did not entirely please the authorities, and working in his father's dye shop which gave him a grounding in chemistry that suggested to him his lectures on laughing gas between 1832 and 1835.

E. K. Root, later his factory foreman and later still president of the company, first saw him in 1829 blow up a raft in a pond at Ware in one of his early experiments with submarine mines.

While the arms Colt played with as a boy were undoubtedly flint-locks, at some time before 1830 the new-style percussion-cap system of ignition came to his notice. This system was a hundred times more adaptable to any repeating mechanism than the clumsy flint-locks with its pan of loose powder, hammer, frizzen or battery, and open hole through the barrel by which the fire reached the charge. Colt saw its advantages at once and, at a time when the system was comparatively unknown in the United States, and had not been adopted by any military force, began to consider its application to the first successful revolver ever to be made.

On August 2, 1830, Colt, then a boy of sixteen, sailed before the mast on the ship *Corlo*, Captain Spaulding master, bound out of Boston for Calcutta. It was during this voyage that Colt first put into tangible substance his ideas concerning a revolving firearm.

The general idea of a revolving firearm is supposed to have come to Colt from watching the ship's wheel and noting that the spokes always returned in perfect line with a clutch that locked the wheel in position with any spoke that was in line with it. From observing this feature of the wheel, Colt conceived of a revolving cylinder bored for a number of chambers, which would hold charges and bring them in line with a hammer, and, eventually, also in line with a single barrel through which they might be discharged.

In his spare time he whittled out a wooden model from a ribbon block and small pieces

— 14 —

Compendium_Roth
Page 0245

THE YOUTH AND EXPERIMENTS OF SAMUEL COLT



## ANSON CHASE EXPERIMENTAL MODEL

| | | | |
|---|---|---|---|
| LENGTH | 14¼ Inches | SHAPE OF BARREL | Octagonal |
| BARREL LENGTH | 10¼ Inches | RAMROD | None |
| CALIBER | .50 | TRIGGERGUARD | Rounded; Light Metal |
| NUMBER OF SHOTS | 5 | FRAME | Experimental |
| SHAPE OF CYLINDER | Straight Round | SIGHTS | Blade and Hammer Notch |
| SHAPE OF SLOTS | Round | BUTT | Rounded |

### MARKS

NONE

REMARKS. This revolver is supposed to be one of the first of the experimental models Colt had made for him by Anson Chase. It exhibits the general features arrived at in the 1836 Patent (see page 541), except that it has a triggerguard and regular trigger, showing that Colt considered using these features at a very early date.

Probably made 1831-32.

*From the Colt Plant Collection.*

— 15 —

A HISTORY OF THE COLT REVOLVER



## EXPERIMENTAL MODEL REVOLVER

| | | | |
|---|---|---|---|
| LENGTH | 7¼ Inches | SHAPE OF BARREL | Octagonal |
| BARREL LENGTH | 3⅞ Inches | RAMROD | None |
| CALIBER | .32 | TRIGGERGUARD | None; Folding Trigger |
| NUMBER OF SHOTS | 5 | FRAME | Experimental |
| SHAPE OF CYLINDER | Straight Round | SIGHTS | Blade and Hammer Notch |
| SHAPE OF SLOTS | Round | BUTT | Rounded |

### MARKS

NONE

REMARKS.  This is one of the experimental models Colt had made before he took out patents and before the Paterson factory was started. The dagger was never applied to any regular production models, although it appears in the patent drawings. The shields over the nipples and chamber mouths were also discarded before any arms were made for sale.

Probably made between 1832 and 1835.

*From the Colt Plant Collection.*

— 16 —

## THE YOUTH AND EXPERIMENTS OF SAMUEL COLT

of wood that seemed to indicate that his first ideas were along the lines of the later "pepperbox" type of revolver.[1] The pepperbox is a multi-barreled arm with the barrels revolving in a block, or with the barrels in a stationary block and a revolving hammer. Either one of these systems is clumsy and inaccurate, and the idea was abandoned by Colt before his arms reached even the metal-model stage. It was taken up by other makers later on to avoid conflicting with Colt's patents.

On his return from the sailing voyage Colt went to Mr. Anson Chase, a gunsmith who worked in a shop called the North Schenevard shop, situated on Main Street, East Side, Hartford. Mr. Chase rented this shop from Mr. Thomas Belden of Hartford in the spring of 1830. Young Colt first came to Mr. Chase in the early summer of 1831, bringing with him a number of drawings and the wooden model he had whittled out on the *Corlo*. Chase worked for Colt during 1831 and part of 1832. From the drawings and the model Mr. Chase, and a Mr. Rowe who worked for him, made, under Colt's supervision, a model pistol.

The first pistol revolved by the act of cocking, but it was locked and unlocked by hand. It blew up when Colt tried to fire it because there were no partitions between the nipples to prevent one discharge from exploding the chambers next to it. A gun was next built with the improvements of partitions between the nipples and a bolt that locked and unlocked the cylinder by the act of cocking. The three main points at which he finally arrived were: the rotation of a many-chambered breech in a single-barreled firearm by the action of cocking the hammer; the locking and unlocking of the cylinder automatically by the same action of cocking the hammer; and

the placing of partitions between the nipples in their position at the rear of a cylindrical many-chambered breech. There were other minor points in his specifications, but these were the three important claims in the patent he later took out, and were later proven to be the basic differences between Colt's arms and all multi-firing arms that preceded them.

Colt's great trouble at this period was lack of money to carry on his experiments. His father had at one time been quite well off, but while Colt was very young he lost most of his money and so could be of no pecuniary aid to his son. To overcome his shortage of cash, Colt embarked on a lecture tour of the United States and Canada. He left Hartford March 30, 1832, and proceeded about the country, giving lectures on, and demonstrating the effects of, nitrous oxide or "laughing gas."[2] Colt appears to have realized, even at this early date, the great value of showmanship and popular appeal. He took the name of Dr. Coult, an old spelling of Colt, and the novel nature of his subject, combined with his own striking and handsome appearance, brought him considerable and widespread success. His performance was noticed editorially in the Boston *Post*, June 22, 1832, and accounts of his activities on the lecture platforms of such widely separated points as New Orleans and Quebec were preserved among his effects.

A report of one of his visits to Albany, published in the Albany *Microscope*, October 26, 1833, gives a good idea of the way that his lectures were received.

We never beheld such an anxiety as there has been during the past week to witness the astonishing effects of Dr. Coult's gas. The Museum was crowded to excess every evening; and so intense was the interest which was manifested, that the doctor has been compelled to give two exhibitions every evening.

[1] See page 350.  [2] See page 251.

— 17 —

Compendium_Roth
Page 0248

## A HISTORY OF THE COLT REVOLVER

The effect which the gas produces on the system is truly astonishing. The person who inhales it becomes completely insensible, and remains in that state for about three minutes, when his senses become restored, and he sneaks off with as much shame as if he had been guilty of some little mean action. No person will begrudge his two shillings for the gratification of half an hour's laugh at the ludicrous feats displayed in the lecture room.

