ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6177
Fax: (916) 731-2144
E-mail: Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

**VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**

Plaintiffs,

**v.**

**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**

Defendants.

Case No. 3:17-cv-01017-BEN-JLB

**COMPENDIUM OF WORKS CITED IN DECLARATION OF RANDOLPH ROTH**

**VOLUME 2 OF 7**

Courtroom: 5A
Judge: Hon. Roger T. Benitez
Action Filed: May 17, 2017

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 28 n.88 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 25 n.79 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 26 n.80 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 35 n.103 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 34 n.102 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 34 n.102 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 35 n.103 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 34 n.99 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 13 n.31, 30 n.90 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 30 n.91 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 30 n.90 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 12 n.30 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 19 n.53 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 15 n.39, 18 n.52, 19 n.53 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 19 n.53 | 0186-0215 |
| George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016); Eric Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001) 137-38 | 12 n.31 | 1750-1752 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 22 n.66 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | 27 n.82, 30 n.91 | 0223-0234 |
| Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000) 25-27, 32, 64-65, 91-92, 114 | 13 n.31 | 1753-1759 |

| | | |
|---|---|---|
| John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152 | 13, n.31 | 1760-1767 |
| Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* 1-8 (Baltimore: John Hopkins University Press, 2016) | 12 n.30 | 1768-1773 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 22 n.66 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 22 n.66 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 30 n.91 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 22 n.67, 22 n.68, 23 n.69, 23 n.70, 23 n.71 | 0283-0329 |
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 19 n.53, 19 n.54 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 19 n.53, 19 n.53 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 23 n.71 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 30 n.90 | 0363-0368 |

| | | |
|---|---|---|
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987)X | 30 n.91 | 0369-0375 |
| Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989) 42-45 | 11 n.29 | 1774-1776 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 17 n.51 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 9 n.13 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 17 n.51 | 0477-0504 |
| Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996) | 12 n.30 | 1777-1778 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 34 n.99 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45, 61-63 (especially the graphs on 38, 39, and 91), 118-121, 145-149, 158, 162, 180-186, 195-196, 199-203, 218-219, 297-302, 332, 337, 354, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 1779-1811 |
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |

| | | |
|---|---|---|
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 31 n.93 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | 9 n.13 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | 9 n.13 | 0684-0689 |
| Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006) 91-102 | 12 n.31 | 1813-1820 |
| Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969) 65-70, 282-291, 319-328, 413-425, 463-467 | 11 n.29 | 1821-1846 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 31 n.93 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 32 n.95, 32 n.96, 33 n.98 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 19 n.53 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 7 n.5 | 0772-0794 |

| | | |
|---|---|---|
| Clayton E. Cramer & Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted Aug. 12, 2016, 6-7, https://papers.ssrn.com/so13/papers.cfm?abstract_id=2599851. | 27 n.83, 28 n.84, 28 n.85, 28 n.86, 28 n.87, | 1848-1862 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 29 n.90 | 0795-0819 |
| C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54 Vanderbilt Law Review 1805, 1805-1847 (2001). | 15 n.38 | 1863-1905 |
| Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017) 308-322 | 12 n.31 | 1906-1914 |
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 10 n.20 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 30 n.91 | 0840-1021 |
| Jack N. Rakove, *The Second Amendment: The Highest State of Originialism*, 76 Chicago-Kent L. Rev. 157 (2000) | 12 n.30 | 1915-1979 |
| Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), https://repository.tcu.edu/handle/116099117/26778. | 24 n.79 | 1980-2210 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 25 n.79, 25 n.80, 27 n.81 | 1022-1036 |

| | | |
|---|---|---|
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216-239 (2007) | 16 n.45 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173-195 (2011) | 24 n.78, 27 n.82 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 6 n.4, 20 n.58 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 34 n.202 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 33 n.97 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 16 n.48 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and Regulations (2012) | 33 n.97 | 1157-1264 |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 35 n.105 | 1266 |

| OTHER SOURCES | | |
|---|---|---|
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 37 n.111 | 1268-1269 |
| Buymymags.com – Home Page (last accessed on Oct. 4, 2022), https://www,buymymags.com/ | 37 n.110 | 2212-2213 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 8 n.7 | 1270-1310 |
| "A Complete Guide to Binary Triggers," Americanfirearms.org, (last accessed Oct. 4, 2022), https://www.americanfirearms.org/guide-to-binary-triggers/ | 37 n.111 | 2214-2237 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 33 n.96 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 37 n.110 | 1322-1325 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 36 n.109 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 37 n.111 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 36 n.108 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 38 n.112 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 13 n.34, 16 n.46, 21 n.64, 24 n.76 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 36 n.107 | 1438-1689 |

| | | |
|---|---|---|
| The Violence Project's Mass Shooter Database, https://www.theviolenceproject.org/mass-shooter-database/ | 39 n.113, 40 n.114 | 1690 |
| Guns.com, AR-15s | 33 n.96 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 33 n.96 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 40 n.115 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 23 n.71 | 1748 |

---

[i] The Declaration of Randolph Roth cites 30 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ n. 29, n. 30, n. 37, n.38, n. 45, n.65, n.77, n.82, n.89, n.91, n.92, n.93, n.94, n.95, n.98, n.99, n.100, (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); ; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); *LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997);

Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Saul Cornell, *A Well-Regulated Milita: The Founding Gathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982). Should the Court wish to receive excerpted copies of these works Professor Spitzer can provide them.

Chapter IV

# The Tip-Ups

## MODEL 1 FIRST ISSUE

Now emerge from the pure historical discussion of Smith & Wesson and examine the various styles, types, and specific models that were produced from the first revolver. It seems logical that this first revolver be called the Model 1 by the factory, even though it was not the first model pistol produced by this firm. The name came as a result of the cartridge being referred to as the Smith & Wesson Number 1 cartridge that was to be fired in their Model 1 revolver. The original advertisements for the .22 caliber revolver refer to the gun as Smith & Wesson's seven shooter and not by any model number. However, soon after its introduction, the name Model 1 was associated with the revolver to

**Model 1 First Issue, Smith & Wesson's first cartridge revolver.**
**Top picture is the Model 1 First Issue having the flat style barrel latch, serial number 21, sold in January 1858.**
**Bottom photograph illustrates the improved latch, circa 1859.**

THE SEVEN SHOOTER.

SMITH & WESSON'S

PATENT REVOLVER.

**The above is a full size drawing of the No. 1 Pistol. It is the lightest Revolver in the world, and shoots with as much force as any other arm. Weight only 10 oz.**

The cartridge for this arm consists of a copper cap having its closed end enlarged, which enlarged end forms a receptacle for the percussion priming. The remainder of the cap being filled with powder, the ball is firmly inserted in its open end, thus enclosing the powder and priming in a perfectly water-proof case.

Some of the advantages of an arm constructed on this plan are :—

The convenience and safety with which both the arm and ammunition may be carried ;
The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion-caps) ;
Certainty of fire in damp weather ;
That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time

DIRECTIONS FOR USE.

By pressing the knobs, A, towards the top of the pistol, the barrel will be allowed to turn back to a right angle with its present position. Place the thumb lightly upon the hammer, and with the other hand remove the cylinder. Place your charges in the chamber of the cylinder, at the *rear end*. Replace the cylinder, turning it to the left, until it becomes locked. Return the barrel to its place, (being sure it is down,) and the arm is ready for use. After having been discharged, the refuse caps are removed from the cylinder by means of the rod 3 shown in the drawing.

While carrying the arm, allow the hammer to rest between two of the caps to avoid accident.

**J. W. STORRS, Sole Ag't,**

**121 Chambers Street, [up stairs,] New-York.**

**N. B.—These Cartridges are sure fire in this Pistol, but are not warranted in other kinds of Pistols.**

**Instruction sheet for Smith & Wesson Model 1, circa 1859.**

distinguish the gun from the Number 1 cartridge. The collector has taken the liberty of renaming the revolver by calling it a Model 1 First Issue to signify that it was the first revolver produced by this firm. It is a small .22 caliber pistol having an oval brass frame that has a small round sideplate located on the left side of the frame. The hammer for this model is produced in two sections with the thumb piece hinged so that it operates the cylinder stop when the hammer is drawn to the cocked position. In general, the gun was finished with a silver-plated frame and blued barrel and cylinder. In

This drawing illustrates the function of the Model 1, showing how the barrel is tipped rearward and the cylinder removed for loading.







The two styles of barrel locking devices used on the Model 1. A and B illustrate side and front views of the spring-loaded button type and C is the less common flat latch.



later production it was available in full plate. This revolver is of the tip-up style in which the barrel is hinged at the top just forward of the cylinder. A spring latch secures the bottom of the barrel to the frame. To load the revolver, the barrel is unlatched and rotated up toward the hammer. The cylinder is then removed for loading. A small rod is secured under the barrel to allow for cartridge extraction.

The serial numbers for this model started at 1 and continued up to approximately 11,046, with the estimated total production being 11,000. These revolvers were produced over a three-and-one-half-year period with the largest percentage being produced in 1858 and 1859.

Like any new product, the Model 1 First Issue was being changed and improved continuously. Collectors

recognize six variations that are simply called Model 1 First Issue First Type through Model 1 First Issue Sixth Type. To completely cover these variations would require an in-depth study that is not warranted here. In general, however, there are two types that can be easily recognized. These are the early flat-spring latch, of which less than 1,150 were manufactured, and the more common spring-loaded button latch, which moves vertically in the barrel housing rather than being part of the revolver frame.

The Model 1 First Issue was marked on the top of the barrel with Smith & Wesson Springfield Massachusetts. The cylinder was rolled with the patent dates covering the gun's manufacture. There are three different cylinder markings known:

1. WHITE
   PATENTED April 3, 1855
2. PATENTED April 3, 1855
3. PATENTED April 3, 1855, June 15, 1858

In 1858, the Model 1 was sold to dealers for $12.75. The factory offered two styles of special Gutta Percha cases for this model. One carried the facsimile of the gun on its cover and the other was the fraternal-type motif. These cases sold to dealers for $1.25 and were a popular accessory. They were originally introduced in August of 1858 and continued in popularity well into the 1860s.





The early presentation cases for the Smith & Wesson Model 1 were molded of Gutta Percha and produced in two styles. The top case was referred to by the factory as the pistol case; the bottom style was simply referred to as the Dag case, relating its style to the then-popular Daguerreotype photo case. In 1861 this case was referred to as the Union case.



d. Hammer
h. Cylinder stop lever
i. Pivot pin hole, for cylinder stop lever
k. Cylinder stop
m. Split spring
n. Firing pin and wedge

**The improved Model 1 hammer and cylinder stop that was incorporated in the redesign of the Model 1.**

The Model 1 First Issue was a difficult gun to manufacture. The small round sideplate made work on the gun tedious and seriously limited production; therefore, the partners continued to search for a better design. This design came into being in the spring of 1860 when the firm made a radical change in the Model 1.

One of the major requirements of high production is to eliminate handwork and allow for easy machining and assembly. The Model 1 First Issue with its oval frame and small round sideplate did not lend itself to mass production. The frames had to be hand-filed and the assemblers had to assemble the lockwork through the one-half-inch sideplate hole.

With these thoughts in mind, Smith and Wesson completely rebuilt the Model 1. The oval frame was discontinued in favor of a flat side brass frame which could be easily machined. The small sideplate was eliminated and replaced by a large, irregularly shaped plate that, when removed, exposed almost the entire side of the revolver frame. This would allow for quick and easy insertion of the internal lockwork. To further improve the revolver, the jointed two-piece hammer of the original Model 1 was changed to a solid-piece hammer. To activate the top-strap-style cylinder stop, the hammer incorporated a wedge-shaped projection that was located on top of the hammer nose. As the hammer was drawn to the rear, this projection was brought to bear against a split spring located on the underside of the cylinder stop. The projection simply lifted the cylinder stop from position, unlocking the cylinder and allowing it to be rotated. When the revolver was fired, the hammer dropped and the sharp leading edge of the wedge-shaped projection separated the split spring upon contact, allowing the hammer to fall without unlocking the cylinder. Although this new design of the Model 1 was simply another engineering change to the company, collectors have completely separated it from the earlier model and refer to it as the Model 1 Second Issue.

**Smith & Wesson's new manufacturing facilities on Stockbridge Street; built in 1860.**

To enable the firm to further increase production of its small .22 caliber revolver, the partners had to further expand their manufacturing operation. They began construction on a new plant located on Stockbridge Street, Springfield, Massachusetts, in 1859. This plant was completed in the spring of 1860. It was in this new building that the assembly of the improved Model 1 began.

## MODEL 1 SECOND ISSUE

The production of the Model 1 Second Issue began in the early spring of 1860 and continued until 1868, with a total production of slightly more than 115,400. These revolvers are serial numbered in a continuation of the original Model 1 series; therefore, the serial range began in the low 11,000 range and continued through 126,400. It is important to realize that these serial numbers are only an approximation obtained from observed guns, since no actual serial records for these models have been found. It is also known that there exists an overlap in serial numbers between the Model 1 First Issue and the Model 1 Second Issue. This overlap generally has been observed between serial numbers 10,500 and 11,500. This is easily explained, since both guns were serial numbered in the same series. The factory simply completed the old models from parts on hand as production of the new series was begun.

The Model 1 Second Issue was relatively free of variations during the eight years it was produced, although close study of this model shows some minor changes. One of the most important variations of this model is that of the Second Quality guns. These were revolvers that had minor defects in the brass casting or the finish of the handgun. The gun was mechanically sound with the defects detracting only from the aesthetic appearance of the gun. These Second Quality revolvers were stamped on the barrel flat 2nd quality or 2nd qual and sold to the dealers for $2 less than the normal price. The demand for handguns created by the



Smith & Wesson Model 1 Second Issue.

American Civil War certainly encouraged the firm to market these Second Quality guns rather than scrap them. A total of 4,402 of the Second Quality guns was sold and, as ironic as it may seem, these cheaper models today are considered rare and will demand a premium by collectors.

The Model 1 Second Issue was marked similarly to the Model 1 First Issue. The 3-3/16'' barrel was stamped Smith & Wesson Springfield Mass, while the cylinder was marked Patented April 3, 1855, July 5, 1859, December 18, 1860. The early variations of this model up to approximately serial number 20,000 will only bear the first two patent dates on the cylinder. It is

Model 1 Second Issue Second Quality — arrow points to flaw in frame that caused this to be designated Second Quality production and to be sold at a reduced price.

an important factor to note that the second patent date of this model (July 5, 1859) is different from that of the Model 1 First Issue. This will allow the collector to immediately identify the replacement of a cylinder in either model.

This model was most commonly finished in two-tone finish of plated frame and blued barrel and cylinder; however, full plated guns of nickel, silver, or gold could be purchased. It is interesting to note that

two of these small pistols were specially manufactured using solid silver frames. Imagine the thrill of uncovering such a treasure!

The cost of the Model 1 Second Issue was $10.50 to dealers and could be purchased in either style Gutta Percha case.

When the American Civil War ended, the United States found itself in an economic recession. The sale of handguns dropped drastically from a peak of 20,000 Model 1 Second Issues per year to less than 8,000. The factory decided that it was time to modernize the Model 1 and look outside the United States for a new market. Therefore, early in 1868, plans were begun to discontinue this model in favor of a new streamlined, more modern-appearing revolver.

## MODEL 1 THIRD ISSUE

In an effort to maintain continuity we will continue our study of the Model 1 series rather than take the models in their chronological progression.

The New Model 1, as the factory called this modernized .22 caliber revolver, was, in reality, not an improved gun but a redesigned gun presenting a more artistic appearance for the sole purpose of stimulating sales. It is called by collectors the Model 1 Third Issue, since it has a completely new appearance. The gun was manufactured completely of wrought iron, having a forged iron frame rather than one of cast brass. The gun was changed so that it had the popular and appealing bird's-head-style grip, fluted cylinder, and round ribbed barrel upon which was marked Smith & Wesson Springfield Mass Pat. Apr. 3, 1855, July 5, 1859, Dec. 18, 1860. Despite the basic changes in the revolver's configuration, the gun mechanically remained the same. The factory did feel that this model was of sufficient difference that they assigned it a new serial number series. Thus, the Model 1 Third Issue series was renumbered beginning at serial number 1 and continuing through 131,163.

Smith & Wesson Model 1 Third Issue.

The production of the Model 1 Third Issue began slowly in 1868 with a yearly total of 392 revolvers being produced. However, by 1869, the yearly production had increased to cover 10,000 of these .22 caliber revolvers and by 1870 the yearly production had reached 20,000.

The demand for this pocket pistol was particularly good because, for the first time, the firm had taken a close look at the handgun market outside of the United States. The factory had exhibited its products at the Paris Exposition of 1867. Here it found a sincere interest in its products and signed a sales agreement with J. H. Crane of London and C. W. May of Paris, to handle the sale of these products in England as well as across the European continent. The factory also made other valuable contacts with representatives from Russia and the eastern European countries. This new emphasis on worldwide marketing helped the factory to increase its sales through 1873. However, in 1872, when their exclusive patent on the bored-through cylinder expired* and other manufacturers jumped into the lucrative market, sales began to decrease rapidly, dropping to only 5,368 handguns in 1874. Since this was the only pocket pistol being produced by Smith & Wesson at the time, the gun remained in production until 1882 when sales dropped to such a level that it was no longer economically feasible to continue production.

The Model 1 Third Issue was manufactured with no major design changes. The only variation which is

New York style engraved Model 1 Third Issue having rare short barrel with barrel markings on side rather than barrel rib.

* The Rollin Whte patent legally expired in 1869; however, renewal efforts by Smith & Wesson delayed the patent from becoming public domain until 1872.

recognized is that of the short-barreled model, which was introduced in 1872. The standard barrel length for this model was 3-3/16''. The factory had received orders for a shorter barrel model that could be more easily concealed by the ''sporting crowd.'' Therefore, a revolver having a barrel length of approximately 2-11/16'' was manufactured. On these short-barreled models, the stamping was relocated on the left side of the barrel and stamped in two lines. These models are considered rare and are very seldom seen.

The Model 1 Third Issue was sold to dealers in 1868 for $9.50 and could be purchased in blue, nickel, or a two-tone finish of nickel frame and blued barrel and cylinder. Other fancy finishes such as gold and silver, as well as a wide variety of engraved models, were also available. The guns were generally sold in

Smith & Wesson Model 1 Third Issue in the standard factory presentation case. Collection of R. Howard.

cardboard boxes which included a small brass cleaning rod. Since the fancy Gutta Percha cases were no longer available, a buyer wishing a fancier set could purchase a small wooden presentation case.

When the Model 1 Third Issue was dropped from the line in 1882, it ended an era for Smith & Wesson. It was the last of the tip-up style pistols produced, which had brought the company its first fame. It also marked the discontinuation of the .22 cartridge, which the factory had originated. The factory would let this cartridge lie dormant for the next ten years before they would again produce a pistol from which it could be fired.

If D. B. Wesson's sound judgement and reasoning did not indicate to the author that he had continued this model as a profitable item until 1882, the author would simply feel that this outdated pistol had been retained in the production line during these last years merely as a reminder to him of how the Model 1 had helped to bring him success and recognition around the world.

## MODEL 2 ARMY

It is now time to retrace our steps and pick up the story where we deviated from the chronological development of the history of Smith & Wesson.

The company realized early in its manufacturing operation that a .22 caliber revolver could not compete sucessfully with the larger caliber percussion revolvers; yet the company was hesitant to begin production of larger caliber revolvers, for they had experienced difficulty in making their revolvers function with the .22 rim fire cartridges. They found that upon discharge, the thin copper base of the cartridge would swell and jam the revolver by preventing the cylinder from rotating.

Raised pad for headspace.

Cylinder hub intregral with frame.

Diagrams of the projection on the rear of frame, directly behind the cartridge to be fired, to improve rotation of the cylinder.

b
a
b
c

A. Cylinder
B. Projection
C. Hole in which prawl projects to revolver cylinder.
Note: Projection has been exaggerated to illustrate its position more clearly.

Thus, to manufacture a revolver of a larger caliber would only magnify the problem. In the early .22 Model 1 revolvers, the recoil shield rotated with the cartridges so that the swelling base did not prevent rotation. This method was costly in manufacture and would not operate as successfully in a larger caliber revolver.

Early in 1859, Smith & Wesson resolved the problem by incorporating a projection to the frame directly behind the case to be fired. Once the cartridge had been expended, it was rotated from behind this projection to an area where the swollen rim of the cartridge has ample freedom of movement. This projection was patented on July 5, 1859.

**Smith & Wesson Model 2 Army, caliber .32 rim fire, engraved by L. D. Nimschke. Collection of Mario Marinetto.**

With this new improvement and other design changes, the factory planned to scale up the Model 1 to a larger .32 caliber revolver to be called the Model 2. Production began in early 1861. This revolver was similar to the Model 1 Second Issue in design except that it was a six shot made of forged wrought iron. The gun was designed to fire the Smith & Wesson Number 2 cartridge that is known today as the .32 Long Rim Fire.

The timing of the introduction of the Model 2 proved important to the partners, for the first guns reached the market in June of 1861, only two months after the first shots were fired that marked the beginning of the American Civil War. This was a time of dramatic turmoil the like of which the citizens had never experienced. Fear of invasion gripped the North, and northern soldiers were searching for compact arms to carry to war. Smith & Wesson found itself in an enviable position with the exclusive patent on a cartridge revolver. The Model 2 was perfectly suited, meeting the demands of a belt-size pistol that could be carried in the waistband or small holster. It could be quickly loaded with the new waterproof metallic cartridges and it proved ideal for the soldier as well as

those on the home front. Smith & Wesson quickly felt the impact of the gun's popularity. Orders rose so fast that by 1862 the company was forced to close its order books because there were orders already for more arms than could be produced during the next three years.

The Model 2 itself was a well-designed revolver. It was of the tip-up style and underwent few major engineering changes from the time of its introduction. Collectors recognize two major variations. The early revolvers had only two pins holding the cylinder stop in position. At approximately serial number 3,000, a third pin was added to the top strap, which limited the vertical movement of the cylinder stop. The reason behind the addition of the third pin has never been clearly stated, however, it has been theorized that it was incorporated to prevent breakage of the cylinder stop, which could occur if the stop were to catch on clothing or holster.

**Smith & Wesson Model 2 Army.**
**Top shows two-pin variation. Bottom shows three-pin variation with the third pin limiting travel of the cylinder stop to prevent accidental breakage.**

The Model 2 was available in 1861 in both 5'' and 6'' barrel lengths with the factory finish being blue, nickel, or a plated frame with blued barrel and cylinder. Special finishes such as gold, silver, or engraving could be ordered at premium prices. In 1864, the factory added a third barrel length to the production line, the 4'' model. The demand for this model was relatively small, and the factory never produced more than the original few hundred. The rarest of all barrel lengths for this model was sold in December 1863. This revolver had an 8'' barrel, extended length grips, and target-style sights. It was probably Smith & Wesson's first target pistol. It is doubtful that the factory produced only 1 of these models but, because of their rarity, it is believed that the total production was less than 10 units.

The Model 2 enjoyed great popularity during its first ten years of production, with a total of 77,020



Smith & Wesson Model 2 Army showing all four barrel lengths (4", 5", 6", and 8").

revolvers being produced by the end of 1870. The partners retained this model in their catalog until 1872 when it was finally discontinued. The total production was approximately 77,155.

The Model 2 is an interesting revolver to collect, for there are many minor variations. It was used by many countries and was part of many colorful historical incidents. If a collector were to separate one model of Smith & Wesson to study, the Model 2 would lend itself easily to such an end and offer a wide variety of fine guns and interesting historical episodes.

## MODEL 1½ SERIES

The Civil War created a large demand for handguns of all sizes and shapes. Smith & Wesson had been successfully producing the Model 1 as a pocket model and the Model 2 as a larger belt model. There

Smith & Wesson Model 1½ First Issue, five shot .32 rim fire.
Top is standard blued model.
Bottom is factory engraved with pearl grips. Engraver unknown.

was, however, a great demand for a pocket model of a larger caliber than the Model 1 .22 rim fire. The factory had designed such a revolver, but had no facilities for its manufacture. This revolver was similar in configuration to the Model 2 except that it was only a five shot, which allowed it to be built on a smaller frame size. The design of the gun was also altered. The cylinder stop was relocated in the bottom of the frame directly in front of the trigger. This eliminated the exposed, combination-style rear sight and cylinder stop, which easily caught on a person's clothing when extracted from a pocket. The cylinder stop had a long lever that engaged a spring-loaded pin on the bottom side of the hammer. This pin was an inclined plane. When the hammer was drawn to the rear, the pin engaged the cylinder stop, pushing down and unlocking the cylinder. As the hammer was pulled to its cocked



Fig: 1.
Fig: 3.
Fig: 2.
Fig: 4.

Diagrams of the Old Model 1½ hammer operation. Fig. 1. hammer at rest. Fig. 2. hammer in rotation to cocked position activating the pin, which engages the cylinder stop arm. Fig. 3. hammer at full cock. Fig. 4. hammer falling, cylinder stop activating arm and depressing inclined ramp in activating pin.

position, the cylinder stop-lever cleared the activating pin and was free to return to position. When the hammer was released, the cylinder stop-lever engaged the inclined ramp of the activating pin, pushing the spring-loaded pin into the hammer and preventing the cylinder stop from unlocking.

The factory called this revolver the Model 1½, and it was designed to fire a smaller .32 caliber cartridge than the Smith & Wesson Number 2 cartridge. This cartridge was called the .32 Rim Fire Short. However, the revolver was capable of firing the regular .32 Long Rim Fire for those wishing the extra power of this larger powder charge.

Though the factory had a design for a .32 caliber pocket pistol, they could not produce the revolver, since the factory was already operating at peak production. For that reason, they negotiated with Savage and King of Middletown, Connecticut, to manufacture the major parts. The parts were then forwarded to Smith & Wesson to be assembled and finished. The Model 1½ was finally completed and reached the market in the spring of 1865; therefore, only a few could have seen any action in the Civil War.

This was the factory's first medium-size revolver

and the beginning of a series of .32 caliber pocket models. Collectors refer to this model as the Model 1½ First Issue or the Old Model 1½. The gun was manufactured with a 3½" barrel and was of a wrought iron frame that was finished in the three standard finishes: blue, nickel, and the combination of blue and nickel.

The Model 1½ First Issue was produced until 1868, with a total production of approximately 26,300 revolvers. In this short period the only major variation was that of a 4" barrel, which was introduced in April 1866. Like the 4" barrel version of the Model 2, it was not popular and, thus, only a few reached the market. It is estimated that the quantity sold was less than 200 revolvers.

In 1868, the Model 1½ revolver also was involved in the modernization plan to boost company sales. The design of the original Model 1½ was changed to correspond to the new look of the Model 1 Third Issue. This revolver is referred to by collectors as the Model 1½ Second Issue. The factory at this time simply referred to it as the New Model 1½, a term that is often used by collectors today. The changes to the gun were a round ribbed barrel, fluted cylinder, and bird's-head grips. The factory also returned to the old-style cylinder stop. It is not clear in factory history why the new-style cylinder stop was dropped at this time, but evaluation of the stop shows that it was costly to manufacture and did not have as positive a lockup as the original design. Unlike the Model 1 series, the New Model 1½ was continued in the same serial range as the original Model 1½. The serial numbers of the New Model 1½ began to appear with the number 26,300. Factory production was reduced following the war; thus Smith

Smith & Wesson Model 1½ Second Issue, five shot .32 rim fire.

& Wesson could begin production of the New Model 1½ in their own plant. After having completed approximately 1,000 revolvers, Savage and King informed the partners that they had on hand 1,500 of the old-style barrels and cylinders that had been completed and billed to Smith & Wesson. The factory immediately instructed them to forward the parts to Springfield. Since the country was involved in a recession and sales were low, the factory could not afford to scrap these parts or hold them for long-range repairs. Therefore, a special group of the new-style frames were manufactured to facilitate the use of the older barrel and cylinder. These frames were of a larger width to allow the old-style barrel catch to operate properly. The factory called the gun the Model 1½ Mongrel, but collectors have politely classified it as the Model 1½ Transition. Yet, it is not truly a transition from one model to another; it is simply an afterthought of a thrifty company that could not afford to see completed parts wasted.

**Smith & Wesson Model 1½ Transition, a five shot .32 rim fire made from parts of both the Model 1½ First and Second Issue.**
**Insert photograph shows the difference in the bottom of the frames to accomodate the First Issue type barrel latch.**
**Top is Transition, bottom is Model 1½ Second Issue.**

The total production for the Model 1½ Transition as computed from daybook sales were approximately 650 revolvers. The records show that these guns were sold as follows:

1. March 17, 1869: 50 to C. W. May for sale in Japan
2. April 19, 1869: 200 to J. W. Storrs of New York City
3. May 17, 1869: 400 to C. W. May for Sale in France

These revolvers are found in the serial range from 27,200 to 28,800 and are mixed-in with the New Model 1½'s within the same range.

Once the Transition Model 1½'s were completed and the production of the New Model 1½ standardized, there were no major engineering changes made

through the remainder of production. The only variation that has any significance in this model is that of the short barrel. The factory produced a limited quantity of less than 1,000 revolvers having a barrel length of 2½''. Like the short-barreled Model 1 Third Issue, the barrel stamping appears on the left side of the barrel rather than on the top of the barrel rib.

**Smith & Wesson Model 1½ Second Issue with New York style engraving and having the short 2½'' barrel with barrel marking on the side rather than on the top rib. Collection of Dave Burghoff.**

Smith & Wesson produced approximately 100,800 of the New Model 1½, with the serial numbers ending at 127,100 when the model was discontinued from production in 1875. During these seven years, this model was available in the three standard finishes and enjoyed good popularity both in the United States and Europe. As an example of its popularity, the French Government purchased 3,895 of this model in June of 1874.

The New Model 1½ was dropped from production when the company was tooling to produce a new line of small top-break revolvers to help them again reach the exclusive position they had held when the Rollin White patent was valid.

The discontinuation of the Model 1½ truly ended the era of the tip-up revolvers. The factory had designed a new top-break revolver in 1869 and had been working to incorporate this design change in all of its models. These changes took time and were the beginning of a new era and another chapter in Smith & Wesson's history.

Chapter V

# The Large-Frame Single Action Top-Breaks

## MODEL 3 DEVELOPMENT

Smith & Wesson, as early as 1862, had plans to manufacture a .44 caliber revolver. At that time, it would have been the first military sidearm firing a metallic cartridge to be produced in the United States, but the pressure of wartime production kept the factory operating at full capacity and prevented the partners from building any but an experimental model of the large handgun. In the spring of 1864 when Colt's Pistol Shop burned to the ground, Smith & Wesson experienced a new surge of interest in a large-caliber revolver. The dealership of Cooper and Pond wrote to the partners requesting that Smith & Wesson furnish them with 3,000 .44 caliber handguns. The partners contracted with the Whitney Armory in New Haven, Connecticut, to manufacture for Smith & Wesson a .44 caliber revolver indentical in design to the Model 2 Army, except enlarged to accept the .44 S&W Rim Fire cartridge.

The firm had been producing the 44/100 cartridge for the Frank Wesson rifles since 1861, and the revolver was designed to fire this same cartridge. When the subject of an outside contract was discussed with Rollin White, who had licensed Smith & Wesson to use his patent of April 3, 1855, he became enraged and stated that the agreement did not give the partners the authority to license outside contractors to build revolvers. Thus the large-caliber project was shelved temporarily while the partners concentrated on enlarging their production facilities, enabling them to better meet the overwhelming demand for handguns.

In January 1865, Smith & Wesson was approached by J.W. Preston, a promoter for the Rollin White Arms Company, with a model of a large-caliber revolver designed by Rollin White. The partners evaluated the White revolver but were not impressed by the design and did not place an order to manufacture the large-caliber handgun.

By mid-1865, the Civil War had ended and the partners had time again to work on the design of a large-caliber revolver. The test of their early prototype, which had been of the tip-up style, proved unsuccessful. The revolver barrel-locking system was shown to be weak, and on occasion, when this handgun was fired

the barrel would be blown open and pivoted back, causing damage to the barrel hinge. The design was changed, making the revolver a solid-frame model with cartridges loaded through a loading gate in the recoil shield and spent cartridges extracted by an extractor rod located under the barrel. The rod was held in position by a spring-loaded latch, which had to be removed in order to be used to punch out each cartridge. This large-caliber revolver was submitted to the U.S. Army Ordnance Department for testing in 1866. The army was not impressed, and Smith & Wesson failed to receive any orders.

Smith & Wesson Model 3 solid frame .44 rim fire revolver. The first large-caliber revolver manufactured by Smith & Wesson, circa 1865.

In answer to a customer's inquiry about a large-caliber pistol, the partners wrote, "We have a model 44/100 calibre revolver, but never made any of that size save one. They would be too heavy for general use, better adapted to Cavalry Service." It could even be questioned whether this model would have been suited for the cavalry, for the 44/100 revolver had an over-all length of 13¾" and a weight of 47½ ounces.

Smith & Wesson Model No. 3 pocket pistol. A four shot .41 rim fire with serial number 38; circa 1867. Collection of Mario Marinetto.

Chapter VI

# The Pocket Single Action Top-Breaks

When Smith & Wesson completed the design of the large Model 3 Single Action revolvers, they turned their attention to the line of currently manfactured pocket pistols, for these small pistols were now of an outmoded design. The new top-break system introduced by the factory was so superior that it was only logical for the firm to redesign their tip-up small pistols to capitalize on their newest improvements. The first of these redesigns was completed in 1870 when the firm patterned both a Model 1 and Model 1½ revolver after the Model 3. Drawings of the Model 1 show it to be a seven shot revolver and, except for the spur trigger and bird's-head grip, it was a scaled-down Model 3. Having completed the drawings, the factory built prototypes of each design, each being stamped Model of 1870. Small quantities of internal parts were produced to test production capabilities. The test work on these early top-break pocket models was completed in late 1870 and early 1871. In 1871, all design work was halted and the project shelved. The reasons for halting the project are unknown, and the action was unusual, since these top-break pocket pistols were certainly of a more practical design than the tip-up Model 1 and Model 1½ that were in production. It has been speculated that this program was suspended as a result of the signing of the Russian contract in May of 1871, which required the factory to concentrate its total production on the manufacture of the Russian models. This is a very realistic possibility, since Smith & Wesson undertook numerous design changes of the Model 3 to satisfy Russian requirements. This work would have completely occupied the time of D. B. Wesson and Charles King, the firm's two major designers. Regardless of the reason, the curtailing of this project may have proven to be a godsend, for evaluation of the existing prototype shows it to be an extremely difficult and costly revolver to produce; one whose parts, because of the small size, were extremely delicate and may have been prone to breakage.

**Original factory drawing of the Model 1 Top Break designed in 1870 to improve Smith & Wesson's small pocket pistol.**

**Smith & Wesson Model 1½ Top Break Experimental Model of 1870 in .32 caliber rim fire.**

### .38 SINGLE ACTION FIRST MODEL (BABY RUSSIAN)

The top-break pocket pistol program remained shelved until 1874. By this time the factory had stabilized production on the Russian model and had increased its production capacity so that it could easily handle increased orders or contracts. The firm had also watched the decline in sales of the Model 1½ from an average of 1,475 units per month to 990 units per month. This 33 percent reduction of small pistol sales was evidence enough to illustrate the need for modernizing the pocket pistol. In redesigning the pocket pistol, the firm evaluated its currently designed Model 3



JAN. 1st 1874.
SMITH & WESSON. MODEL 1874. CALIBRE .38.

Original factory drawing of .38 Single Action Model of 1874, caliber .38 rim fire.

Russian and patterned the new revolver after this model. Drawings of the new pocket model were completed in 1874 and illustrate the gun as a .38 Rim Fire; however D.B. Wesson was not pleased with a rim fire cartridge and designed a new .38 center fire cartridge to be used. To insure accuracy and ease of reloading, this cartridge used a .36 caliber bullet that was so firmly seated within a cartridge case that it was not necessary to crimp the case. The outside dimension of the cartridge case was .380'', and the cartridge became known as the .38 Smith & Wesson center fire cartridge. It became a standard around the world and is still a popular cartridge today; in fact, probably more center fire revolvers have been designed to fire this .38 S&W than any other cartridge produced.

The new revolver was referred to by the factory as a .38 Single Action. Its design was of a top break, incorporating the rack and gear extractor system used on the Model 3 Russian of the Third Model type. By the time the first parts for the .38 were completed in October of 1875, the revolver had been changed to use the new .38 Smith & Wesson center fire cartridge.

The first sale of the new .38 Single Action was made on March 27, 1876, to M. W. Robinson, Smith & Wesson's large New York City distributor. As soon as it

appeared on the market, the revolver was nicknamed the Baby Russian, a reflection of its similarity to the famous Smith & Wesson Russian model. The .38 Single Action First Model, as it is properly known today, was available in both blue and nickel finish. The blued guns were sold with smooth walnut grips, while the more common nickel model had a black composition wood grip or one more commonly constructed of hard rubber. The first production guns with 3¼'' and 4'' barrels were available for sale in July of 1876, and these were followed shortly thereafter by a 5'' barrel model. Each revolver was sold with a small combination tool that served as a screw driver and wrench to disassemble the cylinder.

By the end of 1876, the factory had manufactured 12,919 .38 Single Action revolvers, divided into 3,896 with a blue finish and 9,023 nickel finishes. During this same period, the factory produced 3,730 pairs of wood stocks, 8,288 pairs of rubber, 10 of pearl, and 5 sets of

Smith & Wesson .38 Single Action First Model, commonly referred to by the collector as the Baby Russian, caliber .38 S&W.
Top revolver is early variation with the one-screw side plate.



ivory stocks, but there are no records showing how the stocks were matched to the guns.

The production of this model continued until July 1877 when the factory redesigned the .38 Single Action. From January to July of that year, the firm added a total of 12,629 more to the original production figures for the First Model, of which 10,023 were finished in nickel and 2,606 in blue. The firm produced, for these revolvers, a total of 2,603 stocks in wood, 10,012 in rubber, 9 in pearl, and 4 pairs of ivory stocks. When production ended on this model seventeen months later, Smith & Wesson had produced 19,046 in nickel finish and 6,502 in blue for a total of 25,548 revolvers, all of which were serial numbered in their own series. The firm did not lose any sales of the fast selling .38 Single Actions. Production had been scheduled so that the newly designed .38s would be available for sale prior to the completion of the original .38 Single Action, which had served its purpose of reestablishing the Smith & Wesson pocket pistol line.

### .38 SINGLE ACTION SECOND MODEL

The redesign of the .38 Single Action was a joint venture of D. B. Wesson and J. H. Bullard. It was prompted by the high cost of manufacturing and fitting the extractor system of the First Model. The first redesign shortened the length of the extractor housing by use of a new style of rack and gear extractor. This new extractor system incorporated a pivoted pawl that activated the extractor on opening by engaging the bottom of the frame as the barrel was rotated downward. The advantage of this system was that it eliminated the extractor activator in the bottom of the frame. This redesign also incorporated a different method for retaining the cylinder in position. The new system used an open screw on the cylinder stem that engaged on a twist thread in the cylinder. Now all that was necessary to remove the cylinder was to hold the latch upward to disengage the cylinder retaining lip, pull the cylinder against the thread and rotate it, thus unscrewing it from position. The threads were located so that when the cylinder was in full forward position they were not engaged. The new design was patented by D. B. Wesson and J. H. Bullard on February 20, 1877, and plans for production of the new model .38 Single Action were initiated. However, before the first parts for the new model were completed in June of 1877 Bullard had redesigned the extractor system, eliminating the rack and gear design in favor of a simpler hook-type extractor similar to the one designed by Colonel Schofield. Since Bullard's design was significantly different, he successfully circumvented the Schofield patent. This new extractor was immediately incorporated into the new model .38 Single Action without any significant loss in production time. In July of 1877 the first 842 .38 Single Action Second Models were completed. Since this gun was manufactured in a serial range separate from the First Model, the numbering system began at 1. It was available in both blue and nickel with the blued guns being furnished with wood grips. The demand for the pocket .38 was substantial and in two and one-half years, the factory produced approximately one-half of the total production of 108,225. The production of these early years was: 1877—10,815 in nickel, 1086 in blue; 1878—16,523 in nickel, 2,968 in blue; and 1879—14,793 in nickel, 4,649 in blue. Production dropped in 1880 to only 6,167, since the factory was changing its production to the newly designed double action models. Also, by late 1880s, demand for the smaller pocket single actions was beginning to decline as the public became more

**Patent drawing of the D. B. Wesson and J. H. Bullard redesign of the .38 Single Action.**



Smith & Wesson .38 Single Action Second Model, caliber .38 S&W.

interested in the "self-cockers" or double action revolvers. In 1879, the factory discontinued the use of wood grips on this model both to help keep the cost down and to reflect the decreased demand for this kind of grip.

The .38 Single Action Second Model was a well-designed gun, thus few changes were made during its production. One improvement made was the

Drawings showing the two styles of extractor cams used on the .38 Single Action. Top drawing illustrates the pivoted pawl style; bottom shows the slide-bar type. Both designed by J. H. Bullard.

incorporation of the slide bar for activating the extractor cam, which had been patented on May 11, 1880. This change was made in 1881 between serial numbers 62,000 and 63,000. The only other variation in this model was the barrel length. These reached a peak in 1887 when the firm extended the barrel lengths to include 3¼", 4", 5", 6", 8", and 10", with the latter two being extremely rare.

The .38 Single Action was finally dropped from production in 1891 when the factory modernized its pocket single action line.

## .38 SINGLE ACTION THIRD MODEL

The sales of the .38 Single Action were slow in the latter part of the 1880s and Smith & Wesson decided to try to improve sales of this model by a complete redesign. During 1890, the decision was made to discontinue the spur trigger design .38 Single Action Second Model and produce a model scaled down from the New Model No. 3. This new .38 Single Action was introduced in 1891 and was referred to by the factory as the Model of 1891, with this marking incorporated as part of the barrel stamping.

The .38 Single Action Third Model, as it is classified by collectors, was the most handsome of all the pocket single actions. The revolver had a graceful design and incorporated all of the features of the New Model No. 3. When production of this model began in 1891, the factory assigned the revolver to a separate serial number range beginning again at 1 and continuing to 28,107 with the discontinuation of the model in 1911. The revolver was available in blue or nickel, with barrel lengths of 3¼", 4", and 6". The stocks were of black hard rubber similar to those used in previous models.

Smith & Wesson .38 Single Action Third Model, sometimes referred to as the Model of 1891, caliber .38 S&W.



The basic difference from the .38 Single Action Second Model was the elimination of the spur trigger in favor of a conventional trigger and trigger guard. Though this streamlined the appearance of the revolver, it did not encourage increased sales, for the day of the single action revolver was rapidly coming to a close. Furthermore, the move away from the spur trigger created problems with some of the factory's Latin American customers, particularly Mexico, who still preferred the single action design having the spur trigger. Needing sales for this model, the factory designed a spur trigger that could be inserted into the trigger guard cut to change the model to a spur-trigger style. This model was called the Mexican Model by the factory, but today it is properly classified as the .38 Single Action Mexican Model. For many years, the factory offered the spur trigger inserts as an accessory item, thus some revolvers were converted after the revolver was shipped from the factory. The true Mexican Models, as produced by the factory for the Latin American trade, also incorporated a hammer that had a flat side similar to the hammer used on the early model. There are no records to indicate the quantity of Mexican Models produced, but all research shows the quantity to be small.



**Smith & Wesson .38 Single Action Mexican Model, caliber .38 S&W.**

Smith & Wesson did many things to promote the sale of these models. One of the most productive was offered in 1893 when the factory converted many of these revolvers to single shot target pistols. These were serial numbered in this same serial number series, and if an individual desired the combination of both a revolver and a single shot pistol he could order them from the factory as a set. The single shots were available in .22, .32 S&W, and .38 S&W with barrel lengths of 6'', 8'', and 10''.

Despite efforts to encourage sales for this model,

the demand was so small that the factory dropped these revolvers from its line in 1911, thus ending the era of the .38 Single Action pocket pistol.

## .32 SINGLE ACTION

Once the firm had the .38 Single Action in full production, D. B. Wesson began to consider the reintroduction of his Model 1½ series in .32 caliber. The Model 1½ had been a popular pocket revolver and was one of the first guns redesigned as a top-break but was never produced. The improvements that had been made in the .38 Single Action would make it possible to produce the smaller .32 Single Action. The firm also incorporated another feature in this small pocket pistol design: a rebound hammer patented by D. B. Wesson and James H. Bullard on December 18, 1877. This design prevented the hammer firing pin from resting against the primer when the hammer was at rest. Though this was the first revolver produced by Smith & Wesson to incorporate this feature, it was not the first time the firm had used rebounding hammers, for they had incorporated this style hammer in the Wesson Firearms Company shotgun produced by Smith & Wesson between 1867 and 1871.

In developing the .32 Single Action pistol, D. B. Wesson patterned the gun after the early Model 1½ Second Issue maintaining the general lines and the bird's-head grip that had been very popular. The caliber of the new revolver was a reloadable .32 center fire cartridge designed by D. B. Wesson. It was a short



**Smith & Wesson .32 Single Action, caliber .32 S&W.**



Drawing of early eccentric type mainspring cam (top) and the conventional strain screw used in the majority of the .32 Single Actions (bottom).

cartridge with the bullet seated tightly in the mouth without the use of a crimp, similar to that of the .38 caliber cartridge designed for the .38 Single Action. The new cartridge was called the .32 Smith & Wesson cartridge. It is still being manufactured and for many years was one of the most popular .32 caliber center fire cartridges.

The first parts for the .32 Single Action were completed in November 1877 and the first revolvers were being assembled in January 1878. The first production revolvers incorporated a new style of mainspring tension device that was located under the grip. This device was an eccentric cam that applied tension to the mainspring by rotating clockwise and was used in place of the conventional strain screw. The new tension device did not prove successful and was eliminated by June 1878, six months after the model had been introduced. A total of 6,500 revolvers were manufactured with this unusual mainspring tension device.

Like the .38 Single Action, this model was produced in either a blue or nickel finish with the blue finished models having wood stocks. This practice existed only during the first year's production with a total of 705 pairs of walnut stocks being completed. The nickel finished revolvers were in the largest demand, and by the end of 1881 the factory had produced a total of 50,725 revolvers, of which only 4,336 were of the blue finish and the remainder in nickel.

The .32 Single Action was serial numbered in its own serial series beginning at 1 with the highest number being 95,574. These were sold until 1892 when the model was discontinued. Like its big brother, the .38 Single Action, it was offered in a wide variety of barrel lengths. The widest selection occurred in 1887 when the factory added the 8'' and 10'' barrel lengths to the others, making it available in 3'', 3½'', 6'', 8'', and 10'' lengths. The latter two barrel lengths were very rare and were of a two-piece construction identical to the barrel on the revolving rifle.

There is no doubt that this graceful little single action is an excellent revolver to collect for the individual who wishes to specialize in one of the less expensive models. It offers the collector many variations in barrel and grip marking as well as the minor variation in the extractor lifter also found in the .38 Single Action Second Model. If a collector were to obtain all of these variations and different barrel lengths, he would have accomplished a great deal and could assemble a display that would have broad appeal.

## TARGET SINGLE SHOTS

It is difficult to determine the appropriate place to discuss the single shot pistols produced by Smith & Wesson. The guns are a group all their own, being comprised of four distinct models, all but one of which are single action. Though they are as different as day and night, with the single shot pistol designed as a target gun and the pocket single action designed for self-defense, it seems appropriate to this author to include the single shot pistols with the pocket single actions since they stem from this group. The single shot pistols probably emerged from the pocket pistols because it was not profitable in the beginning to produce them as an entirely separate model.

The discussion of these pistols is limited, since information currently available on the various models is scarce. Further, since target shooters are individuals with a wide range of interests, the variance within each model group is large and has not been totally documented. Four model types generally are recognized. The First Model type was developed on the .38 Single Action frame. The Second Model type was an altered .38 Single Action frame modified to be produced as a single shot only. The Third Model was a solid frame manufactured by using a modified production frame that had been developed for the Perfected .38 Double Action. The last of these models was a completely different style and was the only single shot designed as a new model not incorporating parts from another production model. This single shot was called the Straight Line.

As was mentioned earlier, the First Model Single Shot was introduced in 1893 as a conversion of the .38 Single Action Third Model. The factory first offered a single shot barrel that could be interchanged with the .38 Single Action revolver barrel and cylinder. This barrel was offered in three calibers, .22 Rim Fire, .32 S&W, and .38 S&W. Each barrel could be purchased in 6'', 8'', or 10'' lengths. The company also developed an oversize target grip that lengthened the grip of the frame and gave the shooter a better handful to help control the pistol. The sights were Smith & Wesson target, both front and rear. Generally, the pistol was equipped with a Paine-type sight, but by the end of the 1890s the Patridge sight was also available.

Soon after the introduction of the accessories, barrels, and stocks allowing for conversion to a single shot target pistol, Smith & Wesson began to get requests for a single shot pistol. The factory produced a quantity of single shots in each of the three calibers. It



Smith & Wesson's four Single Shot Models. From top to bottom: First Model; Second Model in rare 6'' barrel length; Third Model, commonly referred to as the Perfected Single Shot; and the Straight Line.

appears that approximately 1,500 single shots were assembled and sold; however, factory records are incomplete and the shipping records record only 862 .22 calibers; 230 .32 calibers; and 160 .38 calibers as being sold. The serial numbers of these pistols are listed in *Smith & Wesson 1857-1945,* by R. G. Jinks and R. J. Neal. It is these models that are classified as First Model Single Shots. They were strictly revolver frames that were factory-produced as single shot pistols. They can be identified as guns that were originally sold as single shots by the fact that the serial number is on the

front strap of the grip, since the factory target stocks covered the butt of the pistol and would have prevented the serial numbers from being readily visible. These factory-produced single shots may also lack the cylinder stop and hand found in a revolver, since neither served a purpose in the single shot pistol. The First Model Single Shot was available in blue or nickel and could be ordered as a combination set consisting of a revolver and a single shot barrel.

As the popularity of the single shot increased, Smith & Wesson reworked the frame to make it strictly a single shot. The traditional story told for this design change was that the factory objected to individuals purchasing combination sets and getting two guns at a lower price. This theory cannot be documented nor are there large quantities of combination sets available to substantiate the claim. The more logical explanation is that the change was made to reduce manufacturing costs as well as to allow for the smoother action required by a target shooter.

The changes that were made from the First Model Single Shot to the Second Model type were: the cylinder recoil shield was eliminated from the frame, making the side of the frame flat; and the hand and cylinder stop cuts were eliminated, since they served no useful purpose in a single shot. Other than these changes, the frame was basically that of the .38 Single Action Third Model.

The Second Model Single Shot was introduced in 1905 and sold until 1909. It was produced in a separate serial number range from that of the First Model. The serial numbers began at 1 and continued through 4,617. The gun, with a finish of blue or nickel, was offered in 10'' barrel length only; however, since large quantities of 6'' and 8'' barrels were available, special orders for these lengths were produced on occasion.

The Second Model Single Shot was produced only in .22 caliber rim fire, which was generally the caliber used in competitive shooting. The factory continued to produce the model as long as frames for the .38 Single Action Third Model were available. By 1909 the supply of frames had been exhausted and the firm selected another .38 caliber frame to use as a substitute. The change of frame resulted in the factory bringing out what has been called the Third Model Single Shot or the Perfected Single Shot.

The name Perfected Single Shot comes from the fact that this Third Model Single Shot was produced on the frame for the .38 Perfected Double Action. This frame had an integral trigger guard, and the side plate

was on the right side of the frame rather than the left. The gun was completely different in that it incorporated the double action hammer and trigger used on the .38 Perfected Model; and, for this reason, it is possible to find the Third Model in double action. The grips on the Third Model were oversized target but produced in walnut rather than hard rubber that had been used on the previous models.

The Third Model Single Shot was introduced in 1909 and produced until 1923. It was serial numbered in a continuation of the Second Model serial number group beginning with number 4,618 and continuing through 11,641. It was catalogued in blue finish only and had a barrel length of 10''.

One of the interesting variations found in this model is called the Olympic Model. This name originated from some experimental work the factory had done to improve accuracy of the barrel. It was determined that if the cartridge chamber were shortened so the shooter had to force the bullet into the rifling when loading the pistol, the results would be a tighter group size. This experimental work had been done for one of the early U. S. Olympic Team members who was shooting the Smith & Wesson Single Shot pistol. However, this short chamber was not incorporated on all single shots, since it made the pistol extremely difficult to load and the added accuracy could be taken advantage of only by the most skilled competitive shooter. Like many other features associated with target shooting, the Olympic-chambered barrels gained such a reputation that the factory offered them as a special feature on this model. To detect if your pistol has this special chamber, it is necessary to insert a long rifle cartridge in the chamber. If the cartridge chambers, the barrel is standard; however, if the cartridge lacks approximately 1/16 inch of chambering and has to be forced into the rifling, the gun has the rare Olympic-style chamber.

In 1923 when this model was discontinued, it ended the period of single shots produced on revolver frames. These three single shot models had been popular guns with competitive shooters and had successfully set records across the United States as well as around the world. Although the firm produced only approximately 13,600 pistols during the thirty years they were offered, these handguns helped establish the fine quality of Smith & Wesson target guns. These pistols also led Smith & Wesson to produce a pistol that was considered to be what every target shooter wanted in a handgun. In 1920, the factory published a

questionnaire that was circulated to competitive shooters across the country to obtain ideas on what they considered to be the ideal pistol. As can be imagined, the results of this inquiry were a hodgepodge of many ideas, for each competitive shooter had his own theory. But from this questionnaire came these common points: the pistol should have the shape of an autoloading pistol, and the hammer and trigger should move in a straight line so that their movement does not disturb the sight alignment. With these ideas in mind, the factory designed its fourth and last model single shot. This pistol was introduced in 1925 and was called the Straight Line because of the manner in which the hammer and trigger functioned. The pistol has the appearance of the autoloading pistol, thus providing the shooter with that grip angle. It was chambered in .22 Long Rifle with the barrel featuring the short Olympic chamber. The barrel length was 10''—providing the shooter maximum sight radius—and the gun had a luxurious Smith & Wesson blue finish.



Smith & Wesson .22 caliber Straight Line in original case with accessories. Collection of William J. Orr.

However, it lacked two interrelated things: dependable function and sales. The primary functional problems were (1) the trigger pull would not remain consistent and (2) because of the tight tolerances to which the pistol had been built, the hammer fall was sluggish if it was over-lubricated.

The factory was proud of this new model and the initial production run was 1,870 units. The last of these was sold in 1936 when the model was dropped from the catalog. This left the firm with a quantity of unfinished parts as well as a chagrinned management that would talk about any single shot they had produced but the Straight Line.

The single shot pistols are an interesting group of guns to study. You can collect them as produced by the factory or in the numerous variations that illustrate the innovative ideas of the competitive shooter who modified the pistol to meet his needs. In this latter group are ones that were modified by some of the most famous of all American gunsmiths; such as H. Pope, who sleeved the S&W barrels with his barrels that featured the famous Pope-style rifling. Probably no other pistol manufactured by Smith & Wesson reflects the personality and individuality of its original owner as these four models of the Smith & Wesson single shot pistols.

Chapter VII

# The Double Action Top-Breaks

Smith & Wesson became interested in the double action style far earlier than most people realize. The first indicaton that the factory had designed a double action, or self-cocker as it was originally called, is found in a letter from the factory to General A. Gorloff. The letter is dated November 20, 1872, and is in reply to a letter from Gorloff discussing delivery and future contracts. For this discussion, the pertinent point in the letter reads:

> Fifth-We will finish twenty thousand self-cocking revolvers like sample furnished by us (if plain blue) packed and delivered as above provided, for the sum of fourteen and 45/100 dollars $14.45.
>
> Sixth-If nickel plated & finished like sample 20 nickel plated at $14.95.

The letter goes on to give some points concerning the Model 3 Russian and various options. When deliveries became the point, the letter states,

> Ninth-If self-cocking revolvers are ordered, four months will be required to make the necessary preparation of tools. After which we can deliver an average of 100 per day.

The letter clearly established the fact that Smith & Wesson had designed and built a double action revolver by 1872, either at the request of the Russian

Smith & Wesson .44 Double Action, built at the request of the Russian Government in 1872. Above is close up with hammer cocked.



Government or in anticipation that there would be a Russian market for a self-cocking-style handgun.

This early double action revolver had a very different appearance from what would be expected. It would seem obvious that the factory would modify the Model 3 into a double action revolver and submit it; however, they chose a completely new style of revolver, using a modified top-break latch that gave the revolver an appearance unlike any previous Smith & Wesson. It is possible that the design of this revolver was patterned after a sample submitted by the Russians. It is also assumed that the samples submitted to Russia were of the same design and in the .44 S&W Russian caliber as is illustrated.

The story of this early self-cocking revolver seems to end right here, since factory records do not record the Russians' response to the gun. Though the self-cocking pistols were mentioned during the 1870 and 1880 period in communications between the Russian Government and Smith & Wesson, no further mention has been found.

**Original factory drawing of J. H. Bullard's .44 Double Action Model of 1876.**

Further development of the self-cocker seemed halted until October of 1876, when J. H. Bullard made drawings of both .38 and .44 caliber revolvers. These revolvers incorporated the long-type barrel latch used on the earlier sample submitted to Russia. It also included a Schofield extractor system and, if the company had used it, they would have had to pay a royalty to Schofield. The exact reasons are unknown, but this new design was not adopted. On August 15, 1878, a further design change was made by modifying a Model 3 revolver to double action. This design used a completely different style double action cocking system and a dual-purpose mainspring that functioned to drive the hammer forward as well as to return the trigger. An added change to be noted in this drawing is that the factory, for the first time, labeled its drawing as a double action rather than a self-cocker. This established the date when this term became standard Smith & Wesson terminology.

**Original factory drawing of the redesigned No. 3 Double Action, dated August 15, 1878.**



## .38 DOUBLE ACTION MODELS

The factory had been experimenting with a double action revolver for six years without plans for production. D. B. Wesson was the type of individual who had learned from past experiences that the design must be perfect before the gun is placed into production. But he was beginning to note a sales drop of single actions, since both Colt and Forehand & Wadsworth were producing double action revolvers. Efforts to improve the Smith & Wesson design were increased and on February 22, 1879, J. H. Bullard completed the drawings for a .32 caliber double action. By October 16, 1879, Bullard had completed the drawings on the .38 Double Action and plans were begun to produce the tooling necessary to manufacture these revolvers.

The first of the double action revolvers completed was the .38 caliber. The firm completed 324 nickel guns in February 1880 and by the end of 1880 had completed 17,691 revolvers, of which 733 were in blue.

The January 1880 catalog announced the introduction of the .38 Double Action revolver describing it as a five shot, weight 18 ounces, caliber 38/100 (.38 S&W) with barrel lengths of 3¼", 4", and 5". The gun could be ordered in blue or nickel but the nickel was the

Original factory drawing of .32 Double Action.

preferred finish. The trigger guard and barrel catch were in a blue finish giving a nice color contrast to the nickel finished guns. It was equipped with hard black rubber stocks as standard, with red rubber offered as an option.

The design of the early Smith & Wesson double action revolver used a rocker-type cylinder stop having two sets of stop notches on the cylinder, with a freeing groove associated with the second set to allow proper function. This feature, the extreme curved trigger and reversed curve in the rear of the trigger guard, allows an individual to quickly identify the Smith & Wesson double action revolver.

Early in 1880, D. B. Wesson had recognized a fault in the design of his double action revolvers. He had designed the double action for ease of assembly, and constructed the frame so the side plate was cut completely across the frame to allow fitters to easily assemble the lockwork. But this cut weakened the strength of the frame and Wesson quickly changed the design so the plate only extended partially across the frame. This frame change marked the beginning of what collectors classify as the .38 Double Action Second Model. During the thirty-one years this model was produced, it was improved by four engineering changes. Each one of these changes has been classified by the collector as a separate model, resulting in the following classifications:

.38 DOUBLE ACTION FIRST MODEL
Original design—has straight cut side plate, produced in 1880 between serial numbers 1 and 4,000

.38 DOUBLE ACTION SECOND MODEL
The side plate changed to irregular shape, not extending across the frame. Produced between 1880 and 1884 from serial number 4,001 to 119,000

.38 DOUBLE ACTION THIRD MODEL
Numerous changes in interior design were made to this model, but the most important was the elimination of the rocker-type cylinder stop; thus making it no longer necessary to have the freeing groove and front cylinder stop notch. This change occurred in 1884 and was produced until 1895 from serial number 119,001 to 322,700

.38 DOUBLE ACTION FOURTH MODEL
In exterior appearance, it is identical to the Third Model. The changes incorporated were in the relocation of the sear to provide a better single action pull. These changes occurred in 1895 and the model was produced until 1909 from serial number 322,701 to 539,000



The five model variations of the Smith & Wesson .38 Double Action.
From top to bottom: First Model, Second Model, Third Model, Fourth Model, and Fifth Model.

.38 DOUBLE ACTION FIFTH MODEL

This model was identical to the previous models, except the barrel catch was changed to a more square type and the front sight was forged as an integral part of the barrel rather than being pinned into position. This change was incorporated in 1909 and produced until 1911 from serial number 539,001 to 554,077

The .38 Double Action revolver was a great success for Smith & Wesson. During its thirty-one years of production, the firm produced 554,077 of these revolvers, with the peak of its popularity in the first ten years when the firm produced slightly over 40 percent of the total production. This model is interesting to study and offers a wide variety of barrel lengths. The 6'' barrel was an additional option from late 1880 to 1888 when the exotic lengths of 8'' and 10'' were offered. For the collector who wishes to study these models in detail, it would be useful to consult *Smith & Wesson 1857-1945,* by R. G. Jinks and R. J. Neal.

.38 DOUBLE ACTION PERFECTED MODEL

The Perfected Model of the .38 double actions was the last of the top-break revolvers introduced by the factory. It was, in reality, a final improvement of the .38 double action series. It was introduced by the firm in 1909 and was built on a solid frame with the trigger guard an integral part of the frame. Essentially, what Smith & Wesson did was to modify the frame for its .32 Hand Ejector Model of 1903 to that of a top-break. The lockwork in this model was identical to that incorporated in the .32 Hand Ejector. This interchangeability of parts, plus a frame that could be produced on part of

Smith & Wesson .38 Double Action Perfected Model, engraved by factory engraver H. Jarvis.



the same tooling as the .32 Hand Ejector, allowed the factory to obtain greater production capacity at a lower cost.

In designing the Perfected Model, Joe Wesson, who had done a great deal of design work since joining the company on November 11, 1880, incorporated all of the latest improvements developed by the firm. He had always heard the argument that a fast-acting thug could disable the standard double action revolver by reaching over the barrel, grasping the latch, and snapping the gun open, thus depositing all cartridges on the ground and leaving the law enforcement officer or holder of the pistol disarmed. To combat this problem, Joe incorporated the thumb-style cylinder latch that required two separate operations to open the revolver. An individual wishing to break the revolver had to pull the top latch upward, push the thumb latch forward, and rotate the barrel down. This feature was unique and many .38 Double Action Perfected Models were sold to law enforcement agencies.

The Perfected Model, as it has been nicknamed, was serial numbered in a separate serial number series from 1 to 59,400. It was produced in both blue and nickel, having barrel lengths of 3¼'', 4'', 5'', and 6''. Like all other Smith & Wessons, minor variations do occur throughout production. The most interesting of these variations was a small group of guns produced without the thumb release catch, but records do not indicate the purpose for which they were produced.

Although the .38 Double Action Perfected Model had been a good small pistol for law enforcement agencies, by 1920 its style and caliber were being replaced by the side swing revolvers produced in .38 Special, and the factory decided to discontinue them to enable the production of revolvers that were in greater demand.

## .32 DOUBLE ACTION MODELS

The introduction of the .32 Double Action followed directly on the heels of the .38 Double Action. Both were of the same design, and production plans were begun at the same time. But completion of the .32 Double Action was delayed when D. B. Wesson discovered the weakness in the frame resulting from the side plate being cut completely across the frame. The problem was magnified in the .32 Double Action, due to the smaller frame size. For this reason, D.B. Wesson delayed production of the .32 frame while tooling was changed to modify the frame to allow for the irregularly shaped side plate that did not extend completely across the frame. D.B. Wesson was fortunate that only 32 of the originally designed frames had been completed. These were set aside and not assembled. By May of 1880, the new frames were completed and the firm went into production of the .32 Double Actions by completing 11 nickel guns. By the end of 1880, the firm had built 9,881 .32 Double Actions with all but 148 of nickel finish. In 1881, the firm completed another 12,133 nickel revolvers, bringing the total for these two years to 22,014 revolvers. In May 1882, D.B. Wesson, for some reason, completed 23 of the originally designed .32 Double Actions having the side plate straight across the frame. In total, the factory completed 30 of these handguns. Serial numbers 3 and 14 were purchased by D.B.Wesson's son, Frank. Number 8 was sent to M. W. Robinson, the firm's largest distributor in New York City. Serial numbers 9 and 26 were sent to the Australian Exposition on September 15, 1880. The remaining units were held in inventory until 1888 when the firm finally disposed of them to various dealers. This extremely limited production model is one of the rarest guns for the collector to obtain. One cannot help but speculate that D. B. preserved these for the fascination of future arms students. Considering the originally designed .32 Double Action Model, there were four major engineering changes, leading early students of Smith & Wessons to classify these in five separate models. To help familiarize the reader with the development of this model each of the groups is listed below.

### .32 DOUBLE ACTION FIRST MODEL

This model was of the original design having a straight cut side plate extending across the frame. Its major parts were produced in 1880 and had serial numbers ranging from 1 to 30

### .32 DOUBLE ACTION SECOND MODEL

This model was identical in design to the original model, except the side plate had been altered from the straight cut to the irregular shape, which did not extend completely across the frame. It was manufactured from 1880 to 1882 and will be found in the serial number range of 31 to 22,172

### .32 DOUBLE ACTION THIRD MODEL

In this change, the factory eliminated the rocker style of cylinder stop, which meant the design of the hammer and trigger were changed. More noticeable is the loss of the two sets of cylinder stops and freeing grooves from the cylinder. The elimination of these items reduced the cost of the manufacturing operation, but the new design was more durable. Therefore, D. B.

**The five model variations of the Smith & Wesson .32 Double Action. From top to bottom: First Model, Second Model, Third Model. Opposite, Fourth Model, and Fifth Model.**

Wesson could maintain the high quality for which his firm was famous. The Third Model was produced for only one year during 1882/83 with the serial numbers ranging between 22,178 and 43,405

.32 DOUBLE ACTION FOURTH MODEL

The Fourth Model of the .32 Double Actions saw only minor changes in its design. These changes were a reduction in size of the cylinder stop and sear. The most notable change was that of the trigger guard, for it was with this model that the firm changed to a standard bow-shaped trigger guard rather than the reverse curve used in the earlier models. The .32 Double Action Fourth Model was produced from 1883 to 1909. It became the longest production group produced in this series. It is found between serial numbers 43,406 and 282,999

.32 DOUBLE ACTION FIFTH MODEL

The Fifth Model of the .32 Double Actions, like other Smith & Wesson top-break revolvers of the 1909 period, were changed by the front sight being forged integrally to the barrel rather than being pinned into position. This change took place in 1909 and the model was produced until 1919. The serial numbers for this change are from 283,000 to 327,641

This model was catalogued in January 1880 and announced as a new model. It was listed as being available in blue or nickel, a five shot weighing 14 ounces with barrel lengths of 3 and 3½''. By 1882, the firm had introduced the 6'' barrel and, in 1888, it made a limited production run of 8'' and 10'' barrels. It is truly a rare item and an unusual sight to see this small revolver equipped with the 10'' barrel length. When this model was finally dropped from the catalog in 1919, Smith & Wesson had produced a combined total of 941,118 revolvers of the .32 and .38 caliber exposed hammer double action; proof enough of their acceptance by the American handgunner.

.44 DOUBLE ACTION

Although the .44 Double Action revolver was the first self cocker designed by the factory, at the request of the Russian Government, it was the last of the models introduced by the firm. The gun was built on a modified Model 3 frame and had all the features of the

Smith & Wesson .44 Double Action, caliber .44 S&W Russian.

early .32 and .38 Double Actions, except for the side plate that extended across the frame. In 1881, when this model was introduced, the firm had already recognized this weakness and it was not incorporated in the design. The catalog of 1881, which illustrated this model, referred to it as the New Model Navy No. 3. The term Navy Model was used to separate this model from the New Model No. 3 Single Action called the Army Model by the factory. Since the original design of the .44 Double Action had been made for the Russian Navy, it was designated the Navy Model. D. B. Wesson kept the name alive, hoping it would be an asset when the Russian Government purchased arms for its Navy.

The catalog stated the gun weighed 2-3/16 pounds and was available in blue or nickel with barrel lengths of 4'', 5'', and 6''. Shortly after the gun had been in production, the 6½'' barrel length became available as a standard catalogued length while a 3½'' barrel length was produced only on special request. The barrel for this model and the New Model No. 3 Single Action were interchangeable, and this led the factory to use barrels from either model. The only technical difference in barrels was in the barrel marking with the new Model No. 3 ending...Reissue July 25, 1871, whereas the Double Action markings end...May 11 & 25, 1880. When purchasing the .44 Double Action, it is important to remember that the serial number on the rear of the barrel toward the barrel latch must match the number on the butt, cylinder, and barrel latch.

The .44 Double Action, unlike the smaller models, remained with the same mechanical design from 1881 until 1913 when it was dropped from the catalog. These guns were produced within their own serial range from 1 to 54,668. The only variation considered was the length of the cylinder, which changed from 1-7/16'' to 1-9/16'' at the turn of the century, allowing the firm to produce one cylinder length for all cartridges.

### .44 DOUBLE ACTION WESSON FAVORITE

The .44 Double Action Wesson Favorite, developed by D. B. Wesson in 1882, is an intriguing model, for a certain amount of mystery surrounds it. Few samples were sold in 1882, with the majority of guns released in 1888/89.

The Wesson Favorite was identical in mechanical design to the .44 Double Action. All changes were made to alter the balance of the gun by lightening its weight. This was accomplished by the following methods: the cuts in the lockwork cavity were increased in depth; the side plate thinned; barrel hinge grooved; grooves were milled in the side of the frame under the cylinder; the 5'' barrel was reduced in diameter; a special sighting groove was cut in the top strap; the cylinder, carrying the company's markings, was reduced in diameter from the front notches forward; the sight was changed to a bead type; and generally, the grips were of wood. What Wesson was trying to prove with this revolver has been lost. It is known, however, that the Russians expressed interest, since the first completed gun was forwarded to Max Fiedler, who was located in St. Petersburg, Russia.

Smith & Wesson .44 Double Action Wesson Favorite, caliber .44 S&W Russian.

The first production guns consisted of 93 units completed in April 1882, one year after the .44 Double Action had been introduced. A total of 1,073 units were finished between April 1882 and February 1885. All were serial numbered between 9,000 and 10,100 within the .44 Double Action series. Sales records indicate that

they were produced on a special order basis, since the guns do not appear in the factory literature of 1882. They are first mentioned in the price sheet dated 1888, retailing for $14.75. By 1889 the price dropped to $13.75. After this date, it disappeared from the price sheets as mysteriously as it had appeared.

From opinions based on present facts, it seems probable that the gun was produced specially for a government or agency, but the final order never materialized. After six years, the factory was forced to sell them out of surplus inventory.

## .44 DOUBLE ACTION FRONTIER AND .38 WINCHESTER DOUBLE ACTION

Like the development of the New Model No. 3, the Double Actions progressed in the same manner. Thus, we have the .44 Double Action Frontier and a smaller caliber model that fired the .38 Winchester center fire cartridge (.38-40). The Double Action Frontier was introduced in 1886 by simply lengthening the cylinder and top strap to 1-9/16'' to accommodate the longer .44-40 cartridge. This model was produced in blue or nickel, having barrel lengths of 4'', 5'', 6'', and 6½''. As was done with the New Model No. 3 Frontier, it was placed in a separate serial range beginning at 1 and reaching 15,340 when the last guns were sold in 1913.

Top photo is the Smith & Wesson .44 Double Action Frontier, factory engraved by Gustave Young, caliber .44-40. Bottom photo is the .38 Winchester Double Action, caliber .38-40.

The .38 Winchester Double Action is the rarest of the Model 3 frame size double action revolvers. It was not as rare as the .38 Winchester Single Action, for it was three times more popular; having a production of 276 units all serial numbered in their own series from 1 to 276. This model was offered from 1900 to 1910 in blue or nickel and barrel lengths of 4'', 5'', and 6''.

Why this caliber was introduced is not known. In recognition of small demand, it was never listed as a separate model in the catalog; only as an optional caliber, even though its records were kept separate. It is the author's opinion that the firm had quantities of parts for the Double Action and New Model on hand and hoped the added caliber offered by this gun would help reduce inventory.

## SAFETY HAMMERLESS DOUBLE ACTIONS

Within the Double Action group of revolvers, there is a series of pocket pistols that are unique in that they do not have an exposed hammer. They are truly just double action revolvers rather than a combination of single and double action models like those previously discussed.

Legend has it that D. B. Wesson developed the Safety Hammerless model in a night-long session after hearing that a child had accidentally been hurt by cocking and pulling the trigger on one of the Smith & Wesson Double Action Revolvers. This legend cannot be substantiated, since factory records show a methodical development of the revolver. D. B. Wesson was a sensitive person and perhaps after hearing of this accident was inspired to work very closely with his son Joe to develop a revolver with a safety on the handle and a strong trigger that would require a long pull, making it impractical for a child to pull through and fire.

The development of this style of revolver also stems from the law enforcement officer's requirement to draw his revolver from his coat pocket without the exterior hammer catching in the pocket lining. From whom the idea for this model originated at Smith &



Factory drawing of experimental .38 Hammerless Model by Joseph H. Wesson.

Wesson is not known; however, the development of the handgun was given to Joe Wesson as one of his first projects while working at the drafting board. Joe Wesson had much of his father's inventiveness, and on February 15, 1882, he completed his first drawing for a .38 Hammerless revolver. This revolver was strictly a double action revolver in which the hammer was completely enclosed by the frame. The design also included a floating firing pin rather than a firing pin located upon the hammer. The design of the .38 Hammerless revolver did not meet D. B. Wesson's safety criteria, thus it was not accepted.

The first Safety Hammerless models were designed by J. H. Wesson on May 1, 1884. The gun was a double action model in which a lever was incorporated into the grip. This lever was pivoted at its base and the top engaged a second lever that blocked the rearward movement of the hammer. To operate the revolver, it was necessary to grip the handle firmly, thus

Factory drawing of May 1, 1884, of the first experimental .32 Hammerless to feature a grip safety.

The January 1886 drawing of the proposed Model 3 Hammerless. Although the gun was advertised by the factory, no production guns were built.

disengaging the rearward hammer block so the revolver could be functional. The design also called for the use of a striker bar-type firing mechanism. But it was not suited to reliable function, for the weight of the striker bar was sufficient so that if the revolver were dropped upon the muzzle, the gun would discharge.

The Safety Hammerless design was finally formalized in a drawing dated January 1886. This drawing illustrates the gun in its original design including a Z-bar-type barrel latch developed by Joe Wesson in 1882 as well as an inertia-type firing pin. This type of firing pin was spring-loaded and hit the primer only after having received a blow of sufficient force from the hammer to overcome the load of the spring. The momentum was thus transferred from the hammer to the firing pin. When the hammer was at rest against the firing pin, this pin would not protrude through the frame and touch the primer. This offered the user an added safety device.

Smith & Wesson experimental Model 3 Hammerless, caliber .44 S&W Russian.

When the revolver was developed in 1886, plans were made to produce it in three calibers: .32 S&W, .38 S&W, and the .44 S&W Russian. In fact, the first advertisements stated that the revolver would soon be produced in all of these calibers. After producing a prototype of the No. 3 Hammerless, as the .44 caliber model was called, all production plans were stopped and it was only produced in the other two calibers.

### .38 SAFETY HAMMERLESS MODELS

The .38 Safety Hammerless was the first of these completed. Eight nickel guns were completed in July 1886 and August production brought an additional 20 nickel units. These 28 units were the total production for 1886 and these guns were held in inventory. There are no records available to indicate why further production and sales were delayed until February 1887, when 1,045 were produced, of which 161 were blue. The total February sales were 898 units; thus beginning distribution of a style of Smith & Wesson handgun that continued to sell for more than seventy years.

The .38 Safety Hammerless models make an interesting study, since the factory changed the barrel locking system four times during the course of its manufacture. These, and several minor changes, resulted in the categorizing of these models into five model classifications, which are:

#### .38 SAFETY HAMMERLESS FIRST MODEL

This was the original design having the Z-bar barrel latch located in the top strap. It was produced in 1886/87 with the serial number range being 1 to 5,250

#### .38 SAFETY HAMMERLESS SECOND MODEL

The Second Model incorporated a new barrel latch that was a lever located on the frame directly behind the barrel rest. To open the revolver, the lever was pressed down. This change was incorporated in late 1887 at approximately serial number 5,251. The model continued in production until 1890 when the serial numbers reached 42,483

#### .38 SAFETY HAMMERLESS THIRD MODEL

Like the Second Model, this incorporated a completely new barrel latch. The new barrel latch was a knurled thumb piece that protruded from the top strap at the rear of the barrel. The revolver also included a safety device that locked the hammer's movement to prevent accidental discharge while the gun was being opened. This model was introduced in 1890 at approximately serial number 42,484 and produced until 1898. At this time the serial numbers had reached approximately 116,002

**The five model variations of the .38 Safety Hammerless. Top to bottom: First Model, Second Model, Third Model, Fourth Model, and Fifth Model.**

.38 SAFETY HAMMERLESS FOURTH MODEL
The Fourth Model of the Safety Hammerless can be identified by the fact that it utilizes the conventional top-break latch that was used on all of the other Smith & Wesson top-break revolvers. This change was incorporated in 1898 at approximately serial number 116,003, and the model was continued until 1907 when it reached serial number 220,000

.38 SAFETY HAMMERLESS FIFTH MODEL
This model is identical to the Fourth Model, except the front sight was forged integrally to the barrel. After this model had been introduced in 1907, another change was made pinning the extractor base pin into position rather than using a screw thread. The Fifth Model is generally believed to have begun at approximately serial number 220,001 and was continued until 1940, when the serial numbers reached 261,493

During the years this model was in production it was available in blue or nickel finish and was offered in a wide range of barrel lengths from 2'' to 6''. This is an interesting and relatively inexpensive model for a beginning or advanced collector to study.

.32 SAFETY HAMMERLESS MODELS
Smith & Wesson introduced its .32 Safety Hammerless in February 1888 when the firm produced 16 nickel revolvers. The factory, taking advantage of design improvements that had been made to the .38 during the eighteen months it had been produced, incorporated them into a model that was a reduced-sized variation of the .38 Safety Hammerless Third Model. As shown below, the factory made two other changes in the .32 Safety Hammerless during its production.

.32 SAFETY HAMMERLESS FIRST MODEL
The .32 Safety Hammerless First Model was designed similarly to the .38 Safety Third Model, except the barrel latch did not engage a safety device to block rearward movement of the hammer upon opening the revolver. This barrel latch was a small knurled button that was located at the rear of the top strap. To open the revolver, the barrel latch was pressed down and the barrel tipped forward. The .32 Safety First Model was manufactured in 1888 and began at serial number 1. It was produced until 1902 and the serial numbers reached 91,417.

.32 SAFETY HAMMERLESS SECOND MODEL
In the .32 Safety Second Model, the factory abandoned the button-style barrel latch and returned to the more

**The three model variations of the .32 Safety Hammerless. Top to bottom: First Model, Second Model, and Third Model.**

conventional T-type barrel latch that had been used on the majority of the top-break pistols. The Second Model was produced from 1902 until 1909 between the serial number range of 91,418 and 169,999

.32 SAFETY HAMMERLESS THIRD MODEL
This model, like all the other Double Actions of this era, was changed by the introduction of the forged front sight that reduced manufacturing cost. The cylinder base pin was also changed from a screwed-in type to one that was held by a cross pin. These changes were incorporated in 1909 at approximately serial number 170,000 and produced until 1937. At this time the serial numbers reached 242,981

The .32 Safety Hammerless model was first offered in only 3'' and 3½'' barrel lengths. In 1898, a 2'' barrel was available and shortly after 1902 the 6'' barrel length was produced. The gun was sold in blue or nickel and normally was equipped with black rubber grips.

The factory terminology for these models clearly refers to the revolver as Safety Hammerless models, but the factory cardboard box labels are marked New Departure rather then Safety Hammerless. The theory is that this term was given to the revolver, because it departed from the conventional style of double action revolvers. The shooter also nicknamed this model Lemon Squeezer since it was felt that the action of firing the gun was similar to squeezing a lemon. The 2'' barreled version of the Safety Hammerless model was called the Bicycle Model, because it was popular with the bicycle riders at the turn of the century.

In 1940, when the last of the top-break .38 Safetys were sold, the factory must have sighed a cry of relief to see the last of these obsolete models sold from inventory. Yet, anyone who had been associated with Smith & Wesson for many years must have stopped to realize that it was the end of an era. The last of the automatic extracting top-breaks that Smith & Wesson had introduced in 1870 and had been the most popular style of revolver produced in America until well into the 1900s—a gun that was probably the most copied design ever produced.

Chapter VIII

# The Hand Ejector Models

Smith & Wesson's history is really a four-part history. First the beginning, when the firm experimented with a cartridge and manufactured a lever-action pistol; second, the development of their revolver and production of the tip-up style pistol; third, the modernization of the design changing it from a tip-up to a top-break; and fourth, the development of the side swing revolver called the Hand Ejector. Each step was important in the growth of the company, but the Hand Ejector models have had the greatest influence of all. In fact, the Hand Ejectors are so important that they really warrant a book rather than a chapter.

Prior to the introduction of these models, all revolvers produced by Smith & Wesson incorporated a system that automatically extracted the cartridges when the revolver was opened. The new Hand Ejector system required that the revolver be opened and, then by pressing the extractor rod toward the cylinder, the cartridges were extracted manually. The name Hand Ejector stems from this manual operation.

Sensing the need for a solid frame revolver of a stronger construction than the top-break previously manufactured, Smith & Wesson began the development of a new style revolver in 1894. These new revolvers were of a solid frame construction with a cylinder swinging to the left to allow for loading. The cylinder was locked into position in the frame by a center pin that traveled inside the extractor rod and through the center of the cylinder. To open the revolver, the front knob of the center pin was grasped and pulled toward the muzzle, this removing the center pin from its rearward locking position. The drawings

Smith & Wesson seven shot K frame .32 caliber revolvers as designed in 1895, were made experimentally by modifying a Colt 1892 Army Model.



The early factory drawings of the proposed solid-framed side swing revolver. The illustration shows the K frame, K cylinder in both six shot .38 and seven shot .32 and the .38 caliber barrel.

completed in September 1894 show that the factory had developed three Hand Ejector revolvers: one was a small-framed revolver in .32 caliber that the factory called the Model I; and a second frame size, called the Model K, was designed both as a seven shot .32 caliber and a six shot .38 caliber.

Although the model was completely new, the designer experienced difficulty in developing a cylinder stop compatible to the lockwork used in the revolver. For lack of a better design, Joe Wesson turned to one of the factory's earliest cylinder stop designs: a top strap lock that was activated by a wedge located on the hammer nose. The cylinder stop was unlocked by the wedge as the hammer was moved to the rear. Upon firing, the sharp edge of the wedge

Factory drawing illustrating the K-frame cylinder stop and matching Model I hammer. This design was almost identical to the original top-strap cylinder-stop system used on the early tip-up models illustrated in the bottom drawing.

would pass through a split spring located on the bottom of the cylinder stop. This system was identical to that developed for the Model 1 Second Issue in 1859.

The newly designed Hand Ejectors were perfected by 1895 with samples of each style revolver completed. The decision was made to produce the Model I frame size revolver in .32 caliber and to continue the design work on the Model K. At this point, each of the Hand Ejectors will be discussed separately. To help the reader understand the interrelation of models, the .32 Hand Ejectors, as well as spin-offs of this model, will be described.



Chapter IX

# The I-Frame Hand Ejector Models

When the factory developed the I- and K-frame models in 1894, they had no idea of the importance of these designs to the arms industry. This style of revolver emerged as the most desired and copied design ever produced.

When the side swing was first designed by Smith & Wesson, the small-frame model was called the Model I, with the larger frame called the Model K. Since these model designations did not describe the guns to the public, they were not widely used. However, factory employees adopted the designations and, when discussing a model or group of handguns internally, they would speak of the gun by the frame size rather than by a proper name. This frame size designation carried over into their discussions with gun writers and enthusiasts so that today the knowledgeable person may also refer to revolvers by frame size.

## .32 HAND EJECTOR MODEL OF 1896

The .32 Hand Ejector was the Model I previously mentioned. The tooling for this model was completed in 1895, and the first production guns manufactured in 1896. In honor of the year in which it was introduced, it was referred to as the .32 Ejector Model of 1896. Except for a hardened steel shim used to line the cylinder notches to prevent them from peening, the design was unchanged from the prototype. Smith & Wesson recognized that when the cylinder was rotated double action, firing the gun rapidly, the abrupt stopping of the cylinder would cause the notch to peen, eventually

Smith & Wesson .32 Hand Ejector First Model, engraved by factory engraver Oscar Young, caliber .32 S&W Long.

widening it and, thus, loosening the lockup. To correct this problem, D. B. Wesson developed a method for lining the notch with a small hardened steel shim. This shim was first used on the .32 Hand Ejector but was soon incorporated in all models and used continually until 1909.

The .32 Hand Ejector First Model, as it is now known, was a six shot revolver of the side swing design with a cylinder unlocked by pulling the head of the extractor rod toward the muzzle. The revolver was produced in blue or nickel, having barrel lengths of 3¼", 4¼", and 6". Special orders could be purchased with target sights. The revolvers were equipped with a round ribbed barrel. For some unknown reason, the factory did not choose to mark its name and patent dates on the rib in the conventional manner but to incorporate them on the cylinder between the flutes, as was done on the .44 Double Action Wesson Favorite. The factory lengthened its .32 S&W cartridge 1/8 inch and produced a caliber called the .32 S&W Long cartridge, allowing for a more powerful load.

Early sales of this model were slow, but several major police agencies, including the Jersey City and Philadelphia Police Departments, purchased this model for their forces, thus stimulating new sales. The .32 Hand Ejector First Model was produced from 1896 until 1903 when the design was further improved. It was serial numbered in a separate series from 1 to 19,712.

## .32 HAND EJECTOR MODEL OF 1903

The factory realized that the First Model had some design weaknesses and changed to a design perfected for the .38 Military and Police Model. This new design discarded the top strap style of cylinder stop in favor of one located in the bottom strap. The revolver was opened by the use of a thumb latch on the left side of the frame, and the cylinder was locked at the rear and front of the extractor rod. The barrel was changed from a ribbed to a round barrel having a forged front sight. The barrel was stamped with the factory name and patents. This model was considered to be so different from the First Model that it was placed in a separate serial number range that duplicated those of the First Model. This model is found with serial numbers from 1 to 19,425. It was produced in barrel lengths of 3¼", 4¼", and 6" and could be purchased in blue or nickel.

With the introduction of the .32 Hand Ejector Model of 1903, the external appearance was set and would remain almost unchanged until the model was temporarily discontinued for wartime production in

**Smith & Wesson .32 Hand Ejector Model of 1903. This was the first of the .32 Hand Ejector Models to feature the locking lug under the barrel.**

1942. Though the appearance was unchanged, the internal design was changed to improve function. To help the collector know when these mechanical changes occurred and the names associated with them, they are listed here. For more in-depth information relating to these changes, it is suggested they be studied in *Smith & Wesson 1857-1945*, by R. G. Jinks and R. J. Neal. The changes from 1903 to 1942 are:

.32 HAND EJECTOR MODEL OF 1903 FIRST CHANGE
Incorporated 1904, produced until 1906. Serial number range 19,426 to 51,126

.32 HAND EJECTOR MODEL OF 1903 SECOND CHANGE
Incorporated 1906, produced until 1909. Serial number range 51,127 to 95,500

.32 HAND EJECTOR MDOEL OF 1903 THIRD CHANGE
Incorporated 1909, produced until 1910. Serial number range 95,501 to 96,125

.32 HAND EJECTOR MODEL OF 1903 FOURTH CHANGE
Incorporated and produced in 1910. Serial number range 96,126 to 102,500

.32 HAND EJECTOR MODEL OF 1903 FIFTH CHANGE
Incorporated 1910, produced until 1917. Serial number range 102,501 to 263,000

.32 HAND EJECTOR THIRD MODEL
Incorporated 1911, produced until 1942. Serial number range 263,001 to 536,684

When the .32 Hand Ejector was placed back into production on July 14, 1949, several changes were made. The large knob on the end of the extractor rod was eliminated and the new type of hammer block, developed in 1944, was incorporated. The I-frame .32 Hand Ejector was continued in production until October 1960 when the frame was discontinued to allow the factory to standardize small frame production by using the J size, which had been introduced in 1950. The J-frame variation of this model can be identified by the Model 30-1 designation. The production of the .32 Hand Ejector on the J frame began on April 20, 1961, at serial number 712,954 of the original .32 Hand Ejector serial number series and continued until 1976 when the Model 30 was discontinued. There were several interesting changes occurring during the J-frame period. Though not a complete list of changes, the following will help the collector identify the most important ones.

1. Elimination of the top side plate screw called the bug screw. This change was authorized on December 13, 1955, beginning at approximately serial number 640,980

2. Addition of Model 30 stamped in yoke cut in 1957

3. Serial numbers changed from .32 Hand Ejector old series in 1969/70 with original series completed in 1970 at serial number 826,977. The new serial series, with an H prefix, began in 1969 at H1

The most important of all the changes was the switch from the I frame to the J in 1960. At this point, the cylinder stop plunger screw was eliminated from in front of the trigger guard, because the J frame had been designed for a cylinder stop that did not use an external spring tension device.

The .32 Hand Ejector series was an important model for the factory. Not only was it the first Hand Ejector model introduced, but it led to an expansion of the Smith & Wesson product line. For example, during the manufacturing period from 1903 to 1942, three other models were produced as spin-off models of the .32 Hand Ejectors but were serial numbered in the same series with the .32 Hand Ejector. These were the .22/32 Bekeart, .22/32 *Kit Gun*, and the .32 Regulation





**Smith & Wesson .32 Hand Ejector. Top revolver is representative of early postwar production manufactured on the I frame; bottom picture is the current production (Model 30) produced on the J frame.**

Police. The .38 Regulation Police, numbered in a separate serial number series, was also built on the .32 caliber frame.

### .22/32 HAND EJECTOR

The first of these spin-off models built on the I frame was a .22 caliber revolver with the idea coming from a San Francisco gun dealer named Philip Bekeart. In 1910, he began discussing with Smith & Wesson the need for a heavy-frame target .22 caliber revolver and suggesting the .32 Hand Ejector as the ideal frame. He further stated that his faith in the model was so great that he would order 1,000 units. Smith & Wesson began tooling for the new model in 1911 and completed the first guns by the spring. The revolver was identical to the .32 Hand Ejector Model, except that it was in .22 caliber, had a 6'' barrel, and sights adjustable for windage and elevation. Also, the stocks were checkered walnut extension type, similar to the style used on the Single Shots.

These .22/32 Target Models were serial numbered from 138,226 to 139,275 in the .32 Hand Ejector series, with the serial number stamped on the forestrap of the pistol grip. The unique thing about the numbering of these early .22/32 Hand Ejectors is that a separate number, indicating the total number of revolvers produced, was stamped on the bottom of the wood grip. These separate serial numbers were only stamped on the first 3,000 guns and the practice was discontinued in 1915.

Instead of 1,000 revolvers, Phil Bekeart received only 292 guns of the initial order, for the market was not as great as he had anticipated. It was not until 1914 that the factory scheduled any additional production. At this time, the factory formally announced the model by cataloguing it as the .22/32 Heavy-Frame Target revolver. The heavy-frame terminology was continued until the 1930s when the firm introduced its K(medium)-frame size .22 Target revolver and changed the name to simply .22/32 Target.

**Top photo is the Smith & Wesson .22/32 Bekeart Model, caliber .22 rim fire. Bottom photo is the Smith & Wesson .22/32 KIT GUN with 4'' barrel and round butt. Collection of William J. Orr.**



In 1936, Smith & Wesson introduced a 4'' barrel version of the .22/32 Target, naming it the .22/32 *Kit Gun* to signify that the gun was designed to be carried in the hunter's or fisherman's travel kit. It was introduced at serial number 530,003 of the .32 Hand Ejector series. The changes that occurred with this model are identical to the longer barrel variation.

The .22/32 Hand Ejector was continued in production until the factory began to meet the World War II needs with the last group of pre-World War II .22/32 Target and *Kit Guns* produced and serial numbered between 534,587 and 534,636 of the .32 Hand Ejector series. Both the Target and *Kit Gun* were reintroduced at the end of World War II with the production beginning September 6, 1950. The serial numbers started at 551,123 of the .32 Hand Ejector series and the numbers continued to be mixed within the .32 series. These revolvers were identical in appearance to the prewar models, except they incorporated the new style hammer block. In 1953, a new series was started and the model was called the .22/32 Target Model of 1953 and .22/32 *Kit Gun* Model of 1953, or what are now referred to as the Model 35 and 34, respectively.

Both 1953 models differed from the original in that they incorporated an improved I frame with a coil-type mainspring and micro-click sights. The improved model was placed in a separate serial number series beginning at serial number 101. The series was continued until October 1968 when the serial numbers had reached 135,465. the numbering series was changed to the M prefix, thus avoiding possible confusion with other models, and the serial numbers began at M1 and continue in this series to this date. The changes that have occurred in this model are:

1. Elimination of the top side plate screw authorized December 13, 1955, and occurring at approximately serial number 11,000 of the 1953 serial number series

2. Additional model numbers stamped in yoke cut occurring 1957

3. Change from I frame to J frame authorized in October 1960 and beginning at serial number 70,000. All J-framed guns are stamped Model 34-1 or 35-1.

Though the Model 34 continues in production, the Model 35, .22/32 Target, was discontinued from production in 1973 when demand for the model dropped to the point where it was no longer economically feasible to produce.



Top is the Smith & Wesson Model 34 .22/32 KIT GUN, caliber .22 rim fire.
Bottom is the Smith & Wesson Model 35 .22/32 Target, caliber .22 rim fire.



There are two other models generally included with the .22/32 *Kit Gun*, Model 34. These are the Model 43 .22/32 *Kit Gun Airweight*, and the Model 51 .22/32 Rim Fire *Magnum*. The Model 43 was first produced in January 1958, with the serial numbers beginning at 32,244.

Though it was produced with the .22/32 *Kit Gun* series, in reality the Model 43 was never manufactured on the I frame. It has always been produced on the J frame, and for this reason there was never a Model 43-1 variation produced. The Model 43 was produced until 1974 when it was dropped as a production model.

The Model 51 was produced in May 1960 beginning at serial number 52,637. It, too, was only produced on a J frame and continued in production





**Top is the Smith & Wesson Model .22/32 KIT GUN AIR-WEIGHT caliber .22 rim fire. Bottom is the Smith & Wesson Model 51 1960 .22/32 KIT GUN MAGNUM rim fire caliber .22 Winchester MAGNUM rim fire.**

until 1974. It was available in both round and square butt, with the round butt being the rarest of the variations with a total production of 600. Both the Model 43 and 51 were serial numbered in the series with the .22/32 revolvers and are, therefore, found having the M prefix.

## .32 REGULATION POLICE

The other direct spin-off model serial numbered within the .32 Hand Ejector series is the .32 Regulation

**Smith & Wesson .32 Regulation Police Models. Top is pre-World War II production, circa 1917-40. Middle is post-World War II early production, circa mid-1950s. Flat thumb piece and what is referred to as the diamond grip, because of the diamond shape around the grip screw, which was used until 1968. Bottom is Model 31 .32 Regulation Police, circa 1970s. Collection of William J. Orr**

Police. This model was identical in design to the .32 Hand Ejector Third Model, except it featured a square walnut extension-style stock similar to the target stocks used on the .22/32 Target models. The metal backstrap of the revolver was rebated so that the larger oversize stock blended into the frame.

Production of this model began on March 5, 1917, at approximately serial number 263,000 of the .32 hand Ejector series. It was produced until 1940 when it was temporarily discontinued. Production resumed in May



Smith & Wesson post-World War II .32 Regulation Police Target, circa 1957.

1949 when the factory assembled some unfinished parts completed prior to World War II. Postwar improvements to this model follow those incorporated in the .32 Hand Ejector and will not be repeated. In 1957, the .32 Regulation Police was stamped Model 31 in the yoke cut. This model number was changed to 31-1 when the frame was changed from I to J in 1960.

The .32 Regulation Police Model, like the .32 Hand Ejector, was available in 3¼'', 4¾'', and 6'' barrel lengths with finishes in blue or nickel. The gun was generally sold as a service sight model but target-sight variations were offered. The last group of target-sighted Regulation Police models produced was in 1957 when the firm completed 196 units serial numbered between 657,174 and 657,369. This target model is truly one of the rare variations of this model. The .32 Regulation Police continues in production today as the Model 31-1 and remains the only .32 caliber revolver left in the long line of Smith & Wesson revolvers.

### .38 REGULATION POLICE & .38 TERRIER

The .38 Regulation Police is a companion to the .32 Regulation Police. The factory referred to this model as the .38/32 revolver, indicating it was a .38 revolver built on a .32 frame. It was identical to the .32 Regulation Police, except that it was serial numbered in its own series. Production of this model began on March 5, 1917 at serial number 1. It was produced until 1940 when it was temporarily discontinued at serial number 54,474. Production was resumed on June 28, 1949, with the model incorporating a new style rebound slide-operating hammer block. The original serial number series was continued until January 17, 1969, when the serial numbers reached 122,678. At that time the serial numbers were changed to the R prefix and the .38 Regulation Police was serial numbered in the same series as the Model 60.

The .38 Regulation Police or Model 33 as it was later known, was available originally in only a 4'' barrel

Smith & Wesson .38 Regulation Police.
Top is post-World War II Model 33 .38 Regulation Police, circa 1960.
Middle is pre-World War II .38 Regulation Police, circa 1917-40.
Bottom is Model 33 .38 Regulation Police, circa 1970.
Collection of William J. Orr

Smith & Wesson .38 Terrier or Model 32, as it was later called.
Top is .38 Terrier, circa 1956.
Bottom is Model 32 .38 Terrier, circa 1969.

length with either a blue or nickel finish. On June 10, 1936, a round butt 2'' barrel version became available. To separate this new model from the .38 Regulation Police, the factory called the new model the .38/32 Terrier. The serial number for this model began at 38,976 of the .32 Regulation Police series. The .38/32 Terrier or Model 32, follows the same developments as the 4'' model. When the change was made from I frames to J frames in 1960, the -1 designation was added to the model number. The change in serial numbers is identical to that of the Model 33. The Model 32 and 33 were discontinued from production in 1974, ending the production of any revolver firing the .38 Smith & Wesson cartridge.

Chapter X

# The K-Frame Revolvers

There is no doubt that the most important development for Smith & Wesson was the Model K line of handguns for, within this line are some of Smith & Wesson's most famous revolvers. The fact of the matter is that the K-frame size handgun has been and continues to be so popular that its production exceeds the combined quantities of all other handguns ever produced by Smith & Wesson. Let us quickly explore the various models produced on the K frame.

## .38 HAND EJECTOR MILITARY AND POLICE MODELS

Smith & Wesson recognized the weaknesses in the original Hand Ejector and continued to experiment with the design after the introduction of the .32 Hand Ejector in 1896. The firm wanted to eliminate the top-style cylinder stop and improve the method of opening the cylinder. To accomplish this, the cylinder lock was changed to a thumb piece on the left side of the frame. When the cylinder was closed, a spring-loaded center pin, previously used for opening and closing the cylinder, forced a bolt from the center pin hole in the frame, allowing the gun to be firmly locked. This bolt was directly connected to the thumb piece used to open the cylinder. To operate, the thumb piece was pressed forward so the bolt was flush with the frame, thus moving the center pin back into the cylinder and freeing the cylinder for opening. The cylinder stop was changed from the top strap to the bottom strap and, rather than operating off the hammer as on the previous model, the cylinder stop was pulled from the locked position by the downward movement of a forward hook on the trigger.

With the mechanical design completed, D. B. Wesson discussed the merits of this gun with his son, Joseph. The revolver was originally designed to fire the .38 United States Service cartridge (.38 Long Colt) but this cartridge had developed a reputation for lack of power. D. B. Wesson suggested the cartridge case be lengthened to allow the powder charge to be increased from 18 grains of black powder to 21½ grains. The bullet weight was changed from 150 grains to 158 grains, this new cartridge was called the .38 S&W Special and the factory literature showed the improved cartridge had a penetration of eight and one-half pine boards, each seven-eighths inch thick, a penetration

two inches greater than that of the U. S. Service load. With the development of the new cartridge, the factory introduced the .38 Military and Police Model. Little did they dream that they had introduced what would become Smith & Wesson's most famous model, plus a new cartridge that would become standard among competitive shooters and law enforcement agencies around the world.

The introduction of the .38 Military and Police occurred in 1899 and was referred to as the Model of 1899. It was produced in two calibers, the .32 Winchester center fire (.32/20) and the .38 S & W Special. Both models were available in blue or nickel having barrel lengths of 4", 5", and 6". Guns of each caliber were serial numbered in a separate series.

**Smith & Wesson .38 Hand Ejector First Model, sometimes called the Model of 1899, caliber .38 Special.**

Many engineering changes were made to this model during the course of its early production. The collector has classified these engineering changes, produced from 1899-1940, into eight model variations. These variations are important in a comprehensive study, but will not be listed here in detail. For the reader's convenience, however, a chart is included that illustrates these variations so the collector can identify them by serial numbers.

The .32/20 Hand Ejector was not an extremely popular revolver. Its sales were basically limited to sportsmen, since it made an excellent companion gun for those using a rifle of this caliber. (A word of caution: to fire the .32/20 Hand Ejector, the shooter must use pistol cartridges rather than the late production, high velocity, cartridges designed only for rifles.) The last of the .32/20 Hand Ejectors was produced on September 8

1939. In the same year, the firm officially dropped this model from its catalog after producing 144,684 revolvers.

The .38 Hand Ejector Military and Police was the most important caliber of the Model of 1899. In fact, it warrants a book of its own, but an effort is made here to help the individual understand some of the important guns produced within this series.

K-FRAME SERIAL NUMBERS & VARIATIONS, 1899-1940

| | .32/20 Hand Ejector | | | | | .38 Hand Ejector Military & Police | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Date | Serial Number | Barrel Length | Finish | Butt Style | Date | Serial Number | Barrel Length | Finish | Butt Style |
| First Model | 1899-1902 | 1-5,311 | 4" 5" 6½" | Blue or Nickel | Round only | 1899-1902 | 1-20,975 | 4" 5" 6" 6½" 8" | Blue or Nickel | Round only |
| Second Model, Model of 1902 | 1902-1903 | 5,312-9,811 | 4" 5" 6½" | Blue or Nickel | Round only | 1902-1903 | 20,976-33,803 | 4" 5" 6" 6½" | Blue or Nickel | Round only |
| Second Model, First Change | 1903-1905 | 9,812-18,125 | 4" 5" 6½" | Blue or Nickel | Round and Square | 1903-1905 | 33,804-62,449 | 4" 5" 6½" | Blue or Nickel | Round and Square |
| Model of 1905 | 1905-1906 | 18,126 22,426 | 4" 5" 6½" | Blue or Nickel | Round and Square | 1905-1906 | 62,450-73,250 | 4" 5" 6½" | Blue or Nickel | Round and Square |
| Model of 1905, First Change | 1906-1908 | 22,427 33,500 | 4" 5" 6" 6½" | Blue or Nickel | Round and Square | 1906-1908 | 73,251-120,000 | 4" 5" 6" 6½" | Blue or Nickel | Round and Square |
| Model of 1905, Second Change | 1908-1909 | 33,501 45,200 | 4" 5" 6" 6½" | Blue or Nickel | Round and Square | 1908 1909 | 120,001 146,899 | 4" 5" 6" 6½" | Blue or Nickel | Round and Square |
| Model of 1905, Third Change | 1909-1915 | 45,201-65,700 | 4" 6" | Blue or Nickel | Round and Square | 1909-1915 | 146,900-241,703 | 4" 6" | Blue or Nickel | Round and Square |
| Model of 1905, Fourth Change | 1915-1940 | 65,701 144,684 | 4" 5" 6" | Blue or Nickel | Round and Square | 1915-1942 | 241,704-1,000,000 | 2" 4" 5" 6" | Blue or Nickel | Round and Square |

The first military purchase of the Smith & Wesson side swing .38 Hand Ejector occurred on June 25, 1900, when the U. S. Navy purchased 1,000 revolvers. These guns were serial numbered within the Smith & Wesson range of 5,000 to 6,000. On February, 1901, the U.S.

Army followed with an order for 1,000 revolvers numbered in the serial range of 13,001-14,000. These purchases were the beginning of the Smith & Wesson .38 Military and Police Model used by the U.S. Armed Services, and it has remained a popular revolver with them.

The most important change made to the .38 M&P, as the gun was commonly called, occurred in 1904 when the firm introduced the model in its square-butt configuration. This important change allowed for better control, made it easier to shoot, and resulted in its becoming the standard frame configuration. This was the last major approval made by the aging D. B. Wesson, who passed away the following year.

The .38 Military and Police revolver soon became the bread and butter gun of Smith & Wesson, with the majority of the firm's production devoted to this model. This fact has remained true since the early 1900s. The only time production of this famous model was discontinued was from June 3, 1918, to February 6, 1919, when the U.S. Government took control of the plant in a concentrated effort to produce the .45 Hand Ejector Model of 1917 for military forces.

**Smith & Wesson .38 Military and Police Model of 1905. This square-butt style was first introduced by Smith & Wesson in late 1904 and became popular immediately.**

The most important variation of the .38 M&P is a group of revolvers produced for the British Commonwealth nations. These are identical in design to the .38 Hand Ejector Model of 1905 Fourth Change, except they were chambered for the .38 S&W instead of the .38 S&W Special cartridge. Because this cartridge was loaded with a 200-grain, round nose, lead bullet, the revolver was nicknamed the .38/200 British Service revolver. Production on this model began on March 11, 1940, and was serial numbered as a continuation of the

**Smith & Wesson .38/200 British Service revolver, caliber .38 S&W, circa 1943. Collection of William J. Orr.**

.38 M&P series. By September 1940, the firm concentrated its efforts on the production of only this model to meet the needs of England's war effort. The factory's production for the month showed 6,125 .38/200 British Service revolvers produced and only 149 various other models. From October 1940 until February 27, 1941, the firm's total production was concentrated on the British Service revolver. On February 27, 1941, Smith & Wesson sufficiently increased its production capacity to allow the .38 Military and Police Model to be placed back into production, and both models were produced from that date forward. Production on the .38/200 British Service revolver continued until March 29, 1945, when it was discontinued with the firm having produced 568,204 revolvers.

On April 24, 1942, Smith & Wesson's serial numbers on the original .38 M&P series reached 1,000,000, and a new series was started having a V prefix beginning at serial number V1. This series was nicknamed the Victory Model to signify the company's hope for a quick victory in World War II. Both the .38/200 British Service revolver and the .38 M&P were serial numbered within this new series. The Smith & Wesson .38/200 British Service revolver was manufactured in 4", 5", and 6" barrel lengths, with early production models having a bright blue finish and revolvers produced from December 4, 1941, to April 10, 1942, having a brush blue finish. After this date, the revolvers were supplied with a sandblast parkerized finish.

The .38 M&P Victory model was produced in the same finishes as the British Service revolver but was available only in 2'' and 4'' barrel lengths. It is marked for the .38 S&W Special cartridge, which distinguishes it from the British Service revolver. Many minor design changes were made during World War II to help increase production. The most important change was the incorporation of a new hammer block. The hammer block, used on the .38 Military and Police during most of World War II, was removed from the blocked position as the hand was raised to rotate the cylinder. The hand simply cammed the hammer block into the side plate. The return of the hammer block was dependent on spring action. Excessive dirt or heavy grease could prevent the hammer block from returning to the position of blocking the hammer, thus eliminating this secondary safety device to prevent accidental discharge of the revolver when dropped.

**Smith & Wesson Victory Model, which was produced primarily for Unites States Armed Services, circa 1943, caliber .38 S&W Special.**

The new-style hammer block was designed during a crash program in December 1944 after the plant superintendent, C. R. Hellstrom, received reports of a Smith & Wesson accidentally discharging when dropped. The new hammer block was directly connected to the rebound slide and operated in a slot in the side plate. It was mechanically forced back into position by the heavy spring action of the rebound slide. Failure of it to function would result in jamming of the revolver. This new hammer block was incorporated at serial number V769,000 of the Victory Model series. To allow for easy identification of

**The two styles of Smith & Wesson hammer blocks. Top illustrates the 1915 hand-operated cylinder stop called the wing style hammer block. Bottom illustrates the rebound slide hammer block incorporated in December 1944.**

revolvers equipped with the new hammer block, the factory changed the prefix from V to VS. All revolvers at Smith & Wesson partially completed were changed from the old-style hammer block to the new. These revolvers can be identified by the stamped SV prefix.

The old buildings had begun to show signs of weakness after serving as a revolver manufacturing facility for eighty-five continuous years, and wartime production literally shook the old Smith & Wesson factory on Stockbridge Street in downtown Springfield, Massachusetts. But production proved rewarding to the company, since it raised it from near bankruptcy to prosperity. The hectic pace of wartime production ended on August 27, 1945, when the firm stamped the last wartime serial number VS811,119 on a .38 M&P Victory Model The company took a brief rest as it

changed back to the production of revolvers for the commercial market. The first commercial revolvers accepted were 100 .38 Military & Police revolvers completed on September 12, 1945. The new commercial serial number for this model was a continuation of the Victory model series, but the victory had been won, the war ended; therefore, the V was dropped, and the S prefix stamped still signified the new hammer block. The new commercial series began with serial number S811,120.

The sales force at the factory stepped up its effort to sell revolvers on a commercial basis, with special emphasis on law enforcement agencies. The .38 M&P revolver had an outstanding reputation and was in demand by the U.S. law enforcement agencies and foreign governments. The U.S. agencies accepted the revolver in the .38 S&W Special caliber but some foreign governments adopted other calibers as standard. Therefore, in February 1947, Smith & Wesson found themselves back in production of a .38/200 revolver to satisfy a British Commonwealth country. The firm produced 10,009 of these revolvers, completing them on August 11, 1947. The firm received many contracts for revolvers of this .38 S&W caliber throughout the 1950s and early 1960s. When assigning model numbers during the 1950s period, the .38/200 revolver was called the Model 11.

One of the rarest groups of Military and Police revolvers completed was manufactured from January 19, 1948, to February 3, 1950. These guns, designated the .32 Military and Police, were designed to fire the .32 S&W Long cartridge rather than the .38 Special. The revolver was standard with a 4'' barrel, but the firm produced a limited supply of 2'' and 5'' lengths. When production was completed, the firm had produced a total of 4,813 revolvers. Today, one of these revolvers would be a rare find for the Smith & Wesson collector.

On February 11, 1948, at serial number S990,184, the factory further improved the .38 Military and Police series by incorporating a new short hammer throw developed for target revolvers. With this change, the .38 Military and Police Model became the revolver recognized today as the Model 10. By March 22, 1948, the factory completed its second million Military and Police revolvers and began a third serial number series having a C prefix. This series began at C1 and continued until November 27, 1967, when Smith & Wesson completed its third million .38 Military and Police revolvers. At this time, a new series having a

prefix D was begun and continues in use today.

During the period from 1948 to 1977, some interesting models have been serial numbered in conjunction with this model. These models are:

MODEL 10 M&P VARIANTS

| Model | Date Introduced | Starting Serial Number | Special Feature |
|---|---|---|---|
| 45 | March 23, 1948 | S982,000 | .22 caliber M&P |
| 12 | September 11, 1952 | C223,999 | **Airweight** Model |
| 13 | September 1974 | | .357 M&P |
| 64 | September 1, 1970 | D224,001 | Stainless Steel M&P |
| 65 | September 1974 | | .357 Stainless Steel M&P |

The Models 13-1, 64, 65-1 are recent innovations of the factory. The Model 13 was originally designed for the New York State Police. When first sold to this agency, it was a special Model 10 heavy barrel in the .357 *Magnum* caliber and was marked with the Model 10-6 designation. It was changed to the Model 13-1 when it became a standard model in September 1974. The Model 65 was originally designed for the Oklahoma

**Top is Smith & Wesson Model 64 Stainless Steel .38 Military and Police with original standard weight barrel. Bottom is Model 64-1 in heavy barrel as introduced in 1972.**







Top is Smith & Wesson Model 65 Stainless Steel .357 Military & Police.
Bottom is Smith & Wesson Model 13-1 .357 Military and Police.

Highway Patrol and, like the Model 13, it was originally marked Model 64-1 in *.357 Magnum* with the official number of Model 65-1 adapted prior to being placed in Smith & Wesson's catalog.

The two most interesting variations listed are the Model 12 Military and Police *Airweight* and the Model 45. The *Airweight* Military and Police was designed to provide the user with an ultra-light revolver with a weight of 14-3/8 ounces in the 2'' round-butt model. This light weight was accomplished by using an aluminum alloy frame and cylinder, making this model the lightest weight 6 shot revolver available. In 1953, the U. S. Air Force purchased a large quantity of these revolvers for use by flight crews. This model was marked with an M13 on the top strap designating it as an Air Force Model 13, but it was not officially assigned a model number by Smith & Wesson. The Air Force experienced difficulty with the aluminum cylinder and they scrapped the gun. In 1954, the factory discontinued the use of the aluminum cylinder, replacing it with a conventional steel cylinder that brought the total revolver weight to 18 ounces.

The Model 45 .22 caliber Military and Police Model was originally designed as a training gun for the U. S. Postal Service and various police agencies. It was produced from 1948 to 1957 (C407,400 serial range) and again in 1963 (C622,700 serial range). Although

Top is Smith & Wesson .38 Military and Police Model AIR-WEIGHT, referred to by the Air Force as the Model 13 Air-crewman.
Bottom is Model 12 .38 Military and Police AIRWEIGHT, circa, 1977.

basically a special order gun, approximately 500 were sold through Smith & Wesson's distributors and, therefore, are seen by the Smith & Wesson collector.

Smith & Wesson has always tried to maintain a versatile line of Military and Police revolvers to meet the needs of all agencies; therefore, it was not a surprise when, on October 21, 1957, they began production of a heavy-barreled version of this model. With this new heavy-barrel variation, the factory offered the gun in round or square butt, steel or aluminum construction, and barrel lengths of 2'', 3'', 4'', 5'', and 6''; with the square butt also available in the 4'' heavy barrel. All were produced in blue or nickel, with blue being the most common finish.

On June 12, 1957, Smith & Wesson began stamping model numbers in the yoke cut of their



Smith & Wesson Model 10-6 .38 Military and Police heavy barrel.

revolvers, thus returning to identifying their revolvers by model number rather than by name. This numbering system also provided the factory with a method of marking the guns by the various engineering changes as each was incorporated. For example, since that date the Military and Police Model has been known as the Model 10, 10-1, 10-2, 10-3, 10-4, 10-5, and 10-6. There is no question that these designations have confused many a collector. To help solve the mystery, the following chart identifies the changes.

MODEL 10 & Model 12 ENGINEERING CHANGES

| Model Number | Date Incorporated | Engineering Change |
|---|---|---|
| 10 | June 12, 1957 | Start of model numbering |
| 10-1 | April 8, 1959 | Designation for heavy-barrel model |
| 10-2 | February 24, 1961 | Change from 1/10'' front sight to 1/8'' front sight. Extractor rod changed from right-hand thread to left-hand |
| 10-3 | February 24, 1961 | Same as 10-2, except heavy-barrel model |
| 10-4 | January 15, 1962 | 1/10'' front sight, screw in front of trigger eliminated |
| 10-5 | January 15, 1962 | 1/8'' front sight, screw in front of trigger guard eliminated |
| 10-6 | January 15, 1962 | Same as 10-5 except heavy barrel |
| 12 | June 12, 1957 | Start of model number |
| 12-1 | January 15, 1962 | Left-hand extractor rod, screw in front of trigger guard eliminated |
| 12-2 | January 15, 1962 | Front sight changed to 1/8'' |

There is no question that the Model 10 and the companion models have not been the glamour guns for Smith & Wesson, but they certainly were the workhorses that never tired and pulled the factory forward to great success.

## K-FRAME TARGET MODELS

The Model K with adjustable target sights was introduced in 1899. In 1900, records indicate the .38 Hand Ejector Target, or .38 Military and Police Target as this model was more commonly called, was used by many leading competitive shooters throughout the world. Smith & Wesson's statistics of 1913 show

Smith & Wesson .38 Hand Ejector First Model with a rare 8'' barrel and fully adjustable target sights. This model was the first of the K-frame Target Models and was manufactured in 1899.

twenty-seven of the forty U. S. Revolver Association (USRA) records were made with the Smith & Wesson target revolver. The USRA at this time was the largest competitive pistol association in the world. The most important and remembered record accomplished with a Smith & Wesson .38 M&P Target (serial number 640,792) took place in the Fergus Motor Gallery in Lewiston, Montana, on January 23, 1934, when Ed McGivern fired five shots into an area the size of a playing card in two-fifths of a second. There is no doubt that this feat has been the subject of discussion by revolver shooters the world over.

As early as 1927, Smith & Wesson began receiving suggestions from competitive shooters to develop a .22 caliber revolver with the same balance as the .38 M&P Target model. The factory began development of a new .22 caliber revolver that same year and, upon investigating various facets of the market, they found that a revolver of this kind was also in heavy demand by the sportsmen of the United States. Production of a new model began in 1930, but revolvers were not completed until January 30, 1931. Smith & Wesson's advertising proudly referred to this model as the K-22 Outdoorsman, signifying the market appeal for this revolver. The catalog simply referred to the gun as the K-22 Target revolver but the name Outdoorsman had been so strongly associated with the new model that it became part of the name. To help separate it from later variations, the collector renamed it the K-22 First Model.

# Frontier Law and Order

## TEN ESSAYS

BY

PHILIP D. JORDAN

UNIVERSITY OF NEBRASKA PRESS   LINCOLN

Compendium_Roth
Page 0330

UNP
Publishers on the Plains

Copyright © 1970 by the University of Nebraska Press
All rights reserved
Standard Book Number 8032–0709–3
Library of Congress Catalog Card Number 70–88086

343.073
J765f

71-57

San Francisco Public Library

Manufactured in the United States of America

To Nibs
my beloved first grandson

CHAPTER ONE

# *The Wearing of Weapons in the Western Country*

The tools of assault are many—the poniard that severs soul from body, the whip that lacerates bare back, the pistol that points the path to eternity, the sharp-honed thumbnail that gouges the eye from its socket. The heavy bowie knife hefts well, and the lyncher's knot tightens well. The six-gun upon occasion was a greater equalizer than was the ballot box. Deadly weapons, grasped by men of vengeance and men of passion and held hard in the clutch of gentlemen at stand on the early morning duelling field, were common to the western country. Powder and ball and blade scarred an advancing frontier, seared low country and high country, and scorched and blistered a land of promise with unbelievable violence, so that murder and mayhem were thought by many to symbolize an age.

An old saw says that guns don't kill—that the man behind the gun does the slaying. It is equally true that, lacking a weapon, a man can neither threaten nor wound nor kill with it. Yet over-simplification deceives, and there are times when deadly devices are a necessity and, when properly used, support and strengthen society. Wise and prudent individuals know quite well what the fool and the bully never comprehend—the possession of weapons does not put the whole world in their hands.

Both purveyors and wearers of weapons throughout the western country justified the carrying of knives and hand-guns on grounds of self-defense. Scores of frontier lawyers, brought up on Blackstone, quoted his commentaries with enthusiasm. These backwoods legalists learned from the English jurist that self-defense is "The *defense* of one's self, or the mutual and reciprocal defense of such as stand in the relations of husband and wife, parent and child, master and servant." In such cases,

continued Blackstone, if the party himself or *any* of his relations be forcibly attacked in person or property, "it is lawful for him to repel force by force; and the breach of the peace which happens is chargeable upon him only who began the affray." The commentaries, appearing in the first American reprint in 1771 and selling some twenty-five hundred copies in America before the Declaration of Independence, also carried a warning: "Care must be taken that the resistance does not exceed the bounds of mere defence and prevention; for then the defender would himself become an aggressor."[1]

Blackstone's definition of self-defense, generally speaking, was accepted and written into state statutes and eventually found its way into manuals published for the guidance of justices of the peace, sheriffs, constables, and marshals. The law usually sought to prevent the need for an individual to defend himself, his kin, and his property by stipulating either that weapons not be carried openly or not be worn concealed. Tennessee, for example, in 1801 passed an act making it illegal for persons to "publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person."[2]

A little more than a decade later, Louisiana statutes made it unlawful for persons to carry weapons concealed in their bosoms, coats or any other place, and permitted peace officers to stop and search those whom they suspected of doing so.[3] Free colored persons in Louisiana were permitted to carry weapons only if they secured a permit from a justice of the peace, and slaves were forbidden, either by day or night, to carry visible or hidden arms.[4] An Alabama act of 1841 was most specific, saying that when a killing in any sudden encounter or affray was caused by an assailant, "by the use of a deadly weapon, concealed before the commencement of the fight, his adversary having no deadly weapon drawn," such a slaying would be deemed murder in the second degree, but stipulated that a jury would not be precluded from finding the assailant guilty in the first degree.[5] Shopkeepers and vendors of Georgia were forbidden in 1837 to sell, keep in stock, or have about their persons bowie or other knives or pistols, dirks, sword canes, and spears.[6]

[1] William Blackstone, *Commentaries on the Laws of England*, ed. with an introduction and notes by George Sharwood, 3 vols. (Philadelphia: J. B. Lippincott & Co., 1872, 1873), vol. 2, bk. 3, pp. 2–4; see also John H. Wigmore, *A Panorama of the World's Legal Systems*, 3 vols. (St. Paul: West Publishing Co., 1928), 3:1094–95.

[2] Edward Scott, comp., *Laws of the State of Tennessee . . . 1715–1820*, 2 vols. (Knoxville: Heiskell & Brown, 1821), 1:710.

[3] Meinrad Greiner, comp., *Louisiana Digest, 1804–1841* (New Orleans: Benjamin Levy, 1841), p. 13.

[4] Ibid., pp. 219, 500.

How deadly dangerous weapons were is made dramatically clear by the language of indictments for murder drawn up in courts throughout the Kentucky country: "That whereas AB late of the county of . . . merchant, and CD . . . laborer, not having the fear of God before their eyes, but seduced by the instigation of the devil" assaulted and killed EF and that AB with a pistol "then and there charged with gun powder, and a leaden bullet, which gun the said AB in his right hand held upon EF and feloniously, voluntarily and of his malice aforethought, did shoot off and discharge" resulting in a fatal wound in the breast half an inch wide and five inches deep.[7]

As the frontier worked its illegal will upon the land, territories and states sought by statute to discourage the wearing of weapons openly or concealed. From the laurel-crowned Allegheníes to the towering Rocky Mountains, toward Colorado mining camps and on to sites where diggers in California courted Lady Luck, the struggle was waged. It continued throughout the Mississippi River basin and on into the southwest. An Illinois act, rather ambiguous, stipulated a fine of not more than a hundred dollars or imprisonment for anyone having "upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon."[8] The words "upon him" could prove tricky in a court presided over by a justice of the peace, for too many were notoriously ignorant of the law, eager to collect their fees, and not anxious, unless imperative, to flaunt popular custom.

It is equally difficult to learn precisely whether a Minnesota statute prohibited the carrying of concealed weapons, although the presumption is, if the law be read literally, that the act proscribed the wearing

[5] *Alabama Acts, 1839–1841* (Tuscaloosa: Hale & Eaton, 1840), p. 123.

[6] *Digest of Statute Laws of Georgia, 1851* (Athens: Christy, Kelsea & Burke, 1851), p. 848; this entire statute was considered and declared *unconstitutional*, so far as it *prohibited* the carrying of weapons; and *constitutional*, as it *prescribed the mode of carrying them* (1 Kelly, p. 243).

[7] John Bradford, *The General Instructor; or, The Office, Duty, and Authority of Justices of the Peace, Sheriffs, Coroners and Constables of the State of Kentucky . . .* (Lexington: John Bradford, 1800), pp. 75–76. See also Abraham E. Gwynne, *A Practical Treatise on the Law of Sheriff and Coroner, with Forms and References to the Statutes of Ohio, Indiana and Kentucky* (Cincinnati: Derby, 1849); William Littell, *The Statute Law of Kentucky* (Frankfort: Robert Johnson, 1814).

[8] *Illinois Revised Laws, 1832–1833* (Vandalia: Greiner & Sherman, 1833), p. 202.

of weapons openly or concealed. On the other hand, it most likely did neither, for it seemed to imply that a person might bear arms, either concealed or not, if he had "reasonable cause to fear an assault or other injury or violence to his person, or to his family or property."[9] On the other hand, a Nebraska act hinged upon the "intent" factor, and mere intent, upon occasion, is difficult to prove. This act, crisply put, held that a person might carry hidden or open weapons if he had no intent to make an assault.[10]

The code of North Dakota forbade the carrying of concealed arms, but said nothing about carrying them openly.[11] The Territory of Arizona forbade the concealment on the person of dirks, bowie knives, slung shots, brass knuckles, and pistols only within towns, villages, and cities. In addition, it stipulated that every person who, not in necessary self-defense, in the presence of two or more persons, drew or exhibited any deadly weapon in a "rude, angry, or threatening manner" was guilty of a misdemeanor.[12] A Texas act, making no mention of how a weapon was worn, offered somewhat of an innovation by stating that any person killed with a bowie knife or dagger, under circumstances which would otherwise render the homicide a case of manslaughter, "the killing shall nevertheless be deemed murder, and punished accordingly." The law, in this instance, defined a bowie knife and a dagger as any knife intended to be worn upon the person, which was capable of inflicting death, and "not commonly known as a pocket knife."[13] Such examples could be multiplied many times, but these are sufficiently typical to demonstrate the law's confusion, or, at least, its inconsistency.

Not until the frontier—that so-called "rough and wooly" period—was drawing its last gasp on the hangman's tree of public opinion which persisted in viewing the frontier only as lawless, did statutes become satisfactorily specific. Both the laws of New Mexico and of Oklahoma, extensive in their provisions and precise enough in their language, made

[9] Moses Sherburne and William Hollinshead, comps., *Public Statutes of the State of Minnesota, 1849–1858* (St. Paul: Pioneer Printing Co., 1859), p. 742.

[10] E. Estabrooke, comp., *Statutes of Nebraska* (Chicago: Page & Hoyne, 1867), p. 624.

[11] *Revised Codes of North Dakota* (Bismarck: Tribune Co., 1896), p. 1293.

[12] Cameron H. King, comp., *Revised Statutes of Arizona* (Prescott: Prescott Courier Print, 1887), p. 726.

[13] *Penal Code of State of Texas* (Galveston: News Office, 1857), p. 96. See also S. Garfielde and E. A. Snyder, comps., *Laws of the State of California, 1850–1853* (Benicia: S. Garfielde, 1853), pp. 642, 645.

clear how weapons were to be borne, defined deadly weapons, and indicated where they might or might not be carried.

The New Mexico statute of 1880 stated categorically that it was unlawful for persons to carry deadly weapons, concealed or otherwise, within any settlement except in the lawful defense of themselves, their families, or their property, which, then and there, were threatened with danger. It defined deadly weapons, by whatever name they might be called, as those with which a dangerous wound could be inflicted. Conviction carried a fine of not less than ten dollars nor more than fifty dollars, or imprisonment of not less than ten days nor more than fifty days at the discretion of the jury trying the case. It provided penalties for persons who drew or used a deadly weapon at any ball, dance, election poll, or any other public place. It permitted travelers to carry arms within territorial settlements or towns for one hour after arriving and while traveling out of towns and away from settlements. It directed that operators of hotels, boarding-houses, and drinking saloons post in conspicuous places a "plain notice in both Spanish and English, to travelers to divest themselves of their weapons." Finally, the act stipulated that every person taking out a license for a ball, dance, or fandango must swear to preserve good order and enforce the law.[14]

The Oklahoma statute of 1890, although kin to the New Mexico act, offered significant variations. This act made it illegal to carry *concealed* on a person, on a saddle, or in saddlebags, any pistol, revolver, bowie knife, dirk, dagger, slung shot, sword cane, spear, metal knuckles, or any type of knife or instrument manufactured or sold for the purpose of defense. It also proscribed the carrying *openly* of the weapons just enumerated. The only arms persons were permitted to carry were shotguns and rifles for hunting or for repair, for killing animals, for use at public musters or militia drills, or while traveling from one place to another. It was made unlawful to sell or give deadly weapons to minors. It was unlawful for anyone, except a peace officer, to carry weapons to church, schools, places of amusement, shows, circuses, or into ballrooms, social parties or gatherings, or to any resort where intoxicating liquors were sold. The act permitted public officers to wear arms only while on duty or while going to and from their homes from their place of duty.[15]

[14] L. Bradford Price, comp., *General Laws of New Mexico* (Albany, N.Y.: W. C. Little & Co., 1880), pp. 312–15.

[15] Will T. Little et al., comps., *Statutes of Oklahoma, 1890* (Guthrie: State Capital Printing Co., 1891), pp. 495–96.

Territorial and state statutes concerning the wearing of weapons were, in a manner, reflected in village, town, and city ordinances. A few examples must suffice. All were passed by western frontier municipalities. On May 6, 1837, the trustees of the recently incorporated town of Burlington, Iowa, then the Territory of Wisconsin, passed the following ordinance: "Any person who shall, except in defence of his person or property, shoot, discharge, or cause to be discharged any firearms of any description" upon conviction was subject to a fine of not less than five dollars, nor more than ten dollars.[16] Three years later Quincy, Illinois, forbade the firing of any musket, fowling-piece or other firearms, except in case of necessity, or in the performance of some public or lawful duty.[17] About the same time St. Louis passed similar ordinances.[18] Memphis, Tennessee, and other southern cities proscribed the firing of guns and pistols within city limits.[19] Not one of these examples, it will be seen, deals directly with the wearing of weapons, openly or concealed. City officials felt that their ordinances forbidding the discharge of guns covered, in a sense, the carrying of them. Furthermore, prosecution could always be initiated under state statutes.

The law then, on both state and local levels, seemed plain enough concerning both the carrying and the firing of weapons. Moreover, acts were equally clear when they spoke of the wearing and use of arms used for thrusting, cutting, and stabbing. Yet, as most persons should know, there is a chasm of difference between the passing of an act and its successful execution. A back-country lawyer once put it to me succinctly: "There's a helluva lot of difference between them legislators writin' an act and passin' hit and gettin' enybody from the sheriff on down to enforcin' er obeying hit."

[16] Journal of the Proceeding of the Board of Trustees of the Town of Burlington, in the Territory of Wisconsin, Elected Agreeably to the Provisions of an Act of the Legislative Assembly of the Said Territory, Entitled "An Act to Incorporate the Inhabitants of Such Towns as Wish to be Incorporated," December 6, 1836, MS, City Clerk's Office, Burlington, Iowa.

[17] Quincy, Illinois, Ordinance Book, 1840–1856, p. 13, MS, City Clerk's Office, Quincy, Illinois.

[18] St. Louis, *Revised Ordinances . . . 1835–1836* (St. Louis: Missouri Argus, 1846), p. 197; also St. Louis, *Revised Ordinances . . . Revised and Digested by the Fifth City Council . . .* (St. Louis: Chambers & Knapp, 1843), p. 300.

[19] *Digest of the Ordinances of the City Council of Memphis, 1826–1857* (Memphis: Memphis Bulletin Co., 1857), p. 161; see *Vicksburg Register*, September 18, 1834: "Be it ordained by the President and Selectmen of the town of Vicksburg, That if any person shall discharge a gun, pistol or other firearms within the limits of the town of Vicksburg, he or she shall incur a penalty of ten dollars for such offense . . . and it shall be the duty of the Town Constable to report to the president all violations of this ordinance."

"The law," said the *New Orleans Bee*, "is tolerably strong relative to carrying dirks, pistols or other weapons of assault. Why is it not enforced?"[20] Three dynamic, viable factors thwarted the law. First, men liked weapons, wanted weapons, enjoyed the power that weapons lent them, and insisted on having and using and carrying and handling them as they pleased. Second, a good many gentlemen of one kind or another—some jurists and some vagrants—were disciples of a religion known as the "higher law." Third, personal weapons, upon occasion, were urgently needed for self-defense.

Arms of every description were easy to come by, and there was scarcely a town in the western country which did not boast of a gunsmith who, in addition to repairing weapons, also peddled them. In cities, several specialty shops and a variety of general stores catered to the gun trade. Newspapers advertised bowie knives, tomahawks, pistols, and daggers for sale not only to gamblers but also to sportsmen.[21] The *Philadelphia Public Ledger* complained in 1837 of the alarming extent to which its citizens were carrying concealed weapons.[22] "No excuse whatever can be used for this practice," said the editor. "As a measure of defence, knives, dirks, and sword canes are entirely useless. They are fit only for attack, and all such attacks are of murderous character. Whoever carries such a weapon has prepared himself for homicide."[23]

Alexander Marjoribanks, an English traveler, found the use of the bowie knife and revolving pistol most prevalent in Cincinnati, and thought that, in this respect, the Queen City was outstripping New Orleans.[24] Another Englishman, surveying the United States, said that throughout New Orleans stalls selling pocket pistols and knives were "scattered in all directions,"[25] T. H. Gladstone observed that "every white stripling in the South may carry a dirk-knife in his pocket, and play with a revolver before he has learned to swim."[26] Foreigners,

[20] *New Orleans Bee*, August 10, 1835.

[21] *Philadelphia Mirror*, October 10, 1836.

[22] *Philadelphia Public Ledger*, March 20, 1837.

[23] Ibid., January 25, 1837.

[24] Alexander Marjoribanks, *Travels in South and North America* (London: Simpkin, Marshall, & Co., 1853), p. 277.

[25] James Logan, *Notes of a Journey Through Canada, the United States of America, and the West Indies* (Edinburgh: Fraser & Co., 1838), p. 178.

[26] T. H. Gladstone, *The Englishman in Kansas* (New York: Miller & Co., 1857), p. xxviii.

however, were not alone in describing both the prevalence and the use of weapons. Many a Yankee, such as a native of Maine and a clergyman from Minnesota, spoke as did visitors from abroad. The man from Maine taught languages at Jefferson College, Mississippi, and his elaborate literary style reflected his profession. He wrote of moonbeams touching bright hilts of Spanish knives stuck in the open bosoms of nearly every New Orleans gentleman. The minister, later to become the first Episcopal bishop of Minnesota, jotted in his diary that, although it was a penitentiary offense for Alabamians to carry concealed weapons in the streets, the law was broken daily.[27]

Wayfarers and travelers, no matter what their calling, were apt to see through a distorted lens and to write contrived observations. If a corrective is needed for those mistaken, out-of-focus, itinerant snoopers of American society, the native newspaper editor provided balance. But both visitors and journalists, however they might bicker over some aspects of frontier life, agreed that the wearing of weapons was both threat and hazard. The national press constantly reported assaults and murders with arms. "Every day," an editor said, "exhibits some portion of the *sovereign* people in arms against the laws of God and the country, and against their own rights and the rights of others." The *Boston Evening Transcript* in 1841 could never recollect a time when there was such an "extensive system of frauds, villainies, and robberies, and all kinds of rascalities." A Minnesota editor, a few years later, spoke of daily lists of sickening, bloody murders.[28] Nor must it be believed, although many travelers did think so and some scholars still do, that the South was more lawless during its frontier period than were other areas during their formative years.[29]

[27] Joseph H. Ingraham, *The South-West: by a Yankee*, 2 vols. (New York: Harper & Bros., 1835), 1:90; Lester B. Shippee, ed., *Bishop Whipple's Southern Diary, 1843–1844* (Minneapolis: University of Minnesota Press, 1937), pp. 86–87.

[28] *Philadelphia Public Ledger*, October 29, 1840; *Boston Daily Evening Transcript*, May 22, 1841; *Winona* (Minnesota) *Argus*, May 14, 1857. For additional editorial comment, see "The Mississippi—Spillway of Sin" and "The Derringer and the Ace of Spades: Reflections on Middle Border Law and Order," pp. 23 and 99, respectively, of this volume.

[29] At least some Southerners held this view. See A. B. Carlson, *The Law of Homicide, Together with the Trial for Murder of Judge Wilkinson, Dr. Wilkinson, and Mr. Murdaugh* . . . (Cincinnati: Robert Clarke & Co., 1882), p. 194, for the argument of Benjamin Hardin: "If you go into the Northern States, it is a rare thing if you can find a man in ten thousand with a deadly weapon on his person. Go into other States that shall be nameless, and you will hear of them as often as of corn-shuckings in an Indian summer. Go further South—to Arkansas or Mississippi, for instance, and though you would be a peaceable man, shuddering at the name of a 'tooth-pick' in the North, in these States you would arm yourself to the teeth, and track your steps in blood with impunity. Why is this, but from the relaxation of the laws that are elsewhere enforced and obeyed?"

Everywhere, north, east, south, and west of the Bluegrass Country, rogues in buckskin and aristocrats in broadcloth snuffed out lives, and afterwards pleaded self-defense or invoked the higher law. The arguments made by both the prosecution and the defense in the famous Galt House murder are perfect examples of nineteenth-century attitudes. This unsavory affair occurred in Louisville, Kentucky, on December 15, 1838. In a barroom brawl, three Mississippians killed a local tailor and bartender in an argument over the fit of a suit of clothes. Feeling ran so high that a change of venue was taken from Louisville, Jefferson County, to Harrodsburg, Mercer County, and trial began on March 11, 1839. Prosecuting was the State, and both plaintiff and defendants were represented by legal talent, among whom were Benjamin Hardin, for the State, and Sergeant S. Prentiss, of Mississippi, for the defense.[30] Among the murder weapons was a bowie knife, "probably," so a witness described, "from eight to ten inches long in the blade, two inches wide, heavy, and shaped at the point like other knives of the same name."[31]

Prentiss, through the trial, harped upon the self-defense theme. "Why," he asked, "is the step of the Kentuckian free as that of the bounding deer; firm, manly and confident as that of the McGregor when his foot was on the heather of his native hills, and eye on the peak of Ben Lomond? It is because he feels independent in the knowledge of his rights, and proud in the generous consciousness of ability and courage to defend them, not only in his own person, but in the persons of those who are dear to him." Warming to his subject, the defense attorney continued: "When the rattlesnake gives warning of his fatal purpose, the wary traveler waits not for the poisonous blow, but plants upon the head his armed heel, and crushes out, at once, his 'venom and his strength.'" There was more to come. "When the hunter hears the rustling in the jungle, and beholds the large green eyes of the spotted tiger glaring upon him, he waits not for the deadly spring, but sends at

[30] Ibid., T. Egerton Browne, *Trial of Judge Wilkinson, Dr. Wilkinson and Mr. Murdaugh, on Indictments for the Murder of John Rothwell and Alexander H. Meeks* . . . (Louisville: T. E. Browne & Co., 1839).

[31] Carlson, *Law of Homicide*, p. 15. For accounts and descriptions of the bowie knife, see J. Frank Dobie, "Bowie and the Bowie Knife," *Southwest Review* 16 (April 1931): 351–68; *Niles' Register*, September 29, 1838. Innumerable foreign travellers and American newspapers commented upon both the knife and its use.

once through the brain of his crouching enemy the swift and leaden death."[32]

The defense's purple prose grew deeper and richer when it justified the substitution of the higher law for man-made statutes. Nowhere in legal pleading appears a better exposition:

> Sirs, there are sins against individuals, as well as sins against heaven, which can only be expiated by blood—and the law of Kentucky is, that the man who is attempted to be *cowhided*, not only *may*, but *must*, if by any possibility he can, *at the time*, kill the man who attempts thus to degrade him. I do not refer to a law of Kentucky, enacted by the Legislature of this State; I mean a law paramount to any enacted by the Kentucky Legislature, a law that emanates from the *hearts* of the people of Kentucky, and is sanctioned by their *heads*—a law that is promulgated in the *os ad coelum* of every Kentuckian, and proclaimed in the sparkling of every eye of *both* sexes and *all* ages—a law, the force of which every one feels, the import of which every one perceives by intuition. It is the law of the *Kentucky instinct*—none are so ignorant as not to know this law; few are so dastardly as to deny its injunction.[33]

Hardin, for the prosecution, generally deplored the wider latitude given to the restraints of law in southern states as against stricter enforcement in northern communities. He told the court that climate affected character, arguing that "he who on the iron-bound coast of the frozen North or on the arid rocks of New Plymouth, would illustrate every noble virtue of his nature, not less distinguished for his piety than his patriotism, for his endurance than his courage, and for his generosity than his bravery, when transplanted to the enervating regions of the South may become different and degenerated, trusting more to his interests than his patriotism, and to concealed weapons than to bravery."

Hardin attacked also Louisville's taverns and saloons, maintaining that their existence was due to political favoritism. "Even the municipal government," he charged, "is either influenced by paltry mercenary motives in its avidity for the revenue of licenses, or it has not the nerve or public interest to grapple with the monster." As no New Englanders turned wayward Southerners were involved in the case and as the only bar involved in the murder was the taproom of the Galt House, Hardin's arguments scarcely seem germane. He was on better, but still

[32] These and subsequent quotations are all taken from Carlson, *Law of Homicide*, pp. 150–51.

[33] J. S. Buckingham published this passage in his *The Eastern and Western States of America*, 3 vols. (London: Fisher, Son, & Co., 1842), 3:33.

shaky, grounds when he attacked the wearing of weapons; "Are we to tolerate this bowie-knife system under the false pretense of self-defense? I say, let your verdict act like the ax laid to the root of the tree, and many a prayer will bless you for your timely check of its growth. Many a woman is made a mourning widow, many a child made a pitiable orphan, and many a father childless by the use of this accursed weapon. Whenever you see men wearing bowie-knives and daggers—hunt them down as you would bears and their cubs, from whom you can expect nothing but injury."

Hardin's pleas proved most unpopular. In the first place, the defendants were being tried for murder, not for carrying weapons. Kentuckians and citizens of other states long had been accustomed to saunter about bearing what pistols and knives they pleased. Indeed, no Kentucky statute prevented them from so doing. It is true that, on February 3, 1813, the legislature had prohibited persons from wearing concealed weapons, but this act was declared unconstitutional by the Court of Appeals in 1822.[34] A similar prohibition was not passed until March 22, 1871.[35] In short, for almost fifty years, the carrying of weapons

[34] C. S. Morehead and Mason Brown, comps., *Digest of Statute Laws of Kentucky*, 2 vols. (Frankfort: Albert H. Hodges, 1835), 2:1289–90. Act to prevent persons in this Commonwealth from wearing concealed Arms, except in certain cases, February 3, 1813: "That any person in this commonwealth who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, unless travelling on a journey, shall be fined in any sum not less than one hundred dollars; which may be recovered in any court having jurisdiction of like sums, by action of debt, or on the presentment of a grand jury; and a prosecutor in such presentment shall not be necessary. One half of such fine shall be to the use of the informer, and the other to the use of this commonwealth." This act declared unconstitutional, *Bliss* v. *Commonwealth*, 2 Litt. 90.

[35] *Kentucky Acts, Adjourned Session, 1871* (Frankfort: Kentucky Yeoman Office, 1871), pp. 89–90. Act to prohibit the carrying of Concealed Deadly Weapons, March 22, 1871: "That if any person shall hereafter carry concealed any deadly weapon upon their persons other than an ordinary pocket-knife, except as provided for in the next session, he shall be fined, on the first conviction, not less than twenty-five dollars, nor more than one hundred dollars, or imprisoned not less than thirty days nor more than sixty days, or both so fined and imprisoned; and on any subsequent conviction not less than one hundred nor more than four hundred dollars, or imprisoned not less than two months nor more than six months, or both. That the carrying of concealed deadly weapons shall be legal in the following cases: 1st. Where the person has reasonable grounds to believe his person, or the person of some of his family, or his property, is in danger from violence or crime. 2d. Where sheriffs, constables, marshals, and policemen carry such concealed weapons as are necessary to their protection in the efficient discharge of their duty. 3d. Where persons are required by their business or occupation to travel during the night, and carrying

openly or concealed was both permissible and allowable. Moreover, public sentiment favored it. One is not unduly surprised, then, to learn that the defendants in the Galt House murder trial were acquitted.

Many a man throughout the western country, as the frontier moved steadily toward the setting sun, believed firmly that his right to bear arms was guaranteed by the constitution of the United States, which recites that "a well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms shall not be infringed." State constitutions carried similar provisions. Indeed, a curious act was passed by the governor and judges of the Northwest Territory under the Ordinance of 1787. This act not only sought to suppress gambling for money, but also attempted to restrain the "disorderly" practice of discharging firearms. Guns were not to be fired near houses nor between sunrise and sunset. Every person shooting at wild game was prohibited from aiming in the direction of settled communities. But the law was careful, in its list of exceptions, to permit the use of weapons in self-defense.[36] There seems little doubt but that the territorial act influenced comparable laws in Ohio and other states carved from the territory.[37]

concealed deadly weapons during such travel." The act defined "concealed" as follows: "That it shall be deemed concealed to carry deadly weapons in a scabbard or belt, if the belt is under the coat, fastened around the person."

[36] Salmon P. Chase, ed., *Statutes of Ohio and of the Northwest Territory, 1788–1833*, 3 vols. (Cincinnati: Corey & Fairbank, 1833), 1:106. Act for suppressing and prohibiting every species of gaming for money or other property, and for making void all contracts and payments made in consequence thereof, and also for restraining the disorderly practice of discharging firearms at certain hours and places, July 26, 1790: "That nothing herein contained shall be deemed or construed to extend to any person lawfully using fire-arms as offensive or defensive weapons, in annoying, or opposing a common enemy, or defending his or her person or property, or the person or property of any other, against the invasion or depredations of any enemy, or in support of the laws of government; or against the attacks of rebels, highwaymen, robbers, thieves, or others unlawfully assailing him or her, or in any other manner where such opposition, defence, or resistance is allowed by the law of the land." The passage relative to wild game is interesting: "Every person shooting at any of such game [buffalo, bears, deer, turkeys, geese, rabbits, etc.] is hereby required to discharge the ball or balls, shot, or missile weapon so employed in a direction from such city, town, or village, or station towards the country so as such ball or balls, missile weapon, or shot, shall pass by or from, and go clear of the buildings pertaining to the same."

[37] *Ohio Acts, Fifty-Third General Assembly, 2nd. Sess., January, 1859* (Columbus: Richard Nevins, 1859), pp. 56–67. Act to prohibit the carrying of concealed weapons, March 18, 1859: "That whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than two months, or both, at the discretion of the court. If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused."

The "constitutional" right of the people to keep and bear arms, no matter what the popular mind believed either in the nineteenth century or today, does not appear to be a common-law right, like that of trial by jury. The Statute of Northampton of 1328 forbade Englishmen to "go nor ride armed by night or by day in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere . . ." Upon the basis of this and other English statutes, it seems clear that the right to keep and bear arms was not regarded as a "fundamental" right of every Englishman. It must be remembered also that the phrase "to bear arms" is a military one, for an individual carrying weapons is not correctly spoken of as "bearing arms."[38]

The middle decades of the nineteenth century witnessed a series of legal wrangles which pivoted on this knotty question of the right of Americans to keep and bear arms. The earliest of these disputes in the western country involved the Kentucky act of 1813, which was ruled unconstitutional nine years later. The Kentucky constitution provided that "the right of the citizens to bear arms in defence of themselves and the state *shall not be questioned*." Therefore, the court of appeals, one of three judges dissenting, held the 1813 act to be in conflict with the constitutional guaranty, and hence void.

The court said: "That the provisions of the act in question do not import an entire destruction of the right of citizens to bear arms in defence of themselves and the state, will not be controverted by the court; for though the citizens are forbid wearing weapons *concealed* in the manner described in the act, they may nevertheless, bear arms in any other admissible form. But to be in conflict with the constitution it is not essential that the act should contain a prohibition against

[38] Lucilius A. Emery, "The Constitutional Right to Bear Arms," *Harvard Law Review* 28 (March 1914): 473–77. See also J. P. Chamberlain, "Legislatures and the Pistol Problem," *American Bar Association Journal* 11 (September 1925): 596–98.

bearing arms in every possible form. It is the *right* to bear arms in defence of the citizens, and the state that is secured by the constitution, and whatever restrains the full and complete exercise of that right, though not an entire destruction of it, is forbidden by the explicit language of the constitution. If, therefore, the act in question imposes *any* restraint upon the right, immaterial what appellation may be given to the act, whether it be an act *regulating* the manner of bearing arms of any other, the consequence, in reference to the constitution, is precisely the same, and its collision with that instrument equally obvious." And the court further on declared that "in principle there is no difference between a law prohibiting the wearing of *concealed* arms and a law forbidding the wearing of such as are exposed." And, therefore, the defendant having been convicted and fined for carrying a sword concealed in a cane, the judgment was reversed.[39]

Such, at times, is the caprice of the legal mind that in 1833 the Supreme Court of Indiana handed down a diametrically opposed ruling to that in the Kentucky case. And this ruling was followed in 1840 by the Supreme Court of Alabama and again a few years later.[40] The Alabama law forbade the wearing of concealed weapons, and the court held that the statute was not in conflict with the state constitution, which provided that citizens enjoyed the right to bear arms in defense of themselves and the state.

In the Alabama case of 1840, the court wrote that the state constitution in declaring that every citizen has the right to bear arms in defense of himself and the state, "has neither expressly nor by implication denied the legislature the right to enact laws in regard to the *manner* in which arms shall be borne. The right guaranteed to the citizen is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the state.' The terms in which this provision is phrased seemed to us necessarily to leave with the legislature the authority to adopt such regulations of police as may be dictated by the safety of the people and the advancement of public morals."[41]

[39] "The Right to Keep and Bear Arms for Private and Public Defence," *Central Law Journal* (St. Louis), nos. 22–23 (May 28 and June 4, 11, and 18, 1874), pp. 259–61, 273–75, 285–87, 295. No more succinct synopsis of *Bliss* v. *Commonwealth*, 2 Littell 90, is in print, and my account of the case is taken verbatim from p. 260 without quotation marks, except those originally used. To the unsigned author, I acknowledge appreciation.

[40] Alabama, *The State* v. *Reid*, 1 Ala. 612; *Owen* v. *The State*, 31 Ala. 387.

[41] Quoted from *Central Law Review*, p. 260, referring to *The State* v. *Reid*.

In the second Alabama case, the court, after viewing with approbation the findings in the 1840 case, commented further: "We do not desire to be understood as maintaining that in regulating the manner of bearing arms, the authority of the legislature has no other limit than its own discretion. A statute, which, under pretence of *regulating* the manner of bearing arms, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution." The court continued: "Under the provision of our constitution, we incline to the opinion that the legislature cannot inhibit the citizen from bearing arms *openly*, because it authorizes him to bear them for the purpose of defending himself and the state, and it is only when carried openly that they can be effectively used for defence."[42]

Another question remains: did a state possess authority, under its constitution to forbid the concealed wearing of *certain* kinds of weapons? Tennessee's constitution, for example, stipulated that free white men held the right to keep and bear arms "for their common defence." The legislature enacted a statute providing proper punishment for persons who carried concealed under their clothes any "bowie-knife, or Arkansas tooth-pick, or other knife or weapon that shall in form, shape or size resemble a bowie-knife, or Arkansas tooth-pick."

The act was challenged and moved up the legal ladder to the high court, which upheld its constitutionality. The court held, in what has been called the most instructive case on this particular point, that: "As the object for which the right to keep and bear arms is secured, is of a *general* and *public* nature, to be exercised by the people in a body for their *common* defence, so the *arms*, the right to keep which is secured, are those which are usually employed in civilized warfare, and that constitute the ordinary military equipment. If the citizens have these arms in their hands, they are prepared in the best possible manner to repel any encroachments upon their rights by those in authority. They need not, for such a purpose, the use of those weapons which are

[42] Ibid., referring to *Owen* v. *The State*.

usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[43]

Neither must it be believed that a person might carry a concealed weapon and justify both the carrying and concealment on the grounds that he, in the past, had been attacked and now, as a result, was wearing a weapon in self-defense. A Kentuckian, arrested and convicted of carrying a concealed weapon, justified his action by proving that he had been shot at by strangers more than two years previously and that, since that attempted assault, he habitually had worn concealed arms. The court declared these facts wholly irrelevant, because there was "neither proof nor cause for apprehension of any such impending danger." The conviction was upheld.[44]

When the frontier was closed formally in 1890, the time-honored, traditional, and established hobby of carrying and drawing deadly weapons had been curtailed in most states throughout the Union.[45] No longer was it legal to comport one's self as did many a disconsolate lover in a multitude of bathetic folk songs:

She then drew out the silver dagger,
And sank it in her snow-white breast,
At first she reeled and then she staggered,
Saying fare you well, I'm going to rest.

He then drew out the silver dagger
And sank it in his manly heart,
Saying this should be an awful warning
That all true lovers should never part.[46]

The law would not have approved such antics, for involved were the wearing of a concealed weapon, the carrying of a forbidden type of weapon, a suicide, and, in another version of the song, a homicide.

[43] Ibid., p. 273, referring to Tennessee, *Aymette* v. *State*, 2 Humph. 154. See also Tennessee, *Andrews* v. *The State*, 3 Heiskell, 165.

[44] Ibid., p. 286, referring to Kentucky, *Hopkins* v. *Commonwealth*, 3 Bush, Ky. 480.

[45] See the attached schedule of the statutes of the several states relative to the carrying or drawing of weapons. The schedule was compiled from Frederick H. Wines, "Report on Crime, Pauperism, and Benevolence in the United States," *Eleventh Census, 1890* (Washington: G.P.O., 1896), vol. 3, pt. 1, pp. 383, 398–411. John Edgar Hoover, *Uniform Crime Reports for the United States* (Washington: G.P.O., 1967), p. 113, reports a total arrest, all ages, of 51,474 for carrying and possessing weapons in 1966.

[46] Vance Randolph, ed., *Ozark Folksongs*, 4 vols. (Columbia: State Historical Society of Missouri, 1946–1950), 2:58.

Yet, to perpetuate a bromide, truth is stranger than folk song, and crimes of love and lust, passion and politics, avarice and arson plus a variety of crafty and cunning improvisations continued to haunt society.

## Appendix

### CARRYING OR DRAWING WEAPON, STATUTES OF THE SEVERAL STATES IN 1890

*North Atlantic Division*

| | | Min. | Max | |
|---|---|---|---|---|
| 1 | Maine | — | — | Persons who go armed may be bound over for one year to keep the peace. |
| 2 | New Hampshire | None | 2 yrs. | Or fine not exceeding $20, or both fine and imprisonment. |
| 3 | Vermont | None | 2 yrs. | Or fine not exceeding $200, or fine and imprisonment; for slung shot no more than five years. |
| 4 | Mass. | None | 1 yr. | Or fine not exceeding $50. |
| 5 | Rhode Island | — | — | — |
| 6 | Conn. | — | — | — |
| 7 | New York | — | — | — |
| 8 | New Jersey | None | 3 mos. | — |
| 9 | Penn. | None | 1 yr. | Or fine not exceeding $50, or both fine and imprisonment. |

*South Atlantic Division*

| | | Min. | Max | |
|---|---|---|---|---|
| 10 | Delaware | 10 days | 30 days | Or fine not less than $25 nor more than $100, or both fine and imprisonment. |
| 11 | Maryland | None | 6 mos. | Or fine not exceeding $500. |
| 12 | Dist. of Columbia | None | 6 mos. | Or fine not less than $50 nor more than $500, or both fine and imprisonment. |

| | | | | |
|---|---|---|---|---|
| 13 | Virginia | Fine | Fine | Fine not less than $20 nor more than $100. |
| 14 | West Virginia | 1 mo. | 1 yr. | And fine not less than $25 nor more than $200. |
| 15 | North Carolina | — | — | Punishable by fine and imprisonment at discretion of court. |
| 16 | South Carolina | None | 1 yr. | Or fine not exceeding $200, or both fine and imprisonment. |
| 17 | Georgia | None | 18 mos. | Punishable under sec. 4310 of Georgia Code: "Accessories after the fact shall be punished by fine not to exceed $1,000, imprisonment not to exceed 6 months, to work in the chain gang on the public works or such other works as the county authorities may employ the chain gang, not to exceed 12 months, and any one or more of these punishments may be ordered, in the discretion of the judge: Provided, That nothing herein contained shall authorize the giving the control of convicts to private persons, or their employment by the county authorities in such mechanical pursuits as will bring the products of their labor into competition with the products of free labor." |
| 18 | Florida | None | 6 mos. | Or fine not exceeding $100. |
| | *North Central Division* | | | |
| 19 | Ohio | — | 30 days | Or fine not exceeding $200. |

| | | | | |
|---|---|---|---|---|
| 20 | Indiana | Fine | Fine | Fine not exceeding $500. |
| 21 | Illinois | Fine | Fine | Fine not less than $20 nor more than $100. |
| 22 | Michigan | None | 3 mos. | Or fine, not exceeding $100, or both fine and imprisonment. |
| 23 | Wisconsin | None | 6 mos. | Or fine not exceeding $100. |
| 24 | Minnesota | None | 3 mos. | Or fine not exceeding $100; persons who go armed may be bound over for one year to keep the peace. |
| 25 | Iowa | — | 30 days | Or fine not exceeding $100. |
| 26 | Missouri | 5 days | 6 mos. | Or fine not less than $50 nor more than $200, or both fine and imprisonment. |
| 27 | North Dakota | None | 1 yr. | Or fine not exceeding $500, or both fine and imprisonment. |
| 28 | South Dakota | None | 1 yr. | Or fine not exceeding $500, or both fine and imprisonment. |
| 29 | Nebraska | None | 30 days | Or fine not exceeding $100. |
| 30 | Kansas | None | 3 mos. | Or fine not exceeding $100, or both fine and imprisonment. |
| | *South Central Division* | | | |
| 31 | Kentucky | 10 days | 30 days | And fine not less than $25 nor more than $100. |
| 32 | Tennessee | 3 mos. | 5 years | The penalty for carrying concealed weapons is imprisonment not less than 3 nor more than 6 months, and fine not less than $200 nor more than $500; for drawing a concealed weapon for purpose of assault or intimidation, imprisonment not less than 3 nor more than 5 years. |

| | | | | |
|---|---|---|---|---|
| 33 | Alabama | None | 6 mos. | Fine not less than $50 nor more than $500, and the offender may also be imprisoned in the county jail or sentenced to hard labor for the county for not more than 6 months. The penalty prescribed is for carrying concealed about the person a bowie knife, or knife or instrument of like kind, or a firearm of any kind or description, or an air gun, or weapon of like description. The penalty in Alabama for carrying a rifle or shotgun cane is imprisonment in the penitentiary not less than 2 years and fine not less than $500 nor more than $1,000, or both such fine and imprisonment. |
| 34 | Mississippi | 1 mo. | 3 mos. | Or fine not less than $25 nor more than $100, or both fine and imprisonment. |
| 35 | Louisiana | None | 3 mos. | And fine not less than $25 nor more than $1,000. |
| 36 | Texas | 10 days | 30 days | And fine not less than $25 nor more than $200. |
| 37 | Arkansas | Fine | Fine | Fine not less than $50 nor more than $200. |
| | *Western Division* | | | |
| 38 | Montana | Fine | 3 mos. | The penalty for carrying concealed weapons is fine not less than $10 nor more than $100; for drawing deadly weapons, imprisonment not less than 1 nor more than 3 months, or fine not less than $10 nor more than $100, or both fine and imprisonment. |

| | | | | |
|---|---|---|---|---|
| 39 | Wyoming | 5 days | 20 days | And fine not less than $5 nor more than $50. The penalty in the table is for carrying deadly weapons whether concealed or not. Any one who has in his possession or upon his person any offensive weapon with intent to commit an assult is punishable by imprisonment not more than 6 months or fine not exceeding $500. |
| 40 | Colorado | None | 30 days | Or fine not exceeding $100, or both fine and imprisonment. |
| 41 | New Mexico | 10 days | 50 days | Or fine not less than $10 nor more than $300. |
| 42 | Arizona | Fine | Fine | Fine not less than $50 nor more than $300. |
| 43 | Utah | None | 6 mos. | Or fine not less than $300, or both fine and imprisonment. |
| 44 | Nevada | None | 6 mos. | Or fine not exceeding $500. This penalty is for drawing a deadly weapon. The penalty for carrying concealed weapons by minors is imprisonment not less than 30 days nor more than 6 months, or fine not less than $20 nor more than $200. |
| 45 | Idaho | 20 days | 50 days | Or fine not less than $50 nor more than $100, or |

| | | | | |
|---|---|---|---|---|
| | | | | both fine and imprisonment. |
| 46 | Washington | None | 30 days | Or fine not less than $20 nor more than $100, or both fine and imprisonment. |
| 47 | Oregon | 5 days | 100 days | Or fine not less than $10 nor more than $200, or both fine and imprisonment. |
| 48 | California | None | 6 mos. | Or fine not exceeding $500, or both fine and imprisonment. |

CHAPTER TWO

# *The Mississippi—Spillway of Sin*

The Mississippi flows a long course, twisting and turning as if it were a fugitive escaping from its own misdeeds. Many have depicted the stream's beauty—its verdant islands, secluded swamps, pictured rocks. Lovers of the Great River sing of it as an explorer's highway, as a personality which helped tie a nation together, as the pulsing heart of the Valley of Democracy. Few have conceived of the river as a highway for highwaymen and as a waterway down which coursed a flood of crime and sin. Concealed beneath the river queen's royal robes of romance were the filthy rags of the vagrant, and, although she beckoned with a swamp lily, she wore a dirk at her belt. To some who knew her and lived with her, she was a lovely Cinderella, symbol of the happy ending; to others she was the beguiling prostitute of mid-America, companion of thieves, gamblers, and murderers.

The Mississippi was both the Green Thumb and the Black Thumb, and these are interesting expressions whose origins are shrouded in uncertainty but whose meaning is unmistakable. The Green Thumbs, so an old river rat told me when I was a boy foolish enough to pole a leaky skiff through the sloughs of Big Island, were those honest settlers up and down the river who took up land, plowed it, and forced it to bring forth corn and rye and wheat. They tended to their own business and bothered no man.

The Black Thumbs were the bearded ones with their slatternly women who never settled down, but who followed the gospel of force and rape and pillage. They were the horse thieves, the makers of bogus green, the river pirates. When I asked my grandfather about the Green Thumbs and the Black Thumbs, he recognized the terms and said his father, who had come into the Iowa country in the 1840s, spoke of honest folk as Green Thumbs and of dishonest folk as Black Thumbs.



"Can I get it back when the cops go on strike?"

# Restricting Handguns

## The Liberal Skeptics Speak Out

*Edited by*

DON B. KATES, JR.

*Foreword by*

FRANK CHURCH

NORTH RIVER PRESS, INC.

© Copyright 1979 by Don B. Kates, Jr. All rights reserved. Except for brief quotes for review purposes, no part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information retrieval system, without written permission from the publisher.

Manufactured in the United States of America

Library of Congress Cataloging in Publication Data
Main entry under title:

Restricting handguns.

1. Firearms — Law and legislation — United States — Addresses, essays, lectures. 2. Firearms — Addresses, essays, lectures. I. Kates, Don B., 1941-
KF3941.A75R47 344'.73'0533 79-12043
ISBN 0-88427-033-5
ISBN 0-88427-034-3 pbk.

347.1
R313

S. F. PUBLIC LIBRARY

ACKNOWLEDGEMENTS

The author gratefully acknowledges permission to reprint from the following sources:

The *New York Law Forum*, for permission to reprint portions of Mark Benenson's article "A Controlled Look at Gun Controls," which originally appeared in Vol. 14 thereof.

The Second Amendment Foundation, for permission to reprint portions of David T. Hardy's monograph *No Case for Stricter Firearms Control: A Rebuttal to the Report of the General Accounting Office.*

*The Chicago-Kent Law Review*, for permission to reprint portions of an article by David T. Hardy and John Stompoly entitled "Of Arms and the Law," which appeared in Vol. 51 of the *Law Review.* This material, revised and supplemented, is the discussion of the Second Amendment herein.

The *Civil Liberties Review* for permission to reprint portions of my debate with Rep. Robert Drinan that appeared in Vol. 3, Nos. 2 and 3 (June/July and August/September, 1976), Copyright © 1976 by the American Civil Liberties Union.

The frontispiece cartoon is by Bill Mauldin. © Copyright 1978 Chicago Sun-Times. Reprinted courtesy Chicago Sun-Times and Bill Mauldin.

# DEDICATION

To B.K.P., J.E.B., and K.M.O. (in order of appearance), this book is affectionately dedicated.

equal administration or the self-defense utility of handguns. The fundamental question is: Do we want to send Jimmy Washington and hundreds of thousands of others like him to jail? After all, sending people to jail is what making it a crime to own a handgun is all about.

The leaders of the movement for a national Sullivan Law are proposing a *mandatory* minimum one-year sentence for anyone found with a handgun — not for misusing it, just for having it. They realize that nothing less drastic will suffice for a serious attempt to enforce national confiscation. As the author of this proposal frankly explained it, "we have to terrify the people," to make them more frightened of the law than of not having the handgun they believe is vital to their survival. I cannot accept "terrify[ing] the people" as a legitimate tactic in a democratic society — particularly not when the source of the problem is the government's failure or inability to protect the people in the first place.

Even if I believed that sending Jimmy Washington to jail would eventually reduce crime, I would find it no more acceptable than arming the police with the Gestapo-like powers that sometimes are also promoted as a way to reduce crime. Doubtless some more "tough-minded" readers will disagree. They will feel that if banning handguns would sharply reduce crime this would justify the imprisonment of any number of Jimmy Washingtons. But at the very least the example of Jimmy Washington should establish where the burden of proof lies. It is up to the advocates of handgun prohibition to prove that there is a sufficient crime-reductive effect to justify jailing Jimmy Washington. The burden of proof should lie upon the proponents of a national Sullivan Law in any event. In a free country, it is up to those who want to restrict the liberty of the people to show that the benefits which are likely to accrue outweigh the likely costs. But that burden of proof is particularly heavy when the liberty in question is so deeply valued by a large part of the population that it can be abrogated only by severely punishing many.

As you read each of the following essays, I hope you will ask yourself whether the argument for handgun prohibition is sufficiently strong and convincing to justify the costs it will impose on the Jimmy Washingtons of our nation.

# SECTION I: Toward a History of Handgun Prohibition in the United States

DON B. KATES, JR.

## Introduction

Though the debate on handgun prohibition bristles with historical assumptions, there has been no specialized inquiry into the development of such legislation in the United States, nor would it be possible to cover in detail so extensive a topic in the limited space available here. I have chosen therefore to focus on two major, and a number of attendant minor, misconceptions which appear to be shared alike by proponents and opponents of handgun prohibition — though, of course, their attitudes toward these historical assumptions are deeply colored by their views on the general issue.

The first of these misconceptions is that unfettered handgun ownership was the pattern of the raw Western frontier, while legal restrictions on handgun ownership developed initially in the Northeast and thence moved West and South in direct relationship to the growth of urbanization. The second misconception is that the movement for handgun probhition had its origins in Eastern, liberal, labor-oriented social philosophy and had as its purpose the control of criminal, rather than political, activity. (Reactions to these misconceptions generally vary according to whether the assessor views himself as liberal or conservative, the East as civilized or "sissified," and the Western tradition as one of brutal *machismo* or of an independent, self-reliant yeomanry.) Corollary to these misconceptions is the assumption that handgun prohibitions are more likely to characterize our urban and densely populated states and that popular support for them has increased in linear progression as urbanization and population density have

increased across the country. Finally, it is assumed that handgun prohibition enjoys majority support, which is frustrated by the machinations of a "gun lobby" composed of well-heeled lobbyists for "the arms merchants."

In part these two misconceptions represent our relative ignorance of nineteenth century urban America, and the romanticized myth of the Old West perpetrated by cinematic and other fictional accounts. But the single most important factor is a projection into a past in which it did not exist of a fundamental division in present attitudes of the American people, of which the "gun control" controversy is symptomatic. B. Bruce-Briggs, a historian and social policy analyst who approaches this controversy as a neutral, has described that division in a brilliant essay aptly entitled "The Great American Gun War" [*The Public Interest*, Fall, 1976]:

> [The handgun prohibition controversy] represents a sort of low grade war between two alternative views of what America is and ought to be. On the one side are those who take bourgeois Europe as a model of a civilized society: a society just, equitable and democratic; but well ordered, with the lines of responsibility and authority clearly drawn, and with decisions made rationally and correctly by intelligent men for the entire nation. To such people, hunting is atavistic, personal violence is shameful, and uncontrolled gun ownership is a blot upon civilization.
>
> On the other side is a group of people who do not tend to be especially articulate or literate, and whose world view is rarely expressed in print. Their model is that of the independent frontiersman who takes care of himself and his family with no interference from the state. They are "conservative" in the sense that they cling to America's unique pre-modern tradition — a non-feudal society with a sort of medieval liberty writ large for every man. To these people, "sociological" is an epithet. Life is tough and competitive. Manhood means responsibility and caring for your own.

The position the first of the groups described by Bruce-Briggs believes its views to have occupied in American history is vividly expressed in a postcard I received a few weeks ago from an

eminent law professor. He wrote about a *Harper's* article in which I argued that banning handguns was both futile and dangerous. He shared my concern that a handgun ban could only be enforced through repugnant police activities, but was appalled at what he took to be my advocacy "of an armed society." Presumably because his postcard bore a picture of the library at Monticello, he asked rhetorically, "What would Thomas Jefferson have thought?"

Before answering that question, it is useful to emphasize a distinction which my eminent colleague overlooked in reading my article. It is possible for me to oppose firearms restrictions without wholeheartedly endorsing the idea of an armed society — just as I can and do oppose anti-homosexual laws without advocating that people become homosexuals. Many criminologists and criminal law specialists oppose handgun restrictions as involving great financial, constitutional, and human costs in enforcement and no commensurate gain in reducing crime. Yet these same people do not own handguns, are not target shooters or sportsmen, and often disapprove of gun ownership for self-defense.

Laying aside for the moment Jefferson's views on firearms ownership, his attitude toward firearms restriction was entirely negative. Among the foremost guarantees in a model state constitution he penned in 1776 was "no free man shall be debarred the use of arms within his own land." But inquiry into Jefferson's reasons reveals that he and the rest of the Founding Fathers were guilty of the charge my eminent colleague leveled against me — they believed in, and advocated, "an armed people." In *The Federalist*, No. 46, Madison congratulates his countrymen on "the advantage of being armed, which the Americans possess over the people of almost every other nation"; he dismisses with contempt the despotisms of Europe that "are afraid to trust the people with arms." In No. 29, Hamilton asserts that all that is necessary to guarantee liberty "to the people at large" is that they be allowed to be "properly armed and equipped. . . ." Despite the enormous political gulf between these men and Patrick Henry at this time, the latter voiced the same sentiments: "The great object is that every man be armed . . . everyone who is able may have a gun."

Much of the Founding Fathers' advocacy of firearms ownership was based upon a belief that ultimately a free people must be able to defend their liberties physically. But they considered firearms not only politically expedient for the people, but personally

desirable as well. The foremost advocate of this view was Thomas Jefferson, who wrote his fifteen-year-old nephew:

> A strong body makes the mind strong. As to the species of exercises, I advise the gun. While this gives a moderate exercise to the body, it gives boldness, enterprise and independence to the mind. Games played with the ball, and others of that nature, are too violent for the body and stamp no character on the mind. Let your gun therefore be the constant companion of your walks.

Jefferson was not only the greatest intellect of his generation in the United States, but also an ardent outdoorsman and naturalist, a superb horseman, a talented amateur gunsmith, and the keeper of a veritable armory of handguns and long guns at Monticello. What, indeed, would Thomas Jefferson have thought of modern notions that "hunting is atavistic . . . and uncontrolled gun ownership is a blot upon civilization"?

When the idea of drastically restricting handgun ownership first surfaced in the United States, it was based upon philosophical concepts far removed from those of Jefferson or the rest of the Founding Fathers. But before ownership restrictions came restrictions of carrying and use of firearms, particularly of handguns. These began to surface even before Jefferson's death in 1826 — but on the frontier, not in the more settled areas of the country.

### Handguns and Handgun Laws on the Western Frontier

The myth of the Old West portrays it as a violent land where everyone carried a revolver. In fact, violence was not endemic to the West, its inhabitants rarely went armed, and when they did so it was rarely with a revolver. For most of the nineteenth century Western revolver ownership was largely confined to outlaws, the military, the police, and company security personnel. Practicalities and economics dictated the rifle and (to a lesser extent) the shotgun as the weapons of Western expansion. On the practical level, the Western settler needed a weapon first of all for hunting, and secondly for defense against Indians. The highly inaccurate and extremely short range black-powder handgun of the period was appropriate for neither use. To the settler who could afford a firearm — and many could not, after buying agricultural implements, livestock, seed, wagon, etc., for the trek West — the first choice was a rifle. If the family were lucky enough to be able to afford two firearms, it would be two rifles or rifle and shotgun. Excepting Indian attack, the Western settler had little to fear from other humans. Assuming the rare instance in which he did anticipate the kind of "shootout" portrayed in fiction, he would carry his shotgun or rifle and most likely have it all over any opponent so foolish as to appear with only a revolver.

For the Western settler, the revolver was a luxury and, until the late 1860s, an extraordinarily expensive one at that. When Samuel Colt's revolutionary weapon first appeared in 1835, it sold for $35.00, a then enormous sum representing many weeks' wages even for a regularly salaried clerk or skilled workman. As a result the Colt factory closed within six years; when business revived through military procurement orders during the Mexican War, Colt had to fill them by manufacturing guns at the Pratt and Whitney plant.

The handgun did not become financially accessible to most Americans until the end of the Civil War brought the sale of large stocks of military surplus weapons. Even then, the military surplus sale of enormous numbers of Henry and Spencer repeating rifles at comparable prices was a more attractive buy for the Western settler. Thus handguns did not begin to flood into the West in overwhelming numbers until the late 1860s with the appearance of numerous extremely cheap off-brands which, for obvious reasons, were generically termed "suicide specials." Even then, and certainly in the years preceding 1875, handguns were more widely distributed in the East than the West. By the 1870s the practice of Eastern manufacturers of men's ready-to-wear trousers was to sew a holster into the right hip pocket of every pair made, to allow the concealed gun-carrying which was still legal in the East.

As the Western frontier was the area in which handguns were most likely to be associated exclusively with criminals, it was the area in which the first restrictions on their use developed. The earliest of these banned the carrying of concealed weapons and applied to knives and other weapons as well as handguns. These laws appeared in the then frontier states of Kentucky (1813), Indiana (1819), and Arkansas and Georgia (1837). The only even arguably "Eastern" state to adopt such legislation was Virginia (1838), which at that time had its own western frontier (now West

Virginia). By 1850 every Western state barred the carrying of concealed weapons. In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century. Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.

### Development of Handgun Ownership Restrictions in the Post-Civil War South

The former slave states were the first to move beyond restricting handgun use to restricting handgun ownership. To understand why, it is necessary to consider the social upheaval resulting from the abolition of slavery. As I have said in another context ["Attitudes Towards Slavery in the New Republic," 53 *Journal of Negro History* 33, 37]:

> Slavery was not just an economic institution; it was a social, and by exclusion, a political one as well. By constitutional, statutory, decisional, administrative and customary law the position of the slave was fixed. He could not possess arms or liquor, make contracts, own land or personalty, travel freely, give testimony or learn to read or write, act independently as a religious leader, compete in the free labor market — above all, he had no political rights. The prohibition of arms, liquor and travel was enforced by a more or less well organized system of special and general searches and night patrols of the *posse comitatus*. Justice to the slave was, within the law or within its enforcement, summarily meted out by masters, possemen and judicial officials alike. As Mr. Chief Justice Taney succinctly expressed it [in the Dred Scott case, the slave had] "no rights which the white man was bound to respect."

Immediately after emancipation destroyed this ornate system of social and political control, the Southern legislatures restored it by enacting the Black Codes. These fixed the black population in serfdom, denying all political rights, excluding them from virtually any chance at economic or social advancement — and, of course, forbidding them to own arms. The indignant Congress of 1866 reacted with a Civil Rights Act, and then the Fourteenth Amendment.

Denied legal avenues for social control, the South substituted illegal methods: a system of massive private terrorism acquiesced in by the public authorities. Having accomplished its objectives by 1876, this campaign of beatings, arson, murder, etc. trailed off into the minimum amounts of intermittent violence necessary to maintain the social and economic status quo. Though a majority in many parts of the South after the Civil War, the blacks were highly vulnerable to such terrorism. Their organization and communications were poor, and above all, they possessed few firearms, and those mostly obsolete. Except for those who had served in the Union Army, blacks had virtually no experience with guns, for ante bellum laws made their possession by even free Southern blacks a highly penal offense. Few blacks had been able to afford revolvers or modern repeating rifles even in the military surplus sale period immediately after the war, much less when the prices returned to normal. Though in theory the Army was available to protect the blacks, it could not be everywhere at once. And when the Southern delegations returned to Congress they reduced it to a maximum of 25,000 enlisted men, many of whom were diverted West by the Indian wars. Though the withdrawal of the Army as part of the Electoral Compromise of 1876 has been pictured as a betrayal of black aspirations, it was actually more a formal surrender to a victory already won by violence-enforced white supremacy.

Meaningful black access to self-defense weapons occurred only in the mid-1870's when the cheap off-brand revolvers began to be sold in the South in large numbers. The Klan recognized in the mere existence of these a threat to its previous virtual monopoly of violence, although by this time the blacks were generally crushed and quiescent. Moreover, in ensuing years those who ruled the South found that there were challengers other than the blacks against whom the forces of social control might have to be exerted. Agrarian agitators arose to inform poor whites that they were trading their political and economic group identity for a fraudulent racial solidarity with a false imperative of preserving white supremacy. For a while men like Tom Watson even dared suggest that poor whites had more in common with poor blacks than with wealthy planters, produce dealers, railroad magnates, merchants, and manufacturers. In the cities of the South similar views were being expressed by other agitators as the laboring poor

began to organize for better wages and working conditions.

Though the reactions of Southern legislatures to the threats of racial and economic change differed in detail, they evinced a common purpose. Those who might menace the status quo must be denied access to arms, while the monopoly of those who would preserve it (if necessary by violence and terror) must be assured. The very next session of the legislature (1870) after white supremacists had regained control of Tennessee set the earliest pattern of legal restrictions. This was a ban on selling all but "the Army and Navy model" handgun, i.e. the most expensive one, which was beyond the means of most blacks and laboring people. Klansmen were not inconvenienced, having long since acquired their guns (many of them surplus Army and Navy weapons), nor were the company goons, professional strike-breakers, etc., whose weapons were supplied by their corporate employers. By 1881 white supremacists were in power in the neighboring state of Arkansas and had enacted a virtually identical "Saturday Night Special" law with virtually identical effect.

Instead of formal legislation, Mississippi, Florida, and the rest of the Deep South states simply continued (in effect) to enforce the pre-emancipation statutes forbidding blacks to possess arms, the Fourteenth Amendment notwithstanding. When blacks appeared with arms these were confiscated, though often the more kind-hearted sheriffs tolerated the possession of obsolete hunting weapons by blacks who were known not to be trouble-makers. No such indulgence was shown as to revolvers, however. Though the sale of these to blacks could not be prohibited per se, it was understood that retailers would report to local authorities whenever blacks (or a white agitator) purchased pistols or ammunition. The sheriff would then arrest them and confiscate their pistols which would be either destroyed or turned over to the local Klavern. In short order, blacks, and whites unpopular with local authorities, learned that pistol purchases were a waste of hard-earned cash, and dangerous to boot.

Mississippi formalized this custom by enacting the first registration law for retailers in 1906. It required them to maintain records of all pistol and pistol ammunition sales, making these available for inspection on demand. This was part of a trend toward formalizing firearms restrictions, which the Southern states exhibited toward the end of the century, perhaps because of the

increasing concern about handgun ownership by certain groups of whites (See discussion in the next section). Alabama in 1893 and Texas in 1907 imposed extremely heavy business and/or transaction taxes on handgun sales in order to resurrect the economic barriers to ownership. Simpler yet was the approach South Carolina adopted in 1902, banning all pistol sales except to sheriffs and their special deputies — i.e., company goons and the KKK.

But in 1911 sophisticated, cosmopolitan New York State rendered obsolete all previous concepts in handgun ownership restriction with the introduction of the flexible, surgically clean Sullivan Law. Of proven success in dealing with political dissidents in Central European countries, this system made handgun ownership illegal for anyone without a police permit. New York City police thereby acquired official authority to implement the disfavor with which they had long looked at possession of handguns by the city's Italian population.

The Sullivan Law established the pattern for police permit requirements which were adopted in the succeeding twenty-three years in Arkansas, Hawaii, Michigan, Missouri, New Jersey, North Carolina, and Oregon. These enactments represented the fruits of a nationwide handgun prohibition campaign by conservative business interests in the early part of the century. Across the land, legislators in conservative states were importuned by business lobbyists bearing glowing endorsements of the Sullivan Law concept from such (then) arch-conservative institutions as the *New York Times* and the American Bar Association. Among the most importunate were national and local businessmen's associations which emphasized the increasing incidence of armed robbery.

### Handgun Restrictions and "The Immigration Problem"

The great importance armed robbery seems to have played in this early campaign indicates yet another dimension of the handgun prohibition movement — its relationship to hatred and fear of the foreign-born. Armed robbery was associated in the public mind with foreign immigrants, not just because they were considered naturally lazy and inclined to violent acquisitiveness, but because armed robbery was a recognized tactic of the "foreign-born anarchist." In America from at least the turn of the

century, and in Europe from the 1870s on, revolutionaries used bank and commercial robberies as a means of gathering funds to finance their underground activities. The businessmen's associations could point out that Sacco and Vanzetti were originally apprehended for violation of Massachusetts' new handgun law, and that they were executed for murder committed in the course of several armed robberies of which they were convicted. Symptomatic of the concerns underlying the businessmen's campaign for Sullivan-type legislation is the fact that even the states that rejected that concept substituted, instead, a flat ban of the ownership of firearms, or at least handguns, by aliens.

It is no coincidence that the period 1870-1934, which saw far more states enacting far more drastic handgun restrictions than ever after, was also the most xenophobic period of American history. Though hatred of foreigners was nothing new, it reached its apogee in this era, as the stream of immigration was darkened by Southern and Eastern European peoples, and the Know Nothings gave way to the Immigration Restriction League and the American Protective Association. However, it must be recognized that such feelings were not the province of the ignorant and the foolish alone. Xenophobia was powerfully supported by the learning and social science of the day, and in ways that lent credence to the desirability of denying handguns to the foreign-born. Well before the turn of the century, an early social psychologist emerged from Ellis Island to announce that most of the foreign-born he had tested there (in English) were feeble-minded. It followed that such people should not be allowed to have handguns, particularly since contemporary criminologists believed that violent acquisitiveness was an inherited characteristic associated with mental retardation.

Many deemed this correlation between feeble-mindedness, violence, and Eastern or Southern European ancestry confirmed by the high incidence of crime among the new immigrants. Most of these had settled in or around the urban areas of the East. Employment opportunities were often scarce there for people with only an agricultural background and mediocre English skills, and in an era characterized by rampant xenophobia and by repeated economic slumps, panics, and depressions. Under these circumstances it is scarcely surprising that some of the new immigrants followed their adopted country's fine old tradition of

violent crime. In fact, like all ghettoized minorities, their depredations were largely confined to their own people and their own neighborhoods. But the average newspaper reader of the period would be unlikely to pick that fact out of the constant diet of stories and exposés of robberies committed by Italian, Jewish, or other immigrant gangs, and of helpless, innocent young white women kidnapped into vile slavery.

The attitude of contemporary newspapers and many of their readers is well illustrated by the argument that Professor Kennett gives in repudiating a charge sometimes made against the Sullivan Law. It is not true, he says, that this law was a cynical political ploy by which corrupt politicians hoped to disarm the gangs of their rivals for office while keeping their own gangs armed. Rather, the Sullivan Law was a sincerely motivated answer to crime — within the framework of contemporary views of the nature of crime:

> [There] was the clear inference that the new measure would strike hardest at the foreign-born element who were seemingly responsible for most of the violence in the city. It had long been held that pistols were found "chiefly in the pockets of ignorant and quarrelsome immigrants of law-breaking propensities" [quoted from a newspaper editorial]. The Italian population seemed particularly addicted to criminality (the [New York] *Tribune's* annual index frequently crosslisted the entries "crime" and "Italians"). As early as 1903 the authorities had begun to cancel pistol permits in the Italian sections of the city. This was followed by a state law of 1905 which made it illegal for aliens to possess firearms "in any public place." This provision was retained in the Sullivan Law.

Beyond the issue of apolitical crime was that of the ideological fitness of these immigrants to have handguns. Almost all of them were known to be Jews, Catholics, or anarchists. Of the three, Jews were least suspect ideologically, being considered no more than usurious Christ-killers and perhaps congenitally criminal as well. But the influx of a vast mass of Catholic immigrants was necessarily a source of disquiet in a nation with an aggressively Protestant libertarian tradition, and particularly to generations raised on Macaulay's *History of England* and Lea's *History of the*

*Inquisition.* The hierarchical form of their Church was regarded as predisposing the immigrants against democracy and republican institutions, and toward the despotic governments of the lands from whence they came. As they were considered ignorant, prejudiced, superstitious — and utterly submissive to religious authority — it was easy to imagine them being led by the nose into any adventure their priests might choose for them.

But if the deeds of "Bloody Mary," Guy Fawkes, and James II gave ancient warning of the dangers of Catholicism, the evil done by "foreign-born anarchists" was a clear and present menace headlined daily in reports from here and abroad. "Anarchists" had assassinated Czar Alexander II (1881), the Austrian Empress Elizabeth (1898), Italian King Humbert (1900), Spanish Premier Canalejas (1912), and our own President McKinley (1901). Mc Kinley's assassin, the foreign-born Leon Czolgosz, did indeed describe himself as an anarchist, but with a fine impartiality the newspapers of the time also bestowed that epithet on people who would more accurately have been classified as communists, socialists, syndicalists, Wobblies, or even peaceful trade unionists. The term anarchist, with the now almost redundant prefix "foreign-born," became synonymous with any radical or otherwise highly divergent political view; it was occasionally even applied to the assassin of President Garfield (1881) and the attempted assassin of former President Roosevelt (1912), though neither of them were foreign-born or even remotely an anarchist.

Similarly "anarchist" or "radical" was widely applied to any labor organization or agitation, it being reflexively assumed that such groups were largely composed of, and led by, foreigners of alien political persuasions. When Canada adopted its handgun permit law in 1919, the debate was replete with references to the recently crushed general strike. This was (erroneously) believed to have been engineered and led by foreigners, and the law's sponsors reviewed at length the absurdity of allowing handgun ownership to those who "bring their bad habits, notions, and vicious practices into this country."

Simiarly, highly publicized incidents involving blacks, foreign-born radicals, or labor agitators seem to have provided the immediate occasion — if not the sole motivation — for most of the American handgun ownership restrictions adopted in the 1901-34 period. The 1934 Hawaii and 1913 Oregon statutes were responses

to the concern felt about labor-organizing by "foreign-born radicals" in the port of Honolulu and Oregon lumber mills respectively. The South Carolina law appears to have been an immediate response to the assassination of President McKinley some months before. It barred only the purchase of pistols weighing less than three pounds and having a barrel less than twenty inches long. Any pistol exceeding those specifications (and none existed, then or now) clearly could not have been concealed in a bandaged arm as Czolgosz's pocket pistol was. Though in the long run New York's Sullivan Law was aimed at every kind of crime to which the foreign-born were believed inclined, its immediate motivation seems to have been anarchists and radicals. It was enacted in the backlash from the London siege of the Houndsditch anarchists and an attempted assassination of New York's mayor by a crazed working-man, which recalled the McKinley assassination.

The Michigan version of the Sullivan Law was hurriedly enacted in the aftermath of a famous trial in which Clarence Darrow defended a black civil rights leader. (Dr. Ossian Sweet, who had moved into an all-white neighborhood, was accused of murder for shooting one of a mob that attacked his house while Detroit police looked on.) The Missouri permit law was enacted in the aftermath of a famous and bloody St. Louis race riot.

The Arkansas, Michigan, Missouri, and North Carolina laws were expressive of one of the lowest periods of race relations in modern American history. A younger generation of blacks — led by soldiers returning from World War I familiar with guns and willing to fight for the equal treatment they had received in other lands — had to be painfully reintroduced to the forces of social control. Once again in the 1910s and 1920s did the Klan become a major force in the South. Once again the public authorities stood by while murders, beatings, and lynchings were openly perpetrated. Once again the handgun legislation of Alabama, Arkansas, Mississippi, Missouri, Tennessee, and Texas deprived the victims of the means of self-defense, cloaking the specially deputized Klansmen in the safety of their monopoly of arms.

But the resurgent Klan of these years was not limited to the South geographically, nor was its concern with blacks alone. The Klan was a force in southern New Jersey and Illinois, in Indiana, Michigan, and Oregon. All of these enacted either handgun permit laws or laws barring alien handgun possession in the years

1913-34. A few years after the Oregon gun law, Klan support helped pass a law banning parochial schools in that state. The Klan opposed not only blacks, but Catholics, Jews, labor radicals, and the foreign-born in general, and these too often fell victim to lynch mobs or other, more clandestine, attacks.

It bears emphasis that such activities were not the sole province of the Klan. The businessman's Sullivan Law campaign occured during the years of a concerted effort by employers and employers' associations to destroy the emergent labor unions through a systematic campaign of drastic wage decreases, lockouts, imported strikebreakers, and surveillance, harrassment, black-listing, and physical attack upon trade unionists — all carried out with the acquiescence or active support of local authorities. One of the most blatant incidents occured in Bixbee, Arizona, where 221 supposed labor radicals were rounded up by a posse and forcibly deported from the state. A 1901 Arizona law barred the carrying of handguns within city limits and provided for the temporary confiscation of strangers' weapons, to be returned when they left town. Needless to say, the carrying ban was not applied to the members of the posse, and the provision for returning confiscated guns was omitted as to the deportees.

### A Caveat on Geography and Fear of Immigration

Though my discussion of this topic is already long, it is necessary to address an issue that may occur to some readers. Since the states that adopted drastic handgun ownership restrictions in the era 1870-1934 were remote from Ellis Island, how can it reasonably be thought that they felt themselves threatened by the dangers of immigration? The answer is simply that the phenomenon in question was hysteria, not a rational reaction. In every effort of workers in these and adjoining states to organize, to demand better wages and working conditions, was seen the lurking specter of "anarchism," and in every outbreak of "anarchism" was supposed to be the influence of the foreign-born.

I encountered such nativist hysteria in a somewhat different context when, as a lawyer for California Rural Legal Assistance, I brought a lawsuit to void California's English literacy requirement for voting as applied to our clients who were literate in Spanish. I found that this requirement had been introduced into

the California legislature in 1891 by a representative of the American Protective Association. Its purpose was not to disenfranchise the Chinese (this had been accomplished by the Constitution of 1879) nor blacks — though the author praised literacy requirements in Mississippi and other Southern states. Rather, his declared purpose was "to protect the purity of the ballot box from the corrupting influences of the disturbing elements from abroad." He seems to have expected these "ignorant classes, who are coming here from Europe, [which is] unloading the refuse of the world upon our shores," to be translated immediately to California from Ellis Island. For he predicted that, unless his measure were enacted, "it will soon come to pass that this element will direct in our politics and our institutions will be overthrown." Motivated at least in part by the same hysterical fears, legislatures (including California) also enacted drastic handgun ownership restrictions in general or against aliens in particular.

In summary, however irrationally, Americans (and Canadians) in the era 1870-1934 felt themselves threatened by a number of forces they associated with the handgun: blacks who wouldn't keep their place; radicals, labor agitators, assassins, robbers, and, by a process of further association, the foreign-born. Reminded of Madison's contempt for "governments [which] are afraid to trust the people with arms," many late nineteenth- and early twentieth-century Americans would have responded that policies that were safe and sound in a population of fine Anglo-Saxon stock were foolish and irresponsible when that population became infected with the feeble-minded, the congenitally criminal, partisans of divisive alien philosophies, and others unable to understand and revere republican institutions. The association in the public mind of the handgun with blacks and the foreign-born criminal, anarchist or labor agitator was at least one major impetus behind the handgun ownership restrictions adopted in this country and Canada during the period 1870-1934. The spirit in which such permit laws were enacted and administered is well expressed by the following from a 1918 New Hampshire case upholding that state's ban of alien firearms ownership, which a 1924 California court repeated in upholding California's similar statute as to handguns:

> Native citizens are justly presumed to be imbued with a natural allegiance to their government which unnaturalized

> foreigners do not possess. The former inherit a knowledge and reverence for our institutions, while the latter as a class do not understand our customs or laws, or enter into the spirit of our social organization.

### Handgun Prohibitions and "Liberal" Thought Since the 1920s

Though many bases for the handgun restrictions in the era 1870-1934 would deeply offend present liberal sensibilities, they were not necessarily repugnant to those considered liberal then. While generally supportive of white laboring people, American liberalism had by the 1890s largely abandoned the Negro and was ambivalent toward the foreign-born. Liberals were themselves deeply concerned about crime and would not have opposed handgun prohibition in principle. If they opposed it at all, it was only because it diverted attention from their own pet solution to violence, the prohibition of alcohol. Loath as we modern liberals are to admit it, Prohibition was the *cause celebre* of four generations of American liberals, the brightest and the best, the most progressive and humane, political figures of their times. Susan B. Anthony started out as a Prohibition speaker. Others who saw in Demon Rum the cause of domestic and acquaintance homicide (as well as robbery and innumerable other social ills) included such luminaries of American liberalism as William Lloyd Garrison, Henry Ward Beecher, Theodore Parker, Frederick Douglass, Jane Addams, William Jennings Bryan, and at least in their youth, Eleanor Roosevelt and Hugo Black. Before dismissing their views as absurd, remember that liquor is a factor in more homicides than are handguns, by about 64 to 50 percent; as Professor Donald Lunde has noted, "Persons with a urine alcohol level of .20-.29 percent (about twice the level required for conviction of drunk driving) make up the largest group of persons arrested for violent crimes."

It was only after the failure of Prohibition became manifest that many of the people who had supported it found in handgun prohibition a similar promise of cutting through the complex social, cultural, and institutional factors that produce violent crime. The addition of this veteran core of social reformers to the already very influential forces calling for handgun prohibition seemed to make a national Sullivan Law a real possibility in the heady early New Deal days of expanding federal power. President

Roosevelt was known to be strongly sympathetic. As Governor of New York, he had vetoed a repeal of the Sullivan Law. The likelihood that handgun prohibition might divert attention from Prohibition was to F.D.R. not a disadvantage, but a major attraction. Whatever its substantive merits, as a political issue in the Democratic party Prohibition was highly divisive. During the preceding two presidential campaigns (1924 and 1928) it had been one of several factors that threatened to dissolve the party into its component sectional and ideological parts. The evident primacy of the national economic emergency enabled F.D.R. to dump Prohibition in 1932, as even the most die-hard Prohibitionists were far too liberal to support Herbert Hoover. (Indeed, as Harvard historian Frank Freidel notes in his analysis of the election, "the nine-point recovery program [adopted in the 1932 convention of the Prohibition party was] practically identical to that later adopted by" F.D.R.)

The commonality of goals and underlying assumptions between handgun and liquor prohibition gave F.D.R. hope that the former could be substituted for the latter in the hearts and minds of Prohibitionist Democrats. Since drinkers numbered in the many millions, but handgun owners less than ten million, the adverse effect on the party of this new prohibition crusade was likely to be considerably less. Thus, even as F.D.R. campaigned on his promise to repeal the Eighteenth Amendment, he was proposing strict federal regulation of handgun ownership. Soon after Prohibition repeal had become a reality, his Attorney General presented Congress with a proposal for national handgun registration along with a host of other firearms restrictions. (The fact that yet another foreign-born assassin had attempted to kill F.D.R. — and had killed the Mayor of Chicago who was with the President — was thought likely to spur sentiment for this proposal.)

But two factors on which the Administration had not counted resulted in a defeat so decisive that drastic handgun ownership restrictions were not to be again seriously considered by Congress for over thirty years. The first of these factors was that F.D.R. was not alone in perceiving the similarity of goals and assumptions underlying the two prohibitions. So also did a lot of other Americans who had become thoroughly disenchanted with the Great Experiment. Americans had grown both skeptical of the likelihood that trying to ban widely popular commodities could

stop crime and profoundly weary of the enormous police intrusions which such attempts necessarily entailed. Illustrative of how deep and widespread was the disenchantement is the opposition to a federal gun law voiced by a congressman whose state had earlier pioneered both liquor and handgun prohibitions: "I tell you that right now in the State of Arkansas there are more federal agents camped on its soil, nosing into the private affairs of individuals, than we have state, county, township, and municipal officers." And a *Saturday Evening Post* editorial offered the pertinent question: "If the federal government cannot prevent the landing of shiploads of rum, how can it stop the criminal from getting the most easily concealed and most vital tool of his trade?"

Another factor which combined with, and helped mightily to stimulate, such sentiments was the strong representations made by gun owners through such groups as the new United States Revolver Association and the older National Rifle Association. The growing threat of state, and now national, confiscation had induced great numbers of handgun owners (and long-gun owners who were afraid their weapons would be next) to join these organizations. By 1930 the N.R.A. had swelled from a tiny, elite organization concerned with arranging, organizing, and providing standards for marksmanship contests to a mass organization forcefully representing its members' fears for their rights and property. Faced with thousands of letters from little people they had never heard of, or from, before on any other issue, the Congress rapidly backed away from handgun prohibition — even while vehemently denouncing the NRA for organizing the letter-writing campaign.

### "The Gun Lobby" and the Defeat of Handgun Prohibitions

Thus was born the so-called gun lobby which is often credited (or blamed) for the failure of both federal and state legislatures to enact onerous restrictions on handgun ownership. The concept of the "gun lobby" is used by advocates of handgun prohibition as the concept of "the liquor lobby" was used by partisans of Prohibition to explain their many defeats before the eventual enactment of the Eighteenth Amendment and the Volstead Act. But both the comparison and the term "lobby" are highly misleading, for they call up pictures of a powerful industry

blocking legislation through insidious pressures or corrupt influence. However true this may have been of nineteenth-century liquor interests, the firearms industry has never been a major force in American business, nor has it opposed legislative regulation of its products.

As to its economic importance, an expert finds that "in no census year has small arms production exceeded .03 percent of total industry." Moreover, to the limited extent of its lobbying power, the domestic small arms industry has actually supported federal firearms restrictions. The federal Gun Control Act of 1968, which banned mail-order gun sales and imports of military surplus firearms, was something domestic manufacturers had been impotently urging for decades. Professor Kennett notes: "in their feelings about 'cheap mail-order guns' the major small arms companies antedated Senator Thomas Dodd by a half century."

Though the 1968 Act unquestionably made acquiring firearms more costly, the effect was not that the number of people buying guns was reduced (as the Act's sponsors may have hoped), but rather that the people had to buy their guns more expensively from domestic manufacturers (as the manufacturers had hoped). The fact is that when social conditions convince people that they need a firearm to protect themselves and their families, they are going to get one, no matter what the cost. Indeed, it is sometimes argued that the Act's sponsors knew this and intended only to restrict access to firearms by minorities and the poor: "The Gun Control Act of 1968 was passed not to control guns but to control blacks," claims liberal journalist Robert Sherrill — an advocate of gun laws. Similarly, B. Bruce-Briggs notes in his *Public Interest* article: "It is difficult to escape the conclusion that the 'Saturday Night Special' is emphasized because it is cheap and is being sold to a particular class of people. The name is sufficient evidence — the reference is to 'niggertown Saturday night.' "

In 1968, Smith and Wesson and six other major firearms manufacturers went on to endorse a national system of Sullivan Law-type mandatory licensing for handgun owners. Because Smith and Wesson has continued to push this (which is also the program of the subsequently organized National Coalition to Ban Handguns and National Council to Control Handguns) it is suffering a nation-wide boycott organized by outraged gun owners. (S&W has little to fear from such a boycott, for its back orders from

domestic and foreign police and other government agencies far exceed its annual handgun production.)

While the pejorative implications of "lobby" do not really apply to either side in the handgun prohibition controversy, the *proponents* come closer to it, while the opponents qualify only as a "people's lobby." Compare their sources of funding and respective means of influencing legislation: A few years ago a liberal millionaire who had himself heavily invested in the military arms industry loaned a new national handgun prohibition organization the money to finance a nationwide mail solicitation for funds. It collapsed when the responsive contributions barely exceeded the amount of the loan. In contrast, although the National Rifle Association does not itself lobby, and so could technically be qualified to receive tax-exempt contributions, it has never attempted to qualify. While it would doubtless not turn down a millionaire's contributions, its enormous funding comes almost exclusively from membership dues and contributions of $50.00 or less. The same is true of other organizations that do lobby, like the Citizen's Committee for the Right to Keep and Bear Arms, Gun Owners of America, the Firearms Lobby of America, and the NRA's own separate lobbying organization. In terms of influence upon legislative bodies, the forte of the handgun prohibition movement (like the liquor prohibition movement before it) is the articulate support given by many of the most humane, good-hearted, and progressive leaders in public and academic life. In contrast, the forte of the gun organizations, demonstrated time after time from 1934 to the present, is the marshaling of overwhelming numbers of individual citizens. These are often not particularly articulate people, and individually they are completely without influence. But in the aggregate they are a force to be reckoned with. Illustrative is a 1978 controversy in which Congress prevented the Carter Administration from imposing regulations on the firearms industry that the gun organizations had denounced as tantamount to national gun registration. Informed citizens should have been aware of the issue, for it was heavily and repeatedly publicized in the media during months of regulatory agency and Congressional hearings. In addition, the antigun organizations circulated repeated pleas for public support:

> This is our first opportunity in some time to let the Carter Administration know that the *majority* of the public wants reasonable gun control [National Coalition to Ban Handguns; emphasis in original]. The majority of Americans want stronger handgun control, but they must be heard. Write a letter or postcard. Urge friends *and* family to do the same . . . [National Council to Control Handguns].

over 62,000 postcards — 7,800 supporting the proposed regulations and 337,000 opposing them.

This is typical of public response whenever handgun restrictions are considered by any branch of federal or state government. Even the most ardently antigun legislators admit to being daunted by the fact that constituent response is always overwhelmingly hostile, sometimes by more than a 50-1 ratio. For liberals to dismiss such responses as "the gun lobby" is not only misleading, but hypocritical to boot. Such phenomena we correctly describe as "democracy in action" when letters from NAACP or Sierra Club members pour in on legislation they oppose.

### Public Opinion on Handgun Prohibition

The inability of the anti-gun organizations to marshall the majoritarian support they claim prompts deeper examination of those claims. They turn out to be based upon answers to questions in a series of polls that are so vaguely worded as to make the answers unintelligible. How can we assign meaning to inquiries like "should the laws covering the sale of handguns be made more strict?" [Gallup, 1975] without knowing how strict the respondent thought the laws were already? The only poll ever to explore that found that 79 percent of the public could not even identify three out of five of the simplest federal gun-sale restrictions. Predictably, the less restrictions the respondent knew about, the more likely he was to think "stricter" laws were needed. A recent poll in Missouri (a state with exceptionally stringent gun laws) was published with the headline "Voters Back Gun Control." Upon examination, the answers showed a majority did not support licensing procedures similar to those which (though they apparently didn't know it) have existed in Missouri for 65 years.

Even when the polls try to solicit opinion as to a specific kind of restriction, inadequate wording often renders the question meaningless. Thus the frequent question whether a "license" or

"permit" should be required for handgun ownership may be interpreted by a New Yorker in light of the Sullivan Law (i.e., virtual handgun prohibition) but by an Illinois resident in light of that state's automatic licensure for anyone free of criminal convictions. Other respondents may interpret it as implying some kind of proficiency testing, as in drivers licensing. The pollsters are ill-equipped either to formulate questions or interpret results because they are themselves lamentably ignorant of current law or proposed changes. Thus the commentary to a recent poll release finds its authors confusing handgun licensure (in any of its forms) with handgun registration. Similarly, Gallup releases contain gross mischaracterizations of state gun laws.

Handgun prohibition appears to enjoy only minority support — and that steadily dwindling — according to the results of the few polls that have directly asked whether respondents want to "outlaw handguns except for police use" [Gallup, September 4, 1959; June 5, 1975]. In the 1959 Gallup poll 59 percent of respondents favored outlawing handguns, with 35 percent opposed and the rest expressing no opinion. But by 1975 sentiment had reversed, the same question elicited a 55 percent negative response with 41 percent supporting. Harris' 1975 question as to a "law that banned the ownership of all handguns by private citizens" found 57 percent opposed and 37 percent favoring. Three years later the minority supporting handgun restrictions had dwindled still more, according to a Cambridge Reports (Patrick Caddell) national poll commissioned by one of the anti-gun organizations. Even as to the less drastic measure of leaving presently owned guns but banning "the future manufacture and sale of all handguns," 23 percent strongly favored this and 9 percent somewhat favored it (total 32 percent), while 36 percent were strongly opposed and 22 percent somewhat so (total 58 percent).

The mistaken impression that the public supports handgun prohibition has been powerfully aided by the strong personal support which Gallup, Harris, etc. give such legislation. The partisanship of Gallup releases is epitomized by one that began by describing three recent tragedies with guns and then continued: "the public today shows itself willing to adopt stricter firearms legislation which might possibly have averted [these incidents]." (A pro-gun fanatic could, of course, have picked out three incidents of people defending themselves with handguns and

proceeded to the effect that these people would be dead today if legislation now favored by the public, etc., etc.) Although Gallup releases headline even a one-percentage-point increase over several years in public *support* for "gun control," Gallup has never mentioned the complete reversal in sentiment on banning handguns between 1959 and 1975. Indeed, in the 1975 release, even the question and results on handgun prohibition are buried in the back; the release is headlined: "Public Overwhelmingly Favors Registration of All Firearms." Similarly, the 1975 Harris Poll, in which fewer people yet supported handgun prohibition, is headlined "Strong Support For Gun Control."

Greater yet was the opposition to handgun prohibition revealed by the 1975 Decision Making Information poll, one of two really extensive polls ever done of public attitudes on the gun issue. (The DMI and the 1978 Cambridge Report poll, both privately commissioned — though by opposite sides — involved many times more questions than the Gallup, etc., which are limited to three or four.) In the DMI poll, 39 percent of the respondents were strongly opposed to handgun prohibition and 31 percent inclined to opposition (total 70 percent) while 15 percent strongly endorsed it and 10 percent were inclined to (25 percent).

Handgun prohibition advocates dismissed the DMI poll because it had been commissioned by the NRA, even though it was independently conducted with scrupulous neutrality by a prestigious private polling organization. But the accuracy of the DMI results, as opposed to that of Gallup and Harris, seemed demonstrated when handgun prohibitionists put it to a public referendum in Massachusetts, a state they selected as electorally the most liberal in the nation. Though Gallup and Harris had said that a majority of Easterners and urbanites support banning handguns, the Massachusetts initiative lost by slightly more than 70 percent. It carried not one major city, not even Cambridge.

The trend in state legislation is itself strong evidence of a steady, long-term decrease in public support for handgun prohibition. In the first thirty-four years of the twentieth century nine states enacted laws either banning handgun sales completely or requiring a permit which the authorities had broad discretion not to issue. In the ensuing forty-five years only Puerto Rico added itself to this group, while New Jersey reaffirmed its membership and South Carolina repealed its law — the oldest and

most stringent of them all. (Two of the original nine had repealed their laws before 1934.)

This dwindling of support for handgun prohibition may seem strange in light of the very one-sided debate on the subject over the past twenty years. The argument for handgun prohibition is a plausible one, and has been forcefully and articulately presented by distinguished political and academic figures. The other side has all too often been represented by people whose intellectual sophistication was insufficient to their argument, and whose manner of presentation did their position more harm than good. But more significant than this debate seems to have been social changes in American life and attitudes since the halcyon years of handgun prohibition in the early part of the century. When handguns were owned by less than 5 percent of the civilian population, it was easy to associate such ownership with groups stereotyped as congenitally or ideologically unfit to own weapons. Fortunately those stereotypes have disappeared — at least to the extent that people of Eastern and Southern European ancestry are accepted as good Americans and good neighbors. Few Americans today would openly argue that any racial or ethnic group should be barred from firearms ownership. Today, also, the innocent pleasures of target shooting and gun collecting are accepted by most Americans, and a less numerous, but still quite large majority, sees self-defense as a justifiable reason for handgun ownership. A major factor in these attitudes is that by the late 1970's nearly half of all American households contained at least one gun, and nearly a quarter contained a handgun. People are unlikely to support confiscation of their own property or of property they know to be owned and deeply valued by their families, friends, and neighbors.

# SECTION II: Crime, Suicide, and Accidents: Some Cross-national and Cross-cultural Comparisons

### Frequency of Problematic Cross-Societal and Cross-Cultural Comparisons

From the early part of the century, when American handgun restrictions were modeled on European legislation, the debate has continually involved cross-national and cross-cultural comparisons. Thus Congressman Robert Drinan (D-Mass.), the sponsor of several handgun prohibition bills, states that "alone among the Western nations, the United States permits the unrestricted availability of handguns, and alone it suffers an astronomical crime rate." If similar statements did not abound, it would be surprising that anyone — much less a legal scholar like Representative Drinan — could pack so many errors of law fact into one medium-sized sentence. First, the United States does not lead the Western nations in violent crime. Mexico, for instance, has a homicide rate several times greater than ours, though its handgun legislation approximates that urged by Representative Drinan. Second, the United States does not have unrestricted availability of handguns. Federal law bars sale to felons, minors, the mentally unstable, and narcotics addicts, among others. Several states have gone beyond this to impose the same kind of handgun permit requirements that Representative Drinan endorses. In some, these are administered more restrictively than in any other Western nation. In fact, a number of other Western nations have firearms restrictions approximating those of our least restrictive states. The rate of actual firearms ownership in countries like Switzerland or Israel well exceeds that in the United States. Moreover, those countries and several others allow, encourage, or even require widespread

WEAPONS AND WARFARE
AN ILLUSTRATED HISTORY OF THEIR IMPACT
PISTOLS
JEFF KINARD

# PISTOLS

## AN ILLUSTRATED HISTORY OF THEIR IMPACT

Jeff Kinard

Santa Barbara, California Denver, Colorado Oxford, England

Copyright 2003 by Jeff Kinard

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, except for the inclusion of brief quotations in a review, without prior permission in writing from the publishers.

Library of Congress Cataloging-in-Publication Data
Kinard, Jeff, 1954-
Pistols : an illustrated history of their impact / Jeffrey Kinard.
p. cm.—(Weapons and warfare series)
Includes bibliographical references and index.
ISBN 1-85109-470-9 (hardback : alk. paper)—ISBN 1-85109-475-X
(e-book)  1.  Pistols—History.  I. Title. II. Series.

TS537.K54 2004
623.4'432'  09—dc22
2004020415

07  06  05  04  03  02      10 9 8 7 6 5 4 3 2 1
This book is also available on the World Wide Web as an e-book.
Visit abc-clio.com for details.

ABC-CLIO, Inc.
130 Cremona Drive, P.O. Box 1911
Santa Barbara, California 93116–1911

This book is printed on acid-free paper.
Manufactured in the United States of America

spite its double-action capability, the Model 1877 suffered a number of deficiencies. Although break-open designs had more than proved themselves, Colt persisted in using a loading gate, thus requiring the slow process of individually loading and unloading each cartridge. To make matters worse, shorter-barreled models were not even fitted with ejector rods, further slowing the reloading process. The pistol was also mechanically somewhat delicate and often required repair. Still, the Model 1877 proved an almost instant success. Known as the Lightning when chambered for the caliber .38 Colt cartridge and the Thunderer when for caliber .41 Colt cartridges, the new six-shooter quickly gained a following throughout the American West. Although not the best endorsement for the pistol, the infamous Billy the Kid was armed with a Lightning when killed by Pat Garrett in 1881. It was often said that the Kid preferred the Lightning because its rather small bird's-head grip fit his hand better than larger handguns.

## Colt Model 1878 (Frontier) and Model 1892

Although the U.S. government failed to place orders for the Model 1877, it eventually showed interest in its successor, the Model 1878 Frontier Double Action Revolver, the product of a collaboration by William Mason and Charles B. Richards. Colt produced the Frontier between 1878 and 1905 and, as it had with the Peacemaker, offered it on the civilian market in a number of calibers that were interchangeable with Winchester long arms. The standard Frontier was sold with checkered hard-rubber grips and was available with either a blued or nickel finish and in a variety of barrel lengths. It was, however, only toward the end of the Frontier's production run in 1902 that the government finally authorized a contract for some 4,600 revolvers chambered in caliber .45. The order for the Model 1902 (also known as the Alaskan Model or Philippine Model) was evidently in response to the combat failure of caliber .38 revolvers.

The Models 1878 and 1902 were among Colt's largest-frame handguns. The Model 1902, like the Model 1878, was loaded through a loading gate on the right side and was fitted with an ejector rod mounted under the right side of the barrel. Both were also equipped with lanyard swivels. The government-issue Model 1902 differed from its predecessor in that it was manufactured with a noticeably larger trigger and trigger guard. It was standard with a blue finish, a 6-inch barrel, and walnut rather than rubber grips.

A HISTORY OF THE AMERICAN COLONIES
IN THIRTEEN VOLUMES

GENERAL EDITORS:
MILTON M. KLEIN & JACOB E. COOKE

AUBREY C. LAND

# COLONIAL MARYLAND

## A HISTORY

kto press

A U.S. DIVISION OF KRAUS-THOMSON ORGANIZATION LIMITED
MILLWOOD, NEW YORK

REF
975.2,L229c
Land, Aubrey C
        Colonial Maryland, a
     history

S. F. PUBLIC LIBRARY
83-41

© Copyright KTO Press 1981

All rights reserved.
No part of this work covered by the
copyright hereon may be reproduced or
used in any form or by any means—graphic,
electronic, or mechanical, including photocopying,
recording, or taping, or information storage
and retrieval systems—without written
permission of the publisher.

First printing

Printed in the United States of America

Library of Congress Cataloging in Publication Data

Land, Aubrey C.
   Colonial Maryland, a history.

   (A History of the American colonies)
   Bibliography: p.
   Includes index.
   1. Maryland—History—Colonial period, ca. 1600–1775.
2. Maryland—History—Revolution, 1775–1783.
I.  Title.  II.  Series:  History of the American colonies.
F184.L34      975.2'02      80-21732
ISBN 0-527-18713-5

FOR
ANNE,
ALISON,
AND
ALEXANDRA

instead issued general pardons, insisting only on an oath of fidelity to the Lord Proprietor. Before leaving Virginia he had promised his soldiery money payment for their service to prevent wholesale pillage, the common compensation for troops. Now that he had accomplished peaceful investiture, he found himself without funds and, fearful of mutiny, prepared to satisfy pay claims from his personal assets or, if necessary, even proprietary monies. In the midst of these arrangements Calvert sickened and on 9 June appeared in the last extremity. He had already commissioned Robert Vaughan as captain general and commander, under himself, of Kent Island. On his deathbed he named Thomas Greene, a leading Roman Catholic, his successor as governor, and to administer his estate and personal affairs he nominated his kinswoman, Margaret Brent. The same evening he died after a ten year term as governor of his brother's province.

To this triumvirate—Greene, Vaughan, and Margaret Brent—fell the task of restoring tranquility to an unsettled province. Vaughan, once an indentured servant, had the job of securing Kent Island, now a separate county and something of a frontier march but still claimed by Claiborne. Governor Greene inherited the complexities of administering a province still small in population but dangerously unbalanced in religion, with Protestants outnumbering Catholics by three to one. But Margaret Brent had the most pressing and ticklish task of the three: satisfying the soldiers' demands for pay with something less than adequate funds in her hands.

This remarkable woman proved herself intrepid as well as resourceful. When Governor Greene summoned his first Assembly Margaret Brent marched in to the gathering and "requested to have vote in the house for her selfe and voyce allso for that att the last Court 3d Jan: it was ordered that the said Mrs. Brent was to be looked uppon and received as his Lordship's Attorney." When the governor as presiding officer "denyed" her request she protested all proceedings "unless shee may be present and have vote as aforesaid." Frustrated in her political demarche, Margaret Brent moved ahead in her most critical job of quieting the pay claims of the soldiery, whose murmurs threatened to grow into mutiny. She took the necessary assets from the estate of the late Governor Calvert and, when these proved insufficient, turned to the properties of the Lord Proprietor himself to stave off possible mutiny. When Lord Baltimore later objected to sequestration of his funds the whole Assembly rallied to her and vouched for her justification in view of contemporary tensions.

In vividness and accomplishment Margaret Brent outmatched Governor Greene, whose administration lasted only fourteen months. In August of 1648 the Lord Proprietor superseded him with a Protestant governor, William Stone, a resident of Southampton County, Virginia, who guided the province through nearly a decade of perils that appeared almost as soon as he assumed his post.

—7—

Governor Stone could hardly have been ignorant of recent troubles in Maryland. Ingle had actually compelled Baltimore's duly commissioned chief magistrate to flee from the colony, a bit of news that spread throughout the Chesapeake even in a day of imperfect communication. Neither could Stone have easily previsioned the troubles in store for his administration, though they grew out of one of his earliest decisions.

> In the yeer 1649, many, both of the congregated Church, and others well-affected people in Virginia, being debarred from the free exercise of Religion under the Government of Sir William Berkeley, removed themselves, Families and Estates into the Province of Maryland, being thereunto invited by Captain Stone . . . with promise of Liberty in Religion and Priviledges of English Subjects.

Stone's invitation was consonant with Baltimore's desire to attract immigrants and with his policy of religious toleration in that intolerant age. The people of the congregated church—Puritans to use their common name—had incurred the wrath of Governor William Berkeley, a staunch Anglican, and some three hundred of them removed from Virginia to settle an area they named "Providence," in good Puritan tradition, at the mouth of the Severn River. Their leader, Richard Bennett, had preceded them by a few months when banished by Governor Berkeley and had selected the spot.

Stone had promised the Puritans land, toleration, and full civil rights. On each commitment he made good. His first Assembly passed the famous "Act Concerning Religion," which provided stiff fines for

such expressions of religious opprobrium as "heretick, Scismatick, Idolater, puritan, Independant, Prespitarian, popish priest, Jesuite, Jesuited papist, Lutheran, Calvenist, Anabaptist, Brownist, Antinomian, Barrowist, Roundhead, Sepratist" or any other. The operative clause of the act read, "no person or persons whatsoever within this Province . . . professing to believe in Jesus Christ, shall from henceforth bee any waies troubled, molested or discountenanced for or in respect of his or her religion nor in the free exercise thereof . . . nor any way compelled to the beleife or exercise of any other Religion against his or her consent." The language and intent are strikingly similar to the instructions Cecilius, Lord Baltimore, had given his brother for guidance at the time of first settlement. Equally protective of Catholic and Protestant confessions, the Act Concerning Religion enjoys the status of the earliest legislation in the English-speaking world explicitly granting toleration to all Christians. The Puritans themselves at the moment professed satisfaction with the "freedom and liberty in the exercise of our religion, under his Lordship's government and interest."

Before long their tune changed. Like their Puritan brethren elsewhere the men of Providence showed remarkable talent for discovering faults. They found in the oath of fidelity to Lord Baltimore certain pretensions to royalty, at a time when the king himself was standing trial for his life in England. Worse still they saw in the oath a commitment to support "that government and those officers who were sworn to countenance and uphold anti-Christ . . . the Roman Catholic Religion." Many among them "exceedingly scrupled" to take the oath.

Against this background of growing uneasiness a single untoward accident set off an avalanche of misfortunes for the proprietary establishment. In England the protracted struggle between the king and a Puritan-dominated Parliament ended when Charles I went to the executioner's block in 1649. Parliament immediately issued a decree making it treason to acknowledge "Charles Stuart, son of the late Charles, commonly called the Prince of Wales . . . to be king or chief magistrate of England or Ireland, or of any dominion belonging thereunto." Nevertheless Thomas Greene, acting as deputy governor during a visit of Governor Stone to Virginia, proclaimed Charles II as lawful sovereign. Stone hurried back to reverse his error but he could never expunge the memory of the blunder. Maryland stood condemned of defiance along with Virginia where Governor Berkeley had declared for King Charles II.

Parliamentary retaliation came in the form of a commission "to reduce all plantations within the Bay of Chesapeake" to obedience. The commission included two members well acquainted with Maryland affairs, Richard Bennett and William Claiborne, who lost no time proceeding to St. Mary's to accept the submission of Governor Stone and his acknowledgment of parliamentary authority. Actually Claiborne acted with considerable restraint. Instead of plundering and otherwise punishing men who had deprived him of Kent Island properties and had passed an act of attainder against him, he joined Bennett in placing the province temporarily in the hands of a "council" and a short time later restoring Governor Stone to office "until the pleasure of the State of England be further known." Bennett and Claiborne then returned to duties in Virginia. But the general effect proved to be a confusion of authority for many months in the future. Rumor and uncertainty left administration of the province in a state of near chaos, with Stone nominally the governor but the Puritans maintaining their autonomy on the Severn.

Not until 1654 did the stalemate disappear and then only to dissolve into civil war. In July the Puritans of Providence urged Bennett and Claiborne to return to Maryland on the pretext that Governor Stone had fallen into "rebellion" against the Commonwealth established by Oliver Cromwell at home. Late in the month Bennett and Claiborne in effect set Stone aside and appointed "for the conservation of the peace and public administration of justice" ten Puritans "to be Commissioners for the well ordering, directing, and governing the affairs of Maryland."

The new Puritan Commissioners convened an Assembly at Patuxent, miles away from St. Mary's City but more convenient to settlers at Providence. Without delay the Assembly overturned the proprietary and his policies, substituting for them a genuinely Puritan regime. Among six laws that members voted to repeal were the toleration act and the act outlawing William Claiborne. The forty-five acts put on the books at the end of the session included the usual Puritan blue laws against sabbath breaking, adultery and fornication, swearing, drunkenness, slander and tale-bearing. But more pointedly an "Act of Recognition" officially sanctioned the Puritan commissioners as the government, a new "Act Concerning Religion" restrained Catholics from the exercise of their religion, and legislation under the title "Concerning Rights of Land" excused provincials from taking the oath

of fidelity to Lord Baltimore. In one brief session during October of 1654 the Puritans had effectively wrested control from proprietary authorities and placed it in the hands of a commission headed by William Fuller, a leading Puritan of Providence.

Thus the stage was set for civil war in provincial Maryland, for Lord Baltimore had successfully appealed to the highest authority back home. Oliver Cromwell had dismissed Parliament and under the title Lord Protector had taken the government of Britain and the dominions into his hands. Lord Baltimore put his case before Cromwell and moved the Lord Protector to reprove the Puritans and to command them to desist from "disturbing the Lord Baltimore, or his officers, or people in Maryland." Once Cromwell had decided in his favor, the proprietor bestirred his governor, William Stone, to reassert his authority in Maryland.

The first step toward restoring proprietary authority proved easy. Governor Stone dispatched one John Hammond to Patuxent where the Puritans had deposited the provincial records at the house of Richard Preston, speaker of the Assembly that had seized control the previous October. Hammond recovered the records without serious difficulty and brought them back to St. Mary's. But the next steps toward restoring authority were less clear. Evidently Governor Stone thought his personal appearance with the symbols of authority most likely to impress the Puritan element in Providence. In March of 1655 he assembled upward of a hundred men, embarked them in a dozen small craft, and moved toward the Severn River.

In the prevailing state of tension and distrust a clash became almost inevitable. The detailed accounts of what happened and how contain much conflicting evidence, but the outline of events emerges quite unmistakably. Both sides sent messengers to the other; both sides received the messages with distrust. On Saturday, 24 March 1655, Stone moved his force close to the Severn River. The Puritans opposed him with even larger numbers of troops, assisted from the water by Roger Heamans, master of the armed ship *Golden Lion*, lying near the shore. As soon as Governor Stone led his men in formation toward the Puritan settlement, Heamans fired a volley with the ship's guns, and William Fuller, commander of the Puritan ground force, gave the word—so an eyewitness recounts—"In the name of God fall on; God is our strength." Outnumbered and outmanned, Governor Stone

yielded upon promise of quarter after losing nearly half his men as casualties.

The aftermath of the Battle of the Severn, described by the most objective of the witnesses as a "skirmish," did nothing to ease bad feelings between proprietary partisans and Puritans. Within three days the victors condemned ten prisoners to death and actually executed four of the number. Governor Stone, slightly wounded in the fighting, was held prisoner along with his council for over a month. Even the interposition of Cromwell himself, who ordered the Puritans to desist pending a hearing of both sides, did not end the uncertain outlook for the proprietary regime.

For more than two years final disposition hung in abeyance until late November of 1657 when a "treaty" between Lord Baltimore and Richard Bennett for the Puritans effected a settlement of the "very sad and distracted condition" of Maryland. Baltimore received confirmation of his patent and agreed to a general amnesty. One of the articles of agreement restored the toleration previously provided in the first "Act Concerning Religion" of 1649. To all appearances Maryland returned to the status quo ante bellum. And yet tribulations had not ended.

—8—

It may have seemed to Lord Baltimore in 1658 that he had finally succeeded in his protracted effort to maintain his patent to Maryland and to keep the lid on the boiling cauldron there. Certainly he had seen the end of imprints in the fierce war of polemics published during the time of troubles. The controversy had produced five major pamphlets, beginning in 1653 with *The Lord Baltimore's Case*, a short piece cast in the form of objections and answers, the answers wholly favorable to the Lord Proprietor. After the fashion of polemical warfare of the time the rejoinder came two years later under the verbose title, *Virginia and Maryland, or the Lord Baltimore's Printed Case Uncased and Answered*. The tone and thrust are clearly indicated in the 218 word subtitle, which includes such phrases as "the illegality of his Patent . . . The Injustice and Tyranny practiced in the Government . . . the Papists late Rebellion against the Government of his Highness the Lord Protector . . . assault on the Protestants . . . the oppression of the poor," and so on. Pamphleteers of the day pulled all the stops. Another imprint,

*Babylon's Fall* (1655), by one Leonard Strong, "Agent for the People of Providence in Maryland," gave a dramatic, anti-proprietary account of the Battle of the Severn and had its counterpart in John Langford's *Refutation of Babylon's Fall,* containing a contradictory but more temperate story of the battle. Exchanges came to a close in 1656 with the longest of these writings, *Leah and Rachel, or, The Two Fruitful Sisters Virginia and Maryland,* by John Hammond, who had been a resident in both colonies. Hammond's piece contained vivid descriptions of both provinces, frequently quoted by later historians, and, as a kind of coda, a brief homily enjoining the provinces to live in peace and fruitfulness as the two sisters Leah and Rachel did in biblical days.

And indeed peace did come to Maryland and Virginia. After signing the agreement with Bennett, Lord Baltimore was finally rid of that "pestilent enemie to the welfare of the Province" as he called William Claiborne. It was among his own people and specifically his own subordinate, Governor Josias Fendall, that the Lord Proprietor had his next vexing problem.

A sturdy supporter of his lordship, Fendall became governor, in name at least, during the months between Stone's imprisonment and the "treaty" with Bennett in late 1657. But not until February of 1658 did Fendall shed his purely nominal role and perform the actual duties as appointed first magistrate. In the following two years he took the province a considerable distance away from the worst disorders of the decade. He managed to persuade the Puritans in the Severn area, now erected into a new county named Anne Arundel, to send representatives to an Assembly that he tactfully held in recently established Calvert County, halfway between their seat and St. Mary's City. Now that the turmoil appeared past, the legislature, formerly unicameral, sat as two separate bodies, an upper house consisting of the governor and council and a lower house of elected delegates from each of the four counties: St. Mary's, Kent, Calvert, and Anne Arundel. At last Maryland had a miniature parliament. Fendall showed legislative skill in shepherding several much needed laws through the Assembly, and he pressed forward in administrative organization of the province when he erected two additional counties, Charles to the west and Baltimore in the frontier area at the head of the bay.

Just as Maryland regained a degree of tranquility a novel occurrence brought fresh trouble. The overt act that gave the name Fendall's

Rebellion to the new disturbance came during a meeting of the Assembly in February and March of 1660, a momentous year for both Maryland and the mother country. As the Assembly convened, General Monck, Cromwell's successor in power, was marching toward London, and a revived Parliament at Westminster was restoring its excluded members preliminary to the recall of Charles Stuart as rightful monarch. These decisive events back home could not have been known on the Chesapeake when Fendall and his council met the elected burgesses for a session unique in Maryland history.

From beginning to end the transactions of this Assembly were unprecedented and obscure. The meetings took place not at St. Mary's City in formal chambers but at "Mr. Thomas Gerrard's howse" for two initial days and thereafter at the house of Robert Slye, elected delegate from St. Mary's County. On the tenth day the elected delegates sent a message to the governor and council, namely, the upper house:

> The Assembly of Burgesses judging themselves to be a lawfull Assembly without dependence on any other power in the Province now in being is the highest court of Judicature And if any Objection can be made to the Contrary, Wee desire to heare it.

To this startling manifesto the upper house returned a message posing two main questions. Did the burgesses mean that the lower house was a complete Assembly without governor and council? All present could easily remember the day when the Commons of England had abolished the House of Lords and made themselves alone the Parliament of the realm. Secondly, did the burgesses mean that they were wholly independent of "the Lord Proprietary yea or nay?" Again Parliament had dethroned the Stuarts, as all could remember.

Two days of conferences did little either to bring the two houses into rapport or to clarify the aims of the burgesses. On Wednesday, 14 March, the only formal record, the upper house journal, abruptly ends with the governor and council sitting in a single body with the burgesses, as demanded during the conferences. Maryland had slipped back to the primitive unicameral legislature of earlier times. Governor Fendall accepted these conditions and the further stipulation that the speaker of the house, not the governor, have power to adjourn the

# *The 1838 Mormon War in Missouri*

*Stephen C. LeSueur*

University of Missouri Press
Columbia, 1987

MAIN

Copyright ©1987 by
The Curators of the University of Missouri
University of Missouri Press, Columbia, Missouri 65211
Printed and bound in the United States of America
All rights reserved

Library of Congress Cataloging-in-Publication Data

LeSueur, Stephen C.
The 1838 Mormon war in Missouri.

Bibliography: p.
Includes index.
1. Mormons–Missouri–History–19th century.
2. Missouri–History. I. Title.
F466.L47 1987 977.8'03 86-16090
ISBN 0-8262-0626-3 (alk. paper)

∞™ This paper meets the minimum requirements of the American National Standard for Permanence of Paper for Printed Library Materials, Z39.48, 1984.

To Arthur Cobery and John Taylor LeSueur
*History Teachers*

F466
L471
1987
MAIN

# 10
## *Surrender*

Mormon leaders still hoped to negotiate a compromise with the militia. Reed Peck, John Corrill, and W. W. Phelps, named by General Doniphan to return to the militia camp for discussions with the officers, were opponents of the Mormons' recent military activities. Joining them in the discussions were Col. George Hinkle and Arthur Morrison, apparently added by Smith to balance the representation on the Mormon committee. Hinkle was a religious and military leader among the Mormons, while Morrison served as a captain in the militia and as a Caldwell County judge. It is not known why Smith and his counselors did not negotiate directly with the officers; perhaps they feared their lives would be in danger outside of Far West.[1] Responsibility for settling the conflict peacefully thus fell upon Hinkle and the others.

On Wednesday morning, 31 October, the Mormons requested an interview with the Missouri militia officers. General Lucas replied that he was too busy organizing his troops and suggested that they meet at 2:00 p.m. instead.[2] The committeemen were able to speak briefly with General Doniphan, who informed them that General Atchison had been relieved of command and that Lucas now directed the troops. Doniphan also informed them that the militia had been called out by order of the governor, but he did not give them the particulars of the extermination order. According to both Corrill and Peck, Doniphan told

1. Smith believed that his enemies had been plotting to kill him from the time he arrived in Missouri in early 1838 (*HC* 3:368, Joseph Smith, "A Bill of Damages," 4 June 1839; cf. Swartzell, *Mormonism Exposed*, p. 36). He later hesitated to go to the militia camp (when General Lucas demanded that he surrender as a hostage), partly because he believed it unsafe. Both Peck and Hinkle believed their own lives were in danger outside of Far West (Peck, "Manuscript," p. 32; Hinkle, "Letter to W. W. Phelps, August 14, 1844," published in S. J. Hinkle, "A Biographical Sketch of G. M. Hinkle," *Journal of History* 13 [October 1920]: 449–50).

2. *Document*, p. 73, General Lucas to the Governor, 2 November 1838.

them that the militia officers delayed their negotiations with the Mormons because they were still waiting for Boggs's orders.[3] Apparently the orders received by the officers the previous day did not contain specific instructions regarding what action to take against the Mormons. The governor's extermination proclamation was sent only to General Clark, who then forwarded it to the other generals.[4] The Mormon representatives returned to Far West with only a limited amount of information. And while they waited to begin negotiations, the Missouri forces continued to grow, swelling to over twenty-five hundred men.

The situation grew worse for the Mormons throughout the day. The news that General Lucas had taken charge of the militia distressed Mormon leaders, for Lucas had been one of their chief persecutors in Jackson County. The Missourians allowed some of their Mormon prisoners to return to Far West that day. The prisoners carried into town William Carey, who lay speechless and suffering, having been struck over the head by one of his captors. Carey died a day or two later. During the early afternoon Charles Rich and a small company of Mormons parading under a white flag escorted two non-Mormon prisoners out of Far West. During their return they were fired upon by Captain Bogart, who recognized Rich as one of his assailants at the Crooked River battle.[5] Although no one was injured, the Mormons believed this incident portended the kind of treatment they could expect from the Missouri troops. About this time a messenger brought news to Far West confirming the worst Mormon fears. A large company of Missourians had attacked and destroyed the Mormon village of Haun's Mill.

### *The Haun's Mill Massacre*

Haun's Mill was located on the eastern edge of Caldwell County, bordering Livingston County, about sixteen miles east

3. Corrill, *A Brief History*, pp. 40–41; and Peck, "Manuscript," p. 25.

4. See *Document*, pp. 61, 72, 76, the Governor to General Clark, 27 October 1838; General Lucas to the Governor, 2 November 1838; General Clark to the Governor, 30 October 1838; and Thorp, *Early Days in the West*, pp. 88–89.

5. Rich, Statement, p. 3; Josiah Butterfield to Mr. John Elden, 17 June 1839. Typescript, LDS Archives; and many other sources describe this incident.

of Far West. Ten to fifteen Mormon families lived at or near the village; another twenty emigrant families had stopped there during the disturbances and were living in their wagons. For two weeks a company of troops from Livingston County, led by Capt. Nehemiah Comstock, had harassed the Saints at Haun's Mill, driving off livestock and ordering the residents to leave their homes. After the 25 October battle at Crooked River, both the Mormons at Haun's Mill and the Livingston troops became fearful of an attack from the other. Consequently, their leaders signed a peace treaty halting the raids on the village. Joseph Smith repeatedly warned the Haun's Mill Saints to move into Far West for safety, but due to a misunderstanding of the Prophet's instructions, they chose to remain at the village, trusting in the Lord and their recently signed treaty to protect them. "None had ever been killed who abode by my counsel," Smith later said. "At Hauns' Mill the brethren went contrary to my counsel; if they had not, their lives would have been spared."[6]

No one knows who ordered the attack on Haun's Mill. The militia companies that participated in the assault belonged to General Parks's brigade, but he did not issue the order.[7] The troops organized under the command of Col. Thomas Jennings, who apparently acted on his own initiative in leading the attack.[8] It is possible that the Missourians received word of Governor Boggs's extermination order and took it upon themselves to carry out the decree, but they never offered this as a reason for the raid.[9] One of the attackers, Charles Ashby, a state legislator from Livingston, said the Missourians attacked because Mormon dissenters fleeing into Livingston warned them

6. *HC* 5:137.

7. Parks was with the troops that marched from Richmond to Far West. No evidence from Mormon or non-Mormon sources suggests that he ordered the attack.

8. *History of Caldwell and Livingston Counties*, p. 151; and Carrie P. Johnston and W. H. S. McGlumphy, *History of Clinton and Caldwell Counties, Missouri* (Topeka-Indianapolis: Historical Publishing Company, 1923), p. 240; both assert that Colonel Jennings, as commanding officer of the expedition, held responsibility for the attack on Haun's Mill. Jennings was a resident of Livingston County.

9. One problem with this theory is that there is no evidence indicating when Governor Boggs's order became known to the Missourians. Generals Atchison, Doniphan, and Lucas did not receive their orders from the governor until the afternoon of 30 October, and they did not receive an official

that the Saints at Haun's Mill were planning an invasion of their county. Local citizens decided they must act to prevent Mormon soldiers from overrunning Livingston as they had Daviess. "We thought it best to attack them first . . . ," Ashby told fellow legislators. "What we did was in our own defence, and we had the right to do."[10]

The Livingston troops were joined by companies from Daviess and Carroll counties. Many of the Daviess men wanted to even the score for Mormon depredations in their county. Capts. Nehemiah Comstock and William Mann, whose troops had been harassing Mormon emigrants and settlers, also brought their companies into the field. Prior to the attack, the Missourians blackened their faces and attached red cloths to their hats and shirts to distinguish themselves from their Mormon enemies. On the afternoon of Tuesday, 30 October, about 200 to 250 Missouri troops swept down upon Haun's Mill.[11]

The Mormons at Haun's Mill were not planning an attack

copy of the extermination order until 31 October. According to Burr Joyce, "The Haun's Mill Massacre," *St. Louis Globe-Democrat*, 6 October 1887, the decision to attack the Mormon village was made on 29 October.

10. *Missouri Republican*, 24 December 1838, speech by Charles Ashby.

11. Numerous descriptions were written by Mormon survivors of the attack. Petitions located in the U.S. Archives: Mosiah Benner, David C. Deming, Catherine Fuller, David Fullmer, Mahlon Johnson, Moses Kelley, Nathan K. Knight, Isaac Leany, Tarlton Lewis, Philandia Merrick, Reuben Naper, Ruth Naper, Alma Smith, Amanda Smith, Hannah York, and Joseph Young. Petitions in the LDS Archives: Jacob Fouts, Nathan K. Knight, Catherine McBride, Jacob Potts, Levi Stilts, and Joseph Young. Detailed accounts in later statements and reminiscences: Olive Ames, statement, *History of the Reorganized Church of Jesus Christ of Latter Day Saints*, 8 vols. (Independence, Mo.: Herald House, 1967), 2:234–37; Margaret Foutz, "Haun's Mill Massacre," LDS Archives; William Leany, "Autobiography of William Leany." Typescript, LDS Archives; David Lewis, "Excerpt From The Journal"; David Lewis, statement, *Times and Seasons* 1 (August 1840): 147–50; Ellis Eamut, statement, Journal History, 30 October 1838; and James McBride, "Autobiography." Photocopy, LDS Archives. The only known description by a non-Mormon participant is found in *Document*, pp. 82–83, D. Ashby's statement of the Battle at the Mill, 23 November 1838. Charles Ashby, also a participant, mentioned the incident in a speech in the state legislature, reported in the *Missouri Republican*, 24 December 1838. The *Missouri Republican*, 12 November 1838, published an account of the battle. The author of the Caldwell County history interviewed participants and local citizens for his account in the *History of Caldwell and Livingston Counties*, pp. 145–59. Joyce, "The Haun's Mill Massacre," also presents details of the incident.

upon Livingston settlers. They had set guards around the village, but because of their recent treaty they were not expecting an attack. The Missouri troops were first seen as they emerged from the woods about one hundred yards from the village. The Mormons, who were simply going about their daily tasks, did not react with alarm, but stared cautiously as the Missourians formed into three companies for their attack. Many of the Saints thought the troops were reinforcements from Far West. Captain Comstock fired his rifle into the air, after which ten seconds of silence followed. During the silence—described by Joseph Young as a "solemn pause"—the Mormons began slowly to grasp the meaning of the soldiers' appearance as they anxiously searched for wives, husbands, children, and the nearest shelter. The Missouri troops raised their guns, and with a thunderous roar broke the spell of silence by firing at the Mormon villagers.

From T. B. H. Stenhouse, *The Rocky Mountain Saints* (New York: D. Appleton and Company, 1881).

As soon as the shooting started, David Evans, the commander of the small militia force at Haun's Mill, ran to the center of the village, waved his hat, and yelled for quarter. So did a number of other Mormons, but the Missouri troops ignored

their appeals and continued firing. Mothers frantically gathered their children and fled into the woods. A rifle ball pierced Mary Stedwell's hand as she attempted to jump a log. Her dress caught the log, and she fell over it, protected, as another twenty balls peppered the fallen tree. Fifteen men and three boys ran into a blacksmith shop, where the Mormons had previously determined to fight if they were attacked. They thought the shop would provide a shelter from which to defend the village, and their brief stand doubtless saved the lives of their fleeing neighbors because they attracted most of the Missourians' fire. But the shop also became a deathtrap, for the Missourians' musket balls easily passed through the large, unchinked cracks between the logs of the shop's walls.

Inside the shop the three boys crawled under the bellows for safety while the men frantically loaded, fired, reloaded, and fired again. The Missourians poured round after round into the shop while the Mormons' fire proved entirely ineffective as one-by-one the Mormon men fell. The Missourians slowly advanced toward the shop until they simply shoved their muskets through the logs and fired into the crowd of bodies. David Lewis attempted to fire through an open window, but, as he raised his gun, saw a Missourian preparing to fire. Lewis ducked just as another Mormon, stepping to the window to fire his musket, was shot in the face. Eventually, the crush of the Missourians' guns through the shop walls was so great that the defenders could not return fire, but could only desperately parry and dodge as the Missourians continued firing into the shop.

About half the Mormon men had fallen when Captain Evans ordered the rest to flee, but most of them were cut down as they ran the gauntlet of soldiers. Thomas McBride, a sixty-two-year-old Mormon who was wounded as he ran from the shop, surrendered his gun when the Missourians came upon him. Jacob Rogers, who ran a ferry in Daviess County, took McBride's loaded gun and discharged it into the old man's breast. Rogers then hacked at McBride with a scythe until his body was mangled from head to foot. Isaac Leany, after having the breach of his rifle shot off, crawled through a window and ran for the woods. He received two shots in the chest, one in the hip, and one in each arm before reaching the safety of the brush. His clothes were torn to shreds by a dozen other balls that grazed his body. Inside

the blacksmith shop the Missourians found ten-year-old Sardius Smith hiding under the bellows. Young Smith, whose father lay mortally wounded on the floor, begged for his life, but William Reynolds of Livingston County put a gun to the boy's head and blew off the top. "Nits will make lice, and if he had lived he would have become a Mormon," Reynolds reportedly said in justification of his act.[12] After the firing ceased, some of the Missourians looted the homes and bodies of the Saints—several of the wounded were stripped as they feigned death—and then rode off. The Missourians suffered three wounded in the attack.

Few of the Saints returned to Haun's Mill until after dark. Some did not wander back until the next day. Amanda Smith returned to find her husband, Warren, and her son Sardius lying dead in the blacksmith shop. She discovered her seven-year-old son, Alma, wounded and feigning death under a pile of bodies (where he had lain since being shot), afraid to move or make any noise until he heard his mother calling several hours later. Bodies lay scattered throughout the village: eighteen had been killed or mortally wounded, twelve to fifteen others wounded.[13] All but one were men or boys. The floor of the blacksmith's shop was almost entirely covered by a pool of blood. The women who came back the night of the massacre tended to the wounded, but left most of the dead where they had fallen. "All through the night we heard the groans of the dying," Amanda Smith recalled. "Once in the dark we crawled over the heap of dead in the blacksmith's shop to try to help or soothe the sufferers' wants; once we followed the cries of a wounded brother who hid in some bushes from the murderers and relieved him all we could."[14] Late that night Isaac Leany crawled back to the village, where the Mormon women blessed him and then hid him under the floor of a cabin. A few of the men returned the next day, but, fearing the Missourians would

12. *History of Caldwell and Livingston Counties*, p. 149. Several different persons were named by the Mormons as having killed young Smith, but the author of the Caldwell County history, who investigated the incident, insisted that Reynolds was the assailant.

13. One of those killed was a non-Mormon named Walker. Walker was apparently a resident of Haun's Mill or a member of a Mormon emigrant company, because he did not belong to the militia. Blair, "The Haun's Mill Massacre," p. 64.

14. "Some Highlights in the Life of Amanda Barnes Smith," n.p. Typescript, BYU Special Collections.

attack, did not take time to bury the dead. Instead, they helped the women gather the bodies, frozen stiff, and threw them into an old well, some feet first, others head first, after which they filled in the well with dirt and straw. Although some of the women stayed to care for the wounded, most of the men fled back into the woods for safety after they disposed of the dead.

The messenger who brought news of the attack to Far West did not know how many had been killed or wounded; he could only report that the Missourians had overrun Haun's Mill and massacred a great number of its inhabitants.

### *Negotiations and Dictated Terms*

News of the massacre seemed to change Joseph Smith's perception of the conflict. He not only saw that the Mormons could not win an all-out war with the Missourians, but he also realized that his people would be utterly destroyed if such a war occurred. He now pressed the five representatives to work out a compromise with the militia. Both Reed Peck and John Corrill wrote that Smith instructed them to "beg like a dog for peace."[15] Hinkle reported that Smith told them to obtain a treaty "on any terms short of a battle."[16] According to Corrill, Smith said he would go to prison for twenty years or even die rather than allow his people to be exterminated.[17] When the appointed time arrived, the Mormon representatives, with clear instructions from Smith to seek a compromise, rode out to meet the Missouri officers.

The negotiators met between Far West and the militia camp.[18] Colonel Hinkle spoke for the Mormons, General Lucas for the Missourians. The militia officers, having now received a copy of Governor Boggs's extermination order from General Clark, were ready to negotiate. After a brief discussion, during which Hinkle

15. Corrill, *A Brief History*, p. 41; and Peck, "Manuscript," p. 24.
16. Hinkle, "Letter to W. W. Phelps, August 14, 1844," p. 449.
17. *A Brief History*, p. 41.
18. Descriptions of the discussions between the Mormon representatives and the militia officers are found in *Document*, p. 73, General Lucas to the Governor, 2 November 1838; Corrill, *A Brief History*, pp. 41–42; Peck, "Manuscript," pp. 25–27; Hinkle, "Letter to W. W. Phelps, August 14, 1844," pp. 448–53; and Arthur Morrison, "Affidavit, January 9, 1840." Petitions, U.S. Archives. Morrison's statement is brief. W. W. Phelps left no known account of this incident.

expressed a desire to settle the conflict without a fight, Lucas read the order to the Mormon representatives. They were shocked by its severity. "I expected we should be exterminated without fail," John Corrill recalled of this moment. "There lay three thousand men, highly excited and full of vengeance, and it was as much as the officers could do to keep them off from us any how; and they now had authority from the executive to exterminate . . . ."[19]

Lucas assured the representatives that he would not be as harsh as the governor had stipulated. The matter could be settled without bloodshed, he said, if the Mormons would accede to four demands:

> 1st. To give up their leaders to be tried and punished.
> 2d. To make an appropriation of their property, all who had taken up arms, to the payment of their debts, and indemnify for damage done by them.
> 3d. That the balance should leave the State, and be protected out by the militia, but to be permitted to remain under protection until further orders were received from the Commander-in-Chief.
> 4th. To give up the arms of every description to be receipted for.[20]

Lucas made it clear that the Mormons who participated in the attack on Bogart's company at Crooked River as well as those who committed the depredations in Daviess County would be liable to trial and punishment.

Hinkle objected strenuously to the demands to surrender their weapons and leave the state. He contended that if the Mormons had committed any crimes, they should be tried and punished according to the law. "But to give up our arms and leave the State, would be virtually throwing away our most sacred rites as citizens of a republican state," he said.[21] Lucas became enraged by Hinkle's obstinacy and declared that no other terms would do. He allowed no discussion of the matter. Still hesitant to agree, Hinkle requested that the Mormons be given until the morning to decide. Lucas agreed, but demanded that Joseph Smith, Sidney Rigdon, Lyman Wight, Parley P. Pratt, and George W. Robinson be surrendered as hostages to insure the Mormons' faithful compliance with the terms. The general

19. *A Brief History*, p. 42.
20. *Document*, p. 73, General Lucas to the Governor, 2 November 1838.
21. Hinkle, "Letter to W. W. Phelps, August 14, 1844," p. 451.



FIGURE 1

*Francis E. Brownell as a private in the 11th New York Regiment or Ellsworth's Zouaves in 1861. Note the bowie knife thrust through his belt. When the regiment marched into Alexandria, Va., Ellsworth was killed by a civilian who was in turn shot by Brownell. For this, Brownell received the Congressional Medal of Honor and the dagger illustrated in figure 86.* NATIONAL ARCHIVES

# AMERICAN KNIVES

## *THE FIRST HISTORY AND COLLECTORS' GUIDE*

*by*
Harold L. Peterson

CHARLES SCRIBNER'S SONS · NEW YORK

671,P442a
Peterson, Harold
American knives

© 1958 BY HAROLD L. PETERSON

*All rights reserved. No part of this book may be reproduced in any form without the permission of Charles Scribner's Sons.*

11 13 15 17 19 MH/C 20 18 16 14 12 10
3 5 7 9 11 13 15 17 19 H/P 20 18 16 14 12 10 8 6 4 2

PRINTED IN THE UNITED STATES OF AMERICA
*Library of Congress Catalog Card Number 58-7523*
*SBN 684-10462-8 (cloth)*
*SBN 684-14440-9 (paper)*

S. F. PUBLIC LIBRARY

3 1223 00927 1058

*TO MY CHILDREN*

Harold Jr., and Kristin Dorothy,
who believe every home
should have an armory

As was noted above, the backwoodsman carried his scalping knife with him when he marched off to fight in the Revolution, while the private in the regular regiments carried a pocketknife. There was also one other knife that saw some use in the Revolution, particularly by officers: the dagger. Both the rifleman's "scalping" knife and the private's jackknife are mentioned in regulations. The dagger was strictly unofficial, carried only at the whim of the individual, and its existence is evidenced only by a few surviving specimens. Judging by these, they were not large weapons. The blades were about six inches long and double-edged. The guards were usually simple cross quillons. The known specimens run the gamut from simple hand forgings to fine silver mounts. None could have been a real fighting weapon, but they could have served as a last defense in an emergency.

These were the principal knives used during the first eight centuries of American history. The next 175 years brought a vastly greater variety and an infinitely larger production. The successors to the pioneer types must be considered separately and at greater length.

# THE BOWIE AND ITS ASSOCIATES

FIGURE 29

FIGURE 30

*James Bowie* BEN PALMER COLLECTION *Rezin P. Bowie*

IN THE history of American arms three weapons stand out above all the rest: the Kentucky rifle, the Colt revolver and the bowie knife. Each was a superb weapon, but more than that, each became so much a part of the American scene that it transcended its role in history and became a part of the great American legend.

Of none is this truer than the bowie knife. A century ago European visitors who ventured beyond the Appalachians found it such an integral part of the American way of life that they felt compelled to comment on it at length in accounts of their adventures. Schools were established in most of the larger cities of the old Southwest to teach its use. In many communities no man, whether hunter, gambler, tradesman or political leader felt himself fully clothed without one. It gave its name to the state

where it was born, and Arkansas has been known unofficially ever since as the Bowie State. Even today the mere mention of its name immediately conjures up a picture of a wild and rough era characterized by violence and sudden death.

Among collectors and students of knives there is no more magic name than "bowie knife." All agree that a bowie is a most desirable knife to own, but ask them exactly what a bowie is, and agreement ends. Some maintain that it is a sheath knife with a clipped point. Any knife, no matter what its size, can qualify. Others insist that only large fighting knives with clipped points can qualify. A third group feels that the shape of the point is immaterial as long as it is a large knife; and a final group is willing to classify all of the various sheath knives of the period from 1830 to 1890 as bowies.

The problem is not simple. Each faction has some justification for its opinion. Certainly the original knife made for James Bowie was a large heavy knife suitable for both self-defense and general utility in the woods. It was single-edged with a false edge at the back of the point permitting a backstroke in fighting. The record is not absolutely clear, but it seems probable that the point was clipped. Thus it would seem that in its purest form the term should apply to large knives with clipped points. It should also be noted, however, that within a decade after the original knife was made, the name was being applied to all sheath knives large enough for use as weapons. This continued for the next thirty or forty years and covered the period of the knife's greatest popularity. The argument of contemporary usage plus the fact that one cannot be absolutely certain that Bowie's original knife had a clipped point provide good grounds for blanketing in all single-edged sheath knives of the period. The matter of size, too, is ephemeral. Everyone would agree that a blade of nine inches or more would qualify a knife as a weapon. But what about six inches? Modern American military knives are only a fraction longer, and a man can be killed with far less.

In view of this situation and of the conflicting definitions, it would seem best to establish how the term will be used here. The bowie in its purest form will be considered a large knife with a clipped point. Other knives of the period will also be classed as bowies but with qualifications describing either the point, the size or any other feature that causes them to vary from the pure form.

The story of this fabulous knife began in 1830. It was made in that



FIGURE 31

*The classical bowie in its purest form. It is a massive hand-forged weapon with a 13¾-inch blade, 2⅜ inches wide. The mountings are iron, and there is a brass strip on the back of the blade. The only marks are crudely engraved stars on the quillon terminals.*
WILLIAM O. SWEET COLLECTION

year, possibly by an Arkansas blacksmith named James Black, for the legendary James Bowie. So much legend surrounds Bowie, in fact, that it is often impossible at this date to distinguish fact from fancy. The romantic tales of Bowie's prowess had such an effect on the popularity of the knife, even in his own time, that it really makes little difference whether they are true or not. Bowie was probably born in Logan County, Kentucky, April 10, 1796. He grew to be a large man, six feet tall, weighing some 180 pounds. He was an open-hearted son of the frontier, generous to a fault and a true gentleman. But even his brother admitted he had a terrible temper. His career was varied and noteworthy, ranging from lumbering to the slave trade and land speculation. He prospered in all and built a considerable fortune. During the late 1820's he became interested in Texas, married there and was granted provisional citizenship by the Mexican government in 1830. When the movement for Texas independence began, Bowie took an active part and was appointed a colonel in the Texas Army. He commanded the forces at the Alamo and died there with the rest of the garrison, March 8, 1836.

The direct antecedent of the bowie knife was made for Rezin P. Bowie, James's brother. According to Rezin himself, he personally designed a knife 9¼ inches long and 1½ inches wide for use in hunting. It was single-edged and had a straight blade. In 1827 he gave this knife to James, who had recently been shot while unarmed by Major Norris Wright, in the thought that he might need it for self-protection. A short time later Bowie did indeed use the knife in the famous Vidalia Sandbar fight. After being shot in the

FIGURE 32

*Early bowie knife made by Searles of Baton Rouge for Rezin P. Bowie. Rezin had a number of these made for presentation to friends. He gave this one to H. W. Fowler of the U. S. Dragoons. From a glass negative found in the effects of Col. Washington Bowie.* BEN PALMER COLLECTION

hip and stabbed in the chest with a sword cane, Bowie, according to a friendly report, killed Wright with the knife and then, after receiving another pistol ball in his left arm, wounded a second antagonist, one Alfred Blanchard, and caused him to flee the sandbar. In 1829 Bowie also is said to have fought a notorious Natchez gambler named John Sturdivant, who had cheated the son of one of his friends. In this encounter the left wrist of the fighters were tied together with a scarf. Sturdivant tried an attack. Bowie parried and slashed his enemy's knife arm, severing the tendons and rendering him helpless. Always a magnanimous victor, Bowie refrained from killing Sturdivant.

Shortly thereafter Bowie went to Texas. On his return with provisional citizenship in 1830, he is purported to have visited the shop of James Black and asked him to make a knife according to a pattern he had devised. Apparently this pattern was based on the knife he had received from Rezin and which had served him so well in his previous encounters.

Black, in later life, always maintained that he had improved on Bowie's model and thus had really invented the Bowie knife himself. As far as can

be determined, Bowie had altered Rezin's knife by increasing its size. Black may have added the false edge at the point if, indeed, he actually made the knife at all.

Shortly after Bowie received his new knife, word spread of a new battle, and this started the knife on its way to fame. Although Bowie had spared Sturdivant's life in the knife duel at Natchez-under-the-Hill, the gambler never forgave him. Instead of being grateful, the story goes, he hired three ruffians to kill Bowie. These desperadoes ambushed James on his return trip to Texas and rushed him, knives in hand. With his new knife Bowie struck off the head of the assassin who seized his bridle. Then, despite a stab wound in the calf, he dismounted and disemboweled the second. The third turned and fled, but Bowie caught him and split his head in two. Word of this feat spread rapidly. Bowie, already noted for his achievements with the weapon, became the prototype of all knife fighters, and quantities of new knives were made or reputedly made in the image of Bowie's. The era of the bowie knife had begun.

The West of Bowie's day provided the perfect environment for the development of the knife cult. The lawless element prevalent in all frontier areas, the rough and violent river men and the plentiful gamblers all found the knife a handy weapon that could be carried inconspicuously and used quietly. The law-abiding citizens needed the knife for protection and for the defense of their frequently over-sensitive honor. The day of the civilian sword had passed. Instead the well-equipped gentleman carried a pistol in his pocket and a knife beneath his coattails.

Hundreds of incidents involving knives were recorded in the newspapers of the day. They ran the gamut from nefarious murders through the settling of violent quarrels and affairs of honor to the saving of lives and virtue from attacking beasts and desperadoes. There were brawls in taverns and gambling houses, on river boats, in the streets and even in state legislatures, all of them settled by knives.

One incident, far less sanguinary than most, involved the U. S. House of Representatives itself. Congressional tempers were short in the spring of 1860. The impending crisis of the Civil War dominated all else, and the air was tense. There were individual fist fights between members, general brawls, duels and challenges to duels. One of the recently seated members was John Fox Potter of Wisconsin. Potter had a reputation in his home state as a mild and gentle man, but his actions in Congress scarcely support it.



FIGURE 33

*The knives of "Bowie Knife" Potter. According to family tradition, the top knife with an 11½-inch blade by R. E. Hardy of Sheffield is the one he planned to use in his duel with Pryor. The specimen at the lower left is a Wostenholm with a 5½-inch blade. In the lower right is one of the trophies which were showered on Potter. It is an American-made knife, and the plate on the grips states that it was captured from one of the Louisiana Tigers at Norfolk in 1862 and presented to Potter on behalf of Brig. Gen. Viele, May 31, 1862.*

WISCONSIN STATE HISTORICAL SOCIETY

He had hardly taken his seat before he was engaged in a fist fight on the aisle during which he captured the wig of a representative from Mississippi, received a black eye in return and was challenged to a duel.

Mutual friends patched up that dispute, but another soon followed. On April 8, 1860, a group of Southerners led by Roger A. Pryor of Virginia tried to silence Owen Lovejoy of Illinois during one of his virulent denunciations of slavery. Potter and others sprang to Lovejoy's defense. The sergeant at arms parted the two groups before the affair had passed beyond mutual insults. Shortly thereafter, when the official record appeared, it stated that Potter had shouted, "This side shall be heard, let the consequences be what they may!" Pryor accused the Wisconsin representative of having composed this statement and inserted it after the event. Words were exchanged, and Pryor's seconds waited on Potter.

In response Potter issued as bizarre a set of conditions as was ever placed before a Southern gentleman schooled in the *code duello* as it was practiced in the East. He declared that he was glad to oblige the offended Virginian and would be pleased to meet him at his convenience in a closed room with bowie knives of equal weight and length of blade, the fight to continue until one of the participants fell, and Potter added that he "would endeavor to carve him [Pryor] so skillfully as forever to remove his desire for fight." Pryor did not learn of the terms until much later. His seconds declined for him immediately upon receipt of Potter's message on the grounds that the proposal was barbarous and ungentlemanly. Another duel was then narrowly avoided when Potter's second thought that the terms of the refusal reflected on his own honor.

The newspapers seized upon the affair with avidity. It became a featured story throughout the country, and Potter became a national figure. Republicans lauded him as a hero while Democrats excoriated him as a "braggart fool." Knives were showered on him from all parts of the country, some bearing the names of persons on whom the donors wished them used. The Republicans of the State of Missouri presented him with a seven-foot knife bearing the punning inscription, "I will always keep a Prior engagement," and for the rest of his life he was known as "Bowie Knife" Potter.

The Potter incident is of no great importance in itself. Its main interest lies in the fact that it involved members of Congress and that it illustrates the knife's hold on the popular imagination thirty years after its first appearance.

Popular opinion of the bowie knife had not been static during these thirty years. Early newspaper accounts seem to dwell with a perverted pride on gory tales of knife-fighting. Then the public tired of the novelty, and a feeling of revulsion set in. From 1837 to 1839 Tennessee, Alabama and Mississippi passed stringent laws covering the use, transfer or even public handling of such knives. Despite these acts, however, the bowie retained much of its appeal, and it was carried as widely as before. During the Mexican War it was a popular though unofficial side arm of American troops. It played an important part in the violence in Kansas and Missouri in the 1850's, and many soldiers on both sides carried it into the Civil War.

So much for the general background of the bowie; what did the knife itself look like? The earliest specimens were those made in America by local smiths supposedly copying Bowie's original. These were large knives with heavy blades nine to fifteen inches long and one and a half to two inches wide. They were thick enough to give the blade sufficient rigidity to lop off saplings, split the skull of a bear or a human adversary, joint game, or dig in rough ground. The blades were usually well made but lacked the high finish of later and imported products. The guard was normally a simple cross often with S-curved quillons or a plate of iron or brass, and the grips were commonly wood, antler or bone. There were almost never any marks or inscriptions. On a few of the blacksmith-made knives there was also a most interesting feature. This was a hardened strip of brass along the back of the blade, apparently designed to catch the edge of an opponent's on a parry and prevent the possibility of its sliding up past the guard and injuring the hand. Knives with this strip are excessively rare today. It is only found on American blades, never on British specimens. The typical hand-forged knives, however, are not so scarce. They were made all along the frontier, starting probably within a few weeks after the original was made and continuing at least until the end of the Civil War, thirty-five years later.

FIGURE 34

*Crude American bowie made from a file. The guard is iron. The 12¾-inch blade is swaged but has no real false edge. It might possibly be Confederate.*

LEON C. JACKSON COLLECTION

FIGURE 35

*American bowie with 12⅛-inch blade and brass mounts. Again, the blade is swaged but has no real false edge. The scabbard is tooled with Masonic emblems, a fouled anchor and other devices.*

WILLIAM SHEMERLUK COLLECTION

FIGURE 36

*Two American-made bowies. The upper specimen has a heavy 9¼-inch blade with a high median ridge. The mounts of the scabbard are tinned iron. It was found in Texas with a tradition of Confederate use. The lower knife has two unusual features. It was forged with a bolster like a carving knife, and the iron guard was passed through the bolster. The sheath has an interesting leather lug designed to hold the knife in place.*

LEON C. JACKSON COLLECTION

It was not long, however, before the English cutlery industry took note of the demand for these knives. George Wostenholm, founder of the Washington Works in Sheffield, had a representative in New York in 1830 and made personal visits to the United States himself in 1836 and after to study the demand and the market. Wostenholm probably made more bowie knives for the American trade than any other firm, and he made some of the best. His trade mark of I*XL became a standard of quality and was accorded the sincere praise of imitation by other English cutlers who approached it as closely as they dared with such variants as XLNT, I*XCD, NON*XL and the like. Ranging behind Wostenholm came the Sheffield firms of Joseph Rodgers & Sons, Edward Barnes, and Alexander. After these came a whole host of others. Some of these endeavored to add appeal to their wares by marking blades and scabbards with the letters U S separated by a star or N Y separated by a federal shield. None of them, however, had any official connection either with the United States government or the State of New York.

American firms apparently did not manufacture bowie knives in any quantity until after the Civil War. Some concerns, however, did have knives made for them in England which bore their names. Thus one finds blades marked "Manufactured by W. & S. Butcher for Graveley & Wreaks, New York" or "E. K. Tryon Co., Phila, Pa., Made in England." Such American names as do appear on bowies prior to the Civil War usually indicate dealers.

With the English imports came the great diversity of forms which characterize the secondary bowie knives. Some followed the classical form with large blades and clipped points. Others introduced the symmetrical spear point; and still others, the slanted point in which the back angles sharply to meet the edge. Blades ran all sizes from fourteen or fifteen inches to six inches. One interesting evolution to notice is the change in the false edge from a sharp cutting surface to a vestigial swage. On the early knives the false edge was always sharp. As time wore on it became a bevel only, left unsharpened. The presence of a sharp false edge is not always an absolute indication of an early knife. Some of the late ones also had it, particularly among the American-made knives of the Civil War period.

Hilts also developed variety. German silver, white brass, coin and sterling silver joined the metals used for mountings. These usually consisted of a guard, a ferrule at the base of the grips, sometimes an escutcheon plate

FIGURE 37

*Early Sheffield bowie, about 1836, made by W. Butcher. The blade is 8¾ inches long. The mountings are German silver.* BEN PALMER COLLECTION

FIGURE 38

*Sheffield bowie knife made by George Wostenholm about 1836–1840. Its 9-inch blade is very similar to that on the one made for Rezin Bowie. The grips are bone; the mounts, German silver.* BEN PALMER COLLECTION

FIGURE 39

*Sheffield bowie, about 1840, without guard. The 9½-inch blade has a semiclipped point. The grips are bone; the mounts, German silver.* BEN PALMER COLLECTION



FIGURE 40

*American bowie by Reinhardt of Baltimore, about 1840. The blade is 9½ inches long, and the grips are wood. The knife itself is mounted in iron, but the sheath mounts are coin silver.* BEN PALMER COLLECTION

FIGURE 41

*Bowie knife about 1840–50 by Alfred Hunter, probably of Sheffield. The blade is 8⅞ inches long. The grips are bone; the mountings, German silver.* BEN PALMER COLLECTION

FIGURE 42

*Slightly later bowie by Butcher, about 1840–45. A very unusual feature on this knife is the folding corkscrew in the handle. The blade is 8⅞ inches long. The grips are bone; the mounts, German silver.* BEN PALMER COLLECTION

FIGURE 43

*Bowie made about 1845–1850 marked "*SHEFFIELD WORKS/2/PHILADELPHIA.*" Little is known about the history of this knife, but several identical specimens exist. The blade is 10 inches long. The grips are wood, and the mounts are brass.* BEN PALMER COLLECTION

on the reverse of the grips and a cap or pommel at the butt end. Grips were made in both one and two pieces from wood, mother-of-pearl, horn, antler, bone, ivory, tortoise shell and German silver.

Along with variations in shapes and materials came the innovation of blade decoration. Usually these decorations were acid etched on the metal and left bright. Occasional specimens using bluing and gilding to accent the etching are known, and some late specimens used a gilt background with the etched designs bright.

Most of these decorations involved patriotic motifs and slogans. It is interesting to note the jingoism of some of these English etched sayings conceived to capture the fancy of prospective American buyers. It is difficult to set up a chronology for these slogans since some persisted from the 1840's through the Civil War. Generally speaking, however, one does note a certain time element. In the 1840's one finds such sayings as "An American Asks for Nothing but what is Right and Submits to Nothing that is Wrong." After the discovery of gold in California this is frequently changed to read a Californian instead of an American, and it is coupled with such comments as "I can dig Gold from Quartz." In the 1850's and early 1860's another phrase is sometimes added: "America, the Land of the Free and the Home of the Brave, Protected by her Noble and Brave Volunteers." During this same period one also finds "The American's Pride, Equal Laws, Equal Rights and Justice to All." The mounting slavery controversy brought such diametrically opposed mottoes as "Death to Abolition" and "Death to Traitors." In addition to these bombastic sayings, there were also many more prosaic legends such as "The Californian Knife," "A Sure Defense," "Self-Defender," "The American Hunting Knife," "The Genuine Arkansas Toothpick," "For Stags & Buffaloes," and many others.

Some blades bore stamped designs instead of etched ones. Among these are found sphinxes, mounted hunters, dogs, deer, lions, unicorns, Maltese crosses and the like, with such words as "Try Me," "The Hunter's Companion," "I Surpass All," "Alabama Hunting Knife" and references to General Zachary Taylor's victory at Buena Vista.

Hilts were also decorated. Some were copied from table cutlery with shells and scrollwork and made entirely of German silver. There were also pommels shaped like horses' heads or shells, and embossed representations of the legendary half-horse half-alligator creation of the Kentucky riflemen. Finally there were state crests and patriotic motifs, including eagles, flags, federal shields and the motto "Liberty."

FIGURE 44

*Sheffield bowie made for an American dealer. The 6-inch blade is stamped* "E. K. TRYON CO./PHIL PA/MADE IN ENGLAND." U. S. NATIONAL MUSEUM

FIGURE 45

*American bowie marked* "SOMMIS/PROVIDENCE," *about 1850. This may have been made in England for Sommis, but aside from the scabbard, the general appearance indicates American workmanship.* THEODORE GOLDENBERG COLLECTION

FIGURE 46

*Group of single-edged Sheffield bowies with spear points. All are mounted in German silver, and blades range from 7⅛ to 10¾ inches. From top to bottom the makers are Wilson Swift, Wragg & Sons, James Rodgers, and G. Wostenholm & Son. Note the notch in the back of the blade of the second knife.* HERB GLASS COLLECTION

FIGURE 47

*Two double-edged bowies with spear points. The upper specimen with a 14½-inch blade and pearl grips is probably American-made. The lower knife with a 12-inch blade was made by Geo. Wostenholm & Co. about 1850–55. The blade was originally etched "*GEO. WOSTENHOLM & CO'S. CELEBRATED CALIFORNIA KNIFE.*"* HERB GLASS COLLECTION

FIGURE 48

*Double-edged bowie with spear point made by George Wostenholm & Son about 1850–55. The 9¾-inch blade is blued and decorated with gilt etching. The mounts are German silver, and the sheath has a green leather veneer.* HARRY D. BERRY, JR. COLLECTION

FIGURE 49

*Sheffield bowie made by H. Y. Wilkinson & Co. about 1855–60. The 8¼-inch blade is decorated with an eagle and mottoes in bright etching. The grips are ivory; the mountings, German silver.* ROBERT ABELS COLLECTION

FIGURE 50

*Sheffield bowie by George Wostenholm & Son made for Southern sympathizers about 1850–60. The 8¼-inch blade is etched "*DEATH TO ABOLITION*" in large letters. The grips are checkered ebony; the mounts, German silver.* ROBERT ABELS COLLECTION

FIGURE 51

*Sheffield bowie made for an American firm. The 11⅞-inch blade is marked "*W&S BUTCHER FOR GRAVELY & WREAKS/NEW YORK.*" The grips are tortoise shell, the mounts, German silver, and the sheath has a red leather veneer.* NORMAN TAPLEY COLLECTION

FIGURE 52

*Three Sheffield bowies of 1850–60 with etched blades and table-cutlery handles of German silver. The blades range from 6½ to 8 inches. From left to right the makers are G. Woodhead, Manson, and S. C. Wraht (?). The last name is somewhat illegible.* HERB GLASS COLLECTION



FIGURE 53

*Sheffield bowies with decorated pommels, 1850–60. The upper specimen by John Klingard has a 6-inch blade, pearl grips and embossed German silver mounts. The lower knife, by Woodhead & Hartley, has a 7¾-inch blade, tortoise-shell grips and a German silver pommel embossed with the mythical half horse-half alligator. The reverse side of the blade is also etched with mottoes.* ROBERT ABELS COLLECTION

FIGURE 54

*Sheffield bowie by James Westa, about 1860, with a version of the Louisiana state arms on the pommel. The blade is 7¾ inches long; the grips, horn; and the mounts, German silver.* CARL PIPPERT COLLECTION

FIGURE 55

*Sheffield bowie made by W. & H. Whitehead about 1860 to appeal to Union sentiment. The 8-inch blade is etched "*Death To Traitors.*" The mountings are German silver; the grips, antler; and the sheath has a maroon leather veneer.* HERB GLASS COLLECTION

This is only a sampling of the commoner decorative devices. Where individual taste and craftsmanship are concerned, the possibilities are always limitless.

The scabbards in which bowie knives were worn throughout the nineteenth century varied according to where the knives were made. American knives usually had sheaths of harness leather, plain but sturdy. Some had belt loops, some studs, and some frogs for attachment to the belt. The English sheaths were most often made of pressed paper or cardboard with a thin leather veneer. They were handsome with gilt tooling, designs and sometimes mottoes. The leather veneer itself was usually colored in one of a variety of hues. Red, green, blue, purple, yellow and golden brown were all popular. The pressed paper would not stand up in service, however. A good soaking in a heavy rain or two or even the effects of continued contact with perspiration caused the pretty scabbards to disintegrate. Then the owner had to seek out the local saddler or cobbler and have a more practical sheath made.

Almost all English sheaths and most American ones had metal throats and tips. These were usually made of German silver, brass, tin or iron. As a rule they were of the same metal as the mountings of the knife itself. The tip prevented the point of the blade from cutting through the sheath and accidentally stabbing the wearer or tearing his clothes. The throat reinforced the opening and helped the sheath hold its shape. Usually the throat had a button on the obverse side which caught over the belt when the knife was thrust beneath it and so helped hold it in position.





FIGURE 56

*Group of Sheffield bowies with horse-head pommels showing some of the variations in shape and size. Blades range from 8½ to 12⅞ inches. All are mounted in German silver. From top to bottom the makers are W. C. Reaves, R. Bunting & Sons, Fenton & Shore, and Ibbotson Peace & Co.* ROBERT ABELS AND BEN PALMER COLLECTIONS

FIGURE 57

*Details of blade etching. From top to bottom these are from the knives illustrated in figures 48, 55, 52 and 56.*

FIGURE 58

*Sheffield bowie by W. F. Jackson with stamped decorations. The 8⅝-inch blade is exceptionally wide and heavy. The mounts are German silver.*

WILLIAM SHEMERLUK COLLECTION

FIGURE 59

*Sheffield bowie by James Walters & Co. with decorated pommel. The blade is 11⅞ inches long. The grips are wood, and the mountings, German silver.*

BEN PALMER COLLECTION

FIGURE 60

*Huge American bowie by Reinhardt with a blade 17¾ inches long. The grips are antler; the mountings, iron.*

BEN PALMER COLLECTION

The Civil War made the bowie as popular on the East Coast as it had been west of the Appalachians. Almost every volunteer on both sides wore one. The town of Ashby, Massachusetts, for instance, presented every one of its residents with a bowie knife when he enlisted, as did Shelburne Falls and many other Massachusetts towns, while Company C of the 1st Georgia Infantry from Cass County were known as "The Bowie Knife Boys." Veterans recalled, however, that the knives were soon abandoned, especially by Union soldiers who found that their issued weapons were sufficient and that they had enough to carry without them. Confederate soldiers were not so well armed, and therefore the big knives remained more popular with them.

Northern soldiers generally carried English-made knives while Confederates relied more on homemade products. Some of these were well made from the best English cast steel, occasionally by former file manufacturers such as Lan & Sherman of Richmond. Other fine knives were made by armories such as that of W. J. McElroy of Macon, Georgia, which was turning out twenty bowie knives a week in 1862. Other Confederate knives were crudely forged by local blacksmiths or cut down from swords. An interesting feature on many Confederate bowie knives is the presence of a knuckle-bow bending in an even curve from the pommel to the base of the grips. This is a unique feature which is almost never found before or after the war.

FIGURE 61

*Bowie made by Alexander of Sheffield with the popular "NY" decoration on blade and scabbard. It was owned by a naval officer during the Civil War. The blade is 6 inches long. The mounts are German silver, and the sheath has a red leather veneer.*

U. S. NATIONAL MUSEUM

FIGURE 62

*American bowie with cast-brass hilt, about 1855–62. The 11⅞-inch blade is unmarked, but it was undoubtedly made by Bown & Tetley of Pittsburgh, who made the bayonet illustrated in figure 75.* BEN PALMER COLLECTION

FIGURE 63

*American bowie by Hassam, Boston, about 1860–65. The blade is 8⅜ inches long. The guard is iron, but all other mounts are German silver.* HERB GLASS COLLECTION

FIGURE 64

*A private of the 4th Michigan Infantry in 1861 with his bowie knife thrust through his belt and a Colt revolver on his hip.* NATIONAL ARCHIVES

FIGURE 65

*Sheffield bowie with 10-inch blade by Joseph Rodgers carried by a Union soldier in the Civil War. The sheath is an American replacement.*
WILLIAM SHEMERLUK COLLECTION

FIGURE 66

*Sheffield bowie with 10-inch blade by G. Wostenholm & Son carried by a Union soldier in the Civil War.*
WILLIAM SHEMERLUK COLLECTION

FIGURE 67

*American bowie by C. Roby of West Chelmsford, Mass., 1860–65. The blade is 9¾ inches long. The guard is iron, but the rest of the mounts are brass. The grips are turned wood.*
WILLIAM SHEMERLUK COLLECTION

FIGURE 68

*John Wilkes Booth's knives. The large knife, by W. F. Jackson of Sheffield, is marked "*RIO GRANDE CAMP KNIFE.*" It was this knife that Booth used to stab Major Rathbone after shooting Lincoln and brandished on the stage of Ford's Theater. The pocket dagger was found on Booth's body when he was killed at Garret's barn.*
NATIONAL PARK SERVICE

FIGURE 69

*Confederate bowie picked up on the Perryville battlefield. The blade is 12⅛ inches long. The grips are wood; the mounts, brass.*
U. S. NATIONAL MUSEUM

FIGURE 70

*Confederate bowie by W. J. McElroy, Macon, Ga., with 12¾-inch blade. The grips are wood; the mounts, brass.* LEON C. JACKSON COLLECTION

FIGURE 71

*Two Confederate bowies with typical knuckle-bows and blades 13⅜ and 16 inches long.* WILLIAM SHEMERLUK COLLECTION

FIGURE 72

*Confederate bowie with 11¾-inch blade. The grips are wood; the mounts, iron.* LEON C. JACKSON COLLECTION

FIGURE 73

*Post Civil War bowie made by I. Lingard of Sheffield. The 8¾-inch blade is ornamented with the words "CALIFORNIAN BOWIE KNIFE" and floral scrolls in the late-type gilt etching. The mounts are German silver; the grips, wood; and the scabbard has a yellow-brown leather veneer.* HERB GLASS COLLECTION

One final development of the bowie knife during the Civil War was its adaptation as a bayonet. Crude specimens are encountered with wooden grips and double brass loops to fit over the gun barrel. These, according to tradition, were used by Arkansas troops. Bown and Tetley of Pittsburgh produced a better-made type, and so did Boyle, Gamble & MacFee of Richmond. The most widely used knife bayonet of the war, however, was the Dahlgren, which was designed for the so-called Plymouth Navy rifle

of 1861. Following the Civil War the idea of combining a bowie knife and a bayonet was dropped until the 1890's, when a small quantity was produced for the Krag rifle for service in the Philippines.

During the twenty-five years from 1840 to 1865, when the popularity of the bowie was at its height, some were used for presentation purposes to distinguished citizens. The practice never became as widespread as the presentation of swords, but occasional specimens are found with such inscriptions. Sometimes a standard model was used with a little extra engraving or plating. At other times knives seem to have been made especially for the purpose just as swords were.

After the Civil War the bowie's popularity declined rapidly. Cowboys and buffalo hunters continued to carry them, but the frontier was swiftly vanishing. The fur trade was almost gone, and civilization was crowding out the big knife. Ironically, this was the period when American cutlers began to make the bowie in quantity, among them Landers, Frary & Clark, Lamson & Goodnow, Collins & Co., the Bridgeport Gun Implement Company and, at the very end, the John Russell Cutlery Company. But these were in reality hunting knives. The fighting bowie had long since disappeared.

The knives of these declining years can easily be distinguished from their predecessors. Aside from the names of manufacturers which are datable and a general shrinking in size, new materials make their appearance. Synthetics imitating bone and ivory appeared about 1870, and celluloid, though developed in 1868, followed later. Hard rubber was popular after the middle 1870's; and finally came plastics for the grips and stainless steel for the blades.

FIGURE 74

*Confederate bowie bayonet of the type reputed to have been popular in Arkansas. It was apparently made to fit a Kentucky rifle which had had the end of its octagonal barrel turned round. The blade is 12¼ inches long. The grips are wood, and the mounts, crudely cast brass.* WILLIAM SHEMERLUK COLLECTION

FIGURE 75

*Bowie bayonet made by Bown & Tetley, Pittsburgh, about 1855–62. The blade is 20¾ inches long. The hilt is cast brass.* BEN PALMER COLLECTION

FIGURE 76

*Two late American bowies. The upper knife with hard rubber grips and an 8½-inch blade was made by the Bridgeport Gun Implement Company (B.G.I.Co.). The brass mounts are nickel-plated. The scabbard is a replacement. The lower knife with an 8-inch blade was made by Landers, Frary & Clark. Its mounts are German silver.* WILLIAM SHEMERLUK COLLECTION

FIGURE 77

*Late knife by Lamson & Goodnow with a 6⅝-inch blade and brass mounts.*
HERB GLASS COLLECTION

FIGURE 78

*Late hunting knives by the John Russell Company, 1890–1929. All are marked* "GREEN RIVER WORKS" *in addition to the company name.* JOHN S. DU MONT COLLECTION

But the bowie tradition had not died. For almost half a century it lay dormant. Then, with the advent of World War II and its jungle campaigns, the fighting bowie came back into its own. Service men of all branches bought or made knives of the bowie pattern for their personal use—and they used them both as weapons and tools in the classic tradition. Finally, the Navy and Marine Corps made such a knife an issue arm.

Today bowie knives as fine as any ever forged are being manufactured in small quantities in the United States. W. D. Randall, Jr., of Orlando, Florida, makes several every month on special order. Each is hand-forged from the finest Swedish steel with blades ranging from nine to eleven inches in length. The guards are brass, the grips built up of sole-leather washers and the butt caps made of Duralumin. These modern knives are true heavy-duty fighting and general-utility implements. They are bought by hunters, trappers, prospectors and soldiers who need that type just as their ancestors did a century ago. Through them the bowie tradition lives on.

Alongside the bowie knife stands another very famous knife name of the same era, the Arkansas Toothpick. Students and collectors today try to distinguish between the toothpick and the bowie and use the names for two different kinds of knives. The distinction seems largely modern, however. The men who carried the knives used the terms interchangeably. Arkansas toothpick was a joking nickname coupling the name of the state where the knife was developed and a humorous comment on the huge size of the blade.

As collectors today use the term, however, it applies to a knife with a straight tapering double-edged blade. Actually this is nothing more than the old dagger—still a popular weapon in the early 1800's. The men who used it most often called it a dagger or a dirk-knife.

As a survival of an old established weapon, daggers can be found ranging from the very beginning of the period until its end. Fine silver-mounted specimens were carried by gentlemen and even by high-ranking or wealthy Army officers. Plainer specimens were popular with all classes in the West and have been excavated at several trading-post sites. Rough homemade specimens comparable to the cruder bowies are also found. Gamblers sometimes used a special version with cross grips that could be carried concealed in a special spring-locked scabbard; and to complete the picture, the dagger also was used at times as a presentation weapon.



FIGURE 79

*Sheffield bowie by E. S. Stenton presented by J. H. Prioleau of Charleston, S. C., to Capt. Edmund Kirby Smith, 1847–1861. Smith was breveted captain in 1847 for gallantry in the Mexican War. He became a general in the Confederate Army.*

WEST POINT MUSEUM

FIGURE 80

*Two modern bowies made by W. D. Randall, Jr., of Orlando, Florida.*

W. D. RANDALL, JR.

FIGURE 81

*American silver-mounted dagger about 1790–1810. The blade is 5½ inches long. The handle is a cylinder of sheet silver filled with a resinous substance.*

CHICAGO HISTORICAL SOCIETY

FIGURE 82

*American (?) dagger of the early 19th century. The blade is 7⅜ inches long. The guard is iron with pierced decorations, and the scabbard is brass. The inscription is apparently commemorative.*

LEON C. JACKSON COLLECTION

FIGURE 83

*Crudely-made American dagger of the middle 19th century, said to have been found in the Southwest. The 8½-inch blade is made from a file. The guard is iron, and the sheath is fastened with copper rivets.* WILLIAM SHEMERLUK COLLECTION

FIGURE 84

*American dagger of the mid-19th century. The heavy blade is 12¾ inches long. The grips are bone, and the guard has apparently been put on upside down. The scabbard is made of wood with brass mounts.* BEN PALMER COLLECTION

FIGURE 85

*American dagger about 1860–80. The 8-inch blade is stamped* "H. WILKINSON/HARTFORD CT." *The guard is German silver; the ferrule is brass; and the grips are wood.* WILLIAM SHEMERLUK COLLECTION

FIGURE 86

*Presentation dagger given by the citizens of Boston to Francis E. Brownell (see frontispiece) during the Civil War. The blade is 7⅞ inches long and undecorated. The grips are carved ivory, and the mountings are silver. The body of the scabbard is velvet.* U. S. NATIONAL MUSEUM

One special form of the dagger did develop during this period, however, which is not encountered among the colonial daggers. This was the folding or pocket dagger. These ranged in size from tiny specimens with four- or five-inch blades to great long affairs with blades up to sixteen and three-eighths inches in length. Most of these folding daggers were designed to be carried in the pocket, but others had special sheaths. Some of these latter types could be used either open or closed, depending on the length of blade the owner felt he needed for any given job.

Although the bowie knife and/or the Arkansas toothpick were certainly the most widely known knives of their era and achieved the greatest historical fame, they were by no means the only forms of sheath knives carried in the American West. The trappers and traders, the mountain men,

who explored the Rockies and braved the Sioux and Blackfoot in search of beaver, flourished well before James Bowie had his knife made. These men carried knives similar to those of the eighteenth-century riflemen, typical butcher knives or knives shaped from files and hilted with antler. Even after the advent of the bowie, these men tended to hold to their old patterns.

Most of the mountain men's early store-bought knives came from England, but after 1834 they got one all their own. In that year John Russell began the manufacture of butcher and carving knives on the Green River at Greenfield, Massachusetts. Many of these knives were shipped west, most often to Pierre Chouteau, Jr., & Co. From the trading posts of this famous fur company the knives were purchased by the hunters, trappers and Indians. An idea of the quantity of Russell's knives which were dispersed throughout the upper Missouri River region can be had from the fact that the average number of knives shipped west each year from 1840 to 1860 was five thousand dozen. These sold wholesale at $1.50 to $3.50 a dozen and retailed at the fur posts for fifty cents to $1.50 each.

FIGURE 87

*Push dagger of the type popular with gamblers in the West, 1848–60. The 4-inch blade is marked* "WILLS & FINK/S. F. CAL." *The grips are ivory. The iron scabbard is designed to hang upside down while the blade is retained by a spring.*
U. S. NATIONAL MUSEUM

FIGURE 88

*Sheffield folding dirk closed and fully extended. When open, the blade is 16⅜ inches long; when closed, 10⅝ inches. Note the American eagle stamped on the German silver mounts of the handle. The grips are ivory. The scabbard is red leather.*
WILLIAM SHEMERLUK COLLECTION

The new knives found favor immediately, and the term "Green River" became a part of the trapper's vocabulary. Frederick Ruxton, in 1848, wrote of the mountain men in his *Life in the Far West*: "For, as may be imagined, a thrust from the keen scalp-knife by the nervous arm of a mountaineer was no baby blow and seldom failed to strike home—up to the 'Green River' on the blade." In this Ruxton referred to the fact that Russell's knives were stamped "J. Russell & Co./Green River Works" on the blade near the hilt. Any knife thrust in "up to the 'Green River' " would have done a thorough job. "Give it to 'em up to the Green River!" became a recognized battle cry. At the same time the term "Green River" or "up to Green River" also became synonymous for anything well done or well made. Thus anything done "up to Green River" was first rate.

The knives which created this impact on the life and speech of the mountain men were not prepossessing in appearance. They were well made and boasted fine blades, but otherwise they were simple butcher and carving knives, the same as might have been found in any New England kitchen. Two of the most popular models sent west, according to company records, were known as "Butcher Knife No. 15," which had a six-inch blade, and "Carving Knife No. 1586," which had an eight-inch blade. Butcher's skinning knives used in the early West are also found quite frequently. The early knives were stamped "J. Russell & Co./Green River Works" in two

lines. Later a diamond-shaped stamp was placed below it. Some time before 1890 the company changed from stamped to etched marks, and finally the commemorative date 1834 was added to some knives.

One change took place almost universally on the knives sent west. The new owner changed the edge of his purchase. Like most cutlers, J. Russell & Co. sharpened their knives evenly, beveling both sides of the blade. The purchasers who wanted to use the knives for skinning ground off the old edge and put the bevel all on one side. This new edge let them skin with less danger of piercing the hide and lowering its value. As a word of caution, it should be noted that many of the Green River knives actually used in the West have been sharpened so many times that their shape is often entirely different from what it was when it left the factory.

When Russell started in business, the Sheffield cutlers did everything they could to interfere. They even dumped quantities of knives on the American market at prices well below cost. Finally, however, they had to admit that the Russell Company was going to stay in business. Then they paid him the ultimate compliment of producing somewhat similar knives also bearing the name "Green River." "Green River" knives made in England can still be purchased today.

FIGURE 89

*Rifle knife made from a half-round file, early 19th century. The blade is 7¼ inches long. When found, the knife was still in its sheath fastened to the strap of a rifle bag.*
ROBERT ALBRECHT COLLECTION

FIGURE 90

*Unusually fine rifle knife, about 1830–40. The blade is 5¼ inches long, and the handle is decorated with German silver and mother-of-pearl inlays to match the rifle it was designed to accompany.*
WILLIAM SHEMERLUK COLLECTION

FIGURE 91

*Two late 19th-century folding daggers shown open and closed. The upper specimen is German. The lower knife, which retains its scabbard, is English. When open, the blades are 9⅝ and 6⅛ inches respectively. Both are mounted in German silver. The German knife has antler handles; the English has horn.*
LEON C. JACKSON COLLECTION



FIGURE 92

*Group of J. Russell "Green River" knives. The top three bear the early stamped mark. The bottom four are skinning knives and have the later etched marks.*
JOHN S. DU MONT COLLECTION

FIGURE 93

*Typical Russell "Green River" butcher knives. The upper specimen is the earliest. All are representative of those shipped West.* JOHN S. DU MONT COLLECTION

FIGURE 94

*Sheffield skinning knife by I. Wilson, about 1890, with "Green River" stamped on the blade. A group of these knives was found recently in an Alaskan trading post, still packed in a cask of moose tallow.* AUTHOR'S COLLECTION

FIGURE 95

*Sheffield knife by George Butler & Co., which also is imitatively marked "Green River Knife." This pattern is still being manufactured.*
JOHN S. DU MONT COLLECTION

These were the most popular knives in the winning of the West: the colorful bowie and Arkansas toothpick in their many variations; the dagger; and the more prosaic but equally efficient Green River knife. With these were a host of other knives, the handmade types previously mentioned and other manufactured varieties in the hands of both civilians and soldiers, to be described in following chapters. None, however, will ever attain the place in American legend held by the bowie.

# ARMY KNIVES

FIGURE 96

*Hicks knife with half knuckle-bow and sheath.* COL. B. R. LEWIS COLLECTION

A SOLDIER in the field is a man on his own. Behind the lines there are dozens of noncombatants to take care of his needs. As he nears the fighting area these helpers gradually melt away until in the final phase there are only other fighting men. Now the soldier prepares his own food, constructs his own shelter, makes emergency repairs to his own equipment and defends his own life. In all these activities he gratefully accepts the services of a good knife.

Any man who has been in a combat area knows how highly a soldier prizes his knife. It is evident in the way he handles it and in the way he takes care of it. And especially in the lengths to which he will go to obtain one that meets his personal requirements. In the Pacific during World War II fighting men set tremendous store by their knives. Despite the fact that they were issued adequate knives, they often encountered others they liked better in the hands of sailors or rear-echelon soldiers. Then nothing would stand in their way until they got it. Money, food, trophies, anything—even

# Arms and Armor in Colonial America 1526-1783

by

Harold L. Peterson

THE STACKPOLE COMPANY
HARRISBURG, PENNSYLVANIA

*Copyright 1956 by* Harold L. Peterson

*L. C. Catalog Card Number: 56-11273*

x 399
P 442 ar

REFERENCE

*Printed and bound in the United States of America*
*by* The Telegraph Press, *established 1831*
*Harrisburg, Pennsylvania*

3 1223 04867 2878



*THE COMPANY OF MILITARY COLLECTORS & HISTORIANS*

Through its Reviewing Board, takes pride in sponsoring this book and in recommending it as a standard work of reference in the field of American military history.

COLONEL HARRY C. LARTER, USA, Ret.
*President*

REVIEWING BOARD

COLONEL ARCADI GLUCKMAN, USA, Ret.
MR. C. O. v. KIENBUSCH
LIEUTENANT COLONEL HERMANN W. WILLIAMS, JR., USAR
COLONEL FREDERICK P. TODD, USAR, *Editor-in-Chief*

WASHINGTON, D. C.

4 42386 SFPL:F--BKS
197SFL 12/18/98 5422

BOOK II

# The French Wars and the Revolution

1689-1783

[153]

Compendium_Roth
Page 0405

# Introduction

IN THE HISTORY of arms and armor, the period from 1689-1783 was in many ways the antithesis of the preceding period. Arms in America had developed rapidly under the pressure of the new environment until they had far surpassed those in general use in Europe. After 1689, aside from the development of the rifle, the rate of progress in America declined while European arms improved. Towards the end of the period, in fact, Americans began to abandon their own distinctive military tactics and the weapons connected with them and once more patterned their military modes after European models.

This transformation, like the one before it, was the result of a change in environment. The colonists faced different enemies under different conditions.

Militarily, the period from 1689-1783 was characterized by a series of wars between England and France for control of the Continent and by the American Revolution, which was closely connected with the previous struggles. King William's War, 1689-1697, began the long conflict. It was followed by Queen Anne's War, 1702-1713; King George's War, 1740-1748; and the French and Indian War, 1755-1763. By the treaty ending the French and Indian War, France was deprived of all her colonies in America, and Great Britain reigned supreme. From these conflicts, however, stemmed many of the conditions which produced the Revolutionary War of 1775-1783 and ended the colonial period of American history.

In the French wars the bulk of the important fighting was done by European troops. The Indian allies on both sides contributed little except through their terrorizing activities and their harassment of the frontier which made it necessary to maintain garrisons all along the line and thus kept many men out of the active campaigns. American troops in general lacked discipline and training in Euro-

pean tactics, and aside from a few brilliant exceptions they were considered unreliable by the English commanders. A small group, however, did render valuable service as scouts and rangers.

As the French wars continued, an attempt was made to raise the caliber of American troops and thus remove some of the load from the British regulars. Colonial governors were encouraged to raise and train special regiments. This was done within the existing militia laws, and there were wide deviations in the way the individual governors interpreted and executed their authority. In some colonies there was little or no improvement over the old militia, but in others, such as Virginia and New Jersey, there developed relatively well disciplined and well equipped American regiments, the first such ever raised in this country.

From the very beginning military leaders in the English colonies had studied English drill manuals. They patterned the American militia system with its muster days after the English militia. Insofar as possible they used the English drill. But the nature of the country and the character of the enemy had prevented them from putting much of it into practice.

By the 18th century, however, conditions had begun to change. The Eastern Seaboard was becoming civilized. Cleared land had begun to replace the forests in many sections. The Indians were no longer a constant menace. In general, conditions there were beginning to approximate those in Europe. Also, the enemy was no longer a savage hiding in a dense forest, but another white man who fought in an open field or behind fortifications. Thus, most of the reasons for the tactics and armament of the earlier period had been removed. In their place were an entirely new set of conditions which called for a return to European tactics.

At the same time, however, there was still a frontier in America, and there the evolution of arms and tactics continued as it had in the early years. Along the Western borders of the colonies, conditions were much the same as they had originally been on the coast. The forests were still thick, and the Indians were still a continuing threat. It was on this frontier that the rifle was developed. The same conditions which had caused the first settlers to seek the lightest, most accurate and fastest shooting guns that they could purchase in Europe continued in the 18th century to foster the evolution of these European types into a purely American gun that met the requirements even better.

Although the rifle was an effective weapon for the purposes for which it was designed, it had little effect on the overall arms picture. It was almost unknown to military men during the French wars, and the Revolutionary War was fought under conditions which relegated the rifle to a minor supporting role. During that war, which was largely confined to the cleared lands of the East Coast, both armies relied heavily on the standard European linear tactics. In such warfare,

the rifle, which lacked the bayonet and which required more time for loading than the musket, was useful only under special conditions.

Thus at the end of the period Americans were once more fighting like Europeans. The rifle was restricted to special troops which acted as light infantry, and the musket and bayonet of European pattern was retained as the standard weapon. The return to linear tactics also had another effect on the development of arms. The pole arm, which had all but disappeared a century before, came back into vogue as American Revolutionary troops were equipped with spontoons, trench spears, pikes and lances.

## Chapter Five

# Firearms

THE HISTORY of firearms in America from 1689 to 1783 follows a pattern entirely different from that of the preceding period. The first 162 years had seen rapid developments and radical changes. Three entirely different systems of ignition had followed one another in quick succession, and there had been many variations and improvements in each. In design these firearms had advanced from heavy, clumsy and ill-balanced contraptions to comparatively light, well-balanced, and relatively efficient weapons. As each of these advances was made, its effect was quickly felt in America where the dependence of the colonist upon his arms caused him to demand the very best that Europe produced and to adopt them as standard arms before they were so recognized abroad.

The last of these major developments had taken place well before 1689, and the next big stride, the invention of the percussion system of ignition, did not occur until well after 1783. Thus the period under consideration was one of refinement and systematization. Older forms were improved upon, resulting in finer guns. Even the rifle and the breech-loader which are often considered the outstanding achievements of this period were but further developments of already known principles.

The other major contribution of the period, the standardization of arms, was also not absolutely new. Some small groups had already begun to try to equalize calibers and to use similar guns before 1689. It was during this period, however, that the heterogeneity of arms in most national armies was gradually done away with and definite models for firearms were developed which can be described and dated. By the end of the period, all the guns of a well-equipped organization were as nearly alike as hand-craftmanship could make them.

The principal firearm of the period was the flintlock musket. This smooth-

bore weapon of large caliber answered perfectly the requirements called for by the military tactics of the day. The basic formation for an enagement was the line of battle. This consisted of two or sometimes three lines of men drawn up shoulder to shoulder, one line close behind the other. About six feet behind these lines was another line of "file closers" or reserves to take the place of casualties. From this formation soldiers advanced to the attack, marching to within sure range of the enemy, delivering a volley, and then charging to decide the issue hand to hand. Likewise, it was in this formation that soldiers received an attacking force in the open fields. They waited until the enemy was within range, fired a volley, loaded, and if possible fired one or two more vollies before the enemy closed with them.[1]

Volley-firing from a line of battle was a very formal practice. All loading

*Author's Collection*

Plate 161. British musket by I. Hawkin of the period of William III-Queen Anne, used in this country.

and firing was done by command, or, as a modern soldier would say, "by the numbers." There was little or no aiming as it is understood today. The volley was delivered directly ahead or to the right or left oblique as commanded. The theory was to lay down a pattern or field of fire, and consequently rapidity of fire was prized much more highly than accuracy.[2]

Thus the musket, which could be loaded rapidly, was considered a fine weapon, even though its accuracy left something to be desired. Some idea of the speed of loading and firing expected of the soldier armed with the musket can be obtained from the following entry in a military treatise of 1768:

> "No recruit to be dismissed from the drill, till he is so expert with his firelock, as to load and fire fifteen times in three minutes and three quarters." [3]

This would mean a sustained fire of one shot every fifteen seconds, a rate which would assure at least two volleys at an approaching enemy in any average charge.

Thus, if, as was often the case, a charge involved only one regiment on each side, and if each regiment consisted of 500 men, it would mean that the attacking force would have to suffer the effects of 1,000 bullets in two volleys in the 20 or 25 seconds it would take them to negotiate a charge of less than 100 yards. The second volley would be received, if delivered properly, at a range of no more than 30 yards.

THE FRENCH WARS AND THE REVOLUTION

BRITISH INFANTRY MUSKETS
BRASS FURNITURE

Company of Military Collectors & Historians
Plate 162. Drawing by Robert L. Miller.

[ 161 ]

Compendium_Roth
Page 0411

Case 3:17-cv-01017-BEN-JLB Document 128-1 Filed 11/11/22 PageID.15112 Page 139 of 153

Colonial Williamsburg

Plate [illegible]. British officer's fusil. The sling is modern.

[illegible] Collection, National Rifle Association

Plate 164. Cavalry musketoons, c. [illegible].

If the charge were more than 100 yards, if there were obstacles to be surmounted, if it was necessary to halt and consolidate forces after the effects of one of these volleys, then the attacking force would have to withstand 500, 1,000, or possibly 1,500 more shots. It should be remembered also that this attacking force was not spread out in the manner in which modern infantrymen advance under fire. It was a compact and solid mass of men, a perfect target for fire from another compact body of men at point blank range. Accuracy would have been superfluous in this type of warfare. Speed was everything. Speed for the defending force to pour as many bullets into the attacking force as possible; speed for the attacking force to close with its adversary before it had been too severely decimated to have sufficient strength to carry the position.

There were some instances, however, in which an accurate weapon was to be desired, and here the musket was weak. Troops detached to act as flankers on a march through hostile territory, pickets, rangers, and other similar small groups where the action was apt to involve only a few men or perhaps single individuals felt the need of accurate weapons. It was to these troops and in these instances that the rifle later proved a valuable arm.

These men wanted accuracy, and they practiced marksmanship even with the musket. There are many orders and references to such target practice, and in one instance the procedure is well described. Frederick Mackenzie, an officer of the Royal Welch Fusiliers, then stationed in Boston, left the following account of British target practice in January 1775:

> 15th Jan[y]. The Regiments are frequently practiced at firing with ball at marks. Six rounds p[r] man at each time is usually allotted for this practice. As our Regiment is quartered on a Wharf which projects into part of the harbour, and there is a very considerable range without any obstruction, we have fixed figures of men as large as life, made of thin boards, on small stages, which are anchored at a proper distance from the end of the Wharf, at which the men fire. Objects afloat, which move up and down with the tide, are frequently pointed out for them to fire at, and Premiums are sometimes given for the best Shots, by which means some of our men have become excellent marksmen.[4]

The limitations of the musket with which these men fired have been well described by one of the most famous marksmen and authorities on shooting of the time. Major George Hanger, who was also well versed with both the German and American rifle, reported that:

> A soldier's musket, if not exceedingly ill-bored (as many of them are), will strike the figure of a man at eighty yards; it may even at 100; but a soldier must be very unfortunate indeed who shall be wounded by a common musket at 150 yards, provided his antagonist aims at him; and as to firing at a man at 200 yards with a common musket, you may just as well fire at the moon and have the same hopes of hitting your object. I do maintain and will prove, whenever called on, that no man was ever killed at 200 yards, by a common soldier's musket, by the person who aimed at him.[5]

These were the general characteristics of the musket and the reasons for its ascendancy as the principle military firearm of the period. Muskets from many nations were used in America in addition to those made here. Great Britain, France, Holland, the various states of Germany, and Spain were all represented.

*Colonial Williamsburg*

Plate 165. British musketoon of the type described in the warrant of 1756, although this specimen is somewhat earlier.

The models differed, but the overall principles and characteristics were the same.

The nation whose muskets wielded the dominant influence in America until the very end of the period was Great Britain. Almost all arms purchased by individuals and by Colonies prior to the Revolution came from there. During the wars with France from at least as early as the reign of Queen Anne (1702-1714), England sent arms to equip colonial troops, and most of these arms remained in America. The British musket was thus the one with which Americans were familiar, and when war broke out between the colonies and Britain in 1775 and the committees of safety of the various colonies began contracting for arms with local gunsmiths, it was the British musket which they chose as their pattern.[6]

When William III ascended the British throne in 1689, there was no standard British musket. Rather, he inherited a great mass of heterogeneous firearms, most of them matchlocks, from his predecessors. William quickly began to make the flintlock the standard weapon for his armies and to eliminate the matchlock. Unfortunately, he was shortly embroiled in a Continental War with repercussions in America, and thus could not proceed to make the conversion as systematic as might have been desired. The need for arms was such that he proceeded to convert what matchlocks he could, to contract with private English gunsmiths, and to purchase many muskets from his allies abroad, especially Holland. By these means he managed in a broad sense to make all his muskets of the same general type and of fairly uniform caliber.[7]

An average example of one of the British manufactured flintlocks of King William's reign would have a roughly made flint lock possibly with a dog catch, of about the same size and shape as the older matchlocks and thus interchangeable

with them. It would be attached by three screws and might bear upon the lock plate in front of the cock the initials "WR" (William Rex) and a crown. There would be no bridle for either the tumbler or the frizzen. The barrel would be 46 inches long and about .75 caliber. It would be octagonal for about 18 inches at the breech. There would be a small fore-sight, but no rear sight. The mounts would be iron except for the brass butt plate. There would probably be no screw plate and no rear ramrod thimble. The stock would be black, and the barrel and iron mounts would also be blackened or russeted.[8]

King William was succeeded in 1702 by Queen Anne, and it was during her reign that the famous "Brown Bess" musket was adopted. There is some question, however, as to whether it actually got into production during her lifetime. This almost legendary arm was selected by John Churchill, Duke of Marlborough, and introduced into the Army under his auspices. The "Brown Bess" was a fine gun, and a great improvement over its predecessors. With only a few modifications it served the British army for well over 100 years. It had a good flint lock attached by two screws with bridles for both the tumbler and frizzen. On the lock plate it bore the cypher of the Queen and the broad arrow denoting government ownership. Sometimes it bore the name of the maker instead. The barrel was 46 inches long, round for its entire length, and of about .75 caliber. It was fastened to the stock by four pins in addition to the tang screw, and there was an ornamental raised band at the breech. An artificial oxidation or acid pickling process colored the barrel brown and thus gave rise to its nickname "Brown Bess." The stock was walnut, and the mounts were brass throughout,

*Colonial Williamsburg*

Plate 166. British musketoon of the type described in 1764.

*Tom Holt Collection*

Plate 167. French musket, model 1717. Muskets of this model conforming exactly to specifications are almost impossible to find. This one has a straighter butt than usual and lacks the barrel band and fore-end cap.

*Fort Ticonderoga*

Plate 168. French musket, model 1728. Note that this specimen lacks the band retaining springs.

*Tom Holt Collection*

Plate 169. French musket, model 1746, surcharged "U.S." during the Revolution.

*Richard K. Sprague Collection*

Plate 170. French musket model 1763.

*Fort Ticonderoga*

Plate 171. French musket model 1777.

*Richard K. Sprague Collection*

Plate 172. French musket model 1777. (Dragoons)

although some early examples were mounted in iron. The ramrod was wooden, and there was a lug for the attachment of a bayonet on top of the barrel.[9]

It was with this arm that Queen Anne set out to replace the motley array of firearms that William III had gathered. The number of these earlier arms with Queen Anne's cyphers on them that are found in America may indicate that it was these arms which she sent to the colonies for their use as she replaced them with the new model at home.

The changes that occurred in the British musket during the remainder of the period were mainly concerned with the length of the barrel, the shape of the brass mountings and the introduction of the iron ramrod. The first change in barrel length occurred late in the reign of George II, probably just before 1760. At that time the length was reduced to 42 inches. It continued that length until sometime in the late 1770's when a final reduction cut it to 39 inches.[10]

During this period there were several changes in the mountings. The length of the tang of the butt plate was reduced about the same time as the introduction of the 42 inch barrel. The key or side plate, which was cast with a convex surface and a long tail in the first model was made flat in the 42 inch model, but retained the tail. The first guns of the 39 inch model used the same key plate as the 42 inch, but soon changed to a convex plate without a tail. Both of the first two models had four ramrod thimbles with the upper one usually trumpet shaped. The third model reduced the number to three and made the first two thimbles trumpet shaped. The heavy mouldings of the trigger guard of the first two models were done away with, and the guard was much lightened in the third model.

The introduction of the iron ramrod was a slow and gradual process. It began about 1724 and continued sporadically over a long period. As late as 1757 some regiments still were only partly equipped with them. These new iron ramrods were usually made with flat "button" heads and without a worm for removing cartridges.[11]

There were also two significant changes in the cock. In the first model and early years of the second model, a tenon on the top jaw of the flint vise slid in a mortise in the tang of the cock. In later years on the second model, a slot was cut in the back of the jaw so that it fitted around the tang, which had been modified somewhat to make this possible. Finally, whereas the head of the flint screw on the first two models was slotted only, the head of the screw of the third model was both slotted and pierced.

It should also be noted that while it was not related to any particular model, the general shape of the lock plate followed the same evolutionary changes found in contemporary locks on other guns. That is, the earliest specimens had lockplates that curved sharply downward at the rear while in other specimens

*Fort Ticonderoga*

Plate 173. French musketoon, model 1776.

*Author's Collection*

Plate 174. Semimilitary guns. Top: New England, c. 1690-1710, iron mounted with fruit wood stock. Bottom: New England, c. 1770, brass mounted with curly maple stock. Note the bayonet stud underneath the barrel.

*Claud E. Fuller Collection, National Park Service*

Plate 175. American Revolutionary musket by Deacon Barrett of Concord, Mass.

the lock gradually straightened across the bottom. Also the surface varied between convex and flat according to contemporary preference.

Finally, of course, the locks were marked differently. Each sovereign used his own cypher, although all three Georges used the same one. Some locks, particularly those made before 1760, are dated and bear the names of the individual contractors who made the arm. Others simply bear the words "Tower" or "Dublin Castle" depending upon the arsenal from which they were issued. Exactly when the practice of marking arms with "Tower" or "Dublin Castle" instead of makers' names began is not known. Some of the later examples of the first model are so marked, and towards the end of the period of the second model, it seems to have become universal.

In addition to the standard infantry musket, there was also a lighter officer's model known colloquially by the older term of fusil or fuzee. Throughout the

entire period it generally followed the design of the regular musket but was lighter, better made, and often embellished with decorations. The brass mounts were usually cast or engraved with ornamental designs, and there was often a silver wire inlay on the wrist of the stock. The normal practice in most British regiments at the beginning of the period was for the officers to carry espontoons and the sergeants to carry halberds. As the period progressed, however, officers in some regiments began to carry fusils, and during the Seven Years War and later, in the Revolution, the officers, including sergeants, changed to fusils almost exclusively for field use in America.[12]

There are also plain muskets with government locks and broad arrows indicating government ownership which are otherwise exactly similar to these officers' fusils. According to tradition, these are artillery and light infantry muskets. It is known that the artillery had long been issued muskets lighter than the usual infantry model. When the concept of light infantry was developed, whether by General Wolfe as some claim or by some more obscure military

*U. S. National Museum*

Plate 176. Committee of Safety musket by H. Watkeys of New York.

*[illegible]*

Plate 177. Committee of Safety musket by Lewis Prahl of Pennsylvania. The stock is an early replacement. The original was undoubtedly flat with a beveled edge.

*Author's Collection*

Plate 178. Committee of Safety musket bearing the Maryland proof mark.

genius, about the middle of the 18th century, these troops were armed with the light artillery musket. No one has as yet been able to produce definite documentary evidence that these are indeed the artillery or light infantry muskets, but the assumption seems justified since no other light muskets of the period are known.[13]

One other form of the smoothbore long arm carried by British troops was the musketoon or carbine. Both terms were used synonymously during at least the first half of the 18th century, the later differentiation based upon the presence or absence of rifling had not yet developed. Several different forms of these

Plate 179. Maryland proof mark.

musketoons are known. Some are found made from regular infantry muskets with eight or ten inches cut off the barrel. Most of the earliest specimens seem to have been made in this manner. A warrant dated April 17, 1756, calls for carbines 4 feet 3 inches long with a ring and bar for attachment to a swivel, and in 1764 the standard carbine had a 28½ inch barrel of about .66 caliber and an overall length of about 44 inches. In all instances the general design and decoration followed that of the contemporary infantry musket.[14]

After the English models the French were probably the next most widely used muskets in America during the years from 1689 to 1783. From the outset,

*Robert L. Miller Collection*

Plate 180. Lock from a Fredericksburg Manufactory musket.

*Arthur A. O'Neill Collection*
Plate 181. Rappahannock Forge musket.

*Arthur A. O'Neill Collection*
Plate 182. Lock from Rappahannock Forge musket.

the period was characterized by wars involving England and France. For most of the period the colonies fought with England against France and knew the French musket only as an enemy weapon. But with the coming of the Revolution and the beginning of the shift in alignment which brought France into the struggle on the side of the colonists, French arms began to become more and more common weapons to Americans. By the end of that struggle the colonists had begun to prefer the French pattern to the Brown Bess, and soon set out to make it the basis for American muskets for the next fifty years. Many of the early French arms are still found in America, mostly in New England and New York, and the evidence is that these arms were used here for many years after they had been discarded in France. A specific instance of this is the fact that a lock from a French musket model 1717 was found on the battlefield of Guilford Courthouse where it had apparently been dropped by an American soldier in 1781.[15]

Unlike the British musket which underwent only a few easily recognizable changes, the French musket of the period passed through 15 different models. The differences in these models were often slight and hard to detect, and the

Plate 183. Banded German musket. *Richard K. Sprague Collection*

Plate 184. Pin-fastened German musket. *Robert James Collection*

Plate 185. Prussian musket. *West Point Museum*

picture is further complicated by the fact that many guns were produced that differed slightly from the specifications.

The first really regulation French musket was the so-called model of 1717. Prior to that time muskets had varied widely. Both matchlock and flintlock were used until 1699, when the matchlock was formally abandoned. Then, although the King supplied the new flintlocks to his troops, they varied widely according to the ideas of the different makers. Also, the individual troop commanders were responsible for replacements, and there was no effective check on the selection of arms that they made as long as they were flintlocks. A regulation of January 4, 1717 contained the specifications for a new infantry musket, and the Royal Manufactories at St. Etienne, Maubeuge, and Nozon near Charleville were shortly placed under the control of inspectors of the Royal Artillery Corps, thus setting the stage for the first standard French musket. The model 1717 and its successors through the model 1777 are cataloged briefly below: [16]

*Musket, Model 1717*

Round barrel 46 inches long with a flat face on top running to within 5 inches of the muzzle. Bayonet stud on top of barrel, which is fastened to the stock by 4 pins. There is also one band around the barrel and

stock at about the normal position of a middle band. All mountings are iron. Sling swivels are round and are fastened on the left side of the piece, one on the barrel band and the other on a ring bolt set in the stock just to the rear of the screw plate. The butt plate is prolonged up the comb of the stock and fastened by a pin. There are 3 ramrod thimbles. The lock plate is flat. The pan is iron, chamfered, and with a fence. There is a vertical bridle from the frizzen screw to the frizzen spring screw. The goose neck cock is flat, and the jaw screw is slotted only. The ramrod is wood. Total length: 62½ inches. Caliber: .69.

*Musket, Model 1728*

Similar to the preceding with the following differences: The barrel is held to the stock by 3 bands, of which the upper band has two rings and a funnel for the ramrod. All bands are held in place by springs set to the rear of the bands. The vertical bridle between frizzen screw and frizzen spring screw is abandoned and instead there is a bridle in the normal fashion from pan to frizzen screw. The wooden ramrod has a slightly bulbous metal band at the tip.

*Musket, Model 1746*

The barrel has 8 long flat faces. The first band is very short, and the middle and lower bands are held in place only by friction. The bridle has been removed from the lock, and the iron ramrod has a button head.

*Author's Collection*

Plate 186. German pattern rifle dated 1725 used in Pennsylvania.

*Bucks County Historical Society*

Plate 187. Rifle made in Pennsylvania and carried by Edward Marshall on his "Indian Walk" of 1737.

Total length reduced to 62 inches. Otherwise similar to the preceding model.

*Musket, Model 1754*

Same as the preceding except that the bridle is returned to the pan, the upper band is lengthened again, and the sling swivels are moved underneath the gun.

*Musket, Model 1763*

Barrel 44½ inches long with two short flat faces, one on either side at the breech. Mountings similar to the preceding except that the upper

*Joe Kindig, Jr. Collection*

Plate 188. American rifles of the type used in the Revolution. The top specimen is mounted in iron.

*Joe Kindig, Jr. Collection*

Plate 189. Reverse side of the rifles in the previous illustration. Note that the rifles have been reversed in order from top to bottom.

Case 3:17-cv-01017-BEN-JLB Document 128-1 Filed 11/11/22 PageID.15125 Page 152 of 153

Joe Kindig, Jr. Collection

Plate [illegible]. Detail of the lock of the [illegible] rifle showing construction details. Even on this very crude specimen there is some relief carving.

band carries both a brass front sight and a ramrod retaining spring and the tang of the butt plate has been shortened. The sling swivels are oval instead of round. The cock is reinforced, and the head of the jaw screw is pierced. The iron ramrod has a trumpet head. Total length: 60 inches. Otherwise it resembles the preceding model.

*Musket, Model 1766*

Similar to the preceding except the construction is lighter, the ramrod retaining spring is attached to the underside of the barrel, the swivels are flat, and the ramrod has a button head.

*Musket, Model 1768*

The trigger guard is a separate piece passing beneath the trigger bow and holding the trigger. The swivels are oval once more, and the total length is reduced to 59 inches. Otherwise it resembles the preceding model.

*Musket, Model 1770*

Exactly the same as the model 1768 except that the lockplate is convex, the bands are stronger, and the ramrod retaining spring is moved to the lower band.

*Musket, Model 1771*

The only changes from the model 1770 consist of the removal of the bayonet stud to the underside of the band, the strengthening of the barrel, and the increase in total length to 60 inches. In some specimens the comb of the stock is quite small.

*Musket, Model 1773*

Exactly similar to the preceding except the ramrod retaining spring is once more attached to the underside of the barrel.

*Musket, Model 1774*

The tail of the frizzen is cut square. The ramrod retaining spring is returned to the lower band, and the ramrod itself has a pear-shaped head. Otherwise no changes from the model 1773.

*Musket, Model 1777 (Infantry)*

The barrel has five short flat faces at breech and a tenon at the muzzle to receive the retaining screw of the front band. The front band carries the ramrod retaining spring and a brass front sight. The middle band is held by a screw which enters the stock. The lower band is held by a spring. The changes on the lock consist primarily of the addition of a brass pan without fence but set at an angle, a convex reinforced cock, and the return of the curled tail on the frizzen. Total length: 60 inches.

*Musket, Model 1777 (Artillery)*

Resembles the infantry musket except that the barrel is reduced to slightly over 36 inches in length, and the furniture except the swivels is brass. The total length is 51½ inches.

*Musket, Model 1777 (Dragoons)*

Resembles the infantry musket except that the barrel is reduced to 42½ inches. All furniture is brass except the middle band which has two rings over the barrel and is iron. Total length: 57½ inches.

*Musket, Model 1777 (Navy)*

Similar to the infantry musket except the length, which is the same as the dragoon. All furniture, including swivels, is brass.

Just as with the British, there were also light muskets for French officers. The spontoon which had previously been regulation for commissioned foot officers was abandoned in 1754, and the regulation officers' fusils begin with the model of that year. In each instance they resembled the contemporary infantry musket but were lighter and better made, and the furniture was often decorated with engraving.[11]

Although the infantry musket had been standardized in 1717, the carbine or musketoon was left to the discretion of the various corps until 1763. The only consideration given was that they should all be of the same caliber. In 1763,