1   Rob Bonta
    Attorney General of California
2   Mark R. Beckington
    Supervising Deputy Attorney General
3   Robert L. Meyerhoff
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**                  **COMPENDIUM OF WORKS**
    **CHRISTOPHER WADDELL, and**          **CITED IN DECLARATION OF**
15  **CALIFORNIA RIFLE & PISTOL**         **RANDOLPH ROTH**
    **ASSOCIATION, INC., a California**
16  **corporation,**                      **VOLUME 5 OF 7**

17                        Plaintiffs,     Courtroom:    5A
                                          Judge:        Hon. Roger T. Benitez
18       **v.**                           Action Filed:  May 17, 2017

19

20  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
21  **California; and DOES 1-10,**

22                        Defendants.

23

24

25

26

27

28                                    1

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 28 n.88 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 25 n.79 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 26 n.80 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 35 n.103 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 34 n.102 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 34 n.102 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 35 n.103 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 34 n.99 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 13 n.31, 30 n.90 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910,* at 372 (Berkeley: University of California Press, 1986) | 30 n.91 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 30 n.90 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 12 n.30 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 19 n.53 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 15 n.39, 18 n.52, 19 n.53 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 19 n.53 | 0186-0215 |
| George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016); Eric Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001) 137-38 | 12 n.31 | 1750-1752 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 22 n.66 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | 27 n.82, 30 n.91 | 0223-0234 |
| Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000) 25-27, 32, 64-65, 91-92, 114 | 13 n.31 | 1753-1759 |

3

| | | |
|---|---|---|
| John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152 | 13, n.31 | 1760-1767 |
| Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* 1-8 (Baltimore: John Hopkins University Press, 2016) | 12 n.30 | 1768-1773 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 22 n.66 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 22 n.66 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 30 n.91 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 22 n.67, 22 n.68, 23 n.69, 23 n.70, 23 n.71 | 0283-0329 |
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 19 n.53, 19 n.54 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 19 n.53, 19 n.53 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 23 n.71 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 30 n.90 | 0363-0368 |

4

| | | |
|---|---|---|
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987)X | 30 n.91 | 0369-0375 |
| Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989) 42-45 | 11 n.29 | 1774-1776 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 17 n.51 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 9 n.13 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 17 n.51 | 0477-0504 |
| Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996) | 12 n.30 | 1777-1778 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 34 n.99 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45, 61-63 (especially the graphs on 38, 39, and 91), 118-121, 145-149, 158, 162, 180-186, 195-196, 199-203, 218-219, 297-302, 332, 337, 354, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 1779-1811 |
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |

5

| | | |
|---|---|---|
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 31 n.93 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | 9 n.13 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | 9 n.13 | 0684-0689 |
| Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006) 91-102 | 12 n.31 | 1813-1820 |
| Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969) 65-70, 282-291, 319-328, 413-425, 463-467 | 11 n.29 | 1821-1846 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 31 n.93 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 32 n.95, 32 n.96, 33 n.98 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 19 n.53 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 7 n.5 | 0772-0794 |

6

| | | |
|---|---|---|
| Clayton E. Cramer & Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted Aug. 12, 2016, 6-7, https://papers.ssrn.com/so13/papers.cfm?abstract_id=2599851. | 27 n.83, 28 n.84, 28 n.85, 28 n.86, 28 n.87, | 1848-1862 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 29 n.90 | 0795-0819 |
| C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54 Vanderbilt Law Review 1805, 1805-1847 (2001). | 15 n.38 | 1863-1905 |
| Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017) 308-322 | 12 n.31 | 1906-1914 |
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 10 n.20 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 30 n.91 | 0840-1021 |
| Jack N. Rakove, *The Second Amendment: The Highest State of Originialism*, 76 Chicago-Kent L. Rev. 157 (2000) | 12 n.30 | 1915-1979 |
| Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), https://repository.tcu.edu/handle/116099117/26778. | 24 n.79 | 1980-2210 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 25 n.79, 25 n.80, 27 n.81 | 1022-1036 |

7

| | | |
|---|---|---|
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216-239 (2007) | 16 n.45 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173-195 (2011) | 24 n.78, 27 n.82 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 6 n.4, 20 n.58 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 34 n.202 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 33 n.97 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 16 n.48 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and Regulations (2012) | 33 n.97 | 1157-1264 |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 35 n.105 | 1266 |

8

| **OTHER SOURCES** | | |
|---|---|---|
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 37 n.111 | 1268-1269 |
| Buymymags.com – Home Page (last accessed on Oct. 4, 2022), https://www,buymymags.com/ | 37 n.110 | 2212-2213 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 8 n.7 | 1270-1310 |
| "A Complete Guide to Binary Triggers," Americanfirearms.org, (last accessed Oct. 4, 2022), https://www.americanfirearms.org/guide-to-binary-triggers/ | 37 n.111 | 2214-2237 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 33 n.96 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 37 n.110 | 1322-1325 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 36 n.109 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 37 n.111 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 36 n.108 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 38 n.112 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 13 n.34, 16 n.46, 21 n.64, 24 n.76 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 36 n.107 | 1438-1689 |

9

| | | |
|---|---|---|
| The Violence Project's Mass Shooter Database, https://www.theviolenceproject.org/mass-shooter-database/ | 39 n.113, 40 n.114 | 1690 |
| Guns.com, AR-15s | 33 n.96 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 33 n.96 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 40 n.115 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 23 n.71 | 1748 |

i The Declaration of Randolph Roth cites 30 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶  n. 29, n. 30, n. 37, n.38, n. 45, n.65, n.77, n.82, n.89, n.91, n.92, n.93, n.94, n.95, n.98, n.99, n.100, (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); ; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath that Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); *LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997);

10

1

2   Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B.

3   Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New

4   York: L. B. Fisher, 1942); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United

5   States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University

6   Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Saul Cornell, *A

7   Well-Regulated Milita: The Founding Gathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006); William M. Tuttle, Jr., *Race

8   Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-

9   1810* (Athens: University of Georgia Press, 1991); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press,

10  1982). Should the Court wish to receive excerpted copies of these works Professor Spitzer can provide them.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# BOOKS

# *Revolution*

## ON THE

# HUDSON

★

NEW YORK CITY AND THE
HUDSON RIVER VALLEY IN THE
AMERICAN WAR OF INDEPENDENCE

## *George C. Daughan*



W. W. Norton & Company
*Independent Publishers Since 1923*
New York   London

tives
o his

i-
a
e
d
y
e

I
ir
ie
en

rd
rs.
it
be

nation,
iatriots
Albany,
ipation
Fourth
e court-
w York
ovincial

ongress
o White

Plains, to Fishkill, to Kingston—a small, heavily patriot town on the Hudson, midway between Manhattan and Albany—and then to Poughkeepsie, after the British burned Kingston in 1777.

Led by John Jay, Gouverneur Morris, Robert R. Livingston, and George Clinton, the delegates to the Provincial Congress approved a republican constitution in April 1777 that was written largely by Jay during the winter while Washington was in Morristown building a new army. At the end of June 1777, militia general Clinton was elected governor, in a close contest, over Philip Schuyler, John Jay, and John Morin Scott. The voting was by secret ballot, something novel in New York politics. It was but one of many progressive measures Jay wrote into the new constitution that, taken together, amounted to a revolution in New York's political life, making it far more democratic. Drastically lowered voting qualifications brought new men into the legislature who would never have been able to serve before. They were strong supporters of the new governor, who, like them, wasn't one of the great landed aristocrats who had previously dominated New York. Of course, Clinton had married one, Cornelia Tappan, which was a great help to his career, but he never lost touch with his roots.

The new government presided over counties that had their own governments and local committees. All were, to one degree or another, supporting the patriot cause. Ulster and Orange counties were strongly patriot; the others were to a lesser degree. A low-key civil war went on in all of them, with the patriots maintaining the upper hand. One of their most difficult problems was dealing with the slaves who were running away in large numbers to British lines seeking their freedom. New York had more slaves than any other state outside the South—as much as 20 percent of the population. Militiamen had to be used at times to hunt down escaped slaves. It was an ugly, uncomfortable business for people whose rallying cry was liberty.

Westchester County was a special case. Its people remained evenly divided politically, as they had been before the war. They fell into a destructive civil war that they could not extricate themselves from. On

and on it went, the circle of violence increasing year after bloody year. Running through the county from Long Island to the Hudson was a thirty-mile-wide strip of land called the "Neutral Ground," situated between the American army to the north and the British to the south. Its boundaries extended roughly from north of Morrisania to the mouth of the Croton River. Fighting between irregulars raged in this godforsaken territory, neighbor against neighbor, throughout the wider war and beyond. James De Lancey's "refugees" were infamous for their brutal treatment of patriots, or anyone they chose to label a rebel. Often they used the word "Skinners" to identify their victims. Other so-called Loyalists, known as "Cowboys," were also active, robbing, raping, and pillaging. Organized groups of rebels fought back as the carnage continued, year after year.

O n Nov
procl
the sp
approach to wi
provided it cou
lunately, Howe
standing of An
for the judgme

To begin
Rhode Island.
ultimate objec
Connecticut ar
heart. Another
junction at Alb
datory provisic
would then dr
York City wou



In 1776 Upper Smithfield and Delaware Townships (not shown) encompassed land in present northern Monroe County and Pike County

**Northampton County 1776**

——— County Lines
–·–·– Township Lines
········ Roads

# $S$WEET LAND

### *of* LIBERTY

· · · · · · · · · · · · · · · · · · · ·

THE ORDEAL OF THE

AMERICAN REVOLUTION

IN NORTHAMPTON COUNTY,

PENNSYLVANIA

FRANCIS S. FOX

*The Pennsylvania State University Press*
*University Park, Pennsylvania*

Compendium_Roth
Page 1753

Congress "who are under no solemn tie of allegiance to the states, unless an oath . . . has been taken very recently."[112] Shortly thereafter these officials took the oath. But even if backcountry men like Michael and Jacob Messinger had taken the Test, their pledge would have been meaningless.[112] "The Whigs at Easton began the war," an informer had heard the two men say, "and the people had better rise and hang them than protect them." The Messingers had also asserted that the leading men in the county were Whigs for the sake of personal gain, and that the King had good reason to hang every one. "We had as good a right to be against the cause as we had for it," the men said, adding, that the "Council of Safety were robbers and them that put their laws in force were the same."[113]

In February 1778, John Gordon slipped into Easton, took the oath before a magistrate, and returned to Philadelphia. A month later, when the young man returned to Easton from the capital, Levers decided that even though John Gordon had taken the oath, he had since visited Philadelphia and must, therefore, certify allegiance to the state by posting a cash bond or signing a parole. Levers cautiously turned to the Council for advice. "I do not see," he said, "by what authority I can legally demand [John Gordon to enter] into security, unless something be alleged against him, either in proof, or on probable grounds of suspicion."[114] Besides, Levers said, the one person in Easton who could actually swear that Gordon had been in Philadelphia refused to do so, on grounds that he would jeopardize his contacts in the city. Nonetheless, John Gordon's return to Easton so agitated Levers that he decided not to wait on the Council and confronted Gordon at once.

Levers questioned the loyalty of the local constable, so he requested the militia to arrest John Gordon and bring him to his office; however, the Northampton militia colonel dodged the assignment and handed the task to a lieutenant in the Continental Army who arrived at Levers's place with "four men from Massachusetts with fixed bayonets." Levers deemed the colonel's conduct to "be such an indignity shown to the natural strength of [Pennsylvania], and reproach on himself and his fellow citizens," that he dismissed the Continentals and sent the constable by himself to find Gordon.[115] Levers informed young Gordon that "there was too much ground for suspicion that he had been in Philadelphia since he had taken the oath" and required that in order for him to remain at large he must sign a parole. Levers advised Council that he had been in this matter more circumstantial than was necessary "because my whole conduct herein might be seen."[116] Council brushed aside Levers's concerns that he had exceeded his authority and in-

formed him that in the matter of John Gordon, "the laws should be put into immediate execution."[117]

As for Lewis Gordon, Levers informed Council that the former prothonotary was "a fixed, determined enemy of the American state; but then [he] is wearing away, lately lost his wife, and peevish at times to childishness; and tho' he is capable of being a dangerous man, yet I sincerely pity him." Nonetheless, Levers continued to press Gordon to take the Test. Finally, in May 1778, as the former chairman of the county's Revolutionary Committee lay on his deathbed, he summoned Levers and swore allegiance to the Commonwealth of Pennsylvania.[118] Justice had been served. However, as Gordon's coffin slid into the earth, some at the burial ground stared at Levers with vengeance in their hearts.

On July 3, 1778, a large force of Tories and Indians massacred several hundred soldiers at Wyoming, about sixty-five miles northwest of Easton. News of the atrocity reached Easton three days later. Levers advised the Council "that upwards of two hundred people had been scalped" and suggested that "our town" might be the next target. On the other hand, Levers speculated that since the British had left Philadelphia and headed back to New York it would be more likely that the Indians would roam the frontier and do "incredible mischief, before a check can be given to them."[119] Frightened settlers north of Blue Mountain joined the stream of refugees who headed south for the relative safety of Lehigh Valley.[120] North of the mountain, Colonel Jacob Stroud, popular leader of Northampton's Fourth Battalion, confronted a painful dilemma. "Shall we retreat with the inhabitants, or stand with a handful of men to be destroyed, or whether I can depend on relief," he pleaded with his superior. "I beg your instructions as I have had none yet from you. . . . I assure you I cannot stand nor keep my men here without more assistance."[121] If the enemy wiped out Stroud's men, they could easily attack the Lehigh Valley, Bucks County, and Philadelphia itself, a fact not lost on the state's leaders.

The Council consulted with Congress who dispatched a detachment of Continental troops to the frontier, along with a troop of cavalry from Count Casimir Pulaski's Legion under the command of Colonel Michael de Kowatz.[122] "But it is necessary to add to these troops a considerable body of militia," the Council said, and ordered Northampton to call out 300 men to go over the mountain and defend the frontier.[123] Despite the gravity of the situation, no one consulted Robert Levers, who knew the settlers and territory north of Blue Mountain as well as any man in the county. The Council

Compendium_Roth
Page 1754

conducted the state's business along strict political and bureaucratic lines, and Levers had no responsibility for the militia. Nonetheless, Levers stuck his neck out and informed the council that "as an individual of the county, from the consideration of the services I owe the public, and a regard to the distressed inhabitants in the upper part of the Delaware, I have thought it my duty to delay no time but to give your honor . . . necessary information."

Levers complained that Colonel de Kowatz was "totally inadequate to the important task of conducting military operations in an Indian country . . . he being as perfectly unacquainted with the country . . . as he is to the nature of the Indian manner of fighting."[124] Levers also advised the Council that he was not "without apprehensions that the upper part of the Delaware will soon receive a severe stroke, unless we shall be so fortunate as to repel the enemy."[125] Two months later, Levers reported that "Tories and Indians are burning and destroying all before them" in the upper Delaware. The men at Stroud's have "neither military stores or provisions so that if [the enemy] should suddenly attack . . . that part of the county must fly before them." To underscore the danger of life on the frontier, Levers warned the Council that "three persons were killed near Wyoming and another was sent in with his life, scalped to his eyebrows almost. . . . You may be convinced that this account is to be depended on."[126]

One week later the Council received a salty letter from Stroud himself. The Council had promised to send help, but none had arrived. "Between me and the great swamp," Stroud told the Council, "there is no settlement but the bare woods. Now if it can be thought best not to have the frontier here, I could wish the Council in their wisdom would point out the place. . . . Hoping you will do at this distressing time something for us . . . as we have our eyes on you, as we have no other place to apply to for relief."[127] But the onset of winter brought a respite from Indian raids on the Northampton frontier, and the Council turned its attention to more pressing business. Levers pouted. There had been no response to his criticism of efforts to stem the war on the frontier. A self-described spectator, Levers focused on managing the court docket, deposing witnesses, and issuing marriage and tavern licenses.[128]

In the spring of 1779, Tories and Indians resumed their raids on the Northampton frontier. Congress stepped in and directed Major General John Sullivan to secure the region. In June, Sullivan mobilized several thousand men at Easton and struck north to drive the enemy back to their base at Niagara, New York. This expedition inflicted much damage on the enemy, but

within months Tories and Indians resumed their attacks on both sides of the upper part of the Delaware River. The following year the enemy forays resumed with even greater intensity. Northampton's militia colonels argued among themselves. With few exceptions militiamen south of Blue Mountain refused to travel beyond it, even at the risk of endangering their own homes and family members. President Joseph Reed, a staunch defender of the militia law who had presided over the Council since December 1778, did not mince words. In a letter to Northampton's colonels and field officers he directed them to "bestir yourself, support your [superior officers] with your utmost weight and influence . . . let there be but one dispute [among you]— who shall serve his country best . . . support each other, and be assured we shall support you with every necessary."[129] To spur bounty hunters to attack the enemy, Reed authorized rewards of $1,500 for every Indian or Tory prisoner taken and $1,000 for every Indian scalp. The bounties were quickly raised to $3,000 and $2,500. Even so, there were few takers.

When enemy incursions on the Northampton frontier resumed in 1781, inhabitants again begged for help. Reed promised money and supplies, but as for sending reinforcements, Pennsylvania's president had lost patience with the commanders of the Northampton militia. "We recommend you to your own exertion and the blessing of Providence which will help those who are earnest to help themselves, and which Council doubts not you will do," he said.[130]

Although the Militia Act rendered it almost impossible for President Reed to replace militia officers who had been elected by their own men, the president had the authority to appoint the county lieutenant, a civilian who commanded the militia in each county. In June 1781, when the Northampton lieutenant submitted his resignation after only one year on the job, President Reed appointed Robert Levers to take charge of the county's militia, which numbered about 6,000 men. "We shall much depend on your activity, firmness, and zeal," Reed told his newest county lieutenant. "Pay strict adherence to the Militia Law on all occasions," he said, "and as the serving militia are to be paid out of the fines of the delinquents, you cannot be too expeditious in collecting them."[131]

For three years Levers had closed his eyes and remained silent while two county lieutenants permitted militia officers to abide by their own rules. Levers assured Reed that he was "well convinced of the real service to be effected by a steady and firm adherence to the Militia Law, and your excellency and the Supreme Executive Council may be fully persuaded that I shall on all

civil offices I hold (which, indeed, are three in number) would permit, I have done my duty, and feel myself extremely happy that the Council have been satisfied with my services. They have been honest exertions, however they may have been wanting.[1]

With the end of the war, the state bureaucracy expanded; it also began to grind at an exceedingly slow pace. A 1784 law plucked the magistracy from the bowl of political plums and required that each township, or pair of townships, elect magistrates annually. Because all local elections had to be certified by the prothonotary, the new law created an avalanche of paperwork for Levers. Another new law also governed the issuance of certain peddlers' licenses. Levers found a loophole in the statute and tossed it to the Council. "Application has been made [at Easton] for a license as a pedlar with one horse," said Levers. "As I know not whether the appliers are to come down to [Philadelphia] to receive their licenses, or to be issued out in the county as in tavern licences, I beg you will take the trouble to inform me by a line."[147] (Levers's by-the-book approach, which must have become tiresome to local inhabitants as well as to officials in Philadelphia, may have led some persons to question his continued usefulness as a public servant.) All in all, however, in the postwar years Levers had begun to achieve some personal financial stability. But his good fortune came to an abrupt end on the night of July 28, 1785.

On that fateful evening Lewis Gordon's sons, Alexander, age twenty-three, and William, twenty-five; Gordon's grandson, James Taylor, about seventeen; and two other young men gathered in front of Robert Levers's house with stones, tomahawks, and axes. They then proceeded to break down the front door. Once inside the house they terrified Levers's family and "injuriously and insultingly treated his house and his office of justice of the peace."[148] The men may have been drunk, but the Gordons had doubtless planned and carried out this attack on Levers and his family in retaliation for the abuse and humiliation suffered by their father and other family members during the Revolution. A magistrate ordered the arrest of Levers's attackers and directed them to appear at September quarter sessions courts; however, the case never came to trial. All but one of the men fled to Virginia where they melded into the populace.

Of the many letters written by Robert Levers—more than 130, containing

. . . . . . . . .

---

about 70,000 words have surfaced thus far—among the most interesting is one in which he welcomes Benjamin Franklin home from France:

> I congratulate you on your safe arrival to America, and particularly into that country and city which has received so many favors from you, and oftentimes has been so highly honored by your past labors and exertions for her welfare and benefits. When I look back so long ago as the year 1754, and reflect on your great care and interests and happiness of America generally, in the wise plan proposed for the Union of the Colonies at the Treaty of Albany; and advance forward to the year 1776 and contemplate the great share you had in establishing the Virtuous Independency of America; and go on to consider your abundant fatigues in an advanced life . . . at the Court of France, and indeed throughout Europe, it may with exactness of truth be said: you went about doing Good. Every good man must feel an uncommon satisfaction of mind at your return; how much more at your condescension to preside in this state. May your efforts be blessed and rewarded with success.[149]

Levers communicated with Franklin not only to praise the man but also, it would appear, to lay the groundwork to protect himself from certain persons in Northampton who had launched an effort to remove him from office. Franklin had returned to Pennsylvania just in time to calm troubled political waters and to win the state's presidential election. That Franklin took office under the banner of the Constitutionalist Party, whose constituents supported the state's Revolutionary government, doubtless gave Levers heart, because Levers held his appointment as prothonotary at the pleasure of the president. At issue, and this is inferred from Levers's correspondence, was a land deal executed by Levers about 1765 that had come back to haunt him. The details are sketchy, but they suggest that Levers found himself at odds over this old transaction with a man who happened to be Northampton's current elected representative on the Supreme Executive Council. In short, Levers found himself confronted with enemies who wanted him out of office. Levers turned to Franklin for help. In this letter he immediately pulled out all stops:

> It is said there is a disposition in the Supreme Executive Council to make a change of officer in the prothonotaryship of this county. At the beginning of the late Revolution I took an early and decided part in fa-

. . . . . . . . .

Compendium_Roth
Page 1756

its own officers. When Geiger discovered that only three votes separated him from the victor, he requested the Board of War to review the election. The colonel did not mince words. The three new senior officers of the Second Battalion were not fit for duty, he said. One of them had been cashiered for leaving his post at the Battle of New York in 1776. Two others had deserted when the battalion had been ordered to Philadelphia. Geiger also claimed that most men in the Second Battalion would not put themselves under the command of the newly elected officers. "Therefore," he said, "I will lay the mattre to your Worships Consideration."" But the Board of War declined to interfere in a local militia election and tabled Geiger's petition. The colonel tried a different tack. Geiger informed the board that the very same Tories whom he had thrown in jail last winter, and who were now free on bail, had elected the new officers. "One of the said Dangerous Persons or Tories as we Cal Them has spook very hil against the Honourable the Congress and against other Gentlemen and Officers," he said, "[and] they was all against me [in the election].""° The board ignored Geiger's petition.

The irony that scalawags and Tories had defeated him in an open battalion election was not lost on the colonel. Democracy, he doubtless hollered, should not work that way. Although Geiger blamed "dangerous Tories" for his defeat, it is likely that a civilian appointee named John Wetzel, who commanded all militia in the county, engineered Geiger's removal as commander of the Second Battalion. There is no evidence for this assertion, but the newly elected senior officers of the battalion happened to be Wetzel's cronies.[41] Meantime, the war engulfed Philadelphia and then moved to the frontier. But of what use was a colonel without a command?

In 1779, Geiger ran for elective office. One of eleven candidates for five seats in the House of Representatives, the colonel did not fare well. Out of 259 votes cast in his district, which comprised the same townships represented in the Second Battalion, Geiger won only forty-seven. He added twelve more votes from the neighboring district, but received none at all from Easton and the district north of Blue Mountain. Overall, Geiger garnered only 59 votes out of 630 cast in the entire county.[42] It is likely that Geiger's reputation as a zealous soldier who marched by the book alarmed those voters who publicly espoused the cause of freedom but who, in private, embraced the middle ground. After the election the county commissioners appointed Geiger one of six tax collectors, an onerous job that provided little solace to the "Lat Colonel."

