1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9               IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**                  **COMPENDIUM OF WORKS**
    **CHRISTOPHER WADDELL, and**          **CITED IN DECLARATION OF**
15  **CALIFORNIA RIFLE & PISTOL**         **RANDOLPH ROTH**
    **ASSOCIATION, INC., a California**
16  **corporation,**                      **VOLUME 6 OF 7**

17                         Plaintiffs,    Courtroom:    5A
                                          Judge:        Hon. Roger T. Benitez
18         **v.**                         Action Filed:  May 17, 2017

19

20  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
21  **California; and DOES 1-10,**

22                         Defendants.

23

24

25

26

27

28                                    1

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 28 n.88 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 25 n.79 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 26 n.80 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 35 n.103 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 34 n.102 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 34 n.102 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 35 n.103 | 0030-0071 |
| **BOOKS[i]** | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 34 n.99 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 13 n.31, 30 n.90 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910*, at 372 (Berkeley: University of California Press, 1986) | 30 n.91 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 30 n.90 | 0103-0109 |

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 12 n.30 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 19 n.53 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 15 n.39, 18 n.52, 19 n.53 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 19 n.53 | 0186-0215 |
| George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016); Eric Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001) 137-38 | 12 n.31 | 1750-1752 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 22 n.66 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | 27 n.82, 30 n.91 | 0223-0234 |
| Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000) 25-27, 32, 64-65, 91-92, 114 | 13 n.31 | 1753-1759 |

3

| | | |
|---|---|---|
| John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152 | 13, n.31 | 1760-1767 |
| Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* 1-8 (Baltimore: John Hopkins University Press, 2016) | 12 n.30 | 1768-1773 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 22 n.66 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 22 n.66 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 30 n.91 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 22 n.67, 22 n.68, 23 n.69, 23 n.70, 23 n.71 | 0283-0329 |
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 19 n.53, 19 n.54 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 19 n.53, 19 n.53 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 23 n.71 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 30 n.90 | 0363-0368 |

4

| | | |
|---|---|---|
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987)X | 30 n.91 | 0369-0375 |
| Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989) 42-45 | 11 n.29 | 1774-1776 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 17 n.51 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 9 n.13 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 17 n.51 | 0477-0504 |
| Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996) | 12 n.30 | 1777-1778 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 34 n.99 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45, 61-63 (especially the graphs on 38, 39, and 91), 118-121, 145-149, 158, 162, 180-186, 195-196, 199-203, 218-219, 297-302, 332, 337, 354, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 1779-1811 |
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |

5

| | | |
|---|---|---|
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 31 n.93 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | 9 n.13 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | 9 n.13 | 0684-0689 |
| Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006) 91-102 | 12 n.31 | 1813-1820 |
| Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969) 65-70, 282-291, 319-328, 413-425, 463-467 | 11 n.29 | 1821-1846 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 31 n.93 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 32 n.95, 32 n.96, 33 n.98 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 19 n.53 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 7 n.5 | 0772-0794 |

6

| | | |
|---|---|---|
| Clayton E. Cramer & Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted Aug. 12, 2016, 6-7, https://papers.ssrn.com/so13/papers.cfm?abstract_id=2599851. | 27 n.83, 28 n.84, 28 n.85, 28 n.86, 28 n.87, | 1848-1862 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 29 n.90 | 0795-0819 |
| C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54 Vanderbilt Law Review 1805, 1805-1847 (2001). | 15 n.38 | 1863-1905 |
| Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017) 308-322 | 12 n.31 | 1906-1914 |
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 10 n.20 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 30 n.91 | 0840-1021 |
| Jack N. Rakove, *The Second Amendment: The Highest State of Originialism*, 76 Chicago-Kent L. Rev. 157 (2000) | 12 n.30 | 1915-1979 |
| Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), https://repository.tcu.edu/handle/116099117/26778. | 24 n.79 | 1980-2210 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 25 n.79, 25 n.80, 27 n.81 | 1022-1036 |

7

| | | |
|---|---|---|
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216-239 (2007) | 16 n.45 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173-195 (2011) | 24 n.78, 27 n.82 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 6 n.4, 20 n.58 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 34 n.202 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 33 n.97 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 16 n.48 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and Regulations (2012) | 33 n.97 | 1157-1264 |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 35 n.105 | 1266 |

Compendium of Works Cited in Declaration of Randolph Roth
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 37 n.111 | 1268-1269 |
| Buymymags.com – Home Page (last accessed on Oct. 4, 2022), https://www,buymymags.com/ | 37 n.110 | 2212-2213 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 8 n.7 | 1270-1310 |
| "A Complete Guide to Binary Triggers," Americanfirearms.org, (last accessed Oct. 4, 2022), https://www.americanfirearms.org/guide-to-binary-triggers/ | 37 n.111 | 2214-2237 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 33 n.96 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 37 n.110 | 1322-1325 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 36 n.109 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 37 n.111 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 36 n.108 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 38 n.112 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 13 n.34, 16 n.46, 21 n.64, 24 n.76 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 36 n.107 | 1438-1689 |

9

| | | |
|---|---|---|
| The Violence Project's Mass Shooter Database, https://www.theviolenceproject.org/mass-shooter-database/ | 39 n.113, 40 n.114 | 1690 |
| Guns.com, AR-15s | 33 n.96 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 33 n.96 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 40 n.115 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 23 n.71 | 1748 |

[i] The Declaration of Randolph Roth cites 30 books in their entirety, consistent with the practice of professional historians. *See* Roth Decl. ¶¶ n. 29, n. 30, n. 37, n.38, n. 45, n.65, n.77, n.82, n.89, n.91, n.92, n.93, n.94, n.95, n.98, n.99, n.100, (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); ; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); *LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997);

Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Hertá E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Saul Cornell, *A Well-Regulated Milita: The Founding Gathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982). Should the Court wish to receive excerpted copies of these works Professor Spitzer can provide them.

11

# BOOKS






*Samuel Kirkland*, by Augustus Rockwell. (Courtesy of the Emerson Gallery, Hamilton College.)

by George
Library &

# The Divided Ground



INDIANS, SETTLERS, AND
THE NORTHERN BORDERLAND OF
THE AMERICAN REVOLUTION

## ALAN TAYLOR



ALFRED A. KNOPF   NEW YORK   2006

Compendium_Roth
Page 1813

and under British leadership. Once the British invasion began, they would call upon the Iroquois for warriors to act as auxiliaries.[36]

The western Iroquois chiefs had their own reasons to balk at Brant's daring plans for unilateral action. Devoted to tradition, lineage, and a deliberate pace, they resented Brant as a boastful and aggressive young man, a minor war chief of obscure origins from a relatively weak people, the Mohawks. As they saw it, Brant assumed improper airs, acting as if he had been commissioned by the Great King to lead all of the Six Nations. Brant's pushy ambition particularly irritated the great old Seneca war chief Sayenqueraghta. Proud and leading a more numerous people, Sayenqueraghta refused to play second fiddle to a Mohawk upstart.[37]

Lacking Brant's colonial education, Johnson patronage, and London visit, Iroquois traditionalists distrusted his emphasis on all three as sources of unique power. Brant's cultural hybridity troubled Iroquois traditionalists. He seemed too fluid, able to flow back and forth between the Indian and the British worlds, depending upon opportunity. That versatility eroded categories that the chiefs wished to keep distinct. Jealous of their political secrets, the Seneca chiefs preferred to deal directly with true Britons—who could be kept in the dark about some things—rather than deal through a fellow Indian who too smoothly shifted between languages and cultures, producing troubling mixtures by breaking down reassuring barriers. To defend Iroquois tradition, the chiefs preferred a cautious alliance with the British rather than gambling on Brant's daring unilateralism, innovative pan-Iroquoian vision, and charismatic leadership. There was plenty of irony to go around. Brant invoked his British contacts and insights to argue for greater Indian autonomy, but traditional chiefs heeded British advice to ignore his aggressive plans for native initiatives because those chiefs saw Brant as too colonial in his ways.

Frustrated at Niagara by British officers and Seneca chiefs, Brant freelanced by heading to Onoquaga in the spring of 1777. He hoped to set an infectious example for the other Iroquois by conducting the war in his own way. Although most of the Onoquaga villagers cautiously held back from joining Brant, he enjoyed surprising success in recruiting the Loyalists who abounded in the settlements of the upper Susquehanna and Delaware valleys. Small farmers living in frontier hardship, they had hoped to sit out the war, but the Patriots demanded taxes, oaths of allegiance, and militia service—and they plundered those who refused. Seeking an opportunity to strike back, these alienated settlers rallied to Brant when he raised the king's flag at nearby Onoquaga.[38]

Brant formed a distinctive and irregular corps of about 100 men known as "Brant's Volunteers." Only a fifth were Mohawks, with the rest drawn

from the Loyalist settlers. More irony: Brant wanted to promote greater Indian autonomy and initiative, but he proved most effective in mustering a company of poor whites who trusted in the personal charisma that so troubled Indian traditionalists. Lacking uniforms, the volunteers dressed and painted themselves as Indian warriors. That role-playing released their inhibitions against attacking rebel neighbors, who became a cultural other. An Indian appearance also compounded the terror of their Patriot targets. But that Indian guise also marked them as race traitors subject to immediate execution when captured by the Patriots, a knowledge that contributed to their desperate effectiveness in combat.

Unpaid by the British, Brant's volunteers relied upon plunder for their compensation and upon Brant's scrounging at Niagara for their rations and clothing. Despite the greater hardships, the volunteers preferred Brant's charismatic, innovative, and spontaneous style over the hierarchy, discipline, and steady pay of a standard regiment. Clinging to Brant, they rebuffed the financial enticements of other Loyalist commanders, including John Butler, who was raising a battalion of rangers. Of course, Brant's irregular unit irritated conventional officers. One Briton complained that the volunteers "refuse to take arms or be under any command. . . . I have been thirty years a soldier, but never had so much trouble as with those fellows." Hated by the Patriots and disdained by British officers, these volunteers developed an especially intense bond to their leader, despite the exceptionally dangerous service that he conducted. Indeed, those dangers compounded his hold, for Brant seemed uniquely capable of guiding them to safety and victory.[39]

In July 1777, Brant led his volunteers north to Oswego, on Lake Ontario, to rendezvous with an advancing army commanded by the British colonel Barry St. Leger, with Sir John Johnson as the second-in-command. At last, the British and the Loyalists had launched their Canadian invasion of the Mohawk Valley. At Oswego, St. Leger and Sir John convened an Indian council that summoned the Six Nations to join the king's cause. Bolstered by Iroquois warriors, the invaders headed southeastward against the Patriot garrison at the renovated Fort Stanwix.[40]

## FORT SCHUYLER

During the summer of 1776, General Schuyler had ordered the reconstruction and garrisoning of Fort Stanwix at the critical portage between the Mohawk River and Wood Creek. Renamed Fort Schuyler, the post guarded the western entrance to the Mohawk Valley, which reassured the Oneidas of protection in the event of a British-led invasion from Canada. In Schuyler's words, the fort would "impress on the Indians an idea that we are capable of

THE DIVIDED GROUND

acting with vigour, and that we do not mean to be trifled with." In August, Schuyler met some Six Nations chiefs in council at German Flats to explain the new policy, to bestow presents, and to promise protection of Oneida lands against encroaching settlers. He pledged that the United States would honor the boundary line established by the 1768 Treaty of Fort Stanwix. In return, the attending chiefs renewed a friendly neutrality that endorsed Schuyler's military plans to defend the valley.[41]

The pretense of Iroquois unity and neutrality collapsed in August 1777, when St. Leger's army advanced from Oswego to attack Fort Schuyler. That diverse force consisted of about 700 Britons and Loyalists joined by 800 Iroquois warriors: a mix of Senecas, Cayugas, Onondagas, and Mohawks. On the other side, Oneidas and some Tuscaroras helped the Patriot defense. At Kahnawake, an Oneida spy, Deacon Thomas, provided an advance warning of the invasion, a warning that facilitated efforts to strengthen Fort Schuyler. Once St. Leger's siege began, about 60 Oneida warriors, led by Honyery (Thawengarakwen) joined the 700 American militia, commanded by General Nicholas Herkimer, who marched from German Flats to relieve the fort.[42]

At Canajoharie, Molly Brant noted the Patriot preparations and sent a secret message of warning to her brother. Tipped off, the Loyalists and Iroquois ambushed Herkimer's men near the Oneida village of Oriske (Oriskany), about five miles southeast of the fort, on August 6. After a bloody, daylong battle in brutal heat, dense gunpowder smoke, and even a brief thunderstorm, the Oneidas and Patriots retreated, leaving behind at least 200 dead. The Patriot losses included five members of the Tryon County Committee of Safety, two state legislators, and General Herkimer. The Loyalists and their Iroquois allies suffered lighter losses but heavy enough by native standards: about 50 dead, including one of Sir William's Indian sons, William Tekawironte. Stunned by their unexpected casualties, the western Iroquois lost interest in further combat, for they longed to return home to conduct condolence ceremonies for the dead. Their desertion grew with news of the approach of another Patriot force commanded by Benedict Arnold. Disheartened by those desertions, St. Leger retreated in haste and disarray to Canada in late August.[43]

The bloody battle at Oriske embittered relations between the Oneidas and the Mohawks. Immediately after the battle, Brant's Mohawks burned Oriske, while the Oneidas (and some Patriots) plundered Tiononderoge and Canajoharie, taking the greatest loot from Molly Brant. Although gratifying to Oneida and settler anger, this plundering weakened the Patriot cause by inducing most of the Mohawks still in the valley to flee to Canada or Niagara, where they strengthened the British with additional warriors. The

Canajoharies, including Molly Brant, headed west to Niagara to reunite with her brother. Led by Captain John Deserontyon, the Tiononderoge refugees fled northward to convene at La Chine near Montreal, where Daniel Claus supplied their needs in return for their military service. Deprived of his Tiononderoge congregation, Rev. John Stuart became a Patriot prisoner, held at Schenectady, while the Patriots converted his Anglican chapel into a tavern and later a stable.[44]

Infuriated by the heavy losses at Oriske, the Patriots increased their persecution of the Loyalists in the Mohawk Valley. Plundered and sometimes horsewhipped, several hundred fled northward to Canada during the winter and spring of 1777–78. Their young men bolstered the Loyalist battalions, including those commanded by John Butler and Sir John Johnson. Meanwhile, the Patriots consolidated their hold on the valley by confiscating Loyalist properties, including the Johnson estates of Kingsborough, Guy Park, and Williamsburgh. Anticipating Loyalist and Indian raids, the Patriots fortified the houses of local leaders with earthworks, palisades, and blockhouses to serve as neighborhood refuges and rallying points. But those preparations did little to ease the destructive Loyalist and Indian raids that surged during the spring. In June 1778, the Niagara commandant reported, "Scalps & Prisoners are coming in every day, which is all the News [that] this Place affords."[45]

## BROTHER AND SISTER

Returning to Onoquaga in 1778, Brant became the most active and able of partisan commanders, rustling cattle, burning houses, and killing Patriots. His notoriety led alarmed Patriots to see his hand in every frontier atrocity, although most were committed by other raiders. For example, in July 1778, Butler and Sayenqueraghta destroyed the Yankee settlements at Wyoming on the Susquehanna River in Pennsylvania. When the raiders slaughtered their prisoners, the Patriots blamed Brant, who was in fact far away at Onoquaga. Proud of his genteel restraint that spared civilians and most prisoners, Brant bristled at the Patriot propaganda casting him as the ultimate bloodthirsty savage. Indeed, Brant's Volunteers behaved better than did the Continental soldiers who ravaged Iroquois villages.[46]

In October 1778, Continental soldiers and frontier militia based at Cherry Valley descended the Susquehanna to destroy Onoquaga. Brant and his Volunteers were away on a raid, leaving the village defenseless. Alerted to the approaching danger, most of the villagers fled westward in time. Onoquaga impressed the Patriot commander as "the finest Indian town I ever saw; on both sides [of] the River there was about 40 good houses, square

logs, shingles & stone Chimneys, good Floors, glass Windows, &c., &c." The soldiers torched the houses, butchered the cattle, chopped down the apple trees, and mowed and spoiled the growing corn crop—and they killed some native children found hidden in the cornfields.[47]

In November, the Loyalists and Iroquois revenged Onoquaga by surprising Cherry Valley. John Butler's arrogant son, Captain Walter Butler, led the raid, but he lost control of the Seneca warriors, who killed 32 civilians in addition to 16 soldiers. The Cherry Valley Massacre embarrassed British commanders who blamed Butler and exonerated Brant. Indeed, his exertions had saved many civilians from vengeful Senecas. Niagara's commandant assured the governor that Brant "behaved with great humanity to all those who fell into his hands at Cherry Valley. This (I am convinced) will recommend him to your Excellency's notice much more than any thing else I could say in his favour." While becoming a brutal savage in Patriot propaganda, Brant won British applause for a genteel restraint applauded as a triumph over his native nature. Daniel Claus extolled Brant's "singular power and command to resist the Excess of Liquor & whenever a little intoxicated his governing himself from the usual savage madness & frenzy."[48]

In early 1779, Brant visited Quebec to call on General Haldimand, a Swiss-born veteran officer who had supplanted Carleton as the commander and governor in Canada. In seeking favors from Haldimand, Brant obtained eager assistance from Claus, who passionately hated John Butler for profiting at the Johnson's expense by cultivating the favor of their nemesis, Sir Guy Carleton. Claus denounced Butler as indolent, blundering, and corrupt. To make a pointed contrast, Claus described Brant as the true and consummate genius of frontier warfare, possessed of a zeal, activity, ability, honesty, and influence that shamed John Butler.[49]

At Quebec, Brant impressed Haldimand, who praised that "very intelligent and good man" as critical to the British war effort. In addition to presents of fine clothing and silver jewelry, Brant obtained a captain's commission in the royal army with a £100 salary. Haldimand also promised clothing, rations, and medical care (but no pay) for Brant's volunteers. And the governor agreed to support Molly Brant's considerable expenses, observing that "whatever may be done for her is Due to the Memory of Sir William Johnson, to Her Services, and will be a handsome Mark of attention to Joseph." Finally, on April 7, Haldimand pledged in writing that "as soon as the present Troubles were at an end" the Mohawks "should be restored at the Expence of Government, to the state they were in before these broke out." This promise later become problematic, when the British failed to subdue the American rebellion. How were the British to restore the Mohawk situation if their homeland remained in Patriot hands?[50]

in May, Brant returned to Niagara to live in the genteel style permitted by his new salary, plunder from raids, and enhanced credit with merchants. A Patriot prisoner recalled:

His dress was very fine; he wore a broadcloth blanket over his shoulders in the usual Indian style, of the finest make, with a deep, rich, red border. When he showed himself about the fort, he was always in full and careful costume, glittering with brooches, etc.

