1　Rob Bonta
　　Attorney General of California
2　Mark R. Beckington
　　Supervising Deputy Attorney General
3　Robert L. Meyerhoff
　　Deputy Attorney General
4　State Bar No. 298196
　　　300 South Spring Street, Suite 1702
5　　Los Angeles, CA  90013-1230
　　　Telephone:  (213) 269-6177
6　　Fax:  (916) 731-2144
　　　E-mail:  Robert.Meyerhoff@doj.ca.gov
7　*Attorneys for Defendant Rob Bonta in his*
　　*official capacity as Attorney General of the*
8　*State of California*

9　　　　　IN THE UNITED STATES DISTRICT COURT

10　　　　FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11　　　　　　　　　CIVIL DIVISION

12

| | |
|---|---|
| 13  **VIRGINIA DUNCAN, RICHARD** | Case No. 3:17-cv-01017-BEN-JLB |
| 14  **LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO,** | **COMPENDIUM OF WORKS** |
| 15  **CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL** | **CITED IN DECLARATION OF RANDOLPH ROTH** |
| 16  **ASSOCIATION, INC., a California corporation,** | **VOLUME 7 OF 7** |
| 17                          Plaintiffs, | Courtroom:    5A |
| 18         **v.** | Judge:          Hon. Roger T. Benitez  Action Filed:  May 17, 2017 |
| 19 | |
| 20  **ROB BONTA, in his official capacity as Attorney General of the State of** | |
| 21  **California; and DOES 1-10,** | |
| 22                          Defendants. | |

23

24

25

26

27

28

　　　　　　　　　　　　　　　1

1

## **INDEX**

2

3

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| Joseph R. Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860 (Cincinnati: Robert Clarke & Co., 1860), 452 | 28 n.88 | 0001 |
| An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63 | 25 n.79 | 0005-0007 |
| An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, §§ 1, 3, 1871 Tex. Gen. Laws 25 | 26 n.80 | 0008-0011 |
| Federal Explosives Act of 1917, 40 Statute 385 | 35 n.103 | 0012-0020 |
| The National Firearms Act of 1934, 48 Statute 1236 | 34 n.102 | 0021-0026 |
| The National Firearms Act of 1938, 52 Statute 1250 | 34 n.102 | 0027-0029 |
| The Organized Crime Control Act of 1970, 84 Statute 922 | 35 n.103 | 0030-0071 |
| **BOOKS**[i] | | |
| Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* 140-156, 181-195 (Princeton: Princeton University Press, 1991) | 34 n.99 | 0073-0079 |
| Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* 3-18 (New York: Vintage, 1996) | 13 n.31, 30 n.90 | 0080-0098 |
| Sucheng Chan, *This Bittersweet Soil: The Chinese in California Agriculture, 1860-1910,* at 372 (Berkeley: University of California Press, 1986) | 30 n.91 | 0099-0102 |
| J. A. Chapman, *History of Edgefield County* 39-41 (Newberry, South Carolina: Elbert H. Aull, 1897) | 30 n.90 | 0103-0109 |

2

| | | |
|---|---|---|
| Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 70-121 (New York: Prometheus Books, 2018) | 12 n.30 | 0110-0138 |
| Robert J. Cottrol & Raymond T. Diamond, "*Public Safety and the Right to Bear Arms*" in David J. Bodenhamer & James W. Ely, Jr., eds., The Bill of Rights in Modern America, revised and expanded, at 88-107 (Bloomington: Indiana University Press, 2008) | 19 n.53 | 0139-0162 |
| Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 69-96, 143-152 (Westport, Connecticut: Praeger, 1999) | 15 n.39, 18 n.52, 19 n.53 | 0163-0185 |
| Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* 74, 83-85, 97-140 (Westport, Connecticut: Praeger Publishers, 1994) | 19 n.53 | 0186-0215 |
| George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016); Eric Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001) 137-38 | 12 n.31 | 1750-1752 |
| Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945*, at 24-28 (Harrisburg, Pennsylvania: Stackpole Books, 1981) | 22 n.66 | 0216-0222 |
| John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* 463-80 (New York: W. W. Norton, 2016) | 27 n.82, 30 n.91 | 0223-0234 |
| Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000) 25-27, 32, 64-65, 91-92, 114 | 13 n.31 | 1753-1759 |

3

| | | |
|---|---|---|
| John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152 | 13, n.31 | 1760-1767 |
| Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* 1-8 (Baltimore: John Hopkins University Press, 2016) | 12 n.30 | 1768-1773 |
| Julian S. Hatcher, *Pistols and Revolvers and Their Use* 8-11 (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927) | 22 n.66 | 0235-0242 |
| Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940*, at 17-43 (New York: Bonanza Books, 1940) | 22 n.66 | 0243-0274 |
| W. Eugene Hollon, *Frontier Violence: Another Look* 93-95 (New York: Oxford University Press, 1974) | 30 n.91 | 0275-0282 |
| Roy G. Jinks, *History of Smith and Wesson* 38-57, 104-170 (North Hollywood: Beinfeld, 1977) | 22 n.67, 22 n.68, 23 n.69, 23 n.70, 23 n.71 | 0283-0329 |
| Philip D. Jordan, Frontier Law and Order—10 Essays, at 1-22 (Lincoln: University of Nebraska Press, 1970) | 19 n.53, 19 n.54 | 0330-0343 |
| Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., Restricting Handguns: The Liberal Skeptics Speak Out 7-30 (Croton-on-Hudson, New York: North River Press, 1979) | 19 n.53, 19 n.53 | 0344-0358 |
| Jeff Kinard, *Pistols: An Illustrated History of Their Impact* 163 (Santa Barbara: ABC-CLIO, 2003) | 23 n.71 | 0359-0362 |
| Aubrey C. Land, *Colonial Maryland: A History* 49-54 (Millwood, New York: Kato Press, 1981) | 30 n.90 | 0363-0368 |

4

| | | |
|---|---|---|
| Stephen C. LeSueur, *The 1838 Mormon War in Missouri* 162-68 (Columbia: University of Missouri Press, 1987)X | 30 n.91 | 0369-0375 |
| Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989) 42-45 | 11 n.29 | 1774-1776 |
| Harold L. Peterson, *American Knives: The First History and Collector's Guide* 25-70 (New York: Scribner, 1958) | 17 n.51 | 0376-0401 |
| Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783*, at 155-225 (New York: Bramhall House, 1956) | 9 n.13 | 0402-0476 |
| Harold L. Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900*, 67-80 (New York: Walker, 1968) | 17 n.51 | 0477-0504 |
| Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Alfred A. Knopf, 1996) | 12 n.30 | 1777-1778 |
| David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* 65-110 (New York: Columbia University Press, 2022) | 34 n.99 | 0505-0553 |
| Randolph Roth, *American Homicide* 42, 45, 61-63 (especially the graphs on 38, 39, and 91), 118-121, 145-149, 158, 162, 180-186, 195-196, 199-203, 218-219, 297-302, 332, 337, 354, 384-385 (Cambridge: The Belknap Press of Harvard University Press, 2009) | passim | 1779-1811 |
| Randolph Roth, "*Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History*," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., A Right to Bear Arms? 116-20, 124-27 (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019) | passim | 0664-0679 |

5

| | | |
|---|---|---|
| Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*, at 151-58 (Baton Rouge: Louisiana State University Press, 1996) | 31 n.93 | 0680-0682 |
| Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* 9-10 (New York: Penguin Press, 2018) | 9 n.13 | 0683 |
| Priya Satia, "*Who Had Guns in Eighteenth Century Britain?*" in Tucker, Hacker, and Vining, A Right to Bear Arms 41-44 (2019) | 9 n.13 | 0684-0689 |
| Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006) 91-102 | 12 n.31 | 1813-1820 |
| Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969) 65-70, 282-291, 319-328, 413-425, 463-467 | 11 n.29 | 1821-1846 |
| Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884*, at 67-109 (Columbus: Ohio State University Press, 2000) | 31 n.93 | 0690-0713 |
| Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* 74-78, 86, 91-93 (New York: Thomas Dunne Books, 2009) | 32 n.95, 32 n.96, 33 n.98 | 0714-0728 |
| **LAW REVIEWS AND JOURNALS** | | |
| Robert J. Cottrol & Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," 80 Geo. L.J. 309, 309-61 (1991) | 19 n.53 | 0730-0771 |
| Clayton E. Cramer, "*Colonial Firearms Regulation*" (April 6, 2016) (available at SSRN: https://bit.ly/3THcMTu) | 7 n.5 | 0772-0794 |

6

| | | |
|---|---|---|
| Clayton E. Cramer & Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted Aug. 12, 2016, 6-7, https://papers.ssrn.com/so13/papers.cfm?abstract_id=2599851. | 27 n.83, 28 n.84, 28 n.85, 28 n.86, 28 n.87, | 1848-1862 |
| Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," 64 Wm. & Mary Q. 621, 621-44 (2007) | 29 n.90 | 0795-0819 |
| C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," 54 Vanderbilt Law Review 1805, 1805-1847 (2001). | 15 n.38 | 1863-1905 |
| Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017) 308-322 | 12 n.31 | 1906-1914 |
| Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* 11-40, 180-183 (New York: Bonanza Books, 1959) | 10 n.20 | 0820-0839 |
| Mary Alice Mairose, "*Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855*" (M.A. thesis, Ohio State University, 1993) | 30 n.91 | 0840-1021 |
| Jack N. Rakove, *The Second Amendment: The Highest State of Originialism*, 76 Chicago-Kent L. Rev. 157 (2000) | 12 n.30 | 1915-1979 |
| Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019), https://repository.tcu.edu/handle/116099117/26778. | 24 n.79 | 1980-2210 |
| Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 UC Davis Law Review 2603, 2609-10 (2021) | 25 n.79, 25 n.80, 27 n.81 | 1022-1036 |

7

| | | |
|---|---|---|
| Randolph Roth and James M. Denham, *Homicide in Florida, 1821-1861*, 86 Fla. Historical Q. 216-239 (2007) | 16 n.45 | 1037-1061 |
| Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg, *Homicide Rates in the Old West*, 42 W. Historical Q. 173-195 (2011) | 24 n.78, 27 n.82 | 1062-1105 |
| Randolph Roth, *Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide*, 16 Homicide Studies 197 (2012) | 6 n.4, 20 n.58 | 1106-1125 |
| Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemporary Problems 238 (2020) | 34 n.202 | 1126-1149 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Department of Commerce, Bureau of the Census, Fourteenth Census of the United States Manufactures: Explosives 1126 (Washington, D.C.: Government Printing Office, 1922) | 33 n.97 | 1151-1154 |
| Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term, as quoted and discussed in Roth, American Homicide at 218-219 and n. 76. | 16 n.48 | 1155-1156 |
| U.S Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, ATF Federal Explosives Law and Regulations (2012) | 33 n.97 | 1157-1264 |
| **NEWS ARTICLES** | | |
| Charlie Savage, *Trump Administration Imposes Ban on Bump Stocks*, N.Y. Times, Dec. 18, 2018 | 35 n.105 | 1266 |

| | | |
|---|---|---|
| **OTHER SOURCES** | | |
| Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, Open Letter to All Federal Firearms Licensees, Mar. 22, 2022 | 37 n.111 | 1268-1269 |
| Buymymags.com – Home Page (last accessed on Oct. 4, 2022), https://www,buymymags.com/ | 37 n.110 | 2212-2213 |
| CDC Wonder Compressed Mortality Files, ICD-10 | 8 n.7 | 1270-1310 |
| "A Complete Guide to Binary Triggers," Americanfirearms.org, (last accessed Oct. 4, 2022), https://www.americanfirearms.org/guide-to-binary-triggers/ | 37 n.111 | 2214-2237 |
| CPI Inflation Calculator (https://bit.ly/3CS5UNl) | 33 n.96 | 1311-1321 |
| Guns.com – Price of Semiautomatic Handguns (https://bit.ly/3CVb1uW) | 37 n.110 | 1322-1325 |
| Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM," YouTube | 36 n.109 | 1326 |
| Lunde Studio, Are Binary Triggers Legal (2022) All You Need to Know | 37 n.111 | 1327-1332 |
| Military-today.com, M16 Assault Rifle | 36 n.108 | 1333-1334 |
| "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube | 38 n.112 | 1335 |
| Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://bit.ly/3TpI4yu) | 13 n.34, 16 n.46, 21 n.64, 24 n.76 | 1336-1437 |
| Department of the Army, TC 3-22.9 Rifle and Carbine Manual (May 2016) | 36 n.107 | 1438-1689 |

9

| | | |
|---|---|---|
| The Violence Project's Mass Shooter Database, https://www.theviolenceproject.org/mass-shooter-database/ | 39 n.113, 40 n.114 | 1690 |
| Guns.com, AR-15s | 33 n.96 | 1691-1696 |
| Gunmagwarehouse.com, AR-15s | 33 n.96 | 1697-1722 |
| 2011 Tucson Shooting," Wikipedia. | 40 n.115 | 1723-1747 |
| Rick Sapp, Standard Catalog of Colt Firearms, at 96 (Cincinnati: F+W Media, 2011) | 23 n.71 | 1748 |

i The Declaration of Randolph Roth cites 30 books in their entirety, consistent with the practice of professional historians.  *See* Roth Decl. ¶¶  n. 29, n. 30, n. 37, n.38, n. 45, n.65, n.77, n.82, n.89, n.91, n.92, n.93, n.94, n.95, n.98, n.99, n.100, (citing Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931); David F. Almendinger, Jr., Nat Turner and the Rising in Southampton County (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996); David Grann, Killers of the Flower Moon: The Osage Murders and the Birth of the FBI (New York, Doubleday, 2017); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); ; William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath that Brought Down Al Capone* (Nashville: Cumberland House, 2004); Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999); *LeeAnna Keith, The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963); Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001); Clare V. McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997);

10

Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Hertà E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000); *Andrew S. Trees, The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003); Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975); Saul Cornell, *A Well-Regulated Milita: The Founding Gathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006); William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982). Should the Court wish to receive excerpted copies of these works Professor Spitzer can provide them.

Compendium of Works Cited in Declaration of Randolph Roth
(3:17-cv-01017-BEN-JLB)

# LAW REVIEWS AND JOURNALS

# The Racist Origins of California's Concealed Weapon Permit Law

Clayton E. Cramer[1] and Joseph Olson

*Abstract: California's concealed weapon permit law has a curious history, awash in racism. This paper examines the history of why California's constitutions (1849 and 1879) lack the right to keep and bear arms provisions common in other state constitution and shows the openly stated racist intentions behind California's three concealed weapon statutes.*

## I.    Introduction

This article provides a history of California's concealed weapon statutes and the associated debates concerning why California's two constitutions lack a guarantee of a right to keep and bear arms, provisions common in most state constitutions (parts II.A. & III).   This article also examines the often directly stated racist purposes of these concealed weapon statutes (parts III.A, and III.B).

## II.    Early California

## A. California's First Constitution and The Absence of An Arms Guarantee

Forty-four states have a guarantee of a right to keep and bear arms written into their state constitutions[2].  California is not one of them.  Why?  For a long time, I assumed that

---

[1] Adjunct History Faculty, College of Western Idaho. Mr. Cramer is the author of Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform (1999) (cited by Justice Breyer in McDonald v. City of Chicago, 130 S. Ct. 3020, 3132 (2010) (Breyer, J., dissenting)), and Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie (2006), and co-author of, among other articles, Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 Geo. J.L. & Pub. Pol'y 511 (2008) (cited by Justice Scalia in District of Columbia v. Heller, 554 U.S. 570, 588 (2008)), and Clayton E. Cramer, Nicholas J. Johnson & George A. Mocsary, *"This Right is Not Allowed by Governments that Are Afraid of the People": The Public Meaning of the Second Amendment When the Fourteenth Amendment Was Ratified*, 17 Geo.Mason L. Rev. 823 (2010) (cited by Justice Alito in *McDonald*, 130 S. Ct. at 3039 n.21, 3041 n.25, 3043). Mr. Cramer's website is Clayton Cramer's Web Page, http://www.claytoncramer.com (last visited Aug. 20, 2013).

Electronic copy available at: https://ssrn.com/abstract=2599591

it was because California was dominated by Iowa transplants—and Iowa is another of those states without such a guarantee. Recently I was reading through the debates from the California Constitutional Convention of 1849, which adopted the Golden State's first state constitution—and I discovered the reasons were a bit more complex.

The delegates debated what individual rights should be listed in the state constitution's bill of rights. Delegate Ord proposed, "Every person has a right to bear arms for the defence of himself and the State." Delegate McCarver wanted to add, "provided that they are not concealed arms."[3] This is not surprising; in the period before the Civil War, many states passed laws either prohibiting or restricting the *concealed* carrying of deadly weapons. State constitutional conventions often added such restrictions to existing arms guarantees to make sure that the legislature could ban what was increasingly regarded as a cowardly way of fighting—the use of "secret arms."[4]

Delegate McCarver, however, also believed that it would be best if there were *no* provision preventing "the Legislature from regulating matters of this kind." He thought guaranteeing a right to bear arms was not "a proper subject for the Constitution." Other delegates agreed with McCarver that there should be no arms provision in the state bill of rights—but not because the state should have the power to regulate the carrying of weapons. Delegate Sherwood argued that denying an individual the right to bear arms "would be null and void, inasmuch as it would be in opposition to the Constitution of the United States," and then quoted the Second Amendment. Sherwood thought an arms

---

[2] Eugene Volokh, STATE CONSTITUTIONAL RIGHTS TO KEEP AND BEAR ARMS, 11 Texas Rev. of Law & Politics 191, 192 (2006).

[3] *J. ROSS BROWNE*, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION… 47 (1850).

[4] CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 52-62 (1999).

Electronic copy available at: https://ssrn.com/abstract=2599851

guarantee was unnecessary because the Second Amendment already protected such a right.[5]

(This may seem a pretty astonishing claim, because only with the *McDonald* v. *Chicago* (2010) decision did the U.S. Supreme Court hold that the Second Amendment restricted the power of the states to regulate the keeping and bearing of arms. And then only through incorporation of the Second Amendment via the 14th Amendment. The 14th Amendment was ratified in 1868, almost twenty years after the California constitutional delegates debated the applicability of the Second Amendment to state law. However, the notion that states were bound by the Second Amendment directly was a minority viewpoint endorsed by several state supreme courts in the antebellum period, not as anachronistic as it first sounds.[6])

Delegate Botts argued against adding the arms guarantee to the state constitution's bill of rights because he feared that it might not be a strong enough protection; such a guarantee belonged in the section that specified the powers of the legislature.

Even Delegate Sherwood was persuaded by this argument, admitting that the arms provision "directly touches the rights of every citizen."[7] When the convention voted on both Ord's proposal for a right to bear arms, and McCarver's amendment that the right not apply to concealed weapons, both proposals died—and with it, any possibility of adding a right to keep and bear arms to the California Constitution's bill of rights.

---

[5] Browne, *Report of the Debates in the Convention of California, on the Formation of the State Constitution*... 47 (1850).

[6] Nunn. v. State, 1 Ga. 243, 250 (1846) (striking down a ban on open carrying of horseman's pistols); State v. Chandler, 5 La. Ann. Rep. 489, 490 (1850) (upholding a ban on concealed carry while observing that the "right to carry arms" is a "right guaranteed by the Constitution of the United States.); State v. Smith, 11 La. Ann. Rep. 638 (1856)(upholding a ban on concealed carry because that law "does not contravene the second article of the amendments of the Constitution of the United States. The arms there spoken of are such as are.. at least carried openly."); State v. Jumel, 13 La. Ann. Rep. 399, 400 (1858)(rejecting a Second Amendment challenge to a concealed weapon law because the laws prohibited "only a particular mode of bearing arms…."); Cockrum v. State, 24 Tex. 394, 396, 401 (1859)(appears to have accepted defendant's argument that the Second Amendment "is applicable to state legislation.")

[7] Browne, *Report of the Debates*, 47.

Electronic copy available at: https://ssrn.com/abstract=2599851

You cannot draw too strong a message from this series of back and forth discussions, but it appears that some delegates argued that there was no need for an individual right to keep and bear arms in California's Constitution, because the Second Amendment already protected such a right; other delegates argued that the right needed to be located elsewhere than in the bill of rights to be better protected.[8]

The only delegate who clearly spoke against a right to bear arms was McCarver. Today, he is most remembered for another proposal he made a few minutes later: that blacks would be forever banned from living in California.[9]  (Such provisions were added to many other state constitutions of the period; McCarver even played a part in Oregon adopting such a ban.[10])   In spite of considerable support from other delegates, this proposal did not pass.

## B. Gun Control and the Gold Rush

Gold Rush California was a wild place.  What had been in 1846 a sleepy backwater of Mexico, became a destination for not only Americans, but also Europeans, Australians, and Chinese, all desperate to "get rich or die tryin'."   California was briefly an independent republic (although run by American immigrants).  After the Mexican War, it was under U.S. military control.  The discovery of gold moved California from an unorganized territory to an American state without ever going through the intermediate step of organized territory.  In the first couple of years of the Gold Rush, there was no properly authorized legal authority in some parts of the state, and miners established vigilance committees that dispensed sometimes rough justice to deal with trouble makers.

---

[8] Browne, *Report of the Debates*, 47.

[9] *Id.*, 49-50.

[10] DAVID ALAN JOHNSON, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890, 129; Oregon, JOURNAL OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF OREGON: HELD AT SALEM 125 (1882).

Electronic copy available at: https://ssrn.com/abstract=2599851

As Roger D. McGrath's *Gunfighters, Highwaymen, & Vigilantes* (1984) explains, Gold Rush mining camps were heavily armed.  While murder rates in the worst of these camps (Bodie, California and Aurora, Nevada) were higher than in any American big city in the last two centuries, the rates for other crimes were often zero or close to it, because everyone was armed.  Most of the murders involved young single men, intent on proving their toughness and courage to other young single men.  To the larger community, these deaths were a form of mutual combat, and generally regarded as more a gain to the community than a loss.[11]

Not just mining camps, but even Gold Rush cities were pretty wild places, and the absence of an effective police force caused many Californians to regularly arm for self-defense.  J.D. Borthwick's *Three Years in Calafornia* [sic] (1857), described how San Francisco was awash in places of entertainment with signs that announced "No weapons admitted."   While Borthwick thought little of the entertainments available, he did describe why it was nonetheless worth going:

> if only to watch the company arrive, and to see the practical enforcement of the weapon clause in the announcements. Several doorkeepers were in attendance, to whom each man as he entered delivered up his knife or his pistol, receiving a check for it, just as one does for his cane or umbrella at the door of a picture-gallery. Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of their neck, or in their breast; demure, pious-looking men, in white neckcloths, lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser-pocket, and a bowie-knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched; an operation which was performed by the doorkeepers, who, I observed, were occasionally rewarded for their diligence by the discovery of a pistol secreted in some unusual part of the dress.[12]

A search of newspapers of the period does show a *lot* of murders, gunfights, and knifings.  I can see why the California legislature felt that they had to do *something*.  But what?  The legislature debated a ban on concealed carry throughout the 1850s.  Even those

---

[11] Roger D. McGrath, Gunfighters, Highwaymen, & Vigilantes: Violence on the Frontier 251-6 (1984).

[12] J.D. Borthwick, *Three Years in Calafornia* [sic], Hutchings Illustrated California Magazine at 2:171-2, October 1857.

Electronic copy available at: https://ssrn.com/abstract=2599851

who supported such laws often had a narrow notion of who needed to be restricted.  During
debates in February of 1856, the state senator who represented Nevada County (a derringer-
shaped county in California's foothills) indicated that he was in support of a bill to ban
concealed carry if it were for the purpose of disarming "Greasers"[13] (a slang term used
throughout the nineteenth and early twentieth century for Mexicans).[14]   However, the
concealed carry ban did not pass the legislature that year.

## C. California's First Concealed Weapon Law

Did California have the authority to regulate the bearing of arms?  Nothing happened
until 1863, when the legislature banned concealed carrying of "any dangerous or deadly
weapon" except for police officers or travelers.[15]   This law is similar in nature and
language to laws passed mostly in the South before the Civil War, to discourage dueling.
(Yes, really, to discourage dueling, even though duelists did not conceal their weapons.
The odd connection was discussed in constitutional convention debates, and in detail in
my book *Concealed Weapon Laws of the Early Republic,* but it is *very* complex, and does
not deserve dozens of pages here.)[16]

In 1863, the California legislature did pass a ban on concealed carry.  As the San
Francisco newspaper the *Daily Alta California* explained it:

> During the thirteen years that California has been a State, there have been more deaths occasioned
> by sudden assaults with weapons previously concealed about the person of the assailant or
> assailed, than by all other acts of violence which figure on the criminal calendar….  Heretofore
> there has been no law passed which would remedy the evil. Public opinion, as expressed through
> the action of our legislators, seems to have sanctioned the custom, barbarous though it be. For
> many sessions prior to the last, ineffectual efforts were made to enact some statute which would
> effectually prohibit this practice of carrying concealed weapons. A radical change of public
> sentiment demanded it, but the desired law was not passed until the last Legislature, by a
> handsome majority, enacted the subjoined act, entitled "An Act to prohibit the carrying of
> concealed weapons."[17]

---

[13] *Letter From Sacramento, DAILY* ALTA (SAN FRANCISCO) CALIFORNIA, February 19, 1856, at 2.
[14] Win Blevins, DICTIONARY OF THE AMERICAN WEST 166 (2001),
[15] Theodore Henry Hittell, 1 THE GENERAL LAWS OF THE STATE OF CALIFORNIA, FROM 1850 TO
1864… 261m, §§ 1585-1586 (1865), 1:261,.
[16] CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC.
[17] City Items, DAILY ALTA (SAN FRANCISCO) CALIFORNIA, June 26, 1863, at 1.

Electronic copy available at: https://ssrn.com/abstract=2599851

Not surprisingly, the law was not universally followed.  Indeed, when I searched for "concealed weapon" in California newspapers from 1863 to 1870, there are hundreds of references to criminal cases involving violation of this law, and doubtless more that did not make the newspapers.  What is fascinating, however, is that some of the same newspapers that had supported passage of the law in 1863, by 1869 and 1870, realized that all the good intentions were not enough—that the law was in some respects counterproductive and needed to be repealed.

Unlike the other states that were early adopters of concealed weapon bans, California repealed its ban on concealed carry in 1870 with no legislative explanation as to why it was doing so.  Even more peculiar, the act repealing the law provided that any charges still pending would continue to trial "as if said Act had not been repealed."[18]

Newspaper coverage provides the only clues as to why the law was repealed, and yet existing charges were allowed to go forward.  Less than six years after that editorial from the *Daily Alta California* supporting  the concealed weapons ban, the same newspaper ran an editorial arguing that the law was both impossible to enforce and unconstitutional because it violated the Second Amendment:

> The Federal Constitution says "the right of the people to keep and bear arms shall not be infringed." The purpose of that provision, it is well known, was to prevent the practice common in Europe in the last century of seizing all the arms in the possession of the common people, especially in times of political disaffection. As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure. Under the rules of general literary interpretation of the Constitutional provision, it is evident that the prohibition of carrying concealed weapons is an infringement of the right to bear arms. [19]

This being a long time ago, the editorial writer recognized that the U.S. Constitution was not living, breathing, and constantly mutating.  Instead, "The rules of legal interpretation, however, require us to find out first what 'the right to keep and bear arms' was in 1791 when this provision was adopted….  We have examined the question, and

---

[18] California sess. laws (1869-70), ch. 63.
[19] *The Carrying of Concealed Weapons*, DAILY ALTA (SAN FRANCISCO) CALIFORNIA, March 13, 1869, at 2.

Electronic copy available at: https://ssrn.com/abstract=2599851

our opinion… is that in 1791 there was a right of keeping and bearing arms, that it was not limited in the matter of carrying concealed weapons, and that our statute is an infringement of the right."[20]

The editorial went on to argue that the statute was in error criminalized the carrying of concealed weapons even when there was no criminal intent in carrying a weapon, They argued instead that putting a gun in your pocket is a convenience: "To put a thing in its customary and convenient receptacle is not concealment. Concealment is a matter of motive. An article dropped by accident in an out of the way place and lost irretrievably is not concealed."[21]

Finally, the editorial argued that the law:

bothers the good and assists the bad. It disarms the orderly citizen and places no obstruction in the way of the robber. Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. But of late years, families have increased, dissipation has decreased, and drunken affrays are more rare. At the same time, robbery on the highway, and especially in this city, is more frequent.[22]

Instead, the editorial argued that repealing the law would only cause an increase of "killing of robbers in self-defence, and that would be a benefit to the community."[23]

The following year, the *Sacramento Daily Union* published an editorial along much the same lines, discussing the 1870 repeal of the concealed weapon ban:

There is reason to believe it was generally observed by the vast majority of good citizens. There is as good reason to believe it was not observed by the vast majority of roughs, fighting men, and predatory characters. In many cases of assault between quiet citizens and these last named characters, it was found that the good citizen had to defend himself unarmed against the predacious one with arms, the former suffering for his respect of the law. It was also found that the police were apt to arrest any quiet citizen on whom they discovered concealed weapons, while they paid little attention to the roughs who were known to carry arms habitually.[24]

Some things never change in California, it seems. The editorial explained that

a law essentially good in theory, became an abomination in practice, in that it placed the peaceful

---

[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Concealed Deadly Weapons*, Sacramento Daily Union, December 16, 1870, at 2.

Electronic copy available at: https://ssrn.com/abstract=2599851

citizen completely at the mercy of a class whose offenses against order it was intended to check, but did not, owing to the remissness in duty of the guardians of the law. [25]

Sacramento's experience with criminals was the immediate cause of the

repealing movement… where bands of armed roughs, scorning the law against carrying concealed weapons, were perpetrating highway robberies on quiet, unarmed citizens, who could not prepare for self-defense without danger of being arrested and fined every day. [26]

The editorial acknowledged that one of the good things hoped for had happened in the intervening months:

It was reasoned with much plausibility that if the roughs once knew that quiet citizens might prepare to defend themselves without danger of being punished for misdemeanor, the bare suspicion that such a person had about him a weapon would disarm the roughs and prevent robberies. This has in fact been one of the results. [27]

Now we know why California passed the 1863 concealed carry ban, and why the legislature repealed it in 1870. The argument for repeal was essentially the argument that has carried the day in most American states today: Concealed carry, at least if done by responsible, law-abiding adults, makes us safer, and eliminates a serious conflict with the Second Amendment. In light of the evidence that the drafters of California's first state constitution recognized that the Second Amendment protected an individual right to bear arms, this provides additional evidence that the current California law was contrary to the original intent of the 1850 constitutional convention.

There is another lesson in that 1870 *Sacramento Daily Union* editorial. The editorial writer, while explaining that his newspaper had supported the repeal, and was still supporting it, also hoped that it would not lead to everyone regularly being armed. "The custom of carrying deadly weapons by day and night, in the street and in the parlor, saloon, and at public social gatherings, has become fearfully common among young men and even mere boys of every class." Not everyone was behaving as responsibly as they should have, with minor disputes escalating to death; the editorial writer hoped that social pressure would discourage some of the bravado that caused "young men and even mere

---

[25] *Id.*
[26] *Id.*
[27] *Id.*

Electronic copy available at: https://ssrn.com/abstract=2599851

boys" to be carrying deadly weapons on a regular basis.[28]  Fewer armed people because of social pressure would lead to fewer escalations.

## III.    The Second California Constitution and the Right To Arms

California held another constitutional convention in 1878.  The 1849 Constitution seemed increasingly inadequate because of questions about water rights and the "Chinese problem." [29]   The 1878 convention seems not to have even discussed the question of a right to keep and bear arms—except for one startling provision.  The convention was divided between a conservative, generally wealthy group, and what became known as "the Workingmen," who represented a populist collection of white laborers, intent on driving Asian immigrants from California. [30]  They had a number of proposals that are shocking in their racism today (but nevertheless were made part of the 1879 California Constitution.

Of most relevance to gun control was the Workingmen's demand that aliens who could not become citizens would be prohibited from bearing arms.[31]  Delegate O'Donnell introduced this request as a constitutional provision: "No alien who cannot become a citizen of the United States shall be allowed to bear arms."  What sort of aliens could not become citizens of the United States?  Until 1952, no "Oriental" (as persons of East Asian ancestry were then described) could become a naturalized citizen.[32]  If you were born in the United States, you were a natural-born citizen, but an immigrant from the Far

---

[28] *Id.*

[29]     SAMUEL CHARLES WIEL, 2 WATER RIGHTS IN THE WESTERN STATES: THE LAW OF PRIOR APPROPRIATION .. 1166 (3d ed. 1911); JOHN ROBERT SOENNICHSEN, THE CHINESE EXCLUSION ACT OF 1882 127-128 (2011).

[30]     EMILY J. ZACKIN,,LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS 200 (2013).

[31] THEODORE H. HITTELL, 4  HISTORY OF CALIFORNIA 615-17 (1897).

[32] DAVIS MCENTIRE, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269  (1960).

Electronic copy available at: https://ssrn.com/abstract=2599851

11

East would always be an alien.  O'Donnell's proposed was "Referred to Committee on Chinese" where it seems to have silently died.[33]

## A. California's Second Concealed Weapon Law & Pancho Villa

Between 1870 and 1917, there was no statewide regulation of concealed carry, but some counties required a license to carry concealed[34] and a fair number of convictions appear.  In the fiscal year ending June 30, 1910, there were 276 convictions across the state for concealed weapons—but these are in only 12 of California's 58 counties.[35] While the counties without convictions might have simply been very law-abiding, it is more likely that most did not have such bans.[36]

In 1917, California again passed a concealed weapon statute.  Instead of completely prohibiting concealed carry (as the 1863 law had done), this law made it a misdemeanor to carry concealed firearms in cities without a license—and a felony for those previously convicted of a felony.  (It was still legal to carry concealed in unincorporated areas.)[37] Also for the first time, California required registration of handgun sales, with a "Dealers' Record of Sale" mailed to local law enforcement.[38]

What provoked the legislature to again pass a statewide law?  I have spent a bit of time trying to find the reason, without finding completely persuasive evidence.  What I have found, however, suggests that racism played a role.  In the previous year, California experienced a burst of anti-Mexican sentiment as a result of Pancho Villa's cross-border

---

[33] E.B. WILLIS AND P.K. STOCKTON, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA… 285 (1880),

[34] Ex parte Cheney, 90 Cal. 617, 27 P. 436 (1891); Ex parte Luening, 3 Cal. App. 76; 84 P. 445 (1906).

[35] STATE OF CALIFORNIA, FOURTEENTH BIENNIAL REPORT OF THE BUREAU OF LABOR STATISTICS OF THE STATE OF CALIFORNIA, 1909-1910 380 (1910).

[36] Decisions upholding these local license requirements: Ex Parte Luening, 3 Cal. App. 76, 77, 78 (1906; Ex parte Cheney, 90 Cal. 617, 619, 620, 621 (1891).

[37] JAMES H. DEERING, COMP., SUPPLEMENT TO THE CODES AND GENERAL LAWS OF THE STATE OF CALIFORNIA Act 889 §§ 3, 6 (San Francisco: Bancroft-Whitney Co., 1917).

[38] Id., Act 889 § 7.

Electronic copy available at: https://ssrn.com/abstract=2599851

raid on Columbus, New Mexico.  Even conservative Republican newspapers such as the *Los Angeles Times* (this was obviously a long time ago), which was far less prejudiced about race than most newspapers of the era, went off the deep end in their fear and hatred of Mexicans, many of whom were refugees from the Mexican Revolution.[39]

In Los Angeles, Police Chief Snively feared that Mexicans sympathetic to Pancho Villa might take up arms, and gave orders that lacked any legal authority:

> Acting under orders from Chief Snively, the police department yesterday took drastic action to prevent any local outburst on the part of Villa sympathizers. The cordon of officers thrown about the Mexican quarter was extended and reinforced and the embargo against the sale of arms and liquor to Mexicans amplified and made general….[40]

The article described the measures taken as being

> for the benefit of Mexicans who have become excited over the action of the Federal government against Villa and who have made threats of vengeance and violence…
>
> No liquor will be sold to Mexicans showing the least sign of intoxication.
>
> No guns can be sold to Mexicans and all dealers who have used guns for window displays have been ordered to take them from the windows and to show them to no Mexican until the embargo is lifted.[41]

At least part of what might have provoked Chief Snively unlawful actions was that:

> Three admitted anarchists, priding themselves upon being disciples of the Magon brothers and all heavily armed, were taken into custody on charges of carrying concealed weapons and were given sixty-day sentences by Police Judge White….[42]

The Magon brothers had no connection to Villa.  Quite the opposite, the Magon brothers regarded Villa as "just another parasite" preventing a socialist revolution in Mexico.[43]  Chief Snively seems to have missed these distinctions.  Nonetheless, there were some significant political demonstrations of pro-Villa support among Mexicans living in Los Angeles, and it appears that Mexicans immigrants were buying guns in what appeared to be unusual numbers.

---

[39] See Clayton E. Cramer, *Race and Reporting: The Los Angeles Times in Early 1916, available at* http://www.claytoncramer.com/unpublished/LATimesAndRace.pdf ( for a detailed examination of changes in reporting as a result of the Villa raid.

[40] *Draw Teeth of War Breeders,* LOS ANGELES TIMES, March 14, 1916, at 2:1.

[41] *Id.*

[42] *Id.*

[43] COLIN M. MACLACHLAN, ANARCHISM AND THE MEXICAN REVOLUTION: THE POLITICAL TRIALS OF RICARD FLORES MAGON IN THE UNITED STATES 64 (1991),.

Electronic copy available at: https://ssrn.com/abstract=2599851

News accounts suggest that these purchases, primarily of "heavy revolvers," might have been for defensive purposes. The Villa raid had inflamed anti-Mexican sentiment among Americans all along the border, and many Mexicans appeared to be buying handguns because they were afraid of being attacked, not to be aggressive.[44]  Was the statewide concealed weapon permit law—and the handgun registration requirement—driven by the somewhat understandable concern about Pancho Villa supporters in California?  It is an interesting question, and one that requires more research.  A search of California newspapers from 1915 to 1917 for "concealed handgun" or "concealed weapon" found no matches.[45]

## B. California's Third Concealed Weapon Law

What is far more certain is what motivated the next revision of California's gun control laws, a package passed in 1923 that included the ancestor of California's current discretionary concealed weapon permit law.[46]  A variation of the Uniform Revolver Act passed in several American states in the 1920s, this law enhanced the punishments for various crimes committed with a handgun,[47] made carrying a handgun without a permit evidence of intention to commit a felony,[48] required a concealed weapon permit anywhere in the state (not just in cities),[49] and also prohibited possession of concealable handguns by anyone who was not a U.S. citizen.[50]

---

[44] *Draw Teeth of War Breeders,* LOS ANGELES TIMES, March 14, 1916, at 2:1, 2:2; *State Troops Ready for War,* LOS ANGELES TIMES, March 27, 1916, at 1:9; *For the Safety of Los Angeles,* LOS ANGELES TIMES, March 16, 1916, at 2:4.

[45] *California Digital Newspaper Collection,* http://cdnc.ucr.edu/cgi-bin/cdnc?a=q&hs=1&r=1&results=1&txq=concealed+handgun&txf=txIN&ssnip=txt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917&puq=&e=--1915---1917--en--20--1--txt-txIN-concealed+weapon------, and http://cdnc.ucr.edu/cgi-bin/cdnc?a=q&hs=1&r=1&results=1&txq=%22concealed+weapon%22&txf=txIN&ssnip=txt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917&puq=&e=--1915---1917--en--20--1--txt-txIN-concealed+handgun------, last accessed April 7, 2015.

[46] Stats. 1923, ch. 339, p. 695, the Dangerous Weapons Control Law of 1923.

[47] Stats. 1923, ch. 339, § 3.

[48] *Id.*

[49] Stats. 1923, ch. 339, § 5.

[50] Stats. 1923, ch. 339, § 2.

Electronic copy available at: https://ssrn.com/abstract=2599851

What motivated passage of this law?  Legislative reports are astonishingly sparse on the reasons, but as is often the case, newspaper coverage is more forthcoming.  Governor Friend W. Richardson signed the law after R. T. McKissick, "president of the Sacramento Rifle and Revolver Club," argued that this law preserved the "rights of those using firearms for competition or hunting or for protection in outing trips."  McKissick was concerned that a more stringent gun control law might be passed if Governor Richardson vetoed this one.  McKissick admitted that the provision prohibiting handgun ownership by non-citizens was of questionable constitutionality, but that he believed that if it was upheld, it would have a beneficial effect "in checking *tong* [gang] wars among the Chinese and vendettas among our people who are Latin descent."[51]

Why did Richardson sign a law with racist intentions?  When Richardson ran for governor in 1922, he would not answer the question of whether he was a member of the Ku Klux Klan—but the Klan enthusiastically endorsed Richardson.[52]

With such blunt statements of racist intent, not surprisingly, the discriminatory effect of the new law was immediately recognized.  The Mexican consul in Los Angeles protested the alien handgun ban, since "a large proportion of the foreigners in California were of Mexican descent."[53]  Mexican immigrants, being white, could at least apply for citizenship.  Asian immigrants were ineligible for naturalization—and therefore were breaking the law if they owned a handgun.

The constitutionality of the alien handgun ban was challenged quite soon after the new law took effect.  A Mexican citizen was convicted of possession of a .25 ACP pistol, and sentenced to one to five years in prison.  The California Supreme Court upheld the conviction in 1924.[54]  And yet, in 1972, the California Court of Appeals correctly determined that the handgun ban violated the equal protection clause of the Fourteenth

---

[51] *New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July 15, 1923, at  3, col. 1.
[52] DAVID M. CHALMERS, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX KLAN 124 (1981, 3rd ed.).
[53] RICARDO ROMO, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983).
[54] In re Ramirez, 193 Cal. 633 (1924).

Electronic copy available at: https://ssrn.com/abstract=2599851

15

Amendment.   (The rest of the package of laws passed as part of that same bill was allowed to stand.)[55]

---

[55] People v. Rappard, 28 Cal.App.3d 302 (1972).

Electronic copy available at: https://ssrn.com/abstract=2599851

# The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America

| I. | INTRODUCTION | .................................................................. 1805 |
|----|--------------|-----|
| II. | SOCIAL NORMS AND DUELING | ........................................... 1808 |
| III. | DUELING AND THE LAW | .................................................. 1813 |
| IV. | DUELING AND ANTI-DUELING IN THE ANTEBELLUM SOUTH | ........................................................................... 1821 |

|  | A. | The South's "Affair of Honor" ................................ 1821 |
|--|----|-----|
|  | B. | The South's Anti-Dueling Laws ............................. 1825 |
|  |  | 1. The Law as Written ..................................... 1825 |
|  |  | 2. The Laws as Enforced ................................. 1831 |

| V. | THE END OF THE AFFAIR | ................................................. 1838 |
|----|-----------------------|-----|
|  | A. | The Civil War and the Demise of Dueling ............. 1838 |
|  | B. | Dueling in Modern American Law ......................... 1841 |
|  | C. | Anti-Dueling Laws and the Management of Social Norms ................................................................. 1842 |

| VI. CONCLUSION | ........................................................................ 1846 |
|----------------|-----|

## I. INTRODUCTION

Jonathan Cilley and William Graves fought their duel in the early afternoon of February 23, 1838.[1] The two faced off near the Anacostia River bridge leading out of Washington, D.C., having

---

1. LORENZO SABINE, NOTES ON DUELS AND DUELLING 97-101 (1856) (quoting a report from the committee of the United States House of Representatives assigned to investigate the Cilley-Graves duel). Sabine's book contains the entire report of the House Committee assigned to investigate the duel, *id.* at 91-108, as well as excerpts from the subsequent Senate debate over the proposed anti-dueling bill for the District of Columbia, *id.* at 381-91. For a more recent historical account of the duel that also draws on Sabine's account, see STEVEN STOWE, INTIMACY AND POWER IN THE OLD SOUTH: RITUAL IN THE LIVES OF THE PLANTERS 38-48 (1987).

1805

Compendium_Roth
Page 1863

agreed in advance to duel with rifles at a distance of eighty paces.[2]
Shortly before three o'clock, they stood opposite one another, and at
the signal, they exchanged shots, Cilley firing first.[3]  Both men
missed.  The men who accompanied them to the duel—their sec-
onds—tried to work out the disagreement that led the men to the
dueling-ground, but to no avail.[4]  For a second time, both stood and
exchanged fire; for a second time, both missed.  Now, Cilley was
ready to end the duel, but by this time Graves was enraged and in-
sisted on another exchange.[5]  The two men's seconds backed away
again, the signal was given again, and the men exchanged fire once
more.  This time, Cilley dropped to the ground, shot dead.[6]

The duel and its result quickly attracted national attention,
for the two duelists were not just gentlemen skirmishing over a pri-
vate slight, but United States Congressmen—Cilley from Maine,
Graves from Kentucky.[7]  So were six of the witnesses at the duel.[8]
The outcry grew when Graves and the other Congressmen were not
immediately expelled from Congress, but instead merely made the
subject of an investigation.[9]

As word of the duel and its outcome spread, Congress was
bombarded with petitions demanding that it pass a law banning
dueling in the District of Columbia, even though dueling was al-
ready illegal under the common law.[10]  Within two weeks of Cilley's
death, Senator Samuel Prentiss of Maine put before the Senate a
bill "[T]o prohibit the giving or accepting within the District of Co-
lumbia of a challenge to fight a duel."[11]  The bill would make send-

2.   SABINE, *supra* note 1, at 97.

3.   *Id.*

4.   *Id.*

5.   *Id.* at 97-98.

6.   *Id.* at 98-100.

7.   Despite their elected offices, Cilley and Graves were not dueling over direct political dif-
ferences, but a fairly trivial slight, which occurred when Cilley refused to accept a letter from a
newspaper publisher that Graves was merely carrying.  *See* STOWE, *supra* note 1, at 40-41.

8.   The House report identified the men as Reps. Crittenden and Menefee of Kentucky;
Wise of Virginia; Duncan of Ohio; Bynum of North Carolina; and Jones of Wisconsin.  SABINE,
*supra* note 1, at 89.

9.   Graves was later censured by the House, but it refused to expel him, and none of the
other Congressmen present at the duel were punished for their role.  *See* DON C. SEITZ, FAMOUS
AMERICAN DUELS 277-78 (1929).

10.   *See, e.g.,* CONG. GLOBE, 25th Cong., 2d Sess. 231 (1838) (petition of citizens of Rocking-
ham, Vermont, calling on Congress to pass a law suppressing dueling); CONG. GLOBE, 25th
Cong., 2d Sess. 233 (1838) (petition of citizens of Sullivan County, New York, calling on Congress
to expel Congressmen involved with the Cilley-Graves duel).

11.   CONG. GLOBE, 25th Cong., 2d Sess. 206 (1838).

ing a challenge a felony punishable by five years imprisonment, and would make killing an opponent in a duel murder.[12]

On the Senate floor, however, the bill met a mixed response. Senators from Northern states, where dueling had largely died out, strongly supported the ban.[13] Southern senators, however, representing the region where dueling still flourished, voiced doubts. A few simply did not believe dueling should be outlawed. Arkansas Senator Ambrose Sevier argued that dueling was often necessary, and that "nine out of every ten [duels] were fought for causes that could not be got over any other way."[14]

Even Senators who professed to abhor dueling argued that the law would do little good. Anti-dueling laws were on the books in all states, but often ignored. Public opinion supported dueling, and until this changed the law would be a dead letter. "What community, . . ." asked Missouri Sen. Lewis Linn, "would pronounce a man either a murder[er] or a felon, who might chance to kill another in a fair fight?"[15] William Preston of South Carolina agreed, pointing out that the reason the common law had not stopped dueling was "a state of public opinion . . . which was averse to the stern execution of the law applicable to dueling."[16] Seeking a middle ground, a few Senators suggested weakening the proposed law's penalties, arguing that a less punitive measure stood a better chance of being enforced; but their proposals were not accepted.[17]

The last Senator to speak on the bill was Henry Clay of Kentucky, who acknowledged that the law would likely have little effect. Dueling was illegal everywhere, yet it was not the law that decided whether men dueled, but public sentiment.[18] In the North, where public opinion opposed dueling, men did not duel; in the South, where dueling was the norm, men dueled, or else risked "having the finger of scorn pointed at them."[19] Clay nonetheless supported the bill, chiefly because he hoped it might alter the "state

---

12. *Id.*

13. *See, e.g.,* SABINE, *supra* note 1, at 384-85 (statements of Senators from Vermont and Connecticut in strong support of the anti-dueling bill).

14. *Id.* at 389.

15. *Id.* at 384-85.

16. *Id.* at 387.

17. *Id.* at 386. One alternative punishment favored by several Senators was a permanent ban from public office for any person convicted of dueling, a proposal modeled after several state laws that, Senators claimed, had helped deter dueling. *See id.* For skepticism on whether such state laws were effective, *see infra* text accompanying notes 194-197.

18. SABINE, *supra* note 1, at 390.

19. *Id.*

of the public mind" on dueling.[20]  But, he concluded, only when
"public opinion was renovated, and chastened by reason, religion,
and humanity, [would] the practice of dueling be . . . discounte-
nanced."[21]

In the end, the Bill to suppress dueling in the District of
Columbia passed the Senate by a vote of 34-1.[22]  Though it died in
the House that year, it was introduced again the next year and be-
came law in February, 1839.[23]  In retrospect, the law appears to
have done little to end dueling.[24]

The Cilley-Graves duel and the ensuing debate over anti-
dueling laws attracted only brief attention during the 1830s, and
both the duel and the resulting law were soon forgotten.  But the
duel and the debate can illuminate legal and social issues still of
profound interest.  Dueling was against the common law, but two
Congressmen dueled without worry they would be punished for
their acts.[25]  Lawmakers claimed to oppose dueling, but stated that
laws would do no good in the face of determined public opinion.  In
modern terms, the debate over anti-dueling laws embodied the ten-
sions between law and social norms.

## II. SOCIAL NORMS AND DUELING

The story of dueling and attempts to suppress it can easily
become a parable—a tale from which we draw a lesson.[26]  To some
hearing the tale, the lesson might be the need to stand fast in the
face of public opinion; for others, the weakness of the law in the
face of determined men. More recently, however, a group of legal

---

20.  *Id.*

21.  *Id.*

22.  *See id.* at 391.  The one Senator voting "No" was Sevier of Arkansas.  *Id.*

23.  CONG. GLOBE, 25th Cong., 3d Sess., 181-82 (1839).

24.  JOYCE APPLEBY, INHERITING THE REVOLUTION: THE FIRST GENERATION AFTER THE
REVOLUTION 45 (2000).

25.  Actually, many of the nation's politicians dueled. Among the many who dueled in this
era were not only Cilley and Graves, but two future presidents, Andrew Jackson and Abraham
Lincoln, and two founding fathers, Vice-President Aaron Burr and former Secretary of the
Treasury Alexander Hamilton, in a famous 1804 duel, and two other vice-presidents, William
Crawford and Henry Clay.  *See* ROBERT BALDICK, THE DUEL: A HISTORY OF DUELING 120-24
(1965); WILLIAM OLIVER STEVENS, PISTOLS AT TEN PACES: THE STORY OF THE CODE OF HONOR IN
AMERICA 37, 47 (1940).  In 1817, the Attorney General of the United States, William Wirt, chal-
lenged his predecessor, William Pinckney, to a duel, which was averted only after Pinckney
apologized for any perceived slight.  *See* ANDREW BURSTEIN, AMERICA'S JUBILEE: HOW IN 1826 A
GENERATION REMEMBERED FIFTY YEARS OF INDEPENDENCE 47-48 (2001).

26.  *See, e.g.,* STOWE, *supra* note 1, at 48-49 (using the Cilley-Graves duel to interpret the so-
cial meanings of the duel).

scholars has drawn a particular lesson about law and social change from dueling, laws against it, and its eventual demise.[27] To borrow their terminology, the rise of anti-dueling legislation and the end of dueling illustrates how over time law can change "social norms."[28]

These scholars note that at the beginning of the nineteenth century, "public prejudice" demanded that a gentleman either defend his honor in a duel or else sacrifice the respect of his peers.[29] Yet at the end of that same century, the vast majority of people would have been horrified were a gentleman to engage in a duel to defend his honor.[30] The "social norm" about dueling—the consensus about what a gentleman ought to do to defend his honor and the consensus about what refusing a duel would mean—had changed.

Pinning down a definition of "social norm" is not an easy task. Legal scholars studying social norms have advanced a series of related definitions.[31] To simplify,[32] most scholars seem to agree that a social norm is a "social regularity," a behavior that is in fact widely adopted in society.[33] What distinguishes these social regularities as social norms is that they are not only what people do, but what society holds that people should do.[34] The particular actions constituting a social norm have larger cultural or social meanings, which lead other members of society to approve or disapprove of

---

27. *See infra* notes 41-49 and accompanying text.

28. Scholars studying social norms are not a monolithic group, but Professor Lawrence Lessig has dubbed the group of social norms scholars based at the University of Chicago the "New Chicago School." Lawrence Lessig, *The New Chicago School*, 27 J. LEGAL STUD. 661, 662 (1998). For other useful surveys of the new social norms literature, see ERIC POSNER, LAW AND SOCIAL NORMS 11-35 (2000); Richard H. McAdams, *Accounting for Norms*, 1997 WISC. L. REV. 625, 631-36; Eric Posner, *Efficient Norms, in* 2 NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW 19 (Peter Newman ed., 1999); Mark Tushnet, *"Everything Old is New Again": Early Reflections on the "New Chicago School,"* 1998 WIS. L. REV. 579, 579-81; and Jeffrey Rosen, *The Social Police*, NEW YORKER, Oct. 20 & 27, 1997, at 170 (presenting an informed journalistic account). A foundation work of the law and social norms literature is ROBERT C. ELLICKSON, ORDER WITHOUT LAW: HOW NEIGHBORS SETTLE DISPUTES (1991).

29. The most influential statement of this parable is Lawrence Lessig, *The Regulation of Social Meaning*, 62 U. CHI. L. REV. 943, 968-72 (1995).

30. *See id.*

31. *See, e.g.,* Robert Cooter, *Expressive Law and Economics*, 27 J. LEGAL STUD. 585, 587 (1998) ("I place 'social' before 'norm' to indicate a consensus in a community concerning what people ought to do."); Richard H. McAdams, *The Origin, Development, and Regulation of Norms*, 96 MICH. L. REV. 338, 340 (1997) (stating that the new norms literature defines norms as "informal social regularities that individuals feel obligated to follow because of an internalized sense of duty, because of a fear of external non-legal sanctions, or both"); *see also* POSNER, *supra* note 28, at 11-35.

32. Readers should be aware that social norms scholarship remains a contentious field and any rough generalization about "what scholars who study social norms think" is just that—a generalization.

33. McAdams, *supra* note 31, at 340.

34. *See* Lessig, *supra* note 28, at 662.

Compendium_Roth
Page 1867

them.[35] The meanings attached to a social norm cause members of society to feel obliged to conform to social norms, either because the meaning has become internalized or because to do otherwise would risk sanction from other members of society.[36] The legal scholar Lawrence Lessig summarized well the workings of social norms when he wrote:

> Social norms regulate . . . . They frown on the racist's joke; they tell the stranger to tip a waiter at a highway diner; they are unsure about whether a man should hold a door open for a woman. Norms constrain the individual's behavior, but not through the centralized enforcement of a state. If they constrain, they constrain because of the enforcement of a community.[37]

For the purposes of this Note, it suffices to say that dueling fits within several of the definitions offered for a social norm. Dueling was prevalent in pre-Civil War Southern upper-class society.[38] Participating in a duel communicated to others—it *meant*—that the duelists were men of honor.[39] Duelists felt compelled by internal and external pressures to duel.[40]

Dueling and the legal campaign against it are particularly interesting to scholars who seek not merely to understand social norms, but to change them.[41] Some scholars believe that attention to social norms can yield valuable new ways to combat undesirable social practices. They target behaviors that are harmful, from

---

35.  *See id.* at 680 ("The cost (whether internal or external) of deviating from a social norm is not constituted by the mere deviation from a certain behavior; it is a cost in part constituted by the meaning of deviating from a certain behavior."). For more complete discussions of the complexity of social meaning, see generally Lessig, *supra* note 29; Dan M. Kahan, *Social Influence, Social Meaning, and Deterrence,* 83 VA. L. REV. 349 (1997).

36.  Eric A. Posner, *The Regulation of Groups: The Influence of Legal and Nonlegal Sanctions on Collective Action,* 63 U. CHI. L. REV. 133, 134 (1996) (referring to norms as simply "nonlegal sanctions"); *see also* Robert C. Ellickson, *Law and Economics Discovers Social Norms,* 27 J. LEGAL STUD. 537, 540 (1998) (referring to social norms as informal systems of external social control).

37.  Lessig, *supra* note 28, at 662.

38.  *See infra* text accompanying notes 134-61.

39.  *See infra* text accompanying notes 141-51.

40.  *See, e.g.,* JOHN HOPE FRANKLIN, THE MILITANT SOUTH 1800-1861, at 48-49 (1956) (discussing intense social pressures on men to duel); STOWE, *supra* note 1, at 15-23 (discussing connections between honor, dueling, and self-esteem).

41.  *See, e.g.,* Cooter, *supra* note 31, at 586 (analyzing how law can change social norms); Dan M. Kahan, *Gentle Nudges vs. Hard Shoves: Solving the Sticky Norms Problem,* 67 U. CHI. L. REV. 607, 608 (2000) (stating that, while some believe law is a "relatively ineffective instrument for changing social norms," the real problem is "the primitive state of our understanding of how law and norms interact"); Lessig, *supra* note 28, at 661 ("The new school identifies alternatives as additional tools for a more effective activism . . . [t]he hope of the new [Chicago School] is that the state can do more."); Cass R. Sunstein, *Social Norms and Social Roles,* 96 COLUM. L. REV. 903, 907 (1996) ("[N]orm management is an important strategy for accomplishing the objectives of the law.").

Compendium_Roth
Page 1868

smoking to date rape to white collar crime, and look for legal sanctions that will not merely punish perpetrators after the fact, but which will attach unfavorable meanings to the targeted activity, and so enlist social pressures to alter the behavior.[42]

In search of such properly crafted laws, these scholars have looked to the anti-dueling laws passed in nineteenth-century America. Dueling has rapidly become an exemplar of the kind of undesirable social norm that can be altered through careful legal planning.[43] In this telling, anti-dueling laws gained their greatest force not from the fines or imprisonment they threatened.[44] Rather, they deterred dueling because they threatened a duelist's honor.[45]

One punishment anti-dueling laws meted out was to bar duelists from elective office.[46] Such a punishment promised to deter dueling in two ways. First, it offered gentlemen who only dueled in response to social pressures a way to defect from the prevailing norm.[47] Faced with a duel, these men could refuse by arguing that a gentleman's first duty was to occupy the positions of leadership the law denied duelists.[48] Second, the laws provided a powerful disincentive even to men who had internalized the dueling norm, for a bar from public office would be a stain on their honor.[49] Rather than accept such shame, these men too might avoid dueling.

There is a strange feature about the recent attention paid to anti-dueling laws. Most scholars acknowledge that the laws, however cleverly designed, did not eliminate dueling.[50] Despite this, they still recommend anti-dueling laws as a model for laws that aim not merely to punish wrongdoing, but to change the social norms about undesirable activities.[51]

---

42. *See, e.g.,* Katherine K. Baker, *Sex, Rape, and Shame,* 79 B.U. L. REV. 663, 701 (1999) (suggesting that laws designed to shame date rapists could draw on the lessons of anti-dueling laws); Dan Kahan & Eric Posner, *Shaming White-Collar Criminals: A Proposal for Reform of the Federal Sentencing Guidelines,* 42 J.L. & ECON. 365, 368-72 (1999).

43. *See* Lessig, *supra* note 29, at 968-71.

44. *See id.* at 971-73.

45. *See id.*

46. *See infra* text accompanying notes 164-83.

47. *See* Lessig, *supra* note 29, at 972-73.

48. *See id.*

49. This second use of disfranchisement, as a shaming penalty for duelists, is not suggested by Lessig, but by Karen Baker, *see* Baker, *supra* note 42, at 701, but I think it consistent with Lessig's general point. On shaming sanctions generally, see Dan M. Kahan, *What Do Shaming Sanctions Mean?,* 63 U. CHI. L. REV. 591 (1996).

50. *See* Lessig, *supra* note 29, at 970. *But see* Tushnet, *supra* note 28, at 579 (citing anti-dueling laws as a successful program to end dueling); Rosen, *supra* note 28, at 178 (same).

51. *See* Paul M. Schwartz, *Internet Privacy and the State,* 32 CONN. L. REV. 815, 839 (2000) (describing dueling as "an example of suboptimality much beloved in the legal literature of

Compendium_Roth
Page 1869

It is these kinds of laws, designed not merely to penalize wrongdoers, but to hold them up for disapproval, shame or ridicule, that appeal to contemporary scholars.[52] Thus, anti-smoking campaigns are proposed that do not merely ban smoking but which communicate social disapproval of the practice.[53] Date rapists and white-collar criminals should, scholars suggest, face "shame" sanctions.[54] In this vision, laws targeted at the "social meanings" that attach to social norms are levers by which lawmakers can move the world.

This Note approaches anti-dueling laws within the contemporary debates over social norms. The Note's primary goal is simply to examine how anti-dueling laws actually affected dueling in pre-Civil War America, as a case study in how laws can affect social norms. Dueling has existed in some legally tolerated or even encouraged form in many western societies for most of the past millennium.[55] Duels were commonplace in Renaissance Italy and in Germany and Austria-Hungary in the early twentieth century.[56] America is no exception; duels can be found in the historical record from the 1620s to the early twentieth century.[57] Yet today the duel as a socially accepted, formal combat for honor has almost disappeared, and its decline coincided with the development of a series of laws designed to shame duelists and render this "affair of honor" a dishonorable practice. This coincidence, however, does not answer the question of whether the laws actually ended dueling.

This Note examines anti-dueling laws, and the end of dueling in the nineteenth-century United States. Section III examines the legal prohibitions laid on dueling in the common law, statutes, and state constitutions in England and America. Section IV focuses on the antebellum South, and asks whether these legal rules and proscriptions had any significant effect on the practice of dueling. Section V discusses the reasons why dueling ended in the years after 1860, and suggests a few lessons that scholars can learn from this historical example.

---

norms"); Tushnet, *supra* note 28, at 583 (describing the example of anti-dueling laws as "an example commonly offered to explain the attractions of the New Chicago School's approach").

52. *See* Baker, *supra* note 42, at 701.

53. *See infra* text accompanying notes 319-22.

54. *See* Baker, *supra* note 42, at 693-706 (date rape); Kahan & Posner, *supra* note 42, at 380-83 (white-collar crime).

55. *See* V. G. KIERNAN, THE DUEL IN EUROPEAN HISTORY: HONOUR AND THE REIGN OF ARISTOCRACY *passim* (1988).

56. *See id.*

57. *See infra* Parts III, IV.

### III. DUELING AND THE LAW

Dueling was an established custom in Europe since the six-
teenth century.[58] It was chiefly the province of upper-class men,
usually aristocrats who sought in the duel to demonstrate their
personal bravery, skill, and honor.[59] Because the duel was preemi-
nently a forum where an individual demonstrated his own qualities
to his peers, it was the antithesis of the legal process. In a duel, a
man defended his own honor; the law, in contrast, placed judgment
in the hands of others.[60] Perhaps because of this, dueling has al-
ways been at odds with the law.[61]

Dueling had been illegal under the Common Law since be-
fore England settled her American colonies.[62] Unlike continental
European legal codes, which classified dueling as an offense sepa-
rate from murder and which generally meted out light punishment
to duelists,[63] the common law slotted dueling into well-established
categories of criminal law.[64] A would-be duelist, who merely chal-
lenged another to duel, was held to have committed incitement; du-
elists who fought, but both of whom survived, would be tried for
assault; and in the case of a duel where one combatant died, the
survivor was held guilty of either manslaughter or murder.[65] While
not universally obeyed, the laws were frequently enforced. In seven-
teenth- and eighteenth-century England, duelists were haled before
Courts and, sometimes, convicted and imprisoned.[66]

Nevertheless, by no means were all duelists punished. Aris-
tocrats frequently avoided being charged with any crimes related to
their duels, while even when charges were leveled at duelists, Eng-

---

58. *See* KIERNAN, *supra* note 55, ch. 1.

59. *See* Julian Pitt-Rivers, *Honor*, 6 INT'L ENCYCLOPEDIA SOC. SCI. 503, 503-10 (1968). The
duel was a signal to observers that the duelists were worthy of honor, and contemporary scholars
have argued that social norms have important "signaling" functions. *See* POSNER, *supra* note 28,
at 18-22.

60. Pitt-Rivers, *supra* note 59, at 509.

61. *See id.*

62. *See* IV WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *145, *199
(1768); 3 JAMES FITZJAMES STEPHEN, A HISTORY OF THE CRIMINAL LAW OF ENGLAND 99-102
(1883).

63. *See* UTE FREVERT, MEN OF HONOR: A SOCIAL AND CULTURAL HISTORY OF THE DUEL 31
(1995).

64. *See* STEPHEN, *supra* note 62, at 100-02.

65. *See* IV BLACKSTONE, *supra* note 62, at *199; STEPHEN, *supra* note 62, at 100.

66. *See* STEPHEN, *supra* note 62, at 100.

Compendium_Roth
Page 1871

Case 3:17-cv-01017-BEN-JLB Document 128-6 Filed 11/11/22 PageID.16518 Page 37 of 402

lish juries or judges were sometimes unwilling to convict the combatants.[67]

In eighteenth-century England, anti-dueling laws were at war with popular sentiment. As Blackstone himself admitted, one reason dueling survived was because too many people believed that a duel was the only way for a gentleman to affirm his honor.[68] Even in the face of legal sanction, Blackstone wrote, desire for honor and fear for their reputations would drive many men to the duelinggrounds: "[For] it requires such a degree of passive valour, to combat the dread of even undeserved contempt, arising from the false notions of honour too generally received in Europe, that the strongest prohibitions and penalties of the law will never be [e]ntirely effectual to eradicate this unhappy custom."[69] This summed up the dilemma of laws prohibiting dueling: while sometimes enforced, the laws were alone insufficient to eliminate the practice so long as the people enforcing the laws did not abhor dueling.

When the English began to settle North America, they brought with them the common law and its prohibitions against dueling.[70] Especially considering how popular dueling became in the nineteenth-century, it is surprising to realize that only a handful of duels took place in English America between 1620 and 1760, and that in these rare instances duelists were usually punished. In 1652, for instance, a Virginia settler, Richard Dunham, challenged a fellow colonist to a duel.[71] For this breach of the peace Dunham received a public whipping.[72]

In the years after 1700, such rough justice was no longer enough to suppress dueling. The more settled nature of colonial life, and the more regular contacts between the colonies and England, led a few Americans to ape the practices of the British aristocracy, including dueling. In Boston, socially prominent young men fought duels in 1718 and 1728.[73] In response, Massachusetts' House of

---

67. *See, e.g.*, KIERNAN, supra note 55, at 167-68; *see also* STEPHEN, *supra* note 62, at 100 (discussing a 1688 case where an English jury wanted to find a particularly ruthless duelist guilty of murder, but was thwarted by sympathetic judges who changed the charge to manslaughter).

68. IV BLACKSTONE, *supra* note 62, at *199.

69. *Id.*

70. *See* ARTHUR P. SCOTT, CRIMINAL LAW IN COLONIAL VIRGINIA 179 (1930); Evarts B. Greene, *The Code of Honor in Colonial and Revolutionary Times*, XXVI PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS 370-71 (1927).

71. *See* SCOTT, *supra* note 70, at 179.

72. *See id.*

73. *See* SEITZ, *supra* note 9, at 48-51; Greene, *supra* note 70, at 371-73. The 1718 duel, in which no one was hurt, was between a British Army captain, Thomas Smart, and the governor's

Delegates passed statutes setting harsher punishments for duelists.[74] The 1718 statute provided that, even in a duel in which no one was injured, the duelists were still liable for a £100 fine and six months' imprisonment.[75]

This law did not work as well as the legislature may have hoped, for in 1728 Boston saw another duel in which one combatant died.[76] In response, the colony's House adopted a new kind of law, one that aimed not only to punish duelists but also to cut the link between dueling and honor. The law was an early attempt to change dueling's social meaning. It provided that, if a man either made a challenge for a duel or accepted a challenge, even if the duel was never held, he was to be "carried publicly in a cart to the gallows, with a rope about his neck, and sit on the gallows for one hour," exposed to public ridicule.[77] Following this he would be imprisoned for a year.[78] Were the duel to prove fatal, the surviving duelist was to be executed for "willful murder."[79] Then, in a punishment designed to drive home the ignominy of dueling, his body would be treated as the body of a suicide: buried without a coffin with a stake through his heart.[80] The legislature's twofold message was clear: duelists would be treated like suicides both because they deserved as little respect as did suicides, and also because in important respects dueling was suicidal.[81] These harsh prohibitions, however, were never enforced.[82]

Despite such laws, dueling began to gain favor in British North America in the 1760s.[83] A variety of changes in colonial soci-

private secretary, John Boydell. *See id.* The 1728 duel was between scions of two of the city's most prominent families, Henry Phillips and Benjamin Woodbridge. *See id.* Woodbridge was killed in the duel, but Phillips was spirited out of the city before he could be punished. *See id.*

74. *See* Greene, *supra* note 70, at 373 (quoting 2 ACTS AND RESOLVES OF THE MASSACHUSETTS HOUSE OF REPRESENTATIVES 135).

75. *See id.* (quoting 2 ACTS AND RESOLVES OF THE MASSACHUSETTS HOUSE OF REPRESENTATIVES 517-18).

76. *See id.* at 374-75.

77. *Id.* at 375 (quoting 2 ACTS AND RESOLVES OF THE MASSACHUSETTS HOUSE OF REPRESENTATIVES 517-18).

78. *See id.*

79. *Id.*

80. *See id.*

81. *See id.* Suicide was considered a particularly heinous crime in early modern England, as it appeared to take the prerogative of giving life and death from God. Thus, equating dueling and suicide was a harsh judgment and permanent stain on one's memory. *See* MICHAEL MACDONALD & TERENCE R. MURPHY, SLEEPLESS SOULS: SUICIDE IN EARLY MODERN ENGLAND 19, 128-54 (1990); STEPHEN, *supra* note 62, at 105.

82. *See* Greene, *supra* note 70, at 375.

83. *See* Bruce C. Baird, *The Social Origins of Dueling in Virginia, in* LETHAL IMAGINATION: VIOLENCE AND BRUTALITY IN AMERICAN HISTORY 88-90 (Michael Bellesiles ed., 1999).

Compendium_Roth
Page 1873

ety contributed to the new acceptability of the duel. For one, large numbers of settlers from a new immigrant group, the Scotch-Irish, arrived in the New World and settled in the backcountry that stretched from Pennsylvania to North Carolina.[84] Coming to America from the wild and lawless borderlands of Great Britain and Ireland, the Scotch-Irish brought with them the belief that private violence was an acceptable way to settle disputes outside the courts.[85] The acceptance of private violence could only have encouraged dueling.[86] The 1760s also saw the beginning of the conflicts that would end in the American Revolution. As elites fought over the future of the English colonies, older habits of cooperation began to break down.[87] Further contributing to the rise of dueling was the fact that many of the disputants in colonial politics had, unlike previous generations, been educated in England, where some had learned dueling as one way the English aristocracy settled conflicts outside the courts.[88]

The greatest spur to dueling in America, however, was the Revolution itself. The War brought to America British and French armies officered by aristocrats with traditions of dueling.[89] At the same time, it created a new and as yet undefined role for many American gentlemen—that of officer in the Colonial army.[90] Newly-minted American officers found it necessary to communicate to both their fellow officers and subordinates that they were gentlemen deserving of respect.[91] One place to publicly demonstrate their gentility and status was in a duel.[92] In 1778, two generals in the new United States Army fought a duel, and a year later one writer complained that dueling had become "in vogue" with officers of the Continental Army.[93]

---

84.   *See id.* at 92-95. *See generally* DAVID HACKETT FISHER, ALBION'S SEED: FOUR BRITISH FOLKWAYS IN NORTH AMERICA 623-29 (1989) (discussing the Scotch-Irish diaspora and the new settlers' notions of socially acceptable violence).

85.   *See* FISHER, *supra* note 84, at 769.

86.   That is not to say that the immigration caused dueling, just to point out that dueling could flourish better in a society that tolerated high levels of violence. *See id.* at 766-71.

87.   *See, e.g.,* Baird, *supra* note 83, at 95-97 (discussing a rising level of violence as basic conflicts over the colonists' political loyalties came to the fore in the 1760s).

88.   *See id.* at 101-02.

89.   *See* KIERNAN, *supra* note 55, at 112-15.

90.   *See* CHARLES ROYSTER, A REVOLUTIONARY PEOPLE AT WAR: THE CONTINENTAL ARMY AND AMERICAN CHARACTER, 1775-1783, at 207-10 (1979).

91.   *See id.*

92.   *See* STEVENS, *supra* note 25, at 14-16.

93.   ROYSTER, *supra* note 90, at 209; *see also* BEN C. TRUMAN, THE FIELD OF HONOR: A COMPLETE AND COMPREHENSIVE HISTORY OF DUELING IN ALL COUNTRIES 260 (1884); Greene,

With the new craze for dueling came new legal attempts to
halt it. The first Articles of War passed by the Continental Con-
gress in 1775 adopted the British Army code's ban against
dueling.[94] That measure, however, was apparently ineffectual, for
within a year the Congress found it necessary to pass a stronger
measure. The revised Article VII of the new nation's Code of War
was designed not only to ban dueling but also to protect the honor
of those who refused to duel. The statute stated that:

> We hereby acquit and discharge all officers and soldiers from any disgrace or
> Opinion of Disadvantage which might arise from their having refused to accept of
> challenges, as they will only have acted in obedience to Our Orders, and done their
> duty as good soldiers, who subject themselves to Discipline.[95]

Yet even in the 1770s dueling had its defenders. Article VII
passed the Continental Congress only over the strenuous objection
of South Carolina delegate Edmund Rutledge, who argued that du-
eling, far from being injurious to the military, was "a measure that
tended to make officers Gentlemen."[96] Nor is it clear that changes
in the Articles of War significantly affected dueling.[97]

The problem, as contemporaries well knew, was that dueling
had become a prime means to publicly demonstrate one's status as
a gentleman. To end dueling, the law would have to render dueling
dishonorable. In 1779, Thomas Jefferson proposed such a law in
Virginia while he was in the process of preparing a revised legal
code for his home state. Jefferson's proposed law provided that du-
eling be outlawed, and whoever killed an opponent be guilty of
murder.[98] But like Massachusetts lawmakers of 50 years before, he
also wanted the law to counter the public acclaim sought by duel-
ists.[99] He provided that, if the killer had been the one who insti-
gated the duel, his body was to be left on the gallows after death,
exposed for all to see.[100] The future president even entertained the
idea that the deceased duelist's estates should be confiscated, as

---

*supra* note 70, at 379 (noting that dueling in the Continental Army was more widespread than
once thought).

94.  *See* Greene, *supra* note 70, at 379.

95.  *Id.* at 377 (quoting the *Articles of War*).

96.  *Id.* at 378.

97.  *See* ROYSTER, *supra* note 90, at 209 (noting the popularity of dueling in the Continental
Army throughout the Revolutionary War).

98.  *See* Greene, *supra* note 70, at 385.

99.  *See id.* (stating that Jefferson's law "reminds one of the Massachusetts law of 1728 in
pursuing the offender after death").

100.  The law read: "Whoever committeth murder by way of duel, shall suffer death by hang-
ing; and if he were the challenger, his body, after death, shall be gibbeted." *Id.* Ever the perfec-
tionist, Jefferson made sure the law included misdemeanor punishments for anyone who took the
duellist's body from the gibbet. *See id.*

was the law with suicides in England; for, Jefferson reasoned, was not the unsuccessful duelist "equally guilty with a suicide"?[101] His law aimed to both punish the duelist and destroy his reputation.

Jefferson's proposed law never passed, however, and for at least the next twenty years dueling would become an acceptable custom in both the North and the South.[102] There were important differences between the kinds of duels that predominated in those regions. To be sure, men from both regions dueled for "honor" and to maintain their standing in the eyes of others. In the North, however, duels were usually fought over political issues, between men who claimed positions of political leadership.[103] In the South, duels were fought over politics, but also over personal slights, between men who saw the duel as a way to maintain their standing in society.[104]

Dueling in the North cannot be understood apart from the political dynamics of the early republic.[105] In the first few decades of the United States, there were no mass political parties holding the loyalties of voters across states or regions.[106] A voter might claim some personal tie to, say, Alexander Hamilton, but he would think it nonsensical to describe himself as a follower of the Federalist Party.[107] Ties between politicians and their followers were thus intensely personal, linked to the character of the politician.[108] In an era of venomous personal politics, invective flowed freely and in-

---

101. *Id.*

102. *See* STEVENS, *supra* note 25, at 19.

103. For the most insightful analysis of dueling in the early Republic, see Joanne B. Freeman, *Dueling as Politics: Reinterpreting the Burr-Hamilton Duel*, 53 WM. & MARY Q. 289, 294-95 (1996) [hereinafter Freeman, *Dueling as Politics*]. My understanding of the North's political duel is deeply indebted to Freeman's work. *See id.; see also* Joanne B. Freeman, *Grappling with the Character Issue*, 28 REVS. AM. HIST. 518 (2000) [hereinafter Freeman, *Grappling with the Character Issue*]; Joanne B. Freeman, *The Election of 1800: A Study in the Logic of Political Change*, 108 YALE L.J. 1959, 1982-86 (1999) [hereinafter Freeman, *Election of 1800*].

104. *See* EDWARD L. AYERS, VENGEANCE AND JUSTICE: CRIME AND PUNISHMENT IN THE 19TH-CENTURY AMERICAN SOUTH 9-33 (1984); BERTRAM WYATT-BROWN, SOUTHERN HONOR: ETHICS AND BEHAVIOR IN THE OLD SOUTH 349-61 (1982).

105. *See* Freeman, *Dueling as Politics*, *supra* note 103, at 293. So important was the political duel's communicative function that the leading scholar of the institution described the duel as constituting a "grammar of political combat." *Id.*

106. *See* Freeman, *Election of 1800*, *supra* note 103, at 1983-86.

107. Indeed, in the popular discourse loyalty to a "party" was equated with loyalty to a "faction," and loyalty to a particular group was seen as the antithesis of loyalty to the nation. This explains why in his farewell address in 1797, George Washington warned his countrymen against the "dangers of parties." George Washington, Farewell Address, *reprinted in* GEORGE WASHINGTON: WRITINGS 969 (John Rhodehamer ed., Library of America 1997).

108. *See* Freeman, *Dueling as Politics*, *supra* note 103, at 294-95.

sults to one's honor were easy to find.[109] It was in this context that
the political duel flourished in the North.

By participating in a duel, specifically a duel with a political
opponent, a politician displayed to his followers that he valued his
principles more than his life.[110] The duel thus served to cement the
personal ties that were so important to politics in the early Repub-
lic.[111] Refusing to participate in a duel sent the opposite message:
that the politician valued his own skin more than the principles he
professed, and was not worthy of political or personal loyalty.[112]
Lest this seem to make politics a real blood sport, one should re-
member that most "affairs of honor" were resolved before a duel,
and in most duels no one died.[113]

The early Republic's political duel is captured in the famous
1804 duel between Aaron Burr, then Vice-President of the United
States, and former Secretary of the Treasury Alexander
Hamilton.[114] Their duel was over a comment made in a political
campaign, specifically a report that Hamilton had called the Vice-
President "a dangerous man, and one that ought not to be
trusted."[115]

The Burr-Hamilton duel was fought, furthermore, solely to
preserve the men's political standing. On the night before the duel,
Hamilton wrote a brief letter to family and friends, trying to justify
the duel.[116] There were, he admitted, many good reasons not to
duel: he had a wife and children, was deeply in debt, bore Burr no
personal ill-will and, not the least, dueling was condemned by both
the law of New York and his Christian religion.[117] Yet however
many reasons there might be to refuse the duel, Hamilton wrote, he

109. *See* APPLEBY, *supra* note 24, at 43.

110. *See* THOMAS FLEMING, DUEL: ALEXANDER HAMILTON, AARON BURR, AND THE FUTURE OF
AMERICA 7 (1999).

111. *See* Freeman, *Grappling with the Character Issue, supra* note 103, at 518-19.

112. *See id.*

113. Scholars' estimates of deaths in actual duels range from a 20% fatality rate to below
10%. *See* FLEMING, *supra* note 110, at 8; KENNETH S. GREENBERG, MASTERS AND STATESMEN:
THE POLITICAL CULTURE OF AMERICAN SLAVERY 32 (1985).

114. For a detailed account of the Burr-Hamilton duel, see JOSEPH ELLIS, FOUNDING
BROTHERS: THE REVOLUTIONARY GENERATION 20-48 (2000); *see also* FLEMING, *supra* note 110,
*passim* (1999);  Freeman, *Dueling as Politics, supra* note 103, at 289-96; W.J. Rorabaugh, *The
Political Duel in the Early Republic: Burr v. Hamilton,* 15 J. EARLY REPUBLIC 1, 1-6 (1995).

115. FLEMING, *supra* note 110, at 275 (quoting *American Citizen* (Albany, NY), June 4, 1804).

116. *See* Freeman, *supra* note 103, at 291-92.

117. The story of Hamilton's last letter has been recounted in several essays. *See* Freeman,
*Dueling as Politics, supra* note 103, at 291-92;  *see also* ROBERT AXELROD, *An Evolutionary Ap-
proach to Norms, in* THE COMPLEXITY OF COOPERATION: AGENT-BASED MODELS OF COMPETITION
AND COLLABORATION 44-45 (1997).

Case 3:17-cv-01017-BEN-JLB  Document 128-6  Filed 11/11/22  PageID.16524  Page 43 of
402

felt a pressing necessity "not to decline the call."[118] To refuse the challenge would have cost Hamilton the political support on which his ambitions depended.[119] "[M]y ability to be in the future useful, whether in resisting mischief or effecting good, in those crises of our public affairs," he wrote, "would probably be inseparable from a conformity with public prejudice in this particular."[120] And so Hamilton went to the dueling-ground, was shot through the side by Burr, and died the next day.[121]

Despite the "public prejudices" demanding dueling, however, dueling would have a relatively brief career in the North. In part, this was due to the Burr-Hamilton duel.[122] Before 1804, many Northerners had at least tolerated dueling.[123] Hamilton's death, however, sparked a backlash against the practice, perhaps because of his relative youth, the widow and small children he left behind, or his public image as Washington's gallant aide-de-camp.[124] And as public sentiment turned against dueling, so did the law. After the duel, New York officials dusted off their state's long-neglected anti-dueling laws and brought charges against Burr and Hamilton's seconds, the men who arranged the duel. The seconds lost their voting rights as punishment for their roles.[125] Burr, who fled New York and New Jersey in fear of a murder indictment, would never again be a force in the young nation's politics.[126]

In the years following the duel, Northern public opinion turned permanently against dueling, and the practice nearly disappeared in the North. The last major duel in Massachusetts, for instance, was fought in 1806.[127]

While public outrage over Hamilton's death was one factor in dueling's decline, deeper social changes also worked to turn public opinion decisively against dueling. In politics, dueling was rendered

---

118. Freeman, *Dueling as Politics*, *supra* note 103, at 293.

119. *Id.*

120. *Id.* Hamilton's worry was not an idle one. Years later, John Quincy Adams speculated that if Hamilton had "decline[d] to meet Colonel Burr, some doubt at least of his personal intrepidity would be entertained by men of military mind. He could no longer expect to be the favorite candidate for the chief military command." FLEMING, *supra* note 110, at 304 (quoting JOHN QUINCY ADAMS, DOCUMENTS RELATING TO NEW ENGLAND FEDERALISM 169).

121. ELLIS, supra note 114, at 30.

122. *See* FLEMING, *supra* note 110; Freeman, *Dueling as Politics*, *supra* note 103, at 296.

123. *See generally* Freeman, *Dueling as Politics*, *supra* note 103.

124. *See* Rorabaugh, *supra* note 114, at 19-20.

125. *See* FLEMING, *supra* note 110, at 370.

126. Rorabaugh, *supra* note 114, at 18-19.

127. *See* MICHAEL S. HINDUS, PRISON AND PLANTATION: CRIME, JUSTICE, AND AUTHORITY IN MASSACHUSETTS AND SOUTH CAROLINA, 1767-1878, at 42 (1980).

superfluous by the growth of strong national political parties, whose leaders no longer needed to keep the personal loyalty of party members. Men now gave their allegiance not to individuals, but to a party.[128] The growth in the North of a mobile, commercial society also worked against dueling.[129] People who succeeded in this new society valued its openness and opportunities, and consequently looked down on such "aristocratic" pretentions as dueling.[130] In such a society it was easier to enforce anti-dueling laws, but also less necessary.

## IV. DUELING AND ANTI-DUELING IN THE ANTEBELLUM SOUTH

### A. The South's "Affair of Honor"

In the South, dueling did not fade away. On the contrary, in the early 1800s the duel developed into one of the central rituals of the planter elite that dominated Southern society.[131] This did not mean dueling was legalized. Even as it was gaining favor, Southern states passed an array of new anti-dueling laws.[132] These laws not only punished duelists, but were carefully designed both to dishonor duelists and to interrupt the steps leading to a duel.[133] Because Southern duels were so carefully choreographed, and carried such meaning for both participants and observers, it is useful to sketch out the rituals that attended a duel.

As historians have noted, the duel was not merely pitched combat between two opponents, but one element of a well-understood ritual, the "affair of honor." [134] It had its own set of rules, the *code duello*.[135] The law itself took cognizance of the care-

---

128. *See* Freeman, *Dueling as Politics*, *supra* note 103, at 316.

129. *See* GORDON WOOD, THE RADICALISM OF THE AMERICAN REVOLUTION 344-45 (1992).

130. *See id.*

131. *See* STOWE, *supra* note 1, at 5.

132. See David Roberts Lewis, Dissent to Dueling: Arguments Against the Code Duello in America 25-51 (1984) (unpublished M.A. thesis, Vanderbilt University) (on file at the Vanderbilt University Library), for an excellent overview of the legal acts passed against dueling in the United States. *See also infra* text accompanying notes 142-62.

133. *See* Lewis, *supra* note 132.

134. *See* STOWE, *supra* note 1, at 5-49; JOHN LYDE WILSON, THE CODE OF HONOR, OR RULES FOR THE GOVERNMENT OF PRINCIPALS AND SECONDS IN DUELLING (1838) (printed as an addendum to JACK K. WILLIAMS, DUELING IN THE OLD SOUTH (1980)). *See generally* AYERS, *supra* note 104, at 9-33 (examining the duel and its place as a central "social drama" of the South); GREENBERG, *supra* note 113, at 23-41 (same); WYATT-BROWN, *supra* note 104, at 349-61 (1982) (same).

135. *See* WILSON, *supra* note 134, at 87.

ful formality of a duel, distinguishing between a duel and an "af-
fray," the latter being a clash springing up when two (or more) men
quarreled and decided to fight then and there.[136]

The affair most often began with some incident between two
men in which one felt insulted by (or chose to take offense at) the
words or deeds of the other.[137] This was followed by an exchange of
letters, in which the man who took insult demanded the other ei-
ther explain why his slight was not an insult, or apologize for the
comment or incident.[138] If these letters did not produce an apology
or satisfactory explanation, each man would then appoint "seconds,"
friends charged with arranging the duel.[139] Only after all these
steps transpired—insult, exchange, challenge, acceptance, ar-
rangement—would the duel itself take place. In most instances, the
affair never reached the dueling stage, as the two men involved
reached an understanding and resolved their disagreement without
combat.[140]

Woven into the "affair of honor" was the concept that un-
derlay and motivated duels: honor, or rather a particularly South-
ern version thereof.[141] The concept of honor has little resonance for
modern Americans,[142] but to antebellum Southerners it was a cen-
tral feature of their civilization.[143] In the culture of the old South, a
white man's honor was measured not by what he thought of him-

---

136. *See* Payne v. State, 391 So. 2d 140, 143-44 (Ala. Crim. App. 1980) ("A duel, as the term
is ordinarily understood . . . is the fighting together of two persons by previous concert with
deadly weapons to settle some antecedent quarrel, and has none of the elements of sudden heat
and passion."); BLACK'S LAW DICTIONARY 62 (6th ed. 1990); IV BLACKSTONE, *supra* note 62, at
*145.

137. *See, e.g.,* Commonwealth v. Hart, 29 Ky. 119 (1831) (discussing a case in which the
challenger accused an opponent of associating with "a negro"); State v. Farrier, 8 N.C. 487, 488
(1821) (a challenge that began when one combatant told the other, "I would as soon vote for Jim,
the barber, as you"). On the mechanics of a duel, see WILSON, *supra* note 134, at 91-92. Wilson's
work was widely read in the South and accepted as an good account of the duel. *See* GREENBERG,
*supra* note 113, at 82; STOWE, *supra* note 1, at 6.

138. *See* WILSON, *supra* note 134, at 91-95.

139. *See id.* at 93. Wilson also urged seconds to do what they could to head off the duel. *See
id.*

140. *See* STOWE, *supra* note 1, at 10.

141. See AYERS, *supra* note 104, at 12-14; *see also* WYATT-BROWN, *supra* note 104, at 363-64,
*passim.*

142. That said, many Southerners still are deeply influenced by inherited notions of honor
and insult. *See generally* FOX BUTTERFIELD, ALL GOD'S CHILDREN: THE BOSKET FAMILY AND THE
AMERICAN TRADITION OF VIOLENCE 1-12, *passim* (1995) (examining the heritage of violence in
one Southern family); RICHARD E. NISBETT & DOV COHEN, CULTURE OF HONOR: THE
PSYCHOLOGY OF VIOLENCE IN THE SOUTH 4-12 (1996) (comparing modern-day Southerners' and
Northerners' responses to insults and slights).

143. *See* AYERS, *supra* note 104, at 9-33.

Compendium_Roth
Page 1880

self, but by what others thought of him.[144] As one anthropologist explains it, in a society with such a view of honor "the being and truth about a person are identical with the being and truth that others acknowledge in him."[145] Thus the need for Southern men to participate in the "affair of honor," even when morally opposed to dueling. The point of a duel was not to reaffirm one's self-worth, but to demonstrate that worth to others.[146]

Honor was not a quality that could be repaired through the legal system.[147] For a man to turn to the legal system to repair his honor, perhaps by filing a libel or slander suit, was akin to a man admitting that he was unable to protect himself.[148] It was an admission of both weakness and cowardice.[149] A libel suit also carried the message that the plaintiff was one who thought his honor could be repaired by monetary damages.[150] The Southern attitude toward honor, personal transgressions, private violence, and the law is probably best summarized by a famous piece of advice given to Andrew Jackson by his mother. As he recalled it, she advised Jackson: "Never tell a lie, nor take what is not your own, nor sue anybody for slander, assault and battery. *Always settle them cases yourself*."[151]

The duel, then, was the product of a culture where a gentleman's worth needed constantly to be communicated to others. Its rituals were designed to demonstrate that the duelists were both gentlemen. No surprise, then, that duels were most often fought between men who were in the public eye and whose exact social status was often in question: journalists and lawyers.[152] Men in such professions were particularly likely to suffer if they lost public favor. They were also, however, likely to benefit if they won their

144. *See id.* at 13.

145. *Id.* (quoting Pierre Bourdieu, *The Sentiment of Honor in Kabyle Society, in* HONOUR AND SHAME: THE VALUES OF MEDITERRANEAN SOCIETY 212 (J. G. Peristiany ed., 1966)).

146. In this sense, dueling fits well with Eric Posner's notion that an important function of social norms is to signal to others that the participant is of a good type, deserving trust in transactions. *See* POSNER, *supra* note 28, at 19-22; *see also* Warren F. Schwartz et al., *The Duel: Can these Gentlemen be Acting Efficiently?*, 13 J. LEGAL STUD. 320, 321-53 (1984).

147. *See, e.g.*, F. D. SRYGLEY, SEVENTY YEARS IN DIXIE: RECOLLECTIONS OF AND SAYINGS OF T. W. CASKEY AND OTHERS 310 (1893) ("Questions affecting personal character were rarely referred to courts of law. . . . To carry a personal grievance into a court of law degraded the plaintiff in the estimation of his peers and put the whole case below the notice of society."), *quoted in* WILLIAMS, *supra* note 134, at 25; *see also* text accompanying notes 60-61.

148. *See id.*

149. *See* GREENBERG, *supra* note 113, at 39; HINDUS, *supra* note 127, at 43 ("At bottom, it was these [legal] proceedings that were objectionable.").

150. *See* GREENBERG, *supra* note 113, at 39.

151. Charles Synor, *The Southerner and the Laws*, 6 J. S. HIST. 12 (1940).

152. *See* AYERS, *supra* note 104, at 17.

Compendium_Roth
Page 1881

duels and so gained attention. Indeed, some men entered into duels precisely to establish their claim to the status of a gentleman.[153]

So inflexible was the equation of dueling with honor that many a man personally opposed to dueling still engaged in duels. One Mississippi congressman explained that he would have to respond to a challenge, for if he turned it down "life will be rendered valueless to him, both in his own eyes and in the eyes of the community."[154] Another commentator explained why one reluctant duelist entered a fray: "[T]o have declined would have disgraced him here [and] destroyed his just weight [and] influence."[155] The Virginia statesman John Randolph reconciled his conscience with the demands of public opinion in his famous 1826 duel with Henry Clay by accepting a challenge but then resolving not to fire at his opponent.[156]

The only sure way for a gentleman to refuse to duel and keep his honor was if he had a long-established reputation for piety.[157] Late-found religion was not enough; one had to have publicly demonstrated a deep religious faith well before the challenge was issued. Such public profession of faith would serve to shield one from the claim that he was refusing to duel simply out of fear.[158]

Other than this, a Southern gentleman, once challenged, faced the choice of either entering the duel or risking expulsion from polite society.[159] Many southerners condemned dueling, and

---

153. *See id.* at 16-17; WOOD, *supra* note 128, at 345 ("Sometimes it appeared that in America's fluid society would-be gentlemen were using challenges as a means of establishing their status or their dignity.").

154. GREENBERG, *supra* note 113, at 37 (quoting Mississippi congressman and avid duelist S. S. Prentiss).

155. *Id.* (regarding an 1845 duel).

156. *See* KENNETH S. GREENBERG, HONOR & SLAVERY 59 (1996). When Randolph got to the dueling-ground, he changed his mind. *See id.* at 60-62.

157. Thus, United States Senator Barnwell Rhett was able to refuse a challenge by reminding his would-be opponent that "[f]or twenty years I have been a member of the Church of Christ. The Senator knows it; everyone knows it. I cannot and I will not dishonor my religious profession." *See* TRUMAN, *supra* note 93, at 16.

158. There are instances where gentlemen refused to duel and still managed to maintain their honor, *see id.* at 434-47, but the instances where this occurred appear to have been unusual, for instance when a challenged duelist had killed a previous opponent, *see id.* at 438, or when the challenger was clearly far below the challenged's social status, *see* WOOD, *supra* note 128, at 345.

159. The great social cost of refusing a duel, the relatively small chance an "affair of honor" would result in death, and the reputational benefits of a duel, have led some scholars to ask whether Southern gentlemen were acting "efficiently" in engaging in dueling. *See* Schwartz et al., *supra* note 146, at 321-53. Asking whether it was rational for individuals to duel *is* not the same, however, as asking whether dueling as an institution was rational or beneficial. For one author's speculations on whether dueling was ever efficient, see Eric Posner, *Law, Economics, and Inefficient Norms*, 144 U. PA. L. REV. 1697, 1736-40 (1996).

Compendium_Roth
Page 1882

regretted the practice's position in their region.[160] When the time
came for action, however, the vast majority of them hewed to the
pro-dueling norm.[161]

## *B. The South's Anti-Dueling Laws*

### 1. The Law as Written

Beginning around 1800, Southern states passed an array of
laws designed not merely to punish dueling, but to sever the link
between dueling and social approval. It is important to remember
that dueling was always illegal in the South; under the common
law, duelists could be held for charges ranging from incitement to
murder, depending on how far the duel progressed.[162] The new laws
went beyond meting out punishment. As one contemporary com-
mentator perceptively noted, they "were intended to apply to the
most common causes of duels, and to turn these very causes into
strong motives against practicing such combats, or any of their an-
tecedent methods."[163]

The earliest laws sought to cut the tie between dueling and
honor by banning duelists from the mark of public favor—public
office.[164] It was an old idea; both Massachusetts and Connecticut
had disqualified duelists from holding political office since before
the Revolution.[165] In the South, such provisions became common in
the years around 1800. In 1799, Kentucky banned duelists from

---

160. Thus, Southerners would condemn dueling in the abstract and even, in rare instances,
join anti-dueling societies allegedly devoted to stamping out the practice. *See* WILLIAMS, *supra*
note 134, at 66. The societies, however, apparently did little good. The English writer Harriett
Martineau, traveling through the south in the 1830s, spoke of the Anti-Dueling Society formed in
New Orleans: "A Court of Honor was instituted [by the society] for the restraint of [dueling]; of
course, without effectual result. Its functioning degenerated into choosing weapons for combat-
ants, so that it ended by sanctioning, instead of repressing, dueling." HARRIET MARTINEAU, 3
SOCIETY IN AMERICA 56 (1837), *quoted in* WILLIAMS, *supra* note 134, at 65.

161. Because Southerners dueled regularly and ostracized men who refused a challenge from
a fellow gentleman, it makes sense to speak of the South's pro-dueling social norm, even though
many professed to be horrified at dueling.

162. *See generally* Baird, *supra* note 83.

163. Robert Reid Howison, *Duelling in Virginia*, 4 WM. & MARY Q. 215, 222-23 (1924). This
is drawn from Howison's (1820-1906) unpublished memoirs; he was a witness to many duels and
related to several famous duelists.

164. *See* GREENBERG, *supra* note 113, at 15 (discussing punishments: "There are similarities
among the stake through the heart, the gibbet, and the disqualification from office:  all are ways
of dishonoring a person in a culture of honor").

165. *See* Greene, *supra* note 70, at 387.

Compendium_Roth
Page 1883

holding public office,[166] followed by North Carolina in 1802,[167] Tennessee in 1809,[168] and Virginia in 1810.[169] Two years later South Carolina enacted a similar law which not only barred duelists and their seconds from holding public office, but banned them from practicing law, medicine, "or any other trade or calling whatsoever."[170] Similar laws soon appeared on the books in Illinois (1815),[171] Georgia (1816),[172] Alabama (1819),[173] and eventually Mississippi (1822),[174] and the District of Columbia.[175] Mississippi[176] and Kentucky[177] were among the states that also placed prohibitions in their state constitutions allowing duelists to be barred from public office.

In their attempts to put roadblocks in the path to the duel, lawmakers did not neglect to criminalize the conduct of seconds, who arranged duels and ensured that they were carried out according to the "code of honor."[178] A duel was, after all, not merely a fight between two combatants, but a carefully arranged ritual that required the assistance of many "stage-managers."[179] Under the common law, when one combatant died in a duel, all the seconds, on either side, were guilty of murder.[180] Several states included seconds in their statutes, and Georgia's statute covered not only duelists but also anyone "consenting to be a second in a duel to be fought with sword, or pistol or other deadly weapon."[181] Mississippi's 1839 anti-dueling law not only forbid duelists and seconds

---

166. *See* J. Winston Coleman, Jr., *The Code Duello in Ante-Bellum Kentucky*, 30 FILSON CLUB HIST. Q. 125, 127 (1956).

167. *See* FRANKLIN, *supra* note 40, at 58 (citing N.C. CODE §§ 203-11 (1855)).

168. *See* TENN. CODE § 5 (1809).

169. *See* 1 VA. CODE REV. § 8 (1819), *quoted in* Chaffin v. Lynch, 1 S.E. 803, 806 (Va. 1887).

170. FRANKLIN, *supra* note 40, at 58 (quoting 5 S.C. STAT. AT LARGE 671-72 (1839)); *see also* Yancey v. State, 29 S.C.L. (2 Speers) 246 (S.C. App. L. 1843).

171. *See* Lewis, *supra* note 132, at 36.

172. *See* Harris v. Georgia, 58 Ga. 332, 332 (1877) (citing LAMAR'S DIGEST 593 (1816)).

173. *See* Lewis, *supra* note 132, at 39.

174. Mississippi only passed its anti-dueling law in 1822, as one proposed in 1817 failed to pass the legislature by a vote of 37-6. *See* Wilmuth S. Rutledge, *Dueling in Antebellum Mississippi*, 26 J. MISS. HIST. 183 (1964).

175. APPLEBY, *supra* note 24, at 45.

176. *See* MISS. CONST. of 1835, art. VI, § 2 (banning "the evil practice of dueling").

177. *See* KY. CONST. of 1850, art. VIII, § 1 (requiring an officeholder to swear an oath that he has never participated in a duel).

178. See, for example, WILSON, *supra* note 134, at 89-90, for an account of the many tasks seconds had to perform to ensure that an "honorable" duel took place.

179. *See id.*

180. *See* IV BLACKSTONE, *supra* note 62, at *199.

181. GA. CODE (LAMAR'S DIGEST) 517 (1816), *cited in* Harris v. Georgia, 58 Ga. 332, 332 (1877).

from holding public office, but placed the same penalties on at-
tending surgeons.[182] Exceeding all of these statutes in scope, Ala-
bama's 1819 law fined and excluded from public office not only du-
elists and seconds but "every person or persons directly or indi-
rectly concerned therein."[183]

From the first, these laws faced problems in being
enforced.[184] When Tennessee updated its anti-dueling law in 1817,
for instance, the new law's preamble explained the change by stat-
ing that the earlier laws were "found by experience to be ineffectual
to prevent a practice so generally condemned by the more thinking
part of society."[185] Yet the new law, too, had little effect on dueling;
the top ranks of Tennessee politics continued to be filled by men
who had engaged in duels, including Tennessee's foremost politician
of the era, Andrew Jackson.[186] Why did these laws fail? In some
cases, the laws themselves were sops to vocal minorities opposed to
dueling, and their passage did not signal any change in the major-
ity's actual tolerance of the practice.[187] A prime example is South
Carolina's anti-dueling law. The legislature adopted it in 1812, fol-
lowing a campaign led by the evangelist Philip Moser, who also
authored the state's first statute that made it illegal to kill a
slave.[188] The legislature was at best, however, lukewarm about the
law, and South Carolina's political elite never intended it to be en-
forced.[189] It was signed into law by a governor who was himself a
veteran duelist.[190] A decade later, South Carolinians twice elected
as governor John Lyle Wilson, author of the classic guide to the

182. *See* Rutledge, *supra* note 174, at 185.

183. Smith v. State, 1 Stew. 506, 506 (Ala. 1828) (quoting the Alabama Act of 1819); *see also*
State *ex rel.* v. Du Bose, 13 S.W. 1088, 1090 (Tenn. 1890) (noting that the Tennessee Constitution
of 1835 punishes not only duelists but an "aider or abettor" in duels as well).

184. *See* FRANKLIN, *supra* note 40, at 59; JACK KENNY WILLIAMS, VOGUES IN VILLANY: CRIME
AND RETRIBUTION IN ANTEBELLUM SOUTH CAROLINA 38 (1957).

185. TENN. CODE § 84 (1817), *quoted in* Lewis, *supra* note 132, at 31.

186. *See* James W. McKee, Jr., *Dueling, in* TENNESSEE ENCYCLOPEDIA OF HISTORY AND
CULTURE 264-65 (Carroll Van West ed., 1999).

187. *See, e.g., Dueling,* 7 PA. L.J. 45, 47 (1847) ("Most of the state constitutions which have
been framed or remodeled within the last twenty years contain clauses declaring the severest
penalties against *fighting duels.* In the legislatures of perhaps every one of these states are to be
found men who have been so engaged.").

188. *See* WILLIAMS, *supra* note 134, at 66.

189. *See* Yancey v. State, 29 S.C.L. (2 Speers) 246, 249 (S.C. App. L. 1843) ("The Act of 1812
. . . of course encountered many covert prejudices, and the pens most skillful in the preparation
of Acts of the Legislature were withheld from the noble and philanthropic service which was then
tendered to them. The work was left to be perfected by a physician unskilled in the law, but his
heart bled for suffering humanity.").

190. *See* WILLIAMS, *supra* note 184, at 37 ("The duelling laws . . . had no obvious loopholes.
They needed none, for they simply were not enforced.").

Compendium_Roth
Page 1885

*code duello, The Code of Honor.*[191] South Carolina was not alone in hypocrisy; the governor who signed into law Georgia's anti-dueling statute, for instance, was also a duelist.[192]

Even assuming some of the laws were sincere attempts to at least express dissatisfaction with dueling,[193] the lawmakers who passed them lacked the will to enforce them. Legislatures that required anti-dueling oaths frequently exempted newly elected duelists from the oath. Mississippi granted an amnesty to one newly elected delegate in 1838 and granted amnesty to fifteen more new legislators in 1858,[194] while Alabama's legislature issued similar exemptions in 1841, 1846, and 1848.[195] Another tactic was simply to change the date after which an oath would become effective, so that an old duel would not prevent a legislator from taking his seat.[196] In Kentucky, something of a prodigy in this area, the legislature changed the effective date of its anti-dueling oath no fewer than 15 times between 1821 and 1848.[197]

These examples expose a deeper problem with attempts to change social norms by legal means: how can legal institutions which depend heavily on public support, enforce laws that strike at widely shared values? As Alexander Hamilton noted in his apologia, success in politics often means adjusting to public prejudices.[198] Passing laws against dueling was one thing, for it fit with the discomfort many in the South felt about dueling.[199] Enforcing these laws, however, would strike directly at the belief that it was sometimes necessary for men to duel to maintain their honor. Thus, no surprise that politicians dependent on public favor did not rush to put such laws into effect.

The more interesting legal attacks on dueling were not those that directly challenged the institution. In addition to the punish-

---

191. WILSON, *supra* note 134, at 89.

192. *See* STEVENS, *supra* note 25, at 38 (stating that Georgia's law "was dead in the water from the minute the ink of the Governor's signature was dry").

193. It appears, for instance, that several of the Southern Senators who voted for the District of Columbia's anti-dueling law in 1838 did so not because they expected it would be strictly enforced, but because it would express disapproval and might sway public opinion. *See* text accompanying notes 15-21  Among those voting in favor of the law, for instance, was Henry Clay, an experienced duelist. *See* TRUMAN, *supra* note 93, at 77.

194. *See* Rutledge, *supra* note 174, at 190.

195. *See* WILLIAMS, *supra* note 134, at 66-68.

196. *See* Lewis, *supra* note 132, at 34.

197. *See id.*

198. *See supra* text accompanying notes 118-20.

199. *See* FRANKLIN, *supra* note 40, at 59-60; Synor, *supra* note 151, at 17. *See generally* Lewis, *supra* note 132.

ments that attempted to expel duelists from public office, and so
mark their duels as dishonorable, antebellum lawmakers proposed
a range of laws intended to interrupt the steps that led to a public
combat.[200] They broadened libel laws considerably to give an in-
sulted party redress apart from the "affair of honor." Mississippi
and Virginia expanded their libel laws to make illegal any state-
ment likely to lead to violence.[201] Virginia's act, first passed as part
of the 1810 Anti-Dueling Act, made actionable "all words which
from their usual construction and common acceptation are consid-
ered as insults, and lead to violence and breach of the peace."[202] So
stringent was Virginia's law that, unlike ordinary libel laws, it
sometimes punished "fighting words" even when they were true.[203]
Some laws were also changed to protect men who refused to duel. In
1832, Florida made it an offense to call a man a coward for refusing
to duel.[204]

The evidence suggests that these laws did not succeed any
better than those which attempted to ban duelists from public
life.[205] Dueling did not noticeably decline in the years after these
laws were passed, nor did the prejudice against bringing libel suits
disappear.[206] In the rare cases where suits were brought, juries
proved unwilling to convict one gentlemen for libeling another, ap-
parently agreeing with the general view that a gentleman should
defend his honor outside of the courtroom.[207] In the state with the
most stringent libel law, Virginia, only a handful of statutory libel
cases were reported before 1865.[208]

---

200. An idea they may have derived from Blackstone, who wrote that dueling would not end
"till a method be found of compelling the original aggressor to make some other satisfaction to
the affronted party, which the world shall esteem equally reputable." IV BLACKSTONE, *supra*
note 62, at *199.

201. *See* John W. Wade, *Tort Liability for Abusive and Insulting Language,* 4 VAND. L. REV.
63, 82-84 (1950). Mississippi's statute, in particular, was clearly designed to deter fighting words,
so much so that it was later held no action could be brought against a corporation under the law,
as a corporation was unable to participate in personal violence. *See id.* at 83.

202. VA. ACTS ch. 10, § 8 (1810), *quoted in* Wade, *supra* note 201, at 83.

203. *See* Moseley v. Moss, 47 Va. (6 Gratt.) 534, 540 (1850) (holding that truth was not an
absolute defense under Virginia's "statutory libel" laws, though it was under common law libel).

204. Herbert J. Doherty, *The Code Duello in Florida,* 29 FLA. HIST. Q. 243, 245 (1951).

205. *But see* WILLIAMS, *supra* note 134, at 70-71 (arguing that the rise in libel suits in South
Carolina after the passage of that state's anti-dueling law in 1812 is a sign the law channeled
some disputes into the legal system).

206. *See* GREENBERG, *supra* note 113, at 14-15.

207. *See* Rorabaugh, *supra* note 114, at 16.

208. *See* Wade, *supra* note 201, at 83-84 nn.131-54 (discussing Virginia statutory libel law).
In contrast, after the 1880s, when dueling had largely disappeared, the number of reported libel
cases appears to have risen. *See id.*

The insult was, however, only the first step to the duel.[209]
The laws were designed to interrupt every step leading to a duel.
Challenges to dueling were often criminalized in the same statutes
that prohibited dueling itself.[210] Alabama's 1819 anti-dueling provi-
sion forbid "sending, giving, accepting, or conveying any such chal-
lenge," and not only banned the challenger from public office, but
sentenced him to three months in jail and a $2,000 fine.[211] Making a
challenge was similarly banned by the anti-dueling acts adopted in
Georgia,[212] Kentucky,[213] North Carolina,[214] South Carolina,[215] and
Tennessee.[216]

To summarize, by the 1820s every Southern state had
adopted laws or Constitutional provisions intended not merely to
punish duelists but to strike at the internal and external pressures
that led so many men to duel. The laws made illegal insults likely
to provoke violent reactions. They forbade men from issuing chal-
lenges to duels. They banned seconds from even carrying chal-
lenges, much less arranging duels. For convicted duelists, the law
promised not only criminal punishment but official ostracism—ex-
clusion from public office—a ban that would tarnish any duelist's
claim to be a "gentleman." If the laws had worked as designed, con-
flict would have been avoided or channeled into the judicial system.
Dueling would have been transformed from a social drama in which
duelists displayed and confirmed their "honor," to a profoundly dis-
honorable custom, engagement in which would permanently dam-
age the honor of any Southern gentleman.

---

209. *See* STOWE, *supra* note 1, at 13-14.

210. Some courts also held that making a challenge was illegal under the Common Law. *See*
Brown v. Commonwealth, 4 Va. (1 Rand.) 516 (1826).

211. *See* Smith v. State, 1 Stew. 506 (Ala. 1828) (holding, apparently against the language of
the statute, that Alabama's anti-dueling act of 1819 criminalized challenges only when actually
followed by a duel).

212. *See* GA. CODE (LAMAR'S DIGEST) 593 (1816), *quoted in* Harris v. Georgia, 58 Ga. 332, 333
(1877).

213. *See* Moody v. Commonwealth, 61 Ky. (1 Met.) 1, 3 (1862).

214. *See* State v. Farrier, 8 N.C. (1 Hawks) 487, 489 (1821) (noting that sending a challenge
was illegal under both the Common Law and North Carolina's 1802 anti-dueling statute).

215. *See* State v. Strickland, 11 S.C.L. (2 Nott & McC.) 181, 183 (1819) ("[T]he law makes
every challenge to fight a duel . . . penal.").

216. *See* Smith v. State, 9 Tenn. (1 Yer.) 228, 232 (1829) (citing the Tennessee Act of 1809
which bans not only dueling but "bearing a challenge for that purpose.").

Compendium_Roth
Page 1888

## 2. The Laws as Enforced

The laws designed to prohibit dueling rarely worked. Their enforcement relied too heavily on men deeply embedded in the very social practices the laws sought to overturn. Seldom were dueling or even murder charges brought against duelists.[217] When they were, Southern judges and juries, drawn from the populace and presumably sharing the beliefs of the wider society, were unwilling to enforce the harshest of the anti-dueling laws.[218] Duelists appeared largely immune from prosecution.[219]

Reluctance to enforce the laws took a variety of forms. In more than one instance, state supreme courts gutted anti-dueling statutes by reading them so narrowly as to make them unenforceable. In *Smith v. State*, Alabama's Supreme Court held that the state's anti-dueling law only banned challenges when followed by an actual duel—thus holding that simply issuing a challenge was not illegal under the law.[220] The South Carolina Supreme Court relied on the privilege against self-incrimination to hold in 1819 that seconds in duels could not be compelled to testify about a duel. Given the private nature of duels, this holding made it extremely difficult to prosecute duelists.[221] In a particularly creative reading

---

217. In the antebellum South, there were only a small number of reported cases in which criminal charges were leveled for either dueling or homicide in connection with a duel. One study found a total of only seventeen published appellate cases dealing with antidueling laws in the states of Alabama, Arkansas, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia, in the years before 1860. Schwartz et al., *supra* note 146, at 327 n.23.

218. *See* WILLIAMS, *supra* note 134, at 66-67 (regarding general unwillingness to enforce anti-dueling laws); *see also* ARIELA J. GROSS, DOUBLE CHARACTER: SLAVERY AND MASTERY IN THE ANTEBELLUM SOUTHERN COURTROOM 30, 37 (2000) (examining the background of judges and jurors in Mississippi).

219. In the rare instances where duelists were punished, it appears most were fined for their actions. *See* WILLIAMS, *supra* note 184, at 37. Intriguingly, out of the small number of published appellate cases, in several the laws were invoked either against men who either were not gentlemen, *see, e.g.*, Commonwealth v. Dudley, 33 Va. (6 Leigh) 613, 613 (1835) (concerning the indictment of a "common laborer" for aiding and abetting in a duel), or who acted in utter ignorance of the *code duello* when making a challenge, *see, e.g.*, Ivey v. State, 12 Ala. 276, 276 (1847) (prosecution under anti-dueling laws of an individual who told the other party he had "half a minute" to prepare for a duel); Commonwealth v. Tibbs, 31 Ky. (1 Dana) 524, 524 (1833) (defendant charged with dueling when he told another party, "I will fight you a duel with a pistol or a rifle, from one step to a hundred yards"); *Strickland*, 11 S.C.L. at 181 (defendant charged with violating dueling laws after urging another to "go into the old field to fight a duel"). These suggest that even when enforced, anti-dueling laws may have been disproportionately enforced against non-elites.

220. *See* Smith v. State, 1 Stew. 506, 507 (Ala. 1828).

221. Duels were publicized, but they were not open to the public. *See* State v. Edwards, 11 S.C.L (2 Nott & McCord) 13, 15 (1819). *Edwards* was a test case of the anti-dueling laws; as one

of the law, in 1860 California's Supreme Court held that the state legislature, in passing an anti-dueling law that set a punishment of five years' imprisonment for a duelist who killed his antagonist, had thereby superseded the state's murder law.[222] In other words, the court held that by passing the anti-dueling statute the California legislature had declared that killing a man in a duel was *not* murder.[223]

Juries presented an even bigger stumbling-block to the enforcement of anti-dueling laws.[224] Drawn to be representative of the larger community, a jury would, one assumes, always be a weak link in enforcing any punitive legislation aimed at altering a broadly held social norm.[225] The accused was to be punished for engaging in activity that was expected of members of society. Dueling was an especially tough issue in this regard, for even men who disapproved of dueling often felt compelled to duel.[226]

Even in instances where the authorities investigated the duel and a grand jury issued indictments against duelists and seconds, petit juries would only rarely convict accused duelists at trial.[227] In acquitting duelists, the petit jury gave voice to the general opinion that, however pernicious dueling was, it should not be a criminal offense.[228] It was this refusal by juries to convict duelists

---

historian has written, once the judge in the case refused to require seconds to testify, "the dueling laws became moot." WILLIAMS, *supra* note 134, at 68. The law was altered in 1823 to give seconds immunity while testifying. *See* HINDUS, *supra* note 127, at 44.

222. *See* People *ex rel.* Terry v. Bartlett, 14 Cal. 652, 653 (1860) (holding that under California law a duelist, in this case former state Chief Justice David Terry, who killed an opponent was not guilty of murder but the separate offense of violating the state's anti-dueling law).

223. *See id.* California was settled by many Southerners in the 1840s and 1850s, saw quite a few duels, and was the site of one of the most famous duels in the nation: the 1859 duel where David S. Terry, the Kentucky-born Chief Justice of the California Supreme Court, killed United States Senator David Broderick. Terry did not hear *People ex rel. Terry*, but his position might help explain why California's Supreme Court held as it did. *See id.*; STEVENS, *supra* note 25, at 228-44.

224. Both case law and secondary works abound with tales of men indicted for a dueling-related crime, only to be quickly acquitted by a jury at trial. *See, e.g.*, Coleman, *supra* note 166, at 133 (following a fatal Kentucky duel in 1829, the surviving duelist was acquitted by a jury that deliberated less than five minutes); Howison, *supra* note 163, at 230 (following a fatal duel in Virginia, a warrant was issued and the surviving duelist arrested, but "on hearing the evidence [the jury] promptly acquitted him"). Southerners' refusal to convict duelists was also cited by Northern critics of the institution. *See* Lewis, *supra* note 132, at 46.

225. Juries were not perfectly representative of Southern white society, but in at least some instances petit juries were drawn from broad cross-sections of the dominant society. *See* GROSS, *supra* note 220, at 37; *see also* HINDUS, *supra* note 127, at 89-91 (noting that the jury trial was "the only stage from arrest to punishment in which public opinion is directly involved").

226. *See supra* text accompanying notes 154-56.

227. *See infra* text accompanying notes 231-35.

228. *See* WILLIAMS, *supra* note 184, at 38.

Compendium_Roth
Page 1890

that lay behind some states' adoption of an anti-dueling oath for legislators and voters.[229] In *Dwight v. Rice,* an 1850 case, the Supreme Court of Louisiana justified that state's oath by pointing out that it was the only way to tame duelists, as juries would never punish them.[230]

It is tempting to see such activities as a nineteenth-century instance of jury nullification, occasions where jurors expressed their disagreement with a law by refusing to convict those charged with violating it.[231] In fact, the situation was complicated considerably by the fact that, even as petit juries were proving themselves unwilling to convict men accused of dueling, grand juries were often willing to indict them for the offense. In South Carolina, grand juries indicted several duelists for murder.[232] South Carolina law, however, allowed petit juries to find that a homicide was either "felonious, justifiable, or excusable," and when dealing with duelists, they usually chose the latter two categories.[233] In Vicksburg, Mississippi, during the antebellum era, grand jurors returned forty indictments charging men with dueling or aiding in a duel.[234] Only two of those indicted in Vicksburg ever came to trial, however, and both were speedily acquitted.[235] The grand and petit jurors' actions here recapitulated Southerners' ambiguous relationship with dueling, signaling disapproval of the practice while avoiding punishing individual duelists.

Only in a few instances did it appear that the anti-dueling laws had any real deterrent effect at all. The one Southern state where the laws may have had a noticeable effect on dueling was Virginia. Virginia's stringent anti-dueling laws, which banned du-

---

229. *See* Dwight v. Rice, 5 La. Ann. 580, 581 (1850).

230. The court in *Rice* contended that the state's 1845 constitution, which prohibited duelists from voting, had helped deter the practice. *Id.* at 581-82. As occurred elsewhere, however, Louisiana later weakened the prohibition. When it passed a new constitution in 1852, the new charter limited the prohibition to those who had dueled "after the adoption of this Constitution." LA. CONST. of 1852, § 126.

231. Due to uncertainty about the historical roots of jury nullification, the parallel should not be pressed. *See* Andrew D. Leipold, *Rethinking Jury Nullification,* 82 VA. L. REV. 253, 257 (1996); Gary J. Simson, *Jury Nullification in the American System: A Skeptical View,* 54 TEX. L. REV. 488, 498-505 (1985).

232. *See* WILLIAMS, *supra* note 184, at 38.

233. *Id.* Even in South Carolina, however, duelists were occasionally convicted for dueling. *See* HINDUS, *supra* note 127, at 44-45 (noting that, while some duelists were convicted of crimes, most were never even indicted).

234. *See* CHRISTOPHER WALDREP, ROOTS OF DISORDER: RACE AND CRIMINAL JUSTICE IN THE AMERICAN SOUTH, 1817-1880, at 190 n.75 (1998). This is probably not representative of dueling in all the old South; Vicksburg was a major center of dueling in the 1840s. *See* WILLIAMS, *supra* note 134, at 8.

235. *See* WALDREP, *supra* note 234, at 190 n.75.

Compendium_Roth
Page 1891

elists from public office and outlawed fighting words, were credited
by some as discouraging dueling in the state, though it is clear the
law did not end the practice of dueling.[236] The law's exact effect,
though, is not certain; while some claimed the law discouraged du-
elists, many prominent Virginia gentlemen dueled long after the
law's passage,[237] and dueling in Virginia did not disappear until
1880s.[238]

In Tennessee, an unusual campaign against dueling also
served to briefly suppress the institution. Dueling came under at-
tack in the late 1820s, not from legislators but from the Tennessee
Supreme Court. In an 1829 case, *Smith v. State*, the court relied on
the common law to disbar Calvin Smith, a Tennessee attorney who
had killed an opponent while dueling in Kentucky.[239] In its opinion,
the court warned if any attorney "violates the laws made to sup-
press dueling, we will strike him from the rolls of the Court."[240] For
a few years, this appeared to have some effect, discouraging attor-
neys from dueling.[241]  In the long run, however, its effects were
limited; dueling in Tennessee continued until after the Civil War.[242]

---

236. *See* Howison, *supra* note 163, at 223 (stating that the Virginia's anti-dueling law was a
"powerful deterrent" against the practice, but also noting that "notwithstanding all these obsta-
cles of human law, duels . . . have continued in Virginia."). In 1841, one judge of the Supreme
Court of Virginia stated that the law had "repressed" dueling, though it is unclear whether he
meant that it had eliminated dueling or merely discouraged it. Brooks v. Calloway, 39 Va. 477,
471 (1841). There is reason for skepticism about the law's deterrent effect. *See infra* notes 237-
38.

237. In 1826, some years after Virginia passed its anti-dueling measure, the state's Senator,
John Randolph fought a duel against Senator Henry Clay. *See* GREENBERG, *supra* note 156, at
58-61. Randolph's behavior in the duel illustrates how the laws may have affected the behavior
of Virginia gentlemen who nonetheless did not obey the laws. At first, he resolved not to fire at
Clay, in part as a way to "honor" the laws of Virginia (which, of course, outlawed dueling alto-
gether). *See id.* Once facing Clay, however, Randolph decided he would fire after all. *See id.* at
60-61. While the anti-dueling law *influenced* Randolph's behavior, he apparently felt no com-
punction to follow it to the letter.

238. *See, e.g.*, Howison, *supra* note 163, at 239-40 (discussing duels fought in Richmond in
the 1840s and 1850s); STEVENS, *supra* note 25, at 14-16 (noting duels that occurred in Virginia in
the 1850s);  *supra* text accompanying notes 287-97 (recounting an outbreak of dueling in Virginia
in the 1880s).

239. Smith v. State, 9 Tenn. (1 Yer.) 228, 229 (1829). In relying on the common law, the court
was able to invoke its own authority to disbar Smith, and thus sidestep the problems facing
other legal institutions that challenged dueling. *Id.* at 230-31.

240. *Id.* at 234.

241. *See* TIMOTHY S. HUEBNER, THE SOUTHERN JUDICIAL TRADITION:  STATE JUDGES AND
SECTIONAL DISTINCTIVENESS, 1790-1890, ch. 2 (1999) (discussing the career of John Catron, the
Tennessee Supreme Court Justice who wrote the opinion in *Smith*). Catron seems to have be-
lieved *Smith* ended dueling in Tennessee, but dueling continued until the Civil War.  *See* McKee,
*supra* note 186, at 265-65.

242. *See id.*

Compendium_Roth
Page 1892

While anti-dueling laws did not eliminate dueling, they helped shape the duel. Many duelists took pains to avoid *publicly* breaking the law.[243] They either kept their duels quiet or, even more common, dueled beyond the reach of their home state's laws.[244] Crossing state borders was a favorite tactic.[245] Under common law and many statutes, a state's jurisdiction did not extend to acts committed beyond its borders, so by leaving their state, duelists ensured they would be immune from home state prosecution.[246] In America, this produced a series of famous dueling-grounds located near a state border, ranging from Bladensburg Heights, across the Maryland line from Washington, D.C., to Cumberland Island, Georgia, a favorite dueling-ground for Floridians.[247] Before the American Indian expulsions, Georgians dueled in that state's then-sovereign Cherokee territory.[248]

This custom of border crossing might also have had a second, unintended effect: by forcing duelists to travel to a dueling ground, the laws gave seconds more time to negotiate a peaceful ending to what would otherwise have been a violent encounter. This was the case when, in 1842, Abraham Lincoln became embroiled in a quarrel with a political rival, James Shields.[249] Lincoln and Shields were both from Springfield, Illinois, but following tradition they resolved to duel out of state, settling on an island in the Mississippi River that belonged to Missouri.[250] The long travel time to this island, however, allowed both men's seconds to arrange a peaceful solution to the affair—a solution that might never have been reached had the two dueled in their hometown.[251]

Illinois and its duels are worth a second look, for it is the one state where the law appeared to have stamped out dueling.[252] While

243. *See* FRANKLIN, *supra* note 40, at 47.

244. *See id.*

245. *Id.*

246. *See* Yancey v. State, 29 S.C.L. (2 Speers) 246, 248 (S.C. App. L. 1843) (stating that while dueling out-of-state cannot be punished in South Carolina, making a challenge while in-state does violate the common law); Warren v. State, 14 Tex. 406, 408 (1855) (holding that Texas' anti-dueling act does not reach individuals who duel out of state); *see also* Howison, *supra* note 163, at 237. *But see Warren*, 14 Tex. at 408 (commenting that Mississippi's anti-dueling act does contain a provision applying to out-of-state duels).

247. *See* FRANKLIN, *supra* note 40, at 47; WILLIAMS, *supra* note 134, at 69-70.

248. *See* FRANKLIN, *supra* note 40, at 47.

249. See DOUGLAS L. WILSON, HONOR'S VOICE: THE TRANSFORMATION OF ABRAHAM LINCOLN 265-92 (1998) for a detailed account of this "affair of honor." My thanks to my colleague Tom Fusonie for this reference.

250. *Id.* at 280.

251. *Id.* at 281-82.

252. *See* Lewis, *supra* note 132, at 37.

Compendium_Roth
Page 1893

not a "Southern" state, Illinois was settled in large part by southern emigrants (witness the Lincolns, who moved there from Kentucky). With such founders, the state might have been expected to see quite a few duels, as did other states settled by Southerners such as California and Texas. Illinois, however, claimed to have had no duels after 1820.[253] This state of affairs owed its existence less to the state's anti-dueling laws, however, than to the disastrous end of Illinois's first well-publicized duel.

In 1815, Illinois passed an anti-dueling law that was similar to those passed elsewhere. It required officeholders to pledge they had never dueled, but at the same time issued an amnesty to anyone who had dueled before the new law was passed.[254] From this, it might appear that Illinois was about to follow its Southern counterparts, in legislating against dueling while tolerating the practice. Four years later, however, two men in Belleville, Illinois, Alonze Stuart and William Bennett, fought the state's first duel, over an errant horse.[255] The men's seconds, not taking the affair too seriously, planned to turn it into a "mock duel" by loading both duelists' guns with powder but no shot.[256] At the duel, however, when the signal was given, Bennett fired and Stuart fell dead with a bullet through the heart.[257] At Bennett's trial, a witness testified that she saw him place a bullet in his pistol when his seconds were not looking.[258] Evidently, Bennett had learned of the prank and resolved to kill his unarmed opponent. He was convicted of murder and hanged in 1821.[259] According to one observer, the duel and its aftermath made dueling "discreditible and unpopular, and laid the foundation for that abhorrence of the practice which had ever been felt and expressed by the people of Illinois."[260]

Illinois' example points to the complex relationship between social norms and the law. Its laws were no different from those of Southern states, and many of its early settlers grew up in the Southern culture that accepted dueling. Before dueling could win acceptance in the new territory, however, the Bennett-Stuart duel

---

253. *See* TRUMAN, *supra* note 93, at 78. The Lincoln-Shields affair, which failed to escalate into a duel, occurred after the events discussed here, suggesting that some remnants of the "affair of honor" remained. *See supra* text accompanying notes 249-51.
254. *See* Lewis, *supra* note 132, at 36.
255. *See* BALDICK, *supra* note 25, at 124-25.
256. *Id.* at 124.
257. *Id.*
258. *Id.*
259. *Id.* at 124-25.
260. SABINE, *supra* note 1, at 289.

intervened to give the practice a particular meaning. Bennett's behavior was anything but "honorable," and his combat with Stuart was, according to the jury, merely a disguised murder. Nor was hanging a "gentlemanly" end. More than any legislative enactment, the Bennett-Stuart duel convinced people in Illinois that dueling was murder and turned public opinion decisively against the practice.

The Bennett-Stuart duel also suggests how a particular social meaning might be established.[261] We can speculate that some social norms or social meanings that would otherwise be firmly established can be cut off, if attacked early or at a strategic moment.[262] In the Southern states, dueling communicated that the duelist was a man of honor. In Illinois, though, before the duel had time to take root, it became associated with cold-blooded murder.[263] This is not to say that all social norms are amenable to such manipulation.[264] Indeed, dueling's long career suggests the exact opposite—once the duel was established in Southern culture, it would take a cataclysm to uproot it.

---

261. There is already substantial literature speculating how norms develop and acquire particular meanings. *See, e.g.,* POSNER, *supra* note 28, at 29-32; McAdams, *supra* note 31, at 352-355; Picker, *supra* note 50, at 1225.

262. Considering that Illinois was settled by both Southerners and Northerners, this might be an example where two social norms, the North's anti-dueling norm and the South's pro-dueling norm, were competing for dominance until the Bennett-Stuart duel "tipped" opinion in favor of the anti-dueling norm. *See* Picker, *supra* note 50, 1227-28, *passim* (modeling how in some instances norms may compete).

263. There are similarities here to the Burr-Hamilton duel. There, however, we can speculate that social norms in the North may already have been "tipping," due to the slow growth of political parties and a more egalitarian social order. *See supra* text accompanying notes 122-28. The South's norms were unaffected by such developments, and its norm regarding dueling may have proven more robust and less amenable to such tipping.

264. A few scholars eager to alter social norms have, it seems, paid insufficient attention to the fact that some norms are remarkably resistant to change, *see, e.g.,* Sunstein, *supra* note 41, at 907-09 (claiming that "existing social conditions are often more fragile than might be supposed"), and have devoted the bulk of their efforts to studying the "norm entrepreneurs" who played successful roles in altering norms, *see* David A. Skeel, Jr., Shaming in Corporate Law 11 (Feb. 2001) (unpublished manuscript, on file with author). Recently, however, Robert Ellickson has noted that norm entrepreneurs are most likely to be successful if the challenged norm has already been undermined by exogenous factors, *id.* (quoting Robert Ellickson, The Evolution of Social Norms, A Perspective from the Legal Community 29-32 (2000) (unpublished paper)), a point that anticipates the ones made in this Note, *see infra* Part V.C.

Compendium_Roth
Page 1895

## V. THE END OF THE AFFAIR

### A. The Civil War and the Demise of Dueling

Despite all legal attempts to stamp it out, dueling remained a part of Southern life on the eve of the Civil War.[265] Not only did it continue to flourish in the Deep South, in its old haunts such as Charleston,[266] but dueling also appeared in areas that attracted large numbers of Southern transplants, such as California.[267] Some students of dueling even contended that dueling increased in the 1850s, as the growing rift between the North and South encouraged Southerners to embrace such distinctively Southern practices as the duel.[268] Yet, within a decade, the duel was a dying or dead institution.[269] Why?

Clearly, the Civil War killed the duel.[270] During the war itself, Southern men still dueled, though perhaps at a less frenetic pace than during the 1850s.[271] Officers in both the Confederate Army and Navy fought several well-known duels.[272] But after the war, the duel rapidly faded. In South Carolina, for instance, only a handful of duels were fought after 1865, and only one of those was fatal.[273] Kentucky's last duel took place in 1866.[274] Recognizing the link between the Civil War and dueling's decline does not, however, explain exactly how the disastrous conflict ended dueling.

Dueling ended in part because the war and its aftermath served to give a new meaning to dueling. The sheer carnage of the

---

265. *See* Coleman, *supra* note 166, at 138 (antebellum Kentucky); Doherty, *supra* note 204, at 243 (antebellum Florida); James T. Moore, *The Death of the Duel: The* Code Duello *in Readjuster Virginia, 1879-1883*, 83 VA. MAG. HIST. BIOG. 259 (1975) (discussing the duel's continued vitality in pre-Civil War Virginia. Out of one article's sample of twenty-five "representative duels" fought in the century between the Revolution and the Civil War, four (16%) took place in the 1850s. *See* Schwartz et al., *supra* note 146, at 352-55.

266. Several famous duels were fought in Charleston in the 1850s. *See* FRANKLIN, supra note 40, at 57; ROSSER H. TAYLOR, ANTE-BELLUM SOUTH CAROLINA: A SOCIAL AND CULTURAL HISTORY 47 (1942).

267. *See* STEVENS, *supra* note 25, at 245.

268. *Id.* at 245. *But see* WILLIAMS, *supra* note 134, at 78-80 (suggesting that dueling in the South declined somewhat after 1830, though also speaking of the duel's persistence in the antebellum era).

269. *See infra* text accompanying notes 277-96.

270. *See* AYERS, *supra* note 104, at 271; WILLIAMS, *supra* note 184, at 37.

271. *See* STEVENS, *supra* note 25, at 246-47.

272. *Id.*

273. *Id.* at 252-53.

274. *See* Coleman, *supra* note 166, at 138-39.

Compendium_Roth
Page 1896

war destroyed the romantic notions attached to arranged combat.[275] By the end of the war, nearly one million of the South's adult white males had served in the Confederate Army.[276] Over a quarter of them had died in the war, including many of its putative aristocrats.[277] The war itself had appeared to many Confederate soldiers as a struggle of honor, and losing the war likely made such staged combat appear both futile and a reminder of losses past.[278] After surviving such slaughter, the returning soldiers must have found little to attract them to the duel.[279] Moreover, the society that appeared after the Civil War and Reconstruction, more urbanized and commercial, more open to ambitious businessmen, was also less hospitable to dueling than was the Old South.[280] A society without an aristocracy is not one where dueling is likely to flourish. It was not that the South's culture of honor had disappeared; rather, the duel was no longer a symbol of that culture. As one Southern professor put it in 1883, "[dueling] is no longer an honorable way of killing."[281]

The end of Southern dueling did not mark the end of Southern violence.[282] After the war, as before, Southerners were more likely to commit murder than their Northern counterparts.[283] Theirs remained a culture suffused with notions of honor and respect, in which mild personal slights produced disproportionately violent responses.[284] But such violence was no longer released in the

275. *See* AYERS, *supra* note 104, at 271-72. Mass war seems to render absurd the pretensions of the individual duel. In similar fashion, World War I ended dueling in Germany, another society that, in its prewar era, had nurtured a romantic cult of dueling. *See* FREVERT, *supra* note 63, at 201-02; KEVIN MCALEER, DUELING: THE CULT OF HONOR IN FIN-DE-SIECLE GERMANY 18 (1994).

276. *See* JAMES M. MCPHERSON, THE BATTLE CRY OF FREEDOM: THE CIVIL WAR ERA 306-07 n.41 (1988).

277. *See id.* at 854 (estimating Southern deaths at above 260,000); *id.* at 330 (noting that officers had a higher death rate than enlisted men, and that senior officers had a higher rate overall, as, for example, Confederate generals were 50% more likely to be killed than enlisted Southern men).

278. *See* JAMES M. MCPHERSON, FOR CAUSE AND COMRADE: WHY MEN FOUGHT IN THE CIVIL WAR 168-70 (1997) (discussing the links many Southerners made between the war and honor).

279. *See* AYERS, *supra* note 104, at 271.

280. *See* EDWARD L. AYERS, THE PROMISE OF THE NEW SOUTH 3-25 (1992) (presenting an overview of the South after the Civil War). The culture was also more like the open one that developed in the North after 1800 and which contributed to the end of Northern dueling. *See supra* note 128 and accompanying text.

281. AYERS, *supra* note 104, at 268 (citation omitted).

282. *See generally* BUTTERFIELD, *supra* note 142; Dov Cohen & Joe Vandello, *Meanings of Violence*, 27 J. LEGAL STUD. 567 (1998).

283. *See* AYERS, *supra* note 104, at 276.

284. *See* Cohen & Vandello, *supra* note 282, at 567.

duel.[285] In the postwar South, as one scholar put it, "aggrieved men [just] shot each other on sight."[286]

Only one state saw a revival of dueling after 1870, and that single outbreak shows how thoroughly dueling had lost its role in Southern culture.[287] From 1879 to 1883 Virginia was riven by an extraordinary dispute over the state debt.[288] Two factions, "funders" and "readjusters," fought pitched battles in the state's legislature and press over how the debt should be settled.[289] For now obscure reasons, participants regarded it as less an ordinary political dispute than a battle over the soul of the State.[290] This conflict produced ten challenges and six duels.[291]

This time, however, the duel appeared to the public not as drama but as farce. Law enforcement was no longer willing to turn a blind eye to duels. When several would-be duelists attempted to meet and duel in private, they found themselves forced to run from the Richmond and Washington police.[292] Once caught, the duelists were required by local judges to post large bonds to guarantee their peaceful behavior, effectively preventing the duel.[293] Prominent public figures no longer felt obliged to follow the *code duello*. When United States Senator William Mahone was challenged by former Confederate General Jubal Early, Mahone simply refused to fight.[294] While the antebellum public might have regarded Mahone as a coward, Virginians in the 1880s did not seem to care about the dispute, and Mahone suffered no damage to his social standing or electoral prospects for having declined to duel.[295]

Most telling, even the duelists themselves no longer had faith in the duel's role as a ritual affirmation of honor. When the funder George D. Wise challenged readjuster Congressman Ambler Smith to a duel, Smith announced that his choice of weapons would be not the traditional dueling pistols but double-barreled shotguns.[296] Smith valued the duel not as an arena to publicly display his honor, but as an opportunity to kill his opponent. The duel

285. *See* C. VANN WOODWARD, THE ORIGINS OF THE NEW SOUTH 161 (1951).
286. AYERS, *supra* note 104, at 268.
287. Moore, *supra* note 265, at 259.
288. *See id.* at 259-61.
289. *Id.* at 262.
290. *Id.* at 264.
291. *Id.* at 260.
292. *Id.* at 265, 266, 270.
293. *See id.* at 265, 270.
294. *See id.* at 270-71.
295. *See id.*
296. *Id.* at 272.

(thankfully) never took place, and this last vogue for dueling was soon over.[297]

The Virginia controversy brought home a fundamental shift in attitudes: the social meaning of dueling had changed. It was, to the general public, no longer a combat for honor but an archaism. With a new social meaning attached to it, the practice of dueling disappeared almost completely, helped along by the new willingness of legal institutions to enforce laws against duelists. By 1883 it was clear the authorities would arrests duelists, the public was indifferent to it, and even the duelists themselves no longer believed in it. After that year, there was never again a major duel in the South.[293]

## B. Dueling in Modern American Law

Today, dueling as a legal issue no longer exists. The few anti-dueling statutes and provisions that remain on the books are recognized anachronisms,[299] and anti-dueling laws have been invoked in only a handful of cases since the turn of the twentieth century.[300] When they are invoked, it is generally by prosecutors seeking to lay an additional charge against a defendant already charged with murder or assault.[301] Since the 1920s, courts have rejected al-

---

297. *See id.* at 273.

298. *See id.* at 275-76.

299. For example, Tennessee's Constitution still prohibits duelists from holding public office, TENN. CONST. art. 9, § 3, while anyone who wants to join the Kentucky bar is still required to pledge they have "not fought a duel with deadly weapons" nor have "sent or accepted a challenge to fight a duel," KY. CONST. § 228.

300. There appear to be fewer than a dozen reported cases since 1900 in which a defendant was charged with violating anti-dueling laws or with committing homicide in a legally cognizable duel, and many of these cases occurred early in the century. *See* Payne v. State, 391 So. 2d 140, 144 (Ala. Crim. App. 1980) (stating that anti-dueling laws are now anachronisms in Alabama); People v. Morales, 247 P. 221 (Cal. App. 1926) (upholding a conviction for fighting a duel); Bundrick v. State, 54 S.E. 683, 684-85 (Ga. 1906) (upholding homicide conviction when two individuals, who had planned to meet later for a duel, met earlier, fought, and one was killed); Ward v. Commonwealth, 116 S.W. 786, 787 (Ky. 1909) (reversing conviction for violating anti-dueling statute); Baker v. Supreme Lodge, K.P., 60 So. 333 (Miss. 1913) (rejecting an insurance company's contention that insured died in a "duel," not murder, where the insured's policy would have been invalidated had he died in a duel); Davis v. Modern Woodmen of America, 73 S.W. 923 (Mo. App. 1903) (rejecting an insurance company's contention that insured died in a "duel," not murder, where the insured's policy would have been invalidated had he died in a duel); State v. Romero, 801 P.2d 681, 684-85 (N.M. Ct. App. 1990) (stating that duels no longer occur); State v. Fritz, 45 S.E. 957, 958 (N.C. 1903) (upholding a conviction for challenging another to a duel); Commonwealth v. Gaynor, 648 A.2d 295, 298 n.5 (Pa. 1994) (criticizing a lower court for characterizing a shooting spree as a "duel"); Griffin v. State, 274 S.W. 611, 612-13 (Tex. Crim. App. 1925) (holding a duel is a combat "arranged with some formality" and overturning a dueling conviction); Daughtry v. State, 113 S.W. 14 (Tex. Crim. App. 1908) (reversing conviction for sending a challenge under state anti-dueling statute).

301. *See, e.g., Payne,* 391 So. 2d at 144; *Romero,* 801 P.2d at 685; *Griffin,* 274 S.W. at 612.

most all attempts to charge defendants with violating anti-dueling laws, recognizing that dueling was not, after all, merely planned combat, but a complex social ritual that depended on both participants and observers to give it meaning.[302] Absent the shared social understandings that structured the "affair of honor," there is no true duel. As early as 1909, in *Ward v. Commonwealth*, the Kentucky Court of Appeals recognized that not every fight, even if agreed to, is a duel.[303] A duel, the court held, is not just an affray but "a combat with deadly weapons, fought according to the terms of precedent agreement and under certain or prescribed rules . . . prescribing the utmost formality and decorum."[304]

Such formal combats simply no longer occur in American culture.[305] The last reported case in which charges of dueling were brought against a defendant was a 1990 New Mexico case, *State v. Romero*, in which a trial court convicted Romero of dueling after he and a neighbor quarreled, both left to retrieve weapons, and then shot one another.[306] The New Mexico Court of Appeals threw out Romero's conviction on the dueling charge, reasoning that he could not have violated the state's anti-dueling laws because formal duels no longer occur. "[T]his form of combat," the court held, "is long since dead."[307]

### C. Anti-Dueling Laws and the Management of Social Norms

Dueling may be dead in the law, but it lives on in the imagination of scholars seeking ways to manage social norms.[308] As noted above, most of these scholars recognize that, historically, anti-dueling laws did not eliminate dueling.[309] Nonetheless, they are attracted to such laws because they see in them a technique by which laws might alter social norms. Anti-dueling laws did not just aim to punish duelists, they sought, through a range of methods ranging

---

302. *See supra* Part IV.A.

303. *See Ward*, 116 S.W. at 787 (rejecting an attempt to charge a defendant with engaging in a duel).

304. *See id.*

305. *See supra* text accompanying notes 286-97.

306. *Romero*, 801 P.2d at 682.

307. *Id.* at 684; *see also* Payne v. State, 391 So. 2d 140, 144 (Ala. Crim. App. 1980) (speaking of the "extinction" of the duel in Alabama); Commonwealth v. Gaynor, 648 A.2d 295, 298 (Pa. 1994) (criticizing a lower court for, in dicta, describing a gunfight as a "duel").

308. *See supra* Part II.

309. *See supra* note 50 and accompanying text.

from legislative bars to public humiliation,[310] to change the social
norm about, and the social meanings attached to, dueling.[311]

Modern-day fans of anti-dueling laws have, however, paid
much less attention to why those laws failed.[312] Between 1800 and
1860, all Southern states passed laws and constitutional provisions
meticulously and cleverly designed to end dueling, by penalizing
and shaming men who did duel, by providing social support to men
who did not wish to duel, and by disrupting the chain of events that
carried men from a slight to a duel.[313] Yet despite these efforts, du-
eling did not die out, and in many parts of the South continued to
flourish. Why did these laws fail, and what does this tell us about
modern attempts to manage social norms and social meanings?

The most direct cause of the laws' failure was the refusal of
state legal actors to enforce them. Even with anti-dueling laws on
the books, most legislators would not bar duelists from public office,
and most judges and jurors would not convict duelists for dueling-
related offenses.[314] In refusing to enforce the laws, these officials
were guided by understandings of dueling suffused throughout
their society.[315] Judges and jurors were, understandably, unwilling
to punish men for dueling when they themselves thought that du-
eling was sometimes necessary to maintain one's honor. The
South's anti-dueling laws had targeted a social norm, but it was a
social norm shared by the men asked to enforce the law. As a result,
it becomes evident why the anti-dueling laws would not be effec-
tively enforced until the social norm itself had changed.[316]

The failure of anti-dueling laws may hold lessons for those
who propose to use the law to manage social norms. Any lesson
drawn from a single example should be taken with a grain of salt;
but it is still worthwhile to close with two admittedly speculative

---

310. *See supra* Part IV.B.1.

311. *See* Lessig, *supra* note 28, at 681-82.

312. At least one scholar has, however, speculated on the lag between the passage of anti-
dueling laws and the end of dueling. *See* Posner, *supra* note 159, at 1736-40.

313. *See supra* part IV.B.1.

314. *See supra* text accompanying notes 217-35.

315. Dan M. Kahan has recently dealt with the similar problem of legal institutions that ref-
use to enforce laws against certain fairly popular social norms. *See generally* Kahan, *supra* note
41. Kahan advocates in such instances the use of mild sanctions ("gentle nudges") to alter
"sticky" norms. The examples Kahan gives of norms that prove resistant to legal manipulation,
however, are contested norms such as date rape or drunk driving, for which there is already
considerable societal disapproval. *Id.* at 607, 609. Dueling in the South was different; while
some expressed dislike of the duel, it was a norm widely tolerated throughout society, resisting
legal attempts to either "nudge" or "shove" out of popularity..

316. *See supra* Part V.A.

suggestions about what can be learned from the career of anti-
dueling laws.

First, the failure of anti-dueling laws illustrates the difficul-
ties facing those who advocate a large role for the "expressive func-
tion" of law.[317] Some laws, scholars have suggested, can change so-
cial norms not merely by penalizing targeted behaviors but by ex-
pressing society's disapproval of that behavior.[318] Expressive laws
work by making public this shared consensus. Richard McAdams
has suggested that anti-smoking laws may well work chiefly
through their expressive function.[319] Anti-smoking ordinances
passed in the 1980s, he points out, were rarely enforced. They
worked, he proposes, not by punishing smokers directly but by
communicating a new social consensus about smoking.[320] In effect,
the laws told opponents of smoking that society was on their side.
This emboldened them to speak out, while also letting smokers
know that many others did not like breathing their second-hand
smoke, leading smokers to curb their own behavior.[321] The law
helped change smokers' and nonsmokers' behavior by publicly ex-
pressing an already-forming consensus.[322]

The example of anti-dueling laws, however, demonstrates
one limit of this approach. Exactly what a law "expresses" is not
always readily apparent. The problem is not that some laws are not
expressive, for, of course, there are many laws that, because of their
contentious nature, technical subjects, or legislative history, ex-
press no societal consensus at all.[323] The problem with "expressive
law" is that many laws' meanings are revealed not in their text but
as they take on life through enforcement.

On the surface, anti-dueling laws' general tone, and the pen-
alties they prescribed, made it appear that there existed in the
South a consensus that condemned duelists. The law as actually
enforced, however, expressed a far different consensus. Courts'
willingness to acquit duelists, and legislatures' willingness to seat

---

317. *See* Cooter, *supra* note 31, at 593-94 (proposing that, under certain circumstances, such
expressive laws can "tip" a society from one social norm to another); Sunstein, *supra* note 41, at
964 (suggesting that expressive laws may have some effect). It should be noted that all propo-
nents of such "expressive" laws recognize that the laws would work only on certain norms and
would in most cases have only modest effects.

318. *See* McAdams, *supra* note 31, at 402-06. *See generally,* Cooter, *supra* note 31; Sunstein,
*supra* note 41.

319. *See* McAdams, *supra* note 31, at 404-05.

320. *See id.* at 405-06.

321. *See id.*

322. *See id.* at 402-07.

323. *Id.* at 403.

Case 3:17-cv-01017-BEN-JLB Document 128-6 Filed 11/11/22 PageID.16549 Page 68 of 402

duelists in contravention to the law, expressed a more complex view of dueling, one that saw the institution as regrettable but held that the individual duelist was not to be stigmatized.[324] The consensus anti-dueling laws expressed was to be found not in the statute but in how the statute was enforced (or ignored) by legislators, judges, and juries.[325]

The disjunction between the laws' text and their enforcement brings us to a second conclusion: laws aimed at changing a social norm will likely succeed only if a significant percentage of the population has already rejected the disfavored norm. This is so not merely because of the weight of numbers, but because in a democratic society legal institutions will, albeit to varying degrees, reflect the beliefs and habits of the citizens. The more strongly citizens have internalized a particular social norm, the less likely it is that they will work through their legal institutions effectively to alter that social norm, even if there are laws on the books against it.[326]

The example of the antebellum South illustrates how social norms can themselves limit the effectiveness of legal institutions and so blunt attempts to alter those norms.[327] Before the Civil War, the anti-dueling laws went largely unenforced because they attacked a social norm that most members of Southern society tolerated or actively supported.[328] These members of Southern society,

---

324. *See supra* Part IV.B.

325. In a different context, Dan Kahan has pointed out that, in a society like our own where interest groups wield disproportionate power, mere passage of a law, even one intended to be "expressive," will not signal that there is, in fact, a consensus over the issue. *See* Kahan, *supra* note 41, at 614 (noting that "[c]itizens are likely to form [the impression that the law represents widespread social consensus] only if they observe their associates complying with, enforcing, or speaking well of the law").

326. In its broadest form, the proposition that legal change alone can rarely work major social changes is hardly novel. In the social norms literature, for instance, proponents of "expressive law" see such laws as acting not to transform social norms but rather to "tip" already changing social norms, often by using the law to let members of society know that the social norm is, indeed, changing. *See, e.g.,* McAdams, *supra* note 31, at 397-401. More generally, social scientists have long pointed out the limited power of legal institutions to work social change. For a good summary of this view, see generally GERALD N. ROSENBERG, THE HOLLOW HOPE: CAN COURTS BRING ABOUT SOCIAL CHANGE? (1991).

That being said, the point that deep-rooted social norms can often resist and undercut legal attempts to alter them *is* worth making, in large part because some of the more ambitious proponents of norm management have embraced social norms precisely because they believe they are amenable to management and alteration. *See supra* note 41 and accompanying text.

327. The problem of how laws can change a genuinely dominant social norm has received little attention. *But see generally* Kahan, *supra* note 41 (claiming that laws that give "gentle nudges" may be the best way to change social norms that enjoy significant, though not universal, social support).

328. *See supra* Part IV.B.

Case 3:17-cv-01017-BEN-JLB Document 128-6 Filed 11/11/22 PageID.16550 Page 69 of 402

unsurprisingly, refused to enforce laws that challenged their own deeply held beliefs. Following the Civil War, the social norm changed, as most members of the public concluded that dueling was not a badge of honor, and therefore abandoned dueling.[329] This new social norm concerning dueling was a necessary precondition for strong enforcement of the anti-dueling laws.[330]

## VI. CONCLUSION

In recent years, new interest has grown in "social norms," the informal social regularities that society generally agrees its members should follow. Legal scholars have not only paid new attention to social norms, but have looked for ways in which law can adjust social norms in order to meet policy goals, or can enlist social norms to more effectively deter or encourage behaviors. As an example of the kind of laws that can effectively manage social norms, these scholars have pointed to the antebellum South's anti-dueling laws, which proposed to eliminate dueling not only by punishing duelists but by changing the social norms concerning duelists and dueling. These laws sought, by means such as banning duelists from public office, to sever the link between dueling and honor and so alter the prevailing social norm. Few believe that the anti-dueling laws actually had a significant effect on dueling; rather, they admire the way the laws targeted social norms and see in them an example for how modern-day laws can effectively alter social norms.

The actual historical record, however, provides a different perspective on attempts to use laws to change social norms. While the South's laws were carefully crafted to change Southerners' perceptions of dueling, and to sever the link between dueling and the South's pervasive culture of honor, they failed. The legislators, judges, and jurors charged with enforcing the laws themselves shared the South's social consensus that dueling was sometimes necessary to maintain one's honor. As a result, they were unwilling consistently to punish or stigmatize men for dueling. Dueling was ended not by laws but by the sweeping social and political impact of the Civil War.

If history is a guide, many modern-day attempts to use laws to transform deep-rooted social norms may similarly be doomed to

---

329. *See supra* Part V.A.
330. *See supra* Part V.A.

failure. Even if laws targeting such entrenched social norms are passed, they will then have to be enforced by legal actors who share the consensus concerning the existing social norm. As a result, resistance to the laws is a likely outcome. Far from the law changing social norms, the example of anti-dueling laws suggests that in such cases social norms must change before the laws will be enforced.

*C. A. Harwell Wells**

---

* My thanks to the historians and legal scholars whose work informs this Note; to Steph Blackman, Rob McGuire, and Rob Roos for editorial advice and patience; to Todd Overman and Rob Mahini for their hard work and quaint fidelity to the antiquated strictures of the *Bluebook*, *see generally* THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION (Columbia Law Review Ass'n et al. eds., 17th ed. 2000); to Prof. Robert Rasmussen for encouragement and suggestions; and especially to Jenny Wells, without whose love and support I would never have attempted either this Note or law school.

Compendium_Roth
Page 1905

# SCARS

*of*

# INDEPENDENCE

*America's Violent Birth*

HOLGER HOOCK

B \ D \ W \ Y
BROADWAY BOOKS
NEW YORK

Compendium_Roth
Page 1906

foodstuffs and livestock"—and, we should add, the family's personal items and their slaves.[17]

Congress, too, tried to mobilize more black soldiers and laborers by authorizing the formation of black regiments in the South. One delegate from New Hampshire hoped that such regiments would lay the foundation for full-scale emancipation and spread "the Blessings of freedom to all the Human Race in America." Most colonies had stopped importing slaves in 1774; in 1780, Pennsylvania passed a law gradually phasing out slavery in the state. Over the course of the war, some 9,000 black men did serve with Revolutionary forces—as laborers and servants, spies and soldiers. But when Congress left the final decision on large-scale recruitment of blacks in the South to the state legislatures, the project was doomed. The South Carolina House of Representatives, dominated by slave-owning planters who feared the loss of property, labor, and control, resoundingly rejected the idea. However, this did not stop Revolutionary forces raiding Loyalist plantations in the South from seizing slaves, including some 130 from Lieutenant Governor John Graham's plantation outside Savannah; there is some evidence that the British Army tried to counter such raids by arming the slaves on deserted Loyalist plantations.[18]

Whether they went off to join the fight or remained on their plantations, blacks in America were becoming embroiled in new forms of violence—as both perpetrators and victims. But it was still unclear whether Britain's strategy would cause white rebels' resistance to crumble or merely stiffen their resolve.

## Beasts of Prey

By June 1780, with Charleston secure, Clinton returned to New York City, which he feared was under threat from a combined attack by the French navy and the Continental Army. Six French ships of the line and 5,500 French troops would arrive in early July, helping boost recruitment to the Continental Army in Pennsylvania and New Jersey, and giving momentum to allied planning. Clinton left General Cornwallis in charge in the South and dispatched a supporting force under Major General Alexander Leslie to Vir-

ginia to cut off rebel supplies. The corpulent, aristocratic Cornwallis was a career officer who had opposed both the Stamp Act and the Declaratory Act before the war but then volunteered to serve in America. After playing a prominent role in several campaigns in the North, Cornwallis had returned home in 1779, advising the government that the "subjugation of America was 'impracticable.'" But when his king asked him, Cornwallis nonetheless returned to America, now as second-in-command to Clinton, with a dormant commission to replace him if he resigned or died; he joined Clinton at the siege of Charleston in February 1780.[19]

At home, the British government had weathered a political storm over the winter of 1779–80, when high taxation, a credit crisis, and concern over the use of public funds fueled demands for political reform that threatened to topple the ministry. The capture of Charleston in May 1780 was a much-needed tonic to an administration under duress. But by then wide swaths of the American lower South presented a scary scene—a virtually permanent little war of raiding and plundering between Patriot and Loyalist militias, prisoner abuse, even outright murder. In addition, armed gangs unaffiliated with any real military units operated in the semi-lawless wasteland between the lines. To put the levels of violence into perspective, it is worth recalling that South Carolina in 1780 and 1781 saw nearly one-fifth of all battlefield deaths of the *entire* American war, and nearly one-third of all battlefield wounded. Strikingly, the majority of these casualties resulted from American-on-American violence.[20]

One British officer who operated at the center of this partisan war was Colonel Banastre Tarleton. As commander of the British Legion—a semi-independent, highly mobile force of American Loyalist cavalry and light infantry, typically between four hundred and six hundred strong—Tarleton became one of a set of younger, ruthless British leaders of Loyalist forces in the South who would have a disproportionate impact on the ways the war was fought and perceived. The son of a prominent Liverpool slave trader and sugar merchant with extensive West Indian plantation holdings, Tarleton was educated at University College, Oxford, and the Middle

Compendium_Roth
Page 1907

Temple, London, where he spent as much time playing cricket and tennis, boxing, riding, and gambling as he did studying. His early inheritance largely frittered away, Tarleton purchased a commission in the 1st Dragoon Guards in April 1775: he was twenty, and war in America presented an opportunity. Tarleton fought across New Jersey, Pennsylvania, and New York. In July 1779, when skirmishing in Westchester County, New York, Tarleton outlined his method for subduing his opponents: "I proposed to the militia terms, that if they would not fire shots from buildings, I would not burn [those buildings]. They interpreted my mild proposal wrong, imputing it to fear. They persisted in firing till the torch stopped their progress, after which no shot was fired."[21]

Once he had moved south, Tarleton also relied on mixed-race raiding parties to scare white masters and undermine the plantation economy: "Upon the approach of any detachment of the King's troops, all negroes, men, women, and children," wrote Tarleton, "thought themselves absolved from all respect to their American masters, and entirely released from servitude. Influenced by this idea, they quitted the plantations and followed the army." In the words of John Cruden—the British commissioner for sequestered estates who oversaw 5,000 slaves growing supplies for the British Army on four hundred rebel plantations—seizing slaves from rebels was a method that struck "at the root of all property" and promised to "bring the most violent to their senses." Since, in the South, men were "great in proportion to the number of their Slaves," Cruden argued, undermining their wealth and status would be the best means of finally pacifying the rebels. African-Americans were soon deeply implicated in whites' partisan war in the South. One "Gibson, a coloured man and his party of tories," were known to murder white rebels. Conversely, Moses Knight (or Moses McIntosh), an African man brought up by General Alexander McIntosh in South Carolina, spent his military service from 1779 to 1782 "chiefly in pursuit of Tories." Where blacks helped whites hunt Loyalists or Revolutionaries, the levels of feared and actual violence were bound to rise.[22]

Tarleton, and those among his fellow officers who also led Loy-



This engraving of Tarleton, derived from Sir Joshua Reynolds's grand oil portrait that was about to be shown at the 1782 annual exhibition at London's Royal Academy of Arts, accompanied a highly laudatory article about the officer in the Westminster Magazine that spring.

alist units, were favored by the new British commander in the South, General Cornwallis. Once Charleston was secured, Cornwallis ordered Tarleton to conduct a sweep through South Carolina's interior. With some 270 Loyalist legionnaires, Tarleton rode 105 miles in just over two days to catch up with Colonel Abraham Buford's Continental force at the northern South Carolina border. Tarleton demanded Buford's surrender, warning that, should he decline, "the blood be upon your head." The Continentals held their fire until Tarleton's cavalry were within just ten yards; the British crashed through the rebel line. As Buford's troops first sought to surrender, Tarleton's horse was shot from under him. Both sides quickly recommenced firing. The "rage of the British soldiers," as one American participant wrote decades later, "excited by the continued fire of the Americans, while a negotiation

was offered by flag, impelled them to acts of vengeance that knew no limits." A rebel doctor added that "for fifteen minutes after every man was prostrate [the British] went over the ground plunging their bayonets into every one that exhibited any signs of life, and in some instances, where several had fallen one over the other, these monsters were seen to throw off on the point of the bayonet the uppermost, to come at those beneath."[23]

There is debate about whether Tarleton had explicitly condoned or even ordered the atrocities. What is clear is that a veritable slaughter took place. Out of approximately 420 Continentals, 115 were killed and 150 wounded; the casualty rate among Tarleton's smaller British force was perhaps one-tenth of that. The disproportionate American losses were largely due to cavalry breaking infantry lines, enhanced by battlefield confusion and a desire on the part of British and Loyalist soldiers to avenge Tarleton. Nonetheless, even Charles Stedman, a British officer and early historian of the war, who commended the British Army for their "activity and ardor on this occasion," conceded that "the virtue of humanity was totally forgot." While the encounter was perhaps not the mass atrocity of historical legend, Patriots quickly dubbed it Buford's Massacre. Their new battle cry, "Tarleton's quarter," helped them explain, if not justify, future atrocities as revenge.[24]

Tarleton became notorious for allowing loose discipline among his troops. A few snapshots suffice to convey the general picture. The British Legion robbed, physically assaulted, and raped several women at a plantation near Moncks Corner, twenty miles outside Charleston. When Tarleton failed to capture or kill Francis Marion, a Patriot guerrilla leader notorious, wrote Cornwallis, for "the terror of his threats and the cruelty of his punishments," the legion marked its retreating path by the columns of smoke rising over thirty plantations. Tarleton had a woman named Mary Carey Richardson flogged for not revealing Marion's whereabouts and allegedly exhumed the body of her late husband, the Patriot general Richard Richardson, in front of his widow and children. People said Tarleton's Loyalist corps "exercised more acts of cruelty than

any one in the British Army." The colonel was building his reputation as "Bloody Tarleton" and "the Butcher"—the latter a moniker he shares in British military history with George III's uncle, the Duke of Cumberland, who had earned his in the Scottish Highlands in 1746. Here was not just another Charles Grey in charge of British regular troops, horrific though the Baylor Massacre had been. The Southern war had enabled a different type of aggressive, less rule-bound commander to emerge—and, by leading American Loyalists against their own neighbors, to lastingly alienate local populations. Seeing or experiencing these violent excesses reinforced Americans' understanding of their Revolutionary struggle as a violent confrontation with a degenerate, oppressive empire that must be defeated at almost any cost.[25]

\* \* \*

Just after Buford's Massacre, and just before he returned to New York in early June 1780, Clinton toughened the British policy towards armed white rebels. All militiamen on parole were now required to swear an oath of allegiance to the king; by forcing them to take an explicit stance, the Crown was essentially nullifying their paroles. If a rebel militiaman was captured and found to have previously served with the British, he was to be executed. There was no doubt in Cornwallis's mind that "in a civil war there is no admitting of neutral characters, & . . . those who are not clearly with us" must be disarmed. As rebels fled to North Carolina and Virginia, many took their slaves with them. Others who previously had been inactive or outwardly neutral were driven into the rebels' arms. After Cornwallis scored a critical victory against General Horatio Gates's larger force at Camden in August—the Continentals and North Carolina militia suffered some 250 killed; another 800 men were wounded and taken captive—he put these policies into action, ordering the execution of several rebel fighters.[26]

Some of Cornwallis's subordinate officers, such as Major James Wemyss of the 63rd Foot, made it their primary mission to destroy

plantations across middle and up-country South Carolina. That September, Wemyss's men burned dozens of houses and plantations in his quest to terrorize the rebels into submission. When one rebel's wife refused to give away her husband's whereabouts, Wemyss's men locked her and her children inside their house and set it on fire. The family eventually escaped, but Wemyss's men incinerated their pigs and chickens. Stories circulated of another British officer who trusted his men would rather overcome scruples against murder than forfeit alcohol: every soldier who took prisoners would lose his rum ration for two months. Such conduct by the British Army, combined with Clinton forcing Americans to take sides, spurred rebel resistance in South Carolina.[27]

So did the conduct of Loyalist militia—and the war of American militias in the South was particularly fierce. Militias, whether Patriot or Loyalist, were more prone to committing excessive violence than regular armies. With a background in frontier conflict and Native American warfare, they specialized in nighttime and dawn attacks, hit-and-run raids, and feed fights. Operating with limited central oversight, their officers rotated frequently, and their composite nature eroded their sense of community, leading to less hierarchical control or peer restraint.[28]

After the British had captured Charleston in May 1780, Cornwallis appointed Captain Patrick Ferguson as British inspector of militia for Georgia and the Carolinas. A path quite different from Tarleton's had brought Ferguson to the American South. The son of a minor Scots aristocrat, Ferguson had joined the British Army at age fourteen and purchased a commission in the 70th Foot in 1768. While Tarleton was enjoying himself in Oxford and London, Ferguson helped suppress a major rebellion of the Carib population in Tobago, where his brother was the governor. After his right arm was permanently injured at Brandywine in 1777, the rebels began calling Ferguson the "one-armed devil." As the British officer newly in charge of Southern militias, Ferguson worked over the summer of 1780 to form some 4,000 Loyalists into seven battalions and led them in multiple controversial actions.[29]

On October 1, Ferguson issued a proclamation meant to rally locals in northern South Carolina to the British cause:

Unless you wish to be eat up by an inundation of barbarians, who have begun by murdering an unarmed son before the aged father, and afterwards lopped off his arms, and who by their shocking cruelties and irregularities, give the best proof of their cowardice and want of discipline; I say, if you wish to be pinioned, robbed, and murdered, and see your wives and daughters, in four days, abused by the dregs of mankind—in short, if you wish or deserve to live and bear the name of men, grasp your arms in a manner and run to camp. The Backwater men have crossed the mountains . . . If you choose to be degraded [one variant has "pissed upon"] forever and ever by a set of mongrels, say so at once and let your women turn their backs upon you, and look out for real men to protect them.

Patriots had indeed recently attacked some unarmed Loyalists, "butchering two young men" and maiming two elderly men. But Ferguson's militias had also left a sad trail across the western Carolinas—of burnt homes, slaughtered cattle, and traitors dangling from trees. The proclamation hardly swelled his Loyalist ranks.[30]

Ferguson and his force of some 1,100 men were now out of contact with the main British army under Cornwallis. On October 7, Ferguson made a stand on Kings Mountain, South Carolina, where his 900 Loyalists (200 men were away foraging) were about to face some 1,700 Patriot riflemen. Both forces had been marching for weeks. The Loyalists had been moving for two days without provisions. Many of the Patriots—hunters, farmers, and artisans from the valleys around the headwaters of the Nolichucky and Watauga Rivers—had endured up to thirty-six hours without sleep, with minimal food. Among the Virginia Patriot militia were at least four blacks, including the former slave Ishmael Titus, who had been freed for substituting for his master's son and had later reenlisted, as

well as one slave. Ferguson was to be the single British participant in the war's largest and most consequential all-American battle.

On Kings Mountain, Ferguson chose a nearly bald-topped plateau at the northeastern end as his fighting ground. This forced a European linear formation on the defendants while allowing the attackers to maximize the impact of their Indian-style fighting. The assailing forces divided into four main columns to encircle the mountain. To tell friend from foe, the Patriots wore pieces of paper in their hats and the Loyalists pine sprigs. The seventeen-year-old Patriot James P. Collins participated in the assault: "We were soon in motion, every man throwing four or five balls in his mouth to prevent thirst, also to be in readiness to reload quick. The shot of the enemy soon began to pass over us like hail." Collins and his fellow soldiers, fighting from tree to tree, "soon attempted to climb the hill, but were fiercely charged upon and forced to fall back to our first position." Eventually the Patriots forced their enemy into an ever-smaller killing zone in the northeast corner, where Ferguson's men were constrained by their own wagons, tents, and formations. When Loyalists initially attempted to surrender, Ferguson cut down their white flags. As he charged on a white stallion, several sharpshooters took him down, one large-caliber round hitting his face, others drilling through his limbs and puncturing his torso. For several more minutes, the frightened horse paraded Ferguson's body, caught in the stirrup.[51]

Abraham De Peyster, next in command, soon sent a flag of truce, "but as the [Patriots] resumed firing, afterwards ours renewed under the supposition that they would not give quarter. And a dreadful havoc took place." With Loyalists trying to surrender, Patriot officers eventually had to knock down the loaded rifles of their own men with their swords to stop the slaughter. In the melee, most soldiers had barely known their own unit's role, let alone grasped the overall battle situation. Yet an element of vindictive retaliation was also at play. For even after Loyalists surrendered themselves as prisoners, some Patriots, "who had heard that at Buford's defeat the British had refused quarter to many who had asked it," continued firing.[52]

The night after the battle presented a grim scene: "The groans of the wounded and dying on the mountain were truly affecting—begging piteously for a little water; but in the hurry, confusion, and exhaustion of the Whigs, these cries, when emenating from the Tories, were little heeded." One injured Loyalist beseeched his Patriot brother-in-law to help him but was coldly turned away. Attending to perhaps two hundred wounded men, a single doctor worked throughout the night, dressing gunshot wounds with rags and amputating limbs with a field surgeon's crude tools. The following day the Patriot James Collins witnessed local Loyalist wives and children finding their "husbands, fathers, and brothers, [dying] dead in heaps, while others lay wounded or dying." The Goforth family had three Loyalist and two Patriot sons; four of them fell on Kings Mountain. The Brandon family, likewise, had six members on the mountain; the Loyalist father would be killed, while four Patriots lived, as did Josiah Brandon, who fought on the Loyalist side that day but would switch to the Patriot militia soon after.[53]

The victors inspected Ferguson's bullet-riddled body for evidence of their marksmanship. They then stripped it for souvenirs and, according to local tradition, urinated on it. Later, though, the Patriots allowed the Loyalists to wrap up the corpse in a cowhide and bury it. Both sides hastily buried their other dead, covering them so thinly with logs, tree bark, and a few rocks that the bodies soon fell prey to scavenging animals. Roaming wolves attracted to the corpses made it too dangerous for locals to venture out at night. Half of the region's dogs had to be put down when they went "mad." People even refused to eat their fat hogs, as they had "gathered in to the place, to devour the flesh of men."[54]

The following day began the march north. With almost as many prisoners as guards, Patriot leaders became concerned about their captives' safety. Colonel William Campbell ordered all officers "to restrain the disorderly manner of slaughtering and disturbing the prisoners." But on October 14, Patriot leaders held what one Loyalist dismissed as a mock trial of men whom their rebel enemies accused of murder, arson, or robbery. Colonel Ambrose

Mills was charged with inciting the Cherokees to make war on the South Carolina frontier. Of some thirty-six Loyalists tried and up to thirty condemned to death, the Patriots hastily hanged nine on a tree before reprieving the others and moving on, lest British forces surprise them. Colonel Mills's wife had said farewell to her husband just before his execution; she and her young child were now seen sitting through the rainy night alongside the colonel's corpse. Together with an old farmhand, the widow of a Loyalist who had just been killed on the mountain cut down the last bodies and buried them in a shallow trench.[35]

British officers complained less about the battle itself than about the murders committed afterward. General Cornwallis remonstrated that "the cruelty exercised on the prisoners taken under Major Ferguson is shocking to humanity; and the hanging of poor old Colonel Mills, who was always a fair and open enemy to your cause, was an act of the most savage barbarity" that would not go unanswered. But by then Washington and his subordinate commanders routinely highlighted Britain's "Violations of the Laws of Nations" and humanitarian outrages across the Southern theater; Cornwallis's protest over the Kings Mountain murders apparently received no official American response.[36]

At Kings Mountain, the Loyalists had suffered their worst debacle of the entire war. Within 65 minutes, 157 Loyalists had been killed and 163 wounded too heavily to be moved; more than 600 men were taken prisoner. The Patriots counted only 29 killed and 62 wounded. The battle cost the British one-third of their effective force in that theater. Cornwallis had to reverse his advance into North Carolina, where he had hoped to mobilize the Loyalists, and instead took his army to spend the winter at Winnsboro, South Carolina. The British force under Major General Leslie that had been destroying rebel supplies in Virginia was ordered to join Cornwallis. Among Revolutionaries, meanwhile, morale rallied. Partisan leaders such as Francis Marion and Thomas Sumter stepped up their guerrilla fight, while Loyalists felt discouraged from further aiding the British. As one British officer saw it, the

brutal defeat "put an end to the disposition of arming for us, renewed the spirits and encreased the number of the rebels." And yet, despite this setback for Britain's Americanization strategy, the civil war in the South for now continued virtually unabated.[57]

*  *  *

Washington's new man in the South was General Nathanael Greene. In the fall of 1780, after losing two armies at Charleston and then at Camden, the Continental commander in chief had put Greene in charge of a third Southern army. The stocky, handsome Quaker from Rhode Island was a gifted strategist whom Washington had long valued as a potential successor, should something happen to him. Greene used the breathing space provided by the Patriot victory at Kings Mountain to reorganize his forces. He found "nothing but murders and devastations in every quarter" as Patriots and Loyalists "pursue[d] each other with as much relentless fury as beasts of prey." Both sides seemed bent on mutual annihilation, worried Greene, and unless "those private massacres" ended, "this Country will be depopulated . . . as neither Whig nor Tory can live." Writing to his wife, Catherine, from camp at Little River, a frustrated Greene exclaimed: "My dear you can have no idea of the horrors of the Southern war. Murders are as frequent here as petty disputes are to the Northward."[58]

As both Patriots and Loyalists recognized the war in the South as particularly violent, predictably, each side blamed the other. Among the most notorious rebels was Colonel Benjamin "Bull Dog" Cleveland, who terrorized Loyalists in the Yadkin country. When Ferguson's proclamation just before Kings Mountain mentioned the rebels "murdering an unarmed son before the aged father, and afterwards lopped off his arms," he was referring to an infamous incident involving the "Bull Dog." In another instance, Cleveland's men broke out two Loyalists from a prison, stood one of them "on a log, put the noose around his neck, threw the end of the rope over a tree limb, fastened it, and kicked the log out from

under him." Cleveland then gave the second Loyalist a choice: he, too, would be hanged, unless he cut off his own ears. The man grabbed a knife, sliced off his ears, and was let go.[59]

Loyalists gave as brutally as they got. One of the Loyalist partisans guilty of excessive violence was Thomas Brown, the South Carolina victim of Patriot torture who lost several toes to his tormentors in 1775. Brown later oversaw the hanging of one, two, or even three dozen rebel captives near Augusta, and the beheading of four more by Native Americans. William "Bloody Bill" Cunningham, another Southern Loyalist partisan leader, became infamous for murdering sick rebels he dragged from their beds. And one historian narrates the horrific moment when a Loyalist band, passing the house of a Patriot, "found his pregnant wife. They stabbed her with bayonets, cut open her breasts, and in her own blood wrote on the wall, 'thou shalt never give birth to a rebel.'"

Such sadistic American-on-American cruelty naturally affected the individuals perpetrating, witnessing, and suffering from it. Some men seemed to become accustomed to the "savage fury" of civil war. In his old age, Moses Hall reflected on how the experience of atrocity had hardened him. In February 1781, Hall, twenty-one years old, served with Henry Lee's Continental dragoons. A Loyalist group moving through North Carolina under Dr. John Pyle approached the dragoons, mistaking their green uniforms for Tarleton's Loyalists. When the truth was discovered, a brief but intense fight broke out at extremely close quarters between two long columns of opponents. Some ninety to one hundred Loyalists were killed; the remainder fled. Apparently no Patriots died. The event became known as Pyle's Massacre."

In his recollections, Hall zoomed in on the murders of the Loyalist prisoners in the aftermath of the fighting. Initially, Hall had reacted with shock and criticism to that "scene which made a lasting impression on my mind. I was invited by some of our comrades to go and see some of the prisoners. We went to where six were standing together." Suddenly someone shouted, "Remember Buford"—Tarleton's slaughter of Colonel Buford's troops at the Waxhaws—

and the prisoners were immediately hewed to pieces with broadswords. At first I bore the scene without any emotion, but upon a moment's reflection, I felt such horror as I never did before nor have since, and, returning to my quarters and throwing myself upon my blanket, I contemplated the cruelties of war until overcome and unmanned by a distressing gloom from which I was not relieved until commencing our march next morning before day by moonlight.

But then Hall made a gruesome discovery near a camp recently abandoned by Tarleton: "Being on the left of the road as we marched along, I discovered lying upon the ground something with appearance of a man. Upon approaching him, he proved to be a youth about sixteen who, having come out to view the British through curiosity, for fear he might give information to our troops, they had run him through with a bayonet and left him for dead. Though able to speak, he was mortally wounded." Experiencing the teen's senseless murder, rather than reinforcing Hall's earlier doubts about Americans killing each other, desensitized him to his own side's brutality. "The sight of this unoffending boy, butchered rather than be encumbered . . . on the march," Hall concluded, "relieved me of my distressful feelings for the slaughter of the Tories, and I desired nothing so much as the opportunity of participating in their destruction." For Hall—who first had felt "unmanned" by his exposure to atrocity—to deal with war's brutalities, he had to cast off sensibility (a notion that peculiarly defined manliness in this period) and recover a form of masculinity that saw him inure himself to violence and thrive on vengefulness.[42]

This hunger for retribution among American partisans eroded Greene's ability to pacify the Southern states. As Greene's Continentals and irregular rebel troops swept through the lower South, he largely avoided pitched battles with the British Army in favor of a strategy of attrition. Gradually, Greene was thus able to expel the British from most areas except for a strip between Charleston and Savannah. When the enemies did clash in larger battles, the Revolutionaries acquitted themselves well. In the Battle of Cowpens

in early 1781, a combined force of Continentals, state troops, and Patriot militias under Daniel Morgan dealt a heavy blow to British regulars and Loyalists commanded by Tarleton: casualties amounted to one-sixth of Cornwallis's army. The victorious Morgan proudly reported to General Greene that, despite Tarleton's "most cruel Warfare, not one man was killed[,] wounded or even insulted after he surrendered." Alas, after the British had ignored many previous "Lessons of Humanity," Morgan feared "they are incorrigible." British Pyrrhic victories like the one they clinched in the Battle of Guilford Courthouse in March 1781, where the Crown sustained vastly greater casualties than the defeated Revolutionaries, further depleted the British Southern army. Throughout this period, the rebels' war of attrition against British supply lines and posts was also continuing to take its toll. British officers were finding it increasingly difficult to persuade local couriers to transmit messages to Cornwallis, as the rebels were said to be murdering any Loyalists they captured. Indeed, "fear or intimidation" drove previously loyal subjects towards the insurgents.[43]

### Harry's Head

Even though their strategy of Americanizing the war appeared to be backfiring on the British, the Empire's prospects in America were not entirely bleak. There were signs that not only the American people but their French allies, too, were tiring of the war, while "widespread disaffection" coursed through the half-starved Continental Army "over wage arrears and poor conditions" after the exceptionally harsh winter of 1779–80, when New York City's waterways were frozen for five weeks, and the fleet at Philadelphia for nearly eleven. And although control of the South Carolina countryside was gradually slipping away from Cornwallis—he found Loyalist support to be "more passive" than he had anticipated—during the spring and summer of 1781 he launched a concerted attempt to cut off rebel supplies at the source, in Virginia. In the historian Andrew O'Shaughnessy's assessment, Cornwallis's broader aim was "to occupy Virginia suffi-

ciently to overturn the government and establish a loyalist militia to police the population."[44]

After the destruction at Norfolk at the start of the conflict, the largest and most populous state had avoided the war until Britain pivoted south. At that point, Virginia repeatedly became the target of British-Loyalist assaults. In mid-1779, coastal raiders destroyed huge amounts of tobacco, salted pork, and naval stores, as well as more than one hundred naval and merchant vessels, and seized 1,500 slaves and several thousand horses and head of cattle. In late 1780, General Greene saw his supply lines seriously disrupted when the traitorous former Patriot general Benedict Arnold led a 1,600-strong raiding force into Virginia. Loyalists, white and black, risked severe repercussions if the rebels caught up with them. After Shadrack Furman, a free black man, provided Arnold's troops with quarters and supplies, rebels burned Furman's house and crops and tortured him to extract intelligence; his Loyalism left Furman blinded and crippled, his back scarred.[45]

Throughout early 1781, British soldiers and Loyalist privateers were pursuing scorched-earth tactics along Virginia's rivers and coastline. They burned warehouses, magazines, shipyards, and naval and merchant vessels, as well as private property. As Johann von Ewald commented, "Terrible things happened . . . churches and holy places were plundered." Compounding injury and insult, all along the way British troops seized scores of slaves, while thousands more streamed towards the army of their own accord. George Washington and Thomas Jefferson numbered among the many planters whose slaves defected during this time. Nathaniel Littleton Savage tabulated damage and very substantial losses totaling £585 that he suffered at the hands of the British Army that burned tobacco and grain destroyed, and various goods plundered, including a library of "100 volumes of the best authors," Savage's single most expensive item was "one Valuable Y.g Negro Fellow __ by the Army."[46]

In May, Cornwallis moved his army across the Roanoke, joined

# Chicago-Kent Law Review

Volume 76
Issue 1 *Symposium on the Second Amendment: Fresh Looks*

Article 5

October 2000

# The Second Amendment: The Highest State of Originalism

Jack N. Rakove

Follow this and additional works at: https://scholarship.kentlaw.iit.edu/cklawreview

 Part of the Law Commons

## Recommended Citation

Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 Chi.-Kent L. Rev. 103 (2000).
Available at: https://scholarship.kentlaw.iit.edu/cklawreview/vol76/iss1/5

This Article is brought to you for free and open access by Scholarly Commons @ IIT Chicago-Kent College of Law. It has been accepted for inclusion in Chicago-Kent Law Review by an authorized editor of Scholarly Commons @ IIT Chicago-Kent College of Law. For more information, please contact jwenger@kentlaw.iit.edu, ebarney@kentlaw.iit.edu.

# THE SECOND AMENDMENT: THE HIGHEST STAGE OF ORIGINALISM

## JACK N. RAKOVE*

To someone who has observed the Second Amendment dispute from a distance—aware of the main lines of engagement, but not fully abreast of all the maneuvers—a sudden plunge into the struggle in the trenches can be a sobering experience, especially when one encounters the contingent who march under the banner of the self-proclaimed "standard model" which argues that the Amendment constitutionally protects a private, individual right to keep and bear arms.[1]   There is something about the *joie de combat* of the participants that unnerves the civilian observer.   Assertions lacking qualifications are propounded with utmost fervor and conviction, as if a commander was hectoring his troops to smash the enemy line, bypassing any obstacle encountered en route; victory is repeatedly declared in self-congratulatory pronouncements even while the other side is pausing to reload.   Searching for the evidentiary authority on which these assertions rest—that is, reading the footnotes—requires a bewildering chase through the relevant manuals and orderly books, the citations that student law review editors, the industrious sappers of the legal academy, insist must be provided, but which often turn out to be one secondary source supporting another with nary a document in sight.   An occasional warrior comes into view, with a strange glint in his eye and a dramatic tale to tell.[2]   Turning the corner in a trench, one encounters odd combatants who seem to have

---

* Coe Professor of History and American Studies, and Professor of Political Science, Stanford University.   I am grateful to Akhil Amar, Larry Kramer, and Robert Post for necessary qualifications and proper criticisms, and to Michael Bellesiles, a card-carrying member of the NRA, for general guidance.

1. Skeptical as I am of the view that this interpretation merits description as the standard model, I will henceforth refer to it as the individual right interpretation.

2. Thus one is somewhat surprised to find Akhil Amar, a well-known textualist, wondering whether, under a modern reading of the Second Amendment, "perhaps the people must be 'armed' with modems more than muskets, with access to the Internet more than to the shooting range," even though the use of these devices would seem to fall under the First Amendment's freedom of press, assembly, and petition. AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 49 (1998). In the strange glint category, I would also be inclined to place Elaine Scarry, *War and the Social Contract: Nuclear Policy, Distribution, and the Right to Bear Arms*, 139 U. PA. L. REV. 1257 (1991).

Compendium_Roth
Page 1916

enlisted on the wrong side; like politics sometimes, the Second Amendment makes strange bunkmates.[3]  And the dehumanization of the foe common in wartime carries over into scholarly expression, so that one combatant comes to be identified in rebuttal not by the name his loving parents gave him before sending him off to battle, but by the title of his essay: *Gun Crazy*.[4]

In this charged atmosphere, odd misstatements of fact that one encounters appear only as distracting ricochets.   Opening one standard statement of the individual right interpretation, one quickly learns that "[t]he American Revolution was sparked at Lexington and Concord, and in Virginia, by British attempts to disarm the individual and hence the militia."[5]  Most historians, however, have labored under the delusion that the Revolution arose from an unmanageable dispute over the right of Parliament to make laws "in all cases whatsoever" for the American colonies, and that the regulars who marched out the future Route 2 did not go door to door looking for weapons, but were instead intent on raiding a town where the Provincial Congress had concentrated whatever arms and munitions the colony was able to muster.  But perhaps Stephen Halbrook only wants to prepare us for a more startling discovery: that "[b]efore the proposal of the Constitution, the newly independent colonies had existed in a state of nature with each other,"[6] which certainly would have been news to the members of the Continental Congress, the framers and ratifiers of the Articles of Confederation and Perpetual Union, and most Americans who thought that the Declaration of Independence was the work of the United States in Congress

3.  *See* Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637 (1989). Those familiar with his other writings and teaching might indulge the suspicion that Levinson sees his essay less as an endorsement of the individual right interpretation on its merits, and more as a useful way to tweak the formal orthodoxies of contemporary law.  In the realm of strange bedmates, one might also cite Leonard Levy, whose chapter on the Second Amendment in his recent synoptic book, *Origins of the Bill of Rights* (1999), endorses the individual right interpretation while dismissing the conclusions it supports as "anachronistic" as they relate to the militia and "feckless" in their invocation of the right of revolution.  *Id.* at 149.  Levy provides no footnotes, however, and his barebones bibliography of eleven books (only one published since 1990, and two since 1980) gives little guidance as to how he reached his conclusions, or why he simply ignores the opposing position represented in this Symposium.

4.  *See* Randy E. Barnett & Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 EMORY L.J. 1139 *passim* (1996) (rebutting Andrew D. Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. REV. 57 (1995)).  One would not want to suggest, however, that Herz's essay is itself a model of scholarly decorum.

5.  STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT 7 (1984).

6.  *Id.* at 65.

assembled. The prolific Don Kates, Jr., reveals that James Monroe was actually a Federalist,[7] though historians previously thought that he had opposed the Constitution; that Thomas Jefferson "played little part in this debate from the remote vantage point of his position as ambassador to France,"[8] though the publication of his letter endorsing the addition of a bill of rights to the Constitution was a source of some concern, not to say anxiety, to his correspondent James Madison; and that New Hampshire, the ninth and decisive state to ratify the Constitution, was actually the first.[9] Sometimes historical figures simply acquire new names or titles. Thus in one recent important essay, Albert Gallatin becomes a senator before he even was elected to Congress; Senator William Grayson of Virginia loses the second syllable of his last name even though his family never passed through Ellis Island; and Tench Coxe, the loyalist eventually turned Jeffersonian, becomes Trench, giving his pronouncements on firearms new authority.[10] The individual right interpretation has also been a boon to the literary reputation of Richard Henry Lee, who is repeatedly restored to his wrongful place as the reputed author of the *Letters from the Federal Farmer*.[11]

While minor errors like these may have little bearing on the substantive arguments their authors go on to make, they do suggest that historical operations in the Second Amendment theater of combat are often mounted by campaigners not intimately familiar with the terrain. These are raiders who know what they are looking for, and having found it, they care little about collateral damage to the surrounding countryside that historians better know as context.[12]

---

7. *See* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 228 (1983).

8. *Id.* at 229.

9. *See id.* at 222.

10. *Compare* Barnett & Kates, *supra* note 4, at 1211 nn.337-38, 1212 & n.344, *with* Stephen P. Halbrook, *To Keep and Bear Their Private Arms: The Adoption of the Second Amendment, 1787–1791*, 10 N. KY. L. REV. 13, 36 & n.90 (1982).

11. *See* HALBROOK, *supra* note 5, at 70-72; David T. Hardy, *The Second Amendment and the Historiography of the Bill of Rights*, 4 J.L. & POL. 1, 26 n.101, 49-51 (1987); Kates, *supra* note 7, at 221-22; Levinson, *supra* note 3, at 647 n.49. On the identification of the Federal Farmer with Melancton Smith of New York, see JACK N. RAKOVE, ORIGINAL MEANINGS: POLITICS AND IDEAS IN THE MAKING OF THE CONSTITUTION 228-29 (1996); Robert H. Webking, *Melancton Smith and the* Letters from the Federal Farmer, 44 WM. & MARY Q. 510 (1987); Gordon S. Wood, *The Authorship of the* Letters from the Federal Farmer, 31 WM. & MARY Q. 299 (1974).

12. To offer one trivial example: Individual right writers occasionally cite a letter by Fisher Ames, the Massachusetts Federalist congressman, as evidence that "Madison's colleagues clearly understood the proposal [his amendments of June 8, 1789] to be protective of individual rights." HALBROOK, *supra* note 5, at 76 (citation omitted). Halbrook quotes Ames in this way:

Like so many ventures in constitutional interpretation, Second Amendment studies are vulnerable to the dishonoring charge of "law office history"—that is, history made batman to the service of a favored cause—although in this case the existence of a state of ideological warfare may provide a better explanation of the expedients to which the protagonists resort.[13]

What better distinguishes the Second Amendment controversy from other disputes, however, is the degree to which the individual right interpretation of its meaning rests upon an explicit, robust commitment to the theory of originalism. Two statements culled from the preface to a leading work on the subject make the point clearly. "Yet if the Bill of Rights has any meaning at all, it must be based on the linguistic usage of those who wrote it," Stephen Halbrook notes.[14] And again, in predicting some ultimate definitive review of existing precedent by the Supreme Court: "The highest court is bound not by judicial precedent but by the intent of the framers of the Constitution"—who embrace not only the authors of the Second Amendment but the Fourteenth as well.[15] To be sure, full deployment of the individual right interpretation relies on another doctrine that some originalists are loath to endorse, for converting the Second Amendment into an effective shield against firearms regulations that would emanate primarily from state and local governments requires invoking the incorporation doctrine of the

---

"'Mr. Madison has introduced his long expected amendments . . . . It contains a bill of rights . . . the right of the people to bear arms.'" *Id.* The letter, in fact, says nothing about whether or not the arms-bearing provision is to be understood as an individual right or a collective one. But what Halbrook omits is more revealing. The second ellipsis in the quotation is preceded by this comment:

> This is the substance. There is too much of it. Oh! I had forgot, the right of the people to bear arms. Risum teneatis amici? [Hold your laughter, friends.] Upon the whole, it may do some good towards quieting men, who attend to sounds only, and may get the mover [Madison] some popularity, which he wishes.

Letter from Fisher Ames to Thomas Dwight (June 11, 1789), *in* 1 WORKS OF FISHER AMES— AS PUBLISHED BY SETH AMES 641, 642 (W.B. Allen ed., 1983). Allen errs in placing a question mark after "amici." The manuscript of this letter can be found in the Fisher Ames Papers at the Dedham Historical Society, Massachusetts; with the assistance of Charlene Bangs Bickford, Ken Bowling, and Chuck diGiacomantonio, I recently consulted a copy of this letter at the offices of the Documentary History of the First Federal Congress project at George Washington University. The real significance of this letter is that it confirms the deprecatory attitude that many, perhaps most, congressmen took toward Madison's project of securing amendments. I am grateful to my colleagues Brad Gregory and Philippe Buc for refining my crude sight translation from the Latin—but I hasten to add that was their only involvement in this Article.

13. Many of these claims are deftly skewered in GARRY WILLS, A NECESSARY EVIL: A HISTORY OF AMERICAN DISTRUST OF GOVERNMENT 112-22, 252-60 (1999).

14. HALBROOK, *supra* note 5, at x.

15. *Id.* at xi-xii.

Compendium_Roth
Page 1919

Fourteenth Amendment.[16]   It would nevertheless be difficult to identify any other constitutional controversy in which originalist modes of analysis figure quite so prominently.

With apologies (not that any are called for) to Lenin, the Second Amendment thus represents the highest stage of originalism, because the advocates for its most expansive interpretation place their greatest reliance on arguments about its meaning to the framers and adopters of the Constitution and its earliest amendments.   They do this, too, in order to counter the seemingly commonsense notion that would hold that this is the one clause of the Constitution for which conclusions drawn from consequentialist arguments should weigh most strongly.   For at bottom, the case for the regulation of the sale, use, and possession of firearms rests on the simple conviction that the high number of casualties incurred annually by the deliberate and accidental use of firearms provides a sufficient, not to say compelling, justification for state action.   It is doubtless important to establish as well that this regulation is made legitimate by a long history of prior legislation, judicial doctrines permitting such legislation, and a reading of the Constitution that says that the Second Amendment really was about supporting a militia that remained subject to the legislative regulation of Congress and the states, while the states were never divested of the fundamental responsibility for regulating "internal police" in the interest of public health and welfare.[17]   But it is reasonable to conclude that the most compelling arguments for regulation stem from the perception that this is one realm of human behavior where the concerns of the present have every right to supersede the obsolescent understandings of generations long past.

Yet originalism remains a legitimate mode of constitutional analysis, and even those who doubt its capacity and authority need to respect its claims.   By the same token, however, avowed originalists can be held accountable for the suppositions on which they profess to act, the quality of the originalist analyses they offer, and the criticisms

---

16.   In this Article, I do not address the distinct claims about the relation between the Fourteenth Amendment and the right to bear arms that might be made under the aegis either of the original meaning of the former, especially as it related to the plight of the African American freemen of the Reconstruction South, or the various theories of incorporation that lie at the heart of so much modern constitutional jurisprudence.

17.   This is not to deny that there are serious consequentialist arguments to be made on the other side, typically emphasizing the deterrent value of firearms.   But to reason whether the availability of firearms does more to promote violent crime and accidental mayhem, on the one hand, or to deter crime in the expectation that evildoers will always find ways to obtain weapons, on the other, is to reason on decidedly nonoriginalist grounds.

to which this theory of interpretation is vulnerable. It is far from a self-evident truth that originalism is the sole authoritative mode of constitutional interpretation,[18] nor do many who dabble in originalist analyses always reflect on the logic of what they are doing. It is one thing to ransack the sources for a set of useful quotations, another to weigh their interpretative authority. Originalism is first and foremost a theory of law and constitutional interpretation, but its viability depends upon its approach to history and its use of historical evidence.

As a venture in originalism, the individual right interpretation depends upon two essential propositions, one concerned with the definition of militia, the other with its function. Where a plain-text reading of the Second Amendment in the light of the militia clause of Article I, Section 8 might suggest that the institutional character of the militia is subject to legislative definition by Congress, the individual right interpretation insists that the militia must be identified with the whole body of the people. In this view, the concept of the militia had a fixed and consensually accepted meaning in ordinary usage, so that it was essentially coterminous with the free adult male population physically capable of bearing arms; and if the language of the Constitution is not to be rendered completely plastic, modern interpretation has to preserve that meaning. Such a militia cannot be equated with our modern conception of the National Guard, which is only a latter-day incarnation of the so-called "select militia" that eighteenth-century republicans regarded as a surrogate of the dreaded standing army—an institution too closely tied to government to be counted upon as a defender of the people's liberties. This definition in turn illuminates the key *functional* argument on which the individual right interpretation also depends. This argument insists that the ultimate purpose of a general militia is to serve as a deterrent against the danger of tyranny, and that only a well-armed people, possessing privately held weapons, can serve as a countervailing latent force, discouraging would-be oppressors from executing their nefarious schemes. This interpretation cannot afford to limit the functions of the militia to those described in Article I,

---

18. For further reflections on the merits and claims of originalism as a theory of constitutional interpretation, with particular reference to the Second Amendment debate, see the essays by Daniel Farber and Michael Dorf in this Symposium. Daniel A. Farber, *Disarmed by Time: The Second Amendment and the Failure of Originalism*, 76 CHI.-KENT L. REV. 167 (2000); Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 CHI.-KENT L. REV. 291 (2000).

Section 8, which clearly treat the militia as a public institution whose duties extend to the suppression of armed resistance against government; it must instead insist upon its pre-, extra-, and even anticonstitutional functions of resistance against tyranny to the point of revolution.

These complementary arguments are originalist for two reasons. First, the definition of the militia, on the crucial issue of membership, cannot be left to legislative determination, as the Militia Clause and the Necessary and Proper Clause might otherwise suggest.[19] It instead depends on the common usage of the time, and this steers us past the four corners of the constitutional text into the political discourse of the eighteenth century. Second, the rationale for maintaining a broad definition of militia further depends upon the political understandings of that era, in particular the belief and expectation that an armed citizenry is a necessary deterrent against tyranny. A plain-text reading of the Constitution, which treats the militia as an institution for suppressing armed insurrection, and which nowhere endorses a right to revolution against republican government, would not by itself be conducive to that interpretation.

In assessing the merits of these originalist claims, it will also be useful to keep in mind three difficulties that color any attempt to provide an historically grounded account of the original meaning of the Second Amendment. First, notwithstanding all the evidence that individual right proponents profess to have adduced in support of their views, there are, in fact, only a handful of sources from the period of constitutional formation that bear directly on the questions that lie at the heart of our current controversies about the regulation of privately owned firearms. If Americans had indeed been concerned with the impact of the Constitution on this right, and addressed the subject directly, the proponents of the individual right theory would not have to recycle the same handful of references to the dissenters in the Pennsylvania Ratification Convention and the protests of several Massachusetts towns against their state's proposed constitution, or to rip promising snippets of quotations from the texts and speeches in which they are embedded. Because the private

---

19. The Militia Clause grants Congress the power "[t]o provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. CONST. art. I, § 8, cl. 15. The Necessary and Proper Clause empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [mentioned in Article I, Section 8], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. CONST. art. I, § 8, cl. 18.

ownership and use of weapons were not at issue in the late 1780s, we are compelled to draw inferences from observations that turn out, in most cases, to be concerned with the militia and its public functions, not with the individual ownership and use of firearms.[20]

Second, because eighteenth-century firearms were not nearly as threatening or lethal as those available today, we similarly cannot expect the discussants of the late 1780s to have cast their comments about keeping and bearing arms in the same terms that we would. Theirs was a rhetoric of public liberty, not public health; of the danger from standing armies, not that of casual strangers, embittered family members, violent youth gangs, freeway snipers, and careless weapons keepers. Guns were so difficult to fire in the eighteenth century that the very idea of being accidentally killed by one was itself hard to conceive. Indeed, anyone wanting either to murder his family or protect his home in the eighteenth century would have been better advised (and much more likely) to grab an axe or knife than to load, prime, and discharge a firearm. And even had guns been more effective as personal weapons, it is nearly inconceivable that eighteenth-century notions of the police power of state and local governments would have precluded their regulation in the name of some vague threat of tyranny. The American colonies and states were not a libertarian utopia; their traditions of governance permitted legislatures and institutions of local government to act vigorously in the pursuit of public health and safety.

Third, our reading of the Second Amendment is conditioned by the results of an era (or several eras) of modern rights-oriented jurisprudence which naturally assumes that bills of rights exist to create legally enforceable immunities against the coercive power of the state. Whether this efflorescence of rights talk and the litigation that accompanies it have been healthy developments for the American polity is a subject of ongoing debate;[21] but the consequences for our conception of constitutional rights is clear. In the eighteenth century, however, bills of rights were often regarded as statements of principle, meant to inform and shape the political behavior of both officials and citizens; but whether they established

---

20. Anyone consulting the index to the respective volumes of *The Documentary History of the Ratification of the Constitution* will discover that there are only scattered entries under the heading "Arms, Right to Bear," in contrast to the far more numerous entries under headings like "Army, Standing" and "Militia."

21. On this point, see especially MARY ANN GLENDON, RIGHTS TALK: THE IMPOVERISHMENT OF POLITICAL DISCOURSE (1991).

legally enforceable claims was far from certain.[22]  Many clauses in the first eight amendments to the Constitution certainly aspired to have and eventually acquired that character, but the Second Amendment is arguably the one provision which partook most of the principle-enunciating attributes of the early state declarations of rights.  Our quest to discover a perfect syntax and vocabulary for its twenty-seven words thus risks ascribing to a general statement of principle a measure of legal exactitude it was never conceived to carry.

Finally, it might be worth stating, in as precise a form as possible, the rival propositions upon which an evaluation of the originalist approach to the Second Amendment should, in my view, depend.  In its most succinct form, the individual right interpretation equates the people whose right to arms the Amendment protects with the entire body of the citizenry, who are members of a general militia that exists, to some significant extent, independently of legislative provision.  The purpose and function of that right rest, in part, on the individual's natural right of self-protection, but they depend more fundamentally on the value of preserving an armed citizenry as a deterrent to oppression, in the (latent) exercise of a natural right of resistance that would be abrogated if citizens lacked access to the arms required to challenge tyranny emanating from either national or state governments.[23]  These concerns were so deeply embedded in eighteenth-century American political culture as to trump the two countervailing propositions upon which the collective right interpretation in turn rests.  First, the extant records of deliberation (as well as the plain text) of the Constitution strongly suggest that the only issue its adopters were consciously considering was the militia,

---

22.  For further discussion, see AMAR, *supra* note 2, at 131-32; DONALD S. LUTZ, POPULAR CONSENT AND POPULAR CONTROL: WHIG POLITICAL THEORY IN THE EARLY STATE CONSTITUTIONS 59-71 (1980); GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC 1776–1787, at 271-73 (1969).  See also JACK N. RAKOVE, DECLARING RIGHTS: A BRIEF HISTORY WITH DOCUMENTS (1998), in which I attempt to trace the ambiguities in American thinking about the exact juridical authority and reach of declarations of rights.

23.  It would be interesting to test this proposition against the historical record of how revolutions actually succeed, in the process differentiating revolutions in which the authority of an entrenched regime actually collapsed from civil wars in which two well-armed camps contended for victory against each other.  Arguably the Russian Revolution of the spring of 1917 (but not the ensuing conflict following the October coup of the Bolsheviks) would illustrate the former case, the Chinese revolution of the 1940s the latter.  Iran in 1979, though not an example Americans would feel partial to endorsing, makes an interesting case.  The success of that revolution clearly did not depend on the mass of the population having countervailing armed forces to apply against and overturn the authority of the shah; rather, it succeeded because the mass of the population had come to reject his right to rule, and the bloody efforts of his armed forces to preserve the regime led only to the collapse of their own willingness and capacity to support the regime.

Compendium_Roth
Page 1924

which would henceforth exist as an institution defined by law. No coherent intention or understanding of the existence and scope of a private, individual right to keep and bear arms could accordingly be derived, because that question did not present itself for public debate in the form in which we now know it. Second, and arguably more important, the attachment that some currents of eighteenth-century political thinking did place on the deterrent value of an armed citizenry should be counterposed to the orthodox understanding of the extent of the police powers of the state (or in the American case, the states), which authorized government to legislate broadly in pursuit of the public health and welfare.[24] This belief was no less a matter of constitutional orthodoxy in the late eighteenth century than the general principle that standing armies posed a danger to liberty that might best be avoided by maintaining a well-regulated citizen militia, and it therefore casts the originalist dimensions of the Second Amendment debate in the most critical light. To ask whether contemporaries would have allowed the individual right interpretation of the Second Amendment to trump this orthodox conception of the regulatory police power of the states identifies, I believe, the true conundrum or desideratum. In effect, the individual right interpretation elevates the speculative danger of tyranny, rooted in potent historic memories of the turmoil of seventeenth-century England, above the observed costs and casualties that the modern cry for firearms regulation seeks to address. Conversely, the collective right interpretation inverts these concerns. It presumes that the manifest dangers of the present outweigh the memories of the past, and indeed that the living generation has a right to seek security against the wanton abuse of firearms, consistent with the principles that have long enabled states and localities to legislate on behalf of public health and welfare.

For the record, then, I believe that the current controversy over the meaning of the Second Amendment, if treated primarily as a problem of originalism, should be cast in these terms: Would the

---

24. In stating this point, I refer especially to WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996), a work which is admittedly concerned with the post-Revolutionary era. Yet Novak's account is also fully consistent with the description of eighteenth-century political economy provided in such classic works as OSCAR HANDLIN & MARY FLUG HANDLIN, COMMONWEALTH: A STUDY OF THE ROLE OF GOVERNMENT IN THE AMERICAN ECONOMY: MASSACHUSETTS, 1774–1861 (1947). There is no reason to think that the Revolutionary era—whatever other changes it introduced in constitutional theory—engendered a shift in underlying understandings of the inherent police power of the states.

Case 3:17-cv-01017-BEN-JLB   Document 128-6   Filed 11/11/22   PageID.16572   Page 91 of
402

presumed preexisting equation of the militia with an armed mass of the citizenry, justified by the need to preserve a natural right of revolution, outweigh (1) the evidence that the principal concern of the late 1780s lay with allocating legislative power over the militia between national and state governments, and (2) the traditional understanding of the police power that the Tenth Amendment (truism that it may be) would have reserved to the states.

### ORIGINALISM: SOME METHODOLOGICAL REFLECTIONS

All exercises in constitutional interpretation begin with a text, but originalism cannot be reduced to mere textualism. A merely textualist approach can stipulate that the word *people* has the same meaning in the Second Amendment as it has in the Fourth Amendment or the Petition and Assembly Clause of the First Amendment or the unenumerated rights and reserved powers of the Ninth and Tenth Amendments.[25] This assumption, though not unreasonable, is itself an arbitrary one, for reasons that James Madison well explained in *The Federalist No. 37* when he observed that "no language is so copious as to supply words and phrases for every complex idea, or so correct as not to include many equivocally denoting different ideas."[26] But, in any case, if the meaning of a disputed term could be determined simply by analyzing its usage within the four corners of the constitutional text, originalism in any substantive sense would be superfluous. Originalism begins where textualism alone fails. It assumes that the meaning of a provision cannot be ascertained by staring at it long enough or juxtaposing it with other relevant clauses, but must instead be derived from usage or elaborated in terms of some contemporary context of thought and debate, thus requiring the intrepid interpreter to initiate an inquiry into sources extrinsic to the text.

If we were dealing with the text of the original, unamended Constitution, we could bring four main sets of sources to bear on our interpretative quest. Two of these consist of the records of debate from the constitutional deliberations of the late 1780s: the journal and notes of debates from the Constitutional Convention of 1787, which

---

25. This is in fact a mantra encountered in most writings favoring the individual right interpretation. *See* HALBROOK, *supra* note 5, at 83; JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 162 (1994); Levinson, *supra* note 3, at 645.

26. THE FEDERALIST NO. 37 (James Madison), *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 346 (J. Kaminski & G. Saladino eds., 1984).

Compendium_Roth
Page 1926

*CHICAGO-KENT LAW REVIEW* [Vol. 76:103]

offer the best evidence of the "original intentions" of the authorial framers; and the records of the ratification campaign that ensued, which illuminate the "original understanding(s)" of the public and the delegates in the state conventions. The two other sets of sources, necessarily defined more broadly, might be labeled contextual. One consists of the variety of inherited intellectual traditions, discourses, and languages that collectively constituted the underlying political grammar and conceptual vocabulary of debate. The second, rather more elusive category comprises what might be called the lessons of recent experience: issues and concerns, perceptions and preferences shaped in the crucible of revolution.[27]

This classification of the different categories of evidence relevant to originalist forays leads to two further observations. First, all originalist inquiries are necessarily historical in nature, and therefore should be conducted with some attention to the problems that historians encounter in weighing the uses and limits of different forms of evidence. Better to be conscious about the nature of the evidence, and its particular properties, than to lump all of its morsels into one hotch-potch of tasty quotations. Second, and rather more problematic, the task of distinguishing different forms of evidence exposes critical differences in the ways in which historians and legal analysts might evaluate the probative value of the sources. Historians attempting to divine the original meaning of the Constitution would prefer the intentions of the framers to the understandings of the ratifiers, because while the latter were merely giving or withholding their assent to the completed document, the former were making the actual decisions that gave it form and content. But the normative principles on which the robust form of originalism rests place greater weight on ratifier understanding and treat the framers' expressed intentions as probative only insofar as they illuminate what the ratifiers were also thinking.[28]

Several additional qualifications deserve consideration when we turn our attention from the main text of the Constitution to the original meaning of its amendments. First, the conditions under which the First Congress assembled in the early spring of 1789 differed significantly from those governing the gathering of the

---

27. For further discussion, see RAKOVE, *supra* note 11, at 11-22, 27.

28. For further discussion of this distinction between framer-intent and ratifier-understanding, see *id*. at 7-11; Charles A. Lofgren, *The Original Understanding of Original Intent?*, *in* INTERPRETING THE CONSTITUTION: THE DEBATE OVER ORIGINAL INTENT 117 (Jack N. Rakove ed., 1990).

Compendium_Roth
Page 1927

Case 3:17-cv-01017-BEN-JLB  Document 128-6  Filed 11/11/22  PageID.16574  Page 93 of 402

Constitutional Convention two years earlier. When the framers of the Constitution straggled into Philadelphia in May 1787, public discussion of their potential agenda of action remained diffuse and unfocused—which in turn explains why James Madison's efforts to shape that agenda loom so large in understanding why the Convention took the course it did. Madison admittedly played something of the same role in forcing the First Congress to pursue "the nauseous project" of amendments, but the proposals he placed before the House of Representatives in his revealing speech of June 8, 1789 had been culled from the extensive corpus of amendments recommended by the state ratification conventions in response to the wide-ranging public discussion of the Constitution that began with its publication on September 19, 1787.[29]

Second (and conversely), the amendments that Congress finally proposed to the states in August 1789 received nothing like the sustained public discussion that greeted the original Constitution. Scholars who have gone hunting for evidence of the *reception* of the Bill of Rights typically come back disappointed. There are scattered traces of popular responses to the substance of the amendments—including a few items relating to the Second Amendment[30]—but in comparison to the mass of materials from the prior discussions, the pickings are slim.[31]

Third, it is important to note that the drafting of the amendments was controlled by Federalists who remained skeptical, like Madison himself, of the value or necessity of a national bill of rights. The concessions extracted from Federalists in closely contested states to join in *recommending* amendments to the consideration of Congress amounted to something less than a firm agreement. By the time

29. Madison's preparations for 1787 and 1789 are described in RAKOVE, *supra* note 11, at 42-56, 330-36. His seemingly disparaging comment about the project of amendments was made in a Letter to Richard Peters (Aug. 19, 1789), *in* 12 THE PAPERS OF JAMES MADISON 346-47 (Charles F. Hobson et al. eds., 1979). For his speech introducing the amendments, see James Madison, Speech Before the House of Representatives (June 8, 1789), *in* 12 THE PAPERS OF JAMES MADISON, *supra*, at 196-209. Madison culled the proposals from a pamphlet published in the fall of 1788, titled *The Ratifications of the New Foederal Constitution, Together with the Amendments, Proposed by the Several States* (1788). *See* 11 THE PAPERS OF JAMES MADISON, *supra*, at 300 n.2.

30. Particularly a single sentence from an early essay by Tench Coxe, discussed further *infra* note 46. Halbrook tells us that this essay was "widely reprinted," but his corroboratory note lists only two such printings. It is also a non sequitur to conclude that the absence of any evidence that any writer "disputed or contradicted Coxe's analysis" means that it would have been generally accepted; silence can mean indifference as easily as approbation. HALBROOK, *supra* note 5, at 77, 224 n.152.

31. *See* ROBERT A. GOLDWIN, FROM PARCHMENT TO POWER: HOW JAMES MADISON USED THE BILL OF RIGHTS TO SAVE THE CONSTITUTION 167-73 (1997).

Congress assembled in the early spring of 1789, Federalists had emerged decisive victors in the first national elections, and the difficulty Madison encountered in convincing his colleagues to take up the issue suggests that few of them thought that prompt action on amendments was required to fulfill the ostensible bargain struck the year before. Madison, of course, felt otherwise. He had publicly committed himself to support amendments in the course of his difficult campaign against James Monroe for election to the House, and—Madison being Madison—he was the most likely member to undertake the initiative of actually drafting amendments. Equally important, Madison understood that prompt consideration of suitable amendments would be a fitting capstone to the entire ratification process, insofar as it would conciliate those moderate Antifederalists who sincerely if misguidedly believed that a constitution lacking a bill of rights was defective. But his motives in proposing his amendments, as his speech of June 8, 1789 makes clear, were far more political than jurisprudential, and the lack of enthusiasm that Congress showed for his "nauseous project" suggests that many of his colleagues remained skeptical about the value of the exercise.[32]  Conversely, to those Antifederalists who had managed to get elected to Congress, the cause of amendments had lost much of its luster.   While still supportive of the general idea of rights-protecting amendments, they now knew that all the other substantive changes they desired lay well beyond the realm of political acceptance.

Understanding this aspect of the politics behind the Bill of Rights is critical to an originalist inquiry because it indicates that the final decisions about the scope and content of Madison's proposals were left not to those who were most ardent for the cause of amendments but to those who doubted that such amendments were even useful, much less necessary. Or to put the point more directly: Federalists did not cave in to their opponents' demands, or modify the Constitution to meet their substantive criticisms; nor, conversely, were Antifederalists in any position to impose their understandings on the party that emerged dominant from the first national elections. The claim that the best or most representative reading of the language of the amendments would conform to the understanding and concerns of the Constitution's original opponents is therefore highly problematic.   Comments from across the entire political

---

32. For general discussion, see RAKOVE, *supra* note 11, at 330-36; Paul Finkelman, *James Madison and the Bill of Rights: A Reluctant Paternity*, 1990 SUP. CT. REV. 301.

Compendium_Roth
Page 1929

Case 3:17-cv-01017-BEN-JLB   Document 128-6   Filed 11/11/22   PageID.16576   Page 95 of 402

spectrum remain relevant to capturing the range of meanings that Americans ascribed to the protections incorporated in the first ten amendments, but to claim that an ordinal Antifederalist under-standing would be dispositive is simply wrong.[33]

Finally, the decision to frame the amendments as supplemental articles, rather than follow Madison's proposal to insert them directly into the original constitutional text, arguably had the effect of preserving a modicum of the juridical ambiguity that had previously made it difficult to ascertain the exact constitutional status of declarations of rights.   Did such documents establish legally enforceable claims, or were they better construed as statements of principle, meant to guide officials in the exercise of their duties and to enable the people at large to monitor and judge the conduct of their rulers, by laying down standards whose violation would expose a deeper threat to liberty?  A bill of rights, in this view, was more a political than a legal text.  It was precisely because declarations of rights, of the kind that accompanied many of the early state constitutions, could so be read that Madison originally proposed to "interweave" his amendments with the text of the Constitution. Adopted in that way, they would act as explicit restrictions affecting particular institutions of government; their legal authority would become more precise and explicit, thereby enhancing the security afforded to rights.   Conversely, framing the amendments as supplemental articles, Madison warned, would make it "difficult to ascertain to what parts of the instrument [the Constitution] the amendments particularly refer."[34]  But that, of course, was exactly what Congress ultimately preferred to do.  In taking that course, however, the majority arguably still shared the dominant conception of 1776 which viewed a bill of rights as a statement of principles affirming the existence of particular rights but not clearly delegating responsibility for their enforcement or protection to any institution.

One final consideration arguably differentiates originalist interpretations of the Bill of Rights from those relating to the main text of the Constitution.  The latter is essentially a closely integrated bundle of provisions organizing institutions of government, defining their respective powers, and establishing rules for the appointment

33.  One can only wonder whom David Williams means to identify when he speaks of "the Anti-Federalist framers of the Second Amendment."  David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 YALE L.J. 551, 584 (1991).

34.  James Madison, Proposal for Constitutional Amendments (Aug. 13, 1789), *in* 12 THE PAPERS OF JAMES MADISON, *supra* note 29, at 333.

and tenure of their members. Though concepts derived from English constitutional history exerted important lingering influences over these matters, it was the experience of American republican constitutionalism since 1776, coupled with the inherently federal structure of the Union and the divided sovereignty to which it led, that defined the parameters of deliberation and decision making at Philadelphia.[35] On matters of practical constitutional design, Hobbes and Locke, potent political thinkers that they were, had little to teach Americans, and American constitutionalism was formed, in any case, in reaction against many facets of the eighteenth-century British constitution. But in the realm of rights, where the legacy of the common-law mind operated so powerfully, a stronger case can be made for some continuities in understanding between prior Anglo-American thinking and the formulations of the 1770s and 1780s. Particular rights had an independent history of their own, and Leonard Levy and other scholars have indeed demonstrated the possibility of tracing changing notions of the substance and content of particular rights in a way that pays close attention to existing (and evolving) legal doctrine. The right to bear arms is clearly susceptible to the same kind of examination. But we can never forget that it is a *history*—that is, a process of change over time—that we are tracing, and that the ways in which Americans conceived of and formulated rights were a product not just of what they had inherited but of what they had experienced. American "rights talk," as Richard Primus has recently argued, is a contingent "social practice" that always reflects immediate political commitments and struggles.[36]

All of these strictures about the practice of originalism may seem excessively fussy—to demand more precision and nuance than the subject really requires. Perhaps the original meaning of the Constitution, like pornography, is something we can just recognize as a matter of common sense. Of course James Madison and his colleagues never imagined that the Constitution could mean X [insert your least favorite interpretation of a particular provision or some other controversial doctrine]. But if originalism is to be taken seriously—and not simply invoked as a rhetorical club in the cause of legal or political argument—the analytical problems it poses require

---

35. Here I obviously rely on WOOD, *supra* note 22.

36. RICHARD PRIMUS, THE AMERICAN LANGUAGE OF RIGHTS 28 (1999). For an appraisal of this book, see Jack N. Rakove & Elizabeth Beaumont, *Rights Talk in the Past Tense*, 52 STAN. L. REV. 1865 (2000) (book review).

Compendium_Roth
Page 1931

reflection; and the dispute over the meaning of the Second
Amendment cannot be immune to that scrutiny.

## TEXT

All constitutional inquiry begins with the authoritative text,
which may be visually imagined as a scriptural statement surrounded
by columns of commentaries that consist of evidence to be derived
from the deliberations that produced the actual language, popular
discussions during the ratification campaign, intellectual traditions,
and what I have called lessons of experience. As everyone knows, the
essential textualist controversy over the Second Amendment revolves
around the relation, if any, between the formula ("A well regulated
Militia being necessary to the security of a free State") and the
operative statement that "the right of the people to keep and bear
arms, shall not be infringed." Staring at the sentence or reading it
aloud will not decide whether the preamble is superfluous or deeply
informative of the end the right is meant to attain. Instead, a textual
analysis can take at least these forms: correlating the meaning of
"people" with other uses in the Constitution; doing the same for
"Militia"; and asking what light the evolution of the specific textual
formula finally adopted might shed on the intentions of its framers.[37]
Defenders of the individual right interpretation emphasize (as already
noted) the harmony between the "people" of the Second
Amendment and the putatively identical entity of the First, Fourth,
Ninth, and Tenth Amendments.[38] As we shall see, however, they are

---

37. This third mode of analysis arguably blurs the difference between mere textualism and
originalism, for it requires a turn to legislative history (or its equivalent) in order to ascertain
how the intentions of the document's framers were reflected in their final editorial decisions
about the text. Given the absence of recorded congressional debate about the key changes in
the text of the Second Amendment, however, it seems useful to treat these editorial revisions as
a mode of primarily textual analysis, the more so when we have to infer intention from changes
between drafts.

38. One does not have to read very far in the Constitution to learn that the House of
Representatives will be "chosen . . . by the People of the several States," but that this people
actually consists of a rather smaller set of "Electors," U.S. CONST. art. I, § 2, cl. 2, and that the
definition of this subset of the whole people will be left to the state legislatures. Or again,
Sanford Levinson suggests (in support of the usual linkage among all the uses of "people" in the
Bill of Rights) that "it would approach the frivolous to read the assembly and petition clause as
referring only to the right of state legislatures to meet and pass a remonstrance directed to
Congress or the President against some governmental act." So it would. Levinson, *supra* note
3, at 645. But it is not frivolous to suggest that the single word *people* has different valences in
different provisions of the Bill of Rights. The concept of a collective people embracing the
entire corpus of private individuals seems strongest or most explicit in the Fourth Amendment's
opening reference to "The right of the people to be secure in their persons." U.S. CONST.
amend. IV. But the Petition and Assembly Clause of the First Amendment can be read as a

rather more reluctant to link the "militia" of the preamble to the institution provided for in Article I of the Constitution; here they prefer a preexisting definition not dependent on the specific provision made for its future organization.

What can we infer about the meaning of the Second Amendment, as finally approved, by tracing its textual evolution? The changes made as the Amendment worked its way through Congress support two main inferences. One concerns the omission of a significant qualifier evoking a particular definition of the militia; the other reveals a potentially important alteration in syntax.

As first introduced by Madison on June 8, the clause read: "The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person."[39]   Here Madison

---

statement of a right held primarily not by individual rights-bearers, but rather by a community or a minority that has coalesced for purposes of political action. Interestingly, the legislative history of the petition half of the clause seems to imply a movement from an individual right to a collective one. The corresponding articles recommended by four of the state ratification conventions distinguish a *collective* right of the people to assemble for political purposes, on the one hand, and a *personal* right to petition for the redress of grievances. In the words of the New York resolution, "That the People have a right peaceably to assemble together to consult for their common good, or to instruct their Representatives; and that every person [freeman in the other versions] has a right to Petition or apply to the Legislature for redress of Grievances." THE COMPLETE BILL OF RIGHTS: THE DRAFTS, DEBATES, SOURCES, AND ORIGINS 140 (Neil H. Cogan ed., 1997) [hereinafter COMPLETE BILL OF RIGHTS]. The language of the Assembly and Petition Clause, however, collapses this distinction, and by its use of the conjunction "and" to link the two members, rather than the "or" which separates the other rights of the First Amendment, it seemingly converts an individual right of petition into a collective right of (peaceful) protest. Recorded debate on the clause in the House of Representatives was primarily concerned with the omission of any reference to the people's right to issue instructions to their representatives. *See id.* at 143-64.

One can play all kinds of language games, especially if we engage in the further maneuver of noting that the framers could always have stated their meaning more explicitly. If they were really intent on protecting an individual right of gun ownership, one could argue, they could have written the Second Amendment to read, "no person shall be deprived of his right to keep and bear arms for his own and the common defense." Choosing the plural "people" is thus inherently more conducive to a collective than an individual right interpretation. Bringing the Tenth Amendment into the equation also raises some interesting questions. Its language reserves not rights but "powers" to either the states or the people; but the power of raising a militia was a matter of legislative authority, not popular initiative. U.S. CONST. amend. X.

This is a useful point to clarify the relation between Akhil Amar's treatment of the right to bear arms and those of the individual right theorists. Although Amar agrees that the equation of militia and people precludes identifying the former with an institution like the National Guard, his "communitarian" reading of the Second Amendment does not endorse the broad individual right interpretation which sees the militia as an entity existing prior to or independently of public regulation. *See* AMAR, *supra* note 2, at 51.

39. COMPLETE BILL OF RIGHTS, *supra* note 38, at 169. Malcolm erroneously claims that "Madison's original version of the amendment, as well as those suggested by the states, described the militia as either 'composed of' or 'including' the body of the people." MALCOLM,

Compendium_Roth
Page 1933

departed from the corresponding recommendation of the Virginia Ratification Convention (item seventeen in its proposed list of enumerated rights), and the formulation to which he was likely to be most sensitive. The Virginia resolution began: "That the people have a right to keep and bear arms; that a well regulated Militia composed of the body of the people trained to arms is the proper, natural and safe defence of a free State . . . ."[40] Both Madison's and the Virginia convention's versions arguably recognized two rights, not one: a right to bear arms, not explicitly tied to membership in the militia; and a right to enjoy the superior form of defense afforded by a well-regulated militia, which would obviate the need for the standing army that the original Virginia resolution had then denounced, though with a warning rather than a flat prohibition.[41] Madison had omitted the clause defining the militia as "the body of the people," but he preserved the duality of rights. Moreover, his respective use of the semicolon and colon in this article suggested that the concept of a well-regulated militia served to justify the exclusion of the religiously scrupulous from military service, not the importance of the people keeping and bearing arms.[42]

The committee of the House to which Madison's amendments were referred made two changes in his draft.[43] First, it transposed the

---

supra note 25, at 162-63. Madison's version did neither. Malcolm also notes that "not one of the ninety-seven distinct amendments proposed by state ratifying conventions asked for a *return* of any control that had been allocated to the federal government over the militia." *Id.* at 163. One cannot be sure how narrowly Malcolm wants to define "return," but here is the text of the eleventh amendment proposed by the Virginia convention:

> That each State respectively shall have the power to provide for organizing, arming, and disciplining its own militia, whensoever Congress shall omit or neglect to provide for the same. That the militia shall not be subject to martial law, except when in actual service in time of war, invasion or rebellion, and when not in the actual service of the United States, shall be subject only to such fines, penalties and punishments, as shall be directed or inflicted by the laws of its own State.

10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 1554 (J. Kaminski & G. Saladino eds., 1993).

40.  COMPLETE BILL OF RIGHTS, *supra* note 38, at 182.

41.  "That standing armies in time of peace are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the Community will admit." *Id.* at 182-83. This wording, of course, illustrates the idea that a bill of rights could consist not of legally enforceable claims but rather of general principles for the guidance of officials and citizens.

42.  The clause granting exemptions from militia service to religious objectors was derived from the nineteenth amendment recommended by the Virginia convention.

Whether Madison was thinking of two rights (arms-bearing distinguished from the security provided by the militia) is, however, far from certain. The use of "being" can still be read to imply that the militia clause modifies the arms-bearing one (semicolon be damned, so to speak); while if the militia clause serves as a preamble to the "religiously scrupulous" one, the use of the conjunction "but" would appear superfluous.

43.  Malcolm errs in noting that Madison's proposed amendments were referred to a committee of three members (Madison, Roger Sherman, and John Vining). *See* MALCOLM,

syntax so that the Amendment took its eventual form, placing the reference to the militia first and replacing the semicolon separating the two members of the clause with a comma. Second, it offered a more specific definition of the militia. The clause now read: "A well regulated militia, composed of the body of the people, being the best security of a free State, the right of the people to keep and bear arms shall not be infringed, but no person religiously scrupulous shall be compelled bear arms."[44] This new definition of the militia was in turn eliminated in the Senate, where the Amendment received its final form. On September 4, the Senate first entertained, but rejected, a motion to add the elements of the Virginia recommendation that Madison had omitted. Five days later, it rejected a motion to insert "for the common defence" after "arms," and then proceeded to replace "the best Security" with "necessary to the Security." In its now final form, the Amendment went to the House, which accepted it without apparent objection.[45]

None of this legislative history of the drafting of the Second Amendment conclusively resolves the vexed question that lies at the heart of the entire controversy: whether "the people" is best interpreted as the entire citizenry, as the individual right interpretation insists; or simply refers instead to whatever form a militia composed of soldiers who retain a significant measure of their civilian identity might take, as the collective right interpretation and prevailing law hold. Defenders of the individual right interpretation like to point to the outline for Madison's speech of June 8, 1789, which contains a note seemingly stating that his proposed amendments "relate 1st. to private rights," as evidence that Madison so regarded the right to bear arms.[46] But that terse inscription stands alone, and is not explicitly linked to the right to bear arms; Madison's sole reference to arms alludes to the parliamentary Bill of Rights of 1689, and there is no corresponding passage in the recorded version of his speech that develops this point.[47] Nor does Madison's proposed

*supra* note 25, at 160. After their introduction on June 8, the amendments were first referred to a committee of the whole House, and then, after the House of Representatives failed to find time to address the issue, to a committee of one member from each state, appointed on July 21, which in turn reported on July 28. *See* 3 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED STATES OF AMERICA: MARCH 4, 1789–MARCH 3, 1791, at 84, 117, 124 (Linda Grant DePauw ed., 1977).

44. COMPLETE BILL OF RIGHTS, *supra* note 38, at 170.

45. *See id.* at 174-76.

46. Notes for Speech in Congress [ca. June 8, 1789], *in* 12 THE PAPERS OF JAMES MADISON, *supra* note 29, at 193.

47. *Id.* at 193-94. The use of "private rights" is further separated from the reference to

placement of this right in Article I, Section 9 conclusively demonstrate its fundamentally private nature, as individual right theorists like to contend, because the original version of the Petition and Assembly Clause would have immediately preceded it, and that clause, as previously noted, is also susceptible to a collective right interpretation. The controlling theme of Article I, Section 9 is neither the definition of individual rights nor restrictions on the powers of the states (the subject of Section 10), but limitations on the powers of Congress.[48]

The most striking defect in the textualist component of the individual right interpretation lies elsewhere, however—in the disparity in the ways in which the key words "people" and "militia"

---

1689 by a new heading: "Bills of Rights—useful—not essential." Perhaps not surprisingly, Halbrook omits this intervening statement when he quotes Madison's outline, without inserting the required ellipses. *See* HALBROOK, *supra* note 5, at 76.

48. Nor, it might be added, does the individual right interpretation derive as much support as it claims from a recurring reference to the explanatory essay published by Tench Coxe ten days after Madison's speech introducing the amendments. In this essay, Coxe glossed Madison's proposal with the observation that "the people are confirmed by the next article in their right to keep and bear *their private arms.*" A Pennsylvanian (Tench Coxe), *Remarks on the First Part of the Amendments to the Federal Constitution,* PHILADELPHIA FED. GAZETTE, June 18, 1789, at 2 (emphasis added). At that point, however, Coxe could only have been commenting on the language and structure of Madison's original proposal, which, as noted earlier, did imply that the right of the people to bear arms was distinct from their right to enjoy a well-regulated militia; the changes that produced the final text of the Amendment, linking the preamble to the arms-bearing clause more directly, were more than two months in the future. To say, as Glenn Reynolds and others writers repeatedly do, that "James Madison approved of Coxe's construction of the Second Amendment," is therefore incorrect on at least two grounds. Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 TENN. L. REV. 461, 468 n.29 (1995). First, the letter from which this seal of approval is extracted was written on June 24, again well in advance of the changes subsequently made by Congress. Second, Madison did not discuss the substance or merits of Coxe's interpretation of particular rights. Here is his entire comment:

> It is much to be wished that the discon[ten]ted part of our fellow Citizens could be reconciled to the Government they have opposed, and by means as little as possible unacceptable to those who approve the Constitution in its present form. The amendments proposed in the H. of Reps. had this twofold object in view; besides the third one of avoiding all controvertible points which might endanger the assent of 2/3 of each branch of Congs. and 3/4 of the State Legislatures. How far the experiment may succeed in any of these respects is wholly uncertain. It will however be greatly favored by explanatory strictures of a healing tendency, and is therefore already indebted to the co-operation of your pen.

Letter from James Madison to Tench Coxe (June 24, 1789), *in* 12 THE PAPERS OF JAMES MADISON, *supra* note 29, at 257.

In fact, during the ratification campaign proper, Coxe had written other essays, which went to some length to emphasize the reserved legislative powers of the states, including the police powers associated with public health and welfare, and one would have to indulge some rather bold leaps of the historical imagination to infer that he had suddenly decided that recognition of an individual right to bear arms trumped the authority of the states in this respect. See especially his second essay written under the pen name "A Freeman," PA. GAZETTE, Jan. 30, 1788, *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 26, at 508.

are defined.  However one gauges the relative authority of the two sections of the Second Amendment, a reading which assumes the primacy of text would insist that every word be given due weight; indeed, textualism, as practiced by someone like Akhil Amar, seems to presuppose that each word has been exquisitely chosen to fit a completely consistent constitutional vision.  But in this case, textualist practice proves curiously inconsistent.  "People" is routinely defined intratextually, by reference to its use in other amendments; but "militia" leaps beyond the proverbial four corners of the document, and is parsed in terms of a historically contingent definition of what the militia has been and must presumably evermore be.

Amar himself provides a case in point.  Citing Kates, Amar first tells us that "when used without any qualifying adjective"—such as the notorious "select"—"'the militia' referred to all citizens capable of bearing arms," making the "militia" of the dependent clause of the Amendment identical with the "people" of the main clause.[49]  The House would have made that equation explicit when it added the qualifying phrase "composed of the body of the people" to its draft; when the Senate "stylistically shortened" the clause by deleting that phrase, it presumably only restored that assumed definition.[50]  But

---

49.  AMAR, *supra* note 2, at 51.

50.  *Id.* at 51-52.  The argument for "stylistic shortening" seems to have two parts: one holding that the formula defining the militia as the people was unnecessary because redundant of common usage; the other suggesting that the insertion of this phrase would have rendered the Amendment a more awkward text, presumably by repetition of the phrase, "the people."  Amar has thus suggested that "[a] modern translation of the amendment might thus be: 'An armed and militarily trained citizenry being conducive to freedom, the right of the electorate to organize itself militarily shall not be infringed.'"  Akhil Reed Amar, *Second Thoughts: What the Right to Bear Arms Really Means*, NEW REPUBLIC, July 12, 1999, at 24, 24-25.  How the electorate—presumably excluding the citizen soldiers of the National Guard—would in fact organize itself militarily is not explained, but the possibilities are endless.  (Could drivers of sport utility vehicles, for example, spontaneously mobilize as an armored corps?  Would Greens form up as mountain troops?)  While we are playing the counter-textual game, we might also suggest that a Senate anxious to preserve the broad reading of the militia-as-people without risking redundancy could have written the Amendment this way: "A well regulated militia, composed of the body of the people, being necessary to the security of a free state, their right to keep and bear arms shall not be infringed."

Malcolm similarly argues away the apparent significance of the changes in the text by explaining: "Doubtless congressmen felt no qualms about streamlining the language and omitting explanatory phrases because their constituents shared an understanding of the institutions and opinions behind it.  But, in the long term, these understandings have vanished and brevity and elegance have been achieved at the cost of clarity."  MALCOLM, *supra* note 25, at 161; *see also* David C. Williams, *The Militia Movement and Second Amendment Revolution: Conjuring with the People*, 81 CORNELL L. REV. 879, 907 (1996) (agreeing that "that omission seems stylistic, not substantive").  Somehow, without really seeking to alter the meaning of the language, the framers of the Amendment kept tinkering with it, but the changes they imposed were immaterial because of a preexisting understanding of "the people"; yet somehow, too, a more "elegant" text actually disguised the meaning they intended to impart.  But, of course,

Compendium_Roth
Page 1937

Case 3:17-cv-01017-BEN-JLB   Document 128-6   Filed 11/11/22   PageID.16584   Page 103 of 402

how do we know that this senatorial editing was only stylistic and not substantive? Any effort to define "militia" intratextually must begin with Article I, Section 8, Clause 16, which treats the militia as an entity that Congress has the legislative responsibility for "organizing, arming, and disciplining." The effect of the Senate's editing was to leave the extent of the militia open to congressional discretion. It might well remain plausible to assume that Americans hoped and even expected that the militia would continue to resemble the body of the people, but any plain-text reading would suggest that Congress retained all the authority it needed to determine whether a select militia would or would not prove more desirable than a massed array of the whole male population. Rather than accept this strictly or merely textual reading of the relevant language, Amar has to reach beyond the text to suggest that "Anti-Federalist and republican ideology" offers the best clues to the fixed meaning of militia. The meaning of militia in the original Constitution now depends on its meaning in the Second Amendment, even though the final version of that Amendment eliminated the qualifying phrase that exponents of "Anti-Federalist and republican ideology" would have preferred. Unfortunately, there were only two Antifederalists in the Senate, both from Virginia, and it is simply counter-intuitive to suppose that they would have favored eliminating the qualifying phrase that their own state's ratification convention had originally proposed.[51]

Federalists who were willing to assuage Antifederalist concerns only if doing so ran no risk of altering the substance of the powers granted to the national government would have had valid reasons to eliminate a phrase that could be interpreted as a restraint on the discretionary authority of Congress.

51. *See* AMAR, *supra* note 2, at 56. Amar further tells us that "jealousy and vigilance are at the heart of the amendment's gloss on clause 16 [the Militia Clause of Article I, Section 8]," and that he has "emphasized republican ideology about militias and armies because that ideology was expressly written into the amendment's preamble." *Id.* Had that ideology really been "expressly written" into the preamble, we would expect to find the usual admonition against standing armies present; its absence, like the omission of the word "expressly" from the Tenth Amendment, reminds us that the spokesmen for the traditional "Anti-Federalist and republican ideology" were not in a position to dictate the content of the Bill of Rights. Amar's interpretation thus seems to rely upon a politically doubtful reconstruction of what was actually transpiring. It is worth noting that the Senate did entertain a motion, almost certainly introduced by the two Virginia Antifederalists, Richard Henry Lee and William Grayson, to add to the Amendment further language, derived from the amendments proposed by the Virginia Ratification Convention, denouncing standing armies as "dangerous to Liberty," urging their avoidance "as far as the circumstances and protection of the community will admit," affirming civilian superiority over the military, and imposing a super-majoritarian requirement to raise a standing army in peacetime. COMPLETE BILL OF RIGHTS, *supra* note 38, at 173-74; *see also* the relevant Virginia resolutions, 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 39, at 1553-54. This motion, which was rejected, would have been a far more genuine expression of "Anti-Federalist and republican ideology" than the final language of the Amendment.

Compendium_Roth
Page 1938

A textualist reading of the evolution of the Amendment could plausibly support at least these inferences. First, if Congress was intent on preserving the traditional image of the militia as the collective body of the people, as the individual right interpretation suggests, its elimination of the appropriate language to that effect is surprising. Congress had open to it the option of engrafting a more expansive definition of the militia onto the Constitution; it rejected that option. Second, if the semicolon in Madison's original resolution could be read as stating two distinct rights, not one, its replacement by a comma would seem to connect the two members of the Amendment more closely; that is, it would link the preamble and the right more intimately than had been the case before, and thereby tie the right of arms bearing to the institution of the militia. Third, if it is conceded that the reference to militia in the preamble to the Amendment has some relevance to its meaning—which of course a textualist must, because textualism presumes that every word is there with a purpose—then a textual approach requires us to ask how other provisions of the Constitution use the same term; and any reader of Article I, Section 8 would find it hard to deny that the text there considers the militia not as an unorganized mass of the citizenry but as an institution subject to close legislative regulation. Fourth, acceptance of language restricting the people's right to bear arms to matters relating to the "common defence" would have had the effect of curtailing the capacity of the militia to be deployed for the other purposes assigned in Article I, Section 8: "to execute the Laws of the Union" and to "suppress Insurrections." But Congress rejected that limitation, and the militia of the Second Amendment thus remained an entity to be mobilized to preserve, not subvert the Constitution. One might presumably argue that the militia could spontaneously mobilize to protect the Constitution against a government staging an anticonstitutional *coup de main*, *coup de marche*, or *coup d'etat*, but nothing in the text of the Constitution supports that conception of its role.

## FRAMERS' INTENTIONS

One striking aspect of the standard statements of the individual right interpretation is how little attention its advocates pay to the debates of either the Constitutional Convention or the First

Congress.[52]    This is unsurprising.    Although many concerns,
assumptions, and beliefs are *imputed* to the framers of both the
Constitution and the Second Amendment, there is virtually nothing in
the extant record of the *in camera* debates of 1787 and 1789 that
directly addresses the issues that lie at the core of our contemporary
controversy.  Neither at Philadelphia nor New York would it have
occurred to anyone to ask whether adoption or amendment of the
Constitution would diminish the capacity of state and local
governments, in the exercise of their conventional police powers, to
impose legislative restrictions on the use or ownership of firearms.
That was not a concept that would have been easy to formulate in
either 1787 or 1789.  Had the Convention wished to do so, it might, in
theory, have considered restricting the power of the state
governments to limit the fundamental right of bearing arms and
keeping in conjunction with the limitations on state authority found in
Article I, Section 10 of the Constitution.  But the framers had no
plausible, much less compelling, reason even to ask whether there
should be any change in the traditional legislative competence of the
states.

Similarly, the structure of debate in 1789 did not oblige the
members of the First Congress to consider the authority of the state
legislatures to regulate private use and ownership of weapons.  The
entire thrust of that debate was directed to identifying powers of the
national government requiring moderation in the interest of
protecting the rights of either the people or the states.  But any
prospect that the adoption of amendments would be used to protect
the people against *both* the national government *and* the states
evaporated when the Senate rejected James Madison's favorite
proposal to impose limitations on the states in the realms of freedom
of speech, religion, and trial by jury.[53]  The entire debate over the
Amendment in the House of Representatives is concerned with the
propriety of exempting religiously scrupulous persons from the
obligation to bear arms if summoned to do so—an issue completely
irrelevant to the current controversy over gun control, yet strongly

---

52. The debate at Philadelphia is completely ignored, for example, in HALBROOK, *supra*
note 5, which adroitly skips from provisions in the state constitutions to the ratification debate
without bothering to stop at Philadelphia.  The Convention is similarly ignored in the leading
article by Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second
Amendment*, 82 MICH. L. REV. 204 (1983).  There is a brief but rather garbled discussion in
MALCOLM, *supra* note 25, at 152-55.

53. *See* 1 DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS OF THE UNITED
STATES OF AMERICA: MARCH 4, 1789–MARCH 3, 1791, *supra* note 43, at 158.

Compendium_Roth
Page 1940

supportive of the idea that the Amendment was indeed about the militia. Tenuous inferences about private rights may be drawn, perhaps, from remarks made by a handful of representatives, but none of these, again, confront the central issue directly.

Nevertheless, insofar as interpretation of the Second Amendment is intertwined with the question of the status of the militia under the Constitution, some guidance might be found in the relevant debates on that subject at the Constitutional Convention, principally the discussions of August 18 and 23, 1787. These debates bear directly on one of the central assumptions undergirding the individual right interpretation, which is that the word "militia" cannot be narrowly defined as a "select militia," which would itself be dangerous because it would be subject to the control of government, but must instead be read broadly to embrace the entire adult male population. In the most expansive reading, this militia forms independently and spontaneously; it does not owe its existence to state law; and it must therefore mean that "all of the people all of the time (not just when called for organized militia duty) have a right to keep arms."[54] The clear implication must be that the militia (in this sense) has always existed, and will ever exist, as a popular institution that precedes, and is immune to, both state and national law; it is, in effect, a pre- and extraconstitutional body whose existence, even if

---

54. HALBROOK, *supra* note 5, at 8. Halbrook subsequently seems to describe the formation of militia units in response to the crisis of 1774–75 as a spontaneous popular development unconnected with structures of legal or political authority.

> As the size and repressive character of the [British] standing army [in America] increased, many Americans began to arm and to organize themselves into independent militias. In 1774, George Mason and George Washington organized the Fairfax County Militia Association, which was not subject to the control of the royal governor and which in fact arose, in part, as a defense force against the regular militia.

*Id.* at 60. This regular militia was, however, apparently composed of equally patriotic Virginians who were not inclined to turn out in support of Governor Dunmore, because, as Halbrook notes two pages later, "the governor could not muster the regular Williamsburg militia against the 'Hanover independent militia company' led by Patrick Henry." *Id.* at 62. Or again: "for Mason a 'well regulated militia' consisted in the body of the people organizing themselves into independent companies, each member furnishing and keeping his own firearms, always ready to resist the standing army of a despotic state." *Id.* at 61. But in fact, while what Charles Royster called the "*rage militaire*" of this period clearly testified to the radical tenor of political sentiment, the formation and invigoration of militia units took place in response to, and under the guidance of, the provincial conventions that acted as the effective surrogate governments in nearly all the colonies after the summer of 1774. *See* CHARLES ROYSTER, A REVOLUTIONARY PEOPLE AT WAR: THE CONTINENTAL ARMY AND AMERICAN CHARACTER, 1775–1783, at 25 (1979). Thus when Mason and Washington formed "The Fairfax independant Company of Voluntiers" in September 1774, these two members of the colony's governing elite were implementing a recommendation of the Virginia Provincial Convention; its independence was aimed against Governor Dunmore, the lawful commander of the militia, but not the Convention, which was effectively acting as the real governing body of the colony. *See* 1 THE PAPERS OF GEORGE MASON 210-11 & note (Robert A. Rutland ed., 1970).

latent, is not constrained by law. Otherwise it could be reduced to the dreaded modern incarnation of a select militia: a National Guard composed of weekend warriors whose two weeks plus twelve weekends of annual training efface their apparent status as citizen-soldiers.

Whatever else might be said of this problematic definition of the militia, it does not comport with the actual discussion of the subject at Philadelphia. For as Madison's notes of the debates conclusively demonstrate, that entire discussion explicitly recognized that the militia was to be the joint object of congressional and state legislation. What was at issue was where the boundary between national and state responsibilities would lie. Nothing that was said during the principal discussions of August 18 and 23, 1787 supports the contention that the militia would henceforth exist as a spontaneous manifestation of the community at large.

In the draft constitution submitted by the committee of detail on August 6, the sole clause relating to the militia would have authorized the national legislature "[t]o call forth the aid of the militia, in order to execute the laws of the Union, enforce treaties, suppress insurrections, and repel invasions."[55] When the Convention reached this clause on August 18, George Mason "moved as an additional power 'to make laws for the regulation and discipline of the Militia of the several States reserving to the States the appointment of the Officers,'" which Mason justified on the grounds of the value of "uniformity."[56] His motion was challenged by the Connecticut delegate Oliver Ellsworth, who offered a substitute motion requiring the militia to "have the same arms & exercise and be under rules established by the Genl Govt. when in actual service of the U. States and when States neglect to provide regulations for militia, it shd. be regulated & established" by Congress.[57] Ellsworth argued that the states should not be deprived of their authority over the militia because they "would pine away to nothing after such a sacrifice of power."[58] By this, of course, he clearly meant that the state governments would atrophy. That view was supported by John Dickinson, who proposed a scheme whereby the national power to discipline the militia would be limited to "one fourth part at a time,

---

55. 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 182 (Max Farrand ed., 1966).

56. *Id.* at 330.

57. *Id.* at 330-31.

58. *Id.* at 331.

which by rotation would discipline the whole Militia."[59] Mason took this objection seriously enough to modify his original motion by inserting the phrase, "not exceeding one tenth part in any one year," noting by way of introduction that this "suggested the idea of a select militia."[60] But this amendment was in turn criticized by General Charles Pinckney, John Langdon, and Madison, all arguing that there were compelling reasons not to divide responsibility for the militia between the national government and the states. In response, Ellsworth dismissed "the idea of a select militia as impracticable."[61] After several further exchanges, the Convention referred both versions of Mason's motion to a "grand Committee" (one delegate from each state) it had just appointed.[62]

The committee's recommendation, delivered three days later, was taken up on August 23. In revived form, the clause now read: "To make laws for organizing, arming & disciplining the Militia, and for governing such parts of them as may be employed in the service of the U.S. reserving to the States respectively, the appointment of the officers, and authority of training the militia according to the discipline prescribed."[63] The ensuing debate is noteworthy in two respects. First, although three separate motions were introduced during this debate to modify the committee's proposal—all in the interest of confining the authority vested in Congress while enhancing the authority reserved to the states—in the end, the Convention rejected all three, thereby preserving the original language.[64] Second, in the course of this debate, several delegates made remarks that offer revealing insight into the framers' deeper understanding of militia-related issues. When, for example, Rufus King, speaking for the committee, first explained that the national authority over "*arming*" the militia meant "specifying the kind size and caliber of arms," Madison worried that this explanation "did not extend to furnishing arms"; and King thereupon explained "that *arming* meant not only to provide for uniformity of arms, but included authority to regulate the

59. *Id.*

60. *Id.* at 330-31. Madison's notes make Mason's reference to the select militia slightly ambiguous; the relevant passage reads: "Mr. Mason–had suggested the idea of a select militia." This seems to be a response to Dickinson, but it is possible that Mason meant that he, too, had that idea originally in mind.

61. *Id.* at 332.

62. *Id.* at 333.

63. *Id.* at 384-85.

64. The three motions came respectively from Roger Sherman, Jonathan Dayton, and again from Ellsworth and Sherman; they can be found *id.* at 385-86.

modes of furnishing, either by the militia themselves, the State Governments, or the National Treasury."[65]  While the first of these alternatives suggests a private duty to obtain arms, as specified by legal regulations, the latter obviously envisioned either the states or the Union providing arms of their own lawful authority.

Whether any institution other than the national government could be relied upon to keep the militia armed and disciplined, however, was something that Madison and his colleague, Edmund Randolph, very much doubted.  "The States neglect their Militia now," Madison observed, "and the more they are consolidated into one nation, the less each will rely on its own interior provisions for its safety & the less prepare its Militia for that purpose; in like manner as the Militia of a State would have been still more neglected . . . ."[66] Randolph endorsed this judgment a few minutes later, "observing that the Militia were every where neglected by the State Legislatures, the members of which courted popularity too much to enforce a proper discipline."[67]  So ardent was Madison for strong national supervision of the militia that he subsequently moved, without success, that the appointment of officers by the states should be confined to those "*under the rank of General officers*," but the main motion was ultimately approved without dissent.[68]

Why is it necessary to call attention to this debate or, conversely, why do individual right writers say so little about it?  Its significance would seem so obvious as to require no notice.  But in the strange world of Second Amendment discourse, what is most obvious sometimes requires the greatest emphasis.

For the framers of the Constitution, whose usage does have some relevance to ascertaining the original intent underlying the document they wrote, the word *militia* could no longer be unthinkingly or automatically equated with the entire male population capable of bearing arms.  That definition certainly remained one of the options from which they could choose, and some of their comments indicate that some delegates still thought of the state militia in just these terms.  When Dickinson and Mason, for example, contemplated rotating portions of the militia under federal discipline, they were presumably imagining drawing on that larger pool.  But that is not the

---

65.  *Id.* at 385.
66.  *Id.* at 387.
67.  *Id.*
68.  *Id.* at 388.

point. What matters is that the framers, clearly reasoning on the basis of hard-earned experience, saw the militia as an institution that would henceforth be regulated through a combination of national and state legislation firmly anchored in the text of the Constitution, rather than some preexisting, preconstitutional understanding. Wherever the exact balance between national and state responsibility would be struck, the militia would always be subject to legislative regulation. When the framers referred to the "states" in these debates, they were always alluding to their governments, not the people at large. The "authority of training the militia according to the discipline prescribed by Congress" that the Constitution reserved to the states was a power and responsibility of the state governments to implement national law. Americans were still entitled to believe that, as a matter of principle and policy, a militia "composed of the body of the people" offered the safest alternative to a standing army, tyranny, or any of a number of other evils, but that does not alter the fundamental delegation of legal authority to the new Congress that the framers understood they were proposing. The Militia Clause itself, buttressed by the Necessary and Proper Clause, empowered Congress, acting conjointly with the state legislatures, to decide what form the American militia would henceforth take.

None of this carried any threat to existing private rights of gun ownership, save, perhaps, in the eventuality that a crisis found the nation poorly armed and legislation was required, as it had been in the past, to bring firearms in all states of repair and disrepair out of private hands so that they could be returned to active and effective public service. But this history does call into question the idea, seemingly central to the individual right argument, that the very concept of the militia had an irrevocable, unalterable populist meaning immune to lawful revision by Congress and the state legislatures.

## RATIFIER UNDERSTANDING

As is well known, Antifederalist criticisms of the Constitution emphasized the danger that American liberties would face from a consolidated national government that would not only possess both the purse and the sword but itself face the daunting task of executing its law across the broad and diverse expanses of an extended republic. Nor is there any mystery as to where the fear of standing armies originated: it was a legacy of the Radical or Real Whig tradition that

so shaped eighteenth-century American political ideology,[69] and it could be well documented by familiar references to both the military rule which Cromwell had imposed on England in the 1650s and to the later efforts of James II to use an army increasingly officered by Irish Catholics as a domestic police force. Federalists answered the charge that the new Constitution would both permit and require government by a standing army in various ways. On prudential grounds, they argued from both experience and even a priori principles that national security would mean nothing if the new government was not fully empowered to raise regular military forces. Nor would these forces constitute a standing army in the rigorous sense of the term, because the two-year limit on appropriations meant that a fresh election of the people's immediate representatives would provide an effective constitutional and political check.

Federalists tended to treat this charge with the same disdain that they dismissed many Antifederalist criticisms. Hamilton's refutation of the standing army allegation in *The Federalist No. 24*, for example, is a sustained sortie in sarcasm.[70] So, too, is his dismissal in *The Federalist No. 29* of the idea that it would be dangerous to rely upon a "select" militia—the same institution which proponents of the individual right interpretation insist Americans generally deemed to be nearly as threatening as a standing army. As far as Hamilton (framer, ratifier, and distinguished commentator on the Constitution, as well as leading member of its first cabinet) was concerned, the only good militia was a select militia. Indeed, Hamilton's discussion in this essay, cast in the form of the advice he would give to a future Congress, nicely captures the tension in Federalist thinking between the received definition of the militia, on the one hand, and the institution the new government should regulate, on the other. Hamilton opens this passage by declaring that "The project of disciplining all the militia of the United States is as futile as it would be injurious, if it were capable of being carried into execution."[71] As

69. The *locus classicus* of this interpretation is BERNARD BAILYN, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (enlarged ed. 1992) (1967). The relation between this ideology and American attitudes toward an armed citizenry was explored in two leading articles: Lawrence Delbert Cress, *An Armed Community: The Origins and Meaning of the Right to Bear Arms*, 71 J. AM. HIST. 22 (1984), and Robert E. Shalhope, *The Ideological Origins of the Second Amendment*, 69 J. AM. HIST. 599 (1982).

70. THE FEDERALIST NO. 24 (Alexander Hamilton).

71. THE FEDERALIST NO. 29 (Alexander Hamilton), *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 26, at 318, 320. As the editors note, this essay was originally *No. 35* in the newspaper publication, but became *No. 29* in the first bound edition, the M'Lean edition published in the spring of 1788. *See id.* at 318.

used here, the phrase "all the militia" connotes the body of the people; but Hamilton immediately proceeds to explain why the inconvenience, cost, and sheer impracticality of training the entire population make it desirable to form "a select corps of moderate extent" who could provide the "well regulated militia" (a phrase Hamilton uses) that the mass of the citizenry could never constitute.[72] A Hamiltonian gloss on the Second Amendment would presumably equate the people whose arms-bearing right must be protected with the militia that could be "well regulated" only if it was select.[73]

To examine Federalist rhetoric on the militia is to enter a conceptual world where the attitudes and concerns that characterized their opponents' mode of thought no longer unthinkingly apply. Equally obviously, these differences also go far toward explaining why the members of the First Federal Congress felt compelled to include some provision—however vaguely worded—relating to the militia in their proposed amendments. Yet it is no less obvious that the ratification debates of 1787–88 did not directly implicate the critical issues at stake today—the extent of national and state authority to regulate the private use and ownership of firearms. Again, we are left to draw inferences from scattered remarks that were principally concerned with the respective powers of the national and state governments in the regulation of the militia.

There is one conspicuous exception to this judgment: the oft-quoted amendments published by the Antifederalist minority in the Pennsylvania Ratification Convention which met at Harrisburg in November 1787. Soundly outnumbered by a two-to-one ratio in the convention, this minority had struggled to have its concerns taken seriously by a Federalist majority anxious to promote the cause of ratification elsewhere by gaining a quick and unequivocal decision in favor of the Constitution.[74] Federalists grudgingly listened to the amendments their antagonists wished to propose, but refused not only to consider them but even to allow them to be entered on the convention's journals, forcing the minority to publish their proposals in the form of a dissent. Two of the minority's fifteen proposed amendments bear on the arms and militia issues:

   7. That the people have a right to bear arms for the defense of

---

72. *Id.* at 320.

73. It is worth noting that, in Hamilton's view, this select militia would still comprise "citizens" linked in fellow feeling not to the dragoons of the national army but to their "fellow citizens" in the states. *Id.*

74. RAKOVE, *supra* note 11, at 110-12, 116-18.

themselves and their own state, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil power.

8. The inhabitants of the several states shall have liberty to fowl and hunt in seasonable times, on the lands they hold, and on all other lands in the United States not enclosed, and in like manner to fish in all navigable waters, and others not private property, without being restrained therein by any laws to be passed by the legislature of the United States.[75]

These statements appear to be by far the strongest affirmations of a belief in a private right to own and use arms, to be rendered immune to federal regulation; they also appear to be the only statements to frame and affirm the right in this way; and they therefore are vulnerable to the charge, among others, that these resolutions are the exceptions that prove a different rule.

A number of qualifications make the probative value of these resolutions doubtful. They were the work of a distinct minority within the Pennsylvania convention, and in the ensuing tests of strength in the first federal elections held a year later, Federalists swept the delegation that Pennsylvania sent to the new Congress. The resolutions say nothing at all (because there was no reason that they should do so) about the *state's* power to regulate ownership and use of firearms—a power that the state had in fact already exercised.[76] While the resolutions articulate a fear of national power, they do not identify the provisions of the Constitution that threatened private rights of ownership, much less the fowling and hunting practices of residents of a state in which the federal government could have no valid title to any land.[77] Nor did the minority members offer any further explanation of the source of their fear when they published their explanatory *Address and Reasons of Dissent* two weeks after the convention adjourned.[78] Interestingly, that *Address* overlooked the

75. 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 597-98, 623-24 (Merrill Jensen ed., 1976).

76. See the discussion in Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 CONST. COMMENTARY 221, 228-37 (1999).

77. The state's western boundary marked the easternmost boundary of the national domain created by the process of state cessions completed in 1784.

78. *The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents*, PA. PACKET AND DAILY ADVERTISER, Dec. 18, 1787,

right to bear arms when it turned to discussing the most important rights to be secured by "the emission of a BILL of RIGHTS."[79] When the dissenters addressed the militia issue at the very close of their protest, they framed their challenge in terms not of private rights of ownership, but rather of the danger that Congress would abuse its power over the militia by subjecting its members to martial law, trampling on the rights of those "conscientiously scrupulous of bearing arms," and marching its members near and far in the cause of "riveting the chains of despotism on their fellow citizens, and on one another."[80]  Finally, it was exactly these resolutions that inspired the Federalist writer Noah Webster to jestingly propose a further "restriction:—'That Congress shall never restrain any inhabitant of America from eating and drinking, *at seasonable times*, or prevent his lying on his *left side*, in a long winter's night, or even on his back, when he is fatigued by lying on his *right*.'"[81]  Was this really the kind of right, Webster insinuated, deserving national constitutional protection?

Had Antifederalists elsewhere rallied around this early expression of the extent of the right to bear arms, our current debate would arguably not have to rely on far less direct or salient data. Instead, we are left to wrestle with the implications of statements that are far more concerned with the familiar juxtaposition of standing army and militia than with the nature, source, and extent of private rights or the limitations upon state legal regulation.  Prominent among these more direct comments is a remark made by George Mason during the Virginia Ratification Convention, which advocates of the individual right interpretation often cite as a succinct endorsement of the equation permanently identifying the militia with the people.  "[W]ho *are* the militia?"  Mason asked on June 14, 1788. "They consist now of the whole people, except a few public officers."[82]

One is not surprised that Mason's very next sentences disappear from the citations of writers like Kates and Halbrook:

---

*reprinted in* 2 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 75, at 617.

79.  *Id.* at 630-31.

80.  *Id.* at 637-39.

81.  Noah Webster, writing as "America," N.Y. DAILY ADVERTISER, Dec. 31, 1787, *reprinted in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 26, at 199.

82.  10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 39, at 1312.

> But I cannot say who will be the militia of the future day. If that paper on the table [the Constitution] gets no alteration, the militia of the future day may not consist of all classes, high and low, and rich and poor; but may be confined to the lower and middle classes of the people, granting exclusion to the higher classes of the people.[83]

As far as Mason was concerned, amendments which did not reach the power of Congress to regulate the militia would be unavailing, because the composition of the militia would be subject to legislative revision. Nor does this crucial point exhaust the importance of Mason's observation, because once his speech is firmly located in the context in which it was made, it supports conclusions rather at odds with the self-reaffirming pronouncements that individual right advocates customarily make.

When Mason spoke, he was not, of course, anticipating our controversy but participating in a debate of his own day; if we are to understand the force of his remarks, we have to know what was under discussion in that debate. Mason was speaking near the end of a two-day debate on the militia clauses of the Constitution (though here, as on other occasions at Richmond, the pyrotechnics of Patrick Henry occasionally led discussion to veer in strange directions). Given that both Federalists and Antifederalists discussed the conditions under which the militia could be disarmed, it might seem surprising that the scholarly literature has slighted this debate.[84] But the surprise quickly dissipates when one understands the assumptions that united speakers from both sides.

When debate began on Saturday, June 14, the first point discussed was the role the militia might be asked to play in enforcing law and suppressing insurrections. In the midst of his lengthy first speech on this subject, which quickly reached the danger of a standing army, Mason warned about the danger that the militia might be abolished. Should the national government ever "attempt to harass and abuse the militia," Mason warned,

> they may easily abolish them, and raise a standing army in their stead. There are various ways of destroying the militia. A standing army may be perpetually established in their stead. . . . The militia may be here destroyed by that method which has been practised in

---

83. *Id.* For truncated citations, see HALBROOK, *supra* note 5, at 74; Kates, *supra* note 7, at 216 n.51; Levinson, *supra* note 3, at 647.

84. One noteworthy exception is Carl T. Bogus, *The Hidden History of the Second Amendment*, 31 U.C. DAVIS L. REV. 309 (1998), which uses this debate, however, primarily to stress the relation in Virginia between fears of slave insurrection and the militia question more generally.

other parts of the world before. That is, by rendering them useless, by disarming them. Under various pretences, Congress may neglect to provide for arming and disciplining the militia, and the State Governments cannot do it, for Congress has an exclusive right to arm them, &c. . . . Should the national Government wish to render the militia useless, they may neglect them, and let them perish, in order to have a pretence of establishing a standing army.[85]

Mason reminded the delegates that forty years earlier, just such a sinister scheme had been proposed by Governor Keith of Pennsylvania, "to disarm the people" in order to "enslave them," but not to "do it openly" — presumably by confiscating their weapons — "but to weaken them and let them sink gradually, by totally disusing and neglecting the militia."[86] Mason's wish, therefore, was to obtain "an express declaration, that the State Governments might arm and discipline" the militia should Congress fail to do so.[87] He further warned that the national government might destroy the militia by using its disciplinary power to make service in the militia so "odious to the people themselves . . . as to make them cry out, *Give us a standing army*."[88]

Mason was answered by Madison, who argued that the power to arm the militia would in fact remain a "concurrent" one, shared between the national government and the states. National responsibility was essential, Madison suggested, because experience demonstrated "that while the power of arming and governing the militia has been solely vested in the State Legislatures, they were neglected and rendered unfit for immediate service."[89] Madison's notion of concurrent powers in turn drew a strong rebuttal from Patrick Henry, who asserted that congressional power over the militia was exclusive, not concurrent. If it were really concurrent, Henry

85. 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 39, at 1270-71.

86. *Id.* at 1271.

87. *Id.* For the identification of Keith, see *id.* at 1298 n.11.

88. *Id.* at 1272. Mason's general argument echoes one made by Luther Martin, the Maryland delegate who left the Constitutional Convention prior to adjournment and who subsequently opposed ratification. Martin complained that the Constitution would "enable the government totally to discard, render useless, and even disarm the militia, when it would remove them out of the way of opposing its ambitious views." Luther Martin, *To the Citizens of Maryland*, MD. J., March 18, 1788, *in* 16 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 419 (John P. Kaminski & Gaspare J. Saladino eds., 1986). The national government, he continued, has "the powers, by *which only* the militia can be organized and armed, and by the neglect of which they may be rendered utterly useless and insignificant, when it suits the ambitious purposes of government." *Id.*

89. 10 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 39, at 1273.

Compendium_Roth
Page 1951

reasoned, the militia would wind up "doubly armed."[90]  This would impose a double set of costs on the militia, Henry warned; yet he also reasoned from experience in terms that strongly echoed Madison. "Every one who is able may have a gun," Henry observed.[91]  "But have we not learned by experience, that necessary as it is to have arms, and though our Assembly has, by a succession of laws for many years, endeavoured to have the militia completely armed, it is still far from being the case?"[92]   In his view, the proper remedy was to empower Congress to arm the militia only after "the States shall have refused or neglected to do it."[93]

Subsequent speakers returned to the question of determining how the militia had actually been armed in the past or might best be armed in the future.  "But it is said, the militia are to be disarmed," the Federalist delegate George Nicholas observed.[94]  "Will they be worse armed than they are now?"[95] Madison was correct to argue for a concurrent power, Nicholas continued,

> For the power of arming them rested in the State Governments before, and although the power be given to the General Government, yet it is not given exclusively.  For, in every instance, where the Constitution intends that the General Government shall exercise any power exclusively of the State Governments, words of exclusion are particularly inserted.[96]

Following this speech, the debate took one of its periodic flights away from the specific clause ostensibly under discussion.  When the militia came back into view some time later, Mason repeated his charge that Congress would use its disciplinary power to impose "such severities . . . on the militia, as would make them wish the use of militia to be utterly abolished; and assent to the establishment of a standing army."[97]  But then Mason, too, veered off to other issues, even surviving a call to order to keep him on point.

We should not be surprised that advocates of the individual right interpretation pay so little attention to these exchanges, because they demonstrate, first and foremost, that leading Federalists and Antifederalists alike assumed that the real problem was to determine

---

90.  *Id.* at 1276.
91.  *Id.*
92.  *Id.*
93.  *Id.*
94.  *Id.* at 1280.
95.  *Id.*
96.  *Id.*
97.  *Id.* at 1289.

Compendium_Roth
Page 1952

CHICAGO-KENT LAW REVIEW

which level of government should be responsible for making sure that the militia was properly armed. George Mason's notion of how the citizenry might be disarmed did not presuppose that federal agents would come gently rapping on farmhouse doors, confiscating weapons and leaving the people evermore unable to thwart the tyrannical designs of their ambitious masters. Rather, the national government would disarm the citizenry simply by failing to provide them with the arms that in fact they rarely possessed or managed to maintain. The preferred Antifederalist alternative was not to allow citizens to acquire weapons on their own; it was rather to shift the burden of supporting the militia to the state governments. But in either case, the militia would clearly remain an institution created and regulated by government. And its effectiveness would depend not on a citizenry already well armed with their own weapons, but on the capacity of government to provide and maintain weapons that the people evidently lacked.

Had this debate been confined to this issue alone, it would already suggest some serious deficiencies in the individual right account. But the discussion which resumed on Monday, June 16, is also revealing in another respect closely related to our modern controversy. For now, with Henry palpably struggling to stick to his subject, discussion turned to the role of the militia in suppressing insurrection and the matter of concurrent national and state powers. In Henry's curious view, seconded by William Grayson,[98] that power "was *exclusively* given to Congress. If it remained in the States it was by implication."[99] Habituated as they were to his distortions, Federalist speakers found this point hard to swallow. John Marshall even "asked if Gentlemen were serious" in these assertions, when "the least attention" would demonstrate their errors.[100] The state governments had always possessed these powers, and nothing in the Constitution deprived them of their original authority to use the militia for their own purposes, except in those specified cases when

98. *Id.* at 1305-06.

99. *Id.* at 1304-05. Grayson went on to repeat the idea that Congress might be free to "entirely neglect" arming the militia in particular states. *Id.* at 1306. This in turn led him to distinguish the deprived situation of the militia in Scotland and Ireland from that in England, which had "an excellent militia law . . . such as I wish to be established by the General Government." And what did this mean in practice? "They have 30,000 select militia in England," Grayson noted approvingly. *Id.* Of course, according to individual right advocates, the idea of a select militia is exactly what Americans were supposed to revile. Unfortunately, Grayson did not have the advantage of reading the contemporary "scholarly consensus" on this point.

100. *Id.*

Congress could legally call the militia into federal service.[101]  State governments would have every right to call out their militia to suppress insurrections, whether emanating from the enslaved element of their populations (who would certainly have enjoyed a natural right to obtain arms for their self-preservation, but whose access to arms was carefully restricted by law) or any other source of disaffection.  But again, what was at stake in this debate was the question of which level of government should be empowered to use the militia to suppress insurrections, not the specter that the Constitution would make it impossible for a privately armed people to rise up against either national or state oppressors.  It was in this context that Mason asked whether a militia which consisted "now of the whole people" would preserve that character in the future.[102]  But here his express concern was not with the danger of the people disarmed, much less of federal confiscation of private weapons, but rather to exempt the militia from the "ignominious punishments and heavy fines" that he expected would be imposed by a Congress too "small, and inadequate" in number to have any "fellow-feeling for the people."[103]

Locating Mason's remark in the context in which it was uttered, then, brings us into a world of assumptions very different from the selective and anachronistic ones that polemicists now choose to impose upon it.  In this world, disarming the militia meant that the government would fail to supply its members with firearms they had little private reason to keep, not sending the lackeys of power out to haul in rusty fowling pieces that would probably not fire in any case, and which one would not bear into combat against better armed regular troops.  In this world, every male citizen might well be eligible for militia service, but the militia was an institution legally created by government, not some pre- or extraconstitutional entity immune to legal regulation.  In this world, what was under debate was not the need to protect a right to revolution but a debate about federalism— that is, a debate about the respective competence and authority of the national and state governments.  And in this world, too, the suspicions that Antifederalists like Mason and Henry voiced only illustrated the deeper deficiencies in their case against the Constitution.

101.  *Id.* at 1306-07.
102.  *Id.* at 1312.
103.  *Id.*

One encounters similar misrepresentations of context in other treatments of leading statements from the ratification period. Among these, the most important is the use made of James Madison's paean to the militia in *The Federalist No. 46*.[104] Rare is the individual-right exposition which does not cite Madison's prediction that any attempt by a standing army to impose tyranny "would be opposed [by] a militia amounting to near half a million of citizens with arms in their hands."[105] It was to "be doubted," Madison continued, "whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops" as the national government could plausibly acquire.[106] And then Madison went on to remind his readers of "the advantage of being armed, which the Americans possess over the people of almost every other nation," and which stood them in sharp contrast to the monarchies of Europe, which "are afraid to trust the people with arms."[107]

We should not be surprised to discover that these vintage snippets are often presented independently of the larger argument they are meant to support and indeed of the very sentences in which they are embedded. Madison's purpose in this essay (and the preceding *Federalist No. 45*) was to compare the relative advantages that the national and state *governments* would enjoy in the zero-sum competition for power that Antifederalists believed the Constitution would launch, and which they further predicted would end in the consolidation of all real authority in the Union while the states withered away as effective jurisdictions of governance.[108] Nowhere in these essays did Madison address, much less defend, the idea that the armed citizenry consisting of the body of the population would be called upon to resist the oppression emanating from the national and state governments in collusion. Instead, his concern throughout was to explain why the political affections and institutional resources that the state governments would command would render any real danger of the erosion of their authority unlikely—including the worst case scenario of military despotism that he then deemed improbable to the point of absurdity.[109]

---

104. THE FEDERALIST NO. 46 (James Madison), *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 26, at 492.

105. *Id.* at 492.

106. *Id.*

107. *Id.* at 493.

108. As I have argued elsewhere, the fear of consolidation was the great controlling theme in Antifederalist polemics. *See* RAKOVE, *supra* note 11, at 148-49, 181-88.

109. It took a lot to get Madison to crank out a truly pungent phrase, but here he observed

The militia was one of those resources that would rally to the support of state government, as (surprise!) the sentences from which his most frequently quoted phrases are extracted (or wrenched) make clear. Thus the sentence in which the reference to half a million armed citizens appears continues: "officered by men chosen from among themselves, fighting for their common liberties"—which are presumably invested in the autonomy of their state governments—and most important, "united and conducted by governments possessing their affections and confidence," the political ingredients that Madison understood would best determine the outcome of whatever rivalry existed between the two levels of American federalism.[110] Similarly, the sentence distinguishing Americans from other peoples begins with the phrase "Besides the advantage of being armed," and then concludes by noting

> the existence of subordinate governments [that is, the states] to which the people are attached, and by which the militia officers are appointed, forms a barrier against the enterprizes of ambition, more insurmountable than any which a simple government of any form [that is, a unified nation-state, whether absolutist like France or parliamentary like Britain] can admit of.[111]

So, too, the thought that other peoples might be less tyrannized if they were possessed of arms is a prelude to a further comment on the advantages of federalism:

> But were the people to possess the additional advantages of local governments chosen by themselves, who could collect the national will, and direct the national force; and of officers appointed out of the militia, by these governments and attached both to them and to the militia, it may be affirmed with the greatest assurance, that the throne of every tyranny in Europe would be speedily overturned, in spite of the legions which surround it.[112]

Nowhere does Madison treat the idea of an armed citizenry existing independently of any government as the best deterrent against despotism; rather, his argument throughout rests on the supposition that the militia is an institution of government, subject to its legal regulation, and the greater likelihood that the members of this militia will commit their affections and loyalty to repel any "projects of

---

that these descriptions of a tyranny imposed by military despotism were "more like the incoherent dreams of a delirious jealousy, or the misjudged exaggerations of a counterfeit zeal, than like the sober apprehensions of genuine patriotism." THE FEDERALIST NO. 46, *supra* note 104, at 492.

110.  *Id.*

111.  *Id.* at 492-93.

112.  *Id.* at 493.

Compendium_Roth
Page 1956

ambition" that the national government might undertake to pursue the "downfal[l] of the State Governments."[113]   Tyranny in the compound republic of the United States would not take the form of a joint national-state assault on the liberties of the people.  Rather, it would necessarily involve an effort by the national government to encroach upon the rights and powers of the states; and should this encroachment take place without the approval of the people's representatives, the state governments would serve as the rallying point for resistance.

For a final example, consider the treatment of the militia question by the writer known as the Federal Farmer, usually identified in the current historical literature as Melancton Smith, the moderate Antifederalist who eventually cooperated in securing ratification by the New York convention in which Federalists were a distinct minority.   In his eighteenth and final letter, the Farmer includes the Mason-like statement that "A militia, when properly formed, are in fact the people themselves, and render regular troops in a great measure unnecessary."[114]   Halbrook, though mistakenly identifying the Farmer with Richard Henry Lee, quotes at length from this essay, which includes an important discussion of the difference between a general militia composed of the body of the people and the select militia which might turn into a tool of power.[115]   But again, the omissions are revealing.   Like Madison in *The Federalist No. 46*, the Farmer poses the problem as one of allocating powers over the militia between two levels of government.   His definition of the militia is preceded by this statement of the problem: "in a federal republic, where the people meet in distinct assemblies, many stipulations are necessary to keep a part from transgressing,

---

113.  *Id.* at 492-93. For representative examples of partial quotations, see HALBROOK, *supra* note 5, at 67-68; Kates, *supra* note 7, at 228.

114.  Letter from the Federal Farmer (Jan. 25, 1788), *in* 17 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 362 (John P. Kaminski & Gaspare J. Saladino eds., 1995).

115.  HALBROOK, *supra* note 5, at 70-72. Halbrook notes that "most of Lee's proposals [that is, the Federal Farmer's] . . . were subsequently adopted in the Bill of Rights, and some with almost identical wording," but in fact the *Letters from the Federal Farmer* contain no such draft of a bill of rights.  On the other hand, as a member of the Continental Congress reviewing the Constitution in late September 1787, Lee had in fact attempted to append a declaration of rights, but his articles contained no mention of the right to bear arms.  The only relevant proposal in Lee's draft amendments was a statement "[t]hat standing Armies in times of peace are dangerous to liberty, and ought not to be permitted unless assented to by two thirds of the Members composing each House of the legislature under the new constitution."  13 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION 239 (John P. Kaminski & Gaspare J. Saladino eds., 1981).  On Lee's efforts to secure amendments, see RAKOVE *supra* note 11, at 108-110.

which would be unnecessary checks against the whole met in one legislature, in one entire government."[116]   The issue, again, was a matter of allocating powers within a structure of federalism, not of defining private rights.   Moreover, in discussing the advantages of a general militia over a select militia, the Farmer actually winds up arguing against the idea that the militia should consist of the entire population.   His own idea, the Farmer writes, was that "the federal head may prescribe a general uniform plan, on which the respective states shall form and train the militia, appoint their officers and solely manage them, except when called into the service of the union."[117] Such an "arrangement," he continues,

> places the sword in the hands of the solid interest of the community, and not in the hands of men destitute of property, of principle, or of attachment to the society and government, who often form the select corps of peace or ordinary establishments: by it, the militia are the people, immediately under the management of the state governments, but on a uniform federal plan . . . .[118]

In this analysis, it turns out, there are two kinds of select militia, neither of which comprises the whole body of the people.   A nationally organized select militia would likely draw upon the worst elements of society, the dregs who formed the feared regular troops of European monarchies; while a state-based select militia (here equated with "the people") would consist of the solid citizens, to the exclusion of the same untrustworthy elements who could not be counted upon to maintain the social order.   And in both cases, the Federal Farmer constructs his argument within a matrix of federalism; he never posits the distinction between government (whether national or state) and population on which the individual right interpretation relies.

Beyond illustrating the propensity of individual right writers to truncate quotations mercilessly, the consideration of these debates and texts demonstrates that the discussions of 1787–88 were preoccupied with the question of the militia, and that this question was addressed almost exclusively under the rubric of federalism. Whether there was, or should be, a private, constitutionally sanctioned right to own and use firearms was simply not at issue. The rhetoric of ratification certainly included many statements from both sides on the advantages of a well regulated militia as a valuable

---

116. Letter from the Federal Farmer (Jan. 25, 1788), *supra* note 114, at 362.

117. *Id.* at 362-63.

118. *Id.* at 363.

alternative to a standing army, but such statements did not require either side to reach the question of the nature and extent of the private rights of ownership and use, much less the question of the power of the states to legislate should the use of firearms prove inimical to the health and welfare of society. No one on either side would have denied that individuals had a private legal right to the ownership of weapons, but the structure of debate neither encouraged nor required anyone to ask whether a constitutional right or duty linked to service in the militia could prevail over matters concerning the internal police of the states—a responsibility that would clearly fall under the reserved powers of the states soon to be recognized in the Tenth Amendment. Both Federalists and Antifederalists, however, did appear to agree on one crucial point: the militia was an institution subject to the legislative control of one level of government or another.

## INTELLECTUAL LEGACIES

Once one grasps how little substantive support the individual right theory derives from the records of debate in 1787–89, it becomes easier to understand why its advocates spend so little time reconstructing these debates, but instead rely on that mode of originalist reasoning that emphasizes the influence of preexisting intellectual traditions. Because those debates did not directly or significantly address the question of whether the new government would be empowered to regulate private ownership of firearms, proponents of the individual right interpretation necessarily turn to those sources that can be read to suggest that a general belief in the liberty-securing advantages of private ownership was so deeply grounded in eighteenth-century Anglo-American political and legal culture as to undergird and inform all discussion of the question. As Joyce Malcolm suggests, the key clues to unlocking the meaning of the Second Amendment lie in "the English legacy," as it was absorbed and expanded upon by the American colonists and revolutionaries. "The English model was constantly before the framers of the American Constitution," Malcolm observes.[119] The Americans faced daunting challenges, but

> Happily, English strategies for prudent control of the sword were ready to hand. When delegates copied English policies the public was reassured. When they departed from them there was grave

---

119. MALCOLM, *supra* note 25, at 150.

Case 3:17-cv-01017-BEN-JLB   Document 128-6   Filed 11/11/22   PageID.16606   Page 125 of 402

concern, which was not allayed until the passage of the Second
Amendment brought the American system more into line with
English practice. Here, then, is the key to the meaning and intent
of the much-misunderstood Second Amendment.[120]

One is only left to wonder how Americans coped with the other
departures from English practice that the Constitution embodied.
Presumably Antifederalists would have been even more assured had
the framers of the Constitution restored monarchy and created an
American nobility.

There is, of course, nothing unique about this effort to locate the
ideas, great and small, of American constitutionalism within larger
intellectual contexts. An enormous literature describes the influence
on American thinking of a host of traditions, ranging from knowledge
of the writings of antiquity, in which all learned men were versed, to
the latest discoveries of Newtonian physics and Lockean psychology,
with ample room for any of a number of other political, religious,
historical, economic, and even literary modes of thought. Yet even if
we concede that different facets of American constitutionalism
reflected one or more or all of these legacies, traditions, and
discourses, the formidable task remains of explaining exactly how
these background beliefs attained dispositive constitutional authority
under the conditions of debate and decision prevailing between 1787
and 1791. It is one thing, after all, to say that a particular belief or
opinion or attitude was part of the *Zeitgeist*, but another matter
entirely to assay its interpretative authority. Nor is this a problem
unique in any way to the Second Amendment. It is in fact a
fundamental problem in writing the intellectual history of the
Constitution to know how to correlate the received wisdom that
shaped the general parameters of political thinking with the particular
decisions on numerous provisions that had to be taken as American
constitutionalism embarked on its inventive, radically textual course.
One can posit, for example, that Locke exerted a pervasive influence
over American ideas about the right of resistance, education, and
epistemology—but with the exception of the Religion Clause and the
Just Compensation Clause, one would be hard pressed to fashion a
Lockean interpretation of any provision of the Constitution.
Montesquieu's theory of the separation of powers exerted enormous
influence over American thinking, as evidenced by the formulaic
restatement of the theory found in the early state constitutions and

120. *Id.* at 151.

declarations of rights. Yet as any reader of *The Federalist No. 47* knows, one can only understand the sense that Americans made of this theory—either in 1776 or 1787—by reconstructing the varied ways in which the framers of their constitutions tried to apply his "doctrine" (if that is even the right term for it).[121]

Consider the problems that Malcolm encounters in the concluding chapter of her recent book on the subject, which is devoted primarily to examining the English background to American practice. Taking Malcolm seriously requires an immediate suspension of disbelief, for neither the language of the Bill of Rights of 1689 nor the doctrine of parliamentary supremacy readily supports the idea that the subject's right to have arms lay beyond the sphere of legislative regulation.[122] Malcolm suggests that the reported popularity of William Blackstone's *Commentaries on the Laws of England* in the colonial market means that the colonists also accepted (lock, stock, and barrel, so to speak) his passing comment on the value of the "auxiliary right" of subjects having "arms for . . . defence."[123] But one cannot implicitly assume that Blackstone's general popularity made his position authoritative on every point; if it had, the colonists would have had to fold their constitutional tents in the face of Blackstone's assertion of parliamentary supremacy. Moreover, Blackstone's own language can be read just as easily—arguably more so—to support the power of legislative regulation. The subjects' right must be "suitable to their condition and degree, and such as are allowed by law," and it is further characterized as "a public allowance, under due restrictions, of the natural right of resistance and self-preservation."[124] Nothing in this language could plausibly be read to establish a private right immune to legislative regulation. Nor does the allusion to a natural right operate as a similar prohibition. It was, after all, one of the great commonplaces of eighteenth-century rights talk to observe that natural rights are always modified by the terms of the social compact. Anglo-Americans operated in a political and legal culture that was deeply

121. *See* THE FEDERALIST No. 47 (James Madison), *in* 15 THE DOCUMENTARY HISTORY OF THE RATIFICATION OF THE CONSTITUTION, *supra* note 26, at 499.

122. "Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." DECLARATION OF RIGHTS art. 7 (1689). The Declaration may be found in LOIS G. SCHWOERER, THE DECLARATION OF RIGHTS, 1689, at 295 (1981).

123. *See* MALCOLM, *supra* note 25, at 142-43 (citation omitted). Blackstone's comments may be found in 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND: A FACSIMILE OF THE FIRST EDITION OF 1765–1769, at 139 (Univ. of Chicago Press 1979).

124. *Id.*

respectful of the natural right of property, but that did not prevent
legislatures on both sides of the Atlantic from imposing taxes and
other regulations of the rights of property in the normal exercise of
their power.[125]

Once Malcolm reaches American shores, the problematic nature
of her argument becomes even more evident.  Legislation requiring
various groups of colonists (primarily in the seventeenth century) to
carry arms does not establish the existence of a late-eighteenth-
century right lying beyond legislative regulation; and in any case, a
legislature that can require arms to be carried in the interest of
intimidating slaves and Indians can also prohibit the same act in the
name of public security.[126]  Nor does repetition of the hackneyed
point that the colonists freely shared an English fear of standing
armies even begin to identify the limits on legislative regulation.
Malcolm documents the claim that Americans "were also alert to the
dangers of a 'select militia'" with a single, rather vague reference to a
1773 sermon.[127]    Only one of the state declarations of rights
(Pennsylvania) adopted in the early years of independence asserted a
right to bear arms for self-defense, as well as the common defense;[128]
and only the Virginia declaration qualified its reference to the militia
with the apposite phrase, "composed of the body of the people."[129]
Not to worry, however, Malcolm assures us.  Even those states "which
failed to mention a right to have arms for individual defence" must
have intended to endorse a general militia.[130]  And how do we know
this?  "Because of their long-standing prejudice against a select militia
as constituting a form of standing army liable to be skewed politically
and dangerous to liberty, every state had created a general militia."[131]
Moreover, "the individual's right to be armed, where not specifically
mentioned, is unmistakably assumed."[132]  And how do we know this?
Because the broad statement of the usual trinity of natural rights,
including the right "of enjoying and defending life and liberty" or
"obtaining happiness and safety" would be meaningless "if citizens

---

125. See the useful summary of this point in FORREST MCDONALD, NOVUS ORDO
SECLORUM: THE INTELLECTUAL ORIGINS OF THE CONSTITUTION 10-36 (1985).

126. *See* MALCOLM, *supra* note 25, at 138-41.

127. *Id.* at 142.

128. *See* 5 THE FOUNDERS' CONSTITUTION 7 (Philip B. Kurland & Ralph Lerner eds.,
1987).

129. *Id.* at 3.

130. MALCOLM, *supra* note 25, at 148.

131. *Id.*

132. *Id.*

were deprived of the right to be armed."[133]

This is less an argument from ample historical evidence than a faulty syllogism resting on questionable premises and circular reasoning. At crucial junctures in her argument—when one has to ask, just how was the English legacy translated into American practice—Malcolm resorts to such vaguely asserted forms of evidence as "long-standing prejudice," things that are "unmistakably assumed,"[134] and the abiding influence of Blackstone's statement about the danger of "oppression,"[135] typically omitting his qualifications subjecting possession and use of arms to legal restriction.[136] These are assertions rather than demonstrations; they establish only that such familiar themes as the fear of standing armies and the belief in a natural right of self-defense were part of the universe of political attitudes shared by eighteenth-century Americans. They do not explain, however, how much interpretative weight these preexisting "attitudes, prejudices, and policies"[137] can bear when we try to determine what the adopters of the Second Amendment thought they were doing, much less why the principles so loosely stated there should trump either existing understandings of the legislative powers of the states or the relevant textual provisions of the federal Constitution.

What the individual right interpretation establishes, then, is something less than meets the eye. Did Americans in general believe or affirm the value of an armed citizenry? Of course they did, and in doing so, they freely invoked images made familiar by the common radical Whig reading of history. Was this belief part of the intellectual currency which shaped the general discussion of issues relating to the standing army, the militia, and the respective authority of the national and state governments? Of course it was. But did Federalists and Antifederalists agree about the relative importance of an armed citizenry in promoting the future welfare of the United States? Of course they did not. For Antifederalists, the appeal to the armed citizenry was meant as an alternative to the substantive provisions of the Constitution which threatened the creation of a standing army that would command obedience at the point of a

---

133. *Id.* at 149.
134. *Id.* at 148.
135. *Id.* at 145.
136. *See* BLACKSTONE, *supra* note 123, at 139, and accompanying text.
137. *Id.* at 162.

bayonet.[138]  For Federalists, by contrast, the presumed existence of an armed citizenry offered yet another reason to dismiss Antifederalist predictions of tyranny as so many phantasms of their opponents' overheated imaginations.

Yet even if one recognizes that this belief remained part of the political culture of the late 1780s, a critical problem persists: how would the legal authority of the states to regulate the use and ownership of firearms be affected or altered by a constitutional provision understood as a restriction on the authority of the national government?  If the colonies and states had previously exercised jurisdiction in this area, as they demonstrably had, and if the logic of the Antifederalist position was to enhance the authority of the state governments vis-à-vis that of the new national government, what difference would the adoption of the Second Amendment make to the reserved powers of the states?  A belief in the value of an armed citizenry is consistent with a view of the Second Amendment as an injunction to the federal government not to rely solely on its own army, but to continue to keep the militia well armed and disciplined.  It could similarly be read as a reminder to the state governments of their responsibility not to depend solely on federal largesse (funded mandates, in effect) to perform their duty to maintain their militia, especially to counteract the danger of domestic insurrection.  But there is no evidence that the generalized belief in the armed citizenry distilled in the Second Amendment was understood to be the equivalent of an Article I, Section 10 restriction on the legislative authority of the states.

## LESSONS OF EXPERIENCE

This reliance on intellectual sources of American attitudes is the more striking when it is set against a final category of evidence that the individual right interpretation seems reluctant to embrace: the lessons learned by the experience of the Revolutionary War, or more generally, from the departures in constitutional thinking and practice to which the Revolution gave rise.  Put simply, the individual right interpretation is an argument against change, and is in that sense

---

138. As Michael Bellesiles notes, perhaps the most important development in the battlefield use of firearms in the eighteenth century came when the Duke of Cumberland realized the advantage of affixing a socket bayonet to the end of a musket, enabling soldiers to fire (or receive) a single volley, and then charge the enemy to inflict more devastating casualties with the blade than they could ever attain with the ball.  *See* MICHAEL A. BELLESILES, ARMING AMERICA: THE ORIGINS OF A NATIONAL GUN CULTURE 144-46 (2000).

fundamentally ahistorical.   It assumes that a body of writings absorbed by Americans prior to 1776 was completely formative of how they thought after 1776; the principles ostensibly laid down in *Cato's Letters* and the other supposed sources remained determinative of American thinking through 1789 (and beyond). Nothing that intervened in the form of experience and experiment could alter or diminish the weight of that received authority.   By contrast, the interpretation of the Second Amendment that anchors its meaning in the immediate debates of the late 1780s, and especially in the specific issue of the militia, presupposes that fundamental changes in American thinking had begun to develop since 1776.  The rhetorical deference that Federalist writers sometimes paid to traditional concepts (like the value of an armed citizenry) could not disguise the self-consciously empirical and experimental qualities of mind that distinguished the proponents of constitutional reform from its antagonists.  Antifederalists may have been men of little faith in the Constitution because they remained all too faithful to ideas that may have carried them into revolution in 1776, but which experience had since rendered problematic if not indeed obsolete.[139]  In this view, the debate over the militia cannot be explained merely by reference to Machiavelli, or Trenchard and Gordon, or Blackstone.  Authority unconfirmed or actively challenged by events was no longer binding; it could only be weighed in the light of events and experience.  Or to put the point more directly: Their ideas (like ours) were shaped not only by what they read, but also (and arguably more powerfully) by what they did or had done to them.[140]  Thinking of the origins of the

---

139.  On this general point, compare BAILYN, *supra* note 69, with the classic essay by Cecelia M. Kenyon, *Men of Little Faith: The Anti-Federalists on the Nature of Representative Government*, 12 WM. & MARY Q. 3 (1955). *See also* RAKOVE, *supra* note 11, at 149-60. There is an extensive scholarly literature which seeks to differentiate Federalists and Antifederalists in terms of qualities of mind, attitudes toward change, and the capacity (we might now say) to think "outside the box" of received authority.

140.  For an illustration of this point, consider this passing comment by Levinson, alluding to an observation made by the distinguished historian, Edmund Morgan: "Morgan argues, incidentally, that the armed yeomanry was neither effective as a fighting force nor particularly protective of popular liberty, but that is another matter.  For our purposes, the ideological perceptions are surely more important than the 'reality' accompanying them." Levinson, *supra* note 3, at 648 n.54. It may well be true that all our constructions of reality (whose existence I, for one, do not doubt) are shaped by ideology, but what is at issue here is, I believe, a more fundamental problem that has deeper echoes in the historiography of the Revolutionary era more generally. No historian would deny that the legacy of radical Whig ideology was a major element in American political thinking, both in 1776 and in 1787. Yet by the latter date, experience (whose existence Levinson seems to posit as "reality") had called into question many of the propositions that were stock elements of that ideology; and the framers of the Constitution, as well as the Federalist majority who proposed the Second Amendment, represented that portion of the spectrum of American political thinking who were now less

Case 3:17-cv-01017-BEN-JLB   Document 128-6   Filed 11/11/22   PageID.16612   Page 131 of 402

Second Amendment within this context yields two major challenges to the individual right interpretation, one of which (the more familiar) can be labeled political, the other (and more recently explored) behavioral.

The political context, which is principally identified with the writings of the historians Lawrence Cress and Don Higginbotham,[141] has already been implicated throughout this article. It suggests, quite simply, that the real object of debate in the late 1780s was the militia, and that thinking about the militia was now driven primarily by lessons derived from the crucible of revolutionary conflict. That the militia had served important functions in that war was not to be denied, and recent historical scholarship has confirmed the point.[142] But to say that the militia had been useful was not to say that national defense could henceforth be allowed to rely upon it. Projects of militia reform were supported by the retired commander in chief, George Washington, and the new secretary of war, Henry Knox, in the mid-1780s, but they fell victim to the desuetude of the Continental Congress. The calling of the Constitutional Convention, however, gave Washington and other like-minded men a new opportunity to lay the necessary groundwork for the desired reforms, and the resulting provisions of the Constitution reflected their desire. Henceforth the militia would be an institution subject to substantial national regulation, with the state governments sharing concurrent responsibility for appointment of officers and the actual conduct of training, and concurrent power to use these units, when not called into national service, for their own lawful purposes (including, of course, the suppression of insurrections by disaffected citizens presumably exercising their natural right of revolution).

Nothing in the ensuing discussions of these proposals required or even encouraged either Federalists or Antifederalists to consider the matter of state or national regulation of the private ownership and use of firearms. It follows that no coherent intentions or understandings can be confidently ascribed to a problem that was never

---

beholden to the received wisdom. That is, they were more inclined to test the ideological inheritance against the lessons of recent experience. Far from this being, in Levinson's words, "another matter," it lies at the heart of the question.

141. *See* Lawrence Delbert Cress, *An Armed Community: The Origins and Meaning of the Right to Bear Arms*, 71 J. AM. HIST. 22 (1984); Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship*, 55 WM. & MARY Q. 39 (1998).

142. See the brilliant essay by John Shy, *The American Revolution: The Military Conflict Considered As a Revolutionary War*, *in* ESSAYS ON THE AMERICAN REVOLUTION 121 (Stephen G. Kurtz & James H. Hutson eds., 1973).

cogently formulated in its own right. Whether or not individuals had a right to own firearms free of regulation by the states was a matter of complete indifference in 1787–89.

The behavioral context is most clearly associated with the work of Michael Bellesiles, which will doubtless attract substantial notice and scrutiny. Probing beyond the hackneyed paeans to American sharpshooting that occur both in the primary sources (some of them clearly contrived for European eyes)[143] and in later writings, Bellesiles is evidently the first historian to examine the actual use of firearms in the colonial, Revolutionary, and post-Revolutionary eras.[144] What he discovers, among other things, is that many, perhaps the majority of American households, did not possess firearms; that Americans imported virtually all of their firearms; that the weapons they had were likely to deteriorate rapidly, firearms being delicate mechanisms, prone to rust and disrepair; that gunsmiths were few, far between, and not especially skilled; that the militia were poorly armed and trained, their occasional drilling days an occasion for carousing rather than acquiring the military art; that Americans had little use for hunting, it being much more efficient to slaughter your favorite mammal grazing in the neighboring pasture or foraging in nearby woods than to take the time to track some attractive haunch of venison with a weapon that would be difficult to load, aim, and fire before the fleshy object of your desire went bounding off for greener pastures. (Trapping was much more efficient than hunting, and hunting was a leisure activity for the elite.)[145] All of these considerations make plausible and explicable the concerns we have already noted in describing the Virginia ratification debate of mid-June 1788: that without a national government firmly committed to the support of the militia, the institution would wither away from inefficiency, indifference, and neglect (which is pretty much what happened in any case, for reasons both Federalists and Antifederalists readily foresaw). Americans of all political persuasions could pay rhetorical lip service to the value of an armed citizenry, because that

---

143. One might express some skepticism about the accuracy of Jefferson's statement of 1778, when (in a letter to an Italian correspondent about music) he explained why he thought American casualties might be half those of the British army: "This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy." Letter from Thomas Jefferson to Giovanni Fabbroni (June 8, 1778), *in* THOMAS JEFFERSON: WRITINGS 760, 760 (Merrill D. Peterson ed., 1984).

144. For a preliminary report of findings, see Michael A. Bellesiles, *The Origins of Gun Culture in the United States, 1760–1865*, 83 J. AM. HIST. 425 (1996).

145. *See* BELLESILES, *supra* note 138, *passim*.

sentiment was embedded in the traditions that the individual right interpretation celebrates; but the reality was quite otherwise.[146]

Bellesiles's findings, coupled with the evidence that militia reform was indeed the object of debate, thus illustrate a fundamental problem that all originalist inquiries must address. Once we move beyond the immediate records of debate to reconstruct deeper assumptions and concerns upon which they rested, originalists need to assess the relative importance of two quite different sets of sources, one consisting of intellectual traditions that doubtless shaped a grammar of discussion, the other of a set of experiences that fashioned an agenda for action. The tension between these two ways of thinking would presumably operate at any period, but we have good reason to think that it was felt more acutely during the Revolutionary era, when Americans were deeply aware of the fundamental break that their experiment in republican constitutionalism was making with the received wisdom of the past. This claim appears repeatedly in Federalist literature—including, most notably, *The Federalist*—and it renders problematic the naive, not to say ahistorical claim that underlies the approach taken by Malcolm and other writers of the individual right school: that transposition of the English experience or the authority of received tradition fills in the silences in the evidentiary record. It may or it may not; but the argument cannot stand on assertion alone. It requires some comparison of received ideas and the lessons of experience; but one searches the individual right literature in vain for any sustained mention, much less discussion, of the immediate concerns on which Americans were acting. In their account, the prior conception of the militia rooted in tradition somehow trumps the newer notions that the experience of the Revolution made more urgent. That is an arguable conclusion, but if so, it must be argued— and historical argument requires weighing conflicting evidence, not accepting one source and discounting another.

## A DECLARATORY RIGHT

Modern thinking about constitutional rights is powerfully and indelibly shaped by the legacy of the Fourteenth Amendment, the gradual development of the incorporation doctrine, the civil rights revolution of the 1950s and the 1960s, and the broader controversies

146. *See id.*

that followed the landmark, rights-enlarging decisions of the Warren and Burger Courts. The logic of the individual right interpretation of the Second Amendment is deeply indebted to these developments in three ways, two of which are fairly obvious, but the third rather more subtle and even deceptive.

First, the rights revolution established the protection of individual rights as the dominant paradigm governing our underlying conception of the problem of rights in general, for it is the "no person" who claims recognition under the Due Process and Equal Protection Clauses of the Fourteenth Amendment who has evolved into the image of the "lone rights-bearer" lamented by Mary Ann Glendon.[147] It is the individual gun owner whose right is perceived to be the endangered object of legislative restriction.

Second, the incorporation doctrine makes the actions of state and local legislative bodies restricting the exercise of federally sanctioned rights subject to judicial review. Its incomplete application accordingly leads to the question: Why has the constitutional right seemingly affirmed by the Second Amendment not enjoyed the benefit of incorporation? Indeed, ending the exile of the Second Amendment to the district of unincorporated rights is as much the object of the individual right interpretation as insisting upon a particular account of the original understanding of 1787–91. It would do no good to demonstrate conclusively that the framers and ratifiers of those years really did regard a fundamental right to own weapons as a necessary security against the danger of tyranny, if one could not at the same time produce a compelling rationale for its incorporation today.

There is, however, a third legacy of incorporation that also shapes—or perhaps distorts—our historical understanding of the nature of the right that the Second Amendment asserts. Given the broad application of the incorporation doctrine to remedy injustice and secure relief in decision after landmark decision, it is only natural that we now regard the Bill of Rights as a set of legally enforceable claims and commands. If a right is asserted, there must be a remedy when its exercise is infringed, and a remedy requires recourse to law. To have a right without a legally efficacious remedy is arguably to have no right at all, and if that is so, it would seem rather naive and pointless to think of a bill of rights (any bill of rights) as a set of hollow principles. As invested as we are (legally) in the jurisprudence

---

147. *See* GLENDON, *supra* note 21, at 47.

of the Bill of Rights and (culturally) in veneration of the wisdom of the constitutional fathers, it is difficult to suggest that they could have been so naive as to enumerate rights for which they did not intend remedies.

Yet at the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands. The state declarations of rights of 1776 were filled with statements of this nature, and many of these statements—and arguably the bills of rights *in toto*—lacked legal authority. A statement endorsing the principle of rotation in office did not impose term limits on legislators; it simply reminded voters that they would be well advised, from time to time, to send the bumpkins back to the country. To be sure, it was precisely because such statements had demonstrated their "inefficacy" that Madison first dismissed bills of rights as so many "parchment barriers,"[148] and then proposed interweaving his amendments in the most salient places in the Constitution, rather than see them appended as supplemental articles. The movement away from the norms of 1776 was also reflected in his congressional colleagues' rejection of the formulaic restatement of natural rights that Madison originally proposed as a sort of second preamble to the Constitution, and which he revealingly classified as "a bill of rights," in apparent contradistinction to his remaining, interwoven amendments.[149] Any comparison of the amendments of 1787 with the state declarations will reveal how far American thinking had moved since 1776.

Yet among all the provisions of the federal Bill of Rights, the Second Amendment is the one that most clearly echoes the earlier tradition. That is the most obvious explanation for the mysterious

---

148. Letter from James Madison to Thomas Jefferson (Oct. 17, 1788), *in* JAMES MADISON: WRITINGS 418, 420 (Jack N. Rakove ed., 1999).

149. *See* James Madison, Speech in Congress Proposing Constitutional Amendments (June 8, 1789), *in* JAMES MADISON: WRITINGS, *supra* note 148, at 437, 441, 444. In rejecting these statements, Congress may have been acting on the same assumptions that Edmund Randolph had voiced at the Constitutional Convention two years earlier, when, as a member of the Committee of Detail, he noted that the national constitution need not come adorned with the rhetorical flourishes that accompanied the state constitutions. Such a "display of theory, howsoever proper in the first formation of state governments, *is* unfit here; since we are not working on the natural rights of men not yet gathered into society, but upon those rights, modified by society, and *interwoven with* what we call the rights of states." Edmund Randolph, *Draft Sketch of Constitution* (July 26, 1787), *in* SUPPLEMENT TO MAX FARRAND'S THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 183, 183 (James H. Hutson ed., 1987).

presence of the distinctive preamble that is the object of so much analysis, from the syntactical to the metaphysical. As Eugene Volokh has recently noted, the preamble is not quite so esoteric or exceptional a statement as it is often made to appear. Set in the larger context of Revolutionary-era pronouncements, it is almost "commonplace."[150] But intent as Volokh is on parsing the relation of the preamble to the operative provision, he misses a more obvious point that better captures or represents the context in which the Second Amendment was formulated. What was still a commonplace was the idea that a declaration of rights could contain statements of republican principles as well as provisions confirming or specifying natural rights (freedom of conscience), political safeguards (freedom of speech, press, assembly, and petition), common law procedural rights (Fourth, Fifth, Sixth, and Eight Amendments), or superfluous remedies against idiosyncratic grievances (such as quartering of soldiers in peacetime).

Under this interpretation, the Second Amendment can be read as a simple, elegant, distilled version of the comparable statements found in the state declarations of rights and the amendments recommended by several ratification conventions. It affirmed the essential proposition—or commonplace—that liberty fared better when republican polities relied upon a militia of citizens soldiers for their defense, rather than risk the dire consequences of sustaining a permanent military establishment. It therefore served as a principled reminder to the federal government (or more particularly, Congress) to act to insure that the militia would indeed remain well organized, armed, and disciplined—not least by guaranteeing that arms be provided to state governments and citizen soldiers who might otherwise lack the resources and desire to obtain and maintain costly firearms prone to disrepair. The Second Amendment, however, also omitted more restrictive provisions that Antifederalists would have liked or expected to find there, because the dominant Federalist majority in Congress saw no need to make the text more explicit. There was no need, for example, to repeat the ritual mantra against standing armies, for Federalists had repeatedly insisted that the constitutional restriction of appropriations to two years meant that a true standing army—that is, a permanent military force existing independently of control by the people's representatives—could

---

150. Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. REV. 793 (1998). Volokh conveniently provides an appendix of similarly styled articles. *See id.* at 814-21.

Compendium_Roth
Page 1971

literally not be created.  One can speculate, too, that the Senate
deleted the substantive phrase, "composed of the body of the
people," for sheer redundancy, in an act (Amar suggests) of "stylistic
shortening."  But a Congress that wanted to affirm a general principle
without compromising its own capacity (or that of future Congresses)
to decide what form the militia should take would have had more
potent reasons to eliminate that phrase.  By the same token, while the
Second Amendment generally endorsed the value of a well-regulated
militia, as a mere statement of principle it made no alteration of any
kind in the delegation and allocation of legislative authority in
Article I.

It goes almost without saying that the statement of a general
principle may fall well short of the provision of adequate remedies for
its infringement.  But that deficiency would have mattered to the
framers of the Second Amendment only insofar as they believed that
the Constitution posed a real threat requiring a remedy.  They lacked
any incentive to move beyond the vague generalities of the language
they finally adopted, and with good reason not to do so if greater
precision could be read as imposing a meaningful restriction on the
ability of Congress to develop whatever form of militia considerations
of national security seemed to require.

Yet the brevity and ambiguity of the Second Amendment may
illuminate a deeper problem with the very conception of a bill of
rights.  We may be reluctant to admit it, but the task of reducing the
statement of a right to a concise textual formula, in the style of the
national Constitution, suggests that the concept of a right may be far
more difficult to cabin successfully than other kinds of statements we
expect to find in a constitutional text.  Stating a theory of freedom of
speech or conscience, for example, is not quite equivalent to
specifying modes of election or terms of office or even the respective
powers of institutions.  The very concept of a right remains a source
of philosophical perplexity, and so, on occasion, does the
identification of the rights bearer, including the keeper and bearer of
arms.  Is that right a duty we owe to the state or a manifestation of a
natural right of resistance and self-protection?  Is the individual who
can claim to exercise a right to protect his home the same individual
who forms part of the people mobilized in the militia?  Does it make
sense to speak of an individual right to arms in the context of a right
of revolution, which must be a collective act of mass resistance if it is

not to devolve into an expression of anarcho-terrorism?[151]

In his letter discussing the problem of bills of rights as "parchment barriers," Madison casually mentioned the problem that would arise if "a positive declaration of some of the most essential rights could not be obtained in the requisite latitude."[152]   His particular example involved a right to which he was far more attached than the right to bear arms: freedom of conscience.  Madison worried that this cherished right might have to be textually tailored more narrowly than it should be in principle if it was to acquire the requisite political support.  But Madison's concern with the difficulty of stating a right in a textually satisfactory way may illuminate a deeper problem.  What textual formula, expressed in the succinct style that the American constitutional tradition initially favored, could possibly capture and distill the  matrix of principles and concerns that underlie any conception of a right, while simultaneously identifying the rights bearer, the interest to be protected, and the point where that protection yields to legitimate demands for regulation?  Given the circumstances of 1789, when we cannot be certain how seriously the framers of the Bill of Rights were taking their assignment, it takes a high degree of confidence in their desire to achieve "perspicuity" to conclude that the authors of the amendments were acting with as much textual exactitude as we seek to extract in our own labored readings of these twenty-seven words. Somewhere up there, one suspects, Fisher Ames might still be chuckling: "Oh! I had forgot, the right of the people to bear arms. Risum teneatis amici[.]"[153]  Hold your laughter, friends!—except that the subject is too deadly serious for that.

---

151.  The leading scholar working on this issue is David Williams, who has argued in various places that while the Second Amendment was framed to express or confirm a popular right of revolution, that right is now obsolete because no unitary people of the kind imagined by the theorists of the eighteenth century could ever again form.  At the same time, Williams denies that the Amendment recognizes a constitutionally protected private right of self-defense.  For Williams's various expositions of his ideas, see David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 YALE L.J. 551 (1991); David C. Williams, *The Constitutional Right to "Conservative" Revolution*, 32 HARV. C.R.-C.L. L. REV. 413 (1997); David C. Williams, *The Militia Movement and Second Amendment Revolution: Conjuring with the People*, 81 CORNELL L. REV. 879 (1996).

152.  Letter from James Madison to Thomas Jefferson, *supra* note 148, at 420.

153.  Letter from Fisher Ames to Thomas Dwight, *supra* note 12, at 642.

Compendium_Roth
Page 1973

## CONCLUSION

Beneath their huzzas of conquest delivered on a field supposedly cleared of beaten opponents, cowed into retreat by the exemplary scholarship of the victors, the proponents of the individual right interpretation betray the reason for the peculiar emphases and distortions that mark their writings. Had there been any reason for the constitutional disputants of the late 1780s to discuss, directly and consciously, the extent of private rights of the ownership and use of firearms, advocates of the individual right interpretation would certainly have filled their articles with the apposite remarks. They would not have had to pepper their quotations with the tell-tale ellipses that invite critical readers to check what has been omitted (as in the use made of *The Federalist No. 46*); or make preposterous claims that are easily refuted (such as James Madison's supposed endorsement of Tench Coxe's description of the right to bear arms as a private right); or suggest that the deletion of a substantive qualification of the nature of the militia ("composed of the body of the people") was an inconsequential exercise in editorial concision; or use one textual rule for defining *people* and another for *militia*. Had the framers and ratifiers of the Constitution really perceived the problem in terms of a private right detached from service in the public institution of the militia, we would know it, and the writings of Halbrook, Kates, Malcolm, and others would take a different form. For *ceteris paribus*, direct expressions of framers' intentions and ratifiers' understandings would always provide the best evidence of the original meaning of a disputed constitutional clause.

But the structure of the debates of the late 1780s did not conduce to pose the problem in the form that proponents of the individual right interpretation would prefer to exploit. As the records from the Constitutional Convention, the ensuing ratification campaign, and the debates in the First Congress of 1789 all demonstrate, the issue under discussion was always the militia, and that issue was posed primarily as a matter of defining the respective powers of two levels of government. It was the inertial condition of American federalism— the existence of states with some intractable measure of autonomy, including the militia, yet bound for collective security in a federal union coeval with their independence—that ineluctably gave the debate this form. This controlling circumstance, to be sure, did not prevent odd expressions of concern about the private ownership and use of weapons from being *voiced*, but it did prevent such concerns

Compendium_Roth
Page 1974

from reaching the threshold required for focused discussion, much less becoming the true object of debate. Nor was there then any reason to think of the ownership and use of firearms as a problem of public health and welfare. Under conceptions prevailing then and even now, such concerns fell completely under the conventional police powers of the states, and nothing in the structure of debate between 1787 and 1789 invited inquiry into the effect the Constitution would have in this realm. The debate over a bill of rights, as everyone knows, was about limiting the powers of the proposed national government, not trenching further on the traditional police responsibilities of the states. Similarly, because firearms had little practical use in private life, and were hardly dangerous except in warfare, it is completely anachronistic to expect the disputants of the eighteenth century to have comprehended, much less addressed, the problem of firearms regulation in its modern form. For much the same reason, the framers and ratifiers of the Fifth Amendment did not consider the problem of wiretapping or more sophisticated forms of electronic surveillance; nor did they ask whether a Constitution that allowed the national government to raise land and naval forces would be embarrassed by the establishment of the United States Air Force.

Given these difficulties, it is not surprising that the individual right interpretation relies so much on the weight of received tradition, in the form of warnings about the danger of standing armies, the virtues of an armed citizenry, and what Joyce Malcolm disarmingly calls "long-standing prejudice" or things that are "unmistakably assumed."[154] Sir William Blackstone never visited America, nor was he a member of the Constitutional Convention, but his works were widely read, so it naturally follows that his speculative claim that an armed people would be able "to restrain the violence of oppression" provides the proverbial smoking pistol to solve the mystery of the Second Amendment.[155]

All that this emphasis on received wisdom can establish or confirm, however, is the familiar point that Americans feared standing armies and hoped that the maintenance of a well regulated militia would obviate the need for a substantial national military establishment. This was indeed, to borrow Malcolm's phrase, a long-standing prejudice, and it certainly left its mark on the grammar of

---

154. MALCOLM, *supra* note 25, at 148.
155. *Id.* at 163.

eighteenth-century republicanism. But the authority of such prior sentiments was exactly what the revolutionaries and constitutionalists of the 1770s and 1780s were prepared to, and did, challenge. Long-standing prejudice suggested that the British constitution was the embodiment of the best political science of the era, but Americans not only departed freely from its form and structure, they also invented a new definition of what a constitution itself was to replace the one they had inherited. The exercises of constitution-writing in 1776 and especially in 1787 were shaped within the crucible, the hothouse experience, of revolution and revolutionary war, and some of the lessons that experience taught bore directly on the subject at hand: the role and value of either the militia as an organized institution or of an armed citizenry whose private weapons proved to be inadequate in number, quality, and repair. Not surprisingly, the individual right interpretation passes in nearly complete silence over the obvious question: Were Americans in the late 1780s thinking about the militia in exactly the same unchanged terms as they had in 1776? Some of them admittedly were, but they were far more likely to be numbered among the losers in the constitutional debates of 1787–89 than the victors. And that is why we can fairly conclude that Madison had substantive reasons for omitting the phrase "composed of the body of the people" from his original draft of the amendment; why a Senate that included Rufus King, one of the committee members who framed the Militia Clause at the Constitutional Convention, would have deleted this phrase after the House had added it; and why a conference committee that included Madison for the House left that deletion unchallenged.

Finally, the complete omission from the individual right interpretation of any discussion of the police power of the states constitutes potentially its most telling flaw, while simultaneously exposing a deeper dilemma in its dependence on originalism. If we read the Constitution intratextually, how do we triangulate the echoes between the *people* of the Second and Ninth Amendments, on the one hand, and the reserved powers of the states under the Tenth Amendment, on the other? Like the Second Amendment, the Tenth Amendment takes the form of an ambiguously stated injunction which arguably adds little if anything to the positive content of the Constitution. Yet it is impossible to conceive how the Tenth Amendment could have excluded the traditional power of government to legislate broadly for public health and safety from the reserved powers of the states. It is precisely because this traditional

function was (and remains) so essential to our concept of governance that the individual right interpretation has to insist that the principal purpose of the Second Amendment is to provide a powerful deterrent against tyranny. Only by evoking that speculative threat to the republic itself can the individual right interpretation identify a danger more ominous than the actual costs annually incurred through the casual and deliberate use of firearms.

If, then, one wished to adjudicate the Second Amendment dispute on originalist grounds, it would not be enough to adduce a historically delimited meaning of the word *militia* and the existence of a right of resistance and revolution that would be rendered meaningless if the population were disarmed. One would also have to ask whether the adopters of the Second Amendment thought or understood that they were seriously restricting the normal police powers of the state in order to preserve that revolutionary option. Even putting aside the formidable problems that this Article has emphasized in the individual right interpreters' use of originalist evidence, their arguments would still need to confront a completely different line of originalist argument—anchored in the Tenth Amendment—that they have so far largely ignored. One originalist argument holds that the danger of tyranny still warrants a broad construction of the Second Amendment, and that the right to be armed must therefore vest in the population as a whole, because the modern militia (the National Guard) is already too closely tied to the potential source of despotism to act the part that Madison and others of his generation accorded to the state-based militia of their era. The other argument holds that the Constitution, amended or unamended, did not diminish the capacity of the states to legislate in pursuit of the public health and safety. What has changed over time is not our basic understanding of the responsibility of state governance in this respect, other shifts in the balance of state and federal activity notwithstanding, but rather our appreciation of the danger that casual use of firearms poses.

The true way, then, in which the Second Amendment problem (as an exercise in originalism) should be cast is this: If its adopters had the same evidence available to them that we possess today, would they place greater weight on the speculative danger of tyranny, rooted in their reconstruction of the history of early modern Europe and their fear of consolidated power? Or would they agree that pressing problems of the present warrant placing greater emphasis on the police powers of the states? Either position can be argued on

originalist grounds, but posing the problem in this way identifies a deeper irony in the larger debate. For at bottom, the individual right interpretation insists that fears rooted in the historical memories of the eighteenth century should still take priority over the judgments we are entitled to reach after two centuries of constitutional self-government.[156] Those fears were certainly legitimate then, for the founders of American constitutionalism had good reason and historical evidence aplenty to wonder whether their experiment would work. That is what makes their leap of constitutional faith so compelling and their fears of standing armies and national despotism so understandable.

But is it true that the success of American constitutionalism two centuries and more later is due to the existence of a well-armed citizenry? We have been told that the decline of bowling leagues may be an index of the well-being of democratic civil society, but does it follow that the welfare of constitutional governance is directly correlated with the distribution of portable weapons, up to and including the automatic weapons that occasionally figure in schoolyard shootings?[157] Somehow I have naively labored under the impression that the strength of our constitutional culture lies elsewhere, in the commitment of our citizenry to principles of representative government, equality, and (increasingly) tolerance; but

---

156. On this point, supporters of the individual right interpretation would argue that our own frame of reference should include the experience of totalitarian rule and genocide in countries like Nazi Germany, the Soviet Union, and other horror stories of the past century; and that is, of course, a telling argument. But so is the appropriate response: that none of these countries had developed a democratic or constitutional culture, or established institutions and conventions of republican government, supported and shared by citizens and ruling elites alike, across a period of some generations, while successfully acculturating immigrants whose own origins were often not rooted in similarly democratic cultures. See the discussion of this point in Reynolds, *supra* note 48, at 504-07, and sources cited therein.

157. I am not completely reassured by the explanation on this point offered by Glenn Harlan Reynolds:

> Because one purpose of the right is to allow individuals to form up into militia units at a moment's notice, the kinds of weapons protected are those in general military use, or those that, though designed for civilians, are substantially equivalent to those military weapons. Because another purpose is the defense of the home, Standard Model writers also import common-law limitations on the right to arms, as they existed at the time of the framing. Under the common law, individuals had a right to keep and bear arms, but not such arms as were inherently a menace to neighbors, or that had an unavoidable tendency to terrify the community. Thus, weapons such as machine guns, howitzers, or nuclear weapons would not be permitted. Note however that the much-vilified "assault rifle" would be protected under this interpretation—not in spite of its military character, but because of it.

*Id.* at 479-80. In some ways, I think I would be more terrified of an AK-47 next door than a howitzer, on the assumption that whatever target the howitzer hit would be some miles distant, while a neighbor fending off a burglar with a full automatic burst could easily put an alarming number of rounds into my own little (and regrettably unfortified) castle.

after this disconcerting journey to the Second Amendment theater, my confidence has been shaken.

THE DEADLY WEAPON LAWS OF TEXAS: REGULATING GUNS, KNIVES, AND

KNUCKLES IN THE LONE STAR STATE, 1836-1930

by

BRENNAN GARDNER RIVAS

Bachelor of Arts, 2010
Oklahoma State University
Stillwater, Oklahoma

Master of Arts, 2013
Texas Christian University
Fort Worth, Texas

Submitted to the graduate faculty of
AddRan College of Liberal Arts
Texas Christian University
in partial fulfillment of the requirements
for the degree of

Doctor of Philosophy

May 2019

THE DEADLY WEAPON LAWS OF TEXAS:
REGULATING GUNS, KNIVES, & KNUCKLES IN THE LONE STAR STATE, 1836-1930

By

Brennan Gardner Rivas

Thesis approved:

Gregg Cantrell

Major Professor

Alan Gallay

Rebecca Sharpless

Todd M Kerstetter

Peter Worthing

For the College of Liberal Arts

Copyright by
Brennan Nicole Rivas
2019

ACKNOWLEDGMENTS

Undertaking this task of researching and writing a dissertation has been the most difficult and rewarding of my life. In pursuing my goal of obtaining a terminal degree, I have received tremendous assistance from others, particularly Gregg Cantrell, my dissertation advisor. Alan Gallay reviewed early chapter drafts and participated greatly in the construction of the final product. The remaining members of my dissertation committee, Rebecca Sharpless and Todd Kerstetter, provided much-needed advice and support in this project and throughout my graduate career at TCU. Other professors and scholars I wish to thank include Randolph B. Campbell, Stephanie Cole, William Meier, and Kara Dixon Vuic.

The completion of this dissertation was made possible in part by the generosity of Marine Lance Cpl. Benjamin W. Schmidt and his family. I wish to thank Dr. David and Mrs. Teresa Schmidt for raising an honorable young man who became a brave American soldier. Their ongoing support of the TCU history department and its emerging scholars is an honor which has not gone unnoticed.

I have also become indebted to many archivists and civil servants who have aided me in locating and accessing records that were crucial to this dissertation. These include Brenda McClurkin with UT-Arlington Library Special Collections, alongside Tonia Wood and Laura Saegert at the Texas State Library and Archives Commission. I would also like to thank Kerry McGuire at the McLennan County Archives. Public officials in Fayette County provided unparalleled assistance, including Judge Ed Janecka, District Clerk Linda Svrcek, and County Clerk Julie Karstedt.

Finally, I would like to thank my husband, Alexis Rivas, for his support and patience while I worked on this project. I also wish to thank my parents, Randy and Vicky Gardner, for instilling in me a love of learning and a passion for history.

Compendium_Roth
Page 1983

TABLE OF CONTENTS

Acknowledgments…………………………………………………………………...ii

List of Figures………………………………………………………………………iv

I. Introduction……………………………………………………………………..1

II. Weapon Regulations in Texas, 1836-1866……………………………………….9

III. A New Era of Gun Regulation in Texas, 1866-1873……………………………..41

IV. "The Proper Costume of a Gentleman": Courts & Constitutionality

from *English* to *Miller*………………………………………………………83

V. "The Revolver Must Go": Regulating Deadly Weapons, 1887-1918………………124

VI. Enforcing the Pistol Law in Texas, 1870-1930…………………………………164

VII. Conclusion……………………………………………………………………196

Bibliography………………………………………………………………………207

Vita

Abstract

Compendium_Roth
Page 1984

## LIST OF FIGURES

1. Fig. 1.1—Bowie knife and sheath…………………………………………………………11

2. Fig. 1.2—Twentieth-century rendition of Arkansas toothpick………………………………11

3. Fig. 2.1—Map of House Democratic votes on HB 297, 1870………………………………..72

4. Fig. 2.2—Map of House votes on HB 115, 1871………………………………………………..78

5. Fig. 4.1—"Toy Pistol Playground"……………………………………………………………133

6. Fig. 4.2—Map of House votes in support of HB 47, 1905…………………………………153

7. Fig. 5.1—Indictments against deadly weapon violators, 1870-1910………………………...173

8. Fig. 5.2—Deadly weapon cases in justice and county courts, Fayette County, 1890-1905…175

9. Fig. 5.3—Average total cost for guilty defendants, Fayette Justice Court, 1876-1904……..178

10. Fig. 5.4—Average total cost for guilty defendants, McLennan County Court,

    1876-1930……………………………………………………………………………………178

11. Fig. 5.5—Penalties for Hispanic violators, 1905-1932……………………………………..181

12. Fig. 5.6—Fayette County census data, 1870-1920…………………………………………192

13. Fig. 5.7—McLennan County census data, 1870-1920……………………………………..192

14. Fig. 5.8—Fayette County violators, 1870-1879……………………………………………192

15. Fig. 5.9—Fayette County violators, 1870-1930……………………………………………193

16. Fig. 5.10—McLennan County Hispanic and Black/Mulatto Violators, 1870-1930……….195

iv

# Introduction

In 1994 the Republican Party cemented its dominance in Texas politics with George W. Bush's gubernatorial victory over the Democratic incumbent Ann Richards. A tangential yet emotionally stirring issue in the campaign involved allowing the carrying of concealed handguns, something that had been illegal in Texas for more than a century. Richards had taken a strong stand against loosening the state's tough gun laws, but Bush promised to sign any bill on the subject passed by the legislature. His position echoed the de-regulatory character of the Reagan-era Republican Party and resonated with many conservative Texans, especially in rural counties. Shortly after Bush's inauguration, the legislature allowed law-abiding residents who passed the requisite training class to obtain state-issued permits to carry concealed handguns. Since that time, the legislature has continued to relax state firearm regulations culminating in the 2015 vote to allow the open carrying of handguns for license-holders.

The 1995 Texas concealed-carry law may seem at first glance like the common-sense removal of an intrusive or unpopular regulation. The stereotype of Texas as a gun-lover's paradise only reinforces this assumption. But this event in the Bush gubernatorial administration marks a significant departure from the past. In fact, the Texas tradition of regulating deadly weapons reached back to the antebellum period and remained popular among the electorate for most of the state's history. The purpose of this book is to separate the gun-toting myth from this regulatory reality.

Much of the scholarship on the history of American firearm regulations has had severe drawbacks in terms of its accuracy, tone, and reception. Our current political debate over gun laws and gun rights has produced partisan scholars who use history as a bully pulpit and skeptical readers who refuse to accept inconvenient facts about the past. Both afflictions hinder a

1

proper understanding of firearms and their regulation in American history. The early twenty-first century controversy over *Arming America* by Michael A. Bellesiles stands as a testament to this ugly impasse between politically engaged historians and the general public. Though recent works on weapons and violence have generated less media attention than that, many have fallen into the same pattern of partisanship and policy advocacy. This exacerbates popular anti-intellectualism and contributes to the further deterioration of our civil discourse.[1]

The well-intentioned yet politically motivated historians who have written about weapon laws do not bear sole responsibility for the state of their academic field today. Another important component has been the production of explicitly partisan material for the consumption of policymakers and jurists. Publications abound from think-tanks and policy centers, the vast majority of which subjugate the study of the past to the desires of the present. These articles, pamphlets, and books show little concern for understanding holistically the views and customs about weapons held by our ancestors; instead, they present the mere facts of gun ownership or government regulation of guns as justification for one or another modern policy. Though both sides of the aisle in American politics employ this tactic, the right has done so far more forcefully and effectively. Right-leaning legal and policy scholars have constructed a "gun rights" outlook that limits discussion exclusively to the Second Amendment, condemns firearm regulations as relics of a racist past, and posits a negative correlation between guns and violent

---

[1] Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Knopf, 2000); Alexander DeConde, *Gun Violence in America: The Struggle for Control* (Boston: Northeastern University Press, 2001); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Caroline Light, *Stand Your Ground: A History of America's Love Affair with Lethal Self-Defense* (Boston: Beacon Press, 2017). The trend is not isolated to works related to gun culture and gun control, as evidenced by Lisa McGirr, *The War on Alcohol: Prohibition and the Rise of the American State* (New York: W.W. Norton, 2015).

2

crime. Though the legal analysis may be sound, these publications rely upon faulty interpretations of the past and their biases undermine their persuasiveness.[2]

The controversial and partisan nature of scholarship pertaining to gun regulations is not the field's only problem. Another is the overwhelming focus upon national narratives and constitutionalism to the exclusion of all else. Many historians and policymakers alike would have the American public believe that the only words of consequence pertaining to gun laws are those of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[3] One side claims this sentence as an unrestricted constitutional right to own and use all manner of weapons, while the other interprets it as a right to collective self-defense. Both perspectives ignore the longstanding, important role of state and municipal governments in regulating the behaviors of their residents. The even-handed analyses that do acknowledge the long history of state restrictions often do so without fully exploring the reasons why the nation's founders vested such authority in local rather than national institutions. For these authors, the existence of colonial, state, or municipal firearm laws justifies their occupation of a nebulous "middle ground" between the opposing camps arguing over the Second Amendment's meaning and history. The problem with this position, however, is that the longstanding coexistence of state-level weapon regulations with the Second Amendment has had more to do with the founding generation's views about federalism than firearms. Losing sight of state-level regulations and authority has

---

[2] Right-leaning Cato Institute has a webpage dedicated to posting and circulating articles about gun control. See https://www.cato.org/research/gun-control. On the left, the Center for American Progress dedicates a page to articles about gun violence. See https://www.americanprogress.org/tag/gun-violence/. John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws* (Chicago: University of Chicago Press, 1998); David B. Kopel, *The Truth about Gun Control* (New York: Encounter Books, 2013); Clayton E. Cramer, *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (Nashville, TN: Nelson Current, 2006); Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876* (Westport, CT: Praeger, 1998).
[3] U.S. Const. amend. II.

3

been detrimental to the study of gun regulations and their history because the statutes in question, particularly those targeted by gun-rights lobbyists since the 1970s, are those enacted by the states.[4]

The matrix of partisan scholarship and Second Amendment myopia has obscured the changing relationship of our American ancestors to their firearms, and to their state governments. At the time of our country's founding, intellectuals drew a distinction between *bearing* arms and simply *carrying* them. A man bearing arms was one fulfilling his civic, manly duty to protect his family and community from invaders or criminals. American men bore arms on a regular basis as members of local militia units that performed various functions for the community. These included well-known actions like fighting in wars and putting down rebellions alongside the less glamorous activities of law enforcement, slave patrol, and killing animals that threatened the harvest. Prior to professional policing, deputized and armed citizens played a crucial role in the apprehension of fugitives, the incarceration of criminals, and the operation of local courts. If bearing arms in service to the community was a custom imbued with meaning for early American men, the mere act of carrying weapons was not. Knives, firearms, and dangerous tools were ubiquitous in the eighteenth and nineteenth centuries. Men of all stripes carried them regularly, or even daily, for the purposes of hunting, self-defense, and dueling. Such activities did not connote the same civic duty and social significance that bearing arms did because they were private and non-noteworthy matters.[5]

---

[4] Winkler posits a "middle ground in which gun rights and laws providing for public safety from gun violence can coexist." Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (New York: W.W. Norton, 2011). See also Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018); Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80, no. 2 (2017): 55-83; Duke University Repository of Historical Gun Laws, https://law.duke.edu/gunlaws/.
[5] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (Oxford: Oxford University Press, 2006), 3-7, 13-18.

Compendium_Roth
Page 1989

As important as the distinction between bearing arms and carrying them is the difference between *arms* and *deadly weapons*. As the nineteenth century progressed, Americans began to separate those weapons used for interpersonal violence from those borne for martial purposes. Militiamen used muskets, rifles, cavalry sidearms, sabers, and even cannon. Laws rarely curtailed access to these weapons of war or restricted their presence in the public sphere (the primary exception being those designed to limit the access of slaves and Indians to firearms). Militia units kept armories and even obtained arms and ammunition from their state governments. Shotguns, important for hunters, received similar exemption from regulation or proscription. Nineteenth-century Americans tended to see revolvers, bowie knives, sword canes, and brass knuckles in a completely different light. These were instruments of interpersonal violence often concealable beneath a coat or in a pocket—they were *deadly weapons*. When state legislatures began prohibiting concealed weapons in the early nineteenth century and enacting comprehensive weapon bans after the Civil War, they specifically targeted these deadly weapons rather than rifles or muskets.

Misunderstanding the relationship between early Americans and their firearms has resulted in widespread ignorance of the power wielded by state governments over the use of weapons throughout American history. This prerogative was rooted in a concept that William Blackstone called "public police." He defined it as, "the due regulation and domestic order of the kingdom: whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighbourhood, and good manners; and to be decent, industrious, and inoffensive in their respective stations."[6] After the Revolution, this intertwined responsibility for the common weal and authority over the

---

[6] William Blackstone, *Commentaries on the Laws of England*, 4 vols. (Oxford: Oxford, 1765-1769), 4:13.

citizenry did not disappear. It became vested within the state governments and took on the name *police power*. Under the auspices of police power, nineteenth-century state governments enacted all manner of regulations upon the behavior of their residents, including laws pertaining to carrying or concealing deadly weapons and the sale or gift of them to untrustworthy persons. The importance of state governments in regulating firearms and other deadly weapons for the common good requires us to rethink the history of gun control in terms of state rather than federal power.[7]

A state-level survey of laws pertaining to the use, sale, and carrying of weapons promises to shed new light upon Americans' views of these devices and their regulation by democratic institutions. The states and territories that embraced weapon regulation statutes most wholeheartedly were those of the American South during the antebellum period and the American West during the postbellum period. A good case study, then, must exemplify both regions in order to explain why their residents became supporters of gun laws.  High rates of interpersonal violence during the early nineteenth century prompted the southern states to make use of their police power insofar as it related to weapons. Between 1800 and 1840, these governments enacted non-comprehensive regulations that prohibited certain modes of carrying weapons, outlawed some activities that required their use, and prevented suspect persons from having them at all. By 1840 white men in much of the South were legally prohibited from concealing knives and pistols under their clothing and participating in duels, while black men had tightly restricted access to arms. During and after the Civil War era, the fast-growing states of the trans-Mississippi West started passing comprehensive laws that prohibited carrying any type of deadly weapon with few exceptions. From Minnesota to Arizona, and Indian Territory to

---

[7] Gary Gerstle, *Liberty and Coercion: The Paradox of American Government from the Founding to the Present* (Princeton: Princeton University Press, 2015), 2-4, 59-61.

Idaho, Americans on the fringe of Anglo settlement voiced support for gun laws that promised to preserve the peace and prevent crime.[8]

Of those few states which straddle both South and West, Texas offers the best state-level survey. The political leaders and early settlers of the Lone Star State were Anglo-American southerners who strongly identified with their section; yet the residents of the western counties had more in common with the American West, subject as they were to Indian raids, lack of transportation, and an abundance of underutilized natural resources. Antebellum Texans prohibited dueling, mounted an anti-concealed-weapon movement, and debated state policy pertaining to slaves' and Indians' access to firearms. In the postbellum period, Texans were among the first to champion comprehensive weapon regulations that criminalized the carrying of deadly weapons in most circumstances. By the early twentieth century, Texas lawmakers began exploring new ways to indirectly pressure gun-toters to leave their pistols at home. The diversity of the state's geography and demography add to its desirability as a case study. Inequitable enforcement of weapon regulations could have been used to harass African Americans, Hispanics, and the politically powerful enclaves of European immigrants.

The chapters that follow illuminate the long history of firearm and weapon laws in Texas. These began during the Republic period of the 1830s and 1840s with overtly discriminatory restrictions upon providing arms to suspicious or untrustworthy persons. The earliest prohibited selling or trading arms and ammunition to Indians, and the 1840 slave code began a tradition of limiting slaves' access to weapons that postbellum leaders tried to apply to black freedmen. The

---

[8] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 180-181; Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, CT: Praeger, 1999); Donald Curtis Brown, "The Great Gun-Toting Controversy, 1869-1910: The Old West Gun Culture and Public Shootings," (PhD diss., Tulane University, 1983). According to Roth, American cities retained low rates of homicide until the 1840s, but high rates of homicide plagued the Southern states throughout much of the eighteenth and nineteenth centuries.

legislature in Austin first enacted race-neutral gun laws, those which we might consider "modern" like our own, during Reconstruction as part of an effort to reduce crime and protect vulnerable minorities from intimidation by former Confederates. In the late nineteenth and early twentieth centuries, Texans from all corners of the state participated in what can only be called a gun control movement seeking to disarm almost everyone—even cowboys. As Texas became a destination for more and better-capitalized business investment, a rising middle class rejected gun-toting as an uncivilized behavior not suitable for respectable men. Widespread support for the deadly weapon laws of Texas remained throughout much of the twentieth century. The final chapter in this story is the erosion of that support in the latter twentieth century, much of it premised upon antipathy toward federal gun legislation and a selective memory of the state's past.

Chapter 1
Weapon Regulations in Texas, 1836-1866

The fundamental concept underlying regulation of weapons, whether in Texas or elsewhere, is the belief that limiting access to them safeguards the community by reducing crime. The legality of laws restricting access to or use of weapons varies depending upon the system of government in place. The concept of *police power* authorized American state governments (and their colonial predecessors) to pass such laws for the common good, but the Bill of Rights prevented the national government from doing the same. In Texas, where a Spanish legal heritage left an indelible mark and the liberal-republican values of the American Revolution inspired the founding documents of the Republic in 1836, the question of police power is a tricky one. The Mexican government certainly wielded something along the lines of police power, restricting the wearing of weapons in public by disgraced Spanish *criollos* after independence in 1822.[1] When Tejanos and Texians joined forces to throw off *centralista* rule, they embraced the limited government and unassailable individual rights of liberal political theory. Insofar as weapons were concerned, the authors of the constitution of the Republic of Texas chose to restrict their police power. In fact, the Republic's version of the American Second Amendment forthrightly declared that citizens had the right to bear arms both for national defense and personal self-defense—a unity of two purposes that is not explicit in the Second Amendment and was not articulated by the United States Supreme Court until 2008.[2]

---

[1] "Decree No. 38," 27 November 1827, Saltillo; in H. P. N. Gammel, comp., *Gammel's Laws of Texas*, vol. 1 (Austin: Gammel Book Company, 1898), 204-205. (Hereafter, all subsequent citations of this and other editions of *Gammel's Laws of Texas* will be cited as "Gammel, (comp.), *Gammel's Laws*" followed by the volume and page numbers.

[2] Rep. of Tex. Const. of 1836. The text from the 1836 constitution states: "Every citizen shall have the right to bear arms in defence of himself and the Republic." The Second Amendment's application to personal self-defense was articulated by the US Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

9

The reason for the Texan interpretation of the right to bear arms as one encompassing both national defense and self-defense likely emanates from the perilous environment of the region during the eighteenth and nineteenth centuries. Early settlers in what is now Texas lived in a time and place filled with opportunities for violent confrontations with soldiers, Indians, wild animals and one another. Relations between Spanish (and later Mexican) officials and Indian leaders were tense at best, and often deadly. The introduction of Anglo American, Protestant settlers under the *empresario* system of the 1820s and early 1830s added yet another group to Texas, one whose desired mode of subsistence (commercial agriculture) put them at odds with ranching Tejanos and raiding Comanches. Farmers and ranchers routinely fell prey to Native American war parties and came to know the dangers of frontier living. The successive military engagements within the borders of Texas from the 1820s to the 1840s left many residents familiar with invasion and occupation. These invasions, along with the daily threat of Indian raids and animal attacks, made Texas a dangerous and violent place to live in comparison to larger population centers in Mexico and the United States.

In a perilous environment like early Texas, weapons were a necessity. Muskets and rifles pulled double-duty by enabling men to hunt as well as protect their communities through service in a militia or posse. Pistols had long been used for activities ranging from dueling to self-defense, though they became more common after the introduction of the Colt revolver in the 1840s. The go-to weapon for personal self-defense, though, was a large 8½ to 12½ inch blade known as the Bowie knife. Texas immigrant Jim Bowie made the knife famous after he used it to great effect in a duel known as the Sandbar Fight.[3] These large knives were quite dependable in a

---

[3] Kevin Dougherty, *Weapons of Mississippi* (Oxford: University of Mississippi Press, 2010), 40-41; *Handbook of Texas Online*, William R. Williamson, "Bowie Knife," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/lnb01.

scrape because, unlike the single-shot pistols of the time, they did not need to be reloaded.

Similar weapons included the Arkansas toothpick, a sharply tapered blade of similar length, and the "Spanish stiletto" or *narvaja*, a slightly shorter folding or switchblade knife (see Figs. 1.1, 1.2).

Fig. 1.1. Bowie knife and sheath, physical object, Date Unknown; (texashistory.unt.edu/ark:/67531/metapth30343/: accessed January 25, 2018), University of North Texas Libraries, The Portal to Texas History, texashistory.unt.edu; crediting Star of the Republic Museum



Fig. 1.2. 20th century rendition of Arkansas Toothpick; made by Jimmy Lile; 1970; Historic Arkansas Museum, Knife Gallery (http://www.historicarkansas.org/collections/knife-arkansas-toothpick accessed January 25, 2018).



11

Though Texas citizens remained insulated from government interference with their right to bear arms, they faced penalties for committing certain weapon-related crimes. The Republic of Texas Congress continued the policies of the preceding Spanish and Mexican governments by restricting the arms trade between settlers and Native Americans. The Spanish prohibited the trading of high-quality weapons to Indians in the eighteenth century, and the Mexican state of Coahuila y Texas reaffirmed the illegality of trading arms to Indians in 1834.[4] The Republic of Texas endured (and at times exacerbated) conflicts with nearby Native Americans for the duration of its decade-long existence. The primary political division within the young republic, between the supporters of Sam Houston and those of Mirabeau Lamar, revolved around rival Indian policies—with the former urging cooperation and peace, and the latter seeking conquest and extermination. Texans found themselves in a unique predicament: unable to fully defend their southern border from Mexican incursions, and simultaneously incapable of preventing Indian raids upon their livestock and people. Their situation was made worse by the thousands of migrants making their way across the Mississippi River, all of whom needed livestock and labor. These migrants included white settlers seeking their fortune in cotton cultivation, as well as the thousands of Native Americans forcibly relocated under the federal policy of Indian Removal. Horses and people captured in Texas often ended up in one or another US-authorized trading posts on the north side of the Red River, in Indian Territory. The Americans running the posts frequently traded in stolen horses, but they generally sought to ransom white captives (a distinction that may have been unclear to Comanches and others who nonetheless rode away having been paid to turn over a hostage).

---

[4] "Decree No. 278," 19 April 1834, Monclova; in Gammel (comp.), *Gammel's Laws*, 1:380-381; Pekka Hämäläinen, *The Comanche Empire* (New Haven: Yale University Press, 2008), 72-73.

Compendium_Roth
Page 1997

The most famous of these Red River trading posts was that of Holland Coffee, a Kentuckian who set up his operation first in Fort Smith, Arkansas before moving west to Indian Territory and finally into Texas in the late 1830s. Coffee was well-acquainted with the customs, languages, and leaders of tribes in the Southwest and traded with them frequently, likely exchanging whiskey, ammunition, and guns for captives, horses, and livestock. Coffee's license from the American Office of Indian Affairs meant that, as long as he remained in Indian Territory, Texans could do no more than complain about his actions. In 1835, Jim Bowie specifically requested that local officials in Nacogdoches investigate Coffee's practices, but war prevented anything from being done. Traders like Coffee found themselves between a rock and a hard place during the Texan war for independence; they hoped to continue their lucrative trade with trans-Mississippi Indians but went up against new competition from Mexican agents hoping to enlist Native Americans against the rebels in Texas.[5] When Coffee moved to Texas in 1837, his reputation as a wartime arms dealer to hostile tribes prompted the Texas Congress to investigate him. Congressmen questioned him under oath but could not convict him of any wrongdoing (and actually reimbursed him for ransoms paid to free white hostages brought to his post). Despite his transition from life on the fringes of society to landed respectability, Coffee's critics continued to accuse him of engaging in illegal Indian trade. One account claims that as late as 1840 he still traded in goods and captives stolen by Comanches, Cherokees, and Kickapoos.[6] A few years later, Jim Bowie had his posthumous revenge—his namesake knife dealt a fatal blow to Coffee during an argument that turned deadly.[7]

---

[5] Grant Foreman, *Pioneer Days in the Early Southwest* (1926; repr., Lincoln: University of Nebraska Press, 1994), 234.
[6] William Physick Zuber, *My Eighty Years in Texas* (Austin: University of Texas Press, 1971), 107-111.
[7] Audry J. and Glenna Middlebrooks, "Coffee of Red River" *Southwestern Historical Quarterly* 69, no 2 (October 1965), 161. On Holland Coffee, see also David R. Jennys, "Holland Coffee: Fur Trader on the Red River," *The Museum of the Fur Trade Quarterly* 29, no. 3 (Fall 1993): 1-9; Larry O'Dell, "Coffee's Post," *The Encyclopedia of Oklahoma History and Culture*, www.okhistory.org (accessed January 25, 2018); *Handbook of Texas Online*, Morris

Laws regulating trade with American Indians might have placed weapons and ammunition on a prohibited list, but they do not qualify as "gun laws" as we understand them today. Numerous scholars of Native American history consistently remind us that they were separate, independent polities that often controlled vast swaths of land nominally claimed by European or American powers. Governments usually exert some control over international trade and prohibit it entirely between their people and their enemies. Within this context, it only makes sense that Texans (along with Spaniards, Mexicans, Britons, and Americans) tried to keep a watchful eye on their Indian traders and prevent potential enemies from obtaining weapons of war. That being said, these common-sense regulations intervened in the affairs of traders and threatened their livelihoods by prohibiting them from providing the very goods that tribes wanted most: arms, ammunition, and alcohol. The risk to their businesses surely tempted them to break the law, as Holland Coffee may very well have done while simultaneously serving in the Texas legislature. The kind of fearless, individualistic, and self-sufficient men who made their fortunes through trapping and trading quite possibly looked with disdain upon distant governing bodies with little or no actual power along the frontier.[8]

The actions of unscrupulous traders posed an existential threat to Texans during the 1830s by providing arms to Indian raiding parties, but it was the way in which Coffee died, not his mode of making money, that posed a more persistent problem in the young republic. The frequency with which residents resorted to violence to settle their disputes led Southern states to enact the nation's first "gun control" laws as part of an effort to reduce these deadly encounters.

---

L. Britton, "Coffee, Holland," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/fco12.

[8] Though scholarship on masculinity among frontiersmen is sparse, the conclusions of Amy S. Greenberg indicate that the aggressive masculinity behind Manifest Destiny is best represented through filibustering campaigns; filibusterers were motivated by self-interest and lacked respect for government policies, much like frontier traders seem to have done. See Amy S. Greenberg, *Manifest Manhood and the Antebellum American Empire* (New York: Cambridge University Press, 2005), 33, 148-152.

Compendium_Roth
Page 1999

Brawls, duels, affrays, and street-fights were a common occurrence throughout the South and Southwest in the century following American independence; in fact, homicide rates on the old southwestern frontier did not begin to decline until the 1930s.[9] As the market economy spread into frontier areas in the early nineteenth century, the boatmen transporting goods up and down the Mississippi River found trouble wherever they stopped along the way. Whiskey and cards led to many a fight, and minds clouded by John Barleycorn were all the more willing to win by reaching into a pocket for a hidden knife or pistol. Kentucky and Louisiana responded in 1813 by banning concealed weapons. Indiana followed suit in 1816, followed by Alabama, Georgia, and Virginia in the 1820s and 1830s. In 1821, Tennessee barred certain weapons from the public sphere altogether. The distinction between regulating the right to bear arms by prohibiting *concealed* weapons and removing the right to bear arms by prohibiting all *concealable* weapons became an important one in Texas. Tennessee became the first state to make this leap when the legislature forbade the carrying of any "dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistol" concealed or openly. Persons found in possession of illicit or hidden weapons typically received a hefty fine, but those carrying or using weapons in the commission of another crime (like burglary or assault) went to the penitentiary.[10]

States banning concealed weapons had several important similarities. Each was experiencing rapid population growth and the establishment of commercial agriculture. Between 1800 and 1820, Tennessee's population quadrupled, while Alabama's population rose by more

---

[9] Roth, *American Homicide*, 341.
[10] The 1821 law provided for a five dollar fine for each offense, and a later statute (1838) called for a harsher sentence for homicides committed with knives. 1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13; 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4. https://law.duke.edu/gunlaws/. On Tennessee's 1838 laws regarding concealed weapons, see Cramer, *Concealed Weapons Laws*, 105-112.

15

than 300 percent from 1800 to 1840.[11] As farmers brought ever more land into cultivation, they frequently moved beyond the reach of government institutions. Sparse population and a lack of roads made it tough to enforce the law in frontier areas. Judges had difficulty traveling their circuits, and criminals could easily tax the resources of county sheriffs. Without roads, post offices, resident judges, or access to state officials, farmers of these rural regions felt forgotten or taken advantage of by politicians in the capital. This absence of government authority in rural areas produced skepticism and disdain about the effectiveness of the law to settle interpersonal disputes.[12] States passing prohibitions against concealed weapons also tended to be slaveholding, Southern states. The lone exception is Indiana, a state initially settled by Southerners that often defies regional trends.[13] Scholars have long suspected that exposure to the brutality of slavery made Southerners a more violent group of people than their Northern counterparts.[14] No doubt the expectation of Southern men to periodically be brutal and unforgiving toward slaves played an important role in justifying extralegal violence like brawls and duels. A final commonality among the states in question is the uncertainty with which middling farmers saw their futures. Despite rapid settlement and population growth, the agricultural regions of the South had a stifled middle class, stuck between a fabulously wealthy planter elite and a desperately impoverished class of poor whites.[15]

---

[11]United States Census of Population and Housing. *United States Resident Population by State: 1790 – 1850*. https://www.census.gov/prod/www/decennial.html.

[12] Roth, *American Homicide*, 220-224.

[13] Roth, *American Homicide*, 219; Cramer, *Concealed Weapons Laws*, 77-78.

[14] David T. Courtwright, *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* (Cambridge: Harvard University Press, 1996), 30; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th Century American South* (New York: Oxford University Press, 1984), 9-33; Roth, *American Homicide*, 180; Cramer, *Concealed Weapons Laws*, 18-22.

[15] On the importance of economic uncertainty in the post-Revolutionary South, see Roth, *American Homicide*, 186-187. Texas scholar William Ransom Hogan also draws a correlation between economic turmoil and interpersonal violence. See William Ransom Hogan, *The Texas Republic: A Social and Economic History* (Norman: University of Oklahoma Press, 1946), 289.

In its early years as a republic and American state, Texas met these conditions. Emigrants "gone to Texas" uprooted themselves from every Southern state (and even a few Northern ones, too). They took with them the desire to become prosperous through commercial farming, especially cotton cultivation. Young men-on-the-make flocked to Texas seeking wealth, wartime glory, and a role in the establishment of a new republic. When financial shortfalls prompted President Sam Houston to disband army volunteer units, some disgruntled soldiers took to terrorizing residents in nearby towns. A Baptist minister in Washington County (then the seat of government) told of their Sabbath drunkenness and gambling.[16] With relatively few marriageable women, startlingly weak church institutions, and a dearth of government officials, there was little in Texas to prevent rowdy young men from doing as they pleased. Lawlessness was especially problematic in the boomtown of Houston, the settlements along the lower Brazos and Colorado Rivers, and East Texas. One chronicler claimed that "it is considered unsafe to walk through the Streets of the Principal Towns without being armed."[17] Gamblers abounded, and the unruly element within Texas towns often harassed law-abiding residents into violent confrontations. Proponents of law and order responded by forming vigilance committees and acquitting their upstanding neighbors when taken to trial over a "difficulty" that culminated in a ruffian's death. Some counties did not receive organized courts or judicial districts until 1838, while East Texas devolved into a small-scale civil war known as the Regulator-Moderator War.[18] Speaking of East Texas in the early 1840s, Sam Houston allegedly said, "I think it advisable to declare [them]… free and independent governments, and let them fight it out."[19]

---

[16] Jesse Guy Smith, *Heroes of the Saddle Bags: A History of Christian Denominations in the Republic of Texas* (San Antonio: The Naylor Company, 1951), 74-75.

[17] Quoted in Joseph William Schmitz, *Texas Culture in the Days of the Republic, 1836-1846* (San Antonio: The Naylor Company, 1960), 80.

[18] Hogan, *The Texas Republic*, 274, 262-263, 274-275, 258.

[19] Quoted in *Handbook of Texas Online*, Gilbert M. Cuthbertson, "Regulator-Moderator War," accessed January 16, 2018, http://www.tshaonline.org/handbook/online/articles/jcr01.

Compendium_Roth
Page 2002

Conditions in Texas were ripe for the enactment of a concealed weapons law, and there was a vocal movement in favor of such legislation. Beginning in 1838, some Texans bemoaned the human cost of crimes "solely attributable to unbridled passions and the practice of wearing concealed weapons."[20] Events in Houston in 1838 fueled this reformist zeal. An argument between two gamblers ended with one, J. C. Quick, killing the other, while a similar dispute between two soldiers left Mandrid Wood dead at the hands of David Jones. The condemned men waited in Houston's newly constructed jail—a weakly guarded palisade—to be rescued by supporters or executed by the law.[21] Some two thousand Texans turned out to witness the republic's first executions for murder, with one spectator praising his countrymen's willingness to "prosecute to the tomb those who . . . perpetrate deeds of Hell." This anonymous contributor spoke for a large number of his fellow Texans who patted themselves on the back for contradicting their nation's reputation as a place where "cold-blooded, malicious murder might be perpetrated without the fear of a condemnation of the law or public feeling." The successful prosecution of Quick and Jones was proof of the republic's civilization, as well as the "moral worth" of its recent immigrants.[22]

If the legal system was strong enough to obtain justice against Quick and Jones, and reduce crime in fast-growing Houston, then a prohibition against concealed weapons could bring similar relief and progress to every corner of Texas. One writer praised Tennessee, whose prohibitions of gambling, grogshops, and concealed weapons were thought to have contributed to "the lessening of crime, and vast improvement in the morals of her once thoughtless and deluded

---

[20] "Execution," *Telegraph and Texas Register* (Houston, TX), March 31, 1838.
[21] On the Quick and Jones cases, see B. H. Carroll, *Standard History of Houston Texas from a Study of the Original Sources* (Knoxville: H. W. Crew & Co., 1912); Hogan, *The Texas Republic*, 261.
[22] "Execution," *Telegraph and Texas Register*.

18

sons."[23] In 1839 a Congressman representing Fayette County in central Texas introduced a bill to do that very thing. James S. Lester's "Act to prevent persons from carrying concealed deadly weapons" easily passed through the House without debate or amendment. Its supporters in the Senate featured men from across the republic, especially East Texas; but they did not have the numbers or the time to push the bill through the upper chamber. The legislative session ended shortly after Lester's bill made its way to the Senate, and the issue remained dormant for about a decade.[24]

Debate among Texans over a concealed weapons ban continued in the 1840s but took place within the halls of the Constitutional Convention of 1845 rather than the legislature. With Texas's entry into the Union that year, Texas politicians had to write a new constitution that conformed to the laws of the United States. There was no question that they would retain a state guarantee for the liberty of bearing arms, but a number of delegates sought to curtail that right as it had existed during the Republic period. William B. Ochiltree, the most successful Whig politician in Texas, suggested a right to keep and bear arms "for their common defense, provided that the Legislature shall have the right to pass laws prohibiting the carrying of deadly weapons secretly." Ochiltree's language represented a sharp break from the past for two reasons: it authorized legislative regulation against concealed weapons; and it removed the explicit inclusion of personal self-defense within the right to bear arms. Ochiltree's suggestion immediately alienated delegates who thought it went too far and simultaneously aroused the opposition of delegates who believed it did not go far enough. Lemuel Evans of north Texas,

---

[23] "A Few Thoughts," *Telegraph and Texas Register* (Houston, TX), October 27, 1838. Reprinted from *Mobile (AL) Chronicle*.
[24] See *Journal of the House of Representatives of the Republic of Texas*, 3d Cong., Reg. Sess. (1838), 325; *Journal of the Senate of the Republic of Texas*, 3d Cong., Reg. Sess. (1838), 126. (Hereafter, all subsequent citations of this and other editions of *Journal of the House of Representatives of the Republic of Texas*, *Journal of the Senate of the Republic of Texas*, *Journal of the House of Representatives of the State of Texas*, and *Journal of the Senate of the State of Texas* will be cited as *"House Journal"* or *"Senate Journal"* with the year following in parentheses).

19

Joseph L. Hogg of east Texas, and John Hemphill of central Texas fell into the latter category because they wanted the legislature empowered to prohibit the carrying of any deadly weapon within the public sphere, whether openly or concealed. Evans and Hogg concerned themselves with the practicality of Ochiltree's proposal, which would endanger the common good by permitting people to openly carry Bowie knives and other "deadly weapons" in public. Ochiltree's response, rooted in the conception of individual rights that is the hallmark of classical liberalism, was that a man "was not to be prevented from carrying them if he thought it necessary." Prohibiting concealed weapons was a reasonable exercise of state police power for the commonweal, but leaving the door open to full disarmament violated certain inalienable rights of free men. Robert E. B. Baylor, representative from Fayette County and associate justice of the Texas Supreme Court, echoed Ochiltree's liberal sentiments and reminded the delegates that the high court of Kentucky (his home state) had overturned a concealed weapons ban. That court decided that any restriction whatsoever upon the right to bear arms was unconstitutional, "for if it [the legislature] had the right to proscribe one mode of wearing arms, it had the right to proscribe another, and thus it might finally defeat the great end and object." Baylor's reference to Kentucky was not merely a counterpoint to Ochiltree, who had mentioned the "supreme tribunals" of Alabama; he cast doubt upon the willingness of Texas Supreme Court justices to recognize the legislature's authority to regulate the wearing of weapons no matter what the constitution said. Judge Baylor had transformed the discussion from one about language to one about legal theory and political philosophy. The Texas constitution could not confer upon the legislature rights that inhered within free persons. Put another way, the police power of the state did not extend to the right of citizens to wear, carry, or keep weapons.

20

John Hemphill, sitting chief justice of the Texas Supreme Court, rose to meet Baylor on the plain of legal theory and political philosophy. His interpretation of the right to bear arms aligns with what historian Saul Cornell has called the "civic" sense, which emphasized the obligation of the citizenry to take up arms as a militia when called upon or when tyrannized by a government. English common law already guaranteed the individual the right of "self-preservation" against lethal attacks, non-lethal beatings, and assaults upon "his reputation or good name."[25] Moreover, those under attack held the inalienable right to having arms "such as are allowed by law" to defend themselves. In a country subscribing to the common law (as the United States did following independence), this natural right to self-defense could not be revoked by a government and was altogether separate from the right to bear arms as enshrined within the American Bill of Rights, Republic of Texas Declaration of Rights, and numerous American state constitutions. Hemphill stated: "The object of inserting a declaration that the people shall have a right to bear arms is, that they may be well armed for the public defence; it is in order that the law regulating the militia be kept up. It is not a supposition which can arise in a country where common law prevails, that it is necessary to bear arms for protection against fellow citizens." According to Hemphill, his opponents were wrong to consider the right to bear arms an obstacle to legislative regulation of the wearing and carrying of deadly weapons in public during peacetime. Any interpretation of common law adopting the view of Baylor or Ochiltree, that the right to arms for self-preservation encompassed the freedom to accoutre oneself with weapons at all times, had taken personal liberty to an antisocial extreme. Interestingly, Hemphill recommended that the convention adopt the language of the Second Amendment verbatim—he understood that right in the civic sense rather than the individual sense of Baylor and the twenty-

---

[25] Blackstone, *Commentaries*, 1:1.

Compendium_Roth
Page 2006

first century US Supreme Court.[26] The convention temporarily adopted the US Second Amendment in lieu of Ochiltree's original recommendation, but Hogg, Hemphill, Evans, and another north Texan named Gustavus Everts could not rally enough delegates to their cause. An unrestricted, individual right to bear arms as was present during the days of the Republic continued into the era Texas statehood when a majority of convention delegates voted that "Every citizen shall have the right to keep and bear arms in defence of himself and of the State."[27]

Baylor's view had won the day in 1845, but the supporters of a concealed weapons ban considered the debate about legislative regulation far from over. A total of five bills received attention between 1851 and 1859, most of them introduced by representatives from East Texas. Two sponsors came from Cherokee County, and one each from Lamar, Rusk, and Galveston Counties. The popularity of concealed weapons legislation in East Texas may have arisen from the relative strength of Protestant denominations there. East and Northeast Texas were fertile areas for Baptist, Methodist, and Cumberland Presbyterian revivals during the 1830s and 1840s, and their relative proximity to the United States left them with stronger denominational ties than elsewhere in Texas.[28] A disproportionately high number of outlaws and desperadoes may also have been a factor, especially for those politicians representing counties along the Red River that suffered longer than most from lawlessness and feuds. Accounts of murders and deaths filled the pages of newspapers in Northeast Texas; one front page from Red River County in 1851 carried

---

[26] On the debate over the right to bear arms in the Texas Constitutional Convention of 1845, see F. M. Weeks, reporter, *Debates of the Texas Convention* (Houston: J. W. Cruger, 1846), 311-312. The debate is quoted at length in Stephen P. Halbrook, "The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights." 41 *Baylor Law Review*, 629-88 (1989), 640-645. For a summary of the debate emphasizing the competition between the civic sense and individual sense of the right to bear arms, see Cornell, *A Well-Regulated Militia*, 160-161.
[27] Tex. Const. of 1845, art. I §13.
[28] Supporters of Lester's original 1839 bill also tended to come from Texas's eastern counties. Protestant missionaries, regardless of denomination, tended to arrive overland via East Texas, giving that region stronger evangelical church organizations. See Smith, *Heroes of the Saddle-bags*.

Compendium_Roth
Page 2007

news of two brawls-turned-deadly, two cold-blooded murders, a story about a dying woman, a poem called "A Dying Boy," and a "solemn thought" about the gravity of human interactions.[29]

The proposed concealed weapons laws of the 1850s generated much more opposition in the legislature than Lester's 1839 bill had. Not one passed a chamber without comment, amendment, or substitution. Opponents of a concealed weapons law claimed that the bills introduced were "reiterations of existing law" or "impolitic."[30] Of these five bills, the one that came closest to actual passage was introduced in 1855 by Cherokee County's Robert H. Guinn, a member of the state Senate who held his seat until 1871.[31] The Senate Judiciary Committee substituted his bill but passed a prohibition of carrying concealed weapons; the House Judiciary Committee, however, did not support the idea and had it postponed indefinitely. The following year, however, Texas lawmakers agreed to punish homicides perpetrated with a dagger or Bowie knife more severely than others. For many years the Bowie knife had been "the weapon most in vogue" throughout Texas, so making an example of blade-wielding murderers promised the results of a concealed weapons prohibition without the political fallout.[32]

The year 1859 saw the end of the anti-concealed weapons movement in Texas. John Hemphill's common-law defense of legislative regulation over deadly weapons had been voided by the enactment of the state's first penal code in 1856. Moreover, Hemphill departed the state's high court for the halls of the US Senate in 1859, leaving the Texas Supreme Court under the leadership of Oran M. Roberts. Shortly after this transition, the court heard the appeal of John Cockrum, a man convicted of manslaughter using a Bowie knife; due to the law about homicide-

---

[29] See *Northern Standard* (Clarksville, TX), May 3, 1851.
[30] Quotations from *Senate Journal* (1853), 2: 34; and *House Journal* (1859), 87. For introductions or first mentions of the proposed bills, see *House Journal* (1851), 97; *House Journal* (1853), 53; *House Journal* (1855), 31; *Senate Journal* (1855), 56; *House Journal* (1859.), 75.
[31] *Senate Journal* (1855), 56, 65, 105, 129, 132, 137; *House Journal* (1855), 153, 210, 235.
[32] Quoted in Schmitz, *Texas Culture*, 80.

23

by-blade, he was to receive the same punishment as a conviction for murder—life in solitary

confinement. His attorney argued that harsher penalties for knife killings unjustly deprived poor

men of their right to bear arms in self-defense. The court upheld Cockrum's conviction and harsh

sentencing, but in doing so yielded only the narrowest ground to the legislature to exercise any

power over the right of Texas citizens to bear arms. The legislature held the sovereign authority

to discourage the use of an "exceeding destructive weapon" like the Bowie knife because it was

"almost certain to produce death, when used offensively." But the right of the citizen to bear

arms was "absolute," delegated individually to each citizen "from the sovereign convention of

the people that framed the state government"; it was "above the law, and independent of the law-

making power."[33] This judicial precedent crippled the Texas movement against concealed

weapons. At the 1859 legislative session, a representative from Lamar County named Eli Shelton

gave the cause one last hurrah. He called upon the House Judiciary Committee to draft a bill

outlawing concealed weapons, but the Committee (surely aware of the *Cockrum* decision)

refused.[34]

    The kinds of disorderly brawls that men like Shelton, Lester, and Hogg had tried to

reduce by way of a concealed weapons ban constituted only part of the violence problem in

Texas. Had they succeeded in their endeavors, they would have discovered, as other states before

them, that prohibitions against concealed weapons did not noticeably reduce crime or homicide.

Anecdotal evidence at times points to such laws as great successes, but historical analysis proves

just the opposite. Concealed weapons bans were not effective because they treated a symptom

rather than its root cause. Rendering heated confrontations just a bit less deadly is a far cry from

taking action to reduce the likelihood of such encounters in the first place. Socio-economic

---

[33] *Cockrum v. Texas*, 24 Tex. 394 (1859).
[34] *House Journal* (1859), 75, 87, 111.

instability remained in the South, as did the institution of slavery and skepticism about the interference of government with the customs of its citizens.[35] Prohibitions against hidden weapons proved almost impossible to enforce; as a result, states frequently turned to the same solution that Texans had in 1856 by exacting harsher penalties upon offenders who used certain weapons in commission of a crime.[36]

  Brawls, affrays, and street-fights were symptomatic of a larger honor culture present in Southern and Southwestern states. Disorderly, spur-of-the-moment confrontations were merely a variation of the quintessential Southern form of extralegal violence—the duel. This adaptation of the medieval "trial by combat" arrived on American shores during the Revolution and remained popular in Southern states well into the nineteenth century.[37] Duels were highly ritualized and expected to conform as much as possible to custom or prescribed rules; the upper classes in the antebellum South treated duels as part of their cultural domain, but Southerners of all stripes participated in them as principals, seconds, or spectators. American notions of equality and democracy opened this high-brow method of avenging one's honor to the more modest segments of the population. In their own way, even the brawls and affrays of poor or young men can be interpreted as efforts to emulate their social superiors.[38] The duel wielded cultural force in the antebellum South because it promised a route to preserve one's honor, and because it dramatized the unique combination of fearsome passion and respectable civility expected of the governing

---

[35] Roth, *American Homicide*, 218-220.

[36] These laws can be easily accessed through the Duke University Repository of Historical Gun Laws, a searchable database. Southern states identified in the database include Maryland (1809), Alabama (1837), Mississippi (1837), and Tennessee (1838). They were joined by Illinois (1845), California (1853), Washington (1854), and Nebraska (1858). https://law.duke.edu/gunlaws/

[37] Historian Randolph Roth, echoing Bertram Wyatt-Brown, states that dueling fell out of favor in Northern states after the Hamilton-Burr duel of 1804. Northern states nonetheless took the time to officially prohibit dueling much later, beginning with Pennsylvania (1810), Michigan (1816), New Jersey, Maine, and Connecticut in the 1820s, and Ohio and Rhode Island in the 1830s. See Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982), 20; and Roth, *American Homicide*, 181.

[38] Wyatt-Brown, *Southern Honor*, 350-361.

Compendium_Roth
Page 2010

class of slaveholders.[39] The propensity toward settling disagreements through combat might have been socially acceptable in the South, but it elicited sharp criticism from Northerners, clergymen, and evangelical Southerners. Anti-dueling efforts received strong support and succeeded in passing legislation in Kentucky (1800), Georgia (1816), Louisiana (1828), Tennessee (1836), and Mississippi (1837). Owning dueling pistols or swords was not illegal but state governments were intervening in the lives of the elite men who participated in duels by limiting what they were permitted to do with their weapons, even on their own property.

Texas joined the anti-dueling chorus in 1836, when the newborn republic declared that any duelist's death would be treated as murder.[40] Like concealed weapons laws, this approach did not attack the root cause of Southern violence, encouraging instead a mere reduction in lethality. It was largely ineffective, and juries frequently acquitted defendants rather than convict them of first-degree murder.[41] Jury nullification like this was more common that we might imagine because the reigning honor culture permitted armed toughs to bully otherwise law-abiding citizens into deadly encounters by assaulting their reputations.[42] But in 1840 the Texas Congress officially prohibited dueling of any kind. Unusually, the legislators prefaced their bill with an explanation for its passage. They said that dueling arose "from a false sense of honor" and was "a relic of an ignorant and barbarous age, justified neither by the precepts of morality, nor the dictates of reason." Participants in a duel would thenceforth be tried in district court and subject to a fine of one thousand dollars and one year in prison; those who took the life of an opponent received these penalties in addition to those of manslaughter. Anyone convicted under

---

[39] Roth speaks quite eloquently on this subject. See Roth, *American Homicide*, 214.
[40] *Telegraph and Texas Register* (Houston, TX) January 11, 1837.
[41] Hogan, *The Texas Republic*, 289-290.
[42] Southern satirist Joseph G. Baldwin published a fictitious account of one such encounter where the bully in question received his just reward for cajoling a neighbor into a duel. See Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi; A Series of Sketches* (New York: D. Appleton, 1853), 192-196.

26

the auspices of the "act to suppress duelling" was forever barred from serving in public office.[43] Though the new law played a role in reducing the frequency of dueling in Texas, it was an imperfect solution that even its supporters occasionally ignored. Five duels besmirched the halls of the Republic of Texas Congress, one of which involved a former Speaker of the House whose signature was attached to the 1840 anti-dueling law.[44] During the constitutional convention of 1845, delegates wrote into the constitution a requirement that no man may serve the state in any capacity if he had participated in a duel.[45] This stipulation was repeated in the three subsequent state constitutions, including the one presently in force.[46]

The anti-dueling law constituted the most substantial antebellum limitation placed upon the rights of citizens to use, keep, carry, and wear deadly weapons, though it was not particularly effective. The classical liberalism which informed the political philosophy of so many Texas politicians, and indeed a sizeable wing of the Democratic Party, prevented the state government from regulating an inherent, inalienable right of Texas citizens to bear arms. The non-citizen residents of Texas, however, were another matter. We have seen how the Republic and later state governments tried to keep weapons out of the hands of hostile American Indians. But the group that experienced the most limited access to weapons in antebellum Texas was, unsurprisingly, the black population of the state. Slaves and "free persons of color" inhabited a "peculiar position" in Texas society because they were legal persons, yet not citizens. What is more, the free status of the latter provided them few benefits under Texas law. Under the 1856 penal code, slaves and free persons of color were "deemed to stand upon terms of equality," meaning that

---

[43] "Act to Suppress Duelling," in Gammel (comp.), *Gammel's Laws*, 2:332-334.
[44] Hogan, *The Texas Republic*, 289-290, 271-273.
[45] Tex. Const. of 1845, art. VII, §1, §5.
[46] Tex. Const. of 1861, art. VII, §1, §5; Tex. Const. of 1866, art. VII, §1, §5; Tex. Const. of 1869, art. XII, §1, §3; Tex. Const. of 1876, art. XVI, §1, §4.

Compendium_Roth
Page 2012

both faced similarly severe consequences for offenses committed against whites. Both groups experienced a shared vulnerability to painful and degrading corporal punishments from which white residents and citizens were immune.[47] The situation for slaves and free persons of color in Texas and the South aligns with the assertion that "in the laws of states and municipalities, those most frequently targeted for surveillance, punishment, and reform were members of suspect groups."[48] Slaves and free blacks endured the full brunt of the state's police power over the right to restrict the use weapons for about thirty-five years before white Texans ever experienced a substantial restriction upon their right to keep and carry weapons in public.

From the earliest introduction of slavery to the English North American colonies in the seventeenth century, bondsmen could be armed by their masters. Weapons were used for hunting as well as self-defense and protection of the plantation from wild animals or intruders. Colonial-era masters overseeing the clearing of land and construction of homes had to rely upon their slaves in a manner unlike their nineteenth-century counterparts. For this reason, the earliest laws regarding bondsmen and weapons provided that slaves be armed *conditionally*, with the permission or even supervision of a master or other suitable white person.[49] In 1664, New York's legislature prohibited slaves from carrying or using any weapon "but in the presence and by the direction of his her or their Master or Mistress, and in their own ground."[50] New Jersey passed a

---

[47] Slaves inhabited the most peculiar position of all because they could at times be considered legal "persons" sometimes, and legal "property" at others. For instance, the Texas Penal Code of 1856 held that, "a slave . . . when tried for a penal offense, is in law a person," but drew a sharp distinction between offenses committed against "slave property" and those against "property other than slaves." See *Penal Code of the State of Texas* (Galveston: The News Office, 1856), x, 158, 161, 162-164.

[48] Gerstle, *Liberty and Coercion*, 64.

[49] The earliest law, from Virginia in 1639, is the subject of a lengthy discourse in T. H. Breen and Stephen Innes, *Myne Owne Ground: Race and Freedom on Virginia's Eastern Shore, 1640-1676* (Oxford: Oxford University Press, 1980), 25-27. The authors contend that the law was "related more directly to taxation than domestic security" and thus not intended to disarm slaves. The full text of the law can be found in Virginia Assembly, "Acts of the General Assembly, Jan. 6, 1639-40," *William and Mary Quarterly* 4, no. 3 (July 1924), 147.

[50] *The Colonial Laws Of New York From The Year 1664 To The Revolution*, (1894), 687.

Compendium_Roth
Page 2013

similar statute in 1694 when, due to slaves' alleged killing of swine in the woods, leaders decided that slaves could not take firearms or dogs into the woods unless the master or his white agent "be with the said slave."[51] These conditional arming restrictions reached the South in the eighteenth century, meaning that prior to that time, planters did not need or expect the legislature to intervene on the subject. Conditional arming regulations were enacted by the legislatures of Maryland (1715), North Carolina (1729), South Carolina (1740), Georgia (1768), Virginia (1792), and Delaware (1798). Text of the laws reveals that planters were concerned about slaves hunting illegally and carrying weapons on Sundays, both of which were serious problems in the colonial South. Shooting a hog was costly to the animal's owner and harmful to the property upon which it was shot, while white Southerners feared slave revolts during Sunday morning worship services. Legislators resisted an outright ban upon bondsmen carrying weapons because such a prohibition would be detrimental to many masters. Slaveholding farms and plantations near backcountry areas received special exemptions from these laws because of the threat posed by predatory animals or other enemies. Masters needed their slaves to protect the plantation or farm. Exemptions also permitted bondsmen to supplement their rations (or perhaps bring home meat for the entire household) by hunting wild game. A blanket prohibition would render this crucial activity illegal—another regulation that non-elite and backcountry planters could not afford. This trend of permitting slaves to use weapons according to their masters' wishes continued into the nineteenth century, not to be reevaluated until the 1840s.[52]

---

[51] *The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey* (1881), 341.

[52] It is worth noting that some scholars have interpreted antebellum laws as strict prohibitions against slaves carrying or using weapons, and a conscious policy on the part of slaveholding governments to keep them disarmed. The facts do not support this interpretation, and the consistent inclusion of exemptions for slaves on the frontier, whose masters had permitted them, or had obtained a special license, clearly shows that at least some slaves carried and used weapons throughout the antebellum period. On this historiographical trend, see Breen and Innes, *Myne Owne Ground*, 24-27. For an example of this interpretation in Texas scholarship, see Halbrook, "The Right to Bear Arms in Texas," 645. Halbrook claims that Texas was "remarkably unlike most other Southern states," and "no one in Texas, regardless of race, was denied the right to possess or carry arms in any manner." Texas was, in fact,

29

A movement toward stricter laws governing slaves' access to and use of weapons began in the post-1840 period. The chronology makes Texas an interesting case study because the Republic of Texas passed its Slave Code that very year. The Texas Congress declared "no slave in this Republic shall carry a gun or other deadly weapon without the written consent of his master, mistress or overseer."[53] Like their counterparts in other American slaveholding states, Texans believed that masters' property rights entitled them to give weapons to their slaves if necessary. Following longstanding custom among other slaveholding states, the Texas Slave Code provided that unpermitted weapons found in the hands of bondsmen could be confiscated by the person discovering the crime. Despite the relative stringency of the Slave Code's provision, Texas legislators enacted stricter laws and even toyed with the idea of prohibiting masters from arming their slaves under any circumstances. This movement was strongest in the counties of East and Central Texas, where slaves formed a substantial portion of the population and Indian raids no longer threatened residents.

The Texas legislature debated six bills between 1843 and 1856 that proposed further curtailing or altogether prohibiting slaves' access to deadly weapons. Those bills seeking an outright ban faced tough opposition from representatives of the more northerly and westerly counties. The cotton culture took root in these regions, but Indian raids and predatory animals still threatened. In 1850, movement supporters achieved a victory when they passed an amendment to the Slave Code limiting masters' power to arm their bondsmen off the plantation. The law declared that any master or employer "who shall, knowingly, permit any slave… to carry firearms of any description, or other deadly weapons" beyond the boundaries of his own

---

remarkably similar to most other Southern states by permitting the conditional arming of slaves and remaining unwilling to prohibit masters' arming them altogether.

[53] "An Act Concerning Slaves," in Gammel (comp.), *Gammel's Laws*, 2:345-346.

Compendium_Roth
Page 2015

property would be guilty of a crime. Offenders received a sizeable fine, along with court costs and seizure of the weapon; the worst part of the punishment was reserved for the slave permitted to carry the weapon—he or she received no fewer than thirty-nine lashes.[54] The legislature had used its police power to interfere with the property rights of slaveholders by curtailing their authority to arm their bondsmen. Interestingly, this law underwent substantial revision just six years later when the legislature restored a great deal of authority to slave owners. After 1856, slaves had to obtain a permit to carry a weapon at any time, even on the master's property; but, masters regained the authority to arm their slaves off-plantation, as long as the slave was "accompanied by his owner, employer, or some white person." The masters themselves were no longer subject to criminal action should they choose to arm their slaves in public. This shift restored to masters the authority that they lost in 1850, indicating that Texans disapproved of the increased police power of the state over slaveholding citizens. Though the law did not specify a punishment for offending slaves, their penalty remained thirty-nine lashes.[55]

What Texans discovered in the 1850s, they might have learned by looking at the history of Mississippi. That state similarly passed an exceedingly strict law that curtailed masters' authority to arm their slaves. As with Texas, the Mississippi legislature amended the law just a few years later, giving greater leeway to masters to permit their slaves to carry weapons.[56] Texans came to the same conclusion as their Mississippi neighbors, but they stand out as an example of legislators' growing interest in curtailing property rights in the name of public safety. The debate over conditionally arming or fully disarming slaves was fundamentally about

---

[54] The law called for slaves in violation to receive at least thirty-nine lashes, and no more than fifty; masters were fined anywhere between twenty-five and one hundred dollars. "An Act Concerning Slaves," in Gammel (comp.), *Gammel's Laws*, 2:345-346.

[55] The Texas Penal Code of 1856 specified "whipping," which "shall in all cases be construed to mean thirty-nine lashes" unless otherwise specified. See *Texas Penal Code* (1856), 163.

[56] 1799 Miss. Laws 113, A Law For The Regulation Of Slaves; 1804 Miss. Laws 90-91, An Act Respecting Slaves, §4.

property rights. Where did the master's authority end and the police power of the state begin? The "peculiar position" of those trapped within the South's peculiar institution turned debates such as this one into flashpoints in a larger battle over sovereignty between state legislatures and their citizens.

American political tradition had held that state legislatures were the best expressions of popular sovereignty. These governing bodies were highly representative (in most cases) and jurists believed them to be responsive to the will of the people. Americans needed protection from a faraway, potentially tyrannical national government, but they needed no such protection from their own state governments. Unhappy majorities within a state could easily reverse bad policies, and unhappy minorities could move elsewhere. But this optimistic view of state government was, in a sense, more wishful thinking than reality. Those closely connected to the organs of state government could use their influence to draw ever more power into a governing structure that they led. In antebellum Texas, elite planters dominated state and local government, meaning that efforts to expand the state's police power over slaveholders came from them. The supporters of tougher restrictions upon slaveholders' conditional arming of their bondsmen came primarily from the eastern coastal plains of Texas, where the slave-based plantation culture was strongest. Sponsors of bills to further curtail the prerogative of masters to arm their own slaves tended to be wealthy planters who represented Washington, Bastrop, Brazoria, Burleson, Bowie,

and Nacogdoches Counties.[57] Their proposed bills include the two mentioned above (the 1850

and 1856 amendments, which became law), along with six others that did not pass.[58]

    A second category of bills also represents an effort to place the arming of slaves under

greater legislative control: proposals to create special patrols to police the enslaved population of

each county. The supporters of such "police bills" desired a militia law that would turn the

militia into an armed guard for the county's slaveholders. State citizens falling within a specified

age range were already forced to register for militia service, but these proposals would have

required them to spend a great deal of time serving on slave patrols and increased their

responsibilities while serving. One of the requirements added to the patrol's list of duties was to

enforce the conditional arming of slaves by checking them for weapons and meting out

punishment for those carrying arms illegally. Most of these bills emerged in the early 1840s and

failed because they mandated draconian punishments for slaves caught by the patrol, as well as

for "defaulters" who failed to muster for patrol duty. Though the bills failed, the home counties

of their supporters illustrate that the wealthy, elite planters of the eastern Gulf Coast supported

not only tougher enforcement of the Slave Code, but a greater degree of state police power

---

[57] These sponsors were: George W. Barnett (Washington), John Caldwell (Bastrop), Stephen W. Perkins (Brazoria), Guy M. Bryan (Brazoria), James Shaw (Burleson), Hardin Runnels (Bowie), and William Ochiltree (Nacogdoches). The sponsors of two bills remain unknown. Barnett and Ochiltree were the only known sponsor outside the class of elite planters; still, both were members of the professional class with strong political connections in Texas. See *Handbook of Texas Online*, Walter L. Buenger, "Whig Party," accessed June 07, 2018, http://www.tshaonline.org/handbook/online/articles/waw01; and *Handbook of Texas Online*, L. W. Kemp, "George Washington Barnett," accessed June 07, 2018, http://www.tshaonline.org/handbook/online/articles/fba71.

[58] Though the text of most of these bills is no longer extant, what information remains suggests that the 1850 law was the culmination of several years' worth of effort on the part of a cohort of lawmakers. Four of five legislatures between 1843 and 1850 saw bills to curtail the conditional arming of slaves, but supporters of the measure did not rally enough votes to enact it until 1850. Only one of the four bills leading up to the 1850 amendment to the Slave Code remains. The three lost bills shared similar titles (bills to prohibit or prevent slaves from carrying fire-arms) and were introduced between 1843 and 1847. The extant bill prior to 1850 resembles the 1850 amendment, with the only significant difference being its attempt to draw "free negroes or mulattoes" within its purview. See House Bill, File No. 55, 3d Leg., Reg. sess. (1849), Texas State Library and Archives Commission (TSLAC); *House Journal* (1849), 371, 394. The 1856 amendment was not controversial and passed rather quickly, while a proposal for the full disarmament of slaves received fleeting attention in the Senate during the Civil War. *Senate Journal* (1856), 394; *Senate Journal* (1864), 18.

Compendium_Roth
Page 2018

wielded over Texas citizens.[59] For the good and safety of the community, men of all ages and incomes had be coerced into patrol service (an unpopular assignment) and used to secure the slave property of the wealthy. An exchange between legislators in 1842 was especially telling, with an opponent of a slave patrol bill saying that slaveholders should take responsibility for their own bondsmen. He declared "if [masters] were required to be answerable for the damages committed by [slaves], there would be little need of patrols under such a law as this."[60] The sentiment that slave policing was the responsibility of masters was widespread, for an amendment exempting non-slaveholders from service was ultimately adopted and killed the bill.[61]

The question of arming slaves became a controversial one in Texas because of the competing claims of authority over them leveled by the state government and the slave masters. One considered them as legal persons subject to state regulation, while the other considered them legal property immune from state intervention. The position of free blacks, on the other hand, was not at all controversial in antebellum Texas. In fact, free blacks across the South endured even more circumscribed access to arms than did slaves. Indiana, predominantly settled by Southerners, prohibited all non-white persons from carrying weapons without exception.[62] In Mississippi, where masters could arm their slaves when necessary, no free "negro or mulatto" was allowed to keep weapons.[63] These states represented an extreme in the early nineteenth century, and until the political tension over slavery reached its boiling point in the post-1840

---

[59] Sponsors of these draconian patrol bills were: Cullen C. Arnett (Liberty), Gustavus A. Parker (Fort Bend), John M. Lewis (Montgomery), and James W. McDade (Washington).
[60] *House Journal* (1841), 395-396.
[61] House Bill, File No. 2668, 6th Cong., Reg. sess. (1842), TSLAC.
[62] 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, §4.
[63] 1799 Miss. Laws 113, A Law For The Regulation Of Slaves.

Compendium_Roth
Page 2019

period, most Southern states permitted free blacks to at least own weapons, albeit under repressive and degrading conditions.

In most Southern states, free blacks could only own and carry arms by license from a local justice of the peace. Requirements for obtaining a license could be cumbersome, with Delaware requiring five white sponsors to attest to the applicant's good character.[64] In most cases, licenses had to be renewed annually, and punishment for violation entailed seizure of the weapon along with a public whipping. Restrictions placed upon free blacks became ever more stringent in the antebellum period. As tension over slavery mounted, Southern legislatures responded by further curtailing free blacks' access to arms. Since its territorial phase, Missouri had permitted free black householders to own a gun, but lawmakers removed the exemption in 1854 and required them to use the licensing process.[65] Beginning in 1840, North Carolina required free blacks to obtain a license in order to "wear, or carry about his or her person, or keep in his or her house" a deadly weapon.[66] The state legislature removed this option in 1860, leaving free blacks with absolutely no way to legally possess arms. Violation resulted in a minimum fifty-dollar fine—an extraordinarily high amount for such a marginalized segment of society.[67] In 1850, Kentucky forbade all "negro" persons from keeping or carrying guns or deadly weapons, specifically excluding free blacks from legally owning weapons. An earlier law had disarmed all non-white persons, but assumed that every "negro" or "mulatto" person was a slave. The new law demanded lashes for offending slaves (as its predecessor had done) and a

---

[64] 1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.
[65] Henry S. Geyer, *A Digest of the Laws of Missouri Territory* (1818), 374; 1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §2-3.
[66] James Iredell, *A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846*, (1847), 73.
[67] 1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, §1.

five dollar fine for offending free blacks, and there were no exceptions to the rule.[68] The state

most aggressive in its laws against armed free blacks was Delaware. In 1843, that state declared

that free blacks could not possess or carry arms under any circumstances, and twenty years later

decided that those in violation who could not pay the fine would be "sold" for up to seven

years.[69] Clearly, most Southerners feared the consequences of armed free blacks much more so

than armed slaves.

Texas did not match the ferocity of these states in its laws regarding free blacks, probably

because there were so few free blacks that they posed no real threat to whites. Upon

independence from Mexico, Texas lawmakers declared that free blacks were not citizens and

needed to leave the fledgling republic, but some applied for special permission to stay on the

grounds that they had served honorably against Santa Anna's army. Those allowed to stay had no

restrictions placed upon their right to bear arms for self-defense but they were forbidden from

joining militia companies and thus unable to bear arms in defense of the republic. In 1849, James

Shaw, a planter from Burleson County in Central Texas, introduced a bill to prohibit free blacks

and slaves from carrying weapons. The bill passed the House but died in the Senate, presumably

for the same reason that other attempts to disarm slaves had: its effects upon slaveholders were

inconvenient and costly.

---

[68] The 1798 law said "No negro, mulatto, or Indian whatsoever, shall keep or carry…" This leaves open the possibility that free blacks were excluded from firearm and weapon ownership all along, but such an interpretation renders the 1850 alteration redundant. It is more likely that the 1798 law was intended to apply to slaves, probably because few or no free blacks lived in Kentucky at that time. The 1850 law, then, closed the existing (or potential) loophole for free black Kentuckians to keep and carry weapons. 1798 Ky. Acts 106, §5; 1851 Ky. Acts 296, Of Dealing With Slaves and Suffering Them to go at Large, §12.

[69] Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index, To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government, 187, Image 195 (1803) available at *The Making of Modern Law: Primary Sources*; 1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, §1.

Compendium_Roth
Page 2021

The increasing repression of free blacks and slaves leading up to the Civil War sheds light on the actions of Southern states in the immediate aftermath of the war. As emancipation created a large free black population across the South, white Southerners believed that they had reason to fear. Freedom suddenly gave male ex-slaves, often derided by whites as "boys" regardless of their age, the power to be men by defending themselves and their families with arms.[70] Just as the Confederate treatment of US Colored Troops represented Southern antipathy toward black masculinity, so did the disarming of freedmen during Presidential Reconstruction. The practice of owning and bearing weapons for defense of home and country was an important part of nineteenth-century masculinity, and one that many Southern white men had no intention of extending to freedmen. Many Confederate soldiers in Texas refused to participate in surrender ceremonies, instead absconding with the arms and ammunition provided for them during the war. They, along with other white men, used their firearms to conduct a reign of terror over freedmen that included stealing their weapons. Reports of violence against former slaves filled the letters of military officers and the pages of congressional journals. Lieutenant Colonel H. S. Hall testified before the Joint Committee on Reconstruction that freedmen and unionists were harassed and persecuted with impunity in 1865. That year, local magistrates put together patrols to preempt rumored black insurrections; the posse members usually consisted of "the most reckless and desperate men" who sought out black residences and "took everything in the shape of arms" from them.[71] The connection between armed white men and violence against blacks was so strong and incontrovertible that Union troops disarmed local residents. In Brenham,

---

[70] See Laura F. Edwards, *Gendered Strife and Confusion: The Political Culture of Reconstruction* (Urbana: University of Illinois Press, 1997), 46-47; Amy Dru Stanley, *From Bondage to Contract: Wage Labor, Marriage, and the Market in the Age of Slave Emancipation* (New York: Cambridge University Press, 1998), 47-50; Laura E. Free, *Suffrage Reconstructed: Gender, Race, and Voting Rights in the Civil War Era* (Ithaca: Cornell University Press, 2015), 87-88.
[71] Report of Joint Committee on Reconstruction, Part IV, 49-50.

Compendium_Roth
Page 2022

occupation forces confiscated all "army guns" upon their arrival, and since that time "citizens have not been since either permitted to keep or carry arms of that kind."[72]

As more Union soldiers spread across the South, reports like those of Lt. Col. Hall made extralegal tactics more of a risk than they were before. The Black Codes filled this gap, giving Southerners the mask of state law to continue their restoration of the status quo antebellum—the forced labor and submission of black people. These codes, enacted throughout the former Confederacy between 1865 and 1867, often included measures designed to disarm freedmen or prevent them from gaining access to deadly weapons. Louisiana forbade tenants from keeping firearms without the consent of their landlords, and St. Landry Parish near New Orleans went a step further by declaring that "no negro who is not in the military service shall be allowed to carry fire-arms…without the special written permission of his employers."[73] Mississippi law declared that "no freedman, free Negro, or mulatto not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk, or Bowie knife."[74] These laws clearly resuscitated the common Southern practice of conditionally arming black men, subject to the authorization of their employers (white elites) or a local judge. The states enacting Black Codes earliest were forthright in stating that the laws applied only to "freedmen, free Negroes, and mulattos" but the Northern outrage at their blatant racism prompted late-comers, like Texas, to create Codes that gave some semblance of racial neutrality. Though Texas civil rights and education laws made specific mention of racial distinctions, an assortment of other laws passed

---

[72] *House Journal* (1866), 1019.

[73] Germaine A. Reed, "Race Legislation in Louisiana, 1864-1920," *Louisiana History: The Journal of the Louisiana Historical Association* 6, no. 4 (Autumn 1965), 380; "An Ordinance Relative to the Police of Negroes Recently Emancipated within the Parish of St. Landry," S. Ex. Doc. No. 2-35 at 93 (1865).

[74] *Laws of the State of Mississippi Passed at the Regular Session of the Mississippi Legislature* (Jackson: J.J. Shannon & Co., 1866), 163. f

at the same time were also part of the Code. These included statutes regulating contracts, apprenticeships, vagrancy, and even freedmen's right to bear arms.[75]

The 1866 "Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizen without the consent of the owner" appeared to apply to all Texans equally, but actually affected freedmen to a much greater degree than white Texans.[76] The law originated in the state Senate with a resolution asking the Judiciary Committee to present legislation that would end the "great nuisance" of "the carrying of deadly weapons by boys and freedmen (especially pistols)."[77] The bill garnered so much support in the Senate and the House that it suffered no debate or amendment. A strong supporter in the House, Mordello Munson, had been an outspoken secessionist and ardent defender of slavery.[78] The law declared that a property owner had to give his permission for others to carry firearms onto his property, though persons discharging military or legal duties received an exemption. The penalty for violation entailed a fine ranging from one to ten dollars, or confinement to the county jail for one to ten days, or both. Property ownership was the key concept in the law; hardly any free blacks owned property in 1866, and most lived in old slave quarters on someone else's property. Thus, the "great nuisance" of pistol-toting freedmen could be resolved by landlords, who had the authority to

---

[75] For discussion of Mississippi black code and its overt disarming of freedmen, see Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, 2–3. On the Texas Black Code, see Barry A. Crouch, " 'All the Vile Passions': The Texas Black Code of 1866," *Southwestern Historical Quarterly* 97 (July 1993): 12–34; Carl Moneyhon, *Texas after the Civil War: The Struggle of Reconstruction* (College Station: Texas A&M University Press, 2004), 60–61; Charles W. Ramsdell, *Reconstruction in Texas* (New York: Columbia University Press, 1910), 122–125.

[76] The semblance of racial neutrality did not fool everyone at the time, but some scholars have chosen to take the legislature at its word. For example, see William L. Richter, *Overreached on All Sides: The Freedmen's Bureau Administrators in Texas, 1865-1868* (College Station: Texas A&M University Press, 1991), 95; and Halbrook, "The Right to Bear Arms in Texas," 652.

[77] *Senate Journal* (1866), 31.

[78] Munson introduced an identical bill in the House, but it received no attention because the Senate's bill arrived in the House shortly thereafter. See *House Journal* (1866), 63. On Munson, see *Handbook of Texas Online*, Stephanie P. Niemeyer, "Munson, Mordello Stephen," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/fmu42.

forbid their tenants from owning firearms. Like other Black Codes, the Slave Codes before them, and antebellum policies toward free blacks, this 1866 law prohibited black men from owning weapons unless they had permission from an authorized white person. It marked a continuity with the antebellum period rather than a point of departure.[79] The status of slaves might have changed, and emancipation may have whetted their appetite for real freedom; but in terms of bearing arms for self-defense, freedmen in 1866 found themselves just where they had been as slaves—outgunned.

---

[79] Not all scholars have come to this conclusion. Stephen Halbrook has stated that the 1866 "Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizen without the consent of the owner" was the state's first gun control law. Not only does this statement overlook the dozens of antebellum statutes pertaining to the ownership and use of weapons, but ignores the clear parallels between the 1866 law's potential consequences for freedmen and the situation of slaves prior to emancipation. See Halbrook, "The Right to Bear Arms in Texas," 653-654.

Compendium_Roth
Page 2025

Chapter 2
A New Era of Gun Regulation in Texas, 1866-1873

In February 1872, a special US Congressional committee issued its report on lawlessness and the Ku Klux Klan in the states of the former Confederacy. Its evidence-gathering focused on the Atlantic Coast and Deep South, where freedmen constituted a large portion of the overall population and racial violence was ubiquitous. Notably absent from the committee's report was similarly detailed coverage of the situation in the trans-Mississippi West, including Texas. Yes, some information on the Lone Star State and its neighbors made its way into the report, but nothing like the in-depth investigations of South Carolina, Georgia, and Alabama. In fact, the committee admitted that "in Mississippi, Arkansas, and Texas the general condition of society is better than ever before."[1] In order for this statement to be true, the Old Southwest must have undergone tremendous socio-cultural change between 1865 and 1872. The road leading from honor culture and backcountry chaos to respect for the rule of law and civil government was a dark one that has eluded many commentators over the years.

Most histories of Reconstruction emphasize the general lawlessness and racial violence that characterized Southern life in the decade or so following the Civil War. Republican governments in the former Confederacy rose up amid endemic violence, and armed conflict often played a major role in their fall. But what this story misses is the success of Republican governments in quelling (at least temporarily) violence and making contributions to the maintenance of law and order that far outlasted their time in office. In other words, the "unfinished revolution" of Reconstruction was in some ways a successful and permanent one. The story of gun regulation in Texas during Reconstruction, inextricably intertwined with issues

---

[1] Joint Select Comm. on Affairs in Late Insurrectionary States, S. Rep. No. 41-42, pt. 1 at 271 (1872).

41

of race and violence, illustrates this point. Republican politicians during Reconstruction enacted the first comprehensive regulation curtailing the right to bear arms in Texas. When Democrats retook control of the state government in 1873-1874, they attested to the soundness of their predecessors' policy by retaining a law that prohibited the carrying of all "deadly weapons" in public. Under this label Texas politicians classed all manner of small, handheld, concealable weapons, including pistols, knives, sword-canes, brass knuckles, and even spears. During Reconstruction, carrying a "deadly weapon" either openly or concealed constituted a violation of the law with few exceptions.

This weapons ban, enacted in two parts during 1870 and 1871, was revolutionary in three ways. First, it lowered the threshold of criminal activity so that persons posing a threat could be neutralized before any real violence occurred. A law with this capability promised to reduce tension in Texas communities while protecting the Republicans who feared violence at the hands of their Democratic political enemies. Second, the strict regulation of the right to bear arms constituted a significant extension of the police power of the State of Texas. When Texas entered the Union in 1845, most Texans adhered to the political philosophy that the state legislature lacked the authority to regulate this important right. All of this changed by 1870. Finally, an embargo against the carrying of deadly weapons outside the home was an attempt to alter the way Texan men comported themselves in the public sphere. Some men only became accustomed to including deadly weapons in their everyday wardrobe due to the recent dislocations of war, but the habit was firmly entrenched and socially acceptable during the antebellum period. This weapon ban, impossible to perfectly enforce, still forced Texans to remove the pistols and knives from their waistbands or risk arrest, trial, and a hefty fine. Its emergence during Reconstruction exemplifies the legal revolution of that era, when the realities of emancipation gave birth to a

42

number of legal innovations that restructured the relationship between citizen and state; the Texas deadly weapon law was one such innovation whose aim was to change the boundaries of acceptable male social behavior.[2]

\*       \*       \*

In the immediate aftermath of the Civil War, local governance in Texas almost completely broke down. In late spring 1865, Confederate soldiers heard about the landing of Union troops under Major General Philip Sheridan in Galveston. It was only a matter of time until Union forces pushed northward from the Rio Grande Valley, and inland from the Gulf Coast to occupy the state. Many soldiers simply abandoned their posts to go home or flee the country, often stopping along the way to loot armories and harass the citizenry.[3] The flight of high-ranking state officials to Mexico, combined with the arrival of Union forces in the state capital threw the government into disarray. As pro-Confederate communities braced themselves for occupation, some among them still clung to the belief that slaveowners would be reimbursed for their emancipated chattel property, or that the Emancipation Proclamation would be overturned. These Texans, laboring under an illusion, tried to force freedmen to remain in slavery well into the summer of 1865.[4] A severe labor shortage prompted cotton farmers to outbid one another for freedmen's wages, making coercion an increasingly difficult and

---

[2] Legal historian Laura Edwards puts it this way: "The Civil War forced the nation to confront slavery. The implications of that confrontation reached beyond the status of former slaves to transform law and legal institutions in ways that affected all the nation's citizens." See Laura F. Edwards, "The Civil War and Reconstruction," in *The Cambridge History of Law in America: Volume II, The Long Nineteenth Century (1789-1920)*, eds. Michael Grossberg and Christopher Tomlins (New York: Cambridge University Press, 2008), 315.

[3] On the immediate postbellum "break up," see Brad R. Clampitt, "The Breakup: The Collapse of the Confederate Trans-Mississippi Army in Texas, 1865," *Southwestern Historical Quarterly* 108 (April 2005): 498-534; William L. Richter, *The Army in Texas during Reconstruction, 1865-1870* (College Station: Texas A&M University Press, 1987), 13; Barry A. Crouch, Larry Peacock, and James M. Smallwood, *Murder and Mayhem: The War of Reconstruction in Texas* (College Station: Texas A&M University Press, 2003), 10-11; Ramsdell, *Reconstruction in Texas*, 27-51.

[4] Ramsdell, *Reconstruction in Texas*, 57; S. Rep. No. 41-42, pt. 1 at 269 (1872).

desperate strategy for securing workers.[5] As harvesting season approached, Union forces and Freedmen's Bureau agents made their way ever deeper into the state, setting up garrisons and offices to oversee labor practices and contracts.

President Andrew Johnson had appointed Andrew J. Hamilton, a wartime Unionist and experienced politician, as the provisional governor of Texas. He directed the reorganization of civil government in the Lone Star State while Union troops fanned out to enforce the Emancipation Proclamation and establish Freedmen's Bureau offices. In late 1865, Hamilton announced elections for a convention to amend the state constitution in light of emancipation and the Confederate defeat. Due to Johnson's lenient Reconstruction policies, most former Confederates were eligible to vote or stand for election to this convention because those not included in his general amnesty received individual pardons upon application. For this reason, the convention and the government created under the auspices of its new constitution were quite sympathetic to the Confederate cause. Confederate veterans were prominent among the delegates, but far more problematic was the strong representation of secessionists. Most of the men charged with repealing the Ordinance of Secession had advocated its passage five years earlier. Unsurprisingly, the convention did not ratify the Thirteenth Amendment abolishing slavery, nor did its constitution guarantee freedmen equality before the law.[6] The Texas Constitution of 1866 hardly represented the kind of conciliatory gesture expected by Northern Republicans, but it won the approval of Texas voters as well as the charitable Johnson administration and went into effect.

---

[5] Moneyhon, *Texas after the Civil War*, 23-25.
[6] The Texas Constitution of 1866 dealt with freedmen in Article VIII, and went no further than saying that they "shall be protected in their rights of person and property by appropriate legislation." Rights specifically protected were rights to contract, bring suit, own and dispose of property, be held accountable to prosecution, and testify in court. See Tex. Const. of 1866, art. VII.

44

Proceedings at the convention revealed deep political divisions among Texans, with especially dangerous discord among the state's Unionists. Governor Hamilton intended to build a new base of political power from the Unionism forged by Sam Houston's 1859 gubernatorial campaign, middle class anti-secessionism as expressed by James W. Throckmorton in 1861, and the wartime loyalty to the federal government that was prevalent in West Texas.[7] Hamilton's position was a difficult one for three reasons. First, he was personally unpopular. A reputation for heavy drinking followed him throughout his political career and his Southern credentials were thrown into doubt when he delivered fiery abolitionist speeches to Northern audiences during the war.[8] Second, Texas Unionists disagreed about important issues, like the legal rights of freedmen and the proper treatment of prewar Unionists who nevertheless aided the Confederacy.[9] With the Unionists bickering among themselves, secessionists at the convention held the deciding votes. Third, the Johnson administration had pressured Hamilton to call a convention before he could unify these disparate factions into one party.

The divisions among the various groups of Unionists at the convention foreshadowed the political differences among Texans throughout the Reconstruction period. Whether the idea came from a desire to appease Congressional Republicans or from sincere belief, a substantial group emerged in support of legal equality between the races. They called themselves the Union Party

---

[7] When Throckmorton cast his vote against the Secession Ordinance in 1861, spectators in the capitol gallery denounced him. He responded with a remark that has since become famous for its brevity and its sense of foreboding. "When the rabble hiss, well may patriots tremble." Quoted in Randolph B. Cambell, *Gone to Texas: A History of the Lone Star State* (2nd ed., New York: Oxford University Press, 2012), 241.

[8] On Hamilton, see *Handbook of Texas Online*, James A. Marten, "Hamilton, Andrew Jackson," accessed September 17, 2018, http://www.tshaonline.org/handbook/online/articles/fha33.

[9] Even among antebellum Unionists like Throckmorton, participation in the Confederate cause was common. In fact, a large number of state senators elected during the height of Republican power in the state (1868-1872) had served the Confederate cause in some way or other. See Patsy McDonald Spaw, *The Texas Senate, Volume II: Civil War to the Eve of Reform, 1861-1889* (Austin: University of Texas Press, 1999), 87-113. On Throckmorton, see Kenneth Wayne Howell, *Texas Confederate, Reconstruction Governor: James Webb Throckmorton* (College Station: Texas A&M University Press, 2008); *Handbook of Texas Online*, David Minor, "Throckmorton, James Webb," accessed August 09, 2018, http://www.tshaonline.org/handbook/online/articles/fth36.

Compendium_Roth
Page 2030

and coalesced around Hamilton and Elisha M. Pease, a Connecticut-born lawyer and veteran of the Texas War of Independence.[10] They tended to have the support of the unwavering wartime Unionists, whose primary concern was increasing their own political strength at the expense of the prewar Unionists who had sold out to support the Confederacy; this conflict was as much about geography as it was about vindication, with residents of the western counties resentful of the continued power of the largely pro-Confederate central and eastern counties. On the other side of the Unionist spectrum was the Throckmorton faction, whose ranks were filled by reluctant Confederates seeking to limit the freedom of black Texans and preserve their power in spite of their wartime activities. The Throckmorton faction became even more formidable when it received the support of John Hancock, a wartime Unionist with strong connections to the national leadership of the Democratic Party. His insider information led him to believe, correctly, that the Johnson administration would not force the Southern states to grant the kind of civil and political rights to freedmen that the Republican Party was demanding. For this reason, he gave his support to the Throckmorton camp, which took the name Conservative Union Party. The secessionists at the constitutional convention saw the Conservative Unionists as the lesser of two evils and tilted the balance of power in their favor. Overlapping policy goals about race and maintaining entrenched patterns of political power underwrote this coalition, which dominated Texas politics between 1866 and 1868.[11]

The first task for Texans was to elect a new civil government, filling every office from governor and state senators to judges and even county sheriffs. In their campaign, the

---

[10] On Pease, see *Handbook of Texas Online*, Roger A. Griffin, "Pease, Elisha Marshall," accessed October 22, 2018, http://www.tshaonline.org/handbook/online/articles/fpe08.

[11] On the political landscape during Presidential Reconstruction, see Moneyhon, *Texas after the Civil War*, 38-43; Carl Moneyhon, *Republicanism in Reconstruction Texas* (Austin: University of Texas Press, 1980), 21-41; Campbell, *Gone to Texas*, 270-271; Ramsdell, *Reconstruction in Texas*, 86-90, 108-110, 114-115.

Compendium_Roth
Page 2031

Conservative Unionists made the purported "radicalism" of Hamilton's Union Party the primary electoral issue. In doing so, they astutely connected Unionists to the Radical Republicans in Congress and bestowed upon their policies a derogatory label that stuck throughout Reconstruction. Throckmorton handily defeated Pease in the gubernatorial election. Support for the Union Party did not reach east of the Colorado River, a fact that crippled Pease's campaign.[12] Furthermore, the secessionists assured Throckmorton's victory by declining to run their own candidate and turning out for the Conservative Union ticket. The fate of other state-level campaigns mirrored the governor's race, with a victorious fusion between secessionists and Conservative Unionists throughout much of the state. Throckmorton oversaw this tenuous alliance, which came to be known as the Conservative faction. Winners of state House and Senate elections formed the Eleventh Legislature, which met from August to November of 1866. Shortly after the overwhelmingly Conservative body met, Johnson declared "a state of peace between Texas and the United States," which only boosted Throckmorton's popularity.[13] Operating under the assumption that the Lone Star State had satisfied the terms of Presidential Reconstruction, legislators set about their work with a sense of confidence that the worst was over and further federal intervention was unlikely or unconstitutional.

An issue of central importance to all Texans in 1866 was bringing an end to the lawlessness that had plagued the state since the end of the war. Texans might have been in agreement about the problem of violence but arriving at a consensus about its root causes and remedies was another matter. Historians have pinpointed a number of factors contributing to lawlessness during Reconstruction, such as race hatred, wounded pride, loss of confidence in

---

[12] This trend has been mapped well by Carl Moneyhon. See Moneyhon, *Republicanism in Reconstruction Texas*, 48.
[13] George P. Sanger, ed., *Statutes at Large*, Acts of the Thirty-ninth Congress, Vol. 14 (Boston: Little, Brown, & Company, 1868), 814-817.

local institutions, and the dislocations of war.[14] Texans of the late 1860s, however, identified the causes of violent crime based on firsthand experiences. Those who consistently opposed the Confederacy saw the problem in purely political terms. Strongest in the counties west of the Colorado River, they claimed that their countrymen persecuted them mercilessly during the war only to find themselves "committed to the protection of the rebels" after it was over. Wartime Unionists remained locked out of political power by Johnson's policies, vulnerable to the statewide pro-Confederate majority.[15] Freedmen also endured violence at the hands of former Confederates and their supporters. Whether their persecutors were former masters convinced of their right "to *whip the nigger*"[16] or poor whites who subjected them to incessant "petty and contemptible persecutions,"[17] the plight of the freedmen was lamentable indeed. After emancipation Texas freedmen succeeded in obtaining weapons for self-defense, though white neighbors confiscated them whenever possible.[18] Their only allies were the wartime Unionists and federal soldiers so despised by the Texans who had retaken control of the state government. Those Texans, the Conservative majority represented by Throckmorton and the Eleventh Legislature, believed that lawlessness emanated from altogether different sources. The true culprits, in their eyes, were common criminals, irresponsible freedmen, and Union soldiers. Conservatives were correct that its position on the fringe of organized, Anglo American society

---

[14] Texas historians have debated the underlying causes of racial violence during the 1860s. Barry Crouch and James Smallwood have emphasized economic motivations for white-on-black violence, while Gregg Cantrell has demonstrated the centrality of politics. See Barry Crouch, "A Spirit of Lawlessness: White Violence; Texas Blacks, 1865-1868," *Journal of Social History* 18, no. 2 (Winter 1984): 217-232; James M. Smallwood, *Time of Hope, Time of Despair: Black Texans during Reconstruction* (Port Washington, NY: Kennikat Press, 1981); Gregg Cantrell, "Racial Violence and Reconstruction Politics, 1867-1868," *Southwestern Historical Quarterly* 93 (Jan. 1990): 333-355. See also George C. Rable, *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* (Athens: University of Georgia Press, 1984); Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper & Row, 1988), 119-123, 342-343.
[15] Memorial on Behalf of the Citizens of Western Texas, H. Mis. Doc. No. 35-42 (1867).
[16] S. Rep. No. 41-42, pt. 1 at 266 (1872).
[17] Benjamin C. Truman, S. Ex. Doc. No. 43-39 at 10 (1866).
[18] Truman, S. Ex. Doc. No. 43-39 at 8-9 (1866).

Compendium_Roth
Page 2033

made Texas a popular destination for deserters and outlaws during the war, with the northern and western border regions especially hard hit by gangs and desperadoes.[19] They, albeit much less persuasively, claimed that freedmen posed a greater danger to one another than did white Texans.[20] But the quandary of freedmen struggling to adjust to their new situation was a serious one. A Freedmen's Bureau agent sympathetic to them still described some as "idle and worthless, and showed no disposition to work, and were wandering about the country utterly demoralized, and were plundering and stealing indiscriminately from the citizens."[21] According to Conservatives, the freedmen would be treated better if the Freedmen's Bureau and its federal garrisons would stop their "interfering." Throckmorton held Union soldiers solely responsible for a series of violent attacks and reprisals in Brenham, and he called the Freedmen's Bureau an agency that "unjustly inflicted" punishments upon citizens who "have but little chance to assert or prove their innocence."[22]

The Texans who held the political reins found themselves in a position to address postbellum violence based upon their perception of the problem. Their approach revolved around reducing the number of arms circulating in public by disarming criminals and freedmen.

---

[19] There is a rich literature on the gangs, outlaws, and feuding vigilantes of Northeast Texas. See Crouch, Peacock, and Smallwood, *Murder and Mayhem*; Donaly E. Brice and Barry A. Crouch, *Cullen Montgomery Baker: Reconstruction Desperado* (Baton Rouge: Louisiana State University Press, 1987); Chuck Parsons, *A Lawless Breed: John Wesley Hardin, Texas Reconstruction, and Violence in the Wild West* (Denton: University of North Texas Press, 2013).

[20] The Foreign Relations Committee report can be found at *House Journal* (1866), 528-533. Union General and Assistant Commissioner of the Texas Freedmen's Bureau Joseph Kiddoo described the racial animus toward freedmen in a letter to General Oliver O. Howard dated August 8, 1866. When his allegations were made public, the legislature responded with a committee report intended to embarrass Kiddoo and defend Texan honor. The fact of white violence toward freedmen in Texas has been proved by historians and nineteenth-century commentators. State and federal reports from the Reconstruction era were often biased against pro-Confederate whites, but the general accuracy of their accusations has been accepted by recent historians. See Moneyhon, *Texas after the Civil War*, 35-37, 209. National and state legislatures commissioned investigations of racial violence in the South and Texas with the assumption that such endeavors would contribute to a solution. See S. Rep. No. 41-42 (1872); Condition of Affairs in Texas, H. Ex. Doc. No. 61-39 (1867); Report of Comm. on Lawlessness and Crime, *Journal of the Reconstruction Convention, which met at Austin, Texas, 1868-1869* (Austin: Tracy, Siemering & Co., 1870), 193-203.

[21] Report of W. E. Strong, January 1, 1866, in S. Ex. Doc. No. 27-39 at 82 (1866).

[22] *House Journal* (1866), 795.

Throckmorton acknowledged that the state constitution guaranteed to every citizen the right "to keep and bear arms in lawful defence of himself or the State," but he thought it a right "most wretchedly abused." His solution was a tax upon weapons carried in public, except in frontier counties and for travelers. The Conservatives clearly saw a correlation between lawfulness and financial means because the governor declared that "any person who felt constrained to wear a weapon, of this sort, for his personal protection, would not think it a hardship to pay the tax." The bad element, defined by Throckmorton as "men and boys, vagabonds and vagrants" presumably could not afford to pay the tax. His word choice is revealing because the latter three categories, "boys, vagabonds and vagrants," denoted recklessness and delinquency—males lacking the honor that came with rootedness, family, work, and maturity. White Texans generally lumped freedmen into this group, too. Emancipated men tried to establish themselves as heads of households worthy of manly honor in a patriarchal society, but white Southerners laughed or raged at their pretensions.[23] One Conservative described them in terms similar to vagabonds, declaring that freedmen "wander about now subject to all the temptations to vice," and "are universally supplied with firearms and other weapons." [24] The "men" within Throckmorton's definition likely referred to the desperadoes whose problem was not so much a lack of manliness as their malicious use of it.

The governor's tax proposal was a way to disarm the bad element without disarming law-abiding citizens. It was conservative in the sense that it retained the antebellum acceptance of armed self-protection as an inherent part of manly behavior, but in a larger sense it marked a dramatic departure from the past. A Conservative governor, who spoke for the majority of white Texans, saw the unregulated right to bear arms as a dangerous habit rather than a positive

---

[23] Edwards, *Gendered Strife and Confusion*.
[24] Address of Gov. James W. Throckmorton, *House Journal* (1866), 530.

Compendium_Roth
Page 2035

patrimony. This shift in thinking opened the door to an expansion of state police power via regulation of the right to bear arms. Throckmorton believed that a tax could achieve the goal of a deadly weapons prohibition without technically violating the individual rights protected by the state constitution. In other words, the state legislature could use its authority to tax with the intention of policing behavior rather than raising revenue.[25] This amounted to an improvisational expansion of police power through a practice known as *surrogacy*, which involves a government "using a power explicitly granted . . . to expand its authority into forbidden legislative terrain." This term applies primarily to the slow, piecemeal growth of federal government power throughout American history, but Throckmorton's approach to deadly weapons reveals its presence in the postbellum expansion of state-level police power, too.[26]

A number of state legislators agreed with Throckmorton and responded by supporting bills that taxed or otherwise regulated deadly weapons. Five such bills were introduced, though none garnered enough support to become law.[27] One of these bills followed Throckmorton's outline, and a look at its history shows us why a tax on the wearing of deadly weapons in public was not achievable in 1866.[28] The bill was introduced by Robert H. Guinn, a veteran state senator from Cherokee County in East Texas who had long supported weapon regulation.[29] In Guinn's scheme, anyone wanting "to carry about his person any weapon whatever" in public would have to apply for a license and post a bond. The license cost five dollars and could only be issued by the local county court. This was no small sum in the mid-nineteenth century, especially

---

[25] *House Journal* (1866), 199-200.
[26] Gerstle contends that surrogacy, privatization, and exemption were the three main strategies used to grow federal government power in an improvisational way throughout American history. See Gerstle, *Liberty and Coercion*, 5-9.
[27] Of these five bills, a record of only one survives. See Senate Bill 14, 11th Leg., Reg. sess. (1866), TSLAC. For the introduction of each bill, see *House Journal* (1866), 65, 246, 879; *Senate Journal* (1866), 31, 240.
[28] Senate Bill 14 (1866), TSLAC.
[29] Robert H. Guinn introduced a concealed weapons ban back in 1855 during the height of the anti-concealed weapons movement. See ch. 1.

Compendium_Roth
Page 2036

in rural, cash-poor areas like much of Texas. If the license fee was not enough to elicit opposition, the stipulation that applicants post one thousand dollars bond certainly was. When the House Judiciary Committee reported on the bill, the only revision requested was the elimination of the bond requirement.[30] The Senate did not take up Guinn's bill for engrossment before the session ended, but the House debated amendments on a tax-based bill similar to it. Members of the House had trouble translating Throckmorton's suggestion into law because they disagreed about every detail. The first problem was whether rifles and shotguns ought to be subject to tax. There had long been (and remains) a distinction between hunting weapons impossible to conceal, and smaller, concealable weapons more conducive to interpersonal conflict. The anti-concealed weapons movement of the antebellum era targeted smaller weapons for regulation because they could be hidden and provide a pugilist with a surprise advantage in a fight. But the House in 1866 refused to exempt rifles and shotguns, even those "borne by troops, either State or Federal, while in service." A representative from East Texas tried to exempt any gun "whose owner obtains one-third of his meat rations by the use of such gun," but even this went down to defeat.[31] The amount to be collected was also a controversial topic, with supporters of flat rates for all firearms versus proponents of scaled rates for six-shooters, five-shooters, and single-shot pistols.

In the end, tax-based bills like Guinn's failed because they threatened to disarm too many Texans. The vast majority of Texan men would have been unable to cough up the money for licensing, and the *right* to bear arms in Texas would become the *privilege* of the wealthy. Taking

---

[30] For the progress of SB 14, see *Senate Journal* (1866), 240, 316. See also Senate Bill 14 (1866), TSLAC.

[31] This cohort, led by the bill's sponsor, Jabez Giddings of Washington County, went to great lengths to ensure that they formed a majority during the session in question. The amendment to exempt military service weapons was withdrawn before it could be put to a vote, presumably meaning that the bill, if passed, would apply to Union soldiers stationed in Texas. Thus it is possible that majority insisting on retention of rifles and shotguns within the bill's purview included those honestly seeking to reduce firearms in circulation alongside others who saw it as a way to annoy Union troops. The text of this bill is no longer extant. *House Journal* (1866), 879-881.

Compendium_Roth
Page 2037

weapons out of hands deemed irresponsible by the governing majority was one thing—the legislature had passed some firearm regulations that targeted specifically freedmen and rowdies; taking them away from law-abiding white men was an altogether different matter.[32] It was unacceptable to disarm the family protectors and war veterans whose manliness was besieged by defeat and occupation.[33] In Texas and throughout the South, the levers of government were controlled by pro-Confederate men seeking to restore the old, antebellum order. Domination of the public sphere through the force of arms was necessary for that task. Communities that totally suppressed or unconditionally permitted deadly weapons in the public sphere put black and white men on an equal footing in violation of the antebellum social rules.

In a decentralized, localized way, Southerners almost at once began implementing a strategy of restoration that entailed disarming and dominating freedmen. In Kentucky, soldiers of the US Colored Troops had their weapons confiscated and were "threatened with *shooting* for going to their old homes and . . . families."[34] Incidents reported by Freedmen's Bureau agents tell of white men going about at night, stealing weapons from black men, and using their superior arms to terrorize black families. One agent in Mississippi described these as young men believed by locals to be "gallant" and "honorable."[35] Similar groups formed in Texas around the same time.[36] An Arkansas man worried over the future of freedmen living in the Red River basin,

---

[32] The legislation referred to includes a prohibition against discharging firearms "on, or across, any public square, street, or alley, or in any city or town in this State," which passed quickly through the legislature with little comment. The only people subject to the accompanying fine (anything up to one hundred dollars) were those who actually posed a danger to the community by engaging in irresponsible behavior. The second group targeted for legislation in 1866 was freedmen, through the law requiring tenants to receive permission from landlords to keep or carry weapons (see ch. 1). See also *Senate Journal* (1866), 462, 505, 603, 610, 627, 642; Gammel (comp.), *Gammel's Laws*, 5:1128.

[33] On the Civil War as a gender crisis, see LeAnn Whites, *The Civil War as a Crisis in Gender: August, Georgia, 1860-1890* (Athens: University of Georgia Press, 1995).

[34] S. Ex. Doc. No. 27-39 at 7-11, 70 (1866).

[35] Carl Schurz, S. Ex. Doc. No. 2-39 at 68-70 (1865).

[36] Secret, extralegal, vigilante groups formed throughout Texas as early as 1865. They sought to "patrol" or otherwise intimidate freedmen. It is likely that they, like their Mississippi counterparts, sometimes disarmed

53

saying that "Our people's wrath over defeat would be poured upon the heads of the helpless ones once their slaves."[37] The Bureau's Inspector General reported that cruelty toward freedmen was worse in Texas than anywhere else he had seen, and most white Texans "seem to take every opportunity to vent their rage and hatred upon the blacks."[38] The honor culture so prevalent throughout the South, including Texas, demanded lethal violence to protect the home, avenge wrongs, and enforce black dependence. In the antebellum era, white men carried out these activities through the use of weapons for dueling, defending, and punishing; the white men seeking to restore the antebellum socio-cultural order did not want to sacrifice the unfettered access to weapons necessary for carrying out their goal.

Texas Conservatives found the Johnson administration altogether sympathetic and generous toward them. As Texas planters became more convinced of the importance of disarming black laborers, the state's political elites became increasingly confident in its feasibility. The 1866 cotton crop fell short of projections, tempting employers to withhold wages owed to black workers. The freedmen responded by doing whatever they could to recover the money owed to them.[39] In some areas the local Freedman's Bureau agent could arbitrate in a labor dispute, but throughout much of the state the Bureau was not a viable option.[40] There simply were not enough agents, and many of those stationed in Texas were harassed by antagonistic local officials.[41] Freedman had to solve problems on their own by accepting

---

freedmen who owned weapons. See James Smallwood, "When the Klan Rode: White Terror in Reconstruction Texas," *Journal of the West* 25 (October 1986): 4-13.

[37] S. Ex. Doc. No. 27-39 at 28 (1866).

[38] S. Ex. Doc. No. 27-39 at 82-83 (1866).

[39] Moneyhon, *Texas after the Civil War*, 64-65.

[40] Christopher B. Bean, *Too Great a Burden to Bear: The Struggle and Failure of the Freedmen's Bureau in Texas* (New York: Fordham University Press, 2016), 114.

[41] On the harassment and even arrest of Bureau agents, see Bean, *Too Great a Burden to Bear*, 52-58.

mistreatment or confronting employers.[42] Conveniently for planters, freedmen had a hard time using weapons in these confrontations because the Eleventh Legislature had just passed a law forbidding tenants from keeping firearms without the permission of their landlords.[43] Those who still owned weapons sometimes feared to use them lest they be confiscated. Blacks in Harrison County in far East Texas were so persecuted by local whites that through 1866 they dared not carry arms in self-defense or seek justice in civil courts.[44] Though their ordeal may have been extreme, it is safe to conclude that most Texas freedmen experienced some degree of such oppression. For white, landowning planters, disempowering the laboring class by confiscating their weapons provided the twin benefits of an advantage in disputes over wages and a reaffirmation of white dominance in the working relationship and the public sphere.[45] What is more, white Texans had every reason to think that they would be allowed to disarm, defraud, and mistreat freedmen with impunity. The leniency of the Johnson administration had lulled many Southerners into a false sense of security about the reconstruction process.

Confident that they had unwavering support from the Johnson administration, northern Democrats, and moderate Republicans, the Texas Conservatives followed in the footsteps of their southern neighbors and antagonized the Radical Republicans in the US Congress. The Eleventh Legislature passed a Black Code, rejected the Fourteenth Amendment, and sent ardent secessionists to represent them in Washington, DC. In their denunciation of the proposed

---

[42] Randolph B. Campbell, *Grass-Roots Reconstruction in Texas, 1865-1880* (Baton Rouge: Louisiana State University Press, 1997), 111; Moneyhon, *Texas after the Civil War*, 56; Bean, *Too Great a Burden to Bear*, 63-79.
[43] Gammel (comp.), *Gammel's Laws*, 5:1008.
[44] Campbell, *Grass-Roots Reconstruction in Texas*, 111.
[45] Christopher Bean has cataloged the cases taken to Freedmen's Bureau courts during the tenure of the organization's court system in Texas, 1865-1866. Over 60% of cases (amounting to 4,439 of 6,794 cases total) involved economic disputes. The numbers demonstrate just how much of the Bureau's time and resources went to instituting free labor in Texas, but they also reveal the inadequacy of the Bureau to redress the grievances of all emancipated Texans. There were certainly more than the 165 violent incidents dealt with by the Freedman's Bureau between 1866 and 1870. In those cases, the accused faced prosecution in civil courts that overwhelmingly favored white defendants, or escaped justice altogether. See Bean, *Too Great a Burden to Bear*, 71-73.

Compendium_Roth
Page 2040

Fourteenth Amendment, the Texas legislature effectively defended the passage of a series of laws that, taken together, comprised the state's Black Code. To admit black men to the "privileges and immunities of white citizens," like voting and bearing arms in the militia, seemed to them a violation of the US Constitution and contrary to "the common instincts of our nature." If the legislators proved their "manly spirit" by rejecting the amendment, they furthered the same goal by brazenly sending to the national capital an entire delegation unable to take the Ironclad Oath required of federal officials.[46] The most odious of these men in the eyes of Republicans was Oran M. Roberts. He had presided over the Secession Convention in 1861, joined the Confederate army, and served as a recruiter for the cause.[47] While in the national capital, Roberts authored a letter to Congress criticizing the Republicans' refusal to seat members of the Texas delegation as an indignity to the state and a violation of constitutional rule.[48] The Republican majority in Congress was outraged by the unrepentant attitude on display by Roberts and the Texas delegation. Despite their confidence in the Johnson administration's support, the would-be senators and representatives returned home with no accomplishments save further provoking the Republicans who controlled Congress.[49] Shortly after Roberts's departure, Congress passed the first Reconstruction Act and articles of impeachment against Andrew Johnson. This initiated a transition from Presidential to Congressional Reconstruction that involved a tremendous increase in federal intervention, and ultimately a substantial expansion of state police power.

---

[46] *House Journal* (1866), 577-583.

[47] Roberts also authored the decision in *Cockrum v. State* (1859) that white men enjoyed an "unrestricted" right to bear arms in Texas. On Roberts, see *Handbook of Texas Online*, Ford Dixon, "Roberts, Oran Milo," accessed August 09, 2018, http://www.tshaonline.org/handbook/online/articles/fro18.

[48] For Roberts's address, along with his commentary and recollections, see O. M. Roberts, "The Experiences of an Unrecognized Senator," *The Quarterly of the Texas State Historical Association* 12, no. 2 (October 1908): 87-147.

[49] Roberts believed that he had not only Johnson's support, but that of William Seward. See Roberts, "Experiences of an Unrecognized Senator," 98, 129-130.

When the Republicans in Congress took the helm of Reconstruction, dramatic changes occurred in Texas and throughout the South. Congress required the states of the former Confederacy to start the reconstruction process over again; those readmitted to the rights and privileges of statehood under Johnson reverted to their previous status outside the Union. This meant that all Southern state governments, including that of Texas, lost their legitimacy in the eyes of the federal government. A second round of constitution-writing and elections was necessary to secure the readmission of each rebel state. Congress required that these new constitutions ratify the Fourteenth Amendment and commit to some degree of political participation for black men. Until this process was complete, the lands of the former Confederacy and their acting governments became subordinated to military oversight by Union generals. Texas and Louisiana became the Fifth Military District under the leadership of Major General Philip Sheridan in New Orleans. Sheridan began exercising his authority over Texas rather quickly, removing Throckmorton from office in the summer of 1867 and installing the defeated Unionist, Pease, in his stead. Sheridan's subordinate in charge of Texas was General Charles Griffin, though he died unexpectedly after only a few months into his assignment. Griffin's time in Texas may have been brief, but he used it to great effect. He began collecting a list of suitably loyal potential office-holders throughout the state and grew the Freedman's Bureau staff to its largest size in Texas. Removal of disloyal state and local officials began under Griffin and continued under his replacement, General Joseph J. Reynolds.[50]

The effects of the Reconstruction Acts upon the besieged Unionists and freedmen in Texas were remarkable. The larger troop strength provided them greater security in politics and the public sphere. The number of Freedmen's Bureau offices and garrisons increased, allowing

---

[50] Moneyhon, *Republicanism in Reconstruction Texas*, 67-69; Moneyhon, *Texas after the Civil War*, 77.

Compendium_Roth
Page 2042

more black Texans to redress their grievances in the more friendly Bureau courts. But it was in realm of politics that the most significant changes occurred. With a limited number of former Confederates disfranchised, and a large number expressing their opposition by declining to vote, the wartime Unionists and freedmen found themselves poised to dominate politics despite being a numerical minority. To capitalize on this advantage and build a solid foundation for northern-style oppositional politics in a state long dominated by the Democratic party, the Texas Unionists formed themselves into a state Republican party. The overwhelming support for Conservatives in Texas (estimated by West Texas Unionists at five-to-one) meant that the Texas Republican party would necessarily be biracial. Thus, their first goal was to register black voters so that Republicans could control the next constitutional convention. To further this endeavor, Republicans established the Union League, or Loyal League, and began organizing chapters across the state. These chapters reported to a state-level president, but they focused primarily on local problems. Union League rank-and-file members, many of them freedmen, asserted black freedom in many locales by forming militia companies and drilling together. Such displays of martial power sent a message to white residents that their black neighbors would no longer be persecuted with impunity; they also provided much-needed organization for black men to protect themselves so that they could register as voters and cast their ballots.[51] The strategy succeeded, and Republicans registered black voters in surprisingly high numbers.[52]

Black men adopting traditionally "manly" behaviors, like bearing arms in public, forming themselves into militias, and casting ballots empowered them in ways that white Texans found

---

[51] Moneyhon, *Texas after the Civil War*, 73-75.
[52] Approximately 89% of eligible black men registered to vote in 1867, while only about 50% of eligible whites did. See Moneyhon, *Texas after the Civil War*, 81-82.

disturbing.[53] Even Northerners, many of whom held the US Colored Troops in high esteem, still vehemently opposed black suffrage. The empowerment of black men became a hallmark of Radical Republican policies during the late 1860s and early 1870s. Radicals believed that the only way to rescue the South from its "backward" socio-economic system was to incubate free labor there. Free labor, the rallying cry of the early Republican Party, assumed the dignity of working men and could not countenance the idea of multiple classes of workers, some more elevated than others. Such a system undermined the dignity of work and the idea that hardworking men could move from the ranks of the landless to the propertied. The party that had come around to the idea of black soldiers eventually came around to the idea of black suffrage, too. This transition reached its climax in 1869 when Congress initiated the ratification of the Fifteenth Amendment.[54]

Unsurprisingly, the elevation of black men as heads of families, voters, potential jurors, officials, militiamen, and politicians—in other words, treating them as *men*—elicited the wrath of most white Texans, indeed of most white Southerners.[55] These Texans cast about for any and every possible way to kill the Republican party in the state and prevent the looming prospect of black equality. The intensification of military intervention in 1867 eliminated their scheme to use civil government to minimize the revolutionary potential of Reconstruction. Sheriffs, judges, and magistrates who exonerated the perpetrators of white-on-black violence were threatened with removal from office and even prosecution in military courts. The altered situation called for a new approach, one that did not rely so heavily on the actions of local officials. Reducing voter registration and voter turnout promised to cast a deep shadow of illegitimacy upon the next

---

[53] On this subject, see Carole Emberton, *Beyond Redemption: Race, Violence, and the American South after the Civil War* (Chicago: University of Chicago Press, 2013).
[54] Eric Foner, *The Fiery Trial: Abraham Lincoln and American Slavery* (New York: W.W. Norton, 2010).
[55] Edwards, *Gendered Strife and Confusion*, 184-217.

Compendium_Roth
Page 2044

constitutional convention and perhaps force the hand of Congressional Republicans to ease up on Texas Conservatives. For this reason, white men in large numbers opted not to register to vote in the winter of 1867 to 1868. The corollary to their non-registration was to prevent black men from registering, too. They tried to accomplish this through intimidation and violence, turning the years 1867 and 1868 into some of the bloodiest in Texas history.[56]

The Confederate sympathizers of Texas, in lockstep with their counterparts across the rest of the South, began waging a campaign of localized violence to suppress black voting and snuff out the proverbial "light of freedom" that black Texans were beginning to enjoy. The ultimate goal of this campaign was to restore the world to the way it was before the Civil War. That antebellum world was ordered and organized around patriarchs—elite white men who protected their households, led their communities, and controlled domestic (i.e., state) politics. In the same way that over-educated women "unsexed" themselves in the minds of nineteenth-century Americans, so the elevation of black men at the expense of the traditional Southern elite "unsexed" these men to some degree. For this reason, the violence undertaken in response was ritualistic, purgative, and male-centric.[57] The Ku Klux Klan, which spread throughout the South like wildfire in 1867, best epitomized this ritualistic violence.

Klan groups acted as a paramilitary arm of the pro-Confederate, Conservative political coalition, but their penchant for costumes and symbolically charged actions reveals a deeper, quasi-religious dimension to their activities. For many white men, including the "gallant" ones in Mississippi, nocturnal raids against "insolent" freedmen and "riotous" black gatherings were nothing new. Instead, the innovation came in the form of costumes, language, and style that were

---

[56] Moneyhon, *Texas after the Civil War*, 59; Cantrell, "Racial Violence and Reconstruction Politics," 344-352. For an example in McLennan County, see Campbell, *Grass-Roots Reconstruction in Texas*, 169.
[57] Wyatt-Brown, *Southern Honor*, 454.

pregnant with meaning. Klan costumes covered many white faces that had unabashedly attacked freedmen in the recent past because the subordination of Southern civil governments to military rule revoked the license they had enjoyed previously. Whipping, threats, and beating were clearly meant to reaffirm white dominance through physical violence. Disarming freedmen and invading their homes stripped black men of the power they claimed as citizens and protectors. The freedmen, no longer protected within white households as slaves, found themselves vulnerable to a form of intimidation and social control that had historically been reserved for poor whites. This charivari tradition involved costume, ritual, and performance to police the boundaries of acceptable social engagement. Now that blacks existed independently of white masters, those pushing beyond their "place" as a laboring underclass became targets of charivari-esque Klan behavior. Many, possibly most, Klan victims emerged from the experience alive. The usual purpose of the Klan was not to kill, but to intimidate, and to do so without being held accountable by civil or military authorities. Klan activities in the coastal and deep South have been better documented than those in Texas, but the evidence from states like South Carolina, Florida, and Mississippi is instructive. Klan attacks often began with a group of masked men barging into a freedman's home and taking control of it and its inhabitants through the force of arms.[58] Klansmen undermined the manliness of a victim by controlling him and his family within

---

[58] Hundreds of examples of Klan encounters were collected by Congress in the early 1870s and compiled into a thirteen-volume collection called *The Condition of Affairs in the Late Insurrectionary States*. The volume containing the majority and minority reports (pt. 1) addresses Texas, with the two groups disagreeing as to whether the Klan actually existed in Texas. Texas scholars have shown that the Klan existed in the Lone Star State, thus vindicating the majority report's claims. There are separate volumes containing the full testimony of witnesses from six states (NC, SC, GA, FL, AL, and MS), so Klan activities in those states are taken here as representative of the Klan in other states. See S. Rep. No. 41-42, pt. 1 at 266 (1872).

61

the home.[59] In order for the Klan's mission to work, white men had to outgun the freedmen, meaning that black men's weapons had to be stolen or neutralized.[60]

Though the state's first Klan group formed in 1866, white Texans did not embrace the idea with much enthusiasm until 1868. This rise corresponded to increased political tension as Texans went to the polls and the Democratic Party returned to state politics.[61] Texas Democrats included the Throckmorton-Roberts coalition of Conservatives, alongside some disillusioned Republicans calling themselves Conservative Reconstructionists.[62] The "Kluxers" of many counties tried to force freedmen to vote Democratic or prevent them from voting at all. Texas freedmen told of Klansmen who "kilt some niggers who wouldn't vote Democrat,"[63] and scared them out of voting "cause them Ku Kluxers was allus at the votin' places."[64] A freedman named Tom Holland summarized the situation well when he said, "If the Negro wanted to vote the Ku Kluxers was right there to keep him from votin'. Negroes was 'fraid to git out and try to 'xert they freedom."[65] Despite this campaign of localized terrorism, described by some historians as a

---

[59] For an example in Texas, see "Testimony of William Hamilton," *Federal Writers Project: Slave Narrative Project*, Texas, Vol. 16 (pt. 2), 108. Hamilton said, "It am allus after dark when dey comes to de house and catches de man and whups him for nothin'. Dey has de power, and it am done for to show dey has de power. It gits so bad round dere, dat de menfolks allus eats supper befo' dark and takes a blanket and goes to de woods for to sleep."
[60] For the general history of the Ku Klux Klan, see Allen W. Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper & Row, 1971). For the Klan in Texas, see James M. Smallwood, "When the Klan Rode: White Terror in Reconstruction Texas," *Journal of the West* 25 (October 1986): 4-13. Klan violence as restorative of threatened white manhood is a common and well-accepted interpretation. See Elaine Frantz Parsons, "Midnight Rangers: Costumes and Performance in the Reconstruction-Era Ku Klux Klan," *Journal of American History* 92 (December 2005), 811-836, 828. Parsons goes to great lengths to explain their use of "inversion" by donning feminine clothing, ultimately attributing it to the "carnivalesque" tradition similar to charivari. A simpler explanation would be that "inverted" dress was fitting for a world turned upside down. Regarding the Klan's use of ritual and the purgative effects of their activities, see Wyatt-Brown, *Southern Honor*, 453-456, 460.
[61] The year 1868 marked the high point for politically motivated violence and Klan activity in Texas. See Cantrell, "Racial Violence and Reconstruction Politics in Texas," 342; Smallwood, "When the Klan Rode," 6-10.
[62] On the reintroduction of the Democratic Party in 1868 and its composition, see Moneyhon, *Republicanism in Reconstruction Texas*, 76-77.
[63] "Testimony of Agatha Babino," *Slave Narrative Project*, Texas, (pt. 1), 38.
[64] "Testimony of Eli Davison," *Slave Narrative Project*, Texas (pt. 1), 297.
[65] "Testimony of Tom Holland," *Slave Narrative Project*, Texas (pt. 2), 147.

mass conspiracy, many thousands of Texas freedman turned out to vote.[66] Black men living in counties with a federal garrison were much more difficult to intimidate than those living outside the protection of Union soldiers.[67] The Republicans, still overrepresented in the electorate, managed to control the constitutional convention, and state politics through the early 1870s.

The Republican delegates to the constitutional convention tended toward infighting and factionalism, but they found unity in addressing the problem of violent crime.[68] A special committee investigating "lawlessness and crime" cataloged the murders, attacks, and sprees committed with racial or political motives. They found 939 homicides between 1865 and the summer of 1868, and a disproportionate number of them were freedmen killed by white hands.[69] Another committee argued that the epidemic of violence, which had worsened over the past year, rendered fair and impartial elections impossible until at least 1869. This was an effort to circumvent elections that Republicans feared losing due to intimidation of black voters, and it ultimately failed. In spite of that, the information gathered and published in the attempt only strengthened the party's claim that Democrats embraced violence to have their way. Included in the committee's statement was the annual report of General Reynolds, which told of the rise of the Ku Klux Klan, conspiracies to intimidate freedman voters, and declared that "the civil law

[66] On KKK as a mass conspiracy, see Trelease, *White Terror*. James M. Smallwood argues persuasively that Klan activities in Texas fit within Trelease's definition. Smallwood, "When the Klan Rode," 12.
[67] For examples of federal soldiers protecting black voters and the integrity of elections in 1868 and 1869, see Campbell, *Grass-Roots Reconstruction*, 120, 154-155.
[68] Republicans broke into four competing factions during the Reconstruction Convention in 1868-1869, and in 1868 the party itself divided into two competing wings. Edmund J. Davis and George T. Ruby headed a coalition of West Texas Unionists and the Union League (dominated by freedmen) called the Radical Republicans, while Elisha M. Pease and A. J. Hamilton represented the proponents of a party based primarily on white participation called Conservative Republicans. See Moneyhon, *Republicanism in Reconstruction Texas*, 96-98.
[69] *Journal of the Reconstruction Convention* (1868-1869), 193-203, 194. White and black Texans were murdered in about equal numbers, which is itself a dramatic overrepresentation of the state's African American population, which constituted about 30% of the state overall. To make matters worse, the overwhelming majority of freedman deaths were committed by whites (373 of 429), yet only ten white deaths came at the hands of freedmen.

east of the Trinity river is almost a dead letter."[70] The "frightful story of blood" contained within the pages of these two reports became the evidentiary foundation for a Republican law-and-order platform in upcoming elections.[71] Republican politicians, especially the supporters of convention president and gubernatorial prospect Edmund J. Davis, felt threatened by their political enemies and did all in their power to protect themselves and their voters. Members of the convention were so concerned about becoming a special target that they worried about "the custom of carrying concealed weapons [which] is openly indulged in by spectators and others who visit this Convention, in the lobbies and elsewhere."[72] For this reason, they passed a resolution banning all deadly weapons in the statehouse and authorizing the sergeant-at-arms to arrest all violators.

The delegates overwhelmingly supported limitations upon the right to bear arms, not only in special circumstances like their own, but across the state. The new constitution protected the right of every person (not just citizens) "to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[73] The addition of a proviso authorizing legislative regulation may seem like a slight alteration, but it actually amounted to a dramatic increase in the state's police power over its residents. Never before had a Texas constitution clearly delegated such authority to the legislature, and never before had state politicians agreed that such a delegation was permissible. In 1845, when a number of lawmakers tried to insert just such a proviso into the Texas constitution, an opposition arose claiming that legislative regulation would violate the sovereign rights of free men and citizens. The delegates

---

[70] See Report and Declaration of Special Committee on the condition of the State concerning elections, in *Journal of the Reconstruction Convention* (1868-1869), 107-115.

[71] *Journal of the Reconstruction Convention* (1868-1869), 194.

[72] *Journal of the Reconstruction Convention* (1868-1869), 248. Stephen Halbrook has stated that the resolution targeted the delegates themselves for disarmament, but that they continued to carry weapons into the debate chamber; this claim misconstrues the intent of the delegates and the purpose of the resolution, which was to protect them from armed spectators and visitors. See Halbrook, "The Right to Bear Arms in Texas," 654-658.

[73] Tex. Const. of 1869, art. I, § XIII.

Compendium_Roth
Page 2049

in the 1868-1869 convention rejected that argument. This alteration represented a victory for two groups: those who, like Throckmorton, wanted an end to the unregulated right to bear arms; and those who, like the Radical Republicans, supported transformational changes to the state that broadened the scope of its authority.[74] The problem of violent crime was so severe, and so intertwined with "the evil practice of carrying private or concealed weapons about the person,"[75] as to merit an augmentation of the state's police power. Though the Reconstruction program of the Radical Republicans in the US Congress forced states to respect many federal rights and guarantees like due process, equal suffrage, and birthright citizenship, it did not extend to the incorporation of the Bill of Rights by the states.[76] The Eleventh Legislature cited the prospect of such incorporation in their rejection of the Fourteenth Amendment in 1866, but their fears proved baseless because Republicans never pressed the issue. Whatever the reasons for the policy, it saved Texas Republicans from being beholden to the strictures of the Second Amendment that inevitably would have protected gun-toting rowdies, criminals, outlaws, and other perpetrators of political or racial violence from the supervisory eye of state government.[77]

---

[74] Gerstle contrasts the desire among Americans to carry out transformational changes to American federal law and governance, versus the improvisational reality. He claims that historians like Richard Bensel have been similarly drawn to the idea of a specific moment or crisis that "transformed" the role of the federal government in American life. Here I make deliberate use of his transformational versus improvisational dichotomy, with the caveat that Texas during Reconstruction gave life to both approaches in its political discussions about weapon regulations. See Gerstle, *Liberty and Coercion*, 91-93. See also Richard Bensel, *Yankee Leviathan: The Origins of Central State Authority in America, 1859-1877* (New York: Cambridge University Press, 1991).

[75] Quoted statements made by W. R. Fayle of Harris County. See *Journal of the Reconstruction Convention* (1868-1869), 152.

[76] See Gerstle, *Liberty and Coercion*, 82-86.

[77] Legal historian Laura Edwards has said, "Ultimately, the integration of a formerly enslaved population into the polity required changes in the basic relations between the federal government and the states, as well as the legal status of all citizens, regardless of race." See Edwards, "The Civil War and Reconstruction," 327. On incorporation, see Gerstle, *Liberty and Coercion*, 84-85; Elizabeth Dale, "Criminal Justice in the United States," in *The Cambridge History of Law in America: Volume II*, eds. Grossberg and Tomlins, 139-140. On incorporation and the Second Amendment, see Carole Emberton, "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South," *Stanford Law and Policy Review* 17 (2006): 615-634; Leslie Friedman Goldstein, "The Specter of the Second Amendment: Rereading *Slaughterhouse* and *Cruikshank*," *Studies in American Political Development* 21 (Fall 2007): 131-148.

With the approval of the new constitution and the successful election of a new civil government, Texans found themselves back on the road to readmission to the Union. The happy event took place in the spring of 1870 with the words "the said State of Texas is entitled to representation in the Congress of the United States."[78] As federal intervention and the protection of Union soldiers and Bureau agents waned, the law-and-order platform of the ascendant Republican party became increasingly important. The leader of the Radical wing of the Republicans, Edmund J. Davis, won election to the governor's office and quickly outlined his vision for restoring peace and tranquility across the state. The problem posed by local majorities willing to harass, intimidate, and assault racial or political minorities could only be resolved by increasing the police presence of the state government. There were two ways in which such a presence could be invigorated: reorganization of a loyal militia, and creation of a police force with statewide jurisdiction.

A militia, composed as it was of regular citizens, posed a special problem because a majority of Texas residents opposed the Republican party and black suffrage. Davis confronted this dilemma by pushing for an elite National Guard within the militia loyal to himself, and greater gubernatorial control over deploying the force and placing lawless areas under martial law. There was no doubt that all Texas lawmakers supported a reorganization of the militia—the Indian problem still lingering along the frontier ensured that; but the fear of executive tyranny, such an important component in the American political tradition, threatened to derail the project. Davis's skeptics received no reassurance from his request to form a State Police force, either. To ensure the fair and equal enforcement of the laws everywhere, he called for a police system "embracing the whole State under one head, and that the police of the different cities, the sheriffs

---

[78] Sanger, ed., *Statutes at Large*, Acts of the Thirty-ninth Congress, Vol. 26 (1871), 80-81.

66

and their deputies and constables, be made a part of that general police, to act in concert with it, and to be subject to the orders of the chief." Davis envisioned the force to be like the Texas Rangers in the sense of having statewide jurisdiction, but it was to be focused on the arrest of criminals and the supervision of local law enforcement, rather than concerned with the Indian question. An Adjutant General would oversee both the militia and State Police organizations. The final piece of this three-tiered law-and-order platform was arms regulation. Davis reminded the legislators that they enjoyed a newfound control over the "privilege" of bearing arms and he asked them to pass restrictions "calculated to prevent the abuse of it." His justification hearkened back to Throckmorton's in 1866: "There is no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State."[79] Politics aside, both men drew the conclusion that the disease of lawlessness could not be cured without removing small weapons from circulation in public; they also agreed that the state government had the *authority to pass* and the *capability to enforce* such laws.

A number of Republican lawmakers heeded Davis's call by introducing bills and resolutions on the subject of regulating weapons. A representative from South Texas, L. B. Camp, was the first House member to act. Camp had spent many years in northeast Texas (Upshur County) but moved west in the 1850s. Like Throckmorton, he voted against the Ordinance of Secession, but diverged from the former governor by refusing to support the Confederacy for the duration of the war. Rather than introduce his own bill, Camp's idea was to have the House Judiciary Committee draft one. That committee had a solid Republican majority, four of whom were fellow Radicals. His resolution described "the custom of carrying deadly weapons upon the person" as "demoralizing in its effects, and . . . the fruitful source of many of

---

[79] *House Journal*, (1870), 17-31, 18, 19.

the crimes which have stained our fair name abroad."[80] The House ultimately adopted the Camp Resolution by an overwhelming margin of 76:2.[81] Not content to allow the Judiciary Committee all the fun, three other Radicals introduced bills "to levy a tax on fire arms," "to prohibit the carrying of six-shooters and other revolving pistols," and to ban "the carrying of pistols, bowie knives, and daggers."[82] The Judiciary Committee did not support the tax-based bill, but the other two formed a foundation for its response to the Camp Resolution. That response came in the form of a substitute for the two bills, to be called HB 297, "an act to suppress the carrying of deadly weapons except in case of self-defense, or lawful defense of the State."[83]

The Judiciary Committee's recommendation stands as one of the toughest, most comprehensive weapon regulation bills ever introduced in the Texas statehouse. The bill broke with tradition in a number of ways. First, it used specific language to define "deadly weapons." Banned arms included "any pistol, dirk, sword in a cane, spear, bowie knife or any other knives manufactured and sold for the purpose of offense and defense." Second, the bill did not limit its scope only to concealed weapons, instead criminalizing "any person having or carrying about his person" any of the aforementioned articles. This was an important innovation that outlawed certain ways of carrying a particular kind of weapon. The bill did not apply to rifles, muskets, or shotguns; nor did it prohibit people from keeping weapons in their bags, wagons, or luggage. Long guns were virtually impossible to conceal, and weapons stowed away were much less likely to be used in an altercation than those carried on the hip. There were a few exceptions to

---

[80] *House Journal* (1870), 44.
[81] The only nay votes were H. C. Ellis, a Democrat from Wood County, and George H. Slaughter, a Radical Republican from Smith County. Slaughter became the Twelfth Legislature's strongest opponent of arms regulation in the House. See *House Journal* (1870), 90-91.
[82] See *House Journal* (1870), 50, 61. In order from first to last these bills are HB 9 (Sheriff, Fort Bend-RA), HB 10 (Grothaus, DeWitt-RA), and HB 35 (Dorris, Caldwell-RA). Bill files for HB 9 and HB 10 are no longer extant. House Bill 35, 12the Leg., 1st Called sess. (1870), TSLAC.
[83] *House Journal* (1870), 750, 391, 418.

the extensive reach of HB 297, but even those were limited or complicated. The most obvious of these included carrying a prohibited weapon "for the lawful defense of the State, or as a peace officer" or within any "frontier county and liable to incursions of hostile Indians." The more convoluted exemptions involved bearing arms in self-defense or while traveling. A person arrested for violating the weapons ban could, *ex post facto*, justify his action by showing "that he was in danger of an attack . . . that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage." But the exemption disappeared if "this danger had its origin in a difficulty first commenced by the accused." Slightly simpler was the dispensation offered to people heading to Mexico, Indian Territory, or frontier counties of Texas. These travelers most certainly needed deadly weapons for self-defense, and HB 297 acknowledged that fact. But the bill required them to inform their local court clerk in advance and pay him fifty cents for a special license stamped with the seal of the district court. This was a cumbersome and expensive requirement that promised to tax not only the clerk's time, but the traveler's patience. HB 297 also made it expensive to appeal a guilty judgment and summarily fired any peace officer who failed to enforce it.[84]

By creating the draconian HB 297, the Judiciary Committee went in a direction that Camp did not expect. As soon as the House took up the bill for engrossment and amendments, he moved for a postponement. When the time finally arrived to return to the subject, Camp introduced a substitute bill. He was joined in his opposition to HB 297 by an East Texas representative named George Slaughter, a fellow Radical Republican. Slaughter had cast one of the two votes against the Camp Resolution in the opening days of the session, so his alliance

---

[84] Law officers could be dismissed not only on a grand jury indictment, but merely on information presented to any magistrate. This is startlingly low evidentiary threshold for such a severe penalty, suggesting that it provided a way for besieged Republicans to replace the many sheriffs and constables who refused arrest white attackers and Klan groups. See House Bill 297, 12th Leg., 1st Called sess. (1870) TSLAC.

with Camp was one of convenience. Where Camp disliked the particular bill, Slaughter disagreed with the entire project. The ultimate cause of his hostility toward arms regulation is unknown, but it may have stemmed from the fact that he held public office as a newcomer and Radical in a particularly troubled part of the state. In the summer of 1867 he arrived in Smith County as a protégé of George W. Whitmore, who represented East Texas in the US Congress. Slaughter quickly became a local officeholder and eventually rose to the rank of vice-president of the Texas Union League. He was firmly tied to the Union League in political matters, so his rejection of a measure intended to protect freedmen is mysterious. There are two possible reasons for his divergence from fellow Radicals. First, he may have found his sidearm a great comfort in a town experiencing what the local Bureau agent called "open warfare."[85] Second, he represented East Texas, a region where whites' hatred of African Americans drove many a Republican into the arms of the Democratic Party; Slaughter could have participated in the Union League out of political savvy rather than sincerity.[86] Camp and Slaughter worked together to have the House appoint a special committee to review HB 297 alongside the Camp substitute and hammer out a compromise. The Republicans controlled the committee with three Radicals, one moderate Republican, one Democrat, and two men of unknown affiliation.[87] The compromise bill they presented to the House members the next day was HB 297 minus the

---

[85] Barbara Leah Clayton, "The Lone Star Conspiracy: Racial Violence and Ku Klux Klan Terror in Post-Civil War Texas, 1865-1877" (master's thesis, Ok. State Univ., 1979), 43-48. https://shareok.org/bitstream/handle/11244/15795/Thesis-1986-C622l.pdf?sequence=1.

[86] Moneyhon, *Republicanism in Reconstruction Texas*, 157-158, 245. Outside of Moneyhon's contribution on the subject, very little information exists on Slaughter and his politics. His political mentor, George Whitmore, was part of the Radical Davis-Ruby faction comprised primarily of West Texans and blacks. It is intriguing that the East Texans Whitmore and Slaughter would ally with the Davis-Ruby group rather than the James and Webster Flanagan faction committed to commercial development in East Texas. On the factions within the party, see Moneyhon, *Republicanism in Reconstruction Texas*, 83-86, 250-252. On Whitmore as a pro-Davis Radical, see *Handbook of Texas Online*, Randolph B. Campbell, "Whitmore, George Washington," accessed August 08, 2018, http://www.tshaonline.org/handbook/online/articles/fwh43.

[87] Members were Burnet (R), Williams, Locke, Cooper (RA), McLean (D), Hawkins and Moore (Unknown)

Compendium_Roth
Page 2055

licensing requirement for armed travelers.[88] The details of Camp's opposition to HB 297 remains unknown, but removing the cumbersome licensing section ended up being sufficient to earn his support.

When House members dedicated themselves to amending and passing this groundbreaking measure, they made the bill so stringent as to be abortive. Additions like giving half the assessed fine to the informant or placing even greater restrictions upon people carrying weapons for self-defense might have been popular in the lower chamber, but they would not likely meet with Senate approval. For this reason, HB 297 as amended by the House stood no chance of becoming law. Notwithstanding this political folly, the representatives voted overwhelmingly in favor of its passage with even thirteen Democrats supporting it. These delegates represented North and Northeast Texas, where outlaw gangs, Klan groups, and other criminals made violence an everyday occurrence and a serious problem. The Republicans voted as a bloc and even Slaughter toed the party line. The nay votes came mostly from Democrats who lived in or near the frontier counties still subject to Indian attacks (see Fig. 2.1).

---

[88] Camp's substitute bill is not extant, so the substance of his opposition to HB 297 remains a matter of speculation. On the history of HB 297, see *House Journal* (1870), 391, 418, 475, 480.

Fig. 2.1. Map of Democratic votes on HB 297, 1870.



■ Democratic vote for HB 297

■ Democratic vote against HB 297

Despite the time and political pressure expended by House Republicans on HB 297, their endeavor went down as a failure. Their counterparts in the Senate crafted a much simpler bill that actually became law. Senator Ebenezer Dohoney, a Democrat from Northeast Texas, introduced a complicated bill similar to HB 297 that died at the hands of the Judiciary Committee—complex policies that involved special licensing processes did not meet with

72

senatorial approval.[89] Constructing the perfect bill that did just enough disarming to reduce crime without trampling on constitutional rights began with a recommendation by Mijamin Priest, a Radical from Rusk County in East Texas.[90] The main thrust of his bill represented a position capable of garnering strong bipartisan support in both chambers. In fact, the very same text appeared in the amended HB 297 as its third section. Priest's bill simply made it a misdemeanor to "have about his person" deadly weapons in certain specified locations. "A bowie knife, dirk or butcher knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind" could not be taken to "any church or religious assembly, any school room . . ., social party . . ., or to any election precinct on the day or days of any election." The most significant aspect of the bill was its clarity in proscribing certain kinds of weapons (which included long guns) from specific locations. A policy like this promised to allow local officials to enforce it without the burden of special licenses and exemptions. If a man felt threatened he could carry a pistol, as long as he did not take it to events that could become riotous. Similarly, black Texans could gather together for worship, parties, and educational meetings as long as they did not take weapons with them. The kinds of locations and events protected by the law were the very ones that most frequently became targets of Klan or other white vigilante violence.

Priest was in a position to personally usher his bill through the Senate Judiciary Committee because he served as its chairman. Still, the committee's substantial Democratic presence required him to accept alterations and support a substitute bill. A controversial second section of Priest's original bill required a direct tax of five dollars on "every five shooter, six shooter or other pistol or firearms of any name or description kept for use to be carried about the person." Though the verbiage is clumsy and vague, Priest did not intend this tax to apply to long

---

[89] Senate Bill 57, 12th Leg., 1st Called sess. (1870), TSLAC; *Senate Journal* (1870), 76-77.
[90] On Priest, see Spaw, *The Texas Senate*, 108-109.

guns. These larger, heavier firearms could not be "carried about the person" in the same way that a pistol could. Not only was this tax quite expensive (a pistol cost anywhere from ten to twenty dollars, so it was a quarter or more of the item's value), it required the statewide registration of all small firearms. The only time something like this had been considered before was in 1861 when the House considered creating an inventory of firearms that could be put into military service. If such a survey was politically impossible during wartime, it stands to reason that it remained unfeasible afterward. Priest's registration idea died in his own committee, so he recommended the passage of a substitute bill that eliminated the offending section.[91]

Priest's bill, labeled SB 20, quickly passed through the Senate because of a little-known controversy that erupted in the summer of 1870. As Davis might have anticipated, a cohort of lawmakers took issue with the centralization of gubernatorial power inherent in the militia and State Police laws. Most of these lawmakers were Democrats whose antipathy toward Davis motivated them as much as their political principles, but some Republicans joined their ranks. As early as 1868, Texas Republicans began dividing into two competing factions. Radical Republicans aligned with Davis and tended to support the political goals of West Texas and freedmen. Conservative Republicans rallied around A. J. Hamilton and Pease and were known for their opposition to the complex *ab initio* cause out of concern that it would hinder railroad development. Conservative Republicans tended to hail from East and Central Texas, and they sometimes found common ground with Democrats on racial matters.[92] An important segment of the Conservative Republican coalition was a collection of East Texas delegates organized around the father-son duo of James and Webster Flanagan. The younger Flanagan held a seat in the state

---

[91] House Bill 129, 9th Leg., Reg. sess. (1861-1862), TSLAC. Senate Bill 20, 12th Leg., 1st Called sess. (1870), TSLAC; *Senate Journal* (1870), 61, 97-98; Gammel (comp.), *Gammel's Laws*, 5:237.
[92] On the divisions among Republicans, see Moneyhon, *Republicanism in Reconstruction Texas*, 96-98, 107-108.

senate and pursued his section's interests from there. His impeccable Republican credentials and strong political connections turned him into the leader of these anti-Davis critics who marched out of the senate chamber to prevent a quorum and stall debate on the militia bill. The sergeant-at-arms forced "the bolters" back into the chamber, but most of them were placed under arrest for violating the rules of the senate. For about three weeks, these nine senators were prohibited from participating in deliberations.[93] What machinations remained open to the vocal minority of anti-Davis senators in a Radical-dominated legislature evaporated with the absence of so many men. A whole host of Republican measures passed rapidly through the chamber with little or no amendment. These included the militia bill, the State Police bill, and even SB 20.[94]

At this point, after the senate's passage of SB 20, and after the return of the arrested Democrats, Matthew Gaines stood up and asked his fellow senators to consider the arms regulation proposed by the House (HB 297). Gaines was one of the eleven African Americans in the Twelfth Legislature and a notable Republican leader in the black-majority Washington County. As one of the few political spokesmen for the state's freedmen, Gaines preferred HB 297 because it prohibited the carrying of weapons in public with very limited exceptions; banning weapons from certain events and locations simply was not good enough to protect black Texans. For the supporters of a tougher bill, the everyday carrying of weapons for self-defense still permitted by SB 20 created an atmosphere of distrust that abetted violence and intimidation. In a show of Radical Republican solidarity and power, the senate suspended the rules to read HB 297 and sent it to the Judiciary Committee. A few days later Mijamin Priest reported to his

---

[93] Spaw, *The Texas Senate*, 123-126; Moneyhon, *Republicanism in Reconstruction Texas*, 91, 139-142. Flanagan worked out a Deal with the Davis faction to trade passage of a bill friendly to the Southern Pacific in exchange for the Militia bill. Upon the advice of his cabinet, Davis vetoed the Southern Pacific bill out of concern for the state budget, further alienating Flanagan and his allies. On Flanagan, see Spaw, *The Texas Senate*, 97-100.
[94] *Senate Journal* (1870), 307-308, 320-321.

Compendium_Roth
Page 2060

fellows that his committee supported the goal of HB 297 but did not have the time to consider it in detail. The senate did not take up the issue again before the end of the session.

Even though the Senate lacked the time and political will to enact a stringent arms regulation law in 1870, the passage of SB 20 by the House marked a new departure for the state in terms of gun control. This first significant curtailment of the right to bear arms in Texas went into effect in October of 1870, just three months before the regular session of the Twelfth Legislature (January to May, 1871). During closing weeks of 1870, the Republican majority of the legislators decided to strengthen the law-and-order platform of the Davis administration. The State Police and militia laws received attention, as did the deadly weapons regulation. The intervening months had highlighted the shortcomings of these laws which, despite representing an unparalleled consolidation of state government power, did not go as far as Davis wanted. The militia and State Police were only partially organized due to a lack of funding; there were not enough state policemen, so Davis asked for the appointment of a reserve corps of "special" policemen in each county who could respond in an emergency; the law "forbidding weapons in public spaces" was insufficient to quell the violence and needed to be strengthened.[95] The pro-Davis Radicals in the legislature followed the governor's instructions, but in doing so alienated moderates and set the stage for the collapse of Reconstruction and statewide Republicanism in 1874.

All the action involved in amending the weapons regulation law took place in the House. The most important contributors in that chamber were Francis Gray Franks, William Sheriff, and Frederick Grothaus, all Radical Republicans. They represented counties along the Gulf Coast and hailed from Wharton, Fort Bend, and DeWitt Counties, respectively—all places with sizeable

---

[95] *Senate Journal*, (1871), 30-33.

black populations. Each of the proposed bills followed the basic design of HB 297 by prohibiting the carrying of certain specified weapons "about the person," but the House Judiciary Committee considered Grothaus's, HB 115, "best calculated to secure the end sought to be attained."[96] The committee did not specify the shortcomings of the other two bills, but Franks's was weak and poorly written and Sheriff's retained some of the requirements that House members had removed from the abortive HB 297 at the previous session.[97] Even though the House had passed over their bills, Sheriff and Franks joined the ranks of the Grothaus bill's supporters. The House had specified a particular day to consider Grothaus's HB 115, but when that day arrived the debate became exceedingly contentious. Thirty members absented themselves, making the bill's supporters struggle to achieve a quorum and carry on regular business. A critical mass of lawmakers, mostly Democrats alongside George Slaughter, obstructed the bill's passage at every turn. They offered outlandish amendments sure to kill it, like a recommendation that violation be upgraded to a felony and carry at least one year in the penitentiary; they tried to overturn the quorum present and adjourn the House; they relied upon complicated rules to keep the debate going endlessly so that the bill's supporters would surrender. On each count the champions of HB 115, about sixty members, held their ground and pushed the bill along. It helped their cause that the Speaker of the House, Ira H. Evans, represented a staunchly Republican district and was an ally of Davis (see Fig. 2.2).[98]

---

[96] *House Journal* (1871), 443-444.
[97] Sheriff's bill kept the cumbersome licensing requirement for travelers.
[98] The entire day of March 9, 1871 was spent debating this bill in the House. See *House Journal* (1871), 523-533.

Compendium_Roth
Page 2062

Fig. 2.2. House votes on HB 115, 1871.



    ■ Vote for HB 115

    ■ Vote against HB 115

    ■ Votes split on HB 115

       Grothaus and his allies fashioned HB 115 in the image of its predecessor, HB 297, with

some important differences. HB 115 prohibited "carrying on or about his person, saddle, or in his

saddle bags any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie-knife,

or any other kind of knife manufactured or sold for the purposes of offense or defense." The

forms of carrying as well as the list of prohibited weapons were much more expansive than

before, indicating that the lawmakers sought to address ambiguities present in the preceding law.

They removed the monetary incentive to inform on neighbors violating the law; it promised

78

better enforcement, but at the expense of county coffers desperately seeking money for infrastructure improvements. The Senate made sure to add a proviso explicitly stating what types of "civil officers" would be exempted, and under what conditions. Exemption from HB 115 only applied to police, militiamen, sheriffs, and revenue and civil officers "while engaged in the discharge of their official duties." But they added new exemptions, such as one for travelers (regardless of their destination), one for residents of frontier counties, and one for anyone "fearing an unlawful attack on his person" that is "immediate and pressing." The penalty entailed forfeiture of the weapon and a fine from twenty-five to one hundred dollars, and repeat offenders could be sentenced to jail time in addition to the fine. Interestingly, the full text of SB 20 (the law already on the books and being superseded) remained within this new bill. Taking the aforementioned deadly weapons "or other fire arm" to certain events or places was a misdemeanor punishable by a much heftier fine of fifty to five hundred dollars. Appealing a guilty verdict was costly, requiring a bond of at least two hundred dollars. Money from fines, bonds, and even the sale or auction of forfeited deadly weapons had to be allocated to "repair and maintenance of public roads." Finally, any magistrate or officer who failed to properly enforce this law faced dismissal, prosecution, and a fine of up to five hundred dollars.[99]

This bill became the 1871 Texas deadly weapon ban—one of the first comprehensive arms control laws in American history. In their bid to protect African Americans and nurture free labor in the South, Texas Republicans ended up championing a measure capable of dramatically changing the way men dressed and behaved in public.[100] No longer could they carry a pistol on

---

[99] Gammel (comp.), *Gammel's Laws*, 6:927; *House Journal* (1871), 443-444, 523-533; House Bill 115, 12th Leg., Reg. sess. (1871), TSLAC.

[100] Some scholars have mistakenly attributed the gun laws of the Reconstruction era to the racist sentiments held by Confederate sympathizers. In fact, these comprehensive weapons regulations tended to be enacted by Republican governments in the states of the former Confederacy. Examples of scholarship that ascribe exclusive authorship of early gun laws to racism, Democrats, and former Confederates include Kevin Yuill, " 'Better Die Fighting against Injustice than to Die Like a Dog': African-Americans and Guns, 1866-1941," in *A Cultural History of Firearms in*

the hip, or a bowie knife on the belt; no longer could they resort to ad hoc duels or knife fights to settle their scores—fisticuffs would have to do. Like any law, it proved impossible to fully enforce, but supporters still sang its praises. One reporter lamented that some reputable men continued the old practice of settling scores "at the muzzle of a six-shooter." He went on to say that "no commentary is needed, to convince good men, not only of the wisdom of the law prohibiting the carrying of firearms, and other deadly weapons, but also of the necessity of its rigid enforcement."[101] Near the end of his term in office, Davis acknowledged the weapon ban as an important measure "for the preservation of the peace" which had a "most happy effect" upon the state. The victory was not merely one of restraint and law over passion and disorder; it was a strategic political victory for the Republicans. One Republican commentator summed up his party's sentiment well when he said, "The Democrats are sullen and angry because the firearm bill has robbed rowdies of their six-shooters, their bowie knives and their sword canes; let us continue to disarm rowdies and murderers, to stop bloody affrays, and to thus oppose the Democracy."[102]

Forcing Texans to leave their weapons at home remained a controversial policy that contributed to the erosion of Davis's support among Texas Republicans. Moderates from within his own wing of the party became disenchanted with Davis because of his promotion of executive power, and many defected to the Conservative Republicans. Though Davis was well within his rights when he declared martial law in three separate Texas counties between 1871

---

the *Age of Empire*, eds. Karen Jones, Giacomo Macola, and David Welch (New York: Routledge, 2013), 211-229. Nineteenth-century Southerners recognized the correlation between weapon regulations and Republican governments: "It has been the policy of the Radicals in some of the other States, to disarm the people while overrunning the country, with a mercenary soldiery; how far this effort will be made in Texas, will be determined to some extent, by the provisions of that act supported by the administration, on the subject of wearing deadly weapons." *Tri-Weekly State Gazette* (Austin, TX), March 15, 1871.
[101] "The District Court," *San Antonio Daily Express* (San Antonio, TX) April 2, 1871.
[102] "A Good Lesson," *Houston Daily Union* (Houston, TX), June 30, 1871.

and 1873, doing so alienated many voters. White Texans, even many Republicans, perceived these declarations as affronts to white honor and violations of white supremacy. Each came in response to a racially charged riot or shootout, and those usually began with black State Police officers trying to make white men follow the law. The most outrageous occurred in Limestone County in 1871 when a black State Policeman named Mitch Cotton ended up in a shootout after demanding that a white man abide by the deadly weapon law. The consequences for Davis and local Republicans proved catastrophic, with several deaths and a Democratic electoral victory through fraud and intimidation.[103] Criminalizing what many people considered the "normal" manly behavior of carrying a weapon made it easy for Davis's detractors to portray him as a loathsome tyrant. Democrats and Conservative Republicans met together in 1871 trying to form an anti-Davis coalition. The two groups remained too far apart to form a political alliance, but they found much common ground in decrying high taxes and bemoaning that "the people have been disarmed throughout the State, notwithstanding their constitutional right 'to keep and bear arms'."[104] But their concern was not limited to the disarming of the people; such disarmament only posed a threat to their liberty because the hated State Police and State Guard, associated with Davis and falsely presumed to be staffed by freedmen, "are armed, and lord it over the land, while the citizen dare not . . . bear arms to defend himself."[105] Lockean liberalism was at play here, but so was a white male chauvinism that could not countenance the trappings of manly authority in black hands. Senator Gaines had identified this sentiment the previous year when he

---

[103] Barry A. Crouch, *The Governor's Hounds: The Texas State Police, 1870-1873* (Austin: University of Texas Press, 2011), 93-115; Reginald G. Jayne, "Martial Law in Reconstruction Texas" (master's thesis, Sam Houston State Univ., 2005), 59-82; Moneyhon, *Texas after the Civil War*, 142-143; Campbell, *Gone to Texas*, 281.

[104] Note that they referred here to the Texas Constitution of 1869, not the US Constitution. Again, the "incorporation" of the Bill of Rights to make it apply to state governments had not yet taken place.

[105] This is the Tax-Payers Convention. On the meeting, see *Handbook of Texas Online*, Carl H. Moneyhon, "Tax-Payers' Convention," accessed August 02, 2018, http://www.tshaonline.org/handbook/online/articles/vft01. Quotation from S. Rep. No. 42-41, pt. 1 at 426 (1872).

Compendium_Roth
Page 2066

claimed that "the idea of gentlemen of my color being armed and riding around after desperadoes" was the root of white opposition to the State Police and militia bills.[106]

The momentum of the Texas Democrats surged as they scored victories in elections for state offices and the US Congress. By 1873, Democrats controlled the state legislature and looked forward to inaugurating a Democratic governor-elect, Richard Coke. Davis hoped for the intervention of the Grant administration to nullify the results and preserve his administration, but the national party had grown tired of reconstructing the South. The embattled governor insisted on finishing out his term in office, but armed Coke supporters forced his resignation in January 1874. Thus ended the Republican control over state government, and for all intents and purposes, ended Reconstruction in Texas.

Slowly but surely, one by one, Texas county governments returned to the Democratic fold over the next decade or so. Democrats in the Thirteenth Legislature swiftly dismantled Davis's law-and-order platform by curtailing the governor's authority over the militia and disbanding the State Police. Interestingly, despite the hue and cry against it, the 1871 weapon ban stayed in place. Lawmakers found it much less threatening once its detested enforcers had been eliminated. No doubt they, like the US congressmen writing in 1872, recognized that the situation in Texas had improved over the past few years. Yes, their world had proverbially "turned upside down" during the revolution that was Republican rule between 1868 and 1873; but that enemy had been defeated and his inventions either destroyed or turned to Democratic ends. The ubiquitous violence so prevalent in the South and Old Southwest during antebellum years exploded in the aftermath of the war, but a combination of innovative legal changes and a

---

[106] *State Journal Appendix: Containing Official Report of the Debates and Proceedings of the Twelfth Legislature of the State of Texas* (Austin: Tracy, Siemering, & Co., 1870), 82. Quoted in Moneyhon, *Republicanism in Reconstruction Texas*, 139.

Compendium_Roth
Page 2067

strong executive branch had restored some semblance of order during the Davis administration. The "tyranny and lawlessness which was, before the war, open and unrestrained" had been rechanneled and concentrated into isolated, localized episodes of extreme violence. This transition made for a South characterized by "more general order and peace . . . than before the war," though the violent episodes became steadily more brutal and reached the point of becoming sacred rituals within white communities.[107] I speak here of the forms of ritualized racial violence that we categorize under the heading of lynching—occasions when town-dwelling, be-suited men could release the "fearsome passion" that had been expected of their antebellum slaveholding forefathers. The generalized, low-level violence that invariably followed gun-toters was on its way out, to be replaced by the concentrated, high-level violence of local "wars," large-scale shootouts, riots, and lynching. How that process unfolded is the subject of the following chapters.

---

[107] The majority report of the Joint Select Committee to inquire into the condition of affairs in the late insurrectionary states declared: "It is the general testimony of old citizens of the South that, notwithstanding the conspiracy known as the Ku Klux Klan, there is more general order and peace in the South than before the war; while this may surprise those familiar with the recent disorders, and unfamiliar with southern society before the war, we deem the statement not extravagant, for the conspiracy appears to us an attempt to exercise in localities, in despite of law, that tyranny and lawlessness which was, before the war, open and unrestrained, and more general, if not so cruel. We should remember how common it was to scourge colored men, and how perilous for northern citizens or southern emancipationists to be found in the Gulf States. How freely the revolver and the knife were used in the renconter or the duel." See S. Rep. No. 42-41, pt. 1 at 271 (1872).

83

Chapter 3
"The Proper Costume of a Gentleman": Courts & Constitutionality from *English* to *Miller*

History textbooks mark the end of Reconstruction in 1877, when Republican Rutherford B. Hayes took office and, by way of an agreement reached with Democrats the previous year, ordered the last of the Union soldiers in the former Confederacy to stand down. The Hayes-Tilden Agreement ended an electoral crisis, but more importantly, acceded to political reality in the South: Democrats had larger numbers and were better organized than Republicans, and their often ruthless tactics had long since delivered much of the South to the Democracy. This process, referred to as Redemption, took place in Texas beginning in 1872. By 1874, Democrats had regained control of the state legislature, the governor's office, and a host of county governments. Some counties stayed in Republican hands a while longer, but Texas was well on its way to becoming a one-party state.

The self-professed Redeemers expressed their goals and explained their actions in martial terms. For this reason, disarming black men and disqualifying them from military service became important battles to be fought and won at any cost. Political culture of the day intertwined manhood, martial service, and citizenship into a complex web that had previously been the exclusive domain of white men. The elevation of black men to legal equality, political participation, and the bearing of arms as citizen-soldiers was an affront to most white men, even those sympathetic to parts of the Republican platform.[1] Higher taxes, scandals, and the consolidation of executive power did not help Edmund J. Davis's cause, but the root of the issue was race—in the end, white racial solidarity trumped all other considerations among the majority

---

[1] For a review of the "citizen-soldier" concept and its connection to the bearing of arms in martial sense, see Cornell, *A Well-Regulated Militia*, 3-7, 13-18.

of Texas voters.[2] Restoring white men to their previously held status as the socio-political elite was accomplished via the degradation of black men. Their voting rights were not taken away quite yet, but they found themselves purged from militias, disarmed, and suddenly vulnerable to the white, Democratic majority in Texas. One of the first acts pursued by the Redeemer government was to replace the militia law that Republicans had worked so hard to pass, and to empower the adjutant general to collect state arms that had been distributed to militia units. In this manner, the biracial and black militia companies formed to protect Republican voters by going toe-to-toe with white paramilitary groups were disarmed, disbanded, and disempowered. Democrats followed up this legislation by authorizing the formation of dozens of rifle companies, all of which received state-supplied weapons and ammunition. Bearing arms in defense of the state reverted to a privilege for white men only.[3]

The popular images that later generations of white Americans held about the "redemption" of the South from the slough of racial equality reinforced this connection between white triumph and black disarmament. In his novel *The Clansman*, North Carolina author Thomas Dixon wrote a denouement in which the local black militia members laid their arms at the feet of the white Klan that defeated them.[4] The scene was also portrayed in the film version, *The Birth of a Nation*. These symbolically laden images could also revolve around white leagues, which were armed groups that emerged in the mid- and late-1870s, after masked terrorism

---

[2] On Davis and his political difficulties, see Carl Moneyhon, *Edmund J. Davis of Texas: Civil War General, Republican Leader, Reconstruction Governor* (Fort Worth: TCU Press, 2010).

[3] A few black militia units remained throughout the late nineteenth century. However, they were used in ceremonial capacity rather than deployed in a martial capacity. On Redemption as a restoration of white manhood, see Emberton, *Beyond Redemption*; for gender analysis of the Civil War era more generally, see Whites, *The Civil War as a Crisis in Gender*; Nina Silber, *The Romance of Reunion: Northerners and the South, 1865-1900* (Chapel Hill: University of North Carolina Press, 1993); Nancy Bercaw, *Gendered Freedom: Race, Rights, and the Politics of Household in the Delta, 1861-1875* (Gainesville: University of Florida Press, 2003).

[4] Thomas Dixon, *The Clansman: An Historical Romance of the Ku Klux Klan* (New York: Grosset & Dunlap, 1905), 340-341.

Compendium_Roth
Page 2070

became a crime punishable by federal rather than state courts. In the early twentieth century, writers like Thomas Nelson Page celebrated the honorable and patriotic white men who "overthrew" the corrupt governments imposing "negro domination" during Reconstruction. The intersection of manhood, martial service, and citizenship was the very heart of the racial tensions within the former Confederacy during the waning years of Reconstruction. None other than William A. Dunning identified "the crux of the race issue" as the black militia units perceived to be tyrannizing white Democrats. "Respectable whites would not serve with the blacks in the militia; the Republican state governments would not . . . exclude the blacks from the military service; the mere suggestion of employing the blacks alone in such service turned every white into practically a sympathizer with the Ku Klux." There is no doubt that the claims made by freedmen upon Southern society, their embrace of what historian Carole Emberton has called "martial manhood," drove white Southerners to their violent mode of Redemption. This remembrance of the collapse of Reconstruction as one of physical and metaphorical restoration of white manhood resonated with Southern audiences because it was largely true.[5]

In the decade or so following their electoral triumph in 1874, Texas Democrats worked hard to shore up their political power. They repealed most of Davis's legislative accomplishments, harried the Republican Party to insignificance, and dramatically reduced state expenditures (and therefore taxes). While placing their political and fiscal houses in order, they got their physical house in order, too. The legislature spent a tremendous amount of time overseeing the financing and construction of a new state capitol, a process that took over a decade. The single-mindedness of Democrats to undo politically and fiscally what had been done

---

[5] Thomas Nelson Page, *The Negro: The Southerner's Problem* (New York: Charles Scribner's Sons, 1904); William A. Dunning, "The Undoing of Reconstruction," in *Essays on the Civil War and Reconstruction and Related Topics* (1897; repr., New York: The Macmillan Company, 1904), 357; Emberton, *Beyond Redemption*, 103-105.

Compendium_Roth
Page 2071

during the Davis administration left them lacking the will or the popular mandate to amend or otherwise pay attention to the deadly weapons ban. Some efforts were made to repeal it, and a few amendatory bills were introduced, but none became law; attention remained focused elsewhere. The only notable legislative event on the subject was the passage of a new state constitution in 1876. It not only retained a right to bear arms but continued the legislature's authority to regulate "the wearing of arms" so long as those requirements were undertaken "with a view to prevent crime."[6] It was no minor irony that the Democrats who had complained about their disarmament by the "tyrannical" Davis took a crucial step in perpetuating strict gun control laws in Texas.

In their effort to consolidate their power statewide, Democrats encountered a difficult obstacle in the shape of reform-minded groups. The Patrons of Husbandry (called Grangers) and later Greenbackers threatened party unity, and in the case of the Greenbackers, pursued a fusion ticket with Republicans that posed the prospect of interracial solidarity. The agrarian reformers of Texas, and the southern and western states more generally, have received a great deal of scholarly attention (deservedly so); but calls for reform reached beyond economic issues to embrace legal ones, too.[7] Just like the economic reformers who proposed innovative policies to improve middle class life in the South and West, legal reformers looked for ways to improve the administration of justice in Texas in order to make the state safe for investment and demographic

---

[6] Tex. Const. of 1876, art. I, § 23. "Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime."

[7] Notable works on agrarian reform movements during the late-nineteenth century include Charles Postel, *The Populist Vision* (New York: Oxford University Press, 2007); Lawrence Goodwyn, *Democratic Promise: The Populist Moment in America* (New York: Oxford University Press, 1976); Elizabeth Sanders, *The Roots of Reform: Farmers, Workers, and the American State, 1877-1917* (Chicago: University of Chicago Press, 1999); Gretchen Ritter, *Goldbugs and Greenbacks: The Antimonopoly Tradition and the Politics of Finance in America* (New York: Cambridge University Press, 1997). Postel, especially, addresses some of the larger social goals of these reform groups, but they are almost universally studied separately from more mundane movements, like legal reform.

Compendium_Roth
Page 2072

growth. The culmination of this movement was the adoption of a new penal code in 1879, and again in 1895. Within this context of legal reform and legislative preoccupation with other matters, the appellate judges of Texas found themselves poised to flesh out the meaning, intent, and constitutionality of the deadly weapons ban. Their decisions shed light upon some of the most significant and intriguing aspects of late nineteenth-century jurisprudence, including the scope of the Fourteenth Amendment and the treatment of male lethal violence under the law. The legal history of "the pistol law" during the two decades after its passage also shows us the federally approved accumulation of state power, and an altogether different view of the Second Amendment than the one we are familiar with.[8]

*     *     *

The first and most significant issue about the deadly weapons ban to be addressed by the Texas Supreme Court was its constitutionality. In light of the state's recent insertion of legislative regulation upon the right to bear arms, this seemed like a simple question with a straightforward answer. Nonetheless, as is customary in American jurisprudence, a case worked its way to the highest court in order to test the validity of the act, indeed the validity of the constitution's authorization for legislative regulation. That case was *English v. State of Texas* (1872).[9]

The Texas court system was as much a victim of socio-political upheaval in the 1860s and 1870s as the state legislature. The Civil War led many courts from the municipal level up to the state supreme court to suspend regular business. The general chaos following surrender meant that the judicial system as a whole did not begin operating properly until 1866, and even

---

[8] On the general political landscape in Texas following Reconstruction, See Campbell, *Gone to Texas*, 304-320; Patrick G. Williams, *Beyond Redemption: Texas Democrats after Reconstruction* (College Station: Texas A&M University Press, 2007); Alwyn Barr, *Reconstruction to Reform: Texas Politics, 1876-1901* (Austin: University of Texas Press, 1971; Seymour V. Connor, *Texas: A History* (New York: Thomas Y. Crowell Company, 1971), 275-282.
[9] *English v. State of Texas*, 35 Tex. 473 (1872).

Compendium_Roth
Page 2073

then judges at all levels faced a backlog of cases. An attitude of intransigence on the part of the James W. Throckmorton faction then in control of the state prompted federal intervention, as was discussed in the previous chapter. That intervention reached into the judicial system, and a number of Texas judges were removed from office as an "impediment to Reconstruction."[10] The entire Texas Supreme Court was dissolved, to be replaced by military appointees.[11] This short-lived Military Court headed up the state judiciary from 1867 to 1870 before the new constitution of 1869 provided for a constitutionally sanctioned court system. That system involved a Texas Supreme Court made up of three justices appointed by the governor and subject to senatorial approval. This Reconstruction Court, often referred to as the Semicolon Court, heard the first appeals arising from the deadly weapons ban, including *English v. State*.[12]

The prohibition against knives and pistols in public places went into effect in the autumn of 1871. There is no way to know how many violators were arrested by law enforcement officials during its first few weeks, but a sufficient number appealed their guilty verdicts to merit the consolidation of three appeals into one decision. William English carried an out-of-repair pistol in town one day while he was drunk; worshippers in church one morning saw the handle of a butcher knife showing in the waistband of William Daniels's pants; the particulars of G. W. Carter's offense remain unknown because the court did not receive a brief on his behalf. The attorney arguing the appellant's case was a man named Reuben A. Reeves, who later became a judge of the Texas Supreme Court. Reeves's case rested upon several claims about the deadly weapons ban. First, he claimed that it violated the Second Amendment to the US Constitution;

---

[10] These judges included Reuben A. Reeves, Robert S. Gould, and John Ireland, each of whom later won appointment or election to the Texas Supreme Court.

[11] Richard Coke, Oran M. Roberts, and George Fleming Moore were among the judges of the dissolved high court. Coke, upon winning the governorship, named Roberts and Moore to a reconfigured state supreme court. Roberts went on to be governor, too.

[12] On the Texas Supreme Court, see James L. Haley, *The Texas Supreme Court: A Narrative History, 1836-1986* (Austin: University of Texas Press, 2013).

Compendium_Roth
Page 2074

second, it violated the Texas Constitution of 1869; third, it deprived Texans of customary rights such as self-defense. Writing for the court, justice Moses Walker, an Ohio native and Union veteran, disagreed profoundly with each of Reeves's arguments.[13]

In his defense of the law against the Second Amendment claim, Walker made an interesting argument. Jurists up to this point in American history generally agreed that the Bill of Rights protected Americans from interference by the *national* government, on the part of the US Congress or the president. Those rights did not protect citizens from interference on the part of their own *state* governments. Civil rights were a state matter, generally guaranteed by a bill of rights within each state constitution. Walker gave a nod to this sharp division of power between the state and national sovereignties but immediately admitted that the right to bear arms was one of the few enumerated in the Bill of Rights that did "bind both the state and national legislatures." This was a direct quotation of Joel Prentiss Bishop, a leading jurist of the time. Walker concurred with Bishop that the Second Amendment had some role to play in protecting the right of all Americans to bear arms, but only in a strictly martial sense. As Bishop put it: "The [Second Amendment] provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils . . . . In like manner, the right to 'bear' arms refers merely to the military way of using them, not to their use for bravado or affray." The kind of weapons protected included: muskets, bayonets, sabres, cavalry pistols, artillery, and side arms. The weapons named in the ban, however, "belong to no military vocabulary," and calling the "instruments" prohibited in the statute "proper or necessary

---

[13] Walker has been labeled by some scholars as the most successful "carpetbagger" in Texas. Born in Ohio, Walker became involved in Texas politics after serving the Freedmen's Bureau as an officer in the Union Army. He sought election to the US Congress as part of the Texas delegation, but lost. On Walker, see Haley, *Texas Supreme Court*, 81-82; *Handbook of Texas Online*, Randolph B. Campbell, "Walker, Moses B.," accessed October 09, 2018, http://www.tshaonline.org/handbook/online/articles/fwa21.

arms of a 'well-regulated militia' is simply ridiculous." Walker went on to condemn Reeve's appeal to the Second Amendment in the most forceful way possible: "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[14]

Walker declared the law in harmony with the state constitution, too. The bill of rights within that document stated that "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[15] The idea that the weapons ban could possibly contravene this constitutional guarantee seemed preposterous to Walker and elicited a vehement response: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly. . . . The history of our whole country but too well justifies the enactment of such laws."[16]

Though Walker only gave cursory attention to the third claim (that the weapons ban deprived Texans of customary rights), his position remains important to understanding the purpose, intent, and justification of gun laws in Texas and elsewhere at this time. He relied upon the police power vested in the state government to defend the deadly weapons ban, and indeed all regulations that advanced "the happiness and well being of the people." The court held that "whatever conduct offends against public morals or public decency comes within the range of legislative authority." This expansive view of police power aligned with the opinion composed

---

[14] *English v. State of Texas*, 35 Tex. 473 (1872).
[15] Tex. Const. of 1869, art. I, §XIII.
[16] *English v. State of Texas* (1872).

by United States Supreme Court Justice Samuel F. Miller in *Slaughterhouse Cases* the following year.

The 5-4 majority in that case protected a state-chartered corporation given a monopoly over all animal slaughtering in the area surrounding New Orleans. The state of Louisiana was responsible for the health and safety of its residents and therefore had the authority to enact any regulation necessary to achieve that end, including the formation of a corporation with special privileges. Miller said, "Upon [police power] depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private social life, and the beneficial use of property." The plaintiffs, a group of butchers inconvenienced by the new law, relied upon the anti-monopoly tradition of England to make their case, but Miller dismissed their claim. In England, monopolies had been granted by the monarch "in derogation of the rights of his subjects . . . in which the people were unrepresented, and their interests uncared for." The situation in Louisiana was altogether different because the members creating the monopoly were the duly elected representatives of the people. Since the early days of the republic, the states—those "laboratories of democracy"— had wielded all power necessary to provide for the common weal in accordance with the sensibilities of the voters. Thus the butchers of Louisiana who had brought the cases needed legislative rather than judicial redress.[17]

The decision in *Slaughterhouse Cases* firmly reestablished state police power against the centralizing tendencies of much of the Republicans' legislative accomplishments.[18] In fact, Miller's concluding words underscored the importance of maintaining the proper "balance between State and Federal power," which had been envisioned by the nation's founders. This

---

[17] *Slaughterhouse Cases*, 83 U.S. 36 (1873).
[18] Gerstle, *Liberty and Coercion*, 278-282.

reaffirmation marked an important event in postbellum jurisprudence because the enemies of the Republicans had long raised the specter national supremacy over the states as the ultimate source of their opposition. After the US Supreme Court clearly declared that states had the right to enact any "police regulation" for the common good, including forming a monopoly corporation, it became less important for states to claim that power themselves. For this reason, the second case addressing the constitutionality of the Texas deadly weapons ban sidestepped the subject of state police power.

In the waning days of 1873, Texas's Reconstruction Court handed down a controversial decision that nullified the results of the recent gubernatorial election in which Democrat Richard Coke defeated Republican Edmund J. Davis. The court technically made the correct decision, which hinged upon the placement of a semicolon in the state constitution's section outlining procedures for gubernatorial elections. The pro-Republican outcome of the case led many Texas Democrats to believe that the state's highest court had rendered a partisan opinion. Davis had appointed all three members of the court, and they shared political interests. Armed paramilitary forces rendered moot this infamous "Semicolon Case" (*Ex parte Rodriguez*) when they physically removed Davis from the governor's office. The court's decision seemed to substantiate every negative claim made by Democrats against their Republican opponents, particularly the charge that they were undemocratic tyrants more interested in imposing their will than listening to the people. For this reason, Coke, a former member of the state's high court, promised to restore power to the people, the voters, and the democratic majority. The legislature, friendly to Coke, paved the way for him to appoint an entirely new court by passing an amendment to the state constitution. In 1874, the Texas Supreme Court became a five-man body appointed by the governor and subject to senatorial approval. Coke's appointees represented the

93

will of the people as expressed in the recent election—although fraud undoubtedly marred the results of that contest. This Redeemer Court included the last of the judicial appointees in Texas; voters began electing judges under the new state constitution in 1876, and it has been that way ever since.[19]

The Redeemer Court, which claimed Oran M. Roberts as its chief and Reuben A. Reeves as one of its associate judges, took another stab at the constitutionality of "the pistol law."[20] The case was *State of Texas v. Duke* (1875), in which a black man named George Duke was arrested for carrying a pistol but succeeded in having the indictment quashed on a technicality. The attorney representing the state sought to have the technicality overruled and the indictment vindicated so that Duke could face prosecution.[21] Ultimately, the court determined that the technicality should stand, and that the case should be dismissed. The points at issue in *Duke* did not directly involve constitutionality, yet the judges ventured onto the subject. That they sought out the constitutional question indicates their desire to adjust the precedent that had been set in *English*.

The Redeemer Court concurred with the Reconstruction Court in holding that the law did not violate either the US or Texas Constitutions but differed in some important respects. First, the new court did not claim police power to justify the enactment of the law. Judge Robert Gould wrote the opinion for the court and stated, "We are not called on to lay down general rules,

---

[19] Haley, *Texas Supreme Court*, 83-89; Moneyon, *Texas after the Civil War*, 194-199.
[20] Haley, *Texas Supreme Court*, 88-90.
[21] *State of Texas v. Duke* 42 Tex. 455 (1874). The technicality in question was whether an indictment must "negative" (negate, or rule out) the exceptions to the law. In other words, did the indictment itself need to state that the violator was not a peace officer, or had no reason to fear a lethal attack, or was not traveling at the time of the offense. Custom regarding this law in its first several years of enforcement had not required the indictment to negative the exceptions, but the court in *Duke* reversed that opinion. This reversal made it incumbent upon grand juries to ascertain whether a legitimate defense existed *before* they granted an indictment. This policy likely advantaged violators whose cases went to a grand jury over those who faced summary charges in a municipal, justice, or county court.

94

prescribing how far legislative regulation may be extended, without trespassing on the rights of the citizen." Without defining the limits of legislative authority, Gould declared the deadly weapons ban "a legitimate and highly proper regulation." This sidestepping of the police power issue indicates agreement with the decision in *English*, and a recognition that cases like *Slaughterhouse* rendered the repetition of it unnecessary. Second, Gould's opinion altered the court's position on the kinds of "arms" protected by the state constitution. Where Walker had limited the scope of the guarantee to weapons used for militia purposes, Gould understood the term "in a more comprehensive sense" that included "arms as are commonly kept . . . and appropriate for open and manly use in self-defense."[22]

The third and final departure from the Reconstruction Court's decision in *English* is so consequential as to deserve a more detailed analysis. The Redeemer Court forthrightly declared that the Second Amendment and the entire Bill of Rights "were intended to be limitations upon the power of the government of the thirteen States, and not on the powers of the State governments." Moreover, despite Walker's prior quotation of Bishop to the contrary, such separation of powers "has been long regarded as the settled construction." This statement rejected an important jurisprudential concept, called incorporation, which relates to the first section of the Fourteenth Amendment. The relevant passage says, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[23] The idea behind

---

[22] This is a significant distinction because Gould intimated that sticking with the *English* ruling might place common weapons (like shotguns, rifles, and pistols) beyond the scope of constitutional protection. Anyone who follows the contemporary gun debates knows the gravity of that problem: a weapon not protected constitutionally could possibly be subject to confiscation or some other unwanted governmental interference.
[23] U.S. Const. amend. XIV.

incorporation is that one or all of these three clauses (Privileges and Immunities, Due Process, and Equal Protection) effectively *incorporate* the Bill of Rights onto the state governments.

The architects of the Fourteenth Amendment, a cohort of northern Republicans, undoubtedly intended it to make the state governments beholden to the Bill of Rights just as the national government was. There has been much scholarly debate over the question of whether the American people understood their intention, but the Texas politicians who rejected the Fourteenth Amendment in 1866 certainly did.[24] Recall that Throckmorton's faction of Conservatives (most of whom had previously been, and later reverted to being, Democrats) controlled the state apparatus immediately following the Civil War. Members of the legislature grounded their opposition to the proposed Fourteenth Amendment in the claim that "there is scarcely any limit to the power sought to be transferred by this section from the States to the United States." They clearly understood that the first section of the amendment signaled *at a minimum* incorporation of the Bill of Rights onto the states: "Its object is . . . under the color of generality, to declare negroes to be citizens of the several States, and as such entitled to all 'the privileges and immunities' of white citizens; in these privileges would be embraced the exercise

---

[24] There is a rich field of literature on the subject of incorporation, beginning with William Winslow Crosskey, Charles Fairman, and Raoul Berger in the mid-twentieth century. More recent scholarship on the subject includes Michael Kent Curtis, *No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights* (Durham: Duke University Press, 1986); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (New Haven: Yale University Press, 1998). A revisionist interpretation has arisen from Bryan H. Wildenthal that the framers of the Amendment intended incorporation, and that Miller's *Slaughterhouse* opinion actually represented a "compromise" between radical incorporationists and anti-incorporationists that bound the state governments to respect the Bill of Rights. His is joined by Gerard Magliocca, Kevin Newsom, and Leslie Friedman Goldstein. See Goldstein, "The Specter of the Second Amendment"; Bryan H. Wildenthal, "The Lost Compromise: Reassessing the Early Understanding in Courts and Congress on Incorporation of the Bill of Rights in the Fourteenth Amendment," *Ohio State Law Journal* 61, no. 3 (2000): 1051-1174; Gerard N. Magliocca, "Why Did the Incorporation of the Bill of Rights Fail in the Late Nineteenth Century?" *Minnesota Law Review* 94, no. 1 (2009): 102-139; Kevin Christopher Newsom, "Setting Incorporationism Straight: A Reinterpretation of the *Slaughterhouse Cases*," *Yale Law Journal* 109, no. 4 (2000): 643-744; An even-handed reply to the revisionists has come from George C. Thomas and is the best introduction to the dispute. George C. Thomas, III, "The Riddle of the Fourteenth Amendment: A Response to Professor Wildenthal," *Ohio State Law Journal* 68, no. 6 (2007): 1627-1657.

of suffrage at the polls, participation in jury duty in all cases, bearing arms in the militia, and other matters which need not here be enumerated."[25]

Regardless of the intentions of its framers or the impressions of its detractors, the Fourteenth Amendment did not effect incorporation—the US Supreme Court made sure of it.[26] A series of cases in the early and mid-1870s raised the prospect of incorporation, and in each case the court skirted the subject or rejected it outright.[27] Justice Miller's opinion in *Slaughterhouse Cases* (1873) has become notorious and widely reviled as the one that started the court on the path of effectively nullifying the Fourteenth Amendment. This understanding of the case, however, has been challenged by a cadre of exceptionally sharp legal scholars who claim that Miller actually intended the amendment to incorporate the Bill of Rights, just no civil rights or civic privileges beyond that. But in the end, both sides of that debate must accede to the fact that *Slaughterhouse*, even if it did not reject incorporation outright, certainly circumscribed its potential effects. Many scholars have read this with a skeptical eye and decided that the overwhelmingly Republican court of the 1870s was in fact secretly plotting the demise of Reconstruction. This is an exceedingly cynical, and therefore unsatisfactory, interpretation of the historical record.[28] One alternative is the aforementioned thesis that *Slaughterhouse* represented

---

[25] *House Journal* (1866), 577-583.

[26] To this day, certain guarantees listed in the Bill of Rights remain unincorporated. Those incorporated rights have been made so via the Due Process Clause of the Fourteenth Amendment, while the Privileges and Immunities Clause is all but irrelevant. The only case decided on the basis of the Privileges and Immunities Clause of the Fourteenth Amendment is *Saenz v. Roe*, 526 U.S. 489 (1999). The subsequent cases include: *Walker v. Sauvinet*, 92 U.S. 90 (1876) and *U.S. v. Cruikshank*, 92 U.S. 542 (1876).

[27] These cases include: *Slaughterhouse Cases*; *Walker v. Sauvinet*; *U.S. v. Cruikshank*; *Twitchell v. Commonwealth* 74 U.S. 321 (1868); *Edwards v. Elliott*, 88 U.S. 532 (1874); *U.S. v. Avery*, 13 Wall. 251 (1872).

[28] Leslie Friedman Goldstein similarly doubts the idea that Republican, antislavery judges would conspire to overthrow Reconstruction. To adhere to this view requires accepting a number of inconsistencies, like Miller's antislavery background and strong defense of the Reconstruction Amendments, and the court's defense of black voting rights in cases arising from the election of 1876. See Goldstein, "The Specter of the Second Amendment," 136-144. On the unfortunate consequences of overly cynical interpretation, see Rita Felski, *The Limits of Critique* (Chicago: University of Chicago Press, 2015).

Compendium_Roth
Page 2082

a compromise position between the two extremes of non-incorporation on the one hand, and the utter hollowing out of state sovereignty on the other.[29]

Another compelling alternative to the traditional view of *Slaughterhouse* hinges upon the Second Amendment. This position holds that a fear of incorporating the Second Amendment led Miller and the court majority to pump the brakes on the whole incorporation project. While a cursory look at this scenario might prompt an observer to ascribe to Justice Miller the same lousy motivations so proudly displayed by Texas Conservatives back in 1866, this interpretation would have us do the opposite. The Republican state governments in the former Confederacy desperately needed to retain police power over the right to bear arms so that they could put down armed paramilitaries like the Klan and white leagues. Incorporating the Second Amendment threatened to empower those terroristic insurgencies and further weaken the very governments seeking to carry out the vision of the Republican Party as encapsulated within the Reconstruction Amendments (XIII, XIV, and XV). Shortly before hearing arguments for *Slaughterhouse*, the US Supreme Court confronted the grim reality of pursuing incorporation, even when limited to the Bill of Rights. In one of the cases arising from the Ku Klux Klan trials in South Carolina, a Klansman defendant claimed that the Fourteenth Amendment guaranteed to armed militia groups like his (unofficial though they were) the right to bear arms as citizens of the Palmetto State and the United States.[30] The court successfully sidestepped the issue, but *Slaughterhouse*, coming

---

[29] Wildenthal, "The Lost Compromise." See also Goldstein, "The Specter of the Second Amendment," 134. Goldstein cites the scholarship of Michael Les Benedict, which argues that the preservation of federalism motivated the US Supreme Court opinions that curtailed the scope of the Fourteenth Amendment. See Michael Les Benedict, "Preserving Federalism: Reconstruction and the Waite Court," *The Supreme Court Review* (1978): 39-79.
[30] Goldstein, "The Specter of the Second Amendment," 137-138 at n. 32.

Compendium_Roth
Page 2083

swift on that case's heels, offered an opportunity to circumscribe incorporation for the security of Southern governments in a decision untarnished by issues of race and Reconstruction.[31]

Whatever the motivations of Miller in his vague, noncommittal stance on incorporation in *Slaughterhouse*, the fact is that soon thereafter the court rendered an explicit decision on incorporation, at least insofar as it pertained to the right to bear arms. The case *U.S. v. Cruikshank* (1875) sounded the death knell for the idea. It arose from the Colfax Massacre in Louisiana, in which competing black and white armed militias entered into a pitched battle over control of the town of Colfax. The white forces won the day but soon came under fire from federal troops. Afterward, dozens of the "redeemers" faced indictment and prosecution in federal court for violating the civil rights of local freedmen. The few who received guilty verdicts appealed and made their way up to the US Supreme Court. This is another of the detested Reconstruction era cases because it favored the defendants and clipped the wings of the Fourteenth Amendment. Writing for a unanimous court, Chief Justice Morrison Waite unambiguously rejected the idea that "bearing arms for a lawful purpose" was a constitutionally protected right of US citizens. "This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. . . . This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow citizens . . . to what is called . . . 'powers which relate to merely municipal legislation, or what was, perhaps, more properly called internal police.'"[32]

---

[31] An illuminating excerpt from Goldstein's argument holds: "It is at least *plausible* that the Court found it more seemly to indicate vaguely that the Bill of Rights had not been incorporated against the states, and then later to find other ways to protect rights of peaceable assembly." Goldstein, "The Specter of the Second Amendment," 146.
[32] Quotation from *The City of New York v. Miln* in *U.S. v. Cruikshank*.

In fact, respect for state police power formed an underlying theme in the *Cruikshank* opinion, much as it had in *Slaughterhouse* just a few years earlier. The justices feared the repercussions of removing so much authority from the states and placing it within federal jurisdiction. Such was not the intention of the nation's founders, nor was it in harmony with existing jurisprudence. Waite reviewed the basic tenets of federalism, the division of powers between two sovereign layers of government. Referring to the national government, Waite wrote, "Within the scope of its powers, as enumerated and defined, it is supreme, and above the States; but beyond, it has no existence. . . . The Government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people." Here was a repudiation of the incorporation argument as a violation of state police power. It is important to note that the state government receiving this reaffirmation of its authority was the Republican one of Louisiana, led at that time by William P. Kellogg. The US Supreme Court refused to accept responsibility for protecting the right of black Louisianans to "bear arms for any lawful purpose" and by doing so circumvented any similar claim by white league members. In a roundabout way, then, *Slaughterhouse* and *Cruikshank* bolstered the authority of besieged Republican governments; the problem was that they often lacked the power and legitimacy to act on that authority.

The *Slaughterhouse* and *Cruikshank* decisions received attention from the leading men of Texas, a class whose ranks overflowed with trained lawyers. Several influential papers carried updates on *Cruikshank*, in particular.[33] Surely the perspective of a Southern Democrat was that the decisions supported the forces seeking the economic improvement and metaphorical

---

[33] Texas commentators well understood the implications of *Cruikshank* in terms of reaffirming state police power. See, for example, "Reserved Rights," *Galveston Daily News* (Galveston, TX), April 7, 1875. The case received substantial coverage in "The Negroes are Arming" and "The Grant Parish Prisoners," *Weekly Democratic Statesman* (Austin, TX) June 18, 1874.

100

"redemption" of the former Confederacy. State governments still retained all the powers that they held prior to the Fourteenth Amendment, prior to the Reconstruction Acts, indeed prior the Civil War—save legally sanctioning slavery. As long as the state *governments* avoided racially motivated discrimination and oppression, the national government would refrain from interference. Thus state courts regained jurisdiction over the vast majority of criminal cases, including conspiracies to suppress voting—a crime that the US Congress had attempted to place within federal jurisdiction. If the US Supreme Court justices believed that they had protected the Republican governments of the South, they were sorely mistaken. Just as the deadly weapons ban, originally a shield for Republican voters, became a tool of their oppression under the Redeemers, so the swollen view of state police power became a liability for all Southern Republicans once those governments fell into the hands of Democrats. Groups of private citizens (Democrats) could intimidate black voters and, if caught, face prosecution in friendly (Democratic-controlled) state courts rather than federal ones. The Fourteenth Amendment and the whole host of Reconstruction-era legislation did not apply because individuals committed the racially discriminatory crime, not the state.

This series of state and federal cases from *English* to *Cruikshank* set a firm precedent that the government of Texas had the authority both to protect the right to bear arms and to regulate that right. The new constitution of 1876 carried on this tradition, and few constitutionality claims made their way to the appellate courts in Texas.[34] That new constitution altered the makeup of the state judiciary in significant ways. First, all appellate judges became subject to popular elections and held six-year terms. Second, the jurisdiction of criminal appeals cases changed.

---

[34] The 1876 constitution, discussed in greater detail in the following chapter, declared that: "Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." Texas Const. of 1876, art. I §XXIII.

Compendium_Roth
Page 2086

The Texas Supreme Court limited itself solely to civil cases appealed from District Court, while a new Court of Appeals heard all criminal appeals, alongside civil appeals arising from County Court. Lawmakers created this new appellate jurisdiction to assist the state's highest court with its caseload, which faced a two-year backlog. The revised judiciary worked for about twenty years but the problem of overcrowded dockets remained and ultimately prompted a constitutional amendment to create an appellate court exclusively dedicated to criminal cases. That body, the Court of Criminal Appeals, became the court of last resort for all criminal appeals and remains so today.[35]

The Court of Appeals (and later Court of Criminal Appeals) heard few arguments against the constitutionality of the deadly weapons ban. One case, from 1878, took issue with the law's requirement that convicted violators surrender the weapon in question. The attorney general argued that forfeiture formed a significant part of the ban's crime-prevention power. Losing one's property, especially if it were valuable, acted as an incentive to abide by the law. The court, however, disagreed. "While [the legislature] has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him." Thus ended forfeiture as part of the penalty.[36] Shortly after this, an intriguing case wended its way to the Court of Appeals. A defendant arrested for carrying a pistol argued that having the weapon upon his person did not place him "beyond the constitutional privilege." The court found this defense so weak that its response consisted of "We think it did."[37]

The constitutionality of the pistol law came under examination one final time in the nineteenth century, but by the US Supreme Court rather than a state court. The case *Miller v.*

---

[35] Texas Const. of 1876, art. III; Haley, *Texas Supreme Court*, 91; *Handbook of Texas Online*, Paul Womack, "Judiciary," accessed October 19, 2018, http://www.tshaonline.org/handbook/online/articles/jzj01.
[36] *Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).
[37] *Lewis v. State of Texas*, 7 Tex. Cr. App. 567. (1880).

Compendium_Roth
Page 2087

*Texas* originated in Dallas, Texas in 1892. A white man named Franklin P. Miller spent a number of weeks or months subject to harassment by local Dallas police officers.[38] The officers gave him a hard time because Miller was rumored to be involved in an intimate relationship with his African American live-in cook. A neighbor even testified that he had seen Miller "with a nigger child in his arms and a pistol in his other hand."[39] Miller claimed that the terrible treatment he received at the hands of neighbors and police drove him to purchase a pistol for self-protection. One day, Miller took to the streets with his pistol and vowed revenge upon the two "blue coated sons-of-bitches" who patrolled his section of town.[40] The policemen heard about it afterward and decided to arrest him the next morning for unlawfully carrying a pistol. A shootout erupted when they went to his house, and one of the officers died in the fracas. Miller claimed self-defense, that they fired first; the surviving policeman testified the opposite, that Miller preemptively shot at them. Miller was arrested on the charge of first-degree murder and became infamous throughout Texas as a cop-killer.

Miller's case is a complex one in which he made numerous claims on appeal. These included the assertion that being arrested without a warrant was unconstitutional, that the judge in his case improperly charged the jury, and that he was unfairly denied a continuance and change of venue. At no point did his attorneys argue to a Texas court that the deadly weapons ban violated the Second Amendment. It was not until Miller's attorneys appealed from the Texas Court of Criminal Appeals to the US Supreme Court that they made a case for the unconstitutionality of the deadly weapons ban. This was a fatal mistake because the federal

---

[38] Cynthia Leonardatos, David B. Kopel, and Stephen P. Halbrook, "*Miller versus Texas*: Police Violence, Race Relations, Capital Punishment, and Gun-Toting in Texas in the Nineteenth Century—and Today," *Journal of Law and Policy Review* 9 (2001): 737-766.
[39] *Miller v. State of Texas*, 32 Tex. Cr. App. 319, 329 (1893).
[40] *Miller v. State of Texas* (1893).

103

justices could not decide a case based on argumentation that was not presented at the court of original jurisdiction. Still, they repeated the settled law from *Cruikshank*, that the Second Amendment "operate[s] only upon the federal power, and [has] no reference whatever to proceedings in state courts."[41] *Miller v. Texas* became the last word on the constitutionality of the Texas deadly weapons ban, and the US Supreme Court did not hear any Second Amendment arguments for another fifty years (in a case that is, confusingly, also named *Miller*). In that case, *U.S. v. Miller* (1939), the regulations being reviewed were federal, and the justices maintained their opinion that the regulation of a right was not tantamount to the negation of it.[42]

Though the jurisprudence pertaining to the pistol law repeatedly upheld its constitutionality, such consistency on other legal issues arising from the law proved impossible. Vexatious questions perennially pestered the court throughout the late-nineteenth century, among them: Who exactly is a "traveler" exempted by the law? Who specifically is a "peace officer," and may he carry a weapon when off-duty? What does it mean to carry a weapon "about the person"? Just how important is the intent of the violator? The justices charged with hearing criminal appeals provided answers to these questions during the first two decades of the deadly weapons ban's existence, though they were subject to change.

A legal issue that quickly garnered the attention of appellate judges was the problem of carrying a pistol to or from a point of sale. None of the exemptions to the deadly weapons ban provided security for persons transporting a pistol home from a sale or repair, or while

---

[41] *Miller v. State of Texas*, (1893); *Miller v. Texas*, 153 U.S. 535 (1894).

[42] *U.S. v. Miller*, 307 U.S. 174 (1939). Cynthia Leonardatos, David B. Kopel, and Stephen P. Halbrook have collaborated on an article pertaining to *Miller v. Texas* and determined that the US Supreme Court did not see the incorporation issue as settled law in 1894. They argue that the procedural errors made by the appellant, Miller, foreclosed consideration of a topic that the court would have been interested in adjudicating. Fascinating though their interpretation may be, a straightforward reading of *Miller* demonstrates the court's clear reaffirmation of anti-incorporation precedent in cases like *Cruikshank* and *Twitchell*. See Leonardatos, Kopel, and Halbrook, "*Miller versus Texas*," 763-764.

purchasing ammunition. Some of the lower level judges and juries employed what we might call a textualist approach to enforcement of this law by convicting men who had done nothing more than this. Two cases in particular stand out in this regard: *Christian v. State of Texas* and *Waddell v. State of Texas*.[43] In the former, William Christian entered into a deal with his neighbor to purchase a pistol from him. As he walked across the street to his home with the newly acquired weapon, he was arrested for unlawfully carrying it. A jury convicted him because, technically, he did not fall within any of the exemptions (not being a traveler, peace officer, militiaman in service, resident of frontier county, etc.). In the latter case, C. W. Waddell purchased a pair of pistols and carried them to another store to buy ammunition for them. He then took them to his home fifteen miles away, only to be arrested later for breaking the pistol law.

In both of these cases the appellate court scolded the lower-court judges for permitting the law to be enforced in such an unfair way. Moses Walker of the pro-Republican Reconstruction Court wrote the *Waddell* opinion and declared that the arrest amounted to a violation of Waddell's constitutional right to keep a weapon for the defense of his family. Waddell never intended to break the law, and his actions "did not constitute a violation of the spirit of the law regulating the keeping and bearing of deadly weapons." The intention of the legislature also became an important element in the case. The goal of the lawmakers was "to suppress the absurd and vicious practice" of carrying deadly weapons, not to unjustly fine law-abiding citizens. Walker warned that "if wrong constructions are placed upon this act, and absurd and vexatious prosecutions . . . are tolerated and entertained by the courts, the law itself must become unpopular, even odious to a free people." This would be "a great public misfortune" for

---

[43] *Christian v. State of Texas*, 37 Tex. 475 (1873); *Waddell v. State of Texas*, 37 Tex. 354 (1873).

Compendium_Roth
Page 2090

Texans because the deadly weapons ban "is wise and salutary." The opinion in *Christian*, written by another of the Reconstruction Court justices, similarly emphasized the intent of the legislature. "The object of the statute," he said, "is to prohibit the carrying of deadly weapons for unlawful purposes." Lawmakers could not have intended to make the mere purchase of a pistol a criminal act, therefore "we are inclined to look upon this case as a frivolous prosecution." The Court of Appeals reaffirmed this position in 1886 by holding that "the transportation of a pistol home from the place of purchase, whether loaded or unloaded, does not constitute the offense of unlawfully carrying a pistol."[44]

There were some limits, however, to the court's leniency. In a series of cases pertaining to hunting and slaughtering livestock, the court rejected the idea that pistols were proper hunting weapons. In the last of these, decided in 1877, the defendant argued that the prior cases ruling out pistols as hunting weapons ought not apply to him because his hunting weapon was broken at the time of the offense. He carried a pistol, hung from his saddle horn, so that he could slaughter a yearling that was grazing some miles distant. Unlike the previous defendants, who merely *chose* to hunt with pistols rather than rifles, he was *compelled* to use one due to circumstances beyond his control. Despite his best efforts, and his desire to abide by the spirit of the law, the court decided against him. "We do not believe that the legislature ever intended that so extended an interpretation should be put upon this law as is claimed by defendant's counsel. . . . If the legislature intended to allow every man to carry a pistol about . . . whenever he thought a necessity for it existed, how easy would it have been" for them to say so in the text of the act![45]

As might be expected, defendants and their lawyers sought out any and every possible loophole in the deadly weapons ban to overturn legitimate convictions. Most of the time

---

[44] *West v. State of Texas*, 21 Tex. Cr. App. 427 (1886).
[45] *Reynolds v. State of Texas*, 1 Tex. Cr. App. 616 (1877).

appellate judges, whether appointed to the Reconstruction or Redeemer Courts, or elected to the Court of Appeals, found ways to dismiss these technical problems and sustain jury verdicts.[46] One important precedent set very early in the pistol law's history was a broad definition of carrying a weapon "about the person." This phrase seems simple at first glance, but in the hands of attorneys it sometimes became uncertain and confusing. The most telling example occurred shortly after the law went into effect. In 1872, the indictment in a case stated that the defendant did "have on his person" a pistol. The defense counsel argued that "having" and "carrying" are two different things, so the conviction should be reversed. The court disagreed: "To have a weapon upon the person is, in contemplation of the law, to carry it."[47]

Other ambiguities arose over holding or carrying pistols. A man named John Baker was convicted for fetching his brother's pistol from the barn. The brother, Julius Baker, was engaged in an ugly domestic dispute with his wife and her family, who jointly owned the property where the event took place. More than likely, the in-law landowners had John arrested as a way of pressuring Julius to return family papers and give up custody of his daughter. In a family kerfuffle like this one, the influence of one party involved could be enough to secure a dubious conviction in a local court; the Baker brothers intelligently appealed, claiming that the mere retrieval of a pistol on someone else's behalf is not illegal. The court agreed and reversed the judgment.[48] In a similar case, the appellate court overturned the conviction of a young man who

---

[46] See, for example *Jenkins v. State of Texas*, 36 Tex. 638 (1872). The defendant was arrested for carrying a pistol some weeks after the law went into effect, but the judge, not paying close enough attention, included in his charge to the jury instructions that the defendant could be convicted for any violation of the law committed in the past year. Of course, the law went into effect only a few weeks prior, so what he described would have amounted to *ex post facto* prosecution. The defendant tried to claim that this slip-up on the judge's part justified a reversal, but Walker disagreed. The issue was moot because the crime for which he was arrested occurred *after* the law went into effect, and the indictment said as much. However, as the nineteenth century drew to a close, reversals on technicalities became more common.

[47] *State of Texas v. Carter*, 36 Tex. 89 (1872).

[48] *Baker v. State of Texas*, 28 Tex. Cr. App. 5 (1889).

Compendium_Roth
Page 2092

simply picked up a pistol lying on a table in front of him. He did not own it, nor did he carry it with him or use it in a threatening manner. "Such handling of the pistol was perhaps through mere idle curiosity, and without any intent whatever to violate the law. It would be a perversion of reason and justice, it seems to us, to hold that the law intends that punishment shall be visited upon an act of this character."[49]

Just as "about the person," "having," "holding," and "carrying" caused ample confusion in Texas courts, so too did "traveler." The deadly weapons ban failed to provide a definition for this term, which foisted a serious problem onto the judiciary. In one of the cases previously mentioned, *Waddell* (1873), the court defined it as a person "living remote from their county seats or market towns, where a day's journey going and coming is required, and where often, from the necessities of business, even a portion of the night is used."[50] But between 1871 and 1879, Texas travelers had to follow strict rules about how and where they could stow their deadly weapons while on the road. The text of the law exempted travelers who carried knives or pistols "with their baggage." Those in wagons or buggies could keep pistols within arm's reach, but not in their hands. Horseback riders were not permitted to carry a pistol in a hip holster, on the saddle, or in their saddlebags. The passage of the Penal Code of 1879 changed these somewhat draconian rules for travelers because the phrase "in the baggage" was dropped from the text.[51]

---

[49] *Brooks v. State of Texas*, 15 Tex. Cr. App. 88 (1883).

[50] *Waddell v. State of Texas* (1872).

[51] The 1871 deadly weapons ban originally prohibited the carrying of specified weapons, with certain exceptions. Some of these exceptions, including the one for travelers, came in the form of a proviso: "provided that this section shall not be so construed as to prohibit . . . persons traveling in the State from keeping or carrying arms with their baggage." The law was transmuted into the Penal Code under Articles 318, 319, and 320 of Chapter 4, Title IX. There, all exemptions were grouped together in Article 319: "The preceding article shall not apply to . . . persons traveling . . . ." The requirement that those travelers keep their deadly weapons stowed away in the baggage disappeared. See Tex. Penal Code §319 (1879). The relevant cases are: *Maxwell v. State of Texas*, 38 Tex. 156 (1873); *Woodward v. State of Texas*, 5 Tex. Cr. App. 295 (1878); *Lewis v. State of Texas*, 2 Tex. Cr. App. 26 (1877). The *Lewis* decision received some abuse from Stephen P. Halbrook, who called it "contradictory" for affirming both

In the post-1879 era, the court was frustratingly inconsistent in its treatment of appellants claiming the traveler's exemption. A man named J. O. Darby had his appeal rejected even though he carried a pistol while traveling overnight to the county seat. He clearly fell within the definition constructed years earlier, yet the court rejected his claim outright.[52] Now that travelers were allowed to carry weapons "about the person," all manner of contemptible behavior suddenly became legal. In one case, a named Jeff Cathey drove two neighbors home from dropping off cotton in the nearest market town. Having just concluded the sale of his crop, he imbibed a few drinks at the local saloon and bought a bottle of whiskey to enjoy on the way home. While driving the wagon, he became drunk and unable to find the bottle. Enraged, he pulled out a pistol and accused his passengers of stealing his whiskey. In years gone by, the court likely would have affirmed his conviction, but in 1887 the opposite happened. "It is not here made an offense to carry a pistol in a wagon; and we do not think the lifting of the pistol as stated, and the holding of it for a few seconds, constitute the offense of carrying a pistol on or about the person."[53] For the bewildered passengers, the encounter was surely more substantial than their neighbor briefly "lifting" a pistol in their presence. Darby's and Cathey's cases seem like products of wildly different courts, but they were handed down the very same year.

Odd judgments like these arose from the lack of specificity in the text of the penal code. The judges had unfettered authority to use their own discretion in assessing whether a traveling claim was valid or not. The case that got the court closest to settling this point was *Stilly v. State of Texas* (1889). J. S. Stilly was accompanying his family back to Texas from Indian Territory

---

the prohibition against travelers carrying arms and the constitutionally guaranteed right to keep and bear arms. What Halbrook's analysis lacks is an understanding of the difference between *carrying* arms and *bearing* them. On this important distinction and its relevance to the militia and citizen-soldier traditions, see Saul Cornell, *A Well-Regulated Militia*, 3-7, 13-18. See also Halbrook, "The Right to Bear Arms in Texas," 668-669.

[52] *Darby v. State of Texas*, 23 Tex. Cr. App. 407 (1887).
[53] *Cathey v. State of Texas*, 23 Tex. Cr. App. 492 (1887).

and stopped near the Red River overnight, in Gainesville. Looking for a bit of fun after what had likely been a boring journey, he decided to visit a gaming hall. But there was bad blood between Stilly and another man living there, so the former decided to keep his pistol on him even while carousing about town. Unsurprisingly, he was arrested and the Court of Appeals affirmed his conviction. But *Stilly* helped the court set a strong precedent that outlined the limits of the traveler exemption.[54] Deadly weapons were allowed for people traveling long distances, outside their home counties, over multiple nights. These travelers could carry their arms as desired on the road and while conducting legitimate business in towns along the way, but that protection ceased when their pursuits switched from business to pleasure.[55]

Without a doubt, the most troublesome of the perennial questions involved the peace officer exemption. The original law permitted a hodge-podge assortment of public officials to carry weapons: policemen, sheriffs and their deputies, constables, town marshals, justices of the peace, as well as civil and revenue officers "while engaged in the discharge of their official duties." This final category was subject to interpretation, and ended up embracing district and county attorneys, prison guards, and even postal employees. These officials could carry prohibited weapons as long as they did so while on the job. For example, the case of A. L. Carmichael in 1881 established a precedent that penitentiary guards fell within the exemption for civil officials. Moreover, guards contracted by lessees to oversee convict laborers were included in this category.[56] But seven years later, the appeal of another guard was dismissed because he was not on duty at the time he carried his pistol. Instead, he used it to intimidate townspeople and

---

[54] *Stilly v. State of Texas*, 27 Tex. Cr. App. 445 (1889).
[55] Other cases involving the traveler exemption include *Shelton v. State of Texas*, 27 Tex. Cr. App. 443 (1889); *Price v. State of Texas*, 34 Tex. Cr. App. 102 (1895).
[56] *Carmichael v. State of Texas*, 11 Tex. Cr. App. 27 (1881).

Compendium_Roth
Page 2095

threaten to kill himself one evening while he was drunk.[57] In 1893, the court conceded that a deputy postmaster could be considered a "civil officer," but only when engaged in his duties. Andrew Love, the defendant in this case, made the mistake of carrying his pistol "when on his private business or pleasure . . . on the public streets." Love made matters even worse for himself because he fired the gun on Christmas eve in the presence of a large crowd gathered near a tamale stand.[58]

The court chose to uphold expansive definitions for civil and peace officers, but there was no question that sheriff's deputies received an exemption. Some sheriff's deputies were salaried employees who assisted the sheriff in executing warrants, subpoenas, and policing the county. But sheriffs and justices of the peace alike had the authority to deputize private citizens to carry out specific tasks, like forming a posse to track down rustlers or other local criminals. These jobs overlapped with the Texas Rangers, but waiting for assistance from the Rangers could waste valuable time and allow a fugitive to escape. Deputies formed an important component in the administration of local justice in Texas, and little was required for them to join the ranks of those allowed to carry deadly weapons. The sheriff had to sign a document stating the name of the appointee, and the county registrar had to administer an oath of office. Sometimes, these part-time deputies tried to claim full-time exemption from the deadly weapons ban.

Beginning in 1878, the Court of Appeals began affirming convictions against part-time deputies and cracking down on their lawbreaking. One man, William Snell, claimed he had permission to carry a pistol with him while voting because a justice had deputized him five

---

[57] *West v. State of Texas*, 26 Tex. Cr. App. 99 (1888).
[58] *Love v. State of Texas*, 32 Tex. Cr. App. 85 (1893).

months earlier to arrest a specific defendant.[59] The court decided that the "emergency" that had justified his appointment "had ceased, and that a private citizen, so deputed, could not claim that he was . . . in the discharge of the duties imposed on him by law."[60] A decade later, a man deputized in one county to escort a prisoner moved to another county and claimed exemption there two years later.[61] The court handed down a firm precedent in yet another of these cases in 1893: If a citizen was specially appointed, he became a "peace officer" but "the authority terminates when the purpose of the appointment has been attained."[62] Still, the appeals kept coming and became more ridiculous. In one instance, a man named J. J. Ringer joined the Ranger's Frontier Battalion on a strictly volunteer basis. "Without having taken the oath required by the State" and "not having reported to his company, or having done a day's service," Ringer openly carried a pistol in Bell County and was arrested. During his trial he admitted that he knew he was breaking the law, and "that he had not and did not expect to do a day's work for the State, and only carried the pistol to prevent some one from pulling his nose or kicking him." Clearly he "was acting in bad faith" and deserved his conviction.[63] Deputized citizens overstepping their limited, temporary authority became such a problem that the legislature had to intervene by setting guidelines for their appointment and limiting the number allowed per county.[64]

During the late nineteenth century, the court and the legislature cracked down on private citizens claiming exemption as civil or peace officers. But sheriffs, their full-time deputies, and other police officers enjoyed a totally unrestricted right to carry deadly weapons at all times and

---

[59] Taking a firearm to a polling place during an election was prohibited by Sec. 3 of the 1871 deadly weapons ban (a word-for-word copy of its 1870 predecessor) as well as a separate statute that specifically outlawed any type of firearm at an active polling place *without any exceptions, even for peace officers*. Tex. Penal Code §180 (1879).
[60] *Snell v. State of Texas*, 4 Tex. Cr. App. 171 (1878).
[61] *Blair v. State of Texas*, 26 Tex. Cr. App. 387 (1888).
[62] *O'Neal v. State of Texas*, 32 Tex. Cr. App. 42 (1893).
[63] *Ringer v. State of Texas*, 33 Tex. Cr. App. 180 (1894).
[64] The laws referred to can be found in Gammel (comp.), *Gammel's Laws*, 9:1051 (1889); 12:192 (1903).

Compendium_Roth
Page 2097

places. Unlike civil officers, their immunity from the pistol law was not confined to their time on duty. The story of Ben Thompson, an Austin town marshal, illustrates this point well. During the early 1880s, Thompson frequently spent his time off-duty visiting San Antonio's gaming halls, brothels, and theaters while wearing his pistol. On one of these trips, Thompson shot and killed another man over a game of cards. Though he was indicted for the homicide, a jury found him not guilty and he became a persona non grata in San Antonio. When he foolishly returned in 1884 (again, legally carrying a gun), San Antonio police and deputized citizens surveilled him and ended up fatally shooting him at a dance hall.[65] Cases of drunken, off-duty officers became problematic during the late nineteenth century because the law permitted them to arm themselves at all times.[66] The Court of Appeals had no choice but to uphold the letter of the law, ruling in 1886 that law enforcement officials were immune from the deadly weapons ban even when not on duty, and even when outside their jurisdiction.[67]

Peace officers sometimes pushed the envelope of legality and sparked deadly conflicts that might otherwise have been avoided. The Dallas policemen involved in the *Miller* case, for instance, undoubtedly elevated the tension level on their beat; they received exemption from the pistol law as "peace officers," but they seemed more interested in exerting power over others than actually preserving the peace. The sheriff of Hall County, in the Texas panhandle, similarly abused his office to settle a score. Several men, including Sheriff Pat Wolfforth and newspaper editor Eugene De Borenfiend, were arrested in 1891 for gaming, but the charges were dismissed within a few days. De Borenfiend then printed a misleading story that made it seem as though

---

[65] Story recounted in Charles L. Olmstead and Edward Coy Ybarra, *The Life and Death of Juan Coy: Outlaw and Lawman* (Austin: Eakin Press, 2001), 21-32.

[66] "The Pistol," *Brenham Daily Banner* (Brenham, TX), September 19, 1883; *Brenham Daily Banner* (Brenham, TX), May 9, 1884.

[67] *Clayton v. State of Texas*, 21 Tex. Cr. App. 343 (1886).

Sheriff Wolfforth was the only one involved. This escalated a preexisting conflict between them and set the two men on the path toward a "difficulty." Wolfforth had to go out of town for a few days, and during that time De Borenfiend approached Mrs. Wolfforth and propositioned her. Not surprisingly, she informed her husband, who rushed home. The two men encountered one another twice on the day of Wolfforth's return, each time trading insults or blows. The next day, Wolfforth went to the post office to mail a letter and saw his enemy standing outside the door. De Borenfiend ran inside, but Wolfforth followed him, pulled out his pistol, and fired four deadly shots.[68]

During his murder trial, Wolfforth made two claims to justify or explain his behavior. First, he said that he shot De Borenfiend in self-defense while trying to arrest him for illegally carrying a pistol. This flimsy excuse did not hold up in court because all the witnesses contradicted it. Second, he claimed that De Borenfiend's insulting language toward Mrs. Wolfforth drove him into such a rage that his reason became impaired. This was a classic "heat of passion" defense, which could reduce a murder charge to manslaughter if properly proven in court. The animating idea behind it was that men are naturally passionate; though they learn to control those passions, certain events can lead even the most buttoned-up of men to release them in a deadly gush of rage, terror, or resentment. The facts surrounding a homicide might make it seem like murder in the second degree, but certain extenuating circumstances justify reducing the charge to manslaughter because the defendant reacted to strong emotions, without intent to kill the victim.[69] Wolfforth's defense foundered on both grounds because he violated the standards of proper manly behavior, and then lied about it. He hid behind his badge, and when that failed, hid

---

[68] *Wolfforth v. State of Texas*, 31 Tex. Cr. App. 387 (1892).
[69] See Pettigrew article, p. 322-323; see also Thomas Johnson Michie, ed., *The Encyclopedic Digest of Texas Reports*, 4 vols (Charlottesville, VA: Michie Co, 1912-1914), 3: 557-570.

Compendium_Roth
Page 2099

behind his wife's skirt. Wolfforth did not react violently to a provocation that had just taken place—he murdered a longstanding enemy in cold blood and then had the nerve to appeal the guilty verdict.[70]

Wolfforth's case is intriguing because he abused his position as a peace officer, but otherwise it fits within a much larger constellation of such cases where male defendants used the "heat of passion" defense. In some instances, the defense succeeded in persuading an all-male jury to either acquit or reduce a charge to manslaughter. Countless such cases reached American courts in the mid- and late-nineteenth century, though some garnered more media attention than others. In three particularly well-studied cases from Northern states, cuckolded husbands received acquittals after claiming a natural, "unwritten" right to kill their wives' lovers. The rise of companionate marriage, lenient divorce laws, and the women's rights movement had apparently prompted American men to feel embattled, becoming easy targets for manipulative defense attorneys who asked them to imagine for themselves how it would feel to discover a wife's adultery.[71] Similar scholarship on Texas "heat of passion" cases has determined that the legal defense represented a way "to uphold a certain male duty to protect women and also to maintain homosocial order."[72]

Cases involving the "heat of passion" defense or the "unwritten law" of husbandly vengeance rested upon juror sympathy above all else. Attorneys asked them to visualize themselves in the defendant's position and worked hard to introduce juicy testimony that

---

[70] *Wolfforth v. State of Texas* (1892).

[71] Hendrick Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America," *Journal of American History* 84, no. 1 (June 1997): 67-96. These are actually cases where the defense rested upon the "unwritten law" that a cuckolded husband had the natural right to kill his wife's lover. This was, in fact, a written law in Texas, though its application in exonerating homicidal husbands was rare.

[72] John C. Pettigrew, "Homosociality and the Legal Sanction of Male Heterosexual Aggression in the Early Twentieth Century," in *Lethal Imagination: Violence and Brutality in American History*, ed. Michael A. Bellesiles (New York: New York University Press, 1999), 322-324.

Compendium_Roth
Page 2100

technically should have been inadmissible.[73] Unsurprisingly, jurors could easily drum up sympathy for a defendant, particularly if he happened to be the aggrieved party in an adulterous love triangle. One judge lamented "It has been common for citizens to serve on the jury, try criminals, acquit them, turn them loose onto society, go out of the court house and denounce the courts, denounce the . . . officers of state government for the lawlessness and crime," but those same jurors "never reflect that they had ever constituted the most important part of the organization of the courts."[74]

Trials in which a "heat of passion" claim worked toward the defendants' benefit have received scholarly attention because they reinforce the presence of the sexual double-standard in the nineteenth century, exemplify the preferential treatment enjoyed by white men (as against women, racial minorities, etc.), and inflame our sense of justice.[75] This is a reasonable and fair response. But the exceptional cases overshadow a much larger number of mundane ones, like *Wolfforth*, in which the defense failed abysmally. In Sheriff Wolfforth's case, the fact that he encountered the victim on two separate occasions *before* shooting him rendered his claim illegitimate. Other defendants failed to meet the "heat of passion" standards in other ways. For example, allowing too much "cooling time" to elapse between discovery of the provocation and the deadly conflict aborted a "heat of passion" claim.[76] Husbands who, after discovering a wife's adultery, armed themselves to confront the paramour did not meet the legal standards for the

---

[73] Hartog makes this point. Judges' acceptance of evidence of past adultery constituted a crucial innovation in the law without which the "unwritten law" concept would have faltered. Interestingly, in a Texas case, the Court of Appeals scolded a lower court judge for admitting evidence of an affair that was not directly relevant to the case at hand. Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law,'" 81-83. See also *Baker v. State of Texas* (1892).

[74] "Judge Fleming's Charge to the Grand Jury," *Frontier Echo* (Jacksboro, TX), November 10, 1876.

[75] Pettigrew, "Homosociality and Male Aggression," 317-325; Hartog, "Lawyering, Husbands' Rights, and 'the Unwritten Law,'" 67-96.

[76] This was called "cooling time." The court never tied its definition to a specific duration, so it was a "matter of fact" left for the jury to decide. Michie, ed., *Encyclopedic Digest*, 2: 562-563.

Compendium_Roth
Page 2101

"heat of passion" defense, either. Instead, their retrieval of deadly weapons indicated express malice toward the victim and made first-degree murder charges a distinct possibility.[77] Insulting language alone was insufficient provocation to justify a reduction from second-degree murder to manslaughter.[78] In 1874 the Redeemer Court said of one such case, "there was no necessity to resort to the use of a deadly weapon for self-protection," even though the language used was "insulting, and calculated to produce a difficulty."[79] A far cry from the antebellum honor culture, indeed! These mundane cases properly contextualize the more exceptional ones and give a fuller picture of the judiciary, from appellate judges to local jurors, policing new rules of manly behavior in the late-nineteenth century.

In a sense, this delineation of legal borders was just one part of the larger endeavor to redefine Southern manhood in the wake of the Civil War and Reconstruction. The antebellum years saw the near-universal arming of Southern men and the wide acceptance of extralegal justice through dueling. But the Civil War demonstrated the failure of that chivalric, Old South manhood and left Southerners with a "crisis in gender" that never really resolved itself.[80] The martially minded Redeemers sought to restore the pride of white Southern men, but the New South promoters played an important role, too.[81] Often well-educated, town-dwelling

---

[77] *Massie v. State of Texas*, 30 Tex. Cr. App. 64 (1891).
[78] Michie, ed., *Encyclopedic Digest*, 2: 565-70.
[79] *Meredith v. State of Texas*, 40 Tex. 447 (1874).
[80] LeAnn Whites used the phrase "crisis in gender" in Whites, *The Civil War as a Crisis in Gender*. On the longevity of this crisis, see Craig Thompson Friend, "From Southern Manhood to Southern Masculinities: An Introduction," in *Southern Masculinity: Perspectives on Manhood in the South since Reconstruction*, ed. Friend (Athens: University of Georgia Press, 2009), vii-xxvi.
[81] Craig Thompson Friend has identified two strains of Southern manhood after Reconstruction, the martial master and the Christian gentleman. See Friend, "From Southern Manhood to Southern Masculinities," xi-xii. The Redeemers fit the description of the former quite well—they used military power and martial skill with an ideological and political purpose of restoring white men to power in the South. The New South promoters fit the second type quite well by elevating self-control and traditional evangelical values (which generally flowered within urban middle classes, see Paul E. Johnson, *A Shopkeeper's Millennium: Society and Revivals in Rochester, New York, 1815-1837* (New York: Hill and Wang, 1978).

Compendium_Roth
Page 2102

professionals, this rising middle class wanted modernization and reform.[82] Their economic

policies are well known, but their views on legal reform less so. New South critiques of the

criminal justice system abounded. Newspapers in towns like Brenham, largely forgotten today

but buzzing regional hubs in the nineteenth century, recommended radical legal reforms and

questioned the value of the traditional Anglo-American judicial system. "It is true we live in an

age of steam and electricity," the *Brenham Banner* editorialized, "but we are tenacious of old

habits, old practices, and old ways, but when the utility of new things are fully demonstrated

people will take hold of them. . . . some would make an entire change by wiping out juries and

courts as now constituted and substituting an entire new plan for quicker trials and speedier

justice."[83] The market towns of Texas were not filled with backward-looking imitators of the Old

South ideal; rather, they sheltered a forward-thinking middle class that, after returning the state

to the perceived safety of white rule, pursued innovation in all realms of life—including the

standards of proper manliness.

      The cultural project of redefining Southern manhood occurred in public spaces and

within private homes, the product of innumerable interpersonal interactions and performative

displays, but the creation and policing of new standards took place in the legal realm, between

the legislature and the judiciary. Lawmakers at the state and municipal levels enacted new laws,

like the deadly weapons ban, that demanded men to behave differently than they had before. This

transformation did not go unnoticed. The *New York Sun* ran a lengthy story about it in 1884

saying, "A wonderful change has taken place in the minds of Texans concerning the proper

costume of a gentleman and the correct way of righting wrongs. The immense immigration . . .

---

[82] Jonathan Daniel Wells, "The Southern Middle Class," *Journal of Southern History* 75, no. 3 (August 2009): 651-662.
[83] "Reform," *Brenham Daily Banner* (Brenham, TX) May 9, 1884.

Compendium_Roth
Page 2103

from England, Germany, and the Northern States has got a good deal to do with this right about face in an important matter, but the native Texans themselves long ago saw the folly and danger of conducting business, society and politics on self-cocking principles."[84] Judges closely guarded the application of the "heat of passion" defense in murder cases, holding men accountable to a new middle-class, even Victorian notion of manhood that elevated restraint over excessive emotion.[85] At the same time that American men claimed the "unwritten law" to acquit themselves of murder, French gentlemen carried on the practice of dueling so recently dropped by Southerners. In England, where duels were a thing of the past and interpersonal violence was on the decline, many men read about or dreamed of an assignment in some far-flung corner of the empire where they could turn loose the aggressiveness that Victorian masculinity disdained.[86] Violent exceptions like these prove the rule of new, stifling expectations of men brought on by the cultural dominance of an industrial bourgeois class.

Texas courts may have done a good job of defining the limits of acceptable manly behavior, but that success did not come without some failures. Predictably, cases involving African American men proved much more complicated for juries and troublesome for appellate judges. On the whole, there were relatively few black men who appealed their convictions for violating the deadly weapons ban. The cost of an appeal likely placed it beyond the means of most black defendants, but those who had the money were about as likely to obtain reversals as

---

[84] From *New York Sun*, reprinted *The Waco Daily Examiner* (Waco, TX), August 26, 1884.

[85] The jurisprudence surrounding the "heat of passion" defense in precedent-setting cases from *Texas Criminal Reports*, a collection of appellate criminal decisions handed down by the Court of Appeals, and later Court of Criminal Appeals. The cases cited in *Encyclopedic Digest* defining "heat of passion" originate in volumes of *Texas Criminal Reports* from the post-1876 period, especially the 1880s and 1890s. See Michie, ed., *Encyclopedic Digest*, 2: 559-560.

[86] Martin Wiener, "Homicide and 'Englishness': Criminal Justice and National Identity in Victorian England," *National Identities* 6, no. 3 (November 2004): 203-213; John Tosh, "Masculinities in an Industrializing Society: Britain, 1800-1914," *Journal of British Studies* 44, no. 2 (April 2005): 330-342, 341.

119

their white counterparts (and that was not very likely).[87] But casting a wider net that includes murder and assault cases reveals some evidence of the problem posed by black men before the law, particularly when their rights as citizens and men had been violated by armed whites.

In 1875, a white man named George McKay was traveling horseback on a public highway. He (illegally) carried a pistol with him and, after dropping it, tried to retrieve it without dismounting. McKay could not reach the pistol and surely looked foolish grasping for it. Dan Duke, a young black man riding along behind him, laughed at the scene. Having admitted defeat and dismounted, McKay angrily shouted to the still-chuckling Duke, "I am the worst man in all these parts and would as soon shoot you as not." McKay then approached Duke and, pointing the pistol at Duke's head, forced him onto his knees for several moments. Duke presumably reported the incident to local police because McKay was arrested. As it turned out, McKay's pistol was not in working condition when he pointed it at Duke, so a prosecution under the deadly weapons ban could not hold water. Instead, local officials charged McKay with assault; Duke did not know that the pistol was broken, and the encounter caused him sufficient shame and mental agony that it qualified as an assault. The jury convicted McKay and fined him twenty-five dollars, but he appealed.

At the time of *McKay v. State of Texas*, the Texas Supreme Court still heard criminal appeals, and Oran M. Roberts was its chief justice. Roberts determined to reverse McKay's decision and twisted himself into knots in order to do so. In the *Duke* decision of the same year, another member of this Redeemer Court rejected the jurisprudence of Joel Prentiss Bishop, whose views on the Second Amendment had been an important part of the Reconstruction

---

[87] Reversals for black and white Texans most often resulted from some technical or procedural failure on the part of the State. On a few rare occasions the court ruled on substantive issues that had deprived defendants of justice. But overall the appellate judges tried to uphold jury convictions, as stated earlier in this chapter.

Compendium_Roth
Page 2105

Court's *English* decision back in 1872. Roberts continued the Redeemer Court's attack on Bishop by rejecting his definition of assault. Bishop had said that actual peril is not necessary to an assault, only the apprehension of it, but Roberts disagreed. "This makes an apparent force sufficient if it creates a well-grounded apprehension of peril in the party assailed, and is believed to be contrary to the provisions of our [penal] code." In other words, Duke's perception of the encounter as a potentially deadly one had no bearing upon the facts of the case, which involved a dysfunctional pistol. The perception and intent of the defendant, the aggressor, were far more important than those of the victim.[88]

The decision in *McKay* departed from an old precedent established in 1856 and rooted in Bishop's definition of assault.[89] It is, then, part of this redefinition of Southern manhood in the postbellum period, and provides some insight into the ways in which race complicated that process. As enforcers of the new manliness, the judges of the Redeemer Court chose to endorse rather than condemn McKay's behavior because it involved a white man asserting his mastery over a black man. White southerners tended to approve of aggressive, martial behavior undertaken for some ideological purpose—as long as it was carried out by their own. In this particular case, McKay restored his pride by intimidating a young black man. Roberts's convoluted opinion in *McKay* sent the message that white men could lead black men to feel threatened without breaking the law. Some commentators disliked the idea that behavior like McKay's was not indictable as assault, asking "Ought we not to judge the act from the bystander's point?"[90] Their editorials accomplished nothing because more was at stake than

---

[88] On the importance of perception in lethal self-defense cases, see Light, *Stand Your Ground*.
[89] This precedent was *Flournoy v. State of Texas*, 14 Tex. 387 (1856).
[90] Quotation from "That Unloaded Gun Again," *San Marcos Free Press* (San Marcos, TX) February 9, 1878.

merely the legality of pointing an unloaded gun at someone; as Roberts realized, the crux of the matter was rendering it licit to purposefully instill fear in someone else's mind.

Despite this important alteration in precedent, tremendous changes had taken place in Texas and the South. Roberts was forced to admit that, had McKay's pistol been functional, the encounter would have constituted an assault. In the antebellum days, even in the immediate postwar era when the Throckmorton faction controlled state politics, such would not have been the case. Indeed, members of the federal congressional committee investigating political violence the former Confederacy had told the truth when they said in 1872 that:

> It is the general testimony of old citizens of the South that, notwithstanding the conspiracy known as the Ku Klux Klan, there is more general order and peace in the South than before the war; while this may surprise those familiar with the recent disorders, and unfamiliar with southern society before the war, we deem the statement not extravagant, for the conspiracy appears to us an attempt to exercise in localities, in despite of law, that tyranny and lawlessness which was, before the war, open and unrestrained, and more general, if not so cruel. We should remember how common it was to scourge colored men, and how perilous for northern citizens or southern emancipationists to be found in the Gulf States. How freely the revolver and the knife were used in the rencounter or the duel. It is admitted that in Mississippi, Arkansas, and Texas the general condition of society is better than ever before.[91]

An all-encompassing sea of violence perpetrated in the name of southern manhood had, through war, Reconstruction, and economic growth, been transformed into a mostly dry landscape with deep pools of ideologically driven brutality scattered about. These pools represent two types of violence, one a holdover from the past and the other a new creation. The former type consisted of men's persistent tendency toward settling disputes through extralegal violence, as evidenced by the rise of "heat of passion" defenses in the late nineteenth century; the latter were the racially charged lynchings that became communal rituals across the South during the height of the Jim Crow system of the late nineteenth and early twentieth centuries. The process of draining the sea

---

[91] Joint Select Comm. on Affairs in Late Insurrectionary States, S. Rep. No. 41-42, pt. 1 at 270-271 (1872).

Compendium_Roth
Page 2107

of violence and rerouting the water into these pools began with the Republican governments during Reconstruction and accelerated as progressive Democratic reformers took the lead in Southern politics during the closing decades of the nineteenth century.

By the mid-1890s, the US Supreme Court and the appellate courts of Texas had given the deadly weapon ban their stamps of approval, and in doing so upheld an expansive view of state police power that rejected the incorporation of the Bill of Rights, especially the Second Amendment. Empowering state governments permitted the continuation of a racial caste system in the "new" South even while the socio-political elite talked of progress, innovation, and reform. It also preserved the locally oriented American judicial system from the shock of large-scale federal intervention in state and county affairs. Aware of their police power over Texas citizens, the state legislature embarked on a reformatory process in the late-nineteenth century that sought to end gun-toting in the Lone Star State once and for all. The efforts of these lawmakers are the subject of the next chapter.

Chapter 4
"The Revolver Must Go": Regulating Deadly Weapons, 1887-1918

As soon as the ink dried on the 1871 deadly weapons ban some Texas politicians began trying to change or eliminate it. There was nothing preventing the Democrats, who controlled the statehouse beginning in 1873, from repealing it along with the other measures enacted during the administration of Republican governor Edmund J. Davis. That they chose not to is one of the more interesting aspects of this law's history. Texas politicians understood that many constituents supported restrictions upon carrying deadly weapons in public, and when people chose to express their opinions most demanded harsher penalties or better enforcement rather than repeal. The press coverage pertaining to the deadly weapons ban in the half-century after its passage was overwhelmingly positive and illustrates the development of an early progressive impulse in Texas. Many legislators heeded the calls of these reformers, seeking to expand the deadly weapon law's scope, toughen its penalties, and protect it from its detractors. But conflict remained among Texans and their lawmakers, with a sufficient number in opposition to slow down the forces supporting regulation and sometimes undo their achievements. For this reason, the history of deadly weapon regulation in Texas between 1887 and 1918, the period during which the law received substantial amendment, is one of false starts, failures, and reversions.

By 1920, the persistence of the reformers had paid off. Though opponents had tried to maintain the original deadly weapon ban without expanding upon it, the forces of reform succeeded in making the law markedly more draconian. They additionally forced the passage of satellite laws, like a punitive tax on pistol sales and the creation of a harshly penalized crime called "assault with a deadly weapon" that supplemented the deadly weapon ban. Texas at the conclusion of the First World War could claim a far-reaching gun-control program that reflected

124

the triumph of progressivism in the state. The journey to that conclusion entailed a contest less over the existence of the law itself than the appropriate severity of punishment for violators and its efficacy as a crime-prevention measure. At the very heart of this debate stood the acceptance or rejection of a proactive, regulatory state as responsible for preventing evil as for prosecuting it.

*     *     *

A central concern for Texans in the late 1870s and 1880s was the continuation of lawlessness even after the Redeemers retook control of the state government. On the whole, Democrats failed to deliver the peace and justice they had promised to white Texans. One commentator compared Democrat Richard Coke to his Republican gubernatorial predecessor, Davis, and found Coke wanting. "Has not Gov. Coke's administration been almost a total failure? Is there not more lawlessness and crime in Texas than at any other period since the close of the war? Was there not better order in Texas under the Davis administration, when the heat of battle had not had time to cool, when all the bitter passions of the people engendered by the war had not subsided?" In other words, Davis may have been a tyrant in the eyes of Democrats, but his policies (especially the State Police) had been effective at quelling violence.[1]

Coke and his successors, Richard Hubbard and Oran M. Roberts, faced an interesting predicament in that Redemption reduced the political violence perpetrated by angry whites even while economic development in South and West Texas increased lawlessness there. Situated as it was on the border between South and West, the Lone Star State experienced the worst of both worlds in the late nineteenth century as homicide rates spiked in the western mining and cattle

---

[1] "Necessity for a State Police," *Galveston Daily News* (Galveston, TX), June 15, 1876.

Compendium_Roth
Page 2110

boomtowns, as well as in some parts of the rural South.[2] At just the time when a Ranger-like force with statewide jurisdiction to recover bail-jumpers and criminals would have been helpful, Democrats eliminated it out of antipathy for Davis and a hypocritical sense that it was too great a centralization of power.[3] Hispanic majorities in South Texas counties distrusted law enforcement and celebrated rebels like Juan Cortina, whom Anglos derided as "bandits." Widespread cattle rustling in counties west of the Colorado River gave rise to all manner of violent conflicts, many of them emanating from a criminal enterprise referred to as the Taylor-Sutton feud. On top of that, the new railroad depots and towns along the frontier line between Wichita Falls to the north and Laredo to the south became a playground for gunslingers like John Wesley Hardin and Sam Bass.[4]

Significantly, Coke, Hubbard, and Roberts said and did very little about the persistent problem of lawlessness. Each governor, understandably, focused on ameliorating the state's fiscal woes without alienating investors. All three drew upon the seemingly limitless resource of public lands fund school systems, subsidize railroad development, and appease commercial investors. None of them made law enforcement a central policy concern or addressed the deadly weapon ban. If anything, they exacerbated the problem by ignoring it or, in Roberts's case, by pardoning a startling number of felons for the sake of economy.[5]

---

[2] Roth, *American Homicide*, 354-357, 375-384, 387, 403-404, 411-412. See also Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997).

[3] I call it a hypocritical idea because Democrats voiced no such opposition to the Texas Rangers, a force similarly under the authority of the governor (and later adjutant general) and granted statewide jurisdiction.

[4] On Juan Cortina, see Jerry Thompson, *Cortina: Defending the Mexican Name in Texas* (College Station: Texas A&M University Press, 2007). On the Taylor-Sutton feud, see James M. Smallwood, *The Feud That Wasn't: The Taylor Ring, Bill Sutton, John Wesley Hardin, and Violence in Texas* (College Station: Texas A&M University Press, 2008).

[5] On these governors and the highlights of their administrations, see *Handbook of Texas Online*, John W. Payne, Jr., "Coke, Richard," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fco15; *Handbook of Texas Online*, Jean S. Duncan, "Hubbard, Richard Bennett, Jr.," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fhu03; *Handbook of Texas Online*, Ford Dixon, "Roberts, Oran Milo," accessed December 03, 2018, http://www.tshaonline.org/handbook/online/articles/fro18.

126

Some Texas legislators joined the Redeemer governors in displaying an ambivalent attitude toward criminal justice reform during the 1870s and early 1880s. In 1873, a House member tried to repeal the deadly weapon ban. Daniel Short of Shelby County in East Texas was an acolyte and later law partner of Oran Roberts who shared his mentor's political sympathies.[6] The committee reviewing his bill immediately transformed it from a repeal measure into an amendatory one that would have settled for scaling back the provisions of the 1871 law. It prohibited only *concealed* weapons and required officers to obtain a warrant prior to any arrest unless they had personally witnessed the offense. Though this bill failed, it was more successful than a subsequent repeal effort that could not even pass the committee stage.[7] The only substantial alteration to the ban came in 1879 when the revised penal code mysteriously dropped the provision allowing convicted gun-toters to be sent to jail. A commentator at the time attributed the move to "deference to public opinion," though judges and juries rarely ever handed down prison sentences for carrying weapons during the 1870s.[8] That the critics of the pistol law failed in their attempts to weaken it and won a meaningless victory in 1879 demonstrates the unpopularity of their position among lawmakers and the general public.

If the deadly weapon ban had truly been unpopular among Texans, their lawmakers surely would have emulated their southern neighbors, most of whom enacted limited gun regulations or loosened the ones put in place during Reconstruction. With the exceptions of Texas, Tennessee, and Arkansas, all southern states prohibited *concealed* weapons only rather

---

[6] *Handbook of Texas Online*, Robert Bruce Blake, "Short, Daniel McDowell," accessed November 20, 2018, http://www.tshaonline.org/handbook/online/articles/fsh32.
[7] In 1876, William H. Jones of Gonzalez County introduced a repeal bill, but it did not make it past committee. See House Bill 54, 15th Leg., Reg. sess. (1876) TSLAC; House Bill 69, 13th Leg., Reg. sess. (1873) TSLAC.
[8] There is exceedingly little recorded opposition to the deadly weapons ban or its optional jail provision in the 1870s. This does not mean the commentator's explanation is untrue, but it does question the strength of such public opinion. See "Pistol Carrying," *Brenham Daily Banner* (Brenham, TX) July 24, 1881. Furthermore, the extant district, county, and justice court records from Fayette, Parker, Jefferson, and McLennan Counties show zero guilty defendants sentenced to jail time between 1871 and 1879.

Compendium_Roth
Page 2112

than proscribing all small arms in public. In Tennessee, the administration of Republican governor Dewitt Clinton Senter confronted an explosion of political and racial violence. The Republican-controlled state legislature responded by passing "An act to preserve the peace and prevent homicide," which declared that: "It shall not be lawful for any person to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver."[9] When Democrats retook the state a year later, as evidenced by the election of Democratic governor John Calvin Brown, the Democratic-controlled legislature changed its position by prohibiting deadly weapons "other than an army pistol, or such as are commonly carried and used in the United States army."[10] This language referred to the Colt 1861 Navy Model and Colt 1860 Army Model revolvers, firearms issued to many Civil War soldiers. During the 1860s they cost about fifteen dollars, placing them beyond the financial means of anyone who was cash-poor or lacked veteran status. Arkansas lawmakers similarly exempted these weapons from regulation in 1881.[11] Texans observed the actions of these southern neighbors, and some considered emulating them. A bill proposing to exempt "Army or Navy size revolvers" from the purview of the deadly weapons ban not only failed but died almost immediately. Senators refused to give a second reading to the proposal, which would have made weapon-carrying contingent upon wealth and military service rather than individual right and threatened another loophole for nefarious individuals to harass law-abiding Texans with impunity.[12]

---

[9] 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, §1.

[10] This is a fascinating policy change because the revised law stipulated that "in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands." Why the Tennessee legislature would opt to criminalize the less deadly modes of carrying pistols (stowed away, in a holster) in favor of the deadliest one (in the hand) is unclear. But the price of Colt Army and Navy Model revolvers placed them beyond the means of most black Tennesseans, and the law made licit the carrying of them by hand. 1871 Tenn. Pub. Acts 81, An Act to Preserve the Public Peace and to Prevent Homicide, ch. 90, § 1.

[11] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), §1; "Deadly Weapons," *Panola Watchman* (Carthage, TX), March 2, 1881.

[12] Senate Bill 219, 17th Leg., Reg. sess. (1881), TSLAC.

Compendium_Roth
Page 2113

Texas lawmakers recognized the popularity of the deadly weapon ban and tried throughout the 1870s and early 1880s to strengthen it in one way or another. A new state constitution went into effect in 1876, and a highly accomplished jurist in the statehouse, James McLeary, worried that its slightly different wording in regard to the right to bear arms might render the pistol law unconstitutional. As of 1876, the state legislature was authorized to "regulate the wearing of weapons with a view to prevent crime."[13] McLeary introduced a bill that altered the deadly weapons ban in some slight ways, but its true purpose was to prove that the legislature intended the law to prevent crime. Ironically, the bill stalled because a minority raised questions about its constitutionality. It stated that "no person shall wear any arms except as hereinafter specified." The language, to them, seemed too extreme. "The citizen has the right to keep and bear arms and he should not be required to go to the statute book to ascertain when and where he can exercise it," the minority reported. Instead, a law should be framed in a more generous way, "to protect him in the right guaranteed" and simultaneously "point out the time, place and circumstances [in] which he shall not exercise it to the misery of social order and his fellow citizen." This conflict may seem like mere semantics, but it raised an important issue at the time; the 1871 pistol law operated very much like a prohibition, yet jurists and policymakers had to be careful to call it a regulation of a constitutional right.[14] Whether the phrase "except as hereinafter specified" became part of the law, the idea behind it had been part of its substance

---

[13] Tex. Const. of 1876, art. I, § 23.

[14] McLeary's bill and the committee substitute for it proposed reducing the minimum fine for carrying a deadly weapon from twenty-five to ten dollars. The bill also broke the few lengthy sections into a dozen or more very short ones, demonstrating an attempt to clarify and systematize the law. See Senate Bill 22 and Senate Bill 83, 15th Leg., Reg. sess. (1876) TSLAC. Quotation in *Senate Journal* (1876), 137-138. Reform-minded Texans like McLeary thought of the pistol law as a blanket ban or prohibition, though the constitutional guarantee required that they pay homage to the right to bear arms by refraining from calling it a prohibition as such. Oran Roberts addressed this complicated issue in *State of Texas v. Duke* 42 Tex. 455 (1874). On McLeary, see *Handbook of Texas Online*, Claudia Hazlewood, "McLeary, James Harvey," accessed November 16, 2018, http://www.tshaonline.org/handbook/online/articles/fmc87.

Compendium_Roth
Page 2114

from the beginning. In fact, as the courts took the lead in interpreting the deadly weapon law, Texans wanting to exercise their right to arm themselves needed not only a statute book but access to appellate court reports in order to stay within the state-mandated guidelines.

There were abortive attempts to add several new weapons to the list of those prohibited in the public sphere. The earliest, considered in 1881, were the rifle cane and shotgun cane. These new devices originated in Europe but began appearing in the United States by the late 1860s.[15] The cane itself was hollow and formed the barrel of the rifle or shotgun. The handle included a trigger button and a breech-loading mechanism.[16] These boutique firearms were available on the market but not particularly common. In 1880, a doctor in Wills Point (about forty miles east of Dallas) showed one to a crowd gathered around him and inadvertently killed his friend.[17] The incident was reported as far away as Austin, so state senator James Wynne in nearby Henderson likely heard the story. The following year, he introduced a bill to include rifle canes and shotgun canes within the purview of the 1871 deadly weapon ban. That law already restricted sword canes, but not long guns like rifles and shotguns. Wynne's bill very nearly became law, passing the Senate and reaching a third and final vote in the House.[18] Nevertheless, it failed and no subsequent legislature addressed the issue. Rifle canes and shotgun canes continued to be sold in small numbers, but they were rare enough to elicit special attention in the press even into the twentieth century.[19]

---

[15] Rifle canes were advertised for sale in North Carolina in 1868. See Wayne K. Durrill, "Political Legitimacy and Local Courts: 'Politicks at Such a Rage' in a Southern Community During Reconstruction," *Journal of Southern History* 70, No. 3 (August 2004): 577-602, at 587.

[16] For a full description of the shotgun cane, see "Shotgun Canes," *Los Angeles Times* (Los Angeles, CA), July 6, 1896.

[17] "Texas Facts and Fancies," *Weekly Democratic Statesman* (Austin, TX), September 16, 1880.

[18] Senate Bill 20, 17th Leg., Reg. sess. (1881) TSLAC; *Senate Journal* (1881).

[19] The confiscation of a rifle cane by a New York Customs official in 1925 garnered significant attention, as did the sale of shotgun canes in 1927. In the latter case, a New York magazine remarked on their popularity among French women as devices "both ornamental and useful" against "the apaches of Paris." See "Weapon Surprises Officials,"

Denunciations of razors began in the early 1880s and continued for decades. Due to their easy affordability, razors became popular weapons of self-defense for the poor. African American men embraced the razor to such an extent that they were known as "the favorite slaying-tool of the colored man." Despite the racial overtone, Texas commentators discussed razors alongside pistols as dangerous weapons that should not be carried in public. If carrying a pistol was considered an antisocial, barbaric behavior, how much more so was carrying a razor? The problem was that the 1871 law did not specifically outlaw them. The failure first became a point of discussion in 1881 when an arms control measure in Arkansas included them in the list of prohibited weapons. Condemnations continued throughout the 1880s and increased significantly in the 1890s. At that point, the legislature took action by trying on several occasions to piggy-back a razor prohibition onto other amendments to the deadly weapons ban, but each time they failed.[20]

A third weapon to gain the attention of Texas lawmakers was the toy pistol. This pistol-shaped, spring-loaded device used cheap cartridges to ignite a firecracker in its barrel. The goal was to create a bright flash and loud noise that youngsters might find fun. Some toy pistols, though, could function just like a regular pistol by firing a lead ball.[21] Children subscribing to some magazines could order them by mail, or even receive them as prizes. Many a young woman took to carrying one "with a view to amusing her sweet heart."[22] But the toy pistol soon proved

---

*Los Angeles Times* (Los Angeles, CA), November 5, 1925; "Shotgun Cane Shown in Los Angeles Shop," *Women's Wear Daily* (New York City, NY), April 25, 1927.

[20] For examples of condemnations of razors, see "Entirely Too Many Revolvers," *Albany News* (Albany, TX), August 22, 1884; "A Little Pistol Practice," *Brenham Daily Banner* (Brenham, TX), March 31, 1892; "Must Not Carry Pistols," *Dallas Morning News* (Dallas, TX), July 4, 1899. On Texans taking notice of Arkansas weapon regulations, see "Deadly Weapons," *Panola Watchman* (Carthage, TX), March 2, 1881. Examples of failed bills seeking to add razors to the restricted list include House Bill 332, 23rd Leg., Reg. sess. (1893), TSLAC; Senate Bill 33, 24th Leg., Reg. sess. (1895), TSLAC; House Bill 54, 25th Leg., Reg. sess. (1897), TSLAC; House Bill 384, 27th Leg., Reg. sess. (1901), TSLAC.

[21] *Brenham Daily Banner* (Brenham, TX), December 7, 1881.

[22] "About a New Plaything," *Jackson Standard* (Jackson, OH), December 20, 1877.

Compendium_Roth
Page 2116

deadly. Close-range shots could disfigure or kill people, and because the cheap cartridges consisted of a patented mixture of finely ground powder that included chemicals detrimental to the nervous system, repeated use could lead to lockjaw and death. These cartridges could be bought hundreds at a time, with one paper reporting that a single pack of six hundred cost only a nickel. This five-cent purchase produced enough toxins to kill a person (see Fig. 4.1). Boston and Baltimore led the way by enacting municipal ordinances that banned the sale, importation, or ownership of toy pistols, and reformers called for city leaders across the country to do likewise.[23] A Louisiana paper appealed to American boys directly, reminding them that they "can get along very well without" receiving a toy pistol for Christmas. "And they should always bear in mind the important fact that—Boys who ne'er with pistols play, Will live to die some other way."[24]

In Texas, denunciations of the toy pistol began in the 1870s and picked up steam in the 1880s. Commentators called it "the premium instrument of death in time of peace" and "a formidable rival of the real pistol as a means of destroying precious life." Papers encouraged parents to "think of the insidious influence of early habit, and be mindful of what little men are doing." At the same time, though, many called for state or municipal regulation. "Preventive measures" like declaring it to be a deadly weapon were popular. A Dallas newspaper argued that "if laws are made to suppress police gazettes and similar sheets, to close whiskey saloons and even barber shops to keep morals good, surely something should be done to suppress the toy pistol." Throughout the state, observers considered enactments against toy pistols to be sensible and legal exercises of local or state police power.[25] To their disappointment, however, cities did

---

[23] "The Boy Exterminator," *Cheyenne Transporter*, (Darlington, IT), September 11, 1882. Reprinted from *Emporia (KS) Republican*. "The Victims of the Toy Pistol," *Medical and Surgical Reporter* (Philadelphia, PA), August 6, 1881.
[24] "The Toy Pistol," *St. Tammany Farmer* (Covington, LA), December 22, 1883.
[25] There are hundreds of Texas newspaper articles denouncing the toy pistol in the late nineteenth century. Quotations from "Murder as Amusement," *Galveston Daily News* (Galveston, TX), July 31, 1881; *Brenham Daily Banner* (Brenham, TX), January 11, 1883. These articles also point toward a statewide or even regional conversation

132

not pass municipal ordinances against the toy pistol. The attempt by state lawmakers to prohibit

their sale died in committee review.[26]

Fig. 4.1



TOY PISTOL PLAY-GROUND
*Puck (1877-1918);* Aug 3, 1881; 9, 230; American Periodicals
pg. 369

While governors ignored the perennial violence problem and legislators failed in their

attempts to strengthen the deadly weapons ban, political commentators stepped into the breech

and voiced the general public's concerns. Newspaper editorials incessantly called for better law

enforcement, legal reform, and an end to lawlessness. The most heartfelt of these challenged

---

about toy pistols by mentioning other newspapers by name, including the *Dallas (TX) Herald* and *Westliche Post* (St. Louis, MO).

[26] I have not seen evidence of any Texas city prohibiting them. The cause of this is uncertain, but a lack of authority in municipal charters might be an important factor. Since they were not technically weapons, toy pistols could not be regulated or prohibited as deadly weapons were. Depending on each city's charter, regulation in the name of public health might have been a possibility, but I have not found evidence of cities moving in this direction. See also House Bill 397, 18th Leg., Reg. sess. (1883), TSLAC.

readers to look in the mirror rather than point fingers at state lawmakers. Some denounced "weak-kneed juries" who were "too tender to enforce the law." As long as jurors failed to convict known criminals, people "will continue to settle their difficulties with knife and club and pistol." Others blamed the general public for succumbing to "the romance of assassination." When a wealthy or well-connected man committed murder, "there are sympathies aroused, and the lawyers plead, and the ladies weep, and the juries fail to agree, and the judge halts; a new trial is granted, and the case is postponed for witnesses that never come, and after a number of months in prison the door is opened and the murderer is out." This put society "back toward that state of barbarism" where "that man has the supremacy who has the strongest arm and the sharpest knife, and the stealthiest revenge, and the quickest spring of a trigger."[27]

As the 1870s wore on, some reform-minded Texans began latching on to the deadly weapons ban as the crucial component in any attempt to reducing violent crime. Associating firearm restrictions with crime prevention was nothing new; James W. Throckmorton had made that connection back in 1866. What was innovative this time was the sense that enforcing the deadly weapons ban held the key to securing safety, peace, and happiness in Texas. The movement really began in 1879 with B. B. Paddock, a newspaper editor and booster in North Texas. Paddock caused a statewide stir when he said: "If the South—if Texas—really desires to achieve that reputation for law and order which has been won by some states and by some communities, the ensign raised, the banner planted, must bear the unequivocal device, 'The Revolver Must Go.' There is too much revolver in this country. No sincere lover of his section, no honest friend of the South, can deny it."[28]

---

[27] Quotations in "That Jury," *North Texas Enterprise* (Bonham, TX), August 7, 1874; "The Suppression of Crime," *Richmond Reflector* (Richmond, TX), April 23, 1879.

[28] Paddock actually picked up the phrase from the Cleveland *Register*. He reprinted an article from that paper which said, "If the West and South would rally around the sentiment, 'The revolver must go,' it would be one more step in

Paddock's mantra received support from other papers and remained the slogan of a gun regulation movement that picked up steam over the next decade. An East Texas paper proceeded to "call upon the press and the people of the State to aid us in exterminating the pistol and bowie-knife in Texas" for "the good of society."[29] Commentators repeatedly voiced their belief that packing heat was the root cause of homicides. Protestant ministers preached respect for law and against concealed weapons, with some taking their message to the western towns bedeviled by outlaws.[30] Grand juries were a special target for reformers, who urged them to "speak out" on the subject and "send up reports, petitions and appeals regarding lawlessness and crime." One district judge reminded his grand jurors that: "The day has passed when it was necessary to carry arms in this country to insure personal safety. There can *now* be no excuse for this violation of the law." He portrayed the deadly weapons ban as a "wholesome law" whose strict enforcement "will do much towards the suppression of bloodshed and murder in this section."[31]

Hundreds of Texans living in the frontier counties exempted from the deadly weapons ban sent petitions to the governor's office and legislature asking for its enforcement. These requests began in the mid-1870s when the threat of Comanche raids had almost entirely subsided and rapid population growth destabilized isolated market towns. Petitions poured in from

---

the interest of civilization." See *Fort Worth Daily Democrat* (Fort Worth, TX), April 3, 1879; May 1, 1879. The slogan was still in use as of the mid-1880s. See "The Cattlemen," *Fort Worth Daily Democrat* (Fort Worth, TX), March 5, 1883; "Other Locals," *Austin Weekly Statesman* (Austin, TX), May 15, 1884; "Gordon Notes," *Palo Pinto Star* (Palo Pinto, TX), August 1, 1885.

[29] Paddock's article was reprinted in the *Waco (TX) Telephone* and received strong support from the *Galveston (TX) Daily News*; see *Fort Worth Daily Democrat* (Fort Worth, TX), May 15, 1879; *Galveston Daily News* (Galveston, TX), June 3, 1879. Quotation in "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879.

[30] For examples of general support for pistol regulations, see *Dallas Daily Herald* (Dallas, TX), October 3, 1884; "Pistols," *Fort Worth Gazette* (Fort Worth, TX), Feb 2, 1885; *Waco Evening News* (Waco, TX), January 27, 1893. On support for the cause by preachers, see "A Sermon," *Christian Messenger* (Bonham, TX), September 14, 1881; "Pistols Gone, Never to Return," *Waco Daily Examiner* (Waco, TX), August 26, 1884.

[31] "Judge Fleming's Charge to the Grand Jury," *Frontier Echo* (Jacksboro, TX), November 10, 1876; "To Grand Juries," *Weekly Democratic Statesman*, (Austin, TX), October 24, 1878; "Must Not Carry Pistols," *Dallas Morning News* (Dallas, TX) July 4, 1899; "Carrying Weapons Is Scored by Judge," *Dallas Morning News* (Dallas, TX), March 12, 1912. Quotation in "Judge Wheeler's Charge," *Albany Star* (Albany, TX), September 21, 1883.

Maverick County in South Texas, Kerr, Mason, Llano, Brown, Taylor, Callahan, Parker, and Montague Counties along the frontier line, and Wheeler County in the panhandle. In each case, the citizens stated that exemption was no longer necessary and had become a burden. As long as Indian raids remained a possibility, pistols and small firearms were a necessary evil, but as soon as the countryside became ready for settlement and the establishment of ranches, these weapons turned into a nuisance. "Lawless men" congregated in newly settled counties, and "law abiding Citizens are more liable to commit crimes when allowed to carry Six-shooters." Moreover, "residents from the surrounding country" visited nearby market towns a few times a year "for the purpose of business but <u>principally</u> to have a 'spree'." They unfailingly took advantage of the frontier exemption by carrying pistols and firing them "indiscriminately in the streets, thereby endangering the lives and greatly annoying the peaceable Citizens." Citizens of Brown County wrote, "when lawless men are disarmed we will have no trouble in enforcing law and order."[32]

Governors Coke, Hubbard, and Roberts had responded to these petitions by issuing proclamations removing counties from the purview of the deadly weapons ban on a case-by-case basis. In 1875, the Texas Senate tried to tackle the problem. The Judiciary Committee drafted a bill that recognized the governor's power to exempt counties based on the Indian threat but placed all incorporated cities within the purview of the deadly weapons ban. The proposed law prohibited the carrying of deadly weapons within one mile of a courthouse and empowered local officials to deputize as many special constables as they deemed necessary "to enforce the provisions of this act."[33] The proposed bill passed the Senate only to die in a House committee. A replay of this process occurred at the next legislative session when a senate bill eliminating the

---

[32] Brown, "Gun-Toting Controversy," 255-259, quotations at 256. See also Petition of Citizens of Eagle Pass, Senate Bill 720, 14th Leg., 2d Called sess. (1875), TSLAC.
[33] Senate Bill 720 (1875), TSLAC.

frontier exemption stalled in the House.[34] The inability of the legislature to pass a bill of this kind meant that a steady flow of petitions continued to reach Texas lawmakers.

Where the legislature dithered and previous governors shirked a comprehensive policy, John Ireland took decisive action. On paper Ireland looks quite similar to his predecessors. He had a long record of public service, supported secession, aided the Confederacy, and ran afoul of military officials during Reconstruction. He differed from the preceding governors, however, on the subjects of economic development and criminal justice. Where Coke, Hubbard, and Roberts had, for the most part, supported the policy of incentivizing railroad development through generous land grants, Ireland did not. Having inherited a state with shaky finances and a rapidly dwindling supply of public lands, he recognized the unforeseen negative consequences of their policy. A similar shift occurred on the subject of criminal justice. His predecessors failed to stem the tide of lawlessness or make legal reform a central part of their platforms, but Ireland did both. In 1884 he "extended the law prohibiting the carrying of six-shooters and other small arms to all parts of the State."[35] In both of his messages to the legislature he recommended increasing the penalty for illegally carrying deadly weapons.[36]

Ireland had the good fortune of being joined in his condemnation of gun-toting by the barons of the cattle industry. Charles Goodnight, the most influential rancher in the Texas Panhandle, had strictly controlled his cowhands' access to pistols from the time of his settlement there in the mid-1870s. Before ranching, Goodnight worked as freight driver and Texas Ranger but managed to insert himself in the cattle business and transform himself into a successful entrepreneur and investor. He recognized that violence and rowdiness led to disorder, which

---

[34] Senate Bill 51, 15th Leg., Reg. sess. (1876), TSLAC.
[35] Brown, "Gun-Toting Controversy," 258-259; *House Journal* (1885), 16.
[36] *House Journal* (1885), 16; *House Journal* (1887), 21.

undermined the financial interests of ranching.[37] As the industry grew in the early 1880s, other like-minded cattlemen arrived at same conclusion. Beginning in 1882, cattle- and stock-raisers' associations throughout the Plains began holding annual conventions to coordinate ranch activities (like annual round-ups, etc.) and address industry problems. One issue that consistently received attention was cowboy gun violence. A stock-raisers' association in Kansas unanimously adopted a resolution to "deprecate [the pistol's] use, except in extreme cases of necessity while on duty in protecting the rights of property against Indians and outlaws" and "in all cases while visiting the towns along the border." The following year, a statewide cattle-raisers' association met in Fort Worth, Texas. The convention used the district courtroom for its meeting hall, and organizers from the host city decorated it with a life-size plaster steer and numerous banners. One of the banners bore Paddock's old slogan, "The last relic of barbarism—The revolver must go."[38] Cattlemen across the West participated in a regional convention held in St. Louis, Missouri in 1884, which similarly denounced the widespread use of pistols by cowhands.[39]

Cattlemen felt the need to enact measures against carrying small firearms because a great many of the cowboys engaged in violent behavior. Cowboys used interpersonal conflict to settle difficulties and to claim manliness for themselves. Living devoid of the usual trappings of manhood—a wife and a home—they sought out other methods of asserting themselves. Newcomers to the trade often received advice from old-timers to purchase and carry a pistol lest they be disrespected by others. Fights erupted between colleagues in the bunkhouse, or between

---

[37] On Goodnight, see *Handbook of Texas Online*, H. Allen Anderson, "Goodnight, Charles," accessed November 26, 2018, http://www.tshaonline.org/handbook/online/articles/fgo11. Goodnight's aversion to gun-toting is also reflected in the title of a biographical representation of his life written by a family friend. See Laura V. Hamner, *The No-Gun Man of Texas: A Century of Achievement, 1835-1929* (Amarillo: Laura V. Hamner, 1935).
[38] Quotations in Brown, "Gun-Toting Controversy," 126; "The Cattlemen," *Fort Worth Daily Democrat* (Fort Worth, TX), March 5, 1883. See also *Brenham Daily Banner* (Brenham, TX), March 7, 1883.
[39] On the cattlemen's gun control movement, see Brown, "Gun-Toting Controversy," 113-164; "The Regenerated Cowboy," *Albany Star* (Albany, TX), March 9, 1883.

Compendium_Roth
Page 2123

outfits on the range. Frequent drunkenness and gambling naturally played a role in creating and escalating these conflicts.[40] As much as the pistol was an aid against Indians and outlaws, it was a nuisance and danger to daily ranch work. When cowboys arrived in the cattle towns of Kansas, and later Texas, they perpetrated all manner of crimes with their weapons. The city fathers of Dodge City, Kansas, famously passed a city ordinance prohibiting the carrying of weapons in town so that they could reduce the lawlessness that came on the heels of the cattle drives. Other cowtowns followed suit, insisting on turning their boomtowns into law-abiding and peaceful communities for middle-class residents.[41]

Governor Ireland's elimination of the frontier exemption to the pistol law in 1884 should have disarmed Texas cowboys. But their daily work on the range and their frequent long-distance traveling placed them well within some of the remaining exemptions. This conundrum made the pistol-toting cowboy, once again, the cattlemen's problem. Large-scale ranchers created and operated modern business enterprises, and they used tactics similar to those of industrialists to enforce order among their workers. When cowboys went on strike in 1883, ranchers responded by hiring strike-breakers, holding out until their workers capitulated, or offering minimal salary increases. When the strike led to a sharp rise in rustling (likely the

---

[40] Jacqueline M. Moore, *Cow Boys and Cattle Men: Class and Masculinities on the Texas Frontier, 1865-1900* (New York: New York University Press, 2010), 178-182; Jacqueline M. Moore, "'Them's Fighting Words': Violence, Masculinity, and the Texas Cowboy in the Late Nineteenth Century," *Journal of the Gilded Age and Progressive Era* 13, no. 1 (January 2014): 28-55. See also "Pistols Gone, Never to Return," *Waco Daily Examiner* (Waco, TX), August 26, 1884.

[41] Robert R. Dykstra, *The Cattle Towns* (New York: Knopf, 1968); Robert R. Dykstra, "To Live and Die in Dodge City: Body Counts, Law and Order, and the Case of *Kansas v. Gill*," in *Lethal Imagination*, ed. Bellesiles, 211-226; Mark R. Ellis, *Law and Order in Buffalo Bill's Country: Legal Culture and Community on the Great Plains, 1867-1910* (Lincoln: University of Nebraska Press, 2007). There has been significant historiographical debate over the relative violence and deadliness of cowboys, cattle towns, and the West in general. Dykstra and Ellis hold firmly to the argument that the new towns of the West were generally law-abiding, and their residents went to great lengths to punish crimes. Criticism has come from McKanna in *Homicide, Race, and Justice in the American West* and Roth in *American Homicide*, who find the West to be an exceedingly violent place, particularly in boomtowns and newly settled areas. Much of the conflict centers on the efficacy of using homicide rates (homicides per 100,000 people) to evaluate violence in small communities of fewer than 1,000 people.

Compendium_Roth
Page 2124

handiwork of unhappy cowboys), cattlemen asked for a special detachment of Texas Rangers to solve the problem by any means necessary.[42] By the late-1880s, many cattlemen had laid down workplace rules that included provisions against carrying pistols in bunkhouses, on round-ups, and even on trail drives.[43] In their anti-pistol efforts, cattlemen discounted the cultural importance of six-shooters to their working-class cowhands; they tried to police the behavior of their workers even during their free time in much the same way that industrialists did.[44] An industry that we typically associate with an antiquated, romantic past was in fact a modern business made possible by the rapid development of industrial capitalism in the second half of the nineteenth century.[45]

Economic and demographic growth indeed provide the proper context for understanding the significance of Ireland's departure from previous governors in calling for tougher enforcement of the pistol law in Texas. The establishment of new towns, and an ever-increasing population in the old ones, meant more interpersonal encounters that could turn deadly. Between 1870 and 1880, the state population nearly doubled from just over 800,000 to almost 1.6 million. By 1900 there were over three million Texas residents.[46] The population was growing so quickly, and to such a degree, that customary methods of policing became inadequate. The small market towns and rural lifestyle of the antebellum decades could be policed by a sheriff with a handful

---

[42] Brown, "Gun-Toting Controversy," 136-38; Mark Lause, *The Great Cowboy Strike: Bullets, Ballots, and Class Conflict in the American West* (New York: Verso, 2017); *Handbook of Texas Online*, Robert E. Zeigler, "Cowboy Strike of 1883," accessed November 26, 2018, http://www.tshaonline.org/handbook/online/articles/oec02.
[43] Brown, "Gun-Toting Controversy," 142-143.
[44] Recent work by historians has drawn connections between cowboys and wage workers more generally. They shared important similarities in their working conditions, gender notions, and attitude toward violence and prohibition. Jacqueline Jones highlights these connections in *Cow Boys and Cattle Men* as does Marke Lause in *The Great Cowboy Strike*.
[45] For an account of the cattle business as a thoroughly modern, capitalist enterprise, see H. W. Brands, *American Colossus: The Triumph of Capitalism, 1865-1900* (New York: Doubleday, 2010), 182-205.
[46] *Handbook of Texas Online*, "Census and Census Records," accessed November 27, 2018, http://www.tshaonline.org/handbook/online/articles/ulc01.

Compendium_Roth
Page 2125

of part-time deputies, but county seats with several thousand residents could not. Texas lagged behind the national average in terms of urbanization, but its town-dwelling population skyrocketed between 1850 and 1900.[47] Many cities established professional police forces, and sheriffs' offices hired more full-time deputies. But police officers were still not likely to know the residents they protected, nor were judges and juries likely to be familiar with the defendants who appeared before them. The old way of adjudicating differences based on knowledge of one's neighbors, their personalities, and their life stories had become a thing of the past.[48] Furthermore, a booming economy rendered the protection of property like land, cattle, and business assets more important than ever. The unfeeling, irrational market that wielded such disproportionate control over the lives of Americans meant that the loss of a valuable commodity, or the death of a family provider, at the hands of some rowdy could lead to financial ruin.

Within this larger context of intertwined economic growth and social instability, many Americans, including a large and vocal segment of the population of Texas, found a proactive government appealing. In the decades after the Civil War, when the northern states had become an industrial powerhouse and the southern economy developed as a result of railroad construction, Americans embraced all sorts of regulations. The most notable of these came in the form of state and local agencies designed to improve the health and safety of residents. For example, a Pennsylvania medical journal addressed the toy pistol epidemic of the early 1880s by calling upon state health boards across the country to gather data about deaths traceable to the

---

[47] *Handbook of Texas Online*, David G. McComb, "Urbanization," accessed November 27, 2018, http://www.tshaonline.org/handbook/online/articles/hyunw.

[48] On the antebellum, customary way of policing neighborly behavior and preserving communal peace, see Laura F. Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009).

Compendium_Roth
Page 2126

device, presumably to advise lawmakers about possible solutions.[49] Though we often think of early twentieth-century progressives as the Americans who authored state and municipal regulations concerning sanitation, health, and child protection, such legislation flooded state capitals and city halls between 1870 and 1900.[50]

In addition to the well-documented efforts of regulatory agencies was a host of state laws and municipal ordinances aimed at policing individual behavior. City councils made rules about the use of public sidewalks designed to discourage loiterers and peddlers; in addition to the deadly weapons ban, the Texas legislature criminalized discharging firecrackers in cities, horse-racing on public streets, refusing to work on public infrastructure projects, and amended laws pertaining to bigamy, prostitution, and disturbing the peace.[51] One policy scholar wrote in 1887 that state governments across the country had enacted laws that "deal with the citizen in every conceivable relation" and "seem to have left nothing for future Legislatures to regulate."[52] In the case of both behavior-reform laws and regulatory agencies, people expected their governments to forestall *potential* problems by preemptively forbidding activities that might give rise to them. Observers typically interpreted such actions as justifiable and constitutional exercises of police power. They elevated the common good over individual interests and did not hesitate to use the coercion of some to protect the liberty of the many.[53]

During the final three decades of the nineteenth century, Texas reformers agitated for increasing the penalty for illegally carrying weapons, and in doing so they made use of this common-good discourse. A Houston writer described "the penchant for carrying arms" as "the

---

[49] "The Victims of the Toy Pistol," *Medical and Surgical Reporter* (Philadelphia, PA), August 6, 1881.
[50] An apt description of this regulatory impulse can be found in Albert Shaw, "The American State and the American Man," *The Contemporary Review* 51 (Jan. 1887): 695-711.
[51] Perusal of the Texas Penal Code of 1895 reveals dozens of such laws enacted or amended between 1870 and 1895. See Tex. Pen. Code (1895).
[52] Shaw, "The American State and the American Man," 698.
[53] The juxtaposition of liberty and coercion here is taken directly from Gerstle, *Liberty and Coercion*.

Compendium_Roth
Page 2127

bane of civilized communities" for making criminals of otherwise upstanding men who thoughtlessly killed someone "when passion clouds judgment and sober sense is drowned in a terrific outburst of temper."[54] Another commentator on the subject asked whether the law's skeptics wanted "society turned over to the personal liberty of gambling, pistol carrying, opium smoking and whatever else man's appetite may demand as an inalienable right?"[55] According to these crusaders, man's liberty existed within certain bounds. Actions that *might* lead to bloodshed received condemnation just as forcefully as inherently violent acts. A central Texas paper declared: "In our opinion under ordinary circumstances the carrying of a concealed deadly revolver . . . ought to afford presumptive evidence that the party in possession of it is ready and willing to take human life . . . just as it ought to be presumed and is a fact that an armed midnight burglar contemplates murder to save himself if caught in a close place."[56] An east Texas critic went even further, accusing those who habitually carried weapons of being either "silly" or "murderous." Furthermore, anyone claiming diminished capacity for shooting someone while drunk should be disregarded. One writer declared: "He was, however, competent to premediate against all mankind when he armed in sober moment with a weapon which could be intended for no other purpose than to kill or seriously injure."[57]

This common-good approach to criminal justice led many reformers to the conclusion that violation of the deadly weapons ban ought to carry a mandatory state prison sentence. As it was written in the 1879 penal code, the deadly weapons ban did not include jail time—just a fine and forfeiture.[58] This was typical for Texas misdemeanor offenses, which were usually punished

---

[54] "The Deadly Revolver," *Stephenville Empire* (Stephenville, TX), April 5, 1884.
[55] *Fort Worth Daily Gazette* (Fort Worth, TX), August 1, 1887.
[56] "Suppress the Deadly Weapon," *Brenham Daily Banner* (Brenham, TX), December 12, 1889.
[57] "Entirely Too Many Revolvers," *Albany News* (Albany, TX), August 22, 1884.
[58] The fine could range from twenty-five to one hundred dollars. In 1878 the Texas Court of Appeals ruled forfeiture of the weapon unconstitutional. *Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).

by a fine, or perhaps a brief period in county jail. Felonies, on the other hand were those which could be punished by execution or confinement in the state penitentiary "either absolutely or as an alternative."[59] Reformers of the late nineteenth century supported "making it a penitentiary offense and a $500 fine for a man to be caught with a pistol or bowie-knife on his person."[60] Most agreed that "a year or more" seemed like a suitable length of time in prison for gun-toters.[61] North Texas representative William Kendall (Denton County) introduced a bill to amend the deadly weapons ban by requiring three to five years in the penitentiary, but it generated so much controversy that it could not pass.[62] The failure of Kendall's bill in 1883 may seem at first glance to indicate widespread disapproval of this "penitentiary offense" movement, but the actions of John Ireland say otherwise. He successfully ran for reelection in 1884, and upon taking the oath of office unambiguously stated that he wanted an "increase of the penalty, and that it be made a felony."[63]

The mandatory imprisonment movement reached an early high point in 1887 with the enactment of the first substantial amendment to the deadly weapons ban.[64] The story of its passage demonstrates the unpredictable nature of the legislative process. It began with a straightforward attempt in the House to close a potential loophole. A defendant had appealed his conviction for carrying brass knuckles by arguing that his weapon was made of steel rather than brass. The Court of Appeals upheld the conviction, but the episode revealed a potential weakness

---

[59] Tex. Pen. Code §54 (1879).
[60] "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879. See also "State Press," *Galveston Daily News* (Galveston, TX), January 6, 1887.
[61] See *Panola Watchman* (Carthage, TX), January 26, 1881; "The Deadly Revolver," *Stephenville Empire* (Stephenville, TX), April 5, 1884.
[62] H. B. 548, 18th Leg (1883); *House Journal* (1883), 416, 424.
[63] *House Journal* (1887), 21.
[64] In drafting the 1879 penal code, the option to jail offenders was taken away. This was a minimal change because 1870s offenders were not typically jailed for carrying deadly weapons; on top of this, the move was sneakily placed in a large penal code revision, which cut off any significant debate about it.

144

in the text of the law.[65] John M. Melson, a young Confederate veteran on the road to becoming a sharp and well-connected attorney, introduced a bill to drop "brass knuckles" in favor of "knuckles made of any metal or any hard substance."[66] E. Taylor Moore, a representative of the Austin area and chairman of the committee reviewing the bill, tacked on a heftier fine of fifty to two hundred dollars.[67] The bill passed the House without any difficulty.

In the Senate, however, Melson's bill generated tremendous controversy and turned into something altogether different from what he had intended. The reviewing committee in the Senate immediately dropped the minimum fine increase.[68] In their view, squeezing a few more dollars out of violators was not enough to solve the problem of persistent pistol-packing. Instead, they required confinement in the county jail for *all* offenders, whether first-time or repeat. This marked a compromise position between the proponents of a penitentiary sentence and their opponents, and it became one of those compromises that left all parties unhappy. One of the bill's strongest supporters only reluctantly cast his vote for it, believing that the required minimum confinement of twenty days was too harsh.[69] The debate over the mandatory imprisonment clause was a brutal process that played out over the course of several days. Opponents used every trick in the book to defeat it, only to see the pro-imprisonment forces use a technicality to force its ultimate passage. After all the strong-arming and machinations that took place in the Senate, the House members acquiesced to their amendments. A simple phraseology

---

[65] *Harris v. State of Texas*, 22 Tex. Cr. App. 677 (1887).
[66] House Bill 51, 20th Leg., Reg. sess. (1887), TSLAC; *Senate Journal* (1887), 156. On Melson, see Eugene C. Barker, ed., *A History of Texas and Texans* by Frank W. Johnson (Chicago: American Historical Society, 1914), 4: 1920-1921.
[67] The fine was set at twenty-five to one hundred dollars, so Moore's amendment effectively doubled the fine. See *House Journal* (1887), 62.
[68] They actually kept the maximum fine increase of two hundred dollars, though defendants rarely ever received more than the minimum. For more information on penalty and enforcement trends pertaining to the deadly weapons ban, see ch. 5.
[69] *Senate Journal* (1887), 195.

Compendium_Roth
Page 2130

fix had evolved into a mandatory penalty of at least twenty-five dollars and twenty days in county jail.[70]

The 1887 amendment turned out to be a short-lived victory for pro-imprisonment agitators. Two years later, the legislature dropped its mandatory jail time. Instead, offenders could be punished by fine, county jail time, or both.[71] These lawmakers restored the sentencing discretion that the 1887 law had taken away from judges and juries. Until the very late nineteenth century, most county jails in Texas were exceedingly small. Many were wooden "dungeon"-style holdovers from the antebellum period; these consisted of a sheriff's quarters plus a windowless lockup accessible only via a trapdoor on the second floor. Other counties used prefabricated holding cells measuring approximately ten square feet. But even the newest, largest county jails from the period had limited capacity for prisoners and likely struggled to house dozens of them for weeks or months at a time.[72] It could be that the prospect of sending otherwise law-abiding men to such a degrading place prompted judges and juries to avoid handing down guilty verdicts for gun-toters.[73] It may also be that rigid enforcement of this law produced jail overcrowding, disease, and an undue burden upon county sheriffs. It was also much easier and financially rewarding for local officials to collect small fines and send violators on their way. Whatever the reason, the mandatory imprisonment amendment had detractors as vocal as its supporters, and the former leapt to action as quickly as possible after their failure in 1887.

---

[70] An Act relating to unlawfully carrying arms, General Laws of Texas, §9 (1887).

[71] Violators could be fined twenty-five to two hundred dollars, jailed from ten to thirty days, or both. One writer considered this alteration an annulment of the pistol law. See An Act relating to limiting the penalty for carrying concealed weapons, General Laws of Texas, §37 (1889); "The Pistol Bill," *Waco Evening News* (Waco, TX), January 17, 1889.

[72] Edward A. Blackburn, *Wanted: Historic County Jails of Texas* (College Station: Texas A&M University Press, 2005).

[73] State senator C. K. Bell expressed this view in 1885: ". . . while I am in favor of inflicting punishment upon all violators of the law commensurate with the crim committed, I am not willing to impose a severe and disgracing punishment upon a good man because a bad man has abused his privileges." See *Senate Journal* (1885), 62-63.

Compendium_Roth
Page 2131

The most common argument against strengthening the deadly weapons ban grew from the ideas of eighteenth-century Italian political philosopher Cesare Beccaria. In the 1760s he authored a treatise called *Essay on Crimes and Punishment*, which criticized Italy's justice system as brutal, barbaric, and tyrannical. He particularly detested laws enacted by overzealous legislators who threw the proverbial baby out with the bathwater. Beccaria blamed what he called "false ideas of utility" for the passage of statutes attempting to prevent potential evils by prohibiting an otherwise harmless activity. These laws "would sacrifice a thousand real advantages to the fear of an imaginary or trifling inconvenience . . . would deprive men of the use of fire for fear of their being burnt, and of water for fear of their being drowned." Beccaria considered weapon regulations within this category. They disarm only the law-abiding and leave them vulnerable to intimidation by the criminals who disregard all statutes.[74]

Beccaria's argument persuaded many readers in the eighteenth century as well as many Americans living in the nineteenth and twentieth centuries. An influential American criminologist, Maurice Parmlee, subscribed to Beccaria's view to some degree. Petty offenses that caused no physical harm to anyone (he used the examples of spitting on the sidewalk or prohibiting alcohol) do more to erode confidence in the justice system than they do to promote the public good. They are unenforceable, he said, and therefore "furnish an admirable means of blackmail for the police." Worse still were those non-violent crimes that did not have overwhelming popular support. The substantial dissenting minority could easily "succeed in nullifying it in practice."[75] Some nineteenth-century Texans, namely the forces seeking to weaken or eliminate the deadly weapons law, agreed with this view. In 1885, one of the many

---

[74] "Of the Means of Preventing Crime," in Cesare Beccaria, *An Essay on Crimes and Punishments* (London: F. Newbery, 1775).
[75] Maurice Parmlee, *Criminology* (New York: The MacMillan Company, 1923), 345-350. For a current introduction to criminology, see Stephen Jones, *Criminology*, 5th ed. (New York: Oxford University Press, 2013).

147

Compendium_Roth
Page 2132

dozens of bills affecting the pistol law received a scathing critique from Senator C. K. Bell. A North Texas (Denton County) attorney who later became a strong voice within the "wet" faction of the Democratic Party, Bell disliked moral legislation that impinged upon personal liberties. Though he did not oppose the deadly weapons ban per se, he rejected the idea of increasing its penalty by requiring jail time. In his view, the law should punish the crimes committed with pistols rather than criminalize carrying them altogether. He said, "I think the trouble with those who are in favor of more stringent laws with reference to the carrying of pistols is that they confuse the trivial offense of carrying a pistol, with the crime which is committed with the pistol."[76]

Jurists and lawmakers of the nineteenth century, however, did not subscribe wholeheartedly to Beccaria's views. Joseph Story found much to criticize in his claim that pardons and paroles undermined law enforcement.[77] Beccaria also said that there ought to be no gradations of crime, nor any consideration of mitigating circumstances that might justify a more lenient punishment. A perusal of any state's criminal statute book from the nineteenth century demonstrates Americans' rejection of this concept. Even in the Italian criminology field, Beccaria's theories, emblematic of the *classical* school, were quickly replaced by those of Cesare Lombroso and Raffaele Garofalo. These early *positivist* criminologists blazed a trail that their counterparts emulated across western Europe and the United States.[78] They found that environment and individual circumstances affected a person's criminal tendencies and recommended that governments take some preventive action to uphold the moral standards of the

---

[76] *Senate Journal* (1885), 62-63. On Bell, see *Handbook of Texas Online*, Anne W. Hooker, "Bell, Charles Keith," accessed November 29, 2018, http://www.tshaonline.org/handbook/online/articles/fbe34.

[77] Joseph Story, *Commentaries on the Constitution of the United States* (Boston: Hilliard, Gray, & Co., 1833), 343-344.

[78] On the exchange of ideas and "social experiments" across the Western world in the late nineteenth and early twentieth centuries, see Daniel T. Rodgers, *Atlantic Crossings: Social Politics in a Progressive Age* (Cambridge: Harvard University Press, 2009).

community. For Garofalo, the best way to achieve this goal was the institution of "a public moral education," and the enactment of a minimal number of laws that limited personal liberty; among those worthy of mention for him were "regulation of liquor-selling, gambling, and the carrying of arms."[79]

The supporters of a harsher deadly weapons ban in Texas took a seemingly odd approach to this philosophical argument over the efficacy of moral prohibitions. They often repeated Beccaria's argument while in the same breath calling for tougher enforcement of the law. For them, agreeing with the gist of Beccaria's assertion did not come at the cost of abandoning the regulation of pistol-toting altogether. For example, one promoter of making the deadly weapons law a felony offense observed that, "it is only the good citizen who is disarmed; the bully cares not a whit for it."[80] Another declared: "The bad men are always armed. The good ones, never."[81] The solution, in their opinion, was to raise the stakes for those choosing to continue packing heat. In other words: "Men will risk a fine freely and many men will risk a term in jail, but they will not, as a rule, risk the state prison at hard labor."[82] John Ireland agreed, stating during his term that the light punishment for carrying weapons was insufficient to intimidate the criminally disposed.[83] These writers firmly believed that, could the punishment be harsh enough, the overwhelming majority of men would voluntarily leave their pistols at home.

The "penitentiary offense" supporters, who continued singing their song well into the twentieth century, interacted with their opponents in interesting ways. Some flat-out dismissed

---

[79] Quoted in Parmlee, *Criminology*, 96.
[80] *Panola Watchman* (Carthage, TX), January 26, 1881.
[81] "They Must Go!" *Panola Watchman* (Carthage, TX), July 30, 1879.
[82] "Anti-Concealed Weapons Movement," *Dallas Morning News* (Dallas, TX), December 9, 1897.
[83] Ireland said, "It cannot be denied that the penalty for the violation of the law regulating the carrying of of arms is too small. No one who is evil disposed hesitates to run the risk of being fined, while peaceable persons, against whom evil is meditated, will, as a general thing, obey they law, and are placed at a great disadvantage. I recommend an increase of the penalty." *House Journal* (1885), 16.

149

the Beccaria argument and all its permutations as "weak and flimsy objections . . . allowed to have too much weight."[84] Others, including B. B. Paddock of Fort Worth, engaged in ad hominem attacks. Robert W. Loughery, an East Texas paper editor, took issue with Paddock's "The Revolver Must Go" slogan. He thought that "the prohibitory law has proved an unmixed evil," and "the best safeguard of society is to permit men to go armed if they see fit, and to enforce the law if arms are improperly used."[85] Paddock responded with a stinging barb against Loughery, calling him "representative of an extinct race" determined to "to go 'heeled' whenever they believe their lives or frontispieces to be in danger."[86] A pro-pistol Kansas editor received similar treatment, being berated as a veritable Rip Van Winkle who had fallen behind the times.[87] These overtly ageist attacks reveal a younger generation of westerners asserting themselves, along with their view that a government ought to enjoy more substantial exertion of power over its citizens.

The controversy over sending deadly weapons carriers to jail continued through the 1890s, and even into the twentieth century.[88] Lawmakers revised the state penal code again in 1895, and in so doing specified that anyone imprisoned for illegally carrying a weapon "may be put to work upon any public work in the county."[89] But at the next legislative session (1897), a critical mass of anti-imprisonment lawmakers took away the option to jail gun-toters. Ironically, the governor at the time, Charles Culberson, had opened the session by praising regulations

---

[84] "Suppress the Deadly Weapon," *Brenham Daily Banner* (Brenham, TX), December 12, 1889.
[85] *Marshall Herald*, quoted in *Fort Worth Daily Democrat* (Fort Worth, TX), April 3, 1879, and *Marshall Herald* quoted in "State Press," *Galveston News* (Galveston, TX), June 3, 1879.
[86] *Fort Worth Daily Democrat*, June 6, 1879.
[87] The editor of the *Caldwell Post* (Caldwell, KS) reprinted an article from *Texas Livestock Journal* (Fort Worth, TX) and used it to criticize the editor of *Hunnewell Independent* (Hunnewell, KS). See Brown, "Gun-Toting Controversy," 125-126; *Caldwell Post* (Caldwell, KS), February 23, 1882.
[88] Quotation from "Anti-Concealed Weapons Movement," *Dallas Morning News* (Dallas, TX), December 9, 1897. See also "Make It a Penitentiary Offense," *Dallas Morning News* (Dallas, TX), December 18, 1889; *Hillsboro Mirror* (Hillsboro, TX), January 17, 1898.
[89] Tex. Pen. Code, §338 (1895).

pertaining to weapons, juvenile delinquency, and "immoral publications." He presumably opposed making the deadly weapons ban a fine-only offense because the revision took effect without his signature.[90]

Lawmakers subjected the deadly weapons ban to critical revision in 1905. In that year, not only was the jail option restored, but the minimum fine skyrocketed from twenty-five to one hundred dollars.[91] This move came in response to a perceived increase in violent crime. Rural areas had certainly experienced more violence in recent years, largely as a result of rising racial conflict. The Democratic Party's suppression of Populism required a restoration of cross-class, white solidarity. Securing it came at the cost of stoking race hatred, intimidating black voters, and ultimately disfranchising them.[92] It was at this crucial turning point that African Americans in Texas became most susceptible to the potentially discriminatory application of the deadly weapons ban. As recipients of the wrath of the Democratic establishment, they needed access to armed self-defense more than they had since Reconstruction. Yet, at that very moment Texas lawmakers pushed them out of the local, state, and federal democratic processes through poll taxes, and later the white primary. The sheriffs, constables, and deputies who patrolled the cotton-growing regions of East, Central, and North Texas did not need to worry about antagonizing African Americans, whose voice in filling those local offices had been silenced.

---

[90] An Act relating to amending the penal code…, General Laws of Texas, §25 (1897). Another noteworthy weapon-related regulation to receive attention in the 1890s was the sale of them to minors. There had long been a small voice in the legislature demanding that this be criminalized, beginning with Robert Zapp in the early 1870s. Zapp and later legislators of a similar sentiment received substantial support in the press. For example, "What use a minor can have for pistol or dirk-knife, it is hard to determine, but the Austin solons think every boy should supply himself with one or both of them." In 1897 the legislature finally passed a law against selling small arms to minors, and the penalty was actually harsher than that for carrying a pistol at the time (fine and/or brief jail time). An Act relating to preventing the barter, sale or gift…, General Laws of Texas, §155 (1897). Quotation in *Dallas Daily Herald* (Dallas, TX), March 28, 1885. See also *Weekly Democratic Statesman* (Austin, TX), June 23, 1881; *Weekly Democratic Statesman* (Austin, TX), April 5, 1883.

[91] An Act relating to carrying arms and fixing a penalty, Texas General Laws, §44 (1905). This revision received praise from Texas reformers, as well as positive attention from outside the state. For example, see "Pistol Toting Banned in Texas" *Aspermont Star* (Aspermont, TX), May 21, 1908. Reprinted from *Atlanta (GA) Constitution*.

[92] Roth, *American Homicide*, 418-434.

Similarly, black town- and city-dwellers could no longer vote for the municipal officials or commissioners who hired and fired police officers. Conviction for carrying a pistol or knife meant a fine so expensive that most black Texans simply could not pay; instead, they went to county jail for a month or more, which undoubtedly hurt their job prospects and took a toll on their families.

If legislators in the fast-growing counties of North and Central Texas could strengthen the deadly weapons ban as a way of imposing order within their districts, they found ready allies among some of their South Texas colleagues (see Fig. 4.2). Ethnic conflict in South Texas had long simmered and reached a boiling point around the turn of the twentieth century. Widespread cattle rustling, attributed to "Mexican bandits," poisoned white residents against the growing number of Mexican immigrants, and indeed their Hispanic fellow-Americans. The tremendous support among culturally Mexican Texans for Gregorio Cortéz exemplifies South Texas's deep ethnic divide as well as Hispanic skepticism of law enforcement officers. Cortéz, through no fault of his own, became a suspected horse thief. The Karnes County sheriff went to Cortéz's home to question him and proceeded to shoot his brother in a misunderstanding. Being on his own property, Cortéz made use of his right to carry a weapon, and he fatally shot the trigger-happy sheriff. Knowing that he would be found guilty of murder in a court filled with Anglo jurors, Cortéz ran from authorities. He avoided capture for ten days and became a folk hero among the Hispanic population of South Texas.[93] Just like Cortéz, these men and women recognized that the *cherifes* (sheriffs) and *rinches* (rangers) would not tolerate a Mexican shooting one of their own, even in self-defense. The law was not on their side, and the deadly weapons ban made their situation all the more precarious by providing officers with a way to

---

[93] Américo Paredes, *"With His Pistol in His Hand": A Border Ballad and Its Hero* (Austin: University of Texas Press, 1958).

Compendium_Roth
Page 2137

keep them disarmed and disempowered. As with African Americans, most Hispanic Texans could not afford a hefty one-hundred-dollar fine and were likely to spend time in jail instead.

The momentum for a mandatory prison sentence continued gaining strength in the early twentieth century. In 1913 J. W. Ussery, a one-term representative from East Texas (Wood County), introduced a bill that declared pistol-carrying a felony. The original version only addressed pistols and required two years imprisonment in the state penitentiary, but House members applied it to all deadly weapons and reduced the prison term to between one and three years. Opponents of the Ussery bill declared it a radical measure, and some critics speculated that it could be declared an unconstitutional, "cruel and unusual" punishment. A ringing endorsement of the bill by long-time House member Thomas Rowell of East Texas (Marion County) stirred enough members to send it to the Senate. He declared: "Certainly it is a drastic measure . . . . So was the law making the running of a gambling house in Texas a felony a drastic



Fig. 4.2. Map of votes in support of HB 47, 1905

153

measure. So was the law making bootlegging a felony a drastic measure. But conditions were so bad that drastic measures were necessary, just as today, the effects of the pistol toting evil are so grave naught save drastic remedies may be applied."[94] In the Senate, the Ussery bill ran into some stiff opposition and had to be modified. In the end, legislators restored the fine (this time ranging from one hundred to five hundred dollars) and moderated the prison sentence. First-time offenses were treated as misdemeanors—violators could be fined, sentenced to no more than two years in the county jail, or both. Repeat offenses could be handled as misdemeanors with the very same consequences as first-timers, or they could be deemed felonies punishable by a state prison sentence ranging from one to three years. The Senate revisions followed the legislative trend of giving wide discretion to judges and juries rather than handing down potentially draconian requirements.[95]

The sitting governor, Oscar B. Colquitt, vetoed the Ussery bill in April 1913. Colquitt gave two reasons for his decision. First, he believed that the revised penalty "is severe, and places a law-abiding citizen, who might from threats or other cause have reason to defend himself against thugs and 'bullies,' at a disadvantage."[96] He preferred to leave the penalties as they were listed in the latest penal code (passed in 1911), unchanged since 1905. Second, he had signed into law a new crime called "Assault with a prohibited weapon." This measure provided exceedingly stringent punishment for anyone who "shall willfully commit an assault or an assault and battery upon another with a pistol, dirk, dagger, slung shot, sword cane, spear or

---

[94] "Felony to Carry Pistol," *Bastrop Advertiser* (Bastrop, TX) March 7, 1913.
[95] House Bill 102, 33rd Leg., Reg. sess. (1913), TSLAC. The Ussery bill received a good deal of attention in the state press. See, "Pistol Carrying," *Alpine Avalanche* (Alpine, TX), Feb. 6, 1913. Reprinted from *San Antonio Express* (San Antonio, TX); "Violence and Its Hoarde," *Lampasas Daily Leader* (Lampasas, TX), Oct. 10, 1914. Reprinted from *San Antonio Express* (San Antonio, TX); "Felony to Carry Pistol," *Bastrop Advertiser* (Bastrop, TX), March 7, 1913; *Schulenburg Sticker* (Schulenburg, TX), March 7, 1913; *Temple Daily Telegram* (Temple, TX), April 5, 1913; *Honey Grove Signal* (Honey Grove, TX), April 4, 1913; "Pistol Bill Passed Finally By Senate," *Plano Star-Courier* (Plano, TX), April 3, 1913; "Would Make Pistol-Toting a Felony," *Plano Star-Courier* (Plano, TX), March 6, 1913.
[96] Veto Proclamation, H. B. 102, 33rd Leg. (1913); *Abilene Daily Reporter* (Abilene, TX), April 18, 1913.

knuckles made of any metal or made of any hard substance, bowie-knife, or any knife manufactured or sold for the purpose of offense or defense, while the same is being carried unlawfully by the person committing the said assault." There were three options for penalty: a fine of up to two thousand dollars; up to two years in county jail; or up to five years in the penitentiary.[97] The sentence here was harsher than aggravated assault with a deadly weapon. That offense could not be a felony because imprisonment in the state penitentiary was not among the options; moreover, the penal code provided penalty ranges for the optional fine or jail time.[98] Whenever a law specified ranges, offenders often received the minimum unless there was some exacerbating circumstance.[99]

Legislators made some slight alterations to the deadly weapons ban over the next decade, but nothing noteworthy. Never again did pro-imprisonment agitators mandate jail time as they did in the late-1880s or come so close to declaring violation a felony as they did in 1913.[100] The possible reasons for this decline in legislators' interest in gun-toting are endless. One of the most plausible might be the expansion of police and sheriff's departments in the twentieth century. More and better law enforcement may have reduced "the habit of pistol-toting."[101] But a more persuasive possibility may be that a cultural shift had occurred in the half-century from 1880 to 1930. As early as 1887, some Texas locales had witnessed a remarkable reduction in the carrying of deadly weapons. Grand jurors in the panhandle's Hemphill County bragged that "we find

---

[97] An Act relating to defining the offense of assault with a prohibited weapon, Texas General Laws, §114 (1913). As far back as 1878, some commentators wanted to see a law like this one that severely punished those *who committed crimes with* their deadly weapons. See "To Grand Juries," *Weekly Democratic Statesman* (Austin, TX), October 24, 1878.
[98] Tex. Pen. Code §1023-1024 (1911). The maximum fine for aggravated assault in 1913 was one thousand dollars, half that for assault with a prohibited weapon.
[99] I make this claim based upon my own observation of County Court and JP Court records for various Texas counties.
[100] Efforts to make it a felony continued. See "New Pistol Toter Bill," *Polk County Enterprise* (Livingston, TX), April 11, 1907.
[101] "Pistol Carrying," *Alpine Avalanche* (Alpine, TX), Feb. 6, 1913. Reprinted from *San Antonio (TX) Express*.

155

lawlessness and crime less in proportion than in the older counties, the deadly weapon called six-shooter banished from among us, our citizens are law-abiding, our courts are composed of solid and substantial men who have the interest of the county at heart."[102] As discussed above (ch. 3), the development of a solid middle class in Texas initiated some important behavioral and cultural changes, one of which entailed dropping the pistol and bowie-knife as everyday accoutrements. The louder and shriller calls throughout this period to make the deadly weapons ban a "penitentiary offense" actually demonstrate the general public's growing impatience with those few who still packed heat. In fact, as middle-class Americans reached a new consensus about the extent and supremacy of government power over individual liberties, Texans employed a new approach to the pistol problem that demonstrates their acceptance of a much more activist state.

For these progressive reformers, life in a modern society called for certain government actions to protect the commonweal. Some called these "positive regulations" because lawmakers pursued policies to actively change and improve society. For example, quarantine laws and railroad rate-setting agencies did not simply define certain illegal market activities. Instead, they conferred a positive effect upon all Texans by protecting them from the negative consequences of exposure to contaminated products and predatory pricing. In a similar vein, the deadly weapons ban was not just a "negative regulation" punishing an overtly criminal act; it was a "positive regulation" designed to lessen the potential for criminal activity throughout the future. Prohibitionists employed this rhetoric most skillfully in their descriptions of the happy, nay utopian, effects of an alcohol-free society. S. C. Padelford, a well-educated attorney in the North Texas town of Cleburne, spoke passionately in support of prohibition. In doing so, he also voiced

---

[102] Mark R. Ellis has used Lincoln County, Nebraska as a case study for the relative safety and lawfulness of newly settled towns on the Great Plains. See Ellis, *Law and Order in Buffalo Bill's Country*. Quotation from "Court Proceedings," *Canadian Free Press* (Canadian, TX), December 21, 1887.

Compendium_Roth
Page 2141

support for the deadly weapons ban as a crime-prevention measure that promoted the common good. He disagreed with the anti-prohibitionists when they said that "the state must fix its limit of action by self-protection, by negative as opposed to positive regulation," and that the state "cannot . . . notice causes." Padelford used the pistol law to praise measures like prohibition, quarantine, and insurance laws that promoted the public good. By reducing gun-toting, which he blamed for "a great many fights, injuries and murders," the deadly weapons ban "strikes at the cause, and not altogether at the effect."[103]

The rapid rise to prominence of the social sciences, particularly sociology and criminology, provided an intellectual framework for understanding, justifying, and implementing "positive regulations." These fields produced scholars of law and public policy who wrote prolifically about new, pragmatic approaches to governance that influenced public servants and reveal much about the outlook of reform-minded Americans at the time. Important policy experts at the turn of the twentieth century saw the interests of the individual and the community in constant, if not irresolvable, tension.[104] John W. Burgess, a prominent American political scientist, defined the police power as "restraining the individual in the exercise of his rights when exaggerated by him to the point of becoming a danger to the community." Consequently, governments must wield "the power to *watch for and prevent* such abuse."[105] As a statist, Burgess wanted to see the national government grow in strength and reduce the "so-called

---

[103] Padelford confusingly then calls the weapon law, quarantine, and "fire limit" laws "negative regulations." This does not follow from the rest of his address and may be a typo. There are other typos in that particular issue of the *Dallas Herald*, notably the instructions guiding the reader through his multi-page speech. "Address of Hon. S. C. Padelford," *Dallas Herald* (Dallas, TX) July 25, 1887.

[104] Aside from the scholars mentioned specifically below, see also Parmlee, *Criminology*, 30.

[105] John W. Burgess, *Political Science and Constitutional Law*, 2 vols. (Boston: Ginn & Company, 1893), 2:216.

157

States" to minimal significance. The accumulation of state-level authority via police-power enactments frustrated him.[106]

Ernst Freund, one of the most notable public policy theorists of the early twentieth century, dedicated an entire volume to the police power, which he considered "practically a growth of the last thirty or forty years."[107] The interaction between private right and public good was crucial to his understanding of the concept, defined as "The power of promoting the public welfare by restraining and regulating the use of liberty and property."[108] For Freund, laws regulating weapons, poisons, and explosives were preventive measures. As far as the Second Amendment was concerned, Freund found no obstacle to sensible regulation: "Constitutional rights must if possible be so interpreted as not to conflict with the requirement of peace, order and security, and that regulations manifestly demanded by these requirements are valid, provided they do not nullify the constitutional right or materially embarrass its exercise."[109] Freund's position, published in 1904, aligned with the approach that Texas jurists had long taken in regard to the deadly weapons ban. Owning arms and participating in the militia remained legal; any other requirement aimed at crime prevention could be constitutionally enacted.

There was another similarity between Texas lawmakers' approach to the pistol problem and Freund's theory of police power, one which involved prohibitive taxation. Policy experts and reformers across the western world proposed legislative solutions to the social problems

---

[106] For a recent evaluation of Burgess and his influence upon American political scientists, with particular emphasis upon his racial views, see Jessica Blatt, "John W. Burgess, the Racial State and the Making of the American Science of Politics," *Ethnic and Racial Studies* 37, no. 6 (2014): 1062-1079. Burgess, *Political Science and Constitutional Law*, 1:184; 2:175-177, 184-185.

[107] On the importance of Freund to early progressives' formulation of a regulatory state, see Daniel R. Ernst, "Ernst Freund, Felix Frankfurter, and the American *Rechtsstaat*: A Transatlantic Shipwreck, 1894-1932," *Studies in American Political Development* 23 (October 2009): 171-188. Quotation from Ernst Freund, *The Police Power: Public Policy and Private Rights* (Chicago: University of Chicago Press, 1904), v.

[108] Freund, *Police Power*, 11-12.

[109] Freund, *Police Power*, 90-91.

generated by industrialization, some of which involved taxes. Tax-based policies included the progressive income tax and Henry George's "single tax" on land.[110] In both of these cases, the tax had some ulterior motive aside from raising revenue—they promised beneficial results for the community. The approach to occupational taxes was much the same, with a tax designed to weed out irresponsible entrants into a field (like medical licensing), or one intended to eliminate a particular industry (like taxing peddlers). Freund considered an occupational tax to be a police measure whenever "its primary purpose is to restrain and control a dangerous business." According to him, prohibitive licenses or taxes were acceptable as long as the action being policed remained within the purview of state authority, and the state had made some attempt to regulate the trade in question. Freund detailed an approach to the "dangerous business" of pistol sales that progressive Texans had long espoused.[111]

Texans began toying with the idea of an occupation tax upon pistol dealers in the 1880s. As early as 1881, some pistol critics considered "the indiscriminate sale, and exhibition for sale, of deadly weapons" a central part of the state's crime problem.[112] In 1885, the House passed a bill proposing to tax all dealers in pistols or pistol cartridges two hundred dollars annually.[113] The issue came up again at the next session, though the bill in question would have raised the tax to five hundred dollars.[114] Discussion of an omnibus occupation tax bill became rather heated in the Senate due to disagreement over the insertion of a tax upon all dealers in firearms. That bill,

---

[110] Daniel T. Rodgers discusses the reorientation of progressive politics from concerns about state power to those about industrialization and the mass accumulation of wealth during the period 1870 to 1900. See Rodgers, *Atlantic Crossings*, 52-55.

[111] Freund, *Police Power*, 33-34; see also Thomas Klingenberg Urdahl, *The Fee System in the United States* (Madison, WI: Democratic Printing Company, 1898), 201.

[112] Quotation by William Homan, from committee report in support of a Senate bill to "prohibit the importation and sale of all deadly weapons, except guns and army or navy size pistols." See *Senate Journal* (1881), 136.

[113] House Bill 22, 19th Leg., Reg. sess. (1885), TSLAC. The initial bill taxes not only dealers in pistol cartridges, but dealers in all types of deadly weapons. The committee substitute, which reduced the scope of the weapons taxed, passed the House only to fail in the Senate. For its full text, see *House Journal* (1885), 94.

[114] House Bill 214, 20th Leg., Reg. sess. (1887), TSLAC; *House Journal* (1887), 105, 188.

too, failed.[115] House members tried yet again during a special session called during 1888.[116] James S. Hogg, whose election to the governor's office in 1890 signaled the ascendance of the reform-oriented wing of the state's Democratic Party, became a promoter of a prohibitive occupation tax. In 1893, he described "carrying concealed deadly weapons" as a sign of "unmanly spirit and cowardice." To disincentivize the habit, he proposed an annual tax upon all persons "engaged in the business of selling or offering for sale any deadly weapons," along with posting a bond promising not to sell "any such weapon to any minor, madman or person in a state of wrath or intoxication."[117]

Opposition to the occupation tax upon arms dealers remained strong throughout the late nineteenth century. Not even the cajoling of Hogg could overcome opponents' hostility to the idea. The argument most often employed by these anti-taxers emphasized the impracticability of it. Dry goods merchants would be affected as severely as those who specialized in selling guns, thus driving up the costs of many consumer items. Furthermore, Texas residents could easily order pistols by mail from out-of-state suppliers. Advertisements for these mail-order dealers filled the back pages of Texas newspapers throughout the late nineteenth century. Some sold cheap pistols, others even gave them away to customers who purchased cartridge packs.[118] A critical legislator in 1885 suggested that a hefty tax upon those actually carrying pistols and knives would be a more effective strategy.[119] The strength of this position held until the early twentieth century, and firearm dealers remained conspicuously absent from the omnibus occupation tax law enacted in 1897.[120]

---

[115] This is House Bill 150 and its senate substitute. See *House Journal* (1887), 989; *Senate Journal* (1887), 698-699.
[116] House Bill 21, 20th Leg., 1st Called sess. (1888), TSLAC; *House Journal* (1888), 269.
[117] Address of Gov. James S. Hogg, *House Journal* (1893), 24-25.
[118] For example, see *Daily Fort Worth Standard* (Fort Worth, TX), October 12, 1877; *Denison Daily News* (Denison, TX), May 14, 1878.
[119] The dissenters proposed $250 or even $500. See minority report for House Bill 22 in *Senate Journal* (1885), 178.
[120] An Act . . . relating to general occupation taxes, General Laws of Texas, §18 (1897).

Compendium_Roth
Page 2145

As the progressives' pragmatic, social-scientific approach to governance gained momentum, a critical mass of Texas senators devised a way to tax pistol sales.[121] In 1907, as the legislature hammered out major revisions to the occupation tax laws, senators successfully inserted an exceedingly high tax on all pistol sales. The senators participating in the conference committee of both chambers insisted on the pistol tax, outraging many House members.[122] All wholesalers and retailers trading in pistols had to track on a quarterly basis the "gross amount collected and uncollected from any and all sales made within this State of all fire arms." At the end of each quarter, such businesses had to send a fifty percent tax upon the gross sales numbers to the state Comptroller of Public Accounts.[123] The "hardware men" and sporting goods suppliers had threatened to fight the tax. A number of attorneys believed they had a solid case, claiming that the prohibitory nature of the tax made it vulnerable to judicial review.[124] Others decided to get out of the pistol business and sold off their entire stock before the tax went into effect.[125]

Again, critics complained that that the tax could be shirked by mail-ordering pistols. For some, this was a doubly bad option because it failed to curb pistol-toting and increased the market share of "Squeers Rawbuck & Co, or Mummery Hard & Co," the hated companies "that are sapping the very life out of state mercantile and industrial enterprises."[126] As it turned out, though, there was an even simpler way to avoid the tax: leasing. Within months of the law's passage, many businesses had switched from selling pistols to renting them for brief periods or

---

[121] Support for a tax had been building for some time, with at least one state house member (Thomas Cobbs of San Antonio) making it a central part of his campaign. See "The Man with the Hog Leg," *Bonham News* (Bonham, TX), March 30, 1906.

[122] When a conference committee reports a revised bill, it must be accepted or rejected in full; no further amendments can be made. Thus any and all House efforts to remove the pistol sales tax were useless. See Hardware Men Hit Hard," *Houston Chronicle* (Houston, TX), May 13, 1907.

[123] An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907).

[124] "Hardware Men Hit Hard," *Houston Chronicle* (Houston, TX), May 13, 1907.

[125] *Hallettsville New Era* (Hallettsville, TX), June 28, 1907.

[126] *Hallettsville Herald* (Hallettsville, TX), May 23, 1907.

leasing them for fifty years. This practice may have been "a violation of the spirit of the law," but it was "not a violation in truth and in fact." One dealer in Austin sent to the comptroller's office a quarterly tax of $4.50 for the sale of one pistol valued at $9.00. He had almost seamlessly transitioned from selling pistols to leasing them.[127] The ease with which this could be done likely stalled any organized effort to fight the tax, which would have been an expensive undertaking.[128]

The occupation tax was just another innovative way in which progressive Texans tried to put an end to their perceived pistol problem. There were some minor changes made to the deadly weapons law after 1913, though each was minimal. Recall that the original 1870 prohibition of deadly weapons in certain spaces remained within the text of the 1871 deadly weapons ban. For this reason, it became a part of the penal code in 1879 and continued to be included in the revisions to that document over the next century. This meant that there were two articles within the penal code under which gun-toters could be arrested, though the older one was seldom used. However, after the minimum fine hike in 1905, the secondary (and largely forgotten) article, whose minimum fine was only fifty dollars, became a loophole for violators to be given lenient treatment. In 1915, a bill raised the minimum fine to one hundred dollars so that *all* deadly weapon defendants faced the same penalties. In 1918, the legislature raised the maximum fine for unlawfully carrying a deadly weapon from two hundred to five hundred dollars; most offenders received the minimum fine, so this amendment qualifies as minimal. The 1918 revision also included agents of the newly created Game, Fish, and Oyster Commission within the definition of peace officers permitted to carry weapons when on duty. In 1923, the Texas

---

[127] "Just One Gun Sold," *Houston Chronicle* (Houston, TX), June 7, 1908.
[128] The *Houston Chronicle* pondered the absence of a lawsuit. On top of that, the tax remained in the statute books without notation or alteration for over twenty years. "Pistol Tax Law," *Houston Chronicle* (Houston, TX), September 12, 1907.

legislature made it a felony to possess "any pistol, arm or weapon" in conjunction with illegal drugs. Finally, after dozens of attempts over the course of nearly twenty years, lawmakers repealed the despised firearm occupation tax.[129]

These were the only anti-pistol laws that took effect in Texas, but they do not by any means exhaust the list of proposals bandied about in the public sphere during the late nineteenth and early twentieth centuries. Texans with all manner of ideas and alternatives rallied to Paddock's mantra "The Revolver Must Go."  Some supported doubling the penalty for homicides and thefts perpetrated with deadly weapons.[130] Providing a financial reward for officers who arrested gun-toters seemed like a good idea to others.[131] One judge even recommended that "when a man kills another man with a pistol which he is unlawfully carrying, the right to plead self-defense shall be taken away from him."[132] Lawmakers' scrambling for newer, better, or more effective ways to disincentivize the carrying of deadly weapons actually obscures the ingenuity of the original law that the Republicans passed in 1871. It was ambitious, innovative legislation for its day, even if its promised implementation of a gun-free public sphere remained more aspirational than real for some decades. Passing and maintaining Texas's principal weapons law, however was one thing; enforcement of it between the time of its passage and the mid-twentieth century was another, and it forms the subject of the following chapter.

---

[129] An Act to amend Article 477 (340) of the Penal Code of the State of Texas 1911 . . ., General Laws of Texas, §80 (1915); An Act to amend Articles 475 and 476 . . ., General Laws of Texas, §91 (1918); General Laws of Texas, §8 (1923).

[130] *Dallas Morning News* (Dallas, TX) January 24, 1893; "Will Now Hang for Robbery," *Denton County News* (Denton, TX), June 25, 1895; *Abilene Reporter* (Abilene, TX), March 5, 1897. See opposition to this idea in *House Journal* (1881), 340. "If a man murders another with a shotgun, the carrying of which is not unlawful, he may be hanged. If the murder is committed with a pistol, can we hang him twice?"

[131] This proposal would have revived a practice that occurred briefly during the Davis administration. See Brown, "Gun-Toting Controversy," 27-28.

[132] "Statutory Progress," *Dallas Morning News* (Dallas, TX), November 7, 1910.

163

Chapter 5
Enforcing the Pistol Law in Texas, 1870-1930

The first violators of the Texas deadly weapon law found themselves inserted into the local, postbellum judicial system. That structure consisted of constables, sheriffs, justices of the peace, and district judges who enforced the laws within their counties. Most of these officials were elected by eligible county voters and had no official training for their positions. Justices of the peace, for instance, held responsibilities as precinct-level judges and coroners without usually receiving a legal or medical education. They tended to be well-esteemed local landowners or businessmen whose perceived wisdom or political connections fit them for the job. Sheriffs similarly did not have standardized qualifications, though it stands to reason that many seeking the job after the Civil War had some military experience. This local justice system was in large measure a continuation of the antebellum, early American one in which reputation meant more than expertise, and sessions of district and county courts became local entertainment events. But in postbellum Texas, this system was in flux. First, military intervention during Reconstruction involved the removal of many county-level officials, like sheriffs, which led to instability and local conflict. Second, population growth following the Civil War was beginning to create docket overcrowding, which later led to significant changes in local judicial procedure.[1]

The case of Jake Dornwell, the first arrested pistol-toter in Fayette County, exemplifies this local justice system poised on the brink of serious changes. He was the son of Augustus

---

[1] *State of Texas v. Jake Donwell* (1873), Criminal Case Files, Office of the District Clerk, Fayette County, Texas. The defendant's name in this case appears as Jake Donwell or Jake Donnell. The documents pertaining to the case indicate that the grand jurors were unsure of the defendant's legal name, lending credence to the idea that the family name and even the eldest son's first name had become Americanized. I refer to the defendant as Jake Dornwell because the family used that name in various documents, including the US census. See US Census, 1860, Fayette County, Texas, M653_1294, 290; US Census, 1870, Fayette County, Texas, Beat 3, M593_1585, 394B; US Census, 1880, Lee County, Texas, Precinct 1, ED 091, 1316, 14C; Fayette County, Texas, District Court Minutes, vol. M (1871-1877).

Dornwald, a German immigrant, and arrived to the United States in utero during the early 1850s. Augustus became a landowning farmer and the family came to be known as the Dornwells. His neighbors elected him a Fayette County justice of the peace under the auspices of the Texas Constitution of 1869. Like many of those elected under this "Radical" Republican Constitution, and the German immigrants of central Texas more generally, the elder Dornwell probably held Republican sympathies. Prior to the elections of 1869, Fayette County had witnessed a revolving door of local sheriffs, all appointed by Union military officials before being removed as opponents to the Reconstruction program. Dornwell was among a class of newly elected (as opposed to appointed) officials, indicating the transition away from military rule and toward constitutional rule. His position gave him substantial local influence, such as being a notary public, an authorized coroner, and the presiding judge of the justice court within his precinct.[2] The five justices of the county together formed the county court, which appointed constables and governed local affairs.[3]

In 1873, Jake Dornwell, aged twenty-two, was arrested for unlawfully carrying a pistol, probably by the constable from his precinct or by the county sheriff. Upon his arrest, he would have been taken to the local justice of the peace (which may have been his own father) for a brief preliminary hearing. This hearing determined whether the case would progress through the legal system and whether bail money would be required for the defendant to avoid county jail. Because the record of Dornwell's preliminary hearing is no longer extant we cannot know

---

[2] Durrill, "Political Legitimacy and Local Courts," 577-602; Edwards, *The People and Their Peace*. On court day in the trans-Mississippi West, see Richard D. Younger, *The People's Panel: The Grand Jury in the United States, 1634-1941* (Providence: Brown University Press, 1963), 157.

[3] Tex. Const. of 1869, art. V, §19-21. I use the term justice court for the sake of clarity; it is not specifically stated in the 1869 constitution, but justices of the peace were described as officers of an "inferior court" which held "such civil and criminal jurisdiction as shall be prescribed by law." For the sake of clarity throughout this chapter, I will refer to these as justice courts which held different jurisdiction than county courts and district courts. On the sheriffs of Fayette County, see Sammy Tise, *Texas County Sheriffs* (Albuquerque: Oakwood Printing, 1989).

whether he had to post bond; however, his appearance in the district court minutes in 1873 indicates that the magistrate considered his case worthy of prosecution and transferred it to the district court. At regular intervals throughout the year, a district judge appeared in each of the counties within his district (usually three or so) to hold court sessions. The county's most serious criminal and civil cases came before him, including appeals from lower courts. Another important function of the district court was the grand jury, called for the duration of the session to determine whether accused criminals should be taken to trial. When Dornwell's case went to district court, the purpose was to put it before this grand jury. In 1873, the grand jury voted in support of his indictment. His case then disappeared from the district court records, suggesting that it was transferred back to justice court for adjudication. As an indicted defendant in justice court, Dornwell could enter a plea of guilty and pay the associated fine, or he could plead not-guilty and receive either a bench or a jury trial. A guilty verdict could be appealed to the district court, though its decision was final. The loss of local county and justice records has left the details of Dornwell's case a mystery, but his transfer in and out of district and justice courts opens a window into the workings of the local justice system in postbellum Texas. This system changed over the next sixty years as Texans wrote a new constitution and made substantial amendments to legal jurisdictions, local governance, and court procedure.

Tracking the enforcement of the pistol law between 1870 and 1930 is an important and informative part of this study of weapon regulations in Texas. It sheds some light upon the post-Civil War process of legal change by showing us which jurisdictions were likely to hear deadly weapon cases and why. Amendments to the deadly weapon ban as well as the laws governing the Texas judiciary had significant consequences for the county-level prosecution of this misdemeanor offense. Examining enforcement trends also illuminates the law enforcement

system within each Texas county and the ways in which local prerogatives affected the decisions of the constables, sheriffs, justices of the peace, and county attorneys who worked together to prosecute the burgeoning number of misdemeanors in Texas courts. As the market towns and cities of Texas grew during this time period, they made use of powers written into their corporate charters to create their own law enforcement networks of city attorneys, municipal courts, and police officers. These parallel systems had different, sometimes competing, interests that complicated the legal process in Texas cities.

A final insight from this examination pertains to the question of selective or racially biased enforcement of the state's deadly weapon law. This is an important issue in light of recent scholarship on the "carceral state" and the racial inequitableness of the justice system. Case studies of Fayette County and McLennan County, both of which had substantial African American minorities, suggest that the deadly weapon law was not generally enforced in a racially discriminatory way during its first two decades of existence. African Americans did not answer charges of violating the pistol law in numbers disproportionate to their segment of the county population until *after* 1890. Thus, discriminatory or selective enforcement on the basis of race evolved over time in conjunction with the construction of the Jim Crow system of segregation laws and black disfranchisement.

*     *     *

Legal procedure is crucial to law enforcement today, just as it was in centuries past. Unsurprisingly, much of the scholarship on the subject focuses on current practices rather than historical ones. It is important to recognize that the law is not stagnant but evolves along with society. This embraces both changes to the substance of the law based upon its interpretation by appellate judges along with innovations in legal procedure. The former have tended to be well-

167

documented, composed as they are of judicial opinions and commentaries; we have seen the changes made to the deadly weapon law's substance and content after 1870. Procedural changes, on the other hand, are much more difficult to detect because they emanate from evolving social customs. Dramatic revisions to legal procedure took place in Texas and the United States during the late nineteenth and early twentieth centuries. The state of Texas revised is civil and penal codes and its code of criminal procedure four times between 1879 and 1925, amended its constitution to create new appellate courts, and repeatedly formed new judicial districts. This growth accelerated after the turn of the twentieth century because there were too many cases for the existing system to handle. The solution that lawmakers settled on was the formation of more courts, some with specialized jurisdictions. Today Texas houses more than four hundred judicial districts, with sixty of them in Houston's Harris County alone. The state's county- and municipal-level court systems constitute an equally complicated mess of overlapping jurisdictions and specialty courts.[4] The deadly weapon violators of the late nineteenth and early twentieth centuries, depending upon the year they were arrested, experienced wildly different legal procedures. The experiences of defendants from the 1920s differed from that of Jake Dornwell back in the 1870s. Not only did they face much higher fines, but their likelihood of being acquitted was lower and the legal system prosecuting them was highly impersonal and bureaucratic.

The most significant procedural change during this time period involved the grand jury and its fading role in the prosecution of misdemeanor crimes. Grand juries are called into a session by judges in order to decide whether an accused criminal should be indicted. In other words, they determine whether there is sufficient evidence and probable cause for a case to go to

---

[4] *Handbook of Texas Online*, Paul Womack, "Judiciary," accessed January 31, 2019, http://www.tshaonline.org/handbook/online/articles/jzj01.

Compendium_Roth
Page 2153

trial. These bodies vary based on state laws (which themselves vary over time) and jurisdiction, but there are some general commonalities. A grand jury tends to be affiliated with courts that handle felonies, and the defense does not present evidence. Most importantly, the grand jury may indict based on a majority rather than a unanimous vote. In Texas, the grand jury has historically been associated with district court sessions and may indict based on the vote of nine out of twelve grand jurors.

Americans inherited this tradition from the British, who preserved it for many centuries as part of their Anglo-Saxon heritage. In the Anglo-Saxon past, grand juries wielded substantial power to investigate and redress crimes. The body took on a republican guise during the seventeenth century when Englishmen called to participate used it as a bully pulpit to denounce the Stuart kings who had centralized monarchical authority after the Restoration.[5] The US Constitution makes mention of grand juries, specifying in the Fifth Amendment that felonies and serious crimes prosecuted by the United States must proceed by indictment.[6] This is one of the few rights of the citizen enumerated in the Bill of Rights that has yet to be incorporated onto the states.[7] For this reason, state laws have traditionally determined which types of cases require an indictment and which do not. It has historically been a general rule of thumb that felony cases must proceed by indictment.[8] The harsh penalties for felonies, like long-term imprisonment, hard labor, or death, led Americans in centuries past to exercise caution in regard to felony cases.

---

[5] George J. Edwards, *The Grand Jury: Considered from an Historical, Political and Legal Standpoint, and the Law and Practice Relating Thereto* (Philadelphia: G. T. Bisel, 1906), 32.

[6] U.S. Const. amend. V.

[7] The other amendment not incorporated as yet is Amendment VII, which secures a jury trial in civil cases. The basic provisions of Amendments I-IV, VI, and VIII have all been incorporated. This process occurred for the Second Amendment in *McDonald v. Chicago*, 561 U.S. 742 (2010).

[8] There were some exceptions to this rule, as in colonial Maryland, where prosecutors did not put criminal cases before a grand jury. Instead, criminal cases required a bill of information filed with the appropriate judge, meaning that the prosecuting and defense attorneys had a chance to present arguments at a preliminary hearing. Ironically, this procedure has become increasingly common in the twentieth century as many states have dropped the grand jury system. See Younger, *The People's Panel*, 12.

169

Misdemeanor offenses of a serious nature, particularly those involving official misconduct, could also be presented to a grand jury.

This tradition of obtaining indictments illustrates the symbolic importance of the grand jury within the American legal system. By reviewing the decisions of "inferior court" judges in preliminary hearings, grand jurors acted as a democratic layer within the legal system. Cases against indicted defendants had a stamp of community approval that validated the prosecution as a fair and reasonable one. The significance of this reached far beyond the individual case to "inspire a general confidence" in the operation of the justice system. Massachusetts justice Lemuel Shaw, who spoke eloquently on the workings of the police power following the Revolution, also described the important function of the grand jury. He believed that the "peace and harmony of society" can only be preserved through a well-respected legal process, which included the participation of upstanding citizens. He said: "To accomplish this, nothing could be better contrived than the selection of a body . . . selected from among their fellow citizens, as persons deemed worthy of this high trust by their moral worth, and general respectability of character."[9]

By operating as a bulwark against unjust prosecutions, the grand jury effectively spoke for the people and protected their interests. Grand jurors sometimes used this power to influence lawmakers or the general public by making public statements. In 1887, one such body assembled in a Texas Panhandle county made a report about peace and prosperity in their county that was published on the front page of a nearby newspaper.[10] An anti-crime advocate in Austin called upon "grand juries in session throughout the State to send up reports, petitions and appeals regarding lawlessness and crime, and making suggestions in regard to the improvement of our

---

[9] Quoted in Edwards, *The Grand Jury*, 43.
[10] "Court Proceedings," *Canadian Free Press* (Canadian, TX), Dec. 21, 1887.

Compendium_Roth
Page 2155

criminal laws."[11] When a grand jury assembled, the district judge swore them in and sometimes gave them a rousing speech about the importance of their public duty. The most inspirational of these "charges" could make headlines in newspapers across the district.[12]

The aspect of the grand jury system that concerns us here is its participation in the prosecution of misdemeanors. Today, indictments are almost exclusively the terrain of felonies, while misdemeanors are prosecuted without them. But it was not always this way. Grand juries could respond to complaints presented to them by issuing indictments, or they could investigate wrongdoing within their own realm of knowledge by issuing presentments (these served the same function as indictments but bore a different name due to their unique origin). It was common in the seventeenth and eighteenth centuries for grand juries to issue presentments and indictments for misdemeanor crimes like drunkenness and breaking the Sabbath.[13] These offenses might not have been felonies, but they represented a serious breach of the public peace that threatened order and stability within the community. For much of Texas history, prosecuting attorneys have held it within their discretionary powers to choose whether to proceed in misdemeanor cases by indictment or another route called a bill of information.[14] A case prosecuted by information begins with the district or county attorney filing a bill of information with the appropriate judge; then the prosecution and defense participate in a preliminary hearing, and the judge decides whether there is sufficient evidence to proceed to trial. This procedure is

---

[11] "To Grand Juries," *Weekly Democratic Statesman* (Austin, TX), Oct. 24, 1878.
[12] Some examples of published "charges" to grand juries include: *Frontier Echo* (Jacksboro, TX) Nov. 10, 1876; "Judge Fleming's Charge to the Grand Jury," *Albany Star* (Albany, TX), Sept. 21, 1883.
[13] Younger, *The People's Panel*, 8.
[14] Tex. Code of Crim. Procedure (1879) §417. The same provision appears in the 1895 and 1911 editions as well. See Tex. Code of Crim. Procedure (1895) §436; Tex. Code of Crim. Procedure (1911) §448.

far simpler than the grand jury, and it has become the standard for the prosecution of most misdemeanors in Texas.[15]

During the nineteenth century there were many misdemeanor cases in which prosecutors opted for grand jury indictment. The most likely contenders were serious misdemeanor offenses that carried a hefty fine, or newer laws that were controversial—much like the deadly weapon ban. Misdemeanor indictments were especially common in Texas during Reconstruction due to changes made to the judiciary branch by the Constitution of 1869. That document removed the judicial function that the county court had historically held in conjunction with its local governance responsibilities. Under previous constitutions, the county court heard misdemeanor cases alongside some civil and probate cases. Furthermore, appeals from justice court could be retried in county court. In their drive to centralize state power and prevent their Democratic enemies from holding important local offices, Republicans removed this layer of justice system. From 1869 to 1876, misdemeanors had to be adjudicated in justice court by a non-lawyer judge, even if the offense in question carried a severe financial penalty. This system was replete with opportunities for the miscarriage of justice, so law enforcement officials frequently directed misdemeanor cases to the district court's grand jury.

Tracking the deadly weapon cases illustrates this procedure in use during the years in which the 1869 constitution operated. Within a sample of 3,259 deadly weapon cases, there are 173 cases between 1871 and 1876 whose initiation procedure is known. In all but three of those cases the prosecuting attorney sought a grand jury indictment. In the subsequent decades, indictments against deadly weapon violators continued to decline (see Fig. 5.1). The Code of

---

[15] The only exception to this general rule is a misdemeanor case involving official misconduct, which must proceed by indictment and be adjudged in District Court. See Tex. Code of Crim. Procedure (1925) §64.

Compendium_Roth
Page 2157

Criminal Procedure from 1879 specifically directed prosecuting attorneys to file a bill of information in misdemeanor cases, leading to a further drop in indictments for carrying weapons.

Fig. 5.1



Though indictments against deadly weapon violators were on the decline during the 1870s and 1880s, reformers called upon grand juries to investigate the problem in their counties and send a message to persistent gun-toters that their habit would not be tolerated. In 1883, a district judge from Albany, near Abilene, declared that "the grand jury is the most potent power in existence" for the suppression of the "nefarious practice" of carrying deadly weapons. [16] This judge asked the grand jury to use its traditional power of presentment by investigating and addressing local crime on its own without waiting for indictments to be presented by prosecutors. By drawing the jurors' attention to this misdemeanor offense when their primary responsibility was to review felony cases, he underscored the severity of the crime of unlawfully carrying weapons.

---

[16] "Judge Wheeler's Charge," *Albany Star* (Albany, TX), Sept. 21, 1883.

173

By about 1885, indictments for deadly weapon cases were becoming quite rare. Instead, prosecutors filed an information with the county court, whose judicial powers had been restored by the 1876 constitution. For most of the nineteenth century, the deadly weapon law was a misdemeanor, non-jail offense in which the highest fine was one hundred dollars. This placed it squarely within the jurisdiction of the justice courts, though as a misdemeanor it could be prosecuted in county court. This overlap between county and justice courts was known as original concurrent jurisdiction, meaning that cases could be adjudicated in either venue. The purpose was to keep the courts running smoothly without backlogs, so the case was handled in whichever court was first to receive the charges.[17] Cases frequently went to county court, but it was also commonplace for gun-toters spotted by a sheriff's deputy to be hauled into justice court right away. Between 1890 and 1905, the year the maximum fine for violation rose to two hundred dollars and moved the offense beyond the jurisdiction of justice court, that venue was just as likely as county court to decide deadly weapon cases. In Fayette County, where records from both jurisdictions are extant, there were about as many cases appearing in county court as in justice court between 1890 and 1905 (see Fig. 5.2).[18]

---

[17] Tex. Code of Crim. Procedure (1895, 1911) §63; Tex. Code of Crim. Procedure (1879) §64.

[18] This chart represents cases actually adjudicated within those jurisdictions, including those whose outcome is unknown. It does not include data for cases transferred out of the jurisdiction in question or arrest warrants.

Compendium_Roth
Page 2159

Fig 5.2



The use of the grand jury became increasingly rare for misdemeanor offenses for two reasons. First, population growth and better policing generated far more misdemeanor cases than grand juries could handle. The process of transferring the case and waiting for the next district court session provided an opportunity for defendants to skip bail. It also wasted the district court's time upon petty offenses when there were much more serious civil and criminal cases requiring attention. The 1879 edition of the Texas Code of Criminal Procedure recognized this reality by recommending that misdemeanors be pursued via information and felonies via indictment. Second, the grand jury system itself was under assault in the late nineteenth and early twentieth centuries. Reformers looked upon this medieval procedure as an inefficient one that needed restructuring if not outright elimination. Their criticism built upon an anti-grand jury movement that had been bubbling in Britain since the Benthamites, a group of pragmatic-thinking reformers, came out against it during the eighteenth century.[19] By the 1880s, the grand

---

[19] Utilitarianism was the brainchild of Jeremy Bentham and holds that the people should seek the well-being of the greatest number of people in making decisions. Bentham's acolyte, John Stuart Mill applied the term "utilitarianism" to Bentham's ends-oriented philosophy during the nineteenth century.

jury had well-educated, progressive critics across the Anglophone world. They tended to harp upon its inefficiency, which they viewed as the result of its inexperienced grand jurors and the high cost of paying them for their service. One such reformer declared that "the summoning of a new body of jurors at each term insures an unfailing supply of ignorance." The attack in Texas emphasized the financial burden of the system by confronting Texans with the $100,000 to $200,000 annual cost of paying grand jurors across the state. Reformers across the country frequently cast their opponents as backward-looking, with one deriding them as people "wedded to antiquity" who "revel in cobwebs." Some states followed the advice of their modernizing lawyers and eliminated the system, pushing every criminal case through information and a preliminary hearing before a judge. Texas legislators, however, refused to abandon the grand jury.[20]

 The three legal jurisdictions involved in prosecuting the Texas deadly weapon law interacted with one another in unpredictable and variable ways. For example, some deadly weapon cases were still being prosecuted via indictment at least to the close of the nineteenth century. In Jefferson County, on the state's eastern Gulf coast, several cases from the late 1890s took the very same procedural route as Jake Dornwell's twenty-five years prior. The cause of this is unknown and open to speculation. These indictments could have been generated by grand jury presentments and handed down independently of the prosecutor; the defendants might have asked specifically for an indictment, which the justice of the peace and district attorney accepted; or the prosecuting attorney may have responded to what he saw as egregious violations by seeking indictments. The decline of indictments for misdemeanors minimized the transfer of deadly weapon cases in and out of district court, but transfers remained quite common. The

---

[20] Eugene Stevenson, "Our Grand Jury System," *Criminal Law Magazine* (December 1886): 713-714; Younger, *The People's Panel*, 138-154, 141, 145.

Compendium_Roth
Page 2161

procedure emerging during the late nineteenth century was to have a preliminary hearing in justice court and transfer the case to county court. After 1905, when the maximum fine doubled, this procedure became the standard for deadly weapon cases.

The transfer of cases from one jurisdiction to another affected the overall cost of the prosecution. In the event of a guilty verdict, the defendant bore the cost of prosecution, but acquittals and dismissals fell at the feet of the county treasury and ultimately state taxpayers. In addition to the fine, which went to the county's coffers, guilty defendants paid the justice of the peace for his time and the sheriff for his arrest. Accused persons who pleaded not guilty and went to trial owed additional fees to the county attorney for his services, to the sheriff for summoning witnesses, and to jurors. When a case was transferred from one jurisdiction to another, the costs transferred, too. Fayette County justices who transferred deadly weapon cases to county court typically recorded about ten dollars in court costs. Defendants found guilty not only had to pay their fine but the costs of prosecution from both jurisdictions. For this reason, cases handled in county court tended to be more expensive than those adjudicated fully within justice court. For example, guilty defendants in Fayette County's justice courts prior to 1905 tended to pay their twenty-five dollar fine plus another ten to twenty dollars in court costs, depending on whether they pleaded not guilty. Rarely did justice court cases amount to fifty dollars or more. Sometimes judges allowed defendants arrested for unlawful carrying to plead guilty to a reduced charge, like rudely displaying a weapon. Fines for this and other minor offenses ranged from one to fifteen dollars, and defendants usually walked away spending less than twenty dollars (see Fig. 5.3). In McLennan County, where the records of county court prosecution costs are extant, guilty defendants spent substantially more than this, even in the pre-1905 period when a typical fine was twenty-five dollars. That county's records indicate an

177

average cost of nearly sixty dollars for guilty gun-toters (see Fig. 5.4). That amounts to $1,689.23 in 2018 dollars.

Fig. 5.3



Fig. 5.4



178

The costs associated with criminal prosecutions in the nineteenth century highlight the fee system that characterized the law enforcement process in Texas and much of the United States during the late nineteenth and early twentieth centuries. Much like the grand jury, the collection of fees by local officials was part of the English inheritance in North America. It was the standard across the Atlantic seaboard during the colonial period as well as between both sections during the antebellum years. The first states to turn away from the practice seem to have been those of the trans-Mississippi West, who condemned it as corrupt and inefficient during the decades following the Civil War. The underlying justifications for the system were twofold. First, varied population densities meant that some public officials spent the majority of their time fulfilling their duties, while others had few burdens placed upon them. Remuneration by fee seemed a rational way to equalize these disparities and pay officials according to work actually performed. Second, and following the theory of self-interest that undergirds classical liberalism and modern libertarianism, fees promised to rouse these part-time officials into action. If a local magistrate or sheriff's deputy received no extra income for the performance of his mundane duties, so the thinking went, he might be tempted to ignore the enforcement of the laws in favor of his own business pursuits.[21]

Despite the lofty intentions expressed in this legal inheritance, by the late nineteenth century the fee system had became a font of corruption and source of perennial criticism in Texas and elsewhere. Sheriffs, clerks, justices, and attorneys in some counties took home enormous fortunes of unknown proportions due to fee collection. Their earnings financed "rings" of local officials in cahoots with one another, and sometimes with criminals, to maximize their income at the expense of taxpayers. A critic of the system, writing in Wisconsin in 1898, told of

---

[21] Urdahl, *The Fee System in the United States*, 186-187, 216-222.

Compendium_Roth
Page 2164

the conspiracy between sheriffs, justices of the peace, and vagrants to line the pockets of officials and secure warm bedding for the transients each winter. The "tramps" would be presented before a justice court under one name in the morning and another in the afternoon, allowing the sheriff and justice to collect two sets of fees for the arrest and judgment. The vagrant, of course, could not pay his fees and was therefore confined to the county jail for several weeks, while the sheriff received an extra allocation of funds to house and feed him. Wisconsin counties addressed this problem in the early 1890s by paying the sheriff a salary rather than a fee based on the number of inmates in his jail; they also mandated that county prisoners perform some public work on farms or roads. These measures removed the incentives for sheriffs and tramps to operate the scheme and, over the course of four years, reduced one county's expenses by twelve thousand dollars.[22]

Reform-minded Texans pursued similar strategies during the 1890s. Members of the Populist Party, who obtained their greatest gains during the elections of 1894, tried mightily in conjunction with reformist Democrats to revise the Texas fee system similarly to what had been done in Wisconsin. Their goal was to cap the salary of each official at two thousand dollars per annum and redirect all surplus to either the county or state treasury. Unsurprisingly, a strong and well-financed opposition movement emerged to prevent their reforms.[23] In 1895 state legislators added a clause to the deadly weapon law stipulating that those confined to the jail could be put to work on county projects for the duration of their incarceration, thus monetizing a stint in jail.[24] This particular innovation had an especially harmful effect upon black and Hispanic gun-toters after the minimum fine was raised to one hundred dollars in 1905. Unable to pay the fine and associated court costs, racial and ethnic minorities were much more likely than their white

---

[22] Urdahl, *The Fee System*, 211-216.
[23] Gregg Cantrell, *The People's Revolt: Texas Populists and the Roots of American Liberalism* (New Haven: Yale University Press, 2019), 408-411.
[24] Tex. Pen. Code, §338 (1895).

180

counterparts to receive jail sentences. For instance, Hispanic gun-toters were penalized by fine prior to 1905, but after that year the vast majority of them received jail sentences instead (see Fig. 5.5). Barring a special dispensation from the courts, these violators spent months working on county road and farming projects.

Fig. 5.5. Based on 64 Hispanic violators adjudged guilty in McLennan, Fayette, Parker, and Jefferson Counties.



Fines for unlawfully carrying deadly weapons tended, in the late nineteenth and early twentieth centuries, to be added to the county road fund. Prior to 1916, there was no state-level agency overseeing the construction of long-distance roads or highways. Instead, the counties had to pay for and construct roads on their own. After 1879, male residents were expected to labor on the road projects at least a few days a year, though the obligation tended to fall harder upon those who lived along the new road's path. Those with enough cash could buy their way out of the obligation and allow the county to pay a day laborer instead. Within the next decade, lawmakers authorized the collection of a county road tax improve overland transportation. County commissioners supplemented this labor force with the inmates crowding the county jail, sending

181

them to remote work sites under the supervision of construction managers and guards.[25] When the deadly weapon fine quadrupled in 1905, the number of arrests and guilty judgments increased.[26] It became a lucrative misdemeanor to enforce because it placed large amounts of cash into road fund coffers *or* provided jailed laborers to do the work for months at a time. Within the first eighteen months of the new provision, Fayette County had collected $1,500.00 for the road fund from convicted gun-toters.[27]

The higher fine for unlawful carrying coincides with the rise of a "good roads" movement in Texas and across the United States. This improvement impulse resulted in the establishment of some state-level highway departments that could properly fund and oversee the construction of intrastate roads, though the Texas movement did not. The Texas Highway Department (later Texas Department of Transportation) did not come into existence until 1916, and even then lawmakers hastily slapped it together to cash in on federal aid to highway improvements.[28] The same reform-minded Texans who objected so vehemently to the fee system and convict labor, like the Populists, tended to support the good roads movement. The difficulties entailed in building public roads and highways without state direction or sufficient funding challenged their principles and confronted them with the kind of decisions that make Americans despise realpolitik. For the Populists, this meant supporting legislation to ensure humane treatment of county-level convict laborers even though the practice was distasteful to them and their constituents.[29]

---

[25] Karl Edward Wallace, "Texas and the good Roads Movement: 1895 to 1948" (master's thesis, Univ. of Texas, 2008), 18-21. See also Cantrell, *The People's Revolt*, 403.

[26] This claim is based upon records of McLennan County Court Criminal Fee Books, which contain a noticeable and sharp uptick in deadly weapon cases after 1905. McLennan County Archives, Waco, Texas.

[27] "La Grange News," *Schulenburg Sticker* (Schulenburg, TX) Jan. 31, 1907.

[28] *Handbook of Texas Online*, John D. Huddleston, "Texas Department of Transportation," accessed February 11, 2019, http://www.tshaonline.org/handbook/online/articles/mctgn.

[29] Cantrell, *The People's Revolt*, 403.

If the county had a vested interest in pursuing and prosecuting gun-toters, so did the municipalities of Texas. Alongside rapid population growth came the proliferation of market towns and the development of the state's big cities. These entities wielded substantial power during the Gilded Age and Progressive Era due to the generous charters given them by the state. Following the Civil War, newly established cities received charters that gave them greater authority to police residents and collect tax revenue than had been the case in the past. Older cities, consequently, applied for new charters so that they could meet the demands of population growth and economic development. Buried within these lengthy legislative documents was an authorization for municipalities to regulate the use and carrying of deadly weapons within their city limits. Unsurprisingly, a cascade of local ordinances ensued from the 1870s through the early twentieth century.[30]

County and justice courts already shared "original concurrent" jurisdiction over misdemeanors like the deadly weapon law, and municipal ordinances added an extra layer of complication to their enforcement. Cities hired their own peace officers (a town marshal and deputies or professional policemen) and created municipal courts to enforce the law within the city limits, especially their city ordinances. The latter, usually called Mayor's or Recorder's Courts, formed another set of "inferior courts" within the state judiciary to enforce local ordinances. They were designed to work like justice courts in that jurisdiction was limited to small claims or misdemeanors and appeals received a trial *de novo* in county court. Thus, cities added a competing layer of enforcement in the form of municipal courts as well as a competing

---

[30] Cities enacting such ordinances included Fort Worth (1873, 1885), Dallas (1887), San Antonio (1899), McKinney (1899), and Marshall (1909). These are listed on the Duke University Repository of Historical Gun laws (https://law.duke.edu/gunlaws/), though dozens of other Texas municipalities enacted similar provisions. These included Denton, Waco, Houston, Galveston, and more. The size of Texas and the number of its incorporated towns and cities places a comprehensive accounting beyond the scope of the present study.

183

layer of legislation in the form of ordinances against unlawfully carrying deadly weapons. Ordinances sometimes restated the state law, but at other times provided alternative stipulations or penalties. Gun-toters arrested within the limits of incorporated cities and towns could be prosecuted under the auspices of either, leading to confusion and occasions for the miscarriage of justice.

A hotbed of deadly weapon injustice was Denison, a town in Grayson County along the Red River in far North Texas. In 1876, a Kansas resident named J. C. Hamilton passed through town on business. While there, he stopped in a store to purchase ammunition and was subsequently disarmed and arrested by a policeman. He was taken immediately to the Denison Mayor's Court, where the mayor declared him guilty and adjudged his penalty at "the lowest fine—five dollars and costs." Hamilton forked over the money to avoid spending the night in the city jail but felt that he had been ill-used by the fathers of Denison and said as much to the mayor the next day. The mayor then recommended a special lawyer, who interviewed the shop owner and promised to have the revolver and money returned as soon as possible. He lived up to his word, though it still cost Hamilton five dollars in legal fees. Hamilton felt as if not only the mayor and police, but the entire town were in on the joke against him: "I paid my attorney his five dollars, and he stepped outside and 'whacked up' with the police, at which the crowd laughed hugely." He wrote to a local editor about the experience, incensed at the "legal black mailing" that he had found "utterly disgust[ing]."[31]

Five years later, in 1880, a case from the Denison Recorder's Court worked its way to Grayson County Court and ultimately the Texas Supreme Court. John Boland, a man passing through Denison, carried a pistol on his travels. He was arrested for violating the city ordinance

---

[31] "To the Public," *Denison Daily News* (Denison, TX), Mar. 7, 1876.

against deadly weapons, which did not include an exemption for travelers as the state law did. Believing that he was justified in his actions, Boland was surprised to receive a guilty verdict both in Denison Recorder's Court and Grayson County Court. His next step was to decline to pay the fine, but Grayson County officials issued an arrest warrant for nonpayment. Upon this secondary arrest, Boland filed a writ of *habeas corpus* and argued to the state supreme court that the municipal ordinance abridged his constitutional and statutory right to carry a weapon for self-defense while traveling. The high court, though, disagreed with Boland's case by saying that he did not qualify for *habeas corpus* because his arrests were lawful; his failure to bring up the constitutionality issue at his appeal rendered the issue moot in the opinion of the judges.[32]

Cases like John Boland's were not the only ones in which city and municipal court systems cooperated in hustling unsuspecting victims. During the Gilded Age, one of the fastest growing Texas cities was Fort Worth, a cattle boomtown and important hub for the Texas and Pacific Railway. The city bustled with activity, particularly after the invention of refrigerated rail cars and the establishment of slaughterhouses. Fort Worth, meanwhile, played host to cowboys, stock purchasers, investors, and rail employees and looked for ways to capitalize on their stay. The city accomplished this through the regulation of a vice district and the collection of licensing fees and misdemeanor fines. It made sense for Fort Worth to prohibit the carrying of deadly weapons in town because there was a steady stream of cowboys looking for saloons and brothels, though this meant that police would not be enforcing the state law, whose fines went to Tarrant County. The city and county officials  appear to have worked out a system whereby arrested gun-toters were fined twice for the same offense, once in municipal court and once in a county-

---

[32] *Ex Parte Boland*, 11 Tex. Cr. App. 159 (1881).

185

affiliated court. The Tarrant County Court heard appeals from all inferior courts, and like Grayson County in John Boland's case, participated in the charade.[33]

In 1890, the city of Waco, a hub for the Missouri-Kansas-Texas Railroad Company about sixty miles south of Fort Worth, received a slap on the wrist from the Texas Court of Appeals for doing something similar. Waco city leaders had enacted numerous municipal ordinances, including one forbidding the unlawful carrying of weapons. Another policy of the fast-growing town was that, where municipal and state laws overlap, jurisdiction goes to that which has the higher fine. Conveniently for Waco officials, their municipal ordinances often provided a fine whose maximum range far surpassed that of the corresponding state law. The Waco deadly weapon ordinance, for instance, punished gun-toting with a fine ranging from twenty-five to two hundred dollars at a time when the state law prescribed twenty-five to one hundred. J. C. McNeil, a man arrested in Waco for carrying a pistol, used this discrepancy to argue in his appeal from municipal court that the case against him was unconstitutional. The McLennan County Court agreed, but then had him arrested for violating the state law instead. When he appealed his guilty verdict on the grounds of double jeopardy, the Texas Court of Appeals condemned Waco's deceptiveness but refused to overturn McNeil's conviction.[34]

There were some occasions, however, when the enforcement of the deadly weapon law bestowed positive effects upon communities. Reformers tended to perceive a drop in crime or other salubrious results after serious enforcement. But sometimes the town accrued the benefits without much comment or crooning about why. Events in Karnes County, a rural, ranch-oriented county south of San Antonio, exemplify this quite well. Feuding was nothing new to the people

---

[33] Dale L. Hinz, *Panther's Rest: History of the Fort Worth Police Department, 1873-21st Century* (Bloomington: Author House, 2007).
[34] *McNeil v. State of Texas* 29 Tex. Cr. App. 48 (1890).

Compendium_Roth
Page 2171

of Karnes County. During the 1870s they had a front-row seat to the infamous Taylor-Sutton feud, which was more a police action against an organized crime ring than a family vendetta.[35] Local ranchers returning from service to the Confederacy, led by William Butler, confronted rustlers operating in Karnes County; it is likely that these were members of the Taylor family and their rustling ring. Having faced them down, Butler subsequently learned to coexist with their illegal activities and became one of the wealthiest and most powerful men in the county.[36]

Butler sidestepped involvement in one feud only to find himself at the center of another. In 1884, his son, Emmett, got drunk in the county seat of Helena and came to the attention of the sheriff and his deputies. The younger Butler, about twenty years of age, shot the sheriff during a confrontation and ran away. A posse, including deputy sheriff Lafayette "Fate" Elder, went after Emmett Butler and killed him. Elder assumed the position of sheriff and hired his brother, Bud, as a deputy. Despite his own son's recklessness, William Butler blamed the local authorities, and especially Fate Elder for the tragedy. Legend has it that when the townspeople of Helena defended Elder, Butler vowed to "kill the town that killed his son." Tensions rose in Karnes County, with residents divided in their allegiance between the wealthy, well-connected Butlers and the politically powerful Elders. When the San Antonio & Aransas Pass Railway arrived in Karnes County, Butler did everything in his power to have the line pass through the western half of the county, nearer his home and distant from Helena. In this sense, he "killed" the town by making it so inconvenient for travelers and residents that they subsequently selected an alternative county seat.

---

[35] Smallwood, *The Feud that Wasn't*.
[36] George W. Saunders, ed., *The Trail Drivers of Texas: Interesting Sketches of Early Cowboys and Their Experiences on the Range and on the Trail during the Days that Tried Men's Souls*, 2 vols. (San Antonio: Jackson Print Co, 1920-1923), 2:154-156.

Compendium_Roth
Page 2172

Butler was a highly successful rancher, and his disdain for the Elders probably had as much to do with landownership and rail access as it did the manner of his son's death. Things came to a head in 1886 during a local option election. Butler arrived at the polling place armed to the teeth with his sons, sons-in-law, and cowboys. A cowboy and hired gun named Juan Coy was among them and attracted the attention of the sheriff because there was an outstanding warrant for his arrest. Coy fired upon Elder, initiating a shootout that engulfed the dusty intersection that was Daileyville, Texas. By the end of the fracas, the Elder brothers and another resident lay dead, though William Butler lost part of his ear lobe in the fighting. Butler, Coy, and a few other members of the Butler entourage were arrested on charges of murder and carrying firearms to an election. But when the district attorney presented the cases before the jury, it refused to hand down murder convictions. Instead, Butler was found guilty of unlawfully carrying a firearm at a polling place and fined one hundred dollars. This indicates juror sympathy for Butler's position along with a condemnation of his behavior. Between the shootout and guilty verdict against Butler, the air had cleared in Karnes County. Deadly weapon regulations had created a way for local residents to censure Butler without labeling him a murderer; the intervention of the legal system eliminated the need for reprisals, and the Butler-Elder feud fell out of memory.[37]

William Butler's arrest and prosecution took place rather quickly, as did those for most of his accomplices. Butler posted their bail, undoubtedly paid their attorney, and managed to obtain dismissals or acquittals for them. There was, however, one exception—Juan Coy. Descended from an old Spanish family, Coy's ancestors were among the earliest settlers in San Antonio. He had inherited family land in what became Karnes County, but economic difficulties prompted

---

[37] On the William Butler and the Butler-Elder feud, see John Perry, "Two Texas Shooting Affairs, Two Karnes County Sheriffs Killed—and the Butlers Did It," *Wild West* (April 2005): 10-12,61; Olmstead and Ybarra, *The Life and Death of Juan Coy*, 79-102; "San Antonio Scrapings," *Galveston Daily News* (Galveston, TX) Sept. 8, 1886; "More Victims of the Daileyville Tragedy," *Galveston Daily News* (Galveston, TX) Sept. 10, 1886.

him to sell it to Butler in the mid-nineteenth century. Coy then went to work for Butler, acting as a hired gun or cowboy as necessary and even introducing his distant relatives to life in the Butlers' employ. The murder charges against him were not dropped, nor was he able to get an acquittal. Instead, his attorney (surely paid for by Butler) repeatedly asked for continuances, or the witnesses summoned to testify failed to appear. The result was a perennial delay in his case, to the point that he died four years later under indictment for murder without ever going to trial.[38]

If the jurors of the district court in neighboring DeWitt County (the cases received a change of venue) showed some sympathy for Butler, they did no such thing for Coy. But for the stalling tactics of a slick attorney, Coy would have spent the final years of his life in the state penitentiary. Sykes Butler, one of William Butler's many sons, also had a reputation for trouble and had previously been involved in a shooting incident, but the paterfamilias succeeded in having his case stricken from the district court's docket. Some of the prejudice against Coy stemmed from his criminal past, but much of it arose from his identity as a Hispanic man.[39]

Coy's case occurred at a crucial moment in Texas and Southern history, during the decades in which states began constructing the systems of racial segregation called Jim Crow. With its substantial population of Hispanics (a numerical majority in several South Texas counties), parts of the Lone Star State segregated along ethnic lines in a system referred to today as Juan Crow. Though casual observers assume that this system of racial regulations appeared immediately after the Civil War, it was indeed a decades-long process that accelerated in the middle and late 1880s. This acceleration came as a response to the *Civil Rights Cases* (1883),

---

[38] DeWitt County, Texas, Office of the District Clerk, District Court Minutes, vols. H-K (1884-1893); Texas State Library and Archives Commission, Reels 1012068, 1012069.

[39] William Butler had eight sons, several of whom seem to have been engaged in illegal activities. Emmett, who died in 1884, had repeatedly been suspected of cattle rustling. His younger brother, Sykes, worked closely with the trigger-happy Juan Coy as a cowhand for his father. Olmstead and Ybarra, *The Life and Death of Juan Coy*, 41, 63.

Compendium_Roth
Page 2174

which held that private corporations could enforce racially discriminatory policies without violating the Fourteenth Amendment—which, as readers will recall, was pared down by the US Supreme Court to apply only to actions taken by *state governments*.[40] The nation's high court validated the ensuing the avalanche of discriminatory state-level legislation in the landmark case of *Plessy v. Ferguson* (1896), famous for its mantra of "separate but equal."[41] Some southern states went yet a step further by revising or rewriting their constitutions to disfranchise black voters. In Texas, local Democratic party organizations began regulating their primaries to exclude black voters. Since the Democrats ruled over a one-party state, to sit out the primary was tantamount to sitting out the entire election. The policy of excluding black primary voters received support at the state level at the turn of the twentieth century with the passage of the poll tax in 1902, which along with the defeat of Populism greatly reduced the black electorate, and the Terrell Election Laws of 1903 and 1905, which established a more modern system of primary elections that greatly advantaged the Democratic Party. Thus the years around the turn of the twentieth century mark a sharp turning point in the history of racial segregation and discrimination in the United States.[42]

White Texans, however, were far from finished with their campaign for white supremacy in the first decade of the twentieth century. In fact, the federal judiciary indicated its acceptance of ever stricter discriminatory policies through the 1920s. For example, Texas Democrats followed up the Terrell Election Law with a statewide white primary in 1923. They held off on the move until it was clear to them, based on a US Supreme Court decision in 1921, that their

---

[40] *Civil Rights Cases*, 109 U.S. 3 (1883).

[41] *Plessy v. Ferguson*, 163 U.S. 537 (1896).

[42] Barr, *Reconstruction to Reform*, 205-207; *Handbook of Texas Online*, O. Douglas Weeks, "Election Laws," accessed March 04, 2019, http://www.tshaonline.org/handbook/online/articles/wde01; Michael Perman, *The Struggle for Mastery: Disfranchisement in the South, 1888-1908* (Chapel Hill: University of North Carolina Press, 2001), 32, 270-298.

Compendium_Roth
Page 2175

attempt would not be interpreted as a violation of the Fourteenth Amendment. In *Newberry v. United States*, the high court held that political parties were, like railway companies, private organizations exempted from the Equal Protection Clause of the Fourteenth Amendment. Though black Texans protested and brought suits to federal court, the white primary persisted until 1944, and with few exceptions the legal structures of Jim Crow and Juan Crow remained solidly in place well into the middle of the twentieth century.[43]

It is not surprising that non-white criminal defendants would experience a greater degree of discrimination in the justice system during this time period in which the system of segregation had firmly established itself. Case studies of deadly weapon violators in Fayette and McLennan Counties reveal that the treatment of black and Hispanic defendants took a turn for the worse around 1890, declined further over the next twenty years, and reached a low point around 1920 that held steady at least through 1930. During this forty-year time period, black defendants went from being a small proportion of deadly weapon defendants to the majority of them, despite their shrinking share of the overall county-wide populations. In Fayette County, African Americans accounted for a higher proportion of the total population in 1870 than at any later time. Though their numbers grew over the next several decades, their percentage of the population fell from 33 percent in 1870 to 23 percent in 1920. Statistics for McLennan County tell much the same story over that half-century; in pure numbers the black population grew, but their share of the total population dropped from 34 percent in 1870 to 21 percent in 1920 (see Figs. 5.6, 5.7).[44]

---

[43] Campbell, *Gone to Texas*, 330-331, 366; Walter L. Buenger, *The Path to a Modern South: Northeast Texas between Reconstruction and the Great Depression* (Austin: University of Texas Press, 2001), 76-83; Darlene Clark Hine, *Black Victory: The Rise and Fall of the White Primary in Texas* (Millwood, NY: KTO Press, 1979); *Handbook of Texas Online*, Sanford N. Greenberg, "White Primary," accessed February 13, 2019, http://www.tshaonline.org/handbook/online/articles/wdw01; *Handbook of Texas Online*, O. Douglas Weeks, "Election Laws," accessed February 13, 2019, http://www.tshaonline.org/handbook/online/articles/wde01.

[44] These results are based upon a random sample of 177 deadly weapon defendants from among a total of 1,778 from those counties. Violator names were randomly selected from these counties and used as a starting point for research in census records. The race or ethnicity remained unclear for 7 sampled violators, or 3.9%. The overall

191

Fig. 5.6

| Fayette County Census Data, 1870-1920 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 10,953 | 67% | 19,167 | 69% | 23,031 | 73% | 26,148 | 72% | 22,434 | 75% | 23,201 | 77% |
| Negro | 5,473 | 33% | 8,763 | 31% | 8,446 | 27% | 10,394 | 28% | 7,351 | 25% | 6,755 | 23% |

Fig. 5.7

| McLennan County Census Data, 1870-1920 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 1870 | | 1880 | | 1890 | | 1900 | | 1910 | | 1920 | |
| White | 8,861 | 66% | 19,276 | 72% | 28,811 | 74% | 45,345 | 76% | 55,991 | 73% | 65,280 | 79% |
| Negro | 4,627 | 34% | 7,643 | 28% | 10,381 | 26% | 14,405 | 24% | 17,234 | 22% | 17,575 | 21% |

In the 1870s and 1880s, 31 percent of Fayette County deadly weapon defendants were black or mulatto, mirroring their share of the population almost perfectly. After 1890, however, their proportion of the county's arrested gun-toters began to increase and crossed the 50 percent mark by 1900. By 1920, black defendants accounted for nearly 70 percent of all deadly weapon violations in the county, though by then they constituted less than 25 percent of the county population (see Figs. 5.8, 5.9).

Fig. 5.8



In the 1870s and 1880s, 31 percent of Fayette County deadly weapon defendants were black or mulatto, mirroring their share of the population almost perfectly. After 1890, however, their proportion of the county's arrested gun-toters began to increase and crossed the 50 percent mark by 1900. By 1920, black defendants accounted for nearly 70 percent of all deadly weapon violations in the county, though by then they constituted less than 25 percent of the county population (see Figs. 5.8, 5.9).

sample is proportional to the number of individual violators arrested in these counties between 1870 and 1930 based on extant records. There were 102 sampled violators from a total of 1,021 in Fayette County, and 75 from a total of 757 in McLennan County. This sample size yields a confidence interval of ±7 when using the worst-case-scenario of 50% accuracy (the standard for polling statistics). Since my figures are based upon straightforward census records rather than subjective polling questions, and I have disregarded violators whose race could not be determined with some certainty, it is fair to consider the accuracy of this sample 95% or higher. Outside of this sample, I investigated *all* Fayette County violators from the 1870s (a total of 82), yielding highly accurate results for that particular decade.

Compendium_Roth
Page 2177

Fig. 5.9



Racially discriminatory law enforcement was nothing new in Texas and the United States in 1890. Certain offenses, like vagrancy, had been applied much more strictly to black citizens than white since the early years of Reconstruction.[45] As the Fayette County data shows, though, the deadly weapon law was not enforced in a discriminatory way during the 1870s and early 1880s. The turning point around 1890 should be interpreted as the visible manifestation of a mostly obscured cancer of racism metastasizing in the state's justice system. Because we already know that black Texans were jailed in far higher proportions than their white counterparts, case studies of other misdemeanor offenses would likely produce similar results of discriminatory enforcement sharpening around 1890.[46]

---

[45] John K. Bardes, "Redefining Vagrancy: Policing Freedom and Disorder in Reconstruction New Orleans," *Journal of Southern History* 84, no. 1 (February 2018): 69-112.

[46] Donald R. Walker, *Penology for Profit: A History of the Texas Prison System, 1867-1912* (College Station: Texas A&M University Press, 1988), 165-167.

This timeline aligns with political events in Fayette County during the very late 1880s. During Reconstruction, Fayette County was firmly within the pro-Davis wing of the Republican Party. Though Democrats made great gains in the mid-1870s, Fayette County voters usually continued to send one Republican to Austin as a part of their delegation to the state legislature. This pattern broke after the election of 1889, when significant white immigration tipped the scales in favor of Democratic voters (see Fig 5.6). Republicans experienced a brief comeback during the zenith of the Populist movement with the elections of 1894, but their position as one commanding a regular seat among the county's representatives was over. The fall of Republicanism in Fayette County matches perfectly the rise of discriminatory law enforcement against black residents. The conclusion is clear: as long as Republican voters held enough political capital to secure a seat at the table, black residents of Fayette County received fair treatment within the fee-based local justice system.[47]

In McLennan County, home to the booming railway entrepot of Waco, a similar pattern discriminatory enforcement emerged. As the African American proportion of the population declined, their share of appearances in court for weapons violations increased. However, fewer extant records from McLennan County and the effects of the high rail traffic produced less clear-cut results than were obtained in Fayette County. Without records covering the years 1877 to 1895, it is impossible to see the kind of sharp break around 1890 that appeared in Fayette County. Waco's position as a rail hub and fast-growing city in need of laborers affected the results of its case study, too. There were more Hispanic violators in McLennan County than Fayette, and more of the gun-toters there seem to have been visitors or transients who proved impossible to identify with certitude. The proportion of non-white violators grew substantially

---

[47] See state senators and representatives of Fayette County, Texas Legislative Reference Library, Legislators and Leaders, https://lrl.texas.gov/legeLeaders/members/lrlhome.cfm.

Compendium_Roth
Page 2179

over the half-century in question, from 13 percent in the early 1870s to 50 percent by 1930. However, this process played out in an ebb-and-flow way that produced temporary decreases around 1905 and 1915 (see Fig. 5.10).

Fig. 5.10



It is clear from the data collected in McLennan and Fayette Counties that the deadly weapon laws of Texas were not enacted to purposefully target black or Republican Texans for disarmament, nor was the law stamped from the beginning with a thinly veiled racism. It took decades for Democrats at the state and local levels to gain sufficient political strength to enact the laws and elect the officials who could preside over a campaign of discriminatory enforcement. The story of the deadly weapon law in these counties, whose substantial minority of black residents made them prime candidates for white-on-black violence, illuminates the reach of segregation far beyond private organizations to the justice system itself. It is the story of good intentions being turned to evil purposes, of the power of local officials over the lives of their constituents, of the necessity for voting rights in a bi-racial democracy.

195

Conclusion

The decade of the 1930s marked an important turning point in the history of firearm regulations in Texas and American history. That greatest of all "positive" progressive regulations, Prohibition, created a space for the proliferation of gangs, whose foot soldiers took to wielding automatic weapons. These types of firearms existed in the latter half of the nineteenth century but needed technological innovation and mass production techniques to make them widely available. A sharp rise in homicides committed by tommy guns produced a new wave of firearm regulations targeting automatic weapons for proscription. This time around, though, the federal government became involved through the passage of the National Firearms Act (NFA) in 1934. That legislation specified that certain types of firearms, including machine guns and short-barreled rifles and shotguns, must be registered. Furthermore, dealers in these "NFA" weapons had to pay an annual occupation tax intended to discourage sales. Some firearm accoutrements, like silencers and mufflers, also fell within the purview of the law.[1]

   Technology proved to a driving force in the adoption of federal gun laws, marking a continuity with state- and municipal-level weapon regulations of the nineteenth century. In antebellum Texas, the prevalence of Bowie knives made them a special target for reformers who succeeded in passing a law that penalized manslaughter-by-knife akin to murder. In the postbellum era, industrialization and rail transport turned cheap revolvers into household items that almost any man could afford. Though high-quality pistols, like Colts, could cost upwards of forty dollars, sellers advertised inexpensive alternatives at five dollars or less. The growth of mail-order purchasing and reliable mail delivery made them widely available for consumers and problematic for reformers. It is no coincidence that "pistol laws" like the one in Texas emerged

---

[1] Winkler, *Gunfight*, 211-219.

when they did, during a period of transition away from blades and toward pistols (revolvers and later semi-automatics) as the weapon of choice for interpersonal disputes.[2] The commercial sale of machine guns in the decades following the First World War marked a similar technological innovation that disrupted the status quo pertaining to weapon laws, ushering in federal legislation. In the late twentieth century, the availability of small caliber, semi-automatic rifles, referred to frequently and contentiously as "assault-type" rifles began posing a comparable problem. Across American history, the technology and consumer appetite for weapons have generally run far ahead of law and courts, creating cultural debates that elevate social tensions.

The introduction of federal-level gun laws reshaped the regulatory landscape pertaining to firearms and ultimately made it a more controversial issue than it had been in the past. Dating back to the eighteenth century, there is a deep strain of antipathy among southerners against interventions by the national government, in large measure because a powerful national government might threaten the South's "peculiar" racial arrangements. Critics then and now portray such interventions as unconstitutional usurpations of state power on the part of the federal government. This cultural inheritance has given the "gun rights" discourse of the New Right a strong popular resonance in the South and in rural areas more generally. Grover Norquist, an important policy advocate in the Republican Party since the 1980s, credits his party's position on gun laws with turning many traditional Democrats into reliable Republicans.[3] This process played out in rhetoric on the subject of federal gun laws alongside policy changes in historically Democratic, newly Republican state legislatures to scale back or repeal their deadly weapon laws. These policies have been as much about the deregulatory platform of the post-

---

[2] The research of historian Randolph Roth indicates that the rise of the handgun in Texas and California occurred over the decades stretching from the late 1840s to the 1870s. Roth, *American Homicide*, 355-356.
[3] "Interview with Grover Norquist," *PBS Frontline* (2004), accessed March 7, 2019.
https://www.pbs.org/wgbh/pages/frontline/shows/choice2004/interviews/norquist.html

Reagan Republican Party as they have been measures to promote public safety by empowering "good guys" to pack heat.

In Texas, the dismantling of the deadly weapon laws began in the 1990s, amid the state's changeover from a Democratic to a Republican stronghold. Republican George W. Bush, running for governor against Democrat Ann Richards, promised to sign concealed-carry legislation that the incumbent had passionately opposed and indeed vetoed. Though it was not a central issue in the race, loosening the state's strict gun laws proved popular with important swing voters in East Texas. Richards's campaign manager, Mary Beth Rogers, believed that Republicans ran a "whisper campaign" aimed at flipping East Texas Democrats. Whether or not the Bush campaign intentionally used the "She's gonna take away your gun" idea to win in the piney woods, a rift among Democratic voters along cultural lines had suddenly become apparent.[4] Since then, cultural conservatism aided Bush's ascendancy to the White House and kept the Lone Star State firmly within the Republican Party's control. In 1995, Bush signed the state's concealed-carry law, which allowed residents who passed a background check and completed the requisite training to obtain a permit for carrying concealed handguns. Twenty years later, state lawmakers decided that permit-holders should also be allowed to carry their handguns openly.

The current debate in Texas and throughout the country over "gun rights" and "gun control" has become a heated one. Proponents of the former portray their political enemies as tyrants seeking to abolish the Second Amendment and confiscate all firearms; supporters of the latter declare that we live in a "crisis" of gun-related deaths even though most statistics show that homicides and violent crime are in decline. As so often happens in this age of mass media, the

---

[4] Patricia Kilday Hart, "Little Did We Know," *Texas Monthly* (Nov. 2004), accessed March 7, 2019. https://www.texasmonthly.com/politics/little-did-we-know/.

rational middle-ground is hard to find, obscured by click-bait and muffled by shrill voices. Examining the history of weapon regulations, however, offers us an opportunity to consider the topic in a way that is less subjective and contentious. This is possible because our American ancestors drew altogether different distinctions about weapons, their use, and their regulation than we do today.[5]

No matter what side of the debate they take, twenty-first-century Americans care about "guns"—although the word itself means different things to different people. When pressed, most gun-control advocates say that they are actually concerned about handguns or "assault-type" guns rather than *all* guns. The most ardent gun-rights supporters, on the other hand, care a great deal about protecting virtually every type of gun from further regulation by the state and federal governments. In the nineteenth century, however, regulators lumped together several kinds of weapons, which included *some* guns alongside knives, metal knuckles, and sword canes. What these weapons had in common was their concealability and their purpose as instruments of personal rather than military defense. For them, the weapons used for hunting and warfare were protected by the federal and state bills of rights and thus received exemption from regulation. All others, termed "deadly weapons" in the nineteenth century, could be regulated in some form. Some states chose to proscribe only the concealment of them while others, like Texas, opted for more far-reaching measures. Where we cringe at the thought of openly borne weapons and the commercial sale of military-grade weapons, our ancestors feared concealed weapons and refused to regulate military-grade weapons. Does this mean that we should follow in their footsteps? Not necessarily. But it does illustrate the extent to which technological innovation and the passage of time have changed the way Americans think about weapons and how to regulate them.

---

[5] An excellent examination of these opposing camps, including their origins and policy goals, can be found in Winkler, *Gunfight*, 15-94.

The 2008 *Heller* decision finally eliminated the longstanding distinction between weapons of civic defense and those of personal defense by holding that the Second Amendment protects all arms in "common use" rather than merely those employed in the common defense.[6] Though this was an important step in the evolution of federal law, it followed what had always been the case in Texas. All six state constitutions have protected individual citizens or residents in their right to own and use arms for both "defence of himself and of the State." Still, state lawmakers and appellate judges across multiple generations believed that some limitations on the carrying and sale of certain types of weapons were constitutional and necessary. In this sense, then, *Heller* is less a turning point than it initially appears. The controversy surrounding its protection of personal-defense weapons constitutes yet another federal red herring which distracts us from the much more dramatic and substantial arena of regulatory power: the states. If the gun-rights lawyers believe that widening the definition of protected weapons *de facto* limits governmental regulatory authority over them, the example of Texas stands firmly in their way.

The legal activists on the political right who seek to dismantle state-level firearm regulations, extend the protections of the Second Amendment, and incorporate it onto the states have found ways of undermining arguments from history that contradict them. One of the most common and least convincing is the contention that gun control is a form of racism. These scholars have argued that the oldest gun laws were those aimed at preventing slaves and free blacks from having them.[7] According to their line of thinking, it follows that all ensuing firearm legislation is the fruit of a racist tree that needs to be chopped down. This is a disingenuous and

---

[6] *District of Columbia v. Heller* (2008).
[7] Some examples include Clayton E. Cramer, "The Racist Roots of Gun Control," *Kansas Journal of Law and Public Policy* 4, (Winter 1995): 17-25; David B. Kopel, *The Truth about Gun Control*; Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*. See also Yuill, "'Better Die Fighting against Injustice than to Die Like a Dog'."

Compendium_Roth
Page 2185

ahistorical position. Certainly all societies across human history which condoned slavery had to consider the wisdom of limiting their slaves' access to weapons, and the United States was no exception. Human beings devoid of legal rights or personhood, race notwithstanding, must always be viewed with suspicion by the governments sanctioning their subordination. But to say that this reality contaminated all future firearms regulations with the poison of racism is to set up a straw-man argument. Laws aimed at preventing American Indians from obtaining weapons, for example, were more about common-sense political security for colonial and state governments than racism per se. Moreover, the oldest North American laws pertaining to slaves and weapons required that households acquire sufficient firearms to arm male slaves if called upon by the Virginia government.[8] Indeed, aside from Kentucky, no Southern state attempted a blanket prohibition on black people carrying firearms. Slavery (and Indian policy) in North America was certainly grounded in racism, but to say that it was the sole animating force behind all state-level weapon laws, thereby justifying a retreat from measured gun regulations, is a deep misinterpretation of the historical record.[9]

A better way to think about race and weapon regulation in North America is to imagine it as an ever-present issue, sometimes in the foreground and other times in the background. In some cases, laws were racially discriminatory on purpose and by their very nature. The slave codes, antebellum laws targeting free blacks, and prohibitions against trading arms to Indians fall within this category. The forces of history made race a salient factor in white Americans' protection of their homes and communities from potential internal and external threats. The deadly weapon laws of Texas from 1836 to 1866 were, for the most part, overtly racial for this

---

[8] Breen and Innes, *Myne Owne Ground*, 25-27.
[9] For an incisive critique of the "gun laws as racism" argument made by contemporary legal scholars, see Charles, *Armed in America*, 287-289.

reason. The wielders of state power, Anglo-white men, did what they could to limit the access of slaves and Indians to arms and ammunition. In other cases, however, race looms in the background. Emancipation, Reconstruction, and their concomitant elevation of racial tensions provide the necessary context for the enactment of race-neutral, even pro-black, weapon laws. In Texas, the legislation of 1870-1871 was specifically designed to protect Republican voters from pro-Confederate intimidation. As federal judges lent their approval to the emerging system of segregation in the 1880s, local enforcement officials had the ability to apply these laws selectively in a racially discriminatory way. It is unlikely that this pattern is universally true across the South, but the best evidence gathered thus far indicates that it was the case for much of Texas. The development of racism in the enforcement of deadly weapon laws says far more about Jim Crow's corruption of the legal system and the rise of the "carceral state" than it does about the philosophical underpinnings of weapon regulation.

The motivations behind the race-neutral weapon laws of Texas emanated from class and political considerations, both of which went hand-in-hand with race. The antebellum legislation against knife-wielding killers alongside James W. Throckmorton's proposed tax upon the carrying of weapons targeted poorer men for moral reform because they, in the eyes of their social betters, resorted too frequently to violence and acted in irresponsible or unmanly ways. These men could be Tejanos, Anglos, or African Americans; the law considered them equally problematic if they fit the description provided by Throckmorton back in 1866: "men and boys, vagabonds and vagrants" carrying "arms about their persons on all occasions."[10] Of course, in postbellum Texas, freedmen clung to the bottom rung of the socio-economic ladder and, at least in the eyes of most white Texans, most closely resembled Throckmorton's portrayal. Though the

---

[10] *House Journal* (1866), 530.

deadly weapon laws of the early 1870s were initially enacted by Republicans to protect vulnerable black voters, the declining cost of purchasing pistols across the closing decades of the nineteenth century adds an important class element to the amendments passed during that time period. Gun-toting defendants tended to be young men who owned no land and held little in the way of social capital. The intersection of poverty and racism transformed these laws, laudable as they may have been in the beginning, into tools of oppression by 1900.

The rise of a new, middle-class masculinity during the post-Civil War period greatly affected the history of gun and weapon regulations in Texas. Where governor Throckmorton had seen financial means as a way of deciding who was "man" enough to carry a pistol, in the 1890s governor Jim Hogg asked Texas voters to be "man" enough *not* to use one.[11] Shifting societal expectations of men followed economic development and demographic growth in Texas during the postbellum era. The middle-class residents arriving daily from other states and countries wanted peace and safety in their newly established communities. In many respects, they got what they wanted. State jurisprudence closely guarded the "heat of passion" defense that men so frequently used to justify their recourse to bloody vengeance; family feuds and vendettas had largely burned out by the end of the century; professional police forces and bureaucratized sheriffs' departments provided more effective law enforcement than the state had ever seen before. Still, this was the era in which ritualized *racial* violence became more common and more culturally meaningful. Even into the late nineteenth century, the paradoxical intermingling of freedom and security for some with the oppression of others continued to define race relations in the United States. If black or Hispanic Texans opted not to carry guns, their decision likely had less to do with the adoption of middle-class values than with an attempt to avoid harassment by

---

[11] *House Journal* (1893), 24-25.

officers. As the ballad of Gregorio Cortéz showed, the very arms that made them arrestable on sight provided their best means of defense against persecution.

Turn-of-the-century Texans might have been trying to live out B. B. Paddock's slogan that "the revolver must go," but they did so during a time period in which national attention remained fixated on pistols and gun violence. Wild West shows, western novels, and the art of Frederick Remington and Charles Russell were popular. Writers turned Civil War figures into western heroes, most notably Jesse James, whose real-life escapades took him to Minnesota rather than Mexico.[12] Why did Americans gravitate toward a violent West filled with gunslingers and desperadoes? Some historians might point toward a shared "myth" of the West that united disparate Americans into a communal endeavor to "civilize" the continent.[13] Others might claim that the final three decades of the nineteenth century witnessed a "greater reconstruction" of the country, best epitomized by the settling of the West, which dominated American politics and culture.[14] Still others might theorize that desperadoes personified an outdated, dying vision of manliness that inhabitants of an industrializing world longed for.[15] Arriving at the question from the perspective of gun laws and their history, one might wonder whether the fascination has a much simpler explanation and grew from living in a "gun culture" or fearing the effects of a "gun crisis."

---

[12] Matthew C. Hulbert, *Ghosts of Guerrilla Memory: How Civil War Bushwhackers Became Gunslingers in the American West* (Athens: University of Georgia Press, 2016).

[13] Richard Slotkin, *Regeneration through Violence: The Mythology of the American Frontier, 1600-1860* (Middletown, CT: Wesleyan University Press, 1973); Richard Slotkin, *The Fatal Environment: The Myth of the Frontier at the Age of Industrialization, 1800-1890* (New York: Atheneum, 1985); Richard Slotkin, *Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America* (New York: Atheneum, 1992).

[14] Richard White, *The Republic for Which It Stands: The United States during Reconstruction and the Gilded Age, 1865-1896* (New York: Oxford University Press, 2017).

[15] Richard White, "Outlaw Gangs of the Middle Border: American Social Bandits," *Western Historical Quarterly* 12, no. 4 (Oct. 1981): 387-408.

204

A more fruitful line of inquiry than debating the presence or absence of a "gun culture" is an examination of the cultural changes, then and now, that produced problematic gun violence. There is no doubt that the postbellum era was a bloody one. The "war" of Reconstruction, the suppression of black voting, the subjugation of the Plains Indians, and rising urbanization made for a tumultuous thirty years. By contrast, the decades marking the turn of the twenty-first century have witnessed a decline in violent crime. Aside from a few notorious pockets of criminal activity, the American streets are as safe as they have ever been. The reason for parallels between the two time periods, which include media attention to gun-related deaths, the profitable mass production and wide availability of firearms, a cultural fascination with violence, and a strong gun-control movement, remain difficult to see.

If we zoom out and consider more holistically the similarities between the present, which Democrats have long referred to as "a second Gilded Age," and the closing decades of the nineteenth century, whose designation as "the Gilded Age" has only recently sparked academic controversy, a clearer picture emerges. Both eras have been marked by technological innovations that disrupted employment patterns and heightened the sense of vulnerability to irrational market forces. Some historians have argued that the two "Gilded Ages" are connected by globalization and its consequent feelings of atomization on the part of those left behind by new political and economic structures.[16] A growing divide is emerging between the well-connected members of a "global community" on the one hand, and the parochial inhabitants of "flyover country" on the other, who feel as though their values, skills, and political voice are under attack. Recent Democratic gaffes accusing these Americans of clinging to "God and guns" or being a collective

---

[16] Niall Ferguson, "Populism as a Backlash against Globalization—Historical Perspectives," *Horizons* 8 (Autumn 2016): 12-21. For an anecdotal, biographical example of this perspective, See J. D. Vance, *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis* (New York: Harper, 2016).

"basket of deplorables" point to a cultural rift in America that even savvy politicians have trouble navigating. It is purely speculative, but this position offers some explanation for the cultural resonance of the gun debate today. No object, no issue (not even abortion) so perfectly draws the dividing line between these two camps. One side wants "gun control" to prevent maniacs with "mental health issues" from shooting up schools and workplaces; the other wants "gun rights" to guard themselves against the ever-present "criminal" who lurks around every corner. Both sides in their fearfulness overlook the common thread among shooting sprees, urban crime, and suicides—which tend to afflict young, hopeless men as the pullers of the trigger.

206

Bibliography

Archival Sources

DeWitt County, Texas, District Court Minutes, vols. H-K, Microfilm Reels 1012068, 1012069 (1879-1898), Texas State Library and Archives Commission.

*Fayette County Records, LaGrange, Texas.*
Office of the District Clerk of Fayette County.
District Court Minutes, vols. K-M (1867-1877).
Office of the County Clerk of Fayette County.
Judge's State Docket, vols. 1-6 (1872-1933).
Bar State Docket (1872-1879).
Bar Criminal Docket (1888-1894).
Office of the County Judge of Fayette County.
Justice Court Criminal Docket, Precinct 1 (1877-1880, 1883-1893, 1899-1901).
Justice Court Criminal Docket, Precinct 6 (1899-1902).
Justice Court Criminal Docket, Precinct 7 (1881-1890, 1893-1904).
Justice Court Criminal Docket, Precinct 8 (1890).
Justice Court Criminal Docket, Precinct Unlisted (1889-1897, 1893-1895, 1895-1897, 1897-1899).
*Jefferson County Records, Beaumont, Texas.*
Office of the County Clerk of Jefferson County.
County Court Criminal Minutes, vol. 1 (1897-1915).
Criminal Judgment Book (1910-1915).
County Court Criminal Index, (1914-1953).
*Jefferson County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*
Justice Court Criminal Docket, Precinct 6 (1908-1915).
Justice Court Civil and Criminal Docket, Precinct 1 (1874-1876).
Justice Court Criminal Docket, Examining Trials, Precinct 1 (1895-1902).
Justice Court Criminal Docket, Examining Trials, Precinct 1 (1921-1925).
*Liberty County Records, Sam Houston Regional Library and Research Center, Liberty, Texas.*
Justice Court Criminal Docket, Precinct 1 (1870-1875).
Justice Court Criminal Docket, Precinct 8 (1912).
*McLennan County Records, McLennan County Archives, Waco, Texas.*
Justice Court Criminal Docket, Precinct 1 (1901-1903).
Justice Court Criminal Docket, Precinct 3 (1894-1904).
Justice Court Criminal Docket, Precinct 5 (1896-1900).
County Court Criminal Fee Book, vols. K-W (1897-1930).
County Court Criminal Minutes, vols. A, H, L (1876-1881, 1896-1922).
County Court Criminal Case Files, Boxes 1-7 (1886-1887).
County Jail Register of Prisoners (1895-1900).
Texas, District Court Criminal Docket (1873-1874).
City of Waco Criminal District Court, Docket (1874-1876).

*Parker County Records, University of Texas at Arlington Central Library, Special Collections, Arlington, Texas.*
County Court Minutes, vols. 5-9 (1896-1937).
Justice Court Criminal Docket, Precinct 1, 9 vols. (1884-1923).

<u>Legislative Documents</u>
*Texas Documents.*
Bill Files, Legislative Records, Texas State Library and Archives Commission, Austin, Texas.
Journals of the Senate of the Republic of Texas, 1st-9th Cong. (1836-1845).
Journals of the House of Representatives of the Republic of Texas, 1st-9th Cong. (1836-1845).
Journals of the Senate of the State of Texas, 1st-41st Leg. (1845-1930).
Journals of the House of Representatives of the State of Texas, 1st-41st Leg. (1845-1930).
Gammel, H.P.N., editor. *Gammel's Laws of Texas*. 28 vols., 1822-1933. Austin: Gammel Book Company, 1897-1933.
Weeks, F. M., reporter. *Debates of the Texas Convention*. Houston: J. W. Cruger, 1846.
*Journal of the Reconstruction Convention, which met at Austin, Texas, 1868-1869.* Austin: Tracy, Siemering & Co., 1870.
*State Journal Appendix: Containing Official Report of the Debates and Proceedings of the Twelfth Legislature of the State of Texas.* Austin: Tracy, Siemering, & Co., 1870.

*United States Federal Documents.*
United States Senate. "Report of Carl Schurz." Senate Executive Document No. 2-39 (1865).
United States Congress. *Report of Joint Committee on Reconstruction* (1866).
United States Senate. "Report of W. E. Strong." Senate Executive Document No. 27-39 (1866).
United States Senate. "Report of Benjamin C. Truman." Senate Executive Document No. 43-39 (1866).
United States House of Representatives. "Memorial on Behalf of the Citizens of Western Texas." House Miscellaneous Document No. 35-42 (1867).
United States House of Representatives. "Condition of Affairs in Texas." House Executive Document No. 61-39 (1867).
United States Congress. *Report of the Joint Select Committee to Inquire into the Condition of Affairs in Late Insurrectionary States* (1872).
United States Senate. Senate Report No. 41-42 (1872).
Federal Writers Project. *Slave Narratives: A Folk History of Slavery in the United States from Interviews with Former Slaves*. Vol. 16. Washington: Works Progress Administration, 1941.

<u>Legal Documents and Court Cases</u>
Texas Legal Documents.
*The Penal Code of the State of Texas*. Galveston: The News Office, 1857.
*1879 Revised Statutes of Texas*. Austin: State Printing Office, 1887.
*1895 Revised Statutes of Texas*. Austin: Eugene Von Boeckmann, 1895.
*1911 Revised Civil Statutes and Revised Criminal Statutes of Texas*. Austin: Austin Printing Company, 1912.

*1925 Revised Civil Statutes and Revised Criminal Statutes of Texas*. Austin: A.C. Baldwin & Sons, 1925.

*1928 Complete Texas Statutes*. Kansas City, MO: Vernon Law Book Company, 1928.

*1931 Supplement to the 1928 Complete Texas Statutes*. Kansas City, MO: Vernon Law Book Company, 1931.

*Cases Argued and Adjudged in the Supreme Court of Texas*. Vols. 32-46, 1869-1876.

*The Texas Criminal Reports: Cases Argued and Adjudged in the Court of Criminal Appeals of the State of Texas*. Vols. 1-60, 1876-1911.

Thomas Johnson Michie, editor. *The Encyclopedic Digest of Texas Reports*. 4 vols. Charlottesville: Michie Co., 1912-1914.

State of Texas Court Cases

*Flournoy v. State of Texas*, 14 Tex. 387 (1856).
*Cockrum v. Texas*, 24 Tex. 394 (1859).
*English v. State of Texas*, 35 Tex. 473 (1872).
*State of Texas v. Carter*, 36 Tex. 89 (1872).
*Jenkins v. State of Texas*, 36 Tex. 638 (1872).
*Christian v. State of Texas*, 37 Tex. 475 (1873).
*Waddell v. State of Texas*, 37 Tex. 354 (1873).
*State of Texas v. Duke* 42 Tex. 455 (1874).
*Meredith v. State of Texas*, 40 Tex. 447 (1874).
*Maxwell v. State of Texas*, 38 Tex. 156 (1873).
*State of Texas v. Duke* 42 Tex. 455 (1874).
*Lewis v. State of Texas*, 2 Tex. Cr. App. 26 (1877).
*Reynolds v. State of Texas*, 1 Tex. Cr. App. 616 (1877).
*Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).
*Woodward v. State of Texas*, 5 Tex. Cr. App. 295 (1878).
*Snell v. State of Texas*, 4 Tex. Cr. App. 171 (1878).
*Lewis v. State of Texas*, 7 Tex. Cr. App. 567. (1880).
*Ex Parte Boland*, 11 Tex. Cr. App. 159 (1881).
*Carmichael v. State of Texas*, 11 Tex. Cr. App. 27 (1881).
*Brooks v. State of Texas*, 15 Tex. Cr. App. 88 (1883).
*West v. State of Texas*, 21 Tex. Cr. App. 427 (1886).
*Clayton v. State of Texas*, 21 Tex. Cr. App. 343 (1886).
*Darby v. State of Texas,* 23 Tex. Cr. App. 407 (1887).
*Harris v. State of Texas*, 22 Tex. Cr. App. 677 (1887).
*Cathey v. State of Texas,* 23 Tex. Cr. App. 492 (1887).
*Blair v. State of Texas*, 26 Tex. Cr. App. 387 (1888).
*West v. State of Texas*, 26 Tex. Cr. App. 99 (1888).
*Stilly v. State of Texas*, 27 Tex. Cr. App. 445 (1889).
*Baker v. State of Texas*, 28 Tex. Cr. App. 5 (1889).
*Shelton v. State of Texas*, 27 Tex. Cr. App. 443 (1889).
*McNeil v. State of Texas* 29 Tex. Cr. App. 48 (1890).
*Massie v. State of Texas*, 30 Tex. Cr. App. 64 (1891).
*Wolfforth v. State of Texas*, 31 Tex. Cr. App. 387 (1892).
*O'Neal v. State of Texas*, 32 Tex. Cr. App. 42 (1893).

209

*Miller v. State of Texas*, 32 Tex. Cr. App. 319 (1893).
*Love v. State of Texas*, 32 Tex. Cr. App. 85 (1893).
*Ringer v. State of Texas*, 33 Tex. Cr. App. 180 (1894).
*Price v. State of Texas*, 34 Tex. Cr. App. 102 (1895).

United States Federal Court Cases.
*Twitchell v. Commonwealth* 74 U.S. 321 (1868)
*U.S. v. Avery*, 13 Wall. 251 (1872).
*Slaughterhouse Cases*, 83 U.S. 36 (1873).
*Edwards v. Elliott*, 88 U.S. 532 (1874).
*Walker v. Sauvinet*, 92 U.S. 90 (1876).
*U.S. v. Cruikshank*, 92 U.S. 542 (1876).
*Miller v. Texas*, 153 U.S. 535 (1894).
*Plessy v. Ferguson*, 163 U.S. 537 (1896).
*U.S. v. Miller*, 307 U.S. 174 (1939).
*Saenz v. Roe*, 526 U.S. 489 (1999).
*District of Columbia v. Heller*, 554 U.S. 570 (2008).


Websites
Texas State Historical Association. *Handbook of Texas Online*. https://tshaonline.org/handbook.
Duke University School of Law. *Repository of Historical Gun Laws*.
    https://law.duke.edu/gunlaws/.
Texas Legislative Reference Library. https://lrl.texas.gov/.
University of North Texas. *The Portal to Texas History*. https://texashistory.unt.edu/.
Oklahoma Historical Society. *Encyclopedia of Oklahoma History and Culture*.
    https://www.okhistory.org/publications/encyclopediaonline.
Cato Institute. *Gun Control*. https://www.cato.org/research/gun-control.
Center for American Progress. *Gun Violence*. https://www.americanprogress.org/tag/gun-violence/.
United States Census of Population and Housing. *United States Resident Population by State: 1790-1850*. https://www.census.gov/prod/www/decennial.html.
"Interview with Grover Norquist," *PBS Frontline* (2004), accessed March 7, 2019.
    https://www.pbs.org/wgbh/pages/frontline/shows/choice2004/interviews/norquist.html


Newspapers
*Abilene (TX) Daily Reporter*
*Abilene (TX) Reporter*
*Albany (TX) News*
*Albany (TX) Star*
*Alpine (TX) Avalanche*
*Aspermont (TX) Star*
*Austin (TX) Weekly Statesman*
*Bastrop (TX) Advertiser*
*Bonham (TX) News*

*Brenham (TX) Daily Banner*
*Caldwell (KS) Post*
*Canadian (TX) Free Press*
*Cheyenne Transporter* (Darlington, IT)
*Christian Messenger* (Bonham, TX)
*Daily Fort Worth (TX) Standard*
*Dallas (TX) Daily Herald*
*Dallas (TX) Herald*
*Dallas (TX) Morning News*
*Denison (TX) Daily News*
*Denton County News* (Denton, TX)
*Fort Worth (TX) Daily Democrat*
*Fort Worth (TX) Daily Gazette*
*Fort Worth (TX) Gazette*
*Frontier Echo* (Jacksboro, TX)
*Galveston (TX) Daily News*
*Hallettsville (TX) New Era*
*Hillsboro (TX) Mirror*
*Honey Grove (TX) Signal*
*Houston (TX) Chronicle*
*Houston (TX) Daily Union*
*Jackson (OH) Standard*
*Lampasas (TX) Daily Leader*
*Los Angeles (CA) Times*
*Medical and Surgical Reporter* (Philadelphia, PA)
*North Texas Enterprise* (Bonham, TX)
*Northern Standard* (Clarksville, TX)
*Palo Pinto (TX) Star*
*Panola Watchman* (Carthage, TX)
*Plano (TX) Star-Courier*
*Polk County Enterprise* (Livingston, TX)
*Richmond (TX) Reflector*
*San Antonio (TX) Daily Express*
*San Antonio (TX) Express*
*San Marcos (TX) Free Press*
*Schulenburg (TX) Sticker*
*St. Tammany Farmer* (Covington, LA)
*Stephenville (TX) Empire*
*Telegraph and Texas Register* (Houston, TX)
*Temple (TX) Daily Telegram*
*Tri-Weekly State Gazette* (Austin, TX)
*Waco (TX) Daily Examiner*
*Waco (TX) Evening News*
*Weekly Democratic Statesman* (Austin, TX)
*Women's Wear Daily* (New York City, NY)

211

Books and Articles

Amar, Akhil Reed. *The Bill of Rights: Creation and Reconstruction.* New Haven: Yale University Press, 1998.

Ayers, Edward L. *Vengeance and Justice: Crime and Punishment in the 19th Century American South*. New York: Oxford University Press, 1984.

Baldwin, Joseph G. *The Flush Times of Alabama and Mississippi; A Series of Sketches*. New York: D. Appleton, 1853.

Bardes, John K. "Redefining Vagrancy: Policing Freedom and Disorder in Reconstruction New Orleans." *Journal of Southern History* 84, no. 1 (February 2018): 69-112.

Barr, Alwyn. *Reconstruction to Reform: Texas Politics, 1876-1901.* Austin: University of Texas Press, 1971.

Bean, Christopher B. *Too Great a Burden to Bear: The Struggle and Failure of the Freedmen's Bureau in Texas.* New York: Fordham University Press, 2016.

Beccaria, Cesare. *An Essay on Crimes and Punishments.* London: F. Newbery, 1775.

Bellesiles, Michael A., ed. *Lethal Imagination: Violence and Brutality in American History*. New York: New York University Press, 1999.

Bellesiles, Michael A. *Arming America: The Origins of a National Gun Culture*. New York: Knopf, 2000.

Bensel, Richard. *Yankee Leviathan: The Origins of Central State Authority in America, 1859-1877.* New York: Cambridge University Press, 1991.

Bercaw, Nancy. *Gendered Freedom: Race, Rights, and the Politics of Household in the Delta, 1861-1875.* Gainesville: University of Florida Press, 2003.

Blackburn, Edward A. *Wanted: Historic County Jails of Texas.* College Station: Texas A&M University Press, 2005.

Blackstone, William. *Commentaries on the Laws of England*. 4 vols. Oxford: Oxford, 1765-1769.

Blatt, Jessica "John W. Burgess, the Racial State and the Making of the American Science of Politics." *Ethnic and Racial Studies* 37, no. 6 (2014): 1062-1079.

Brands, H. W. *American Colossus: The Triumph of Capitalism, 1865-1900.* New York: Doubleday, 2010.

212

Breen, T.H. and Stephen Innes. *Myne Owne Ground: Race and Freedom on Virginia's Eastern Shore, 1640-1676.* Oxford: Oxford University Press, 1980.

Brice, Donaly E. and Barry A. Crouch. *Cullen Montgomery Baker: Reconstruction Desperado.* Baton Rouge: Louisiana State University Press, 1987.

Buenger, Walter L. *The Path to a Modern South: Northeast Texas between Reconstruction and the Great Depression.* Austin: University of Texas Press, 2001.

Burgess, John W. *Political Science and Constitutional Law.* 2 vols. Boston: Ginn & Company, 1893.

Campbell, Randolph B. *Grass-Roots Reconstruction in Texas, 1865-1880.* Baton Rouge: Louisiana State University Press, 1997.

Campbell, Randolph B. *Gone to Texas: A History of the Lone Star State*. 2nd ed., New York: Oxford University Press, 2012.

Cantrell, Gregg. *The People's Revolt: Texas Populists and the Roots of American Liberalism*. New Haven: Yale University Press, 2019.

Cantrell, Gregg. "Racial Violence and Reconstruction Politics, 1867-1868." *Southwestern Historical Quarterly* 93 (January 1990): 333-355.

Carroll, B. H. *Standard History of Houston Texas from a Study of the Original Sources*. Knoxville: H. W. Crew & Co., 1912.

Charles, Patrick J. *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry*. New York: Prometheus Books, 2018.

Clampitt, Brad R. "The Breakup: The Collapse of the Confederate Trans-Mississippi Army in Texas, 1865." *Southwestern Historical Quarterly* 108 (April 2005): 498-534.

Connor, Seymour V. *Texas: A History.* New York: Thomas Y. Crowell Company, 1971.

Cornell, Saul. *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America.* Oxford: Oxford University Press, 2006.

Courtwright, David T. *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City*. Cambridge: Harvard University Press, 1996.

Cramer, Clayton E. *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie.* Nashville, TN: Nelson Current, 2006.

Cramer, Clayton E. *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*. Westport, CT: Praeger, 1999.

213

Cramer, Clayton E. "The Racist Roots of Gun Control." *Kansas Journal of Law and Public Policy* 4 (Winter 1995): 17-25.

Crouch, Barry A. *The Governor's Hounds: The Texas State Police, 1870-1873.* Austin: University of Texas Press, 2011.

Crouch, Barry A. Larry Peacock, and James M. Smallwood. *Murder and Mayhem: The War of Reconstruction in Texas*. College Station: Texas A&M University Press, 2003.

Crouch, Barry A.  " 'All the Vile Passions': The Texas Black Code of 1866," *Southwestern Historical Quarterly* 97 (July 1993): 12–34.

Crouch, Barry. "A Spirit of Lawlessness: White Violence; Texas Blacks, 1865-1868." *Journal of Social History* 18, no. 2 (Winter 1984): 217-232.

Curtis, Michael Kent. *No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights.* Durham: Duke University Press, 1986.

DeConde, Alexander. *Gun Violence in America: The Struggle for Control*. Boston: Northeastern University Press, 2001.

Dixon, Thomas. *The Clansman: An Historical Romance of the Ku Klux Klan.* New York: Grosset & Dunlap, 1905.

Dougherty, Kevin. *Weapons of Mississippi.* Oxford: University of Mississippi Press, 2010.

Dunning, William A. "The Undoing of Reconstruction." In *Essays on the Civil War and Reconstruction and Related Topics.* New York: The Macmillan Company, 1904. First published 1897 by Peter Smith (New York).

Durrill, Wayne K. "Political Legitimacy and Local Courts: 'Politicks at Such a Rage' in a Southern Community During Reconstruction." *Journal of Southern History* 70, no. 3 (August 2004): 577-602.

Dykstra, Robert R. *The Cattle Towns.* New York: Knopf, 1968.

Edwards, George J. *The Grand Jury: Considered from an Historical, Political and Legal Standpoint, and the Law and Practice Relating Thereto.* Philadelphia: G. T. Bisel, 1906.

Edwards, Laura F. *Gendered Strife and Confusion: The Political Culture of Reconstruction*. Urbana: University of Illinois Press, 1997.

Edwards, Laura F. *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South.* Chapel Hill: University of North Carolina Press, 2009.

Ellis, Mark R. *Law and Order in Buffalo Bill's Country: Legal Culture and Community on the Great Plains, 1867-1910.* Lincoln: University of Nebraska Press, 2007.

Emberton, Carole. *Beyond Redemption: Race, Violence, and the American South after the Civil War.* Chicago: University of Chicago Press, 2013.

Emberton, Carole. "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South." *Stanford Law and Policy Review* 17 (2006): 615-634.

Ernst, Daniel R.  "Ernst Freund, Felix Frankfurter, and the American *Rechtsstaat*: A Transatlantic Shipwreck, 1894-1932." *Studies in American Political Development* 23 (October 2009): 171-188.

Felski, Rita. *The Limits of Critique.* Chicago: University of Chicago Press, 2015.

Ferguson, Niall. "Populism as a Backlash against Globalization—Historical Perspectives." *Horizons* 8 (Autumn 2016): 12-21.

Foner, Eric. *Reconstruction: America's Unfinished Revolution, 1863-1877.* New York: Harper & Row, 1988.

Foner, Eric. *The Fiery Trial: Abraham Lincoln and American Slavery.* New York: W.W. Norton, 2010.

Foreman, Grant. *Pioneer Days in the Early Southwest*. 1926; reprint, Lincoln: University of Nebraska Press, 1994.

Free, Laura E. *Suffrage Reconstructed: Gender, Race, and Voting Rights in the Civil War Era.* Ithaca: Cornell University Press, 2015.

Freund, Ernst. *The Police Power: Public Policy and Private Rights.* Chicago: University of Chicago Press, 1904.

Friend, Craig Thompson, editor. *Southern Masculinity: Perspectives on Manhood in the South since Reconstruction*. Athens: University of Georgia Press, 2009.

Gerstle, Gary. *Liberty and Coercion: The Paradox of American Government from the Founding to the Present*. Princeton: Princeton University Press, 2015.

Goldstein, Leslie Friedman. "The Specter of the Second Amendment: Rereading *Slaughterhouse* and *Cruikshank*." *Studies in American Political Development* 21 (Fall 2007): 131-148.

Goodwyn, Lawrence. *Democratic Promise: The Populist Moment in America.* New York: Oxford University Press, 1976.

Compendium_Roth
Page 2200

Greenberg, Amy S. *Manifest Manhood and the Antebellum American Empire.* New York: Cambridge University Press, 2005.

Grossberg, Michael and Christopher Tomlins, eds. *The Cambridge History of Law in America: Volume II, The Long Nineteenth Century (1789-1920)*. New York: Cambridge University Press, 2008.

Haag, Pamela. *The Gunning of America: Business and the Making of American Gun Culture*. New York: Basic Books, 2016.

Halbrook, Stephen P. *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876*. Westport, CT: Praeger, 1998.

Halbrook, Stephen P. "The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights." 41 *Baylor Law Review* (1989): 629-88.

Haley, James L. *The Texas Supreme Court: A Narrative History, 1836-1986.* Austin: University of Texas Press, 2013.

Hämäläinen, Pekka. *The Comanche Empire*. New Haven: Yale University Press, 2008.

Hamner, Laura V. *The No-Gun Man of Texas: A Century of Achievement, 1835-1929.* Amarillo: Laura V. Hamner, 1935.

Hart, Patricia Kilday. "Little Did We Know." *Texas Monthly* (November 2004). Accessed March 7, 2019. https://www.texasmonthly.com/politics/little-did-we-know/.

Hartog, Hendrick. "Lawyering, Husbands' Rights, and 'the Unwritten Law' in Nineteenth-Century America." *Journal of American History* 84, no. 1 (June 1997): 67-96.

Hine, Darlene Clark. *Black Victory: The Rise and Fall of the White Primary in Texas.* Millwood, NY: KTO Press, 1979.

Hinz, Dale L. *Panther's Rest: History of the Fort Worth Police Department, 1873-21st Century*. Bloomington: Author House, 2007.

Hogan, William Ransom *The Texas Republic: A Social and Economic History*. Norman: University of Oklahoma Press, 1946.

Howell, Kenneth Wayne. *Texas Confederate, Reconstruction Governor: James Webb Throckmorton.* College Station: Texas A&M University Press, 2008.

Hulbert, Matthew C. *Ghosts of Guerrilla Memory: How Civil War Bushwhackers Became Gunslingers in the American West.* Athens: University of Georgia Press, 2016.

216

Jennys, David R. "Holland Coffee: Fur Trader on the Red River." *The Museum of the Fur Trade Quarterly* 29, no. 3 (Fall 1993): 1-9.

Johnson, Frank W. *A History of Texas and Texans.* Chicago: American Historical Society, 1914.

Johnson, Paul E. *A Shopkeeper's Millennium: Society and Revivals in Rochester, New York, 1815-1837.* New York: Hill and Wang, 1978.

Jones, Stephen. *Criminology*, 5th ed. New York: Oxford University Press, 2013.

Kopel, David B. *The Truth about Gun Control*. New York: Encounter Books, 2013.

Lause, Mark. *The Great Cowboy Strike: Bullets, Ballots, and Class Conflict in the American West.* New York: Verso, 2017.

Leonardatos, Cynthia, David B. Kopel, and Stephen P. Halbrook. "*Miller versus Texas*: Police Violence, Race Relations, Capital Punishment, and Gun-Toting in Texas in the Nineteenth Century—and Today." *Journal of Law and Policy Review* 9 (2001): 737-766.

Les Benedict, Michael. "Preserving Federalism: Reconstruction and the Waite Court." *The Supreme Court Review* (1978): 39-79.

Light, Caroline. *Stand Your Ground: A History of America's Love Affair with Lethal Self-Defense.* Boston: Beacon Press, 2017.

Lott, John R., Jr. *More Guns, Less Crime: Understanding Crime and Gun Control Laws.* Chicago: University of Chicago Press, 1998.

Magliocca, Gerard N. "Why Did the Incorporation of the Bill of Rights Fail in the Late Nineteenth Century?" *Minnesota Law Review* 94, no. 1 (2009): 102-139.

McGirr, Lisa. *The War on Alcohol: Prohibition and the Rise of the American State.* New York: W.W. Norton, 2015.

McKanna, Clare V. Jr. *Homicide, Race, and Justice in the American West, 1880-1920.* Tucson: University of Arizona Press, 1997.

Middlebrooks, Audry J. and Glenna. "Coffee of Red River." *Southwestern Historical Quarterly* 69, no. 2 (October 1965): 145-162.

Moneyhon, Carl. *Republicanism in Reconstruction Texas.* Austin: University of Texas Press, 1980.

Moneyhon, Carl. *Texas after the Civil War: The Struggle of Reconstruction.* College Station: Texas A&M University Press, 2004.

217

Moneyhon, Carl *Edmund J. Davis of Texas: Civil War General, Republican Leader, Reconstruction Governor.* Fort Worth: TCU Press, 2010.

Moore, Jacqueline M. " 'Them's Fighting Words': Violence, Masculinity, and the Texas Cowboy in the Late Nineteenth Century." *Journal of the Gilded Age and Progressive Era* 13, no. 1 (January 2014): 28-55.

Moore, Jacqueline M. *Cow Boys and Cattle Men: Class and Masculinities on the Texas Frontier, 1865-1900.* New York: New York University Press, 2010.

Newsom, Kevin Christopher. "Setting Incorporationism Straight: A Reinterpretation of the *Slaughterhouse Cases.*" *Yale Law Journal* 109, no. 4 (2000): 643-744.

Olmstead, Charles L. and Edward Coy Ybarra. *The Life and Death of Juan Coy: Outlaw and Lawman.* Austin: Eakin Press, 2001.

Page, Thomas Nelson. *The Negro: The Southerner's Problem.* New York: Charles Scribner's Sons, 1904.

Paredes, Américo. *"With His Pistol in His Hand": A Border Ballad and Its Hero.* Austin: University of Texas Press, 1958.

Parmlee, Maurice. *Criminology.* New York: The MacMillan Company, 1923.

Parsons, Chuck. *A Lawless Breed: John Wesley Hardin, Texas Reconstruction, and Violence in the Wild West.* Denton: University of North Texas Press, 2013.

Parsons, Elaine Frantz. "Midnight Rangers: Costumes and Performance in the Reconstruction-Era Ku Klux Klan." *Journal of American History* 92 (December 2005): 811-836.

Perman, Michael. *The Struggle for Mastery: Disfranchisement in the South, 1888-1908.* Chapel Hill: University of North Carolina Press, 2001.

Perry, John. "Two Texas Shooting Affairs, Two Karnes County Sheriffs Killed—and the Butlers Did It." *Wild West* (April 2005): 10-12, 61.

Postel, Charles. *The Populist Vision.* New York: Oxford University Press, 2007.

Rable, George C. *But There Was No Peace: The Role of Violence in the Politics of Reconstruction.* Athens: University of Georgia Press, 1984.

Ramsdell, Charles W. *Reconstruction in Texas.* New York: Columbia University Press, 1910.

Reed, Germaine A. "Race Legislation in Louisiana, 1864-1920." *Louisiana History: The Journal of the Louisiana Historical Association* 6, no. 4 (Autumn 1965): 379-392.

Richter, William L. *Overreached on All Sides: The Freedmen's Bureau Administrators in Texas, 1865-1868*. College Station: Texas A&M University Press, 1991.

Ritter, Gretchen. *Goldbugs and Greenbacks: The Antimonopoly Tradition and the Politics of Finance in America.* New York: Cambridge University Press, 1997.

Roberts, O. M. "The Experiences of an Unrecognized Senator." *The Quarterly of the Texas State Historical Association* 12, no. 2 (October 1908): 87-147.

Rodgers, Daniel T. *Atlantic Crossings: Social Politics in a Progressive Age.* Cambridge: Harvard University Press, 2009.

Roth, Randolph. *American Homicide.* Cambridge: Belknap Press of Harvard University Press, 2009.

Sanders, Elizabeth. *The Roots of Reform: Farmers, Workers, and the American State, 1877-1917.* Chicago: University of Chicago Press, 1999.

Saunders, George W. editor. *The Trail Drivers of Texas: Interesting Sketches of Early Cowboys and Their Experiences on the Range and on the Trail during the Days that Tried Men's Souls.* 2 vols. San Antonio: Jackson Print Co, 1920-1923.

Schmitz, Joseph William. *Texas Culture in the Days of the Republic, 1836-1846*. San Antonio: The Naylor Company, 1960.

Shaw, Albert. "The American State and the American Man." *The Contemporary Review* 51 (January 1887): 695-711.

Silber, Nina *The Romance of Reunion: Northerners and the South, 1865-1900.* Chapel Hill: University of North Carolina Press, 1993.

Slotkin, Richard. *Regeneration through Violence: The Mythology of the American Frontier, 1600-1860.* Middletown, CT: Wesleyan University Press, 1973.

Slotkin, Richard. *The Fatal Environment: The Myth of the Frontier at the Age of Industrialization, 1800-1890.* New York: Atheneum, 1985.

Slotkin, Richard. *Gunfighter Nation: The Myth of the Frontier in Twentieth-Century America.* New York: Atheneum, 1992.

Smallwood, James M. *The Feud That Wasn't: The Taylor Ring, Bill Sutton, John Wesley Hardin, and Violence in Texas.* College Station: Texas A&M University Press, 2008.

Smallwood, James. "When the Klan Rode: White Terror in Reconstruction Texas." *Journal of the West* 25 (October 1986): 4-13.

Smallwood, James M. *Time of Hope, Time of Despair: Black Texans during Reconstruction.* Port Washington, NY: Kennikat Press, 1981.

Smith, Jesse Guy. *Heroes of the Saddle Bags: A History of Christian Denominations in the Republic of Texas.* San Antonio: The Naylor Company, 1951.

Spaw, Patsy McDonald. *The Texas Senate, Volume II: Civil War to the Eve of Reform, 1861-1889.* Austin: University of Texas Press, 1999.

Spitzer, Robert J. "Gun Law History in the United States and Second Amendment Rights." *Law and Contemporary Problems* 80, no. 2 (2017): 55-83.

Stanley, Amy Dru. *From Bondage to Contract: Wage Labor, Marriage, and the Market in the Age of Slave Emancipation.* New York: Cambridge University Press, 1998.

Stevenson, Eugene. "Our Grand Jury System," *Criminal Law Magazine* (December 1886).

Story, Joseph. *Commentaries on the Constitution of the United States.* Boston: Hilliard, Gray, & Co., 1833.

Thomas, George C. III. "The Riddle of the Fourteenth Amendment: A Response to Professor Wildenthal." *Ohio State Law Journal* 68, no. 6 (2007): 1627-1657.

Thompson, Jerry. *Cortina: Defending the Mexican Name in Texas.* College Station: Texas A&M University Press, 2007.

Tise, Sammy. *Texas County Sheriffs.* Albuquerque: Oakwood Printing, 1989.

Tosh, John. "Masculinities in an Industrializing Society: Britain, 1800-1914." *Journal of British Studies* 44, no. 2 (April 2005): 330-342.

Trelease, Allen W. *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction.* New York: Harper & Row, 1971.

Urdahl, Thomas Klingenberg. *The Fee System in the United States.* Madison, WI: Democratic Printing Company, 1898.

Vance, J. D. *Hillbilly Elegy: A Memoir of a Family and Culture in Crisis.* New York: Harper, 2016.

Virginia Assembly. "Acts of the General Assembly, Jan. 6, 1639-40." *William and Mary Quarterly* 4, no. 3 (July 1924): 145-162.

Walker, Donald R. *Penology for Profit: A History of the Texas Prison System, 1867-1912.* College Station: Texas A&M University Press, 1988.

Compendium_Roth
Page 2205

Wells, Jonathan Daniel. "The Southern Middle Class." *Journal of Southern History* 75, no. 3 (August 2009): 651-662.

White, Richard. *The Republic for Which It Stands: The United States during Reconstruction and the Gilded Age, 1865-1896.* New York: Oxford University Press, 2017.

White, Richard. "Outlaw Gangs of the Middle Border: American Social Bandits." *Western Historical Quarterly* 12, no. 4 (Oct. 1981): 387-408.

Whites, LeAnn. *The Civil War as a Crisis in Gender: August, Georgia, 1860-1890.* Athens: University of Georgia Press, 1995.

Wiener, Martin. "Homicide and 'Englishness': Criminal Justice and National Identity in Victorian England." *National Identities* 6, no. 3 (November 2004): 203-213.

Wildenthal, Bryan H. "The Lost Compromise: Reassessing the Early Understanding in Courts and Congress on Incorporation of the Bill of Rights in the Fourteenth Amendment." *Ohio State Law Journal* 61, no. 3 (2000): 1051-1174.

Williams, Patrick G. *Beyond Redemption: Texas Democrats after Reconstruction.* College Station: Texas A&M University Press, 2007.

Winkler, Adam. *Gunfight: The Battle over the Right to Bear Arms in America*. New York: W.W. Norton, 2011.

Wyatt-Brown, Bertram. *Southern Honor: Ethics and Behavior in the Old South.* New York: Oxford University Press, 1982.

Younger, Richard D. *The People's Panel: The Grand Jury in the United States, 1634-1941.* Providence: Brown University Press, 1963.

Yuill, Kevin. " 'Better Die Fighting against Injustice than to Die Like a Dog': African-Americans and Guns, 1866-1941." In *A Cultural History of Firearms in the Age of Empire*, edited by Karen Jones, Giacomo Macola, and David Welch, 211-229. New York: Routledge, 2013.

Zuber, William Physick. *My Eighty Years in Texas.* Austin: University of Texas Press, 1971.


Theses and Dissertations
Brown, Donald Curtis. "The Great Gun-Toting Controversy, 1869-1910: The Old West Gun Culture and Public Shootings." PhD diss., Tulane University, 1983.

Clayton, Barbara Leah. "The Lone Star Conspiracy: Racial Violence and Ku Klux Klan Terror in Post-Civil War Texas, 1865-1877." Master's thesis, Oklahoma State University, 1979.

Compendium_Roth
Page 2206

Jayne, Reginald G. "Martial Law in Reconstruction Texas." Master's thesis, Sam Houston State University, 2005.

Wallace, Karl Edward. "Texas and the Good Roads Movement: 1895 to 1948." Master's thesis, University of Texas, 2008.

Compendium_Roth
Page 2207

VITA

| | |
|---|---|
| Personal Background | Brennan Gardner Rivas<br>Born February 14, 1988<br>Daughter of Randy and Vicky Gardner<br>Married to Alexis Rivas August 24, 2013 |
| Education | Diploma, Bethesda Christian School, Fort Worth, 2006<br>Bachelor of Arts with Honors, History, Oklahoma State University, Stillwater, Oklahoma<br>Master of Arts, Texas Christian University, Fort Worth, 2013<br>Doctor of Philosophy, Texas Christian University, Fort Worth, 2019 |
| Experience | TCU Benjamin W. Schmidt Memorial Scholar, 2018-2019<br>Teaching Assistantship, TCU, 2017-2018<br>Graduate Assistantship, TCU, 2014-2017 |
| Professional Memberships | Texas State Historical Association<br>Southern Historical Association<br>Society for Historians of the Gilded Age and Progressive Era |

ABSTRACT

THE DEADLY WEAPON LAWS OF TEXAS: REGULATING GUNS, KNIVES AND
KNUCKLES IN THE LONE STAR STATE, 1836-1930

by Brennan Gardner Rivas, Ph.D., 2019
Department of History
Texas Christian University

Dissertation Advisor: Dr. Gregg Cantrell, Professor of History and Erma and Ralph Lowe Chair
in Texas History

This dissertation examines the regulation of firearms and other weapons throughout Texas

history, from the founding of the Republic of Texas in 1836 until the eve of federal firearm

legislation in 1930. During that near-century, Texans lived with increasingly stringent laws

regulating the ownership, sale, and carrying of various weapons. During Reconstruction, Texas

stood out as a pioneer in the realm of comprehensive weapon regulations, going so far as to ban

pistols, knives, and sword canes in the public sphere. Some Texans enjoyed exemption from this

regulation, though over the course of the late nineteenth century such exceptions became

increasingly rare. Though Republicans enacted the initial legislation during their brief tenure in

power, Democrats retained the law and indeed amended it over the ensuing decades to make it

more effective. State courts had ample opportunity to assess its constitutionality and consistently

declared it to be a legitimate exercise of the state's police power. The popularity of this law over

the course of the late nineteenth and early twentieth centuries points to the rise of middle-class

values in Texas that eschewed rowdiness and male violence in favor of restraint. Alongside this

shift in societal conceptions of "manly" behavior, the retention of this "pistol law" illustrates the

early development of a progressive impulse among the inhabitants of the bustling market towns

in America's interior. The coercive side of this progressivism was on display in the enforcement

of the state's deadly weapon laws. Statistical evidence indicates that enforcement in the early decades was equitable but became racially discriminatory by 1890, aligning with the establishment of segregation laws around the same time. Despite the Lone Star State's reputation as a bastion of "Wild West" gun violence, by the eve of the First World War Texas actually boasted the most far-reaching gun and weapon laws. This dissertation focuses on the formulation, amendment, and enforcement of state-level legislation, a crucial part of the history of firearm regulation that has been overlooked by many scholars.

# OTHER SOURCES

HOME    MY ACCOUNT    GIFT CERTIFICATES    SIGN IN OR CREATE AN ACCOUNT    VIEW CART

SEARCH FOR A PRODUCT   ›

# BUYMYMAGS.COM

ΜΟΛΩΝ ΛΑΒΕ

| RIFLE MAGS | PISTOL MAGS | CUSTOM MAGS | 10 ROUND MAGS | ACCESSORIES | CONTACT

**DUE TO VERY HIGH VOLUME OF ORDERS CURRENT SHIPPING TIMES MAY TAKE UP TO _14 BUSINESS DAYS_.**

**DUE TO HIGH VOUME OF CORRESPONDENCES WE ARE ONLY RESPONDING TO EMAILS REGARDING RETURN/EXCHANGES. CURRENT LEAD TIME ON EMAIL RESPONSE IS UP TO _10 BUSINESS DAYS_.**

**WE APPRECIATE YOUR BUSINESS AND PATIENCE.**



● ● ● ●

## FEATURED PRODUCTS



SIG Sauer P250/P320 .45ACP Sub-Compact 6Rd Magazine
**$29.99**

ADD TO CART



Beretta 92/92fs/M9 9mm 15 rd
**$17.99**

ADD TO CART



Armalite AR-7 22 Long Rifle 15Rd magazine
~~$34.99~~ **$25.99**

ADD TO CART



Taurus G3 9mm 30rd Magazine
**$24.99**

ADD TO CART



HK G3/PTR-91 7.62 NATO 20 Round
Steel Magazine Grade 1

**$24.99**

OUT OF STOCK

We are open and still fulfilling orders. Due to high demand, order processing is experiencing delays

CATEGORIES

Rifle Mags
Pistol Mags
Custom Mags
10 Round Mags
Accessories

Vendor

SIGN UP TO OUR
NEWSLETTER

Your Name:

Your Email:

>

All prices are in USD Copyright 2022 BuyMyMags. Sitemap |





Reviews, Shooting Accessories

# A Complete Guide to Binary Triggers



Michael R Crites                              Updated: February 4, 2022

*Disclosure*: Products are selected by our editors. We may earn a commission on purchases from a link. *How we select gear*.



What is a binary trigger? An aftermarket trigger for semi-automatic guns that allows one round to be fired upon the trigger pull and a single round to be fired as the trigger springs back AKA binary shooting or double tap. The binary trigger will enable you to shoot twice as fast with the same amount of work, making for a fun but short day







ou as we continue.



| In This Article: | ⌄ |
|---|---|

## Binary Trigger Comparison

Below is my list of the best binary triggers for 2022. I list the best choices in terms of value, performance, design, and cost.

Click on the name to head to the product page, read reviews and check prices or skip ahead to the **list of triggers**.

| Name ⇕ | Best For ⇕ | Price ⇕ |
|---|---|---|
| Franklin Armory BFSIII AR-C1 Binary Trigger | AR Platform (Top Chocie) | $386 |
| FosTech Echo AR-II Binary Trigger | AR Platform (Runner Up) | $449 |
| Franklin Armory BFSIII AK-C1 Binary Trigger | AK Platform | $449 |
| Franklin Armory BFSIII PC-C1 Binary Trigger | Ruger PC Carbine | $269 |
| Franklin Armory BFSIII B&T-C1 Binary Trigger | B&T APC9 | $449 |
| Franklin Armory BFSIII 22-C1 Binary Trigger | Ruger 10/22 | $269 |
| Franklin Armory BFSIII CZ-C1 Binary Trigger | CZ Scorpion (Curved Trigger) | $449 |
| Franklin Armory BFSIII HK-C1 | HK Firearms | $449 |
| Franklin Armory BFSIII CZ-S1 | CZ Scorpion (Flat Trigger) | $449 |

## Why You Should Listen To Us



Ⓧ

Compendium_Roth
Page 2215







*A 3 position safety selector that's common with most binary triggers.*

Firearms have always been a part of my family tradition. I loved breaking down and cleaning my father's and grandfather's guns as a kid. After shining up all the weapons I could get my hands on, I began to teach myself how to fix a couple of firearms that needed minor repairs. From that moment on, I've been addicted to firearms and continuing to improve my shooting ability.

I love to shoot the AR-15 I built several years ago, and I'm always looking for ways to improve it, including trigger upgrades like a binary trigger.







## Franklin Armory BFSIII AR-C1 Trigger

( View at Optics Planet )

Considered by many to be the leading binary trigger manufacturer, Franklin Armory also produces firearms that feature their triggers.

The BFSIII Franklin Armory Binary Trigger is an actual binary trigger, so it will fire a shot when you pull the trigger and when you release the trigger. As long as it's legal in your state, you won't need additional paperwork from the ATF as of this writing.

The BFSIII AR-C1 works in most AR platforms without the need for a gunsmith. This trigger will fit an AR-10, AR-15, F17, .22LR upper, and 9mm upper without the need for modification.

This is great for every AR owner looking to upgrade their trigger because you can install this trigger at home with a few basic tools.

This trigger is designed for owners of the AR platforms and AR competitive shooters. It fits most AR platform firearms, but you should ensure it works with yours before you purchase because a couple of people complained about it not fitting their gun.



## 2. FosTech Echo AR-II Binary Trigger


$449







FosTech Outdoors manufactures rifles, pistols, shotguns, and binary triggers. Their firearms have the binary triggers installed, so you won't have to purchase them separately if you wish to go that route.

The **Echo AR-II** is a drop-in trigger for AR-15's. It's doesn't require visiting a gunsmith because it's straightforward to install.

I don't like that you need to purchase a full-auto bolt carrier group to function properly. Sadly, the full-auto bolt carrier does not come with the Echo AR-II.

The Echo AR-II is an excellent choice for firearms enthusiasts building their dream AR-15. If you own another style of AR, this is not the trigger for you.



### 3. Franklin Armory BFSIII AK-C1 Binary Trigger

$449

Franklin Armory BFSIII AK-C1 Binary Trigger

View at Optics Planet

Franklin Armory produces a wide array of binary triggers, including for the popular AK platforms. They also manufacture several firearms parts and guns.

There are two seperate models of the **BFSIII AK-C1**, one is for AK firearms calibered in 7.62x39mm, and the other is for 9mm AKs.







## 4. Franklin Armory BFSIII PC-C1 Binary Trigger



$269

### Franklin Armory BFSIII PC-C1 Binary Trigger

View at Optics Planet

Franklin Armory designs binary triggers for rifles, pistols, and carbines, covering the spectrum of firearms enthusiasts.

The **BFSIII PC-C1** is specifically designed for the Ruger PC carbine. The trigger works in most 9mm and .40 cal Ruger PC trigger housings so your carbine can have a binary mode after installing this trigger.

I recommend having a gunsmith install this trigger as the installation is not as easy as other Franklin Armory triggers. Still, I'm sure a handy individual could adequately install it.

The BFSIII PC-C1 is best for competition shooters who shoot a .40 or 9mm, but recreational shooters have a lot of fun at the range with this trigger.

  







*BFSIII Installed on Ruger PC Carbine*



## 5. Franklin Armory BFSIII B&T-C1 Binary Trigger


$449




Delivers
GET DELIVERY
Uber Eats
GRUBHUB
DOORDASH
Delivery available in select areas. See Subway.com/delivers for details.





View at Optics Planet

Franklin Armory delivered another outstanding three-position trigger to add to their firearms and gun parts lineup.

The **BFSIII B&T-C1** is explicitly designed for the B&T APC9 and helps the shooter place multiple rounds in a tighter group in less time.

Installing the trigger may require slight modifications, so I recommend hiring a gunsmith for professional installation of the BFSIII B&T-C1. The stock trigger will still work despite the alterations if you desire to reinstall it after making changes for your new binary trigger.

This trigger is only for B&T APC9 gun enthusiasts and competition shooters. If you enjoy sending a lot of lead downrange, then the BFSIII B&T-C1 is for you.



## 6. Franklin Armory BFSIII 22-C1 Binary Trigger



$269

Franklin Armory BFSIII 22-C1 Binary Trigger

View at Optics Planet









BFSIII 22-C1.

work.

but don't want to spend a

*BSFIII 22-C1 installed on a 10/22*

⭐

## 7. Franklin Armory BFSIII CZ-C1 Binary Trigger

$449












To go along with Franklin Armory's firearms and other binary triggers, they manufacture a binary trigger system for the CZ Scorpion EVO 3.

The BFSIII CZ-C1 delivers significantly reduced split times between shots compared with the stock trigger assembly. The selector lever allows you to choose between the gun on safety, semi-automatic mode, or binary fire mode.

The BFSIII CZ-C1 is designed only to fit the CZ Scorpion to significantly improve the weapon's performance. The C1 model has a curved trigger that most people use.

Tactical shooters who own the CZ Scorpion are the only individuals who should consider this trigger. If you own another firearm, this trigger will not work.



## 8. Franklin Armory BFSIII HK-C1

$449

### Franklin Armory BFSIII HK-C1

View at Optics Planet









s.

ejector pin, and ejector

ilar to a traditional trigger

el.

The BFSIII HK-C1 is an excellent choice for all HK rifle owners looking to increase their fire rate at the range.



### 9. Franklin Armory BFSIII CZ-S1



$449

Franklin Armory BFSIII CZ-S1

View at Palmetto State

Franklin Armory added an option for the CZ Scorpion owners with the **BFSIII CZ-S1**. So if you were unsure about Franklin Armory before, just know they're always coming out with new products.

The BFSII line-up of products claims to be the fastest semi-auto trigger on the market. Like the CZ-C1, the CZ-S1 was explicitly designed for the CZ Scorpion.

However, it has a couple of features that set it apart from the CZ-C1. The first is the most obvious; the trigger is straight and not curved. The other component is an ambidextrous safety selector, which makes all the left-handed shooters much happier.

The BFSII CZ-S1 is for the CZ scorpion owner who's left-handed or prefers a straight trigger.

## Why Buy a Binary Trigger?





X

Compendium_Roth
Page 2224





Some people argue binary triggers should be banned.

I disagree.

Clearly, they have never experienced the thrill of a mag dump at the range. Now imagine doing it twice as fast as normal! I admit a binary firing system requires the user to pay a little more attention to what their firearm is doing, but as responsible gun owners, we should be doing this anyway.

In theory, having the option to send more lead down range gives you the advantage over someone trying to cause you or your family harm. However, the quicker you shoot, the less accurate you tend to be, remember there are pros and cons to every situation.

With most binary triggers, you have the option to switch between semi-auto and binary modes. So you're not always stuck with binary/echo mode, and you can avoid the unintentional discharge by flipping the safety switch to your preferred firing method.

## Binary Triggers Vs...











*Binary triggers can change the operation of a firearm, as with this Glock selector on the slide.*

Binary triggers have some key differences from other fire-rate enhancements. They won't turn your firearm into a machine gun or fully automatic firearm because they require the shooter to manipulate the trigger to fire each round. Binary triggers work by firing one round with both the pull and release of the trigger, that pull then release trigger is considered two separate actions — which makes binary firing systems legal in most states that don't have regulations around accessories that impact "theoretical fire rate".

In Deleware, binary triggers can only be used in pistol platforms. The states that have banned binary triggers at the time of writing are:

  





- Rhode Island
- Washington

This list is subject to change, so you should check your state's firearm laws to ensure you're not breaking any laws that have been passed since the writing of this article.

You can "outshoot" your firearm with a binary trigger sometimes, this can be overcome with a stronger buffer spring that often comes with the trigger.

## Bump Stocks

Bump fire stocks are very different than binary triggers, even though they both accomplish the task of rapid-fire and have a relatively easy installation process.

A bump stock uses the gun's recoil to push the upper and lower receiver backward towards the stock, which causes the weapon to cycle and keeps firing while your finger stays in place on a "cover" near the trigger guard. The movement of the firearm causes the trigger to quickly hit your finger and allows a semi-automatic weapon to sound as though it's a fully automatic weapon.

Bump stocks are now illegal. The ATF considers them machine guns because the shooter doesn't manipulate the trigger to fire each round; the gun works for you.

## Fully Automatic Firearms

Unlike binary triggers, the shooter holds the trigger when shooting a fully automatic gun, and rounds begin to fire and won't stop until the shooter releases the trigger. The shooter doesn't continuously manipulate the trigger. The gun does all the work, similar to a bump stock but technically not the same even though bump stocks are considered machine guns.

Fully automatic weapons shoot faster than binary triggers because binary triggers still depend on the reflexes of a human to initiate the trigger release. Whereas the only limitations on full auto firearms are jams and overheating.

The ATF heavily regulates fully automatic firearms, however, fully automatic weapons are technically legal if made *before* 1986, when Congress passed the Firearm Owners' Protection Act. This means technically, they are not illegal, but they require a lot of paperwork and money to obtain.  It's now illegal to manufacture new automatic weapons for civilian use, so you'll be dealing in antiques that cost a lot more than your average semi-auto varmint rifle.

## Important Binary Trigger Considerations





Compendium_Roth
Page 2227







You won't always want to be in binary mode, so purchasing a binary trigger that has a semi-auto selector is the best option. If the trigger you plan to buy doesn't have this feature, then I recommend you keep shopping









rectly. If you want to achieve

eeded to enable binary

### Trigger Pull/Feel

The metal trigger pull weight is another critical factor to consider. You don't want a trigger that's tough to pull or lacks a positive reset but you also don't want a trigger that's so light a gentle breeze sets it off. Every shooter has their preference as to how many pounds pull a trigger should be, so experiment and determine which best suits you.

The feel of the trigger is another vital consideration. Many people still prefer standard curved triggers. However, straight triggers are gaining popularity. Once again, this comes down to what you're most comfortable with, so if you usually shoot straight triggers, go with a straight trigger or vice versa.

### Drop-in vs. Professional Installation

I enjoy tinkering with my firearms, but I know that's not for everyone. If I need to, I won't hesitate to take my gun to a professional gunsmith and have them fix or install the part. A trigger is a reasonably simple mechanism to install most of the time, especially when you have clear directions.

Know your experience level and limits with firearms when choosing between installing a trigger yourself or having it professionally installed. Some binary triggers won't play nice with polymer lowers, for example. These are good things to know before you drop a couple hundo on a would-be paperweight.

## Price Ranges vs. Features

The price doesn't vary too much from one binary trigger to another. They all cost at least a few hundred dollars.

The price primarily depends on the caliber and gun in which it was designed to be used. A quality .22 caliber binary trigger will cost at least $250, and a high-quality AR platform binary trigger will cost around $400. You can expect to pay over $650 for the binary firing system for some specialty firearms.

## How We Selected Our Recommendations

I would love the opportunity to test out every binary firing system on the market. However, that's not financially feasible, so I lean on my experience shooting firearms, online reviews, and discussion with experts to recommend the best products to you.

I don't enjoy wasting my money on products, so I wouldn't recommend a product I wouldn't buy.

Yes, there's a LOT of Franklin Armory on this list, but that's because the binary trigger space is still pretty new, and I'll be sure the update and revise this list as new players enter the market and offer competitive options.







How much is a binary trigger for an AR?    ⌄

Is a binary trigger worth it?    ⌄

Can you hunt with a binary trigger?    ⌄

## Sources

1. Vox. (2017) The legal loopholes that let people get automatic guns
2. ATF. (2019) Bump Stocks

⭐

*MORE ON ACCESSORIES:*

### Top Hunting Watches: 12 Impressive Watches to Guide Your Next Hunt

Sometimes the most useful piece of hunting gear gets overlooked — and an awesome hunting watch is a tiny piece of equipment that can provide a serious advantage. We take a look at some of the best.

### Nexbelt Review [Hands On]: Your new favorite EDC belt?

Nexbelt is a newer company, just seven years in at this point, but the Rancho Cucamonga upstart is taking the belt industry by storm. While

### Magpul DAKA Review: Are Magpul's Tactical Bags & Pouches Worth 'Da Squeeze?

When Magpul approached us about taking a look at their DAKA pouches, cans, and bags, we couldn't pass up the chance to torture test some of their latest gear.

### Top Pistol Cases: 9 Soft & Hard Pistol Cases To Guard Your Gats

Part of being a safe and responsible gun owner is storing your firearms securely, especially pistols. You'll also want a convenient and easy way to









We use years of experience, deep research, and hands-on testing to scrutinize our product recommendations and provide you with as close to objectively accurate results we humans can muster. If you've found different results in your own testing, think we missed something important, or otherwise need to adjust our work, please let us know. If it's noteworthy we'll consider integrating your feedback into our article. After all, it takes a village.

**Email the editor**

## *THE LATEST REVIEWS*



### KelTec SUB2000 Review: A Fantastic, Formidable, Foldable PCC
November 10, 2022



### HK VP9 Review: A Terrific Teutonic Masterpiece
November 7, 2022





Compendium_Roth
Page 2231







### Remington 870 Reviewed: Appreciating A Scattergun For The Ages

October 25, 2022



### Glock 19 Review: Still The Best Carry Gun Anywhere?

October 23, 2022



### The 5 Shotgun Types

October 16, 2022











*FIREARM NEWS*



New From Staccato: An Officer-Sized 2011

November 7, 2022











### Springfield Armory Hellcat Pro, now in FDE

November 7, 2022



### Sig Sauer Has 2 New M400 Rifles

November 7, 2022



### Dan Wesson Heirloom 2022 1911 (and CZ Lions)

November 3, 2022





X











 

The Best Weatherby Shotguns

The Best 6.8 SPC Rifles

Best Single-Shot Shotguns in 2022

Recce Rifle Ultimate Guide

The Best Remington 700 Rifles

## Handguns:

13 Practical Home Defense Pistols For Any Situation

The Best Ruger 9mm Pistols

A Guide to the .357 Magnum

Pocket Pistol Guide: Petite pistol picks that don't suck.

Best 10mm Pistols in 2022

## Gear & Gunsmithing:

The Ultimate M4 Upper Guide

Best Ruger 10/22 Slings in 2022

7 Winning .450 Bushmaster Barrels For Big Game Success

Real Avid Tools Review [Hands-On]

The Best Aero Precision Lowers for 2022

## Safes & Storage:

5 Gun Safe Dehumidifiers That Will Keep Your Collection Dry

5 Budget Gun Safes That Don't Skimp On Safety

7 Ammo Safes To Protect Your Brass From The Elements

7 Brilliant Pistol Safes Made For Piece of Mind

6 Bedside Gun Safes To Keep Your Piece Nearby At Night

## Holsters & CCW:

We The People Holsters Review [Hands-On]

4 Quality Car Holsters & Gun Mounts For Mobile Protection Anywhere

The Best Taurus G2C Holsters

The Best Running Holsters in 2022

5 Concealed Carry Belts That Make EDC Adventures A Breeze

## Scopes & Optics:

The Best Binoculars Under $100

The Best Backup Iron Sights (BUIS)

   

Compendium_Roth
Page 2236





Your email

Subscribe

## About Us

American Firearms was established by firearm fans for firearm fans as a modern-day take on all things that go BOOM. We're reader-supported, which means we may earn a small part of the sale from links to any products or services on this site. You do not pay anything extra and your purchase helps support our work.

 

BROWSE

COMPANY

LEARN

Copyright © 2022 American Firearms LLC. All rights reserved.

Independently published in Beavercreek, Oregon

We and our partners share information on your use of this website to help improve your experience. | Do not sell my info | Ok    ✕

  

