C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>                    Plaintiffs,<br><br>            v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al.,<br><br>                    Defendant. | Case No:  17-cv-1017-BEN-JLB<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF** |

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................ ii

Table of Authorities ........................................................................................... iv

Introduction .........................................................................................................1

Background ...........................................................................................................3

I.   Prevalence of Firearms and Magazines Able to Hold More Than Ten Rounds of Ammunition .........................................................................................3

II.  The History of Magazine Capacity Restrictions ......................................4

III. California's Ban on Magazines Over Ten Rounds ....................................5

IV.  Procedural History ...................................................................................6

Argument ..............................................................................................................9

I.   California's Magazine Ban Violates the Second Amendment ..................9

   A.   The Proper Standard for Analyzing Second Amendment Claims ..............9

   B.   California's Modern Magazine Ban Restricts Conduct Within the Ambit of the Second Amendment ................................................11

      1.   Magazines Are "Arms" Within the Scope of the Second Amendment ...................................................................11

      2.   Magazines Over Ten Rounds Are in Common Use for Lawful Purposes ..................................................................16

   C.   California Cannot Show That Relevant Historical Tradition Justifies Its Modern Magazine Ban Under *Bruen* .................................21

      1.   None of the Historical Evidence that the State Relies on Establishes a Relevant and Enduring Historical Tradition of Firearm Regulation ...................................................................23

         a.   Medieval and pre-founding English history .........................23

         b.   Colonial America and the Founding Era ...............................25

         c.   Antebellum America and Reconstruction ............................28

         d.   Twentieth Century regulations .............................................33

      2.   The State's Unmoored Use of Analogical Reasoning Defies *Bruen* and Should Be Ignored ................................37

TABLE OF CONTENTS

a.    California's modern magazine ban does not address an unprecedented societal concern or dramatic technological change ...................................................................38

b.    Even if resorting to "analogical reasoning" were appropriate, the State has not established that its modern magazine ban imposes a "comparable burden" as any historical analogue or is "comparably justified" ..................................41

II.    Plaintiffs' Takings Clause and Due Process Claims..............................44

III.    The State Does Not Need More Time to Pack the Record with Even More Irrelevant Historical Evidence ..................................................................45

IV.    The State Is Not Entitled to the Extraordinary Relief of a Stay, Indefinitely Denying Californians of Their Constitutional Rights Yet *Again* While This Case Winds Through the Courts ...................................................................47

Conclusion ..........................................................................................................49

iii

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrews v. State*,
  50 Tenn. 165 (1871) ......................................................................... 31

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6,
  2022) ................................................................................................... 42

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7,
  2022) ..................................................................................... 34, 46, 49

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.*,
  910 F.3d 106 (3d Cir. 2018) .............................................. 8, 14, 16

*Bliss v. Commonwealth*,
  12 Ky. 90 (1822) .............................................................................. 12

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ................................................................. 19, 23

*Canterbury Liquors & Pantry v. Sullivan*,
  999 F. Supp. 144 (D. Mass. 1998) ................................................. 48

*Christian v. Nigrelli*,
  No. 22-cv-695, 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov. 22,
  2022) ................................................................................................... 49

*Costco Wholesale Corp. v. Hoen*,
  No. C04-360P, 2006 U.S. Dist. LEXIS 65774 (W.D. Wash. Sep. 14,
  2006) ................................................................................................... 47

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................. *passim*

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) .............................................................. 12

*Duncan v. Becerra*,
  265 F. Supp. 3d 1106 (S.D. Cal. 2017) ........................................... 6

*Duncan v. Becerra*,
   366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..............................................*passim*

*Duncan v. Becerra*,
   742 F. App'x 218 (9th Cir. 2018) ....................................................6, 12

*Duncan v. Becerra*,
   970 F.3d (9th Cir. 2020)...............................................................7, 8, 21

*Duncan v. Bonta*,
   142 S. Ct. 2895 (2022) ........................................................................44

*Duncan v. Bonta*,
   19 F.4th 1087 (9th Cir.)...............................................................*passim*

*Duncan v. Bonta*,
   2022 WL2347579 (U.S. June 30, 2022) ..............................................8, 9

*Elrod v. Burns*,
   427 U.S. 347 (1976) .............................................................................49

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011)..........................................................13, 20

*Firearms Pol'y Coal., Inc. v. McCraw*,
   No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25,
   2022)...................................................................................................34

*Friedman v. City of Highland Park*,
   784 F.3d 406, 415 (7th Cir. 2015)........................................................16

*Funk* v. *United States*,
   290 U.S. 371 (1933) .............................................................................24

*Fyock v. City of Sunnyvale*,
   25 F. Supp. 3d. 1267 (N.D. Cal. 2014) ..........................................14, 18

*Fyock v. Sunnyvale*,
   779 F.3d 991 (9th Cir. 2015)........................................................*passim*

*Gamble v. United States*,
   -- U.S. --, 139 S. Ct. 1960 (2019) (Thomas, J., concurring) .................31

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*,
   788 F.3d 1318 (11th Cir. 2015).............................................................20

v
TABLE OF AUTHORITIES

*Hardaway v. Nigrelli*,
No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022) ................................................................................34, 46, 49

*Heller v. District of Columbia* (*Heller II*),
670 F.3d 1244 (D.C. Cir. 2011) ...............................................16

*Hollis v. Lynch*,
827 F.3d 436 (5th Cir. 2016) ...................................................19

*Hurtado v. California*,
110 U.S. 516 (1884) ...............................................................21

*Index Newspapers LLC v. United States Marshals Serv.*,
977 F.3d 817 (9th Cir. 2020) ...................................................47

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014) ..............................................12, 20

*Jones v. Bonta*,
34 F.4th 704 (9th Cir. 2022) ...................................................12

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016) ...................................................13

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ...........................................14, 16, 19

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36 (1961) ...............................................................10

*Luis v. United States*,
578 U.S. 5 (2016) ..............................................................12, 13

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ...................................................19, 20, 24, 42

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) ...................................................49

*Miller v. Bonta*,
542 F. Supp. 3d 1009 (S.D. Cal. 2021) ......................................40

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ......................................................*passim*

vi
TABLE OF AUTHORITIES

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015).................................................................*passim*

*Nken v. Holder*,
    556 U.S. 418 (2009) ..........................................................................48

*Parker v. District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007) ..........................................................22

*Peterson v. Martinez*,
    707 F.3d 1197,1218-19 (10th Cir. 2013) ..........................................20

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005)..............................................................49

*Staples v. United States*,
    511 U.S. 600, 612 (1994) ..................................................................35

*State v. Reid*,
    1 Ala. 612 (1840) ..............................................................................12

*State v. Wilburn*,
    66 Tenn. 57 (1872) ............................................................................31

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc)..............................................12

*United States v. Decastro*,
    682 F.3d 160 (2d Cir. 2012)..............................................................20

*United States v. Nutter*,
    No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug.
    29, 2022)............................................................................................34

*Wilson v. Cook Cty.*,
    937 F.3d 1028 (7th Cir. 2019)............................................................20

*Wilson v. State*,
    33 Ark. 557 (1878) ............................................................................31

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ..........................................................13, 19

TABLE OF AUTHORITIES

**Statutes**

1 Stat. 271 (1792) (Militia Act)................................................................26

18 U.S.C. § 922(w).............................................................................5

1927 Cal. Stat. 938.............................................................................36

1933 Cal. Stat. 1169...........................................................................36

1932 La. Acts 337-38..........................................................................36

1785 Va. Statutes at Large 12 (12 Hening c. 1) .......................................26

1784 Mass. Acts 142...........................................................................26

1927 Mass. Acts 413...........................................................................36

1786 N. Y. Laws 228..........................................................................26

1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5 ....................................43

1933 Or. Laws 488.............................................................................36

1933 Wis. Sess. Laws 245, 164.01........................................................36

1929 Pa. Laws 777, §1........................................................................36

Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 .......................36

Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452....................................35

Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337 ..........................35

Act of Mar. 7, 1934, ch. 96, § 1(a), 1934 Va. Acts 137.............................35

Act of Mar. 2, 1934, no. 731 § 1, 1934 S.C. Acts 1288.............................35

Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).....................31

Cal. Penal Code § 16740 .......................................................................5

Cal. Penal Code § 16900 .....................................................................13

Cal. Penal Code § 31910 .....................................................................13

Cal. Penal Code § 32310 .......................................................5, 6, 49, 50

Colo. Rev. Stat. §§ 18-12-301–302 ........................................................................4

Conn. Gen. Stat. § 53-202w ...................................................................................5

D.C. Code § 7-2506.01(b) .......................................................................................5

Del. Code Ann. tit. 11, § 1469(a) ...........................................................................5

Haw. Rev. Stat. § 134-8(c) .....................................................................................5

Mass. Gen. Laws ch. 140, § 121 ............................................................................5

Mass. Gen. Laws ch. 140, § 131 ............................................................................5

Md. Code, Crim. Law § 4-305(b) ...........................................................................5

N.J. Stat. § 2C:39-1y, -3j, -9h ...............................................................................5

N.Y. Penal Law § 265.00 ........................................................................................5

N.Y. Penal Law § 265.36 ........................................................................................5

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-
322, 108 Stat. 1999 (1994) ...........................................................................5

Vt. Stat. Ann. tit. 13, § 4021 ..................................................................................5

**Other Authorities**

Christopher S. Koper, et al., *An Updated Assessment of the Federal
Assault Weapons Ban: Impacts on Gun Markets and Gun Violence,
1994-2003* (Nat'l Instit. Just. June 2004) ....................................................4

David B. Kopel, *The History of Firearm Magazines and Magazine
Prohibitions*, 78 Alb. L. Rev. 849, 851-64, 871-72 (2015) ........................3

David B. Kopel, *What Should America Do About Gun Violence?*: Hearing
Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013) .......................5

Herbert L. Osgood, *The American Colonies in the Seventeenth Century*
499-500 (1904) ............................................................................................26

Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery*
117-18 (1849) ..............................................................................................12

Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City at 142-143 (1834), *available at Modern Law of Modern Law: Primary Sources* ........................................................................................27

Matthias Gafni, *For One Week, High-Capacity Ammunition Magazines Were Legal in California: Hundreds of Thousands May Have Been Sold*, S.F. Chron. (April 11, 2019), *available at* https://www.sfchronicle.com/bayarea/article/for-one-week-high-capacity-gun-magazines-were-13757973.php (last accessed Nov. 22, 2022) ................................48

S.B. 1446, 2015-2016 Reg. Sess. (Cal. 2016) ................................................................6

Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* (Bombardier Books 2022). M1 ................................................................18

Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880) ................12

U.S. Const., amend. II ................................................................................*passim*

U.S. Const., amend. XIV ................................................................................*passim*

Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245 ................35

Wikipedia, Gish gallop, https://en.wikipedia.org/wiki/Gish_gallop (last visited Nov. 29, 2022) ................................................................1

x

TABLE OF AUTHORITIES

# INTRODUCTION

> *Bruen*'s embrace of the text-and-history test provides clear guideposts for how the constitutionality of these types of bans must now be assessed. In short, there is zero historical support from the Founding—or even the Reconstruction era—for banning commonly possessed arms; under the *Bruen* test, that is the end of the matter.[1]

That should indeed be the end of the matter. But California refuses to respect the fundamental right to keep and bear arms, and rages against the confines of *Bruen*'s text-and-history test. The State knows there are no "well-established and representative analogues" for banning magazines that are commonly owned by millions of Americans for lawful purposes, including self-defense, hunting, target shooting, and competition shooting. Certainly, historical predecessors to modern firearms equipped with magazines able to hold more than ten rounds did exist. What did not exist is a longstanding American tradition of banning them. Regular Americans could—and did—lawfully own these weapons in the 19th century.

The State, dealing with a Second Amendment that has at long last been restored and will now be much more difficult to infringe, presents a Gish gallop[2] of a brief and evidentiary record to try and bully Plaintiffs into submission. Without asking for leave of this Court, it filed an over 60-page supplemental brief, and supplemented that brief with over 7,500 pages of exhibits attached to its experts' declarations in an attempt to elevate the opinions of modern academics into equivalence with historical laws. Yet

---

[1] Mark W. Smith, *NYSRPA v. Bruen: A Supreme Court Victory for the Right to Keep and Bear Arms—and a Strong Rebuke to "Inferior Courts"*, 24 Harvard J. L. & Pub. Policy Per Curiam 8 (2022).

[2] The Gish gallop "is a rhetorical technique in which a person in a debate attempts to overwhelm their opponent by providing an excessive number of arguments with no regard for the accuracy or strength of those arguments…. During a Gish gallop, a debater confronts an opponent with a rapid series of many specious arguments, half-truths, misrepresentations, and outright lies in a short space of time, which makes it impossible for the opponent to refute all of them within the format of a formal debate." Wikipedia, Gish gallop, https://en.wikipedia.org/wiki/Gish_gallop (last visited Nov. 29, 2022).

