C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No:  17-cv-1017-BEN-JLB |
| Plaintiffs, | **DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 43** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

1

DECLARATION OF GARY KLECK

17cv1017

I, Gary Kleck, declare as follows:

**Introduction**

1.     I am Dr. Gary Kleck, Emeritus Professor of Criminology & Criminal Justice at Florida State University. Counsel for plaintiffs have asked me to offer a rebuttal opinion regarding the supplemental reports filed by Lucy Allen and Louis Klarevas. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

**Background & Qualifications**

2.     I  am an emeritus Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I was, at the time of my retirement in May 2016, the David J. Bordua Professor of Criminology at Florida State University, where I served on the faculty from 1978 to 2016. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime." (William J. Vizzard, *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control* , 2003, p. 183).

3.     I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." I also authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001) - books that likewise addressed the topic of guns and violence.

4.     I have also published scholarly research articles in virtually all the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review*, *American Journal of Sociology*,

*Social Forces*, *Social Problems*, *Criminology*, *Journal of Criminal Law and Criminology*, *Law & Society Review*, *Journal of Research in Crime and Delinquency*, *Journal of Quantitative Criminology*, *Law & Contemporary Problems*, *Law and Human Behavior, Law & Policy Quarterly*, *Violence and Victims*, *Journal of the American Medical Association*, and other scholarly journals.

5.     I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs—Violence Task Force, and as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

6.     Finally, I have taught doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology.

7.     My current curriculum vitae, which includes a full list of my qualifications and publications, is attached hereto as **Exhibit 43.**

**Legal Cases in Which I Have Served as an Expert Witness**

8.     In the past ten years, I have been deposed and/or testified at trial in the following matters:

*Heller v. District of Columbia*, D.D.C. (deposed July 2, 2013).

*Cook et al. v. Hickenlooper*, D. Colo. (deposed and testified Mar. or April 2013).

*Wilson v. Cook County* (deposed Sept. 16, 2013).

*Kolbe v. O'Malley*, D. Md. (deposed Jan. 2, 2014).

*Barbra Schlifer Commemorative Clinic v. HMQ Canada* ("Cross-examined" [Canadian term for deposed] Feb. 24, 2014).

3

DECLARATION OF GARY KLECK

*Friedman v. City of Highland Park* (deposed May or June 2014).

*Tracy Rifle and Pistol v. Harris*, E.D. Cal. (deposed Nov. 2, 2016).

*Flanagan v. Becerra*, U.S. District Court, Central District of
   California.  Deposed July 25, 2017.

*Worman v. Baker*, U.S. District Court for the District of
   Massachusetts.  Deposed October 25, 2017.

*Duncan v. Becerra*, U.S. District Court, Southern District of
   California.  Deposed January 3, 2018.

*MSI v. Hogan*, U.S. District Court, District of Maryland.  Deposed
   May 18, 2018.

*Association Of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Grewel
   et al*., United States District Court  District Of New Jersey.
   Deposed 8-2-18.  Trial testimony 8-17-18.

*Rupp v. Becerra*., U. S. District Court, Central District of California.
   Deposed 12-12-18.

*NRA v. Swearingen*, United States District Court for the Northern
   District of Florida, Deposed via Zoom 8-13-20.

*Maryland Shall Issue v. Anne Arundel County*.  United States District
   Court for Maryland.  Deposed via Zoom on 9-29-22.

**Compensation**

    9.    I am being compensated for my time in this case at an hourly rate of $400 per hour. My compensation is not contingent on the results of my analysis or the substance of my testimony.

**I.**    **Response to Supplemental Report of Lucy Allen**

    **A.**    *Allen's Claims About the Use of Large-capacity Magazines in Mass
    Shootings*

    10.    Less than 2% of gun crimes known to the police involve offenders firing over 10 rounds (Reedy and Koper 2xxx). Since ordinary crimes almost never involve over 10 rounds fired, the rationale for banning large-capacity magazines

(LCMs) is focused almost entirely on mass shootings (commonly defined as incidents in which 4 or more victims are killed), since they do involve many rounds fired.  Lucy Allen's defense of the LCM ban is consequently based on two claims about LCM use in mass shootings: (1) a large share of mass shootings involve use of LCMs, (and the related proposition that mass shooters prefer LCMs over smaller magazines), and that (2) use of LCMs in mass shootings causes a higher casualty count.

11.    What share of mass shootings (4+ dead) *actually* involve the use of large-capacity magazines (LCMs), defined herein as those with over 10-round capacity?  Allen uses a miscellaneous set of four largely overlapping sources of data to defend her assertion that LCMs are frequently used in mass shootings, concluding that 60% involve an LCM.  Unfortunately, what all four of her datasets have in common is that they all cover only a small minority of all mass shootings, and the few incidents they do cover are clearly unrepresentative of the full set of mass shootings.

12.    The most comprehensive compilation of mass shooting incidents is contained in the Gun Violence Archive (GVA), publicly available at https://www.gunviolencearchive.org/.  Significantly, Allen ignored this widely used data source – available since 2013 - in favor of her four radically incomplete compilations.  The earliest GVA figures are for 2013, and the most recent complete year covered is 2021.

13.    The most comprehensive source on mass shootings involving LCMs can be found on the Violence Policy Center (VPC) website, available at https://vpc.org/fact_sht/VPCshootinglist.pdf.  VPC advocates bans on LCM, and its staff searches hundreds of news sources for stories reporting LCM use in mass shootings.  If even a single news story reports use of a magazine holding over 10 rounds, it is included in the VPC database.  Any given individual news source might omit mention of LCM use from their account of a mass shooting that involved one,

but in order for an LCM-involved mass shooting to be missed in the VPC search, mention of LCM involvement would have to be omitted from every single news source searched – even those with editorial policies favoring bans on LCMs.  Such an occurrence is highly unlikely, so it is correspondingly unlikely that the VPC database excludes any significant number of LCM-involved mass shootings.

14.     I compiled counts from these two comprehensive sources to create the following table.  It shows how often LCMs are involved in *all* mass shootings (4+ dead in a single incident), as distinct from Allen's tiny, arbitrarily selected subset of mass shootings.

