```
 1                UNITED STATES DISTRICT COURT        ┌──────────┐
                                                      │ ORIGINAL │
 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA  └──────────┘

 3                      BEFORE THE HONORABLE
             ROGER T. BENITEZ, DISTRICT JUDGE PRESIDING
 4    _____

 5    VIRGINIA DUNCAN, et al.,    ) Case No: 3:17-cv-01017-BEN-JLB
                                  )
 6    Plaintiffs,                 ) Motion Hearings
                                  ) Department 5A
 7              v.                )
                                  ) Date: 12/12/2022
 8    ROB BONTA, in his official  )
      capacity as attorney general)
 9    of the State of California  )
                                  )
10    Defendants.                 )
                                  )
11    _____

12    KIM RHODE, et al.,          ) Case No: 3:18-cv-00802-BEN-JLB
                                  )
13    Plaintiffs,                 )
                                  )
14    v.                          )
                                  )
15    ROB BONTA, in his official  )
      capacity as attorney general)
16    of the State of California, )
                                  )
17    Defendants.                 )
18    _____

      JAMES MILLER, et al.,       ) Case No: 3:19-cv-01537-BEN-JLB
19                                )
      Plaintiffs,                 )
20                                )
      v.                          )
21                                )
      CALIFORNIA ATTORNEY GENERAL  )
22    ROB BONTA, et al.,          )
                                  )
23    Defendants.                 )
      _____
24

25            --- caption continued on the following page ---
```

1  _____

2  RUSSELL FOUTS, et al.,           ) Case No: 3:19-cv-01662-BEN-JBL
                                    )
3  Plaintiffs,                      )
                                    )
4  v.                               )
                                    )
5  ROB BONTA, in his official       )
   capacity as attorney general     )
6  of the State of California.      )
                                    )
7  Defendants.                      )
   _____

8
                **REPORTER'S TRANSCRIPT OF PROCEEDINGS**
9
                    Pages 1 through 51
10

11

12

13

14

15

16

17

18

19

20

21       **--- appearances continued on the following page ---**
   _____
22
   REPORTED BY:              Abigail R. Torres, CSR, RPR/RMR, FCRR
23                           CSR No. 13700
                             United States District Court
24                           Southern District of California
                             333 West Broadway, Suite 420
25                           San Diego, California 92101

```
 1   APPEARANCES:

 2
     For the Plaintiffs:      MICHEL & ASSOCIATES, PC
 3   Duncan, et al.          180 East Ocean Boulevard, Suite 200
                             Long Beach, California 90802
 4                           By:  ANNA M. BARVIR, ESQ.
                             By:  SEAN A. BRADY, ESQ.
 5                           By:  KONSTADINOS T. MOROS, ESQ.

 6   For the Defendants:     DEPARTMENT OF JUSTICE
     Becerra, et al.         OFFICE OF ATTORNEY GENERAL
 7                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 9012
 8                           Los Angeles, California 90013
                             By:  KEVIN J. KELLY, ESQ.
 9                                    -oOo-
                             DEPARTMENT OF JUSTICE
10                           OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
11                           300 South Spring Street, Suite 1702
                             Los Angeles, California 90013
12                           By:  MARK R. BECKINGTON, ESQ.

13   APPEARANCES:

14   For the Plaintiffs:      MICHEL & ASSOCIATES, PC
     Rhode, et al.           180 East Ocean Boulevard, Suite 200
15                           Long Beach, California 90802
                             By:  ANNA M. BARVIR, ESQ.
16                           By:  SEAN A. BRADY, ESQ.
                             By:  KONSTADINOS T. MOROS, ESQ.
17
     For the Defendants:     DEPARTMENT OF JUSTICE
18   Becerra, et al.         OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                             Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                      -oOo-
21                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.

24
25      --- appearances continued on the following page ---
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:      DILLON LAW GROUP, APC
     Miller, et al.,          2647 Gateway Road, Suite 105, No. 255
 3                            Carlsbad, California 92009
                              By:  JOHN W. DILLON, ESQ.
 4
     For the Defendants:      DEPARTMENT OF JUSTICE
 5   Becerra, et al.,         OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
 6                            300 South Spring Street, Suite 9012
                              Los Angeles, California 90013
 7                            By:  KEVIN J. KELLY, ESQ.
                                       -oOo-
 8                            DEPARTMENT OF JUSTICE
                              OFFICE OF ATTORNEY GENERAL
 9                            GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 1702
10                            Los Angeles, California 90013
                              By:  MARK R. BECKINGTON, ESQ.
11   APPEARANCES:

12
     For the Plaintiffs:      LAW OFFICE OF ALAN BECK
13   Fouts, et al.,           2692 Harcourt Drive
                              San Diego, California 92123
14                            By:  ALAN A. BECK, ESQ.
                                       -oOo-
15                            STAMBOULIEH LAW, PLLC
                              PO Box 428
16                            Olive Branch, Mississippi 38654
                              By:  STEPHEN D. STAMBOULIEH, ESQ.
17
     For the Defendants:      DEPARTMENT OF JUSTICE
18   Becerra, et al.          OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
19                            1300 I Street, Suite 125
                              Sacramento, California 95814
20                            By:  ANTHONY P. O'BRIEN, ESQ.
                                       -oOo-
21                            DEPARTMENT OF JUSTICE
                              OFFICE OF ATTORNEY GENERAL
22                            GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 1702
23                            Los Angeles, California 90013
                              By:  MARK R. BECKINGTON, ESQ.
24

25
```

1    **SAN DIEGO, CALIFORNIA; MONDAY, DECEMBER 12, 2022; 10:38 A.M.**

2                              -oOo-

3           THE COURT:  Good morning.

4           THE CLERK:  Calling 1, 2, 3, and 4 on calendar.

5           One, 17-cv-1017, *Duncan, et al., v. Becerra, et al.*

6           Two, 18-cv-0802, *Rhode, et al., v. Becerra, et al.*

7           Three, 19-cv-1537, *Miller, et al., v. Becerra, et al.*

8           Four, 19-cv-1662, *Fouts, et al., v. Becerra, et al.*

9           All set for status conference.

10          THE COURT:  All right, Counsel.  Thank you for being

11   here this morning.  Let's start with the Plaintiff.

12          If you would please identify yourself.  Please speak

13   slowly, clearly, so that my court reporter can take down your

14   names and so that I can, hopefully, do justice to them.  Okay?

