C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| VIRGINIA DUNCAN, et al., | Case No:  17-cv-1017-BEN-JLB |
|---|---|
| Plaintiffs, | **PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al., | |
| Defendant. | |

1

# TABLE OF CONTENTS

2
**Page**

3  Table of Contents ................................................................................... ii

4  Table of Authorities.............................................................................. iii

5  Introduction ...........................................................................................1

6  Argument ...............................................................................................1

7  I.  California Bans Magazines in Common Use for Lawful Purposes .....................2

8
9  II.  The State's Charts Merely Affirm What *Heller* Already Held—There Is No Enduring American Tradition of Banning Arms in Common Use for Lawful Purposes ...............................................................................................5

10
11      A.  Medieval England to Colonial America (1383 – 1689) .............................8

      B.  The Founding Era (1750 – 1790) ....................................................9

12
13          1.  Restrictions on Carry, Possession, or Use by Enslaved People and Racial Minorities ..................................................10

14          2.  Restrictions on Setting "Trap Guns" and "Spring Guns" ..............11

15          3.  Gunpowder Restrictions ................................................12

16          4.  Restrictions on Carry or Use While Engaged in Unlawful Activities................................................................13

17      C.  Antebellum America and the Reconstruction Era (1812 – 1877) .............14

18
19          1.  Restrictions on Blunt Weapons, Bowie Knives, and Similar Arms ....................................................................14

20          2.  Restrictions on Carry of Pistols and Other Arms.........................15

21          3.  Restrictions on Transfers to and Possession by Minors..................17

22          4.  Property Taxes and Occupational Taxes.....................................18

23          5.  Miscellaneous Restrictions on Brandishing, Shooting at Vehicles, and Using Certain Arms in Duels .................................19

24      D.  The Late-nineteenth and Early-twentieth Centuries (1878 – 1934)..........19

25  Conclusion.............................................................................................22

26

27

28

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Antonyuk v. Hochul*,
    No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6,
    2022) ..................................................................................................................6

*Antonyuk v. Hochul*,
    No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7,
    2022) ................................................................................................................19

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
    910 F.3d 106 (3d Cir. 2018) ..........................................................................3, 4

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..................................................................................*passim*

*Drummond v. Robinson Twp.*,
    9 F.4th 217 (3d Cir. 2021) .................................................................................1

*Duncan v. Becerra*,
    366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..........................................................3, 7

*Duncan v. Becerra*,
    970 F.3d 1133 (9th Cir. 2020) ..................................................................*passim*

*Duncan v. Bonta*,
    19 F.4th 1087 (9th Cir. 2021) .........................................................................4, 7

*Firearms Pol'y Coal., Inc. v. McCraw*,
    No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25,
    2022) .............................................................................................................5, 20

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) .............................................................................4

*Funk v. United States*,
    290 U.S. 371 (1933) .......................................................................................8, 19

*Fyock v. City of Sunnyvale*,
    25 F. Supp. 3d 1267 (N.D. Cal. 2014) ...............................................................3

iii

TABLE OF AUTHORITIES

17cv1017

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) ............................................................................ 4

*Gamble v. United States*,
    -- U.S. --, 139 S. Ct. 1960 (2019) ..................................................................... 17

*Hardaway v. Nigrelli*,
    No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3,
    2022) ................................................................................................................ 21

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ......................................................................... 4

*Jackson v. City & Cnty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) ............................................................................. 3

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ......................................................................... 3, 4

*Luis v. United States*,
    578 U.S. 5 (2016) ............................................................................................... 3

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. __, 142 S. Ct. 2111 (2022) .......................................................... *passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) .......................................................................... 3, 4

*Nunn v. State*,
    1 Ga. 243 (1846) .............................................................................................. 15

*S. Bay Rod & Gun Club, Inc. v. Bonta*,
    No. 22-cv-01461 (S.D. Cal. Dec. 12, 2022) .................................................... 5

*Scott v. Sanford*,
    60 U.S. (19 How.) 393 (1856) ......................................................................... 11

*United States v. Harrison*,
    2023 U.S. Dist. LEXIS 18397 (W.D. Okla. 2023) ................................... 10, 11

*United States v. Nutter*,
    No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug.
    29, 2022) ........................................................................................................... 19

*Worman v. Healey*,
   922 F.3d 26 (1st Cir. 2019) ...................................................................... 3

**Statutes**

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil
   Consequences Thereof, reprinted in Cumberland Gazette (Portland,
   MA), Nov. 17, 1786 ............................................................................... 13

Cal. Code Civ. Proc. § 1021.11 ................................................................ 5

Cal. Penal Code § 32310 ................................................................ 2, 5, 22

1881 Del. Laws 987, An Act Providing for the Punishment of Persons
   Carrying Concealed Deadly Weapons, ch. 548, § 1 .......................... 17

George Brooks Young, General Statutes of the State of Minnesota in
   Force January 1, 1889 (Vol. 2, 1888), Making, Selling, etc., Dangerous
   Weapons, §§333-34 ......................................................................... 17, 18

33 Hen. 8 c. 6, §1 ...................................................................................... 9

33 Hen. 8, ch. 6 §§ 1, 18 (1541) ............................................................... 8

4 Jac. I, ch. 1 (1606) ................................................................................. 8

Joplin Code of 1917, Art. 67, § 1201 ..................................................... 17

L. W. Moultrie, City Attorney, Charter and Ordinances of the City of
   Fresno, 1896, § 53 (1896) ................................................................. 18

1784 Laws of N.Y. 627, ch. 28 ............................................................... 12

1783 Mass. Acts 37 ............................................................................ 12, 13

1784 Mass. Acts 142 ................................................................................ 10

1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the
   Safe Keeping of Gun Powder, ch. 25, § 1 ....................................... 13

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other
   Game, and to Prevent Trespassing with Guns, ch. 539, § 10 ....... 11, 12

1786 N.Y. Laws 228 ................................................................................ 10

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the
    Sale and Carrying of Dangerous Weapons, ch. 195, § 1 ...........................17

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments,
    ch. 6 .........................................................................................................14

7 Rich. 2, ch. 13 (1383) ...............................................................................8

20 Rich. 2, ch. 1 (1396) ...............................................................................8

1923 S.C. Acts 221 ......................................................................................18

1 Stat. 271 (1792) (Militia Act).....................................................................10

1855-56 Tenn. L. 92, ch. 81 .........................................................................17

