1   Rob Bonta
    Attorney General of California
2   Mark R. Beckington
    Supervising Deputy Attorney General
3   Kevin J. Kelly
    Deputy Attorney General
4   John D. Echeverria
    Deputy Attorney General
5   State Bar No. 268843
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3479
7    Fax:  (415) 703-1234
     E-mail:  John.Echeverria@doj.ca.gov
8   *Attorneys for Defendant Rob Bonta,*
    *in his official capacity as Attorney General*
9   *of the State of California*

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                       CIVIL DIVISION

13

14  **VIRGINIA DUNCAN et al.,**          Case No. 3:17-cv-01017-BEN-JLB

15                        Plaintiffs,

16           **v.**                       **DEFENDANT'S BRIEF IN
                                          RESPONSE TO THE COURT'S
17                                        ORDER ENTERED ON
                                          DECEMBER 15, 2022**
18  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**   Courtroom:    5A
19  **California,**                        Judge:        Hon. Roger T. Benitez
                                          Action Filed:  May 17, 2017
20                        Defendant.

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

Introduction ........................................................................................................ 1

Argument ........................................................................................................... 4

    I.    Section 32310 Does Not Burden Conduct Covered by the "Plain Text" of the Second Amendment ....................................................... 4

        A.    Plaintiffs Cannot Demonstrate that LCMs Are "Arms" ............. 5

        B.    Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense ........ 7

    II.    Section 32310 Is Consistent with the Nation's Traditions of Weapons Regulation ............................................................................. 11

        A.    This Case Requires a "More Nuanced" Analogical Approach .................................................................................. 12

            1.    LCMs Represent a Dramatic Technological Change from the Firearms Technologies Widely Available During the Founding and Reconstruction Eras .............. 12

            2.    Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings ........................................ 14

        B.    California's Restrictions on Large-Capacity Magazines Are Consistent with Historical Laws Regulating Other Dangerous Weapons ................................................................ 16

            1.    The Surveys of Relevant Dangerous Weapons Laws ................................................................................ 17

                 a.    Medieval to Early Modern England (1300–1776) ............................................................ 19

                 b.    Colonial and Early Republic (1600–1812) .......... 20

                 c.    Antebellum and Reconstruction Periods (1813–1877) ........................................................ 20

                 d.    Late 19th and Early 20th Centuries (1878–1930s) ............................................................... 22

             2.    The Surveyed Weapons Restrictions Are Relevantly Similar to Section 32310 .............................. 23

Conclusion ...................................................................................................... 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

CASES

*Accuracy Firearms, LLC v. Pritzker*
    2023 Ill. App. (5th) 230035 (Jan. 31, 2023).........................................................2

*Arnold v. Brown*
    No. 22CV41008 (Haney Cnty. Cir. Ct. Dec. 15, 2022) ......................................2

*Aymette v. State*
    21 Tenn. 154 (1840) ..........................................................................................22

*Bliss v. Commonwealth*
    12 Ky. (2 Litt.) 90 (1822) ...................................................................................21

*Defense Distributed v. Bonta*
    2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ...............................................4, 6

*District of Columbia v. Heller*
    554 U.S. 570 (2008) .................................................................................*passim*

*Dred Scott v. Sandford*
    19 How. 393 (1857)...........................................................................................18

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) (en banc).......................................................*passim*

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) .............................................................................22

*Fouts v. Bonta*
    561 F. Supp. 3d 941 (S.D. Cal. 2021) .................................................................4

*Friedman v. City of Highland Park, Ill.*
    784 F.3d 406 (7th Cir. 2015) .............................................................................13

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015)...............................................................................7

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) ......................................................................10, 25

ii

1

2

### TABLE OF AUTHORITIES
#### (continued)

**Page**

3

4

*New York State Rifle and Pistol Association, Inc. v. Bruen*
    142 S. Ct. 2111 (2022) ................................................................*passim*

5

6

*Ocean State Tactical, LLC v. State of Rhode Island*
    2022 WL 17721175 (D.R.I. Dec. 14, 2022).............................*passim*

7

8

*Or. Firearms Fed'n, Inc. v. Brown*
    2022 WL 17454829 (D. Or. Dec. 6, 2022)...............................*passim*

9

*Presser v. People of State of Ill.*
    116 U.S. 252 (1886) ............................................................. 22

10

11

*Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of Boulder Cnty.*
    2022 WL 4098998 (D. Colo. Aug. 30, 2022) ....................... 3

12

13

*State v. Mitchell*
    3 Blackf. 229 (Ind. 1833) ................................................... 21

14

15

*State v. Reid*
    1 Ala. 612 (1840).................................................................. 22

16

17

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018) .......................................... 6

18

19

*United States v. Hasson*
    2019 WL 4573424 (D. Md. Sept. 20, 2019).......................... 6

20

21

*United States v. Kelly*
    2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) .................. 4, 16, 17

22

*United States v. Miller*
    307 U.S. 174 (1939) ............................................................. 11

23

24

*United States v. Reyna*
    2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................... 4, 8

25

26

*Worman v. Healey*
    922 F.3d 26 (1st Cir. 2019) ................................................. 8

27

28

1

2

# <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

3    **STATUTES**

4

5    California Penal Code
      § 16740 ................................................................ 1

6       § 32310 ...................................................... *passim*
      § 32310(c) ........................................................... 3

7       § 32310(d) ........................................................... 3

8    Colo. Rev. Stat. § 18-12-301–303 ..................................... 1

9    Conn. Gen. Stat. §§ 53-202w ............................................ 1

10

11   D.C. Code Ann. §§ 7-2506.01(b), 7-2507.06(a)(4) ........... 1

12   Del. Code Ann. Title 11, §§ 1468(2), 1469(a) ................. 1

13   Haw. Rev. Stat. Ann. § 134-8(c) ...................................... 1

14   720 Ill. Comp. Stat. § 5/24-1.10 ....................................... 1

15   Ind. Rev. Stat. 192, Chapter 24 ....................................... 21

16

17   Mass. Gen. Laws, Chapter 140, §§ 121, 131M ................ 1

18   Md. Code Ann., Crim. Law § 4-305 ................................. 1

19   N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) ........... 1

20   N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.37 ........... 1

21   2022 Or. Ballot Measure 114 § 11, 11(d) ........................ 1

22   R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a) ..................... 1

23   Vt. Stat. Ann. Title 13, § 4021 ......................................... 1

24

25   Wash. Rev. Code Title 9, §§ 9.41.010(16), 9.41.370 ........ 1

26   **CONSTITUTIONAL PROVISIONS**

27   United States Constitution
      Second Amendment .......................................... *passim*

28

iv

1

2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>**Page**</u>

3     Thirteenth Amendment........................................................................................ 18

4     Fourteenth Amendment .............................................................................*passim*

5   Kentucky Constitution

6     Article XIII, § 25 (1850) .................................................................................. 21

7   **OTHER AUTHORITIES**

8   Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms in

9     America 115 (2011)...................................................................................... 20, 24

10  Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135

11    Harv. L. Rev. F. 537 (2022) ............................................................................ 18

12  Clayton E. Cramer, Concealed Weapon Laws of the Early Republic:

13    Dueling, Southern Violence, and Moral Reform 62 (1999)............................. 21

14  Guns.com, Accessories, https://www.guns.com/accessories ................................5

15  H.R. 1808, 117th Cong. (2022) ............................................................................ 2

16  H.R. Rep. No. 103-489 (1994) .............................................................................. 2

17  John Yoon, *Shootings Revive Push for an Assault Weapons Ban*, N.Y.

18    Times, Jan. 24, 2023............................................................................................ 2

19  Lori Ann Post & Maryann Mason, *The Perfect Gun Policy Study in a*

20    *Not So Perfect Storm*, 112 Am. J. Pub. Health 1707, 1707 (2022)................... 25

21  Philip Bump, *2023 Is Experiencing Mass Shootings at a Record Pace*,

22    Wash. Post, Jan. 25, 2023............................................................................... 2, 3

23  U.S. Census, State Population Totals and Components of Change:

24    2020–2022 ........................................................................................................... 2

25  William Baude & Stephen E. Sachs, *Originalism & the Law of the*

26    *Past*, 37 L. & Hist. Rev. 809 (2019)................................................................. 18

27  William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1 (2019) ................ 20

28

v

**INTRODUCTION**

California's restrictions on manufacture, importation, sale, and possession of large-capacity magazines ("LCMs")—firearm magazines capable of holding more than ten rounds of ammunition—fully comport with the Second Amendment.[1]  The surveys of relevant historical laws submitted in accordance with the Court's December 15 Order only reinforce that conclusion.  *See* Dkt. 139.  Those surveys list hundreds of laws, ordinances, and authorities that demonstrate a robust tradition of regulating certain specified weapons deemed by the government to be uniquely dangerous to the public and susceptible to criminal misuse.  In the past, state and local governments restricted concealable weapons that were contributing to rising homicide rates.  Today, governments are also restricting other types of weapons and accessories, including LCMs, that are being used frequently in mass shootings and contributing to greater numbers of victims killed and injured in such shootings.

