ROB BONTA
Attorney General of California
MARK BECKINGTON
Supervising Deputy Attorney General
KEVIN J. KELLY
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*In his official capacity as Attorney*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN et al.,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:17-cv-01017-BEN-JLB<br><br>**DECLARATION OF JOHN D. ECHEVERRIA IN SUPPORT OF DEFENDANT'S BRIEF IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022**<br><br>Dept:        5A<br>Judge:       Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

I, John D. Echeverria, declare as follows:

1.      I am a Deputy Attorney General with the California Department of Justice and serve as counsel to Defendant Rob Bonta, in his official capacity as Attorney General of the State of California ("Defendant"), in the above-captioned matter.  Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts from the transcript of the Deposition of Stephen C. Helsley [Vol. I], dated January

1

19, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the transcript of the Deposition of Stephen C. Helsley – Vol. II, dated January 30, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

4.    Attached hereto as **Exhibit 3** is a true and correct copy of the Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, filed in the matter, *Rupp v. Bonta*, U.S. District Court for the Central District of California, Case No. 8:17-cv-00746-JLS-JDE.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of the Declaration of Kevin Sweeney, dated February 5, 2023, filed in the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

6.    Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the transcript of the Deposition of Ashley Hlebinsky, dated January 20, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

7.    Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the transcript of the Deposition of Clayton Cramer, dated January 19, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM.

Declaration of John D. Echeverria in Support of Defendant's Brief in Response to the Court's Order Entered on December 15, 2022 (3:17-cv-01017-BEN-JLB)

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.  Executed on February 10, 2023, at

3    San Francisco, California.

4                                                          *s/ John D. Echeverria*
                                                          John D. Echeverria

## INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| 1 | Excerpts from the transcript of the Deposition of Stephen C. Helsley [Vol. I], dated January 19, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 1-32 |
| 2 | Excerpts from the transcript of the Deposition of Stephen C. Helsley – Vol. II, dated January 30, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 33-55 |
| 3 | Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, filed in the matter, *Rupp v. Bonta*, U.S. District Court for the Central District of California, Case No. 8:17-cv-00746-JLS-JDE | 56-72 |
| 4 | Declaration of Kevin Sweeney, dated February 5, 2023, filed in the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 73-106 |
| 5 | Excerpts from the transcript of the Deposition of Ashley Hlebinsky, dated January 20, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 107-138 |
| 6 | Excerpts  from the transcript of the Deposition of Clayton Cramer, dated January 19, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM | 139-183 |

# EXHIBIT 1

# Deposition of Stephen C. Helsley

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 19, 2023



**206.287.9066 I 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

_____

OREGON FIREARMS FEDERATION,      )
INC., et al.,                    )
                                 )
            Plaintiffs,          )
                                 ) Case Nos.
      v.                         ) 2:22-cv-01815-IM
                                 ) 3:22-cv-01859-IM
KATE BROWN, et al.,              ) 3:22-cv-01862-IM
                                 ) 3:22-CV-01869-IM
            Defendants.          )
_____ )
                                 )
                                 )
      (Continued)                )

_____

* VIDEOCONFERENCE *

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

STEPHEN C. HELSLEY

_____

Witness located in:

El Dorado Hills, California


* All participants appeared via videoconference *


DATE TAKEN:   January 19, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                      Oregon #22-0001

_____

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 2

```
 1            (Continued)              )
                                       )
 2     MARK FITZ, et al.,              )
                                       )
 3                    Plaintiffs,      )
           v.                          )
 4                                     )
       ELLEN F. ROSENBLUM, et al.,     )
 5                                     )
                     Defendants.       )
 6     _____)
       KATERINA B. EYRE, et al.,       )
 7                                     )
                      Plaintiffs,      )
 8         v.                          )
                                       )
 9     ELLEN F. ROSENBLUM, et al.,     )
                                       )
10                   Defendants.       )
       _____)
11     DANIEL AZZOPARDI, et al.,       )
                                       )
12                    Plaintiffs,      )
           v.                          )
13                                     )
       ELLEN F. ROSENBLUM, et al.,     )
14                                     )
                     Defendants.       )
15     _____

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1                        APPEARANCES

 2
       For Oregon Firearms Federation and the Witness:
 3
                       LEONARD WILLIAMSON
 4                     VAN NESS WILLIAMSON
                       960 Liberty Street SE, Suite 100
 5                     Salem, OR 97302
                       (503) 365-8800
 6                     L.williamson@vwllp.com

 7
       For the State of Oregon Defendants:
 8
                       HARRY WILSON
 9                     MARKOWITZ HERBOLD
                       1455 SW Broadway, Suite 1900
10                     Portland, OR 97201
                       (503) 972-5076
11                     HarryWilson@markowitzherbold.com

12
       For the Proposed Intervenor-Defendant Oregon Alliance
13     for Gun Safety:

14
                       ZACHARY J. PEKELIS
15                     W. SCOTT FERRON
                       PACIFICA LAW GROUP
16                     1191 Second Avenue, Suite 2000
                       Seattle, WA 98101
17                     (206) 245-1700
                       Zach.Pekelis@PacificaLawGroup.com

18
19     Videographer:
                       CATHY ZAK
20                     BUELL REALTIME REPORTING
                       1325 Fourth Avenue, Suite 1840
21                     Seattle, WA 98101
                       (206) 287-9066
22                     Info@buellrealtime.com
                              *   *   *   *   *
23
24
25
```

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 4

1                          EXAMINATION INDEX

2     EXAMINATION BY:                        PAGE

3     Mr. Wilson                              6

4     Mr. Pekelis                            85

5     Mr. Williamson                        103

6

7                            EXHIBIT INDEX

8     EXHIBIT        DESCRIPTION                      PAGE

9     EXHIBIT 27     Declaration of Stephen Helsley.  12

10    EXHIBIT 28     Declaration of Massad Ayoob in   67
                     Support of Plaintiffs' Motion
11                   For Preliminary Injunction;
                     Exhibits A-C.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                              Stephen C. Helsley

Page 5

1      El Dorado Hills, California; Thursday, January 19, 2023

2                              1:49 p.m.

3                                -o0o-

4

5               THE VIDEOGRAPHER:  Good afternoon.

6          This is the deposition of Stephen Helsley in

7      the matter of Oregon Firearms Federation, Inc. et al.

8      v. Brown et al., Case Numbers 2:22-cv-01815-IM,

9      3:22-cv-01859-IM, 3:22-cv-01862-IM, and

10     3:22-CV-01869-IM in the United States District Court

11     for the District of Oregon and was noticed by Markowitz

12     Herbold.

13         The time now is approximately 1:50 p.m. on

14     this 19th day of January 2023, and we are convening via

15     Buell virtual depositions.

16         My name is Cathy Zak from Buell Realtime

17     Reporting, LLC, located at 1325 4th Avenue, Suite 1840,

18     in Seattle, Washington 98101.

19         Will counsel please identify themselves for

20     the record.

21               MR. WILSON:  Harry Wilson, special

22     assistant Attorney General for the state of Oregon for

23     defendants.

24               MR. WILLIAMSON:  Leonard Williamson for

25     plaintiffs OFF here in Oregon.

Page 6

1          MR. PEKELIS:  Zach Pekelis for intervenor

2   defendant Oregon Alliance for Gun Safety, and I'm in

3   Seattle, Washington.

4          THE WITNESS:  And Steve Helsley, witness.

5          THE VIDEOGRAPHER:  Thank you.

6      The court reporter may now swear in the

7   witness.

8          THE COURT REPORTER:  Can I please get a

9   stipulation from counsel to swear in the witness, as

10  I'm a Washington State court reporter and notary, and

11  the witness is in California?

12          MR. WILSON:  So stipulated.

13          MR. WILLIAMSON:  So stipulated.

14          MR. PEKELIS:  Same.

15

16              STEPHEN C. HELSLEY,

17       Having been first duly sworn by the

18    Certified Court Reporter, was deposed as follows:

19

20              EXAMINATION

21  BY MR. WILSON:

22      Q.  Good afternoon, Mr. Helsley.  My name is Harry

23  Wilson.  As you just heard, I am an attorney for the

24  state of Oregon.

25          Could we begin today by having you state your

Page 7

1    full name for the record?

2         A.  Yes.  It's Steven, S-T-E-P-H-E-N; Craig,

3    C-R-A-I-G; Helsley, H-E-L-S-L-E-Y.

4         Q.  Mr. Helsley, do you understand that the oath

5    that you just took is the same oath that you would take

6    if we were in a courtroom?

7         A.  I do.

8         Q.  Do you understand that this deposition is

9    being transcribed by a court reporter?

10        A.  I do.

11        Q.  And do you also understand that this

12   deposition is being recorded by audio and video?

13        A.  I do.

14        Q.  Do you understand that we may be able to

15   playback that video or read from the transcript at a

16   hearing or a trial on this matter?

17        A.  I do.

18        Q.  Okay.

19             This afternoon I'm going to ask you a series

20   of questions in this deposition.  And unless you tell

21   me that you don't understand my question, I will assume

22   that you've understood it.

23             Does that make sense?

24        A.  It does.

25        Q.  Mr. Helsley, is there anything that would

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 8

1    prevent you from thinking clearly today?

2        A.   No.

3        Q.   Is there anything that would prevent you from

4    testifying truthfully today?

5        A.   No.

6        Q.   As we go through the questions, please feel

7    free to -- if there comes a point, you know, in the

8    next few hours that you would like to take a break,

9    just let me know, and I would be happy to go off the

10   record and do that.  Just so you know, if there's a

11   question pending, I will ask that you answer that

12   question before we take the break.

13            Make sense?

14       A.   I understand.

15       Q.   Okay.

16            Mr. Helsley, is it correct that presently you

17   are a retired peace officer from the California

18   Department of Justice?

19       A.   That is correct.

20       Q.   And about how many years did you serve as a

21   peace officer for the California Department of Justice?

22       A.   26 years.

23       Q.   Did you serve exclusively within the state of

24   California?

25       A.   I did.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 65

1          The time is 3:42 p.m.

2    BY MR. WILSON:

3          Q.  Welcome back, Mr. Helsley.

4          So I'm still on your report.  At this time, I

5    would like to take a look -- go to page 13.

6          A.  Got it.

7          Q.  And in the middle of that page, there's a

8    number 2, and then it says in italics "Limiting the

9    law-abiding citizen to a magazine of ten rounds limits

10   their ability

11   to protect themselves from violent criminals in certain

12   situations.  Such limits on magazine capacity are

13   likely to impair the ability of citizens to engage in

14   lawful self-defense in those crime incidents

15   necessitating that the victim fire many rounds to stop

16   the aggressive actions of offenders, while having

17   negligible impact on the ability of criminals to carry

18   out violent crimes."

19         Mr. Helsley, did you write that sentence --

20   those two sentences yourself?

21         A.  As best I can recall, I did.

22         Q.  And then there follows on, after that 2,

23   page 14 through to page 15, a number of paragraphs

24   discussing the use of firearms in self-defense

25   situations.

Ex. 1_Echeverria Decl.
Page 11
2d2d2168-0c87-408d-8a37-17183014be83

Page 66

1      Did you write those paragraphs yourself?

2      A.  Let me see the -- the paragraphs on page 14?

3      Q.  Yes.

4      A.  Well, if I didn't write something, I would

5  have put quotes on it and attributed it, so I don't --

6  I don't remember this specifically.  But again, if --

7  if it's not mine, I would have quoted it.

8             MR. WILSON:  I'd like to introduce an

9  exhibit now.  And I'll put it in the chat.  I'm also

10 going to email it around.

11      Leonard, I don't have the witness's email

12 address, and I'm just going to send it to you.  And so

13 after I hit send here, maybe we can go off the record

14 for a minute while we work on getting that exhibit on

15 screen?

16      So I'm hitting send now.

17             THE VIDEOGRAPHER:  Would you like to go

18 off the record now?

19             MR. WILSON:  And, yes, let's go off the

20 record.  Thank you.

21             THE VIDEOGRAPHER:  Going off the record.

22      The time is 3:45 p.m.

23             (Pause in the proceedings.)

24             THE VIDEOGRAPHER:  We are back on the

25 record.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 67

1       The time is 3:52 p.m.

2  BY MR. WILSON:

3       Q.  Okay.

4           Mr. Helsley, we are marking what is

5  Exhibit 28, and I'll let the court reporter do that.

6                (Exhibit 28 marked for identification.)

7                THE COURT REPORTER:  Exhibit 28 has been

8  marked.

9  BY MR. WILSON:

10      Q.  And then Mr. Helsley, Exhibit 28 should be

11 what you are looking at in front of you on your phone.

12 And if you would just tell me, does the first

13 page appear to be a court document captioned

14 "Declaration of Massad Ayoob in Support of Plaintiff's

15 Motion for Preliminary Injunction Exhibits A through

16 C"?

17      A.  No.

18      Q.  What do you see?

19      A.  The document that I just opened up is, I

20 think, the same one that I got before.  It starts off

21 with Stephen J. Joncus, OSB Number 013072.

22      Q.  Okay.

23          I think -- I think you're probably looking at

24 your expert report.

25      A.  Yes, I am.  But that's the one I just -- that

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 68

1    I just -- oh, wait one minute.  No.  That's -- oh,

2    shame on me.  I didn't scroll down far enough.

3          Okay.  Now I've got it.

4      Q.  Okay.

5          So what you're looking at says "Declaration of

6    Massad Ayoob"?

7      A.  Correct.

8      Q.  Okay.

9          So that has been marked as Exhibit 28.

10         And then Exhibit 27 is your expert report.

11   And I'm going to put that on the Zoom screen, and I

12   just want you to confirm that that is, in fact, what

13   you see when I put it on the screen.  So give me just a

14   second.

15         Okay.  Do you see on the screen

16   "Declaration" --

17     A.  I do.

18     Q.  -- "of Stephen Helsley"?

19         Okay.

20     A.  Wait.

21         Yeah.

22         Oops.  Yes.

23     Q.  Great.  Okay.

24         So Mr. Helsley, we were just discussing

25   Section 2 of your report on page 13, and I'm scrolling

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 69

1   down to that.  And you'll see on the screen I'm just

2   putting some highlighting.

3        A.   Mm-hm.

4        Q.   Do you see that?

5        A.   Yes, I do.

6        Q.   Okay.

7             Is that the section from your report that we

8   just read?

9        A.   Yes, it is.

10       Q.   Okay.

11            Now Mr. Helsley, could you, on your phone, on

12   Exhibit 28, scroll to the second page of the

13   declaration of Massad Ayoob and look at the bottom of

14   that page, paragraph 5 at the very bottom, and tell me

15   when you get there.

16       A.   On what -- what page this is?

17       Q.   On page 2, paragraph 5.

18       A.   Page 2.  Page 2, paragraph -- got it.

19       Q.   So paragraph 5 of Exhibit 28 of Mr. Ayoob's

20   declaration states "Limiting the law-abiding citizen to

21   a magazine of ten rounds or less will clearly limit

22   their ability to protect themselves from violent

23   criminals in certain situations.  Such limits on

24   magazine capacity are likely to impair the ability of

25   citizens to engage in lawful self-defense in those

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 70

1   crime incidents, necessitating that

2   the victim fire many rounds in order to stop the

3   aggressive actions of offenders."

4        Mr. Helsley, would you agree that that

5   language in paragraph 5 of Mr. Ayoob's declaration is

6   nearly identical to the language in Section 2 of your

7   declaration?

8        A.   Let me see here.  "Limiting --" (witness

9   mumbling/reading.)

10        Yes.  It is for about the first half of it,

11   yes.

12        Q.   Mr. Helsley, do you know Mr. Ayoob?

13        A.   I do not.

14        Q.   Have you ever had a conversation with him?

15        A.   No.

16        Q.   Mr. Helsley, did you copy your language in

17   your expert report from Mr. Ayoob's report here in

18   front of you?

19        A.   I don't think so.  I certainly am not inclined

20   to do that sort of a thing.  I don't recall doing it.

21   I don't think I did it.

22        Q.   Mr. Helsley, if you look back to your

23   report -- and I'm going to scroll down here -- you'll

24   see that I'm going to highlight this paragraph that

25   begins "Likewise."

Page 71

1     A.   Mm-hm.

2     Q.   That is a paragraph in your expert report;

3  correct?

4     A.   Let me see.

5          Yeah.

6     Q.   And then if you could, on Mr. Ayoob's report,

7  please scroll to page 8, paragraph 18.

8     A.   Page 8, paragraph 18.

9          Got it.

10    Q.   Okay.

11         So the paragraph in Exhibit 27, which is your

12 report, states "Likewise, the average homeowner who

13 keeps a defensive firearm is unlikely to have time to

14 gather spare ammunition or magazines."

15         In Mr. Ayoob's report, paragraph 18 states

16 "The homeowner who keeps a defensive firearm and is

17 awakened in the night by an intruder is most unlikely

18 to have time to gather spare ammunition."

19         And then both paragraphs continue on until the

20 end of the paragraph.

21         Would you agree that the language in these two

22 paragraphs is almost but not entirely identical?

23    A.   They're similar.

24    Q.   For example, in the paragraph in your report

25 you wrote "Ideally, one hand would be occupied with the

Page 72

1    handgun and the other with a telephone to call police."

2          And in Mr. Ayoob's report, it states "Ideally,

3    one hand would be occupied with the handgun itself, and

4    the other, with a telephone to call the police."

5          Do you agree that those are nearly identical?

6    A.   Yes.

7    Q.   So I guess my same question.  Did you copy

8    your report from Mr. Ayoob's report?

9    A.   Well, I don't -- I don't know that I ever saw

10   his report.  Again, I'm not sure of the time sequence

11   as to when I prepared this, but I don't -- I don't know

12   him, and I don't -- I don't recall seeing a report from

13   him, but they're clearly similar.

14   Q.   Mr. Helsley, if you'd go to page 15 of

15   Mr. Ayoob's report.  And just to help you find it,

16   page 15 is Mr. Ayoob's signature page.

17   A.   Okay.  I'm getting there.

18        Yeah.

19   Q.   And do you see that it's dated May 19th, 2017?

20   A.   Yes.

21   Q.   Your report, in contrast, on page 17, it's

22   dated December 20th, 2022; is that correct?

23   A.   Yes.

24   Q.   Is it fair to say that you created your report

25   after Mr. Ayoob signed and filed this report?

Page 73

1      A.  It seems like it, yes.

2      Q.  If you look at page 14 of your report, at the

3  top of the page, and I've scrolled to it here just so

4  you can see, beginning "The off-duty officer and the

5  private law-abiding citizen are thus unlikely to have

6  much, if any, spare ammunition on their person or

7  elsewhere readily accessible."

8          If you could also scroll to page 11 of

9  Mr. Ayoob's report, paragraph 27, please.

10     A.  Page 11.  Got it.

11     Q.  You'll see that paragraph 27 of Mr. Ayoob's

12  report also begins "The off-duty officer and the

13  law-abiding citizen alike are not likely to have that

14  volume of spare ammunition on their person or elsewhere

15  readily

16  accessible."

17          Would you agree that paragraph 27 of

18  Mr. Ayoob's report and the paragraph of your report

19  that begins "The off-duty officer" are nearly

20  identical?

21     A.  Yes.

22     Q.  I'm now looking at the paragraph beginning

23  "Criminals bent on causing harm" in your report.

24  That's paragraph 27.  And I'm on page 8, paragraph 20

25  of Mr. Ayoob's report.

Page 74

1       Would you please compare the first three

2   sentences of the paragraph in your report, and I'll

3   highlight them for you, to the sentences in paragraphs

4   20 and 21 in Mr. Ayoob's report?

5       Would you agree they are nearly identical?

6       A.  Yes.

7       Q.  The paragraph beginning "The virtuous citizen"

8   in your report appears to be nearly identical to the

9   paragraph beginning -- or the paragraph numbered Number

10  24 in Mr. Ayoob's report, which also begins with the

11  words "The virtuous citizen."

12      And it's my same question:  Are those

13  paragraphs nearly identical?

14      A.  Yes.

15      Q.  The paragraph beginning "Supporters of the

16  magazine capacity limitation" in your report appears to

17  be identical to the paragraph numbered paragraph 30 in

18  Mr. Ayoob's report.

19      Would you agree that those paragraphs are

20  nearly identical?

21      A.  Yes.

22      Q.  And then there's a paragraph that starts

23  "Finally, it's worth noting," in Exhibit 27, that's

24  your report.  And I ask that you compare that to

25  paragraph 11 of Mr. Ayoob's report and tell me whether

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 75

1    you believe that those paragraphs are nearly identical.

2        A.  You said 11 in his?

3        Q.  Mm-hm.  Yes.

4        A.  Paragraph 11.  Which paragraph is -- am I

5    comparing it with on the screen?

6        Q.  The paragraph beginning --

7        A.  "Finally"?

8        Q.  -- "Finally, it is worth noting."

9        A.  This 11 on my computer is "It is difficult to

10   say exactly."

11           So am I supposed to be on page 4?

12       Q.  Yes.  Page 4 of Exhibit 28, Mr. Ayoob's

13   report, paragraph 11, beginning "It is difficult to say

14   exactly."

15       A.  I just don't see it on my cell phone here.

16           My 11 says "It is difficult to say exactly how

17   many private citizens."

18           Oh, there -- okay.  There -- there it is.

19           "Finally..." (witness mumbling/reading.)

20           Yes.

21       Q.  Mr. Helsley, we've been discussing the

22   paragraphs in your report under Section 2, which began

23   with the italicized words "Limiting the law-abiding

24   citizen" and which began on page 13 and have run all

25   the way through page 15 of your report.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 76

1          When did you write these paragraphs?

2     A.   That's a -- that's a very good question.   I

3  don't know.

4          This was a document, I believe, that I'd

5  written in the main part for a California case, and

6  then I was requested to become involved in the Oregon

7  case.  And I just -- I -- I don't remember when it

8  was -- when I wrote it, primarily because the last

9  three or so years have been a blur because I've been

10  hospitalized and all sorts of surgeries and things.  I

11  just believe that I wrote this principally some years

12  ago, but I don't know when exactly I wrote it.

13     Q.  You mentioned that the -- in the last several

14  years that you've undergone some hospitalizations.  And

15  let me just say I'm sorry to hear that and I hope that

16  your health is improved and you feel like you're in

17  good shape.

18          My question is, is it -- is it possible that

19  during that period, you copied the words of Mr. Ayoob

20  at some point, and they have now been submitted as part

21  of your report, but they are not, in fact, your

22  original opinion and work?

23     A.  Well, I -- I would have written it before I

24  had the medical problems like in the area of, you know,

25  2017.  But I'm just saying I can't -- some of this

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 77

1    stuff is a blur.

2            I know that these things represent my

3    opinions.  I've just never copied the works of other

4    folks.  It's certainly -- there's certainly a strong

5    comparison.  But I don't think when I wrote it because

6    I don't remember the sequence of events, because the --

7    the attorney that I worked with in California, I've

8    done a lot of work there.  And the attorney here asked

9    permission of them to use some of the work that I had

10   done, and I updated it, I thought.  But beyond that, I

11   just can't say.

12                   MR. WILLIAMSON:  Counsel?

13                   MR. WILSON:  Go ahead.

14                   MR. WILLIAMSON:  Yeah.  Can we go off the

15   record for a moment?

16                   MR. WILSON:  Sure.

17                   THE VIDEOGRAPHER:  Going off the record.

18         The time is 4:12 p.m.

19                   (Pause in the proceedings.)

20                   THE VIDEOGRAPHER:  We are back on the

21   record.

22         The time is 4:15 p.m.

23                   MR. WILSON:  Mr. Williamson, would you

24   like to make a statement on the record?

25                   MR. WILLIAMSON:  Yes.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 78

1       So as I've been listening to the direct

2   examination of Mr. Helsley, it occurred to me in

3   looking at the Exhibit 1, Helsley Exhibit 1, as counsel

4   scrolled through it, it looked unfamiliar to me in

5   certain sections of it that I specifically discussed

6   with Mr. Helsley on the phone and then updated and

7   changed and sent the approved exhibit to my support

8   staff to attest his declaration and final filing with

9   the court.

