C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California, et al., <br><br> Defendant. | Case No: 17-cv-1017-BEN-JLB <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEFS RE: CHARTS OF HISTORICAL LAWS (ECF NOS. 142 & 143)** |

# TABLE OF CONTENTS

**Page**

Table of Contents ........................................................................................... i

Table of Authorities........................................................................................ ii

Introduction ....................................................................................................1

Argument .........................................................................................................1

I.      California's Magazine Ban Is Unconstitutional Because It Prohibits Arms That Are "Typically Possessed" for Lawful Purposes; Under *Heller*, No Further Analysis Is Appropriate ...............................................................................1

II.     There Is No Relevant Historical Tradition.................................................5

    A.      The State Is Not Entitled to a "More Nuanced" Approach .......................5

    B.      The State Has Not Established an Enduring Tradition of *Laws* Banning Arms in Common Use for Lawful Purposes .................................................8

Conclusion .....................................................................................................12

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*,
910 F.3d 106 (3d Cir. 2018)............................................................................2

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .....................................................................................3, 4

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................................4

*District of Columbia v. Heller*,
554 U.S. 570 (2008).............................................................................1, 2, 10

*Duncan v. Becerra* ("*Duncan I*"),
265 F. Supp. 3d 1106 (S.D. Cal. 2017) ...........................................................4

*Duncan v. Becerra* ("*Duncan III*"),
366 F. Supp. 3d 1131 (S.D. Cal. 2019) ...........................................................1

*Duncan v. Becerra* ("*Duncan IV*"),
970 F.3d 1133 (9th Cir. 2020) .........................................................................4

*Fyock v. Sunnyvale*,
779 F.3d 991 (9th Cir. 2015)............................................................................2

*Gamble v. United States*,
-- U.S. --, 139 S. Ct. 1960 (2019) ..................................................................11

*Hardaway v. Nigrelli*,
No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022)...............9

*Jackson v. City & Cnty. of San Francisco*,
746 F.3d 953 (9th Cir. 2014)............................................................................2

*Miller v. Bonta*,
542 F. Supp. 3d 1009 (S.D. Cal. 2021) ...........................................................7

*N.Y. State Rife & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ........................................................................... passim

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242 (2d Cir. 2015).............................................................................4

*Nevada Comm'n on Ethics v. Carrigan*,
    564 U.S. 117 (2011) ...................................................................................11

*Ocean State Tactical, LLC v. Rhode Island*,
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ......................3

*Or. Firearms Fed'n, Inc. v. Brown*,
    No. 22-cv-01815, 2022 WL 17454829 (D. Or. Dec. 6, 2022)....................3

*Powell v. Alabama*,
    287 U.S. 45 (1932) ...................................................................................11

*Rupp v. Bonta*,
    No. 17-cv-00746 (C.D. Cal. Feb. 3, 2023) ................................................4

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017).....................................................................2

*Timbs v. Indiana*,
    -- U.S. --. 139 S. Ct. 682 (2019)..............................................................11

*United States v. Kelly*,
    No. 22-cr-00037, 2022 U.S. Dist. LEXIS 215189 (M.D. Tenn. Nov. 16, 2022) .......9

*Virginia v. Moore*,
    553 U.S. 164 (2008) .................................................................................11

**Rules**

Fed. R. Evid. 702 ...................................................................................................4

**Other Authorities**

Ida B. Wells, *Southern Horrors.* N.Y. Age (June 25, 1892)..........................................8

Library of Congress, *American Firearms and Their Makers: A Research Guide*,
    https://tinyurl.com/27dpmbbb (last visited Feb. 15, 2023)............................8

Mairead McCardle, *Report: Parkland Shooter Did Not Use High-Capacity Magazines*,
    Nat'l Rev. (Mar.1, 2018), *available at* https://tinyurl.com/pudu9kxs ......................6

Myles Hudson, *Wounded Knew Massacre: United States Hisory [1890]*, Britannica,
    https://www.britannica.com/event/Wounded-Knee-Massacre (last updated Dec. 22,
    2022)..........................................................................................................6

