ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
KEVIN J. KELLY
Deputy Attorney General
State Bar No. 337425
 300 S. Spring St., Ste. 9012
 Los Angeles, CA 90013
 Telephone: (213) 266-6615
 Fax: (916) 731-2124
 E-mail: Kevin.Kelly@doj.ca.gov
*Attorneys for Defendant Rob Bonta,
in his official capacity as Attorney General
of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California,**<br><br>Defendant. | Case No. 3:17-cv-01017-BEN-JLB<br><br>**DEFENDANT'S BRIEF IN RESPONSE TO PLAINTIFFS' BRIEF FILED ON FEBRUARY 10, 2023**<br><br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

## INTRODUCTION

California Penal Code section 32310 ("Section 32310"), which restricts large-capacity magazines capable of holding more than ten rounds ("LCMs"), fully comports with the Second Amendment under the standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Plaintiffs have failed to satisfy *Bruen*'s threshold requirement to show that the "plain text" of the Second Amendment contemplates a right to possess LCMs. But even if they had made that threshold showing, Plaintiffs' challenge to Section 32310 nevertheless fails under *Bruen*'s historical analysis. Section 32310 is consistent with a long tradition of restrictions on items that are uniquely dangerous and especially prone to criminal misuse. Under the "more nuanced" analytical approach that this case requires, these historical laws are "relevantly similar" to Section 32310—that is, they are comparable in the minimal burdens they impose on the Second Amendment right to armed self-defense and in the justifications underlying them.

Plaintiffs fail to rebut the Attorney General's showing that historical firearms laws and modern LCM restrictions are "relevantly similar" under *Bruen*. Instead, Plaintiffs rely on an incorrect interpretation of *Bruen* that would require a government to identify a "historical twin" or "dead ringer" in the historical record. *Bruen*, 142 S. Ct. at 2133. As history establishes, firearms restrictions before, during, and after ratification of the Second and Fourteenth Amendments, including those limiting gunpowder possession, "dangerous weapons," and "trap guns," are analogous to Section 32310 in burdens and justifications, and thus establish its constitutionality under *Bruen*.[1]

---

[1] The Attorney General incorporates by reference all of his prior briefing in this matter, as well as all submitted supporting declarations; to the extent any of Plaintiffs' additional objections as set forth in their response to the Court's Order entered on December 15, 2022 are not discussed herein, the Attorney General relies on arguments submitted in earlier briefing.

# ARGUMENT

## I. PLAINTIFFS HAVE FAILED TO SHOW THAT THE "PLAIN TEXT" OF THE SECOND AMENDMENT COVERS THEIR CONDUCT.

At the first step of the *Bruen* analysis, Plaintiffs cannot establish that LCMs are bearable "Arms" protected by the Second Amendment. While an ammunition-feeding device may be "necessary for the function of those firearms designed to use them," Pls.' Suppl. Br. re: Charts of Historical Laws (Dkt. 141) ("Pls.' Suppl. Br.") at 3, Section 32310 does not impede access to an ammunition-feeding device. *See Duncan v. Bonta*, 19 F.4th 1087, 1104 (9th Cir. 2021) (en banc), c*ert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).[2] Moreover, Plaintiffs cannot simply characterize the conduct regulated by Section 32310 as the mere "obtaining" or "possession" of ammunition (Pls.' Suppl. Br. at 3), or the mere "possession" of a firearm. Plaintiffs must define their proposed course of conduct with greater specificity. *See* Def.'s Br. in Resp. to the Court's Order Entered Dec. 15, 2022 ("Def.'s Br. re: Dec. 15 Order") (Dkt. 142) at 4 n.7); *United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) (characterizing the proposed course of conduct as "'possession of a firearm *with an obliterated serial number*' and not 'mere possession [of a firearm]'" (emphasis added)); *Oakland Tactical Supply, LLC v. Howell Twp.*, 2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) (noting that "[t]he proposed conduct could not be simply 'training with firearms'" where challenged zoning ordinance did not prohibit "training with firearms"). And Plaintiffs cannot show that firearms equipped with LCMs are commonly used (or even suitable) for self-defense. *See* Def.'s Suppl. Br. at 7–11; *see also* Suppl. Decl. of Lucy P. Allen (Dkt. 118-1) ¶ 10 (out of 736 self-defense incidents between January 2011 and May 2017 that involved the use of firearms, defenders fired only 2.2 shots on average).

