ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
KEVIN J. KELLY
Deputy Attorney General
State Bar No. 337425
  300 S. Spring St., Ste. 9012
  Los Angeles, CA 90013
  Telephone: (213) 266-6615
  Fax: (916) 731-2124
  E-mail: Kevin.Kelly@doj.ca.gov
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as Attorney General*
*of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN et al.,** | Case No. 3:17-cv-01017-BEN-JLB |
| Plaintiffs, | |
| **v.** | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| **ROB BONTA, in his official capacity as Attorney General of the State of California,** | Courtroom:    5A<br>Judge:         Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |
| Defendant. | |

1 **TO THE COURT, THE PARTIES, AND THEIR COUNSEL:**

2      **PLEASE TAKE NOTICE** that, on March 9, 2023, the United States Court of

3 Appeals for the Eleventh Circuit issued an opinion in *National Rifle Ass'n v. Bondi*,

4 Case No. 21-12314, upholding under the Second Amendment Florida's prohibition

5 on the sale of firearms to 18-to-20-year-olds. *Nat'l Rifle Ass'n v. Bondi*, __ F.4th

6 __, 2023 WL 2484818, at *13 (11th Cir. Mar. 9, 2023).

7      This opinion is relevant to several arguments raised in the parties'

8 supplemental briefing, concerning the proper application of the text-and-history

9 standard announced in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.

10 Ct. 2111 (2022), and identification of the relevant time period to be examined in

11 determining the Nation's relevant traditions of firearms regulation. *See, e.g.*, Def.'s

12 Suppl. Br. in Resp. to Ct. Order of Sep. 26, 2022 (Dkt. 118) at 8-13, 6-47; Pls.'

13 Suppl. Br. re: Charts of Historical Laws (Dkt. 141) at 5-19; Def.'s Br. in Resp. to

14 the Ct.'s Order Entered on Dec. 15, 2022 (Dkt. 142) at 4-5, 11-25; Defs.' Br. in

15 Resp. to the Pls.' Br. Filed on Feb. 10, 2023 (Dkt. 145) at 3-10.

16      A true and correct copy of the Eleventh Circuit's *National Rifle Association*

17 opinion is attached hereto as Exhibit 1.

18 Dated: March 15, 2023           Respectfully submitted,

19

20                             ROB BONTA
                            Attorney General of California

21                             MARK R. BECKINGTON
                            Supervising Deputy Attorney General

22                             JOHN D. ECHEVERRIA
                            Deputy Attorney General

23

24                             *s/ Kevin J. Kelly*

25                             KEVIN J. KELLY
                            Deputy Attorney General

26                             *Attorneys for Defendant Rob Bonta, in*
                            *his official capacity as Attorney*

27                             *General of the State of California*

28

# EXHIBIT 1

2023 WL 2484818
Only the Westlaw citation is currently available.
United States Court of Appeals, Eleventh Circuit.

NATIONAL RIFLE ASSOCIATION,
Radford Fant, Plaintiffs-Appellants.

v.

Pam BONDI, In her official capacity as
Attorney General of Florida, et al., Defendants,
Commissioner, Florida Department of
Law Enforcement, Defendant-Appellee.

No. 21-12314
|
Filed: 03/09/2023

Appeal from the United States District Court for the Northern District of Florida, D.C. Docket No. 4:18-cv-00137-MW-MAF

**Attorneys and Law Firms**

John Parker Sweeney, Connor McCarthy Blair, Marc A. Nardone, Bradley Arant Boult Cummings, LLP, Washington, DC, Clifford Vincent LoCurto, La Curto Law Firm, PA, Tallahassee, FL, Robert Craig Mayfield, Bradley Arant Boult Cummings, LLP, Tampa, FL, James Wallace Porter, III, Bradley Arant Boult Cummings, LLP, Birmingham, AL, Kenneth Wayne Sukhia, Sukhia Law Group, PLC, Tallahassee, FL, for Plaintiff-Appellant National Rifle Association.

John Parker Sweeney, Bradley Arant Boult Cummings, LLP, Washington, DC, for Plaintiff-Appellant Dominic Kelsey.

Christopher John Baum, Deputy Solicitor General, Attorney General's Office, Miami, FL, Florida Attorney General Service, Office of the Attorney General, Tallahassee, FL, for Defendant-Appellee Commissioner, Official Capacity, Florida Department of Law Enforcement.

Jeffrey Matthew Harris, Consovoy McCarthy, PLLC, Arlington, VA, for Amicus Curiae NRA Civil Rights Defense Fund.

Madeline B. Jenks, Sullivan & Cromwell, LLP, Washington, DC, for Amici Curiae NRA Civil Rights Defense Fund Giffords Law Center To Prevent Gun Violence, Brady, Team Enough, Orange Ribbons for Gun Safety, March for Our Lives Action Fund.

Alex Hemmer, Illinois Attorney General's Office, Solicitor General's Office, Chicago, IL, for Amici Curiae District of Columbia, State of California, State of Connecticut, State of Delaware, State of Illinois.

Darren Laverne, Kramer Levin Naftalis & Frankel, LLP, New York, NY, for Amicus Curiae Everytown for Gun Safety Support Fund.

Before Wilson, Rosenbaum, Circuit Judges, and Conway, District Judge. [*]

[*]    The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation

**Opinion**

Rosenbaum, Circuit Judge:

**\*1**  In Ohio, a 19-year-old son shoots and kills his father to "aveng[e] the wrongs of [his] mother." [1]  In Philadelphia, an 18-year-old "youth" shoots a 14-year-old girl before turning the gun on himself "because she would not love him." [2]  In New York, a 20-year-old shoots and kills his "lover" out of jealousy. [3]  In Washington, D.C., a 19-year-old shoots and kills his mother, marking another death due to "the careless use of firearms." [4]  In Texas, a 19-year-old shoots a police officer because of an "[o]ld [f]eud" between the police officer and the 19-year-old's father. [5]

[1]    *The Walworth Tragedy*, HIGHLAND WEEKLY NEWS, June 26, 1873, at p.1.

[2]    *Crimes and Casualties*, MILAN EXCHANGE (Milan, Tenn.), Oct. 18, 1884, p.6.

[3]    *News Items*, JUNIATA SENTINEL & REPUBLICAN, Apr. 19, 1876, at p.2.

[4]    *Accidental Shooting of a Lady, By Her Son*, EVENING STAR (D.C.), Jan. 23, 1872, at p.1.

[5]    *Shooting Affray*, FORT WORTH DAILY GAZETTE, Nov. 7, 1884, at p.8.