Even during the time that he was lecturing, Colt was working on his pistol idea, returning to Hartford occasionally to see how his models were progressing. In 1832, Chase having completed for him two arms, a pistol and a rifle, he deposited them in the patent office in Washington with a description of his arm and its mechanism. Some arms were also made for him in Baltimore during this period by a gunsmith named Pearson. He gave up lecturing in 1835 and went to Europe, where he took out English and French patents. He then returned to America where he completed his American patents, which were finally granted February 25, 1836.[3]

For those who are attracted by the peculiarities of the long arm of coincidence, the 25th of February, 1836, is an interesting date. The Texan-Mexican War and the Colt revolver were each important to the other. The call for Colt revolvers to be used in the Mexican war by Texas and U. S. officers who had used them earlier, led to the government order that started Colt on his own career. The Paterson revolvers in the hands of the Texas Rangers did much towards winning independence and statehood for Texas. And on February 25, 1836, when Colt's patent was being granted, the forces of Santa Anna launched the attack on the Alamo that culminated in the massacre of its one hundred and eighty-odd defenders. As the war went on, Texas Rangers, Colt revolvers in hand, charged through the shattered Mexican ranks

[3] See pages 252 and 541.

to the cadence of the reiterated war cry, "Remember the Alamo," which was punctuated by the jarring crash of "Colt's Repeaters," both the results of a single day.

The last experimental arm previous to the opening of the Paterson factory was made about this time. This arm was handsomely stocked and elaborately mounted and engraved for use as a specimen in interesting investors in forming a stock company to manufacture arms under his patents. It was a five-shot .40 caliber revolver with shields over the nipples and the front of the cylinder, a three-and-one-quarter-inch barrel and an overall length of seven and one-quarter inches (page 19).

On the strength of this arm, The Patent Arms Manufacturing Company of Paterson, New Jersey, Colt's Patent, was formed and chartered by the legislature of New Jersey March 5, 1836. It began to manufacture revolving firearms during the summer of the same year. The officers and directors were Thomas A. Emmet, Daniel K. Allen, Elias B. D. Ogden, Daniel Holsman, and Elias Vanardale, Jr. The subscription books of the company were opened in April with a proposed capital of $230,000. But from some of Colt's later statements concerning the Paterson company, it seems that only about $150,000 in stock was sold.

Colt's position in connection with the company is outlined in *Armsmear* as follows:

He assigned his letters patent to the Company, and undertook to give his time and attention to the business, receiving therefor a fixed price, varying from one to two dollars, for each arm manufactured. His proposition of March 9th, 1836, was to assign the patent, and the right to all improvements in arms and machinery; to devote not over nine months to setting the factory in operation, and to give such future aid as might be needed in perfecting the improvements, at a salary of one thousand dollars per annum—the company to establish the works within six months and extend

— 18 —

Compendium_Roth
Page 0249

## THE YOUTH AND EXPERIMENTS OF SAMUEL COLT

them as might be needed; not to dispose of any right without his consent, to pay him semi-annually half the net profits of the company, and half the proceeds of the sale of any right, six thousand dollars being advanced in six monthly payments, and the right of subscription to $50,000 worth of stock being reserved to him for one year.



### PROMOTION MODEL REVOLVER

| | | | |
|---|---|---|---|
| LENGTH | 7¼ Inches | RAMROD | None |
| BARREL LENGTH | 3¼ Inches | TRIGGERGUARD | None |
| CALIBER | .40 | FRAME | Experimental |
| NUMBER OF SHOTS | 5 | SIGHTS | Blade and Rear Notch on Barrel, |
| SHAPE OF CYLINDER | Straight Round | | Hole in Nose of Hammer |
| SHAPE OF SLOTS | Round | BUTT | Rounded |
| SHAPE OF BARREL | Octagonal | | |

### MARKS

NONE

REMARKS.  This is the arm supposed to have been used as a promotion model in selling stock in the Patent Arms Manufacturing Company. It is finely stocked, inlaid with silver, and engraved on all metal parts. It has the unusual feature of a wood forestock, as the idea at the time was to try and make the new arms look as much like standard weapons as possible. It was probably made shortly before the company was formed.

Made in 1835.

*From the Colt Memorial Collection in the Wadsworth Athenaeum at Hartford, Connecticut.*

— 19 —

*CHAPTER THREE*

# THE PATERSON FACTORY

*Its Output and Its Failure*

THE Patent Arms Manufacturing Company of Paterson, New Jersey, Colt's Patent, commenced to manufacture revolving firearms during the summer of 1836, went into bankruptcy in 1841, and closed permanently in 1842.

The exact number of arms made at the Paterson factory between these dates will probably never be known. Some writers place the figure at under two thousand arms of all types, but this figure seems low, as it allows for an average factory output of only about six arms per week during the six years from 1836 to 1842. Possible indication of the number of Paterson Colts that were made is the number of them at present in the hands of collectors in relation to the number of Whitneyville Walkers that are still extant. In the course of about twenty years of arms collecting we have seen and handled over forty Paterson Colts, and only about seven Whitneyville Walkers. As it is definitely known that a thousand Whitneyville Walkers were made in 1847 and all delivered to the army, it would seem that the numbers of them lost or destroyed would be no higher in percentage than among the Paterson Colts, which went all over the country during a period of six years.

Allowing the same percentage of survival for both types, with a known thousand of the Whitneyvilles, the forty Patersons should be the survivors of at least five or six thousand originally manufactured. We have checked with other collectors, and find that the ratio in types seen of five or six to one between Patersons and Whitneyvilles corresponds to the experience of most of them.

The experimental arms made by Anson Chase and the Baltimore gunsmiths, and the model used to promote the Patent Arms Company, follow closely in appearance the drawings of the first patent, having shields over the nipples and the front of the cylinder, birdshead butts, and a spur behind the hammers.

It can easily be seen from the patent drawings,[1] however, that the mechanism of these arms was extremely complicated, and it probably did not lend itself well to factory manufacture, even of as primitive a nature as must have gone on in the early days of the Paterson plant. A few arms of this type were probably made at Paterson during the experimental period at the beginning of operations, but the majority of the arms made there tend to follow more and more closely the revolver shown in the drawings for the patent of 1839,[2] which indicate a partial simplification of the mechanism and the

[1] See page 541.
[2] See page 549.

— 20 —

Compendium_Roth
Page 0251



## THE PATERSON FACTORY



## EXPERIMENTAL MODEL

| | | | |
|---|---|---|---|
| LENGTH | 13½ Inches | SHAPE OF BARREL | Octagonal |
| BARREL LENGTH | 8 Inches | RAMROD | None |
| CALIBER | .47 | TRIGGERGUARD | None; Folding Trigger |
| NUMBER OF SHOTS | 5 | FRAME | Experimental |
| SHAPE OF CYLINDER | Round Straight | SIGHTS | Blade and Hammer Notch |
| ENGRAVING OF CYLINDER | None | BUTT | Flattened at Bottom and Sides |
| SHAPE OF SLOTS | Round | | |

## MARKS

NONE.

REMARKS. This is a very large example of the Experimental models; it was probably made at the Paterson factory, as it shows in the shape of the butt and the general construction a trend toward the regular Paterson revolvers, although the cylinder and nipple shields are still retained.

Probably made in 1836.