Five months after his defeat at the polls, Geiger's career took an unex-

pected turn. At the triennial election of militia officers required by law, the men in Geiger's former battalion chose him as their commanding officer. Geiger now turned his attention to Indians and Tories who had ravaged the frontier and who, in one attack, had come within six miles of his house. When word reached Easton that a militia patrol had been ambushed, Geiger and some of his men volunteered to bury the dead. After a forty-five mile march north of Blue Mountain they reached the scene of the action at a place named Nescopec, and found "ten soldiers dead, scalped, stripped naked, and in a most cruel and barbarous manner tomahawked, their throats cut, etc., etc." Other members of the company had been taken away as prisoners.[43]

Panic spread across Northampton County. The county lieutenant assigned Geiger and more than 100 men to patrol a twenty-five mile stretch of frontier north of Blue Mountain. But the proposed deployment of the militia did not satisfy Geiger. In spring 1781, he expressed his concern to President Joseph Reed, and even enclosed a hand-drawn map to help make his point. Geiger pointed out that it had been the practice to station two to four men at each house, but this created gaps of two or three miles in the line of defense. "By that reason the frontier being open whereby the Indians may go through the Whole Countrie Without any enderniss [hinderance] and kill the poor inhabitants."[44] Alarmed by relentless attacks on the frontier, President Reed advised Geiger that he had appointed a new county lieutenant [Robert Levers], "and we hope you will not in future have the same reason to complain of the stationing of the militia.["49] Within weeks, Geiger informed Reed that the new lieutenant repeated the mistakes of his predecessors. "The proper way to defend the frontier is to hunt the enemy and not wait for him to come to you," he told Reed. "In the last war I whas officers but we Whas obliged to go Every Day upon a scout out sids the inhabitant longs the frontiers And so it should be yet and the frontier would be beter scurt [secured]."[46] To carry the fight to the enemy may have been a successful tactic when executed by trained soldiers, but the bloody toll of the Nescopec ambush reminded militiamen what might happen to them should they venture on patrol. As a result, Tories and Indians continued to burn the Northampton frontier without serious opposition from the local militia.[47]

The Treaty of Paris (1783), which marked the official end of the War of the Revolution, gave amnesty to some Tories. When copies of the preliminary Articles of Peace reached Northampton, Geiger organized and chaired a countywide committee to protest the treaty. The committee petitioned

. . . . . . . . .

days after the Brethren had returned to their homes in Emmaus, Wetzel struck again and summoned them to appear in Allentown.

Wetzel not only renewed his demand that the Brethren pay substitute money, but he also informed them that he now had a person who would swear that they were disaffected against the state. Andreas Giering, one of those summoned, countered that "he could prove that the [Brethren] were friends of the country." At this "Wetzel flew into a rage. He rushed up and down in the room and stamped with his feet, and threatened to beat and shoot Giering."⁸⁹ In the end the "court of inquiry" granted the Brethren a week to pay fines of £53 each; nonetheless, Wetzel continued to harass Giering. At Wetzel's request, magistrate Robert Levers issued a warrant for Giering's arrest on grounds that he "had been unfriendly toward independence."⁹⁰ The Moravian surrendered to the constable, who delivered him to the Easton jail to await trial at quarter sessions court on June 18, 1778. At his arraignment Giering again refused to take the Test, whereupon one of the judges ruled that if he did not swear within thirty days, his estate would be sold. Giering pleaded with the Supreme Court to review his case, but this body rejected his appeal. After seven weeks in jail, he paid a fine, swore allegiance to the state, and returned to Emmaus.⁹¹

The Militia Act and the Test Act shook the Church of the United Brethren. A few Brethren had no scruples against bearing arms or taking the Test. Most, however, followed Ettwein's lead and said: "We will not yield though we should rot in jail!"⁹² To gain relief from Wetzel's predatory attacks on church members, Moravian leaders petitioned Congress and the Pennsylvania Assembly. Ettwein, who drafted and delivered the memorials, discovered that many members of both bodies sympathized with the Brethren. But the skilled diplomat also found no congressman or assemblyman who would step forward and challenge the enforcement of either the Militia Act or the Test Act, the twin cornerstones of public policy under Pennsylvania's Revolutionary government. However, some radical assemblymen recognized that Wetzel's behavior might become a political liability to Constitutionalists and prevailed on the president to restrain his lieutenant in Northampton County.

As President Wharton was ill, Vice President George Bryan informed Wetzel that Moravians and Schwenkfelders were not to be feared. Therefore, Bryan said, "it is the wish of government not to distress them by any unequal fines . . . or by calling them to take the oath at all." Also, "we wish it to be understood that Council and the Assembly desires to avoid any noise

. . . . . . . . . .

90

*John Wetzel and John Ettwein*

from the people mentioned above."⁹³ Bryan also requested Robert Levers "to interpose himself in a prudent way [to stop] the tumultuous and riotous treatment" of Moravians and Schwenkfelders in Northampton.⁹⁴ Levers opposed Wetzel's tactics, but he believed the Brethren should comply with the laws of the state. "The Honorable Assembly is the Eye of the Law," Levers informed Ettwein, adding, "We ought in good conscience to pay obedience thereto, for '*the Powers that be are ordained of God*'" (emphasis in original).⁹⁵ Wetzel immediately leapt to his own defense. He informed Bryan that despite complaints to the Assembly by Moravians and Schwenkfelders, he had merely been enforcing the laws of the commonwealth. "The bad behavior of the Tories in this county," he said, "and those in particular who have been some time ago committed to the Easton jail, merit no leniency, notwithstanding I have treated them . . . in such a manner as no part of my conduct shall or may be looked upon as rigorous, or my actions ever deserve the name of persecution." Moreover, Wetzel concluded, "I will promote peace and harmony, and suppress anything that would give our Council or Assembly distress or trouble."⁹⁶ Wetzel's *mea culpa* may have put some persons at ease, but even as he crossed his heart the lieutenant continued to plot against the disaffected.

The Council soon received three petitions from seventy-five officers of Northampton's First, Second, and Fourth Battalions. In nearly identical memorials, the commanders demanded that Moravians be denied the privilege of petitioning any legislative body in the commonwealth until they swore allegiance to the state. In a striking demonstration of raw political power, Wetzel had rallied his troops and used them to warn the government to stand fast.⁹⁷ Furthermore, even as the petitions arrived in Philadelphia, Wetzel and Limbach conspired to bring to trial a group of Mennonites who refused to bear arms and swear oaths because of their religious beliefs. Since Vice President Bryan did not include Mennonites in his letter, had Wetzel merely taken advantage of a loophole? Or was the lieutenant testing the resolve of state authorities? But even as the Council contemplated how it might shorten the reins on the lieutenant in Northampton County, the war in Pennsylvania moved from Philadelphia, which had been abandoned by the British, to the Pennsylvania frontier.

On July 3, 1778, at a site just sixty-five miles northwest of Easton, the enemy massacred more than 200 soldiers. When Wetzel learned that a force of about 750 Indians and Tories was marching toward settlements on the Delaware, he panicked. Wetzel informed Bryan that he had "ordered out

91

half of the battalions of the county, but by all accounts it is not a sufficient number to withstand the [enemy]." Wetzel also urged Bryan to hasten to Northampton, or as Wetzel's scribe put it, "we humbly beg your interposition on the premises."⁹⁸ In Philadelphia, the guerilla war unleashed on helpless settlers by Tories and Indians brought action. The Board of War sent arms and ammunition to Northampton. Congress ordered units of the Continental Army and Count Casimir Pulaski's Legion to help turn back the invaders. But in Northampton, militiamen south of Blue Mountain refused to be drawn into battle. It was not their fight, they said. To drill, shoot mark, and drink whiskey was one thing, but they had no intention of serving as human targets. Thus, Wetzel found himself in the precarious position of levying fines on ordinary militiamen who refused to muster or pay for substitutes. Tensions eased when the enemy, worn out by a long campaign, began to pull back. The emergency past, Wetzel and his cronies immediately resumed their drive to bankrupt Moravians and seize their land. This scheme to get even and to get rich also generated an immediate residual benefit for the county lieutenant. By holding up the Brethren as a common enemy, Wetzel blurred factional disputes within battalions, and in doing so he dampened the rivalry between battalion commanders, which might have led one or all of them to challenge his authority.

On September 7, 1778, a constable accompanied by two armed militiamen confronted Ettwein at an inn near Bethlehem. The constable informed the minister that he had a warrant, signed by Justice Frederick Limbach, summoning all men in Bethlehem and three nearby Moravian settlements who had not taken the oath of allegiance to appear before magistrates at an Allentown tavern one week hence. "You must give me the names of all male inhabitants of Bethlehem," the constable told Ettwein. "If not," he said, nodding in the direction of the militiamen, "I'll take them by force." Ettwein, who had charmed visiting dignitaries from near and far, invited the constable and the guards to have dinner with him. Afterwards, the constable agreed to let his host execute the warrant. In return, Ettwein gave the constable a receipt for the warrant, which certified that the constable had done his duty."

No sooner had the constable departed than one of Northampton's assemblymen arrived in Bethlehem. He informed Ettwein that the Mennonite affair had caused an uproar in the Assembly, and that both moderates and radicals, including the speaker, had vowed to amend the Test Act.¹⁰⁰ When Ettwein showed his visitor the warrant issued by Limbach, the legislator im-

mediately informed Justice Limbach "that a supplement to the Test Law, for the ease and relief of all quiet minded persons in this state" was being discussed in the Assembly. He indicated that the amendment might come to a vote in a matter of days and urged Limbach to suspend any prosecution until the proceedings of the Assembly were known.¹⁰¹ At Ettwein's request, Northampton's representative on the Supreme Executive Council also advised Limbach to "suspend the rigorous execution of the Test Act" until the Assembly had finished its business.¹⁰² Despite these appeals, Limbach refused to rescind the warrant. Ettwein hurried to Philadelphia.

On September 10, the day Ettwein arrived in the capital city, the Assembly took up the Test Act, but radicals fended off attempts by moderates to modify the statute and merely closed a few loopholes in the original legislation. Thus, although some members of the state's Second Assembly had begun to agitate for modifications in the Test Act, radicals refused to allow the issue to come to the floor. Working against time—the Assembly adjourned the following day—Ettwein distributed copies of Limbach's warrant to legislators sympathetic to the Moravians.

Hoping to avoid a calamity like the one that had befallen the Mennonites in Northampton, an uneasy Assembly appointed a committee to study the warrant and then consult with Ettwein.¹⁰³ While awaiting the committee's response, Ettwein conferred with Speaker John Bayard, who expressed hope that the Moravians would be able to escape prosecution until the next Assembly, when he believed the Test Act would be amended. "We have made a sharp weapon," the Speaker acknowledged, "and mad men have got it into their hands, and we must try and get it from them again."¹⁰⁴

The committee appointed to review Limbach's warrant wanted to know how Wetzel and Limbach could be prevented from prosecuting Moravians until the next Assembly. Council lawyers studied the matter and carved a loophole in the statute. The Test Act, they advised the Council, could not be applied to the Moravians because the law contained no provision for administering the oath to a mass of persons at the same time and place; therefore, the warrant issued by Justice Limbach was illegal.¹⁰⁵ The lawyers also believed that the court would set aside Limbach's warrant. The special committee appointed to assist Ettwein hoped the delay would give the Moravian leader time to lay his case before the next Assembly. In the meantime, they said, if Wetzel and Limbach attempted to enforce the warrant, Ettwein should report them to the Council at once.

Wetzel had been informed of Ettwein's mission to Philadelphia.



# BEYOND PHILADELPHIA

*The*
*American Revolution*
*in the*
*Pennsylvania Hinterland*

*Edited by*
*John B. Frantz and William Pencak*

*The Pennsylvania State University Press*
*University Park, Pennsylvania*

tively small number of areas. Slaves held in Bristol Borough, Bristol and Newtown Townships, and by men associated with the Durham furnace made up more than 40 percent (about 55 of 130) of the total recorded in the incomplete records of 1775. Adding the 20 slaves held by six wealthy families living in affluent Falls Township, adjacent to Bristol, increases the proportion concentrated in these five political subdivisions to just short of 60 percent of the total recorded in the fifteen political subdivisions for which we have records. In short, these fragmentary records of slaveholding do not confirm the "truly disastrous" economic decline suggested by McCusker and Menard for the period 1775–90.[62]

Tax arrearages for the county also suggest a mixed picture. During the 1780s, residents of Bucks County did fairly well in paying their taxes. In the winter of 1787–88, John Nicholson, the comptroller general of Pennsylvania, reported that across the state approximately £354,651 in back taxes remained unpaid. This figure represented about £3.2 for every adult white male in the state sixteen years old or older. Bucks County residents owed an average of about £1.4. While considerably below the mean, this amount was higher than the averages in a number of other counties. In the same vein, in late winter 1788 a number of people from Bucks County petitioned the legislature for relief from debt.[63]

If the Bucks County economy showed signs of healing in the early 1780s, the wounds in the body politic continued to fester. Some of the more belligerent patriots had migrated. John Lacey, who issued the shoot-on-sight orders against farmers trading with Philadelphia, married and moved to the vicinity of Mount Holly, New Jersey. Even there, however, violence followed him. Well after the war, he apparently shot and killed Joel Cooke behind the Quaker meetinghouse after what some thought was a business dispute.[64]

Other violent men remained and continued to disrupt the county. Among these, the Doans stood out, robbing, burning, and spreading terror over a wide geographic range. They reputedly robbed a horse from Mr. Shaw in Plumstead, and when he complained they returned in the dead of the night, beat him bloody, and took the rest of his horses. They also were given credit for robbing tavernkeeper Robert Robinson, and for stripping the corpulent businessman naked and whipping him. Public opinion as well as petitions to the government credited the Doans with pillaging houses and stealing horses and cattle in the lower parts of the county.[65]

Separating fact from fiction here is not easy, but the Doans' most notorious deed is fairly well documented. At about 1:00 on the morning of October 27, 1781, Aaron, Levi, and possibly Moses Doan, along with Robert Steele and a

number of "brown figures, in linsey-woolsey coats, knee-britches . . . and small felt hats with round crowns," robbed the county treasury at Newtown. Armed with cocked pistols, clubs, swords, and flintlock muskets, they forced their way into the home of the treasurer, ransacked his dwelling, and compelled him to open the county's coffers. At the end of three hours, the gang of fifteen to twenty men made off with more than £650.[66]

In the next few years a number of the known members of the gang died violently. At least one was shot resisting arrest, and two were hanged in 1788. Others fled, some to Canada where, it was later rumored, they joined the British in fighting against the Americans in the War of 1812.[67]

Who the Doans were, how much of the county's endemic violence they caused, and why they took to arms remain matters of conjecture. Most of the families with that name lived in the northern parts of the county, in and around Plumstead and Bedminster Townships. Of English descent, the first inhabitant of that name arrived in Bucks in the seventeenth century from Puritan New England, where his conversion to Quakerism had made him unwelcome. In Bucks the family had a checkered religious career. Some were disowned from the Quaker Meeting for their experiments with astrology, others for marrying out of the Meeting. By 1778 at least one branch of the family were widely known loyalists. Whether led to that position by their Quaker religious principles, or by disputes with patriot forces over the confiscation of property or by compulsory military duty remains unclear.[68]

Whatever the cause, from 1778 well into the 1780s the Doan gang earned credit for terrifying and abusing substantial numbers of people in all sections of the county. These exploits, whether real or fictional, illustrate the violent and unsettled status of the county long after the British and the patriot armies had moved on.

Other kinds of hostilities persisted. The departure of the British loosed a torrent of patriot abuse on loyalists, neutrals, and trimmers. The legislature authorized the confiscation of loyalist property. Ironically, one of the victims was Gilbert Hicks, who had chaired the meeting in the summer of 1774 that had inaugurated the Revolutionary movement in Bucks County. Between 1777 and 1779, the state legislature, dominated by Scots-Irish Presbyterians, enacted a series of Test Acts that disfranchised all who would not abjure the King and pledge allegiance to Pennsylvania. At first persuasive rather than punitive, the final Test Act permanently disfranchised all who did not take the oath by the fall of 1779.[69]

southern door no longer seemed secure. The Six Nations felt hostility toward the New Englanders for upsetting their fragile balance of diplomacy and the chain of friendship they had so carefully forged with Pennsylvania over the years. The Confederacy also bitterly remembered the Yankees' fraudulent purchase of Wyoming lands and their murder of Teedyuscung, the Confederation's Delaware cousin and prop in the Wyoming Valley, and the mayhem his death unleashed up and down the Susquehanna with the revenge of his son, Captain Bull. An Indian delegation journeyed to Philadelphia and on September 24, 1771, held a conference with the Provincial Council. Cheahogah, a Cayuga chief, spoke for all the natives present, including the Six Nations. The New Englanders, Cheahogah said, claimed that the Indians gave them the Wyoming lands, but, he stated, "we who are here of several Nations namely, the Six Nations, Shawanese, Delawares, Mohickons, Nanticoke, and Conoys, we all declare that the Indians never did give this land to the New England people, but we gave it to the proprietor Onas [Penn], and to no other person, and we not only gave Wyoming to him, but a great space of land round about it, except the places where Indians live."[23]

In June 1772, the Moravian Munsee-Delaware converts living at Friedenshütten (Wyalusing) and Sheshequin (Ulster), both in the area of the Susquehannah claim, determined to leave for the Ohio country. Their neutrality in the early years of the struggle for the Wyoming Valley had been for naught. White people were invading their lands, and the Six Nations wanted them well beyond the Stanwix Treaty line so no conflict would break out.[24]

The provincial threat abated during the years 1772–75, which found the Susquehannah Company vigorously advertising the lush plains of Wyoming. Many Connecticut newcomers made their way into the Wyoming Valley, having been assured that they would find paradise. On June 2, 1773, a meeting of the Susquehannah Company at Hartford drew up a law code for Wyoming called the "Articles of Agreement," which established a system of local government for each town and provided for a three-man directorate to maintain order, levy taxes, and raise a militia. Now any settler who felt that his legal rights, especially his property rights, were being violated by a town's directorate could appeal his case to a quarterly meeting of directors from all the towns.[25]

In 1773, the Susquehannah Company sent 140 settlers to plant a town on the West Branch of the Susquehanna, but they met with stiff resistance from a Pennamite posse comitatus and were expelled. William Plunket, a Northumberland magistrate and the leader of the posse, reported to the governor that he

and his comrades could not "hope for peace" while Susquehannah Company claimants kept possession of Wyoming.[26]

Proprietor John Penn, for his part, issued proclamation after proclamation against the Susquehannah Company's incursion into Wyoming lands. Finally, in December 1773, Pennsylvania claimants from Northumberland County appealed to Penn and the assembly to take a strong hand and drive out the "lawless intruders," but the assembly failed to appropriate funds to send troops against the settlement.[27] Penn answered the protests and pleas from the frustrated Northumberland petitioners with yet another proclamation, while he issued after the Connecticut General Assembly had met in January 1774 and created the town of Westmoreland and attached it to Connecticut's Litchfield County after years of intense lobbying by Susquehannah Company agents.[28]

The protracted debate over Wyoming lands also raged on in the British courts until the Revolution. Penn used harsh words in his February 28, 1774, proclamation against the colony of Connecticut and its "emigrants," who had in a "hostile" manner taken possession of Wyoming under a pretended "right to lands" within the boundaries of Pennsylvania's Royal Grant and without a claim confirmed by the King's Privy Council. Penn did not recognize the town of Westmoreland, and he called Connecticut's appointment of Zebulon Butler, the Susquehannah Company's principal agent at Wyoming, as justice of the peace an illegal act and "pretense." He concluded that any settler without a "grant or license" issued by the province would be brought to justice.[29] The dispute festered, and Penn's continuing war of words seemed hollow to Pennsylvania claimants who were expelled from Westmoreland by Zebulon Butler and his settlers' committee in November 1774. When the year 1775 found the British Empire threatened by its rebellious American colonies, the Second Continental Congress became the court of last resort for this continuing quarrel over Wyoming lands. The Continental Congress sought an expedient political solution to the troublesome matter through compromise but could satisfy neither party.[30]

On July 27, 1775, Zebulon Butler and a large delegation of Susquehannah Company settlers conferred with a group of thirty natives and several headmen from the Six Nations. The Indians journeyed to Wyoming from Oquaga (Windsor, New York), a bustling polyglot village principally of Oneida and Tuscarora. The leader of the Six Nations delegation, a Tuscarora chief, gave the principal speech. He said the delegation attending the treaty Conference of Oswego, conducted by Colonel Guy Johnson (William Johnson's nephew and successor), had then decided to trek to Wyoming. "We come," he continued,

"also to let you know the Six Nations have been somewhat afraid, but now are glad to see all things look like peace, and they think there will be no quarrel among yourselves, with one another. And you must not believe bad reports or remember times pass'd that have been unfriendly."[31] On a more practical note, the chief requested that safe passage for the Iroquois be ensured along the main path from the headwaters of the Susquehanna through Wyoming and down to Philadelphia, for the purpose of hunting, trade, and travel.

Butler and his delegation also seemed satisfied with the demeanor and promises of neutrality made by the natives in the present strife between the colonies and Great Britain. In his official response to the Tuscarora chief's message, Butler said: "Your young men are welcome to hunt in our neighborhood, and we are glad to trade with them for their skins, but you must caution them not to make our women and children afraid, either by word or action."[32] The Indians stayed at Wyoming until August 3 and were given provisions for their journey home. It is significant that wampum, the accepted device for recording and establishing cross-cultural contact and agreement, was not exchanged at this conference. These were perilous and swiftly changing times. Had Butler but known what would transpire at Albany a mere twenty-eight days after the close of the Wyoming Conference, he would not have been so elated about prospects for peace with the Iroquois on the Wyoming frontier.