On the Niagara River, six miles above the fort, Brant acquired a farm with a stout log house, which he augmented by building a small chapel for Anglican services. To work the farm and serve the household, Brant appropriated slaves captured during his frontier raids. He began to approximate the mode of life he had seen at Johnson Hall.[51]

A new marriage enhanced his prospects. His second wife, Susanna, had died in late 1778, probably of tuberculosis. A year later, Brant married Catharine Croghan (Adonwentishon), the twenty-year-old daughter of George Croghan (one of Sir William's deputies) and a Mohawk woman. As the niece of Tekarihoga, the most prestigious chief of Canajoharie, Catharine dramatically boosted Brant's standing and clout among the Mohawks. Although a love match, the marriage was also as politically shrewd as Sir William's choice of Molly Brant.[52]

By public honors and gifts, Haldimand hoped to enhance Brant's standing and influence among the Six Nations, but the British rewards backfired by provoking the jealousy of rival chiefs, especially Sayenqueraghta. Walter Butler warned that Brant "has been more notice taken of than has been good for his own interest with his own people." A British general opined that, without a royal commission, Brant "would be much happier and would have more weight with the Indians, which he in some measure forfeits by their knowing that he receives pay." Learning this lesson in late 1779, Haldimand quietly retrenched his favor to Brant by pocketing a promotion from captain to colonel offered by Lord Germain. By securing a government pension for Sayenqueraghta, Haldimand also belatedly sought to reward "the man of greatest influence in the whole Six Nations, by whose intrigues Major Butler has been able to carry through many essential points."[53]

But no chief, neither Sayenqueraghta nor Joseph Brant, could match the Iroquois influence of Molly Brant. To an inherited prestige greater than her brother's, she added a formidable will, keen mind, pointed eloquence, and a powerful mystique as Sir William's widow. One British officer considered Molly's influence "far superior to that of all their Chiefs put together." According to Daniel Claus, she publicly rebuked Sayenqueraghta for slight-

ing Seneca obligations to "the late Sir William Johnson, whose memory she never mentioned without tears in her eyes, which affects the Indians greatly." Shamed, Sayenqueraghta and the other Seneca chiefs immediately "promised henceforth truthfully to keep their engagements with her late friend, the Baronet, for she is in every respect considered and esteemed by them as Sir William's Relict, and one word from her is more taken notice of by the Five Nations than a thousand from any white man." Claus added that Molly "prevented many a mischief & much more so than of her Brother Joseph, whose present Zeal & Activity occasioned rather Envy & Jealousy."⁵⁴

In reward for her Loyalist zeal and native connections, Molly expected an almost unlimited respect and generosity from British officers. Collecting an annual pension of £100, she dressed in a calico gown fastened with abundant silver brooches. At Carleton Island, a British base at the northeastern corner of Lake Ontario, the government built a fine mansion for Molly and her family. When that proved inadequate, British officers had another built on the nearby mainland. In addition to her own prodigious consumption, Molly demanded goods to sustain her servants, children, and extensive kin. Guy Johnson grumbled: "Molly used to go to the Stores & take out everything she pleased & give to her particulars. She is certainly, you know, pretty large minded. . . . I fear that any Expense or Attention will fall short of her Desires, though I wish to gratify them." Needing her Iroquois influence, and intimidated by her imperious manner, few officers dared to disappoint Molly Brant.⁵⁵

## EVERLASTING FRIENDSHIP

As most of the Iroquois rallied to the British and Loyalists to raid the Mohawk Valley, the Oneidas and Tuscaroras soared in importance to the Patriot cause. As guides and warriors, they became indispensable to the defense of an embattled frontier. Serving as allies, rather than as hired soldiers, the Oneidas conducted the war as they saw best. While fighting the British and Loyalists with verve, the Oneidas avoided (after the battle of Oriske) combat with their fellow Iroquois, who reciprocated the restraint. That mutual caution served the interests of the frontier Patriots, who were on the defensive, better than the British, who complained that their Iroquois allies avoided any area where they might clash with the Oneidas. That mutual restraint also enabled Oneida spies to mingle with their Iroquois friends at Niagara and in Canada, gathering information that alerted the Patriots to impending attacks. And by circulating American overtures and news of Patriot victories, the Oneida agents worked to disaffect Loyalists and their Iroquois allies

from the British cause. Ruing the Oneida effectiveness in the shadow war of the northern frontier, Haldimand declared: "The Treachery of the Onidas and [the] constant obstacles they present to our Scouts in any attempt upon the Mohawk River makes it a matter of serious consideration to compel them to relinquish the Rebel Interest, or to cut them off."⁵⁶

Recognizing their crucial importance, General Schuyler carefully wooed the Oneidas. In early 1776, he wrote to them: "Be assured that you will be a happy people whilst you remain in Love and Friendship with us and that I will do my utmost to make you love me as much as I do you." Although desperately short on supplies, Schuyler did everything he could to provide something for the Oneidas. In October 1776, he observed, "They are such good Friends, that I wish to have it in my power to give them some Cloathing." Schuyler also promised American protection for Oneida lands after defeating the British and the Loyalists: "You will then partake of every Blessing we enjoy, and united with a free people, your Liberty and Property will be safe."⁵⁷

Schuyler bolstered Oneida morale by forcefully disseminating news of Patriot victories. After George Washington's Continental Army won the battles of Trenton and Princeton during the winter of 1776–77, Schuyler rushed the news to Kanonwalohale. He sent along barrels of rum, "wishing you to drink Health, peace and Liberty to your American Brethren and everlasting Friendship between you and them." Upon receiving a subsequent keg in early 1779, to celebrate another Patriot victory, the Oneidas assured Schuyler, "It makes us feel happy & wish further Success & greater Victories to your Chief Warrior and all his Men." Alas, the chiefs also reported that a drunken warrior had gotten lost and had frozen to death in the snow outside of Fort Schuyler. Both the British and the Patriots exploited alcohol to try to manage their Iroquois allies. In the process, both promoted an often deadly addiction that they had piously denounced in peacetime.⁵⁸

## INVASION

Stung by the frontier raids of 1778, the Patriots counterattacked in 1779, when Washington diverted part of his Continental Army to invade western Iroquoia. Anticipating such an invasion, the Iroquois chiefs begged Haldimand to renovate and garrison the lapsed fortress at Oswego on Lake Ontario. Instead, the governor dithered, citing a lack of men and supplies. Discounting the Patriot offensive capacity, Haldimand worried far more that a French fleet and army might ascend the St. Lawrence River to attack his headquarters at Quebec.⁵⁹

Compendium_Roth
Page 1817

In April, Colonel Goose Van Schaick led the first Patriot probe into Iroquoia. Heading west from Fort Schuyler, his troops surprised and destroyed the main Onondaga village, killing 12 and taking 33 prisoners. Because the most militant Onondagas had already withdrawn to Niagara, the villagers were neutralists and easy pickings for a surprise attack. The Onondagas accused the Patriot soldiers of raping and killing women captured at the village, "yet these Rebels call themselves Christians."[60]

During the summer, the main Patriot invasion advanced in three prongs. From Pittsburgh, Colonel Daniel Broadhead marched north against the Seneca villages in the Allegheny Valley. From the Mohawk Valley, General James Clinton led his brigade down the Susquehanna River to Tioga to meet the main thrust, commanded by General John Sullivan, who marched up that river, past the ruins of Wyoming. Samuel Kirkland joined the Sullivan expedition as a chaplain, mixing Christianity with patriotism to inspire the troops. In mid-August at Tioga, Clinton rendezvoused with Sullivan, creating an army of 3,000 men, more than three times the number of Loyalists and western Iroquois mustered to resist.[61]

At Newtown Point on August 29, Sullivan's soldiers brushed aside resistance led by Brant, Butler, and Sayenqueraghta. The Patriot troops then methodically located, looted, and burned the Iroquois villages around the Finger Lakes and in the Genesee Valley, while Broadhead did the same in the Allegheny Valley. Everywhere, the soldiers marveled at the substantial villages of log cabins, the broad fields of Indian corn, and the extensive orchards of apple, peach, and cherry trees, all of which they systematically destroyed. Patriot torches claimed Kanadasega, Sayenqueraghta's home village that had hosted Kirkland's original mission in 1765. On September 15, Sullivan turned back, returning via the Chemung and Susquehanna rivers to Pennsylvania. In retrospect, he boasted of destroying 40 Iroquois villages and at least 160,000 bushels of corn. Impressed by Iroquoia's fertile soil, many officers and soldiers eagerly anticipated a postwar return as conquering settlers.[62]

In a gratuitous finishing flourish, Clinton's returning soldiers dispossessed the four Mohawk families who still lingered at Tiononderoge, hoping for safety in their neutrality. Arrested and evicted, they lost their homes to envious settlers. Colonel Peter Gansevoort observed, "It is remarked that the Indians live much better than most of the Mohawk River farmers, their Houses [being] very well furnished with all [the] necessary Household utensils, great plenty of Grain, several Horses, cows and waggons." That lost property represented the fruits of their long, profitable alliance with Sir William Johnson. This dispossession troubled Philip Schuyler as a betrayal of the trust that the neutral Mohawks had placed in his public promise of

their safety. His protests led Washington to order the Mohawks freed from the Albany jail, but they failed to recover their confiscated homes.[63]

In early September, Haldimand belatedly dispatched Sir John Johnson from Montreal to defend Iroquoia against Sullivan's invasion. In addition to acting far too late, Haldimand sent far too little, entrusting Sir John with only 400 Loyalists and Britons, about 200 Canadian Iroquois, and Guy Johnson. After three years of comfortable inertia in New York City, Guy had at last made his way to his duty in Canada. During the relief expedition, neither Johnson manifested Sir William's initiative and charisma. Advancing slowly and complaining all the way, they did nothing to inspire their Indian allies. Equally reluctant to leave Canada, the Indians drank heavily and displayed a truculence that repeatedly delayed an already laggard expedition. It seemed fitting that the ill-starred Guy Johnson would appear only at the moment of disaster to help lead a long, slow progress from Montreal to futility.[64]

At last, the Johnsons reached Niagara on October 5, three weeks too late to catch Sullivan—a good thing, given their inadequate numbers. At Niagara, they found 5,000 despairing Iroquois refugees, in a straggling, makeshift village that stretched eight miles above Fort Niagara along the river. Desperately ragged and hungry, the disgruntled refugees faced the cold rains of autumn without adequate shelter. They blamed the British for their woes. In a subtle but calculated insult, the Iroquois chiefs initially declined to conduct the customary welcoming ceremony expected by Guy and Sir John, a slight unthinkable in Sir William's day and evidence that the Sullivan expedition had strained the British relationship with their Iroquois allies.[65]

With Butler's and Brant's help, Guy and Sir John tried to distract the Iroquois chiefs by organizing a revenge raid to destroy the Oneida villages. Unenthusiastic, most of the chiefs dragged their heels by getting "very drunk & very troublesome." When the raid did, at last, get under way, only 87 warriors showed up, half of them Mohawks, for Brant was the only chief to show any enthusiasm for the venture. In late October, Sir John halted the farce by canceling the raid.[66]

Returning to Montreal, he left Guy Johnson behind to cope with Iroquois anger through the long, cold, and hungry winter, when hundreds died from malnutrition, exposure, and disease. But far from breaking the western Iroquois—as the Patriots had expected—dispossession and suffering enhanced the survivors' grim determination to renew their raids in the spring of 1780. The Loyalist Richard Cartwright observed, "The rebels must have found that their grand Western Expedition, attended with such vast labour and enormous expense, instead of conquering, had only served to exasperate the Indians."[67]

## LOSS

Employing most of their troops to attack Patriots along the Atlantic seaboard, the British could spare only small garrisons to defend Canada and the forts scattered along the Great Lakes. A mere 400 soldiers, mostly Loyalists, guarded Niagara, an extensive fort built for three times that number. To screen undermanned Niagara from Patriot attack, the British procured about 900 Iroquois warriors to raid the settlements in the Mohawk Valley. By putting the frontier Patriots on the defensive, the British preserved their forts, prevented a renewed invasion of Canada, and destroyed farms and gristmills that supplied the Continental Army. Those raids also demoralized the valley Patriots by exposing their vulnerability to a frontier war of surprise and terror. Brant, Sayenqueraghta, the Seneca chief Cornplanter, and Walter Butler led war parties out of Niagara, while Sir John Johnson conducted parallel raids from the St. Lawrence.[68]

This frontier war took an increasingly grim toll on the Oneidas. In July 1779, when Deacon Thomas died resisting arrest at Kahnawake, Haldimand celebrated the death of "the right arm of Parson Kirkland." In February 1780, Schuyler sent the Oneida chiefs Skenandon and Good Peter to Niagara to promote Iroquois defection from the British alliance. But the western Iroquois rejected the overture, and Guy Johnson cast the emissaries into the fort's dungeon, a bitterly cold and windowless "black hole." Held on short rations for 150 days, Good Peter and Skenandon cracked, winning their release by consenting to guide the Loyalist war parties.[69]

During the campaign of 1780, the British and their Indian allies initially targeted the Oneida and Tuscarora country, determined to eliminate that forward base of Patriot influence in Iroquoia. Impending attack intimidated the Tuscaroras of Kanaghsoraga, at the western margin of the Oneida country. Defecting from the Patriot alliance, they fled westward to join the Loyalists at Niagara in early June. Their removal exposed Old Oneida to attack, inducing those villagers also to withdraw to Niagara and to submit to British guidance. From Kanaghsoraga and Old Oneida, the British retrieved 294 Indians, a mix of Tuscaroras, Onondagas, and Oneidas. Guy Johnson gloried in the defections as his greatest coup. In a triumphant speech, he rebuked the defectors for their delay: "What think you would your old Friend, the late Sir William Johnson, have said to you on this Occasion, to whom you were always carrying complaints of the Encroachments made on your Lands & frauds committed by those very People to whom you have been since so much attached[?]"[70]

The evacuation of Kanaghsoraga and Old Oneida left Kanonwalohale isolated and vulnerable. In mid-July, Joseph Brant led another war party out

of Niagara against Kanonwalohale, compelling Skenandon and Good Peter to come along to urge their people to surrender. A few Oneidas, including Captain Jacob Reed, did surrender, but most (over 400) instead took refuge at Fort Schuyler, where Kirkland served as the garrison's chaplain. Brant's raiders then systematically destroyed the crops, houses, and meetinghouse that represented the material progress of Kirkland's mission. The Kanonwalohale Oneidas lost about seventy-three houses, as well as almost all of their horses and other personal possessions. That destruction deepened the Oneidas' enmity for Brant, who had acted on his own anger at them for plundering his home (and that of his sister Molly) at Canajoharie. In early 1781, Claus described Brant as "fixed in his Mind to take Revenge on [the Oneidas] . . . for sundry insults that he as well as his Sister received from them."[71]

The Oneidas moved their women, children, and old men to a bleak refugee camp near Schenectady. Most of the warriors then returned to Fort Schuyler to assist the Patriot defense of the Mohawk Valley. Because American finances and logistics were a mess, the refugees suffered from ragged clothing, scanty food, and cold, leaky huts. A smallpox epidemic, pervasive poverty, and rambling begging took their toll on Oneida morale. Samuel Kirkland recalled, "The devastation of their towns reduced them to absolute want & dependence & their dispersion among the whites rendered them more than ever idle, intemperate & abject." Cherishing the Oneidas as his best fighters, General Schuyler warned Congress in October 1780:

> In the late incursions of the enemy, they joined with our troops with alacrity and behaved with a spirit which drew the admiration of the officers under whose command they fought and bled, but I fear their virtue will at last yield to a continuation of distress which no human being can endure and that they will renounce an alliance which has exposed them to such abuse.

In British Canada, Haldimand seconded the strategic importance of the Oneidas, urging his subordinates to destroy the Schenectady refugee camp: "This opportunity should, if possible, be taken to extirpate the remaining unfriendly Oneidas who much impede our scouts and recruiting Parties and are in many respects very useful to the Rebels." Fortunately, that British raid fell short.[72]

The destruction of the Oneida villages exposed the Patriot settlements to British and Indian raiders. The raiders' access further improved during the spring of 1781, when the Patriots abandoned Fort Schuyler. Unable to supply the fort adequately or to repair the damages wrought by a flood and a fire in rapid succession, the Patriots withdrew the demoralized garrison. By the end

of 1781, the raiders had destroyed most of the Mohawk Valley settlements, making refugees of at least two-thirds of the inhabitants, widowing 380 women, and leaving about 2,000 children without fathers. New York's Patriot governor, George Clinton, lamented, "Schenectady may now be said to become the limits of our western Frontier."[73]

### EXTRAVAGANCE

To rally Iroquois raiders, the British multiplied the presents delivered at Fort Niagara. The Iroquois experienced a great boom in rum, guns, ammunition, cloth, clothing, hatchets, hoes, mirrors, and jewelry. In 1781 at the three Great Lakes posts of Niagara, Detroit, and Michilimackinac, the British delivered presents worth £100,000—up dramatically from the £500 given in 1775. The increased presents included massive quantities of alcohol: over 7,000 gallons of rum annually during the early 1780s at Niagara alone. The commander there, General Allan MacLean, marveled that "the People at the head of [the] Indian department seem to Vie with each other who shall expend [the] most Rum, and the great Chiefs are striving [to see] who shall Drink [the] most Rum."[74]

In wartime, the British at last acted with a generosity that impressed their allies. Addressing an Indian council at Niagara in 1779, Sayenqueraghta urged:

> It is also your Business Brothers to exert yourselves in the Defense of this Road by which the King, our Father, so fully supplied our Wants. If this is once stopt we must be a miserable People, and be left exposed to the Resentment of the Rebels, who notwithstanding their fair Speeches, wish for nothing more than to extirpate us from the Earth, that they may possess our Lands, the Desire of attaining which we are convinced is the Cause of the present War between the King and his disobedient Children.