---

1   try as one might to find the needle in this haystack, few of the voluminous pages

2   contain *any* "relevantly similar" analogues to California's modern ban on magazines

3   over ten rounds. The State devotes pages to immaterial pre-Founding and 20th century

4   history, but when it comes to the most relevant time period—the Founding—it

5   presents nothing remotely analogous to a ban on commonly possessed arms. As to the

6   Reconstruction era, the best the State offers are laws restricting the *carry* (but not

7   possession) of concealed pistols and certain other weapons like Bowie knives. All the

8   while, its experts openly admit that no state laws regulated the repeating rifles the

9   paved the way for today's semiautomatic firearms equipped with detachable

10  magazines over ten rounds.

11       When all else fails, the State tries to revive the interest-balancing test that *Bruen*

12  definitively rejects, mentioning mass shootings and presenting expert declarations that

13  mostly have no bearing on the merits of this case. While they should not need to,

14  Plaintiffs' experts respond to the State's experts at length, establishing that: (1) mass

15  murder is not a new societal problem; (2) repeating arms able to fire more than ten

16  rounds before reloading were common in the 19th century and were not regulated; (3)

17  magazines over ten rounds are commonly owned and used today for lawful purposes;

18  and (4) the State's evidence has not established that such magazines make mass

19  shootings worse, even if that were a valid consideration under *Bruen*.

20       The State concludes by again demanding more time to conduct more discovery.

21  But it does not need more time. It needs historic laws that simply do not exist. If the

22  State is given more time, it will simply continue its efforts to overwhelm Plaintiffs and

23  their limited resources with more "experts" offering opinions on everything *but*

24  relevant historic laws. Plaintiffs (and all Californians who seeks to obtain standard

25  magazines over ten rounds) have waited long enough for their rights to be respected.

26  This Court should rule on the merits promptly.

27  / / /

28  / / /

---

2

**PLAINTIFFS' SUPPLEMENTAL BRIEF**

17cv1017

# BACKGROUND

**I.** **PREVALENCE OF FIREARMS AND MAGAZINES ABLE TO HOLD MORE THAN TEN ROUNDS OF AMMUNITION**

Today, magazines are essential to the operation of most modern firearms, Hanish Decl. ¶¶ 21-25; Helsley Decl. ¶ 9; Hlebinsky Decl. ¶ 12. But firearms and magazines able to accept more than ten rounds have been commonly possessed by the American public for generations. Hanish Decl. ¶ 18; Helsley Decl. Ex. 10 at 3-5; Hlebinsky Decl. ¶¶ 22-23, 27; *see also* Barvir Decl. Ex. 39 at 307-316, 320-321 [David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851-64, 871-72 (2015)]. They have existed since well before the American Revolution. Helsley Decl. Ex. 10 at 4; Barvir Decl. Ex. 39 at 307-316, 320-21; *see also* Helsley Decl. ¶¶ 7-8 (noting that Washington and Adams were personally involved in negotiations for a deal that would have seen the United States purchase multi-shot muskets); Barvir Decl. Supp. Mot. Summ. J. (ECF No. 50-8) ("Barvir MSJ Decl.") ¶¶ 12-15, Exs. 13-20. And they "have been very commonly possessed in the United States since 1862." *Id.*, Ex. 39 at 320; *see also* Helsley Decl. Ex. 10 at 5. "In terms of large-scale commercial success, rifle magazines over more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified. Handgun magazines of more than ten rounds would become popular in the 1930s." Barvir Decl. Ex. 39 at 320. Their popularity has only steadily increased over time, especially as technology has improved. *Id.*, Ex. 39 at 307-08; Helsley Decl. ¶ 11 (between 500 million and 1 billion magazines with a capacity of over ten rounds produced), Ex. 10 at 307-15; *see also* Barvir MSJ Decl. ¶¶ 13-31, 36-38, Exs. 15-51, 55-57.[3]

---

[3] For an enlightening list of "highlights" from the long history of firearms and magazines over ten rounds in this country, see Judge Bumatay's dissent from the (now reversed) en banc decision in this matter. *Duncan v. Bonta* ("*Duncan V*"), 19 F.4th 1087, 1155 (9th Cir.) (Bumatay, J., dissenting) (recounting the historical precedents for "large capacity magazines" from a 16-shooter developed in 1580 to the Winchester M1873, able to hold 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919).

3

1    Between 1990 and 2015, by one count, about 115 million magazines able to hold

2  more than ten rounds were in circulation in the United States. Hanish Decl. ¶ 18;

3  Helsley Decl. ¶ 11; Barvir Decl. Ex. 40 at 362 [Christopher S. Koper, et al., *An*

4  *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets*

5  *and Gun Violence, 1994-2003* at 65 (Nat'l Instit. Just. June 2004)]. This number

6  represents roughly half of all magazines acquired during that period. Barvir Decl. Ex.

7  39 at 321. Indeed, magazines of a much larger capacity—up to 30 rounds for rifles and

8  up to 20 rounds for handguns—are "*standard equipment* for many popular firearms."

9  *Id.*, Ex. 39 at 312-14, 322 (emphasis added); *see also* Hanish Decl. ¶ 27; Helsley Decl.

10  Ex. 10 at 3; Barvir Decl. Exs. 30-35.

11  **II.  THE HISTORY OF MAGAZINE CAPACITY RESTRICTIONS**

12    As an historical matter, no relevant evidence suggests an "enduring American

13  tradition," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2155-56 (2022), of

14  government restrictions on arms based on their magazine or firing capacity. Firearms

15  and magazines able to hold more than ten rounds have existed since the mid-1500s,

16  yet there were no restrictions on them at the time of the ratification of the Second

17  Amendment. *Id.*, Ex. 39 at 316; Hlebinsky Decl. ¶ 47. In fact, the first such law

18  appeared "during the prohibition era, nearly a century and half after the Second

19  Amendment was adopted, and over half a century after the adoption of the Fourteenth

20  Amendment." *Id.* Save for a single law in the District of Columbia, a version of which

21  remains in effect, those original laws have since been repealed. *Id.*, Ex. 39 at 317;

22  Hlebinsky Decl. ¶ 47.

23    Today, the overwhelming majority of states place *no* restrictions on magazine-

24  capacity, let alone demand that citizens surrender magazines considered too "large"

25  under threat of criminal penalty. The restrictions that *are* in place are of recent vintage,

26  and they vary greatly as to what constitutes a "large capacity magazine." Barvir Decl.

27  Ex. 12 at 303-06 (history of magazine capacity restrictions in the U.S.); Req. Jud. Ntc.,

28  Ex. 12 [Colo. Rev. Stat. §§ 18-12-301–302] (15-round limit; adopted 2013); Ex. 13

4

[Conn. Gen. Stat. § 53-202w] (10-round limit; adopted 2013), Ex. 14 [D.C. Code § 7-2506.01(b)] (12-round limit adopted in 1932, reduced to ten rounds in 2009), Ex. 15 [Haw. Rev. Stat. § 134-8(c)] (10-round limit for handguns only; adopted in 1992), Ex. 16 [Md. Code, Crim. Law § 4-305(b)] (20-round limit on transfer adopted in 1994; reduced to 10 in 2013), Ex. 17 [Mass. Gen. Laws ch. 140, §§ 121, 131(a)] (10-round limit without permit; adopted 1994), Ex. 18 [N.J. Stat. § 2C:39-1y, -3j, -9h] (15-round limit; adopted 1990), Ex. 19 [N.Y. Penal Law §§ 265.00, 265.36] (10-round limit; transfer banned in 2000, possession banned in 2013); Ex. 20 [Vt. Stat. Ann. tit. 13, § 4021] (10-round limit for a long gun, 15-round limit for a handgun; adopted 2017); Ex. 21 [Del. Code Ann. tit. 11, § 1469(a)] (17-round limit; adopted 2022); Ex. 22 [*see* 2022 Oregon Ballot Measure 114, Sec. 11] (10-round limit; adopted 2022).

Except for one brief period, the federal government has taken the same approach as most states. It did not regulate magazine capacity at all. In 1994, Congress adopted a nationwide prospective ban on certain magazines, which included a grandfather clause. Req. Jud. Ntc., Ex. 11 [Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1999 (1994) (formerly codified at 18 U.S.C. § 922(w)]; *see also* Barvir Decl. Ex. 39 at 317. Ten years later, Congress vindicated the wisdom of the grandfather clause, but not the efficacy of the ban, allowing the ban to expire after a study commissioned by the Department of Justice revealed that the law made no appreciable impact on crime. Barvir Decl. Ex. 41 at 400 [David B. Kopel, *What Should America Do About Gun Violence?*: Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013)], Ex. 39 at 317. The possession and acquisition of magazines able to hold more than ten rounds of ammunition remains legal under federal law today.

## III.   CALIFORNIA'S BAN ON MAGAZINES OVER TEN ROUNDS

Since 2000, California has been one of the very few states to prohibit the manufacture, importation, sale, and transfer of any "large-capacity magazine," which California broadly defines as "any ammunition feeding device with the capacity to accept more than 10 rounds," with some exceptions not relevant here. Cal. Penal Code

§§ 32310, 16740. While California did not, at first, try to confiscate such magazines from those who had lawfully obtained them, in July 2016, the Legislature eliminated even this modest nod in the direction of reliance interests and the Taking Clause. *See* S.B. 1446, 2015-2016 Reg. Sess. (Cal. 2016). The legislation required those in possession of lawfully acquired (and until then lawfully possessed) magazines to surrender, permanently alter, or otherwise dispossess themselves of their magazines.

A few months later, the voters approved Proposition 63, a ballot initiative that took a similar approach. *See* Cal. Penal Code § 32310. Proposition 63 requires any Californian in possession of a magazine over ten rounds to surrender it to law enforcement for destruction, permanently alter it, remove it from the state, or sell it to a licensed firearms dealer. *Id.* § 32310(a), (d). Failure to dispossess oneself of a lawfully acquired magazine is punishable by up to a year in prison, as well as a fine. *Id.* § 32310(c).

## IV.   PROCEDURAL HISTORY

Plaintiffs sued to enjoin enforcement of California's magazine restrictions. Compl. (May 17, 2017) (ECF No. 1). They alleged that the ban violates their rights under the Second Amendment, the Takings Clause, and the Due Process Clause. *Id.* ¶¶ 64-76, While Plaintiffs challenged the ban as a whole, they immediately sought a narrow preliminary injunction limited to enjoining enforcement of the new possession ban. Pls.' Mot. Prelim. Inj. 1 (May 26, 2017) (ECF No. 6). This Court, recognizing that the ban "criminaliz[es] the mere possession of these magazines that are commonly held by law-abiding citizens for defense of self[ and] home," held that Plaintiffs were likely to prevail under *both Heller*'s "text, history, and tradition" approach and the now-defunct two-step test that this Ninth Circuit then employed. *Duncan v. Becerra* ("*Duncan I*"), 265 F. Supp. 3d 1106, 1118, 1139 (S.D. Cal. 2017). The state took an interlocutory appeal, and a divided panel of the Ninth Circuit affirmed. *Duncan v. Becerra* ("*Duncan II*"), 742 F. App'x 218, 222 (9th Cir. 2018) (unpublished).

While the preliminary injunction order was on appeal, the parties engaged in

1    substantial discovery efforts. Plaintiffs assembled a summary judgment record

2    establishing, among other things, (1) that ammunition magazines are "arms" within the

3    scope of the Second Amendment, (2) the historical and present-day ubiquity of the

4    magazines that California seeks to ban and confiscate, and (3) the lack of a

5    longstanding historical tradition of laws in the United States restricting firearm

6    capacity. After reviewing the parties' historical and factual record, this Court granted

7    Plaintiffs' motion for summary judgment. *Duncan v. Becerra* ("*Duncan III*"), 366 F.

8    Supp. 3d 1131, 1186 (S.D. Cal. 2019).

9          This Court first found that magazines over 10 rounds are unquestionably

10   common, as roughly 115 million of them are owned by Americans for all manner of

11   lawful purposes. *See id.* at 1143-45. The Court then thoroughly considered—and

12   thoroughly rejected—the State's argument that there is a longstanding historical

13   tradition of regulating firing or magazine capacity. *See id.* at 1149-53. To the contrary,

14   the Court explained, "[h]istory shows ... restrictions on the possession of firearm

15   magazines of any size have no historical pedigree." *Id.* at 1149. Indeed, "the earliest

16   firing-capacity regulation appeared in the 1920s and 1930s," and "[e]ach was

17   repealed." *Id.* at 1150, 1153. Even today, magazine capacity remains "unregulated in

18   four-fifths of the states." *Id.* at 1149.

19         A divided panel of the Ninth Circuit affirmed. *Duncan v. Becerra*

20   ("*Duncan IV*"), 970 F.3d, 1133 (9th Cir. 2020), *reversed en banc*, *Duncan V*, 19 F.4th

21   1087 (9th Cir. 2021), *vacated and remanded*, 2018 U.S. App. LEXIS 31051 (9th Cir.

22   Sept. 23, 2022). The panel first concluded that "[t]he record ... amply shows" that the

23   prohibited magazines are the "antithesis of unusual," as "nearly half of all magazines

24   in the United States today hold more than ten rounds of ammunition," and such

25   magazines are "overwhelmingly owned and used for lawful purposes." *Id.* at 1146-47.