Table 1 – Prevalence of LCM Use in All Mass Shootings, 2013-2021

| Year | Mass Shootings | LCM-involved Mass Shootings |
|------|----------------|------------------------------|
| 2013 | 25 | 2 |
| 2014 | 20 | 0 |
| 2015 | 26 | 4 |
| 2016 | 25 | 4 |
| 2017 | 24 | 4 |
| 2018 | 22 | 3 |
| 2019 | 31 | 4 |
| 2020 | 21 | 0 |
| 2021 | 28 | 5 |
| | | |
| 2013-2021 | 222 | 26 |

15.     Thus, when one examines the full set of *all* mass shootings instead of the tiny, arbitrarily selected subset examined by Allen, one finds that only **11.7%** of all mass shootings (4+ dead) in the U.S. involve LCMs – a far cry from Allen's claimed 60% (Allen, p. 19).  It would be more accurate to say that mass shooters *rarely* use LCMs.

16.     Further, in terms of absolute frequency, it would also be fair to say that mass shootings in which an LCM was known to have been used are freakishly rare, occurring an average of just 2.9 times per year in the entire United States in 2013-

6

DECLARATION OF GARY KLECK

2021 (26/9 years=2.9).  Specifically regarding California, while it is a big state, it still claims only about 12% of the U.S. population, so one could expect **0.35** LCM-involved mass shootings in a typical year in California (12% of 2.9=0.35), or about 1 every 3 years.  Thus, the benefit of even a California LCM ban that somehow managed to completely eliminate LCM-involved mass shootings would be close to nonexistent.

B.   *Does Mass Shooter Use of LCMs Cause a Higher Casualty Count?*

17.   Allen correctly notes that mass shooters who used LCMs inflicted more casualties than those who did not, but leaves the impression that LCM use must have somehow *caused* the higher casualty count. She does not mention the obvious alternative explanation for this statistical association—that shooters more intent on hurting many people would prepare to do so by acquiring LCMs and bringing them to the scene of their crime. That is, lethality of intent determines both the choice of weaponry and ammunition and the outcome of the crime. If this completely accounts for the association, it means that the association is spurious, i.e. non-causal. That is, it means the LCM use has no effect of its own on the number of casualties inflicted.

18.   This alternative explanation entails two component assertions:

(1)   Greater lethality of offender intent causes shooters to fire more rounds and inflict more casualties.

(2)   Greater lethality of intent makes it more likely that mass shooters will use weaponry they believe is suited to their deadly intentions.

Regarding assertion (1), it is scarcely credible that the outcomes of mass shootings are not even slightly affected by what the shooters intended. While the correspondence between intent and outcome is not perfect, it surely is strong.  To my knowledge, no proponent of LCM bans or scholarly student of LCM effects, including Allen, has ever denied this assertion. Thus, assertion (1) is widely accepted.

7

DECLARATION OF GARY KLECK

17cv1017

19.     Likewise, to my knowledge, no proponent of LCM bans or scholarly student of LCM effects has ever denied that many mass shooters commonly plan their attacks well in advance, and that this planning includes obtaining firearms and ammunition. News accounts of mass shootings routinely describe the perpetrators of mass shootings planning their attacks weeks or months in advance, acquiring guns and magazines that they later use to kill and injure. Assertion (2) is completely consistent with all evidence about mass shootings known to me or included in Allen's report.

20.     Therefore, the association between (a) LCM use and (b) the numbers of rounds fired and victims hurt in mass shootings, is at least partly (and possibly entirely) spurious (not causal), and is instead attributable to the common effects of (c) shooter lethality of intent on both (a) and (b). If propositions (1) and (2) are correct, the only way to support the claim that the association between (a) and (b) is *not* entirely spurious (and thus is at least partly causal in nature) is to measure and control for (c). Allen has not done this, nor has anyone else, to my knowledge. Thus, Allen has made no affirmative case for the claim that the association between (a) and (b) is even partially causal, or the position that LCM use has any causal effect on the number of casualties in mass shootings.

C.     *Allen does not Provide Any Reason <u>Why</u> LCM Use Would Affect the Number Killed or Wounded in a Mass Shooting*

21.     Allen fails to provide even a speculative explanation of *why* use of LCMs would increase the number of people killed or wounded in mass shootings – even though such an hypothesized effect is the main rationale for banning LCMs. Allen's implied position that LCM use actually affects the number of casualties might have been strengthened if she had cited details of actual mass shootings that indicate that LCMs were necessary for firing many rounds and inflicting many casualties, or that fewer rounds would have been fired and fewer casualties inflicted, had the shooter lacked LCMs.  For example, she might have tried to cite substantial

numbers of shootings in which the offender used an LCM, but had only one gun and one magazine, since, in such a situation, bystanders would have a better chance of tackling the shooter while he was reloading, and potential victims would have additional time to escape while the shooter was reloading. Allen did not do this. To my knowledge, she could not do this because there are no such known cases.

22.     All mass shooters use multiple guns or multiple magazines and therefore could, even if they did not have LCMs, fire many rounds without significant interruption, by either firing additional guns once the first one was emptied or by quickly changing magazines, something that takes only about 3-4 seconds (Kleck 2016).  Allen neither acknowledges nor denies this, and consequently fails to provide any explanation as to *why* LCM use would cause a mass shooter to kill or wound more people.  She appears to believe that merely citing the crude statistical association between LCM use and casualty county is sufficient to establish a case for cause-and- effect.  However, as even beginning statistics students know, correlation is not causation.  This is especially true in this case because close examination of how mass shootings occur does not reveals any causal mechanism by which LCM use by U.S. mass shooters could increase the number of people they killed or wounded.

23.     Advocates of LCM bans have hypothesized two possible mechanisms by which preventing LCM use by a mass shooter might decrease the casualty count, both based on the fact that shooters confined to smaller capacity magazines would have to reload more often.  First, more pauses to reload implies that bystanders would have more opportunities to tackle the shooter and stop him before he hurt more victims.  Second, the time the shooter devoted to reloading would give prospective victims additional time to escape or hide.

24.     Regarding the first possibility, there have been no mass shootings in the U.S. in the past 30 years in which the shooter was tackled while he was reloading. All cases purported to involve such a scenario turn out to be incidents in which the

9

DECLARATION OF GARY KLECK

shooter was tackled while struggling with a jam or a defective magazine (Kleck 2016).  Since a ban on larger capacity magazines would not increase the frequency of gun jamming or use of defective magazines in mass shootings, this kind of opportunity for bystander intervention would not be increased by an LCM ban.  For example, the incident most frequently cited by LCM ban advocates to support the claim of bystander intervention while the shooter was reloading is the Arizona shooting involving an attack on Representative Gabriel Giffords in 2011.  Some bystanders claimed that the shooter was reloading when he was tackled, but subsequent police investigation found that one of the magazines was defective because its spring was broken.  As far as can be determined from eye witness testimony, the shooter was struggling with this defective magazine when he was tackled, rather than reloading.