15          MS. BARVIR:  Thank you, Your Honor.

16          Anna Barvir, B-a-r-v-i-r, for Plaintiff Virginia

17   Duncan, et al.

18          THE COURT:  All right.

19          MR. BRADY:  Good morning, Your Honor.

20          Sean Brady, S-e-a-n, B-r-a-d-y, on behalf of the

21   Plaintiffs.

22          MR. MOROS:  Good morning, Your Honor.

23          Konstadinos Moros on behalf of the Plaintiffs.  That's

24   K-o-n-s-t-a-d-i-n-o-s.  And last name is Moros, M-o-r-o-s.

25          THE COURT:  Okay.  And for the State?

```
1              MR. O'BRIEN:  Good morning, Your Honor.
2              Deputy Attorney General Anthony O'Brien,
3    A-n-t-h-o-n-y; O, apostrophe, B-r-i-e-n, on behalf of the
4    Attorney General and the Fouts and Rhode matter.
5              THE COURT:  Okay.
6              MR. KELLY:  Your Honor, excuse me.  I'm also
7    appearing -- I'm appearing on behalf of the State and the
8    Attorney General in the Duncan and Miller matters.
9              My name is Kevin Kelly.  K-e-v-i-n.  Kelly, K-e-l-l-y.
10   Deputy Attorney General.  Thank you.
11             THE COURT:  I'm sorry.  You're on Duncan and Miller?
12             MR. KELLY:  Correct, Your Honor.
13             THE COURT:  Okay.  Boy, I hope I can keep all this
14   straight.  Okay.
15             MR. BECKINGTON:  Good morning, Your Honor.
16             Mark Beckington, B-e-c-k-i-n-g-t-o-n.  I'm joining
17   Mr. O'Brien and Mr. Kelly on all four cases.
18             THE COURT:  I'm sorry?
19             MR. BECKINGTON:  I'm joining Mr. Kelly and Mr. O'Brien
20   on all four of the cases.
21             THE COURT:  On all four.  I remember you from the
22   Miller case.
23             MR. BECKINGTON:  Yes, Your Honor.
24             THE COURT:  Yeah.  Okay.  Great.
25             All right.  All right.  Let's see Plaintiff in the
```

```
 1   Rhode case.
 2              MR. BRADY:  Your Honor, Sean Brady on behalf of the
 3   Plaintiffs on Rhode.
 4              MS. BARVIR:  Anna Barvir on behalf of the Plaintiffs
 5   and Rhode as well.
 6              THE COURT:  All right.  And on the Fouts matter?
 7              MR. STAMBOULIEH:  Steven Stamboulieh,
 8   S-t-a-m-b-o-u-l-i-e-h, for Plaintiff Fouts.
 9              THE COURT:  I'm sorry.  Just a second.
10              Can you repeat your last name again for me, please?
11              MR. STAMBOULIEH:  Stamboulieh, S-t-a-m-b-o-u-l-i-e-h.
12              MR. BECK:  Alan Beck on behalf of the Plaintiffs.
13   A-l-a-n.  Last name B-e-c-k, sir.
14              THE COURT:  Okay.  Have I missed anyone?
15              MR. DILLON:  Your Honor, this is John Dillon appearing
16   on behalf of the Plaintiffs for the Millers and --
17              THE COURT:  I'm sorry.  For Miller?
18              MR. DILLON:  Yes.
19              THE COURT:  And?
20              MR. DILLON:  John Dillon.
21              THE COURT:  Just on the Miller case?
22              MR. DILLON:  Yeah, just for Miller.
23              THE COURT:  All right.  Have I missed anyone?
24              Okay.  Well, thank you so much for being here this
25   morning.  The reason why I called the status conference -- and
```

1    I called all these cases at the same time -- is because, you

2    know, a great deal of my life over the last few years has been

3    devoted to dealing with these Second Amendment cases.

4         As you probably know, I have four of these cases and

5    recently inherited the fee-shifting case from two other judges.

6    And I've spent an awful lot of time, an awful lot of time, and

7    read an awful lot of material and heard testimony on some of

8    these -- at least one of these cases, anyway.

9         And so I thought that, given the fact that these cases

10   have been returned to me following the Bruen opinion, that I

11   didn't want to duplicate effort.  First of all, my time, as I'm

12   sure your time, my law clerk's time is valuable.

13        And so I thought that perhaps there was some way that

14   we could approach a joint methodology for dealing with all of

15   these cases, essentially, at one time and in one -- in one way.

16   So my understanding of -- of Heller, is that Heller has not

17   changed.  It has not been overruled.  It is still good law.

18        Bruen, the Bruen opinion, I believe, discarded the

19   intermediate scrutiny test that I also thought was not very

20   useful; and has, instead, replaced it with a text history and

21   tradition test.  Now, the text history and tradition issue is

22   pretty much common, I think, to all of these cases.

23        There may be some nuance as to whether, for example,

24   in some case the -- the history and tradition may effect

25   ammunition.  In another case, it may effect the type of weapon,

1    for example, whether it's a rifle or a dirk or a dagger.  But

2    in the end, it's the same.  We're basically looking at the same

3    body of history and tradition that we're going to be looking at

4    in all of the cases.

5          So I have an idea of how this case ought to go

6    forward, and I'll tell you what I would like to have -- by the

7    way, I might add, I'm not sure, Mr. O'Brien, whether you filed

8    the supplemental brief in the Fouts case.  I'm not sure who

9    filed that.

10         MR. O'BRIEN:  Yes, Your Honor, I did.

11         THE COURT:  All right.  Well, let me compliment you on

12   that, because one of the things that I thought you did that I

13   really appreciated was you filed several declarations.  One of

14   those declarations did a historical analysis of several rules,

15   laws, regulations, and so on and so forth, all of which I have

16   read, I might add.  So --

17         You can sit down.

18         -- I found that to be very, very helpful.

19         But I would like to ask you folks to do something a

20   little bit different; very similar.  But I don't have the

21   staff.  I don't have, really, the resources to do this, at

22   least not to do it in a timely fashion.

23         So I thought that I would ask you to do something for

24   me, which is to, essentially, do a similar survey as,

25   Mr. O'Brien, you did in the -- in the Fouts case.

1          And I would like that survey, if you would.  I mean,

2   I'm sure you all have access to Excel spreadsheets and so on.

3   But I'd like to see a survey that does the following for me:

4   First of all, on a chronological bases, starting with date, the

5   date of any law, regulation, ordinance, restriction.  And I'm

6   going to refer to those from now on as "restrictions."  Okay.

7   Generically, okay, restriction or regulation.  Okay.

8          So if you could start out chronologically, if you

9   would give me the date, and then if you would tell me what was

10  it that was restricted.  So, for example, in many of those

11  regulations, they regulate dirks, daggers, metal knuckles.  In

12  some cases, it might be storage of gunpowder or cartridges.

13  Some of them, some of these, are "use" regulations.  In other

14  words, you cannot use these while committing a crime.  You

15  cannot use them while breaking and entering into somebody's

16  property.  You cannot display them in anger.

17         So what is it exactly that the law or the regulation

18  restricted?  What type of weapon?  What was the weapon that was

19  being restricted?  Was it a knife? a Bowie knife? a stiletto?

20  metal knuckles? pistols? rifles?  Then I would like to know

21  whether or not that statute was repealed and, if it was

22  repealed, what was repealed by, and was it replaced by

23  something else?  And if so, if you would do the same analysis?

24  Again, continuing a chronological order.  Right?

25         And then, finally, whether or not that regulation or

1    restriction was reviewed by court or courts?  And if so, what

2    was the -- what was the outcome?  For example, was it found to

3    be unconstitutional, or was it found to be constitutional?  And

4    if you'll give me a citation so that I can then go and look at

5    the cases and see what the cases say.

6          I think -- so to pose an example, I think there are

7    one or two regulations that I have found that restricted --

8    specifically restricted billys.  Okay.  So in the Fouts case, I

9    think that would be particularly relevant.  I think I found one

10   or two that restricted rifles and shotguns.  I think I found

11   one or two that restrict certain ammunition, cartridges.

12   Right.  I think I found one that restricts a weapon that can

13   fire more than 16 or 18 rounds.  And I found one that dealt

14   with machine guns and automatic rifles.

15         You see, that's the sort of thing that I've read

16   through that I've captured, but I can't really capture it in a

17   way that I think that the Supreme Court would like us to do it,

18   which is a chronological order, so that we can determine what

19   regulations, what tradition exists with regards to restrictions

20   at the adoption of the Second Amendment; and then I think,

21   secondarily, at the time that the Fourteenth Amendment was

22   adopted.

23         I think with that body of information, I think this

24   Court would be in a much better position to make a decision as

25   to what to do in each one of these cases.

1          So the cases have been sent back to me, given the

2     Bruen opinion, and I'm now going to attempt to deal with them,

3     but I don't want to have to deal and read the same stuff over

4     and over and over again, because I've already read some of it

5     twice.  And, frankly, there's a lot of material there.  I don't

6     know how many boxes of five-inch binders I have, but it's a

7     lot, and I have only so much time.

8          So I would suggest both sides, if you can, please do

9     that for me.  Okay.  And I think that would be very helpful.

10         Now, as far as actually setting a hearing to -- to

11    hear your arguments on these, I don't think there's any use in

12    taking any evidence, meaning testimony, from anyone in any of

13    these cases.

14         I mean, the history and tradition is what it is.  I

15    don't need, you know, Mr. Spitzer or Mr. Cornell to tell me

16    what his view of the history and tradition is.  I see no point

17    in that; nor do I think any additional discovery is necessary

18    or additional expert work is necessary.  So, anyway, that's

19    my -- that's my initial thought on this case.

20         If anyone has any suggestions on how we can go about

21    proceeding with these cases, I would love to hear your views.