1897 Tex. Gen. Laws 221, An Act to Prevent the Barter, Sale And Gift of
    Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles
    Made of Any Metal Or Hard Substance to Any Minor Without the
    Written Consent of the Parent or Guardian of Such Minor..., ch. 155 ..................17

Thomas Wetmore, Commissioner, The Charter and Ordinances of the City
    of Boston: Together with the Acts of the Legislature Relating to the
    City 142-43 (1834), *available at The Making of Modern Law: Primary*
    *Sources* ....................................................................................................13

1785 Va. Statutes at Large 12 (12 Hening c. 1) ...........................................10

1891 W. Va. Code 915, Of Offences Against Peace, ch. 148 § 7.................17

1882 W. Va. Acts 421-22 .............................................................................17

W. Va. Code, ch. 148, § 7 ...........................................................................17

William H. Bridges, Digest of the Charters and Ordinances of the City of
    Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the
    Legislature Relating to the City, with an Appendix, at 44 (1867),
    Police Regulations of the State, Offences Against Public Peace, § 4747..........16, 17

**Other Authorities**

Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act
    to prohibit the carrying of concealed weapons by minors, § 1 ................18

Herbert L. Osgood, *The American Colonies in the Seventeenth Century*
    499-500 (1904)........................................................................................10

U.S. Const. amend. II ............................................................................*passim*

William English, Ph.D., 2021 *National Firearms Survey: Updated
    Analysis Including Types of Firearms Owned*, at 2 (May 13, 2022),
    https://bit.ly/3HaqmKv ............................................................................4

vii

TABLE OF AUTHORITIES

**INTRODUCTION**

The Supreme Court's recent decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), guides courts to "not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133  (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)).

Frankly, even remote resemblances are not within the grasp of any of the *hundreds* of proposed analogues the State has submitted to this Court. It saw fit to include English laws that pre-date Shakespeare, fire-safety laws, laws that barred the concealed carry (but not possession) of certain weapons, and puzzlingly, even an assortment of racist laws that only applied to slaves, free African Americans, and Native Americans. But the State *did not* include laws dating to the ratification of the Second or Fourteenth Amendments that banned the possession of an entire class of common arms based on their firing capacity—because, try as it might, the State could not find a single example of such a law.

Even after extended supplemental briefing was complete, this Court gave the State another opportunity to find any laws it considered proper analogues. Given that opportunity, the State has once again failed to present a "well established and representative" analogue to its modern-day ban on magazines able to hold over ten rounds of ammunition. *Id*. It has not—and cannot—"demonstrate that [the magazine ban] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The law violates the Second Amendment.

**ARGUMENT**

The Second Amendment provides that "the right of the people to keep and bear Arms … shall not be infringed." U.S. Const. amend. II. That right, the Supreme Court recently confirmed, necessarily "protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2118 (2022). And it "extends, prima facie, to all instruments that constitute

1

bearable arms, even those that were not in existence at the time of the founding."
*District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). In short, if an arm is
"typically possessed by law-abiding citizens for lawful purposes" today, the State
cannot ban it—full stop. *Id.* at 625-627. This must be so. For the state has no power to
ban what that the Constitution protects. Indeed, if the Second Amendment means
anything, it must mean that the government cannot prohibit "an entire class of 'arms'
that is overwhelmingly chosen by American society for [a] lawful purpose." *Id.* at 628.

Yet California has taken the extreme step of banning the acquisition and
possession of common magazines able to hold more than 10 rounds—items that the
State pejoratively (and arbitrarily) calls "large capacity magazines." Cal. Penal Code §
32310(a). Because the law is a flat ban on these arms, this case is a straightforward
one. Indeed, *Heller*'s exhaustive historical analysis establishes that "bearable arms"
can be prohibited only if they are  "dangerous and unusual." 554 U.S. at 627. On the
other hand, the State cannot ban arms that are "typically possessed by law-abiding
citizens for lawful purposes." *Id.* at 625. *Bruen* did not change this test for analyzing
arms bans. This case thus boils down to a single issue: Are the magazines that
California bans "typically possessed" for lawful purposes? As many courts, including
this one, have already held, the answer is irrefutably "yes." Under *Heller* (as elaborated
by *Bruen*), no further inquiry is required.

But even if this Court indulges the State's treasure hunt for historical analogues
to justify its modern restriction, it will quickly see that such a search is futile. There is
simply *no* "enduring American tradition" of banning arms in common use for lawful
purposes, like the magazines at issue here. *Id.* at 2135. California's modern magazine
ban is thus unconstitutional, and it should be permanently enjoined (again).

## I.    CALIFORNIA BANS MAGAZINES IN COMMON USE FOR LAWFUL PURPOSES

The textual right "to keep and bear Arms," of course, implies the right to *use*
them "for offensive or defensive action." *Id.* at 2134; *see also id.* at 2127, 2134-35
(Second Amendment protects the right to keep and bear arms "in common use," "in

2

case of confrontation," "for self-defense"). And the right to *use* arms implies the right to obtain and possess the ammunition and the components necessary to fire them. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). This includes, as this Court as already held, ammunition-feeding devices (like detachable magazines) necessary for the function of those firearms designed to use them. *Duncan v. Becerra* ("*Duncan III*), 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019); Order Re: Prelim. Inj. at 16 (June 29, 2017), ECF No. 28 ("Without protection for the closely related right to keep and bear ammunition magazines …, 'the Second Amendment would be toothless.'") (quoting *Luis v. United States*, 578 U.S. 5, 27 (2016)). It is thus no surprise that every appellate court to have considered the issue has understood that magazines are "arms" within the plain meaning of the Second Amendment.[1]

What's more, the record shows that the magazines that California bans "are used for self-defense by law-abiding citizens. And they are common." *Duncan III*, 366 F. Supp. 3d at 1143; *see, e.g.*, Barvir MSJ Decl. Ex. 2 at 30-32; Ex. 12 at 295, Ex. 56, Ex. 58 at 846-48; *see generally* Barvir MSJ Decl. Exs. 52-57, 62. Recall, magazines over ten rounds come standard with many of the most popular firearms on the market. Helsley Decl. Ex. 10 at 3-4; Barvir Suppl. Br. Decl., Ex. 31 (ECF No. 132-5); *id.* at Ex. 34 at 240-42, Ex. 39 at 314-15 (ECF No. 132-6); *see also Duncan III*, 366 F. Supp. 3d at 1145 (discussing, among others, the popular "Glock 17, which is designed for, and