California is not alone in imposing limits on magazine capacity.  It is among fifteen states, including the District of Columbia, that have done so to date—four enacted their magazine-capacity limits in 2022 (Delaware, Oregon, Rhode Island, and Washington), and Illinois enacted its law just weeks ago.[2]  As of today, more

---

[1] The Attorney General incorporates by reference his Supplemental Brief in Response to the Court's Order of September 26, 2022 ("Def.'s Suppl. Br.") and the supporting declarations.  *See* Dkt. 118.

[2] *See* Cal. Penal Code §§ 16740, 32310 (10-round limit); Colo. Rev. Stat. § 18-12-301–303 (15-round limit); Conn. Gen. Stat. §§ 53-202w (10-round limit); Del. Code Ann. tit. 11, §§ 1468(2), 1469(a) (17-round limit); D.C. Code Ann. §§ 7-2506.01(b), 7-2507.06(a)(4) (10-round limit); Haw. Rev. Stat. Ann. § 134-8(c) (10-round limit for handguns); 720 Ill. Comp. Stats. 5/24-1.10 (10-round limit for long guns and 15-round limit for handguns); Md. Code Ann., Crim. Law § 4-305 (10-round limit); Mass. Gen. Laws, ch. 140, §§ 121, 131M (10-round limit); N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-3(j), 2C:39-9(h) (10-round limit); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.37 (10-round limit); 2022 Or. Ballot Measure 114, § 11(d) (10-round limit); R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3(a) (10-round limit); Vt. Stat. Ann. tit. 13, § 4021 (10-round limit for long guns and 15-round limit for handguns); Wash. Rev. Code tit. 9, §§ 9.41.010(16), 9.41.370 (10-round limit).  Illinois's LCM laws (720 Ill. Comp. Stat. § 5/24-1.10) and Oregon's LCM law (2022 Or. Ballot Measure 114, § 11) are currently subject to a temporary

1

than one-third of the American population resides in a state that has enacted magazine-capacity limits.[3]  These laws aim to mitigate the lethality of mass shootings.  *See* Philip Bump, *2023 Is Experiencing Mass Shootings at a Record Pace*, Wash. Post, Jan. 25, 2023, http://bit.ly/3jEftsi.

In *New York State Rifle and Pistol Association, Inc. v. Bruen*, the Supreme Court adopted a new standard "rooted in the Second Amendment's text, as informed by history," 142 S. Ct. 2111, 2127 (2022), but reaffirmed that the Second Amendment right is "not unlimited," *id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)), and does not impose a "regulatory straightjacket" on government attempts to address gun violence, *id.* at 2133.  The Second Amendment does not protect an unfettered "right to keep and carry any weapon whatsoever."  *Id.* at 2128 (citation omitted).  Rather, the Second Amendment protects only those "weapons 'in common use' today for self-defense."  *Id.* at 2134 (citation omitted).

Under *Bruen*, California's LCM restrictions, set forth in California Penal Code section 32310 ("Section 32310"), comport with the Second Amendment at both the

---

restraining order and a preliminary injunction, respectively, issued by state trial courts on state constitutional grounds.  *See Accuracy Firearms, LLC v. Pritzker*, No. 5-23-0035, 2023 Ill. App. (5th) 230035, at *17, 35–38 (Jan. 31, 2023) (noting that no Second Amendment claims were alleged but affirming temporary restraining order based on equal protection guarantees in the Illinois Constitution); Opinion Letter at 22–25, *Arnold v. Brown*, No. 22CV41008 (Haney Cnty. Cir. Ct. Dec. 15, 2022) (granting injunction based on the Oregon Constitution), *appeal filed* (Jan. 23, 2023).

[3] The total population in the fifteen jurisdictions with magazine-capacity limits is estimated to be 120,060,105, and the total U.S. population is 333,287,557.  *See* U.S. Census, State Population Totals and Components of Change: 2020–2022, http://bit.ly/40yhFSK.  All Americans lived with LCM restrictions while the federal assault weapons ban was in effect from 1994 to 2004.  *See* H.R. Rep. No. 103-489 (1994).  And efforts are underway at the federal level to renew those restrictions; in 2022, the U.S. House of Representatives passed a renewed assault weapons ban with LCM restrictions, and the President has called for a renewal of the federal assault weapons law.  *See* H.R. 1808, 117th Cong. (2022); John Yoon, *Shootings Revive Push for an Assault Weapons Ban*, N.Y. Times, Jan. 24, 2023.

2

1    textual and historical stages of the analysis.  Plaintiffs cannot show that the

2    manufacture, importation, sale, or possession of LCMs is conduct covered by the

3    "plain text" of the Second Amendment.  *Bruen*, 142 S. Ct. at 2129  But even if they

4    can satisfy their initial burden, the Attorney General has shown that Section 32310

5    is "consistent with the Nation's historical tradition of firearm [and other weapons]

6    regulation." *Id.* At 2130.[4]  Recently, two federal district courts have held that

7    Second Amendment challenges to LCM restrictions are unlikely to succeed on the

8    merits, based on substantially similar arguments, evidence, and historical record

9    presented here.  *See Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), __ F.

10   Supp. 3d __, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *6–14 (D. Or. Dec. 6,

11   2022) (denying motion for temporary restraining order), *notice of appeal filed*, No.

12   22-36011 (9th Cir. Dec. 7, 2022); *Ocean State Tactical, LLC v. State of Rhode*

13   *Island* (*Ocean State*), No. 22-CV-246 JJM-PAS, 2022 WL 17721175, at *5–16

14   (D.R.I. Dec. 14, 2022) (denying motion for preliminary injunction).[5]  On a similar

15   record here, this Court should uphold Section 32310 under the Second

16   Amendment.[6]

---

17       [4] *Bruen* did not call into question the en banc panel's determination that

18   Section 32310(c) and (d) do not violate the Takings or Due Process Clauses.  *See*
     Def.'s Suppl. Br. at 60; *Duncan v. Bonta*, 19 F.4th 1087, 1099 n.1, 1112–13 (9th

19   Cir. 2021) (en banc) *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022),
     *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).  The Attorney General is

20   entitled to judgment on those claims.

21       [5] One district court entered a TRO against enforcement of a newly enacted
     municipal LCM law, *Rocky Mountain Gun Owners v. Bd. of Cnty. Comm'rs of*

22   *Boulder Cnty.*, No. 1:22-cv-02113-CNS-MEH, 2022 WL 4098998 (D. Colo. Aug.
     30, 2022), but did so without providing the defendant an opportunity to file an

23   opposition.  It "provides no guidance on the constitutionality of [LCM] restrictions
     post-*Bruen*," *Oregon Firearms*, 2022 WL 17454829, at *7 n.10, and the plaintiffs

24   have since voluntarily dismissed their case, Notice of Voluntary Dismissal, *Rocky*

25   *Mountain Gun Owners* (Oct. 12, 2022), Dkt. 30.