10      And I'm looking back at my email from December

11  29th to my legal assistant with the updated exhibit

12  attached to it.  I've compared it to the one that's

13  filed with the court and attached to his declaration,

14  and it's the wrong one.  It simply looks like a copy of

15  the one that was filed in the California case in 2017.

16              MR. WILSON:  Okay.

17  BY MR. WILSON:

18      Q.  With that statement made by Mr. Waters,

19  Mr. Helsley, I'm going to follow up with a couple

20  questions.  Okay?

21      A.  Very good.

22      Q.  First of all, your lawyer has just made a

23  statement on the record that he believes that the wrong

24  exhibit may have been filed in this case.

25              The document that we have on the screen, which

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 79

1    is Exhibit 27, and I'm scrolling to the top here, is

2    titled "Expert Witness Report of Steven Helsley, Oregon

3    Firearms Federation, Inc., et al., v. Brown et al."

4         Earlier we talked about whether this was a

5    report you believe that you created.

6         Do you still believe that this is a report

7    that you created and you wrote?

8         A.  Correct.

9         Q.  And then at the -- I'm scrolling down to the

10   end of it.  You'll see this is on page 17 of

11   Exhibit 27.  It's dated December 20th, 2022.  There's a

12   signature.

13        And as we discussed earlier, that is your

14   signature; correct?

15        A.  Correct.

16        Q.  Do you have a recollection of executing this

17   report on December 20th, 2020?

18        A.  I have a recollection of the January 2nd

19   because something was emailed to me on the 30th or

20   29th, and I couldn't get to it.  And then we had to

21   change the date because it had rolled over to '23.  I

22   remember that.

23        The reason that I don't remember specifically

24   is because I've had a number of these California,

25   Washington DC, Oregon, where I've been sending things

Page 80

1    back and forth, and I don't remember this specifically.

2        Q.  Before you append your signature to a document

3    to be filed in court, do you review that document

4    carefully?

5        A.  Yes.  And I had reviewed this one.  I wasn't

6    clear as to what the relevance was to this case because

7    I had written the first part of this, and

8    Mr. Williamson and I had discussed that.

9            And then it seemed to me that all of a sudden,

10   the second half appeared.  And I just assumed that, you

11   know, everybody knew what they were doing and that was

12   supposed to be part of the package.

13       Q.  So is it your testimony that you did not

14   review the second half of the report to confirm that it

15   was your own work?

16       A.  No, no.  It -- I didn't know whether the

17   second half of the report was something that was going

18   to be -- that was relevant to this case.

19       Q.  So is it your testimony that the second half

20   of the report -- and I think when we say "second half

21   of the report," what we mean is Exhibit Helsley-1 --

22   that you are referring to the portion that begins on

23   page 9; correct?

24       A.  Yes.

25       Q.  Does it remain your testimony that the second

Page 81

1   half of the report is entirely your own work?

2         A.   Best I can recall, yes.

3         Q.   And do you have -- can you account for why it

4   is that many of the paragraphs in this report appear to

5   be identical or nearly identical to paragraphs in

6   Mr. Ayoob's report?

7         A.   I cannot.

8         Q.   Given the similarity between the paragraphs in

9   Mr. Ayoob's declaration and in your report, can you say

10  confidently that the court can fairly rely on your

11  expert work in -- what you've submitted here as your

12  own product?

13        A.   When you say what I've submitted here, you're

14  now referring to Part 1 and Part 2?

15        Q.   Why don't I withdraw that question and try to

16  ask it in a better way.

17             Mr. Helsley, can you say with confidence that

18  the portion of your expert report beginning on page 9

19  and continuing on through the end is your work with

20  enough confidence to ask the court to rely on it?

21        A.   Well, if the -- if the issue is the content, I

22  clearly agree on the content.

23             If your question is solely about did I author

24  it, content aside, well, you know, as best I can

25  recall, I did.  But if I wrote this, which I think I

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 82

1    did, it was years ago, I think.  I think this was -- I

2    think this was, for the most part, written probably in

3    2017.

4         Q.  So you can't remember exactly when it was you

5    created this second portion of your report?

6         A.  I can remember -- no.  Well, the second

7    portion being Part 1, as I see it, yeah, I remember

8    that specifically because Mr. Williamson and I

9    discussed that because I was on a very short timeline

10   to produce that because I got pulled into this, I want

11   to say, mid-December, and it's -- I think this may have

12   been -- the second half now that we're comparing with

13   what Massad did, this may have been something to do

14   with the Duncan case.  And if it is, then I've already

15   been deposed extensively on that report.

16        Q.  I just want to kind of make sure I fully

17   understand what we've talked about over the last few

18   minutes.

19             Is it your testimony that you are not entirely

20   confident that you are the original author of portions

21   of your report beginning on page 9, which is on the

22   screen in front of you, and continuing to the end?

23        A.  Well, as to confidence, I can't say because I

24   just don't remember.  Again, I think this was written

25   some time ago.  It's probably why I don't remember it.

Ex. 1_Echeverria Decl.
Page 28
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 83

1       But it's just not my style to copy things
2   without attributing them.  And I just -- I don't know.
3   I don't think so.
4       Q.  So you don't know -- you don't know for sure,
5   but you don't think so?
6       A.  Correct.
7           I don't know for sure because I simply don't
8   remember.  It's too long ago.
9       Q.  Mr. Helsley, when was the last time you went
10  to The SHOT Show?
11      A.  Went where?
12      Q.  The SHOT Show.
13      A.  Probably, oh, 15 years ago.
14      Q.  Gotcha.
15          And when was the last time you saw Andrei
16  Ugarov in person?
17      A.  I saw him -- I saw him in 2011 or '12 in
18  person.  And then I saw him, I think, in 2015.
19      Q.  Did you see him when you were in Russia in
20  2020?
21      A.  Yes.  I stayed with him at his house.
22      Q.  So you saw him in 2020.  Is that --
23      A.  Oh, no.  No, no.  I saw him -- I stayed with
24  him, I believe it was, in 2009 or '10 at his home in
25  Moscow.

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

2d2d2168-0c87-408d-8a37-17183014be83

Page 84

1    Q.   Where did you stay in Russia in 2020?

2    A.   I wasn't there that year.  I was there in '17

3  and, I believe, in '10.

4    Q.   Okay.  I'm sorry.  I must have written

5  something down wrong.

6        I understand you took an anniversary trip one

7  year?

8    A.   Yes, in '17.

9    Q.   In '17.  Okay.

10       Where did you stay in 2017?

11   A.   We were on a cruise, and so we -- we stayed on

12  the ship, and then we, you know, got on a bus and

13  toured around.

14          MR. WILSON:  Okay.  I have no further

15  questions at this time.  We -- the state -- the

16  defendants will want to keep this deposition open

17  pending any changes that are made to the declaration.

18  Of course, we reserve all rights to challenge,

19  depending on what gets filed and what gets done.

20  Thanks.

21          THE COURT REPORTER:  Any questions from

22  other counsel?

23          MR. PEKELIS:  Yeah.  I have some

24  questions.

25          And Mr. Helsley, my name is --

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 85

1      Can we take the declaration down?

2            MR. WILSON:  Yeah.  Just a second, and I

3  will do that.

4

5                    EXAMINATION

6  BY MR. PEKELIS:

7      Q.  Good afternoon, Mr. Helsley.  My name is Zach

8  Pekelis, and I'm the attorney for intervenor defendant

9  Oregon Alliance For Gun Safety in this case.

10           And given the uncertainties about your report

11  and what the correct version is, I'm not going to ask

12  you about that at all, and we're just going to wait

13  until we have whatever the intended correct final

14  version of it is.  And like defendants, we'll reserve

15  the right to reopen or keep open the deposition.

16           All the ground rules and principles that were

17  discussed by defendant's counsel earlier today,

18  Mr. Wilson, still apply.

19           Does that make sense?

20      A.  Yes.

21      Q.  What did you do to prepare for today's

22  deposition?

23      A.  Nothing in particular.

24      Q.  So I take it you did not read the declaration

25  that you submitted in this case before today's

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 106

1                      C E R T I F I C A T E

2

3      STATE OF WASHINGTON

4      COUNTY OF PIERCE

5

6           I, Tia Reidt, a Certified Court Reporter in and

7      for the State of Washington, do hereby certify that the

8      foregoing transcript of the deposition of STEPHEN C.

9      HELSLEY, having been duly sworn, on January 19, 2023, is

10     true and accurate to the best of my knowledge, skill and

11     ability.

12          IN WITNESS WHEREOF, I have hereunto set my hand

13     and seal this 26th day of January, 2023.

14

15

16          _____

17          /S/ Tia B. Reidt
            Tia B. Reidt, RPR, CSR Oregon #22-0001
18          NOTARY PUBLIC, State of
            Washington.
19          My commission expires
            5/15/2026.

20

21

22

23

24

25

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

# EXHIBIT 2

# Deposition of Stephen Helsley - Vol. II

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 30, 2023



**206.287.9066  I  800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 107

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

```
OREGON FIREARMS FEDERATION,   )
INC., et al.,                 )
                              )
          Plaintiffs,         )   Case Nos.
                              )   2:22-cv-01815-IM
   vs.                        )   3:22-cv-01859-IM
                              )   3:22-cv-01862-IM
KATE BROWN, et al.,           )   3:22-cv-01869-IM
                              )
          Defendants.         )
_____)
MARK FITZ, et al.,            )   VIDEO-RECORDED
                              )   VIDEOCONFERENCE
          Plaintiffs,         )   DEPOSITION OF
                              )   STEPHEN HELSLEY,
   vs.                        )   VOLUME II
                              )
ELLEN F. ROSENBLUM, et al.,   )
                              )
          Defendants.         )
_____)   *CAPTION
KATERINA B. EYRE, et al.,     )    CONTINUES*
                              )
          Plaintiffs,         )
                              )
   vs.                        )
                              )
ELLEN F. ROSENBLUM, et al.,   )
                              )
          Defendants.         )
```

_____


```
DATE TAKEN:  JANUARY 30, 2023

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337
```

Page 108

1   DANIEL AZZOPARDI, et al.,        )
                                     )
2               Plaintiffs,          )
                                     )
3       vs.                          )
                                     )
4   ELLEN F. ROSENBLUM, et           )
    al.,                             )
5               Defendants.          )
                                     )
6

7

8   _____

9           VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

10                           OF

11                   STEPHEN HELSLEY
                        VOLUME II

12  _____

13

                        10:06 a.m.
14

            EL DORADO HILLS, CALIFORNIA
15

    (All participants appeared via videoconference.)
16

17

18

19

20

21

22

23

24

25

eca924fc-a9ca-4c74-bbda-8156300a7993

Page 109

1          R E M O T E   A P P E A R A N C E S

2

3   FOR THE OFF PLAINTIFFS (via videoconference):

4          LEONARD W. WILLIAMSON
           Van Ness, Williamson, LLP
5          960 Liberty Street, Suite 100
           Salem, Oregon 97302
6          503.365.8800
           l.williamson@vwllp.com

7

8   FOR THE DEFENDANTS (via videoconference):

9          HARRY B. WILSON
           Markowitz Herbold, PC
10         1455 SW Broadway, Suite 1900
           Portland, Oregon 97201-3412
11         503.295.3085
           harrywilson@markowitzherbold.com

12

13
    FOR THE PROPOSED INTERVENOR-DEFENDANT OREGON ALLIANCE
14  FOR GUN SAFETY:

15         ZACHARY J. PEKELIS
           Pacifica Law Group, LLP
16         1191 Second Avenue, Suite 2000
           Seattle, Washington 98101-3404
17         206.245.1700
           zach.pekelis@pacificalawgroup.com

18

19  ALSO PRESENT (via videoconference):

20
           MELODY SORENSEN, VIDEOGRAPHER
21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 37
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 110

1        VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION
           OF STEPHEN HELSLEY, VOLUME II

2
               EXAMINATION INDEX

3

4   EXAMINATION BY:                   PAGE

5   Mr. Pekelis                    112

6   Mr. Wilson                     159

7   Mr. Williamson                163

8   Mr. Pekelis                    166

9

10                 EXHIBIT INDEX

11  EXHIBITS FOR IDENTIFICATION          PAGE

12  Exhibit 51    Corrected Declaration of Stephen  115
                 Helsley

13
   Exhibit 52    Declaration of Stephen Helsley in  125

14               Support of Plaintiffs'
                 Supplemental Brief; Exhibit 10 -

15               Duncan vs. Becerra

16  Exhibit 53    Top 10 Most Audacious Shootouts in  144
                 US History

17

18

19

20

21

22

23

24

25

Page 111

1           EL DORADO HILLS, CALIFORNIA; JANUARY 30, 2023

2                          10:06 a.m.

3                          --oOo--

4

5                    THE VIDEOGRAPHER:  We are now on the

6       record.  This is Volume 2 of the virtual video-recorded

7       deposition of Stephen Helsley in the matter of Oregon

8       Firearms Federation, Inc., et al., versus Brown, et

9       al., in the United States District Court, District of

10      Oregon, Portland Division.  The case numbers are

11      2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM,

12      and 3:22-cv-01869-IM.

13               The time is now approximately 10:06 a.m. on

14      January 30th, 2023.  My name is Melody Sorensen from

15      Buell Realtime Reporting.  Will counsel please identify

16      themselves for the record.

17                    MR. PEKELIS:  Zachary Pekelis --

18                    MR. WILLIAMSON:  Leonard Williamson

19      representing OFF Plaintiffs.

20                    MR. WILSON:  Harry Wilson, special

21      assistant attorney general, for Defendants.

22                    MR. PEKELIS:  Zachary Pekelis for

23      Intervenor-Defendant, Oregon Alliance For Gun Safety.

24                    THE VIDEOGRAPHER:  The court reporter

25      today is Lorrie Chinn, who will now swear in the

Page 112

1    witness.

2

3      STEPHEN HELSLEY,      witness herein, having been first

4                            duly sworn under oath, was

5                            examined and testified as follows:

6

7                        E X A M I N A T I O N

8    BY MR. PEKELIS:

9         Q.   Mr. Helsley, good morning again.

10        A.   Good morning.

11        Q.   Nice to see you.  We met last week at your

12   deposition on January 19th, 2023.  Do you remember

13   that?

14        A.   Yes.

15        Q.   And this is a continuation or a reopening of

16   your deposition in the same case.  Do you understand

17   that?

18        A.   Yes.

19        Q.   So the same guidelines and rules that

20   Mr. Wilson went over at your deposition on January 19th

21   still apply.  Does that make sense to you?

22        A.   I understand.

23        Q.   And I'll just go over a couple of those that I

24   think are the most important.  Especially given that

25   this is taking place over Zoom, it's important to make

Page 113

1  sure that I've finished asking my questions before you

2  begin your answer.  So leave a little bit of a pause

3  perhaps.  Does that sound good?

4      A.  Yes.

5      Q.  And then you understand the oath that you took

6  today?

7      A.  Say again.

8      Q.  Do you understand the oath that you took

9  today?

10     A.  Yes.

11     Q.  And is there anything that might prevent you

12  from understanding my questions and answering them

13  truthfully?

14     A.  No.

15     Q.  Okay.  What did you do to prepare for today's

16  deposition?

17     A.  Well, I read a variety of documents that were

18  emailed to me.  I had to go through and find the errors

19  in the transcript from the first hearing.  That's what

20  I spent a great deal of time doing.

21     Q.  Anything else that you did in preparation?

22     A.  No.

23     Q.  And what were the documents that were emailed

24  to you that you mentioned, besides the transcript of

25  the January 19th deposition?

Ex. 2_Echeverria Decl.
Page 41
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 114

1    A.  I think I'd defer to Mr. Williamson on that
2  because his office shipped me a whole variety of
3  things, and I don't know that I can recall them all.
4    Q.  Can you recall any of them?
5    A.  Yeah.  It was essentially the same thing that
6  I've seen before:  My resume, my statements in this
7  case, the documents I wrote for it, and there was
8  material in there regarding the Duncan case in
9  California.
10    Q.  Would that be your declaration that you
11  submitted in the Duncan case?
12    A.  I'm sorry.  You have to speak up.  I can't --
13    Q.  Would that be your declaration that you
14  submitted in the Duncan case?
15    A.  Yeah.  I don't know whether the declaration
16  was there.  I know that I was deposed, and I saw the
17  transcript for being deposed in that case.
18    Q.  I see.  How about your declaration in that
19  case, did you review that?
20    A.  There was -- there was too much material for
21  me to read.  I got it at about 8 o'clock this morning,
22  and so I don't know what all is there because I
23  couldn't get through it all.
24    Q.  Understood.  Anything else that you did to
25  prepare for today's deposition?

Page 156

1    and people who are particularly good at it can do a

2    magazine change in probably less than a second.

3         Q.  What would you say that the average range is

4    in terms of time to change a magazine?

5         A.  Well, it depends on how you carry it, you

6    know, is it in your pocket or is it in a magazine pouch

7    on your belt?  Are you wearing a coat over the top of

8    the magazine?

9         Q.  How about just from the time that the magazine

10   is in your hand, the new magazine is in your hand?

11        A.  Okay.  It depends a little bit on how the

12   magazine release works.  Some of the older pistols had

13   a -- like the Walther P38, for instance, had a thing

14   that you had to push to clear the way for the magazine

15   to go into the frame.

16        Q.  How about for a modern handgun?

17        A.  Modern -- if the magazine has been -- the

18   empty magazine has been released from the firearm and

19   you have a magazine in your hand and you're slamming it

20   home, again, if you're well trained, in the second

21   range.

22        Q.  And how about if your training is merely

23   average?

24        A.  Well, then it can be more substantial because

25   you're not familiar with how it should be done.  You

Ex. 2_Echeverria Decl.
Page 43
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 157

1    may have to look to make sure the magazine fits into

2    the magazine well in the firearm.  It could be three

3    seconds, four seconds to do it.

4        Q.  Okay.  Would you say that the stress of an

5    actual firearm confrontation could make that changing a

6    magazine take longer?

7        A.  Yes.

8        Q.  When an armed attacker pauses to reload, would

9    you agree that it can provide an opportunity for

10   victims to flee or attempt to disarm him?

11       A.  In theory, yes.  Again, the magazine change

12   can happen so quickly, depending on the shooter's

13   skill, that it's almost invisible.  So, yeah, I mean,

14   it's possible that citizens could attack a shooter who

15   is doing a magazine change.  I suppose it's happened,

16   but it's pretty unlikely.

17       Q.  Understood.  The last thing I wanted to ask

18   you about, in your January 19th deposition, Mr. Wilson

19   showed you the declaration from Massad Ayoob.  Do you

20   recall that?

21       A.  Yes.

22       Q.  And we saw that several portions of your

23   expert report were identical to Mr. Ayoob's declaration

24   in Duncan.  Do you recall that?

25       A.  I do.

Ex. 2_Echeverria Decl.
Page 44
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 158

1     Q.  And I noticed that the material in your

2    corrected declaration, Exhibit 51, is the same.  It

3    hasn't been changed and it's still identical in certain

4    respects to Ayoob's declaration.  Do you have any

5    further light to shed on why there were those

6    similarities and overlap between your declaration and

7    Mr. Ayoob's?

8     A.  I certainly wish I had some because it's been

9    a source of pretty substantial anxiety for me since --

10   during the last week.  But, no, I don't.  I said before

11   I just don't remember.  I don't recall.  I don't know

12   how it could have gotten there.  I don't know that --

13   yeah.  I'm puzzled.  I just don't know.

14    Q.  Is it possible that maybe some of the

15   attorneys in the Duncan case who were assisting you

16   with the preparation of your declaration may have

17   inserted some of the language from Ayoob's declaration

18   without telling you?

19    A.  I don't think so.

20    Q.  Okay.  I don't have any other questions.

21   Thank you for your time, Mr. Helsley.

22    A.  You bet.

23

24

25                              '

Page 159

1              E X A M I N A T I O N

2    BY MR. WILSON:

3         Q.  Good morning, Mr. Helsley.  This is Harry

4    Wilson.  We spoke a week or so ago as well.  And I am

5    an attorney and the special assistant attorney general

6    representing the Defendants in this matter.

7              Do you remember our conversation last

8    January 19th?

9         A.  I do.

10        Q.  I have just a few brief questions.

11   Mr. Pekelis just asked you about the conversation you

12   and I had with respect to the portions of your original

13   declaration in this matter that appeared to be

14   identical to the declaration of a Mr. Massad Ayoob from

15   2017.

16             Since that time you've submitted a corrected

17   declaration, and that corrected declaration has been

18   listed as Exhibit 51, correct?

19        A.  Correct.

20        Q.  As Mr. Pekelis just pointed out, the corrected

21   declaration does not appear to change any of the

22   material you and I discussed that seemed to be

23   identical to the declaration of Mr. Ayoob, correct?

24        A.  Correct.

25        Q.  And since the time you and I last talked on

eca924fc-a9ca-4c74-bbda-8156300a7993

Page 160

1    January 19th, 2023, have you had any conversations with

2    Mr. Ayoob about why your expert report is similar to

3    his expert declaration?

4         A.   No.  I don't know him.  I've never spoken to

5    him.

6         Q.   One thing I just wanted to quickly check is

7    that Mr. Pekelis put on the screen Exhibit 52.  And if

8    the videographer and the court reporter could put that

9    back up on the screen for just one moment.

10             Great.  Thank you.  And please scroll to what

11   is listed as page 20 -- oh, I'm terribly sorry.  I said

12   the wrong number.  I'm looking for Exhibit 52, not 50

13   -- is this 52?  Yes, it is.  I'm sorry.  So please keep

14   scrolling down.

15             THE VIDEOGRAPHER:  (Scrolling).

16        Q.   And I would like to scroll to the signature

17   page of this document.  So, Mr. Helsley, you signed

18   this Exhibit 52, this expert report, on October 6th,

19   2017, correct?

20        A.   Correct.

21        Q.   And do you remember the date that the

22   declaration of Massad Ayoob was signed?

23        A.   Oh, I have no idea.

24        Q.   And we discussed it during the deposition we

25   had last January 19th.  And to refresh your

Page 161

1    recollection, I'll represent to you that we discussed

2    that his declaration was signed on May 19th of 2017.

3    Does that sound familiar to you?

4        A.   Well, not really, but I'll take your word for

5    it.

6        Q.   Why don't I just send it to you.  I'm going to

7    send it to Leonard and to -- Lorrie, I'll send this to

8    you as well.

9               THE REPORTER:  Thank you.

10              MR. PEKELIS:  Harry, can I just

11   interject?  It is already marked as an exhibit.  I

12   don't know if you plan to use 28, which is already

13   marked.

14              MR. WILSON:  Yes.  This is Exhibit 28.

15   And if everyone already has it, that's the one I'm

16   going to refer to.

17              THE VIDEOGRAPHER:  So do you want me to

18   stop sharing this one?

19              MR. WILSON:  Yes, please.  And, Melody,

20   I don't have your email address, but I'm looking to

21   place on the screen Exhibit 28.  Do you need that?

22              THE VIDEOGRAPHER:  Yes.  It's

23   happymel45@hotmail.com.

24       Q.   BY MR. WILSON:  So, Mr. Helsley, those

25   documents are circulating now to the videographer and

eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 162

1   the court reporter, so give me just a moment.

2                MR. PEKELIS:  I sent one out as well,

3   and mine actually has the exhibit sticker on it.  I

4   don't know if you want to use that.

5                MR. WILSON:  Great.

6                THE VIDEOGRAPHER:  I did get that.  I

7   got that one, so...

8                MR. WILSON:  Why don't we use that one.

9   And if you could scroll to page 15 of Exhibit 28.

10               THE VIDEOGRAPHER:  Just a second.

11   Sorry.

12               MR. WILSON:  That's okay.

13               THE VIDEOGRAPHER:  (Scrolling).  Just a

14   minute.