Nicholas J. Johnson, *Firearms Law Second Amendment Regulation, Rights, & Policy*
    521 (3d ed. 2021) ...................................................................................8

iii

TABLE OF AUTHORITIES

1

Paula J. Giddings, *Ida: A Sword Among Lions* 153-54 (2008) .........................................8

2

U.S. National Parks Service, *Wilson's Creek National Battlefield Foundation
    Purchases Rare Henry Repeating Rifle for Museum Collection* (June 18, 2020),
    https://www.nps.gov/wicr/learn/news/20-15.htm (last visited Feb. 15, 2023)...........8

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

TABLE OF AUTHORITIES

**INTRODUCTION**

At this point, it should be elementary that the State cannot ban arms typically possessed for lawful purposes. This case is thus a very simple one. As this Court reasoned in its order granting Plaintiffs' motion for summary judgment, the only relevant questions are "Is the firearm hardware commonly owned? Is the hardware commonly owned by law-abiding citizens? Is the hardware owned by those citizens for lawful purposes? If the answers are "yes," the test is over." *Duncan v. Becerra* ("*Duncan III*"), 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019). Here, the answer to all these questions is a resounding "yes." Magazines over ten rounds are in common use for lawful purposes by law-abiding Americans. They cannot be banned, full stop.

The State presented an overwhelming number of historical laws, and Plaintiffs painstakingly examined each of them. Not one 19th century or earlier law, not even an outlier, involved a restriction on the capacity of a firearm. Because of that inescapable fact, the State reached for anything it could grasp, including racist laws, laws restricting carry, fire-safety laws, "trap gun" laws, and more. Given that broad sweep, Plaintiffs wonder what the State would argue is *not* an analogue to its modern magazine ban. In any event, the State has failed to meet its burden under *Bruen*. This Court should again enter judgment for the Plaintiffs.

**ARGUMENT**

**I.    CALIFORNIA'S MAGAZINE BAN IS UNCONSTITUTIONAL BECAUSE IT PROHIBITS ARMS THAT ARE "TYPICALLY POSSESSED" FOR LAWFUL PURPOSES; UNDER *HELLER*, NO FURTHER ANALYSIS IS APPROPRIATE**

In *Heller*, the Supreme Court laid out "a simple Second Amendment test in crystal clear language. It is a test that anyone can understand. The right to keep and bear arms is a right enjoyed by law-abiding citizens to have arms that are not unusual 'in common use' 'for lawful purposes.'" *Duncan III*, 366 F. Supp. 3d at 1142 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008)). *Heller* is clear that an "arm" is "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581. While the Second Amendment does not

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

explicitly list either ammunition or magazines, the Ninth Circuit has repeatedly held that Second Amendment protection necessarily extends to ammunition and the components necessary to fire it. *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc).

So, as this Court has repeatedly held, magazines meet the definition of "arms" set forth in *Heller* and elaborated in *Jackson*, *Fyock*, and *Teixeira*. *Duncan III*, 366 F. Supp. 3d at 1142; Order Re: Prelim. Inj. at 16 (June 29, 2017). They are part of the firearm that is taken into the hands as a weapon, and they are essential components of any firearm that uses a magazine. Indeed, "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).

The State concedes this fact (as it must), but argues that as long as magazines of ten rounds or fewer are allowed, the law does not implicate the Second Amendment because people can defend themselves with these smaller magazines. Dkt.No.142 at 6-7. But because the test asks only whether the item is an "arm," the State is apparently arguing that a magazine *under* ten rounds is an "arm," but somehow one *over* ten rounds is *not*. This is not only absurd, but it also empowers the State to determine exactly where that line is to be drawn.[1] The *Heller* Court, however, has rejected the idea that Second Amendment rights can be so easily manipulated. *See, e.g.*, *Heller*, 554 U.S. at 629 ("Whatever the reason, handguns are the most popular weapon *chosen by Americans* for self-defense in the home, and a complete prohibition of their use is invalid.") (emphasis added); *id.* at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not

---

[1] The State looks to other states' magazine restrictions to justify its law, but some of those states set different limits, like Delaware's 17-round limit. *See, e.g.*, Del. Code Ann. tit. 11, §§ 1468(2), 1469(a). Under the State's logic, a 17-round magazine is a protected arm in Delaware, but in California, it is not. That is not how rights work.