---

[2] Although *Duncan* was vacated, it is cited for its persuasive value.

Plaintiffs claim that firearms equipped with LCMs are "used for self-defense" because they are purportedly "chosen" by civilians for that purpose. Pls.' Suppl. Br. at 3-4. But this "choice" is often subject to influence by manufacturers and dealers in the sale and marketing of certain firearms. *See* Decl. of Ryan Busse (Dkt. 118-3) ¶¶ 9–10. Plaintiffs also claim that LCMs are purportedly "common" because 62.4% of respondents polled in a 2021 survey *owned* magazines over ten rounds for home defense. *Id*. at 4. But even if true, this claim does not demonstrate that LCMs are commonly used or well-suited to lawful, defensive applications. *See* Def.'s Suppl. Br. at 16–23.

As the Attorney General has shown, LCMs are not instruments of self-defense but, to the contrary, are most useful in combat, and thus fall outside the plain text of the Second Amendment. Def.'s Suppl. Br. at 7–11; *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *3, 14–15 (D.R.I. Dec. 14, 2022); *Or. Firearms Fed'n, Inc. v. Brown* (*Oregon Firearms*), 2022 WL 17454829, at *10–11 (D. Or. Dec. 6, 2022). Plaintiffs cannot meet their burden at the textual stage under *Bruen*.

## II. SECTION 32310 IS CONSISTENT WITH THE NATION'S TRADITION OF FIREARM REGULATION.[3]

### A. Plaintiffs Misstate *Bruen*'s "Text-and-History" Standard.

Under *Bruen*'s historical analysis, a government may justify a modern firearm-related restriction by identifying a "relevantly similar" restriction enacted when the Second or Fourteenth Amendments were ratified. 142 S. Ct. at 2132–33. In determining whether a restriction is "relevantly similar," a court should examine "how and why the regulations burden a law-abiding citizen's right to armed self-

---

[3] The Attorney General preserves all prior objections to the post-*Bruen* proceedings in this matter, including those premised on the need for a reasonable discovery period. Plaintiffs' assertion that the Attorney General "has not provided Plaintiffs with either the full text of most of these laws or a source from where [the Attorney General] obtained them" (Pls.' Suppl. Br. at 8, n. 3) only illustrates the need for a reasonable discovery period to assess the historical record.

1 defense." *Id.* And a "more nuanced approach" is needed when a modern restriction addresses "unprecedented societal concerns or dramatic technological changes." *Id.* at 2131–32. As such, a proper *Bruen* analysis requires a holistic and contextualized examination of the historical record. *See* Def.'s Br. in Resp. to the Court's Order Entered on Feb. 7, 2023 ("Def.'s Br. re: Feb. 7 Order") (Dkt. 143) at 2–3. Indeed, the Supreme Court acknowledged that under some circumstances, a *Bruen* analysis "can be difficult" and may require nuanced judgments about how to interpret relevant evidence. *Bruen*, 142 S. Ct. at 2130 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 803-04 (2010) (Scalia, J., concurring)). Because Section 32310 addresses both dramatic changes in firearms technologies (*see* Def.'s Br. re: Dec. 15 Order at 12–14) and the unprecedented social problem of mass shootings (*see id.* at 14–16),[4] a more nuanced approach is warranted here.

Plaintiffs do not acknowledge this "more nuanced approach," suggesting instead that the Court "consider whether the challenged modern law and the proposed historical analogue impose a similar *type* of burden (not just a similarly *severe* burden) on the right of armed self-defense." Pls.' Suppl. Br. at 6. But to the extent Plaintiffs rely on a dissent from the Ninth Circuit's vacated en banc decision in *Duncan*, 19 F.4th at 1156–59 (Bumatay, J., dissenting) for this proposition, that reliance is unavailing. That dissent is not binding on this Court, and it pre-dates *Bruen*. Similarly, Plaintiffs' reliance on pre-*Bruen* proceedings in this matter for the proposition that "history and tradition establish the complete *absence* of 'a well-established and representative historical analogue,'" Pls.' Suppl. Br. at 7, is unavailing, because neither this Court nor the Ninth Circuit analyzed Section 32310 under *Bruen*. *See, e.g.*, *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1149–53 (S.D.