These stories are ripped from the headlines—the Reconstruction Era headlines, that is. But they could have been taken from today's news. Unfortunately, they illustrate a

persistent societal problem. Even though 18-to-20-year-olds now account for less than 4% of the population, they are responsible for more than 15% of homicide and manslaughter arrests. [6]

> [6]    *Crime in the United States*, U.S. DEP'T OF JUST. (2019),   https://ucr.fbi.gov/crime-in-the-u.s/2019/ crime-in-the-u.s.-2019/topicpages/tables/ table-38#:~:text=Arrests%2C%20by%20Age%2C %202019%20In%202019%2C %2093.0%20percent,88.9%20percent%20*of* %20persons%20arrested%20for%20property %20crimes; *Age and Sex Composition in the United States: 2021*, U.S. CENSUS BUREAU (2021), https://www.census.gov/data/tables/2021/ demo/age-and-sex/2021-age-sex- composition.html.

And in the more than 150 years since Reconstruction began, guns have gotten only deadlier: automatic assault rifles can shoot sixty rounds per minute with enough force to liquefy organs. [7] Tragically, under-21-year-old gunmen continue to intentionally target others—now, with disturbing regularity, in schools. So along with math, English, and science, schoolchildren must become proficient in running, hiding, and fighting armed gunmen in schools. Their lives depend upon it.

> [7]    *E.g.*, Scott Pelly, *What Makes the AR-15 Style Rifle the Weapon of Choice for Mass Shooters*, CBS NEWS (May 22, 2022), https://www.cbsnews.com/news/ar-15- mass-shootings-60-minutes-2022-05-29/.

But State governments have never been required to stand idly by and watch the carnage rage. In fact, during the Reconstruction Era—when the people adopted the Fourteenth Amendment, thereby making the Second Amendment applicable to the States—many States responded to gun violence by 18-to-20-year-olds by prohibiting that age group from even possessing deadly weapons like pistols.

Acting well within that longstanding tradition, Florida responded to a 19-year-old's horrific massacre of students, teachers, and coaches at Marjory Stoneman Douglas High School in a far more restrained way. The Marjory Stoneman Douglas High School Public Safety Act ("the Act") precludes those under 21 only from buying firearms while still leaving that age group free to possess and use firearms of any legal

type. *See* 2018 Fla. Laws 10, 18–19 (codified at Fla. Stat. § 790.065(13)).

**\*2**    That kind of law is consistent with our Nation's historical tradition of firearm regulation. Indeed, the Supreme Court has already identified "laws imposing conditions and qualifications on the commercial sale of firearms" as "longstanding" and therefore "presumptively lawful" firearm regulations. *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Florida's law does just that by imposing a minimum age as a qualification for buying firearms.

Because Florida's law is consistent with our Nation's historical tradition of firearm regulation, we affirm the district court's judgment.

## I.

After a 19-year-old shot and killed seventeen people at Marjory Stoneman Douglas High School, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which bans the sale of firearms to 18-to-20-year-olds. *See* 2018 Fla. Laws 10, 18–19 (codified at Fla. Stat. § 790.065(13)). In doing so, the Legislature sought "to comprehensively address the crisis of gun violence, including but not limited to, gun violence on school campuses." *Id.* at 10.

Shortly after the law passed, the NRA challenged it, alleging that the law violates the Second and Fourteenth Amendments. The parties eventually filed cross-motions for summary judgment, and the district court ruled in Florida's favor. The NRA then filed this appeal. [8]

> [8]    We appreciate and respect our colleague Judge Wilson's position that he would rather wait to resolve this appeal until the Florida legislature completes its consideration of H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023), to see whether any new legislation moots the pending appeal. But most respectfully, we see things differently. We issue our opinion today because the opinion resolves a case that remains very much alive, and the parties have come to us to resolve it.
> First, this case is not (and may never become) moot. For it to become moot at some point down the

National Rifle Association v. Bondi, --- F.4th ---- (2023)

road, several contingencies would need to occur. For starters, the bill must pass out of the House Committee, pass the House floor, pass out of the Senate Committee, pass the Senate floor, and be signed by the Governor. None of these things have yet occurred and they may never happen. And the mootness scenario is even less likely than that because H.B. 1543 is at the very beginning of the legislative process (having been filed two days ago). So even if some form of H.B. 1543 is eventually enacted, we do not know whether the enacted version would completely moot this case. For instance, the legislature could amend the bill and decide to enact a version of H.B. 1543 that changes the minimum age for buying firearms to twenty or nineteen as some type of compromise position. Either way, the resulting law would not moot this case.

Add to that the fact that this case has been pending for some time, and the parties have endured two rounds of briefing (before and after the Supreme Court issued *Bruen*) and oral argument to have us resolve it. Neither party has asked us to stay our consideration of this case pending resolution of H.B. 1543. Given these circumstances —the speculative nature of any possible mootness scenario and the fact that neither party has asked us to wait to see whether any mootness potentiality materializes—we think we should resolve the parties' disagreement without further delay.

## II.

Under the Second Amendment, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. The Supreme Court has held that that provision guarantees an "individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592, 128 S.Ct. 2783. But that right "is not unlimited." *Id.* at 626, 128 S.Ct. 2783.

**\*3** After the Supreme Court decided *Heller*, we applied a two-part test to analyze the Second Amendment's limits. First, we asked whether the Second Amendment protected the conduct that the government sought to restrict. *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012). If so, we then evaluated the law under the appropriate level of means-end scrutiny. *Ibid.*

But the Supreme Court abrogated step two of this framework in *New York State Rifle & Pistol Association, Inc. v. Bruen*, ––– U.S. ––––, 142 S. Ct. 2111, 2127, 213 L.Ed.2d 387 (2022). Now, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. To rebut that presumption, "the government must demonstrate that" a state's "regulation" of that conduct "is consistent with this Nation's historical tradition of firearm regulation."*Id.* In other words, if "the Second Amendment's plain text covers an individual's conduct," then "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126–27.

Like the Fifth Circuit, we read *Bruen* as articulating two analytical steps. *See* *United States v. Rahimi*, 59 F. 4th 163, 173 (5th Cir. 2023) (observing that "*Bruen* articulated two analytical steps"). First, we consider the plain text of the Amendment, as informed by the historical tradition. Second, we look for a historical analogue—not a historical "dead ringer," *Bruen*, 142 S. Ct. at 2118—of the challenged law. *Bruen* therefore brings historical sources to bear on both inquires.

In our view, though, the Reconstruction Era historical sources are the most relevant to our inquiry on the scope of the right to keep and bear arms. That is so because those sources reflect the public understanding of the right to keep and bear arms at the very time the states made that right applicable to the state governments by ratifying the Fourteenth Amendment.

### A. Historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era.

We begin by explaining why historical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era. In short, because the Fourteenth Amendment is what *caused* the Second Amendment to apply to the States, the Reconstruction Era understanding of the right to bear arms—that is, the understanding that prevailed when the States adopted the Fourteenth Amendment—is what matters.