*From the Colt Memorial Collection in the Wadsworth Athenaeum at Hartford, Connecticut.*

— 21 —

## A HISTORY OF THE COLT REVOLVER



## MODEL REVOLVER

| | | | |
|---|---|---|---|
| LENGTH | 8 Inches | SHAPE OF BARREL | Octagonal |
| BARREL LENGTH | 4¼ Inches | RAMROD | None |
| CALIBER | .32 | TRIGGERGUARD | None; Folding Trigger |
| NUMBER OF SHOTS | 5 | FRAME | Experimental |
| SHAPE OF CYLINDER | Round Straight | SIGHTS | Blade and Hammer Notch |
| SHAPE OF SLOTS | Round | BUTT | Square-Cornered with a Flat Bottom |

### MARKS

NONE

REMARKS.  This is another of the experimental type revolvers, some of which were made at the Paterson factory before regular production started, and some of which were made for Colt in Hartford and Baltimore between 1832 and 1835. None of these pistols carries regular Paterson marks, so they were probably not made for sale, but as experiments in mechanism, which culminated in the form of Paterson revolver that is usually found. This arm also has a dagger under the barrel, a feature that was never a part of regular-issue arms. This arm shows several very late features of the model group, among them the lack of shields over the nipples and chambers, the evenly curved backstrap, and flat butt.

Probably made at the Paterson factory in 1836.

*From the Colt Memorial Collection in the Wadsworth Athenaeum at Hartford, Connecticut.*

— 22 —

## THE PATERSON FACTORY

discarding of the shields over the front of the cylinder and the nipples.

Arms made at the Paterson factory included pistols, rifles, carbines, shotguns, and a few muskets, all having a "rotating chambered breech," or revolving cylinder as we call it today, with chambers for five or more charges of ammunition, each fired by a percussion cap on a nipple at the back of the chamber.

The bulk of the arms were five-shot repeating pistols, made in calibers from .28 to .40, with barrel lengths from three to ten inches.

The stock models of the pistols were revolving arms in calibers .28, .31, .34, and .40. Some larger caliber pistols were made in very small quantities, largely for experiment. The usual features were an octagonal barrel, no frame above the cylinder, a concealed trigger that sprung out when the hammer was pulled back, a round, five-chambered cylinder that unlocked, turned, and locked again by the act of cocking, and butts that were either rounded with a reverse curve at the bottom or had square corners.

Further improvements were made both in the mechanism and the outer form as time went on. One of the earliest was a chamfer at the muzzles of the chambers with the double purpose of deflecting the fire of the discharge from the other chambers and helping to start the bullet into the chamber for easier loading. No ramrod of any type was provided with the earliest issue, but the arbor on which the cylinder turned was cupped at its outer end so that when the arm was taken apart to load, it could be used to force the round bullets home.

Another change was the rounding off of the back end of the cylinder between the nipples, apparently to lessen the possibility of percussion caps jamming between the cylinder and the standing breech when the cylinder revolved.

In 1839 an improvement in the form of a jointed lever ramrod was designed, which was commonly used separately but sometimes attached to the Paterson pistols. Arms with the rammer attached are called by collectors Model of 1839 Pistols. On these arms the standing breech was cut away on the right side for capping, and a small recess was made at the bottom of the barrel lug to allow the round bullets to come under the rammer. The rammer had a short handle and was held up to the barrel by a spring cramp that fitted into the joint between its two parts to keep it in place. These arms could, of course, be loaded completely without being taken apart, but they form a relatively small percentage of the surviving Paterson Pistols, so it is probable that not many of them were made. The dealer's advertisement on page 268 shows this model and gives directions for its use.

The jointed lever ramrod, combination powder and bullet charger, and the cap magazine were patented in 1839.[a] At this time a complete cased outfit consisted of the following articles, put up in a cloth-lined wooden case and held in place with small wire loops instead of the wooden partitions of the usual pistol case of the period:

1) The revolver itself, marked on the barrel, in script, *"The Patent Arms M'g. Co. Paterson, N.J. Colt's Patent."* and on the cylinder, *"Colt."* The standard arms were plain blued finish with the only ornament a roller-die-engraved band around the cylinder, depicting either a centaur with two revolvers killing two horsemen, or a stagecoach-holdup scene, similar to the one on the cylinders of the later models of pocket pistols. A small front sight was let into

[a] See page 549.

— 23 —

Compendium_Roth
Page 0254

## A HISTORY OF THE COLT REVOLVER

the barrel and a notch was cut in the tip of the hammer to form the rear sight when the pistol was cocked and ready to fire. As the Paterson arms were designed for round bullets, the rifling in the pistols has so slight a pitch that it looks nearly straight. The grooves are semicircular rather than straight-sided, and appear to be about half again as wide as the lands. As uniformity was not one of the virtues of the Paterson plant, the number of grooves probably differs in different arms, but some of them at least had eleven grooves.

2) A combined bullet and powder flask that loaded five measured charges of powder into the chambers at once from one end, and put five round bullets simultaneously in the chambers from the other end. This charger had a hole in the center to receive the center pin of the pistol, so that it could be used simply by removing the barrel without taking the cylinder from the frame.

3) A magazine-capping device that held forty or fifty percussion caps and fed them out one at a time in a way that made their application to the nipples much easier and quicker than the same operation done by hand.

4) A bullet mold with wooden handles and a neck cutter that cast one round bullet.

5) A brass cleaning rod with a wooden handle.

6) A very ingenious tool that combined several uses. One end was a screw driver, and pivoted near this end was a short rammer made so that it would drive the bullet home in the chamber when the screw driver was slipped into the slot in the center pin usually occupied by the barrel bolt, and the user pulled down on the other end. The back end was enlarged to form a light hammer for knocking out the barrel bolt, and hollowed so that it unscrewed to disclose a nipple

picker and a nipple wrench. In the outfits in which the revolver itself was provided with a jointed lever rammer under the barrel, working through a hole in the fore part of the frame, the separate rammer was not necessary, and so was not included, but the majority of revolvers were put out without the rammer attached.

7) An extra cylinder to be carried ready loaded and put in place of the fired one, thus giving ten shots without reloading, an additional talking point in selling the arm.

Perhaps the greatest single market for Colt arms during the Paterson period was the South and the Southwest, and especially the struggling Republic of Texas, engaged in its war for freedom from Mexican rule. So many of the Paterson revolvers went to this destination that Colt in later years called the regular Paterson model "The Texas Arm," and these weapons, particularly in the larger size, did yeoman service in the hands of the hardy Texans.

The first strictly military model Colt revolver is supposed to have been the outgrowth of the Texan use of the earlier Colt arms. This is the famous and much-disputed "Paterson Walker Colt" supposed to have been made in 1839.

According to the story as it is usually told, Captain Samuel Walker came to New York in 1839 in search of arms for the Texas Rangers and met Samuel Colt in a gun store in the city. He complimented him on his revolver, but said that a heavier model should be made for cavalry use. With his suggestions and help, a new model revolver, with simplified mechanism, a regular trigger and triggerguard, an attached loading lever, and a caliber of .44, was designed. The new arm was called the Walker Colt, in honor of the co-designer, and a considerable number, from one to three hundred according to dif-

— 24 —

Compendium_Roth
Page 0255

## THE PATERSON FACTORY

ferent accounts, were made and sold to Texas, and were carried by the Texas Rangers throughout the war and also in the later war between the United States and Mexico.