Following this conference at Wyoming, the Continental Congress commissioners for Indian affairs, Oliver Wolcott, Philip Schuyler, Turbott Francis, and Volkert Douw, next treated with the sachems of the Six Nations Confederation. They met in Albany on August 25 to secure their neutrality in the ongoing dispute with Great Britain. On August 31 the Onondaga sachem Tiahogwando (Teyohaqueande), a close ally of the late Sir William Johnson and a man of great influence in the Six Nations Confederacy, made an important speech that totally repudiated the Connecticut claims and was designed to influence the events in the Wyoming Valley anew in favor of Pennsylvania. If both Pennsylvania and the Iroquois considered the New Englanders' pretensions to Wyoming lands fraudulent, perhaps the new government of the united colonies would drive the interlopers out. The Iroquois then could renew their chain of friendship with Pennsylvania and secure the southern door to their homeland. But the renewal and peace Tiahogwando hoped for never came to pass.[33] In July 1776, after Congress announced American independence, the British-American conflict broke the Iroquois Confederacy asunder. After 1777, the Great Council fire was

covered at Onondaga. Most of the Six Nations supported the British, although a majority of the Oneidas and Tuscaroras allied with the Americans.[34]

By September 1775 the Susquehannah Company moved to establish a settlement along the West Branch of the Susquehanna River that did nothing to soothe the apprehensions of the Pennsylvania settlers already there. On September 22, 1775, an angry Northumberland County official, William Maclay, sent a message to Joseph Shippen, secretary to Pennsylvania's governor. He warned Shippen that the Wyoming settlement soon planned to send 300 settlers to the West Branch and that Connecticut controlled "every motion of the people at Wyoming."[35] On September 25, an armed force of 150 Connecticut settlers from Wyoming made its way to the Pennamite settlement at Freeland Mills, some thirteen miles from Sunbury. Around 200 armed inhabitants rushed to disperse the invaders. A fight ensued. One Wyoming settler was killed, two were wounded, and seventy-two were captured. The Pennamites also confiscated 130 firearms and thirty horses.[36]

The threat from Wyoming agitated the already rankled Pennsylvania freeholders of Northampton and Northumberland Counties. They petitioned Pennsylvania's Committee of Safety to protect them and their property from further "hostile invasion" by "lawless intruders" from Wyoming.[37] On November 20, the sheriff, William Scull, and a few magistrates of Northumberland visited Zebulon Butler and other leaders of the Wyoming settlement and asked them to submit to the laws of the province. The leaders said they would never do so, as long as the "common people" of Wyoming threatened and cursed the magistrates.[38]

The Pennsylvania Assembly did not accept this insult. On November 25 it asked the governor to coerce the leadership of Wyoming to comply with its laws. The Wyoming expedition, composed of more than 500 well-armed men, left Fort Augusta (Sunbury) around December 15 under the command of Magistrate William Plunket and Sheriff William Scull.[39] They planned to journey up the Susquehanna via Wapwallopen and Nanticoke Falls to Wyoming, where a forewarned Zebulon Butler, Lazarus Stewart, and a force of 400 men awaited their arrival. There, on Christmas Eve and again on Christmas Day, the Yankees repulsed the Pennamites with some lost lives and many wounded on both sides. The Yankees referred to the Pennamite expedition as a Tory invasion.[40]

By December 25, 1775, the Pennsylvania government's feeble attempt to destroy the Connecticut claimants' foothold in the Wyoming Valley had ended

in shambles. The quarrel between the two colonies continued to fester throughout the Revolutionary War, threatening the political stability and unity of the Second Continental Congress. The Congress, for its part, hoped to draw up some compromise resolution that would put off a decision over jurisdictional soil rights until the indefinite future after the "present troubles in the colonies" had passed. Ironically, on December 20, 1775, as Plunket's force moved up the Susquehanna toward Wyoming, Congress ordered that "the contending parties immediately cease all hostilities and avoid every appearance of force, until the dispute can be legally decided."[41] Again, on December 23, it recommended to Connecticut "not to introduce any settlers on the said lands till the further order of this congress."[42] Although the colony of Connecticut had already agreed to the latter recommendation, the Wyoming settlers were unaware of this decision.

By 1776 a number of Pennsylvania claimants had already settled upriver from Wyoming on lands in and around Wyalusing, the former productive settlement of Munsee-Delaware Moravian converts. The Moravians had left the forsaken settlement to the oversight of Job Chillaway, a well-known Indian guide and trapper who held a Pennsylvania claim in the area. Thomas Willing, a rich Pennsylvania claimant, and Alexander Patterson, a staunch Pennamite leader, owned large Pennsylvania land grants in the area. John Depue and some other disgruntled Connecticut claimants moved up to Wyalusing from Wyoming shortly after the Munsees left in 1772. In 1775, Chillaway sold some land to the son of Henry Pauling, a member of the Pennsylvania Assembly. John and James Secord, Frederick Vanderlip, and a number of other wealthy farmers were working grants in the area. According to Alexander Patterson, these predominantly Pennsylvania freeholders could not live in peace with settlers at Wyoming.[43] In March 1776, the Wyoming settlers' Committee of Inspection, acting under the existing Connecticut laws against treason, arrested a number of upriver Pennsylvania claimants who were suspected of Toryism. First, John Secord was brought in on charges of spying and of harboring and provisioning escaped British prisoners. The outraged Secord petitioned the Pennsylvania Assembly on March 6 and the Continental Congress on April 15, 1776, and was freed. The committee also arrested Philip and Abraham Van Gorder and shipped them off to Litchfield, Connecticut, for trial. Eight other people also were rounded up and sent to Hartford, Connecticut, where their cases were ultimately dismissed.[44]

By Fall 1776 the Connecticut settlers in Wyoming realized that to the north, and no more than a few days' journey by river, were the bustling Indian commu-

nities of Tioga, Chemung, Newtown, Otsiningo, and Owego. The Wyoming leadership recognized that they sat on the brink of a hostile frontier at the edge of civilization, and they began to fear the gathering storm. In order to control their destiny and keep a watchful eye on the Pennsylvania claimants near the northern Indian borderlands, they decided to erect a fort at Wyalusing. The Six Nations Confederacy heard about this and immediately protested that they were "unwilling" to have fortifications built upriver. "A fort at Wyalusing will block up our new made, wide and smooth road," they insisted, "and again make us strangers to one another."[45] Two days later, Zebulon Butler responded to the sachems' message. "The fort We think of building at Wyalusing," he said, "is for your defense as well as ours; for if [the loyalist forces of John] Butler and [Sir John] Johnson do come down the River we think they will likely fall upon you—in which case you can flee to Wyalusing and be safe with our people, your brothers."[46] Butler's stilted words (Zebulon Butler was not related to John Butler) did nothing to assuage the Six Nations' angry complaint.

Throughout the remainder of 1776, the Wyoming authorities constantly sent militiamen to check on the Pennsylvania claimants and continued openly to harass them. Finally, when Pennsylvania settlers refused to journey the sixty miles to Wyoming to train for the militia under Yankee officers, they were branded as Tories and forcibly taken to Wyoming with all their movable property. Indian neighbors from the Wyalusing area interceded on their behalf and warned that they would complain to the Continental Congress if their good neighbors were not released. The upriver Pennsylvania settlers were released without their property and ambushed on their journey home. The Pennsylvania claimants, wrote Patterson, were so tormented by the Yankees "that they were driven to seek an asylum with the Indians and at length retreated to Niagara for protection."[47] Many of these tormented upriver settlers found their revenge against the New Englanders at Wyoming by fighting on the side of the British. During the winter of 1776–77, a disgruntled John Depue committed himself to the British cause and made his way through the harsh cold to Fort Niagara to meet with Captain John Butler. He carried with him letters from seventy upriver Pennsylvania settlers who desired to serve the Crown. Depue eventually became Butler's leading recruiter of upriver settlers for the British cause.[48] Soon many other upriver settlers, entire families like the Augers, the Windrons, and the Vanderlips, encouraged by Depue and with assurance from John Butler, abandoned their farms and trekked to Niagara.[49] Beginning in early 1777, upriver Pennsylvania claimants from Tunkhannock to Wyalusing kept in con-

their long and bitter exodus from the valley with fictitious stories of a hideous massacre. Rumors of the "savages'" wanton torture, rape, and mutilation of women and children made their way into the sensational newspaper accounts of the day. "Wyoming" became a well-worn battle cry for rebel revenge throughout the remainder of the Revolutionary War. Even today the folklore of the Battle of Wyoming continues to fascinate Wyoming Valley residents, despite the reality that not one noncombatant was harmed after the surrender. John Butler wrote to Colonel Mason Bolton that it gave him "the sincerest satisfaction" that "not a single person has been hurt of the inhabitants but such as were in arms."[61] After word of the Wyoming debacle and some small enemy raiding parties reached settlers living on the West Branch of the Susquehanna, they also deserted in droves. The "Great Runaway" was on.[62]

In September 1778, Colonel Thomas Hartley took the 200 men of the Sixth Pennsylvania Battalion and raced up the Susquehanna in a raid of retribution. Twelve vengeful Wyoming settlers joined Hartley's invasion into Indian country. His men burned the deserted town of Tioga and some surrounding villages to the ground. Hearing there was a superior force of Rangers in the area of Chemung, he then retreated downstream. While in retreat, Hartley's troops also killed and scalped a number of persistent Indian resisters in and around Wyalusing.[63]

In 1779, General George Washington, determined to pacify the chaotic New York and Pennsylvania frontier, chose Major General John Sullivan to lead a huge and meticulously planned expeditionary force against the Iroquois. On May 31, 1779, Washington recommended to Sullivan that he establish a post in the middle of Indian country "whence parties should be detached to lay waste all settlements around, with instructions to do it in the most effectual manner; that the country may not be merely overrun but destroyed."[64] John Sullivan met General James Clinton, his second in command, over the ashes of Tioga on August 22, 1779. Clinton's forces had already destroyed a number of Indian communities en route. Now Sullivan and Clinton began their "scorched-earth" campaign against the verdant communities of the Iroquois. Colonel Daniel Brodhead was also poised in Pittsburgh to destroy every Seneca and Munsee-Delaware town on the Allegheny River in Pennsylvania and New York. As Sullivan's forces made their way through Iroquois country, the women, children, and elderly fled in terror before them. Except for one notable battle at Newtown (near Elmira, New York) and a few skirmishes, Sullivan's force encountered little resistance.[65]

The journals kept by Sullivan's men describe the lush landscapes surrounding the Seneca and Cayuga communities: the fertile soil, the well-built houses, the extensive acres of vegetables, tall Indian corn, and abundant orchards.[66] Sullivan's men scrupulously turned this abundance into ashes. On September 30, 1779, Sullivan reported the success of his campaign to John Jay, president of the Congress. He wrote that his army had destroyed forty Indian towns, vast fields of vegetables and fruit trees, and 160,000 bushels of corn.[67] Mary Jemison, a white woman and Seneca adoptee who fled from Sullivan's wrath, recalled that when she returned to her Seneca lands "there was not a mouthful of any kind of sustenance left, not even enough to keep a child one day from perishing with hunger."[68] Ironically, some native communities escaped Sullivan's torch, and some buried caches of food aided the communal renewal of the Seneca and Cayuga in the summer of 1780 following Sullivan's invasion. That summer, incensed warriors embarked on raids of revenge that stretched along the borderlands of New York and Pennsylvania to Wyoming. The Sullivan/Clinton campaign to quell the Indian danger in the hinterlands of New York and Pennsylvania proved a failure. For the next two years, Indian and loyalist attacks intensified and nearly depopulated the Susquehanna and Mohawk valleys.[69]

Before Sullivan's troops left the Wyoming Valley at the close of his campaign, one of his men, Lieutenant Erkuries Beatty, wrote in his journal: "Chief of the inhabitants have left this settlement [and] what few there is here erected small hutts [sic] where they live very uncomfortable."[70] They were protected by a Continental garrison at Fort Wyoming (Wilkes-Barre) that consisted of 125 officers and men. Colonel Zebulon Butler, perhaps the largest landowner in Wyoming, commanded the fort. Later that year, the Yankee-Pennamite controversy over land claims erupted again.[71] Connecticut's continued obstinacy and legal maneuvering frustrated a Continental Congress that was unable to reach a compromise. By November 20, 1780, President Joseph Reed of Pennsylvania's Supreme Executive Council wrote the Board of War a justification for his refusal to send supplies to Colonel Butler's garrison at Wyoming: Connecticut had refused to submit the land controversy "to amicable settlement by Congress agreeable to the terms of the Confederation." Noting that the entire command of the garrison "is a claimant of Lands under Connecticut Title,"[72] he insisted that Pennsylvania take over the running of Fort Wyoming. This ongoing discontent worried Congress, which directed George Washington to remove the existing Pennsylvania garrison and replace it with soldiers from neither side.

Compendium_Roth
Page 1765

Washington then replaced Butler's men with a detachment from the Jersey Line.[73]

When Congress publicly proclaimed the ratification of the Articles of Confederation on March 1, 1781, Pennsylvania saw its chance to petition Congress to oversee a final solution to the Wyoming lands question. Under Article IX of the Confederation, whenever two or more states claimed jurisdiction over the same rights to the soil, controversies could be decided by specially appointed commissions or courts. The state's petition was forwarded to Congress on November 21, 1781. Congress consented to Pennsylvania's plea to arbitrate and, in January 1782, Connecticut grudgingly accepted Congressional auspices to settle the dispute.[74] The hearing held at Trenton, New Jersey, to settle the controversy lasted from November 12 to December 30, 1782. After weeks of lengthy arguments, the five commissioners rendered their decision: "We are unanimously of opinion that the State of Connecticut has no right to the lands in controversy."[75]

Although the Continental court awarded jurisdiction over the disputed territory to Pennsylvania, another bloody phase of the Yankee-Pennamite contest followed quickly. After the Trenton decree, Connecticut state politicians lost interest in the settlers' cause. Also, early in 1783 the Jersey Line detachment was withdrawn and replaced in March by Pennsylvania troops.[76] The Connecticut settlers realized that they faced an ominous future, as Pennsylvania claimants prepared a number of legal suits to eject the Connecticut settlers from Wyoming lands. In February the Pennsylvania General Assembly ordered a commission to journey to Wyoming to investigate land titles and soil rights, temporarily holding lawsuits over settlement of the valley in abeyance. The commissioners arrived in Wyoming on April 15, 1783.[77] Ironically, on April 19, 1783, twenty years to the day on which Teedyuscung was assassinated and most of his town of Wyoming was reduced to ashes by Connecticut settlers, the Pennsylvania commissioners told the Connecticut claimants that Pennsylvania would not "deprive her [own] citizens [or Connecticut claimants] of any part of their property legally obtained."[78] This signaled the eventual expulsion from Wyoming of the Connecticut claimants, who refused to compromise over rights to the soil. In August 1783, the Wyoming commissioners made their formal report to the Pennsylvania General Assembly, which in turn accepted the harsh recommendations of the commission, stating: "Our hopes of a friendly compromise seem now vanished."[79] On September 9, the Assembly repealed its Act of March 13 "to prevent and stay suits" against the Connecticut claimants at Wyoming.[80]

In early August 1783, a German traveler named Johann David Schoepf spent a week in Wyoming and recorded the following description of the inhabitants:

> Since the garrison was placed here . . . the Commanding officer has at the same time acted as a Justice, without any recourse to military law. The inhabitants hear his opinion and adjust their dealings thereby, if that seems good to them. But the people of Wyoming, with all their freedom, and living on the most productive lands, are pauper-poor. The war was something of a [setback], but their sloth is still more so. They live in miserable block-houses, are badly clothed, farm carelessly, and love easeful days.[81]

The Wyoming settlers' "easeful days" were destined to end with a number of tragic events that would befall them. In September, Alexander Patterson, a Pennamite claimant, returned to the Wyoming Valley as justice of the peace, reorganized the community, and used the two companies of state militia stationed at Fort Wyoming to coerce rent payments from the inhabitants; to harass and jail Zebulon Butler and his cronies; and to turn people out of their dwellings and replace them with Pennamites.[82] On March 15, 1784, days of rain, a rough winter, and an early thaw caused a flood to inundate the settlements situated on the plains close to the Susquehanna River. Patterson took advantage of the people's distress, and on May 13 and 14, according to John Franklin, a major resistance leader during Patterson's reign of terror, the settlers were forced from Wyoming at the "point of the bayonet" by the militia at Wyoming and the Pennamites. Patterson's men confiscated the property of more than 500 men, women, and children, who "were compelled to march on foot eighty miles through a wilderness unsettled country" to settlements along the Delaware River.[83]

By June 1784, Patterson's forces had cleared Wyoming of Connecticut settlers. John Dickinson, president of the Supreme Executive Council of Pennsylvania, feared the escalating civil unrest at Wyoming.[84] In late May, Dickinson, troubled by the renewed violence executed by Patterson's Pennamite followers, sought an equitable end to the Wyoming controversy. In a spirit of compromise and conciliation, Dickinson ordered the Pennsylvania Supreme Court to investigate the ongoing violence against the Connecticut settlers at Wyoming by Pennsylvania claimants. The Court was unsympathetic to the rampant vigilantism

instigated by Patterson and brought indictments of riot against Patterson and forty-five other Pennamites.[85] By the end of November, with the Pennsylvania militia ordered back to Philadelphia, the Connecticut Yankees returned to the valley and settled down to an uneasy truce with the Pennsylvania authorities.[86] In August 1786, Timothy Pickering, noted Revolutionary war veteran and wealthy Massachusetts entrepreneur, traveled to Wyoming to survey some land he had purchased with a group of speculators. He found the culture of the Connecticut people impoverished, "ordinary," and of "the most slovenly kind." The settlers' dwellings were "wretched beyond description"; children and entire families went about ragged and dirty. "Indeed," he wrote, "I did not imagine such general apparent wretchedness could be found in the United States."[87]

The Wyoming controversy between Connecticut and Pennsylvania claimants over soil rights lingered on into the nineteenth century. The Confirming Act of 1787 sanctioned the soil rights of Connecticut claimants settled at Wyoming before the Trenton decree; the Compromise Act of 1799 offered Pennsylvania claimants compensation in lands in Luzerne County; finally, the Act of 1807 permitted Connecticut claimants to receive soil rights regardless of the Trenton decree.[88] The half-century dispute over ownership of the rich bottomlands of the Wyoming Valley frontier finally came to an end.

What was the fate of the Iroquois at the close of the Revolutionary War? During the eighteenth century, the colonies of Pennsylvania, New York, and Connecticut recognized the Iroquois League as the legitimate landlord of the Wyoming Valley through their official policies and treaty protocols. The Six Nations Confederation, of course, sold the Wyoming lands to Pennsylvania at Fort Stanwix in 1768 in order to keep the ever-encroaching Anglo-Americans away from its southern door. At the end of the Revolutionary War, the broken Confederation found itself stripped of its former geopolitical power. The Treaty of Paris in 1783 ended the war but made no provisions for the Indians. The Treaty of Fort Stanwix on October 22, 1784, proved disastrous for the Seneca, the Cayuga, the Onondaga, and the Mohawk. Under the harsh terms of the treaty, these people ceded their lands as rights of conquest to the United States. The nations were forced to abandon all claims to Ohio lands, and the Seneca lost their fertile lands in western New York and Pennsylvania. The Confederation later rejected the treaty. In future treaties the Iroquois were defrauded of their best lands and dispersed to a few small reservations in the United States and Canada. Indian society collapsed amid the growth of this alien reservation culture.[89]

# 8

# *The Upper Juniata Valley*

*Tim H. Blessing*

For the first quarter-century of settlement, those who inhabited the Juniata Valley lived beyond the reach of sovereign authority, but ever since they have lived beyond the limits of historical scholarship. It is a rare history of Pennsylvania that does more than glance at the seven counties—Bedford, Blair, Fulton, Huntingdon, Juniata, Mifflin, and Perry—that the Juniata River drains. In some ways this lack of attention seems peculiar, for the history of the region has been anything but unremarkable. The valley, which makes up 10 percent of the land area of Pennsylvania, provides a natural corridor between the Susquehanna and the Delaware Valley and the Ohio Basin (see Map 1). In the early years, Indians used the Juniata Valley as a military highway to strike at more settled parts of Pennsylvania, and squatters used it as a pathway to pass beyond the boundaries

WITNESS TO HISTORY

Peter Charles Hoffer and Williamjames Hull Hoffer, *Series Editors*

ALSO IN THE SERIES

Williamjames Hull Hoffer, *The Caning of Charles Sumner: Honor, Idealism, and the Origins of the Civil War*

Tim Lehman, *Bloodshed at Little Bighorn: Sitting Bull, Custer, and the Destinies of Nations*

Daniel R. Mandell, *King Philip's War: Colonial Expansion, Native Resistance, and the End of Indian Sovereignty*

Erik R. Seeman, *The Huron-Wendat Feast of the Dead: Indian-European Encounters in Early North America*

Peter Charles Hoffer, *When Benjamin Franklin Met the Reverend Whitefield: Enlightenment, Revival, and the Power of the Printed Word*

William Thomas Allison. *My Lai: An American Atrocity in the Vietnam War*

Peter Charles Hoffer, *Prelude to Revolution: The Salem Gunpower Raid of 1775*

Michael Dennis, *Blood on Steel: Chicago Steelworkers and the Strike of 1937*

Benjamin F. Alexander, *Coxey's Army: Popular Protest in the Gilded Age*

John R. Van Atta, *Wolf by the Ears: The Missouri Crisis, 1819–1821*

Donald R. Hickey, *Glorious Victory: Andrew Jackson and the Battle of New Orleans*

Sean Condon, *Shays's Rebellion: Authority and Distress in Post-Revolutionary America*

John C. McManus, *Hell Before Their Very Eyes: American Soldiers Liberate Concentration Camps in Germany, April 1945*

Lorri Glover, *The Fate of the Revolution: Virginians Debate the Constitution*

# the alien and sedition acts of 1798

## TESTING THE CONSTITUTION

*Terri Diane Halperin*

Johns Hopkins University Press | *Baltimore*

*prologue*

ON THE EVENING of May 7, 1798, a few hundred men intent on inflicting harm upon their political opponents marched through the streets of Philadelphia. They had one particular target in mind—Benjamin Franklin Bache, a printer who in his newspaper, the *Aurora*, routinely, forcefully, and quite nastily criticized President John Adams and his predecessor George Washington. In preparation for the mob, Bache gathered his friends to defend his property. All the young men could do was to hurl threats and insults.

The assault on Bache was not the first event of the night for these men. Earlier in the evening, a larger group of about 1,000 young men visited President Adams's house to pledge their support and to offer their services for the defense of the nation. Only days before, Americans had learned that Adams's diplomatic mission to France, the purpose of which had been to negotiate an end to French attacks on American shipping, had failed spectacularly with what became known as the XYZ Affair. The Quasi-War with France would continue and mostly likely intensify. These men now promised to support Adams's policies in any way they could. On this night, Adams, dressed in full military uniform and with a sword at his side, proudly accepted the young men's accolades by saying, "no prospect or spectacle could excite a stronger

sensibility in my bosom than this which now presents itself before me."[1] After visiting the president, the group repaired to dinner, where most certainly numerous toasts to the country, the Union, the Constitution, and its leaders were made. It was after this dinner that the smaller group left for Bache's house. Although Bache fended them off this time, the tumult was far from over.

Two days later, on May 9, violence erupted in the streets. Adams had declared the day to be a fast day, a day for the nation to pray for peace and deliverance from the crisis with France. Defiantly, Bache rejected the fast, going about his business as usual. In the *Aurora* that day, he printed an editorial in which he criticized young men's involvement in politics by declaring, "They have not discretion sufficient to ballast their zeal."[2] Certainly, the men who had paraded through the streets a few days before believed that Bache was insulting them. Another mob formed that night with the intent of burning Bache's house to punish his defiance, but again Bache was able to defend his property. With the help of his friends and neighbors, Bache refused to concede ground to the Federalist mob. A few months later, he published a pamphlet titled "Truth Will Out! The Foul Charges of the Tories against the Editor . . . repelled by positive proof and plain truth and his base calumniators put to shame," detailing the Federalists' efforts to silence him. Bache's choice of title showed that he expected the truth of the Federalists' treachery would come out and lead to their defeat. Of the May 7 attack, he declared, "It will serve only to convince the Editor of the number and spirit of his friends; who shewed themselves . . . determined . . . to assist him in repelling force by force."[3]

While his house may have been safe, the rest of Philadelphia was not, and many residents believed themselves to be in danger. Pennsylvania's governor called out the militia to restore peace in the streets. Reporting on the unrest, Vice President Thomas Jefferson noted that, for the few days preceding the fast, supporters of both the Federalists and Democratic-Republicans took to the streets but not always at the same time or place. On May 9, when both groups were out in force, Jefferson described the scene as "so filled with confusion from about 6. to 10. oclock last night that it was dangerous going out."[4] Fifteen years later, Adams could still recall the terror of that day when he estimated that more than 10,000 people flooded the streets. He certainly believed that his own life was in danger as he praised his servants for being willing to "Sacrifice their Lives in my defence." Even with his servants' protec-

tion, Adams "judged it prudent and necessary to order Chests of Arms from the War Office to be brought through bye Lanes and back Doors" to defend his residence.[5] It was not just the streets of Philadelphia that were unsafe—the whole republic seemed at risk.