Rather than imposing the British will on the Indians, vulnerable Fort Niagara was a vital Indian asset worth protecting from Patriot attack.[75]

Niagara became notorious for drinking, brawling, whoring, and cheating. Crude taverns, stores, and bordellos sprouted on "the Bottom," the riverside flat below the fort. The Bottom boasted Indian prostitutes infamous for both beauty and drinking. Wartime Niagara also attracted profiteering traders. In 1779, a mercantile clerk marveled that such an isolated post should annually consume £30,000 in merchandise. Dealing with illiterate customers and tricking a distant bureaucracy invited conniving and corrup-

tion by officials and merchants. Every post commandant reached General MacLean's conclusion, "It's a maxim I find that has been long adopted in this Part of the World, that what ever can be got from Government, is well got, where no censure can insue."[76]

Two major firms predominated: that of Edward Pollard and the rival partnership of Forsyth & Taylor. To maximize their profits, the firms bought the interest of key officials who swayed the allocation of government contracts. Early in the war, Pollard exploited his friendship with John Butler to secure most of the government business supplying the Indians at Niagara. In return, Butler took a cut of the profits. That profitable understanding came to a crashing halt in October 1779, when Guy Johnson arrived to take charge of the Indian Department at Niagara. To undermine Butler's influence with the Indians, Guy switched government favor to Forsyth & Taylor.[77]

The Johnsons underestimated Butler as a crude bumpkin who had risen far beyond his competence and his class thanks to Sir Guy Carleton's misguided patronage. How dare Butler exercise the government largesse and conduct Indian councils in the manner of Sir William? Once Haldimand replaced Carleton, the Johnsons expected to cut Butler down to size, restoring his subservience. But Haldimand appreciated Butler's talents as an agent to Indians. In addition to speaking the Iroquois languages better than could Sir John or Guy Johnson, the rough-and-ready Butler mixed better, sharing in the hardships and profane humor of the Indians. Loath to sacrifice those talents to the Johnsons' resentment, Haldimand ordered them to collaborate tactfully with Butler. Ignoring Haldimand's advice, Guy Johnson robbed Butler of the fruits of his corruption and spared few chances to insult him.[78]

But Guy made crucial mistakes. Desperate to buy influence among the Iroquois, Guy Johnson spent government money in profligate quantities and kept sloppy records. In both regards, Guy followed Sir William's example—but to a greater degree driven by a sense of inferiority. Lacking Sir William's charisma and cunning, Guy Johnson could never get away with the same excesses, to say nothing of greater ones.

To win Sayenqueraghta away from Butler, Guy Johnson gave "a fine blue Coat, trimmed with Gold-Lace, and a gold-embroidered Waist Coat" supplemented with abundant silver jewelry. Sayenqueraghta's son collected a scarlet coat with gold epaulets and a silver gorget. When Haldimand protested such extravagance, Johnson confessed his inability to resist ambitious chiefs: "Many of the Indians will no longer wear Tinsel Lace and are becoming Good Judges of Gold & Silver." Their families also expected wine, tea, coffee, sugar, chocolate, and fine linens. And the favor bestowed on one chief invited clamors for similar gifts from jealous rivals.[79]

To maintain their own influence, chiefs needed additional gifts for their

*A new science of politics is needed for a new world.*
—ALEXIS DE TOCQUEVILLE, 1835

*The Institute of Early American History and Culture is sponsored jointly by the College of William and Mary and Colonial Williamsburg, Incorporated.*

# THE
# CREATION
## OF THE
# AMERICAN
# REPUBLIC
## 1776-1787

*by GORDON S. WOOD*



*Published for the*
INSTITUTE OF EARLY AMERICAN HISTORY AND CULTURE
*at Williamsburg, Virginia, by*
THE UNIVERSITY OF NORTH CAROLINA PRESS · CHAPEL HILL

Compendium_Roth
Page 1821

receive no damage.'"[39] But it was not simply a matter of invoking the Ciceronian maxim, *Salus Populi suprema Lex est*. The extensive mercantilist regulation of the economy, the numerous attempts in the early years of the war to suppress prices, control wages, and prevent monopolies, reaching from the Continental Congress down through the states to counties and towns, was in no way inconsistent with the spirit of '76, but in fact was ideally expressive of what republicanism meant.[40] In the minds of the most devoted Commonwealthmen it was the duty of a republic to control "the selfishness of mankind . . . ; for liberty consists not in the permission to distress fellow citizens, by extorting extravagant advantages from them, in matters of commerce or otherwise."[41] Because it was commonly understood that "the exorbitant wealth of individuals" had a "most baneful influence" on the maintenance of republican governments and "therefore should be carefully guarded against," some Whigs were even willing to go so far as to advocate agrarian legislation limiting the amount of property an individual could hold and "sumptuary laws against luxury, plays, etc. and extravagant expenses in dress, diet, and the like."[42]

Even at the beginning, however, there were some good Whigs who perceived the inherent conflict between individual liberty and traditional republican theory. Ancient Sparta, William Moore Smith told the members of the Continental Congress in the spring of 1775, had demonstrated the problem. Knowing that luxury was the great enemy of republicanism and liberty, Lycurgus had sought to avoid the evil by eliminating wealth itself. But

39. David Ramsay, *The History of the Revolution of South Carolina* (Trenton, N. J., 1785), I, 351.
40. For the consuming majoritarian character of Revolutionary thought see Bernard Wishy, "John Locke and the Spirit of '76," *Pol. Sci. Qtly.*, 73 (1958), 413–25. On the mercantilist regulation see Allan Nevins, *The American States during and after the Revolution, 1775–1789* (N. Y., 1924), 64–65, 77; Richard B. Morris, "Labor and Mercantilism in the Revolutionary Era," in Richard B. Morris, ed., *The Era of the American Revolution* (N. Y., 1939), 76–139; Oscar and Mary F. Handlin, "Revolutionary Economic Policy in Massachusetts," *Wm. and Mary Qtly.*, 3d Ser., 4 (1947), 3–26.
41. Charleston *S.-C. and American Gazette*, Aug. 14–21, 1776. For other examples of the Whigs' denial that liberty meant "that in a state or society you had a right to do as you please," see Cushing, ed., *Writings of Samuel Adams*, II, 5; *Four Letters*, 10; Zabdiel Adams, *A Sermon Preached . . . May 29, 1782 . . .* (Boston, 1782), 16, 17.
42. Payson, *Sermon Preached May 27, 1778*, Thornton, ed., *Pulpit*, 338; Boston *Independent Chronicle*, Mar. 6, 1777. See also Boyd, ed., *Jefferson Papers*, VI, 290; Adams, ed., *Works of John Adams*, IV, 199, IX, 375.

in doing so he undermined the very basis of freedom. "He seems not to have reflected that there can be no true liberty without security of property; and where property is secure, industry begets wealth; and wealth is often productive of a train of evils naturally destructive to virtue and freedom!" "Here, then," said Smith, "is a sad dilemma in politics." If the people "exclude *wealth*, it must be by regulations intrenching too far upon civil *liberty*." But if wealth is allowed to flourish, "the syren *luxury*" soon follows at its heels and gradually contaminates the whole society. "What is to be done in this case?" Must the society, "to secure the first of blessings, *liberty*," strangle wealth, the first offspring of liberty, in its birth and thus in effect destroy liberty as well? "Or, is there no proper use of *wealth* and *civil happiness*, the genuine descendants of *civil liberty*, without abusing them to the nourishment of *luxury* and *corruption*?" Smith, like other Whigs in 1776, thought there was an answer to the dilemma in the more enlightened policy and "purer system of *religion*" of this modern age—"to regulate the use of wealth, but not to exclude it."

The dilemma was not new, but was actually the central issue Americans had wrestled with since the seventeenth century. Nearly every intellectual movement from Puritanism to Quakerism to Arminianism had struggled with the problems involved in the social maturation of the American body politic, in a continuing effort to find the means of controlling the amassing and expenditure of men's wealth without doing violence to their freedom. American intellectual life was an intensive search for an ever-renewed compression of tensions for the aspiring Americans who were allowed prosperity but denied luxury. The republicanism of 1776 actually represented a new, more secular version of this same social spring, a new mode of confronting and resisting the temptations and luxury of the world, a new social restraint to which, said Smith, "all systems of education, all laws, all the efforts of patriotism, ought to be directed."[43]

## 4. The Need for Virtue

Perhaps everyone in the eighteenth century could have agreed that in theory no state was more beautiful than a republic, whose whole object by definition was the good of the people. Yet

43. Phila. *Pa. Packet*, May 29, 1775.

everyone also knew that it was a fragile beauty indeed. It was axiomatic that no society could hold together without the obedience of its members to the legally constituted authority. In a monarchy the complicated texture of the society, "the magnificence, costly equipage and dazzling splendors" lavished on the prince, the innumerable titles, the degrees and subordination of ranks, the pervading sense of honor, the "multitude of criminal laws, with severe penalties," the very vigor of the unitary authority often with the aid of a standing army and an established religious hierarchy, all worked to maintain public order, even though in the eyes of a good Commonwealthman it was an order built on show, where "respect and obedience" were derived "only from the passion of fear." But in a republic which possessed none of this complicated social texture, where the elected rulers were merely "in fact the servants of the public" and known by all "to be but men," and where the people themselves shared in a large measure of the governing—in such a state, order, if there was to be any, must come from below.[44] The very greatness of republicanism, its utter dependence on the people, was at the same time its source of weakness. In a republic there was no place for fear; there could be no sustained coercion from above. The state, like no other, rested on the consent of the governed freely given and not compelled. In a free government the laws, as the American clergy never tired of repeating, had to be obeyed by the people for conscience's sake, not for wrath's.

As Jonathan Boucher warned, by resting the whole structure of government on the unmitigated willingness of the people to obey, the Americans were making a truly revolutionary transformation in the structure of authority.[45] In shrill and despairing pamphlets the Tories insisted that the Whig ideas were undermining the very principle of order. If respect and obedience to the established governments were refused and if republicanism were adopted, then, admonished Thomas Bradbury Chandler, "the bands of society would be dissolved, the harmony of the world confounded, and the order of nature subverted." The principles of the Revolutionaries, said Boucher, were directed "clearly and literally against *authority*." They were destroying "not only all authority over us as it now exists, but any and all that it is

possible to constitute." The Tory logic was indeed frightening. Not only was the rebellion rupturing the people's habitual obedience to the constituted government, but by the establishment of republicanism the Whigs were also founding their new governments solely on the people's voluntary acquiescence. And, as Blackstone had pointed out, "obedience is an empty name, if every individual has a right to decide how far he himself shall obey."[46]

The Whigs were well aware of the hazards involved in the revolution they were attempting. Many knew with Hamilton that when the people were "loosened from their attachment to ancient establishments" they were apt "to grow giddy" and "more or less to run into anarchy." Even Samuel Adams warned in 1775 that "there may be Danger of Errors on the Side of *the People*." Sensing the risk of licentiousness in the throwing off of British authority, many Whig leaders urged the people from the outset to "have their hearts and hands with the magistrates," for as long as their appointed rulers acted lawfully and for the public good "they are bound to obey them." But despite Tory charges that the Whig principles were "cutting asunder the sinews of government, and breaking in pieces the ligament of social life," the Americans in 1776 did not regard their republican beliefs as inherently anti-authoritarian.[47] The Revolution was designed to change the flow of authority—indeed the structure of politics as the colonists had known it—but it was in no way intended to do away with the principle of authority itself. "There must be," said John Adams in 1776, "a Decency, and Respect, and Veneration introduced for Persons in Authority, of every Rank, or We are undone." The people would naturally be more willing to obey their new republican rulers; for now "love and not fear will become the spring of their obedience." The elected republican magistrate would be distinguished not by titles or connections but by his own inherent worth and would necessarily "know no good,

44. [Mather], *America's Appeal*, 67, 68; Duché, *Duty of Standing Fast*, Moore, ed., *Patriot Preachers*, 81.
45. Boucher, *View of the Causes*, 520–21.

46. [Thomas B. Chandler], *A Friendly Address to All Reasonable Americans . . .* (N. Y., 1774), 5; Boucher, *View of the Causes*, 552–53; William Blackstone, *Commentaries on the Laws of England* (London, 1765–69), I, 251.
47. Hamilton to John Jay, Nov. 26, 1775, Syrett and Cooke, eds., *Hamilton Papers*, I, 176–77; Samuel Adams to James Warren, Dec. 5, 1775, Worthington C. Ford, ed., *Warren-Adams Letters . . .* (Mass. Hist. Soc., *Collections*, 72–73 [1917, 1925]), I, 191; Foster, *Short Essay on Civil Government*, 40; West, *Sermon Preached May 29th, 1776*, Thornton, ed., *Pulpit*, 276; John Adams, quoting "Massachusettensis" (Daniel Leonard), Adams, ed., *Works of John Adams*, IV, 75.

separate from that of his subjects."[48] But such a change in the nature of authority and the magistracy, the Whigs realized, only mitigated the problem of obedience in a republican system. The people themselves must change as well.

In a monarchy each man's desire to do what was right in his own eyes could be restrained by fear or force. In a republic, however, each man must somehow be persuaded to submerge his personal wants into the greater good of the whole. This willingness of the individual to sacrifice his private interests for the good of the community—such patriotism or love of country—the eighteenth century termed "public virtue." A republic was such a delicate polity precisely because it demanded an extraordinary moral character in the people. Every state in which the people participated needed a degree of virtue; but a republic which rested solely on the people absolutely required it. Although a particular structural arrangement of the government in a republic might temper the necessity for public virtue, ultimately "no model of government whatever can equal the importance of this principle, nor afford proper safety and security without it." "Without some portion of this generous principle, anarchy and confusion would immediately ensue, the jarring interests of individuals, regarding themselves only, and indifferent to the welfare of others, would still further heighten the distressing scene, and with the assistance of the selfish passions, it would end in the ruin and subversion of the state." The eighteenth-century mind was thoroughly convinced that a popularly based government "cannot be supported without *Virtue*." Only with a public-spirited, self-sacrificing people could the authority of a popularly elected ruler be obeyed, but "more by the virtue of the people, than by the terror of his power." Because virtue was truly the lifeblood of the republic, the thoughts and hopes surrounding this concept of public spirit gave the Revolution its socially radical character—an expected alteration in the very behavior of the people, "laying the foundation in a constitution, not without or over, but within the subjects."[49]

This public virtue, "this endearing and benevolent passion,"

48. Adams to James Warren, Apr. 22, 1776, Ford, ed., *Warren-Adams Letters*, I, 234; [Mather], *America's Appeal*, 68.

49. Payson, *Sermon Preached May 27, 1778*, Thornton, ed., *Pulpit*, 337; Jonathan Mason, Jr., *Oration Delivered March 5, 1780* . . . (Boston, 1780), in Niles, ed., *Principles*, 62; Williams, *Discourse on the Love of Our Country*, 13; [Mather], *America's Appeal*, 68.

was "the noblest which can be displayed" and represented all that men of the eighteenth century sought in social behavior. "Its grand source" lay in the attitudes and actions of the individuals who made up the society, "in that charity which forms every social connection."[50] In other words, public virtue, the willingness of the people to surrender all, even lives, for the good of the state, was primarily the consequence of men's individual private virtues. While some men of the eighteenth century could see public virtue arising out of the individual's pride and need for approbation, few endorsed Mandeville's paradoxical view that private vices produced public virtue.[51] For most Americans in 1776 vicious behavior by an individual could have only disastrous results for the community. A man racked by the selfish passions of greed, envy, and hate lost his conception of order; "his sense of a connection with the *general* system—his benevolence—his desire and freedom of *doing good*, ceased." It seemed obvious that a republican society could not "be maintained without justice, benevolence and the social virtues." Since at least the seventeenth century, enlightened intellectuals had been fascinated with the attempt to replace the fear of the hereafter as the basis for morality with a more natural scientific psychology. The Earl of Shaftesbury in particular had tried to convince men of the exquisite happiness and pleasure that would flow from self-sacrifice and doing good. Somehow, as a Boston writer argued in the manner of Francis Hutcheson, the individual's widening and traditionally weakening circles of love—from himself to his family to the community—must be broken into; men must be convinced that their fullest satisfaction would come from the subordination of their individual loves to the greater good of the whole. It was man's duty and interest to be benevolent. "The happiness of every individual" depended "on the happiness of society: It follows, that the practice of all the social virtues is the law of our nature, and the law of our nature is the law of God." "Public good is not a term opposed to the good of individuals; on the contrary, it is the good of every individual collected." "The public good is, as it were, a common bank in which every individual has his respective share; and consequently whatever damage that sustains the individual unavoidably partake of that calamity." Once men correctly perceived their relation to the commonwealth they would never

50. Pinkney's Wmsbg. *Va. Gazette*, Feb. 16, 1775.
51. Lovejoy, *Reflections on Human Nature*, Sec. V.

injure what was really their personal interest to protect and sustain.[52]

## 5. EQUALITY

That the Americans would come to perceive correctly their relation to the state was not simply a matter of faith. The revolutionary change in the structure of political authority involved in their adoption of republicanism was to be matched and indeed ultimately sustained by a basic transformation of their social structure. Henceforth their society would be governed, as it had not been in the past, by the principle of equality—a principle central to republican thinking, the very "life and soul," said David Ramsay, of republicanism.[53]

The doctrine possessed an inherent ambivalence: on one hand it stressed equality of opportunity which implied social differences and distinctions; on the other hand it emphasized equality of condition which denied these same social differences and distinctions. These two meanings were intertwined in the Americans' use of equality and it is difficult to separate them. Many might agree that "if there could be something like an equality of estate and property, it would tend much to preserve civil liberty," since, as everyone knew, "Luxury is always proportional to the inequality of fortune." Yet despite some sporadic suggestions for leveling legislation, most Whigs generally "acknowledged" that it was "a difficult matter to secure a state from evils and mischiefs from . . . wealth and riches." A real equality just "cannot be expected."[54]

Equality was thus not directly conceived of by most Americans in 1776, including even a devout republican like Samuel Adams, as a social leveling; it would not mean, as Thomas Shippen emphasized, the destruction of "the necessary subordination." Rather it was considered to be an "equality, which is adverse to every species of subordination beside that which arises from the difference of capacity, disposition, and virtue." By republicanism the Americans meant only to change the origin of social and political preeminence, not to do away with such preeminence altogether. "In monarchies," commented David Ramsay, "favor is the source of preferment; but, in our new forms of government, no one can command the suffrages of the people, unless by his superior merit and capacity." In a republican system only talent would matter. It was now possible "that even the reins of state may be held by the son of the poorest man, if possessed of abilities equal to the important station." The ideal, especially in the southern colonies, was the creation and maintenance of a truly natural aristocracy, based on virtue, temperance, independence, and devotion to the commonwealth. It meant, as John Adams excitedly put it, that in the choice of rulers "Capacity, Spirit and Zeal in the Cause, supply the Place of Fortune, Family, and every other Consideration, which used to have Weight with Mankind." The republican society, said Charles Lee, would still possess "honour, property and military glories," but they now would "be obtain'd without court favour, or the rascally talents of servility." Only such an egalitarian society, declared young John Laurens, the son of the famous Charleston merchant, could permit "the fullest scope for ambition directed in its proper channel, in the only channel in which it ought to be allowed, . . . for the advancement of public good."[55]

Certainly most Revolutionaries had no intention of destroying the gradations of the social hierarchy by the introduction of republicanism. The Livingstons of New York, for example, were as acutely conscious of degrees of rank and as sensitive to the slightest social insult as any family in America; yet, much to the anger and confusion of William Smith, they took the transformation to republicanism in stride. Smith in frustration pleaded with

52. Samuel Magaw, *A Discourse Preached . . . on Sunday, October 8th, 1775* (Phila., 1775), 7; Payson, *Sermon Preached May 27, 1778*, Thornton, ed., *Pulpit*, 338; Boston *Independent Chronicle*, Dec. 4, 1777; Paine, *Dissertations on Government*, Foner, ed., *Writings of Paine*, II, 371; Hurt, *Love of Our Country*, 10.
53. Ramsay, *Oration on Advantages of American Independence*, Niles, ed., *Principles*, 375.
54. Chatham *New-Jersey Journal*, May 10, 1780, in Nelson *et al.*, eds., *New Jersey Archives*, 2d Ser., IV, 366; Warren, *Oration, Delivered July 4th, 1783*, 11, quoting Montesquieu; Payson, *Sermon Preached May 27, 1778*, Thornton, ed., *Pulpit*, 338; Chatham *New-Jersey Journal*, May 10, 1780, in Nelson *et al.*, eds., *New Jersey Archives*, 2d Ser., IV, 366.