26   After conducting a "long march through the history of firearms," the panel likewise

27   found no evidence that magazine capacity restrictions have any historical pedigree. *Id.*

28   at 1148-49. While "firearms capable of holding more than ten rounds of ammunition

have been available in the United States for well over two centuries," restrictions on such magazines have been rare, recent, and short-lived. *Id.* at 1149-50. Indeed, the panel held, "[o]nly during Prohibition did a handful of state legislatures enact capacity restrictions," and "'most of those laws were invalidated by the 1970s.'" *Id.* (quoting *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty Gen. of N.J.* ("*ANJRPC I*"), 910 F.3d 106, 117 n.18 (3d Cir. 2018)).

The Ninth Circuit then took the case en banc, and a divided en banc panel reversed. *See Duncan V*, 19 F.4th 1087. The en banc majority first expressly refused to embrace the text, history, and tradition approach that *Bruen* now mandates, declaring that "[u]nless and until the Supreme Court tells us ... that, for a decade or more, we all have fundamentally misunderstood the basic framework for assessing Second Amendment challenges, we reaffirm our two-step approach." *Id.* at 1101. Employing that (now-abrogated) approach, the majority began by "assuming, without deciding, that California's law" both "implicates the Second Amendment" and implicates the "core" of the Second Amendment right, which obviated the need to engage in "an extensive historical inquiry." *Id.* at 1103. Giving "deference" to the State's "reasonable ... judgment" "that large-capacity magazines significantly increase the devastating harm caused by mass shootings and that removing those magazines from circulation will likely reduce deaths and serious injuries," *id.* at 1111, the en banc panel then concluded that the ban satisfies intermediate scrutiny, *id.*

Plaintiffs petitioned for a writ of certiorari. The Supreme Court held the petition pending resolution of *Bruen*, and shortly after it issued its decision in that case, the Court granted the petition, vacated the en banc decision, and remanded "for further consideration." *See Duncan v. Bonta* ("*Duncan VI*"), 2022 WL2347579, at *1 (U.S. June 30, 2022). On remand to the Ninth Circuit, the en banc panel ordered the parties "to file supplemental briefs on the effect of *Bruen* on th[e] appeal, including whether the en banc panel should remand this case to the district court." Order (Aug. 2, 2022) (9th Cir. Dkt. No. 202). After the parties' filed their supplemental briefs, the Ninth

8

PLAINTIFFS' SUPPLEMENTAL BRIEF

17cv1017

Circuit remanded the case to this Court for further proceedings. *Duncan VI*, 2022 U.S. App. LEXIS 31051.

This Court issued an order spreading the mandate, reinstating the preliminary injunction while this case proceeds, and setting a schedule for supplemental briefing under *Bruen*. Order (Sept. 26, 2022) (ECF No. 111). Weeks later, the State filed a motion for reconsideration, requesting that the Court re-open discovery to give the State time to engage in fact and expert discovery it opted not to engage in when this case was first before this Court. Def.'s Mot. for Reconsid. (Oct. 12, 2022) (ECF No. 112). Plaintiffs opposed that request. That motion is still pending.

## ARGUMENT

### I.    CALIFORNIA'S MAGAZINE BAN VIOLATES THE SECOND AMENDMENT

#### A.    The Proper Standard for Analyzing Second Amendment Claims

In *Bruen*, the Supreme Court recognized that "Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges." 142 S. Ct. at 2125. The first step, the Court explained, asked if the government could justify a given regulation by showing that "the original scope of the [Second Amendment] based on its historical meaning" countenanced that kind of restriction on the right to keep and bear arms. *Id.* at 2126. If it could, the analysis would "stop there." *Id.* But if history suggested that such a restriction was not "originally understood" as consistent with the right, or if the historical record was inconclusive, courts moved to a second step at which they typically subjected the regulation to intermediate scrutiny. *Id.*

The Supreme Court has now jettisoned that analysis, expressly stating that "[d]espite the popularity of this two-step approach, *it is one step too many*." *Bruen*, 142 S. Ct. at 2127 (emphasis added). The correct Second Amendment analysis starts and stops with consideration of text and historical tradition. *Id.* So, when faced with a Second Amendment challenge, courts must begin by asking whether the conduct in which an individual seeks to engage is within the ambit of the Second Amendment. *Id.* at 2129-30. If it is, "the Constitution presumptively protects that conduct," *id.*, and "the

government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127. "Only" if the government can "identify a well-established and representative historical analogue" to the regulation it seeks to defend, *id.* at 2133, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command,'" *id.* at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961))

*Bruen* also reaffirmed certain critical principles that govern (and constrain) the historical analysis. For one thing, the Court made emphatically clear that the government shoulders the burden of justifying a restriction on Second Amendment rights by proving that a longstanding American tradition supports that restriction. Indeed, the Court said so over and over:

- "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

- "[T]he *government must affirmatively prove* that its firearms regulation is part of the historical tradition." *Id.* at 2127.

- "The *government must then justify its regulation* by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

- "[A]nalogical reasoning requires … that the *government identify* a well-established and representative historical analogue." *Id.* at 2133.

- "[A]gain, *the burden rests with the government* to establish the relevant tradition of regulation." *Id.* at 2149, n.25.

- "Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. *That is respondent's burden.*" *Id.* at 2150.

- "[W]e conclude that *respondents have not met their burden* to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156.

As for what history courts should examine, the Court admonished that "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. For example, "[h]istorical evidence that long predates" the Constitution "may not

illuminate the scope of the right" if it contradicts American traditions, and courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* The Court also restricted the kind of historical tradition on which the government may rely is "an *enduring* American tradition of state regulation," and not just a handful of laws in "outlier jurisdictions." *Id.* at 2155-56 (emphasis added).

Under the correct application of *Bruen*'s history-and-tradition test, California's total ban on magazines over ten rounds is out of step with this country's tradition of firearm regulation. It is unconstitutional.

### B.   California's Modern Magazine Ban Restricts Conduct Within the Ambit of the Second Amendment

The first question under *Bruen* is whether the Second Amendment protects the conduct in which an individual seeks to engage. 142 S. Ct. at 2129-30. The answer here is obviously yes. Plaintiffs simply want to purchase, possess, and use common magazines for lawful purposes. That conduct falls comfortably within the Second Amendment.

### 1.   Magazines Are "Arms" Within the Scope of the Second Amendment

The text of the Second Amendment guarantees individuals the rights "to keep and bear Arms." U.S. Const. amend. II. That, of course, includes the right to use them "for offensive or defensive action." *Bruen*, 142 S. Ct. at 2134; *see also id.* at 2127, 2134- 35 (Second Amendment protects the right to keep and bear arms "in common use," "in case of confrontation," "for self-defense"); *id.* at 2158- 59, 2161 (Alito, J., concurring) (Second Amendment protects both "possessing … and *using* a gun" (emphasis added)). After all, the Amendment's text must be interpreted as it would ordinarily have "be[en] understood by the voters" who ratified it. *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008). And history shows that those who ratified the Second Amendment understood it to guarantee a right to *use* a firearm for a multitude of lawful purposes, including self-defense.

Indeed, early state court decisions interpreted analogous state guarantees as protecting the effective use of firearms. *See, e.g.*, *State v. Reid*, 1 Ala. 612, 616-17 (1840) (Alabama's guarantee barred the legislature from adopting rules that "render [firearms] wholly useless"); *Bliss v. Commonwealth*, 12 Ky. 90, 92 (1822) (Kentucky's analogous guarantee "consisted in nothing else but in the liberty of the citizens to bear arms"). And nineteenth century commentators read the Second Amendment the same way. *See, e.g.*, Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery* 117-18 (1849) (without "impl[ying] the right to use" firearms the "guarantee would have hardly been worth the paper it consumed"); Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880) ("to bear arms implies something more than the mere keeping; it implies the learning to handle and use them").

Because the Second Amendment right to "keep and bear arms" implies the right to *use* them, the fact that the challenged law bans magazines and not firearms themselves changes nothing. "Constitutional rights implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) (collecting examples). "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized." The Federalist No. 44, at 282 (James Madison) (Charles R. Kesler ed., 2003). For that reason, even the Ninth Circuit's pre-*Bruen* precedent confirms that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). Indeed, the Ninth Circuit repeated that observation again and again.[4] Other circuits agree that the Second Amendment protects those predicate activities necessary to use a firearm for lawful purposes. *See, e.g.*, *Drummond v. Robinson Twp.*, 9 F.4th 217, 224, 227-28 (3d Cir. 2021) (zoning rules barring for-

---

[4] *See Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), *vacated on reh'g*, 2022 WL 4090307; *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc).

profit shooting ranges and practice with center-fire ammunition); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (access to firing range for training); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) (possession of "component parts" like detachable magazines), *vacated*, 849 F.3d 114 (4th Cir. 2017) (en banc), *abrogated by Bruen*, 142 S. Ct. at 2126-27.

As this Court already held, the same is true for magazines. *Duncan III*, 366 F. Supp. 3 at 1142; *see also Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) (recognizing the "right to possess the magazines necessary to render … firearms operable"). "Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, 'the Second Amendment would be toothless.'" Order Granting Prelim. Inj. at 16 (ECF No. 28) (quoting *Luis*, 136 S. Ct. at 1097). Magazines are essential to the operation of most modern firearms. Hlebinsky Decl. ¶ 12; Helsley Decl. ¶ 9; Hanish Decl. ¶¶ 21-25; *see also* Barvir Decl. Ex. 25 at 69-79, Ex. 26 at 88-90, Ex. 27 at 107. Their function is to hold and to automatically feed individual ammunition cartridges into the chamber for firing. Barvir Decl. Ex. 25 at 69-79, Ex. 26 at 89-90, Ex. 27 at 107. Without the magazine in place, firearms designed for use with magazines are limited to firing a single round—or none at all. *See id.*, Ex. 29 at 119. Indeed, for safety reasons, many pistols are designed to fire *only* when the magazine is in place. *Id.*, Ex. 26 at 89, Ex. 28 at 29.[5] It is thus no surprise that *no* court has held that magazines are not arms. *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019) (assuming without deciding that a magazine restriction implicates the Second Amendment); *N.Y. State Rifle & Pistol Ass'n v. Cuomo* ("*NYSRPA*"), 804 F.3d 242, 257 (2d Cir. 2015)

---

[5] In fact, California prohibits licensed dealers from selling pistols that will fire a chambered cartridge with the detachable magazine removed. Cal. Penal Code § 31910(b)(6) (requiring pistols to be equipped with a "magazine disconnect mechanism"); *id.* § 16900 (defining "magazine disconnect mechanism" as "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating ... when a detachable magazine is not inserted in the semiautomatic pistol").

("we proceed on the assumption that these laws [bans on "assault weapons" and "large capacity magazines" ban weapons protected by the Second Amendment"); *ANJRPC I*, 910 F.3d at 116 ("The law challenged here regulates magazines, and so the question is whether a magazine is an arm under the Second Amendment. The answer is yes."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015) ("[T]he court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns.").[6]

The State tries to relitigate this already well-settled question, arguing for the first time, after years of litigation, that magazines are not "arms" at all because, the State's linguistics expert opines, they would have been considered "accoutrements," not "arms," during the Founding and Reconstruction Eras. Def.'s Suppl. Br. 17 (citing Baron Decl. ¶ 25). The claim (even if true) does not support the State's position that magazines are not protected by the Second Amendment. It ignores the long line of precedent discussed above that unquestionably holds that items like ammunition and magazines are protected because they are "necessary to render … firearms operable" for their lawful purposes. *Fyock*, 779 F.3d at 998.

Baron claims that historical evidence "shows that during the Founding Era and the Reconstruction Era, *arms* [was] used as a general term for weapons," like swords, knives, rifles, and pistols. Baron Decl. ¶ 7. The term apparently did not include "ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields," which Baron explains were often called "accoutrements." *Id.* Baron can only speculate that modern detachable magazines would also fall under that umbrella term in early America because, as he admits, detachable magazines did not appear until 1919 or later. *Id.* ¶ 57; *see also* Hlebinsky Decl. ¶ 47. And a modern magazine is nothing like

---

[6] In fact, only the Third Circuit has ruled that magazines over ten rounds are not protected—though not because they are not arms, but because the court held they are most useful in military service. *Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017).

an ammunition container of the type Baron references. Those containers did not attach to the firearm. Nor were they necessary for the firearm to function. Magazines, on the other hand, are essential to the firearm that individuals "take into [their] hands," and are thus classified as part of the "arm" itself. *Heller*, 554 U.S. at 581.[7]

Even if magazines are "accoutrements," like ammunition, they must still be protected, like ammunition, because they are *essential* to the operation of the firearms that use them. Hlebinsky Decl. ¶ 12; Helsley Decl. ¶ 9; Hanish Decl. ¶¶ 21-25. The State admits as much. Def.'s Suppl. Br. 17, n.10 ("To be sure, some type of magazine is essential to the use of many handguns."). Still, the State argues that, because firearms can accept smaller magazines, magazines *over ten rounds* are not necessary to the operation of any firearm. *Id.* at 16 (citing Busse Decl. ¶¶ 7, 9). But that is not an argument that magazines over ten rounds are not *arms* for Second Amendment purposes. If a magazine under ten rounds is an *arm*, as the State concedes, it does not magically transform into something else once it meets the State's arbitrary threshold for being "too large."