25.    The second mechanism by which additional reloading might reduce the casualty count is that it purportedly provides additional time for victims to escape or hide.  To be sure, all mass shootings involve pauses between shots, whether because the shooter was choosing his next victim, was reloading, or for other reasons.  The key issue is whether the additional reloads *add* to these pauses to an extent that results in the shooter attacking fewer victims.  The plausibility of the speculation that reloads provide *additional* opportunity for victim evasion is dependent on just how much time it takes to reload a semiautomatic firearm, and how this compares with the length of the other pauses in shooting that occur when the offender is not reloading.

26.    Analysis of mass shootings in which it was possible to determine the offender's rate of fire reveals that mass shooters using semiautomatic guns fire at relatively slow rates, invariably less rapid than the rate of which the weapons are capable (3 or more rounds per second) (Kleck 2016) .  Reloading a detachable magazine takes ordinary shooters only about 3-4 seconds, and mass shooters who rehearse their crimes by practicing rapid reloads could probably do still better.  The

DECLARATION OF GARY KLECK

average interval between shots in mass shootings, however, is well over 3-4 seconds (see Table 3 in Kleck 2016).  This means that pauses in shooting due to reloading are actually shorter in duration than the pauses between shots that mass shooters routinely take whether or not they are reloading.  Thus, it is implausible that inducing mass shooters to reload more often provides any additional time sufficient for more victims to escape or hide.

27.     In sum, there is no known mechanism by which bans on LCMs could reduce the casualty count in mass shootings, and thus no empirical support for the benefits that Allen claims would accrue from such a ban.

D.     *Allen's Claims About the Number of Rounds Fired in Defensive Gun Uses*

28.     Allen asserts that very few defensive gun uses (DGUs) involve over 10 rounds being fired, implying that LCMs are unneeded for defensive purposes.  As a preliminary logical note, it is important to point out that the data used by Allen could not tell her anything about incidents in which victims *needed* an LCM to carry out effective self-defense, but did not have one.  Thus, as far as Allen knows, there could have been thousands of crime incidents in which crime victims needed to fire more than 10 rounds and would have benefited from use of an LCM but not possess one.

29.     In any case, Allen's claims about DGUs have no reliable foundation in evidence.  She cites data from the "Armed Citizen" column of the National Rifle Association's (NRA) magazine, *American Rifleman*, and concludes that "it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds." She does not confine this conclusion to persons whose defensive gun use (DGU) was reported in the *American Rifleman*, but clearly intends it to apply to Americans in general. The NRA's database of "armed citizen" stories is not a representative sample of DGUs, nor does the NRA even claim it to be so. Indeed, Allen herself does not claim that the NRA sample is representative.  She acknowledges the

11

DECLARATION OF GARY KLECK

possibility of bias in selecting cases "in favor of stories that put use of guns in self-defense in the best possible light." Therefore, there is no formal basis for generalizing the results of any analysis of this sample to any larger population of DGUs.

30.    The utility of the NRA sample is, however, even worse than merely being unrepresentative of DGUs in a general way. More specifically, there is strong reason to believe that the sample will largely exclude DGU incidents in which the defender fired more than 10 rounds. NRA staff nonrandomly select these incidents from news media-reported cases of DGU, most of them submitted by readers of the "Armed Citizen" feature of *American Rifleman*.  Based on the content of these stories published in the magazine, it is clear that they are selected to convey the impression that DGU is an extremely legitimate and effective activity, engaged in by responsible law-abiding persons, for clearly legally justifiable purposes, carried out in clearly lawful ways. The reality of the full array of DGUs is considerably more diverse, but the NRA has a political agenda to portray DGU in as positive a light as possible.

31.    Thus, Allen is quite right to note that the selection practices of NRA staff are likely to favor inclusion of DGU stories that put DGU "in the best possible light." She does not, however, appear to understand how this bias would work regarding stories in which defenders fired large numbers of rounds. It could not serve the NRA's purposes to disseminate accounts of DGUs in which the defenders appeared to use excessive force, indiscriminately firing arguably excessive numbers of rounds at their adversaries. The more seemingly excessive the defender's use of force appears to be, the less likely it is that his actions would appear to a reader to be justifiable. Likewise, the NRA is unlikely to want to disseminate stories in which effective self-defense was difficult and dangerous, requiring the firing of large numbers of rounds to protect the defender. Instead, NRA staff would better serve their political ends by selecting stories of DGUs in which the defenders used the

minimum amount of force needed to defend themselves, firing the fewest rounds needed to serve that purpose. This would bias the sample of selected DGUs in the direction of excluding cases in which many rounds were fired.

32.     Even though the NRA sample is not representative of DGUs in general, Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in which more than 10 rounds are fired *do* occur. Her analysis of the NRA sample identified two incidents in which over 10 rounds were fired, a frequency that Allen characterizes as "rare." This is indeed rare in absolute terms, but then so are mass shootings in which LCMs are used, typically occurring less than three times a year in the entire U.S.  (see Table 1 herein).  Indeed, detailed examination of the way mass shootings actually occur indicates that the number of incidents in which use of LCMs increased the number of victims killed or injured in a typical year may well be *zero* (Kleck 2016).

33.     It is therefore worth considering the implications if 0.3% of all DGUs involved over 10 rounds being fired, as Allen's results indicate. The numerous national surveys that have specifically asked about DGUs have consistently indicated 0.5-3.5 million DGUs per year, averaging about 2.2 million DGUs a year (Kleck 2021).  (Gun control advocates have speculated that these surveys overestimate the frequency of DGUs, but nearly all known sources of error in surveys tend to contribute to *under*estimation -  Kleck 2018).