22    I may not adopt your suggestion, but I'll certainly consider

23    it.  So if -- if anybody wants to address what I have said, or

24    anything else on how we proceed with these cases, please feel

25    free to speak up.

13

 1          Maybe we'll start with Duncan, since it was the first

 2   case that I dealt with.

 3          So do you have anything you want to add?

 4          MS. BARVIR:  Should I move here?

 5          THE COURT:  Yeah.  Whatever.  If you feel comfortable

 6   there at the table, that's fine.

 7          MS. BARVIR:  Again, Anna Barvir for Plaintiff Virginia

 8   Duncan.

 9          Thank you, Your Honor, for your thoughtful

10   consideration of all four matters.  I'm sorry.  I'm -- we've

11   heard what -- that Your Honor is asking for from each party.  I

12   think that makes a lot of sense, though I do want to, I think,

13   perhaps, focus the Court a little bit on what Plaintiffs' view

14   as the kind of proper way of reviewing this case.  And in our

15   position, it doesn't really rely on -- it actually shouldn't

16   rely, and it might be improper to rely on the sorts of -- even

17   the laws that Your Honor is referencing in this survey and/or

18   spreadsheet that we were talking about just now.

19          It is our position that Heller already tells -- Your

20   Honor, tells all of us how to analyze this.  The -- this is an

21   arms banned possession case.  So the Heller court then, backed

22   up by the decision in Bruen, already handled that entire

23   analysis.  The analysis starts with --

24          THE COURT:  But if that were so, why would the Ninth

25   Circuit have kicked it back to me?  I mean, I agree with you in

14

1    concept, but, you know, the Ninth Circuit kicked it back to me,

2    so...

3         MS. BARVIR:  Excuse me.  I think that's a good

4    question, and perhaps that's why Your Honor is, I think,

5    intelligent, smart to ask the parties to do what we're doing.

6    But I think that -- excuse me -- the Ninth Circuit also has a

7    lot of these -- had a lot of these cases before it.  And,

8    obviously, all of the pro Second Amendment cases had gone up to

9    en banc, and perhaps the Court wasn't willing to handle those

10   at that point.

11        I'm not trying to cast aspersions, but I think we can

12   all kind of agree that we've seen a lot of decisions that are

13   not upholding lower-court decisions that strike California

14   state laws, gun control laws, just overturned.

15        So perhaps they'd like to see that Your Honor do some

16   more work on this case, but I don't think it requires --

17        THE COURT:  Would you like some water?

18        MS. BARVIR:  Yes.

19        I don't think that that requires us to do a new

20   analysis of all the history that's out there.  The Heller court

21   was very -- had done a very detailed deep dive into all of the

22   historical laws that are banning possession of arms and other

23   types of gun control laws since the Founding and before.

24        And it found that the test is if it's -- excuse me --

25   that the only time the State can lawfully ban a firearm or

```
 1   other type of arm that is protected by the Second Amendment is

 2   if it's dangerous and unusual.  The flip side being, typically

 3   possessed by law-abiding citizens for lawful purposes or

 4   other -- we've also heard it called the "common use" test.  And

 5   so that test came out of the Court's analysis of the history

 6   and tradition.

 7          So if the Court -- so the question that really is

 8   posed -- that Duncan poses this Court today, is whether or not

 9   magazines, and maybe more specifically magazines capable of

10   holding more than ten rounds, are protected arms, bearable

11   arms, under the Second Amendment's text.

12          And then, secondly, if there -- excuse me --

13   otherwise, if there's a longstanding tradition, meaning are

14   they dangerous and unusual.  And this Court has already found

15   that -- I mean, we have a really large record showing that

16   they're not dangerous and unusual.  And several courts have

17   agreed with that finding both in the Ninth Circuit and other

18   circuits have found it or they have been willing to accept it.

19   And I don't think that Heller or -- I mean, I'm sorry -- I do

20   not think Bruen changed that outcome.

21          So that's what we would like Your Honor to consider

22   and to look at and perhaps think about when we are doing this

23   search for more historical restrictions.

24          THE COURT:  Let me ask you a question that I think has

25   troubled me somewhat.  So I think facts matter.  And in
```

1    certain -- and in cases -- every case, there are parties that

2    have greater access to evidence than others.  Right.  And at

3    least in California, we have a presumption, for example, that

4    when a party has the largest body of evidence but fails to

5    present it, there's a presumption that if the evidence were to

6    be considered by the Court, that the presumption would be that

7    the party who has a greater body of evidence, that it would be

8    held against him.

9           Now, one of the things that I'm concerned about, for

10   example, is I just read someone said, "There's no evidence that

11   a homeowner has ever fired more than ten rounds in defense."

12   And I kind of think that that's -- I mean, I think probably the

13   best evidence of that would be the State.  The State would have

14   the investigative reports, police reports, and so on, to

15   explain that.

16          But I wonder if you agree with that statement, that

17   there are no cases where a homeowner or a business owner has

18   ever fired more than ten rounds in defense.  And if so, and if

19   that's the case, have you provided the Court with any

20   information to support that?

21          MS. BARVIR:  I don't -- I don't, standing here, know

22   that that's true.  I think that part of that is -- it's a kind

23   of a false thing to do when you're limited to that number,

24   anyway, but also --

25          THE COURT:  I understand you.  I understand -- I hear

1    you.  I hear you.  But I -- particularly in the Miller case, I

2    took issue with Ms. Alan's -- Ms. Alan's analysis.  And then I

3    think I read something recently -- I can't recall which court

4    it was -- but somebody said, "Oh, there's no evidence that a

5    homeowner has fired more than ten rounds."

6          And defense -- and of course all that anyone has to do

7    is go on the Internet and do a cursory search and find out that

8    that's not true.

9          MS. BARVIR:  Right.

10         THE COURT:  And I wonder if you've done that.

11         MS. BARVIR:  I think when we were here on MSJ -- and

12    that's why we had this conversation several years ago.

13         THE COURT:  You know, I'm sorry.  But as I said, I

14    have four of these, and if I get you all confused with one

15    another, please forgive me.  You know, I'm not as young as I

16    used to be, so...

17         MS. BARVIR:  None of us are.

18         When we were here on MSJ, I think we had this

19    conversation as well.  And a lot of times that was coming

20    from -- you know, from Plaintiffs' side was coming from, I

21    guess you could say, anecdotal news stories.  Because we don't

22    -- we aren't the State.  We don't have access to those same

23    sorts of records.

24         I don't think that it's true that that's never

25    happened.  That there's no evidence that it's ever happened.

1  But, again, even if it never happened, which I find

2  extraordinarily hard to believe -- the police do it all the

3  time -- it's not a relevant matter because the test --

4          THE COURT:  Yeah, I know.

5          MS. BARVIR:  -- for common use is typically

6  possession.

7          THE COURT:  I heard you.  I know that.  But I was just

8  wondering if you agreed with that statement that there's no

9  evidence that the homeowner has ever fired more than ten

10 rounds, and just wanted to pick your brain on that.

11         Okay.  I distracted you.

12         MS. BARVIR:  That's okay.  I have nothing more to add.

13         THE COURT:  Okay.  Great.

14         MS. BARVIR:  So thank you for your time.

15         THE COURT:  Sometimes -- sometimes less is more.

16 Okay.

17         Anyone else?  No one else?  Gee, I'm so glad.

18         MR. KELLY:  Your Honor, could I be heard?

19         THE COURT:  No.  Sorry.  I've heard all I need to

20 hear.