---

[1] *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 36 (1st Cir. 2019) (assuming without deciding that a magazine restriction implicates the Second Amendment); *see Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.* ("*ANJRPC*"), 910 F.3d 106, 116 (3d Cir. 2018) ("Because ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment."); *N.Y. State Rifle & Pistol Ass'n v. Cuomo* ("*NYSRPA*"), 804 F.3d 242, 257 (2d Cir. 2015) ("[W]e proceed on the assumption that these laws [bans on "assault weapons" and "large capacity magazines"] ban weapons protected by the Second Amendment."); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015) ("[T]he court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns.")
In fact, only the Fourth Circuit has ruled that magazines over ten rounds are not protected—though not because they are not arms, but because the court held they are most useful in military service. *Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017).

3

typically sold with, a 17-round magazine" and the AR-15, of which more than 5 million have been sold since the 1980s and which "are typically sold with 30-round magazines"). Tens of millions of these magazines are in the hands of Americans today. Hanish Decl. ¶ 18; Helsley Decl. ¶ 11; Barvir Suppl. Br. Decl. Ex. 40 at 362 (ECF No. 132-6). And they account for "approximately half of all privately owned magazines in the United States." *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1142 (9th Cir. 2020); *Duncan v. Bonta* ("*Duncan V*"), 19 F.4th 1087, 1097 (9th Cir. 2021). Under any reasonable measure, they are common. *NYSPRA*, 804 F.3d at 255-57 ("large-capacity magazines" are "in common use" based on even the most conservative estimates).

And not only are they "common," magazines over ten rounds are typically possessed for lawful purposes. Renowned firearms historian, Stephen Helsley, explains that firearms and magazines over ten rounds were developed for self- and home-defense. Helsley Decl. Ex. 10 at 7-9. Manufacturers market them for those purposes. Hanish Decl. ¶¶ 18-20, 26-29. And civilians regularly choose them to increase their chances of staying alive in violent confrontations. Helsley Decl. ¶ 11, Ex. 10 at 5; Barvir Suppl. Br. Decl. Ex. 39 at 307-09 (ECF No. 132-6). Indeed, a recent survey of gun owners found that 62.4% of those polled own magazines over ten rounds for home defense. William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 2 (May 13, 2022), https://bit.ly/3HaqmKv. Other reasons cited include lawful activities like target shooting (64.3%), hunting (47%), and defense outside the home (41.7%).

All this likely explains why nearly every appellate court that has analyzed the issue has found, or was willing to assume, that bans on magazines over ten rounds burden conduct protected by the Second Amendment. *See, e.g.*, *Fyock v. Sunnyvale*, 779 F.3d 991, 998-99 (9th Cir. 2015); *ANJRPC*, 910 F.3d at 116; *NYJRPC*, 804 F.3d at 255; *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *but see Kolbe*, 849 F.3d at 137-38 (standing alone in holding that "large capacity magazines" are unprotected

4

1  because they are best suited for "military purposes").

2      And though it conveniently takes a different position here to argue the

3  magazines at issue are unprotected by the Second Amendment, Def.'s Suppl. Br. 16-17

4  (ECF No. 118), even the State has agreed that laws restricting magazines restrict

5  *firearms*. In a challenge to California Code of Civil Procedure section 1021.11 recently

6  before this Court, the State expressly argued that "there is nothing indefinite about

7  applying section 1021.11 to a suit challenging that law [section 32310]: The large-

8  capacity magazines ban appears in the Penal Code's title on 'Firearms,' in the division

9  on 'Special Rules Relating to Particular Types of Firearms or Firearm Equipment,' and

10  a restriction on the ammunition that may be used in a firearm is a restriction on

11  firearms." Intervenor-Defendants' Supplemental Br. 14, *S. Bay Rod & Gun Club, Inc.*

12  *v. Bonta*, No. 22-cv-01461 (S.D. Cal. Dec. 12, 2022) (ECF No. 32).

13      In short, it is well documented and almost universally accepted that magazines

14  over ten rounds are commonly possessed in the United States for lawful purposes—

15  including the core lawful purpose of self-defense. They are thus protected by the

16  Second Amendment, and they cannot be banned.

17  **II.   THE STATE'S CHARTS MERELY AFFIRM WHAT *HELLER* ALREADY HELD—
      THERE IS NO ENDURING AMERICAN TRADITION OF BANNING ARMS IN
18      COMMON USE FOR LAWFUL PURPOSES**

19      At the very least, because California restricts the acquisition and possession of

20  arms in common use for lawful purposes—conduct that "the Constitution

21  presumptively protects"—the State must "justify its regulation by demonstrating that it

22  is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.

23  Ct. at 2126, 2130. "Only then may [this] court conclude that" the conduct Plaintiffs

24  wish to engage in "falls outside the Second Amendment's 'unqualified command.'" *Id.*

25  Try as it might, California has not—because it cannot—meet this heavy burden.

26      As explained in Plaintiffs' Supplemental Brief, *Bruen* demands that the State

27  present "well established and representative" historical analogues. *Bruen*, 142 S. Ct. at

28

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

2133.[2] While the State need not identify a "historical twin," it must present a genuine analogue that is "relevantly similar" to the modern restriction it seeks to defend. *Id.* at 2122. The *Bruen* Court did not establish all the ways proposed analogues may be "relevantly similar," but it explained that "*Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). When looking at the "how," courts should ask whether a proposed analogue imposes a "comparable burden." *Id.* To prevent this analysis from devolving into just another way to balance burdens and benefits—a test *Bruen* explicitly rejected—courts should consider whether the challenged modern law and the proposed historical analogue impose a similar *type* of burden (not just a similarly *severe* burden) on the right of armed self-defense. And when looking at the "why," courts should consider "whether th[e] burden is comparably justified," always mindful that historical laws enacted for one purpose cannot be used as a pretext to justify a modern law that was enacted for entirely different reasons. *Id.*

In short, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). But this is the sort of strained comparison-making that nearly all of the State's proposed historical analogues rely on.