26       [6] This brief responds to the Court's December 15 Order, but the Attorney
     General notes that there is no motion pending and that the Court has not ruled on

27   the Attorney General's requests to reconsider the current schedule, permit
     discovery, and resolve the case on dispositive motions.  *See* Def.'s Suppl. Br. at 56–

28

1

**ARGUMENT**

2

**I.    SECTION 32310 DOES NOT BURDEN CONDUCT COVERED BY THE "PLAIN TEXT" OF THE SECOND AMENDMENT.**

3

4      Plaintiffs' challenge to Section 32310 fails at the threshold, textual stage of the

5  *Bruen* analysis.  The Court does not proceed to the historical step of the text-and-

6  history standard unless the party challenging the law first establishes that the "plain

7  text" of the Second Amendment covers the conduct in which the party wishes to

8  engage.  *See Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL

9  15524977, at *5 (C.D. Cal. Oct. 21, 2022) ("Much as [the plaintiff] would like to

10  move history and tradition forward in the course of relevant analysis under *Bruen*,

11  its attempt does not survive a careful, and intellectually-honest, reading of that

12  decision.").  As previously briefed, Plaintiffs bear the initial burden of

13  demonstrating that the text of the Second Amendment presumptively protects their

14  desired conduct.[7]  *See* Def.'s Suppl. Br. at 14–16; *see also Oregon Firearms*, 2022

15  60; Dkt. 112-1 at 18–19.  The Attorney General preserves his objections to the
current post-remand proceedings and maintains that a reasonable discovery period
is called for under *Bruen*.  Moreover, to the extent the Court has suggested that
expert testimony may be irrelevant and that a survey of historical laws may suffice
to resolve this case, *see* Dec. 12, 2022 Hr'g. Tr. at 23–25, the Attorney General
reiterates that expert elucidation is fundamental to application of the *Bruen*
standard.  *Bruen*'s text-and-history standard is not an "abstract game of spot-the-
analogy-across-the-ages."  *United States v. Kelly*, No. 3:22-cr-00037, 2022 WL
17336578, at *6 (M.D. Tenn. Nov. 16, 2022).  Instead, *Bruen* requires "an
evaluation of the challenged law in light of the broader attitudes and assumptions
demonstrated by those historical prohibitions."  *Id.* at *5 n.7.  Expert testimony is
needed to provide the requisite context for interpreting the historical restrictions in
the record.  *Cf. Fouts v. Bonta*, 561 F. Supp. 3d 941, 951 (S.D. Cal. 2021)
("[H]istory is the work of historians rather than judges."), *vacated and remanded*,
2022 WL 4477732 (9th Cir. Sept. 22, 2022).  Nevertheless, the material submitted
here is "analogous enough," *Bruen*, 142 S. Ct. at 2133, to show that California's
LCM restrictions comport with the Second Amendment.

25      [7] Plaintiffs' proposed course of conduct cannot be characterized generally as
mere possession of a magazine (of any capacity), or even more generally as
possession of a firearm (because it happens to be equipped with a magazine).  *See*
*United States v. Reyna*, No. 3:21-CR-41 RLM-MGG, 2022 WL 17714376, at *4
(N.D. Ind. Dec. 15, 2022) (cautioning against defining the proposed conduct

4

WL 17454829, at *9 (holding that "*Plaintiffs have not shown*, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense" (emphasis added)); *Ocean State*, 2022 WL 17721175, at *12 ("Although *it is their burden* to show that large-capacity magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert opinion on the meaning of the word 'Arms.'" (emphasis added)). The Supreme Court has explained that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller*, 554 U.S. at 623. Plaintiffs' boundless interpretation of the Second Amendment, however, would extend its protections to *any type* of weapon—provided a sufficient (and unspecified) number of people want to acquire it—and to instruments and devices that are not even weapons at all.  Because Plaintiffs cannot show that Section 32310 burdens conduct covered by the Second Amendment, the Court should uphold it at the textual stage of the *Bruen* analysis.  *See Oregon Firearms*, 2022 WL 17454829, at *8–11; *Ocean State*, 2022 WL 17721175, at *11–15.

## A.   Plaintiffs Cannot Demonstrate that LCMs Are "Arms"

Plaintiffs cannot establish that LCMs are bearable "Arms" protected by the plain text of the Second Amendment.  LCMs are not weapons in themselves, nor are they necessary to operate any firearm for self-defense.  *See* Def.'s Suppl. Br. at 16–17.[8]  As the *Duncan* en banc panel correctly observed, Section 32310 "outlaws *no weapon*, but only limits the size of the magazine that may be used with firearms."  *Duncan*, 19 F.4th at 1096 (emphasis added);[9] *see also Ocean State*, 2022 WL 17721175, at *12 (relying on *Duncan* for same conclusion); *see also* Dkt. 140

---

generally as "mere possession," because "any number of other challenged regulations would similarly boil down to mere possession, then promptly and automatically proceed" to the historical stage of the *Bruen* analysis).

[8] Today, dealers list magazines under the "accessories" sections of their websites.  *See, e.g.*, Guns.com, Accessories, https://www.guns.com/accessories; *see* Busse Decl. ¶ 9.

[9] Although this opinion was vacated, it is cited for its persuasive value.

1    (referring to the challenged law as regulating "an ammunition device or [imposing]

2    a limit on an amount of ammunition").  "LCMs, like other accessories to weapons,

3    are not used in a way that 'cast[s] at or strike[s] another,'" *Ocean State*, 2022 WL

4    17721175, at *12, but rather are more properly viewed like silencers and other

5    accessories that "'generally have no use independent of their attachment to a gun.'"

6    *Id.* (quoting *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at *2 (D.

7    Md. Sept. 20, 2019)); *see also United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir.

8    2018) ("A silencer is a firearm accessory; it's not a weapon in itself (nor is it

9    'armour of defence').").  This conclusion is supported by corpus linguistics

10   analysis; historically, the term "Arms" referred to "weapons such as swords, knives,

11   rifles, and pistols," and did not include "accoutrements," like "ammunition

12   containers, flints, scabbards, holsters, or 'parts' of weapons." *Ocean State*, 2022

13   WL 17721175, at *13 (crediting the testimony of Professor Dennis Baron); *see*

14   Decl. of Dennis Baron ¶¶ 7, 24, Dkt. 118-2.

15        Plaintiffs also cannot show that LCMs are "necessary to the use of firearms for

16   self-defense," such that they should be construed as bearable "Arms."  *Oregon*

17   *Firearms*, 2022 WL 17454829, at *9.  Magazines holding ten or fewer rounds can

18   be used to operate a firearm for self-defense.  *See id.* at *9 (crediting declaration of

19   Ryan Busse); Decl. of Ryan Busse ¶ 13, Dkt. 118-3.  To the extent Plaintiffs read

20   into the "plain text" of the Second Amendment an "implie[d]" right to "*use*"

21   firearms in certain ways, Pls.' Suppl. Br. at 12, Dkt. 132, nothing in California's

22   law precludes the effective use of firearms for self-defense.[10]  California law

23   permits the manufacture, sale, and possession of magazines holding ten or fewer

24   rounds for use in firearms for self-defense, and does not restrict the number of such

---

[10] The Court should be wary of finding un-enumerated, implied rights in the "plain text" of the Second Amendment.  *See Defense Distributed*, 2022 WL 15524977, at *4 (noting that plaintiffs identify a "penumbra" of covered activities beyond keeping and bearing arms, including a right to manufacture firearms, which "is quite-clearly not a 'plain text' analysis, required under *Bruen*").