15       Q.  BY MR. WILSON:  Okay.  Great.  So,

16   Mr. Helsley, does this refresh your recollection that

17   Mr. Ayoob's declaration was signed on May 19th of 2017?

18       A.  Yes.

19       Q.  And so is it correct to say that your

20   declaration in the Duncan matter -- your expert report

21   in the Duncan matter, which was signed on October 6th

22   of 2017, was signed after Mr. Ayoob submitted his

23   declaration on May 19th of 2017?

24       A.  Yes.

25       Q.  Okay.  I don't have any further questions.

Page 163

1            THE VIDEOGRAPHER:  Do you have any

2    further questions, Mr. Pekelis?

3            MR. PEKELIS:  No, I don't.

4            THE VIDEOGRAPHER:  Mr. Williamson, any

5    questions?

6            MR. WILLIAMSON:  Yes, I do have some

7    follow-up questions.  Thank you.

8

9                 E X A M I N A T I O N

10   BY MR. WILLIAMSON:

11       Q.  If we could bring up Exhibit 53, please.

12   Mr. Helsley, you indicated you didn't know who

13   FlameHorse was; is that correct?

14       A.  Correct.

15       Q.  Could the videographer hover above the word

16   FlameHorse?  And could you click on the word

17   FlameHorse?  And could you scroll about halfway down

18   there?  Pause right there, please.  Do you see where it

19   says who is behind the Listverse?  On the left-hand

20   side of the left column do you see where it says who is

21   behind the Listverse, Mr. Helsley?

22       A.  Yeah, Jamie Frater.

23       Q.  Do you know that person?

24       A.  I do not.

25       Q.  Is that the person you attributed the material

Page 164

1    to originally?

2        A.  Yes.

3        Q.  Okay.  And counsel asked you if you had ever

4    treated a gunshot wound.  Do you remember that

5    question?

6        A.  Correct.

7        Q.  When you were shot, did you treat yourself?

8        A.  No.

9        Q.  You didn't administer any first aid to

10   yourself?

11       A.  I'm sorry.  You're a little bit garbled.

12       Q.  Sure.  The question is, did you attempt to

13   administer any first aid to yourself?

14       A.  I still can't get what you're saying.

15       Q.  The question is, when you were shot, did you

16   attempt to administer any first aid to yourself?

17       A.  No.

18       Q.  Okay.  Do you recall last week on the 19th the

19   confusion around the originally dated report -- expert

20   report dated December 20 and the report that you

21   approved as dated December 29?  Do you remember that

22   confusion?

23       A.  Do I recall the confusion?

24       Q.  Yes.

25       A.  Yes, I do.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 165

1      Q.   Do you recall contributing or making or
2  directing the changes to the report that ended up being
3  the final one dated December 29th?
4      A.   Yes.   In particular it was the additional
5  articles I had written.
6      Q.   In addition to the articles, you mean
7  additional insertions of Measure 114; is that correct?
8      A.   Yeah.
9      Q.   Between December 29 when that was dated and
10  when the declaration was resubmitted last week with the
11  correct report, did you direct any additional changes
12  to occur to your expert report?
13      A.   There was a lot of back and forth, but I can't
14  recall directing any changes.   If they were, they were
15  so minor that I don't -- you know, I don't recall them.
16      Q.   Okay.   If I'm following the exhibits here
17  correctly, Exhibit 51 is the corrected declaration.
18  Could the videographer pull that up and then go down to
19  page 23, please?   Not page 23 of the -- yeah, page 23
20  at the top there.   Right there.   Scroll down to about
21  the middle of the page.   There you go.
22          Mr. Helsley, do you see the title of that
23  document there?
24      A.   I do.
25      Q.   And I'm going to read it aloud here:

Page 166

1    Deposition of Stephen Helsley, Monday, December 18th,

2    2017.  Do you recall that deposition?

3         A.  Yes, I do.

4         Q.  And that deposition would have occurred after

5    Mr. Massad Ayoob's declaration and the one that you

6    submitted October 6th of 2017; is that correct?

7         A.  Correct.

8         Q.  Okay.  I have no other questions.  Thank you.

9              THE VIDEOGRAPHER:  Are there any other

10   questions?

11             MR. WILSON:  No redirect.

12             THE VIDEOGRAPHER:  Mr. Pekelis?  Do you

13   have anything further, Mr. Pekelis?  You're muted.

14             MR. PEKELIS:  I guess I have one -- just

15   one -- a couple more questions.

16

17              E X A M I N A T I O N

18    BY MR. PEKELIS:

19        Q.  So, Mr. Helsley, just to go back to the

20   question of the similarities -- the identical aspects

21   of your declaration and Mr. Ayoob's declaration, would

22   you agree that based on the identical language

23   contained therein, it's clear that either you copied

24   Mr. Ayoob's declaration or he copied yours?

25        A.  I think that's a reasonable conclusion.

Page 167

1      Q.   Okay.   I don't have anything else.   Thank you,

2  sir.

3                    THE VIDEOGRAPHER:   Anyone else?

4                    MR. WILLIAMSON:   Nothing here.

5                    THE VIDEOGRAPHER:   We are going off the

6  record at 11:45, and this concludes this deposition for

7  today.

8             (Deposition adjourned at 11:45 a.m.)

9             (Reading and signing was not requested

10             pursuant to FRCP Rule 30(e).)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 168

1                     REPORTER'S CERTIFICATE

2

3        I, LORRIE R. CHINN, the undersigned Certified Court
Reporter, pursuant to RCW 5.28.010 authorized to administer
4  oaths and affirmations in and for the State of Washington, do
hereby certify:

5

        That the sworn testimony and/or remote proceedings, a
6  transcript of which is attached, was given before me at the
time and place stated therein; that any and/or all witness(es)
7  were duly sworn remotely to testify to the truth; that the
sworn testimony and/or remote proceedings were by me
8  stenographically recorded and transcribed under my
supervision, to the best of my ability; that the foregoing
9  transcript contains a full, true, and accurate record of all
the sworn testimony and/or remote proceedings given and
10  occurring at the time and place stated in the transcript; that
a review of which was requested; that I am in no way related
11  to any party to the matter, nor to any counsel, nor do I have
any financial interest in the event of the cause.

12

        Reading and signing was not requested pursuant to
13  FRCP Rule 30(e).

14        WITNESS MY HAND AND DIGITAL SIGNATURE this 3rd day of
February, 2023.

15

16

17

18  LORRIE R. CHINN, RPR, CCR
Washington State Certified Court Reporter No. 1902
19  Oregon State Certified Court Reporter No. 97-0337
lorrie@buellrealtime.com

20

21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 55
eca924fc-a9ca-4c74-bbda-8156300a7993

# EXHIBIT 3

1   ROB BONTA
    Attorney General of California
2   P. PATTY LI
    Supervising Deputy Attorney General
3   ANNA FERRARI
    Deputy Attorney General
4   State Bar No. 261579
    JOHN D. ECHEVERRIA
5   Deputy Attorney General
    State Bar No. 268843
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
7     Telephone:  (415) 510-3479
      Fax:  (415) 703-1234
8     E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Rob Bonta,*
9   *in his official capacity* [1]

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                     WESTERN DIVISION

13

14

15   **STEVEN RUPP; STEVEN**          8:17-cv-00746-JLS-JDE
     **DEMBER; CHERYL JOHNSON;**
16   **MICHAEL JONES;**               **SUPPLEMENTAL EXPERT**
     **CHRISTOPHER SEIFERT;**         **REPORT AND DECLARATION**
17   **ALFONSO VALENCIA; TROY**       **OF COLONEL (RET.) CRAIG**
     **WILLIS; and CALIFORNIA RIFLE** **TUCKER**
18   **& PISTOL ASSOCIATION,**
     **INCORPORATED,**
19
                        Plaintiffs,   Courtroom:   8A
20                                    Judge:       The Honorable Josephine
            **v.**                                 L. Staton
21
22   **ROB BONTA, in his official capacity**   Action Filed:  April 24, 2017
     **as Attorney General of the State of**
23   **California; and DOES 1-10,**

24                        Defendants.

25

26   ─────────────────
27        [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
     Attorney General of the State of California. Pursuant to Federal Rule of Civil
     Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
28   the defendant in this case.

                                      1

**SUPPLEMENTAL EXPERT REPORT AND DECLARATION
OF COLONEL (RET.) CRAIG TUCKER**

I, Colonel (Ret.) Craig Tucker, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report and declaration on the purpose, use, and features of certain semiautomatic firearms.  This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

**PROFESSIONAL QUALIFICATIONS**

2.      I am a Colonel, US Marine Corps, (Retired).  I served as an infantry officer in the Marine Corps for 25 years.  I have commanded infantry units from platoon to regiment.  I commanded Regimental Combat Team -7 (RCT-7) in Iraq from February 2004 to April 2005.  During my time in Iraq, I commanded 22 different US Marine, US Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and US Special Forces, and supported National Tier 1 assets.  I commanded the Regiment in both Fallujah battles and numerous smaller battles.  I was the target of 9 assassination attempts and was wounded in Husaybah Iraq in July 2004.  Upon my return from Iraq, I was assigned to the US Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

3.      I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

4.     After I retired from military service in 2006, I served as an Assistant Deputy Administrator for the Office of Secure Transportation (OST), National Nuclear Security Agency.  OST is a paramilitary organization consisting of federal agents armed with M4s.[2]  I was also the Department's Render Safe program in Albuquerque NM.

5.     In 2012, I joined Innovative Reasoning LLC, which provides professional support services to the U.S. Department of Defense and other government clients.  While at Innovative Reasoning, I developed training programs and planning capabilities for the Marine Corps, and I developed and taught a training course on tactical decision-making for law enforcement officers.

6.     Through my military service, I gained extensive knowledge and familiarity with the full range of US combat weapon systems.  The automatic rifle is the foundational combat weapon system.  Ground and aviation weapon systems are specifically designed to support the automatic rifle.  My primary purpose in the latter stages of my career was coordinating, and teaching others to coordinate, air and ground weapon systems to support the rifleman and his automatic rifle.

7.     I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56 AR rifle.  Both are advertised as the civilian version of the M16 combat rifle.  In addition to my automatic rifle experience, I have extensive experience with the AK-47, having been on the receiving end of hundreds of 7.62 rounds; an experience best typified during the Battle of Hit when a single individual with one rifle and apparently inexhaustible supply of 7.62 ammo and magazines kept nine Marines pinned down for 15 minutes until a LAV-25 20mm chain gun solved the problem.  I have extensive experience with the Colt 1911 .45 caliber semi-automatic and the Berretta .9m semi-automatic pistol and used both weapons in Iraq.

---

[2] The M4 is a gas-operated, magazine-fed carbine.  It is the shortened version of the M16 assault rifle.

3

8.       I currently serve as a trainer and planner for the City of Albuquerque's Office of Emergency Management.

9.       I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master's degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

10.      A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

11.      I have been retained by the California Department of Justice to serve as an expert witness in this case.  I am being compensated at a rate of $200 per hour.

## OPINIONS

12.      I have reviewed the statutory definitions of an "assault weapon," as defined under California's Assault Weapons Control Act (AWCA) in California Penal Code section 30515(a).[3]  Under Penal Code section 30515(a), a semiautomatic centerfire rifle that does not have a fixed magazine qualifies as an assault weapon if it has any of the following features:  (1) a pistol grip that protrudes conspicuously beneath the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[4]  A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine with the capacity to hold more than 10 rounds or has an overall length of less than 30 inches.[5]  I have also reviewed the list of rifles that qualify as "assault weapons"

---

[3] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

[4] Cal. Penal Code § 30515(a)(1)(A)-(F).

[5] Cal. Penal Code § 30515(a)(2)-(3).

under California Penal Code § 30510(a), which have many of the same features and accessories listed in § 30515(a).

13.    I am familiar with the features, accessories, and capabilities of rifles regulated by Penal Code § 30515(a).  The AR-15, like the M4, is an offensive combat weapon system.  The only difference is the AR-15 cannot fire on full-auto (continual shots fired in succession so long as the trigger is pulled) or burst (several shots fired in succession with a single pull of the trigger)—a picayune difference that cannot serve to support a non-combat role for the AR-15.  In my experience, soldiers are trained to set select-fire weapons to semi-auto mode, so that a single round is fired with each pull of the trigger.  An M4 or M16 on full-automatic is an area fire weapon: the auto rate of fire makes the weapon too difficult to control on a point target.  Rifle fire on full automatic is not aimed fire, uses an excessive amount of ammunition and will damage the weapon if used too often.  In fact, in my 14 months of combat, I did not once see an M4 or M16 fired on full auto.  Semi-auto function is used almost exclusively in combat.  When operated in semi-auto mode, the AR-15 and M4 share the same rates of fire, the same maximum effective range, the same maximum range, use the same magazines designed for combat and the same ammunition.  The AR-15 and M4 are both designed to fire a .223 round that tumbles upon hitting flesh and rips thru the human body.  A single round is capable of severing the upper body from the lower body, or decapitation.  The round is designed to kill, not wound, and both the AR-15 and M4 contain barrel rifling to make the round tumble upon impact and cause more severe injury.  The combination of automatic rifle and .223 round is a very efficient killing system.  The same can be said of the AR-15.

14.    Automatic rifles, like the M-16 and its more modern carbine variant M4, are functionally similar to semiautomatic rifles regulated under California's AWCA and  often are equipped with the very same features, like pistol grips and adjustable stocks.  It is my opinion, based on my military service, that these

1  features, individually and in combination, make semiautomatic rifles more lethal

2  and most useful in combat settings, as described in more detail below.

3       15.    Detachable magazines:  In order for a rifle to qualify as an assault

4  weapon under California Penal Code § 30515(a), the rifle must have the capability

5  of accepting a detachable ammunition magazine (by not having a fixed magazine).

6  Detachable magazines improve the killing efficiency of automatic rifles, allowing

7  the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-

8  round magazines, to rapidly change magazines in combat, and to increase killing

9  efficiency by significantly reducing reload time.  Changing magazines during

10  intense combat is the most important individual skill taught to Marines.  During

11  intense combat, the detachable magazine provides a rifleman the capability to fire

12  120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds

13  per minute.  In a civilian self-defense context, by contrast, an individual would not

14  have a need for such a high rate of fire.

15       16.    Pistol grip protruding beneath the action of a rifle:  I am a 15th Award

16  Expert on the M16 and M4.  I carried an M4 every day for 14 months during my

17  time in command of RCT-7 in Iraq.  I used an M4 in combat, and I killed with it.

18  The pistol grip beneath the action of an automatic rifle serves only two purposes.

19  First, the pistol grip allows the rifleman to pull the rifle into her shoulder with each

20  shot, an action which increases stock weld, reduces semi-automatic/automatic

21  recoil, and reduces barrel rise.  Stock weld or cheek weld refers to the firmness of

22  the contact between the rifle stock, the shooter's cheek, and the shooter's shoulder.

23  A firm stock weld is required for effective semi-automatic and automatic rapid fire.

24  Absent any pistol grip, a semi-automatic rifle would be difficult to operate when

25  fired rapidly, as the rifle barrel would seesaw up and down with each shot fired in

26  succession.  Second, the pistol grip functions as a hand rest to reduce hand/finger

27  fatigue during long combat engagements.  Both actions increase the killing

28

6

1  efficiency of automatic rifles and are necessities in sustained combat operations of

2  weeks or months when firing a rifle rapidly.

3      17.  <u>Forward pistol grip</u>:  The forward pistol grip provides leverage to

4  tighten a stock weld on short barrel automatic weapons and reduces recoil and

5  barrel rise on short barrel automatic rifles.  Forward pistol grips were added to the

6  M4 to increase M4 killing efficiency.

7      18.  <u>Folding stock</u>:  A folding stock causes weapon instability.  For that

8  reason, folding stock automatic rifles are designed for military personnel, whose

9  primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be

10  required to escape from a mangled vehicle, or who may need to abandon a

11  destroyed weapon system and need a substitute weapon for offensive combat.

12  Outside of the military context, folding stocks that are not properly locked in place

13  can cause significant safety risks to the shooter due to recoil.

14      19.  <u>Grenade or flare launcher</u>:  A Marine Corps fireteam consists of a

15  fireteam leader, a rifleman, an assault gunner, and a grenadier.  The grenadier is

16  armed with a grenade launcher.  The grenadier uses the grenade launcher to

17  suppress or kill human beings so the rest of the fireteam can maneuver into position

18  to kill those humans with automatic rifle fire.  The launcher is a separate weapon

19  system attached to as few rifles as possible dependent on the combat mission.  In

20  my experience, grenade launchers attached to rifles are cumbersome, difficult to

21  aim, difficult to carry, and are not as effective as a standalone grenade launcher.

22  They have no legitimate use in self-defense.

23      20.  <u>Flash suppressor/flash hider</u>:  The purpose of the flash suppressor is to

24  reduce combat signature by cooling and dispersing burning gases.  This makes it

25  more difficult for the enemy to pinpoint a rifleman's location, especially in low

26  light conditions.  The flash suppressor facilitates night combat operations by

27  reducing muzzle flash and mitigating muzzle flash impact on night vision goggles.

28

7

This accessory serves specific combat-oriented purposes and is not needed for self-defense.

21.   <u>Fixed magazine with the capacity to accept more than 10 rounds</u>: Automatic rifles are offensive combat weapons systems designed to kill efficiently and effectively.  Any increase to magazine capacity increases the killing efficiency of the automatic rifle.  A 30-round fixed magazine can fire more rounds in a given amount of time than three 10-round detachable magazines, which would need to be reloaded to fire the same number of rounds, slowing down the rate of fire.  Similarly, a 100-round drum magazine can fire more rounds in a given period of time than ten 10-round detachable magazines.  As noted above in connection with detachable magazines, an individual using a rifle in self-defense would not need such a high, continuous rate of fire.

22.   The AR-15 is an offensive combat weapon no different in function or purpose than an M4.  In my opinion, both weapons are designed to kill as many people as possible, as efficiently as possible, and serve no legitimate sporting or self-defense purpose.  Self-defense and military combat are different.  The weapons and accessories needed in one may not be needed or appropriate in the other.  For instance, when I was serving in the military, I carried my M4 for offensive combat and a handgun for self-defense.  Defensive combat is generally up close and very personal.  At that range, it is very difficult to use a rifle as a defensive weapon, except as a blunt force instrument.  My 9mm pistol was the self-defense weapon of choice, and we were trained to expend only 1-2 rounds per adversary in pistol combat.  The features identified in California Penal Code § 30515(a) enhance the lethality of both semiautomatic and automatic rifles and are most appropriate for combat applications when used in conjunction with those types of weapons systems.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6, 2023 at Sandia Park, New Mexico

_____
Col. (Ret.) Craig Tucker

# EXHIBIT A

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

**CITY OF ALBUQUERQUE OFFICE OF EMERGENCY MANAGEMENT (07/2021-PRESENT)**

- Training and Education Coordinator/Acting Senior OEM Planner
  - Coordinate with County and State agencies to develop training and exercise programs that prepare the City of Albuquerque to mitigate, respond to, and recover from disasters.
  - Develop response plans for wildfire, flood, earthquake, and weapons release and test the plans in tabletop exercises and drills.
  - *In coordination with Albuquerque Public Schools developed and executed a school drill assessment/evaluation program.*
  - *Created, developed, and initiated training for APS, APD, and AFR on a doctrinal, best-practices-based approach to "Command and Control, Active Shooter, in a School, School in Session"*
  - Develop a training and exercise program to meet FEMA National Qualification Standards.
  - Serve as the Operations Chief for EOC activations and training.
  - Responsible for Plans updates and revisions, including a rewrite of the CABQ Comprehensive Emergency Management Plan.
  - Write and manage OEM Grants, including SHSGP, EMPG and Hazard Mitigation Grants.

**RAVENSWOOD SOLUTIONS INC. (10/2019 – 06/2021)**

- Program Manager, US Marine Corps Operations

  - Provide subject matter expertise and develop capture plans to provide live, virtual, and constructive capabilities in support of the Commandant's Planning Guidance.

  - Project Manager for Ravenswood Solutions live-instrumented training and AAR support to MAGTF Warfighting Exercise-20 (MWX 20), the largest instrumented exercise in USMC history.

  - Co-authored White Paper on the application of machine-learning and Artificial intelligence to support unit readiness reporting.

  - Provided subject matter expertise to support ML/AI Wargaming prototype development.

  -

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Project Director, Middle East Operations

  o Lead planner and primary proposal author of a of a multi-corporation proposal to develop an 800-structure urban live fire and maneuver range in a Gulf Coast Coalition country.

  o Lead planner and primary proposal author of a multi-corporation proposal to develop a comprehensive training program for an emergent Marine Corps in a Gulf Coast Country.

- Program Manager, National Security Operations

  o Provide subject matter expertise, develop, and supervise training services in support of Department of Energy nuclear security and non-proliferation operations.

- Independent Contractor (01/2022 – 06/2022)

  o Acted as the Ravenswood Solutions Inc. US Marine Corps subject matter expert.

  o Acted as the Ravenswood Solutions Inc., training and leadership subject matter expert.

**INNOVATIVE REASONING, LLC  (08/2012 - 09/2019)**

- Director, Studies and Analysis

  o Provided analyses, recommendations and participated as the senior tactical SME in support of the following Marine Corps Combat Development Command requirements.

    • Development of the U.S. Marine Corps post-war on terror Training Strategy.

    • Development of an adaptive planning capability employing multi-agent modeling, experiential learning theory, and machine learning.

    • Improving Small Unit Leader Decision-making through training in Recognition Primed Decision-making and experiential learning theory.

    • Chaired US Marine Corps 3d Annual Maneuver Warfare Conference (2018).

- Director, Federal Programs

  o Provided direction, supervision, and oversight to 5 program managers assigned to DOD and Department of Energy contracts in the United States and overseas.

Ex. 3_Echeverria Decl.
Page 68

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- <u>Program Director, Law Enforcement Tactical Decision-making</u>

  - Created, certified, and taught tactical decision -making courses focused on making decision in high risk, low occurrence, fast moving circumstances with risk of death, serious injury.

  - Developed and taught 400+ series of National Incident Management Courses to support local law enforcement requirements.

**DEPARTMENT OF ENERGY (09/2006 – 07/2012)**

- <u>Render Safe, Program Manager (SES)</u>

  - Responsible for the Department of Energy (DOE) operational elements conducting nuclear counterterrorism and nuclear accident response in support of Tier 1 elements.

  - Responsible for organizing, resourcing, developing, and executing crisis response render-safe operations in support of Presidential and National Security policy.

- <u>Assistant Deputy Administrator (SES), Office of Secure Transportation (OST)</u>

  - Responsible for the safe and secure transportation of nuclear weapons, materials, and components in the continental United States.

  - Acted as the Senior Energy Official and National Nuclear Security Administration Incident Commander for incidents involving OST assets and during DHS-directed NIMS National Training Programs

  - Provided leadership, vision, and direction to a 1000+ mixed para-military and civilian workforce.

  - Developed and implemented innovative security practices focused on intelligence-driven operations, leadership, and performance-based approach to training. Resulting security Doctrine provided a blueprint for significant changes to DOE physical security doctrine.

  - Provided astute and responsible management of a $270 million budget.

**UNITED STATES MARINE CORPS (06/1981- 08/2006)**

- <u>Director of Training, Tactical Training Exercise Control Group (TTECG)</u> (07/2005-08/2006)

  - Selected by the Commandant to rebuild and lead the Marine Corps

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

Service-level pre-deployment training program.

- Responsible for the successful integration of emergent and innovative urban operations with conventional combined arms operations. Trained organizations from the US and numerous allied countries.

- Managed a training budget of $30 million. Developed and implemented new approaches to training to maximize effective use of increased training budget. Increased the number of Marines/units trained per year and successfully integrated complex, multi-discipline training requirements into a coherent, effective training program

- Commanding Officer, Regimental Combat Team 7 (RCT-7) (06/2003 - 07/2005)

  - Commanded U.S. Marine Corps Regimental Combat Team 7 during Operation Iraqi Freedom II. Tour included 14 months of continuous combat command in Al Anbar Province.