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

future legislatures or (yes) even future judges think that scope too broad.")

To be clear, when the State claims the Second Amendment is not implicated because smaller magazines suffice, it is simply arguing that the burden placed on the right of armed self-defense is minimal. That is just interest-balancing *disguised* as a "plain text" argument. Asking if "the Second Amendment's plain text covers an individual's conduct" is far different from asking what burden a law imposes on the ability to exercise self-defense. Yet the State treats these questions as if they are the same. And, in doing so, it tries to short-circuit *Bruen* by arguing that the Second Amendment is irrelevant just because the ability to use some firearm for self-defense remains intact despite the State's magazine restriction. But, as we know, "[t]he right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano v. Massachusetts*, 577 U.S. 411, 421 (2016) (Alito, J., concurring).

Again, every appellate court to examine this issue has ruled that magazines are "arms," or assumed they are. The only contrary authority the State offers are two recent (and patently incorrect) preliminary injunction orders. Dkt.No.142 at 3 (citing *Or. Firearms Fed'n, Inc. v. Brown*, No. 22-cv-01815, 2022 WL 17454829, at *6-14 (D. Or. Dec. 6, 2022); *Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *5-16 (D.R.I. Dec. 14, 2022). Ignoring *Bruen*'s clear rejection of interest-balancing tests, both district courts held that magazines over ten rounds are not protected because "a firearm does not *need* a magazine [of that size] to be useful." *Ocean State*, 2022 WL 17721175, at *30 (emphasis added); *Brown*, 2022 WL 17454829, at *25 (similarly holding plaintiffs failed to prove that magazines over ten rounds "are necessary to the use of firearms for lawful purposes such as self-defense").

But the idea that the Second Amendment's "plain text" covers only what is *necessary* to exercise self-defense is not in any Supreme Court Second Amendment decision. Rather, the argument appears to be a sloppy mishmash of two inquiries— whether a magazine is an "arm" because it is necessary to a functioning firearm and whether magazines over ten rounds are typically used for lawful purposes, including

3

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

self-defense. Framed appropriately, neither inquiry could lead to any conclusion except that magazines over ten rounds are protected by the Second Amendment.[2]

What's more, the magazines that California bans are in "common use" for lawful purposes. This is not even a close call. Millions of them are owned by law-abiding citizens throughout the country. *Duncan v. Becerra* ("*Duncan I*"), 265 F. Supp. 3d 1106, 1118, 1143-45 (S.D. Cal. 2017). And they account for "approximately half of all privately owned magazines in the United States." *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1142 (9th Cir. 2020). This is so although 15 states—representing one-third of the U.S. population—restrict such items. Dkt.No.142 at1-2. Even under the most conservative estimates, they are common. *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255-57 (2d Cir. 2015).

The State's only response is that defining common use based on mere popularity is not enough. Dkt.No.142 at n.12. The claim is unsupported, and it conflicts with Justice Alito's guidance on what really matters: "[T]he more relevant statistic is that 'hundreds of thousands of tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 states." *Caetano*, 577 U.S. at 420 (Alito, J.,

---

[2] The State improperly smuggles in "expert" testimony from *other matters* to support its claim that magazines over ten rounds are unprotected. Dkt.No.142-1, Ex. 3 (report of Colonel Tucker from *Rupp v. Bonta*); Ex. 4 (report of Kevin M. Sweeney from *Oregon Firearms*). **Plaintiff's object to this eleventh-hour submission**. First, it ignores this Court's instruction that the parties limit their briefs to the State's proposed historical analogues, and instead seeks to relitigate the already-settled question about whether the magazines are protected. What's more, Plaintiffs have had no chance to depose either Colonel Tucker or Professor Sweeney, nor have they had a chance to see the data underlying their opinions.