---

[4] Recently, on January 21, 2023, LCMs were used in the mass shooting in Monterey Park, California, and those magazines would have been subject to Section 32310(c) had it gone into effect. *See* Jeremy White & K.K. Rebecca Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times, Jan. 26, 2023 (noting that 42 shell casings and an LCM were recovered at the Star Ballroom Dance Studio), http://bit.ly/3IKmq4T.

Cal. Mar. 29, 2019) (concluding that Section 32310 is not "presumptively lawful" because "there is no longstanding historically-accepted prohibition on detachable magazines of any capacity" or on "firing-capacity"); *Duncan v. Becerra*, 970 F.3d 1133, 1150–51 (9th Cir. 2020) (concluding Section 32310 is not "presumptively lawful" because "laws restricting ammunition capacity emerged in 1927 and all but one have since been repealed").[5]

Contrary to Plaintiffs' arguments (*see* Pls.' Suppl. Br. at 12, 13, 14, 15, 16, 20), *Bruen* makes clear that the *means* by which a restriction burdens a Second Amendment right is not determinative; rather, what is determinative is the *degree* to which the restriction does so (and why). *See, e.g.*, *Bruen*, 142 S. Ct. at 2145 (distinguishing historical restrictions from challenged statute where "[n]one of these [historical] restrictions imposed a *substantial burden* on public carry *analogous to the burden* created by New York's restrictive licensing regime" (emphases added)); *id.* at 2150 (distinguishing historical limitations where "none *operated to prevent* law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose" (emphasis added)); *see also* Def.'s Br. re: Dec. 15 Order at 24–25. Plaintiffs' suggested approach would effectively require the Attorney General to identify a "historical twin" or "dead ringer" as an analogous restriction—an approach that *Bruen* explicitly rejected. *See Bruen*, 142 S. Ct. at 2133.

**B. Pre-Founding and Post-Reconstruction Laws Are Relevant.**

Plaintiffs dispute the relevance of analogous laws in English history and after the Fourteenth Amendment was ratified. *See* Pls. Suppl. Br. at 8–9, 11–12, 17, 19–20. But as *Bruen* explains, the Second Amendment codified a pre-existing right

---

[5] Plaintiffs contend that their suggested approach is warranted in order to avoid any impermissible balancing of burdens and benefits (Pls.' Suppl. Br. at 6), but they do not explain how comparing historical and modern burdens and justifications would require any balancing. In applying *Bruen*, judges retain "the ordinary tools of reasoning that they have employed throughout the common law tradition," as *Bruen* did not create "some now-freshly-discovered species of judicial power confined to a single, rigid form of resolving ambiguity." *United States v. Kelly*, 2022 WL 17336578, at *6 (M.D. Tenn. Nov. 16, 2022).

"inherited from our English ancestors," 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599), and thus restrictions on that right recognized under English law prior to the founding of the United States are relevant in understanding the scope of the inherited right. And *Bruen* also recognized that "a regular course of practice can liquidate & settle the meaning of disputed or indeterminate terms & phrases in the Constitution," especially "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic." *Id.* at 2136–37 (internal quotation marks omitted). The laws cited from early England and the post-Reconstruction era—which are entirely consistent with laws cited during the formation of the Second and Fourteenth Amendments—are thus relevant under *Bruen*. *See* Def.'s Suppl. Br. at 34–37, 47–49.

### C. Historical Regulations on Gunpowder Possession Are Relevantly Similar.

As the Attorney General has established, New York's 1784 law regulating the possession of gunpowder (which was in effect at the time of the Second Amendment's ratification) is relevantly similar to Section 32310. Its burden on Second Amendment rights was comparable to Section 32310's burden because, for example, it limited—without eliminating—the right to possess an item essential to the operation of a firearm for self-defense purposes; it required maximum quantities of that item to be stored in separate containers; and it limited the amount of that item that could be kept in private "magazines." *See* Def.'s Br. re: Feb. 7 Order at 4. Indeed, the law imposed an even greater burden than Section 32310 due to the extended time it took to reload founding-era muskets. *Id.* The law's burden was also comparably justified—the restriction was not intended to serve any illegitimate purpose (such as to disarm or otherwise limit any lawful act of armed defense), but to prevent significant harm to the public. *See id.* at 5. And it stands in line with a "broad tradition" of consistent regulation of especially dangerous arms. *See id.* at 4. Moreover, there is no record that New York's gunpowder storage law was

understood to be inconsistent with the Second Amendment during the relevant time period, *see* Def.'s Br. re: Dec. 15 Order at 23–24.