To start, the Supreme Court has explained that historical sources are relevant because the Constitution's "meaning is fixed according to the understandings of those who ratified it," *Bruen*, 142 S. Ct. at 2132. But "when it comes to

interpreting the Constitution, not all history is created equal." *Id.* at 2136. As the Supreme Court itself has declared, "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (emphasis added by *Bruen* Court) (quoting *Heller,* 554 U.S. at 634–35, 128 S.Ct. 2783).

It is that understanding—the one shared by those who ratified and adopted the relevant constitutional provision—that serves as originalism's claim to democratic legitimacy. *See, e.g.,* *Heller,* 554 U.S. at 634–35, 128 S.Ct. 2783 (describing the "enumeration of a right" as "the very product of an interest balancing by the people"); Michael C. Dorf, *Integrating Normative and Descriptive Constitutional Theory: The Case of Original Meaning,* 85 GEO. L.J. 1765, 1810 (1997) ("The traditional view of originalism perceives legitimacy as deriving from the act of lawmaking."). In other words, we must respect the choice that those who bound themselves to be governed by the constitutional provision in question understood themselves to be making when they ratified the constitutional provision.

**\*4** The people who adopted the Second Amendment shared the understanding that it "applied only to the Federal Government." *McDonald v. City of Chicago,* 561 U.S. at 742, 754, 130 S.Ct. 3020 (2010) (plurality opinion); *see also id.* at 806, 130 S.Ct. 3020 (Thomas, J., concurring in part and concurring in the judgment).

But when the States ratified the Fourteenth Amendment during the Reconstruction Era, they made the Second Amendment applicable to the States. As the Supreme Court has explained, the ratification of the Fourteenth Amendment "incorporated almost all of the provisions of the Bill of Rights." *Id.* at 764, 130 S.Ct. 3020 (plurality opinion). As a result, those rights now apply to the state and federal governments alike. *Id.* at 765–66, 130 S.Ct. 3020.

The key takeaway from this bit of history is that the States are "bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen,* 142 S. Ct. at 2137 (citing *Barron ex rel. Tiernan v. Mayor of Baltimore,* 32 U.S. (7 Pet.) 243, 250–51, 8 L.Ed. 672 (1833)). And so the understanding of the Second Amendment right that ought to control in this case—where a State law is at issue—is the one shared by the people who adopted "the Fourteenth Amendment, not the Second." *Id.*[9]

[9]

Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, "the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago,* 651 F.3d 684, 702 (7th Cir. 2011) (Sykes, J.); *see also, e.g.,* Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 223 (1998) (observing "that when we 'apply' the Bill of Rights to the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789"); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment was Ratified in 1868: What Rights are Deeply Rooted in History and Tradition?,* 87 TEX. L. REV. 7, 115–16 (2004) (asserting that "Amar is exactly right"—"the question is controlled not by the original meaning of the first ten Amendments in 1791 but instead by the meaning those texts and the Fourteenth Amendment had in 1868"); Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States,* 8 GEO J.L. & PUB. POL'Y 1, 52–53 (2010).

The Supreme Court has not yet decided this question, although it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," *Bruen,* 142 S. Ct. at 2137. But an assumption is not a holding. *See, e.g., Brown v. Electrolux Home Prods., Inc.,* 817 F.3d 1225, 1239 (11th Cir. 2016) (explaining that the Supreme Court's "assumptions are not holdings"). To the contrary, the Supreme Court in *Bruen* expressly declined to decide whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." 142 S. Ct. at 2138.

**\*5** The *Bruen* Court did not need to decide the question because it read the historical record to yield the conclusion that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry"—the specific Second Amendment right at issue there. *Id.* Yet even if that is true for public carry, "the core applications and central meanings of the right to keep and bear arms ... were very

Supplemental Authority_Exhibit 1
Page 5

different in 1866 than in 1789." Amar, *The Bill of Rights: Creation and Reconstruction*, *supra*, at 223. Because the understanding of the right to keep and bear arms in 1866 generally differed from the understanding of that right in 1789, *Bruen* is likely an exception in its ability to assume away the differences. 142 S. Ct. at 2138. For most cases, the Fourteenth Amendment Ratification Era understanding of the right to keep and bear arms will differ from the 1789 understanding. And in those cases, the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States.

What the Supreme Court has said, though, is that the "individual rights enumerated in the Bill of Rights and made applicable against the states through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137. So the Second Amendment right to keep and bear arms (restricting the federal government) and the Fourteenth Amendment right to keep and bear arms (restricting State governments) share the same scope.

Yet the right's contours turn on the understanding that prevailed at the time of the later ratification—that is, when the Fourteenth Amendment was ratified.

This is necessarily so if we are to be faithful to the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." 142 S. Ct. at 2136 (citation omitted). As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), "the later-enacted [provision] controls to the extent it conflicts with the earlier-enacted [provision]." *See Miccosukee Tribe of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289, 1299 (11th Cir. 2010) (explaining the rule as it applies to statutes).

The opposite rule would be illogical. After all, it makes no sense to suggest that the States would have bound themselves to an understanding of the Bill of Rights—including that of the Second Amendment—that they did not share when they ratified the Fourteenth Amendment.

**B. For purposes of this opinion, we assume without deciding that the Second Amendment's plain text**

**covers persons between eighteen and twenty years old when they seek to buy a firearm.**

Having concluded that historical sources from the Reconstruction Era are more probative than those from the Founding Era on the scope of the Second Amendment right, we now apply *Bruen*'s two analytical steps.

*Bruen*'s first analytical step asks whether "the Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126. This question has two components. We begin by asking whether the individual—here, an 18-to-20-year-old—is among " 'the people' whom the Second Amendment protects." *Id.* at 2134 (citation omitted); *see also Heller*, 554 U.S. at 579, 128 S.Ct. 2783 (observing that the "first salient feature of the [Second Amendment's] operative clause is that it codifies a 'right of the people.' "). If so, we "turn to whether the plain text of the Second Amendment protects" that individual's "proposed course of conduct" (here, buying firearms). *Bruen*, 142 S. Ct. at 2134.

Once both components are satisfied, we advance to *Bruen*'s second step. There, the burden shifts to the government to demonstrate that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

**\*6** As to the first component of *Bruen*'s first step, it's not clear whether 18-to-20-year-olds "are part of 'the people' whom the Second Amendment protects," *id.* at 2134 (citation omitted). In *Bruen*, the "pleadings" described the petitioners as "law-abiding, *adult citizens* of Rensselaer County, New York." *Id.* at 2124–25 (emphasis added). The Court then repeated that description of the petitioners before concluding that the petitioners "[we]re part of 'the people' whom the Second Amendment protects." *Id.* at 2134. But the historical record reveals that 18-to-20-year-olds did not enjoy the full range of civil and political rights that adults did. *See infra* at ——. And even today, 18-to-20-year-olds do not share all the rights that those over 21 do. For instance, the drinking age and tobacco-use age in most states is 21. [10]

10    *See., e.g.*, 23 U.S.C. § 158 (directing the Secretary of Transportation to withhold money from states with a drinking age of under 21); *South Dakota v. Dole*, 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (holding that 28 U.S.C. "§ 158 is a valid use of the spending power").