Then, when the war between the United States and Mexico broke out, the United States Government sent Captain Walker, as an officer of the U. S. Mounted Rifles, to find Colt and procure more of his repeating pistols. Colt advertised for a specimen of the Paterson Walker pistol but was unable to obtain one in the East in the time that he had to spare. He therefore redesigned from memory a close copy of the former model, and had one thousand arms of the type made at the armory of Eli Whitney at Whitneyville, Connecticut. He then started his own factory at Hartford on an order for another thousand, which were made with some variation from the first lot.

This is the usual story, and in our opinion, so far as it concerns Walker as the designer of any arm made at Paterson or there ever having been a regular issue to the Texas Rangers of Paterson-made revolvers with triggerguards and loading levers, designed to use conical bullets, it is legend pure and simple, and it is about time it was branded as such.

The earliest reference to the "Walker Pistol," as such, that we have been able to locate is in the book *Armsmear*, written in 1865 by Professor Henry Barnard, of St. John's College, Annapolis, Maryland, at the request of Mrs. Colt as a memorial volume to her husband. We consider this work as a valuable and interesting record of the doings of Colonel Colt and the details of his arms *after he came to Hartford* and established the organization that was still in operation at the time the book was written. But we feel that Professor Barnard made some mistakes concerning the Paterson factory, writing, as he

did, twenty-three years after the factory had discontinued operation.

The illustration in *Armsmear* which we have reproduced on page 41 shows a six-shot weapon exactly like the Model of 1847 pistols, and in the text Professor Barnard writes concerning it as follows:

Another pistol similar to the Texas Arm was also made at Paterson. It was called the Walker Pistol by Colonel Colt, out of compliment to a distinguished Texas Ranger of that name, with whom the pistol was a great favorite. It was much larger and heavier than the Texas Arm, and although it differs in the proportion of the parts, was in form and arrangement very similar to the pistol known as "Colt's Old Model Army Pistol." The lever and rammer were attached to this pistol, though the idea of a lever rammer was suggested by sketches of a much earlier date. Its caliber was .44.

This is the earliest reference to the "Walker Pistol" by name, and even this account does not show that Captain Walker had anything to do with designing the pistol or adding the triggerguard to it. Accepted at its face value, it only indicates the manufacture of a number of large revolvers with simplified mechanism, triggerguards, and loading levers, some of which were carried by the Texas Rangers.

But its face value is considerably impaired by another statement in the book to the effect that Walker's own revolver was an item in Colt's cabinet of arms, having been acquired by Colt after Walker's death. The illustration of a "Walker Pistol" from *Armsmear*, which we have reproduced on page 41, is presumably from this pistol that was Walker's own. It happens, however, that Colt's cabinet of arms is preserved in the Wadsworth Atheneum at Hartford. It was left to the museum by Mrs. Colt and we have the curator's authority for the statement that it is now exactly as it was during Colt's lifetime.

— 25 —

Compendium_Roth
Page 0256



A HISTORY OF THE COLT REVOLVER



## TEXAS ARM
### Paterson Colt
### Model of 1836

| | | | |
|---|---|---|---|
| LENGTH | 9½ Inches | SHAPE OF SLOTS | Round |
| BARREL LENGTH | 5½ Inches | SHAPE OF BARREL | Octagonal |
| CALIBER | .31 | RAMROD | None |
| NUMBER OF SHOTS | 5 | TRIGGERGUARD | None; Folding Trigger |
| SHAPE OF CYLINDER | Round Straight Rounded Back | FRAME | Regular Rounded Back |
| | | SIGHTS | Knifeblade and Hammer Notch |
| ENGRAVING OF CYLINDER | Centaur Killing Two Horsemen | BUTT | Square-Cornered |

### MARKS

BARREL.   Patent Arms M'g. Co., Paterson, N. J. Colt's Pt.

CYLINDER.   Colt.

FRAME.   676.

REMARKS.   This is a typical model of 1836 Paterson Colt of medium size.

Made from 1836 to 1841.

*From Charles T. Haven's collection.*

— 26 —

### THE PATERSON FACTORY

Examination of the arms it contains shows no arm made at Paterson that remotely resembles the *Armsmear* illustration. But it does show a Whitneyville Walker Colt made in 1847, with all the correct markings, but no company numbers, indicating that it was an officer's private property arm, with Walker as the likely owner (page 45). It is our opinion that Professor Barnard made a mistake in his dates, and placed Colt's connection with Walker, of which we have ample documentary evidence as having existed in 1847, some years too early, which led him to assume that the arms that resulted from this connection were made at Paterson instead of at Whitneyville.

It is probable that later writers, with the *Armsmear* account in mind, came upon a passage in Colt's own account of his early career (Part Three) [4] and read carelessly the following passage:

They were, however, most successfully used by Commodore Moore of the Texas Navy, as well as Colonel Hays, and other distinguished Texan Rangers, during the wars with Mexico and the Indians from 1837 to 1848.

In consequence of the peace [in Florida] they were scarcely again employed until the year 1847, when the Mexican campaign commenced, under the command of General Taylor, who, having seen the utility of these weapons in Florida, where he was also in command, sent Captain Walker of the Texan Rangers, to procure from the author a supply of these arms, not one however, could be procured, but by great exertion commensurate with the exigencies of the period a number were manufactured.

Here was Walker mentioned in connection with the manufacture of a number of revolvers for use against the Mexicans, consequently they must be the Walker Colts referred to in *Armsmear* as made at Paterson, so here the legend appeared full grown, sometimes told with variations, including

[4] See page 317.

an account published in the magazine *Shooting and Fishing* before 1900, in which the same story is told, but wherein another Ranger captain, Jack Hays this time, is made the collaborator instead of Walker. No recent writer has troubled, apparently, to check these stories to any original source.

With the thought in mind that the Paterson Walker did not exist, consider a few passages from the early documents collected in Part Three, some of them concerning the Paterson output, and others referring to Walker and the Model of 1847 pistols, which have some bearing on the subject.

So far as the arms of the Texas Rangers are concerned, Commodore Moore of the Texas Navy, in a report to the United States Senate in 1848, [5] says,

The Colt's pistols used by the Texas Rangers before annexation were all supplied from the Navy, after they had been in constant use by that arm of the service for upwards of four years, and I know some of these arms that have been in constant use for nine years and are still good.

Commodore Moore's report does not sound as though the arms of the Texas Rangers were especially designed for them by one of their officers or delivered to them direct from the Paterson factory.

Colt's advertisement in 1846 for "one of my repeating pistols to use as a model" did not refer to any specific type or caliber, but simply to any one of his pistols.

The contract of January 4, 1847, and the group of letters between Colt, Walker, Whitney, and the Ordnance Department (pages 272 to 297), which are all concerning the design, manufacture, inspection, and delivery of the Model of 1847 pistols, make no reference to any closely similar design that was being followed, or

[5] See page 304.

— 27 —

Compendium_Roth
Page 0258

## TYPES OF PATERSON COLT REVOLVERS

*(Shown on opposite page)*

A Presentation Model of 1836 Paterson Colt Showing the Rounded Corners of the Butt and Rounded Back of the Cylinder.

Made from 1836 to 1841.

A Regular Model of 1836 Paterson Colt Revolver Showing the Straight-Back Cylinder and Rounded Butt.

Made from 1836 to 1841.

A Regular Model of 1836 Paterson Colt Revolver Showing the Rounded-Back Cylinder and Square-Cornered Butt.