There was certainly enough blame to go around. Newspapers throughout the country printed at least two versions of those early May events. In one account, Bache's supporters and those wearing tricolored cockades in support of the French Revolution and Democratic-Republican Party were censured for failing to disperse as ordered by the mayor and other officials. Order was only restored when the "cavalry paraded through the city during the night, and a number of young men who voluntarily offered themselves . . . as guards to the military mint, &c." protected the city. The other version accused Federalist newspapers editors—particularly Peter Porcupine, the pen name of the English printer William Cobbett, who was just as much a Federalist as Bache was a Democratic-Republican—for daring young Federalists to take to the streets. Cobbett had predicted tumult, which was exactly what happened. The writer accused "the fabricators of this scheme of arraying our citizens against each other." He predicted that they would only succeed in pushing the nation over the precipice and into a revolution, which the friends of order (as Federalists often called themselves) had desperately sought to avoid.[6]

Such public displays—whether peaceful, boisterous marches through town or violence directed against a particular person or symbol—had long been part of American politics.[7] In the 1790s, Federalists and Democratic-Republicans used public meetings, demonstrations, dinners, toasts, and other methods to explain their views to the people, to prove that they had the people's support, and to garner that support. Of course, neither party was ever in complete control of these demonstrations, and mobs assumed an ambiguous role in American politics. This particular mob was sanctioned by the president when Adams met them in full military regalia and accepted their support. A few days later, the mob's character had changed. It seemed more unruly and dangerous. The public now seemed to disapprove of the mob, making no outcry when the militia was called out to restore the peace. It seemed that the mobs and Bache had acted as expected. When the young men marched to Adams's house and pledged their fidelity to the Union and Adams's policies, they were behaving as Federalists believed the people should. They were showing their support for Adams, the government, and thus the nation. By attacking Bache, the mob confronted someone who seemed intent on damaging and

dividing the nation. In contrast, by being a persistent critic of the government and openly disobeying Adams's fast day proclamation, Bache was fulfilling the role Democratic-Republicans prescribed to the people. In this view, the people were to be ever watchful of the government to ensure officials did not violate the people's rights.

Differences over the role of the people in a republic as embodied by Bache and the Philadelphia mobs were one point of separation between the parties, which may better be characterized as coalitions. Often the ties between local, state, and national leaders were loose, and the parties could accommodate a diversity of opinions. The Federalist and Democratic-Republican Parties had developed over the course of the first half of the 1790s after the ratification of the Constitution. These divisions were similar to those factions that emerged during the debate over the ratification of the Constitution between Federalists and Anti-Federalists. Most, but not all, Federalists joined the Federalist Party, and the vast majority of Anti-Federalists became Democratic-Republicans. The initial divisions had occurred over Treasury Secretary Alexander Hamilton's financial program and solidified over conflicts regarding relations with Great Britain and the Jay Treaty of 1795. Throughout the decade, the parties remained largely sectional, with the Federalists strongest in New England and Democratic-Republicans in the South with the exception of South Carolina, which had a Federalist majority. The Middle States were more closely divided. Generally, the Federalists had a more commercial orientation, the Democratic-Republicans a more agrarian one.

The Philadelphia Convention delegates did not plan for political parties when writing the Constitution. The existence of national political parties or coalitions itself was a problem because most Americans associated them with corruption, believing that parties had no constructive role in a republic. Indeed, Americans' persistent anti-partyism was a feature of politics in the 1790s. One constant question was who could and did speak for the people. Federalists would have quickly answered that government officials, chosen by the people, spoke for them and that the people spoke through elections. Democratic-Republicans would have said that the people spoke for themselves. Yet an important question remained: through what means could the people speak? Elected officials, petitions, public meetings, demonstrations, organized groups, newspapers? Federalists wanted to define those means quite narrowly and tried to do so through the Alien and Sedition Acts. Democratic-Republicans sought a broader definition.

The new constitution divided powers and responsibilities between state and national governments and within the new federal government. Within this structure, Americans asked whether the state governments, representatives in Congress, or the president best represented them and protected their interests. Sometimes none of them did; other times people chose the state governments, which could be more attuned to local concerns; and other times people looked to the federal government. Such questions of federalism persist today. In the 1790s, they were at the base of many of the most contentious issues and helped to define the differences between the Federalist and Democratic-Republican Parties.

The disagreements over policy of the first half of the 1790s reflected the parties' distinct visions of the republic. On the one hand, Federalists favored a strong national government, a foreign policy that protected commercial interests, and a domestic policy that proactively encouraged the nation's economic development. Although they would court popular support in limited and controlled ways, they were wary of unfettered popular participation in politics and suspicious of the ideas of democracy, equality, and liberty being touted by European radicals and revolutionaries in the 1790s. This concern was one reason Bache's activities and newspaper created such anxieties for Federalists. On the other hand, Democratic-Republicans tended to favor strong state governments, a foreign policy that favored other republics, and a domestic policy that did not favor one interest over another. Democratic-Republicans believed the people should play an active role in policy making. Although not all people who identified as Democratic-Republicans would embrace the ideas of democracy, liberty, and equality with equal enthusiasm, they did not identify these ideas as threats to the Union. Federalists and Democratic-Republicans did have important points of agreement. They both believed it was best if the United States remained neutral in the European wars in the 1790s, but they disagreed on the terms of that neutrality. They wanted to protect and preserve their republic, but again clashed over which threats posed the greatest dangers and how best to combat those hazards.

One issue dividing Americans was how to both support and disagree with government policies. Bache and the mobs embodied this struggle. Americans argued about how much criticism a young republic could withstand. Some did not see any danger in a vigorous political debate. When violence erupted, these men argued that more democratic debate could alleviate the perceived necessity of violence. Others recoiled from the chaos and uncertainty to argue

that a more limited discussion would suffice. The May 1798 mobs and the reaction to them exemplified these different visions of the role of the people and debate in the American Republic.

To combat the chaos of the late 1790s and to quell the violence that political debate produced, the Federalists enacted the Alien and Sedition Acts, a set of four laws, in the summer of 1798. The Naturalization Act increased the residency requirement for citizenship from five to fourteen years. Significantly, it established a federal registry of all aliens and prohibited state courts from naturalizing citizens. Citizenship became exclusively the federal government's responsibility. The Alien Friends Act, which expired in June 1800, gave the president the power to jail and to deport aliens he suspected of dangerous or suspicious activities. The Alien Enemies Act was essentially the same as the Alien Friends Act, but it would only become effective in the event of a formally declared war. Because war with France was never declared, the Alien Enemies Act was not invoked.* Both laws denied immigrants the right to a fair hearing and access to the judicial system. They placed great trust in the president's discretion to act fairly and with cause. Finally, the Sedition Act operated directly against citizens—the only law of the four to do so. Citizens were prohibited from writing or speaking critically of the president, Congress, or government upon penalty of imprisonment and a fine. The law expired on March 3, 1801, the final day of John Adams's term as president.

The effectiveness of the Alien and Sedition Acts cannot simply be measured by the number of deportations or convictions for sedition. While no aliens were deported under the Alien Friends Act, some were watched and many, particularly recent French immigrants, voluntarily left the country or delayed their planned emigration rather than subject themselves to an arbitrary law. Although there were only fourteen indictments under the Sedition Act in addition to the three under common law, all were against Democratic-Republicans; most were against newspaper editors and writers. Federalists targeted those who they thought posed the greatest danger to the nation. Democratic-Republicans had to watch what they said, and many moderated their public comments rather than invite arrest.

A key issue in the debate was the meaning of the Bill of Rights. The ab-

---

* Unlike the Alien Friends and Sedition Acts, the Alien Enemies Act never expired. It was invoked during World War II to arrest and put under surveillance immigrants from Germany, Italy, and Japan.

sence of such a bill of rights had been one of the strongest arguments against ratification of the Constitution in 1787–88. During the First Congress, Virginian James Madison, who had quickly emerged as a leader in the House of Representatives, made good on his promise made during his congressional campaign against James Monroe to remedy this weakness. The Constitution's first ten amendments provided important protections to individuals that the Alien and Sedition Acts denied. The Fifth and Sixth Amendments guarantee the right to due process and a fair and speedy trial, but the Alien Acts denied immigrants these rights. The First Amendment prohibits Congress from passing laws "respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." The Sedition Act infringed upon the rights of speech, but, as many opponents argued, the law also posed a threat to the other rights listed in the amendment—particularly the rights to petition and assembly and ultimately the right to free elections. Many Anti-Federalists had believed that the amendments were merely "throwing a tub to the whale," simply creating a distraction, much as when seamen would throw an empty tub toward a whale for him to play with rather than ram their ship. As such, these amendments were merely tokens and did not represent real reform. Upon adoption, no one knew what the impact of the Bill of Rights or the meaning of these amendments would be.⁸ The Alien and Sedition Act controversy would test Americans' assumptions about the Bill of Rights.

A little more than twenty years after Americans declared independence and less than ten since they had ratified both the Constitution and Bill of Rights, Congress, with the initial support of the people, enacted a series of laws that limited some of the very rights these documents promised to protect. What were the circumstances that allowed such laws to pass? How did Americans and their political leaders react to the revolutions in France and rebellions elsewhere in Europe, especially Ireland in 1798? Could politically radical immigrants who were fleeing government oppression in their own countries be integrated into American society? Could or should they become citizens? Did they pose the same apparent danger to the established government as they did in their native countries?

Federalists and Democratic-Republicans answered these questions differently. Americans were not only struggling with an influx of immigrants, but they were also grappling with defining the scope and shape of their new

nation. In the 1790s, the Constitution was the dominant political issue—how to interpret it, what the powers of the executive were, what the proper balance between the national and state governments was. Americans asked throughout the decade what their republic should look like. They asked what the people's role in political debate ought to be. Should the people only be heard during elections, or should they be free to voice their opinions at any time? Where and how could the people and even opposition politicians properly voice their disagreement with the administration? When did dissent become treason?

These questions figured prominently in political debates leading up to 1798 and the passage of the Alien and Sedition Acts. From 1798 through the Election of 1800, these matters became more pressing as US security and independence seemed particularly at risk from both foreign and domestic sources. Historians have answered these questions in a variety of ways. Significantly, the Alien and Sedition Acts and the controversy they created present issues that are still not fully resolved today.



# Governing a Republic

"THE UNION: WHO ARE ITS REAL FRIENDS?" asked the title of a 1792 newspaper article by James Madison. In it, Madison asked the readers of the *National Gazette* to consider which political leaders truly represented the people. The Union's real friends were not those who sought to give the government "unlimited discretion, contrary to the will and subsersive [sic] of the authority of the people." Rather, its friends were those who opposed the "spirit of usurpation and monarchy" and advocated for a republican policy.[1] Even posing this question exposed the growing divisions among Americans. In the series of articles of which this was one, Madison explained how he and his friends disagreed with Alexander Hamilton about the meaning of the Constitution and extent of federal government power. These disputes during George Washington's presidency raised issues that would continue to be debated during the Alien and Sedition Acts controversy later in the decade. Amid the controversies over the Neutrality Proclamation, Whiskey Rebellion, the Jay Treaty, and finally Washington's Farewell Address, the nation continued to argue about the proper role of the people in a republic. The political parties of the Federalists and Democratic-Republicans and the public were engaged in a decades-long debate.

# THE LAST
# OF THE FATHERS

*James Madison
and the Republican Legacy*



DREW R. McCOY

*Harvard University*



CAMBRIDGE UNIVERSITY PRESS

*Cambridge*

*New York   New Rochelle*

*Melbourne   Sydney*

esy of the New-

ent will of "the people" as reflected in these momentary legislative majorities. The Scottish thinker David Hume, whose apparent influence on Madison has caught the fancy of more than one modern scholar, nicely sketched the essence of the problem that confronted the Virginian in the 1780s. Hume defined justice as an artificial virtue, consisting largely of a respect for the property rights of others; it followed that the rules that defined just behavior were human conventions essential to the well-being of any civilized society.[4] According to Hume, all men were generally "sensible of the necessity of justice to maintain peace and order" and, in turn, of "the necessity of peace and order for the maintenance of society." Nevertheless, such was "the frailty or perverseness" of human nature that it proved impossible "to keep men faithfully and unerringly in the paths of justice." Sometimes a man found his interests to be "more promoted by fraud and rapine, than hurt by the breach which his injustice makes in the social union"; just as often, he could be "seduced from his great and important, but distant interests, by the allurement of present, though often very frivolous temptations." And this calamitous inversion of the proper hierarchy between the immediate and the remote – between temporary, selfish advantage and the "real and permanent interests" of the community – was especially likely, Hume suggested, in popular regimes.[5]

In the 1780s Madison saw far too many of his countrymen who fell into each of Hume's categories and who, to make matters worse, did not have to resort to devious or extralegal means of advancing their specious interests; they could do so through the conventional and legitimizing forms of republican government and the principle of majority rule. Pondering the legislative chaos of these postwar years, Madison may indeed have appreciated the Scot's wisdom in defining the fundamental purposes of government in terms of administering justice and preserving moral order. If so, Hume had another relevant message for the young political scientist in North

America: the "great weakness" that caused men to ignore what they knew were the proper standards of justice was "incurable in human nature." Statesmen could only "endeavour to palliate," therefore, what they could never hope to remove altogether.[6] In this connection, Madison's signal intellectual achievement in the late 1780s – this time, perhaps, with the direct guidance of Hume – was to discern in the new Constitution a potential "Republican remedy" for what he so memorably described in *Federalist* number ten as "the diseases most incident to Republican Government."[7] Those diseases, of course, were faction, injustice, and instability; and the remedy devised by the Philadelphia convention was to extend the sphere of republican government from the state level, where it was working so poorly, to the federal level, where majority factions were less likely to form and be oppressive and where a "filtration of talent" would likely empower those wise and able statesmen who were the "proper guardians of the public weal." And this remedy,

4 For a lucid and succinct discussion of this matter, see David Miller, *Philosophy and Ideology in Hume's Political Thought* (Oxford, 1981), chap. 3 ("Justice As An Artificial Virtue"), 60–77.

5 Hume, "Of the Origin of Government," in *Essays Moral, Political and Literary* (Oxford, 1963 [orig. publ. 1741, 1742]), 35–36.

6 *Ibid.*, 36.

7 Jacob E. Cooke, ed., *The Federalist* (Middletown, Conn., 1961 [orig. publ. 1788]), 65. Hume's influence on Madison now appears indisputable, though clearly subject to exaggeration and misconstruction. Douglas Adair's famous essay, "That Politics May Be Reduced to A Science': David Hume, James Madison, and the Tenth Federalist," *Huntington Library Quarterly* 20 (1957), 343–360, is the necessary point of departure. The essay is conveniently reprinted in Trevor Colbourn, ed., *Fame and the Founding Fathers: Essays by Douglas Adair* (New York, 1974), 93–106. Adair pointed to several of Hume's essays – "Of the Independency of Parliament," "Of the First Principles of Government," "Of Parties in General," "Of the Parties of Great Britain," and "Idea of a Perfect Commonwealth" – for evidence of Madison's almost literal borrowing of ideas and even language. More recently, Garry Wills has pushed the thesis harder, in different, often dubious directions, lengthening the list of influential Hume essays and focusing on other Madison writings than *Federalist* ten. Wills's emphasis on what he calls "the Humean sources" (p. 33) of *Federalist* forty-nine, for instance, is immensely suggestive, but his reading of that essay, which essentially presents Madison as an antidemocratic authoritarian, is grossly distorted and misleading. See *Explaining America: The Federalist* (New York, 1981), esp. chap. 3. Two recent articles place the Hume/Madison connection in a more cautious and sensible light; see Theodore Draper, "Hume and Madison: The Secrets of Federalist Paper No. 10," in *Encounter* 58 (1982), 34–47, and Edmund S. Morgan, "Safety in Numbers: Madison, Hume, and the Tenth *Federalist*," in *Huntington Library Quarterly* 49 (1986), 95–112.

Compendium_Roth
Page 1775

Madison could boast, was suitably republican precisely because it neither violated nor compromised the Revolutionary commitment to the sovereignty of the people.[8]

Thirty years later, the venerable "Father of the Constitution" could still bask in the glow of that remarkable achievement. From the vantage point of his retirement, Madison doubtless believed that, notwithstanding many disappointments and unexpected developments, this ingenious, peculiarly American experiment of "extending the sphere" of republican government had on the whole been vindicated. But another legacy of these postwar years – Madison's fear of popular passion and public disorder – proved deepseated and tenacious. Indeed, his republicanism contained a serious tension that surfaced often during his retirement, and the roots of that tension can be found in the confederation period, when he first sought to accommodate his unshakeable commitment to popular government, with all of its manifest dangers, to his principled concern for preserving order, upon which he placed all hope of furthering justice and the public good. What arose from this creative tension was a republican commitment that differed in significant ways from the republicanism of even his closest political ally, Thomas Jefferson.

The conventional view of the Jefferson–Madison partnership as, in Adrienne Koch's words, "the great collaboration," tends to obscure the significance of their genuine theoretical differences. Madison's sensitivity to the dangers of passionate disorder shaped a fundamentally conservative vision of popular government, the origins and character of which can best be discerned by juxtaposing his and Jefferson's views on fundamental matters at two very different, but thematically linked, stages of their careers – during the late 1780s and, much later, during their final years in retirement.[9] As

8  Madison, *Federalist* ten, in Cooke, ed., *The Federalist*, 62; the phrase "filtration of talent" is taken from Wood, *Creation of the American Republic*, 506–518. For elaboration of the issues hastily summarized here, see Wood, passim, esp. 471–615.
9  For extended analysis of the Jefferson–Madison relationship and of their comparative views, see Adrienne Koch, *Jefferson and Madison: The Great Collaboration* (New York, 1950). As her title suggests, Koch emphasizes the complementary and mutually enriching nature of her subjects' political ideas – a sensible and

44

such an examination confirms, Madison's principled emphasis on justice and stability was the enduring legacy of his troubled journey through the 1780s. And that legacy defined his understanding of the Constitution in ways that continued not only to inform the central concerns of his retirement years, but to distinguish those concerns, in important ways, from Jefferson's.

I

When Madison departed the Philadelphia convention in the late summer of 1787, he had not seen or spoken to Jefferson for over three years. Their separation during the latter's tenure as minister to France proved no obstacle to a budding intimacy, however, so long as they could sustain a regular correspondence. Madison would later write that during the fifty years of their acquaintance, there had never been "an interruption or diminution of mutual confidence and cordial friendship, for a single moment in a single instance."[10] This was a moving tribute both to the memory of Jefferson and to the most influential collaboration in American political history. But Madison's surge of emotion for his lost friend should not blind us to what was easily overlooked in 1826: for a brief time just after the Constitutional Convention, their relationship appears to have been in no little jeopardy.

Since he had been away from the United States for several years, Jefferson lacked his fellow Virginian's intimate knowledge of both the convention and American affairs in general. Their contrasting perspectives on the Constitution clearly reflected the influence of their different surroundings. If Madison was overwhelmed by the evidence of potential chaos emerging from popular licentiousness in the various American states, Jefferson – from a vantage point in ancien régime France that magnified the evils of monarchical despotism – seemed far more concerned with the traditional danger of

effective approach that minimizes, however, the substantially different philosophical casts of their republicanism.
10  Madison to N. P. Trist, July 6, 1826, in Gaillard Hunt, ed., *The Writings of James Madison* (New York and London, 1900–1910), IX, 248.

45

Compendium_Roth
Page 1776



# ORIGINAL MEANINGS

## POLITICS AND IDEAS IN THE
## MAKING OF THE CONSTITUTION

# JACK N. RAKOVE



*Alfred A. Knopf   New York   1996*

as their chief securities against arbitrary rule.
ce under the state constitutions to expose the
Madison in 1787: first, that the abuse of leg-
nous than arbitrary acts of the executive; sec-
of rights was less to protect the ruled from
minorities and individuals against factious
ough government; and third, that agencies of
s dangerous than state and local despotisms.
a significant departure in Anglo-American
helps to explain why Federalist qualms about
nvolved more than political oversight. It also
ked implications for American ideas of judi-
ial review, the distinctive doctrine that, over
ges the special responsibility for protecting
viously consigned to local juries.



HTS came naturally to the colonists; it was,
ngue.⁸ As eighteenth-century writers repeat-
glish settlers had carried all their rights with
s on to their descendants as a birthright and
Britons and Americans enjoyed unparalleled
r rights permeated their political science and
: frequency and enthusiasm with which they
*berties* also gave those terms a flabby impre-
nultivalent than *liberty.* Along with their
great triad of inalienable natural rights. But
ind, the sense of personal security that en-
er rights free from the fear of tyrannical rule.
: political liberty of the subject is a tranquil
opinion each person has of his safety." Lib-
was often defined in relation to its deviant
:h as the concept of rights often implied a
s, so true liberty had to be exercised with

natically about rights involved distinguishing
that individuals could never renounce from
exercise was subject to the regulatory power
property comprised the fundamental trinity
Americans tinkered with the formula by

which these rights were expressed. The "life, liberty, and the pursuit of
happiness" in the Declaration of Independence took a somewhat modified
form in the state bills of rights, which preferred a triad of "enjoying and
defending life and liberty, acquiring, possessing, and protecting property,
and pursuing and obtaining happiness and safety."¹⁰ To these familiar
rights Americans were also inclined to add a fourth "natural and inalien-
able" right: "to worship Almighty God according to the dictates of their
own consciences and understandings," or to enjoy "the free exercise of re-
ligion, according to the dictates of conscience," as the Virginia Declara-
tion of Rights put it more simply. Presumably the class of alienable rights
comprised all other rights that existed in the state of nature but which
had subsequently been placed under the control of society. But in many
ways this distinction was more theoretical than practical. Nearly all the
activities that constituted the realms of life, liberty, property, and religion
were subject to regulation by the state; no obvious landmarks marked the
boundaries beyond which its authority could not intrude, *if* its actions
met requirements of law.¹¹ 

A different set of distinctions identified the multiple holders of rights.
Rights did not pertain to individuals alone, nor did they come neatly bun-
dled. The people as a whole had a right to be ruled by law. Communities,
corporate bodies, and governing institutions all had rights, which they ex-
ercised on behalf both of the collective groups so constituted and their in-
dividual members. A farmer in Medway, Massachusetts, who voted for
his town's deputy to the General Court simultaneously exercised an indi-
vidual right of suffrage and a communal right of representation. In theory,
he also had a stake in his deputy's right to speak freely at the General
Court in Boston, and the assembly's sole right to levy whatever taxes
would burden its constituents; while the assembly in turn had a right to
chastise malcontents who criticized its decisions too severely.¹²

The realm of rights was not confined to these overt forms of political
expression. A comprehensive overview of the rights of eighteenth-century
Englishmen, as Forrest McDonald has noted, would run from the great
natural rights to such prosaic aspects of daily existence as "grazing, wood
gathering, hunting, passage, and the use of water" (and a host of others).
The exercise of rights of property was subject to the supervisory authority
of the state, which regulated markets, enacted sumptuary laws, granted
monopoly privileges, and imposed various forms of takings through for-
feiture, eminent domain, and taxation. Other civil rights defined the re-
lation between the state and its subjects through such safeguards against
arbitrary power as habeas corpus, rules for search and seizure, and trial by
jury, "the genuinely crucial right." In England and America, freedom of

Compendium_Roth
Page 1778



RANDOLPH ROTH

# American Homicide

THE BELKNAP PRESS OF
HARVARD UNIVERSITY PRESS
Cambridge, Massachusetts
London, England
2009

Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
    American homicide / Randolph Roth.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 978-0-674-03529-1 (cloth : alk. paper)
    1. Homicide—United States—History.   I. Title.