55. *Boston Gazette*, Jan. 21, 1771, Cushing, ed., *Writings of Samuel Adams*, II, 142–53; "Loose Thoughts on Government" (1776), Force, ed., *American Archives*, 4th Ser., VI, 730; Ramsay, *Oration on Advantages of American Independence*, Niles, ed., *Principles*, 377, 375; Adams to Abigail Adams, July 10, 1776, Butterfield, ed., *Family Correspondence*, II, 42; Lee to Patrick Henry, July 29, 1776, *Lee Papers*, II, 177; Laurens quoted in George C. Rogers, Jr., *Evolution of a Federalist: William Loughton Smith of Charleston, 1758–1812* (Columbia, S. C., 1962), 79.

Compendium_Roth
Page 1825

rate analysis of the Englishmen's assumptions about politics indicated, the new understanding of a constitution involved all sorts of adjustments and changes in other areas of political thought. The rush of new and unforeseen events in the years after Independence drove Americans in search of new ways of describing and dealing with a rapidly changing political reality. In the process old ideas, old images, were twisted and eventually shattered.

## 4. THE SOCIAL CONTRACT

When many Americans in 1776 and after identified "a proper and clear line" between rulers and ruled with that between representatives and constituents, and quoted *Cato's Letters* against a society's trusting "to the sole management, mere mercy, and absolute discretion of its own magistrates" to justify restrictions on the legislature, they were, whether they fully realized it or not, profoundly shifting the basis for their Whig understanding of politics.³⁹ Trenchard and Gordon and most radical Whigs had not generally equated the magistrates or rulers with the representatives of the people or ruled. Such an equation would have made nonsense of their theory of politics, just as it was doing for the Americans in the years after Independence, most obviously revealed in the pressure being put on the contractual metaphor that had been designed to explain the people's obedience to the prerogatives of their rulers. Although some writers in the eighteenth century were hesitantly and ambiguously ascribing a magisterial character to the elected representatives of the people, no one had clearly attempted to describe the relationship between representatives and constituents in terms of the traditional contract theory, that is, as a mutual bargain in which protection and allegiance were the considerations, since the people's obedience to Parliament still commonly rested on representational consent, however virtual it may have become. Thus when the Americans began conceiving of their written constitution as something more than a Magna Carta, indeed, as a set of fundamental principles circumscribing all parts of the government, representatives included, the constitution's imaginary characterization as a charter or reciprocal agreement between rulers and people lost its meaning.

39. Albemarle County Instructions, Boyd, ed., *Jefferson Papers,* VI, 286; *Rudiments of Law and Government,* 32.

The mutual contract between rulers and ruled began to seem inoperable once the character and the obligations of the two parties overlapped and combined and became indistinguishable. Unless the idea of representational consent was abandoned, this contractual image was bound to blur.

There was, however, another contractual analogy that ran through the Whig mind of the eighteenth century. This was the idea of the social compact, the conception John Locke had developed in his *Second Treatise on Civil Government,* not a governmental contract between magistrates and people, rulers and ruled, but an agreement among isolated individuals in a state of nature to combine in a society—a social compact which by its very character was anterior to the formation of government. Although this Lockean notion of a social contract was not generally drawn upon by Americans in their dispute with Great Britain, for it had little relevance in explaining either the nature of their colonial charters or their relationship to the empire, it became increasingly meaningful in the years after 1776. Under the changing exigencies of their polemics and politics, Americans needed some new contractual analogy to explain their evolving relationships among themselves and with the state. Only a social agreement among the people, only such a Lockean contract, seemed to make sense of their rapidly developing idea of a constitution as a fundamental law designed by the people to be separate from and controlling of all the institutions of government.⁴⁰

Pennsylvania in 1776, with its remarkably advanced theories of a constitution, witnessed some of the earliest struggles to describe what was new in the traditional contractual language. The constitution was obviously not an old-fashioned colonial charter republicanized, not just the form of government, not merely a document separating power and liberty. A constitution did not contain the division and distribution of the state's power; rather it *"describes* the portions of power with which the people invest the legislative and executive bodies, and the portions which they *retain* for themselves." Indeed, it was "the particular business of a Constitution to mark out *how much* they shall

40. On Locke's contract see John W. Gough, *John Locke's Political Philosophy* (Oxford, 1956), 121. Cf. Thad W. Tate, "The Social Contract in America, 1774–1787: Revolutionary Theory as a Conservative Instrument," *Wm. and Mary Qtly.,* 3d Ser., 22 (1965), 375–91.

give up." Thus if it were a charter, "*that* Charter should be the act of *all* and not of *one man*." The constitution seemed in fact to be the basis of the society itself—"the *charter* or *compact* of the whole people, and the LIMITATION of all *legislative* and *executive* powers." There actually seemed to be in one writer's mind two distinct stages involved in the constitution-making process. First, a special delegation of the people must form a "Social Compact" which "should be unalterable in every point, except by a delegation of the same kind of that which originally framed it, appointed for that purpose." But then "what should be done after this compact is finally agreed upon?" Another charter, "a *charter of delegation*" was needed, which would be "a clear and full description of the quantity and degree of power and authority, with which the society vests the persons intrusted with the powers of the society, whether civil or military, legislative, executive or judicial."[41]

Others elsewhere were also grappling with the nature of the contracts that supposedly lay behind the existence of government. A Rhode Islander in 1779, citing Locke and Sidney and quoting extensively from Pufendorf, described what he thought were three covenants involved in the creation of a body politic. "1. To unite in the establishment of a commonwealth. 2. To submit to the form of government agreed upon by the majority. 3. To support and maintain the government established by the constitution, and to preserve all the rights and privileges of the rulers and subjects agreeable thereto."[42] Yet elaborate as such a description was it lacked depth and development. It was in western Massachusetts and New Hampshire that the conception of a social contract was most fully worked out. For the towns of the Connecticut River valley the contractual nature of the body politic came to possess more than an intellectual meaning; it emerged not simply out of quotations from enlightened thinkers but out of their experience.

Throughout the entire Revolutionary era the Massachusetts towns west of the Connecticut River were in a state of virtual rebellion from the governing authorities in the East. Popular uprisings and mob violence were continual and extraordinarily ef-

41. [Paine], "Candid and Critical Remarks on a Letter Signed Ludlow," June 4, 1777, Foner, ed., *Writings of Paine*, II, 275; *Four Letters*, 19, 15; Phila. *Pa. Gazette*, Oct. 30, 1776; Phila. *Pa. Journal*, May 22, 1776.
42. *Providence Gazette*, Apr. 3, 1779.

fective. The courts were closed in 1774 and did not open again in Hampshire County until 1778 and in Berkshire County until after the Massachusetts Constitution of 1780 was put into effect, and even through the eighties mob outbursts periodically forced the courts to suspend judication. "Those unhappy Tumults and Disorders which both so much prevailed in this part of the State" were not the fancies of overwrought minds; the threat of "a Total Subversion of Government among us" was continuously real.[42] Shays's uprising in 1786 was only the climactic episode in one long insurrection, where the dissolution of government and the state of nature became an everyday fact of life. Indeed, it was as if all the imaginings of political philosophers for centuries were being lived out in a matter of years in the hills of New England.

As early as 1774 the Berkshire Constitutionalists, led by Thomas Allen of Pittsfield, began an attack on the royal court structure that led in the following years to a full-fledged assault on the patriot authorities in the East; for if these westerners could not control their own town and county governments, particularly the courts, "we are indifferent who assumes it whether any particular persons on this or on the other side of the water." By 1775 their antagonism was focused on "that Constitution now adopting in this province," the old 1691 Charter being resumed by the Whig government in Boston. They would prefer to remain in a state of nature than to have that "antient Mode of Government among us which we so much detest and abhor." Only the establishment of a constitution "De novo" could preserve the people's liberties. From these negative beginnings the Berkshire Constitutionalists moved swiftly toward a fuller understanding of how governments should actually be constituted. By May 1776 they were convinced that the Revolution had thrown the people "into a state of Nature," where they would remain until "the formation of a fundamental Constitution as the Basis and ground work of Legislation." Changing the wording of the judges' commissions, reducing the legal fee tables—"all is to us Nothing whilst the foundation is unfixed the Corner stone of Government unlaid." This could be done only by the people themselves, not by the representatives of the people—"they being but servants of the people cannot be greater than their Masters."

43. Towns of Goshen and Chesterfield (1784), quoted in Taylor, *Western Massachusetts*, 121.

To contend, as some had, that the representatives of the people in the legislature, however often elected, could impose on the society whatever constitution pleased them was "the rankest kind of Toryism, the self-same Monster we are now fighting against." The American people had heard much of "Governments being founded in Compact," but none existed in Massachusetts; that is, no "Barrier" between rulers and people had been established. "What is the fundamental Constitution of this province, what are the unalienable Rights of the people the power of the Rulers, how often to be elected by the people etc. have any of these things been as yet ascertained."[44]

So far the Berkshire Constitutionalists had used only the absence of the traditional Whig contract between rulers and people to justify their being in a state of nature. Seizing on this point, William Whiting, in his 1778 *Address to the Inhabitants of the County of Berkshire. Respecting Their Present Opposition to Civil Government*, sought to undercut the Constitutionalists' claim that they were free of all obligation to obey the temporary political authority that possessed the acquiescence of the majority of the society. Although the Declaration of Independence may have destroyed the political constitution of Massachusetts, said Whiting, it had not annihilated the social compact and thrown the people into a state of nature. "No revolution in, or dissolution of, particular constitutions or forms of government, can absolve the members of the society from their allegiance to the major part of the community." Forming a society was one thing and framing a government or constitution was another—two separate and distinct stages which the Berkshire inhabitants had hopelessly confused, rendering their justification for civil disobedience "altogether groundless."[45]

Yet Whiting's argument depended upon equating the constitution with the form of government, an identification most Americans were rapidly abandoning, since the government must clearly be only the creature of the constitution. By November 1778 the Berkshire Constitutionalists perceived the difference and now

44. Pittsfield Memorial, Dec. 26, 1775, and Pittsfield Petitions, May 29, 1776, Handlin, eds., *Popular Sources*, 64, 61, 64, 90, 91, 91, 91, 91–92. See also Taylor, *Western Massachusetts*, 86.
45. [Whiting]. *Address to Inhabitants*, 10–16, 25–26. See Stephen T. Riley, "Dr. William Whiting and Shays' Rebellion," American Antiquarian Society, *Proceedings*, 66 (1956), 119–66.

subtly shifted their emphasis away from a purely political contract, a "sacred Barrier" against the rulers' oppression, like Magna Carta or the Bill of Rights, which were but "imperfect Emblems of the Securities of the present grand period." What was now needed was a "social Compact," uniting men one to another and justifying majority rule; for in all free states the "social Tie" itself was "founded in Compact." Only such a truly fundamental, social constitution could make intelligible the important distinction between a constitution and the acts of the legislators, "it being the foundation on which they themselves stand and from which the Legislature derives its Authority."[46]

The towns of western New Hampshire reached similar conclusions about the contractual nature of the constitution with even more explicitness. Because of their strong conviction that every town in the state should be equally represented in the legislature, the towns, in an *Address* written in July 1776, completely denied the legitimacy of the existing government established by the temporary Constitution in January 1776, "a little horn, growing up in the place where the other was broken off." In truth, they said, there was "no legal power subsisting in the Colony. . . . It is still in the hands of the people." By 1777 it appeared even clearer that the Declaration of Independence had nullified all governmental authority; "by that act the people of the different colonies slid back into a state of nature, and in that condition they were to begin anew." Whatever doubts there may have been about what happened to the people of the other colonies, there could be no question that the people of these western towns had "reverted to a state of nature." Because this Green Mountain territory had been disputed in the middle of the eighteenth century by both New York and New Hampshire, Governor Benning Wentworth of New Hampshire had issued royal charters to new towns in the Connecticut River valley pending the resolution of the contested land. Now with the Revolution these towns of the New Hampshire Grants saw themselves in a unique situation: since they had been joined to New Hampshire only through the royal governor's commissions the voiding of all royal authority had left them "unconnected with the former Government of New

46. Pittsfield Address to the General Court, Nov. 1778, Robert J. Taylor, ed., *Massachusetts, Colony to Commonwealth: Documents on the Formation of Its Constitution, 1775–1780* (Chapel Hill, 1961), 98, 99, 100.

Compendium_Roth
Page 1828

Hampshire or any other incorporated State." They were free, they declared, to join with whatever state they wished.[47]

In a 1778 reply Timothy Walker, a member of the governing Council, pointed out the dangerous consequences of the westerners' principles "that the Declaration of Independence dissolves all political relations and connections." If all the provincial lines were eliminated by Independence and the people truly "reduced to a State of Nature," as the towns claimed, then all the subordinate corporations, all the town lines, were likewise void. The society then became a jumbled "heap of sand, without any cement to hold it together," leading only to chaos and civil war. For what then could compel all those minorities who wished to tie themselves to the state of New Hampshire to obey the majorities in each of the rebellious towns?[48]

The New Hampshire Grant towns backed away from this logic, arguing that the people in the old provinces of New Hampshire did not by the Declaration of Independence revert to a complete state of nature after all. When the Crown's authority was rejected, "*the people made a stand at the first legal stage, viz. their town incorporations,*" miniature constitutions that made every one of the towns "a State by itself," able to justify binding its minority by the majority. So convinced now were these rebellious westerners that a corporate charter was needed to establish and make legal a body politic that they recommended in 1778 to all towns not already incorporated that they "forthwith incorporate themselves."[49]

By now the decisive conclusion was being drawn: the existence of society itself depended upon a concrete charter or constitution. In fact, the western radicals argued, it was precisely the lack of such a charter that had differentiated New Hampshire from her sister colonies in New England. Charters alone had made the people of Massachusetts and Connecticut "a body corporate

47. *Address of the Inhabitants of the Towns [of Grafton County]*, Bouton et al., eds., *State Papers of N. H.*, X, 233–34; Letter of the Republican, Jan. 30, 1777, in Chase, *Dartmouth College*, 431–32; Address of the Towns of the New Hampshire Grants to the Assembly, June 11, 1777, *ibid.*, 455–56. See also *Observations on the Right of Jurisdiction . . . over the New Hampshire Grants . . .* (Danvers, Vt., 1778), in Bouton et al., eds., *State Papers of N. H.*, X, 159–67.
48. [Timothy Walker], An Address to the Inhabitants of the New Hampshire Grants, July 18, 1778, in Bouton et al., eds., *State Papers of N. H.*, X, 170.
49. *A Public Defence of the Right of the New-Hampshire Grants . . . to Associate Together, and Form Themselves into an Independent State* (Dresden, Vt., 1779), *ibid.*, 312–13; Chase, *Dartmouth College*, 460, 461, 485.

and politic in name and fact," and through these social compacts the people "hold themselves indissolubly connected together." But the inhabitants of New Hampshire possessed no such compact, "for take away the royal prerogative power which alone held them together, and what have they left? Nothing but a number of little town incorporations. . . . In short, *they never were a body politic in any legal sense whatever.*" It had long since become evident that a body politic could rest only on a constitution, a "compact or agreement of the People whereby they became united . . . into a new and distinct State."[50]

Although other Americans never quite experienced the state of nature and the Lockean contract so vitally as these dissident New Englanders, they could not resist the appeal of the contractual analogy. The Massachusetts Constitution of 1780 declared itself to be "a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." Since in the forming of such a compact or in the changing of a constitution, as the New Hampshire rebels suggested as early as 1776, "it is absolutely necessary that the whole should be active in the matter, in order to surrender their privileges in this case, as they cannot be curtailed without," every adult male, regardless of his property-holding or the suffrage restrictions provided in the Constitution being established, was entitled to participate—since it was the society itself that was being constituted, as Thomas Dawes exclaimed in a Boston oration celebrating the new Constitution. "We often read of the original contract, and of mankind, in the early ages, passing from a state of nature to immediate civilization"—a time so distant, so far removed that no eyes had ever penetrated to it. "And yet," said Dawes, "the people of Massachusetts have reduced to practice the wonderful theory." The people had "convened in a state of nature, and, like our ideas of the patriarchs," had actually drawn and signed "a glorious covenant."[51]

What was explicitly stated in Massachusetts was less officially but no less conclusively being reached elsewhere in the 1780's.

50. *Public Defence*, Bouton et al., eds., *State Papers of N. H.*, X, 314–15; *Observations on the Right of Jurisdiction*, in *ibid.*, 164.
51. Mass. Cons. (1780), Handlin, eds., *Popular Sources*, 441; *Address of the Inhabitants of the Towns of [Grafton County]*, Bouton et al., eds., *State Papers of N. H.*, X, 233–34; Dawes, *Oration Delivered March 5th 1781*, in Niles, ed., *Principles*, 71.