And the State's argument that a larger magazine is not "necessary" for a firearm to function for self-defense does not change anything. Otherwise, sights, stocks, rifles barrels, and all but one caliber could be banned. Taken to its logical conclusion, no particular firearm model would enjoy Second Amendment protection because none is "necessary" for self-defense. To allow government the power to whittle down all aspect of arms to those it deems "necessary" would be affording it the power to destroy the right.

At bottom, the State is arguing that the government may ban a subcategory of arms (here, magazines) as long as other arms remain available for effective self-

---

[7] Under *Heller*, anything that "a man wears for his defence" or "armour of defence" is considered a protected "arm" as well. *Heller*, 554 U.S. at 581. It would be strange indeed if body armor was protected by the Second Amendment, but not a firearm's magazine.

defense—a borderline frivolous argument that *Heller* soundly rejected. 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.")

For these reasons, it is hardly debatable that California's modern magazine ban restricts *arms* under a plain reading of the Second Amendment.

### 2. Magazines Over Ten Rounds Are in Common Use for Lawful Purposes

The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. In support of their motion for summary judgment, Plaintiffs presented overwhelming evidence that the magazines California bans are in common use for lawful purposes—and have been for decades. Barvir MSJ Decl. Ex. 2 at 30-32; Ex. 12 at 295, Ex. 56, Ex. 58 at 846-48; *see generally* Barvir MSJ Decl. Exs. 52-57, 62. And nearly every appellate court that has analyzed this issue has found, or was willing to assume, that bans on magazines over ten rounds burden conduct protected by the Second Amendment. *See, e.g.*, *Fyock*, 779 F.3d at 999; *ANJRPC I*, 910 F.3d at 116; *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *but see Kolbe*, 849 F.3d at 137-38 (standing alone in its holding that "large capacity magazines" are unprotected because they are best suited for military purposes). In short, it is well documented and almost universally accepted that the restricted magazines have long been commonly possessed in the United States for lawful purposes—including, *but not limited* to, the core lawful purpose of self-defense.

*Bruen* did not alter the common-use analysis, so it is improper to relitigate the issue here. The State attempts to do so nonetheless, but it has provided nothing new that should prompt this Court to disturb its earlier holding that magazines over ten rounds are protected because they "are used for self-defense by law-abiding citizens. And they are common." *Duncan III*, 366 F. Supp. 3d at 1143.

In short, firearms able to discharge more than ten rounds without reloading were common in the United States by the time the Second and Fourteenth Amendments were ratified. Helsley Decl. Ex. 10 at 4; Hlebinsky Decl. ¶¶ 23, 29; Barvir Decl. Ex. 12 at 295; *see generally* Barvir MSJ Decl. Exs. 13-51 (recounting the history of rifles and handguns with capacities over ten rounds). And that popularity has only solidified as technology has improved and become more affordable. Barvir Decl. Ex. 39 at 307-15; Helsley Decl. ¶ 11, Ex. 10 at 5; *see also* Barvir MSJ Decl. ¶¶ 13-31, 36-38, Exs. 15-51, 55-57. Indeed, many of the nation's best-selling firearms—including the ever-popular Glock pistol—have for decades come *standard* with magazines California now prohibits. Helsley Decl. Ex. 10 at 3-4; Barvir Decl. Ex. 39 at 314-15, Ex. 31, Ex. 34 at240-42; *see also Duncan III*, 366 F. Supp. 3d at 1145 (discussing, among others, the popular "Glock 17, which is designed for, and typically sold with, a 17-round magazine" and the AR-15 style rifle, of which more than 5 million have been sold since the 1980s and which "are typically sold with 30-round magazines"). Today, *millions* of these magazines are in the hands of law-abiding Americans, and they are lawful in at least 40 states and under federal law. Hanish Decl. ¶ 18; Helsley Decl. ¶ 11; Barvir Decl. Ex. 40 at 362. Under any reasonable measure, they are common. *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 255-57 (noting "large-capacity magazines" are "in common use" based on even the most conservative estimates).

What's more, these magazines are overwhelmingly used for lawful purposes. Renowned firearms historian, Stephen Helsley, explains that firearms and magazines over ten rounds were developed for self- and home-defense. Helsley Decl. Ex. 10 at 7-9. Firearm industry senior executive, Mark Hanish, explains that firearms that come standard with magazines over 10 rounds, like AR-15 style rifles, have many benefits including "personal defense, target shooting, competition, and hunting," all of these being lawful purposes under *Heller*. Hanish Decl., ¶ 11. Manufacturers specifically market them for those purposes. Hanish Decl. ¶¶ 18-20, 26-29. Civilians overwhelmingly choose them to increase their chances of staying alive in violent

confrontations. Helsley Decl. ¶ 11, Ex. 10 at 5; Barvir Decl. Ex. 39 at 307-09. And even the U.S. government played a part in the distribution of them: Through the Civilian Marksmanship Program, between 1958 and 1967, the federal government sold around 207,000 M1 Carbines rifles to American citizens. Stephen P. Halbrook, *America's Rifle: The Case for the AR-15* at 198 (Bombardier Books 2022). M1 carbines came standard with 15-round and later 30-round magazines. *Id.* at 58. "Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century." Barvir Decl. Ex. 39 at 320-21. It is no wonder, then, that few courts have had trouble concluding that these magazines are typically possessed for lawful purposes.

Unable to rebut the overwhelming evidence (and the trail of precedent, including this very Court's findings) that magazines over ten rounds are "typically possessed for lawful purposes," including self-defense, the State retreats to yet another specious argument that has already been rejected by this Court. The State claims that "the test for Second Amendment protection of a particular weapon is common *use*, not common *ownership*." Def.'s Suppl. Br. 21 (citing *Bruen*, 142 S. Ct. at 2138, 2142, n.12, 2143, 2156). According to the State, "a firearm being 'commonly owned' 'for lawful purposes," *Duncan* [*III*], 366 F. Supp. at 142, is not enough." *Id.* It must also, apparently, be both *suitable for* and *in actual use for* that purpose. *Id.* (citing *Duncan V*, 19 F.4th at 1105 (Berzon, J., concurring); *Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense")).

As the district court in *Fyock* held, "Second Amendment rights do not depend on how often the magazines are used. Indeed, the standard is whether the prohibited magazines are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether the magazines are often *used* for self-defense." 25 F. Supp. 3d at 1276 (quoting *Heller*, 554 U.S. at 625) (double emphasis added). It is enough that they are commonly possessed for self-defense and other lawful purposes, not that their actual

uses in self-defense meet some threshold the State has not identified. If it were otherwise, the State could justify a ban on all firearms able to fire more than 2 or 3 shots since, according to the State's expert Lucy Allen, "on average, only 2.2 shots were fired by defenders." Def.'s Suppl. Br. 21 (citing Allen Decl. ¶ 10). Taken to its natural conclusion, the State's reasoning would justify banning *any* firearm for that matter. For most firearms have never *actually* been used in self-defense at all. Surely, that cannot be the result under *Bruen* or *Heller*.

The State then complains that a "mere popularity" test for protection of arms is unworkable. Def.'s Suppl. Br. 20.[8] It argues that "the phrase 'in common use' as used in *Bruen*, *Heller*, and *McDonald* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold." *Id.* The claim is unsupported, and it conflicts with Justice Alito's guidance on what really matters: "[T]he more relevant statistic is that 'hundreds of thousands of tasers and stun guns [the arms at issue] have been sold to private citizens,' who it appears may lawfully possess them in 45 states." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring))

Even if that is so, the record does not merely establish that magazines over ten rounds are popular for popularity's sake. It shows (1) that they are marketed for self-defense, Hanish Decl., ¶¶ 18-20, 26-29; (2) that they often come standard with the most popular self-defense firearms, Helsley Decl., Ex. 10 at 3-4; Barvir Decl., Ex. 39 at 314-15, Ex. 31, Ex. 34 at 240-42; and (3) that they are overwhelmingly chosen by Americans for self-defense, Helsley Decl., ¶ 11, and Ex. 10 at 5; Hanish Decl., ¶ 18, and Ex. 5; Barvir Decl., Ex. 39 at 307-09. The record also reflects many reasons many

---

[8] The courts appear to be divided over whether "mere popularity" or something more is required. *Compare Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016) (analyzing commonality by reviewing raw number percentage and jurisdiction counting); *NYSRPA*, 804 F.3d at 255 (holding that "large capacity magazines" are in common use because 50 million units were available for purchase); *with Kolbe*, 849 F.3d at 141-42 (noting that *Heller* did not "confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical").

citizens prefer them for that purpose. Helsley Decl., ¶11, Ex. 10 at 5; Hanish Decl., ¶ 26 This is more than is needed to show that magazines over ten rounds are "typically possessed" for the core lawful purpose of self-defense.

The State's belief that the magazines are "unsuitable for self-defense," Def's. Suppl. Br. 21, is not supported by the record and is, quite frankly, irrelevant. Whatever politicians might think citizens "need" for effective self-defense is beside the point. The record shows that Americans overwhelmingly choose magazines over ten rounds for lawful self-defense. That choice is entitled to "unqualified deference." *Bruen*, 142 S. Ct. at 2131.

The State also rests much of its argument on the claim that these magazines' usefulness for military purposes makes them both "unsuitable" for lawful self-defense and unprotected. Def.'s Suppl. Br. 18 (citing *Bruen*, 142 S. Ct. at 2133); *id.* at 21 (citing *Duncan V*, 19 F.4th at 1105). But the Supreme Court's precedents do not withhold Second Amendment protection from arms merely because they are useful in militia service. It is true that *Bruen* "repeatedly confirms that self-defense … is the '*central component*' of the right" the Second Amendment protects. Def.'s Suppl. Br. 18 (quoting *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010)); *id.* at 2125 (also discussing *Heller* and *McDonald*); *id.* at 2128 (same)) (emphasis added). But this was equally true before *Bruen* came down. Indeed, one thing the courts could agree on, even before *Bruen*, was that the "core" of the Second Amendment protected right was "self-defense."[9] But referring to the "central component" or the "core" of the right does not suggest that the arms used in "militia

---

[9] *See, e.g.*, *Wilson v. Cook Cty.*, 937 F.3d 1028, 1032 (7th Cir. 2019) (discussing the core right of self-defense); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1323 (11th Cir. 2015) (same); *Peterson v. Martinez*, 707 F.3d 1197,1218-19 (10th Cir. 2013) (same); *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (same); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (same); *see also Fyock*, 779 F.3d at 998 (recognizing that protection extends to magazines); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (recognizing that protection extends to ammunition).

service" are altogether without Second Amendment protection. That would be an odd reading of the Second Amendment indeed. Indeed, it would render its entire prefatory clause meaningless; a result that cannot be. *Hurtado v. California*, 110 U.S. 516, 534 (1884) ("[W]e are forbidden to assume, without clear reason to the contrary, that any part of this most important amendment is superfluous.").

In sum, magazines over ten rounds are used by tens of millions of Americans for lawful purposes across this country, with restrictions on such magazines being in effect in only a handful of states. Lawful purposes indisputably include self-defense, but they also include hunting, target shooting, competition shooting, and as our history teaches us, as a final failsafe against a tyrannical government. Such magazines are thus protected by the Second Amendment.

### C.    California Cannot Show That Relevant Historical Tradition Justifies Its Modern Magazine Ban Under *Bruen*

Under a faithful application of the *Bruen* test, the State cannot come close to meeting its burden of proving that its magazine ban is part of the Nation's historical tradition. There simply is no "well established and representative" historical analogues dating to the 19th century or before. To the contrary, as both this Court and every member of the Ninth Circuit to engage with the historical record on appeal has concluded, history and tradition establish the complete *absence* of "a well-established and representative historical analogue." *See Duncan III*, 366 F. Supp. 3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (after conducting a "long march through the history of firearms," the panel found no evidence that magazine capacity restrictions have any historical pedigree); *Duncan V*, 19 F.4th at 1156-59 (Bumatay, J. dissenting) ("In the end, California fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban.").

This is likely why the State resorts to disfiguring the *Bruen* test beyond recognition, summarizing it as follows: "A modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it 'impose[s] a

comparable burden on the right of armed self defense" as its historical predecessors, and the modern and historical laws are 'comparably justified.'" Def.'s Suppl. Br. 13 (citing *Bruen*, 142 U.S. at 2133). But whether there is a comparable burden on the right of armed self-defense is appropriate only when a challenged regulation seeks to address some "unprecedented societal concern" or "dramatic technological change." *Bruen*, 142 U.S. at 2133. And even then, such reasoning requires the State to first show that a "well established and representative," *id.*, historical analogue *even exists*. Because there are no comparable restrictions on the possession of common arms, let alone flat bans on firearms based on their firing capacity, in the 19th century or earlier, the State resorts to arguing that *Bruen* allows it to rely on *in*comparable regulations that imposed a "comparable burden." This it cannot do.