34.     If 0.3% of DGUs involved over 10 rounds fired, this would imply there are about 6,600 such DGUs per year (0.003x2,200,000=6,600). Thus, the percentage of DGUs in which over 10 rounds were fired does not have to be very large in order for it to imply a number of DGU incidents many times the number of mass shootings with LCM use, or crimes in which LCM use increased the harm inflicted on victims. In short, Allen's own results from her "Armed Citizen" analysis, taken at face value, imply that *there are far more DGUs each year in which the defender fires over 10 rounds than there are mass shootings involving LCM use.*

E.      *Allen's Analysis of DGUs Reported in the News*

35.      DGUs reported in news outlets are no more likely to be representative of all DGUs than the "Armed Citizen" sample. News outlets rarely find out about crimes on their own—they find out about crimes from the police. DGUs that victims are willing to report to the police, like the NRA-selected DGUs, are likely to be especially legitimate and justified.  Conversely, defenders are less likely to report their DGUs to the police if their actions are likely to appear to the police as involving excessive force or indiscriminate firing of a gun. This means that incidents in which defenders fired over 10 rounds are likely to be rare among DGUs reported to the police and consequently covered by news outlets, even if they were common among all DGUs.

36.      Allen uncovered 4,800 news stories of DGUs over a span of six years, but needlessly sampled just 200 of the stories for analysis. Her sample was selected randomly and may well be approximately representative of the full set of DGU *news stories*, but since the set of DGUs reported in the news is itself likely to be an unrepresentative sample of all DGUs, Allen's sampling procedures cannot produce a representative sample of DGUs. She therefore has no basis for generalizing the results of this analysis to the entire population of DGUs.

37.      To summarize, Lucy Allen's own results indicate the Americans use guns for defense and fire over 10 rounds thousands of times a year.  Further, the best available evidence indicates that, contrary to Allen's claims, (1) mass shootings rarely involve LCMs, and (2) LCM use does not cause a larger number of victims to be killed or wounded.

## II.      Response to Supplemental Report of Louis Klarevas

A.      *Klarevas' Claims About the Magnitude of the Threat of Mass Shootings*

38.      As he did in his first expert report (Klarevas 2017), Klarevas makes the extraordinary claim that "gun massacres presently pose the deadliest threat to the

safety and security of American society, and the problem is growing," adding that "I continue to stand by the opinions and conclusions expressed in my 2018 Report" (Klarevas 2022, p. 3),   The claim is as absurd now as it was then.

39.     Klarevas documented 113 "gun massacres" (which he defines as incidents involving 6 or more dead), in which 1,009 people were killed, over the period from 1968 through September 2017. This is a period of 49 and ¾ years, so his own figures imply that an average of 20.3 Americans have been killed in "gun massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250 Americans were killed in criminal homicides of all types in 2016 (FBI 2017). Thus, only 1/10th of 1% of all murder victims are killed in "gun massacres."

40.     Alternatively, we can state the seriousness of the threat to the safety of Americans by computing the fraction who will be killed in a "gun massacre" in a given year.  Since there were about 323,127,513 Americans in 2016, the annual average of 20.3 deaths implies that the probability of an American dying in a "gun massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9 million.  As a point of comparison, defense expert Lucy Allen has calculated that the rate of Americans dying because they were struck by lightning is 0.09 per 100,000 population (Allen 2017, p. 16).  Thus, the risk of an American being killed in a "gun massacre" is less than 1/14th of the risk of being killed by a bolt of lightning—itself a freakishly rare event. However horrific individual mass shootings may be, it is absurd to describe their threat to the safety of Americans as "the greatest threat … to the … safety of American society in the present era." This sort of overheated rhetoric is appropriate to propagandists, not to serious scholars.

B.     *Klarevas' Claims About the Frequency of LCM Use in Mass Shootings*

41.     Like Lucy Allen, Louis Klarevas attempts to make the case that a large share of mass shootings involve LCM use. His principle tactic to advance this claim is to restrict his analyses to only the rarest kinds of mass shootings, those with a huge number (10 or more) of fatalities (Klarevas 2022).  This represents his most

15

DECLARATION OF GARY KLECK

significant change from his initial expert report (Klarevas 2017)  He has changed the cut-off of the minimum number of number of deaths for a mass shooting to be included in his analysis from 6 to 10, making his conclusions even more trivial than before because they pertain only to an even more freakishly rare subset ("double-digit fatality" incidents) of a subset of violent crimes that was already freakishly rare to begin with.  He shows that 23 of 30 of these extreme cases involved LCMs (his Table 1), or 77% - an even higher share than the 48% share (53 of 111) he obtained when he used a fatalities cut-off of six or more.  Of course, Klarevas could have gone even further and analyzed only cases with over 50 deaths, since he then would have been able to report that *100%* of this set involved LCM use.  There was just one such incident and it did indeed involve LCM use (the Las Vegas shootings included in his Table 1).  Such an "analysis" of a single cased would be perceived by most scholars as pointless, but it is only marginally more pointless than analyzing the most extreme 30 cases.

42.     Over the entire history of the United States, Klarevas was able to identify just 30 mass shootings with 10 or more deaths – well under one per year over that entire history.  Even over the most recent 10 years, when such incidents became relatively more common, the average was just 1.6 per year.  In light of how extremely rare these incidents are, the share of them that involved LCM use is trivial and irrelevant to policy-making.

43.     This shift in the cut-off number of deaths Klarevas uses to define the set of shootings to analyze also has another subtle effect.  It allows him to make a claim that there is an upward trend in mass shootings that could not be sustained if he used the cut-off of four deaths commonly used by other scholars.  If one uses the conventional definition of four+ fatalities, there has been no trend in recent years.  Table 1 included in this report provides counts of such shootings for 2013-2021 (all of the years for which complete data are available), based on the most comprehensive source available, and it shows there have been only slight

16

DECLARATION OF GARY KLECK

fluctuations in the past decade around an average of 25 incidents per year.  Indeed, if one were selective enough to focus only on the trends from 2015 to 2018, or from 2020 to 2021, one could even make it seem like there has been a *downward* trend in mass shootings.  Taking the data as a whole, however, there has been no upward trend in mass shootings.

44.     It was only when Klarevas limited his focus to "double-digit fatality incidents" that the data would fit his claim of an increasing frequency of mass shootings (Klarevas 2022, pp. 7-8).  Unfortunately, the more Klarevas' claims are confined to increasingly tiny subsets of shooting incidents, the less relevant they become to the likely benefits of a ban on LCMs.  As previously noted, in a typical year California experiences *zero* "double-digit fatality incidents," with or without LCMs used, and thus there are zero such shootings that could be prevented by an LCM ban.