21         No.  Go ahead.

22         MR. KELLY:  So the State would like to renew its

23 request for an addition discovery period, not a lengthy

24 discovery period in this action.  Just a three-month is all we

25 would ask for.

```
 1              THE COURT:  Tell me why.

 2              MR. KELLY:  Sorry, Your Honor?

 3              THE COURT:  Tell me why.

 4              MR. KELLY:  There's two reasons:  First of all, this

 5   is a brand-new area of law, and it's a brand new area of

 6   historical analysis.  And a three-month period would give our

 7   experts more time to actually look into this.  I think we

 8   submitted a declaration from Professor Schrag, who details the

 9   types of work that is required of historians when they approach

10   an issue like this.

11              And, also, Professor Cornell in his declaration also

12   said that, "This work is still ongoing, and we did our level

13   best" --

14              THE COURT:  What happens in three months when the work

15   stops?  What's the -- what's the miracle?  Was the miracle

16   pertinent?  Drops down in three months and work stops?

17              MR. KELLY:  Well, Your Honor, obviously, I can't

18   represent that new evidence will be found, but that's also

19   because I don't know what I don't know, at this point, and

20   neither do our experts.

21              So we would, again, renew our request for an

22   additional discovery period followed by supplemental briefing.

23              And -- excuse me -- I had another point to make on

24   that.

25              THE COURT:  Okay.  Go ahead.
```

```
 1              MR. KELLY:  So we would also want an opportunity for
 2    our experts to examine the evidence, the new evidence that the
 3    plaintiffs included in their response to our supplemental
 4    briefing.  And that would also give our experts a chance to do
 5    so, and then --
 6              THE COURT:  So give me an example.
 7              MR. KELLY:  So I will give -- one moment, Your Honor.
 8              So the Plaintiffs brought or included a declaration
 9    from Ashley Hlebinsky, who claimed that "repeating rifles were
10    not commonly owned in the nineteenth century," presumably in
11    response to our declaration from Professor Vorenberg.
12              THE COURT:  I'm sorry.  They said "they were not"?
13              MR. KELLY:  They were not commonly owned in the
14    nineteenth century.
15              THE COURT:  She says they were not.
16              MR. DILLON:  No.
17              THE COURT:  No.  I think you're wrong.  I think you're
18    opposite.  I think she says --
19              MR. KELLY:  Opposing counsel will correct me if I'm
20    wrong.
21              THE COURT:  Yeah, I think you're wrong.  I think she
22    said the opposite.
23              MR. DILLON:  I don't believe that's the case that she
24    said they were not.
25              (Court reporter interruption.)
```

```
1                MR. DILLON:  John Dillon on behalf of the Miller
2     defendants.
3                THE COURT:  Yeah.  So she said they were commonly
4     owned.
5                MR. DILLON:  Yeah.
6                THE COURT:  So the Model 94 Winchester --
7                MR. DILLON:  She was rebutting Dr. Saul Cornell's
8     statement that these guns were, in fact, not common.  That's
9     what his testimony was, Your Honor.
10               THE COURT:  All you got to do, if you look at
11    Professor Cornell's declarations and you look at the website
12    that he refers to -- to Winchester -- to the Winchester
13    company, if you look at that website, you see that, in fact,
14    they were commonly owned.
15               So, I mean, what are you going to do?  You going to --
16               MR. KELLY:  Your Honor, if --
17               THE COURT:  How are you going to -- I mean, if you
18    look at Mr. Vorenberg's declaration, and you look at -- for
19    example, as I sit here right now, I can recall one instance
20    that he talks about where two miners were mining for borax.
21               Do you recall the incidents?
22               MR. KELLY:  Sorry.  Do I recall the incidents, Your
23    Honor?
24               THE COURT:  Yeah.
25               MR. KELLY:  I do not, no.
```

1          THE COURT:  Okay.  So two miners were mining for

2    borax.  And I can't recall whether it was Montana or Wyoming or

3    Nebraska, or whatever.  These are just two miners, two common

4    folks that were miners for miners -- I mean, mining for borax,

5    and they're attacked by a band of 40 Indians.  And these two

6    miners happen to have Henry rifles, and they were able to

7    defeat the 40 Indians that were attacking them.

8          So the point -- the point was, if you look at Mr. --

9    Professor Cornell's -- if you look at Professor Vorenberg's

10   materials, which I have looked at, you see that the statement

11   that they were not commonly owned is just not true.

12         For example, there's a statement in there about how

13   after the Civil War many of the -- of the soldiers, when they

14   were released from duty, were, in fact, allowed to buy the

15   repeating rifles and took the repeating rifles home.

16         And you can do the statistical analysis, by the way,

17   which I sat down and did because maybe I have too much time on

18   my hands.  But there was an awful lot of those weapons that

19   wound up in civilian hands.

20         So, I mean, the evidence is there.  You can call, I

21   suppose, this person for a deposition and take her deposition.

22   But I don't think, no matter what she says, it's not going to

23   contradict her own experts' declarations and the materials that

24   they themselves refer to.

25         You follow what I'm saying?  Okay.

```
 1              MR. KELLY:  Your Honor, I do have another example of
 2     something we would want to explore and --
 3              THE COURT:  Okay.  Give me one more.
 4              MR. KELLY:  So the Plaintiffs also include a
 5     declaration from Clayton Cramer --
 6              THE COURT:  Okay.
 7              MR. KELLY:  -- presumably in response to Professor
 8     Roth's position that mass murder was not a new phenomenon or --
 9     excuse me -- mass murder, yes, correct, is a new phenomenon at
10     this point.  And we would want -- to my knowledge, Mr. Cramer
11     was not disclosed as an expert, was not deposed in any prior
12     proceeding in Duncan.
13              And we would first want an opportunity for Professor
14     Roth to examine the new evidence that the Plaintiffs have
15     brought, as well as potentially depose Mr. Cramer on that
16     issue.
17              THE COURT:  Well, before I get to that issue, let me
18     point out something, Mr. Kelly.  I don't know how long you've
19     been in this case.  But you said something about -- going back
20     to the reason why you needed three months; that you needed --
21     that this was a new area and so on and so forth.
22              Did I get you right?
23              MR. KELLY:  That's correct, Your Honor.
24              THE COURT:  Yeah.  How long you have been in this
25     case, Mr. Kelly?
```

1          MR. KELLY:  Several weeks, Your Honor.

2          THE COURT:  It's not fair to dump you into a case like

3    this.  Mr. -- Professor Cornell has gone on record and stated

4    -- in 2017, Professor Cornell stated that he had been

5    researching and writing on the history and tradition of Second

6    Amendment regulations for two decades.  That's 20 years,

7    20 years before 2017.  We're now in 2023.  Add five years to

8    that; that's 25 years.  That's a quarter of a century that

9    Professor Cornell has been writing, researching on the history

10   of and tradition of the Second Amendment.

11         And I've read an awful lot of that material.

12   Professor Cornell cites to Spitzer.  Spitzer cites to

13   Vorenberg.  Vorenberg cites to Bazilli.  Bazilli, I think it

14   is, who cites to -- these folks have been working on this for a

15   really, really long time.

16         In 2000- -- well, as you probably know in the Rhode --

17   Rhode case, I issued an opinion where I said that the State's

18   regulation had no historical pedigree, and I was right.  The

19   Ninth Circuit asked the State to file a supplemental brief on

20   the issue of the historical pedigree.

21         In response to that request from the Ninth Circuit,

22   the State at Footnote 3, page 11 of its response, cites to Saul

23   Cornell and Nathan DeNino, "A Well Regulated Right.  The Early

24   American Origins of Gun Control," 2004, surveying firearms

25   regulations from Founding era through the nineteenth century.

1          Mr. Kelly, with all due respect, Mr. Cornell and all

2    these other folks have been researching and writing on this

3    issue for 25 years.  We're not here, looking -- this is not a

4    question for the missing link.  We're not looking for truffles.

5    If it's a history and tradition, 25 years of research and

6    writing should have disclosed it by now.

7          And as you know, probably in Bruen -- I think it was

8    in Bruen.  It might have been in Heller, as well, where the

9    Court said, "Look, 'a lot of' doesn't show a history and

10   tradition."  Right.  So I don't think -- I mean, with all due

11   respect, I understand what you're doing, and I appreciate that.

12   And I'm sorry that you got dumped into this just a few -- just

13   a few weeks ago.

14         But, realistically, you don't need more time.  I might

15   give you a little more time to depose the one expert, and that

16   might be it, but that's about it.  Okay.

17         MR. KELLY:  Thank you, Your Honor.

18         THE COURT:  All right.  Is there anything else you

19   wanted to add?

20         MR. KELLY:  Actually, a point of clarification, Your

21   Honor.

22         THE COURT:  Sure.  Go ahead.

23         MR. KELLY:  Would Your Honor like us to submit one set

24   of briefing for all four matters, or one for each matter?