In response to this Court's request for a compendium of purportedly relevant historical analogues, the State filed two charts, listing over 300 laws dating all the way back to 1300s England. Survey of Relevant Statutes (Pre-Founding-1888), ECF No.

---

[2] This, of course, assumes the State even has a right to engage in argument by analogy. For the reasons explained in Plaintiffs' supplemental brief, it should not be here. Pls.' Suppl. Br. 37-41 (ECF No. 132). In short, firearms able to fire many rounds before reloading are not a modern technological breakthrough; repeating arms pre-date the Founding by hundreds of years, and they became common during and just after the Civil War. Yet *not one law* the State cites restricted firearm capacity. "When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly* similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

139-1; Survey of Relevant Statutes (1889-1930), ECF No. 139-2. Consisting of a remarkably broad sampling of historical weapons regulations—from Colonial-era gunpowder laws to 20th-century machine-gun restrictions—the State's charts appear designed to construct a narrative that the government has always been free to regulate any weapon it considers "dangerous or unusual" in any way it chooses.

But, at best, the State's assemblage of historical laws simply affirms what Supreme Court precedent already tells us: While there may be a tradition of regulating "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, there is no historical justification for a flat ban on arms that are "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625. To the contrary, as both this Court and every member of the Ninth Circuit to engage with the historical record has concluded, history and tradition establish the complete *absence* of "a well-established and representative historical analogue." *See Duncan III*, 366 F. Supp. 3d at 1149-53; *Duncan IV*, 970 F.3d at 1147-51 (after conducting a "long march through the history of firearms," the panel found no evidence that magazine capacity restrictions have *any* historical pedigree); *Duncan V*, 19 F.4th at 1156-59 (Bumatay, J. dissenting).

As Judge Bumatay observed in his dissent en banc:

> Not only is California's ban not historically longstanding, but it also **differs in kind** from the regulatory measures mentioned in *Heller*. Regulations on possession by people dangerous to society, where a firearm may be carried, and how firearms may be exchanged, *see Heller*, 554 U.S. at 626-27, **are about the manner or place of use or sale or the condition of the user**. California's ban, on the other hand, is much more like a "prohibition on an entire class of 'arms' that is overwhelmingly chosen by American society" for home defense. *Id.* at 628. Also, like the ban in *Heller*, California's ban extends "to the home, where the need for defense of self, family, and property is most acute." *Id.*

*Duncan V*, 19 F.4th at 1158-59 (Bumatay, J. dissenting) (double emphasis added). The same can be said of nearly every law the State includes in its charts of allegedly relevant historical laws.

Plaintiffs' objections to the inclusion of each of the State's proposed analogues

7

are laid out in Plaintiffs' Disagreements Re: Defendant's Survey of Relevant Statutes, ECF No. 139-3.[3] Plaintiffs explain those objections further here.

### A.      Medieval England to Colonial America (1383 – 1689)

In describing the Second Amendment's history-and-tradition-based analysis, the *Bruen* Court cautioned that not all history is created equal: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S. Ct at 2136. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," the *Bruen* Court gave very little weight to evidence of medieval English and Colonial American restrictions that did not take hold in post-Revolution America. *Id.* (citing *Heller*, 554 U.S. at 634). As the Court explained, "[s]ometimes, in interpreting our own Constitution, 'it [is] better not to go too far back into antiquity for the best securities of our liberties,' [citation omitted] *unless evidence shows that medieval law survived to become our Founders' law*." *Id.* (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)) (emphasis added).

Even still, just as it began its supplemental brief, the State begins its chart with a handful of English laws pre-dating the Founding by hundreds of years. ECF No. 139-1, at 1 (citing 7 Rich. 2, ch. 13 (1383) (banning possession of launcegays); 20 Rich. 2, ch. 1 (1396) (same); 33 Hen. 8, ch. 6 §§ 1, 18 (1541) (banning possession of crossbows, handguns, hagbutts, and demy hakes); 4 Jac. I, ch. 1 (1606) (same)). And just as it did in its supplemental brief, the State includes a 1541 English law restricting the keeping of handguns that *Bruen* itself already considered. The *Bruen* Court looked at this very law and rejected it, explaining that the justification for the 1541 restriction was not comparable to concerns about public safety often used to justify modern regulations

_____

[3] Plaintiffs do not concede that the State has accurately described the laws it listed in each chart because the State has not provided Plaintiffs with either the full text of most of these laws or a source from where the State obtained them.

today. The Court observed that:

> Henry VIII's displeasure with handguns arose not primarily from concerns about their safety but rather their inefficacy. Henry VIII worried that handguns threatened Englishmen's proficiency with the longbow—a weapon many believed was crucial to English military victories in the 1300s and 1400s, including the legendary English victories at Crécy and Agincourt.

142 S. Ct. at 2140. The Court also highlighted a more fundamental issue with the English law banning handguns—it is "inconsistent with *Heller'*s historical analysis":

> In any event, lest one be tempted to put much evidentiary weight on the 1541 statute, it impeded not only public carry, but further made it unlawful for those without sufficient means to "kepe in his or their houses" any "handgun." 33 Hen. 8 c. 6, §1. ***Of course, this kind of limitation is inconsistent with Heller's historical analysis*** regarding the Second Amendment's meaning at the founding and thereafter. ***So, even if a severe restriction on keeping firearms in the home may have seemed appropriate in the mid-1500s, it was not incorporated into the Second Amendment's scope***.

*Id.* at n.10 (double emphasis added).

In short, the Supreme Court has already rejected the very history the State now submits to this Court. That precedent is binding.

**B.    The Founding Era (1750 – 1790)**

Moving to the Founding—the only period that *Bruen* makes unmistakably clear is relevant to the analysis—the State's charts fall woefully short of making a case for a an "enduring American tradition" of "relevantly similar" laws. 142 S. Ct. at 2132. Citing just *ten* American laws adopted between 1750 and 1790 (and only five more laws adopted by the start of the 19th century), the State yet again "fails to point to a single Founding-era statute that is even remotely analogous to its magazine ban." *Duncan V*, F.4th at 1159 (Bumatay, J. dissenting). Indeed, the State remains unable to identify even one law that flatly bans possession of an entire class of arms—let alone a law that targets arms for prohibition based on their firing capacity.