1  magazines that may be kept, the manner in which such magazines are stored, or the

2  amount of ammunition that may be kept for use with such magazines.  *See Oregon*

3  *Firearms*, 2022 WL 17454829, at *9 ("Plaintiffs have not produced evidence that

4  these weapons [including Glock pistols] can *only* operate with magazines that

5  accept more than ten rounds of ammunition and cannot operate with magazines that

6  contain ten or fewer rounds, as allowed under [Oregon's LCM law].").  While

7  "magazines in general are necessary to the use of [certain] firearms for self-

8  defense," and a law that "banned the manufacture, sale, transfer, possession, and

9  use of *all* magazines would make it impossible for individuals to operate [those]

10 firearms for self-defense," *id.*, LCMs are not "'necessary to render . . . firearms

11 operable.'"  *Oregon Firearms*, 2022 WL 17454829, at *9 (quoting *Fyock v.*

12 *Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015)).[11]  Accordingly, Plaintiffs cannot

13 show that their desired conduct falls within the "plain text" of the Second

14 Amendment.

15

16   **B.    Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense**

17        Even if LCMs could qualify as bearable "Arms," Plaintiffs cannot establish

18 that they are "in common use" for self-defense, such that their possession is

19 protected by the plain text of the Second Amendment.  *See* Def.'s Suppl. Br. at 17–

20 23; *Bruen*, 142 S. Ct. at 2134 (noting that no party disputed that handguns are "in

21 common use" at the textual stage of the analysis).  The Second Amendment covers

22 only weapons "'in common use' today for self-defense," such as "the quintessential

23 self-defense weapon," the handgun.  *Id.* (citation omitted).  But it does not cover a

24

25        [11] Certain parts and accessories of a firearm are no doubt necessary to operate
   a firearm, such as ammunition, a barrel, a trigger, and (for rifles) a stock.  *See* Pls.'
26 Suppl. Br. at 15.  The Attorney General does not suggest that all parts or
   accessories may be banned, but rather that there is a historical distinction between
27 arms and accessories and that only those accessories necessary to operate a firearm
   warrant protection as "Arms."
28

weapon that is "uncommon or unusually dangerous or not typically used by law-abiding people for lawful purposes." *Reyna*, 2022 WL 17714376, at *3 (citing *Bruen*, 142 S. Ct. at 2128). On substantially similar records as the one presented here, two district courts have held in well-reasoned orders that LCMs are not in common use for self-defense. *Oregon Firearms*, 2022 WL 2022 WL 17454829, at *11; *Ocean State*, 2022 WL 17721175, at *14.

As explained in the Attorney General's prior supplemental brief, there no evidence that LCMs are frequently used in self-defense.[12] To the contrary, the record reflects that it is "exceedingly rare for an individual, in a self-defense situation, to fire more than ten rounds." *Oregon Firearms*, 2022 WL 2022 WL 17454829, at *10 (crediting the same Supplemental Declaration of Lucy P. Allen filed in this action). Nor are LCMs particularly suitable for self-defense. There is "no credible evidence in the record" to support the assertion that LCMs are "weapons of self-defense and there is ample evidence put forth by the State that they are not." *Ocean State*, 2022 WL 17721175, at *14.

While any weapon (or accessory) could conceivably be used in self-defense, the accessory at issue here (an LCM) is not well-suited for lawful self-defense. *See Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[W]ielding the proscribed [assault weapons and LCMs] for self-defense within the home is tantamount to using a sledgehammer to crack open the shell of a peanut."), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2127 n.4. Even if Plaintiffs could present stories of LCMs being used in self-defense, that would not establish that LCMs are commonly used in self-defense or well-suited for that purpose. Anecdotal evidence

---

[12]A definition of "common use" based on industry-created production and ownership estimates, *see* Pls.' Suppl. Br. at 7, would be circular and inconsistent with *Heller. See* Def.'s Suppl. Br. at 20–21; *Duncan*, 19 F.4th at 1127 (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon.").

offered by Plaintiffs concerning the purported need for LCMs for self-defense is also insufficient to meet their burden.[13]  LCMs were designed for military applications and are "particularly suited to military use," as they "'enable a shooter to hit multiple human targets very rapidly.'"  *Oregon Firearms*, 2022 WL 17454829, at *11 (citation omitted).  As explained in an expert report and declaration prepared for use in another action by Colonel (Ret.) Craig Tucker—a decorated combat veteran and retired Marine Colonel who commanded soldiers in both Fallujah battles during the Iraq War—detachable magazines serve specific combat-related purposes:

> Detachable magazines improve the killing efficiency of automatic rifles, allowing the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-round magazines, to rapidly change magazines in combat, and to increase killing efficiency by significantly reducing reload time.  Changing magazines during intense combat is the most important individual skill taught to Marines.  During intense combat, the detachable magazine provides a rifleman the capability to fire 120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds per minute.  In a civilian self-defense context, by contrast, an individual would not have a need for such a high rate of fire.

---

[13] The testimony is also unreliable.  For *example*, the supplemental declaration of Stephen Helsley (Dkt. 132-4) appears to include copied material (often verbatim) from a declaration of Massad Ayoob, which was filed previously in this action (Dkt. 6-8).  *Compare* Dkt. 132-4 at 5 ("Limiting the law-abiding citizen . . ."), *with* Dkt. 6-8 ¶ 5; Dkt. 132-4 at 6 ("Likewise, the average homeowner . . ."), *with* Dkt. 6-8 ¶ 18; Dkt. 132-4 at 6 ("The off-duty officer . . ."), *with* Dkt. 6-8 ¶ 27; Dkt. 132-4 at 7 ("Criminal bent on causing harm . . ."), *with* Dkt. 6-8 ¶¶ 20-21; Dkt. 132-4 at 7 ("The virtuous citizen . . ."), *with* Dkt. 6-8 ¶ 24; Dkt. 132-4 at 7 ("Supporters of the magazine capacity limitation . . ."), *with* Dkt. 6-8 ¶ 30; Dkt. 132-4 at 7 ("Finally it is worth noting . . ."), *with* Dkt. 6-8 ¶ 11.  Mr. Helsley was recently confronted with this fact during his deposition in *Oregon Firearms Federation*, in which Mr. Helsley's report and Mr. Ayoob's declaration were also filed.  True and correct copies of relevant excerpts from the deposition transcripts are attached as Exhibits 1 and 2 to the accompanying Declaration of John D. Echeverria ("Echeverria Decl.").  During his January 19, 2023 deposition, Mr. Helsley could not explain the uncanny similarities between the documents, *see* Echeverria Decl., Ex. 1 at 68–83, and when his deposition continued on January 30, he was still at a loss, *id.*, Ex. 2 at 158 ("I certainly wish I had some [more information] because it's been a source of pretty substantial anxiety for me . . . . I'm puzzled.  I just don't know.").

Suppl. Expert Report & Decl. of Col. (Ret.) Craig Tucker ¶ 15, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023).[14]  According to Colonel Tucker, an individual using a weapon in self-defense would not have "need for such a high, continuous rate of fire" afforded by magazines holding more than 10 rounds. *Id.* ¶ 21.

Though the Supreme Court's decision in *Heller* did not delineate "the full scope of the Second Amendment," 554 U.S. at 626, it did set at least one guidepost: "weapons that are most useful in military service—M16 rifles and the like—may be banned," *id.* at 627.  As the Fourth Circuit held, LCMs are not protected by the Second Amendment because they are "like" "M-16 rifles," "weapons that are most useful in military service," and thus are "beyond the Second Amendment's reach." *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017) (en banc) (quoting *Heller*, 554 U.S. at 627), *abrogated on other grounds by Bruen*, 142 S. Ct at 2126; *see also Oregon Firearms*, 2022 WL 17454829, at *11 (same).  The *Duncan* en banc panel observed that the analogy to the M16 has "significant merit" because LCMs have limited "lawful, civilian benefits" and "significant benefits in a military setting." *Duncan*, 19 F.4th at 1102.  Nothing in *Bruen* calls into question *Heller*'s view that weapons most useful in military service, like the M16 rifle or M4 carbine, may be banned.