  - Commanded RCT-7 during major urban combat operations to include battles of Fallujah I, Al Fajr (Fallujah II), Husaybah, Ramadi, and Hit.

  - Developed and implemented successful strategic plans for reconstruction of western Iraq; managed over $200 million in construction and procurement contracts. Responsibilities included establishing border security, counter-terrorism operations, infrastructure development, and security forces training.

  - Acted as Superintendent for an elementary school system consisting of 12 elementary schools throughout Al AnBar province. Constructed the schools, hired teachers, hired administrators, and provided safety and security for students, teachers, and staff.

  - Responsible for the Force Protection and security of US bases and approximately 20,000 military and contractor personnel.

- Director of Operations, Training and Education Command (06/2002-05/2003)

  - Responsible for the Marine Corps' training programs, with an 80,000+ personnel annual throughput.

  - Developed and successfully initiated programming and procurement for the Marine Corps' 10-year range modernization and instrumentation plan. Established and chaired Range Instrumentation Working Group.

  - U.S. Marine Corps Service-level representative to the OSD working group responsible for developing training transformation strategies.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Successfully led USMC effort to meet the congressionally mandated requirement to replace Vieques Island with a CONUS based amphibious live-fire training capability within the year.

  o Commander, 2nd Battalion,7th Marine Regiment,

  o Director of Operations, 7th Marine Regiment.

  o Director of Operations, 13th Marine Expeditionary Unit (13th MEU).

    - Responsible for leadership and performance of a task-organized team with 1000+ members.

    - Served as primary planner in Naval and Joint crisis action planning and execution, to include the development of training plans, equipment procurement, and exercise development for the organization's worldwide contingency operations.

  o Operations Planner, I Marine Expeditionary Force (I MEF).  Primary planner and architect for a multi-national effort to rewrite the operations plan for defense of the Republic of Korea.

  o Commander, Presidential Security Force, Camp David, MD

    - Commanding Officer of Marine Corps Detachment responsible for the security of the Presidential Retreat at Camp David.
    - Successfully balanced a 33% reduction in force structure with implementation of an innovative physical security plan that integrated personnel reductions, new technologies, and manpower, while increasing the security posture.

  o Commanding Officer:
    - Weapons Company, Marine Infantry Battalion. (1988-1989)
    - Infantry Company, Marine Infantry Battalion. (1986-1988)
    - Guard Company, Nuclear Weapons Security, Adak, AK. (1984-1986)
    - Headquarters Company, Supply Battalion. (1983-1984)

**AWARDS**
(2) Legions of Merit with Combat Valor device, Purple Heart, Navy Commendation Medal for Heroic Action, Combat Action Ribbon, (7) Sea Service Deployment Ribbons, numerous other awards, and

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289
decorations.

**PAPERS**

- "On Demand Readiness for Army Commanders Through AI and Machine Learning" (2020) (White Paper for Army Applied Laboratory and the Office of Naval Research. (co-authored with SOMETE Technology and Lockheed Martin)

- "Band of Brothers: The 2D Marine Division and the Tiger Brigade in the Persian Gulf War" An Analysis of the Impact of Organizational Culture on Tactical Joint Warfare (School of Advanced Military Studies, US Army Command and General Staff College)

- "False Prophets: The Myth of Maneuver Warfare and the Inadequacies of FMFM 'Warfighting'" (School of Advanced Military Studies, US Army Command and General Staff College,

- "Towards an Intellectual Component to Joint Doctrine: The Philosophy and Practice of Experiential Intelligence" (Naval War College)

**EDUCATION**

- B.S. Criminal Justice, University of Dayton
- MMAS, U.S. Army Command and General Staff College
- MMAS, US Army School of Advanced Military Studies
- MA, National Security and Strategic Studies, College of Naval Warfare (Highest Distinction)

# EXHIBIT 4

**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
| | 3:22-cv-01862-IM (trailing case) |
| Plaintiffs, | 3:22-cv-01869-IM (trailing case) |
| v. | **DECLARATION OF KEVIN SWEENEY** |
| TINA KOTEK, et al., | |
| Defendants, | |
| and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
| Intervenor-Defendant. | |

**Page 1 -  DECLARATION OF KEVIN M. SWEENEY**

MARK FITZ, et al.,

                                                        Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

                                                        Defendants.

KATERINA B. EYRE, et al.,

                                                        Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

                                                        Defendants,

              and

OREGON ALLIANCE FOR GUN SAFETY,

                                              Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                                                        Plaintiffs,

                    v.

ELLEN F. ROSENBLUM, et al.,

                                                        Defendants.

## DECLARATION OF KEVIN M. SWEENEY

I, Kevin M. Sweeney, declare the following:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.   I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use

**Page 2 -   DECLARATION OF KEVIN M. SWEENEY**

dating from the 1600s, 1700s, and early 1800s.  During these years, in my own research on

material culture, I made use of colonial-era probate inventories to study such topics as home

furnishings in an effort to discover what types of possession were commonly found in households,

to measure changes in standards of living, and to gain insights into domestic architecture.[1]  I also

examined critically and wrote about the strengths and weaknesses of these sources, their

usefulness and pitfalls.[2]  For decades, historians who are aware of these records' usefulness and

their limitations have used estate inventories to study agricultural changes in England, wealth and

social structures in England and its colonies, the institution of slavery in colonial American and

the lives of slaves, and household possessions in America, England, and France.[3]

      3.      My current research on seventeenth and eighteenth-century firearms and militias

utilizes similar types of methodologies, documentary sources, and period artifacts.  This project,

which has been going on for over a decade, was initially inspired by my skepticism of the

controversial claims and pretended use of evidence from probate inventories in Michael A.

Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A.

Knopf, 2000).  As part of my on-going project, I have given papers at the annual meetings of the

American Historical Association and the Organization of American Historians, at conferences on

firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two

essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] Some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases see: James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 282-286171-174; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd. ed. (London: Routledge, 1996), esp. 201-207.

**Page 3 -   DECLARATION OF KEVIN M. SWEENEY**

Militias in Seventeenth- and Eighteenth-Century England and America" (2019).  A third essay is forthcoming on "Revolutionary State Militias in the Backcountry and Along the Frontiers," and I am currently working on a fourth essay as well as working on a book-length manuscript.  My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

4.      I have been retained by the State of Oregon Defendants to provide an expert opinion on repeating firearms in eighteenth-century America.  I make this declaration on the basis of my training, professional expertise, and research.  For my work in this case, I am being compensated at a rate of $50 per hour.

5.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms.  As Harold Peterson stated in his classic 1956 book -- *Arms and Armor in Colonial America, 1526-1783:*"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons.  In 1783, almost a hundred years later, the period ended with the same weapons [i.e. muzzle-loading smooth-bore muskets and pistols] still supreme, and without even any notable improvements in their design or construction."[4]  Peterson continued: "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[5]

6.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications.  First, these weapons described by Peterson [i.e., the muzzle-loading smooth-bore musket and pistol] were still "supreme" in 1800 and probably as late as 1810.  Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets.  Finally, it is more accurate to

---

[4] Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[5]      *Ibid.*, 221.

**Page 4 -   DECLARATION OF KEVIN M. SWEENEY**

say that repeaters had *occasionally* appeared on the scene and not "frequently" as Peterson believed.  Here, he was probably misled by the preference that private collectors and institutional collections had (and still have) for obtaining rare examples of unusual or innovative firearms.

## I.    Firearms Owned By Eighteenth-Century Americans

7.     Today, we tend to refer to any muzzle-loading eighteenth-century gun as a musket, and this is what Peterson did in the statement quoted above.  However, Peterson knew better, as did Ben Franklin.  In the mid-1740s, Franklin informed the readers of his Philadelphia newspaper that a "Musket" was "the Name of a particular Kind of Gun."[6]  An eighteenth-century musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for attaching a bayonet.  It weighed about 10 to 11 pounds and was .69 caliber in its bore if French or .75 caliber if English, with an average barrel length of 44 inches.[7]  On a battlefield, a musket was more than just a firearm: because of its weight and sturdy construction and because of its bayonet, a musket also functioned as a club and a spear.  These capabilities were integral to its role as an eighteenth-century military arm.  The combination of these features and capabilities made a musket "a Universal Weapon."[8]

8.     Eighteenth-century muskets did have two serious drawbacks which they shared with all flintlock, muzzle-loading smoothbores.  First, their accuracy and range were limited. The round ball fired by these weapons was not very aerodynamic, and this produced a great deal of drag that reduced its velocity.  A musket's smooth-bore barrel also lacked rifling, which were spiral grooves cut inside the barrel.  When a ball traveled down a barrel with rifling, the grooves imparted a spin to the ball that stabilized and flattened its trajectory, increasing its distance and accuracy.  (The effect of rifling on a rifle ball's flight can be compared to throwing a spiral pass

---

[6]     "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[7]  Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121-141.

[8]  Stuart Reid, *The Flintlock Musket: Brown Bess and Charleville 1715-1865* (Oxford: Osprey, 2016), 61, 55-60.

**Page 5 -   DECLARATION OF KEVIN M. SWEENEY**

in football which also flattens trajectory and improves accuracy.)  While a smooth-bore musket may have been just as accurate as an eighteenth-century muzzle-loading rifle at distances of up to 50 yards, most authorities agree that a musket was not very accurate at ranges beyond 100 yards.[9]  Today, pistols and most long arms other than shotguns have rifled barrels.

9.      Loading and reloading eighteenth-century muskets was a complicated and relatively slow process by today's standards.  To load a musket, a shooter held it in front of him parallel to the ground, pulled back the gun's cock to its half cock position to prevent a premature discharge, and then took from a cartridge box an individual paper cartridge that contained a pre-measured load of gunpowder and a ball.  Next one opened the priming pan, bit the cartridge and poured a small amount of powder into the priming pan which was then closed shut.  Following this, the shooter placed the musket upright on the ground and poured the remainder of the cartridge's gun powder down the barrel, and then crammed the paper cartridge with its ball into the barrel.  (The cartridge's paper wrapper served as wadding, holding the ball in place.)  A ramrod was used to push the cartridge paper and ball down the barrel, after which the ramrod was recovered and secured in its resting place under the barrel.  The musket was then raised, placed on full cock, aimed, and the trigger pulled.  Pulling the trigger released the cock, which held a flint that moved forward, striking a steel frizzen, creating sparks that ignited the powder in the priming pan which in turn ignited the charge of powder placed in the barrel, creating an explosion that—finally—discharged the musket ball.  As a rule, a musket could realistically be loaded and fired two or three times a minute in combat by well-equipped and trained soldiers.[10]

10.     The process of loading and reloading a musket took even longer if instead of using a prepared paper cartridge, one used gunpowder from a powder horn to prime the pan and

---

[9] Reid, *Flintlock Musket*, 34.  For a claim that a rifle had an advantage over a musket at distances greater than 50 yards see John F. Winkler, *Point Pleasant, 1774: Prelude to the American Revolution* (Oxford: Osprey, 2014), 29.  For a claim that a rifle and a musket were equally accurate at 100 yards see Alexander Rose, *American Rifle, A Biography* (New York: Delta Trade Paperbacks, 2009), 20.

[10] Jeremy Black, *European Warfare, 1660-1815* (New Haven: Yale University Press, 1994), 40; Hew Strachen, *European Armies and the Conduct of War* (London: George Allen & Unwin, 1983), 17.

**Page 6 -   DECLARATION OF KEVIN M. SWEENEY**

then poured into the horn's measuring cap the amount of powder needed to charge the barrel. With this procedure one also had to remove an individual musket ball from a shot pouch and place it in the barrel after pouring down the measured charge of powder.  The ball was then rammed home.  Using this method of loading not only took longer, but also lacked the wadding provided by a paper cartridge which helped hold the ball in place.  According to the results of one modern test, wadding also increased a smoothbore's muzzle velocity by about 30%.[11]  Most hunters, backwoods men with muzzle-loading rifles, and many colonial militiamen lacked cartridge boxes and paper cartridges and instead used powder horns and shot bags.

11.     Even with these drawbacks, colonial governments and later state governments armed troops with these muskets during the French and Indian War (1754-1763) and the Revolutionary War (1775-1783).  There really weren't serious alternatives.  As a result, the British Ordnance Office loaned colonial governments 22,000 muskets to arm provincial troops raised for active service in the field during the French and Indian War, and at least 100,000 European muskets—most of them French—were imported during the American War for Independence.[12]  During the French and Indian War, the British also sent muskets to arm Georgia and North Carolina militiamen who lacked arms, and state governments sometimes provided arms for mobilized militiamen during the Revolutionary War.[13]

12.     As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting.  Especially popular in New England were locally made or imported smoothbore and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[14]  The narrower

---

[11] Glenn Foard, *Battlefield Archaeology of the English Civil War* British Series 570 (Oxford: British Archaeological Reports, 2012), 105.

[12] De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120-123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484-485.

[13] Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, eds. *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, 2013), 335, 348, 351-352.

[14] Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150-166.

**Page 7 -   DECLARATION OF KEVIN M. SWEENEY**

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[15] Some New England fowlers could outrange muskets and some were modified to carry a bayonet.[16] However, because of their lighter weights and sleeker construction, they were not necessarily as sturdy or as "soldier-proof" as a musket nor as effective as a club.

13.     Many residents living in the colonies stretching from New York to Virginia owned "trade guns." These were inexpensive, muzzle-loading, single shot, smooth-bore firearms designed and produced for trade with Native Americans. Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[17] Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder than compared to a musket for each shot. However, these light, often cheaply constructed firearms did not function well as clubs and were not designed to carry a bayonet.

14.     In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles. As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 caliber bores—though some were even smaller—and barrels averaging 42 inches in length, and fired projectiles weighing much less than musket balls.[18] Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them. However, they took more time to reload because riflemen had to use powder horns and bullet pouches instead of paper cartridges, and reloading became harder as

---

[15] Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121-122; Neumann, *Battle Weapons of the American Revolution*, 206-210.

[16] Douglas D. Scott, et al., "Colonial Era Firearm Bullet Performance: Live Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Tom Grinslade, *Flintlock Fowlers: The First Guns Made in America* (Texarkana, Texas: Scurlock Publishing 2005), 59,72, 73, 75.

[17] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203-205.

[18] Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215-225.

**Page 8 -   DECLARATION OF KEVIN M. SWEENEY**

gunpowder residue built up in the grooves of the barrel's rifling.[19]  Additionally, these long rifles were not designed to take a bayonet, and they could break if used as a club.

15.    Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[20]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and as a result, they were often made in pairs "so that the owner might have two shots at his command."[21]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[22]  As it was, period pistols were discharged in close proximity to their targets because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[23]

16.    Civilian officials and military officers generally had a low opinion of trade guns, fowlers and even the period's American-made long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[24]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian

---

[19] John W. Wright, "The rifle in the American Revolution," *American Historical Review* Vol. 29, No. 2 (January 1924), 293-299.

[20] Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[21] Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[22] For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd ed. (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[23] Scott, et al., "Colonial Era Firearm Bullet Performance," 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

[24] "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265-266.

**Page 9 -   DECLARATION OF KEVIN M. SWEENEY**

Trade," and not muskets.[25]  Later, George Washington referred to such smooth-bore long arms as "trash or light arms."[26]  Over the course of the Revolutionary War, he and his officers even phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[27]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[28]

17.      Data drawn from group of probate inventories of males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners (Table 1).  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms. Even cursory descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single shot muzzle loading firearm. Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, muskets and rifles constituted a minority of such weapons.

18.      The more expensive guns found in these 3,249 eighteenth-century probate inventories were also likely to be some type of muzzle loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was twice or three times the cost of common muzzle-loading smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, was the period's more realistic provision for being able to

---

[25] "Blair Report," 171.

[26] General George Washington to Gentlemen, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[27] Wright, "Rifle in the American Revolution," 297-298.

[28] Thomas Jefferson, *Notes on the State of Virginia*, edited by William Peden (New York: W. W. Norton, 1982), 88.

**Page 10 - DECLARATION OF KEVIN M. SWEENEY**

readily discharge more than one shot.  Only one gun found in this database of 3,249 probate inventories may have been a repeater: an "air gun" owned by Philippe Guillaume Chion [Philip Williamson?], Charleston merchant, who died in 1797.[29] However, as is noted below in paragraph 40, not all air guns available in America were repeaters.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 1.9% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 532 | 32.0% | 0.2% | 2.3% | 5.1% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 459 | 62.9% | 3.7% | 4.1% | 23.3% |
| Totals | 3249 | 46.6%* | 1.4%* | 2.0%* | 7.8%* |

**Note:** *The percentages at the bottoms of the columns are not averages of the percentages in the columns, but percentages of the total of 3249 inventories found in each category: 1514 inventories with firearms, 45 inventories with muskets, 66 inventories with rifles and 254 inventories with pistols.  **Sources:**  The sources for the probate inventories used in this table are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

19.     Partial militia returns from the state of Virginia dating from 1781 to 1784 provide additional evidence that American consumers preferred smoothbore firearms that were not muskets.  Even though state law required "every militia-man to provide himself with arms [i.e. muskets] usual in regular service [i.e. the Continental Army] . . . this injunction was always in

---

[29] Inventory of Philippe Guillaume Choin, 1797, South Carolina Inventories and Appraisement Books, Vol. C, 1793-1800, 212-213. at Fold 3 by Ancestry https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872. <Accessed online 1/23/2023 at 6:00 P.M.>

**Page 11 - DECLARATION OF KEVIN M. SWEENEY**

differently complied with."[30]  Most did not own muskets, even in wartime.  Only about 16.7% of the privately owned long arms were muskets, while another 20.3% were rifles owned by residents of the state's western counties.[31]  By contrast, 63.0% of the privately owned long arms were smoothbores that were not muskets.[32]

**Table 2:  Partial Virginia Militia Returns Indicating Types of Arms in Use, 1781-1784**

| Year | Number of Counties | Number of public muskets | Number of private muskets | Number of private long arms* | Number of private rifles | Number of private pistols | Total Number of Guns |
|------|------|------|------|------|------|------|------|
| 1781 | 27 | 1502 | 1333 | 4225 | 1293 | 204 | 8557 |
| 1782 | 10 | 565 | 242 | 2113 | 767 | 60 | 3747 |
| 1784 | 15 | 541 | 441 | 1260 | 392 | 68 | 2702 |
| ALL | 52 | 2608 | 2016 | 7598 | 2452 | 332 | 15006 |

<u>Note</u>: *Number of "private long arms" are privately owned long arms that were not muskets and not rifles.
<u>Sources</u>: **Militia Returns 1777-1784, microfilm, Accession 36929; State Government Records Collection; "General Return of Arms, Accoutrements, and Military Stores, 19th May, 1784," Accession 36912, House of Delegates, Executive Communications, Library of Virginia, Richmond**

20.    A large portion of the firearms used in eighteenth-century America would have been imported from England.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by craftsmen who were woodworkers.  By the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual

---

[30]  Jefferson, *Notes on the State of Virginia*, 88.

[31]  Calculated from data in Table 2.

[32]  *Ibid.*.

**Page 12 - DECLARATION OF KEVIN M. SWEENEY**

manufacturing processes."[33] In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.[34]

21.     Other than American long rifles and some New England fowlers, most eighteenth-century firearms used by colonists were not likely to have been custom made or "one-off" products. During the years from 1756 to 1763, at least 36,592 firearms were imported into the thirteen American colonies from England for civilian customers.[35]   Another 18,900 trade guns were imported to sell to Native American customers.[36]   Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels. Most of the pistols sold in the colonies were not produced in the colonies.[37]   A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[38] When it came to his gunsmithing business, this skilled craftsman may have had more in common with a twentieth-century TV repairman than he did with Samuel Colt or Eli Whitney.

## II.     References to Repeating Arms in Eighteenth-Century Media

22.     So, how common were repeating weapons in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Information drawn from eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5,000 newspapers, with 450 dating from before 1800— tells much the same story.[39]  This newspaper database was searched by entering the terms "gun,"

---

[33] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

[34] Williams, *Birmingham Gun Trade*, 21-24; De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I: Andrew Mowbrey, 2009), 93-102.

[35] Bailey*, Small Arms*, 237.

[36] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" American Society of Arms Collectors *Bulletin* No. 85, 19.

[37] Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46.

[38] Susan McGowan, "Agreeable to his Genuis: John Partridge Bull (1731-1813), Deerfield, Massachusetts" (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[39] *America's Historical Newspapers* (Chester, VT: Readex, 2004).

**Page 13 - DECLARATION OF KEVIN M. SWEENEY**

"musket," "fowler," "rifle," "pistol," "shot" and "militia,"  The search turned up 9 references to what appear to be repeating guns.  To the information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777.  This makes a total of 10 references to eighteenth-century repeaters in the period from 1720 to 1800.

23.   What do these period references to repeating guns tell us about their features and how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America?  The earliest known reference in an American newspaper to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723:  "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once.  This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730.  This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty.  There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[40]

---

[40] John Pimm's 1715 revolver with a hand rotated cylinder and flint priming system bears an apparent resemblance to a modern Smith & Wesson .38 caliber revolver.  Brown, *Firearms in Colonial America*, 255-256.  Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed.  The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint.  The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel.  He then pulled back the hammer by hand.  Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball.  To fire again, the shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above.  Primm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530.  Brown, *Firearms in Colonial America*, 50.  However, they remained rare in the American colonies, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously.  Brown, *Firearms in Colonial, America*, 50-51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56.  The revolver patented by Samuel Colt in 1836 and produced in his factory in Paterson, New Jersey

**Page 14 - DECLARATION OF KEVIN M. SWEENEY**

Case 3:17-cv-01017-BEN-JLB   Document 142-1   Filed 02/10/23   PageID.18312   Page 92 of
187
Case 2:22-cv-01815-IM   Document 124   Filed 02/06/23   Page 15 of 27

24.     The next reference in an American newspaper to a repeating firearm is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*.  It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading."  This advertisement also makes clear the novelty of such a repeating firearm.  Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—the equivalent of a day's wage of unskilled labor—to see it fired.  Basically, this gun was being used in an eighteenth-century version of a sideshow. There is no indication that Miller was producing or selling such firearms.

25.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson advertised for sale a gun capable of firing 9 bullets in rapid succession.  It was "A handy Gun of 9 and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle or the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun."  The advertisement provides a spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Armouries Museum in Leeds, and the Victoria and Albert Museum in London that were all produced sometime around 1690 by John Cookson, an English gunsmith.[41]  These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges.

26.     Cookson's English repeater employed what was known as the Lorenzoni breech-loading system. [42]  This system placed at the breech-end of the barrel a complex and delicate

---

employed percussion caps in its priming system and remains the first practical revolver to enter production.  The cylinder rotated when the gun was cocked and fired when the trigger was pulled.  However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory.  See Peterson, *Treasury of the Gun*, 211.

[41] Brown, *Firearms in Colonial America*, 144-146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June 2022), 43-63.

[42] Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot.  His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon earlier innovations by gunsmiths, Peter and Mathias Kaltoff. Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun*, 229-231.

**Page 15 - DECLARATION OF KEVIN M. SWEENEY**

gunlock operated by a handle or lever attached to the left side of the lock. Separate tubes in the stock of the firearm were filled with priming powder, gunpowder for each charge, and 9 to 11 balls. The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough primer to set off the charge in the barrel when the trigger was pulled. To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger. If the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flame might leak back and explode the black powder stored in the butt. Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks.

27.     Sometime before 1701, John Cookson moved to Boston.[43] Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston. There are no surviving eighteenth-century, American-made Cookson repeaters.[44] This is actually not surprising given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[45] The authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[46] The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[47]

---

Today this type of repeating firearm is generally identified by English and American collectors and curators as employing the Lorenzoni system.

[43] Weaver and Godwin, "John Cookson, gunmaker," 51-56, 59-61

[44] *Ibid.*, 56, 60. Weaver and Godwin make clear that the firearm referred to as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was made in the late 1600s by John Shaw, a London gunsmith.

[45] *Ibid.*, 55.