Even setting aside the procedural impropriety, it is obvious from even a cursory read that Tucker is not qualified as an expert on self-defense because his commentary is not based on sufficient facts or data, nor is it the product of reliable methods. Fed. R. Evid. 702. This Court should act as a "gatekeeper" to exclude this unreliable expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-91 (1993). As just one example of the outlandish claims he makes, Tucker writes that "[a] single round [of .223] is capable of severing the upper body from the lower body, or decapitation." Dkt.No.142-1, Ex. 3 at ¶ 15. As the *Rupp* rebuttal expert put it, Tucker's claim "is so ridiculous that it should, and actually does, cast doubt on his qualifications as an expert in the field of firearms." Rebuttal Report of J. Buford Boone III, at 7, *Rupp v. Bonta*, No. 17-cv-00746 (C.D. Cal. Feb. 3, 2023). If Tucker is this wrong on very basic wound ballistics, his opinion that magazines over ten rounds are unnecessary for civilian self-defense is not worth a second look.

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

concurring). Given that the "relevant statistic" is popularity among private citizens, and that stun guns are protected because hundreds of thousands were sold, surely *over 100 million* magazines are entitled to the same protection. No matter what the State *feels* Californians *need* for self-defense, millions of Americans have chosen magazines over ten rounds for their firearms. They are protected and cannot be banned.

## II.   THERE IS NO RELEVANT HISTORICAL TRADITION

### A.   The State Is Not Entitled to a "More Nuanced" Approach

At the very least, the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2130. The State has come nowhere near meeting its burden. Instead, it contends the magazine ban addresses the "new" social problem of mass shootings, arguing that modern firearms with magazines over ten rounds empower individuals, acting alone, to commit such atrocities. Dkt.No.142 at 12-16. Because its magazine ban addresses this "unprecedented societal concern" and a "dramatic technological change," the State claims it is entitled to a "more nuanced approach" for identifying a relevant historical tradition of arms regulation. But both the general social problem of mass killing and firearms able to fire multiple rounds before reloading predate the founding. And *Bruen* instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131.

Tragically, mass murder is not some new phenomenon. Indeed, even the State's own expert concedes that "mass murder has been a fact of life in the United States since the mid-nineteenth century." Roth Decl. ¶ 40 ("From the 1830s into the early twentieth century, mass killings were common."); *see also* Cramer Decl. ¶ 24. The State thus contends that the new social problem is the use of *firearms* to commit mass murder. Dkt.No.142 at 15. But there *were* mass shootings dating to at least the 19th century, including the Wounded Knee Massacre where U.S. soldiers murdered nearly

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

300 Lakota people in a botched attempt to disarm them.[3]

So the State makes its criteria *even more specific*, restricting its "unprecedented social problem" to mass shootings with ten or more fatalities committed by a single person. Dkt.No.142 at 14-15. With these arbitrary limitations, the State claims that historical mass killings were not as lethal as the mass public shootings of today. Certainly, every social problem can seem unprecedented if you force the criteria down to such specific facts. Even still, mass killings with ten or more victims committed by a single person *did* occur in the past. Cramer Decl. ¶¶ 32- 34.[4] And though they often involved explosives or arson, such tragedies did at times involve firearms. *Id.*

Finally, the State claims that "[o]f all the shootings in American history involving 14 or more fatalities, 100% involved the use of LCMs." Dkt.No.142 at 15. "[Fourteen] or more fatalities" is of course, is an oddly specific dividing line. But no matter why the State chose that arbitrary figure, the claim is misleading, at best, and very likely false, at worst. It is misleading because it lumps all magazines over ten rounds together and calls them "LCMs," then claims such magazines have been used in 100% of this very specific type of mass murder. The State could just have well defined "LCMs" as all magazines over three rounds, and the claim would be just as true. Worse yet, the State's claim cannot be verified. The Parkland shooter, for example, was reported to have killed 17 people and injured another 17, while using only 10-round magazines. Mairead McCardle, *Report: Parkland Shooter Did Not Use High-Capacity Magazines*, Nat'l Rev. (Mar.1, 2018), *available at* https://tinyurl.com/pudu9kxs.

What's more, the State's premise that mass shootings, specifically, are so

---

[3] Myles Hudson, *Wounded Knew Massacre: United States Hisory [1890]*, Britannica, https://www.britannica.com/event/Wounded-Knee-Massacre (last updated Dec. 22, 2022) (fact-checked by the Editors of Encyclopedia Britannica).