Instead, Plaintiffs argue that these laws are distinguishable because they regulated only the "manner" of keeping of gunpowder (Pls.' Suppl. Br. at 12–13), but as indicated above and in the Attorney General's earlier briefing, the manner or mode of regulation is irrelevant to *Bruen*'s analogical analysis, so long as the burdens imposed and justifications are comparable.[6] And to the extent gunpowder laws "did not completely ban the possession of any common arm," *id.* at 13, Section 32310 does not do so either—it permits the possession of magazines of less than 10 rounds and does not restrict the possession of any actual firearm.

Plaintiffs further argue that the justifications underlying gunpowder laws and Section 32310 are not sufficiently similar because the former were intended "to prevent catastrophic explosions and fires in town limits and near powder houses," and "the highly combustible and unstable nature of loose gunpowder" is "not a modern concern." Pls.' Suppl. Br. at 12–13. But as with Section 32310, gunpowder laws were intended to prevent significant harm to the public as well as unintended injury to bystanders. *See* Def.'s Br. re: Dec. 15 Order at 23–24. If any of the specific public safety concerns underlying Section 32310 differ in kind, that is because they arise from subsequent technological and social developments. Plaintiffs would preclude modern governments from invoking historical restrictions to justify newer restrictions addressing unprecedented safety concerns, even if, for practical purposes, the actual burdens imposed were comparable. *Bruen* explicitly counsels otherwise, by endorsing a "more nuanced approach."

---

[6] In any event, Section 32310 regulates in a similar "manner"—it limits the quantity of ammunition that can be kept in a magazine to ten or fewer rounds, much as the New York gunpowder law required seven-pound quantities of gunpowder to be stored in separate containers. *See* Def.'s Br. re: Feb. 7 Order at 4.

**D.   "Dangerous Weapons" Laws Are Relevantly Similar.**

From 1813 to the Mexican War, nine states and territories restricted the concealed carry of weapons such as Bowie knives, pistols, dirks, and sword canes. *See* Def.'s Br. re: Dec. 15 Order at 21. These laws were intended to address the growing problem of murders and assaults that spread throughout the South. *Id.* And two years before the ratification of the Fourteenth Amendment, New York prohibited the "furtive possession" and carrying of slungshots, billies, sandclubs, metal knuckles, and dirks. *Id.* at 22.[7] Like Section 32310, these laws imposed a comparably modest burden on Second Amendment rights insofar as they did not restrict weapons well-suited to self-defense, and they left effective alternative weapons available for that purpose. *Id.* at 24. And they were similarly justified because, like Section 32310, they were enacted in regions experiencing a rise in specific types of unlawful activities (that is, murders and serious assaults) in which the regulated items were often used. *Id.* at 25. As such, because "high-capacity magazines are particularly dangerous weapon accessories, their regulation accords with history and tradition." *Bevis v. City of Naperville, Illinois*, 2023 WL 2077392, at *16 (N.D. Ill. Feb. 17, 2023). These laws were consistent with earlier-enacted laws traced to the pre-founding era [6].[8]

Plaintiffs attempt to distinguish these regulations from Section 32310 (Pls.' Suppl. Br. at 14–16), arguing that they merely regulated the method of carrying the

---

[7] Plaintiffs' characterization of Memphis's law restricting both the concealed carry and sale of "pocket pistols" as a "late law" (*see* Def.'s Suppl. Br. at 16) is belied by the year of its enactment (1867), which predated the ratification of the Fourteenth Amendment the following year.

[8] Contrary to Plaintiffs' claims (Pls.' Suppl. Br. at 10–11), laws applicable to only certain groups may still reflect a relevant tradition of firearm regulation, even if those laws were morally repugnant and would be unconstitutional today under the Equal Protection Clause or other provision of the Constitution. *See* Def.'s Br. re: Dec. 15 Order at 18, n. 21. By enumerating specific weapons for heightened regulation, those historical laws provide additional evidence of a regulatory tradition, even if the tradition was applied more narrowly and in an otherwise unconstitutional manner. *See id.*

regulated items, rather than their acquisition or possession more broadly. But this is contrary to the Supreme Court's determination that "the important limitation on the right to *keep* and carry" weapons "is fairly supported by the historical tradition of prohibiting the *carrying* of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (emphases added); *see also* Def.'s Br. re: Dec. 15 Order at 24–25.[9]