In this case, Florida does not dispute the NRA's contention that 18-to-20-year-olds are part of "the people" whom the

Second Amendment protects. So we will assume that 18-to-20-year-olds are part of the people whom the Second Amendment protects.

Next up is the second component of *Bruen*'s first step. The question there is whether the Second Amendment's "plain text" covers 18-to-20-year-olds' "proposed course of conduct"—that is, buying firearms. *Bruen*, 142 S. Ct. at 2134. Of course, the Second Amendment's plain text includes only a right "to keep and bear arms," not a right to buy them. U.S. Const. amend II. That said, our sister circuits have found that the right to keep and bear arms includes the right to acquire them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc); *Ezell*, 651 F.3d at 704.

We need not decide this question today. Rather, we can assume for now that "the Second Amendment's plain text" covers 18-to-20-year-olds when they buy firearms. *Bruen*, 142 S. Ct. at 2126.

### C. The Act's restriction on the sale of firearms to 18-to-20-year-olds is consistent with this Nation's relevant historical tradition of firearm regulation.

Given our assumption that the Second Amendment's plain text provides some level of coverage for (a) 18-to-20-year-olds who seek (b) to buy firearms, we move on to *Bruen*'s second analytical step. Here, Florida "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

This inquiry entails "reasoning by analogy" to determine whether historical firearms regulations are "relevantly similar" the challenged modern regulation. *Bruen*, 142 S. Ct. at 2132 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). We evaluate two metrics to determine whether historical and modern firearms regulations are "relevantly similar": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.*

Here, "a well-established and representative historical analogue" exists for Florida's challenged law. *Id.* In fact, the historical record shows that regulations from the Reconstruction Era burdened law-abiding citizens' rights to armed self-defense to an even greater extent and for the same reason as the Act does. In other words, at *Bruen*'s second step,

Florida has satisfied its burden as to both the "how" and the "why."

We begin with the "how"—that is, how the Act's historical analogues similarly (and, in most cases, more severely) burdened Second Amendment rights for 18-to-20-year-olds. Alabama, Tennessee, and Kentucky led the charge in passing laws that prohibited 18-to-20-year-olds from buying (or even possessing) arms. Twelve years before the Fourteenth Amendment's ratification—and continuing through the Reconstruction Era [11]—Alabama prohibited selling, giving, or lending, "to any male minor, a bowie knife, or knife, or instrument of the like kind or description, by whatever named called, or air gun, or pistol," 1855 Ala. Laws 17. At that time, the age of majority in Alabama was twenty-one years. [12] In other words, in 1856, Alabama law prohibited the sale (and even the giving or lending) of handguns and other handheld, smaller arms to 18-to-20-year-olds.

---

[11]   *See, e.g.*, ALA. CODE. § 4230 (1876), *reprinted in* The Code of Alabama 1876 901 (Wade Keyes & Fern. M. Wood eds. 1877).

[12]   *See, e.g.*, *Brown v. Beason*, 24 Ala. 466, 466 (1854) (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing "a minor under the age of twenty-one years"); *Vincent v. Rogers*, 30 Ala. 471, 473 (1857) (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract).

**\*7**   Two years later, Tennessee codified a similar law. Tennessee's law prohibited selling, loaning, giving, or delivering "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling," TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858). At that time, the age of majority in Tennessee was twenty-one years old. [13] Like Alabama's law, Tennessee's law persisted through the Reconstruction Era. *SeeState v. Callicutt*, 69 Tenn. 714, 714 (1878) (explaining that Section "4864 of the Code ... makes it

a misdemeanor to sell, give, or loan a minor a pistol or other dangerous weapon").

13    *See, e.g.,* <u>Warwick v. Cooper,</u> 37 Tenn. 659, 660–61 (1858) (describing "an infant under the age of twenty-one"); <u>Seay v. Bacon,</u> 36 Tenn. 99, 102 (1856).

Kentucky followed suit within a year. It enacted a law that prohibited selling, giving, or loaning "any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon ... to any minor," 1859 Ky. Acts 245, § 23. The law contained an exception that allowed parents or guardians to give, lend, or sell deadly weapons to their minor children. *Seeid.* At that time, the age of majority in Kentucky was twenty-one years old. 14 Kentucky's law prohibiting the sale of firearms to minors also persisted through the Reconstruction Era. *See* ch. 29 KY. CODE § 1 (1877), *reprinted in* The General Statutes of Kentucky 359 (J.F. Bullitt & John Feland eds. 1877).

14    *See, e.g.,* <u>Newland v. Gentry,</u> 57 Ky. 666, 671 (1857).

In sum, then, Alabama and Tennessee generally prohibited selling, loaning, or even giving handguns and other handheld arms to 18-to-20-year-olds in the years leading up to the Fourteenth Amendment's ratification. Because those laws made it unlawful not only to sell those types of arms to 18-to-20-year-olds, but also to lend those arms to that age group, those laws imposed a greater burden on the right to keep and bear arms than does the Act, which (as Florida concedes) leaves 18-to-20-year-olds free to obtain firearms through legal means other than purchasing. *See*<u>Fla. Stat. § 790.065(13)</u> ("A person younger than 21 years of age may not *purchase* a firearm.") (emphasis added).

On that score, Florida's law and Kentucky's law impose similar burdens on the right to keep and bear arms for self-defense: Kentucky left parents and guardians free to provide a "pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon" to their minor child, 1859 Ky. Acts 245, § 23, while Florida allows anyone to give or loan (but not sell) firearms to 18-to-20-year-olds. Because both laws leave pathways for 18-to-20-year-olds to acquire weapons, both laws impose similar burdens.

As for the "why" of those historical regulations, it is also "relevantly similar" to the "why" of the Marjory Stoneman Douglas High School Public Safety Act. Both "regulations

burden a law-abiding citizen's right to armed self-defense" for the same reason: enhancing public safety. <u>Bruen,</u> 142 S. Ct. at 2132–33. Indeed, Tennessee and Kentucky passed their regulations in tandem with laws that prohibited giving spirits to minors, 15 demonstrating those states' understandings that alcohol and firearms both represented dangers to minors' safety. *See also infra* at ——– – —— (discussing the public's understanding that these laws aimed to advance public safety). By passing the Act, Florida also aims to "enhance public safety" by addressing "gun violence on school campuses." 2018 Fla. Laws 10.