Made from 1836 to 1841.

A Regular Model of 1839 Paterson Colt Revolver Showing the Hinged Lever Ramrod, Rounded-Back Cylinder, and Round-Cornered Butt.

Made from 1839 to 1841.

A Regular Model of 1839 Paterson Colt Revolver Showing the Hinged Lever Ramrod, Rounded-Back Cylinder, and Square-Cornered Butt. This is an unusually small example of the Paterson Colt.

Made from 1839 to 1841.

Compendium_Roth
Page 0259



THE PATERSON FACTORY

*Photo furnished by McMurdo Silver.*

— 29 —

Compendium_Roth
Page 0260

### A HISTORY OF THE COLT REVOLVER

any previous connection between Colt and Walker. They do speak of the problem of seating a conical bullet with a lever ramrod as a new one, and the six-chambered cylinder and brass triggerguard are also mentioned as innovations.

Changes even in the first design agreed upon in the contract were apparently being made continuously as the '47 pistols approached completion. Under date of July 6, 1847, Colt wrote to the Ordnance Department: [6]

I have completed the thousand patent repeating pistols ordered by you, *with all the alterations and improvements requested by Captain Walker; making them in every respect superior to the model, or any other arm ever built of my construction.*

Colt's letter to the Senate, December 12, 1848,[7] speaks of the '47 pistols as of increased caliber over his earlier arms. The Anson Chase model, illustrated on page 15, shows that the triggerguard was considered by Colt before the Paterson arms were in production, and discarded for what seemed good reason at the time.

Loading levers of several types were applied to both pistols and rifles at the Paterson factory, including one on a very early experimental model, but apparently not for conical bullets. Colt wrote to Walker concerning the Model of 1847 pistols on January 23, 1847, as follows:

I have been bothered to deth in endevering to lode the cillinders with the conical ball by means of the old fashioned leaver and have abandoned it as a bad job. There must be a leaver attached to the barrel on a new plan which will work purpindicular otherwise you never can get your balls strate in the cillinder.

Examination of the illustrations on pages 39 and 62 will show what Colt's "new plan" turned out to be. The lever and ram-

[6] See page 288.
[7] See page 297.

mer attached under the barrel of the Paterson arms were held together by a screw passing through a round hole in each part. The lever was held to the barrel by another screw passing through round holes in the lever and the barrel-lug. On account of the relative position of these screws, as the lever was pulled down, the rammer was forced away from the barrel at its joint with the lever as well as down into the chamber, which·it entered at a slight but increasing angle as the lever came all the way down. A conical bullet seated by this arrangement would inevitably be tipped outward toward the circumference of the cylinder.

As can be seen from the illustration on page 62, the later arms, including all the hinged-lever models from the Model of 1847 on, did away with the outward movement of the rammer by providing an oval slot for the lever screw to slide in instead of a round hole, and making the guide hole in the barrel-lug long enough to keep the rammer running straight, thus seating the conical bullets true with the bore. This was Colt's new plan mentioned in two letters and developed during January and February, 1847.

Another Paterson experimental model (page 40) shows a number of the simplified mechanical features of the later arms, as well as the later type of trigger and triggerguard.

And to climax the whole story, Samuel Walker, the man who was supposed to have come back from Texas in 1839 to get arms for the company of Rangers that he captained, did not go to Texas for the first time until 1842, was not captain of a Ranger company until several years after that, and did not return to the East again until the fall of 1846.

A few pages and illustrations of a history of the Ranger companies during and pre-

Compendium_Roth
Page 0261



THE PATERSON FACTORY



## TEXAS ARM
### Paterson Colt Revolver
### Model of 1836 Paterson

| | | | |
|---|---|---|---|
| LENGTH | 14 Inches | SHAPE OF SLOTS | Round |
| BARREL LENGTH | 9 Inches | SHAPE OF BARREL | Octagonal |
| CALIBER | .40 | RAMROD | None |
| NUMBER OF SHOTS | 5 | TRIGGERGUARD | None; Folding Trigger |
| SHAPE OF CYLINDER | Round Straight Rounded Back | FRAME | Regular Paterson |
| | | SIGHTS | Pin and Hammer Notch |
| ENGRAVING OF CYLINDER | Centaur Killing Horsemen | BUTT | Flaring Round-Cornered |

### MARKS

BARREL.  Patent Arms M'g. Co., Paterson, N. J. Colt's Pt.
CYLINDER.  Colt.

REMARKS.   This is a beautifully gotten up presentation piece. It is elaborately engraved, inlaid with silver, and fitted with an ivory stock. The arm is in almost perfect condition and shows the original finish of the best Paterson workmanship.

Made from 1836 to 1841.

*From the Colt Memorial Collection in the Wadsworth Athenaeum at Hartford, Connecticut.*

— 31 —

### A HISTORY OF THE COLT REVOLVER

vious to the Mexican War, written by a member of one of them, will be found on page 269, and also two newspaper accounts of Walker's death, which occurred on October 9, 1847. Walker's activities in Texas and the dates of them are clearly set forth in these accounts, which are taken from one of a number of similar histories, all written by eyewitnesses and published within a few years of the actual events, which we have checked over, and from which we have selected the most comprehensive passage for reproduction. There were many references to the exploits of the Rangers between 1840 and 1847, and all these early accounts refer to the arms of the Rangers as *five-shooters*, which is the number of shots of the regular folding-trigger Paterson models, and not as *six-shooters*, which the Paterson Walkers were supposed to have been.

These facts, and a number of other references to the Paterson and Whitneyville arms, have convinced us that the arms made at Whitneyville were not close copies of any previous Paterson model, and that no regular model closely resembling them was made at Paterson, either with Walker's collaboration or without it. It is our opinion that the Whitneyville Walker Colt was a combination of what Colt remembered of the best features of the arms made at Paterson, modified in several respects to fulfill the requirements of the government contract, and designed to enable the utmost possible speed of manufacture, and that the Paterson Walker is as much a myth as the cockatrice or the salamander.

Long guns were made at the Paterson factory in two different main types, known usually among collectors as the Model of 1837 and the Model of 1839. The first model was a hammerless arm, having in the earlier examples made during 1836 a shield over the

nipples and another over the front of the cylinder. The shields over the nipples and cylinder were soon discarded, as they were found to cause the fire from one shot to run around the front of the cylinder and fire the charges in the other chambers. Cocking of this model was effected by a lever in front of the trigger. Sometimes this lever was another trigger, but usually it was a ringed lever lying outside and in front of the triggerguard. The arm was taken apart to load; a small ramrod was furnished with it as well as an extra cylinder, as in the case of the pistols. Later on some of this model had jointed ramrods put on the side of the barrel at the factory.

Some of the Model of 1839 long arms were equipped with jointed lever rammers under the barrels like the later arms, but most of them had the rammer on the side. They had much simpler lock mechanisms with regular center hammers.[8] The Model '37 and Model '39 long arms were both made in rifles, carbines, and shotguns, with from five to eight chambers in the cylinders, and one or two muskets were made for government tests.