    HV6524.R68 2009
    364.1520973—dc22        2009016830

To Allison,
the memory of William Slothrop,
and God's second sheep

3 1223 08609 1858

French, the Dutch, and the Native Americans. Leaders caught up in the struggle for trade and territory used homicide as a tool of public policy: for them, force was a means of achieving political ends, even in times of peace. They recognized that the right to rule depended on military superiority, not on treaty rights or the legitimacy of other colonists' claims. The struggle for trade and territory was also indirectly responsible for many homicides because of its corrosive impact on public morality and social institutions. Whites and Indians, singly or in groups, imitated the behavior of tribes and nations: they took goods, seized land, killed anyone—native or colonist—who stood in their way, and felt justified in doing so. Colonial authorities reported numerous robbery murders, vigilante murders, and revenge murders, which flourished where neither natives nor colonists could gain the upper hand and establish political control. Together such homicides accounted for a third of the known murders of English colonists in the early years of colonization (the other two-thirds were political murders or other kinds of murders among people who knew one another).[25]

Political conflict also weakened institutions that might have re-



**Figure 1.2**  Unrelated-adult homicide rates in New England and New Netherlands, 1630–1797 (per 100,000 adults per year).

strained violence. The lack of a common legal or law-enforcement system and the refusal in most instances of rival tribes and nations to accept the legitimacy of one another's systems meant that criminals were almost certain to get away with murder and that the friends and relatives of murder victims had little hope of obtaining justice. The lack of security on the frontier also discouraged the migration of families from Europe, so European colonies during the frontier period had large contingents of young, unmarried men, who make up the most homicidal group in the majority of human populations.[26] Many of them, like John Smith and Myles Standish, were soldiers or sailors and veterans of foreign wars whose fighting skills were coveted by colony leaders. Their combat experience and readiness to fight made them a threat not only to their enemies but also to their friends and neighbors, especially their fellow soldiers and sailors.

Homicides caused directly by political conflict were responsible for another third of the murders of colonists that occurred on the early



**Figure 1.3**  Unrelated-adult homicide rates in Virginia and Maryland, 1607–1800 (per 100,000 adults per year).

over them, and "carried awaye their gunnes & what els they liked." Although Governor Winthrop considered Bagnall "a wicked fellowe" who "had muche wronged the Indians," the English authorities hunted down Squidrasget's men and lynched one of his leading warriors. They could not tolerate the murder of Englishmen, no matter how justified.[32]

Both Native American and European leaders were willing to use homicide to intimidate allies, deter undesirable behavior, and preempt attacks by potential adversaries. Although the Powhatans had initially formed an alliance with the settlers at Jamestown and helped feed them, they were irritated by the colonists' incessant demands during the "starving time" of 1609–10 and tried to send them a message by killing every settler who left the colony to beg or steal food. One party was found "slain, with their mouths stopped full of bread, being done, as it seems, in contempt and scorn, that others might expect the like when they should come to seek for bread and relief amongst them."[33]

Plymouth Colony also used homicide to send messages to its neighbors. In the winter of 1623 the colonists were afraid that the Massachusetts were about to "cut off" the survivors of Thomas Weston's failing colony at Wessagusett (in present-day Weymouth, Massachusetts) and that they would "do the like" to Plymouth, "thinking the people here would revenge their death." Weston's men, who had arrived in the spring of 1622 with too few supplies, were starving, and they had angered the Massachusetts by stealing corn and kidnapping the child of a sachem for training in England. Since Weston's beleaguered men were damaging the aura of European invincibility and giving the Massachusetts just cause for war, Plymouth decided to act, especially after hearing rumors that the Massachusetts were preparing to attack. The colonists sent an armed party north under Captain Myles Standish, who had fought as a mercenary in the Dutch Wars and was well schooled in the techniques of terror and intimidation. Standish invited Massachusetts leaders to a feast at Wessagusett, where he and his men stabbed six of them to death and hanged another. Only one escaped. Standish cut off the head of the most prominent man and stuck it on a post on top of the blockhouse at Plymouth as a "warning and terror" to the Massachusetts. They got the point. Thereafter they

called the English "Wotoquansawge, which in their language signifieth stabbers or Cutthroats."[34]

Like colonial and tribal leaders, private individuals did not shrink from killing people to defend their interests or get what they wanted. They adopted the same defensive, hostile, or predatory postures toward acquaintances and strangers that governments showed toward each other. Europeans and Native Americans alike committed robbery murders, singly and in groups. Pecksuot, a Massachusett, told a tale about a French ship that came into Massachusetts Bay before 1620 with "much goods to Trucke." He persuaded his friends to take "all for nothing." They paddled out to the ship with beaver skins to trade, each man concealing a knife in his loincloth. They sold their goods "very Cheap," and when the French lowered their guard, they killed everyone except Finch, the master of the ship, who leaped into the hold wounded. "We bidd him com up, but he would not. Then we cutt thayr Cable & the ship went Ashore & lay upon her sid & slept ther. Finch Came up & we killed him. Then our Sachem devided thayr goods & fiered theyr Ship." In 1638 Arthur Peach, who was fleeing prosecution in Massachusetts for having fathered an illegitimate child by a servant woman, murdered Penowanyanquis, a Narragansett whom he met on his way to New Netherlands. When his accomplices, three runaway servants, balked at his plan to kill and rob Penowanyanquis, Peach, a veteran of the Pequot War, was incredulous. What did the life of an Indian matter? He "had killed many of them." Peach murdered the man and took cloth and five fathoms of wampum from him to finance his journey.[35]

People who had lost family, friends, or property to robbers or murderers sometimes turned to robbery and murder to gain satisfaction, since there was no other means of redress on the frontier. When Richard Killingbeck, a Virginia militia captain, led a small party of men to trade with the Chickahominies in 1617, the Chickahominies killed and robbed them, in part to avenge the killing of the twelve tribesmen by the militia earlier that year during the corn levy and in part because of "the greate quantity of trucke" that Killingbeck was carrying. They then stole some sacred objects from their own village and fled. Similarly mixed motives prompted a Wiechquaeskeck to kill and rob Claes Smit, a Dutch wheelwright who lived near the East River in New Neth-

erlands. The man went to Smit's house to trade for cloth, but when Smit stooped over a trunk to unlock it, the man grabbed an ax and hit Smit in the neck, killing him instantly. The Wiechquaeskeck believed himself entitled to Smit's life because as a young boy he had seen his uncle murdered at Fort Amsterdam by three white men who wanted his beaver pelts. The boy promised himself that one day he would repay the Dutch for the murder, and when the opportunity presented itself, he did.[35]

Even simple thefts spurred homicides. Victims struck at targets of convenience and left more vengeful victims in their wake. Dixy Bull, an English trader on the Penobscot River in Maine, turned pirate after the French stole all his goods in a raid in 1632. He raided not only the French but also the English, because they had failed to avenge his losses. His raids wounded dozens of people and cost the life of at least one of his men, shot dead in a raid on the French post at Pemaquid.[37]

Law and order was compromised on the frontier not only by political conflict but also by the profusion of jurisdictions. Sometimes those jurisdictions harbored killers, but even when rival jurisdictions worked together, it was difficult to agree on an appropriate response to homicides. Most Native peoples believed that they could make amends for homicides with goods or with the blood of the perpetrator's kin or countrymen, if the original perpetrator could not be found. Europeans, on the other hand, believed that perpetrators should be held personally accountable for their crimes and that willful murderers deserved death. In 1634 the Wiscomesses acknowledged that they had killed two Englishmen and five Susquehannas on the Isle of Kent on Maryland's Eastern Shore. A Susquehanna had made fun of a Wiscomesse at a peace parley, and the Englishmen and the Susquehannas had laughed. The victims had been killed to avenge an insult, but ultimately the murder was political: the Wiscomesses were anxious about losing the struggle for control of the upper Chesapeake and had to make it clear to their Native and European neighbors that they were not to be taken lightly. The Wiscomesses tried to compensate Maryland and Virginia, both of which claimed the Isle of Kent, but their offer of *roanoke*, the beads used as currency in the fur trade, was rejected. The English demanded the murderers. The Wiscomesses declined to give them up. The conflict led to years of killings and intermittent warfare.[38]

The clash between Native and European cultures was exacerbated by the presence of so many aggressive young men who were accustomed to violence and knew no other way to command respect. Those of the colonists who had seen service in European wars were likely to reach for a weapon whenever they were challenged or insulted. Edward Stallings, master of a ship that had run aground near Newport News, Virginia, argued with William Epps, the commander of the militia company of Smythes Hundred. Stallings' "uncivill and unmanly wordes" so enraged Epps that he struck Stallings on the head and killed him. George Harrison, a planter at Martin's Hundred, quarreled with Richard Stephens, a Jamestown merchant and fellow militia officer, over a shipment of goods. They agreed to a duel, and Harrison died of his wounds.[36] Such homicides were responsible for a third of the murders that occurred during the early years of colonization.

The violence-prone nature of men who had been schooled in the military made discipline difficult to maintain both in the regular army and in the militia. Officers sometimes had to kill their men to maintain order, and militiamen, who were more fractious than ordinary soldiers, sometimes killed officers whom they felt had mistreated them. In 1646 Thomas Cromwell, captain of an English man-of-war that had captured "sundry prizes" from the Spanish in the Caribbean, killed a sailor in Plymouth when the man "reviled his captain with base language" and came at him with a rapier still in its scabbard. In November 1643, at the height of Kieft's War, a Dutch militiaman killed an officer, Captain Daniel Patrick, for refusing to lead a militia company against the Indians in the dead of winter. The man accused Patrick of "treachery," and Patrick spat in his face. As Patrick turned to leave, the man shot him in the back of the head with a pistol. That same year, Maryn Adriaensen, a Dutch militia officer and former privateer who had led several campaigns against the Indians, attempted to kill the colonial governor, William Kieft, in his office at Fort Amsterdam. He felt Kieft was trying to blame him for the war against the Indians, which was causing an increasing number of casualties among the Dutch in New Netherlands. He held a pistol to Kieft's head, saying, "What devilish lies art thou reporting of me?" Kieft was saved when another man grabbed Adriaensen's pistol and let the hammer snap on his thumb. One of Adriaensen's men then fired at Kieft and was in turn shot dead.[40]

mer servants to vote and acquire land. It also further increased the penalty for hog theft: second-time offenders would have their ears cut off, and third-time offenders would be hanged. The contest of wills was clear.[59]

Indentured servitude helped make North America a very homicidal place for Europeans by relegating previously free laborers to the status of de facto slaves. Like other murders among unrelated colonists, these homicides were rooted in the violent behavior that seventeenth-century Europeans brought to the New World with them and in the feelings and beliefs about government and society that caused that behavior. Those feelings and beliefs, which arose out of political, religious, and class conflict and the disruption of the European social hierarchy by economic hardship, traveled to the colonies with the settlers and combined with weak and incapacitated colonial governments to produce high homicide rates that persisted even after the frontier period.

# "All Hanging Together"

*The Decline of Homicide in the Colonial Period*

In the final quarter of the seventeenth century the murder rate in the colonies suddenly dropped. The exact timing of the fall in the homicide rate in these years is uncertain because so many court records from the late seventeenth century have been lost, but it appears that between 1675 and 1693 the rate for European adults fell abruptly twice: once after Bacon's Rebellion (1675) and King Philip's War (1675–76) and again in the late 1680s and early 1690s, at the time of the Glorious Revolution in England. The rate remained low by historical and modern standards for nearly eighty years, until the revolutionary crisis of the 1760s and 1770s.

The patterns were very different for African Americans and Native Americans. African Americans were killed by unrelated adults at high rates in the late seventeenth and early eighteenth centuries, when racial slavery replaced indentured servitude as the primary source of bound labor in British North America. Native Americans in New England were killed by unrelated adults at high rates throughout the colonial period, especially between 1720 and 1760.

## European American Homicide

The decline in homicide rates among European Americans was dramatic. In Maryland the rate at which unrelated European adults killed

61

each other fell from 29 per 100,000 adults per year to 15 per 100,000 between the mid-1670s and the mid-1690s. In Virginia it fell from 37 per 100,000 to 10 per 100,000, and in New England from 6 per 100,000 to an astonishing 1 per 100,000. By the end of the century, the homicide rate for colonists in the Chesapeake was for the first time within the range of contemporary western European rates—roughly 12 per 100,000 adults per year. The rate in New England may very well have been the lowest in the Western world (Figures 1.2 and 1.3).[1]

Historians have suggested a number of reasons for the sudden drop in homicides among European colonists: the spread of more civilized standards of conduct, a decline in gun ownership, increased prosperity, or improved law enforcement. But none of these suggestions can explain the decline. It was too abrupt to have been caused by an increase in civility, and gun ownership held steady through the eighteenth century. Although the economic circumstances of most free young men and women did improve over the seventeenth and eighteenth centuries, war crippled the New England economy in the late seventeenth century, and in the Chesapeake the economy was decidedly mixed. The General Court improved law enforcement in Massachusetts, but the emphasis was on rooting out "debauchery, irreligion, prophaneness, & atheisme," not on catching murderers.[2]

The character of the colonial population changed during this period, but its growing diversity might have been expected to raise homicide rates rather than lower them. In some places rates did go up, but increases were short-lived and localized. In the late seventeenth and early eighteenth centuries, settlers from Germany, Scotland, and Ireland poured into the colonies. Many were Lutherans, Presbyterians, or Catholics, and their presence was disconcerting to the resident Congregationalists, Baptists, Quakers, and Anglicans. Wherever these new immigrants faced severe discrimination, as Irish Catholics did in New England and the Chesapeake, they were two to four times more homicidal than other colonists. Wherever they were numerous enough to cause a political backlash among the original settlers, as they did in Pennsylvania in the 1720s, the homicide rate tripled. There were few such nativist outbursts, however, and homicide rates for German, Scots, and Irish immigrants moved quickly toward those of other settlers in the colonies where they lived.[3]

The decline of indentured servitude did contribute to the decrease

in homicides among unrelated colonists, especially in the Chesapeake, where there had been so many indentured servants. The revival of the English labor market after 1675 lowered the supply and raised the price of indentured servants, forcing New Englanders to rely almost exclusively on free or family labor. Chesapeake tobacco planters turned to slave labor, which became more affordable with the end of the Royal African Company's monopoly of the slave trade and decreased demand for slaves from Caribbean sugar planters (who had seen prices and profits drop). The proportion of white colonists who were bound servants fell in the Chesapeake from nearly half in the mid-seventeenth century to no more than a tenth by the mid-eighteenth century, and in New England from a tenth to near zero.[4]

But these numbers were not the whole story. The proportion of bound servants among homicide victims fell far faster than their proportion in the population. After 1675 masters were suddenly less likely to subject bound white laborers to lethal abuse. By the 1680s and 1690s, the number of murdered servants included in the colonists' homicide rate had fallen from 18 per 100,000 adults per year in Maryland to 2, and in Virginia from 11 per 100,000 adults per year to 3. By the mid-eighteenth century, that number had fallen in Maryland and Virginia to less than 1 per 100,000 adults per year. In New England, only one servant was reported murdered between 1675 and 1692, and none from 1693 to the Revolution. Indentured servitude was not only less common; it was less lethal.

This sudden drop in lethal abuse paralleled the sudden drop in the murder rate of colonists in general. Every kind of homicide became rarer among unrelated European Americans: rape murders, robbery murders, political murders, property dispute murders. Although it is impossible to measure changes in relationships or the emotions they reflected, it appears that empathy, solidarity, and mutual forbearance increased, except where Catholics were concerned. Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together. The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders.

all Three dam'd together." Bernard asked Fitch "whether his father taught him such Language," to which Fitch replied, "dont tell me of my father. . . . I know who got you my bob Tailed Dog got you and you are all Tail and yet it[']s all ye part of a man yᵉ belongs to you." As the exchange heated up, the boys' Puritan antecedents came to the fore. One young man called his adversary "the scum of Sodom." Another declared, "I am going to Heaven. . . . You are fire brands of Hell. You are scorched already." This was stale stuff by modern standards, but it still ended up in court. Bernard and his friends brought charges against Fitch for blasphemy, but the court found Mudge guilty of calling Fitch "a Devill Worshiper," and all were found guilty of quarreling.[66]

Using wit against rivals also gave outsiders a nonviolent means of humbling their would-be superiors and had a calming effect on public life generally. The favorite targets of New England satirists were the self-righteous, especially the ministers of orthodox churches. Young Benjamin Franklin, who was too poor to attend Harvard, made fun of Harvard-educated ministers in the early 1720s in the famous "Silence Do-Good" letters written for his freethinking brother's newspaper. The tradition of satire continued through the early 1760s, when a writer for the *New Hampshire Gazette* suggested a remedy for the colony's high taxes and low morals: fire all the ministers and have them open taverns, where they could preach to the individuals who needed their services most. Such satires, which were widely disseminated and repeatedly rehearsed, gave Anglicans, freethinkers, and young journeymen a voice, helped reconcile them to New England's social order, and lessened the chances that alienation would break out into violence.[67]

The continuing low homicide rate among unrelated colonists in New England and the Chesapeake correlated with other changes in colonial society. The fact that a greater proportion of the population was native-born improved prospects for social solidarity. The economy strengthened after 1715, so that poor and middle-income men had a better chance of getting ahead, and their improved prospects helped persuade them that the colonial social hierarchy was legitimate. But like the changes in male culture, these shifts occurred after the homicide rate had fallen. The major changes in homicide rates coincided with the expansion of religious, racial, and political solidarity and the

improved stability and legitimacy of government that had occurred in the late seventeenth century.

The decline in the homicide came later in North Carolina than in New England or the Chesapeake, but by the mid-eighteenth century it appears that North Carolina also had a low homicide rate, and for much the same reasons (Figure 2.2). North Carolina was far more homicidal than the Chesapeake in the early eighteenth century, because Indian warfare and political strife (including three rebellions against the colonial government) had periodically reduced the colony to lawlessness. But as racial slavery took hold in North Carolina in the 1720s and 1730s, white solidarity increased, and as the colony's government became more effective, the homicide rate declined and was soon comparable to the Chesapeake's—probably 12 per 100,000 adult



Figure 2.2  Homicide rates in New France, North Carolina, and Pennsylvania, 1650–1800 (per 100,000 persons per year). Pennsylvania, 1775–1783, is extrapolated from 1764–1774. *Sources:* Lachance (1984: 132, 192); Spindel (1989: 57); Marietta and Rowe (1999: 29).

who hoped that state intervention would force their husbands to reform. They were de facto civil suits.

Before the mid-eighteenth century, divorce and separation could not have played much of a role in deterring marital violence in the Anglo-American world. England's divorce laws were then more restrictive than those of any other Protestant nation, and the colonies generally followed English precedent. Throughout the colonial period the only permissible grounds for divorce in Virginia and Maryland were adultery, desertion, impotence, or neglect. The courts did not grant divorces on the grounds of cruelty, but they did permit separations in extreme cases. In 1676, for instance, Sarah Gibson was "Left to her Liberty" by the General Court of Virginia "Either to goe for England or Stay with her husband" as she thought "best for her Safety," after her husband beat and maimed her. The same court granted Mrs. Burt "seaprate maintenance" in 1679 because her husband was "a terrible fellow" who "ill treated" her.[25]

The colonial governments of New England were more likely to permit separations on the grounds of cruelty, but they, too, stopped short of granting divorces on those grounds, even when they were afraid that one spouse might kill the other. They viewed marriage, in the tradition of radical or reformed Protestantism, as a civil contract that could be voided by civil authorities if one party failed to live up to the terms of the contract, but the only grounds recognized for voiding the contract were adultery, desertion, and impotence. Marital violence was too commonplace to be considered as grounds for divorce, and, as in England, men were allowed to discipline their wives by beating them, just as they would their children, servants, and slaves. Violence could be prosecuted only as an assault—that is, as a violation of the general civil contract.[26]

By the end of the eighteenth century circumstances had changed. Vermont and New Hampshire were the first states to sanction divorce on the grounds of marital violence. The American Revolution led authorities in northern New England to conclude that spouses had a right to live free from violence and that marriage, like any other civil compact among freeborn citizens, should rest only on consent, not coercion. In 1787 Vermont made "intolerable severity" grounds for divorce, and in 1791 New Hampshire followed suit with a less sweeping but still forceful law against "extreme cruelty." These laws were not

dead letters. Abused spouses used them freely to protect themselves against violence, and the courts used them to punish violent spouses by granting victims property, alimony, and child custody.[27]

The Massachusetts and Connecticut legislatures also recognized the need to protect spouses, especially wives, against abuse. In 1786 Massachusetts passed a law that allowed abused spouses to seek legal separation "from bed and board." The law did not permit divorces on the grounds of cruelty, but it allowed victims to leave troubled marriages, taking their children and property with them, and freed them from debts incurred by their spouses after the separation. Connecticut did not officially amend its divorce law, but in 1790 the state assembly began to rule favorably on petitions for divorce on the grounds of cruelty. Equally important, in the late 1760s every jurisdiction in New England began granting a substantially greater number of divorces on the grounds of adultery, desertion, and neglect. Many of the marriages dissolved on those grounds were violent, and public officials were willing to hear testimony about abuse as long as the bulk of the testimony pertained to legal grounds for divorce.[28]

The changes in divorce proceedings in Massachusetts and Connecticut did not protect as many victims of chronic abuse as the antiabuse statutes in Vermont and New Hampshire, but they were indicative of the broad consensus that began to take hold in New England after the Revolution: in marriage as in government, tyranny was unacceptable. The ability of abused spouses to dissolve violent marriages may well have become a deterrent to violence and may even have been the primary reason that the spouse murder rate fell by half in New England after the Revolution.

Abused women in the colonies had other resources besides the state, however: their neighbors and relatives. Public scorn for abusers and the intervention of neighbors to protect victims—both of which had their roots in the culture of early modern England—did more than criminal prosecution or the threat of divorce to restrain marital violence. Intervention by third parties was common not only in the seventeenth century, when families enjoyed little privacy and when friends and neighbors had few qualms about interfering in other people's affairs, but also in the nineteenth century, when modern notions of privacy were emerging. Neighbors, servants, and relatives even stepped in when marital violence was mutual.[29]

In the seventeenth-century Chesapeake, where tolerance for fighting and brawling was high, relatives and neighbors appear to have been more reluctant than their counterparts in England and New England to intervene in troubled marriages. But they did intercede to stop extreme marital violence. In 1625 Mr. Bransbie, a Virginia tobacco planter, and two of his indentured servants stormed into Joseph Johnson's house to make him stop abusing his wife. Bransbie, an officer in the Virginia militia, told Johnson that if "he did beat and abuse his wiefe any more he wold beate him tyghtlie unless ye Governor comanded ye contrary." Bransbie intervened again at a later date, even though Johnson "presented his peece owt at his window" and yelled "W[ha]t have you to do heere, you were best kepe back or I will make ye stande back." Bransbie walked up to Johnson and grabbed the gun right out of his hands.[30]

Such interventions could be dangerous. Matilda Nash of Sullivan, New Hampshire, a seventy-year-old widow, gave shelter to the wife and children of a mentally ill neighbor, Daniel Corey, and when she tried to reason with him he struck her on the head with a gunstock and killed her. But most interventions ended peacefully. Constables and justices of the peace were sometimes called in when there was violence, but they intervened more often as neighbors than as town officials.[31]

Relatives, neighbors, and domestic employees also supported abused spouses when they decided to prosecute, separate, or divorce. In poor areas of the country it was not uncommon for friends and relatives to support abuse victims who left their spouses and remarried without divorcing. The practice was probably most common in the seventeenth and eighteenth centuries, when divorce was largely unavailable. As long as the couple behaved well, everyone embraced the fiction that they were married and the abusive spouse was dead.[32] Similar tolerance was not extended to spouses who deserted their families merely to take up with a new love.