From South Carolina to New Jersey the constitution had become "a social covenant entered into by express consent of the people," "that original compact entered into by every individual of a society, whereby a certain form of government is chalked out and established unalterably, except by the people themselves: thus by a constitution then, . . . we do not mean government itself, but the manner of its formation and existence."[52] Although many continued to refer to the constitution as that "*civil compact*" which "points out the manner in which we chuse to be governed, the *privileges* of the people, and the *prerogatives* of the governing body," once the changes Americans were making in the nature of politics were grasped, the constitution could no longer be intelligibly regarded as a contract, like Magna Carta, between rulers and people. All authority in all parts of the government was equivalently derived from the people, "through the medium of that constitutional compact, which binds them together in one body." The constitution was not a bargain between two parties but had become the very basis of the society, and because "established by the people, it is stronger than any law the assembly can make, it being the foundation whereon they stand."[53]

So crucial was this conception of a constitution to the Americans' interpretation of government and their relationship to it that it could easily become the focal point of wide-ranging political arguments, as it did in Maryland in 1787 in the debate over the right of the people to instruct the Senate. "The question between us," Judge Alexander Hanson told his antagonist William Paca, "depends on the construction of the compact." Since the people of Maryland, Hanson argued, had not retained in their Constitution the right of instructing their legislators, they did not and could not possess it, for "it is plain they can have no rights '*paramount*' the compact." This Paca denied, insisting that the people's rights belonged to them in a state of nature, "before compact, and therefore, if not transferred by compact, might be exercised, although not mentioned therein, defined or ascertained." When Hanson questioned the existence of any such state of nature, Paca exploded with quotations from Locke and Sidney,

52. [Tucker], *Conciliatory Hints*, 12; [John Stevens], *Observations on Government, Including Some Animadversions on Mr. Adams' Defence of the Constitutions* . . . (N. Y., 1787), 44.
53. Adams, *Sermon Preached May 29, 1782*, 21; Cumings, *Sermon Preached May 28, 1783*, 16; [Isaac Backus], *A Door Opened for Equal Christian Liberty* . . . (Boston, [1783]), 5.

contending that the Americans' understanding of government and a constitution absolutely depended on a state of nature. Hanson conceded that there may have been at one time such a hypothetical state of nature; yet "when the people entered into a compact of government" they "thereby parted with the whole legislative power." Therefore since this so-called natural right of the people to instruct their legislators, although not explicitly denied in the Constitution, "is incompatible with the exercise of the legislative power, conferred on a body, or bodies of men, common sense must decide, that it is given up, as clearly, as if it had been mentioned." But, replied Paca, a constitution and the delegation of legislative power by the people did not work that way. It was not a wholesale surrender of power; it was piecemeal and controlled. None of the rights of the people were "parted with or transferred by any compact that we have made." In fact, said Paca, the constitution was not inclusive of the people's rights; it did not and could not define them. When the colonists resisted the tyranny of Great Britain they also had referred to charters, compacts, and constitutions. Yet, asked Paca, did they "rest the rights of America upon these charters or compacts? Or did they deduce them from a higher source, *the laws of God and nature?*" With such questions Paca had stumbled into the most perplexing problem of American constitutional law.[54]

## 5. The Ambiguity of American Law

Important as this development of the constitution as a fundamental law superior to ordinary legislative acts was to American constitutionalism, it ultimately was not the most important source of the peculiarly effective nature of American constitutional restrictions on legislative power. What in the final analysis gave meaning to the Americans' conception of a constitution was not its fundamentality or its creation by the people, but rather its implementation in the ordinary courts of law. The idea of fundamental law was, after all, a continuing one in Western political thought, especially among Englishmen in the seventeenth century who likewise had experimented with a written constitution. And despite its precipitous decline in the eighteenth century, the con-

54. Baltimore *Md. Journal*, Aug. 3, 31, 1787; Annapolis *Md. Gazette*, June 28, Aug. 2, 16, 1787.

Compendium_Roth
Page 1830

provincial congresses as lawful and of as much force as if they had been passed by a legitimate legislature. As justifiable by expediency, nature, or history as the Americans' Revolutionary conventions and congresses were "in these very Critical and Alarming Times," still they were no substitute for properly constituted representations of the people in regular legislatures.[20]

Yet the convention in American thinking eventually became something more than a legally deficient legislature, indeed became an extraordinary constitution-making body that was considered to be something very different from and even superior to the ordinary legislature—all so rapidly and so suddenly that it is difficult to recapture its origins. It was perhaps inevitable that the Americans' conventions of 1774–75, as the instruments of revolution and constitution-making, should have eventually assumed an unusual importance in their eyes. Some Englishmen at the time of their own Revolution in 1688 had also been unable to avoid the significance of what their Convention, defective as it was, had done. In 1689 a few pamphleteers, in a distinctly minority opinion, had argued that the Convention placing William and Mary on the throne, although made up of the same Lords and Commons that usually composed a Parliament, "yet being the Representatives of the whole Kingdom gathered together in an extraordinary case and manner, and for extraordinary ends, . . . seemeth to be something greater, and of greater power than a Parliament." An early eighteenth-century English pamphlet, republished in Philadelphia in 1775, echoed this view of the 1688 Convention, arguing that when a society was thrown into a state of nature by revolution it had "an Inherent Right" to put itself under any form of

20. Samuel Adams to Joseph Warren, Sept. 1774, Cushing, ed., *Writings of Samuel Adams*, III, 157; Cushing, *Transition in Massachusetts*, 179; Address of the Georgia Provincial Congress to the Governor, July 17, 1775, in "Proceedings and Minutes of the Governor and Council . . . ," *Ga. Hist. Qtly.*, 34 (1950), 295. See in this regard the opinion of St. George Tucker in *Kamper* v. *Hawkins* in 1793: the Revolutionary conventions "were the *people*, assembled by their deputies, not a *legal*, or *constitutional assembly*, or part of the *government* as then organized. Hence they were not, or could be deemed the ordinary legislature; that body being composed of the governor, council, and burgesses, who sat in *several distinct chambers* and *characters*: while the other was composed of a *single* body, having neither the character of governor, council, or legitimate representatives among them: they were, in effect, *the people themselves*, assembled by their delegates, to whom the care of the commonwealth was especially, as well as unboundedly confided." Judges Brockenbrough and Holmes, eds., *A Collection of Cases Decided by the General Court of Virginia . . . Commencing in the Year 1789 . . .* (Phila., 1815), I, 69.

government it chooses. "Yet it cannot be regularly said to be done by the Society, unless it be done by such Persons as are appointed by the Society for that purpose." In 1764 James Otis voiced a similar impression of the Glorious Revolution, implying that the Convention of 1688 in some curious way had actually created the government anew and thus was not less but in fact more than an ordinary Parliament.[21]

The Americans with a similar heritage and confronted with similar situations during their own constitution-making experience would approximate and elaborate these sporadically expressed ideas about the English Convention-Parliament. But they would do more. They would make the conventions that created their constitutions something more than simply extraordinary constituent bodies isolated in time without duplication before or since. The conventions of the people would become for Americans permanent continuing institutions, integral parts of their political system, essential for its working, and always available for the people's use. It was as if the revolution the Americans had begun in the early 1770's never ceased, as if the government dissolved in those years, throwing "back, into the hands of the people the powers they had delegated," and leaving them "as individuals to shift for themselves," was never really resumed.[22] Indeed, all the developments and creations of the period, including the idea of a constitution and the institution of a constitutional convention, were ultimately grounded in the increasing difficulty Americans had in sustaining representative legislatures which could satisfactorily speak for the people. Beginning with the Revolutionary movement (but with roots deep in American history) the American people came to rely more and more on their ability to organize themselves and to act "out-of-doors," whether as "mobs," as political clubs, or as conventions.

### 3. The People Out-of-Doors

America had a long tradition of extra-legislative action by the people, action that more often than not had taken the form of mob violence and crowd disturbance. From the time of the first

21. Jameson, "Early Political Uses," *Amer. Hist. Rev.*, 3 (1897–98), 470; *Essay upon Government*, 113–14; Otis, *Rights of the British Colonies*, Bailyn, ed., *Pamphlets*, I, 411–22.
22. Jefferson, *Notes on Virginia*, ed. Peden, 127.

settlements on through the eighteenth century rioting at one time or another paralyzed all the major cities; in the countryside outbursts of angry farmers and frontier settlers periodically destroyed property, closed courts, and brought government to a halt. These were not the anarchic uprisings of the poor and destitute; rather they represented a common form of political protest and political action in both England and the colonies during the eighteenth century by groups who could find no alternative institutional expression for their demands and grievances, which were more often than not political.[23] The South Carolina Regulators of 1767–68, for example, formed extralegal associations composed largely of back-country property-holders in order to bring some measure of order and stability to a chaotic area that the existing government in Charleston had ignored. Although the Regulators' vigilante movement, because it posed no direct threat to the constituted authorities in the East, gained a kind of legitimacy that other contemporary mob uprisings did not, its composition, its resort to formal association and written articles, and its discrimination in the choice of victims and force were not essentially different in character from the North Carolina disturbances in 1769–70, or from the Paxton uprisings in Pennsylvania in 1763–64, or even from the numerous mobs that erupted in the cities during the 1760's. All were efforts by discontented groups to use violence and intimidation to redress diverse grievances unsatisfied by weak and unresponsive governments.[24] In fact it seemed at times that the governments were so weak that they had to be bypassed in dealing with such mobs. Counter-mob elements were often compelled to organize their own extralegal associations to put down the insurrectionist movements in the defense of the state.[25]

Good Whigs, particularly those in the Commonwealth tradition, recognized and appreciated the political existence of the people "out-of-doors," that is, outside of the legal representative

13. See Bailyn, ed., *Pamphlets*, I, 581–84; Gordon S. Wood, "A Note on Mobs in the American Revolution," *Wm. and Mary Qtly.*, 3d Ser., 23 (1966), 635–42; and sources cited in these.

24. Richard M. Brown, *The South Carolina Regulators* (Cambridge, Mass., 1963); Basset, "The Regulators of North Carolina," Amer. Hist. Assoc. *Annual Report, 1894*, 141–212; Brooke Hindle, "The March of the Paxton Boys," *Wm. and Mary Qtly.*, 3d Ser., 3 (1946), 461–86; Bridenbaugh, *Cities in Revolt*, 113–18, 301–14; Morgan, *Stamp Act Crisis*, Chap. VIII.

25. Brown, *South Carolina Regulators*, Chap. VIII; Basset, "Regulators of North Carolina," Amer. Hist. Assoc., *Annual Report, 1894*, 197; Hindle, "Paxton Boys," *Wm. and Mary Qtly.*, 3d Ser., 3 (1946), 475.

institutions, and under certain circumstances were even willing to grant a measure of legitimacy to their actions. "I love a mob," the Duke of Newcastle was supposed to have said, or so Bostonians read in their newspapers in the early seventies. "We owe the Hanoverian succession to a mob." Popular demonstrations were often condoned and even led by "better sorts" in the society when they could be turned to political advantage. The Regulator movements in the Carolinas contained many men of wealth and status. The march of the Paxton Boys in 1764, noted one observer, was "invited and Encouraged by many Considerable persons in Philadelphia" who shared the westerners' hostility to the Pennsylvania legislature. Even John Adams, as much as he detested "private mobs," was cautiously willing to justify "Popular Commotions . . . in Opposition to attacks upon the Constitution," but "only when Fundamentals are invaded." It was in this spirit that many Whig leaders instigated or permitted the mob violence of the sixties and early seventies. Riots and mobbing, threatening royal officials, enforcing nonimportation agreements, intimidating Tories, persecuting printers, were not only excused but often directed and abetted by respectable members of the community—planters, merchants, lawyers—like Christopher Gadsden of South Carolina, or Robert Morris of Pennsylvania, or John Ashe of North Carolina. The Sons of Liberty became in effect organized mobs, "a necessary ingredient," said the Tories, in fomenting the American Revolution.[26]

The disintegration of royal authority in the early seventies and the corresponding growth of revolutionary organizations intensified the Whigs' reliance on extralegal popular action. Clubs and associations that had in the 1760's been organized as extralegal pressure groups for particular and limited purposes, whether for the intimidation of stamp collectors or for the enforcement of nonimportation agreements, now began to assume the actual functions of government. Many of the groups that had hitherto used or participated in mobs or other loosely organized "popular assemblies," as Lieutenant-Governor William Bull of South Caro-

16. Newcastle citation, in Bridenbaugh, *Cities in Revolt*, 309; Hindle, "Paxton Boys," *Wm. and Mary Qtly.*, 3d Ser., 3 (1946), 477; Adams to Abigail Adams, July 7, 1774, Butterfield, ed., *Family Correspondence*, I, 131; Arthur M. Schlesinger, "Political Mobs and the American Revolution, 1765–1776," American Philosophical Society, *Proceedings*, 99 (1955), 244. On the respectability of the leaders of the mobs see Morgan, *Stamp Act Crisis*, 211–17; Walsh, *Charleston's Sons of Liberty*, 32–33, 46, 48, 71; Bridenbaugh, *Cities in Revolt*, 114, 307.

lina called them, now joined in the committees and conventions that were fast springing up everywhere, and thereby gained a quasi-legitimacy that they had not had before. Mob violence as such, with the exception of the tea parties, rapidly declined in the two years before the Revolution, since in effect it had been institutionalized by the new revolutionary associations. By 1775 committees and conventions in nearly all of the colonies were controlling and regulating all aspects of American life, more completely perhaps than ever before in the eighteenth century: overawing voters, dictating appointments, disposing of the militia, regulating trade, levying taxes, supervising courts, and in fact, as the Tories protested, even directing "what we shall eat, drink, wear, speak, and think."[27]

The "dangers" of thus throwing all power back into the hands of the people were "conspicuous," wrote Jefferson in 1774, but, as Jefferson had intended, much more conspicuous to the Tories than to the Whigs. Royal officials saw only too well what the multiplication of committees and conventions, where "a private man take upon him to summon a whole province," might lead to: "There will be nothing but cabals and combinations, and the peace of the Province, and minds of the people, continually heated, disturbed, and distracted." Some Whigs too, "men of property," it was claimed, began to sense "that the many headed power the People, who have hitherto been obediently made use of by their numbers and occasional riots to support the claims set up in America, have discovered their own strength and importance, and are not now so easily governed by their former leaders." Just as the Sons of Liberty had become a cloak for all sorts of brigandage and lawlessness in the mid-sixties, so the more numerous and more legitimate committees and associations of 1774–75 became a cover for various extensions into public areas, even in some cases for

purely private purposes, by "warm People," as Joseph Galloway complained, "of neither Property nor significance among us."[28] As early as May 1774, Gouverneur Morris warned that it was becoming "impossible to curb" the "mobility" exercising "tribuntial powers" through numerous extralegal committees and associations. "How to keep them down" became a central question not only to Tories in the years before Independence but increasingly to the Whigs themselves in the decade after Independence.[29]

"In planning a government by representation," James Burgh wrote in his *Political Disquisitions*, "the people ought to provide against their own *annihilation*. They ought to establish a regular and constitutional method of acting by and from *themselves*, without, or even in opposition to their *representatives*, if necessary"—surely the most disruptive yet the most creative idea expressed in the entire Revolutionary era, since it meant that the final and full embodiment of the people in the government was impossible. As the English radicals observed with approval, the Americans had successfully acted upon this idea in the sixties and seventies when their constitutional legislatures had been prevented from sitting. Now with Independence and with popular governments of their "own establishment, equal to all the purposes for which government is instituted, and laws of our own making," some Americans continued to act upon this idea, continued to assemble in committees and conventions outside of the legal governments and "to consult and debate upon the degree of submission due the constitutional government"—actions which increasingly seemed to others to "lead, if in the first instance they do not amount, to a reassumption of the power to govern into the hands of the people."[30]

Interstate and regional conventions and committees for the purpose of regulating the economy began meeting at the very out-

27. Walsh, *Charleston's Sons of Liberty*, 46; [Seabury], *View of the Controversy*, 37. On the powers assumed by the committees and conventions see *To the Privates of the Several Battalions of Military Associators in the Province of Pennsylvania* (Phila., 1776), 2–3; *To the Freeholders and Freemen of the City and County of New-York* ([N. Y., 1775]), 1–2; Ramsay, *History of Revolution of South Carolina*, I, 60; Walsh, *Charleston's Sons of Liberty*, 60, 64, 65, 71–73; Collins, "Committees of Correspondence," Amer. Hist. Assoc, *Annual Report, 1901*, I, 264–67. On "the Introduction of Anarchy and Oppression" caused by the new institutions see Calhoon, ed., "Robert Beverly," *Va. Mag. of Hist. and Biog.*, 73 (1965), 50–51. For examples of mob persecution in the Revolution see Wallace Brown, *The King's Friends: The Composition and Motives of the American Loyalist Claimants* (Providence, 1966), 47–48, 64–65, 78, 135, 212.

28. [Jefferson], *Summary View*, Boyd, ed., *Jefferson Papers*, I, 131; Governor Wright to the Earl of Dartmouth, Aug. 24, 1774, Force, ed., *American Archives*, 4th Ser., I, 711; Governor Bull to the Earl of Dartmouth, Mar. 28, 1775, quoted in Rogers, *William Loughton Smith*, 78; Galloway to Samuel Verplanck, Jan. 14, 1775, quoted in Julian P. Boyd, *Anglo-American Union: Joseph Galloway's Plans to Preserve the British Empire 1774–1788* (Phila., 1941), 40. For examples of private committees see Northumberland County (Pa.) Committee, May 24, 1776, Force, ed., *American Archives*, 4th Ser., VI, 562; Selsam, *Pennsylvania Constitution*, 115–16.

29. Gouverneur Morris to John Penn, May 20, 1774, Force, ed., *American Archives*, 4th Ser., I, 342.

30. Burgh, *Disquisitions*, I, 6; *Providence Gazette*, Sept. 9, 2, 1786.

Compendium_Roth
Page 1833

[324]    *Creation of the American Republic*

break of war, at first under congressional and state auspices, then less officially, justified, as Samuel Adams said in 1777, by the right of the people "to assemble upon all occasions to consult measures for promoting liberty and happiness." When by the late seventies Congress and the state legislatures began to turn against these efforts to control prices and wages and to stabilize credit, local committees and county conventions in the New England and middle states became more and more spontaneous, springing up without legislative authorization to take action against monetary depreciation, engrossing, and profiteering, often relying on crude force and intimidation for enforcement. The very failure of the states' penal laws to restrain rising prices became a justification for the resort to voluntary associations which military companies offered to support by arms. Whenever goods seemed short or prices seemed exorbitant men proposed committees for investigation and control. By 1779 groups in Philadelphia were parading the streets in search of forestallers and monopolizers. In fact to some the entire mercantilist system of committees had become simply "a Mob . . . assembled to regulate prices."[31]

Organization of the people outside of the government was not confined to the regulation of the economy. Committees and associations of the people, given form and sanction by the experience of the Revolutionary movement, were spilling out everywhere to voice grievances or to realize political goals. "I am afraid," said Christopher Gadsden in 1778, the former tribune of the people of Charleston, "we have too many amongst us who want again to be running upon every fancy to the Meeting of [the] liberty tree."[32] Serious rioting under the direction of radical committees recurred in all of the major cities and formed the background for the incorporation movements in Boston, New Haven, Philadelphia, and Charleston in the 1780's.[33] Electioneering and attempts to influ-

31. Adams, quoted in Benjamin Rush's Diary, Feb. 4, 1777, and Daniel of St. Thomas Jenifer to Gov. Thomas Johnson, Jr., May 24, 1779, both in Burnett, ed., *Letters of Congress*, II, 234, IV, 232. On the mercantilist regulation see Morris, "Labor and Mercantilism," in Morris, ed., *Era of the Revolution*, 76-139; Robert L. Brunhouse, *The Counterrevolution in Pennsylvania 1776-1790* (Harrisburg, 1942), 70-74; Walsh, *Charleston's Sons of Liberty*, 64-65, 73-74, 77; Oscar and Mary Handlin, "Revolutionary Economic Policy in Massachusetts," *Wm. and Mary Qtly.*, 3d Ser., 4 (1947), 3-26.
32. Walsh, *Charleston's Sons of Liberty*, 87.
33. Merrill Jensen, *The New Nation: A History of the United States during the Confederation, 1781-1789* (N. Y., 1958), 118-22.