Moreover, all of the State's attempts to point to evidence of a relevant historical tradition, rests on the misguided premise that California's modern magazine ban is part of an Anglo-American tradition of "restrictions on 'dangerous' *or* 'unusual' weapons, *Heller*, 554 U.S. at 627, while allowing law-abiding residences to possess and acquire other firearms for self-defense purposes." Def.'s Suppl. Br. 3 (emphasis added). The argument itself rests on two borderline frivolous premises.

First, the idea that the government may ban a class of commonly possessed arms just because it leaves others untouched was soundly rejected in *Heller*. Indeed, "[t]t is no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." 554 U.S. at 629; *see also*, *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition does not implicate the Second Amendment because it does not threaten total disarmament. *We think that argument frivolous*. It could be similarly contended that all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller*, 554 U.S. 570 (emphasis added)).

Second, and perhaps most shockingly, the State literally rewrites the *Heller* test

22

for what arms are protected. While it may be true that there is some "historical tradition" of excluding "'dangerous *and* unusual' weapons from the Amendment's protection," *Duncan V*, 19 F.4th at 1148 (quoting *Heller*, 554 U.S. at 627), the Supreme Court does not speak in terms of "dangerous [*or*] unusual" weapons—no matter how many times the State uses brackets to slip "or" into the test. *See* Def.'s Suppl. Br. 24:2, 33:2, 39:12, 52:5 (referring to "dangerous [or] unusual weapons"); *see also id.* at 24, n.13, 26:1, 26:5-6, 26:9-10, 33:7, 39:20, 39:21, 40:10-11, 41:5, 42:1, 55:18 (referring to "dangerous or unusual weapons"). The State engages in a sleight of hand that is neither accidental nor harmless.

As this Court once explained: "The Second Amendment does not exist to protect the right to bear down pillows and foam baseball bats. *It protects guns and every gun is dangerous.* 'If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous.' … '[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Duncan III*, 366 F. Supp. 3d at 1146 (quoting *Caetano*, 577 U.S. at 418 (Alito, J., concurring)) (double emphasis added). The State's citation to Blackstone's reference "to the crime of carrying 'dangerous *or* unusual weapons'" notwithstanding, Def.'s Suppl. Br. 24, n.13, the Second Amendment protects arms unless they "dangerous *and* unusual." It "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring).

### 1.   None of the Historical Evidence that the State Relies on Establishes a Relevant and Enduring Historical Tradition of Firearm Regulation

### a.   Medieval and pre-founding English history

In reaffirming *Heller*'s test rooted in our historical tradition of firearm regulation, the Court cautioned that not all history is created equal: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that

long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." *Bruen*, 142 S. Ct at 2136. The Court also made clear that the kind of historical tradition the government must prove is "an enduring *American* tradition of *state* regulation." *Id*. at 2155-56 (emphasis added).

When it came to pre-founding and English history, the Court gave such history very little weight because "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* at 2136 (citing *Heller*, 554 U.S. at 634). English history is ambiguous at best, and the Court saw "little reason to think that the Framers would have thought it applicable in the New World." *Id*. at 2139. That's not to say pre-founding history is *never* relevant to the analysis, but the standard for when it can be is high. As the Court explained, a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone is far more likely to be part of our law than a short-lived, 14th-century English practice." *Id.* at 2136. "Sometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' [citation omitted] unless evidence shows that medieval law survived to become our Founders' law." *Id*. (citing *Funk* v. *United States*, 290 U.S. 371, 382 (1933)).

Given how limited pre-colonial history is in value, it is curious the State chose to rely on it so heavily. Opp'n at 34-37. Beacause the history of banning mere possession of commonly owned arms is almost nonexistent, it is obvious that the State is grasping at anything it can. For example, relying on pre-founding history, the State argues that the right to bear arms is a "subordinate right" that fell beneath other, "primary right." *Id.* at 35. The Supreme Court has already rejected this argument. The Second Amendment recognizes a preexisting fundamental right, not some ancillary, conditional afterthought. *McDonald*, 561 U.S. at 778.

It only gets worse from there. The State cites the very laws *Bruen* itself considered, including a 1541 law under Henry VIII in which the use or keeping of handguns was restricted. The State claims that "Henry VIII was concerned about safety

issues associated with the particular prohibited weapons; the prohibition targeted 'little short handguns' and 'little haquebuts,' which were a source of 'great peril and continual feare and danger of the kings loving subjects.' " Opp'n at 36. The Supreme Court looked at this very law and rejected it, explaining:

> Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. Henry VIII worried that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt.

*Bruen*, 142 S. Ct. at 2140. The Court also explained the larger issue with these enactments—they contradict *Heller's* historical analysis:

> In any event, lest one be tempted to put much evidentiary weight on the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. Of course, this kind of limitation is inconsistent with *Heller's* historical analysis regarding the Second Amendment's meaning at the founding and thereafter. ***So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the Second Amendment's scope.*** We see little reason why the parts of the 1541 statute that address public carry should not be understood similarly.

*Id.* at n.10.

The Supreme Court has thus already considered—and rejected—the very history the State now wants to relitigate in this Court. That precedent binds this Court. On a more basic level, the history cited by the State did not save New York's *carry* regime at issue in *Bruen*. So it is puzzling why the State thinks it would save its flat ban on mere *possession* of commonly owned magazines.

### b.  Colonial America and the Founding Era

Moving to the Founding Era—the only era that *Bruen* makes unmistakably clear is relevant to the analysis—the State's mountain of historical evidence fares no better. Just as it did on appeal, "California fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban." *Duncan V*, F.4th at 1159 (Bumatay, J.

1  dissenting). Indeed, not one of the State's historians could identify a single Founding-

2  era law flatly banning a class of arms commonly chosen by Americans for lawful

3  purposes. "Ironically, the closest Founding-era analogues to ammunition [or firing

4  capacity] regulations appear to be laws *requiring* that citizens arm themselves with

5  particular arms and a specific *minimum* amount of ammunition." 1784 Mass. Acts 142;

6  1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271

7  (1792) (Militia Act); Herbert L. Osgood, *The American Colonies in the Seventeenth*

8  *Century* 499-500 (1904) (showing that states required citizens to equip themselves with

9  adequate firearms and ammunition—varying between twenty and twenty-four

10  cartridges *at minimum*)." *Id.* The existence of such laws cuts *against* the State's

11  argument, not in favor of it.

12       That said, Plaintiffs will the State's proposed Founding-era regulations in turn.

13  In support of its claim that "[d]uring the colonial period and through the Founding,

14  colonial and state governments imposed regulations on firearms hardware and

15  accessories and other weapons deemed to pose threats to public safety," Def.'s Suppl.

16  Br. 37, the State relies primarily on three types of laws: restrictions on the storage of

17  gunpowder, restrictions on "trap guns," and bans on the "carrying of dangerous *and*

18  unusual weapons," *id.* at 37-40.[10] None of the proposed laws is remotely similar to the

19  State's flat ban on acquiring and possessing a class of arms typically possessed for

20  lawful purposes.

21       ***Gunpowder Laws***: The State first introduces several Colonial Period regulations

22

23

24       [10] The State also cites the Conductor Generalis, "a founding-era guide for
justices of the peace, sheriffs, and constables" that described an "affray," and included

25  instances "where a man arms himself with dangerous and unusual weapons, in such a
manner as will naturally cause a terror to the people." Def.'s Suppl. Br. at 40 (quoting

26  The Conductor Generalis: Or, the Office, Duty, and Authority of Justices of the Peace,
High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, JuryMen, and Overseers
of the Poor, and also The Office of Clerks of Assize, and of the Peace, &c. Albany,

27  1794, at 26). The Conductor Generalis is merely a guide for law enforcement, not an
enactment. But even if it were a law, it does not ban any "dangerous and unusual

28  weapon." It does nothing more than define "affray" to include the carry of "dangerous
and unusual weapons" in a way that would *naturally cause terror to the people*." *Id.*

26

1    on gunpowder storage . But those laws were enacted, as the State admits, Def.'s Suppl.

2    Br. at 38 (citing Cornell Decl. ¶¶ 41, 45), to prevent catastrophic explosions and fires

3    in town limits or near a powder house.[11] They were necessary because of the highly

4    combustible and unstable nature of loose gunpowder, which is not a modern concern.

5    They were not enacted to combat crime, in general, or mass killings, more specifically.

6    And, more importantly, they regulated only the *manner* of storing gunpowder; they did

7    not prohibit possession or use of any common arm. These distinctions are key because,

8    as explained below, *see infra*, Argument, Part I.C.2.b, the State's proposed historical

9    analogues must be both similar in type and similar in justification. *Bruen*, 142 S. Ct. at

10   2133. Dissimilar laws are not legitimate analogues rooted in "an enduring American

11   tradition of state regulation" of arms. *Id.* at 2155-56.

12        ***Trap Gun Restrictions:*** "Trap guns" were devices rigged to fire  without the

13   presence of a person. Spitzer Decl. ¶ 50. They could be triggered by any unsuspecting

14   animal or person that happened to walk by. The State claims that the existence of laws

15   restricting the use of "trap guns" in early America provides relevant historical support

16   for its modern magazine ban because they "originated during the colonial period" and

17   "were enacted due to the threat posed to innocent life." Def.'s Suppl. Br. at 38-39

18   (citing Spitzer Decl. ¶¶ 50-53, Ex. F). But like early gunpowder restrictions, these

19   laws, by and large, did not ban any class of arms. Rather, they regulated the *manner* of

20   using them. That is, they banned setting a loaded, unattended gun to prevent

21   unintended discharges. For instance, the 1771 New Jersey law the State relies on, *id.*

22   at 39, does not ban "trap guns" (or any class of arms) per se; it prohibits the manner of

23   setting "any loaded Gun in such Manner as that the same shall be intended to go off or

24

25   ———————————

26        [11] *See, e.g.*, Thomas Wetmore, Commissioner, The Charter and Ordinances of
     the City of Boston: Together with the Acts of the Legislature Relating to the City at
27   142-143 (1834), *available at The Making of Modern Law: Primary Sources* (An Act ...
     Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of
28   loaded arms in the houses of the town of Boston, . . . is dangerous . . . when a fire
     happens to break out in said town").

discharge itself, or be discharged by any String, Rope, or other Contrivance," 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

What's more, these laws (according to the State) were enacted "due to the threat posed to innocent life," Def.'s Suppl. Br. at 39 (citing Spitzer Decl. ¶ 50), (both human and animal). But that characterization of the justification for such laws is far too broad. Just about any gun restriction can be described as necessary to promote public safety or protect life. But "trap gun" restrictions were necessary because setting loaded, unattended guns to discharge automatically imposes an incredibly specific threat to life that is entirely unrelated to violent crime.

***Bans on Carry***: Finally, the State turns to Colonial-era restrictions on carrying "dangerous *and* unusual" weapons. Def.'s Suppl. Br. at 39 (citing *Bruen*, 142 S. Ct. at 2143; *see also* Spitzer Decl. Ex. E). Once again, the State is relying not on flat bans on the possession or use of any arm, but rather the *manner* of carrying them in public (i.e., concealed). Like restrictions on gunpowder storage and setting "trap guns," early restrictions on concealed public carry are not remotely analogous to California's magazine ban. It matters not that, according to the State, some such laws targeted the concealed public carry of particular types of firearms. *See* Def.'s Suppl. Br. at 39 (citing See Spitzer Decl. Ex. E (citing The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881)). What matters is that, unlike the magazine ban at issue here, such laws did *not* ban possession of even those arms targeted for restriction.

c.      **Antebellum America and Reconstruction**

Failing to identify a single relevant Founding-era law, let alone an "enduring American tradition" of regulation, the State shifts its focus to antebellum America and the Reconstruction Era. The State argues that "[d]uring the antebellum and postbellum period, around the time that the Fourteenth Amendment was ratified, numerous states restricted particular weapons deemed to be particularly dangerous or susceptible to

PLAINTIFFS' SUPPLEMENTAL BRIEF

17cv1017

criminal misuse." Def.'s Suppl. Br. at 41. Even if that is true, such a tradition is irrelevant to the prohibition of standard magazines over ten rounds—arms that millions of Americans possess and use for lawful purposes, including (but not limited to) self-defense. What's more, *Heller* already rejected the premise that arms that are otherwise commonly chosen by the law-abiding for lawful purposes can be banned just because criminals might misuse them. 554 U.S. at 628-29 (maj. op.). Indeed, *Heller* struck D.C.'s modern handgun ban even though such weapons made up a significant majority of all stolen guns and are *overwhelmingly* used in violent crimes. *Id.* at 698 (Breyer, J., dissenting). Beyond these fundamental flaws in the State's reasoning, however, Reconstruction-era history does nothing to justify California's modern magazine ban under the *Bruen* test.