C.     *Klarevas' Claims About Long-0term Historical Trends in Mass Shootings*

45.     Not satisfied with addressing recent trends in mass shootings, Klarevas claims to have established trends going back to 1776, using the Newspaper Archive (Klarevas 2022, pp. 3-6).  He describes this as a source that contains articles from "local and major metropolitan newspapers dating back to 1607" (p. 4, fn. 6).  This is a misleadingly incomplete description.  This archive includes *a few* local newspapers going back that far.  Prior to the 20th century most of the nation was not covered by these few local newspapers, so correspondingly few mass murders would be covered by these sources.

46.     This not only results in a gross undercount of mass shootings, but it also gives a misleading impression of trends over time.  Since the share of the population covered by newspapers included in this archive increased over time, the share of mass shootings covered in archive newspaper stories would also increase, even if there was no actual increase in the national number of mass shootings.  Thus, the

17

DECLARATION OF GARY KLECK

appearance of increasing mass shooting prevalence in Klarevas' Table 1 is at least partly just a reflection of historical increases in the share of the nation's events that were covered by newspapers.  Consequently, Klarevas had no reliable information on trends in mass shootings for any part of the nation's history up until this increase in newspaper coverage levelled off sometime in the late 20th century.  His data can tell us nothing about trends in mass shooting frequency for earlier periods..

47.   The scope of Klarevas' claims about historical trends is also extremely constricted by the arbitrary limits he placed on what kinds of mass shootings he was willing to count.  Those familiar with the history of firearm massacres of native Americans in the 18th and 19th centuries might wonder why they do not show up in Klarevas's data.  His footnote 6 explains why: "Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded."  If these were incidents in which large numbers of people were killed with firearms, what is the justification for not defining them as mass shootings?  If nearly all the mass shootings in these earlier periods fell into these excluded categories, Klarevas' arbitrary definitional decisions had the effect of magically making it seem that mass shootings are exclusively a product of very recent times - the impression clearly left by his Table 1 and Figure 1.  The nation's extensive earlier history of mass shootings simply vanishes.  This definitional maneuver, however, was necessary if Klarevas was to create the impression that mass shootings became frequent only when LCM-equipped firearms became common.  Earlier mass shootings may have differed from our contemporary stereotypes of what a mass shooting is, but the relevant historical reality is that Americans were able to carry out hundreds of mass shootings before the late 20th century without benefit of LCM use (for example, see Brown 1970 for examples of massacres of native Americans), just as is true today (see my Table 1).

48.   An even fundamental problem with Klarevas' analysis lies in the narrow focus on mass murders committed *with firearms*.  Virtually all of the mass

murders with very high fatality counts in the U.S. have been committed by means *other than shooting* (Duwe 2007).  Most prominently, the 9-11 mass murders of nearly 3,000 Americans were committed by crashing airliners.  More commonly, virtually all mass murders with very high fatality counts have been committed using arson, or occasionally with explosives (Duwe 2007).  Only two mass murders with over 32 dead in the 20th century were committed with firearms (Klarevas 2022, Table 1), while all others were committed with non-firearms methods, most commonly arson (Duwe 2007).  The obvious point is that it is not even necessary to use firearms to murder large numbers of people, never mind firearms equipped with LCMs.

       D.    *Klarevas' Hinted Claim that LCM Use <u>Causes</u> Higher Fatality Counts*

      49.    Klarevas does not explicitly state that LCM use by mass shooters *causes* higher numbers of fatalities or woundings; rather he just leads readers up that conclusion by presenting crude bivariate correlations between LCM use and casualty counts (e.g., his p. 7 statement that "100 percent of mass shootings resulting in more than 14 deaths involved LCMs holding more than 10 bullets"), without stating any disclaimers that the correlations may be entirely spurious, i.e. not causal in nature. His problem is the same one that afflicted Lucy Allen – he did nothing to rule out the possibility that both the higher casualty counts and the shooter's choice to use LCMs could be due to the common effect of offender lethality.  That is, aggressors determined to kill larger numbers of victims are more likely to actually do so (lethality of intent affects fatality counts), and are also more likely to acquire and use LCMs in their crime (lethality of intent affects weapon choice).  Klarevas did not control for *any* potentially confounding variables, including offender lethality, so he had no legitimate foundation for concluding – or hinting to readers – that LCM use caused higher casualty counts. And if there is no causal effect of LCM use on casualty counts, there is no logical basis for believing that reducing LCM availability and use will cause a reduction in mass shooting casualties.

DECLARATION OF GARY KLECK

50.     Further, like Lucy Allen, Klarevas can offer no coherent explanation of *why* LCM use would increase casualty counts.  Three 10-round magazines of the sort left legally available after LCMs are banned contain exactly as many rounds as a 30-round magazine of the type prohibited by LCM bans. Therefore, LCM use does not affect how many rounds a mass shooter can acquire or fire in an attack.  Reloading creates a pause in firing that bystanders theoretically might use to tackle the shooter and stop the killing, but there are no known cases of this actually happening in the U.S. in the past 30 years.  Likewise, reloading does not slow the shooters rate of fire, which might have allowed more prospective victims to escape or hide (Kleck 2016). So how does use of an LCM by a mass shooter increase how many people he hurts?  Conversely, how would preventing LCM use through a law banning LCMs decrease the number hurt?  Klarevas does not say.

E.     *Klarevas' Claims About Trends in LCM Availability*

51.     Another new element in Klarevas' Supplemental Declaration is his attempt to document trends in "the availability of LCMs in the U.S. civilian firearm marketplace" (Klarevas 2022, pp.7-9).  He uses data from *Gun Digest*, an annual catalog of firearms that were available for sale new (i.e., not used) at the time of publication.  His discussion of this analysis is misleading because of his slippery use of the phrase "number of firearms."  From context, it can be determined that Klarevas' numbers do not in fact pertain to numbers of firearms, but rather to numbers of firearms *models*.  This distinction is critical because *Gun Digest* does not report any figures on numbers of firearms equipped with LCMs – it merely lists models of guns (e.g., the "Accu-tek Model HC-380SS Auto Pistol") and notes the size of magazine with which they come equipped.  In short, Klarevas did not actually have any data on how many firearms came factory equipped with LCMs. For all he could tell from the *Gun Digest* catalog, there may have been very few of the models that were equipped with LCMs manufactured and sold in a given year (regardless of how many *models* of that type there were), and huge numbers of guns

DECLARATION OF GARY KLECK

manufactured and sold that were not so equipped.  In sum, Klarevas did not have any data that actually measure the availability of LCMs or trends in that availability.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on December 1, 2022.