25         THE COURT:  I'm open to suggestions.  I don't want to

1    have to be rereading the same stuff over and over and over

2    again.  So what do you think?

3           MR. KELLY:  Your Honor, I think they should be heard

4    separately.  I think as Your Honor said, you know, there is

5    some overlap here in terms of the historical analysis,

6    et cetera.  But there's also enough nuance among the cases

7    that, I think, both, as a matter of fairness, and to make your

8    burden easier, they should be heard separately.

9           For example, I think the textual analyses is different

10   in these case; the first prong under Bruen as to whether the

11   regulated items constitute arms under the Second Amendment.

12   And our position is a different analysis in each case.

13          THE COURT:  Okay.  Well, what you say makes sense.

14   All right.  So how about if what we do is we have a joint

15   historical analysis?  In other words, what I suggested at the

16   very beginning of this hearing?  How about if we have that as

17   one?

18          And, yes, I can understand how you might want to

19   argue, for example, that in the Fouts case, looking at the

20   historical analysis, there's, you know, history and tradition.

21   And that you might want to brief that separately.

22          Yeah, I can understand what you're saying.  I'll hear

23   from the Plaintiffs in just a second, see if they have a

24   different idea.  But that makes sense.  I can go along with it.

25          MR. KELLY:  Thank you, Your Honor.

```
 1              THE COURT:  All right.  Thank you.

 2              Anyone else?

 3              All right.  Let's go back to the Plaintiffs.  Anyone

 4    have anything you want to comment in response?

 5              MR. BRADY:  Sure, Your Honor.  Sean Brady on behalf of

 6    the Plaintiffs.

 7              I agree.  I think that makes sense.  But to address

 8    the nuance, there are some things that are going to sort of be

 9    boilerplate with respect to this compendium of Excel

10    spreadsheet of the laws.  If the State prepares that, they're

11    going to have to prepare that for all the cases.  Right.  So it

12    wouldn't be an additional burden on them.

13              THE COURT:  I want you to look at it, and see if you

14    agree or disagree because I want to know, you know, if there's

15    disagreement.  Right.

16              MR. BRADY:  If Your Honor would like us to meet and

17    confer, you know -- I guess our position is that it's the

18    State's burden to research and present these laws, and they've

19    had adequate time for that.  We don't need to get into --

20              THE COURT:  I think I agree.  But I think it's always

21    really a good idea to meet and confer.  So if you could do

22    that, that would be wonderful.

23              MR. BRADY:  Absolutely.  And if Your Honor wants us to

24    do that prior to -- instead of dressing it in our opposition

25    and meeting and conferring beforehand, we're more than happy to
```

1    do that.

2         THE COURT:  Why don't you do that.  And then if

3    there's any disagreement, if there's any disagreement, then we

4    can deal with that later.  Right.

5         So here's something that I do with jury instructions.

6    I ask the parties to meet and confer and come up with an

7    agreed-upon body of jury instructions.  Okay.  And then if

8    there are any jury instructions that they disagree with, then

9    they can file a brief to tell me what instructions they

10   disagree with and what other instructions they want me to give.

11        Perhaps this is a good policy for us to apply here.

12   If you meet and confer and agree on the historical analysis,

13   then that's great.  You can submit that.  And if there are any

14   disagreements, then you can submit that separately.

15        How's that?  That work?

16        MR. BRADY:  I think that works, Your Honor.

17        THE COURT:  Mr. Kelly?

18        MR. KELLY:  Yeah, that works for us, Your Honor.

19        THE COURT:  Great.

20        MR. BRADY:  This meet-and-confer process, though, is

21   there going to be another status conference or -- that's my

22   only concern.  Or are we just going to address it in our

23   briefing?

24        THE COURT:  No.  I don't think we need another

25   meet-and-confer conference after this.  I think -- look, I

```
 1   don't want to slow-walk these cases.  These are important cases

 2   both to the State and to the Plaintiffs and the people that

 3   insist that they have these rights, and I think we need to move

 4   these cases along.

 5          So a meet-and-confer.  Give me an agreed-upon

 6   historical analysis, and then what I will do is I will give you

 7   a time period for that to be filed.  I'll give you a time

 8   period for additional briefs to be filed, and then we're going

 9   to have hearings, and we're going to put these cases to bed.

10          MR. MOROS:  Your Honor, one question.

11          Is the State to be limited in the presentation of its

12   laws to laws before the year 1900?  Because I know in their

13   supplemental briefing, they went into twentieth century laws,

14   and our position is those aren't relevant.  But if you want a

15   comprehensive view, just to get everything.

16          THE COURT:  You know, frankly, I don't see much point

17   in those because I think that there would be so many laws.  I

18   mean, let's face it, after -- there came a point when -- when

19   they began to grow exponentially.

20          I think in the Bruen opinion it talks about -- the way

21   I see it, it places greater emphasis on those laws that were,

22   essentially, in effect at the time the Second Amendment was

23   adopted, and then with a secondary emphasis at the time that

24   the Fourteenth Amendment incorporated the Second Amendment by

25   reference.  I think that's the time period.
```

1          In fact, I think the one -- if I'm not mistaken, the

2    one statute that regulates -- that was submitted in the Fouts

3    case, it talks about machine guns and automatic rifles, is a

4    1927 statute, if I'm not mistaken; which, frankly, I thought

5    was irrelevant, anyway.

6          So why don't we limit it to -- how about this?  How

7    about, let's say, 20 years -- how about an arbitrary and

8    capricious number that I'm going to give you?  Twenty years

9    after the Second Amendment was incorporated by the Fourteenth

10   Amendment -- or the Fourteenth Amendment was adopted.  How's

11   that?

12         MR. MOROS:  So, 1888.  Okay.

13         THE COURT:  All right.  Twenty years after the

14   Fourteenth Amendment was adopted.

15         MR. KELLY:  Your Honor, we would object to that.

16         THE COURT:  Why?

17         MR. KELLY:  In Bruen, it specifically says that

18   statutes after the Fourteenth Amendment's ratification can be

19   used as evidence so long as they do not conflict with the

20   restrictions that were in place prior to then around the

21   Founding and the Reconstruction period.

22         So we would want to reserve our right to introduce

23   those laws if -- if we do, in fact, do that.

24         THE COURT:  Can you cite me to the page in Bruen?

25         MR. KELLY:  Yes, Your Honor.

```
1              THE COURT:  And if that were the case, why would --
2    why would the Supreme Court have overturned the New York
3    statute on concealed carry?  Since there were -- I would
4    imagine there's probably 100, if not 200, statutes that have
5    prohibited the methodology for obtaining concealed carry
6    permits.
7              MR. KELLY:  So, Your Honor, the page we're referring
8    to is at 142, Supreme Court page 2153, Note 28.
9              THE COURT:  Can you read it for me?  Because I -- I
10   don't have a photographic memory.
11             MR. KELLY:  Sure, Your Honor.  Just give us one
12   moment.
13             Your Honor, the footnote says:  "We will not address
14   any of the twentieth century historical evidence brought to
15   bear by respondent or their amici.  As with their
16   late-nineteenth-century evidence, the twentieth century
17   evidence presented by Respondent's in the amici --"
18             (Court reporter interruption.)
19             MR. KELLY:  "-- the twentieth century evidence
20   presented by Respondents and their amici does not provide
21   insight into the meaning of the Second Amendment when it
22   contradicts earlier evidence."
23             And we would argue that that footnote would allow us
24   to introduce statutes and regulations post-Reconstruction so
25   long as they do not contradict earlier restrictions.
```

1          THE COURT:  The problem with that, though, as I

2     said -- how many -- how many laws have been enacted?  I mean,

3     just look at California.  Let's just take, for example, the

4     Miller case, right, the AR-15-type regulations.

5          How many of those laws have been enacted since 1927?

6     Lots and lots and lots and lots.  But how does that help me

7     decide the history and tradition of regulation of rifles --

8          MR. KELLY:  I think, Your Honor --

9          THE COURT:  -- at the time the Second Amendment was

10    adopted, or at the time the Fourteenth Amendment was adopted?