And even though Judge Bumatay pointed to these laws when this case was heard en banc, the State did *not* include the arguably "closest Founding-era analogues to

9

ammunition [or firing capacity] regulations"—those "laws *requiring* that citizens arm themselves with particular arms and a specific *minimum* amount of ammunition." *Id.* (citing 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, *The American Colonies in the Seventeenth Century* 499-500 (1904) (explaining that states often required citizens to equip themselves with adequate firearms and ammunition, including between 20 and 24 cartridges *at minimum*). This is likely because the existence of such laws weighs *against* the State's claim that its modern magazine ban is constitutional, *not in favor of it*.

That said, Plaintiffs will address the State's proposed Founding-era analogues in turn. The State's charts include four types of 18th-century laws: (1) restrictions on carry, possession, or use by enslaved people and racial minorities; (2) restrictions on "trap guns"; (3) gunpowder-storage regulations; and (4) restrictions on the carry or use of certain weapons while engaged in unlawful behavior. None of the proposed laws is remotely similar to the State's flat ban on an entire class of arms typically possessed for lawful purposes.

### 1.    Restrictions on Carry, Possession, or Use by Enslaved People and Racial Minorities

The State's charts do not include a single founding-era law that bans the possession of any class of arms, let alone a class of arms in common use. Instead, the State relies on several laws banning the carry, possession, or use of arms by enslaved people, Indians, and other racial minorities. ECF No. 139-1, at 1, 3-7, 13, 17-18 (citing laws of New York (1664), Virginia (1792), Delaware (1797), Kentucky (1798), and Georgia (1860), as well as the territories of Mississippi (1799, 1804), Indiana (1804), Missouri (1818), Arkansas (1835), North Carolina (1846), and the city of Harrodsburg, KY (1859)). The State's "reliance on these laws is concerning, but in any event, they do not support the constitutionality of" California's modern magazine ban. *United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397, at *41 (W.D. Okla. 2023) (declaring

10

1  federal ban on possession of firearms by marijuana users unconstitutional).

2       Indeed, it should go without saying that slave codes and explicitly racist laws

3  enacted to disarm classes of marginalized people provide no legitimate analogue for

4  modern arms bans. Otherwise, the *Bruen* Court would have mentioned them even once,

5  but the Court rightly ignored them. Aside from being repugnant to American (and

6  Californian) values of liberty, equality, and human dignity,

7

8           historical restrictions on slaves and Indians provide *no*
            insight into the constitutionality of [a modern gun
            restriction]. That is because neither slaves nor Indians

9           were understood to be a part of the "political community"
            of persons protected by the Second Amendment. Slaves,

10          of course, were not made a part of the political
            community until the post-Civil War amendments and

11          thus did not hold any Second Amendment rights—a point
            infamously, yet explicitly, made by *Dred Scott v.*

12          *Sanford* itself. Indians, likewise, were also generally not
            considered to be a part of the political community

13          protected by the Second Amendment.

14  *Id.* (citing *Scott v. Sanford*, 60 U.S. (19 How.) 393, 404 (1856)) (emphasis added).

15  "[H]istorical restrictions on these groups [thus] provide little insight into the meaning

16  of the Second Amendment because the ratifying public would not have understood

17  those groups to be protected by" it. *Id.* at *41-42.

18                 **2.    Restrictions on Setting "Trap Guns" and "Spring Guns"**

19       "Trap guns" and "spring guns" were devices rigged to fire without the presence

20  of a person. Spitzer Decl. ¶ 50. The State has claimed that laws restricting the use of

21  the devices in early America provide relevant historical support for its modern

22  magazine ban because they "originated during the colonial period" and "were enacted

23  due to the threat posed to innocent life." Def.'s Suppl. Br. 38-39 (citing Spitzer Decl.

24  ¶¶ 50-53, Ex. F). But the State's charts cite only *one* Founding-era restriction on the

25  setting of "trap guns." ECF No. 139-1, at 2 (citing 1763-1775 N.J. Laws 346, An Act

26  for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns,

27  ch. 539, § 10). It was not until the late 19th century that such restrictions appeared

28  elsewhere. ECF No. 139-1, at 21, 31, 35, 49 (laws from the territory of Utah (1865), as

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

well as Minnesota (1873), Michigan (1875), and Vermont (1884)); ECF No. 139-2, at 6, 9 (laws from North Dakota (1891, 1895)). They were thus enacted far too long after the Founding to be given much weight. *Heller*, 554 U.S. at 634-35; *Bruen*, 142 S. Ct. at 2136 (cautioning against "giving postenactment history more weight than it can bear").

More importantly, these laws did not ban any class of arms. Rather, they regulated the *manner* of using them. That is, they banned setting loaded, unattended guns to prevent unintended discharges. Indeed, the only Founding-era "trap gun" restriction the State lists, ECF No. 139-1, at 2, barred only the *setting* of "any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance," 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10. What's more, according to the State, these laws were enacted "due to the threat posed to innocent life," Def.'s Suppl. Br. 39 (citing Spitzer Decl. ¶ 50), both human and animal. But just about any gun restriction can be vaguely described as necessary to promote public safety or protect life. "Trap gun" restrictions were necessary because setting loaded, unattended guns to discharge automatically imposes an incredibly specific threat to life that is entirely unrelated to violent crime.

Because early American "trap gun" laws are not comparable to California's magazine ban—either in terms of the type of burden they imposed or the government's justification for that burden—they are not constitutionally relevant analogues.

### 3.   Gunpowder Restrictions

Next, the State's charts cite two Founding-era city laws regulating gunpowder storage and possession. ECF No. 139-1, at 3 (citing 1783 Mass. Acts 37, § 2 (prohibiting the possession of firearms loaded with gunpowder in the city of Boston); 1784 Laws of N.Y. 627, ch. 28 (prohibiting the keeping of more than 28 pounds of gunpowder in New York City)).[4] But these laws were enacted, as the State has

---

[4] A handful of other jurisdictions adopted similar laws in the mid-1800s. ECF No. 139-1, at 7, 13, 17 (laws from Maine (1821), Chicago, IL (1851), and St. Paul, MN

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

admitted, Def.'s Suppl. Br. 38 (citing Cornell Decl. ¶¶ 41, 45), to prevent catastrophic explosions and fires in town limits and near powder houses.[5] They were necessary because of the highly combustible and unstable nature of loose gunpowder, which is not a modern concern. They were not enacted to combat crime, in general, or mass killings, more specifically. And, more importantly, most such laws regulated only the *manner* of keeping of gunpowder; they did not completely ban the possession of any common arm. These distinctions are key because, as explained above, the State's proposed historical analogues must be similar in both type and justification. *Bruen*, 142 S. Ct. at 2133.