Historically, "high-capacity firearms," like the Henry and Winchester rifles, were understood during the era of Reconstruction to be "weapons of war or anti-insurrection, not weapons of individual self-defense."  *Ocean State*, 2022 WL 17721175, at *15 (quoting same declaration of Professor Vorenberg filed in this

---

[14] Col. Tucker's expert report and declaration in *Rupp* was prepared after the filing of the Attorney General's prior supplemental brief and includes testimony relevant to this action.  The Attorney General respectfully submits Col. Tucker's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal.  It is attached as Exhibit 3 to the Echeverria Declaration.

case).  And during the founding, such high capacity firearms were not prevalent, *see* Decl. of Kevin Sweeney ¶¶ 5–6, *Oregon Firearms* (Feb. 6, 2023),[15] and were not part of a militiaman's "ordinary military equipment" that he would be expected to bring to muster at that time, *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 178 (1939)).  When LCMs began to circulate more widely in the 1980s, they were regarded as military accessories.  In 1989, the Bureau of Alcohol, Tobacco, and Firearms found that "large-capacity magazines are indicative of military firearms," and later in 1998, it determined that "detachable large-capacity magazine[s] [were] originally designed and produced for . . . military assault rifles."  *Oregon Firearms*, 2022 WL 17454829, at *11 (quoting *Duncan*, 19 F.4th at 1105–06); *see also* Dkt. 53-7 (Exs. 12 and 13).

Plaintiffs cannot show that LCMs are commonly used in—let alone suitable for—lawful self-defense.  Accordingly, these accessories are not protected by the Second Amendment, and Section 32310 should be upheld.

## II.  SECTION 32310 IS CONSISTENT WITH THE NATION'S TRADITIONS OF WEAPONS REGULATION

Even if Plaintiffs could meet their initial burden of showing that the manufacture, importation, sale, and possession of LCMs are activities covered by the "plain text" of the Second Amendment and original public meaning of that text (they cannot), the Attorney General has amply shown that California's 10-round magazine-capacity limitation is consistent with the Nation's traditions of weapons regulation.  In accordance with the Court's Order, Dkt. 134, the Attorney General assembled surveys of hundreds of relevant laws and authorities that show that, from

---

[15] Professor Sweeney is a history professor at Amherst College and is an expert on firearms of the 17th and 18th centuries.  His declaration was filed in *Oregon Firearms* after submission of the Attorney General's supplemental brief in this case.  The Attorney General respectfully submits Professor Sweeney's declaration in this action so that it may comprise part of the record assessed by this Court and on appeal.  A true and correct copy of Professor Sweeney's declaration in *Oregon Firearms* is attached as Exhibit 4 to the Echeverria Declaration.

1   pre-founding America through the 1930s, state and local governments regularly
2   enacted restrictions on certain enumerated weapons viewed at the time to be
3   particularly dangerous.  *See* Dkt. 139.  These laws are relevantly similar to Section
4   32310 because they impose a comparably modest burden on the right to armed self-
5   defense—by restricting weapons and devices that are not particularly useful for
6   self-defense while ensuring access to other arms for effective self-defense—and
7   those minimal burdens are comparably justified by public-safety concerns.

8   **A.   This Case Requires a "More Nuanced" Analogical Approach**

9         A "more nuanced" analogical approach is called for in assessing the
10   similarities between Section 32310 and the surveyed historical laws.  *See Bruen*,
11   142 S. Ct. at 2131–32.  In a case that proceeds to the historical stage of the *Bruen*
12   analysis, the government need not identify a "historical *twin*" or a "dead ringer"; it
13   can justify a modern restriction by identifying a "relevantly similar" restriction
14   enacted when the Second or Fourteenth Amendments were ratified.  *Id.* at 2132–33.
15   When the challenged law addresses "unprecedented societal concerns or dramatic
16   technological changes," the courts should engage in a "*more* nuanced approach"
17   because "[t]he regulatory challenges posed by firearms today are not always the
18   same as those that preoccupied the Founders in 1791 or the Reconstruction
19   generation in 1868." *Bruen*, 142 S. Ct. at 2131–32 (emphasis added).  Here, unlike
20   the "fairly straightforward" analysis in *Bruen* and *Heller*, *id.* at 2131, a more
21   nuanced approach is required because LCMs implicate dramatic technological
22   change in firearms technology and an unprecedented societal concern—mass
23   shootings.  *Oregon Firearms*, 2022 WL 17454829, at *12–13.

24   **1.   LCMs Represent a Dramatic Technological Change from
       the Firearms Technologies Widely Available During the
25       Founding and Reconstruction Eras**

26         LCMs represent the "kind of dramatic technological change envisioned by the
27   *Bruen* Court," requiring a more nuanced approach when evaluating the
28   constitutionality of laws regulating them.  *Oregon Firearms*, 2022 WL 17454829,

12

at *12.  Firearms capable of firing more than 10 rounds repeatedly may have existed before and during the founding, but they were "experimental, designed for military use, rare, defective, or some combination of these features." *Id.*[16]  LCMs and multi-shot weapons were "not common in 1791," *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015), and the few multi-shot weapons that did exist were materially different from LCMs that feed ammunition into a semiautomatic firearm, contributing to a much higher effective rate of fire, *see* Def.'s Suppl. Br. at 28–30; Decl. of Robert Spitzer ¶¶ 18–33, Dkt. 118-9.  Professor Kevin Sweeney has explained in *Oregon Firearms* that "repeaters had *occasionally* appeared on the scene" during the founding era, but they were not widely adopted at the time.  Echeverria Decl., Ex. 4 ¶ 6.

And during Reconstruction, the only bearable, high-capacity firearms capable of firing more than 10 rounds were the lever-action Henry Rifle and the Winchester Repeating Rifle (the Winchester 66 and Winchester 73 models), which were capable of holding 15 rounds in a fixed chamber within the firearm.  Decl. of Michael Vorenberg ¶¶ 21–22, Dkt. 118-10.  But those rifles were not widely owned by civilians during Reconstruction, and they were materially different from modern LCM-equipped semiautomatic firearms.  As Professor Vorenberg explained, the Henry and Winchester repeaters were not adopted by the Union or Confederate militaries during the Civil War and were not commonly acquired by soldiers returning from the Civil War.  *Id.* ¶¶ 25–29 ("Production and sales numbers reveal

---

[16] During her deposition in *Oregon Firearms Federation*, Plaintiffs' witness, Ashley Hlebinsky, acknowledged that her firearms research did not examine the "prevalence" of repeater firearms among civilians during the founding and that some of the firearms she mentioned were "one-offs."  Hlebinsky Dep. at 131–33; *see also id.* at 45-46 (testifying that she was not aware of a specific example of a repeater, including one with a magazine with a capacity of more than ten rounds, that was commercially available in the United States during the ratification of the Second Amendment).  A true and correct copy of relevant excerpts from Hlebinsky's deposition in *Oregon Firearms* is attached as Exhibit 5 to the Echeverria Declaration.

that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles."). Following the Civil War, the circulation of Henry and Winchester lever-action repeating rifles remained low, with few documented instances of possession by civilians. *Id.* ¶¶ 96.[17]  By the time the Fourteenth Amendment was ratified, the Winchester Model 1866 became a "huge commercial success" due "almost entirely to sales to foreign armies," not to Americans. *Id.* at 51.  Plaintiffs' witness, Ashley Hlebinsky, admits that "repeating technology would not be widely popular for use in war until the late nineteenth century," Decl. of Ashley Hlebinsky ¶ 21, Dkt. 132-1, and Plaintiffs concede that "detachable magazines did not appear until 1919 or later," Pls.' Suppl. Br. at 14.  And semiautomatic firearms technologies did not spread broadly until the late 20th century, and those weapons were generally sold with magazines holding ten or fewer rounds. *See* Decl. of Brenan Rivas ¶¶ 29–32, Dkt. 118-7.  A more nuanced analogical approach to the Second Amendment is required here because the modern firearm technologies at issue represent "dramatic technological changes." *Bruen*, 142 S. Ct. at 2132.