[46] *Ibid.*, 60.

[47] *Ibid.*, 56-57.

**Page 16 - DECLARATION OF KEVIN M. SWEENEY**

28.     The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records and correspondence of the Continental Congress.  Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid [sic.] to discharge eight balls one after another, in eight, five or three seconds of time."[48]  He also claimed that such a gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[49]  Its stated range was a mere 20 to 30 yards.  On July 10, 1777, Belton demonstrated a firearm that successively discharged 16 bullets.  He also claimed that this weapon could "do execution [at] 200 yards" which would have been a dramatic—and somewhat inexplicable—increase in the weapon's supposed range of 20 to 30 yards.[50]  In any event, Belton and Congress failed to agree on a financial arrangement.  Belton requested the princely sum of £13,000—£1000 from each of the 13 states—to compensate him for inventing this system, though he subsequently reduced his demand to only £500 from each of the states.[51]  There is no documentary or physical evidence indicating that Belton produced any of these firearms in 1777.

29.     The specific design of the firearm that Belton demonstrated in 1777 remains unclear.  There is a brass-barreled, flintlock fusil in the collection of the Smithsonian Institution that has been proposed as the actual gun or a prototype for the gun that Joseph Belton demonstrated in 1777.[52]  It is engraved "IOS. BELTON INVENTOR ET ARTIFEX – PHILAL-

---

[48] Quoted in Brown, *Firearms in Colonial American*, 317.  This letter and others are reproduced in their entirety at Joseph Belton to the Continental Congress, April 1, 1777 at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[49] *Ibid.*

[50] Letter with Enclosure, Joseph Belton to the Continental Congress, July 10, 1777, at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[51] Joseph Belton to the Continental Congress, May 7, 1777 and Joseph Belton to John Hancock, May 8, 1777 at https://en.wikkisource/ Correspondence _between_ John_Belton [sic.]_and_ the_ Continental _Congress.

[52] Robert Held, "The Guns of Joseph Belton Part I" *American Rifleman* (March 1987), 36-39, 68-69; *Oregon Firearms Federation v. Brown*, U.S. Dist. Ct. Civ. No. 2:22-cv-01815-IM (lead case), Declaration of Ashley Hlebinsky (ECF 72) at 18, n 24.

**Page 17 - DECLARATION OF KEVIN M. SWEENEY**

MDCCLVIII [i.e. 1758]".  An additional engraving on the gun refers to "CAPT JOSEPH BELTON OF Philad."[53]  However, the Joseph Belton who arrived in Philadelphia in 1775 and who came into contact with Benjamin Franklin and subsequently other members of the Continental Congress and the Continental Army was a 1769 graduate of the College of Rhode Island, which is today Brown University.[54]  In 1758, this Joseph Belton was not in Philadelphia; he was not a captain; and he was not then a gunsmith.  Despite claims to the contrary, it is unlikely that this particular gun was demonstrated in Philadelphia in July of 1777.[55]

30.     However as Harold Peterson suggested many years ago, it is quite likely that the firearm demonstrated in 1777 employed some version of what is known as a superimposition system.[56]  In the simplest version of a superimposed or superposed system of loading a firearm, a series of alternating powder charges and balls are loaded directly into a gun's barrel.  There is no detachable or integral magazine, just a standard barrel that is loaded from the muzzle in an alternating sequence of gunpowder and balls.  All of these charges were—ideally—set off in order from front to back by igniting the powder charge located behind the ball closest to the muzzle of the gun's barrel.  There is no magazine involved, and the ensuing discharge of balls is uncontrolled after it is initiated.

31.     The superposed system for discharging a succession of balls had been tried as early as 1580 by a German gunsmith working in London.[57]  Today, early flintlock pistols that used a simple superposed loading system are sometimes referred to as "Roman candle pistols" because they employed "the same principle as the firework" which involves setting off "a chain

---

[53] Smithsonian National Firearms Collection, :https://americanhistory.si.edu/collections/search/object,nmah_440031 Accessed 2/2/2013.

[54] Benjamin Franklin to Silas Deane, August 27, 1775 in *Papers of Benjamin Franklin*, Vol. 22, 183-185, especially footnote, 2.

[55] Quite distinct from the questions raised by what is known of Joseph Belton's biography is the claim in Adam Weinstein "I am Tired of Being Tired" December 21, 2018 that his grandfather, Kenneth Weinstein, a gunsmith, fabricated this particular firearm. adamweinstein.substack.com/p/i-am-tired-of-being-tired <Accessed 2/2/2023 at 12:00PM>.

[56] Peterson, *Arms and Armor in Colonial America*, 218.

[57] Peterson, *Treasury of the Gun*, 195.

**Page 18 - DECLARATION OF KEVIN M. SWEENEY**

reaction of multiple discharges."[58]  Other writers also liken flintlock long arms that employed a simple superposed system of multiple charges to "Roman candles".[59]

32.     Later in London, Joseph Belton was involved in producing a sophisticated and controllable version of a firearm employing a superposed system.  In 1784, Belton went to England where he failed to interest the English Ordnance Department in some version of his superposed system.  By 1786, he had entered into a partnership with London gunsmith William Jover (active 1750-1810).  Together they produced for Britain's East India Company a smoothbore repeating firearm with a sliding gunlock, that moved down the barrel to ignite a succession of powder charges that propelled a series of musket balls contained in a replaceable metal magazine holding 7 projectiles.  There are two authentic examples of this particular firearm in the collection of the Royal Armouries, National Firearms Center in Leeds, England.

33.     Belton's 1786 firearm allowed the shooter to control the weapon's discharge and aim each shot, which was not possible with the simpler superposed system.  As the 1786 firearm's moving gunlock lined up with the next powder charge and ball, the shooter primed a pan, pulled back the cock on the sliding gunlock, and then pulled a trigger firing off a single projectile.  Because of the need to cock and prime each time before pulling the trigger and firing the gun, this was not a rapid-fire repeating arm.  This firearm was also something of a challenge to handle.  It weighs 10 pounds unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the Keeper of Firearms and Artillery at the Leeds Firearms Center observes in an on-line video that managing the weapon is "a bit of a three-handed job."[60]

34.     A much cruder version of a firearm employing a superposed system was produced in America in the early 1790s.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and

---

[58] Jeff Kinard, *Pistols: An Illustrated History of their Impact (Santa Barbara*, CA: ABC-CLIO, 2004), 37.

[59] Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[60] Jonathan Ferguson, "Flintlock Repeating – 1786" youtube.com/watch?v=-wOmUM40G2U.  <Accessed online 11/6/2022 at 4:00 P.M>

**Page 19 - DECLARATION OF KEVIN M. SWEENEY**

philosophic Mr. Chambers of Mercersburg in Pennsylvania." This was Joseph Gaston Chambers (1756-1829). According to the news report, this pistol "discharged six balls in succession, with only one loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger." Later in the year, Chambers attempted to interest the United States War Department in buying long arms employing his version of the superposed system.

35.     A drawing that was probably done later reveals that Chambers's superposed system for a musket employed two gunlocks: one near the front of the barrel and the other in the usual location at the barrel's breech. First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech. This was the reserve shot. Next a succession of 8 special, cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel. Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle, which fired the first cylindrical projectile. A hole in the next projectile carried the charge through it and down its conical tail, which ignited the charge, which propelled the second cylindrical charge, and so on. Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[61] Chamber's system did not employ a detachable magazine, and once initiated, the gun's discharge could not be controlled. A drawing of this firearm is attached as **Exhibit B.**

36.     Chambers's initial efforts to win government interest in 1793 and a patent for his invention were unsuccessful. A demonstration in May of 1793 failed to impress the War Department. Later in 1813, Chambers did secure a patent and supplied the U.S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[62] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government. His guns did work, but they could also produce devastating malfunctions. As historian Andrew Fagal has pointed out, cramming the gun's barrel with

---

[61] For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821" pages 2-3 of 6.

[62] Peterson, *Treasury of the Gun*, 197.

**Page 20 - DECLARATION OF KEVIN M. SWEENEY**

projectiles and gunpowder produced what was potentially a pipe bomb.[63]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[64]  In the 1820s, the "complexity and inherent dangers" of superposed systems that filled gun barrels with multiple charges of explosive gun powder "led to their wholesale abandonment."[65]

37.    A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use black powder as a propellant.  There are two advertisements—one for a demonstration and one for an auction—that contained references to an air gun able to fire 20 times with a single charging.  The February 10, 1792, issue of New York City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, though in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

38.    The air gun demonstrated by Baker appears to have resembled or possibly might have been an actual example of a European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun had a magazine with a capacity of 22 balls, each of which was propelled by discharges of compressed air from a replaceable cannister carried in the gun's stock.  The gun

---

[63] Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[64] Peterson, *Treasury of the Gun*, 198.

[65] Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" page 2 of 6. <Accessed online 10/25/2022 at 4:55 P.M>  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**Page 21 - DECLARATION OF KEVIN M. SWEENEY**

weighed about 10 pounds—which was about the same as a musket—but was shorter, being only four feet in length overall.  As contemporaries in Europe reported, these air guns were not without their problems: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully."[66]  In the late 1700s, the Austrian Army, which had a peacetime establishment of 304,628 men, purchased 1,500 Girardoni air rifles that, theoretically, could have armed only 0.5% of its soldiers.[67]  As it turned out, "after a while no more than one-third of them were in a usable state," and they were all phased out by 1810 if not before.[68]

39.     The American military's use of a Girardoni air rifle was more limited in number and briefer in its timespan, but is also much better known.  On their 1804-1806 expedition to the Pacific Ocean and back, Lewis and Clark and their "Corps of Discovery" carried with them a single Girardoni air rifle.[69]  While it was occasionally used for hunting, their air rifle was primarily employed to impress Natives that they encountered along the way.  As Private Joseph Whitehouse recorded in his journal: "Captain Lewis took his Air Gun and shot her off, and by the Interpreter, told them that there was medicine in her, and that she could do very great execution."  "They all stood amazed at this curiosity."[70]  Eight decades after John Pimm's repeating firearm had been used to impress Native Americans in Boston, Lewis and Clark—like the showman Philadelphia Gardiner Baker—were still able to exploit the rarity of a repeating gun to awe and entertain.

40.     It is possible that someone in the United States may have been marketing Girardoni air rifles or something very similar to them in the mid-1790s.  An announcement for a public

---

[66] Quoted in Frederick J. Chiaventone, "The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon" *Military Heritage*  Vol. 14  No. 5 (January 2015), 19.

[67] Richard Bassett, *For God and Kaiser: The Imperial Austrian Army* (New Haven: Yale University Press, 2015), 186.

[68] Chiaventone, "Girardoni Air Rifle," 19.

[69] For the identification of the air rifle on the Lewis and Clark Expedition as a Girardoni see Madeline Hiltz, "The Lewis and Clark Air Rifle: A Blast from the Past" *War History on Line* (June 16, 2021) https://warhistoryonline.com/war-articles/lewis-and-clark-air-rifle.html?firefox=1 <Accessed online 1/21/2023, 8:00AM>

[70] Chiaventone, "Girardoni Air Rifle," 66.

**Page 22 - DECLARATION OF KEVIN M. SWEENEY**

auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot." This air gun appears to be a repeating gun because of its reference to a "Magazine." However, one should not automatically assume that all early air guns were repeaters. Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single shot air guns, though some writers erroneously assume that they were repeaters like Girardoni's air rifle.[71] It wasn't until the 1880s that two Michigan companies—the most famous of which was the Daisy Manufacturing Company—would begin marketing the first commercially successful, mass-produced repeating air rifles, aiming them at a youth market, employing a lever-action operating system, and shooting BB-caliber pellets.

41.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers. One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia". However, this particular news report has been dismissed as a fabrication.[72] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina. It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries. Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular, he could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

42.     Ransier appears to be describing imported Belgian or French-made Segales pistols which had four rifled barrels. These were small pistols that had a box lock and a swiveling

---

[71] Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West. <Accessed online on 10/31/2022, at 10:40 A.M> On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[72] Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability, as does the fact that it was immediately followed by a news report on a Sea Monster. An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report. Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

Page 23 - DECLARATION OF KEVIN M. SWEENEY

breech attached to a cluster of four separate barrels: two upper barrels placed on top of two lower barrels.  The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels.  Each barrel was loaded separately at the muzzle with powder and ball.  The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky).  After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard.  Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously.  However, as experts have pointed out: "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[73]  If this happened, the gun would explode in the shooter's hand.

43.     Finally, something needs to be said about a gun which—ironically—was never found in the 13 Colonies, but has assumed an out-sized importance in the minds of some writing about colonial Americans and their presumed interest in and familiarity with repeating firearms.[74]  In the early 1700s, James Puckle, an English lawyer, writer, and part-time inventor created a firearm fed by a 11-shot magazine located at the back of the gun that was rotated by a crank.  Rotating the crank aligned a power charge and bullet in the magazine with the weapon's barrel.  After locking the magazine and the barrel together, the operator had to manually prime each shot and pull back the cock before pulling the trigger for each discharge of the weapon.  Because of the time needed to prime and cock the hammer before each shot and to change the magazine after it was emptied, the gun had a rate of fire of only 9 rounds per minute.  It was

---

[73] Rimer, *Smithsonian's Firearms,* 56.

[74] Clayton E. Cramer and Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America" *Willamette Law Review* Vol. 44. No. 4 (Summer 2008), 716-717; David B. Kopel, "The History of Firearm Magazines and Magazine Prohibitions" *Albany Law Review* Vol. 78, No. 2 (2014-2015), 852.

**Page 24 - DECLARATION OF KEVIN M. SWEENEY**

never used in battle.  The company producing it went out of business before 1730.  This gun had no discernable impact on colonial Americans nor on the development of firearms technology.[75]

44.     However, the Puckle gun lives on in the imaginations of some.[76]  Because of its weight, the Puckle gun used a tripod.  Visually the weapon bears an undeniable physical resemblance to certain .30 caliber machine guns used in World War II.  As a result, some refer to it today as "an eighteenth-century machine gun."  It was not a machine gun as we understand and use the term today, in either its mode of operation or its rate of fire.  The machine gun, invented by Hiram Maxim in 1884, used the recoil action of the gun to load it continuously and discharge spent cartridges.  Just pull the trigger and it kept firing bullets as long as the operator's assistant kept feeding it an ammo belt.  Another less common version of the machine gun diverted some of the gasses produced by discharging the weapon into a tube with a piston that automatically and repeatedly loaded the gun and ejected spent cartridges.  (A modern assault rifle uses a similar system that also employs diverted gasses to operate a piston.)  The .30 caliber medium machine gun used by the American army during World War II fired approximately 500 rounds a minute.  The only thing this weapon had in common with the eighteenth-century Puckle Gun was its use of a tripod.

45.     In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's firearm, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  However, such superposed systems were in the assessment of military historian Joseph G. Bilby "a developmental dead end."[77]  Well into the third-quarter of the nineteenth century, the American government armed the overwhelming

---

[75] Brown, *Firearms in Colonial America*, 239. Brown appears to misstate the capacity of the magazine as 9-shot, when it was actually a 11-shot magazine.

[76] See note 74 above.

[77] Joseph G. Bilby, *A Revolution in Arms: History of the First Repeating Rifles* (Yardly, Penn.: Westholme Publishing, 2015), 41.

**Page 25 - DECLARATION OF KEVIN M. SWEENEY**

majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating long arms made by Samuel Colt, the Spencer Arms Company, and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.[78]

46.     The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is unsurprising given the colonists' demonstrated preferences for inexpensive, light firearms that used less gunpowder and lead than did muskets.  By contrast, most of the period's repeating arms were expensive, heavy, and required greater expenditures—that were often uncontrollable—of gunpowder and lead.  Because repeating firearms contained multiple charges of explosive black powder gunpowder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile.  Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb.  As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[79]  For these reasons, eighteenth-century advertisements and homes were filled with muzzle-loading, single shot firearms.

47.     The fact that some repeating firearms had been produced in Europe for four centuries by 1800 does not necessarily support the conclusion that Americans in the late 1700s would have assumed that such weapons would inevitably become reliable, safe, and widely available.  An individual looking back from 1800 might have been just as likely to conclude that very little progress had been made over the previous four centuries.  It was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder.  The superposed systems employed by Belton and Chambers, the Girardoni air rifle, and the Puckle Gun proved to be dead ends.  Calling these weapons and others like them "eighteenth-century assault rifles" or "an eighteenth-century machine gun" are examples of modern-day

---

[78] Bilby, *Revolution in Arms*, 44-48, 60-91.

[79] Peterson, *Treasury of the Gun*, 233.

**Page 26 - DECLARATION OF KEVIN M. SWEENEY**

rhetoric, not evidence of inevitable developments in firearms technology.  As George Basalla, an historian of technology, has cautioned: "All too often it is assumed that the development of technology is rigidly unilinear."[80]

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 5 day of February, 2023.

Kevin M. Sweeney

---

[80] George Basalla, *The Evolution of Technology* (New York: Cambridge University Press, 1988), 189.

**Page 27 - DECLARATION OF KEVIN M. SWEENEY**

**Curriculum Vitae: Kevin M. Sweeney**

Home Address:  9 Orchard Street,
                          Greenfield, MA  01301

Home Phone:    (413) 774-5027
E-mail:               kmsweeney@amherst.edu

**Education:**  Ph.D. in History    1986, Yale University.
                       B.A.   in History    1972, Williams College.

**Employment:**

2000-2016    Professor of History and American Studies, Amherst College.
1993-2000    Associate Professor of History and American Studies, Amherst College.
1989-1993    Assistant Professor of History and American Studies, Amherst College.
1986-1989    Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986    Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984    Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980    History Instructor, Westover School, Middlebury, Conn.

**Other Academic Appointments:**

2007              Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
                       Mass.
1987-1989    Assistant Professor of American Studies at Smith College under the Five
                       College Program.
1985-1986    Adjunct Assistant Professor, Early American Culture, University of
                       Delaware.
1982-1984    Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981              Adjunct, Art History Department, University of Hartford.

**Declarations Filed as an Expert Witness:**

2022         *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023         *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland
                 Security*, United States District Court, District of Delaware, Case No. 1:22-cv-00951-RGA.

**Academic Honors and Prizes:**

2003    Book Prize, New England Historical Association.
2003    Award of Merit, American Association for State and Local History.

1995   Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986   Jamestown Prize of the Institute of Early American History and Culture,
            Williamsburg, VA.
1986   Frederick W. Beinecke Prize in History, Yale University.
1973   Mary Cady Tew Prize in History, Yale University.
1972   William Bradford Turner Prize in American History, Williams College.
1971   Phi Beta Kappa, Williams College.

**Publications:**

   **Books**

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives
   of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on
   Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New
   England Historical Association and 2003 Award of Merit, American Association for State and Local
   History.

   **Articles/Book Chapters/Catalogue Essays**

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on
   the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference
   Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in
   Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested
   Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian
   Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors*, The
   Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of
   Massachusetts Press, forthcoming August 2013), 310-382.

 "Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of
   History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell
   Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text*" The New England
   Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.

"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.

**Exhibitions:**

2007-2008   Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005   Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985   Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, - 1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982        Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.

**Films/Videos:**

2012   Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009   Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005   Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003   Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT

**Memberships in Professional and Scholarly Societies:**

    American Historical Association.
    Colonial Society of Massachusetts.
    Massachusetts Historical Society.
    Organization of American Historians.
    Society of Military Historians

**Other Professional Activities**

2008-2010   Chair, History Department, Amherst College.
2005-2007   Chair, American Studies Department, Amherst College.
2003-2004   Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid"
              Pocumtuck Valley Memorial Association and Historic Deerfield, Inc.
1997-2001   Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association.
1997-1999   Chair, History Department, Amherst College.
1997-1998   Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England,"
              Historic Deerfield., Inc.
1996-1998   Member, Advisory Committee for the Dickinson Homestead, Amherst College.
1994-1995   Chair, Committee on Priorities and Resources, Amherst College.
1993-1995   Chair, American Studies Department, Amherst College
1992         Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington
              Foundation, Hadley, Mass.
1991         Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge
              Village.
1991-1994   Member, Five College Standing Committee on American Indian Studies.
1986-1989   Member, Five College American Studies Steering Committee.
1981-1986   Member, Advisory Committee for Historic Deerfield.


1/27/2023



# EXHIBIT 5

# Deposition of Ashley Hlebinsky

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 20, 2023



206.287.9066  I  800.846.6989
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

| | | |
|---|---|---|
| OREGON FIREARMS FEDERATION, | ) | |
| INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case Nos. |
| | ) | 2:22-cv-01815-IM |
| vs. | ) | 3:22-cv-01859-IM |
| | ) | 3:22-cv-01862-IM |
| KATE BROWN, et al., | ) | 3:22-cv-01869-IM |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| MARK FITZ, et al., | ) | VIDEO-RECORDED |
| | ) | VIDEOCONFERENCE |
| Plaintiffs, | ) | DEPOSITION OF |
| | ) | ASHLEY HLEBINSKY |
| vs. | ) | |
| | ) | |
| ELLEN F. ROSENBLUM, et al., | ) | |
| | ) | |
| Defendants. | ) | *CAPTION |
| _____ | ) | CONTINUES* |
| KATERINA B. EYRE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ELLEN F. ROSENBLUM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____

DATE TAKEN:  JANUARY 20, 2023

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 2

1    DANIEL AZZOPARDI, et al.,      )
                                    )
2              Plaintiffs,          )
                                    )
3       vs.                         )
                                    )
4    ELLEN F. ROSENBLUM, et         )
     al.,                           )
5                                   )
               Defendants.          )
6

7

8    _____

9        VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

10                          OF

11                  ASHLEY HLEBINSKY

12   _____

13                     1:03 p.m.

14                  LAS VEGAS, NEVADA

15    (All participants appeared via videoconference.)

16

17

18

19

20

21

22

23

24

25

Ex. 5_Echeverria Decl.
Page 110
39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 3

1          R E M O T E   A P P E A R A N C E S

2

3    FOR THE OFF PLAINTIFFS (via videoconference):

4          LEONARD W. WILLIAMSON
           Van Ness, Williamson, LLP
5          960 Liberty Street, Suite 100
           Salem, Oregon 97302
6          503.365.8800
           l.williamson@vwllp.com

7

8    FOR THE DEFENDANTS (via videoconference):

9          HARRY B. WILSON
           Markowitz Herbold, PC
10         1455 SW Broadway, Suite 1900
           Portland, Oregon 97201-3412
11         503.295.3085
           harrywilson@markowitzherbold.com

12
           BRIAN S. MARSHALL
13         Senior Assistant Attorney General
           Special Litigation Unit, Trial Division
14         Oregon Department of Justice
           100 SW Market Street
15         Portland, Oregon 97201
           971.673.1880
16         brian.s.marshall@doj.state.or.us

17

18   FOR THE PROPOSED INTERVENOR-DEFENDANT OREGON ALLIANCE
     FOR GUN SAFETY:

19         ZACHARY J. PEKELIS
           W. SCOTT FERRON
20         Pacifica Law Group, LLP
           1191 Second Avenue, Suite 2000
21         Seattle, Washington 98101-3404
           206.245.1700
22         zach.pekelis@pacificalawgroup.com
           scott.ferron@pacificalawgroup.com

23

24   ALSO PRESENT (via videoconference):

25         TANIA GRANT, VIDEOGRAPHER

Ex. 5_Echeverria Decl.
Page 111
39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 4

```
1            VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION
                      OF ASHLEY HLEBINSKY
2
                       EXAMINATION INDEX
3

4    EXAMINATION BY:                            PAGE

5    Mr. Wilson                                 6

6    Mr. Pekelis                                82

7    Mr. Williamson                             145

8    Mr. Wilson                                 149

9

10                      EXHIBIT INDEX

11   EXHIBITS FOR IDENTIFICATION                PAGE

12   Exhibit 30     Declaration of Ashley Hlebinsky    9

13   Exhibit 31     NRA Women|Ashley Hlebinsky:        97
                    Historically Speaking
14
     Exhibit 32     Testimony of Ashley Hlebinsky,     101
15                  United States Senate, Subcommittee
                    on the Constitution, Committee on
16                  the Judiciary, Stop Gun Violence:
                    Ghost Guns, May 11, 2021
17

18

19

20

21

22

23

24

25
```

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 5

1              LAS VEGAS, NEVADA; JANUARY 20, 2023

2                        1:03 p.m.