[4] The State introduces portions of a deposition of Mr. Cramer from a different matter to cast doubt on his opinions. **Plaintiffs object**. *At the State's request*, this Court reopened discovery *expressly* to allow the State to take his deposition. For whatever reason, *the State chose not to*. Plaintiffs did not get to defend Mr. Cramer's deposition, and they cannot know the context of the claimed errors in Cramer's work to address the State's characterization of the quotes it plucked from the transcript.

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS
17cv1017

common today that they rise to the level of an "unprecedented societal concern" does not really reflect findings that (even today) such crimes, though horrific, really are rare. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1018 (S.D. Cal. 2021) (recognizing that mass shootings are horrific, but fortunately, rare); *see also* Kleck Decl. ¶ 40 ("[T]he risk of an American being killed in a 'gun massacre' is less than 1/14th of the risk of being killed by a bolt of lightning—itself a freakishly rare event.").

The State's argument that the use of magazines over ten rounds represents a "dramatic technological change" fares no better. Dkt.No.142 at 12-14. To the contrary, by the founding, "repeating … firearms had been around for a long time." Hlebinsky Decl. ¶ 20. Indeed, "repeaters, including those with magazines, could have capacities of over ten rounds at least a century before and during the ratification of the Second Amendment." *Id.* By the mid-19th century, revolvers able to fire 5-6 shots before reloading had replaced single-shot flintlock pistols in popularity. *Id.* ¶ 30, n.43. And slow-to-load muzzleloaders were displaced by lever-action repeater rifles, like the Henry and Winchester rifles, which could fire up to 16 rounds before reloading. *Id.* ¶¶ 30-31. Despite the existence of these technologies, no law in the 18th or 19th centuries banned such firearms or restricted their capacity.

In response to the undeniable commonality of repeating arms, the State essentially asks us to not believe our eyes, insisting that Henry and Winchester rifles were uncommon, and that any success was because of sales made to foreign armies. Dkt.No.142 at 14 (citing Vorenberg Decl. ¶¶ 51). But we know that "between 1861 and 1877, a total of 164,466 Henry and all models of Winchester were made, with [only about] 56,000 going to foreign governments." Hlebinsky Decl. ¶ 31. And we know that it was mostly *individuals* that bought the remainder because the military did not adopt such rifles until much later. Vorenberg Decl. ¶¶ 25-29.

This was true even early on. According to the National Parks Service, Henry "made about 14,000 of the rifles between 1860 and 1866, but the U.S. Ordnance Department purchased only about 1,731 or the rifles. However, many soldiers acquired

their own...."[5] The Library of Congress refers to Winchester's Model 1873 as the "gun that won the west."[6] And it is interesting the State cites racist laws restricting firearm ownership by Black Americans since this marginalized group embraced Winchesters to protect themselves, implicitly confirming the 19th century popularity of these rifles. For instance, the Vice President of the National Colored Press Association, encouraged Black people to buy Winchesters to protect their families from the "two-legged animals…growling around your home in the dead of the night."[7] Ida B. Wells wrote in 1892 that a "Winchester rifle should have a place of honor in every black home, and it should be used for the protection which the law refuses to give."[8]

In short, repeating rifles were popular by the time the Fourteenth Amendment was ratified. Yet the State cannot identify a single law banning the possession of these rifles based on their firing capacity at any time in history. Indeed, as the State has admitted, there simply are no such enactments to be found. This is strong evidence that California's modern magazine ban is unconstitutional. *Bruen*, 142 S. Ct. at 2131.

## B.   The State Has Not Established an Enduring Tradition of *Laws* Banning Arms in Common Use for Lawful Purposes

The State has not shown that it should be allowed to proceed to the "more nuanced approach" of analogical inquiry. But even if it had, it has not proven that there was an enduring American tradition of relevantly similar *laws* banning protected arms. Plaintiffs' supplemental briefs thoroughly addressed the State's proposed analogues. Dkt.No.141 at 5-22; Dkt.No.132 at 21-43. There is neither reason nor space to do so again here. But Plaintiffs will address several new points the State has raised.