To the extent Plaintiffs argue that these laws differed in "burden" because they included exceptions for self-defense or travel, Pls.' Suppl. Br. at 16, the Attorney General has demonstrated that LCMs are not necessary or even suitable to engage in private self-defense, and California's laws restricting them allow for effective alternatives. Similarly, while Plaintiffs cite to a Georgia Supreme Court case that found a ban on the sale and possession of Bowie knives, pistols, dirks, sword-canes, and spears to be unconstitutional, *id*. at 14–15 (citing *Nunn v. State*, 1 Ga. 243 (1846)), that court did so in light of its observation that "[a] statute which, under the pretence of *regulating*, amounts to a *destruction* of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional," *Nunn*, 1 Ga. at 249. Section 32310 does none of these things. *See Hertz v. Bennett*, 294 Ga. 62, 68 (2013) (observing that *Nunn* "was never intended to hold that men, women, and children had some inherent right to keep and carry arms or weapons *of every description*").

---

[9] *Heller* relied on various historical authorities for this proposition, including 4 Blackstone 148–149 (1769) ("The offence of *riding or going armed, with dangerous or unu[s]ual weapons*, is a crime again[s]t the public peace, by terrifying the good people of the land . . . ."). While *Bruen* distinguished this authority in the context of a modern public carry restriction, it did so in support of its conclusion that, by the time of the founding, English law would not have justified a right to the public carry of arms suitable for self-defense only for those who demonstrate a special need for it. *See Bruen*, 142 S. Ct. at 2142. In contrast, *Heller* cited to this authority in support of its conclusion that the right to "*keep* and carry arms" includes those that are "in common use at the time," which is in turn supported by the historical limitation on "the *carrying* of 'dangerous and unusual weapons.'" 554 U.S. at 627 (emphases added). As such, *Heller* supports the notion that the distinction between a historical limitation on "carrying" and a modern limitation on "possessing" (that is, "keeping") should not be determinative, so long as the respective burdens and justifications are comparable.

**E.  Historical Prohibitions on "Trap Guns" Are Relevantly Similar.**

Several jurisdictions in the 18th and 19th centuries prohibited "trap guns" before and after the founding. *See* Def.'s Br. re: Dec. 15 Order at 20, 22. These laws imposed a comparable burden to Section 32310 on the right to self-defense because they were "dangerous weapons commonly used for criminal behavior and not for self-defense." *Oregon Firearms*, 2022 WL 17454829, at *13. Indeed, their burden on that right was comparably minimal—the firearms themselves could still be operated for self-defense—and their justification was comparable because they were intended to prevent unintentional injuries and deaths. Def.'s Suppl. Br. at 39.

Plaintiffs attempt to distinguish "trap gun" laws as regulating the "manner" of using a class of arms and because they were not intended to address violent crime. Pls.' Suppl. Br. at 12. As explained above, a difference in the mode of regulation is insufficient to establish Section 32310's unconstitutionality (*infra* at 4–5), but in any event, "trap gun" laws regulated a particularly dangerous configuration of an arm—just as Section 32310 does. And, Section 32310 does not solely address intentional "violent" acts, but unintentional acts as well. *See Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc) ("when inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders"), *abrogated on other grounds by Bruen*, 142 S. Ct. at 2126. These laws are thus sufficiently comparable.

## CONCLUSION

For these reasons, and those discussed in the Attorney General's other briefs, Section 32310 comports with the Second Amendment.[10]

---

[10] The Attorney General respectfully repeats this request for a stay of any judgment in Plaintiffs' favor for a sufficient period to allow the Attorney General to seek a stay from the Ninth Circuit. Dkt. 118 at 61–63; Dkt. 142 at 25. That multiple district courts have credited many of the same arguments and historical evidence in other challenges to large-capacity magazine and assault weapon laws demonstrates that Defendants have made a "substantial case on the merits" involving "serious legal questions." *Leiva-Perez v. Holder*, 640 F.3d 962, 966–67 (9th Cir. 2011).

| | | |
|---|---|---|
| 1 | Dated: February 21, 2023 | Respectfully submitted, |

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General

*s/ Kevin J. Kelly*

KEVIN J. KELLY
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as Attorney General of the State of California*