15    *See*TENN. CODE § 4863 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (prohibiting the selling, giving, or delivering "to any minor, or any other person for the use of such minor, any of the liquors specified" elsewhere in the code); 1859 Ky. Acts 245, §§ 22, 24 (prohibiting selling, giving, or loaning "spiritous liquors" or "playing cards" to minors).

**\*8**   And that is well in keeping with traditional firearm regulations. Public universities have long prohibited students from possessing firearms on their campuses. On August 9, 1810, for instance, the University of Georgia passed a resolution that prohibited students from keeping "any gun, pistol," or "other offensive weapon in College or elsewhere," meaning that students could not possess such weapons even while they were away from college. 16 Just over a decade later, the University of Virginia passed a resolution —with supporting votes from Thomas Jefferson and James Madison—that prohibited students from keeping or using "weapons or arms of any kind, or gunpowder," on school grounds. 17 The University of North Carolina similarly prohibited students from keeping "firearms, or gunpowder" by the mid-nineteenth century. 18

16    *See* University of Georgia Libraries, *The Minutes of the Senatus Academicus 1799–1842* (Nov. 4, 1976), https://perma.cc/VVT2-KFDB.

17    *University of Virginia Board of Visitors Minutes,* ENCYC. VA. (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/.

18    Acts of the General Assembly and Ordinances of the Trustees, for the Organization and Government of the University of North Carolina 15 (1838).

That context serves as the backdrop for the flurry of state regulations, enacted soon after the Fourteenth Amendment's ratification, that banned the sale of firearms to all 18-to-20-year-olds—on or off a college campus. Between the Fourteenth Amendment's ratification and the close of the nineteenth century, [19] at least sixteen states and the District of Columbia joined Alabama, Kentucky, and Tennessee—a total of at least twenty jurisdictions—in banning sales of firearms to 18-to-20-year-olds. *See* Appendix (collecting laws). These regulations, like their pre-ratification predecessors, were state responses to the problem of deaths and injuries that underage firearm users inflicted.

19    The Supreme Court looks to post-enactment history because "a regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution." *Bruen*, 142 S. Ct. at 2136 (cleaned up); *see also NLRB v. Noel Canning*, 573 U.S. 513, 525, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014) (explaining how the Supreme "Court has treated practice as an important interpretive factor ... even when that practice began after the founding era"); *cf. The Pocket Veto Case*, 279 U.S. 655, 689, 49 S.Ct. 463, 73 L.Ed. 894 (1929) (explaining that "settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions"). Of course, when post-enactment practice *differs* from pre-enactment practice, the post-enactment practice cannot override the pre-enactment practice. *Cf. Bruen*, 142 S. Ct. at 2137. But both *Heller* and *Bruen* used post-enactment practice as "confirmation of what the Court thought had already been established." *Id.* (citation omitted); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008) (Roberts, C.J., dissenting) ("Although we have sometimes looked to cases postdating the founding era as evidence of common-law traditions, we have never done so ... where the practice of later courts was so divergent."). Here, the post-enactment laws were similar to (and in some cases, the same as) the pre-enactment laws.

Many of those post-ratification regulations were similar, if not identical, to their pre-ratification predecessors in Alabama, Tennessee, and Kentucky. Maryland, for example, made it "unlawful" for anyone "to sell, barter, or give away any firearm whatsoever or other deadly weapon, except for shot guns, fowling pieces and rifles to any person who is a minor under the age of twenty-one years." 1882 Md. Laws 656; *see also, e.g.*, 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon").

 **\*9** Unlike those laws, the Act leaves 18-to-20-year-olds free to acquire firearms of any legal type—so long as they don't buy them.

True, the Act and its Reconstruction Era analogues apply to overlapping, but not coextensive, classes of arms. But for two reasons, the Reconstruction Era statutes are "similarly relevant" and no less burdensome to 18-to-20-year-olds' Second Amendment rights than the Act.

First, the Reconstruction Era statutes and the Act are "similarly relevant" because both apply broadly to many—though not all—types of "arms" under the Second Amendment. The term "arms" has long been understood to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581, 128 S.Ct. 2783 (quoting 1 A New and Complete Dictionary). Besides firearms, this definition included "bows and arrows" and other weapons suited for self-defense. *Ibid.* So while the Act covers all firearms and thus handguns, *see* Fla. Stat. § 760.065(13)—but not "arms" that are not firearms—we assume for purposes of this opinion that the Reconstruction Era laws applied to handguns (but not long guns) and non-firearm types of deadly weapons like dirks and bowie knifes. [20] *See, e.g.*, 1883 Wis. Sess. Laws 290 (covering only "pistol[s]" and "revolver[s]"); 1884 Iowa Acts 86 (covering only "pistol[s], revolver[s] or toy pistol[s]"); 1881 Ill. Laws 73 (covering only "pistol[s], revolver[s], derringer[s], bowie knife[s], dirk[s] or other deadly weapon[s] of like character"). In other words, both the Act and its Reconstruction Era predecessors apply to the sale of handguns and some other class of arms to minors.

20    Some might suggest that the catch-all phrase "other deadly weapons of like character" includes long guns. Good arguments exist on both sides of the question. For instance, at least one state had an

explicit carveout for long guns. *See, e.g.*, TENN. CODE § 4864 (1858). That might indicate that the drafters of the provision saw the catch-all phrase as covering long guns, or else there would have been no need to expressly exclude them. But on the other side of the coin, the ejusdem generis canon counsels against construing the statutes as covering long guns, *see, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012), because the class of weapons that precedes the catch-all phrase includes only smaller, handheld arms. So long guns, which are neither smaller nor handheld, are not of the same type as the list of weapons preceding the catch-all phrase. We need not resolve that debate here. Instead, we simply assume for purposes of this opinion that the statutes do not cover long guns.

And second, the Reconstruction Era statutes prohibited selling, giving, or loaning handguns—the "quintessential self-defense weapon," *Heller*, 554 U.S. at 630, 128 S.Ct. 2783—to 18-to-20-year-olds. As a result, those statutes are at least as burdensome to 18-to-20-year-olds' Second Amendment rights as the Act. For while the Act also bans the sale of handguns to 18-to-20-year-olds, unlike its Reconstruction Era predecessors, the Act leaves open avenues for 18-to-20-year-olds to acquire that "quintessential self-defense weapon," *id.*, (as well as long guns). Thus, we have no trouble concluding that the Reconstruction Era statutes serve as historical analogues for the Act. We are not concerned that the Act and its Reconstruction Era predecessors are not precisely the same because they need be only analogues, not twins, *Bruen*, 142 S. Ct. at 2133, and for the reasons we've discussed, they surely are that.