The regular finish of all arms made at the Paterson factory was plain blued steel with polished wood stocks. Special arms, with shape and number of shots differing from the regular issue, were made to order, and any kind of ornamentation, such as browned twist steel, engraving, inlay, or ivory or pearl stocks could be had by anyone who wished to pay for them. There is no knowing what form some of these special arms may have taken, except that, so far as can be told from specimens preserved or from records or statements by anyone connected with the company, no arms were made at the Paterson factory which did not use the revolving

[8] See page 550.

— 32 —

Compendium_Roth
Page 0263

## THE PATERSON FACTORY

breech mechanism that was the basis of the company's patents.

Colt tried in 1837 to get his arms adopted by the government, but after tests by the ordnance board of 1837 they were reported on unfavorably, and the government declined to go any further with the matter of their adoption. The reasons given for the board's unfavorable report were the complicated mechanism, which they feared would get out of order, and the expense, also the fact that the regular army was armed with flint-lock single-shot muskets and pistols which seemed to be good enough, and a change was unwarranted at that time.

Colt, however, had faith in his arms and was sure that if he could get them into the hands of men who were using arms, their many virtues would be apparent to hard-pressed soldiers, who would be more interested in the practical advantages of an arm that could deliver several shots without reloading when faced by a savage foe than by its theoretical drawbacks in the testing rooms.

Taking a number of his arms with him, he journeyed, in the face of hardships and privations that included shipwreck on the way back, to the seat of the Seminole War in Florida, which was the only active warfare going on at the time. Here he sold what arms he had to officers of the troops engaged with the Indians. Although these arms must all have been of the earlier type made at the Paterson factory, they were found by their users to be a tremendous improvement over any weapons then in use. The following are extracts from letters of two officers who served in the Florida campaign and used Colt's arms. One was written to the War Department in an attempt to get more of Colt's revolvers, and the other was written in answer to an inquiry from Colt some years after the Seminole campaign.

Long since, when at Fort King, East Florida, I applied to the ordnance depot at Garey's Ferry, Black Creek, for these arms [Colt's] for my company and was informed that there were none on hand; for, having satisfied myself that the simplicity of construction, which is but little more than a system of levers, surpassed that of an ordinary gun lock, and could be easier repaired, while its efficiency as a small weapon was unequalled by any in service, I was anxious for its use in my company, and considered thereby that my command would be equivalent to a much superior force. . . .

This weapon, eight times as efficient as a musket, would inspire confidence in our ranks, however great the disparity otherwise. . . .

I must recommend this strongly as that to which in the hour of danger I would be most willing to trust my reputation and my life. . . .

> Your Most Obedient Servant
> G. T. RAINS
> Captain Seventh Infantry
> Commanding Company A.

Washington, January 14, 1848.

Dear Sir,

In answer to your inquiries as to my present opinion of your patent revolving firearms, I am free to say that, after an experience of more than ten years in their use, commencing with the Florida war, and continuing through our contest with Mexico up to this time, no arm, in my judgment, ever yet constructed, can equal them. They are, with fair usage, as little liable to get out of order as any other, and they are at least three time as effective. I consider them invaluable in the present state of affairs in Mexico, where our cavalry are always compelled to face an overwhelming force of the enemy, and they will be equally valuable on our frontiers; when it is known that we possess such arms, they will be less apt to commence hostilities with us. I also consider them for these services the most economical arms that can be used. It is my intention to apply to the Honourable Secretary of War, to have all the regular cavalry equipped with your improved holster pistol; for I am confident that, if they were armed in this way, incalculable advantages would be gained.

> In haste, your obedient servant,
> W. S. HARNEY
> Colonel Second United States Dragoons.

— 33 —

Compendium_Roth
Page 0264

# A HISTORY OF THE COLT REVOLVER

An account in the *New York Military Magazine* for October 3, 1841, also gives a fair idea of the feelings of practical military men concerning Colt Arms at this time.

## COLT'S REPEATING CARBINES.

The Citizen Volunteers of Paterson, New Jersey, arrived at Jersey City and commenced target practice. They were armed with Colt's Patent Repeating Carbines, and paraded to the number of about 35 pieces. The principal object of their parading was to show the utility of the piece, and to exhibit the celerity with which the firings could be made. We were told by one of the officers that one of these pieces had been discharged sixty times in the course of ten minutes. We should think there were at least 70 shots in the target after all had fired. This may be considered excellent firing as many of the company had never before handled their pieces. The prize to be shot for was a splendid patent repeating pistol, presented the corps by the manufactury at Paterson. They were received by the Mayor and the Common Council, to whom they exhibited the celerity of firing their pieces, which performance they went through to the great satisfaction of the spectators, among whom we recognized many of our most distinguished officers.

We are sorry not to see these patent arms more generally adopted by our companies, as a man armed with one of them is fully equal to five or six armed with the common musket. We should like to see a company organized with these pieces. What execution they might do along the ranks of an enemy. We consider them a great improvement in gunnery.

While Colt was in the swamps of Florida making his weapons known to the men who were to lay the first foundations of a reputation destined to become world-wide, until the name "Colt" was synonymous for "revolver" wherever arms were used, the heads of the enterprise at home were quarreling about its management. The Patent Arms Manufacturing Company of Paterson, New Jersey, Colt's Patent, failed and went out of business through bankruptcy in 1842. There were several reasons for this failure. Among these

were the high price of the revolvers,[9] which, due to lack of perfected methods and machinery, had to be made in part by hand; the lack of any need for a multi-firing arm by the average citizen in peace time; the newness of the arms and their apparent complication in comparison to a flint-lock horse pistol; and the lack of transportation and communication facilities with Texas and Florida, the only two real markets in the country.

But in view of the later successes of Colt's enterprises, it would seem that the real reason for the failure was the fact that Colt was only a paid employee of the company and not its supreme head. Where Colt was, things went fairly smoothly, but if he went out to sell in distant parts, trouble developed at the factory; and if he did not go out, nothing was sold. His was the dominating figure in the public mind even then, and when the new weapons were spoken of, it was as "Colt's pistols," not as the arms of The Patent Arms Manufacturing Company. A New Orleans paper of January, 1842, notices a local duel as follows:

Allston drew his knife to stab him, but Stewart, perceiving his intention, fired three shots at him with one of Colt's pistols. Allston though severely wounded, fired a rifle and shotgun at his opponent, which instantly killed him. The citizens of Brazoria arrested Allston, took him out, and shot him.[10]

Even in a correct and formal government ordnance report dated 1846, they were "Colt's carbines and pistols." So it seems, from the multiple activities of Colt in his later years, that, given a free rein, he would in some way have kept the factory going until the real value of his arms became apparent to the public at large. The govern-

---

[9] See page 253.
[10] Quoted in *Notes on Duels and Duelling*, by L. Sabine, Boston, 1855.

Compendium_Roth
Page 0265

### THE PATERSON FACTORY

ment bought a few carbines in 1839, 1840, and 1841,[11] but some of them were lost in a river before they were ever used,[12] and there is a romantic story of a fort in the middle of the Florida Everglades that was burned by the Indians while a number of Paterson Colts lay in the cellar in their original boxes. Rumor has it that they are still there, pre-

served, no doubt, in the grease they were sent in and waiting a treasure hunter to dig them up. Tales of treasure and mishap may or may not be true, but the final summing-up of the case seems to be that not enough Colt arms reached such groups as needed something of the sort to create a sufficiently widespread demand for more of them at the time the Paterson factory was in operation. Consequently, it ceased to exist.