Aggrieved spouses who turned to the courts could not expect much help, and wives had much more difficulty than husbands in making their cases. In most jurisdictions, judges and jurors were lenient toward husbands who had extramarital affairs or claimed they used corporal punishment only to discipline their wives. Still, women could use court proceedings to proclaim to the world that their husbands were abusers

or cheats, and husbands could bring disgrace upon wives who had been abusive or unfaithful. Taking a spouse to court could thus enhance the aggrieved spouse's reputation and expose the abuser or adulterer to the scorn of the community. That was no small matter in an era when churches were a powerful force in community life. Adultery prosecutions may even have helped prevent lethal violence against women, because they enabled husbands to regain control over their wives and to punish their wives' lovers.[33]

Husbands and wives who wanted to shame their spouses could also appeal to the community for support by posting advertisements in local newspapers. The custom became especially popular after the Revolution, when constraints on public and private expression relaxed. Unhappy spouses, most of them women, accused their partners of drunkenness, indolence, abuse, adultery, and theft. These postings sometimes rehearsed the entire history of a troubled marriage. Mercy Griffis told readers of the *Vermont Gazette* about the suffering she had endured over sixteen years of marriage to Benjamin Griffis. Hannah West asked readers of the Windsor *Vermont Journal* to "Hear the Truth" about her husband, who had absconded and left her penniless after nine years of marriage. He took "all my cloth that I had to clothe my family with, and all my yarn I had spinned. . . . He carried away my flax, wood, and all the provisions which we raised on our farm the last year." He left "five children to cry and sob to see the desolation of my family. Since last winter he had been more cruel, and has abused me and his children in a shameful manner, and jamming me till I was black and blue."[34]

Postings usually marked the end of marriages. They were meant to destroy the reputation of spouses who had failed as husbands or wives, but they may also have deterred violence by giving wronged spouses a means of avenging themselves and defending their honor. In addition, they served as a warning to others about the public humiliation that awaited them if they abused their spouses. Postings appeared in Maryland and Virginia and in other areas of the United States, but they were extraordinarily popular in New England, where high levels of literacy and newspaper subscription meant that more spouses could write them and a wider audience could read them.[35]

The literate culture of New England also preserved many stories about spouses who dealt creatively with marital problems that under

ous rage, and drunken quarrels were common among Native Americans in the mid-eighteenth century, a further sign that warfare in northern New England and loss of land in southern New England had a disastrous effect on the morale of Native Americans and led to violence both inside and outside families.[84]

---

CHAPTER 4

# "A Sense of Their Rights"

*Homicide in the Age of Revolution*

Although rates of family and intimate homicide remained low for most people in western Europe and North America well into the nineteenth century, the long decline in homicide among unrelated adults ended amid the revolutionary turmoil of the late eighteenth century. The political stability that had prevailed through most of the Western world since the mid-seventeenth century was shattered by a succession of revolutions, civil wars, and military conquests. National loyalties and faith in government were strained and sometimes destroyed by revolutionary ideas, popular protests, and divisive wars. Some regimes collapsed, and those that survived found it difficult to reestablish their authority and revive patriotic feeling among their citizens. Beset by treasonous plots and rebellions and plagued by threats from abroad, newly emerged governments floundered. Their citizens fell to squabbling among themselves over politics, questioning one another's loyalties and refusing to obey laws or administrations they considered illegitimate. The three most important correlates of homicide were thus in place in much of the Western world during the Age of Revolution: political instability, a loss of government legitimacy, and a decline in fellow feeling among citizens. Together, these conditions created the feelings of anger, alienation, and powerlessness that caused homicide rates to spike.

Nowhere was the rise in homicide greater than in revolutionary

145

France. The collapse of the ancien régime, which had governed with a strong hand since the late seventeenth century, led to a brutal struggle for power that lasted from the fall of the Bastille in 1789 until 1802, when Napoleon ended the French Revolution by establishing a dictatorship. By the mid-1790s the homicide rate probably ranged from 30 to 80 per 100,000 adults per year in eastern, southern, and western France, where the republican government was weak and citizens were divided by the Revolution or openly hostile to it. The homicide problem may have been less severe in and around Paris, where the post-Jacobin government had established its authority. But the actual homicide rate for all of France will probably prove to have been 40 per 100,000 adults per year or more, once government and newspaper accounts of homicides are taken into account.[1]

France was not the only Western nation to experience a dramatic rise in homicide during the Age of Revolution. In England and in Sweden, the two countries for which national statistics are available, homicide rates doubled between the 1780s and the 1830s. According to studies of selected towns, homicide rates also appear to have doubled in Germany, Switzerland, and Italy. The rate rose to 20 per 100,000 adults per year in Geneva after that city-state's elite crushed an uprising in 1782 led by the Représentants, the delegates to the lower house of Geneva's ruling council, who had demanded political equality for lower-ranking citizens. In Leiden the rate rose to 30 per 100,000 adults per year after 1801, when Napoleon imposed an authoritarian government on the Netherlands. Rates fell gradually in Canada, where political calm prevailed until the Patriote uprising of 1837, but they increased everywhere else as political stability, faith in government, and national feeling faltered.[2]

Homicide rates among unrelated adults in the United States did not follow a uniform pattern, but in the states and counties studied intensively the number of homicides soared wherever the Revolution divided people into Tory and rebel camps. In other words, homicide rates were highest where the struggle for power between Tories and rebels—and between the British and Continental armies—was most intense. In the countryside around New York City and Philadelphia, in the Ohio Valley, and in the backcountry from southwestern Virginia to northwestern Georgia, homicide rates reached seventeenth-century levels as governments collapsed, law and order broke down,

and neighbor turned against neighbor. For most white Americans, the Revolution was profoundly disruptive and divisive, but in those areas it was a genuine civil war. The criminal justice system disbanded or became the partisan tool of whoever was in power locally. Vigilante and revenge killings ensued, some motivated by politics, some not. As in revolutionary France, the proliferation of politically charged homicides was matched by an increase in garden-variety homicides as individuals adopted the same hostile and predatory attitudes toward their neighbors that political partisans showed toward their opponents. The extremely high homicide rates persisted until the end of the War of 1812, when they finally returned to the levels that prevailed in the rest of the nation.

Homicide rates doubled even in places where the struggle for power between Tories and rebels was intermittent or short-lived and the criminal justice system remained effective, like New England and the Chesapeake. In colonies that experienced political violence during the imperial crisis of the 1760s and early 1770s, like Pennsylvania, Massachusetts, and North Carolina, the increase in homicide began before the Revolution as the withering of British patriotism and the erosion of loyalty to the governments imposed upon the colonies by the crown undermined the fellow feeling that had kept homicide in check since the late seventeenth century. And in most communities within those colonies, the revolutionary movement was too divisive for solidarity to be reestablished while the outcome of the Revolution remained in doubt. But in places like the Shenandoah Valley of Virginia, where the Revolution won broad support and caused little disruption, the homicide rate among unrelated white adults continued to fall in the late eighteenth century. Homicide rates also continued to fall for African Americans in the South and in New England. Blacks were less likely to be murdered by whites and by one another, in large part because of the vitality of the antislavery movement, which freed many slaves and increased humanitarian regard for blacks. The movement also forged greater solidarity among blacks and gave them hope for a better future.

Wherever government broke down, political, robbery, and revenge homicides proliferated. The political upheaval undermined existing loyalties and institutions and made people from all walks of life more impatient with legal and economic restraints and more sensitive to

personal slights. Ordinary men were suddenly more likely to kill to defend their reputations, property, or rights. Public men—politicians, military officers, attorneys, and newspaper editors—were particularly vulnerable to the Revolution's disruptive effects. In a republic that had yet to develop strong parties or political institutions, they were at the mercy of public opinion, and a surprising number of them died trying to defend their honor in duels.

The American Revolution might have had an even worse effect on the homicide rate if it had created a long-lasting economic crisis or a deep-seated disruption of the social hierarchy. Life was difficult for the poor in America's largest cities—Boston, New York, and Philadelphia—and the urban poor were especially restive and violent in the late eighteenth century.[3] But in small towns and in the countryside, most people were still able to form households and to buy their own shops or farms, thanks to the British victory in the French and Indian War, which had opened vast tracts of land to settlement. African Americans everywhere looked forward to new opportunities because of the decline of slavery. In the slaveholding South, revolutionary ideas would challenge the social hierarchy and lead to a permanent increase in homicides there, but almost everywhere else the Revolution's impact on homicide was confined to the years between 1764 and 1790, when government broke down and fellow feeling declined.

The increase in all kinds of homicides among unrelated adults began the moment conflict between colonists and the government turned violent. Homicide rates rose in Pennsylvania, North Carolina, and South Carolina after revolts broke out in the backcountry in the 1760s over Indian policy, land policy, and the failure to grant newly settled counties adequate representation in colonial assemblies (Figure 2.2). The turning point in New England was 1770, the year of the Boston Massacre (Figure 1.2). In the Chesapeake politics remained nonhomicidal until 1775, when fighting broke out between loyalist and patriot forces (Figure 1.3). Many of the homicides that occurred were political or war-related. In southern New England and the Chesapeake, where the homicide rate for whites doubled, such homicides were probably responsible for a third of the increase in the 1770s and early 1780s. On the Vermont frontier and in the southern and western backcountry, political homicides were responsible for more than half the increase.[4]

The revolutionary conflict had a direct impact on the homicide rate everywhere, but in most parts of the country its indirect impact on the homicide rate was even greater. By eroding British patriotism, undermining the legitimacy of political institutions and political leaders of all stripes, weakening the legal system, and generally vitiating the social contract that kept the peace, the conflict that gave rise to political homicides generated more hostile, defensive, and predatory behavior and spawned other kinds of homicide, such as robbery and revenge murders.

### The Rise in Homicide throughout the Country

British patriotism had been on the wane since the mid-1750s. Colonists who served in the armed forces during the French and Indian War—probably one of every three adult males—saw British soldiers up close for the first time and did not like what they saw. They were stunned by the arrogance of British officers, who considered all colonials their inferiors, and shocked by their brutality toward enlisted men. They found regular British soldiers servile, profane, and impious.[5]

The colonists were further alienated by the Stamp Act, which made it clear that their interests were not safe in British hands. Many of them began referring to themselves explicitly as "American" rather than "British." In colonial newspapers the proportion of references to the colonies as "British" or "royal" fell from 38 percent before the war to only 6 percent by its end; references to the colonies as "American" rose from 20 percent to 43 percent. The share of implicit references to the colonies as American also rose, from 5 percent to 17 percent. The erosion of British patriotism was also evident in the names colonial assemblies gave new counties. The proportion of new counties named for British notables fell from 81 percent in the first half of the eighteenth century to 64 percent in the third quarter of the century as disputes over colonial policies intensified. It then plummeted to 18 percent from 1775 to 1789, and to 2 percent in the last decade of the eighteenth century (Figure 2.1).[6]

In New England anti-British feeling generated political homicides long before the war began, during riots against British officials, soldiers, and sympathizers. Ebenezer Richardson was a Boston customs

gests that whites became more protective of their rights and their good names once the Revolution began. The concern with reputation manifested itself in the sudden resurgence of dueling, which had all but disappeared in British North America in the late seventeenth and early eighteenth centuries. The only colony where duels had persisted into the 1680s and 1690s was South Carolina, where planter "aristocrats" from the West Indies kept the custom alive. One or two isolated instances of dueling cropped up elsewhere in the early to mid-eighteenth century. In 1728, for instance, Benjamin Woodbridge, the son of an admiralty judge from Barbados, was killed in a duel on Boston Common. He and Henry Phillips, a recent graduate of Harvard, had quarreled after Woodbridge asked Phillips to sign a note for a gambling debt he owed him and Phillips refused. The men called each other thieves and liars and, in accordance with the code of dueling, borrowed swords so that they could settle their differences honorably. Their friends thought they were joking and learned that Woodbridge had been wounded only when Phillips ran to a tavern for help. Phillips fled rather than face prosecution.[27]

Bostonians were shocked by Woodbridge's death. Clearly, they felt that society had moved beyond dueling. The Reverend Joseph Sewall captured their feelings in a sermon endorsed by all of Boston's ministers in which he denounced "the Society of Evil Doers" that encouraged young men to fight "Bloody and Mortal Duels." Colonial gentlemen rarely fought or challenged each other—it simply was not done. Émigrés might resort to dueling, but colonial gentlemen settled their differences peacefully.[28]

That pattern changed abruptly during the Stamp Act crisis of 1765. The trust and mutual regard that had existed among elites were shattered, and men began to attack each other furiously over political differences. One Virginian, who lamented the new incivility in public life, tried to explain the extreme reactions of friends whose letters to the editor drew public criticism. "Our writers are generally such as have been very little used to Contradiction, and know not how to bear it from one another; and when they find their Writings not treated with that Respect they have been accustomed to in their private Characters, they grow angry, and sometimes abuse one another." Gentlemen who took Britain's side or who wavered before taking the patriot side were subjected to all kinds of public abuse, verbal and physical. Those who

accepted stamp distributorships were branded traitors. Many of them were burned in effigy or had their houses vandalized.[29]

Taken aback by this turn of events, gentlemen defended their reputations and proclaimed their superior status (and their disdain for society's legal institutions) by reviving the custom of dueling. They opposed the leveling force of revolutionary ideology by resuming a practice that made it impossible to command the respect of others without resorting to violence. In doing so they helped to create conditions that strongly correlate with higher homicide rates. Yet most challenges came to nothing or were resolved in other ways. Williamsburg attorney James Mercer, whose brother Richard had accepted a stamp distributorship, challenged Arthur Lee, a young physician whose brother Richard Henry had incited the mob that had sent Richard Mercer scurrying back to England. They agreed to a duel with pistols at a race ground, but their shots went wide, and each accused the other of cowardice. The dispute ended in a coffeehouse, where Lee tried to cane Mercer. The crowd took away their canes and pistols, but Mercer would not give up. He pummeled Lee, bloodying his nose and blackening his eyes. The local paper had the last word:

> To fisty-cuffs go the exalted duelists. O sad, sad! the Doctor [Lee], instead of being handsomely run or fired through the body, which would have given him infinite satisfaction, is bled at the nose, and has his eyes closed, as if he had been no better than a clown or peasant. The poor, abus[e]d, unfortunate Doctor, lifts his discomposed, tumefied, bloody, and sightless head; and, notwithstanding the inconvenience of such a situation for the display of oratory, makes a very fine harangue on the most grossly and shamefully violated laws of honour; for which, as a mischief to society, with a truly disinterested spirit, he expresses more concern than for any injury done to his own person. The Coffee-House would manifest their esteem by laughing.

With that peculiarly American scorn for pretension, the editor savaged the duelists for setting themselves above the common man with their silly rituals and pompous speechifying.[30]

Fear of ridicule, however, was no longer enough to deter duelists. Political passions were simply too intense. Colonel James Bayliss died in 1765 in a duel in Dumfries, Virginia, two days after rioters paraded effigies of the colony's new stamp collectors through town with copies

Compendium_Roth
Page 1792

country, where it took decades to create strong, stable governments and where men created their own justice by killing people who wronged them. From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established (Figures 4.1 and 4.2). In the backcountry, where settlers and Indians (and the Spanish and British) were still fighting for control, rates probably reached 200 or more per 100,000. Those numbers had not been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked strong institutions that could uphold law and order, the revolutionary backcountry was plagued by vigilantism, revenge murders, political murders, systematic violence by criminal gangs, and campaigns against peaceable Native Americans who did not move on after they were defeated militarily. During the Revolution more backcountry whites took the law into their own hands and killed to advance their interests or defend their rights, lives, and property. This pattern would reappear later in Florida, the Southwest Territory, the lower Mississippi Valley, Texas, and California.



Figure 4.1 Homicide rate in plantation counties in Georgia, 1790–1900 (per 100,000 adults per year). Franklin, Jasper, and Wilkes Counties.

The Revolution came at a difficult time for settlers in the southern backcountry. They lacked the means to govern or defend themselves adequately, and they were divided over whether their interests would be better served by the British government or by patriot governments dominated by coastal elites. Virginia's government took steps before the Revolution to maintain law and order by establishing county governments in the southwest, paying for local improvements, and giving settlers adequate representation in the General Assembly. But the planters and merchants of coastal North Carolina, South Carolina, and Georgia did not want to share power with the frontier population; they deliberately delayed the formation of new counties and refused to give settlers adequate representation in state assemblies or funding for public projects. Their actions compounded the homicide problem in the Lower South by depriving settlers of courts, constables, and militia companies. Settlers in that region had no choice but to take the law into their own hands, and their efforts to protect themselves against criminals and Indian attacks were probably responsible



Figure 4.2 Unrelated-adult homicide rates in rural Ohio, 1798–1900 (per 100,000 adults per year).

CHAPTER 5

# The Emergence of Regional Differences

*Homicide in the Postrevolutionary Period*

Homicide rates increased in most American communities during and immediately after the Revolution, but as the long-term consequences of the Revolution became clear, they began to fall in the North and the mountain South. By the 1820s rates in the North were at historic lows that ranged from under 1 to just over 6 per 100,000 adults. They would remain at that level through the early 1840s. Those rates were comparable to rates in Canada, Sweden, and the Low Countries, and lower than rates in the rest of Europe. The United States would never see numbers that low again.[1]

In the Ozark and Appalachian highlands of the South, where there were few slaves, homicide rates were as low as those in the rural Midwest by the 1830s and early 1840s. But the populations there were too small to affect the South's overall homicide rate. In slaveholding areas of the South, the homicide rate after 1800 ranged from 8 to 28 per 100,000 adults per year—at least twice what it had been for whites at its low point in the Chesapeake in the late 1750s and 1760s and three times what it had been for blacks in the 1780s and 1790s. After the Revolution homicide rates were thus most strongly linked to the presence or absence of slavery.[2]

It took time for these distinct patterns to take shape in the North, the mountain South, and the slave South. Backcountry violence was an interregional problem until the end of the War of 1812, when homi-

cide rates in Ohio finally fell below those in the Georgia Piedmont (Figures 4.1 and 4.2). Dueling was a national problem until the death of Alexander Hamilton in 1804, after which northerners made it clear that anyone who killed a man in a duel would be drummed out of public life. Homicide rates were high in northern and southern port cities through the War of 1812. Independence opened American ports to ships of all nations, and international tensions created hostility among American and foreign sailors, especially during the Napoleonic era. In Boston, for instance, in the decade after the British occupation, Portuguese, English, American, and French sailors were all involved in murders over women, national honor, or turf. In Savannah, Georgia, thirteen sailors were murdered from 1804 to 1815: a German, a Swede, a Norwegian, two Englishmen, two Frenchmen, two Irishmen, and four Americans. These homicides peaked in 1811–1813, when riots among sailors led to killings in New York, Norfolk, Charleston, Savannah, and New Orleans. The surge in such homicides subsided after the Napoleonic Wars as the maritime economy rebounded.[3]

After the War of 1812 it was clear even to contemporaries that homicide rates in the slave South were diverging from those in the rest of the nation. In the North and the mountain South the homicide rate among unrelated adults fell to its lowest level in American history as loyalist-patriot divisions disappeared and patriotism soared. People in those regions began to boast about America's superiority and to celebrate the unique character of America's political institutions. Edward Tiffin, Ohio's first governor, extolled the transformation of the government from one under which "we [could only] *breathe*, to one under which we may *live*." The Reverend Samuel Williams of Vermont was confident that Americans had devised the finest government in the world. It was, he said, a government that "reverences the people." He considered the United States "the best poor man's country," a place of opportunity where "the highest perfection and felicity, which man is permitted to hope for in the present life, may rationally be expected."[4]

Widespread self-employment and the removal of many legal and institutional barriers to advancement based on religion, class, or race, including slavery, persuaded the vast majority of northerners and whites in the mountain South that their social hierarchy was becoming more legitimate. A "Citizen of Color" captured the optimism of northern blacks when he wrote in 1814 that "we dwell in safety and pursue our

180

honest callings" with "none daring to molest us, whatever his complexion or circumstances."[75] Homicide was still a problem in urban neighborhoods where the level of self-employment was low and on frontiers that did not yet have effective governments, and the decline in self-employment that began in the 1820s and 1830s caused widespread anxiety and prompted riots that were responsible for a number of deaths in northern cities. But elsewhere in these regions homicides were rare.

The situation was very different in the slave South. Revolutionary ideas and aspirations wreaked havoc with the status hierarchy of slave society in a number of ways. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical. Prominent whites were subjected to the rough-and-tumble of democracy and were infuriated by the way they were treated. Blacks despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of black rebellion. As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw more than its share of deadly quarrels, property disputes, duels, and interracial killings.

People in the slaveholding South were also less likely than people in the North or the mountain South to trust the federal government and to identify with the new nation. Distrust blossomed in the 1820s and 1830s as proslavery southerners realized that the federal government had turned against them on a number of vital issues, including the admission of new slave states and territories and the suppression of abolitionist speech. The distrust may not have been strong enough to raise the homicide rate, but it was strong enough to nullify the dampening effect that the patriotism of the post–War of 1812 period should have had on the homicide rate among whites. In those decades, when American nationalism reached its nineteenth-century peak, identification with national heroes was weaker in the South than in the nation as a whole. The difference was so strong that a higher percentage of places were named in the North than in the South for the South's national heroes, including Washington, Jefferson, and Jackson. Regional differences in national loyalty would become even more marked in the 1850s, of course, and, again in the 1890s. But they were substantial enough in the postrevolutionary period to help raise the homicide

rate above the levels of the middle and late eighteenth century.[6] The slaveholding South thus became the first region of the United States to deviate from the long-term trend toward lower homicide rates in North America and western Europe.

None of the correlates of lower homicide rates were present in the Southwest. In the Mexican borderlands rates tripled from the 1820s to the 1840s, probably reaching 40 per 100,000 adults per year in the Rio Grande Valley of New Mexico and in slaveholding areas of east Texas, and 100 or more per 100,000 in California and Hispanic areas of Texas. Mexico's war for independence from Spain (1810–1821) unsettled relations among classes and racial castes, just as the American Revolution had done in the slaveholding South, and led to murders that crossed class and racial lines. Government instability and frontier violence compounded the problem; Mexicans, Americans, and Native Americans killed one another over trade and territory. Mexico's counterrevolution of 1834 set off violent rebellions in nine of Mexico's twenty-seven states and territories, including Texas, California, and New Mexico, which led to a cycle of political killings, robbery murders, revenge murders, and vigilantism. Together, political instability, the failure of the federal and territorial governments to establish their legitimacy, the lack of national feeling, and the delegitimation of the social hierarchy made the Southwest one of the most homicidal regions in North America.

### The Decline of Homicide in the North

The turning point in homicide rates in the northern backcountry and in northern ports like New York City was the end of the War of 1812 (Figures 4.2 and 5.1–5.3). Elsewhere in the North, particularly in southern New England and eastern Pennsylvania, the turning point had occurred in the late 1780s (Figures 1.2 and 2.2). Homicide rates declined as soon as political conflict subsided, the Constitution was ratified, and a stronger national government emerged. In Pennsylvania, for example, moderates were determined to build a stronger, more inclusive state government and to lay to rest the divisions of the war years. In 1786 moderate assemblymen altered the Test Act so that pietists could affirm their loyalty without swearing oaths. Two years later they gutted the Militia Act by suspending the fines for refusing



**Figure 5.1**  Unrelated-adult homicide rate in New Hampshire and Vermont, 1775–1900 (per 100,000 adults per year).

**Figure 5.2**  Unrelated-adult homicide rates in rural Illinois, 1820–1900 (per 100,000 adults per year).

military service. As their hold on power strengthened in the 1790s, they abolished other unpopular wartime acts and implemented universal male suffrage and a volunteer militia—measures that proved widely popular. The legitimacy of government was rebuilt that way in every state, step by step.[7]

The Revolution had undermined fellow feeling in the North, especially among white Protestants, in ways that would take a generation to repair. Patriotic feeling did not really began to flourish until the 1820s and early 1830s (Figure 2.1), and many northerners still questioned the legitimacy of the central government and the character of the men who ran it. But the Revolution also fostered a belief in the unique promise of the new nation that seemed to help suppress homicide. America would be a country where everyone had a chance to be eco-



**Figure 5.3**  Urban homicide rates in the northern United States, 1797–1900 (per 100,000 adults per year).

nomically independent. The abolition of slavery, the extension of voting rights, increased toleration for religious dissenters, and high levels of homeownership and self-employment convinced the vast majority of northerners that they were on their way toward putting an end to the oppression and prejudice that had kept people in abject poverty for centuries in aristocratic and monarchical societies. Obviously there was room for improvement in their society, but most people believed that now everyone could get married, set up a household, and own a shop or farm. The sole requisite for success was hard work. Even the poor, Catholics, and former slaves shared in their belief, despite the financial obstacles and social prejudices they faced. The social hierarchy that emerged in the North after the Revolution was thus perceived as far more legitimate than any that had preceded it.