*Conventions of the People*    [325]

ence town meetings and legislative bodies—citizens threatening "their fellows with loss of property for voting according to their own judgment"—had never seemed so prevalent. "A POLITICAL PHALANX" was always ready to be used "on *all* favorite mob or electioneering occasions."[34] The Whig and Republican societies of Philadelphia and the Marine Anti-Britannic Society of Charleston were only the most famous of many such self-constituted bodies organized for quasi-public purposes. In fact more such groups sprang up in the dozen years after Independence than in the entire colonial period.[35] The people's representatives in the legislature seemed "so far out of our Reach" that men felt pressed to fill "this wide Step and Vacancy" between themselves and their delegates either, as one pamphlet in 1782 suggested, by the establishment of regular county assemblies, or more commonly, by the spontaneous constitution of separate organizations of the people to watch over "that which they had gained by wisdom and fortitude" and did not want to lose by "remissness and inattention."[36] Western Massachusetts never really resumed a constitutional government after its dissolution in 1774, but lived under a series of mob-like committees and conventions. Even after the establishment of the 1780 Constitution, mobs calling themselves Regulators continued to close courts and intimidate public officials, culminating with the Shays movement in 1786. These rioters were not rabble, as one observer noted. They were country farmers under strong economic pressures, prompted by "a certain jealousy of government, first imbibed in the beginning of our controversy with Britain, fed by our publications against the British government, and now by length of time became in a manner habitual and ready to rise whenever burthens press, at once concluding, that *burthens* must be grievances." By the middle eighties the whole of New England was beset by conventions voicing not only local grievances and resentments against the impost and commutation measures of the Confederation Congress, but contesting the aims of other conventions. In the summer of 1787 even counties in Virginia were rising in spontaneous association, burning courthouses and stopping tax

34. Nathaniel Whitaker, *The Reward of Toryism* . . . (Newburyport, 1783), 31; Charleston *Extra Gazette of the St. of S.-C.*, July 12, 1784.
35. Jensen, *New Nation*, 141.
36. *Proposals to Amend and Perfect the Policy of the Government* . . . ([Phila.], 1782), 8; *Principles and Articles Agreed On by the Members of the Constitutional Society* . . . (Phila., 1780).

[326]     *Creation of the American Republic*

collections. In those states in the 1780's, particularly Massachu-
setts, Connecticut, and South Carolina, where large groups were
unable to satisfy their grievances through ordinary legislative pol-
itics, "defiance of law, and resistance to its authority, was every-
where breathed."³⁷

To the participants such associations of the people outside of
the regularly constituted government seemed as necessary under
their new republican governments as they did under the British
government, "for," as Suffolk County, Massachusetts, declared in
1784, "whenever any measures are adopted . . . destructive to the
Commonwealth, the people must either submit to them, or (if
they proceed with decency and regularity) must take this method
for relief." Did the present opponents of such extralegal organiza-
tions of the people, it was repeatedly and pointedly asked, "at the
time of the Stamp Act, stickle so for Government? . . . Did they
give the opprobrious epithet of MOBS to the leaders of the mea-
sures in those days?" The Revolution was fought precisely be-
cause government had acted contrary to the interests of the peo-
ple. "Do not the fears and jealousies of the good people of the State
at this day spring from the *like source?*"³⁸

So prevalent did the usurpation of governmental functions by
conventions and associations become that some Americans began
to fear that the whole society would "shortly be overrun by com-
mittees." "The original ostensible design of them was laudable,
and under proper regulations might, perhaps, produce good ef-
fects." But now they seemed to be merely "Instruments in the
Hands of designing Men" who wish "to place the Government
again in the Hands of the People" for their own selfish purposes.
"The interference of clubs and private societies" in politics and
lawmaking, "instead of being of any public use, *only* serves, if at-
tended to, to embarrass the assembly, and split the members into
parties. If one club meddles, may not another, and a third, and so
on, with *equal* right and propriety." In reaction some of the once
fervent Whig leaders began to sound like the Tories of 1775.
There were legitimate channels for public expression in the town
meetings, warned Governor John Sullivan of New Hampshire;
assemblies of private orders of men "under the cover of conven-

37. Taylor, *Western Massachusetts*, Chaps. V–VII, quotation from 119; Brant,
Madison, III, 116; Charleston *St. Gazette of S.-C.*, Feb. 22, 1787.
38. Boston *Independent Chronicle*, May 20, 1784; Charleston *Gazette of the
St. of S.-C.*, May 13, 1784.

*Conventions of the People*     [327]

tion authority" would only undermine the constitution of the
state. Even the old Son of Liberty, Samuel Adams, by 1784 had
come to believe that "popular Committees and County Conven-
tions are not only useless but dangerous." When they were used
in place of the royal legislatures, they had served "an excellent
Purpose," but "as we now have constitutional and regular Govern-
ments and all our Men in Authority depend upon the annual and
free Elections of the People, we are safe without them. . . . Bodies
of Men, under any Denomination whatever, who convene them-
selves for the Purpose of deliberating upon and adopting Mea-
sures which are cognizable by Legislatures only will, if continued,
bring Legislatures to Contempt and Dissolution."³⁹ "Where
will this capricious *retail tyranny* end?" men asked. Organized
mobs and unconstitutional combinations were "continually start-
ing up here or there, and carried on merely as the gnawing worm
of malice or resentment may bite individuals." In Connecticut the
apprehensions became so great that the Assembly refused to rec-
ognize the legitimacy of any convention and on those grounds de-
clined to send any delegates to Annapolis in 1786.⁴⁰ The press,
especially in New England, was filled with confused and anxious
pleas for the people to recognize the difference between 1774 and
1784. With Independence "the reason and necessity of the Con-
vention ceased." Despite guarantees of the people's right of as-
sembly in the Massachusetts Constitution, the framers had never
intended "to institute a subordinate representative body to act for
the people." The English people's organizing of themselves out-
side of Parliament was justified, but the Americans' was not. "In
a government constituted like that of Great-Britain, the attention
of the Representatives are turned wholy to the Ministry, or men
in power, unless where disappointed ambition throws it into the
scale of opposition." But in the American republics the legislatures
faced entirely toward the people: "The pleasure or displeasure of
the people, rests with great weight upon their Deputies in the leg-
islatures." If the people "cannot trust representatives who have a

39. Meriwether Smith to Jefferson, June 25, July 30, 1779, William Fleming
to Jefferson, July 13, 1779, Boyd, ed., *Jefferson Papers*, III, 16, 33, 59; Charleston
*Gazette Extra. of the St. of S.-C.*, July 17, 1784; Sullivan quoted in Phila. *Pa.
Packet*, Oct. 21, 1786; Samuel Adams to John Adams, Apr. 16, 1784, Adams to
Noah Webster, Apr. 30, 1784, Cushing, ed., *Writings of Samuel Adams*, IV, 296,
305–06.
40. Charleston *South-Carolina Gazette and General Advertiser*, May 11–13,
1784; Madison to Jefferson, Aug. 12, 1786, Boyd, ed., *Jefferson Papers*, X, 232.

*Creation of the American Republic*

common interest with us, . . . what greater reason is there to expect that our county conventions will be more faithful?"[41]

### 4. A POWER SUPERIOR TO THE ORDINARY LEGISLATURE

The mistrust of all men and all institutions set above the people-at-large was precisely the point. No legislative assembly, however representative, seemed capable of satisfying the demands and grievances of large numbers of Americans. And it was this dissatisfaction and the suspicion it engendered, as much as the idea of fundamental law, that explained the prominence that one kind of convention existing outside of the normal representative legislature gained in American thought. The unique position of its legitimacy that the constitutional convention eventually attained, together with its close connection with the new conception of a constitution, has tended to obscure the disruptive forces that made such an extralegislative body possible and comprehensible—forces that had been laid bare at the very beginning of the Revolutionary movement. "Some step forth and tell you," said Philip Livingston in 1775 in answer to New York Tories, "you ought to support your Representatives—what! right or wrong!"[42] Out of just such exhortations to civil disobedience and such pervasive mistrust of the representational process was the conception of the constituent convention essentially formed.

As early as 1775 some Whigs were observing that the people in their revolutionary conventions had never been more fully and fairly represented in any legislatures in their history.[43] "The more just and equal representations of the people in the Colony Congresses," wrote Ezra Stiles, "acquire more and more weight, and feel more liberty to act for the public good unchecked by an arbitrary Governor." When the South Carolina Congress in March 1775 admonished the New York legislature, which was still sit-

41. Response of the Worcester Committee of Correspondence to Pittsfield, Oct. 8, 1778, Handlin, eds., *Popular Sources*, 372; Boston *Independent Chronicle*, Sept. 14, 1786, Apr. 8, 1784, Mar. 25, 1784.
42. (Livingston), *To the Inhabitants of New-York*, 2.
43. Thus the Georgia Convention told Gov. Wright in 1775 that "the Province never was more fully represented in any Assembly"; and the Virginia Convention declared in the same year that their body was "the most numerous assembly that had ever been known in this colony." Address of the Ga. Provincial Congress, July 11, 1775, in *Ga. Hist. Qtly.*, 34 (1950), 295; "A Declaration of the [Convention]," in Purdie's Wmsbg. *Va. Gazette*, Sept.

---

*Conventions of the People* [329]

ting, for not joining in the general association of the colonies, it did so with an argument that had radical implications for the place of the convention and the people's relation to the institutions of government that few Whigs then envisioned. Perhaps the New York Assembly's refusal to act, suggested the South Carolina Congress, stemmed from a doubt of its authority, having been chosen prior to the present dispute. Surely "the legal representatives" of the people of New York were not really representing "the opinion of their constituents," but only intended to leave the voicing of that opinion "to another representation, not so much according to the letter of the law, but equally respectable, and as much to be depended on." The constituted legislature of New York must realize that it was not "the definitive voice of the colony." As the experience of the other colonies was demonstrating, other bodies, conventions or congresses, could perhaps better reflect the people's will than the regular legislatures. Yet precisely because the conventions were irregular bodies, "extraordinary perhaps in their nature, but warranted by necessity," dissatisfied groups could contend that even they were unequal to the "new affairs of the utmost importance." In fact simply to infer that the people's will was being fully represented by any institution, to infer that "the acts of those Representatives are the acts of their constituents," was not enough for some in these years, and in the years ahead it was to become never enough. "Why should such an inference be made? Where is the necessity for it? Cannot an appeal be made to the people? Their sentiments taken—be from themselves, and not guessed at? If they have not wisdom and virtue enough to become agents in promoting their own temporal salvation, it is vain for others to attempt it."[44]

No American in a responsible position by 1775 challenged the purity of the people in the contest with the Crown; all by then were good Whigs, with some, of course, more radical than others. John Adams's ideas that the people were the "Source of all Authority and Original of all Power" were not, as he recalled in his autobiography, "new, strange and terrible Doctrines, to the greatest Part of the Members" of the Continental Congress, although Adams's suggested timing and methods for their implementation perhaps were. Even the Tory, Daniel Leonard, writing as "Massa-

44. Ezra Stiles to Richard Price, Apr. 10, 1775, "Price Letters," Mass. Hist. Soc., *Proceedings*, 2d Ser., 17 (1903), 283; Phila. *Pa. Journal*, Apr. 12, 1775; Address of the Assembly of N. C. to Gov. Josiah Martin, Apr. 1775, Niles, ed., *Principles*, 312; Essay, June 22, 1774, Force, ed., *American Archives*, 4th Ser., I, 441.

[412]    Creation of the American Republic

was new elections. Somehow the people were both licentious and tyrannical, but ironically the remedy for one was the source of evil for the other.[28]

Shays's Rebellion in western Massachusetts was received with excited consternation mingled with relief by many Americans precisely because it was an anticipated and understandable abuse of republican liberty. Liberty had been carried into anarchy and the throwing off of all government—a more comprehensible phenomenon to most American political thinkers than legislative tyranny. The rebels, announced the town of Boston, must obey the majority. "Let the majority be ever so much in the wrong," it was the only remedy for grievances "compatible with the ideas of society and government!" The insurgents, argued a publicist, must rely on their elected representatives for the redress of wrongs: "Can human wisdom devise a more effectual security to our liberties?"[29] So relieved by the rebellion were many social conservatives that some observers believed the Shaysites were fomented by those who wanted to demonstrate the absurdity of republicanism.[30]

Nothing so insidious has been proved, but many social conservatives did see the rebellion as encouraging the move for constitutional reform. It was both a confirmation of their worst fears —hence their horror, and a vindication of their desires for stronger government—hence their relief. It fitted nicely into the traditional pattern of political thinking and thus cleared the air of much of the confusion which had hung over the 1780's. Yet Shays's Rebellion was irrelevant to the major constitutional difficulty experienced in the Confederation period—the problem of legal tyranny, the usurpation of private rights under constitutional cover. Connecticut had no violence like that of Massachusetts, said Noah Webster, "because the Legislature wear the complexion of the people." Only "the temporizing of the legislatures in refusing legal protection to the prosecution of the just rights of creditors," remarked David Ramsay, freed the southern states from similar disturbances. Within a few months, however, observers noted

28. Charleston St. Gazette of S.-C., June 13, 1785; Boston Independent Chronicle, Mar. 1, 1787, in Ames, ed., Works of Fisher Ames, II, 106; Webster, "Government," American Magazine, 1 (1787–88), 75, 206.
29. Boston Independent Chronicle, Sept. 14, Oct. 12, Nov. 2, 1786.
30. See Robert A. East, "The Massachusetts Conservatives in the Critical Period," in Morris, ed., Era of the Revolution, 379–80; Main, Antifederalists, 59–64.

Vices of the System    [413]

that the Shaysites were trying their strength in another way, "that is," said James Madison, "by endeavoring to give the elections such a turn as may promote their views under the auspices of constitutional forms." Merely subduing the rebels and calling upon them to obey the authority of the legislature did not go to the heart of the Americans' predicament. With "a total change of men" in the legislature, wrote Webster, "there will be, therefore, no further insurrection, because the Legislature will represent the sentiments of the people." Hence some Americans in the 1780's could come to believe that "sedition itself will sometimes make laws."[31]

The classical political spectrum did not make sense to a perceptive and probing mind trying to understand American politics. "It has been remarked," wrote Madison to Jefferson, "that there is a tendency in all Governments to an augmentation of power at the expense of liberty." But for Madison the statement now seemed ill founded. There seemed little danger in the American republics that the tyranny of the rulers would subvert liberty. No doubt, said Madison, governmental power, when it attained a certain degree of energy and independence, went on to expand itself. "But when below that degree, the direct tendency is to further degrees of relaxation, until the abuses of liberty beget a sudden transition to an undue degree of power." Licentiousness, in other words, led not to anarchy, but to a new kind of popular despotism. Only in this sense, said Madison, was the traditional spectrum of power "applicable to the Governments in America." America had little to fear from the traditional abuse of power by the few over the many. "It is much more to be dreaded that the few will be unnecessarily sacrificed to the many."[32]

5. POLITICAL PATHOLOGY

This fear by the few of the power of the many, as crucial as it was in shaping a new understanding of politics and in promoting the desire for a new central government, did not go to the heart

31. Ramsay to Jefferson, Apr. 7, 1787, Madison to Jefferson, Apr. 23, 1787, Jay to Jefferson, Apr. 24, 1787, Boyd, ed., Jefferson Papers, XI, 279, 307, 313; [Noah Webster], "To the Public," May 8, 1787, in Warfel, ed., Letters of Webster (N. Y., 1953), 64–65; Boston Independent Chronicle, May 10, 1787. See also East, "Massachusetts Conservatives," Morris, ed., Era of the Revolution, 378.
32. Madison to Jefferson, Oct. 17, 1788, Boyd, ed., Jefferson Papers, XIV, 20.

of the pervasive sense of anxiety in the 1780's. The crisis was not confined to any one economic or social group, although the evidence of alarm is clearly weighted on those who were most articulate, that is, on those who considered themselves the established social leaders and who were most likely to write for the press and to preserve their correspondence. Indeed, it seems that it was precisely the actions of those least liable to be aware of the social and moral significance of what they were doing that so frightened American intellectuals in the 1780's. Yet the period was truly critical not solely because members of the social and economic elite felt themselves as members of the social and economic elite felt themselves and their world threatened, but because anyone who knew anything of eighteenth-century political science could not help believing that the American republics were heading for destruction even as they were being created.

The crisis was therefore of the most profound sort, involving no limited political or economic problems but the success of the republican experiment itself. Indeed no more appropriate term than "crisis" could have been used to describe what was happening. Viewing the state as analogous to the human body, Americans saw their country stricken by a serious sickness. The 1780's seemed to mark the point in the life of the young nation where a decisive change had to occur, leading either to recovery or death. It was a "crisis of moral and national reputation." "The reputation of America is at stake. . . . The fate of (perhaps it may be said without exaggerating) mankind depends upon the issue of American councils at this crisis!" The writings of Americans in the eighties became a series of self-diagnoses, an intensive examination of the sources of political decay characteristic of the age of Gibbon. Writers from Montesquieu to Edward Wortley Montagu were ransacked in a continuing search to understand what was called "political pathology."[33] All the lessons that had been learned from the analysis of Britain's fate in the 1760's and seventies were now brought home to Americans with a renewed vividness. While virtue was advantageous for any kind of government, it was, as a group of New Hampshire ministers affirmed in

33. Charleston S.-C. *Gazette and General Advertiser*, Aug. 9, 1783; *Providence Gazette*, Aug. 12, 1786; "On the Present State of Affairs," *American Museum*, 2 (1787), 170. For references to Edward Wortley Montagu's work see Warren, *Oration, Delivered July 4th*, 1783, 18; Gardiner, *Oration, Delivered July 4*, 1785, 8; Butterfield, ed., *Diary of Adams*, III, 444n. See Gerald J. Gruman, "'Balance' and 'Excess' as Gibbon's Explanation of the Decline and Fall," *History and Theory*, 1 (1960–61), 75–85.