### Restrictions on Carrying Blunt Weapons, Bowie Knives, and Similar Arms:

The State first argues that "[t]hroughout the 1800s, states enacted a range of laws restricting the *carrying* of blunt weapons," including laws restricting "bludgeons," "billies," certain "clubs,"[12] "slungshots," "sandbags," and concealed weapons, generally. Def.'s Suppl. Br. at 41 (citing Spitzer Decl. Ex. C) (emphasis added). And 49 states banned so-called Bowie knives. *Id.* (Spitzer Decl. ¶ 39 & Ex. C). But as the State itself admits, "[m]ost of these restrictions targeted the *carrying* of such" items, not the mere possession. *Id.* (citing Spitzer Decl. Ex. E at 24). The State cites a *single* such law, adopted in Iowa in 1887, that also banned the possession of Bowie knives and other "dangerous or deadly weapon[s]." *Id.* (citing Spitzer Decl. Ex. E at 24). Both common sense and Supreme Court precedent are clear that courts should "not 'stake [their] interpretation of the Second Amendment upon a single law, in effect in a single

---

[12] The State candidly admits that "[t]hese 19th century laws generally prohibited slaves from carrying clubs." Def.'s Suppl. Br. at 41, n. 22. It should go without saying that racist laws enacted to disarm classes of marginalized people provide no legitimate analogue for modern day arms bans. If they did, certainly *Bruen* would have mentioned them even once.

[State], that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense.'" *Bruen*, 142 S. Ct. at 2153 (quoting *Heller*, 554 U.S. at 632).

What's more, David Kopel, a renowned Second Amendment historian and prolific legal scholar whose work was cited favorably in *Bruen*, recently published a detailed evaluation of Reconstruction-era Bowie knife laws. He concluded:

> ***At the end of the 19th century, no state prohibited possession of Bowie knives***. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.
>
> Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century…. As with handguns, ***the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives***…. The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors.

Barvir Decl. Ex. 38 at 304.

So, once again, the State relies primarily on historical laws restricting just the *manner* of carrying arms in public, not their possession or even use. At best, the State has provided evidence that the act of concealed carry was disfavored in Reconstruction-era America. But such evidence was not enough to justify modern-day bans on concealed carry in *Bruen*, so it is difficult to see how such enactments could bear the weight of California's flat ban on the acquisition, possession, and use of commonly possessed magazines.

***Bans on Carrying Revolvers and Pistols:*** Next, the State takes aim at restrictions on carry of revolvers and pistols. Def.'s Suppl. Br. at 42 (citing Roth Decl., ¶ 26) (discussing restrictions on the ***carrying of certain concealable weapons*** in Kentucky, Louisiana, Indiana, Georgia, and Virginia between 1813 and 1838). And again, the State misses the mark. Because, again, restrictions on the manner of carrying

arms in public do not impose a burden on the Second Amendment that is in any way like the burden imposed by a ban on their acquisition and possession. They are not "relevantly similar" as *Bruen* requires. 142 S. Ct. at 2122.

Perhaps the closest the State comes to identifying relevant historical analogue are two laws, adopted in the 1870s in Arkansas and Tennessee, that restricted not just public carry, but also imposed "regulations on dealers selling pistols." Def.'s Suppl. Br. at 43 (citing Rivas Decl. ¶ 15). But even those late laws are not persuasive. As the State's brief bizarrely explains, in less than ten years, both of "[t]hese attempts to regulate pistols *were invalidated by the state courts* for being overly broad in prohibiting the keeping and carrying of all pistols in public. *Id.* at 43 (citing *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557 (1878)) (emphasis added). The State tries to resuscitate these short-lived restrictions by explaining that they were later amended to restrict only concealed public carry of certain pistols, *id.* at 43 (citing *State v. Wilburn*, 66 Tenn. 57, 61 (1872); Acts of the General Assembly of Arkansas, No. 96 § 3 (1881); Rivas Decl. ¶ 17). But these narrower concealed carry bans are still concealed carry bans. And historical concealed carry bans (especially in just two states) justify modern day concealed carry bans, let alone flat bans on the possession and acquisition of protected arms.

What's more, *Bruen* warned that courts should refrain from "giving postenactment history more weight than it can rightly bear." 142 S. Ct. at 2136. "[T]o the extent later history contradicts what the text says," as the State's Reconstruction-era concealed carry bans do, "the text controls." *Id.* at 2137 (citing *Gamble v. United States*, -- U.S. --, 139 S. Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

***Non-statutory Regulation of Repeaters:*** Finally, in a last-ditch effort to find support for its unprecedented ban on magazines over ten rounds, the State resorts to tales of regulation of repeating rifles, like the Winchester and Henry lever-action repeating rifles. Def.s' Suppl. Br. at 45-46. But instead of pointing to an actual *law* regulating these rifles, the State makes dubious claims that these firearms were not

1  really popular amongst civilians at the time, Def.'s Suppl. Br. at 45 (citing Vorenberg

2  Decl. ¶¶ 21-25, 47, 96-97, and that "de facto regulation of repeating rifles effectively

3  controlled the[ir] use and circulation … reducing any need for legislative responses to

4  the threats that they posed," *id.* at 46 (citing Vorenberg Decl. ¶ 8). Neither claim

5  provides the relevant historical justification for California's modern magazine ban.

6       First, Vorenberg strangely claims that few civilians bought repeating rifles, but

7  also, that they were so plentiful that Native Americans somehow acquired enough of

8  them to legitimately threaten U.S. military forces. Vorenberg Decl. ¶ 63 ("Native

9  Americans [at the Battle of the Little Bighorn] carried a variety of weapons, many of

10 which were Winchesters."). Native Americans did not have factories to manufacture

11 their own rifles—they acquired them secondhand. Indeed, as Vorenberg explains,

12 "[m]any of the weapons had been seized from American emigrants and settlers whom

13 the Natives had attacked. Many also had been robbed from shippers heading to or

14 through the Western Territories." *Id.* at ¶ 60. Henry-Winchester rifles then *must* have

15 been possessed by American citizens

16      Vorenberg also acknowledges that Americans came to regard self-defense as

17 important in the western states, and the Winchester Company capitalized on this in

18 their marketing. *Id.* at ¶ 54. Yet he contends they were not popular and did not sell

19 well, and even the U.S. army rarely had them. *Id.* at ¶¶ 55-59. Unfortunately for

20 Vorenberg and the State, only about one-third of the rifles produced went to foreign

21 governments, and the rest stayed in the United States. Hlebinsky Decl. ¶ 31. Given that

22 the military did not adopt Henry-Winchester rifles, and given that over 100,000 of

23 them that were produced in the Reconstruction era stayed in the United States, it

24 follows that they were commonly owned by regular citizens. *Id.*; *see also* Barvir Decl.

25 Ex. 39 at 319 ("The best of these was the sixteen-shott Henry Rifle, introduced in 1861

26 with a fifteen-round magazine. The Henry Rifle was commercially successful, but

27 Winchester Model 1866, with its seventeen-round magazine, was massively

28 successful.")

While Henry-Winchesters were quite clearly popular by the time the Fourteenth Amendment was ratified, the State failed to identify a single *law* banning the acquisition and possession of these rifles based on their firing capacity at any time in history. Indeed, as the State has candidly admitted, *there simply are no such enactments* to be found. *Id.*; Vorenberg Decl. ¶ 8 ("[E]xplicit legal text prohibiting civilian possession of the most dangerous weapons of war was not commonly the means by which such weapons were regulated in the United States."). Its attempt to instead rely on post-Civil War regulation that was never adopted by any legislative body in the country does not constitute the sort of "*enduring American tradition of state regulation*" that *Bruen* requires. Nor do its convoluted and speculative explanations for why legislative action was purportedly unnecessary. *See* Def.'s Suppl. Br. at 46 (citing Vorenberg Decl. ¶¶ 63-64) (characterizing the U.S. army's ban on trade of repeating rifles to Native Americans after Little Big Horn as a restriction on their ownership by non-statutory means). To the contrary, *Bruen* demands that the State identify relevant and well-established historical laws evidencing an American tradition of similar regulation—not excuses for why no such laws exist.

### d.   Twentieth Century regulations

As discussed above, the Supreme Court gave little weight to pre-Founding era history, finding it only relevant where there is a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone" that is "far more likely to be part of our law than a short-lived, 14th-century English practice." *Bruen*, 142 S. Ct at 2136. The Court considered 20th century history even *less* important. It only referenced it in a footnote, stating that it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154, n.28. The State nevertheless cites several laws adopted in the 20th century that it claims banned firearms based on their firing capacity. Def.'s Suppl.

33

Br. 48-49. These laws contradict this country's long history of *not* banning classes of arms in common use for lawful purposes. They are thus irrelevant outliers that provide no insight into the original meaning of the Second Amendment. This Court should thus follow the *Bruen* Court's lead and ignore the State's 20th century evidence.

Indeed, based on *Bruen*'s clear guidance, the first wave of post-*Bruen* Second Amendment decisions have rebuked calls to rely on evidence of 20th century regulations. As the Northern District of New York recently observed, "to the extent these laws were from the 17th or 20th centuries, the [c]ourt has trouble finding them to be 'historical analogues' that are able to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127 (N.D.N.Y. Nov. 7, 2022). And the Western District of New York likewise observed that:

> *Bruen* itself invalidated a century-old New York proper-cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* in the face of a much broader and much older public-carry tradition. ***If such was a failure of analogs or tradition in Bruen, the State's argument must also fail here.***

*Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *37, n.16 (W.D.N.Y. Nov. 3, 2022) (double emphasis added); *see also United States v. Nutter*, No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding that laws originating in the 20th century alone cannot uphold a law unless similar laws existed in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state laws adopted in the 20th century was insufficient historical justification for a ban on firearms purchases for those under the age of 21).

In an apparent effort to see just how many pages it can fill, the State ignores all of this precedent to argue that 20th century history justifies its modern magazine ban. Def.'s Suppl. Br. 48-49. While such evidence is irrelevant to the question before this

1   Court, Plaintiffs address the State's proposed 20th century supposed "analogues."

2         To begin with, this Court already considered much of the 20th century history

3   the State's supplemental brief references and found it unpersuasive. *Duncan v.*

4   *Becerra*, 366 F. Supp. 3d 1131, 1149, 1150 (S.D. Cal. 2019). Because the State could

5   find no restrictions on magazines over ten rounds enacted before 1990, the State

6   argued in its opposition to summary judgment that "the historical prohibition question

7   is not one of detachable magazine size, but instead is a question of firearm 'firing-

8   capacity.'" *Id.* Casting that wider net, the State presented several laws dating to the

9   1930s. Def.'s Opp'n Mot. Summ. J. 4-5 (citing Uniform Machine Gun Act, ch. 206, §

10   1, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1(a), 1934 Va. Acts

11   137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80,

12   § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288).

13   But, as this Court observed, the laws the State cited then (and cites again now) were

14   actually restrictions on *machine guns*,[13] and all were repealed within decades. *Duncan*,

15   366 F. Supp. 3d at 1150.[14] What's more, all had limits of *over* ten rounds. *Id*. And two

16   of the cited laws only punished offensive uses, but "protected citizen machine gun

17   possession for defensive use or any other use that was not manifestly aggressive or

18   offensive." *Id.* at 1153. Only the District of Columbia has had a capacity restriction in

19   place since the 1930s, and even there, the limit was more than 10. *Id*. The State

20   submits these same laws once again, even though the intervening decision in *Bruen*

21   weakened their persuasive value by making clear that 20th century laws are of little use

22   to the Second Amendment analysis. Opp'n at 48.

23         Through one of its experts, the State submits additional laws from the 1920s and

---

[13] For the full text of all the laws the state referred to in its earlier briefing, as well as the new laws it submits for the first time, see the Spitzer Declaration at Ex. D.

[14] Of course, what makes a machine gun "dangerous and unusual" is its ability to fire automatically, not to accept detachable magazines over 10 rounds. *See Staples*, 511 U.S. 600, 612 (1994) (identifying the difference between the lawfully possessed AR-15 and the unlawfully possessed M-16 military machine gun, both capable of accepting "large capacity magazines," as the latter's ability to fire automatically).

1930s for the Court's consideration. Opp'n at 48 (citing Spitzer Decl. ¶¶ 12-14, Ex. D). Just like the 20th-century firing-capacity laws this Court already rejected, *Duncan*, 366 F. Supp. 3d at 1150, several of Mr. Spitzer's newly uncovered laws restricted automatic firearms only, with three (Oregon, Pennsylvania, and Wisconsin) limiting such magazines to just *two* rounds. Spitzer Decl. ¶ 13 (citing 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; 1933 Wis. Sess. Laws 245, 164.01). The State also draws special attention to a 1927 California law, but that too applied only to automatic weapons. Opp'n at 48 (citing 1927 Cal. Stat. 938). The State even bizarrely talks about federal restrictions that *failed* to pass. Opp'n at 49 (discussing an earlier draft of the National Firearms Act that would have restricted semiautomatic weapons).