Gary Kleck

DECLARATION OF GARY KLECK

**References**

Allen, 2017. *Expert Report of Lucy P. Allen in Duncan v. Becerra.*

Allen, 2022. *Supplemental Report of Dr. Lucy P. Allen in Duncan v. Becerra*

Brown, Dee. 1970. *Bury My Heart at Wounded Knee: An Indian History of the American West.* NY: Holt, Rinehart and Winston.

Duwe, Grant. 2007. *Mass Murder in the United States: A History.* NY: McFarland & Company.

Federal Bureau of Investigation (FBI) 2017. <u>Crime in the United States, 2016</u>. Washington, D,C,: U.S. Government Printing Office.

Klarevas, Louis. 2017. <u>Expert Report of Dr. Louis Klarevas</u>. United States District Court for the Southern District of California.

Klarevas, Louis. 2022. <u>Supplemental Declaration of Louis Klarevas</u>. United States District Court for the Southern District of California.

Kleck, Gary. 2016. "Large-capacity magazines and the casualty counts in mass shootings." *Justice Research and Policy* 17(1):28-47.

Kleck, Gary. 2018 "Response errors in survey estimates of defensive gun use." *Crime & Delinquency* 64(9):1119-1142.

Kleck, Gary. 2021. "What do CDC's surveys say about the prevalence of defensive gun use?" <u>American Journal of Criminal Justice</u> 46:401-421.

Reedy, D. C., and Christopher S. Koper, 2003. "Impact of Handgun Types on Gun Assault Outcomes, *Injury Prevention* 9:151-155.

# EXHIBIT 43

CURRICULUM VITAE

GARY KLECK

(Updated May 27, 2021)

PERSONAL

| | |
|---|---|
| Place of Birth: | Lombard, Illinois |
| Date of Birth: | March 2, 1951 |
| Address: | College of Criminology and Criminal Justice<br>The Florida State University<br>112 S. Copeland Street<br>Tallahassee, FL 32306-1273<br><br>Tallahassee, Florida 32306-1127 |
| Telephone Number: | Home: (850) 559-0922 |
| e-mail Address: | gkleck@fsu.edu |
| website: | http://criminology.fsu.edu/faculty-and-staff/college-faculty/gary-kleck/ |

CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

EDUCATION

| | | |
|---|---|---|
| A.B. | 1973 - | University of Illinois, with High Honors and with Distinction in Sociology |
| A.M. | 1975 - | University of Illinois at Urbana, in Sociology |

Ph.D.          1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
Criminology, for the book that made "the most outstanding contribution to
criminology"   (for <u>Point Blank: Guns and Violence in America</u>).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

Paper of the Year awarded by <u>Criminal Justice Review</u> for "Does Gun Control Reduce
Crime?," Volume 4, pp. 488-513 (2016).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to<br>May 2016 | Professor, College of Criminology and Criminal Justice,<br>    Florida State University |
| Fall, 1984 to<br>Spring, 1991 | Associate Professor, School of Criminology,<br>    Florida State University. |
| Fall, 1979<br>to Spring, 1984 | Assistant Professor, School of  Criminology,<br>    Florida State University. |
| Fall, 1978 to<br>Spring, 1979 | Instructor, School of Criminology,<br>    Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory
Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and
Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,    Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005     Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American Society of Criminology.  Republished in 2005 in paperback by Transaction Publishers.

Reviewed in Contemporary Sociology, American Journal of Sociology, Social Forces, Journal of Criminal Law and Criminology, The Criminologist, The Public Interest, Criminal Law Forum, Social Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and Law Enforcement, Newsletter of Public Policy Currents, Commonweal, Choice, and others.

1997    Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997    The Great American Gun Debate: Essays on Firearms and Violence (with Don B. Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001    (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.: Prometheus Books.

Selected to Choice: Current Reviews for Academic Libraries' 39th annual "Outstanding Academic Title List," awarded for "excellence in scholarship and presentation, the significance of their contribution to their field, and their value as an important treatment of their topic."  Awarded to less than one percent of books.

2017    (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control. NY: Routledge.

RESEARCH MONOGRAPH

1979    Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforcement Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979    "Capital punishment, gun ownership, and homicide."  <u>American Journal of Sociology</u> 84(4):882-910.

1981    "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." <u>American Sociological Review</u> 46(6):783-804.

1982    "On the use of self-report data to determine the class distribution of criminal behavior." <u>American Sociological Review</u> 47(3):427-33.

1983    (with David Bordua) "The factual foundation for certain key assumptions of gun control."  <u>Law and Policy Quarterly</u> 5(3):271-298.

1985     "Life support for ailing hypotheses:  modes of summarizing the evidence on racial discrimination in criminal sentencing."  <u>Law and Human Behavior</u> 9(3):271-285.

1986     "Evidence that 'Saturday Night Specials' not very important for crime."  <u>Sociology and Social Research</u> 70(4):303-307.

1987     "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988    "Crime control through the private use of armed force."  <u>Social Problems</u> 35(1):1-21.

1988    "Miscounting suicides."  <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990    (with Susan Sayles) "Rape and resistance."  <u>Social Problems</u> 37(2):149-162.

1991    (with Karen McElrath) "The effects of weaponry on human violence."  <u>Social Forces</u> 69(3):669-92.

1993    (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery."  <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993    (with E. Britt Patterson)  "The impact of gun control and gun ownership levels on violence rates."  <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993    "Bad data and the 'Evil Empire': interpreting poll data on gun control."  <u>Violence and Victims</u> 8(4):367-376.

1995    "Guns and violence: an interpretive review of the field."  <u>Social Pathology</u> 1(1):12-47.

1995    "Using speculation to meet evidence." Journal of Quantitative Criminology 11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." American Behavioral Scientist 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down." Journal of Criminal Law and Criminology 87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?" Journal of the American Medical Association 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." St. Louis University Public Law Review 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of  opportunity and motivation as mediating factors."

Criminology 40(3):649-680.

2004   "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004   (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005   (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006   (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007   "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007   (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008   (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009   "Mass shootings in schools: the worst possible case for gun control."  American Behavioral Scientist 52:1447-1464.