11    All that tells me is -- has happened after the Civil War when

12    states found out that, yes, they could restrict certain

13    firearms.  Right.  That all of a sudden there was an explosion

14    of restrictions because the states found out, "Hey, guess what?

15    We can do this."  So then they did it.

16          But how does that help me determine the history and

17    tradition of these laws at the time the Second Amendment was

18    adopted or at the time that the Nineteenth -- I mean the

19    Fourteenth Amendment was adopted?

20          MR. KELLY:  Your Honor, I'm only speculating that

21    these laws are out there.  I personally do not know.  I think

22    we would just want to reserve our right and not be barred from

23    doing so should it come to that.

24          THE COURT:  I'll tell you what I'll do.  I'll let you

25    file a separate one.  You can file -- you can file a separate

```
 1    survey, and we'll call it "Post 20 years after" -- "20 Years
 2    After the Ratification of the Fourteenth Amendment."
 3                How's that?
 4                MR. KELLY:  That sounds good, Your Honor.
 5                THE COURT:  And include as many as you want.  In fact,
 6    the more the merrier.
 7                MR. DILLON:  Your Honor, if I may?
 8                THE COURT:  Yes, go ahead.
 9                MR. DILLON:  I just wanted to clarify on the parameter
10    of exactly what you're requesting.  As I heard you, you're
11    looking for a single spreadsheet-style chronological order of
12    all the statutes, ordinances, restrictions that the State can
13    come up with that identify what was restricted, what act was
14    restricted, whether it was a law that was repealed or not
15    repealed, and whether or not it was ever brought before a
16    court.
17                And then they'll present -- they'll draft that
18    document with no argument, no expert witness testimony.
19                THE COURT:  Correct.
20                MR. DILLON:  It will just be a straight list of the
21    laws.  We will have a chance to review it as Plaintiffs.  And
22    like a summary judgment, if we have a contested issue of the
23    summary of the law that they present, we can note that contest
24    in the -- you know, a joint document?  Is that what you're --
25                THE COURT:  Sounds reasonable.  Sounds reasonable to
```

```
 1    me.
 2              MR. DILLON:  No problem.  Thank you, Your Honor.
 3              MR. KELLY:  Your Honor, I think we would object to
 4    that as well.  I think we would want, if we need to, to
 5    introduce experts to interpret some of the laws and the
 6    standards --
 7              THE COURT:  No.
 8              MR. KELLY:  -- in the language --
 9              THE COURT:  No.
10              MR. KELLY:  -- and the statute --
11              THE COURT:  No.  Look -- no, no.
12              Mr. Kelly, with all due respect, I don't need -- every
13    one of these experts that you've put forth, I have read, just
14    like experts that they have put forth, like Mr. Copill, for
15    example.  Your experts -- these are people that have, you know,
16    biased points of view.  I mean, Mr. Bosey, for example -- I
17    hope I'm pronouncing his name.  The fellow who worked for --
18              MR. MOROS:  Kimber, Your Honor.
19              THE COURT:  Kimber.  Yeah.  Who at some point in time
20    had an epiphany and realized that all the work that he'd been
21    doing for all these years, selling these weapons to the public
22    was not good.  And now he works -- he's a consultant for
23    Everytown -- I'm trying to remember.
24              Anyway, look.  These people's opinions of what these
25    statutes say, right, means nothing.  It means nothing.  It's
```

1   like, I remember -- I think it was Justice Brier in -- I think

2   it was Bruen, who talked about, "Well, we need to have this

3   factual record," and this and that, what have you.

4         No.  702 says that the admission of expert testimony

5   is help -- is possible if, because of the expert's knowledge,

6   skill, or experience, it will assist the trier of fact.  Okay.

7         But there's nothing.  I mean, I've read these

8   declarations.  Every one of these folks come in here with a

9   biased -- it's not like they're really neutral experts, okay,

10  or they're not experts who've come up on these opinions as a

11  result of these cases, okay, doing research for these cases.

12        These are all people that already come with

13  preconceived ideas and opinions, but their opinion is not worth

14  any more than your opinion or her opinion.  They're going to

15  tell me, "Well, in my opinion, if you look at this statute,

16  this statute means that -- you know, that the State of Wyoming

17  regulated concealed carry of brass knuckles," and so I can read

18  that.  I can figure that out by myself.

19        MR. KELLY:  Well, Your Honor, I think the issue that

20  we might have with simply creating a spreadsheet and submitting

21  it to the Court doesn't take into account that restrictions

22  were found in places other than statutes.  In our supplemental

23  briefing, we -- Professor Vorenberg testified as to how, for

24  example, in the Reconstruction period, the U.S. Army acted to

25  restrict firearms with magazines or carrying more than ten

1    rounds.

2         THE COURT:  When was the Reconstruction period?  It

3    was after the Civil War.

4         MR. KELLY:  Correct, Your Honor.

5         THE COURT:  Yeah.  It was after the Fourteenth

6    Amendment?

7         MR. KELLY:  It was during the same period, Your Honor;

8    during the same time period.

9         THE COURT:  And why would I want to give -- in fact, I

10   think there was some discussion about this.  I thought maybe it

11   was in Bruen.

12        Why would I want to give any credit to -- to what the

13   U.S. Army was doing in their territories?  In fact, I think,

14   wasn't it Bruen that somewhat criticizes applying laws that

15   were regulations that were used in territories that --

16        MR. KELLY:  Your Honor, it goes to the history and

17   tradition of firearm regulations.  That may not be a statute.

18        THE COURT:  But, look.  If it's the State's position

19   that there's a long history and tradition to regulating

20   firearms, if that's your position, you don't need to present

21   any evidence.  I'll buy that.  I understand that.

22        Any time the State can get their -- the ability to

23   regulate something, they'll do it, and they've been regulating

24   firearms for a long time.  Right.  But that doesn't mean that

25   it's an analog to the particular statute that's at issue in the

 1    cases that I have before me.

 2           So the fact that, for example, in the territories in

 3    the Reconstruction period, the Army may not have wanted to have

 4    people to have this, that or whatever, that doesn't help me.

 5    It's not an analog.

 6           Yes, we know.  We know.  We know.  We don't have -- I

 7    don't need to take testimony of the fact that there's a history

 8    and tradition in the United States in regulating firearms.

 9    Right.  But if that were the test, if that were the test,

10    Heller would not have been decided the way it was, and neither

11    would McDonald, and neither would Bruen, and neither would

12    Caetano.

13           That's not the test.  But the test is, is there a

14    reasonable analog?  It doesn't have a twin.  It doesn't have to

15    be a twin.  But is there a reasonable analog in the history and

16    tradition of firearm regulation or arms regulation?  Because in

17    the Fouts case, we're dealing with billy clubs.

18           Is there an analog in the history and tradition of

19    regulating this type of weapon, this type of conduct, this type

20    of behavior?  That's what we're looking at.

21           So, anyway, all right.  Anyone else?

22           Yes.

23           MR. O'BRIEN:  Your Honor, just wanted to check.

24           With respect to Fouts and Rhode, what the Court's

25    requesting here, what effect does it have on kind of the

1    existing posture of those cases?

2         With respect to Fouts, the Plaintiffs have an

3    opposition brief due on the 22nd, currently.  And Rhode, there

4    hasn't been any order with respect to briefing.  So I'm just

5    trying to check and see what's the -- what is kind of the

6    process going forward.

7         THE COURT:  Thank you.  I appreciate your mentioning

8    that.

9         So here's what I'd like for you to do.  As I said,

10   Professor Cornell, Spitzer, and some of these other folks, they

11   have been working on this for a really long time.  So it really

12   shouldn't take them really long to be able to come up with

13   this -- with a survey that I've requested.  So I'm going to ask

14   that that be done within 30 days.  Okay.

15        I will then -- given that, I will then give each side

16   an opportunity to file a brief, and the reason why I use the

17   word "brief," it's because I want it to be brief.  Okay.  I'm

18   not going to -- I'm not going to require a 25-page maximum, but

19   I don't think it needs to be 25 pages for you to tell me what

20   the analogs are that I should apply in your case.  And I'll

21   give you 30 days to do that.  Then I'll give you 10 days to

22   each side to file a response.