As the *Heller* Court explained in the context of analyzing D.C.'s handgun ban, Founding-era gunpowder restrictions "did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. [Citation] Nothing about those fire-safety laws undermines our analysis; *they do not remotely burden the right of self-defense as much as an absolute ban on handguns.*" 554 U.S. at 632 (discussing the dissent's reliance on early American gunpowder restrictions) (emphasis added). They likewise "do not remotely burden the right of self-defense as much as an absolute ban on" common ammunition magazines.

### 4.    Restrictions on Carry or Use While Engaged in Unlawful Activities

Finally, that State's charts include two founding-era laws from Massachusetts and the territory of Ohio that prohibited the carry of certain weapons while engaged in or intending to engage in unlawful activities. ECF No. 139-1, at 3 (citing An Act to

---

(1858)); *see also id.* at 7, 44 (laws from Connecticut (1836) and the territory of Washington (1881) authorizing local cities to regulate gunpowder storage).

[5] *See, e.g.*, ECF No. 139-1, at 3 (citing 1783 Mass. Acts 37 (The preamble reads: "Whereas the depositing of loaded arms in the houses of the town of Boston, is *dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in said town*.") (Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City 142-43 (1834), *available at The Making of Modern Law: Primary Sources*)); *id.* at 7 (citing 1821 Me. Laws 98, An Act *for the Prevention of Damage by Fire*, and the Safe Keeping of Gun Powder, ch. 25, § 1).

13

1    Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof,

2    reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1; 1788-1801 Ohio

3    Laws 20, A Law Respecting Crimes and Punishments, ch. 6). Throughout the

4    nineteenth century, these laws spread to New Jersey (1799, 1877), Maryland (1811),

5    Georgia (1816), Illinois (1845), California (1853), Indiana (1855), Florida (1868),

6    Massachusetts (1873), Arkansas (1875), and Colorado (1876), as well as the territories

7    of Nebraska (1858), Idaho (1875), and Wyoming (1876). ECF No. 139-1, at 4-6, 12,

8    14, 16, 24, 30, 33, 35-37.

9        Once again, these laws are not "relevantly similar" to California's modern

10   magazine ban because they did not ban any class of arms. Rather, they regulated the

11   *manner* of using them; specifically, they restricted only the carry or use of weapons *in*

12   *the commission of crimes*, like assault, burglary, and rioting, or when being arrested

13   under a warrant. To the extent that such laws burden the right to keep and bear arms at

14   all, any burden is fundamentally different from a flat ban on standard magazines

15   typically possessed for lawful purposes.

16       **C.    Antebellum America and the Reconstruction Era (1812 – 1877)**

17

18       **1.    Restrictions on Blunt Weapons, Bowie Knives, and Similar Arms**

19       By far, the most oft-cited type of law the State relies on are those laws adopted

20   throughout the 1800s regulating certain sharp instruments (including "Bowie knives,"

21   "Arkansas toothpicks," "sword canes," "dirks," and "daggers"), "blunt weapons"

22   (including "bludgeons," "billies," "clubs," "slungshots," and "sandbags") and

23   concealed weapons, generally. But as the State has admitted, "[m]ost of these

24   restrictions targeted the carrying of such" items, not the mere acquisition or possession

25   of them for lawful purposes. Def.'s Suppl. Br. 41 (citing Spitzer Decl. Ex. E at 24).

26       By Plaintiffs' count, the State lists only *two* laws that restricted the possession of

27   such arms before the end of the Reconstruction era. *See* ECF No. 139-1 (laws from

28   Georgia (1837) and New York (1866)). The oldest of the two was an 1837 law from

14

Georgia that banned the sale and possession of "Bowie or other kinds of knives," as well as "pistols, dirks, sword-canes, [and] spears." *Id.* at 8-9 (citing Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838)). Shortly after its adoption, however, the Georgia Supreme Court held that the entire law (except for one section barring concealed carry) violated the Second Amendment. *Nunn v. State*, 1 Ga. 243 (1846).

What's more, David Kopel, a prolific legal scholar whose work was cited favorably in *Bruen*, recently published a detailed evaluation of Reconstruction-era Bowie knife laws. He concluded:

> ***At the end of the 19th century, no state prohibited possession of Bowie knives***. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.

> Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century…. As with handguns, ***the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives***…. The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors.

Barvir Suppl. Br. Decl. Ex. 38 at 304 (ECF No. 132-5) (double emphasis added).

So, once again, the State relies on historical laws restricting just the *manner* of carrying arms in public, not their possession or even use. At best, the State has shown that concealed carry was disfavored in Reconstruction-era America. But such evidence was not enough to justify modern-day bans on concealed carry in *Bruen*, so it is hard to see how such enactments could bear the weight of California's flat ban on the possession of commonly possessed magazines here.

### 2.      Restrictions on Carry of Pistols and Other Arms

According to the State's charts, Antebellum America also saw a rise in the number of regulations on the manner of carrying arms, including pistols, in public (e.g., while concealed carry was restricted, open carry was generally allowed). *See,*

15

1  *e.g.*, ECF No. 139-1, at 5, 7-30, 35-37 (laws from Louisiana (1813, 1842, 1855, 1870),

2  Massachusetts (1836), Arkansas (1837), Tennessee (1837, 1869, 1871), Virginia

3  (1838), Alabama (1839, 1841, 1868, 1873, 1876, 1877), Maine (1841, 1847), Ohio

4  (1859), California (1864), Georgia (1870, 1873), D.C. (1871), Texas (1871), as well

5  as the territories of Florida (1839), New Mexico (1853), Colorado (1862, 1867),

6  Montana (1864), and South Dakota (1877)).

7       Like restrictions on gunpowder storage and setting "trap guns," these early

8  restrictions on public carry are not remotely analogous to California's magazine ban.