## 2. Section 32310 Addresses the Unprecedented Social Problem of Mass Shootings

Section 32310 also addresses a societal concern that did not exist at the founding or during Reconstruction:  mass shootings.  There are no known shooting

---

[17] During the December 12, 2022 hearing, the Court indicated that Professor Vorenberg discussed an episode in which two miners used Henry rifles to "defeat 40 Indians that were attacking them" and referred to these shooters as "common folks."  Dec. 12, 2022 Hr'g. Tr. at 21–22.  Professor Vorenberg explained that this incident was popularized by the manufacturers of Henry-Winchesters in advertising (hardly a neutral source of history) and that this anecdote is not an example of individual self-defense (because the miners were guarding a commercial enterprise in a war-like context).  Vorenberg Decl. ¶ 55.  These individuals were not "common folks" using widely available weapons for lawful self-defense, and such anecdotes do not demonstrate that repeaters were widely circulated, let alone commonly used for self-defense, during the 19th century.

incidents involving ten or more fatalities before 1949, and the number of such double-digit mass shootings increased dramatically in the period before and after the federal assault weapons ban. *See* Suppl. Decl. of Louis Klarevas ¶ 12 & tbl. 1, Dkt. 118-6; *see Oregon Firearms*, 2022 WL 17454829, at *13 (crediting Professor Klarevas's findings). And as Professor Roth explained, from the colonial period to the early 20th century, mass killings were generally committed by groups of people because technological limitations generally limited the ability of a single person to commit mass murder. *See* Decl. of Randolph Roth ¶ 40, Dkt. 118-8.[18]  The development and proliferation of semiautomatic and automatic firearms technologies in the 1920s and 1930s substantially increased the amount of carnage an individual could inflict, which led to government regulation of those technologies. *See* Spitzer Decl. ¶ 2–3; Roth Decl. ¶ 46.  And LCMs in particular have greatly enhanced the lethality of mass shootings when they occur. *See* Suppl. Decl. of Lucy P. Allen ¶¶ 26–29, Dkt. 118-1; Roth Decl. ¶¶ 53–56.  Of all the shootings in American history involving 14 or more fatalities, 100% involved the use of LCMs.  Klarevas Suppl. Decl. ¶ 13.  Therefore, one of the primary concerns

---

[18] Of course, there were exceptions.  Clayton Cramer's testimony that individuals committed "mass murder" throughout American history without firearms, including cases of familicide and arson, misses the point and does not demonstrate that mass shootings are not an unprecedented societal concern.  First, Cramer uses a definition of "mass murder" not recognized in the literature, with an unusually low threshold of fatalities (just two deaths) to qualify as "mass murder." Decl. of Clayton Cramer at 1, Dkt. 132-7.  Cramer was deposed in *Oregon Firearms* about the same opinions offered in this case.  True and correct copies of relevant excerpts from the deposition transcript are attached as Exhibit 6 to the Echeverria Declaration.  During his deposition, Cramer acknowledged that he knew of no "scholarly authorities that would define mass murder using two or three dead." *See* Echeverria Decl., Ex. 6 at 46-47.  Mr. Cramer also admitted that the dataset he used in this case is riddled with errors and inconsistencies, *id.* at 87-91 (admitting the data was "clearly wrong"), and conceded that a court "might [be] reluctant to accept the data . . . as it is presented," *id.* at 106.  In any event, the fact that mass murders have been committed by individuals in the past with other weapons and implements does not mean that the problem of mass *shootings* is not a modern societal concern requiring modern solutions.

15

addressed by Section 32310—mass shootings—is a modern problem that did not exist in 1792 or 1868.  For this additional reason, a more nuanced approach is required.

**B.    California's Restrictions on Large-Capacity Magazines Are Consistent with Historical Laws Regulating Other Dangerous Weapons**

The Attorney General has identified hundreds of laws from pre-founding England and colonial America through the 1930s, including clusters of similar laws enacted around the time that the Second and Fourteenth Amendments were ratified.  Dkt. 139.  Even if Section 32310 were viewed to burden conduct covered by the plain text of the Second Amendment, Defendants have provided "significant historical evidence to overcome the presumption of unconstitutionality of a measure that infringes upon conduct covered by the Second Amendment."  *Oregon Firearms*, 2022 WL 17454829, at *12.

In evaluating the relevant similarities of these laws to modern firearm regulations, the identification of relevant laws is the first step.  The laws must then be contextualized historically and compared to modern laws within an appropriate analytical framework.  *Bruen* focuses "not on a minutely precise analogy to historical prohibitions, but rather an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions."  *Kelly*, 2022 WL 17336578, at *5 n.7.  The absence of a precise twin in the historical record would not necessarily mean that a modern firearms restriction is inconsistent with the Second Amendment.  Under *Bruen*, the Second Amendment does not "forbid all laws other than those that *actually existed* at or around the time of the [Second Amendment's] adoption," but rather "the Second Amendment must, at most, forbid laws that *could not have existed* under the understanding of the right to bear arms that prevailed at the time."  *Id.*  Thus, a mere "list of the laws that *happened to exist* in the founding era"—such as the laws identified in the surveys—"is, as a matter of basic logic, not the same thing as an exhaustive account of what

16

1   laws would have been theoretically *believed to be permissible* by an individual

2   sharing the original public understanding of the Constitution." *Id.* at *2.  In any

3   event, the laws identified by the Attorney General are relevantly similar to Section

4   32310 according to the two metrics identified in *Bruen*:  "how and why the

5   regulations burden a law-abiding citizen's right to armed self-defense."  142 S. Ct.

6   at 2133.

7                1.    **The Surveys of Relevant Dangerous Weapons Laws**

8           The Court ordered the Attorney General to "create, and the plaintiffs shall

9   meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or

10  regulations in chronological order" that shall "begin at the time of the adoption of

11  the Second Amendment and continue through twenty years after the Fourteenth

12  Amendment."  Dkt. 134.  The Order also permitted the Attorney General to create a

13  second survey "covering a time period following that of the first list."  *Id.*  The

14  Attorney General prepared and filed two surveys of relevant laws uncovered in the

15  time permitted—one from the pre-founding era through 1888 [1–191][19]  and

16  another from 1888 through the 1930s [192–316], Dkt. 139-1, 139-2—and submitted

17  a third survey that included Plaintiffs' positions concerning the relevance of those

18  laws, Dkt. 139-3.[20]

19          These surveys identify over 300 state and local laws, including laws enacted

20  by the District of Columbia, and six additional laws and authorities from pre-

21  founding England, which regulated, or authorized the regulation, of certain

22  _____

23  [19] Numbers in brackets refer to the numbers assigned to the laws listed on
    Defendants' surveys of historical analogues.  Dkt. 139-1 [1–191]; Dkt. 139-2 [192–
24  316].

25  [20] During the December 12 hearing, the Court characterized an 1888 cut-off
    as "an arbitrary and capricious number."  Dec. 12, 2022 Hr'g. Tr. at 30.  In *Bruen*,
26  the Supreme Court did not specify a 20-year limit after the ratification of the
    Fourteenth Amendment.  *See* 142 S. Ct. at 2163 (Barrett, J., concurring) (noting
27  that the Court did not answer the question of "[h]ow long after ratification may
    subsequent practice illuminate original public meaning?").