3                        --oOo--

4

5              THE VIDEOGRAPHER:  Good afternoon.  This

6    is the video-recorded deposition of Ashley Hlebinsky in

7    the matter of Oregon Firearms Federation, Incorporated,

8    et al., versus Brown, et al.  Cause numbers are

9    2:22-cv-01815-IM and 3:22-cv-01859-IM and

10   3:22-cv-01862-IM and 3:22-cv-01869-IM, in the U.S.

11   District Court for the District of Oregon, and was

12   noticed by Harry Wilson.

13              Today's date is January 20th, 2023.  The time

14   is now 1:03 p.m.  My name is Tania Grant from Buell

15   Realtime Reporting, LLC, located at 1325 Fourth Avenue,

16   Seattle, Washington.  Your court reporter is Lorrie

17   Chinn.

18              Will counsel please identify yourselves and

19   state whom you represent.

20              MR. WILSON:  Harry Wilson.  I'm special

21   assistant attorney general for Defendants.

22              MR. PEKELIS:  Zach Pekelis in Seattle,

23   Washington, and I represent Intervenor-Defendant Oregon

24   Alliance for Gun Safety.

25              MR. WILLIAMSON:  Leonard Williamson.  I

Page 6

1    represent the Plaintiffs in OFF.

2                    THE REPORTER:  Mr. Ferron?

3                    MR. FERRON:  Scott Ferron also with

4    Pacifica Law Group for the Intervener-Defendants.

5                    THE VIDEOGRAPHER:  Thank you.  The court

6    reporter may now swear in the witness.

7

8     ASHLEY HLEBINSKY,    witness herein, having been first

9                         duly sworn under oath, was

10                        examined and testified as follows:

11

12                   E X A M I N A T I O N

13    BY MR. WILSON:

14       Q.  Good afternoon, Ms. Hlebinsky.  My name is

15    Harry Wilson.  I am an attorney representing Defendants

16    in the four matters that the videographer just read

17    into the record.

18           Could you -- could we start by having you

19    state your full name for the record?

20       A.  Yes.  My name is Ashley Hlebinsky.

21       Q.  Do you understand that the oath that you just

22    took is the same oath that you would take if you were

23    in a courtroom today?

24       A.  I do.

25       Q.  Okay.  Do you understand that this deposition

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 7

1   is being transcribed by a court reporter?

2         A.   I do.

3               MR. PEKELIS:   Harry, I'm sorry.   Could

4   we go off the record for one sec?

5               MR. WILSON:   Yeah.

6               THE VIDEOGRAPHER:   We're now going off

7   the record.   The time is 1:05 p.m.

8         (A discussion was held off the record.)

9               THE VIDEOGRAPHER:   We're now back on the

10  record.   The time is 1:06 p.m.

11        Q.   BY MR. WILSON:   Okay.   I can't remember if I

12  got the last question out, so let me just ask again.

13  Do you understand that this deposition is being

14  transcribed by a court reporter?

15        A.   I do.

16        Q.   And do you understand that this deposition is

17  being recorded by audio and video?

18        A.   I do.

19        Q.   Do you understand that we may be able to play

20  back the video and audio or read from the transcript at

21  hearings or at a trial in this matter?

22        A.   I do.

23        Q.   This afternoon I'm going to ask you a bunch of

24  questions.   And as we go along, I will assume that you

25  understand my question unless you tell me that you

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 8

1    don't understand the question.  Fair?

2        A.  Fair.

3        Q.  Great.  Is there anything that would prevent

4    you from thinking clearly today?

5        A.  Nope.

6        Q.  And anything that would prevent you from

7    testifying truthfully today?

8        A.  No.

9        Q.  I have emailed to Leonard Williamson a copy of

10   a declaration that was filed in the litigation that

11   we're here today.  Do you -- and it was filed by you.

12   Do you have a copy of that in front of you?

13       A.  I do.  I have a hard copy.

14       Q.  Okay.  And does that copy have a line across

15   the top that says Case 2:22-cv-01815 and then some

16   other information?

17       A.  It says 29CEE04E.

18       Q.  Hm.

19       A.  Do I have the wrong one?

20       Q.  Maybe.  I'm looking for a document that should

21   have that header across the top, and then it should

22   have some attorney information right below that

23   starting with Stephen J. Joncus.

24       A.  It does start with Stephen J. Joncus.

25       Q.  Okay.  So maybe -- is the version you're

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 42

1      A.   Correct.

2      Q.   And how accurate is a Glock 19?

3      A.   That's not within my expertise.

4      Q.   Is there -- do you know if there's a way to

5   measure the accuracy of a firearm?

6      A.   Possibly.

7      Q.   But it's not one that you're familiar with?

8      A.   No.

9      Q.   Okay.  I want to talk a little bit about the

10  Founding Era.  When we discuss the Founding Era, I'm

11  going to use that phrase sometimes, the Founding Era.

12  And when I use that I'm talking about the years around

13  which the Constitution and the Bill of Rights were

14  ratified.  So do you understand that when I use that

15  phrase, that's what I mean?

16     A.   Yes.

17     Q.   And you understand the Constitution was

18  ratified in 1788?

19     A.   Correct.

20     Q.   And the Bill of Rights was ratified in 1791?

21     A.   Yes.  And I've got -- the date that I use is

22  the Second Amendment date.

23     Q.   So I'm kind of about around paragraph 19 of

24  your declaration, and you actually have the heading The

25  Founding Era, so I guess we'll start there.

BUELL REALTIME REPORTING, LLC
206.287.9066 I 800.846.6989

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 43

1      A.  Cool.

2      Q.  Okay.  So do you know about how many people

3   lived in the United States in the Founding Era?

4      A.  I do not.

5      Q.  In paragraph 19 you state kind of in the

6   middle -- and I'm on page 13 of your declaration.  You

7   state, "...repeaters, including those with magazines,

8   could have capacities of over ten rounds at least a

9   century before and during the ratification of the

10  Second Amendment."

11          So I want to -- what I want to do is try to

12  understand what those repeaters are that you're

13  referring to.  And so my first question is just can you

14  provide a list of which repeaters you're referring to

15  in that statement?

16     A.  I would have to pull up -- let me see.

17  Because for me looking historically the -- yes, there

18  are ones over ten rounds, but it's not like there was

19  any standard in what people were choosing.  And so I

20  believe one of the Lorenzonis was over ten rounds.

21  There was also a lot of one-offs made in Europe that

22  you can see in the Cody collection that don't really

23  have a lot of background on who the manufacturer was or

24  the maker was.  Sorry.

25          And I believe one of the Cooksons was over ten

Ex. 5_Echeverria Decl.
Page 118
39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 44

1    rounds.  And then looking at my notes, I know there was

2    a really early firearm that had 16 shots as well.  But,

3    like I say, it's not -- it's not thought of in the same

4    way that we think about it today.  So it's -- one could

5    be eight rounds.  One could be 12.  It just kind of

6    depended on what they were working on and sometimes

7    what people were commissioning.

8         Q.  Okay.  So you mentioned that you were

9    referring to your notes.  Do you have a set of notes in

10   front of you?

11        A.  Oh, no, sorry, I was looking at the

12   declaration.

13        Q.  Okay.  Got it.  Okay.  So that statement in

14   paragraph 19, then some of the firearms that you were

15   referring to was the Lorenzoni, the Cookson, and then

16   there are some one-offs in Europe, plus the fourth one

17   you mentioned is there's some rifle that has -- or, I'm

18   sorry, some firearm that had a 16-shot, but you didn't

19   know the name offhand.  Is that right?

20        A.  Yeah.  I have the -- it's just kind of -- I've

21   seen lots of people call it different things.  It's a

22   16-shot odd firearm you can see in the collection.

23   It's got many different components to make it a

24   repeater.  It's pretty advanced technology.

25        Q.  I see.  Are there any other firearms to which

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                              Ashley Hlebinsky

Page 45

1   you're referring in that particular sentence in

2   paragraph 19 that I just read that you haven't

3   mentioned?

4        A.  Not specifically.  I just know that within

5   different collections I've been in, there have been a

6   lot of different repeaters.  It's just the names aren't

7   necessarily as memorable.

8        Q.  So if there are ones that you can't

9   remember -- can't remember their names but you've seen

10  them, are those most likely one-off examples?

11       A.  They can be, yeah.  A lot of things during

12  this timeframe, when I say one-off is because we're not

13  really dealing with armories or major manufacturers, I

14  mean.  So you're not getting mass production of really

15  anything unless it's an inexpensive firearm for the

16  military.  And even then that's slow compared to, you

17  know, 19th century standards.

18            So for me just because it's a one-off doesn't

19  mean that it's not relevant to the conversation because

20  that's just kind of how gun making was back then.  It

21  was considered an art.

22       Q.  Sure.  And I appreciate that, but at times I

23  want to understand how common a firearm was.  So let me

24  ask this:  Were you -- are you aware of repeaters,

25  including those with magazines with a capacity over ten

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 46

1    rounds, that were available during the ratification of

2    the Second Amendment that were commercially available

3    in the United States?

4         A.  A specific example, not necessarily, but I

5    will say that pretty much all repeaters that would have

6    been sold and many during that period would have been

7    sold to individuals and not the military.

8         Q.  But you can't identify a repeater with ten

9    rounds or more that was commercially available at the

10   time of the ratification of the Second Amendment?

11        A.  There were ones that were created before the

12   Second Amendment.  I'm not sure what the year, if there

13   was something specific.  However, they were certainly

14   designed and around.  And as I repeated as well,

15   everything would have been commercial at that point for

16   the repeaters.

17        Q.  So are you aware of any -- you know, in the

18   Founding Era, were you aware of any repeaters with more

19   than ten rounds that were being sold in the United

20   States?

21        A.  In terms of, you know, around the specific

22   Founding Era in 1791 I'm sure there were individuals,

23   but I do, you know, have the Cookson example of certain

24   firearms that were being marketed to be sold.

25        Q.  You say -- well, let's split that answer

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 47

1    apart.  So you believe the Cookson was being marketed

2    and sold in the Founding Era, correct?

3         A.  It was a little bit earlier.  That's what I

4    said is a lot --

5         Q.  Sure.

6         A.  -- of this is kind of leading up to that

7    specific timeframe.

8         Q.  Okay.  So the Cookson, is it your testimony

9    that the Cookson was being sold in the colonies either

10   during the Founding Era or earlier?

11        A.  During the -- according to the Royal

12   Armouries, which kind of had a lot of that information

13   because of the English Cookson, there is reference to

14   an advertisement.  You saw advertisements with early

15   firearms sometimes, certainly not along the same vein

16   that you get them in the late 1800s, but periodically

17   you would see that.

18        But, like I said, a lot of times people were

19   specifically coming for something that they wanted,

20   needed.

21        Q.  So there was an advertisement for a Cookson in

22   the Founding Era or earlier?

23        A.  Yes, according to, you know, my note.  There

24   was another firearm that I'm aware of, but it was

25   Europe.  And I want to say it was 1600s, maybe 1700s,

Page 48

1   that also made an advertisement for a repeating firearm

2   for the commercial market, but I didn't have that

3   listed there.  But I do know of one other through an

4   exhibition I worked on a couple of years -- probably

5   like five years ago.

6       Q.  Okay.  In that other advertisement, you said

7   that was an advertisement that was in Europe?

8       A.  I believe so, yeah.

9       Q.  Okay.  And then for the advertisement for the

10  Cookson, you said according to your note.  Are you

11  referring to a footnote in your declaration?

12      A.  Yes.  Sorry.  I'll try to stop saying notes.

13  But, yeah, the Boston Gazette in, oh, gosh, paragraph

14  21.  That information circulated originally through the

15  Royal Armouries and Leeds.

16      Q.  Okay.  And which footnote is that?  Is that

17  22?

18      A.  That's 22, correct.  There's a couple of --

19  there's a couple of things listed there.  The firearms

20  history blog spot is what Royal Armouries references

21  and links to.

22      Q.  Okay.  So it's that particular link that will

23  be a link to the advertisement?

24      A.  No.  It's a link to the firearm, and it's got

25  some history behind it.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 49

1      Q.   Okay.  So when you're identifying that

2  particular advertisement for the Cookson, do you know

3  where we could review a copy of that?

4      A.   I've not seen that one specifically, no.

5      Q.   And so how do you know that there was an

6  advertisement?

7      A.   I was going off of the expertise of the

8  scholars at the Royal Armouries.

9      Q.   Oh, okay.  And so -- and that's -- I'm sorry.

10 I'm getting confused.  Sorry.  Is that expertise found

11 in that -- in the links that are in footnote 22?

12     A.   There's a description of the Cookson that

13 Royal Armouries links to --

14     Q.   Okay.

15     A.   -- and it lists that.

16     Q.   I see.  So there's a link within the link that

17 will --

18     A.   Yeah.  Yeah.  Royal Armouries has -- I believe

19 it's their Cookson or one of their Lorenzoni types, and

20 then -- yeah.

21     Q.   Okay.  So are you aware of any other

22 advertisement advertising a ten-round or more repeater

23 in the Founding Era or earlier other than what we've

24 just discussed?

25     A.   I'm not.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 50

1       Q.   Okay.  So I'm going to back up just a little

2   bit here.  So earlier, a few minutes ago we were

3   talking about the firearms that you were referring to

4   in paragraph 19 that have ten rounds or more.  And the

5   first category you mentioned were some one-offs made in

6   Europe.  Do you know the specific names of those to

7   which you're referring?

8       A.   The ones that I've listed?

9       Q.   So just the ones that are here in the

10  declaration?

11      A.   Those are the ones I know specifically.  But

12  the reason I don't necessarily have the names for them

13  is because I've seen them in the museum collection, but

14  I don't recall exactly what they were.  And I'm not in

15  Wyoming anymore, so I couldn't list all of them.

16      Q.   Sure.  And the ones I've seen in the

17  declaration are the Kalthoff, the Berselli, and the

18  Lorenzoni.  And then it kind of goes on and talks about

19  the Cookson.  But those are three?

20      A.   Yeah.

21      Q.   Are those --

22      A.   Yeah.  And it's -- the Lorenzoni was

23  replicated a lot of times by other people, so it's not

24  one -- or, I mean, there was one person that developed

25  it, but then they call them Lorenzoni types.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 125

1    race, ethnicity.

2         Q.  Is it a book that's an online form or -- I

3    don't see a publisher or anything on there.

4         A.  It's on several different platforms.  I think

5    it's the sedgwickcounty.org has a copy of it.  It looks

6    to be like it would be an article.  It's not extensive

7    like a published book.  It's kind of just a listing of

8    the laws with a few paragraphs.

9         Q.  So for your assertion here in the first

10   sentence of paragraph 23, were you primarily relying on

11   Eckwall's research?

12        A.  I have used Eckwall's research in the past.

13   So, yeah, it was a large portion of that, but I did

14   also use the Duke repository for several parts of this.

15        Q.  Okay.  Including that assertion in the first

16   sentence of paragraph 23?

17        A.  Correct.

18        Q.  For the last sentence of paragraph 23, it

19   reads, "It is generally understood that early laws were

20   largely motivated by race."

21             Do you see that?

22        A.  I do.

23        Q.  And for that you cite in footnote 30 a

24   publication by Clayton Cramer, Colonial Firearms

25   Regulation; is that right?

Page 126

1      A.   That is correct.

2      Q.   Who is Clayton Cramer?

3      A.   Clayton Cramer is a scholar on firearms

4  history.

5      Q.   Is he a recognized historian in the field?

6      A.   I believe he is.  I know that he's cited in a

7  lot of different historical works.  I've read several

8  of his things over the years.

9      Q.   And is this a published article?

10     A.   I believe so.

11     Q.   In what publication?

12     A.   I'm not sure.  I thought I put it in there,

13  but I didn't.

14     Q.   Did you consider whether Mr. Cramer might have

15  any bias before relying on his publication?

16     A.   Well, of course.  You always kind of consider

17  that, but I've also seen in other declarations, in

18  other reports from people who, you know, have differing

19  opinions on firearms that that is something that people

20  acknowledge that they're race based.

21          They may not agree on the culture context

22  behind it, but the fact that a lot of them are race

23  based, I think is -- from what I've read, especially

24  someone I don't know declarations on this specifically,

25  but on other declarations that that is generally

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                      Ashley Hlebinsky

Page 127

1    accepted.  What people disagree on usually is why,

2    motivation, and relevancy.

3        Q.  So were you aware that Mr. Cramer is also an

4    expert witness in this case on behalf of Plaintiffs?

5        A.  I wasn't when I wrote this.  I am now.

6        Q.  Were you aware of that before I asked the

7    question?

8        A.  I was.

9        Q.  Okay.  I'll represent to you that in his

10   deposition yesterday -- the days are blurring

11   together -- I think it was yesterday.  Mr. Cramer

12   testified that he is a long-time supporter of the NRA.

13   He considers himself firmly on one side of the, quote,

14   unquote, culture war over firearms regulations, that

15   the NRA donated a thousand dollars to his state senate

16   campaign, and that he is not a neutral witness when it

17   comes to the issues in this case.

18       Does any of that cause you to question your

19   reliance on Mr. Cramer for your work?

20       A.  I was not aware of a lot of that.  I had some

21   personal interactions with Mr. Cramer when I first

22   started, but it is something that I would consider.  I

23   also don't think that having, you know, an opinion and

24   having a relationship with gun people, gun industry

25   negates your ability to still evaluate your own biases.

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Ashley Hlebinsky

Page 128

1    But I would have to kind of consider that because, as I

2    said, I wasn't aware of that prior to this.

3              MR. WILLIAMSON:  Counsel, I'm going to

4    interject right here.  I think there's kind of a

5    misrepresentation about Mr. Cramer's donation that he

6    received.  Isn't it true that he returned that donation

7    to the NRA?

8              MR. PEKELIS:  That was his testimony;

9    although, the documents or evidence was a bit unclear

10   on that.

11             MR. WILLIAMSON:  All right.  Thank you.

12        Q.  BY MR. PEKELIS:  Page -- same page -- oh, no,

13   sorry.  Next page, 18, paragraph 24 of Exhibit 30.

14        A.  Yes.

15        Q.  Final sentence you write, "As a result,

16   Revolutionary leaders, such as Paul Revere, required

17   possession of arms and ammunition by militiamen and

18   many required powder and projectiles in quantities

19   greater than ten pounds and rounds respectively."

20             Do you see that?

21        A.  I do.

22        Q.  And what sources are you relying on for that

23   assertion?

24        A.  For that one I was using the original -- one

25   of the early summaries in Duncan.

Page 129

1      Q.   And Duncan is cited in footnote 34?

2      A.   Yes.

3      Q.   Okay.  And that's the district court's

4  decision in Duncan from 2019?

5      A.   I believe so, yes.

6      Q.   Any other sources that you relied on for that

7  proposition?

8      A.   I did see it in -- I believe I saw it also in

9  Johnson, et al., in their section on powder

10 regulations.  I believe it's in there as well.

11     Q.   And Johnson, et al., you're referring to the

12 citation in footnote 31, which is a law school

13 casebook?

14     A.   Correct.

15     Q.   Okay.  Well, let's take Duncan first.  Do

16 historians typically rely on contemporary judicial

17 opinions as sources for understanding historical

18 events?

19     A.   I think that's up to the person.  A lot of

20 times with that it's coming from experts.  So if it was

21 a place where I could find something that was a

22 succinct analysis of it and then I saw the laws on the

23 Duke site, then, yes, I would use it.

24     Q.   Okay.  It's a secondary source, you agree?

25     A.   Correct.

Page 130

1    Q.  Probably several steps removed from the

2  original source, whatever it's relying on, you would

3  agree?

4    A.  Correct.

5    Q.  In this case the Duncan decision was reversed

6  by the Court of Appeals.  Were you aware of that when

7  you cited it?

8    A.  I wasn't aware of all of the different

9  components of it.  I know it went through, and then I

10  know it went up, and now it's back down for evaluation.

11    Q.  Right.  So the fact that that decision was

12  actually vacated or reversed, does that cause you any

13  concern with relying on this as an assertion?

14    A.  Not necessarily.

15    Q.  Why not?

16    A.  Because just because the overarching argument

17  created by one side may have had -- may have been

18  reversed for specific reasons, it doesn't mean that's

19  one of them.

20    Q.  Let's go to paragraph 26.  This is on the next

21  page, page 19.  And you write, "In summary, at the time

22  of the Founding Era, laws about firearms restriction

23  were regularly directed towards groups of people rather

24  than the firearms themselves."

25         Do you see that?

39b9b88f-d22f-4d83-af8f-a9a749fbfda9

Page 131

1       A.   I do.

2       Q.   And what are your sources for that assertion?

3       A.   I -- oh, I don't have that footnoted there,

4   but it's a combination of things, secondary sources

5   I've read over the years, as well as the Duke site

6   analyses that we used and have reviewed for Cody, many

7   different places.

8       Q.   But you haven't cited those here?

9       A.   No, I did not.  I was speaking more generally

10  there.

11      Q.   Okay.  I want to go back to the Johnson

12  casebook.  Do historians typically rely on law school

13  casebooks as sources for understanding historical

14  events?

15      A.   If it provides a good description of it, I

16  don't know why you wouldn't.

17      Q.   Okay.  Also paragraph 26, this is the last

18  sentence -- oh, no, sorry.  It's the next sentence.

19  "Within these laws, repeating and firing capacity are

20  not mentioned."

21           So did you conduct a search of laws mentioning

22  repeating or firing capacity in the Duke repository?

23      A.   I believe I looked up repeating, not firing

24  capacity, because I don't think that's wording that

25  they would use.  And then I utilized, you know, other

Page 132

1    resources that have summaries of the laws.  But I do

2    think I searched repeating when I was doing that, but I

3    was also trying to be creative to make sure that I was

4    covering other firearms-based verbiage that they could

5    have used.

6         Q.  Did you examine the prevalence of repeaters or

7    magazine-fed repeaters among civilians in the Founding

8    Era?  I think I asked you that already.

9         A.  The prevalence of it, no, not comprehensively.

10   But of the ones I mentioned I do reference that they're

11   one-offs or if they've been made.

12        Q.  So just as kind of a common sense matter,

13   might the lack of widespread existence of those

14   technologies be a reason why you didn't find laws

15   mentioning them?

16        A.  Not necessarily.  Because in terms of

17   repeating, possibly.  But in terms of regulations on

18   specific firearms, I mean, there were many firearms

19   around there, and I didn't necessarily find through my

20   searching things about firearms features in the

21   timeframe either.  It's more focused, like I said, on

22   groups.

23            And then there are some other categories of

24   things that are more with, you know, gunsmith

25   relationships that I saw a few on on stamping and that

Page 133

1    kind of thing.  That wasn't really relevant to this,

2    but I saw when I was looking on the Duke site.

3        Q.  So I think you're saying that you did conduct

4    a comprehensive, exhaustive search of firearm statutes,

5    ordinances, other laws from the 18th and 19th

6    centuries.  Is that your testimony?

7        A.  I said I looked into the Duke law and tried to

8    find at much as I could, and then I also utilized

9    secondary sources on that as well.  I did not print out

10   every law and, you know, file it like has been done now

11   in California.  I did not do that, but I did do my due

12   diligence to find as many things that I could that

13   would be related to that.

14       Q.  Did you spend more time looking at the primary

15   source material or the secondary source material?

16       A.  I would say I utilized a lot of secondary

17   sources, but I also did utilize primary.