---

[5] U.S. National Parks Service, *Wilson's Creek National Battlefield Foundation Purchases Rare Henry Repeating Rifle for Museum Collection* (June 18, 2020), https://www.nps.gov/wicr/learn/news/20-15.htm (last visited Feb. 15, 2023).

[6] Library of Congress, *American Firearms and Their Makers: A Research Guide*, https://tinyurl.com/27dpmbbb (last visited Feb. 15, 2023).

[7] Nicholas J. Johnson, *Firearms Law Second Amendment Regulation, Rights, & Policy* 521 (3d ed. 2021) (citing Paula J. Giddings, *Ida: A Sword Among Lions* 153-54 (2008)).

[8] *Id.* (citing Ida B. Wells, *Southern Horrors.* N.Y. Age (June 25, 1892)).

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

17cv1017

First, because the State knows it cannot prevail by pointing to constitutionally relevant historical *laws*, it asks the Court to treat the speculative opinions of its biased experts as if they are analogues and demands even *more* time to craft such opinions. Dkt.No.142 at 16. But the *Bruen* Court considered only enacted *laws* as analogues, and district courts applying *Bruen* have agreed: "The historical record itself, and not expert arguments or opinions, informs the analysis." *Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *6 n.6 (W.D.N.Y. Nov. 3, 2022). Perhaps when the meaning or context of an *enacted* historical law is unclear, experts might assist the courts. But when, as here, the meaning and context of the State's purported analogues are clear, courts can readily determine their relevance under *Bruen*.

The State asserts that rather than evaluate what laws existed, we must attempt to divine what might have been believed to be allowed in 1791. Dkt.No.142 at 16-17 (citing *United States v. Kelly*, No. 22-cr-00037, 2022 U.S. Dist. LEXIS 215189, at *5 (M.D. Tenn. Nov. 16, 2022)). *But the best way we have to know what laws the people of a different time would have considered acceptable is by looking at the laws they enacted*. The State's attempt to instead rely on post-Civil War regulation that was never adopted by any legislative body in the country does not constitute the sort of "enduring American tradition of state regulation" that *Bruen* requires. Nor do its speculative explanations for why legislative action was unnecessary. *Bruen* demands that the State identify relevant and well-established historical *laws* evidencing an American tradition of similar regulation—not excuses for why no such laws exist. The State had plenty of time to present its analogues, *and it submitted hundreds of them*. The Court does not need extended expert opinion or more discovery.

Second, even the State's "best analogues" are not relevantly similar to its modern magazine ban. When analogical reasoning is appropriate, *Bruen* teaches that whether a proposed analogue is "relevantly similar" relies on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2132. All the State's proposed analogues ignore one or both of these metrics.

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

For instance, what the State calls "dangerous weapon law[s]," Dkt.No.142 at 24-25, were, by and large, restrictions on the *carry* of certain arms, not their mere possession. The State argues that the burden on self-defense is "modest" for both its magazine restriction and historical carry restrictions. *Id*. But, in doing so, the State exposes its misunderstanding of *Bruen*. Whether an analogue is "relevantly similar" is not simply a measure of the subjective *amount* of burden on self-defense compared to the modern law. It is *how* the compared laws burden the right.

As discussed in Plaintiffs' earlier briefs, historical carry laws regulated only the *manner* of carrying certain arms in public. Dkt.No.141 at 14-17; Dkt.No.132 at 28-31. Many included express exemptions for defensive use. Dkt.No.141 at 16. California's magazine ban restricts even the *possession* of magazines even *in the home* and even for *self-defense* purposes. What's more, the State does not argue that the "dangerous weapons" these laws targeted were in common use for lawful purposes. So it has not shown that such laws are anything like modern laws banning arms that are.