 **\*10**  Our conclusion that Florida's "firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2127, finds further support from Reconstruction Era newspapers. As the Supreme Court has explained, the "discussion of the Second Amendment ... in public discourse after the Civil War" can shed important light on the public understanding of a right at the time of the ratification of the Fourteenth Amendment. *Id.* at 2128 (citation and quotation marks omitted). To ascertain "widely held" views, the Supreme Court has consulted, among other sources, newspaper "editorial[s]." *See, e.g.*, *Heller*, 554 U.S. at 615, 128 S.Ct. 2783 (relying on "an editorial" to conclude that a "view ... was ... widely held"). We follow the Supreme Court's lead.

Based on newspapers from the Reconstruction Era, historians have confirmed that the public did not understand the right to keep and bear arms to protect the rights of 18-to-20-year-olds to purchase such weapons. In fact, much of the public at the time supported restrictions. *See* Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 156 (2019) (noting that "lawmakers and the public supported" "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of firearm-related injuries at the hands of minors"); *see also, e.g.*, *id.* at 172 (noting that "the general public" did not view laws "prohibiting minors from using firearms" as "a violation of the Second Amendment or the right to arms"); *The Law Interferes*, N.Y. TRIB., Feb. 22, 1884, p.4 (urging the legislature to "regulate the sale of ... so-called toy-pistols" because minors "ought not to be trusted with deadly weapons"); [21] *Law in the Interest of Civilization*, KENOSHA TEL., Feb. 9, 1883, p.2 ("The bill introduced in the early part of the present session, prohibiting the selling of pistols or revolvers to minors, and forbidding the carrying of such by minors, ought not to fail of becoming a law."); *General Gossip*, SALT LAKE HERALD, Feb. 22, 1884, p.8 (describing "toy pistols" as "murderous nuisances" and opining that "[t]he Legislative Council did a wise and proper thing in passing the bill to prevent the sale of giving away of toy pistols to minors"); *The City Law Business*, DAILY GAZETTE (Wilmington, Del.), July 16, 1880, p. 1 ("As the Legislature will meet during next winter, I suggest that a committee on legislation be appointed at an early day so that mature consideration may be given to matters on which it may be deemed important to invoke the aid of the Legislature; such as ... the sale of fire-arms and toy pistols to minors ...."); *Monmouth Musings*, MONMOUTH INQUIRER, June 14, 1883, p.3 ("The first conviction in the State under the new law to prevent the sale of pistols to minors, took place in Paterson recently, where a junk dealer was fined ten dollars and costs for its violation. It should be strictly enforced in this County."); *The Deadly Toy Pistol*, EVENING STAR (D.C.), July 21, 1881, p.4 (expressing approval of "[t]he first arrest for selling dangerous toy pistols to minors"); *Our Harvest*, MOWER CNTY. TRANSCRIPT, Sept. 6, 1882, p.2 ("The LeRoy *Independent* thinks there ought to be a law against the carrying of pistols and revolvers by minors ....").

[21]    Despite the moniker "toy guns," in the Reconstruction Era, little difference existed between so-called "toy guns" and real guns. *See* Catie Carberry, *The Origins of Toy Guns in*

*America*, DUKE CTR. FOR FIREARMS L. (July 18, 2019), https://firearmslaw.duke.edu/2019/07/the-origin-of-toy-guns-in-america/ (observing that "states initially struggled to differentiate between toy guns and real guns"); *see alsoid.* (noting, for instance, that under a "Pennsylvania statute from 1883, toy (or imitation guns) were 'arranged as to be capable of being loaded with gunpowder or other explosive substance, cartridges, shot, slugs or balls and being exploded, fired off and discharged' ').

**\*11** It would be odd indeed if the people who adopted the Fourteenth Amendment did so with the understanding that it would invalidate widely adopted and widely approved-of gun regulations at the time.

The courts generally shared the public's approval of laws that prohibited providing handguns and other dangerous weapons to minors. Take the Supreme Court of Tennessee. In 1871, that court "held that a statute that forbade openly carrying a pistol ... violated the state constitutional provision (which the court equated with the Second Amendment)." *Heller*, 554 U.S. at 629, 128 S.Ct. 2783 (citing *Andrews v. State*, 50 Tenn. 165, 187 (1871)). Seven years later, that same court described Section 4864 of Tennessee's Code—which prohibited "the sale, gift, or loan of a pistol or other like dangerous weapon to a minor"—as "not only constitutional ... but wise and salutary in all its provisions." *Callicutt*, 69 Tenn. at 716–17; *see alsoDabbs v. State*, 39 Ark. 353, 357 (1882) (placing a law that banned the sale of firearms in the same permissible "category" as laws regulating "gaming, the keeping of bawdy-houses," and "the sale of spirituous liquors").

The Supreme Court has also directed us to consult contemporaneous legal commentators to discern the public understanding of the right at the time of ratification. *Bruen*, 142 S. Ct. at 2128. Here, legal commentators viewed the Reconstruction Era statutes as constitutional. Thomas Cooley "wrote a massively popular 1868 Treatise on Constitutional Limitations." *Heller*, 554 U.S. at 616, 128 S.Ct. 2783. Cooley's treatise espoused the view that states could use their police power to prohibit the sale of arms to minors. Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

Given these facts, it should come as no surprise that our research indicates that laws prohibiting the sale of arms to minors went virtually "unchallenged," *Bruen*, 142 S. Ct. at 2137, from their enactment through the middle of the

nineteenth century. In fact, our research suggests that a litigant challenged a law banning the sale of arms to minors only once during that time frame. *See Callicutt*, 69 Tenn. at 716–17 (rejecting a challenge to Tennessee's statute, which banned selling, loaning, or even giving handguns and other arms to minors). And the Supreme Court has recognized that "where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Bruen*, 142 S. Ct. at 2137 (quoting *Noel Canning*, 573 U.S. at 572, 134 S.Ct. 2550 (Scalia, J., concurring in the judgment)). We can see no reason why, when we are construing a constitutional provision incorporated against the States by the Fourteenth Amendment the rule should be any different where a governmental practice has been open, widespread, and unchallenged since the early days of the Reconstruction Era ratification. Indeed, the fact that there was apparently only a single challenge to these twenty statutes' constitutionality until well into the twentieth century suggests that the public understanding at the time of the ratification considered the statutory prohibitions constitutionally permissible.

**\*12** Based on the historical record, we can distill two key points. First, several states burdened 18-to-20-year-olds' rights to keep and bear arms—both before and after the Fourteenth Amendment's ratification—by making it unlawful even to give or lend handguns and other deadly weapons to minors. In total, at least nineteen states and the District of Columbia banned the sale and even the giving or loaning of handguns and other deadly weapons to 18-to-20-year-olds by the close of the nineteenth century. Second, those states did so to enhance public safety.

These points show that the Marjory Stoneman Douglas High School Public Safety Act "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. To begin with, the Act is no more restrictive than its forebearers: while the Act burdens 18-to-20-year-olds' rights to buy firearms, unlike its Reconstruction Era analogues, it still leaves 18-to-20-year-olds free to acquire any type of firearm—including "the quintessential self-defense weapon," the handgun, *Heller*, 554 U.S. at 630, 128 S.Ct. 2783—in legal ways, as long as they don't buy the weapons.