[11] See page 389.
[12] See page 208.



### THE PATERSON FACTORY

The group of buildings in the left foreground of this picture was a silk mill on the banks of the Passaic River at Van Houten and Mill Streets in Paterson, New Jersey. From the summer of 1836 to 1842 it was the manufacturing plant of the Patent Arms Manufacturing Company of Paterson, New Jersey, Colt's Patent. For many years afterward, until it was torn down, it was known as "The Old Gun Mill."

*Original picture in the Colt Plant Collection.*

— 35 —

A HISTORY OF THE COLT REVOLVER



## A PATERSON COLT CASED WITH ALL PROPER ACCESSORIES

The accessories are those patented in 1839 and were made from 1839 to 1841. The revolver is the regular type of medium-sized Paterson revolver made from 1836 to 1841.

*From Charles T. Haven's collection.*

— 36 —

THE PATERSON FACTORY



COMBINED SCREW DRIVER, RAMMER, NIPPLE WRENCH
AND NIPPLE PICKER SUPPLIED WITH PATERSON CASE

BULLET MOLD SUPPLIED WITH PATERSON CASE.
THIS MOLD CASTS ONE ROUND BULLET

— 37 —

A HISTORY OF THE COLT REVOLVER



COMBINED POWDER- AND BULLET-CONTAINER SUP-
PLIED WITH PATERSON CASE. PATENTED IN 1839



CAP MAGAZINE SUPPLIED WITH PATERSON CASE

— 38 —

Compendium_Roth
Page 0269

THE PATERSON FACTORY



## A CASED MODEL OF 1839 PATERSON REVOLVER WITH ALL ACCESSORIES

This plate shows the casing and accessories of the revolvers which were fitted with loading levers as patented in 1839. A cap groove is cut on the right side of the standing breech, and the barrel lug in front of the lower part of the cylinder is recessed slightly to make room for the round bullet under the rammer. The rammer lever is held up to the barrel by a spring hook at the joint of its hinge. The powder flask is designed to throw a single measured charge from an inside measuring chamber and is very nicely made of brass. The bullet mold casts one round bullet and is the same as the molds in the cases for pistols not provided with attached rammers. The nipple wrench, spring cramp, and screw driver combined differs from those in the other type cases, as in them these pieces are part of the separate loading lever. It is more like those provided with the Model of 1847 pistols.

Made from 1839 to 1841.

*From the Colt Memorial Collection in the Wadsworth Athenaeum at Hartford, Connecticut.*

— 39 —

## A HISTORY OF THE COLT REVOLVER



## LARGE PATERSON EXPERIMENTAL MODEL

| | | | |
|---|---|---|---|
| LENGTH | 13⅝ Inches | SHAPE OF BARREL | Octagonal |
| BARREL LENGTH | 7 Inches | RAMROD | None |
| CALIBER | .47 | TRIGGERGUARD | Oval and of Light Construction |
| NUMBER OF SHOTS | 6 | | |
| SHAPE OF CYLINDER | Straight Round Rounded Back | BACKSTRAP | Iron |
| | | FRAME | Regular Oval Back; Cut for Capping |
| ENGRAVING OF CYLINDER | None | SIGHTS | Blade and Hammer Notch |
| SHAPE OF SLOTS | Oval | | |

### MARKS

NONE

REMARKS. This is a very interesting arm. It has a number of the features of the later models, including the triggerguard and a much simplified interior mechanism. It was probably made near the end of the Paterson period.

Probably made in 1840-41.

*From the Colt Plant Collection.*

— 40 —



THE PATERSON FACTORY

WALKER PISTOL.

## ILLUSTRATION OF THE "PATERSON WALKER COLT" FROM *ARMSMEAR*

The illustration in *Armsmear* listed as the "Walker Pistol." Note its close resemblance, both in general appearance and specific detail, to the regular issue of the Model of 1847 Army Pistol or "Whitneyville Walker."

*Armsmear* states that Captain Walker's own revolver was one of Colt's cherished possessions at the time of his death, and was displayed in a cabinet of arms in his home. So it is probable that it was used as the model for this drawing.

The only arm resembling this illustration now in Colt's private cabinet of arms is a regular Model of 1847 Pistol made at Whitneyville, which we have illustrated in the next chapter on page 45.

TEXAS ARM.

## A SECTION DRAWING OF A PATERSON COLT REVOLVER

This drawing shows well the complicated mechanism of the early Colt models. Compare this drawing with the cut on page 62. The number of moving parts in the lock was reduced from seventeen in the earliest Paterson models to five in the standard models made after 1847.

— 41 —

Compendium_Roth
Page 0272

# A HISTORY OF THE COLT REVOLVER



## A MODEL OF 1837 PATERSON REVOLVING CARBINE

This is a hammerless arm; cocking is effected by pulling down on the ring under the fore part of the frame. A jointed lever ramrod has been added to this piece at the factory some time after 1839.

Made from 1837 to 1839.                    *From J. C. Harvey's collection.*



## A MODEL OF 1839 PATERSON REVOLVING RIFLE

This arm has its ramrod on the side of the frame. Some arms of this model were so equipped and others had the ramrod placed under the frame similarly to those of the later-model revolvers.

Made from 1839 to 1841.                    *From J. C. Harvey's collection.*

— 42 —

THE PATERSON FACTORY



## A PATERSON COLT AND THE 1837 MILITARY PISTOL

A Paterson Colt compared with the military pistol regularly issued to the services at the time Colt's arms were rejected by the Ordnance Department in 1837. The issue pistol is a smooth-bore, .54 caliber single-shot flint-lock pistol, capable of being fired about twice a minute. The Paterson Colt is a .40 caliber rifled five-shot percussion-cap repeating pistol issued with an extra cylinder and capable of being fired ten times in about forty seconds.

*Both pieces from J. C. Harvey's collection.*

— 43 —

Compendium_Roth
Page 0274



# FRONTIER VIOLENCE
## ANOTHER LOOK
### W. Eugene Hollon

Compendium_Roth
Page 0275

# FRONTIER
# VIOLENCE

*Another Look*

W. EUGENE HOLLON

New York
OXFORD UNIVERSITY PRESS
1974

Compendium_Roth
Page 0276

GLOUCESTERSHIRE
Class 973
Copy a
COUNTY LIBRARY

GLOUCESTERSHIRE COUNTY LIBRARY.
RESERVE

Copyright © 1974 by Oxford University Press, Inc.
Library of Congress Catalogue Card Number: 73-87617
Printed in the United States of America

inated by whites, they could expect to be the butt of frequent
practical jokes. Sometimes the jokes were sadistic, like one
at a mining camp near present Butte, Montana, in 1868, when
the miners got drunk and celebrated the occasion by hanging
one of the Chinese workers. "It was not a judicial execution,"
the *Anaconda Standard* explained many years later. "It was
simply the cool, premeditated act of disheartened, yet patriotic
and Fourth of July conscious miners who hanged the China-
man to a cottonwood tree just for the devilment and in hopes
that it might bring luck." [14] Obviously, the victim did not ap-
preciate either the humor or the patriotic fervor of the oc-
casion.