The belief that they had created a society in which everyone had a chance to get ahead did not create the kind of solidarity that fear of Indians, anti-Catholicism, or patriotism had among European colonists in the late seventeenth century. But most northerners believed they had a shared interest in sustaining the social and political order that emerged after the Revolution. The hatred they might have harbored for wartime enemies—many of whom had packed up and left for Canada anyway—was displaced by pride in their extraordinary victory over the British. The hostile, defensive, and predatory emotions that lay behind the murders of friends, acquaintances, and strangers—never as strong in the North as in the South or on the frontier—were supplanted by the feeling that everyone in America could participate in this grand social and political experiment.

For most people this faith in the social and political order of the postrevolutionary North was justified. By the end of the War of 1812, 60 percent of all adult men in the North owned their own shops or farms; the proportion was closer to 80 percent for men in their midthirties and older. Most of those who did not own shops or farms at least owned homes or headed independent households. Owning a house or shop or farm was the standard by which people were judged. Those who owned property had a sense of accomplishment, greater resilience in the face of disappointments, and a strong bond with other property owners.[8]

It is impossible to prove that the growing legitimacy of the North's social hierarchy and the respect and satisfaction derived from eco-

nomic independence were responsible for the decline in homicide in the postrevolutionary North, but it is clear that high levels of self-employment and homeownership were strongly associated with low homicide rates. Of all the areas studied, northern New England and Holmes County, Ohio, where homeownership and self-employment rates were very high, continued to have the lowest homicide rates. Other factors undoubtedly had an impact on rates in the North. The presence of nonviolent pietists like the Amish and Mennonites kept rates low in parts of Ohio and Pennsylvania, for example, whereas the presence of sailors raised the rates of port cities. Like indentured servants, sailors were deprived of rights and wholly at the mercy of their employers, and the humiliation they endured left them predisposed to violence. But self-employment and home ownership were probably the most important deterrents to homicide, because they were the most important sources of respect in a society that judged people by their work ethic and their investment in the community.

Places with the lowest levels of self-employment and homeownership, such as Boston, New York City, and Philadelphia, had the highest homicide rates. The poor, tenement-ridden neighborhoods of those cities were the most homicidal areas of the North. In the first decades of the nineteenth century, these neighborhoods were packed with Scots and Irish immigrants who eked out a living doing work that most natives rejected. They found it very hard to live in such close quarters with others, especially in a society where homeownership was the norm and adult renters were viewed as failures. Crammed together in flats without water or sanitary facilities, they fought constantly to defend their territory and whatever scraps of dignity they still had. Trivial disputes easily escalated into murder. Peter Kain, for example, was driven to distraction by his noisy neighbors in New York City. One Saturday night he smashed all their doors and windows and stabbed one of them to death. Catherine Burney got into an argument with a fellow Scot, Margaret Dix, in their tenement in Boston. She picked up a flatiron and crushed Dix's skull.[9]

Poor urban laborers had less patience than other northerners when challenged or treated with disrespect, and on occasion they fought to the death over card games, elections, and neighborhood turf. After the War of 1812 some of this desperate hunger for respect was channeled into bare-knuckle fighting, which became popular among

Vigilantes rarely killed people, except on the frontier, where homicide rates were higher and livestock theft endemic, and along major rivers like the Mississippi, Missouri, and lower Ohio, where criminal gangs flourished well into the 1840s, taking advantage of good roads, riverboats, and the proximity of state borders to escape capture. Iowa, for instance, experienced a terrible crime wave after the Black Hawk Purchase was opened to settlement in July 1833. Iowa did not have its own territorial government until 1838, and there were no secure jails, effective courts, or law enforcement until the early 1840s. As a result, Iowans felt they had to take the law into their own hands. They formed vigilance committees and hunted down murderers and horse thieves at considerable risk to themselves. After a mass meeting, citizens in Poweshiek County searched the woods north of Montezuma for members of the "Fox and Long" gang. They caught two, tried them "by a self-constituted jury," and shot them. W. W. Brown's gang plagued communities along the Mississippi River for several years, stealing horses, passing counterfeit money, pirating boats, and murdering witnesses, until residents of Jackson County formed a citizens' army to stop them. The vigilantes cornered the gang at Brown's Hotel in Bellevue. They killed three outlaws and captured all but six of the survivors, but they themselves suffered four dead and seven wounded.[24]

These postrevolutionary northern vigilantes made an effort not to be lawless or vengeful. In Iowa vigilantes executed only seven men in the 1830s and early 1840s, and in each instance they held a trial (a "lynch court") before condemning the accused to death. In every other case, they simply whipped and banished the accused or turned them over to territorial authorities. Their justice was rough—they extracted confessions under threat of death—but it was formal and democratic. At the end of the trial for the thirteen gang members captured after the shootout in Bellevue, the vigilantes voted with beans to decide the men's fate: a white bean for hanging and a red bean for whipping. The red beans prevailed, forty-two to thirty-eight, so the surviving gang members were not hanged, even though they had killed four vigilantes. They were given thirty-nine lashes each, placed on the Mississippi in a boat with three days' provisions, and told not to return on penalty of death.[25]

Despite such violence, homicide rates remained low into the early

1840s, even for African Americans. Blacks were murdered at the same rate as whites in New York City and at only a slightly higher rate in Philadelphia (Figure 5.4)—remarkable statistics given the poverty of most African Americans and the high proportion of African American men who worked as sailors or dockworkers. In Philadelphia several blacks lost their lives in drunken quarrels with other blacks, and a few blacks killed or were killed during robberies or beatings, but on the whole there were few homicides, intentional or unintentional, among blacks. Nor were there many homicides of either type between blacks and whites, except during the "Flying Horse Riot" of 1834, in which two black men died (and another was castrated) after a fight between blacks and whites over who would ride on a carousel.[26]

Homicide rates were also low for blacks in northern New England and in the Midwest. Once the War of 1812 ended, blacks were not in-



**Figure 5.4** Homicide rates in New York City and Philadelphia by race, 1797–1900 (per 100,000 adults per year). New York City: all homicides. Philadelphia: homicides among unrelated adults, indictments only.

volved in a single homicide in the rural midwestern counties studied intensively, or in Cuyahoga County, Ohio, even though several of the counties had substantial black populations. In Vermont and New Hampshire only one African American—an ex-convict—committed a homicide between the late 1780s and the late 1840s, and none were murdered. In short, the patterns that were established in the North during and after the Revolution persisted. Whites seldom engaged in homicidal violence against blacks except during riots, when law and order broke down and assailants had a degree of anonymity; and blacks seldom engaged in homicidal violence against anyone.[27]

By contrast, the long-term impact of the Revolution on homicide rates for Irish Catholics in the North was mixed. Their rates were actually very low in small towns and in the countryside in the early nineteenth century, especially by the standards of contemporary Ireland. In the rural Midwest their homicide rate fell to only 4 per 100,000 adults per year, and in northern New England it fell to 1 per 100,000. That was two-thirds higher than the rates for African Americans or for other whites, but it was much lower than it had been in the eighteenth century. Some of the difference can be explained by proximate causes—that is, by the desperate competition for jobs and by the Irish tradition of recreational violence—but at bottom the higher homicide rate stemmed from a craving for respect, which was all the more powerful in a society dominated by Protestants of English descent who regarded the Irish as "white Negroes."[28]

Irish immigrants were seldom involved in the kind of predatory violence that runaway Irish servants had engaged in before the Revolution. Most Irishmen who were recent immigrants worked as unskilled laborers in mining, canal building, and railroad building. The number of workers usually exceeded the number of jobs, so laborers—many of them desperately poor—often had to fight for employment. Irish laborers were probably no more homicidal than their peers, but their concentration in these competitive occupations increased the likelihood that they would engage in fights or riots that could turn deadly.[29]

The Irish did have a penchant for recreational violence. They considered fighting a sport, and they glorified powerful fighters. But all too often, Saturday night brawls at dances, drinking parties, and brothels ended in death. Clearly, Irish immigrants brought this kind of vio-

lence with them to the United States; such killings, usually associated with heavy drinking, made up a large proportion of the homicides that occurred in Ireland in the nineteenth century.[30]

Still, like other rural northerners, rural Irish Catholics saw their homicide rates decline in the early nineteenth century. Optimism about the future probably played a role in moderating violence. Although anti-Irish prejudice and anti-Catholic laws did not die easily, in the late eighteenth and early nineteenth centuries new state laws established religious freedom for Catholics and separated church from state. In addition, America's successful rebellion against Great Britain and its bold stand against British aggression during the Napoleonic Wars fired the imagination of Irish patriots, many of whom came to see the United States as a model and an ally. Immigration to America meant emancipation from British oppression, from Protestant prejudice, from "tyrannous landlords" who worked them like slaves. As laborer John Quinlivan put it, America gave him a chance to be independent and to have "a place to Stop that I can call my own." To many Irish Catholics it was "the land that flows with milk and hon[e]y—the land of work and peace."[31]

But nativism was intensifying even in the rural North in the 1820s and 1830s as Catholics began to outnumber Protestants among Irish immigrants, and many Irish Catholic immigrants had very little hope of bettering themselves. They were simply too poorly paid ever to achieve economic independence, and the only positive recognition they could hope for from the Protestant majority was to be remembered upon their deaths as faithful servants. The newspapers of the period sometimes characterized Irish individuals in passing as "respectable," but such remarks only implied that most Irish men and women did not fit that description. Still, the Irish believed that their achievements in the United States went "far beyont what it was possible for them to have done had the[y] stop[p]ed in Ireland," and they did gain a degree of acceptance in the rural North, at least before the Great Famine.[32] They were a reliable source of cheap labor, and they posed no serious threat to the Protestant majority because they made up less than 5 percent of the population.

In cities like New York and Philadelphia, however, Irish Catholics faced hostility and discrimination from the 1790s through the early

1840s. Wherever they were numerous enough to threaten the jobs and the political power of Protestants, their homicide rate hovered around 12 per 100,000 adults per year—twice the rate for African Americans and three times the rate for non-Irish whites and for contemporary Ireland. They were often killed or implicated in homicides that occurred during riots. They fought and died to defend their neighborhoods, their right to vote, and their right to enter skilled trades. Yet they were far more likely to die in fights with each other.[33] Living in tenements and working for wages had a demoralizing effect on all the urban poor—and Irish Catholics were disproportionately poor. But prejudice and discrimination made matters worse for the urban Irish, some of whom were so angry about their treatment at the hands of the Protestant majority that they turned to gang violence and to predatory crime, which further increased their homicide rate. That pattern would be repeated in the late nineteenth century in cities across the United States: the minority in each city that felt it was losing ground and being pushed to the bottom of the social hierarchy would have the highest homicide rate—the Chinese in San Francisco, for example, or African Americans in Philadelphia, or Hispanics in Los Angeles.

Urban Irish had a powerful ally in their effort to become full and equal members of American society. The Democratic Party courted Irish Catholic voters by opposing anti-immigrant laws and denouncing anti-Irish prejudice. It awarded them patronage jobs, supported their candidacies for state and local offices, and, perhaps most important, gave them a sense of belonging and empowerment. The party also encouraged the Irish to support an antiblack, proslavery agenda and persuaded them to begin thinking of themselves as more deserving than blacks by virtue of their skin color. Given the competition between African Americans and Irish Catholics for jobs and housing in northern cities, the Irish needed little encouragement. As yet they had not clashed with blacks in significant numbers, but clearly there was potential for trouble.[34] Serious violence did not erupt, however, until the late 1840s and 1850s, when the competition between the two groups increased homicide rates both directly—by spawning interracial riots—and indirectly, as disillusionment with politics and frustration with declining economic prospects led to a general increase in homicides of all kinds.

### White Homicide in the South

As in the North, homicide rates in the mountain South were probably at their lowest levels in history by the 1830s and early 1840s. Frontier disputes with Native Americans were at times a problem, especially during the forced removal of the Cherokees and other Native peoples to reservations in the West. In Gilmer County, Georgia, for example, several Cherokees murdered a teenaged farm laborer who had encroached on their land, and another murdered an ill-tempered white trader who was selling liquor to the Natives. But those were the county's only reported homicides, and once the frontier period had passed, homicide rates in northern Georgia, in the Ozarks of southern Missouri, and in the upper Cumberland in Kentucky and Tennessee fell nearly to zero (Figure 5.5).[35]

Southern mountain communities were very similar to rural commu-



Figure 5.5  Homicide rates in mountain counties, 1816–1900 (per 100,000 adults per year).

nities in the North in the early national period. The land was still fertile, and timber was plentiful. People made a decent living raising hogs, sheep, and cattle, and population pressure was low. Slaves made up less than 5 percent of the population in these rugged counties, so white laborers did not have to compete against slave labor, and farmers did not have to compete against planters for land, political power, or social prestige, at least within their own communities. Land titles were less secure in the mountain South than in the North, and many settlers were still renting or squatting on land owned by speculators in the 1820s and 1830s, but by midcentury roughly two-thirds of adult white males owned at least a house and a small acreage. In plantation counties that figure was 50 percent or less.[56]

People in the mountain South did not need much land to make a good living. Their livestock usually ran free on the land of absentee owners, and without competition from slaves or free blacks, a third of all adult white males were able to earn most of their income outside agriculture, as opposed to a quarter or less in counties where slaves made up a tenth or more of the population. Food was plentiful, and the hazards of urban life were far away. As a result, the white inhabitants of the mountain South were among the tallest, healthiest people in the United States. The sense of empowerment and the expectation of economic independence were as strong in these communities as in the small towns and rural areas of the North. So, too, were patriotism and faith in the new nation, which is one reason why so many people in the mountain South were Unionists during the sectional crisis and the Civil War.[57]

In contrast, by the 1820s the homicide rate in the slaveholding South was at least twice what it had been at its low point in the mid-eighteenth century, and much higher than in the rest of the United States. Although the homicide rate varied widely in plantation counties in Georgia and South Carolina, in the North Carolina Piedmont, and in the Chesapeake and the Shenandoah Valley of Virginia, on the whole it was probably 10 to 25 per 100,000 adults per year for both blacks and whites (Figures 4.1, 5.6, and 5.7). That was double the rate in cities like Philadelphia and New York, which were the most homicidal places in the North. The plantation South was as prosperous as any other region in the United States, so poverty cannot explain the rising homicide rate. Nor can weak criminal justice institutions. The

South built prisons at the same rate as the North, and its cities had the first modern, uniformed police forces in the United States. In rural counties, slave patrols supplemented local sheriffs.[58]

The primary cause of the slaveholding South's higher homicide rate was the Revolution, which had a disruptive effect on slave society and on the relationship between proslavery southerners and the federal government. The Revolution undermined the pretensions of the *soi-disant* aristocracy and increased doubts about the rationale for slavery, but southern society was still firmly controlled by the slaveholding gentry, and many blacks and nonslaveholding whites felt frustrated and aggrieved at not having a share in the fruits of victory. Aware of these feelings, whites were more fearful of blacks, and slaveholders were also distrustful of the federal government. They had been very patriotic during the War of 1812, but their patriotism declined quickly as the national controversy over slavery intensified in the 1820s and 1830s. They had not yet become southern nationalists, but they were rapidly becoming



Figure 5.6  Homicide rates in Virginia by race, 1790–1900 (per 100,000 adults per year). Amelia, Lancaster, Rockbridge, and Surry Counties.

alienated from whites in the North and the mountain South, and they viewed the nonslaveholding whites in their midst as actual or potential abolitionists.[39] Together, the loss of faith in federal government, the decline in fellow feeling among whites, the growing fear of blacks among whites, and frustration among blacks and poor whites with the social hierarchy gave rise to the anger and alienation that caused the increase in homicide.

Fear of the antislavery movement was responsible for the initial jump in the homicide rate. Slaveholders were afraid that the success of the movement in the North would encourage blacks to murder whites in the South. For the most part, slaves and free blacks in the South,



Figure 5.7  Homicide rates in plantation counties, 1815–1863 (per 100,000 adults per year). *Sources:* North Carolina: Bynum (1992: 82); Frederick County, Maryland: Rice (1994: 34, 100); Whitfield and Greene Counties, Georgia: Ayers (1984: 115).

like their counterparts in the North, chose other means to resist slavery and oppression, which whites were increasingly afraid of slaves, especially after the Haitian Revolution in 1791 and the exposure of slave rebellion plots in Virginia and North Carolina in 1800. Determined to do whatever it took to keep the institution alive, white militants used force ruthlessly to suppress abolitionists and to stop the spread of rebellion in the South.

The defeat of the southern antislavery movement was not a foregone conclusion in the 1790s and early 1800s, but southerners knew that their society was at a crossroads. As one anonymous Virginian put it, "The question now is a plain one. Shall we abolish slavery, or shall we continue it? There is no middle course to steer." The abolition of slavery in the North, the disappearance of convict servitude, and the rapid decline of apprenticeship and indentured servitude left southern slavery as the only formal remnant of the hierarchical society of the mid-eighteenth century. There were no longer degrees of servitude in America: only one remained, and African Americans were more impatient than ever to throw off that last form of bondage. George Tucker, a young Virginian from a prominent family, warned in 1801 that slave rebellions were inevitable.

> The love of freedom . . . is an inborn sentiment, which the God of nature has planted deep in the heart: long may it be kept under by the arbitrary institutions of society; but, at the first favourable moment, it springs forth, and flourishes with a vigour that defies all check. This celestial spark . . . is not extinguished in the bosom of the slave. It may be buried in the embers; but it still lives; and the breath of knowledge kindles it into flame. Thus we find . . . there never have been slaves in any country, who have not seized the first favorable opportunity to revolt.

The desire of the slaves for freedom was "an eating sore," rapidly growing worse because of "the very nature of our government, which leads us to recur perpetually to the discussion of natural rights."[40]

John Randolph of Roanoke saw the same dangers: since the Revolution blacks had acquired a "sense of their rights, and contempt of danger, and a thirst for revenge." Whites in the plantation South were divided—and would remain divided—about what course to take. The dangers of slavery, and the moral problems it posed, wore on an increasing number of slaveowners, some of whom manumitted their

in nearly every southern state, and antidueling societies formed in Charleston, Savannah, Vicksburg, and other hotbeds of murder; but they had no impact on dueling or on the murder rate as a whole. Antidueling laws were never enforced, and antidueling societies had trouble even getting their own members to honor their pledges.[74] Some humorists, like Longstreet, tried to discourage violence by poking fun at men with violent tempers and by censuring the bloodthirstiness of those who egged them on, but they were swimming against the tide.

Most southerners wanted to attack the problem of increased violence more directly by outlawing concealed weapons. Few whites had carried pistols or fighting knives in the eighteenth century, but the practice became popular in the plantation South in the nineteenth century as fears of black violence grew and whites became more anxious and belligerent. The proportion of homicides committed with such weapons is uncertain, since most records did not specify the kind of gun or knife used, but guns and knives accounted for a growing share of the known weapons that whites used to kill other whites. After the Revolution, guns or knives were used in 67 percent of homicides among whites in plantation counties in Virginia, Georgia, and South Carolina. According to contemporary observers, a substantial number of those weapons were pistols, dirks, or Bowie knives, manufactured expressly to kill people.[75]

Proponents of concealed weapons claimed that they were necessary for personal defense. Cassius Clay, who carried pistols and knives for protection against antiabolitionist mobs, said that "when society *fails to protect us,* we are authorized by the laws of God and nature to defend ourselves; based upon *the right,* 'the pistol and the Bowie knife' are to us as sacred as the gown and the pulpit." But opponents of concealed weapons believed that men carried concealed weapons for two reasons: to intimidate others and to seize the advantage in spontaneous disputes. In 1834 the grand jurors of Jasper County, Georgia, denounced "the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shoot-

ing & murdering so many of our citizens." The justices of the Louisiana Supreme Court echoed these sentiments. "Unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries. Those who opposed concealed weapons did not blame them for the slaveholding South's homicide problem, but they understood the psychology of white-on-white violence and believed that concealed weapons made the homicide problem worse by giving bullies and cowards the means to kill anyone they disliked.[76]

Opponents of concealed weapons won the public debate in the South. In an effort to stem the tide of backcountry violence, especially among boatmen on the Ohio and Mississippi Rivers, Kentucky and Louisiana passed the nation's first concealed-weapons laws in 1813. They were joined in the late 1830s by Alabama, Arkansas, Tennessee, Georgia, and Virginia. Whigs and Christian reformers lent the movement its most enthusiastic support in the 1830s and 1840s, but it was extremely popular in most states. It had the support of people who condemned violence outright, but it was also supported by people who believed that there would be fewer deaths if combatants were forced to "fight fair."[77]

Despite their popularity, concealed-weapons laws had no clear impact on homicide rates. They may have discouraged the carrying of handguns and fighting knives, but they were hard to enforce, and they did not address the underlying causes of violence. Men in the North and the mountain South had guns and knives, too, but they rarely used them to kill anyone. Only one free state felt the need for a concealed-weapons law in these years: Indiana, which had been settled predominantly by white southerners. The appeal of violence for men in the slaveholding South—its sporting nature, its excitement, and the opportunity it afforded to prove oneself in front of one's peers—was undiminished, as was the antagonistic spirit that prompted the violence in the first place.

As historian Bertram Wyatt-Brown has observed, a society that was at once a slave society and a revolutionary society could not demand "groveling, obsequiousness, and slavishness" from its freeborn white citizens. It had to give them a chance to prove that they were independent men who could command deference and respect from others. But in a slave society, men had to dominate other men to earn respect, and everyone understood that principle. As a young attorney in Ala-

more likely than marital or romance murders to have been provoked by at least one of the factors that correlate with homicides among unrelated adults. Letitia Blaisdell was an extreme example of someone who was dissatisfied with her position in life and turned to murder because she desperately wanted to be as rich as her relatives were. But many native-born Protestants appeared to feel increasing levels of dissatisfaction with their economic progress, and their frustrated expectations were beginning to produce higher homicide rates not only in the society at large, but within their own families.

CHAPTER 7

# "All Is Confusion, Excitement and Distrust"

*America Becomes a Homicidal Nation*

Between the mid-nineteenth and early twentieth centuries homicide rates fell in nearly every Western nation. Wherever stable, legitimate governments took shape and people developed a strong sense of patriotism and national identity, homicide rates tumbled to historically low levels. The homicide rate in England and Wales fell twice during this period, after 1867 and 1884. Those drops correlate perfectly with two major reforms that changed the nature of the British political system. The 1867 Reform Act gave the vote to all men who were heads of households in incorporated cities and towns, adding just under a million voters to the rolls. The 1884 act enfranchised all male household heads in the countryside, adding six million voters. The homicide rate fell abruptly after each act was passed and then decreased gradually to an astonishing 1 per 100,000 adults per year on the eve of World War I (Figure 5.11).[1] Giving poor and middle-class Britons the vote reduced every kind of murder among unrelated adults, from rape and robbery murders to killings in tavern brawls and in employer-employee disputes.