1784, "absolutely necessary to the existence of a republick." "In a Republic," declared Samuel West in 1786, "the people are not only the source of authority, but the exercise of it, is in a great measure, lodged in their hands. Corruption therefore among the people at large, must be immediately felt, and if not seasonably prevented, proves fatal in the end." However uncritical the conditions of the 1780's may seem in retrospect, to those imbued with eighteenth-century assumptions about the nature of the social hierarchy and the signs of health and sickness in the body politic, those conditions took on a dreadful significance. American society seemed to possess all the symptoms of the most destructive diseases that could afflict a republic. As early as 1779 it had become "undeniably evident . . . that some malignant disorder has seized upon our body politic, and threatens at least an interruption of our advances to manhood, if not a political dissolution." The American people apparently did not possess and were unwilling to acquire the moral and social character necessary to sustain republican governments.[34]

Since "the individual conduct of those who compose a community, must have an intimate and extensive connection with all our public measures, it is from the nature and tendency of that conduct that our public character must receive its complexion." The war with Britain had scarcely begun before the nature and tendency of American behavior was frighteningly revealed. The self-sacrifice and patriotism of 1774–75 soon seemed to give way to greed and profiteering at the expense of the public good. Perhaps, it was suggested, that peculiar expression of virtue in those few years before Independence had been simply the consequence of a momentary sense of danger. At one time public spirit had been "the governing principle and distinguishing characteristic of brave Americans. But where is it now? Directly the reverse. We daily see the busy multitude engaged in accumulating what they fondly call riches, by forestalling, extortioning and imposing upon each other." Men returning from abroad in the early eighties found "sentiments of the people of this country . . . surprisingly altered" since they had left. "They were no longer governed by that pure, disinterested patriotism, which distinguished the Infancy of the Contest." Everywhere "Private Interest seemed to

34. Boston *Independent Chronicle*, Dec. 16, 1784; Samuel West, *A Sermon Preached before His Excellency James Bowdoin . . .* (Boston, 1786), 21. Trenton *N.-J. Gazette*, Mar. 17, 1779, Nelson et al., eds., *New Jersey Archives*, 2d Ser., III, 140.

Compendium_Roth
Page 1838

[416]

predominate over every Consideration that regarded the public weal."[35]

Throughout all the states orators and writers warned of the vicious effects of wealth and prosperity. "The great body of the people, smote by the charms and blandishments of a life of ease and pleasure, fall easy victims to its fascinations." The great increase of private and public credit and the paper money and debtor-favoring legislation stemming from it, it was widely argued, were not actually the result of a scarcity of specie and the peculiar economic problems of the 1780's. They were rather a consequence and a symptom of the degenerate character of the people. All men, rich and poor, northerners and southerners, were living "in a manner much more expensive and luxurious, than they have Ability to support," borrowing heavily on the promises of the future, captivated by "*an immoderate desire of high and expensive living.*" "Our citizens," said a Carolinian, "seem to be seized with a general emulation to surpass each other in every article of expence. Those who possess affluent fortunes lead the way, and set the example. Others, whose estates are not sufficient to bear them out, madly adopt the same expensive system, and in order to support it, contract debts which they have no rational prospect of discharging. All they seem to wish, is to obtain credit, to figure away, and to make a brilliant appearance at the expence of others."[36] The end of the war saw only a scramble to purchase long-denied European luxuries. America's commerce seemed to have become almost exclusively importation. It was a strange sight—a young undeveloped country acting the part of a mature one. Indeed, said a New Yorker, "we are affected in a quite a different manner from all the other nations upon earth, for, with others, wealth is the mother of luxury, but with us poverty has the same effect."[37]

By 1780 Patrick Henry "feared that our Body politic was

dangerously sick." The signs of disease spread everywhere. Merchants and farmers were seeking their own selfish ends; hucksters were engrossing products to raise prices. Even government officials, it was charged, were using their public positions to fill their own pockets.[38] The fluctuation in the value of money was making "every kind of commerce and trade precarious, and as every individual is more or less interested in it," was putting a premium on selfishness. Everyone was doing "what was right in his own eyes," and "thus the whole of that care and attention which was given to the public weal is turned to private gain or self preservation."[39] That benevolence among the people had not grown as a result of the Revolution was measured in the frightening increase in litigation, to as many as eight hundred cases in a single New England county court during a year, most of which were actions of debt for only five or six pounds.[40] Vices now seemed more prevalent than before the war. Virtue was being debased by "the visible declension of religion, . . . the rapid progress of licentious manners, and open profanity." Such symptoms of degeneracy threw the clergy especially into confusion. Instead of bringing about the moral reformation they had anticipated from victory, the Revolution had only aggravated America's corruption and sin. The Americans, they said in sermon after sermon throughout the eighties, could only be an ill-tempered and unrighteous people, so soon forgetting the source of their deliverance from British tyranny. Such ingratitude and sinfulness could only bring upon them God's terrible and just vengeance—a Providential penalty that marvelously coincided with the dreadful calamity predicted by the political scientists for a corrupted people.[41]

35. Boston *Independent Chronicle*, Aug. 31, 1786; John Brooks, *An Oration Delivered to the Society of the Cincinnati in the Commonwealth of Massachusetts, July 4th 1787* (Boston, 1787), 8; Phila. *Pa. Gazette*, Mar. 31, 1779; William Bingham to John Jay, July 1, 1780, Johnston, ed., *Papers of Jay*, I, 564.
36. Thomas Welsh, *An Oration, Delivered March 5, 1783* . . . (Boston, 1783), J. in Niles, ed., *Principles*, 76; Stephen Higginson to John Adams, July 1786, J. Franklin Jameson, ed., "Letters of Stephen Higginson, 1783–1804," Amer. Hist. Assoc., *Annual Report, 1896*, I, 740; Thomas Reese, *An Essay on the Influence of Religion, in Civil Society* (Charleston, 1788), 69.
*Findley* (1786), in Carey, ed., *Debates of the General Assembly* . . . quoted in Spaulding, *New York* . . .

37. Silvius, "Letter III, on Frugality and Industry . . . ," *Amicus*, "Letter I . . . ," Trench Coxe, "An Address to an Assembly of the Friends of American Manufactures . . . ," *American Museum*, I (1787), 116, 217, 253.
38. Patrick Henry to Jefferson, Feb. 15, 1780, Boyd, ed., *Jefferson Papers*, III, 293; Madison, *Sermon Preached in Botetourt*, 14–18; Charleston *S.-C. and American Gazette*, Feb. 19–26, 1778; Nathan Williams, *A Sermon, Preached in the Audience of the General Assembly of the State of Connecticut* . . . (Hartford, 1780), 21, 37. See the discussion of the mingling of business and government in the 1780's in Ferguson, *Power of the Purse*, 70–105.
39. Trenton *N.-J. Gazette*, Apr. 7, 1779, in Nelson et al., eds., *New Jersey Archives*, 2d Ser., III, 208–11; [Cooper], *Enquiry into Public Abuses*, 16; Cumings, *Sermon Preached May 28, 1783*, 39.
40. Hartford *Conn. Courant*, Sept. 30, 1783; Taylor, *Western Massachusetts*, 127.
41. Charleston *S.-C. and American Gazette*, Jan. 21, 1779. For examples of the clergy's concern see John Murray, *Jerubbaal, or Tyranny's Grove Destroyed, and the Altar of Liberty Finished* (Newburyport, 1784), 8, 12, ff; Macclintock,

Throughout all the secular and religious jeremiads of the eighties the key term was "luxury," that important social product and symptom of extreme selfishness and pleasure-seeking. Over and over men emphasized "the destructive tendency of luxury," so much so that it had become by 1788 "a beaten topic." But still "the history of the world points to this, as the rock on which the state vessel hath most commonly split." The success of the war had taught the effete British "that the savage wilds of America could produce a barrier to their attempts" to erect a tyranny. But now a more insidious enemy was sapping America's strength and liberty from within. "LUXURY, LUXURY, the great source of dissolution and distress, has here taken up her dismal abode; infectious as she is, she is alike caressed by rich and poor" and was thus destroying "that simplicity of manners, native manliness of soul, and equality of station, which is the spring and peculiar excellence of a free government."[42] Associations sprang up to combat all the increased displays of extravagance, and writers debated over the kinds of art and theater permissible in a republic. These were not simply the legacies of some old puritanical fever, for, as Joel Barlow said in 1787, "It is for existence that we contend." "Whenever democratic states degenerate from those noble republican virtues which constitute the chief excellency, spring, and even basis of their government, and instead of industry, frugality, and economy, encourage luxury, dissipation and extravagance," Americans were warned, "we may justly conclude that ruin is near at hand." "No virtue, no Commonwealth." It was that simple.[43]

Like Puritanism, of which it was a more relaxed, secularized version, republicanism was essentially anti-capitalistic, a final attempt to come to terms with the emergent individualistic society that threatened to destroy once and for all the communion and

*Sermon*, June 3, 1784, 9–10; William Symmes, *A Sermon Preached before His Honor Thomas Cushing* . . . (Boston, [1785]), 7; Wales, *Dangers of National Prosperity*, 5–10. See Miller, "From the Covenant to the Revival," in Smith and Jameson, eds., *Shaping of American Religion*, 343–50.
   42. Reese, *Essay on the Influence of Religion*, 71; Boston *Independent Chronicle*, Aug. 24, 1786; "An Oration Delivered at Petersburgh, Virginia, on the 4th of July, 1787 . . . ," *American Museum*, 2 (1787), 420.
   43. Phila. *Pa. Journal*, Feb. 14, 1784; *American Museum*, 1 (1787), 165–66; *Providence Gazette*, Apr. 7, 21, May 26, June 9, 23, July 14, 1787; Joel Barlow, "An Oration, Delivered . . . in Hartford . . . July the Fourth, 1787 . . . ," "Oration Delivered at Petersburgh," *American Museum*, 2 (1787), 138, 420; Boston *Independent Chronicle*, June 21, 1787.

benevolence that civilized men had always considered to be the ideal of human behavior. Right from the beginning of the Revolution there had been some Americans who had doubted the ability of any people, including the Americans, to surrender their individual interests for the good of the whole. The questioning of American virtue begun by men like Livingston and Jay of New York during the prerevolutionary debates in the Continental Congress was broadened during the critical years of the war.[44] Throughout the seventies all the discussions of the Continental Congress on the issues of economic regulation or moral and sumptuary controls tended to hinge on the capacity of the public law to control vice and individual behavior. For those at the very outset of the Revolution who had discounted American virtue, at least among the mass of the society, the scrambling of the people to satisfy private wants and aspirations became a vindication of their doubts. A merchant, or anyone for that matter, it was increasingly said by such men, could not be expected for the sake of some nebulous public good "to quit the line which interest marks out for him." "It is inconsistent with the principles of liberty," said Robert Morris, "to prevent a man from the free disposal of his property on such terms as he may think fit."[45] With the movement of people with these kinds of thoughts into positions of influence and authority once the war was underway, it was inevitable that the old patriots who had thrived on the spirit of 1774–75 should have become alarmed. The issue between them was brought to a head in the Continental Congress over the Lee-Deane affair.

On the surface the split in Congress in the late seventies assumed sectional lines, New England favoring Arthur Lee against the South favoring the Yankee merchant Silas Deane, with the middle states divided. Yet beneath this sectional division was a more complicated disagreement among American leaders that transcended state interests. The Lee-Deane imbroglio was not simply a quarrel provoked by personal or family pique or even by the conduct of American diplomacy. It went to the heart of the fundamental disagreement rapidly emerging among American leaders over the virtuous character of the American people and the nature of the republican society being formed. The Lees of

   44. See above, 95–96.
   45. Silas Deane to Jonathan Williams, Sept. 24, 1781, quoted in Ferguson, *Power of the Purse*, 74n; Robert Morris, quoted in *ibid.*, 110.

Virginia and the Adamses of Massachusetts saw in Silas Deane and in the connections and support he mustered a serious threat to the success of the Revolution, even to the point, wrote John Adams, of "endangering a civil War in America." In the eyes of strict republicans like the Lees, the Adamses, and Henry Laurens of South Carolina, Deane's cause was the cause of all the "avaricious and ambitious men" who sought to reverse the Revolution and to establish an aristocratic and mercantile society that would allow full play to private interests.[46] The American Revolution, said John Adams, "had not been sustained by such characters" as Gouverneur Morris and John Jay, those "Tory friends and Mercantile Abettors" of Deane, as Richard Henry Lee called them, who represented so many "Mandevilles . . . who laugh at virtue, and with vain ostentatious display of words will deduce from vice, public good"—these men were "much fitter to be Slaves in the corrupt, rotten despotisms of Europe, than to remain citizens of young and rising republics." Although Deane was a Yankee, said Samuel Adams, his principles were not those of New England; they were "commercial and interested." If allowed to flourish they would eventually destroy America's experiment in republicanism, since, as even the retired and redeemed merchant Henry Laurens said, the "bane of patriotism" was "commerce."[47]

By the late seventies the old patriots, embodied in the Adams-Lee junto, saw a "Design" afoot, "a joynt Combination of political and Commercial Men" entering in New York and the South, which aimed to exclude from power all "those who took an early active Part and have continued consistent in Support of the Liberties of America" in order "to get the Trade, the Wealth, the Power and the Government of America into their own Hands." It increasingly seemed to these old patriots "that the Principles and Manners of New England," the manners, said Richard Henry Lee, of a "wise, attentive, sober, diligent and frugal" people, had

46. John Adams, entry, Feb. 12, 1779, Butterfield, ed., *Diary of Adams*, II, 354; R. H. Lee to William Shippen, Jr., Apr. 18, 1779, Ballagh, ed., *Letters of R. H. Lee*, II, 45; see also 31. The best discussion of the Lee-Deane affair and of continental congressional politics in general is in Herbert James Henderson, Party Politics in the Continental Congress, 1774–1783 (unpubl. Ph.D. diss., Columbia Univ., 1962), Chaps. III–IX.
47. Adams, entry, June 22, 1779, Butterfield, ed., *Diary of Adams*, II, 390; R. H. Lee to Purdie's Wmsbg. Va. Gazette, Jan. 1, 1776, R. H. Lee to Henry Laurens, June 6, 1779, both in Ballagh, ed., *Letters of R. H. Lee*, II, 5, 62–63; Samuel Cooper, Jan. 3, 1779, Cushing, ed., *Writings of Samuel Adams* (N. Y., 1915), 335–

"produced that Spirit which finally has established the Independence of America."[48] As the southern fears of eastern Presbyterianism and leveling tendencies and the New Englanders' dislike of the aristocratic and luxurious manners of the South—an antagonism implicit from the beginning— became more and more exposed, Lee's and Laurens's alliance with New England became increasingly anomalous. If individual and state interests were to reign supreme, then, men believed, southerners had no business supporting New England. By the early 1780's many New Englanders saw themselves as the last bastion of devout republicanism standing against the torrent of aristocratic vice and luxury that was sweeping America.[49]

But, as these strict republicans knew only too well, New England itself was not free of the baneful influences of luxury and aristocracy. When a friend wrote to Samuel Adams in 1777 telling him that self-denial was now a rare virtue in Boston, Adams was shocked. "God forbid," said Adams, that the people of Boston "should so soon forget their own generous Feelings for the Publick and for each other as to set private Interests in Competition with that of the great Community." Yet Adams's beloved Boston—his hope for a "Christian Sparta"—never seemed capable of recapturing the patriotism of those wonderful years of 1774 and 1775. By 1778 new merchants and a "Spirit of Avarice" had taken over; by 1781 Adams was questioning "whether there is not more Parade among our Gentry than is consistent with sober republican Principles." By the mid-1780's Boston was wallowing in luxury and amusement. Adams could only express sorrow and indignation over "the Equipage, the Furniture and expensive Living of too many, the Pride and Vanity of Dress which pervades thro every Class, confounding every Distinction between the Poor and the Rich."[50] As evidence Adams could point

48. Samuel Adams to Samuel Cooper, Dec. 25, 1778, and Jan. 3, 1779, to James Warren, Jan. 6, 1779, and Feb. 12, 1779, all in Cushing, ed., *Writings of Samuel Adams*, IV, 105, 113, 115, 106, 115, 124; R. H. Lee to Arthur Lee, Feb. 11, 1779, Ballagh, ed., *Letters of R. H. Lee*, II, 33.
49. Stephen Higginson to John Adams, Dec. 30, 1785, Jameson, ed., "Letters of Higginson," Amer. Hist. Assoc., *Annual Report*, 1896, I, 718–19; Mass. Delegates to the Governor of Mass., Sept. 3, 1785, Burnett, ed., *Letters of Congress*, VIII, 208.
50. Adams to John Scollay, Mar. 20, 1777, to Francis Lightfoot Lee, 1778, to John Scollay, Dec. 30, 1780, to Mrs. Adams, Feb. 1, 1781, to John Adams, July 2, 1785, all in Cushing, ed., *Writings of Samuel Adams*, III, 365, IV, 19–20, 236–38, 248, 3–16.

to what was the confirmation of his worst fears, the establishment in Boston in 1785 of, of all things, a tea club.