   Of the restrictions purportedly applying to semiautomatic firearms[15] that were not already rejected by this Court, some limited magazines to just one or two rounds, revealing that the restriction was not so much about capacity as it was about restricting *automatic* weapons. Otherwise, the restriction would have made most firearms of the time illegal. Spitzer Decl. ¶ 13 (citing 1927 Mass. Acts 413, 413-14; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232). Others were not capacity restrictions at all, except as they pertained to hunting, as Mr. Spitzer explains in a footnote. Spitzer Decl. ¶ 13, n.30. The State's brief attempts to mislead this Court, grouping all of these unrelated restrictions together as if they all pertained to blanket magazine capacity restrictions on weapons in common use for lawful purposes. That is not the case. More

_____

[15] Spitzer refers to "ambiguous law[s] that could apply to semi-automatic in addition to automatic firearms." Spitzer Decl. ¶ 10. But several laws he categorizes as "ambiguous" *unmistakably* refer to machine guns. *See, e.g.* 1933 Cal. Stat. 1169 (referring to machine guns); 1932 La. Acts 337-38 ("An Act to Regulate the Sale, Possession and Transportation of Machine Guns"); 1927 Mass. Acts 413 (defining machine guns); 1934 S.C. Acts 1288 ("For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device."). There is no "ambiguity."

36

importantly, most of these laws were later repealed. Barvir Decl. Ex. 39 at 317 ("The [District of Columbia] stands alone in its historical restriction of magazines.").

To be clear, 20th century laws do not establish a historical tradition; they can only confirm what came before. And as already discussed, there is no relevant Founding-era or Reconstruction-era tradition of banning a class of arms commonly chosen for lawful purposes. *See supra*, Argument, Part I.C.1.b-c. The 20th century laws the State cites thus contradict the relevant historical tradition instead of reaffirming it. Under *Bruen*, that makes them irrelevant to the analysis.

### 2.   The State's Unmoored Use of Analogical Reasoning Defies *Bruen* and Should Be Ignored

The State finally argues that its modern magazine ban addresses an "unprecedented societal concern" and "dramatic technological changes" that entitle the State to wide latitude in identifying "relevant historical analogues." Def.'s Suppl. Br. 26 (citing *Bruen*, 142 S. Ct. at 2132). To be sure, the *Bruen* Court did note that "unprecedented societal concerns or dramatic technological changes may require a *more nuanced approach*" to determining whether a law is consistent with historical tradition. 142 S. Ct. at 2132 (emphasis added). But it cautioned that reasoning by analogy in such cases must be carefully constrained by an inquiry into both "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. It did not suggest, as the State does, that such changes give the government a blank check to rely on just about any historical practice no matter how far removed from *Bruen*'s clear dictate that burdens on the Second Amendment must be rooted in "an *enduring* American tradition of *state regulation*," *Id.* at 2155-56 (emphasis added). Even if it did, California's modern magazine ban addresses neither an "unprecedented societal concern" nor a "dramatic technological change" in firearms.

/ / /

/ / /

a.   **California's modern magazine ban does not address an unprecedented societal concern or dramatic technological change**

"[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at n. 2131. The State contends that its modern magazine ban addresses the supposedly unprecedented social problem of mass shootings, arguing that modern weapons equipped with magazines over ten rounds have empowered individuals, *acting alone*, to commit such atrocities. Opp'n at 31.[16]

But, tragically, mass murder is not some new phenomenon in America. It has plagued the world for centuries, as the State's own expert concedes (though contending early mass murders were a "group activity"): "[M]ass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and non lethal violence of all kinds became more common." Roth Decl. ¶ 40. "From the 1830s into the early twentieth century, mass killings were common." *Id.* "Mass murder is not particularly new…. Almost everything can be, and has been, used to commit mass murder in America." Cramer Decl. ¶46; *see also* Cramer Decl. ¶ 24 (confirming that there were over 1,600 known mass murders by 1960).

Such killings committed by a single person acting alone is not a new development either; it has persisted since at least the end of the 18th century (and probably longer). The State's own expert witness, Professor Vorenberg, tells of an 1869 mass shooting in Florida. Vorenberg Decl. ¶ 97. A single shooter "fired 'thirteen or fourteen shots in rapid succession,' killing and wounding many of the party." *Id.*

---

[16] The State arbitrarily limits its historical overview to mass shootings involving ten or more victims killed. Def.'s Suppl. Br. 31. While there are many competing definitions and standards, Plaintiffs know of no definition of "mass shooting" or "mass killing" that limits it to incidents where ten or more are killed.

"because of the speed and volume of the shots fired," it was reported that the assailant had likely used a Henry rifle. *Id.*

Plaintiffs' expert witness, Clayton Cramer, has been working on research into the history of mass murder since 2019. Cramer Decl. ¶ 3. He has painstakingly examined archived articles to identify thousands of mass murders in American history. *Id*. ¶¶ 12-17. While there are competing definitions of "mass murder," he has synthesized the FBI and Secret Service definitions for his project, defining a mass murder to include at least two murder victims within 24 hours. *Id.* ¶ 4. Further, Cramer excludes mass murders committed during riots, gang disputes, mutual combat, acts of war or other government-backed mass killings, and most mass murders of Native Americans by other Native Americans. *Id.* ¶¶ 5-11. Cramer finds that "individual mass murder is neither particularly modern nor dependent on technological advances." *Id.* ¶ 19. And he has found that firearms were used to commit several mass murders in the 19th century. *Id.* ¶ 24 (detailing firearm-related mass murders that occurred in 1860, 1865, 1870, and 1889).

Given its arbitrary limitation of "*shootings* with ten or more victims killed,"[17] the State may complain that many of these mass killings were not as lethal as the mass public shootings of today. Def.'s Suppl. Br. 31-32 (emphasis added). But mass killings with ten or more victims did happen in the past, they just tended to involve explosives or arson more often than firearms, as Cramer details extensively. Cramer Decl. ¶¶ 32-34 (detailing mass murders that killed 10 or more people in 1903, 1913, 1916, 1920, 1925, 1927, 1944, 1955, and 1958). Some of the mass murders described had horrific numbers of victims, such as the 1955 dynamite bombing of an airliner that killed 44 people, an arsonist killing 27 people in 1913, or another arsonist killing 95 in 1958. *Id.* All three of these were acts of individuals acting alone. *Id.* Mass killings are simply not

---

[17] The limitation is arbitrary indeed. The State's new tactic is "to restrict [the] analyses to only the rarest kinds of mass shootings, those with a huge number (10 or more) of fatalities (Klarevas 2022)….

a new problem in our history.

But even if there were good reason to arbitrarily limit the definition to only *shootings* with ten or more killed and comparing that to only firearm-related mass killings of earlier eras, this is a difference in degree, not in kind. The State is engaging in a forbidden interest-balancing and legislative-deference argument, essentially telling this Court that because, it claims, our mass shooting (but not mass killing) problem is worse now, the State should be given more room to rely on stretched analogies to uphold its otherwise unprecedented law. This Court should reject that invitation. *Bruen* tells us that its examination of analogues is not meant to be a way to sneak back in the abrogated interest-balancing tests: "This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry…. Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances…. It is not an invitation to revise that balance through means-end scrutiny." *Bruen*, 142 S. Ct. at 2133, n.7.

What's more, the State's premise that mass shootings, specifically, are so common today that they rise to the level of an "unprecedented societal concern" that justifies resort to a "more nuanced approach," does not really comport with findings that (even today) such crimes, though horrific, really are relatively rare. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1018 (S.D. Cal. 2021) ("In the *terrible mass shooting context, which fortunately is a rare event*, reducing the number of innocent victims is the State's goal, although it is not at all clear that a less accurate rifle would reduce the number of victims. A less accurate rifle in the hands of a mass shooter may very well result in different victims, but not necessarily less victims. On the other hand, *in the self-defense context, which seems to be more common*, taking accurate shots at attackers is vitally important for the innocent victim."); *see also* Kleck Decl. ¶ 40 ("[T]he risk of an American being killed in a 'gun massacre' is less than 1/14th of the risk of being killed by a bolt of lightning—itself a freakishly rare event.").

Nor has there been, as the State argues, Opp'n at 26-30, a dramatic change in

firearm technology that would justify the State's use of overextended analogies to justify its modern magazine ban. Semiautomatic firearms with detachable magazines are a technological *improvement* over what came before; that much cannot be denied. But the more significant shift occurred between the American Revolution and the ratification of the 14th Amendment. In 1791, most firearms were single-shot weapons requiring time to reload between shots. *But see* Hlebinsky Decl. ¶¶ 21-23 (commenting on various multi-shot firearms that existed during or before the founding era). But by 1868, and over the decades that followed, revolvers gave Americans five or six shots in a single compact firearm, while repeating rifles like the Henry Rifle allowed the bearer to fire up to 16 shots before reloading, with only a quick operation of the lever action between each shot. Hlebinsky Decl. ¶¶ 30, n.43. The Model 1866 Winchester Rifle similarly had a capacity over ten rounds, and of the 164,466 combined Henry and Winchester Rifles that were made between 1861 and 1877, two-thirds were sold to civilians. *Id.* ¶ 31.

Going from single-shot firearms to repeating rifles and revolvers is a far more significant technological leap than going from repeating rifles and revolvers to modern-day semiautomatics with detachable magazines. Yet as Plaintiffs established above, not one law banned possession of repeating rifles, nor did any state limit civilians to repeating rifles with capacities of 10 rounds or less. Indeed, the Civil War and Reconstruction eras saw a dramatic change in individual firepower, but the government did not respond to that change by banning (or even regulating) firearms based on their firing capacity.

      **b.**     **Even if resorting to "analogical reasoning" were appropriate, the State has not established that its modern magazine ban imposes a "comparable burden" as any historical analogue or is "comparably justified"**

If this Court concludes that the State's modern magazine ban really does address some dramatic technological change or new social issue, the sort of "analogical reasoning" *Bruen* requires demands that the State present "well established and

representative" historical analogues. *Bruen*, 142 S. Ct. at 2133. But not just any law or tradition can be plucked from the history books. While the State need not identify a "historical twin," it must present a genuine analogue—one that is "relevantly similar" to the modern restriction it seeks to defend. *Id.* at 2122. The *Bruen* Court did not establish all the ways proposed analogues may be relevantly similar, but it explained that "*Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Speaking very generally, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). In short, dissimilar historical laws cannot meet the *Bruen* standard even if they impose comparable burdens.

To that end, when looking at the "how," courts must analyze whether a historical analogue imposes a "comparable burden." *Bruen*, 142 S. Ct. at 2133. In conducting that analysis, courts should consider whether the challenged modern law and the proposed historical analogue impose a similar *type* of burden (not just a similar *severity* of burden) on the right of armed self-defense. For example, old laws prohibiting the concealed carry of small pistols (but allowing for their open carry, or for the open carry of larger pistols) do not impose a comparable burden as, for example, D.C.'s total ban on handguns that was invalidated in *Heller*. *See* 554 U.S. at 573 ("The District's total ban on handgun possession in the home amounts to a prohibition on an entire class of 'arms' that Americans overwhelmingly choose for the lawful purpose of self-defense.") The former limited only the particular method of *carry* of *some* pistols, while the latter restricted even the mere possession of all pistols in the home. The burdens imposed are wildly different—even if it might be said that they impose as severe or even more severe a burden on the ability to engage in self-defense at a given moment. So they cannot meet the test laid out in *Bruen*.

When looking at the "why," courts consider "whether th[e] burden is

comparably justified." *Bruen*, 142 S. Ct. at 2133. This side of the analogical reasoning coin ensures that historical laws enacted for one purpose are not used as a pretext to justify a modern law that was enacted for entirely different reasons. *Id.*

This is the sort of strained comparison-making that all of the State's proposed historical analogues rely on. For instance, as discussed above, the State's reliance on Founding-era gunpowder storage laws, Def.'s Suppl. Br. 37-38 (citing Cornel Decl. ¶¶ 41, 45), misses the analogical mark because they do not impose "comparable burdens" nor are they "comparably justified." So while it is true that there are examples of restrictions on keeping loaded guns in the home or storing gun powder, those laws were not enacted to address crime (let alone mass killings, even though those existed at the time). They were fire prevention measures enacted to prevent explosions and unintended discharges because of the highly combustible nature of gunpowder at the time. Def.'s Suppl. Br. 38 (citing Cornell Decl. ¶¶ 41, 45). More important, while such laws restricted the *manner of storing arms*, they indisputably did *not* prohibit the possession or acquisition of any arms—the burden that the State's modern magazine ban challenged here imposes.[18] These things are not "relevantly similar" under *Bruen* or any reasonable analysis.

As Judge Bumatay observed in his dissent en banc:

> Not only is California's ban not historically longstanding, but it also ***differs in kind*** from the regulatory measures mentioned in *Heller*. Regulations on possession by people dangerous to society, where a firearm may be carried, and how firearms may be exchanged, *see Heller*, 554 U.S. at 626-27, ***are about the manner or place of use and sale or the condition of the user***. California's ban, on the other hand, is much more like a "prohibition

---

[18] As an aside, the State also points out an 1821 Maine law that apparently "authoriz[ed] town officials to enter any building to search for gun powder." Def.'s Suppl. Br. 38, n. 19 (citing Cornell Decl., ¶ 45 (citing 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5)). But a law that merely authorizes law enforcement to search for evidence of a crime upon reasonable suspicion *and* after obtaining a warrant, Cornell Decl., ¶ 45, is *not* the sort of "relevantly similar" law that *Bruen* requires.