2009   (with Shun-Yung Wang) "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009   (with Tomislav Kovandzic)  "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009   (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2011   (with James C. Barnes)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Journal of Criminal Justice Education 22(1):43-66.

2011   (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of  Criminal Justice 39(4):312-319.

2013   (**w**ith Will Hauser)  "Guns and fear: a one-way street?"  Crime and Delinquency 59:271-291.

2013   "Gun control after Heller and McDonald: what cannot be done and what ought to be done."  Fordham Urban Law Journal 39(5):1383-1420.

2013   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  Crime and Delinquency 59(7):1006-1035.

2013   (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach."  Journal of Quantitative Criminology 28(4):477-541.

2014   (**w**ith Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury."  Violence Against Women 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?"  Crime and Delinquency 60(5):716-738.

2015   "The impact of gun ownership rates on crime rates:  a methodological review of the evidence." Journal of  Criminal Justice 43(1):40-48.

2016   (with Tomislav Kovandzic and Jon Bellows)  "Does gun control reduce violent crime?"  Criminal Justice Review 41:488-513.

2016   "Objective risks and individual perceptions of those risks."  Criminology & Public Policy 15:767-775.

2016   (with Dylan Jackson)  "What kind of joblessness affects crime?  A national case-control study of serious property crime."  Journal of Quantitative Criminology 32:489-513.

2016   "Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages."  Justice Research and Policy 17:28-47.

2017   (**w**ith Will Hauser)  "The impact of police strength and arrest productivity on fear of crime and subjective assessments of the police."  American Journal of Criminal Justice 42:86-111.

2017   (with Dylan Jackson)  "Does crime cause punitiveness?"  Crime & Delinquency. 63(12):1572-1599.

2017   (with Bethany Mims)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Journal of Criminal Justice Education 28(4):467-487.

2018   (**w**ith Moonki Hong) "The short-term deterrent effect of executions: an analysis of daily homicide counts." <u>Crime & Delinquency</u> 64(7):939-970.

2018   "Response errors in survey estimates of defensive gun use." <u>Crime & Delinquency</u> 64(9):1119-1142.

2019   "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence." <u>Social Science Quarterly</u> 100(3):936-950.

2019   "Regulating guns among young adults." <u>American Journal of Criminal Justice</u> 44:689-704.

2021   "What do CDC's surveys say about the prevalence of defensive gun use?" <u>American Journal of Criminal Justice</u> 46:401-421.

2021   "The continuing vitality of bad research on guns and violence: a comment on Fridel." <u>Justice Quarterly</u> 38(5):916-924.

2021    "Compliance with universal background check gun laws." <u>Journal of Crime and Justice</u> (published online 9-2-20).

2021   Tomislav Kovandzic and Kleck.  "The impact of firearm levels on homicide rates: the effects of controlling for cultural differences in cross-national research." <u>American Journal of Criminal Justice</u> (published online 1-4-21).

2021   "The cross-national association of gun ownership rates and suicide rates: an analysis of 192 nations." <u>Archives of Suicide Research</u> (published online 5-12-21).

OTHER PUBLISHED ARTICLES

1985   "Policy lessons from recent gun control research." <u>Law and Contemporary Problems</u> 49(1):35-62.

1992   "Assault weapons aren't the problem."  <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993   "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6.  Invited article.

1994   "Guns and self-protection."  <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1998   "Using speculation to meet evidence: reply to Alba and Messner."  <u>Journal on Firearms and Public Policy</u> 9:13-49.

1998   "Has the gun deterrence hypothesis been discredited?"  Journal on Firearms and Public Policy 10:65-75.

1999   "There are no lessons to be learned from Littleton."  Criminal Justice Ethics 18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  Journal of the American Medical Association 282(2):136-136.

1999   "The misfire that wounded Colt's."  New York Times October 23, 1999.  Invited Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."  Journal on Firearms and Public Policy 11:77-137.

2000   "Guns aren't ready to be smart."  New York Times March 11, 2000.  Invited Op-Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using interrupted time series designs to evaluate social policy impact."  Journal on Firearms and Public Policy 12:197-247.

2001   "School lesson: armed self-defense works."  Wall Street Journal March 27, 2001.  Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth."  Journal of Quantitative Criminology 17:75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Journal on Firearms and Public Policy 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  Journal on Firearms and Public Policy 14:51-72.

2006   "Off target."  New York Sun January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  Journal on Firearms and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  Wall Street Journal January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011.  Invited opinion article.

2015    "Defensive gun ownership is not a myth: why my critics still have it wrong."
        Politico Magazine, February 17, 2015.  Online at Politico.Com.

2021    "The futility of non-response responses: a reply to Fridel."  Justice Quarterly (in
        press).

## BOOK CHAPTERS

1984    (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in
        Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge,
        Mass.: Ballinger.

        (Also appeared in Federal Regulation of Firearms, report prepared by the
        Congressional Research Service, Library of Congress, for the Committee on
        the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S."
        Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in
        Kates, above.

1996    "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and
        Society, Volume III – Readings: Criminal Justice, edited by George Bridges,
        Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine
        Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in
        Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by
        Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and
        Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor
        & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
        What is Crime?: Controversy over the Nature of Crime and What to Do About It,
        edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
        Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
        Punishment and Social Control: Enlarged Second Edition, edited by Thomas G.
        Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in The
        Criminal Justice System: Politics and Policies, 9th edition, edited by George F.
        Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008    "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of Survey Methodology for the Social Sciences, edited by Lior Gideon.  NY: Springer.

2013    "An overview of gun control policy in the United States."  Pp. 562-579 in The Criminal Justice System, 10th edition. Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2014    "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of Criminology and Criminal Justice.  Berlin: Springer Verlag.

2019    "The effect of firearms on suicide."  Pp. 309-329 in Gun Studies: Interdisciplinary Approaches to Politics, Policy, and Practice, edited by Jennifer Carlson, Kristin Goss, and Harel Shapira. NY: Routledge.

2019    "Gun control."  Pp. 153-166 in The Handbook of Social Control, edited by Mattieu Deflem.  Hoboken, NJ: Wiley-Blackwell.

2021    "Research on guns and crime."  Chapter in The Encyclopedia of Research Methods and Statistical Techniques in Criminology and Criminal Justice, edited by J. C. Barnes and David R. Forde for Wiley Blackwell.

BOOK REVIEWS

1978    Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984    Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984    Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1985    Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988    Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989    Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991    Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999    Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001    Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010    Review of  <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992    "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993    "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999    "Risks and benefits of gun ownership."  <u>Journal of the American Medical Association</u> 282:136.