23        Now, Mr. Kelly, you said you wanted to take somebody's

24   deposition, and I'm more than happy to give you a chance to

25   depose someone.  See what happens.

1          So who did you want to depose?

2          MR. KELLY:  Mr. Cramer, Your Honor.

3          THE COURT:  Mr. Cramer.  Whose witness is Mr. Cramer?

4          MS. BARVIR:  Clayton Cramer is the Duncan Plaintiffs'

5     declarant.  He was responding, I think, to Professor Roth.

6          I would think that if Your Honor is going to give the

7     State some time to depose our witness, we should also get the

8     chance to depose Mr. Roth.  He was also not disclosed at any

9     point prior to filing that.

10          THE COURT:  You each have 20 days to work out an

11     agreement to -- one, to depose Mr. Cramer, to depose Mr. Roth.

12     Okay.

13          MR. STAMBOULIEH:  Yes, Your Honor.  I'm with --

14     Stephen Stamboulieh for the Fouts Plaintiffs.

15          Plaintiff Cramer is also going to be our expert even

16     though we're outside the discovery deadline.  He has,

17     obviously, not been disclosed to them as an expert, just like

18     their witnesses were not disclosed to us as an expert.

19          I'm not really sure that he needs to be deposed since

20     he's just going to be responding to Mr. Spitzer's declaration

21     of what the -- what he's found the historical analogs to be.

22     So I'm not really sure, other than wasting money and time, what

23     a deposition would bring to them.

24          I did have one question, and I -- the page length for

25     the supplemental briefs, my understanding of the local rules is

1    that we were limited to 25 pages.  We have not filed motions to

2    strike.  We have not tried to burden the docket with anything.

3    I figured I would just ask the Court.

4          Do we have the same page limit that the Defendants do,

5    which I believe was 36 pages?  We're not going to burden --

6          THE COURT:  I don't think we need 36 pages, especially

7    if we're breaking it up.  Okay.  So we've got -- so we have

8    the -- so we have the historical survey.  Right.  I don't know

9    why you would need 36 pages.  So why would you need 36 pages to

10    tell me that the history and tradition of arm regulations --

11    I'm going to use the Fouts case -- for billys is consistent

12    with the history and tradition of that which has been provided

13    to me by way of that survey?  You don't need 36 pages;

14    25 pages, max, for any opening brief, and 10 pages for any

15    reply.

16          MR. STAMBOULIEH:  Let me go back one step, Your Honor.

17          They filed the supplemental brief that this Court

18    ordered.  I'm not sure the actual date; October 17th, I

19    believe.  And they took 36 pages.  Ours is coming up.  The

20    response is due on the 22nd.

21          So my question to the Court, and perhaps the Court

22    just answered me when you limited it to 25 pages.  The reason

23    that we might need to go a little bit beyond that page limit,

24    Your Honor, is they've raised this issue and said that there's

25    really been no historical analysis of the "dangerous" -- and

1   they corrected it to be "or unusual" instead of "dangerous and

2   unusual" language.

3          THE COURT:  Yeah.  I noted that.  I noted that.  I

4   found that to be rather distressing, even though in the -- in

5   the past, they have referred to some instances as "dangerous or

6   unusual."  But as Justice Alito pointed out in his concurring

7   opinion in Caetano, anyone with a ninth-grade education can

8   read the Heller opinion and determine that, in fact, it is

9   "dangerous and unusual," i.e., the conjunctive, not a

10  disjunctive.

11         So I don't know why that keeps popping up.  I mean, I

12  heard some supposedly distinguished legal scholar make that

13  same error, and I don't know whether that's intentional or not.

14  I hope that's not intentional.

15         MR. STAMBOULIEH:  Well, the Supreme Court said

16  "dangerous and unusual," Your Honor, so we're going to go with

17  what the Supreme Court --

18         THE COURT:  That's a good thing to do.

19         MR. STAMBOULIEH:  Right.

20         THE COURT:  That's a really good thing to do.

21         MR. STAMBOULIEH:  So my question, Your Honor -- and

22  I'm sorry for taking so long on this.

23         THE COURT:  It's okay.

24         MR. STAMBOULIEH:  We have briefed "dangerous and

25  unusual."  It takes us beyond 35 pages.  It's about 35 pages.

1    We've briefed it.  So to the extent the Court wants to see

2    it -- if the Court limits us to 25, we'll cut the "dangerous

3    and unusual" and just cite back "see Supreme Court.  See

4    Justice Alito" who references Caetano --

5            THE COURT:  Are you saying -- are you talking about

6    whether or not the weapon is dangerous and unusual, or are you

7    talking about the fact that the test that some folks referred

8    to it as "dangerous or unusual"?  You follow what I'm saying?

9    Are you talking about the weapon?  Because, certainly, I can

10   understand, particularly in your case, talking about whether or

11   not the weapon is or is not dangerous and unusual.

12           But I don't want to talk about whether or not the test

13   is "dangerous and unusual" or "dangerous or unusual."  That has

14   been decided by somebody who's way above my pay grade.  Okay.

15           MR. BECK:  Alan Beck for the Plaintiffs Fouts, Your

16   Honor.

17           Our briefing also indicates that the phrase "dangerous

18   and unusual" doesn't actually refer to any sort of intrinsic

19   property of an arm.  Historically, in Heller, the Court

20   references the tradition of prohibiting carrying "dangerous and

21   unusual" weapons.

22           And after we took a look at what that actually was,

23   that -- that typically refers to prohibitions on carrying in

24   certain manners, that were actually what terrified people.

25           So our position is that the possession of any weapon

1   cannot be justified simply through this historical tradition of

2   carrying dangerous and unusual weapons, because it doesn't

3   refer to types of weapons; it refers to certain types of

4   conduct with weapons.

5           And in light of the fact that the State's brief was

6   36 pages, we're just hoping to have an equal-length brief as

7   the brief they filed so we can demonstrate that to the Court,

8   Your Honor.

9           THE COURT:  And you've already prepared this, you're

10  telling me?

11          MR. BECK:  Yes, Your Honor.

12          THE COURT:  Okay.  File it.

13          MR. BECK:  Thank you.

14          THE COURT:  File it.  Thank you for making my life

15  that much more difficult, but whatever.  Okay.  File it.  I'm

16  done.

17          Okay.  So -- so --

18          MR. O'BRIEN:  Your Honor --

19          THE COURT:  You have 30 days to file the survey.  You

20  have 30 days after that to file any brief that you wish to

21  file.  And this goes for both sides.  Having looked at the

22  survey, having made your decisions, et cetera, you've got

23  30 days after that to file your brief.  You've got 10 days

24  after that to file any opposition that you want to in that

25  brief.  You have 20 days to depose Mr. Cramer and Mr. Roth.

1           Anything else?

2           MR. O'BRIEN:  Your Honor, if I may.  With respect to

3     the survey due in 30 days --

4           THE COURT:  Yes.

5           MR. O'BRIEN:  -- we would request, if possible, to

6     extend that to 60 days.

7           THE COURT:  I could probably do it -- if I had the

8     time and the resources, I think I could probably do that in

9     probably less than two weeks.  The State has unlimited

10    resources.  You can do this.  Trust me, you can do it.  I've

11    looked at it.  And if I had the resources and the time to do

12    it, I could do it in probably -- I could probably do it in a

13    week.

14          MR. O'BRIEN:  Well, you know, I understand where the

15    Court is coming from.

16          I think that there's a couple of issues.  One, we do

17    have a holiday period, and I think that our resources will be

18    limited at least, you know --

19          THE COURT:  Yeah.  I hear you.  I feel your pain.

20          MR. O'BRIEN:  -- to the last week, so I think to

21    expand beyond that, that takes away one week.

22          Also, as we note, even in Fouts, even, you know, in a

23    case where, you know, we provided a lot of that historical, you

24    know, information, it's still, I think with respect to what the

25    Court's asking for, is going to, you know, require, you know,

1   some additional time, especially in researching each of those

2   laws and determining whether or not they were challenged, and

3   what the -- what the disposition was in those cases.

4           THE COURT:  I would imagine, Mr. O'Brien, with all due

5   respect, that whoever came up with that -- I don't know,

6   whatever it is, 40 pages, 30 pages of statutes or whatever,

7   already has, pretty much, that information.  And if they

8   submitted it to the Court for purposes of persuading the Court,

9   they should also have the information to determine, for

10  example, whether or not that statute has been previously held

11  unconstitutional or constitutional, and should be able to

12  provide me with a citation.

13          I don't think 30 days is unreasonable.  I understand,

14  but my order remains.  All right.

15          Is there anything else?  I'm sorry.  I don't --

16          Yeah, go ahead.

17          MR. O'BRIEN:  One more, Your Honor.

18          You know, we would just also request with respect

19  to -- as you're allowing for -- I believe, in the Miller or the

20  Duncan cases, for deposing Professor Cramer.  I don't know what

21  Professor Cramer or Mr. Cramer will testify to with respect to

22  Fouts.  I would -- if we need to depose him, and I don't know

23  if they're -- you know, we want to have that opportunity to do

24  so if we need.

25          THE COURT:  Well, if you don't know what you want from

1    them in Fouts, what's the point of deposing him?

2         MR. O'BRIEN:  Well, we need to have an opportunity to

3    review his -- his declaration and --

4         THE COURT:  Was the declaration already filed or not?

5         MR. STAMBOULIEH:  The declaration is not filed yet,

6    Your Honor.  The declaration, I would think, is probably

7    substantially complete.  It's a rebuttal of Mr. Spitzer's

8    expert report.

9         THE COURT:  Tell you what we'll do.  Let's leave that

10   up in the air.  You take a look at it.  When you get the

11   opposition -- opposition, you get the declaration.

12        I've read Mr. Spitzer's declaration.  I'd say it's

13   probably one of the better ones I think that I've read.  If

14   after you read -- and, hopefully, you'll read it pretty

15   quickly.  But it isn't Mr. Cramer -- or is it Professor or

16   Mr. Cramer?  I hate to insult people.  But whatever it is he

17   says, if you think you need to depose him, let me know and let

18   me know quickly.

19        And if I decide that, in fact, that deposition is

20   necessary, I'll probably order that deposition to be taken on

21   very short notice, in which case I will allow you to take the

22   deposition of Mr. Spitzer.  And we'll take it from there.

23        We're going to get all this done, folks, in the time

24   period that I have set.

25        As I said, these are important cases to the State and

```
 1   to the Plaintiffs and to the -- to the People of the State of

 2   California.  So I want to move it along.  And that's that.

 3   Okay.  I really appreciate you all being here.

 4          MR. BRADY:  Regretfully, Your Honor, I have to raise

 5   one issue --

 6          THE COURT:  What's that?

 7          MR. BRADY:  -- about the Rhode case that may,

 8   unfortunately, complicate things.

 9          And that is, the Rhode case, the analysis is a little

10   bit different than these other cases which have to do with

11   whether these specific items, right, are protected.  Here we're

12   talking about -- I don't think that there's any dispute that

13   ammunition is protected, and sale of it.  But what I suspect

14   the State, and what we've seen in the Ninth Circuit briefing,

15   their position is going to be that background checks on any

16   arm, regardless, are going to be covered historically, because

17   Bruen suggested that background checks on carry license are

18   going to be protected.

19          Our position is, obviously, going to be ammunition is

20   different, right, because the State admits that this is the

21   very first time that ammunition background check has ever been

22   put in place.  So our position is going be that's treated

23   differently.

24          But I think that we need, potentially, a backup

25   argument to make in case the State's argument carries the day
```

```
 1    that background checks are generally okay or outside the scope
 2    of the Second Amendment, and that is to point out that even if
 3    background checks on ammunition are outside of the scope of the
 4    Second Amendment, at some point the burden on them becomes so
 5    great that --
 6              THE COURT:  Well, I already decided that.  Didn't I
 7    already decide in the ammunition case --
 8              MR. BRADY:  Yes.
 9              THE COURT:  -- that I thought that requiring people to
10    pay $19 every time they buy ammunition is unreasonable?
11              MR. BRADY:  Correct.
12              THE COURT:  I thought I decided that.
13              MR. BRADY:  You did, Your Honor.
14              THE COURT:  So we don't need to rehash stuff that
15    we've already gone through.
16              I think the question -- I think the question is:  Is
17    there any history or tradition that supports these background
18    checks?
19              Now, with that, Counsel, let me just say this.  The
20    Bruen case did say that background checks were okay, right,
21    with regard to the concealed carry.  Now, they also said,
22    however, that you can't impose unreasonable restrictions
23    because, you know, you can regulate the Second Amendment out of
24    existence by imposing regulations on something.  Right.
25              MR. BRADY:  Correct.  And that's what I was getting
```

1    at, Your Honor.  If you're saying that your previous findings

2    are the law of the case and the findings up to this point --

3            THE COURT:  I'm not changing my mind.

4            MR. BRADY:  Okay.  Then I -- so no --

5            THE COURT:  You know, but I do want to raise

6    something, by the way.  You know, I'm glad you mentioned that.

7    I'm going to take a wild guess that your position is that any

8    background check for buying ammunition is not reasonable.  I'm

9    putting words in your mouth.  Okay.

10           Now, I said that this regulation -- which is not what

11   the legislature had originally enacted; right?

12           MR. BRADY:  Correct.

13           THE COURT:  This -- the way the bureaucracy has now

14   regulated purchases of ammunition is unreasonable.  But I guess

15   what I'm offering to you folks to talk about is whether or

16   not -- and I don't expect that this will be fruitful, but I

17   have to offer it because I think it's possible that if there

18   was a consent decree that said that the regulation of

19   purchasing ammunition as set forth by the legislature in the

20   legislative enactment would be what would be required, my

21   analysis might be very different.

22           And so I'm thinking that that perhaps might be a way

23   to compromise a resolution of that case.  I just offer that as

24   an idea, folks, but you can do with it whatever you wish.

25           I've spent about as much time on this case as I'm

1    going to.  So I need to go, unless there's something really,

2    really, really important you need to address.

3                MR. BECKINGTON:  Your Honor, I apologize for testing

4    your patience.  I'll be very brief.

5                THE COURT:  Okay.

6                MR. BECKINGTON:  Just for the clarification of the

7    record, we did have a motion for reconsideration.  We did have

8    requests, I think, both in the Miller and in Fouts and Rhode

9    for the additional time to do discovery, to submit evidence,

10   et cetera.

11               Is the Court making a formal rule on those matters --

12               THE COURT:  Nothing -- nothing is -- the only thing

13   that has changed -- the only thing that has changed since I

14   issued my rulings on the cases that I've issued rulings is what

15   Bruen -- the Bruen opinion says, which is that we consider the

16   history and tradition of the firearm regulation or the arm

17   regulation.  Okay.  That's the only thing that has changed.

18               All right.  Thank you.  Thank you very much.

19               MR. O'BRIEN:  Just one other thing, Your Honor.

20   Apologize.  Is the Court going to be issuing a written order?

21   We did the best we can to kind of keep track of what you were

22   looking for with respect to the survey, but I just wanted to

23   clarify that as well.

24               THE COURT:  Well, you couldn't write that fast?

25               MR. O'BRIEN:  I tried, Your Honor.

1          MR. DILLON:  We have to summarize, Your Honor.

2          MR. O'BRIEN:  Yeah.

3          THE COURT:  We'll do our best.  I'll issue a written

4    order.  Thank you very much.  And I appreciate you all being

5    here.

6          (The proceedings were adjourned at 11:50 a.m.)

7                              -oOo-

8                    **C E R T I F I C A T E**

9          I, Abigail R. Torres, certify that I am a duly
     qualified and acting Official Court Reporter for the United
10   States District Court; that the foregoing is a true and
     accurate transcript of the proceedings as taken by me in the
11   above-entitled matter on December 12, 2022, and that the format
     used complies with the rules and requirements of the United
12   States Judicial Conference.

13   DATED:  December 20, 2022, San Diego.
     S/ABIGAIL R. TORRES
14   _____
     Abigail R. Torres, CSR No. 13700
15   U.S. Official Court Reporter

16

17

18

19

20

21

22

23

24

25