9  Nineteenth-century carry laws regulated only the *manner* of carrying certain arms in

10  public. And several such laws even included express exceptions for self-defense or

11  while traveling. ECF No. 139-1, at 11-12, 35-39 (laws from Alabama (1841, 1876,

12  1877), Maine, (1841), and Mississippi (1878), as well as the city of Boise, ID (1979)).

13  California's modern magazine ban, on the other hand, restricts the mere *possession* of

14  magazines even *in the home* for *self-defense* purposes. The burdens imposed are thus

15  wildly different—even if it might be said that they impose an equally severe a burden

16  on the ability to engage in self-defense at any given moment.

17       Perhaps the closest the State comes to identifying a relevant historical analogue

18  is an 1867 Memphis law that restricted not just the concealed carry of "pocket pistols,"

19  but also prohibited the sale of such arms. ECF No.139-1, at 24 (citing William H.

20  Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to

21  1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an

22  Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public

23  Peace, § 4747). But this late law is far from persuasive. On the contrary, Supreme

24  Court precedent is clear that courts should "not stake [their] interpretation of the

25  Second Amendment upon a single law, in effect in a single city, that contradicts the

26  overwhelming weight of other evidence regarding the right to keep and bear arms for

27  defense.'" *Heller*, 554 U.S. at 632; *see also Bruen*, 142 S. Ct. at 2153 (quoting *Heller*

28  with approval).

What's more, *Bruen* warned that courts should refrain from "giving postenactment history more weight than it can rightly bear." 142 S. Ct. at 2136. "[T]o the extent later history contradicts what the text says," as the State's Reconstruction-era concealed carry bans do, "the text controls." *Id.* at 2137 (citing *Gamble v. United States*, -- U.S. --, 139 S. Ct. 1960, 1987 (2019) (Thomas, J., concurring)).

### 3.  Restrictions on Transfers to and Possession by Minors

In the mid-19th century (and well into the 20th century), several states and cities began adopting laws regulating transfers of weapons to and concealed carry by minors. ECF No. 139-1, at 16-17, 24, 32, 35-36, 41-43, 45-46, 55 (Tennessee (1856, 1873), Georgia (1876), Alabama (1877), Delaware (1881), Nevada (1881), Illinois (1881), West Virginia (1882, 1891), Kansas (1883), Minnesota (1888), as well as the cities of Herrodsburg, KY (1859) and Memphis, TN (1867)); ECF No. 139-2, at 10, 12, 15, 18-19, 23-25 (laws from Texas (1897), New York (1900, 1911), and South Carolina (1923), as well as the cities of Fresno, CA (1896) and Joplin, MO (1917)). Yet again, the State's proposed analogues miss the mark.

By and large, these laws regulated the transfer of arms to, *but not the possession of arms by*, children.[6] Some included exemptions for common arms possessed for lawful purposes, like hunting guns, self-defense guns, and ordinary pocket knives.[7] While others allowed for transfers to minors with the consent of parents, guardians, or the magistrate.[8] And others still restricted only concealed carry in public. *See, e.g.*,

---

[6] *See, e.g.*, 1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1; Joplin Code of 1917, Art. 67, § 1201; 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7; 1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.

[7] *See, e.g.*, 1855-56 Tenn. L. 92, ch. 81 (hunting guns); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State, Selling Liquors or Weapons to Minors, § 4864 (guns for self-defense); 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 (pocket knives).

[8] *See, e.g.*, George Brooks Young, General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 (magistrate consent); 1897 Tex. Gen. Laws 221, An Act to

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1).

But even if these historical laws did not give way to the minor's rights to possess common arms for lawful purposes, like hunting and self-defense, California is not simply regulating the transfer of magazines over ten rounds to minors without their parents' consent. *It is banning the right of law-abiding **adults** to acquire and **possess** these common magazines for all purposes.* Like all the other laws the State cites, the vast majority of the historical minor restrictions impose no where near the sort of burden California's modern magazine ban imposes. They are not relevantly similar, and they should be given no weight.

### 4.    Property Taxes and Occupational Taxes

As the State's charts show, in the most of the years just before the Civil War and during Reconstruction, a handful of states also levied personal property taxes on certain classes of arms, ECF No. 139-1, at 12, 14-16, 22, 27, 33-34 (laws from Mississippi (1841, 1850, 1854, 1856, 1871), Alabama (1851, 1867, 1875), North Carolina (1866), and Virginia (1874)), and two states imposed occupational taxes on the sellers of such arms, ECF No. 139-1, at 8, 32, 33, 45, 48, 50 (laws from Alabama (1837, 1874, 1875)), and Georgia (1882, 1884, 1886)). Like dozens of other laws the State relies on, these tax laws are not analogous to California's modern magazine ban.

While taxes do burden the right to keep and bear arms by making the right more expensive to exercise, such a burden is in no way comparable (in either kind or severity) to a flat ban on the possession of an entire class of arms. What's more, these

---

Prevent the Barter, Sale And Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal Or Hard Substance to Any Minor Without the Written Consent of the Parent or Guardian of Such Minor. . ., ch. 155 (parental consent); L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896, at 37, § 53 (1896) (same); 1923 S.C. Acts 221 (parental consent for children over 13 years old).

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

17cv1017

laws—adopted in just five states—appear from the State's charts to be merely outliers, not evidence of a "well-established" tradition of firearm regulation in America.

### 5.   Miscellaneous Restrictions on Brandishing, Shooting at Vehicles, and Using Certain Arms in Duels

Finally, in the mid-to-late 1800s, California, Mississippi, and Indiana, as well as the territory of Washington, took steps to curb the brandishing or exhibition of weapons in a threatening, rude, or angry manner. ECF No. 139-1, at 9, 15, 18-19, 25, 34. Indiana banned shooting at vehicles. *Id.* at 42. And California, Nevada, and the territory of Montana, adopted laws enhancing the penalties for using certain weapons in fights or duels. *Id.* at 15, 19, 39. None of these laws are constitutionally relevant, because not one of them bans the possession of any arm, let alone an entire class of arms in common use for lawful purposes. And *Bruen* instructs that the 19th-century laws of the Western territories are of little value because they are "most unlikely to reflect 'the origins and continuing significance of the Second Amendment." 142 S. Ct. at 2154.

### D.   The Late-nineteenth and Early-twentieth Centuries (1878 – 1934)

As discussed above, the Supreme Court gave very little weight to laws that long pre-dated the Founding, finding them only relevant where evidence shows that they survived to become the laws of the Founders. 142 S. Ct at 2136 (citing *Funk*, 290 U.S. at 382). The Court considered 20th century history even *less* important, relegating its discussion of the laws of the period a mere footnote. *Id.* at 2154, n.28. Declining to even consider such evidence, the Court explained that like laws of the late-19th-century, the "20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment *when it contradicts earlier evidence*." *Id.* (emphasis added). Indeed, based on *Bruen*'s clear guidance, the first wave of post-*Bruen* Second Amendment decisions have rebuked calls to rely on evidence of 20th century regulations entirely. *See, e.g.*, *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127 (N.D.N.Y. Nov. 7, 2022); *United States*

19

*v. Nutter*, No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding that laws originating in the 20th century cannot justify a law unless similar laws existed at the Founding); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state laws adopted in the 20th century was insufficient historical justification for a ban on firearms purchases for those under the age of 21).

Even still, the State pads its compendium with 183 late-19th-century and early-20th-century laws. To be sure, *most* of these laws do resemble laws adopted throughout the 1800s, including taxes on dealers[9] and restrictions on the manner of carry,[10] possession by and transfer to minors,[11] and the setting of "trap guns."[12] But these laws are not relevantly similar to California's modern magazine ban for all the reasons discussed above. *See supra*, Sections I.C.2, I.C.4 & I.C.5.

Also during this period, five states (and one city) adopted laws that—for the first time since Georgia's 1837 ban on pistols was found unconstitutional—banned possession of not just Bowie knives, blackjacks, and the like, but also pistols, revolvers, and "other firearms." ECF No. 139-1, at 41 (law from Illinois (1881)); ECF

---

[9] ECF No. 139-1 (laws from Georgia (1882, 1884, 1886, 1888) and Alabama (1887); ECF No. 139-2 (laws from Georgia (1890, 1892) and Alabama (1892, 1897)).

[10] ECF No. 139-1 (laws from Mississippi (1878), North Carolina (1879), Ohio (1880), South Carolina (1880), Alabama (1881), Arkansas (1881), Colorado (1881), Nevada (1881), Georgia (1882), West Virginia (1882), Missouri (1883), Maine (1884), Tennessee (1884), Oregon (1885), Michigan (1887), Virginia (1887), Florida (1888), Minnesota (1888), as well as the territories of Washington (1881) and Montana (1887); ECF No. 139-2 (laws from Michigan (1891), West Virginia (1891, 1925), Delaware (1893), Rhode Island (1893, 1896, 1908, 1927), North Dakota (1895), Mississippi (1896), Washington (1897), Georgia (1898), Alaska (1899), South Dakota (1903), New Jersey (1905), Idaho (1909), New York (1911, 1931), Iowa (1913), North Dakota (1915), California (1917, 1923), Oregon (1917), Missouri (1923), Massachusetts (1927), Illinois (1931), and D.C. (1932), as well as the territories of Arizona (1889, 1893, 1901), Idaho (1889), Oklahoma (1890, 1903), and Hawaii (1913)).

[11] ECF No. 139-1 (laws from Delaware (1881), Illinois (1881), Nevada (1881), West Virginia (1882), Kansas (1883), Minnesota (1888)); ECF No. 139-2 (laws from Louisiana (1890), West Virginia (1891), North Carolina (1893), Texas (1897), New York (1900, 1911), and South Carolina (1923)).

[12] ECF No. 139-1 (laws from Vermont (1884); ECF No. 139-2 (laws from North Dakota (1891, 1895), Utah (1901), South Dakota (1909), Washington (1909), Vermont (1912), New Hampshire (1915), Oregon (1925), Michigan (1931), and South Carolina (1931)).

20

No. 139-2, at 9, 19-23 (laws from New York (1911, 1913), California (1917), Oregon (1917), as well as the territory of Montana (1885) and the city of Rawlins, WI (1893)). This Court should not even consider these late laws banning the possession of certain arms because they contradict the Nation's long history of *not* banning the mere possession of entire classes of arms—especially arms in common use for lawful purposes. They are thus irrelevant outliers, and they provide no insight into the original meaning of the Second Amendment. As the Western District of New York recently observed:

> *Bruen* itself invalidated a century-old New York proper-cause requirement … in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* in the face of a much broader and much older public-carry tradition. *If such was a failure of analogs or tradition in Bruen, the State's argument must also fail here.*

*Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *37, n.16 (W.D.N.Y. Nov. 3, 2022) (emphasis added).

Finally, the State submits a collection of about 30 machine-gun bans adopted in 24 states between 1925 and 1934—several of which the State already submitted to this Court in support of its opposition to summary judgment. ECF No. 139-2, at 28-39. But again, the "machine gun statutes cited by the Attorney General do not stand as proof of long-standing prohibitions on the firing-capacity of Second Amendment-protected commonly possessed firearms." *Duncan*, 366 F. Supp. 3d at 1152. That is because, this Court has held, "machine guns, like grenades and shoulder-fired rocket launchers, are not commonly possessed by law-abiding citizens for lawful purposes, they are specific arms that fall outside the safe harbor of the Second Amendment." *Id.* These laws are neither longstanding nor relevantly similar to California's ban on protected magazines.

To reiterate, 20th century laws alone cannot establish a historical tradition; they can only confirm what came before. As already discussed, there is no relevant Founding-era or Reconstruction-era tradition of banning arms commonly chosen for

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

17cv1017

lawful purposes. *See supra*, Section I.B & I.C. The 20th century laws the State cites thus contradict the relevant historical tradition rather than reaffirm it. Under *Bruen*, that makes them irrelevant to the analysis.

## CONCLUSION

For these reasons, the Court should (again) declare California Penal Code section 32310 unconstitutional and permanently enjoin its enforcement.

Dated: February 10, 2023        **MICHEL & ASSOCIATES, P.C.**

*/s/ Anna M. Barvir*
Anna M. Barvir
Email: abarvir@michellawyers.com
Attorneys for Plaintiffs

PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS

17cv1017

## CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**PLAINTIFFS' SUPPLEMENTAL BRIEF RE: CHARTS OF HISTORICAL LAWS**

on the following parties by electronically filing the foregoing on February 10, 2023, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

    I declare under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2023, at Long Beach, CA.

Laura Palmerin