28

enumerated weapons and items.[21]  As explained in the Attorney General's prior supplemental brief, this history shows that governments have been free to adopt laws like Section 32310, consistent with the Second Amendment—restricting particular weapons and weapons configurations that pose a danger to society and are especially likely to be used by criminals, so long as the restriction leaves available other weapons for constitutionally protected uses.  Def.'s Supp. at 34–49.  The enactments identified by the Attorney General show that Section 32310 is a constitutionally permissible exercise of California's police powers.[22]

---

[21] The vast majority of these laws were generally applicable, but some restrictions applied only to certain groups.  Twelve of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments [5, 15, 16, 17, 18, 21, 22, 26, 28, 50, 69, 72].  These laws are morally repugnant and would obviously be unconstitutional today.  They are provided only as additional examples of laws identifying certain weapons for heightened regulation, and they are consistent in this respect with the other generally applicable laws.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

[22] Plaintiffs contend that it is "*likely* that many of the laws the State cites here have been repealed or replaced or are otherwise no longer enforced."  Dkt. 139-3 at 1 n.3 (emphasis added).  To the extent the surveys do not provide information on repeal status or judicial review, it is Plaintiffs' burden to rebut the historical record assembled by the Attorney General and provide potentially adverse information about the analogues.  This Court's Order did not impose the burden of identifying any repeal or adverse judicial opinions solely on the Attorney General, but rather required Plaintiffs to provide information that they view as relevant to the Court's analysis in this regard.  *See* Dec. 12, 2022 Hr'g. Tr. at 9–12 ("So I would suggest

18

1              **a.    Medieval to Early Modern England (1300–1776)**

2        In pre-founding England, the right to keep and bear arms was limited to arms

3   "allowed by law" [7, 9], and the Crown prohibited the possession of certain

4   enumerated weapons, like launcegays [1, 2], crossbows, handguns, hagbutts, and

5   demy hakes [3, 4].  These laws are part of the tradition inherited from England

6   when the Second Amendment was ratified.  *See Bruen*, 142 S. Ct. at 2127 (noting

7   that the Second amendment "codified a right inherited from our English ancestors"

8   (quoting *Heller*, 554 U.S. at 599)).  The 1689 English Bill of Rights was the

9   "predecessor to our Second Amendment," *id.* at 2141 (quoting *Heller*, 554 U.S. at

10  593), and although it was "initially limited" to Protestants and "matured" by the

11  founding, *id.* at 2142, there is no indication that the "as allowed by law"

12  qualification was written out of the right when the Second Amendment was ratified.

13       Pre-ratification English law is relevant, especially where it is consistent with

14  laws contemporaneous with the enactment of the Second or Fourteenth

15  Amendments.  *Id.* at 2136 (suggesting that it is permissible for "courts to 'reach

16  back to the 14th century' for English practices that 'prevailed up to the 'period

17  immediately before and after the framing of the Constitution'" (cleaned up)); *id.*

18  ("A long, unbroken line of common-law precedent stretching from Bracton to

19  Blackstone is far more likely to be part of our law than a short-lived, 14th-century

20  English practice.").  Pre-founding English law was evaluated in *Bruen*, *McDonald*,

21  and *Heller*, and it remains relevant here.

22

23
  _____

24  *both sides*, if you can, please do that for me." (emphasis added)).  And *Bruen* itself
    did not envision defendants providing the entire historical record for review, but
25  rather viewed this as a task of all parties; the Court noted that judges may be
    "relatively ill equipped" to "engage in 'searching historical surveys,'" but that they
26  may "decide a case based on the historical record compiled by *the parties*."  *Bruen*,
    142 S. Ct. at 2130 n.6 (emphasis added) (citation omitted).  If anything, Plaintiffs'
27  failure to provide evidence that an analogue was repealed or struck down by a court
28  weighs in favor of the law's constitutionality.

1

**b.    Colonial and Early Republic (1600–1812)**

2       "Gun safety regulation was commonplace in the American colonies from their

3   earliest days."  Adam Winkler, Gunfight: The Battle Over the Right to Bear Arms

4   in America 115 (2011).  During this period, several jurisdictions enacted

5   restrictions on the possession of certain weapons and devices before ratification of

6   the Second Amendment, including limitations on the keeping and storing of

7   gunpowder [11, 12] and trap guns [10].  *See* Def.'s Suppl. Br. at 37–40.  In

8   addition, some jurisdictions prohibited the carrying of certain listed weapons,

9   including a 1686 New Jersey law prohibiting the carrying of any pocket pistol,

10  skein, stiletto, dagger, or dirk [6] and other laws prohibiting the carry of certain

11  weapons in certain circumstances [8, 13, 14, 19, 20, 23].  Such pre-ratification

12  restrictions should "guide [this Court's] interpretation" of the Second Amendment.

13  *Bruen*, 142 S. Ct. at 2137.  And laws enacted after ratification of the Second

14  Amendment during this period are relevant in showing the continuing tradition of

15  regulating certain enumerated weapons.  Moreover, post-ratification practice can

16  "liquidate" indeterminacies in the meaning of constitutional provisions.  *Id.* at 2136

17  (citation omitted).  The Supreme Court has not determined "[h]ow long after

18  ratification may subsequent practice illuminate original public meaning."  *Id.* at

19  2163 (Barrett, J., concurring).  But some period of time post-ratification must be

20  relevant because constitutional "liquidation" required time for "successive

21  Legislative bodies, through a period of years and under the varied ascendancy of

22  parties," to sanction post-ratification practice and for the public to accede to those

23  practices.  William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 18–20

24  (2019) (cleaned up).

25      **c.    Antebellum and Reconstruction Periods (1813–1877)**

26      During the period before and after the ratification of the Fourteenth

27  Amendment, state and municipal weapons restrictions proliferated in response to

28  prevailing threats to public safety.  Prior to the Civil War, state and local

governments enacted a range of restrictions on certain weapons, particularly "fighting knives," like Bowie knives and Arkansas toothpicks. *See* Def.'s Suppl. Br. at 41–47. From 1813 to the Mexican War, nine states and territories (Kentucky, Louisiana, Indiana, Arkansas, Georgia, Florida, Tennessee, Alabama, and Virginia) restricted the concealed carrying of particular weapons, namely Bowie knives, pistols, dirks, and sword canes.[23] Though the Kentucky Supreme Court invalidated Kentucky's 1813 concealed-weapons law, *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822), the law was reenacted in 1854 after the Kentucky Constitution was amended to allow this in 1850. *See* Ky. Const. art. XIII, § 25 (1850); Clayton E. Cramer, Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform 62 (1999).

These concealed weapons laws were "not intended as a solution to a general problem of violence," but instead "were a solution to one very specific type of violence": murders and assaults that spread throughout the South at that time as a consequence of anti-dueling measures and contributed to an alarming increase in homicides. *Id.* at 7; *see also id.* at 64-65 ("[A]ttempts to suppress dueling usually predate, and sometimes immediately predate, passage of concealed weapon laws."). Without the ability to duel, individuals turned to concealable weapons, to ambush their political rivals or settle scores in spontaneous fights. *Id.* Concealed weapons laws targeted the specific weapons commonly used in these types of crimes. Roth Decl. ¶¶ 23–27. Other laws restricted the carrying or use of those weapons, Dkt. 139-1 at 5–24, and taxed them, particularly Bowie knives [31, 47, 53, 54, 59, 64, 82, 83]. These laws were enacted in regions experiencing rising homicide rates at

---

[23] In addition to the surveyed laws [24, 31, 32, 33, 36, 40, 41], Kentucky enacted a similar concealed-weapon law in 1813, *see* Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky, at 100-01 (1813), and Indiana did the same in 1820 and 1831, *see* Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly, at 39 (1820); 1831 Ind. Rev. Stat. 192, ch. 24. Indiana's concealed carry regime was upheld in *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833).

the time.  Roth Decl. ¶ 26.  In addition, several laws regulated the possession of gunpowder [27, 55, 67] and the setting of any trap gun [80].

Notably, just two years before the ratification of the Fourteenth Amendment, New York prohibited "furtively possess[ing]" and carrying any slungshot, billy, sandclub, metal knuckles, or dirk [81].  It was understood that states retained the power "to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens." *Aymette v. State*, 21 Tenn. 154, 159 (1840); *see also State v. Reid*, 1 Ala. 612, 616 (1840) (Legislature retained "the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals").  This understanding continued after 1868.[24] Governments continued to regulate enumerated, unusually dangerous weapons, including trap guns [95], restricting the carrying and use of certain specified weapons, Dkt. 139-1 at 24–37, and taxing certain weapons, like Bowie knives [98, 112, 115, 116, 117].  This period is especially important because the scope of the states' police powers "depends on how the right [to keep and bear arms] was understood when the Fourteen Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).

### d.   Late 19th and Early 20th Centuries (1878–1930s)

From the end of Reconstruction to the end of the 19th century, states and localities continued to enact restrictions on certain enumerated weapons deemed to be uniquely dangerous, like slungshots and Bowie knives.  Notably, in 1881, Illinois enacted a prohibition on the possession of a slungshot or metallic knuckles [146].  And in 1885, the Territory of Montana prohibited possession of certain weapons, including dirks and sword canes [170].  In addition, states and localities

---

[24] Additionally, laws restricting unauthorized militias "demonstrate[] the government's concern with the danger associated with assembling the amount of firepower capable of threatening public safety—which, given firearm technology in the 1800s, could only arise collectively." *Oregon Firearms*, 2022 WL 17454829, at *14 (discussing *Presser v. People of State of Ill.*, 116 U.S. 252, 253 (1886)).

22

1   continued to regulate the carrying and use of uniquely dangerous weapons, like

2   Bowie knives and metal knuckles.  Dkt. 139-1 at 41–56; Dkt. 139-2 at 1–14.

3        During the early 20th century, dangerous weapons laws continued to

4   proliferate, including more prohibitions on the possession of certain weapons.  *See*

5   Dkt. 139-2 at 15–39.  Notably, when semiautomatic and automatic weapons began

6   to circulate more widely in society and appear more frequently in crime in the

7   1920s, states began to regulate semiautomatic and automatic weapons capable of

8   firing a certain number of rounds successively and weapons capable of receiving

9   ammunition from feeding devices.  Def.'s Suppl. Br. at 47–49.  These early 20th

10  century laws are relevant because they are consistent with earlier enacted laws, in

11  identifying certain types of weapons for heightened regulation.  *Cf. Bruen*, 142 S.

12  Ct. at 2154 n.28 (discounting probative value of 20th century laws that

13  "contradict[ed] earlier evidence").  And they are uniquely relevant here, where this

14  was the earliest era in which comparable firearms technology appeared.

### 2.   The Surveyed Weapons Restrictions Are Relevantly Similar to Section 32310

15
16       The surveyed dangerous weapons laws enacted from the pre-founding era

17  through the early 20th century are relevantly similar to Section 32310 in light of

18  their comparable burdens and justifications.  Def.'s Suppl. Br. at 49–56.  ***First***, the

19  gunpowder and loaded-weapon restrictions enacted since the founding-era [11, 12,

20  27, 30, 55, 67, 153] are relevantly similar to the magazine-capacity limit challenged

21  here.  The gunpowder restrictions regulated possession, including inside the home.

22  Decl. of Saul Cornell ¶ 36, Dkt. 118-4.  Just as a 10-round magazine capacity limits

23  the amount of firepower that can be used in self-defense (without reloading),

24  historical gunpowder storage requirements limited the firepower that could be

25  exerted for self-defense.  But the gunpowder storage laws were far more

26  burdensome than limits on detachable magazines, particularly Massachusetts' 1783

27  prohibition on the possession of a loaded firearm [11].  Given how "time-

28

1   consuming the loading of a gun was in those days," this restriction "imposed a

2   significant burden on one's ability to have a functional firearm available for self-

3   defense in the home," and yet "there is no record of anyone's complaining that this

4   law infringed the people's right to keep and bear arms." Winkler, Gunfight, *supra*,

5   at 117. And in a direct parallel to modern magazine-capacity limits, gunpowder

6   storage requirements limited the amount of gunpowder that could be kept in

7   "magazines," which at the founding were storehouses used for storing gunpowder.

8   Baron Decl. ¶ 24. By preventing explosions or fires, these laws sought to protect

9   the public from mass-casualty incidents and minimize the threat of harm.

10      ***Second***, the dangerous weapons laws [1, 2, 3, 4, 6], including the restrictions

11   on concealable weapons enacted during the 1800s, *see supra* note 19–22, are also

12   relevantly similar to the law challenged here. Those restrictions on certain

13   unusually dangerous weapons imposed a comparably modest burden on Second

14   Amendment rights because like the LCM restrictions here, those laws did not

15   restrict weapons that are well suited to self-defense, and they left available

16   alternative weapons to be used for effective and lawful self-defense. *See Oregon*

17   *Firearms*, 2022 WL 17454829, at *13 (determining that the ban on possession of

18   large-capacity magazines imposed a comparable burden on "the right to self-

19   defense" as laws regulating "certain types of weapons, such as Bowie knives, blunt

20   weapons, slingshots, and trap guns because they were dangerous weapons

21   commonly used for criminal behavior and not for self-defense"); *id.* at n.19

22   (crediting the same declaration of Professor Spitzer as filed in this case).

23      Many of these laws regulated the public carry of certain weapons, but *Bruen*

24   does not require a historical regulation to use the same mode of regulation to

25   qualify as an analogue; it need only "impose a comparable burden on the right of

26   armed self-defense" that is "comparably justified." *Bruen*, 142 S. Ct. at 2133.

27   Historical restrictions on the carrying of certain weapons can support limits on what

28   arms may be possessed—the "important limitation on the right to *keep* and carry"

1  weapons "is fairly supported by the historical tradition of prohibiting *the carrying*

2  *of dangerous and unusual weapons.*" *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J.,

3  concurring) (quoting *Heller*, 554 U.S. at 626–27) (emphases added).  The concealed

4  weapons laws targeted the specific types of weapons, such as dirks, Bowie knives,

5  and pocket pistols, that were commonly used in the murders and serious assaults

6  that caused an alarming rise in homicides at the time.  Roth Decl. ¶ 24.  Today,

7  Section 32310 is justified because it regulates a weapon accessory that is used

8  frequently in mass shootings and leads to greater numbers of casualties when they

9  are used.  LCM restrictions are further justified by data showing that they can

10  reduce the number of casualties and the *incidence* of mass shootings.[25]

11     ***Third***, the prohibitions on the setting of trap guns also relevantly similar to

12  LCM restrictions.  They regulate possession of firearms, even inside the home, and

13  the manner in which they could be configured [10, 80, 109, 121, 168].  Spitzer

14  Decl. ¶¶ 50–53.  But the burden on the right to armed self-defense was minimal

15  because the firearms themselves could still be operated for self-defense without

16  being configured in a way to fire remotely, just as Section 32310 does not prohibit

17  the use of firearms with magazines capable of holding ten or fewer rounds for

18  lawful self-defense.  These laws sought to prevent unnecessary gunshot injuries and

19  death, as well as unintended harm.  *See Kolbe*, 849 F.3d at 127.

20                              **CONCLUSION**

21     For these reasons, the Court should uphold Section 32310 under the Second

22  Amendment, the Takings Clause, and the Due Process Clause.[26]

23  _____

24  [25] *See* Klarevas Suppl. Decl., Ex. D at 1760; Lori Ann Post & Maryann
    Mason, *The Perfect Gun Policy Study in a Not So Perfect Storm*, 112 Am. J. Pub.
25  Health 1707, 1707 (2022) (noting that Klarevas's "seminal study" "continues to
    have a large impact" in academic circles), https://bit.ly/3I1k95e.

26  [26] If the Court is inclined to rule in Plaintiffs' favor, the Attorney General
27  respectfully requests a stay of any judgment, at least for a sufficient period to allow
    the Attorney General to seek a stay from the Ninth Circuit. Def.'s Suppl. Br. at 61–
28  63.

1    Dated:  February 10, 2023                    Respectfully submitted,

2                                                 ROB BONTA
                                                  Attorney General of California
3                                                 MARK R. BECKINGTON
                                                  Supervising Deputy Attorney General
4                                                 KEVIN J. KELLY
                                                  Deputy Attorney General
5

6                                                 s/ John D. Echeverria

7

8                                                 JOHN D. ECHEVERRIA
                                                  Deputy Attorney General
9                                                 *Attorneys for Defendant Rob Bonta,
                                                  in his official capacity as Attorney
10                                                General of the State of California*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28