18       Q.  Which would you say more?

19       A.  I would probably say secondary in this case.

20       Q.  Okay.  So in footnote 69 you cite David

21   Yamane?

22       A.  Yes.

23       Q.  Who is David Yamane?

24       A.  He is a sociology professor at Wake Forest.

25       Q.  Okay.  And you're citing a book called

Page 134

1   Concealed Carry Revolution:  Expanding the Right to

2   Bear Arms in America?

3        A.   That is correct.

4        Q.   That's a secondary source?

5        A.   That is correct.

6        Q.   I haven't read it, but Amazon describes it as

7   brief and accessibly written.  Would you agree with

8   that?

9        A.   It is brief.  David is currently working on a

10  much larger book on what he calls Gun Culture 2.0.  And

11  so he published this one as kind of a small segment of

12  his research.

13       Q.  Okay.  And --

14       A.   I did not read that description, though.

15  That's...

16       Q.   Well, he's a sociologist too.  He's not an

17  historian, right?

18       A.   Correct, but there's a lot of history in his

19  research.

20       Q.   So in the paragraph that you're citing him --

21  this is paragraph 38 -- you say, "Racial firearm bans

22  continued into the nineteenth century.  States

23  including but not limited to Louisiana, South Carolina,

24  Florida, Delaware, Maryland, North Carolina, and

25  Mississippi enacted race bans between ratification and

Page 135

1    the American Civil War."

2         Do you see that, right?

3    A.   I do.

4    Q.   Okay.  And the source you're citing there is

5    Eckwall?

6    A.   Correct.

7    Q.   And that's the only source for that assertion

8    there?

9    A.   Just for that summary he had a good succinct

10   listing of that, but it would reflect that as well in

11   Duke.  I just knew that that was a good kind of

12   succinct area, so that's why I footnoted that instead

13   of footnoting a lot of other areas.

14   Q.   Did you try to compare the number of racially

15   restrictive firearm laws with race neutral firearm laws

16   in the 19th century?

17   A.   I did not do a full comparison like that, no.

18   Q.   Okay.  Paragraph 39, the next paragraph,

19   starts as follows:  "During this period in between

20   ratifications of the Second and the Fourteenth

21   Amendments, some laws emerged restricting carry by any

22   person."

23        Did you conduct a comprehensive survey of 19th

24   century laws restricting carry by any person?

25   A.   No.  I also -- although, I did not reference

Page 136

1   it in this, Randolph Roth's declaration in a few cases

2   talks about this pretty extensively.  I probably could

3   have cited him on that, but that was one of the other

4   places that I looked.

5        Q.  Would you say you relied on Mr. Roth's

6   declaration?

7        A.  No.  I just knew it had good information in it

8   on some of the cases, so that was one of other places

9   where I did -- in addition to the websites and David

10  Yamane's scholarship -- and I believed -- well, for

11  that I didn't really look at the Johnson series as

12  much, but I took it from several other places just to

13  kind of confirm what I had seen.

14       Q.  So your testimony is that Rolfe's dec -- or,

15  excuse me, Roth's declaration has some of this material

16  in it, but you didn't rely on it for creating your

17  declaration in this case?

18       A.  I mean, I utilized it, but I wouldn't say I

19  relied on it.

20       Q.  What's the difference?

21       A.  Utilizing it would be taking his research and

22  seeing validity in it based on an evaluation and then

23  also putting it in here, but I wouldn't say it's the

24  only thing I looked at.

25       Q.  I don't mean rely as like that's the only

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Ashley Hlebinsky

Page 151

1                        REPORTER'S CERTIFICATE

2

3          I, LORRIE R. CHINN, the undersigned Certified Court
    Reporter, pursuant to RCW 5.28.010 authorized to administer
4    oaths and affirmations in and for the State of Washington, do
    hereby certify:

5
           That the sworn testimony and/or remote proceedings, a
6    transcript of which is attached, was given before me at the
    time and place stated therein; that any and/or all witness(es)
7    were duly sworn remotely to testify to the truth; that the
    sworn testimony and/or remote proceedings were by me
8    stenographically recorded and transcribed under my
    supervision, to the best of my ability; that the foregoing
9    transcript contains a full, true, and accurate record of all
    the sworn testimony and/or remote proceedings given and
10   occurring at the time and place stated in the transcript; that
    a review of which was requested; that I am in no way related
11   to any party to the matter, nor to any counsel, nor do I have
    any financial interest in the event of the cause.

12
    Reading and signing was not requested pursuant to FRCP
13   Rule 30(e).

14          WITNESS MY HAND AND DIGITAL SIGNATURE this 26th day
    of January, 2023.

15

16

17

18   LORRIE R. CHINN, RPR, CCR
    Washington State Certified Court Reporter No. 1902
19   Oregon State Certified Court Reporter No. 97-0337
    lorrie@buellrealtime.com

20

21

22

23

24

25

# EXHIBIT 6

# Deposition of Clayton Cramer

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 19, 2023



**206.287.9066 | 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com



Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OREGON FIREARMS FEDERATION,    )
INC., et al.,                  )
                               )
            Plaintiffs,        )
                               ) Case Nos.
        v.                     ) 2:22-cv-01815-IM
                               ) 3:22-cv-01859-IM
KATE BROWN, et al.,            ) 3:22-cv-01862-IM
                               ) 3:22-CV-01869-IM
            Defendants.        )
                               )
                               )
                               )
        (Continued)            )


* VIDEOCONFERENCE *
VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF EXPERT
CLAYTON CRAMER


Witness located in:

Middleton, Idaho


* All participants appeared via videoconference *



DATE TAKEN:   January 19, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                    Oregon #22-0001

Page 2

```
_____

          (Continued)                    )
                                          )
MARK FITZ, et al.,                        )
                                          )
                    Plaintiffs,           )
         v.                               )
                                          )
ELLEN F. ROSENBLUM, et al.,               )
                                          )
                    Defendants.           )
_____          )
KATERINA B. EYRE, et al.,                 )
                                          )
                    Plaintiffs,           )
         v.                               )
                                          )
ELLEN F. ROSENBLUM, et al.,               )
                                          )
                    Defendants.           )
_____          )
DANIEL AZZOPARDI, et al.,                 )
                                          )
                    Plaintiffs,           )
         v.                               )
                                          )
ELLEN F. ROSENBLUM, et al.,               )
                                          )
                    Defendants.           )
_____
```

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 3

1                              APPEARANCES

2

     For Oregon Firearms Federation and the Witness:

3
                         LEONARD WILLIAMSON
4                        VAN NESS WILLIAMSON
                         960 Liberty Street SE, Suite 100
5                        Salem, OR 97302
                         (503) 365-8800
6                        L.williamson@vwllp.com

7

     For the State of Oregon Defendants:

8
                         ERIN DAWSON
9                        HARRY WILSON
                         MARKOWITZ HERBOLD
10                       1455 SW Broadway, Suite 1900
                         Portland, OR 97201
11                       (503) 972-5076
                         ErinDawson@markowitzherbold.com
12                       HarryWilson@markowitzherbold.com

13

     For the Proposed Intervenor-Defendant Oregon Alliance
14   for Gun Safety:

15                       ZACHARY J. PEKELIS
                         W. SCOTT FERRON
16                       PACIFICA LAW GROUP
                         1191 Second Avenue, Suite 2000
17                       Seattle, WA 98101
                         (206) 245-1700
18                       Zach.Pekelis@PacificaLawGroup.com

19

     Videographer:
20                       CATHY ZAK
                         BUELL REALTIME REPORTING
21                       1325 Fourth Avenue, Suite 1840
                         Seattle, WA 98101
22                       (206) 287-9066
                         Info@buellrealtime.com

23
                         *   *   *   *   *
24

25

Page 4

```
1                          EXAMINATION INDEX

2    EXAMINATION BY:                      PAGE

3    Ms. Dawson                            8

4    Mr. Pekelis                          105

5    Mr. Williamson                       164

6                           EXHIBIT INDEX

7    EXHIBIT      DESCRIPTION                          PAGE

8    EXHIBIT 11   Second Declaration of Clayton         15
                  Cramer.
9
     EXHIBIT 12   First Declaration of Clayton          97
10                Cramer.

11   EXHIBIT 13   Navy Yard Shooting Leaves Gun        112
                  Control Crowd Out of Excuses -
12                Firearms News.

13   EXHIBIT 14   Early American Gunsmithing: A        115
                  Family Affair.
14
     EXHIBIT 15   Ninth Circuit Victory: The End      118
15                of the Beginning - Firearms News.

16   EXHIBIT 16   Clayton Cramer: A Victory in         122
                  California.
17
     EXHIBIT 17   Clayton Cramer: A Major Victory      127
18                in California.

19   EXHIBIT 18   An Unfavorable California            131
                  Decision that May Later Bear
20                Fruit | An Official Journal Of
                  The NRA.
21
     EXHIBIT 19   What is it Like to be a              134
22                California Gun Owner? | An
                  Official Journal Of The NRA.
23
     EXHIBIT 20   Why Oregon Ballot Measure 114        136
24                is Unconstitutional | An Official
                  Journal Of The NRA.
25
```

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 5

1                        EXHIBIT INDEX CONTINUED

2

     EXHIBIT      DESCRIPTION                                    PAGE

3
     EXHIBIT 21   Donor Lookup, OpenSecrets.                     138
4
     EXHIBIT 22   Clayton Cramer: Federal Judge                  142
5                 Temporarily Blocks California's
                  New Magazine Ban. Blog.
6
     EXHIBIT 23   Clayton Cramer: Does Limiting                  144
7                 Magazine Capacity Matter? Blog.

8    EXHIBIT 24   Can Biden Take Your Rights With                148
                  The Stroke of a Pen? | An
9                 Official Journal Of The NRA.

10   EXHIBIT 25   CRAMER: On the right side of                   151
                  the bullet - Washington Times.
11
     EXHIBIT 26   Tough Targets, When Criminals                  154
12                Face Armed Resistance from
                  Citizens.
13

14

15

16

17

18

19

20

21

22

23

24

25

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 6

1              Middleton, Idaho; Thursday, January 19, 2023

2                            10:17 a.m.

3                              -o0o-

4

5              THE VIDEOGRAPHER:  Good morning.

6         This is the deposition of Clayton Cramer in

7    the matter of Oregon Firearms Federation, Inc., et al.,

8    v. Brown, et al, Case Numbers 2:22-cv-01815-IM,

9    3:22-cv-01859-IM, 3:22-cv-01862-IM, and

10   3:22-cv-01869-IM in the United States District Court

11   for the District of Oregon, and was noticed by

12   Markowitz Herbold.

13        The time now is approximately 9:37 a.m. on

14   this 19th day of January, 2023, and we are convening

15   via Buell virtual depositions.

16        My name is Cathy Zak from Buell Realtime

17   Reporting, LLC, located at 1325 4th Avenue, Suite 1840,

18   in Seattle, Washington 98101.

19        Will Counsel please identify themselves for

20   the record.

21              MS. DAWSON:  I'm Erin Dawson.  I'm with

22   the law firm Markowitz Herbold, and we represent

23   Defendants.

24              MR. WILLIAMSON:  This is Leonard

25   Williamson from the law firm Van Ness Williamson, LLP

Ex. 6_Echeverria Decl.
Page 146
c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 7

1    in Salem, Oregon, and we represent the Oregon Federal

2    Firearms Federation, Plaintiffs in this matter.

3                    MR. PEKELIS:  This is Zach Pekelis with

4    the law firm Pacifica Law Group in Seattle, Washington,

5    and I represent Intervenor-Defendant Oregon Alliance

6    for Gun Safety.

7                    MR. WILSON:  Harry Wilson, Special

8    Assistant Attorney General with Markowitz Herbold for

9    Defendants.

10                   MS. BLAESING:  Lauren Blaesing from

11   Markowitz Herbold, also counsel for Defendants.

12                   THE VIDEOGRAPHER:  All right.  Thank you.

13        The court reporter may now swear in the

14   witness.

15                   THE COURT REPORTER:  Can I please get a

16   stipulation from counsel to swear in the witness, as

17   I'm a Washington state court reporter and notary, and

18   the witness is in Idaho.

19                   MR. WILLIAMSON:  OFF plaintiffs stipulate.

20                   MS. DAWSON:  Defendants stipulate as well.

21                   MR. PEKELIS:  Intervenor-Defendant as

22   well.

23

24                   CLAYTON CRAMER,

25              having been first duly sworn by the

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 8

1       Certified Court Reporter, was deposed as follows:

2

3                         EXAMINATION

4    BY MS. DAWSON:

5       Q.   Mr. Cramer, it's nice to meet you.  As I said,

6    my name is Erin Dawson.  I'm with the law firm

7    Markowitz Herbold, and I represent defendants.

8            Just for the record, what is your full name?

9       A.   Clayton Earl Cramer.

10      Q.   And do you understand that this deposition is

11   being transcribed by the court reporter here as well as

12   being recorded by audio and video?

13      A.   Yes, I do.

14      Q.   Great.

15           And can you confirm for me that Mr. Williamson

16   shared with you the ground rules that the parties

17   agreed to in advance of this deposition?

18      A.   Yes, he did.

19      Q.   Wonderful.

20           So do you understand that the oath that you

21   just took is the same type of oath that you would take

22   in a courtroom?

23      A.   Absolutely.

24      Q.   And here is how I envision this going:

25           I'll ask you questions.  If you don't

Page 9

1   understand any particular question, just let me know,

2   and I'll do my best to either reframe it or restate it.

3        A.   Okay.

4        Q.   The converse of that would be I'll assume that

5   you understood my question if you go ahead and answer

6   it.  Does that seem fair?

7        A.   Yes, it does.

8        Q.   Okay.

9             And we discussed this off the record, but just

10  for the record, if you need a break, let me know.  As

11  long as there's no question kind of pending, waiting

12  for your answer, we can take a break at any time.

13       A.   I understand.

14       Q.   I will do my best to break after about an

15  hour, but if I lose track of time, you're welcome to

16  signal me on that as well.

17       A.   Okay.

18       Q.   So is there anything that would prevent you

19  from thinking clearly today?

20       A.   No.

21       Q.   And is there anything that would prevent you

22  from answering truthfully today?

23       A.   No.  Nothing preventing me from answering

24  truthfully ever.

25       Q.   Okay.  Great.

Page 42

1      A.   My recollection from reading it was it had no

2   such limitation in terms of -- of location.

3      Q.   Okay.

4           So would you agree, and I think you touched on

5   this briefly, that the Secret Service definition

6   includes attacks where three or more people are either

7   wounded or killed?

8      A.   Right.

9      Q.   So it doesn't describe an attack kind of in

10  the amount of deaths?

11     A.   That's true.  Three or more harmed.

12     Q.   Okay.

13          So could it -- you know, theoretically, it

14  could include an attack that results in zero deaths.

15     A.   Yes.

16     Q.   That would qualify?

17     A.   Yes.  There might -- well, there are

18  frequently incidents where several people are injured

19  but no one actually dies.

20     Q.   Okay.

21          So if we move to the next paragraph, you

22  write -- this is the last paragraph on page 8, "For

23  purposes of my research, I have adapted the Secret

24  Service's definition.  For purposes of this research, I

25  slightly extended the FBI definition to include at

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 43

1    least two murder victims committed in multiple

2    locations within 24 hours and use the Secret Service's

3    'three more people harmed.'"

4         Is that an accurate --

5    A.   Yes.

6    Q.   -- reading or your statement?

7         Okay.

8         So I want to make sure that I understand kind

9    of your definition.  You state that you used the Secret

10   Service's three or more people harmed definition?

11   A.   Well, in some ways I sort of -- I adapted -- I

12   sort of merged that and the FBI definition.

13        (Reporter requests to please speak slowly.)

14             THE WITNESS:  Okay.

15        I said that I adapted -- maybe a more accurate

16   description is that I merged the Secret Service's

17   definition with the FBI's definition to include at

18   least two murder victims.  And this can be incidents

19   that are committed in multiple locations within 24

20   hours.

21   BY MS. DAWSON:

22   Q.   So at least two murder victims, and could be

23   multiple locations, and --

24   A.   Yeah.

25   Q.   -- and 24 hours?

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 44

1      A.   And three or more people harmed.  So if two

2   people are killed and four people are wounded during

3   this attack, then that would qualify.

4      Q.   Okay.

5           [Indecipherable].

6              (Reporter clarification.)

7           MS. DAWSON:  Sorry.  It's muttering.  I

8   tend to do that.  I apologize.

9   BY MS. DAWSON:

10     Q.   So I'm trying to figure out if you were

11  defining mass murder, why did you select a definition

12  or kind of create a definition that included harm

13  rather than sticking to the murder aspect?

14     A.   Because a great many events that are commonly

15  thought of as mass murders.  For example, the incident

16  in Isla Vista several years back involve a number of

17  people that are wounded and only a few people that are

18  actually murdered.

19          And as I said, because the Secret Service had

20  used this notion of three or more people harmed, it

21  seemed like a logical thing.  I mean, if someone

22  attempts to mass murder and they're not very good at

23  it, they only kill, like, two people but they injure

24  five or six others, it's a pretty good assumption they

25  were not just trying to kill two people.  They were

Ex. 6_Echeverria Decl.
Page 152
c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 45

1    probably trying to murder a lot more than two.

2         Q.   However, the Secret Service definition is of a

3    mass attack rather than a mass murder.  So it didn't

4    seem as if they were purporting to define mass murder

5    in the same way that when I read mass murder in your

6    definition you have kind of the word "murder" in there.

7    Is there a reason you elected not to go with the FBI's

8    definition, which I think you state is kind of what's

9    accepted in scholarly research and is what the FBI

10   employs?

11        A.   In fact, I'm not sure that there's any

12   agreement that it has to all be in one location or one

13   event.  Because in fact, quite a few of the mass

14   murders that have been reported over the last 20 or 30

15   years have involved attacks that took place in several

16   locations.  People commit murders in one place and move

17   on to commit murders in another place during the same

18   few hours.

19        Q.   And I may have mis- -- misheard.  I think your

20   definition of kind of what the scholarly -- scholarship

21   in the field accepts is just four or more dead.

22        A.   Right.

23        Q.   So setting aside the location, is there a

24   reason you didn't select that definition that you said

25   is pretty commonly accepted?

Page 46

1    A.  Mostly because of the fact the Secret Service

2  had this other strange definition of three or more

3  harmed.  And that particular report was, in fact,

4  almost entirely related to firearms mass murders.  They

5  seem to have paid very little attention to other

6  categories of mass murder.

7    Q.  So it sounds like you have -- FBI, you have

8  the field of scholarship.  And then you happen to have

9  a mass attack definition kind of hanging out over here

10  with the Secret Service definition.  But you decided to

11  go with that one instead?

12    A.  Well, as I said, I sort of -- I used

13  components of both of those to come up with a

14  definition, which seemed to me to be pretty logical.

15  At least two people are dead, and a lot of other

16  people -- other people are injured, presumably because

17  the killer was intending to kill more than those two

18  people.

19    Q.  Okay.

20      So other than kind of the presence of the

21  Secret Service definition, was there anything else that

22  led you to base your decision to create your

23  definition?  Did you base it on anything else?

24    A.  Nope.

25    Q.  Okay.

Page 47

1    And do you know of any scholarship, kind of

2    scholarly authorities that would define mass murder

3    using two or three dead?

4        A.  I can -- not immediately.

5        Q.  Okay.

6        So if you move on to page 9, first paragraph,

7    first sentence, you note there that -- and I'll quote

8    you.  It says "Suicide or lawful killing of the mass

9    murderer or murderers is not included in the total

10   dead."

11       And that's part of your definition; is that

12   correct?

13       A.  They will not be included in the count of the

14   number of dead.

15       Q.  Okay.

16       A.  So if someone goes on a rampage and shoots

17   three or four people and a police officer or a civilian

18   shoots and kills the murderer during the commission of

19   that crime, the murderer's death will not be included

20   in the total dead for that incident.

21       Q.  Are you using the murderer's death to create

22   -- to include it in your dataset, though?  So let's say

23   you had -- if your definition is two murder victims and

24   the murderer kills one person and is then shot by

25   police officers, notwithstanding that you aren't going

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 48

1    to include him as part of your death count, would you

2    then classify that as a mass murder incident in your

3    dataset?

4        A.   His death does not count as one of the deaths

5    that matter.   I mean, if he shoots someone and kills

6    them, and the police shoot and kill him, that's only

7    two dead.   Even if he shoots two people and the police

8    shoot him, that's really only two victims.   So two

9    dead.

10       Q.   Okay.

11            So you're not counting his death for purposes

12   of whether or not to classify this incident --

13       A.   No.

14       Q.   -- in your dataset?

15       A.   No.

16       Q.   Okay.   Thank you for clarifying that.

17            (Reporter asks parties to speak one at a

18   time.)

19            THE WITNESS:   Okay.   Sorry.

20   BY MS. DAWSON:

21       Q.   On page 9, first full paragraph, first

22   sentence, you state "I have excluded multiday mass

23   murders committed in riots, such as the New York City

24   draft riots of 1863 and many of the race riots of the

25   20th century because they were not in one location."

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 81

1     in this chart?  Because --

2          A.   Yes.

3          Q.   -- when I read it --

4          A.   It is.

5          Q.   Okay.

6                    (Reporter asks parties to speak one at a

7     time.)

8                    MS. DAWSON:   Sorry.

9                    THE WITNESS:   Yes, that is a separate

10    query I did to find out which ones only involve

11    non-firearms, which ones only used firearms.

12    BY MS. DAWSON:

13         Q.   Okay.

14              Is that number where you have 3,809 for

15    non-firearms, and you have 2,068 for firearms

16    reflective of the entire dataset of multiple weapon

17    incidents in your data?

18         A.   Yes.

19         Q.   So total, if I were to add those two numbers

20    together, that's everything that's not included in your

21    single-weapon-incident chart on page 20?

22         A.   Could you ask that question again?

23         Q.   If I added the -- the incidents listed on

24    page 20 in your chart, and I added the two numbers that

25    you have on the top of page 21, which is 3,809 and

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 82

1    2,068, if I added those sets together, that would

2    cumulatively be your entire dataset; is that correct?

3         A.   And I -- I can see a problem there.   I can

4    definitely see a difficulty with that because the

5    "Firearm Unknown" category is 25 -- 2,571.   So --

6         Q.   You also have --

7              Sorry.

8         A.   So pretty clearly, that count -- those counts

9    are not quite right.

10        Q.   You also have an "Unknown" category that's

11   862.   So one of my questions was going to be:

12             How do you know it's a single-weapon incident

13   if it's unknown?

14        A.   Well --

15        Q.   Do you have a sense for that?

16        A.   "Unknown" means that we have absolutely no

17   idea.   There's no other weapons identified.   There's no

18   weapons identified as having caused the murder.

19   There's a surprising number of these news accounts that

20   merely tell us that a whole family was murdered, and

21   they don't identify how.

22        Q.   So it could have been multiple weapons, and it

23   could have been a single weapon.   You just don't know

24   because there's no weapon listed at all?

25        A.   Right.

Page 83

1      Q.   Okay.

2           So for purposes of the numbers listed at the

3  top of page 21, which is non-firearms used, 3,809, and

4  then firearms, 2,068, is it possible those overlap

5  there between that and your other chart?

6      A.   I do not think that they overlap, but I do

7  think that that firearms-only mass murder count is

8  probably too low.

9      Q.   Okay.

10          When you have here on page 20, you have your

11 categories listed, can you tell me what "personal"

12 means?

13     A.   Meaning that -- well, that was basically

14 things like someone being murdered by a fist or feet.

15 There's one where the -- which perhaps could have been

16 categorized as blunt, where one of the murderers picked

17 up a child and basically smashed his head against a

18 tree trunk.

19     Q.   And then for the "Other Sharp" category, can

20 you tell me what that is?

21     A.   That includes things like razors and pretty

22 much anything that is not explicitly a knife that is a

23 sharp object used to kill someone.

24     Q.   And then what about "Other"?

25     A.   That includes fairly unusual things.  There's

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                        Clayton Cramer

Page 84

1    one incident where the killers, two of them used

2    blowtorches on couples in a lovers' lane in Yypsilanti,

3    Michigan in 1931.

4                    (Reporter clarification.)

5                    THE WITNESS:  Ypsilanti, Michigan.

6          And there's also another one where there was a

7    Christmas party happening in a union event somewhere in

8    Michigan where the -- there's a lot of people upstairs

9    at a Christmas party, and someone opens up the front

10   door and shouts "Fire!  Fire!  Everyone get out!"  And

11   it's one of those doors which you don't see anymore

12   that basically opens inward, not outward.  And so this

13   huge crowd of people are trying to get out, 74 people

14   are stomped, trampled to death trying to get out of

15   this door that would not open.

16   BY MS. DAWSON:

17        Q.  So in that instance when someone yelled

18   "Fire!" you coded that as a mass murder under "Other"?

19        A.  Yes.

20        Q.  And I just want to confirm that the numbers

21   listed here on page 20 in this chart, these are for

22   incidents, not deaths; is that correct?

23        A.  Yeah, incidents.

24        Q.  And can you tell me why you didn't include a

25   list of deaths here as opposed to incidents?

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 85

1      A.  Mostly because I was not thinking about that.

2   Although, it would be -- actually, a very good

3   suggestion would be to show a breakdown by total -- by

4   deaths -- by -- for each of these.

5      Q.  And did you perform a chronological breakdown

6   of the data you have here?

7      A.  I performed chronological breakdowns of

8   various types.  I'm not sure how many of them I

9   included.  Some of it isn't the -- in many cases I

10  started working on chronological breakdowns like that

11  and did -- did not actually complete them because I'm

12  primarily entering data at this point because the data

13  analysis part of this document I would consider quite

14  incomplete.

15          One of the breakdowns that I did make over

16  time was, for example, identifying mental-health-caused

17  mass murders over time.

18     Q.  So when you say that the data analysis part of

19  this project is incomplete, you mean you collected some

20  data and you -- the incomplete part is...?

21     A.  I have not -- I've not written all of the

22  queries that I need and produced all the charts that I

23  need to present positive conclusions yet.  I can see

24  some things that pop up rather obviously, and others

25  are not so obvious.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 86

1       Q.   And we have talked a little bit about numbers.

2    There's numbers elsewhere in your declaration, and I

3    just want to make certain that I understand what went

4    into each of them.

5       A.   Okay.

6       Q.   So I apologize in advance.  I'm going to hop

7    around just a little bit.  But I'll let you know which

8    pages I'm on.  So we have page 20 with this chart.

9           I have -- have you added up kind of these

10   columns to come to a total for your

11   single-weapon-incident chart?

12      A.   I have not added them up, no.

13      Q.   Does 10,032 seem about right?

14      A.   That seems a little on the high side just

15   because the largest single category here is 2,571, and

16   most the rest of these are quite a bit smaller.

17      Q.   So I can represent to you that we added the

18   numbers, and it's 10,032.  But for purposes of the

19   conversation, we can take a break if you want to add

20   them up yourself and come to kind of your own

21   conclusion.

22      A.   You know, that might not -- might not be a bad

23   idea to do that.

24           MS. DAWSON:   Okay.

25           Let's do that.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 87

1      Let's go ahead and take -- how long do you
2  think you'd like just to not feel pressured and be able
3  to run those numbers?
4          THE WITNESS:  I'd say about ten minutes.
5          MS. DAWSON:  Okay.
6      Let's go ahead and take a quick ten-minute
7  break, then.
8          THE VIDEOGRAPHER:  Going off the record.
9      The time is 11:15 a.m.
10         (Pause in the proceedings.)
11         THE VIDEOGRAPHER:  We are back on the
12  record.
13     The time is 11:19 a.m.
14  BY MS. DAWSON:
15     Q.  Mr. Cramer, during our break, did you have the
16  opportunity to calculate a total number for that chart
17  on page 20?
18     A.  Yes.  And you're right.  It is -- it is -- I'm
19  not sure exactly which query produced that data, but
20  it's clearly wrong.  I can tell you how many incidents
21  and dead there were by firearms before 1960 and how
22  many by non-firearm before 1960.
23     Q.  And can you explain to me when you say that
24  it's clearly wrong?
25     A.  Well, the query that I constructed to request

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 88

1   this information for the database was clearly not

2   properly constructed.  I will say that I -- SQL

3   database queries can be sometimes rather confusing.

4   And I will not say that I'm quite as expert perhaps as

5   I need to be, but I at least have numbers that make

6   some sense now.

7       Q.  So we have the -- we have the chart here,

8   which it sounds like you agree is likely incorrect.  We

9   have the numbers on page 21.  And just so that I am

10  clear, what do those numbers represent in the first

11  paragraph on page 21 where it says "When grouped by

12  incidents..."?

13      A.  Incidents where only a non-firearm item was

14  marked.  Because I've added a few entries in the

15  last -- in the last few days, incidents before 1960,

16  the non-firearms incidents are now 3,812 dead, a total

17  of 807 incidents.  And the incidents by firearm are now

18  866 incidents, 3,740 dead.  It definitely changes

19  things a bit.

20      Q.  Okay.

21          And so if you flip to -- I'll take you to --

22  let me take a look at my page number.  For my own

23  information, when we're looking at your non-firearm

24  data, were there any instances or incidents in that

25  dataset where more than 50 people were killed?

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 89

1      A.   Yes.

2      Q.   What were those events?

3      A.   Well, the one I just mentioned where 74 people

4   died being trampled coming out of a -- out of that

5   hall.  There's another one that happened not before

6   1960.  There are a few other fairly large ones that --

7   let me take a quick look, and I can find you the number

8   of incidents that took place that involved more than --

9      Q.   Prior to 1960?

10     A.   Yes, before 1960.

11     Q.   And is this based on the dataset that you have

12  that you put together?

13     A.   Yes.

14          Actually, it might take a little more -- more

15  time than --

16     Q.   Okay.

17          Can you tell me, does the phrase

18  "non-firearms" for purposes of your statement on

19  page 21, does that includes deaths where the weapon was

20  coded "Unknown"?

21     A.   No, it does not.

22     Q.   Okay.

23          And then -- so as I understand from our prior

24  conversation, the datasets between page 20 and page 21

25  do not have overlap?

Page 90

1     A.   They should, but they clearly do not.

2     Q.   Okay.

3          On page 14, if you'll move to page 14.

4     A.   Page 14.

5     Q.   Mm-hm.

6          And if you look at the second full paragraph

7  below the subheader "Data Limitations," there you state

8  "Before 1960, these intrafamily mass murders are 741 of

9  1,796 incidents and 2,784 out of 12,730 dead."

10    A.   Yes.

11    Q.   Can you help me understand why the death total

12 there is 12,730, but then it appears you have a death

13 total on pages 20 and 21 that differ from that?

14    A.   Let's see.  If you mean the table by weapon

15 type, yes, I agree that's clearly wrong.

16    Q.   Well, if you look at page 21 and you add those

17 two numbers together, that is not 12,730.

18    A.   No.  But -- yeah.  I would agree with you on

19 that.

20         The "Other" is part of that, but it's not all

21 of it.

22    Q.   Okay.

23    A.   The "Unknown," I mean.  Yeah, "Unknown" and

24 "Other" definitely fiddle with this a bit.

25    Q.   Well, when I look at the total number of

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                     Clayton Cramer

                                                                    Page 91

1    incidents here, it looks like it's, as you've stated,

2    1,796.  And then on page 20, you stated that the

3    numbers here reflect incidents as well.  And as we've

4    calculated, it's 10,032.

5        A.  Yeah, that number is clearly wrong.  This --

6    the table here on page 20 is clearly incorrect.

7        Q.  Okay.

8            And then if you look at page 16.

9        A.  Okay.

10       Q.  And you look at the first full paragraph, you

11   state "Through 1960, there were seven thousand --"

12   sorry "-- 797 non-firearm mass murders."  And then you

13   have ": 3,781 dead: an average of 4.74 dead per

14   incident; 840 exclusively firearms mass murders, 3,653

15   dead: an average of 4.35 dead per incident."

16           What went into that calculation?

17       A.  Well, basically I went ahead and asked for an

18   account of all the mass murders that did not involve

19   firearms, that were some other category, and the total

20   number of people killed in these incidents, and the

21   database also calculated the average.  The average

22   number of dead per incident.

23       Q.  And does that include single-weapon incidents?

24       A.  That would include any incident involving any

25   non-firearm weapon.  And the other one involves

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Page 92

1    anyone -- any incident that involved at least one

2    firearm.  You know, it could be a pistol.  It could be

3    a rifle.  It could be both.  It could be the "Firearm

4    Unknown" category.

5         Q.  So you have here non-firearm incidents and

6    firearm incidents.  Your non-firearm incidents you have

7    listed as 797.  Your firearm incidents you have listed

8    as 840.  Total, those are 1,637.  You have on page 14 a

9    total incident count of 1,796.

10        Can you tell me why those are different?

11        A.  Because some of the -- some of the intrafamily

12   mass murders do not fit in the category of either

13   "Firearm" or "Non-Firearm" in many cases because

14   they're unknown or they're in the "Other" category.

15        Q.  Okay.

16        So on your -- any of your lists, whether it's

17   page 21, which has a non-firearm/firearm calculation,

18   or page 14, which has -- so a total number of

19   incidents, which is 1,796, and then on pages 16, where

20   you have them broken out again, but you still have kind

21   of overall number -- you have incidents for each, tell

22   me which of those datasets you have excluded numbers

23   from as you just described to me you did for one

24   dataset.

25        A.  Non-firearm mass murders includes only things

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 93

1    like only the axes, the hatchets, knives, other sharp,

2    arson, strangulation.  It does not include anything

3    that had a firearm of any type coded.

4        Q.  Understood, that it would not include a

5    firearm.

6        A.  Right.

7        Q.  But you have -- you have a -- I think what

8    you've told me is that the -- one of your totals, which

9    is the intrafamily total on page 14, has excluded --

10   did you say it excluded or included a certain number of

11   incidents?

12       A.  It would have -- it would have excluded

13   several incidents -- no.  That lists all of the -- all

14   of the incidents that are intrafamily.

15       Q.  So that is not an overall number of incidents?

16   It's just intrafamily incidents?

17       A.  741, yeah, is the intrafamily murders.

18       Q.  Okay.

19           So let me take a quick look here.

20           I -- so perhaps you can clarify for me.  It

21   says "Before 1960, these intrafamily mass murders are

22   741 of 1,796 incidents."

23           Are the 1,796 incidents the total number of

24   incidents in your dataset?

25       A.  Yes.

Page 94

1    Q.   Okay.

2         So if that is the total number of incidents in

3    your dataset, which is how I read that, and then you

4    compare it with the information that you have on

5    page 16, where you have listed 797 non-firearm mass

6    murders and that you have also listed 840 exclusively

7    firearms mass murders, when you add those totals

8    together they do not total 1,796.  So my question is:

9         Why the difference?

10   A.   Which the answer is, you know, I'm not

11   entirely sure.  But pretty clearly I did something

12   wrong when I was requesting this information out of the

13   database.

14   Q.   Do you recall if you specifically omitted

15   anything from any of your totals?  And I'm happy to

16   walk through each of them.  So the intrafamily mass

17   murder total, total of incidents, do you recall -- do

18   you recall excluding anything from that dataset when

19   you listed total incidents?

20   A.   No.

21        In fact, I can find that right here, I think.

22        No, what I did is I selected for all -- for

23   all the items that have the category "Fam," family.

24   Q.   So those incidents only included family-based

25   murders?

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                          Clayton Cramer

Page 95

1      A.   Yes.   Those are ones where it was someone who

2   was -- a murder that took place where a family member

3   or someone who lived in the home murdered -- murdered

4   many or all of a family.

5      Q.   Okay.

6           And then in your research, what is the

7   relationship between the type of weapon used and the

8   number of victims in a mass murder?

9           So for example, if the weapon is an explosive,

10  is the average number of victims higher than if, say,

11  the weapon is an ax?

12     A.   I cannot immediately tell you the answer to

13  that because that's part of the data analysis I have

14  not gotten to.

15     Q.   Okay.

16     A.   I can tell you that many of the explosives

17  incidents are in fact -- often have fairly high death

18  counts.  The ax murders, they tend to be a smaller

19  number, of course.  But sometimes you have as many as

20  eight people murdered with an ax.

21     Q.   But what I think I'm hearing you say is you

22  haven't run that analysis?

23     A.   No, I've not run an analysis.

24     Q.   Okay.

25           So on page 18 in that last full paragraph

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                          Clayton Cramer

Page 96

1    there --

2         A.  Okay.

3              Last full.  Okay.

4         Q.  You state "Firearms became more common weapons

5    by the 1920s."

6              What were you relying on for that conclusion?

7         A.  The fact that as I was entering these things

8    in, I began to notice firearms a little more commonly

9    showing up in these mass murders.

10             Before that point, they had tended to use more

11   axes and hatchets and knives.  I have not --

12        Q.  So what did --

13             Go ahead.

14        A.  I have not actually produced graphs or charts

15   of that.  That's more an impressionistic viewpoint of

16   what I was finding.

17        Q.  Would it be fair to say, then, that firearms

18   were less common weapons before the 1920s?

19        A.  I would say so, yes.

20        Q.  Okay.

21        A.  Firearms, I think, become more common because

22   they become more commonly owned and used.

23             The axes and hatchets are, of course, part of

24   the use of the wood for illumination and then cooking.

25   Every house has an ax or a hatchet if they have a wood

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 97

1    stove.

2        Q.   I'd like to ask you just a couple of questions

3    about your other declaration.  Do you have that one

4    handy?

5        A.   Let me go ahead and open that.

6        Q.   So this would be the one that's actually

7    titled "First Declaration of Clayton Cramer."  And then

8    below that, it says "Permit System."  And at the top,

9    it would say "Document 74."

10       A.   Yeah, I'm finding that.

11            MS. DAWSON:  And for the court reporter,

12   I'd like, if we haven't already, to go ahead and mark

13   that one Exhibit 12.

14            (Exhibit 12 marked for identification.)

15            THE COURT REPORTER:  Exhibit 12 has been

16   marked.

17            THE WITNESS:  This one says Document 74?

18   BY MS. DAWSON:

19       Q.   Yes.

20       A.   Okay.

21       Q.   If you could flip to page 13.  I'm going to do

22   likewise.

23       A.   Okay.

24       Q.   Hold on one second.  I'm going to try and

25   catch up with myself.

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 98

1          Okay.

2          So under the heading "Summary" in the second

3   sentence you state that "...licensing of concealed

4   carry is a post-1868 phenomenon.  Concealed weapon laws

5   were complete bans with ill-defined exceptions."

6          Do you see that?

7     A.   Yes.

8     Q.   Okay.

9          Can you tell me, what are you basing that on?

10    A.   The statutes that I have read from the period

11   before 1840 that regulate concealed carry, a very

12   common term that's used in those in some of the

13   post-war statutes, like Texas's 1871 have exceptions

14   for travelers.  And they never define what "travelers"

15   mean.

16    Q.   And so is it fair to say that -- well,

17   actually, let me ask you.

18         Are you making a distinction between concealed

19   carry licensing and concealed weapons laws in that

20   statement?

21    A.   Yes, I'm making a distinction.  There are a

22   lot of laws that prohibit concealed carry but do not

23   necessarily -- but do not provide a licensing system.

24   They basically say you may not carry a concealed weapon

25   except for one or two conditions.  But licensing is not

Page 99

1    something that's -- something that they go ahead and

2    provide for.

3         Q.  Okay.

4              So following that statement that you make

5    where you say "Concealed weapon laws were complete bans

6    with ill-defined exceptions," you have a text below it

7    from an Indiana law.  Based on the footnote, it looks

8    like it's an Indiana law from 1820.

9         A.  Yes.

10        Q.  Can you tell me how that relates to your prior

11   statement?

12        A.  When I said "ill-defined exceptions," at the

13   very end it says "Provided, however, this act shall not

14   be so construed to affect travelers."

15        Q.  So is this one of the laws you're stating are

16   a complete ban?

17        A.  Well, it's not a licensing law.  It's a ban

18   that has a couple of exceptions that does not define

19   what they mean by them.  But basically, there's no

20   license provided.  There's no way to issue a license

21   for this.  It's just --

22        Q.  Got it.  Okay.

23        A.  It's just your general ban with this one

24   exception.

25        Q.  So I think what you're saying here is that

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 100

1    this is just a lot of ban this behavior and -- period,

2    flat ban.

3         A.  Well, a flat ban except for this -- this

4    exception about travelers.

5         Q.  Understood.

6              Okay.  Thank you.

7              Have you found other examples of similar types

8    of laws?

9         A.  Yeah.  The 1831 Indiana ban has a similar

10   exception for travelers and the 1871 Texas law that is

11   disputed in English [indecipherable].

12              (Reporter clarification.)

13              THE WITNESS:  In English v. State, 1872,

14   had a similar exception for travelers.

15              At a later time, the Texas courts ended up

16   deciding that if you were crossing a county line, that

17   qualified as traveling, and therefore if you were

18   crossing county line, you were okay to be carrying

19   concealed.

20   BY MS. DAWSON:

21        Q.  On page -- oh, I'm sorry.

22        A.  Go ahead.

23        Q.  On the following page, if you just flip it

24   over, you have two laws there, 1831 Indiana ban and

25   1838 Arkansas ban.  Is that what you're referring to

Page 101

1  when you were listing other laws that were similar?

2        A.  Well, those are other laws that are similar.

3  There is a -- there's another law from -- I think it's

4  Arkansas, which is after the Civil War, which, again,

5  has exceptions for people that are traveling.

6        Q.  Do you recall the date on that?

7        A.  No, I do not immediately recall it.  I mean, I

8  could probably find it if I worked a little bit.  It

9  was -- it was after 1868, however, interestingly

10  enough.

11        It definitely -- there's a dispute about a guy

12  who's carrying a pistol in his saddlebags, and he's --

13  I guess also he was apparently brandishing the gun

14  later.  His defense was that he was a traveler.  My

15  recollection is that the state supreme court ended up

16  accepting that argument.  And the following year, the

17  Arkansas legislature, again, revised their concealed

18  weapon permit law.  Not permit to conceal but carry ban

19  to deal with the problem with this sort of behavior.

20        Q.  Do you have a sense for how common these types

21  of bans were?

22        A.  They were -- they were actually quite common

23  in the South.  California's 1863 concealed carry ban

24  also has that same exception for travelers.

25        Q.  Okay.

Page 102

1          Do you -- do you know why they were enacted?

2          A.   Well, I can tell you the hypothesis, which I

3     think I proved in my book Concealed Weapon Laws of the

4     Early Republic, and it's sort of an odd thing.  What

5     happened was that many of the southern states passed

6     laws prohibiting dueling, which would seem to have no

7     connection.  But what happened was that people would be

8     required as a condition of holding certain offices,

9     like, for example, being elected to the legislature or

10    militia officers or various types of public figures --

11    the public officials, they would be required as a

12    condition of their oath to swear that they would not

13    participate in a duel, either as a participant or in

14    carrying a challenge, something like that.  After a

15    particular date.

16          And the reason that it was specified a

17    particular date is that as people who wanted to hold

18    these offices were being elected or appointed, they

19    almost always had some sort of incident in their past

20    which was after that date.  And so legislatures keep

21    changing the dates on these laws basically to allow

22    people who otherwise would not have been allowed to

23    hold office to go ahead and hold the office.

24          The weird thing about this is that in many

25    cases these laws come about because people get into

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 103

1   arguments.  And if you can see that someone is openly

2   carrying a weapon, you're not going to get into a big

3   argument that might lead to a duel.  Whereas if you

4   don't know they're carrying a weapon because it's

5   concealed, there is a real risk that you might go ahead

6   and -- and shoot or stab the guy or try to.

7        So the weird thing is that they seem to be

8   more concerned about having to perjure themselves about

9   participating in a duel than they were about killing

10  someone in a fight.  There's a debate at the Kentucky

11  Constitutional Convention of 1851, I think it is, where

12  they actually get into a discussion of whether a

13  concealed carry is worst than dueling because of this

14  very question.  So it's a very odd, unexpected thing.

15       My initial hypothesis to explain the adoption

16  of these laws turned out to be wrong.  I had assumed

17  that they where in some way related to issues of race,

18  but it turned out that a fair number of Americans of

19  Scots-Irish ancestry had settled in the back country

20  parts of many of the southern states, and they came

21  from an honor culture where you had to seem very tough

22  in order to protect your property and yourself.  And

23  these people tended to be partial to dueling because

24  dueling was a way of clarifying to everyone "I'm a

25  dangerous person.  You don't want to mess with me."

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                              Clayton Cramer

Page 104

1      Q.   So is it kind of based on what you told me

2   about the existence of these bans?  You mentioned

3   California, and there was a few in your declaration.

4   You said they were prevalent probably in the South.  Is

5   it fair to say that some states were enacting laws

6   prohibiting concealed carry laws prior to 1868?

7      A.   Yeah, they were prohibiting it.  They were not

8   licensing it.

9      Q.   Got it.

10          Okay.  Thank you for clarifying.

11             MS. DAWSON:  At this point I have no

12   further questions.

13          I believe Intervenors may have some for you.

14          Thank you for your time.

15             THE WITNESS:  Okay.

16          And thank you for helping me to see some

17   things I need to fix in this database query.

18             MR. PEKELIS:  Good morning, Mr. Cramer.  I

19   do have questions.  I think it might be helpful to take

20   a break before we get into that, so let's go off the

21   record.

22             THE WITNESS:  Okay.

23             THE VIDEOGRAPHER:  Going off the record.

24          The time is 11:44 a.m.

25             (Pause in the proceedings.)

c7729379-a7ba-4d7b-a41b-460b439ff5d3

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Clayton Cramer

Page 105

1          THE VIDEOGRAPHER:  We are back on the

2   record.

3          The time is 11:51 a.m.

4

5                      EXAMINATION

6   BY MR. PEKELIS:

7      Q.  Good morning, Mr. Cramer.  My name is Zach

8   Pekelis, and I represent Intervenor-Defendant Oregon

9   Alliance for Gun Safety in this matter.

10          I just have a few questions for you.

11          To pick up on Ms. Dawson's line of

12   questioning -- oh, let me say just out of the gate, the

13   exact same guidelines that Ms. Dawson went over at the

14   beginning of her questioning apply to this questioning

15   as well.

16          Does that make sense?

17      A.  Yes.

18      Q.  Okay.

19          So would you agree that in Ms. Dawson's

20   questioning and analysis of your declaration,

21   Exhibit 11, that she identified and you together

22   identified some fairly significant flaws in the data

23   contained in that declaration?

24      A.  I would agree that some of the data there is

25   inconsistent and definitely requires some repair.  And

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                              Clayton Cramer

Page 106

1     although the general theme that a non-firearm

2     [indecipherable] is actually quite common in American

3     history --

4                    (Reporter clarification.)

5                    THE WITNESS:  That non-firearm mass

6     murders are actually quite common in American history,

7     they've become more common -- firearm mass murders have

8     become more common in the last century or so.  But

9     there's all sorts of horrible ways that people have

10    committed mass murder in American history without guns.

11    BY MR. PEKELIS:

12        Q.  Understood.

13            Would you want the court to rely on the data

14    in your declaration, Exhibit 11?

15        A.  Well, I can understand why they might be

16    reluctant to accept the data exactly as -- as it is

17    presented.  Although, some of the larger themes that

18    I'm presenting, the problem with the fact that mental

19    illness is a major factor in what causes these mass

20    murders is, I think, still a valid point.

21        Q.  Understood.

22            You mentioned when discussing your educational

23    backgrounds that you have a master's degree and a

24    bachelor's degree; is that right?

25        A.  Correct.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Clayton Cramer

Page 170

1                          C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6          I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of CLAYTON

9    CRAMER, having been duly sworn, on January 19, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12         IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 26th day of January, 2023.

14

15

16         _____

17         /S/ Tia B. Reidt
           Tia B. Reidt, RPR, CSR Oregon #22-0001
18         NOTARY PUBLIC, State of
           Washington.
19         My commission expires
           5/15/2026.

20

21

22

23

24

25