What's more, the State considers its "best analogue" to be gunpowder-storage laws. It highlights, for example, a 1784 New York restriction on keeping more than 28 pounds of gunpowder in one place. Dkt.No.143 at 3-4. The State argues the New York gunpowder limit and its modern magazine ban were both enacted "to prevent significant harm to the public." *Id*. at 5. But that characterization of the reason for such laws is far too broad. Indeed, just about any arms restriction can be described as necessary to promote public safety or protect life. That does not make it similar in justification for identifying "relevantly similar" historical analogues under *Bruen*. *See* 142 S. Ct. at 2132.

Besides, the *Heller* majority, responding to Justice Breyer's citation to this very law, explained that historical gunpowder laws were fire-safety measures; they were not concerned with gun crime at all. *Heller*, 554 U.S. at 631-32. And they "did not clearly prohibit loaded weapons." *Id*. at 632. As *Heller* explained in the context of D.C.'s handgun ban, "[n]othing about th[e]se fire-safety laws undermines our analysis; they

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS

do not remotely burden the right of self-defense as much as an absolute ban on" protected arms. *Id.* In short, even the State's claimed best analogue is not "relevantly similar" to its modern magazine restrictions.

Finally, a word about the period this Court should consider when reviewing the State's historical record. The *Bruen* Court made a passing mention of an "ongoing scholarly debate" over whether the analytical focus should be on the laws of the Founding, the Reconstruction era, or both. 142 S. Ct. at 2138. Plaintiffs are unaware, however, of a single Supreme Court case that looked to Reconstruction as the period from which to determine the original meaning of the Bill of Rights. Of course, the Court need not always consult history to decide cases about incorporated provisions of the Bill of Rights. But when it has, the Court has always considered the Founding—or very shortly before or after—to be the principal or exclusive period to examine.[9] Justice Thomas's statement in *Bruen* that the Court has "generally *assumed* that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," is too modest. *Id.* at 2137. The Court is unlikely to overturn its entire Bill of Rights jurisprudence based on some "scholarly debate."

In short, the meaning of a constitutional provision is fixed according to the understanding at the Founding, so the laws of that laws period (not the Reconstruction) should guide this Court's analysis. California's charts identify hundreds of alleged analogues. But it turns out that *only seven*[10] of these are from the relevant period. Dkt.No. 139-1 at 2-3. A handful were adopted too early. But most were adopted far too late, having been adopted during the Civil War period or later. Of the *seven* founding-

---

[9] *See, e.g.*, *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011) (freedom of speech); *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008) (Fourth Amendment); *Gamble v. United States*, -- U.S. --, 139 S. Ct. 1960, 1965 (2019) (double jeopardy); *Powell v. Alabama*, 287 U.S. 45, 60 67 (1932) (right to counsel); *Timbs v. Indiana*, -- U.S. --. 139 S. Ct. 682, 687–99 (2019) (excessive fines).
[10] Plaintiffs previously miscounted the number of founding-era laws in the State's charts, stating that there were ten such laws and generously included another five adopted by the turn of the 19th century. Dkt.No.141 at 9.

PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS
17cv1017

era laws, one was British law confining the right to Protestants, two were *local* gunpowder laws, one restricted the setting of "trap guns," and three restricted carry of certain arms while engaged in unlawful activities. *Id.* These can hardly be characterized as anything but irrelevant outliers; they are not evidence of the enduring tradition of regulation *Bruen* demands.

## CONCLUSION

For these reasons, and those discussed in Plaintiffs' earlier briefs, this Court should declare section 32310 unconstitutional and permanently enjoin its enforcement.

Dated: February 21, 2023                    **MICHEL & ASSOCIATES, P.C.**

                                            */s/ Anna M. Barvir*
                                            Anna M. Barvir
                                            Email: abarvir@michellawyers.com
                                            Attorneys for Plaintiffs

12
PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPP. BRIEF RE: CHARTS
17cv1017

## <u>CERTIFICATE OF SERVICE</u>
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

      I have caused service of the following documents, described as:

**PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEFS RE: CHARTS OF HISTORICAL LAWS (ECF NOS. 142 & 143)**

on the following parties by electronically filing the foregoing on February 21, 2023, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

      I declare under penalty of perjury that the foregoing is true and correct. Executed on February 21, 2023, at Long Beach, CA.

Laura Palmerin

---

CERTIFICATE OF SERVICE