The Act also aims to improve public safety just like its historical analogues sought to do—that is, the Act has an analogous "why."

**Supplemental Authority_Exhibit 1**
**Page 11**

So the Act and its historical predecessors are "relevantly similar under the Second Amendment." *Bruen*, 142 S. Ct. at 2132. And for that reason, the Act does not infringe on the right to keep and bear arms. *See id.* at 2161 (Kavanaugh, J., concurring) (explaining that *Bruen* articulates the test "for evaluating whether a government regulation infringes on the Second Amendment right to possess and carry guns for self-defense").

Trying to avoid this conclusion, the NRA responds that that Founding Era federal law obliged 18-to-20-year-olds to join the militia. *See, e.g.*, Act of May 8, 1792, ch. 33, § 1, 1 Stat. 271, 271 (requiring "each and every free able-bodied white citizen" that is over "the age of eighteen years, and under the age of forty-five years" to "enroll[ ] in the militia"). In other words, the NRA contends that the fact that Congress required 18-to-20-year-olds to muster for the militia is compelling evidence that 18-to-20-year-olds had the right to an unimpeded ability to purchase firearms.

The NRA's conclusion is incorrect. The NRA mistakes a legal obligation for a right. *See Heller*, 554 U.S. at 605, 128 S.Ct. 2783 (explaining that the Second Amendment "protect[s] an individual right unconnected with militia service"); *see also id.* at 582, 601, 608, 610, 611, 612, 613, 616, 617, 128 S.Ct. 2783. The fact that federal law obliged 18-to-20-year-olds to join the militia does not mean that 18-to-20-year-olds had an absolute right to buy arms.

To the contrary, the historical record shows that merely being part of the militia did not entitle 18-to-20-year-olds to enjoy the same political and civil rights as adults. *See, e.g.*, Corinne T. Field, *The Struggle for Equal Adulthood: Gender, Race, Age, and the Fight for Citizenship in Antebellum America* 55 (2014) (explaining that, during the early nineteenth century, the "relevance of chronological age stood out most sharply in the celebration of age twenty-one as a transition to full citizenship for white men"). For instance, the Tennessee Supreme Court expressly rejected the argument that "every citizen who is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him" firearms and concluded instead that Tennessee's prohibition on the sale, gifting, or lending of firearms to those under 21 "d[id] not in fact abridge, the constitutional right of the 'citizens of the State to keep and bear arms for their common defense.' " *Callicutt*, 69 Tenn. at 716.

**\*13** In other words, Congress imposed upon 18-to-20-year-olds a specific obligation to serve in the militia but did not give them all the rights associated with full citizenship (like, at that time, the right to vote). So we can't infer from the fact that 18-to-20-year-olds had a specific obligation that they had a specific right.

Plus, even assuming that the Founding Era federal mustering obligations could be viewed as entitling 18-to-20-year-olds to buy firearms in 1791, that's not the public understanding that prevails here. Rather, it's clear that the public understanding of the Second Amendment at the time of the Fourteenth Amendment's ratification—as demonstrated by the wealth of Fourteenth Amendment-Ratification Era analogues for Florida's law—permitted the states to limit the sale of firearms to those 21 and older. *See* Appendix (collecting laws that banned 18-to-20-year-olds from buying or possessing firearms). So even if federal law obliged 18-to-20-year-olds to muster for the militia, laws banning that same group from buying firearms do not infringe on the right to keep and bear arms. And the fact that Congress required 18-to-20-year-olds to muster for the militia cannot overcome the litany of historical analogues that are relevantly similar to the Marjory Stoneman Douglas High School Public Safety Act.

### III.

Unfortunately, firearm violence among some 18-to-20-year-olds is nothing new. Tragically, all that has changed since the Reconstruction Era is the amount of carnage a single person can inflict in a short period because of the advances made in firearm technology over the last 150, or so, years.

But "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634–35, 128 S.Ct. 2783). And as our history shows, the states have never been without power to regulate 18-to-20-year-olds' access to firearms. Going back to the Reconstruction Era, that is exactly what many states around the country did. Indeed, many states, when the Fourteenth Amendment was ratified, banned 18-to-20-year-olds from buying and sometimes even possessing firearms. And they did so to address the public-safety problem some 18-to-20-year-olds with firearms have long represented.

Florida enacted the Marjory Stoneman Douglas High School Public Safety Act—as its name indicates—for precisely the

**National Rifle Association v. Bondi, --- F.4th ---- (2023)**

same reason as states in the Reconstruction Era adopted their firearm restrictions for 18-to-20-year-olds—to address the public-safety crisis some 18-to-20-year-olds with firearms represent. Because Florida's Act is at least as modest as the firearm prohibitions on 18-to-20-year-olds in the Reconstruction Era and enacted for the same reason as those laws, it is "relevantly similar" to those Reconstruction Era laws. *Bruen*, 142 S. Ct. at 2132. And as a result, it does not violate the Second Amendment.

We therefore affirm the district court's order granting summary judgment in Florida's favor.

**AFFIRMED.**

## Appendix

### Appendix 1: Reconstruction Era Laws Banning the Sale of Firearms to 18-to-20-year-olds (Ordered Chronologically)

| State | Citation(s) |
|---|---|
| Alabama | 1855 Ala. Laws 17 (making it unlawful to "sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol"); *see also* *Brown v. Beason*, 24 Ala. 466, 466 (1854) (discussing the plaintiff's "several children, some of whom were over twenty-one years of age, and some minors"); *Saltonstall v. Riley*, 28 Ala. 164, 172 (1856) (describing "a minor under the age of twenty-one years"); *Vincent v. Rogers*, 30 Ala. 471, 473–74 (1857) (explaining that the plaintiff "was a minor, under twenty-one years of age" when she entered the disputed contract; "that she became and was of age before this suit was instituted; and that after she became twenty-one years of age," she reaffirmed the contract). |
| Tennessee | TENN. CODE § 4864 (1858), *reprinted in* 1 The Code of Tennessee Enacted by the General Assembly of 1857-8 871 (Return J. Meigs & William F. Cooper eds. 1858) (making it unlawful to sell, loan, or give, "to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defence in traveling"); *see also* *Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660–61 (1858) (referring |

| | |
|---|---|
| | to twenty-one as the age of majority); _Seay v. Bacon_, 36 Tenn. (4 Sneed) 99, 102 (1856) (same). |
| Kentucky | 1859 Ky. Acts 245, § 32 (making it unlawful for anyone, "other than the guardian," to "sell, give, or loan any pistol, dirk, bowie-knife, brass-knucks, slung-shot, cold, cane-gun, or other deadly weapon ... to any minor"); _see also, e.g._, _Newland v. Gentry_, 57 Ky. (18 B. Mon.) 666, 671 (1857) (referring to twenty-one as the age of majority). |
| Indiana | 1875 Ind. Acts 59 (making it "unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one-years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon"). |
| Georgia | 1876 Ga. Laws 112 (making it unlawful "to sell, give, lend or furnish any minor or minors any pistol, dirk, bowie knife or sword cane"); _see also_ _McDowell v. Georgia R.R_, 60 Ga. 320, 321 (1878) (noting that "age of legal majority" in Georgia was "twenty-one years; until that age all persons [were] minors"). |
| Mississippi | 1878 Miss. Laws 175 (making it unlawful "for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any" "bowie knife, pistol, brass knuckles, slung shot, or other deadly weapon of like kind or description); _see also_ _Rohrbacher v. City of Jackson_, 51 Miss. 735, 744, 746 (1875) (observing that a provision, which authorized "female citizens over eighteen years of age" to vote, "authoriz[d] females, some of whom are minors, to have a voice in the election"); _Acker v. Trueland_, 56 Miss. 30, 34 (1878) (providing an exception for widows and children "until the youngest child |

| | |
|---|---|
| | shall be twenty-one years of age"). |
| Missouri | MO. REV. STAT. § 1274 (1879), *reprinted in* 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879) (making it unlawful to "sell or deliver, loan or barter to any minor" "any deadly or dangerous weapon" "without the consent of the parent or guardian of such minor"); *see also id.* § 2559 (setting the age of majority at twenty-one for males and eighteen for females). |
| Illinois | 1881 Ill. Laws 73 (making it unlawful for anyone other than a minor's father, guardian, or employer to "sell, give, loan, hire or barter," or to "offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character"); *see also* ch. no. 64 ILL. COMP. STAT. § 1 (1881) (setting the age of majority at twenty-one for males and eighteen for females). |
| Nevada | NEV. REV. STAT. § 4864 (1885) (making it unlawful for anyone "under the age of twenty-one (21) years" to "wear or carry any pistol, sword in case, slung shot, or other dangerous or deadly weapon"). |
| Delaware | 16 Del. Laws 716 (1881) (making it unlawful to "knowingly sell a deadly weapon to a minor other than an ordinary pocket knife"); *see also* Revised Statutes of the State of Delaware 60 (The Mercantile Printing Co. ed. 1893) (setting the age of Majority at twenty-one for males and eighteen for females); Revised Statutes of the State of Delaware 484–85 (James & Webb ed. 1874) (same). |
| Maryland | 1882 Md. Laws 656 (making it "unlawful for any person ... to sell, barter, or give away any |

| | |
|---|---|
| | firearm whatsoever or other deadly weapon, except for shot gun, fowling pieces and rifles to any person who is a minor under the age of twenty-one years."). |
| West Virginia | 1882 W. Va. Acts 421 (making it unlawful for a person to "sell or furnish" "any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character" "to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years"). |
| Kansas | 1883 Kan. Sess. Laws 159 (making it unlawful to "sell, trade, give, loan or otherwise furnish any pistol, revolver or toy pistol ... or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapon[ ] to any minor"); *see alsoBurgett v. Barrick*, 25 Kan. 526, 527–28 (Kan. 1881) (referring to twenty-one as the age of majority) |
| Wisconsin | 1883 Wis. Sess. Laws 290 (vol. 1) (making it "unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state"); *see alsoHepp v. Huefner*, 61 Wis. 148, 20 N.W. 923, 924 (1884) (referring to twenty-one as the age of majority) |
| Iowa | 1884 Iowa Acts 86 (making it "unlawful for any person to knowingly sell, present or give any pistol, revolver or toy pistol to any minor"); *see alsoIn re Mells*, 64 Iowa 391, 20 N.W. 486 (1884) (referring to twenty-one as the age of majority); *Hoover v. Kinsey Plow Co.*, 55 Iowa 668, 8 N.W. 658 (1881) (referring to twenty-one as the age of majority). |
| Louisiana | 1890 La. Acts 39 (making it unlawful "for any person to sell, |

National Rifle Association v. Bondi, --- F.4th ---- (2023)

| | |
|---|---|
| | or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years"). |
| Wyoming | 1890 Wyo. Terr. Sess. Laws 140 (making it "unlawful for any person to sell, barter or give to any other person under the age of twenty-one years any pistol, dirk or bowie-knife, slung-shot, knucks or other deadly weapon that can be worn or carried concealed upon or about the person"); *see also* Revised Statutes of Wyoming 1253 (J.A. Van Orsdel & Fenimore Chatterton eds. 1899) (codifying the same). |
| District of Columbia | 27 Stat. 116–17 (1892) (making it unlawful to "sell, barter, hire, lend or give to any minor under the age of twenty-one years" "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles"). |
| North Carolina | 1893 N.C. Sess. Laws 468 (making it "unlawful for any person, corporation or firm knowingly to sell or offer for sale, give or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot"); *see also State v. Kittelle*, 110 N.C. 560, 15 S.E. 103, 103–04 (1892) (referring to twenty-one as the age of majority). |
| Texas | 1897 Tex. Gen. Laws 221–22 (making it unlawful to "knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear, or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense |

**Supplemental Authority_Exhibit 1**
**Page 17**

**National Rifle Association v. Bondi, --- F.4th ---- (2023)**

or defense, without the written consent of the parent or guardian of such minor, or of some one standing in lieu thereof"); *see also* 2 Sayles' Annotated Civil Statutes of the State of Texas 1009 (John Sayles & Henry Sayles eds. 1898) (setting the age of majority at twenty-one for males and unmarried females).

---

**Wilson**, Circuit Judge, concurring in the judgment:

 **\*14**  I would wait to issue an opinion until the current session of the Florida legislature completes its consideration of H.B. 1543, 2023 Leg., Reg. Sess. (Fla. 2023), which may render the issue moot. If passed, H.B. 1543 would reduce the minimum age in the law at issue from 21 to 18. However, I concur in the judgment given the law as it exists today.

**All Citations**

--- F.4th ----, 2023 WL 2484818

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF SERVICE

Case Name:  ***Duncan, et al. v. Bonta, et al.***   Case No.  **3:17-cv-01017-BEN-JLB**

I hereby certify that on <u>March 15, 2023</u>, I electronically filed the following document(s) with the Clerk of the Court by using the CM/ECF system:

## NOTICE OF SUPPLEMENTAL AUTHORITY (with Exhibit 1)

I certify that **all** participants in the case are registered CM/ECF users and that service will be electronically accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>March 15, 2023</u>, at San Francisco, California.


| Vanessa Jordan | Vanessa Jordan |
|:---:|:---:|
| Declarant | Signature |