How many innocent Chinese were strung up by exuberant
mobs throughout the mining frontier is impossible to determine
at this date. In the cemetery at Florence, Idaho, these words
appear on the gravestone of a former Chinese resident: "Hung
by mistake." The victim may or may not have been the inspira-
tion for a popular ballad written sometime before 1900 and
still sung by folksingers through the Northwest:

Old John Martin Duffy was judge of the court
In a small mining town in the West;
Although he knew nothing about rules of the law,
At judging he was one of the best.

One night in the winter a murder occurred,
And the blacksmith was accused of the crime;
We caught him red-handed and give him three trials,
But the verdict was "guilty" each time.

Now he was the only good blacksmith we had
And we wanted to spare him his life,
So Duffy stood up in the court like a lord
And with these words he settled the strife:

"I move we dismiss him, he's needed in town";
Then he spoke out these words which have gained him renown:

"We've got two Chinese laundrymen, everyone knows;
Why not save the poor blacksmith and hang one of those?"

What most California historians refer to as one of the most
violent and barbaric episodes in the history of the state began
on October 24, 1871. It originated among the Chinese them-
selves, in the Chinatown district of Los Angeles. The Mexicans
had originally named the area "Calle de los Negros," but it
eventually became known by the less elegant name of "Nigger
Alley." [15] In the 1860's and 1870's the Chinese who concen-
trated along Calle de los Negros usually settled their disputes
without benefit of legal procedure, and murder was not un-
common. The tragedy of 1871 started with the threat of a tong
war. A young, attractive Chinese woman had run away from
her master, and she soon came into the possession of a rival
company. The original owner regained possession of his chattel
through legal procedure, only to have her stolen away again.
This time Yo Hing, the wealthy and respected leader of the
company who had lost the decision of the court, married the
Chinese woman in order to strengthen his otherwise illegal title
to her. Whereupon the rival company offered a reward of
$1000 for Yo Hing's scalp.

On the morning of October 23, two shots were fired at Yo
Hing as he passed along Calle de los Negros. The attempted as-
sassins were soon arrested, along with their intended victim,
but all three got out on bail immediately. Both sides then pre-
pared for open conflict, and when the police officer heard
shooting near Chinatown the next afternoon and approached
the scene of action, he too was fired upon. The officer then
called for help. After reinforcements had arrived, along with a
crowd of spectators, he attempted to enter a Chinese place of
business. A bullet, fired through the door, struck him in the
head, and he died one hour later. Two others among the crowd
received minor injuries from additional shots fired from inside
the building. By then the crowd had grown to a mob of 500

"Angels," practically all of whom were equipped with rifles, bowie knives, or pistols.

This enraged "scum and dregs of the city," as Professor Cleland described them, stormed through the Alley, broke down doors and windows of the houses, and beat or stabbed all of the hapless Chinese they could find. One who was flushed from his hiding place and attempted to run away was shot down in the street. Another was chased down by the crowd, dragged through the streets to a near-by corral and strung up by the neck. The rope broke the first time, but the second attempt proved successful. A third man was captured and dragged over the cobbled stones of the street with a rope around his neck until all signs of life were gone. The total number of victims hanged, shot, or beaten to death by the mob is estimated from twenty to twenty-five. One of them was a doctor named Gene Tong, an inoffensive old man who had pleaded for his life in Spanish and English and is said to have offered his captors several thousand dollars in exchange for his life. The mob strung him up anyway, then ripped off his trousers to obtain his money more readily. As he was choking to death, someone in the crowd rushed up and severed a finger from his hand with a bowie knife to get a large diamond ring that would not slip off easily.[16]

While these murders were taking place, other members of the mob were robbing and looting every room, trunk, and box in the Alley. Estimates of the loss of property vary from $3000 to $70,000. "Of all the Chinamen murdered, it is not believed that a single one of them was in any way involved in the shooting, except Ah Cloy. The leaders, Yo Hing and his gang, all fled to the country when the fight commenced." [17] The grand jury which investigated the affair a month later condemned the rabble for "disgracing our city," and criticized the law officials for not performing their duty properly. But the jury failed to indict and bring to trial a single individual associated with the crime. Nine years later, A. J. Wilson, a poet-historian, wrote

that "American 'hoodlums' and Mexican Greasers, Irish 'tramps'
and French communists—all joined to murder and dispatch
the foe. He who did not shoot, could shout; who feared to stab,
could steal; there was work for all." [18]

The overwhelming majority of the citizens of Los Angeles
deplored the massacre of 1871, and the anti-Chinese movement
did not gain expression there again until 1876. In that year
"Anti-Coolie Clubs" began to spring up throughout the state,
primarily as a result of agitation by Denis Kearney and the ris-
ing influence and power of his Workingmen's party. An in-
crease in Chinese immigration in the early 1870's coincided
with a deterioration of economic conditions and provided
Kearney with considerable ammunition in his campaign "to
tax, boycott, and exile all Chinese from the borders of the
state." But California would never experience another massacre
of its Chinese residents similar to the Los Angeles affair of
1871. Although verbal and legislative harassment continued for
several years, the Workingman's party suffered a series of de-
feats after 1877. The signing of a bill, on May 6, 1882, by Presi-
dent Arthur, which provided for the suspension of Chinese
immigration for ten years, helped take some of the pressure off
of those already here. But Orientals still had a long way to go
before they would be accepted into the mainstream of Ameri-
can society.

The murder of Orientals became such a commonplace oc-
currence throughout the second half of the nineteenth cen-
tury that newspapers seldom printed the story. But an event
took place in Rock Springs, Wyoming Territory, in Septem-
ber 1885 which attracted nationwide attention, for it proved to
be even more of an outrage than the massacre in Los Angeles
fourteen years earlier. Many Chinese laborers had settled in
the Union Pacific town following the completion of the main
line of the railroad in 1869. Most of them worked in the coal
mines, which were owned and operated by the company, de-
spite the strong opposition of white workers. A strike against



Seven thousand Chinese workers literally hacked out the right-of-
way through the Sierras for the tracks of the Central Pacific Rail-

# HISTORY OF SMITH & WESSON

## No Thing of Importance Will Come Without Effort

By Roy G. Jinks

BEINFELD PUBLISHING, INC.
North Hollywood, California
1977

$15.95

S. F. PUBLIC LIBRARY

623.44
J 564h

79 35

Model names appearing in italics in this work
are Registered Trademarks of
Smith & Wesson.

Copyright © 1977 by Beinfeld Publishing, Inc.
All Rights Reserved.
No portion of this book may be reproduced, copied,
or duplicated by any means,
or by any system including data storage or tape recording
without prior written consent.
Brief excerpts for the purpose of review only are permitted.

Library of Congress
Catalog Card Number 77-78796 ISBN 0-917714-14-8
First Printing, May 1977
Second Printing, Ausust, 1977
Third Printing, December 1977

Published by
BEINFELD PUBLISHING, INC.
North Hollywood, California

Printed by
TAYLOR PUBLISHING COMPANY
Dallas, Texas

designed by L.S. Beinfeld

v

# Dedication

This book is dedicated to the employees of Smith &
Wesson whose untiring efforts and dedication are
responsible for the high quality of Smith & Wesson's
products and its place in the history of firearms;
and to
Anthony A. (Tony) Fidd, Sr., who, as a friend and
tutor, has been a source of inspiration in my pursuit to
collect Smith & Wesson memorabilia.

Compendium_Roth
Page 0284