Homicide rates continued to fall in Canada's core provinces after Canadians won the right to self-government and began to develop strong two-party systems and a clearer sense of identity and nationality. Homicide rates were extremely low in the Confederation provinces that achieved independence from Britain in 1867—Nova Scotia, New

297

Brunswick, Quebec, and Ontario—despite their ethnic and religious divisions. By the 1880s the homicide indictment rate was less than 1 per 100,000 adults per year (Figure 5.10). But in the 1850s and early 1860s the western frontier of Canada was as violent as the northwestern frontier of the United States. Among white settlers the homicide rate was at least 25 per 100,000 adults per year in British Columbia, and it was much higher among Native Americans. Homicide rates were probably also high in Newfoundland, where conflict persisted between English Protestants and Irish Catholics; and in Manitoba, where mixed-blood Métis twice rebelled against the central government to defend their land against encroachment by English and Scots-Irish settlers. Because of the homicide rates in its outlying provinces, Canada as a whole had a higher homicide rate in the late 1920s than England and Wales, but its rate was still low by historic standards: 2.3 per 100,000 adults per year.[2]

National unification and the emergence of a strong central government sent the homicide rate plummeting in Italy. The data from Germany are far from complete, but the rate at which Germans were tried for homicide also fell rapidly after national unification, dropping by a third between the early 1880s and the beginning of World War I. Only France saw its homicide rate rise slightly in the late nineteenth and early twentieth centuries. The French rate was not very high—perhaps a little more than 2 per 100,000 adults per year, or about the same as Canada's—but it was 50 percent higher under the Third Republic than it had been under the Second Empire of Louis Napoleon. Both regimes had representative assemblies and universal suffrage for men, but Louis Napoleon's constitutional monarchy was more widely popular and would probably have survived had it not suffered a disastrous defeat in the Franco-Prussian War. Conservative and moderate republicans governed well after 1870, but they governed from a narrow middle ground, and only by default, because the monarchist majority could not agree on whether to turn to a Bourbon, an Orleans, or a Bonaparte or to choose a strong man like former general and Minister of War Georges Boulanger. The right consolidated its power over the army and the Catholic Church, while the left turned to radical republicanism, socialism, and anarchism, and both the right and left threatened to overthrow the Republic. Politics became so heated that

assassinations and duels among public men reappeared. This constant political turmoil, with ideologues of all stripes warring over what form the government should take, was accompanied by an elevated homicide rate among unrelated adults. By World War I, France's homicide rate was double the rates in more politically stable and unified nations such as England, Wales, Sweden, and Norway.[3]

It was at this time that homicide rates in the United States truly diverged from rates elsewhere in the Western world. In the late 1840s and 1850s they exploded across the nation, not only in the plantation South and the Southwest, where higher rates already prevailed, but also in the mountain South and the North, which had previously had extremely low rates. The least homicidal places in the Western world suddenly became the most homicidal. By the end of the Civil War, homicide rates among unrelated adults were substantially higher in the North than in Canada or western Europe, and higher still by one or two orders of magnitude in the South and Southwest. All kinds of homicide increased: robbery murders, rape murders, and killings over insults, bar tabs, card games, property disputes, and small debts. Ethnically and racially motivated murders increased, as did murders in the workplace and along the nation's roads, railroads, and waterways. Everywhere and under all sorts of circumstances, Americans, especially men, were more willing to kill friends, acquaintances, and strangers.

Immigration, economic hardship, and the conquest of areas populated by Hispanic and Native peoples contributed to the rise in homicide in the late 1840s and 1850s. Irish, French Canadian, German, and Chinese immigrants were well represented both as victims and as perpetrators wherever substantial numbers of them worked as unskilled laborers; and Hispanic and Native peoples in the trans-Mississippi West saw their homicide rates rise because of dispossession, demoralization, and victimization by white settlers. Yet homicide rates also surged among native-born Protestants, and in most areas of the country their rates rose as quickly as those of immigrants or ethnic minorities.[4] Many native-born workers, particularly African Americans, saw their standard of living decline in cities around the nation as masses of immigrants flooded into the country from Ireland, Germany, and French Canada. But native-born murder rates continued to climb even in ru-

ral areas, where there was unprecedented prosperity in the late 1840s and 1850s. Immigration, war, and poverty may have contributed to the rise in homicide, but they did not cause it. The rise was too sudden and too widespread. Besides, Canadians and Europeans faced their own problems with immigration, war, and poverty, yet their homicide rates fell.

Ultimately the increase in homicide in the United States occurred because Americans could not coalesce into a nation. As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and the rise of industrialized cities—the patriotic faith in government that most Americans had felt so strongly after the Revolution was undermined by anger and distrust. Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors. They were losing the sense that they were participating in a great adventure with their fellow Americans. Instead, they were competing in a cutthroat economy and a combative electoral system against millions of strangers whose interests and values were antithetical to their own.

In his inaugural address of 1853, President Franklin Pierce tried to restore faith in America's destiny. He saw "abundant grounds for hopeful confidence." The future was "boundless." It didn't look that way to most Americans. In 1846 the United States had embarked upon a war of conquest to spread slavery into Mexico, a sister republic, and it appeared that slaveholders and proslavery politicians would govern new territory. A flood of immigrants usurped what are now referred to as entry-level jobs, and after three decades of steady decline in self-employment, the promise of opportunity began to ring hollow. Banking monopolies and federal subsidies for special interests fostered economic inequality, and politicians promoted the belief that government corruption was rife (even though the government was no worse than it had ever been). Tenements were overflowing, but more mansions were being built every day. People began to wonder if democracy was a lost cause in the United States. Their fears were exacerbated by the failure of the European revolutions of 1848, which ended in class conflict, socialist uprisings, and military repression. Americans had once hoped, as a writer to the *Southern Literary Messenger* said, that

"the rotten and antiquated foundations of every despotic and exclusive institution of the Old World" would "crumble into ruin." Instead, the United States appeared to be recreating old Europe at its worst.[5]

Politics polarized along ethnic, regional, religious, class, and racial lines, and the national polity disintegrated as people argued about whether immigrants, free blacks, Catholics, Hispanics, Asians, and Native Americans should become full citizens and whether slavery would be allowed in the western territories. The rise in homicide coincided with a nationwide decline in patriotism (especially in identification with national political symbols) and with a loss of faith in government and in moderate, mainstream political parties. The proportion of new counties named after national heroes fell from a high of 45 percent in the 1820s and 1830s to only 17 percent in the 1850s and 1860s (Figure 2.1). The Democrats failed as a national party and the Whigs failed altogether, leaving the two-party system in ruins. Parties that were more aggressive ideologically took their place. The leaders of these parties questioned the legitimacy of national institutions and challenged other Americans' morality, patriotism, and right to citizenship. They used extreme rhetoric to generate partisan enthusiasm, and they encouraged righteous and retributive violence, especially in defense of property or rights.[6]

Aggression and vitriolic language invaded personal as well as political relationships and turned everyday encounters over debts or minor offenses like trespassing into deadly ones. More people chose to protect their rights or interests by force, either because they felt that they could no longer count on the government to protect them or because they despised the government so much that they would not seek justice from it. Some even refused to recognize legal decisions that went against them because the government was no longer "their government." And as more Americans became frustrated by their inability to achieve economic independence or anxious about preserving it, the heightened sensitivity about social status and respect that had characterized male behavior in the plantation South and the Southwest spread to other areas of the country. People responded violently not only to threats to their property or person but also to disrespect. They killed over a word, a gesture, a glance. In every region, the majority of murders were everyday homicides—sexual assault murders, rob-

bery murders, property dispute murders, and so on—with no obvious connection to politics. But across the nation, the areas with the greatest political strife had the highest homicide rates.

### Homicide in the North

Homicide rates among unrelated adults in the northern United States followed the arc of the nation's political history. They rose in the late 1840s and 1850s, during the Mexican War and the Kansas crisis, remained high through the Civil War, and declined in most places in the late 1860s and 1870s as the nation emerged from chaos and the two-party system revived. Across the northern United States, homicide rates that had ranged in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to a high of 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities (Figures 4.2 and 5.1–5.3).[7] As with most previous surges in homicide, the increase affected everyone: blacks and whites, the native-born and immigrants, Protestants and Catholics, the rich and the poor. Murders of unrelated adults remained the near-exclusive province of men, but the rate at which women murdered and were murdered by unrelated adults also rose. Victimization and perpetration rates doubled or more than doubled for everyone.

Thousands of homicides that appeared to arise out of class, ethnic, religious, racial, or partisan hostility had an obvious political dimension. Like the killings of blacks by Irish rioters in New York, for example, or of German immigrants by nativists in Chicago, they were caused by conflicts over slavery and immigration and by the fear that the decline in self-employment generated. But the great majority of homicides seemed to have nothing to do with politics. They were the result of tavern brawls, fights over property, and other everyday disputes. Ultimately, however, they stemmed from the same emotions that political homicides did—anger about the government's failure to protect their interests, a decline in fellow feeling, and frustration over the declining opportunities for self-employment that undermined the legitimacy of the North's social hierarchy.

The decline in self-employment was critical. The key to achieving status in the United States was economic independence, but the pro-

portion of adult men in the North who were self-employed fell steadily from around three-fifths in 1815 to two-fifths by 1860 and a third in 1880. By the mid-nineteenth century many Americans faced the prospect of working their entire lives as "wage slaves." In time, the creation of high-paying jobs for skilled and semiskilled workers on railroads and in factories would make wage work more attractive, and Americans would come to consider it honorable for a man to spend his life working for a corporation. That was not yet the case in the mid-nineteenth century. Many Americans were demoralized by their failure to achieve self-employment and despondent about their children's chances of achieving it. It was all well and good for Abraham Lincoln to say that "there is no such thing as a freeman being fatally fixed for life, in the condition of a hired laborer," and that if a man spent his life working for others it was "not the fault of the system, but because of either a dependent nature which prefers it, or improvidence, folly, or singular misfortune." What had been true in the 1820s was no longer true in the 1850s and 1860s. Critics noted that men who thought like Lincoln lived in frame houses, not log cabins. Labor reformer Ira Stewart wondered if Lincoln wanted to be admired because he had once worked with his hands, or because he no longer had to. The Whigs' vision of boundless opportunity was compelling to many poor and middle-income men, but it did not lessen their anger and anxiety about the difficulty of getting ahead.[8]

Although real wages rose, even for the poor, working people experienced their loss of economic independence as a loss of dignity, and they blamed the rich for trampling on their fellow citizens to get ahead. Strikes and other labor conflicts proliferated in coal mining and railroading as workers realized that they would have to fight to improve their wages and working conditions or live like slaves on what their employers were willing to give them.

Mass violence in coal mining and railroading took nearly 200 lives in the 1860s and 1870s, and as workers in small firms grew increasingly frustrated over their wages, working conditions, and prospects, an increasing number of them murdered their employers in disputes over wages, firings, and arrests for disturbances in the workplace. Workers had become more jealous of their rights, and employers were less respectful of people who worked for wages. The relationships between employers and employees were most volatile when they lived together,

Fort Sumter in April 1861. Initially, at least, the war created a stronger sense of national unity among southern whites, and the vast majority of former Unionists flocked to the Confederate cause. Most of them had supported the Union only as long as it respected southern rights; once the North used force, they joined the fight for southern independence. The prewar power structure remained intact, and support for slavery and white supremacy was as strong as it had been in the late 1850s. Accordingly, during the first years of the Civil War homicide rates held steady throughout most of the South.

Wherever the transition to the Confederacy did not go smoothly, however, and the loyalties of the local population were divided, prewar conflicts exploded into violence. Wherever the Union lost control and the Confederacy failed to gain control, homicide rates rose to 100–200 per 100,000 adults per year. Those circumstances prevailed in the mountain South and in the Confederacy's northwestern borderlands, especially in north Texas, where wheat farmers and cattlemen had long been at odds with the plantation owners who raised cotton in the fertile bottoms along the Sulphur River. The plantation owners, many of whom came from prominent families in the Deep South, looked down upon the farmers and ranchers, most of whom came from the Upper South and were poorer and less well educated. Kate Stone, whose family had come from Louisiana with 130 slaves, found her neighbors repellent. They were low, crude, brutal, lazy, and ignorant. She called north Texas "the dark corner of the Confederacy."[69]

The prejudice of plantation families against the area's ranchers and farmers was exacerbated by differences in religion and politics. Many of the ranchers and farmers belonged to the Church of God or the Northern Methodist Church, which had condemned slavery, and few had any interest in the Confederacy. State representative Robert Taylor of Fannin County asked on the floor of the Texas House, "In this new Cotton Confederacy what will become of my section, the wheat growers and stock raisers? . . . I fear [secessionists] will hang, burn, confiscate property and exile any one who may be in the way of their designs." The markets of ranchers and wheat farmers lay in the North, and the value of their real estate depended on immigration from Missouri and Kentucky. Few owned slaves, and most of them did not want to live in a planter-dominated republic where the rich held all the cards. Thomas Henderson Terry, who enlisted reluctantly in the Con-

federate army, complained that "the slaveholders stayed at home and let the poor whites fight the war for them." That was not the case in Texas, where the wealthy were overrepresented in the army; but it was a common belief among dissidents in north Texas, who viewed state laws that set a 10 percent tax on produce (not land or slaves) as a way of enabling the wealthy to evade the draft by hiring substitutes.[70]

North Texas farmers and ranchers voted against secession and were never reconciled to it. A good number joined the Union army or moved to California to be out of harm's way, but the majority stayed home and resisted. Young men dodged the draft or deserted from the Confederate army and hid out in thickets along the Sulphur River. The Confederate Home Guard—known by its adversaries as "heel flies" after a pest that plagued Texas cattle—went on the offensive against dissidents. Accompanied by vigilante groups organized by cotton planters, such as the "Sons of Washington" and the "Ten Stitchers," they promised to kill ten Unionists for every Confederate. As the editor of the *Texas State Gazette* put it, "We cannot tolerate in our midst the presence of an internal hostile element, who are treacherously remaining here, to sow the seeds of servile war, and to give aid and comfort to blockading fleets and invading armies." Five north Texas Unionists were lynched by planter vigilantes in January 1862. One had given an antisecession speech during the secession crisis; another had said that "he would lay in Sulphur bottom until the moss grew a foot long on his back before he would go into the Confederate army." A third was condemned because "he put up two pens when he gathered [hogs] in the fall before and, being asked his reason for it, said one pen was for Jeff Davis and the other for Abraham Lincoln."[71]

By the fall of 1862 so many dissidents had been lynched or assassinated that survivors in Cooke County organized a "Peace Party." The Confederates regarded the move as an act of treason. They rounded up forty-two Peace Party members and lynched them all. For north Texas dissidents that was the last straw. Martin Hart, a prominent stockman and prewar politician who had raised a cavalry company for the Confederacy in 1861, turned his back on the Confederacy and took thirty recruits to Missouri, where they formed a Union cavalry brigade to fight the Home Guards in Arkansas and north Texas. Their undersized unit was captured only four weeks into its mission, and Captain Hart and his lieutenant were hanged. But in that brief period

were endemic. Future president James Garfield, who was then a Union officer, said that war had turned southern Appalachia into a "black hole" where men killed for "envy, lust, or revenge." In Gilmer and Rabun Counties in northern Georgia, the homicide rate during the Civil War was probably 100–200 per 100,000 adults per year, including political homicides committed by irregulars; and in the upper Cumberland region on the Tennessee-Kentucky border, the rate was at least 600 per 100,000.[78]

People in southern Appalachia were deeply divided over secession and the conduct of the war. A substantial minority remained loyal to the Union, and an even larger proportion of men—perhaps half the military-age population—deserted from the Confederate army or dodged the draft. Many refused to pay their taxes to support a war that would benefit rich slaveholders and leave their own families in need. Andrew Jones, a North Carolinian, declared that slaveowners looked upon "a white man who has to labor for an honest living as no better than one of their negroes . . . these bombastic, high falutin, aristocratic fools have been in the habit of driving negroes and poor helpless white people until they think they can control the world of mankind."[79] By mid-1862 thousands of deserters and draft resisters were hiding in the mountains, some supported by family and friends, others stealing to stay alive. To ferret them out, the Confederates loosed guerrilla leaders like John Gatewood and Champ Ferguson on the countryside, and the dissenters, deserters, and draft dodgers, whether Unionist or not, organized guerrilla bands to defend themselves.

The violence escalated rapidly. It was hard to know, as Mrs. Lou Plemmons of Gilmer County recalled, if any guerrilla band had "a side." They were all dangerous men who were willing to use any means —including terror, torture, and murder—to survive. Even those who had started out fighting for the Union or the Confederacy were not deserters, criminals, or runaway slaves started to kill indiscriminately, in part because they did not know whom they could trust. John Gatewood operated in largely Unionist territory, so he killed every man he came across. He even shot several Confederate soldiers who were home on leave because he thought their papers might be forged. The governor of North Carolina observed that "the murder of prisoners and non-combatants in cold blood . . . has become quite common, and, in fact, almost every other horror incident to brutal and unre-

strained soldiery." Women were brutalized, whipped, or hanged until nearly dead for helping guerrillas. Young boys were taken prisoner and shot.[80]

Such tactics spread fear and distrust throughout the region, and the desire for vengeance led to more political murders, predatory murders, lynchings, and bushwhackings. It was dangerous to go unarmed, even in broad daylight, and it was equally dangerous not to have friends or associates who would avenge a death. Nearly every family in the county armed itself and chose sides. With the number of combatants increasing, the number of deaths mounted steadily.

The violence continued in the mountain South well after the Civil War was over. From the late 1860s through the 1870s, the homicide rate was at least 55 per 100,000 adults per year in Taney County in the Ozarks of southern Missouri and in Gilmer and Rabun counties in northern Georgia, and at least 250 per 100,000 in Fentress and Wayne counties on the upper Cumberland Plateau in Kentucky and Tennessee (Figure 5.5). All these counties had been nonhomicidal before the war. Now they were five to twenty-five times more violent than the slaveholding South had been.[81]

In the first years after the war, men killed mostly for revenge. As journalist Whitelaw Reid observed in November 1865, "men who had been driven from their homes or half starved in the mountains, or hunted for with dogs, were not likely to be very gentle in their treatment of the men who had persecuted" them. Partisan women were just as vindictive. Frank Wilkeson, a private in the Union army who guarded a refugee camp for women and children starved or driven out of southern Appalachia, heard women "repeat over and over to their children the names of men which they were never to forget, and whom they were to kill when they had sufficient strength to hold a rifle." In the upper Cumberland, a former Union guerrilla murdered the Confederate who had killed his father during the war; in turn, he was murdered by his victim's son-in-law. The son-in-law was jailed for that killing, but a mob led by the former guerrilla's family broke into the jail, took him to the top of a mountain, tied him to a horse's tail, and shot him repeatedly as the horse bolted. Most revenge murders ended by the early 1870s, but by then hundreds of people had been killed.[82]

Former Confederates and former Unionists found new reasons to kill each other as postwar Democrats and Republicans. Few mountain

blacks in their place again. "We will have no mercy for them. We will kill them like dogs. I [was] never down on a nigger as I am now." But the effectiveness and inclusiveness of the city's Republican government and the conciliatory gestures made by conservative white elites prevented the violence from becoming worse.[122]

### Homicide in the Southwest

Because its population was so small, the Southwest did not have a great impact on the nation's homicide rate in the mid-nineteenth century. But the region was staggeringly violent. Homicide rates rose in the late 1840s and early 1850s to the highest levels in the United States—probably 250 per 100,000 adults per year or more. In California rates declined gradually after the mid-1850s but remained high through the 1870s. In counties dominated by immigrants from Europe and the eastern United States they stood at roughly 25 per 100,000, and in mining counties and in farming and ranching counties where Hispanics and Indians made up a substantial minority of the population they were 60 per 100,000 or more (Figure 7.2). In Arizona, Colorado, New Mexico, and south and west Texas, where the mining and cattle booms were just under way in the late 1860s and the 1870s, homicide rates did not decline during this period. They ranged at a minimum from 140 per 100,000 adults per year in Colorado and 250 per 100,000 in New Mexico and in south and west Texas to 600 per 100,000 in Arizona.[123]

The increase in homicide in the Southwest can be attributed in part to the feelings and beliefs that settlers from the North and South brought with them. The same sorts of homicides that plagued the North and South appeared in the Southwest as soon as settlers arrived: murders that stemmed from political, ethnic, racial, or religious conflict, from vigilante or predatory violence, or from personal quarrels or property disputes. In San Francisco, for example, from 1849 to 1880, 6 percent of victims were murdered by mobs, vigilantes, or politically or racially motivated killers, 16 percent by disputants over property, and 25 percent by robbers, rapists, or gang members. Fifty-two percent were killed over insults, gambling disputes, or questions of honor, half of them in brothels, dance halls, or taverns.[124]

The rapid influx of so many settlers during the cattle and mining booms also contributed to the Southwest's homicide problem. The

lawlessness of cattle towns and mining camps and the propensity of their largely male population to gamble, drink heavily, and consort with prostitutes made predatory and recreational violence far more common than in the North or South and increased homicide rates for men and women alike. Women seldom became killers themselves, unless they were involved in prostitution or engaged in property disputes alongside their husbands; but they were killed more often by rapists and robbers than women elsewhere in the country, especially if they worked as prostitutes, saloon waitresses, or dance hall girls. In California in the 1850s and early 1860s the rate stood at 9 per 100,000 women per year (the rate for men was 81 per 100,000). The violence was compounded by handguns, which became the weapons of choice for His-



**Figure 7.2**  Homicide rates in California, 1849–1900 (per 100,000 adults per year). Farming counties: Sacramento and San Joaquin. Mining counties: Calaveras and Tuolumne. Ranching counties: San Diego, San Luis Obispo, and Santa Barbara.

town killings in Kansas were officers of the law—they were mostly Republicans in a hostile, Democratic environment. Teddy Blue Abbott noted that southern cattlemen were always "getting filled up" with talk about killing Yankees.

> Those early day Texans was full of that stuff. Most of them . . . being from Texas and Southerners to start with, was on the side of the South, and oh, but they were bitter. That was how a lot of them got killed, because they were filled full of that old dope about the war and they wouldn't let an abolitionist arrest them. The marshals in those cow towns on the trail were usually Northern men, and the Southerners wouldn't go back to Texas and hear people say: "He's a hell of a fellow. He let a Yankee lock him up." Down home one Texas Ranger could arrest the lot of them but up North you'd have to kill them first.

The problem was that northern lawmen were just as "filled up" about killing them. Politics was deadly business in the mid-nineteenth century, even on the open range.[185]

The political crisis of the mid-nineteenth century did not play out in the same way in the North, the South, and the Southwest. As a result, it had a distinctive impact on homicides in each region. Minorities also experienced the political crisis of the mid-nineteenth century differently, so the homicidal histories of African Americans, Hispanics, Native Americans, and Asian and European immigrants differed from those of native-born whites. America's homicide problem was not caused, however, by regional, ethnic, or racial differences, or by religious or class differences, for that matter. Those differences had not made the United States unusually homicidal in the early national period, and Canada and western Europe had most of the same divisions in the mid-nineteenth century, but they experienced declines in homicide. America became homicidal in the mid-nineteenth century because it was the only major Western country that failed at nation-building. Once the American polity dissolved over slavery, immigration, and the Mexican War, all sorts of disputes, whether political, petty, or personal, were more likely to end in homicide. The homicide problem was made worse by the decline in self-employment, which disrupted the nation's social hierarchy and left many people anxious and

fearful about their standing in society, and by the failure of state and territorial governments to establish their authority in the post–Civil War South and on the mining and ranching frontiers of the West. Ultimately, however, it was the federal government's loss of legitimacy and the weakening of patriotism and fellow feeling in the mid-nineteenth century that set the United States on course to become a more homicidal nation.