The Tea Assembly, or "Sans Souci Club" as it was labeled, seems innocuous enough—meeting every other week for dancing and card-playing. But because the club was to be the exclusive domain of the newly parading gentry, like Harrison Gray Otis, it was immediately and viciously attacked in the press, creating a frenzied public uproar that is inexplicable, and indeed ludicrous, unless viewed within the terms in which contemporaries described social character. The club, wrote an "Observer" (probably Samuel Adams), represented another example of effeminate refinement, another symptom of the dissipation of the day, another amusement designed "to lull and enervate these minds already too much softened, poisoned and contaminated by idle pleasures, and foolish gratifications." The republic was truly in grave danger. "We are prostituting all our glory, as a people, for new modes of pleasure, ruinous in their expences, injurious to virtue, and totally detrimental to the well being of society." The Tea Assembly, declared "Candidus" (probably Benjamin Austin), was considered by most of the people at this very critical time "as a very *dangerous* and *destructive institution*," suitable perhaps for "the long, established Courts of *Europe*," but fatal to the infant republics of America.[51]

It was not simply the public encouragement of gaming that bothered these severe republicans; it was more the social pretensions of the club's subscribers, their efforts to use the Tea Assembly to promote "decent manners and polite attentions." In a republican government "when all the individuals of a State are so nearly on an equality," said one critic, everyone tried to keep up public appearances by being fashionable and thus pursued such public amusements even to the ruin of fortune and family. The "*politeness* and *gentility*" of the Tea Assembly were powerful allurements; the "*etiquette* and *stile*" of the club were "*more inticing,*" more destructive of republican character "than an evening spent in a *back chamber* of a tavern, among a group of wretches."[52]

This was no trivial debate. The issue at stake was nothing less than the nature of American society. "We, my countrymen," de-

51. Charles Warren, "Samuel Adams and the Sans Souci Club in 1785," Mass. Hist. Soc., *Proceedings*, 3d Ser., 60 (1926–27), 322–23, 328.
52. Boston *Independent Chronicle*, Jan. 27, 1785.

clared "Candidus," "have a character to establish." What kind of people were Americans anyhow? This was the fundamental question that ran through the thought of the 1780's. Supporters of the Sans Souci Club charged that its enemies were eaten with "envy and malice," pining for pleasures that they were "not qualified to enjoy." The club was no orgy, but rather a company "observant of the nicest and most scrupulous laws of delicacy," encouraging only the purest and highest manners as benefiting the best kind of republic. One defender was bold enough to state that the club had been drawn from the example of America's French ally, the model of manners for the world. For America to imitate France was to display "delicacy of taste" and "a genius for what is elegant and sublime." And Americans needed such refinement. Already foreign states thought Americans were "a rude, imbecile people, inspired with antipathy to the very name of gentlemen and adverse to the innovations of taste." Another writer even attempted a tentative defense of luxury. Without it, he said, Americans must abandon commerce, refuse all connections with the arts and sciences, live in savage simplicity, and end up cutting one another's throats. For "Candidus," however, this was the strangest doctrine he had ever heard broached—the idea that luxury was a communal blessing! "Rome, Athens, and all ye cities of reknown, whence came your fall?"[53]

Americans could not rid themselves of this compelling and frightening analogy with the ancient world. "Every page of the history of the great revolution of Rome shows some instances of the degeneracy of Roman virtue, and of the impossibility of a nation's continuing free after its virtue is gone." And so the writings went: essays, sermons, pamphlets, throughout the Confederation period—all pointing to the fate of states which had died because their people had become corrupted. And America seemed equally fated. "While we are pleasing and amusing ourselves with Spartan constitutions on paper, a very contrary spirit reigns triumphant in all ranks. . . . Spartan constitutions and Roman manners, peculiar to her declining state, never will accord." One or the other must give way. Apparently the revolution from the infection of the mother country had not been in time after all. "In emancipating ourselves from British tyranny, we expected to

53. Warren, "Sans Souci Club," Mass. Hist. Soc., *Proceedings*, 3d Ser., 60 (1926–27), 325–26; Boston *Independent Chronicle*, Jan. 20, 27, 1785; Boston *Mass. Centinel*, Jan. 10, 1785.

escape from that torrent of corruption which deluges their land, preys upon the labor and industry of its best citizens, and reduces them to little better than slaves." But the expectation was vain. The child seemed to be going the way of the parent, dissipated and corrupted even as it got on its feet, rushing through its life in a matter of years. "In other countries," said Aedanus Burke, "governments, like the human body, have had their growth, perfection and decay: but ours, like an untimely birth, suffered an abortion before it was in maturity fit to come into the world."⁵⁴

It was this fear of premature death for their country that made the 1780's truly critical for American intellectuals. By 1787 correspondents were writing Jefferson in Paris that America was "marked by symptoms . . . truly alarming, which have tainted the faith of the most orthodox republicans." The American people were no longer uniquely virtuous. They were "a Luxurious Voluptuous indolent expensive people without Economy or Industry." "Instead of finding general proofs of industry, economy, temperance, and other republican virtues," some Americans now saw themselves as "a nation that was more luxurious, more indolent, and more extravagant, than any other people on the face of the earth." Such a people could not possess the proper character for republican government. America was not to be another Sparta or Rome after all. Americans had hoped to establish "great, wholesome equal republics," but the "high expectations," as James Wilson called them, seemed smashed. "We are not," said Charles Lee, "materials for such divine manufacture." The war, Robert Livingston told Gouverneur Morris in 1779, had not produced the effect "expected from it upon the manners of the people." It had not "rendered them more worthy, by making them more virtuous, of the blessings of free government." The people had been given an extraordinary amount of power in the 1776 constitutions but apparently were not qualified to wield it. "The idea of liberty has been held up in so dazzling colours," declared the *Essex Result* as early as 1778, "that some of us may not be willing to submit to that subordination necessary in the freest States." The people were not as self-sacrificing as had been hoped. "Shall we alone boast an exemption from the general fate of mankind?" was the ominous question. "Are not our manners becoming soft and luxurious, and have not our vices began to shoot?" "Too

54. Phila. *Pa. Packet*, Aug. 8, 1786; Boston *Independent Chronicle*, June 3, 1779; Phila. *Pa. Packet*, Aug. 20, 1778; [Burke], *Considerations on the Cincinnati*, 28.

much," said John Jay, "has been expected from the Virtue and good Sense of the People." Americans, concluded William Livingston in the common reckoning of 1787, "do not exhibit the virtue that is necessary to support a republican government."⁵⁵

In 1776 America had seemed the fittest place in the world for the republican experiment, wrote Jeremy Belknap in 1784. Let the republican system "have fair play" in the New World, Americans had urged, "and it will be seen that men can live together on a plan of equality, and govern themselves without foreign connections or domestic usurpation." All this was "very pretty," said Belknap, but all chimerical. Republicanism could not work unless the foundations of the state were laid as deep as Lycurgus had driven them. The state must prevent men from rising one above the other. All foreign commerce must be stopped. All men must eat together at one table and their labor be put into common stock—"in short, let *individuals be poor and the State rich*, and then set off in your republican career: but if you attempt it on any other plan," warned Belknap, "you may be sure it will come to nothing." "If 'Equality is the soul of a republic' then we have no soul." America's property was not equally distributed. The individuals were rich and the state was poor. The farmers of New England were the most equal in the country, yet they lacked any semblance of public virtue: they were mean and selfish, and were as greedy for land as the merchants were for cash. Was this not sufficient evidence then, concluded Belknap, "that the people of this country are not destined to be long governed in a democratic form?"⁵⁶

### 6. The Continuance of Hope

For all of the expressions of pessimism in the 1780's, it is clear that not all American intellectuals had lost their confidence in the republican experiment. Jefferson, viewing the new republics

55. Madison to Jefferson, Mar. 19, 1787, William Hay to Jefferson, Apr. 26, 1787, James Currie to Jefferson, Aug. 1, 1787, all in Boyd, ed., *Jefferson Papers*, XI, 219, 318–19, 328–29; Sylvius, "Letter III," *American Museum*, 2 (1787), 114–15; Charles Lee to Benjamin Rush, Apr. 30, 1780, *Lee Papers*, III, 427; Wilson, in McMaster and Stone, eds., *Pennsylvania and the Federal Constitution*, 228; Dangerfield, *Livingston*, 108; *Essex Result*, Parsons, *Memoir*, 364, 378; Jay to Jefferson, Feb. 9, 1787, Boyd, ed., *Jefferson Papers*, XI, 129; Theodore Sedgwick, *A Memoir of the Life of William Livingston* (N. Y., 1833), 403.
56. Jeremy Belknap to Ebenezer Hazard, Mar. 3, 1784, *Belknap Papers*, 312–14.

and to which, therefore, the judges cannot witfully blind themselves."[48]

The Americans, as Iredell pointed out, had rejected the conventional British "theory *of the necessity of the legislature being absolute in all cases*" and had been willing to run the risk of conducting their government on other principles, principles best described by the doctrine of separation of powers.[49] Separation of powers, wrote Alexander Hamilton in *The Federalist*, Number 78, the most concise and frank defense of judicial review in the 1780's, required that the weakest department in what had become the tripartite division of American government be given the power to defend its independence against the encroachments of other departments. But since the American governments were limited, the judiciary must also defend the constitution against violations by the other departments, particularly the legislature. Without this power of judicial review of legislation, "all the reservations of particular rights or privileges" by the people and the several departments of government "would amount to nothing." What made such a judicial power comprehensible, Hamilton acutely realized, was the changed relation that had taken place between the people and their supposed representatives in the legislature. The representatives of the people were not really the people, but only the servants of the people with a limited delegated authority to act on behalf of the people. Americans, said Hamilton, had no intention of enabling "the representatives of the people to substitute their *will* to that of their constituents." It was in fact "far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." The decisive assumption in the development of this judicial agency and authority was the real and ultimate sovereignty of the people. Judicial review did not "by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statutes, stands in opposition to that of the people, declared in the constitution, the judges . . . ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental." With these kinds of arguments constitu-

48. Richard Spraight to James Iredell, Aug. 12, 1787, Iredell to Spraight, Aug. 26, 1787, and "To the Public," Aug. 17, 1786, all in McRee, *Life of Iredell,* II, 169–70, 172–76, 148.
49. "To the Public," Aug. 17, 1786, *ibid.,* 146.

---

tional reformers in the 1780's were preparing the way for a more radical reconstruction of their political system than anyone had conceived possible a few years earlier.[50]

## 5. THE ABANDONMENT OF THE STATES

As vigorously as the constitutional reforms of the states were urged and adopted in the 1780's, they never seemed sufficient. Despite the remedies embodied in the New York, Massachusetts, and New Hampshire constitutions and the probability of reform in the other states, the disillusionment with American politics in the 1780's only grew more intense. Although some could admit that "many of the state constitutions we have chosen, are truly excellent," possessing in theory the necessary powers to act vigorously, it seemed increasingly evident that such powers were not being implemented. In the politics of the various states "it often happens, that those who are appointed to manage the affairs of the State, are extremely averse to exercise those powers with which they are invested. . . . While they feel themselves so frequently dependent on the breath of the people for a continuance in their elevated stations, many will . . . court the favour of the multitude and basely violate the most solemn obligations rather than hazard their own popularity." Only by shifting the arena of reform to the federal level, it seemed, could the evils of American politics be finally remedied. "It is very extraordinary . . . ," some were saying as early as 1783, "that so much pains have been taken to form and organize the constitutions of the several individual governments, and so little has been taken, in that which respects the whole nation of America, and which is superiorly important, that all our greatness, and our greatest concerns rest upon it." While some like Charles Carroll of Maryland were still convinced as late as 1787 that "a Reform of our State Constitutions or Governments should accompany, if not precede the reformations of the federal Government," most reformers by that date were looking to some sort of modification of the structure of the central government as the best, and perhaps the only, answer to America's problems.[51]

50. *The Federalist,* No. 78. See James Wilson, "Lectures on Law," Wilson, ed., *Works of Wilson,* I, 455–61.
51. Hartford *Conn. Courant,* Nov. 19, 1787; Boston *Independent Chronicle,* Sept. 7, 1786; Phila. *Pa. Journal,* July 2, 1783; Philip A. Crowl, ed., "Charles Carroll's Plan of Government," *Amer. Hist. Rev.,* 46 (1941), 592.

The central government had never been entirely ignored. Right from the beginning of the war a continental-minded minority centered in the middle Atlantic states had sought to strengthen the authority of the Confederation at the expense of the states. By the early eighties the nationalist program of men like Robert Morris and Alexander Hamilton had gathered a substantial amount of support from various groups. The war was dragging on, and the value of the paper money issued to finance it was sinking fast. The attempts of the states to prevent the depreciation of currency by legal-tender laws, price-fixing, and anti-monopoly legislation only aggravated discontent among business interests. Both the army and the public creditors of the Confederation were clamoring for help. It seemed for a moment in 1780–81 that the weakness of the central government was actually threatening the victory against Britain. Yet despite such pressure even the nationalists' proposals for a limited federal impost and a restricted congressional commercial power could not overcome the Revolution's commitment to the separate sovereignty of the states. And with the end of the war and the reassertion of state authority, expressed most explicitly in the states' absorption of the congressional debt, the nationalist program rapidly dissipated. The reputation of Robert Morris, as the superintendent of finance, became clouded with suspicion. The army grumbled but disbanded, and most of the nationalist delegates in Congress completed their three-year terms and retired. By the middle eighties Congress had virtually collapsed. The danger of the Union's falling to pieces, however great, meant little in the face of most Americans' deeply rooted mistrust of central power. As urgent as the need for some sort of revision of the Articles had become by 1785, many creditors and merchants like Theodore Sedgwick, Stephen Higginson, and the entire Massachusetts delegation in Congress hesitated to subject the Confederation to "a *chance of alteration*" for fear of giving "birth to new hopes of an aristocratical faction which every community possesses." In the opinion of the Massachusetts delegates there were too many Americans with "artfully laid, and vigorously pursued" plans afoot which aimed at transforming "our republican Governments into balefull Aristocracies."[52]

52. Theodore Sedgwick to Caleb Davis, Jan. 31, 1786, quoted in Welch, *Sedgwick*, 38; Elbridge Gerry, Samuel Holton and Rufus King to Gov. Bowdoin, Sept. 3, 1785, Charles R. King, *The Life and Correspondence of Rufus King* (N. Y., 1894–1900), I, 65. The nationalists' program of the early eighties is most fully analyzed in Ferguson, *Power of the Purse*, Chaps. VI–VII.

In the end it was not pressure from above, from the manifest debility of the Confederation, that provided the main impulse for the Federalist movement of 1787; it was rather pressure from below, from the problems of politics within the separate states themselves, that eventually made constitutional reform of the central government possible.

By early 1787 with the experience of Shays's rebellion and its aftermath Sedgwick, Higginson, and other New England men like them had altered their thinking and reinterpreted their fears. Not only the fact of the rebellion itself but the eventual victory of the rebels at the polls brought the contradictions of American politics to a head, dramatically clarifying what was taking place in nearly all the states. Urging the people to obey the laws of their state governments as a cure for the anarchical excesses of the period seemed to be backfiring, resulting in evils even worse than licentiousness. If the elected representatives in the state legislatures were likely, as they increasingly seemed to be, "to establish iniquity by Law," then obedience to these unjust laws was no solution to the evils of the day. Orators and writers, struggling with the consequences, admitted, on the one hand, that legislators in the enactment of "private views" could be "tyrannical" and warned that "statutes contradictory and inconsistent are to be expected, and even such as might invert the order of things, and substitute vice, in the room of virtue." Yet, on the other hand, they realized at the same time that the need for authority and "our social obligations require us to be subject to laws which we may think very inconvenient." Although the legislatures were daily committing acts of "injustice" and were violating "the most simple ties of common honesty," still "while we pretend to be governed by our Representatives in General Court assembled, let not each man foolishly assume the reins of government, and attempt to enforce his sentiments against the majority." State governments, *however well structured, no longer* seemed capable of creating virtuous laws and citizens. Had not the Massachusetts Constitution of 1780, asked Thomas Dawes in a Fourth of July oration of 1787, been acclaimed as the model of political perfection? "But if our constitution is the perfect law of liberty, whence those mighty animosities which have so lately distracted the bosom of peace, and stained the first pages of our history with civil blood?" Actually, said Dawes, in an opinion that others had reached by this time, the structure of the Massa-

chusetts Constitution was not at fault. "Our sufferings have arisen from a *deeper fountain* than the deficiency of a single constitution." Even if Massachusetts had possessed a more perfect and more exalted government, its citizens, declared Dawes, would continue to experience evils, "should our *National Independence* remain deprived of its proper *federal authority*." "In vain," said Stephen Higginson in 1787, "must be all our exertions to brace up our own Government without we have a better federal System than the present."[53]

By 1786–87 the reconstruction of the central government had become the focal point of most of the reform sentiment that had earlier been concentrated on the states. The continental-minded of the early eighties now found their efforts to invigorate the national government reinforced by the support of hitherto suspicious state-minded men. What had formerly been considered advisable for the functioning of the Confederation was fast becoming essential for the future of republicanism itself. It was no longer simply a matter of cementing the union or of satisfying the demands of particular creditor, mercantile, or army interests. The ability of America to sustain any sort of republican government seemed to be the issue. As long as the revision of the Articles was based solely on the need to solve specific problems of finance, commerce, and foreign policy, its support was erratic and fearful. But once men grasped, as they increasingly did in the middle eighties, that reform of the national government was the best means of remedying the evils caused by the state governments, then the revision of the Articles of Confederation assumed an impetus and an importance that it had not had a few years earlier. The desire for reform of the states now came together with national reform opinion to create a new and powerful force. As Benjamin Rush told Richard Price in June of 1787, "the same enthusiasm *now* pervades all classes in favor of *government* that actuated us in favor of *liberty* in the years 1774 and 1775, with this difference, that we are more *united* in the former than we were in the latter pursuit."[54]

53. Theodore Sedgwick to Gov. Bowdoin, Apr. 8, 1787, quoted in Welch, *Sedgwick*, 54; David Parsons, *A Sermon, Preached before His Excellency, John Hancock . . . May 28, 1788 . . .* (Boston, [1788]), 16–29; Boston *Independent Chronicle*, Jan. 11, 1787; Thomas Dawes, Jr., *An Oration, Delivered July 4, 1787 . . .* (Boston, 1787), 13–15; Higginson to Nathan Dane, June 16, 1787, Jameson, ed., "Letters of Higginson," Amer. Hist. Assoc., *Annual Report, 1896*, I, 759–60.
54. Rush to Price, June 2, 1787, Butterfield, ed., *Rush Letters*, I, 418–19.

The move for a stronger national government thus became something more than a response to the obvious weaknesses of the Articles of Confederation. It became as well an answer to the problems of the state governments. It was "the vile State governments," rather than simply the feebleness of the Confederation, that were the real "sources of pollution," preventing America from "being a nation." It was "the corruption and mutability of the Legislative Councils of the States," the "evils operating in the States," that actually led to the overhauling of the federal government in 1787. These vices coming out of the state governments, said Madison, "so frequent and so flagrant as to alarm the most stedfast friends of Republicanism, . . . contributed more to that uneasiness which produced the Convention, and prepared the public mind for a general reform, than those which accrued to our national character and interest from the inadequacy of the Confederation to its immediate objects." The federal Constitution became the culmination of a decade's efforts by Americans to readjust their constitutional structures to fit what Hamilton called "the commercial character of America" and what Jay called "manners and circumstances" that were "not strictly democratical."[55] The calling of the Philadelphia Convention in 1787 was the climax of the process of rethinking that had begun with the reformation of the state constitutions in the late seventies and early eighties, a final step "taken from the fullest conviction that there was not a better, perhaps no other, which could be adopted in this crisis of our public affairs." The federal Convention, Americans told themselves repeatedly, was to frame a constitution that would "decide forever the fate of republican government."[56]

55. Henry Knox to Rufus King, July 15, 1787, King, *Life of King*, I, 228; John Francis Mercer and Hamilton in Farrand, ed., *Records of the Federal Convention*, II, 288, I, 291; Madison to Jefferson, Oct. 24, 1787, Boyd, ed., *Jefferson Papers*, XII, 276; *The Federalist*, No. 11; Jay to Washington, Jan. 7, 1787, Johnston, ed., *Papers of Jay*, III, 227. See also R. H. Lee to Francis Lightfoot Lee, July 14, 1787, Ballagh, ed., *Letters of R. H. Lee*, II, 423–24; Phila. Pa. *Journal*, June 30, 1787; Farrand, ed., *Records of the Federal Convention*, I, 466–67, II, 47–48; Robert A. Rutland, *The Ordeal of the Constitution: The Antifederalists and the Ratification Struggle of 1787–1788* (Norman, Okla., 1966), 27, 51.
56. Boston *Independent Chronicle*, Sept. 20, 1787; Madison, quoted in Charles Warren, *The Making of the Constitution* (Cambridge, Mass., 1947), 82.