43

PLAINTIFFS' SUPPLEMENTAL BRIEF

17cv1017

1
2
3

> on an entire class of 'arms' that is overwhelmingly
> chosen by American society" for home defense. *Id.* at
> 628. Also, like the ban in *Heller*, California's ban extends
> "to the home, where the need for defense of self, family,
> and property is most acute." *Id.*

4 *Duncan V*, 19 F.4th at 1158-59 (Bumatay, J. dissenting) (double emphasis added).

5   Moreover, the State's reliance on comparable burdens and justifications appears

6 to be just a thinly veiled use of the now-rejected interest-balancing approach. But the

7 Supreme Court did not expressly reject the interest-balancing approach only to re-

8 adopt it later in the same case. "The Second Amendment 'is the very product of an

9 interest balancing by the people' and it 'surely elevates above all other interests the

10 right of law-abiding, responsible citizens to use arms' for self-defense. (Citation.) It is

11 this balance—struck by the traditions of the American people—that demands our

12 unqualified deference." *Bruen*, 142 U.S. at 2131 (quoting *Heller*, 554 U.S. at 635). The

13 State seems to want to rid itself of the responsibility of having to establish similar

14 eighteenth or nineteenth century laws altogether, but it cannot do so. *Bruen* may not

15 impose a "regulatory straightjacket," but it also forbids the "regulatory blank check"

16 the State is apparently requesting. *Id*. at 2133.

17 **II.    PLAINTIFFS' TAKINGS CLAUSE AND DUE PROCESS CLAIMS**

18   The State argues that because the Ninth Circuit sitting en banc decided

19 Plaintiffs' takings and due process claims, and because *Bruen* does not expressly or

20 implicitly abrogate the en banc panel's holdings, this Court should enter judgment in

21 favor of the State on those claims. Def.'s Suppl. Br. 37-38 (citing *Duncan V*, 19 F.4th

22 at 1112). The problem with the State's request is that Plaintiffs' petition for writ of

23 certiorari asked the Supreme Court to reconsider not only the en banc's erroneous

24 Second Amendment decision, but also its Takings Clause holding. Petition for Writ of

25 Certiorari at ii, *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) (No. 21-1194).

26   When the Supreme Court granted certiorari, vacated the en banc ruling, and

27 remanded this case, it did not limit the remand to just Plaintiffs' Second Amendment

28 claims, and it never decided Plaintiffs' takings claim. *Duncan v. Bonta*, 142 S. Ct.

2895 (2022). That claim (as well as the related due process claim) are thus still very much alive until all appeals are exhausted.

Plaintiffs rest on the takings and due process arguments they made in their motion for summary judgment.

### III. THE STATE DOES NOT NEED MORE TIME TO PACK THE RECORD WITH EVEN MORE IRRELEVANT HISTORICAL EVIDENCE

If it weren't enough to submit a 63-page supplemental brief,[19] supported by no fewer than 10 expert declarations and over 7500 pages of documentary evidence, the State resurrects its complaint that it needs more time to prepare its case, asking the Court yet again to delay deciding the matter by several more months so that it might conduct further discovery and build a historical record. Opp'n at 56-60. Plaintiffs need not repeat all the reasons that indulging the State's request is improper, but they do reiterate that *Bruen* requires that the State "demonstrate that [its modern magazine ban] is consistent with this Nation's historical tradition of *firearm regulation*." *Bruen*, 142 S. Ct. at 2126 (emphasis added). If it can, the law might stand. If it cannot, the law is unconstitutional. This test does not demand (or even countenance) that the parties present Ph.D.-level dissertations on American history.

Here, all the State must do is present laws from the relevant period that it claims are "well established and representative" analogues to its modern magazine ban. *Id.* at 2133. This Court then determines whether: (1) those proposed analogues are indeed well established and representative, and (2) whether they are relevantly similar enough to uphold the State's magazine ban. *Id.* at 2132-33. Judges are better equipped than

---

[19] Plaintiffs maintain that Local Rule 7.1(h), which governs the length of all "briefs or memoranda in support of or in opposition to all motions," applies to the parties' court-ordered supplemental briefs. Because the State did not request leave from this Court before filing their oversized brief, the State's supplemental brief violates the 25-page page limitation set by the local rules. Pls.' Mot. to Strike Def.'s Oversized Suppl. Br. (Dec. 1, 2022) (ECF No. 130). Plaintiffs must still respond to the State's arguments and have thus sought leave to file their own oversized brief to do so. Ex Parte Mot. to Extend Pg. Limits (Dec. 1, 2022) (ECF No. 131).

PLAINTIFFS' SUPPLEMENTAL BRIEF

anyone to compare modern laws to old ones without extrinsic aids. A New York district court has agreed, stating that "[t]he Court's view of the State's expert's declaration is that live testimony and cross examination are not needed… The historical record itself, and not expert arguments or opinions, informs the analysis." *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *6 n.6 (W.D.N.Y. Nov. 3, 2022). Still another New York district court explained that "[t]he State Defendants are fully capable of meeting their burden of producing analogues (especially when prodded to do so), and judges appear uniquely qualified at interpreting the meaning of statutes." *Antonyuk v. Hochul*, 2022 U.S. Dist. LEXIS 201944, at *125 n.73.

These district courts' observations reflect the realities of *Bruen* itself. Recall, *Bruen* never even made it past the pleadings in the district court. There was no discovery. No battle of the experts. No lengthy diatribes from history professors speculating about why our Forefathers refrained from passing restrictions on public carry with any real regularity. There was nothing like that. And still, the Supreme Court managed to analyze the historical laws the government presented and, without remanding the case for further development, held that New York's modern carry law is not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2156; *but see id*. at 2164 (Breyer, J., dissenting) (complaining that the Court should remand the case to develop the record).

The State's plot to undermine *Bruen* here is as transparent as it is malicious. The Attorney General intends to elevate the opinions of its anti-gun "experts" to the equivalent of historical laws. That is because the State knows it will not find support in historical laws alone. Indeed, at least of the State's experts has practically admitted that the relevant analogues that would be necessary to uphold the State's modern magazine ban simply do not exist. Vorenberg Decl. ¶ 8 ("Evidence for these assertions does not necessarily take the form of statutes or court decisions, and that is entirely unsurprising: explicit legal text prohibiting civilian possession of the most dangerous

PLAINTIFFS' SUPPLEMENTAL BRIEF

weapons of war was not commonly the means by which such weapons were regulated in the United States during the Civil War and Reconstruction."). So the State wants more time so its "experts" can "expand the scope of their research to include additional archival and unpublished sources." Opp'n at 59.

No such material is relevant here. Only old laws (and potentially historical evidence that clarifies those laws) are relevant. But the State has not presented a single 18th or 19th century law banning the mere possession of arms commonly possessed by Americans for lawful purposes. And it has certainly failed to present any historically relevant law that bans firearms based on their firing capacity—despite the prevalence of firearms able to fire more than 10 rounds at the Founding. Helsley Decl. ¶ 8; Hlebinsky Decl. ¶¶ 20-23. There is not even an outlier to speak of, let alone a "well established and representative" analogue. *Bruen*, 142 S. Ct. at 2133. The reason the State has not presented such laws is not because it has had insufficient time to do so, it is because such laws simply do not exist.

**IV.    THE STATE IS NOT ENTITLED TO THE EXTRAORDINARY RELIEF OF A STAY, INDEFINITELY DENYING CALIFORNIANS OF THEIR CONSTITUTIONAL RIGHTS YET *AGAIN* WHILE THIS CASE WINDS THROUGH THE COURTS**

Having failed to raise a single appropriate analogue, the State still insists that the Court should stay enforcement of its eventual judgment pending appeal. "To decide whether to grant the Federal Defendants' motion for a stay pending appeal, our case law requires that we consider: (1) whether the Federal Defendants have made a strong showing that they are likely to succeed on the merits; (2) whether the Federal Defendants will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020).

It is true that "'[w]hen the request for a stay is made to a district court, common sense dictates that the moving party need not persuade the court that it is likely to be reversed on appeal.'" *Costco Wholesale Corp. v. Hoen*, No. C04-360P, 2006 U.S. Dist.

1  LEXIS 65774, at *7 (W.D. Wash. Sep. 14, 2006) (citing *Canterbury Liquors & Pantry*

2  *v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass. 1998)). At the same time, that does not

3  mean the State meets this first element simply by claiming it has raised novel issues. It

4  is not enough that the chance of success on the merits be "better than negligible"; more

5  than a mere possibility of relief is required. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

6  Remember, the State has failed to cite a *single relevant analogue* to uphold its

7  magazine ban. This is not a close case. The State fails to meet the first element.

8       Second, the State has offered no evidence of the imaginary irreparable harm it

9  would suffer if a stay is denied. This is despite the fact that the banned magazines were

10  bought by the hundreds of thousands (or perhaps the millions) when this Court

11  temporarily enjoined the State's ban in 2019,[20] creating a natural experiment to see if

12  any actual harms would result. Did the parade of horribles the State warns of come to

13  pass? If it did, the State has not tried to substantiate as much. The State even

14  acknowledges that over a million such magazines "flooded" the State during Freedom

15  Week, Opp'n at 62, but it never even hints that their presence in California caused any

16  notable harm.[21]

17       Finally, under the third and fourth factors, other parties and the public interest

18  benefit from this Court's ruling taking effect immediately. The public interest would be

19  harmed if the ruling is stayed because "[i]t is well established that the deprivation of

---

22  [20] Matthias Gafni, *For One Week, High-Capacity Ammunition Magazines Were Legal in California: Hundreds of Thousands May Have Been Sold*, S.F. Chron. (April 11, 2019), *available at* https://www. sfchronicle.com/bayarea/article/for-one-week-high-capacity-gun-magazines-were-13757973.php (last accessed Nov. 22, 2022) ("[I]n the span of a single week after a federal judge temporarily set aside the prohibition, hundreds of thousands of the devices, if not millions, made their way into the hands of state residents, industry leaders say. The run on high-capacity magazines from March 29 to April 5—so fervid that online traffic from gun enthusiasts around the state crashed at least one retail website—was hailed as 'Freedom Week' by the California Rifle and Pistol Association.").

27  [21] And too that the State somewhat misleads the Court when it claims that magazines over ten rounds have been illegal to acquire since 2000, Opp'n at 61-62, given that so many were legally bought when they were legal after this Court enjoined the enforcement of section 32310(c) in 2019.

constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Further, "all citizens have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

As the *Hardaway* district court recently explained in rejecting the government's request for a stay:

> Here, a stay pending appeal is not warranted. As discussed above, Plaintiffs' constitutional rights are being violated absent a preliminary injunction. The State fails to establish irreparable injury in the absence of a stay. The balance of hardships and public interest weigh in favor of Plaintiffs, also as discussed above. Finally, it is *Plaintiffs* who have demonstrated that they are likely to succeed on the merits. ***Legislative enactments may not eviscerate the Bill of Rights. Every day they do is one too many***.

2022 U.S. Dist. LEXIS 200813, at *47-48 (double emphasis added); *see also Antonyuk*, 2022 U.S. Dist. LEXIS 201944, at *243 (agreeing with *Hardaway* and declining to grant a stay pending appeal); *Christian v. Nigrelli*, No. 22-cv-695, 2022 U.S. Dist. LEXIS 211652, at *26 (W.D.N.Y. Nov. 22, 2022) (declining to grant the government's request for a stay because "it is *Plaintiff* who has demonstrated that he is likely to succeed on the merits").

In short, Plaintiffs—and all Californians seeking to have their Second Amendment rights vindicated—have waited long enough. Should this Court rule in Plaintiffs' favor and declare section 32310 unconstitutional, it should not stay its ruling.

## CONCLUSION

The State has not presented—and cannot present—a "well established and representative" analogue to its modern-day ban on magazines able to hold over ten rounds of ammunition. *Bruen*, 142 S. Ct. at 2133. It thus cannot "demonstrate that [the magazine ban] is consistent with this Nation's historical tradition of firearm

49

regulation." *Id.* at 2126. The law violates the Second Amendment.

For these reasons, the Court should (again) declare California Penal Code section 32310 unconstitutional in its entirely and permanently enjoin its enforcement. The Court should also reject the State's invitations to keep delaying the vindication of Plaintiffs' rights either through months of additional, irrelevant discovery or by needlessly staying the enforcement of any permanent injunction while this case is on appeal.

Dated: December 1, 2022          **MICHEL & ASSOCIATES, P.C.**

                                 */s/ Anna M. Barvir*
                                 Anna M. Barvir
                                 Email: abarvir@michellawyers.com
                                 Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

### PLAINTIFFS' SUPPLEMENTAL BRIEF

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov


I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

*Laura Palmerin*
Laura Palmerin