2000    (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." <u>Journal of the American Medical Association</u> 284:2718-2719.

2001    "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002    "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u>/8/3/252.

2005    "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9, 2005.

## UNPUBLISHED REPORT

1987 <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

## RESEARCH FUNDING

1994 "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997 "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

## PRESENTED PAPERS

1976 "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979 "The assumptions of gun control."  Presented at the annual meetings of the American Sociological Association, New York City.

1981 "Lethality comparisons between handguns and weapons which might be substituted in assault if handguns were prohibited."  Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1982 "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial discrimination."  Presented at the annual meetings of the American Society of Criminology, Toronto.

1984 "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985 "Policy lessons from recent gun control research." Presented at the annual meetings of the American Society of Criminology, San Diego.

1986 "Miscounting suicides."  Presented at the annual meetings of the American Sociological Association, Chicago.

1987 (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Presented at the annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the annual meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the annual meetings of the American Society of Criminology, Chicago.

1989    (with Karen McElrath)  "The impact of weaponry on human violence." Presented at the annual meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the annual meetings of the American Society of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the annual meetings of the American Political Science Association, Washington, D.C.

1991    "Victim resistance and weapons effects in robbery."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1991    "News media bias in covering gun control issues."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

1992    "Interrupted time series designs: time for a re-evaluation."  Presented at the annual meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the annual meetings of the American Society of Criminology, Phoenix.

1993    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the annual meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."   Presented at the annual meetings of the American Society of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates."  Presented at the annual meetings of the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the annual meetings of the American Society of Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data."
Presented at the annual meetings of the Homicide Research Working Group,
Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the
General Social Surveys."  Presented at the annual meetings of the American
Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of
deterrence-based crime control policy."  Presented at the annual meetings of the
American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the annual meetings
of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?"
Presented at the annual meetings of the American Society of Criminology,
Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun
control movement."  Presented at the annual meetings of the American Society of
Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime
rates."  Presented at the annual meetings of the American Society of Criminology,
Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented
at the annual meetings of the American Society of Criminology, Atlanta.

2002    "The effects of gun ownership levels and gun control laws on urban crime rates."
Presented at the annual meetings of the American Society of Criminology,
Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends
on who has them." Presented at the annual meetings of the American Society of
Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
Presented at the annual meetings of the American Society of
Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in
the community influence whether individuals own guns?"  Presented at the annual
meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the annual meetings of the American Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the annual meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the annual meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the annual meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the annual meetings of the American Society of Criminology, Atlanta.

2008    (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the annual meetings of the American Society of Criminology,  St. Louis.

2008    "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u> Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the annual meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the annual meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual meetings of the American Society of Criminology, November 16, 2011, Washington, D.C.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2011    (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2012    (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 15, 2012, Chicago, IL.

2013    (with Will Hauser) "Confidence in the police and fear of crime: Do police force

size and productivity matter?"  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2013.    (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2014    (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual meetings of the American Society of Criminology, November 20, 2014, San Francisco, CA.

2015    "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual meetings of the American Society of Criminology, November 18, 2015, Washington, D.C.

2015    (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual meetings of the American Society of Criminology, November 20, 2015, Washington, D.C.

2016    "Firearms and the lethality of suicide methods."  Presented at the annual meetings of the American Society of Criminology, November 16, 2016, New Orleans, L.A.

2017    "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence."  Presented at the annual meetings of the American Society of Criminology, November 15, 2017, Philadelphia, PA.

2018    "Interstate gun movement is almost entirely due to migration, not gun trafficking." Presented at the annual meetings of the American Society of Criminology, November 16,  2018, Atlanta, GA.

2019    "What do CDC's surveys say about the prevalence of defensive gun use?"  Presented at the annual meetings of the American Society of Criminology, November 13, 2019, San Francisco, CA.

2020    "Compliance with universal background check requirements."  Accepted to be presented at the annual meetings of the American Society of Criminology which were to be held in Washington, D.C., November 18-21, 2020 but were cancelled due to Covid-19 issues.

2021    "Do mass shooters favor using large-capacity magazines?"  Presented in poster form at the Annual Meeting of the American  Society of Criminology in Chicago, Illinois, November of 2021.

## CHAIR

1983    Chair, session on Race and Crime.  annual meetings of the American Society of Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  annual meetings of the American Society of Criminology, Reno.

1994    Chair, session on Interrupted Time Series Designs. annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. annual meetings of the American Society of Criminology, Phoenix.

1995    Chair, session on International Drug Enforcement. annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  annual meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. annual  meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  annual meetings of the American Society of Criminology, Nashville.

## DISCUSSANT

1981    Session on Gun Control Legislation, annual meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, annual meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, annual meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, annual meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, annual meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, annual meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, annual meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.

2010    Panel discussion of news media coverage of high profile crimes
        Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -
        American Sociological Review
        American Journal of Sociology
        Social Forces
        Social Problems
        Law and Society Review
        Journal of Research in Crime and Delinquency
        Social Science Research
        Criminology
        Journal of Quantitative Criminology
        Justice Quarterly
        Journal of Criminal Justice
        Violence and Victims
        Violence Against Women
        Journal of the American Medical Association
        New England Journal of Medicine
        American Journal of Public Health
        Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene Carte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to 2016.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology, Fall, 1987.

Member, Recruitment Committee, School of Criminology, Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to 2000.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-2008t.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-2008.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-2010.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-?.

Member, University Promotion and Tenure Committee, Fall, 2003 to ?.

Member of University Graduate Policy Committee, Fall 2003 to 2011.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2015.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Served as major professor for doctoral students, Moonki Hong who defended his dissertation on April 14, 2016.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice

Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the Tallahassee Democrat.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

Public lecture, "Do Guns Cause Homicide?," Center for the Study of Liberal Democracy, University of Wisconsin-Madison, December 5, 2018.

OTHER ITEMS
Listed in:
        Marquis Who's Who
        Marquis Who's Who in the South and Southwest
        Who's Who of Emerging Leaders in America
        Contemporary Authors
        Directory of American Scholars
        Writer's Directory

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed

through National Public Radio.  Further details are available at http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in <u>Florida State University Research in Review</u>, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges website (http://www.forensicscolleges.com/), 2014.

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

     I have caused service of the following documents, described as:

**DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 43**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

     I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin